## <u>APPENDIX OF UNPUBLISHED OPINIONS</u>

A.  *Dailey v. Hands*,
  2015 WL 1293188 (S.D. Ala. Mar. 23, 2015)

B.  *Donald J. Trump for President, Inc. v. Boockvar*,
  2020 WL 5407748 (W.D. Pa. Sept. 8, 2020)

C.  *Donald J. Trump for President, Inc. v. Boockvar*,
  --- F. Supp. 3d ----, 2020 WL 5997680 (W.D. Pa. Oct. 10, 2020)

D.  *Donald J. Trump for President, Inc. v. Cegavske*,
  --- F. Supp. 3d ----, 2020 WL 5626974 (D. Nev. Sept. 18, 2020)

E.  *Fender v. Washington County, Pennsylvania*,
  2014 WL 1491138 (W.D. Pa. Apr. 15, 2014)

F.  *Glover v. South Carolina Democratic Party*,
  2004 WL 3262756 (D.S.C. Sept. 3, 2004)

G.  *Golden v. Government of the Virgin Islands*,
  2005 WL 6106401 (D.V.I. Mar. 1, 2005)

H.  *Hotze v. Hollins*,
  2020 WL 6437668 (S.D. Tex. Nov. 2, 2020)

I.  *In re November 3, 2020 General Election*,
  --- A.3d ----, 2020 WL 6252803 (Pa. Oct. 23, 2020)

J.  *Martel v. Condos*,
  --- F. Supp. 3d ----, 2020 WL 5755289 (D. Vt. Sept. 16, 2020)

K.  *Moore v. Circosta*,
  --- F. Supp. 3d ----, 2020 WL 6063332 (M.D.N.C. Oct. 14, 2020)

L.  *Paher v. Cergavske*,
  2020 WL 2748301 (D. Nev. May 27, 2020)

M.  *Pennsylvania Democratic Party v. Boockvar*,
  --- A.3d ----, 2020 WL 5554644 (Pa. Sept. 17, 2020)

N.  *Pennsylvania Democratic Party v. Republican Party of Pennsylvania*,
  2016 WL 6582659 (E.D. Pa. Nov. 7, 2016)

O.   *Pennsylvania Voters Alliance v. Centre County*,
     --- F. Supp. 3d ----, 2020 WL 6158309 (M.D. Pa. Oct. 21, 2020)

P.   *Republican National Committee v. Common Cause Rhode Island*,
     --- S. Ct. ----, 2020 WL 4680151 (Aug. 13, 2020)

Q.   *Samuel v. Virgin Islands Joint Board of Elections*,
     2013 WL 842946 (D.V.I. Mar. 7, 2013)

R.   *Texas League of United Latin American Citizens v. Hughs*,
     --- F.3d ----, 2020 WL 6023310 (5th Cir. Oct. 12, 2020)

S.   *Wise v. Circosta*,
     --- F.3d ----, 2020 WL 6156302 (4th Cir. Oct. 20, 2020)



**A**

2015 WL 1293188
Only the Westlaw citation is currently available.
United States District Court,
S.D. Alabama,
Southern Division.

Delouise DAILEY, Plaintiff,

v.

Sylvia HANDS, et al., Defendants.

Civil Action No. 14–00423–KD–M.
|
Signed March 23, 2015.

**Attorneys and Law Firms**

Amardo Wesley Pitters, Montgomery, AL, for Plaintiff.

Mark L. Redditt, Herman Finhold Cox, Jr., Maynard Cooper & Gale, PC, Mobile, AL, for Defendants.

**ORDER**

KRISTI K. DuBOSE, District Judge.

 **\*1** After due and proper consideration of the issues raised, and there having been no objections filed, the Report and Recommendation of the Magistrate Judge made under 28 U.S.C. § 636(b)(1)(B) and dated February 20, 2015, is **ADOPTED** as the opinion of this Court.

Accordingly, it is **ORDERED** that Defendants' motion to dismiss is **GRANTED** and Plaintiff's Complaint is **DISMISSED with prejudice** in its entirety for failure to state a claim upon which relief can be granted.

**DONE** and **ORDERED.**

*REPORT AND RECCOMENDATION*

BERT W. MILLING, JR., United States Magistrate Judge.

The Defendant's Motion to Dismiss has been referred to the undersigned for report and recommendation under 28 U.S.C. 636(b)(1)(B) and Local Rule 72.2. After careful consideration of the pleadings, the Motion to Dismiss, Plaintiff's Response

thereto and Defendant's Reply, it is recommended that Defendant's Motion to Dismiss be granted for failure to state a claim upon which relief may be granted.

I. Facts and Proceedings

Plaintiff Delouise Dailey[1] filed her three-count Complaint (Doc. 1) on September 16, 2014, alleging causes of action under the First Amendment via 42 U.S.C. § 1983, and for defamation and for intentional infliction of emotional distress under Alabama law. The basis of the Complaint stems from an offer of compromise presented to Plaintiff by Defendant Hands in Defendant Hands' election contest, as well as multiple gatherings between Defendants wherein they allegedly subjected Plaintiff's good character to shame, disrepute and humiliation. (Doc. 1 at 5). As Defendants, Plaintiff names Sylvia Hands, Linda Rowell, and Sue Starr. (Doc. 1). Upon service of the Complaint, Defendants filed their Motion to Dismiss, to which Plaintiff responded in opposition, and Defendants filed their Reply. (Docs.1, 5, 10, 11). The fully briefed Motion has been considered; the Court finds in favor of Defendants for the reasons set out below.

[1]     The Court's electronic filing system refers to Plaintiff as "Deloris Dailey." Plaintiff's Civil Cover Sheet refers to her as "Deloris Dailey." The caption in Plaintiff's Complaint and Response in Opposition to Defendant's Motion to Dismiss refers to her as "Delouise Dailey." (Docs.1, 10). Defendants likewise refer to Plaintiff as "Delouise Dailey." Despite the discrepancy between Plaintiff's own Civil Cover Sheet and her Complaint, the Court will refer to her Delouise Dailey since that seems to be the spelling most used throughout this action. In addition to this naming error, the Court notes that Plaintiff's Complaint and her response to Defendants' Motion was fraught with typographical and grammatical errors making each submission a difficult read for the Court. The Court cautions counsel for Plaintiff that, though briefs filed in federal court are not expected to be flawless, they should be sufficiently error-free and coherent to allow the Court to understand the party's arguments without having to splice it together based on what we think the party intends to argue. *See, e.g., U.S. ex rel. Crenshaw v. Degayner,* 622 F.Supp.2d 1258 n. 5 (11th Cir.2008) (citing *In re Roete,* 936 F.2d 963, 967 (7th Cir.1991)(upholding imposition of sanctions where numerous unsupported arguments and grammatical errors in a party's pleading required the

court to spend additional time to insure that a proper decision is reached)).

Plaintiff states that "at all times material hereto, Defendant Hands was the duly elected member serving District 1 of the Council for the Town of Frisco City, Alabama." (Doc. 1 at 2). Plaintiff further contends that "at all times material hereto, Defendant Sue Starr was the duly elected Mayor for the Town of Frisco City, Alabama, ... and Defendant Linda Rowell was the duly elected member serving District 5 of the Council for the Town of Frisco City, Alabama." (*Id.*).

Municipal elections for the town of Frisco City were held on August 28, 2012. For the City Council District One representative, Defendant Sylvia Hands was the incumbent against whom Loyce Richardson ran. (Doc. 1 at 2). Plaintiff Delouise Dailey is the sister of Loyce Richardson. (*Id.*). Loyce Richardson was declared the winner by two votes, receiving 69 votes to Defendant's 67. (*Id.*). On September 7, 2012, Defendant Hands filed a lawsuit in her individual capacity as a resident and qualified elector of District One of Frisco City contesting the results of that election. (*Id.*). The lawsuit was filed in the Circuit Court of Monroe County, Alabama.

**\*2** After filing the election contest, Defendant Hands sent Plaintiff Dailey an offer of compromise in a strange attempt to settle the election contest. (*Id.* at 3). The Court notes that, oddly, Plaintiff was not a named party in the election contest lawsuit, but received the offer in compromise anyway. The offer of compromise indicated that Defendant Hands would be willing to dismiss her pending election contest if Plaintiff Dailey complied with three conditions: (1) Plaintiff must send a signed letter to the Mayor and City Council stating that she would not be designated by any candidate, or serve, as a poll watcher at any future municipal election in Frisco City; (2) Plaintiff must submit a letter to the Monroe County Judge of Probate stating that she would not serve as a poll worker in Monroe County in any future election; and (3) Plaintiff would reimburse Defendant Hands her filing/ service fee of $291.00, along with her attorney's fees which were, at the time, $850.00. (*Id.*). As a result of receiving the offer in compromise, Plaintiff contends that Defendant Hands' actions "were tantamount [sic] subjugating [sic] her civil rights to serve in the election process by engaging in acts of intimidation and extortion."[2] (Doc. 1 at 3).

2      In addition to the alleged civil rights violation in Count I, Plaintiff asserts in Counts II and III that Defendants Starr and Rowell acted in concert with Defendant

Hands, under the color of state law, in their official and individual capacities, to "unlawfully affect the out come [sic] of the election results and voting for elective offices to the Town. Defendant Hands, Starr and Rowell, [sic] met with each other at the home of Hands and at the Fire Department ... which was a designated polling station wherein they engaged in acts to unduly and unlawfully affect the results of municipal elections of 2012. Plaintiff avers that in open council meetings ... she called into question certain actions of elected officials, among them misuse of city funds, use of city workers and equipment for private property, [and] Defendants Linda Rowell and Sue Starr made verbal attacks against her good name and character. Plaintiff avers that the actions complained of herein submitted her to libel, slander, and violations of rights secured to her by" Alabama state law and the First and Fourteenth Amendments. (*Id.* at 3–4).

Counts II and III address these alleged acts of defamation which purportedly intentionally inflicted emotional distress on Plaintiff. These claims, titled "Defamation" and "Intentional Infliction of Emotional Distress," respectively, Defendants submit, and Plaintiff concedes that, state law does not provide Plaintiff a cause of action under the circumstances. (Doc. 10 at 6). Therefore, the Court treats this concession as a voluntary dismissal for those Counts, and for Defendants Starr and Rowell, as Count I does not contain any allegations against Starr and Rowell. The Court will not address these allegations or these Defendants any further beyond this point.

Count I titled Federal Cause of Action, alleges that Defendant Hands, acting under color of state law, undermined through intimidation Plaintiff's First Amendment rights to free speech, political expression and to petition the government for redress. (*Id.* at 4). Plaintiff contends that "under applicable voting rights law, state and federal, [she] has the right to serve as a poll watcher and participate in the electoral process, ... and that the First Amendment's Free Speech Clause guarantees [ ] her ... the right to express her views on the affairs of city government for [t]he Town of Frisco City. Speech, including, oral, written and symbolic expression, is entitled to comprehensive protection under the First Amendment ...." (*Id.*).

As a result of the alleged First Amendment violation, Plaintiff allegedly suffered "damages, including but not limited to emotional anguish." (*Id.*). Plaintiff seeks compensatory damages in an unspecified amount, and "injunctive relief, enjoining the actions of the defendants [sic] from trammeling of [sic] rights of the plaintiffs [sic] and citizens of the Town of Frisco City from serving as poll watchers and participating in the electoral process." (*Id.*).

In her Motion to Dismiss, (Doc. 5), Defendant Hands contends that Plaintiff's First Amendment claim is due to be dismissed because it fails to allege any facts which give rise to a violation of free speech. Factually, Defendant argues that Plaintiff has failed to make any specific factual allegation demonstrating that she was *actually* precluded, prevented, or otherwise inhibited from engaging in any actions, speech, expression or other conduct implicated by the First Amendment, or that her right to freedom of expression was chilled in any way. (Doc. 5–1 at 5). Defendant Hands contends that absent any such factual allegations, Plaintiff's free speech claim "stops short of the line between possibility and plausibility of 'entitlement to relief' " as discussed in the landmark cases, *Iqbal and Twombly, infra,* pp. 9–10.

**\*3** Defendant further points out that Plaintiff fails to provide any facts tending to prove that Defendant Hands acted under color of state law, which is an essential element to her § 1983 claim. Defendants contend that Plaintiff mouths the buzzwords "under color of state law," but never provides any facts sufficient to prove that Defendant Hands acted under color of state law in sending her an offer of compromise.

In an effort to salvage the single remaining claim in her Complaint, Plaintiff responds in opposition to Defendants' Motion and concludes without sufficient factual allegations that her claims are more than a formulaic recitation of the elements of a First Amendment claim. (Doc. 10). "Plaintiff submits that her federal cause of action claim asserting First Amendment infringement by the defendants transcend [sic] merely serving as a poll watcher and more profoundly alleges an infringement of the right to vote and participate in the electoral process." (*Id.* at 2). Plaintiff then attempts to raise in her response claims of "retaliation and infringement of political affiliation," as well as "unlawful employment discriminatory practices" based on race—none of which are alleged anywhere in her Complaint. (*Id.* at 2, 4). Plaintiff contends that Defendants' arguments are "preposterous" and concludes again without support that "at all time material hereto the defendants were elected officials of Frisco City" acting under color of state law to influence the outcome of future elections and voting processes. (*Id.* at 5).

Concluding her response, Plaintiff states, "to the extent that this Court finds that her First Amendment claim needs to be amended, the appropriate relief is not dismissal but rather the filing of a more definite statement by way of an amended complaint." (*Id.* at 5–6).

Defendant's Reply succinctly reiterates her previously asserted arguments regarding Plaintiff's unsupported conclusory allegations. The Reply closes with the argument that Plaintiff's allegations regarding retaliation, political infringement, race or ethnicity discrimination are due to be stricken as they were never raised in the Complaint, but only in Plaintiff's Response to the Motion to Dismiss. The Defendants correctly state that those claims are not before the Court given that they were not raised in the Complaint, and thus have not been briefed via the pending Motion to Dismiss.

## II. Discussion

### a. Motion to Dismiss Standard

A defendant may move to dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) if the plaintiff has failed to state a claim upon which relief may be granted. To survive a 12(b)(6) motion to dismiss for failure to state a claim, the complaint "does not need detailed factual allegations;" however, the "plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (internal citations omitted). Factual allegations, on the assumption that all allegations in the complaint are true, must be enough to raise a right to relief above the speculative level and state a claim for relief that is plausible on its face. *Id.* at 555, 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged.... Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)(quoting *Twombly* at 556, 557, 570)(quotation marks omitted).

**\*4** The Court accepts all facts as true and limits its consideration to the pleadings and exhibits attached thereto. *Abraham v. Greater Birmingham Humane Soc'y, Inc.,* No. 2:11–CV–4358–SLB, 2014 WL 1043230, \*1 (N.D.Ala. Mar. 17, 2014)(*citing Grossman v. Nationsbank, N.A.,* 225 F.3d 1228, 1231 (11th Cir.2000) (citation omitted). All reasonable inferences are drawn in favor of the plaintiff; however, unsupported conclusions of law or of mixed fact and law have long been recognized not to prevent a Rule 12(b)(6) dismissal.

*Abraham,* 2014 WL 1043230 at *1 (*citing Dalrymple v. Reno,* 334 F.3d 991, 996 (11th Cir.2003) (citation omitted).

### b. First Amendment

The First Amendment states, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for redress of grievances." The First Amendment has long been held to apply to the states through the Fourteenth Amendment. *Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 792 n. 2 (1984) (citation omitted).

### c. 42 U.S.C. § 1983

As stated above, Plaintiff seeks redress for the alleged violation of her First Amendment rights via this civil rights action under 42 U.S.C. § 1983. Section 1983 states in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

42 U.S.C. § 1983 (1994). Thus, to state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law. *West v. Atkins,* 487 U.S. 42, 48 (1988). "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Id.* (citations omitted).

### d. Application

### 1. First Amendment Right To Serve As Poll Watcher

Plaintiff contends that "[u]nder applicable voting rights law, state and federal, the plaintiff has the right to serve as a poll watcher and participate in the electoral process. (Doc. 1 at 4). Plaintiff alleges that these fundamental rights were violated by Defendant Hands when she sent a letter in compromise to Plaintiff on the heels of Defendant Hands filing an election contest for the election she lost to Plaintiff's brother, Loyce Richardson. As stated previously, the settlement offer requested Plaintiff to agree to forgo serving as a poll watcher in future elections in exchange for Defendant Hands dropping her election contest. Defendant Hands' Motion to Dismiss correctly states that poll watching is not a fundamental right which enjoys distinct First Amendment protection, and thus Plaintiff's First Amendment rights were not violated by the offer in compromise. *See Cotz v. Mastroeni,* 476 F.Supp.2d 332, 364 (S.D.N.Y.2007); *Lopez Torres v. N.Y. State Bd. of Elections,* 462 F.3d 161, 183 (2d Cir.2006); *Anderson v. Celebrezze,* 460 U.S. 780, 787 (1983); *Williams v. Rhodes,* 393 U.S. 23, 30–31 (1968).

**\*5** In response to Defendant's arguments and supporting case law, Plaintiff proposes that poll watching is actually a First Amendment right that "transcends" merely serving as a poll watcher, and to limit her "right" to serve as a poll watcher profoundly infringes on her right to vote and participate in the electoral process. Plaintiff provides no case law to support her transcendence argument; Plaintiff's argument is not well taken.

First, the Court notes, and Defendant points out, that Plaintiff's Complaint is completely devoid of any allegation that she was actually precluded, prevented or otherwise inhibited from engaging in *any* actions, speech, expression or other conduct implicating her First Amendment rights. There are no allegations that Defendant Hands *actually* prevented Plaintiff from participating as a poll watcher in any election, or otherwise abrogated Plaintiff's participation in the electoral process. At best, the Court finds that Defendant Hands sent Plaintiff a letter which offended her by asking that Plaintiff agree to forgo future poll watching in exchange for Defendant dropping her election contest against Plaintiff's brother. To the Court's knowledge, Plaintiff did not agree to any of the stipulations in the letter as the election contest was resolved via bench trial by a circuit court judge, rather than by compromise.[3] (*See Hands v. Richardson,* CV–12–31, Order dated February 27, 2013).

3      The contested election results were ultimately vacated via bench trial due to the fact that at one polling location,

at least two voters were present and ready to vote, but
unable to do so because the ballots were late arriving to
that location. This situation ultimately caused the margin
to win to change, thereby rendering the election for
District One null, leaving the position vacant.

Furthermore, the Court finds that the proposed offer in
compromise had no force or effect over Plaintiff, as she
was not a party to the election contest, was not obligated
to any terms in the offer, and it is unclear whether there
was requisite consideration sufficient to create a binding
settlement agreement. Though Plaintiff may have felt a moral
or familial obligation to agree to the offer in order to spare
her brother's election results, the Court does not find that
Defendant Hands' proposed offer in compromise violated
Plaintiff's right to serve as a poll watcher, since poll watching
is not a fundamental right protected by the First Amendment.
There is also no indication that Defendant's proposed offer
in compromise was power exercised and possessed by virtue
of state law or that the filing the election contest was made
possible only because she was clothed with the authority of
state law. *See West, supra,* p. 13.

Regarding the First Amendment claim, the Court concludes
that Plaintiff's Complaint sounds more in bitterness, revenge
and insult rather than in seeking protection from a deprivation
of rights. Mere insult and offense does not rise above the level
of speculation, and thus fails to state a claim for which relief
can be granted under Rule 12(b)(6), and *Iqbal* and *Twombly*.

### 2. "Under Color of State Law"

Plaintiff's Complaint alleges that Defendants, "acting under
color of state law, in their individual and official capacity,
unlawfully engaged in acts of intimidation to undermine and
violate her First Amendment rights to free speech, political
expression and to petition the Government for redress." (Doc.
1 at 4). Defendant disagrees, as does the Court.

 **\*6** Initially, the Court determines that Plaintiff's § 1983
claim fails as a matter of law because Plaintiff has provided no
facts sufficient to support her claim that Defendants' actions
were taken under the color of state law. As is well-established
under federal pleading standards, "a formulaic recitation of
the elements of a cause of action will not do ... Factual
allegations must be enough to raise a right to relief above the
speculative level." *Twombly,* 550 U.S. at 555–56. Plaintiff,
in sum, insists that all actions taken by Defendants were in
their individual *and* official capacities as elected officials

of the Town of Frisco City. (Doc. 1 at 4). Those actions
include the following: (1) the initiation of an election contest
by Defendant Sylvia Hands; and (2) the sending of a letter
form Defendant Hands to Plaintiff in an attempt to settle the
election contest.

Despite the mere statement that Defendant Hands acted under
color of state law, Plaintiff provides absolutely no factual
support for the conclusory allegations that any of these actions
were taken pursuant to any power granted to Defendant Hands
by virtue of her position as elected official of the Town of
Frisco City. In fact, the complaint in the election contest does
not mention anywhere that Hands was filing in her official
capacity. Rather, it states that Hands was merely a resident
and qualified elector of the Town of Frisco City, and was
filing as such. (*See Hands v. Richardson,* CV–12–31, Am.
Petition dated September 7, 2012). The complaint does make
note that Hands was one of the candidates running for the
position, and that she received votes in the election, but
it never specifically states that she filed the contest in her
official capacity based on the power she possessed by virtue
of being the previous elected representative of District One.
Thus, without any factual allegations indicating such, those
allegations are merely speculative and do not rise to the level
of a § 1983 violation.

Furthermore, the Alabama statute under which Hands filed
her election contest does not require that it be filed in any
official capacity, but expressly states that an election contest
may be filed by "any person who was at the time of the
election a qualified elector of such city or town ...." Ala.Code
§ 11–46–69. Defendant Hands fits that description.

Absent any factual support that Defendant Hands' actions
were exercised based on the power possessed by her by virtue
of state law, Plaintiff cannot satisfy fundamental elements of
her First Amendment and § 1983 claims and her Complaint
is due to be dismissed for that reason.

### III. Conclusion

Based on the foregoing, the Court recommends that
Defendant Hands' Motion to Dismiss be granted, and
Plaintiff's Complaint be dismissed with prejudice in its
entirety for failure to state upon which relief can be granted.

*NOTICE OF RIGHT TO FILE OBJECTIONS*

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(B); S.D. Ala. L.R.72.4. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1293188

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

B

2020 WL 5407748
Only the Westlaw citation is currently available.
United States District Court, W.D. Pennsylvania.

DONALD J. TRUMP FOR
PRESIDENT, INC., et al., Plaintiffs

v.

Kathy BOOCKVAR, in her capacity
as Secretary of the Commonwealth
of Pennsylvania, et al., Defendants

No. 2:20-cv-966
|
Signed 09/08/2020

**OPINION**

J. Nicholas Ranjan, United States District Judge

 *1  On August 23, 2020, this Court abstained from ruling on the merits of Plaintiffs' claims and stayed this case. Since then, the Pennsylvania Supreme Court has accepted a similar case for review, and appears poised to rule on unsettled state-law questions that are critical to Plaintiffs' claims here—specifically, the validity of mail-in ballot "drop boxes" and the permissibility of counting mail-in ballots that suffer from certain procedural defects.

But before the Pennsylvania Supreme Court decided to tackle these issues, Plaintiffs filed a motion for "limited preliminary injunctive relief," primarily asking this Court to order that all ballots delivered to drop boxes be segregated, so that they won't be commingled with other ballots. Plaintiffs fear that without such an injunction, they won't be able to challenge the ballots delivered to drop boxes in the event that the Pennsylvania Supreme Court doesn't act in time.

Some of Plaintiffs' concerns are valid. For example, if the Pennsylvania Supreme Court doesn't timely decide whether drop boxes are authorized by the election code, votes could be cast through those locations and, if the ballots are not otherwise traceable, it might then be too late to un-ring the bell in the event that the Supreme Court later finds that drop boxes are not allowed. That said, while these concerns are valid, they're also premature. The Pennsylvania Supreme Court appears to be on track to decide this, and

other questions of importance to the voters and candidates in this Commonwealth, in short order. And that court still has sufficient time to reach these issues before any ballots are cast, collected, or canvassed.

In sum, because the harm Plaintiffs fear has not yet materialized in any actualized or imminent way, the Court will deny Plaintiffs' motion for injunctive relief, but will do so without prejudice to Plaintiffs' (or any other party's) right to seek injunctive relief if a more imminent and irreparable harm materializes.

**BACKGROUND**

**I. The Court's August 23, 2020, opinion.**
In its prior opinion, the Court found that most of Plaintiffs' federal-constitutional claims turn on unsettled questions of state law under the recently enacted Act 77. Thus, to allow the state courts to offer a potentially case-dispositive construction of the unsettled state-law questions, the Court abstained under the *Pullman* doctrine. *See, e.g.*, *Planned Parenthood of Cent. N.J. v. Farmer*, 220 F.3d 127, 149 (3d Cir. 2000) ("[A]bstention under Pullman is appropriate where an unconstrued state statute is susceptible to a construction by the state judiciary which might avoid in whole or in part the necessity for federal constitutional adjudication, or at least materially change the nature of the problem." (cleaned up)).

The Court acknowledged in its opinion that, while most of Plaintiffs' claims were subject to *Pullman* abstention, a few were not. [ECF 409, pp. 34-37]. But in exercising its inherent authority, the Court found it better to stay the entire case rather than proceed on a small subset of claims, only to have to do most of the proceedings over again once the state courts interpreted the relevant election code provisions. [*Id.*]. The Court did, however, give the parties the option to move to lift the stay on October 5, 2020, concerning this subset of claims if the state courts had not yet resolved the state-law issues arising from the unsettled election-code provisions. [ECF 410].

**II. The Pennsylvania Supreme Court's exercise of extraordinary jurisdiction.**
 *2  On September 1, 2020, the Pennsylvania Supreme Court granted Secretary Boockvar's "Application for the Court to Exercise Extraordinary Jurisdiction over the Commonwealth Court Case Docketed at 407 MD 2020." [ECF 418;

ECF 418-3]. The Pennsylvania Supreme Court ordered all supplemental briefing to be filed by today, September 8, 2020. [ECF 418-3]. The issues before the Pennsylvania Supreme Court include whether "Act 77 ... permit[s] county election boards to designate drop-off locations other than their official office address for receipt of mail-in ballots" and whether "mail-in ballots delivered to the county election boards without the inner envelope (*i.e.*, 'naked ballots') [may] be counted." [ECF 388-1, p. 5; ECF 418-3].

### III. Plaintiffs' motion to modify the stay and for limited preliminary injunctive relief.

On August 28, 2020, Plaintiffs moved to modify this Court's abstention order, and to request "limited preliminary injunctive relief." [ECF 414, p. 1]. This is the first time Plaintiffs have moved for a preliminary injunction in this case, though they had reserved their right to do so and their amended complaint seeks injunctive relief. *See* [ECF 409, p. 33] (discussing Plaintiffs' request for preliminary-injunctive relief and decision to forgo filing a motion for preliminary injunction).

In their motion, Plaintiffs request that the Court grant four types of preliminary-injunctive relief: (1) order Defendants to "segregate and maintain intact all cast absentee and mail-in ballots that" are returned in drop boxes; lack an inner secrecy envelope or contain marks, text, or symbols thereon; or are a non-disabled voter's ballot that was delivered by a third party; (2) enjoin Defendants "from pre-canvassing or canvassing" the same;[1] (3) order Defendants "to retain and make available for periodic review all digital images and video' (to the extent they exist) that are captured by a camera "used to monitor drop-boxes or other sites and locations ... used for the return and collection of cast absentee and mail-in ballots;" and (4) modify the stay so that it is lifted on September 14, 2020, rather than October 5, 2020. [ECF 414, pp. 1-2; ECF 414-1].

---

[1]   Related to this, Plaintiffs also request that the Court order Defendants to resolve the ballot challenges pursuant to 25 P.S. §§ 3146.8(f) and (g)(5), and that Defendants produce "a list of all electors, by precinct, whose ballots have been segregated and are being challenged under this [Proposed] Order." [ECF 414-1, ¶¶ 2-3].

In seeking a preliminary injunction, Plaintiffs emphasize that Pennsylvania's Secretary of the Commonwealth, Kathy Boockvar, recently issued new guidance particularly for the November 3, 2020, general election. *See, e.g.*, [ECF 414, ¶¶ 14-16, 33]. Specifically, Secretary Boockvar issued two new

sets of guidance on August 19, 2020—four days before the Court's abstention opinion, but after all briefing on the then-pending motions had been completed.

One set of guidance relates to the collection of absentee and mail-in ballots, including the use and implementation of ballot return sites like drop boxes. [ECF 415-19]. Specifically, the guidance states that "[c]ounty boards of elections may establish multiple ballot return locations where voters may return their own voted ballot," which may include establishing a "secure ballot return receptacle." [*Id.* at § 1.1]. The guidance also instructs that any "secure ballot return receptable"—*i.e.*, drop boxes—should comply with certain design requirements, and the county boards of elections must ensure the drop boxes comply with enumerated security features, including anti-tampering features, locks, video monitoring, and removal when the site is closed or the drop box cannot be monitored. [*Id.* at §§ 2.2-2.5].

**\*3**   Additionally, this guidance directs the counties to implement certain, specific procedures for collecting ballots from drop boxes and transporting them to the county election office. [*Id.* at §§ 3.1-3.3]. That is, in relevant part, that all ballots retrieved from drop boxes (or other ballot collection sites) should be placed into a "secure ballot transfer container," and "[t]he designated election officials should note on *Ballot Return Site Collection Forms* the site and unique identification number of the ballot return site and the date and time of retrieval." [*Id.* at § 3.1]. The guidance further specifies that this collection form should be "maintained in a manner prescribed by the board of elections to ensure that the form is traceable to its respective secure ballot container." [*Id.* at § 3.2].

The second set of new guidance relates to the counting of "naked" ballots, and instructs that "naked" ballots should be counted notwithstanding the lack of a "secrecy" envelope. [ECF 415-20]. It also instructs counties to develop a consistent process for counting such "naked" ballots. [*Id.* at p. 2]. In providing this guidance, the Secretary notes that "[t]he failure to include the inner ['secrecy'] envelope ... does not undermine the integrity of the voting process" and thus, "no voter should be disenfranchised for failing to place their ballot in the official election ballot envelope." [*Id.*].

Plaintiffs argue that Defendants' inconsistent use of drop boxes and counting of "naked" ballots are unconstitutional, and that Secretary Boockvar's new guidance does not remedy the constitutional defects. *E.g.*, [ECF 414, ¶¶ 19-20, 41].

Further, Plaintiffs point out that the Secretary's new guidance is inconsistent with Defendants' prior positions, in that the guidance now says all "naked" ballots should be counted regardless of the elector's reason for not placing the ballot in the secrecy envelope. *E.g.*, [*id.* at ¶ 16]. Plaintiffs say that this guidance violates the election code and is likely to be implemented in a non-uniform and potentially unconstitutional manner (*i.e.*, by some counties but not others). *E.g.*, [*id.* at ¶¶ 18, 20].

Plaintiffs argue that, without an injunction, this unlawful guidance will irreparably harm them. That's because, according to Plaintiffs, nothing in the Secretary's new guidance instructs counties to segregate ballots that were received at drop boxes or that are "naked." [*Id.* at ¶ 23]. Thus, Plaintiffs suggest that unless this Court orders Defendants to not commingle the challenged ballots with other "proper" ballots, Plaintiffs will not be able to obtain the relief they seek even if they win their legal challenges. *E.g.*, [*id.* at ¶¶ 33, 43-44]. They argue that, once the ballots are commingled, it will be impossible to "un-commingle" them. As such, preventing this commingling will, according to Plaintiffs, protect the public interest. *E.g.*, [*id.* at ¶¶ 45-46].

Defendants and Intervenors have a different take. They argue that Plaintiffs' motion, despite its label, is really a motion for reconsideration of this Court's abstention order. And they contend that Plaintiffs cannot meet the heavy burden of justifying such reconsideration. Defendants and Intervenors also argue that the Court cannot award Plaintiffs a preliminary injunction as Plaintiffs' claims are not justiciable because Plaintiffs lack standing, their claims aren't ripe, and their claims are barred by the Eleventh Amendment of the U.S. Constitution. Defendants and Intervenors further argue that the Pennsylvania Supreme Court's exercise of extraordinary jurisdiction renders any preliminary injunction unnecessary and improper because the Supreme Court will quickly decide certain state-law questions, mooting Plaintiffs' alleged need for injunctive relief.

**\*4** Additionally, Defendants and Intervenors argue that granting a preliminary injunction would be inconsistent with this Court's abstention order because to award a preliminary injunction, the Court would need to assess the merits of Plaintiffs' claims, something the Court declined to do in its abstention opinion. And finally, they argue that Plaintiffs do not meet their burden to show a preliminary injunction is warranted.

Briefing is complete. No party has requested an evidentiary hearing, and the Court, based on the nature of the motion, finds that one is not required. *See Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1175-76 (3d Cir. 1990) ("The applicable Federal Rule does not make a hearing a prerequisite for ruling on a preliminary injunction."). Thus, the motion is ready for disposition.

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). Because a preliminary injunction is an "extraordinary remedy," the plaintiff must make "a clear showing that the plaintiff is entitled to such relief." *Id.* at 22, 24, 129 S.Ct. 365; *see also Holland v. Rosen*, 895 F.3d 272, 285 (3d Cir. 2018) ("A preliminary injunction is an extraordinary remedy which should be granted only in limited circumstances. We do not issue that relief unless the movant, by a clear showing, carries the burden of persuasion." (cleaned up) (citations omitted)).

The first two factors that a plaintiff must show—"(1) a reasonable likelihood of success on the merits ... [and] (2) irreparable harm"—are "prerequisites" to obtain a preliminary injunction. *Holland*, 895 F.3d at 286. Each of these two factors is also a prerequisite to the other. *See, e.g., id.* (opining that because the plaintiff did not sufficiently "demonstrate that [he] can win on the merits ... we do not delve deeply into the second factor" (cleaned up)); *In re Arthur Treacher's Franchisee Litig.*, 689 F.2d 1137, 1143 (3d Cir. 1982) ("[A] failure by the moving party to satisfy these prerequisites: that is, a failure to show a likelihood of success or a failure to demonstrate irreparable injury, must necessarily result in the denial of a preliminary injunction.").

Thus, if a plaintiff fails to show that it is likely to suffer irreparable harm, the Court may deny the preliminary injunction, and need not address the remaining factors. *See Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) ("[W]e have repeated that a district court—in its sound discretion—should balance those four factors so long as the party seeking the injunction meets the threshold on the first two."); *see, e.g., In re Arthur Treacher's Franchisee Litig.*, 689 F.2d at 1143; *Doe v. U. of Sciences*, No. 19-358, 2020

WL 5211028, at *4, n.7 (E.D. Pa. Sept. 1, 2020) ("Because the Court finds [Plaintiff] failed to establish irreparable harm, it need not address the parties' arguments with respect to the possibility of harm to others from granting the injunction, or the public interest in granting injunctive relief.").

### DISCUSSION & ANALYSIS

**I. The Court will consider Plaintiffs' motion.**

As an initial matter, the parties dispute whether the Court can entertain Plaintiffs' motion at all, given that it was filed after this Court stayed the case based on *Pullman* abstention. The Third Circuit has said that district judges have the authority to consider (and even that they *must* consider) a preliminary-injunction motion at the same time they are deciding whether to abstain based on *Pullman. See, e.g., Chez Sez III Corp. v. Township of Union*, 945 F. 2d 628, 634 n.4 (3d Cir. 1991); *New Jersey-Phila. Presbytery of the Bible Presbyterian Church v. N.J. State Board of Higher Education*, 654 F.2d 868, 886 (3d Cir. 1981).[2] But there is no authority specifically mandating or authorizing a district court to consider a preliminary-injunction motion filed *after* it stays the entire case under *Pullman. See Fuente v. Cortes*, 207 F. Supp. 3d 441, 453 (M.D. Pa. 2016) ("[T]hough courts in the past have entertained parties' requests for emergency relief contemporaneously with a decision to abstain on the merits of the case, this scenario is distinguishable from such instances[.]" (cleaned up)).

2    The two cases that stand for this proposition create a puzzling tension. On one hand, district courts are instructed by *Pullman* not to delve into the merits of any unsettled state-law issues to avoid offering "a forecast rather than a determination" that would cause "needless friction with state policies." *Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496, 500, 61 S.Ct. 643, 85 L.Ed. 971 (1941); *see also id.* ("The reign of law is hardly promoted if an unnecessary ruling of a federal court is thus supplanted by a controlling decision of a state court. The resources of equity are equal to an adjustment that will avoid the waste of a tentative decision as well as the friction of a premature constitutional adjudication.").

On the other hand, to decide a preliminary-injunction motion, the district court must do that very thing—determine reasonable probability of success on the merits, essentially deciding, or at least predicting, the state-law issues in the process. This seems at odds with *Pullman*'s concern for avoiding advisory opinions that might later be voided by a state-court decision under

state law. *See id.; see also Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 11, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987) ("When federal courts interpret state statutes in a way that raises federal constitutional questions, a constitutional determination is predicated on a reading of the statute that is not binding on state courts and may be discredited at any time—thus essentially rendering the federal-court decision advisory and the litigation underlying it meaningless." (cleaned up)).

In *New Jersey-Philadelphia*, the Third Circuit seemed to recognize this tension, but found that it was of little consequence under the specific circumstances of that case. 654 F.2d at 885-86. That's because, in the Third Circuit's view, "the district court [did] not construe[ ] the state statute or regulations at all," and explained, a preliminary injunction is just that—preliminary—and the state courts could always decide the state-law questions and issue narrowing constructions before entry of a final permanent injunction. *Id.*

**\*5** It strikes the Court as inconsistent with the core principles of *Pullman* for a plaintiff to be able to seemingly circumvent a *Pullman*-based stay by, at any later point in time, coming back to federal court, claiming an emergency has arisen, and asking the federal court to basically reconsider and take immediate jurisdiction over the case. "Indeed, abstention could not serve its proper function if the parties could, by their own decisions, force us to confront an otherwise avoidable constitutional question." *Nicholson v. Scoppetta*, 344 F.3d 154, 168 (2d Cir. 2003). In that scenario, the Court would be inviting, not avoiding, the "needless friction" that abstention is designed to prevent. *See Moore v. Tangipahoa Parish School Bd.*, 507 F. App'x 389, 396 (5th Cir. 2013) ("This [preliminary-injunction motion] presents the very conflict that Pullman abstention seeks to avoid—*i.e.*, needless friction between a federal pronouncement and state policies—as it involves a federal court enjoining a state's legislatively-determined funding decisions prior to allowing the state to consider whether such decisions comport with its own constitution.").[3]

3    In other Circuits, courts have specifically abstained from deciding motions for a preliminary injunction based on *Pullman. See, e.g., Caldera v. City of Boulder*, 341 F. Supp. 3d 1241, 1243 (D. Colo. 2018) (abstaining from deciding "preliminary injunction (# 4) against enforcement of [an] Ordinance"), *aff'd Caldara v. City of Boulder*, 955 F.3d 1175 (10th Cir. 2020); *Moore*, 507 F. App'x at 396 (holding that district court erred in granting preliminary injunction "in light of the *Pullman* abstention doctrine."); *Jayaraj v. Scappini*, 66 F.3d 36, 38 (2d Cir. 1995) (holding that the district court "erred in granting the preliminary injunction" because "abstention

under [*Pullman*] is warranted.”); *Chun v. State of N.Y.*, 807 F. Supp. 288, 289 (S.D.N.Y. 1992) (abstaining from deciding “preliminary injunction to enjoin the State of New York from prosecuting [plaintiff] for violating New York's anti-gambling laws.”).

That said, this Court is bound by Third Circuit precedent, and the Third Circuit appears to have ordered district courts to consider and decide preliminary-injunction motions even while abstaining under *Pullman*. The Court could draw a distinction between this case on the one hand (preliminary-injunction motion filed after the *Pullman* stay), and *New Jersey-Philadelphia* and *Chez Sez* on the other (preliminary-injunction motion filed contemporaneously with the complaint and before *Pullman* stay). But that distinction doesn't seem to necessarily flow from the reasoning of the Third Circuit's decisions. Thus, based on this binding precedent, the Court finds that it is obligated to consider Plaintiffs’ motion.

However, as will be discussed, the Court also finds that Plaintiffs’ motion must, at this stage, be denied due to the absence of any irreparable harm. Because that issue is dispositive, this Court need not delve into a merits-based determination that could cause tension with the principles of *Pullman*.[4]

4    In discussing this issue, Plaintiffs rely heavily on *Pierce v. Allegheny County Bd. of Elections*, 324 F. Supp. 2d 684 (W.D. Pa. 2013) (Conti, J.). *See* [ECF 414, ¶¶ 33, 37-47]. In *Pierce*, the court abstained under *Pullman*, but granted a limited injunction, ordering the segregation of 937 ballots. 324 F. Supp. 2d at 707-09. A review of *Pierce* demonstrates the difficult position in which the Third Circuit's decisions placed the district court, and how those decisions limited the court's merits review. There, the district court recognized that “the likelihood of plaintiffs’ success, while a close question, appear[ed] to turn on an issue, which [was] more appropriate for the Pennsylvania courts to determine[.]” *Id.* at 705. But, in light of its abstention decision, the district court found it “inappropriate, based upon the doctrines of comity and federalism, to speculate as to how the Pennsylvania courts would interpret” the relevant state-law issue. *Id.* The district court eventually reached its merits decision on the injunction by qualifying it and finding that it turned on “how the state court interpret[ed] the provision of the election code at issue,” without engaging in such an interpretation. *Id.*

**II. Plaintiffs cannot establish irreparable harm.**

**\*6** At least at the current stage of proceedings and on the record presently before this Court, Plaintiffs have not established that they are entitled to the “extraordinary remedy” of a preliminary injunction. *Greater Phila. Chamber of Commerce v. City of Phila.*, 949 F.3d 116, 133 (3d Cir. 2020). That is chiefly because Plaintiffs have not shown that they will suffer “irreparable harm” if the Court denies the injunction.[5]

5    Defendants and Intervenors raise a number of other procedural and substantive challenges to Plaintiffs’ motion. Because Plaintiffs’ failure to establish irreparable harm is dispositive to the present motion, the Court need not address these other arguments. *See, e.g.*, *Exec. Home Care Franchising LLC v. Marshall Health Corp.*, 642 F. App'x 181, 183 (3d Cir. 2016) (“We conclude that the District Court properly disposed of Executive Care's motion for a preliminary injunction on the basis of the ‘irreparable harm’ requirement.’ ”); *B.P.C. v. Temple Univ.*, No. 13-7595, 2014 WL 4632462, at \*5 (E.D. Pa. Sept. 16, 2014) (“Because of the failure to establish irreparable harm, the other factors (likelihood of success, balance of harms and public interest) need not be addressed.” (citing *AT&T v. Winback & Conserve Program*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994))).

A party seeking preliminary injunctive relief must “demonstrate that irreparable injury is *likely* in the absence of an injunction.” *Winter*, 555 U.S. at 22, 129 S.Ct. 365 (emphasis in original). An injury is “irreparable” only if it “cannot be redressed by a legal or an equitable remedy following a trial.” *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992) (citation omitted). Further, “[t]he preliminary injunction must be the *only* way of protecting the plaintiff from harm.” *Id.* (emphasis in original). As well, preliminary relief that is “mandatory,” rather than prohibitive, and “will alter the status quo” must “meet a higher standard of showing irreparable harm in the absence of an injunction.” *Bennington Foods LLC v. St. Croix Renaissance, Grp., LLP*, 528 F.3d 176, 179 (3d Cir. 2008); *see also Christie-Spencer Corp. v. Hausman Realty Co.*, 118 F. Supp. 2d 408, 418 (S.D.N.Y. 2000) (“Such relief is granted sparingly, because mandatory injunctions are more burdensome than prohibitory injunctions, and disturb the status quo prior to final adjudication.”). In such circumstances, Plaintiffs’ right to relief must be “indisputably clear.” *Hope v. Warden York County Prison*, ─── F.3d ───, 2020 WL 5001785, at \*3 (3d Cir. Aug. 25, 2020).

Plaintiffs argue that they will suffer irreparable harm without an injunction because Defendants may commingle all

absentee and mail-in ballots after they are cast and collected. Once that happens, Plaintiffs say, there will be "no way to discern which, or how many, of those ballots were cast in the manner being challenged by Plaintiffs." [ECF 414, p. 17, ¶ 43]. To avoid this harm, they ask that the Court order Defendants to (1) segregate, account for, and "deem challenged" all ballots within the categories Plaintiffs wish to contest (*e.g.*, all absentee and mail-in ballots returned to "drop boxes"); and (2) retain, and allow Plaintiffs to "periodically review," video surveillance footage used to monitor "drop boxes" or other absentee and mail-in ballot return sites. [ECF 414-1, ¶¶ 1-3].

After careful consideration, the Court does not believe either category of preliminary relief is warranted at this time.

### A. Plaintiffs' request for ballot segregation.

**\*7** First, Plaintiffs ask the Court to preliminarily enjoin Defendants from "commingling and counting (either during a pre-canvass or canvass) cast absentee and mail-in ballots" that are either: (1) "returned or collected through drop boxes"; (2) "lack an inner secrecy envelope or contain marks, texts, or symbols thereon"; or (3) "have been delivered in-person by someone other than the non-disabled voters." [ECF 414-1, p. 2]. Plaintiffs further ask that this Court "deem" all such ballots to be "challenged" under the election code and direct Defendants to "segregat[e] and set aside [the challenged ballots] in a secure location at the offices of each of the Defendant County Elections Boards." [*Id.*]

In practice, this means that all the challenged ballots would be excluded from counting in the ordinary course and subjected to a hearing procedure used for adjudicating challenges to absentee ballots or ballot applications under 25 P.S. § 3146.8(f) and (g)(5). Presumably, Plaintiffs intend to ask that these ballots be disqualified, after the votes are cast, if they prevail on their claims challenging the use of drop boxes (either in state court or in this Court).

For several reasons, Plaintiffs have not shown that they will suffer irreparable harm if the Court declines to order this relief.

### 1. Plaintiffs can obtain relief by operation of the Pennsylvania Supreme Court's decision.

Initially, Plaintiffs have not shown that the harm they fear is "likely," or that an injunction is the "only" way to prevent it, because the Pennsylvania Supreme Court is poised to resolve Plaintiffs' claims on state-law grounds in short order, before such harm occurs. *See Winter*, 555 U.S. at 22, 129 S.Ct. 365; *Campbell Soup Co.*, 977 F.2d at 91.

Per that court's recent order exercising extraordinary jurisdiction over the parallel state-court litigation, the question of whether the election code permits counties to use "drop boxes" is now teed up for decision, as is the question of whether ballots submitted without an "inner secrecy envelope" (or with "marks" on that envelope) may be counted. [ECF 388-1, p. 5; ECF 418-3]. Those issues will be fully briefed by today, September 8, 2020, and presumably decided promptly after that. [ECF 418-3]. While Plaintiffs argue that there is no guarantee the Pennsylvania Supreme Court will quickly and conclusively decide these issues [ECF 437, pp. 2-3], this Court trusts that it will, considering the importance and urgency of the parties' disputes. Once the Pennsylvania Supreme Court has weighed in, its decision will likely moot Plaintiffs' federal claims here by either (1) invalidating the use of drop boxes and counting of "naked ballots" on state-law grounds; or (2) determining that the Secretary's guidance on those points is lawful.[6] That's why this Court abstained under *Pullman* in the first place.

---

6    As it pertains to these claims, Plaintiffs do not assert a facial constitutional challenge to the election code or to the constitutionality of drop-boxes and mail-in voting generally. Instead, as this Court explained in its prior opinion, Plaintiffs' federal claims depend on the Secretary having issued unlawful guidance that will be implemented inconsistently across the counties. [ECF 409, pp. 2, 26, n.6]. Thus, if the Secretary's guidance is declared either lawful or unlawful by the Pennsylvania Supreme Court, and the correct interpretation of the election code is then implemented uniformly across the counties, nothing remains of Plaintiffs' related federal claims in this case.

As for the timing of the commingling Plaintiffs seek to preempt, the earliest possible harm referenced by Plaintiffs' motion is that one county (Delaware County) plans to install drop boxes to collect mailed ballots on October 1, 2020. [ECF 414, p. 12, ¶ 22]. Assuming that is true,[7] it would mean that ballots could be cast, collected, and *then* possibly mixed-in with others at some point after that—nearly a month or more from now.

7      The Secretary's new guidance suggests that all ballot return sites should be accessible "not less than 30 days before the day of the election, and on the day of the election." [ECF 415-19, § 2.1]. This suggests that Plaintiffs are correct to believe that at least some drop boxes will be made accessible starting October 1, 2020.

 **\*8**  Even then, however, Plaintiffs have not shown that Defendants intend to commingle ballots cast in drop boxes in an untraceable way. In fact, the Secretary's new guidance instructs that ballots collected from drop boxes (and other ballot collection sites) shall be placed in a "secure ballot transfer container," and that county officials shall then "note on *Ballot Return Site Collection Forms* the site and unique identification number of the ballot return site and the date and time of retrieval." [ECF 415-19, § 3.1]. What's more, the guidance specifies that these collection forms should be maintained by the counties "to ensure that the form is traceable to its respective secure ballot container." [*Id.* at § 3.2]. This suggests that cast ballots will be traceable back to the site where they were deposited. Plaintiffs have not shown that any Defendant plans to disregard this guidance, let alone do so at a time that would result in commingling of ballots before the Pennsylvania Supreme Court weighs in.

For these reasons, Plaintiffs have not carried their burden to show that votes will "likely" be cast in drop boxes—let alone collected and irreversibly commingled with other ballots— before the Pennsylvania Supreme Court decides the correct interpretation of the election code. To the contrary, all signs suggest that the Supreme Court understands the urgency and will issue a decision before ballot collection is substantially underway, hopefully in the next several weeks. So long as that happens, Plaintiffs will not suffer irreparable harm. *See ARRM v. Piper,* 319 F. Supp. 3d 1156, 1163 (D. Minn. 2018) ("When an adequate remedy exists under state law, injunctive relief is not appropriate.") (citations omitted); *cf. Little v. Tube City Renaissance*, No. 19-172, 2020 WL 436616, at \*2 (W.D. Pa. Jan. 28, 2020) (Horan, J.) ("In addition, Mr. Little has not demonstrated that he could not have received adequate protections through the state appellate process ... Mr. Little abandoned an adequate state law remedy to challenge the constitutionality of the Conservatorship Act. Accordingly, injunctive relief is not available[.]").

As for Plaintiffs' challenge to the Secretary's guidance on the counting of ballots submitted without an inner secrecy envelope (or with "marks" on that envelope), the harm Plaintiffs argue they will suffer without injunctive relief is even more attenuated.

Under the election code, the outer envelopes of mail-in and absentee ballots cannot be opened until after 7:00 a.m. on election day, November 3, 2020. *See* 25 P.S. §§ 2602(q.1); 3146.8(g)(1.1). Until that happens, election officials have no way of knowing if a ballot lacks an *inner* secrecy envelope or contains "marks, texts, or symbols thereon," nor are they able to "commingle" such ballots with others. The Secretary's briefing confirms that this is her understanding of the election code, [ECF 424, pp. 11-12], and Plaintiffs make no contrary showing.

Assuming that there is a decision on whether such ballots may be counted before election day, Plaintiffs have not established that they are "likely" to suffer any harm. So-called "naked ballots" can simply be counted, or not, consistent with any decision by the Pennsylvania Supreme Court (or this Court) that issues before election day.

To be clear, the Court's analysis here is predicated on the Pennsylvania Supreme Court deciding these issues in a timely and expeditious manner, and the fact that sufficient time remains before Plaintiffs' commingling concerns materialize. Plaintiffs' concern that the Pennsylvania Supreme Court may not timely act are well-taken, and thus there could be a point in the run-up to the election where Plaintiffs' assertions of irreparable harm become likely and imminent enough to warrant some type of injunctive relief—provided, of course, that the other elements required to obtain preliminary injunctive relief are satisfied.

## 2. State law and the Secretary's guidance protect Plaintiffs from harm due to third-party ballot delivery.

 **\*9**  For a different reason, Plaintiffs have also failed to show that they will suffer irreparable harm if the Court does not order Defendants to segregate all absentee and mail-in ballots that are cast for non-disabled voters but "delivered in-person by someone other than the non-disabled voters" themselves. [ECF 414-1, ¶ 2].

This request stems from Plaintiffs' claim that a few counties accepted delivery of such ballots by third parties (such as voters' spouses) during the recent primary election. But everyone now agrees that the election code forbids third-party ballot delivery, and Secretary Boockvar has issued updated guidance clarifying that counties should only permit voters to

return "*their own* voted absentee and mail-in ballots." [ECF 424-1, § 1.1] (emphasis added).

Given this, it appears that state law will afford Plaintiffs full protection from the "harm" of counties accepting in-person delivery of mail-in or absentee ballots by individuals other than the voter. Plaintiffs have not presented evidence that any Pennsylvania county is "likely" to disobey the unambiguous election code or the Secretary's clarifying guidance forbidding third-party delivery. And without such evidence, the mere possibility that individual county officials might disobey unambiguous state election code requirements does not rise to the level of federal constitutional concern.[8] *See Shipley v. Chicago Bd. of Election Commissioners*, 947 F.3d 1056, 1062 (7th Cir. 2020) (explaining that even "a deliberate violation of state election laws by state election officials does not transgress against the Constitution") (cleaned up); *Lecky v. Virginia State Bd. of Elections*, 285 F. Supp. 3d 908, 919 (E.D. Va. 2018) ("[E]ven assuming the Fredericksburg officials' failure to provide provisional ballots amounted to a violation of state law, it would not rise to the level of an equal protection violation.").

[8]   If, despite the unambiguous statute and guidance from the Secretary, instances of non-compliance arise in specific counties, Plaintiffs would of course still be able to seek emergency relief in state court, where claims for election-law violations are typically adjudicated. *See, e.g. Shipley*, 947 F.3d at 1062 ("[T]hat is a state law claim for a violation of state law, not a federal claim for a violation of constitutional rights ... Plaintiffs may have other avenues available to raise their complaints, but federal court is not one of them.").

In sum, absent any arguably unlawful guidance from the Secretary or demonstrated intent by other Defendants to disobey the election code, Plaintiffs cannot satisfy the high bar for preliminary-injunctive relief.

**B. Plaintiffs' request for video surveillance footage.**
In addition to requesting the segregation of ballots they intend to challenge, Plaintiffs ask that the Court order Defendants to "make available for periodic review upon request by Plaintiffs" any video surveillance footage "used to monitor any drop-boxes and/or other sites or locations, including a county election office, for the return and collection of absentee and mail-ballots." [ECF 414-1, ¶ 2].

Plaintiffs, however, have not shown that an injunction is "the *only* way of protecting [them] from harm" in this instance. *Campbell Soup Co.*, 977 F.2d at 91 (emphasis in original). The Secretary's latest guidance already suggests that video surveillance footage related to drop box and other ballot-collection sites "should be retained by the county election office through 60 days following the deadline to certify the election." [ECF 424-1, § 2.5]. And if this guidance on its own lacks teeth, Defendants' evidence preservation obligations in this (and any other) litigation do not. To be clear, at least in this case, Defendants are under an ongoing duty to preserve all such evidence in their possession, custody, and control until the conclusion of this litigation. *See Romero v. Allstate Ins. Co.*, 271 F.R.D. 96, 110 (E.D. Pa. 2010) ("It is well-settled that a party which reasonably anticipates litigation has an affirmative duty to preserve relevant evidence." (cleaned up)); *see also Archer v. York City Sch. Dist.*, 227 F. Supp. 3d 361, 380 (M.D. Pa. 2016).

**\*10**   The Court has seen no evidence that any Defendant has spoliated, or plans to spoliate, relevant video footage in the imminent future.[9] Thus, Plaintiffs have not shown that harm is "likely" or that injunctive relief is necessary to force Defendants to "retain" such footage.[10]

[9]   Plaintiffs suggest that some Defendants did not retain video surveillance footage taken during the primary election. [ECF 414, p. 11 n.7]. But this litigation was not pending or anticipated at that time (indeed, Plaintiffs' claims here are based in large part on events that allegedly occurred *during* the primary election), and so Defendants did not then have any obligation to suspend retention policies that might result in the loss of such evidence.

[10]   Even if limited injunctive relief directing Defendants to "retain" existing surveillance footage were appropriate, Plaintiffs' further request that Defendants be compelled to authorize "periodic review" of such footage by campaigns does not appear warranted in light of the significant burdens associated with mandating that Defendants oversee ongoing, statewide video surveillance by private parties in the lead up to the election. Additionally, any need for review of such footage is likely to be eliminated or diminished by the Pennsylvania Supreme Court's impending decision resolving the legality of drop boxes. While video footage could, in theory, provide some "color" evidence to support Plaintiffs' allegations with respect to the perils of using drop boxes, that really is ancillary to the legal

question of whether drop boxes are authorized by the election code.

### III. The Court will not move up the date on which it will consider motions to lift the stay.

The Court previously ordered that either party could lift the stay as to "the claims that are not based on unsettled issues of state law" starting October 5, 2020, due to "a prolonged delay by the state courts[.]" [ECF 410, p. 2]. Plaintiffs ask the Court to modify that order and allow the stay to be "lifted on September 14, 2020, rather than October 5, 2020, with respect to all settled state-law claims." [ECF 414, p. 2]. Plaintiffs argue that maintaining the October 5 date will "result in substantial prejudice to Plaintiffs and their claims." [*Id.* at ¶ 34]. The Court disagrees.

The most urgent apparent basis for Plaintiffs' request is that September 14, 2020, is the date when county election boards may begin mailing ballots to voters. [*Id.* at p. 12, ¶, 129 S.Ct. 365 21]. But Plaintiffs do not explain, and the Court cannot discern, the connection between September 14 and the claims that the Court said it would consider deciding after October 5—those not based on unsettled or ambiguous issues of state law. Those claims include: (1) Plaintiffs' third-party ballot-delivery claims that are set forth in parts of Counts I, II, and III; (2) Plaintiffs' facial challenge to Pennsylvania's poll-watching residency restriction set forth in Counts IV and V; and (3) Plaintiffs' claims related to improper provisional voting as set forth in Counts VIII and IX. [ECF 410, p. 2].

The connection between these claims and either the mailing of ballots to voters or the installation of drop boxes is tenuous, at best.[11]

11   The one exception is, perhaps, the third-party ballot delivery claim. But as discussed above, that no longer seems to be a "live" issue after the Secretary's latest guidance. The rest of these claims relate to issues that just need to be decided soon enough to allow proper implementation by election day—*e.g.*, whether out-of-county residents may serve as poll-watchers and what the correct procedure is for handling voters who show up to vote in-person on election day after requesting an absentee or mail-in ballot beforehand.

**\*11**  As the Court outlined above, the state-law issues at the heart of Plaintiffs' central claims are on track to be resolved in an expeditious manner in state court, and this Court can resolve any constitutional issues that have not been mooted or that have otherwise been refined shortly thereafter. It remains likely that the Pennsylvania Supreme Court will act this month, before the current October 5, 2020, deadline arrives. Thus, the Court sees no reason to modify its prior order at this time.

### CONCLUSION

For the reasons discussed, the Court will deny Plaintiffs' motion to modify the Court's stay order and for limited preliminary-injunctive relief. A corresponding order consistent with this Opinion will follow.

**All Citations**

Slip Copy, 2020 WL 5407748

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

C

2020 WL 5997680
Only the Westlaw citation is currently available.
United States District Court, W.D. Pennsylvania.

DONALD J. TRUMP FOR
PRESIDENT, INC., et al., Plaintiffs
v.
Kathy BOOCKVAR, in her capacity
as Secretary of the Commonwealth
of Pennsylvania, et al., Defendants.

No. 2:20-cv-966
|
Signed 10/10/2020

**Attorneys and Law Firms**

Ronald L. Hicks, Jr., Carolyn Batz McGee, Jeremy A. Mercer, Russell D. Giancola, Devin A. Winklosky, Porter Wright Morris & Arthur LLP, Pittsburgh, PA, Justin R. Clark, Pro Hac Vice, Matthew Earl Morgan, Pro Hac Vice, Elections LLC, Washington, DC, for Plaintiffs.

Daniel T. Donovan, Pro Hac Vice, Caroline Darmody, Pro Hac Vice, Kristen Leigh Bokhan, Michael Glick, Pro Hac Vice, Susan Marie Davies, Pro Hac Vice, Kirkland & Ellis LLP, Washington, DC, Howard G. Hopkirk, Karen Mascio Romano, Keli Marie Neary, Pro Hac Vice, Nicole Boland, Pro Hac Vice, Stephen Moniak, Pennsylvania Office of Attorney General, Kathleen M. Kotula, Kenneth L. Joel, M. Abbegael Giunta, Governor's Office of General Counsel, Timothy Gates, Pennsylvania Department of State Office of Chief Counsel, Harrisburg, PA, Daniel T. Brier, Donna A. Walsh, John B. Dempsey, Nicholas F. Kravitz, Pro Hac Vice, Myers, Brier & Kelly, LLP, Scranton, PA, Jaywin Singh Malhi, Pro Hac Vice, Madelyn Morris, Sara S. Tatum, Kirkland & Ellis LLP, New York, NY, for Defendant Kathy Boockvar.

Molly R. Mudd, Pro Hac Vice, County of Adams, Gettysburg, PA, for Defendant Adams County Board of Elections.

Andrew F. Szefi, Allan J. Opsitnick, George M. Janocsko, Allegheny County Law Department, Pittsburgh, PA, for Defendant Allegheny County Board of Elections.

Steven B. Silverman, Molly E. Meacham, Sean R. Keegan, Andrew Degory, Babst, Calland, Clements and Zomnir, P.C., Pittsburgh, PA, Elizabeth A. Dupuis, Babst Calland, State College, PA, for Defendants Armstrong County Board of Elections, Bedford County Board of Elections, Centre County Board of Elections, Columbia County Board of Elections, Fayette County Board of Elections, Indiana County Board of Elections, Lackawanna County Board of Elections, Lebanon County Board of Elections, Montour County Board of Elections, Northumberland County Board of Elections, Venango County Board of Elections.

Nathan A. Morgan, Beaver, PA, for Defendant Beaver County Board of Elections.

Christine D. Steere, Deasey, Mahoney & Valentini, Ltd., Media, PA, for Defendant Berks County Board of Elections.

Steven B. Silverman, Molly E. Meacham, Sean R. Keegan, Andrew Degory, Babst Calland Clements and Zomnir, PC, Pittsburgh, PA, Elizabeth A. Dupuis, Babst Calland, State College, PA, Nathan W. Karn, Evey Black Attorneys LLC, Hollidaysburg, PA, for Defendant Blair County Board of Elections.

Mark A. Aronchick, Christina Matthias, Pro Hac Vice, John B. Hill, Pro Hac Vice, Michele D. Hangley, Pro Hac Vice, Peter V. Keays, Robert Wiygul, Pro Hac Vice, Hangley Aronchick Segal Pudlin & Schiller, Philadelphia, PA, Joseph J. Khan, County of Bucks, Doylestown, PA, for Defendant Bucks County Board of Elections.

William Gleason Barbin, Cambria County Solicitor's Office, Ebensburg, PA, for Defendant Cambria County Board of Elections.

Gerard Joseph Geiger, Pro Hac Vice, Newman Williams, Stroudsburg, PA, for Defendant Carbon County Board of Elections.

Mark A. Aronchick, Christina Matthias, Pro Hac Vice, John B. Hill, Pro Hac Vice, Michele D. Hangley, Pro Hac Vice, Robert Wiygul, Pro Hac Vice, Hangley Aronchick Segal Pudlin & Schiller, Philadelphia, PA, for Defendant Chester County Board of Elections.

Christopher P. Gabriel, Carfardi Ferguson Wyrick Weis + Gabriel, Sewickley, PA, for Defendant Clarion County Board of Elections.

Frank A. Blum, III, Jefferson Hills, PA, for Defendant Clearfield County Board of Elections.

Keith A. Button, Shafer Law Firm, Meadville, PA, for Defendant Crawford County Board of Elections.

Keith O. Brenneman, Law Office of Keith O. Brenneman, P.C., Mechanicsburg, PA, for Defendant Cumberland County Board of Elections.

Steven B. Silverman, Molly E. Meacham, Sean R. Keegan, Andrew Degory, Babst Calland Clements and Zomnir, PC, Pittsburgh, PA, Elizabeth A. Dupuis, Babst Calland, State College, PA, Joseph A. Curcillo, III, Dauphin County, Harrisburg, PA, for Defendant Dauphin County Board of Elections.

Edward D. Rogers, Pro Hac Vice, Elizabeth Wingfield, Pro Hac Vice, Kahlil Williams, Pro Hac Vice, David S. Fryman, Ballard, Spahr, Andrews & Ingersoll, Terence Grugan, Pro Hac Vice, Ballard Spahr, Philadelphia, PA, for Defendant Delaware County Board of Elections.

Thomas S. Talarico, Talarico & Niebauer, Erie, PA, for Defendant Erie County Board of Elections.

Andrew W. Norfleet, Frank J. Lavery, Jr., Stephen B. Edwards, Lavery Law, Harrisburg, PA, for Defendants Franklin County Board of Elections, Perry County Board of Elections.

Robert Eugene Grimm, Robert Eugene Grimm Attorney, Smithfield, PA, for Defendant Greene County Board of Elections.

Peter M. McManamon, Pro Hac Vice, Gill, McManamon & Ghaner, Huntingdon, PA, Steven B. Silverman, Molly E. Meacham, Sean R. Keegan, Andrew Degory, Babst Calland Clements and Zomnir, PC, Pittsburgh, PA, Elizabeth A. Dupuis, Babst Calland, State College, PA, for Defendant Huntingdon County Board of Elections.

C.J. Zwick, Zwick & Zwick LLP, DuBois, PA, Gregory D. Sobol, Brookville, PA, for Defendant Jefferson County Board of Elections.

Donald Zagurskie, Pro Hac Vice, Johnston & Zagurskie, PC, Mifflin, PA, for Defendant Juniata County Board of Elections.

Christina L. Hausner, Pro Hac Vice, County of Lancaster, Lancaster, PA, for Defendant Lancaster County Board of Elections.

Steven B. Silverman, Molly E. Meacham, Sean R. Keegan, Andrew Degory, Babst Calland Clements and Zomnir, PC, Pittsburgh, PA, Thomas W. Leslie, New Castle, PA, Elizabeth

A. Dupuis, Babst Calland, State College, PA, for Defendant Lawrence County Board of Elections.

Thomas M. Caffrey, Pro Hac Vice, PO BOX A, Coplay, PA, Sarah Mae Murray, Pro Hac Vice, County of Lehigh, Allentown, PA, for Defendant Lehigh County Board of Elections.

Lawrence J. Moran, Jr., Matthew J. Carmody, Joyce, Carmody & Moran, P.C., Regina M. Blewitt, Joyce Carmody Moran, Pittston, PA, for Defendant Luzerne County Board of Elections.

Joseph D. Smith, McCormick Law Firm, Williamsport, PA, for Defendant Lycoming County Board of Elections.

Anthony V. Clarke, The Clarke Firm, Bradford, PA, for Defendant Mckean County Board of Elections.

Steven B. Silverman, Molly E. Meacham, Sean R. Keegan, Babst, Calland, Clements and Zomnir, P.C., Pittsburgh, PA, William J. Madden, Solicitor, Mercer County, Sharon, PA, Elizabeth A. Dupuis, Babst Calland, State College, PA, for Defendant Mercer County Board of Elections.

Gerard Joseph Geiger, Newman Williams, Stroudsburg, PA, for Defendants Monroe County Board of Elections, Pike County Board of Elections, Schuylkill County Board of Elections, Snyder County Board of Elections, Wayne County Board of Elections.

Mark A. Aronchick, Christina Matthias, Pro Hac Vice, John B. Hill, Pro Hac Vice, Michele D. Hangley, Pro Hac Vice, Robert Wiygul, Pro Hac Vice, Hangley Aronchick Segal Pudlin & Schiller, Philadelphia, PA, Maureen Calder, Pro Hac Vice, Montgomery County Solicitor's Office, Norristown, PA, for Defendant Montgomery County Board of Elections.

Brian Taylor, Pro Hac Vice, Richard E. Santee, Pro Hac Vice, County of Northampton, Easton, PA, Timothy P. Brennan, Pro Hac Vice, County of Northampton, PA, PA, for Defendant Northampton County Board of Elections.

Mark A. Aronchick, Christina Matthias, Pro Hac Vice, John B. Hill, Pro Hac Vice, Michele D. Hangley, Robert Wiygul, Pro Hac Vice, Hangley Aronchick Segal Pudlin & Schiller, Zachary Strassburger, City of Philadelphia Law Department, Philadelphia, PA, for Defendant Philadelphia County Board of Elections.

Thomas R. Shaffer, Glassmire & Shaffer Law Offices, Coudersport, PA, for Defendant Potter County Board of Elections.

Michael P. Barbera, Barbera, Melvin, Svonavec & Sperlazza LLP, Somerset, PA, for Defendant Somerset County Board of Elections.

Kenneth R. Levitzky, Kenneth R. Levitzky, Esquire, Dushore, PA, for Defendants Sullivan County Board of Elections, Wyoming County Board of Elections.

Robert Gawlas, Robert Schaub, Rosenn Jenkins & Greenwald LLP, Wilkes-Barre, PA, for Defendant Susquehanna County Board of Elections.

Christopher P. Gabriel, Carfardi Ferguson Wyrick Weis + Gabriel, Sewickley, PA, Raymond E. Ginn, Jr., Pro Hac Vice, Ginn & Vickery, P.C., Wellsboro, PA, for Defendant Tioga County Board of Elections.

Steven B. Silverman, Sean R. Keegan, Babst, Calland, Clements and Zomnir, P.C., Pittsburgh, PA, Allen P. Page, McNerney, Page, Vanderlin & Hall, Williamsport, PA, for Defendant Union County Board of Elections.

Nathaniel Justus Schmidt, Schmidt Law Firm, Warren, PA, for Defendant Warren County Board of Elections.

Robert J. Grimm, Swartz Campbell, Ryan Michael Joyce, Swartz Campbell, LLC, Pittsburgh, PA, for Defendant Washington County Board of Elections.

David A. Regoli, New Kensington, PA, for Defendant Westmoreland County Board of Elections.

Michelle Pokrifka, Pro Hac Vice, York County Solicitor's Office, York, PA, Steven B. Silverman, Molly E. Meacham, Sean R. Keegan, Andrew Degory, Babst Calland Clements and Zomnir, PC, Pittsburgh, PA, Elizabeth A. Dupuis, Babst Calland, State College, PA, for Defendant York County Board of Elections.

Adriel I. Cepeda Derieux, Pro Hac Vice, Dale E. Ho, Pro Hac Vice, Sophia Lin Lakin, Pro Hac Vice, American Civil Liberties Union Foundation, Christopher R. Noyes, Pro Hac Vice, Eleanor Davis, Pro Hac Vice, Jared Vasconcellos Grubow, Pro Hac Vice, Lori A. Martin, Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY, Benjamin David Geffen, Mary McKenzie, Public Interest Law Center, Philadelphia, PA, David P. Yin, Pro Hac Vice, Sarah E.

Brannon, Pro Hac Vice, American Civil Liberties Union Foundation, John Michael Powers, Pro Hac Vice, Lawyers' Committee for Civil Rights Under Law, Washington, DC, Jason H. Liss, Pro Hac Vice, Boston, MA, Samantha Picans, Pro Hac Vice, Wilmer Cutler Pickering Hale and Dorr LLP, Denver, CO, Witold J. Walczak, Aclf of PA, Pittsburgh, PA, for Defendant NAACP Pennsylvania State Conference.

Adriel I. Cepeda Derieux, Pro Hac Vice, Dale E. Ho, Pro Hac Vice, Sophia Lin Lakin, Pro Hac Vice, American Civil Liberties Union Foundation, Christopher R. Noyes, Pro Hac Vice, Eleanor Davis, Jared Vasconcellos Grubow, Pro Hac Vice, Lori A. Martin, Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY, Benjamin David Geffen, Mary McKenzie, Public Interest Law Center, Philadelphia, PA, David P. Yin, Pro Hac Vice, Sarah E. Brannon, Pro Hac Vice, American Civil Liberties Union Foundation, John Michael Powers, Pro Hac Vice, Lawyers' Committee for Civil Rights Under Law, Washington, DC, Jason H. Liss, Pro Hac Vice, Boston, MA, Samantha Picans, Pro Hac Vice, Wilmer Cutler Pickering Hale and Dorr LLP, Denver, CO, Witold J. Walczak, Aclf of PA, Pittsburgh, PA, for Defendant Common Cause Pennsylvania.

Adriel I. Cepeda Derieux, Dale E. Ho, Sophia Lin Lakin, American Civil Liberties Union Foundation, Christopher R. Noyes, Eleanor Davis, Jared Vasconcellos Grubow, Lori A. Martin, Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY, Benjamin David Geffen, Mary McKenzie, Public Interest Law Center, Philadelphia, PA, David P. Yin, Pro Hac Vice, Sarah E. Brannon, American Civil Liberties Union Foundation, John Michael Powers, Pro Hac Vice, Lawyers' Committee for Civil Rights Under Law, Washington, DC, Jason H. Liss, Boston, MA, Samantha Picans, Wilmer Cutler Pickering Hale and Dorr LLP, Denver, CO, Witold J. Walczak, Aclf of PA, Pittsburgh, PA, for Defendants League of Women Voters of Pennsylvania, Patricia Demarco, Danielle Graham Robinson, Kathleen Wise.

## OPINION

J. Nicholas Ranjan, United States District Judge

**\*1** Plaintiffs in this case are President Trump's reelection campaign, the Republican National Committee, and several other Republican congressional candidates and electors. They originally filed this suit, alleging federal and state constitutional violations stemming from Pennsylvania's

implementation of a mail-in voting plan for the upcoming general election.

Since then, the Pennsylvania Supreme Court issued a decision involving similar claims, which substantially narrowed the focus of this case. And Secretary of the Commonwealth, Kathy Boockvar, issued additional election "guidance," which further narrowed certain of the claims.

Therefore, as this case presently stands, only three claims remain. First, whether the use of so-called "drop boxes"[1] for mail-in ballots is unconstitutional, given the lack of guidance or mandates that those drop boxes have security guards to man them. Second, whether the Secretary's guidance as to mail-in ballots—specifically, her guidance that county election boards should not reject mail-in ballots where the voter's signature does not match the one on file—is unconstitutional. Third, whether Pennsylvania's restriction that poll watchers be residents in the county for which they are assigned, as applied to the facts of this case, is unconstitutional.

1    "Drop boxes" are receptacles similar to U.S. Postal Service mailboxes. They are made of metal, and have a locking mechanism, storage compartment, and an insert or slot into which a voter can insert a ballot. *See generally* [ECF 549-9].

In order to present these claims to the Court on a complete record, the parties engaged in extensive fact and expert discovery, and have filed cross-motions for summary judgment. No party has raised a genuine dispute of material fact that would require a trial, and the Court has found none. As such, the parties' cross-motions for summary judgment are ready for disposition.

After a careful review of the parties' submissions and the extensive evidentiary record, the Court will enter judgment in favor of Defendants on all of Plaintiffs' federal-constitutional claims, decline to exercise supplemental jurisdiction over the state-constitutional claims, and dismiss this case. This is so for two main reasons.

First, the Court concludes that Plaintiffs lack Article III standing to pursue their claims. Standing, of course, is a necessary requirement to cross the threshold into federal court. Federal courts adjudicate cases and controversies, where a plaintiff's injury is concrete and particularized. Here, however, Plaintiffs have not presented a concrete injury to warrant federal-court review. All of Plaintiffs' remaining claims have the same theory of injury—one of "vote dilution."

Plaintiffs fear that absent implementation of the security measures that they seek (guards by drop boxes, signature comparison of mail-in ballots, and poll watchers), there is a risk of voter fraud by other voters. If another person engages in voter fraud, Plaintiffs assert that their own lawfully cast vote will, by comparison, count for less, or be diluted.

**\*2** The problem with this theory of harm is that it is speculative, and thus Plaintiffs' injury is not "concrete"— a critical element to have standing in federal court. While Plaintiffs may not need to prove actual voter fraud, they must at least prove that such fraud is "certainly impending." They haven't met that burden. At most, they have pieced together a sequence of uncertain assumptions: (1) they assume potential fraudsters may attempt to commit election fraud through the use of drop boxes or forged ballots, or due to a potential shortage of poll watchers; (2) they assume the numerous election-security measures used by county election officials may not work; and (3) they assume their own security measures may have prevented that fraud.

All of these assumptions could end up being true, and these events could theoretically happen. But so could many things. The relevant question here is: are they "certainly impending"? At least based on the evidence presented, the answer to that is "no." And that is the legal standard that Plaintiffs must meet. As the Supreme Court has held, this Court cannot "endorse standing theories that rest on speculation about the decisions of independent actors." *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013).

Second, even if Plaintiffs had standing, their claims fail on the merits. Plaintiffs essentially ask this Court to second-guess the judgment of the Pennsylvania General Assembly and election officials, who are experts in creating and implementing an election plan. Perhaps Plaintiffs are right that guards should be placed near drop boxes, signature-analysis experts should examine every mail-in ballot, poll watchers should be able to man any poll regardless of location, and other security improvements should be made. But the job of an unelected federal judge isn't to suggest election improvements, especially when those improvements contradict the reasoned judgment of democratically elected officials. *See Andino v. Middleton*, ––– U.S. ––––, ––– S.Ct. ––––, ––––, ––– L.Ed.2d ––––, 2020 WL 5887393, at \*1 (Oct. 5, 2020) (Kavanaugh, J. concurring) (state legislatures should not be subject to "second-guessing by an unelected federal judiciary," which is "not accountable to the people") (cleaned up).

Put differently, "[f]ederal judges can have a lot of power—especially when issuing injunctions. And sometimes we may even have a good idea or two. But the Constitution sets out our sphere of decision-making, and that sphere does not extend to second-guessing and interfering with a State's reasonable, nondiscriminatory election rules." *New Georgia Project v. Raffensperger*, ––– F.3d ––––, ––––, 2020 WL 5877588, at *4 (11th Cir. Oct. 2, 2020).

As discussed below, the Court finds that the election regulations put in place by the General Assembly and implemented by Defendants do not significantly burden any right to vote. They are rational. They further important state interests. They align with the Commonwealth's elaborate election-security measures. They do not run afoul of the United States Constitution. They will not otherwise be second-guessed by this Court.

## **BACKGROUND**

### **I. Procedural Background**

#### **A. Plaintiffs' original claims.**

On June 29, 2020, Plaintiffs filed their original complaint in this case against Defendants, who are the Secretary of the Commonwealth and the 67 county boards of elections. [ECF 4]. With their lawsuit, Plaintiffs challenged a number of Pennsylvania's procedures with respect to mail-in voting —in particular, the use of drop boxes and the counting of mail-in ballots that contained certain procedural defects. *See* [*id.*]. Shortly after filing their original complaint, Plaintiffs moved for expedited discovery and an expedited declaratory-judgment hearing. [ECF 6]. Defendants opposed the motion. The Court partially granted the motion, scheduled a speedy hearing, and ordered expedited discovery before that hearing. [ECF 123; ECF 124].

**\*3** After Plaintiffs filed the original complaint, many non-parties sought to intervene in the action, including several organizations.[2] The Court granted all intervention motions. [ECF 309].

---

2     Intervenors include the Pennsylvania State Democratic Party, the League of Women Voters, the NAACP Pennsylvania State Conference, Common Cause Pennsylvania, Citizens for Pennsylvania's Future, the Sierra Club, the Pennsylvania Alliance for Retired Americans, and several affiliated individuals of these organizations.

Defendants and Intervenors moved to dismiss the original complaint. In response, Plaintiffs filed an amended complaint. [ECF 234]. The amended complaint maintained the gist of the original, but added two new counts and made a variety of other drafting changes. *See* [ECF 242]. Defendants and Intervenors moved to dismiss the first amended complaint, too, primarily asking the Court to abstain and stay the case.

Plaintiffs' first amended complaint asserted nine separate counts, but they could be sorted into three overarching categories.

### **1. Claims alleging vote dilution due to unlawful ballot collection and counting procedures.**

The first category covered claims related to allegedly unlawful procedures implemented by some Defendants for the collection and counting of mail-in and absentee ballots. Those included claims related to (1) Defendants' uneven use of drop boxes and other satellite ballot-collection sites, (2) procedures for verifying the qualifications of voters applying in person for mail-in or absentee ballots, and (3) rules for counting non-compliant ballots (such as ballots submitted without a secrecy envelope, without an elector declaration, or that contained stray marks on the envelope).

In Count I, Plaintiffs alleged violations of the Elections Clause and the related Presidential Electors Clause of the U.S. Constitution. [ECF 234, ¶¶ 193-205]. Plaintiffs asserted that, under these provisions, only the state legislature may set the time, place, and manner of congressional elections and determine how the state chooses electors for the presidency. [*Id.* at ¶ 196].

In support of this claim, Plaintiffs alleged that Secretary Boockvar's guidance concerning the use of mail-in ballot drop boxes, whether county boards of elections must independently verify mail-in ballot applications, and the counting of non-compliant mail-in ballots, was an executive overreach—in that the Secretary's guidance allegedly violated certain provisions of the Election Code enacted by the Pennsylvania General Assembly. [*Id.* at ¶ 201]. Plaintiffs also claimed that the Secretary's "unlawful guidance" increased the risk of fraudulent or unlawful voting and infringed on the right to vote, which, they said, amounted to additional

violations of the 1st and 14th Amendments to the U.S. Constitution. [*Id.* at ¶¶ 202-03].

In Count II, Plaintiffs alleged a violation of the Equal-Protection Clause under the 14th Amendment. [*Id.* at ¶¶ 206-15]. Plaintiffs asserted that the implementation of the foregoing (*i.e.*, mail-in ballot drop boxes, the verification of mail-in ballot applications, and the counting of non-compliant ballots) was different in different counties, thereby treating voters across the state in an unequal fashion. [*Id.* at ¶¶ 211-13].

**\*4** In Count III, Plaintiffs asserted a violation of the Pennsylvania State Constitution. [*Id.* at ¶¶ 216-22]. Plaintiffs alleged that the same actions and conduct that comprised Counts I and II also violated similar provisions of the Pennsylvania Constitution. [*Id.* at ¶ 220].

Finally, in Counts VI and VII, Plaintiffs alleged that Defendants violated provisions of the federal and state constitutions by disregarding the Election Code's notice and selection requirements applicable to "polling places." [*Id.* at ¶¶ 237-52]. Plaintiffs alleged that drop boxes are "polling places," and thus subject to certain criteria for site selection and the requirement that county election boards provide 20 days' public notice. [*Id.* at ¶¶ 239-42]. Plaintiffs asserted that Defendants' failure to provide this notice or select appropriate "polling places" in the primary election, if repeated in the general election, would create the risk of voter fraud and vote dilution. [*Id.* at ¶¶ 243-246].

**2. Poll-watcher claims.**

The second category of claims in the first amended complaint consisted of challenges to the constitutionality of Election-Code provisions related to poll watchers.

In Count IV, Plaintiffs alleged violations of the 1st and 14th Amendments. These claims had both a facial and an as-applied component. [ECF 234, ¶ 230 ("On its face and as applied to the 2020 General Election ...")].

First, Plaintiffs alleged that 25 P.S. § 2687 was facially unconstitutional because it "arbitrarily and unreasonably" limits poll watchers to serving only in their county of residence and to monitoring only in-person voting at the polling place on election day. [*Id.* at ¶ 226]. Second, Plaintiffs alleged that the same provision was unconstitutional as

applied in the context of Pennsylvania's new vote-by-mail system, because these poll-watcher restrictions, combined with insecure voting procedures, create unacceptable risks of fraud and vote dilution. [*Id.* at ¶ 228]. Plaintiffs contended that these limitations make it "functionally impracticable" for candidates to ensure that they have poll watchers present where ballots are deposited and collected, given the widespread use of remote drop boxes and other satellite collection sites. [*Id.*].

Count V was the same as Count IV, but alleged that the same poll-watching restrictions violated the Pennsylvania Constitution, too. [*Id.* at ¶ 234].

**3. In-person voting claims.**

The third category of claims consisted of challenges to the procedures for allowing electors to vote in person after requesting a mail-in ballot.

That is, in Counts VIII and IX, Plaintiffs asserted that the Election Code permits an elector that has requested a mail-in ballot to still vote in person so long as he remits his spoiled ballot. [ECF 234, ¶¶ 253-267]. Plaintiffs asserted that during the primary, some counties allowed such electors to vote in person, while others did not, and they fear the same will happen in the general election. [*Id.* at ¶¶ 255, 259]. Plaintiffs also asserted that some counties allowed electors who had voted by mail to vote in person, in violation of the Election Code. [*Id.* at ¶¶ 257-58]. Plaintiffs alleged that this conduct also violates the federal and state constitutional provisions concerning the right to vote and equal protection. [*Id.* at ¶¶ 261, 265].

**B. The Court's decision to abstain.**
**\*5** Upon consideration of Defendants' and Intervenors' motions to dismiss the first amended complaint, on August 23, 2020, the Court issued an opinion abstaining under *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) and temporarily staying the case. [ECF 409, 410].

In doing so, the Court determined that the three requisite prongs for *Pullman* abstention were met, and that the discretionary considerations weighed in favor of abstention. [ECF 409, p. 3 ("[Under *Pullman*, federal courts abstain] if (1) doing so requires interpretation of 'unsettled questions

of state law'; (2) permitting resolution of the unsettled state-law questions by state courts would 'obviate the need for, or substantially narrow the scope of adjudication of the constitutional claims'; and (3) an 'erroneous construction of state law would be disruptive of important state policies[.]' " (citing *Chez Sez III Corp. v. Township of Union*, 945 F.2d 628, 631 (3d Cir. 1991))); *id.* at p. 30 (explaining that after the three prongs of *Pullman* abstention are met, the court must "make a discretionary determination of whether abstention is appropriate given the particular facts of this case," which requires weighing "such factors as the availability of an adequate state remedy, the length of time the litigation has been pending, and the impact of delay on the litigants." (cleaned up)) ].

The Court found that abstaining under *Pullman* was appropriate because of several unresolved ambiguities in Pennsylvania's Election Code. Specifically, the Court found that there were significant ambiguities as to whether the Election Code (1) permitted delivery of ballots to locations other than the county election board's headquarters, such as drop boxes, (2) permitted counties to count ballots that were not placed within the "secrecy envelope" (*i.e.*, "naked ballots"), (3) considered drop boxes and other ballot-collection sites as "polling places," as defined in the Election Code, and (4) required counties to automatically verify ballot applications for mail-in ballots (where the person applied for the ballot in person), even if there was no "bona fide objection" to the application. [ECF 409, pp. 17-23].

The Court explained that each of these ambiguities, if settled, would significantly narrow—or even resolve—some of Plaintiffs' claims. As the Court explained, for example, if a state court interpreted the Election Code to disallow drop boxes, Plaintiffs would obtain their requested relief (*i.e.*, no drop boxes); alternatively, if drop boxes were authorized by the Election Code, then Plaintiffs' allegations that drop boxes were illegal would be eliminated, which would, in turn, significantly affect the constitutional analysis of Plaintiffs' claims. [*Id.* at pp. 25-28]. The same held true for "naked ballots," the breadth of coverage of "polling places," and the requisite verification for personal ballot applications.

The Court then explained that it was appropriate for it to abstain until a state court could interpret the ambiguous state law. [*Id.* at pp. 28-30]. The Court concluded that if it interpreted the ambiguous state law, there was a sufficient chance that a state court could disagree with the interpretation, which would render this Court's interpretation not only

advisory, but disruptive to state policies. The Court noted that especially in the election context, states have considerable discretion to implement their own policies without federal intervention. Accordingly, because these were questions of uninterpreted state law that were sufficiently ambiguous, federalism and comity demanded that a state court, not this Court, be the first interpreter.

**\*6** Finally, the Court explained that, despite the imminence of the election, abstention was still proper. [*Id.* at pp. 30-33]. The Court noted that state-court litigation was already pending that would resolve some of the statutory ambiguities at issue. [*Id.* at p. 31]. Further, the Court highlighted three courses Plaintiffs could immediately take to resolve the statutory ambiguities: intervene in the pending state-court litigation; file their own state-court case; or appeal this Court's abstention decision to the Third Circuit, and then seek certification of the unsettled state-law issues in the Pennsylvania Supreme Court. [*Id.* at pp. 31-33].

Additionally, the Court explained that it would stay the entire case, despite several of Plaintiffs' claims not being subject to *Pullman* abstention as they were not based on ambiguous state law. [*Id.* at pp. 34-37]. That's because, in its discretion, the Court determined it would be more efficient for this case to progress as a single proceeding, rather than in piecemeal fashion. [*Id.*]. However, the Court allowed any party to move to lift the stay as to the few claims not subject to *Pullman* abstention, if no state-court decision had been issued by October 5, 2020. [*Id.*].

On August 28, 2020, five days after the Court abstained, Plaintiffs moved to modify the Court's stay, and moved for a preliminary injunction. [ECF 414]. Plaintiffs requested, among other things, that the Court order Defendants to segregate, and not pre-canvass or canvass, all ballots that were returned in drop boxes, lacked a secrecy envelope, or were delivered by a third party. [*Id.*]. Plaintiffs also requested that the Court lift the stay by September 14, 2020, instead of October 5, 2020. [*Id.*].

The Court denied Plaintiffs' motion for preliminary injunctive relief, finding that Plaintiffs failed to show they would be irreparably harmed. [ECF 444; ECF 445]. The Court also declined to move up the date when the stay would be lifted. [*Id.*]. The Court noted that, at the request of Secretary Boockvar, the Pennsylvania Supreme Court had already exercised its extraordinary jurisdiction to consider five discrete issues and clarify Pennsylvania law in time for

the general election. [*Id.* at p. 1]. Since that case appeared to be on track, the Court denied Plaintiffs' motion without prejudice, and the Court's abstention opinion and order remained in effect.

### C. The Pennsylvania Supreme Court's decision.

On September 17, 2020, the Pennsylvania Supreme Court issued its decision in *Pennsylvania Democratic Party v. Boockvar*, —— Pa. ——, —— A.3d ——, 2020 WL 5554644 (Sept. 17, 2020). The court clarified three issues of state election law that are directly relevant to this case.

### 1. Counties are permitted under the Election Code to establish alternate ballot-collection sites beyond just their main county office locations.

The Pennsylvania Supreme Court first considered whether the Election Code allowed a Pennsylvania voter to deliver his or her mail-in ballot in person to a location other than the established office address of the county's board of election. *Boockvar*, —— A.3d at ——, 2020 WL 5554644, at *8. The court further considered the means by which county boards of election could accept hand-delivered mail-in ballots. *Id.*

Consistent with this Court's abstention opinion, the court found that "the parties' competing interpretations of the Election Code on [these questions] are reasonable, rendering the Code ambiguous" on these questions. *Id.* After applying traditional principles of statutory interpretation, the court held that "the Election Code should be interpreted to allow county boards of election to accept hand-delivered mail-in ballots at locations other than their office addresses including drop-boxes." *Id.* at.——, 2020 WL 5554644, at *9. The court reached this conclusion due to "the clear legislative intent underlying Act 77 ... to provide electors with options to vote outside of traditional polling places." *Id.*

 *7 The respondents in that case further argued that this interpretation would cause county boards of election to "employ myriad systems to accept hand-delivered mail-in ballots," which would "be unconstitutionally disparate from one another in so much as some systems will offer more legal protections to voters than others will provide" and violate the Equal-Protection Clause *Id.* The court rejected this argument. It found that "the exact manner in which each county board of election will accept these votes is entirely unknown at this point; thus, we have no metric by which to measure whether

any one system offers more legal protection than another, making an equal protection analysis impossible at this time." *Id.*

### 2. Ballots lacking inner secrecy envelopes should not be counted.

The court next considered whether the boards of elections "must 'clothe and count naked ballots,' *i.e.*, place ballots that were returned without the secrecy envelope into a proper envelope and count them, rather than invalidate them." *Boockvar*, —— A.3d at ——, 2020 WL 5554644, at *21. The court concluded that they should not.

The court held that "the Legislature intended for the secrecy envelope provision [in the Election Code] to be mandatory." *Id.* at ——, 2020 WL 5554644, at *24. In other words, the relevant provisions "make clear the General Assembly's intention that, during the collection and canvassing processes, when the outer envelope in which the ballot arrived is unsealed and the sealed ballot removed, it should not be readily apparent who the elector is, with what party he or she affiliates, or for whom the elector has voted." *Id.* The secrecy envelope "properly unmarked and sealed ensures that result," and "[w]hatever the wisdom of the requirement, the command that the mail-in elector utilize the secrecy envelope and leave it unblemished by identifying information is neither ambiguous nor unreasonable." *Id.*

As a result, the court ultimately concluded, "a mail-ballot that is not enclosed in the statutorily-mandated secrecy envelope must be disqualified." *Id.* at ——, 2020 WL 5554644, at *26

### 3. Pennsylvania's county-residency requirement for poll watchers is constitutional.

The final relevant issue the court considered was whether the poll-watcher residency requirement found in 25 P.S. § 2687(b) violates state or federal constitutional rights. *Boockvar*, —— A.3d at ——, 2020 WL 5554644, at *26. Relying on *Republican Party of Pennsylvania v. Cortés*, 218 F. Supp. 3d 396 (E.D. Pa. 2016), the court concluded that the poll-watcher residency provision "impose[d] no burden on one's constitutional right to vote and, accordingly, requires only a showing that a rational basis exists to be upheld." *Id.* at ——, 2020 WL 5554644, at *30. The court found rational-basis review was appropriate for three reasons.

First, "there is no individual constitutional right to serve as a poll watcher; rather, the right to do so is conferred by statute." *Id.* (citation omitted). Second, "poll watching is not incidental to the right of free association and, thus, has no distinct First Amendment protection." *Id.* (cleaned up). Third, "poll watching does not implicate core political speech." *Id.* (citation omitted).

The court went on to find that there was a "clear rational basis for the county poll watcher residency requirement[.]" *Id.* That is, given "Pennsylvania has envisioned a county-based scheme for managing elections within the Commonwealth," it is "reasonable that the Legislature would require poll watchers, who serve within the various counties of the state, to be residents of the counties in which they serve." *Id.*

In upholding the constitutionality of the "county poll watcher residency requirement," the court rejected the claim that "poll watchers are vital to protect against voter fraud and that because of the distribution of voters throughout Pennsylvania, the residency requirement makes it difficult to identify poll watchers in all precincts." *Id.* The court concluded that the claims of "heightened election fraud involving mail-in voting" were "unsubstantiated" and "specifically belied by the Act 35 report issued by [Secretary Boockvar] on August 1, 2020." *Id.* Moreover, the court held that the "speculative claim that it is 'difficult' for both parties to fill poll watcher positions in every precinct, even if true, is insufficient to transform the Commonwealth's uniform and reasonable regulation requiring that poll watchers be residents of the counties they serve into a non-rational policy choice." *Id.*

**\*8** Based on the foregoing, the court declared "that the poll-watcher residency requirement does not violate the state or federal constitutions." *Id.* at ——, 2020 WL 5554644, at \*31.

### D. Plaintiffs' notice of remaining claims.

Following the Pennsylvania Supreme Court's decision, this Court lifted the stay it had imposed pursuant to the *Pullman* abstention doctrine and ordered the parties to identify the remaining viable claims and defenses in the case. [ECF 447].

In their notice, Plaintiffs took the position that nearly all their claims remained viable, with a few discrete exceptions. Plaintiffs conceded that their "federal and state constitutional claims of voter dilution solely on the basis that drop boxes and other collection sites are not statutorily authorized by the

Pennsylvania Election Code [were] no longer viable." [ECF 448, p. 4]. They also stated that their "facial challenge to the county residency requirement under 25 P.S. § 2687 is no longer a viable claim." [*Id.* at p. 10]. Plaintiffs also moved for leave to amend their complaint a second time to add new allegations and a new claim relating to Secretary Boockvar's recent signature-comparison guidance. [ECF 451].

Defendants and Intervenors, for their part, suggested that Plaintiffs' claims had been substantially narrowed, if not outright mooted, by the Pennsylvania Supreme Court's decision, and reminded the Court that their arguments for dismissal remained outstanding.

### E. The Court's September 23, 2020, memorandum orders.

In response to the notices filed by the parties and Plaintiffs' motion for leave to amend the first amended complaint, the Court issued an order granting Plaintiffs' motion, narrowing the scope of the lawsuit, and establishing the procedure for resolving the remaining claims. [ECF 459].

As to Plaintiffs' proposed amendment to their complaint, the Court found that the new claim and allegations were relatively narrow, and thus amendment wouldn't prejudice Defendants and Intervenors. [*Id.* at pp. 3-4]. As a result, the Court granted the motion. [*Id.* at p. 4].

The Court, however, did inform the parties that it would "continue to abstain under *Pullman* as to Plaintiffs' claim pertaining to the notice of drop box locations and, more generally, whether the "polling place" requirements under the Election Code apply to drop-box locations." [*Id.* at p. 5]. This was so because those claims involve still-unsettled issues of state law. The Court explained that the "fact that the Pennsylvania Supreme Court did not address this issue in its recent decision is immaterial" because the "propriety of *Pullman* abstention does not depend on the existence of parallel state-court proceedings." [*Id.* (citing *Stoe v. Flaherty*, 436 F.3d 209, 213 (3d Cir. 2006)) ]. Moreover, Plaintiffs had several other avenues to pursue prompt interpretation of state law after this Court abstained. [*Id.* at p. 6].

The Court also informed the parties, for similar reasons, that it would continue to abstain with respect to Plaintiffs' claims regarding Secretary Boockvar's guidance that personal applications for mail-in ballots shall be accepted absent a "bona fide objection." [ECF 460].

The Court found that "no Article III 'case or controversy' remain[ed] with respect to the claims on which the Pennsylvania Supreme Court effectively ruled in Plaintiffs' favor on state-law grounds (*e.g.*, illegality of third-party ballot delivery; excluding 'naked ballots' submitted without inner-secrecy envelopes)." [ECF 459, p. 6]. Because there was "no reason to believe Defendants plan to violate what they themselves now agree the law requires," the Court held that Plaintiffs' claims were premature and speculative. [*Id.* at p. 7]. The Court therefore dismissed those claims as falling outside of its Article III power to adjudicate. [*Id.* (citations omitted) ].

**\*9** To resolve the remaining claims, the Court directed the parties to file cross-motions for summary judgment presenting all arguments for dismissal or judgment under Federal Rule of Civil Procedure 56. [*Id.* at pp. 8-10]. Before briefing on those motions, the Court authorized additional expedited discovery. [*Id.* at pp. 4-5]. The parties completed discovery and timely filed their motions; they identified no material disputes of fact; and therefore, the motions are now fully briefed and ready for disposition.

**F. The claims now at issue.**

Based on the Pennsylvania Supreme Court's prior ruling, this Court's prior decisions, Plaintiffs' nine-count Second Amended Complaint, and recent guidance issued by Secretary Boockvar, the claims remaining in this case are narrow and substantially different than those asserted at the outset of the case.

**Drop Boxes (Counts I-III).** Plaintiffs still advance a claim that drop boxes are unconstitutional, but in a different way. Now that the Pennsylvania Supreme Court has expressly held that drop boxes are authorized under the Election Code, Plaintiffs now assert that the use of "unmanned" drop boxes is unconstitutional under the federal and state constitutions, for reasons discussed in more detail below.

**Signature Comparison (Counts I-III).** Plaintiffs' newly added claim relates to signature comparison. Secretary Boockvar's September 2020 guidance informs the county boards that they are not to engage in a signature analysis of mail-in ballots and applications, and they must count those ballots, even if the signature on the ballot does not match the voter's signature on file. Plaintiffs assert that this guidance is unconstitutional under the federal and state constitutions.

**Poll Watching (Counts IV, V).** The Pennsylvania Supreme Court already declared that Pennsylvania's county-residency requirement for poll watchers is ***facially*** constitutional. Plaintiffs now only assert that the requirement, *as applied*, is unconstitutional under the federal and state constitutions.

The counts that remain in the Second Amended Complaint, but which are ***not*** at issue, are the counts related to where poll watchers can be located. That is implicated mostly by Counts VI and VII, and by certain allegations in Counts IV and V. The Court continues to abstain from reaching that issue. Plaintiffs have filed a separate state lawsuit that would appear to address many of those issues, in any event. [ECF 549-22; ECF 573-1]. Counts VIII and IX concern challenges related to voters that have requested mail-in ballots, but that instead seek to vote in person. The Secretary issued recent guidance, effectively mooting those claims, and, based on Plaintiffs' positions taken in the course of this litigation, the Court deems Plaintiffs to have withdrawn Counts VIII and IX. [ECF 509, p. 15 n.4 ("[I]n the September 28 guidance memo, the Secretary corrected [her] earlier guidance to conform to the Election Code and states that any mail-in voter who spoils his/her ballot and the accompanying envelopes and signs a declaration that they did not vote by mail-in ballot will be allowed to vote a regular ballot. Therefore, Plaintiffs agree to withdraw this claim from those that still are being pursued.") ].

**II. Factual Background**

**A. Pennsylvania's Election Code, and the adoption of Act 77.**

**1. The county-based election system.**

Pennsylvania's Election Code, first enacted in 1937, established a county-based system for administering elections. *See* 25 P.S. § 2641(a) ("There shall be a county board of elections in and for each county of this Commonwealth, which shall have jurisdiction over the conduct of primaries and elections in such county, in accordance with the provisions of [the Election Code]."). The Election Code vests county boards of elections with discretion to conduct elections and implement procedures intended to ensure the honesty, efficiency, and uniformity of Pennsylvania's elections. *Id.* §§ 2641(a), 2642(g).

**2. The adoption of Act 77.**

**\*10** On October 31, 2019, the Pennsylvania General Assembly passed "Act 77," a bipartisan reform of Pennsylvania's Election Code. *See* [ECF 461, ¶¶ 91]; 2019 Pa. Legis. Serv. Act 2019-77 (S.B. 421).

Among other things, by passing Act 77, Pennsylvania joined 34 other states in authorizing "no excuse" mail-in voting by all qualified electors. *See* [ECF 461, ¶¶ 92]; 25 P.S. §§ 3150.11-3150.17; [ECF 549-11, p. 5 ("The largest number of states (34), practice no-excuse mail-in voting, allowing any persons to vote by mail regardless of whether they have a reason or whether they will be out of their jurisdiction on Election Day.") ]. Previously, a voter could only cast an "absentee" ballot if certain criteria were met, such as that the voter would be away from the election district on election day. *See* 1998 Pa. Legis. Serv. Act 1998-18 (H.B. 1760), § 14.

Like the previous absentee voting system, Pennsylvania's mail-in voting system requires voters to "opt-in" by requesting a ballot from either the Secretary or the voter's county board of elections. *See* 25 P.S. §§ 3146.2(a), 3150.12(a). When requesting a ballot, the voter must provide, among other things, his or her name, date of birth, voting district, length of time residing in the voting district, and party choice for primary elections. *See* 25 P.S. §§ 3146.2(b), 3150.12(b). A voter must also provide proof of identification; namely, either a driver's license number or, in the case of a voter who does not have a driver's license, the last four digits of the voter's Social Security number, or, in the case of a voter who has neither a driver's license nor a Social Security number, another form of approved identification. 25 P.S. § 2602(z.5)(3). In this respect, Pennsylvania differs from states that automatically mail each registered voter a ballot—a practice known as "universal mail-in voting." [ECF 549-11, p. 6] ("[N]ine states conduct universal vote-by-mail elections in which the state (or a local entity, such [as] a county or municipality) mails all registered voters a ballot before each election without voters' [sic] having to request them.").

**3. The COVID-19 pandemic.**

Since early 2020, the United States, and Pennsylvania, have been engulfed in a viral pandemic of unprecedented scope and scale. [ECF 549-8, ¶ 31]. In that time, COVID-19 has spread to every corner of the globe, including Pennsylvania, and jeopardized the safety and health of many people. [*Id.* at ¶¶ 31, 38-39, 54-55, 66]. As of this date, more than 200,000 Americans have died,

including more than 8,000 Pennsylvanians. *See* Covid in the U.S.: Latest Map and Case Count, The New York Times, available at https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last visited Oct. 10, 2020); COVID-19 Data for Pennsylvania, Pennsylvania Department of Health, available at https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx (last visited Oct. 10, 2020).

There have been many safety precautions that Pennsylvanians have been either required or urged to take, such as limiting participation in large gatherings, maintaining social distance, and wearing face coverings. [ECF 549-8, ¶¶ 58, 63-65]. The threat of COVID-19 is likely to persist through the November general election. [*Id.* at ¶¶ 53-56, 66-68].

**B. Facts relevant to drop boxes.**
**\*11** Pennsylvania's county-based election system vests county boards of elections with "jurisdiction over the conduct of primaries and elections in such county, in accordance with the provisions" of the Election Code. 25 P.S. § 2641(a). The Election Code further empowers the county boards to "make and issue such rules, regulations and instructions, not inconsistent with law, as they may deem necessary for the guidance of voting machine custodians, elections officers and electors." *Id.* at § 2642(f). The counties are also charged with the responsibility to "purchase, preserve, store and maintain primary and election equipment of all kinds, including voting booths, ballot boxes and voting machines." *Id.* at § 2642(c).

As noted above, in *Pennsylvania Democratic Party v. Boockvar*, the Pennsylvania Supreme Court interpreted the Election Code, which allows for mail-in and absentee ballots to be returned to the "county board of election," to "permit[ ] county boards of election to accept hand-delivered mail-in ballots at locations other than their office addresses including drop-boxes." —— A.3d at ——, 2020 WL 5554644, at \*10.

Thus, it is now settled that the Election Code permits (but does not require) counties to authorize drop boxes and other satellite-collection locations for mailed ballots. 25 P.S. § 3150.16(a). Pennsylvania is not alone in this regard—as many as 34 other states and the District of Columbia authorize the use of drop boxes or satellite ballot collection sites to one degree or another. [ECF 549-11, p. 8, fig. 4]. Indeed, Secretary Boockvar stated that as many as 16% of voters nationwide had cast their ballots using drop boxes in the 2016 general election, including the majority of voters in Colorado

(75%) and Washington (56.9%). [ECF 547, p. 18 (citing ECF 549-16) ].

### 1. Secretary Boockvar's guidance with respect to drop boxes.

Since the passage of Act 77, Secretary Boockvar has issued several guidance documents to the counties regarding the counties' implementation of mail-in voting, including guidance with respect to the use of drop boxes. [ECF 504-21; 504-22; 504-23; 504-24; 504-25; 571-1, Ex. E]. In general terms, the Secretary's guidance as to drop boxes informed the counties that the use of drop boxes was authorized by the Election Code and recommended "best practices" for their use. Her latest guidance offered standards for (1) where drop boxes should be located, [ECF 504-23, § 1.2], (2) how drop boxes should be designed and what signage should accompany them, [*id.* at §§ 2.2-2.3], (3) what security measures should be employed, [*id.* at § 2.5], and (4) what procedures should be implemented for collecting and returning ballots to the county election office, [*id.* at §§ 3.1-3.3, 4].

As to the location of drop boxes, the Secretary recommended that counties consider the following criteria, [*id.* at § 1.2]:

- Locations that serve heavily populated urban/suburban areas, as well as rural areas;

- Locations near heavy traffic areas such as commercial corridors, large residential areas, major employers and public transportation routes;

- Locations that are easily recognizable and accessible within the community;

- Locations in areas in which there have historically been delays at existing polling locations, and areas with historically low turnout;

- Proximity to communities with historically low vote by mail usage;

- Proximity to language minority communities;

- Proximity to voters with disabilities;

- Proximity to communities with low rates of household vehicle ownership;

- Proximity to low-income communities;

- Access to accessible and free parking; and

- The distance and time a voter must travel by car or public transportation.

With respect to drop-box design criteria, the Secretary recommended to counties, [*id.* at § 2.2]:

**\*12** • Hardware should be operable without any tight grasping, pinching, or twisting of the wrist;

- Hardware should require no more than 5 lbs. of pressure for the voter to operate;

- Receptacle should be operable within reach-range of 15 to 48 inches from the floor or ground for a person utilizing a wheelchair;

- The drop-box should provide specific points identifying the slot where ballots are inserted;

- The drop-box may have more than one ballot slot (e.g. one for drive-by ballot return and one for walk-up returns);

- To ensure that only ballot material can be deposited and not be removed by anyone but designated county board of election officials, the opening slot of a drop-box should be too small to allow tampering or removal of ballots; and

- The opening slot should also minimize the ability for liquid to be poured into the drop-box or rainwater to seep in.

The Secretary's guidance as to signage recommended, [*id.* at § 2.3]:

- Signage should be in all languages required under the federal Voting Rights Act of 1965 (52 U.S.C. Sec. 10503);

- Signage should display language stating that counterfeiting, forging, tampering with, or destroying ballots is a second-degree misdemeanor pursuant to sections 1816 and 1817 of the Pennsylvania Election Code (25 P.S. §§ 3516 and 3517);

- Signage should also provide a statement that third-party return of ballots is prohibited unless the person returning the ballot is rendering assistance to a disabled voter or an emergency absentee voter. Such assistance requires a

declaration signed by the voter and the person rendering assistance; and

• Signage should provide a statement requesting that the designated county elections official be notified immediately in the event the receptacle is full, not functioning, or is damaged in any fashion, and should provide a phone number and email address for such purpose.

With respect to ballot security, the Secretary stated that county boards should implement the following security measures, [*id.* at § 2.5]:

• Only personnel authorized by the county board of elections should have access to the ballots inside of a drop-box;

• Drop-boxes should be secured in a manner to prevent their unauthorized removal;

• All drop-boxes should be secured by a lock and sealed with a tamper-evident seal. Only authorized election officials designated by the county board of elections may access the keys and/or combination of the lock;

• Drop-boxes should be securely fastened in a manner as to prevent moving or tampering, such as fastening the drop-box to concrete or an immovable object;

• During the hours when the staffed return site is closed or staff is unavailable, the drop-box should be placed in a secure area that is inaccessible to the public and/or otherwise safeguarded;

• The county boards of election should ensure adequate lighting is provided at all ballot return sites when the site is in use;

• When feasible, ballot return sites should be monitored by a video security surveillance system, or an internal camera that can capture digital images and/or video. A video security surveillance system can include existing systems on county, city, municipal, or private buildings. Video surveillance should be retained by the county election office through 60 days following the deadline to certify the election; and

**\*13** • To prevent physical damage and unauthorized entry, the drop-box at a ballot return site located outdoors should be constructed of durable material able to withstand vandalism, removal, and inclement weather.

With respect to ballot collection and "chain of custody" procedures, the Secretary stated that counties should adhere to the following standards, [*id.* at §§ 3.1-3.2]:

• Ballots should be collected from ballot return sites only by personnel authorized by the county board of elections and at times determined by the board of elections, at least every 24 hours, excluding Saturdays and Sundays;

• The county board of elections should designate at least two election officials to collect voted ballots from a ballot return site. Each designated election official should carry identification or an official designation that identifies them as an election official authorized to collect voted ballots;

• Election officials designated to collect voted ballots by the board of elections should sign a declaration declaring that he or she will timely and securely collect and return voted ballots, will not permit any person to tamper with a ballot return site or its contents, and that he or she will faithfully and securely perform his or her duties;

• The designated election officials should retrieve the voted ballots from the ballot return site and place the voted ballots in a secure ballot transfer container;

• The designated election officials should note on *Ballot Return Site Collection Forms* the site and unique identification number of the ballot return site and the date and time of retrieval;

• Ballots collected from any ballot return site should be immediately transported to the county board of elections;

• Upon arrival at the office of the county board of elections, the county board of elections, or their designee(s), should note the time of arrival on the same form, as described above;

• The seal number should be verified by a county election official or a designated representative;

• The county board of elections, or their designee(s), should inspect the drop-box or secure ballot transfer container for evidence of tampering and should receive the retrieved ballots by signing the retrieval form and including the date and time of receipt. In the event tampering is evident, that fact must be noted on the retrieval form;

- The completed collection form should be maintained in a manner proscribed by the board of elections to ensure that the form is traceable to its respective secure ballot container; and

- The county elections official at the county election office or central count location should note the number of ballots delivered on the retrieval form.

And finally, as to election day and post-election day procedures with respect to drop boxes, the Secretary provided as follows, [*id.* at §§ 3.3, 4]:

- The county board of elections should arrange for authorized personnel to retrieve ballots on election night and transport them to the county board of elections for canvassing of the ballots;

- Authorized personnel should be present at ballot return sites immediately prior to 8:00 p.m. or at the time the polls should otherwise be closed;

- At 8:00 p.m. on election night, or later if the polling place hours have been extended, all ballot return sites and drop-boxes must be closed and locked;

 **\*14**  • Staff must ensure that no ballots are returned to the ballot return site after the close of polls;

- After the final retrieval after the closing of the polls, the drop-box must be removed or locked and/or covered to prevent any further ballots from being deposited, and a sign shall be posted indicating that polling is closed for the election; and

- Any ballots collected from a return site should be processed in the same manner as mail-in ballots personally delivered to the central office of the county board of elections official by the voter and ballots received via the United States Postal Service or any other delivery service.

The Secretary and her staff developed this guidance in consultation with subject-matter experts within her Department and after review of the policies, practices, and laws in other states where drop boxes have been used. [ECF 549-6, pp. 23:14-22]. The evidence reflects at least one instance in which the Secretary's deputies reiterated that these "best practices" should be followed in response to inquiries from county officials considering whether to use drop boxes.

[ECF 549-32 ("Per our conversation, the list of items are things the county must keep in mind if you are going to provide a box for voters to return their ballots in person.") ].

Approximately 24 counties plan to use drop boxes during the November general election, to varying degrees. [ECF 549-28; ECF 504-1]. Of these, about nine counties intend to staff the drop boxes with county officials, while about 17 counties intend to use video surveillance in lieu of having staff present. [ECF 549-28].

## 2. Defendants' and Intervenors' evidence of the benefits and low risks associated with drop boxes.

Secretary Boockvar advocates for the use of drop boxes as a "direct and convenient way" for voters to deliver cast ballots to their county boards of elections, "thereby increasing turnout." [ECF 547, p. 22 ¶ 54 (citing 549-11 at pp. 10-11) ]. The Secretary also touts the special benefits of expanding drop-box use in the ongoing COVID-19 pandemic. Specifically, she asserts that drop boxes reduce health risks and inspire voter confidence because "many voters understandably do not wish to cast their votes in person at their polling place on Election Day" due to COVID-19. [*Id.* at ¶¶ 55, 57 (citing ECF 549-2 ¶ 39; ECF 549-11 at p. 10; 549-8, ¶ 95) ]. Drop boxes, she says, allow voters to vote in person without coming into "close proximity to other members of the public, compared to in-person voting or personally delivering a mail-in ballot to a public office building." [*Id.* at ¶ 57].

Secretary Boockvar also states that drop boxes are highly convenient, and cost-saving, for both counties and voters. For counties, she notes that "24-hour secure ballot drop boxes" are "cost-effective measures ... as they do not have to be staffed by election judges." [*Id.* at p. 24 ¶ 62 (citing ECF 549-11 at p. 11); ECF 549-9 at ¶ 34]. As for voters, the Secretary explains that, in a state where "ten counties ... cover more than 1,000 square miles" and "two-thirds" of counties "cover more than 500 square miles," many Pennsylvania voters "could be required to drive dozens of miles (and perhaps in excess of 100 miles) if he or she wished to deposit his or her mail-in ballot in person at the main county board of elections office." [*Id.* at ¶ 58 (citing ECF 549-29) ].

 **\*15**  In addition to any tangible benefit drop boxes may have for voter access and turnout, Secretary Boockvar also states that drop boxes have a positive impact on voter confidence.

In particular, she cites a recent news article, and a letter sent by the General Counsel of the U.S. Postal Service regarding Pennsylvania's absentee and mail-in ballot deadline, which have raised concerns over the timeliness and reliability of the U.S. Postal Service. [*Id.* at ¶¶ 60-61 (citing ECF 549-13; ECF 549-14); ECF 549-17; ECF 549-2 ¶¶ 42-43]. Voters' fears that votes returned by mail will not be timely counted could, the Secretary worries, "justifiably dissuade voters from wanting to rely upon the Postal Service for return of their mail-in or absentee ballot." [ECF 547, ¶ 61]. Drop boxes, she says, can address this concern by allowing voters to safely return mail-in ballots to an in-person location.

In exchange for these benefits, the Secretary insists that any potential security risk associated with drop boxes is low. She notes that the federal Department of Homeland Security has released guidance affirming that a "ballot drop box provides a secure and convenient means for voters to return their mail ballot," and recommending that states deploy one drop box for every 15,000 to 20,000 registered voters. [*Id.* at ¶¶ 63-65 (citing ECF 549-24, p. 1) ]. She also points to a purported lack of evidence of systemic ballot harvesting or any attempts to tamper with, destroy, or otherwise commit voter fraud using drop boxes, either in Pennsylvania's recent primary election, or in other states that have used drop boxes for many years. [*Id.* at ¶¶ 68-74 (citations omitted) ]. And she asserts that "[i]n the last 20 years in the entire state of Pennsylvania, there have been fewer than a dozen confirmed cases of fraud involving a handful of absentee ballots" among the many millions of votes cast during that time period. [*Id.* at ¶ 70 (citing ECF 549-10, pp. 3-4) ].

Finally, the Secretary, and other Defendants and Intervenors, argue that Pennsylvania already has robust measures in place to prevent fraud, including its criminal laws, voter registration system, mail-in ballot application requirement, and canvassing procedures. [*Id.* at ¶¶ 66-67 (citing 25 P.S. §§ 3516 - 3518) ]; [ECF 549-9, p. 15, ¶¶ 46-47 ("These allegations are not consistent with my experience with drop box security, particularly given the strong voter verification procedures that are followed by elections officials throughout the country and in Pennsylvania. Specifically, the eligibility and identity of the voter to cast a ballot is examined by an election judge who reviews and confirms all the personal identity information provided on the outside envelope. Once voter eligibility is confirmed, the ballot is extracted and separated from the outside envelope to ensure the ballot remains secret. During this step, election judges confirm that there is only one ballot in the envelope and checks for

potential defects, such as tears in the ballot.... Regardless of the receptacle used for acceptance of the ballot (drop box versus USPS mailbox), ballot validation occurs when the ballot is received by the county board of elections. The validation is the same regardless of how the ballots are collected or who delivers the ballot, even where that delivery contravenes state law.") ].

Defendants and Intervenors also point to several expert reports expressing the view that drop boxes are both low risk and beneficial. These experts include:

**Professor Matthew A. Barreto**, a Professor of Political Science and Chicana/o Studies at UCLA. [ECF 549-7]. Professor Barreto offers the opinion that ballot drop boxes are an important tool in facilitating voting in Black and Latino communities. Specifically, he discusses research showing that Black and Latino voters are "particularly concerned about the USPS delivering their ballots." [*Id.* at ¶ 22]. And he opines that ballot drop boxes help to reassure these voters that their vote will count, because "there is no intermediary step between the voters and the county officials who collect the ballot." [*Id.* at ¶ 24].

 **\*16** **Professor Donald S. Burke**, a medical doctor and Distinguished University Professor of Health Science and Policy, Jonas Salk Chair in Population Health, and Professor of Epidemiology at the University of Pittsburgh. [ECF 549-8]. Professor Burke details the "significant risk of exposure" to COVID-19 in "enclosed areas like polling places." [*Id.* at ¶ 69]. He opines that "depositing a ballot in a mailbox and depositing a ballot in a drop-box are potential methods of voting that impart the least health risk to individual voters, and the least public health risk to the community." [*Id.* at ¶ 95].

**Amber McReynolds**, the CEO of the National Vote at Home Institute, with 13 years of experience administering elections as an Elections Director, Deputy Director, and Operations Manager for the City and County of Denver, Colorado. [ECF 549-9]. Ms. McReynolds opines that "[b]allot drop-boxes can be an important component of implementing expanded mail-in voting" that are "generally more secure than putting a ballot in post office boxes." [*Id.* at ¶ 16 (a) ]. She notes that "[d]rop boxes are managed by election officials ... delivered to election officials more quickly than delivery through the U.S. postal system, and are secure." [*Id.*].

Ms. McReynolds also opines that Secretary Boockvar's guidance with respect to drop boxes is "consistent with

best practices and advice that NVAHI has provided across jurisdictions." [*Id.* at ¶ 35]. But she also notes that "[b]est practices will vary by county based on the county's available resources, population, needs, and assessment of risk." [*Id.* at ¶ 52].

More generally, Ms. McReynolds argues that "[d]rop-boxes do not create an increased opportunity for fraud" as compared to postal boxes. [*Id.* at ¶ 44]. She also suggests that Pennsylvania guards against such fraud through other "strong voter verification procedures," including "ballot validation [that] occurs when the ballot is received by the county board of elections" and "[r]econciliation procedures adopted by election officials ... [to] protect against the potential risk of double voting." [*Id.* at ¶¶ 46-48]. She notes that "Pennsylvania's balloting system requires that those who request a mail-in vote and do not return the ballot (or spoil the mail-in ballot at their polling place), can only vote a provisional ballot" and "[i]f a mail-in or absentee ballot was submitted by an individual, their provisional ballot is not counted." [*Id.* at ¶ 48].

**Professor Lorraine C. Minnite**, an Associate Professor and Chair of the Department of Public Policy and Administration at Rutgers University-Camden. [ECF 549-10]. Professor Minnite opines that "the incidence of voter fraud in contemporary U.S. elections is exceedingly rare, including the incidence of voter impersonation fraud committed through the use of mail-in absentee ballots." [*Id.* at p. 3]. In Pennsylvania specifically, she notes that "[i]n the last 20 years ... there have been fewer than a dozen confirmed cases of fraud involving a handful of absentee ballots, and most of them were perpetrated by insiders rather than ordinary voters." [*Id.* at pp. 3-4]. As a "point of reference," she notes that 1,459,555 mail-in and absentee ballots were cast in Pennsylvania's 2020 primary election alone. [*Id.* at 4].

**Professor Robert M. Stein**, a Professor of Political Science at Rice University and a fellow in urban politics at the Baker Institute. [ECF 549-11]. Professor Stein opines that "the Commonwealth's use of drop boxes provides a number of benefits without increasing the risk of mail-in or absentee voter fraud that existed before drop boxes were implemented because (manned or unmanned) they are at least as secure as U.S. Postal Service ('USPS') mailboxes, which have been successfully used to return mail-in ballots for decades in the Commonwealth and elsewhere around the U.S." [*Id.* at p. 3]. According to Professor Stein, the use of drop boxes "has been shown to increase turnout," which he suggests is

particularly important "during a global pandemic and where research has shown that natural and manmade disasters have historically had a depressive effect on voter turnout." [*Id.* at p. 4]. Professor Stein notes that "[d]rop boxes are widely used across a majority of states as a means to return mail-in ballots" and he is "not aware of any studies or research that suggest that drop boxes (manned or unmanned) are a source for voter fraud." [*Id.*]. Nor is he aware "of any evidence that drop boxes have been tampered with or led to the destruction of ballots." [*Id.*].

**\*17** **Professor Paul Gronke**, a Professor of Political Science at Reed College and Director of the Early Voting Information Center. [ECF 545-7]. Professor Gronke recommends that "drop boxes should be provided in every jurisdiction that has significant (20% or more) percentage[ ] of voters casting a ballot by mail, which includes Pennsylvania" for the general election. [*Id.* at ¶ 6]. He avers that "[s]cientific research shows that drop boxes raise voter turnout and enhance voter confidence in the elections process." [*Id.* at ¶ 7]. Voters, he explains, "utilize drop boxes heavily—forty to seventy percent of voters in vote by mail states and twenty-five percent or more in no-excuse absentee states." [*Id.*]. Professor Gronke further states that he is "not aware of any reports that drop boxes are a source for voter fraud" despite having "been in use for years all over the country." [*Id.* at ¶ 8]. And he suggests that the use of drop boxes is "especially important" in an election "that will be conducted under the cloud of the COVID-19 pandemic, and for a state like Pennsylvania that is going to experience an enormous increase in the number of by-mail ballots cast by the citizenry of the state." [*Id.* at ¶ 9].

Based on this evidence, and the purported lack of any contrary evidence showing great risks of fraud associated with the use of drop boxes, Defendants and Intervenors argue that Pennsylvania's authorization of drop boxes, and the counties' specific implementation of them, furthers important state interests at little cost to the integrity of the election system.

**3. Plaintiffs' evidence of the risks of fraud and vote dilution associated with drop boxes.**

Plaintiffs, on the other hand, argue that the drop boxes allow for an unacceptable risk of voter fraud and "illegal delivery or ballot harvesting" that, when it occurs, will "dilute" the votes of all lawful voters who comply with the Election Code. *See, e.g.*, [ECF 461, ¶¶ 127-128]. As evidence of the

dilutive impact of drop boxes, Plaintiffs offer a combination of anecdotal and expert evidence.

Foremost among this evidence is the expert report of Greg Riddlemoser, the former Director of Elections and General Registrar for Stafford County, Virginia from 2011 until 2019. [ECF 504-19]. According to Mr. Riddlemoser, "voter fraud exists." [*Id.* at p. 2]. He defines the term "voter fraud" to mean any "casting and/or counting of ballots in violation of a state's election code." [*Id.*]. Examples he gives include: "Voting twice yourself—even if in multiple jurisdictions," "voting someone else's ballot," and "[e]lection officials giving ballots to or counting ballots from people who were not entitled to vote for various reasons." [*Id.* at pp. 2-3]. All of these things, he asserts, are "against the law and therefore fraudulent." [*Id.*].[3]

[3]    As noted above, Plaintiffs and Mr. Riddlemoser use the term "voter fraud" to mean "illegal voting"—*i.e.*, voter fraud is any practice that violates the Election Code. For purposes of the Court's decision and analysis of Plaintiffs' vote-dilution claims, the Court accepts this definition.

Mr. Riddlemoser argues that "ballot harvesting" (which is the term Plaintiffs use to refer to situations in which an individual returns the ballots of other people) "persists in Pennsylvania." [*Id.* at p. 3]. He points to the following evidence to support this opinion:

• Admissions by Pennsylvania's Deputy Secretary for Elections and Commissions, Jonathan Marks, that "several Pennsylvania counties permitted ballot harvesting by counting ballots that were delivered in violation of Pennsylvania law" during the recent primary election, [*Id.*];

• "[S]everal instances captured by the media where voters in the June 2020 Primary deposited multiple ballots into unstaffed ballot drop boxes," [*Id.* at p. 4];

• "Other photographs and video footage of at least one county's drop box (Elk County) on Primary Election day" which "revealed additional instances of third-party delivery," [*Id.*]; and

• "Documents produced by Montgomery County" which "reveal that despite signs warning that ballot harvesting is not permitted, people during the 2020 Primary attempted to deposit into the five drop boxes used by that county ballots that were not theirs," [*Id.*].

**\*18** With respect to the use of "unstaffed" or "unmanned" ballot drop boxes, Mr. Riddlemoser expresses the opinion that "the use of unmanned drop boxes presents the easiest opportunity for voter fraud" and "certain steps must be taken to make drop boxes 'secure' and 'monitored.' " [*Id.* at p. 16].

He states that, to be "secure," drop boxes must be "attended" by "sworn election officials" at all times (*i.e.*, "never left unattended at any time they are open for ballot drop-off."). [*Id.*]. He further suggests that officials stationed at drop boxes must be empowered, and required, to "verify the person seeking to drop off a ballot is the one who voted it and is not dropping off someone else's ballot." [*Id.*]. Doing so, he says, would, in addition to providing better security, also "allow the election official to ask the voter if they followed the instructions they were provided ... and assist them in doing so to remediate any errors, where possible, before ballot submission." [*Id.*].

In addition to being "manned," Mr. Riddlemoser suggests that certain procedures with respect to ballot collection are necessary to ensure the integrity of votes cast in drop boxes. For example, he suggests that, at the end of each day, drop boxes, which should themselves be "tamperproof," should "be verifiably completely emptied into fireproof/tamperproof receptacles, which are then sealed and labeled by affidavit as to whom, where, when, etc." [*Id.*] Once sealed, the containers "must then be transported by sworn officials in a county owned vehicle (preferably marked law enforcement) back to the county board where they are properly receipted and safeguarded." [*Id.*]. Emptied drop boxes should also be sealed at the end of each day "such that they are not able to accept any additional ballots until they are 'open' again[.]" [*Id.*]. And boxes should be "examined to ensure no ballots are in the box, that nothing else is inside the box, and that the structural integrity and any security associated with the box remains intact." [*Id.*]. All of this, he suggests, should also be "available for monitoring by poll watchers." [*Id.*].

According to Mr. Riddlemoser, anything short of these robust procedures won't do. In particular, "video cameras would not prevent anyone from engaging in activity that could or is designed to spoil the ballots inside the box; such as dumping liquids into the box, lighting the ballots on fire by using gasoline and matches, or even removing the box itself." [*Id.* at p. 17]. Even if the "identity of the person responsible may be determined ... the ballots themselves would be destroyed —effectively disenfranchising numerous voters." [*Id.*]. And

given "recent footage of toppled statues and damage to government buildings" in the news, Mr. Riddlemoser finds the "forcible removal of ballot drop boxes" to be "a distinct possibility." [*Id.*]. In addition to increasing the risk of ballot destruction, Mr. Riddlemoser notes that reliance on video cameras would also "not prohibit someone from engaging in ballot harvesting by depositing more than one ballot in the drop box[.]" [*Id.*].

Beyond Mr. Riddlemoser's expert testimony, Plaintiffs proffer several other pieces of evidence to support their claims that drop boxes pose a dilutive threat to the ballots of lawful voters. Most notably, they present photographs and video stills of, by the Court's count, approximately seven individuals returning more than one ballot to drop boxes in Philadelphia and Elk County (the same photographs referenced by Mr. Riddlemoser). [ECF 504-19, PDF pp. 49-71].

 **\*19**  Those photographs depict the following:

• **An unidentified woman holding what appear to be two ballots at a Philadelphia drop box.**



• **Instagram user "thefoodiebarrister" posing for a selfie with two ballots in Philadelphia; captioned, in part, "dropping of [sic] my votes in a designated ballot drop box."**



• **A photograph posted to social media showing a hand placing two ballots in a drop box; captioned, in part, "Cory and I voted!"**

Case 4:20-cv-02078-MWB   Document 93-10   Filed 11/12/20   Page 39 of 279



 Li Kramer Halpern
Monday at 12:53 PM · One Montgomery Plaza · 🌐

**Cory** and I voted! I miss my sticker. If you're using the drop box in Norristown, walk through the construction the building is open. Closed at noon today but other days open 7am - 8pm through June 2nd. https://www.montcopa.org/ArchiveCenter/ViewFile/Item/5177

• **A photograph of an unidentified man wearing a "Philadelphia Water" sweater and hat, placing two ballots in a Philadelphia drop box.**



• **Several video stills that, according to Plaintiffs, show voters depositing more than one ballot in an Elk County drop box.**





In addition to these photographs and video stills, Plaintiffs also provide a May 24, 2020, email sent by an official in Montgomery County (which placed security guards to monitor its drop boxes) observing that security "have turned people away yesterday and today without incident who had ballots other than their own." [ECF 504-28].

Separate and apart from this evidence specific to the use of drop boxes, Plaintiffs and their expert also provide evidence of instances of election fraud, voter fraud, and illegal voting generally. These include, for example:

• A case in which a New Jersey court ordered a new municipal election after a city councilman and councilman-elect were charged with fraud involving mail-in ballots. [ECF 504-19, p. 3].

• A New York Post article written by an anonymous fraudster who claimed to be a "master at fixing mail-in ballots" and detailed his methods. [*Id.*].

• Philadelphia officials' admission that approximately 40 people were permitted to vote twice during the 2020 primary elections. [*Id.*].

• A YouTube video purporting to show Philadelphia election officials approving the counting of mail-in

ballots that lacked a completed certification on the outside of the envelope. [*Id.* (citation omitted) ].

• The recent guilty plea of the former Judge of Elections in South Philadelphia, Domenick J. DeMuro, to adding fraudulent votes to voting machines on election day. [ECF 461, ¶ 61]; *see United States v. DeMuro*, No. 20-cr-112 (E.D. Pa. May 21, 2020).

• The 2014 guilty plea of Harmar Township police chief Richard Allen Toney to illegally soliciting absentee ballots to benefit his wife and her running mate in the 2009 Democratic primary for town council, [ECF 461, ¶ 69];

• The 2015 guilty plea of Eugene Gallagher for unlawfully persuading residents and non-residents of Taylor, in Lackawanna County, Pennsylvania, to register for absentee ballots and cast them for him during his councilman candidacy in the November 2013 election, [*Id.*];

   **\*20**   • The 1999 indictment of Representative Austin J. Murphy in Fayette County for forging absentee ballots for residents of a nursing home and adding his wife as a write-in candidate for township election judge, [*Id.*];

• The 1994 Eastern District of Pennsylvania and Third Circuit case *Marks v. Stinson*, which involved an alleged incident of extensive absentee ballot fraud by a candidate for the Pennsylvania State Senate, *see Marks v. Stinson*, 19 F.3d 873 (3d Cir. 1994); *Marks v. Stinson*, No. 93-6157, 1994 WL 146113 (E.D. Pa. Apr. 26, 1994), [ECF 461, ¶ 78]; and

• A report from the bipartisan Commission on Federal Election Reform, chaired by former President Jimmy Carter and former Secretary of State James A. Baker III, which observed that absentee voting is "the largest source of potential voter fraud" and proposed that states "reduce the risks of fraud and abuse in absentee voting by prohibiting 'third-party' organizations, candidates, and political party activists from handling absentee ballots." [ECF 461, ¶¶ 66-67, 80].

**C. Facts relevant to signature comparison.**

Many of the facts relevant to Plaintiffs' signature-comparison claim relate to the verification procedures for mail-in and absentee ballots, on one hand, and those procedures for in-person voting, on the other. These are described below.

**1. Mail-in and absentee ballot verification.**

As noted above, Pennsylvania does not distribute unsolicited mail-in and absentee ballots. Rather, a voter must apply for the ballot (and any voter can). [ECF 549-2, ¶ 64]. As part of the application for a mail-in ballot,[4] an applicant must provide certain identifying information, including name, date of birth, length of time as a resident of the voting district, voting district if known, party choice in the primary, and address where the ballot should be sent. 25 P.S. § 3150.12(b). In applying for a mail-in ballot, the applicant must also provide "proof of identification," which is defined by statute as that person's driver's license number, last four digits of Social Security number, or another specifically approved form of identification. [ECF 549-2, ¶ 64; ECF 549-27]; 25 P.S. § 2602(z.5)(3). A signature is not mentioned in the definition of "proof of identification." 25 P.S. § 2602(z.5)(3). However, if physically capable, the applicant must sign the application. *Id.* at § 3150.12(c)-(d).

4      The procedure for absentee ballots and applications largely resembles the procedure for mail-in ballots and applications.

Upon receiving the mail-in ballot application, the county board of elections determines if the applicant is qualified by "verifying the proof of identification and comparing the information provided on the application with the information contained on the applicant's permanent registration card." 25 P.S. § 3150.12b(a). The county board of elections then either approves the application[5] or "immediately" notifies the applicant if the application is not approved. *Id.* at § 3150.12b(a), (c). Upon approval, the county mails the voter the mail-in ballot.

5      If the application is approved, the approval is "final and binding," subject only to challenges "on the grounds that the applicant was not a qualified elector." 25 P.S. § 3150.12b(a)(2). An unqualified elector would be, for example, an individual who has not "been a citizen of the United States at least one month." Pa. Const. Art. 7, § 1; *see also* 25 P.S. § 2602(t) (defining "qualified elector" as "any person who shall possess all of the qualifications for voting now or hereafter prescribed by the Constitution of this Commonwealth, or who, being otherwise qualified by continued residence in his election

district, shall obtain such qualifications before the next ensuing election").

**\*21**  After receiving the ballot, the mail-in voter must "mark the ballot" with his or her vote, insert the ballot into the "secrecy" envelope, and place the "secrecy" envelope into a larger envelope. *Id.* at § 3150.16(a). Then, the voter must "fill out, date and sign the declaration printed on [the larger] envelope. [The larger] envelope shall then be securely sealed and the elector shall send [it] by mail ... or deliver it in person to said county board of election." *Id.* The declaration on the larger envelope must be signed, unless the voter is physically unable to do so. *Id.* at § 3150.16(a)-(a.1).

Once the voter mails or delivers the completed mail-in ballot to the appropriate county board of elections, the ballot is kept "in sealed or locked containers until they are to be canvassed by the county board of elections." *Id.* at § 3146.8(a). The county boards of elections can begin pre-canvassing and canvassing the mail-in ballots no earlier than election day. *Id.* at § 3146.8(g)(1.1).

When pre-canvassing and canvassing the mail-in ballots, the county boards of elections must "examine the declaration on the [larger] envelope of each ballot ... and shall compare the information thereon with that contained in the ...Voters File." *Id.* at § 3146.8(g)(3). The board shall then verify the "proof of identification" and shall determine if "the declaration [on the larger envelope] is sufficient." *Id.* If the information in the "Voters File ... verifies [the elector's] right to vote," the ballot shall be counted. *Id.*

### 2. In-person voting verification.

When a voter decides to vote in-person on election day, rather than vote by mail, the procedures are different. There is no application to vote in person. Rather, on election day, the in-person voter arrives at the polling place and "present[s] to an election officer proof of identification," which the election officer "shall examine." *Id.* at § 3050(a). The in-person voter shall then sign a voter's certificate" and give it to "the election officer in charge of the district register." *Id.* at § 3050(a.3) (1). Next, the election officer shall "announce the elector's name" and "shall compare the elector's signature on his voter's certificate with his signature in the district register." *Id.* at § 3050(a.3)(2). If the election officer believes the signature to be "genuine," the in-person voter may vote. *Id.* But if the election officer does not deem the signature "authentic," the

in-person voter may still cast a provisional ballot and is given the opportunity to remedy the deficiency. *Id.*

### 3. The September 11, 2020, and September 28, 2020, sets of guidance.

In September 2020, Secretary Boockvar issued two new sets of guidance related to signature comparisons of mail-in and absentee ballots and applications. The first, issued on September 11, 2020, was titled "Guidance Concerning Examination of Absentee and Mail-In Ballot Return Envelopes." [ECF 504-24]. The guidance stated, in relevant part, the "Pennsylvania Election Code does not authorize the county board of elections to set aside returned absentee or mail-in ballots based solely on signature analysis by the county board of elections." [*Id.* at p. 3]. The second set of guidance, issued on September 28, 2020, was titled, "Guidance Concerning Civilian Absentee and Mail-In Ballot Procedures." [ECF 504-25]. This September 28, 2020, guidance stated, in relevant part, "The Election Code does not permit county election officials to reject applications or voted ballots based solely on signature analysis. ... No challenges may be made to mail-in and absentee ballots at any time based on signature analysis." [*Id.* at p. 9]. Thus, as evidenced by these two sets of guidance, Secretary Boockvar advised the county boards of elections not to engage in a signature-comparison analysis of voters' signatures on ballots and applications for ballots.

**\*22**  Most of the counties intend to follow the Secretary's guidance and will not compare signatures on mail-in ballots and applications for the upcoming general election. *E.g.*, [ECF 504-1]. A few counties, however, stated their intent to not comply with the guidance, and instead would compare and verify the authenticity of signatures. *E.g.*, [*id.* (noting the counties of Cambria, Elk, Franklin, Juniata, Mifflin, Sullivan, Susquehanna, and Wyoming, as not intending to follow Secretary Boockvar's guidance to not compare signatures)].

According to Defendants, there are valid reasons to not require signature comparisons for mail-in and absentee ballots. For example, Secretary Boockvar notes that signature verification is a technical practice, and election officers are not "handwriting experts." [ECF 549-2, p. 19, ¶ 68]. Secretary Boockvar also notes that voters' signatures can change over time, and various medical conditions (*e.g.*, arthritis) can impact a person's signature. [*Id.*] Defendants' expert, Amber McReynolds, also finds that "signature verification"

involves "inherent subjectivity." [ECF 549-9, p. 20, ¶ 64]. Ms. McReynolds further notes the "inherent variability of individuals' signatures over time." [*Id.*] And according to Secretary Boockvar, these are just some reasons Pennsylvania implements verification procedures other than signature comparisons for mail-in voters, who, unlike in-person voters, are not present when their signature would be verified. [ECF 549-2, p. 20, ¶ 69].

Plaintiffs' expert, Greg Riddlemoser, on the other hand, states that signature comparison is "a crucial security aspect of vote-by-mail" and failing to verify signatures on mail-in ballots would "undermine voter confidence and would increase the possibility of voter fraud." [ECF 504-19, pp. 10-11]. Mr. Riddlemoser asserts that Secretary Boockvar's September 11, 2020, and September 28, 2020, guidance "encourage, rather than prevent, voter fraud." [*Id.* at p. 12]. As such, Mr. Riddlemoser explains that mail-in voters should be subject to the same signature-comparison requirement as in-person voters. [*Id.* at pp. 13-14].

### 4. Secretary Boockvar's King's Bench petition.

In light of this case and the parties' disagreement over whether the Election Code mandates signature comparison for mail-in ballots, Secretary Boockvar filed a "King's Bench" petition with the Pennsylvania Supreme Court on October 4, 2020. In that petition, she asked the Pennsylvania Supreme Court to exercise its extraordinary jurisdiction, in light of the impending election, to clarify whether the Election Code mandates signature comparison of mail-in and absentee ballots and applications. [ECF 556, p. 11; ECF 557].

On October 7, 2020, several groups, including Donald J. Trump for President, Inc. and the Republican National Committee—who are Plaintiffs in this case—moved to intervene as Respondents in the Pennsylvania Supreme Court case. [ECF 571-1]. The Pennsylvania Supreme Court has not yet decided the motion to intervene or whether to accept the case. The petition remains pending.

### D. Facts relevant to poll-watcher claims.

The position of "poll watcher" is a creation of state statute. *See* 25 P.S. § 2687. As such, the Election Code defines how a poll watcher may be appointed, what a poll watcher may do, and where a poll watcher may serve.

### 1. The county-residency requirement for poll watchers.

**\*23** The Election Code permits candidates to appoint two poll watchers for each election district. 25 P.S. § 2687(a). The Election Code permits political parties and bodies to appoint three poll watchers for each election district. *Id.*

For many years, the Pennsylvania Election Code required that poll watchers serve only within their "election district," which the Code defines as "a district, division or precinct, ... within which all qualified electors vote at one polling place." 25 P.S. § 2687(b) (eff. to May 15, 2002) (watchers "shall serve in only one district and must be qualified registered electors of the municipality or township in which the district where they are authorized to act is located"); 25 P.S. § 2602(g). Thus, originally, poll watching was confined to a more limited geographic reach than one's county, as counties are themselves made up of many election districts.

Then, in 2004, the General Assembly amended the relevant poll-watcher statute to provide that a poll watcher "shall be authorized to serve in the election district for which the watcher was appointed and, when the watcher is not serving in the election district for which the watcher was appointed, in any other election district in the county in which the watcher is a qualified registered elector." 25 P.S. § 2687(b) (eff. Oct. 8, 2004).

This county-residency requirement is in line with (or is, in some cases, more permissive than) the laws of at least eight other states, which similarly require prospective poll watchers to reside in the county in which they wish to serve as a watcher or (similar to the pre-2004 Pennsylvania statute) limit poll watchers to a sub-division of the county. *See, e.g.*, Fla. Stat. Ann. § 101.131(1) (Florida); Ind. Code Ann. § 3-6-8-2.5 (Indiana); Ky. Rev. Stat. Ann. § 117.315(1) (Kentucky); N.Y. Elec. Law § 8-500(5) (New York); N.C. Gen. Stat. Ann. § 163-45(a) (North Carolina); Tex. Elec. Code Ann. § 33.031(a) (Texas); S.C. Code Ann. § 7-13-860 (South Carolina); Wyo. Stat. Ann. § 22-15-109(b) (Wyoming). However, at least one state (West Virginia) does not provide for poll watchers at all. *See* W. Va. Code Ann. § 3-1-37; W. Va. Code Ann. § 3-1-41

The General Assembly has not amended the poll-watcher statute since 2004, even though some lawmakers have advocated for the repeal of the residency requirement. *See Cortés*, 218 F. Supp. 3d at 402 (observing that legislative

efforts to repeal the poll-watcher residency requirement have been unsuccessful).

As part of its September 17, 2020, decision, the Pennsylvania Supreme Court found that the county-residency requirement does not violate the U.S. or Pennsylvania constitutions. *Boockvar*, —— A.3d at ——, 2020 WL 5554644, at *31.

### 2. Where and when poll watchers can be present during the election.

The Pennsylvania Election Code sets forth the rules for where and when poll watchers are permitted to be present.

The Election Code provides that poll watchers may be present "at any public session or sessions of the county board of elections, and at any computation and canvassing of returns of any primary or election and recount of ballots or recanvass of voting machines under" the Code. 25 P.S. § 2650. Additionally, one poll watcher for each candidate, political party, or political body may "be present in the polling place ... from the time that the election officers meet prior to the opening of the polls ... until the time that the counting of votes is complete and the district register and voting check list is locked and sealed." 25 P.S. § 2687(b).

**\*24** During this time, poll watchers may raise objections to "challenge any person making application to vote." *Id.* Poll watchers also may raise challenges regarding the voters' identity, continued residence in the election district, or registration status. 25 P.S. § 3050(d).

Although Pennsylvania has historically allowed absentee ballots to be returned by U.S. Postal Service or by in-person delivery to a county board of elections office, the Election Code does not provide (and has never provided for) any right to have poll watchers in locations where absentee voters fill out their ballots (which may include their home, office, or myriad other locations), nor where those votes are mailed (which may include their own mailbox, an official U.S. Postal Service collection box, a work mailroom, or other places U.S. Postal Service mail is collected), nor at county board of elections offices. [ECF 549-2, ¶¶ 86-90].

Before Act 77, absentee ballots were held in election districts rather than centralized at the county board of elections. *See* 25 P.S. § 3146.8 (eff. Mar. 14, 2012 to Oct. 30, 2019) ("In all election districts in which electronic voting systems are used, absentee ballots shall be opened at the election district, checked for write-in votes in accordance with section 1113-A and then either hand-counted or counted by means of the automatic tabulation equipment, whatever the case may be.").

At such time (again, before Act 77), poll workers opened those absentee ballots at each polling place after the close of the polls. *Id.* ("Except as provided in section 1302.1(a.2), the county board of elections shall then distribute the absentee ballots, unopened, to the absentee voter's respective election district concurrently with the distribution of the other election supplies. Absentee ballots shall be canvassed immediately and continuously without interruption until completed after the close of the polls on the day of the election in each election district. The results of the canvass of the absentee ballots shall then be included in and returned to the county board with the returns of that district." (footnote omitted)).

With the enactment of Act 77, processing and counting of mail-in and absentee ballots is now centralized in each county board of elections, with all mail-in and absentee ballots in such county held and counted at the county board of elections (or such other site as the county board may choose) without regard to which election district those ballots originated from. 25 P.S. § 3146.8(a) (eff. Mar. 27, 2020); [ECF 549-2, ¶ 81].

Under Act 12, counties are permitted to "pre-canvass" mail-in or absentee ballots received before Election Day beginning at 7:00 a.m. on Election Day. 25 P.S. § 3146.8(g)(1.1). Counties are further permitted to "canvass" ballots received after that time beginning "no earlier than the close of the polls on the day of the election and no later than the third day following the election." *Id.* § 3146.8(g)(2).

The Election Code permits "[o]ne authorized representative of each candidate" and "one representative from each political party" to "remain in the room in which the absentee ballots and mail-in ballots are pre-canvassed." 25 P.S. § 3146.8(g)(1.1). Similarly, during canvassing, the Election Code permits "[o]ne authorized representative of each candidate" and "one representative from each political party" to "remain in the room in which the absentee ballots and mail-in ballots are canvassed." 25 P.S. § 3146.8(g)(2).

**\*25** The Election Code provisions pertaining to the "pre-canvass" and "canvass" do not make any separate reference to poll watchers, instead referring only to the "authorized representatives" of parties and candidates. *See* 25 P.S. § 3146.8.

On October 6, 2020, Secretary Boockvar issued guidance concerning poll watchers and authorized representatives. [ECF 571-1]. The guidance states that poll watchers "have no legal right to observe or be present at ... ballot return sites," such as drop-box locations. [ECF 571-1, Ex. E, p. 5]. The guidance also states that while a candidate's authorized representative may be present when mail-in ballots are opened (including during pre-canvass and canvass), the representative cannot challenge those ballots. [*Id.* at Ex. E, p. 4].

On October 9, 2020, in a separate lawsuit brought by the Trump Campaign in the Philadelphia County Court of Common Pleas, the state court there confirmed Secretary Boockvar's guidance. Specifically, the state court held that satellite ballot-collection locations, such as drop-box locations, are not "polling places," and therefore poll watchers are not authorized to be present in those places. [ECF 573-1, p. 12 ("It is clear from a reading of the above sections [of the Election Code] that the satellite offices where these activities, and only these activities, occur are true 'offices of the Board of Elections' and are not polling places, nor public sessions of the Board of Elections, at which watchers have a right to be present under the Election Code.") ]. Immediately after issuance of this decision, the Trump Campaign filed a notice of appeal, indicating its intention to appeal the decision to the Commonwealth Court of Pennsylvania. Having just been noticed, that appeal remains in its infancy as of the date of this Opinion.

**3. Plaintiffs' efforts to recruit poll watchers for the upcoming general election.**

In order to become a certified poll watcher, a candidate must meet certain criteria. [ECF 504-20, ¶ 9]. That is, a poll watcher needs to be "willing to accept token remuneration, which is capped at $120 under Pennsylvania state law" and must be able to take off work or otherwise make arrangements to be at the polling place during its open hours on Election Day, which can mean working more than 14 hours in a single day. [*Id.*].

The Pennsylvania Director for Election Day Operations for the Trump Campaign, James J. Fitzpatrick, stated that the Trump Campaign wants to recruit poll watchers for every county in Pennsylvania. [ECF 504-2, ¶ 30]. To that end, the RNC and the Trump Campaign have initiated poll-watcher recruitment efforts for the general election by

using a website called DefendYourBallot.com. [ECF 528-14, 265:2-15, 326:14-329-7]. That website permits qualified electors to volunteer to be a poll watcher. [*Id.*]. In addition, Plaintiffs have called qualified individuals to volunteer to be poll watchers, and worked with county chairs and conservative activists to identify potential poll watchers. [*Id.*].

Despite these efforts, the Trump Campaign claims it "is concerned that due to the residency restriction, it will not have enough poll watchers in certain counties." [ECF 504-2, ¶ 25]. Mr. Fitzpatrick, however, could not identify a specific county where the Trump Campaign has been unable to obtain full coverage of poll watchers or any county where they have tried and failed to recruit poll watchers for the General Election. [ECF 528-14, 261:21-262:3, 263:8-19, 265:2-266:3].

**\*26** In his declaration, Representative Reschenthaler shared Mr. Fitzpatrick's concern, stating that he does not believe that he will "be able to recruit enough volunteers from Greene County to watch the necessary polls in Greene County." [ECF 504-6, ¶ 12]. But Representative Reschenthaler did not provide any information regarding his efforts to recruit poll watchers to date, or what he plans to do in the future to attempt to address his concern. *See generally* [*id.*].

Representative Kelly stated in his declaration that he was "likely to have difficulty getting enough poll watchers from within Erie County to watch all polls within that county on election day." [ECF 504-5, ¶ 16]. Representative Kelly never detailed his efforts (*e.g.*, the outreach he tried, prospective candidates he unsuccessfully recruited, and the like), and he never explained why those efforts aren't likely to succeed in the future. *See generally* [*id.*].

In his declaration, Representative Thompson only stated that based on his experience, "parties and campaigns cannot always find enough volunteers to serve as poll watchers in each precinct." [ECF 504-4, ¶ 20].

According to statistics collected and disseminated by the Pennsylvania Department of State, there is a gap between the number of voters registered as Democrats and Republicans in some Pennsylvania counties. [ECF 504-34]. Plaintiffs' expert, Professor Lockerbie, believes this puts the party with less than a majority of voters in that county at a disadvantage in recruiting poll watchers. [ECF 504-20, ¶ 15]. However, despite this disadvantage, Professor Lockerbie states that "the Democratic and Republican parties might be able to meet the relevant criteria and recruit a sufficient population of qualified

poll watchers who meet the residency requirement[ ].” [*Id.* at ¶ 16].

Additionally, Professor Lockerbie finds the gap in registered voters in various counties to be especially problematic for minor political parties. [*Id.* at ¶ 16]. As just one example, according to Professor Lockerbie, even if one were to assume that all third-party voters were members of the same minor party, then in Philadelphia County it would require “every 7th registrant” to be a poll watcher in order for the third party to have a poll watcher observing each precinct.” [*Id.*].

Professor Lockerbie believes that disruptions to public life caused by the COVID-19 pandemic “magnified” the difficulties in securing sufficient poll watchers. [*Id.* at ¶ 10].

Nothing in the Election Code limits parties from recruiting only registered voters from their own party. [ECF 528-14, 267:23-268:1]. For example, the Trump Campaign utilized at least two Democrats among the poll watchers it registered in the primary. [ECF 528-15, P001648].

**4. Rationale for the county-residency requirement.**

Defendants have advanced several reasons to explain the rationale behind county-residency requirement for poll watchers.

Secretary Boockvar has submitted a declaration, in which she has set forth the reasons for and interests supporting the county-residency requirement. Secretary Boockvar states that the residency requirement “aligns with Pennsylvania's county-based election scheme[.]” [ECF 549-2, p. 22, ¶ 77]. “By restricting poll watchers’ service to the counties in which they actually reside, the law ensures that poll watchers should have some degree of familiarity with the voters they are observing in a given election district.” [*Id.* at p. 22, ¶ 78].

**\*27** In a similar vein, Intervenors’ expert, Dr. Barreto, in his report, states that, voters are more likely to be comfortable with poll watchers that “they know” and are “familiar with ... from their community.” [ECF 524-1, p. 14, ¶ 40]. That's because when poll watchers come from the community, “there is increased trust in government, faith in elections, and voter turnout[.]” [*Id.*].

At his deposition, Representative Kelly agreed with this idea: “Yeah, I think – again, depending how the districts

are established, I think people are probably even more comfortable with people that they – that they know and they recognize from their area.” [ECF 524-23, 111:21-25].

## LEGAL STANDARD

Summary judgment is appropriate “if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” Fed. R. Civ. P. 56(a). At summary judgment, the Court must ask whether the evidence presents “a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.” *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making that determination, the Court must “consider all evidence in the light most favorable to the party opposing the motion.” *A.W. v. Jersey City Pub. Schs.*, 486 F.3d 791, 794 (3d Cir. 2007).

The summary-judgment stage “is essentially ‘put up or shut up’ time for the non-moving party,” which “must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument.” *Berckeley Inv. Grp. Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006). If the non-moving party “fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial,” summary judgment is warranted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

“The rule is no different where there are cross-motions for summary judgment.” *Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008). The parties’ filing of cross-motions “does not constitute an agreement that if one is rejected the other is necessarily justified[.]” *Id.* But the Court may “resolve cross-motions for summary judgment concurrently.” *Hawkins v. Switchback MX, LLC*, 339 F. Supp. 3d 543, 547 (W.D. Pa. 2018). When doing so, the Court views the evidence “in the light most favorable to the non-moving party with respect to each motion.” *Id.*

## DISCUSSION & ANALYSIS

Plaintiffs, Defendants, and Intervenors all cross-move for summary judgment on all three of Plaintiffs’ remaining claims, which the Court refers to, in the short-hand, as (1) the

drop-box claim, (2) the signature-comparison claim, and (3) the poll-watching claim. The common constitutional theory behind each of these claims is vote dilution. Absent the security measures that Plaintiffs seek, they fear that others will commit voter fraud, which will, in turn, dilute their lawfully cast votes. They assert that this violates the federal and Pennsylvania constitutions.

The Court will address only the federal-constitutional claims. For the reasons that follow, the Court finds that Plaintiffs lack standing to bring their federal-constitutional claims because Plaintiffs' injury of vote dilution is not "concrete" for Article III purposes.

But even assuming Plaintiffs had standing, the Court also concludes that Defendants' regulations, conduct, and election guidance here do not infringe on any right to vote, and if they do, the burden is slight and outweighed by the Commonwealth's interests—interests inherent in the Commonwealth's other various procedures to police fraud, as well as its overall election scheme.

**\*28** Finally, because the Court will be dismissing all federal-constitutional claims, it will decline to exercise supplemental jurisdiction over any of the state-constitutional claims and will thus dismiss those claims without prejudice.

## I. Defendants' procedural and jurisdictional challenges.
At the outset, Defendants, Intervenors and Intervenors raise a number of jurisdictional, justiciability, and procedural arguments, which they assert preclude review of the merits of Plaintiffs' claims. Specifically, they assert (1) the claims are not ripe and are moot, (2) there is a lack of evidence against certain county boards, and those boards are not otherwise necessary parties, and (3) Plaintiffs lack standing. The Court addresses each argument, in turn.

### A. Plaintiffs' claims are ripe and not moot.
Several Defendants have argued that Plaintiffs' claims in the Second Amended Complaint are not ripe and are moot. The Court disagrees.

### 1. Plaintiffs' claims are ripe.

The ripeness doctrine seeks to "prevent the courts, through the avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Artway v. Attorney*

*Gen. of N.J.*, 81 F.3d 1235, 1246-47 (3d Cir. 1996) (cleaned up). The ripeness inquiry involves various considerations including whether there is a "sufficiently adversarial posture," the facts are "sufficiently developed," and a party is "genuinely aggrieved." *Peachlum v. City of York*, 333 F.3d 429, 433-34 (3d Cir. 2003). Ripeness requires the case to "have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them." *Wyatt, Virgin Islands, Inc. v. Gov't of the Virgin Islands*, 385 F.3d 801, 806 (3d Cir. 2004) (quoting *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 244, 73 S.Ct. 236, 97 L.Ed. 291 (1952)). "A dispute is not ripe for judicial determination if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Id.*

Ultimately, "[r]ipeness involves weighing two factors: (1) the hardship to the parties of withholding court consideration; and (2) the fitness of the issues for judicial review." *Artway*, 81 F.3d at 1247. Unlike standing, ripeness is assessed at the time of the court's decision (rather than the time the complaint was filed). *See Blanchette v. Connecticut General Ins. Corp.*, 419 U.S. 102, 139-40, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974).

The Court finds that Plaintiffs' claims are ripe. Applying the two-factor test here, the Court first concludes that the parties would face significant hardship if the Court were to hold that the case was unripe (assuming it was otherwise justiciable). The general election is less than one month away, and Plaintiffs assert claims that could significantly affect the implementation of Pennsylvania's electoral procedures. Further, if the Court were to find that Plaintiffs' claims were not ripe, Plaintiffs would be burdened. This is because Plaintiffs would then have to either wait until after the election occurred—and thus after the alleged harms occurred—or Plaintiffs would have to bring suit on the very eve of the election, and thus there would be insufficient time for the Court to address the issues. This hardship makes judicial review at this time appropriate. The first factor is met.

**\*29** Some Defendants argue that because some of the Secretary's guidance was issued after the 2020 primary election, Plaintiffs' claims that rely on such guidance are not ripe because the guidance has not been implemented in an election yet. The Court disagrees. Both the allegations in the Second Amended Complaint, and the evidence presented on summary judgment, reveal that the guidance issued after the

primary election will apply to the upcoming general election. This is sufficient to make this a properly ripe controversy.[6]

[6]    In her summary-judgment brief, Secretary Boockvar argues that Plaintiffs' as-applied challenge to Pennsylvania's county-residency requirement is unripe. [ECF 547, pp. 60-63]. The Secretary reasons that Plaintiffs have not shown sufficient evidence that they are harmed by the county-residency requirement. This argument is directed more towards a lack of standing and a lack of evidence to support the claim on the merits. As the sufficiency of the evidence of harm is a separate issue from ripeness (which is more concerned with timing), the Court does not find Plaintiffs' as-applied challenge to the county-residency requirement unripe. *See Progressive Mountain Ins. Co. v. Middlebrooks*, 805 F. App'x 731, 734 (11th Cir. 2020) ("The question of ripeness frequently boils down to the same question as questions of Article III standing, but the distinction between the two is that standing focuses [on] whether the type of injury alleged is qualitatively sufficient to fulfill the requirements of Article III and whether the plaintiff has personally suffered that harm, whereas ripeness centers on whether that injury has occurred yet." (cleaned up) (citations omitted)).

The second factor the Court must consider in determining ripeness is "the fitness of the issues for judicial review." *Artway*, 81 F.3d at 1247. "The principal consideration [for this factor] is whether the record is factually adequate to enable the court to make the necessary legal determinations. The more that the question presented is purely one of law, and the less that additional facts will aid the court in its inquiry, the more likely the issue is to be ripe, and vice-versa." *Id.* at 1249.

Under this framework, the Court concludes that the issues are fit for review. The parties have engaged in extensive discovery, creating a developed factual record for the Court to review. Further, as shown below, the Court finds it can assess Plaintiffs' claims based on the current factual record and can adequately address the remaining legal questions that predominate this lawsuit. As such, the Court finds Plaintiffs' claims fit for judicial review.

Thus, Plaintiffs' claims are presently ripe.

**2. Plaintiffs' claims are not moot.**

Some Defendants also assert that Plaintiffs' claims are moot because Plaintiffs reference allegations of harm that occurred during the primary election, and since then, Secretary Boockvar has issued new guidance and the Pennsylvania Supreme Court has interpreted the Election Code to clarify several ambiguities. The Court, however, concludes that Plaintiffs' remaining claims are not moot.

Mootness stems from the same principle as ripeness, but is stated in the inverse: courts "lack jurisdiction when 'the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.' " *Merle v. U.S.*, 351 F.3d 92, 94 (3d Cir. 2003) (quoting *Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969)). Like ripeness and unlike standing, mootness is determined at the time of the court's decision (rather than at the time the complaint is filed). *See U.S. Parole Commission v. Geraghty*, 445 U.S. 388, 397, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980). When assessing mootness, the Court may assume (for purposes of the mootness analysis) that standing exists. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (citation omitted).

**\*30**  Here, the Court finds that Plaintiffs' claims are not moot, as the claims Plaintiffs are proceeding with are "live." First, Plaintiffs' claims are based on guidance that issued after the primary election and are to be applied in the upcoming general election. As such, the *harms* alleged are not solely dependent on the already-passed primary election. Second, Defendants, by and large, have made clear that they intend to abide by guidance that Plaintiffs assert is unlawful or unconstitutional. Third, Plaintiffs sufficiently show that certain Defendants intend to engage in the conduct (*e.g.*, use unmanned drop-boxes) that Plaintiffs say infringes their constitutional rights. Thus, these issues are presently "live" and are not affected by the completion of the primary election.[7] Plaintiffs' claims are not moot.

[7]    In their briefing, the parties focused on the "capable of repetition yet evading review" exception to the mootness doctrine. The Court, however, does not find that it needs to rely on this exception. Nearing the eve of the election, it is clear that Defendants intend to engage in the conduct that Plaintiffs assert is illegal and unconstitutional. Thus, the claims are presently live, and are not "evading review" in this circumstance.

**3. All named Defendants are necessary parties to this lawsuit.**

Many of the county boards of elections that are Defendants in this case argue that the claims against them should be dismissed because Plaintiffs did not specifically allege or prove sufficient violative facts against them. Plaintiffs argue in response that all county boards have been joined because they are necessary parties, and the Court can afford relief without their presence in this case. The Court agrees with Plaintiffs, and declines to dismiss the county boards from the case. They are necessary parties.

Federal Rule of Civil Procedure 19(a) states that a party is a necessary party that must be joined in the lawsuit if, "in that [party's] absence, the court cannot accord complete relief among existing parties." Fed. R. Civ. P. 19(a)(1)(A).

Here, if the county boards were not named defendants in this case, the Court would not be able to provide Plaintiffs complete relief should Plaintiffs prove their case. That's because the Court could not enjoin the county boards if they were not parties. *See* Fed. R. Civ. P. 65(d)(2).[8] This is important because each individual county board of elections manages the electoral process within its county lines. As one court previously summarized, "Election procedures and processes are managed by each of the Commonwealth's sixty-seven counties. Each county has a board of elections, which oversees the conduct of all elections within the county." *Cortés*, 218 F. Supp. 3d at 403 (citing 25 P.S. § 2641(a)). "The county board of elections selects, fixes and at times alters the polling locations of new election districts. Individual counties are also tasked with the preservation of all ballots cast in that county, and have the authority to investigate fraud and report irregularities or any other issues to the district attorney[.]" *Id.* (citing 25 P.S. §§ 2726, 2649, and 2642). The county boards of elections may also make rules and regulations "as they may deem necessary for the guidance of voting machine custodians, elections officers and electors." 25 P.S. § 2642(f).

8    While Rule 65(d)(2)(C) states that an injunction binds "[non-parties] who are in active concert or participation" with the parties or the parties' agents, the Court does not find that Rule 65(d) helps the county boards. As discussed, the county boards manage the elections and implement the electoral procedures. While the Court could enjoin Secretary Boockvar, for example, from using unmanned drop boxes, each individual county election board could still use unmanned drop boxes on their own. Doing so would not result in the counties being in "active concert or participation" with Secretary Boockvar, as each county is independently managing the electoral process within their county lines. *See*

*Marshak v. Treadwell*, 595 F.3d 478, 486 (3d Cir. 2009) ("[N]on-parties guilty of aiding or abetting or acting in concert with a named defendant or his privy in violating the injunction may be held in contempt." (cleaned up) (citations omitted)). In other words, each county elections board would not be "aiding or abetting" Secretary Boockvar in violating the injunction (which would implicate Rule 65(d)(2)(C)); rather, the counties would be utilizing their independent statutory authority to manage elections within their county lines.

 ***31**  Indeed, Defendants' own arguments suggest that they must be joined in this case. As just one example, a handful of counties assert in their summary-judgment brief that the "[Election] Code permits Boards to exercise discretion in certain areas when administering elections, to administer the election in a manner that is both legally-compliant and meets the unique needs of each County's citizens." [ECF 518, p. 6]. Thus, because of each county's discretionary authority, if county boards engage in unconstitutional conduct, the Court would not be able to remedy the violation by enjoining only Secretary Boockvar.[9]

9       As evidence of the county boards' indispensability, one court recently found that the failure to join local election officials in an election case can make the harm alleged not "redressable." It would be a catch-22 to say that county boards cannot be joined to this case as necessary parties, but then dismiss the case for lack of standing due to the boards' absence. *Cf. Jacobson v. Florida Secretary of States*, 974 F.3d 1236, —— – ——, 2020 WL 5289377, at *11-12 (11th Cir. Sept. 3, 2020) ("The problem for the [plaintiffs] is that Florida law tasks the [county] Supervisors, independently of the Secretary, with printing the names of candidates on ballots in the order prescribed by the ballot statute. ... The Secretary is responsible only for certifying to the supervisor of elections of each county the names of persons nominated ... Because the Secretary didn't do (or fail to do) anything that contributed to [plaintiffs'] harm, the voters and organizations cannot meet Article III's traceability requirement." (cleaned up)).

To grant Plaintiffs relief, if warranted, the Court would need to enter an order affecting all county boards of elections— which the Court could not do if some county boards were not joined in this case. Otherwise, the Court could only enjoin violative conduct in some counties but not others. As a result, inconsistent rules and procedures would be in effect throughout the Commonwealth. While some counties can pledge to follow orders issued by this Court, the judicial system cannot rely on pledges and promises, regardless of

the county boards' good intent. The only way to ensure that any illegal or unconstitutional conduct is uniformly remedied, permanently, is to include all county boards in this case.

Thus, because the county boards are necessary parties, the Court cannot dismiss them.

### 4. Plaintiffs lack Article III standing to raise their claims of vote dilution because they cannot establish a "concrete" injury-in-fact.

While Plaintiffs can clear the foregoing procedural hurdles, they cannot clear the final one—Article III standing.

Federal courts must determine that they have jurisdiction before proceeding to the merits of any claim. *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 94-95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." One component of the case-or-controversy requirement is standing, which requires a plaintiff to demonstrate the now-familiar elements of (1) injury in fact, (2) causation, and (3) redressability. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

Standing is particularly important in the context of election-law cases, including a case like this one, that challenge the laws, regulations, and guidance issued by elected and appointed state officials through the democratic processes. As the Supreme Court has explained, the standing "doctrine developed in our case law to ensure that federal courts do not exceed their authority as it has been traditionally understood." *Spokeo, Inc. v. Robins*, ––– U.S. ––––, 136 S. Ct. 1540, 1547, 194 L.Ed.2d 635 (2016) (cleaned up). The doctrine "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Id.* In this way, "Article III standing serves to prevent the judicial process from being used to usurp the powers of the political branches." *Id.* Nowhere is that concern more acute than in a case that challenges a state's exercise of its core constitutional authority to regulate the most deeply political arena of all—elections.

**\*32** Here, Defendants and Intervenors claim that Plaintiffs lack standing, largely arguing that Plaintiffs' injury is too speculative. [ECF 547, pp. 43-50]. The Court agrees and finds that Plaintiffs lack Article III standing for this reason.

Initially, to frame the standing inquiry, understanding the specific claims at issue is important. As discussed above, there are essentially three claims remaining in this case: (1) a challenge to Secretary Boockvar's guidance that does not require all drop boxes to have manned security personnel; (2) a challenge to Secretary Boockvar's guidance that counties should not perform a signature comparison for mail-in ballots; and (3) a challenge to Pennsylvania's county-residency restriction for poll-watchers. *See* [ECF 509, pp. 4-5]. The theory behind all of these claims and the asserted injury is one of vote dilution due to the heightened risk of fraud; that is, without the above measures in place, there is an imminent risk of voter fraud (primarily by mail-in voters); and if that fraud occurs, it will dilute the votes of many of Plaintiffs, who intend to vote in person in the upcoming election. [ECF 551, p. 12 ("As qualified electors who will be voting in the November election, Plaintiffs will suffer an injury through their non-equal treatment and/or the dilution or debasement of their legitimately case votes by absentee and mail-in votes that have not been properly verified by matching the voters' signatures on their applications and ballots to the permanent voter registration record and/or that have been improperly delivered by others to drop boxes or other mobile collection sites in manners that are different[ ] from those offered or being used in their counties of residence.") ].

Turning to the familiar elements of Article III standing, the first and, in the Supreme Court's estimation, "foremost" element—injury-in-fact—is dispositive. *See Gill v. Whitford*, ––– U.S. ––––, 138 S.Ct. 1916, 1929, 201 L.Ed.2d 313 (2018). Specifically, the Court finds that Plaintiffs' theory of vote dilution, based on the evidence presented, is insufficient to establish standing because Plaintiffs' injury-in-fact is not sufficiently "concrete."

With respect to injury-in-fact, the Supreme Court has made clear that an injury must be "concrete" and "particularized." *See Spokeo*, 136 S. Ct. at 1548. Defendants argue that the claimed injury of vote dilution caused by possible voter fraud here is too speculative to be concrete. The Court agrees.

To establish a "concrete" injury, Plaintiffs rely on a chain of theoretical events. They first argue that Defendants' lack of election safeguards (poll watchers, drop-box guards, and signature-comparison procedures) creates a risk of voter fraud or illegal voting. *See* [ECF 461, ¶¶ 230-31, 240, 256]. That risk, they say, will lead to potential fraudsters committing voter fraud or ballot destruction. [*Id.*]. And if that happens,

**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**
Case 4:20-cv-02078-MWB   Document 93-10   Filed 11/12/20   Page 50 of 279
2020 WL 5997680

each vote cast in contravention of the Election Code will, in Plaintiffs' view, dilute Plaintiffs' lawfully cast votes, resulting in a constitutional violation.

The problem with this theory of harm is that this fraud hasn't yet occurred, and there is insufficient evidence that the harm is "certainly impending."

To be clear, Plaintiffs need not establish actual fraud at this stage; but they must establish that fraud is "certainly impending," and not just a "possible future injury." *See Clapper*, 568 U.S. at 409, 133 S.Ct. 1138 ("Thus, we have repeatedly reiterated that threatened injury must be certainly impending to constitute injury in fact, and that allegations of possible future injury are not sufficient.") (cleaned up).

**\*33** This case is well past the pleading stage. Extensive fact and expert discovery are complete. [ECF 462]. Nearly 300 exhibits have been submitted on cross-motions for summary judgment (including 68 by Plaintiffs alone). Plaintiffs bear the burden of proof on this issue, and unlike on a motion to dismiss, on summary judgment, they must come forward with proof of injury, taken as true, that will prove standing, including a concrete injury-in-fact. *See Lujan*, 504 U.S. at 561, 112 S.Ct. 2130 (1992) ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice ... In response to a summary judgment motion, however, the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts ... which for purposes of the summary judgment motion will be taken to be true.") (cleaned up).

Based on the evidence presented by Plaintiffs, accepted as true, Plaintiffs have only proven the "possibility of future injury" based on a series of speculative events—which falls short of the requirement to establish a concrete injury. For example, Plaintiffs' expert, Mr. Riddlemoser, opines that the use of "unstaffed or unmanned" drop boxes merely "increases the *possibility* for voter fraud (and vote destruction)[.]" [ECF 504-19, p. 20 (emphasis added) ]. That's because, according to him (and Plaintiffs' other witnesses), theoretical bad actors *might* intentionally "target" a drop box as the "easiest opportunity for voter fraud" or with the malicious "intent to destroy as many votes ... as possible." [*Id.* at pp. 16-18; *see also* ECF 504-2, ¶ 12 (declaring that drop boxes "*may* serve as a target for bad actors that may wish to tamper with lawfully case ballots before such ballots are counted") (emphasis added) ]. But there's no way of knowing whether these independent actors will ever surface, and if they do,

whether they will act as Mr. Riddlemoser and Plaintiffs predict.

Similarly, Mr. Riddlemoser concludes that, at most, not conducting signature analysis for mail-in and absentee ballots "open[s] the door to the potential for massive fraud through a mechanism already susceptible to voter fraud." [ECF 504-19, p. 20].

This increased susceptibility to fraud and ballot destruction is the impetus for Plaintiffs, in their various capacities, to express their concerns that vote dilution might occur and disrupt their right to a "free and fair election." *See, e.g.,* [504-3, ¶ 6; 504-4, ¶ 7; ECF 504-6, ¶¶ 6-8; ECF 504-7, ¶¶ 5-9]. But these concerns, as outlined above, are based solely on a chain of unknown events that may never come to pass.

In addition to Plaintiffs' expert report, Plaintiffs' evidence consists of instances of voter fraud in the past, including an article in the N.Y. Post purporting to detail the strategies of an anonymous fraudster, as well as pointing to certain prior cases of voter fraud and election irregularities (*e.g.*, Philadelphia inadvertently allowing 40 people to vote twice in the 2020 primary election; some counties counting ballots that did not have a completed declaration in the 2020 primary election). [ECF 461, ¶¶ 63-82; ECF 504-19, p. 3 & Ex. D]. Initially, with one exception noted directly below, none of this evidence is tied to individuals using drop boxes, submitting forged mail-in ballots, or being unable to poll watch in another county —and thus it is unclear how this can serve as evidence of a concrete harm in the upcoming election as to the specific claims in this case.

**\*34** Perhaps the best evidence Plaintiffs present are the several photographs and video stills, which are depicted above, and which are of individuals who appear to be delivering more than one ballot to a drop box during the primary election. It is undisputed that during the primary election, some county boards believed it be appropriate to allow voters to deliver ballots on behalf of third parties. [ECF 504-9, 92:4-10; ECF 504-10, 60:3-61:10; ECF 504-49].

But this evidence of past injury is also speculative. Initially, the evidence is scant. But even assuming the evidence were more substantial, it would still be speculative to find that third-party ballot delivery will also occur in the general election. It may; it may not. Indeed, it may be less likely to occur now that the Secretary issued her September 28, 2020, guidance, which made clear to all county boards that for

the general election, third-party ballot delivery is prohibited. [ECF 504-25 ("Third-person delivery of absentee or mail-in ballots is not permitted, and any ballots delivered by someone other than the voter are required to be set aside. The only exceptions are voters with a disability, who have designated in writing an agent to deliver their ballot for them.") ]. It may also be less likely to occur in light of the Secretary's other guidance, which recommends that county boards place signs near drop boxes, warning voters that third-party delivery is prohibited.

It is difficult—and ultimately speculative—to predict future injury from evidence of past injury. This is why the Supreme Court has recognized that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief if unaccompanied by any continuing, present adverse effects." *Lujan*, 504 U.S. at 564, 112 S.Ct. 2130 (cleaned up).

In fact, based on Plaintiffs' theory of harm in this case, it is almost impossible for them to present anything other than speculative evidence of injury. That is, they would have to establish evidence of a certainly impending illegal practice that is likely to be prevented by the precautions they seek. All of this sounds in "possible future injury," not "certainly impending" injury. In that way, this case is very much like the Supreme Court's decision in *Clapper*.

In *Clapper*, plaintiffs-respondents were attorneys, other advocates, and media groups who communicated with clients overseas whom they feared would be subject to government surveillance under a FISA statute. 568 U.S. at 406, 133 S.Ct. 1138. The plaintiffs there alleged that the FISA statute at issue created a risk of possible government surveillance, which prevented them from communicating in confidence with their clients and compelled them to travel overseas instead and incur additional costs. *Id.* at 406-07, 133 S.Ct. 1138. Based on these asserted injures, the plaintiffs filed suit, seeking to invalidate provisions of FISA. *Id.* at 407, 133 S.Ct. 1138.

The Supreme Court held that plaintiffs there lacked standing because their risk of harm was not concrete—rather, it was attenuated and based on a series of speculative events that may or may not ever occur. *Id.* at 410, 133 S.Ct. 1138 (finding that "respondents' argument rests on their highly speculative fear that: (1) the Government will decide to target the communications of non-U.S. persons with whom they communicate; (2) in doing so, the Government will choose to invoke its authority under § 1881a rather than

utilizing another method of surveillance; (3) the Article III judges who serve on the Foreign Intelligence Surveillance Court will conclude that the Government's proposed surveillance procedures satisfy § 1881a's many safeguards and are consistent with the Fourth Amendment; (4) the Government will succeed in intercepting the communications of respondents' contacts; and (5) respondents will be parties to the particular communications that the Government intercepts).

**\*35** In the end, the Court found that it would not "endorse standing theories that rest on speculation about the decisions of independent actors." *Id.* at 414, 133 S.Ct. 1138.

Like *Clapper*, here, Plaintiffs' theory of harm rests on speculation about the decisions of independent actors. For drop boxes, that speculation includes that unknown individuals will utilize drop boxes to commit fraud or other illegal activity; for signature comparison, that fraudsters will submit forged ballots by mail; for poll watchers, that illegal votes will not be sufficiently challenged; and for all these claims, that other security measures in place to monitor drop boxes, to verify ballot information, and to challenge ballots will not work.

All of this may occur and may result in some of Plaintiffs' votes being diluted; but the question is whether these events are "certainly impending." The evidence outlined above and presented by Plaintiffs simply fails to meet that standard.

This is not to say that claims of vote dilution or voter fraud never give rise to a concrete injury. A plaintiff can have standing to bring a vote-dilution claim—typically, in a malapportionment case—by putting forth statistical evidence and computer simulations of dilution and establishing that he or she is in a packed or cracked district. *See Gill*, 138 S. Ct. at 1936 (Kagan, J., concurring). And a plaintiff can have standing to bring a voter-fraud claim, but the proof of injury there is evidence of actual fraud in the election and thus the suit will be brought after the election has occurred. *See, e.g., Marks v. Stinson*, 19 F.3d 873 (3d Cir. 1994). But, at least based on the evidence presented here, a claim of vote dilution brought in advance of an election on the theory of the risk of potential fraud fails to establish the requisite concrete injury for purposes of Article III standing.

Plaintiffs advance three other theories of harm here, in order to establish standing—none of which establish a concrete injury-in-fact.

First, Plaintiffs assert that since some of them are Republican candidates and that Republicans are more likely to vote in person and Democrats more likely to vote by mail, that their injury here is a competitive disadvantage in the electoral process. [ECF 551, pp. 16-18 ("The challenged guidance will further harm the RNC through the institutional prioritization of voting by mail and the potential disenfranchisement of Republican voters, who prefer to vote in person in the upcoming General Election.") ]. This too is a speculative, non-concrete injury. There is nothing in the record to establish that potential voter fraud and dilution will impact Republicans more than Democrats.

**\*36** To be sure, the information that Plaintiffs present shows that more Democrats are likely to use mail-in ballots. [ECF 551, p. 31 ("[I]n Pennsylvania, of the 1.9 million absentee or mail-in ballots that have been requested for the November 3, 2020 General Election, 'nearly 1.5 million Democrats have requested a mail-in ballot—nearly three times the requests from Republicans.' ") (quoting L. Broadwater, "Both Parties Fret as More Democrats Request Mail Ballots in Key States," New York Times (Sept. 30, 2020), *available at* https://www.nytimes.com/2020/09/30/us/mail-voting-democrats-republicans-turnout.html) ]. But it doesn't necessarily follow that more Democrats will commit voter fraud, such as through the destruction of drop boxes or third-party ballot harvesting, and thus more Republicans' votes will be diluted.

In fact, as Plaintiffs' expert, Mr. Riddlemoser, explains, fraudsters from either party could target drop boxes in specific areas in order to destroy ballots, depending on who may be the predominant party in the area. [ECF 504-19, at pp. 17-18 ("In short, nothing would prevent someone from intentionally targeting a drop box in a predominantly Republican or predominantly Democratic area with an intent to destroy as many votes for that political party or that party's candidate(s) as possible.") ]. Indeed, the more important fact for this theory of harm is not the party of the voter, but the party of the fraudster—and, on this, Plaintiffs present no evidence that one party over the other is likely to commit voter fraud.

Second, Plaintiffs also argue that the RNC, the Congressional Plaintiffs, and the Trump Campaign have organizational standing because they "have and will continue to devote their time and resources to ensure that their Pennsylvania supporters, who might otherwise be discouraged by the Secretary's guidance memos favoring mail-in and absentee

voting and Defendants' implementation thereof, get out to the polls and vote on Election Day." [ECF 551, p. 19]. This is a similar argument raised by the plaintiffs in *Clapper*, and rejected there by the Supreme Court. Because Plaintiffs' harm is not "certainly impending," as discussed above, spending money in response to that speculative harm cannot establish a concrete injury. *Clapper*, 568 U.S. at 416, 133 S.Ct. 1138 ("Respondents' contention that they have standing because they incurred certain costs as a reasonable reaction to a risk of harm is unavailing—because the harm respondents seek to avoid is not certainly impending. In other words, respondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."); *see also Donald J. Trump for President, Inc. v. Cegavske*, ––– F. Supp. 3d ––––, ––––, 2020 WL 5626974, at *5 (D. Nev. Sept. 18, 2020) ("Outside of stating 'confusion' and 'discouragement' in a conclusory manner, plaintiffs make no indication of how AB 4 will discourage their member voters from voting. If plaintiffs did not expend any resources on educating their voters on AB4, their voters would proceed to vote in-person as they overwhelmingly have in prior elections.").

Third, with respect to the poll-watching claim, Plaintiffs argue that at least one of the Plaintiffs, Ms. Patterson, is a prospective poll watcher who is being denied the right to poll watch based on the county-residency restriction, and thus she meets the Article III requirements. [ECF 551, p. 34 (citing ECF 551-3, ¶¶ 9-10) ]. However, Ms. Patterson cannot establish standing because, by Plaintiffs' own concession, the theory of harm in this case is not the denial of the right to poll watch, but instead dilution of votes from fraud caused from the failure to have sufficient poll watchers. [ECF 509, p. 67 ("But, the core of the as-applied challenge here is not that the Plaintiffs cannot staff a particular polling place, it is that a candidate and his or her party is presented with the Hobson's choice of selecting limited polling places to observe due to the residency requirement and accept that unobserved polling places must exist due to the inability to recruit a sufficient force of poll watchers due to the necessity that candidates be county residents.") ].

**\*37** And the remedy sought here is much broader than simply allowing Ms. Patterson to poll watch in a certain county, but is tied to the broader harm of vote dilution that Plaintiffs assert. [ECF 503-1, p. 3, ¶ 3 ("Plaintiffs shall be permitted to have watchers present at all locations where voters are registering to vote, applying for absentee or mail-in ballots, voting absentee or mail-in ballots, and/or returning

or collecting absentee or mail-in ballots, including without limitation any satellite or early voting sites established by any county board of elections.") ]. Standing is measured based on the theory of harm and the specific relief requested. *See Gill*, 138 S. Ct. at 1934 ("We caution, however, that 'standing is not dispensed in gross': A plaintiff's remedy must be tailored to redress the plaintiff's particular injury."). As with all of the claims, the poll-watching claim rests on evidence of vote dilution that does not rise to the level of a concrete harm.

In sum, Plaintiffs here, based on the evidence presented, lack Article III standing to assert their claims. Because they lack standing, the Court will enter judgment in Defendants' favor and dismiss all claims.[10] However, because of the novelty of Plaintiffs' claims and theories, a potential appeal in this case, and the short time before the general election, out of an abundance of caution, the Court will, in the alternative, proceed to examine the claims on the merits.

[10]    The organizational Plaintiffs also raise certain associational and organizational standing arguments, asserting that they represent their members' interests. The associational standing arguments are derivative of their members' interests. That is, because the Court has found no concrete injury suffered by the individual voters, which would include the members of the organizational Plaintiffs, there are no separate grounds to establish standing for these organizations. *See United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1997) (an organization only has standing to sue on behalf of its members when "its members would otherwise have standing to sue in their own right") (citation omitted).

## II. Defendants and Intervenors are entitled to summary judgment on Plaintiffs' claim that drop boxes violate the U.S. Constitution.

Plaintiffs' drop-box claim has materially changed since the Pennsylvania Supreme Court's decision authorizing the use of drop boxes. Plaintiffs now allege that drop boxes effectively allow third parties to return the ballots of voters other than themselves because, they say, no one is there to stop them. Absent an in-person guard or poll worker to monitor the drop boxes and prevent the return of ballots cast in a manner contrary to what the Election Code permits, Plaintiffs assert that they face an unacceptable risk of vote dilution, which burdens their right to vote. Plaintiffs also argue that the "uneven" use of drop boxes in Pennsylvania, by some counties but not others, violates equal protection by

subjecting voters in different counties to different amounts of dilutive risk, and perhaps by diluting lawful votes cast by individuals who failed to comply with the Election Code.

The evidence relevant to these claims is undisputed. *See* [ECF 509, p. 45 ("After the completion of extensive discovery, including numerous depositions and responses to discovery requests, no genuine dispute of material fact exists regarding Plaintiffs' constitutional claims.") ]. Viewed in the light most favorable to Plaintiffs, the Court could conclude from this evidence, and will assume for purposes of this decision, that (1) drop boxes allow for greater risk of third-party ballot delivery in violation of the Election Code than in-person polling locations or manned drop boxes, and (2) that the use of drop boxes is "uneven" across Pennsylvania due to its county-based election system—*i.e.*, some counties are using "unmanned" drop boxes with varying security measures, some are using "manned" drop boxes, some are using dozens of drop boxes in a variety of locations, some are using one drop box in a county office building, and some are not using drop boxes at all. The question before the Court is whether this state of affairs violates equal protection or due process.

**\*38**  The Court finds that it does not. The uneven use of drop boxes across counties does not produce dilution as between voters in different counties, or between "lawful" and "unlawful" voters, and therefore does not present an equal-protection violation. But even if it did, the guidelines provided by Secretary Boockvar are rational, and weighing the relative burdens and benefits, the Commonwealth's interests here outweigh any burden on Plaintiffs' right to vote.

### A. Pennsylvania's "uneven" use of drop boxes does not violate federal equal-protection rights.

Plaintiffs' primary claim concerns the uneven use of drop boxes across the Commonwealth, which they contend violates the Equal-Protection Clause of the 14th Amendment.

The 14th Amendment's Equal-Protection Clause commands that "no State shall ... deny to any person within its jurisdiction the equal protection of laws." U.S. Const. amend. XIV, § 1. This broad and simple promise is "an essential part of the concept of a government of laws and not men." *Reynolds v. Sims*, 377 U.S. 533, 568, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

But while the Constitution demands equal protection, that does not mean all forms of differential treatment are forbidden. *See Nordlinger v. Hahn*, 505 U.S. 1, 10, 112

S.Ct. 2326, 120 L.Ed.2d 1 (1992) ("Of course, most laws differentiate in some fashion between classes of persons. The Equal Protection Clause does not forbid classifications."). Instead, equal protection "simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Id.* (citation omitted). What's more, "unless a classification warrants some form of heightened review because it jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest." *Id.* (citations omitted).

Of course, the right of every citizen to vote is a fundamental right. *See Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979) ("[F]or reasons too self-evident to warrant amplification here, we have often reiterated that voting is of the most fundamental significance under our constitutional structure.") (citations omitted). Indeed, it is a foundational right "that helps to preserve all other rights." *Werme v. Merrill*, 84 F.3d 479, 483 (1st Cir. 1996); *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964) ("Other rights, even the most basic, are illusory if the right to vote is undermined."). And its scope is broad enough to encompass not only the right of each voter to cast a ballot, but also the right to have those votes "counted without dilution as compared to the votes of others." *Minn. Voters Alliance v. Ritchie*, 720 F.3d 1029, 1031 (8th Cir. 2013) (cleaned up).

As a result, Plaintiffs are quite correct when they suggest that a state election procedure that burdens the right to vote, including by diluting the value of votes compared to others, must "comport with equal protection and all other constitutional requirements." *Cortés*, 218 F. Supp. 3d at 407. That much, at least, is not in dispute.

At the same time, however, the Constitution "confers on the states broad authority to regulate the conduct of elections, including federal ones." *Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004) (citing U.S. Const. Art. I, § 4, cl. 1). This authority includes "broad powers to determine the conditions under which the right of suffrage may be exercised." *Shelby Cnty., Ala. v. Holder*, 570 U.S. 529, 543, 133 S.Ct. 2612, 186 L.Ed.2d 651 (2013) (cleaned up). Indeed, "[c]ommon sense, as well as constitutional law, compels the conclusion" that states must be free to engage in "substantial regulation of elections" if "some sort of order, rather than chaos, is to accompany the democratic processes." *Burdick v. Takushi*,

504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (cleaned up). And all "[e]lection laws will invariably impose some burden upon individual voters." *Id.*

**\*39** If the courts were "to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest," it "would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Id.* The "machinery of government would not work if it were not allowed a little play in its joints." *Bain Peanut Co. of Tex. v. Pinson*, 282 U.S. 499, 501, 51 S.Ct. 228, 75 L.Ed. 482 (1931). Thus, when faced with a constitutional challenge to a state election law, or to the actions of state officials responsible for regulating elections, a federal court must weigh these competing constitutional considerations and "make the 'hard judgment' that our adversary system demands." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 190, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008).

The Supreme Court has supplied lower courts guidance as to how to make these hard judgments, by "forg[ing]" the "flexible standard" for assessing the constitutionality of election regulations into "something resembling an administrable rule." *Id.* at 205, 128 S.Ct. 1610 (Scalia, J. concurring) (citing *Burdick*, 504 U.S. at 434, 112 S.Ct. 2059).

Under this standard, first articulated in *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) and then refined in *Burdick*, the fact "[t]hat a law or state action imposes some burden on the right to vote does not make it subject to strict scrutiny." *Donatelli v. Mitchell*, 2 F.3d 508, 513 (3d Cir. 1993); *see also Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 585 (6th Cir. 2006) ("[V]oting regulations are not automatically subjected to heightened scrutiny."). Instead, any "law respecting the right to vote—whether it governs voter qualifications, candidate selection, or the voting process," is subjected to "a deferential 'important regulatory interests' standard for nonsevere, nondiscriminatory restrictions, reserving strict scrutiny for laws that severely restrict the right to vote." *Crawford*, 553 U.S. at 204, 128 S.Ct. 1610 (Scalia, J. concurring).

In practice, this means that courts must weigh the "character and magnitude of the burden the State's rule imposes" on the right to vote "against the interests the State contends justify that burden, and consider the extent to which the State's concerns make that burden necessary." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358, 117 S.Ct.

1364, 137 L.Ed.2d 589 (1997) (cleaned up). If the state imposes a "severe" burden on the right to vote, strict scrutiny applies—the rule may survive only if it is "narrowly tailored" and only if the state advances a "compelling interest." *Id.* But if the state imposes only "reasonable, nondiscriminatory restrictions," its "important regulatory interests will usually be enough" to justify it. *Id.* Indeed, where state regulations are "minimally burdensome and nondiscriminatory" a level of scrutiny "closer to rational basis applies[.]" *Ohio Council 8 Am. Fed'n of State v. Husted*, 814 F.3d 329, 335 (6th Cir. 2016). And where the state imposes no burden on the "right to vote" at all, true rational basis review applies. *See Biener v. Calio*, 361 F.3d 206, 215 (3d Cir. 2004) ("Biener also cannot establish an infringement on the fundamental right to vote ... As the [election] filing fee does not infringe upon a fundamental right, nor is Biener in a suspect class, we consider the claims under a rational basis test.") (citation omitted); *Common Cause/New York v. Brehm*, 432 F. Supp. 3d 285, 310 (S.D.N.Y. 2020) ("Under this framework, election laws that impose no burden on the right to vote are subject to rational-basis review.").

**\*40** This operates as a "sliding scale"—the "more severe the burden imposed, the more exacting our scrutiny; the less severe, the more relaxed our scrutiny." *Arizona Libertarian Party v. Hobbs*, 925 F.3d 1085, 1090 (9th Cir. 2019); *see also Fish v. Schwab*, 957 F.3d 1105, 1124 (10th Cir. 2020) ("We, and our sister circuits and commentators, have referred to this as a 'sliding scale' test."); *Libertarian Party of New Hampshire v. Gardner*, 638 F.3d 6, 14 (1st Cir. 2011) ("We review all of the First and Fourteenth Amendment claims under the sliding scale approach announced by the Supreme Court in *Anderson* ... and *Burdick*[.]"); *Burdick*, 504 U.S. at 434, 112 S.Ct. 2059 ("[T]he rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights.").

Against that backdrop, the Court now turns to Plaintiffs' claim that the use of unmanned drop boxes by some Pennsylvania counties, but not others, violates equal protection. As will be discussed, Plaintiffs' equal-protection claim fails at the threshold, without even reaching *Anderson-Burdick*, because Plaintiffs have not alleged or shown that Pennsylvania's system will result in the dilution of votes in certain counties and not others. Furthermore, even if the Court applies *Anderson-Burdick*, the attenuated "burden" Plaintiffs have identified—an increased risk of vote dilution created by the use of unmanned drop boxes—is more than justified by Defendants' important and precise interests in regulating elections.

**1. Plaintiffs have not shown that Pennsylvania treats equivalent votes in different counties differently.**

Plaintiffs' equal-protection claim asserts differential treatment on a theory of vote dilution. As far as the Court can discern, this claim has two dimensions.

First, the main thrust concerns differential treatment as between counties. Plaintiffs assert that some counties will use drop boxes in certain ways (specifically, without in-person guards or in varying number and locations), while others will not—resulting in differential treatment. *See, e.g.,* [ECF 551, p. 44 ("Plaintiffs assert (and have proven) that Defendants have adopted, and intend to implement in the General Election, an election regime that applies Pennsylvania's Election Code in a way that treats the citizens of Pennsylvania unequally depending on ... the location where they happen to live: in some counties, voters will have around-the-clock access to 'satellite election offices' at which they can deposit their vote, but in other counties, voters will have no access at all to such drop boxes; in some counties those drop boxes will be staffed and secure, but in other counties drop boxes will be unmonitored and open to tampering[.]") ]; [*Id.* at p. 46 ("Defendants' ongoing actions and stated intentions ensure that votes will not be counted the same as those voting in other counties, and in some instances, in the same Congressional district. For instance, the harm flowing from those actions will fall disproportionately on the Republican candidates that bring suit here because many Democrat-heavy counties have stated intentions to implement the Secretary's unconstitutional ... ballot collection guidance, and many Republican-heavy counties have stated intentions to follow the Election Code as it is written.") ].

**\*41** Second, although less clear, Plaintiffs' equal-protection claim may also concern broader differential treatment between law-abiders and scofflaws. In other words, Plaintiffs appear to suggest that Pennsylvania discriminates against all law-abiding voters by adopting policies which tolerate an unacceptable risk of a lawfully cast votes being diluted by each unlawfully cast vote anywhere in Pennsylvania. *See, e.g.,* [ECF 509, p. 55 ("The use of unstaffed drop boxes ... not only dilutes the weight of *all* qualified Pennsylvanian electors, it curtails a sense of security in the voting process.") (emphasis in original) ]; [ECF 509 p. 68 ("There will be no

protection of one-person, one-vote in Pennsylvania, because her policies ... allowing inconsistently located/used drop boxes will result in illegal ballots being cast and counted with legitimate votes[.]") ].

As discussed below, both of these species of equal protection fail because there is, in fact, no differential treatment here— a necessary predicate for an equal-protection claim.

Initially, Plaintiffs "have to identify a burden before we can weigh it." *Crawford*, 553 U.S. at 205, 128 S.Ct. 1610 (Scalia, J. concurring). In the equal-protection context, this means the plaintiff "must present evidence that s/he has been treated differently from persons who are similarly situated." *Renchenski v. Williams*, 622 F.3d 315, 337 (3d Cir. 2010) (cleaned up). And not just any differential treatment will do. As discussed above, differences in treatment raise equal-protection concerns, and necessitate heightened scrutiny of governmental interests, only if they burden a fundamental right (such as the right to vote) or involve a suspect classification based on a protected class. *See Obama for Am. v. Husted*, 697 F.3d 423, 429 (6th Cir. 2012) ("If a plaintiff alleges only that a state treated him or her differently than similarly situated voters, without a corresponding burden on the fundamental right to vote, a straightforward rational basis standard of review should be used.").

Plaintiffs argue that equal protection is implicated because Pennsylvania has permitted counties to use drop boxes to varying extents, and with varying degrees of security. Some, like Delaware County, intend to use dozens of drop boxes. *See generally* [ECF 549-28]. Many others will not use drop boxes at all. *See generally* [ECF 504-1]. And among the counties that *do* use drop boxes, some will staff them with county officials, while others will monitor them only with video surveillance or not at all. *See generally* [ECF 549-28].

In this respect, Plaintiffs argue that they suffer an equal-protection harm similar to that found by the Supreme Court in *Bush v. Gore*, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000). There, the Supreme Court held that the Florida Supreme Court violated equal protection when it "ratified" election recount procedures that allowed different counties to use "varying standards to determine what was a legal vote." *Id.* at 107, 121 S.Ct. 525. This meant that entirely equivalent votes might be counted in one county but discounted in another. *See, e.g., id.* ("Broward County used a more forgiving standard than Palm Beach County, and uncovered almost three times as many new votes, a result markedly disproportionate to the difference in population between the counties."). Given the absence of uniform, statewide rules or standards to determine which votes counted, the Court concluded that the patchwork recount scheme failed to "satisfy the minimum requirement for nonarbitrary treatment of voters necessary to secure the fundamental right [to vote]." *Id.*

**\*42** While the Supreme Court expressly limited its holding in *Bush* "to the present circumstances" of a standardless "statewide recount under the authority of a single state judicial officer," *id.* at 109, 121 S.Ct. 525, a few courts have found its reasoning to be persuasive as a broader principle of equal protection. *See Stewart v. Blackwell*, 444 F.3d 843, 859 (6th Cir. 2006) ("Somewhat more recently decided is *Bush v. Gore*, ... which reiterated long established Equal Protection principles."); *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 598 (6th Cir. 2012) ("We agree with all of the parties and the district court that the consent decree likely violates the equal protection principle recognized in *Bush v. Gore.*"); *Pierce v. Allegheny Cty. Bd. of Elections*, 324 F. Supp. 2d 684, 705 (W.D. Pa. 2003) (Conti, J.) ("As noted above, the court finds that the facts presented raise a serious equal protection claim under a theory similar to that espoused by the United States Supreme Court in *Bush v. Gore, supra.*"); *Black v. McGuffage*, 209 F. Supp. 2d 889, 899 (N.D. Ill. 2002) ("The Court is certainly mindful of the limited holding of Bush. However, we believe that situation presented by this case is sufficiently related to the situation presented in Bush that the holding should be the same.").

Indeed, *Bush*'s core proposition—that a state may not take the votes of two voters, similarly situated in all respects, and, for no good reason, count the vote of one but not the other—seems uncontroversial. It also seems reasonable (or at least defensible) that this proposition should be extended to situations where a state takes two equivalent votes and, for no good reason, adopts procedures that greatly increase the risk that one of them will not be counted—or perhaps gives more weight to one over the other. *See, e.g., Black*, 209 F. Supp. 2d at 899 ("Plaintiffs in this case allege that the resulting vote dilution, which was found to be unacceptable in *Bush* without any evidence of a disproportionate impact on any group delineated by traditional suspect criteria, is impacting African American and Hispanic groups disproportionately.... Any voting system that arbitrarily and unnecessarily values some votes over others cannot be constitutional."); *see also Reynolds*, 377 U.S. at 555, 84 S.Ct. 1362 ("[T]he right of suffrage can be denied by a debasement or dilution of the

weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

That is the sort of equal-protection claim Plaintiffs purport to be asserting—a claim that voters in counties that use drop boxes are subjected to a much higher risk of vote dilution than those in other counties that do not. But that characterization falls apart under scrutiny. Indeed, despite their assertions, Plaintiffs have not actually alleged, let alone proven, that votes cast in some counties are diluted by a greater amount relative to votes cast in others. Rather, they have, at best, shown only that events causing dilution are more likely to occur in counties that use drop boxes. But, importantly, the effect of those events will, by Plaintiffs' own admission, be felt by every voter across all of Pennsylvania. [ECF 509, p. 55. ("The use of unstaffed drop boxes places the security of unknown hundreds (if not thousands) of ballots in jeopardy of theft, destruction, and manipulation. This not only dilutes the weight of *all* qualified Pennsylvanian electors, it curtails a sense of security in the voting process.") (citations omitted) (emphasis in original) ]. Such dilution impacts the entire electorate equally; not just voters in the county where it occurs.

To illustrate this distinction, consider, for example, a presidential election. The Court agrees with Plaintiffs that the relevant electoral unit in such an election is "the entire Commonwealth of Pennsylvania." [ECF 551, p. 55 ("The electoral unit in this election is the entire Commonwealth of Pennsylvania.") ]. Indeed, on election night, votes cast in each of Pennsylvania's 67 counties will be canvassed, counted, and ultimately added to a statewide vote total that decides who wins Pennsylvania's 20 electoral votes. So, ask: what is the dilutive impact of a hypothetical illegal vote cast in Philadelphia during that election? Does it cause, in any sense, an "unequal evaluation of ballots" cast in different counties, *Bush*, 531 U.S. at 106, 121 S.Ct. 525, such that lawful ballots cast in Philadelphia will be less likely to count, worth less if they do, or otherwise disfavored when compared to votes cast in other counties? The answer is evident—it does not. Rather, the hypothetical illegal vote cast in Philadelphia dilutes *all lawful votes* cast in the election *anywhere* in the Commonwealth by the exact same amount.

**\*43** The same reasoning holds in elections that occur within part of a state, rather than statewide. For example, consider a hypothetical legislative district covering two counties—one that uses drop boxes and one that does not. There may well be a greater risk that illegal voting will occur in the county that

uses drop boxes. But any dilutive impact of those votes will be felt equally by voters in *both* counties.

This is categorically different from the harm at issue in *Bush* and cases like it. In *Bush*, Florida's arbitrary use of different recount standards in different counties meant that the state was counting equivalent ballots differently in different counties, meaning that voters in some counties were more likely to have their votes counted than those in others.

In *Black v. McGuffage*, an Illinois district-court case on which Plaintiffs heavily rely, the plaintiffs alleged that the type of voting machines used in some Illinois counties were statistically much more likely to result in equivalent votes being discounted at a much higher frequency in some counties than others, and that the worst machines were those being used in counties with high populations of minority groups. 209 F. Supp. 2d at 899. As a result, voters (and, specifically, minority voters) were much more likely to have their votes discounted, based just on the county in which they lived. *See id.* ("As a result, voters in some counties are statistically less likely to have their votes counted than voters in other counties in the same state in the same election for the same office. Similarly situated persons are treated differently in an arbitrary manner.... In addition, the Plaintiffs in this case allege that the resulting vote dilution ... is impacting African American and Hispanic groups disproportionately.").

Finally, *Stewart v. Blackwell*, another case cited by Plaintiffs, was the same as *Black*—voters in counties that used punch-card voting were "approximately four times as likely not to have their votes counted" as a voter in a different county "using reliable electronic voting equipment." 444 F.3d at 848.

What ties these cases together is that each of them involves a state arbitrarily "valu[ing] one person's vote over that of another," *Bush*, 531 U.S. at 104-05, 121 S.Ct. 525, by permitting counties to either apply different standards to decide what votes count (*Bush*) or use different voting technologies that create a great risk of votes being discounted in one county that does not exist in others (*Black* and *Stewart*). It is this sort of "differential treatment ... burden[ing] a fundamental right" that forms the bedrock of equal protection. *Sullivan v. Benningfield*, 920 F.3d 401, 409 (6th Cir. 2019).

Plaintiffs, in contrast, have shown no constitutionally significant differential treatment at all.

Instead, as discussed, if Plaintiffs are correct that the use of drop boxes increases the risk of vote dilution, all votes in the relevant electoral unit—whether that is statewide, a subset of the state, or a single county—face the same degree of increased risk and dilution, regardless of which county is most at fault for elevating that risk.

What Plaintiffs have really identified, then, are not uneven **risks of vote dilution**—affecting voters in some counties more than equivalent voters in others—but merely different voting procedures in different counties that may contribute different amounts of vote dilution **distributed equally across the electorate as a whole**. The Court finds that this is not an equal-protection issue.

**\*44** To be clear, the reason that there is no differential treatment is solely based on Plaintiffs' theory of harm in this case. In the more "routine" vote-dilution cases, the state imposes some restriction or direct impact on the plaintiff's right to vote—that results in his or her vote being weighed less (*i.e.*, diluted) compared to those in other counties or election districts. *See Gill,* 138 S. Ct. at 1930, (explaining that "the holdings in *Baker* and *Reynolds* were expressly premised on the understanding that the injuries giving rise to those claims were individual and personal in nature, because the claims were brought by voters who alleged facts showing disadvantage to themselves as individuals") (cleaned up). In this case, though, Plaintiffs complain that the state is *not* imposing a restriction on **someone else's** right to vote, which, they say, raises the risk of fraud, which, if it occurs, could dilute the value of Plaintiffs' vote. The consequence of this inverted theory of vote dilution is that all other votes are diluted in the same way; all feel the same effect.

Finally, the Court's ruling in this regard is consistent with the many courts that have recognized that counties may, consistent with equal protection, employ entirely different election procedures and voting systems within a single state. *See, e.g., Wexler v. Anderson,* 452 F.3d 1226, 1231-33 (11th Cir. 2006) ("Plaintiffs do not contend that equal protection requires a state to employ a single kind of voting system throughout the state. Indeed, local variety in voting systems can be justified by concerns about cost, the potential value of innovation, and so on.") (cleaned up); *Hendon v. N.C. State Bd. of Elections,* 710 F.2d 177, 181 (4th Cir. 1983) ("A state may employ diverse methods of voting, and the methods by which a voter casts his vote may vary throughout the state."); *Short v. Brown,* 893 F.3d 671, 679 (9th Cir. 2018) ("[T]he appellants' reading of the Supreme Court's

voting cases would essentially bar a state from implementing any pilot program to increase voter turnout. Under their theory, unless California foists a new system on all fifty-eight counties at once, it creates 'unconstitutional vote-dilution' in counties that do not participate in the pilot plan. Nothing in the Constitution, the Supreme Court's controlling precedent, or our case law suggests that we can micromanage a state's election process to this degree."); *Fla. State Conference of N.A.A.C.P. v. Browning,* 569 F. Supp. 2d 1237, 1258 (N.D. Fla. 2008) ("[A]s with countless public services delivered through Florida's political subdivisions— such as law enforcement and education—resource disparities are to some degree inevitable. They are not, however, unconstitutional."); *Green Party of State of New York v. Weiner,* 216 F. Supp. 2d 176, 192 (S.D.N.Y. 2002) ("Even in that situation, [*Bush v. Gore*] did not challenge, and the Court did not question, the use of entirely different technologies of voting in different parts of the state, even in the same election."); *Paher v. Cegavske,* No. 20-243, 2020 WL 2748301, at \*9 (D. Nev. May 27, 2020) ("[I]t cannot be contested that Clark County, which contains most of Nevada's population—and likewise voters (69% of all registered voters [ ] )—is differently situated than other counties. Acknowledging this as a matter of generally known (or judicially noticeable) fact and commonsense makes it more than rational for Clark County to provide additional accommodations to assist eligible voters."); *Ron Barber for Cong. v. Bennett,* No. 14-2489, 2014 WL 6694451, at \*5 (D. Ariz. Nov. 27, 2014) ("[T]he [*Bush v. Gore*] Court did not invalidate different county systems regarding implementation of election procedures."); *Tex. Democratic Party v. Williams,* No. 07-115, 2007 WL 9710211, at n.4 (W.D. Tex. Aug. 16, 2007) ("In *Bush v. Gore,* the Supreme Court specifically noted: 'The question before the Court is not whether local entities, in the exercise of their expertise, may develop different systems for implementing elections.' ").

**\*45** Equal protection does not demand the imposition of "mechanical compartments of law all exactly alike." *Jackman v. Rosenbaum Co.,* 260 U.S. 22, 31, 43 S.Ct. 9, 67 L.Ed. 107 (1922). Rather, "the Constitution is sufficiently flexible to permit its requirements to be considered in relation to the ... contexts in which they are invoked." *Merchants Nat'l Bank of Mobile v. Dredge Gen. G. L. Gillespie,* 663 F.2d 1338, 1343 (5th Cir. 1981). And in this context, "few (if any) electoral systems could survive constitutional scrutiny if the use of different voting mechanisms by counties offended the Equal Protection Clause." *Trump v. Bullock,* ---- F.3d ----, ----, 2020 WL 5810556, at \*14 (D. Mont. Sept. 30, 2020).

The distinction—between differences in county election procedures and differences in the treatment of votes or voters between counties—is reflected in *Bush* itself. There, the Supreme Court took pains to clarify that the question before it was "not whether local entities, in the exercise of their expertise, may develop different systems for implementing elections." *Bush*, 531 U.S. at 109, 121 S.Ct. 525; *see also id.* at 134, 121 S.Ct. 525 (Souter, J. dissenting) ("It is true that the Equal Protection Clause does not forbid the use of a variety of voting mechanisms within a jurisdiction, even though different mechanisms will have different levels of effectiveness in recording voters' intentions; local variety can be justified by concerns about cost, the potential value of innovation, and so on."); *Bullock*, ––– F.3d at ––––, 2020 WL 5810556, at *14 ("[T]he Supreme Court was clear in *Bush v. Gore* that the question was not whether local entities, in the exercise of their expertise, may develop different systems for implementing elections.") (cleaned up).

Thus, coming back to the theory of Plaintiffs' case, Plaintiffs contend that Secretary Boockvar's drop-box guidance will result in differences between counties and differing risks of fraud. But the result of that uneven implementation will not be votes in certain counties being valued less than others. And the result won't be that voters who vote in person will have their votes valued less, either. Instead, if Plaintiffs are right, any unlawful votes will dilute all other lawful votes in the same way. While certainly voter fraud and illegal voting are bad, as a matter of equal protection, there is no unequal treatment here, and thus no burden on Plaintiffs' rights under the Equal Protection Clause.

In addition to their equal-protection claim based on county differences, Plaintiffs also appear to allude to a more general type of equal-protection violation. They assert that Pennsylvania comprises a single election unit. [ECF 551, p. 55 ("The electoral unit in this election is the entire Commonwealth of Pennsylvania.") ]. They assert that they intend to cast their ballots lawfully. *See, e.g.*, [ECF 504-3, ¶ 4 ("As a Pennsylvania qualified registered elector, I have always voted in-person at primary and general elections, and I intend to vote in-person at the upcoming November 3, 2020 General Election.") ]. And they assert that unmanned drop boxes across the Commonwealth (regardless of the county) will, on a statewide basis, dilute their votes. *See, e.g.*, [*id.* at ¶ 6 ("As a Pennsylvania qualified registered elector who votes in-person, I do not want my in-person vote diluted or cancelled by votes that are cast in a manner contrary

to the requirements enacted by the Pennsylvania General Assembly.") ]. For example, if one "qualified elector" casts a lawful ballot, but a fraudulent voter casts ten ballots, then that elector's vote will, under Plaintiffs' theory, be diluted by a magnitude of ten—resulting in differential treatment.

**\*46** The problem with this theory is that there does not appear to be any law to support it. Indeed, if this were a true equal-protection problem, then it would transform every violation of state election law (and, actually, every violation of every law) into a potential federal equal-protection claim requiring scrutiny of the government's "interest" in failing to do more to stop illegal activity. This is not the law. To the contrary, it is well-established that even violations of state election laws by state officials, let alone violations by unidentified third parties, do not give rise to federal constitutional claims except in unusual circumstances. *See Shipley v. Chicago Bd. of Election Commissioners*, 947 F.3d 1056, 1062 (7th Cir. 2020) ("A violation of state law does not state a claim under § 1983, and, more specifically, a deliberate violation of state election laws by state election officials does not transgress against the Constitution.") (cleaned up); *Martinez v. Colon*, 54 F.3d 980, 989 (1st Cir. 1995) ("[T]he Constitution is not an empty ledger awaiting the entry of an aggrieved litigant's recitation of alleged state law violations—no matter how egregious those violations may appear within the local legal framework.").

Thus, this type of equal-protection claim fails as a matter of law, as well.

**2. If Pennsylvania's "uneven" use of drop boxes indirectly burdens the right to vote at all, that burden is slight, and justified by important state interests.**

Even assuming that Plaintiffs could establish unequal treatment to state an equal-protection claim, their claim nonetheless fails because the governmental interests here outweigh any burden on the right to vote.

Initially, the Court finds that the appropriate level of scrutiny is rational basis. Defendants' failure to implement a mandatory requirement to "man" drop boxes doesn't directly infringe or burden Plaintiffs' rights to vote at all. Indeed, as discussed above in the context of standing, what Plaintiffs characterize as the burden or harm here is really just an ancillary 'increased risk' of a theoretical harm, the degree of which has not been established with any empirical precision.

*See Obama*, 697 F.3d at 429 ("If a plaintiff alleges only that a state treated him or her differently than similarly situated voters, without a corresponding burden on the fundamental right to vote, a straightforward rational basis standard of review should be used."); *Brehm*, 432 F. Supp. 3d at 310 ("Under this framework, election laws that impose no burden on the right to vote are subject to rational-basis review.").

On rational-basis review, the Secretary's guidance here passes constitutional muster. Her guidance certainly provides some flexibility in how counties may use drop boxes, but the guidance overall is rationally related to a legitimate governmental interest—namely, the implementation of drop boxes in a secure manner, taking into account specific county differences. That Plaintiffs feel the decisions and actions of the Pennsylvania General Assembly, Secretary Boockvar, and the county Defendants are insufficient to prevent fraud or illegal voting is of no significance. "[R]ational-basis review in equal protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Heller v. Doe by Doe*, 509 U.S. 312, 319, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993).

As detailed above, Secretary Boockvar's guidance provides lawful, comprehensive, and reasonable standards with respect to (1) selecting the location of drop boxes, (2) drop-box design criteria, (3) signage, (4) drop-box security measures, and (5) drop-box ballot collection and chain of custody procedures. Of particular note, with respect to ballot security, the Secretary's guidance calls for the use of reasonably robust measures like video surveillance, durable and tamperproof design features, regular ballot collection every 24 hours, chain-of-custody procedures to maintain ballot traceability, and signage advising voters that third-party delivery is prohibited, among other things.

To be sure, the Secretary's guidance doesn't insist on the use of security personnel—though some counties have decided to post security guards outside of drop boxes on their own. But the Court can't say that either the Secretary's failure to provide that requirement, or the decision of some counties to proceed with drop boxes "unmanned," is irrational. For example, the evidence presented demonstrates that placing a security guard outside of a drop box at all times is costly, particularly for cash-strapped counties—at least $13 per hour or about $104 (8 hours) to $312 (24 hours) per day, according to Defendants' expert, Professor Robert McNair. [ECF 549-11, p. 11] In the context of a broader election system that detects and deters fraud at many other stages of the voting process, and given

that that there are also no equivalent security measures present at U.S. postal mailboxes (which constitute an arguably more tempting vehicle for the would-be ballot harvester), the Court finds that the lack of any statewide requirement that all drop boxes be manned or otherwise surveilled is reasonable, and certainly rational.

**\*47** But even assuming Plaintiffs are right that their right to vote here has been burdened (and thus a heightened level of scrutiny must apply), that burden is slight and cannot overcome Defendants' important state interests under the *Anderson-Burdick* framework. Indeed, courts routinely find attenuated or ancillary burdens on the right to vote to be "slight" or insignificant, even burdens considerably *less* attenuated or ancillary than any burden arguably shown here. *See, e.g., Weber v. Shelley*, 347 F.3d 1101, 1106 (9th Cir. 2003) ("Under *Burdick*, the use of touchscreen voting systems is not subject to strict scrutiny simply because this particular balloting system may make the possibility of some kinds of fraud more difficult to detect.").[11]

11    *See, also, e.g., Dudum v. Arntz*, 640 F.3d 1098, 1117 (9th Cir. 2011) ("If the aspects of the City's restricted IRV scheme Dudum challenges impose any burdens on voters' constitutional rights to vote, they are minimal at best."); *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1354–55 (11th Cir. 2009) ("The district court determined that the burden imposed on Georgia voters who lack photo identification was not undue or significant, and we agree.... The NAACP and voters are unable to direct this Court to any admissible and reliable evidence that quantifies the extent and scope of the burden imposed by the Georgia statute."); *Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1183 (9th Cir. 1988) ("Appellants claim that Hawaii's absentee voting law fails to prohibit 'the solicitation, examination and delivery of absentee ballots by persons other than the voters' and that such activities occurred during the special election ... We agree with the district court that the Hawaii absentee ballot statute and the regulations adopted under it adequately protect the secrecy and integrity of the ballot. Although Hawaii has not adopted a regulation to prevent the delivery of ballots by persons other than the voter, the Hawaii regulations go into great detail in their elaboration of procedures to prevent tampering with the ballots."); *McLain v. Meier*, 637 F.2d 1159, 1167 (8th Cir. 1980) ("[A]lthough ballot format has an effect on the fundamental right to vote, the effect is somewhat attenuated."); *Nemes v. Bensinger*, —— F. Supp. 3d ——, ——, 2020 WL 3402345, at \*13 (W.D. Ky. June 18, 2020) ("The burden imposed

by the contraction to one polling place is modest, and the identified groups are afforded various other means under the voting plans to easily and effectively avoid disenfranchisement. As already discussed, Defendants have offered evidence of the substantial government interest in implementing voting plans that provide for a free and fair election while attempting to minimize the spread of COVID-19."); *Paralyzed Veterans of Am. v. McPherson*, No. 06-4670, 2008 WL 4183981, at *22 (N.D. Cal. Sept. 9, 2008) ("Plaintiff Bohlke's listed burdens rely on speculative risk or the ancillary effects of third party assistance, but not on evidence of any concrete harm. Such speculations or effects are insufficient under Supreme Court and Ninth Circuit precedent to demonstrate a severe burden on the fundamental right to vote.").

To begin with, application of the *Anderson-Burdick* framework here presents something of a "square peg, round hole" dilemma. After all, that test assumes there is some constitutional injury to "weigh" against the state's "important" regulatory interests in the first place. And without differential treatment of votes or voters, there isn't any equal-protection injury for the Court to balance.

The *Anderson-Burdick* test is also ill-fitted to Plaintiffs' claims for another reason. Typically, *Anderson-Burdick* is invoked where the government takes some direct action to burden or restrict a plaintiff's right to vote. Here, in contrast, Plaintiffs complain that Pennsylvania has indirectly burdened the right to vote through ***inaction***—*i.e.*, by not imposing ***enough*** regulation to secure the voting process it has adopted, which, Plaintiffs say, will allow third parties to vote in an unlawful way, which, if it happens, will dilute (and thus burden) the right to vote.

 **\*48**  This unusual causal daisy-chain makes it difficult to apply *Anderson-Burdick*'s balancing approach. After all, it is one thing to assess the government's interest in taking a specific action that imposed burdens on the right to vote. It is much less natural for a court to evaluate whether the government had a good reason for not doing something differently, or for failing to do more to prevent (or reduce the risk of) misconduct by third parties that could burden the right to vote.

To the extent *Anderson-Burdick* applies in such circumstances, the appropriate course would, in this Court's view, be to weigh any burden stemming from the government's alleged failures against the government's interest in enacting the broader election scheme it has

erected, of which the challenged piece is usually only one part. Focusing solely on the allegedly inadequate procedure being challenged, such as the state's authorization of "drop boxes" here, would ignore the fact that Election Code provisions and regulations operate as part of a single, complex organism balancing many competing interests, all of which are "important" for purposes of the *Anderson-Burdick* analysis. *See, e.g.*, *Crawford*, 553 U.S. at 184, 128 S.Ct. 1610 ("deterring and detecting voter fraud"); *Tedards v. Ducey*, 951 F.3d 1041, 1067 (9th Cir. 2020) ("voter turnout"); *Lunde v. Schultz*, 221 F. Supp. 3d 1095, 1106 (S.D. Iowa 2014) ("expanding ballot access to nonparty candidates"); *Greenville Cnty. Republican Party Exec. Comm. v. South Carolina*, 824 F. Supp. 2d 655, 671 (D.S.C. 2011) ("promoting voter participation in the electoral process"); *Mays v. LaRose*, 951 F.3d 775, 787 (6th Cir. 2020) ("orderly administration of elections"); *Dudum*, 640 F.3d at 1115 ("orderly administration of ... elections"); *Paher v. Cegavske* , 457 F.Supp.3d 919, ——, 2020 WL 2089813, at *7 (2020) ("protect[ing] the health and safety of ... voters" and "safeguard[ing] the voting franchise"); *Nemes*, —— F. Supp. 3d at ——, 2020 WL 3402345, at *13 ("implementing voting plans that provide for a free and fair election while attempting to minimize the spread of COVID-19").

Thus, on the "burden" side of the equation is Plaintiffs' harm of vote dilution predicated on a risk of fraud. As discussed above in the context of lack of standing, that burden is slight, factually, because it is based on largely speculative evidence of voter fraud generally, anecdotal evidence of the mis-use of certain drop boxes during the primary election, and worries that the counties will not implement a "best practice" of having poll workers or guards man the drop boxes. *See* [ECF 461, ¶¶ 63-82; ECF 504-2, ¶ 12; 504-3, ¶ 6; 504-4, ¶7;; ECF 504-6, ¶¶ 6-8; ECF 504-7, ¶¶ 5-9; ECF 504-9, 92:4-10; ECF 504-10, 60:3-61:10; 504-19, pp. 3, 16-18, 20 & Ex. D; ECF 504-25; ECF 504-49; ECF 509, p. 67; ECF 551, p. 34].

This somewhat scant evidence demonstrates, at most, an increased risk of some election irregularities—which, as many courts have held, does not impose a meaningful burden under *Anderson-Burdick*. "Elections are, regrettably, not always free from error," *Hutchinson v. Miller*, 797 F.2d 1279, 1286–87 (4th Cir. 1986), let alone the "risk" of error. In just about every election, votes are counted, or discounted, when the state election code says they should not be. But the Constitution "d[oes] not authorize federal courts to be state election monitors." *Gamza v. Aguirre*, 619 F.2d 449, 454 (5th Cir. 1980). It is "not an empty ledger awaiting the entry of an

aggrieved litigant's recitation of alleged state law violations." *Fournier v. Reardon*, 160 F.3d 754, 757 (1st Cir. 1998). Nor is it "an election fraud statute." *Minnesota Voters*, 720 F.3d at 1031.

**\*49** "Garden variety" election irregularities, let alone the "risk" of such irregularities, are simply not a matter of federal constitutional concern "even if they control the outcome of the vote or election." *Bennett v. Yoshina*, 140 F.3d 1218, 1226 (9th Cir. 1998). And as discussed above, most often, even "a deliberate violation of state election laws by state election officials does not transgress against the Constitution." *Shipley*, 947 F.3d at 1062. *see, e.g., Lecky v. Virginia State Bd. of Elections*, 285 F. Supp. 3d 908, 919 (E.D. Va. 2018) ("[E]ven assuming the Fredericksburg officials' failure to provide provisional ballots amounted to a violation of state law, it would not rise to the level of an equal protection violation.").

Compared, then, to Plaintiffs' slight burden, the Commonwealth has put forward reasonable, precise, and sufficiently weighty interests that are undisputed and that can be distilled into three general categories: (1) the benefits of drop boxes, (2) the Commonwealth's interests in furthering its overall election-security plan concerning drop boxes, and (3) the interests inherent in the Commonwealth's general mail-in ballot scheme.

The first category concerns the benefits of drop boxes generally. Secretary Boockvar has pointed out the Commonwealth's interests generally in using drop boxes—including, (1) the increase of voter turnout, (2) the protection of voters' health in the midst of the ongoing pandemic, (3) the increase of voter satisfaction, in light of ongoing U.S. Postal Service issues, and (4) the reduction of costs for counties. [ECF No. 547, at pp. 22-25; ECF No. 549-2, ¶¶ 36-39, 42-44]. Plaintiffs do not dispute any of these interests.

The second category of interests concerns the Commonwealth's interests in implementing drop boxes with appropriate and effective safety measures and protocols in place. That is, Secretary Boockvar has, in her capacity as the chief state official charged with overseeing elections, issued uniform guidance to all counties regarding the use of drop boxes, which is noted above. That guidance includes (1) advising counties that the Election Code permits the use of drop boxes, and (2) setting forth best practices that the counties should "consider" with respect to their use. Among other things, the Secretary advised that counties

should maintain a traceable chain of custody for mail-in and absentee ballots retrieved from drop boxes; utilize drop boxes with various security features (*e.g.,* anti-tampering features, locks, video surveillance, and removal when the site is closed or cannot be monitored); and designate sworn county personnel to remove ballots from drop boxes. And evidence suggests that the Secretary's deputies have emphasized these best practices when queried by county officials. [ECF 549-32 ("Per our conversation, the list of items are things the county must keep in mind if you are going to provide a box for voters to return their ballots in person.") ].

This guidance is lawful, reasonable, and non-discriminatory, and so does not create any constitutional issue in its own right. With this guidance, the Secretary has diminished the risks tolerated by the legislature in adopting mail-in voting and authorizing drop-boxes, by encouraging the counties to adopt rather comprehensive security and chain-of-custody procedures if they do elect to use drop boxes. Conversely, the legislature's decision to leave the counties with ultimate discretion when it comes to how, and to what extent, to use drop boxes (as opposed to adopting a scheme in which the Secretary could enforce compliance with her guidance) is also reasonable, and justified by sufficiently weighty governmental interests, given the many variations in population, geography, local political culture, crime rates, and resources. [ECF 549-9 ("There is no logical reason why ballot receptacles such as drop boxes must be uniform across different counties; particularly because the verification of the voter is determined by election officials upon receipt of the ballot. Counties vary in size and need. Across the country, best practices dictate that counties determine what type of box and size works for them. The needs of a large county are very different from the needs of a smaller county."); ECF 549-11, p. 9 ("Such variation between counties even within a state makes sense, since the needs of different counties vary and their use of drop boxes reflects those considerations (e.g., the geographic size of a county, the population of the county, and the ease with which voters in the county can access other locations to return mail-in ballots).").

**\*50** The third category of interests is, more generally, the interests of the Commonwealth in administering its overall mail-in ballot regime, including the various security and accountability measures inherent in that legislative plan.

Pennsylvania did not authorize drop boxes in a vacuum. Last year, the Pennsylvania legislature "weigh[ed] the pros and cons," *Weber*, 347 F.3d at 1107, and adopted a broader system

of "no excuse" mail-in voting as part of the Commonwealth's Election Code. As the Pennsylvania Supreme Court has now confirmed, that system left room for counties to authorize drop boxes and other satellite locations for returning ballots to the county boards of elections. *See Boockvar*, ⸺ A.3d at ⸺, 2020 WL 5554644, at *9 ("[W]e need not belabor our ultimate conclusion that the Election Code should be interpreted to allow county boards of election to accept hand-delivered mail-in ballots at locations other than their office addresses including drop-boxes.").

Inherent in any mail-in or absentee voting system is some degree of increased risk of votes being cast in violation of other provisions of the Election Code, regardless of whether those ballots are returned to drop boxes, mailboxes, or some other location. For example, there is simply no practical way to police third party delivery of ballots to any mailbox anywhere in the Commonwealth, where Plaintiffs do not dispute that such ballots can be lawfully returned. It is also likely that more (and perhaps many more) voters than usual will be disenfranchised by technicalities this year, for failing to comply with the procedural requirements associated with mail-in ballots, such as the requirement that such ballots be placed in "inner secrecy envelopes."

But in enacting the "no excuse" mail-in voting system that it did, the Pennsylvania legislature chose to tolerate the risks inherent in that approach. And the key point is that the legislature made that judgment in the context of erecting a broader election scheme that authorizes other forms of voting and has many other safeguards in place to catch or deter fraud and other illegal voting practices. These safeguards include voter registration; a mail-in ballot application and identity verification process, 25 P.S. §§ 3146.2, 3150.12; a system for tracking receipt of mail-in ballots, 25 P.S. §§ 3146.3(a), 3150.13(a); and, perhaps most important of all, a pre-canvassing and canvassing process during which mail-in ballots are validated before being counted. In addition, Pennsylvania law also seeks to deter and punish fraud by imposing criminal penalties for unlawful voting, 25 P.S § 3533; voting twice in one election, 25 P.S § 3535; forging or destroying ballots, 25 P.S § 3517; unlawful possession or counterfeiting of ballots 25 P.S § 3516; and much more of the conduct Plaintiffs fear, *see* 25 P.S. § 3501, *et seq.*

In this larger context, the Court cannot say that the balance Pennsylvania struck across the Election Code was unreasonable, illegitimate, or otherwise not "sufficiently weighty to justify," *Crawford*, 553 U.S. at 191, 128 S.Ct.

1610, whatever ancillary risks may be associated with the use of drop boxes, or with allowing counties to exercise discretion in that regard. Pennsylvania may balance the many important and often contradictory interests at play in the democratic process however it wishes, and it must be free to do so "without worrying that a rogue district judge might later accuse it of drawing lines unwisely." *Abbott*, 961 F.3d at 407.

**\*51** Thus, balancing the slight burden of Plaintiffs' claim of dilution against the categories of interests above, the Court finds that the Commonwealth and Defendants' interests in administering a comprehensive county-based mail-in ballot plan, while both promoting voting and minimizing fraud, are sufficiently "weighty," reasonable, and justified. Notably, in weighing the burdens and interests at issue, the Court is mindful of its limited role, and careful to not intrude on what is "quintessentially a legislative judgment." *Griffin*, 385 F.3d at 1131. "[I]t is the job of democratically-elected representatives to weigh the pros and cons of various balloting systems." *Weber*, 347 F.3d at 1106. "So long as their choice is reasonable and neutral, it is free from judicial second-guessing." *Id.*; *see also Abbott*, 961 at 407, ("That the line might have been drawn differently ... is a matter for legislative, rather than judicial, consideration.") (cleaned up); *Trinsey v. Com. of Pa.*, 941 F.2d 224, 235 (3d Cir. 1991) ("We take no position on the balancing of the respective interests in this situation. That is a function for which the legislature is uniquely fitted.").

Thus, even under the *Anderson-Burdick* framework, the Court finds that Plaintiffs' constitutional challenge fails as a matter of law.

### B. Pennsylvania's use of drop boxes does not violate federal due process.

In addition to their equal-protection challenge to the use of drop boxes, Plaintiffs also appear to argue that the use of unmanned drop boxes violates substantive due process protected by the 14th Amendment. This argument is just a variation on their equal-protection argument—*i.e.*, the uneven use of drop boxes will work a "patent and fundamental unfairness" in violation of substantive due process principles. *See Griffin v. Burns*, 570 F.2d 1065, 1077 (1st Cir. 1978) (substantive due process rights are violated "[i]f the election process itself reaches the point of patent and fundamental unfairness[.]"). The analysis for this claim is the same as that for equal protection, and thus it fails for the same reasons.

But beyond that, this claim demands even stricter proof. Such a claim exists in only the most extraordinary circumstances.

*See Nolles v. State Comm. for Reorganization of Sch. Districts*, 524 F.3d 892, 898 (8th Cir. 2008) ("A canvass of substantive due process cases related to voting rights reveals that voters can challenge a state election procedure in federal court only in limited circumstances, such as when the complained of conduct discriminates against a discrete group of voters, when election officials refuse to hold an election though required by state law, resulting in a complete disenfranchisement, or when the willful and illegal conduct of election officials results in fraudulently obtained or fundamentally unfair voting results.") (cleaned up); *Yoshina*, 140 F.3d at 1226 ("We have drawn a distinction between 'garden variety' election irregularities and a pervasive error that undermines the integrity of the vote. In general, garden variety election irregularities do not violate the Due Process Clause, even if they control the outcome of the vote or election.") (citation omitted); *Bennett v. Mollis*, 590 F. Supp. 2d 273, 278 (D.R.I. 2008) ("Before an election error becomes a key that unlocks the restraints on the federal court's authority to act, the Plaintiffs must demonstrate either an intentional election fraud or an unintentional error resulting in broad-gauge unfairness.").

Indeed, "only the most egregious official conduct can be said to be arbitrary in the constitutional sense"—the "executive action must be so ill-conceived or malicious that it 'shocks the conscience.' " *Miller v. City of Phila.*, 174 F.3d 368, 375 (3d Cir. 1999) (cleaned up).

Based on the slight burden imposed here, and the Commonwealth's interests in their overall county specific voting regime, which includes a host of other fraud-prevention measures, the Court finds that the drop-box claim falls short of the standard of substantive due process.

### III. Defendants and Intervenors are entitled to summary judgment on Plaintiffs' signature-comparison claims.

**\*52** Plaintiffs' next claim concerns whether the Secretary's recent guidance on signature comparison violates the federal Constitution. Plaintiffs frame their claims pertaining to signature comparison in two ways—one based on due process and the other based on equal protection.

Plaintiffs initially assert that the Election Code requires a signature comparison for mail-in and absentee applications and ballots. Thus, according to Plaintiffs, Secretary Boockvar's guidance, which says the opposite, is creating unconstitutional vote dilution, in violation of due-process principles—*i.e.*, certain unlawful, unverified ballots will

now be counted, thereby diluting the lawful ones cast by other voters (such as in-person voters, whose signatures are verified). Plaintiffs also appear to argue more generally that absent signature comparison, there is a heightened risk of voter fraud, and therefore a heightened risk of vote dilution of lawful votes.

In addition to due process, Plaintiffs argue that the guidance violates equal-protection principles—first, by counties engaging in a patchwork of procedures (where some counties intend to do a signature comparison for mail-in ballots, while others do not); and second, by implementing different standards between mail-in ballots and in-person ones.

In contrast, Defendants and Intervenors take the position that state law does not require signature comparison, and for good reason. According to them, requiring such comparisons is fraught with trouble, as signatures change over time and elections officials are not signature-analysis experts. This leaves open the possibility for arbitrary and discriminatory application that could result in the disenfranchisement of valid voters.

For the reasons that follow, the Court will dismiss the signature-comparison claims and enter judgment in favor of Defendants. A plain reading of the Election Code demonstrates that it does not impose a signature-comparison requirement for mail-in ballots and applications, and thus Plaintiffs' vote-dilution claim sounding in due process fails at the outset. Further, the heightened risk of fraud resulting from a lack of signature comparison, alone, does not rise to the level of a federal constitutional violation. Finally, the equal-protection claims fail because there are sound reasons for the different treatment of in-person ballots versus mail-in ballots; and any potential burdens on the right to vote are outweighed by the state's interests in their various election security measures.

#### A. The Election Code does not require signature comparison for mail-in and absentee ballots or ballot applications.

Plaintiffs' federal-constitutional claims in Count I of their Second Amended Complaint are partially based on the Secretary's guidance violating state law. That is, Plaintiffs' first theory is that by the Secretary violating state law, unlawful votes are counted and thus lawfully cast votes are diluted. According to Plaintiffs, this violates the 1st and 14th Amendments, as well as the Elections Clause (the latter of

which requires the legislature, not an executive, to issue election laws).[12]

[12]  The parties do not specifically brief the elements of an Elections-Clause claim. This is typically a claim brought by a state legislature, and the Court has doubts that this is a viable theory for Plaintiffs to assert. *See Lance v. Coffman*, 549 U.S. 437, 442, 127 S.Ct. 1194, 167 L.Ed.2d 29 (2007). Regardless, if state law does not require signature comparison, then there is no difference between the Secretary's guidance and the Election Code, and the Elections-Clause claim necessarily fails.

**\*53** Thus, a necessary predicate for these constitutional claims is whether the Election Code mandates signature comparison for mail-in and absentee ballots. If it doesn't, as the Secretary's guidance advises, then there can be no vote dilution as between lawful and unlawful votes, nor a usurpation of the legislature's authority in violation of the Elections Clause.

After carefully considering the parties' arguments and the relevant law, the Court finds that the plain language of the Election Code imposes no requirement for signature comparison for mail-in and absentee ballots and applications.[13] In other words, the Secretary's guidance is consistent with the Election Code, and creates no vote-dilution problems.[14]

[13]  Several Defendants and Intervenors have asked this Court to abstain from deciding this issue on the basis of *Pullman*. As this Court previously discussed, a court can abstain under *Pullman* if three factors are met: "(1) [the dispute] requires interpretation of "unsettled questions of state law,"; (2) permitting resolution of the unsettled state-law questions by state courts would "obviate the need for, or substantially narrow the scope of adjudication of the constitutional claims"; and (3) an "erroneous construction of state law would be disruptive of important state policies[.]" " [ECF 409, p. 3 (quoting *Chez Sez*, 945 F.2d at 631) ]. But if on, the other hand, the answer to the state law dispute is "clear and unmistakable," abstention is not warranted. [*Id.* at p. 15 (citing *Chez Sez*, 945 F.2d at 632) ]. Here, the Court concludes (as discussed below) that the Election Code is clear that signature comparison is not required and further, that Plaintiffs' competing interpretation is not plausible. As such, the Court cannot abstain under *Pullman*.
The *Pullman* analysis does not change simply because Secretary Boockvar has filed a "King's Bench" petition

with the Pennsylvania Supreme Court, requesting that court to clarify whether the Election Code mandates signature comparison of mail-in and absentee ballots and applications. [ECF 556, p. 11; ECF 557]. The fact that such a petition was filed does not change this Court's conclusion that the Election Code is clear. The *Pullman* factors remain the same. And they are not met here.

[14]  The Secretary's September 11, 2020, guidance, stated that the "Pennsylvania Election Code does not authorize the county board of elections to set aside returned absentee or mail-in ballots based solely on signature analysis by the county board of elections." [ECF 504-24, p. 3, § 3]. Similarly, the Secretary's September 28, 2020, guidance stated that "Election Code does not permit county election officials to reject applications or voted ballots based solely on signature analysis. ... No challenges may be made to mail-in and absentee ballots at any time based on signature analysis." [ECF 504-25, p. 9, § 5.2].

Plaintiffs, in advancing their claim, rely on section 3146.8(g)(3)-(7) of the Election Code to assert that the Code requires counties to "verify" the signatures on mail-in and absentee ballots (*i.e.*, examine the signatures to determine whether they are authentic). Plaintiffs specifically point to section 3146.8(g)(3) as requiring this signature verification. [ECF 509, pp. 17-18].

Section 3146.8(g)(3) states:

> When the county board meets to pre-canvass or canvass absentee ballots and mail-in ballots ... the board shall examine the declaration on the envelope of each ballot ... and shall compare the information thereon with that contained in the "Registered Absentee and Mail-in Voters File," the absentee voters' list and/or the "Military Veterans and Emergency Civilians Absentee Voters File," whichever is applicable. If the county board has verified the proof of identification as required under this act and is satisfied that the declaration is sufficient and the information contained in the "Registered Absentee and Mail-in Voters File," the absentee voters' list and/or the "Military Veterans and Emergency Civilians Absentee Voters File" verifies his right to vote, the county board shall provide a list of the names of electors whose absentee ballots or mail-in ballots are to be pre-canvassed or canvassed.

**\*54** 25 P.S. § 3146.8(g)(3).

According to Plaintiffs, Section 3146.8(g)(3)'s requirement to verify the proof of identification, and compare the

information on the declaration, is tantamount to signature comparison. The Court disagrees, for at least three reasons.

First, nowhere does the plain language of the statute require signature comparison as part of the verification analysis of the ballots.

When interpreting a statute enacted by the Pennsylvania General Assembly, courts apply Pennsylvania's Statutory Construction Act, 1 Pa. C.S. §§ 1501-1991. And as the Act instructs, the "object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." 1 Pa C.S. § 1921(a). If the words of the statute are clear and unambiguous, the letter of the law applies. *Id.* at § 1921(b). Otherwise, courts may consider a variety of factors to determine the legislature's intent, including "other statutes upon the same or similar subjects" and "[t]he consequences of a particular interpretation." *Id.* at § 1921(c)(5)-(6).

Section 3146.8(g)(3) does not expressly require any signature verification or signature comparison. 25 P.S. § 3146.8(g) (3). It instead requires election officials to (1) "examine the declaration on the envelope of each ballot," (2) "compare the information thereon with that contained in the ... 'Voters file' [or] the absentee voters' list," and (3) if "the county board has [a] verified the proof of identification as required under this act and [b] is satisfied that the declaration is sufficient and the information contained in the [Voter's file] ... verifies his right to vote," the election official shall include the ballot to be counted. *Id.*

Under the express terms of the statute, then, the information to be "verified" is the "proof of identification." *Id.* The Election Code defines "proof of identification" as the mail-in/absentee voter's driver's license number, last four digits of their Social Security number, or a specifically approved form of identification. 25 P.S. § 2602(z.5)(3)(i)-(iv).[15] The only other "verification" the election official must conduct is to determine whether "the information contained in the [Voter's file] ... verifies his right to vote."

[15]  The Election Code's definition of "proof of identification" in full provides:
   The words "proof of identification" shall mean ... For a qualified absentee elector ... or a qualified mail-in elector ...:

i. in the case of an elector who has been issued a current and valid driver's license, the elector's driver's license number;

ii. in the case of an elector who has not been issued a current and valid driver's license, the last four digits of the elector's Social Security number;

iii. in the case of an elector who has a religious objection to being photographed, a copy of a document that satisfies paragraph (1) [*i.e.*, "a valid-without-photo driver's license or a valid-without-photo identification card issued by the Department of Transportation"]; or

iv. in the case of an elector who has not been issued a current and valid driver's license or Social Security number, a copy of a document that satisfies paragraph (2) [*i.e.*, "a document that shows the name of the individual to whom the document was issued and the name substantially conforms to the name of the individual as it appears in the district register; shows a photograph of the individual to whom the document was issued; includes an expiration date and is not expired, except (A) ... or (B) ...; and was issued by" the federal, state, or municipal government, or an "accredited Pennsylvania public or private institution of higher learning [or] "a Pennsylvania are facility."].
25 P.S. § 2602(z.5)(3).

**\*55**  Nowhere does this provision require the election official to compare and verify the authenticity of the elector's signature. In fact, the word "signature" is absent from the provision. It is true that the elector must fill out and sign the declaration included on the ballot. 25 P.S. §§ 3146.6(a), 3150.16(a). However, while section 3146.8(g)(3) instructs the election official to "examine the declaration ... and compare the information thereon with that contained in the [Voter's file]," the provision clarifies that this is so the election official can be "satisfied that the declaration is sufficient." 25 P.S. § 3146.8(g)(3). In other words, the election official must be "satisfied" that the declaration is "fill[ed] out, date[d] and sign[ed]," as required by sections 3150.16(a) and 3146.6(a) of the Election Code. Notably absent is any instruction to verify the signature and set aside the ballot if the election official believes the signature to be non-genuine. There is an obvious difference between checking to see if a signature was provided at all, and checking to see if the provided signature is sufficiently authentic. Only the former is referred to in section 3146.8(g)(3).

Second, beyond the plain language of the statute, other canons of construction compel the Court's interpretation. When interpreting statutes passed by the General Assembly, Pennsylvania law instructs courts to look at other aspects of

the statute for context. *See* 1 Pa. C.S. § 1921(c)(5) ("When the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering ... other statutes upon the same or similar subjects."); *O'Rourke v. Commonwealth*, 566 Pa. 161, 778 A.2d 1194, 1201 (2001) ("The cardinal rule of all statutory construction is to ascertain and effectuate the intent of the Legislature. To accomplish that goal, we should not interpret statutory words in isolation, but must read them with reference to the context in which they appear." (citation omitted)).

Context here is important because the General Assembly mandated signature comparison for in-person voting elsewhere in the Election Code—thus evidencing its intention not to require such comparison for mail-in ballots. *See Fonner v. Shandon, Inc.*, 555 Pa. 370, 724 A.2d 903, 907 (1999) ("[W]here a section of a statute contains a given provision, the omission of such a provision from a similar section is significant to show a different legislative intent.") (citation omitted).

In addressing in-person voting, the General Assembly explicitly instructs that the election official shall, after receiving the in-person elector's voter certificate, immediately "***compare the elector's signature*** on his voter's certificate with his signature in the district register. If, upon such comparison, the signature upon the voter's certificate appears to be genuine, the elector who has signed the certificate shall, if otherwise qualified, be permitted to vote: Provided, That ***if the signature on the voter's certificate, as compared with the signature as recorded in the district register, shall not be deemed authentic*** by any of the election officers, such elector shall not be denied the right to vote for that reason, but shall be considered challenged as to identity and required to [cure the deficiency]." 25 P.S. § 3050(a.3)(2) (emphasis added).

Elsewhere, the General Assembly also explicitly accounts for signature comparison of in-person voters: "[I]f it is determined that the individual was registered and entitled to vote at the election district where the ballot was cast, ***the county board of elections shall compare the signature on the provisional ballot envelope with the signature on the elector's registration form and, if the signatures are determined to be genuine, shall count the ballot*** if the county board of elections confirms that the individual did not cast any other ballot, including an absentee ballot, in the election. ... [But a] provisional ballot shall not be counted if ... the signature[s] required ... are either not genuine or are not executed by the same individual ..." 25 P.S. §

3050(a.4)(5)(i)-(ii) (emphasis added); *see also* 25 P.S. § 2936 ("[When reviewing nomination papers], the Secretary of the Commonwealth or the county board of elections, although not hereby required so to do, ***may question the genuineness of any signature or signatures appearing thereon***, and if he or it shall thereupon find that any such signature or signatures are not genuine, such signature or signatures shall be disregarded[.]" (emphasis added)).

**\*56** Clearly then, the General Assembly, in enacting the Election Code, knew that it could impose a signature-comparison requirement that requires an analysis to determine whether a signature is "genuine." And when that was its intent, the General Assembly explicitly and unequivocally imposed that requirement. It is thus telling, from a statutory construction standpoint, that no such explicit requirement is imposed for returned mail-in or absentee ballots. Indeed, the General Assembly is aware—and in fact, requires—that a voter must sign their application for an absentee or mail-in ballot, and must sign the declaration on their returned ballot. 25 P.S. §§ 3146.2(d) (absentee-ballot application), 3150.12(c) (mail-in-ballot application), 3146.6(a) (absentee-voter declaration), 3150.16(a) (mail-in voter declaration). Despite this, the General Assembly did not mention a signature-comparison requirement for returned absentee and mail-in ballots.

The Court concludes from this context that this is because the General Assembly did not intend for such a requirement. *See, e.g.*, *Mishoe v. Erie Ins. Co.*, 573 Pa. 267, 824 A.2d 1153, 1155 (2003) ("In arriving at our conclusion that the foregoing language does not provide for the right to a jury trial, we relied on three criteria. First, we put ***substantial emphasis*** on the fact that the PHRA was silent regarding the right to a jury trial. As we explained, 'the General Assembly is well aware of its ability to grant a jury trial in its legislative pronouncements,' and therefore, 'we can presume that the General Assembly's express granting of trial by jury in some enactments means that it did not intend to permit for a jury trial under the PHRA.' " (cleaned up) (emphasis added)); *Holland v. Marcy*, 584 Pa. 195, 883 A.2d 449, 456, n.15 (2005) ("We additionally note that the legislature, in fact, did specify clearly when it intended the choice of one individual to bind others. In every other category addressed by Section 1705(a) other than (a)(5) which addressed uninsured owners, the General Assembly specifically referenced the fact that the decision of the named insured ... binds other household members.... Similar reference to the ability of the uninsured owner's

deemed choice to affect the rights of household members is conspicuously missing from Section 1705(a)(5).").

Accordingly, the Court finds that the General Assembly's decision not to expressly refer to signature comparisons for mail-in ballots, when it did so elsewhere, is significant.

Third, this Court is mindful that Pennsylvania's election statutes are to be construed in a manner that does not risk disenfranchising voters. *See, e.g.,* 1 Pa. C.S. § 1922(3) ("In ascertaining the intention of the General Assembly in the enactment of a statute the following presumptions, among others, may be used: ... That the General Assembly does not intend to violate the Constitution of the United States or of this Commonwealth."); *id.* at § 1921(c)(6) (in interpreting a statute, the court may consider "[t]he consequences of a particular interpretation").

As the Pennsylvania Supreme Court emphasized last month, "[I]t is well-settled that, although election laws must be strictly construed to prevent fraud, they ordinarily will be construed liberally in favor of the right to vote. Indeed, our goal must be to enfranchise and not to disenfranchise the electorate." *Boockvar,* ⎯⎯ A.3d at ⎯⎯, 2020 WL 5554644, at *9 (cleaned up); *see also id.* ("[A]lthough both Respondent and the Caucus offer a reasonable interpretation of Section 3150.16(a) as it operates within the Election Code, their interpretation restricts voters' rights, as opposed to the reasonable interpretation tendered by Petitioner and the Secretary. The law, therefore, militates in favor of this Court construing the Election Code in a manner consistent with the view of Petitioner and the Secretary, as this construction of the Code favors the fundamental right to vote and enfranchises, rather than disenfranchises, the electorate.").

 **\*57** Here, imposing a signature-comparison requirement as to mail-in and absentee ballots runs the risk of restricting voters' rights. This is so because election officials, unstudied and untested in signature verification, would have to subjectively analyze and compare signatures, which as discussed in greater detail below, is potentially problematic.[16] [ECF 549-2, p. 19, ¶ 68]; [ECF 549-9, p. 20, ¶ 64]. And perhaps more importantly, even assuming an adequate, universal standard is implemented, mail-in and absentee voters whose signatures were "rejected" would, unlike in-person voters, be unable to cure the purported error. *See* 25 P.S. § 3146.8(a) (stating that in-person and absentee ballots "shall [be safely kept] in sealed or locked containers until they are to be canvassed by the county board of

elections," which § 3146.8(g)(1.1)-(2) states is no earlier than election day); *Boockvar,* ⎯⎯ A.3d at ⎯⎯, 2020 WL 5554644, at *20 ("[A]lthough the Election Code provides the procedures for casting and counting a vote by mail, it does not provide for the 'notice and opportunity to cure' procedure sought by Petitioner. To the extent that a voter is at risk for having his or her ballot rejected due to minor errors made in contravention of those requirements, we agree that the decision to provide a 'notice and opportunity to cure' procedure to alleviate that risk is one best suited for the Legislature."). As discussed in more detail below, unlike in-person voters, whose signatures are verified in their presence, mail-in and absentee voters' signatures would be verified at a later date outside the presence of the voter. *See generally* 25 P.S. § 3146.8(a), (g) (requiring mail-in and absentee ballots to be kept secured in a sealed container until Election Day). Unbeknownst to the voter, then, and without an opportunity to remedy the purported error, these mail-in and absentee voters may not have their votes counted. Based on this risk of disenfranchisement, which the Court must consider in interpreting the statute, the Court cannot conclude that this was the General Assembly's intention.

| 16 | While election officials must engage in signature comparison for in-person voters, that requirement is explicitly required by the Election Code, unlike for mail-in ballots. 25 P.S. § 3050(a.3)(2). And as discussed below, in-person voters, unlike mail-in voters, are immediately notified if their signatures are deficient. |
|---|---|

The Court is not persuaded by Plaintiffs' arguments to the contrary.

Plaintiffs argue that section 3146.8(g)(5)-(7) provides a voter, whose ballot-signature was rejected, notice and an opportunity to cure the signature deficiency. [ECF 509, pp. 13, 18, 50]. That section, however, refers to when a person raises a specific challenge to a specific ballot or application on the grounds that the elector is not a "qualified elector." 25 P.S. § 3146.8(g)(4) (stating that mail-in and absentee ballots shall be counted unless they were challenged under §§ 3146.2b or 3150.12b, which allow challenges on the grounds that the elector applying for a mail-in or absentee ballot wasn't qualified). Thus, the "challenges" referenced in § 3146.8(g) (5)-(7) refer to a voter's qualifications to vote, not a signature verification.

Plaintiffs similarly argue that section 3146.8(h) provides mail-in voters notice and opportunity to cure signature deficiencies. [ECF 552, p. 60]. But that section relates to

"those absentee ballots or mail-in ballots for which proof of identification has not been received or could not be verified." 25 P.S. § 3146.8(h). As discussed above, "proof of identification" is a defined term, and includes the voter's driver's license number, last four digits of their Social Security number, or a specifically approved form of identification. 25 P.S. § 2602(z.5)(3)(i)-(iv). Not included is the voter's signature.[17]

> [17]  Plaintiffs also argue that signature comparison for mail-in and absentee ballots is supported by historical case law. [ECF 552, pp. 58-59]. Plaintiffs cite to two cases from the 1960s that the Court of Common Pleas decided. [*Id.*]. The first, *Appeal of Fogleman*, concluded that under the then-applicable election law, an absentee voter had to sign a declaration to show that he was a proper resident who had not already voted in that election. 36 Pa. D. & C.2d 426, 427 (Pa. Ct. Comm. Pl. 1964). Regarding the voter's signature, the court simply stated, "[i]f the elector fails or refuses to attach his or her signature, then such elector has not completed the declaration as required by law of all voters." *Id.* Thus, no signature comparison or verification was implicated there; rather, the court simply stated that the declaration must be signed (*i.e.*, completed). The second case Plaintiffs cite, *In re Canvass of Absentee Ballots of Gen. Election* [ECF 552, pp. 58-59], arose from individual, post-election challenges to 46 individual absentee ballots. 39 Pa. D. & C.2d 429, 430 (Pa. Ct. Comm. Pl. 1965). Thus, a universal and mandatory signature-comparison requirement here was not at issue there, unlike what Plaintiffs contest here. This Court finds neither case persuasive.

**\*58**  At bottom, Plaintiffs request this Court to impose a requirement—signature comparison—that the General Assembly chose not to impose. Section 3146.8(g)(3) does not mention or require signature comparison. The Court will not write it into the statute.

For the same reasons that the Election Code does not impose a signature-comparison requirement for mail-in and absentee ballots, the Election Code does not impose a signature-comparison requirement for mail-in and absentee ballot ***applications.*** While the General Assembly imposed a requirement that the application be signed, there is no mention of a requirement that the signature be verified, much less that the application be rejected based solely on such verification. 25 P.S. §§ 3146.2(d) (absentee-ballot application), 3150.12(c) (mail-in-ballot application). Again, finding no explicit instructions for signature comparison here (unlike elsewhere in the Code), the Court concludes that

the General Assembly chose not to include a signature-comparison requirement for ballot applications.

The Court again finds Plaintiffs' arguments to the contrary unavailing. Plaintiffs argue that "there is no other proof of identification required to be submitted with the ballot applications," and thus, a signature comparison must be required. [ECF 509, p. 16].

But the Election Code expressly requires the applicant to include several pieces of identifying information, including their name, mailing address, and date of birth. 25 P.S. §§ 3146.2(b), 3150.12(b). And after receiving the applicant's application, the election official must "verify[ ] the proof of identification [a defined term as discussed above] and compar[e] the information provided on the application with the information contained on the applicant's permanent registration card."[18] *Id.* at §§ 3146.2b(c), 3150.12b(a). Thus, contrary to Plaintiffs' argument, the General Assembly provided for certain methods of identification as to ballot applications. Signature verification isn't one of them.

> [18]  This identifying information on a ballot application includes much of the same information expressly listed for what a voter must provide in initially registering to vote. 25 Pa. C.S.A. § 1327(a) (stating that the "official voter registration application" shall request the applicant's: full name, address of residence (and mailing address if different), and date of birth).

For these reasons, the Court concludes that the Election Code does not impose a signature-comparison requirement for absentee and mail-in ballots and applications. As such, the Secretary's September 11, 2020, and September 28, 2020, guidance is consistent with the Election Code. Plaintiffs' claims of vote dilution based on this guidance will therefore be dismissed.

### B. The lack of a signature comparison does not violate substantive due process.

In addition to alleging that the Secretary's guidance violates the Election Code, Plaintiffs appear to also argue that their right to vote is unconstitutionally burdened and diluted due to a risk of fraud. That is, regardless of what the Election Code requires, Plaintiffs assert that absent signature comparison, mail-in and absentee ballots will be prone to fraud, thereby diluting other lawful ballots. [ECF 509, pp. 45-50; 504-19, pp. 10-15]. Plaintiffs argue that this significantly burdens their

fundamental right to vote, resulting in a due-process violation, and thus strict scrutiny applies. The Court disagrees.

**\*59** As discussed above in the context of Plaintiffs' drop-box claim, Plaintiffs' claim here simply does not rise to the high level for a substantive due process claim. To violate substantive due process in the voting-rights context, the infringements are much more severe. Only in extraordinary circumstances will there be "patent and fundamental unfairness" that causes a constitutional harm. *See Bonas v. Town of North Smithfield*, 265 F.3d 69, 74 (1st Cir. 2001); *Shannon v. Jacobowitz*, 394 F.3d 90, 94 (2d Cir. 2005).

Here, Plaintiffs' signature-comparison claim does not meet this high standard. This isn't a situation of malapportionment, disenfranchisement, or intentional discrimination. And the risk of voter fraud generally without signature comparison —as a matter of fact and law—does not rise to "patent and fundamental unfairness."

Indeed, as discussed above, Plaintiffs' evidence of potential voter fraud here is insufficient to establish "patent and fundamental unfairness." In their summary-judgment brief, Plaintiffs argue that "the Secretary's September 2020 guidance memos promote voter fraud." [ECF 509, p. 48]. Plaintiffs then offer a hypothetical where a parent signs a ballot application on their child's behalf because the child is out-of-state. [ECF 509, p. 48]. Plaintiffs assert that without signature comparisons, such "fraud" could proceed unchecked. [*Id.*]. Plaintiffs continue, arguing that the "fraud" would "snowball," so that "spouses, neighbors, acquaintances, strangers, and others" were signing applications and ballots on others' behalf. [*Id.* at pp. 48-49]. To prevent such fraud, Plaintiffs' expert, Mr. Riddlemoser, asserts that signature comparison is needed. [ECF 504-19, p. 10 ("Not only does enforcing the Election Code's requirement of a completed and signed declaration ensure uniformity, which increases voter confidence, it also functions to reduce fraud possibilities by allowing signature verification.") ].

Mr. Riddlemoser first highlights that in Philadelphia in the primary, ballots were counted "that lacked a completed declaration." [*Id.* at p. 11]. Mr. Riddlemoser further opines that the September 11, 2020, guidance and September 28, 2020, guidance, in instructing that signature comparison is not required for mail-in and absentee ballots and applications, "encourage[s], rather than prevent[s], voter fraud." [*Id.* at pp. 12-13]. Mr. Riddlemoser also notes that signature comparison

is "the most common method" to verify ballots and that the Secretary's guidance "leave the absentee/mail-in ballots subject to the potential for unfettered fraud." [*Id.* at p. 14]. He concludes that the guidance "invites the dilution of legitimately cast votes." [*Id.*].

Based on this evidentiary record, construed in Plaintiffs' favor, the Court cannot conclude that there exists "patent and fundamental unfairness." Rather, Plaintiffs present only the possibility and potential for voter fraud. In their briefing, Plaintiffs relied on hypotheticals, rather than actual events. [ECF 509, p. 48]. Mr. Riddlemoser admits that failing to verify signatures only creates "the potential" for fraud and "invites" vote dilution. [ECF 504-19, pp. 14, 15]. Even assuming an absence of signature comparison does indeed invite the potential for fraud, the nondiscriminatory, uniform practice and guidance does not give rise to "patent and fundamental unfairness" simply because of a "potential" for fraud. Plaintiffs have not presented evidence to establish a sufficient burden on their constitutional right to vote.

**\*60** Indeed, even if the Court assumed some "forged" applications or ballots were approved or counted, this is insufficient to establish substantial, widespread fraud that undermines the electoral process. Rather, limited instances of "forged" ballots—which according to Plaintiffs' definition, includes an individual signing for their spouse or child— amount to what the law refers to as "garden variety" disputes of limited harm. As has long been understood, federal courts should not intervene in such "garden variety" disputes. *Hutchinson*, 797 F.2d at 1283 ("[C]ourts have uniformly declined to endorse action under § 1983 with respect to garden variety election irregularities.") (cleaned up); *Yoshina*, 140 F.3d at 1226 ("In general, garden variety election irregularities do not violate the Due Process Clause, even if they control the outcome of the vote or election." (collecting cases)); *Curry v. Baker*, 802 F.2d 1302, 1314-15 (11th Cir. 1986) ("[I]f the election process itself reaches the point of patent and fundamental unfairness, a violation of the due process clause may be indicated and relief under § 1983 therefore in order. Such a situation must go well beyond the ordinary dispute over the counting and marking of ballots." (cleaned up)).

To be clear, the Court does not take Plaintiffs' allegations and evidence lightly. Election fraud is serious and disruptive. And Plaintiffs could be right that the safer course would be to mandate signature comparison for all ballots. But what Plaintiffs essentially complain of here is whether the

procedures employed by the Commonwealth are sufficient to prevent that fraud. That is a decision left to the General Assembly, not to the meddling of a federal judge. *Crawford*, 553 U.S. at 208, 128 S.Ct. 1610 (Scalia, J. concurring) ("It is for state legislatures to weigh the costs and benefits of possible changes to their election codes, and their judgment must prevail unless it imposes a severe and unjustified overall burden upon the right to vote, or is intended to disadvantage a particular class."). *Griffin*, 385 F.3d at 1131-32 ("[S]triking of the balance between discouraging fraud and other abuses and encouraging turnout is quintessentially a legislative judgment with which we judges should not interfere unless strongly convinced that the legislative judgment is grossly awry.").

### C. Plaintiffs' federal equal-protection claims based on signature comparison fail.

Plaintiffs present two federal equal-protection claims. The Court will address each in turn.

### 1. County differences over signature comparison do not violate federal equal-protection rights.

Plaintiffs' first federal equal-protection claim is based on some county boards of elections intending to verify the signatures on mail-in and absentee ballots and applications, while others do not intend to do so. To that end, Plaintiffs have presented evidence that some, but not all, counties do intend to verify signatures. *E.g.*, [ECF 504-1].[19] According to Plaintiffs, this arbitrary and differential treatment of mail-in and absentee ballots among counties—purportedly caused by the Secretary's September 11, 2020, and September 28, 2020, guidance—violates the Equal-Protection Clause because voters will be treated differently simply because of the county in which they reside. The Court, however, finds no equal-protection violation in this context.

[19]   The counties that intend to compare and verify signatures in the upcoming election include at least the following counties: Cambria, Elk, Franklin, Juniata, Mifflin, Sullivan, Susquehanna, and Wyoming. [ECF 504-1].

The Secretary's guidance about which Plaintiffs complain is uniform and nondiscriminatory. It was issued to all counties and applies equally to all counties, and by extension, voters. Because the uniform, nondiscriminatory guidance is rational, it is sound under the Equal-Protection Clause. *See Gamza*, 619 F.2d at 453 (5th Cir. 1980) ("We must, therefore, recognize a distinction between state laws and

patterns of state action that systematically deny equality in voting, and episodic events that, despite non-discriminatory laws, may result in the dilution of an individual's vote. Unlike systematically discriminatory laws, isolated events that adversely affect individuals are not presumed to be a violation of the equal protection clause.") (citation omitted). Indeed, the guidance merely instructs counties to abide by the Election Code—an instruction to follow the law is certainly rational and related to an obviously rational government interest.

**\*61**  In fact, if there is any unequal application now, it is caused by those counties that are ***not*** following the guidance and are going above and beyond the Election Code to impose a signature-comparison requirement. That claim, though, is not before the Court, as Plaintiffs here do not assert that imposing a signature-comparison requirement violates the Constitution (they allege the opposite).

In any event, to the extent there was uncertainty before, this decision informs the counties of the current state of the law as it relates to signature comparison. If any county still imposes a signature-comparison requirement in order to disallow ballots, it does so without support from the Secretary's guidance or the Election Code. Further, counties that impose this signature-comparison requirement to reject ballots may be creating a different potential constitutional claim for voters whose ballots are rejected. *Boockvar*, ––– A.3d at ––––, 2020 WL 5554644, at \*34, n.16 (Wecht, J. concurring) (noting that courts around the country have found due process issues with signature-comparison requirements; and collecting cases).

For these reasons, Plaintiffs' equal-protection claim falls short.

### 2. Different treatment between in-person ballots and mail-in ballots also does not violate federal equal-protection rights.

Plaintiffs also assert a second federal equal-protection claim on the grounds that the Election Code, by not requiring signature comparison for mail-in and absentee ballots, treats such ballots differently than in-person ballots (which require signature comparisons). Plaintiffs argue that this is an unconstitutionally arbitrary and unequal treatment. The Court disagrees.

It is well-settled that states may employ in-person voting, absentee voting, and mail-in voting and each method need not be implemented in exactly the same way. *See Hendon*, 710 F.2d at 181 ("A state may employ diverse methods of voting, and the methods by which a voter casts his vote may vary throughout the state.")

"Absentee voting is a fundamentally different process from in-person voting, and is governed by procedures entirely distinct from in-person voting procedures." *ACLU of New Mexico v. Santillanes*, 546 F.3d 1313, 1320 (10th Cir. 2008) (citations omitted). It is an "obvious fact that absentee voting is an inherently different procedure from in-person voting." *Indiana Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 830-31 (S.D. Ind. 2006). Because in-person voting is "inherently different" from mail-in and absentee voting, the procedures for each need not be the same. *See, e.g., Santillanes*, 546 F.3d at 1320-21 ("[B]ecause there are clear differences between the two types of voting procedures, the law's distinction is proper."); *Rokita*, 458 F. Supp. 2d at 831 ("[I]t is axiomatic that a state which allows for both in-person and absentee voting must therefore apply different requirements to these two groups of voters."); *Billups*, 439 F. Supp. 2d at 1356-57 ("[A]bsentee voting and in-person voting are inherently different processes, and both processes use different standards, practices, and procedures.").

Plaintiffs argue that while absentee and mail-in voting "is a fundamentally different process from in-person voting," Defendants have "no justification in this instance to create such an arbitrary and disparate rule between absentee/mail-in voters and in-person voters." [ECF 509, p. 51]. Not so.

**\*62** Because of the "inherent" differences between in-person voting and mail-in and absentee voting, Pennsylvania's requirement for signature comparison for in-person ballots, but not mail-in and absentee ballots, is not arbitrary. By way of example, Secretary Boockvar articulated several valid reasons why Pennsylvania implements different verification procedures for mail-in and absentee voters versus in-person voters. [ECF 504-12; ECF 549-2].

In her deposition, Secretary Boockvar explained that for in-person voters, the only possible verification is signature comparison and verification. [ECF 504-12, 55:19-56:19]. This is because, unlike mail-in and absentee voters who must apply for a ballot, in-person voters may simply show up at the polls on Election Day and vote. In contrast, for mail-in and absentee voters, there are several verification steps implemented before the voter's mail-in/absentee ballot is counted, such as checking their application and their drivers' license number or social security number. [*Id.* at 56:8-19]. Thus, counties don't need to resort to a signature comparison to identify and verify the mail-in or absentee voter.

This is important, as Defendants and Intervenors present valid concerns about the uniformity and equality of signature comparisons, in part, due to the technical nature of signature analysis, the subjective underpinnings of signature analysis, and the variety of reasons that signatures can naturally change over time. [ECF 549-2, pp. 19-20, ¶ 68; ECF 549-9, p. 20, ¶¶ 63-64]. Such factors can reasonably justify not requiring a signature comparison when the elector is not physically present.

For example, Secretary Boockvar notes the concern with non-handwriting-expert election officials comparing signatures, without uniform standards. [ECF 549-2, pp. 19-20, ¶ 68]. She also notes that people's signatures can change over time, due to natural and unavoidable occurrences, like injuries, arthritis, or the simple passage of time. [*Id.*]. Such reasons are valid and reasonable. *See Boockvar*, ⸺ A.3d at ⸺, 2020 WL 5554644, at \*34 (Wecht, J. concurring) ("Signature comparison is a process fraught with the risk of error and inconsistent application, especially when conducted by lay people.").

Secretary Boockvar further asserts that signature comparison is justified for in-person voting, but not mail-in or absentee voting, because the in-person voter is notified of his or her signature deficiency, and afforded an opportunity to cure. [ECF 549-2, pp. 19-20, ¶¶ 66-68 (explaining that in-person voters can be immediately notified of the signature deficiency, but mail-in/absentee voters cannot) ]. Secretary Boockvar's justifications are consistent with the Election Code's framework.

When a voter votes in person, he or she signs the voter's certificate, and the election official immediately, in the voter's presence, verifies the signature. 25 P.S. § 3050(a.3)(1)-(2). If the election official finds the signature to be problematic, the in-person voter is told as such. *Id.* at § 3050(a.3)(2). Notably, however, the in-person voter may still cast a ballot. *Id.* ("[I]f the signature on the voter's certificate ... shall not be deemed authentic by any of the election officers, such elector shall not be denied the right to vote for that reason[.]"). The in-person voter whose signature is questioned must, after casting the ballot, "produce at least one qualified elector of the election

Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)
Case 4:20-cv-02078-MWB Document 93-10 Filed 11/12/20 Page 73 of 279

2020 WL 5997680

district as a witness, who shall make affidavit of his identity or continued residence in the election district." *Id.* at § 3050(d). Thus, the in-person voter whose signature is not verified is immediately notified, is still allowed to cast a ballot, and is given the opportunity to remedy the signature-deficiency.

**\*63** In contrast, a voter who casts a mail-in or absentee ballot cannot be afforded this opportunity. Absentee and mail-in ballots are kept in "sealed or locked containers" until they are "canvassed by the county board of elections." 25 P.S. § 3146.8(a). The pre-canvassing and canvassing cannot begin until Election Day. *Id.* at § 3146.8(g)(1.1)-(2). As such, the absentee and mail-in ballots cannot be verified until Election Day, regardless of when the voter mails the ballot. Further, even if there were sufficient time, a voter cannot cure these types of deficiencies on their mail-in or absentee ballot. *Boockvar*, ––– A.3d at ––––, 2020 WL 5554644, at \*20 ("[A]lthough the Election Code provides the procedures for casting and counting a vote by mail, it does not provide for the "notice and opportunity to cure" procedure sought by Petitioner.").

Therefore, if mail-in and absentee ballots were subject to signature comparison, an election official—who is unstudied in the technical aspects of signature comparison—could deem a voter's signature problematic and not count the ballot, which would effectively disenfranchise that voter. Unlike the in-person voter, the mail-in or absentee voter may not know that his or her signature was deemed inauthentic, and thus may be unable to promptly cure the deficiency even if he or she were aware.

Accordingly, the Court concludes that the inherent differences and opportunities afforded to in-person voters compared to mail-in and absentee voters provides sufficient reason to treat such voters differently regarding signature comparison. The Court concludes that the lack of signature comparison for mail-in and absentee ballots is neither arbitrary, nor burdens Plaintiffs' equal-protection rights.

For these reasons, the Court will dismiss Plaintiffs' federal equal-protection claims related to signature comparison.

### 3. The Election Code provisions related to signature comparison satisfy *Anderson-Burdick*.

Finally, even assuming the Election Code's absence of a signature-comparison requirement imposes some burden

on Plaintiffs' constitutional rights, Plaintiffs' constitutional claims still fail.

As discussed above with respect to Defendants' drop-box implementation, *Anderson-Burdick* does not apply neatly to this claim either. This is because Plaintiffs aren't challenging a specific regulation affecting their right to vote, but are instead challenging the ***lack*** of a restriction on someone else's right to vote. This makes both the burden difficult to assess and also the state's interests in ***not*** doing something more abstract. As such, the Court finds that the proper application of the *Anderson-Burdick* framework here includes weighing the burden involving Plaintiffs' risk of vote dilution against the state's interests and overall plan in preventing against voter fraud, including with respect to forged mail-in ballots.

Weighing these considerations compels a conclusion that there is no constitutional violation here. With respect to any burden on Plaintiffs' right to vote, that burden is slight, at best. A failure to engage in a signature comparison may, crediting Plaintiffs' evidence, increase the risk of voter fraud. But even then, this remains a largely speculative concern. This burden too is lessened by the numerous other regulations imposed by the Election Code, including the detailed verification procedure as to the information on mail-in ballots (discussed above), and the deterrence furthered by criminal sanctions for those engaging in such voter fraud.

Against these burdens, the Commonwealth has precise and weighty interests in verifying ballot applications and ballots in an appropriate manner to ensure that they are accurate. As discussed above, the Commonwealth determined that the risk of disenfranchising mail-in and absentee voters, did not justify signature comparison for those voters. [ECF 549-2, pp. 19-20, ¶¶ 66-69]. Unlike for in-person voters, there are other means of identifying and verifying mail-in and absentee voters, such as having to specifically apply for a mail-in or absentee ballot and provide various categories of identifying information. [ECF 504-12, 55:19-56:19]; 25 P.S. §§ 3146.2(b), 3150.12(b). And ultimately, due to the slight burden imposed on Plaintiffs, Pennsylvania's regulatory interests in a uniform election pursuant to established procedures is sufficient to withstand scrutiny. *Timmons*, 520 U.S. at 358, 117 S.Ct. 1364.

**\*64** The General Assembly opted not to require signature comparisons for mail-in and absentee ballots and applications. And as previously discussed, absent

extraordinary reasons to, the Court is not to second-guess the legislature.

**IV. Defendants and Intervenors are entitled to summary judgment on Plaintiffs' as-applied, federal constitutional challenge to the county-residency requirement for poll watchers.**

Plaintiffs next take exception with the provision of the Election Code that restricts a registered voter from serving as a poll watcher outside the county of his or her residence. [ECF 461, ¶ 217].

Plaintiffs argue that "[a]s applied to the 2020 General Election, during the midst of the COVID-19 pandemic, Pennsylvania's residency requirement for watchers violates equal protection." [ECF 509, p. 58]. That's because, according to Plaintiffs, the "current pandemic severely challenges the ability of parties to staff watchers[.]" [*Id.* at p. 60]. And not having enough poll watchers in place "puts into danger the constitutionally-guaranteed right to a transparent and undiluted vote," [*id.* at p. 68], by "fostering an environment that encourages ballot fraud or tampering," [ECF 461, ¶ 256]. As such, Plaintiffs believe that the county residency requirement "is not rationally connected or reasonably related to any interest presented by the Commonwealth." [ECF 509, p. 63].

Defendants and Intervenors have a markedly different view.

As an initial matter, the Democratic Intervenors argue that Plaintiffs "are precluded from relitigating their claim that the Commonwealth lacks a constitutionally recognized basis for imposing a county-residence restriction for poll watchers" based on the doctrine articulated in *England v. Louisiana State Bd. of Med. Examiners*, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964). [ECF 529, p. 16]. That doctrine requires that after a federal court has abstained under *Pullman*, the plaintiff must expressly reserve the right to litigate any federal claims in federal court while litigating state-law issues in state court. *England*, 375 U.S. at 419, 421-22, 84 S.Ct. 461. Defendants and Intervenors contend that Plaintiffs (specifically, the Trump Campaign, the RNC, and the Republican Party) failed to do so in the proceedings before the Pennsylvania Supreme Court.

And if the *England* doctrine doesn't bar this claim, Defendants and Intervenors argue that "Plaintiffs' as-applied challenge simply fails to state a constitutional claim." *See, e.g.*, [ECF 547, p. 65]. They believe that the county-residency

requirement does not infringe on a fundamental right or regulate a suspect classification (such as race, sex, or national origin). [*Id.*]. As a result, the Commonwealth need only provide a rational basis for the requirement, which Defendants and Intervenors believe the Commonwealth has done. [*Id.*].

After carefully reviewing the record and considering the parties' arguments and evidence, the Court finds that the *England* doctrine does not bar Plaintiffs' ability to bring this claim. Even so, after fully crediting Plaintiffs' evidence, the Court agrees with Defendants and Intervenors that Plaintiffs' as-applied challenge fails on the merits.

**A. The *England* doctrine does not bar Plaintiffs' federal challenge to the county-residency requirement.**

 **\*65**  In *England*, the Supreme Court established that after a federal court abstains under *Pullman*, "if a party freely and without reservation submits his federal claims for decision by the state courts, litigates them there, and has them decided there, then ... he has elected to forgo his right to return to the District Court." 375 U.S. at 419, 84 S.Ct. 461. To reserve those rights, a plaintiff forced into state court by way of abstention must inform the state court that he is exposing the federal claims there only to provide the proper context for considering the state-law questions. *Id.* at 421, 84 S.Ct. 461. And that "he intends, should the state court[ ] hold against him on the question of state law, to return to the District Court for disposition of his federal contentions." *Id.* Essentially, in *England*, the Supreme Court created a special doctrine of *res judicata* for *Pullman* abstention cases.

The Democratic Intervenors argue that because none of the three Plaintiffs who participated in the Pennsylvania Supreme Court case as either intervenors or *amici* "reserved the right to relitigate [Plaintiffs' poll-watcher claim] in federal court," they are now "precluded" from doing so. [ECF 529, p. 17]. The Court is not convinced that this doctrine bars Plaintiffs' claim for at least two reasons.

First, in its original abstention decision, the Court noted that "[n]one of Plaintiffs' poll-watching claims directly ask the Court to construe an ambiguous state statute." [ECF 409, p. 24]. Instead, these claims resided in a *Pullman* gray area, because they were only indirectly affected by other unsettled state-law issues. In light of that, the Court finds that the *England* doctrine was not "triggered," such that Plaintiffs needed to reserve their right to return to federal court to litigate the specific as-applied claim at issue here.

Second, even if it were triggered, not all of the Plaintiffs here were parties in the Pennsylvania Supreme Court case, and only one (the Republican Party) was even given intervenor status. But even the Republican Party, acting as an intervenor, did not have an opportunity to develop the record or present evidence relevant to its as-applied challenge. Thus, this claim wasn't "fully litigated" by any of the Plaintiffs, which is a necessary condition for the claim to be barred under the *England* doctrine. *Cf. Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1073 (3d Cir. 1990) (explaining that a litigant "may not relitigate an issue s/he fully and unreservedly litigated in state court").

Thus, Plaintiffs are not precluded by the *England* doctrine from bringing their remaining as applied poll-watcher claim. The Court will now address the claim on the merits.

**B. The county-residency requirement, as applied to the facts presented and the upcoming general election, does not violate the U.S. Constitution.**

Originally, Plaintiffs raised a facial challenge to the county-residency requirement under 25 P.S. § 2687. That is, Plaintiffs first took the position that there was no conceivable constitutional application of the requirement that an elector be a resident of the county in which he or she seeks to serve. But, as Plaintiffs' concede, that facial challenge is no longer viable in light of the Pennsylvania Supreme Court's recent decision. [ECF 448, p. 10]. As a result, Plaintiffs now focus solely on raising an as-applied challenge to the county-residency requirement.

"[T]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010).

At a fundamental level, a "facial attack tests a law's constitutionality based on its text alone and does not consider the facts or circumstances of a particular case. *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010). By contrast, an "as-applied attack" on a statute "does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right." *Id.* The distinction between facial and an as-applied attack, then, "goes to the breadth of the remedy employed by the Court, not what must be pleaded

in a complaint." *Citizens United*, 558 U.S. at 331, 130 S.Ct. 876; *see also Bruni v. City of Pittsburgh*, 824 F.3d 353, 362 (3d Cir. 2016) ("The distinction between facial and as-applied constitutional challenges, then, is of critical importance in determining the remedy to be provided).

**\*66** Because the distinction is focused on the available remedies, not the substantive pleading requirements, "[t]he substantive rule of law is the same for both challenges." *Edwards v. D.C.*, 755 F.3d 996, 1001 (D.C. Cir. 2014); *see also Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 509, n.5 (D.C. Cir. 2016) ("Indeed, the substantive rule of law is the same for both as-applied and facial First Amendment challenges.") (cleaned up); *Legal Aid Servs. of Or. v. Legal Servs. Corp.*, 608 F.3d 1084, 1096 (9th Cir. 2010) ("The underlying constitutional standard, however, is no different [in an as-applied challenge] th[a]n in a facial challenge.").

"In other words, *how* one must demonstrate the statute's invalidity remains the same for both type of challenges, namely, by showing that a specific rule of law, usually a constitutional rule of law, invalidates the statute, whether in a personal application or to all." *Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219, 228 (2d Cir. 2006), *abrogated on other grounds by Bond v. United States*, 564 U.S. 211, 131 S.Ct. 2355, 180 L.Ed.2d 269 (2011).

In determining whether a state election law violates the U.S. Constitution, the Court must "first examine whether the challenged law burdens rights protected by the First and Fourteenth Amendments." *Patriot Party of Allegheny Cnty. v. Allegheny Cnty. Dep't of Elections*, 95 F.3d 253, 258 (3d Cir. 1996). "Where the right to vote is not burdened by a state's regulation on the election process, ... the state need only provide a rational basis for the statute." *Cortés*, 218 F. Supp. 3d at 408. The same is true under an equal protection analysis. "If a plaintiff alleges only that a state treated him or her differently than similarly situated voters, without a corresponding burden on the fundamental right to vote, a straightforward rational basis standard of review should be used." *Obama*, 697 F.3d at 428 (6th Cir. 2012); *see also Biener*, 361 F.3d at 214-15 (applying rational basis where there was no showing of an "infringement on the fundamental right to vote."); *Donatelli*, 2 F.3d at 515 ("A legislative classification that does not affect a suspect category or infringe on a fundamental constitutional right must be upheld against equal protection challenge if there is any reasonably

conceivable state of facts that could provide a rational basis for the classification." (cleaned up)).

But where the law imposes at least some burden on protected rights, the court "must gauge the character and magnitude of the burden on the plaintiff and weigh it against the importance of the interests that the state proffers to justify the burden." *Patriot Party*, 95 F.3d at 258 (citations omitted).

Consistent with the Pennsylvania Supreme Court's recent decision, but now based on a complete record, this Court finds that the county-residency requirement for poll watching does not, as applied to the particular circumstances of this election, burden any of Plaintiffs' fundamental constitutional rights, and so a deferential standard of review should apply. *See Boockvar*, ––– A.3d at ––––, 2020 WL 5554644, at *30. Under a rational-basis review and considering all the relevant evidence before the Court, the county-residency requirement is rational, and thus constitutional. But even if the requirement burdened the right to vote, that burden is slight—and under the *Anderson-Burdick* test, the Commonwealth's interests in a county-specific voting system, viewed in the context of its overall polling-place security measures, outweigh any slight burden imposed by the county-residency restriction.

**1. The county-residency requirement neither burdens a fundamental right, including the right to vote, nor discriminates based on a suspect classification.**

 **\*67** At the outset, "there is no individual constitutional right to serve as a poll watcher[.]" *Boockvar*, ––– A.3d at ––––, 2020 WL 5554644, at *30 (citing *Cortés*, 218 F. Supp. 3d at 408); *see also Dailey v. Hands*, No. 14-423, 2015 WL 1293188, at *5 (S.D. Ala. Mar. 23, 2015) ("[P]oll watching is not a fundamental right protected by the First Amendment."); *Turner v. Cooper*, 583 F. Supp. 1160, 1162 (N.D. Ill. 1983) ("Plaintiffs have cited no authority ..., nor have we found any, that supports the proposition that [the plaintiff] had a first amendment right to act as a poll watcher.").

"State law, not the Federal Constitution, grants individuals the ability to serve as poll watchers and parties and candidates the authority to select those individuals." *Cortés*, 218 F. Supp. 3d at 414; *see also Boockvar*, ––– A.3d at ––––, 2020 WL 5554644, at *30 (the right to serve as a poll watcher "is conferred by statute"); *Tiryak v. Jordan*, 472 F. Supp. 822, 824 (E.D. Pa. 1979) ("The number of poll-watchers allowed, the manner of their appointment, their location within the

polling place, the activities permitted and the amount of compensation allowed are all dictated by [25 P.S. § 2687].")). Given the nature of the right, "[i]t is at least arguable that the [Commonwealth of Pennsylvania] could eliminate the position of poll watcher" without offending the constitution. *Cotz v. Mastroeni*, 476 F. Supp. 2d 332, 364 (S.D.N.Y. 2007). In fact, one neighboring state—West Virginia—has eliminated poll watchers. W. Va. Code Ann. § 3-1-37; W. Va. Code Ann. § 3-1-41.

Nor does the county-residency requirement hinder the "exercise of the franchise." *Cortés*, 218 F. Supp. 3d at 408. It doesn't in any way limit voters' "range of choices in the voting booth"—voters can still "cast ballots for whomever they wish[.]" *Id.* And, as Plaintiffs admit, the county-residency requirement doesn't make the actual act of casting a vote any harder. *See* [ECF 524-24, 67:1-6]. Indeed, at least one of the plaintiffs here, Representative Joyce, testified that he was unaware of anyone unable to cast his ballot because of the county-residency requirement for poll watchers [*Id.*].

Finally, Plaintiffs' claim that Pennsylvania's "poll watching system" denies them "equal access" to the ability to observe polling places in the upcoming election does not, on its own, require the Court to apply anything other than rational-basis scrutiny. [ECF 551, p. 75]. To the extent Plaintiffs are denied equal access (which discussed below, as a matter of evidence, is very much in doubt), it isn't based on their membership in any suspect classification.

For a state law to be subject to strict scrutiny, it must not only make a distinction among groups, but the distinction must be based on inherently suspect classes such as race, gender, alienage, or national origin. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439-40, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Political parties are not such a suspect class. *Greenville Republican Party*, 824 F. Supp. 2d at 669 ("[T]his court is unfamiliar with, and Plaintiffs have not cited, any authority categorizing political parties as an inherently suspect class.") Likewise, "[c]ounty of residence is not a suspect classification warranting heightened scrutiny[.]" *Short*, 893 F.3d at 679.

Plaintiffs don't dispute this. [ECF 509, p. 65 ("To be clear, the right at issue here is the right of **candidates** and **political parties** to participate in an election where the process is transparent and open to observation and the right of the **voters** to participate in such election." (emphasis in original)) ]. Rather, Plaintiffs' theory as to how the county-residency

requirement burdens the right to vote is based on the same threat of vote dilution by fraud that they have advanced with their other claims. In other words, Plaintiffs' claim that the county-residency requirement for poll watchers limits the ability to find poll watchers, which, in turn, limits the ability for poll watchers to detect fraud and ballot tampering. [ECF 461, ¶¶ 256-57]. The resulting fraudulent or destroyed ballots cause the dilution of lawfully cast ballots. [ECF 509, pp. 64-68].

**\*68** Thus, based on this theory, to establish the burden flowing from the county-residency restriction, Plaintiffs must show (1) the county-residency requirement prevents them from recruiting enough registered Republican poll watchers in every county, (2) the absence of these Republican poll watchers creates a material risk of increased fraud and ballot tampering, and (3) this risk of fraud and ballot tampering will dilute the value of honestly cast votes.

There are both factual and legal problems fatal to Plaintiffs' vote-dilution theory in this context. Factually, Plaintiffs' evidence, accepted as true, fails to establish that they cannot find enough poll watchers because of the county-residency requirement. But even if they made that factual showing, the inability to find poll watchers still does not burden any recognized constitutional right in a way that would necessitate anything more than deferential review.

**2. Plaintiffs' evidence does not establish any factual predicate for their theory.**

Even accepting as true Plaintiffs' version of events, Plaintiffs have not established that the county-residency requirement is responsible for an inability to find enough poll watchers for at least two reasons.

First, Plaintiffs' evidence stops short of demonstrating any actual shortfall of desired poll watchers.

For example, in his declaration, James J. Fitzpatrick, the Pennsylvania Director for Election Day Operations for the Trump Campaign, stated only that the "Trump Campaign is *concerned* that due to the residency restriction, it will not have enough poll watchers in certain counties." [ECF 504-2, ¶ 25 (emphasis added) ]. Notably, however, Mr. Fitzpatrick, even when specifically asked during his deposition, never identified a single county where the Trump Campaign has *actually* tried and failed to recruit a poll watcher because

of the county-residency requirement. *See, e.g.*, [ECF 528-14, 261:21-25] ("Q: Which counties does the Trump campaign or the RNC contend that they will not be able to obtain what you refer to as full coverage of poll watchers for the November 2020 election? A: I'm not sure. I couldn't tell you a list.").

Nor do any of Plaintiffs' other witness declarations establish an actual, inability to recruit poll watchers in any specific county. Representative Reschenthaler stated only that he was "concerned" that he "will not be able to recruit enough volunteers from Greene County to watch the necessary polls in Greene County." [ECF 504-6, ¶ 12].

Representative Kelly stated that he was "likely to have difficulty getting enough poll watchers from within Erie County to watch all polls within that county on election day." [ECF 504-5, ¶ 16]. "Likely difficulty" isn't the same as an "actual inability." That aside, the declaration doesn't provide any basis for Representative Kelly's assessment of this "likely difficulty." Nowhere does he detail the efforts he took (*e.g.*, the outreach he tried, prospective candidates he unsuccessfully recruited, and the like), nor did he explain why those efforts aren't likely to succeed in the future.

The same goes for Representative Thompson's declaration. Representative Thompson stated that during some unspecified prior elections, unidentified parties and campaigns did not "always find enough volunteers to serve as poll watchers in each precinct." [ECF 504-4, ¶ 20]. But this undetailed statement doesn't help Plaintiffs' cause, because it doesn't identify the elections during which this was a problem, the parties and campaigns affected by a lack of poll watchers, or the precincts for which no poll watcher could be found.

**\*69** Representative Joyce's declaration doesn't even express a "concern" about "likely difficulty" in recruiting poll watchers. He simply stated his belief that "[p]oll watchers play a very important role in terms of protecting the integrity of the election process[.]" [ECF 504-7, ¶ 11]. While he may be right, it has no bearing on whether Plaintiffs can find enough people to play that "very important role."

Indeed, Plaintiffs' prediction that they will "likely" have difficulty finding poll watchers is belied by the uncontested Pennsylvania voter registration statistics for 2019 that they included as an exhibit to their summary-judgment brief. [ECF 504-34]. Those statistics suggest that there is no shortage of registered Republican voters who are qualified to serve as poll watchers. [*Id.*]. Even in the three specific counties in

which Plaintiffs warn that "Democratic registered voters out-number ... their Republican counterparts" (*i.e.*, Philadelphia, Delaware, and Centre), there are still significant numbers of registered Republicans. *See* [ECF 504-34 (Philadelphia – 118,003; Delaware – 156,867; and Centre – 42,903) ]. And only a very small percentage of the registered Republicans would be needed to fill all the necessary poll watcher positions in those allegedly problematic counties. *See, e.g.*, *Cortés*, 218 F. Supp. 3d at 410 (noting that, in 2016, the Republican Party "could staff the entirety of the poll watcher allotment in Philadelphia county with just 4.1% of the registered Republicans in the county."). While Plaintiffs argue that these statistics don't show the number of registered Republicans *willing* to serve as a poll watcher, the Court is hard pressed to see, nor do Plaintiffs show, how among the tens—or hundreds—of thousands of registered Republicans in these counties, Plaintiffs are unable to find enough poll workers.[20]

20    Plus, these figures do not even tell the whole story because they do not take into account the hundreds of thousands of voters who are registered to other parties who could also conceivably serve as poll watchers for the Trump Campaign and the candidate Plaintiffs. [504-34]. While that may not be the ideal scenario for Plaintiffs, they concede there's nothing in the Election Code that limits them to recruiting only registered voters from the Republican Party. [ECF 528-14, 267:23-268:1 (Q: And you don't have to be a registered Republican to serve as a poll watcher for the Trump Campaign, do you? A: No.) ]. To that point, the Trump Campaign utilized at least two Democrats among the poll watchers it registered in the primary. [ECF 528-15, P001648].

Plaintiffs have not presented any evidence that would explain how, despite these numbers, they will have a hard time finding enough poll watchers. In fact, Plaintiffs' own expert, Professor Lockerbie, admits that "the Democratic and Republican parties might be able to meet the relevant criteria and recruit a sufficient population of qualified poll watchers who meet the residency requirements[.]" [ECF 504-20, ¶ 16].

Professor Lockerbie's report makes clear, and Plaintiffs appear to agree, that the county-residency requirement only potentially burdens other, "minor" political parties' ability to recruit enough poll watchers. [ECF 509, p. 61 (citing ECF 504-20, ¶¶ 16-17) ]. Regardless, any burden on these third parties is not properly before the Court. They are not parties to this litigation, and so the Court doesn't know their precise identities, whether they have, in fact, experienced any

difficulty in recruiting poll watchers, or, more fundamentally, whether they even want to recruit poll watchers at all.[21]

21    To the extent that Plaintiffs are attempting to bring their claim on behalf of these third parties (which is unclear), they would lack standing to do so. Ordinarily, "a litigant must assert his or her own legal rights and interests and cannot rest a claim of relief on the legal rights or interests of third parties." *Powers v. Ohio*, 499 U.S. 400, 410, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). The only time a litigant can bring an action on behalf of a third party is when "three important criteria are satisfied." *Id.* "The litigant must have suffered an 'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute; the litigant must have a close relation to the third party; and there must exist some hindrance to the third party's ability to protect his or her own interest." *Id.* at 410-11, 111 S.Ct. 1364 (cleaned up). Plaintiffs cannot satisfy the second or third criteria.

Plaintiffs claim that they "have a close relationship with these minor parties such that it will act as an effective advocate for the minor parties." [ECF 551, p. 30]. It is hard to see how Plaintiffs can be said to have a close relationship with rival political parties who are their direct adversaries in the upcoming election.

Plaintiffs also argue that these "minor parties are hindered from protecting their own interests, particularly in this action when there are no minor party intervenors." [*Id.*]. But that doesn't hold water either. Just because these other parties have not asked to intervene, it does not mean they were incapable of intervening or seeking relief elsewhere. Indeed, these parties and their candidates have demonstrated time and again that they can raise their own challenges to election laws when they so desire, including by filing suit in federal district court. *See, e.g.*, *Stein v. Cortés*, 223 F. Supp. 3d 423 (E.D. Pa. 2016) (Green Party Presidential candidate Jill Stein seeking recount); *Libertarian Party of Conn. v. Merrill*, No. 20-467, 2020 WL 3526922 (D. Conn. June 27, 2020) (seeking to enjoin Connecticut's ballot access rules that required minor party candidates to petition their way onto the ballot); *Green Party of Ark. v. Martin*, 649 F.3d 675 (8th Cir. 2011) (challenging Arkansas' ballot access laws).

**\*70**  Additionally, Plaintiffs failed to present evidence that connects the county-residency requirement to their inability to find enough poll watchers. To succeed on their theory Plaintiffs cannot just point to difficulty recruiting poll watchers, they need to also show that "Section 2687(b) is responsible for their purported staffing woes." *Cortés*, 218 F. Supp. 3d at 410. Plaintiffs fail to show this, too.

Plaintiffs argue that the ongoing COVID-19 pandemic greatly reduces the number of people who would be willing to serve as a poll watcher, which further exacerbates the alleged problem caused by the county-residency requirement. [ECF 509, p. 60]. The primary problem with this argument, though, is that Plaintiffs have not presented any evidence to support it. Plaintiffs have not put forward a statement from a single registered voter who says they are unwilling to serve as a poll watcher due to concerns about contracting COVID-19.

Despite this shortcoming, the Court also acknowledges that COVID-19 generally has made it more difficult to do anything in person, and it is entirely plausible that the current pandemic will limit Plaintiffs from recruiting poll watchers to man polling places on election day. But that is likely true for just about every type of election rule and regulation. For example, the effects of the ongoing pandemic coupled with the requirement that the poll watcher be a registered voter (a requirement that unquestionably narrows the pool of potential candidates) would also make it harder to recruit poll watchers. There is no basis to find that the current public-health conditions, standing alone, render the county-residency requirement irrational or unconstitutional.

To bolster their concerns over COVID-19, Plaintiffs point to *Democratic Nat'l Committee v. Bostelmann*, No. 20-249, —— F.Supp.3d ——, 2020 WL 5627186 (W.D. Wis. Sept. 21, 2020), where the court there enjoined Wisconsin's statute that requires that each election official (*i.e.*, poll worker) be an elector of the county in which the municipality is located. That case is distinguishable in at least two important ways.

First, *Bostelmann* concerned poll **workers**, not poll **watchers**. *Id.* at ——, 2020 WL 5627186, at *7. The difference between the two is significant. Poll workers are a more fundamental and essential aspect of the voting process. Without poll workers, counties cannot even open polling sites, which creates the possibility that voters will be completely disenfranchised. In fact, in *Bostelmann*, the plaintiffs presented evidence that Milwaukee was only able to open 5 of its normal 180 polling places. *Id.* A failure to provide voters a place to vote is a much more direct and established constitutional harm than the one Plaintiffs allege here.

Second, the plaintiffs in *Bostelmann* actually presented evidence that they were unable to find the poll workers they needed due to the confluence of the COVID-19 pandemic and

the challenged restriction. *Id.* As discussed above, Plaintiffs here have presented no such evidence.

To succeed on summary judgment, Plaintiffs need to move beyond the speculative concerns they offer and into the realm of proven facts. But they haven't done so on two critical fronts —they haven't shown an actual inability to find the necessary poll watchers, or that such an inability is caused by the county-residency requirement. Because Plaintiffs have not pointed to any specific "polling place that Section 2687(b) prevents [them] from staffing with poll watchers," Plaintiffs' theory of burden is doomed at launch. *Cortés*, 218 F. Supp. 3d at 409.

### 3. Even if Plaintiffs could establish a factual predicate for their theory, it would fail as a matter of law.

**\*71**  As the Pennsylvania Supreme Court concluded last month, Plaintiffs' "speculative claim that it is 'difficult' for both parties to fill poll watcher positions in every precinct, *even if true*, is insufficient to transform the Commonwealth's uniform and reasonable regulation requiring that poll watchers be residents of the counties they serve into a non-rational policy choice." *Boockvar*, —— A.3d at ——, 2020 WL 5554644, at *30 (emphasis added).[22] The fundamental constitutional principles undergirding this finding are sound.

[22]   The Sierra Club Intervenors argue this should end the analysis. [ECF 542, p. 14 ("Even 'as applied,' Plaintiffs' claim has already been rejected") ]. While the Court finds the Pennsylvania Supreme Court's apparent ruling on Plaintiffs' as-applied challenge instructive, it is not outcome determinative. That is because the Pennsylvania Supreme Court did not have the benefit of the full evidentiary record that the Court has here.

Plaintiffs' only alleged burden on the right to vote is that Defendants' lawful imposition of a county-residency requirement on poll watching will result in an increased risk of voter irregularities (*i.e.*, ballot fraud or tampering) that will, in turn, potentially cause voter dilution. While vote dilution is a recognized burden on the right to vote in certain contexts, such as when laws are crafted that structurally devalue one community's or group of people's votes over another's, there is no authority to support a finding of burden based solely on a speculative, future possibility that election irregularities might occur. *See, e.g.*, *Minnesota Voters*, 720 F.3d at 1033 (affirming dismissal of claims "premised on potential harm in the form of vote dilution caused by insufficient pre-election verification of EDRs' voting eligibility and the absence of

post-election ballot rescission procedures"); *Common Cause Rhode Island v. Gorbea*, 970 F.3d 11, 15 (1st Cir. 2020) (rejecting the claim that a ballot witness signature requirement should not be enjoined during a pandemic because it would allegedly increase the risk of voter fraud and put Republican candidates at risk); *Cook Cnty. Rep. Party v. Pritzker*, No. 20-4676, 2020 WL 5573059, at *4 (N.D. Ill. Sept. 17, 2020) (denying a motion to enjoin a law expanding the deadline to cure votes because plaintiffs did not show how voter fraud would dilute the plaintiffs' votes).

Without a recognized burden on the right to vote, Plaintiffs' "argument that the defendants did not present an adequate justification is immaterial." *Green Party of Tennessee v. Hargett*, No. 16-6299, 2017 WL 4011854, at *4 (6th Cir. May 11, 2017). That's because the Court need not apply the *Anderson-Burdick* framework, and its intermediate standards, in this situation. *See Donatelli*, 2 F.3d at 514 & n.10. Instead, just as the Pennsylvania Supreme Court held, the Commonwealth here need only show "that a rational basis exists [for the county-residency requirement] to be upheld. *Boockvar*, ⸺ A.3d at ⸺, 2020 WL 5554644, at *30 (citing *Cortes*, 218 F. Supp. 3d at 408); *see also Voting for Am., Inc. v. Andrade*, 488 F. App'x 890, 899 (5th Cir. 2012) (applying rational basis review as opposed to the *Anderson-Burdick* balancing test because state election law did not implicate or burden specific constitutional rights); *McLaughlin v. North Carolina Bd. of Elections*, 65 F.3d 1215, 1227 (4th Cir. 1995) (concluding that a ballot access law "fails the *Anderson* balancing test only if it also does in fact burden protected rights").

 ***72** "Under rational-basis review, the challenged classification must be upheld 'if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.' " *Donatelli*, 2 F.3d at 513 (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)). "This standard of review is a paradigm of judicial restraint." *FCC*, 508 U.S. at 314, 113 S.Ct. 2096. It "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Id.* at 313, 113 S.Ct. 2096. Nor is it the Court's "place to determine whether the [General Assembly's decisions] were the best decisions or even whether they were good ones." *Donatelli*, 2 F.3d at 518.

Applying this deferential standard of review, the Pennsylvania Supreme Court found that given Pennsylvania's "county-based scheme for conducting elections, it is reasonable that the Legislature would require poll watchers,

who serve within the various counties of the state, to be residents of the counties in which they serve." *Boockvar*, ⸺ A.3d at ⸺, 2020 WL 5554644, at *30 (citing *Cortes*, 218 F. Supp. 3d at 409). The Court agrees.

There are multiple reasons for this. As Secretary Boockvar advises, "[b]y restricting poll watchers' service to the counties in which they actually reside, the law ensures that poll watchers should have some degree of familiarity with the voters they are observing in a given election district." [ECF 549-2, p. 22, ¶ 78]. In a similar vein, Intervenors' expert, Dr. Barreto, in his report, states that, voters are more likely to be comfortable with poll watchers that "they know and they recognize from their area." [ECF 524-1, ¶40 ("Research in political science suggests that voters are much more comfortable and trusting of the process when they know or are familiar with poll workers who are from their community.") ]. When poll watchers come from the community, "there is increased trust in government, faith in elections, and voter turnout[.]" [*Id.*].

At his deposition, Representative Kelly agreed with this idea: "Yeah, I think – again, depending how the districts are established, I think people are probably even more comfortable with people that they – that they know and they recognize from their area." [ECF 524-23, 111:21-25].

Whether requiring poll watchers to be residents of the county in which they will serve is the best or wisest rule is not the issue before the Court. The issue is whether that rule is *reasonable* and rationally advances Pennsylvania's legitimate interests. This Court, like multiple courts before it, finds that it does.

### 4. Plaintiffs' poll-watcher claim fails under the *Anderson-Burdick* framework.

Even if rational-basis review did not apply and Plaintiffs had established a burden on their right to vote, their claim nonetheless fails under the *Anderson-Burdick* framework.

Viewing Plaintiffs' evidence in the best possible light, at most, the county-residency requirement for poll watching places only an indirect, ancillary burden on the right to vote through an elevated risk of vote dilution.

Against this slight burden, the Commonwealth has sound interests in imposing a county-residency requirement,

including, as noted above, local familiarity with rules, regulations, procedures, and the voters. Beyond this, in assessing the Commonwealth's interest in imposing the county-based restriction, that interest must be viewed in the overall context of the Commonwealth's security measures involving polling places that are designed to prevent against fraud and vote dilution.

As the court in *Cortés* recognized, "while poll watchers may help guard the integrity of the vote, they are not the Election Code's only, or even best, means of doing so." 218 F. Supp. 3d at 404.

**\*73** Each county has the authority to investigate fraud and report irregularities to the district attorney. 25 P.S. § 2642(i). Elections in each district are conducted by a multimember election board, which is comprised of an election judge, a majority inspector, and a minor inspector. 25 P.S. § 2671. Each voting district may also use two overseers of election, who are appointed from different political parties by the Pennsylvania Courts of Common Pleas, and "carry greater authority than poll watchers." *Cortés*, 218 F. Supp. 3d at 403 (citing 25 P.S. § 2685). "Election overseers have the right to be present with the officers of an election 'within the enclosed space during the entire time the ... election is held." *Id.* "Poll watchers have no such right," they must "remain 'outside the enclosed space' where ballots are counted or voting machines canvassed." *Id.* (citing 25 P.S. § 2687(b)). Election overseers can also challenge any person offering to vote, while poll watchers have no such authority. 25 P.S. § 2687. For these reasons, concerns "over potential voter fraud —whether perpetrated by putative electors or poll workers themselves—appear more effectively addressed by election overseers than poll watchers[.]" *Id.* at 406.

Plaintiffs complain that poll watchers may not be present during the pre-canvass and canvass meetings for absentee and mail-in ballots. But the Election Code provides that "authorized representatives" of each party *and* each candidate can attend such canvassing. 25 P.S. § 3146.8(g)(1.1), (2). That means if, for example, 15 Republican candidates appear on ballots within a particular county (between both the state and federal elections), there could be up to 16 "authorized representatives" related to the Republican Party (one for each candidate and one for the party as a whole) present during canvassing. Adding poll watchers to that mix would just be forcing unnecessary cooks into an already crowded kitchen.[23] *See* [ECF 549-2, p. 23, ¶ 83 ("If every certified poll watcher within a county was permitted to attend the pre-canvass

meeting, the elections staff could be overwhelmed by the vast numbers of poll watchers, and the pre-canvassing process could become chaotic and compromised.") ].

23    After the briefing on the cross-motions for summary judgment had closed, on October 6, 2020, Secretary Boockvar issued additional guidance, which Plaintiffs then raised with the Court the following day. [ECF 571]. This new guidance confirms that poll watchers cannot be present during the pre-canvassing and canvassing of mail-in ballots. It also makes clear that while the authorized representative can be present, the representative cannot make any challenges to the ballots. The Court finds that this new guidance has minimal relevance to the current disputes at issue here. The scope of duties of a representative is not before the Court. Of sole relevance here is whether this new guidance changes how this Court weighs the burdens and benefits of the county-residency restriction for poll watchers. The Court finds that the representative's inability to challenge mail-in ballots does appear to provide less protection to Plaintiffs; but in the grand election scheme, particularly in light of the role of the election overseers, the Court does not find the new guidance to materially upset the Commonwealth's interests in its overall election-monitoring plan.

**\*74** Further, Secretary Boockvar testified that Pennsylvania has adopted new voting systems that will provide an additional layer of security. [ECF 524-27, 237:21-238:11]. That is, there will now be a paper trail in the form of verifiable paper ballots that will allow voters to confirm their choice, and the state recently piloted a new program that will help ensure that votes can be properly verified. [*Id.*].

On balance, then, it is clear that to the extent any burden on the right to vote exists, it is minimal. On the other hand, the Commonwealth's interest in a county-specific voting system, including with county-resident poll watchers, is rational and weighty, particularly when viewed in the context of the measures that the Commonwealth has implemented to prevent against election fraud at the polls. As such, under the flexible *Anderson-Burdick* standard, Plaintiffs have failed to establish that the county-residency requirement is unconstitutional.

**5. The Court will continue to abstain from deciding where the Election Code permits poll watching to occur.**

Plaintiffs also appear to challenge any attempts to limit poll watching to "monitoring only in-person voting at the polling place on Election Day." [ECF 461, ¶ 254]. That is, in their proposed order accompanying their Motion for Summary Judgement, Plaintiffs seek a declaration that they are "permitted to have watchers present at all locations where voters are registering to vote, applying for absentee or mail-in ballots, voting absentee or mail-in ballots, and/or returning or collecting absentee or mail-in ballots, including without limitation any satellite or early voting sites established by any county board of elections." [ECF 503-1, ¶ 3].

Plaintiffs also argue that Secretary Boockvar's October 6, 2020, guidance expressly, and unlawfully, prohibits poll watchers from being present at county election offices, satellite offices, and designated ballot-return sites. [ECF 571].

This challenge, however, is directly related to the unsettled state-law question of whether drop boxes and other satellite locations are "polling places" as envisioned under the Election Code. If they are, then Plaintiffs may be right in that poll watchers must be allowed to be present. However, the Court previously abstained under *Pullman* in addressing this "location" claim due to the unsettled nature of the state-law issues; and it will continue to do so. [ECF 459, p. 5 ("The Court will continue to abstain under *Pullman* as to Plaintiffs' claim pertaining to the notice of drop box locations and, more generally, whether the 'polling place' requirements under the Election Code apply to drop-box locations. As discussed in the Court's prior opinion, this claim involves unsettled issues of state law.") ].

Moreover, Plaintiffs have filed a lawsuit in the Court of Common Pleas of Philadelphia to secure access to drop box locations for poll watchers. The state court held that satellite ballot-collection locations, such as drop-box locations, are not "polling places," and therefore poll watchers are not authorized to be present in those places. [ECF 573-1, at p. 12]. The Trump Campaign immediately filed a notice of appeal of that decision. Regardless of what happens on appeal, Plaintiffs appear to be on track to obtain resolution of that claim in state court. [ECF 549-22]. Although this isn't dispositive, it does give the Court comfort that Plaintiffs will be able to seek timely resolution of these issues, which appear to be largely matters of state law. *See Barr v. Galvin*, 626 F.3d 99, 108 n.3 (1st Cir. 2010) ("Though the existence of a pending state court action is sometimes considered as a factor in favor of abstention, the lack of such pending proceedings does not necessarily prevent abstention by a federal court.").

## V. The Court will decline to exercise supplemental jurisdiction over Plaintiffs' state-constitutional claims.

**\*75** In addition to the federal-constitutional claims addressed above, Plaintiffs assert violations of the Pennsylvania Constitution in Counts III, V, VII, and IX of the Second Amended Complaint. Because the Court will be dismissing all federal-constitutional claims in this case, it will decline to exercise supplemental jurisdiction over these state-law claims.

Under 28 U.S.C. § 1367(c)(3), a court "may decline to exercise supplemental jurisdiction over state law claims if it has dismissed all claims over which it has original jurisdiction[.]" *Stone v. Martin*, 720 F. App'x 132, 136 (3d Cir. 2017) (cleaned up). "It 'must decline' to exercise supplemental jurisdiction in such circumstances 'unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for [exercising supplemental jurisdiction].' " *Id.* (quoting *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (emphasis in original)).

Courts have specifically applied this principle in cases raising federal and state constitutional challenges to provisions of the state's election code. *See, e.g., Silberberg v. Bd. of Elections of New York*, 272 F. Supp. 3d 454, 480–81 (S.D.N.Y. 2017) ("Having dismissed plaintiffs' First and Fourteenth Amendment claims, the Court declines to exercise supplemental jurisdiction over plaintiffs' state law claims."); *Bishop v. Bartlett*, No. 06-462, 2007 WL 9718438, at \*10 (E.D.N.C. Aug. 18, 2007) (declining "to exercise supplemental jurisdiction over the state constitutional claim" following dismissal of all federal claims and recognizing "the limited role of the federal judiciary in matters of state elections" and that North Carolina's administrative, judicial, and political processes provide a better forum for plaintiffs to seek vindication of their state constitutional claim), *aff'd*, 575 F.3d 419 (4th Cir. 2009).

Beyond these usual reasons to decline to exercise supplemental jurisdiction over the state-constitutional claims, there are two additional reasons to do so here.

First, the parties do not meaningfully address the state-constitutional claims in their cross-motions for summary judgment, effectively treating them as coextensive with the federal-constitutional claims here. The Pennsylvania Supreme Court, however, has held that Pennsylvania's "Free

and Equal Elections" Clause is not necessarily coextensive with the 14th Amendment. *See League of Women Voters v. Commonwealth*, 645 Pa. 1, 178 A.3d 737, 812-813 (2018) (referring to the Pennsylvania Free and Equal Elections Clause as employing a "separate and distinct standard" than that under the 14th Amendment to the U.S. Constitution). Given the lack of briefing on this issue and out of deference to the state courts to interpret their own state constitution, the Court declines to exercise supplemental jurisdiction.

Second, several Defendants have asserted a defense of sovereign immunity in this case. That defense does not apply to Plaintiffs' federal-constitutional claims under the *Ex parte Young* doctrine. *See Acosta v. Democratic City Comm.*, 288 F. Supp. 3d 597, 627 (E.D. Pa. 2018) ("Here, the doctrine of *Ex parte Young* applies to Plaintiffs' constitutional claims for prospective injunctive and declaratory relief, and therefore the First and Fourteenth Amendment claims are not barred by the Eleventh Amendment. Secretary Cortés, as an officer of the Pennsylvania Department of State, may be sued in his individual and official capacities 'for prospective injunctive and declaratory relief to end continuing or ongoing violations of federal law.' "). But sovereign immunity may apply to the state-law claims, at least those against Secretary Boockvar. The possibility of sovereign immunity potentially applying here counsels in favor of declining supplemental jurisdiction to decide the state-law claims.

**\*76** As such, all state-constitutional claims will be dismissed without prejudice.

## CONCLUSION

For the foregoing reasons, the Court will enter judgment in favor of Defendants and against Plaintiffs on all federal-constitutional claims, decline to exercise supplemental jurisdiction over the remaining state-law claims, and dismiss all claims in this case. Because there is no just reason for delay, the Court will also direct entry of final judgment under Federal Rule of Civil Procedure 54(b). An appropriate order follows.

## All Citations

--- F.Supp.3d ----, 2020 WL 5997680

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# D

2020 WL 5626974
Only the Westlaw citation is currently available.
United States District Court, D. Nevada.

DONALD J. TRUMP FOR
PRESIDENT, INC., et al., Plaintiff(s),
v.
Barbara CEGAVSKE, Defendant(s).

Case No. 2:20-CV-1445 JCM (VCF)
|
Signed 09/18/2020

**Synopsis**

**Background:** Presidential election campaign and political party brought action challenging constitutionality of Nevada statute which expanded mail-in voting for Nevada voters during COVID-19 pandemic. Nevada Secretary of State moved to dismiss.

**Holdings:** The District Court, James C. Mahan, Senior District Judge, held that:

presidential election campaign and political party lacked associational standing to bring suit on behalf of its member voters, and

plaintiffs lacked direct organizational standing.

Motion granted.

**Attorneys and Law Firms**

Donald J. Campbell, J Colby Williams, Campbell & Williams, Las Vegas, NV, Thomas McCarthy, Pro Hac Vice, Cameron Thomas Norris, Pro Hac Vice, Tyler Green, Pro Hac Vice, William Spencer Consovoy, Pro Hac Vice, Consovoy McCarthy PLLC, Arlington, VA, for Plaintiff(s).

Aaron D. Ford-AG, Nearvada Attorney General, Craig A. Newby, Gregory Louis Zunino, Nevada State Attorney General's Office, Carson City, NV, for Defendant(s).

ORDER

James C. Mahan, UNITED STATES DISTRICT JUDGE

**\*1** Presently before the court is defendant Barbara Cegavske, Nevada Secretary of State's, motion to dismiss the first amended complaint. (ECF No. 37). Plaintiffs Donald J. Trump for President, Inc. ("Trump campaign"), the Republican National Committee, and the Nevada Republican Party responded. (ECF No. 42). Defendant replied. (ECF No. 45).

**I. Background**

On August 3, 2020, Nevada joined the growing ranks of states that have expanded mail-in voting due to the COVID-19 pandemic.[1] *See* Assembly Bill No. 4 of the 32nd Special Session (2020) of the Nevada Legislature, Act of August 3, 2020, ch. 3, 2020 Nev. Stat. 18, §§ 1–88 ("AB 4"). The Nevada State Legislature passed Assembly Bill 4 ("AB 4"), which codified procedures for elections impacted by emergencies or disasters.[2] Specifically, the law directs city and county election officials to mail paper ballots to all active registered voters in Nevada. AB 4 at § 15.

1       Prior to the COVID-19 pandemic, Nevada voters could request an absentee ballot without providing an excuse or justification, and certain voters in rural areas could be grouped together in "mailing precincts" and "automatically mailed their paper ballots." (*See* ECF No. 37 at 7 (citing NRS §§ 293.3038-.340; 293.343-.355)).

2       "[I]f a state of emergency or declaration of disaster is proclaimed by the Governor or by resolution of the Legislature pursuant to NRS 414.070 for the entire State of Nevada, the following elections are deemed to be affected elections." AB 4 at § 8. Governor Steve Sisolak declared a state of emergency due to the COVID-19 pandemic on March 12, 2020. (ECF No. 29 at ¶ 103).

The next day, plaintiffs filed this instant suit.[3] (ECF No. 1). They challenge several key provisions of AB 4:

3       This suit is one of several that the Trump campaign has filed challenging expansions of mail-in voting during the COVID-19 pandemic. *See Donald J. Trump for President, Inc. v. Bullock*, No. CV 20-6-H-DLC (D. Mont. filed Sept. 2, 2020); *Donald J. Trump for President, Inc. v. Murphy*, No. 3:20-cv-10753, 2020 WL

4805762 (D.N.J. filed Aug. 18, 2020); *Donald J. Trump for President, Inc. v. Boockvar*, No. 2:20-cv-00966 (W.D. Pa. filed Jun. 29, 2020). This court only takes notice of the existence of these lawsuits, and not the disputed facts therein. Fed. R. Evid. 201.

Section 20(2) of AB 4 establishes a presumption that a ballot was cast in time, as long as it is received by election officials before 5 p.m. on the third day after the election, even if it lacks a postmark.[4] AB 4 at § 20(2). Plaintiffs allege that section 20(2) is preempted by federal laws that set the date of the general election,[5] because the provision allegedly permits election officials to count ballots cast after election day. (ECF No. 29 at ¶¶ 104–123). Plaintiffs theorize that, due to the speed of the United States Postal Service, a ballot mailed in Clark or Washoe county "in a state-provided, postage prepaid first-class envelope on the Wednesday or Thursday after Election Day will likely be received [by election officials] before 5:00pm on the Friday after the election" and "almost certainly will arrive without bearing a postmark." (*Id.* at ¶ 96).

[4]    Section 20(2) of AB 4 duplicates NRS § 293.317, a statute that has been in effect since January 1, 2020, but makes it applicable to affected elections. (ECF No. 37 at 8, 15).

[5]    U.S. Const. art. I, § 4, cl. 1 (Elections Clause); U.S. Const. art. II, § 1, cl. 4 (Electors Clause); U.S. Const. art. VI, § 2 (Supremacy Clause); 3 U.S.C. § 1 ("Time of appointing electors"); 2 U.S.C. § 7 ("Time of election"); 2 U.S.C. § 1 ("Time for election of senators").

**\*2**  Sections 11 and 12 of AB 4 require election officials to establish a minimum number of in-person voting locations for early voting and election-day voting, respectively. AB 4 at §§ 11, 12. A county with a population of "700,000 or more" must establish at least 100 voting centers for election day. *Id.* at § 12. A county with a population of "100,000 or more but less than 700,000" must establish at least 25 voting centers. *Id.* And a county with a population of "less than 100,000" may establish one or more voting center. *Id.* Plaintiffs allege that sections 11 and 12 authorize the disparate treatment of rural voters in violation of the Equal Protection Clause, because there will be "more in-person voting places per capita for voters in urban counties than in rural counties." (ECF No. 29 at ¶ 100). Plaintiffs speculate that rural Nevada counties will have substantially higher numbers of registered voters per in-person voting location than urban counties such as Washoe. (*Id.* at ¶¶ 130–138).

Section 22 of AB 4 requires election officials to establish "procedures for the processing and counting of mail ballots" for any affected election.[6] AB 4 at § 22. Section 25 provides that "if two or more mail ballots are found folded together to present the appearance of a single ballot" and "a majority of the inspectors are of the opinion that the mail ballots folded together were voted by one person, the mail ballots must be rejected."[7] AB 4 at § 25(2). Plaintiffs allege that sections 22 and 25 violate the Equal Protection Clause, because they authorize " 'standardless' procedures" across counties and cities for processing, inspecting, and counting mail ballots with no "specific rules designed to ensure uniform treatment" and no " 'minimal procedural safeguards.' " (ECF No. 29 at ¶¶ 145, 159) (quoting *Bush v. Gore*, 531 U.S. 98, 105–106, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) (per curiam)).

[6]    Section 22 is read together with other provisions in AB 4 that establish procedures for processing and counting mail ballots. For example, section 17 requires election officials to secure proof of identification from certain first-time voters before counting their mail ballots. AB 4 at § 17. Section 23 requires election officials to verify the signature on mail ballots. *Id.* at § 23. Section 26 requires election officials to verify that the voter did not vote in person before counting the mail ballot. *Id.* at § 26. And Section 22(b) forbids election officials from establishing any procedures that conflict with sections 2 to 27 of AB 4. *Id.* at § 22.

[7]    Section 25 of AB 4 duplicates NRS § 293.363, a statute that has been in effect since 1960, but makes it applicable to affected elections. (ECF No. 37 at 9, 21).

And finally, plaintiffs allege that all of the aforementioned provisions of AB 4, along with section 21,[8] "facilitate fraud and other illegitimate voting practices" and "dilute the value of honest, lawful votes" in violation of the Fourteenth Amendment. (ECF No. 29 at ¶ 169).

[8]    Section 21 allows for "a person authorized by the voter may return the mail ballot on behalf of the voter by mail or personal delivery to the county or city clerk, as applicable, or any ballot drop box established in the county or city, as applicable." AB 4 at § 21.

On August 20, 2020, plaintiffs amended their complaint without altering the parties or their claims. (ECF No. 29). Defendant now moves to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(1). (ECF No. 37).

## II. Legal Standard

Federal courts are courts of limited jurisdiction. *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978). "A federal court is presumed to lack jurisdiction in a particular case unless the contrary affirmatively appears." *Stock West, Inc. v. Confederated Tribes of Colville Reservation*, 873 F.2d 1221, 1225 (9th Cir. 1989).

### A. Federal Rule of Civil Procedure 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) allows defendants to seek dismissal of a claim or action for a lack of subject matter jurisdiction. Dismissal under Rule 12(b)(1) is appropriate if the complaint, considered in its entirety, fails to allege facts on its face sufficient to establish subject matter jurisdiction. *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 984–85 (9th Cir. 2008).

**\*3** Plaintiffs bear the burden of proving that the case is properly in federal court to survive a Rule 12(b)(1) motion. *McCauley v. Ford Motor Co.*, 264 F.3d 952, 957 (9th Cir. 2001) (citing *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936)). They must plead "the existence of whatever is essential to federal jurisdiction, and, if [plaintiffs do] [ ] not do so, the court, on having the defect called to its attention or on discovering the same, must dismiss the case, unless the defect be corrected by amendment." *Smith v. McCullough*, 270 U.S. 456, 459, 46 S.Ct. 338, 70 L.Ed. 682 (1926).

### B. Article III Standing

Standing to sue is a "doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, ⸺ U.S. ⸺, 136 S. Ct. 1540, 1547, 194 L.Ed.2d 635 (2016). The doctrine "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Id.* In this way, standing "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013)); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 576–77, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

To establish standing, plaintiff must plead three elements: (1) an injury in fact; (2) a causal connection between the injury and the alleged misconduct; and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130. The party invoking federal jurisdiction bears the burden of demonstrating that it has standing to sue. *Id.* at 561, 112 S.Ct. 2130. "[A]t the pleading stage, the plaintiff must 'clearly ... allege facts demonstrating' each element" of standing. *Spokeo*, 136 S. Ct. at 1547 (quoting *Warth v. Seldin*, 422 U.S. 490, 518, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)).

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent[.]' " *Spokeo*, 136 S. Ct. at 1548. Moreover, a concrete injury must actually exist and affect the plaintiff in a personal and individual way. *Id.* As the Supreme Court noted in *Spokeo*:

> Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right. Article III standing requires a concrete injury even in the context of a statutory violation. For that reason, [plaintiff] could not, for example, allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III.

*Id.* at 1549 (citing *Summers v. Earth Island Institute*, 555 U.S. 488, 496, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009) ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation ... is insufficient to create Article III standing.")).

## III. Discussion

Defendant argues that plaintiffs do not have standing to bring their claims for relief. (ECF Nos. 37, 45). This court agrees.

Plaintiffs attempt to establish standing in three ways: (1) associational standing to vindicate harms to their member voters, (2) direct organizational standing due to their need to divert resources, and (3) direct and associational standing to vindicate competitive injuries to their candidates. (ECF No. 42).

This court will address each of plaintiffs' theories in turn.

### A. Associational Standing for Voters

**\*4** Plaintiffs argue that they have associational standing to vindicate the injuries caused to their member voters by

AB 4. (ECF No. 42 at 10–13). These injuries are two-fold: an individual "right under the Constitution to have [your] vote fairly counted, without being distorted by fraudulently cast votes"—vote dilution—and an "arbitrary and disparate treatment of the members of its electorate"—violations of the Equal Protection Clause. (ECF No. 29 at ¶¶ 33, 35).

An entity may establish associational standing to bring suit on behalf of its members when: (1) "its members would otherwise have standing to sue in their own right;" (2) "the interests it seeks to protect are germane to the organization's purpose;" and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

This court finds that the Trump campaign fails to satisfy the second prong of associational standing: the interests of the voters are not "germane to the organization's purpose." *Id.* The Trump campaign does not represent Nevada voters. The Trump campaign represents only Donald J. Trump and his "electoral and political goals" of reelection. (ECF No. 29 at ¶ 11). By statutory definition, a federal election candidate's "principal campaign committee" is simply a reserve of funds set aside for that campaign. *See* 52 U.S.C. § 30102 ("Organization of political committees"). Although the Trump campaign may achieve its "organization's purpose" through Nevada voters, the individual constitutional interests of those voters are wholly distinct. (ECF No. 29 at ¶ 11).

In contrast to the Trump campaign, the Republican National Committee and Nevada Republican Party satisfy the second prong; the interests of their member voters are germane to their "organization's purpose." *See Hunt*, 432 U.S. at 343, 97 S.Ct. 2434. Still, however, plaintiffs' member voters would not "otherwise have standing to sue in their own right." *Id.* Plaintiffs' alleged injury of vote dilution is impermissibly "generalized" and "speculative" at this juncture. *Drake v. Obama*, 664 F.3d 774, 783 (9th Cir. 2011). To establish these future injuries, plaintiffs must plead facts that establish a " 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158, 134 S.Ct. 2334, 189 L.Ed.2d 246 (2014) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013)). Plaintiffs' allegations of equal protection violations are also generalized and speculative. However, plaintiffs' claim against sections 11 and 12 fail to satisfy redressability as well—"a likelihood that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130.

To demonstrate the substantial risk of voter fraud, plaintiffs cite studies and news articles on the subject. (ECF No. 29 at ¶¶ 63–81). The news articles describe a parade of administrative problems in Wisconsin, New Jersey, Connecticut, and New York, states that "hurriedly" implemented mail-in voting for elections during the COVID-19 pandemic. (*Id.* at ¶¶ 63–75). Plaintiffs also point to reported irregularities in Nevada's June 2020 mail-in primary elections. (*Id.* at ¶¶ 57–62).

Even if accepted as true, plaintiffs' pleadings allude to vote dilution that is impermissibly generalized. The alleged injuries are speculative as well, *see Lujan*, 504 U.S. at 560, 112 S.Ct. 2130, but their key defect is generality. As a court in this district has already recognized, plaintiffs' claims of a substantial risk of vote dilution "amount to general grievances that cannot support a finding of particularized injury as to [p]laintiffs." *Paher v. Cegavske*, No. 3:20-cv-00243-MMD-WGC, 2020 WL 2748301, at *4 (D. Nev. May 27, 2020). Indeed, the key provisions of AB 4 apply to all Nevada voters. Plaintiffs never describe how their member voters will be harmed by vote dilution where other voters will not. As with other "[g]enerally available grievance[s] about the government," plaintiffs seek relief on behalf of their member voters that "no more directly and tangibly benefits [them] than it does the public at large." *Lujan*, 504 U.S. at 573–74, 112 S.Ct. 2130; *see Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 485, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) ("The proposition that all constitutional provisions are enforceable by any citizen simply because citizens are the ultimate beneficiaries of those provisions has no boundaries."). Plaintiffs' allegations are "precisely the kind of undifferentiated, generalized grievance about the conduct of government" that fail to confer Article III standing. *Lance v. Coffman*, 549 U.S. 437, 442, 127 S.Ct. 1194, 167 L.Ed.2d 29 (2007).

**\*5** As to plaintiffs' equal protection claims, plaintiffs first argue that "[s]ections 11 and 12 of AB4 authorize disparate treatment of voters in rural counties" due to the law's differences in *minimum* number of in-person voting locations across counties and lack of further guidance on how election officials should make their determinations. (ECF No. 29 at ¶ 126). However, plaintiffs fail to demonstrate how these harms are redressed by their requested relief. "The proposition that plaintiffs must seek relief that actually improves their position is a well-established principle." *Townley v. Miller*, 722 F.3d 1128, 1134 (9th Cir. 2013). AB 4 simply establishes a minimum number of in-person voting locations. AB 4 at

§§ 11, 12. Removing this one safeguard does not alleviate plaintiffs' concerns. In fact, it "worsen[s] plaintiffs' injury rather than redressing it." *Townley*, 722 F.3d at 1135 ("[I]f plaintiffs were to prevail in this lawsuit, ... voters would no longer have the opportunity to affirmatively express their opposition at the ballot box at all. The relief plaintiffs seek will therefore *decrease* their (and other voters') expression of political speech rather than increase it, worsening plaintiffs' injury rather than redressing it."). An injunction against the enforcement of AB 4 would not address plaintiffs' issues with the discretion that Nevada election officials have to establish in-person voting locations. It would instead eliminate the safeguard of a minimum number of in-person voting locations from all counties.[9]

9    During the pendency of this motion, Nevada election officials established polling places and voting centers for the 2020 general election. *2020 General Election & Polling Locations*, Nevada Secretary of State (2020), https://www.nvsos.gov/sos/elections/election-day-information (presenting this information by county). This does not impact this court's finding on redressability.

Plaintiffs also claim that "AB 4's three-day, post-election receipt deadline for non-postmarked ballots—coupled with its deeming rule, the faster average mailing time in urban districts such as Clark County, and the postal service's practice of not postmarking prepaid mail—will result in significantly more untimely ballots being counted from urban areas." (ECF No. 42 at 12). These injuries are too speculative to establish standing. Plaintiffs offer a patchwork theory of harm that does not rely on AB 4, but on the speed of the United States Postal Service, an entity out of defendant's control. (ECF No. 29 at ¶¶ 73–81, 90–97). A "future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List*, 573 U.S. at 158, 134 S.Ct. 2334. Even among the segment of voters who vote by mail, plaintiffs offer no indication that the alleged future injury is "certainly impending" or "substantial[ly]" likely. *Id.*

This court finds that plaintiffs do not have associational standing to represent their member voters.

**B. Direct Organizational Standing**
Plaintiffs next allege that they have direct organizational standing to bring their claims. (ECF No. 42 at 3–8). Organizational standing is recognized where the alleged misconduct of the defendant causes "a drain on [plaintiffs'] resources from both a diversion of its resources and frustration of its mission." *Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1219 (9th Cir. 2012) (quotation omitted); *see Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982) ("Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests."). Plaintiffs allege that AB 4 forces them "to divert resources and spend significant amounts of money educating Nevada voters ... and encouraging them to still vote." (ECF No. 29 at ¶ 17). Plaintiffs also briefly allege a need to divert resources to counteract voter fraud. (ECF No. 42 at 5) (citing *Am. Civil Rights Union v. Martinez Rivera*, 166 F. Supp. 3d 779, 800 (W.D. Tex. 2015)).

This court is unpersuaded by plaintiffs' theory of organizational standing. Plaintiffs argue that AB 4 would "confuse" their voters and "create incentive to remain away from the polls." (ECF No. 29 at ¶ 17). Outside of stating "confus[ion]" and "discourage[ment]" in a conclusory manner, plaintiffs make no indication of how AB 4 will discourage their member voters from voting. (ECF No. 29); *see Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd*, 553 U.S. 181, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008) (holding that a "new law injures" a political party when it compels it "to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote."). If plaintiffs did not expend any resources on educating their voters on AB 4, their voters would proceed to vote in-person as they overwhelmingly have in prior elections. (ECF No. 29 at ¶¶ 43–47). AB 4 does not abolish in-person voting. An organization cannot "simply choos[e] to spend money fixing a problem that otherwise would not affect the organization at all. It must instead show that it would have suffered some other injury if it had not diverted resources to counteracting the problem." *Valle del Sol, Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013) (quoting *La Asociacion de Trabajadores de Lake Forest v. Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010)). Plaintiffs make no showing of their voters' confusion. Indeed, voters exercised their ability to vote by mail in Nevada's 2020 primary election. NRS §§ 293.343-.355; *see Paher v. Cegavske*, No. 320CV00243MMDWGC, ---- F.Supp.3d ----, ----, 2020 WL 2089813, at *2 (D. Nev. Apr. 30, 2020) ("[A]ll active

registered voters will be mailed an absentee ballot (mail-in ballot) for the primary election.").

**\*6** In making this fact-intensive finding, this court also notes the substantive differences between AB 4 and the laws challenged in plaintiffs' cited authority. *Compare* AB 4, *with Pavek v. Simon*, No. 19-CV3000 (SRN/DTS), —— F.Supp.3d ——, ——, 2020 WL 3183249, at \*14 (D. Minn. June 15, 2020) (finding organizational standing to challenge a state law which "requires that in Minnesota general elections, major political party candidates must be listed, on the ballot, in reverse order based on the average number of votes that their party received in the last state general election"); *Democratic Nat'l Comm. v. Reagan*, 329 F. Supp. 3d 824, 841 (D. Ariz. 2018), *rev'd on other grounds sub nom. Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989 (9th Cir. 2020) (en banc) (finding organizational standing to challenge a state law that prohibits third-party ballot collection); *Georgia Coal. for People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251, 1258 (N.D. Ga. 2018) (finding organizational standing to challenge a state voter identification and registration law); *Feldman v. Arizona Sec'y of State's Office*, 208 F. Supp. 3d 1074, 1080–81 (D. Ariz. 2016) (finding organizational standing to challenge a state law that "limits who may possess another's early ballot"); *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd*, 553 U.S. 181, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008) (finding organizational standing to challenge a state voter identification law). In these cases with organizational standing, the challenged law has a direct and specific impact on a voter's ability to vote. Indeed, a diversion of resources for education would be required in such situations. But here, the challenged law expands access to voting through mail without restricting prior access to in-person voting. Thus, as detailed above, plaintiffs need not *divert* resources to enable or encourage their voters to vote.

Plaintiffs also briefly argue that they will need to divert resources to fight voter fraud. (ECF No. 42 at 4–5.) This court repeats its prior finding on vote dilution: it is a speculative and "generalized grievance" in this case. *See Paher*, 2020 WL 2748301, at \*4 (finding no standing where plaintiffs failed to "state a particularized injury" and did no more than "speculatively connect the specific conduct they challenge ... and the claimed injury [of] vote dilution"); *Am. Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 789 (W.D. Tex. 2015) ("[T]he risk of vote dilution[ is] speculative and, as such, [is] more akin to a generalized grievance about the government than an injury in fact."). Plaintiffs note in their response to defendant's motion to dismiss that they will need

to divert resources to combat voter fraud. (ECF No. 42 at 4–5.) Plaintiffs cannot divert resources to combat an impermissibly speculative injury. *See Susan B. Anthony List*, 573 U.S. at 158, 134 S.Ct. 2334. Not only have plaintiffs failed to allege a substantial risk of voter fraud, the State of Nevada has its own mechanisms for deterring and prosecuting voter fraud. *See* NRS §§ 293.700-.840 ("unlawful acts and penalties" in the context of an election). Here, plaintiffs do not allege that those mechanisms would fail and that they would need to divert resources accordingly. This court finds that plaintiffs have again failed to show that they would "suffer[ ] some other injury if [they] had not diverted resources to counteracting the problem." *Valle del Sol*, 732 F.3d at 1018.

**C. Direct and Associational Standing for Candidates**

Finally, plaintiffs argue that they have both direct and associational standing to challenge "competitive harms" to their electoral candidates. (ECF No. 42 at 8.) "Competitive standing" can exist when a state action will lead to the "potential loss of an election." *Drake*, 664 F.3d at 783 (quoting *Owen v. Mulligan*, 640 F.2d 1130, 1132–33 (9th Cir. 1981)).

Plaintiffs seek to vindicate the rights of their candidates, because AB 4 will undermine the ability of "Republican candidates to receive[ ] effective votes in Nevada" by "confus[ing] voters, undermin[ing] confidence in the electoral process, and creat[ing] incentives to remain away from the polls." (ECF No. 29 at ¶¶ 16–17). The pleadings make no showing of "an unfair advantage in the election process." *Drake*, 664 F.3d at 783. Plaintiffs rely on conclusory statements on confusion and disincentives that this court has already found unpersuasive. *See supra* III.B. Plaintiffs seek to muster "*competitive* standing," yet their candidates face no harms that are unique from their electoral opponents. *Owen*, 640 F.2d at 1132–33 (finding competitive standing where the postal service gave plaintiff's opponent a preferential mailing rate).

**\*7** As to AB 4's disparate treatment of rural voters, this court repeats its prior findings: plaintiffs' requested relief fails to satisfy redressability and the alleged harm is too speculative. *See supra* III.A. Enjoining Nevada election officials from enforcing AB 4 would not apparently improve the odds for plaintiffs' candidates. *See Drake*, 664 F.3d at 783 (quoting *Owen*, 640 F.2d at 1132–33 (9th Cir. 1981)). Plaintiffs make no such allegations. Election officials would operate without the guidance of AB 4's minimum number of in-person voting locations. On plaintiffs' theory as to Sections 20 and 22 of AB

4, plaintiffs have not established a "substantial risk" that their alleged harm will occur. *Susan B. Anthony List*, 573 U.S. at 158, 134 S.Ct. 2334. Thus, neither plaintiffs nor their member candidates "have standing to sue in their own right." *Hunt*, 432 U.S. at 343, 97 S.Ct. 2434.

Ultimately, as plaintiffs concede, they hold "policy disagreements" with proponents of AB 4. (ECF No. 42 at 2). Although they purport to allege constitutional harms that go beyond these policy disagreements, at this juncture, plaintiffs' allegations remain just that. (*Id.*). Since initiating this matter on August 4, 2020, (ECF No. 1), plaintiffs have not requested an injunction or expedited review. Plaintiffs ask for a remedy to cure the "confusion" caused by AB 4, yet they have positioned this case for last minute adjudication before the general election.[10]

[10]   The Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, No. 19A1016, ––– U.S. ––––, 140 S.Ct. 1205, 1207, 206 L.Ed.2d 452 (2020) (citing *Purcell*; *Frank v. Walker*, 574 U.S. 929, 135 S.Ct. 7, 190 L.Ed.2d 245 (2014); and *Veasey v. Perry*, 574 U.S. ––––, 135 S. Ct. 9, 190 L.Ed.2d 283 (2014)).

This court grants defendant's motion to dismiss due to plaintiffs' lack of standing. (ECF No. 37). Plaintiffs' amended complaint is hereby dismissed. (ECF No. 29). The remaining motions before the court are denied as moot. (ECF Nos. 10, 40, 41, 43).

**IV. Conclusion**

Accordingly,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED that defendant's motion to dismiss the amended complaint (ECF No. 37) be, and the same hereby is, GRANTED.

IT IS FURTHER ORDERED that defendant's motion to dismiss the original complaint (ECF No. 10) be, and the same hereby is, DENIED as moot.

IT IS FURTHER ORDERED that intervenor-defendants DNC Services Corporation/Democratic National Committee, Democratic Congressional Campaign Committee, and the Nevada State Democratic Party's motion to dismiss the amended complaint (ECF No. 40) be, and the same hereby is, DENIED as moot.

IT IS FURTHER ORDERED that plaintiff's motion for partial summary judgment (ECF No. 41) be, and the same hereby is, DENIED as moot.

IT IS FURTHER ORDERED that non-parties Walker River Paiute Tribe and Pyramid Lake Paiute Tribe's motion to intervene (ECF No. 43) be, and the same hereby is, DENIED as moot.

The clerk is instructed to close the case.

**All Citations**

--- F.Supp.3d ----, 2020 WL 5626974

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**E**

2014 WL 1491138
Only the Westlaw citation is currently available.
United States District Court,
W.D. Pennsylvania.

Gary P. FENDER, Plaintiff,

v.

WASHINGTON COUNTY,
PENNSYLVANIA, Samuel Romano
Individually and in his capacity
as Sheriff of Washington County,
Pennsylvania, Defendants.

No. 14cv0142.
|
Signed April 15, 2014.

**Attorneys and Law Firms**

Peter N. Georgiades, Greystone Legal Associates, Pittsburgh, PA, for Plaintiff.

Paul D. Krepps, Michaelene E. Weimer, Marshall, Dennehey, Warner, Coleman & Goggin, Pittsburgh, PA, for Defendants.

*Memorandum Order*

ARTHUR J. SCHWAB, District Judge.

**I. Introduction**

*1 This is a civil rights action. Plaintiff alleges that Washington County, and Samuel Romano, individually and in his capacity as Sheriff of Washington County, Pennsylvania, while acting under color of state law pursuant to 42 U.S.C. § 1983, violated his due process rights under the Fourteenth Amendment when they wrongfully denied his constitutionally protected right to carry a concealed firearm for self-defense with no explanation in violation of 18 Pa.C.S. § 6109. Pending before this Court is Defendants' Motion to Dismiss pursuant to Fed. R. Civ. Pr. 12(b)(6). For the reasons that follow, the Court will deny as moot Defendants' motion to dismiss (doc. no. 7), but will abstain for exercising jurisdiction at this time, and administratively close these proceedings while Plaintiff pursue his rights pursuant to the applicable state remedy. Defendant Romano shall properly follow the protocol set forth under 18 Pa.C.S. § 6109, by

issuing the requested firearm permit or if the application/ re-application is indeed denied, Defendant Romano must notify Plaintiff in writing of the denial and the specific reasons for the denial, and Plaintiff may then file an appeal to the Washington County Court of Common Pleas. Once Defendant Romano follows his non-discretionary duties pursuant to 18 Pa.C.S. § 6109, and Plaintiff receives a ruling from the applicable state court(s), the Court will reopen this matter upon appropriate motion by either party.

**II. Facts**

The facts of this case, according to the Complaint, which for purposes of this Memorandum Order are accepted as true, allege that Plaintiff, who has never been convicted of a criminal offense that would legally prohibit him from possessing firearms or ammunition, previously held a license to carry a firearm concealed or in a motor vehicle, pursuant to 18 Pa.C.S. § 6109, and sometime prior to the year 2000, he was notified by the Sheriff to surrender his license.

Plaintiff complied with the directive of the Sheriff, and surrendered his Firearms License at the Office of the Sheriff of Washington County, based upon some unspecified "objection" received by the Chief of Police of Chartiers Township more than 13 years ago. According to the Complaint, no reason was ever given, nor was Plaintiff advised that he had a right to a hearing on this matter.

In 2013, Plaintiff twice applied for issuance of a Pennsylvania license to carry a firearm concealed or in a motor vehicle, pursuant to 18 Pa.C.S. § 6109. Most recently, on December 27, 2013, Plaintiff's attorney wrote to Defendant Sheriff Romano seeking the specific reasons that he has refused to issue a Firearms License to Plaintiff, or to even process the Plaintiff's application for a Firearms License. As of the date of the filing of the Complaint, January 30, 2014, no reply was received by Plaintiff.

Therefore, according to the Complaint, Defendants have failed to provide any justification for its decision to deny Plaintiff's request for permit. There has been no reply by Defendants, and not any of the Defendants, nor any of their subordinates, "have been willing to articulate for the Plaintiff what the objection was, whether the objection is based upon any specific facts, or how or why that 'objection' warrants the Sheriff's refusal to process the Plaintiff's application in accordance with 18 Pa.C.S. § 6109." Doc. No. 1.

**\*2** 18 Pa.C.S. § 6109, addresses the requirements for the revocation or issuance of a license to carry a firearm. According to Section 6109(i), "an individual whose license is revoked may appeal to the Court of Common Pleas of the Judicial district in which the individual resides." While Plaintiff did not avail himself of the protocol, neither has Defendant Romano formally denied his current request.

### III. Discussion/Applicable Case Law[1]

[1] Because the Court will not dismiss this *case* for lack of standing or for any of the other grounds listed in Defendants' motion to dismiss, the Court will not review this case on the ordinary standard of review for a motion to dismiss.

The Court is mindful that as a federal court, it has a "virtually unflagging obligation" to exercise its jurisdiction, and may only abstain from exercising jurisdiction only when the clearest of justifications warrants it. *National City Mortgage v. Stephen,* 647 F.3d 78 (3d Cir.2011). Indeed, abstention may only be used i n the exceptional circumstances where the order to the parties to repair to the state court would serve an important countervailing interest, and not merely because a state court could entertain it. *Id.* at 82–83. After careful consideration, this Court finds that the facts of this case appear to be one such extraordinary circumstance, because the established procedure to revoke/deny/not accept/grant Plaintiff's application for a gun permit, being a largely local matter on which there is pertinent statutory authority, and one in which the proper steps for determination have not been followed by *either* side (at least according to the facts of the Complaint).

There are three traditional (comity) grounds for abstention, the first of which appears to be most applicable to the instant dispute: (1) *Pullman* abstention, ... which is proper when a state court determination of a question of state law might moot or change a federal constitutional issue presented in a federal court case; (2) *Burford* abstention, ... which is proper when questions of state l aw i n which the state has expressed a desire to establish a coherent policy with respect to a matter of substantial public concern are presented; and, (3) *Younger* abstention, ... which is proper when federal jurisdiction has been invoked for the purpose of restraining certain state proceedings. *Trent v. Dial Medical of Florida, Inc.,* 33 F.3d 217, fn. 5 (3d. Ci r.1994) (citi ng *Railroad Comm'n of Text v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098,

87 L.Ed. 1424 (1943) and *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971)).[2]

[2] In this Circuit, when a *case* does not fall within the traditional abstention doctrines, the *case* may fall under the *Colorado River* Doctrine. *Trent v. Dial Medical of Florida, Inc.,* 33 F.3d 217, 222 (3d r.1994). Among the factors to consider i n determining whether the Court should abstain under the *Colorado River* Doctrine includes: (1) whether the state court assumed i n rem jurisdiction over property; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; and (4) the order i n which jurisdiction was obtained by the concurrent forums." *Ryan v. Johnson,* 115 F.3d 193, 196 (3d Ci r.1997) (citing *Colorado River Water Conservation Dist. v. U.S .,* 424 U.S. 800, 818, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)). The Colorado River Doctrine is also potentially applicable, with the exception of the factor that because Romano has allegedly failed to accept the application, no state court proceedings are now taking place.

The question presented by Plaintiff falls within the array of cases under which this Court has discretion to exercise its authority to abstain. *Pullman* abstention requires the following special circumstances: (1) uncertain issues of state law underlying the federal constitutional claim; (2) state law issues subject to state court interpretation that could obviate the need to adjudicate or substantially narrow the scope of the federal constitutional claim; and (3) an erroneous construction of state law by the federal court would disrupt important state policies. *Presbytery of New Jersey of the Orthodox Presbyterian Church v. Whitman,* 99 F.3d 101, 106 (3d Cir.1996).

**\*3** In many cases examined by the United States Court of Appeals for the Third Circuit, the Court looked at ambiguous statutory language where fairness and federalism require a proper interpretation of state law by the state court prior to federal adjudication. *See, e.g., Chez Sez III Corp. v. Township of Union,* 945 F.2d 628 (3d Ci r.1991) (recognizing as ambiguous the terms "motion picture theater" and "retail shop" for the purposes of a *Pullman* analysis). The case before this Court does not contain the sort of facial ambiguity as most commonly understood by *Pullman;* however, it does necessarily contain uncertain issues of state law or the application of state law to the facts underlying the federal claim. Plaintiff avers that Defendant has given no cause for the revocation and later denial of his firearm permit. Though Defendant Romano is outside the scope of his authority in concealing from Plaintiff his reasoning, it is

Fender v. Washington County, Pa., Not Reported in F.Supp.3d (2014)

2014 WL 1491138

not yet known if Defendant had any legitimate cause for such revocation or denial. In other words, the parties have not yet availed themselves of the available administrative remedies. These questions must be resolved at the state level —both administratively and judicially—before this Court may properly analyze the underlying federal constitutional claim. The first consideration of the *Pullman* analysis is satisfied, as the statutory and procedural ambiguities are best addressed at the state, and not the federal, level.

At this point, this Court finds that a proper adjudication by the Court of Common Pleas of Washington County, where 18 Pa.C.S. § 6109(i) recommends this applicant seek redress, would sufficiently address Plaintiff's Complaint. Thus, the resolution of this question of state law would potentially obviate the need for federal adjudication of Plaintiff's constitutional claims, satisfying the second element of the *Pullman* considerations.

"Abdication of the obligation to decide cases can be justified under [the *Pullman* doctrine] only in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest." *Allegheny Cnty. v. Frank Mashuda Co.,* 360 U.S. 185, 188–89, 79 S.Ct. 1060, 3 L.Ed.2d 1163 (1959). Recognizing the importance of the state's authority to regulate the licensing of firearms to its own citizens, the third consideration under *Pullman* is satisfied.

"A *Pullman*-type abstention serves two basic purposes: the avoidance of unnecessary constitutional pronouncements, and the avoidance of undue interference with sensitive state programs." *United States v. City of Pittsburgh,* 757 F.2d 43, 45 (3d Cir.1985). Both purposes are served by this Court's exercise of *Pullman* abstention in this case. However, that exercise of abstention does not amount to a denial of jurisdiction in any case. *Allegheny Cnty. v. Frank Mashuda Co.,* 360 U.S. 185, 188, 79 S.Ct. 1060, 3 L.Ed.2d 1163 (1959). Instead, it is a "decline to exercise or postpone[ment of] the exercise of its jurisdiction." *Allegheny Cnty. v. Frank Mashuda Co.,* 360 U.S. 185, 188, 79 S.Ct. 1060, 3 L.Ed.2d 1163 (1959). Plaintiff may, following state adjudication of his claims, file a motion to re-open this case in this Court if the need still exists. At this time, however, this Court exercises its discretion in *Pullman* abstention in deference to state authority over this claim.

*4 To summarize, according to the Complaint, Plaintiff was never provided with a written explanation of the denial of his application, and this "notice" shall be in writing and shall state the specific reason for revocation/denial, and shall be sent by certified mail. The language of 18 Pa.C.S.A. § 6109, sets forth specific procedures to be followed by both the Sheriff, and the Plaintiff, none of which appear to have been followed here. Although there may be federal constitutional implications at play, the Court notes that, the matter of denials of applications to carry firearms is traditionally a state law matter, in which important state law interests are implicated. These issues have been resolved routinely by the trial and appellate courts of Pennsylvania, and this Court's research has revealed as much. The Court sees no reason to disturb the normal and well-established protocol i n this case, at this juncture. Where, as here, the state court determination of this issue has the great possibility of mooting and/or significantly altering the potential constitutional issues presented in this case, notions of comity and wise judicial administrative counsel this Court's decision to abstain from exercising jurisdiction over this dispute, at this time. *Pullman,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971.

## IV. Conclusion

IT IS HEREBY ORDERED that the parties are directed to follow the well-established statutory protocol: (1) by Defendants accepting Plaintiff's written application, and (2) (i) by Defendants issuing the requested firearm license, or (2) (ii) by Defendants providing written notice of the reasons for denying Plaintiff's application, via certified mail to Plaintiff. If the application is denied, upon receipt of such notice, Plaintiff then shall avail himself of the Court of Common Pleas of Washington County and any appropriate appeals. Upon the conclusion of the state court proceedings, either party may re-petition this Court to re-open this case for further proceedings. The Clerk shall mark the docket as administratively closed. Accordingly, Defendants' Motion to Dismiss (doc. no. 7) is DENIED AS MOOT.

## SO ORDERED.

## All Citations

Not Reported in F.Supp.3d, 2014 WL 1491138

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

**F**

2004 WL 3262756
Only the Westlaw citation is currently available.
United States District Court, D.
South Carolina, Florence Division.

Maggie Wallace GLOVER, Bishop
R.F. Davis, Rev. Terry Law, J. Calvin
Thomas, Rev. Franklin Reaves,
and Willie Gladden, Plaintiffs,

v.

SOUTH CAROLINA DEMOCRATIC
PARTY, Sc Election Commission,
Executive Committee of the South
Carolina Democratic Party, Florence
County Election Commission, Marion
County Election Commission, Marlboro
County Election Commission, Dillon
County Election Commission, and
Governor Mark H. Sanford, Defendants.

No. C/A 4–04–CV–2171–25.
|
Sept. 3, 2004.

## Attorneys and Law Firms

Brenda R Reddix–Smalls, Reddix–Smalls and Associates,
Columbia, SC, for Plaintiffs.

William Norman Nettles, Clyde Havird Jones, Jr., Henry
Dargan McMaster, John W. McIntosh, Thomas Stephen
Lynch, Tracey Colton Green, SC Attorney General's Office,
Henry Jerome White, Office of the Governor, Columbia, SC,
Charlie James Blake, Jr., Florence County Attorney, Florence,
SC, Lucas C. Padgett, Jr., Michael C. Scarafile, McNair Law
Firm, Charleston, SC, for Defendants.

ORDER

WOOTEN, J.

*Procedural History*

*1 This matter comes before the Court upon the filing
of multiple motions by the parties. Specifically, the
following motions are presently pending before the Court: (i)
Plaintiffs' motion for a temporary restraining order and/or for
preliminary injunctive relief (Doc. # 4); (ii) Defendants South
Carolina Democratic Party ("Democratic Party") and South
Carolina Election Commission's ("Election Commission")
motion to dismiss for lack of jurisdiction (Doc. # 9); (iii)
Defendant South Carolina Election Commission's motion to
dismiss for lack of jurisdiction (Doc. # 12); (iv) Defendant
Governor Mark Sanford's ("Governor Sanford") motion to
dismiss for lack of jurisdiction (Doc. # 18); (v) Defendant
South Carolina Democratic Party's motion to dismiss for
failure to state a claim upon which relief may be granted (Doc.
# 23); (vi) Candidate Tim Norwood's ("Norwood") motion
to intervene and/or to participate as *amicus curiae* (Doc. #
28); (vii) Candidate Tim Norwood's motion to dismiss, for
judgment on the pleadings, and/or for summary judgment
(Doc. # 38); (viii) Plaintiffs' motion for judgment on the
pleadings (Doc. # 41); (ix) Plaintiffs' motion for a request
to enter a restraining order "until a three judge district court
can be convened" (Doc. # 45); (x) Defendants South Carolina
Democratic Party and South Carolina Democratic Party
Executive Committee's ("Executive Committee") motion for
concurrence and adoption of positions taken by candidate
Tim Norwood (Doc. # 46); and (xi) Defendants South
Carolina Democratic Party and South Carolina Democratic
Party Executive Committee's motion to dismiss and/or for
summary judgment (Doc. # 55). Each of these motions will
be addressed herein. In its analysis of the pending motions,
the Court has carefully considered the pleadings, arguments
of legal counsel, statutory and common law, and testimony
elicited during the course of hearings held in this case.

*Factual Background*

The facts in the instant case are not largely in dispute. On
June 8, 2004, the South Carolina Democratic Party primary
election for State Senate District No. 30 was held. Incumbent
Senator Maggie Glover ("Glover") finished first, candidate
Tim Norwood ("Norwood") finished second, and candidate
Kent Williams ("Williams") finished third. However, none of
the candidates received a majority of the votes.[1] As a result,
the State Board of Canvassers ordered a recount of the votes
cast pursuant to state law.

1     Senator Glover finished less than five hundred (500)
      votes ahead of candidate Norwood. Candidate Williams

finished approximately six (6) votes behind candidate Norwood.

On June 14, 2004, the recount was commenced and completed. Prior to the completion of the recount, candidate Williams timely filed a protest in regards to the election results. The recount established that Senator Glover remained in first place, candidate Williams was declared the new second-place finisher, and candidate Norwood was declared the new third place finisher.[2] Subsequently, candidate Williams moved to withdraw his protest.

2      The recount revealed an approximate seven (7) vote difference between candidate Norwood and candidate Williams.

On June 16, 2004, candidate Norwood also filed a protest regarding the election results with the South Carolina Law Enforcement Division and sent a facsimile copy to the Chairman of the Executive Committee. Candidate Norwood's protest alleged widespread voter fraud. In particular, Norwood's protest alleged that: (i) disqualified, convicted felons had been allowed to vote; (ii) election ballots were cast and counted by persons who did not sign the list of voters; and (iii) persons in nursing homes and assisted living facilities were either forced or tricked into signing absentee ballots that did not reflect the voters' intent.

 *2  According to the plaintiffs, Norwood's protest was untimely filed pursuant to state law. As well, the plaintiffs allege that they did not receive proper notice of the Norwood protest hearing as required by state law. The staff persons at the South Carolina Democratic Party's office did not personally serve Senator Glover with either the Norwood protest or Williams' motion to dismiss his protest prior to the commencement of the June 17, 2004, hearing addressing these matters. The parties dispute whether persons associated with the Senator Glover campaign were told by the South Carolina Democratic Party's office that there would be no June 17, 2004, hearing and/or that the Norwood protest would also be heard on that date.

On June 17, 2004, the Executive Committee of the South Carolina State Democratic Party met for the purpose of hearing protests including both the Williams protest and the Norwood protest. At the hearing Williams and Norwood were apparently represented by legal counsel. Attorney Glenn Gray, who is associated with plaintiff Senator Glover's election campaign, participated in the June 17, 2004, protest hearings. Legal counsel for each candidate was allowed

to make opening and closing statements, cross-examine witnesses, and present evidence. No one objected to the hearing of Norwood's protest on the basis of lack of either proper service or lack of sufficient notice. Attorney Gray made no request to delay the Norwood protest hearing. Both Attorney Gray and legal counsel for Williams did argue that Norwood's protest was not timely filed.

Based on the evidence of fraud submitted, the Executive Committee voted 18–3 to void the election in its entirety. According to the Executive Committee, substantial irregularities and illegalities were committed during the voting process, including voting by convicted felons, double voting by persons casting absentee ballots and voting in person, and absentee ballots collected in violation of law by paid campaign staff that were contrary to the will of the voter. An Order was then submitted to the Governor asking that he set a new date for the election pursuant to S.C.Code Ann. § 7–13–1170.

Thereafter, Senator Glover and Williams petitioned the South Carolina Supreme Court for review of the Executive Committee's decision voiding the election. On June 29, 2004, while Senator Glover's petition for review remained pending before the South Carolina Supreme Court, Senator Glover filed the instant lawsuit in this Court. By Orders dated July 20, 2004, the South Carolina Supreme Court denied both Senator Glover's and Williams' petitions for certiorari.

The plaintiffs in this case are not seeking a "new" hearing before the Executive Committee regarding its fraud determination. Instead, the plaintiffs request that this Court vacate the decision of the Executive Committee which voided the election. As well, the plaintiffs have not challenged the decision of the Executive Committee that widespread fraud during the election warranted a new primary election. Rather, the plaintiffs argue that, because there was a modification of state procedural requirements which were not "precleared" under the Voting Rights Act, this Court should vacate the decision of the Executive Committee which voided the primary election.

 *3  At the hearings held regarding the pending motions, legal counsel for the plaintiffs argued, in part, that three (3) separate types of claims were raised in the complaint: (1) Violations of § 2 and § 5 of the Voting Rights Act; (2) Violations of the Due Process and Equal Protection Clauses of the United States Constitution; and (3) Violations of 42 U.S.C. § 1983.

Glover v. South Carolina Democratic Party, Not Reported in F.Supp.2d (2004)

2004 WL 3262756

The defendants deny these allegations and have filed motions to dismiss and/or for summary judgment.[3]

[3]    By Court Order filed August 3, 2004, the undersigned indicated that, because the parties were requesting that matters be considered outside of the pleadings in consideration of their motions to dismiss, those motions would be treated as being for summary judgment pursuant to Rule 12(b) of the Federal Rules of Civil Procedure.

*Standard for Summary Judgment*

The standard for summary judgment is familiar. Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In evaluating a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party. *See Id.,* 477 U.S. at 255, 106 S.Ct. at 2514. However, once the movant has shown an absence of any genuine issue of material fact, the nonmoving party must produce evidence demonstrating that a triable issue of fact exists. *See Id.,* 477 U.S. at 248, 106 S.Ct. at 2510; *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

*Analysis*

*I. Motions to dismiss for lack of jurisdiction*

Initially, the defendants assert that the *Rooker–Feldman* doctrine deprives this Court of jurisdiction in this case.[4] While this legal position deserves careful consideration and its potential merit cannot be ignored, the undersigned declines to dismiss this case due to lack of jurisdiction for the reasons set forth below.

[4]    The defendants also assert in their pleadings that this Court should abstain from exercising jurisdiction in this case. However, these arguments were withdrawn at oral argument following the denial of petitions for writ of

certiorari to the South Carolina Supreme Court filed by Williams and Senator Glover.

The *Rooker–Feldman* doctrine, as enunciated in *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983), and *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923), holds that lower federal courts cannot engage in appellate review of state court decisions. *Feldman,* 460 U.S. at 482, 103 S.Ct. 1303, 75 L.Ed.2d 206. The United States Supreme Court reasoned that once in the state court system, litigants must exhaust all means of appeals in that system. *Id.* at 483, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206. A litigant may then appeal the final state court decision to the United States Supreme Court. *Id.* Thus, the *Rooker–Feldman* doctrine precludes federal "review of adjudications of the state's highest court [and] also the decisions of its lower courts." *Shooting Point, L.L.C. v. W.M. Cumming Jr.,* 368 F.3d 379 (4th Cir.2004) (*citing Jordahl v. Democratic Party,* 122 F.3d 192, 199 (4th Cir.1997)).

**\*4** Moreover, the *Rooker–Feldman* doctrine extends not only to issues actually decided by a state court but also to those that are "inextricably intertwined with questions ruled upon by a state court." *Id.* Under either the "actually decided" or the "inextricably intertwined" prong, the principle is the same: "[A] party losing in state court is barred from seeking what in substance would be appellate review of the state judgment in a United States District Court, based on the losing party's claim that the state judgment itself violates the loser's federal rights." *Id.* (*citing Brown & Root, Inc. v. Breckenridge,* 211 F.3d 194, 199 (4th Cir.2000) and *Johnson v. De Grandy,* 512 U.S. 997, 1005–06, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994)). "If in order to grant the federal plaintiff the relief sought, the federal court must determine that the state court judgment was erroneously entered or must take action that would render the judgment ineffectual, *Rooker–Feldman* is implicated." *Jordahl,* 122 F.3d at 202. Because federal jurisdiction to review the decisions of state courts is reserved exclusively to the Supreme Court, it is improper for federal district courts to exercise jurisdiction over a case that is the functional equivalent of an appeal from a state court judgment. *Id.*

Furthermore, the *Rooker–Feldman* doctrine only applies to litigants who were parties of both the state court decision and the federal claim. *See eg. Johnson v. De Grandy,* 512 U.S. 997, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994) (holding that because the United States was not a party to the state

2004 WL 3262756

court action, *Rooker–Feldman* was not a bar to its federal claims); *Roe v. State of Alabama,* 43 F.3d 574, 580 (11th Cir.1995) (holding *Rooker–Feldman* did not deprive district court of subject matter jurisdiction to entertain claims of voter and two candidates because they were not parties to state court action); *Marks v. Stinson,* 19 F.3d 873, 885 (3rd Cir.1994) (holding that Latino absentee voters were not barred by *Rooker–Feldman* because they were not parties to any of the state court proceedings).

In this case, the plaintiffs, except Senator Glover, were not parties to the state court proceedings. They are presenting their claims for the first time before this Court. Likewise, the plaintiffs are now raising federal claims, including claims brought pursuant to the Voting Rights Act, in a federal forum. Nothing in the record definitively indicates whether these particular claims were presented to the South Carolina Supreme Court. Again, the plaintiffs in this case focus on rights that arise under federal law. As well, the parties have not presented the Court with clear Fourth Circuit Court of Appeals precedent requiring this Court to dismiss due to a lack of jurisdiction when such federal claims are raised in federal court. Accordingly, the undersigned concludes that *Rooker–Feldman* does not present a bar for the exercise of jurisdiction in this case.

 **\*5**  Similarly, the Court does not find persuasive defendants' arguments that either *res judicata* and/or collateral estoppel bar Senator Glover's claims. The arguments of claim and issue preclusion are closely related to the principles embodied in *Rooker–Feldman. See Valenti v. Mitchell,* 962 F.2d 288, 297 (3 [rd] Cir.1992). As the record presently reflects, it is not entirely clear which parties, claims, and/or issues were presented to the South Carolina Supreme Court for consideration in Senator Glover's petition for certiorari. Therefore, because different parties, claims, and issues may have been presented to the state court, the undersigned also concludes that *res judicata* and collateral estoppel do not prevent Senator Glover from bringing her claims at this time.

Furthermore, this Court is cognizant that many federal courts have held that they should not intervene in state election disputes, "subject to specific exceptions." *See eg. Scheer v. City of Miami,* 15 F.Supp.2d 1338 (S.D.Fla.1998). Only when election irregularities are "fundamentally unfair" and transcend "garden variety" problems do federal courts have a duty to step in to ensure that citizens' rights are protected. *Id.* Requests for equitable intervention into factual disputes over the conduct of elections are unavailing except in "rare

and extraordinary circumstances." *Hutchinson v. Miller,* 797 F.2d 1279, 1280 (4th Cir.1986). However, the right to vote is a fundamental right as important as any right possessed by citizens of a democracy. As explained by the Fourth Circuit Court of Appeals:

> No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined. Our Constitution leaves no room for classification of people in a way that unnecessarily abridges this right.

*Daly v. Hunt,* 93 F.3d 1212 (4th Cir.1996) (citing *Wesberry v. Sanders,* 376 U.S. 1, 17–18, 84 S.Ct. 526, 534–35, 11 L.Ed.2d 481 (1964)). With this background, this Court elects to address the plaintiffs' claims.

## II. *Alleged Violations of Section 2 of the Voting Rights Act*

In the present case, the plaintiffs assert that the decision of the Executive Committee violates § 2 of the Voting Rights Act. Section 2(a) of the Voting Rights Act of 1965 prohibits a State or its political subdivisions from imposing any voting practice "in a manner which results in a *denial or abridgement* of the right of any citizen of the United States to vote on account of race or color." *Lewis v. Alamance County, North Carolina,* 99 F.3d 600 (4 [th] Cir.1996) (*citing* 42 U.S.C. § 1973(a)) (Emphasis added). Section 2(b) of the Voting Rights Act, as amended in 1982, further provides that a violation of § 2(a) occurs, if, based on "the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b). That statute provides, in full, that:

 **\*6**  (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a *denial or abridgement* of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section. (Emphasis added).

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973(b).

Initially, the undersigned concludes that summary judgment is appropriate in favor of the defendants on the plaintiffs § 2 claims, since the record fails to reflect any "denial or abridgement" of the right of any citizen's right to vote. If a new primary is held, all eligible citizens will once again be afforded the right to vote for the candidate of their choice. Each of the plaintiffs who testified in this case indicated that they would vote in any new election set. There has been no showing by the plaintiffs that they or others would be *denied* the right to vote on account of their race and/or color in a new primary election. While plaintiffs did offer expert testimony and an affidavit from Dr. John Ruoff, which arguably leads to the conclusion that "persons of fewer financial resources" may have more difficulty than others voting in a second primary election, no testimony was elicited tending to show that *only* persons of a particular race or color would be adversely affected. All persons at the lower end of the socio-economic scale could be adversely affected if required to participate in more than one election, regardless of race or color. This Court acknowledges that a second primary election may impose an inconvenience, and hence a difficulty, for those who vote a second time. However, the Court does not find that difficulty voting equates with a "denial or abridgement" of the right to vote.

The plaintiffs also raise the issue of "dilution" of the right to vote under § 2 of the Voting Rights Act. In *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), the United States Supreme Court interpreted the amended Voting Rights Act as it applied to a challenge to multi-member districts in which candidates were elected at large.

*Id.* By analogy, *Thornburg* warrants mentioning. Rejecting the claim that an at-large election scheme is *per se* violative of the Voting Rights Act, the United States Supreme Court established certain preconditions to show that such a voting system dilutes minority group voting strength sufficiently to violate the Act. One condition requires that the minority demonstrate that the white majority votes sufficiently as a bloc to enable it to usually to defeat the minority's preferred candidate. *Thornburg,* 478 U.S. at 50–51, 106 S.Ct. at 2766–67. If the preconditions are met, the court must then determine under the "totality of circumstances" whether there has been a violation of § 2. *Johnson v. De Grandy,* 512 U.S. 997, ——, 114 S.Ct. 2647, 2657, 129 L.Ed.2d 775 (1994); *Collins v. City of Norfolk, Va. .,* 816 F.2d 932, 938 (4th Cir.1987). In this case, the plaintiffs have not shown, in accordance with the noted factor in *Thornburg,* that "the white majority votes sufficiently as a bloc to enable it [to] usually to defeat the minority's preferred candidate."

**\*7** As the record reflects, the plaintiffs submitted the affidavit of Dr. John Ruoff and elicited testimony from him for consideration by the Court. In both his affidavit and testimony, Dr. Ruoff indicated that since 1988, the minority preferred candidate in every election for the Senate District 30 seat has won. Hence, white-bloc voting has never defeated a minority-preferred candidate in Senate District 30. No genuine issue of material fact exists on this issue. Likewise, Senator Glover has not been defeated in her quest for the Senate District 30 seat.

Furthermore, all voters, regardless of race or color, will be given the opportunity to vote in a second primary election. Again, since *all* voters, regardless of race or color, will be allowed to vote in a second primary election, there is no "dilution" of the right to vote of any particular group of persons. For the reasons set forth, summary judgment in favor of the defendants is appropriate on the plaintiffs' § 2 claims pursuant to the Voting Rights Act.

*III. Alleged Violations of Section 5 of the Voting Rights Act*

According to the plaintiffs, the defendants have also violated § 5 of the Voting Rights Act, 42 U.S.C. § 1973c, in several respects. In particular, the plaintiffs argue that the Executive Committee's: (i) decision finding Norwood's protest to be timely; (ii) decision to hold a hearing on Norwood's protest on June 17, 2004; and (iii) failure to strictly comply with the

2004 WL 3262756

state statutory notice requirements, violated § 5 of the Voting Rights Act.

Section 5 of the Voting Rights Act provides that:

Whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973a(a) of this title based upon determinations made under the first sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964, or whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the second sentence of section 1973b(b) of this title shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1968, or whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the third sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1972, such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: Provided, That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, or upon good cause shown, to facilitate an expedited approval within sixty days after such submission, the Attorney General has affirmatively indicated that such objection will not be made. Neither an affirmative indication by the Attorney General that no

objection will be made, nor the Attorney General's failure to object, nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure. In the event the Attorney General affirmatively indicates that no objection will be made within the sixty-day period following receipt of a submission, the Attorney General may reserve the right to reexamine the submission if additional information comes to his attention during the remainder of the sixty-day period which would otherwise require objection in accordance with this section. Any action under this section shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of Title 28 and any appeal shall lie to the Supreme Court.

**\*8** 42 U.S.C. § 1973c.

Consequently, a covered jurisdiction, such as the State of South Carolina, may not implement any change in a voting "qualification, prerequisite, standard, practice, or procedure" unless it first obtains either administrative preclearance from the Attorney General or judicial preclearance from the District Court ..." 42 U.S.C. § 1973c. To obtain judicial preclearance, the jurisdiction bears the burden of proving that the change "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color." *Reno v. Bossier Parish School Board,* 520 U.S. 471, 117 S.Ct. 1491, 137 L.E.2d 730 (1997) (citing *City of Rome v. United States,* 446 U.S. 156, 183, n. 18, 100 S.Ct. 1548, 1565, n. 18, 64 L.Ed.2d 119 (1980)). Because § 5 focuses on "freez[ing] election procedures," a plan has an impermissible "effect" under § 5 only if it "would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Id.*

However, the approval requirements of § 5 apply only when "a state or political subdivision shall enact or seek to administer a change in its *voting* procedures." *United States v. Saint Landry Parish School Board,* 601 F.2d 859 (5th Cir.1979) (citing 42 U.S.C. § 1973c) (Emphasis added). "[O]ne would not normally conclude that a state 'enacts or administers' a new voting procedure every time a state official deviates from the states required procedures. *Id.* Thus, § 5 "is not invoked every time a state official deviates from the states required procedures." *Landry v. City of Kenner,* 2004 WL 97704 (E.D. La. Jan 20, 2004).

Viewing the evidence in the light most favorable to the plaintiffs, the facts of record show that Senator Glover

was not personally served with a written copy of either the Norwood protest and/or notice of the time and place of the hearing as required by S.C.Code Ann. § 7–17–560. Further, the defendants assert that the Norwood protest was served on Attorney Glen Gray, who the defendants argue was representing Senator Glover, on June 14, 2004. Thereafter, Attorney Gray appeared on behalf of Senator Glover and participated in the June 17, 2004, Norwood protest hearing. As well, the Norwood protest hearing was held on June 17, 2004. That hearing could have been held on the later date of June 24, 2004, which apparently was the "Thursday following the deadline" for filing protests as required by S.C.Code Ann. § 7–17–570. There is no indication in the record, nor have the parties argued, that the procedures followed were based upon racial animus. The testimony of State Democratic Party Chairman, Mr. Joe Erwin, reflects that the reasons the procedural process was not followed exactly as set forth in the state statute was because of the Democratic Party's desire to "move quickly" on a matter of great importance to the residents of Senate District 30 and for the convenience of the members of the Executive Committee who were available to attend the hearing. According to Mr. Erwin, had the issue of either insufficient notice and/or insufficient service been raised at the June 17, 2004, Norwood protest hearing, the hearing would have been delayed. However, no such objections were raised.

 *9  Considering the evidence in the light most favorable to the plaintiffs, certain specifics of the procedural requirements under state law were not followed. However, this Court concludes that such deviations from state law by the defendants do not give rise to a claim pursuant to § 5 of the Voting Rights Act. Further, this Court concludes that the alleged failure by election officials to follow the specific, detailed procedures does not constitute a § 5 claim requiring preclearance. *See eg. Miller v. Daniels,* 509 F.Supp. 400 (S.D.N.Y.1981) and *Montgomery v. Leflore County Republican Executive Committee,* 776 F.Supp. 1142 (N.D.Miss.1991) (both cases holding that misconduct of election officials does not constitute a § 5 claim). Were this Court to conclude otherwise, it would be:

> ... thrust into the details of virtually every election, tinkering with the state's election machinery, reviewing petitions, registration cards, vote tallies, and certificates of election for all manner of error and insufficiency under state and federal law ... (W)e are not inclined to undertake such a wholesale expansion of our jurisdiction into an area which, with certain narrow and well defined exceptions, has been in the exclusive cognizance of the state courts.

*Powell v. Powell,* 436 F.2d 84 (2nd Cir.1970).

Additionally, the plaintiffs have not provided the undersigned with controlling case law holding that the failure to follow specific notice procedures, when a hearing has been held to consider the impact of fraud in an election, falls under § 5 of the Voting Rights Act and requires preclearance. Absent persuasive case law, this Court concludes that the alleged failure by election officials to follow certain specific, procedural requirements under state law does not constitute a § 5 claim requiring preclearance. Therefore, the undersigned concludes that summary judgment is appropriate in favor of the defendants as it relates to the plaintiffs' claims pursuant to § 5 of the Voting Rights Act.

*IV. Plaintiff's Request for the Convening of a Three Judge Panel*

Additionally, the plaintiffs have also requested that this Court act as a "gatekeeper" and request the convening of a three judge panel to hear the merits of their alleged violations of § 5. As noted above, the alleged procedural deficiencies by the plaintiffs are not the types of claims that fall within the coverage or scope of § 5. Thus, the undersigned concludes that the convening of a three-judge panel is not required.

A single judge has some limited power to determine whether cases are appropriate for a three-judge court. *Backus v. Spears,* 677 F.2d 397 (4th Cir.1982). For example, a single-judge district court to whom a request for a three-judge court is made has the authority "to determine if a three-judge court is required." *United States v. Saint Landry Parish School Board,* 601 F.2d 859 (5th Cir.1979). Similarly, 28 U.S.C. § 2281 does not require the convening of a three-judge court when the constitutional attack upon the state statutes is insubstantial. *Goosby v. Osser,* 409 U.S. 512, 518, 93 S.Ct. 854, 858, 35 L.Ed.2d 36 (1973). In order for a federal court not sitting in diversity to respond to a question of local law (either by abstaining or, in appropriate circumstances, determining the state-law issue itself), the local question must be entwined with a substantial federal claim. *Backus,* 677 F.2d at 399– 340. Courts which have addressed the issue have concluded that three-judge panels should be sparingly invoked. *Allen v. Board of Elections,* 393 U.S. 544, 551–562, 89 S.Ct. 817, 829–830, 22 L.Ed.2d 1 (1969). As explained by the United States Supreme Court in *Allen:*

**\*10** We have long held that congressional enactments providing for the convening of three-judge courts must be strictly construed ... Convening a three-judge court places a burden on our federal court system, and may often result in a delay in a matter needing swift adjudication ... Also, a direct appeal may be taken from a three-judge court to [the Supreme] Court, thus depriving us of the wise and often crucial adjudications of the courts of appeal. Thus we have been reluctant to extend the range of cases necessitating the convening of three-judge courts.

*Id.*

Again, viewing the evidence in the light most favorable to the plaintiffs, as is legally required, the types of § 5 claims alleged by the plaintiffs are not the type of claims covered by the Voting Rights Act that require review by a three-judge panel. For this reason, the plaintiffs' request to convene a three-judge panel pursuant to § 5 of the Voting Rights Act is denied.

*V. Alleged Violations of the Due Process and Equal Protection Clauses to the United States Constitution*

Plaintiffs next assert that the defendants' actions in this case violate both the Due Process and Equal Protection Clauses of the United States Constitution. In particular, the plaintiffs argue, in part, that because the defendants did not personally serve Senator Glover with either a copy of candidate Norwood's election protest and/or a notice of the Norwood protest hearing itself, their constitutional rights have been violated.

In general, the Fourteenth Amendment to the United States Constitution provides that no "state shall deprive any person of life, liberty, or property, without due process of law ..." *Irby v. Fitz–Hugh,* 692 F.Supp. 610 (E.D.Va.1988) *aff'd Irby v. Virginia State Bd. of Elections,* 889 F.2d 1352 (4th Cir.1989) *cert. denied Irby v. Virginia State Bd. of Elections,* 496 U.S. 906, 110 S.Ct. 2589, 110 L.Ed.2d 270 (1990). A party seeking relief under the Due Process Clause must establish that: (i) he has been deprived by the state of "life, liberty, or property;" and (ii) the deprivation occurred without "due process." *Id.* Due process normally entails both notice and an opportunity to be heard.

Moreover, the Equal Protection Clause is that provision within the Fourteenth Amendment to the United States Constitution which prohibits a State from denying any person within its jurisdiction the equal protection of the laws. Plaintiffs may prove an equal protection claim by establishing that the defendants denied or restricted their fundamental right to vote. *Mosely v. Price,* 300 F.Supp.2d 389 (E.D.Va.2004) (*citing Hayward v. Clay,* 573 F.2d 187, 190 (4th Cir.1978)).

As previously noted, no person's fundamental right to vote has been denied or restricted in this case. Instead, all eligible persons will once again be afforded the opportunity to vote in the new primary election once it is rescheduled. No person's fundamental right to vote for a candidate of their choice will be denied or abridged in a future primary election. Because the plaintiffs have not established that the defendants have or will deny or restrict any person's fundamental right to vote, there is no violation of the Equal Protection Clause. For this reason, summary judgment in favor of the defendants is appropriate on the plaintiffs' claims brought pursuant to the Equal Protection Clause.

**\*11** Furthermore, summary judgment in favor of the defendants is also appropriate on the plaintiffs' claims brought pursuant to the Due Process Clause. As the record reflects, Attorney Gray participated in the June 17, 2004, hearing addressing Norwood's election protest before the Executive Committee. Attorney Gray was afforded the opportunity to present opening and closing statements, cross-examine witnesses, and introduce evidence on behalf of Senator Glover. At no time, did any party or representative, including Attorney Gray, object to the issues of either insufficient notice or insufficient service which are now before this Court. Absent any such objection, there is a basis to conclude that it would be inappropriate for this Court to rule upon an objection not raised before the Executive Committee, since issues in an election dispute not ruled upon by a lower tribunal are barred from review by this Court. *In re Bamberg Ehrhardt School Board,* 337 S.C. 561, 565, 524 S.E.2d 400, 403 (1999).

Likewise, summary judgment is appropriate on the plaintiffs' claims of alleged due process violations, because Senator Glover received sufficient due process. As the record reflects, Senator Glover was ultimately informed of the Norwood protest hearing and Attorney Gray appeared and participated on her behalf at the hearing. As noted, Attorney Gray was given the opportunity to present opening and closing statements, cross-examine witnesses, and introduce evidence on behalf of Senator Glover. Likewise, Attorney Gray did not raise either the issues of insufficient notice or insufficient service. As well, Attorney Gray did not request that the

hearing be continued to a later date. Although the Executive Committee did have the option of holding the Norwood protest hearing at a later date, the failure to do so did not deny Senator Glover of sufficient due process.

As well, the plaintiffs do not seek a new hearing before the Executive Committee of the Democratic Party. The plaintiffs do not seek to challenge the decision of the Executive Committee to void the election results based upon fraud. Instead, the plaintiffs seek to have this Court uphold a primary election that the Executive Committee found to be tainted by widespread voter fraud.

Because Senator Glover was afforded sufficient due process, summary judgment in favor of the defendants should be granted as it relates to the plaintiffs' claims brought pursuant to the Due Process Clause.

## VI. *Alleged Violations of the Fourteenth and Fifteenth Amendments to the United States Constitution*

Finally, plaintiffs allege that the decision of the Executive Committee voiding the election violates both the Fourteenth and Fifteenth Amendments to the United States Constitution by "diluting, minimizing, and canceling [the] African American voting strength ..." After careful consideration, the Court concludes that relief is also not warranted on this basis.

Claims of racially discriminatory vote dilution exist under both the Fifteenth Amendment and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *Washington v. Finlay,* 664 F.2d 913 (4th Cir.1981). Such claims can only be established by proof that: (i) vote dilution exists and (ii) vote dilution results from a racially discriminatory purpose chargeable to the state. *Id.* (*citing City of Mobile v. Bolden,* 446 U.S. 55, 66–70, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980) (plurality opinion)).

 **\*12** Initially, as noted above, the issue of vote "dilution" was previously discussed in this Order. That discussion applies to these claims. Because the plaintiffs have failed to put forth sufficient evidence establishing the existence of vote dilution, the first requirement of their claims brought pursuant to either the Fifteenth Amendment or the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution cannot be established. Therefore, summary judgment in favor of the defendants is also appropriate on these claims.

Additionally, the plaintiffs have also failed to put forth sufficient evidence establishing the existence of "a racially discriminatory purpose chargeable to the state." Absent such a showing, the plaintiffs also cannot establish the second requirement of their claims brought pursuant to either the Fifteenth Amendment or the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

In this case, the plaintiffs, despite two (2) full days of testimony, have failed to put forth evidence that the Executive Committee's decision to void the election was motivated by racial discrimination. Rather, as the testimony of State Democratic Party Chairman Joe Erwin reflected, the only reasons procedures were not followed was because of the Democratic Party's desire to "move quickly" on a matter of great importance to the residents of Senate District 30 and for the convenience of the Executive Committee members who were available to attend the hearing. No evidence, or argument of legal counsel, was presented that the any decision of the Executive Committee occurred as a result of racial animus. As well, none of the plaintiffs testified that they would not vote in the new election. No evidence was presented that any particular individual would be denied the opportunity to vote in the new election. As the record reflects, the decision of the Executive Committee to void the election was based upon widespread voter fraud, not racial animus.

In sum, because the plaintiffs have failed to prove that either "vote dilution exists" and/or that "vote dilution results from a racially discriminatory purpose chargeable to the state," their Fourteenth and Fifteenth Amendment claims are also subject to summary judgment in favor of the defendants.

## *Conclusion*

For the above stated reasons, the defendants South Carolina Democratic Party and the Executive Committee of the South Carolina Democratic Party's motion for summary judgment is GRANTED (Doc. # 55). Similarly, for identical reasons, all of the remaining defendants are DISMISSED as parties to the instant action. All remaining and pending motions are DENIED (Docs.# 4, 9, 12, 18, 23, 28, 38, 41, 45, 46).

IT IS SO ORDERED.

## All Citations

Not Reported in F.Supp.2d, 2004 WL 3262756

**Glover v. South Carolina Democratic Party, Not Reported in F.Supp.2d (2004)**

2004 WL 3262756

---

**End of Document**                                  © 2020 Thomson Reuters. No claim to original U.S.
                                                                      Government Works.

G

2005 WL 6106401
Only the Westlaw citation is currently available.
FOR PUBLICATION-PRECEDENTIAL
District Court of the Virgin
Islands, Division of St. Croix.

Carmen GOLDEN and Arnold M. Golden
individually and on behalf of the voters
of the District of St. Croix, Plaintiff,

v.

GOVERNMENT OF THE VIRGIN
ISLANDS, Virgin Islands Joint Board of
Elections, St. Croix Board of Elections,
Evelyn James, as Chairman of the St.
Croix Board of Elections, John Abramson,
Jr., as Supervisor of Elections, Raymond
Williams, Hope Gibson, and Mary
Louise Moorehead Evans, Defendants.

Nos. 1:05-CV-00005RLFGWC, CIV.2005/0005.
|
March 1, 2005.

**Attorneys and Law Firms**

Pamela L. Colon, Esq., Christiansted, VI, for Plaintiffs.

Michael McLaurin, Department of Justice, Christiansted, VI,
for Government of the Virgin Islands, Virgin Islands Joint
Board of Elections, St. Croix Board of Elections, Evelyn
James, and John Abramson, Jr.

Hope Gibson, Gallow Bay Station, VI, Pro se.

Mary Louise Moorehead Evans, Frederiksted, VI, Pro se.

Krim M. Ballentine, St. Thomas, VI, Amicus Curiae.

*MEMORANDUM OPINION*

FINCH, J.

**\*1** THIS MATTER comes before the Court on the Motion
for Preliminary Injunction filed by Plaintiffs Carmen and
Arnold Golden. A hearing was held on such motion on
February 23, 2005.

**I. Background**

Carmen Golden sought to be re-elected to the St. Croix Board
of Elections in 2004. She enrolled as a Democrat, ran as a
candidate in the Democratic primary, and received the second
highest number of votes. Because only four Democrats may
sit on the St. Croix Board of Elections,[1] and three members
were sitting as Democrats, only one seat was certified for the
Democratic primary.[2] Therefore, Golden was not listed on the
ballot as a Democrat in the general election held on November
2, 2004, in which four new members of the St. Croix Board
of Elections were to be elected. *See* 18 V.I.C. § 357(a) (1998).

[1]  Title 18 V.I.C. § 41(b) (Supp.2004) provides in relevant
part:
   Each board shall consist of seven (7) members No
   more than four (4) members of the same political
   party including individuals who are not affiliated
   with any political party shall be members of each
   Board.

[2]  Title 18 V.I.C. § 343 (1998) requires that the Supervisor
of Elections, prior to each primary, ascertain the public
offices to be filled at the ensuing general election for
which candidates are to be nominated at the primary.

Although Golden was not listed on the general election ballot,
Golden received write-in votes. When the votes were tallied,
Golden was the write-in candidate with the most votes, and
the candidate with the fourth highest number of votes overall.
Accordingly, the Chairman of the St. Croix Board of Elections
notified Golden that she had been elected as a member of the
Board of Elections. *See* 18 V.I.C. § 4(b)(4) (1998). However,
shortly thereafter, the Chairman of the St. Croix Board of
Elections informed Golden that, based on an opinion of
the Attorney General which is not of record in this case,
the St. Croix Board of Elections had voted to decertify her
as the winning write-in candidate. The Court infers from
Golden's Complaint, that the reason for her decertification
was that the Democratic seats were full, and that since she
was enrolled and elected as a Democrat, she could not take a
non-Democratic seat.

Carmen and Arnold Golden bring this action as voters who
cast votes for Carmen Golden. They claim that since, from
their point of view, Carmen Golden is entitled to a seat
on the St. Croix Board of Elections as the winning write-

in candidate, their votes have not been honored, effectively disenfranchising them.

They assert that Golden is entitled to be a member of the St. Croix Board of Elections for three reasons: (1) Two Democratic seats should have been certified for the Democratic primary because one of the continuing members of the St. Croix Board of Elections had run and was elected as an Independent candidate in the 2002 general election and, therefore, should not have been seated as a Democrat; (2) Since an Independent can occupy a seat reserved for a Democrat with impunity, then a Democrat may take an Independent seat; and (3) Because Carmen and Arnold Golden cast their votes for a write-in candidate without specifying the candidate's party affiliation, then that write-in candidate, Carmen Golden, being the write-in candidate with the most votes, must be seated on the St. Croix Board of Elections, regardless of her party affiliation.

## II. Subject Matter Jurisdiction

Defendants, Government of the Virgin Islands, Evelyn James, John Abramson, Jr. and Raymond Williams [hereinafter "the Government Defendants], pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, contend that this Court lacks subject matter jurisdiction

**\*2** "Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of America,* 511 U.S. 375, 377 (1994). The burden of establishing subject matter jurisdiction rests upon the party asserting jurisdiction. *Id.* When plaintiffs assert a non-frivolous federal claim, federal jurisdiction is proper. *Martin v. United Way of Erie County,* 829 F.2d 445, 447 (3d Cir.1987). On the other hand, if the right claimed is "so insubstantial, implausible, foreclosed by prior decisions of [the Supreme Court], or otherwise completely devoid of merit as not to involve a federal controversy," dismissal for lack of jurisdiction is appropriate. *Kulick v. Pocono Downs, Racing Ass'n, Inc.,* 816 F.2d 895, 899 (3d Cir.1987) (quotation omitted).

The Government Defendant have made a facial attack to this Court's jurisdiction, in that they contest the sufficiency of the pleadings. When a facial challenge is made pursuant to Rule 12(b)(1), the Court accepts the complaint's allegations as true. *Turicentro, S.A. v. American Airlines Inc.,* 303 F.3d 293, 300 n. 4 (3d Cir.2002).

In the jurisdictional clause of the Complaint, Plaintiffs allege that this Court has subject matter jurisdiction pursuant to 42

U.S.C. § 1971 *et seq.,* known as the Voting Rights Act of 1965. Complaint, ¶ 1. The Government Defendants point out that the facts as alleged do not state a claim for violation of any provision of the Voting Rights Act. Thus, the Government Defendants argue, Plaintiffs have not met the jurisdictional pleading requirement of Rule 8(a)(1) of the Federal Rules of Civil Procedure.

The Government Defendants, however, overlook Plaintiffs' allegations in paragraph 33 of the Complaint:

> 33. Defendants have violated (1) the First Amendment rights of Plaintiffs by illegally discriminating in favor of Independent Williams over write-in Golden; (2) the equal protection rights of Plaintiffs by illegally discriminating in favor of Independent Williams over write-in Golden with no rational reason or purpose; (3) the substantive due process right of Plaintiffs to a free and fair election, and (4) the rights of Plaintiffs under the Voting Rights Act.

In the first three clauses of paragraph 33, Plaintiffs claim that the Government Defendants have violated their First and Fourteenth Amendment constitutional rights. Read liberally, "so as to do substantial justice" pursuant to Rule 8(f) of the Federal Rules of Civil Procedure, Plaintiffs are attempting to assert claims under 42 U.S.C. § 1983.[3,4] *See Randall v. United States,* 95 F.3d 339, 346 (4th Cir.1996) (interpreting Rule 8(a)(1) in light of Rule 8(f)); *see also Gardner v. First American Title Ins. Co.,* 294 F.3d 991, 994 (8th Cir.2002) (recognizing that Rule 8(a)(1) is satisfied if the complaint "says enough about jurisdiction to create some reasonable likelihood that the court is not about to hear a case that it is not supposed to have the power to hear" (quotation omitted)). "Although a plaintiff must allege essential jurisdictional facts in a complaint, federal jurisdiction may be sustained on the basis of a statute not relied on or alleged in the pleadings." *Randall,* 95 F.3d at 346 (quoting *Celli v. Shoell,* 40 F.3d 324, 328 (10th Cir.1994)).

3   Indeed, on the date of the hearing on the preliminary injunction motion, Plaintiffs moved for leave to amend their Complaint to specify that the case is also brought pursuant to 42 U.S.C. § 1983.

4   Title 42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory ..., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the

Constitution and laws, shall be liable to the party
injured in an action at law, suit in equity, or other
proper proceeding for redress....

**\*3** If Plaintiffs have presented a substantial claim under
section 1983, then the Court has subject matter jurisdiction
pursuant to 28 U.S.C. § 1343(a)(4) which states that "[t]he
district courts shall have original jurisdiction of any civil
action authorized by law to be commenced by any person: ...
(4)[t]o recover damages or to secure equitable or other relief
under any Act of Congress providing for the protection
of civil rights, including the right to vote." *See Rossello-
Gonzalez,* 2004 WL 3143501, \*9 (1st Cir., Dec. 15, 2005);
*Bonas v. Town of North Smithfield,* 265 F.3d 69, 73 (1st
Cir.2001). "[F]ederal courts have jurisdiction over claims
arising out of a state or local electoral dispute if, and to the
extent that, the complaint limns a set of facts that bespeaks
the violation of a constitutionally guaranteed right." *Bonas,*
265 F.3d at 73-74.

The right to vote is a "fundamental political right" *Yick Wo v.
Hopkins,* 118 U.S. 356, 370 (1886), constitutionally protected
in territorial, as well as federal elections, *see Reynolds v. Sims,*
377 U.S. 533, 554 (1964). Qualified electors have the right to
vote in territorial elections under the Equal Protection Clause
of the Fourteenth Amendment.[5] *See Harper v. Virginia State
Board of Elections,* 383 U.S. 663, 665 (1966). The right to
vote extends to all phases of the voting process, including
having that vote actually count. *See United States v. Mosley,*
238 U.S. 383, 386 (1915). If a candidate were to be sworn
in as an elected representative who received fewer votes than
another candidate, then each of the votes cast for the other
candidate would be ignored. *Marks v. Stinson,* 19 F.3d 873,
887 (3d Cir.1994). This would violate the constitutionally
protected right to vote of those voters who had voted for the
candidate who received the most votes, but was not seated. *Id.*

[5]     The Equal Protection Clause of the Fourteenth
        Amendment has been extended to the United States
        Virgin Islands by section 3 of the Revised Organic Act
        of 1954, 48 U.S.C. § 1561, entitled "Bill of Rights."

Plaintiffs both voted for Carmen Golden. Carmen Golden
received the highest number of write-in votes for a seat on
the St. Croix Board of Elections. The St. Croix Board of Elections
has now decertified Carmen Golden as the winning candidate,
and presumably will be certifying another candidate who
received fewer votes than she did. If Plaintiffs are correct and
Carmen Golden should have a place on the St. Croix Board of
Elections, then by decertifying Golden, the St. Croix Board

of Elections has effectively disenfranchised Plaintiffs in that
their votes have not counted.

Thus, the Court finds that Plaintiffs have stated a claim
under section 1983 for infringement of their right to
have their vote count in violation of the Fourteenth
Amendment's Equal Protection Clause.[6] *See Pierce v.
Allegheny County Board of Elections,* 324 F.Supp.2d
684, 694-95 (W.D.Pa.2003). Moreover, because Plaintiffs
claim deprivation of a fundamental right protected by the
Constitution, even if the Court ultimately were to determine
that Plaintiffs have failed to state a claim upon which relief
may be granted under section 1983, the Court is not deprived
of subject matter jurisdiction. *See Kulick,* 816 F.2d at 898.

[6]     Because Plaintiffs have presented a substantial claim
        for violation of their equal protection rights, the Court
        does not address Plaintiffs' First Amendment or due
        process allegations in determining that it has subject
        matter jurisdiction.

### III. Standing

**\*4** Defendant Hope Gibson asserts that Plaintiffs lack
standing to pursue this matter in this Court. Standing is a core
component of the case-or-controversy requirement of Article
III of the United States Constitution. *Luian v. Defenders of
Wildlife,* 504 U.S. 555.560 (1992). To have standing in federal
court, a plaintiff must allege an injury in fact caused by
the defendant that can be redressed by a favorable decision
of the court. *Id.* at 560-61. Beyond Article IE standing, a
plaintiff must assert his own legal rights and interests, the
plaintiff may not depend on generalized grievances, and "the
plaintiffs complaint must fall within the zone of interests
to be protected or regulated by the statute or constitutional
guarantee in questions." *Society Hill Towers Owners' Ass'n v.
Rendell,* 210 F.3d 168, 178 (3d Cir.2000).

Here, Plaintiffs, who voted for Carmen Golden for a seat on
the St. Croix Board of Elections, have alleged that Carmen
Golden, notwithstanding having received the most votes, has
been decertified as the winning candidate. They allege that
the St. Croix Board of Elections' decertification of Carmen
Golden has injured them in that the votes that they, personally,
cast have not been honored. Plaintiffs request that this Court
take steps to preserve Carmen Golden's position on the St.
Croix Board of Elections by finding that the St. Croix Board
of Elections violated their constitutional rights as voters. Such
relief would provide Plaintiffs with a remedy.

2005 WL 6106401

Thus, Plaintiffs have met the requirements for standing under Article HI, as well as the prudential considerations that standing implicates.

## IV. Abstention

None of the parties have suggested that the Court abstain in exercising its jurisdiction in this matter. Indeed, Plaintiffs argue that this Court lacks the authority to abstain.

The Court has considered each of the various abstention doctrines and finds none to be applicable in this matter. In light of the Court's "virtually unflagging" obligation to adjudicate claims within its jurisdiction, the Court concludes that it would be inappropriate to abstain in this case. *See Marks,* 19 F.3d at 881 (quotation omitted).

## V. Preliminary Injunction Analysis

"[T]o obtain a preliminary injunction, plaintiffs must show both (1) that they are likely to experience irreparable harm without an injunction and (2) that they are reasonably likely to succeed on the merits." *Adams v. Freedom Forge Corp.,* 204 F.3d 475, 484 (3d Cir.2000). The Court must also consider whether granting preliminary relief will result in even greater harm to the nonmoving party and whether granting the preliminary relief will be in the public interest. *Council of Alternative Political Parties v. Hooks,* 121 F.3d 876, 879 (3d Cir.1997).

### A. *Irreparable Harm*

Violation of Plaintiffs' constitutional right will cause them irreparable injury. *Council of Alternative Political Parties v. Hooks,* 121 F.3d 876, 883 (3d Cir.1997). If Plaintiffs' exercise of their voting rights is burdened by the improper decertification of the winning candidate for whom Plaintiffs' cast their vote, Plaintiffs will be irreparably harmed. Thus, the first factor is satisfied.

### B. Likelihood of Success

**\*5** The Court examines the merits of Plaintiffs' three principal arguments:

### 1. Raymond Williams' Seat

Plaintiffs maintain that the Court can provide them with relief on the merits by finding that Raymond Williams, who ran as an Independent in the 2002 general election, has been unlawfully given a seat on the St. Croix Board of Elections

reserved for a member of the Democratic Party. Even if the Court were to find that find that Williams must occupy an Independent seat, Plaintiffs would not be afforded any relief. The St. Croix Board of Elections would be statutorily constrained from certifying Carmen Golden as an occupant of the Democratic seat released by Williams. Title 18 V.I.C. § 342 (1998) requires that all candidates of political parties running for public offices be nominated and elected at primary elections. Section 342 provides in relevant part:

> Except as provided in sections 307 and 359 and as otherwise provided by law, all candidates of political parties, as defined in section 301 of this title, for public offices shall be nominated, ... at primary elections held in accordance with the provisions of this title *and in no other manner.*

(emphasis added). Carmen Golden was nominated, but lost the election at the Democratic primary. Since she lost the Democratic primary, she was not placed on the ballot for the general election, 18 V.I.C. § 357 (1998), and she was precluded from being seated as a Democrat, *see* 18 V.I.C. § 342.

Plaintiffs also theorize that if the Court finds that Williams had been improperly seated as a Democrat, two seats would have been open at the Democratic primary, and since Carmen Golden received the second most votes at the Democratic primary, she would likely have had a spot on the ballot, and would likely have won the second-most votes in the general election.

Not only does this chain of logic involve considerable speculation, what Plaintiffs seek is federal overturning of the territorial primary election because only one Democratic seat was certified instead of two. Yet, just as Plaintiffs have raised a challenge now, Plaintiffs could have challenged the availability of only one Democratic seat before the primary election. Although the Court has the power to invalidate constitutionally infirm elections, *Hadnott v. Amos,* 394 U.S. 358, 367 (1969), equitable considerations must be taken into account. *See Soules v. Kauaians Nukolii Campaign Committee,* 849 F.2d 1176, 1180 (9th Cir.1988). Laches bars post-election relief when the party seeking such relief has lacked diligence, and when the party asserting the laches defense will be prejudiced. *Costello v. United States,* 365 U.S. 265, 282 (1961). The Court must consider "the extremely disruptive effect of election invalidation and the havoc it wreaks upon local political continuity." *Soules,* 849 F.2d at 1180.

Plaintiff Carmen Golden, as a member of the St. Croix Board of Elections, and Plaintiff Arnold Golden, her husband, were well aware that only one seat had been certified for the Democratic primary, when they believed that two seats should have been certified. They lacked diligence by waiting to see whether their candidate of choice won the one certified seat, before bringing a legal action arguing that a second seat should have been certified. The doctrine of laches bars such post-election "sandbagging on the part of wily plaintiffs." *Id.* "[T]he failure to require pre-election adjudication would permit, if not encourage, parties who could raise a claim to lay by and gamble upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in a court action." *Id.* (quotations omitted). Because Plaintiffs, without adequate explanation, did not raise their challenge in an appropriate forum before the election, they are barred by the doctrine of laches from the equitable relief of overturning the results of the election. *See id.*

2. Seating Carmen Golden as an "Independent."

**\*6** Second, Plaintiffs suggest that if an Independent candidate can be seated as a Democrat, then a Democrat can be seated as an Independent. "Two wrongs do not make a right." Plaintiffs constitutional rights would not be vindicated by further violation of the election statutes intended to protect their fundamental right to vote.

Plaintiffs state that after the general election, Carmen Golden changed her status from a Democrat to an Independent, and argue that now that Carmen Golden is no longer a Democrat, she should be seated as an Independent. Although Carmen Golden's Voter Registration card indicates "No Party," to be a nominated candidate for election at the Democratic primary, she must have enrolled as a Democrat. 18 V.I.C. §§ 302, 344(a) (1998). Golden could have changed her party enrollment up until 30 days before the general election, which was held on November 2, 2004. *See* 18 V.I.C. § 91 (1998). Golden does not allege that she did so. Any change to her party enrollment after the general election would not alter the fact that she was registered as a Democrat at the time that she received the greatest number of write-in votes at the general election. Again, because she did not win at the Democratic primary, she could not be seated as a Democrat. *See* 18 V.I.C. § 342.

3. Validity of Statute Concerning Election of Party Members

Finally, the Court cannot fully resolve this matter without reaching the constitutional question raised by *Amicus Curiae* Krim Ballentine, and apparently adopted by Plaintiffs. *See* Opp. to Mot. to Dismiss filed by Def. Gibson, at 13, 14; Opp. to Mot. to Dismiss filed by Gov. Defs. at 12. Ballentine asks the Court to find that to require candidates who are affiliated with a party to be elected by their party before they can be certified for an elected position, even if they received the highest number of votes as a write-in candidate, is unconstitutional. According to Ballentine, this denies the electorate equal protection in that a voter may write-in a candidate of choice without knowing the candidate's political affiliation. The voter may intend to cast a vote for the candidate regardless of the candidate's party. Instead, if the write-in candidate belongs to a political party, the vote will be effectively ignored, disenfranchising the voter.

In deciding whether 18 V.I.C. § 342, the law requiring that candidates affiliated with a party be elected by the party at a primary election, violates the Equal Protection Clause, the Court must determine the appropriate standard of review. *See Donatelli v. Mitchell,* 2 F.3d 508, 513 (3d Cir.1993). Because the law does not affect any suspect classes or infringe any fundamental constitutional rights, the Court applies rational-basis review. *Id.* That a law imposes a burden on the right to vote does not make it subject to strict scrutiny. *Id.* "Under rational-basis review, the challenged classification must be upheld if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* (quotation omitted). "[R]ational-basis review under the Equal Protection Clause is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Id.* at 514 (quotation omitted).

**\*7** The Supreme Court recognized in *Storer v. Brown,* that "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." 415 U.S. 724, 730 (1974). The *Storer* decision addressed a claim from a candidate that had been recently affiliated with the Democratic Party, but desired to be placed on the ballot as an Independent candidate, which was not permitted under California law without a year's lapse. The Court wrote:

> After long experience, California came to the direct party primary as a desirable way of nominating candidates for public office A candidate in one party primary may not now run in that of another; if he loses in the primary, he may not run as an independent; and he must not have been associated with another political party for a year prior to

the primary. The direct party primary in California is not merely an exercise or warm-up for the general election but an integral part of the entire election process, the initial stage in a two-stage process by which the people choose their public officers. If functions to winnow out and finally reject all but the chosen candidates. The State's general policy is to have contending forces within the party employ the primary campaign and primary election to finally settle their differences. The general election ballot is reserved for major struggles; it is not a forum for continuing intraparty feuds. The provision against defeated primary candidates running as independents effectuates this aim, the visible result being to prevent the losers from continuing the struggle and to limit the names on the ballot to those who have won the primaries and those independents who have properly qualified. The people, it is hoped, are presented with understandable choices and the winner in the general election with sufficient support to govern effectively. *Id.* at 734-35 (footnotes and statutory citations omitted).

Other points the Supreme Court enunciated as favoring limiting a candidate affiliated with a party from running immediately as an Independent are:

It protects the direct primary process by refusing to recognize independent candidates who do not make early plans to leave a party and take the alternative course to the ballot. It works against independent candidacies prompted by short-range political goals, pique, or personal quarrel. It is also a substantial barrier to a party fielding an "independent" candidate to capture and bleed off votes in the general election that might well go to another party.

*Id.* at 735. The Supreme Court found California's interest in a period of disaffiliation with a party before being elected as an Independent to be "not only permissible, but compelling." *Id.*

The Virgin Islands statute requiring candidates with a party affiliation to be elected only through the primary process, 18 V.I.C. § 342, is rational and compelling for many of

the reasons expressed in *Storer.* Allowing a Democratic or Republican candidate to lose in the primary, maintain his or her party affiliation and compete against the Democratic or Republican primary winner as a write-in candidate will result in intraparty feuding. Allowing the party candidates to challenge each other a second time at the general election would defeat the whole purpose of holding a primary election. The electorate would not winnow out and finally reject all but the chosen candidate at the primary election. Some of the same contenders of the same party affiliation would be available to them as write-in candidates at the general election.

**\*8** Section 342 tends to preserve the two-stage election process and to reduce intraparty feuding. It would be undermined if write-in candidates could be certified regardless of their party affiliation. Because section 342 has a rational basis, as well as serves a compelling interest, Ballentine's equal protection constitutional challenge fails.

### VI. Conclusion

After reviewing all of Plaintiffs' arguments in support of the certification of Carmen Golden as a member of the St. Croix Board of Elections, the Court finds no likelihood of success on the merits. Plaintiffs have failed to establish an adequate basis for entering a preliminary injunction. Because the Court finds that preliminary injunctive relief is not warranted, it need not consider the remaining two factors-whether granting such relief would result in greater harm to Defendants or would be in the public interest.

For the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction is **DENIED.**

### All Citations

Not Reported in F.Supp.2d, 2005 WL 6106401

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

H

2020 WL 6437668

2020 WL 6437668
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas, Houston Division.

Steven HOTZE, M.D., Wendell
Champion, Hon. Steve Toth,
and Sharon Hemphill, Plaintiffs,

v.

Chris HOLLINS, in his official capacity
as Harris County Clerk, Defendant.

Civil Action No. 4:20-cv-03709
|
Signed 11/02/2020

**Attorneys and Law Firms**

Jared Ryker Woodfill, Woodfill Law Firm P.C., Houston, TX, for Plaintiffs.

Richard Warren Mithoff, Jr., Mithoff Law Firm, Kenneth Royce Barrett, KBR Law, Houston, TX, Charles Stein Siegel, Waters & Kraus, LLP, Dallas, TX, S. Nasim Ahmad, The Ahmad Law Firm, The Woodlands, TX, for Defendant.

## **ORDER**

Andrew S. Hanen, United States District Judge

**\*1** The Court has before it the Motion for Preliminary Injunction (Doc. No. 3) filed by Plaintiffs Steven Hotze, M.D., Wendell Champion, Hon. Steve Toth, and Sharon Hemphill (collectively, "Plaintiffs"), the Response in Opposition (Doc. No. 22) filed by Defendant Chris Hollins in his official capacity as Harris County Clerk (hereinafter, "Defendant"), and various Motions to Intervene filed on behalf of forty-eight individuals and/or entities. The Court also has before it *amicus curiae* briefs filed by the Texas Coalition of Black Democrats, The Lincoln Project, the Libertarian Party of Texas, Joseph R. Straus, III, and election law professor, Benjamin L. Ginsberg.

## **I.**

Due to the time constraints given the issue involved, this Court cannot issue the formal opinion that this matter deserves. Consequently, given those confines, this Order must suffice. The Court first notes that it appreciates the participation of all counsel involved and the attention each gave to this important topic on such short notice.

This Court's overall ruling is that the Plaintiffs do not have standing (as explained below). While this ruling is supported by general Equal Protection and Election Clause cases, it is somewhat without precedent with regard to the Plaintiffs (or Intervenors) who are actual candidates for elected office. Therefore, the Court, in anticipation of an appeal or petition for writ of mandamus and knowing that the appellate court could draw a distinction in that regard and hold that standing exists, has gone further to indicate what its ruling would have been in that case.

## **II.**

The Court finds that Plaintiffs lack standing to sue. Federal courts must determine whether they have jurisdiction before proceeding to the merits. *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 94–95 (1998). Article III of the Constitution limits federal jurisdiction to "Cases" and "Controversies." One component of the case or controversy requirement is standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). The Supreme Court has repeatedly held that an individual plaintiff raising only a generalized grievance about government does not meet the Article III requirement of a case or controversy. *Id.* at 573–74. This Court finds that the Plaintiffs here allege only a "generalized grievance about the conduct of government." *Lance v. Coffman*, 549 U.S. 437, 442 (2007).

The Plaintiffs' lack of a particularized grievance is fatal to their claim under the Equal Protection Clause. "The rule against generalized grievances applies with as much force in the equal protection context as in any other." *U.S. v. Hays*, 515 U.S. 737, 743 (1995). Plaintiffs' general claim that Harris County's election is being administered differently than Texas's other counties does not rise to the level of the sort of particularized injury that the Supreme Court has required for constitutional standing in elections cases. *See id.; Gill v. Whitford*, 138 S. Ct. 1916, 1933 (2018) (no standing in equal protection case when alleged injury involved "group political interests" and not "individual legal rights").

**\*2** Further, it is unclear that individual plaintiffs have standing to assert claims under the Elections Clause at all. The Supreme Court has held that individual plaintiffs, like those here, whose only asserted injury was that the Elections Clause had not been followed, did not have standing to assert such a claim. *See Lance*, 549 U.S. at 442. Conversely, the Court has held that the Arizona Legislature did have standing to allege a violation of the Elections Clause as it was "an institutional plaintiff asserting an institutional injury." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 802 (2015). In addition, the Supreme Court has also held plaintiffs had such standing when they were state senators whose "votes had been completely nullified" by executive action. *Id.* at 803 (citing *Raines v. Byrd*, 521 U.S. 811, 822–23 (1997)). These cases appear to stand for the proposition that only the state legislature (or a majority of the members thereof) have standing to assert a violation of the Elections Clause.

The Court finds that the Plaintiffs here are akin to those in *Lance v. Coffman*, in which the Supreme Court held that private citizens, whose primary alleged injury was that the Elections Clause was not followed, lacked standing to bring a claim under the Elections Clause. 549 U.S. at 442. To summarize the Plaintiffs' primary argument, the alleged irreparable harm caused to Plaintiffs is that the Texas Election Code has been violated and that violation compromises the integrity of the voting process. This type of harm is a quintessential generalized grievance: the harm is to every citizen's interest in proper application of the law. *Lujan*, 504 U.S. at 573–74; *Fairchild v. Hughes*, 258 U.S. 126, 129 (1922) (holding that the right, possessed by every citizen, to require that the Government be administered according to the law does not entitle a private citizen to institute a lawsuit in federal court). Every citizen, including the Plaintiff who is a candidate for federal office, has an interest in proper execution of voting procedure. Plaintiffs have not argued that they have any specialized grievance beyond an interest in the integrity of the election process, which is "common to all members of the public." *United States v. Richardson*, 418 U.S. 166, 176–77.[1]

the fact they cannot individualize their damage beyond their rightful feeling that an election should be conducted lawfully. Neither this Court's research nor the briefing of the parties have brought forth any precedent to support this concept under either of the two pleaded causes of action based upon claimed violations of Equal Protection or the "Elections Clause." Given the timing of this case and the impact that such a ruling might have, this Court finds it prudent to follow the existing precedent.

## III.

If the Court had plaintiffs with standing, it would have denied in part and granted in part the motion for preliminary injunction.[2] A preliminary injunction is an "extraordinary remedy" that should only be granted if the movant has "clearly carried the burden of persuasion" on all four factors. *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 196 (5th Cir. 2003). The movant, however, "need not prove his case." *Lakedreams v. Taylor*, 932 F.2d 1103, 1109 (5th Cir. 1991) (citing *H & W Indus. v. Formosa Plastics Corp.*, 860 F.2d 172, 179 (5th Cir. 1988)). Before a court will grant a preliminary injunction, the movants must clearly show "(1) a substantial likelihood that they will prevail on the merits, (2) a substantial threat that they will suffer irreparable injury if the injunction is not granted, (3) that their substantial injury outweighs the threatened harm to the party whom they seek to enjoin, and (4) granting the preliminary injunction will not disserve the public interest." *City of El Cenizo v. Texas*, 890 F.3d 164, 176 (5th Cir. 2018) (quoting *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 574 (5th Cir. 2012)); *see also Winter v. NRDC*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."). "The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974).

---

1    This Court finds the answer to this question to be particularly thorny, given that some of the Plaintiffs are actual candidates who have put in time, effort, and money into campaigning, to say nothing of the blood, sweat, and tears that a modern campaign for public office entails. This Court would readily understand if some appellate court finds that these Plaintiffs have standing despite

2    The Defendant and Intervenors suggested both in oral argument and in their written presentations that the Court should abstain under either *Pullman, Colorado River*, or *Rooker-Feldman* doctrine. Since standing is jurisdictional and since this Court is dismissing this action, it need not analyze these arguments. *See Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61

S. Ct. 643 (1941); *Colorado River Water Conservation Dist. v. U.S.*, 424 U.S. 800 (1976); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923); and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).

**\*3** This Court finds that there is a difference between the voting periods presented to it. The merits need to be analyzed separately by early voting and election day voting. With respect to the likelihood of success, the Court would find that the Plaintiffs do not prevail on the element of likelihood of success with respect to early voting. First, § 85.062 of the Texas Election Code provides for "temporary branch polling places" during early voting. Tex. Elec. Code. § 85.062. The statute authorizes county election officials to use "movable structure[s]" as polling places. *Id.* § 85.062(b). The Code does not define "structure," but Black's Law Dictionary defines the term as: "Any construction, production, or piece of work artificially built up or composed of parts purposefully joined together." Black's Law Dictionary (11th ed. 2019). The Court finds, after reviewing the record, the briefing, and considering the arguments of counsel, that the tents used for drive-thru voting qualify as "movable structures" for purposes of the Election Code. The Court is unpersuaded by Plaintiffs' argument that the voters' vehicles, and not the tents, are the polling places under the drive-thru voting scheme. Consequently, the Court finds that drive-thru voting was permissible during early voting. Moreover, the Plaintiffs failed to demonstrate under the Texas Election Code that an otherwise legal vote, cast pursuant to the instructions of local voting officials, becomes uncountable if cast in a voting place that is subsequently found to be non-compliant.

Additionally, the promptness with which one brings an injunction action colors both the elements of likelihood of success on the merits and irreparable harm. *See Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 685 (2014) ("In extraordinary circumstances, however, the consequences of a delay in commencing suit may be of sufficient magnitude to warrant, at the very outset of the litigation, curtailment of the relief equitably awardable."); *Environmental Defense Fund, Inc. v. Alexander*, 614 F.2d 474, 478 (1980) ("equitable remedies are not available if granting the remedy would be inequitable to the defendant because of the plaintiff's long delay."). Here, the Court finds that the Plaintiffs did not act with alacrity. There has been an increasing amount of conversation and action around the subject of implementing drive-thru voting since earlier this summer. The Defendant has argued, and no one has refuted, that discussions were held with leaders of both major political parties, and, using that input, a drive-thru voting plan was developed. The Harris

County Commissioners Court approved a budget for drive-thru voting in late September. Finally, actual drive-thru voting began October 13, 2020. At virtually any point, but certainly by October 12, 2020, Plaintiffs could have filed this action. Instead, they waited until October 28, 2020 at 9:08 p.m. to file their complaint and did not file their actual motion for temporary relief until mid-day on October 30, 2020—the last day of early voting. The Court finds this delay is critical. It is especially important in this compact early voting timeframe, in a particularly tense election, where each day's voting tally functionally equated to many days or even weeks of early voting in different situations.

Therefore, this Court finds the Plaintiffs do not prevail on the first element.

With regard to the second element, "irreparable injury," this point is covered more thoroughly in the standing discussion, but suffice it to say, in response to the Court's question during oral argument, Plaintiff's counsel described their injuries as the concern for the voting law to be accurately enforced and voting to be legal. In response to the Court's questions, Plaintiffs' Counsel said their irreparable injury was that the election process was being compromised, and that it prevents there being uniformity in the manner of voting throughout Texas. While certainly valid concerns, those are not the kind of injuries that separate Plaintiffs from other concerned citizens. Plaintiffs have no evidence of individualized irreparable injuries.

The one element that the Court finds the Plaintiffs have prevailed on is the harm to the party defendant. The Court finds that there would be no harm to Harris County. The only suggested harm is that the County has spent millions of dollars to implement drive-thru voting. While these funds may have been better spent, their loss does not prevail over tens of thousands of potentially illegal votes. Further, if granted, the injunction would only require the Defendant to conduct elections as Harris County has conducted them in the past without drive-thru voting.

**\*4** The last element must, like the first, take on extraordinary significance in this context. That element concerns the public interest. Plaintiffs argue, correctly, that the public has an interest in seeing that elections are carried out pursuant to the Election Code. This is no doubt true; however, this generalized interest is offset by two somewhat stronger factors. First, the drive-thru early voting as designed and implemented is, to this Court's reading, legal as described

above. Second, there have been over 120,000 citizens who have legally voted utilizing this process. While Plaintiffs have complained about anecdotal reports of irregularities, the record reflects that the vast majority were legal voters, voting as instructed by their local voting officials and voting in an otherwise legal manner. The only claimed widespread illegality is the place of voting—a tent outside the polling place instead of inside the actual building. To disenfranchise over 120,000 voters who voted as instructed the day before the scheduled election does not serve the public interest.

Therefore, if the Court had found standing existed, it would have denied an injunction as to the drive-thru early voting.

The Court finds the issue as to Election Day to cut the opposite direction. On Election Day, as opposed to early voting, there is no legislative authorization for movable structures as polling places. The Election Code makes clear that, on Election Day, "[e]ach polling place shall be located inside a building." Tex. Elec. Code § 43.031(b). The term "building" is not defined in the Code. Nevertheless, Black's Law Dictionary defines "building" as: "A structure with walls and a roof, esp. a permanent structure." Black's Law Dictionary (11th ed. 2019). The Court finds, after reviewing the record and arguments of counsel, that the tents used for drive-thru voting are not "buildings" within the meaning of the Election Code. Further, they are not inside, they are clearly outside. Accordingly, if the Plaintiffs had standing, the Court would have found that the continuation of drive-thru voting on Election Day violates the Texas Election Code.

It also finds that, unlike in early voting, the Plaintiffs prevail when one weighs the various elements that underlie the issuance of an injunction. First, as stated above, the Court does not find a tent to be a building. Therefore, under the Election Code it is not a legal voting location. Second, the

Plaintiffs' request for injunctive relief is timely. While it could and should have been made earlier, it was made days before the election. The Court would have found that the Plaintiffs had a likelihood of success. The analysis of the second element remains the same. With regard to the loss that the Defendant might suffer, the Court finds this to be minimal. While it apparently spent millions in implementing the drive-thru voting system, it had over 120,000 voters use it—so it is money well-spent. The fact it would not be used on Election Day does not diminish its benefit. The analysis of the last element, public interest, swings in favor of the Plaintiffs. No one should want votes to be cast illegally or at an illegal polling place. No one has voted yet—so no one is being disenfranchised. Moreover, for those who are injured or worried that their health would be compromised should they be compelled to enter the building to vote, curbside voting is available under § 64.009 of the Texas Election Code.[3] Lastly, there are very few citizens who would want their vote to be in jeopardy, so it is incumbent on election officials to conduct voting in a proper location—not one which the Attorney General has already said was inappropriate. Consequently, this Court, had it found that standing existed, would have granted the injunction prospectively and enjoined drive-thru voting on Election Day and denied all other relief.

[3]   This Court is quite cognizant of the Texas Supreme Court ruling (in a slightly different context) that fear of contracting COVID-19 does not establish an exception. *In re State*, 602 S.W.3d 549 (Tex. 2020).

 **\*5** Nevertheless, since it found standing does not exist, this action is hereby dismissed.

**All Citations**

Slip Copy, 2020 WL 6437668

   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

I

2020 WL 6252803
Only the Westlaw citation is currently available.
Supreme Court of Pennsylvania.

IN RE: NOVEMBER 3,
2020 GENERAL ELECTION

Petition of: Kathy Boockvar, Secretary
of the Commonwealth of Pennsylvania

No. 149 MM 2020
|
Submitted: October 16, 2020
|
Decided: October 23, 2020

**Synopsis**
**Background:** Secretary of the Commonwealth filed application with the Supreme Court, asking the Court to assume its King's Bench jurisdiction and to consider her request for declaratory relief regarding the meaning of election law.

The Supreme Court, No. 149 MM 2020, Todd, J., held that county boards of elections are barred from rejecting absentee or mail-in ballots based on a signature comparison conducted by county election officials or employees or as result of third-party challenges based on signature analysis and comparisons.

Ordered accordingly.

**Attorneys and Law Firms**

Richard L. Bazelon, Esq., Bazelon, Less & Feldman, P.C., for Amicus Curiae Brennan Center for Justice at New York University School of Law

Mark P. Gaber, Esq., John P. Lavelle Jr., Esq., Morgan, Lewis & Bockius LLP, Chris Miller, Esq., for Amicus Curiae Urban League of Greater Pittsburgh

Kathleen Marie Kotula, Esq., Pennsylvania Department of State, for Participants Kathleen Marie Kotula, Esq., Pennsylvania Department of State, Department of State

Dallin Brockbank Holt, Esq., Richard P. Limburg, Esq., Obermayer, Rebmann, Maxwell & Hippel, LLP, Mathieu Jode Shapiro, Esq., Lawrence J. Tabas, Esq., Jason Torchinsky, Esq., for Possible Intervenors Joseph B. Scarnati, Jake Corman

Zachary Michael Wallen, Esq., Chalmers & Adams LLC, for Possible Intervenor Cutler, Bryan, Benninghoff, Kerry

Michael Crossey, Pro Se

Sierra Club, Pro Se

Daniel Thomas Brier, Esq., Myers, Brier & Kelly, LLP, John Bartley Delone, Esq., Howard Greeley Hopkirk, Esq., Michael John Scarinci, Esq., Pennsylvania Office of Attorney General, Joshua D. Shapiro, Esq., Josh Shapiro, Attorney General of the Commonwealth of Pennsylvania, Donna Ann Walsh, Esq., Myers, Brier & Kelly, LLP, for Petitioner Kathy Boockvar

Kathleen A. Gallagher, Esq., Porter Wright Morris & Arthur, LLP, John M. Gore, Esq., for Elizabeth Radcliffe, Possible Intervenor, Donald J. Trump for President, Inc., Republican Party of Pennsylvania, Republican National Committee, National Republican Congressional Committee, Intervenors - Appellees

Michele D. Hangley, Esq., Robert Andrew Wiygul, Esq., Mark Alan Aronchick, Esq., Hangley, Aronchick, Segal, Pudlin & Schiller, for Respondents Bucks County Board of Elections, Chester County Board of Elections, Montgomery County Board of Elections, Philadelphia County Board of Elections

Regina Marie Blewitt, Esq., Joyce, Carmody & Moran, P.C., for Respondent Luzerne County Board of Elections

Adam Craig Bonin, Esq., The Law Office of Adam C. Bonin, for Respondent Pennsylvania Alliance for Retired Americans

Heather Lynn Bozovich, Esq., for Respondent Clearfield County Board of Elections

Andrew Francis Szefi, Esq., Richard Eugene Santee, Esq., Timothy Patrick Brennan, Esq., for Respondent Northampton County Board of Elections

Keith Adam Button, Esq., Shafer Law Firm, P.C., for Respondent Crawford County Board of Elections

Thomas M. Caffrey, Esq., Lehigh County Department of Law, for Respondent Lehigh County Board of Elections

Molly Elizabeth Meacham, Esq., Elizabeth A. Dupuis, Esq., Babst Calland Clements and Zomnir, PC, for Respondent Armstrong County Board of Elections

Jonathan Paul Foster, Esq., BRADFORD COUNTY COMMISIONERS, for Respondent Bradford County Board of Elections

Christopher P. Gabriel, Esq., Cafardi Ferguson Wyrick Weis & Gabriel LLC, for Respondent Tioga County Board of Elections, Clarion County Board of Elections

Robert D. Schaub, Esq., Robert Lawrence Gawlas, Esq., Rosenn, Jenkins & Greenwald, LLP, for Respondent Susquehanna County Board of Elections

Kevin Michael Greenberg, Esq., Anthony Michael Pratt, Esq., Greenberg Traurig, LLP, Clifford B. Levine, Esq., Dentons Cohen & Grigsby, PC, for Respondents Pennsylvania State Democratic Party, Dwight Evans

Robert Eugene Grimm, Esq., for Respondent Greene County Board of Elections

Elizabeth Victoria Wingfield, Esq., Edward David Rogers, Esq., Terence Martin Grugan, Esq., Ballard Spahr LLP, for Respondent Delaware County Board of Elections

Christina Lee Hausner, Esq., Lancaster County Solicitor's Office, for Respondent Lancaster County Board of Elections

Jennifer B. Hipp, Esq., Cumberland County Solicitor's Office, for Respondent Cumberland County Board of Elections

Andrew Francis Szefi, Esq., Allan Joseph Opsitnick, Esq., George M. Janocsko, Esq., Allegheny County Law Department, for Respondent Allegheny County Board of Elections

Frank J. Lavery Jr., Esq., Lavery Law, for Respondent Franklin County Board of Elections, Perry County Board of Elections

Kenneth Richard Levitzky, Esq., for Respondents Sullivan County Board of Elections, Wyoming County Board of Elections

Lori A. Martin, Esq., Wilmer Cutler Pickering Hale and Dorr LLP, for Respondent League of Women Voters of Pennsylvania, NAACP Pennsylvania State Conference, Common Cause Pennsylvania

Sean Alexander Mott, Esq., Adams County Solicitor's Office, Molly Ruth Mudd, Esq., Adams County, for Respondent Adams County Board of Elections

David Allen Regoli, Esq., Westmoreland County Solicitor's Office, for Respondent Westmoreland County Board of Elections

Nathaniel Justus Schmidt, Esq., Warren County Solicitor, for Respondent Warren County Board of Elections

Thomas R. Shaffer, Esq., Glassmire & Shaffer Law Offices, P.C., for Respondent Potter County Board of Elections

Krista Ann M. Staley, Esq., Babst Calland Clements and Zomnir, PC, for Respondents Lackawanna County Board of Elections, Centre County Board of Elections, Blair County Board of Elections, Bedford County Board of Elections, Dauphin County Board of Elections, Fayette County Board of Elections, Huntingdon County Board of Elections, Indiana County Board of Elections, Lawrence County Board of Elections, Lebanon County Board of Elections, Montour County Board of Elections, Northumberland County Board of Elections, Venango County Board of Elections, York County Board of Elections, Armstrong County Board of Elections

Christine D. Steere, Esq. Deasey, Mahoney & Valentini, Ltd., for Respondent Berks County Board of Elections

Thomas George Wagner, Esq., Meyer Wagner Brown & Kraus, for Respondent Elk County Board of Elections

H. William White III, Esq., Butler County Solicitor's Office, for Respondent Butler County Board of Elections

Citizens for Pennsylvania's Future, Pro Se

PA County Board of Elections, Pro Se

SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.

## OPINION

JUSTICE TODD

**\*1** On October 14, 2020, our Court granted the application of the Secretary of the Commonwealth, Kathy Boockvar

("Secretary"), to assume King's Bench jurisdiction[1] and consider her request for declaratory relief, limited to answering the following question: "Whether the Election Code[2] authorizes or requires county election boards to reject voted absentee or mail-in ballots during pre-canvassing and canvassing[3] based on signature analysis where there are alleged or perceived signature variances?" *In Re: November 3, 2020 General Election, Petition of Kathy Boockvar, Secretary of the Commonwealth of Pennsylvania*, 149 MM 2020, 2020 WL 6110774 (Pa. filed Oct. 14, 2020) (order). For the reasons that follow, we conclude that the Election Code does not authorize or require county election boards to reject absentee or mail-in ballots during the canvassing process based on an analysis of a voter's signature on the "declaration"[4] contained on the official ballot return envelope for the absentee or mail-in ballot. We, therefore, grant the Secretary's petition for declaratory relief, and direct the county boards of elections not to reject absentee or mail-in ballots for counting, computing, and tallying based on signature comparisons conducted by county election officials or employees, or as the result of third-party challenges based on such comparisons.

1    As we have recently explained, our Court's King's Bench jurisdiction is derived from Article V, § 2 of the Pennsylvania Constitution and 42 Pa.C.S. § 502, and "is generally invoked to review an issue of public importance that requires timely intervention by the court of last resort to avoid the deleterious effects arising from delays incident to the ordinary process of law." *Friends of Danny DeVito v. Wolf*, ––– Pa. ––––, ––––, 227 A.3d 872, 884 (Pa. 2020). We may exercise this power of review even where, as here, no dispute is pending in a lower court of this Commonwealth. *Id.*

2    The Pennsylvania Election Code, 25 P.S. §§ 2600-3591 ("Election Code" or "Code").

3    As defined by the Election Code, the process of "pre-canvassing" is "the inspection and opening of all envelopes containing official absentee ballots or mail-in ballots, the removal of such ballots from the envelopes and the counting, computing and tallying of the votes reflected on the ballots. The term does not include the recording or publishing of the votes reflected on the ballots." 25 P.S. § 2602. The process of "canvassing" is "the gathering of ballots after the final pre-canvass meeting and the counting, computing and tallying of the votes reflected on the ballots." *Id.* § 2602. At

times herein, we refer to these two stages broadly as "canvassing."

4    The voter's declaration is a pre-printed statement required to appear on the ballot return envelope containing a voter's absentee or mail-in ballot declaring: that the voter is qualified to vote the ballot enclosed in the envelope, and that the voter did not already vote in the election for which the ballot was issued. 25 P.S. § 3146.2. The declaration also contains lines for the voter to print his or her name and address, a space for the voter to sign his or her name or make a mark if unable to sign, and a space for the voter to enter the date on which he or she executed the declaration. *Id.* § 3146.6.

## I. Facts and Procedural History

**\*2**  As our Court has recently observed, "[i]n October 2019, the General Assembly of the Commonwealth of Pennsylvania enacted Act 77 of 2019,[5] which, *inter alia*, created for the first time in Pennsylvania the opportunity for all qualified electors to vote by mail, without requiring the electors to demonstrate their absence from the voting district on Election Day." *Pennsylvania Democratic Party v. Boockvar*, ––– A.3d ––––, ––––, 2020 WL 5554644, at *1 (Pa. Sept. 17, 2020). Subsequently, in March 2020, the legislature made further revisions to the Election Code via the passage of Act 12 of 2020,[6] which, among other things, authorized for the June 2, 2020 primary election,[7] and for all subsequent elections, the mail-in voting procedures established by Act 77.[8]

5    Act of October 31, 2019, P.L. 552, No. 77 (hereinafter, "Act 77").

6    Act of March 27, 2020, P.L. 41, No. 12 (hereinafter, "Act 12").

7    This election was rescheduled from May 17, 2020 due to the COVID-19 pandemic.

8    We collectively refer to Act 77 and Act 12 as the "recent Code amendments."

Because of the substantial nature of the recent Code amendments, as well as the anticipated massive increase in the number of mail-in and absentee ballots which county boards of elections would be confronted with due to the COVID-19 pandemic, in order to ensure that the procedures set forth in the Election Code regarding pre-canvassing and canvassing of absentee and mail-in ballots would be uniformly applied and implemented by county boards of elections, Secretary

Boockvar issued two written guidance documents for those boards to follow when canvassing such ballots.

In the first guidance document issued on September 11, 2020 to all county boards, Secretary Boockvar set forth the procedure the boards were to follow upon receipt of an absentee or mail-in ballot. This guidance directed the county boards to examine the declaration contained on the ballot return envelope containing the absentee or mail-in ballot. It further directed the county board to "compare the information on the outer envelope, i.e., the voter's name and address, with the information contained in the 'Registered Absentee and Mail-In Voters File, the absentee voter's list and/or the Military Veterans' and Emergency Civilians Absentee Voters File.' " Pennsylvania Department of State, *Guidance Concerning Examination of Absentee and Mail-In Ballot Return Envelopes*, 9/11/20, at 3, *available at* https://www.dos.pa.gov/VotingElections/ OtherServicesEvents/Documents/Examination%20of %20Absentee%20and%20Mail-In%20Ballot%20Return %20Envelopes.pdf. The Secretary advised that, if the declaration is signed and the county board is satisfied that the declaration is sufficient, then the absentee or mail-in ballot should be approved for canvassing unless it is challenged in accordance with the Election Code. The Secretary specifically cautioned the county boards of elections in this regard that "[t]he Pennsylvania Election Code does not authorize the county board of elections to set aside returned absentee or mail-in ballots based solely on signature analysis by the county board of elections." *Id.*

Subsequent to our Court's decision in *Boockvar*, *supra*, the Secretary issued supplemental guidance to all county boards concerning, *inter alia*, matters addressed by our decision – *i.e.*, the establishment by county boards of satellite offices, provision of drop boxes for voters to return absentee and mail-in ballots, and the mandatory requirements that such ballots be returned only by the voter and be enclosed in a secrecy envelope. In this supplemental guidance, the Secretary also directed the county boards to set aside ballots which were returned to them without the declaration envelope having been "filled out, dated and signed." Pennsylvania Department of State, *Guidance Concerning Civilian Absentee And Mail-In Ballot Procedures*, 9/28/20, at 9, *available at* https://www.dos.pa.gov/VotingElections/ OtherServicesEvents/Documents/DOS%20Guidance %20Civilian%20Absentee%20and%20Mail-In%20Ballot %20Procedures.pdf. This guidance buttressed her earlier instruction, reiterating that "[t]he Election Code does not

permit county election officials to reject applications or voted ballots based solely on signature analysis. ... No challenges may be made to mail-in and absentee ballots at any time based on signature analysis." *Id.*

**\*3** Meanwhile, Intervenors in the instant matter, Donald J. Trump for President, Inc., and the Republican National Committee, filed suit in the United States District Court for the Western District against the Secretary over several election issues.[9] *See Donald J. Trump for President, Inc. v. Boockvar*, No. 2:20-cv-966 (W.D. Pa.). In response to the Secretary's guidance to the county boards, on September 23, 2020, Intervenors filed an amended complaint in that matter challenging Secretary Boockvar's interpretation of the Election Code as precluding county boards from rejecting absentee and mail-in ballots based on a signature comparison.

9
> This lawsuit challenged, as an alleged violation of the due process and equal protection guarantees of the 14th Amendment to the United States Constitution, *inter alia*, the Secretary's allowance in the upcoming election of the use of drop boxes, satellite election offices for the collection of absentee and mail-in ballots, and the counting of ballots which were returned without a secrecy envelope, and the requirement in the Election Code that poll watchers reside in the county in which they sought to serve in this capacity.

On October 1, 2020, Intervenors filed a motion for summary judgment in the federal action alleging, *inter alia*, that the Secretary's guidance was contrary to the Election Code and, thus, constituted an infringement on the "fundamental right to vote and to a free and fair election." Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment *filed in Donald J. Trump for President, Inc. v. Boockvar*, No. 2:20-cv-966 (W.D. Pa.) (Exhibit D to Secretary's Application for Extraordinary Relief), at 15-19, 45-50. Intervenors sought, as relief, the entry of an injunction directing the Secretary to withdraw her guidance, and, also, to require county boards of elections to compare signatures on applications for absentee and mail-in ballots, and the ballots themselves, with the voter's permanent registration record. *Id.*

The Honorable J. Nicholas Ranjan denied Intervenors' motion for summary judgment, and granted judgment in favor of the Secretary. *Donald J. Trump for President, Inc. v. Boockvar*, —— F.Supp.3d ——, 2020 WL 5997680 (W.D. Pa. filed Oct. 10, 2020) (hereinafter "*Trump*"). Relevant to the present dispute, in his scholarly and comprehensive supporting opinion, Judge Ranjan concluded that "the plain

language of the Election Code imposes no requirement for signature comparison for mail-in and absentee ballots and applications." *Trump* at ——, 2020 WL 5997680, at *53. In reaching this conclusion, Judge Ranjan analyzed the provisions of the Election Code governing pre-canvassing and canvassing of absentee and mail-in votes returned by the elector, set forth in Section 3146.8(g), which provides:

### § 3146.8. Canvassing of official absentee ballots and mail-in ballots

\* \* \*

(g)(1)(i) An absentee ballot cast by any absentee elector as defined in section 1301(a), (b), (c), (d), (e), (f), (g) and (h) shall be canvassed in accordance with this subsection if the ballot is cast, submitted and received in accordance with the provisions of 25 Pa.C.S. Ch. 35 (relating to uniform military and overseas voters).

(ii) An absentee ballot cast by any absentee elector as defined in section 1301(i), (j), (k), (l), (m) and (n), an absentee ballot under section 1302(a.3) or a mail-in ballot cast by a mail-in elector shall be canvassed in accordance with this subsection if the absentee ballot or mail-in ballot is received in the office of the county board of elections no later than eight o'clock P.M. on the day of the primary or election.

**\*4** (1.1) The county board of elections shall meet no earlier than seven o'clock A.M. on election day to pre-canvass all ballots received prior to the meeting. A county board of elections shall provide at least forty-eight hours' notice of a pre-canvass meeting by publicly posting a notice of a pre-canvass meeting on its publicly accessible Internet website. One authorized representative of each candidate in an election and one representative from each political party shall be permitted to remain in the room in which the absentee ballots and mail-in ballots are pre-canvassed. No person observing, attending or participating in a pre-canvass meeting may disclose the results of any portion of any pre-canvass meeting prior to the close of the polls.

(2) The county board of elections shall meet no earlier than the close of polls on the day of the election and no later than the third day following the election to begin canvassing absentee ballots and mail-in ballots not included in the pre-canvass meeting. The meeting under this paragraph shall continue until all absentee ballots and mail-in ballots received prior to the close

of the polls have been canvassed. The county board of elections shall not record or publish any votes reflected on the ballots prior to the close of the polls. The canvass process shall continue through the eighth day following the election for valid military-overseas ballots timely received under 25 Pa.C.S. § 3511 (relating to receipt of voted ballot). A county board of elections shall provide at least forty-eight hours' notice of a canvass meeting by publicly posting a notice on its publicly accessible Internet website. One authorized representative of each candidate in an election and one representative from each political party shall be permitted to remain in the room in which the absentee ballots and mail-in ballots are canvassed.

(3) When the county board meets to pre-canvass or canvass absentee ballots and mail-in ballots under paragraphs (1), (1.1) and (2), the board shall examine the declaration on the envelope of each ballot not set aside under subsection (d) and shall compare the information thereon with that contained in the "Registered Absentee and Mail-in Voters File," the absentee voters' list and/or the "Military Veterans and Emergency Civilians Absentee Voters File," whichever is applicable. If the county board has verified the proof of identification as required under this act and is satisfied that the declaration is sufficient and the information contained in the "Registered Absentee and Mail-in Voters File," the absentee voters' list and/or the "Military Veterans and Emergency Civilians Absentee Voters File" verifies his right to vote, the county board shall provide a list of the names of electors whose absentee ballots or mail-in ballots are to be pre-canvassed or canvassed.

(4) All absentee ballots which have not been challenged under section 1302.2(c) and all mail-in ballots which have not been challenged under section 1302.2-D(a)(2) and that have been verified under paragraph (3) shall be counted and included with the returns of the applicable election district as follows:

(i) The county board shall open the envelope of every unchallenged absentee elector and mail-in elector in such manner as not to destroy the declaration executed thereon.

(ii) If any of the envelopes on which are printed, stamped or endorsed the words "Official Election Ballot" contain any text, mark or symbol which reveals the identity of the elector, the elector's political

affiliation or the elector's candidate preference, the envelopes and the ballots contained therein shall be set aside and declared void.

(iii) The county board shall then break the seals of such envelopes, remove the ballots and count, compute and tally the votes.

**\*5** (iv) Following the close of the polls, the county board shall record and publish the votes reflected on the ballots.

(5) Ballots received whose applications have been challenged and ballots which have been challenged shall be placed unopened in a secure, safe and sealed container in the custody of the county board until it shall fix a time and place for a formal hearing of all such challenges, and notice shall be given where possible to all absentee electors and mail-in electors thus challenged and to every individual who made a challenge. The time for the hearing shall not be later than seven (7) days after the deadline for all challenges to be filed. On the day fixed for said hearing, the county board shall proceed without delay to hear said challenges, and, in hearing the testimony, the county board shall not be bound by the Pennsylvania Rules of Evidence. The testimony presented shall be stenographically recorded and made part of the record of the hearing.

(6) The decision of the county board in upholding or dismissing any challenge may be reviewed by the court of common pleas of the county upon a petition filed by any person aggrieved by the decision of the county board. The appeal shall be taken, within two (2) days after the decision was made, whether the decision was reduced to writing or not, to the court of common pleas setting forth the objections to the county board's decision and praying for an order reversing the decision.

(7) Pending the final determination of all appeals, the county board shall suspend any action in canvassing and computing all challenged ballots received under this subsection irrespective of whether or not appeal was taken from the county board's decision. Upon completion of the computation of the returns of the county, the votes cast upon the challenged official absentee ballots that have been finally determined to be valid shall be added to the other votes cast within the county.

25 P.S. § 3146.8(g) (footnotes omitted).

Judge Ranjan discerned nothing in the text of these provisions which requires county boards of elections to "verify" the signatures on mail-in and absentee ballots – that is, to examine the signatures to determine whether or not they were authentic, *Trump* at ——, 2020 WL 5997680, at *53, and thus rejected Intervenors' argument that Section 3146.8(g)(3) requires county boards of elections to engage in signature comparison and verification. In Judge Ranjan's view, the county board of elections is required under this statutory provision to verify only the proof of the voter's identification by examining the voter's driver's license number, the last four digits of his or her social security number, or other specifically approved form of identification which is required by Section 2602(z.5) of the Election Code.[10] Indeed, Judge Ranjan noted that nowhere in Section 3146.8(g)(3) does the term "signature" appear. *Trump*, at ——, 2020 WL 5997680, at *55.

---

10    This statutory section provides:

The words "proof of identification" shall mean:

(1) In the case of an elector who has a religious objection to being photographed, a valid-without-photo driver's license or a valid-without-photo identification card issued by the Department of Transportation.

(2) For an elector who appears to vote under section 1210, a document that:

(i) shows the name of the individual to whom the document was issued and the name substantially conforms to the name of the individual as it appears in the district register;

(ii) shows a photograph of the individual to whom the document was issued;

(iii) includes an expiration date and is not expired, except:

(A) for a document issued by the Department of Transportation which is not more than twelve (12) months past the expiration date; or

(B) in the case of a document from an agency of the Armed forces of the United States or their reserve components, including the Pennsylvania National Guard, establishing that the elector is a current member of or a veteran of the United States Armed Forces or National Guard which does not designate a specific date on which the document expires, but includes a designation that the expiration date is indefinite; and

(iv) was issued by one of the following:

(A) The United States Government.

(B) The Commonwealth of Pennsylvania.

(C) A municipality of this Commonwealth to an employee of that municipality.

(D) An accredited Pennsylvania public or private institution of higher learning.

(E) A Pennsylvania care facility.

(3) For a qualified absentee elector under section 1301 or a qualified mail-in elector under section 1301-D:

(i) in the case of an elector who has been issued a current and valid driver's license, the elector's driver's license number;

(ii) in the case of an elector who has not been issued a current and valid driver's license, the last four digits of the elector's Social Security number;

(iii) in the case of an elector who has a religious objection to being photographed, a copy of a document that satisfies paragraph (1); or

(iv) in the case of an elector who has not been issued a current and valid driver's license or Social Security number, a copy of a document that satisfies paragraph (2).

25 P.S. § 2602(z.5) (footnotes omitted).

**\*6** Judge Ranjan found that, while 25 P.S. §§ 3146.6(a) and 3150.16(a) require a voter submitting an absentee or mail-in ballot to "fill out and sign the declaration" printed on the ballot return envelope, the county board's duty under these sections is merely to examine the declaration and determine if these requirements have been comported with. Critically, in his view, this language did not require that a county board inquire into the authenticity of the signature; rather, the county boards were required to determine only that a voter had supplied his signature in the declaration.

Judge Ranjan observed that, by contrast, other provisions of the Election Code such as those governing in-person voting, *see* 25 P.S. § 3050(a.3)(2), allow a vote to be challenged where a voter's signature on the voting certificate executed at the polls is deemed not to be authentic when compared to the signature recorded in the district register of voters. Likewise, other sections of the Election Code allow boards of elections to reject provisional ballots based on an election official's conclusion that the voter's signature on the ballot envelope is not authentic, *see* 25 P.S. § 3050(a.4)(5)(i)-(ii), and allow election officials to reject nominating petitions based on the official's conclusion that the signatures contained therein are not authentic, *see* 25 P.S. § 2936. From Judge Ranjan's perspective, these provisions of the Code demonstrated that the Pennsylvania General Assembly knew how to require signature verification when they so desired, and the fact they did not do so in Section 3146.8(g)(3) indicated that signature

verification was not a requirement for absentee or mail-in ballots.

Judge Ranjan also considered the effect of interpreting Section 3146.8(g)(3) to require signature comparison. In his view, doing so would create a risk that voters would be disenfranchised, given that mail-in and absentee ballots are kept securely stored until election day when the pre-canvassing process begins, and the Election Code contains no requirement that voters whose ballots are deemed inadequately verified be apprised of this fact. Thus, unlike in-person voters, mail-in or absentee voters are not provided any opportunity to cure perceived defects in a timely manner.[11]

11    Judge Ranjan additionally rejected Intervenors' claims that a lack of signature comparison requirements violated the guarantees of the United States Constitution to substantive due process and equal protection. Because the present issue which we have accepted for our King's Bench review concerns only a pure question of state law involving interpretation of our Commonwealth's Election Code, we need not discuss Judge Ranjan's resolution of those claims.

In the instant matter, on October 4, 2020, just before Judge Ranjan issued his decision, Secretary Boockvar filed with this Court an application seeking invocation of our King's Bench authority, and seeking, *inter alia*, a declaration that, under the Election Code, county boards of elections are precluded from rejecting absentee or mail-in ballots at canvassing based upon signature comparisons, in accordance with her guidance to the county boards. Thereafter, the Secretary submitted a letter to our Court pursuant to Pa.R.A.P. 2501 apprising us of Judge Ranjan's decision. In this letter, the Secretary noted that Judge Ranjan's opinion concluded that her guidance to the county boards of elections was "uniform and non-discriminatory" and "informs the counties of the current state of the law as it relates to signature comparison." Secretary's Letter to Supreme Court Prothonotary, 10/11/20, at 2 (quoting *Trump* at ——, 2020 WL 5997680, at *61). Nevertheless, recognizing that our Court is the final word on the interpretation of Pennsylvania law, the Secretary maintained her request for our Court to grant King's Bench review. *Id.* ("[T]he district court's opinion, while timely and persuasive, is not authoritative. Only this Court can render the ultimate determination concerning Pennsylvania law.").

**\*7** As indicated above, our Court granted the Secretary's application for invocation of our King's Bench authority because we determined the Secretary presented an issue of

public importance that required our immediate intervention. *See supra* note 1. In our order granting review, we also granted the petitions to intervene of Donald J. Trump for President Inc., the Republican Party of Pennsylvania, the Republican National Committee, and the National Republican Congressional Committee ("Intervenors"). We denied the petitions for intervention of Elizabeth Radcliffe, a qualified elector, Bryan Cutler, Speaker of the Pennsylvania House of Representatives, Kerry Benninghoff, Majority Leader of the Pennsylvania House of Representatives, Joseph B. Scarnati III, Pennsylvania Senate President Pro Tempore, and Jake Corman, Senate Majority Leader. However, these parties were granted leave to file *amicus* briefs.[12] We additionally granted leave for the Brennan Center for Justice, the Urban League of Pittsburgh, the Bucks, Chester, Montgomery and Philadelphia County Boards of Elections, and the Pennsylvania Alliance for Retired Persons to file *amicus* briefs.

12    After the filing deadline set in our order, Senate President Pro Tempore Scarnati and Senate Majority Leader Corman filed an application for leave to file an *amicus* brief *nunc pro tunc*, alleging that technical difficulties with our electronic filing system prevented timely filing their *amicus* brief. We grant the application.

## II. Arguments of the Parties

The Secretary first highlights the fact that, when a voter applies for a mail-in ballot, Sections 3150.12(a) and (b)(1)-(2) of the Election Code require the voter to fill out an application form listing his name, address, date of birth, voting district, and the length of time he has resided in the voting district.[13] According to the Secretary, the paper version of that form also requires a voter to sign a declaration that he or she is eligible to vote in the election for which he is requesting a ballot.[14] Upon receipt of this application, a county board of elections confirms whether the applicant is qualified to receive a mail-in ballot under Section 3250.12b by verifying the proof of identification supplied with the application, such as the voter's drivers' license number or the last four digits of the voter's social security number, and the county board compares that information with the voter's permanent registration card. The Secretary contends that this comparison process is all that is required by the Election Code, and that there is no provision therein which requires county boards of elections to compare signatures for purposes of verification, which is why the

Secretary points out, the application can be completed and submitted electronically through a Commonwealth website.

13    The Secretary argues that absentee ballot application and approval procedures set forth in 25 P.S. §§ 3146.2 and 3146.2b are similar and, hence, for the sake of convenience, discusses only the mail-in balloting provisions.

14    This form is available on the Secretary's website at https://www.votespa.com/Register-to-Vote/ Documents/PADOS_MailInApplication.pdf.

Once this verification is completed, the Secretary proffers that the Code requires the application be marked approved and a ballot issued. *See* 25 P.S. § 3150.12b(a)(1). The Secretary emphasizes that the only permissible challenge to the ballot application under Section 3150.12b(a)(2) is that the applicant was not a qualified elector.

With regard to the pre-canvassing and canvassing procedures for absentee and mail-in ballots set forth in Section 3146.8 of the Election Code,[15] the Secretary notes that the pre-canvassing process, which entails opening the ballot return envelopes, removing the ballots, and counting, computing and tallying them, can begin no earlier than 7:00 a.m. on election day. When the return envelope is opened during that process, according to the Secretary, the only examination which the county board may conduct under Section 3146.8(g) (3) and 3146.2c(c)[16] is to compare "the 'information' on the envelope—i.e., the voter's name and address—with the names and addresses on the lists of approved absentee and mail-in voters." Secretary's Application for Extraordinary Relief, 10/04/20, at 19. The Secretary stresses that no other examination is permitted under the plain terms of the Code.

15    Section 3146.8, by its title, "Canvassing of official absentee ballots and mail-in ballots," and its plain terms, governs both the pre-canvassing and canvassing of absentee and mail-in ballots.

16    Section 3146.2c(c) provides:
    Not less than five days preceding the election, the chief clerk shall prepare a list for each election district showing the names and post office addresses of all voting residents thereof to whom official absentee or mail-in ballots shall have been issued. Each such list shall be prepared in duplicate, shall be headed "Persons in (give identity of election district) to whom absentee or mail-in ballots have been issued for the election of (date of election)," and shall be signed by

him not less than four days preceding the election. He
shall post the original of each such list in a conspicuous
place in the office of the county election board and
see that it is kept so posted until the close of the polls
on election day. He shall cause the duplicate of each
such list to be delivered to the judge of election in the
election district in the same manner and at the same
time as are provided in this act for the delivery of other
election supplies, and it shall be the duty of such judge
of election to post such duplicate list in a conspicuous
place within the polling place of his district and see
that it is kept so posted throughout the time that the
polls are open. Upon written request, he shall furnish
a copy of such list to any candidate or party county
chairman.

25 P.S. § 3146.2c(c).

**\*8**  If the county board's examination determines that the
declaration is sufficient, and the voter's name and address
appears in the lists of approved absentee and mail-in voters,
then, according to the Secretary, the Code requires the
ballots to be counted. 25 P.S. § 3146.8(g)(3) and (4). The
Secretary asserts that the only exception involves challenges
to a voter's eligibility raised at the ballot application stage
under Section 3150.12b(a)(2).[17] The Secretary contends that
such challenges must be made by 5:00 p.m. on the Friday
before election day and, thus, cannot be made during the pre-
canvassing procedure (which does not begin until election
day).

17      *See also* 25 P.S. § 3146.2b(b) and (c) (limiting challenges
        to approval of application for absentee ballots to the
        ground that the applicant was not a "qualified absentee
        elector" or a "qualified elector").

The Secretary argues that there is no provision of the Election
Code which allows or requires the county boards of elections
to entertain challenges "based on perceived signature
mismatches," Secretary's Application for Extraordinary
Relief, 10/04/20, at 20, or to reject absentee or mail-in ballots
because of such an assessment. The Secretary notes that the
General Assembly knows how to draft provisions requiring
signature comparison, as it did for the in-person voting
process governed by Section 3050(a.3)(2), which directs
election officials to compare the signature of the voter signing
the voter certificate at the polls with the district register, and
then to make the determination of whether the signature on
the voter certificate is genuine. Moreover, unlike for in-person
voting, there is no provision in the Code which requires a
voter to be notified that his signature has been challenged
during the canvassing process; hence, a voter whose ballot is

rejected during canvassing because of a perceived signature
mismatch has no opportunity to respond to the challenge
and have his ballot counted. In sum, the Secretary contends
that requiring signature comparison during canvassing would
improperly add a requirement to the Election Code which the
legislature did not see fit to include.

Although the Secretary views the Election Code in this regard
to be clear and unambiguous, she notes that, even if we were
to find it to be ambiguous, we must still reject a signature
comparison requirement, given that there are no standards
or guidelines contained within the Code governing how an
election official should perform such a comparison. In this
vacuum, the Secretary asserts individual county boards will
improvise "*ad hoc*" procedures, which would vary from
county to county, creating a significant risk of error and
uncertainty in the review of ballots. Secretary's Application
for Extraordinary Relief, 10/04/20, at 24. In the Secretary's
view, this would constitute a denial of equal protection to
voters whose ballots were challenged and rejected under such
varying and imprecise standards. This process would also
present an "unjustified risk of disenfranchisement," *id.* at
25, given that a voter's ballot could be rejected without any
opportunity to be heard on the issue.

Intervenors respond that the Election Code's use of the
term "shall" in Sections 3146.6(a) and 3150.16(a) with
respect to the requirement that electors sign the declaration
on the outside of the ballot return envelope, together
with the Code's companion requirement that county boards
examine the declaration and determine if it is "sufficient,"
mandates that county boards conduct signature verification.
Intervenors Supplemental Brief at 6. Intervenors develop
that, "because a voter's noncompliance with the signature
mandate 'renders the ballot invalid,' that mandate necessarily
contemplates the 'enforcement mechanism' of county boards
engaging in—and invalidating ballots during the pre-canvass
or canvass based upon—verification of the voter's signature."
*Id.* Intervenors maintain that the "mandate" established by
these statutory provisions "authorizes and requires signature
verification and invalidation of ballots based upon signature
mismatch." *Id.* Additionally, Intervenors maintain that,
because Section 3148.8(g)(3) requires a determination of
whether a declaration is "sufficient," and establishes that a
declaration will only be sufficient when signed by the elector,
this "encompasses the enforcement mechanism of signature
analysis and verification during the pre-canvass and canvass."
*Id.* Further, Intervenors insist that objections can be made at
canvassing to ballots revealing signature mismatches.

**\*9** Although contending that these provisions of the Election Code are clear, Intervenors assert that principles of statutory construction also support their suggested interpretation. Specifically, Intervenors maintain that signature comparison is necessary to prevent fraud, and that prior decisions from lower courts of the Commonwealth have endorsed this practice to effectuate this purpose. *See id.* at 7-8 (citing *Appeal of Orsatti*, 143 Pa.Cmwlth. 12, 598 A.2d 1341 (1991); *In re Canvass of Absentee Ballots of Nov. 2, 1965, Gen. Election*, 39 Pa. D. & C.2d 429 (Montg. Cty. Common Pleas 1965); *Fogleman Appeal*, 36 Pa. D. & C.2d 426 (Juniata Cty. Common Pleas 1964); *In re City of Wilkes-Barre Election Appeals*, 44 Pa. D. & C.2d 535 (Luzerne Cty. Common Pleas 1967)). Intervenors also suggest the fact that, when a ballot return envelope is scanned upon receipt by a county board of elections, the voter's registration card, which includes his or her signature, as contained in the Commonwealth's "SURE" ("Statewide Uniform Registry of Electors") system appears on the election official's computer screen. Intervenors view this fact as indicating that even the Secretary believes signature verification is required.

Addressing the potential impacts of the competing interpretations, Intervenors suggest that the Secretary's interpretation implicates due process and equal protection concerns, given that voters who vote in person are subject to signature verification, whereas those who vote by mail-in or absentee ballots would not be. Intervenors contend we should avoid an interpretation of the Code that results in such potential constitutional violations.

Intervenors rebuff the practical difficulties of implementing a system of signature verification raised by the Secretary, asserting that Chester County has already promulgated and produced such a system.[18] Intervenors further dispute that voters could be disenfranchised without their knowledge based on enforcement of a signature comparison requirement. They point to the notice, hearing, and judicial review provisions in Section 3146.8(g)(5)-(7) for adjudicating ballot challenges, which they contend would allow a voter whose signature has been challenged during canvassing to have the challenge adjudicated and thereby preserve their right to vote.

---

[18]   Notably, Chester County filed an *amicus* brief supporting the Secretary's position.

## III. Analysis

As the issue on which we accepted King's Bench review is purely one of statutory interpretation, our standard of review is *de novo*, and our scope of review is plenary. *Danganan v. Guardian Protection Services*, 645 Pa. 181, 179 A.3d 9, 15 (2018). In matters of statutory interpretation, our objective is to ascertain and effectuate the intent of the General Assembly. *Id.*; *see also* 1 Pa.C.S. § 1921(a). As we have so oft observed, "[t]he best indication of legislative intent is the plain language of the statute." *Crown Castle NG East v. Pennsylvania Public Utility Commission*, —— Pa. ——, 234 A.3d 665, 674 (2020). In ascertaining the plain meaning of statutory language, we consider it in context and give words and phrases their "common and approved usage." *Commonwealth by Shapiro* v. *Golden Gate National Senior Care*, 648 Pa. 604, 194 A.3d 1010, 1027-28 (2017). When the words of a statute are free and clear of all ambiguity, they are the best indicator of legislative intent; hence, in such circumstances, "we cannot disregard the letter of the statute under the pretext of pursuing its spirit." *Fletcher v. Pennsylvania Property & Casualty Insurance Guarantee Association*, 603 Pa. 452, 985 A.2d 678, 684 (2009) (citing 1 Pa.C.S. § 1921(b)).

Turning to the text of the governing statutory provisions, Section 3146.8(g)(3) of the Election Code enumerates only three duties of the county boards of elections during the pre-canvassing and canvassing process:

(1) to "examine the declaration on the envelope of each ballot not set aside under subsection (d) [requiring rejection of ballots for deceased voters] and shall compare the information thereon with that contained in the 'Registered Absentee and Mail-in Voters File,' the absentee voters' list and/or the 'Military Veterans and Emergency Civilians Absentee Voters File,' whichever is applicable";

**\*10** (2) to verify "the proof of identification as required under this act," and

(3) to be "satisfied that the declaration is sufficient and the information contained in the 'Registered Absentee and Mail-in Voters File,' the absentee voters' list and/or the 'Military Veterans and Emergency Civilians Absentee Voters File' verifies his right to vote."

25 P.S. § 3146.8(g)(3).

If an absentee or mail-in ballot comports with these statutory requirements, and it has not been challenged under Section 3146.2b (providing for challenges to approval of absentee ballot application on the ground that the applicant was not a "qualified absentee elector," or a "qualified elector"), or Section 3150.12b (providing that the exclusive means for challenging a mail-in ballot application is "on the grounds that the applicant was not a qualified elector"),[19] then Section 3146.8(g)(4) requires the ballot to be considered "verified" and directs that it "shall be counted and included with the returns of the applicable election district." 25 P.S. § 3146.8(g)(4)(a). The only exception is set forth in Section 3146.8(g)(4)(ii), which requires that, "[i]f any of the envelopes on which are printed, stamped or endorsed the words 'Official Election Ballot,' contain any text, mark or symbol which reveals the identity of the elector, the elector's political affiliation or the elector's candidate preference, the envelopes and the ballots contained therein shall be set aside and declared void."*Id.* § 3146.8(g)(4)(ii).

[19] As the Secretary has argued, the plain text of these provisions requires challenges to applications for mail-in ballot applications to be brought no later than 5:00 p.m. on the Friday before the election. 25 P.S. § 3150.12b(a)(2). Likewise, challenges to absentee ballot applications of registered voters, except for those permanently registered, must be brought by that same deadline. *Id.* § 3146.2b(c). Finally, challenges which are brought to a registered voter who is on the permanent registration list must be brought by the deadline for receipt of absentee ballots. *Id.* § 3146.2b(b). Hence, none of these challenges may be brought during the canvassing process.

To assess the signature analysis question before us, we review in turn each of the three canvassing duties set forth above from Section 3146.8(g)(3). First, as noted, the county boards must examine the declaration on the ballot return envelope and then "compare the information thereon with that contained in the 'Registered Absentee and Mail-in Voters File,' the absentee voters' list and/or the 'Military Veterans and Emergency Civilians Absentee Voters File." *Id.* § 3146.8(g)(3).

Initially, we note that, with respect to the "Registered Absentee and Mail-in Voters File," it seems this file, previously utilized, is now a virtually empty relic. Prior to the recent Code amendments, subsection (a) of Section 3146.2c specified that this file was to contain duplicate "voter's temporary registration cards."[20] *See id.* § 3146.2c(a) (effective to Oct. 30, 2019). Indeed, the provision provided that these registration cards "shall constitute" the file, indicating the

file had no other content. *Id.* Critically, however, with the passage of Act 12, the legislature deleted subsection (a). Act 12, § 8 (deleting 25 P.S. § 3146.2c(a)). Thus, while the canvassing provisions of 25 P.S. § 3146.8(g)(3) still require a voter's declaration to be compared against the file, that comparison would appear to be a meaningless exercise. The only informational remnant in the file, if it is still being maintained, is that set forth in Sections 3146.2(h) and 3150.12(e), requiring a voter's absentee and mail-in ballot application number to be entered in the file. Manifestly, there is no present requirement that the file contain the type of signature information necessary to perform the signature comparison Intervenors contend is mandatory.

[20] This provision then provided, in full:

The county board of elections shall maintain at its office a file containing the duplicate absentee voter's temporary registration cards of every registered elector to whom an absentee ballot has been sent. Such duplicate absentee voter's temporary registration cards shall be filed by election districts and within each election district in exact alphabetical order and indexed. The registration cards so filed shall constitute the Registered Absentee Voters File for the Primary or Election of (date of primary or election) and shall be kept on file for a period commencing the Tuesday prior to the day of the primary or election until the day following the primary or election or the day the county board of elections certifies the returns of the primary or election, whichever date is later. Such file shall be open to public inspection at all times subject to reasonable safeguards, rules and regulations.

25 P.S. § 3146.2c(a) (effective to Oct. 30, 2019).

**\*11** With respect to a comparison of the declaration against the absentee voters' list and the "Military Veterans and Emergency Civilians Absentee Voters File," as highlighted by the Secretary, *see* Secretary's Application for Extraordinary Relief, 10/04/20, at 19 n.14, the only lists against which such a comparison may be conducted are those which the county boards are required to keep under subsections (b) and (c) of Section 3146.2c. Those subsections provide:

(b) The county board of elections shall post in a conspicuous public place at its office a master list arranged in alphabetical order by election districts setting forth the name and residence, and at primaries, the party enrollment, of (1) every military elector to whom an absentee ballot is being sent, each such name to be prefixed with an "M"; (2) every bedridden or hospitalized veteran outside the county of his residence

who is not registered and to whom an absentee ballot is being sent, each such name to be prefixed with a "V"; and (3) every registered elector who has filed his application for an absentee ballot too late for the extraction of his original registration card and to whom a ballot is being sent and every qualified elector who has filed his application for an absentee ballot and is entitled, under provisions of the Permanent Registration Law as now or hereinafter enacted by the General Assembly, to absentee registration prior to or concurrently with the time of voting, each such name to be prefixed with a "C." This list shall be known as the Military, Veterans and Emergency Civilians Absentee Voters File for the Primary or Election of (date of primary or election) and shall be posted for a period commencing the Tuesday prior to the day of the primary or election until the day following the primary or election or the day on which the county board of elections certifies the returns of the primary or election, whichever date is later. Such file shall be open to public inspection at all times subject to reasonable safeguards, rules and regulations. This posted list shall not contain any military address or reference to any military organization. Upon written request, the county board shall furnish a copy of such list to any candidate or party county chairman.

(c) Not less than five days preceding the election, the chief clerk shall prepare a list for each election district showing the names and post office addresses of all voting residents thereof to whom official absentee or mail-in ballots shall have been issued. Each such list shall be prepared in duplicate, shall be headed "Persons in (give identity of election district) to whom absentee or mail-in ballots have been issued for the election of (date of election)," and shall be signed by him not less than four days preceding the election. He shall post the original of each such list in a conspicuous place in the office of the county election board and see that it is kept so posted until the close of the polls on election day. He shall cause the duplicate of each such list to be delivered to the judge of election in the election district in the same manner and at the same time as are provided in this act for the delivery of other election supplies, and it shall be the duty of such judge of election to post such duplicate list in a conspicuous place within the polling place of his district and see that it is kept so posted throughout the time that the polls are open. Upon written request, he shall furnish a copy of such list to any candidate or party county chairman.

*12 25 P.S. § 3146.2c(b) and (c).

Notably, the only information required to be kept in these lists is, as the Secretary highlights, the names and addresses of registered voters, and, in the case of voters serving in the military, even their addresses need not be disclosed. Consequently, in comparing a declaration against these lists, a county board may determine only whether the name and address information the voter has listed on the ballot envelope matches.[21] There is no signature information in these lists for county election officials to compare against a voter's signature on his declaration; therefore, pursuant to the plain language of the Election Code, these lists cannot facilitate the signature comparison Intervenors maintain is required.

[21]   This comparison process operates to eliminate ballots of voters who have provided a different name entirely than that which appears on these lists.

Next, in canvassing the ballots under Section 3146.8(g)(3), the county boards must verify "the proof of identification as required under this act." As indicated above, *see supra* note 9, Section 2602(z.5)(3)(i)-(iv) of the Election Code enumerates the various *types* of identification which a voter may utilize in completing a ballot application. Consequently, we conclude the county board's duty in this regard is to check the identification listed on the voter's mail-in or absentee ballot to see if it is of the *type* permitted by the Election Code, and to verify that it is valid. This duty does not, however, require or authorize county boards to go further and compare the signature on the voter's mail-in or absentee ballot to ensure that it is the same as that which appears on the form of identification the voter has listed on the application. Hence, this unambiguous provision likewise does not permit or require signature comparison.

Finally, a county board is required to determine if the ballot declaration is "sufficient." 25 P.S. § 3146.8(g)(3). The requirements for a ballot declaration are set forth in Section 3146.6(a) (absentee ballots) and Section 3150.16(a) (mail-in ballots). Both sections require that the elector "fill out, date and sign the declaration." *Id*. §§ 3146.6(a), 3150.16(a). Thus, in determining whether the declaration is "sufficient" for a mail-in or absentee ballot at canvassing, the county board is required to ascertain whether the declaration on the return envelope has been filled out, dated, and signed. This is the extent of the board's obligation in this regard. In assessing a declaration's sufficiency, there is nothing in this language which allows or compels a county board to compare signatures. Accordingly, we decline to read a signature comparison requirement into the plain and unambiguous

language of the Election Code, as Intervenors urge us to do, inasmuch as the General Assembly has chosen not to include such a requirement at canvassing.

Even if there were any ambiguity with respect to these provisions, we observe that the General Assembly has been explicit whenever it has desired to require election officials to undertake an inquiry into the authenticity of a voter's signature. *See, e.g.*, 25 P.S. § 3050(a.3)(2) (governing procedures for in-person voting at polling places and requiring an "election officer" to "compare the elector's signature on his voter's certificate with his signature in the district register," and based "upon such comparison ... if the signature on the voter's certificate, as compared with the signature as recorded in the district register, *shall not be deemed authentic by any of the election officers*, such elector shall not be denied the right to vote for that reason, but shall be considered challenged as to identity," and requiring the voter to execute an affidavit and provide proof of his identity in order to vote (emphasis added)); *id.* § 3050(a.4)(5) (i) ("Except as provided in subclause (ii); if it is determined that [an individual who attempts to cast an in-person ballot at a polling place, but whose name did not appear on the district register of eligible voters] was registered and entitled to vote at the election district where the ballot was cast, the county board of elections shall compare the signature on the provisional ballot envelope with the signature on the elector's registration form *and, if the signatures are determined to be genuine*, shall count the ballot if the county board of elections confirms that the individual did not cast any other ballot, including an absentee ballot, in the election." (emphasis added)).

**\*13** In this regard, we note that, when the Election Code was first promulgated by the General Assembly in 1937, it contained explicit signature comparison requirements for canvassing certain absentee ballots. *See* Act of June 3, 1937, P.L. 1333, No. 320. Article XIII of that law, a precursor of the current mail-in ballot procedures, provided certain military service members the right to use mail-in ballots, referred to as "Detached Soldier's Ballots." Similar to today's mail-in ballots, the service member was required to complete an affidavit on an outer envelope, along with the jurat of his witnessing officer, and then place his completed ballot inside that outer envelope. *Id.* § 1329. In canvassing such ballots, the county boards were instructed to "open such registered letter and after examining the affidavit and jurat, [to] *compare the signature of such absent voter with his signature upon any register or other record in their possession. If the county*

board is satisfied that the signatures correspond and that the affidavit and jurat are sufficient*, they shall announce the name of the elector and shall give any person present an opportunity to challenge the same ...." *Id.* § 1330 (emphasis added). Absent any challenge, such ballots were counted. Notably, in 1945, this signature comparison language was removed from the Code.[22]

[22]    Act of March 9, 1945, P.L. 29, No. 17, §§ 9-10. Thereafter, as set forth in the 1945 amendment, the county board was required to maintain a "Military File" containing the names and addresses of service members sent absentee ballots, *id.* § 10 (reenacting Section 1305 of Act of 1937), something akin to the "Military Veterans and Emergency Civilians Absentee Voters File" in the present Election Code. Also, like the current Code, at canvassing, the board was required to review only the ballot affidavit (and jurat) to determine "[i]f the board is satisfied that the affidavit and jurat are sufficient and that the elector has qualified." *Id.* § 10 (reenacting Section 1307 of Act of 1937). Thus, signature comparison was no longer part of the county board's canvassing obligations.

We draw two inferences from this early history. First, the legislature understands how to craft language requiring signature comparisons at canvassing when it chooses to do so, as it did in 1937. Second, in the 1937 Code, the legislature drew a clear distinction between assessing the *sufficiency* of the ballot affidavit (and jurat) and a *comparison* of the ballot signature. The legislature having subsequently stripped out the signature comparison language from the Code, we ought not to construe, as Intervenors suggest, the remaining sufficiency determination as incorporating a signature comparison.

Our conclusion that Section 3146.8(g)(3) of the Election Code does not impose a duty on county boards to compare signatures is also consistent with the recent evolution of the Election Code, wherein the legislature expanded the allowances for voting by mail. Notably, at the same time it liberalized voting by mail, the legislature first restricted, and then eliminated, the ability of third-parties to challenge ballots at canvassing.

Prior to the recent Code amendments, absentee ballots were the only permissible form of voting by mail. At that time, at canvassing, after a county board was satisfied that the declaration on an absentee ballot was sufficient, the Code provided that the board "shall announce the name of the elector and shall give any candidate representative

or party representative present an opportunity to challenge any absentee elector" on specified grounds. *See* 25 P.S. § 3146.8(g)(3) (effective Nov. 9, 2006 to Mar. 13, 2012).[23] There were three permissible grounds for challenge: that the absentee elector was not a qualified elector; that the absentee elector, despite alleging otherwise, was present in his municipality of residence on election day; or that the absentee elector, despite alleging otherwise, was in fact able to appear at the polling place on election day. *Id.*

[23]    A similar procedure was provided to allow poll watchers to challenge ballots. 25 P.S. § 3146.8(e) (effective Nov. 9, 2006 to Mar. 13, 2012). However, this procedure was deleted in its entirety in 2019. *See* Act 77, § 7 (deleting 25 P.S. § 3146.8(e)).

**\*14**  However, when the legislature first allowed for no-excuse mail-in voting in 2019, the legislature simultaneously reduced the bases on which canvassing challenges could be made by eliminating the present-in-his-municipality objection (albeit while allowing the remaining challenges to be asserted against mail-in ballots). *See* Act 77, § 7 (amending 25 P.S. § 3146.8(g)(3)). Then, in 2020, the legislature eliminated time-of-canvassing challenges *entirely* from Section 3146.8(g)(3). *See* Act 12, § 11 (amending 25 P.S. § 3146.8(g)(3) to eliminate the challenging grounds and procedures, and amending Section 3146.8(g)(2) to eliminate the proviso that "Representatives shall be permitted to challenge any absentee elector or mail-in elector in accordance with the provisions of paragraph (3)"). Accordingly, the Election Code presently provides no mechanism for time-of-canvassing challenges by candidate or party representatives. *See* 25 P.S. § 3146.8(g)(4) ("All absentee ballots which have not been challenged under section 1302.2(c) [pertaining to absentee ballot *applications*] and all mail-in ballots which have not been challenged under section 1302.2-D(a)(2) [pertaining to mail-in ballot *applications*] and that have been verified under paragraph (3) shall be counted and included with the returns of the applicable election district ...."). [24] Moreover, as is plain from the above account, at no time did the Code provide for challenges to ballot *signatures*.[25]

[24]    Admittedly, there are some vestiges remaining in the Election Code of the prior, now eliminated, system for time-of-canvassing ballot challenges. *See, e.g.,* 25 P.S. § 3146.8(f) (requiring a $10 deposit for each challenge to an absentee or mail-in ballot application *or ballot*); *id.* § 1308(g)(5) (discussing procedures

for handling "[b]allots received whose applications have been challenged and *ballots which have been challenged*" (emphasis added)). Now untethered to a procedure for asserting time-of-canvassing challenges in Section 3146.8(g)(3), however, we view the references to ballots in these provisions to be the overlooked remnants of a prior, now eliminated, process.

[25]    For this reason, we reject Intervenors' contention that the notice, hearing, and judicial review provisions in Section 3146.8(g)(5)-(7) pertain to adjudicating signature challenges.

Presumably, in expanding voting by mail, the legislature sought to streamline the process for canvassing such ballots, perhaps to avoid undermining the expansion effort by eliminating the prospect that voters – including a potentially large number of new mail-in voters – would be brought before the board or the courts to answer third-party challenges. Regardless, Intervenors would have us interpret the Election Code, which now does not provide for time-of-canvassing ballot challenges, and which never allowed for signature challenges, as both requiring signature comparisons at canvassing, and allowing for challenges on that basis. We reject this invitation.

It is a well established principle of statutory interpretation that that we "may not supply omissions in the statute when it appears that the matter may have been intentionally omitted." *Sivick v. State Ethics Commission,* —— A.3d ——, ——, 2020 WL 5823822, at \*10 (Pa. Oct. 1, 2020). It is not our role under our tripartite system of governance to engage in judicial legislation and to rewrite a statute in order to supply terms which are not present therein, and we will not do so in this instance.

## IV. Conclusion

For all of the aforementioned reasons, we grant the Secretary's petition for declaratory relief, and hold that county boards of elections are prohibited from rejecting absentee or mail-in ballots based on signature comparison conducted by county election officials or employees, or as the result of third-party challenges based on signature analysis and comparisons.


Chief Justice Saylor and Justices Baer, Donohue, Dougherty and Wecht join the opinion.

Justice Mundy concurs in the result.

**All Citations**

--- A.3d ----, 2020 WL 6252803

---

**End of Document**                                      © 2020 Thomson Reuters. No claim to original U.S.
                                                                   Government Works.

J

2020 WL 5755289
Only the Westlaw citation is currently available.
United States District Court, D. Vermont.

Tracey MARTEL, Robert Frenier,
Brian Smith, Raoul Beaulieu,
and Mary Beausoleil, Plaintiffs,

v.

James C. CONDOS, in his official
capacity as the Secretary of
State of Vermont, Defendant.

Case No. 5:20-cv-131
|
Signed 09/16/2020

**Synopsis**

**Background:** Five registered voters brought action to challenge Secretary of State directive that an election ballot be mailed to every active voter on the statewide voter checklist, alleging that the directive was unconstitutional, ultra vires, and contrary to law and seeking an injunction rescinding the directive and preventing Secretary of State from issuing mail-in ballots. Voter filed motion for preliminary injunction, and Secretary of State filed motion to dismiss.

The District Court, Geoffrey W. Crawford, Chief Judge, held that voters lacked concrete and particularized injury in fact necessary for standing.

Motion for injunction denied, case dismissed.

**Attorneys and Law Firms**

David A. Warrington, Esq., Pro Hac Vice, Kutak Rock LLP, Richmond, VA, Deborah T. Bucknam, Esq., Bucknam Law PC, Walden, VT, Harmeet K. Dhillon, Esq., Pro Hac Vice, Dhillon Law Group Inc., San Francisco, CA, Mark P. Meuser, Esq., Pro Hac Vice, Dhillon Law Group Inc., San Francisco, CA, for Plaintiffs.

David R. Groff, Esq., Philip A. Back, Esq., Office of the Vermont Attorney General, Montpelier, VT, for Defendant.

## ORDER ON MOTION FOR PRELIMINARY INJUNCTION AND ON MOTION TO DISMISS

Geoffrey W. Crawford, Chief Judge

**\*1** In the spring of 2020, faced with the crisis resulting from the spread of COVID-19 infection, the Vermont legislature passed two bills that changed Vermont election law for the 2020 primary and general elections. *See* 2020 Vt. Acts & Resolves Nos. 92 and 135 (Act 92 and Act 135, respectively). These became law in July 2020 after the governor declined to sign or veto the measures. *See* Letter from Philip B. Scott, Governor, to the Vt. Gen. Assembly (July 2, 2020), https://governor.vermont.gov/sites/scott/files/documents/Vermont% 20General% 20Assembly% 20Letter% 20re% 20S.348.pdf. Vermont Secretary of State James C. Condos issued a Directive on July 20, 2020 exercising the authority conferred upon him by the two Acts. (Doc. 1-1.) The Directive includes, among other things, a provision stating that, for the November general election, "[a] ballot will be mailed to every active voter on the statewide voter checklist." (Doc. 1-1 at 4.)

The above-captioned plaintiffs have filed a complaint against Secretary Condos seeking a declaration that the Directive is unconstitutional, *ultra vires*, and contrary to law. (Doc. 1 at 25.) They also seek an injunction rescinding the Directive and preventing Secretary Condos from distributing mail-in ballots as contemplated by the Directive. (*Id.*) Currently pending is Plaintiffs' Motion for a Preliminary Injunction (Doc. 2) and Defendant's Motion to Dismiss (Doc. 10). The court held a hearing on the motions on September 15, 2020.

### Background

The provisions in Acts 92 and 135 principally at issue in this case concern the legislature's decision to authorize the Secretary of State to require local election officials to send ballots by mail to all registered voters. Act 92 states, in pertinent part:

In the year 2020, the Secretary of State is authorized, in consultation and agreement with the Governor, to order or permit, as applicable appropriate elections procedures for the purpose of protecting the health, safety and welfare of voters, elections workers, and candidates in carrying out elections including:

(1) requiring mail balloting by requiring town clerks to send ballots by mail to all registered voters ....

Act 92, § 3(a). Act 135 amended Act No. 92. It removed the requirement of "agreement" with the Governor. Act 135, § 1. It also added a new subsection (c):

If the Secretary of State orders or permits the mailing of 2020 General Election ballots to all registered voters pursuant to subsection (a) of this section, the Secretary shall:

(1) inform the Governor as soon as reasonably practicable following the Secretary's decision to do so; and

(2) require the return of those ballots to be in the manner prescribed by 17 V.S.A. § 2543 (return of ballots) as set forth in Sec. la of this act, the provisions of which shall apply to that return.

*Id.*[1] Other changes in election practices authorized by the Acts include provisions for collecting and counting mail-in ballots early, permitting drive-up, car window collection of ballots, and extending both voting hours and the time to process and count ballots. Act 92, § 3(a)(1–6); Act 135 § 1 a(1–6).

[1]  Paragraph (2) of subsection (c) contains a mistake. Section 2543 of Title 17 sets out procedures for returning early ballots to local election officials. Sec. 1a appeared in prior versions of Act No. 135. It contained procedures restricting so-called "ballot harvesting" by third party organizations. Section la was dropped from the final version of Act 135 and never enacted. The reference to it is a legislative drafting mistake which was noted in the Governor's July 2, 2020 letter as a technical error. It refers to a proposed change in the law which was not ultimately passed. Such mistakes are unhelpful in understanding statutory language, but this one does not have any effect on the other provisions of Acts 92 and 135. The court will apply the other provisions of the Acts despite the mistaken reference to the (non-existent) Section 1a.

**\*2**  In response to the legislative initiative, the Secretary of State issued a Directive on July 20, 2020 exercising the authority conferred upon him by the two Acts. (Doc. 1-1.) The Directive states that it is issued "[n]otwithstanding any provisions of law contained in Title 17 of the Vermont Statutes Annotated to the contrary" and "pursuant to the authority granted to the Secretary of State by Act 92 (2020) and Act 135 (2020)." (*Id.* at 1.) The Directive describes a variety of measures for both the August primary and November general elections, including new procedures for ballot returns, processing, outdoor and drive-through polling places, outdoor ballot handling, overseas voters, changes of polling places, qualifications of election officials, home delivery of ballots, mask requirements, and voting in person after receiving a ballot by mail. (*See id.* at 1–4.) Regarding ballot returns, the Directive states that, with four enumerated exceptions, "[b]allots may not be returned to the Clerk by any candidate whose name appears on the ballot for that election, or any campaign staff member of any such candidate." (*Id.* at 1.) Regarding changes to polling places, the Directive states that "[t]he location of a polling place may be changed no less than 15 days prior to the election." (*Id.* at 3.)

The Directive contains the following provision for "mailed ballots" in the November general election:

A ballot will be mailed to every active voter on the statewide voter checklist. "Active" voters are any voters that have not been sent a challenge letter by the BCA asking the voter to affirm their residence, or who have responded to any such letter and have affirmed their residence.

• Ballots will be mailed to all active registered voters starting Friday, September 18.

• Ballots will be mailed or otherwise delivered to all military and overseas voters no later than the September 19 deadline mandated by federal law.

• All ballots will be mailed from a central location by the Secretary of State's Office.

• For mailing purposes, the Secretary of State will use the mailing address contained in any pending request for a General Election ballot first, and if none will use the mailing address in the voter's record second, and if none the legal address in the voter's record.

• The issue date for all ballots will be recorded in the statewide election management system by the Secretary of State on a batch basis as they are sent. Clerks will only by required to record the date that ballots are returned. Clerks will be required to enter the request, issue, and return date for any ballots requested by voters after the statewide mailing is sent, including for those voters who may register after that date.

• Postage for the mailing of ballots and the return of ballots to the Clerks by voters will be paid by the Secretary of State's office. All envelopes will be pre-paid.

(*Id.* at 4–5.)

After issuing the Directive and in preparation for the August primary election, the Secretary caused absentee primary ballot request forms printed on postcards to be sent to every person listed on the statewide voter checklist. (Doc. 1 ¶ 42.) According to the Complaint, the issuance of the postcards "was intended to be a test of the process by which Condos intended to mail ballots to all voters on the statewide voter checklist pursuant to the Directive." (*Id.* ¶ 43.) Plaintiffs allege that the postcard mailing revealed "numerous problems," such as postcards being sent to voters at addresses they no longer used, postcards sent to people who are no longer eligible to vote in Vermont, and some longtime registered voters who received no postcard. (*Id.* ¶¶ 45–48.)

The Secretary of State is prepared to follow the Directive and Acts 92 and 135 by mailing out ballots to all active registered voters on Friday, September 18, 2020.

## Analysis

### I. Plaintiffs' Challenges

Plaintiffs are five registered Vermont voters. In addition to their status as registered voters, several have played a role in local and state government. Plaintiff Tracey Martel is the town clerk of Victory, Vermont, where she is responsible for the administration of Victory's elections. Robert Frenier is a former member of the Vermont House of Representatives. Brian Smith is a current member of the Vermont House. Mary Beausoleil is a resident of Lyndon and previously a Justice of the Peace.

### A. Challenge to Statewide Mail-In Ballots

**\*3** Plaintiffs complain that their individual votes will be diluted if the distribution of mail-in ballots leads—as they fear—to mistaken votes or widespread voter fraud. The Complaint alleges that:

> if General Election mail-in ballots are automatically distributed to every eligible voter (any voter on a voter check-list), without any request for such a ballot from that voter, many castable ballots will inevitably fall in the hands of persons other than the voter to whom the mail-in ballot was directed, including some mail-in ballots that will be sent to persons to have moved, died or otherwise become ineligible."

(Doc. 1 ¶ 25.) Plaintiffs fear that ballots will be mailed to voters who have moved away, died, or otherwise become ineligible and that these ballots will be used to vote illegally by the ineligible voter or others who acquire the ballots and return them to polling places. (*See id.* ¶ 62.)

### B. Other Challenges

In addition to their challenge based on alleged dilution of their votes, Plaintiffs assert in Count II that the Directive is unconstitutional and an *ultra vires* use of legislative power. They assert that the Directive contains provisions that are inconsistent with Vermont law. (*See id.* ¶ 71.) Finally, in Count III, Plaintiffs assert that the Directive is *ultra vires* because, in Plaintiffs' view, it does nothing beyond existing Vermont law to "protect[ ] the health, safety, and welfare of voters, elections workers, and candidates in carrying out elections"—the stated purpose of Acts 92 and 135. *See* Act 92, § 3(a); Act 135 § 1(a).

## II. Standing

Plaintiffs' case begins and ends with the issue of standing. This is a constitutional requirement which operates as a check on the ability of litigants to file claims for injuries which are insufficiently specific and direct in their effect on the plaintiff. *See Allen v. Wright*, 468 U.S. 737, 754, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) ("This Court has repeatedly held that an asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court."), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126–27, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014).[2] Cases in which plaintiffs assert "generalized grievances" of unlawful governmental action are commonly dismissed on standing grounds. *See United States v. Richardson*, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974) (impact of government action plainly undifferentiated and common to all members of the public). The constitutional minimum of standing consists of three elements: "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Liberian Cmty. Ass'n of Conn. v. Lamont*, 970 F.3d 174, 184 (2d Cir. 2020) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

2    Standing has both a constitutional and a prudential aspect. In this case, the court is only concerned with

constitutional standing. Because it is absent, there is no need to consider the further issue of whether standing is not present for prudential reasons.

The requirement of "injury in fact" serves multiple purposes. It limits justiciable cases to those controversies which are sufficiently well-defined by injury to the plaintiff that the parties will develop the facts and seek remedies which are responsive to the harm. *See Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) ("The requirement of 'actual injury redressable by the court' ... tends to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." (internal citations omitted)). In a manner directly relevant to this case, the requirement supports principles of separation of power and caution in second-guessing decisions made by the other branches. *See Laird v. Tatum,* 408 U.S. 1, 15, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972) ("Carried to its logical end, [litigation without direct injury] would have the federal courts as virtually continuing monitors of the wisdom and soundness of Executive action; such a role is appropriate for the Congress acting through its committees and the 'power of the purse,' it is not the role of the judiciary, absent actual present or immediately threatened injury resulting from unlawful governmental action."). The "injury in fact" must have been "concrete and particularized" and also "actual or imminent, not conjectural or hypothetical." *Liberian Cmty. Ass'n of Conn.*, 970 F.3d at 184 (quoting *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130).

**\*4** Standing doctrine has an extensive history in the context of challenges to election practices. In *United States v. Classic,* 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941), the Supreme Court recognized the constitutional right to vote and have one's vote counted. "Obviously included within the right to choose [representatives], secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted at Congressional elections." *Id.* at 315, 61 S.Ct. 1031. *See The Ku Klux Cases,* 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274 (1884). In reapportionment cases, the Court has long recognized the standing of the disadvantaged voter. *See Baker v. Carr,* 369 U.S. 186, 208, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) ("[Plaintiffs] are asserting a plain, direct and adequate interest in maintaining the effectiveness of their votes, not merely a claim of the right possessed by every citizen to require that the government be administered according to law.") (citations and internal quotations omitted).

Standing in such cases, however, does not extend to parties who have not themselves suffered discrimination or other individualized injury. *See United States v. Hays,* 515 U.S. 737, 745, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995) (without evidence that "plaintiff has personally been subjected to a racial classification ... [he] would be asserting only a generalized grievance against governmental conduct of which he or she does not approve."); *Sinkfield v. Kelley,* 531 U.S. 28, 121 S.Ct. 446, 148 L.Ed.2d 329 (2000) (majority white voters lacked standing to complain of unlawful racial practices to which they had not been subjected). The Second Circuit recognized the same principles in *League of Women Voters of Nassau County v. Nassau County Bd. of Supervisors,* 737 F.2d 155, 162 (2d Cir. 1984) ("[parties] who are not persons domiciled in underrepresented voting districts lack standing to prosecute this appeal.") *See Roxbury Taxpayers Alliance v. Delaware Cty Bd. of Supervisors*, 80 F.3d 42 (2d Cir. 1996) (only underrepresented voters have standing to bring claims of disproportional representation).

It would over-simplify the standing analysis to conclude that no state-wide election law is subject to challenge simply because it affects all voters. State legislation which unfairly restricts a voter's right to vote is subject to review by the courts. "We have long recognized that a person's right to vote is 'individual and personal in nature.' " *Gill v. Whitford*, ––– U.S. ––––, 138 S. Ct. 1916, 1929, 201 L.Ed.2d 313 (2018) (citing *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964)). But as the *Gill* decision illustrates, the Supreme Court continues to decline to extend standing to plaintiffs asserting generalized objections to state election laws. In this case, the alleged injury is similar to the impact alleged by the majority voters who lacked standing in the reapportionment cases. The gerrymandered districts altered the proportional impact of every vote, but only those specifically disadvantaged by the unconstitutional scheme have standing. A vote cast by fraud or mailed in by the wrong person through mistake has a mathematical impact on the final tally and thus on the proportional effect of every vote, but no single voter is specifically disadvantaged.

These cases lead the court to be cautious in this case about extending standing to any registered voter – such as the five who have sued here – who alleges an injury common to all other registered voters. If every voter suffers the same incremental dilution of the franchise caused by some third-party's fraudulent vote, then these voters have experienced a generalized injury. As the affidavit submitted by plaintiffs' expert makes clear, plaintiffs believe that the new processes

in place for the 2020 general election in Vermont have an excessive error rate. They propose a different system with heightened security, principally through a system to compare the signature accompanying the mail-in ballot with the signature on file. It is unnecessary to decide whether their proposed change is a good idea or not since the standing doctrine does not permit everyone and anyone to bring a lawsuit to challenge the merits of legislation.

The Vermont Superior Court in *Paige v. State of Vermont* recently rejected a similar challenge to the Directive on standing grounds. In that case, a Vermont voter and candidate for elected office in the upcoming election, H. Brooke Paige, challenged the Directive's statewide mail-in ballot procedure in the context of what he described as an interlocutory appeal of an administrative election complaint that he had filed. The Superior Court declined to hear the case because Mr. Paige had not exhausted his administrative remedies. *Paige v. State of Vermont*, No. 20-CV-00307 (Vt. Super. Ct. Sept. 8, 2020) (Zonay, J.). But the court also held that Mr. Paige lacked standing to challenge the statewide mail-in ballot procedure based on concerns of fraud because his claim consisted of "theoretical harms to the election process rather than threats of actual injury being caused to a protected legal interest." *Id.*

 **\*5** Plaintiffs seek to distinguish *Paige.* They note that Mr. Paige filed his suit prematurely. That is one of the bases for the Superior Court's decision, but the court also separately found that Mr. Paige lacked standing. On the issue of standing, Plaintiffs argue that Mr. Paige had standing because a Vermont statute allowed him to file an election complaint with the Secretary of State. Plaintiffs here do not rely on that Vermont statute, but instead assert that they have alleged an individualized and particular harm flowing from the Directive. For the reasons stated above, the court disagrees; Plaintiffs have failed to show the "injury in fact" necessary to have standing. The *Paige* court's conclusion on the standing issue applies with equal force in this case. *Accord, Paher v. Cegavske*, No. 3:20-cv-00243-MMD-WGC, —— F.Supp.3d ——, ——, 2020 WL 2089813, at \*5 (D. Nev.

Apr. 30, 2020) (Nevada voters lacked standing to challenge all-mail election plan based on concerns of an increase in illegal votes; their "purported injury of having their votes diluted due to ostensible election fraud may be conceivable raised by any Nevada voter. Such claimed injury therefore does not satisfy the requirement that Plaintiffs must state a concrete and particularized injury").

At oral argument, counsel for the plaintiff drew attention to a problem different from dilution by fraudulent votes which formed the focus of the complaint. Instead, plaintiffs seek to argue that the universal mail-in system may deprive them of an individualized right to vote if they (1) do not receive their ballot in the mail and (2) fail to take other measures to obtain a ballot such as contacting the town clerk directly or appearing at the polling place on election day in person. As this is not a class action, the court considers the experience of the individual plaintiffs themselves. These are sophisticated voters who have gone to considerable lengths to obtain counsel skilled in election law and to file a lawsuit in federal court. Of all people likely to be confused about how to vote, these five plaintiffs must be last on the list. The court will not enjoin a state-wide mailing because one or more of these plaintiffs may be confused by the non-receipt of a separate mailing last month in connection with the primary election.

## Conclusion

Plaintiffs' Motion for Preliminary Injunction (Doc. 2) is DENIED.

Defendant's Motion to Dismiss (Doc. 10) is GRANTED.

This case is DISMISSED WITHOUT PREJUDICE.

## All Citations

--- F.Supp.3d ----, 2020 WL 5755289

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

K

2020 WL 6063332

Editor's Note: Additions are indicated by Text and deletions by ~~Text~~ .

Only the Westlaw citation is currently available.
United States District Court, M.D. North Carolina.

Timothy K. MOORE, et al., Plaintiffs,
v.
Damon CIRCOSTA, et al., Defendants,
and
North Carolina Alliance for Retired
Americans, et al., Defendant-Intervenors.
Patsy J. Wise, et al., Plaintiffs,
v.
The North Carolina State Board
of Elections, et al., Defendants,
and
North Carolina Alliance for Retired
Americans, et al., Defendant-Intervenors.

1:20CV911
|
1:20CV912
|
Signed 10/14/2020

## Synopsis

**Background:** State legislative leaders and individual registered voters sued the executive director and members of the North Carolina State Board of Elections (SBE), seeking an injunction against enforcement and distribution of memoranda issued by SBE pertaining to absentee voting. In a second case, individual voters, a campaign committee, national political parties, and two Members of the U.S. House of Representatives also sought an injunction against the same memoranda. Advocacy group for retirees and individual registered voters who were plaintiffs in a related state court action that resulted in a consent judgment intervened in both cases. Plaintiffs moved for preliminary injunction.

**Holdings:** The District Court, William L. Osteen, J., held that:

plaintiffs lacked Article III standing to bring vote-dilution claim;

individual plaintiffs who had already cast their absentee ballots by mail had standing to raise equal protection claims;

plaintiffs demonstrated a likelihood of success on the merits of their equal protection claims against the mail-in ballot witness-requirement cure procedure and extension of mail-in ballot receipt deadline;

plaintiffs demonstrated a likelihood of irreparable injury on their equal protection claims against witness-requirement cure procedure and extension of mail-in ballot receipt deadline;

balance of equities weighed heavily against preliminary injunction, and thus district court would deny injunctive relief; and

SBE exceeded its statutory authority and emergency powers when it entered into consent agreement and eliminated witness requirements for mail-in ballots.

Motion denied.

## Attorneys and Law Firms

David H. Thompson, Peter A. Patterson, Nicole Jo Moss, Cooper & Kirk, PLLC, Washington, DC, Nathan Andrew Huff, Phelps Dunbar LLP, Raleigh, NC, for Plaintiffs.

Alexander McClure Peters, Sarah G. Boyce, Terence Steed, North Carolina Department of Justice, Raleigh, NC, for Defendants.

Burton Craige, Patterson Harkavy LLP, Raleigh, NC, Marc E. Elias, Lalitha D. Madduri, Perkins Coie, LLP, Uzoma N. Nkwonta, Kirkland & Ellis, LLP, Washington, DC, Narendra K. Ghosh, Patterson Harkavy, LLP, Chapel Hill, NC, for Defendant-Intervenors.

## MEMORANDUM OPINION AND ORDER

OSTEEN, JR., District Judge

**\*1** Presently before this court are two motions for a preliminary injunction in two related cases.

In the first case, <u>Moore v. Circosta</u>, No. 1:20CV911 ("<u>Moore</u>"), Plaintiffs Timothy K. Moore and Philip E. Berger (together, "State Legislative Plaintiffs"), Bobby Heath, Maxine Whitley, and Alan Swain (together, "<u>Moore</u> Individual Plaintiffs") seek an injunction against the enforcement and distribution of several Numbered Memoranda issued by the North Carolina State Board of Elections pertaining to absentee voting. (<u>Moore v. Circosta</u>, No. 1:20CV911, Mot. for Prelim. Inj. and Mem. in Supp. ("<u>Moore</u> Pls.' Mot.") (Doc. 60).)

In the second case, <u>Wise v. North Carolina State Board of Elections</u>, No. 1:20CV912 ("<u>Wise</u>"), Plaintiffs Patsy J. Wise, Regis Clifford, Samuel Grayson Baum, and Camille Annette Bambini (together, "<u>Wise</u> Individual Plaintiffs"), Donald J. Trump for President, Inc. ("Trump Campaign"), U.S. Congressman Gregory F. Murphy and U.S. Congressman Daniel Bishop (together, "Candidate Plaintiffs"), Republican National Committee ("RNC"), National Republican Senatorial Committee ("NRSC"), National Republican Congressional Committee ("NRCC"), and North Carolina Republican Party ("NCRP") seek an injunction against the enforcement and distribution of the same Numbered Memoranda issued by the North Carolina State Board of Elections at issue in <u>Moore</u>. (<u>Wise</u> Pls.' Mem. in Supp. of Mot. to Convert the Temp. Restraining Order into a Prelim. Inj. ("<u>Wise</u> Pls.' Mot.") (Doc. 43).)

By this order, this court finds Plaintiffs have established a likelihood of success on their Equal Protection challenges with respect to the State Board of Elections' procedures for curing ballots without a witness signature and for the deadline extension for receipt of ballots. This court believes the unequal treatment of voters and the resulting Equal Protection violations as found herein should be enjoined. Nevertheless, under <u>Purcell</u> and recent Supreme Court orders relating to <u>Purcell</u>, this court is of the opinion that it is required to find that injunctive relief should be denied at this late date, even in the face of what appear to be clear violations.

## I. BACKGROUND

### A. Parties

#### 1. Moore v. Circosta (1:20CV911)

State Legislative Plaintiffs Timothy K. Moore and Philip E. Berger are the Speaker of the North Carolina House

of Representatives and the President Pro Tempore of the North Carolina Senate, respectively. (<u>Moore v. Circosta</u>, No. 1:20CV911, Compl. for Declaratory and Injunctive Relief ("<u>Moore</u> Compl.") (Doc. 1) ¶¶ 7-8.) Individual Plaintiffs Bobby Heath and Maxine Whitley are registered North Carolina voters who voted absentee by mail and whose ballots have been accepted by the State Board of Elections on September 21, 2020, and September 17, 2020, respectively. (<u>Id.</u> ¶¶ 9-10.) Plaintiff Alan Swain is a resident of Wake County, North Carolina, who is running as a Republican candidate to represent the State's Second Congressional District. (<u>Id.</u> ¶ 11.)

Executive Defendants include Damon Circosta, Stella Anderson, Jeff Carmon, III, and Karen Brinson Bell are members of the State Board of Elections ("SBE"). (<u>Id.</u> ¶¶ 12-15.) Executive Defendant Karen Brinson Bell is the Executive Director of SBE. (<u>Id.</u> ¶ 15.)

**\*2** Intervenor-Defendants North Carolina Alliance for Retired Americans, Barker Fowler, Becky Johnson, Jade Jurek, Rosalyn Kociemba, Tom Kociemba, Sandra Malone, and Caren Rabinowitz ("Alliance Intervenors") are plaintiffs in the related state court action in Wake County Superior Court. (<u>Moore v. Circosta</u>, No. 1:20CV911 (Doc. 28) at 15.)[1] Barker Fowler, Becky Johnson, Jade Jurek, Rosalyn Kociemba, Tom Kociemba, Sandra Malone, and Caren Rabinowitz are individual voters who are concerned they will be disenfranchised by Defendant SBE's election rules, (<u>id.</u>), and North Carolina Alliance for Retired Americans ("NC Alliance") is an organization "dedicated to promoting the franchise and ensuring the full constitutional rights of its members ...." (<u>Id.</u>)

1    All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

#### 2. Wise v. N.C. State Bd. of Elections (1:20CV912)

Individual Plaintiffs Patsy J. Wise, Regis Clifford, Camille Annette Bambini, and Samuel Grayson Baum are registered voters in North Carolina. (<u>Wise v. N.C. State Bd. of Elections</u>, No. 1:20CV912, Compl. for Declaratory and Injunctive Relief ("<u>Wise</u> Compl.") (Doc. 1) ¶¶ 25-28.) Wise has already cast her absentee ballot for the November 3, 2020 election by mail, "in accordance with statutes, including the Witness

Requirement, enacted by the General Assembly." (Id. ¶ 25.) Plaintiffs Clifford, Bambini, and Baum intend to vote in the November 3, 2020 election and are "concern[ed] that [their] vote[s] will be negated by improperly cast or fraudulent ballots." (Id. ¶¶ 26-28.)

Plaintiff Trump Campaign represents the interests of President Donald J. Trump, who is running for re-election. (Id. ¶¶ 29-30.) Together, Candidate Plaintiffs Trump Campaign, U.S. Congressman Daniel Bishop, and U.S. Congressman Gregory F. Murphy are candidates who will appear on the ballot for re-election in the November 3, 2020 general election. (Id. ¶¶ 29-32.)

Plaintiff RNC is a national political party, (id. ¶¶ 33-36), that seeks to protect "the ability of Republican voters to cast, and Republican candidates to receive, effective votes in North Carolina elections and elsewhere," (id. ¶ 37), and avoid diverting resources and spending significant amounts of resources educating voters regarding confusing changes in election rules, (id. ¶ 38).

Plaintiff NRSC is a national political party committee that is exclusively devoted to electing Republican candidates to the U.S. Senate. (Id. ¶ 40.) Plaintiff NRCC is the national organization of the Republican Party dedicated to electing Republicans to the U.S. House of Representatives. (Id. ¶ 41.) Plaintiff NRCP is a North Carolina state political party organization that supports Republican candidates running in North Carolina elections. (Id. ¶¶ 44-45.)

Executive Defendant North Carolina SBE is the agency responsible for the administration of the elections laws of the State of North Carolina. (Id. ¶ 46.) As in Moore, included as Executive Defendants are Damon Circosta, Stella Anderson, Jeff Carmon, III, and Karen Brinson Bell of the North Carolina SBE. (Id. ¶¶ 47-50.)

Alliance Intervenors from Moore are also Intervenor-Defendants in Wise. (1:20CV912 (Doc. 22).)

**B. Factual Background**

**1. This Court's Decision in *Democracy***

On August 4, 2020, this court issued an order in a third related case, Democracy North Carolina v. North Carolina State Board of Elections, No. 1:20CV457, ––– F.Supp.3d ––––,

2020 WL 4484063 (M.D.N.C. Aug. 4, 2020) ("the August Democracy Order"), that "left the One-Witness Requirement in place, enjoined several rules related to nursing homes that would disenfranchise Plaintiff Hutchins, and enjoined the rejection of absentee ballots unless the voter is provided due process." (Id. at ––––, 2020 WL 4484063, at *1.) As none of the parties appealed that order, the injunctive relief is still in effect.

**2. Release of the Original Memo 2020-19**

**\*3** In response to the August Democracy Order, on August 21, 2020, SBE officials released guidance for "the procedure county boards must use to address deficiencies in absentee ballots." (Numbered Memo 2020-19 ("Memo 2020-19" or "the original Memo") (Moore v. Circosta, No. 1:20CV911, Moore Compl. (Doc. 1) Ex. 3 – NC State Bd. of Elections Mem. ("Original Memo 2020-19") (Doc. 1-4) at 2.) This guidance instructed county boards regarding multiple topics. First, it instructed county election boards to "accept [a] voter's signature on the container-return envelope if it appears to be made by the voter ... [a]bsent clear evidence to the contrary," even if the signature is illegible. (Id.) The guidance clarified that "[t]he law does not require that the voter's signature on the envelope be compared with the voter's signature in their registration record," as "[v]erification of the voter's identity is completed through the witness requirement." (Id.)

Second, the guidance sorted ballot deficiencies into two categories: curable and uncurable deficiencies. (Id. at 3.) Under this version of Memo 2020-19, a ballot could be cured via voter affidavit alone if the voter failed to sign the certification or signed in the wrong place. (Id.) A ballot error could not be cured, and instead, was required to be spoiled, in the case of all other listed deficiencies, including a missing signature, printed name, or address of the witness; an incorrectly placed witness or assistant signature; or an unsealed or re-sealed envelope. (Id.) Counties were required to notify voters in writing regarding any ballot deficiency – curable or incurable - within one day of the county identifying the defect and to enclose either a cure affidavit or a new ballot, based on the type of deficiency at issue. (Id. at 4.)

In the case of an incurable deficiency, a new ballot could be issued only "if there [was] time to mail the voter a new ballot ... [to be] receive[d] by Election Day." (Id. at 3.) If a voter who submitted an uncurable ballot was unable to receive

a new absentee ballot in time, he or she would have the option to vote in person on Election Day. (Id. at 4.)

If the deficiency was curable by a cure affidavit, the guidance stated that the voter must return the cure affidavit by no later than 5 p.m. on Thursday, November 12, 2020. (Id.)

### 3. Rescission of Numbered Memo 2020-19

The State began issuing ballots on September 4, 2020, marking the beginning of the election process. (Wise, No. 1:20CV912, Wise Pls.' Mot. (Doc. 43).) On September 11, 2020, SBE directed counties to stop notifying voters of deficiencies in their ballot, as advised in Memo 2020-19, pending further guidance from SBE. (Moore, No. 1:20CV911, Moore Pls.' Mot. (Doc. 60) Ex. 3, Democracy Email Chain (Doc. 60-4) at 6.)

### 4. Revision of Numbered Memo 2020-19

On September 22, over two weeks after the State began issuing ballots, SBE issued a revised Numbered Memo 2020-19, which set forth a variety of new policies not implemented in the original Memo 2020-19. (Numbered Memo 2020-19 ("the Revised Memo" or "Revised Memo 2020-19") (Moore v. Circosta, No. 1:20CV911 (Doc. 36) Ex. 3, Revised Numbered Memo 2020-19 ("Revised Memo 2020-19") (Doc. 36-3).) In subsequent litigation in Wake County Superior Court, SBE advised the court that both the original Memo 2020-19 and the Revised Memo were issued "to ensure full compliance with the injunction entered by Judge Osteen." (Moore v. Circosta, No. 1:20CV911, Exec. Defs.' Br. in Supp. of Joint Mot. for Entry of Consent Judgment ("SBE State Court Br.") (Doc. 68-1) at 15.) Moreover, on September 28, 2020, during a status conference with a district court in the Eastern District of North Carolina prior to transfer to this court, counsel for Defendant SBE stated that Defendant SBE issued the revised Memo 2020-19 "in order to comply with Judge Osteen's preliminary injunction in the Democracy N.C. action in the Middle District." (Moore v. Circosta, No. 1:20CV911, Order Granting Mot. for Temp. Restraining Order ("TRO") (Doc. 47) at 9.) At that time, counsel for SBE indicated that they had not yet submitted the Revised Memo 2020-19 to this court, "but that it was on counsel's list to get [it] done today." (Id.) (internal quotations omitted.) On September 28, 2020, Defendant SBE filed the Revised Memo 2020-19 with

this court in the Democracy action. (Democracy N.C. v. N.C. State Bd. of Elections, No. 1:20CV457 (Doc. 143-1).)

**\*4** The revised guidance modified which ballot deficiencies fell into the curable and uncurable categories. Unlike the original Memo 2020-19, the Revised Memo advised that ballots missing a witness or assistant name or address, as well as ballots with a missing or misplaced witness or assistant signature, could be cured via voter certification. (Moore v. Circosta, No. 1:20CV911, Revised Memo 2020-19 (Doc. 36-3) at 3.) According to the revised guidance, the only deficiencies that could not be cured by certification, and thus required spoliation, were where the envelope was unsealed or where the envelope indicated the voter was requesting a replacement ballot. (Id. at 4.)

The cure certification in Revised 2020-19 required voters to sign and affirm the following:

> I am submitting this affidavit to correct a problem with missing information on the ballot envelope. I am an eligible voter in this election and registered to vote in [name] County, North Carolina. I solemnly swear or affirm that I voted and returned my absentee ballot for the November 3, 2020 general election and that I have not voted and will not vote more than one ballot in this election. I understand that fraudulently or falsely completing this affidavit is a Class I felony under Chapter 163 of the North Carolina General Statutes.

(Moore v. Circosta, No. 1:20CV911 (Doc. 45-1) at 34.)

The revised guidance also extended the deadline for civilian absentee ballots to be received to align with that for military and overseas voters. (Moore v. Circosta, No. 1:20CV911, Revised Memo 2020-19 (Doc. 36-3) at 5.) Under the original Memo 2020-19, in order to be counted, civilian absentee ballots must have been received by the county board office by 5 p.m. on Election Day, November 3, 2020, or if postmarked, by Election Day, by 5:00 p.m. on November 6, 2020. (Moore v. Circosta, No. 1:20CV911, Original Memo 2020-19 (Doc. 1-4) at 5 (citing N.C. Gen. Stat. § 163-231(b)).) Under the Revised Memo 2020-19, however, a late civilian ballot would be counted if postmarked on or before Election Day and received by 5:00 p.m. on November 12, 2020. (Moore v. Circosta, No. 1:20CV911, Revised Memo 2020-19 (Doc. 36-3) at 5.) This is the same as the deadline for military and overseas voters, as indicated in the Original Memo 2020-19. (Id.)[2]

2

In <u>Democracy N. Carolina v. N.C. State Board of Elections</u>, No. 1:20CV457, an order is entered contemporaneously with this Memorandum Opinion and Order enjoining certain aspects of the Revised Memo 2020-19.

## 5. <u>Numbered Memoranda 2020-22 and 2020-23</u>

SBE issued two other Numbered Memoranda on September 22, 2020, in addition to Revised Numbered Memo 2020-19.

First, SBE issued Numbered Memo 2020-22, the purpose of which was to further define the term postmark used in Numbered Memo 2020-19. (<u>Wise</u>, No. 1:20CV912, Wise Compl. (Doc. 1), Ex. 3, N.C. State Bd. of Elections Mem. ("Memo 2020-22") (Doc. 1-3) at 2.) Numbered Memo 2020-22 advised that although "[t]he postmark requirement for ballots received after Election Day is in place to prohibit a voter from learning the outcome of an election and then casting their ballot.... [T]he USPS does not always affix a postmark to a ballot return envelope." (<u>Id.</u>) Recognizing that SBE now offers "BallotTrax," a system in which voters and county boards can track the status of a voter's absentee ballot, SBE said "it is possible for county boards to determine when a ballot was mailed even if does not have a postmark." (<u>Id.</u>) Moreover, SBE recognized that commercial carriers offer tracking services that document when a ballot was deposited with the commercial carrier. (<u>Id.</u>) For these reasons, the new guidance stated that a ballot would be considered postmarked by Election Day if it had a postmark, there is information in BallotTrax, or "another tracking service offered by the USPS or a commercial carrier, indicat[es] that the ballot was in the custody of USPS or the commercial carrier on or before Election Day." (<u>Id.</u> at 3.)

 **\*5**  Second, SBE issued Numbered Memo 2020-23, which provides "guidance and recommendations for the safe, secure, and controlled in-person return of absentee ballots." (<u>Wise</u>, No. 1:20CV912, Wise Compl. (Doc. 1), Ex. 4, N.C. State Bd. of Elections Mem. ("Memo 2020-23") (Doc. 1-4) at 2.) Referring to N.C. Gen. Stat. § 163-226.3(a)(5),[3] which prohibits any person other than the voter's near superior or legal guardian to take possession of an absentee ballot of another voter for delivery or for return to a county board of elections, (<u>id.</u>), Numbered Memo 2020-23 confirms that "an absentee ballot may not be left in an unmanned drop box." (<u>Id.</u>) The guidance reminds county boards that they must keep a written log when any person returns an absentee ballot in person, which includes the name of the individual

returning the ballot, their relationship to the voter, the ballot number, and the date it was received. (<u>Id.</u> at 3.) If the individual who drops off the ballot is not the voter, their near relative, or legal guardian, the log must also record their address and phone number. (<u>Id.</u>)

3

The Memoranda incorrectly cites this statute as N.C. Gen. Stat. § 163-223.6(a)(5).

At the same time, the guidance advises county boards that "[f]ailure to comply with the logging requirement, or delivery or an absentee ballot by a person other than the voter, the voter's near relative, or the voter's legal guardian, is not sufficient evidence in and of itself to establish that the voter did not lawfully vote their ballot." (<u>Id.</u> at 3.) Instead, the guidance advises the county board that they "may ... consider the delivery of a ballot ... in conjunction with other evidence in determining whether the ballot is valid and should be counted." (<u>Id.</u> at 4.)

## 6. <u>Consent Judgment in North Carolina Alliance for Retired Americans v. North Carolina State Bd. of Elections</u>

On August 10, 2020, NC Alliance, the Defendant-Intervenors in the two cases presently before this court, filed an action against SBE in North Carolina's Wake County Superior Court challenging, among other voting rules, the witness requirement for mail-in absentee ballots and rejection of mail-in absentee ballots that are postmarked by Election Day but delivered to county boards more than three days after the election. (<u>Moore v Circosta</u>, No. 1:20CV911, SBE State Court Br. (Doc. 68-1) at 15.)

On August 12, 2020, Philip Berger and Timothy Moore, Plaintiffs in <u>Moore</u>, filed a notice of intervention as of right in the state court action and became parties to that action as intervenor-defendants on behalf of the North Carolina General Assembly. (<u>Id.</u> at 16.)

On September 22, 2020, SBE and NC Alliance filed a Joint Motion for Entry of a Consent Judgment with the superior court. (<u>Id.</u>) Philip Berger and Timothy Moore were not aware of this "secretly-negotiated" Consent Judgment, (<u>Wise</u> Pls.' Mot. (Doc. 43) at 6), until the parties did not attend a previously scheduled deposition, (<u>Democracy v. N.C. Bd. of Elections</u>, No. 1:20CV457 (Doc. 168) at 73.)

Among the terms of the Consent Judgment, SBE agreed to extend the deadline for receipt of mail-in absentee ballots mailed on or before Election Day to nine days after Election Day, to implement the cure process established in Revised Memo 2020-19, and to establish separate mail in absentee ballot "drop off stations" at each early voting site and county board of elections office which were to be staffed by county board officials. (Moore v. Circosta, No. 1:20CV911, SBE State Court Br. (Doc. 68-1) at 16.)

In its filings with the state court, SBE frequently cited this court's decision in Democracy as a reason for why the Wake County Superior Court Judge should accept the Consent Judgment. SBE argued that a cure procedure for deficiencies related to the witness requirement were necessary because "[w]itness requirements for absentee ballots have been shown to be, broadly speaking, disfavored by the courts," (id. at 26), and that "[e]ven in North Carolina, a federal court held that the witness requirement could not be implemented as statutorily authorized without a mechanism for voters to have adequate notice of and [an opportunity to] cure materials [sic] defects that might keep their votes from being counted," (id. at 27). SBE argued that, "to comply with the State Defendants' understanding of the injunction entered by Judge Osteen, the State Board directed county boards of elections not to disapprove any ballots until a new cure procedure that would comply with the injunction could be implemented," (id. at 30), and that ultimately, the cure procedure introduced in Revised Memo 2020-19 as part of the consent judgment would comply with this injunction. (Id.) SBE indicated that it had notified the federal court of the cure mechanism process on September 22, 2020, (id.), although this court was not made aware of the cure procedure until September 28, 2020, (Democracy N.C. v. N.C. State Bd. of Elections, No. 1:20CV457 (Doc. 143-1)), the day before the processing of absentee ballots was scheduled to begin on September 29, 2020, (Moore v. Circosta, No. 20CV911 Transcript of Oral Argument ("Oral Argument Tr.")(Doc. 70) at 109.)

**\*6** On October 2, 2020, the Wake County Superior Court entered the Stipulation and Consent Judgment. (Moore v. Circosta, No. 1:20CV911, State Court Consent Judgment (Doc. 45-1).) Among its recitals, which Defendant SBE drafted and submitted to the judge as is customary in state court, (Oral Argument Tr. (Doc. 70) at 91), the Wake County Superior Court noted this court's preliminary injunction in Democracy, finding,

> WHEREAS, on August 4, 2020, the United States District Court for the Middle District of North Carolina enjoined

the State Board from "the "disallowance or rejection ... of absentee ballots without due process as to those ballots with a material error that is subject to remediation." Democracy N.C. v. N.C. State Bd. of Elections, No. 1:20-cv-00457-WO-JLW [—— F.Supp.3d ——, 2020 WL 4484063] (M.D.N.C. Aug. 4, 2020) (Osteen, J.). ECF 124 at 187. The injunction is to remain in force until the State Board implements a cure process that provides a voter with "notice and an opportunity to be heard before an absentee ballot with a material error subject to remediation is disallowed or rejected." Id.

(State Court Consent Judgment (Doc. 45-1) at 6.)[4]

4    An additional discussion of the facts related to SBE's use of this court's order in obtaining a Consent Judgment is set out in this court's order in Democracy v. North Carolina State Board of Elections, No. 1:20CV457, 2020 WL 6058048 (M.D.N.C. Oct. 14, 2020) (enjoining witness cure procedure).

## 7. Numbered Memoranda 2020-27, 2020-28, and 2020-29

In addition to the Numbered Memoranda issued on September 22, 2020, as part of the consent judgment in the state court case, SBE has issued three additional numbered memoranda.

First, on October 1, 2020, SBE issued Numbered Memo 2020-27, which was issued in response to this court's order in Democracy regarding the need for parties to attend a status conference to discuss Numbered Memo 2020-19. (Moore v. Circosta, No. 1:20CV911 (Doc. 40-2) at 2.) The guidance advises county boards that this court did not find Numbered Memo 2020-19:

> "consistent with the Order entered by this Court on August 4, 2020," and indicates that its preliminary injunction order should "not be construed as finding that the failure of a witness to sign the application and certificate as a witness is a deficiency which may be cured with a certification after the ballot has been returned."

(Id.) "In order to avoid confusion while related matters are pending in a number of courts," the guidance advises that "[c]ounty boards that receive an executed absentee container-return envelope with a missing witness signature shall take no action as to that envelope." (Id.) In all other respects, SBE stated that Revised Numbered Memo 2020-19 remains in effect. (Id.)

Second, on October 4, 2020, SBE issued Numbered Memo 2020-28, which states that both versions of Numbered Memo 2020-19, as well as Numbered Memoranda 2020-22, 2020-23, and 2020-27 "are on hold until further notice" following the temporary restraining order entered in the instant cases on October 3, 2020. (Moore v. Circosta, No. 1:20CV911 (Doc. 60-5) at 2.) Moreover, the guidance reiterated that "[c]ounty boards that receive an executed absentee container-return envelope with a deficiency shall take no action as to that envelope," including sending a cure notification or reissuing the ballot. (Id. at 2-3.) Instead, the guidance directs county boards to store envelopes with deficiencies in a secure location until further notice. (Id. at 3.) If, however, a county board had previously issued a ballot and the second envelope is returned without any deficiencies, the guidance permits the county board to approve the second ballot. (Id.)

**\*7** Finally, on October 4, 2020, SBE issued Numbered Memo 2020-29, which states that it provides "uniform guidance and further clarification on how to determine if the correct address can be identified if the witness's or assistant's address on an absentee container-return envelope is incomplete. (Wise, No. 1:20CV912 (Doc. 43-5).) First, the guidance clarifies that if a witness or assistant does not print their address, the envelope is deficient. (Id. at 2.) Second, the guidance states that failure to list a witness's ZIP code does not require a cure; a witness or assistant's address may be a post office box or other mailing address; and if the address is missing a city or state, but the county board can determine the correct address, the failure to include this information does not invalidate the container-return envelope. (Id.) Third, if both the city and ZIP code are missing, the guidance directs staff to determine whether the correct address can be identified. (Id.) If they cannot be identified, then the envelope is deficient. (Id.)

### C. Procedural History

On September 26, 2020, Plaintiffs in Moore filed their action in the United States District Court for the Eastern District of North Carolina. (Moore Compl. (Doc. 1).) Plaintiffs in Wise also filed their action in the United States District Court for the Eastern District of North Carolina on September 26, 2020. (Wise Compl. (Doc. 1).)

Alliance Intervenors filed a Motion to Intervene as Defendants in Moore on September 30, 2020, (Moore v. Circosta, No. 1:20CV911 (Doc. 27)), and in Wise on October 2, 2020, (Wise, No. 1:20CV912 (Doc. 21)). This court granted

Alliance Intervenors' Motion to Intervene on October 8, 2020. (Moore v. Circosta, No. 1:20CV911 (Doc. 67); Wise, No. 1:20CV912 (Doc. 49).)

The district court in the Eastern District of North Carolina issued a temporary restraining order in both cases on October 3, 2020, and transferred the actions to this court for this court's "consideration of additional or alternative injunctive relief along with any such relief in Democracy North Carolina v. North Carolina State Board of Elections ...." (Moore v. Circosta, 1:20CV911, TRO (Doc. 47) at 2; Wise, No. 1:20CV912 (Doc. 25) at 2.)

On October 5, 2020, this court held a Telephone Conference, (Moore v. Circosta, No. 1:20CV911, Minute Entry 10/05/2020; Wise, No. 1:20CV912, Minute Entry 10/05/2020), and issued an order directing the parties to prepare for a hearing on the temporary restraining order and/or a preliminary injunction and to submit additional briefing, (Moore v. Circosta, No. 1:20CV911 (Doc. 51); Wise, No. 1:20CV912 (Doc. 30)). On October 6, 2020, Plaintiffs in Wise filed a Memorandum in Support of Plaintiffs' Motion to Convert the Temporary Restraining Order into a Preliminary Injunction, (Wise Pls.' Mot. (Doc. 43)), and Plaintiffs in Moore filed a Motion for a Preliminary Injunction and Memorandum in Support of Same, (Moore Pls.' Mot. (Doc. 60)). Defendant SBE filed a response to Plaintiffs' motions in both cases on October 7, 2020. (Moore v. Circosta, No. 1:20CV911, State Defs.' Resp. to Pls.' Mot. for Prelim. Inj. ("SBE Resp.") (Doc. 65); Wise, No. 1:20CV912 (Doc. 45).) Alliance Intervenors also filed a response to Plaintiffs' motions in both cases on October 7, 2020. (Moore v. Circosta, No. 1:20CV911, Proposed Intervenors' Mem. in Opp'n to Pls.' Mot. for a Prelim. Inj. ("Alliance Resp.") (Doc. 64); Wise, No. 1:20CV912 (Doc. 47).)[5]

5    Defendant SBE and Alliance Intervenors' memoranda filed in opposition to Plaintiffs' motions for a preliminary injunction in Moore are identical to those that each party filed in Wise. (Compare SBE Resp. (Doc. 65) and Alliance Resp. (Doc. 64) with Wise, No. 1:20CV912 (Doc. 45) and Wise, No. 1:20CV912 (Doc. 47).) For clarity and ease, this court will cite only to the briefs Defendant SBE and Alliance Intervenors filed in Moore in subsequent citations.

This court held oral arguments on October 8, 2020, in which all of the parties in these two cases presented arguments with respect to Plaintiffs' motions for a preliminary injunction. (Moore v. Circosta, No. 1:20CV911, Minute

Entry 10/08/2020; <u>Wise</u>, No. 1:20CV912, Minute Entry
10/08/2020.)

**\*8** This court has federal question jurisdiction over these
cases under 28 U.S.C. § 1331. This matter is ripe for
adjudication.

### D. <u>Preliminary Injunction Standard of Review</u>
"A plaintiff seeking a preliminary injunction must establish
that he is likely to succeed on the merits, that he is likely to
suffer irreparable harm in the absence of preliminary relief,
that the balance of equities tips in his favor, and that an
injunction is in the public interest." <u>Winter v. Nat. Res. Def.
Council, Inc.</u>, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d
249 (2008). Such an injunction "is an extraordinary remedy
intended to protect the status quo and prevent irreparable
harm during the pendency of a lawsuit." <u>Di Biase v. SPX
Corp.</u>, 872 F.3d 224, 230 (4th Cir. 2017).

## II. <u>ANALYSIS</u>
Executive Defendants and Alliance Intervenors challenge
Plaintiffs' standing to seek a preliminary injunction regarding
their Equal Protection, Elections Clause, and Electors Clause
claims. (Alliance Resp. (Doc. 64) at 14-18; SBE Resp.
(Doc. 65) at 11-13.) Executive Defendants and Alliance
Intervenors also challenge this court's ability to hear this
action under abstention, (Alliance Resp. (Doc. 64) at 10-14;
SBE Resp. (Doc. 65) at 10-11), <u>Rooker-Feldman</u> (Alliance
Resp. (Doc. 64) at 13), and preclusion doctrines, (SBE
Resp. (Doc. 65) at 7-10). Finally, Executive Defendants
and Alliance Intervenors attack Plaintiffs' motions for
preliminary injunction on the merits. (Alliance Resp. (Doc.
64) at 19-26; SBE Resp. (Doc. 65) at 13-18.)

Because Rooker-Feldman, abstention, and preclusion are
dispositive issues, this court addresses them first, then
addresses Plaintiffs' motions on standing and the likelihood
of success on the merits.

As to each of these abstention doctrines, as will be explained
further, this court's preliminary injunction order, (Doc. 124),
in <u>Democracy North Carolina v. North Carolina State Board
of Elections</u>, No. 1:20CV457, played a substantial role as
relevant authority supporting SBE's request for approval, in
North Carolina state court, of Revised Memo 2020-19 and
the related Consent Judgment. (<u>See</u> discussion <u>infra</u> Part
II.D.3.b.i.) As Berger, Moore, and SBE are all parties in
<u>Democracy</u>, this court initially finds that abstention doctrines

do not preclude this court's exercise of jurisdiction. This
court's August <u>Democracy</u> Order was issued prior to the filing
of these state court actions, and that Order was the basis of
the subsequent grant of affirmative relief by the state court.
This court declines to find that any abstention doctrine would
preclude it from issuing orders in aid of its jurisdiction, or as
to parties appearing in a pending case in this court.

### A. <u>Rooker-Feldman Doctrine</u>
<u>Rooker-Feldman</u> doctrine is a jurisdictional doctrine that
prohibits federal district courts from " 'exercising appellate
jurisdiction over final state-court judgments.' " <u>See Thana
v. Bd. of License Comm'rs for Charles Cnty.</u>, 827 F.3d
314, 319 (4th Cir. 2016) (quoting <u>Lance v. Dennis</u>, 546
U.S. 459, 463, 126 S.Ct. 1198, 163 L.Ed.2d 1059 (2006)
(per curiam)). The presence or absence of subject matter
jurisdiction under <u>Rooker-Feldman</u> is a threshold issue that
this court must determine before considering the merits of the
case. <u>Friedman's, Inc. v. Dunlap</u>, 290 F.3d 191, 196 (4th Cir.
2002).

**\*9** Although <u>Rooker-Feldman</u> originally limited only
federal-question jurisdiction, the Supreme Court has
recognized the applicability of the doctrine to cases brought
under diversity jurisdiction:

> <u>Rooker</u> and <u>Feldman</u> exhibit the limited circumstances in
> which this Court's appellate jurisdiction over state-court
> judgments, 28 U.S.C. § 1257, precludes a United States
> district court from exercising subject-matter jurisdiction
> in an action it would otherwise be empowered to adjudicate
> under a congressional grant of authority, <u>e.g.</u>, § 1330 (suits
> against foreign states), § 1331 (federal question), and §
> 1332 (diversity).

<u>See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.</u>, 544 U.S.
280, 291-92, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005). Under
the <u>Rooker-Feldman</u> doctrine, courts lack subject matter
jurisdiction to hear "cases brought by [1] state-court losers
complaining of [2] injuries caused by state-court judgments
[3] rendered before the district court proceedings commenced
and [4] inviting district court review and rejection of those
judgments." <u>Id.</u> at 284, 125 S.Ct. 1517. The doctrine is
"narrow and focused." <u>Thana</u>, 827 F.3d at 319. "[I]f a plaintiff
in federal court does not seek review of the state court
judgment itself but instead '<u>presents an independent claim</u>, it
is not an impediment to the exercise of federal jurisdiction that
the same or a related question was earlier aired between the
parties in state court.' " <u>Id.</u> at 320 (quoting <u>Skinner v. Switzer</u>,
562 U.S. 521, 532, 131 S.Ct. 1289, 179 L.Ed.2d 233 (2011)).

Rather, "any tensions between the two proceedings should be managed through the doctrines of preclusion, comity, and abstention." Id. (citing Exxon, 544 U.S. at 292–93, 125 S.Ct. 1517).

Moreover, "the Rooker–Feldman doctrine applies only when the loser in state court files suit in federal district court seeking redress for an injury allegedly caused by the state court's decision itself." Davani v. Va. Dep't of Transp., 434 F.3d 712, 713 (4th Cir. 2006); see also Hulsey v. Cisa, 947 F.3d 246, 250 (4th Cir. 2020) ("A plaintiff's injury at the hands of a third party may be 'ratified, acquiesced in, or left unpunished by' a state-court decision without being 'produced by' the state-court judgment.") (internal citations omitted).

Here, Plaintiffs are challenging SBE's election procedures and seeking injunction of those electoral rules, not attempting to directly appeal results of a state court order. More importantly, however, the Fourth Circuit has previously found that a party is not a state court loser for purposes of Rooker-Feldman if "[t]he [state court] rulings thus were not 'final state-court judgments' " against the party bringing up the same issues before a federal court. Hulsey, 947 F.3d at 251 (quoting Lance, 546 U.S. at 463, 126 S.Ct. 1198). In the Alliance state court case, Alliance brought suit against SBE. The Plaintiffs from this case were intervenors. They were not parties to the Settlement Agreement and were in no way properly adjudicated "state court losers." Given the Supreme Court's intended narrowness of the Rooker-Feldman doctrine, see Lance, 546 U.S. at 464, 126 S.Ct. 1198, and Plaintiffs' failure to fit within the Fourth Circuit's definition of "state-court losers," this court will decline to abstain under the Rooker-Feldman doctrine.

## B. Abstention

### 1. Colorado River Abstention

 *10 Abstention "is the exception, not the rule." Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 813, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976); see also id. at 817, 96 S.Ct. 1236 (noting the "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them"). Thus, this court's task "is not to find some substantial reason for the exercise of federal jurisdiction," but rather "to ascertain whether there exist 'exceptional' circumstances, the 'clearest of justifications,' ... to justify the surrender of that jurisdiction." Moses H. Cone Mem'l Hosp.

v. Mercury Constr. Corp., 460 U.S. 1, 25-26, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).

First, and crucially for this case, the court must determine whether there are ongoing state and federal proceedings that are parallel. Al-Abood ex rel. Al-Abood v. El-Shamari, 217 F.3d 225, 232 (4th Cir. 2000) ("The threshold question in deciding whether Colorado River abstention is appropriate is whether there are parallel suits."); Ackerman v. ExxonMobil Corp., 734 F.3d 237, 248 (4th Cir. 2013) (finding that abstention is exercised only "in favor of ongoing, parallel state proceedings" (emphasis added)). In this instance, the parties have failed to allege any ongoing state proceeding that this federal suit might interfere with. In fact, Plaintiffs in this case were excluded as parties in the Consent Judgment and are bringing independent claims in this federal court alleging violations, inter alia, of the Equal Protection Clause. This court does not find that Colorado River abstention prevents it from adjudicating Equal Protection claims raised by parties who were not parties to the Consent Judgment.

### 2. Pennzoil Abstention

As alleged by Defendants, Pennzoil does dictate that federal courts should not "interfere with the execution of state judgments." Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 14, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987). However, in the very next sentence, the Pennzoil court caveats that this doctrine applies "[s]o long as those challenges relate to pending state proceedings." Id. In fact, in Pennzoil itself, the Court clarified that abstention was proper because "[t]here is at least one pending judicial proceeding in the state courts; the lawsuit out of which Texaco's constitutional claims arose is now pending before a Texas Court of Appeals in Houston, Texas." Id. at 14, 107 S.Ct. 1519 n.13.

Abstention was also justified in Pennzoil because the Texas state court was not presented with the contested federal constitutional questions, and thus, "when [the subsequent] case was filed in federal court, it was entirely possible that the Texas courts would have resolved this case ... without reaching the federal constitutional questions." Id. at 12, 107 S.Ct. 1519. In the present case, Plaintiffs raised their constitutional claims in the state court prior to the entry of the Consent Judgment. The state court, through the Consent Judgment and without taking evidence, adjudicated those claims as to the settling parties. The Consent Judgment is effective through the 2020 Election and specifies no further

basis upon which Plaintiffs here may seek relief. As a result, there does not appear to be any relief available to Plaintiffs for the federal questions raised here. For these reasons, this court will also decline to abstain under Pennzoil.

**3. Pullman Abstention**

Pullman abstention can be exercised where: (1) there is "an unclear issue of state law presented for decision"; and (2) resolution of that unclear state law issue "may moot or present in a different posture the federal constitutional issue such that the state law issue is potentially dispositive." Educ. Servs., Inc. v. Md. State Bd. for Higher Educ., 710 F.2d 170, 174 (4th Cir. 1983); see also N.C. State Conference of NAACP v. Cooper, 397 F. Supp. 3d 786, 794 (M.D.N.C. 2019). Pullman does not apply here because any issues of state law are not, in this court's opinion, unclear or ambiguous. Alliance's brief in Moore posits that "whether NCSBE has the authority to enter the Consent Judgment and promulgate the Numbered Memos" are at the center of this case, thereby urging Pullman abstention. (Alliance Resp. (Doc. 64 at 12).) SBE has undisputed authority to issue guidance consistent with state law and may issue guidance contrary to state law only in response to natural disasters – the court finds this, though ultimately unnecessary to the relief issued in this case, fairly clear. (See discussion supra at Part II.E.2.b.ii.) Moreover, this court has already expressly assessed and upheld the North Carolina state witness requirement, which is the primary state law at issue in this case. Democracy N. Carolina, —— F.Supp.3d at ——, 2020 WL 4484063, at *48.

 *11  Furthermore, Defendants and Intervenors would additionally need to show how "resolution of ... state law issues pending in state court" would "eliminate or substantially modify the federal constitutional issues raised in Plaintiffs' Complaint." N.C. State Conference of NAACP, 397 F. Supp. 3d at 796. As Alliance notes, the Plaintiffs did not appeal the state court's conclusions, but sought relief in federal court – there is no state law issue pending in state court here. For all of these reasons, this court declines to abstain under Pullman.

**C. Issue Preclusion**

Collateral estoppel, or issue preclusion "refers to the effect of a prior judgment in foreclosing successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, whether or not the issue arises on the same or a different claim." New Hampshire v. Maine, 532 U.S. 742, 748-49, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001). The purpose of this doctrine is to "protect the integrity of the judicial process ...." Id. at 749, 121 S.Ct. 1808 (internal quotations omitted).

Plaintiffs argue that issue preclusion does not bar their Equal Protection claims. Citing Arizona v. California, 530 U.S. 392, 120 S.Ct. 2304, 147 L.Ed.2d 374 (2000), Plaintiffs in Wise argue that a negotiated settlement between parties, like the consent judgment between the Alliance Intervenors and Defendant SBE in Wake County Superior Court, does not constitute a final judgment for issue preclusion. (Wise Pls.' Mot. (Doc. 43) at 23.) Plaintiffs in Moore, citing In re Microsoft Corp. Antitrust Litig., 355 F.3d 322 (4th Cir. 2004), argue that issue preclusion cannot be asserted because the Individual Plaintiffs in Moore were not parties to the state court litigation that resulted in the consent judgment. (Moore Pls.' Mot. (Doc. 60) at 4.)

In response, Defendant SBE argues that, under North Carolina law, issue preclusion applies where (1) the issue is identical to the issue actually litigated and necessary to a prior judgment, (2) the prior action resulted in a final judgment on the merits, and (3) the plaintiffs in the latter action are the same as, or in privity with, the parties in the earlier action, (SBE Resp. (Doc. 65) at 7), and the parties in these federal actions and those in the state actions are in privity under the third element of the test, (id. at 8).

This court finds that issue preclusion does not bar Plaintiffs' claims. In Arizona v. California, the Supreme Court held that "[i]n most circumstances, it is recognized that consent agreements ordinarily are intended to preclude any further litigation on the claim presented but are not intended to preclude further litigation on any of the issues presented." 530 U.S. at 414, 120 S.Ct. 2304 (internal quotations omitted). Moreover, "settlements ordinarily occasion no issue preclusion ... unless it is clear ... that the parties intend their agreement to have such an effect." Id.

The Consent Judgment SBE and Alliance entered into does not clearly demonstrate that they intended their agreement to have an issue preclusive effect with regard to claims brought now by Plaintiffs in Moore and Wise. The language of the Consent Judgment demonstrates that it "constitutes a settlement and resolution of Plaintiffs' claims against Executive Defendants pending in this Lawsuit" and that "by signing this Stipulation and Consent Judgment, they are

releasing any claims ... that they might have against <u>Executive Defendants</u>." (State Court Consent Judgment (Doc. 45-1) at 14 (emphasis added).) Although Timothy Moore and Philip Berger, State Legislative Plaintiffs in <u>Moore</u>, were Defendant-Intervenors in the <u>NC Alliance</u> action, they were not parties to the consent judgment. (<u>Id.</u>) Thus, because the plain language of the agreement did not expressly indicate an intention to preclude Plaintiffs Moore and Berger from litigating the issue in subsequent litigation, neither these State Legislative Plaintiffs, nor any other parties with whom they may or may not be in privity, are estopped from raising these claims now before this court.

**D. <u>Plaintiffs' Equal Protection Claims</u>**

**\*12** Plaintiffs raise "two separate theories of an equal protection violation," – a "vote dilution claim, and an arbitrariness claim." (Oral Argument Tr. (Doc. 70) at 52; <u>see also</u> <u>Wise</u> Pls.' Mot. (Doc. 43) at 12-15.)

**1. <u>Voting Harms Prohibited by the Equal Protection Clause</u>**

Under the Fourteenth Amendment of the U.S. Constitution, a state may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. The Fourteenth Amendment is one of several constitutional provisions that "protects the right of all qualified citizens to vote, in state as well as federal elections." <u>Reynolds v. Sims</u>, 377 U.S. 533, 554, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Because the Fourteenth Amendment protects not only the "initial allocation of the franchise," as well as "to the manner of its exercise," <u>Bush v. Gore</u>, 531 U.S. 98, 104, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000), "lines may not be drawn which are inconsistent with the Equal Protection Clause ...." <u>Id.</u> at 105, 121 S.Ct. 525 (citing <u>Harper v. Va. State Bd. of Elections</u>, 383 U.S. 663, 665, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966)).

The Supreme Court has identified two theories of voting harms prohibited by the Fourteenth Amendment. First, the Court has identified a harm caused by "debasement or dilution of the weight of a citizen's vote," also referred to "vote dilution." <u>Reynolds</u>, 377 U.S. at 555, 84 S.Ct. 1362. Courts find this harm arises where gerrymandering under a redistricting plan has diluted the "requirement that all citizens' votes be weighted equally, known as the one person, one vote principle," and resulted in one group or community's vote counting more than another's. <u>Raleigh Wake Citizens</u>

<u>Ass'n v. Wake Cnty. Bd. of Elections</u>, 827 F.3d 333, 340 (4th Cir. 2016); <u>see also</u> <u>Gill v. Whitford</u>, 585 U.S. ——, ——, 138 S. Ct. 1916, 1930-31, 201 L.Ed.2d 313 (2018) (finding that the "harm" of vote dilution "arises from the particular composition of the voter's own district, which causes his vote – having been packed or cracked – to carry less weight than it would carry in another, hypothetical district"); <u>Wesberry v. Sanders</u>, 376 U.S. 1, 18, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964) (finding that vote dilution occurred where congressional districts did not guarantee "equal representation for equal numbers of people"); <u>Wright v. North Carolina</u>, 787 F.3d 256, 268 (4th Cir. 2015) (invalidating a voter redistricting plan).

Second, the Court has found that the Equal Protection Clause is violated where the state, "[h]aving once granted the right to vote on equal terms," through "later arbitrary and disparate treatment, value[s] one person's vote over that of another." <u>Bush</u>, 531 U.S. at 104-05, 121 S.Ct. 525 (2000); <u>see also</u> <u>Baker v. Carr</u>, 369 U.S. 186, 208, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) ("A citizen's right to a vote free of arbitrary impairment by state action has been judicially recognized as a right secured by the Constitution, when such impairment resulted from dilution by a false tally, or by a refusal to count votes from arbitrarily selected precincts, or by a stuffing of the ballot box.") (internal citations omitted). This second theory of voting harms requires courts to balance competing concerns around access to the ballot. On the one hand, a state should not engage in practices which prevent qualified voters from exercising their right to vote. A state must ensure that there is "no preferred class of voters but equality among those who meet the basic qualifications." <u>Gray v. Sanders</u>, 372 U.S. 368, 379-80, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963). On the other hand, the state must protect against "the diluting effect of illegal ballots." <u>Id.</u> at 380, 83 S.Ct. 801. Because "the right to have one's vote counted has the same dignity as the right to put a ballot in a box," <u>id.</u>, the vote dilution occurs only where there is both "arbitrary <u>and</u> disparate treatment." <u>Bush</u>, 531 U.S. at 105, 121 S.Ct. 525. To this end, states must have "specific rules designed to ensure uniform treatment" of a voter's ballot. <u>Id.</u> at 106, 121 S.Ct. 525.

**2. <u>Standing to Bring Equal Protection Claims</u>**

**\*13** In light of the harms prohibited by the Equal Protection Clause, this court must first consider whether Plaintiffs have standing to bring these claims.

For a case or controversy to be justiciable in federal court, a plaintiff must allege "such a personal stake in the outcome of the controversy as to warrant his invocation of federal court jurisdiction and to justify exercise of the court's remedial powers on his behalf." White Tail Park, Inc. v. Stroube, 413 F.3d 451, 458 (4th Cir. 2005) (quoting Planned Parenthood of S.C. Inc. v. Rose, 361 F.3d 786, 789 (4th Cir. 2004)).

The party seeking to invoke the federal courts' jurisdiction has the burden of satisfying Article III's standing requirement. Miller v. Brown, 462 F.3d 312, 316 (4th Cir. 2006). To meet that burden, a plaintiff must demonstrate three elements: (1) that the plaintiff has suffered an injury in fact that is "concrete and particularized" and "actual or imminent"; (2) that the injury is fairly traceable to the challenged conduct of the defendant; and (3) that a favorable decision is likely to redress the injury. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

In multi-plaintiff cases, "[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint." Town of Chester v. Laroe Estates, Inc., 581 U.S. ——, ——, 137 S. Ct. 1645, 1651, 198 L.Ed.2d 64 (2017). Further, if there is one plaintiff "who has demonstrated standing to assert these rights as his own," the court "need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit." Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264 & n.9, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

In the voting context, "voters who allege facts showing disadvantage to themselves as individuals have standing to sue," Baker, 369 U.S. at 206, 82 S.Ct. 691, so long as their claimed injuries are "distinct from a 'generally available grievance about the government,' " Gill, 138 S. Ct. at 1923 (quoting Lance v. Coffman, 549 U.S. 437, 439, 127 S.Ct. 1194, 167 L.Ed.2d 29 (2007) (per curiam)).

Defendant SBE and Alliance Intervenors argue that Individual Plaintiffs in Wise and Moore have not alleged a concrete and particularized injury under either of the two Equal Protection theories. (Alliance Resp. (Doc. 64) at 14-15; SBE Resp. (Doc. 65) at 12-13.)

First, under a vote dilution theory, they argue that courts have "repeatedly rejected this theory as a basis for standing, both because it is unduly speculative and impermissibly generalized." (Alliance Resp. (Doc. 64) at 17.) Second, under an arbitrary and disparate treatment theory, they argue that the

injury is too generalized because the Numbered Memoranda apply equally to all voters across the state and that Plaintiffs "cannot claim an injury for not having to go through a remedial process put in place for other voters." (SBE Resp. (Doc. 65) at 12.)

Plaintiffs in Moore and Wise do not address standing for their Equal Protection claims in their memoranda in support of their motions for a preliminary injunction. (See Wise Pls.' Mot. (Doc. 43); Moore Pls.' Mot. (Doc. 60).) At oral argument held on October 8, 2020, however, counsel for the Moore Plaintiffs responded to Defendant SBE and Alliance Intervenor's standing arguments. (Oral Argument Tr. (Doc. 70) at 52-59.)

*14 First, under a vote dilution theory, counsel argued that "the Defendants confuse a widespread injury with not having a personal injury," (id. at 53), and that the Supreme Court's decision in Reynolds demonstrates that "impermissible vote dilution occurs when there's ballot box stuffing," (id.), suggesting that each voter would have standing to sue under the Supreme Court's precedent in Reynolds because their vote has less value. (Id.) Second, under an arbitrary and disparate treatment theory, counsel argued that Plaintiffs were subjected to the witness requirement and that "[t]here are burdens associated with that" which support a finding of an injury in fact. (Id. at 56.) Counsel argued the harm that is occurring is not speculative because, for example, voters have and will continue to fail to comply with the witness requirement, (id. at 55-56), and ballots will arrive between the third and ninth day following the election pursuant to the Postmark Requirement, (id. at 58.) Moreover, counsel argued that the "regime" imposed by the state is arbitrary, citing limitations on assistance allowed to complete a ballot, compared to the lessened restrictions associated with the witness requirement under Numbered Memo 2020-19. (Id. at 59.)

This court finds that Individual Plaintiffs in Moore and Wise have not articulated a cognizable injury in fact for their vote dilution claims. However, all of the Individual Plaintiffs in Moore, and one Individual Plaintiff in Wise have articulated an injury in fact for an arbitrary and disparate treatment claim.

a. Vote Dilution

Although the Supreme Court has "long recognized that a person's right to vote is 'individual and personal in nature.' " Gill, 138 S. Ct. at 1930 (citing Reynolds, 377 U.S. at 561, 84

S.Ct. 1362), the Court has expressly held that "vote dilution" refers specifically to "invidiously minimizing or canceling out the voting potential of racial or ethnic minorities," Abbott v. Perez, 585 U.S. ——, ——, 138 S. Ct. 2305, 2314, 201 L.Ed.2d 714 (2018) (internal quotations and modifications omitted) (emphasis added), a harm which occurs where "the particular composition of the voter's own district ... causes his vote – having been packed or cracked – to carry less weight than it would carry in another, hypothetical district." Gill, 138 S. Ct. at 1931.

Indeed, lower courts which have addressed standing in vote dilution cases arising out of the possibility of unlawful or invalid ballots being counted, as Plaintiffs have argued here, have said that this harm is unduly speculative and impermissibly generalized because all voters in a state are affected, rather than a small group of voters. See, e.g., Donald J. Trump for President, Inc. v. Cegavske, Case No. 2:20-CV-1445 JCM (VCF), —— F.Supp.3d ——, ——, 2020 WL 5626974, at *4 (D. Nev. Sept. 18, 2020) ("As with other generally available grievances about the government, plaintiffs seek relief on behalf of their member voters that no more directly and tangibly benefits them than it does the public at large.") (internal quotations and modifications omitted); Martel v. Condos, Case No. 5:20-cv-131, —— F.Supp.3d ——, ——, 2020 WL 5755289, at *4 (D. Vt. Sept. 16, 2020) ("If every voter suffers the same incremental dilution of the franchise caused by some third-party's fraudulent vote, then these voters have experienced a generalized injury."); Paher v. Cegavske, 457 F.Supp.3d 919, 926–27 (D. Nev. 2020) ("Plaintiffs' purported injury of having their votes diluted due to ostensible election fraud may be conceivably raised by any Nevada voter."); Am. Civil Rights Union v. Martinez-Rivera, 166 F. Supp. 3d 779, 789 (W.D. Tex. 2015) ("[T]he risk of vote dilution [is] speculative and, as such, [is] more akin to a generalized grievance about the government than an injury in fact.").

Although "[i]t would over-simplify the standing analysis to conclude that no state-wide election law is subject to challenge simply because it affects all voters," Martel, —— F.Supp.3d at ——, 2020 WL 5755289, at *4, the notion that a single person's vote will be less valuable as a result of unlawful or invalid ballots being cast is not a concrete and particularized injury in fact necessary for Article III standing. Compared to a claim of gerrymandering, in which the injury is specific to a group of voters based on their racial identity or the district where they live, all voters in North Carolina, not just Individual Plaintiffs, would suffer the injury Individual

Plaintiffs allege. This court finds this injury too generalized to give rise to a claim of vote dilution, and thus, neither Plaintiffs in Moore nor in Wise have standing to bring their vote dilution claims under the Equal Protection Clause.

**b. Arbitrary and Disparate Treatment**

 **\*15**  In Bush, the Supreme Court held that, "[h]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." 531 U.S. at 104-05, 121 S.Ct. 525. Plaintiffs argue that they have been subjected to arbitrary and disparate treatment because they voted under one set of rules, and other voters, through the guidance in the Numbered Memoranda, will be permitted to vote invalidly under a different and unequal set of rules, and that this is a concrete and particularized injury. (Oral Argument Tr. (Doc. 70) at 70-71.)

For the purposes of determining whether Plaintiffs have standing, is it not "necessary to decide whether [Plaintiffs'] allegations of impairment of their votes" by Defendant SBE's actions "will, ultimately, entitle them to any relief," Baker, 369 U.S. at 208, 82 S.Ct. 691; whether a harm has occurred is best left to this court's analysis of the merits of Plaintiffs' claims, (see discussion infra Section II.D.3). Instead, the appropriate inquiry is, "[i]f such impairment does produce a legally cognizable injury," whether Plaintiffs "are among those who have sustained it." Baker, 369 U.S. at 208, 82 S.Ct. 691.

This court finds that Individual Plaintiffs in Moore and one Individual Plaintiff in Wise have standing to raise an arbitrary and disparate treatment claim because their injury is concrete, particularized, and not speculative. Bobby Heath and Maxine Whitley, the Individual Plaintiffs in Moore, are registered North Carolina voters who voted absentee by mail and whose ballots have been accepted by SBE. (Moore Compl. (Doc. 1) ¶¶ 9-10.) In Wise, Individual Plaintiff Patsy Wise is a registered voter who cast her absentee ballot by mail. (Wise Compl. (Doc. 1) ¶ 25.)

If Plaintiffs Heath, Whitley, and Wise were voters who intended to vote by mail but who had not yet submitted their ballots, as is the case with the other Individual Plaintiffs in Wise, (Wise Compl. (Doc. 1) ¶¶ 26-28), or voters who had intended to vote in-person either during the Early Voting period or on Election Day, then they would not in fact have

been impacted by the laws and procedures for submission
of absentee ballots by mail and the complained-of injury
would be merely "an injury common to all other registered
voters," Martel, ––– F.Supp.3d at ––––, 2020 WL 5755289,
at *4. See also Donald J. Trump for President, Inc., –––
F.Supp.3d at ––––, 2020 WL 5626974, at *4 ("Plaintiffs never
describe how their member voters will be harmed by vote
dilution where other voters will not."). Indeed, this court
finds that Individual Plaintiffs Clifford, Bambini, and Baum
in Wise do not have standing to challenge the Numbered
Memoranda, because any "shock[ ]" and "serious concern[s]"
they have that their vote "will be negated by improperly cast
or fraudulent ballots," (Wise Compl. (Doc. 1) ¶¶ 26-28), is
merely speculative until such point that they have actually
voted by mail and had their ballots accepted, which Plaintiffs'
Complaint in Wise does not allege has occurred. (Id.)

Yet, because Plaintiffs Heath, Whitley, and Wise have, in fact,
already voted by mail, (Moore Compl. (Doc. 1) ¶¶ 9-10; Wise
Compl. (Doc. 1) ¶ 25), their injury is not speculative. Under
the Numbered Memoranda 2020-19, 2020-22, and 2020-23,
other voters who vote by mail will be subjected to a different
standard than that to which Plaintiffs Heath, Whitley, and
Wise were subjected when they cast their ballots by mail.
Assuming this is an injury that violates the Equal Protection
Clause, Baker, 369 U.S. at 208, 82 S.Ct. 691, the harm alleged
by Plaintiffs is particular to voters in Heath, Whitley, and
Wise's position, rather than a generalized injury that any
North Carolina voter could claim. For this reason, this court
finds that Individual Plaintiffs Heath, Whitley, and Wise have
standing to raise Equal Protection claims under an arbitrary
and disparate treatment theory. Because at least one plaintiff
in each of these multi-plaintiff cases has standing to seek
the relief requested, the court "need not consider whether
the other individual and corporate plaintiffs have standing to
maintain the suit." Vill. of Arlington Heights, 429 U.S. at 264
& n.9, 97 S.Ct. 555.

### 3. Likelihood of Success on the Merits

 **\*16**  Having determined that Individual Plaintiffs have
standing to bring their arbitrary and disparate treatment
claims, this court now considers whether Plaintiffs' claims are
likely to succeed on the merits. To demonstrate a likelihood
of success on the merits, "[a] plaintiff need not establish a
certainty of success, but must make a clear showing that he is
likely to succeed at trial." Di Biase, 872 F.3d at 230.

#### a. Parties' Arguments

Plaintiffs argue that four policies indicated in the Numbered
Memoranda are invalid under the Equal Protection Clause:
(1) the procedure which allows ballots without a witness
signature to be retroactively validated through the cure
procedure indicated in Revised Numbered Memo 2020-19
("Witness Requirement Cure Procedure"); (2) the procedure
which allows absentee ballots to be received up to nine
days after Election Day if they are postmarked on Election
Day, as indicated in Numbered Memo 2020-19 ("Receipt
Deadline Extension"); and (3) the procedure which allows
for anonymous delivery of ballots to unmanned drop boxes,
as indicated in Numbered Memo 2020-23 ("Drop Box Cure
Procedure"); (4) the procedure which allows ballots to be
counted without a United States Postal Service postmark,
as indicated in Numbered Memo 2020-22 ("Postmark
Requirement Changes"). (Moore Compl. (Doc. 1) ¶ 93; Wise
Compl. (Doc. 1) ¶ 124; Wise Pls.' Mot. (Doc. 43) at 13-14.)

Plaintiffs in Wise argue that the changes in these Memoranda
"guarantee that voters will be treated arbitrarily under the
ever-changing voting regimes." (Wise Pls.' Mot. (Doc. 43)
at 11.) Similarly, Plaintiffs in Moore argue that the three
Memoranda were issued "after tens of thousands of North
Carolinians cast their votes following the requirements set
by the General Assembly," which deprives Plaintiffs "of
the Equal Protection Clause's guarantee because it allows
for 'varying standards to determine what [i]s a legal vote.'
" (Moore Compl. (Doc. 1) ¶ 90 (citing Bush, 531 U.S. at 107,
121 S.Ct. 525).)

In response, Defendants argue that the Numbered Memoranda
will not lead to the arbitrary and disparate treatment of
ballots prohibited by the Supreme Court's decision in Bush
v. Gore, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388
(2000). Defendant SBE argues that the consent judgment and
Numbered Memos do "precisely what Bush contemplated: It
establishes uniform and adequate standards for determining
what is a legal vote, all of which apply statewide, well in
advance of Election Day. Indeed, the only thing stopping
uniform statewide standards from going into effect is the
TRO entered in these cases." (SBE Resp. (Doc. 65) at 17.)
Moreover, Defendant SBE argues that the consent judgment
"simply establishes uniform standards that help county boards
ascertain which votes are lawful," and "in no way lets votes
be cast unlawfully." (Id. at 18.)

Alliance Intervenors argue that the Numbered Memos "apply equally to all voters," (Alliance Resp. (Doc. 64) at 18), and "Plaintiffs have not articulated, let alone demonstrated, how their right to vote – or anyone else's – is burdened or valued unequally," (id. at 19). Moreover, Alliance Intervenors argue that the release of the Numbered Memoranda after the election began does not raise equal protection issues because, "[e]lection procedures often change after voting has started to ensure that the fundamental right to vote is protected." (Id. at 20.)

Both Defendant SBE and Alliance Intervenors argue that the release of the Numbered Memoranda after the election began does not raise equal protection issues, as election procedures often change after voting has started. (SBE Resp. (Doc. 65) at 18; Alliance Resp. (Doc. 64) at 20.) For example, Defendant SBE argues that "[i]f it is unconstitutional to extend the receipt deadline for absentee ballots to address mail disruptions, then it would also be unconstitutional to extend hours at polling places on Election Day to address power outages or voting-machine malfunctions." (SBE Resp. (Doc. 65) at 18 (citing N.C. Gen. Stat. § 163-166.01).) "Likewise, the steps that the Board has repeatedly taken to ensure that people can vote in the wake of natural disasters like hurricanes would be invalid if those steps are implemented after voting begins." (Id.)

**b. Analysis**

 **\*17** This court agrees with the parties that an Equal Protection violation occurs where there is both arbitrary and disparate treatment. Bush, 531 U.S. at 105, 121 S.Ct. 525. This court also agrees with Defendants that not all disparate treatment rises to the level of an Equal Protection violation. As Defendant SBE argues, the General Assembly has empowered SBE to make changes to voting policies and procedures throughout the election, including extending hours at polling places or adjusting voting in response to natural disasters. (SBE Resp. (Doc. 65) at 18.) Other federal courts have upheld changes to election procedures even after voting has commenced. For example, in 2018, a federal court enjoined Florida's signature matching procedures and ordered a cure process after the election. Democratic Exec. Comm. of Fla. v. Detzner, 347 F. Supp. 3d 1017, 1031 (N.D. Fla. 2018), appeal dismissed as moot sub nom. Democratic Exec. Comm. of Fla. v. Nat'l Republican Senatorial Comm., 950 F.3d 790 (11th Cir. 2020). Similarly, a Georgia federal court in 2018 ordered a cure process in the middle of the absentee and early

voting periods. Martin v. Kemp, 341 F. Supp. 3d 1326 (N.D. Ga. 2018), appeal dismiss sub nom. Martin v. Sec'y of State of Ga., No. 18-14503-GG, 2018 WL 7139247 (11th Cir. Dec. 11, 2018).

A change in election rules that results in disparate treatment shifts from constitutional to unconstitutional when these rules are also arbitrary. The ordinary definition of the word "arbitrary" refers to matters "[d]epending on individual discretion" or "involving a determination made without consideration of or regard for facts, circumstances, fixed rules, or procedures." Arbitrary, Black's Law Dictionary (11th ed. 2019). This definition aligns with the Supreme Court's holding in Reynolds and Bush, that the State must ensure equal treatment of voters both at the time it grants citizens the right to vote and throughout the election. Bush, 531 U.S. at 104-05, 121 S.Ct. 525 ("Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another."); Reynolds, 377 U.S. at 555, 84 S.Ct. 1362 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

The requirement that a state "grant[ ] the right to vote on equal terms," Bush, 531 U.S. at 104, 121 S.Ct. 525, includes protecting the public "from the diluting effect of illegal ballots," Gray, 372 U.S. at 380, 83 S.Ct. 801. To fulfill this requirement, a state legislature must define the manner in which voting should occur and the minimum requirements for a valid, qualifying ballot. In North Carolina, the General Assembly has passed laws defining the requirements for permissible absentee voting, N.C. Gen. Stat. § 163-226 et seq., including as recently as this summer, when it modified the one-witness requirement, 2020 N.C. Sess. Laws 2020-17 (H.B. 1169) § 1.(a). As this court found in its order issuing a preliminary injunction in Democracy, these requirements reflect a desire by the General Assembly to prevent voter fraud resulting from illegal voting practices. Democracy N. Carolina, ––– F.Supp.3d at ––––, 2020 WL 4484063, at \*35.

A state cannot uphold its obligation to ensure equal treatment of all voters at every stage of the election if another body, including SBE, is permitted to contravene the duly enacted laws of the General Assembly and to permit ballots to be counted that do not satisfy the fixed rules or procedures the state legislature has deemed necessary to prevent illegal voting. Any guidance SBE adopts must be consistent with the

guarantees of equal treatment contemplated by the General Assembly and Equal Protection.

Thus, following this precedent, and the ordinary definition of the word "arbitrary," this court finds that SBE engages in arbitrary behavior when it acts in ways that contravene the fixed rules or procedures the state legislature has established for voting and that fundamentally alter the definition of a validly voted ballot, creating "preferred class[es] of voters." Gray, 372 U.S. at 380, 83 S.Ct. 801.

**\*18** This definition of arbitrariness does not require this court to consider whether the laws enacted by the General Assembly violate other provisions in the North Carolina or U.S. Constitution or whether there are better public policy alternatives to the laws the General Assembly has enacted. These are separate inquiries. This court's review is limited to whether the challenged Numbered Memos are consistent with state law and do not create a preferred class or classes of voters.

### i. Witness Requirement Cure Procedure

This court finds Plaintiffs have demonstrated a likelihood of success on the merits with respect to their Equal Protection challenge to the Witness Requirement Cure Procedure in Revised Memo 2020-19.

Under the 2020 N.C. Sess. Laws 2020-17 (H.B. 1169) § 1. (a), a witnessed absentee ballot must be "marked ... in the presence of at least one [qualified] person ...." This clear language dictates that the witness must be (1) physically present with the voter, and (2) present at the time the ballot is marked by the voter.

Revised Memo 2020-19 counsels that ballots missing a witness signature may be cured where voters sign and affirm the following statement:

I am submitting this affidavit to correct a problem with missing information on the ballot envelope. I am an eligible voter in this election and registered to vote in [name] County, North Carolina. I solemnly swear or affirm that I voted and returned my absentee ballot for the November 3, 2020 general election and that I have not voted and will not vote more than one ballot in this election. I understand that fraudulently or falsely completing this affidavit is a Class

I felony under Chapter 163 of the North Carolina General Statutes.

(Moore v. Circosta, No. 1:20CV911 (Doc. 45-1) at 34.)

This "cure" affidavit language makes no mention of whether a witness was in the presence of the voter at the time that the voter cast their ballot, which is the essence of the Legislature's Witness Requirement. 2020 N.C. Sess. Laws 2020-17 (H.B. 1169) § 1.(a). In fact, a voter could truthfully sign and affirm this statement and have their ballot counted by their county board of elections without any witness becoming involved in the process.[6] Because the effect of this affidavit is to eliminate the statutorily required witness requirement, this court finds that Plaintiffs have demonstrated a likelihood of success on the merits in proving that the Witness Requirement Cure Procedure indicated in Revised Memo 2020-19 is arbitrary.

6      Plaintiffs do not challenge the use of the cure affidavit for ballot deficiencies generally, aside from arguing that the cure affidavit circumvents the statutory Witness Requirement. (See Moore Compl. (Doc. 1) ¶ 93; Wise Compl. (Doc. 1) ¶ 124.) Although not raised by Plaintiffs, this courts finds the indefiniteness of the cure affidavit language troubling as a means of correcting even curable ballot deficiencies.

During oral arguments, Defendants did not and could not clearly define what it means to "vote," (see, e.g., Oral Argument Tr. (Doc. 70) at 130-32), which is all that the affidavit requires voters to attest that they have done. (Moore v. Circosta, No. 1:20CV911, State Court Consent Judgment (Doc. 45-1) at 34.) Under the vague "I voted" language used in the affidavit, a voter who completed their ballot with assistance from an unauthorized individual; a voter who does not qualify for voting assistance; or a voter who simply delegated the responsibility for completing their ballot to another person could truthfully sign this affidavit, although all three acts are prohibited under state law. See N.C. Gen. Stat. § 163-226.3(a)(1). Because the cure affidavit does not define what it means to vote, voters are permitted to decide what that means for themselves.

This presents additional Equal Protection concerns. A state must ensure that there is "no preferred class of voters but equality among those who meet the basic qualifications." Gray, 372 U.S. at 380, 83 S.Ct. 801. Because the affidavit does not serve as an adequate means to ensure that voters did not engage in unauthorized ballot casting procedures, inevitably, not all voters will be held to the same standards for casting their ballot. This is, by definition, arbitrary and disparate treatment inconsistent with existing state law.

This court's concerns notwithstanding, however, Plaintiffs do not challenge the use of a cure affidavit in other contexts, so this court will decline to enjoin the use of a cure affidavit beyond its application as an alternative for compliance with the Witness Requirement.

**\*19** Based on counsel's statements at oral arguments, Defendant SBE may contend that the guidance in Revised Memo 2020-19 is not arbitrary because it was necessary to resolve the <u>Alliance</u> state court action. (Oral Argument Tr. (Doc. 70) at 105 ("Our reading then of state law is that the Board has the authority to make adjustments in emergencies or as a means of settling protracted litigation until the General Assembly reconvenes.").) However, Defendant SBE's arguments to the state court judge and the court in the Eastern District of North Carolina belie that assertion, as they advised the state court that both the original Memo 2020-19 and the Revised Memo were issued "to ensure full compliance with the injunction entered by Judge Osteen," (SBE State Court Br. (Doc. 68-1) at 15), and they advised the court in the Eastern District of North Carolina that they had issued the revised Memo 2020-19 "in order to comply with Judge Osteen's preliminary injunction in the <u>Democracy</u> N.C. action in the Middle District." (TRO (Doc. 47) at 9.) As this court more fully explains in its order issued in <u>Democracy</u>, this court finds that Defendant SBE improperly used this court's August <u>Democracy</u> Order to modify the witness requirement. <u>Democracy v. N. Carolina</u>, No. 1:20CV457, 2020 WL 6058048 (M.D.N.C. Oct. 14, 2020) (enjoining witness cure procedure). Because Defendant SBE acted improperly in that fashion, this court declines to accept an argument now that elimination of the witness requirement was a rational and justifiable basis upon which to settle the state lawsuit. Furthermore, it is difficult to conceive that SBE was authorized to resolve a pending lawsuit that could create a preferred class of voters: those who may submit an absentee ballot without a witness under an affidavit with no definition of the meaning of "vote."

This court also finds Plaintiffs have demonstrated a likelihood of success on the merits in proving disparate treatment may result as a result of the elimination of the Witness Requirement. Individual Plaintiffs Wise, Heath, and Whitley assert that they voted absentee by mail, including complying with the Witness Requirement. (<u>Wise</u> Compl. (Doc. 1) ¶ 25; <u>Moore</u> Compl. (Doc. 1) ¶¶ 9-10.) Whether because a voter inadvertently cast a ballot without a witness or because a voter was aware of the "cure" procedure and thus, willfully did not cast a ballot with a witness, there will be voters whose ballots are cast without a witness. Accordingly, this

court finds that Plaintiffs have demonstrated a likelihood of success on the merits in proving that the Witness Requirement Cure Procedure indicated in Memo 2020-19 creates disparate treatment.

Thus, because Plaintiffs have demonstrated a likelihood of success on the merits with respect to arbitrary and disparate treatment that may result from under Witness Requirement Cure Procedure in Revised Memo 2020-19, this court finds Plaintiffs have established a likelihood of success on their Equal Protection claim.

### ii. <u>Receipt Deadline Extension</u>

This court finds that Plaintiffs are likely to succeed on their Equal Protection challenge to the Receipt Deadline Extension in Revised Memo 2020-19.

Under N.C. Gen. Stat. § 163-231(b), in order to be counted, civilian absentee ballots must have been received by the county board office by 5 p.m. on Election Day, November 3, 2020, or if postmarked by Election Day, by 5:00 p.m. on November 6, 2020. The guidance in Revised Memo 2020-19 extends the time in which absentee ballots must be returned, allowing a late civilian ballot to be counted if postmarked on or before Election Day and received by 5:00 p.m. on November 12, 2020 (Revised Memo 2020-19 (Doc. 36-3) at 5.)

Alliance Intervenors argue that, "[t]o the extent Numbered Memo 2020-22 introduces a new deadline, it affects only the counting of ballots for election officials after Election Day has passed – not when voters themselves must submit their ballots. All North Carolina absentee voters still must mail their ballots by Election Day." (Alliance Resp. (Doc. 64) at 21.)

This court disagrees, finding Plaintiffs have demonstrated a likelihood of success on the merits in proving that this change contravenes the express deadline established by the General Assembly, by extending the deadline from three days after Election Day, to nine days after Election Day. Moreover, it results in disparate treatment, as voters like Individual Plaintiffs returned their ballots within the time-frame permitted under state law, (<u>Wise</u> Compl. (Doc. 1) ¶ 25; <u>Moore</u> Compl. (Doc. 1) ¶¶ 9-10), but other voters whose ballots would otherwise not be counted if received three days

after Election Day, will now have an additional six days to return their ballot.

Because Plaintiffs have demonstrated a likelihood of success on the merits in proving arbitrary and disparate treatment may result under the Receipt Deadline Extension, this court finds Plaintiffs have established a likelihood of success on the merits of their Equal Protection claim.

### iii. Drop Box Cure Procedure

**\*20** Plaintiffs have failed to establish a likelihood of success, however, on their Equal Protection challenge to the Drop Box Cure Procedure indicated in Numbered Memo 2020-23. (Wise, No. 1:20CV912, Memo 2020-23 (Doc. 1-4).)

N.C. Gen. Stat. § 163-226.3(a)(5) makes it a felony for any person other than the voter's near relative or legal guardian to take possession of an absentee ballot of another voter for delivery or for return to a county board of elections.

"Because of this provision in the law," and the need to ensure compliance with it, SBE recognized in Memo 2020-23 that, "an absentee ballot may not be left in an unmanned drop box," (Wise, No. 1:20CV912, Memo 2020-23 (Doc. 1-4) at 2), and directed county boards which have a "drop box, slot, or similar container at their office" for other business purposes to place a "sign indicating that absentee ballots may not be deposited in it." (Id.)

Moreover, the guidance reminds county boards that they must keep a written log when any person returns an absentee ballot in person, which includes the name of the individual returning the ballot, their relationship to the voter, the ballot number, and the date it was received. (Id. at 3.) If the individual who drops off the ballot is not the voter, their near relative, or legal guardian, the log must also record their address and phone number. (Id.) The guidance also advises county boards that "[f]ailure to comply with the logging requirement, or delivery or an absentee ballot by a person other than the voter, the voter's near relative, or the voter's legal guardian, is not sufficient evidence in and of itself to establish that the voter did not lawfully vote their ballot." (Id. at 3.) Instead, the guidance advises the county board that they "may ... consider the delivery of a ballot ... in conjunction with other evidence in determining whether the ballot is valid and should be counted." (Id. at 4.)

Plaintiffs argue that this guidance "undermines the General Assembly's criminal prohibition of the unlawful delivery of ballots," (Moore Compl. (Doc. 1) ¶ 68), and "effectively allow[s] voters to use drop boxes for absentee ballots," (Wise Pls.' Mot. (Doc. 43) at 13), and thus, violates the Equal Protection Clause, (Moore Compl. (Doc. 1) ¶ 93). This court disagrees.

Although Numbered Memo 2020-23 was released on September 22, 2020, (Wise, No. 1:20CV912, Memo 2020-23 (Doc. 1-4) at 2), the guidance it contains is not new. Consistent with the guidance in Numbered Memo 2020-23, SBE administrative rules adopted on December 1, 2018, require that any person delivering a ballot to a county board of elections office provide:

(1) Name of voter;

(2) Name of person delivering ballot;

(3) Relationship to voter;

(4) Phone Number (if available) and current address of person delivering ballot;

(5) Date and time of delivery of ballot; and

(6) Signature or mark of person delivering ballot certifying that the information provided is true and correct and that the person is the voter or the voter's near relative as defined in [N.C. Gen. Stat § 163-226(f)] or verifiable legal guardian as defined in [N.C. Gen. Stat. § 163-226(e)].

8 N.C. Admin. Code 18.0102 (2018). Moreover, the administrative rule states that "the county board of elections may consider the delivery of a ballot in accordance with this Rule in conjunction with other evidence in determining whether the container-return envelope has been properly executed according to the requirements of [N.C. Gen. Stat. § 163-231]," (id.), and that "[f]ailure to comply with this Rule shall not constitute evidence sufficient in and of itself to establish that the voter did not lawfully vote his or her ballot." (Id.)

**\*21** Because the guidance contained in Numbered Memo 2020-23 was already in effect at the start of this election as a result of SBE's administrative rules, Individual Plaintiffs were already subject to it at the time that they cast their votes. Accordingly, because all voters were subject to the same guidance, Plaintiffs have not demonstrated a likelihood of success on the merits in proving disparate treatment.

It is a closer issue with respect to whether Plaintiffs have demonstrated a likelihood of success on the merits in proving that the rules promulgated by Defendant SBE are inconsistent with N.C. Gen. Stat. § 163-226.3(a)(5).

This statute makes it a felony for any person other than the voter's near relative or legal guardian to take possession of an absentee ballot of another voter for delivery or for return to a county board of elections. Id. It would seem logically inconsistent that the General Assembly would criminalize this behavior, while at the same time, permit ballots returned by unauthorized third parties to be considered valid. Yet, upon review of the legislative history, this court finds the felony statute has been in force since 1979, 1979 N.C. Sess. Laws Ch. 799 (S.B. 519) § 4, https://www.ncleg.gov/enactedlegislation/sessionlaws/pdf/1979-1980/sl1979-799.pdf (last visited Oct. 13, 2020), and in its current form since 2013. 2013 N.C. Sess. Laws 381 (H.B. 589) § 4.6.(a).

That the General Assembly, by not taking legislative action, and instead, permitted SBE's administrative rule and the General Assembly's statute to coexist for nearly two years and through several other elections undermines Plaintiffs' argument that Defendant SBE has acted arbitrarily. For this reason, this court finds that Plaintiffs have not demonstrated a likelihood of success on the merits in proving the arbitrariness of the guidance in Numbered Memo 2020-23 and accordingly, Plaintiffs have failed to establish a likelihood of success on their Equal Protection challenge to Numbered Memo 2020-23.

If the General Assembly believes that SBE's administrative rules are inconsistent with its public policy goals, they are empowered to pass legislation which overturns the practice permitted under the administrative rule.

### iv. Postmark Requirement Changes

Similarly, this court finds that Plaintiffs have failed to establish likelihood of success on the merits with respect to their Equal Protection challenge to the Postmark Requirement Changes in Numbered Memo 2020-22. (Wise, 1:20CV912, Memo 2020-22 (Doc. 1-3).)

Under Numbered Memo 2020-22, a ballot will be considered postmarked by Election Day if it has a USPS postmark, there is information in BallotTrax, or "another tracking service offered by the USPS or a commercial carrier, indicat[es] that

the ballot was in the custody of USPS or the commercial carrier on or before Election Day." (Id. at 3.) This court finds that these changes are consistent with N.C. Gen. Stat. § 163-231(b)(2)b, which does not define what constitutes a "postmark," and instead, merely states that ballots received after 5:00 p.m. on Election Day may not be accepted unless the ballot is "postmarked and that postmark is dated on or before the day of the ... general election ... and are received by the county board of elections not later than three days after the election by 5:00 p.m."

In the absence of a statutory definition for postmark, this court finds Plaintiffs have not demonstrated a likelihood of success on the merits in proving that Numbered Memo 2020-22 is inconsistent with N.C. Gen. Stat. § 163-231(b)(2)b, and thus, arbitrary. If the General Assembly believes that the Postmark Requirement Changes indicated in Memo 2020-22 are inconsistent with its public policy goals, they are empowered to pass legislation which further specifies the definition of a "postmark." In the absence of such legislation, however, this court finds that Plaintiffs have failed to establish a likelihood of success on the merits of their Equal Protection challenge.

### 4. Irreparable Harm

**\*22** In addition to a likelihood of success on the merits, a plaintiff must also make a "clear showing that it is likely to be irreparably harmed absent preliminary relief" in order to obtain a preliminary injunction. UBS Fin. Servs. Inc. v. Carilion Clinic, 880 F. Supp. 2d 724, 733 (E.D. Va. 2012) (quoting Real Truth About Obama, Inc. v. Fed. Election Comm'n, 575 F.3d 342, 347 (4th Cir. 2009)). Further, an injury is typically deemed irreparable if monetary damages are inadequate or difficult to ascertain. See Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546, 551 (4th Cir. 1994), abrogated on other grounds by Winter, 555 U.S. at 22, 129 S.Ct. 365. "Courts routinely deem restrictions on fundamental voting rights irreparable injury." League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 247 (4th Cir. 2014). "[O]nce the election occurs, there can be no do-over and no redress. The injury to these voters is real and completely irreparable if nothing is done to enjoin th[ese] law[s]." Id.

The court therefore finds Plaintiffs have demonstrated a likelihood of irreparable injury regarding the Equal Protection

challenges to the Witness Requirement and the Receipt Deadline Extension.

## 5. **Balance of Equities**

The third factor in determining whether preliminary relief is appropriate is whether the plaintiff demonstrates "that the balance of equities tips in his favors." Winter, 555 U.S. at 20, 129 S.Ct. 365.

The Supreme Court's decision in Purcell v. Gonzalez, 549 U.S. 1, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006), urges that this court should issue injunctive relief as narrowly as possible. The Supreme Court has made clear that "lower federal courts should ordinarily not alter the election rules on the eve of an election," Republican Nat'l Comm. v. Democratic Nat'l Comm., 589 U.S. ——, ——, 140 S. Ct. 1205, 1207, 206 L.Ed.2d 452 (2020) (per curiam), as a court order affecting election rules will progressively increase the risk of "voter confusion" as "an election draws closer." Purcell, 549 U.S. at 4-5, 127 S.Ct. 5; see also Texas All. for Retired Americans v. Hughs, —— F.3d ——, ——, 2020 WL 5816887, at *2 (5th Cir. Sept. 30, 2020) ("The principle ... is clear: court changes of election laws close in time to the election are strongly disfavored."). This year alone, the Purcell doctrine of noninterference has been invoked by federal courts in cases involving witness requirements and cure provisions during COVID-19, Clark v. Edwards, Civil Action No. 20-283-SDD-RLB, —— F.Supp.3d ——, —— – ——, 2020 WL 3415376, at *1-2 (M.D. La. June 22, 2020); the implementation of an all-mail election plan developed by county election officials, Paher v. Cegavske, 2020 WL 2748301, at *1, *6 (D. Nev. 2020); and the use of college IDs for voting, Common Cause v. Thomsen, No. 19-cv-323-JDP, 2020 WL 5665475, at *1 (W.D. Wis. Sept. 23, 2020) – just to name a few.

Purcell is not a per se rejection of any injunctive relief close to an election. However, as the Supreme Court's restoration of the South Carolina witness requirement last week illustrates, a heavy thumb on the scale weighs against changes to voting regulations. Andino v. Middleton, —— U.S. ——, —— S.Ct. ——, —— L.Ed.2d ——, 2020 WL 5887393, at *1 (Oct. 5, 2020) (Kavanaugh, J., concurring) ("By enjoining South Carolina's witness requirement shortly before the election, the District Court defied [the Purcell] principle and this Court's precedents.").

In this case, there are two SBE revisions where this court has found that Plaintiffs are likely to succeed on the merits. First, the Witness Requirement Cure Procedure, which determines whether SBE will send the voter a cure certification or spoil the ballot and issue a new one. This court has, on separate grounds, already enjoined the Witness Requirement Cure Procedure in Democracy North Carolina v. North Carolina State Board of Elections, No. 1:20CV457, 2020 WL 6058048 (M.D.N.C. Oct. 14, 2020) (enjoining witness cure procedure). Thus, the issue of injunctive relief on the Witness Requirement Cure Procedure is moot at this time. Nevertheless, in the absence of relief in Democracy, it seems likely that SBE's creation of "preferred class[es] of voters", Gray, 372 U.S. at 380, 83 S.Ct. 801, with elimination of the witness requirement and the cure procedure could merit relief in this case.

**\*23** Ripe for this court's consideration is the Receipt Deadline Extension, which contradicts state statutes regarding when a ballot may be counted. Ultimately, this court will decline to enjoin the Receipt Deadline Extension, in spite of its likely unconstitutionality and the potential for irreparable injury. The Purcell doctrine dictates that this court must "ordinarily" refrain from interfering with election rules. Republican Nat'l Comm., 140 S. Ct. at 1207. These issues may be taken up by federal courts after the election, or at any time in state courts and the legislature. However, in the middle of an election, less than a month before Election Day itself, this court cannot cause "judicially created confusion" by changing election rules. Id. Accordingly, this court declines to impose a preliminary injunction because the balance of equities weighs heavily against such an injunction.

## E. **Plaintiffs' Electors Clause and Elections Clause Claims**

As an initial matter, this court will address the substantive issues of the Electors Clause and the Elections Clause together. The Electors Clause of the U.S. Constitution requires "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors" for President. U.S. Const. art. II, § 1, cl. 2. Plaintiffs in Wise argue that, in order to "effectuate" this Electors requirement, "the State must complete its canvas of all votes cast by three weeks after the general election" under N.C. Gen. Stat. § 163-182.5(c). (Wise Pls.' Mot. (Doc. 43) at 15.) Plaintiffs argue that (1) the extension of the ballot receipt deadline and (2) the changing of the postmark requirement "threaten to extend the process and threaten disenfranchisement," as

North Carolina "must certify its electors by December 14 or else lose its voice in the Electoral College. (Id.)

The meaning of "Legislature" within the Electors Clause can be analyzed in the same way as "Legislature" within the Elections Clause. For example,

> As an initial matter, the Court finds no need to distinguish between the term 'Legislature' as it is used in the Elections Clause as opposed to the Electors Clause. Not only were both these clauses adopted during the 1787 Constitutional Convention, but the clauses share a "considerable similarity.
>
> ....
>
> ... [T]he Court finds that the term "Legislature" is used in a sufficiently similar context in both clauses to properly afford the term an identical meaning in both instances.

Donald J. Trump for President, Inc. v. Bullock, No. CV 20-66-H-DLC, ——— F.Supp.3d ———, ———, 2020 WL 5810556, at *11 (D. Mont. Sept. 30, 2020). Nor do Plaintiffs assert any difference in the meaning they assign to "Legislature" and its authority between the two Clauses.

This court finds that all Plaintiffs lack standing under either Clause. The discussion infra of the Elections Clause applies equally to the Electors Clause.

**1. Elections Clause**

**a. Standing**

The Elections Clause standing analysis differs in Moore and Wise, though this court ultimately arrives at the same conclusion in both cases.

**i. Standing in Wise**

In Wise, Plaintiffs are private parties clearly established by Supreme Court precedent to have no standing to contest the Elections Clause in this manner. Plaintiffs are individual voters, a campaign committee, national political parties, and two Members of the U.S. House of Representatives. Even though Plaintiffs are part of the General Assembly, they bring their Elections Clause claim alleging an institutional harm to the General Assembly. Though the Plaintiffs claim to have

suffered "immediate and irreparable harm", (Wise Compl. (Doc. 1) ¶¶ 100, 109), this does not establish standing for their Elections Clause claim or Electors Clause claim. See Corman v. Torres, 287 F. Supp. 3d 558, 573 (M.D. Pa. 2018) ("[T]he Elections Clause claims asserted in the verified complaint belong, if they belong to anyone, only to the ... General Assembly."). The Supreme Court has already held that a private citizen does not have standing to bring an Elections Clause challenge without further, more particularized harms. See Lance, 549 U.S. at 441-42, 127 S.Ct. 1194 ("The only injury [private citizen] plaintiffs allege is that ... the Elections Clause ... has not been followed. This injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance in the past."). Plaintiffs allege no such extra harms, and in fact, do not speak to standing in their brief at all.

**ii. Standing in Moore**

*24 In Moore, both Plaintiff Moore and Plaintiff Berger are leaders of chambers in the General Assembly. The Plaintiffs allege harm stemming from SBE flouting the General Assembly's institutional authority. (Wise Pls.' Mot. (Doc. 43) at 16.) However, as Proposed Intervenors NC Alliance argue, "a subset of legislators has no standing to bring a case based on purported harm to the Legislature as a whole." (Alliance Resp. (Doc. 64) at 15.) The Supreme Court has held that legislative plaintiffs can bring Elections Clause claims on behalf of the legislature itself only if they allege some extra, particularized harm to themselves – or some direct authority from the whole legislative body to bring the legal claim. Specifically, the Supreme Court found a lack of standing where "[legislative plaintiffs] have alleged no injury to themselves as individuals"; where "the institutional injury they allege is wholly abstract and widely disperse"; and where the plaintiffs "have not been authorized to represent their respective Houses of Congress in this action." Raines v. Byrd, 521 U.S. 811, 829, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997).

An opinion in a very similar case in the Middle District of Pennsylvania is instructive:

> [T]he claims in the complaint rest solely on the purported usurpation of the Pennsylvania General Assembly's exclusive rights under the Elections Clause of the United States Constitution. We do not gainsay that these [two] Senate leaders are in some sense aggrieved by the

Pennsylvania Supreme Court's actions. But that grievance alone does not carry them over the standing bar. United States Supreme Court precedent is clear — a legislator suffers no Article III injury when alleged harm is borne equally by all members of the legislature.

Corman, 287 F. Supp. 3d at 567. In the instant case, the two members of the legislature do not allege individual injury. The institutional injury they allege is dispersed across the entire General Assembly. The crucial element, then, is whether Moore and Berger are authorized by the General Assembly to represent its interests. The General Assembly has not directly authorized Plaintiffs to represent its interests in this specific case. See Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n, 576 U.S. 787, 802, 135 S.Ct. 2652, 192 L.Ed.2d 704 (2015) (finding plaintiff "[t]he Arizona Legislature" had standing in an Elections Clause case only because it was "an institutional plaintiff asserting an institutional injury" which "commenced this action after authorizing votes in both of its chambers"). Moore and Berger argued the general authorization in N.C. Gen. Stat. Section 120-32.6(b), which explicitly authorizes them to represent the General Assembly "[w]henever the validity or constitutionality of an act of the General Assembly or a provision of the Constitution of North Carolina is the subject of an action in any State or federal court." N.C. Gen. Stat. § 120-32.6(b). The text of § 120-32.6 references N.C. Gen. Stat. § 1-72.2, which further specifies that Plaintiffs will "jointly have standing to intervene on behalf of the General Assembly as a party in any judicial proceeding challenging a North Carolina statute or provision of the North Carolina Constitution." (emphasis added).

Neither statute, however, authorizes them to represent the General Assembly as a whole when acting as plaintiffs in a case such as this one. See N.C. State Conference of NAACP v. Berger, 970 F.3d 489, 501 (4th Cir. 2020) (granting standing to Moore and Berger in case where North Carolina law was directly challenged, distinguishing "execution of the law" from "defense of a challenged act"). The facts of this case do not match up with this court's prior application of N.C. Gen. Stat. § 1-72.2, which has been invoked where legislators defend the constitutionality of legislation passed by the legislature when the executive declines to do so. See Fisher-Borne v. Smith, 14 F. Supp. 3d 699, 703 (M.D.N.C. 2014). Furthermore, to the extent Plaintiffs Moore and Berger disagree with the challenged provisions of the Consent Judgment, they have not alleged they lack the authority to bring the legislature back into session to negate SBE's exercise of settlement authority. See N.C. Gen. Stat. § 163-22.2.

*25 Thus, even Plaintiff Moore and Plaintiff Berger lack standing to proceed with the Elections Clause claim. Nonetheless, this court will briefly address the merits as well.

## 2. Merits of Elections Clause Claim

### a. The 'Legislature' May Delegate to SBE

The Elections Clause of the U.S. Constitution states that the "Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." U.S. Const. art. I, § 4, cl. 1. Plaintiffs assert that the General Assembly instituted one such time/place/manner rule regarding the election by passing H.B. 1169. Therefore, Plaintiffs argue, SBE "usurped the General Assembly's authority" when it "plainly modif[ied]" what the General Assembly had implemented. (Wise Pls.' Mot. (Doc. 43) at 14.)

The Elections Clause certainly prevents entities other than the legislature from unilaterally tinkering with election logistics and procedures. However, Plaintiffs fail to establish that the Elections Clause forbids the legislature itself from voluntarily delegating this authority. The "Legislature" of a state may constitutionally delegate the power to implement election rules – even rules that may contradict previously enacted statutes.

State legislatures historically have the power and ability to delegate their legislative authority over elections and remain in compliance with the Elections Clause. Ariz. State Legislature, 576 U.S. at 816, 135 S.Ct. 2652 (noting that, despite the Elections Clause, "States retain autonomy to establish their own governmental processes"). Here, the North Carolina General Assembly has delegated some authority to SBE to contravene previously enacted statutes, particularly in the event of certain "unexpected circumstances." (SBE Resp. (Doc. 65) at 15.)

The General Assembly anticipated that SBE may need to implement rules that would contradict previously enacted statutes. See N.C. Gen. Stat. § 163-27.1(a) ("In exercising those emergency powers, the Executive Director shall avoid unnecessary conflict with the provisions of this Chapter." (emphasis added)). Plaintiffs claim that "[t]he General Assembly could not, consistent with the Constitution of the United States, delegate to the Board of Elections the

power to suspend or re-write the state's election laws." (Wise Compl. (Doc. 1) ¶ 97.) This would mean that the General Assembly could not delegate <u>any</u> emergency powers to SBE. For example, if a hurricane wiped out all the polling places in North Carolina, Plaintiffs' reading of the Constitution would <u>prohibit</u> the legislature from delegating to SBE <u>any</u> power to contradict earlier state law regarding election procedures. (See SBE Resp. (Doc. 65) at 15).

As courts have adopted a broad understanding of "Legislature" as written in the Elections Clause, <u>see</u> <u>Corman</u>, 287 F. Supp. 3d at 573, it follows that a valid delegation from the General Assembly allowing SBE to override the General Assembly in certain circumstances would not be unconstitutional. <u>See</u> <u>Donald J. Trump for President</u>, ––– F.Supp.3d at ––––, 2020 WL 5810556, at *12 (finding that the legislature's "decision to afford" the Governor certain statutory powers to alter the time/place/manner of elections was legitimate under the Elections Clause).

**b. <u>Whether SBE Exceeded Legitimate Delegated Powers</u>**

**\*26** The true question becomes, then, whether SBE was truly acting within the power legitimately delegated to it by the General Assembly. Even Proposed Intervenors NC Alliance note that SBE's actions "could ... constitute plausible violations of the Elections Clause if they exceeded the authority granted to [SBE] by the General Assembly." (Alliance Resp. (Doc. 64) at 19.)

SBE used two sources of authority to enter into the Consent Agreement changing the laws and rules of the election process after it had begun: N.C. Gen. Stat. § 163-22.2 and § 163-27.1.

**i. <u>SBE's Authority to Avoid Protracted Litigation</u>**

First, this court finds that, while N.C. Gen. Stat. § 163-22.2 authorizes agreements in lieu of protracted litigation, it does not authorize the extensive measures taken in the Consent Agreement:

> In the event any portion of Chapter 163 of the General Statutes or any State election law or form of election of any county board of commissioners, local board of education, or city officer is held unconstitutional or invalid by a State or federal court or is unenforceable because of objection interposed by the United States Justice Department under

the Voting Rights Act of 1965 and such ruling adversely affects the conduct and holding of any pending primary or election, the State Board of Elections shall have authority to make reasonable interim rules and regulations with respect to the pending primary or election as it deems advisable so long as they do not conflict with any provisions of this Chapter 163 of the General Statutes and such rules and regulations shall become null and void 60 days after the convening of the next regular session of the General Assembly. The State Board of Elections shall also be authorized, upon recommendation of the Attorney General, to enter into agreement with the courts in lieu of protracted litigation until such time as the General Assembly convenes.

N.C. Gen. Stat. § 163-22.2. While the authority delegated under this statute is broad, it limits SBE's powers to implementing rules that "do not conflict with any provisions of this Chapter." Moreover, this power appears to exist only "until such time as the General Assembly convenes." Id. By eliminating the witness requirement, SBE implemented a rule that conflicted directly with the statutes enacted by the North Carolina legislature.

Moreover, SBE's power to "enter into agreement with the courts in lieu of protracted litigation" is limited by the language "until such time as the General Assembly convenes." Id. Plaintiffs appear to have a remedy to what they contend is an overreach of SBE authority by convening.

**ii. <u>SBE's Power to Override the Legislature in an Emergency</u>**

Second, Defendants rely upon N.C. Gen. Stat. § 163-27.1. That statute provides:

> (a) The Executive Director, as chief State elections official, may exercise emergency powers to conduct an election in a district where the normal schedule for the election is disrupted by any of the following:

> (1) A natural disaster.

> (2) Extremely inclement weather.

> (3) An armed conflict involving Armed Forces of the United States, or mobilization of those forces, including North Carolina National Guard and reserve components of the Armed Forces of the United States.

N.C. Gen. Stat. § 163-27.1(a)(1-3). As neither (a)(2) or (3) apply, the parties agree that only (a)(1), a natural disaster, is at issue in this case. On March 10, 2020, the Governor of North Carolina declared a state of emergency as a result of the spread of COVID-19. N.C. Exec. Order No. 116 (March 10, 2020). Notably, the Governor did not declare a disaster pursuant to N.C. Gen. Stat. § 166A-19.21. Instead, on March 25, 2020, it was the President of the United States who declared a state of disaster existed in North Carolina:

> **\*27**  I have determined that the emergency conditions in the State of North Carolina resulting from the Coronavirus Disease 2019 (COVID-19) pandemic beginning on January 20, 2020, and continuing, are of sufficient severity and magnitude to warrant a <u>major disaster declaration</u> under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 et seq. (the "Stafford Act"). Therefore, I declare that such a major disaster exists in the State of North Carolina.

Notice, North Carolina; Major Disaster and Related Determinations, 85 Fed. Reg. 20701 (Mar. 25, 2020) (emphasis added). The President cited the Stafford Act as justification for declaring a major disaster. See 42 U.S.C. § 5122(2). Notably, neither the Governor's Emergency Proclamation nor the Presidential Proclamation identified COVID-19 as a natural disaster.

On March 12, 2020, the Executive Director of SBE, Karen Brinson Bell ("Bell"), crafted an amendment to SBE's Emergency Powers rule. Bell's proposed rule change provided as follows:

> (a) In exercising his or her emergency powers and determining whether the "normal schedule" for the election has been disrupted in accordance with G.S. ~~163A-750~~ , <u>163-27.1</u>, the Executive Director shall consider whether one or more components of <u>election</u> administration has been impaired. The Executive Director shall consult with State <u>Board</u> members when exercising his or her emergency powers if feasible given the circumstances set forth in this Rule.

> (b) For the purposes of G.S. ~~163A-750~~ , <u>163-27.1</u>, the following shall apply:

> (1) A natural disaster or extremely inclement weather include ~~a~~: <u>any of the following</u>:

> (A) Hurricane;

> (B) Tornado;

(C) Storm or snowstorm;

(D) Flood;

(E) Tidal wave or tsunami;

(F) Earthquake or volcanic eruption;

(G) Landslide or mudslide; or

(H) Catastrophe arising from natural causes ~~resulted and resulting~~ <u>in a disaster declaration by the President of the United States or the</u> ~~Governor.~~ <u>Governor, a national emergency declaration by the President of the United States, or a state of emergency declaration issued under G.S. 166A-19.3(19).</u> "<u>Catastrophe arising from natural causes</u>" <u>includes a disease epidemic or other public health incident. The disease epidemic or other public health incident must make</u> [~~that makes~~ ] <u>it impossible or extremely hazardous for elections officials or voters to reach or otherwise access the voting</u> [~~place or that creates~~ ] <u>place, create a significant risk of physical harm to persons in the voting place, or</u> [~~that~~ ] <u>would otherwise convince a reasonable person to avoid traveling to or being in a voting place.</u>

https://files.nc.gov/ncoah/documents/Rules/RRC/06182020-Follow-up-Tab-B-Board-of-Elections.pdf at 5 (proposed changes in strikethroughs, or underline.) Shortly after submitting the rule change, effective March 20, 2020, SBE declared COVID-19 a natural disaster, attempting to invoke its authority under the Emergency Powers Statute, § 163-27.1. However, the Rules Review Commission subsequently unanimously rejected Bell's proposed rule change, finding in part that there was a "lack of statutory authority as set forth in G.S. 150B-21.9(a)(1)," and more specifically, that "the [SBE] does not have the authority to expand the definition of 'natural disaster' as proposed." North Carolina Office of Administrative Hearings, Rules Review Commission Meeting Minutes (May 21, 2020), at 4 https://files.nc.gov/ncoah/Minutes-May-2020.pdf.

In a June 12, 2020 letter, the Rules Review Commission Counsel indicated that Bell had responded to the committee's findings by stating "that the agency will not be submitting a new statement or additional findings," and, as a result, "the Rule [was] returned" to the agency. Letter re: Return of Rule 08 NCAC 01.0106 (June 12, 2020) at 1 https://files.nc.gov/ncoah/documents/Rules/RRC/06182020-Follow-up-Tab-B-Board-of-Elections.pdf.

Despite the Rules Review Commission's rejection of Bell's proposed changes, on July 17, 2020, Bell issued an Emergency Order with the following findings:

**\*28** 18. N.C. Gen. Stat. § 163-27.1 and 08 NCAC 01. 0106 authorize me to exercise emergency powers to conduct an election where the normal schedule is disrupted by a catastrophe arising from natural causes that has resulted in a disaster declaration by the President of the United States or the Governor, while avoiding unnecessary conflict with the laws of North Carolina. The emergency remedial measures set forth here are calculated to offset the nature and scope of the disruption from the COVID-19 disaster.

19. Pursuant to N.C. Gen. Stat. § 163-27.1 and 08 NCAC 01. 0106(a) and (b), and after consultation with the State Board, I have determined that the COVID-19 health emergency is a catastrophe arising from natural causes — i.e., a naturally occurring virus — resulting in a disaster declaration by the President of the United States and a declaration of a state of emergency by the Governor, and that the disaster has already disrupted and continues to disrupt the schedule and has already impacted and continues to impact multiple components of election administration.

(Democracy N. Carolina, No. 1:20CV457 (Doc. 101-1) ¶¶ 18-19.) This directly contradicted the Rules Commission's finding that such a change was outside SBE's authority. In keeping with Bell's actions, the State failed to note in argument before this court that Bell's proposal had been rejected explicitly because SBE lacked statutory authority to exercise its emergency powers. In fact, at the close of a hearing before this court, the State made the following arguments:

but the Rules Review Commission declined to let it go forward as a temporary rule, I think I'm remembering this right, without stating why. But it did not go through.

In the meantime, the president had declared a state of national -- natural disaster declaration. The president had declared a disaster declaration, so under the existing rule, the powers kicked into place.

....

And the statute that does allow her to make those emergency decisions says in it, in exercising those emergency decisions says in it, in exercising those emergency powers, the Executive Director shall avoid

unnecessary conflict with the provisions of this chapter, this chapter being Chapter 163 of the election laws.

(Democracy N. Carolina, No. 1:20CV457, Evidentiary Hr'g Tr. vol. 3 (Doc. 114) at 109.) This court agrees with the Rules Review Commission: re-writing the definition of "natural disaster" is outside SBE's rulemaking authority. N.C. Gen. Stat. § 163-27.1(a)(1) limits the Executive Director's emergency powers to those circumstances where "the normal schedule for the election is disrupted by any of the following: (1) A natural disaster."[7]

[7]     Notably, Bell makes no finding as to whether this is a Type I, II, or III Declaration of Disaster, which would in turn limit the term of the Disaster Declaration. See, e.g., N.C. Gen. Stat. § 166A-19.21.

Nor does the President's major disaster proclamation define COVID-19 as a "natural disaster" – at least not as contemplated by the state legislature when § 163-27.1 (or its predecessor, § 163A-750) was passed. To the contrary, the Emergency Powers are limited to an election "in a district where the normal schedule for the election is disrupted." N.C. Gen. Stat. § 163-27.1(a). Nothing about COVID-19 disrupts the normal schedule for the election as might be associated with hurricanes, tornadoes, or other natural disasters.

**(a) Elimination of the Witness Requirement**

Finally, even if, as SBE argues, it had the authority to enter into a Consent Agreement under its emergency powers, it did not have the power to contradict statutory authority by eliminating the witness requirement. See N.C. Gen. Stat. § 163-27.1(a) ("In exercising those emergency powers, the Executive Director shall avoid unnecessary conflict with the provisions of this Chapter.") (emphasis added). The legislature implemented a witness requirement and SBE removed that requirement. This is certainly an unnecessary conflict with the legislature's choices.

**\*29** By the State's own admission, any ballots not subject to witnessing would be unverified. The State of North Carolina argued as much in urging this court to uphold the one-witness requirement:

As Director Bell testified, it is a basic bedrock principle of elections that you have some form of verifying that the voter is who they say they are; voter verification. As she said, when a voter comes into the poll, whether that is on election day proper or whether it is by –

....

Obviously, you can't do that when it is an absentee ballot. Because you don't see the voter, you can't ask the questions. So the witness requirement, the purpose of it is to have some means that the person who sent me this is the person -- the person who has sent this absentee ballot is who they say they are. That's the purpose of the witness requirement. The witness is witnessing that they saw this person, and they know who they are, that they saw this person fill out the ballot and prepare the ballot to mail in. And that is the point of it.

And, as Director Bell testified, I mean, we've heard a lot from the Plaintiffs about how many states do not have witness requirements. And that is true, that the majority of states, I think at this point, do not have a witness requirement.

But as Director Bell testified, they're going to have one of two things. They're going to either have the witness requirement, or they're going to have a means of verifying the signature ....

One thing -- and I think that is unquestionably an important State interest. Some means of knowing that this ballot that says it came from Alec Peters actually is from Alec Peters, because somebody else put their name down and said, yes, I saw Alec Peters do this. I saw him fill out this ballot.

Otherwise, we have no way of knowing who the ballot -- whether the ballot really came from the person who voted. It is there to protect the integrity of the elections process, but it is also there to protect the voter, to make sure that the voter knows -- everybody knows that the voter is who they say they are, and so that somebody else is not voting in their place.

Additionally, it is a tool for dealing with voter fraud. (Democracy N. Carolina, No. 1:20CV457, Evidentiary Hr'g Tr. vol. 3 (Doc. 114) at 111-12.) In this hearing, the State continued to note that "there needs to be some form of verification of who the voter is," which can "either be through a witness requirement or ... through signature verification," but "it needs to be one or the other." (Id. at 115-16.) Losing the witness requirement, according to the State, would mean having "no verification." (Id. at 116.) Contravening a legislatively implemented witness requirement and switching to a system of "no verification," (id.), was certainly not a necessary conflict under § 163-27.1(a).

SBE argues that this court does not have authority to address how this switch contradicted state law and went outside its validly delegated emergency powers. This is a state law issue, as the dispute is over the extent of the Executive Director's authority as granted to her by the North Carolina Legislature. The State claims that, since a North Carolina Superior Court Judge has approved this exercise of authority, this court is obligated to follow that state court judgment. (SBE Resp. (Doc. 65) at 16.)

**\*30** However, when the Supreme Court of a state has not spoken, federal courts must predict how that highest court would rule, rather than automatically following any state court that might have considered the question first. See Doe v. Marymount Univ., 297 F. Supp. 3d 573, 590 (E.D. Va. 2018) ("[F]ederal courts are not bound to follow state trial court decisions in exercising their supplemental jurisdiction."). The Fourth Circuit has addressed this issue directly in diversity jurisdiction contexts as well:

a federal court sitting in diversity is not bound by a state trial court's decision on matters of state law. In King v. Order of United Commercial Travelers of America, 333 U.S. 153, 68 S. Ct. 488, 92 L. Ed. 608 (1948), the Supreme Court upheld the Fourth Circuit's refusal to follow an opinion issued by a state trial court in a South Carolina insurance case. The Court concluded, "a Court of Common Pleas does not appear to have such importance and competence within South Carolina's own judicial system that its decisions should be taken as authoritative expositions of that State's 'law.' " Id. at 161, 68 S. Ct. 488. Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 370 (4th Cir. 2005). In other words, this court's job is to predict how the Supreme Court of North Carolina would rule on the disputed state law question. Id. at 369 ("If the Supreme Court of [North Carolina] has spoken neither directly nor indirectly on the particular issue before us, [this court is] called upon to predict how that court would rule if presented with the issue.")(quotation omitted); Carter v. Fid. Life Ass'n, 339 F. Supp. 551, 554 (E.D.N.C.), aff'd, 740 F. App'x 41 (4th Cir. 2018) ("Accordingly, the court applies North Carolina law, and the court must determine how the Supreme Court of North Carolina would rule."). In predicting how the North Carolina Supreme Court might decide, this court "consider[s] lower court opinions in [North Carolina], the teachings of treatises, and the practices of other states." Twin City Fire Ins. Co., 433 F.3d at 369. This court "follow[s] the decision of an intermediate state appellate court unless there is persuasive data that the highest court would

decide differently." Town of Nags Head v. Toloczko, 728 F.3d 391, 397-98 (4th Cir. 2013).

In all candor, this court cannot conceive of a more problematic conflict with the provisions of Chapter 163 of the North Carolina General Statutes than the procedures implemented by the Revised 2020-19 memo and the Consent Order. Through this abandonment of the witness requirement, some class of voters will be permitted to submit ballots with no verification. Though SBE suggests that its "cure" is sufficient to protect against voter fraud, the cure provided has few safeguards: it asks only if the voter "voted" with no explanation of the manner in which that vote was exercised. (Moore v. Circosta, No. 1:20CV911, State Court Consent Judgment (Doc. 45-1) at 34.) This court believes this is in clear violation of SBE's powers, even its emergency powers under N.C. Gen. Stat. § 163-27.1(a). However, none of this changes the fact that Plaintiffs in both Wise and Moore lack standing to challenge the legitimacy of SBE's election rule-setting power under either the Elections Clause or the Electors Clause.

## III. CONCLUSION

This court believes the unequal treatment of voters and the resulting Equal Protection violations as found herein should be enjoined. Nevertheless, under Purcell and recent Supreme Court orders relating to Purcell, this court is of the opinion that it is required to find that injunctive relief should be denied at this late date, even in the face of what appear to be clear violations. For the foregoing reasons, this court finds that in Moore v. Circosta, No. 1:20CV911, Plaintiffs' Motion for Preliminary Injunction should be denied. This court also finds that in Wise v. N. Carolina State Bd. of Elections, No. 1:20CV912, the Plaintiffs' Motion to Convert the Temporary Restraining Order into a Preliminary Injunction should be denied.

**\*31 IT IS THEREFORE ORDERED** that Plaintiffs' Motion for Preliminary Injunction in Moore v. Circosta, No. 1:20CV911, (Doc. 60), is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Convert the Temporary Restraining Order into a Preliminary Injunction in Wise v. N. Carolina State Bd. of Elections, No. 1:20CV912, (Doc. 43), is **DENIED**.

**All Citations**

--- F.Supp.3d ----, 2020 WL 6063332

---

End of Document     © 2020 Thomson Reuters. No claim to original U.S. Government Works.

L

2020 WL 2748301
Only the Westlaw citation is currently available.
United States District Court, D. Nevada.

Stanley William PAHER, et al., Plaintiffs,
v.
Barbara CEGAVSKE, in her official
capacity as Nevada Secretary
of State, et al., Defendants.

Case No. 3:20-cv-00243-MMD-WGC
|
Signed 05/27/2020

**Attorneys and Law Firms**

James Bopp, Jr., Pro Hac Vice, Richard E. Coleson, Pro
Hac Vice, Amanda Narog, Pro Hac Vice, Corrine Youngs,
Pro Hac Vice, The Bopp Law Firm PC, Terre Haute, IN,
David C. O'Mara, The O'Mara Law Firm, P.C., Reno, NV, for
Plaintiffs Stanley William Paher, Terresa Monroe-Hamilton,
Garry Hamilton.

Amanda Narog, Terre Haute, IN, David C. O'Mara, The
O'Mara Law Firm, P.C., Reno, NV, for Plaintiffs Daryl Bryon
DeShaw, Mark Ecker, Gary Gladwill, Linda Barnett, Nevada
Right to Life.

Gregory Louis Zunino, Nevada State Attorney General's
Office, Craig A. Newby, Office of the Attorney General,
Carson City, NV, for Defendant Barbara Cegavske.

Herbert B. Kaplan, Reno, NV, for Defendant Deanna Spikula.

Mary-Anne M. Miller, Clark County District Attorney, Las
Vegas, NV, for Defendant Clark County Registrar of Voters.

ORDER

MIRANDA M. DU, CHIEF UNITED STATES DISTRICT
JUDGE

**I. SUMMARY**

**\*1** The Court has already ruled in this case. *See Paher.
et al. v. Cegavske, et al.*, No. 3:20-cv-00243-MMD-WGC,
—— F. Supp. 3d ——, 2020 WL 2089813 (D. Nev. Apr. 30,
2020). But Plaintiffs then amended their complaint ("AC")
(ECF No. 64) and brought a new motion for preliminary

injunction ("Second PI Motion") (ECF No. 65). The AC
consists of four claims and materially rehashes the original
complaint except for the addition of more Plaintiffs and a
new claim against a new Defendant—Joseph P. Gloria in
his official capacity as the Registrar of Voters for Clark
County ("Clark Registrar"). (*Compare* ECF No. 1 *with*
ECF No. 64.) The Second PI Motion is in gist largely a
motion for reconsideration; albeit, it glaringly repackages
old arguments to achieve a different disposition without
necessary justification. Plaintiffs' decision to bring the AC
at this late hour, as opposed to seeking expedited appellate
review of the Court's order ("PI Order") regarding their
original motion for preliminary injunction ("First PI Motion")
(ECF No. 57), is confounding and contrary to their position
that a quick disposition of this matter is needed due to the
impending June 9, 2020 Nevada primary election ("June
Primary") (*see* ECF Nos. 1, 2, 3, 4). Ultimately, Plaintiffs'
second proverbial bite at the apple is no more fruitful
than the first. And the new fourth claim challenging Clark
County essentially making mail-in ballots more accessible
to registered voters is legally tenuous because Defendants
are not constitutionally prohibited from making voting easier.
The Court will deny the Second PI Motion for the reasons
below.[1]

1      In addition to the Second PI Motion, the Court has
       considered the various responses (ECF Nos. 72, 74, 75,
       78) and Plaintiffs' reply (ECF No. 80). Plaintiff filed
       "Supplemental Authority" without seeking leave of court
       as required by LR 7-2(g). (ECF No. 243.) The document
       provides two references—a recent Sixth Circuit decision
       and a 1969 Supreme Court decision. While Plaintiffs'
       failure to cite to the former is apparent since the decision
       was issued on May 26, 2020, Plaintiffs' reference to the
       latter is clearly an attempt to improperly augment their
       arguments after briefing has completed. Regardless, the
       Court will strike the improper supplement.

**II. BACKGROUND**
The facts of this case have been largely recited in the Court's
PI Order (ECF No. 57). The Court will not repeat the facts as
previously stated here. Additional facts are taken from the AC
(ECF No. 64) and exhibits attached thereto as well as other
evidence submitted concerning the Second PI Motion.

**A. The Parties**
As relevant to the Second PI Motion, the field of Plaintiffs
and Defendants have expanded. As a reminder, the original
Plaintiffs are William Paher, Gary Hamilton, and Terresa

Monroe-Hamilton. They previously sued only Nevada's Secretary of State Barbara Cegavske (the "Secretary") and Deanna Spikula—Registrar of Voters for Washoe County ("Washoe Registrar").

The new individual plaintiffs are Daryl Byron DeShaw, Jeff Ecker, Gary Gladwill, and Linda Barnett. All are eligible-registered voters. DeShaw and Ecker intend to vote in person while Gladwill and Barnet have already voted by mail. Gladwill, who is a resident of Lyon County, is also a candidate for county commissioner in that county. In addition to the new individual plaintiffs, the entity Nevada Right to Life ("NVRTL") is also included as a plaintiff. NVRTL advocates "for life in all of its stages and all ages" and have members, who are eligible-registered voters "who intend to vote in the coming primary but fear disenfranchisement." (ECF No. 64 at 4.)

**\*2** These Plaintiffs collectively sue the Secretary, the Washoe Registrar and the Clark Registrar (collectively, "Defendants"). (*Id.* at 4–5.) Like the Washoe Registrar in Washoe County, the Clark Registrar is responsible for implementing the state's election laws in Clark County. (*Id.*)

### B. Relevant Facts

As provided in the PI Order, the impetus for Plaintiffs' lawsuit is to enjoin the implementation of the all-mail election for the June Primary ("the Plan"). The Secretary developed the Plan in partnership with Nevada's 17 county election officials to diminish the spread of the novel coronavirus disease 2019 ("COVID-19") pandemic. In the PI Order, the Court summed up the original Plaintiffs' claims as largely contending that the Plan was inconsistent with Nevada law and violated the United States Constitution because it is not "chosen" by Nevada's Legislature, and that an all-mail election strips voter-fraud-prevention safeguards and unconstitutionally violates Plaintiffs' right to vote due to purported vote dilution resulting in disenfranchisement. (*See* ECF Nos. 1, 57.)

In the PI Order, the Court concluded as a threshold matter that Plaintiffs lacked standing because they had not established an injury particularized to them. (ECF No. 57 at 2, 8–10.) The Court additionally found that Plaintiffs were unlikely to succeed on the merits of any of their claims chiefly because: (1) Nevada's interests in protecting the health and safety of Nevada's voters and to safeguard the voting franchise are compelling and longstanding interests that outweighed what amounts to Plaintiffs' preference for in-person voting under

the *Anderson-Burdick* balancing test[2]; and (2) the Plan is consistent with Nevada law because the Secretary has been vested with the authority to implement it. (*Id.* at 10–22.) The Court also concluded that a balancing of the equities and the public interest weigh against the granting of an injunction. (*Id.* at 22–24.)

2    *Anderson v. Celebrezze*, 460 U.S. 780, 788–89 (1983) & *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

In the AC, Plaintiffs assert the following four claims: (1) the Plan violates the fundamental right to vote by direct disenfranchisement in violation of the First and Fourteenth Amendments of the United States Constitution; (2) the Plan violates the fundamental right to vote by vote-dilution disenfranchisement in violation of the same; (3) the Plan violates Article I, Section 4, Clause 1 of the Constitution; and (4) Clark County's plan to send mail-in ballots to all registered voters and to allow for the collection of ballots ("Clark County's Plan" or "CC Plan") violates the Fourteenth Amendment's Equal Protection Clause.[3] (ECF No. 64 at 20–25.) As to the CC Plan, Plaintiffs particularly highlight Clark County's plan to: (i) send absent ballots to inactive registered voters and, as reported, "allow a bipartisan group of deputized 'field registrars' to collect sealed ballots from voters"; and (ii) create more vote centers than other Nevada counties. (ECF No. 64 at 2.)

3    The header of the fourth claim broadly asserts that the Plan violates the Equal Protection Clause, but the substance of the allegation is specifically concerned with Clark County and the CC Plan. (*See* ECF No. 64 at 24–25.)

The AC and the Second PI Motion, particularly as to the first three claims, are brought under the theory that the threats surrounding the spread of COVID-19 have diminished and that current social distancing measures are adequate to respond to concerns about public health such that enjoining the Plan is now merited. (*See id.* at 14–17; ECF No. 65 at 2–3.) In so contending, Plaintiffs rely heavily on articles and/or information concerning other states—not Nevada—reopening, deciding not to allow vote by mail, and about COVID-19 cases allegedly having not spiked two weeks after the infamous Wisconsin primary.[4] (*Id.*)

4    *See, e.g.*, D. Chen & J. Diedrich, *Two weeks after election, COVID-19 cases have not spiked in Wisconsin but experts urge caution about conclusions*, Milwaukee J. Sentinel, Apr. 22, 2020, https://www.jsonline.com/

story/news/2020/04/22/covid-19-hasnt-spiked-after-wisconsinelection-experts-urge-caution/2997394001/

**\*3**  But not much has changed in Nevada since the Court issued the PI Order. COVID-19 continues to present a threat to public health. It is undisputed that the state continues to grapple with protecting the public from COVID-19 and remains under a declaration of state emergency.[5] Nevada is still in the initial stage of reopening—phase one—with a recent announcement for phase two to start on May 29, 2020.[6] *See id.* Under Nevada's phase one guidelines, most business and entities remain closed and/or subject to significant restrictions and local government and businesses are empowered to take even stricter social distancing guidelines than the statewide standards.[7] Moreover, Nevada's Governor, Steve Sisolak, continues to direct and "strongly encourage[ ]" Nevadans to stay home "[r]ecognizing that COVID-19 is still present in Nevada and highly contagious."[8] "Nevadans are advised that they are safer at home and should avoid interpersonal contact with persons not residing in their households to the extent practicable."[9] Public gatherings of individuals not of the same household are limited to no more than ten, though the limit will be increased to 50 in phase two.[10] And Governor Sisolak has repeatedly cautioned that phased lifting of restrictions depends on Nevada achieving established virus containment benchmarks, the failure of which may lead to restrictions being imposed again as needed.

5    *See* the Official State of Nevada Website, Emergency Orders and Regulations, http://gov.nv.gov/News/ Emergency_Orders/Emergency_Orders/ (last visited May 25, 2020).

6    *See id.*; James DeHaven, *May 29 marks start of Phase 2 in Nevada. Sisolak says 'we'll remain cautious.'*, Reno Gazette Journal, May 26, 2020, https://www.rgj.com/story/news/2020/05/26/ sisolak-nevadas-phase-2-reopening-begin-friday-bars-gyms-more/5264546002/.

7    Steve Sisolak, *Roadmap to Recovery for Nevada, Guidelines and Protocols for Individuals and Businesses*, http://gov.nv.gov/uploadedFiles/ govnewnvgov/Content/News/ Emergency_Orders/2020/0   18-Roadmap-to-Recovery-Phase-One-Initial-Guidance.pdf (last visited May 26, 2020).

8    *See* the Official State of Nevada Website, *Emergency Orders and Regulations*, Declaration of Emergency Directive 018, http://gov.nv.gov/News/

Emergency_Orders/2020/2020-05-07_-_COVID-19_Declaration_of_Emergency_Directive_018_-_Phase_One_Reopening_(Attachments)/ (last visited May 26, 2020).

9    *Id.*

10    *Id.*; DeHaven *supra.*

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 65 governs preliminary injunctions. " 'An injunction is a matter of equitable discretion' and is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.' " *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010) (quoting *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22, 32 (2008)). This relief is "never awarded as of right." *Alliance for the Wild Rockies v. Cottrell ("Alliance")*, 623 F.3d 1127, 1131 (9th Cir. 2011). To qualify for a preliminary injunction, a plaintiff must satisfy four requirements: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm; (3) that the balance of equities favors the plaintiff; and (4) that the injunction is in the public interest. *See Winter*, 555 U.S. at 20. A plaintiff may also satisfy the first and third prongs by showing serious questions going to the merits of the case and that a balancing of hardships tips sharply in plaintiff's favor. *Alliance*, 632 F.3d at 1135 (holding that the Ninth Circuit's "sliding scale" approach continues to be valid following the *Winter* decision).

On the merits-success prong, "the burdens at the preliminary injunction stage track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006); *see also id.* at 428 (citing *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004)).

## IV. DISCUSSION

Beyond the merits of the AC, the Court will deny the Second PI Motion for three reasons: (1) lack of standing; (2) based on laches; and (3) under the *Purcell*[11] principle.

11    *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam).

### A. Standing

The Court finds that Plaintiffs have not remedied their lack of standing, which based on the PI Order and the Court's conclusions *infra* most directly concerns the instant first three claims. "[T]he irreducible constitutional minimum of standing contains three elements." *Lujan v. Defs. of Wildlife*,

504 U.S. 555, 560 (1992). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). The party invoking federal jurisdiction must show that it has standing for each type of relief sought. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).

**\*4**  A party may cure a standing defect by adding parties, removing parties, or supplementing the facts of a complaint under Fed. R. Civ. P. 15. *See, e.g., Northstar Fin. Advisors Inc. v. Schwab Invs.*, 779 F.3d 1036, 1044–48 (9th Cir. 2015), *as amended on denial of reh'g and reh'g en banc* (Apr. 28, 2015), *In re Schugg*, 688 F. App'x 477, 479–80 (9th Cir. 2017); *cf. Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198, 1202 n.3 (Fed. Cir. 2005) ("The initial standing of the original plaintiff is assessed at the time of the original complaint, even if the complaint is later amended.") (citations omitted). However, Plaintiffs' AC suffers from the same failure to establish standing as the original complaint—Plaintiffs have again failed to allege a particularized injury.

As with the original complaint, the claims in the AC are materially grounded on ostensible election fraud that may be conceivably raised *by any Nevada voter.* Thus, Plaintiffs' claims amount to general grievances that cannot support a finding of particularized injury as to Plaintiffs. *See, e.g., Lujan*, 504 U.S. at 573–74 (explaining that U.S. Supreme Court's case law has "consistently held that a plaintiff raising only a generally available grievance about government— claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy").

Plaintiffs essentially seek to have the Court reconsider its finding as to standing, arguing that they do not merely assert "citizen" standing and that harm is specific to them as registered, eligible voters, who actually vote. (*See* ECF No. 65 at 19–21.) But even if the Court were to find that Plaintiffs state a particularized injury, and even if they had argued the reconsideration standard, Plaintiffs face an additional obstacle. As the Court concluded in the PI Order, Plaintiffs fail to show a nexus between the alleged violations and their claimed injury. (*See* ECF No. 57 at 10 n.7.) Here, Plaintiffs again fail to more than speculatively connect the specific conduct they challenge—

that mail-in ballots are sent to Nevada voters without request for an absentee ballot—and the claimed injury—direct voter disenfranchisement or disenfranchisement through vote dilution (in sum, disenfranchisement).[12]

12    Plaintiffs rely on numerous articles and studies to support their contentions that voting by mail leads to voter fraud. (*See* ECF No. 65 at 6–8.) The articles and studies are simply insufficient to establish that sending mail-in ballots to Nevada voters will result in voter fraud that particularly disenfranchises Plaintiffs as voters. Said differently, they do not meaningfully improve Plaintiffs' burden to concretely establish voter fraud that harms them. Plaintiffs' contention that issues with mail delivery to and from voters will lead to disenfranchisement based on what allegedly happened in Ohio and Wisconsin (*id.* at 8–9) is equally unpersuasive as to Nevada. As the Washoe Registrar notes, for example, the situation with respect to "timing and preparation" of the June Primary is quite different in Nevada than it was for Wisconsin, (*See* ECF No. 74-2 at 5.) Moreover, as the Court noted in the PI Order, the material safeguards against voter fraud are maintained under the Plan. (ECF No. 57 at 14; *see also* ECF No. 74-2 at 9 ("The all mail primary election provides all of the voter fraud safeguards that exist in statute.").)

**\*5**  Accordingly, Plaintiffs have failed to overcome the Court's original finding that they lack standing, thereby precluding them from seeking to enjoin the Plan—at least via the first three claims.

**B. Laches**

The Secretary argues that the doctrine of laches further bars Plaintiffs from obtaining equitable relief after unreasonable delay in filing the AC and the Second PI Motion. (ECF No. 78 at 8–9.) The Court agrees.

"Laches is an equitable defense." *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 950 (9th Cir. 2001). It precludes a plaintiff who, "with full knowledge of the facts, acquiesces in a transaction and sleeps upon his rights." *Id.* at 950–51 (quotations and citations omitted). A defendant is entitled to relief under the doctrine where the defendant proves "both an unreasonable delay by the plaintiff and prejudice to itself." *Couveau v. Am. Airlines, Inc.*, 218 F.3d 1078, 1083 (9th Cir. 2000). The Court finds, as the Secretary argues, that both factors are satisfied here.

With the following considerations, the Court agrees Plaintiffs have unreasonably delayed seeking preliminary injunctive relief. Plaintiffs brought this case in its initial form on April 21, 2020 (ECF No. 1). They requested and were granted expedited briefing and an expedited hearing (ECF Nos. 3, 14). Recognizing the urgency with which Plaintiffs indicated they brought this case and the finality that was needed, the Court issued its decision on the First PI Motion—the PI Order—two days after extensive briefing closed, on April 30, 2020. (*Compare* ECF No. 43 *with* ECF No. 57.) Plaintiffs waited 14 days after the PI Order was issued and only 26 days before the June Primary to file the AC and bring the Second PI Motion. (*See* ECF Nos. 64, 65.) In doing so, Plaintiffs again sought expedited relief. (ECF No. 66.)

Except the specific claim based on the CC Plan, the AC materially asserts no claim that could not have been raised—or that was not raised—the first time around. To be sure, Plaintiffs did not seek reconsideration of the Court's PI Order. Nor did Plaintiffs file an appeal. Moreover, the AC also indicates that Plaintiffs had notice of the CC Plan, upon which the fourth claim is grounded, by at least May 4, 2020. (ECF No. 64 at 8.) Therefore, it is inexplicable that Plaintiffs would delay bringing the AC and Second PI Motion for another nine days in light of their claimed urgency. Plaintiffs surely have not acted with the alacrity that they claim this case necessitates.

Plaintiffs' failure to seek legal relief and finality has certainly prejudiced Defendants. As noted, the June Primary was only 26 days away when Plaintiffs brought the AC and Second PI Motion. Even with expedited briefing, Plaintiffs could have anticipated that any foreseeable briefing schedule would result in a decision being issued, at minimum, several days closer to the election. Notably, since this Court issued the PI Order, mail-in ballots have been sent to Nevada voters and a substantial number of eligible voters, including Plaintiffs Gladwill and Barnett, have already sent in their mail-in ballots. (*See, e.g.*, ECF No. 74-2 at 5–6 ("By the end of April, the actual mail ballots were mailed to all active registered voters in Washoe County. Upon information and belief, all ballots for all Nevada voters have been mailed ...."); *see also id.* at 7 ("The mail-in primary election plan is in full swing ... Many voters have already completed their ballots and returned the same via mail or by dropping them off at my office."); ECF No. 64 at 9 ("Mail ballots to active, registered voters went out on May 6, 2020.").) The state has also made significant monetary investments and efforts to implement the Plan and on media and marketing campaigns to inform

Nevada voters of how to exercise their right to vote via mail (ECF No. 74-1 at 4–6, ECF No. 74-3).

**\*6** The Court finds that Plaintiffs' second request for preliminary injunctive relief is therefore unreasonable and inequitable in seeking to undo the votes already casted by Nevadans and would result in squandering the state's investment for the sake of an unestablished specter of voter fraud. This conclusion is particularly merited where the AC and Second PI Motion are largely repetitive of the original complaint and motion. Even if the additional claim—the fourth claim based on the CC Plan—was meritorious, it would not entitle Plaintiffs to the wholesale relief of voiding the Plan, which is ultimately what Plaintiffs seek here. Even if Plaintiffs' preliminary injunction request was on firmer grounds, the Court cannot foresee any viable manner of undoing the Plan or stopping its further implementation without increasing the risks to the health and safety of Nevadans and putting the integrity of the election at risk—particularly without sufficient time to prepare an adequate alternative. (*See, e.g.*, ECF No. 74-2 at 7–9) (discussing the adverse consequences for Nevada in changing the method and processes of voting in the June Primary at this juncture). For all these reasons, the Court finds that the doctrine of laches bars Plaintiffs' second request for preliminary injunctive relief and the Court will likewise deny the request on this additional basis.

### C. *Purcell*

The *Purcell* principle is yet another barrier to the grant of preliminary injunctive relief here. Of course Plaintiffs are no stranger to *Purcell*. They argued in the First PI Motion that *Purcell* bars the implementation of the Plan so close to the June Primary. (ECF No. 2 at 16–17.) The irony of Plaintiffs' argument was not lost on the Court. The Court disagreed with Plaintiffs' contention as to the state and noted that *Purcell* counseled against considering the First PI Motion. The Secretary, Washoe Registrar and Intervenor-Defendants here argue that *Purcell* is ever more relevant now where Plaintiffs seek to change the state's Plan governing the June Primary because the election is days away and Nevadans are already exercising their right to vote. (*See* ECF No. 72 at 15–16; ECF No. 74 at 4, 30–33; ECF No. 78 at 2, 9.) The Court agrees.

The *Purcell* principle provides that near an impending election court orders themselves risk debasement and dilution of the right to vote because "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter

2020 WL 2748301

confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." 549 U.S. at 4–5. The Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm. ("RNC")*, 140 S. Ct. 1205, 1207 (2020) (citing *Purcell*; *Frank v. Walker*, 574 U.S. 929 (2014); and *Veasey v. Perry*, 574 U. S. ——, 135 S. Ct. 9 (2014)); *see also Republican Party of Pa. v. Cortés*, 218 F. Supp. 3d 396, 405 (E.D. Pa. 2016) ("Federal intervention at this late hour risks 'a disruption in the state electoral process [which] is not to be taken lightly.' 'This important equitable consideration goes to the heart of our notions of federalism.' ") (alteration in original) (citation and quotation omitted). This principle is particularly pertinent where plaintiffs ask courts to "impose large-scale changes to the election process." *Bryan v. Fawkes*, 61 V.I. 416, 469 (2014) (collecting cases).

The Court will follow the *Purcell* principle and declines to take any action to alter the Plan at this late hour. The Court is reassured that such is the right course in light of the exceptional relief that Plaintiffs request in the AC, which would completely upend the June Primary. Among other things, Plaintiffs seek injunctive relief ordering Defendants to disregard the mail ballots that have already been sent to voters and to notify voters that their mailed in ballots will not be counted; to undertake a counter media public information campaign to notify "every registered voter" of the changes Plaintiffs seek; and to undo the CC Plan. (*See* ECF No. 64 at 25–26.) Going along with Plaintiffs' request would surely cause great disruption and confusion for Nevada voters. Plaintiffs' request is therefore in many ways more injurious to Nevada voters at this juncture than the very grounds underlying the AC, particularly given the speculative claimed of voter disenfranchisement. The Court therefore also denies a grant of preliminary injunctive relief based on *Purcell.*

### D. Touching Upon the Merits

**\*7** Touching upon the merits, it is also clear that Plaintiffs' claims should be plainly rejected.

Plaintiffs' second and third claims are foreclosed by the PI Order because they are materially the same as the second and third claims alleged in the original complaint. (*Compare* ECF No. 1 *with* ECF No. 64.) Plaintiffs effectively seek reconsideration of these claims without establishing the requirements of Fed. R. Civ. P. 60, which governs a motion for reconsideration. (*See generally* ECF No. 65 (providing no

Rule 60 arguments).)[13] The Court therefore adopts its rulings from the PI Order and likewise find that Plaintiffs are unlikely to succeed on the merits of these claims.[14]

[13]   A motion to reconsider must set forth "some valid reason why the court should reconsider its prior decision" and set "forth facts or law of a strongly convincing nature to persuade the court to reverse its prior decision." *Frasure v. United States*, 256 F. Supp. 2d 1180, 1183 (D. Nev. 2003). "A motion for reconsideration is not an avenue to re-litigate the same issues and arguments upon which the court already has ruled." *Brown v. Kinross Gold, U.S.A.*, 378 F. Supp. 2d 1280, 1288 (D. Nev. 2005). A district court may decline to consider claims and issues that were not raised until a motion for reconsideration. *Hopkins v. Andaya*, 958 F.2d 881, 889 n.5 (9th Cir. 1992), *impliedly overruled on other grounds in Federman v. County of Kern*, 61 F. App'x 438, 440 (9th Cir. 2003). It is not an abuse of discretion to refuse to consider new arguments in a reconsideration motion even though "dire consequences" might result. *Schanen v. United States Dept. of Justice*, 762 F.2d 805, 807–08 (9th Cir. 1985).

[14]   To the extent Plaintiffs challenge the Court's finding that the Washoe Register complied with the notice requirements (ECF No. 57 at 19–20; *see* ECF. No 65 at 4–6), Plaintiffs fail to meaningfully contest the Court's conclusion that the notice issue does not arise to the level of a constitutional violation—necessary to void the Plan—even if technically inconsistent with Nevada law.

Plaintiffs' first claim, despite discretely alleging direct disenfranchisement, in many ways echoes Plaintiffs' second and third claims. The crux of this claim is Plaintiffs' assertion that "[d]ue to ... widespread disenfranchisement caused by not abiding by the legislature's law, the Plan violates the right to vote by direct disenfranchisement." (ECF No. 64 at 22.) The first claim therefore also seeks to avoid the Court's ruling in the PI Order, where the Court concluded that the Plan is consistent with Nevada law and within the authority conferred upon the Secretary. (*See* ECF No. 57 at 16–20.) Moreover, as already discussed here and in the PI Order, Plaintiffs' claims of voter disenfranchisement are speculative at best. Accordingly, Plaintiffs are also unlikely to succeed on the merits of this claim.

While Plaintiffs' fourth and last claim is entirely new, it is of no greater avail for Plaintiffs even assuming Plaintiffs have standing.[15] This claim is in gist that Clark County's plan to mail ballots to all registered voters, including inactive voters, and to allow for assistance in returning ballots will result in

more votes coming out of Clark County because the CC Plan makes it easier to vote in Clark County than any other county, resulting in an Equal Protection violation. (ECF No. 64 at 24–25.) The Washoe and Clark Registrars and Intervenor Defendants point out that this claim is undermined by the Ninth Circuit's decision in *Short v. Brown*, 893 F.3d 671 (9th Cir. 2018). (ECF No. 72 at 11–12; ECF No. 74 at 24–25; ECF No. 75 at 4.) Plaintiffs reply that *Short* does not apply because Plaintiffs allege that the violation is that Clark County will have greater voter strength in the June Primary in violation of the one person, one vote principle[16] (ECF No. 80 at 8–9; *see also* ECF No. 65 at 21–23; ECF No. 64 at 24–25). The Court disagrees with Plaintiffs.

15    The Secretary notes that she gave deference to the Clark Registrar regarding his decision to send ballots to inactive registered voters under the CC Plan because "NRS § 293.345(1) is silent on whether ballots may be mailed to inactive voters as well as active voters" (ECF No. 78 at 7). *See* NRS 293.345(1) (providing that "the county clerk shall cause to be mailed to each *registered voter* in each mailing precinct and in each absent ballot mailing precinct an official mailing ballot, and accompanying supplies, as specified in NRS 293.350") (emphasis added). Plaintiffs do not directly challenge the Secretary's statement. Instead, Plaintiffs for the first time in their reply argue NAC § 293.412(4) is a relevant regulation barring sending ballots to inactive voters (ECF No. 80 at 9–10). Even if the Court agreed, the Court does not consider the newly raised argument/legal provision asserted for the first time in Plaintiffs' reply. *See, e.g., Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief."). Moreover, to the extent the Secretary deferred to Clark County in implementing the CC Plan, the discretion of the Secretary to do so would also likely fall under the provisions cited in the PI Order as being the basis of the Secretary's authority in the electoral process. *See* NRS §§ 293.124, 293.213(4) and 293.247.

16    Plaintiffs rely on *Bush v. Gore*, 531 U.S. 98 (2000) as their basis for applying the doctrine to this case. (*E.g.,* ECF No. 64 at 24.) However, *Bush v. Gore*, is not directly on point where the concern there was that the various Florida counties used different standards in a recount to assess what votes should be counted in a presidential election. *See id.* at 107. The facts of Plaintiffs' Equal Protection claim here are completely different because Plaintiffs cannot support a claim that under the Plan or the CC Plan votes will be counted differently, or what constitutes a valid vote would

differ as among the counties. Moreover, in the context of the Equal Protection Clause, the one person, one vote principle ordinarily concerns requiring states to design both congressional and state legislative districts with equal populations and must regularly reapportion districts to prevent malapportionment. *See, e.g., Evenwel v. Abbott*, 136 S. Ct. 1120, 1123–24 (2016).

**\*8**  Plaintiffs essentially speculate that beyond the size of Clark County's voter base relative to other counties, the CC Plan will ensure that Clark County voters' vote carry greater weight solely because ballots are also mailed to inactive registered voters and county deputized election workers are allowed to collect ballots. (*See id.; cf.* ECF No. 75 at 3, 12.) To be sure, Plaintiffs expressly disavow any challenge to the provisions of the CC Plan allowing for more polling places in Clark County. (ECF No. 80 at 8–9.)

Further, Plaintiffs do not address the Clark Registrar's contention that it is anticipated that "most" of the ballots sent to inactive voters "will come back undeliverable because we had previously sent election notifications to those addresses and the notifications were returned as undeliverable or we received notification by the USPS that the voter had moved out of town." (ECF No. 75 at 12.) The Clark Registrar's unchallenged contention accepted as true significantly diminishes Plaintiffs' contention that also sending ballots to Clark County inactive voters will result in greater voting strength for voters in that county. Plaintiffs' argument necessarily presupposes that inactive voters in Clark County would not alternatively go to the polling sites to vote in the June Primary. (*See id.* (noting the inactive voters are eligible to vote in the June Primary at a polling site).)[17]

17    *See* NAC § 293.412(5) ("An inactive voter may vote in person at a polling place in the same manner as an active voter.").

Additionally, the Court is convinced that deputized staff members of the Clark Registrar picking up ballots does not add to Plaintiffs' contention of Clark County voters having a greater voter strength than other counties. Plaintiffs do not challenge the Clark Registrar's representation that this service is based upon request, that the county has not received much requests for this service, and that it is provided as an alternative particularly for those with disabilities who would rather not send their ballots by mail or deliver to a drop-off site (*see* ECF No. 75 at 12). Notably, these individuals would have already voted. (*Id.*) Therefore, it is unlikely that the mere act of the alternative of picking up an already voted ballot, for which there is also an option to drop off or mail-in

with postage provided (*see id.*), would result in greater voting strength. For these reasons, the Court concludes that Plaintiffs have not supported the contention that the CC Plan leads to greater voter strength for Clark County voters.

It also appears to the Court that Plaintiffs' chief concern (if not purported harm) is that the CC Plan will result "in the most populous county of a certain persuasion ... garner[ing] many more votes of the dominant political persuasion in that county." (*E.g.*, ECF No. 80 at 10.) It is not clear to the Court why this concern is even relevant to the June Primary. As the Washoe Registrar notes, Nevada is a closed primary, therefore only members of a party can vote for candidates for that party (*see* ECF No. 74 at 6). *See* NRS § 293.257(3) ("A registered voter may cast a primary ballot for a major political party at a primary election only if the registered voter designated on his or her application to register to vote an affiliation with that major political party."). Thus, Plaintiffs' concern of more votes for a certain political persuasion appears reaching at best and materially does not support their Equal Protection claim, if at all, particularly in the primary context.

**\*9** The Court further concludes that the Equal Protection claim fails under *Short*, which the Court finds applicable to the claim. In *Short*, the appellants challenged California's Voter's Choice Act ("VCA"), claiming it violated the Equal Protection Clause because it permitted voters in some counties to receive a mail ballot automatically while voters in other counties had to apply for a mail ballot. *Id.* at 677–79. The Ninth Circuit Court of Appeals concluded that there was no constitutional violation because there was no evidence that "the VCA [would] prevent anyone from voting." *Id.* at 677. The appellate court specifically noted that the appellants had failed to cite "any authority explaining how a law that makes it easier to vote would violate the Constitution." *Id.* at 677–78.

As in *Short*, Clark County's Plan may make it easier or more convenient to vote in Clark County, but does not have any adverse effects on the ability of voters in other counties to vote. Plaintiffs are unlikely to succeed on their claim of an Equal Protection violation where they provide no evidence—and cannot provide any—that the CC Plan makes it harder for voters in other counties to vote. Nor is there any allegation that under the CC Plan representation is differently allocated between Clark County and other counties or that the CC Plan operates to discriminate based on a suspect classification. If it did, it would be subject to heightened scrutiny requiring compelling justification under the *Anderson-Burdick* test.[18]

*See Id.* at 677–79. However, "[c]ounty of residence is not a suspect classification warranting heightened scrutiny." *Id.* at 679. Applying a lesser level of scrutiny, it cannot be contested that Clark County, which contains most of Nevada's population—and likewise voters (69% of all registered voters (*see* ECF No. 75 at 12))—is differently situated than other counties. Acknowledging this as a matter of generally known (or judicially noticeable) fact and commonsense makes it more than rational for Clark County to provide additional accommodations to assist eligible voters. Moreover, there is no contention that under the Plan, other counties could not have similarly adopted further accommodations for their residents. Thus, like their other claims, Plaintiffs' fourth claim of an Equal Protection violation falls flat.

18    The Court explains the relevant balancing under this test in the PI Order (ECF No. 57 at 12–13) and will not recite it here.

In sum, the Court finds that Plaintiffs are not likely to succeed on the merits of any claim asserted in the AC. The Court also adopts its conclusion from the PI Order that a balancing of the equities and the public interest weigh against granting an injunction to Plaintiffs.

## V. CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the issues before the Court.

It is therefore ordered that Plaintiffs' second motion for preliminary injunction (ECF No. 65) is denied for the reasons provided herein.

It is further ordered that Plaintiffs' motion to consolidate hearing on the second motion for preliminary injunction with a hearing on the merits (ECF No. 67) is denied as moot.

It is further ordered that Plaintiffs' supplemental brief (ECF No. 82) is stricken as improperly submitted without leave of court.

## All Citations

Slip Copy, 2020 WL 2748301

**Paher v. Cegavske, Slip Copy (2020)**

2020 WL 2748301

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

M

238 A.3d 345
Supreme Court of Pennsylvania.

PENNSYLVANIA DEMOCRATIC PARTY,
Nilofer Nina Ahmad, **Danilo Burgos,**
Austin Davis, **Dwight Evans,** Isabella
Fitzgerald, Edward Gainey, Manuel M.
Guzman, Jr., Jordan A. Harris, Arthur
Haywood, Malcolm Kenyatta, Patty H.
Kim, Stephen Kinsey, Peter Schweyer,
Sharif Street, and Anthony H. Williams
v.
Kathy BOOCKVAR, in her Capacity
as Secretary of the Commonwealth of
Pennsylvania; Adams County Board
of Elections; Allegheny County Board
of Elections; Armstrong County Board
of Elections; Beaver County Board
of Elections; Bedford County Board
of Elections; Berks County Board of
Elections; Blair County Board of Elections;
Bradford County Board of Elections;
Bucks County Board of Elections; **Butler
County Board of Elections;** Cambria
County Board of Elections; Cameron
County Board of Elections; Carbon County
Board of Elections; Centre County Board
of Elections; Chester County Board
of Elections; Clarion County Board of
Elections; Clearfield County Board of
Elections; **Clinton County Board of
Elections;** Columbia County Board of
Elections; Crawford County Board of
Elections; **Cumberland County Board
of Elections;** Dauphin County Board of
Elections; **Delaware County Board of
Elections;** Elk County Board of Elections;
Erie County Board of Elections; Fayette
County Board of Elections; Forest County
Board of Elections; **Franklin County
Board of Elections;** Fulton County Board
of Elections; **Greene County Board of
Elections;** Huntingdon County Board
of Elections; Indiana County Board
of Elections; **Jefferson County Board
of Elections;** Juniata County Board of
Elections; Lackawanna County Board
of Elections; Lancaster County Board
of Elections; **Lawrence County Board
of Elections;** Lebanon County Board
of Elections; Lehigh County Board of
Elections; Luzerne County Board of
Elections; Lycoming County Board
of Elections; Mckean County Board
of Elections; Mercer County Board
of Elections; Mifflin County Board of
Elections; Monroe County Board of
Elections; **Montgomery County Board
of Elections;** Montour County Board
of Elections; Northampton County
Board of Elections; Northumberland
County Board of Elections; Perry County
Board of Elections; Philadelphia County
Board of Elections; **Pike County Board
of Elections;** Potter County Board of
Elections; Schuylkill County Board
of Elections; Snyder County Board of
Elections; Somerset County Board of
Elections; Sullivan County Board of
Elections; Susquehanna County Board of
Elections; Tioga County Board of Elections;
Union County Board of Elections;
Venango County Board of Elections;
Warren County Board of Elections;
Washington County Board of Elections;

Wayne County Board of Elections;
Westmoreland County Board of Elections;
Wyoming County Board of Elections;
and York County Board of Elections
Petition of: Kathy Boockvar, in
Her Capacity as Secretary of the
Commonwealth of Pennsylvania

No. 133 MM 2020
|
Submitted: September 8, 2020
|
Decided: September 17, 2020

**Synopsis**
**Background:** Democratic party, elected officials, and
congressional candidates petitioned for review against
Secretary of the Commonwealth and county election boards,
seeking declaratory and injunctive relief regarding various
aspects of mail-in voting and the poll watcher residency
requirement. Secretary's application for the Supreme Court
to exercise extraordinary jurisdiction was granted, and
applications to intervene by Republican party and elected
officials were granted.

**Holdings:** The Supreme Court, No. 133 MM 2020, Baer, J.,
held that:

Election Code permits county boards to accept hand-
delivered mail-in ballots at locations other than their office
addresses including drop-boxes;

three-day extension of absentee and mail-in ballot received-
by deadline was warranted;

county boards were not required to provide opportunity
to cure mail-in and absentee ballots that were filled out
incompletely or incorrectly;

an elector's failure to enclose mail-in ballot in the secrecy
envelope renders the ballot invalid; and

statute imposing residency requirement on being poll watcher
did not violate due process, equal protection, free speech, and
association rights.

Relief granted in part and denied in part.

Wecht, J., filed concurring opinion.

Saylor, Chief Justice, filed concurring and dissenting opinion
in which Mundy, J., joined.

Donohue, J., filed concurring and dissenting opinion in which
Saylor, Chief Justice, and Mundy, J., joined in part.

Mundy, J., filed dissenting opinion.

**Attorneys and Law Firms**

Kathleen Marie Kotula, Nicole Jeanne Boland, Pennsylvania
Department of State, John Bartley Delone, Timothy Eugene
Gates, Mary Abbegael Giunta, Pennsylvania Governor's
Office, Howard Greeley Hopkirk, Sean Andrew Kirkpatrick,
Karen Mascio Romano, Pennsylvania Office of Attorney
General, Stephen Moniak, Josh Shapiro, Attorney General
of the Commonwealth of Pennsylvania, Kenneth Lawson
Joel, Harrisburg, Richard Louis Armezzani, Myers, Brier
& Kelly, LLP, Daniel Thomas Brier, John B. Dempsey,
Donna Ann Walsh, Myers, Brier & Kelly, LLP, Scranton,
Susan M. Davies, Daniel T. Donovan, Michael A. Glick,
Kirkland & Ellis LLP, Washington, DC, Daniel Barrett
Mullen, Pennsylvania Office of Attorney General, Pittsburgh,
for Petitioner Kathy Boockvar.

Richard P. Limburg, Obermayer, Rebmann, Maxwell &
Hippel, LLP, Philadelphia, Jonathan Lienhard, Shawn
Sheehy, Jason Torchinsky, Holtzman Vogel Josefiak and
Torchinsky, LLP, Haymarket, VA, for Intervenors – Appellees
Jake Corman, Joseph Scarnati.

Mark Alan Aronchick, Hangley, Aronchick, Segal, Pudlin
& Schiller, Michele D. Hangley, John Brent Hill, Hangley,
Aronchick, Robert Andrew Wiygul, Segal, Pudlin & Schiller,
Philadelphia, for Respondents Bucks County Board of
Elections, Chester County Board of Elections, Montgomery
County Board of Elections, Philadelphia County Board of
Elections.

William Gleason Barbin, Ebensburg, for Respondent
Cambria County Board of Elections.

Thomas M. Caffrey, Lehigh County Department of Law, Coplay, Sarah Mae Murray, Allentown, for Respondent Lehigh County Board of Elections.

Larry E. Coploff, Coploff, Ryan, Welch & Houser Lock Haven, for Respondent Clinton County Board of Elections.

Jonathan Lee DeWald, McNerney, Allen P. Page, IV, Page, Vanderlin & Hall, Williamsport, for Respondent Union County Board of Elections.

Elizabeth A. Dupuis, Babst Calland Clements and Zomnir PC, State College, for Respondents Armstrong County Board of Elections, Bedford County Board of Elections, Blair County Board of Elections, Centre County Board of Elections, Columbia County Board of Elections, Dauphin County Board of Elections, Fayette County Board of Elections, Huntingdon County Board of Elections, Indiana County Board of Elections, Lackawanna County Board of Elections, Lawrence County Board of Elections, Lebanon County Board of Elections, Mercer County Board of Elections, Montour County Board of Elections, Northampton County Board of Elections, Northumberland County Board of Elections, Venango County Board of Elections, and York County Board of Elections.

Christopher P. Gabriel, Cafardi Ferguson Wyrick Weis & Gabriel LLC, for Respondents Clarion County Board of Elections and Tioga County Board of Elections.

Gerard Joseph Geiger, Newman Williams, P.C., Stroudsburg, for Respondents Carbon County Board of Elections, Monroe County Board of Elections, Pike County Board of Elections, Snyder County Board of Elections, Wayne County Board of Elections.

Kevin Michael Greenberg, Anthony Michael Pratt, Adam R. Roseman, Greenberg Traurig, LLP, Philadelphia, Alex Michael Lacey, Clifford B. Levine, Dentons Cohen & Grigsby P.C., Pittsburgh, for Respondent Pennsylvania Democratic Party, et al.

Robert Eugene Grimm, Law Office of Robert Eugene Grimm, Smithfield, for Respondent Greene County Board of Elections.

Robert J. Grimm, for Swartz Campbell, LLC, Pittsburgh, for Respondent Washington County Board of Elections.

Christina Lee Hausner, Lancaster County Solicitor's Office, Lancaster, for Lancaster County Board of Elections.

Frank J. Lavery, Jr., Stephen Bradley Edwards, Andrew W. Norfleet, Lavery Law PC, Harrisburg, for Respondents Franklin County Board of Elections and Perry County Board of Elections.

Lawrence John Moran, Jr., Joyce, Carmody & Moran, P.C., Pittston, for Respondent Luzerne County Board of Elections.

Sean Alexander Mott, Adams County Solicitor's Office, Molly Ruth Mudd, Gettysburg, for Respondent Adams County Board of Elections.

David Allen Regoli, Westmoreland County Sheriff's Office, Greensburg, for Respondent Westmoreland County Board of Elections.

Edward David Rogers, Terence Martin Grugan, Elizabeth Victoria Wingfield, Ballard Spahr LLP, Philadelphia, for Respondent Delaware County Board of Elections.

Robert D. Schaub, Rosenn, Jenkins & Greenwald, LLP, Wilkes-Barre, for Respondent Susquehanna County Board of Elections.

Steven B. Silverman, Babst Calland Clements and Zomnir PC, Pittsburgh, for Respondents Armstrong County Board of Elections, Bedford County Board of Elections, Blair County Board of Elections, Centre County Board of Elections, Columbia County Board of Elections, Dauphin County Board of Elections, Fayette County Board of Elections, Huntingdon County Board of Elections, Indiana County Board of Elections, Lackawanna County Board of Elections, Lawrence County Board of Elections, Mercer County Board of Elections, Montour County Board of Elections, Venango County Board of Elections, and York County Board of Elections.

Stephen S. Snook, BMZ Law, PC, Lewistown, for Respondent Mifflin County Board of Elections.

Gregory Dale Sobol, Zwick & Zwick LLP, Brookville, Carl John Zwick, Zwick & Zwick LLP, Dubois, for Respondent Jefferson County Board of Elections.

Christine D. Steere, Deasey, Mahoney & Valentini, Ltd., Media, for Respondent Berks County Board of Elections.

Andrew Francis Szefi, George M. Janocsko, Allan Joseph Opsitnick, Allegheny County Law Department, Pittsburgh, for Respondent Allegheny County Board of Elections.

Thomas S. Talarico, Talarico & Associates, Erie, for Respondent Erie County Board of Elections.

Thomas George Wagner, Meyer Wagner Brown & Kraus, Saint Marys, for Respondent Elk County Board of Elections.

H. William White, III, Butler County Solicitor's Office, Butler, for Respondent Butler County Board of Elections.

Regina Marie Blewitt, Joyce, Carmody & Moran, P.C., Pittston, for Respondent Luzerne County Board of Elections.

Timothy Patrick Brennan, Richard Eugene Santee, Brian J. Taylor, Easton, for Respondent Northampton County Board of Elections.

Robert Lawrence Gawlas, Rosenn, Jenkins & Greenwald, LLP, Wilkes-Barre, for Respondent Susquehanna County Board of Elections.

William J. Madden, William J. Madden PC, Sharon, for Respondent Mercer County Board of Elections.

Ryan Michael Joyce, Swartz Campbell, LLC, Pittsburgh, for Respondent Washington County Board of Elections.

Nathan W. Karn, Hollidaysburg, for Respondent Blair County Board of Elections.

Sean Robert Keegan, Babst Calland Clements and Zomnir PC, Pittsburgh, for Respondents Armstrong County Board of Elections, Bedford County Board of Elections, Blair County Board of Elections, Centre County Board of Elections, Columbia County Board of Elections, Dauphin County Board of Elections, Fayette County Board of Elections, Huntingdon County Board of Elections, Indiana County Board of Elections, Lackawanna County Board of Elections, Lawrence County Board of Elections, Lebanon County Board of Elections, Mercer County Board of Elections, Montour County Board of Elections, Northumberland County Board of Elections, Venango County Board of Elections, and York County Board of Elections.

Krista Ann M. Staley, Babst, Calland, Clements and Zomnir, P.C., Pittsburgh, for Respondents Armstrong County Board of Elections, Bedford County Board of Elections, Blair County Board of Elections, Centre County Board of Elections, Columbia County Board of Elections, Dauphin County Board of Elections, Fayette County Board of Elections, Huntingdon County Board of Elections, Indiana County Board of Elections, Lackawanna County Board of Elections, Lawrence County Board of Elections, Lebanon County Board of Elections, Montour County Board of Elections, Northumberland County Board of Elections, Venango County Board of Elections, and York County Board of Elections.

Kathleen A. Gallagher, Russell David Giancola, Devin Arlie Winklosky, Porter Wright Morris & Arthur LLP, Pittsburgh, for Intervenor – Appellee Republican Party of Pennsylvania, Possible Intervenors Donald J. Trump for President, Inc., Republican National Committee.

Tara Lynn Hazelwood, Pennsylvania House of Representatives, Harrisburg, Pennsylvania House of Representatives Democratic Caucus, Amicus Curiae.

Lori A. Martin, Wilmer Cutler Pickering Hale and Dorr LLP, New York, Common Cause Pennsylvania, Patricia M. Demarco, League of Women Voters of Pennsylvania, Make the Road Pennsylvania, Robinson, Danielle Graham, The Black Political Empowerment Project, Kathleen Wise, Amici Curiae, Common Cause Pennsylvania, Patricia M. DeMarco, League of Women Voters of Pennsylvania, Make the Road Pennsylvania, Danielle Graham Robinson, The Black Political Empowerment Project, Kathleen Wise, Possible Intervenors.

Ralph J. Teti, Willig, John R. Bielski, Williams & Davidson, Philadelphia, Pennsylvania AFL-CIO, et al, Amicus Curiae.

Claude Joseph Hafner, II, Pennsylvania State Senate, Harrisburg, for Senate Democratic Leader, State Senator Jay Costa, et al., Possible Intervenor.

SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.

## OPINION

JUSTICE BAER

**\*1** In October 2019, the General Assembly of the Commonwealth of Pennsylvania enacted Act 77 of 2019, which, *inter alia*, created for the first time in Pennsylvania the opportunity for all qualified electors to vote by mail, without requiring the electors to demonstrate their absence from the voting district on Election Day, 25 P.S. §§ 3150.11-3150.17. The Pennsylvania Democratic Party and several Democratic elected officials and congressional candidates, some in their official capacity and/or as private citizens (collectively, "Petitioner"), filed the instant action,

initially in the Commonwealth Court, in the form of a petition for review seeking declaratory and injunctive relief relating primarily to five issues of statutory interpretation involving Act 77 and the Election Code, 25 P.S. §§ 2600-3591.[1] This Court exercised Extraordinary Jurisdiction to address these issues and to clarify the law of this Commonwealth in time for the 2020 General Election.[2]

[1]    The caption reflects the Secretary of the Commonwealth Kathy Boockvar as filing the petition before the Court based upon her application for extraordinary review, which this Court granted. Regardless, as noted, we now refer to the plaintiffs in the underlying lawsuit as "Petitioner" and, as noted *infra*, Secretary Boockvar as "Secretary."

[2]    Pursuant to 42 Pa.C.S. § 726, this Court

may, on its own motion or upon petition of any party, in any matter pending before any court or magisterial district judge of the Commonwealth involving an issue of immediate public importance, assume plenary jurisdiction of such matter at any stage thereof and enter a final order or otherwise cause right and justice to be done.

## I. FACTS AND PROCEDURAL HISTORY

On July 10, 2020, Petitioner filed its petition for review in the Commonwealth Court against Secretary of the Commonwealth Kathy Boockvar ("Secretary") and all 67 county election boards ("Boards").[3] In its petition, Petitioner requested that the Commonwealth Court issue declaratory and injunctive relief "so as to protect the franchise of absentee and mail-in voters." Petition for Review ("Petition"), 7/10/2020, at 5.[4]

[3]    At the time Petitioner filed its petition, an action filed by Donald J. Trump for President, Inc., the Republican National Committee ("RNC"), and several Republican congressional candidates and electors (collectively, "Republican Party") against the Secretary and the Boards was pending in the U.S. District Court for the Western District of Pennsylvania. In that case, the Republican Party alleged federal and state constitutional violations stemming from the recent implementation of no excuse mail-in voting under Act 77. The specific issues raised by the Republican Party in the federal action are, to some extent, the mirror image of the issues raised by Petitioner in the case *sub judice*.

[4]    Concurrently, Petitioner filed both an Application for Special Relief in the Nature of an Expedited Motion for Alternative Service and an Application for an Expedited Discovery Schedule and Evidentiary Hearing, to which several responses were filed. On July 15, 2020, the Commonwealth Court denied Petitioner's request for alternative service. On July 30, 2020, the Commonwealth Court, *inter alia*, granted in part and denied in part Petitioner's application for an expedited discovery schedule and evidentiary hearing. In this order, the Commonwealth Court set forth specific deadlines for responsive pleadings.

**\*2** Specifically, Petitioner raised several discrete issues for the Commonwealth Court's consideration, which are discussed in more detail *infra*. Briefly, in Count 1, Petitioner requested declaratory relief to confirm that Act 77 permits Boards "to provide secure, easily accessible locations as the Board deems appropriate, including, where appropriate, mobile or temporary collection sites, and/or drop-boxes for the collection of mail-in ballots." *Id.* at 47, ¶ 165. Additionally, Petitioner sought an injunction requiring the Boards to "evaluate the particular facts and circumstances in their jurisdictions and develop a reasonable plan ... to ensure the expedient return of mail-in ballots." *Id.* at ¶ 166.

In Count 2, Petitioner sought an injunction to "lift the deadline in the Election Code across the state to allow any ballot postmarked by 8:00 p.m. on Election Night to be counted if it is received by the Boards" by 5:00 p.m. on Tuesday, November 10, which is the deadline for ballots to be received under the Federal Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA").[5] *Id.* at 50, ¶ 178. In the alternative, Petitioner posited that the Commonwealth Court could, with a few caveats, "enjoin the Counties to extend a more tailored ballot extension deadline to the date that is 21 days after the particular voter's ballot is mailed by the county[.]" *Id.* at ¶ 179.

[5]    The UOCAVA delineates, *inter alia*, the process and procedure in which overseas voters and voters in the uniformed services receive absentee ballots for federal elections. *See generally* 52 U.S.C. §§ 20301-20311.

In Count 3, Petitioner highlighted that the "procedure for mail-in ballots often leads to minor errors, which result in many ballots being rejected and disenfranchising voters who believe they have exercised their right to vote." *Id.* at 51, ¶ 186. In anticipation of these expected errors, Petitioner again sought an injunction requiring Boards that have knowledge of an incomplete or incorrectly filled out ballot and the elector's contact information to contact the elector and provide them

"the opportunity to cure the facial defect until the UOCAVA deadline." *Id.* at 52, ¶ 187.

In Count 4, Petitioner requested a declaration that there is no statutory authority to set aside an absentee or mail-in ballot solely for failure to place it into the official election ballot envelope (hereinafter referred to as the "secrecy envelope"), as well as an injunction prohibiting any "naked ballots," which are otherwise without error, from being invalidated.[6] *Id.* at 54, ¶ 198-199. A "naked ballot" refers to an official mail-in ballot that is not placed in the secrecy envelope before mailing.

6    As explained more fully below, upon receipt of an official mail-in ballot, the mail-in elector is to mark the ballot in secret, and then fold the ballot, enclose, and securely seal the same in the secrecy envelope provided. 25 P.S. § 3150.16(a). The secrecy envelope "shall then be placed in the second one, on which is printed the form of declaration of the elector, and the address of the elector's county board of election and the local election district of the elector." *Id.*

Finally, in Count 5, Petitioner sought a declaration that the "Election Code's poll watcher residency requirement does not violate the United States Constitution's First and Fourteenth Amendments, its Equal Protection Clause, or the Equal Protection and Free and Equal Elections Clauses of the Pennsylvania Constitution." *Id.* at 55, ¶ 207.

On August 13, 2020, the Secretary filed an Answer and New Matter to the petition. In addition, twenty of the named Boards filed answers with new matter, fourteen of the Boards filed answers, and nine of the Boards filed preliminary objections.[7] Requests to intervene were filed by Donald J. Trump for President, Inc., the Republican Party of Pennsylvania, and the RNC, as well as Joseph B. Scarnati III, President Pro Tempore, and Jake Corman, Majority Leader of the Pennsylvania Senate, in opposition to the petition. The Common Cause Pennsylvania, The League of Women Voters of Pennsylvania, The Black Political Empowerment Project ("B-PEP"), Make the Road Pennsylvania, a project of Make the Road States ("Make the Road PA"), Patricia M. DeMarco, Danielle Graham Robinson, and Kathleen Wise filed a joint application to intervene as co-petitioners.

7    On August 27, 2020, Petitioner filed its: (1) Answer to the Secretary's New Matter; (2) Answer to the new matter filed by various Boards; and (3) an omnibus memorandum of law opposing the preliminary objections filed by several Boards.

**\*3** On August 16, 2020, the Secretary filed an application asking this Court to exercise extraordinary jurisdiction over Petitioner's petition for review.[8] Highlighting, *inter alia*, the two major political parties' "diametric positions" on the interpretation of several Act 77 provisions and the fast-approaching 2020 General Election, the Secretary asserted that "[t]he exercise of extraordinary jurisdiction by this Court is the only means available to resolve these disputes without disrupting the election." Secretary's Application for Extraordinary Relief, 8/16/2020, at 14-16. On August 19, 2020, Petitioner filed an Answer to the Secretary's application, noting that it had no objection to this Court exercising its extraordinary jurisdiction.[9]

8    In her application, the Secretary informed this Court that she had filed a motion in the aforementioned federal action urging the District Court to abstain from rendering a decision pursuant to *R.R. Comm'n of Tex. v. Pullman*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) (explaining that, where appropriate, a federal court may abstain from deciding a case to permit a state court the opportunity to resolve a state law question). Secretary's Application for Extraordinary Relief, 8/16/2020, at 17. This motion was later granted. *See Trump for President, Inc. v. Boockvar,* —— F.Supp.3d ——, ——, 2020 WL 4920952, at *21 (W.D. Pa. 2020).

9    In addition, on August 18, 2020, Bucks, Chester, Montgomery, and Philadelphia County Boards of Election filed an Answer in Support of the Secretary's application. Likewise, on August 19, 2020, Armstrong, Bedford, Blair, Centre, Columbia, Dauphin, Fayette, Huntingdon, Indiana, Lackawanna, Lawrence, Lebanon, Montour, Northumberland, Venango, and York County Boards of Election also filed an answer joining the Secretary's application. Several of the remaining 67 counties filed no answer letters. On August 20, 2020, answers were filed by the Republican proposed intervenors, as well as proposed co-petitioners, The Common Cause Pennsylvania, The League of Women Voters of Pennsylvania, B-PEP, Make the Road PA, Patricia M. DeMarco, Danielle Graham Robinson, and Kathleen Wise.

Faced with a national election scheduled to occur on November 3, 2020 and substantial legal issues that required the highest court of Pennsylvania's analysis and response to ensure a free and fair election, on September 1, 2020, this Court granted the Secretary's Application and set

forth a schedule for supplemental briefing and filings.[10] Later, on September 3, 2020, this Court filed an order granting the motions to intervene filed by the Republican Party of Pennsylvania (hereinafter, "Respondent") and Joseph B. Scarnati III, Pennsylvania Senate President Pro Tempore, and Jake Corman, Senate Majority Leader, representing the Republican Senate Caucus (hereinafter, "Caucus"). Applications to intervene filed by Donald J. Trump for President, Inc., and the RNC; Common Cause of Pennsylvania, the League of Women Voters of Pennsylvania, B-PEP, Make the Road PA, Patricia M. DeMarco, Danielle Graham Robinson, and Kathleen Wise were denied without prejudice to the parties' ability to file briefs as *amicus curiae* pursuant to Pa.R.A.P. 531.[11] The parties have submitted supplemental filings in support of their respective positions, and this matter is now ripe for disposition of the discrete five legal issues before us.

10    The Secretary highlighted in her application for extraordinary relief to this Court that there was insufficient time to engage in full pre-trial proceedings and discovery before applications for summary relief could be filed. *See* Secretary's Application for Extraordinary Relief, 8/16/2020, at 13-14. In fact, the Secretary explained that because of all the uncertainties surrounding the case, it was unclear "whether discovery, dispositive motions, and a hearing were even necessary." *Id.* at 14 n.3. She maintained that Petitioner's application to expedite discovery and a hearing in Commonwealth Court was premature. Thus, the Secretary sought extraordinary review of the discrete legal claims alleged in the lawsuit as if at the summary relief stage of the case. Cognizant of our authority when exercising extraordinary jurisdiction, this Court granted the Secretary's request. *See* Order dated 9/1/2020. Accordingly, because of the intense time pressure confronting this Court, we do not address the various procedural filings in the case and, rather, address only the five discrete legal claims before us. *See* 42 Pa.C.S. § 726 (this Court may "assume plenary jurisdiction of [any matter pending before any court] at any stage thereof and enter a final order or otherwise cause right and justice to be done").

11    After this Court granted the Secretary's application and set a schedule for supplemental filings, Bryan Cutler and Kerry Benninghoff, Speaker and Majority Leader of the Pennsylvania House of Representatives, respectively, filed an Application to Intervene, while State Senator Jay Costa, on behalf of the Senate Democratic Caucus filed an Application to Intervene, which was later amended

to include State Representative Frank Dermody, on behalf of the House Democratic Caucus. Because of the necessary expediency of reaching a decision in this case, and given that adequate advocacy has been provided, these applications, submitted close to this Court's deadline for supplemental filings, are denied. In any case, the requests are moot given the issuance of our decision.

## II. RELEVANT OVERARCHING PRINCIPLES OF LAW

**\*4** Generally speaking, each of the five issues presented by Petitioner presents a pure question of law, over which our standard of review is *de novo* and our scope of review is plenary. *In re Vencil*, 638 Pa. 1, 152 A.3d 235, 241 (2017). Specifically, in large part, Petitioner requests relief in the form of declarations of law regarding Act 77 pursuant to the Declaratory Judgments Act, 42 Pa.C.S. §§ 7531-7541. Accordingly, we address the issues presented mindful of the following.

The Declaratory Judgments Act, which is to be liberally construed and administered, was promulgated to "settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations[.]" 42 Pa.C.S. § 7541(a). Pertinent to the instant matter, this Act provides, in relevant part, that "[a]ny person ... whose rights, status, or other legal relations are affected by a statute ... may have determined any question of construction or validity arising under the ... statute ... and obtain a declaration of rights, status, or other legal relations thereunder." 42 Pa.C.S. § 7533.[12]

12    Notably, while Petitioner has styled its requested relief as "injunctive" in reality it seeks declaratory relief. We will treat its prayers for relief accordingly. In this regard, as noted, essentially, we are treating the matter as if it is at the summary relief stage. *See Hosp. & Healthsystem Ass'n of Pa. v. Com.*, 621 Pa. 260, 77 A.3d 587, 602 (2013) ("An application for summary relief may be granted if a party's right to judgment is clear and no material issues of fact are in dispute.") (citation omitted). *See also* Pa.R.A.P. 1532(b) (providing that "[a]t any time after the filing of a petition for review in an appellate or original jurisdiction matter, the court may on application enter judgment if the right of the applicant thereto is clear.").

When presented with matters of statutory construction, this Court is guided by Pennsylvania's Statutory Construction

Act, 1 Pa.C.S. § 1501-1991. Under this Act, "the object of all statutory construction is to ascertain and effectuate the General Assembly's intention." *Sternlicht v. Sternlicht*, 583 Pa. 149, 876 A.2d 904, 909 (2005) (citing 1 Pa.C.S. § 1921(a) ("The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly")). When the words of a statute are clear and unambiguous, "the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b); *see also Sternlicht, supra*. However, when the words of a statute are not explicit, the General Assembly's intent is to be ascertained by consulting a comprehensive list of specific factors set forth in 1 Pa.C.S. § 1921(c). *See also Pennsylvania Associated Builders & Contractors, Inc. v. Commonwealth Dep't of Gen. Servs.,* 593 Pa. 580, 932 A.2d 1271, 1278 (2007) (recognizing that when the "words of the statute are not explicit, the General Assembly's intent is to be ascertained by considering matters other than statutory language, like the occasion and necessity for the statute; the circumstances of its enactment; the object it seeks to attain; the mischief to be remedied; former laws; consequences of a particular interpretation; contemporaneous legislative history; and legislative and administrative interpretations").

Moreover, we recognize that in this Commonwealth, "[e]lections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." Pa. Const. art. I, § 5 (hereinafter referred to as the "Free and Equal Elections Clause"). The broad text of this specific provision "mandates clearly and unambiguously, and in the broadest possible terms, that *all* elections conducted in this Commonwealth must be 'free and equal.' " *League of Women Voters v. Commonwealth*, 645 Pa. 1, 178 A.3d 737, 804 (2018) (emphasis in original). Stated another way, this clause was "specifically intended to equalize the power of voters in our Commonwealth's election process[.]" *Id.* at 812.

 **\*5** Finally, this Court has previously observed that the purpose and objective of the Election Code, which contains Act 77, is "[t]o obtain freedom of choice, a fair election and an honest election return[.]" *Perles v. Hoffman*, 419 Pa. 400, 213 A.2d 781, 783 (1965). To that end, the Election Code should be liberally construed so as not to deprive, *inter alia*, electors of their right to elect a candidate of their choice. *Id.* at 784. With these general principles in mind, this Court will address in turn each of the five discrete issues presented by Petitioner.

## III. ISSUES

### A. COUNT I OF THE PETITION FOR REVIEW

Section 3150.16(a) of the Election Code, 25 P.S. § 3150.16(a), is part of Act 77 and pertinent to several issues in this matter. That statutory provision, which is entitled "Voting by mail-in electors," states as follows:

> **(a) General rule.--**At any time after receiving an official mail-in ballot, but on or before eight o'clock P.M. the day of the primary or election, the mail-in elector shall, in secret, proceed to mark the ballot only in black lead pencil, indelible pencil or blue, black or blue-black ink, in fountain pen or ball point pen, and then fold the ballot, enclose and securely seal the same in the envelope on which is printed, stamped or endorsed "Official Election Ballot." This envelope shall then be placed in the second one, on which is printed the form of declaration of the elector, and the address of the elector's county board of election and the local election district of the elector. The elector shall then fill out, date and sign the declaration printed on such envelope. Such envelope shall then be securely sealed and the elector shall send same by mail, postage prepaid, except where franked, or deliver it in person to said county board of election.

25 P.S. § 3150.16(a). The last sentence of this provision is the primary focus of the first question of law that we will address. The plain language of this sentence allows an elector to mail her securely sealed envelope containing the elector's "Official Election Ballot" to her "county board of election" or, more relevant to this issue, "deliver it in person to said county board of election." *Id.*

In Count I of its petition for review, Petitioner seeks a declaration that a reasonable interpretation of Section 3150.16(a) of the Election Code permits county boards of election to provide electors with as many secure and easily accessible locations to deliver personally their mail-in ballots as each board deems appropriate.[13] Petitioner suggests that these locations can consist of mobile or temporary collection sites and that county boards of election may utilize secure drop-boxes for the collection of hand-delivered mail-in ballots.

13      Under Count I, Petitioner also sought relief "in the
          form of an affirmative injunction requiring that county
          Boards are required to evaluate the particular facts
          and circumstances in their jurisdictions and develop a

reasonable plan reflecting the needs of the citizens of the county to ensure the expedient return of mail-in ballots." Petition at 47, ¶ 166. Petitioner accurately concedes that it must establish a clear right to this relief. *Id.* at ¶ 167; *see Roberts v. Bd. of Directors of Sch. Dist. of City of Scranton*, 462 Pa. 464, 341 A.2d 475, 478 (1975) (explaining that, "for a mandatory injunction to issue, it is essential that a clear right to relief in the plaintiff be established"). To the extent that Petitioner continues to seek injunctive relief in this form, we summarily decline the request, as there simply is no legal authority that would allow this Court to mandate that the county boards of election "evaluate the particular facts and circumstances in their jurisdictions and develop a reasonable plan reflecting the needs of the citizens of the county to ensure the expedient return of mail-in ballots." In other words, Petitioner cannot establish a clear right to relief with regard to their request for a mandatory injunction.

**\*6** Indeed, Petitioner contends that, by enacting Section 3150.16(a) of the Election Code, the General Assembly clearly and unambiguously intended to provide the various county boards of election with the option of accepting hand-delivered mail-in ballots at any location controlled by the boards, not just at the boards' central offices. In support of this position, Petitioner points out, *inter alia*, that pursuant to Section 3151 of the Election Code, the General Assembly empowered each county board of election to receive "ballot boxes and returns" in their offices or "in any such other place as has been designated by the board."[14] 25 P.S. § 3151.

14    Section 3151 of the Election Code states, in full, as follows:
      Each county board of elections shall cause its office to remain open, in charge of one or more members of the board, during the entire duration of each primary and election, and after the close of the polls, until all the ballot boxes and returns have been received in the office of the county elections board, or received in such other place as has been designated by the board. 25 P.S. § 3151.

The Secretary builds on Petitioner's argument. In so doing, the Secretary highlights that, in construing Section 3150.16(a) of the Election Code, the Court should consider that the General Assembly defined "county board" or "board" as meaning "the county board of elections of any county herein provided for." 25 P.S. § 2602. According to the Secretary, this definition clarifies that, for purposes of Section 3150.16(a), "county board of election" refers to a municipal body, not a physical office or address. In other words, the Secretary believes

that, when this definition is used for purposes of Section 3150.16(a), that Section unambiguously permits voters to deliver mail-in ballots in person to places designated by county boards of election, other than their respective office addresses.

In further support of this position, the Secretary asserts that the Election Code contemplates that county boards of election will operate out of multiple locations. *See* 25 P.S. § 2645(b) (stating, *inter alia*, that the "county commissioners or other appropriating authorities of the county shall provide the county board with suitable and adequate offices at the county seat, property furnished for keeping its records, holding its public sessions and otherwise performing its public duties, and shall also provide, such branch offices for the board in cities other than the county seat, as may be necessary"). Echoing Petitioner's argument, the Secretary further suggests that the Election Code anticipates that "ballot boxes and returns" may be received "in the office of the county elections board, or received in such other places as has been designated by the board." 25 P.S. § 3151.

The Secretary insists that the Election Code is devoid of any language limiting county boards of election from accepting delivery of mail-in votes solely at their primary office addresses. In fact, the Secretary takes the position that to hold otherwise would contravene the plain language of the Election Code. However, assuming *arguendo* that this Court deems the Election Code ambiguous on this point, the Secretary advocates that a reasonable interpretation of the Code nonetheless authorizes county boards of election to utilize multiple drop-off sites to accept hand-delivered mail-in ballots.

In this regard, the Secretary focuses on the statutory considerations to which this Court may refer when construing an ambiguous statute, 1 Pa.C.S. § 1921(c), as described *supra*. More specifically, the Secretary posits that the General Assembly enacted Act 77 with the object of increasing the electorate's participation in the electoral process by making it easier and more convenient to vote, providing all electors with the option to mail in their ballots. The Secretary opines that, consistent with this objective, the General Assembly intended to allow county boards of election to accept hand-delivered mail-in ballots at locations besides the boards' central office addresses. The Secretary takes the position that, if this Court deems reasonable the various parties' competing interpretations of the Election Code, then the Court should construe the Code in favor of the right to vote.

**\*7** Contrary to the contentions of the Secretary and Petitioner, Respondent submits that the Election Code prohibits county boards of election from designating locations other than their established county offices for hand delivery of mail-in ballots. Rather, according to Respondent, Section 3150.16(a) of the Election Code unambiguously mandates that an elector must either mail her mail-in ballot to the office address of the county board of election or deliver that ballot in person to the same office address. Stated differently, Respondent takes the position that the Election Code requires electors either to place their mail-in ballots, addressed to their county boards of election, into the United States Postal Service's ["USPS"] system or personally to deliver their mail-in ballot to that office.

In further support of this position, Respondent highlights the Election Code's use of the word "office" in the "deadline" provision for mail-in votes, Section 3150.16(c), which states that "a completed mail-in ballot must be received in the office of the county board of elections no later than eight o'clock P.M. on the day of the primary or election." 25 P.S. § 3150.16(c). Respondent also points out that the Election Code requires that a secure envelope containing a mail-in ballot have printed upon it "the address of the elector's county board of election," so that "the elector shall send same by mail, postage prepaid, except where franked, or deliver it in person to said county board of election." 25 P.S. § 3150.16(a). Thus, Respondent believes that, in sum, these statutory directives clearly indicate that the General Assembly intended that electors either mail or personally deliver mail-in ballots to the established office addresses of the county boards of election.

Next, Respondent reminds us that the Secretary and Petitioner are asking this Court to interpret the Election Code to allow voters to deliver their mail-in ballots to locations that will include unmanned drop-boxes. Respondent contends that Petitioner and the Secretary fail to articulate where the Election Code mentions "drop-boxes" or "satellite locations." Respondent then asserts that, if this Court were to interpret the Election Code as Petitioner and the Secretary propose, the Court would invalidate an alleged requirement of Act 77, *i.e.*, the need to deliver mail-in ballots to the established offices of county boards of election.

In addition, Respondent suggests that the preferred interpretation of the Election Code advocated by the Secretary and Petitioner permits the individual counties to implement differing ballot-return regimes. Respondent avers that this outcome would violate principles of equal protection. In support, Respondent quotes *Pierce v. Allegheny County Bd. of Elections*, 324 F.Supp.2d 684, 697 (W.D. Pa. 2003), for the proposition that "[a] state must impose uniform statewide standards in each county in order to protect the legality of a citizen's vote. Anything less implicates constitutional problems under the equal protection clause of the Fourteenth Amendment." For these reasons, Respondent contends that the interpretation of the Election Code posited by Petitioner and the Secretary must fail.

**\*8** The primary argument of the Caucus largely tracks that of Respondent, particularly the contention that the relief proposed by Petitioner and the Secretary would create an equal protection problem. According to the Caucus, pursuant to the solution offered by Petitioner and the Secretary, some counties will provide more locations for voters to deliver their mail-in ballots, while other counties will allow voters to convey their mail-in ballots solely to the office addresses of the county boards of election. The Caucus views this possibility as a violation of equal protection.

Notably, in an apparent break from Respondent's position, subject to its equal protection argument, the Caucus seems to concede that Pennsylvania law allows county boards of election to provide for in person delivery of mail-in ballots at more than one county election board office located within the county's borders. However, the Caucus insists that additional offices must comply with various requirements, including those outlined in Section 2645(b) of the Election Code. *See*25 P.S. § 2645(b) (explaining that "[t]he county commissioners or other appropriating authorities of the county shall provide the county board with suitable and adequate offices at the county seat, property furnished for keeping its records, holding its public sessions and otherwise performing its public duties, and shall also provide, such branch offices for the board in cities other than the county seat, as may be necessary"). In closing, the Caucus submits that unstaffed drop-boxes would not constitute a branch office of a county board of election and are otherwise not authorized by the Election Code as a method for collecting hand-delivered mail-in ballots.

Turning to our analysis, we observe that the question before us consists of the following two-part query regarding the Election Code: Does the Election Code allow a Pennsylvania voter to deliver her mail-in ballot in person to a location other than the established office address of her county's board of election, and if so, what means can county boards

of election utilize to accept hand-delivered mail-in ballots? For the reasons that follow, we find that the parties' competing interpretations of the Election Code on this issue are reasonable, rendering the Code ambiguous as it relates to this query. *See A.S. v. Pennsylvania State Police*, 636 Pa. 403, 143 A.3d 896, 905-06 (2016) (explaining that a "statute is ambiguous when there are at least two reasonable interpretations of the text").

In reaching this conclusion, we observe that Section 3150.16(a) of the Election Code explicitly allows an elector to deliver in person her securely sealed envelope containing her mail-in ballot "to said county board of election." 25 P.S. § 3150.16(a). The Election Code simply defines "county board" or "board" to mean "the county board of elections of any county herein provided for." 25 P.S. § 2602(c). Thus, the language used by the Legislature regarding where a mail-in ballot may be delivered in person is not solely limited to the official central office of the county board of election, and other sections of the Election Code permit a board of election to operate outside of its principal office. *See*, *e.g.*, 25 P.S. § 2645(b) (stating, *inter alia*, that the "county commissioners or other appropriating authorities of the county shall provide the county board with suitable and adequate offices at the county seat, property furnished for keeping its records, holding its public sessions and otherwise performing its public duties, and shall also provide, such branch offices for the board in cities other than the county seat, as may be necessary"). Therefore, on the one hand, these provisions tend to favor the view of Petitioner and the Secretary that the General Assembly did not intend to limit voters to delivering personally their mail-in ballots solely to the established office addresses of their county boards of election. Rather, as these parties rationally contend, when this definition is utilized for purposes of construing Section 3150.16(a), that exercise suggests that a voter can hand deliver her mail-in ballot to any location designated by the county board of election as a place where the board will accept these ballots.

**\*9** Alternatively, we recognize that Section 3150.16(a) of the Election Code directs that an elector may deliver her mail-in ballot in person only to "the county board of election." 25 P.S. § 3150.16(a). As Respondent in particular understandably emphasizes, neither this statutory language nor any other provision of the Election Code explicitly empowers a county board of election to establish satellite mail-in ballot collection facilities or to utilize secure drop-boxes for purposes of accepting hand-delivered mail-in

ballots. These observations, when viewed in the totality of the various arguments, lead us to conclude that the parties' competing interpretations are reasonable.

Accordingly, we turn to interpretive principles that govern ambiguous statutes generally and election matters specifically. In so doing, we are mindful of the "longstanding and overriding policy in this Commonwealth to protect the elective franchise." *Shambach v. Bickhart*, 577 Pa. 384, 845 A.2d 793, 798 (2004) (citations omitted). Moreover, it is well-settled that, "although election laws must be strictly construed to prevent fraud, they ordinarily will be construed liberally in favor of the right to vote." *Id.* (internal quotation marks omitted). Indeed, "[o]ur goal must be to enfranchise and not to disenfranchise [the electorate]." *In re Luzerne Cty. Return Bd.*, 447 Pa. 418, 290 A.2d 108, 109 (1972). Lastly, in resolving statutory ambiguity, we may consider, *inter alia*, the occasion and necessity for, the mischief to be remedied by, and the object to be obtained by the statute. 1 Pa.C.S. § 1921(c)(1), (3), and (4), respectively.

With all of that said, we need not belabor our ultimate conclusion that the Election Code should be interpreted to allow county boards of election to accept hand-delivered mail-in ballots at locations other than their office addresses including drop-boxes. This conclusion is largely the result of the clear legislative intent underlying Act 77, which animates much of this case, to provide electors with options to vote outside of traditional polling places. Section 3150.16(a) of the Election Code undeniably exemplifies this intent by granting the Pennsylvania electorate the right to vote by way of a mail-in ballot beyond the circumstances that ordinarily allow this alternative, such as voter absenteeism.

Accordingly, although both Respondent and the Caucus offer a reasonable interpretation of Section 3150.16(a) as it operates within the Election Code, their interpretation restricts voters' rights, as opposed to the reasonable interpretation tendered by Petitioner and the Secretary. The law, therefore, militates in favor of this Court construing the Election Code in a manner consistent with the view of Petitioner and the Secretary, as this construction of the Code favors the fundamental right to vote and enfranchises, rather than disenfranchises, the electorate.

In light of this conclusion, we will briefly address the equal protection argument of Respondent and the Caucus. The premise of that argument, as detailed *supra*, is that, if this Court interprets the Election Code in a manner that is

consistent with the position of Petitioner and the Secretary, which we have, then the county boards of election will employ myriad systems to accept hand-delivered mail-in ballots, which allegedly will be unconstitutionally disparate from one another in so much as some systems will offer more legal protections to voters than others will provide. However, the exact manner in which each county board of election will accept these votes is entirely unknown at this point; thus, we have no metric by which to measure whether any one system offers more legal protection than another, making an equal protection analysis impossible at this time. Accordingly, the equal protection argument of Respondent and the Caucus does not alter our conclusion in this matter.

**\*10** Thus, for these reasons, this Court declares that the Election Code permits county boards of election to accept hand-delivered mail-in ballots at locations other than their office addresses including drop-boxes.[15]

15    We note that the Secretary has issued guidelines in this regard specifying that the Boards "may provide voters with access to a secure ballot return receptacle." *See* Secretary's Post-Submission Communication dated 8/24/2020, setting forth the Secretary's Absentee and Mail-in Ballot Return Guidance at 1.1. Additionally, and consistent with the requirement that all votes must be cast by Election Day, these guidelines specify that: "Authorized personnel should be present at ballot return sites immediately prior to 8:00 p.m. or at the time the polls should otherwise be closed"; "At 8:00 p.m. on election night, or later if the polling place hours have been extended, all ballot sites, and drop-boxes must be closed and locked"; and "Staff must ensure that no ballots are returned to ballot return sites after the close of the polls." *Id.* at 3.3.

## B. COUNT II OF THE PETITION FOR REVIEW

In its second count, Petitioner presents this Court with an as-applied challenge to the Election Code's deadline for receiving ballots ("received-by deadline"), which requires mail-in and absentee ballots to be returned to Boards no later than 8:00 p.m. on Election Day, 25 P.S. §§ 3146.6(c), 3150.16(c). It contends that strict enforcement of this deadline, in light of the current COVID-19 pandemic and alleged delays in mail delivery by the USPS, will result in extensive voter disenfranchisement in violation of the Pennsylvania Constitution's Free and Equal Elections Clause.

As noted above, the Free and Equal Elections Clause provides that "[e]lections shall be free and equal; and no power, civil

or military, shall at any time interfere to prevent the free exercise of the right to suffrage." Pa. Const. art. I, § 5. Petitioner interprets this provision as forbidding the Boards from interfering with the right to vote by failing to act in a timely manner so as to allow electors to participate in the election through mail-in voting. Petition at 49, ¶ 176.

In support of its as-applied challenge in regard to the upcoming General Election, Petitioner recounts this Commonwealth's recent experience during the June Primary. It emphasizes that, during the Primary, the Boards were inundated with over 1.8 million requests for mail-in ballots, rather than the expected 80,000 - 100,000, due in large part to the COVID-19 pandemic, which caused many voters to be wary of congregating in polling places. Petitioner's Brief at 2, 51. Petitioner asserts that "[t]his crush of applications created massive disparities in the distribution and return of mail-in ballots." Petition at 24, ¶ 70.

It explains that, while some Boards were able to process the requests within the statutory requirements established by Act 77,[16] other boards, especially those in areas hard-hit by the pandemic, were unable to provide electors with ballots in time for the electors to return their ballot in accord with the statutory deadline. Petition at 23, ¶ 66. Indeed, it avers that in Delaware County, thousands of ballots were "not mailed out until the night" of the Primary, making timely return impossible. Petition at 26, ¶ 77. Bucks County apparently experienced similar delays.

16    Act 77, *inter alia*, requires Boards to verify an applicant's submitted information to determine whether the applicant is "qualified to receive an official mail-in ballot." 25 P.S. § 3150.12b(a). After approving an application, the Election Code, as amended by Act 77, instructs that "the board shall deliver or mail official mail-in ballots to the additional electors within 48 hours." 25 P.S. § 3150.15.

**\*11** To remedy this situation, the Election Boards of Bucks and Delaware Counties sought relief in their county courts.[17] Recognizing that the Election Code "implicitly granted [the courts the] authority to provide relief when there is a natural disaster or emergency" that threatens to deprive electors of the opportunity to participate in the electoral process, the Courts of Common Pleas of Bucks and Delaware Counties extended the deadline for the return of mail-in ballots for seven days, so long as the ballot was postmarked by the date of the Primary. *In re: Extension of Time for Absentee and Mail-In Ballots to be Received By Mail and Counted in the 2020 Primary*

*Election*, No. 2020-02322-37 (C.P. Bucks) (McMaster, J.)*; see also In re: Extension of Time for Absentee and Mail-In Ballots to be Received By Mail and Counted in the 2020 Primary Election*, No.-CV 2020-003416 (C.P. Delaware).

17    The Election Code grants courts of common pleas the authority to address situations which arise on the day of a primary or general election, 25 P.S. § 3046. Section 3046 entitled "Duties of common pleas court on days of primaries and elections," provides:

During such period said court shall act as a committing magistrate for any violation of the election laws; shall settle summarily controversies that may arise with respect to the conduct of the election; shall issue process, if necessary, to enforce and secure compliance with the election laws; and shall decide such other matters pertaining to the election as may be necessary to carry out the intent of this act.

25 P.S. § 3046.

Petitioner also observes that voters in six counties received an extension to the return deadline pursuant to an executive order issued by Governor Wolf, invoking the Emergency Management Services Code, 35 Pa.C.S. § 7301(c).[18] In Executive Order No. 2020-02, Governor Wolf addressed impediments to timely ballot return arising from the pandemic as well as civil unrest that had arisen immediately before the Primary in the specified counties following the killing of George Floyd by police officers. The impediments included road closures, public transportation disruptions, and curfews. To combat the potential disenfranchisement of voters, especially in light of the "unprecedented number" of mail-in ballots due to the pandemic, the Governor extended the received-by deadline for seven days, so long as the ballots were postmarked by the date of the Primary. Governor Wolf, Executive Order No. 2020-02 (June 1, 2020).

18    The affected counties were Allegheny, Dauphin, Delaware, Erie, Montgomery, and Philadelphia.

While voters in specified counties benefitted from extensions of time to return their ballots, Petitioner emphasizes that the Commonwealth Court rejected a request for a statewide extension of the ballot received-by deadline in *Delisle v. Boockvar*, 319 M.D. 2020 (Pa. Cmwlth. June 2, 2020) (Memorandum Opinion), favoring instead a county-by-county remedy. Indeed, while not mentioned by Petitioner, this Court additionally denied relief to a petitioner seeking a statewide extension of the ballot received-by deadline weeks before the June Primary, where the petitioner similarly argued for the extension based upon the overwhelming number of

mail-in ballot applications and delays in the USPS system. *Disability Rights Pa. v. Boockvar*, No. 83 MM 2020, —— Pa. ——, 2020 WL 2820467 (May 15, 2020).

In light of the lessons learned from the June Primary, Petitioner asserts that a statewide remedy is now necessary for the General Election. It suggests that the lack of a statewide remedy risks an equal protection challenge as only some voters would benefit from the extended deadline based on their county court's determination. Petition at 32-33, ¶ 105. Moreover, it emphasizes that a statewide order from this Court early in the election process would reduce voter confusion, as compared to the last-minute county-by-county relief granted during the Primary to address emergency situations. Petitioner's Brief at 26-27 n.9.

**\*12** Petitioner avers that the difficulties encountered by Boards processing the ballot applications prior to the June Primary will only be exacerbated in the November General Election. It emphasizes the continued grip of the pandemic, and a potential second wave of infections, which will result in more electors seeking to exercise their right to vote by mail. Petition at 49, ¶ 173-175. Additionally, it recognizes the undisputed fact that heavily contested Presidential elections involve substantially greater voter participation than largely uncontested primaries, further observing that "[i]t is normal in elections with significant public attention for there to be a flood of registrations received right before deadlines." Petition at 26, ¶ 79. It highlights that the Secretary estimates that 3 million electors will seek mail-in or absentee ballots for the General Election in contrast to the 1.5 million votes cast by mail at the Primary, and the pre-pandemic assumption of 80,000 - 100,000 absentee and mail-in ballots. Petitioner's Brief at 51.

Petitioner asserts that the overwhelming demand on the Boards will be exacerbated by delays in the USPS mail delivery system. Petitioner observes that historically the law presumed that a document placed in a mail collection box would be delivered within three days of placement, rather than the current two to five day delivery expectation of the USPS. *Id.* at 50. Petitioner avers that substantial delivery delays have resulted from a combination of recent operational changes at the USPS and decreased staffing caused by the pandemic. *Id.* at 20-21. It emphasizes that the USPS recently warned that there is a "significant risk" that Pennsylvania voters who submit timely ballot requests will not have sufficient time to complete and return their ballot to meet the Election Code's received-by deadline. *Id.* at 2-3 (quoting USPS General

Counsel and Executive Vice President Thomas Marshall's July 29, 2020 letter to the Secretary (hereinafter "USPS General Counsel's Letter"), discussed in detail *infra*).

Petitioner avers that this Court has the authority to act to protect electors' right to cast their ballot, as protected by Pennsylvania's Free and Equal Elections Clause. It emphasizes that " '[c]ourt[s] possess broad authority to craft meaningful remedies' when 'regulations of law ... impair the right of suffrage.' " *Id.* at 48-49 (quoting *League of Women Voters of Pa.*, 178 A.3d at 809, 822) (alterations in original). It observes that courts have exercised that authority to provide equitable relief to voters faced with natural disasters that impede their right to vote. As an example, Petitioner highlights the Commonwealth Court's actions in *In re General Election-1985*, 109 Pa.Cmwlth. 604, 531 A.2d 836, 838-39 (1987), in which the court affirmed a two-week suspension in an election where severe flooding prevented electors from safely voting due to "circumstances beyond their control." Petitioner asserts that Pennsylvania electors in the November General Election similarly face a threat to their ability to vote due to no fault of their own, but instead due to a perfect storm combining the dramatic increase in requested ballots due to the COVID-19 pandemic and the inability of the USPS to meet the delivery standards required by the Election Code.

Accordingly, Petitioner asks this Court to grant an injunction ordering the Respondent to "lift the deadline in the Election Code across the state in a uniform standard to allow any ballot postmarked by 8 p.m. on Election Night to be counted if it is received by the deadline for ballots to be received" under the UOCAVA, specifically by 5:00 p.m. on Tuesday, November 10.[19] Petition at 50, ¶ 178. Recognizing that the Secretary recommends a three-day extension, as detailed below, Petitioner counters that "[a] 7-day extension to the ballot receipt deadline is consistent with the USPS's recommendation to the Secretary that voters should mail their ballots to Boards no later than October 27, 2020," which is seven days prior to Election Day. Petitioner's Brief at 53 (referencing USPS General Counsel's Letter at 2). While it acknowledges that a seven-day extension could impact other post-election deadlines as discussed *infra*, it asserts that this Court has the authority to alter those deadlines to be consistent with the relief granted in this case. *Id.* at 55.

[19]    As adopted in Pennsylvania, the UOCAVA provides that military and overseas ballots will be counted if received by the county board by "5:00 p.m. on the seventh day following the election," which this year will be November 10, 2020. 25 Pa.C.S. § 3511.

As an alternative remedy, Petitioner proposes that each ballot could have an individualized deadline twenty-one days after the specific ballot is mailed by the county, so long as it is received before the UOCAVA deadline. Petition at 50, ¶ 108, 179.

**\*13**    As noted, the Secretary sought extraordinary jurisdiction to allow this Court to resolve the various challenges to the mail-in ballot process in an orderly and timely fashion before the impending General Election, where she estimates more than three million Pennsylvanians will exercise their right to vote by mail. Secretary's Brief at 1. The Secretary observes that she previously advocated against a similar request for an extension of the received-by deadline for mail-in and absentee ballots in the *Crossey* case. She, however, reassessed her position following receipt of the USPS General Counsel's Letter, which she attaches to her Application. Secretary's Application at 10, Exhibit A.

Significantly, the USPS General Counsel's Letter opined that "certain deadlines for requesting and casting mail-in ballots are incongruous with the Postal Service's delivery standards," providing for 2-5 day delivery for domestic First Class Mail and 3-10 day delivery for domestic Marketing Mail. USPS General Counsel's Letter at 1. As the parties recognize, the Election Code designates October 27, 2020, as the last day for electors to request a mail-in ballot. 25 P.S. § 3150.12a(a) ("Applications for mail-in ballots shall be processed if received not later than five o'clock P.M. of the first Tuesday prior to the day of any primary or election."). Even if a county board were to process and mail a ballot the next day by First Class Mail on Wednesday, October 28th, according to the delivery standards of the USPS, the voter might not receive the ballot until five days later on Monday, November 2nd, resulting in the impossibility of returning the ballot by mail before Election Day, Tuesday November 3rd. The USPS General Counsel's Letter, instead, advised that voters should mail their ballots no later than October 27, 2020 in order to meet the received-by deadline. USPS General Counsel's Letter at 2. "This mismatch [between the USPS's delivery standards and the Election Code deadlines] creates a risk that ballots requested near the deadline under state law will not be returned by mail in time to be counted under [Pennsylvania's Election Code]." *Id.* at 1.

In light of the information contained in the USPS General Counsel's Letter, the Secretary concludes that a temporary extension of the Election Code's received-by deadline is

necessary for the upcoming General Election to ensure a free and equal election as protected by Article I, Section 5 of the Pennsylvania Constitution. Secretary's Application at 27. The Secretary specifically asks that this Court order an extension of the deadline to allow the counting of any ballot postmarked by Election Day and received on or before the third day after Election Day, which is November 6, 2020.[20] *Id.* at 27-28. The Secretary deems a three-day extension of the deadline, rather than the seven-day extension sought by Petitioner, to be sufficient to address the potential delay in mailing while also not disrupting other elements of election administration. *Id.* at 29.

[20]  She specifically recommends that the Court "order that ballots mailed by voters by 8:00 p.m. on Election Day be counted if they are otherwise valid and received by the county boards of election by November 6, 2020. Ballots received within this period that lack a postmark or other proof of mailing, or for which the postmark or other proof of mailing is illegible, should enjoy a presumption that they were mailed by Election Day." Secretary's Application at 29. We observe that this proposal therefore requires that all votes be cast by Election Day but does not disenfranchise a voter based upon the absence or illegibility of a USPS postmark that is beyond the control of the voter once she places her ballot in the USPS delivery system.

**\*14** The Secretary emphasizes that the remedy sought here is not the invalidation of the Election Code's received-by deadline, but rather the grant of equitable relief to extend temporarily the deadline to address "mail-delivery delays during an on-going public health disaster." Secretary's Brief at 18. As no party is seeking the invalidation of the received-by deadline, the Secretary rejects the suggestion of Respondent and the Caucus that the remedy would trigger the nonseverability provision of Act 77, reasoning that the Court would be granting "a temporary short extension to address the exigencies of a natural disaster" rather than "the invalidation of a statutory deadline." *Id.* at 21 (referencing Section 11 of Act 77 set forth *infra*). She emphasizes that the statutory deadline would remain unchanged for future elections.

The Secretary observes that courts have previously granted temporary equitable relief to address natural disasters, given that neither the Election Code nor the Constitution "provides any procedure to follow when a natural disaster creates an emergency situation that interferes with an election." *Id.* at 19 (citing *In re General Election-1985*, 531 A.2d at 839).[21] She argues that the current pandemic is equivalent to other natural

disasters and that it necessitates the requested extension of the Election Code's received-by deadline for mail-in ballots.

[21]  The Secretary observes that other jurisdictions have likewise granted temporary extensions when faced with natural disasters, such as hurricanes. Secretary's Application at 28 (citing *Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250, 1259 (N.D. Fla. 2016); *Georgia Coalition for the Peoples' Agenda, Inc. v. Deal*, 214 F. Supp. 3d 1344, 1345 (S.D. Ga. 2016)).

In contrast, Respondent contends that Petitioner asks this Court to rewrite the plain language of Act 77 and to substitute its preferred ballot deadline for the statutory deadline that resulted from the legislative compromise during the bi-partisan enactment of Act 77. It emphasizes that this Court "recently reaffirmed [that] the judiciary 'may not usurp the province of the legislature by rewriting [statutes].' " Respondent's Supplemental Brief at 16 (quoting *In re Fortieth Statewide Investigating Grand Jury*, 649 Pa. 574, 197 A.3d 712, 721 (2018)).

Judicial restraint, according to Respondent, is especially necessary in regard to election law, where this Court has long recognized that "[t]he power to regulate elections is a legislative one, and has been exercised by the General Assembly since the foundation of the government." *Id.* at 17 (quoting *Winston v. Moore*, 244 Pa. 447, 91 A. 520, 522 (1914)). Indeed, it observes that the United States Constitution dictates that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each state by the Legislature thereof," subject to directives of Congress, U.S. Const. art. I, § 4, cl. 1, and that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct," electors for President and Vice President. U.S. Const. art. II, § 1, cl. 2.[22] Respondent highlights special concerns relevant to Presidential elections, emphasizing that " '[w]ith respect to a Presidential election,' state courts must 'be mindful of the legislature's role under Article II in choosing the manner of appointing electors.' " Respondent's Supplemental Brief at 20 (quoting *Bush v. Gore*, 531 U.S. 98, 114, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) (Rehnquist, C.J., concurring)).

[22]  Respondent further observes that the Pennsylvania Constitution specifically directs the Legislature to "provide a manner in which, and the time and place at which" a qualified elector can submit an absentee ballot. Pa. Const. art. VII, § 14(a).

Respondent additionally warns that if this Court were to deem application of the deadline unconstitutional and substitute a judicially-determined deadline, it would trigger the nonseverability provision of Act 77, which would invalidate the entirety of the Act, including all provisions creating universal mail-in voting. Specifically, Section 11 provides: "Sections 1, 2, 3, 3.2, 4, 5, 5.1, 6, 7, 8, 9 and 12 of this act are nonseverable. If any provision of this act or its application to any person or circumstances is held invalid, the remaining provisions or applications of this act are void." Act 77, § 11. It emphasizes that this Court has previously deemed nonseverability provisions to be constitutionally proper and additionally recognized that nonseverability provisions are crucial to the legislative process as they "may be essential to securing the support necessary to enact the legislation in the first place." Respondent's Supplemental Brief at 18 (citing *Stilp v. Commonwealth*, 588 Pa. 539, 905 A.2d 918, 978 (2006)). Respondent asserts that it is clear that the severability provision in Act 77 "was intended to preserve the compromise struck" in the bipartisan enactment. *Id.* at 19.

**\*15** On the merits, Respondent asserts that the plain language of the Election Code setting the deadline for submission of ballots by 8:00 p.m. on Election Day does not violate the Free and Equal Elections Clause but instead provides "a neutral, evenhanded rule that applies to all Pennsylvania voters equally." Respondent's Answer to the Secretary's Application at 21. It emphasizes that numerous courts, including this Court during the June Primary, have upheld the application of mail-in deadlines during the COVID-19 pandemic. Respondent's Supplemental Brief at 24 (citing, *inter alia*, *Disability Rights Pa. v. Boockvar*, No. 83 MM 2020, ––– Pa. ––––, 2020 WL 2820467 (May 15, 2020)).

Respondent additionally rejects the Secretary's assertion that the deadline should be extended based upon the threat of mail delays. It avers that these concerns are "speculative at best." *Id.* at 25. Moreover, it contends that "given Pennsylvania's unparalleled and generous absentee and mail-in voting period, any voter's inability to cast a timely ballot is not caused by the Election Day received-by deadline but instead by their own failure to take timely steps to effect completion and return of their ballot." *Id.* at 26-27 (internal citation and quotation marks omitted).

Respondent further supports its argument by attaching to its Supplemental Brief a declaration of USPS Vice President Angela Curtis, which in turn attaches the statement provided by Postmaster General Louis DeJoy to the Senate

Committee on Homeland Security and Governmental Affairs on August 21, 2020 and his statement of August 24, 2020, to the House Committee on Oversight and Reform. In his statement, Postmaster General Louis DeJoy addressed public accusations that the implementation of various cost-saving reforms had allegedly resulted in delays in mail delivery that threatened the timely delivery of election mail.

While disputing the validity of the accusations, the Postmaster General provided the following commitments relating to the delivery of election mail:

> [R]etail hours at Post Offices won't be changed, and mail processing equipment and blue collection boxes won't be removed during this period. No mail processing facilities will be closed and we have terminated the pilot program that began in July that expedited carrier departures to their delivery routes, without plans to extend or expand it. To clear up any confusion, overtime has, and will continue to be, approved as needed. Finally, effective October 1, 2020, we will engage standby resources in all areas of our operations, including transportation, to satisfy any unforeseen demand for the election.

Statement of Postmaster General Louis DeJoy provided to Senate Committee on Homeland Security and Governmental Affairs Hearing of Aug. 21, 2020, at 14; Statement of Postmaster General Louis DeJoy provided to House Committee on Oversight and Reform of Aug. 24, 2020, at 14. Respondent emphasizes that Postmaster General DeJoy also asserted that the "USPS has not changed [its] delivery standards, [its] processing, [its] rules, or [its] prices for Election Mail[,]" and that it "can, and will, handle the volume of Election Mail [it] receive[s]." Respondent's Supplemental Brief at 10.

Finally, Respondent argues that moving the received-by deadline until after Election Day would undermine the federal designation of a uniform Election Day, as set forth in three federal statutes, specifically 3 U.S.C. § 1 ("The electors of President and Vice President shall be appointed, in each State, on the Tuesday next after the first Monday in November, every fourth year succeeding every election of a President and Vice President"); 2 U.S.C. § 7 ("The Tuesday next after the 1st Monday in November, in every even numbered year, is established as the day for the election, in each of the States and Territories of the United States, of Representatives and Delegates to the Congress commencing on the 3d day of January next thereafter."); and 2 U.S.C. § 1 ("At the regular election held in any State next preceding the expiration of the term for which any Senator was elected to represent such

State in Congress is regularly by law to be chosen, a United States Senator from said State shall be elected by the people thereof for a term commencing on the 3d day of January next thereafter.").[23]

> 23
>
> In so arguing, Respondent seemingly ignores the fact that allowing the tabulation of ballots received after Election Day does not undermine the existence of a federal Election Day, where the proposal requires that ballots be cast by Election Day, similar to the procedure under federal and state law allowing for the tabulation of military and overseas ballots received after Election Day.

**\*16** The Caucus also files a brief with this Court arguing against the extension of the deadline for mail-in votes. It asserts that "[t]here is no constitutional right to vote by mail" and that states have broad authority to enact regulations to ensure the integrity of its elections, including mail-in ballots, as was done in Act 77, including by setting a deadline for the receipt of ballots. Caucus's Brief at 19.

The Caucus warns that granting an extension of the mail-in ballot received-by deadline in this case "would have a cascading effect on other election code deadlines, thereby causing chaos for election officials and confusion for voters." *Id.* at 26. It observes that the Election Code requires that Boards begin canvassing absentee and mail-in ballots within three days of Election Day and shall continue through the eighth day following the Election. *Id.* at 28 (citing 25 P.S. § 3146.8(g)(2)). Additionally, the Boards shall submit the unofficial returns to the Secretary on the Tuesday following the Election, and the Secretary must determine whether a recount is required within nine days of Election Day, citing 25 P.S. § 3154(f), (g)(2), and the Boards must certify the final results to the Secretary no later than twenty days after Election Day, citing 25 P.S. § 2642(k). It additionally asserts that federal law requires all state recounts and challenges to be "resolved at least 6 days prior to the meeting of electors," which it asserts this year is December 14. Caucus's Brief at 28 n.17 (citing 3 U.S.C. §§ 1, 5). The Caucus therefore urges this Court to refrain from altering the received-by deadline for mail-in ballots, asserting that the "requested injunction would override the election deadlines which were fully debated and properly enacted by the peoples' representatives in the Pennsylvania General Assembly." *Id.* at 29.

Unlike other provisions of Act 77 currently before this Court, we are not asked to interpret the statutory language establishing the received-by deadline for mail-in ballots.

Indeed, there is no ambiguity regarding the deadline set by the General Assembly:

> **Deadline.**--Except as provided under 25 Pa.C.S. § 3511[24] (relating to receipt of voted ballot), a completed mail-in ballot must be received in the office of the county board of elections no later than eight o'clock P.M. on the day of the primary or election.

25 P.S. § 3150.16(c). Moreover, we are not asked to declare the language facially unconstitutional as there is nothing constitutionally infirm about a deadline of 8:00 p.m. on Election Day for the receipt of ballots. The parties, instead, question whether the application of the statutory language to the facts of the current unprecedented situation results in an as-applied infringement of electors' right to vote.

> 24
>
> Section 3511 addresses the timeline for the return of ballots of uniform military and oversees voters and provides for the counting of such votes if delivered to the county board by 5 p.m. on the seventh day after Election Day:
>
> **§ 3511. Receipt of voted ballot**
> **(a) Delivery governs.**--A valid military-overseas ballot cast under section 3509 (relating to timely casting of ballot) shall be counted if it is delivered by 5 p.m. on the seventh day following the election to the address that the appropriate county election board has specified.
> **(b) Rule regarding postmarks.**--If, at the time of completing a military-overseas ballot and balloting materials, the voter has declared under penalty of perjury that the ballot was timely submitted, the ballot may not be rejected on the basis that it has a late postmark, an unreadable postmark or no postmark.
> 25 Pa.C.S. § 3511.

**\*17** In considering this issue, we reiterate that the Free and Equal Elections Clause of the Pennsylvania Constitution requires that "all aspects of the electoral process, to the greatest degree possible, be kept open and unrestricted to the voters of our Commonwealth, and, also, conducted in a manner which guarantees, to the greatest degree possible, a voter's right to equal participation in the electoral process for the selection of his or her representatives in government." *League of Women Voters*, 178 A.3d at 804. Nevertheless, we also recognize that "the state may enact substantial regulation containing reasonable, non-discriminatory restrictions to ensure honest and fair elections that proceed in an orderly and efficient manner." *Banfield v. Cortes*, 631 Pa. 229, 110 A.3d 155, 176–77 (2015) (internal citation and quotation marks omitted).

As we have recently seen, an orderly and efficient election process can be crucial to the protection of a voter's participation in that process. Indeed, the struggles of our most populous counties to avoid disenfranchising voters while processing the overwhelming number of pandemic-fueled mail-in ballot applications during the 2020 Primary demonstrates that orderly and efficient election processes are essential to safeguarding the right to vote. An elector cannot exercise the franchise while her ballot application is awaiting processing in a county election board nor when her ballot is sitting in a USPS facility after the deadline for ballots to be received.

We are fully cognizant that a balance must be struck between providing voters ample time to request mail-in ballots, while also building enough flexibility into the election timeline to guarantee that ballot has time to travel through the USPS delivery system to ensure that the completed ballot can be counted in the election. Moreover, we recognize that the determination of that balance is fully enshrined within the authority granted to the Legislature under the United States and Pennsylvania Constitutions. *See* U.S. Const. art. I, § 4, cl. 1; *id.* art. II, § 1, cl. 2.

Nevertheless, we find the Commonwealth Court's rationale in *In re General Election-1985* germane to the current challenge to the application of the ballot received-by deadline. In that case, the court recognized that, while neither the Constitution nor the Election Code specified "any procedure to follow when a natural disaster creates an emergency situation that interferes with an election," courts could look to the direction of 25 P.S. § 3046. *In re General Election-1985*, 531 A.2d at 839. As noted, Section 3046 provides courts of common pleas the power, on the day of an election, to decide "matters pertaining to the election as may be necessary to carry out the intent" of the Election Code, which the Commonwealth Court properly deemed to include providing "an equal opportunity for all eligible electors to participate in the election process," which in that case necessitated delaying the election during a flood. *Id.*

We have no hesitation in concluding that the ongoing COVID-19 pandemic equates to a natural disaster. *See Friends of Devito v. Wolf*, ––– Pa. –––, 227 A.3d 872, 888 (2020) (agreeing "that the COVID-19 pandemic qualifies as a 'natural disaster' under the Emergency Code"). Moreover, the effects of the pandemic threatened the disenfranchisement of thousands of Pennsylvanians during the 2020 Primary,

when several of the Commonwealth's county election boards struggled to process the flow of mail-in ballot applications for voters who sought to avoid exposure to the virus. *See, e.g.,* Delaware County Board of Elections' Answer to Petition at 15, ¶ 77 (acknowledging that it "mailed out thousands of ballots in the twenty-four hour period preceding the election"). It is beyond cavil that the numbers of mail-in ballot requests for the Primary will be dwarfed by those applications filed during the upcoming highly-contested Presidential Election in the midst of the pandemic where many voters are still wary of congregating in crowded locations such as polling places. We acknowledge that the Secretary has estimated that nearly three million Pennsylvanians will apply for mail-in applications, in contrast to the 1.5 million cast during the Primary. Secretary's Brief at 1.

**\*18** In light of these unprecedented numbers and the near-certain delays that will occur in Boards processing the mail-in applications, we conclude that the timeline built into the Election Code cannot be met by the USPS's current delivery standards, regardless of whether those delivery standards are due to recent changes in the USPS's logistical procedures or whether the standards are consistent with what the General Assembly expected when it enacted Act 77. In this regard, we place stock in the USPS's General Counsel's expression that his client could be unable to meet Pennsylvania's statutory election calendar. General Counsel's Letter at 2. The Legislature enacted an extremely condensed timeline, providing only seven days between the last date to request a mail-in ballot and the last day to return a completed ballot. While it may be feasible under normal conditions, it will unquestionably fail under the strain of COVID-19 and the 2020 Presidential Election, resulting in the disenfranchisement of voters.

Under our Extraordinary Jurisdiction, this Court can and should act to extend the received-by deadline for mail-in ballots to prevent the disenfranchisement of voters. We have previously recognized that, in enforcing the Free and Equal Elections Clause, this "Court possesses broad authority to craft meaningful remedies when required." *League of Women Voters*, 178 A.3d at 822 (citing Pa. Const., art. V, §§ 1, 2, 10; 42 Pa.C.S. § 726 (granting power to "enter a final order or otherwise cause right and justice to be done")). We additionally conclude that voters' rights are better protected by addressing the impending crisis at this point in the election cycle on a statewide basis rather than allowing the chaos to brew, creating voter confusion regarding whether extensions will be granted, for how long, and in what counties.[25] Instead,

we act now to allow the Secretary, the county election boards, and most importantly, the voters in Pennsylvania to have clarity as to the timeline for the 2020 General Election mail-in ballot process.

25      We recognize that we rejected a very similar argument presented in *Disability Rights Pennsylvania* on May 15, 2020, weeks prior to the Primary. *Disability Rights Pa. v. Boockvar*, No. 83 MM 2020, —— Pa. ——, 2020 WL 2820467 (May 15, 2020). At that time, the potential of voter disenfranchisement was speculative as many unknowns existed relating to the magnitude of the pandemic, the extent to which voters would seek mail-in applications, and the ability of Boards to handle the increase. Those uncertainties no longer exist in light of our experience in the 2020 Primary where thousands of voters would have been disenfranchised but for the emergency actions of the courts of common pleas and the Governor.

After consideration, we adopt the Secretary's informed recommendation of a three-day extension of the absentee and mail-in ballot received-by deadline to allow for the tabulation of ballots mailed by voters via the USPS and postmarked by 8:00 p.m. on Election Day to reduce voter disenfranchisement resulting from the conflict between the Election Code and the current USPS delivery standards, given the expected number of Pennsylvanians opting to use mail-in ballots during the pandemic.[26] We observe that this extension provides more time for the delivery of ballots while also not requiring alteration of the subsequent canvassing and reporting dates necessary for the Secretary's final reporting of the election results. In so doing, we emphasize that the Pennsylvania's election laws currently accommodate the receipt of certain ballots after Election Day, as it allows the tabulation of military and overseas ballots received up to seven days after Election Day. 25 Pa.C.S. § 3511. We conclude that this extension of the received-by deadline protects voters' rights while being least at variance with Pennsylvania's permanent election calendar, which we respect and do not alter lightly, even temporarily.

26      We likewise incorporate the Secretary's recommendation addressing ballots received within this period that lack a postmark or other proof of mailing, or for which the postmark or other proof of mailing is illegible. Accordingly, in such cases, we conclude that a ballot received on or before 5:00 p.m. on November 6, 2020, will be presumed to have been mailed by Election Day unless a preponderance of the evidence demonstrates that it was mailed after Election Day.

We emphasize that voters utilizing the USPS must cast their ballots prior to 8:00 p.m. on Election Day, like all voters, including those utilizing drop boxes, as set forth *supra*. We refuse, however, to disenfranchise voters for the lack or illegibility of a postmark resulting from the USPS processing system, which is undeniably outside the control of the individual voter.

## C. COUNT III OF THE PETITION FOR REVIEW

 **\*19**  In Count III of its petition, Petitioner seeks to require that the Boards contact qualified electors whose mail-in or absentee ballots contain minor facial defects resulting from their failure to comply with the statutory requirements for voting by mail, and provide them with an opportunity to cure those defects. More specifically, Petitioner submits that when the Boards have knowledge of an incomplete or incorrectly completed ballot as well as the elector's contact information, the Boards should be required to notify the elector using the most expeditious means possible and provide the elector a chance to cure the facial defect up until the UOCAVA deadline of November 10, 2020, discussed *supra*.

Petitioner bases this claim on its assertion that the multi-stepped process for voting by mail-in or absentee ballot inevitably leads to what it describes as minor errors, such as not completing the voter declaration or using an incorrect ink color to complete the ballot. *See* 25 P.S. § 3146.6(a) (explaining the process for voting by absentee ballot, which requires, *inter alia*, an elector to mark the ballot using only certain writing implements and ink; and to fill out, date, and sign the declaration printed on the outer envelope); *id.* § 3150.16(a) (explaining the process for voting by mail-in ballot, which imposes the same requirements). According to Petitioner, these minor oversights result in many ballots being rejected and disenfranchising voters who believe they have exercised their right to vote.

Petitioner submits that voters should not be disenfranchised by technical errors or incomplete ballots, and that the "notice and opportunity to cure" procedure ensures that all electors who desire to cast a ballot have the opportunity to do so, and for their ballot to be counted. Petitioner further claims there is no governmental interest in either: (1) requiring the formalities for the completion of the outside of the mailing envelope to be finalized prior to mailing as opposed to prior to counting, or (2) rejecting the counting of a ballot so long as ballots continue to arrive under federal law, which is the UOCAVA deadline of seven days after Election Day.

As legal support for its position, Petitioner relies upon the Free and Equal Elections Clause. Pa. Const. art. I, § 5 ("Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage."); *see also Winston*, 91 A. at 523 (explaining that elections are "free and equal" for constitutional purposes when, *inter alia*, "the regulation of the right to exercise the franchise does not deny the franchise itself, or make it so difficult as to amount to a denial; and when no constitutional right of the qualified elector is subverted or denied him"). It further emphasizes that election laws should be construed liberally in favor of voters, and that "[t]echnicalities should not be used to make the right of the voter insecure." *Appeal of James*, 377 Pa. 405, 105 A.2d 64, 65-66 (1954). Petitioner also asserts that ballots with minor irregularities should not be rejected, except for compelling reasons and in rare circumstances. *Id.* at 66. Based on these legal principles, as well as this Court's "broad authority to craft meaningful remedies" when necessary, *League of Women Voters*, 178 A.3d at 822, Petitioner claims that the Pennsylvania Constitution and spirit of the Election Code require the Boards to provide a "notice and opportunity to cure" procedure, and that this Court has the authority to afford the relief it seeks.

Unlike the other claims asserted herein, the Secretary opposes Petitioner's request for relief in this regard. She counters that there is no statutory or constitutional basis for requiring the Boards to contact voters when faced with a defective ballot and afford them an opportunity to cure defects. The Secretary further notes that, while Petitioner relies upon the Free and Equal Elections Clause, that Clause cannot create statutory language that the General Assembly chose not to provide. *See Winston*, 91 A. at 522 (noting that "[t]he power to regulate elections is legislative").

 **\*20**  The Secretary submits that so long as a voter follows the requisite voting procedures, he or she "will have an equally effective power to select the representative of his or her choice." *League of Women Voters*, 178 A.3d at 809. Emphasizing that Petitioner presents no explanation as to how the Boards would notify voters or how the voters would correct the errors, the Secretary further claims that, while it may be good policy to implement a procedure that entails notice of defective ballots and an opportunity to cure them, logistical policy decisions like the ones implicated herein are more properly addressed by the Legislature, not the courts.

Respondent echoes the Secretary's opposition to Petitioner's request for relief.[27] Specifically, it reiterates that Petitioner has failed to assert a legal basis to support imposing a "notice and opportunity to cure" procedure, noting that the Free and Equal Elections Clause does not enable courts to rewrite the Election Code to align with a litigant's notion of good election policy. Respondent emphasizes that "ballot and election laws have always been regarded as peculiarly within the province of the legislative branch of government," *Winston*, 91 A. at 522, and that to the extent restrictions are burdensome, relief should be sought in the Legislature. *Id.* at 525.

27    The Caucus does not advance argument on the merits of this issue.

Respondent also discusses the practical implications of granting Petitioner's request, expressing concern that implementing a "notice and opportunity to cure" procedure would be a monumental undertaking requiring the expenditure of significant resources, particularly on the eve of an election. Respondent thus reiterates that the Legislature, not this Court, is the entity best suited to address the procedure proposed by Petitioner.

Respondent adds that the tardiness of Petitioner's request is alone a sufficient basis to deny it and that, in any event, Petitioner cannot show a "plain, palpable and clear abuse of the [legislative] power which actually infringes on the rights of the electors" with respect to this claim. *Patterson v. Barlow*, 60 Pa. 54, 75 (1869). Respondent notes that, to the contrary, a requirement that voters follow the appropriate procedures when filling out their ballots easily passes constitutional muster.

Upon review, we conclude that the Boards are not required to implement a "notice and opportunity to cure" procedure for mail-in and absentee ballots that voters have filled out incompletely or incorrectly. Put simply, as argued by the parties in opposition to the requested relief, Petitioner has cited no constitutional or statutory basis that would countenance imposing the procedure Petitioner seeks to require (*i.e.*, having the Boards contact those individuals whose ballots the Boards have reviewed and identified as including "minor" or "facial" defects—and for whom the Boards have contact information—and then afford those individuals the opportunity to cure defects until the UOCAVA deadline).

While the Pennsylvania Constitution mandates that elections be "free and equal," it leaves the task of effectuating that mandate to the Legislature. *Winston*, 91 A. at 522. As noted herein, although the Election Code provides the procedures for casting and counting a vote by mail, it does not provide for the "notice and opportunity to cure" procedure sought by Petitioner. To the extent that a voter is at risk for having his or her ballot rejected due to minor errors made in contravention of those requirements, we agree that the decision to provide a "notice and opportunity to cure" procedure to alleviate that risk is one best suited for the Legislature. We express this agreement particularly in light of the open policy questions attendant to that decision, including what the precise contours of the procedure would be, how the concomitant burdens would be addressed, and how the procedure would impact the confidentiality and counting of ballots, all of which are best left to the legislative branch of Pennsylvania's government. Thus, for the reasons stated, the Petitioner is not entitled to the relief it seeks in Count III of its petition.

## D. COUNT IV OF THE PETITION FOR REVIEW

 **\*21**  In Count IV, Petitioner seeks a declaration that under Act 77, the Boards must "clothe and count naked ballots," *i.e.*, place ballots that were returned without the secrecy envelope into a proper envelope and count them, rather than invalidate them. It further seeks a preliminary injunction prohibiting the Boards from excluding such ballots from the canvass.

To understand the nature of a "naked ballot," as well as Petitioner's claim that such ballots are valid and should be counted, we examine the relevant provisions of Act 77. The Act directs Boards to send to the qualified mail-in elector an official mail-in ballot, the list of candidates when authorized, the uniform instructions as prescribed by the Secretary, and two envelopes to be returned to the Boards, as described in detail *infra*. 25 P.S. § 3150.14(c).

Section 3150.14(a) ("Envelopes for official mail-in ballots") explains the nature of the envelopes sent to the mail-in voter. This provision directs the Boards to "provide two additional envelopes for each official mail-in ballot of a size and shape as prescribed by the Secretary of the Commonwealth, in order to permit the placing of one within the other and both within the mailing envelope" addressed to the elector. *Id.* § 3150.14(a). On the smaller of the two envelopes to be returned to the Boards shall be printed only the words "Official Election Ballot." *Id.* On the larger envelope shall be printed: (1) "the form of the declaration of the elector;" and (2) the "name and address of the county board of election of the proper county;"

and (3) "information indicating the local election district of the mail-in voter." *Id.*

As noted, Section 3150.16(a) directs the mail-in elector to mark the ballot in secret with the enumerated ink or lead pencil and then fold the ballot, enclose it, and secure it in the smaller envelope on which is printed "Official Election Ballot." 25 P.S. § 3150.16(a). The statute further directs the mail-in elector to place the smaller envelope into the second envelope on which is printed the form of declaration of the elector, the elector's local election district, and the address of the elector's county board of election. *Id.* The statute next directs the mail-in elector to fill out, date, and sign the declaration printed on the second envelope, and secure the ballot and send it by mail or deliver it in person to his or her county board of election. *Id.* A ballot is "naked" for purposes of this action if the mail-in elector fails to utilize the smaller envelope on which is printed "Official Election Ballot," and, instead, places the official election ballot directly into the second envelope, upon which is printed the form of declaration of the elector and the address of the elector's county board of election.

Act 77 additionally sets forth the procedure by which mail-in ballots are canvassed. *See id.* § 3146.8(a) (providing that mail-in ballots "shall be canvassed in accordance with subsection (g)"). Relevant thereto, the Act directs that mail-in ballots cast by electors who died prior to Election Day shall be rejected and not counted. *Id.* § 3146.8(d). Additionally, the Act provides that mail-in ballots shall be counted as long as: (1) election officials verify the ballots by comparing the voter's declaration with the official voting list; and (2) the ballots are not challenged on the ground that the voter is unqualified to vote. *Id.* §§ 3146.8(g)(4); 3150.12b(a)(2). Notably, Section 3146.8(g)(4)(ii) provides that if any of the envelopes on which are printed "Official Election Ballot" "contain any text, mark or symbol which reveals the identity of the elector, the elector's political affiliation or the elector's candidate preference, the envelopes and the ballots contained therein shall be set aside and declared void." *Id.* § 3146.8(g)(4)(ii).

 **\*22**  The crux of Petitioner's position is that although Act 77 directs a mail-in voter to utilize the secrecy envelope in submitting the mail-in ballot, there is no provision in the Election Code authorizing the Boards to discard a ballot on grounds that the voter failed to insert the ballot into the secrecy envelope before returning it to the Boards. Rather, Petitioner asserts, the statute directs the Boards to reject mail-

in ballots only if the mail-in elector died prior to Election Day, *id.* § 3146.8(d), the ballot is unverified or challenged on grounds that the mail-in voter was unqualified to vote, *id.* § 3146.8(g)(4), or the ballot is returned in an "Official Election Ballot" envelope that contains "any text, mark or symbol which reveals the identity of the elector, the elector's political affiliation or the elector's candidate preference." *Id.* § 3146.8(g)(4)(ii). Petitioner concludes that the failure to place the ballot in a secrecy envelope does not fall within these enumerated statutory grounds which would result in an invalid mail-in ballot.

Moreover, Petitioner emphasizes that the General Assembly was aware of how to invalidate ballots for lack of a secrecy envelope, as it expressly did so in another provision of the Election Code regarding provisional ballots. *See id.* § 3050(a.4)(5)(ii)(C) (providing that a "provisional ballot shall not be counted if: ... a provisional ballot envelope does not contain a secrecy envelope").[28] Had the General Assembly intended to invalidate mail-in ballots on this basis, Petitioner submits, the Legislature would have included a similar provision in Act 77, but chose not to do so.

28       A provisional ballot is a ballot cast by an individual who claims to be properly registered and eligible to vote at the election district, but whose name does not appear on the district register and whose registration cannot be determined. 25 P.S. § 3050(a.4)(1).

Absent statutory authority directing the Boards to invalidate a ballot based exclusively on the lack of a secrecy envelope, Petitioner contends that the refusal to canvass and count ballots cast without a secrecy envelope violates the Election Code, as well as the rights of electors to have their vote counted under the Free and Equal Elections Clause. It posits that rather than disenfranchising the voter in contravention of these edicts, the Boards could take corrective measures to protect privacy, such as placing the naked ballot inside a replacement secrecy envelope before canvassing.

Accordingly, Petitioner requests a declaration that naked ballots must be counted, as well as injunctive relief requiring Boards to undertake reasonable measures to protect the privacy of naked ballots cast by mail-in electors.

The Secretary's position aligns with Petitioner on this issue as she agrees that the counting of naked ballots is permitted by the Election Code and furthers the right to vote under the

Free and Equal Elections Clause and the First and Fourteenth Amendments to the United States Constitution.[29]

29       The Secretary's position herein is consistent with the directive that the Department of State distributed to the counties on May 28, 2020, indicating that there is no statutory requirement nor any authority for setting aside an absentee or mail-in ballot exclusively because the voter forgot to insert it into the official election ballot envelope. *See* Exhibit B to Petition, Directive of Deputy Secretary for Elections and Commissions Jonathan M. Marks to the county election directors, May 28, 2020. The directive further indicated that "[t]o preserve the secrecy of such ballots, the board of elections in its discretion may develop a process by which the members of the pre-canvass or canvass boards insert these ballots into empty official ballot envelopes or privacy sleeves until such time as they are ready to be tabulated." *Id. See also* Exhibit J to Petition, Guidance for Missing Official Election Ballot Envelopes.

The Secretary contends that the secrecy envelope procedure set forth in Section 3150.16(a) is merely directory, and that this Court's longstanding precedents establish that ballots should not be disqualified based upon the failure to follow directory provisions. *See Bickhart,* 845 A.2d at 803 (holding that although the Election Code provides that an elector may cast a write-in vote for any person not printed on the ballot, a write-in vote for a candidate whose name, in fact, appears on the ballot is not invalid where there is no evidence of fraud and the voter's intent is clear); *Weiskerger Appeal,* 447 Pa. 418, 290 A.2d 108, 109 (1972) (holding that the elector's failure to mark the ballot with the statutorily enumerated ink color does not render the ballot invalid unless there is a clear showing that the ink was used for the purpose of making the ballot identifiable or otherwise indicating fraud).

**\*23** The Secretary further opines that no fraud arises from counting naked ballots, considering that the naked ballot remains sealed in an envelope and the sealed ballot is certified by the elector. Accordingly, the Secretary concludes that no voter should be disenfranchised for failing to place his or her mail-in ballot in the secrecy envelope before returning it to the Boards.

In response, Respondent argues that the statutory language of Section 3150.16(a), providing that the mail-in elector "shall ... enclose and securely seal the [ballot] in the envelope on which is printed, stamped or endorsed 'Official Election Ballot,'" is clear and constitutes a mandatory requisite to casting a mail-in ballot, and having that ballot counted. It relies on *In re*

*Canvass of Absentee Ballots of Nov. 4, 2003 Gen. Election*, 577 Pa. 231, 843 A.2d 1223 (2004) ("*Appeal of Pierce*"), where this Court held that the use of the term "shall" in Section 3146.6(a) of the Election Code, providing that the elector "shall" send an absentee ballot or deliver the ballot in person, carries a mandatory meaning, thereby precluding third parties from hand-delivering absentee ballots to county election boards, and invalidating those ballots that were hand-delivered by a third party. Respondent submits that Section 3150.16(a) requires the same invalidation of ballots where the mandatory statutory requisite of enclosing the ballot in a secrecy envelope is ignored.

Respondent observes that the Election Code further directs election officials to "set aside and declare[ ] void" a ballot whose secrecy envelope contains "any text, mark, or symbol which reveals the identity of the elector, the elector's political affiliation or the elector's candidate preference." 25 P.S. § 3146.8(g)(4)(ii). Citing *Appeal of Weiskerger*, *supra*, it argues that the purpose of this provision is to prevent the disclosure of the elector's identity. Respondent posits that a ballot unclothed by a secrecy envelope and placed directly in the outer envelope also discloses the elector's identity because the outer envelope contains the elector's signed declaration. Thus, it concludes, Section 3146.8(g)(4)(ii) requires invalidation of any ballot contained in an envelope that reveals the identity of the voter, regardless of whether that envelope is a secrecy envelope or an outer envelope. To hold to the contrary, Respondent argues, would violate Article VII, Section 4 of the Pennsylvania Constitution, which provides, in relevant part, that "secrecy in voting shall be preserved." Pa. Const. art. VII, § 4.[30]

[30]   Article VII, Section 4 ("Method of elections; secrecy in voting") states, in full, that "[a]ll elections by the citizens shall be by ballot or by such other method as may be prescribed by law: Provided, That secrecy in voting shall be preserved." Pa Const. art. VII, § 4.

Respondent discounts the Secretary's suggestion that because there is no fraud involved in the submission of a naked ballot, the ballot should be counted. The secrecy envelope provision of the statute, in Respondent's view, advances the distinct constitutional interest of protecting the sanctity of the ballot by preventing the ballot from disclosing the elector's identity. The significance of this interest, it submits, distinguishes this matter from cases involving noncompliance with minor procedural demands set forth in the Election Code, such as the color of ink used to mark a ballot or the listing of a write-in candidate whose name already appears on the ballot.

Accordingly, Respondent requests that we deny Petitioner's request for declaratory and injunctive relief.

**\*24**   The Caucus reiterates all of the arguments expressed by Respondent. It contends that in addition to violating voter secrecy, the counting of naked ballots raises the concern of voter fraud. It contends that when a ballot arrives at the county election board without the protective shield of a sealed privacy envelope, the election official cannot guarantee that the ballot travelled from the voter's hand to the county election board without compromise. It argues that there is no way for the election official to verify that the vote was accurately recorded, because the mere act of ascertaining the voter's identity from the elector's declaration may violate the secrecy protections of Article VII, Section 4. The Caucus concludes that the only way to be certain that no fraud has taken place is to reject all naked ballots.

Turning now to our analysis, we observe that, in determining the propriety of naked ballots, we must ascertain the General Assembly's intention by examining the statutory text of the secrecy envelope provision to determine whether it is mandatory or directory, as that will govern the consequences for non-compliance. *See JPay, Inc. v. Dep't of Corr. & Governor's Office of Admin.*, 89 A.3d 756, 763 (Pa. Cmwlth. 2014) (internal citation omitted) (observing that "[w]hile both mandatory and directory provisions of the Legislature are meant to be followed, the difference between a mandatory and directory provision is the consequence for non-compliance: a failure to strictly adhere to the requirements of a directory statute will not nullify the validity of the action involved").

Upon careful examination of the statutory text, we conclude that the Legislature intended for the secrecy envelope provision to be mandatory. We respectfully reject the contentions of Petitioner and the Secretary that because the General Assembly did not delineate a remedy narrowly linked to the mail-in elector's failure to utilize a secrecy envelope, the language of the Election Code is directory, and an elector's violation of the command inconsequential.

As noted, Section 3150.16(a) provides:

[The mail-in elector] shall, in secret, ... enclose and securely seal the [ballot] in the envelope on which is printed, stamped or endorsed "Official Election Ballot." This envelope shall then be placed in the second one, on which is printed the form of declaration of the elector, and the address of the elector's county board of election and the local election district of the elector.

*Id.*

This statutory text must be read *in pari materia*[31] with Subsection 3146.8(g)(4)(ii), which also speaks directly to secrecy envelopes, providing:

> If any of the envelopes on which are printed, stamped or endorsed the words 'Official Election Ballot' contain any text, mark or symbol which reveals the identity of the elector, the elector's political affiliation or the elector's candidate preference, the envelopes and the ballots contained therein shall be set aside and declared void.

25 P.S. § 3146.8(g)(4)(ii).

[31]    Section 1932 of our Statutory Construction Act, "Statutes in pari materia," provides:
>     (a) Statutes or parts of statutes are *in pari materia* when they relate to the same persons or things or to the same class of persons or things.
>     (b) Statutes *in pari materia* shall be construed together, if possible, as one statute.
>     1 Pa.C.S. § 1932.

These provisions make clear the General Assembly's intention that, during the collection and canvassing processes, when the outer envelope in which the ballot arrived is unsealed and the sealed ballot removed, it should not be readily apparent who the elector is, with what party he or she affiliates, or for whom the elector has voted. The secrecy envelope properly unmarked and sealed ensures that result, unless it is marked with identifying information, in which case that goal is compromised. Whatever the wisdom of the requirement, the command that the mail-in elector utilize the secrecy envelope and leave it unblemished by identifying information is neither ambiguous nor unreasonable.

**\*25** As noted cogently by Respondent, this case is distinguishable from those cases relied upon by the Secretary, which deemed mandatory language merely directory and without consequence. For example, in *Bickhart*, 845 A.2d at 795, the Court declined to invalidate a write-in vote cast for a candidate who was named on the ballot proper. In reaching that conclusion, the Court observed that "ballots containing mere minor irregularities should only be stricken for compelling reasons," noting that marking a ballot is an imprecise process, the focus of which is upon the "unmistakable registration of the voter's will in substantial conformity to the statutory requirements." *Bickhart*, 845 A.2d at 798-99 (internal quotation marks and citations omitted).

Similarly, in *Appeal of Weisberger*, *supra*, this Court declined to invalidate a ballot based upon the "minor irregularity" that it was completed in the wrong color of ink. The statute at issue provided: "Any ballot that is marked in blue, black or blue-black ink ... shall be valid and counted." 290 A.2d at 109 (citing 25 P.S. § 3063). Thus, the only mandatory direction it provided was for the canvassers who receive the ballots, not the electors who prepared them. In providing that ballots completed in the right color must be counted, the Legislature neither stated nor implied that ballots completed in a different color must not be counted. Neither statutory provision at issue in *Bickhart* nor *Weisberger* contained anything analogous to the directive at issue in this case, which involves secrecy in voting protected expressly by Article VII, Section 4 of this Court's state charter.

As posited by Respondent, most analogous to the instant case is our decision in *Appeal of Pierce*. There, we held that the Election Code's "in-person" ballot delivery requirement, *see* 25 P.S. § 3146.6, was mandatory, and that votes delivered by third persons must not be counted. The provision in question unambiguously provided that "the elector shall send [the absentee ballot] by mail, postage [prepaid], except where franked, or deliver it in person to [said county] board of election." *Appeal of Pierce*, 843 A.2d at 1231 (quoting 25 P.S. § 3146.6(a)). The parties seeking to ensure that votes delivered by third parties would be counted cited *Weisberger* and its flexibility with respect to "minor irregularities."

This Court, however, was unpersuaded and declined the invitation to interpret "shall" as anything less than mandatory. Moreover, the Court rejected precisely the same reasoning for interpreting "shall" as directory that Petitioner and the Secretary offer in this case. As in the instant case, the provision of the Election Code at issue in *Appeal of Pierce* did not expressly provide for voiding a ballot delivered by someone other than the voter. Nevertheless, we held that to construe the in-person requirement "as merely directory would render its limitation meaningless and, ultimately, absurd." *Id.* at 1232. The Court further distinguished *Weisberger* and its safe harbor for "minor irregularities," noting that the in-person requirement served the salutary purpose of "limit[ing] the number of third persons who unnecessarily come in contact with the ballot[,] ... provid[ing] some safeguard that the ballot was filled out by the actual voter, ... and that once the ballot has been marked by the actual voter in secret, no other person has the opportunity to tamper with it." *Id.* The provision thus served the spirit of

the Code, "which requires that a voter cast his ballot alone, and that it remain secret and inviolate." *Id.*

Petitioner and the Secretary attempt to distinguish *Appeal of Pierce* by emphasizing that there was no statutory provision in that case that was inconsistent with the judicially inferred remedy, such as the provisional ballot secrecy envelope provision in this case. They assert that here, by contrast, the Legislature has directed the disqualification of provisional ballots not enclosed in the secrecy envelope, and of mail-in ballots with certain markings on the secrecy envelope, rendering its silence with regard to omitted secrecy envelopes for mail-in ballots all the more conspicuous.

**\*26** The clear thrust of *Appeal of Pierce*, however, is that, even absent an express sanction, where legislative intent is clear and supported by a weighty interest like fraud prevention, it would be unreasonable to render such a concrete provision ineffective for want of deterrent or enforcement mechanism. What we learn from that decision is that violations of the mandatory statutory provisions that pertain to integral aspects of the election process should not be invalidated *sub silentio* for want of a detailed enumeration of consequences.

We must in all instances assume that the General Assembly does not intend a statute to be interpreted in a way that leads to an absurd or unreasonable result. *See* 1 Pa.C.S. § 1922(1) ("In ascertaining the intention of the General Assembly in the enactment of a statute the following presumptions ... may be used: (1) That the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable."). The result proffered by Petitioner and the Secretary is no more reasonable than that which the Court in *Appeal of Pierce* found untenable. The Court in *Appeal of Pierce* viewed a textual mandate pertaining to fraud prevention and ballot secrecy as signaling the Legislature's intent that its violation would require voiding the ballot, notwithstanding no statutory provision to that effect. To avoid an absurd result, it inferred that intent from nothing more than the provision itself.

We reach the same result here. It is clear that the Legislature believed that an orderly canvass of mail-in ballots required the completion of two discrete steps before critical identifying information on the ballot could be revealed. The omission of a secrecy envelope defeats this intention. Moreover, in providing for the disqualification of mail-in ballots that arrive in secrecy envelopes that bear markings identifying the elector, the elector's party affiliation, or the elector's vote, all

categories of information that appear on the ballot itself, the Legislature signaled beyond cavil that ballot confidentiality up to a certain point in the process is so essential as to require disqualification. Thus, we find that our holding in *Appeal of Pierce* leads to the inescapable conclusion that a mail-in ballot that is not enclosed in the statutorily-mandated secrecy envelope must be disqualified.

Accordingly, we hold that the secrecy provision language in Section 3150.16(a) is mandatory and the mail-in elector's failure to comply with such requisite by enclosing the ballot in the secrecy envelope renders the ballot invalid.

### E. COUNT V OF THE PETITION FOR REVIEW

In Count V of its petition, Petitioner seeks a declaration specifying that the poll watcher residency requirement, found in Section 2687(b) of the Election Code, 25 P.S. § 2687(b), does not violate state or federal constitutional rights.[32] Petition at 55, ¶ 207. The Secretary concurs with Petitioner in this regard.

[32]     Specifically, Petitioner maintains that the poll watcher residency requirement does not violate the United States Constitution's First Amendment, the Fourteenth Amendment, the Equal Protection Clause, or the Equal Protection and Free and Equal Elections Clauses of the Pennsylvania Constitution.

The Election Code permits candidates and political parties to appoint "poll watchers" to monitor the integrity of the voting process.[33] "Each watcher so appointed must be a qualified registered elector of the county in which the election district for which the watcher was appointed is located." 25 P.S. § 2687(b). This provision, in full, specifies:

**\*27** Each watcher so appointed must be a qualified registered elector of the county in which the election district for which the watcher was appointed is located. Each watcher so appointed shall be authorized to serve in the election district for which the watcher was appointed and, when the watcher is not serving in the election district for which the watcher was appointed, in any other election district in the county in which the watcher is a qualified registered elector: Provided, That only one watcher for each candidate at primaries, or for each party or political body at general, municipal or special elections, shall be present in the polling place at any one time from the time that the election officers meet prior to the opening of the polls under section 1208 until the time that the

counting of votes is complete and the district register and voting check list is locked and sealed, and all watchers in the room shall remain outside the enclosed space. It shall not be a requirement that a watcher be a resident of the election district for which the watcher is appointed. After the close of the polls and while the ballots are being counted or voting machine canvassed, all the watchers shall be permitted to be in the polling place outside the enclosed space. Each watcher shall be provided with a certificate from the county board of elections, stating his name and the name of the candidate, party or political body he represents. Watchers shall be required to show their certificates when requested to do so. Watchers allowed in the polling place under the provisions of this act, shall be permitted to keep a list of voters and shall be entitled to challenge any person making application to vote and to require proof of his qualifications, as provided by this act. During those intervals when voters are not present in the polling place either voting or waiting to vote, the judge of elections shall permit watchers, upon request, to inspect the voting check list and either of the two numbered lists of voters maintained by the county board: Provided, That the watcher shall not mark upon or alter these official election records. The judge of elections shall supervise or delegate the inspection of any requested documents.

25 P.S. § 2687(b) (footnote omitted).

33      Section 2687(a) provides:

Each candidate for nomination or election at any election shall be entitled to appoint two watchers for each election district in which such candidate is voted for. Each political party and each political body which had nominated candidates in accordance with the provisions of this act, shall be entitled to appoint three watchers at any general, municipal or special election for each election district in which the candidates of such party or political body are to be voted for. Such watchers shall serve without expense to the county.

25 P.S. § 2687(a).

Petitioner observes that the General Assembly enacted the current poll watcher residency requirement in 2004 and that no changes were made to this requirement in Act 77. Petitioner asserts that this provision does not suffer from any constitutional infirmities and notes that the provision has been upheld as constitutional by the federal District Court for the Eastern District of Pennsylvania in *Republican Party of Pennsylvania v. Cortés*, 218 F. Supp. 3d 396 (E.D. Pa. 2016), discussed further below.

The Secretary likewise maintains that the poll watcher residency requirement is constitutional. The Secretary notes that the United States Supreme Court in *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), recognized the importance of States in regulating elections. There, the Court stated,

> We have recognized that, 'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.'

*Id.* at 788, 103 S.Ct. 1564 (citing *Storer v. Brown*, 415 U.S. 724, 730, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974)). In this regard, the Secretary observes that the Election Code provides a comprehensive scheme of regulations for voting and elections in the Commonwealth. The Secretary maintains that these regulatory interests are generally considered sufficient to justify reasonable, nondiscriminatory restrictions on elections. *Id.*; *see also Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997) (specifying that "[s]tates may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder").

Regarding the provisions in the Election Code requiring that poll watchers be qualified registered electors from the county in which they serve, like Petitioner, the Secretary observes that although this Court has not previously addressed the question of whether this requirement is constitutional, the federal District Court for the Eastern District of Pennsylvania has done so and rejected a constitutional challenge to the poll watcher residency requirement in *Cortés, supra.*

Specifically, there, the District Court considered a constitutional challenge to Section 2687(b) of the Election Code by the respondent here. Respondent claimed that the poll watcher residency requirement found at Section 2687(b), requiring poll watchers to reside in the county in which they serve, is violative of its Fourteenth Amendment rights to due process and equal protection and their rights to free speech and association under the First Amendment.

**\*28** The District Court rejected these claims, noting first, that the regulation does not violate due process or equal protection. The court observed that serving as a poll watcher does not implicate a fundamental constitutional right, like the right to vote, but rather, is a right conferred by statute. *Id.* at 408. Additionally, the court found that because the state's regulation of the qualifications of who may serve as a poll watcher does not burden one's voting rights or any

2020 WL 5554644

other constitutional right, the state imposing the regulation need only cite a rational basis for the regulation to be upheld. *Id.* (citing *Donatelli v. Mitchell*, 2 F.3d 508, 514 & n.10 (3d Circ. 1993) (declining to apply intermediate scrutiny standards because the plaintiffs' fundamental rights were not burdened by state law)); and *Voting for Am., Inc. v. Andrade*, 488 Fed.Appx. 890, 899 (5th Cir. 2012) (applying rational basis review as opposed to an intermediate balancing test because state election law did not implicate or burden specific constitutional rights). In this regard, the court concluded as follows:

> There is a rational basis for Section 2678(b)'s requirement that poll watchers be qualified electors in the county in which they work. The Secretary notes that in 1937, the General Assembly enacted a county-based scheme to manage elections within the state, and consistent with that scheme the legislature endeavored to allow county election officials to oversee a manageable portion of the state in all aspects of the process, including in credentialing poll watchers. In short, Pennsylvania opted to design a county-by-county system of elections; in doing so it ensured as much coherency in this patchwork system as possible. To that end it ensured that participants in the election-- voters and watchers alike--were qualified electors in the relevant county. The legislature's decision to allow county election officials to credential only poll watchers from their own county is rationally related to the state's interest in maintaining its county-run election system; each county election official is tasked with managing credentials for a discrete part of the state's population. As the Secretary's counsel noted at the hearing, the legislature chose to 'draw the lines' at the county level, something entirely rational in fashioning a scheme for a state as large as Pennsylvania.

*Cortés*, 218 F.Supp. 3d at 409.

The District Court, likewise, rejected Respondent's claims that Section 2687 violates the First Amendment. The court first noted that courts have found that "poll watching is not incidental to" the right of free association and has "no distinct First Amendment protection." *Id.* at 414 (citing *Cotz v. Mastroeni*, 476 F.Supp.2d 332, 364 (S.D. N.Y. 2007); and *Dailey v. Hands*, No. 14-00423, 2015 WL 1293188, at *5 (S.D. Ala. Mar. 23, 2015) ("[P]oll watching is not a fundamental right protected by the First Amendment.")). Moreover, the court found that poll watchers do not engage in core political speech while completing their duties. *Id.* at 415. Rather, the court observed that "when a poll watcher reports incidents of violations, he is performing a public function delegated by the state." *Id.* (citing *Flagg Bros., Inc.*

*v. Brooks*, 436 U.S. 149, 158, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978) (stating that "[w]hile the Constitution protects private rights of association and advocacy with regard to the election of public officials, [the Supreme Court] cases make it clear that the conduct of the elections themselves is an [e]xclusively public function.")). Thus, the District Court found that the Commonwealth's county poll watcher residency requirement did not implicate poll watchers' private rights of association or advocacy and, therefore, did not violate the First Amendment.

Respondent again maintains that the poll watcher residency requirement set forth in the Election Code is unconstitutional.[34] First, Respondent maintains that *Cortés* is distinguishable from this matter because of the procedural posture and the timing of that case. Specifically, Respondent emphasizes the fact that in *Cortés* it sought a preliminary injunction eighteen days before the general election and that on this basis the court found the request for relief to be untimely. Thus, it contends that the court's further discussion of the constitutionality of the poll watcher residency requirement was *dicta*.

[34]  The Caucus does not advocate in favor of finding the poll watcher residency requirement unconstitutional.

 **\*29**  Additionally, Respondent argues that the court in *Cortés*, like the Secretary here, gave short shrift to the Commonwealth's obligation to safeguard the electorate from voter fraud, noting that "every voter in a federal ... election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." Respondent's Brief at 45 (citing *Anderson v. United States*, 417 U.S. 211, 227, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974)). Respondent maintains that due to the distribution of voters throughout the Commonwealth, the county residency requirement makes it difficult for both political parties to identify poll watchers in all precincts. Thus, it asserts that, in the absence of poll watchers, "fraud can flourish." *Id.* at 46. Respondent further argues that with Pennsylvania moving to an entirely new election regime under Act 77, with alleged increased opportunities for ballot fraud and tampering, the need for poll watchers is heightened.

Turning to the merits, initially, regarding Respondent's assertion that the District Court's discussion of the constitutionality of the poll watcher residency requirement constitutes *dicta* because the court found the claims there

to be untimely, we note that although that court pointed out that the emergent nature of Respondent's claims amounted to a "judicial fire drill" based on their late filing, the court opined further that the relief sought "would be inappropriate for a number of reasons, not the least of which is that at this late hour courts should not disrupt an impending election 'absent a powerful reason for doing so.' " *Cortés*, 218 F.Supp.3d. at 405 (citation omitted). The court then went on to analyze the merits of the constitutional claims asserted and denied relief. Accordingly, it appears the court made its decision on multiple bases, including the merits as well as the timing of the claims. Moreover, regardless of the status of the District Court's determination of the constitutional issues presented there, we find its analysis persuasive and agree with its reasoning in upholding the constitutionality of the poll watcher residency requirement.

The "times, places and manner" of conducting elections generally falls to the states. U.S. Const. art. I, § 4 (providing that "the Times, Places and Manner of holding Elections...shall be prescribed in each State by the Legislature thereof"). Pennsylvania has enacted a comprehensive code of election laws pursuant to its authority to regulate its elections. The General Assembly, in enacting its comprehensive scheme, has required that any person serving as a poll watcher for a particular candidate or party be a resident of the county in which she serves in her position. 25 P.S. § 2687(b).

This provision is a legislative enactment which enjoys the presumption that the General Assembly did not intend to violate constitutional norms, "in part because there exists a judicial presumption that our sister branches take seriously their constitutional oaths." *Stilp v. Commonwealth*, 588 Pa. 539, 905 A.2d 918, 938–39 (2006); *see also* 1 Pa.C.S. § 1922(3). Accordingly, a statute is presumed to be valid, and will be declared unconstitutional only if it is shown to be "clearly, palpably, and plainly [violative of] the Constitution." *West Mifflin Area School District v. Zahorchak*, 607 Pa. 153, 4 A.3d 1042, 1048 (2010).

In analyzing whether a state election law violates the constitution, courts must first examine the extent to which a challenged regulation burdens one's constitutional rights. *Burdick v. Takushi*, 504 U.S. 428, 434, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). Upon determining the extent to which rights are burdened, courts can then apply the appropriate level of scrutiny needed to examine the propriety of the regulation. *See id.* (indicating that "the rigorousness of our inquiry into the propriety of a state election law depends upon

the extent to which a challenged regulation burdens First and Fourteenth Amendment rights").

**\*30** Where a state election regulation imposes a "severe" burden on a plaintiff's right to vote, strict scrutiny applies and requires that the regulation is "narrowly drawn to advance a state interest of compelling importance." *Id.* When a state election law imposes only "reasonable, nondiscriminatory restrictions," upon the constitutional rights of voters, an intermediate level of scrutiny applies, and "the State's important regulatory interests are generally sufficient to justify" the restrictions. *See Id.* (upholding Hawaii's ban on write-in voting in the primary where doing so places a minimal burden on one's voting right and supports the state's interest in supporting its ballot access scheme). Where, however, the law does not regulate a suspect classification (race, alienage, or national origin) or burden a fundamental constitutional right, such as the right to vote, the state need only provide a rational basis for its imposition. *See Donatelli*, 2 F.3d at 510 & 515.

In examining the constitutionality of the poll watcher residency provision at issue here, we conclude, as the District Court in *Cortés* concluded, that it imposes no burden on one's constitutional right to vote and, accordingly, requires only a showing that a rational basis exists to be upheld. In this regard, as the District Court aptly noted, there is no individual constitutional right to serve as a poll watcher; rather, the right to do so is conferred by statute. *Cortés*, 218 F.Supp.3d at 408. Additionally, courts have indicated that "poll watching is not incidental to" the right of free association and, thus, "has no distinct First Amendment protection." *Cotz*, 476 F.Supp.2d at 364. Finally, poll watching does not implicate core political speech. *Cortés*, 218 F.Supp.3d at 415.

As the poll watcher county residency requirement does not burden one's constitutional voting rights, the regulation need only be shown to satisfy a rational basis for its imposition. Again, as the District Court aptly recounted, from its inception, Pennsylvania has envisioned a county-based scheme for managing elections within the Commonwealth. Consistent therewith, the Legislature has endeavored to allow county election officials to oversee and manage their portion of the state in all aspects of the election process, including credentialing poll watchers. Given that Pennsylvania's General Assembly chose a county-based scheme for conducting elections, it is reasonable that the Legislature would require poll watchers, who serve within the various counties of the state, to be residents of the counties

in which they serve. Thus, there is a clear rational basis for the county poll watcher residency requirement, and we determine, therefore, that this requirement should be upheld.

Respondent does not claim that poll watching involves a fundamental constitutional right or that a level of scrutiny other than rational basis needs to be shown regarding the regulation of poll watcher qualifications. Instead, Respondent claims that poll watchers are vital to protect against voter fraud and that because of the distribution of voters throughout Pennsylvania, the residency requirement makes it difficult to identify poll watchers in all precincts. While Respondent asserts the greater need for poll watchers because of heightened election fraud involving mail-in voting, these claims are unsubstantiated and are specifically belied by the Act 35 report issued by the Secretary on August 1, 2020, concerning mail in voting in the Primary Election, finding:

> [D]ata provided by the counties reinforces numerous independent studies that conclude that mail ballot fraud is exceedingly rare, and it demonstrates that the errors that occurred [in the Primary Election] accounted for a very small fraction of the nearly 1.5 million absentee and mail-in ballots requested and cast by voters.

Pennsylvania 2020 Primary Election Act 35 of 2020 Report at 39; Appendix to Petitioner's Brief, Exhibit F. Moreover, Respondent's speculative claim that it is "difficult" for both parties to fill poll watcher positions in every precinct, even if true, is insufficient to transform the Commonwealth's uniform and reasonable regulation requiring that poll watchers be residents of the counties they serve into a non-rational policy choice.

 **\*31** Based on the foregoing, we conclude that the poll watcher residency requirement does not violate the state or federal constitutions.[35] Accordingly, we grant the relief sought by Petitioner in their petition for review and declare the poll watcher residency requirement set forth in Section 2687(b) of the Election Code, 25 P.S. § 2687(b), to be constitutional.

[35]    Respondent has not asserted that the Pennsylvania Constitution offers greater protection under the circumstances presented. Thus, for purposes of our review, we treat them as co-extensive.

### IV. CONCLUSION

Based on our disposition of all of the claims set forth above, we grant relief on the claims set forth in Counts I, II, and V of the Democratic Party's petition for review as follows and hold that: (Count I) the Election Code permits county boards of election to collect hand-delivered mail-in ballots at locations other than their office addresses including drop-boxes as indicated herein, *see supra.* at —— n. 15; (Count II) a three-day extension of the absentee and mail-in ballot received-by deadline is adopted such that ballots mailed by voters via the United States Postal Service and postmarked by 8:00 p.m. on Election Day, November 3, 2020, shall be counted if they are otherwise valid and received by the county boards of election on or before 5:00 p.m. on November 6, 2020; ballots received within this period that lack a postmark or other proof of mailing, or for which the postmark or other proof of mailing is illegible, will be presumed to have been mailed by Election Day unless a preponderance of the evidence demonstrates that it was mailed after Election Day; (Count V) the poll watcher residency requirement set forth in Section 2687(b) of the Election Code, 25 P.S. § 2687(b), is constitutional. Also, for the reasons set forth herein, we deny the relief sought in Count III and IV of the petition for review.

Justices Todd, Dougherty, and Wecht join the opinion.

Chief Justice Saylor and Justice Mundy join Parts I, II, and III(C), (D) and (E) of the opinion.

Justice Donohue joins Parts I, II, and III(A), III(C), III(D) and III(E) of the opinion.

Justice Wecht files a concurring opinion.

Chief Justice Saylor files a concurring and dissenting opinion in which Justice Mundy joins.

Justice Donohue files a concurring and dissenting opinion in which Chief Justice Saylor and Justice Mundy join Part II.

JUSTICE WECHT, concurring

I join the learned Majority's Opinion in full. "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined."[1] As the Supreme Court of the United States has explained, the right to vote comprises not just "the right of qualified voters within a state to cast their ballots," but also the right "to have their ballots counted."[2] In our Commonwealth, the franchise

is guaranteed by the Free and Equal Elections Clause of the Pennsylvania Constitution, which commands: "Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage."[3] The history of that clause, which predates the United States Constitution and has no federal counterpart, evinces the intent of its framers that it be given "the broadest interpretation, one which governs all aspects of the electoral process."[4]

1    *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964).

2    *United States v. Classic*, 313 U.S. 299, 314, 315, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941); *accord United States v. Mosley*, 238 U.S. 383, 386, 35 S.Ct. 904, 59 L.Ed. 1355 (1915).

3    Pa. Const. art. I, § V.

4    *League of Women Voters of Pa. v. Pa.*, 645 Pa. 1, 178 A.3d 737, 809 (2018); *see Winston v. Moore*, 244 Pa. 447, 91 A. 520, 523 (1914).

**\*32** Expounding upon the contours of the guarantee of free and equal suffrage contained within the Constitution of Kentucky, which was modeled on our own organic charter, the Kentucky Supreme Court observed that, "when any substantial number of legal voters are, from any cause, denied the right to vote, the election is not free and equal, in the meaning of the Constitution."[5]

[T]his constitutional provision admits of no evasions or exceptions. No amount of good intention or good faith can be allowed to defeat its purpose or its meaning. When the question arises, the single inquiry will be: Was the election free and equal, in the sense that no substantial number of persons entitled to vote and who offered to vote were denied the privilege?[6]

Although the conditions that might infringe the franchise are too manifold to enumerate, when we are satisfied that a violation of the right has occurred or is likely to occur, "our Court possesses broad authority to craft meaningful remedies when required."[7]

5    *Wallbrecht v. Ingram*, 164 Ky. 463, 175 S.W. 1022, 1026 (1915).

6    *Id.* at 1027.

7    *League of Women Voters*, 178 A.3d at 822 (citing Pa. Const. art. V, §§ 1, 2, 10); *see Reynolds v. Sims*, 377 U.S. 533, 566, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) ("[A] denial of constitutionally protected rights demands judicial protection; our oath and our office require no less of us.").

"Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy."[8] To that end, we recognized in *League of Women Voters* that "[a] broad and robust interpretation" of the Free and Equal Elections Clause could restore the public's confidence in the redistricting process by "guard[ing] against the risk of unfairly rendering votes nugatory."[9] The same easily could be said of an election scheduled in the wake—or midst—of a natural disaster, civil unrest, or other emergency, where systemic disruptions in basic government services like mail delivery—upon which the machinery of our election system relies more than ever with the advent of broad mail-in voting —can be demonstrated or reasonably anticipated.[10] Indeed, the "adverse consequences" occasioned by a dysfunctional electoral process that threatens to disenfranchise a broad swath of the electorate are no less pernicious than those of partisan gerrymandering. Left unabated, each threatens to "discourag[e] voters from participating in the electoral process because they have come to believe" that their vote will not count through no fault of their own.[11]

8    *Purcell v. Gonzalez*, 549 U.S. 1, 4, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006) (*per curiam*).

9    *League of Women Voters*, 178 A.3d at 814.

10    *See In re General Election-1985*, 109 Pa.Cmwlth. 604, 531 A.2d 836, 839 (1987) ("To permit an election to be conducted where members of the electorate could be deprived of their opportunity to participate because of circumstances beyond their control ... would be inconsistent with the purpose of the election laws.").

11    *League of Women Voters*, 178 A.3d at 814; *cf. Working Families Party v. Commonwealth*, —— Pa. ——, 209 A.3d 270, 306-07 (2019) (Wecht, J., concurring and dissenting) ("The Free and Equal Elections Clause is compromised where the regulatory approach adopted by the legislature has the well-documented effect of ... depressing voter enthusiasm and participation.").

In determining whether present systemic disruptions in government services are well-documented in this Commonwealth, we need look no further than the recent Congressional testimony of Postmaster General Louis DeJoy.

Appearing before committees of the United States House and Senate, DeJoy acknowledged that "[a] substantial portion of [mail] delays are related to COVID."[12] Highlighting the acute effects of the pandemic on mail delays within Pennsylvania, DeJoy explained:

**\*33**  As the coronavirus cases throughout the country have expanded it has had an impact on our employee availability. And in the urban areas that are hotspots—the averages don't play out what the real picture is like in areas like Philadelphia, where employee availability is significantly below normal run rates.[13]

Lacking any materially contradictory evidence, we have no reason to doubt the accuracy of DeJoy's testimony on these points. While the Postal Service may be able to prioritize election mail to mitigate these concerns, they cannot alter the laws of time and space.

[12]  Examining the Finances and Operations of the United States Postal Service During COVID-19 and Upcoming Elections: Hearing Before the S. Homeland Security Comm., 116th Cong. (Aug. 21, 2020).

[13]  Protecting the Timely Delivery of Mail, Medicine, and Mail-in Ballots: Hearing Before the H. Oversight & Gov't Reform Comm., 116th Cong. (Aug. 24, 2020).

The extraordinary circumstances under which this year's quadrennial presidential election must be contested manifestly justify an equitable remedy modifying the received-by deadline for absentee and mail-in ballots to account for these exigencies and to ensure that no unnecessary impediments to each citizen's exercise of the franchise be interposed that reasonably can be avoided. Having determined that the convergence of a once-in-a-century pandemic and unprecedented operational delays in United States Postal Service delivery capacity threatens to undermine the integrity of our general election, this *force majeure* necessitates relief.

I endorse the Majority's narrowly-tailored remedy, which extends the received-by deadline by just three days to compensate for projected mail-delivery delays of similar duration. Extrapolating from the Department of State's primary election data, that timeframe should capture the vast majority of late-arriving ballots that were deposited with the Postal Service on or in the few days before Election Day. That approach also will minimize the number of voters denied the franchise simply for mailing their votes based upon long-trusted, but presently unrealistic expectations about the speed of the post, while minimizing any subsequent delay in the tallying of votes and avoiding any material disruption to the sequence of events that follow in the weeks following a national election.

While I join the Majority's resolution of Count III, I do so subject to the belief that it is limited to the particular concerns litigated and the lack of any proposal regarding a practicable manner of relieving the problem alleged. In my view, today's ruling should be understood to extend no farther than to ballot defects that are capable of objective assessment pursuant to uniform standards[14]—a qualification that captures all of the defects Petitioners seek the opportunity to cure in this case.

[14]  *See* Pa. Const. art. VII, § 6 ("All laws regulating the holding of elections by the citizens ... shall be uniform throughout the State."); *Kuznik v. Westmoreland Cty. Bd. of Comm'rs*, 588 Pa. 95, 902 A.2d 476, 490 (2006) ("We have held that 'to be uniform in the constitutional sense ... a law [regulating the holding of elections] must treat all persons in the same circumstances alike.' ") (quoting *Kerns v. Kane*, 363 Pa. 276, 69 A.2d 388, 393 (1949)).

**\*34**  For example, the failure to "fill out, date and sign the declaration printed on" the ballot return envelope, as required by 25 P.S. § 3150.16(a), is a deficiency that can be readily observed. Absent some proof that the enforcement of such a uniform, neutrally applicable election regulation will result in a constitutionally intolerable ratio of rejected ballots, I detect no offense to the Free and Equal Elections Clause. Moreover, Petitioners propose only an amorphous standard that would permit electors to cure "minor" defects and omissions; they supply no judicially manageable criteria for distinguishing "minor" defects from "major" ones that could be adopted on a statewide basis, nor do they propose a process to facilitate the opportunity to cure that they seek that can be implemented and fairly administered in every voting district in the Commonwealth in the weeks between now and the general election. So long as the Secretary and the county boards of elections provide electors with adequate instructions for completing the declaration of the elector—including conspicuous warnings regarding the consequences for failing strictly to adhere—pre-deprivation notice is unnecessary.

But I view these issues as distinct from circumstances in which a ballot's validity turns on subjective assessments, such as signature mismatches assessed by poll workers with no training or expertise in matching signatures. The enforcement of such requirements presents risks of inconsistency and

arbitrariness that may implicate constitutional guarantees not raised in this case, including due process and equal protection principles. Signature comparison is a process fraught with the risk of error and inconsistent application, especially when conducted by lay people.[15] While this case offers no challenge to such inherently subjective bases for disqualifying ballots, I do not view today's Opinion as foreclosing the possibility of relief in a future case seeking the opportunity to address circumstances in which a subjective, lay assessment of voter requirements as to which reasonable minds might differ stands between the elector and the tabulating machine.

[15]   *Cf. United States v. Starzecpyzel*, 880 F.Supp. 1027, 1046 (S.D.N.Y. 1995) (noting the risk of "natural variations" in handwriting and citing factors such as "disease, intoxication and the passage of time," and citing a putative handwriting expert as observing that "[s]ome people have a lot of individuality present in their writing and other people do not").

We would not write on a blank slate in this regard. These concerns have been recognized by numerous tribunals in recent years, and various courts have granted relief on similar grounds, including three federal courts in the last few weeks alone.[16] Those courts have found that the administrative burden of a notice-and-cure remedy is outweighed by the threat to the fundamental rights of voters whose ballots otherwise would not be counted.

[16]   *See, e.g., Ariz. Dem. Party v. Hobbs*, CV-20-01143-PHX-DLR, ––– F.Supp.3d ––––, 2020 WL 5423898 (D. Ariz. Sept. 10, 2020); *Richardson v. Tex. Sec. of State*, SA-19-cv-00963-OLG, ––– F.Supp.3d ––––, 2020 WL 5367216 (W.D. Tex. Sept. 8, 2020); *Frederick v. Lawson*, 1:19-cv-01959-SEB-MDJ, ––– F. Supp. 3d ––––, 2020 WL 4882696 (S.D. Ind. Aug. 20, 2020); *see also League of Un. Latin Am. Citizens of Iowa v. Pate*, Polk Cty. CVCV056403, 2018 WL 3946147, at *1 (Iowa Aug. 10, 2018) (enjoining use of signature-matching provisions in Iowa's Election Code); *Martin v. Kemp*, 341 F. Supp. 3d 1326 (N.D. Ga. 2018) (enjoining enforcement of Georgia statute permitting rejection of absentee ballots and ballot applications due to alleged signature mismatch), *emergency motion for stay of injunction pending appeal denied, Georgia Muslim Voter Project v. Kemp*, 918 F.3d 1262 (11th Cir. 2019); *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 222 (D. N.H. 2018) (holding that New Hampshire's signature-match requirement for absentee ballots was facially unconstitutional under the Fourteenth Amendment); *Florida Dem. Party v. Detzner*,

4:16cv607-MW/CAS, 2016 WL 6090943, at *9 (N.D. Fla. Oct. 16, 2016) (striking down Florida's mail-in ballot signature match law as violative of the Fourteenth Amendment); *Zessar v. Helander*, 05 C 1917, 2006 WL 642646, at *10 (N.D. Ill. 2006) (finding that the Illinois Election Code provisions requiring signature comparisons on absentee ballots violated voters' due process rights); *La Follette v. Padilla*, CPF-17-515931, 2018 WL 3953766, at *3 (Cal. Super. Ct. Mar. 5, 2018) (holding that California Election Code ballot signature-mismatch provision facially violates due process); *cf.* Susie Armitage, *Handwriting Disputes Cause Headaches for Some Absentee Voters*, ProPublica (Nov. 5, 2018), www.propublica.org/article/handwriting-disputes-cause-headaches-for-some-absentee-voters (discussing legal challenges to signature-match laws).

**\*35**   While one might hope that the General Assembly would revisit the issue and consider furnishing such a procedure on its own initiative, this Court has the prerogative to address this problem if it proves worthy upon closer examination. As a "state court with the power to assure uniformity," we have the authority, and indeed the obligation, to direct the canvassing of absentee and mail-in ballots in a manner that satisfies "the rudimentary requirements of equal treatment and fundamental fairness" when we find a palpable failure to meet those constitutional thresholds.[17] Regardless, Petitioners do not bring a discrete challenge to the Commonwealth's prescribed processes for examining the validity of signatures on ballot envelopes, so resolution of that question must wait.[18]

[17]   *Bush v. Gore*, 531 U.S. 98, 109, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) (*per curiam*).

[18]   During the pendency of this appeal, Secretary Boockvar issued a guidance document that, in furtherance of "consistency across the 67 counties," instructs election officials that "[t]he Pennsylvania Election Code does not authorize the county board of elections to set aside returned absentee or mail-in ballots based solely on signature analysis by the county board of elections." Guidance Concerning Examination of Absentee and Mail-In Ballot Return Envelopes at 3 (Sept. 11, 2020) www.dos.pa.gov/VotingElections/OtherServicesEvents/Documents/Examination%20of%20Absentee%20and%20Mail-In%20Ballot%20Return%20Envelopes.pdf.

Turning finally to Count IV, I agree wholeheartedly with the Majority's analysis. I write separately to underscore that this case illustrates most consequentially the potential for

mischief, albeit well-meaning, when we are called upon to question the "true" meaning of the General Assembly's contextually ambiguous use of the word "shall." In my view, there are times when this Court has done so gratuitously. But far more frequently, this unfortunate circumstance is foisted upon us by the choices made by the General Assembly during the often tortuous drafting process,

The difficulty inherent in that enterprise, and concomitantly the risk that we will misconstrue legislative intent, is clear. In searching for methods to remove the guesswork from such situations, Pennsylvania courts have labored mightily but in vain to fashion a coherent organizing principle for determining when the legislature meant "you may" when it said "you must."

For example, the Superior Court once suggested that the distinction inheres in "the *effect* of non-compliance .... A provision is mandatory when failure to follow it renders the proceedings to which it relates illegal and void; it is directory when the failure to follow it does not invalidate the proceedings."[19] But where the court considers the consequences of a failure to perform a task stated in mandatory language, this distinction is nonsensical: we cannot gauge the effect of non-compliance simply by asking what the effect of non-compliance is. In *Bell v. Powell*, we proposed an equally confounding alternative:

> [Shall] may be construed to mean 'may' when no right or benefit to any one depends on its imperative use, when no advantage is lost, when no right is destroyed, when no benefit is sacrificed, either to the public or to any individual, by giving it that construction, or when it is absolutely necessary to prevent irreparable mischief, or to construe a direction so that it shall not interfere with vested rights, or conflict with the proper exercise of power by either of the fundamental branches of government ....[20]

This impenetrable passage suggests nothing to me so much as that we are free to do whatever we want only when only what we do does not matter.

19    *Borough of Pleasant Hills v. Carroll*, 182 Pa.Super. 102, 125 A.2d 466, 469 (1956) (*en banc*) (emphasis in original).

20    *Commonwealth ex rel. Bell v. Powell*, 249 Pa. 144, 94 A. 746, 748 (1915) (cleaned up).

 *36   To be sure, there may be value in legislating in both mandatory and directory terms. But no benefit is served

by, nor is there any excuse for, rendering the distinction opaque with critical omissions, such as the failure to specify a specific consequence for failing to adhere to a particular mandate—especially where, as in the case of naked ballots, the legislature did so for closely related, if not constructively identical, correlative statutory provisions. The General Assembly must endeavor always to distinguish between what it intends to be mandatory and what directory, in its words or by clear and necessary inference. When it fails to do so, courts are left to bend unclear texts toward whatever ends that they believe to be consonant with legislative intent, but with little or no contemporaneous insight into whether they have done so successfully. When the General Assembly does not choose its words carefully according to their intended effect, it leaves courts with no choice but to sharpen what the drafters made dull.

For this Court's part, if we are to maintain a principled approach to statutory interpretation that comports with the mandate of our Statutory Construction Act, if we are to maximize the likelihood that we interpret statutes faithfully to the drafters' intended effect, we must read mandatory language as it appears, and we must recognize that a mandate without consequence is no mandate at all. If the result, at times, is that the Court imposes a more doctrinaire result than the legislature intended, that body has the tools at its disposal to ensure that the same mistake does not recur.

CHIEF JUSTICE SAYLOR, concurring and dissenting

I join Parts I, II, and III(C), (D) and (E) of the majority opinion, and I respectfully dissent relative to Parts III(A) and (B), concerning the approval of unmanned drop boxes and the extension of the deadline for receiving mail-in ballots.

With regard to drop boxes, I agree with Respondent and the Caucus that the statutory option for a voter to deliver a mail-in ballot "in person to said county board of election" contemplates in-person delivery to a manned, office location. 25 P.S. § 3150.16(a). Although another provision of the Election Code contemplates receipt of "ballot boxes and returns ... in such other place as has been designated by the board" on Election Day, *id.* § 3151, no analogous provision applies to the submission by voters of individual ballots. Moreover, the legislative policy to restrain aggregated handling of mail-in ballots by third parties is manifest, *see, e.g.*, *id.* § 3150.16(a) (requiring *the elector* to mail or deliver a ballot), and the enforceability of this policy is weakened by the use of non-statutory, unmanned drop boxes. This, to

me, this suggests against a permissive interpretation of the Election Code.

Relative to the deadline for receiving mail-in ballots, I join Part II of Justice Donohue's concurring and dissenting opinion, as this most closely hews to the express legislative intent that the election be concluded by 8:00 p.m. on election night.

Finally, although the majority decision appears to be designed to accommodate only ballots actually mailed on Election Day or before, the majority does not so much as require a postmark. Particularly in combination with the allowance of drop boxes, this substantially increases the likelihood of confusion, as well as the possibility that votes will be cast after 8:00 p.m. on Election Day, thus greatly undermining a pervading objective of the General Assembly.

Justice Mundy joins this concurring and dissenting opinion.

JUSTICE DONOHUE, concurring and dissenting

I.

I join the Majority's opinion as to Parts I, II, and III(A), III(C), III(D) and III(E).

II.

With respect to Part III(B), I agree that Petitioners are entitled to relief, but I distance myself from the Majority's analysis to reach this conclusion as well as the specific relief granted. Petitioners base their request for relief on the infringement of the rights afforded by Article 1, Section 5 of the Pennsylvania Constitution, our Free and Equal Elections Clause.[1] In my mind, the issue must be framed as an as-applied challenge, during the duration of the COVID-19 public health crisis and current USPS service standards, to the constitutionality of Sections 3150.12a(a) and 3150.16(c) of Act 77, which respectively set the last date on which voters may request mail-in ballots and the deadline for when ballots must be received by county boards of elections. With deference to my learned colleagues, I believe that this issue should have been decided in a case in this Court's original jurisdiction under Act 77, *Michael Crossey et al, v. Kathy Bookckvar, et al.*, No. 108 MM 2020, where the claims likewise were based on the Free

and Equal Elections clause and in which this Court ordered the creation of a complete evidentiary record to determine whether the petitioners there had met their high burden to prove the existence of a constitutional injury entitling them to relief.

1 Article I, Section 5 of the Pennsylvania Constitution provides as follows:

  Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage.

 Pa. Const., art. 1, § 5.

**\*37** Despite invoking an as-applied constitutional challenge in the present case, Petitioners and the Secretary (as in *Crossey*) seek equitable relief in the form of an order permitting non-compliance with the received-by provision in Act 77 (Section 3150.16(c)) during the COVID-19 pandemic. I am not as comfortable as the Majority with the ability of this Court to exercise equitable powers in election matters.[2] Because they are inherently political, elections are appropriately regulated by the political branch. *In re Guzzardi*, 627 Pa. 1, 99 A.3d 381, 385 (2014). As such, out of respect for legislatures and for the sake of regularity and orderliness in the election process, the supreme courts of our sister states have routinely held that courts cannot exercise equitable powers to mitigate harsh results in derogation of legislative requirements for strict compliance with election-related deadlines. *Butts v. Bysiewicz*, 298 Conn. 665, 5 A.3d 932, 947 (2010) ("Equity only applies in the absence of a specific statutory mandate."); *see also Martin v. Secretary of State*, 482 Mich. 956, 755 N.W.2d 153, 154 (2008); *Smith v. Kiffmeyer*, 721 N.W.2d 912, 914–15 (Minn. 2006); *Andrews v. Secretary of State*, 235 Md. 106, 200 A.2d 650, 651 (1964). Following the leads of these courts, in 2014, this Court denied equitable relief to a litigant in an election case, holding as follows:

[T]he judiciary should act with restraint, in the election arena, subordinate to express statutory directives. Subject to constitutional limitations, the Pennsylvania General Assembly may require such practices and procedures as it may deem necessary to the orderly, fair, and efficient administration of public elections in Pennsylvania. At least where the Legislature has attached specific consequences to particular actions or omissions, Pennsylvania courts may not mitigate the legislatively prescribed outcome through recourse to equity.

*Guzzardi*, 99 A.3d at 385. The Court recently reaffirmed our decision in *Guzzardi*. *Reuther v. Delaware Cty. Bureau of Elections*, —— Pa. ——, 205 A.3d 302, 308-09 (2019).

2    Section 3046 of the Election Code provides courts of common pleas with authority, with some latitude, to make rulings on Election Day to secure compliance with the election laws. 25 P.S. § 6046. Specifically, a judge or judges from each county will remain in session on Election Day to "act as a committing magistrate for any violation of the election laws; shall settle summarily controversies that may arise with respect to the conduct of the election; shall issue process, if necessary, to enforce and secure compliance with the election laws; and shall decide such other matters pertaining to the election as may be necessary to carry out the intent of this act." *Id.* The Commonwealth Court relied on Section 3046 in deciding *In re General Election-1985*, 109 Pa.Cmwlth. 604, 531 A.2d 836 (1987) (in light of a flood occurring on election day, the court of common pleas had the authority to suspend voting in certain districts until the emergency was over), *appeal denied*, 518 Pa. 653, 544 A.2d 963 (1988).

The Majority relies on *In re General Election-1985* to support our broad equitable powers to act in this case despite the limitations in Section 3046.

Without the availability of equitable relief, it is my view that Petitioners are entitled to relief only in the context of an as-applied constitutional challenge. Specifically, Petitioners must prove that in light of the existing circumstances, the short seven-day timeframe established by Sections 3150.12a(a) and 3150.16(c) of Act 77 provides insufficient time for a voter to request a mail-in ballot (by October 27, 2020) and return it to a county board of elections by the statutorily set received-by date (8:00 p.m. on Election Day, November 3, 2020), so that the vote is counted. Such a constitutional challenge requires a plain showing of injury. "There is a presumption that lawfully enacted legislation is constitutional. Should the constitutionality of legislation be challenged, the challenger must meet the burden of rebutting the presumption of constitutionality by a clear, palpable and plain demonstration that the statute violates a

constitutional provision." *Yocum v. Commw. of Pennsylvania Gaming Control Bd.*, 639 Pa. 521, 161 A.3d 228, 238 (2017).

**\*38**  In *Crossey*, the petitioners produced sufficient evidence to meet this high "clear, palpable and plain" burden of proof. Given the deadlines set for the request of and subsequent return of ballots, considered in light of the pandemic and current lagging USPS service standards (which are highly unlikely to improve significantly before Election Day), the evidence in *Crossey* established that there is a strong likelihood that voters who wait until the last day to apply for a mail-in or absentee ballot will be disenfranchised, as their mail-in ballots will not be delivered by Election Day and thus will not be counted. Thus, the short seven-day window set forth in Sections 3150.12a(a) and 3150.16(c) of Act 77 constitutes an interference with the free exercise of the right to vote as guaranteed by our Free and Equal Elections Clause. The evidentiary linchpin for establishing the unconstitutionality of the seven-day time frame was correspondence from Thomas J. Marshall, General Counsel and Executive Vice President for the USPS, to Secretary Boockvar dated July 29, 2020 advising that the current service standards for delivery of First Class Mail is two to five days, and cautioning that Pennsylvania's application and return deadlines for mail-in ballots are such that despite prompt actions by voters, the ballots may "not be returned in time to be counted." The letter was accepted into evidence in *Crossey* and was further supported by the testimony of the Deputy Postmaster at the time the correspondence was crafted.

The existence of the constitutional injury suffered by virtue of adherence to the statutory deadlines for request and return of ballots is illustrated in the following chart, which incorporates the fact of receipt by the board of elections of an application on the statutory deadline of October 27, 2020. It also assumes that the application is immediately processed and a ballot mailed to the voter within forty-eight hours of receipt of the application.[3] I further take into account that mail is processed by USPS but not delivered on Sundays. All computations are based on the use of First-Class Mail:

| DATE BALLOT MAILED BY BOARD | DELIVERY TIME (in days) | DATE BALLOT IS RECEIVED BY VOTER | DATE BALLOT IS MAILED BACK BY VOTER | DELIVERY TIME (in days) | DATE BALLOT IS RECEIVED BY BOARD | BALLOT RECEIVED IN TIME TO BE COUNTED? |
|---|---|---|---|---|---|---|
| Thursday, | 2 | | Saturday, | 2 | Monday, 11/2/2020 | YES |

Pennsylvania Democratic Party v. Boockvar, 238 A.3d 345 (2020)
2020 WL 5554644

| | | | | | |
|---|---|---|---|---|---|
| 10/29/2020 | | 10/31/2020 | 3 | Tuesday, 11/3/2020 | YES |
| | Saturday, | | 4 | Wednesday, 11/4/2020 | NO |
| | 10/31/2020 | | 5 | Thursday, 11/5/2020 | NO |
| | | | 2 | Wednesday, 11/4/2020 | NO |
| | Saturday, | Monday, | 3 | Thursday, 11/5/2020 | NO |
| | 10/31/2020 | 11/2/2020 | 4 | Friday, 11/6/2020 | NO |
| | | | 5 | Saturday, 11/7/2020 | NO |
| | Monday, 11/2/2020 | | 2 | Wednesday, 11/4/2020 | NO |
| 3–4 | Monday, 11/2/2020 | Monday, | 3 | Thursday, 11/5/2020 | NO |
| | Monday, 11/2/2020 | 11/2/2020 | 4 | Friday, 11/6/2020 | NO |
| | | | 5 | Saturday 11/7/2020 | NO |
| | | Tuesday, | 2–5 | (After Election Day) | NO |
| 5 | Tuesday, | 11/3/2020 | 2–5 | (After Election Day) | NO |
| | 11/3/2020 | Wednesday, 11/4/2020 | 2–5 | (After Election Day) | NO |

The only way the current statutory framework works is if the ballot is delivered by USPS in two days, the voter immediately returns the ballot, and it is received by the board of elections within three days. All other voters who comply with the statutory framework are disenfranchised, even though they complied with the statute.

3    In this regard, we note that 25 P.S. § 3150.15 provides that county boards of elections must deliver the ballots to the voters within forty-eight hours **after** approval of the application. *See* 25 P.S. § 3150.15 ("As additional applications are received and approved, the board shall deliver or mail official mail-in ballots to the additional electors within 48 hours.").

The role of the judiciary when a meritorious constitutional challenge is brought "includes the obligation to vindicate" the constitutional rights at issue, and in doing so courts have wide latitude to craft an appropriate remedy." *Robinson Twp. v. Commonwealth*, 623 Pa. 564, 83 A.3d 901, 953 (2013); *see also League of Women Voters of Pa. v. Commonwealth*, 645 Pa. 1, 178 A.3d 737, 793 (2018) ("The Court possesses broad authority to craft meaningful remedies [for constitutional violations] when required."). Where, as here, "a legislatively

unforeseen constitutional problem requires modification of a statutory provision as applied," the United States Supreme Court has admonished courts to look to legislative intent when devising a remedy. *See United States v. Booker*, 543 U.S. 220, 246-47, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005) (after ruling that federal sentencing statute that made guidelines mandatory was unconstitutional, the Court made an effort to determine what " 'Congress would have intended' in light of the Court's constitutional holding.") *Id*. at 246-47, 125 S.Ct. 738.

**\*39** In *Crossey* (and in the present case), Petitioners recommend that the "received by" date be moved from Election Day to seven days after Election Day, so long as the mailing is postmarked by Election Day. In *Crossey* (and here), Secretary Boockvar believes that moving the received-by day forward by three days is sufficient, and that Petitioners' longer time period would in fact interfere with other important functions that must take place after Election Day. In crafting a remedy for an as-applied constitutional violation, a court's duty is to effectuate the intent of the General Assembly to the extent possible and to otherwise not disrupt the statutory scheme. In light of these principles, I do not believe that either of the parties' recommended remedies provide the appropriate solution.

There is no reasonable reading of the statute that would lead to the conclusion that the Tuesday before Election Day was of any institutional importance. Instead, the clear legislative intent was that all ballots were to be cast by 8:00 p.m. on Election Day, the termination of the balloting process. It cannot be viewed as a coincidence that the closing of the polls terminating in-person voting and the receipt of mail-in ballots were designated by the statute to be the same. The last date on which applications for ballots would be accepted was tied to an assumption that a timely vote could be cast before the only meaningful milestone, Election Day. As a result, the remedy to best effectuate the legislative intent before the intervening circumstances is to move back, i.e., make earlier, the final date on which applications for mail-in ballots may be submitted to the county boards of elections. I would accept Secretary Boockvar's opinion that three additional days will substantially correct the problem. However, moving back by three days the deadline for the receipt of applications by the boards of elections would result in that deadline falling on Saturday. Instead, to reflect normal business days, the deadline for receipt of the application by the boards of election should be moved to Friday, October 23, 2020. The received-by date for the ballot by the boards of elections, Election Day by 8:00 p.m., should remain unchanged.

For comparison, the following chart illustrates the new deadlines interfaced with current USPS delivery standards:

| DATE BALLOT MAILED BY BOARD | DELIVERY TIME (in days) | DATE BALLOT RECEIVED BY VOTER | DATE BALLOT MAILED BY VOTER | DELIVERY TIME (in days) | DATE BALLOT RECEIVED BY BOARD | BALLOT RECEIVED IN TIME TO BE COUNTED? |
|---|---|---|---|---|---|---|
|  |  |  |  | 2 | Friday, 10/30/2020 | YES |
|  |  | Wednesday, | Wednesday, | 3 | Saturday, 10/31/2020 | YES |
|  |  | 10/28/2020 | 10/28/2020 | 4 | Monday 11/2/2020 | YES |
|  |  |  |  | 5 | Monday 11/2/2020 | YES |
|  |  | Wednesday, |  | 2 | Saturday, 10/31/2020 | YES |
| Monday, |  | 10/28/2020 | Thursday, | 3 | Monday, 11/2/2020 | YES |
| 10/26/2020 |  | Thursday, | 10/29/2020 | 4 | Monday, 11/2/2020 | YES |

| | | | | | |
|---|---|---|---|---|---|
| | | 10/29/2020 | | 5 | Tuesday, 11/3/2020 | YES |
| 3 | Thursday, 10/29/2020 | Friday, 10/30/2020 | 2 | Monday, 11/2/2020 | YES |
| | | | 3 | Monday, 11/2/2020 | YES |
| | Friday, | | 4 | Tuesday, 11/3/2020 | YES |
| | 10/30/2020 | | 5 | Wednesday, 11/4/2020 | NO |
| 4 | Friday, | | 2 | Monday, 11/2/2020 | YES |
| | 10/30/2020 | Saturday, | 3 | Tuesday, 11/3/2020 | YES |
| | Saturday, | 10/31/2020 | 4 | Wednesday, 11/4/2020 | NO |
| 5 | 10/31/2020 | | 5 | Thursday, 11/5/2020 | NO |
| | Saturday, 10/31/2020 | Monday, 11/2/2020 | 2–5 | (After Election Day) | NO |

As with the previous illustration, I assume that county boards of elections will process **and** send out the ballots within forty-eight hours of receipt. Whether this is possible, likely or impossible is apparently immaterial, since Secretary Boockvar, with knowledge of the capacities of the county boards of elections, recommended a three-day extension, so I assume that it accounted for this factor.

As required when remedying an as-applied constitutional defect, this remedy is the least disruptive to the enacted statutory scheme. The problem to be remedied here is that the seven-day period to complete the mail-in vote process has been rendered unworkable by the current extraordinary circumstances. I have no doubt that the statute was intended to accommodate the realities as they existed when Act 77 was enacted. It is unconstitutional as applied to the November 2020 general election because of current realities.

**\*40** For these reasons, in connection with the November 2020 general election only, the deadline for requesting a ballot should be moved to Friday, October 23, 2020.[4] The legislative choice of Election Day at 8:00 p.m. should remain intact.

4   To the extent that the non-severability clause in Section 11 of Act 77, 1 Pa.C.S. § 1925 is enforceable, I do not view the election specific remedies at issue here as-applied constitutional violation as triggering the draconian consequence. In the context of the COVID-19 pandemic, applying the non-severability provision to void Act 77 in its entirety would itself be unconstitutional, as it would disenfranchise a massive number of Pennsylvanians from the right to vote in the upcoming election.

More broadly, in *Stilp v. Commonwealth*, [588 Pa. 539], 905 A.2d 918, 978 ([Pa.] 2006), this Court declined to apply an identically worded non-severability provision, *id.* at 973, refusing to allow the General Assembly to "dictate the effect of a judicial finding that a provision in an act is 'invalid.' " *Id.* at 976. Here, as in *Stilp*, Act 77's boilerplate non-severability provision "sets forth no standard for measuring non-severability, but instead simply purports to dictate to the courts how they must decide severability." *Id.* at 973.

In summary, I agree with the Majority that the received-by date for ballot applications in light of the deadline for submission of ballots to the county boards of election is unworkable under current circumstances. I dissent from the invocation of equitable powers to craft a remedy. In my view, this issue should have been decided on the evidentiary record developed in *Crossey* based on the analytical framework for an as-applied challenge to the constitutionality of the statutory provisions as violative of Article 1, Section 5 of our Constitution, with the remedy crafted based upon the legislative intent in enacting the circumstantially defective statutes.


Chief Justice Saylor and Justice Mundy join Part II of this concurring and dissenting opinion.


Emergency Applications to Stay

JUSTICE MUNDY, dissenting

In my view, Intervenors[1] make a substantial case on the merits that this Court should stay the portion of our opinion extending the deadline for receipt of mail-in ballots past 8:00 p.m. on November 3, 2020, Election Day.[2] In *Pennsylvania Democratic Party v. Boockvar*, —— Pa. ——, —— A.3d ——, 2020 WL 5554644 (2020), a majority of this Court held that all mail-in ballots postmarked by 8:00 on Election Day, and received by 5:00 p.m. November 6, 2020, even those lacking a postmark or bearing an illegible postmark, would be counted. *Id.* at ——, 2020 WL 5554644, at *37. Without further explanation, the majority qualified that such ballots "will be presumed to have been mailed by Election Day unless a preponderance of the evidence demonstrates that it was mailed after Election Day." *Id.* The Republican Party of Pennsylvania Intervenors argue that virtually no evidence exists to overcome such a presumption, and "the Court's presumption opens the door to illegally and untimely cast or mailed ballots being counted in, and tainting the

results of, the imminent general election in which millions of Pennsylvanians will exercise their right to vote." Republican Party of Pennsylvania Application for Partial Stay at 4.

1   Intervenors refers to the Republican Party of Pennsylvania and Joseph B. Scarnati III, President Pro Tempore, Jake Corman, Majority Leader of the Pennsylvania Senate, Bryan Cutler, Speaker of the Pennsylvania House of Representatives, and Kerry Benninghoff, Majority Leader of the Pennsylvania House of Representatives.

2   A stay may be granted where Petitioners, "make a substantial case on the merits and show that without the stay, irreparable injury will be suffered. Additionally, before granting a request for a stay, the court must be satisfied the issuance of the stay will not substantially harm other interested parties in the proceedings and will not adversely affect the public interest." *Maritrans G.P., Inc. v. Pepper, Hamilton & Scheetz,* 573 A.2d 1001, 1003 (1990).

**\*41**  Intervenors assert that there is a substantial likelihood that they will be successful on the merits of the stay application and writ of certiorari to be filed in the United States Supreme Court. Citing to *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, —— U.S. ——, 140 S. Ct. 1205, 206 L.Ed.2d 452 (2020), Intervenors note that the United States Supreme Court stayed a judgment of a federal district Court in Wisconsin and held that "[e]xtending the date by which ballots may be cast by voters after the scheduled election day fundamentally alters the nature of the election." *Id.* at 1207. It is reasonable that the United States Supreme Court may view this Court's presumption regarding ballots lacking a postmark or bearing an illegible postmark in the same light. As a result, I would grant a stay to preserve the public confidence in the integrity of the upcoming election.


All Citations

238 A.3d 345, 2020 WL 5554644

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

N

Case 4:20-cv-02078-MWB Document 93-10 Filed 11/12/20 Page 220 of 279
Pennsylvania Democratic Party v. Republican Party of..., Not Reported in Fed....

2016 WL 6582659

2016 WL 6582659
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

PENNSYLVANIA
DEMOCRATIC PARTY, Plaintiff,
v.
REPUBLICAN PARTY OF
PENNSYLVANIA; Donald J. Trump
for President, Inc.; Roger J. Stone, Jr.;
and Stop the Steal Inc., Defendants.

Civ. No. 16-5664
|
Signed 11/07/2016

**Attorneys and Law Firms**

Dawn L. Smalls, Boies Schiller & Flexner LLP, New York, NY, Marc E. Elias, Perkins Coie LLP, Michael Julian Gottlieb, Boies Schiller & Flexner LLP, Washington, DC, Mark A. Aronchick, Hangley Aronchick Segal & Pudlin, Philadelphia, PA, for Plaintiff.

Rebecca L. Warren, Lawrence J. Tabas, Obermayer Rebmann Maxwell & Hippel LLP, Thomas C. Sullivan, Bruce S. Marks, Marks & Sokolov LLC, Philadelphia, PA, Matthew Bingham Banks, Banks Law Group, Wyomissing, PA, Chad A. Readler, Jones Day, Columbus, OH, Paul Rolf Jensen, Jensen & Associates, APC, Costa Mesa, CA, for Defendants.

**MEMORANDUM**

Diamond, District Judge

*1 On October 30, 2016, the Pennsylvania Democratic Party filed suit, asking me to enjoin the Pennsylvania Republican Party, Donald J. Trump for President, Inc., and others from illegally conspiring to suppress minority voting during the November 8 national election. Plaintiff relies upon newspaper and Internet stories, YouTube videos, unattributed reports, and judicial decisions—some decades old; others years, months, or weeks old. Remarkably, Plaintiff did not actually move for injunctive relief until Thursday, November 3, after I ordered it to do so. Plaintiff has not explained this delay, which has crippled Defendants' ability to respond, made

relief impracticable, and likely precluded appellate review of this Memorandum and Order before tomorrow's election. Moreover, Plaintiff has produced no evidence of any planned voter intimidation in this District. Finally, insofar as Plaintiff asks me to enjoin conduct that is already prohibited by criminal statutes, such an injunction is impermissible.

After considering all the Parties' submissions and their presentations at today's hearing, I conclude that because Plaintiff has not made the required "clear showing" of entitlement to the relief it seeks, I will deny its Motion.

**I. Procedural History**

Beginning on October 30, 2016, state Democratic parties have filed six identical lawsuits and claims for emergency injunctive relief against different state Republican parties, Donald J. Trump for President, Inc., Roger J. Stone, Jr., and Stop the Steal Inc., alleging imminent voter intimidation in violation of the Voting Rights Act of 1965 and the Civil Rights Act of 1871. (Doc. No. 1; see also No. 16-3752, Doc. No. 1 (D. Ariz. Oct. 31, 2016); No. 16-13924, Doc. No. 1 (E.D. Mich. Nov. 4, 2016); No. 16-2514, Doc. No. 1 (D. Nev. Oct. 30, 2016); No. 16-1288, Doc. No. 1 (M.D.N.C. Nov. 4, 2016); No. 16-2645, Doc. No. 1 (N.D. Ohio Oct. 30, 2016)); 52 U.S.C. § 10307(b); 42 U.S.C. § 1985(3).

On October 30, Plaintiff filed its Complaint here, seeking emergency declaratory and injunctive relief. (Doc. No. 1 ¶¶ 6, 16, 74, 80.) Oddly, it filed no motion for emergency relief, nor did it seek expedited discovery. On Wednesday, November 2, when Plaintiff still had filed no motion, I ordered Plaintiff to do so by November 3. (Doc. No. 10.) The next day, Plaintiff filed its Motion for a Temporary Restraining Order and/or Preliminary Injunction, but still did not seek expedited discovery. (Doc. No. 14.)

I gave Defendants only 24 hours to respond to Plaintiff's Motion. Accordingly, I received the RPP's Response, and the RPP and Trump Campaign's Joint Response, late on Friday, November 4. (Doc. Nos. 26, 41.) Over the weekend, Plaintiff filed a Reply, the Trump Campaign filed a sur-reply, and Plaintiff filed a sur-sur-reply. (Doc. Nos. 29, 30, 35.) The RPP has also moved to dismiss for failure to state a claim. (Doc. No. 31.) Plaintiff has filed proofs of service as to Mr. Stone and STS. (Doc. Nos. 15, 16, 33.) Counsel for Mr. Stone and STS appeared at today's hearing and argued that neither Defendant had been properly served. Counsel also filed a legal memorandum in which Mr. Stone and STS ask me to deny injunctive relief. (Doc. No. 42.)

**\*2** At the hearing I conducted earlier today, Plaintiff called two witnesses who, as I describe below, testified to little more than their dismay at Mr. Trump's statements and a concern that those statements might discourage minority voters.

The relief Plaintiff now seeks is a broad "obey-the-law" injunction. Plaintiff initially asked me to restrain and enjoin the RPP, the Trump Campaign, Mr. Stone, STS, "and those persons who are in active concert or participation with them" from:

a. Funding, encouraging, organizing or otherwise supporting, individuals who are not officially appointed poll watchers under Pennsylvania law to be present at or around polling places or voter lines to challenge, investigate, interfere, or otherwise act to prevent any person from voting, including but not limited to confronting potential voters and verifying their eligibility at the polls, distributing literature (and/or stating to) individuals that voter fraud is a crime, or describing the penalties under any State or Federal statute for impermissibly casting a ballot.

b. Monitoring polling places, or permitting, encouraging, or assisting individuals to monitor polling places, including but not limited to confronting potential voters and verifying their eligibility at the polls, distributing literature (and/or stating to) individuals that voter fraud is a crime, or describing the penalties under any State or Federal Statute for impermissibly casting a ballot, if the proposed monitor does not meet the statutory requirements for service as a poll watcher;

c. Gathering or loitering within ten (10) feet of a polling place, or permitting, encouraging, or assisting any individuals to gather or loiter within ten (10) feet of a polling place, unless such person is one of the identified poll watchers for each candidate or party who may be present in a polling place at any time;

d. Interrogating, interfering with, or verbally harassing voters or prospective voters, or training, organizing, or directing others to do the same, with the sole exception of questioning that is explicitly authorized by Pennsylvania law;

e. Following, taking photos of, or otherwise recording voters or prospective voters, those assisting voters or prospective voters, or their vehicles, or training, organizing, or directing others to do the same;

f. Recruiting, training, organizing, or deputizing any persons to question, voters at Pennsylvania polling locations under the guise of the purported "exit polling" or "citizen journalist" operations organized and encouraged by Defendants Stone and Stop the Steal;

g. Otherwise organizing efforts to engage in voter intimidation.

(Doc. No. 14-1.)

At 1:59 a.m. this morning, Plaintiff filed an Amended Proposed Order, asking me to restrain and enjoin Defendants from:

a. Blocking the entrance to the polling place;

b. Asking voters for documentation when none is required;

c. Disrupting voting lines inside and outside of the polling place;

d. Disseminating false or misleading election information;

e. Ostentatious showing of weapons at a polling place;

f. Photographing or videotaping voters to intimate [sic] them;

g. Frivolous challenges to voters that are made without a stated good faith basis;

h. Verbal or physical confrontation of voters by persons dressed in official-looking uniforms;

**\*3** i. Violence or using the threat of violence to interfere with a person's right to vote.

(Doc. No. 34.) Plaintiff also asks me to order Stone and STS to abide by and distribute guidelines that those Defendants have purportedly proposed. (See id. at 2.)

On November 4, the Ohio District Court granted what appeared to be a nationwide injunction prohibiting Defendants Trump Campaign, Mr. Stone, STS, as well as other non-party "individuals or groups, including groups associated with the Clinton for Presidency [sic] campaign," from violating the law. (Doc. No. 30-4.) But see Perez v. Ohio Bell Tel. Co., No. 15-3303, 2016 WL 3755795, at \*6 (6th Cir. July 14, 2016) ("The Supreme Court has warned against 'sweeping injunction[s] to obey the law' and has cautioned courts about their 'duty to avoid' such orders." (quoting Swift & Co. v. United States, 196 U.S. 375, 401 (1905))). Yesterday,

the Sixth Circuit stayed the injunction, finding that the District Court had abused its discretion because the plaintiff (the Ohio Democratic Party) had not demonstrated it was likely to succeed on the merits of its suit. (Doc. No. 30-5.)

On the same day the Ohio Court issued its injunction, the Arizona District Court denied all relief. (Doc. No. 30-3.) The Nevada District Court denied relief against Trump and the state Republicans, deferring a ruling on Mr. Stone and STS pending a hearing to be held this afternoon. (Doc. No. 30-2.)

Today, the Middle District of North Carolina held oral argument in the suit there. (See No. 16-1288, Doc. No. 7 (M.D.N.C. Nov. 5, 2016).) As of this writing, there has been no substantive activity in the Michigan case. (See No. 16-13924 (E.D. Mich.).)

Finally, sometime yesterday, Plaintiff subpoenaed RPP Chairman Rob Gleason—who resides some 240 miles away in Johnstown—to appear at the hearing this morning (the day before Election Day) and bring with him, *inter alia*, all Republican Party documents relating to its poll watching activities. Because the subpoena is vexatious and abusive, I granted the RPP's Motion to Quash earlier this morning. (See Doc. Nos. 32, 38.)

### II. Standing

Plaintiff alleges that it is "a state party organization affiliated with the [National] Democratic Party," and that it "works 'to elect Democrats from the top of the ticket on down' in local, county, state, and federal elections." (Doc. No. 1 ¶ 7 (citation omitted).) Defendants do not dispute that Plaintiff has standing to bring the instant suit, which is intended to protect the interests of both Democratic candidates running for office and Democratic voters. (Id. ¶ 14.) I agree that Plaintiff has standing to proceed. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992); Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc., 528 U.S. 167, 180 (2000); Warth v. Seldin, 422 U.S. 490, 511 (1975); Constitution Party of Pa. v. Aichele, 757 F.3d 347, 368 (3d Cir. 2014).

### III. Legal Standards

### A. Preliminary Injunction

Rule 65 authorizes me to issue the injunctive relief Plaintiff seeks. See Fed. R. Civ. P. 65(a). "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (quoting 11A Wright & Miller, Fed. Prac. & Proc. § 2948 (3d ed. Apr. 2016)). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008) (citations omitted). The moving party bears the "heavy burden" of showing that these elements weigh in favor of a preliminary injunction. Republican Party of Pa. v. Cortés, No. 16-5524, 2016 WL 6525409, at *4 (E.D. Pa. Nov. 3, 2016) (citing Ferring Pharms., Inc. v. Watson Pharms., Inc., 765 F.3d 205, 210 (3d Cir. 2014), and Punnett v. Carter, 621 F.2d 578, 588 (3d Cir. 1980)).

### B. Voting Rights Act of 1965

**\*4** Section 11(b) of this Act, as amended and codified, provides that "[n]o person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote." 52 U.S.C. § 10307(b); see also 28 U.S.C. § 1343(a)(4) (providing private cause of action "under any Act of Congress providing for the protection of civil rights, including the right to vote").

### C. Civil Rights Act of 1871

This Act, as amended and codified, provides that

if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States...the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).

### IV. Discussion

Case 4:20-cv-02078-MWB   Document 93-10   Filed 11/12/20   Page 223 of 279
Pennsylvania Democratic Party v. Republican Party of..., Not Reported in Fed....

2016 WL 6582659

As Judge Pappert recently stated in rejecting the RPP's belated request for Election Day injunctive relief: "There was no need for this judicial fire drill and Plaintiff[ ] offer[s] no reasonable explanation or justification for the harried process [it] created." Cortés, 2016 WL 6525409, at *4. The same situation obtains here. Plaintiff has not explained what it learned in the last month or even the last week that created emergent conditions. On the contrary, Plaintiff has long known of the acts and statements on which it bases its claims. For instance, Plaintiff emphasizes an inapposite 2004 Complaint and TRO filed against Senator John Thune, seeking to enforce the District of New Jersey's 1982 and 1987 Consent Orders. (Doc. Nos. 14-21, 14-23.) Plaintiff also points to purported voter intimidation by the Republican mayoral candidate during Philadelphia's 2003 election. (Doc. No. 14-19 at 7-8.) Plaintiff also offers comments ostensibly made by Mr. Trump going back to early August. (See, e.g., Doc. Nos. 14-9, 14-12).

During today's hearing, I repeatedly asked Plaintiff to explain its dilatory conduct and to identify any recent occurrence that compelled it to seek emergency relief so close to Election Day. Plaintiff was unable to do so. Significantly, Plaintiff has not alleged that Defendants have intimidated voters in the four states that allow early voting—Arizona, Nevada, North Carolina, and Ohio—where suits identical to the instant suit have been filed. Plaintiff has not explained why it filed its Emergency Motion only two business days before the election—again, only after I ordered it to do so. (See Doc. No. 10.) Nor has Plaintiff explained why it failed to seek expedited discovery, opting yesterday instead to subpoena Mr. Gleason and a cache of documents. Remarkably, during today's hearing, Plaintiff stated that it had not sought expedited discovery because it believed that Defendants would voluntarily produce all discoverable materials without being formally asked to do so.

Plaintiff's dilatory conduct "weighs decidedly against granting the extraordinary relief [it] seek[s]"—especially "where, as here, an election is looming." Cortés, 2016 WL 6525409, at *3 (citing United States v. City of Phila., No. 06-4592, 2006 WL 3922115, at *2 (E.D. Pa. Nov. 7, 2006) (citing in turn Purcell v. Gonzalez, 549 U.S. 1 (2006))); see also Crookston v. Johnson, No. 16-2490, 2016 WL 6311623, at *2 (6th Cir. Oct. 28, 2016) ("Call it what you will—laches, the *Purcell* principle, or common sense—the idea is that courts will not disrupt imminent elections absent a powerful reason for doing so."). The election will be underway in a matter of hours.

**\*5** Plaintiff's failure to take discovery has compelled it to rely almost entirely on media reports. Because the Federal Rules of Evidence do not strictly apply during preliminary injunction proceedings, I must exercise discretion in "weighing all the attendant factors, including the need for expedition, to assess whether, and to what extent, affidavits or other hearsay materials are appropriate given the character and objectives of the injunctive proceeding." Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 719 (3d Cir. 2004) (internal quotation marks and citation omitted).

The plaintiff seeking an injunction will typically support her request with an affidavit, verifying that the facts alleged are true and correct according to her best information, knowledge, and belief. See Fed. R. Civ. P. 65(b)(1)(A) (requiring "specific facts in an affidavit or a verified complaint [that] clearly show that immediate and irreparable injury, loss, or damage will result to the movant" for TRO); 11A Wright & Miller, Fed. Prac. & Proc. § 2949 (3d ed. Apr. 2016) ("Affidavits are appropriate on a preliminary-injunction motion and typically will be offered by both parties....All affidavits should state the facts supporting the litigant's position clearly and specifically." (footnote omitted)).

Plaintiff has produced its evidence in an Appendix comprising online newspaper articles and other reports and statements—almost all having nothing to do with this District. (See Doc. Nos. 14-6, 14-7, 14-9, 14-11, 14-12, 14-13, 14-14, 14-15, 14-16, 14-17, 14-18, 14-19, 14-20, 14-22, 14-24, 14-25, 14-27.) The Appendix is "verified" by one of Plaintiff's lawyers, who avers only that the exhibits are accurate copies. (See Doc. No. 14-3.) He says nothing about the truth of their content. (See id.)

I am thus compelled to base a ruling that could restrict Defendants' Election Day speech and conduct on media reports because Plaintiff has contrived to transform this litigation into a mad scramble. Although I could deny relief on this ground alone, given the importance of the voting rights Plaintiff alleges are threatened, I will consider all the Winter factors. See Cortés, 2016 WL 6525409, at *1 (citing unreasonable delay as a basis for denying injunctive relief); Smart Vent Prods., Inc. v. Crawl Space Door Sys., Inc., No. 13-5691, 2016 WL 4408818, at *12 (D.N.J. Aug. 16, 2016) (delay "knocks the bottom out of any claim of immediate and irreparable harm").

Case 4:20-cv-02078-MWB   Document 93-10   Filed 11/12/20   Page 224 of 279

Pennsylvania Democratic Party v. Republican Party of..., Not Reported in Fed....

2016 WL 6582659

## A. Likelihood of Success on the Merits

To make out this factor, "the plaintiff need only prove a *prima facie* case, not a certainty that he or she will win." Highmark, Inc. v. UPMC Health Plan, Inc., 276 F.3d 160, 173 (3d Cir. 2001). The Third Circuit has held that "a sufficient degree of success for a strong showing exists if there is a 'reasonable chance, or probability, of winning.' " In re Revel AC, Inc., 802 F.3d 558, 568-69 (3d Cir. 2015) (quoting Singer Mgmt. Consultants, Inc. v. Milgram, 650 F.3d 223, 229 (3d Cir. 2011) (en banc)). Plaintiff alleges that the Trump Campaign, Mr. Stone, STS, and the RPP "are conspiring to threaten, intimidate, and thereby prevent minority voters in urban neighborhoods from voting in the 2016 election." (Doc. No. 14-2 at 2.) Like the Arizona and Ohio Democratic Parties, Plaintiff here has not made the requisite "clear showing" that it will prevail on the merits of its claims.

To succeed on its Voting Rights Act claim, Plaintiff must show that Defendants acted or attempted "to intimidate, threaten, or coerce any person for voting or attempting to vote." 52 U.S.C. § 10307(b). To succeed on its Civil Rights Act claim, Plaintiff must show that Defendants conspired to do so. 42 U.S.C. § 1985(3). Plaintiff has not demonstrated a likelihood of succeeding on either claim.

**\*6** Plaintiff relies heavily on Defendants' alleged statements as reported in online newspaper articles. These statements were made in connection with the upcoming election. See Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 339 (2010) ("Speech is an essential mechanism of democracy....The First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office." (internal quotation marks and citations omitted)). Once again, virtually none of the statements were made in this District or suggested that any illegal activity would occur in this District. Moreover, as the Arizona District Court found, some of these statements are taken grossly out of context. (Doc. No. 30-3 at 16.) The same is true here. For example, Plaintiff opens its brief with the following claim:

> The stated goal of the Trump Campaign, as explained by an unnamed official to Bloomberg News on October 27, 2016, is to depress voter turnout, and particularly minority voter turnout—in the official's words: "We have three major voter suppression operations under way."

(Doc. No. 14-2 at 2 (quoting Doc. No. 14-11).) Plaintiff thus suggests that these "major voter suppression operations" are

targeted at intimidating minority voters. In context, however, it is clear that the "unnamed official" is plainly describing protected political activity:

> "We have three major voter suppression operations under way," says a senior official. They're aimed at three groups Clinton needs to win overwhelmingly: idealistic white liberals, young women, and African Americans. Trump's invocation at the debate of Clinton's WikiLeaks e-mails and support for the Trans-Pacific Partnership was designed to turn off Sanders supporters. The parade of women who say they were sexually assaulted by Bill Clinton or harassed or threatened by Hillary is meant to undermine her appeal to young women. And her 1996 suggestion that some African American males are "super predators" is the basis of a below-the-radar effort to discourage infrequent black voters from showing up at the polls—particularly in Florida.

(Doc. No. 14-11 at 6-7.) In context, these are not "suppression" efforts at all, and they do not appear designed to threaten or intimidate voters. Rather, they are coarse efforts to convince Secretary Clinton's likely supporters not to vote for her.

Plaintiff also points to the Trump Campaign's "signup form on its website for supporters to sign up to be 'Trump Election Observers' in order to stop 'Crooked Hillary From Rigging this Election.' " (Doc. No. 14-2 at 4 (quoting Doc. No. 14-5).) Plaintiff thus alleges that Mr. Trump is "further encouraging his supporters to join in a common plan to 'watch' voters in 'certain areas' of states like Pennsylvania for voter fraud." (Id.) Yet, Pennsylvania law allows poll watching, and Plaintiff has not shown that the poll watching proposed here will raise any impermissible activity. See Cortés, 2016 WL 6525409, at \*1-2 (describing the Pennsylvania Election Code's poll-watching provisions (citing 25 P.S. § 2687)). Indeed, Defendants point out that the Clinton campaign is engaged in the same exercise. (Doc. No. 41 at 11; see Join Victory Counsel, HillaryClinton.com, https://www.hillaryclinton.com/forms/protect-the-vote ("Volunteer to protect the vote as a poll observer this election cycle.") (last visited Nov. 7, 2016).

To show the "conspiracy" between Defendants RPP and Trump Campaign, Plaintiff offers an August 3, 2016 statement purportedly made by Governor Pence at a town hall event: "[T]he Trump campaign and the Republican National Committee are working very, very closely with state governments and secretaries of states all over the country to ensure ballot integrity." (Doc. No. 14-2 at 10 (quoting

Case 4:20-cv-02078-MWB   Document 93-10   Filed 11/12/20   Page 225 of 279

Pennsylvania Democratic Party v. Republican Party of..., Not Reported in Fed....

2016 WL 6582659

8-3 Replay: Pence Denver Rally Town Hall at 16:22-17:27, TrumpTube.tv, http://trumptube.tv/donald-trump-rally-speech-video/video/pence-live-stream-town-hall-8-3-16).)
Similarly, Plaintiff offers RPP Chairman Gleason's early-August statement to the Washington Post that he was "glad to hear" that Mr. Trump was becoming focused on voter fraud and "taking additional measures to recruit poll watchers in Philadelphia," as well as the RPP's now-unsuccessful effort to invalidate restrictions on Pennsylvania poll watchers. (Doc. No. 14-2 at 10-11 (citing Doc No. 14-9 and Complaint, Cortés, No. 16-5524, Doc. No. 1 (E.D. Pa. Oct. 21, 2016).) Assuming these purported statements accurately reflect actions that have actually been taken, no voter intimidation is even suggested. Once again, the Pennsylvania Election Code explicitly allows candidates and political parties to appoint poll watchers who "help 'guard the integrity of the vote.' " See Cortés, 2016 WL 6525409, at *1-2 (quoting Tiryak v. Jordan, 472 F. Supp. 822, 824 (E.D. Pa. 1979)); 25 P.S. § 2687.

*7  As to Mr. Stone and STS, Plaintiff alleges that they "are actively recruiting Trump supporters for 'exit polling,' specifically targeting nine Democratic-leaning cities with large minority populations, including Philadelphia." (Doc. No. 14-2 at 6 (citing Doc. No. 14-6).) Mr. Stone and STS have purportedly signed up 2822 volunteers to engage in "exit polling," including 150 volunteers in Pennsylvania. (Id.) Yet, it is not clear that STS is even operational. See Robert Kuniegel, Where Is the Training for Exit Polls[?], Stop the Steal (Oct. 29, 2016), https://stopthesteal.org/where-is-the-training-for-exit-polls ("I have no idea where this post is going or if anyone will see it. I suspect that no one will. I have 10 people that wish to do exit polling in Philly and have tried for one month to find a way to get assigned or trained."). In any event, "the act of exit polling...constitute[s] protected expressive speech" under the First Amendment. See PG Pub. Co. v. Aichele, 705 F.3d 91, 100-01 (3d Cir. 2013) (citing Daily Herald Co. v. Munro, 838 F.2d 380, 382 (9th Cir. 1988)); see also Daily Herald Co., 838 F.2d at 384 ("[E]xit polling constitutes speech protected by the First Amendment, not only in that the information disseminated based on the polls is speech, but also in that the process of obtaining the information requires a discussion between pollster and voter."). As the Arizona District Court concluded, exit polling is permissible even if it is not "scientific" and those conducting it are not professional pollsters. (See Doc. No. 30-3 at 19.)

Finally, Plaintiff alleges that the conspiracy to intimidate minority voters "reaches beyond the defendants," discussing

at length the activities of "white nationalist, alt-right, and militia movement groups" that have been "[e]nergized by Trump's candidacy." (See Doc. No. 14-2 at 11-12 (citing Doc. No. 14-25).) Unless it is psychic, Plaintiff has no idea who might have been "energized by" Mr. Trump. Plaintiff's heated suggestion does not even rise to the level of speculation.

In sum, Plaintiff has not shown that any Defendant has engaged or will engage in voter intimidation in this District, an essential element of both of Plaintiff's claims. Plaintiff has thus failed to demonstrate that it is likely to succeed on the merits of either claim.

## B. Likelihood of Irreparable Harm

I agree with Plaintiff that a violation of voting rights would work an irreparable harm for which there is no adequate remedy at law. See Council of Alt. Political Parties v. Hooks, 121 F.3d 876, 883 (3d Cir. 1997) (infringement on voting rights "cannot be alleviated after the election"). I also agree with Plaintiff that given this nation's troubled history, the federal courts must take special care to protect the voting rights of minority communities. As I have discussed, however, Plaintiff has not made out even the possibility—much less the likelihood—that Defendants will intimidate any voters in this District.

During today's hearing, Plaintiff called Reverend Mark Kelly Tyler of Mother Bethel A.M.E. Church and former Philadelphia Councilman Angel L. Ortiz. Neither witness knew of any actual voter intimidation efforts or of any voters who had actually been intimidated. Rather, both were concerned that Mr. Trump's statements "might" or "could" intimidate African-American or Latino voters. This is not proof of the likelihood of harm. See ECRI v. McGraw-Hill, Inc., 809 F.2d 223, 226 (3d Cir. 1987) ("Establishing a risk of irreparable harm is not enough. A plaintiff has the burden of proving a 'clear showing of immediate irreparable injury.' " (citation omitted)).

## C. Balance of Equities and the Public Interest

Because these factors are intertwined, I consider them together. To prevent unproven voter intimidation, Plaintiff asks me to curtail Defendants' right to free expression and speech. U.S. Const., amend. I; Citizens United, 558 U.S. at 326-27 ("Courts, too, are bound by the First Amendment...

2016 WL 6582659

[and] must give the benefit of any doubt to protecting rather than stifling speech." (internal quotation marks and citation omitted)); id. at 340 ("[P]olitical speech must prevail against laws that would suppress it, whether by design or inadvertence."). Yet, virtually all the minatory acts Plaintiff asks me to enjoin are already proscribed by criminal statutes, subject to severe punishment. See, e.g., 18 U.S.C. § 594 (actual or attempted intimidation, threats, or coercion in federal elections punishable by up to one year's imprisonment and a fine); 25 P.S. §§ 3527 (interference with election officials, blocking the entrance of a polling place, voter intimidation, various acts of voter fraud, and conspiracy punishable by up to seven years' imprisonment and a $15,000 fine), 3528 (voter intimidation at a polling place at which one is not entitled to vote punishable by up to seven years' imprisonment and a $15,000 fine), 3547 (use or threat of force or duress punishable by up to two years' imprisonment and a $5000 fine), 3552 (punishing any person convicted of willfully violating the Election Code with four years' disenfranchisement). Moreover, any coordinated efforts (much less a "conspiracy") between the Trump Campaign and STS would violate federal election law. See, e.g., 52 U.S.C. § 30116(a)(7); 26 U.S.C. § 527.

**\*8** The Supreme Court has long cautioned courts about their "duty to avoid" issuing "sweeping injunction[s] to obey the law." Swift & Co., 196 U.S. at 401; see also Belitskus v. Pizzingrilli, 343 F.3d 632, 650 (3d Cir. 2003) (injunction impermissibly "require[d] defendants 'to obey the law' in the future...a requirement with which they must comply regardless of the injunction" (quoting SEC v. Warren, 583 F.2d 115, 121 (3d Cir. 1978))). That admonition is especially apposite here, where the broad injunction Plaintiff seeks would itself curtail the constitutional rights of Defendants. For instance, Plaintiff asks me to enjoin Defendants from "disseminating false or misleading election information." (Doc. No. 34.) Virtually all "election information" could be deemed "false" or "misleading," depending on the beholder. The broad prohibition Plaintiff seeks could thus effectively silence Defendants' political speech on Election Day.

In these circumstances, the balance of equities and public interest factors weigh against the issuance of a preliminary injunction.

### V. Conclusion

Our Republic is premised on the right of its citizens to select their leaders. Had Plaintiff made any credible showing —much less the required clear showing—that Defendants intended to jeopardize that right, I would not hesitate to take immediate action. Plaintiff has made no such showing, however. Its belated, inflammatory allegations appear intended to generate only heat, not light. Presumably, that is why identical efforts have so far been rejected by the Arizona and Nevada District Courts and the Sixth Circuit. I will also deny Plaintiff's eleventh-hour request for emergency injunctive relief.

An appropriate Order follows.

### All Citations

Not Reported in Fed. Supp., 2016 WL 6582659

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.



2020 WL 6158309
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

PENNSYLVANIA VOTERS
ALLIANCE, et al., Plaintiffs,
v.
CENTRE COUNTY, et al., Defendants.

No. 4:20-CV-01761
|
Filed 10/21/2020

**Attorneys and Law Firms**

Jordan P. Shuber, Ronald T. Elliott, Thomas Eric Breth, Dillon McCandless King Coulter & Graham, LLP, Butler, PA, Erick G. Kaardal, Pro Hac Vice, Mohrman, Kaardal & Erickson, P.A., Minneapolis, MN, Thomas W. King, III, Dillon McCandless King Coulter & Graham LLP, Buter, PA, for Plaintiffs.

Elizabeth A. Dupuis, Babst Calland, State College, PA, Molly E. Meacham, Babst, Calland, Clements and Zomnir, P.C., Pittsburgh, PA, for Defendant Centre County.

Edward D. Rogers, Pro Hac Vice, Elizabeth Wingfield, Pro Hac Vice, Terence M. Grugan, Pro Hac Vice, Timothy D. Katsiff, Ballard Spahr LLP, Philadelphia, PA, for Defendant Delaware County.

Claire Ann Blewitt, Jerry R. Desiderato, Timothy James Ford, Dilworth Paxson LLP, Philadelphia, PA, for Defendant the City of Philadelphia.

Michele D. Hangley, Robert A. Wiygul, Hangley Aronchick Segal Pudlin& Schiller, Philadelphia, PA, Stephen Moniak, Pa Office of Attorney General, Harrisburg, PA, for Defendant Kathy Boockvar.

**MEMORANDUM OPINION**

Matthew W. Brann, United States District Judge

**I. BACKGROUND**

 **\*1** Plaintiffs filed this civil rights action to enjoin Centre County, Delaware County, and the City of Philadelphia (collectively "Defendants") from receiving election grants

from the Center of Tech and Civic Life ("CTCL").[1] Plaintiffs argue that these grants violate the Election and Equal Protection Clauses of the United States Constitution,[2] and that they are preempted by both the Constitution and federal law.[3]

[1]      Doc. 1. Plaintiffs have since amended their complaint and added Kathy Boockvar, in her capacity as Secretary of the Commonwealth of Pennsylvania, as a Defendant. Doc. 38 at ¶ 196.

[2]      *Id.* at ¶¶ 102-76.

[3]      *Id.* at ¶¶ 177-216. Specifically, Plaintiffs argue that these grants are preempted by the Elections Clause, the Supremacy Clause, the Help America Vote Act, and the National Voters Registration Act. *Id.*

**A. Plaintiffs**

Plaintiffs consist of the Pennsylvania Voters Alliance organization ("PVA") and fourteen individual registered voters who reside in Pennsylvania.[4] These fourteen individuals are residents of Centre County, Delaware County, and the City of Philadelphia.[5] They all generally oppose the election of "progressive" candidates in local, state, and federal elections.[6]

[4]      *Id.* at ¶¶ 4-18.

[5]      *Id.* at ¶¶ 5-18.

[6]      *Id.* Several Plaintiffs are members of the Pennsylvania House of Representatives and several are Republican candidates in the upcoming election. *Id.* at ¶¶ 5, 9-18. But because neither group asserts claims based on these statuses, they will be treated the same as the other individual Plaintiffs.

**B. CTCL and the CTCL Grants**

CTCL, a non-party to this action, is a nonpartisan, nonprofit organization formed in 2012 by a "team of civic technologists, trainers, researchers, election administration and data experts" to "foster a more informed and engaged democracy" and to help "modernize elections."[7] CTCL has designated $250,000,000 in grant money to be paid to election offices across the country "to help ensure that [these offices] have the staffing, training, and equipment necessary so this November every eligible voter can participate in a safe and timely way and have their vote counted."[8]

7      *Id.* at ¶ 44; Doc. 37 at 5.

8      Doc. 38 at ¶ 55.

These funds may be used for election-related expenses, including to: maintain in-person polling on election day; obtain personal protective equipment for election officials and voters; support drive-thru voting; publish reminders to voters to update their voter registration information; educate voters on election policies and procedure; recruit and hire poll workers; provide increased cleaning and sanitation at poll sites; train poll workers; expand in-person early voting sites; and deploy additional staff or technology to improve mail ballot processing.[9]

9      *Id.* at ¶ 59.

CTCL provides grant funds to any local election office that applies, and the final grant is calculated using nonpartisan criteria.[10] CTCL reports that over 1,100 local election administrators across the country have applied for CTCL grants, including eighteen counties within Pennsylvania, as well as the Pennsylvania Department of State.[11] Of these eighteen counties, eleven voted for Donald Trump over Hillary Clinton in the 2016 election, "and five did so by more than a two-to-one margin."[12]

10      Doc. 37 at 6.

11      *Id.*

12      *Id.*

  **\*2**  Nevertheless, Plaintiffs claim that CTCL provides funds only to regions that contain "demographics with overwhelmingly progressive voters."[13] Plaintiffs count Defendants among such regions, and note that for the 2016 presidential election, Hillary Clinton received 84.3% of the votes in Philadelphia, 61.58% of the votes in Delaware County, and 50.93% of the votes in Centre County.[14]

13      *Id.* at 17. Specifically, Plaintiffs contend that CTCL is "a progressive organization [that] targets urban counties and cities for its private federal election grants to turn out the progressive vote so [that] progressive candidates win." Doc. 38 at ¶ 53.

14      *Id.* at ¶¶ 72-74.

  **C. Procedural Posture**

The genesis of this action stems from Defendants' decision to accept funding from CTCL, allegedly without the consent of the United States Congress or the Commonwealth of Pennsylvania.[15] Each Defendant has accepted grant money from CTCL to varying degrees.[16] This money has been used to fund various election-related initiatives and to defray certain election-related expenses. For example, Defendants have used CTCL moneys to: purchase processing equipment for mail-in and absentee voting; create satellite election offices; install secure drop-boxes; pay for in-person voting expenses; and cover the cost of printing and postage.[17] All three counties have also received election grants under the Help America Vote Act ("HAVA") and the Coronavirus Aid, Relief, and Economic Securities Act, both of which are distributed by the Secretary of the Commonwealth of Pennsylvania.[18]

15      *Id.* at ¶¶ 79-83.

16      Philadelphia received $10,012,000, Delaware County received $2,200,000, and Centre County received $863,838. *Id.*; *see* Doc. 37 at 15-16.

17      Doc. 38-3.

18      Doc. 38 at ¶¶ 87-97.

Plaintiffs allege that Defendants' acceptance of the CTCL grants is unlawful for two reasons. First, they argue that any authority granted to the Defendants to receive these CTCL grants is preempted by the Elections Clause, the Supremacy Clause, HAVA, and the National Voters Registration Act.[19] And second, Plaintiffs claim that the grants directly violate the Pennsylvania Election Code, the Election Clause of the United States Constitution, and the Equal Protection Clause of the Fourteenth Amendment.[20] Specifically, Plaintiffs argue that the CTCL grants violate the Equal Protection Clause because only some counties chose to apply for them; thus resulting in those counties with CTCL funding having more money to spend on elections than those who chose to forgo applying.[21] It is this resultant inequity that Plaintiffs argue is unconstitutional.[22]

19      *Id.* at ¶¶ 102-76.

20      *Id.* at ¶¶ 176-217.

21      *Id.* at ¶¶ 211, 213.

22    *Id.* Plaintiffs' claims against Defendant Boockvar are premised on the alleged illegality of the CTCL grants. Plaintiffs argue that Boockvar is culpable because she permitted Defendants to accept the grants.

Plaintiffs have filed a motion for a temporary restraining order and preliminary injunction.[23] They contend that: they are likely to succeed on the merits of their claims; they will be irreparably harmed absent an injunction; there will be little to no harm to Defendants should an injunction issue; and the public interest weighs in favor of an injunction.[24]

23    Doc. 4.

24    Doc. 5.

Plaintiffs make sweeping constitutional claims. But there is less to this case than meets the eye. That is because, despite their assertions, Plaintiffs cannot satisfy the threshold standing requirement of Article III. The Court thus concludes that it cannot reach the merits of Plaintiffs' motion because they lack standing. Accordingly, the complaint will be dismissed without prejudice.[25]

25    *See Cottrell v. Alcon Labs.*, 874 F.3d 154, 164 n.7 (3d Cir. 2017) ("Because the absence of standing leaves the court without subject matter jurisdiction to reach a decision on the merits, dismissals 'with prejudice' for lack of standing are generally improper").

## II. DISCUSSION

**\*3**  "Article III of the United States Constitution limits the power of the federal judiciary to 'cases' and 'controversies.' "[26] "For a federal court to exercise jurisdiction under Article III, plaintiffs must allege—and eventually prove—that they hav[e] 'standing' to pursue their claims."[27] "The [United States] Supreme Court has repeatedly described the question of Article III standing as a 'threshold' issue."[28] "It is an 'irreducible constitutional minimum,' without which a court would not have jurisdiction to pass on the merits of the action."[29] "As a result, federal courts 'have an obligation to assure themselves of litigants' standing under Article III.' "[30] As the United States Court of Appeals for the Third Circuit has explained, the "continuing obligation to assure that [courts] have jurisdiction requires that [they] raise the issue of standing sua sponte."[31]

26    *Id.* at 161-62 (quoting U.S. Const. art. III).

27    *Id.*

28    *Wayne Land & Mineral Grp., LLC v. Delaware River Basin Comm'n*, 959 F.3d 569, 573-74 (3d Cir. 2020) (quoting *Va. House of Delegates v. Bethune-Hill*, —— U.S. ——, 139 S. Ct. 1945, 1951, 204 L.Ed.2d 305 (2019)).

29    *Id.* at 574 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

30    *Id.* (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006) (brackets omitted)).

31    *Id.* (brackets and ellipsis omitted).

"The plaintiff, 'as the party invoking federal jurisdiction,' bears the burden of establishing the minimal requirements of Article III standing: '(1) an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.' "[32] "In assessing whether a plaintiff has carried this burden, [courts must] separate [the] standing inquiry from any assessment of the merits of the plaintiff's claim."[33] "To maintain this fundamental separation between standing and merits at the dismissal stage, [courts] assume for the purposes of [the] standing inquiry that a plaintiff has stated valid legal claims."[34] "While [the Court's] standing inquiry may necessarily reference the nature and source of the claims asserted, [the Court's] focus remains on whether the plaintiff is the proper party to bring those claims."[35]

32    *Cottrell*, 874 F.3d at 162 (quoting *Spokeo, Inc. v. Robins*, —— U.S. ——, 136 S. Ct. 1540, 1547, 194 L.Ed.2d 635 (2016) (ellipsis omitted)).

33    *Id.*

34    *Id.*

35    *Id.* (brackets, citation, and internal quotation marks omitted).

Plaintiffs assert three theories of standing.[36] First, they argue that the CTCL grants disadvantage the Plaintiffs because they provide an advantage to progressive and Democrat candidates in the counties where Plaintiffs live and vote.[37] Second, they argue that, without injunctive relief, the CTCL grants will delegitimize and thus invalidate the elections, consequently resulting in Plaintiffs lacking political representation until the election can be re-done.[38] Third, Plaintiffs offer the

novel theory that they have suffered an injury as a third-party beneficiary to the "social contract" between the federal government and the individual States.[39]

36    Plaintiff PVA premises its associational standing on the standing of its members, the individual named Plaintiffs in this case. Doc. 39 at 4. Accordingly, the Court will analyze Plaintiffs' standing together. Similarly, because Plaintiffs base their theories of standing against all Defendants on the same injuries, the Court will analyze Plaintiffs' standing against the Defendants as a whole.

37    *Id.* at 5-7.

38    *Id.* at 7.

39    *Id.* at 9-10.

None of these theories are persuasive. Plaintiffs have not shown that they can satisfy any of the three elements of standing. That is, Plaintiffs have not shown that they will suffer an injury in fact, that any injury is fairly traceable to Defendants, or that any purported injury is likely to be redressable. Consequently, their complaint is dismissed.

### A. Injury in Fact

**\*4** Plaintiffs have not alleged an injury in fact sufficient to support standing. "To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent.' "[40] Plaintiffs' injuries lack particularity and imminence, and the Court accordingly dismisses this action for lack of standing.

40    *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149, 130 S.Ct. 2743, 177 L.Ed.2d 461 (2010)).

### 1. Particularity

All three of Plaintiffs' alleged injuries constitute generalized grievances and are thus insufficiently particularized to support standing. Limiting jurisdiction to those cases which are "personal and individual" to the party "ensures that courts exercise power that is judicial in nature."[41] Thus, the Supreme Court has made clear that "[a] federal court is not 'a forum for generalized grievances.' "[42] The Supreme Court defines generalized grievances as those "predicated upon an interest ... which is held in common by all members of the public."[43] As a result, the Supreme Court has repeatedly

rejected challenges to government action premised solely on an individual's general interest in ensuring that the law is followed.[44]

41    *Lance v. Coffman*, 549 U.S. 437, 441, 127 S.Ct. 1194, 167 L.Ed.2d 29 (2007).

42    *Gill v. Whitford*, ––– U.S. ––––, 183 S. Ct. 1916, 1929, 201 L.Ed.2d 313 (2018).

43    *Lance*, 549 U.S. at 441, 127 S.Ct. 1194.

44    *E.g., id.* at 442; *United States v. Richardson*, 418 U.S. 166, 176-77, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974); *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 220-21, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974).

In the voting rights context, the Supreme Court has "long recognized that a person's right to vote is individual and personal in nature."[45] But this right does not give plaintiffs carte blanche to challenge any action that conceivably infringes upon that right. For example, a mere violation of the Elections Clause, on its own, will not support standing because it constitutes a generalized grievance.[46] Nor will "statewide harm" to a voter's interest in "collective representation in the legislature" or in "influencing the legislature's overall 'composition and policymaking.' "[47] To the extent that the latter interest is recognized, it is "embodied in [an individual's] right to vote for [his or her] representative."[48]

45    *Lance*, 549 U.S. at 442, 127 S.Ct. 1194.

46    *Id.*

47    *Gill*, ––– U.S. at ––––, 138 S. Ct. at 1931.

48    *Id.*

In asserting their first theory of standing, Plaintiffs argue that Defendants, by accepting and using CTCL funding, have disadvantaged and wasted Plaintiffs' votes in the upcoming state and federal elections.[49] They claim that Defendants accepted CTCL funding "for the specific purpose to maintain, promote, or favor a historic specific demographic group that can influence the outcome of federal elections within the boundaries of those counties and city."[50] The general crux of this argument seems to be that Defendants' use of CTCL funding will improve voter turnout which in turn will make it more likely that progressive candidates will succeed in the upcoming election.

49    Doc. 39 at 6.

50    *Id.*

Importantly, however, Plaintiffs try to dodge the burden of articulating precisely which of their interests have been purportedly infringed. Despite citing their "right to vote," Plaintiffs do not allege that CTCL funding has actually been used to restrict that right. They do not argue that Defendants have used the CTCL funding to impede Plaintiffs' ability to vote or deny them the ability to effectively participate in the upcoming election. Moreover, Plaintiffs remain free to advocate on behalf of their preferred candidates and encourage others to vote.[51] Thus, Plaintiffs' appear to allege only that their right to vote has been infringed because it now might be more difficult for them to elect their preferred candidate.

51    Their efforts may even be more easily rewarded now that Defendants have taken additional steps to facilitate early and in-person voting.

**\*5** Plaintiffs' argument is unavailing because, at core, their claim is merely a generalized grievance. Though Plaintiffs have done a valiant job of disguising it, the only interest they have identified is of a general nature: that Plaintiffs ability to influence state and federal elections will be diluted if Defendants take steps that might result in increased voter turnout. This is not a legally cognizable injury under Article III. And it is "precisely the kind of undifferentiated, generalized grievance about the conduct of government that [the Supreme Court has] refused to countenance in the past."[52] The Court therefore finds Plaintiffs' first theory insufficient to support standing.

52    *Lance*, 549 U.S. at 442, 127 S.Ct. 1194.

Plaintiffs' second theory of standing also fails because it constitutes a generalized grievance. Plaintiffs argue that maintaining CTCL's grants to Defendants would result in Plaintiffs losing representation in their individual districts (because the election results would be subsequently invalidated). But the Court is not aware of any cases holding that the right to be politically represented is a legally cognizable interest under Article III. And the Court declines to expand standing doctrine in such a manner, especially given that any right to political representation would be one "held in common by all members" of the county.[53] This injury is not sufficiently particularized, and thus does not satisfy standing.

53    *Schlesinger*, 418 U.S. at 220, 94 S.Ct. 2925.

Finally, Plaintiffs' third theory of injury also constitutes a generalized grievance. They claim that there is a social contract between the federal government and the individual States, and that Plaintiffs, as citizens, are third-party beneficiaries to this contract. The general thrust of this argument is that Plaintiffs' interest as third-party beneficiaries are harmed whenever the government violates the Constitution, and that this injury is particularized enough to predicate standing.

The Court cannot accept this argument. To adopt Plaintiffs' conception of standing would be to reject the entirety of standing doctrine as it exists today. Under Plaintiffs' theory, any citizen of the United States would have standing to challenge any constitutional violation for any reason. This is simply not supported by precedent or doctrine.[54] And the Court declines to take such an expansive approach in this case.

54    *Lance*, 549 U.S. at 441, 127 S.Ct. 1194 (asserting only that the law has not been followed is insufficient to establish standing); *Richardson*, 418 U.S. at 176-77, 94 S.Ct. 2940 (holding that a federal taxpayer does not have standing to challenge certain CIA expenditures as a violation of the Constitution's Accounts Clause absent a showing that he suffered a particular injury); *Schlesinger*, 418 U.S. at 220, 94 S.Ct. 2925 ("[S]tanding to sue may not be predicated upon an interest of the kind alleged here which is held in common by all members of the public, because of the necessarily abstract nature of the injury all citizens share.").

## 2. Imminence

Even if Plaintiffs could establish that their first two theories state a particularized and concrete injury, the alleged injuries are far too speculative to support standing.[55] To show standing for an alleged future injury, a party must show that the injury is imminent.[56] "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending."[57] Standing thus cannot be predicated on a "highly attenuated chain of possibilities."[58] And courts should exercise caution when determining whether to

"endorse standing theories that rest on speculation about the decisions of independent actors."[59]

55     It is clear that Plaintiffs' "social contract" theory is too generalized to establish standing.

56     *Clapper*, 568 U.S. at 409, 133 S.Ct. 1138.

57     *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 565, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)) (emphasis in original).

58     *Id.* at 410, 133 S.Ct. 1138.

59     *Id.* at 414, 133 S.Ct. 1138.

 *6  Plaintiffs' theories of standing fail to show that any alleged injury is certainly impending because they rely on a highly attenuated causal chain of events. For example, both theories require the Court to assume that: (1) CTCL funding will result in higher voter turnout; (2) any higher voter turnout will be in support of progressive candidates; (3) the higher voter turnout will be significant enough to impact the outcome of the election; (4) this turnout will impact the election in favor of progressive candidates; and (5) regarding Plaintiffs' second theory, that a party will challenge the election if this Court does not grant Plaintiffs' motion and that challenge will result in the invalidation of the election results.

None of these assumptions are supported by the record. Defendants have used CTCL funding in a nonpartisan way to facilitate the upcoming election; they have spent the CTCL money to set up satellite election offices, offer dropboxes, and pay for various election-related expenses. Defendants have notably not attempted to use the CTCL funds to increase voter turnout by, for example, implementing get-out-the-vote efforts. There simply is no indication in the record that CTCL funds will increase voter turnout at all, which Plaintiffs allege is the root cause of their purported harm.[60]

60     It could be argued that safer, more efficient funding will increase voter turnout in these areas. However, it is equally likely that even without safe and efficient funding, voters in a presidential election—especially one that is viewed as highly consequential to both Republican and Democratic candidates—will still be motivated to turn out in the same numbers regardless of any risks associated with voting during a pandemic.

Further, nothing in the record suggests that, if Defendants' use of the CTCL funding does increase voter turnout, it will necessarily benefit progressive candidates. The implication

that increased voter turnout is inherently beneficial to progressive candidates is dubious at best.[61] And the Court finds this assumption far too dependent on the actions of tens, if not hundreds, of thousands of voters to premise standing. As a result, the Court finds that Plaintiffs' injuries are too speculative and not sufficiently imminent to support standing.

61     As the adage goes, "a rising tide lifts all boats." *Missouri v. Jenkins*, 515 U.S. 70, 102, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995).

   **B. Causation**

Plaintiffs also fail to establish that any alleged injury "is fairly traceable to the challenged conduct of the defendant."[62] In *Allen v. Wright*, the Supreme Court concluded that standing was absent where "[t]he links in the chain of causation between the challenged Government conduct and the asserted injury [we]re far too weak for the chain as a whole to sustain respondents' standing."[63] There, the plaintiffs challenged the Internal Revenue Service's grant of tax-exempt status to certain racially discriminatory schools, arguing that such tax-exempt status aided the schools in maintaining segregation and, accordingly, in harming their children by forcing them to attend segregated schools.[64]

62     *Cottrell*, 874 F.3d at 162.

63     *Allen v. Wright*, 468 U.S. 737, 759, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014).

64     *Id.* at 743-45, 104 S.Ct. 3315

Such alleged harm was "not fairly traceable to the Government conduct respondents challenge as unlawful" because there was no evidence that "there were enough racially discriminatory private schools receiving tax exemptions in respondents' communities for withdrawal of those exemptions to make an appreciable difference in public school integration."[65] The Supreme Court noted that it was unclear "how many racially discriminatory private schools [we]re in fact receiving tax exemptions," whether the withdrawal of tax-exempt status "from any particular school would lead the school to change its policies," "whether any given parent of a child attending such a private school would decide to transfer the child to public school as a result of any changes in educational or financial policy made by the private school once it was threatened with loss of

tax-exempt status," or "whether, in a particular community, a large enough number of the numerous relevant school officials and parents would reach decisions that collectively would have a significant impact on the racial composition of the public schools."[66]

65    *Id.* at 757-58, 104 S.Ct. 3315.

66    *Id.* at 758, 104 S.Ct. 3315.

**\*7** Ultimately, any alleged harm "involve[d] numerous third parties (officials of racially discriminatory schools receiving tax exemptions and the parents of children attending such schools) who may not even exist in respondents' communities and whose independent decisions may not collectively have a significant effect on the ability of public school students to receive a desegregated education."[67] Given that the harm was not directly traceable to the IRS, the Supreme Court concluded that plaintiffs did not have standing to pursue their claims.[68]

67    *Id.* at 759, 104 S.Ct. 3315.

68    *Id.* at 759-60, 104 S.Ct. 3315.

Here too, Plaintiffs' alleged harms result from a third-party and, thus, their alleged injuries are not fairly traceable to Defendants. The purported injuries here arise not from Defendants' acceptance of CTCL funds, but from CTCL's decision to allegedly direct those funds to counties with higher rates of progressive voters. Indeed, Plaintiffs make clear in their amended complaint that they are not harmed by the use of funds to secure a safer and more efficient election, but instead "are injured by CTCL's private federal election grants because they are targeted to counties and cities with progressive voter patterns."[69] Because Plaintiffs' injuries are not fairly traceable to Defendants' actions but, instead, to the actions of a non-defendant (CTCL), Plaintiffs do not have standing to pursue their claims in this action.[70]

69    Doc. 38 at 2.

70    *See Leeke v. Timmerman*, 454 U.S. 83, 86-87, 102 S.Ct. 69, 70 L.Ed.2d 65 (1981) (injury indirect insufficient to support standing because injury turned on the action of a prosecutor who was not a party not before the court); *Linda R.S. v. Richard D.*, 410 U.S. 614, 617-18, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973) (injury too indirect

to support standing where injury turned on the action of non-party actor).

**C. Redressability**

Lastly, the Court finds that standing is absent because Plaintiffs have not demonstrated that any purported harm is likely to be redressed by a favorable decision.[71] At bottom, Plaintiffs claim rests on supposition—their conclusion that safer and more efficient voting as a result of CTCL funds will necessarily lead to increased progressive voter turnout, thereby harming Plaintiffs' preferred conservative candidates.

71    *Cottrell*, 874 F.3d at 162.

However, as discussed above, there is no evidence that CTCL funds will result in an increase in voter participation. Indeed, a majority of the funding appears to be dedicated to assisting with the processing of mail-in voting and, thus, would appear likely to have no discernable effect on voter turnout. It appears then that the harm alleged by Plaintiffs would instead be caused by the number of progressive voters who may turn out to vote, not by additional funding that increases the safety and efficiency of the election in the Defendant counties. Consequently, simply forcing Defendants to return all CTCL funding is not likely to stem the harm of which Plaintiffs complain, as those voters may still turn out regardless of whether or not Defendants keep or return the CTCL grant.

It is therefore "entirely conjectural whether the ... activity that affects respondents will be altered or affected by" the Court blocking Defendants from using CTCL funding.[72] Because Plaintiffs' alleged injuries stem from the actions of voters, not Defendants, their claims are not redressable and the Court finds that they lack standing.

72    *Lujan*, 504 U.S. at 571, 112 S.Ct. 2130.

**III. CONCLUSION**

In accordance with the above discussion, Plaintiffs' complaint will be dismissed without prejudice for lack of standing.

**\*8** An appropriate Order follows.

**All Citations**

--- F.Supp.3d ----, 2020 WL 6158309

**Pennsylvania Voters Alliance v. Centre County, --- F.Supp.3d ---- (2020)**

2020 WL 6158309

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

P

2020 WL 4680151
Only the Westlaw citation is currently available.
Supreme Court of the United States.

REPUBLICAN NATIONAL
COMMITTEE, et al., Applicants,

v.

COMMON CAUSE RHODE ISLAND, et al.

No. 20A28.
|
August 13, 2020

**Opinion**

**\*1** Application for stay presented to Justice Breyer and by him referred to the Court denied. Unlike *Merrill v. People*

*First of Alabama,* 591 U.S. ——, —— S.Ct. ——, —— L.Ed.2d ——, 2020 WL 3604049 (2020), and other similar cases where a State defends its own law, here the state election officials support the challenged decree, and no state official has expressed opposition. Under this circumstances, the applicants lack a cognizable interest in the State's ability to "enforce its duly enacted" laws. *Abbott v. Perez,* 585 U.S. ——, —— n. 17, 138 S.Ct. 2305, 201 L.Ed.2d 714 (2018). The status quo is one in which the challenged requirement has not been in effect, given the rules used in Rhode Island's last election, and many Rhode Island voters may well hold that belief. Justice Thomas, Justice Alito, and Justice Gorsuch would grant the application.

**All Citations**

--- S.Ct. ----, 2020 WL 4680151 (Mem)

---

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Q

2013 WL 842946
District Court of the Virgin
Islands, Division of St. Croix

Norma Pickard SAMUEL, Individually and
as a St. Thomas Candidate for Delegate
to Congress, Wilma Marsh–Monsanto,
individually and as a St. Thomas candidate
for Senate–at–Large, Lawrence Olive,
individually and as a St. Thomas Candidate
for the 30th Legislature, Diane Magras,
Individually and as a St. Thomas candidate
for Board of Elections, and Harriet
Mercer, individually and as a St. Thomas
Candidate for Board of Elections, Plaintiffs,
v.
VIRGIN ISLANDS JOINT BOARD OF
ELECTIONS, St. Croix Board of Elections,
St. Thomas–St. John Board of Elections,
John Abramson, Jr., as supervisor of
Elections, Rupert Ross, Jr., as chairman
of the St. Croix Board of Elections, Alecia
Wells, as chairwoman of the St. Thomas–
St. John Board of Elections, Defendants.

Civil No.2012–0094
|
March 7, 2013

**Attorneys and Law Firms**

Norma Pickard Samuel, Pro Se, St. Thomas, U.S.V.I.

Wilma Marsh–Monsanto, Pro Se, St. Thomas, U.S.V.I.

Lawrence Olive, Pro Se, St. Thomas, U.S.V.I.

Diane Magras, Pro Se, St. Thomas, U.S.V.I.

Harriet Mercer, Pro Se, St. Thomas, U.S.V.I.

Tamika M. Archer, Esq. Ariel Smith–Francois, Esq., St. Thomas, U.S.V.I., For the Defendants

**MEMORANDUM OPINION**

Finch, Senior Judge

**\*1** THIS MATTER comes before the Court on Defendants' Motion to Dismiss, filed on January 18, 2013. (Dkt. No. 84). In their motion, Defendants argue that this case should be dismissed on numerous grounds, including lack of standing, failure to state a claim, and laches. Plaintiffs, proceeding *pro se,* have opposed the motion. (Dkt. No. 86). For the reasons that follow, the Court grants Defendants' motion and dismisses the Amended Complaint.

**BACKGROUND**

On December 11, 2012, Plaintiffs Norma Pickard–Samuel, Wilma Marsh–Monsanto, Lawrence Olive, Diane Magras, and Harriet Mercer filed a Complaint pursuant to 42 U.S.C. § 1983 and other statutes in which they sought, *inter alia,* to decertify the November 6, 2012 general election in the Virgin Islands. (Dkt. No. 1). They filed an Amended Complaint on December 21, 2012, which also contained an "Application for a Temporary Restraining Order, Injunctive Relief, Mandamus Relief, Declaratory Judgment and Costs." (Dkt. No. 33).

As set forth in the Amended Complaint, Plaintiff Norma Pickard–Samuel was a federal candidate for the territory-wide position of Delegate to Congress in the November 2012 elections; Plaintiff Wilma Marsh–Monsanto was a candidate for the territory-wide position of Senator–at–Large; Plaintiff Lawrence Olive was a candidate for the St. Thomas District position as Senator for the 30th Legislature; and Plaintiffs Diane Magras and Harriet Mercer were candidates for the St. Thomas/St. John District Board of Elections. (Dkt. No. 33, ¶¶ 7–11). Plaintiffs were not elected in the November 2012 election. Plaintiffs claimed that Defendants—the Virgin Islands Joint Board of Elections; the St. Croix Board of Elections; the St. Thomas–St. John Board of Elections; John Abramson, Jr., Supervisor of Elections; Rupert Ross, Jr., Chairman of the St. Croix Board of Elections; and Alecia Wells, Chairwoman of the St. Thomas–St. John Board of Elections—have not addressed their election-related concerns and complaints, and had violated various federal and local laws which cast the results of the election in doubt. Plaintiffs also sought a temporary restraining order and a preliminary

2013 WL 842946

injunction to enjoin the January 2013 swearing in of the Virgin Islands' officials elected in November 2012.

The procedural background in this case was set forth in the Court's January 6, 2013 Memorandum Opinion denying a preliminary injunction:

> Plaintiffs' twenty-one page Amended Complaint contains a number of general factual allegations that can be roughly divided into eight categories: (1) Defendants have ignored admonishments by the District Court and the Superior Court of the Virgin Islands contained in *Bryan v. Todman,* 1993 U.S Dist. LEXIS 21461 (D.V.I. Oct. 29, 1993) and *St. Thomas–St. John Bd. of Elections v. Daniel,* 2007 WL 4901116 (V.I. Sept. 17, 2007), [Dkt. No. 33] ¶ 25; (2) Defendants have failed to enforce the Uniformed and Overseas Citizens Absentee Voting Act, amended by the Military & Overseas Voter Empowerment Act, *id.* ¶ 26; (3) On occasions in 2001, 2003, and 2006, Defendant Abramson acted in a manner that has exposed or could expose the election system to compromise, *id.* ¶ 27; (4) Defendants have misrepresented the "true status of electronic voting machine certification" between 2010 and 2012 when, *inter alia,* Defendant Abramson stated that the Virgin Island voting machines were federally certified by the Election Assistance Commission ("EAC") when they were not, *id.* ¶ 28; (5) various individuals, including Plaintiff Marsh–Monsanto, made written requests for "election intervention and audit pertaining to the integrity and security of the Election System and Boards of Elections" from 2009 to 2012, *id.* ¶ 30; (6) Plaintiffs submitted correspondence to the Virgin Islands Attorney General and United States Attorney challenging the 2012 primary election process, which were neither officially acknowledged, acted upon "fully and impartially, nor resolved to the satisfaction of the plaintiffs," *id.* ¶¶ 31, 32; (7) between August and November 2012, "a number of candidates" and others submitted correspondence and inquiries to the Boards of Elections expressing serious concerns about the primary election; a person filed a complaint for a recount, which was granted but did not strictly conform to the statute; an unnamed person challenged the certification of the primary election; Plaintiff Pickard–Samuel submitted a letter to the Attorney General and U.S. Attorney concerning the use of non–EAC certified voting machines in the general election, in contravention of the Help America Vote Act of 2002 ("HAVA"), 116 Stat. 1666, 42 U.S.C. § 15301 *et seq.,* which she felt would negatively impact her election bid; a person challenged the Attorney General's announcement

that his office would conduct an investigation into the 2012 general election, documenting a conflict of interest. According to Plaintiffs, all of this correspondence was ignored. *Id.* ¶¶ 33–44; and (8) Plaintiffs hand-delivered petitions for recount concerning the general election to the St. Thomas/St. John Elections Office "alleging a wide variety of substantiated election-related complaints," including fraud, resulting in "the public's diminished trust and confidence in the Election System," and they believe they are entitled to a new election because Defendants failed to establish a quorum at the meeting where they decided the recount issue, as required by 18 V.I.C. §§ 629(b) and (c). *Id.* ¶¶ 45, 46.

> **\*2** Based on these allegations, Plaintiffs contend that Defendants have infringed on "voters' fundamental right to vote, fair and transparent elections and to equal protection"; they will be "severely burdened in exercising their due process right" to have their election challenges decided; and the legitimacy of the general election results, in terms of vote tabulation and certification are in doubt, as the tabulation is "independently unverifiable and indeterminable." *Id.* ¶¶ 48–50. They do not specifically explain how their constitutional rights have been violated.

> Plaintiffs assert that Defendants, acting under color of law, have administered the election in a manner inconsistent with federal and local election law, violating 42 U.S.C. § 1983, and seek decertification of the general election and a new election. *Id.* ¶¶ 52–53. They request that Defendants be enjoined from conducting the January 8, 2013 swearing-in ceremony of all candidates. They also request that the Court declare that: (1) Defendants' denial of petitions for recount by lack of quorum violates their due process rights; (2) Defendants have violated 18 V.I.C. §§ 629(b) and (c); (3) the 2012 general election is null and void, order the Boards of Elections to decertify the election, and issue an order to conduct the new election on a one-page paper ballot. *Id.* pp. 19–20.

*Samuel v. Virgin Islands Joint Bd. of Elections,* 2013 WL 106686, at \*2 (Jan. 6, 2013) (footnote omitted).

The Court issued an Amended Order denying Plaintiffs' petition for a temporary restraining order on January 2, 2013 (Dkt. No. 69), and later denied Plaintiff's motion for reconsideration of that Order. (Dkt. No. 83). On January 4, 2013, the Court held a hearing on Plaintiffs' motion for a preliminary injunction, and denied the motion in a Memorandum Opinion issued on January 6, 2013. (Dkt. No. 76). Plaintiffs filed a "Motion to Reconsider and Alter

Judgment" on January 11, 2013, in which they asked the Court to reconsider its denial of their request for a preliminary injunction. (Dkt. No. 81). The Court denied that motion on February 1, 2013. (Dkt. No. 87). On February 4, 2013, the Court denied Plaintiffs' motion to stay proceedings in this case while the motion to reconsider the denial of the preliminary injunction was pending. (Dkt. No. 88).

On January 18, 2013, Defendants filed the instant Motion to Dismiss. (Dkt. No. 84, 85). Plaintiffs opposed the motion (Dkt. No. 86), and Defendants filed a reply brief. (Dkt. No. 89). The matter is now ripe for disposition.

## *DISCUSSION*

### A. Standard of Review

In deciding a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny,* 515 F.3d 224, 231 (3d Cir.2008) (quoting *Pinker v. Roche Holdings Ltd.,* 292 F.3d 361, 374 n.7 (3d Cir.2002)). To withstand a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "After *Iqbal,* it is clear that conclusory or 'bare-bones' allegations will no longer survive a motion to dismiss: 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' " *Fowler v. UPMC Shadyside,* 578 F.3d 203, 210 (3d Cir.2009) (quoting *Iqbal,* 129 S.Ct. at 1949)). Therefore,

**\*3** after *Iqbal,* when presented with a motion to dismiss for failure to state a claim, district courts should conduct a two-part analysis. First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. [*Iqbal,* 129 S.Ct. at 1949]. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." *Id.* at 1950. In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to "show" such an entitlement with its facts. *See Phillips [v. Cnty. of Allegheny],* 515 F.3d 224, 234–35 [3d Cir.2008].

*Id.* at 210–211. In adjudicating a motion to dismiss, the Court may consider certain narrowly-defined types of materials without converting the motion to a summary judgment motion, including items that are integral to or explicitly relied on in the complaint." *Rockefeller Ctr. Properties, Inc. Sec. Litig.,* 184 F.3d 280, 287 (3d Cir.1999).

### B. Standing: The § 1983 Causes of Action

Defendants contend that Plaintiffs lack standing to bring this case because Plaintiffs have not alleged any facts that would tend to establish that they suffered a concrete or actual injury caused by Defendants' actions that can be redressed in this action. According to Defendants, because Plaintiffs' injuries are at best conjectural, and they claim no particularized harm to themselves, they do not have standing that would allow this Court to exercise jurisdiction over Plaintiffs' claims. (Dkt. No. 85 at 7–8). Plaintiffs have not addressed the standing issue regarding their § 1983 cause of action in their opposition to the motion to dismiss. Because standing implicates the Court's subject matter jurisdiction over a case, the Court will address this issue first. *See Adams v. Ford Motor Co.,* 653 F.3d 299, 304 (3d Cir.2011) ( "As in all cases, we must first address the issue of standing because '[i]f plaintiffs do not possess Article III standing, ... the District Court ... lack [s] subject matter jurisdiction to address the merits of plaintiff's case.' ") (quoting *ACLU–NJ v. Twp. of Wall,* 246 F.3d 258, 261 (3d Cir.2001)).[1]

1        "A motion to dismiss for want of standing is ... properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter." *Ballentine v. United States,* 486 F.3d 806, 810 (3d Cir.2007).

Article III of the Constitution limits federal courts' jurisdiction to "Cases" and "Controversies." As the Supreme Court has explained, "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 341 (2006) (internal quotation marks omitted). "One element of the case-or-controversy requirement" is that plaintiffs "must establish that they have standing to sue." *Raines v. Byrd,* 521 U.S. 811, 818 (1997). "The 'irreducible constitutional minimum' of Article III standing consists of three elements." *Toll Bros., Inc. v. Twp. of Readington,* 555 F.3d 131, 137 (3d Cir.2009) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992)). "First, the plaintiff must have suffered a 'concrete,' 'particularized' injury-in-fact, which must be 'actual or

imminent, not conjectural or hypothetical.' Second, that injury must be 'fairly traceable to the challenged action of the defendant.' Third, the plaintiff must establish that a favorable decision likely would redress the injury." *Id.* at 137–38 (citations omitted). While "all three of these elements are constitutionally mandated, the injury-in-fact element is often determinative. Under it, the plaintiff must suffer a palpable and distinct harm. That harm must affect the plaintiff in a personal and individual way." *Id.* at 138 (citations and internal quotation marks omitted). In addition, even though the "injury can be widely shared," it must "nonetheless be concrete enough to distinguish the interest of the plaintiff from the generalized and undifferentiated interest every citizen has in good government." *Id.*

**\*4** The Court has parsed Plaintiffs' Amended Complaint for allegations of injury they alleged they have suffered. In addition to allegations that Defendants have "consistently misrepresented and misle[ ]d the true status of electronic voting machine certification" (Dkt. No. 33, ¶ 28), and that Defendants did not respond to, or did not fully act upon, Plaintiffs' concerns about the validity of vote tabulation and election certification (*id.,* ¶¶ 31–40), the focus of Plaintiffs' allegations of injury (stated in the context of irreparable harm) is that

> Plaintiffs believe defendants have infringed on voters' fundamental right to vote, fair and transparent elections and to equal protection. It is anticipated that voters or other candidates will be similarly aggrieved by defendants' actions in the future absent injunctive relief. The aggrieved plaintiffs have standing in their individual capacity, but neither the claims asserted nor the relief requested herein requires the participation of the Plaintiffs to vindicate their individual rights. The actual and threatened injuries suffered by the plaintiffs have been and will continue to be suffered by thousands of Virgin Island citizens absent injunctive relief.

> Plaintiffs believe[ ] that, absent injunctive relief, they and other candidates and voters will continue to be disenfranchised or severely burdened in exercising their due process right to have their election concerns, complaints and challenges lawfully acknowledged, vetted, and fully and impartially decided due to the collusionary practices, derelict and negligent misconduct of oath-sworn government and elected officials.

> The outcome of the vote tabulation is independently unverifiable and indeterminable as an accurate metric

that reflects the will of the voter. The overall process suggests the Plaintiffs were denied, and continue to be denied, due process, and the election process may have been deliberately left open to compromise and vulnerabilities exploited, thus yielding disbelievable vote outcomes and irreparably harming plaintiffs, voters and future candidates of the U.S. Virgin Islands through coercion and disenfranchisement.

(*Id.,* ¶¶ 48–50).

In its Memorandum Opinion denying Plaintiffs' request for a preliminary injunction, the Court considered whether Plaintiffs suffered irreparable harm (*i.e.,* injury). The Court wrote that Plaintiffs'

> allegation of irreparable harm is based on systemic allegations of a compromised voting system, but Plaintiffs do not elucidate how *they* were irreparably harmed, or how such harm is imminent. *See Chester ex rel. NLRB v. Grane Healthcare Co.,* 666 F.3d 87, 89 (3d Cir.2011) (observing that the threat of irreparable harm must be "imminent."). They do not allege, for example, that but for the operation of the voting machines or some miscounting of the votes, or but for the various responses or non-responses of Defendants to their concerns, they would have been elected, or they were otherwise injured, and why whatever injury is would be addressed by decertifying the election results. *See Golden,* 2005 WL 6106401 at \*3. *Samuel,* 2013 WL 106686, at \*8. This reasoning applies to the issue of standing as well, as Plaintiffs must show that they have suffered injury-in-fact. They have not done so with regard to their 42 U.S.C. § 1983 due process and equal protection claims.

As indicated above, an injury for standing purposes may be widely shared; however, it must "nonetheless be concrete enough to distinguish the interest of the plaintiff from the generalized and undifferentiated interest every citizen has in good government." *Toll Bros., Inc.,* 555 F.3d at 138. Plaintiffs' allegations do not distinguish their concerns—about the use of certain voting machines in the election or the election results in general—from concerns of other voters or even other candidates. In fact, they make a point that their injuries are completely aligned with local voters when they allege that "[t]he actual and threatened injuries suffered by the plaintiffs have been and will continue to be suffered by thousands of Virgin Island citizens absent injunctive relief." (Dkt. No. 33 at ¶ 50); *see also id.* (the election results will "harm[ ] plaintiffs, voters and future candidates of the U.S. Virgin Islands through coercion and disenfranchisement."); (*id.,* ¶

48) ("[N]either the claims asserted nor the relief requested herein requires the participation of the Plaintiffs to vindicate their individual rights."). At best, Plaintiffs allege "a type of institutional injury"—use of improper voting machines —"which necessarily damages" all Virgin Islands voters "equally." *Raines,* 521 U.S. at 821; *see also Lujan,* 504 U.S. at 573–74 (explaining that the Supreme Court has "consistently held that a plaintiff ... seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy.").

**\*5** Moreover, Plaintiffs "do not claim that they have been deprived of something to which they personally are entitled"—such as election to the various positions they sought. They do not claim a loss of "any private right, which would make the injury more concrete." *Id.* The injuries about which Plaintiffs complain are phrased conjecturally: Plaintiffs "believe" they and Virgin Islands voters have suffered injury or that the election process "may have been" left open to compromise (Dkt. No. 33, ¶¶ 48–50); they are phrased generally, as amorphous due process claims, without requisite concreteness; and they are phrased as ongoing claims that will harm voters in the future, without the requisite imminence. Although Plaintiffs "believe" Defendants have infringed on "voters' fundamental right to vote, fair and transparent elections and to equal protection," (Dkt. No. 33 at 17), these are conclusory allegations without factual support. For example, Plaintiffs do not explain what actually occurred during the November 2012 election that would show that the results did not reflect the will of the voters, how those vague injuries took place, or how a failure to use EAC–certified machines may have caused such injuries.

In short, Plaintiffs have not alleged how their due process or equal protection rights were violated by Defendants' actions. As a result, they have "not alleged a sufficiently personal injury to establish standing [.]" *Lavergne v. Bryson,* 2012 WL 4127268, at \*2 (3d Cir. Sept. 20, 2012) (citing *Schaffer v. Clinton,* 240 F.3d 878, 885 (10th Cir.2001)). Accordingly, Plaintiffs' 42 U.S.C. § 1983 claims must be dismissed on standing grounds for failure to allege an injury-in-fact.[2]

---

[2]   Even if Plaintiffs had established standing under § 1983 for their equal protection and due process claims, the Court would dismiss that cause of action for failure to state a claim. In order to state an equal protection claim, Plaintiffs must establish that they are similarly situated to other persons, and that there was no rational reason for the differential treatment of similarly situated persons.

*Congregation Kol Ami v. Abington Twp.,* 309 F.3d 120, 136–37 (3d Cir.2002). The Amended Complaint is bereft of any reference that Plaintiffs may have been treated differently than people who were similarly-situated. For example, Plaintiffs did not articulate how their right to vote was interfered with or impinged to such an extent that it amounted to a constitutional violation by not participating on an equal basis with other—unnamed—citizens, or how election officials treated them differently from other people.

In terms of Plaintiffs' due process allegations, "[i]t is well established that the Due Process Clause contains both a procedural and substantive component." *Am. Express Travel Related Servs., Inc. v. Sidamon–Eristoff,* 669 F.3d 359, 366 (3d Cir.2012). To establish a procedural due process claim, "a plaintiff must demonstrate that '(1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of life, liberty, or property, and (2) the procedures available to him did not provide due process of law.' " *Iles v. de Jongh,* 638 F.3d 169, 173 (3d Cir.2011) (quoting *Biliski v. Red Clay Consol. Sch. Dist. Bd. of Educ.,* 574 F.3d 214, 219 (3d Cir.2009)). To establish a substantive due process claim, a plaintiff must establish that an election was "conducted in a manner that is fundamentally unfair." *Montgomery Cnty. v. Microvote Corp.,* 2000 WL 134708, at \*4 n.3 (E.D.Pa. Feb. 3, 2000). Plaintiffs allege, in general, that the November 2012 election suffered from certain irregularities—in particular, the fact that the voting machines were not EAC–certified, that the election was subverted by "fraud, corruption, and mistake," and that the public has "diminished trust and confidence in the Election System, its processes, instruments, officials, and vote outcomes." (Dkt. No. 33 at 16). None of these allegations rise to the level of widespread fraud—fundamental unfairness —establishing a substantive due process claim and requiring the invalidation of the election. Plaintiffs have not alleged, for example, that the voting machine irregularities were so pervasive that they affected the outcome of the election. As far as procedural due process, while "[t]he right to vote—to the extent it exists and an individual has been deprived of it—is certainly a protected liberty interest," Plaintiffs have not alleged that they were personally deprived of that right, or make any other representation that they suffered a constitutional deprivation of life, liberty or property. *Barefoot v. City of Wilmington, N.C.,* 37 F. App'x 626, 635 n.5 (4th Cir.2002). The only deprivation they assert is a general lack of confidence in the election system, which simply does not rise to the level of a life, liberty, or property interest protected

by the Fourteenth Amendment. They also have no constitutional right to have their election concerns and complaints, conveyed in various writings over the years, fully and impartially decided. In sum, Plaintiffs have not stated a claim under § 1983.

### C. Whether Plaintiffs Have Stated a Claim Under the Help America Vote Act (HAVA)

**\*6** Plaintiffs' claims fail on other grounds as well. It is well-established that " 'a plaintiff must demonstrate standing for each claim he seeks to press' and 'for each form of relief that is sought.' " *Davis v. Fed. Election Comm'n,* 554 U.S. 724, 734 (2008) (quoting *DaimlerChrysler Corp.,* 547 U.S. at 352)). Defendants contest whether Plaintiffs have stated a cognizable claim under the Help America Vote Act of 2002 ("HAVA"), Pub.L. 107–252, 116 Stat. 1666, 42 U.S.C. §§ 15301–15545, because HAVA does not permit Plaintiffs to file a private cause of action. A failure to allege statutory standing is analyzed in the context of failure to state a claim rather than lack of subject matter jurisdiction. *See In re Century Aluminum Co. Sec. Litig.,* __ F.3d __, 2013 WL 11887, at \*4 (9th Cir. Jan. 2, 2013) ("Failure to allege statutory standing results in failure to state a claim on which relief can be granted, not the absence of subject matter jurisdiction.") (citing cases).

Plaintiffs' HAVA–related allegations are found in paragraphs 18, 20, 21, and 41 of the Amended Complaint. Plaintiffs allege that Defendants are required to act in accordance with HAVA concerning the conduct of "elections containing a federal candidate on the ballot"; that HAVA requires jurisdictions that use paper ballot voting systems, punch card voting systems, or a central count voting system to provide, *inter alia,* voter education on how to use the systems and a record that can be audited; Virgin Islands law mandates only EAC–certified voting machines, as required by HAVA, to be used in general and special elections; and Plaintiff Samuel expressed her concerns in a November 2011 letter to the Virgin Islands Attorney General and United States Attorney that non–EAC voting machines would be used in the 2012 general election, in contravention of HAVA. (Dkt. No. 33, ¶¶ 18, 20, 21, 41).

Defendants are correct that Plaintiffs, to the extent that they are seeking to state a claim against Defendants under HAVA, either directly or under § 1983, may not do so because the HAVA provisions that they cite do not permit individual plaintiffs to enforce those provisions by bringing a private cause of action. Plaintiffs refer to two different sections of HAVA. Section 301, 42 U.S.C. § 15481, provides for, *inter alia,* voter education and ability to audit the voting system

in use. (Amended Complaint ¶ 20). The HAVA provision that refers to certification of voting machines, 42 U.S.C. § 15371(a)(2), provides that, "[a]t the *option* of a State, the State may provide for the testing, certification, decertification, or recertification of its voting system hardware and software by the laboratories accredited by the Commission under this section." (emphasis added).

In *Gonzaga Univ. v. Doe,* 536 U.S. 273 (2002), the Supreme Court held that there is no private right to enforce a statute unless Congress, in a clear voice, unambiguously confers that right. *Id.* at 280. Nowhere in Section 15371 or Section 15481 has Congress indicated an intention that these provisions may be enforced by private individuals. This result is consistent with other circuit and district courts that have found no private right of action under particular sections of HAVA. *See Sandusky Cnty. Democratic Party v. Blackwell,* 387 F.3d 565, 572 (6th Cir. 2004) ("HAVA does not itself create a private right of action."); *Crowley v. Nev. ex rel. Nev. Sec'y of State,* 678 F.3d 730, 731 (9th Cir. 2012) ("Because HAVA § 301 was not intended to benefit voters and candidates in local elections ... such individuals do not have a private right of action under § 1983."); *Taylor v. Onorato,* 428 F.Supp.2d 384, 387 (W.D.Pa. 2006) (finding that HAVA did not provide a private right of action to enforce § 301, nor did it create a federal right enforceable against state officials under 42 U.S.C. § 1983).[3]

3    In Plaintiffs' Brief in Opposition to the Motion to Dismiss, they refer to *United States v. New York State Bd. of Elections,* a case filed in the Northern District of New York in 2006 which set forth "a variety of allegations identical in many respects to Plaintiffs' present cause of action, thereby invoking subject matter jurisdiction of the Court, and ultimately obtaining an Order from the Court compelling the Defendants to 'take all necessary actions to come into compliance with the requirements of Section 301 and 303(a) of HAVA as soon as practicable [.]' " (Dkt. No. 86 at 5). Plaintiffs apparently argue that the New York case demonstrates that a court has subject matter jurisdiction over a HAVA cause of action and, by implication, that this Court has jurisdiction over their HAVA cause of action. However, there is a dispositive distinction between the two cases. The New York case was brought by the United States Attorney General, pursuant to 42 U.S.C. § 15511, which permits the Attorney General—not private citizens—to bring a civil action against any state to carry out the requirements of HAVA §§ 301, 302, and 303. Here, Plaintiffs, as private citizens, have attempted to enforce certain provisions

of HAVA, including § 303. The statute does not permit that. Accordingly, the New York case does not support Plaintiffs' effort to state a claim under HAVA.

**\*7** Even if Plaintiffs could bring an action under HAVA directly or pursuant to § 1983, HAVA's provision concerning EAC–certified voting machines, 42 U.S.C. § 15371(a)(2) is permissive, not mandatory. Section 15371 imposes no requirement on Defendants to use EAC–certified machines. Although Plaintiffs assert that Defendants administered the election in a manner inconsistent with HAVA, *id.* ¶ 53, this allegation has no traction because HAVA does not require Defendants to use EAC–certified voting machines and thus there would be nothing to enforce. As a consequence, Defendants cannot be found to have administered the election in violation of HAVA.

Accordingly, to the extent Plaintiffs have alleged a cause of action under HAVA, either directly or under § 1983, they have failed to state a claim and such a cause of action must be dismissed.

### D. Constitutional Claims Under Local Election Laws

Plaintiffs' fundamental concern in their Amended Complaint and in their Opposition to the Motion to Dismiss is that Defendants violated *local* election laws—particularly Act 7334. Act 7334 (Bill No. 29–0047) was enacted by the Twenty–Ninth Legislature of the Virgin Islands during its 2011 Regular Session on December 28, 2011. Section 3a of Act 7334 provides that "only voting machines and equipment that are EAC–certified pursuant to The Help America Vote Act of 2002 ... shall be utilized as the official voting systems or equipment" in the Virgin Islands (amending Act No. 5281, Bill No. 17–0100). In their Amended Complaint, Plaintiffs contend that the use of non–EAC certified voting machines in the primary and general elections, and other irregularities, violated the provisions of numerous local statutes. (Dkt. No. 33, ¶¶ 24, 32, 39, 46).

In order to bring a claim in federal court for violation of a local election statute, Plaintiffs must allege a constitutional violation that interferes with their right to vote. Violations of local election laws are properly litigated in state court unless a constitutional violation has been alleged. *See Shannon v. Jacobowitz,* 394 F.3d 90, 94, (2d Cir.2005) ("Because the states traditionally have authority over their own elections and because the Constitution contemplates that authority, courts 'have long recognized that not every state election dispute implicates federal constitutional rights.' ") (quoting

*Burton v. Georgia,* 953 F.2d 1266, 1268 (11th Cir.1992)); *Griffin v. Burns,* 570 F.2d 1065, 1076 (1st Cir.1987) (opining that while the Constitution affords federal courts the power to intervene and invalidate local elections, only exceptional circumstances warrant the exercise of that power). Cases draw "[a] distinction ... between 'garden variety' election irregularities and pervasive errors that undermine the integrity of the vote." *Bennett v. Yoshina,* 140 F.3d 1218, 1226 (9th Cir.1998). "Garden variety election irregularities do not generally violate the Due Process Clause, even if they control the outcome of the vote or election." *Id.* Only when election irregularities transcend garden variety problems is the election invalid. *Id. See also Hennings v. Grafton,* 523 F.2d 861, 864 (7th Cir.1975) (finding "no constitutional violation where irregularities were caused by mechanical or human error and were not due to invidious or fraudulent intent," and ruling "[i]t is not every election irregularity, however, which will give rise to a constitutional claim and an action under section 1983. Mere violation of a state statute by an election official, for example, will not. *See Snowden v. Hughes,* 321 U.S. 1, 11 (1944)).").

**\*8** Plaintiffs' allegation that the electronic voting machines were not EAC–certified, violating the provisions of Act 7334, which *may have* affected the entire election process, including the validity of vote tabulation, does not rise to the level of widespread fraud—fundamental unfairness—to state a claim for a constitutional violation, requiring decertification of the election. *See Bryan v. Todman,* 28 V.I. 42, 45, 1992 V.I. Lexis 19 (Terr.Ct. Dec. 17, 1992), *aff'd* 1993 U.S. Dist. Lexis 21461 (D.V.I. Oct. 29, 1993) (opining that an election should be invalidated where "there is a finding of fraud or deprivation of rights which would implicate the Constitution of the United States ... Where irregularities are alleged, the burden of proof is on the plaintiff to show that the irregularities affect or change the result of the election by the questioned votes."). Plaintiffs have not alleged facts demonstrating that the alleged irregularities rose to a constitutional level that affected the outcome of the election. *Compare St. Thomas–St. John Bd. of Elections v. Daniel,* 2007 WL 4901116, at \*21 (V.I. Sept. 17, 2007) (Swan, J., dissenting) (opining that where pervasive violations of Virgin Island election laws deprived voters of their ability to choose candidates of their choice, resulting in reasonable doubt that the election reflected the will of the voters, invalidation of the election would be a proper result); *see also* analysis in January 6, 2013 Memorandum Opinion denying Motion for Preliminary Injunction, Dkt. No. 76 at 16 (discussing how allegations that Defendants violated other

2013 WL 842946

local laws did not reach constitutional dimensions); supra, n.2.

Plaintiffs' Amended Complaint does not contain sufficient factual matter, accepted as true, that states a claim to relief under local election law that is plausible on its face. *Iqbal,* 129 S.Ct. at 1949. Accordingly, Plaintiffs have failed to state a claim for a violation of a constitutional right that would permit their allegations that Defendants violated local election laws to be decided in federal court.

**E. The Voting Rights Act and the Military & Overseas Voter Empowerment Act**

In their Amended Complaint, Plaintiffs make a passing reference to the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973j, which prohibits "any discrimination based on a potential voter's race, or on ethnic factors or minority language that diminishes an individual's voting rights." (Dkt. No. 33, ¶ 23). Plaintiffs also refer to "Defendants' deliberate and chronic failure to enforce the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), as amended by the Military & Overseas Voter Empowerment (MOVE) Act,

in spite of multiple opportunities to comply since November of 2009, resulted in an action by the United States to force compliance. *See United States of America v. The Territory of the Virgin Islands, et al.* Case No. 3:12–cv–0069." (Dkt. No. 33, ¶ 26). These "conclusory or 'bare-bones' allegations," which recite the statutory provisions of the Voting Rights Act and the UOCAVA, do not set forth any factual allegations to support the causes of action. *Fowler,* 578 F.3d at 210 (quoting *Iqbal,* 129 S.Ct. at 1949). The Court therefore dismisses these causes of action.

*CONCLUSION*

For the foregoing reasons, Defendant's Motion to Dismiss (Dkt. No. 84) is granted. An appropriate Order accompanies this Memorandum Opinion.

**All Citations**

Slip Copy, 2013 WL 842946

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

R

Case 4:20-cv-02078-MWB   Document 93-10   Filed 11/12/20   Page 248 of 279
Texas League of United Latin American Citizens v. Hughs, 978 F.3d 136 (2020)
2020 WL 6023310

978 F.3d 136
United States Court of Appeals, Fifth Circuit.

TEXAS LEAGUE OF UNITED LATIN
AMERICAN CITIZENS; National League
of United Latin American Citizens;
League of Women Voters of Texas; Ralph
Edelbach, **Barbara Mason**; Mexican
American Legislative Caucus, Texas House
of Representatives; Texas Legislative
Black Caucus, Plaintiffs—Appellees,
v.
Ruth HUGHS, in her official
capacity as Texas Secretary of
State, Defendant—Appellant.
**Laurie-Jo Straty**; Texas Alliance
for Retired Americans; BigTent
Creative, Plaintiffs—Appellees,
v.
Ruth Hughs, in her official
capacity as Texas Secretary of
State, Defendant—Appellant.

No. 20-50867
|
FILED October 12, 2020

**Synopsis**
**Background:** Following Governor's proclamation, in
response to COVID-19 pandemic, to expand the options
for voters to vote in-person early or to vote by absentee
ballot in upcoming general election, various individuals
and interest groups filed action challenging Governor's
subsequent proclamation specifying that mail-in ballots could
be delivered only to one designated location per county.
The United States District Court for the Western District of
Texas, Robert L. Pitman, J., 2020 WL 5995969, enjoined the
later proclamation on grounds that it constituted an improper
restriction on the right to vote. Secretary of State appealed and
sought emergency stay.

**Holdings:** The Court of Appeals, Duncan, Circuit Judge, held
that:

Secretary was likely to prevail on appeal with respect to
district court's ruling on voting rights claim;

Secretary was likely to prevail on appeal with respect to
district court's ruling on equal protection claim; and

Secretary was entitled to grant of stay pending appeal.

Stay granted.

Ho, Circuit Judge, concurred and filed opinion.

Appeals from the United States District Court for the Western
District of Texas, USDC No. 1:20-CV-1006, USDC No. 1:20-
CV-1015, Robert L. Pitman, U.S. District Judge

**Attorneys and Law Firms**

Chad Wilson Dunn, Esq., Brazil & Dunn, Austin, TX,
Danielle Marie Lang, Campaign Legal Center, Washington,
DC, Luis Roberto Vera, Jr., Esq., Law Offices of Luis Roberto
Vera, Jr. & Associates, San Antonio, TX, for Plaintiff—
Appellee Texas League of United Latin American Citizens.

Chad Wilson Dunn, Esq., Brazil & Dunn, Austin, TX,
Danielle Marie Lang, Campaign Legal Center, Washington,
DC, for Plaintiffs—Appellees National League of United
Latin American Citizens, League of Women Voters of
Texas, Ralph Edelbach, Barbara Mason, Mexican American
Legislative Caucus, Texas House of Representatives, and
Texas Legislative Black Caucus.

Skyler Howton, Perkins Coie, L.L.P., Dallas, TX, for
Plaintiffs—Appellees Laurie-Jo Straty, Texas Alliance for
Retired Americans, and BigTent Creative.

Kyle Douglas Hawkins, Lanora Christine Pettit, Office of the
Attorney General, Office of the Solicitor General, Patrick K.
Sweeten, Office of the Attorney General of Texas, Special
Counsel Unit, Austin, TX, for Defendant—Appellant Ruth
Hughs.

Elizabeth Bonnie Wydra, Chief Counsel, Constitutional
Accountability Center, Washington, DC, for Amicus Curiae
Members of Congress.

Justin Carl Pfeiffer, County Attorney's Office for the County of Fort Bend, Richmond, TX, for Amici Curiae John W. Oldham, and Chris Hollins.

Angela Cai, Wilkinson Walsh, L.L.P., New York, NY, for Election Law Scholars, Rebecca Green, Justin Levittt, and Nicholas Stephanopoulos.

Caroline Van Zile, Esq., Office of the Attorney General for the District of Columbia, Washington, DC, for Amicus Curiae District of Columbia, and the States of California, Connecticut, Delaware, et al.

Robert Stephen Notzon, Law Office of Robert S. Notzon, Austin, TX, for Amicus Curiae Texas State Conference of NAACP Branches.

Before Willett, Ho, and Duncan, Circuit Judges.

**Opinion**

Stuart Kyle Duncan, Circuit Judge:

**\*1**  In response to the coronavirus pandemic, Texas Governor Greg Abbott has issued various proclamations about the upcoming November election. Among other things, these measures have expanded the options for Texans to vote in-person early or to vote by absentee ballot. Take, for instance, early in-person voting. Normally, early voting would have started October 19. Now it will start October 13, six days earlier. Or take absentee ("mail-in") ballots. Normally, if a voter wanted to hand-deliver her mail-in ballot, she would have had only *one* day to do it—Election Day. Now, under the Governor's expanded policy, she can deliver the ballot anytime until Election Day. That effectively gives voters *forty* extra days to hand-deliver a marked mail-in ballot to an early voting clerk. And the voter still has the traditional option she has always had for casting a mail-in ballot: mailing it.

To make the situation clear, this chart compares what we will call "pre-COVID" early-voting and absentee-ballot rules and "COVID" rules:

| Pre-COVID | COVID |
|---|---|
| Early voting starts October 19. | Early voting starts October 13 (six extra days). |
| Absentee ballots may be mailed. | Absentee ballots may be mailed. |
| Absentee ballots may be hand-delivered *only on Election Day.* | Absentee ballots may be hand-delivered *before and up to Election Day* (forty extra days). |

The controversy we now face involves the rules for hand-delivering absentee ballots. As noted, the Governor's prior proclamation expanded the timeframe for doing that by forty days. But it happened that a few large Texas counties wanted to set up *multiple* delivery locations for these ballots. The Governor disagreed with this policy which, in his view, threatened election uniformity and security. Consequently, on October 1, the Governor issued a new proclamation. This proclamation, refining the previous one, specified that mail-in ballots could be delivered only to *one* designated location per county. But it left in place the previous forty-day expansion for delivering mail-in ballots and the always-available option of the U.S. mail.

A coalition of Plaintiffs sued, claiming the October 1 proclamation violated their right to vote by *restricting* absentee voting options. The district court agreed and enjoined the October 1 proclamation. The Texas Secretary of State appealed and now seeks an emergency stay. Among other things, the Secretary argues that the district court fundamentally misunderstood the context of the October 1 proclamation. She explains that the proclamation is part of the forty-day *expansion* of Texans' opportunities to hand-deliver absentee ballots beyond what state election rules normally permit. The proclamation refines that expanded voting period by specifying where ballots are to be delivered. But it leaves the enlarged period in place, and also does

nothing to prevent Texans from mailing in their absentee ballots, as they have done in the past in election after election. Properly understood, the Secretary tells us, the October 1 proclamation is part of an *expansion* of absentee voting in Texas, not a *restriction* of it.

**\*2** We agree with the Secretary and grant the stay.

## I.

### A.

Texas law allows eligible voters to vote early, either by mailing in a ballot or by personally appearing at an early voting place. Tex. Elec. Code §§ 81.001(a), 82.001–82.005. In response to the coronavirus pandemic, on July 27, 2020, Governor Abbott issued a proclamation (the "July 27 Proclamation") expanding early voting opportunities for the upcoming November 3 election beyond those provided in the Texas Election Code. Allegedly issued pursuant to authority granted the Governor by the Texas Disaster Act of 1975, *see* Tex. Gov't Code §§ 418.001–418.261, this measure was one of a series of pandemic-driven changes to Texas election effected taken since the Governor's March 13 coronavirus disaster declaration. *See In re Steven Hotze, et al.*, —— S.W.3d ——, —— – ——, 2020 WL 5919726, at \*1–2 (Tex. Oct. 7, 2020) (explaining "[t]he Governor has repeatedly asserted his authority under the [Texas Disaster] Act to modify election procedures beginning shortly after his March 13 disaster proclamation," and listing measures including the July 27 Proclamation).[1]

[1]    *See also* Tex. Gov't Code § 418.002(4) (purpose of Texas Disaster Act is, *inter alia*, to "clarify and strengthen the roles of the governor, state agencies, the judicial branch of state government, and local governments in prevention of, preparation for, response to, and recovery from disasters").

Among other things, the July 27 Proclamation authorized early in-person voting to begin on October 13, instead of October 19, thus allowing six extra days to vote in person.[2] The proclamation also expanded opportunities for delivering marked mail ballots in person to an early voting clerk's office. Previously, voters wishing to hand-deliver their mail ballots could do so "only while the polls are open on election day." Tex. Elec. Code § 86.006(a-1).[3] The July 27 Proclamation, however, suspended this requirement by "allow[ing] a voter to

deliver a marked mail ballot to the early voting clerk's office *prior to and including on election day*" (emphasis added). This had the effect of extending the amount of time for a voter to hand-deliver a mail ballot: as the Texas Director of Elections explained in this case, "because counties began sending mail ballots on or before September 19, 2020, the proclamation increased the opportunities for voters to hand-deliver their marked mail ballots from only one day—election day—to over forty days." Additionally, of course, voters retained the ability to send in their mail ballots the traditional way—through the mail. *See id.* § 86.006(a)(1), (2).

[2]    The proclamation did this by suspending Texas Election Code § 85.001(a), which provides in relevant part that "[t]he period for early voting by personal appearance begins on the 17th day before election day and continues through the fourth day before election day." Tex. Elec. Code § 85.001(a).

[3]    Section 86.006(a-1) provides as follows:
The voter may deliver a marked ballot in person to the early voting clerk's office only while the polls are open on election day. A voter who delivers a marked ballot in person must present an acceptable form of identification described by [Texas Election Code] Section 63.0101.

**\*3** Following the July 27 Proclamation, at least four Texas counties—Harris, Travis, Fort Bend, and Galveston—announced their intention to have multiple mail ballot delivery locations in their counties for the November election. In response to this development, Governor Abbott issued a second proclamation on October 1 (the "October 1 Proclamation") amending the previous one. This new proclamation first reiterated that early in-person voting would begin on October 13. It then clarified that the prior suspension of section 86.006(a-1), concerning hand-delivery of mail ballots, applied only under certain conditions. First, a voter must deliver the ballot "at a single early voting clerk's office location that is publicly designated by the early voting clerk for the return of marked mail ballots under Section 86.006(a-1) and this suspension." Second, the early voting clerk must "allow[ ] poll watchers the opportunity to observe" the ballot delivery. Finally, the proclamation specified that "[a]ny marked mail ballot delivered in person to the early voting clerk's office prior to October 2, 2020, shall remain subject to the July 27, 2020 proclamation."

### B.

Case 4:20-cv-02078-MWB Document 93-10 Filed 11/12/20 Page 251 of 279
Texas League of United Latin American Citizens v. Hughs, 978 F.3d 136 (2020)
2020 WL 6023310

On October 2, 2020, three individuals and several organizations (collectively, "Plaintiffs")[4] challenged the October 1 Proclamation by filing two separate actions in federal district court against Governor Abbott, Texas Secretary of State Ruth Hughs, and four local election officials. They requested a preliminary injunction against the October 1 Proclamation on the grounds that it (1) places an undue burden on their right to vote under the First and Fourteenth Amendments and (2) violates the Equal Protection Clause of the Fourteenth Amendment. Consolidating the two cases for purposes of the preliminary injunction motion, on October 9, 2020, the district court granted the motion in part, enjoining Secretary Hughs and the local officials from enforcing the Proclamation's restriction on hand-delivering mail ballots to a single designated early voting clerk's office.

[4]   The individuals are Ralph Edelbach, Barbara Mason, and Laurie-Jo Straty. The organizations are the Texas League of United Latin American Citizens; the National League of United Latin American Citizens; the League of Women Voters of Texas; the Mexican American Legislative Caucus, Texas House of Representatives; the Texas Legislative Black Caucus; the Texas Alliance for Retired Americans; and BigTent Creative.

Initially, the court ruled that various threshold issues did not prevent it from deciding Plaintiffs' claims. First, the court found that both the individual and organizational plaintiffs had standing. Second, the court rejected Secretary Hughs' Eleventh Amendment argument, concluding she had sufficient connection to enforcing the proclamation for purposes of *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). The court did, however, dismiss Governor Abbott on Eleventh Amendment grounds based on our decision in *In re Abbott*, 954 F.3d 772 (5th Cir. 2020). Additionally, the court declined to abstain under the *Pullman* doctrine, despite the fact that the October 1 Proclamation is currently being challenged in state litigation. *See R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 501, 61 S.Ct. 643, 85 L.Ed. 971 (1941); *Moore v. Hosemann*, 591 F.3d 741, 745 (5th Cir. 2009). Finally, the court declined to stay its hand under the so-called *Purcell* principle that a federal court should avoid altering state election rules close to an election. *See Purcell v. Gonzalez*, 549 U.S. 1, 6, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006); *see also Republican Nat'l Comm. v. Democratic Nat'l Comm.*, ––– U.S. ––––, 140 S. Ct. 1205, 1207, 206 L.Ed.2d 452 (2020) (per curiam). The court reasoned that it was the October 1 Proclamation, and not its injunction, that caused voter confusion and that therefore its "injunction supports the *Purcell* principle."

On the merits, the district court evaluated the Plaintiffs' voting claims under the *Anderson-Burdick* balancing framework. *See Burdick v. Takushi*, 504 U.S. 428, 434, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). It found that the proclamation's burden on Plaintiffs' voting rights was "somewhere between 'slight' and 'severe,'" because it forced absentee voters to "choose between risking exposure to coronavirus to deliver their ballots in-person or disenfranchisement if the [United States Postal Service] is unable to deliver their ballots on time." The court found this burden outweighed the State's professed interests in ballot security, election integrity, and voter safety. Consequently, the court found Plaintiffs were likely to succeed on their voting claims. The court also found likelihood of success on Plaintiffs' equal protection claims because the proclamation disproportionately burdened absentee voters in larger counties by subjecting them to "increased distance, increased wait time, and increased potential for exposure to the coronavirus," without any countervailing justification.

 **\*4**  On October 9, Secretary Hughs timely appealed and, the next day, sought an emergency stay and a temporary administrative stay. On October 10, we granted a temporary stay and requested a response to her emergency stay motion, which was timely filed earlier today on October 12.

## II.

In deciding whether to grant a stay pending appeal, "[w]e evaluate '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.' " *Texas Democratic Party v. Abbott*, 961 F.3d 389, 397 (5th Cir. 2020) (*TDP I*) (quoting *Nken v. Holder*, 556 U.S. 418, 426, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009)). The first two factors carry the most weight. *Barber v. Bryant*, 833 F.3d 510, 511 (5th Cir. 2016). The party seeking the stay bears the burden of showing its need. *Clinton v. Jones*, 520 U.S. 681, 708, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997).

## III.

We first consider whether Secretary Hughs has made a strong showing she will likely succeed on the merits. We conclude she has done so on at least one ground: that the district court erred in analyzing the Plaintiffs' voting-rights and equal protection claims. We therefore need not address, and so express no opinion about, the Secretary's arguments concerning standing, *Ex parte Young*, *Purcell*, or *Pullman* abstention.[5]

[5]      *Cf., e.g., Texas All. for Retired Am. v. Hughs*, No. 20-40643, 976 F.3d 564, 567 (5th Cir. Sept. 30, 2020) (observing that "[t]he Secretary's arguments as to standing ... [and] sovereign immunity ... are harder to decide on our necessarily expedited review, but we need not reach them because the Secretary has made a strong showing that she is likely to succeed on" one of her merits arguments).

## A.

As to the Plaintiffs' voting-rights claims, the district court applied *Anderson-Burdick* balancing. Under this framework, a court "must weigh the character and magnitude of the asserted injury" to voting rights "against the precise interests put forward by the State as justifications for the burden imposed by its rule." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 387–88 (5th Cir. 2013) (quoting *Burdick*, 504 U.S. at 434, 112 S.Ct. 2059); *Anderson*, 460 U.S. at 789, 103 S.Ct. 1564) (cleaned up). A "severe burden" on voting can be justified only by state rules "narrowly drawn to advance a state interest of compelling importance." *Id.* at 388 (quoting *Burdick*, 504 U.S. at 434, 112 S.Ct. 2059). "Lesser burdens, however, trigger less exacting review, and a State's 'important regulatory interest' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.' " *Id.* (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997)).

The district court classified the burden on Plaintiffs' right to vote as "somewhere between 'slight' and 'severe' " because due to the order, "absentee voters must choose between risking exposure to coronavirus to deliver their ballots in-person or disenfranchisement if the USPS is unable to deliver their ballots on time." This burden, the court reasoned, outweighed the State's asserted interests in ballot security, uniformity, and lessening voter confusion. The court asserted the Governor's proclamation was "the true source of confusion and disparate treatment among voters." Further, it found the State had not introduced evidence of voter

fraud or shown that the security measures at additional drop-off locations were subpar. Therefore, the State, "by merely asserting an interest in promoting ballot security," could not "establish that the interest outweighs a significant burden on voters." Finally, the court added the Governor's authority to issue the orders was rooted in his emergency powers, which enable him to act to protect public health and safety, but the "justifications for the October 1 Order's limitation on ballot return centers bear no relationship to protecting public health and safety."

**\*5** Assuming *Anderson-Burdick* applies,[6] for at least two reasons we conclude the Secretary will likely show the district court erred in applying it.

[6]      The Secretary persuasively argues that, under *McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969), the October 1 Proclamation does not implicate the right to vote at all. *See id.* at 807, 89 S.Ct. 1404 (distinguishing "the right to vote" from "a claimed right to receive absentee ballots"); *see also TDP I*, 961 F.3d at 403–06 (discussing *McDonald*'s continuing viability); *Tully v. Okeson*, 977 F.3d 608, 611 (7th Cir. Oct. 6, 2020) (observing that "[i]n *McDonald* ..., the Supreme Court told us that the fundamental right to vote does not extend to a claimed right to cast an absentee ballot by mail"). Because the Secretary is likely to prevail under the relatively more stringent *Anderson-Burdick* framework, we need not assess *McDonald*'s impact. That said, we recognize there is force to the argument that *McDonald* applies with equal rigor to early voting as it does to absentee voting—after all, both forms of voting are affirmative accommodations offered by the state and "designed to make voting more available," *TDP I*, 961 F.3d at 403 (quoting *McDonald*, 394 U.S. at 807–08, 89 S.Ct. 1404), and are not laws that "*themselves* deny [voters] the exercise of the franchise. *Id.* at 415 (Ho, J., concurring) (quoting *McDonald*, 394 U.S. at 807–08, 89 S.Ct. 1404). For courts to intervene, a voter must show that the state "has in fact precluded [voters] from voting"—that the voter has been "prohibited from voting *by the State*." *Id.* (Ho, J., concurring) (quoting *McDonald*, 394 U.S. at 808 & n.7, 89 S.Ct. 1404) (emphasis added).

First, the district court vastly overstated the "character and magnitude" of the burden allegedly placed on voting rights by the October 1 Proclamation. *Steen*, 732 F.3d at 387 (quoting *Burdick*, 504 U.S. at 434, 112 S.Ct. 2059). Indeed, one strains to see how it burdens voting at all. After all, the proclamation is part of the Governor's *expansion* of

opportunities to cast an absentee ballot in Texas well beyond the stricter confines of the Election Code. Previously, as we have explained, mail ballots could be hand-delivered to the early voting clerk *only on Election Day*. *See* Tex. Elec. Code § 86.006(a-1). The Governor's July 27 Proclamation effectively extended that hand-delivery option by forty days, and the impact of the October 1 Proclamation can be measured only against that baseline. To be sure, the proclamation requires a single designated drop-off location per county during the expanded forty-day period. But that represents merely a partial refinement of the bounds of a still-existing expansion of absentee voting opportunities. In a related context, we have recently explained that to "abridg[e]" the right to vote means to "place a barrier or prerequisite to voting, or otherwise make it more difficult to vote." *Texas Democratic Party v. Abbott*, —— F.3d ——, ——, 2020 WL 5422917, at *15 (5th Cir. Sept. 10, 2020) (*TDP II*). By contrast, "a law that makes it *easier* for others to vote does not abridge any person's right to vote." *Id.* The July 27 and October 1 Proclamations—which must be read together to make sense—are beyond any doubt measures that "make[ ] it *easier*" for eligible Texans to vote absentee. *Id.* How this expansion of voting opportunities burdens anyone's right to vote is a mystery.[7]

7    As noted, Governor Abbott has taken unprecedented steps in the wake of COVID-19 to *expand* voting opportunities generally, and mail-in voting options specifically. In taking these (and other) pandemic-driven actions, the Governor has invoked his broad emergency powers under the Texas Disaster Act. No party questions the constitutional limits of that Act—unsurprisingly, as this case is about *loosening* restrictions during a public-health emergency, not *imposing* them. But a different case may require courts to confront head-on the constitutional extent of gubernatorial power under the Texas Disaster Act. Neither the United States nor Texas Constitution includes a pandemic exception. *See TDP I*, 961 F.3d at 413 (Ho, J., concurring) ("We do not suspend the Constitution during a pandemic."); *In re Salon a La Mode*, —— S.W.3d ——, ——, 2020 WL 2125844, at *1 (Tex. May 5, 2020) (Blacklock, J., concurring) ("When properly called upon, the judicial branch must not shrink from its duty to require the government's anti-virus orders to comply with the Constitution and the law, no matter the circumstances."). All public servants, no matter how well-intentioned, must heed federal and state constitutional constraints. While desperate times permit desperate measures, we must resist defining desperation down.

**\*6** But even if we focused myopically on the voting options restricted by the October 1 Proclamation, as the district court did, we would still find no more than a *de minimis* burden on the right to vote. The district court emphasized that some absentee voters would have to travel farther to drop off mail ballots at a centralized location and that, as a result, would confront a higher risk of exposure to coronavirus. The court also warned that voters unwilling or unable to do so would "risk[ ] ... disenfranchisement if the USPS is unable to deliver their ballots on time." This drastic picture painted by the district court fails to account for the numerous ways Texans can vote early or absentee in the November 3 election. As we have recounted, under the Governor's expansion of voting opportunities, Texans can (1) vote early in-person for an expanded period starting on October 13 (as opposed to the previous early-voting period starting on October 19); (2) hand-deliver a marked mail ballot during a forty-day period starting on September 19 (as opposed to the previous *one day*—Election Day—on which this was permitted); or (3) drop an absentee ballot in the mail. In light of those options, the October 1 Proclamation's partial refinement of one avenue for absentee voting does not amount to a "severe restriction" on the right to vote. *Burdick*, 504 U.S. at 434, 112 S.Ct. 2059; *see also A. Philip Randolph Inst. of Ohio v. LaRose*, —— F. App'x ——, 2020 WL 6013117 (6th Cir. Oct. 9, 2020) (unpublished) (concluding a similar drop-box restriction on absentee ballots "surely does not impose a 'severe restriction[ ] on the right to vote' ") (quoting *Mays v. LaRose*, 951 F.3d 775, 779 (6th Cir. 2020)).

We are especially unpersuaded by the district court's view that voters must have multiple drop-off locations in order to "avoid the delays involved with mailing their ballots through the U.S. Postal Service." The USPS recommends voters request absentee ballots at least fifteen days before election day to ensure timely arrival. Texas law, however, allows voters to request ballots up to eleven days before election day. Therefore, the district court concluded, a voter may legally request an absentee ballot that is not *guaranteed* to arrive on time. The court thus concluded that absentee voters face an insoluble choice between "risk[ing] infection with a deadly disease to return their ballots in person or disenfranchisement if the USPS is unable to deliver their ballots in time." This kind of speculation about late-arriving ballots comes nowhere close to rendering Texas's absentee ballot system constitutionally inadequate. Neither Plaintiffs nor the district court have cited any authority suggesting that a State must afford every voter multiple infallible ways to vote. As we explained in *TDP I*, mail-in ballot rules that merely

make casting a ballot more inconvenient for some voters are not constitutionally suspect. 961 F.3d at 405. The principle holds true even if "circumstances beyond the state's control, such as the presence of the [coronavirus,]" or, here, possible postal delays, make voting difficult. *Id.*; *see also McDonald*, 394 U.S. at 810 & n.8, 89 S.Ct. 1404 (explaining that a State is not required to extend absentee voting privileges to all classes of citizens, even those for whom "voting may be extremely difficult, if not practically impossible," such as persons caring for sick relatives or businessmen called away on business). We cannot conclude that speculating about postal delays for hypothetical absentee voters somehow renders Texas's absentee ballot system constitutionally flawed.

Second, the district court undervalued the state interests furthered by the October 1 Proclamation.[8] Even assuming the proclamation poses any burden on voting rights, that burden is minimal and would "trigger less exacting review," meaning that "a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Steen*, 732 F.3d at 388 (internal quotations and citation omitted). The district court found that Texas's "vague interests" in ballot security, election uniformity, and avoiding voter confusion were insufficiently substantiated to outweigh the proclamation's "significant burden on voters." The Secretary is likely to show on appeal that the district court erred.

[8]   This analysis again assumes *arguendo* that Plaintiffs' claims are not subject to the Supreme Court's *McDonald* decision. *See TDP I*, 961 F.3d at 404 (observing that, "under *McDonald*, a state's refusal to provide a mail-in ballot does not violate equal protection unless ... the state has 'in fact absolutely prohibited' the plaintiff from voting") (quoting *McDonald*, 394 U.S. at 808 n.7, 89 S.Ct. 1404).

**\*7** States have critically important interests in the orderly administration of elections and in vigilantly reducing opportunities for voting fraud. *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 195–96, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters" and "in orderly administration and accurate recordkeeping[.]"). Indeed, both the Supreme Court and our court have recognized that "mail-in voting" is "far more vulnerable to fraud" than other forms of voting. *Veasey v. Abbott*, 830 F.3d 216, 263 (5th Cir. 2016) (en banc) (observing that, in contrast to in-person voting, record evidence showed "mail-in voting ... is far

more vulnerable to fraud, particularly among the elderly"); *id.* (criticizing challenged law because it "does nothing to address the far more prevalent issue of fraudulent absentee ballots"); *see also Crawford*, 553 U.S. at 195–96 & n.12, 128 S.Ct. 1610 (discussing examples "in recent years" of "fraudulent voting ... perpetrated using absentee ballots and not in-person fraud ... demonstrat[ing] that not only is the risk of voter fraud real but that it could affect the outcome of a close election"); *TDP I*, 961 F.3d at 414 (Ho, J., concurring) (observing that "courts have repeatedly found that mail-in ballots are particularly susceptible to fraud") (and collecting authorities). In sum, "[w]hile the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear." *Crawford*, 553 U.S. at 196, 128 S.Ct. 1610.

It is therefore evident that Texas has an "important regulatory interest" in policing how its citizens' votes are collected and counted. *Steen*, 732 F.3d at 388. This interest is acute when it comes to mail-in ballots. *Crawford*, 553 U.S. at 195–96 & n.12, 128 S.Ct. 1610; *see also Veasey*, 830 F.3d at 239 (concluding "mail-in ballot fraud is a significant threat"). It is likely, then, that the Secretary will prevail on appeal in showing that the October 1 Proclamation was justified by the State's important interests in election integrity. As explained, that proclamation is part-and-parcel of a sizable expansion of absentee voting options occasioned by the Governor's pandemic-related orders. *See In re Steven Hotze*, —— S.W.3d at —— – ——, 2020 WL 5919726, at \*1– 2. Opportunities for absentee voters to hand-deliver ballots ballooned from a pre-COVID *one* day (Election Day itself) to an in-COVID *forty* days. The evidence showed this expansion of absentee voting provoked an increase in drop-off locations in certain counties. While this reaction is understandable, also understandable is the Governor's goal of centralizing delivery locations, and deploying poll watchers there, in order to maximize ballot security. The Secretary is thus likely to show on appeal that the October 1 Proclamation was a "reasonable, nondiscriminatory" measure justified by Texas's important interests in election integrity. *Steen*, 732 F.3d at 388.

The Secretary is also likely to show that the district court erred in scrutinizing whether the proclamation furthered those interests. *Cf. id.* (requiring "less exacting review" for laws placing "[l]esser burdens" on voting rights). For example, the district court demanded evidence of "actual examples of voter fraud" justifying the centralization of mail ballot delivery locations. Such evidence has never been required to justify a state's prophylactic measures to decrease occasions

2020 WL 6023310

for vote fraud or to increase the uniformity and predictability of election administration. For instance, in *Crawford*, the Supreme Court upheld Indiana's voter identification law, despite the fact that "[t]he record contain[ed] no evidence of [in-person voter] fraud actually occurring in Indiana at any time in its history." 553 U.S. at 181, 128 S.Ct. 1610. "Here, as in *Crawford*, Texas need not show specific local evidence of fraud in order to justify preventive measures." *Steen*, 732 F.3d at 394; *see also Munro v. Socialist Workers Party*, 479 U.S. 189, 194–95, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986) ("We have never required a State to make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable [voting regulations]."). Furthermore, the Secretary articulated other interests beyond fraud, such as uniformity across counties. The district court too quickly discounted the state's interest in promoting uniformity in how mail ballots are delivered. In doing so, the court appears to have overlooked evidence showing the unusual nature of the developing absentee ballot process. As the Director of Elections stated, following the July 27 Proclamation, only four of Texas's 254 counties announced their intention "to utilize more than one location for in-person delivery of mail ballots," and there were concerns about whether the additional locations complied with Texas election law.

**\*8** In sum, Secretary Hughs has shown she is likely to prevail on the merits of the Plaintiffs' voting-rights claims.

**B.**

We turn to Plaintiffs' equal protection claims.[9] Because the right to vote is fundamental, *Burdick*, 504 U.S. at 433, 112 S.Ct. 2059, "once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment." *Harper v. Virginia State Bd. of Elec.*, 383 U.S. 663, 665, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); *Gray v. Sanders*, 372 U.S. 368, 379, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963) ("[A]ll who participate in the election are to have an equal vote—whatever their race, whatever their sex, whatever their occupation, whatever their income, and wherever their home may be in [the] geographical unit. This is required by the Equal Protection Clause."). The district court held the Plaintiffs were likely to show that the October 1 Proclamation violated these principles by imposing disproportionate burdens on voters based on where they live. Plaintiffs argued that the elimination of additional drop-off locations would force voters in large

and populous counties to travel farther, wait longer, and risk increased exposure to the coronavirus. Meanwhile, voters in smaller and less populous counties would not face the same difficulties. Because the district court concluded that the proclamation resulted in disparate treatment of voters based on county of residence, it applied the *Anderson-Burdick* framework. It reasoned that absent evidence that drop-off locations have posed or will pose a threat of voter fraud, Texas's proffered interest in election integrity was not "sufficiently weighty" to justify the differential burdens on voters.

9    Once again we assume, for the sake of argument only, that the Supreme Court's *McDonald* decision does not apply here. *Cf. TDP I*, 961 F.3d at 403–05.

The Secretary is likely to show this analysis was mistaken. As with the voting-rights claim, the district court misconstrued the nature of the alleged burden imposed by the October 1 Proclamation. It is true that the Equal Protection Clause guarantees that "every voter is equal to every other voter in his State," regardless of race, sex, occupation, wealth, or residence. *Gray*, 372 U.S. at 380, 83 S.Ct. 801. But the district court accepted Plaintiffs' contention that the proclamation "dol[es] out electoral opportunity based on county lines." That is incorrect. The proclamation establishes a uniform rule for the entire State: each county may designate one early voting clerk's office at which voters may drop off mail ballots during the forty days leading up to the election. That voters who live further away from a drop-off location may find it inconvenient to take advantage of this particular, additional method to cast their ballots does not "limit[ ] electoral opportunity," as the district court thought. As we have explained, the October 1 Proclamation was part of an *expansion* of absentee voting opportunities beyond what the Texas Election Code provided. The fact that this expansion is not as broad as Plaintiffs would wish does not mean that it has illegally *limited* their voting rights.

Moreover, the cases relied on by the district court are easily distinguishable. The court cited *Moore v. Ogilvie*, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969), and *Gray v. Sanders*, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821, to support its conclusion that the October 1 Proclamation necessarily treats voters differently on the basis of county residence. But both *Moore* and *Gray* confronted state election laws that effectively gave more *weight* to the votes cast by voters in certain counties. The Illinois statute in *Moore* required independent candidates for the offices of electors to obtain a set number of voters' signatures from each of at least

fifty counties. The Court invalidated the law because it gave voters in some counties "greater voting strength" than others, an idea "hostile to the one man, one vote basis of our representative government." *Moore*, 394 U.S. at 819, 89 S.Ct. 1493. Similarly, *Gray* examined Georgia's county unit system of counting votes, under which the candidate who won each county was considered to have "carried the county" and received votes corresponding to that county's number of representatives. As a result of widely varying populations per county, one "unit vote" in one county represented less than 1,000 residents, while a unit vote in another county represented over 90,000 residents. Such a system "weights the rural vote more heavily than the urban vote and weights some small rural counties heavier than other larger rural counties." *Gray*, 372 U.S. at 379, 83 S.Ct. 801.

 **\*9** The effects of the October 1 Proclamation are nothing like the effects of the laws in *Moore* and *Gray*. As we have explained, *supra* III(A), the burden imposed by the proclamation is at most *de minimis*. More to the point, it applies a uniform rule to every Texas county and does not weight the votes of those in some counties more heavily than others.

Consequently, Secretary Hughs is likely to show that the October 1 Proclamation does not impermissibly classify voters based on county of residence. Moreover, a "state's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory" voting regulations. *Anderson*, 460 U.S. at 788, 103 S.Ct. 1564. As we have explained, *supra* III(A), the Secretary has articulated important state interests in ensuring election uniformity and integrity that the October 1 Proclamation furthers.

## IV.

Having concluded the Secretary will likely succeed on the merits, we address the remaining *Nken* factors: "whether [the Secretary] will be irreparably injured absent a stay," "whether issuance of the stay will substantially injure" other interested parties, and "where the public interest lies." *Nken*, 556 U.S. at 426, 129 S.Ct. 1749.

The Secretary has shown irreparable harm absent a stay. When a district court's injunction prevents a State from effectuating its own election procedures, put in place by elected officials, it suffers irreparable harm. *See TDP I*, 961 F.3d at 411 (holding an injunction that effectively required

"Texas to institute [an absentee ballot] policy against its will presents significant, irreparable harm").

The remaining two factors are also met. Issuing a stay will not substantially injure Plaintiffs, who retain numerous avenues for casting their absentee ballots under the expanded voting opportunities afforded by the Governor's proclamations. What we said recently in *TDP I* applies equally here: "Given the great likelihood that the state officials will ultimately succeed on the merits, combined with the undeniable, irreparable harm that the injunction would inflict on them—factors that we consider 'the most critical,'—we hold that the balance of harms weighs in favor of the state officials." 961 F.3d at 412 (citation omitted). Finally, we conclude that public interest favors the Secretary. When a State is the party appealing an injunction, "its interest and harm merge with that of the public." *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (per curiam).

Because the Secretary has met her burden, we exercise our discretion to grant a stay pending appeal.

\*\*\*

Leaving the Governor's October 1 Proclamation in place still gives Texas absentee voters many ways to cast their ballots in the November 3 election. These methods for remote voting outstrip what Texas law previously permitted in a pre-COVID world. The October 1 Proclamation abridges no one's right to vote.

The Secretary's emergency motion for stay pending appeal is GRANTED.

James C. Ho, Circuit Judge, concurring:
I concur fully in Judge Duncan's typically thoughtful opinion. But I also do so grudgingly. I firmly agree that the federal district court usurped the authority that our Constitution vests in state legislatures to set the rules governing federal elections. But so did the Governor of Texas—as Judge Duncan also cautions. *See supra* at 145 n.7.

The district court was wrong to rewrite Texas law. But the distinguished judge who did so was simply following in the Governor's footsteps. It is surely just as offensive to the Constitution to rewrite Texas election law by executive fiat as it is to do so by judicial fiat. Yet that is what occurred here. Respected legislators and public leaders called on the Governor to call a special session so that legislators in both

parties could consider and debate amendments to the state's election rules to accommodate voter concerns arising out of the pandemic. But the Governor rejected those calls, and instead issued a series of executive proclamations purporting to unilaterally "suspend" various Texas election laws.

**\*10** Those actions have generated significant controversy. Members of the Texas Supreme Court described the Governor's actions as "*a clear abuse of discretion of a public official*," *In re Hotze*, ––– S.W.3d ––––, ––––, 2020 WL 5919726, at \*7 (Tex. Oct. 7, 2020) (Devine, J., dissenting) (emphasis in original) (quotations omitted), that "raise[s] important questions about the constitutionality of government action during the coronavirus crisis," *id.* at ––––, 2020 WL 5919726, at \*3 (Blacklock, J., concurring).

Only the district court's rewriting of Texas law is before us today, however. And that leads us to an unfortunate irony: by setting aside only the district court's rewriting of Texas law, we must restore the Governor's rewriting of Texas law. It recalls the adage that sometimes it's only the guy who throws the second punch that gets caught. The Dictionary of Modern Proverbs 209 (2012). I grudgingly concur.

I.

Under the Constitution, it is the state legislature—not the governor *or* federal judges—that is authorized to establish the rules that govern the election of each state's Presidential electors, U.S. Senators, and U.S. Representatives. *See* U.S. Const. art. I, § 4, cl. 1 ("The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof ...."); U.S. Const. art. II, § 1, cl. 2 ("Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors [for President and Vice President].").[1]

[1]     *See also Smiley v. Holm*, 285 U.S. 355, 367, 52 S.Ct. 397, 76 L.Ed. 795 (1932) ("[T]he exercise of the authority [to regulate Congressional elections] must be in accordance with the method which the state has prescribed for legislative enactments."); *McPherson v. Blacker*, 146 U.S. 1, 27, 13 S.Ct. 3, 36 L.Ed. 869 (1892) ("The constitution ... leaves it to the legislature exclusively to define the method of" appointment of Presidential electors).

But apparently that is not how federal elections will be administered in Texas this year.

If officials were following Texas law, "[t]he period for early voting by personal appearance" would "begin[ ] on the 17th day before election day"—or Monday, October 19, 2020. Tex. Elec. Code § 85.001(a). *See also* Tex. Elec. Code § 85.001(c) ("If the date prescribed ... for beginning the period is a Saturday, Sunday, or legal state holiday, the early voting period begins on the next regular business day."). But not this year. On July 27, 2020, the Governor of Texas proclaimed that, due to the COVID-19 pandemic, he will "suspend Section 85.001(a)" so that "early voting by personal appearance shall begin on Tuesday, October 13, 2020"—six days earlier than the date provided by the Texas Legislature.

Furthermore, Texas law ordinarily provides that, if qualified individuals elect to receive their ballots by mail but ultimately choose to deliver their marked ballots in person, they may do so "only while the polls are open on election day." Tex. Elec. Code § 86.006(a-1). But once again, not this year. In that same July 27 proclamation, the Governor of Texas announced that he would also "suspend Section 86.006(a-1)" and "allow a voter to deliver a marked mail ballot in person ... prior to ... election day"—again in direct conflict with the framework set forth by the Texas Legislature. And on October 1, 2020, the Governor amended his July 27 proclamation to make clear that he would suspend section 86.006(a-1) *unless* a county designates more than one location for qualified voters to deliver marked mail ballots, or offers a location that is not monitored by poll watchers—again without support in the Texas Election Code.

**\*11** It did not have to be this way. The Texas Constitution imposes strict limits on the number of days the Legislature can meet in regular session to consider legislation—once every two years for 140 days. *See* Tex. Const. art. 3, §§ 5, 24. But it also empowers the Governor to call the Legislature back for a special session to focus on any topic of his choosing. *See* Tex. Const. art. 3, § 40. So the Governor did not have to act unilaterally to amend Texas election law in the wake of the pandemic. He could have called a special session. Indeed, a number of respected legislators and public leaders urged him to do just that—to quote one particularly emphatic plea, "if ever a special session was justified, now is the time."[2]

[2]     Patrick Svitek, *Texas Republicans sue to stop Gov. Greg Abbott's extension of early voting period during the pandemic*, Texas Tribune (Sep. 23, 2020), https://www.texastribune.org/2020/09/23/ texas-republicans-greg-abbott-early-voting/. *See also*

*Editorial: Abbott must provide cure to voting in a pandemic*, San Antonio Express-News (Apr. 14, 2020), https://www.expressnews.com/opinion/editorials/article/Editorial-Abbott-must-provide-cure-to-voting-in-15198980.php ("Gov. Greg Abbott would be remiss if he fails to call a special legislative session to address myriad concerns threatening the primary runoffs and November general election."); Patrick Svitek, *Ector County GOP censures Abbott over executive power amid coronavirus, state Sen. Charles Perry calls for special session*, Texas Tribune (July 4, 2020), https://www.texastribune.org/2020/07/04/ector-county-coronavirus-texas-censure-greg-abbott/ (noting calls for special session by various state senators and representatives).

But instead, the Governor concluded that a special session was unnecessary because the Texas Disaster Act of 1975 gives him the authority to legislate all by himself. That act, however, only gives the governor limited power to "suspend the provisions of any regulatory statute prescribing the procedures for conduct of state business ... *if* strict compliance with [such requirements] would in any way prevent, hinder, or delay *necessary action in coping with a disaster*." Tex. Gov't Code § 418.016(a) (emphases added). Moreover, the Act, like any other Texas law, must be construed in light of the Texas Constitution. That includes the constitutional provision that "[n]o power of suspending laws in this State shall be exercised except by the Legislature." Tex. Const. art. I, § 28. *See also In re Hotze*, ‒‒‒ S.W.3d ‒‒‒, ‒‒‒, 2020 WL 4046034, at *2 (Tex. July 17, 2020) (Devine, J., concurring) ("I find it difficult to square [the Texas Disaster Act of 1975], and the orders made under it, with the Texas Constitution."). It also includes the Governor's constitutional authority to call special sessions of the Legislature. Tex. Const. art. 3, § 40.

It is difficult to see how it is "necessary ... in coping with a disaster" for the governor to suspend provisions of the Texas Election Code over *three months before* the November election. "[W]hen a crisis stops being temporary, and as days and weeks turn to months and years, the slack in the leash eventually runs out." *Capitol Hill Baptist Church v. Bowser*, No. 20-cv-02710 (TNM), slip op. at 15, 2020 WL 5995126 (D.D.C. Oct. 9, 2020). And that is especially so considering that the Constitution expressly forbids anyone other than the Legislature from suspending Texas laws—and considering that members of the Legislature are not only willing and able but demanding to convene a special session to consider legislation in response to the pandemic.[3]

3    The Governor's proclamation was recently challenged in state court as invalid under Texas law. The Texas Supreme Court ultimately rejected the challenge on procedural grounds. *In re Hotze*, ‒‒‒ S.W.3d ‒‒‒, 2020 WL 5919726. But various members acknowledged the weight of the relator's objections. *See id.* at ‒‒‒, 2020 WL 5919726, at *7 (Devine, J., dissenting) (describing "the Governor's actions in contravention of [the Secretary of State's] duties to carry out the Election Code's clear provisions on the timing and manner of early voting" as "potentially unconstitutional" under Texas law, and concluding that mandamus relief should be granted "*to correct a clear abuse of discretion of a public official*") (quotations omitted); *id.* at ‒‒‒, 2020 WL 5919726, at *3 (Blacklock, J., concurring) (acknowledging that "[t]he petitioners raise important questions about the constitutionality of government action during the coronavirus crisis"). No member of the court defended the Governor, by contrast—and certainly not in response to the separate federal constitutional concerns identified here.

**\*12** But now that the Governor has paved the way for rewriting Texas election law based on personal policy disagreements over how elections should be run during the pandemic, it should surprise no one that a federal district court has seen fit to jump in as well, in response to the "*executive*-caused voter confusion" resulting from "Governor Abbott's unilateral decision to reverse his July 27 Order." *Tex. League of United Latin American Citizens v. Abbott*, No. 1:20-cv-01006-RP, at 33, 2020 WL 5995969 (W.D. Tex. Oct. 9, 2020) (emphasis in original).

On October 9, a federal district court entered a preliminary injunction that effectively set aside a portion of the Governor's October 1 proclamation in favor of his July 27 proclamation. Under the preliminary injunction, state officials are enjoined from forbidding counties to establish more than a single location where qualified voters can deliver marked mail ballots.

In response, the Secretary of State seeks a stay of the preliminary injunction pending appeal. Tellingly, however, nowhere in her stay papers does the Secretary suggest that the preliminary injunction conflicts with Articles I and II of the U.S. Constitution—perhaps because she recognizes that the Governor's proclamations suffer from the same defect.

That said, no one is asking us to set aside the Governor's July 27 proclamation. To the contrary, the plaintiffs want that proclamation enforced as is—while the State of Texas wants

Case 4:20-cv-02078-MWB Document 93-10 Filed 11/12/20 Page 259 of 279
Texas League of United Latin American Citizens v. Hughs, 978 F.3d 136 (2020)
2020 WL 6023310

the July 27 proclamation enforced, but only as amended by the Governor's October 1 proclamation. So we must take the July 27 proclamation as a given. The only question before us is whether the district court was correct to set aside a portion of the Governor's October 1 proclamation. I agree with my colleagues that the district court was wrong to do so, and that a stay should therefore be granted.

## II.

None of this is to say, of course, that there are not valid *policy* reasons to support the conflicting judgments reached by the Governor and the federal district court. The ongoing global pandemic has already roiled the lives and livelihoods of millions of Texans. It is understandable that citizens have strong views on the myriad ways that election rules and procedures might be reformed to maximize voter access in these difficult and challenging times. After all, "[t]o lose the ability to vote in an upcoming election due to fear of the pandemic would be beyond heartbreaking for citizens who are already hurting, for it is a right they will *never* be able to recover." *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 413 (5th Cir. 2020) (Ho, J., concurring) (quotations omitted).

So the Governor may well believe sincerely that expanding the early voting period furthers the goal of maximizing voter access, and that limiting where mail ballots may be delivered in person will help maximize ballot integrity. On the other hand, the plaintiffs counter that the Governor's approach to mail ballots gets it backward—and that in fact there is a greater risk of fraud when ballots are returned by mail than when they are delivered in-person. To quote the plaintiffs: "the unrebutted evidence demonstrates that allowing voters to return their absentee ballots at the annexes is 'more secure than returning [ballots] by mail.' " Numerous courts agree. As a distinguished panel of the Seventh Circuit once observed: "Voting fraud is a serious problem in U.S. elections generally ... and it is facilitated by absentee voting .... [A]bsentee voting is to voting in person as a take-home exam is to a proctored one." *Griffin v. Roupas*, 385 F.3d 1128, 1130–31 (7th Cir. 2004) (collecting authorities). *See also Tex. Democratic Party*, 961 F.3d at 414 (Ho, J., concurring) ("[C]ourts have repeatedly found that mail-in ballots are particularly susceptible to fraud.") (collecting cases).[4]

---

[4]     *See also* Adam Liptak, *Error and Fraud at Issue as Absentee Voting Rises*, N.Y. Times (Oct. 6, 2012), https://www.nytimes.com/2012/10/07/us/

politics/as-more-vote-by-mail-faulty-ballots-could-impact-elections.html ("[F]raud in voting by mail ... is vastly more prevalent than ... in-person voting fraud ..., election administrators say.") (collecting examples); *id.* (noting the "bipartisan consensus" that "voting by mail ... is more easily abused than other forms" of voting and that " '[a]bsentee ballots remain the largest source of potential voter fraud,' " which is " 'why all the evidence of stolen elections involves absentee ballots and the like' ") (quoting a 2005 report signed by President Jimmy Carter and James A. Baker III, and Yale Law School Dean Heather Gerken, respectively).

**\*13**   But if changes to Texas election rules are warranted in response to the pandemic, they must be made consistent with the Constitution. And under our Constitution, it is for the Texas Legislature through the legislative process—and not for the Governor or the judiciary by executive or judicial fiat —to determine how best to maximize voter access as well as ballot security. *See, e.g.*, *Griffin*, 385 F.3d at 1131 (noting that "the striking of the balance between discouraging fraud and other abuses and encouraging turnout is quintessentially a legislative judgment").

What's more, there may be special cause for concern when unilateral changes to election laws are made by a single elected official. As the Chief Justice once wrote, "those who govern should be the *last* people to help decide who *should* govern." *McCutcheon v. FEC*, 572 U.S. 185, 192, 134 S.Ct. 1434, 188 L.Ed.2d 468 (2014) (plurality opinion). He made that observation in the context of a case involving campaign finance regulation. But the same principle readily applies to any area of election law. Indeed, skepticism about politicians regulating politics is "deeply engrained in our nation's DNA." *Stringer v. Whitley*, 942 F.3d 715, 725 (5th Cir. 2019) (Ho, J., concurring). "As Americans, we have never trusted the fox to guard the henhouse." *Id.*

So the Governor's actions in this case should trouble you regardless of whether you agree or disagree with any of his actions as a policy matter. For there is a more fundamental principle at stake: If a governor can unilaterally suspend early voting laws to reach policy outcomes that you prefer, it stands to reason that a governor can also unilaterally suspend other election laws to achieve policies that you oppose. Want to expand voting by mail? Too bad—the governor can suspend mail-in ballots all by himself, for the same reason restaurants have replaced paper menus with online ones in response to consumer concerns about the pandemic. Want to restrict voting by mail? Sorry—the governor can expand mail-in

voting on his own, because some people fear going to the polls during the pandemic.

But that of course is not how our Constitution works. The Constitution vests control over federal election laws in state legislatures, and for good reason—that's where we expect the voice of the people to ring most loudly and effectively. Moreover, change by other means doesn't just undermine respect for legal process. It threatens to undermine the very legitimacy of the election results—the last thing we need in these divisive and uncertain times.[5]

| 5 | *See, e.g., Editorial: Abbott must provide cure to voting in a pandemic*, San Antonio Express-News (Apr. 14, 2020) ("If more mail balloting is going to be encouraged ... there needs to be a legislative directive .... If the state is going to expand access to mail ballots ... it needs to do it right."). |

I concur.

**All Citations**

978 F.3d 136, 2020 WL 6023310

---

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

S

978 F.3d 93
United States Court of Appeals, Fourth Circuit.

Patsy J. WISE; Regis Clifford; Samuel
Grayson Baum; Donald J. Trump for
President, Inc.; Gregory F. Murphy,
U.S. Congressman; Daniel Bishop, U.S.
Congressman; Republican National
Committee; National Republican
Senatorial Committee; National
Republican Congressional Committee;
North Carolina Republican Party; Camille
Annette Bambini, Plaintiffs – Appellants,

v.

Damon CIRCOSTA, in his official capacity
as Chair of the State Board of Elections;
Stella Anderson, in her official capacity as
Secretary of the State Board of Elections;
Jeff Carmon, in his official capacity
as Member of the NC State Board of
Elections; Karen Brinson Bell, in her
official capacity as Executive Director
of the North Carolina State Board of
Elections; North Carolina State Board
of Elections, Defendants – Appellees,
and
Barker Fowler; Becky Johnson; Jade
Jurek; Rosalyn Kociemba; Tom Kociemba;
Sandra Malone; North Carolina Alliance
for Retired Americans; Caren Rabinowitz,
Intervenors/Defendants – Appellees.
Timothy K. Moore, in his official capacity
as Speaker of the North Carolina House
of Representatives; Philip E. Berger,
in his official capacity as President
Pro Tempore of the North Carolina

Senate; Bobby Heath; Maxine Whitley;
Alan Swain, Plaintiffs – Appellants,

v.

Damon Circosta, in his official capacity
as Chair of the North Carolina State
Board of Elections; Stella Anderson, in
her official capacity as a member of the
North Carolina State Board Elections;
Jeff Carmon, III, in his official capacity
as a member of the North Carolina State
Board of Elections; Karen Brinson Bell,
in her official capacity as the Executive
Director of the North Carolina State Board
of Elections, Defendants – Appellees,
and
Barker Fowler; Becky Johnson; Jade
Jurek; Rosalyn Kociemba; Tom Kociemba;
Sandra Malone; North Carolina Alliance
for Retired Americans; Caren Rabinowitz,
Intervenors/Defendants – Appellees.

No. 20-2104, No. 20-2107
|
FILED: October 20, 2020

**Synopsis**
**Background:** North Carolina legislators brought federal
actions seeking a temporary restraining order (TRO) to
prevent a state court consent judgment, agreed to by Board
of Elections, that extended the receipt deadline for mail-in
ballots. After the TRO was granted, Board of Elections filed
for an emergency injunction pending appeal. Before the Court
of Appeals panel acted on the injunction request, the United
States District Court for the Middle District of North Carolina,
William L. Osteen, J., 2020 WL 6063332, denied motions
for a preliminary injunction and to convert the TRO into a
preliminary injunction.

**Holdings:** The Court of Appeals, en banc, Wynn, Circuit
Judge, held that:

status quo was the extension of the deadline, disfavoring an injunction;

legislators were unlikely to succeed on merits of Equal Protection claim;

legislators lacked standing to bring Elections Clause claim; and

*Pullman* abstention doctrine strongly counseled against federal courts exercising jurisdiction over Elections Clause challenge.

Injunction denied.

Motz, Circuit Judge, filed concurring opinion.

Wilkinson and Agee, Circuit Judges, filed dissenting opinion in which Niemeyer, Circuit Judge, joined.

Niemeyer, Circuit Judge, filed dissenting opinion.

ORDER

Upon consideration of submissions relative to the emergency motions for injunction pending appeal, the court denies injunctive relief pending appeal.

**\*1** Chief Judge Gregory, Judge Motz, Judge King, Judge Keenan, Judge Wynn, Judge Diaz, Judge Floyd, Judge Thacker, Judge Harris, Judge Richardson, Judge Quattlebaum, and Judge Rushing voted to deny the motions for injunction. Judge Wilkinson, Judge Niemeyer, and Judge Agee voted to grant the motions for injunction.

Judge Wynn wrote an opinion on the denial of emergency injunctive relief. Judge Motz wrote a concurring opinion. Judge Wilkinson and Judge Agee wrote a dissenting opinion in which Judge Niemeyer joined. Judge Niemeyer wrote a separate dissenting opinion.

WYNN, Circuit Judge, denying emergency injunctive relief: The judges of the Fourth Circuit and our fellow judges on North Carolina's state and federal courts have done an admirable job analyzing these weighty issues under substantial time constraints. Our prudent decision today

declines to enjoin the North Carolina State Board of Elections's extension of its deadline for the receipt of absentee ballots for the ongoing general election.

Reading the dissenting opinion of our colleagues Judge Wilkinson and Judge Agee, one might think the sky is falling. Missing from their lengthy opinion is a recognition of the narrowness of the issue before us. Importantly, the *only* issue we must now decide is Plaintiffs' request for an emergency injunction pending appeal regarding a single aspect of the procedures that the district court below refused to enjoin: an extension of the deadline for the receipt of mail-in ballots. *All ballots must still be mailed on or before Election Day.* The change is simply an extension from three to nine days after Election Day for a timely ballot to be received and counted. That is all.

Implementation of that simple, commonsense change was delayed by judicial intervention. To be sure, some of that intervention was by the state courts: although a state trial court approved of the ballot-receipt extension, a state appellate court stayed it pending appeal, a stay that was lifted late yesterday afternoon. *See* Defendants' Supp. Letter (Oct. 19, 2020). That stay was, of course, the state court's prerogative. But prior to the state appellate court's intervention, it was solely *federal court* intervention that kept this change from being implemented. Our dissenting colleagues would perpetuate that intervention now, despite the Supreme Court's admonitions against taking such action.

Yet North Carolina voters deserve clarity on whether they must rely on an overburdened Post Office to deliver their ballots within three days after Election Day. The need for clarity has become even more urgent in the last week, as in-person early voting started in North Carolina on October 15 and will end on October 31. As our dissenting colleagues so recently reminded us, a federal court injunction would "represent[ ] a stark interference with [North] Carolina's electoral process right in the middle of the election season," which is inappropriate because "the federal Constitution provides States—not federal judges—the ability to choose among many permissible options when designing elections," especially when the "law is commonplace and eminently sensible." *Middleton v. Andino,* No. 20-2022, ―― F.3d ――, ――, 2020 WL 5752607, at \*1 (4th Cir. Sept. 25, 2020) (Wilkinson and Agee, JJ., dissenting) (internal quotation marks omitted).

**\*2** This fast-moving case is proceeding in state court and involves an ongoing election—two sound reasons for us to stay our hand. Because Plaintiffs have not established a likelihood of success on the merits—and because, in any event, *Purcell* and *Andino* require that we not intervene at this late stage—we rightly decline to enter an injunction pending appeal.

I.

The North Carolina Alliance for Retired Americans and several individual voters filed suit against the State Board of Elections ("Board") in Wake County Superior Court on August 10, 2020, challenging, among other provisions, the state's requirement that mail-in ballots be received within three days of Election Day. Speaker Tim Moore and Senate President Pro Tempore Phil Berger—two of the plaintiffs here—intervened as defendants alongside the Board on August 12.[1]

[1] The political-committee Plaintiffs in the *Wise* case before us also successfully intervened in the *NC Alliance* litigation on September 24, 2020, where they claimed to represent the interest of "Republican voters throughout the state." *Moore v. Circosta*, No. 20-2062, Defendants-Appellants' App'x at 286.

On September 15, the State Board voted unanimously—and in bipartisan fashion!—to extend the receipt deadline for this election until nine days after Election Day (November 12, 2020).[2] The *NC Alliance* plaintiffs agreed to a settlement based, in part, on this change. On September 22, they joined the Board in asking the state court to approve a Consent Judgment formalizing the new receipt deadline. The state court issued an order approving the Consent Judgment on October 2.[3] This October 2 order established the relevant status quo for *Purcell* purposes. Under this status quo, all absentee votes cast by Election Day and received by November 12 would be counted.

[2] This was far from a radical move. The Board regularly extends its absentee ballot receipt deadlines in response to the hurricanes that befall us in the autumn. *See* Emergency Order—Updated 11/5/1018, N.C. State Bd. of Elections (Nov. 5, 2018), https://s3.amazonaws.com/dl.ncsbe.gov/ State_Board_Meeting_Docs/Orders/Executive

%20Director%20Orders/Order_2018-10-19.pdf (extending deadline to nine days after Election Day in response to Hurricane Florence); Second Emergency Executive Order, N.C. State Bd. of Elections (Sept. 6, 2019), https://s3.amazonaws.com/dl.ncsbe.gov/ State_Board_Meeting_Docs/Orders/Executive %20Director%20Orders/Order2_2019-09-06.pdf (extending deadline to eight days after Election Day in response to Hurricane Dorian).

[3] The state court explicitly found that the Consent Judgment was the product of arms-length negotiations between the parties. *See Wise* Intervenor-Appellees' App'x at 37. Efforts to characterize this good-faith agreement as a collusive backroom deal bulldoze through that plainly supportable conclusion.

However, on September 26, Speaker Moore, Leader Berger, and others initiated two federal lawsuits in the Eastern District of North Carolina. On October 3—the day *after* the state court issued final judgment—Judge Dever granted those parties' request for a Temporary Restraining Order, preventing the Consent Judgment from going into effect.[4] Judge Dever's order thus suspended the status quo already created by the state court order.

[4] By that order, Judge Dever also transferred the case to Judge Osteen in the Middle District of North Carolina.

**\*3** On October 5, the Board filed emergency motions for administrative and temporary stays of the TRO—which it properly understood to be a preliminary injunction, in effect if not in name—pending appeal in this Court. While those motions were pending, on October 6, Plaintiffs filed a motion in the district court to formally convert the TRO into a preliminary injunction. On the same day, Plaintiffs sought a writ of supersedeas as well as a temporary stay and expedited review of the *NC Alliance* judgment from the North Carolina Court of Appeals.

A week went by. The Fourth Circuit panel assigned to hear the Board's motions to stay Judge Dever's TRO did not take any action. The district court finally ruled on the motions for preliminary injunctions on October 14. And on October 15, the state appellate court granted a temporary stay—a stay that it dissolved yesterday when it denied the petitions for writs of supersedeas. Accordingly, the ballot receipt extension has gone into effect. *See* Defendants' Supp. Letter (Oct. 19, 2020).

Again, before us now is only the issue of whether to grant an injunction—which a district court has already denied—of the ballot-receipt extension. Our dissenting colleagues apparently believe the witness-requirement issue is also before us, as their opinion is peppered with references to it, and even proposes to order injunctive relief on that point. *See* Wilkinson and Agee Dissenting Op. at ——. Yet, as Plaintiffs themselves vigorously assert, "the *only* aspect of the revised Numbered Memo 2020-19 that Appellants are seeking to enjoin is the extension of the receipt deadline." *Moore* Reply Br. at 1; *see also Wise* Reply Br. at 3 (noting that the most recent version of the memo issued by the Board "honor[s] the Witness Requirement"). And indeed, as the district court noted, the one-witness requirement remains in place under the district court's August 4, 2020 injunction. *Moore v. Circosta*, No. 1:20CV911, —— F.Supp.3d ——, ——, 2020 WL 6063332, at *2 (M.D.N.C. Oct. 14, 2020). The injunction our colleagues propose to issue on the witness requirement is therefore inappropriate, and their references throughout their opinion to that aspect of the parties' dispute are inapposite.


**II.**

From the outset, *Purcell* strongly counsels *against* issuing an injunction here.

The status quo is plainly that the ballot-receipt extension is in place. The extension took effect after the district court's TRO expired (October 16) and the state appellate court dissolved its temporary administrative stay (October 19). But even before those injunctions lifted, the ballot-receipt extension has been the status quo ever since the trial court approved the settlement (October 2).

The Supreme Court's recent decision in *Andino* instructs that it is not federal court decisions, but state decisions, that establish the status quo. In *Andino*, there was a state law in place that was modified by a federal court injunction for the primaries; the state law continued to be in place for the November election; and the district court again enjoined it. My view was that the injunction at the time of the primaries —establishing the rules when voters most recently voted— was the status quo. *Middleton v. Andino*, No. 20-2022, —— F.3d ——, ——, 2020 WL 5752607, *——, 2020 U.S. App. LEXIS 31093 at *10 (4th Cir. Sep. 30, 2020) (Wynn, J., concurring). But our dissenting colleagues disagreed, viewing the state law as the status quo and federal court intervention

as inappropriate under *Purcell. See Middleton*, —— F.3d at ——, 2020 WL 5752607, at *1 (Wilkinson and Agee, JJ., dissenting). The Supreme Court agreed with our colleagues. *Andino v. Middleton*, No. 20A55, —— U.S. ——, ——, —— S.Ct. ——, ——, —— L.Ed.2d ——, 2020 WL 5887393, at *1 (U.S. Oct. 5, 2020). Apparently, then, it is the state's action— not any intervening federal court decision—that establishes the status quo.

**\*4** Here, the state's action was to implement the challenged modifications.[5] The status quo was therefore established on October 2, when the state court approved the Consent Judgment in *NC Alliance*. The district court below agreed. *See Moore*, —— F.Supp.3d at ——, 2020 WL 6063332, at *23 (refusing to enjoin the absentee ballot receipt deadline extension as it would be inappropriate to cause confusion by "changing [the] election rules" the state established on October 2). *Purcell* and *Andino* therefore require that we refuse to enter an injunction here.

5     Our dissenting colleagues believe that we must defer to the General Assembly over the Board. Wilkinson and Agee Dissenting Op. at ——. But whether the Board may properly act as an agent of the state legislature is a complicated question of state law that is, at this moment, being litigated in state court. As discussed below, *Pullman* abstention requires that we refrain from injecting ourselves into the middle of this dispute.

Further, contrary to our dissenting colleagues' assertion, Wilkinson and Agee Dissenting Op. at —— – ——, *Purcell* is about *federal court* intervention. *See, e.g., Andino*, —— U.S. ——, ——, —— S.Ct. ——, ——, —— L.Ed.2d ——, 2020 WL 5887393, at *1 (Kavanaugh, J., concurring) ("[F]or many years, this Court has repeatedly emphasized that *federal courts* ordinarily should not alter state election rules in the period close to an election." (emphasis added)); *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, —— U.S. ——, 140 S. Ct. 1205, 1207, 206 L.Ed.2d 452 (2020) ("This Court has repeatedly emphasized that *lower federal courts* should ordinarily not alter the election rules on the eve of an election." (emphasis added)); *Middleton*, —— F.3d at ——, 2020 WL 5752607, at *1 (Wilkinson and Agee, JJ., dissenting) ("[T]he federal Constitution provides *States —not federal judges*—the ability to choose among many permissible options when designing elections. The [contested injunction] upends this whole structure and turns its back upon our federalist system." (internal quotation marks and citation omitted) (emphasis added)); *cf. Scarnati v. Boockvar*, No. 20A53, —— U.S. ——, ——, —— S.Ct. ——, ——, ——

L.Ed.2d ——, 2020 WL 6128194 at *1, 2020 U.S. LEXIS 5182 at *1 (Oct. 19, 2020) (denying by divided vote an application for stay of decision by Pennsylvania Supreme Court extending deadline for receipt of absentee ballots); *Republican Party of Pa. v. Boockvar*, No. 20A54, —— U.S. ——, ——, —— S.Ct. ——, ——, —— L.Ed.2d ——, 2020 WL 6128193 at *1, 2020 U.S. LEXIS 5181 at *1 (Oct. 19, 2020) (same).

Our dissenting colleagues' attempt to stretch *Purcell* beyond its clear limits to cover not just federal court action, but also action by state courts *and* state executive agencies acting pursuant to a legislative delegation of authority, proves too much. They cite no authority for this expansion, and there is none.

Indeed, our dissenting colleagues' assertion that "there is no principled reason why this rule should not apply against interferences by state courts and agencies," Wilkinson and Agee Dissenting Op. at ——, flips *Purcell* on its head: our colleagues *justify* federal court intervention—the one thing *Purcell clearly* counsels against—based on their own notions of what the Supreme Court *should have* said in *Purcell*. We cannot agree with such an expansion of federal court power at the expense of states' rights to regulate their own elections.[6] To do so would amount to inappropriate judicial activism.

[6] Additionally, the primary justification behind the *Purcell* principle—as our dissenting colleagues correctly state—is to avoid "chaos." *See* Wilkinson and Agee Dissenting Op. at ——, ——, ——; *see also Purcell v. Gonzalez*, 549 U.S. 1, 4–5, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006) (noting that "[c]ourt orders affecting elections" can create "voter confusion"). It is difficult to conceive what chaos our colleagues can possibly be envisioning here. *Voter behavior cannot be impacted by our decision one way or another.* Voters *must* postmark their mail-in ballots on or before Election Day. Thus, the deadline extension only changes two things: more votes cast by mail will be counted rather than discarded because of mail delays, and fewer voters will have to risk contracting the novel coronavirus by voting in person. Only a grotesquely swollen version of *Purcell* would consider this "voter confusion," or in any way harmful.

## III.

**\*5** Turning to whether Plaintiffs are likely to succeed on the merits, the district court concluded that the Board likely violated the Equal Protection Clause when it extended the deadline for receipt of civilian absentee ballots postmarked by Election Day from three days after Election Day to nine days after Election Day. The court relied heavily on *Bush v. Gore*, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) (per curiam). *See Moore*, —— F.Supp.3d at ——, ——, 2020 WL 6063332, at *17, 19. *Bush* prohibits arbitrary and disparate treatment in the valuation of one person's vote in relation to another's.[7]

[7] Of course, *Bush* is of limited precedential value. *See Bush*, 531 U.S. at 109, 121 S.Ct. 525 ("Our consideration is limited to the present circumstances, for the problem of equal protection in election processes generally presents many complexities."). This analysis treats it as binding for present purposes.

This case totally lacks the concern with arbitrary or disparate standards that motivated *Bush*. The standard could not be clearer or more uniform: *everyone* must cast their ballot on or before Election Day, and the ballot will be counted for *everyone* as long as it is received within nine days after Election Day. Nor will the ballot receipt extension lead to the "unequal evaluation of ballots," another worry in *Bush*. 531 U.S. at 106, 121 S.Ct. 525. Everyone's ballot is worth the same under the extension.

Looking beyond *Bush*, there appears to be no support for the district court's equal protection conclusion anywhere in our jurisprudence. Here, no voter would be treated differently than any other voter as everyone will be able to have their absentee ballots counted if mailed in on time and received on time. Moreover, in a sharp departure from the ordinary voting-rights lawsuit, *no one was hurt by this deadline extension*. The extension does not in any way infringe upon a single person's right to vote: all eligible voters who wish to vote may do so on or before Election Day.

Indeed, several of the plaintiffs have already voted. *See Moore*, —— F.Supp.3d at —— – ——, 2020 WL 6063332, at *1–2. The extension simply makes it easier for more people to vote absentee in the middle of a global pandemic that has killed over 200,000 Americans. How this implicates the Equal Protection Clause—a key provision of the Reconstruction Amendments that protects individuals' right to *equal protection* under the law[8]—is beyond our understanding.

[8] *Cf. Baten v. McMaster*, 967 F.3d 345, 355 (4th Cir. 2020), *as amended* (July 27, 2020) (Niemeyer, J.) ("Despite the

plaintiffs' argument to the contrary, no vote ... is diluted. Every qualified person gets one vote and each vote is counted equally in determining the final tally.").

But there is more. Plaintiffs' equal protection argument is plainly in conflict with the Supreme Court's recent action in *Andino*, where the Court permitted votes that lacked a witness signature to be counted so long as they were cast before the Supreme Court's stay issued and were received within two days of the order. *Andino*, —— U.S. ——, ——, —— S.Ct. ——, ——, —— L.Ed.2d ——, 2020 WL 5887393, at *1. If the Board's absentee ballot receipt deadline violates the Equal Protection Clause by changing rules mid-election, so did the Supreme Court's order in *Andino*.

Nor is the perfunctory analysis of our dissenting colleagues on this point persuasive: they merely reference state officials applying "different rules to different voters in the same election" and concerns about "the diluting effect of illegal ballots." Wilkinson and Agee Dissenting Op. at —— — ——. Whether ballots are *illegally* counted if they are received more than three days after Election Day depends on an issue of state law from which we must abstain.

 **\*6** As for applying different rules to different voters, again, the Board's change does no such thing. All voters must abide by the exact same restriction: they must cast their ballots on or before Election Day. The change impacts only an element outside the voters' control: how quickly their ballots must be received to be counted. This change, of course, may have its own important consequences for the health of our citizenry—in terms of unnecessary infections avoided—and our democracy—in terms of lawful ballots cast and counted.

## IV.

Plaintiffs also believe that the Board violated the Elections Clause when they extended the absentee ballot receipt deadline. But as the district court properly concluded, Plaintiffs lack standing to bring their Elections Clause claim. *Moore*, —— F.Supp.3d —— — ——, 2020 WL 6063332, at *23–25. Two of the plaintiffs in *Moore* are leaders of their respective chambers in the North Carolina General Assembly: the Speaker of the House (Moore) and the President Pro Tempore of the Senate (Berger).

In their current request for an injunction, they argue that they have standing to bring an Elections Clause claim on behalf of the North Carolina General Assembly pursuant to N.C.

Gen. Stat. § 120-32.6(b), which provides in relevant part that "[w]henever the validity or constitutionality of an act of the General Assembly or a provision of the Constitution of North Carolina is the subject of an action in any State or federal court, the Speaker of the House of Representatives and the President Pro Tempore of the Senate, as agents of the State through the General Assembly, shall be necessary parties." This provision does nothing to confer standing on Plaintiffs Moore and Berger because the subject of this action is a change by the Board, not the validity or constitutionality of an act of the General Assembly or a provision of the North Carolina Constitution.

## V.

Furthermore, even if Plaintiffs had standing to pursue the Elections Clause issue, the *Pullman* abstention doctrine strongly counsels us, as a federal court, against exercising jurisdiction over that claim. *Pullman* abstention applies where "there is (1) an unclear issue of state law presented for decision (2) the resolution of which may moot or present in a different posture the federal constitutional issue such that the state law issue is potentially dispositive." *Educ. Servs., Inc. v. Md. State Bd. for Higher Educ.*, 710 F.2d 170, 174 (4th Cir. 1983) (internal quotation marks omitted).

Here, Plaintiffs are asking federal courts to determine whether the Board acted within the scope of its authority delegated by the Legislature. This is a close issue of *state* law involving competing interpretations of North Carolina's statutes governing election procedures and implicating complex questions concerning the separation of powers in the state. None of the parties have suggested or argued that state courts have already settled this issue conclusively. Indeed, the state court that approved the Consent Judgment considered and rejected Plaintiffs' argument as to this issue, while the district court reached the opposite conclusion. *See Wise* Intervenor-Appellees' App'x at 454–56; *Moore*, —— F.Supp.3d at —— — ——, 2020 WL 6063332, at *26–30. This very conflict suggests that the issue is far from settled.[9]

9    That being said, a state trial court approved of the ballot-receipt extension, and a state appellate court declined to enjoin it. Accordingly, all evidence suggests that the state courts do not believe the Board acted beyond its authority in ordering the extension.

Nor is there any question that the resolution of this state law question is "potentially dispositive." *Educ. Servs.*, 710 F.2d

at 174. If a reviewing state court decides that the Board acted within its authority, then there is plainly no Elections Clause problem. Conversely, if the state court concludes that the Board lacked authority and declares the Consent Judgment invalid, we will no longer have a case since that would moot all of the federal constitutional claims.

**\*7** Indeed, we have previously deemed *Pullman* abstention appropriate where the resolution of an issue concerning state delegation of authority would moot the constitutional questions presented. *See K Hope, Inc. v. Onslow Cnty.*, 107 F.3d 866 (4th Cir. 1997) (unpublished table disposition). And contrary to the district court's misstatement, *Moore*, —— F.Supp.3d at ——, 2020 WL 6063332, at \*11, the state-law question concerning the scope of the Board's authority remains squarely before the state courts.[10] *See Wise* Intervenor-Appellees' App'x at 686–92. "Where there is an action pending in state court that will likely resolve the state-law questions underlying the federal claim," the Supreme Court has "regularly ordered abstention." *Harris Cnty. Comm'rs Ct. v. Moore*, 420 U.S. 77, 83, 95 S.Ct. 870, 43 L.Ed.2d 32 (1975).

[10]    Accordingly, although the district court is of course correct that we generally "must predict how [a state's] highest court would rule" when it has not yet done so, here, we need not guess: we may simply allow this lawsuit to proceed, as it is presently doing, in the state courts. *Moore*, —— F.Supp.3d at ——, 2020 WL 6063332, at \*30.

Few cases implicate the "dual aims" of the *Pullman* abstention doctrine—"avoiding advisory constitutional decisionmaking" and "promoting the principles of comity and federalism"—more strongly than this one. *Pustell v. Lynn Pub. Schs.*, 18 F.3d 50, 53 (1st Cir. 1994). Thus, we should abstain from "needless federal intervention into local affairs." *Id.*

Plaintiffs do not have standing to pursue their Elections Clause claim anyway. But nonetheless, this issue may have implications for their Equal Protection claim as well.

In assessing Plaintiffs' likelihood of success on the merits regarding their Equal Protection challenge to the receipt deadline extension, the district court rested its analysis in part on the fact that the "change contravenes the express deadline established by the General Assembly," which is three days after Election Day. *Moore*, —— F.Supp.3d at ——, 2020 WL 6063332, at \*19; *see also* Wilkinson and Agee Dissenting

Op. at —— (appearing to agree with the district court's analysis on this point by referring to "the diluting effect of illegal ballots"). Of course, if the Board is the agent of the Legislature for purposes of the Elections Clause—the very state-law issue from which we must abstain deciding—there is no contravention and there are no illegal ballots.

## VI.

In sum, Plaintiffs are not likely to succeed on the merits with their novel Equal Protection theory. They lack standing to raise their Elections Clause challenge; even if they did not, we ought to exercise *Pullman* abstention. Furthermore, all suggestions from the state courts point to the conclusion that the Board properly exercised its legislative delegation of authority. There is no irreparable harm from a ballot extension: again, *everyone must submit their ballot by the same date*. The extension merely allows more lawfully cast ballots to be counted, in the event there are any delays precipitated by an avalanche of mail-in ballots.

And the balance of equities is influenced heavily by *Purcell* and tilts against federal court intervention at this late stage. *Andino* establishes that the appropriate status-quo framework is the status quo created by the state's actions, not by later federal court interventions. We ought not to perpetuate any further this inappropriate intervention by granting the "extraordinary and drastic remedy" of a preliminary injunction. *CASA de Md., Inc. v. Trump*, 971 F.3d 220, 241 (4th Cir. 2020) (Wilkinson, J.) (quoting *Munaf v. Geren*, 553 U.S. 674, 690–91, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008)). Such a remedy would be particularly extraordinary here, where the injunction would be granted by a federal appellate court in the first instance—after a federal trial court, state trial court, *and* state appellate court all declined to do so.

**\*8** And even if reasonable minds can disagree on the merits, an injunction is still inappropriate here. The district court believed that Plaintiffs were *likely to succeed* on their equal protection claims. But, pursuant to *Purcell*, the court concluded that injunctive relief was inappropriate at this late date. *Moore*, —— F.Supp.3d at ——, 2020 WL 6063332, at \*1. We rightfully do not disturb that sound judgment from a judge who has been thoughtfully considering these matters for months. Nor need we: the state appellate court has itself exercised control over this matter and the Supreme Court of North Carolina stands ready to act thereafter. As the district court wisely recognized, there is no need, in the middle of an

ongoing election, for the federal courts to intervene into the voting affairs of North Carolina.

Accordingly, this Court must deny the requested injunction. To do otherwise would risk endangering a great many of our doctrines, to say nothing of the health of the voters of North Carolina as they attempt to safely exercise their right to vote.

DIANA GRIBBON MOTZ, Circuit Judge, concurring in the denial of emergency injunctive relief:
I concur in full with Judge Wynn's excellent opinion for the court. I write separately to reiterate just two points.

First, recent actions of the Supreme Court make clear that it is up to a state to decide what election procedures are in effect on Election Day. *See, e.g.*, *Republican Party of Pa. v. Boockvar, Sec. of Pa.*, No. 20A54, 592 U.S. ——, —— S.Ct. ——, —— L.Ed.2d —— (Oct. 19, 2020); *Andino v. Middleton*, No. 20A55, —— U.S. ——, —— S.Ct. ——, —— L.Ed.2d ——, 2020 WL 5887393 (U.S. Oct. 5, 2020). Indeed, in a case strikingly similar to this one, the Supreme Court recently declined to grant a stay where "the state election officials support the challenged decree." *Republican Nat'l Comm. v. Common Cause Rhode Island*, No. 20A28, —— U.S. ——, —— S.Ct. ——, —— L.Ed.2d ——, 2020 WL 4680151 (U.S. Aug. 13, 2020). So too here. The North Carolina legislature by statute conferred authority on the Board of Elections to "exercise emergency powers to conduct an election in a district where the normal schedule is disrupted by" a "natural disaster." N.C. Gen. Stat. § 163-27.1. That two individual legislators disagree with this delegation of power by the legislature is of no moment: "individual members [of a state legislature] lack standing to assert the institutional interests of a legislature" absent clear authorization. *Virginia House of Delegates v. Bethune-Hill*, —— U.S. ——, 139 S. Ct. 1945, 1953, 204 L.Ed.2d 305 (2019).

Second, the plaintiffs' equal protection argument is deeply troubling. Quite unlike the ordinary challenge to state election procedures, plaintiffs here have not asserted *any* injury to their fundamental right to vote. *See Anderson v. Celebrezze*, 460 U.S. 780, 789, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). Rather, they challenge measures that remove burdens on other citizens exercising their right to vote. The dissent seeks to recast these measures, aimed at maximizing citizens' ability to have "a voice in the election," *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), as ones with nefarious "diluting effect[s]," Dissenting Op. at —— (quoting

*Gray v. Sanders*, 372 U.S. 368, 380, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963)). Not so. To be sure, a state "may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 105, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000). But if the extension went into effect, plaintiffs' votes would not count for less *relative to other North Carolina voters*. This is the core of an Equal Protection Clause challenge. *See Reynolds v. Sims*, 377 U.S. 533, 568, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) ("Simply stated, an individual's right to vote ... is unconstitutionally impaired when its weight is in a substantial fashion diluted *when compared with* votes of citizens living on other parts of the State.") (emphasis added). The extension does not dilute some votes relative to others — rather, it has the same effect on all North Carolina voters.

WILKINSON and AGEE, Circuit Judges, with whom NIEMEYER, Circuit Judge, joins, dissenting:
**\*9** We dissent from the court's grant of a hearing *en banc* in this case and the failure of the court to grant appellants' motions for injunctions against the North Carolina State Board of Elections pending appeal. Because of this case's importance, we judge it is necessary to lay out our reasoning with clarity. This course is necessary in order to draw attention to the accelerating pace of pre-election litigation in this country and all the damaging consequences ensuing therefrom.[1]

1       Two cases are consolidated before us: *Moore v. Circosta*,
        No. 20-2107, and *Wise v. Circosta*, No. 20-2104. For
        the sake of concision, we refer to Timothy Moore,
        Speaker of the North Carolina House of Representatives,
        and Philip Berger, President Pro Tempore of the North
        Carolina Senate, as the "legislative leader plaintiffs" and
        all the individual voter plaintiffs in both cases as the
        "voter plaintiffs." The defendants in both cases are the
        North Carolina State Board of Elections and its officers,
        members, and Chair, whom we refer to collectively as
        "the Board."

Here, as in *Andino v. Middleton*, No. 20A55, —— U.S. ——, —— S.Ct. ——, —— L.Ed.2d ——, 2020 WL 5887393 (U.S. Oct. 5, 2020), we are faced with nonrepresentative entities changing election law immediately preceding or during a federal election. In making those changes, they have undone the work of the elected state legislatures, to which the Constitution clearly and explicitly delegates the power to "prescribe[ ]" "[t]he Times, Places and Manner of holding Elections." U.S. Const. art. I, § 4, cl. 1. The Constitution does

not assign these powers holistically to the state governments but rather pinpoints a particular branch of state government —"the Legislatures thereof." *Id.* Whether it is a federal court —as it was in *Andino*—or a state election board—as it is here —does not matter; both are unaccountable entities stripping power from the legislatures. They are changing the rules of the game in the middle of an election—exactly what *Purcell v. Gonzalez*, 549 U.S. 1, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006), counsels against. By the time the Board changed the rules, voters had cast over 150,000 ballots in North Carolina.

Let's understand the strategy that is being deployed here. The status quo is the election law enacted by the North Carolina General Assembly. The Constitution grants state legislatures that power. Principles of democratic accountability reinforce it. The fair notice to all voters of election ground rules well in advance of Election Day commend it.

Then along come the disruptive efforts of federal courts or, in this case, a state election board to upend the set rules right in the middle of an election. The disruptors then hail their action as the new status quo, which is (the irony of this is rich) claimed to be beyond any power of disturbance.

It takes no special genius to know what this insidious formula is producing. Our country is now plagued by a proliferation of pre-election litigation that creates confusion and turmoil and that threatens to undermine public confidence in the federal courts, state agencies, and the elections themselves.

Only by repairing to state legislative intent can we extricate ourselves from this debilitating condition. The statutes of state legislatures are our sole North Star. When, as here, the plain wording of those enactments is transgressed, the entire body politic pays a grievous price. In the service of policy objectives, the majority is stripping state legislatures of the responsibility our founding charter has assigned them. And in so doing, it has encouraged others to regard state statutes as little more than advisory and for pre-election litigants fair game.

 **\*10**  Sometimes the state legislature will be in the hands of one party. Sometimes it will be in the hands of the other. Sometimes control may be divided. It matters not. These laws are what we as a nation have to live by, and to witness our democratic dissolution in this manner is heart-rending for the many good Americans of all persuasions who still view partisan advantage as subordinate to their country's lasting welfare.

As for *Scarnati v. Boockvar*, No. 20A53, —— U.S. ——, —— S.Ct. ——, —— L.Ed.2d ——, 2020 WL 6128194 (U.S. Oct. 20, 2020), where a stay was denied by the Supreme Court on a 4-4 vote: the circumstances here are materially different. For one thing, the petition in *Boockvar* was brought to the court by representatives of a single house of the Pennsylvania legislature, whereas here representatives of both houses are united in their petition before the courts. In addition, the questionable circumstances that plainly indicated a state agency's subversion of the state legislature's intent were not present in the Pennsylvania case. The agency's extension of the statutory receipt deadline for mailed absentee ballots was twice as long as in the Pennsylvania suit. Nor did the Pennsylvania action involve the elimination by an agency of a statutory witness signature requirement. In short, this case presents a clean opportunity for the Supreme Court to right the abrogation of a clear constitutional mandate and to impart to the federal elections process a strong commitment to the rule of law.

Allowing the Board's changes to go into effect now, two weeks before the election and after half a million people have voted in North Carolina, would cause yet further intolerable chaos. Thus for the reasons that follow, we dissent and would grant the request for an injunction pending appeal. We urge plaintiffs to take this case up to the Supreme Court immediately. Not tomorrow. Not the next day. Now.

I.

A.

On June 12, 2020, Governor Roy Cooper signed into law the Bipartisan Elections Act of 2020 (Bipartisan Elections Act), in which an overwhelming bipartisan majority of the General Assembly amended North Carolina's election procedures. *See* 2020 N.C. Sess. Laws § 2020-17. Responding to the COVID-19 pandemic, the bill altered the state's election law to facilitate safe voting, while maintaining the integrity of the state's elections. In one key part, the law reduced the witness requirement for absentee ballots from two witnesses to one witness on the condition that the witness include his or her name and address with their signature. *See id.* § 1.(a). The General Assembly also left in place the deadline for receipt of absentee ballots postmarked on or before Election Day; that deadline continued to be "three days after the election by 5:00 p.m." N.C. Gen. Stat. § 163-231(b)(2)b.

A series of state and federal lawsuits followed the passage of this law, challenging its contents as well as unchanged provisions of North Carolina's election code.

In the first federal case, Democracy North Carolina and several North Carolinian voters sued the Board in the Middle District of North Carolina. The court allowed the Speaker of the North Carolina House of Representatives (Speaker) and the President Pro Tempore of the North Carolina Senate (President Pro Tempore) to intervene in the case. On August 4, Judge Osteen issued an order granting in part and denying in part the preliminary injunction requested by the plaintiffs. *See Democracy N.C. v. N.C. State Bd. of Elections*, No. 1:20-CV-457, ––– F.Supp.3d ––––, ––––, 2020 WL 4484063, at *64 (M.D.N.C. Aug. 4, 2020). He upheld the one-witness requirement as constitutional and declined to supplant the legislature by ordering the establishment of contactless drop boxes. *Id.* at ––––, ––––, 2020 WL 4484063 at *36, *45.

### B.

**\*11** Not even a week after Judge Osteen issued his opinion and order, the North Carolina Alliance for Retired Americans and a different set of individual voters filed suit against the State Board of Elections in the North Carolina Superior Court for the County of Wake. On August 12, the Speaker and the President Pro Tempore filed a notice of intervention as of right. On August 18, the plaintiffs requested a preliminary injunction and filed briefing and evidence in support on September 4. On September 22, the plaintiffs and the Board defendants jointly moved for entry of a consent decree. The legislative defendant-intervenors opposed entry of the decree.

The consent decree ordered three changes to North Carolina's election procedures.[2] First, the decree extended the statutory receipt deadline for mailed absentee ballots postmarked on or before Election Day by six days. *Moore* Appellant App. at 35. That change trebled the legislature's receipt deadline from three days to nine. Second, the decree effectively eliminated the witness requirement for absentee ballots by creating a cure process through which voters could—without a witness—self-certify their ballots. *See id.* at 36. Third, the decree required the establishment of "a separate absentee ballot drop-off station at each one-stop early voting location and at county board offices." *Id.*

[2]   These changes were outlined in three Board memoranda: the September 2020-19 memo, the Numbered Memo 2020-22, and the Numbered Memo 2020-23.

On September 26, the Speaker and the President Pro Tempore along with three individual voters sought a TRO and preliminary injunction in the Eastern District of North Carolina to prohibit the implementation of these changes.

On October 2, the state court entered the consent judgment, which it explained in an October 5 opinion. The North Carolina Court of Appeals issued an administrative stay against the consent decree on October 16, 2020, and lifted it without opinion on October 19, 2020.

On October 3, Judge Dever, the federal judge in the Eastern District of North Carolina, granted the requested TRO enjoining the implementation of the State Board's three memoranda until October 16, 2020, and transferred the case to Judge Osteen to hold preliminary injunction hearings in conjunction with *Democracy N.C. Moore v. Circosta*, No. 5:20-CV-507-D, 2020 WL 5880129, at *9 (E.D.N.C. Oct. 3, 2020). Without considering plaintiffs' Elections Clause claim, Judge Dever found their Equal Protection Clause arguments "persuasive." *Id.* at *5. He found that, by changing election rules after the North Carolina election had begun, the Board "ignored the statutory scheme and arbitrarily created multiple, disparate regimes under which North Carolina voters cast absentee ballots." *Id.* at *7. These actions led to a high likelihood of "a debasement or dilution of the weight of a citizen's vote," *id.* at *6 (quoting *Reynolds v. Sims*, 377 U.S. 533, 554, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964)), and an "arbitrary or disparate treatment of members of [the state's] electorate," *id.* (quoting *Bush v. Gore*, 531 U.S. 98, 105, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) (per curiam)) (alteration in original). The court issued the TRO as necessary "to maintain the status quo." *Id.* at *7 (citing *Purcell v. Gonzalez*, 549 U.S. 1, 4–6, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006) (per curiam)).

### C.

After hearings, Judge Osteen denied the preliminary injunction. He rejected the defendant Board's arguments that (1) the court lacked jurisdiction, (2) abstention was appropriate, and (3) collateral estoppel barred the plaintiffs' claims. *Moore* Appellant App. at 93–101. In *Democracy North Carolina*, Judge Osteen issued an All Writs Act injunction that prohibited the Board from instituting the witness requirement cure procedure, and that injunction is

not before this court on appeal. We note, however, that Judge Osteen found that the Board (1) "mischaracterize[ed]" his August 4 "injunction in order to obtain contradictory relief in another court," *Wise* Appellant App. at 386, and (2) misrepresented to him the arguments that it made to the state court, *see id.* at 388–89.

**\*12** Considering the voter plaintiffs' Equal Protection Clause claims first, Judge Osteen found that none had standing on their vote dilution theory, but that they did have standing on their arbitrary and disparate treatment theory. *Id.* at 107–08. The voter plaintiffs articulated a cognizable injury for that theory because they had already cast their absentee ballots and thus had to meet a different standard for voting than the absentee voters who had not yet voted when the Board issued its changes in September. *Id.* at 111–14. On the Elections Clause claim, the court held that the legislative leaders lacked standing because "[t]he General Assembly ha[d] not directly authorized Plaintiffs to represent its interests in this specific case," but rather its statutory authorization covered only intervening as defendants when the constitutionality of a North Carolina statute was challenged. *Id.* at 140–43.

Judge Osteen found that the voter plaintiffs had established a likelihood of success on the merits. *Id.* at 121. The Board's actions were arbitrary because its witness cure process contravened the duly enacted laws of the state legislature. *See id.* at 122–23. The Board's procedure allowed votes for which there was no witness at any point in the process, and this created a preferred class of voters. *Id.* at 124. Judge Osteen noted that his August 4 injunction did not require the Board to do this, so it could not be the basis of settling the state court lawsuit through the consent decree, which he characterized as "secretly-negotiated." *Id.* at 83, 124. The extension of the ballot deadline was also arbitrary because the change "contravene[d] the express deadline established by the General Assembly." *Id.* at 126. Since these constitutional violations could not be remedied after the election, he found that the voters would suffer irreparable harm. *Id.* at 134. However, he found that the balance of the equities weighed against relief because he believed the *Purcell* principle, which bars courts from changing election rules shortly before federal elections, applied to prohibit him from entering an injunction so close to an election. *Id.* at 135–37.

Despite not finding standing for the legislative plaintiffs, Judge Osteen nevertheless addressed the merits of the Elections Clause claim and found that the Board had exceeded

its authority under North Carolina law because its rules had created "an unnecessary conflict with the legislature's choice" when it was under a statutory mandate to minimize conflict with the state's election law. *Id.* at 154.

On October 15, the legislative leaders and the voter plaintiffs filed a notice of appeal and requested an injunction pending resolution of their appeal to preserve the status quo. We have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1) to review the denial of a preliminary injunction.

## II.

As a preliminary matter, the Board defendants present two reasons why the district court could not hear plaintiffs' claims. First, they argue that plaintiffs are collaterally estopped from making their Equal Protection Clause argument in light of the North Carolina state court decision. Second, they argue that the voter plaintiffs do not have standing to seek relief. For the reasons discussed herein, they are mistaken.

### A.

Collateral estoppel does not bar plaintiffs from raising their Equal Protection Clause claim in federal court. We look to the preclusion law of North Carolina to make this determination because "the Full Faith and Credit Act requires that federal courts give the state-court judgment ... the same preclusive effect it would have had in another court of the same State." *Parsons Steel, Inc. v. First Ala. Bank*, 474 U.S. 518, 525, 106 S.Ct. 768, 88 L.Ed.2d 877 (1986). In North Carolina, under the doctrine of collateral estoppel, "the determination of an issue in a prior judicial or administrative proceeding precludes the relitigation of that issue in a later action, provided the party against whom the estoppel is asserted enjoyed a full and fair opportunity to litigate that issue in the earlier proceeding." *Whitacre P'ship v. Biosignia, Inc.*, 358 N.C. 1, 591 S.E.2d 870, 880 (2004). Defendants must establish that all requirements are satisfied. *Thomas M. McInnis & Assocs. v. Hall*, 318 N.C. 421, 349 S.E.2d 552, 557 (1986).

**\*13** In the instant case, the Board is attempting to collaterally estop the voter plaintiffs from arguing that its rule changes and the state court consent decree violate their rights to vote under the Equal Protection Clause. Those voters were not party to the state court litigation, so the Board must show

that the voter plaintiffs in the instant case "[a]re in privity with parties" to the state court case—that is, the legislative leaders. *Id.*

In its broad contours, " 'privity' for purposes of ... collateral estoppel 'denotes a mutual or successive relationship to the same rights of property.' " *Hales v. N.C. Ins. Guar. Ass'n*, 337 N.C. 329, 445 S.E.2d 590, 594 (1994) (quoting *Settle ex rel. Sullivan v. Beasley*, 309 N.C. 616, 308 S.E.2d 288, 290 (1983)). The North Carolina Supreme Court has said that "interest[ ] in the same question" is not sufficient to establish privity. *State ex rel. Tucker v. Frinzi*, 344 N.C. 411, 474 S.E.2d 127, 130 (1996) (quoting 47 Am. Jur. 2d *Judgments* § 663 (1995)). The defendants point to no shared property rights between the legislative leaders and the voter plaintiffs and offer only out-of-state precedent for the proposition that these parties' relationship is one that can give rise to privity. Since the general rule in American law is one of nonparty preclusion in only "limited circumstances," *Taylor v. Sturgell*, 553 U.S. 880, 898, 128 S.Ct. 2161, 171 L.Ed.2d 155 (2008), we decline to so extend North Carolina privity law and find that the voter plaintiffs are not collaterally estopped from bringing their Equal Protection Clause claim.

We also agree with Judge Osteen's conclusion that the legislative plaintiffs are not collaterally estopped from bringing their Elections Clause claim, and we reject defendants' arguments to the contrary. As the Supreme Court explained in *Arizona v. California*, 530 U.S. 392, 414, 120 S.Ct. 2304, 147 L.Ed.2d 374 (2000), the general American rule is that "consent judgments ordinarily support claim preclusion but not issue preclusion." *Id.* (quoting 18 Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 4443, pp. 384-85 (1981)). Although the consent decree discusses the release of claims *against* the Board, it evinces no intent to preclude the legislative leaders from litigating their Election Clause claim in subsequent litigation. And the legislative leaders never consented to or signed the consent decree. *See Nash Cty. Bd. of Ed. v. Biltmore Co.*, 640 F.2d 484 (4th Cir. 1981) (under North Carolina law a "lack of actual consent" negates preclusion). And even if the consent decree *could* have preclusive effect, our review of the record suggests that the legislative plaintiffs did not have "a full and fair opportunity to litigate that issue in the earlier proceeding," *Whitacre P'ship*, 358 N.C. 1, 591 S.E.2d at 880. The state court addressed the legislative leaders' Election Clause argument in a single conclusory sentence without any analysis. Under North Carolina preclusion law, plaintiffs are

not barred from relitigating the important Elections Clause issues they raise in this case.

**B.**

Article III of the U.S. Constitution limits federal courts to resolving "cases and controversies," of which "[t]he doctrine of standing is an integral component." *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006). As the parties invoking federal jurisdiction, plaintiffs "bear[ ] the burden of establishing standing." *Id.* To do so, they must show that their injury is (1) "actual[,] ... not conjectural or hypothetical, (2) ... traceable to the challenged conduct[,] and (3)" redressable by a favorable court order. *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). We first address the legislative leaders' standing to bring the Elections Clause claim and then turn to the voters' standing to bring the Equal Protection Clause claim.

**\*14** The Speaker and the President Pro Tempore have standing to bring a challenge under the Elections Clause. Under North Carolina law, the Speaker and the President Pro Tempore jointly represent the interests of the General Assembly of North Carolina and can pursue those interests in court. *See* N.C. Gen. Stat. § 1-72.2. Although the General Assembly did not authorize this particular suit, that is just one possible indicium of institutional injury, not a requirement. It is sufficient that the General Assembly authorized them to represent their interests in court. And, unlike *Virginia House of Delegates v. Bethune-Hill*, —— U.S. ——, 139 S. Ct. 1945, 204 L.Ed.2d 305 (2019), in which a closely-divided Court did not find standing, the legislative leaders in this case represent both houses and are asserting an interest of the legislature *qua* legislature, not one of the state. Thus, this case is more analogous to *Arizona State Legislature v. Arizona Independent Redistricting Commission*, 576 U.S. 787, 135 S.Ct. 2652, 192 L.Ed.2d 704 (2015), in which the Court did finding legislative standing.

In analyzing legislative standing, the Supreme Court has applied the same framework from *Lujan* that governs general standing analysis. *See Ariz. State Legislature*, 576 U.S. at 799–800, 135 S.Ct. 2652. The legislative leaders maintain that the General Assembly has been injured by the Board usurping their authority under the Elections Clause to set "[t]he Times, Places and Manner of holding Elections" because the Board's rule changes contravene the recently enacted election statute. Like the Arizona Legislature with

its redistricting plan, the North Carolina General Assembly claims its election timeline and witness requirement have been "completely nullified" by impermissible executive action. *Id.* at 803, 135 S.Ct. 2652 (quoting *Raines v. Byrd*, 521 U.S. 811, 823, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997)). This is a sufficiently concrete infringement on the General Assembly's constitutional prerogatives to proceed to the merits. And the traceability and redressability prongs are also met because an injunction against the implementation of the Numbered Memoranda would return the electoral procedures to the status quo, which the legislative leaders believe is consistent with the statute they enacted and thus redresses their Elections Clause grievance.

The voters have standing to bring an Equal Protection Clause claim. They argue that the Board's allowance of ballots without a witness and ballots received after the statutory deadline arbitrarily and disparately treats them differently from other voters in violation of the Equal Protection Clause. *See Bush v. Gore*, 531 U.S. 98, 104–05, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000). Since the Board's procedural changes directly caused this alleged harm and an injunction would return the electoral procedures to the status quo, the traceability and redressability prongs of standing have been satisfied. For much the same reasons as the district court, we find that the plaintiffs have demonstrated an actual injury they will suffer if they are correct on the merits. Since some voter plaintiffs have already cast their absentee ballots, the effective elimination of the witness requirement and the extension of the ballot receipt deadline would create requirements for later voters that differed from those to which the plaintiffs were subject.[3]

---

[3]    The voter plaintiffs also allege a harm stemming from vote dilution. Because a single basis is sufficient to establish standing, we do not assess this argument.

Therefore, we find that the voter plaintiffs have adequately pleaded facts to support their standing to bring this case.

## III.

To merit an injunction pending appeal, plaintiffs must show they are likely to succeed on the merits of their appeal, that they will be irreparably injured absent an injunction, that the equitable balance favors an injunction, and that an injunction benefits the public. *See John Doe Co. v. Consumer Fin. Prot. Bureau*, 849 F.3d 1129, 1131 (D.C. Cir. 2017); *Feldman v.*

*Ariz. Sec'y of State's Office*, 843 F.3d 366, 367 (9th Cir. 2016). We conclude that all four factors favor plaintiffs, and we therefore would issue the injunction pending appeal.

**\*15**  Ordinarily, we would hesitate to issue an injunction pending appeal. But two special factors are present in this case. First, our disagreement with the district court is very narrow. We agree with the district court's conclusion that plaintiffs are likely to succeed on the merits of their claims and that they will be irreparably injured absent a preliminary injunction. However, the district court reasoned that the *Purcell* principle, which bars courts from changing balloting rules shortly before federal elections, required denying a preliminary injunction "even in the face of what appear to be clear violations." *Moore* Appellant App. at 158. We believe that *Purcell* requires the opposite result, and that it operates to bar the Board from changing the rules at the last minute through a state-court consent decree.

Second, an injunction pending appeal is necessary to preserve the status quo, properly understood. Exercising its constitutional power under the Elections Clause of the U.S. Constitution, the General Assembly set rules for the upcoming election in response to the COVID-19 pandemic. By changing those rules during an ongoing election, the Board changed the status quo. Only an injunction pending appeal can "alleviate that ongoing harm." *John Doe Co.*, 849 F.3d at 1137 (Kavanaugh, J., dissenting). Allowing the Board's changes to go into effect now, only two weeks before the election and after half a million North Carolinians have voted, will cause chaos that equity cannot tolerate.

## A.

First, we agree with the district court that plaintiffs are likely to succeed on the merits of their appeal. The Board has commandeered the North Carolina General Assembly's constitutional prerogative to set the rules for the upcoming federal elections within the state. The Constitution explicitly grants the power to set the rules for federal elections to the General Assembly. The Elections Clause states that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed *in each State by the Legislature thereof*; but Congress may at any time by Law make or alter such Regulations." U.S. Const. art. 1, § 4, cl. 1 (emphasis added). The Electors Clause states that "[e]ach State shall appoint, in such Manner *as the Legislature thereof may direct*," electors for President and Vice President. U.S.

Const. art. II, § 1, cl. 2 (emphasis added); *see also McPherson v. Blacker*, 146 U.S. 1, 27, 13 S.Ct. 3, 36 L.Ed. 869 (1892) (explaining that this clause "convey[s] the broadest power of determination" and "leaves it to the legislature exclusively to define the method" of appointing presidential electors).

Unlike many parts of the Constitution, these clauses speak in clear, direct language. The power to regulate the rules of federal elections is given to a specific entity within each State: the "Legislature thereof." The word "legislature" was "not of uncertain meaning when incorporated into the Constitution." *Smiley v. Holm*, 285 U.S. 355, 365, 52 S.Ct. 397, 76 L.Ed. 795 (1932); *Hawke v. Smith*, 253 U.S. 221, 227, 40 S.Ct. 495, 64 L.Ed. 871 (1920). In North Carolina, the legislative power is given solely to the General Assembly. N.C. Const. art. II, § 1 ("The legislative power of the States shall be vested in the General Assembly ....").

But these clauses also embody the brilliance of other constitutional provisions: they establish a check on the power of the state legislature. That power is given to one institution: the United States Congress. This power is not given to the state courts, and it is not given to the states' executive branches. *See, e.g.*, The Federalist No. 59 (Alexander Hamilton) (discussing division of power between the state legislatures and Congress to make federal election rules but mentioning no other branches of government). The Founders knew how to distinguish between state legislatures and the State governments as a whole. They did so repeatedly throughout the Constitution. *See, e.g.*, U.S. Const. art. 1, § 2 (distinguishing between "State" and "State Legislature"). Therefore, the only plausible inference from the constitutional text is that the term "legislature" unambiguously excludes the power to regulate federal elections from state courts and executive-branch officials.[4]

[4]    In *Arizona State Legislature*, the Court found that the legislative power of a State to draw congressional district lines could be shared with other branches of state government. 576 U.S. at 808–09, 135 S.Ct. 2652 ("[O]ur precedent teaches us that redistricting is a legislative function, to be performed in accordance with the State's prescriptions for lawmaking, which may include the referendum and the Governor's veto."). That case does not control this one because the Arizona Constitution changed the state's "lawmaking process" to empower an entity in addition to the state legislature: the people acting through referendum. *Id.* at 817–18, 135 S.Ct. 2652. The Court's analysis was also limited to the Elections Clause, which was relevant to crafting congressional districts,

and not the Electors Clause. Even if *Arizona State Legislature* stands for the proposition that North Carolina *could* empower the Board to change the election rules in federal presidential and legislative races consistent with the Elections Clause and the Electors Clause, it is apparent that state law does not authorize what the Board did in this case, as Judge Osteen concluded below.

**\*16**    Defendants argue that this is just a state-law case, and that the federal courts have no business acting upon it. We agree with defendants that federalism and a robust respect for the substantial authority of the state courts are essential to our constitutional order. When the federal Constitution was ratified, the States retained sovereign powers, including the general police power to pass legislation. When a state exercises the police power to pass legislation, it is subject to the limits of its own constitution. And the responsibility of determining the meaning of a state's legislation belongs primarily to that state's judiciary. Federal courts must take great care not to intrude on that power. *See, e.g.*, *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

But those weighty principles do not control in this case. The federal Constitution did a bit more than just recognize the States' preexisting police powers. It also granted state legislatures a new power they did not possess before ratification: the power to set the rules for federal elections. *See U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 803, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995). Because federal elections "arise from the Constitution itself," any "state authority to regulate election to those offices ... had to be delegated to, rather than reserved by, the States." *Cook v. Gralike*, 531 U.S. 510, 522, 121 S.Ct. 1029, 149 L.Ed.2d 44 (2001). When the state legislatures exercise this power, they are exercising a federal constitutional power that cannot be usurped by other branches of state government. *See Arizona State Legislature*, 576 U.S. at 807–08, 135 S.Ct. 2652 (distinguishing between state legislative powers "derived from the people of the State" and those with a "source in the Federal Constitution" (quoting *Hawke*, 253 U.S. at 229–30, 40 S.Ct. 495)).

Thus, a "significant departure from the [State's] legislative scheme for appointing Presidential electors" or for electing members of the federal Congress "presents a federal constitutional question" we must answer. *Bush v. Gore*, 531 U.S. 98, 113, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) (Rehnquist, C.J., concurring); *see also Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 4 L.Ed. 97 (1816) (concluding Virginia court misinterpreted state law in order to reach

a federal question); Richard H. Fallon, Jr., et al., *Hart & Wechsler's The Federal Courts and the Federal System* 487–88 (7th ed. 2015) (discussing how federal courts can answer antecedent state-law questions to reach federal legal questions). Although we hesitate to opine on state law, the constitutional delegation of power to the state legislature means that "the text of [state] election law itself, and not just its interpretation by the courts of the States, takes on independent significance." *Bush*, 531 U.S. at 112–13, 121 S.Ct. 525 (Rehnquist, C.J., concurring). This obligates us to analyze state law to determine if the federal Constitution was violated. The integrity of federal elections is not a simple state-law matter.

In the present case, the Board does not even try to argue that the consent decree is consistent with the Bipartisan Elections Act of 2020. Instead, the Board argues that it had authority to change the election rules under N.C. Gen. Stat. § 163-27.1, which gives it authority to "exercise emergency powers to conduct an election in a district where the normal schedule is disrupted by" a "natural disaster," "extremely inclement weather," or "an armed conflict."

We agree with the district court that the Board's claim of statutory authority for its actions is meritless. Although the COVID-19 pandemic is a traumatic event for the country, it is not the type of "natural disaster" referred to by the statute. The statute envisions a *sudden* disaster "where the normal schedule for the election is disrupted" and the General Assembly does not have time to respond to it before a scheduled election. This limitation on the statute is reinforced by the fact that it grants the Board power to make changes only "in a district" where disruption occurs, suggesting the power is far more limited than the Board suggests. A good example of a disaster that would qualify is if a hurricane devastated part of the State a couple of days before the election. Here, in contrast, the pandemic has been ongoing for months and the General Assembly convened to adopt a bill specifically intended to account for the conditions created by COVID-19. The Board cannot characterize COVID-19 as a sudden disaster "where the normal schedule for the election is disrupted."

**\*17** Further, the statute envisions only minor departures from the General Assembly's election rules. The provision relied upon by the Board states that the Board "shall avoid unnecessary conflict" with other provisions of the State's election rules. N.C. Gen. Stat. § 163-27.1. Ignoring that language, the Board adopted major changes to the election

law that clearly clash with the General Assembly's intent. Rarely will legislative intent be as straightforward as it is in this case. Just a few months ago, an overwhelming bipartisan majority of the General Assembly passed, and Governor Cooper signed, a bill setting the rules for the upcoming election in light of the COVID-19 pandemic. Bipartisan Elections Act of 2020, 2020 N.C. Sess. Laws § 2020-17. Although the General Assembly substantially expanded mail-in voting and made it easier, it also retained important limitations on that voting to combat potential voter fraud, a fight which "the State indisputably has a compelling interest" in winning. *Purcell*, 549 U.S. at 4, 127 S.Ct. 5 (quoting *Eu v. S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214, 231, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989)). For example, the General Assembly shifted from requiring absentee voters to secure *two* witnesses to requiring only one witness. Although that move expresses a desire to facilitate absentee voting, it also expresses a firm desire to retain a witness requirement. The Board produced an "unnecessary conflict" with state law in violation of N.C. Gen. Stat. § 163-27 by discarding the witness requirement in favor of a process in which voters could self-certify their ballots. And the fact that the General Assembly maintained its deadline for the receipt of absentee ballots, even as other states were significantly extending them, evinces an intent not to allow absentee votes to be received well after the election. That the Board agreed to a receipt day far later than the General Assembly enacted produced another "unnecessary conflict" with state law in violation of N.C. Gen Stat. § 163-27.[5]

---

[5]   We also agree with Judge Osteen that the Board was not authorized to adopt these rule changes under N.C. Gen. Stat. § 163-22(a), which allows the Board to adopt rules and regulations for elections "so long as they do not conflict with any provisions" of the General Assembly's election rules. As discussed, the Board's changes in this case flatly contradict the rules set by the General Assembly. We also concur with Judge Osteen's conclusion that the Board did not have authority to change the election rules under N.C. Gen. Stat. § 163-22.2.

In light of such clear legislative intent, we cannot identify a significant rationale for the Board's decision to jettison the General Assembly's election rules in a lawsuit. As is unfortunately happening in just about every state where competitive elections are occurring, a series of lawsuits were brought to challenge the state legislature's choices. But considering the Supreme Court's well-established rule that courts should not change the rules of federal elections shortly

before they begin, and the long list of cases upholding witness requirements and absentee ballot deadlines, these lawsuits had little chance of success. Indeed, a federal judge upheld the rules that the Board voided just two months ago. But a practically identical challenge was then brought in state court, and the Board showed little or no interest in defending the General Assembly's rules even after an initial federal-court victory. The Board agreed to a consent decree that bargained away important safeguards designed to protect the integrity of mail-in balloting. And Judge Osteen found that the Board negotiated this deal secretly and without consulting the legislative leaders, and it continued to advocate for the consent decree even though the leaders of the General Assembly intervened and vigorously objected to it. We therefore cannot conclude that the Board's actions constituted a good faith effort to implement the General Assembly's election law.

Finally, the Board's actions appear to violate the North Carolina Constitution, which establishes that the General Assembly is the "Legislature" and exercises all legislative power under state law. N.C. Const. art. II, § 1 ("The legislative power of the States shall be vested in the General Assembly ...."). And the North Carolina Supreme Court has established a nondelegation doctrine limiting the ability of the General Assembly to delegate legislative power to an executive agency. *Adams v. N.C. Dep't of Nat. & Econ. Res.*, 295 N.C. 683, 249 S.E.2d 402, 410 (1978) ("[T]he legislature may not abdicate its power to make laws or delegate its supreme legislative power to any coordinate branch or to any agency which it may create."). Permissible delegations are limited to situations featuring "complex conditions involving numerous details with which the Legislature cannot deal directly." *N.C. Turnpike Auth. v. Pine Island, Inc.*, 265 N.C. 109, 143 S.E.2d 319, 323 (1965). This makes the Board's broad interpretation of its emergency powers under N.C. Gen. Stat. § 163-27.1 even more implausible, as it would transform the provision from a clearly acceptable narrow delegation into a dubiously broad delegation.

 **\*18** We do not question the ability of the Board, or other state election boards, to make minor *ad hoc* changes to election rules in response to sudden emergencies. There is a long history, both in North Carolina and in other states, of this power being exercised, and we understand that this power is important to the smooth functioning of elections. For example, if an electrical power outage halts voting in a precinct, we are confident that the Board could legally extend voting in that precinct.

But here the state legislature's constitutional power is at stake. If we refuse to defend the prerogative of the General Assembly to create election rules in a case as clear as this one, the power of the state legislatures under the Elections Clause and the Electors Clause will be at the mercy of other state-government actors. If non-representative state officials can disregard a clear mandate from the state legislature merely by *claiming* state-law authority, and if federal courts cannot review that claim, non-representative state officials will be able to strip the state legislatures of their federal constitutional power whenever they disagree with legislative priorities. The power of the people's representatives over elections will be jeopardized. That cannot be, and the Constitution does not allow it.

We also agree with the conclusion of both Judge Osteen and Judge Dever that plaintiffs have a good chance of vindicating their Equal Protection Clause claims on appeal. As noted, the Board changed the rules after voters had cast over 150,000 ballots in North Carolina. Plaintiffs' Equal Protection Clause claims thus raise serious questions about the scope of the Supreme Court's one-person, one-vote principle, and the attendant limitations on the ability of state officials to apply different rules to different voters in the same election. *See Gill v. Whitford*, —— U.S. ——, 138 S. Ct. 1916, 1929, 201 L.Ed.2d 313 (2018) (" '[V]oters who allege facts showing disadvantage to themselves as individuals have standing to sue' to remedy that disadvantage." (quoting *Baker v. Carr*, 369 U.S. 186, 206, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962))); *Reynolds v. Sims*, 377 U.S. 533, 555, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). By intentionally allowing votes to be cast that violate the Bipartisan Elections Act of 2020, defendants created serious questions under the Equal Protection Clause that should be considered on appeal. *Anderson v. United States*, 417 U.S. 211, 226, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974) ("The right to an honest [vote count] is a right possessed by each voting elector, and to the extent that the importance of his vote is nullified, wholly or in part, he has been injured in the free exercise of a right or privilege secured to him by the laws and Constitution of the United States." (internal quotation marks and citation omitted)). Because the Supreme Court has explained that the Equal Protection Clause protects against "the diluting effect of illegal ballots," *Gray v. Sanders*, 372 U.S. 368, 380, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), plaintiffs are likely to succeed on their appeal of this claim.

B.

Second, the plaintiffs will suffer irreparable injury absent an injunction pending appeal. The state legislative leaders will suffer irreparable injury if their carefully crafted legislation for the upcoming election is upset. Enjoining a "State from conducting [its] elections pursuant to a statute enacted by the Legislature ... seriously and irreparably harm[s] [the State]." *Abbott v. Perez*, ___ U.S. ___, 138 S. Ct. 2305, 2324, 201 L.Ed.2d 714 (2018). As Chief Justice Roberts has explained, the inability to "employ a duly enacted statute" is an irreparable harm. *Maryland v. King*, 567 U.S. 1301, 1303, 133 S.Ct. 1, 183 L.Ed.2d 667 (2012) (Roberts, C.J., in chambers). This irreparable harm is especially poignant in the present case because the General Assembly adopted election rules *specifically for this election*, and allowing them to be disregarded until after the election renders their legislative action completely pointless. As to the Equal Protection Clause claim, the injury the voter plaintiffs allege will necessarily come to pass in the absence of an injunction, thus causing irreparable injury.

C.

**\*19** Finally, we conclude that the balance of the equities and the public interest favor plaintiffs. Endless suits have been brought to change the election rules set by state legislatures. *See* Stanford-MIT Healthy Elections Project, *COVID-Related Election Litigation Tracker* (last visited Oct. 19, 2020) (documenting 385 lawsuits filed against election rules this year), https://healthyelections-case-tracker.stanford.edu/. This pervasive jockeying threatens to undermine public confidence in our elections. And the constant court battles make a mockery of the Constitution's explicit delegation of this power to the state legislatures.

The Supreme Court has repeatedly made clear that courts should not change the rules of a federal election in the "weeks before an election." *Purcell v. Gonzalez*, 549 U.S. 1, 4, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006) (per curiam); *see also Republican Nat'l Comm. v. Democratic Nat'l Comm.*, ___ U.S. ___, 140 S. Ct. 1205, 1207, 206 L.Ed.2d 452 (2020) (per curiam). The district court denied injunctive relief solely on the basis of *Purcell*. We commend the district court for its good-faith effort to comply with *Purcell* in a year where courts are too often meddling in elections. However, we conclude the district court misunderstood how *Purcell*

applies to this case. As the district court observed, *Purcell* has traditionally been applied against federal courts changing the rules shortly before elections. But there is no principled reason why this rule should not apply against interferences by state courts and agencies. The victim of a last-minute interference, whatever its source, is the same: a federal election. It is a difficult enough task to conduct an election in the middle of a pandemic without proliferating lawsuits and constantly changing rules. Attempts to change election rules, whether facilitated in federal or state court, cause the "judicially-created confusion" that the *Purcell* principle is designed to guard against. *See Republican Nat'l Comm.*, 140 S. Ct. at 1207. Whenever interference occurs, it incentivizes an avalanche of partisan and destabilizing litigation against election rules duly enacted by state legislatures. If *Purcell* did not apply in state courts, federal election rules would continue to be at the mercy of litigation and rushed, last-minute decisions by state judges in contravention of the delegation of authority by the Constitution under the Elections Clause.

Therefore, we conclude that *Purcell* requires granting an injunction pending appeal in this case. The status quo, properly understood, is an election run under the General Assembly's rules—the very rules that have been governing this election since it began in September. The Board and the North Carolina Superior Court for the County of Wake impermissibly departed from that status quo approving changes to the election rules in a consent decree in the middle of an election. Over 150,000 ballots had already been received when the Board changed the rules, and its actions have draped a shroud of uncertainty upon North Carolina's elections. Now that over half a million votes have been cast, allowing the Board's changes to go into effect would cause even greater turbulence. *Purcell* counsels in favor of ending this uncertainty by issuing injunctive relief pending appeal.

The General Assembly established rules for orderly elections amidst a pandemic. A wave of last-minute litigation in federal and state courts has resulted in North Carolina's rules changing repeatedly within a few weeks. This is happening as hundreds of thousands of North Carolinians have already voted in important elections. This chaos must end. Because only an injunction pending appeal restores order, we would issue it.

**\*20**
* * *

This phenomenon is hardly unique to North Carolina. Around the country, courts are changing the rules of the upcoming elections at the last minute. It makes the promise of the Constitution's Elections and Electors Clauses into a farce. It disrespects the Supreme Court's repeated and clear command not to interfere so late in the day. This pernicious pattern is making the courts appear partisan, destabilizing federal elections, and undermining the power of the people to choose representatives to set election rules. By not issuing the injunction pending appeal we propose in Part IV, this court has missed an opportunity to stand athwart this destructive trend.

IV.

Our proposed injunction pending appeal would read as follows:

> Upon consideration of submissions relevant to appellants' emergency motions for injunctions pending appeal, we hereby grant the motions. The North Carolina Board of Elections is enjoined from eliminating the North Carolina General Assembly's requirement that absentee and mail-in ballots include a witness signature. *See* Elections Act of 2020, 2020 N.C. Sess. Laws § 2020-17. The North Carolina Board of Elections is also enjoined from extending the deadline for the receipt of absentee and mail-in ballots beyond that established by the North Carolina General Assembly in N.C. Gen. Stat. § 163.231(b)(2)b. Under the General Assembly's law, such absentee and mail-in ballots must be mailed and postmarked on or before Election Day, and they must be received within "three days after the election by 5:00 p.m." This order will remain in effect until these cases are finally decided on the merits, or until further notice by this Court.

NIEMEYER, Circuit Judge, dissenting:
I am pleased to join the dissenting opinion written by the panel majority. This case was originally assigned to a panel, but the work of the panel was hastily preempted by an en banc vote requested by the panel's dissenter after the panel majority had shared its views but before those views could be published.

To be sure, an en banc hearing may be requested at anytime. But the traditional practice of this court is for the assigned panel to hear a case and publish its opinion before the court considers whether to rehear the case en banc. Once in a rare while, the court has elected instead to hear a case en banc before consideration by a panel on the ground that the extraordinary importance of the matter justifies the participation of the entire court. But here, neither course was followed. The panel considered the case assigned to it and promptly exchanged votes on the outcome. Finding that he had been outvoted, the dissenting judge immediately initiated an en banc vote before the panel could even circulate its views to the entire court, let alone to the public. This departure from our traditional process strikes me as needlessly divisive — even considering the matter's time sensitive nature. I am saddened to see it, especially on a court that has taken such pride in its collegiality.

**\*21** On the merits, the en banc action appears to be just as aggressive. After a substantial number of North Carolina voters — well over 1,000,000 as of October 17, 2020 — have voted and only two weeks before election day, the en banc majority now acts to permit changes to balloting rules. Such action by the en banc majority, as the panel majority has explained, flies in the face of the principle that balloting rules for federal elections must not be changed shortly before elections — indeed, in this case, *during* an election.

I dissent from the preemptive en banc action in this case, and for the reasons given by the panel majority, I vote to grant the requested injunction against implementation of last minute ballot rules changes.

**All Citations**

978 F.3d 93, 2020 WL 6156302

---

End of Document                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.