# EXHIBIT 7

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| JILL STEIN AND RANDALL REITZ, | CIVIL ACTION |
| Plaintiffs, | |
| v. | NO. 16-CV-06287 |
| PEDRO A. CORTÉS, *et al.* | |
| Defendants, | |
| and | |
| President-Elect Donald Trump, *et al.*, | |
| Defendant-Intervenors. | |

## INTERVENORS PRESIDENT-ELECT DONALD TRUMP; VICE PRESIDENT-ELECT MICHAEL PENCE; ALL OF THE PENNSYLVANIA ELECTORS OF PRESIDENT-ELECT DONALD TRUMP AND VICE PRESIDENT-ELECT MICHAEL PENCE; DONALD J. TRUMP FOR PRESIDENT, INC.; AND THE REPUBLICAN PARTY OF PENNSYLVANIA'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Lawrence J. Tabas, I.D. No. 27815
Rebecca L. Warren, I.D. No. 63669
OBERMAYER REBMANN MAXWELL
& HIPPEL LLP
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA 19102
(215) 665-3158

Chad Readler*
JONES DAY
325 John H. McConnell Blvd., Ste. 600
Columbus, OH 43215
(614) 469-3939

David Morrell*
JONES DAY
51 Louisiana Ave. NW
Washington, DC 20001
(202) 879-3939
*Admitted *pro hac vice*

# <u>TABLE OF CONTENTS</u>

Table of Authorities……………………………………………………………. ii

Introduction……………………………………………………………………  1

Statement of Facts…………………………………………………………...  10

Argument ………………………………………………….................  15

I. This Court Lacks Jurisdiction Over This Suit …………………………  16

    A. Plaintiffs lack standing……………………………………………  16

    B. The *Rooker-Feldman* doctrine deprives the Court of jurisdiction over Plaintiffs' claims  …………………………………………  17

II. Plaintiffs Are Not Entitled To Injunctive Relief …………………………  21

    A. Stein has not established any likelihood of success on her constitutional claims …………………………………………………  22

    B. Plaintiffs do not face any irreparable injury ………………………  30

    C. Plaintiffs' requested relief would seriously harm Intervenors…….  31

    D. Granting an injunction would be contrary to the public interest…...  31

CONCLUSION  ………………………………………………………...35

CERTIFICATE OF SERVICE……………………………………………..38

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anderson v. Celebrezze*,
  460 U.S. 780 (1983)........................................................................25

*AT&T v. Winback & Conserve Program, Inc.*,
  42 F.3d 1421 (3rd Cir. 1994) ..........................................................22

*Banfield v. Cortés*,
  110 A.3d 155 (Pa. 2015) ...................................................................3

*Belitskus v. Pizzingrilli*,
  343 F.3d 632 (3d Cir. 2003) ...........................................................25

*Bonas v. Town of N. Smithfield*,
  265 F.3d 69 (1st Cir. 2001) .............................................................25

*Bush v. Gore*,
  531 U.S. 98 (2000)......................................................................5, 15

*Caudill v. Eubanks Farms, Inc.*,
  301 F.3d 658 (6th Cir. 2002) ..........................................................34

*Constitution Party of Penn. v. Cortes*,
  116 F. Supp. 3d 486 (E.D. Pa. 2015)..............................................25

*D.C. Court of Appeal v. Feldman*,
  460 U.S. 462 (1983)..................................................................19, 21

*Duncan v. Poythress*,
  657 F.2d 691 (5th Cir. 1981) ..........................................................25

*FMC Corp. v. AMVAC Chem. Corp.*,
  379 F. Supp. 2d 733 (E.D. Pa. 2005)........................................27, 28

*Gollmar's Election Case*,
    175 A. 510 (Pa. 1934) ...................................................................13

*Great W. Mining & Mineral Co. v. Fox Rothschild L.L.P.*,
    615 F.3d 159 (3d Cir. 2010) .................................................18, 19, 20

*Griffin v. Burns*,
    570 F.2d 1065 (1st Cir. 1978) ....................................................25, 26

*Harper v. Bd. of Educ.*,
    383 U.S. 663 (1966) .....................................................................23

*Hoblock v. Albany Cty. Bd. of Elections*,
    487 F. Supp. 2d 90 (N.D.N.Y. 2006) ..............................................25

*Huffman v. Pursue, Ltd.*,
    420 U.S. 592 (1975) .....................................................................33

*League of Women Voters of Ohio v. Brunner*,
    548 F.3d 463 (6th Cir. 2008) ......................................................25, 26

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992).......................................................................17

*Madera v. Ameriquest Mortg. Co. (In re Madera)*,
    586 F.3d 228 (3d Cir. 2009) ...........................................................18

*Marks v. Stinson*,
    19 F.3d 873 (3d Cir. 1994) .............................................................26

*Moore v. Sims*,
    442 U.S. 415 (1979).......................................................................33

*Port Auth. Police Benevolent Ass'n, Inc. v. Port Auth. of N. Y. & N.J.*
    *Police Dept't*,
    973 F.2d 169 (3d Cir. 1992) .....................................................18, 33

*Siegel v. LePore*,
    234 F.3d 1163 (11th Cir. 2000) ......................................................25

*United States v. Koreh*,
    59 F.3d 431 (3d Cir. 1995) ...................................................................28

*United States v. Mosley*,
    238 U.S. 383 (1915) ...........................................................................25

*Wittman v. Personhuballah*,
    136 S. Ct. 1732 (2016) ......................................................................16

## STATUTES

3 U.S.C. § 5 ....................................................................................5, 15, 31

3 U.S.C. § 7 ...............................................................................................15

25 P.S. § 3192 ..........................................................................................31

25 P.S. § 3456 ..........................................................................................29

## INTRODUCTION

Green Party presidential candidate Jill Stein finished fourth in the Pennsylvania presidential election, garnering less than 1% of the votes cast by Pennsylvanians. Yet despite being no more than a blip on the electoral radar, Stein (along with one Pennsylvania voter) asks the Court to join them in commandeering Pennsylvania's electoral process, first by ordering a recount of each of the nearly six million ballots cast in the election, and second by requiring a forensic examination of voting machines, all with the final Electoral College deadlines just days away.

The gravity of Stein's allegations, particularly in the context of a presidential election, give rise to numerous threshold questions.

*What evidence does Stein have to back her claims?* None, really. Stein demands a recount due to the *possibility* of foreign-sourced hacking. She admits that "[a] majority of machines voted for Donald Trump in Pennsylvania." (Mem. of Law In Support of Mot. for a Preliminary Injunction (ECF 5) [hereinafter "PI Mot."] at 2.) But she nevertheless demands a recount to answer what she believes to be a distinct question: "who did *the people* vote for?" *Id.* (emphasis added).

Despite its ominous nature, Stein's complaint is entirely devoid of factual grounding. There is no evidence—or even an allegation—that any tampering with Pennsylvania's voting systems actually occurred. To be sure, Stein claims there

are vulnerabilities in Pennsylvania's voting machines and references election-related hacking *outside of* Pennsylvania. But she does not offer any evidence or allegations that a single voting machine in Pennsylvania was hacked, let alone on a scale sufficient to flip the Pennsylvania election. And don't take our word for it alone: Stein herself recently admitted that "there is no evidence of fraud at the ballot box." Daniella Diaz, *Jill Stein defends her recount efforts*, cnn.com (Nov. 28, 2016).[1]

The absence of any evidence of tampering is no surprise. Before the election, Pennsylvania Secretary of State Pedro Cortés assured Pennsylvania voters that Pennsylvania's voting systems are "secure," and criticized contrary suggestions as "not only wrong and uninformed," but also "dangerous." *See* Remarks by Secretary of State Pedro A. Cortés, Press Conference, Capitol Media Center, Harrisburg, PA (Oct. 20, 2016) (attached as Exhibit 1). He explained that all voting systems in Pennsylvania were "examined and certified to federal and state standards," and that voting machines were "not connected to the Internet" or "to one another," thus reducing the risk of compromise. *Id.* And even though already "recognized [as a] leader among states in cybersecurity," the State adopted a belt-and-suspenders approach by partnering with federal agencies, including the Department of Homeland Security, "to ensure the integrity of [its] systems and

---

[1] *Available at* http://www.cnn.com/2016/11/28/politics/jill-stein-recount-2016-election/.

networks." *Id.*  And all of this comports with the conclusions reached in previous

litigation involving a challenge to the integrity of the same voting machines

Plaintiff challenges here. *See Banfield v. Cortés*, 110 A.3d 155, 174 (Pa. 2015)

("[T]he Commonwealth Court found … the Appellants had not shown any more

than the mere possibility that the certified DREs in theory could be subject to

tampering, presenting no evidence that the challenged devices have failed to

accurately record votes or experienced a security breach in an actual election.").

    *Does anyone other than Stein and her small band of voters believe a recount

is necessary?*  No.  To start, unlike the 1% candidate Stein, Secretary Cortés has

not lost confidence in the election's integrity.  Indeed, much the opposite.  Asked

whether there was any evidence of voting irregularities during the November 8

contest, his answer was as adamant as it was unequivocal: "There is *no evidence

whatsoever* that points to any type of irregularity in any way, shape or form."  *See*

Dan McQuade, *Here's How the Jill Stein-Led Recount Effort Is Going In Philly*,

phillymag.com (Nov. 29, 2016) (emphasis added).[2]  The White House, notably, has

said the same.  *See* Geller, *White House insists hackers didn't sway election, even

as recount begins*, POLITICO (Nov. 26, 2016).[3]  And so has the runner-up Clinton

campaign.  Despite a flood of requests for the Clinton campaign to investigate the

election results, the campaign declined to challenge the election because it was

---

[2] *Available at* http://www.phillymag.com/news/2016/11/29/jill-stein-recount-philadelphia/.
[3] *Available at* https://perma.cc/5Z5C-Z59S.

unable to uncover "any actionable evidence of hacking or outside attempts to alter

the voting technology."  *See* Marc Erik Elias, *Listening and Responding To Calls*

*for an Audit and Recount*, medium.com (Nov. 26, 2016).[4]

Even Stein's biggest proponents lack confidence in her claims.  Professor

Alex Halderman—an expert Stein has enlisted in this case—published an article

just two weeks ago, stating: "Were this year's deviations from pre-election polls

the results of a cyberattack?  *Probably not*."  *See* J. Alex Halderman, *Want to*

*Know if the Election was Hacked? Look at the Ballots*, medium.com (Nov. 23,

2016) (emphasis added).[5]

This chorus of voices explains why the only evidence of election-related

hacking or attempted hacking Stein references here concerns entities or persons

outside of Pennsylvania—the Democratic National Committee, Illinois, and

Arizona.  Allegations relating to these entities plainly cannot justify upsetting the

election results in Pennsylvania.

*What are the ramifications of Stein's requested relief?*  Pennsylvania's

absence from the Electoral College.  Even with heroic efforts by state and local

elections officials, Stein's proposed process would last weeks, perhaps even

months.  Either way, her requested relief would virtually guarantee that

---

[4] *Available at* https://medium.com/@marceelias/listening-and-responding-to-calls-for-an-audit-and-recount-2a904717ea39#.8qzvzno97.
[5] *Available at* https://medium.com/@jhalderm/want-to-know-if-the-election-was-hacked-look-at-the-ballots-c61a6113b0ba#.umbgt1gvq.

Pennsylvania would not be able to certify its Presidential Electors by December 13, the federal safe-harbor deadline for doing so. *See* 3 U.S.C. § 5 (requiring disputes over electors to be resolved by December 13); *Bush v. Gore*, 531 U.S. 98, 110 (2000) (this statute "requires that any controversy or contest that is designed to lead to a conclusive selection of electors be completed by" that date). If this occurs, Pennsylvania's very seat at the Electoral College is jeopardized, which in turn risks disenfranchising *all* of the Pennsylvania voters whose constitutional rights Stein purports to vindicate. In fact, Stein acknowledged this risk in advancing similar recount efforts in Michigan, telling the Sixth Circuit that "Michigan *must* complete a recount of votes by December 13, the federally imposed deadline for the selection of electors to the Electoral College." Stein's Mem. of Law at 1, *Stein v. Thomas*, No. 16-2690 (6th Cir. Dec. 6, 2016) (ECF 12) (emphasis added). Stein omits any such language in her filings here, likely because she knows that her demands all but ensure that Pennsylvania could not possibly meet that deadline.

 *What are Pennsylvanians' reaction to Stein's last-minute recount request?* Shock and dismay, most likely. Having endured a lengthy, expensive, hard-fought Presidential election, Pennsylvania voters surely expected their votes would be accounted for when the Electoral College meets this December. Yet the legal antics of a 1% candidate call all of that into question.

*Has Stein asked local voting officials to conduct recounts themselves*?  Yes, and the results there contradict her claims here.  Stein's first initiative was to corral voters and fund them to file recount petitions in voting precincts across the State.  Virtually all of those are complete, and they have shown very little change in the final vote tally.  Nor, critically, have they shown any evidence of the diabolical plot imagined by Stein.

*Is this the first court to hear Stein's claims?*  No.  Before this case, she pursued similar claims as part of an election contest filed with the Commonwealth Court of Pennsylvania.  There, like here, Stein cited "grave concerns" about the integrity of the election.  Despite weeks' worth of time and energy, however, Stein and her allies could not even allege—much less prove—a single instance of fraud or tampering *anywhere* in the State.  She ultimately dismissed her action as a result, clamoring that "the fix was in."  Caroline Kenny, *Jill Stein says she'll 'escalate' Pennsylvania recount case after earlier plans to drop it*, cnn.com (Dec. 5, 2016).[6]  That "fix" apparently necessitated Stein "escalating" her claims to this Court.  *Id.*

*Has Stein accurately characterized her prior court proceedings?*  Unfortunately, no.  Facing the certainty of dismissal of her election contest due to a complete absence of evidence of fraud, Stein and her allies voluntarily dismissed

---

[6]*Available at*  http://www.cnn.com/2016/12/03/politics/jill-stein-drops-pennsylvania-recount/.

the case the weekend before her Monday morning hearing (presumably to avoid a published order rejecting her claims). At the time, Stein and her allies told the state court the dismissal was due to the fact that the petitioners could not "afford" to post the $1 million bond required by the Commonwealth Court. We now know that is false.

Asked in an interview why she decided to pursue an "action in federal court instead of paying out the $1 million bond," Stein replied: "Well, the problem was *not that it was too expensive*, but that it was a dead-end course of action." Prachi Gupta, *Jill Stein on What's Next With the Recount Effort in Wisconsin, Michigan, and Pennsylvania*, Cosmopolitan.com (Dec. 6, 2016) (emphasis added).[7] She complained that the state court was being "political" by demanding evidence of election-related tampering she simply did not possess. *See id.* So she strategically dismissed her case.

This has not stopped Stein from advancing a contrary position in this Court, however. Consistent with what petitioners told the Commonwealth Court—but in direct contradiction to what Stein has since told the media and the public—Stein claims that the Commonwealth Court's decision to set bond at $1 million "forced" petitioners "to withdraw the contest proceeding," because they "could not possibly post an exorbitant $1 million bond." (Complt. (ECF 1) at ¶¶91-92.) She cites this

---

[7] *Available at* http://www.cosmopolitan.com/politics/a8467128/jill-stein-voter-recount-wisconsin-michigan-pennsylvania/.

fact to tee up her constitutional claims here—namely, that the $1 million bond was an "insurmountable barrier[]" to obtaining a recount and thus an unconstitutional abridgment of the right to vote. (PI Mot. at 30.) So she had no choice, we are told, to "escalate" her legal claims.

*Setting aside the reason Stein failed to pursue state statutory remedies, have Stein and Reitz satisfied Article III standing requirements for asserting claims in federal court?* No. Neither she nor Plaintiff Reitz have Article III standing to seek such relief. As to Stein, she has not alleged an injury-in-fact likely to be redressed by any ruling related to the need for a recount. She does not contend that a Pennsylvania recount will result in her securing Pennsylvania's electoral votes, and in fact has conceded it will not. *See* Stein, *Why the recount matters: Jill Stein*, USA Today (Dec. 1, 2016) (conceding that the "goal" of the recount "is not to change the result of the election").[8] Reitz has no better claim to standing. Even if he voted in the election, there are no factual allegations or evidence that give rise to a plausible assumption that his vote was not properly counted.

*Assuming they do have standing, what relief do Stein and Reitz seek?* That Pennsylvania comply with a procedure she and her own experts devised—a hand recount of "the paper ballots in optical scan counties," and a "forensic examination" in counties using direct-recording electronic systems. (PI Mot. at 1.)

---

[8] *Available at* https://perma.cc/VZK4-5BVF.

Those procedures, we learn from Stein, are compelled by the Constitution of the United States to ensure election "integrity."  And that is true, we are told, even where a plaintiff (like Stein) maintains only the mere suspicion of electoral improprieties

*Where in the United States Constitution can one find the blanket constitutional right to a recount to ensure election integrity?*  Nowhere.  No one doubts the fundamental nature of the right to vote.  But no court, to our knowledge, has read that privilege to include not only the right to cast one's vote, but also the right to request a recount *after* the vote to ensure an election's integrity.  It thus should come as no surprise that a federal court in Michigan just yesterday rejected Stein's claims there, finding no constitutional right to a speculation-fueled recount. *See* Order, *Stein v. Thomas*, No. 2:16-cv-14233 (E.D. Mich. Dec. 7, 2016) (ECF 36) (attached as Exhibit 2).  Which only makes sense.  After all, if all Americans do enjoy that right, ballot counting could become year-round sport.

*Will Stein be irreparably harmed absent the Court's intervention?*  No, a conclusion bolstered by Stein's own actions.  Despite having suspicions about the integrity of Pennsylvania's voting systems *before* the November 8 election, and having an opportunity to seek relief immediately after the election, Stein waited until November 28—the last possible day—to file her election contest in the Commonwealth Court, and December 5, nearly a month after the election, to file

this suit.  Anyone fearing an irreparable injury of the magnitude suggested here surely would have acted sooner.  Stein did not, and she now has only herself to blame for much of the purported emergency she now asserts.

*Finally, does Stein satisfy any of the other elements that must be met before emergency relief is granted?*  No, most notably because her request does not serve the public interest.  If granted, her requested relief is certain to harm election officials, voters, and vote counters forced hastily to take up recounts, creating confusion and uncertainty in an already challenging environment.  Such relief would also harm all Pennsylvanians, who would not only be on the hook for a multi-million-dollar recount tab, but who would also face the risk of disenfranchisement, should their Electoral votes not be counted.

The one thing over which there should be no question is that Stein's claims are baseless and legally flawed.  Accordingly, the Court should deny a preliminary injunction and dismiss the Complaint.

## STATEMENT OF FACTS

For most, the November 8, 2016 presidential election concluded early the next morning, when the major news outlets declared President-elect Donald Trump the winner and Secretary Hillary Clinton graciously conceded.   But not for Dr. Jill Stein.  After an aggressive online fundraising push, Stein and her campaign attorney, through voters they corralled, filed recount petitions throughout the State,

and also brought an election contest in Pennsylvania's Commonwealth Court on November 28, the statutory deadline for filing such a case.

As in this case, the election-contest petition invited the Commonwealth Court to revisit the November 8 election for United States President and Vice-President due to the alleged possibility of foreign-sourced hacking. The petition did not allege a single known or even a single suspected incident of hacking in Pennsylvania. Nor did it identify which foreign entities would have engaged in the hypothesized hacking, or indicate which presidential candidates would have benefited or been harmed from such conduct. Instead, it merely expressed a belief that the possibility for hacking existed, and, on this basis, requested a statewide recount.

On November 29, the Commonwealth Court scheduled a hearing on the election-contest petition for Monday, December 5, at 10 a.m. *See* Order (attached as Exhibit 3). On December 2, the court issued another order setting the statutorily required bond at $1,000,000, which it directed to be posted by 5:00 p.m. on December 5. *See* Order (attached as Exhibit 4). The schedule thus allowed petitioners to argue their case and potentially obtain a ruling on Monday morning before having to post a bond that evening. The Commonwealth Court also gave the parties the opportunity to address the bond amount in the meantime if they were unhappy with it. *See id.* ("Upon good cause shown, the amount of the bond

may be modified by the Court.").  To make this remedy easily available over the weekend, the Chief Clerk of the Commonwealth Court notified counsel that the court would accept filings submitted through PACFile (Pennsylvania's electronic-filing system) after hours, and in turn would docket them before the hearing.

On Saturday, December 3, petitioners moved to withdraw their petition. Even though (1) Stein had raised nearly $7 million at the time (and has since exceeded that number), (2) the court expressly authorized petitioners to request a different bond amount for good cause, and (3) petitioners could have argued their case before having to post a bond, petitioners simply asserted that they could not afford to post the bond.  "Petitioners are regular citizens of ordinary means," they claimed, and thus could not "afford to post the $1,000,000 bond required by the Court."  *See* Praecipe to Discontinue and Withdraw (attached as Exhibit 5).  The court thus closed the case that day.  *See* Order (attached as Exhibit 6).

While petitioners' much-publicized explanation for their voluntary withdrawal was on its face implausible given the considerable resources Stein had raised, Stein has since confirmed that the explanation was in fact false.  She explained that "the problem was not that [the $1 million bond] was too expensive," but that the state-court proceeding "was a dead-end course of action" since she had no evidence of election-related tampering to present at the hearing.  Prachi Gupta, *Jill Stein on What's Next With the Recount Effort in Wisconsin, Michigan, and*

12

*Pennsylvania*, Cosmopolitan.com (Dec. 6, 2016) (emphasis added).[9] The withdrawal, in other words, was strategic.

This makes sense. As Stein's public comments confirm, she and her allies knew that petitioners could not possibly meet the substantive requirements for contesting the election. Under the governing election-contest standards, they were required to exercise "due diligence to ascertain and specify the facts which, if sustained by proof, would require the court to set aside the result of the election." *Gollmar's Election Case*, 175 A. 510, 512 (Pa. 1934). This standard required allegations of particular acts of fraud, that such fraud increased the vote of the victor, and that it affected the outcome of the election. *See id.* Yet the election-contest petition failed to meet even these basic pleading standards. It did not allege any specific acts of fraud or tampering in Pennsylvania, much less that any such fraud increased the votes of President-elect Trump, let alone to such degree that it affected the outcome of the election. Nor did the petition identify any basis for believing that Stein's ongoing recount efforts would uncover even a shred of evidence of election tampering. But rather than risk a court stating these conclusions on the record and thereby undermining her three-state recount efforts, Stein opted instead to withdraw and try her hand in yet another forum, this time a federal one.

---

[9] *Available at* http://www.cosmopolitan.com/politics/a8467128/jill-stein-voter-recount-wisconsin-michigan-pennsylvania/.

On December 5, Stein filed suit in this Court.  In her complaint, Stein alleged that the very state-devised system she invoked in the previous weeks was unconstitutional because, in her estimation, it makes a statewide recount too difficult.  But despite allegations of imminent and irreparable harm to her alleged constitutional rights, Stein waited a day to file her motion for preliminary injunction seeking a statewide recount and forensic examination of Pennsylvania's voting systems.  The premise of Stein's argument—in direct contradiction to what she told the media and the public—is that the $1 million bond was an "insurmountable barrier[]" to obtaining a recount, and thus an unconstitutional abridgment of the right to vote.  (Mot. for PI at 30.)

Finally, while Stein's county-level efforts to force a recount and obtain forensic examinations are too numerous to describe here, one such proceeding is worth noting—specifically, Stein's request for recounts and forensic examinations in Philadelphia County.  The Philadelphia County Board of Elections granted her recount requests, but denied her request to conduct forensic examinations during that process.  Stein appealed and, on December 7, the Pennsylvania Court of Common Pleas affirmed, concluding that Stein possessed no state-law right to the forensic examinations she requested.  *See* Opinion, *Stein v. Philadelphia Cnty. Bd. of Elections*, No. 161103335 (Ct. of Common Pleas) (attached as Exhibit 7).

14

In the course of reaching that conclusion, the court made several observations that bear repeating here.  The court explained that Stein had a statutory right not only to be present when the county board tested its voting systems both before and after the election, but also "to have a technically qualified person there to make independent tests of the equipment prior to, during, and following the vote count."  *Id.* at 3.  But, the court noted, there was no evidence that "Dr. Stein took advantage of these provisions."  *Id.*  The court added that the Board's recount efforts "revealed no discrepancies in the electronic tallies," and that there was "absolutely no evidence of any voting irregularities."  *Id.* at 4.

## **ARGUMENT**

The Court should deny Plaintiffs' request for a preliminary injunction, both because this Court lacks jurisdiction over the asserted claims and because Stein cannot possibly satisfy the standards for obtaining such relief.

But before addressing these issues, Intervenors note the mandatory deadline imposed by the federal safe harbor set forth in 3 U.S.C. § 5.  This provision requires certification of the Presidential Electors by Pennsylvania's Governor on or before December 13, 2016.  *See also Bush v. Gore*, 531 U.S. 98, 110 (2000).  Meeting this deadline is critical to participating in the formal Electoral College vote on December 19, 2016.  *See* 3 U.S.C. § 7.  The remedies Plaintiffs request,

even if merited, could thus never be implemented in time, a fact that alone justifies denying Plaintiffs' requested relief.

The following are additional grounds for reaching the same result.

## I. This Court Lacks Jurisdiction Over This Suit.

### A. Plaintiffs lack standing.

"A party has standing only if he shows that he has suffered an 'injury in fact,' that the injury is 'fairly traceable' to the conduct being challenged, and that the injury will likely be 'redressed' by a favorable decision." *Wittman v. Personhuballah*, 136 S. Ct. 1732, 1736 (2016). Stein, however, has not alleged an injury-in-fact likely to be redressed by any ruling related to the need for a recount. She does not contend that she will (or even might) win Pennsylvania's electoral votes after a recount. Nor, in any event, would a victory in Pennsylvania send Stein to the White House. After all, Stein gained no more than three percent of the vote in any state where she appeared on the ballot. *See* America's Election Headquarters, FOX NEWS, http://www.foxnews.com/politics/elections/2016/presidential-election-headquarters (last visited Nov. 29, 2016). Accordingly, she has failed to allege facts showing that she has suffered a constitutionally cognizable injury.

Nor does Plaintiff Reitz satisfy Article III standing requirements. Reitz describes himself as a "voter in the State of Pennsylvania." Assuming Reitz did

vote, he still has not alleged any facts giving rise to a plausible assumption that his vote was not properly counted. He is left with only a "merely speculative" injury, one that does not meet Article III's injury-in-fact requirement for establishing standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Insofar as Plaintiffs seek to defend the interest in a free and fair election, they have no standing to assert that grievance either. It is a "generally available grievance," one for which relief benefits Plaintiffs no more "than it does the public at large." *Id.* at 573–74 ("We have consistently held that a plaintiff raising only a generally available grievance,"—"claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy."). That generalized grievance "does not state an Article III case or controversy." *Id.* at 574. And even if Plaintiffs could seek relief for a generalized grievance, they failed to allege any facts plausibly suggesting that fraud or mistake tainted the election results.

This Court thus has no jurisdiction over this case, which alone warrants denying Plaintiffs' request for a preliminary injunction.

### B. The *Rooker-Feldman* Doctrine deprives this Court of jurisdiction over Plaintiff's claims.

In addition to Plaintiffs' standing problem, the *Rooker-Feldman* doctrine independently deprives this Court of jurisdiction over Plaintiffs' claims.

**1.** The *Rooker-Feldman* doctrine provides that "lower federal courts lack subject matter jurisdiction to engage in appellate review of state-court determinations or to evaluate constitutional claims that are inextricably intertwined with the state court's decisions in a judicial proceeding." *Port Auth. Police Benevolent Ass'n, Inc. v. Port Auth. of N. Y. & N.J. Police Dept't,*, 973 F.2d 169, 177 (3d Cir. 1992) (citing *D.C. Court of Appeal v. Feldman*, 460 U.S. 462, 483 n.16 (1983)). The doctrine "precludes lower federal courts from exercising appellate jurisdiction over final state-court judgments because such appellate jurisdiction rests solely with the United States Supreme Court." *Madera v. Ameriquest Mortg. Co. (In re Madera)*, 586 F.3d 228, 232 (3d Cir. 2009) (quoting *Lance v. Dennis*, 546 U.S. 459, 463 (2006)).

"[T]here are four requirements that must be met for the *Rooker-Feldman* doctrine to apply: (1) the federal plaintiff lost in state court; (2) the plaintiff complains of injuries caused by the state-court judgments; (3) those judgments were rendered before the federal suit was filed; and (4) the plaintiff is inviting the district court to review and reject the state judgments." *Great W. Mining & Mineral Co. v. Fox Rothschild L.L.P.*, 615 F.3d 159, 166 (3d Cir. 2010).

"The second requirement—that a plaintiff must be complaining of injuries caused by a state-court judgment—may also be thought of as an inquiry into the source of the plaintiff's injury." *Id.* Under this requirement, "[t]he critical task is

… to identify those federal suits that profess to complain of injury by a third party, but actually complain of injury produced by a state-court judgment and not simply ratified, acquiesced in, or left unpunished by it." *Id.* at 167 (quoting *Hoblock v. Albany County Board of Elections*, 422 F.3d 77, 88 (2d Cir. 2005)).  "A useful guidepost is the timing of the injury, that is, whether the injury complained of in federal court existed prior to the state-court proceedings and thus could not have been 'caused by' those proceedings." *Id.*

"[C]losely related" to the second requirement, the fourth element "targets [] whether the plaintiff's claims will require appellate review of state-court decisions by the district court." *Id.* at 169.  Prohibited appellate review "consists of a review of the proceedings already conducted by the lower tribunal to determine whether it reached its result in accordance with law." *Id.* (quoting *Bolden v. City of Topeka*, 441 F.3d 1129, 1143 (10th Cir. 2006)).  Prohibited appellate review also includes constitutional claims that a plaintiff declined to assert in state court but are "inextricably intertwined with" the state court's decision.  *Feldman*, 460 U.S. at 482 n. 16.

**2.**  Here, all four requirements of the *Rooker-Feldman* test are met.  *First*, Plaintiffs lost their election contest.  They sought a statewide recount and a declaration that the presidential election was "illegal," but they failed to obtain either.  They also requested a bond amount of $25,000, which the Commonwealth

Court rejected in setting the bond at $1,000,000.  While Reitz was a formal party in that proceeding and Stein was not, Stein has been the driving force behind all of the recount efforts in Pennsylvania, Michigan, and Wisconsin.  Having publicly owned that role and raised millions as a result, she should be estopped from claiming that she was not a party in the state-court proceeding, especially where doing so would allow her to evade subject-matter limitations on this Court's jurisdiction.

*Second*, it is the Commonwealth Court's decision to set bond at $1,000,000 that (according to their pleadings) caused petitioners to withdraw their election contest—the same decision Plaintiffs allege caused their injuries here.  Indeed, Plaintiffs repeatedly cite the bond amount as one of the "insurmountable barriers" to vindicating their alleged constitutional right to a recount and forensic examination.  (PI Mot. at 30, 35.)  And the fact that this barrier did not "exist[]" prior to the state-court proceedings" (*Great W. Mining & Mineral Co.*, 615 F.3d at 166) reinforces that the state-court judgment caused Plaintiffs' asserted injuries.

*Third*, the state-court judgments were rendered before the federal suit was filed.  The Commonwealth Court established the bond amount on December 2 and closed the case on December 3.  This suit was not filed until December 5.

*Finally*, Plaintiffs are inviting this Court to review and reject a state judgment—namely, the Commonwealth Court's decision to set a $1,000,000 bond.

Plaintiffs have alleged that this decision abridged their constitutional rights by imposing an onerous burden on obtaining a statewide recount. To state the argument is to demonstrate that Plaintiffs' constitutional claims and the bond amount are "inextricably intertwined." *Feldman*, 460 U.S. at 482 n.16. Plaintiffs' theory here would thus necessarily entail review of the state court's decision, which is precisely what the *Rooker-Feldman* doctrine prohibits.

Enforcing this doctrine is particularly important in today's case. In setting the bond, the Commonwealth Court expressly indicated that it was open to modifying the amount upon a showing of "good cause." Plainly, avoiding a constitutional violation would amount to "good cause." The Commonwealth Court even allowed the parties to file after hours and over the weekend. While petitioners took advantage of this concession to withdraw their petition, they declined to request a lower bond amount. Having made the decision not to raise their constitutional concerns in the state forum, Plaintiffs should not be permitted to obtain review of the bond amount here. That would effectively allow an end-run around the state judiciary, and impermissibly expand this Court's subject-matter jurisdiction.

## II. Plaintiffs Are Not Entitled To Injunctive Relief.

Even setting aside the fundamental jurisdictional problems inherent in the Complaint, Stein's request for a preliminary injunction fails on the merits: there is

no constitutional right to a recount and, even if there were, her request is much too late to justify such relief. And because the other preliminary-injunction factors weigh against her request, she has not carried her burden to obtain the "extraordinary remedy" she seeks. *AT&T v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1426-27 (3rd Cir. 1994).

### A. Stein has not established any likelihood of success on her constitutional claims.

**1.** Boiled down, Plaintiffs charge that Pennsylvania's Election Code is unconstitutional because, in Stein's estimation, it makes obtaining a statewide recount too difficult, especially for 1% candidates like herself. This argument borders on the frivolous, as there is no constitutional right to a recount, especially so where there is no evidence of fraud or tampering.

The First Amendment gives a right to political association. The Fourteenth Amendment requires that, if states permit voters to vote for president, they must fairly tabulate the votes. And the Due Process Clause prohibits voting procedures that are fundamentally unfair. But the mere absence of an easily invoked, mandatory statewide recount provision does not jeopardize any of these rights. There is no dispute that every Pennsylvania voter had the legal right and ability to cast his or her vote. Nor is there evidence—or even an allegation—that the votes already cast have not been fairly and accurately tabulated. Indeed, Plaintiffs cite no evidence of tampering or fraud, but instead invoke the *possibility* that someone,

somewhere tampered with a voting machine (or machines!) in Pennsylvania.
Who?  We are not told.  To help which candidate?  Again, we are not told.  How
did they do it?  Silence.

We are thus left solely with speculation that the results *could* have been
inaccurate, which Stein insists triggers a constitutional right to a recount to show
that they are not.  By that logic, however, every person, in every state, has the
constitutional right to a recount anytime one thinks votes might have been
inaccurately counted, without regard to whether that person has evidence
suggesting as much.  And the tab for those recounts would be the state's alone,
calling into question ubiquitous state laws requiring recount requestors to pay some
or all of the recount fee.  After all, just as the right to cast a ballot cannot be
infringed by a poll tax, *see generally Harper v. Bd. of Educ.*, 383 U.S. 663 (1966),
the recount right similarly could not encumbered by state fees.

All of this explains why the only court to address the precise claims Stein
raises here rejected them in full.  On Wednesday, a federal district court in
Michigan denied Stein's request for a statewide recount in that state.  *See* Order,
*Stein v. Thomas*, No. 2:16-cv-14233 (E.D. Mich. Dec. 7, 2016) (ECF 36) (attached
as Exhibit 2).  The reasons for doing so was eminently clear: "[t]here is no case
law recognizing an independent federal right to a recount that either this Court or
the parties have come across, in the absence of actual deprivation of voting rights."

*Id.* at 7.  And "to date," the court explained, "Plaintiffs have not presented evidence of tampering or mistake."  *Id.*  "Instead," as in this case, "they present speculative claims going to the vulnerability of the voting machinery—but not actual injury."  *Id.*  And "because mere potentiality does not amount to a claim that the vote was not fairly conducted," the court concluded that plaintiffs had shown "[n]o likelihood of success" on the merits.  *Id.*  Indeed, Plaintiff's theory "has never been endorsed by any court":

> [I]nvoking a court's aid to remedy that problem in the manner Plaintiffs have chosen—seeking a recount as an audit of the election to test whether the vulnerability led to actual compromise of the voting system—has never been endorsed by any court, and would require, at a minimum, evidence of significant fraud or mistake—and not speculative fear of them.  Such evidence has not been presented here.

*Id.*  The court did not engage in the balancing test Plaintiffs invite here (PI Mot. 29-30), but rightly dismissed the claims out of hand since (as here) there was no evidence that Stein's rights were burdened *at all*.[10]

Nothing in Plaintiffs' 41 pages of briefing here undermines these conclusions.  Indeed, Plaintiffs do not cite a *single* case suggesting that there is a

---

[10]  Plaintiffs cite an earlier, now-dissolved TRO order from the same federal district court.  (PI Mot. 32-33.)  But that order is wholly inapposite, because it merely addressed the *timing* of a statewide recount that had already been ordered by the state elections board on state-law grounds (the district court did not, as Plaintiffs misleadingly suggest, order the statewide recount in the first place).  *See* Order at 4, *Stein v. Thomas*, No. 2:16-cv-14233 (E.D. Mich. Dec. 5, 2016) (ECF 16).  Shortly after the TRO was issued, the Michigan Court of Appeals ruled that Stein lacked a right to a recount under state law.  Within 24 hours of that ruling, the federal district court promptly dissolved its TRO and issued the opinion (discussed above) rejecting Stein's alleged *constitutional* right to a recount.

constitutionally protected right to a recount. Plaintiffs' decisions are not even

close. Some involved challenges to a decision not to count a voter's ballot in the

first place. *See Hoblock v. Albany Cty. Bd. of Elections*, 487 F. Supp. 2d 90, 98

(N.D.N.Y. 2006); *Griffin v. Burns*, 570 F.2d 1065, 1074 (1st Cir. 1978). Others

involved challenges to provisions governing candidates' ability to appear on the

ballot. *See Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Belitskus v. Pizzingrilli*,

343 F.3d 632, 636 (3d Cir. 2003); *Constitution Party of Penn. v. Cortes*, 116 F.

Supp. 3d 486 (E.D. Pa. 2015). One case involved constitutional claims based on

deficiencies in the state system that allegedly precluded plaintiffs from voting or

resulted in their votes not being counted. *League of Women Voters of Ohio v.*

*Brunner*, 548 F.3d 463, 469 (6th Cir. 2008). Still others involved a decision to

cancel or refuse to hold an election altogether. *See Bonas v. Town of N. Smithfield*,

265 F.3d 69, 75 (1st Cir. 2001); *Duncan v. Poythress*, 657 F.2d 691, 693 (5th Cir.

1981).

Others are even further afield. One case declined a request by voters for a

preliminary injunction stopping a manual recount provided under state law. *Siegel*

*v. LePore*, 234 F.3d 1163, 1187 (11th Cir. 2000). Another case concerned the

validity of an indictment that alleged violations of the Enforcement Act of 1870,

which protects voters from intimidation. *United States v. Mosley*, 238 U.S. 383

(1915). And another involved a conspiracy between a candidate and members of

the county election board "to cause numerous illegally obtained absentee ballots to be cast." *Marks v. Stinson*, 19 F.3d 873, 875 (3d Cir. 1994).

Regarding this last case, Stein suggests that the Third Circuit court found the state-law proceedings themselves unconstitutional (for example, because they required a $50,000 bond). (PI Mot. 35.) That is false. Setting aside that the Commonwealth Court specifically set a hearing for Stein to present her fraud claims here (which Stein declined to attend by dismissing the action), *Marks* cited the difficulties plaintiffs faced in the state proceedings solely as background for its *abstention* ruling. *See Marks*, 19 F.3d at 879 ("In order to understand the first of these issues [abstention], some knowledge of the state proceedings in this controversy is required."). And, in any event, *Marks* did not involve a recount, let alone a constitutionally required recount.

Thus, none of Plaintiffs' cases involved a court-ordered recount. In fact, some of the cases—to the extent they touched on recounts—undermine her position. *See Griffin v. Burns*, 570 F.2d 1065, 1078 (1st Cir. 1978) (suggesting a claim is more likely to succeed where the federal court is "not asked to count and validate ballots"); *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 478 (6th Cir. 2008) (expressly contrasting the case before it, which alleged a plausible constitutional claim, with a claim requesting "a recount of the 2004 electoral results," which the court suggested would not be proper). At the very least, the

absence of even a single case granting the relief Plaintiffs demand—and one squarely rejecting it—is good evidence that they in fact have no constitutional right to a recount.

Finally, it is worth reminding the Court of the discrepancies between Stein's public comments and the constitutional arguments raised here. The premise of Stein's constitutional argument is that the $1 million bond set by the Commonwealth Court created an "insurmountable barrier[]" to obtaining a constitutionally required recount through the state system. Yet Stein, who instigated and directed the state-court litigation, has since admitted that petitioners' asserted plight—that they were "regular citizens of ordinary means" who could not "afford to post the $1,000,000 bond"—was a farce. Posting the bond was not the problem, she explained. *Supra*, note 7. Rather, it was the virtual certainty that petitioners would lose on the merits due to their inability to prove fraud or tampering. *Id.* Stein has admitted, in other words, that she has no valid constitutional grievance, but is simply unhappy that the state court would not roll over and grant a statewide recount without any evidence of actual fraud.

With these facts in view, it is clear there is no constitutional violation. Moreover, even if there were, this Court should decline to grant a preliminary injunction due to Stein's decision to make a mockery of the state and federal courts. "Courts condone neither forum shopping nor forum avoidance." *FMC*

27

*Corp. v. AMVAC Chem. Corp.*, 379 F. Supp. 2d 733, (E.D. Pa. 2005). "Attempting to avoid a particular judge or precedent is exactly the kind of forum shopping anticipated and expressly prohibited by the local rules of many districts." *Id.* Because there is good reason to believe this occurred here, Stein's efforts should not be rewarded with a preliminary injunction.

**2.** There is another problem with Plaintiffs' request: it comes much too late in the day and is thus barred by the doctrine of laches.

A party asserting the defense of laches must show: "(1) lack of diligence by party against whom the defense is asserted and (2) prejudice to the party asserting the defense." *United States v. Koreh*, 59 F.3d 431, 445 (3d Cir. 1995). Both elements are satisfied here.

First, Stein's conduct is a study in "lack of diligence." The premise of Stein's claim is that Pennsylvania's election machinery is vulnerable to attack. But the machinery has not changed in years. Nor has the evidence that Stein relies upon in an attempt to support her theory. (*See, e.g.*, PI Mot. at 4, 6-7 (citing studies, events, and research from 2005, 2007, 2008, and 2009). Thus, if Stein's motivation for this recount was truly to ensure election integrity, she could have raised these issues *before* the election. And if she had specific concerns about what had occurred during Pennsylvania's election on November 8, she could have

raised these concerns on *November 9*, immediately following the election. Pennsylvania law allows for such a challenge.  *See* 25 P.S. § 3456.

But Stein did not do so.  She did not raise her concerns before the election, as she could have done.  She did not raise these concerns immediately following the election, as she could have done.  Instead, she waited until November 28—just hours before the deadline—to file her election-contest petition, which she then dismissed before the court-ordered hearing.  She then waited two more days to file her complaint here and three days to file her motion seeking a preliminary injunction.  She now has the audacity to argue that the entire recount and election-contest process under the Pennsylvania Election Code is unconstitutional, and that this Court should intervene on an emergency basis.  But it is Stein's own unjustified delay that has caused the concerns she now raises.  If ever there were a case of "lack of diligence" by a party, this is it.

Second, the prejudice to a host of parties—including Intervenors—is clear. A last-minute, unexpected statewide recount would have the enormous financial impact of causing Pennsylvania's taxpayers to shoulder massive expenses to complete the undertaking in less than a week.  It would also cause a logistical nightmare for both state officials and political parties, who would have to train and recruit volunteers to assist in conducting and overseeing an accurate recount.  And if this process failed to conclude by December 13 (which it almost certainly

would), it would jeopardize Pennsylvania's ability to identify and certify its Presidential Electors and thus the State's place at the Electoral College table. This could disenfranchise millions of Pennsylvania voters, all while robbing the presidential and vice-presidential candidates of the added electoral heft that Pennsylvania's twenty electoral votes would provide. Because this morass could have been easily avoided by a prompt filing of Stein's claims, laches independently bars her requested relief.

### B. Plaintiffs do not face any irreparable injury.

Plaintiffs cannot demonstrate any harm, much less irreparable harm, which explains why their brief struggles to identify any *concrete* impending injury (invoking constitutional platitudes instead) and quickly pivots to discussing the supposed reasonableness of the requested relief (to be clear: in the section on irreparable harm). (*See* PI Mot. at 37-39.) This is not surprising. For Stein, there is no possible outcome of a recount that would cause her to win the statewide election in Pennsylvania for President of the United States. She received less than 1% of the Pennsylvania vote, and there is simply no conceivable way for any recanvass or recount to change the more than 2.8 million votes necessary for Stein to earn Pennsylvania's twenty electoral votes. Indeed, Stein herself has admitted that her aim is not to change the election result. *Supra*, at note 8.

As for Reitz, he has not identified *any* evidence—or, for that matter, even alleged—that his vote was not properly tabulated. On this record, there is simply no basis for concluding that either faces irreparable harm.

### C. Plaintiffs' requested relief would seriously harm Intervenors.

Intervenors, Defendants, and all citizens of Pennsylvania face almost certain irreparable harm if a preliminary injunction is entered, as it would run the risk of preventing Pennsylvania from meeting state and federal deadlines for participating in the Electoral College.

As noted, the federal safe harbor requires Pennsylvania to certify its electors by December 13. *See* 3 U.S.C. § 5. State law requires the electors to vote on the federally scheduled date, December 19. *See* 25 P.S. § 3192. At this point, however, time is short, especially given the nature of the requested relief. The State would have just four days to put together a massive workforce capable of conducting the recounts in over 9,100 election districts, and oversee that the recount is conducted properly. This is not possible. And to order it creates the very real possibility of disenfranchising every Pennsylvania voter who exercised their right to vote on election day.

### D. Granting an injunction would be contrary to the public interest.

The recount in question would also undermine confidence in Pennsylvania's elections, and force the State to pay potentially millions for a recount admittedly

31

undertaken for completely academic reasons. Perhaps Pennsylvania's courts would have concluded that Pennsylvania's laws required the State to bear those costs. Stein, however, made certain we would never find out; she and her allies aborted the state-law process before it was even concluded. But what is clear is that declining Plaintiffs' request now will save the State from wasting millions of dollars of taxpayer money, and thousands of hours of manpower, and will avoid the chaos that a hurried, last-minute recount would create. Indeed, it is difficult to emphasize enough the disruption an eleventh-hour recount order would cause to state electoral processes already underway. Most counties have already certified their election results. The rest will do so any day now. All must be completed by December 13, the critical federal safe-harbor deadline. A statewide recount would thwart that process, and virtually guarantee that the State would not certify its Presidential Electors by state and federal deadlines, and disenfranchising millions of voters who voted honestly this election.

At a minimum, the availability of state-court proceedings (even if Stein elected to bail out of them for strategic considerations) suggests that this Court should abstain from deciding this matter. It could do so under the *Younger* abstention doctrine, which applies where there are ongoing state proceedings that are judicial in nature, the state proceedings implicate important state interests, and the state proceedings afford an adequate opportunity to raise federal claims. *Port*

*Auth. Police Benev. Ass'n, Inc.*, 973 F.2d at 173. Here, it is beyond dispute that Pennsylvania's regulation of its election process and an individual's right to vote is a state interest of great importance. Additionally, the state-court election contest certainly afforded Plaintiffs sufficient opportunity to raise their constitutional claims. Although Plaintiffs voluntarily discontinued the state election contest, abstention is nevertheless warranted because they had the ability to pursue remedies in that forum. *See id.* at 174 ("One cannot escape *Younger* abstention by failing to assert remedies in a timely manner in state court."); *Huffman v. Pursue, Ltd.*, 420 U.S. 592 (1975) (*Younger* abstention appropriate where plaintiff sought injunctive relief in federal court rather than appealing state trial court judgment within the state system). It is also warranted because Plaintiffs in effect are requesting this Court to stand in judgment of the Commonwealth Court's bond order. *See Port Auth. Police Benev. Ass'n, Inc.*, 973 F.2d at 174 ("the federal courts must also generally abstain from reviewing the state court orders themselves, where the state provides an adequate forum for appellate review of all claims of a federal nature").

This Court could also abstain under the *Pullman* abstention doctrine, which applies in cases where a litigant asks a federal court to reach a constitutional question predicated on the federal court's own, non-binding interpretation of state law. *Moore v. Sims*, 442 U.S. 415, 423 (1979). Or, alternatively, the Court could

apply the *Burford* abstention doctrine, which is proper "where timely and adequate state-court review is available and (1) a case presents difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar, or (2) the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Caudill v. Eubanks Farms, Inc.*, 301 F.3d 658, 660 (6th Cir. 2002). At the very least, the spirit of these doctrines—that federal courts not needlessly interfere with states' prerogatives—suggests that the Court's decision to stay its hand would advance the public interest.

*   *   *

Stein's law-defying efforts to enlist this Court's assistance in upsetting an election she could not possibly win prompts the question: What is the reason for Stein's request? We know it has nothing to do with changing the election's outcome. Stein did not win the State of Pennsylvania. Not by a longshot. She finished over 2.8 million votes behind the winner in the 2016 Presidential election.

Nor could her request have rested on ensuring the fairness and accuracy of Pennsylvania's presidential election. All available evidence indicates that the 2016 general election was not tainted by fraud or mistake.

So why is Stein seeking a recount?  All we know for certain is that she is using it to line her pockets with funds donated from those she has scared into believing that Pennsylvania's electoral process was hijacked by nameless foreign entities.  It would be bad enough if she were wasting only her own time and resources as part of her electoral farce.  But she is also wasting millions of dollars in taxpayer money and calling into doubt Pennsylvania's ability to meet the deadline for certifying its electors in accordance with federal and state law.

With Stein having made the same demands in neighboring states as well, she threatened to put at risk confirmation of the entire election's outcome when Congress meets in January 2017.  Ultimately, Stein cannot change the outcome of the presidential election.  She apparently has no qualms, however, with creating chaos in her attempts to do so.  Rejection of today's case should amount to the final blow to Stein's self-interested electoral odyssey.

## **CONCLUSION**

For these reasons, Intervenors respectfully request that this Court deny Plaintiffs' motion for a preliminary injunction and dismiss their Complaint with prejudice.

Respectfully submitted,

/s/ *Lawrence J. Tabas*
Lawrence J. Tabas, I.D. No. 27815
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA 19102
Phone: 215-665-3158
Email: lawrence.tabas@obermayer.com

/s/ *Rebecca L. Warren*
Rebecca L. Warren, I.D. No. 63669
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA 19102
Phone: 717-221-1602
Email: rebecca.warren@obermayer.com

*/s/ Chad Readler*
Chad A. Readler*
JONES DAY
325 John H. McConnell Blvd., Suite 600
Columbus, OH 43215
Phone: 614-469-3939
careadler@jonesday.com
* Admitted *pro hac vice*

*/s/ David M. Morrell*
David M. Morrell*
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 879-3717 (direct)
Email: dmorrell@jonesday.com
*Admitted *pro hac vice*

Donald F. McGahn II (I.D. No. 73796)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001
Phone: (202) 879-3748 (direct)
Email: dmcgahn@jonesday.com

Dated:    December 8, 2016

EXHIBIT 1



## Remarks by Secretary of State Pedro A. Cortés
## Press Conference, Capitol Media Center, Harrisburg, PA
## October 20, 2016

Thank you for joining us for this press conference where I will discuss the steps that the DOS and counties are taking to ensure a fair, secure and smooth election. I will provide remarks and then open the floor for questions.

I want to thank Jerry Feaser, Dauphin County Director of Elections for being with us this afternoon.

Voting is one of our most fundamental rights as citizens. We must ensure that all eligible voters who want to exercise their franchise can do so well informed about the process and their rights.

Governor Wolf and I strongly believe that one of our roles as public servants is to encourage as many people as possible to engage in the electoral process, exercise their right to vote and have a say in what happens in their municipality, county, state and nation.

Unfortunately, in recent weeks, some have decided to take a different approach. Some have suggested that our system lacks integrity and security. Some have suggested that fraud is rampant and election officials at the local and state level have ill intended motives.

This is not only wrong and uninformed – it is dangerous. To imply that fraud is rampant – at any level – from the precinct-level to an entire city or state – is without merit and lacks any credence or proof within the modern history of elections in this country or commonwealth.

It is also not backed up by any science or research. To the contrary, a study by Loyola University looked at one billion votes – a billion – and found just 31, unrelated and small-scale examples of improper activity.

Applying singular, unconnected and rare instances of fraud to claim a widespread conspiracy is irresponsible and destructive to the democratic process. Efforts to suppress voting or seek for citizens to call into question the value of their participation is counter to our core values of freedom and liberty. A good democracy hinges on well-informed voters, and all of us have an obligation to speak about this process with honesty and objectivity.

I want to applaud my colleagues across the state and country who are speaking out on these outrageous claims. Democrats, Republicans, third parties and non-partisans have rejected conspiracy theorizing. They have put our democracy above politics.

One such voice Philadelphia City Commissioner Al Schmidt, a Republican, has said: "The real threat to the integrity of elections in Philadelphia isn't voter fraud, though it does rarely occur. The real threat to the integrity of elections is irresponsible accusations that undermine confidence in the electoral process."

Ohio Secretary of State Jon Husted, a Republican, said "there are many safeguards in place in our election system" and that "this kind of conversation moves America backward, and it should be dismissed. Don't make people feel despair. Make them feel uplifted, and hopeful that there is a better day ahead for all of us."

I am here today to deliver the same message to the people of Pennsylvania. Our voting systems are secure. Historically we have seen very, very minimal improper activity; so little that it is statistically non-existent. The people who oversee our elections take pride in ensuring the system is fair and accountable. From our staff at the Department of State to county election workers to poll-workers in the more than 9,100 precincts across Pennsylvania.

To suggest that these hardworking public servants are participating in something nefarious is not just unfair – it is offensive to me. I am proud of the hard work done by our county and state election officials to protect and promote the democratic process.

I take these unfounded and misleading statements very, very seriously. Those who run our elections at the local and precinct level come from every walk of life and include people of every gender, creed, and ethnicity. To demean their efforts is unacceptable and I want to reassure anyone who has reservations about working this election that the counties and my department will do everything we can to ensure they can work without interruption, or undue stress.

Now I want to address a few other issues that have arisen in the last few weeks:

## Voting Systems

The Pennsylvania Department of State and Pennsylvania's 67 county election boards work diligently to safeguard and promote the integrity of elections in the Commonwealth.

All of the voting systems in use in Pennsylvania have been examined and certified to federal and state standards.  These standards include an audit capability independent from the

way in which the votes are tabulated on election night.  There is in fact an audit trail.

The voting systems used in Pennsylvania are also equipped with redundant memory, meaning that cast vote records are encrypted and stored in at least one other location on the voting machine in addition to being stored on the removable media.

Very important – voting machines in Pennsylvania are not connected to the Internet.  In fact, they are not even connected to one another.

In addition, voting machines are kept under a strict chain of custody.  Prior to every election the machines are tested for logic and accuracy.  After successful testing, the machines are locked down and physical tapes/locks are applied that would detect equipment tampering.  Furthermore, the voting machines are keep separate from the tabulation equipment.

On Election Day, a zero tape is run on every machine to ensure they do not contain prior votes.  This is done in the presence of poll workers and watchers.

Once the polls close, a physical tally of votes is run for every machine and posted at the polling place.  A copy of that paper tally is also included with the electronic memory card for each machine, which are transported to the county board of elections in individual security/tamper proof bags. The Judge of Elections and the Minority Inspector also get a copy.

Election night reporting of unofficial results takes place using the Commonwealth's secured network.  Pennsylvania is a recognized leader among states in cybersecurity.

In addition to the Commonwealth cybersecurity tool and procedures, the Commonwealth has partnered with federal agencies, including the Department of Homeland Security, to ensure the integrity of our systems and networks.

The Department of State and the counties take very seriously their responsibility to ensure fair, secure and smooth elections.  We are confident the November election will meet those high standards; as it has been the case in years past.

**Poll-watching**

The Department of State is committed to ensuring that elections run as smoothly and fairly as possible. In recent weeks, poll-watching has been widely discussed and I want to reaffirm the guidelines for who can be in the polling place. Those people are:

1.  Precinct Election Officials. These include the Judge of Election, the Inspectors (Majority

and Minority), appointed clerks and machine operators.
2. Voters in the process of voting but no more than 10 voters at a time.
3. Persons lawfully providing assistance to voters.
4. Overseers that are registered voters of the precinct appointed by a County judge
5. Constables and Deputy Constables for preserving the peace.
6. And Poll watchers

Poll watchers must be identified in advance and assigned to specific precincts. Watchers receive a credential from the county Board of Elections and must present the credential upon demand.

Each party is entitled to appoint three watchers per precinct and each candidate is entitled to appoint two watchers per precinct. The watcher must be a registered voter of the county in which the watcher is appointed. Of those, only one poll watcher per party and candidate can be inside the polling place at the same time.

Watchers may not engage voters or otherwise interfere with the orderly process of voting. Watchers should direct all challenges and other comments directly to the Judge of Elections who is the official in charge at the polling place.

**Voter Intimidation**

Voter intimidation and discriminatory conduct is illegal under federal and Pennsylvania law. Any activity that threatens, harasses or intimidates voters, including any activity that is intended to, or has the effect of, interfering with any voter's right to vote, whether it occurs outside the polling place or inside the polling place is illegal.

It is illegal for any person or corporation to directly or indirectly practice intimidation or coercion through the use of force, violence, restraint, or threats in order to induce or compel a person to vote or refrain from voting for a particular candidate or on a particular political issue.

Further, it is illegal for a person or corporation to use abduction, duress, coercion, or any other forcible or fraudulent means to impede, prevent or otherwise interfere with a person's right to vote.

Individuals who intimidate voters can be fined up to $5,000 and face up to two years in prison.

I have full faith in our law enforcement officers, working in concert with election workers, to protect voters and ensure no citizen in terrorized or intimidated in their pursuit of their civic duty.

Individuals who witness voter intimidation or who are victims of voter intimidation should report the incident to their precinct/division, Judge of Elections, County Board of Elections and County District Attorney.

**<u>END</u>**

That is the conclusion of my prepared remarks and I would be happy to take your questions. I just want to reiterate the faith, confidence and respect that I have for our county, local and precinct election workers who are among some of the best public servants I have ever met. We are committed to delivering fair, secure and smooth elections for the people of Pennsylvania and the nation.

EXHIBIT 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JILL STEIN, et al.,

                Plaintiffs,                        Case No. 16-14233
                                                       Hon. Mark A. Goldsmith

vs.

CHRISTOPHER M. THOMAS,
et al.,

                Defendants.
_____/

### **ORDER DISSOLVING TEMPORARY RESTRAINING ORDER (Dkt. 16)**

On December 5, 2016, this Court entered a temporary restraining order ("TRO") requiring Defendants "to cease any delay in the commencement of the recount of the presidential vote cast in Michigan" and to "continue [the recount] until further order of this Court." 12/5/2016 Op. & Order at 7 (Dkt. 16). Defendants appealed that order to the United States Court of Appeals for the Sixth Circuit (Dkts. 22, 25).

On December 6, 2016, the U.S. Court of Appeals affirmed this Court's grant of the TRO, holding that it was not an abuse of discretion to "halt[ ] operation of the waiting period law," Mich. Comp. Laws § 168.882(3).[1] See Stein v. Thomas, 12/6/2016 Order at 8, Case No. 16-2690 (6th Cir. Dec. 6, 2016). The majority further stated that "[i]f, subsequently, the Michigan courts determine that Plaintiffs' recount is improper under Michigan state law for any reason, we

---

[1] Mich. Comp. Laws § 168.882(3) requires that "the board of state canvassers shall not begin a recount unless 2 or more business days have elapsed since the board ruled on the objections under this subsection . . . ." On Friday, December 2, 2016, the Board of State Canvassers ruled on objections to the recount filed by Donald J. Trump on that same day. See Compl. ¶ 27. By operation of the statute, the Board, therefore, could not commence the recount until two business had passed, i.e., until Wednesday, December 7, 2016. Id. ¶¶ 28-29.

expect the district court to entertain any properly filed motions to dissolve or modify its order in this case." <u>Id.</u>

Shortly after the Sixth Circuit issued its order, the Michigan Court of Appeals held that the recount of the votes case in the presidential election should never have been initiated in the first place, because Stein was not an "aggrieved candidate" as required to initiate a recount under Mich. Comp. Laws § 168.879.  <u>See generally</u> <u>Attorney Gen. v. Bd. of State Canvassers</u>, 12/6/2016 Op. & Order, Case Nos. 335947 & 335958 (Mich. Ct. App. Dec. 6, 2016). The Michigan court found that the statute accorded "aggrieved" status only to a candidate who could state in good faith that "but for mistake or fraud, the candidate would have had a reasonable chance of winning the election" – a standard the Michigan court said the recount petitioner could not satisfy. <u>Id.</u> at 5.  Shortly after that ruling, Michigan Attorney General Bill Schuette, the Michigan Republican Party, and the original Defendants each filed in this Court emergency motions to dissolve the TRO (Dkts. 26, 28, 29). This Court immediately entered an order for a hearing on the motions, which was conducted earlier today.

All agree that the initial justification for the TRO — i.e., Plaintiffs' challenge to the two-day rule — is no longer at issue.  Recognizing this fact, Plaintiffs filed an amended complaint (Dkt. 30) before filing their response to Defendants' motions to dissolve the TRO (Dkt. 33), broadening their claims in this case. Based on the assertion that there may have been fraud or other mistakes in the recordation of the votes, they now assert that any act by Defendants that "jeopardizes completion" of a recount amounts to maintaining a system of voting that denies Michigan voters the right to have their votes counted, in violation of their rights under the equal protection clause, the due process clause, and the First Amendment.

In tandem with their new claims, Plaintiffs' response to the motions to dissolve argues that the TRO should be preserved on either of two alternative bases: (i) that the Michigan Court of Appeals' ruling on the "aggrieved party" issue represents a "distorted interpretation of the text" of Mich. Comp. Laws § 168.879, see Pls. Resp. at 3-4; and (ii) that Plaintiffs have a federal constitutional right to a recount independent of the state statutory scheme providing for a recount, see id. at 10. The Court finds neither argument persuasive.[2]

Plaintiffs argue that the Michigan Court of Appeals abrogated the authority of the Michigan Legislature by interpreting the term "aggrieved" incorrectly. Id. at 2-3. Recognizing that federal courts typically avoid overruling a state court's interpretation of state law, Plaintiffs invoke precedents from the momentous litigation surrounding the 2000 presidential election, in which the Supreme Court addressed when such traditional deference need not be accorded. Plaintiffs' theory is that those cases establish an allowance for federal courts to ignore certain state court pronouncements on state election laws concerning presidential elections in certain circumstances. However, Plaintiffs overstate the impact of these precedents and, in any case, ignore crucial differences between those cases and ours.

---

[2] As to the first issue, Intervenor Schuette argues that the law of the case doctrine requires this Court to simply accept the decision of the Michigan Court of Appeals without further analysis, on the theory that the Sixth Circuit has already decided that any ruling from the Michigan courts would be dispositive on Michigan law. However, in the present circumstances, the application of the law of the case doctrine is less than clear. It comes into play with respect to issues "previously determined" by a higher court. Bowling v. Pfizer, Inc., 132 F.3d 1147 (6th Cir. 1998). Here, the Sixth Circuit's decision did not require an answer to whether a forthcoming Michigan court ruling would have to be accepted without further analysis; nor was the Sixth Circuit presented with the arguments Plaintiffs have made in response to the motions to dissolve the TRO. Further, it did not specifically direct this Court to accept any ruling by a Michigan court without further analysis. Instead, it directed this Court to "entertain" any motion to dissolve the TRO should there be a Michigan court ruling denying a right to a recount. This Court has done precisely that. Because the applicability of the doctrine is less than certain, this Court proceeds to consider Plaintiffs' arguments on the merits.

In <u>Bush v. Palm Beach County Canvassing Board</u>, 531 U.S. 70 (2000) (<u>Bush I</u>), a Florida election official had declined to waive the statutory deadline for submitting recount returns, but the Florida Supreme Court nevertheless extended the deadline by 12 days. In reviewing the Florida Supreme Court's decision, which had interpreted Florida election laws, the Supreme Court expressed its apprehension that, in interpreting the election laws enacted by the Florida Legislature, the Florida Supreme Court had concluded that its legislature potentially was "circumscribe[d]" by the state constitution. <u>Id.</u> at 78. The U.S. Supreme Court recognized that Article II, § 1 grants the authority to select electors <u>directly</u> to the state legislatures, <u>id.</u> at 76-77, notwithstanding any limitations on that authority purporting to flow from another source of law, such as the state constitution. Accordingly, it remanded to the Florida Supreme Court for clarification of the basis of the ruling. Importantly, however, <u>Bush I</u> did not purport to overrule a state court ruling – rather, it sought clarification whether the state court had viewed itself constrained by its state constitution to the extent that its organic law was at variance with the legislative intent as evidenced by the statute itself. <u>See</u> <u>Bush I</u>, 531 U.S. at 77-78.

In <u>Bush v. Gore</u>, 531 U.S. 98, 101 (2000) (<u>Bush II</u>), the Supreme Court concluded (under a variety of theories endorsed by different Justices) that continuation of the Florida recount could not be conducted consistent with the U.S. Constitution in sufficient time to take advantage of the "safe harbor" provision in 3 U.S.C. § 5. In a concurrence to the per curiam opinion in <u>Bush II</u>, Chief Justice Rehnquist, joined by Justices Thomas and Scalia, elaborated further, stating that, with respect to statutes enacted pursuant to Article II, § 1's grant of authority,

> the general coherence of the legislative scheme may not be altered by judicial interpretation so as to wholly change the statutorily provided apportionment of responsibility among these various bodies. In any election but a Presidential election, the Florida Supreme Court can give as little or as much deference to Florida's executives as it chooses, so far as Article II is concerned, and this

> Court will have no cause to question the court's actions. But, with respect to a Presidential election, the court must be both mindful of the legislature's role under Article II in choosing the manner of appointing electors and deferential to those bodies expressly empowered by the legislature to carry out its constitutional mandate.

Id. at 114 (Rehnquist, C.J., concurring).

The theory of the concurrence — a federal judicial override of state court determinations of state election laws in presidential elections — was not endorsed by a majority of the court. Indeed, it sparked disagreement by Justice Stevens (joined by Justices Ginsberg and Breyer). Id. at 124 ("Neither [3 U.S.C.] § 5 nor Article II grants federal judges any special authority to substitute their views for those of the state judiciary on matters of state law."). Thus, it is unclear to what extent a federal court may utilize the less deferential approach that may be located in some of the Bush opinions.

Whatever may be the vitality of the doctrine that Plaintiffs invoke, it has no application here. The Michigan Court of Appeals' interpretation of its election laws does not alter "the general coherence" of the legislative recount scheme enacted in Mich. Comp. Laws § 168.879. It is at least arguable that the Michigan Legislature intended to confine costly and disruptive recounts to cases where a losing candidate stood a reasonable chance of changing the outcome of the election. That is certainly the typical petitioner for a recount, and nothing has been placed in the record to suggest that the Legislature may have had in mind a petitioner simply wishing to confirm the voting results, notwithstanding the absence of any reasonable likelihood of changing the result. Further, the Michigan court utilized traditional tools of analysis to reach that result, pointing to dictionaries and precedents in other contexts where the "aggrieved" concept is utilized in Michigan law. Plaintiffs offer cogent reasons to challenge the Michigan court's

conclusions, but none leads to the conclusion that the Michigan court disregarded or plainly misread the legislature's intent.

This is a far cry from the Bush litigation.  In Bush I, the Florida Supreme Court invoked its "equitable powers" to override an express 7-day deadline found in the statute and extend it by 12 days.  See Bush I, 531 U.S. at 75-76.  The U.S. Supreme Court's remand was based on its suspicion that the Florida Supreme Court arguably had impermissibly attributed its decision to an irrelevant source of law — that is, something other than the state legislature exercising its delegated Article II powers.  Id.  Here, the Michigan Court of Appeals neither ignored a statutory term, nor is there a hint that it was basing its decision on something other than the statute; it merely made an arguable interpretation of the statute before it.  It cannot be said that the Michigan Court of Appeals "departed from the statutory meaning," Bush II, 531 U.S. at 115, or recognized a limitation on the legislature's Article II powers in the same way that the Florida Supreme Court may have attempted to do in Bush I.

Because there is no basis for this Court to ignore the Michigan court's ruling and make an independent judgment regarding what the Michigan Legislature intended by the term "aggrieved," Plaintiffs have not shown an entitlement to a recount under Michigan's statutory scheme.

Nor have Plaintiffs shown an entitlement to a recount that derives from a source other than the recount procedures established by the Michigan Legislature.  It is true that presidential candidates and voters, once enfranchised by a state legislature, have a general right to have the vote counted fairly.  See, e.g., Bush II at 104-105.  But unlike Plaintiffs' first argument — which invokes the right to have a state's statutory election machinery applied as the legislature dictated, and may be made whenever the statute is violated — Plaintiff's second argument certainly

6

requires facts amounting to an actual impact on the right to vote.  There is no case law recognizing an independent federal right to a recount that either this Court or the parties have come across, in the absence of actual deprivation of voting rights.  Rather, Plaintiffs' asserted right to a recount is just a restatement of her right to participate in a fair election, free from tampering or mistake.  But, to date, Plaintiffs have not presented evidence of tampering or mistake.  Instead, they present speculative claims going to the vulnerability of the voting machinery -- but not actual injury.  Because mere potentiality does not amount to a claim that the vote was not fairly conducted, Plaintiffs' new claims are insufficient to maintain the existing TRO.  No likelihood of success on that claim has been shown.

The issues that Plaintiffs raise are serious indeed. The vulnerability of our system of voting poses the threat of a potentially devastating attack on the integrity of our election system.  But invoking a court's aid to remedy that problem in the manner Plaintiffs have chosen — seeking a recount as an audit of the election to test whether the vulnerability led to actual compromise of the voting system — has never been endorsed by any court, and would require, at a minimum, evidence of significant fraud or mistake — and not speculative fear of them.  Such evidence has not been presented here.

For all these reasons, this Court dissolves the TRO effective immediately.

SO ORDERED.

Dated:  December 7, 2016                           s/Mark A. Goldsmith
      Detroit, Michigan                          MARK A. GOLDSMITH
                                     United States District Judge

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on December 7, 2016.

s/Karri Sandusky
Case Manager

EXHIBIT 3

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re: Matter of the 2016          :
Presidential Election              :
                           :
Petition of: One Hundred (100)     :
or more unnamed registered voters of :
the Commonwealth of Pennsylvania   :   No. 659 M.D. 2016

**PER CURIAM**          **O R D E R**

AND NOW, this 29th day of November 29, 2016, upon review of the Class II Election Contest Petition (Contest Petition) and the Praecipe to Substitute and Attach Verifications thereto, and it appearing that a conclusive decision must be entered by December 13, 2016, it is hereby ORDERED:

1) Pennsylvania's Electors for President and Vice-President as identified by the Pennsylvania Department of State shall respond to the factual averments in the Contest Petition and file dispositive applications for relief on or before 12:00 noon on Friday, December 2, 2016.

2) Applications to intervene must be filed on or before 12:00 noon on Friday, December 2, 2016, and shall be accompanied by a response to the Contest Petition.

3) Hearing is set for Monday, December 5, 2016, at 10:00 a.m. in Courtroom 5001, Fifth Floor, Pennsylvania Judicial Center, 601 Commonwealth Avenue, Harrisburg, Pennsylvania. Argument on any dispositive applications shall be heard at the same time.

Certified from the Record

NOV **2 9** 2016

And Order Exit

EXHIBIT 4

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re: Matter of the 2016　　　　　:
Presidential Election　　　　　　　:
　　　　　　　　　　　　　　　　:
Petition of: One Hundred (100)　　 :
or more unnamed registered voters of　:
the Commonwealth of Pennsylvania　:　　No. 659 M.D. 2016

**PER CURIAM**

### O R D E R

　　　　AND NOW, this 2nd day of December, 2016, upon consideration of Petitioners' request that the Court set the statutory bond required in this matter in the amount of $25,000, and the response thereto filed by the Pennsylvania Electors of President-Elect Donald J. Trump and Vice-President-Elect Michael Pence, *et al.*, that the bond be set at $10,000,000, it is hereby ORDERED as follows:

　　　　1.　By no later than 5:00 p.m. on Monday, December 5, 2016, Petitioners must file a bond in the amount of $1,000,000 that complies with Section 1759 of the Pennsylvania Election Code, Act of June 3, 1937, *as amended*, P.L. 1333, 25 P.S. §3459.

　　　　2.　Upon good cause shown, the amount of the bond may be modified by the Court.

Certified from the Record

DEC 02 2016

And Order Exit

EXHIBIT 5

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

## HARRSIBURG, PENNSYLVANIA

In re: The matter of the 2016 Presidential Election: Docket No: 659 MD 2016

: ELECTION MATTER

## PRAECIPE TO DISCONTINUE AND WITHDRAW


TO THE PROTHONOTARY:

Petitioners are regular citizens of ordinary means.  They cannot afford to post the $1,000,000

bond required by the Court.  Accordingly, kindly mark the above captioned matter withdrawn

and discontinued.


Respectfully submitted,

/s/ LAWRENCE M. OTTER, ESQ.

_____

LAWRENCE M. OTTER, ESQUIRE
ATTORNEY FOR PETITIONERS
PA ATTORNEY ID  31383
PO Box 575
SILVERDALE, PA 18901
267-261-2984
Email: larryotter@hotmail.com

Date:  December 3, 2016

Of counsel:  Emery Celli Brimcerhoff & Abady, LLP

600 Fifth Avenue
New York NY 10019
212-763-5000
by:     Andrew G. Celli, Jr.*
        Ilann M. Maazel*
Alison Frick*
Douglas Lieb*

* pro hac vice pending

EXHIBIT 6

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re:  Matter of the 2016          :
Presidential Election               :
                                    :
Petition of:  One Hundred (100)     :
or more unnamed registered voters of :
the Commonwealth of Pennsylvania    :  No. 659 M.D. 2016

**PER CURIAM**

**O R D E R**

AND NOW, this 3rd day of December, 2016, Petitioners having filed a Praecipe to Discontinue and Withdraw the above-captioned matter, the hearing scheduled for Monday, December 5, 2016, at 10:00 a.m. is CANCELLED, and the Chief Clerk is directed to mark this matter CLOSED.

EXHIBIT 7

**COURT OF COMMON PLEAS**
**PHILADELPHIA COUNTY**
**CIVIL TRIAL DIVISION**

**RECEIVED**

DEC 0 7 2016

OFFICE OF JUDICIAL
RECORDS

STEIN                    :
                         :
   v.                    :        No. 161103335
                         :
**PHILADELPHIA COUNTY BOARD**   :
**OF ELECTIONS**              :


    AND NOW, this 7th day of December 2016, upon consideration of the partial appeal of

petitioner, it is hereby ORDERED that the appeal is DENIED and the decision of the

Philadelphia County Board of Elections is AFFIRMED. The reasons for denial are set forth in

the attached opinion.



                                BY THE COURT:


                                Abbe F. Fletman, Judge


Stein Vs Philadelphia C-ORDRF

Case No: 161103335

**COURT OF COMMON PLEAS**
**PHILADELPHIA COUNTY**
**CIVIL TRIAL DIVISION**

STEIN                                           :
                                                :
        v.                                      :        No. 161103335
                                                :
PHILADELPHIA COUNTY BOARD                       :
OF ELECTIONS                                    :

**OPINION**

Before the Court is the partial appeal of appellant Jill Stein of the decision of the

Philadelphia County Board of Elections (the "Board") not to permit a forensic examination of the

electronic voting system Philadelphia employs. For the reasons explained below, the Court

affirms the Board's decision and dismisses Dr. Stein's appeal.

**FACTS**

Appellant Jill Stein was a presidential candidate in the federal election held on November

8, 2016. Before the Board finished computing the vote, 297 Philadelphia voters filed petitions

(the "Petitions") for a recount under 25 P.S. § 3154(e)(West 2004). Each of the Petitions

requested that "a reasonable subset of the DRE [direct-recording electronic voting system]

machines be forensically analyzed by appropriate computer experts for potential tampering,

malware, and/or hacking." *See* Ex. A to Appellant's Partial Appeal of Decision of Philadelphia

Board of Elections (December 2, 2016) (the "Appeal"). At a public meeting on December 1,

2016, the Board announced that its staff had evaluated the Petitions and determined that 282 of

them met the requirements of the Pennsylvania Election Code. Based on those Petitions, the

Board voted to recanvass and recount the votes in 75 of the City's 1,686 polling divisions.

In advance of the December 1st Board meeting, Dr. Stein requested that the Board allow

"forensic examination by independent experts of the election management computers and a

sampling of the electronic voting machines and movable media used in the 2016 general election."  November 30, 2016 letter from Ilann M. Maazel to Deputy Commissioner Fred Voigt, attached as Ex. B to the Appeal.  The Board heard argument by counsel to Dr. Stein and counsel for the electors for President Elect Donald Trump, Vice President Elect Mike Pence and the Republican Party of Pennsylvania.  The Board denied Dr. Stein's request.[1]

Dr. Stein timely appealed the Board's denial to this Court on December 2, 2016.[2]  Dr. Stein's Appeal requested that "she be permitted to perform a forensic examination of the DRE electronic voting system used in the 75 election districts that are the subject of the Board-ordered recount."  Appeal at ¶ 12.  The Court heard argument on December 6, 2016.

## DISCUSSION

Dr. Stein argues that she is entitled to the requested forensic examination under Section 2650(c) of the Election Code, which provides: "Any candidate, attorney or watcher present at any recount of ballots or recanvass of voting machines shall be entitled to examine the ballots, or the voting machine and to raise any objections regarding the same, which shall be decided by the county board, subject to appeal, in the manner provided by this act."  25 P.S. § 2650(c)(West 2004).  Dr. Stein is mistaken.

Our country is based on a federal system in which individual states govern the voting process within their borders.[3]  The Legislature in this Commonwealth has enacted a comprehensive Election Code that entrusts the integrity of elections to the Secretary of the

---

[1] The Board did not announce its reasoning.

[2] This Court has jurisdiction over this appeal pursuant to 25 P.S. § 3157 (West 2004), which provides for an appeal to the Court of Common Pleas from "any order or decision" of a County Board of Elections "regarding the computation or canvassing of the returns of any primary or election, or regarding any recount or recanvass thereof under" 25 P.S. §§ 3261, 3262 and 3263.

[3] The conduct of elections, of course, is also governed by the Constitution and federal voting statutes.  The relief requested in this appeal, however, rests solely upon state law.

Commonwealth and county election boards. The Secretary of the Commonwealth, after examination, must approve any electronic voting system before it may be put to use. *Id.* at § 3031.7. Further, it is the Board's solemn duty to "inspect systematically and thoroughly the conduct of . . . elections . . . to the end that . . . elections may be honestly, efficiently, and uniformly conducted." *Id.* at § 2642(g). The Board further is compelled to "investigate election frauds, irregularities and violations of this act. . . ." *Id.* at § 2642(i).

The Election Code further requires the Board to test the "central automatic tabulating equipment" both before and after the election. *Id.* at § 3031.14(a). Each political party or body represented on the ballot is permitted to be present during the testing of the vote tabulating equipment, the actual counting of ballots and the recounting or recanvassing of ballots." *Id.* at §§ 2650(c) and 3031.14(b)(2). They also are permitted to have "a technically qualified person" there "to make independent tests of the equipment prior to, during, and following the vote count; Provided, however, That such testing shall in no way interfere with the official tabulation of the ballots and district totals cards." *Id.* at § 3031.14(b)(2). Nothing in the record evidences whether Dr. Stein took advantage of these provisions, which allowed her representatives, including those with technical knowledge, to be present during the testing of the vote tabulating equipment.

Section 2650(c) is part of a provision entitled, "Watchers or attorneys at sessions of county board; candidates may be present". Subsection (a) provides that "[a]ny party or political body or body of citizens . . . entitled to have watchers at any . . . election" shall also be entitled to appoint watchers "at any recount of ballots or recanvass of voting machines. . . ." *Id.* at § 2650(a). It is in this context that § 2650(c) entitles "[a]ny candidate, attorney or watcher present at any recount of ballots or recanvass of voting machines" to "examine . . . the voting machine and to raise any objections regarding the same. . . ." *Id.* Section 2650(c), by its own terms, is

3

limited to examination of **voting machines.** When a court is called upon to interpret a statute, "[t]he best indication of legislative intent is the plain language of the statute." *Bowling v. Office of Open Records,* 75 A.3d 453, 466 (Pa. 2013). This statute simply does not mandate or allow a candidate to "perform a forensic examination of the DRE electronic voting system used in the 75 election districts that are the subject of the Board-ordered recount." Appeal at ¶ 12.

In 1980, the General Assembly amended the Election Code to allow the use of electronic voting systems, which include DREs. 25 P.S. §§ 3031.1-3031.22 (electronic voting systems). The Legislature could have enacted legislation providing candidates with unbridled rights to examine electronic voting systems before, during and after elections. It did not and has not. This Court will not impose requirements the Legislature has not seen fit to establish.

This is especially true when, as in this case, there is absolutely no evidence of any voting irregularities. To the contrary, the elected and appointed officials charged with safeguarding our voting system, uniformly maintain its integrity. Secretary of State Pedro A. Cortés publicly stated before the election that "[a]ll of the voting systems in use in Pennsylvania have been examined and certified to federal and state standards." Remarks by Secretary of State Pedro A. Cortés Press Conference, October 20, 2016.[4] More specifically, the Board's review of the 75 recanvassed divisions in Philadelphia revealed no discrepancies in the electronic tallies. Dr. Stein's brief cites cyber-attacks in Arizona and Illinois, and against the Democratic National Committee, but none affecting the voting system in Philadelphia.

Dr. Stein further raises concerns about hacking by a foreign government to interfere with the U.S. election process. *See* Ex. A to the Appeal, Halderman Aff. ¶ 6 & attached exhibits.

---

[4] Respondent, the Republican State Committee of Pennsylvania, entered Secretary Cortés's remarks into evidence as R-1 at the December 6, 2016 hearing.

4

These instances, while of course of concern, do not establish any wrongdoing in Philadelphia and do not compel a different result.

Indeed, just last year our Supreme Court address the security of electronic voting systems in *Banfield v. Cortes,* 110 A.3d 115 (Pa. 2015). In affirming the Commonwealth Court's decision upholding the Secretary of State's certification of the use of DREs in Pennsylvania elections, the Court noted that "all voting systems are imperfect and not immune from tampering. . . ." *Id.* at 174. In that case, the Secretary had determined that the DREs satisfied the Election Code's requirements. *Id.* As those appellants had not alleged fraud, bad faith, an abuse of discretion, or an arbitrary decision, the Supreme Court declined to disturb the Secretary's administrative discretion. *Id.* Similarly, in this case, appellants have raised no specter of fraud, bad faith, abuse of discretion or arbitrariness. Accordingly, this Court will not disturb the Board's decision.

## CONCLUSION

"The needs of our democracy require accurate and rapid ascertainment of the people's will. And it is for that reason that the Legislature has entrusted the County Board of Elections with plenary powers in the administration of the election code." *Appeal of McCracken,* 88 A.2d 787, 788 (Pa. 1952). The Philadelphia Board of Elections, after a public hearing, determined not to allow a forensic review that the Election Code does not require. For all the foregoing reasons, the Court affirms the decision of the Philadelphia Board of Elections and dismisses the appeal of appellant Jill Stein.

Abbe F. Fo⎯⎯⎯⎯
                                                    J.

Dated: December 7, 2016

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| JILL STEIN AND RANDALL REITZ, | : | CIVIL ACTION |
|  | : |  |
| Plaintiffs, | : |  |
|  | : |  |
| v. | : | NO. 16-CV-06287 |
|  | : |  |
| PEDRO A. CORTÉS, in his official capacity as Secretary of the Commonwealth; and JONATHAN MARKS, in his official capacity as Commissioner of the Bureau of Commissions, Elections, and Legislation, | : | |
|  | : |  |
| Defendants, | : |  |
|  | : |  |
| and | : |  |
|  | : |  |
| President-Elect Donald Trump; Vice President-Elect Michael Pence; all of the Pennsylvania Electors of President-Elect Donald Trump and Vice President-Elect Michael Pence; Donald J. Trump for President, Inc.; and the Republican Party of Pennsylvania | : | |
|  | : |  |
| Defendant-Intervenors. | : |  |

## ORDER

AND NOW, this _____ day of _____ 2016, upon consideration of

Plaintiffs Jill Stein and Randall Reitz' Motion for Preliminary Injunction, and the

Response in Opposition by President-Elect Donald Trump; Vice President-Elect

Michael Pence; all of the Pennsylvania Electors of President-Elect Donald Trump

and Vice President-Elect Michael Pence; Donald J. Trump for President, Inc.; and

the Republican Party of Pennsylvania, it is hereby ORDERED that Plaintiffs'

Motion for Preliminary Injunction is DENIED.  It is FURTHER ORDERED

Plaintiff's Complaint is DISMISSED with prejudice.

                              BY THE COURT:


                              _____
                              Paul S. Diamond, J.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Proposed Order, Response, and Memorandum of Law were electronically filed with the Clerk of Court on December 8, 2016 using CM/ECF, which will send notification of such filing to counsel of record.

I hereby certify that a true and correct copy of the foregoing Proposed Order, Response, and Memorandum of Law will be served by first-class mail, postage prepaid, on December 8, 2016 on the following individuals at the following addresses:

Ilann M. Maazel
Emery Celli Brinckerhoff & Abady LLP
600 Fifth Avenue, 10th Floor
New York, NY 10020
Phone: 212-763-5000
Fax: 212-763-5001
Email: imaazel@ecbalaw.com

Jeffrey Cutler
P.O. BOX 2806
YORK, PA 17405
215-872-5715
*(Movant)*

/s/ *Lawrence J. Tabas*
Lawrence J. Tabas, I.D. No. 27815
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA  19102
Phone: 215-665-3158
Email: lawrence.tabas@obermayer.com

/s/ *Rebecca L. Warren*
Rebecca L. Warren, I.D. No. 63669
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA  19102
Phone: 717-221-1602
Email: rebecca.warren@obermayer.com

/s/ *Chad Readler*
Chad A. Readler*
JONES DAY
325 John H. McConnell Blvd., Suite 600
Columbus, OH  43215
Phone: 614-469-3939
careadler@jonesday.com
* Admitted *pro hac vice*

/s/ *David M. Morrell*
David M. Morrell*
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001
Phone: (202) 879-3717 (direct)
Email: dmorrell@jonesday.com
*Admitted *pro hac vice*

39

Donald F. McGahn II (I.D. No. 73796)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 879-3748 (direct)
Email: dmcgahn@jonesday.com

Dated:          December 8, 2016

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | : | |
| JILL STEIN AND RANDALL REITZ, | : | CIVIL ACTION |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | NO. 16-CV-06287 |
| | : | |
| PEDRO A. CORTÉS, *et al.*, | : | |
| | : | |
| Defendants, | : | |
| | : | |
| and | : | |
| | : | |
| President-Elect Donald Trump, *et al.*, | : | |
| | : | |
| Defendant-Intervenors. | : | |

**PRESIDENT-ELECT DONALD TRUMP; VICE PRESIDENT-ELECT
MICHAEL PENCE; ALL OF THE PENNSYLVANIA ELECTORS OF
PRESIDENT-ELECT DONALD TRUMP AND VICE PRESIDENT-ELECT
MICHAEL PENCE; DONALD J. TRUMP FOR PRESIDENT, INC.; AND
THE REPUBLICAN PARTY OF PENNSYLVANIA
RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**

President-Elect Donald Trump; Vice President-Elect Michael Pence; all of

the Pennsylvania Electors of President-Elect Donald Trump and Vice President-

Elect Michael Pence, Donald J. Trump for President, Inc., and the Republican

Party of Pennsylvania (collectively, the "Intervenors"), by and through their

undersigned counsel, hereby respond in opposition to Plaintiffs' Motion for

5106047

Preliminary Injunction. In support of their Response, Intervenors incorporate the

attached Memorandum of Law in Opposition to the Plaintiffs' Motion for

Preliminary Injunction, which is incorporated by reference as if set forth herein.

Respectfully submitted,

/s/ *Lawrence J. Tabas*
Lawrence J. Tabas, I.D. No. 27815
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA  19102
Phone: 215-665-3158
Email: lawrence.tabas@obermayer.com

/s/ *Rebecca L. Warren*
Rebecca L. Warren, I.D. No. 63669
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA  19102
Phone: 717-221-1602
Email: rebecca.warren@obermayer.com

*/s/ Chad Readler**
Chad A. Readler
JONES DAY
325 John H. McConnell Blvd., Suite 600
Columbus, OH  43215
Phone: 614-469-3939
careadler@jonesday.com
*admitted *pro hac vice*

5106047

*/s/ David M. Morrell\**
David M. Morrell
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001
Phone: (202) 879-3717 (direct)
Email: dmorrell@jonesday.com
\*admission *pro hac vice*

Donald F. McGahn II I.D. No. 73796
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001
Phone: (202) 879-3748 (direct)
Email: dmcgahn@jonesday.com

Dated:    December 8, 2016