# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DONALD J. TRUMP FOR
PRESIDENT, INC., *et al.*,

      Plaintiffs,

      v.

KATHY BOOCKVAR, *et al.*,

      Defendants,

NAACP-PENNSYLVANIA STATE
CONFERENCE, *et al.*,

      Intervenor-Defendants,

DNC SERVICES
CORPORATION/DEMOCRATIC
NATIONAL COMMITTEE,

      Intervenor-Defendant.

Civil Action
No. 4:20-cv-02078-MWB

Hon. Matthew W. Brann

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS BY
INTERVENOR-DEFENDANTS NAACP-PENNSYLVANIA STATE
CONFERENCE, BLACK POLITICAL EMPOWERMENT PROJECT,
COMMON CAUSE PENNSYLVANIA, LEAGUE OF WOMEN VOTERS
OF PENNSYLVANIA, JOSEPH AYENI, LUCIA GAJDA, STEPHANIE
HIGGINS, MERIL LARA, RICARDO MORALES, NATALIE PRICE, TIM
STEVENS, AND TAYLOR STOVER**

## **TABLE OF CONTENTS**

Introduction ................................................................................................. 1

Procedural History ...................................................................................... 4

Statement of Facts....................................................................................... 5

Statement of Questions Involved ................................................................ 6

Argument..................................................................................................... 7

I.    The Doctrine of Laches Bars Plaintiffs' After-the-Fact Attempt to
      Invalidate the Election. ...................................................................... 7

      A.    A Candidate Cannot Wait For Election Results Before
            Challenging Alleged Errors That Could Have Been Raised
            Earlier. ..................................................................................... 8

      B.    Plaintiffs Could Have Raised These Claims In Time To
            Address Them............................................................................ 10

      C.    Plaintiffs' Delay Was Prejudicial....................................................... 14

II.   Plaintiffs' Requested Relief Is Unavailable as a Matter of Law. ................. 15

      A.    Plaintiffs' Requested Relief Would Itself Violate Voters'
            Constitutional Rights.......................................................... 16

      B.    The Complaint Fails to Allege Misconduct—Let Alone the Sort
            of Pervasive Fraud that Could Even Conceivably Justify the
            Relief They Seek. ............................................................. 18

Conclusion .......................................................................................... 21

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Appeal of Simon*,
  46 A.2d 243 (Pa. 1946)................................................................16, 19, 20

*Baber v. Dunlap*,
  349 F. Supp. 3d 68, 76 (D. Me. 2018)..............................................16

*Bush v. Gore*,
  531 U.S. 98 (2000) (per curiam).................................................17, 18

*Carlson v. Ritchie*,
  830 N.W.2d 887 (Minn. 2013) ............................................................9

*Costello v. United States*,
  365 U.S. 265 (1961)..............................................................................8

*Coughlin v. Ryder*,
  260 F. Supp. 256 (E.D. Pa. 1966) ......................................................8

*Crookston v. Johnson*,
  841 F.3d 396 (6th Cir. 2016) ..............................................................9

*Del. Cty. Republican Exec. Comm. v. Del. Cty. Bd. of Elections*,
  No. CV-2020-007523 (Del. Cty. C.C.P. Nov. 4, 2020) ....................12

*Democratic Nat'l Comm. v. Wis. State Legislature*,
  No. 20A66, 2020 WL 6275871 (U.S. Oct. 26, 2020) (Kavanaugh,
  J., concurring) .....................................................................................9

*Donald J. Trump for President, Inc. v. Boockvar*,
  No. 2:20-CV-966, 2020 WL 5997680 (W.D. Pa. Oct. 10, 2020).......18

*Hendon v. N.C. State Bd. of Elections*,
  710 F.2d 177 (4th Cir. 1983) ..........................................................3, 8

*In re Canvassing Observation Appeal of: Donald J. Trump for
  President, Inc.*,
  No. 201107003, 2020 WL 6556823 (Pa. Com. Pl. Nov. 3, 2020) ....11

*In re Canvassing Observation Appeal of: Donald J. Trump for
  President, Inc.*, No. 1094 C.D. 2020, 2020 WL 6551316 (Pa.
  Commw. Ct. Nov. 5, 2020).........................................................11, 19

*In re Luzerne Cty. Return Bd.*,
   290 A.2d 108 (Pa. 1972) ..................................................................21

*In re Recount of Ballots Cast in Gen. Election on Nov. 6, 1973*,
   325 A.2d 303 (Pa. 1974) ..................................................................20

*Lewis v. Cayetano*,
   823 P.2d 738 (Haw. 1992) ...................................................................9

*McMichael v. Napa County*,
   709 F.2d 1268 (9th Cir. 1983) (Kennedy, J., concurring) ..................................18

*Pa. Democratic Party v. Boockvar*,
   238 A.3d 345 (Pa. 2020) ..................................................................19

*Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*,
   143 F.3d 800 (3d Cir. 1998) .................................................................7

*Powell v. Power*,
   436 F.2d 84 (2d Cir. 1970) ................................................................16

*Republican Party of Pa. v. Cortes*,
   218 F. Supp. 3d 396, 404-05 (E.D. Pa. 2016) ..................................................10

*Soules v. Kauaians for Nukolii Campaign Comm.*,
   849 F.2d 1176 (9th Cir. 1988) ..........................................................2, 8

*Stein v. Cortes*,
   223 F.Supp. 3d 423, 437 (E.D. Pa. 2016)....................................................3, 17

*Stein v. Cortes*,
   No. 2:16-cv-6287 (E.D. Pa. filed Dec. 8, 2016) (Ex. A) ......................................4

*Stilp v. Hafer*,
   718 A.2d 290 (Pa. 1998) ...................................................................8

*Toney v. White*,
   488 F.2d 310 (5th Cir. 1973) ..............................................................8

*United States v. City of Cambridge, Md.*,
   799 F.2d 137 (4th Cir. 1986) ..............................................................9

*Warner v. Sun Ship, LLC*,
   No. 11-cv-7830, 2012 WL 1521866 (E.D. Pa. Apr. 30, 2012) ...........................8

iii

**Statutes and Rules**

Fed. R. Civ. P. 12 .............................................................................8

25 P.S. § 3146.8 .............................................................................10

25 P.S. § 3150.16 ...........................................................................20

**Other Authorities**

Ryan Eldredge, *Some Pennsylvania Counties Offer Second Chances at Mail Ballots, Others Do Not*, WHP-TV (Harrisburg) (Oct. 15, 2020) .............................................................................13

Jonathan Lai, *Pennsylvania Struggles With How—or If—to Help Voters Fix Their Mail Ballots*, Philadelphia Inquirer (Oct. 29, 2020) .............................................................................13

Office of Philadelphia City Comm'rs, Cancelled Ballot Notification Information, https://www.philadelphiavotes.com/en/home/item/1873-cancelled_ballot_notification_info .......................................14

Pa. Dep't of State, Guidance Concerning Poll Watchers and Authorized Representatives (Oct. 28, 2020) .......................................11

Karen Shuey, *What Berks County Voters Need to Know About Mistakes With Mail-in Ballots*, The Mercury (Oct. 19, 2020)...........................13

## INTRODUCTION

This case seeks unprecedented relief.  After the presidential election has ended, Plaintiffs ask a federal court to bar the Commonwealth from certifying the results, disenfranchising the ***more than 6.8 million*** Pennsylvanians who voted. (Compl. p.84, cl. i.)  Alternatively, they target seven counties and ask the Court to toss out every absentee and mail-in ballot cast in those counties—the votes of ***more than a million*** qualified Pennsylvania voters.  (Compl. ¶ 108; *id.* p.84 cls. ii–iii.) Plaintiffs have not advanced a single allegation of a fraudulent ballot or count in support of their extraordinary requests.  Instead, they complain about two purported election administration issues that they knew about long before filing this action, but chose not to raise until after the election results were clear: that observers should have been able to stand closer to the counting, and that voters should not have been allowed to cast a valid vote after being informed of defects with their mail-in ballot. Plaintiffs' demand is stunning, calling for the disenfranchisement of millions of qualified Pennsylvania voters who braved a pandemic to cast ballots in record numbers, without any allegation that these voters are somehow ineligible to vote or engaged in wrongdoing.

This Motion is brought by eight of these Pennsylvania voters who are at risk of disenfranchisement, and by organizations representing nearly 50,000

Pennsylvanians (the "Voter Intervenors").[1]  Some of the Voter Intervenors submitted mail-in ballots that were rejected for technical reasons, so exercised their statutory right to vote in-person by provisional ballot.  Others cast perfectly valid mail-in ballots.  All voted in good faith, relying on the General Assembly's decision to allow mail-in voting.

According to Plaintiffs, these individuals' votes and the votes of millions like them should play no role in electing the next President.  That is disenfranchisement, plain and simple.  It would violate settled principles of election law, create (not cure) constitutional problems, and sow chaos.  This Motion will not repeat the many prudent grounds for dismissal explained by others.  It offers the perspective of voters, and two fundamental reasons why this Court should not discard millions of votes.

*First*, "if aggrieved parties, without adequate explanation, do not come forward before the election, they will be barred from the equitable relief of overturning the results of the election." *Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1180 (9th Cir. 1988).  That is what happened here.  Plaintiffs knew *before* Election Day that counties were notifying voters of the need to cure defective ballots.  And they knew *before* Election Day, and certainly before any

---

[1] The Voter Intervenors are the NAACP-Pennsylvania State Conference, Black Political Empowerment Project, Common Cause Pennsylvania, League of Women Voters of Pennsylvania (together, the "organizational Intervenors"), Joseph Ayeni, Lucia Gajda, Stephanie Higgins, Meril Lara, Ricardo Morales, Natalie Price, Tim Stevens, and Taylor Stover.

counting happened, the level of access observers would have.  State law creates procedures for prompt resolution of these types of disputes.  If Plaintiffs had followed them, they could have sought timely remedies—*without* threatening the counting of a single vote.  Instead, they "gamble[d] upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in a court action." *Hendon v. N.C. State Bd. of Elections*, 710 F.2d 177, 182 (4th Cir. 1983) (quotation marks omitted).  "Plaintiffs are not entitled to the 'emergency' relief they seek because they have inexcusably waited well past the eleventh hour to seek it." *Stein v. Cortes*, 223 F.Supp. 3d 423, 437 (E.D. Pa. 2016).

*Second*, as a matter of law, Plaintiffs do not allege facts capable of supporting the relief they seek.  Plaintiffs ask this Court to overturn the results of a democratic election.  Whatever level of misconduct or fraud might justify such a remedy, it is unavailable here, where there are no well-pleaded allegations of bad faith or intentional misconduct by Defendants, and nothing even resembling fraud or misconduct by a single voter, much less systemic fraud.  The relief requested would itself violate the Constitution: massive disenfranchisement of Pennsylvanians generally, or targeted disenfranchisement of millions of Pennsylvanians based on where they live and what lawful means they used to cast a ballot.

Four years ago, President Trump won the most votes in Pennsylvania.  Faced with a federal lawsuit brought by a losing third-party candidate seeking to disrupt certification of that result, then-President-Elect Trump protested his opponents'

effort to "disenfranchise millions of Pennsylvania voters, all while robbing the presidential and vice-presidential candidates of the added electoral heft that Pennsylvania's twenty electoral votes would provide." Br. of Intervenors President-Elect Donald Trump et al. at 30 (Dkt. 38-1), *Stein v. Cortes*, No. 2:16-cv-6287 (E.D. Pa. filed Dec. 8, 2016) (Ex. A). Disenfranchisement would have been wrong then, and it is wrong now. This case should be dismissed.

## PROCEDURAL HISTORY

Six days after the November 3, 2020 General Election, and two days after every major media outlet projected that Joe Biden had won Pennsylvania's electoral votes, Plaintiffs filed this action seeking emergency relief. Compl. ¶ 15. Plaintiffs allege six constitutional violations: three related to claims that county officials permitted insufficient observation to vote canvassing sites, and three related to claims that county officials improperly permitted voters to cure mail-in and absentee ballots that were rejected because of alleged deficiencies.[2] Plaintiffs ask the Court to enjoin certification of the election results entirely, or alternatively, to prohibit counting every mail-in or absentee ballot in six counties and to prohibit counting "cured" ballots.

---

[2] Plaintiffs strain to conjure up the specter of widespread fraud, but offer no well-pleaded allegations of it, and their causes of action are ultimately premised solely on the alleged restrictions on observation and on the notice given to voters to about defective mail-in and absentee ballots.

## STATEMENT OF FACTS

The Voter Intervenors are eight Pennsylvanians who voted by mail-in, absentee, or provisional ballot in the 2020 General Election and four nonpartisan organizations that are dedicated to eliminating barriers to voting and increasing civic engagement among their members and in traditionally disenfranchised communities. Some of the organizations' members, and many other Pennsylvania voters, cast mail ballots, and some of those voters needed to correct technical submission errors.

Lucia Gajda, Stephanie Higgins, and Tim Stevens cast their votes by mail-in ballot. Their votes were received and recorded without issue. Ms. Gajda has medical conditions, including an autoimmune disorder, and she returned her absentee ballot in Northampton County via an official dropbox to avoid exposure to COVID-19. (Dkt. 31-6, ¶¶ 3, 6.) Ms. Higgins is in her third trimester of a high-risk pregnancy, so she, too, chose to return her absentee ballot in Philadelphia County via an official dropbox to avoid the risk of COVID-19 exposure. (Dkt. 31-5, ¶¶ 6–7.) Mr. Stevens returned his mail-in ballot at the post office in Allegheny County because he faces increased risk of a serious COVID-19 infection because of his age (he is 75 years old), and based on news articles regarding how the disease disproportionately impacts Black people such as himself. (Dkt. 31-2, ¶ 2.)

Joseph Ayeni, Meril Lara, Ricardo Morales, Natalie Price, and Taylor Stover submitted mail-in ballots before Election Day that were rejected due to minor technical errors or simple mistakes made by individuals new to mail-in voting. Mr.

Ayeni received a call, and Ms. Lara received an email, from county election officials notifying them that they failed to include the secrecy envelope, and both voters subsequently cast provisional ballots. (Dkt. 31-9, ¶¶ 7–9; Dkt. 31-10, ¶¶ 7–9; Dkt. 31-8, ¶¶ 7–14; Dkt. 31-11, ¶¶ 6–9.) Mr. Morales was notified by a text from the Service Employees International Union that his ballot had been rejected, which he believes was due to his signing an Anglicized version of his name to fit it in the small signature space. (Dkt. 31-7, ¶ 7.) He cast a provisional ballot. (*Id.* ¶ 9.) Ms. Price was notified by the Democratic Party that her ballot was rejected. (Dkt. 31-8, ¶¶ 8, 10.) She drove to two locations, in a different town, in the pouring rain, in order to cure her ballot and ensure her vote was counted. (*Id.* ¶ 15.)

The organizational Intervenors represent nearly 50,000 members in Pennsylvania, many of whom voted by mail and did everything that was asked of them to cast a valid ballot. The organizational Intervenors expend substantial resources on voter education and turnout efforts, and did so again in the run-up to the November general election. (Dkt. 31, at 4-7.) It is their overarching mission to ensure that every eligible Pennsylvanian has an opportunity to cast a ballot that is counted.

## STATEMENT OF QUESTIONS INVOLVED

Should the Court dismiss Plaintiffs' prayer for relief, where Plaintiffs' request for injunctive relief is untimely and seeks to disenfranchise millions of qualified Pennsylvania voters based on allegations of only minor discrepancies in

application of the Pennsylvania Election Code and no allegation of a single fraudulent vote?

## ARGUMENT

### I.     The Doctrine of Laches Bars Plaintiffs' After-the-Fact Attempt to Invalidate the Election.

Plaintiffs do not allege that a single ballot was counted that did not reflect the actual voting preference of an actual registered Pennsylvania voter.   Rather, Plaintiffs seek to discard valid votes because they are dissatisfied with the results. The law prohibits such gambits by requiring challenges to election procedures to be raised before the election is conducted.   This rule protects voters and reflects common sense: pre-election challenges allow problems to be fixed *before* the election is held, without disrupting votes *after* they have been cast.

This bedrock rule of election law is a forceful application of laches.   "Laches is an equitable doctrine that prevents recovery when a defendant can show inexcusable delay in instituting suit and prejudice to the defendant resulting from such delay."   *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 804 (3d Cir. 1998).   "Laches requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense."

*Costello v. United States*, 365 U.S. 265, 282 (1961); *see also Stilp v. Hafer*, 718 A.2d 290, 293 (Pa. 1998).[3]

> **A.  A Candidate Cannot Wait For Election Results Before Challenging Alleged Errors That Could Have Been Raised Earlier.**

Since overturning the results of an election is an extraordinary intervention by the judiciary into democratic processes, a challenge to election procedures should be brought *when there is still time to correct those procedures*.  Otherwise, parties could "'lay by and gamble upon receiving a favorable decision of the electorate' and then, upon losing, seek to undo the ballot results in a court action."  *Hendon v. N.C. State Bd. of Elections*, 710 F.2d 177, 182 (4th Cir. 1983) (quoting *Toney v. White*, 488 F.2d 310, 314 (5th Cir. 1973)).  "[C]ourts have been wary lest the granting of post-election relief encourage sandbagging on the part of wily plaintiffs."  *Soules*, 849 F.2d at 1180.

Numerous cases confirm this "general rule" of election law: "a candidate or other election participants should not be allowed to ambush an adversary or subvert the election process by intentionally delaying a request for remedial action to see

---

[3] Courts in the Third Circuit have routinely granted Rule 12 motions to dismiss "where laches can be determined without the necessity for further factual inquiry." *Coughlin v. Ryder*, 260 F. Supp. 256, 260 (E.D. Pa. 1966); *see also, e.g.*, *Warner v. Sun Ship, LLC*, No. 11-cv-7830, 2012 WL 1521866, at *2 (E.D. Pa. Apr. 30, 2012) ("the Third Circuit has held that laches may serve as the basis for dismissal pursuant to Rule 12(b)(6) if applicability of the doctrine is apparent from the face of the Complaint"). Laches are evident from the Complaint and judicially noticeable materials that are properly considered on a Motion to Dismiss. Alternatively, the Court may convert this motion to a motion for summary judgment under Rule 12(d), because the facts of Plaintiffs' delay are not subject to dispute.

first whether they will be successful at the polls." *United States v. City of Cambridge, Md.*, 799 F.2d 137, 141 (4th Cir. 1986); *see also, e.g.*, *Carlson v. Ritchie*, 830 N.W.2d 887, 892 (Minn. 2013) ("[P]etitioners cannot wait until after elections are over to raise challenges that could have been addressed before the election."); *Lewis v. Cayetano*, 823 P.2d 738, 741 (Haw. 1992) (laches barred post-election challenge to form of ballot, where voters had at least constructive notice of the form for a month prior to the election).

Laches is a close cousin of the "*Purcell* principle," the "basic tenet of election law" that "[w]hen an election is close at hand, the rules of the road should be clear and settled." *Democratic Nat'l Comm. v. Wis. State Legislature*, No. 20A66, 2020 WL 6275871, at *3 (U.S. Oct. 26, 2020) (Kavanaugh, J., concurring).  It is a "principle of judicial restraint" that "not only prevents voter confusion but also prevents election administrator confusion—and thereby protects the State's interest in running an orderly, efficient election and in giving citizens (including the losing candidates and their supporters) confidence in the fairness of the election." *Id.* at *4.  The principles underlying *Purcell* are "especially" strong "when a plaintiff has unreasonably delayed bringing his claim." *Crookston v. Johnson*, 841 F. 3d 396, 398 (6th Cir. 2016) ("Call it what you will—laches, the *Purcell* principle, or common sense—the idea is that courts will not disrupt imminent elections absent a powerful reason for doing so.").

9

**B.     Plaintiffs Could Have Raised These Claims In Time To Address Them.**

Plaintiffs' belated complaints about how the Commonwealth of Pennsylvania ran this election are exactly what the doctrine of laches forecloses.  Plaintiffs could have raised all of their claims in time to address them without disturbing votes after they are cast and counted.  Instead, they waited for the results of the election to become apparent, and then nearly a week after Election Day tried to reverse the outcome.[4]  "Plaintiffs unreasonably delayed filing their Complaint and Motion, something which weighs decidedly against granting the extraordinary relief they seek." *Republican Party of Pa. v. Cortes*, 218 F. Supp. 3d 396, 404-05 (E.D. Pa. 2016) (declining to enjoin aspects of Pennsylvania's poll-watcher statute in case filed "eighteen days before the election").

***Observers.***  Plaintiffs failed to act with diligence in raising their complaints about the level of access granted to campaign observers during  pre-canvassing and canvassing of absentee and mail-in ballots.  Amendments to the Election Code, enacted in 2019, provided that "*[o]ne authorized representative* of each candidate in an election and one representative from each political party shall be permitted to *remain in the room* in which the absentee and mail-in ballots are pre-canvassed" and "canvassed."   25  P.S.  § 3146.8(g)(1.1),  (2) (emphasis  added).   Plaintiffs  now

---

[4]  To the extent the Complaint suggests that allowing both in-person and absentee/mail-in balloting somehow violates the Constitution (*e.g.*, Compl. ¶ 14)— a suggestion that invalidate the voting laws of every State—Plaintiffs were necessarily aware of this two-track voting system long before the election.

demand far more access than "one" representative being "in the room."  *See, e.g.*, Compl. ¶¶ 141, 176 (alleging that "meaningful" "presen[ce]" in the room requires an opportunity to view and read ballots).  Particularly given the reality that many election workers process ballots simultaneously, the Election Code itself put Plaintiffs on notice that they would not have such intimate access that they could read the writing on each envelope.[5]

Moreover, almost a full week before Election Day, the Secretary issued revised guidance making clear that "one authorized representative" would be permitted to remain in the room where absentee and mail-in ballots were pre-canvassed and canvassed, and that these authorized representatives would be required to "maintain social distancing practices and ensure they are at least 6 feet from others at all times."  Guidance § 4.  And Plaintiffs would have witnessed exactly how much access observers were given shortly after 7:00 a.m. on Election Day, when pre-canvassing began.

At any of these points, if Plaintiffs were dissatisfied with their access, they could have gone to court.  Indeed, less than an hour into pre-canvassing on Election Day, the Trump Campaign did exactly that in Philadelphia, seeking closer access. *In re Canvassing Observation Appeal of: Donald J. Trump for President, Inc.,* No.

---

[5] Pa. Dep't of State, Guidance Concerning Poll Watchers and Authorized Representatives (Oct. 28, 2020), *available at* https://www.dos.pa.gov/VotingElections/OtherServicesEvents/Documents/Poll%2 0Watcher%20Guidance%20Final%2010-6-2020.pdf.

201107003, 2020 WL 6556823 (Pa. Com. Pl. Nov. 3, 2020), *rev'd*, No. 1094 C.D. 2020, 2020 WL 6551316 (Pa. Commw. Ct. Nov. 5, 2020).  And the Delaware County Republican Party did the same thing, obtaining an Order by consent on November 4.  Yet Plaintiffs did not file similar challenges to observer access in Defendant Allegheny, Centre, Chester, Montgomery, and Northampton Counties, when they plainly could have done so.

Plaintiffs complain that despite entry of the Delaware County order, they had insufficient access.  (Compl. ¶ 143.)  But what they describe is exactly what the consent order requires, and Plaintiffs never sought any access beyond that. (*Compare id.* (objecting that observers were allowed in a room "for only five minutes every two hours") *with* Consent Order, *Del. Cty. Republican Exec. Comm. v. Del. Cty. Bd. of Elections*, No. CV-2020-007523 (Del. Cty. C.C.P. Nov. 4, 2020) (Ex. B) (observers may enter room "[a]t two-hour intervals" with "the time not to exceed five minutes each visit").)   And if Plaintiffs were dissatisfied with Philadelphia's compliance (*see* Compl. ¶ 146), they could have promptly sought enforcement in state court, rather than wait for several more days of counting to be completed.  On top of all this, Plaintiffs' Philadelphia and Delaware cases never suggested a concern with lack of uniform treatment of observers across Pennsylvania, an Equal Protection complaint that emerged for the first time in this lawsuit.

***Notice and Cure.***  Nor can Plaintiffs deny knowing, long before this lawsuit, that some counties would allow voters to cure allegedly defective absentee or mail-in ballots, whether by correcting their ballots, requesting new absentee or mail-in ballots, or casting provisional ballots.  The Complaint acknowledges Secretary Boockvar's guidance that counties "'should provide information to party and candidate representatives during the pre-canvass that identifies the voters whose ballots have been rejected' so that those voters 'may be issued a provisional ballot.'" (Compl. ¶ 135.)  Even before that, it was prominently reported that Secretary Boockvar's deputy had notified every county that they should promptly mark defective ballots as cancelled so that voters would receive automatic emails notifying them that they should cure.[6]

Indeed, as early as mid-October, there was public reporting that counties were notifying voters of defects so that they would have an opportunity to cure.[7]

---

[6] *See, e.g.*, Jonathan Lai, *Pennsylvania Struggles With How—or If—to Help Voters Fix Their Mail Ballots*, Philadelphia Inquirer (Oct. 29, 2020), https://www.inquirer.com/politics/election/pennsylvania-flawed-mail-ballots-cure-20201029.html (Ex. C).

[7] *See* Ryan Eldredge, *Some Pennsylvania Counties Offer Second Chances at Mail Ballots, Others Do Not*, WHP-TV (Harrisburg) (Oct. 15, 2020), https://local21news.com/news/local/some-pennsylvania-counties-offer-second-chances-at-mail-ballots-others-do-not (Ex. D); Karen Shuey, *What Berks County Voters Need to Know About Mistakes With Mail-in Ballots*, The Mercury (Oct. 19, 2020), https://www.pottsmerc.com/news/what-berks-county-voters-need-to-know-about-mistakes-with-mail-in-ballots/article_d5c9d2ad-3671-5c29-a814-5a68924c6ded.html (Ex. E).

Philadelphia publicly advised voters on its website that if their ballot was marked as cancelled, they could request a replacement or vote provisionally.[8]

### C.   Plaintiffs' Delay Was Prejudicial.

Plaintiffs' delay prejudiced not just Defendants but voters throughout Pennsylvania who relied on the guidance given to them by election officials.  Had Plaintiffs brought these claims earlier, they could have sought tailored remedies to correct Pennsylvania's alleged errors in administering the election.   Instead, Plaintiffs waited, and now seek to leverage their own calculated delay to ask this Court to disenfranchise millions of voters.

***Observers.***   If Plaintiffs were right that Pennsylvania law required more observer access, and if Plaintiffs had timely raised such claims, they could have secured that access through state-court actions (like the one they brought against Philadelphia) targeting other counties they considered problematic—and done so at the beginning of the counting.  By remedying the alleged flaw promptly, there would have been no question that mail-in and absentee ballots would be counted.  Instead, by waiting until after the end of counting, Plaintiffs now try to cast a cloud over ballots cast in good faith by at least 1.3 million Pennsylvania voters in the Defendant counties.  That includes voters like Intervenors Ms. Gadja, Ms. Higgins, and Mr.

---

[8] Office of Philadelphia City Comm'rs, Cancelled Ballot Notification Information, *available at* https://www.philadelphiavotes.com/en/home/item/1873-cancelled_ballot_notification_info.

Stevens, who took all necessary steps to ensure that their voices count in this election. It is difficult to conceive of greater prejudice from delay.

*Notice and Cure.* Likewise, Plaintiffs' delay in asserting their notice-and-cure claims prejudices voters like individual intervenors Mr. Ayeni, Ms. Lara, Mr. Morales, Ms. Price, Mr. Stover, and many of the organizational Intervenors' members. These voters did everything asked of them, in some cases taking additional steps to make sure that their ballots were accepted and tallied. If Plaintiffs had timely raised this claim, at least some voters would have been aware that there was a risk that their absentee or mail-in ballots would be rejected, and that they would not be notified of that rejection. Those voters could have then ensured that their votes would be counted by heading to polling places and casting provisional ballots. If Plaintiffs have their way, those voters will simply be disenfranchised. Moreover, even assuming *arguendo* that different counties *were* following different notice-and-cure procedures *and* that any such variation gave rise to equal-protection issues, if Plaintiffs had timely asserted these claims, the Commonwealth could have taken additional steps to ensure equal treatment of rejected ballots.

## II.    Plaintiffs' Requested Relief Is Unavailable as a Matter of Law.

Because of their unreasonable delay, it is too late for Plaintiffs to seek remedies tailored to the asserted violations. Instead they seek mass disenfranchisement. Even if state or county officials committed some error, that cannot justify depriving millions of Pennsylvania voters of their right to a say in who

15

will be President.  This is a classic case in which "the cure [is] worse than the alleged disease, at least insofar as the professed concern is with the right of voters to cast effective ballots in a fair election." *Baber v. Dunlap*, 349 F. Supp. 3d 68, 76 (D. Me. 2018).

Plaintiffs' notion that any alleged error in election administration can be a basis for tossing out the results is deeply impractical and at odds with centuries of law.  Courts have refused to "believe that the framers of our Constitution were so hypersensitive to ordinary human frailties as to lay down an unrealistic requirement that elections be free of any error." *Powell v. Power*, 436 F.2d 84, 88 (2d Cir. 1970). Pennsylvania law is in accord: "For mere irregularities in conducting an election it is not to be held void," "because the rights of voters are not to be prejudiced by the errors or wrongful acts of the officers of the election." *Appeal of Simon*, 46 A.2d 243, 246 (Pa. 1946).  Plaintiffs' Complaint, which does not allege any instances of fraud, systemic or otherwise, in this election, cannot support the extreme relief requested.  And far from curing any constitutional violation, Plaintiffs' requested injunction would *create* grave constitutional violations.

### A.   Plaintiffs' Requested Relief Would Itself Violate Voters' Constitutional Rights.

Plaintiffs' prayer for relief leads with the shocking request that this Court prohibit Defendants from certifying the 2020 general election results.  (Compl. p.84.)  That would mean not only that Pennsylvania does not participate in the

Electoral College, but that Pennsylvania would send no Representatives to the U.S. House in January, and as of December 1 the Commonwealth would have only 25 state senators and zero state representatives. Such an order would obviously violate the Constitution.

"When the state legislature vests the right to vote for President in its people, the right to vote as the legislature has prescribed is fundamental." *Bush v. Gore*, 531 U.S. 98, 104 (2000) (per curiam). This "right to vote necessarily includes the right to have the vote fairly counted." *Stein*, 223 F. Supp. 3d at 437–38 (collecting cases). Permanently enjoining the results of the election from being certified would disenfranchise every Pennsylvanian who voted in the election, and therefore would violate rights safeguarded by the Fourteenth Amendment's Due Process Clause. *Id*. at 442 (citing *Bush v. Gore*, 531 U.S. at 110).

As a fallback, Plaintiffs ask this Court to prohibit Defendants from certifying election results that "include the tabulation of absentee and mail-in ballots for which Plaintiffs' watchers were prevented from observing during the pre-canvass and canvass in the County Election Boards." (Compl. p.84.) The request is just as egregiously unconstitutional. Plaintiffs ask the Court to disenfranchise 1.3 million voters (Compl. ¶ 108)—none of whom is alleged to be ineligible to vote—solely because a campaign could not read all the mail-in ballot envelopes as they were being opened. (*E.g.*, *id.* ¶ 148.) The Fourteenth Amendment does not permit the Government to nullify the fundamental right to vote on such an arbitrary basis.

17

Moreover, while Plaintiffs' Equal Protection claims are insubstantial, their proposed *remedy* would create an enormous Equal Protection violation. Plaintiffs ask this Court to count or discard votes solely on the basis of where the voter lives: Plaintiffs never objected to access at Lycoming County's canvassing site, so Lycoming mail-in votes get counted, but Plaintiffs are not satisfied with the social distancing protocols at Centre County's site, so every Centre County mail-in voter is disenfranchised. This would create unconstitutional disparities between the treatment of voters who live in those counties and those who live elsewhere. *See Bush v. Gore*, 531 U.S. at 104–05.

### B.     The Complaint Fails to Allege Misconduct—Let Alone the Sort of Pervasive Fraud that Could Even Conceivably Justify the Relief They Seek.

Only the most egregious elections misconduct could even conceivably justify the sort of mass disenfranchisement Plaintiffs seek. *See McMichael v. Napa County*, 709 F.2d 1268, 1273–94 (9th Cir. 1983) (Kennedy, J., concurring) (invalidation of election results "has been reserved for instances of willful or severe violations of established constitutional norms"). Plaintiffs identify no such misconduct. *At most*, they allege good-faith disagreements over interpretation of the Election Code. As a matter of law, such allegations cannot support the relief they seek.

***Observers.*** Plaintiffs do not have any constitutional right to have observers present at all, much less to have them so close that they can read every envelope. *See, e.g.*, *Donald J. Trump for President, Inc. v. Boockvar*, No. 2:20-CV-966, 2020

18

WL 5997680, at *67 (W.D. Pa. Oct. 10, 2020) ("At the outset, 'there is no individual constitutional right to serve as a poll watcher[.]'") (quoting *Pa. Democratic Party v. Boockvar*, 238 A.3d 345 (Pa. 2020)).  Nor could closer access have had any practical impact on the canvassing process.  The Commonwealth Court, in ordering closer access in Philadelphia (*see* Compl. ¶ 145), "acknowledge[d]" that such access is ultimately "pointless because [observers] may not challenge individual ballots in any event."  *In Re: Canvassing Observation Appeal*, 2020 WL 6551316, at *4.  An alleged failure to grant a "pointless" degree of access cannot possibly be an error capable of invalidating millions of votes.

The Supreme Court of Pennsylvania has long held that "[n]either an individual voter nor a group of voters can be justly disfranchised 'except for compelling reasons.'"  *Appeal of Simon*, 46 A.2d at 246.  In *Appeal of Simon*, "[i]rregularities were disclosed" in the counting process, and these irregularities might even "have facilitated the commission of fraud if fraud had been planned."  *Id*.  But "no [actual] fraud was alleged," so there was no compelling basis to invalidate the 3,011 ballots at issue.  *Id*.

Here there is a request to invalidate *at least* 1.3 million ballots.  Any alleged "irregularities" concerning observer access are far less substantial, and there is no question that "no fraud is alleged."  There is not even any basis to doubt election officials' good faith.  *See In Re: Canvassing Observation Appeal*, 2020 WL 6551316, at *3–4 (despite ordering closer access, concluding that Philadelphia's

interpretation of the Election Code was "reasonable" and "in strict compliance with the text of the Election Code"). Even if county officials erred, "the rights of voters are not to be prejudiced by [officials'] errors." *Simon*, 46 A.2d at 246. The disenfranchisement of millions of Pennsylvania is plainly not an available remedy.

**Notice and Cure.** Nor can the allegations support an injunction against counting "cured" ballots. (*See* Compl. p.84.) Pennsylvania law is clear that a voter "who requests a mail-in ballot and who is not shown on the district register as having voted may vote by provisional ballot." 25 P.S. § 3150.16(b)(2). Instead, their grievance is exclusively that some counties or third parties notified voters that those voters' absentee or mail-in ballots were deficient. But it is entirely conjectural that Defendants' notice procedures caused Plaintiffs to suffer any injury—that is, that, as a result of Defendants' notice procedures rather than their own realization that their ballots might not be accepted, enough voters cast "cured" ballots to materially alter the outcome of the election—and the Complaint fails to allege facts supporting such inference.

Moreover, even if county boards somehow erred in giving notice, and could have been enjoined from doing so had a suit been timely filed, nowhere does the Complaint allege that *voters* did anything wrong in taking action to correct their innocent mistakes and cast a valid votes. *See In re Recount of Ballots Cast in Gen. Election on Nov. 6, 1973*, 325 A.2d 303, 309 (Pa. 1974) (even where an official erred, courts reject "invalidation of a ballot where the voter has complied with all

20

instructions communicated to him").  Having neglected to challenge county notice-and-cure procedures in a timely fashion, Plaintiffs ask this Court to presume that voters who received notice would not have cast a valid vote but for the notice.  Such a presumption defies Pennsylvania's longstanding policy: "[o]ur goal must be to enfranchise and not to disenfranchise."  *In re Luzerne Cty. Return Bd.*, 290 A.2d 108, 109 (Pa. 1972).

## CONCLUSION

The Court should dismiss the Complaint.

Dated:  November 12, 2020

Mary M. McKenzie (PA No. 47434)*
Benjamin D. Geffen (PA No. 310134)*
Claudia De Palma (PA No. 320136)
PUBLIC INTEREST LAW CENTER
1500 JFK Blvd., Suite 802
Philadelphia, PA 19102
Telephone: (215) 627-7100
mmckenzie@pubintlaw.org
bgeffen@pubintlaw.org
cdepalma@pubintlaw.org

Shankar Duraiswamy
(admitted *pro hac vice*)
David M. Zionts (admitted *pro hac vice*)
COVINGTON & BURLING LLP
One City Center
850 Tenth Street NW
Washington, DC 20001
Telephone: (202) 662-6000
SDuraiswamy@cov.com
DZionts@cov.com

Respectfully submitted,

*/s/  Witold J. Walczak*
Witold J. Walczak (PA No. 62976)
AMERICAN CIVIL LIBERTIES UNION OF PENNSYLVANIA
P.O. Box 23058
Pittsburgh, PA 15222
Telephone: (412) 681-7736
vwalczak@aclupa.org

Marian K. Schneider (PA No. 50337)
AMERICAN CIVIL LIBERTIES UNION OF PENNSYLVANIA
P.O. Box 60173
Philadelphia, PA 19102
Telephone: (215) 592-1513
mschneider@aclupa.org

Sophia Lin Lakin*
Adriel I. Cepeda Derieux*
Ihaab Syed*
Dale Ho*

21

Rani Gupta (admitted *pro hac vice*)
COVINGTON & BURLING LLP
3000 El Camino Real
5 Palo Alto Square
Palo Alto, CA 94306-2112
Telephone: (650) 632-4700
RGupta@cov.com

Ezra Rosenberg*
Jon Greenbaum (admitted *pro hac vice*)
Kristen Clarke*
LAWYERS COMMITTEE FOR CIVIL RIGHTS
UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005
Telephone: (202) 662-8300
erosenberg@lawyerscommittee.org
jgreenbaum@lawyerscommittee.org
kclarke@lawyerscommittee.org

* *Pro hac vice* application forthcoming

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2500
slakin@aclu.org
acepedaderieux@aclu.org
isyed@aclu.org
dho@aclu.org

Sarah Brannon*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street, NW
Washington, DC 20005
Telephone: (202) 210-7287
sbrannon@aclu.org

*Counsel for Intervenor-Defendants
NAACP-Pennsylvania State Conference,
Black Political Empowerment Project,
Common Cause Pennsylvania, League of
Women Voters of Pennsylvania, Joseph
Ayeni, Lucia Gajda, Stephanie Higgins,
Meril Lara, Ricardo Morales, Natalie
Price, Tim Stevens, and Taylor Stover*

**CERTIFICATE OF WORD COUNT**

I HEREBY CERTIFY on this 12th day of November that the above

memorandum contains fewer than 5000 words (4975).

*/s/  Witold J. Walczak*
Witold J. Walczak

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date, the foregoing memorandum of law in support of the motion to dismiss was filed electronically and served on Plaintiffs' counsel of record via the ECF system of the U.S. District Court for the Middle District of Pennsylvania; and via e-mail on counsel for defendants.

Dated: November 12, 2020

*/s/  Witold J. Walczak*
Witold J. Walczak
