# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| DONALD J. TRUMP FOR PRESIDENT, INC., *et al.*, | Civil Action |
| Plaintiffs, | No.: 4:20-cv-02078-MWB |
| v. | Hon. Matthew W. Brann |
| KATHY BOOCKVAR, *et al.*, | |
| Defendants, | |
| NAACP-PENNSYLVANIA STATE CONFERENCE, *et al.*, | |
| Intervenor-Defendants, | |
| DNC SERVICES CORPORATION/DEMOCRATIC NATIONAL COMMITTEE, | |
| Intervenor-Defendant. | |

**EXHIBITS CITED IN MEMORANDUM IN SUPPORT OF MOTION TO DISMISS BY INTERVENOR-DEFENDANTS NAACP-PENNSYLVANIA STATE CONFERENCE, BLACK POLITICAL EMPOWERMENT PROJECT, COMMON CAUSE PENNSYLVANIA, LEAGUE OF WOMEN VOTERS OF PENNSYLVANIA, JOSEPH AYENI, LUCIA GAJDA, STEPHANIE HIGGINS, MERIL LARA, RICARDO MORALES, NATALIE PRICE, TIM STEVENS, AND TAYLOR STOVER**

| DOCUMENT | EXHIBIT |
|---|---|
| *Stein v. Cortes*, No. 2:16-cv-6287 (E.D. Pa. filed Dec. 8, 2016) | A |
| Consent Order, *Delaware Cnty. Republican Exec. Comm. v. Delaware Cnty. Bd. of Elections*, No. CV-2020-007523 (Delaware Cnty. C.C.P. Nov. 4, 2020) | B |
| Jonathan Lai, *Pennsylvania Struggles With How—or If—to Help Voters Fix Their Mail Ballots*, Philadelphia Inquirer (Oct. 29, 2020) | C |
| Ryan Eldredge, *Some Pennsylvania Counties Offer Second Chances at Mail Ballots, Others Do Not*, WHP-TV (Harrisburg) (Oct. 15, 2020) | D |
| Karen Shuey, *What Berks County Voters Need to Know About Mistakes With Mail-in Ballots*, The Mercury (Oct. 19, 2020) | E |

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| JILL STEIN AND RANDALL REITZ, | : | CIVIL ACTION |
|  | : |  |
| Plaintiffs, | : |  |
|  | : |  |
| v. | : |  |
|  | : | NO. 16-CV-06287 |
| PEDRO A. CORTÉS, *et al.* | : |  |
|  | : |  |
| Defendants, | : |  |
|  | : |  |
| and | : |  |
|  | : |  |
| President-Elect Donald Trump, *et al.*, | : |  |
|  | : |  |
| Defendant-Intervenors. | : |  |

## INTERVENORS PRESIDENT-ELECT DONALD TRUMP; VICE PRESIDENT-ELECT MICHAEL PENCE; ALL OF THE PENNSYLVANIA ELECTORS OF PRESIDENT-ELECT DONALD TRUMP AND VICE PRESIDENT-ELECT MICHAEL PENCE; DONALD J. TRUMP FOR PRESIDENT, INC.; AND THE REPUBLICAN PARTY OF PENNSYLVANIA'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Lawrence J. Tabas, I.D. No. 27815
Rebecca L. Warren, I.D. No. 63669
OBERMAYER REBMANN MAXWELL
& HIPPEL LLP
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA 19102
(215) 665-3158

Chad Readler*
JONES DAY
325 John H. McConnell Blvd., Ste. 600
Columbus, OH 43215
(614) 469-3939

David Morrell*
JONES DAY
51 Louisiana Ave. NW
Washington, DC 20001
(202) 879-3939
*Admitted *pro hac vice*

# TABLE OF CONTENTS

Table of Authorities………………………………………………………… ii

Introduction……………………………………………………………… 1

Statement of Facts……………………………………………………... 10

Argument ………………………………………………............... 15

I. This Court Lacks Jurisdiction Over This Suit …………………………… 16

    A. Plaintiffs lack standing……………………………………………… 16

    B. The *Rooker-Feldman* doctrine deprives the Court of jurisdiction over Plaintiffs' claims …………………………………………… 17

II. Plaintiffs Are Not Entitled To Injunctive Relief ………………………… 21

    A. Stein has not established any likelihood of success on her constitutional claims ……………………………………………… 22

    B. Plaintiffs do not face any irreparable injury ……………………… 30

    C. Plaintiffs' requested relief would seriously harm Intervenors……. 31

    D. Granting an injunction would be contrary to the public interest…... 31

CONCLUSION …………………………………………………...35

CERTIFICATE OF SERVICE…………………………………………..38

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anderson v. Celebrezze*,
460 U.S. 780 (1983) ..................................................................................25

*AT&T v. Winback & Conserve Program, Inc.*,
42 F.3d 1421 (3rd Cir. 1994) ...................................................................22

*Banfield v. Cortés*,
110 A.3d 155 (Pa. 2015) .............................................................................3

*Belitskus v. Pizzingrilli*,
343 F.3d 632 (3d Cir. 2003) ....................................................................25

*Bonas v. Town of N. Smithfield*,
265 F.3d 69 (1st Cir. 2001) .....................................................................25

*Bush v. Gore*,
531 U.S. 98 (2000) ...............................................................................5, 15

*Caudill v. Eubanks Farms, Inc.*,
301 F.3d 658 (6th Cir. 2002) ...................................................................34

*Constitution Party of Penn. v. Cortes*,
116 F. Supp. 3d 486 (E.D. Pa. 2015) .......................................................25

*D.C. Court of Appeal v. Feldman*,
460 U.S. 462 (1983) ...........................................................................19, 21

*Duncan v. Poythress*,
657 F.2d 691 (5th Cir. 1981) ...................................................................25

*FMC Corp. v. AMVAC Chem. Corp.*,
379 F. Supp. 2d 733 (E.D. Pa. 2005) ..................................................27, 28

*Gollmar's Election Case,*
    175 A. 510 (Pa. 1934) ...................................................................13

*Great W. Mining & Mineral Co. v. Fox Rothschild L.L.P.,*
    615 F.3d 159 (3d Cir. 2010) ................................................18, 19, 20

*Griffin v. Burns,*
    570 F.2d 1065 (1st Cir. 1978)...................................................25, 26

*Harper v. Bd. of Educ.,*
    383 U.S. 663 (1966)........................................................................23

*Hoblock v. Albany Cty. Bd. of Elections,*
    487 F. Supp. 2d 90 (N.D.N.Y. 2006)..............................................25

*Huffman v. Pursue, Ltd.,*
    420 U.S. 592 (1975)........................................................................33

*League of Women Voters of Ohio v. Brunner,*
    548 F.3d 463 (6th Cir. 2008) .....................................................25, 26

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992)........................................................................17

*Madera v. Ameriquest Mortg. Co. (In re Madera),*
    586 F.3d 228 (3d Cir. 2009) ...........................................................18

*Marks v. Stinson,*
    19 F.3d 873 (3d Cir. 1994) .............................................................26

*Moore v. Sims,*
    442 U.S. 415 (1979)........................................................................33

*Port Auth. Police Benevolent Ass'n, Inc. v. Port Auth. of N.Y. & N.J.*
    *Police Dept't,*
    973 F.2d 169 (3d Cir. 1992) .....................................................18, 33

*Siegel v. LePore,*
    234 F.3d 1163 (11th Cir. 2000) ......................................................25

*United States v. Koreh*,
    59 F.3d 431 (3d Cir. 1995) ................................................................28

*United States v. Mosley*,
    238 U.S. 383 (1915).........................................................................25

*Wittman v. Personhuballah*,
    136 S. Ct. 1732 (2016) ....................................................................16

## STATUTES

3 U.S.C. § 5 ...........................................................................5, 15, 31

3 U.S.C. § 7 ...................................................................................15

25 P.S. § 3192 ...............................................................................31

25 P.S. § 3456 ...............................................................................29

## INTRODUCTION

Green Party presidential candidate Jill Stein finished fourth in the Pennsylvania presidential election, garnering less than 1% of the votes cast by Pennsylvanians. Yet despite being no more than a blip on the electoral radar, Stein (along with one Pennsylvania voter) asks the Court to join them in commandeering Pennsylvania's electoral process, first by ordering a recount of each of the nearly six million ballots cast in the election, and second by requiring a forensic examination of voting machines, all with the final Electoral College deadlines just days away.

The gravity of Stein's allegations, particularly in the context of a presidential election, give rise to numerous threshold questions.

*What evidence does Stein have to back her claims?* None, really. Stein demands a recount due to the *possibility* of foreign-sourced hacking. She admits that "[a] majority of machines voted for Donald Trump in Pennsylvania." (Mem. of Law In Support of Mot. for a Preliminary Injunction (ECF 5) [hereinafter "PI Mot."] at 2.) But she nevertheless demands a recount to answer what she believes to be a distinct question: "who did *the people* vote for?" *Id.* (emphasis added).

Despite its ominous nature, Stein's complaint is entirely devoid of factual grounding. There is no evidence—or even an allegation—that any tampering with Pennsylvania's voting systems actually occurred. To be sure, Stein claims there

are vulnerabilities in Pennsylvania's voting machines and references election-related hacking *outside of* Pennsylvania. But she does not offer any evidence or allegations that a single voting machine in Pennsylvania was hacked, let alone on a scale sufficient to flip the Pennsylvania election. And don't take our word for it alone: Stein herself recently admitted that "there is no evidence of fraud at the ballot box." Daniella Diaz, *Jill Stein defends her recount efforts*, cnn.com (Nov. 28, 2016).[1]

The absence of any evidence of tampering is no surprise. Before the election, Pennsylvania Secretary of State Pedro Cortés assured Pennsylvania voters that Pennsylvania's voting systems are "secure," and criticized contrary suggestions as "not only wrong and uninformed," but also "dangerous." *See* Remarks by Secretary of State Pedro A. Cortés, Press Conference, Capitol Media Center, Harrisburg, PA (Oct. 20, 2016) (attached as Exhibit 1). He explained that all voting systems in Pennsylvania were "examined and certified to federal and state standards," and that voting machines were "not connected to the Internet" or "to one another," thus reducing the risk of compromise. *Id.* And even though already "recognized [as a] leader among states in cybersecurity," the State adopted a belt-and-suspenders approach by partnering with federal agencies, including the Department of Homeland Security, "to ensure the integrity of [its] systems and

---

[1] *Available at* http://www.cnn.com/2016/11/28/politics/jill-stein-recount-2016-election/.

networks." *Id.* And all of this comports with the conclusions reached in previous litigation involving a challenge to the integrity of the same voting machines Plaintiff challenges here. *See Banfield v. Cortés*, 110 A.3d 155, 174 (Pa. 2015) ("[T]he Commonwealth Court found … the Appellants had not shown any more than the mere possibility that the certified DREs in theory could be subject to tampering, presenting no evidence that the challenged devices have failed to accurately record votes or experienced a security breach in an actual election.").

*Does anyone other than Stein and her small band of voters believe a recount is necessary?* No. To start, unlike the 1% candidate Stein, Secretary Cortés has not lost confidence in the election's integrity. Indeed, much the opposite. Asked whether there was any evidence of voting irregularities during the November 8 contest, his answer was as adamant as it was unequivocal: "There is *no evidence whatsoever* that points to any type of irregularity in any way, shape or form." *See* Dan McQuade, *Here's How the Jill Stein-Led Recount Effort Is Going In Philly*, phillymag.com (Nov. 29, 2016) (emphasis added).[2] The White House, notably, has said the same. *See* Geller, *White House insists hackers didn't sway election, even as recount begins*, POLITICO (Nov. 26, 2016).[3] And so has the runner-up Clinton campaign. Despite a flood of requests for the Clinton campaign to investigate the election results, the campaign declined to challenge the election because it was

---

[2] *Available at* http://www.phillymag.com/news/2016/11/29/jill-stein-recount-philadelphia/.
[3] *Available at* https://perma.cc/5Z5C-Z59S.

unable to uncover "any actionable evidence of hacking or outside attempts to alter the voting technology."  *See* Marc Erik Elias, *Listening and Responding To Calls for an Audit and Recount*, medium.com (Nov. 26, 2016).[4]

Even Stein's biggest proponents lack confidence in her claims.  Professor Alex Halderman—an expert Stein has enlisted in this case—published an article just two weeks ago, stating: "Were this year's deviations from pre-election polls the results of a cyberattack?  *Probably not*."  *See* J. Alex Halderman, *Want to Know if the Election was Hacked? Look at the Ballots*, medium.com (Nov. 23, 2016) (emphasis added).[5]

This chorus of voices explains why the only evidence of election-related hacking or attempted hacking Stein references here concerns entities or persons outside of Pennsylvania—the Democratic National Committee, Illinois, and Arizona.  Allegations relating to these entities plainly cannot justify upsetting the election results in Pennsylvania.

*What are the ramifications of Stein's requested relief?*  Pennsylvania's absence from the Electoral College.  Even with heroic efforts by state and local elections officials, Stein's proposed process would last weeks, perhaps even months.  Either way, her requested relief would virtually guarantee that

---

[4] *Available at* https://medium.com/@marceelias/listening-and-responding-to-calls-for-an-audit-and-recount-2a904717ea39#.8qzvzno97.
[5] *Available at* https://medium.com/@jhalderm/want-to-know-if-the-election-was-hacked-look-at-the-ballots-c61a6113b0ba#.umbgt1gvq.

Pennsylvania would not be able to certify its Presidential Electors by December 13, the federal safe-harbor deadline for doing so. *See* 3 U.S.C. § 5 (requiring disputes over electors to be resolved by December 13); *Bush v. Gore*, 531 U.S. 98, 110 (2000) (this statute "requires that any controversy or contest that is designed to lead to a conclusive selection of electors be completed by" that date). If this occurs, Pennsylvania's very seat at the Electoral College is jeopardized, which in turn risks disenfranchising *all* of the Pennsylvania voters whose constitutional rights Stein purports to vindicate. In fact, Stein acknowledged this risk in advancing similar recount efforts in Michigan, telling the Sixth Circuit that "Michigan *must* complete a recount of votes by December 13, the federally imposed deadline for the selection of electors to the Electoral College." Stein's Mem. of Law at 1, *Stein v. Thomas*, No. 16-2690 (6th Cir. Dec. 6, 2016) (ECF 12) (emphasis added). Stein omits any such language in her filings here, likely because she knows that her demands all but ensure that Pennsylvania could not possibly meet that deadline.

 *What are Pennsylvanians' reaction to Stein's last-minute recount request?* Shock and dismay, most likely. Having endured a lengthy, expensive, hard-fought Presidential election, Pennsylvania voters surely expected their votes would be accounted for when the Electoral College meets this December. Yet the legal antics of a 1% candidate call all of that into question.

Case 4:20-cv-02887-MWB Document 3951 Filed 12/08/20 Page 14 of 40

*Has Stein asked local voting officials to conduct recounts themselves*?  Yes, and the results there contradict her claims here.  Stein's first initiative was to corral voters and fund them to file recount petitions in voting precincts across the State.  Virtually all of those are complete, and they have shown very little change in the final vote tally.  Nor, critically, have they shown any evidence of the diabolical plot imagined by Stein.

*Is this the first court to hear Stein's claims?*  No.  Before this case, she pursued similar claims as part of an election contest filed with the Commonwealth Court of Pennsylvania.  There, like here, Stein cited "grave concerns" about the integrity of the election.  Despite weeks' worth of time and energy, however, Stein and her allies could not even allege—much less prove—a single instance of fraud or tampering *anywhere* in the State.  She ultimately dismissed her action as a result, clamoring that "the fix was in."  Caroline Kenny, *Jill Stein says she'll 'escalate' Pennsylvania recount case after earlier plans to drop it*, cnn.com (Dec. 5, 2016).[6]  That "fix" apparently necessitated Stein "escalating" her claims to this Court.  *Id.*

*Has Stein accurately characterized her prior court proceedings?*  Unfortunately, no.  Facing the certainty of dismissal of her election contest due to a complete absence of evidence of fraud, Stein and her allies voluntarily dismissed

---

[6]*Available at*  http://www.cnn.com/2016/12/03/politics/jill-stein-drops-pennsylvania-recount/.

the case the weekend before her Monday morning hearing (presumably to avoid a published order rejecting her claims).  At the time, Stein and her allies told the state court the dismissal was due to the fact that the petitioners could not "afford" to post the $1 million bond required by the Commonwealth Court.  We now know that is false.

Asked in an interview why she decided to pursue an "action in federal court instead of paying out the $1 million bond," Stein replied: "Well, the problem was *not that it was too expensive*, but that it was a dead-end course of action."  Prachi Gupta, *Jill Stein on What's Next With the Recount Effort in Wisconsin, Michigan, and Pennsylvania*, Cosmopolitan.com (Dec. 6, 2016) (emphasis added).[7]  She complained that the state court was being "political" by demanding evidence of election-related tampering she simply did not possess.  *See id.*  So she strategically dismissed her case.

This has not stopped Stein from advancing a contrary position in this Court, however.  Consistent with what petitioners told the Commonwealth Court—but in direct contradiction to what Stein has since told the media and the public—Stein claims that the Commonwealth Court's decision to set bond at $1 million "forced" petitioners "to withdraw the contest proceeding," because they "could not possibly post an exorbitant $1 million bond."  (Complt. (ECF 1) at ¶¶91-92.)  She cites this

---

[7] *Available at* http://www.cosmopolitan.com/politics/a8467128/jill-stein-voter-recount-wisconsin-michigan-pennsylvania/.

fact to tee up her constitutional claims here—namely, that the $1 million bond was an "insurmountable barrier[]" to obtaining a recount and thus an unconstitutional abridgment of the right to vote.  (PI Mot. at 30.)  So she had no choice, we are told, to "escalate" her legal claims.

*Setting aside the reason Stein failed to pursue state statutory remedies, have Stein and Reitz satisfied Article III standing requirements for asserting claims in federal court?*  No.  Neither she nor Plaintiff Reitz have Article III standing to seek such relief.  As to Stein, she has not alleged an injury-in-fact likely to be redressed by any ruling related to the need for a recount.  She does not contend that a Pennsylvania recount will result in her securing Pennsylvania's electoral votes, and in fact has conceded it will not.  *See* Stein, *Why the recount matters: Jill Stein*, USA Today (Dec. 1, 2016) (conceding that the "goal" of the recount "is not to change the result of the election").[8]  Reitz has no better claim to standing.  Even if he voted in the election, there are no factual allegations or evidence that give rise to a plausible assumption that his vote was not properly counted.

*Assuming they do have standing, what relief do Stein and Reitz seek?*  That Pennsylvania comply with a procedure she and her own experts devised—a hand recount of "the paper ballots in optical scan counties," and a "forensic examination" in counties using direct-recording electronic systems.  (PI Mot. at 1.)

---

[8] *Available at* https://perma.cc/VZK4-5BVF.

Those procedures, we learn from Stein, are compelled by the Constitution of the

United States to ensure election "integrity."  And that is true, we are told, even

where a plaintiff (like Stein) maintains only the mere suspicion of electoral

improprieties

     *Where in the United States Constitution can one find the blanket*

*constitutional right to a recount to ensure election integrity?*  Nowhere.  No one

doubts the fundamental nature of the right to vote.  But no court, to our knowledge,

has read that privilege to include not only the right to cast one's vote, but also the

right to request a recount *after* the vote to ensure an election's integrity.  It thus

should come as no surprise that a federal court in Michigan just yesterday rejected

Stein's claims there, finding no constitutional right to a speculation-fueled recount.

*See* Order, *Stein v. Thomas*, No. 2:16-cv-14233 (E.D. Mich. Dec. 7, 2016) (ECF

36) (attached as Exhibit 2).  Which only makes sense.  After all, if all Americans

do enjoy that right, ballot counting could become year-round sport.

     *Will Stein be irreparably harmed absent the Court's intervention?*  No, a

conclusion bolstered by Stein's own actions.  Despite having suspicions about the

integrity of Pennsylvania's voting systems *before* the November 8 election, and

having an opportunity to seek relief immediately after the election, Stein waited

until November 28—the last possible day—to file her election contest in the

Commonwealth Court, and December 5, nearly a month after the election, to file

this suit. Anyone fearing an irreparable injury of the magnitude suggested here surely would have acted sooner. Stein did not, and she now has only herself to blame for much of the purported emergency she now asserts.

*Finally, does Stein satisfy any of the other elements that must be met before emergency relief is granted?* No, most notably because her request does not serve the public interest. If granted, her requested relief is certain to harm election officials, voters, and vote counters forced hastily to take up recounts, creating confusion and uncertainty in an already challenging environment. Such relief would also harm all Pennsylvanians, who would not only be on the hook for a multi-million-dollar recount tab, but who would also face the risk of disenfranchisement, should their Electoral votes not be counted.

The one thing over which there should be no question is that Stein's claims are baseless and legally flawed. Accordingly, the Court should deny a preliminary injunction and dismiss the Complaint.

## **STATEMENT OF FACTS**

For most, the November 8, 2016 presidential election concluded early the next morning, when the major news outlets declared President-elect Donald Trump the winner and Secretary Hillary Clinton graciously conceded. But not for Dr. Jill Stein. After an aggressive online fundraising push, Stein and her campaign attorney, through voters they corralled, filed recount petitions throughout the State,

and also brought an election contest in Pennsylvania's Commonwealth Court on November 28, the statutory deadline for filing such a case.

As in this case, the election-contest petition invited the Commonwealth Court to revisit the November 8 election for United States President and Vice-President due to the alleged possibility of foreign-sourced hacking. The petition did not allege a single known or even a single suspected incident of hacking in Pennsylvania. Nor did it identify which foreign entities would have engaged in the hypothesized hacking, or indicate which presidential candidates would have benefited or been harmed from such conduct. Instead, it merely expressed a belief that the possibility for hacking existed, and, on this basis, requested a statewide recount.

On November 29, the Commonwealth Court scheduled a hearing on the election-contest petition for Monday, December 5, at 10 a.m. *See* Order (attached as Exhibit 3). On December 2, the court issued another order setting the statutorily required bond at $1,000,000, which it directed to be posted by 5:00 p.m. on December 5. *See* Order (attached as Exhibit 4). The schedule thus allowed petitioners to argue their case and potentially obtain a ruling on Monday morning before having to post a bond that evening. The Commonwealth Court also gave the parties the opportunity to address the bond amount in the meantime if they were unhappy with it. *See id.* ("Upon good cause shown, the amount of the bond

may be modified by the Court."). To make this remedy easily available over the weekend, the Chief Clerk of the Commonwealth Court notified counsel that the court would accept filings submitted through PACFile (Pennsylvania's electronic-filing system) after hours, and in turn would docket them before the hearing.

On Saturday, December 3, petitioners moved to withdraw their petition. Even though (1) Stein had raised nearly $7 million at the time (and has since exceeded that number), (2) the court expressly authorized petitioners to request a different bond amount for good cause, and (3) petitioners could have argued their case before having to post a bond, petitioners simply asserted that they could not afford to post the bond. "Petitioners are regular citizens of ordinary means," they claimed, and thus could not "afford to post the $1,000,000 bond required by the Court." *See* Praecipe to Discontinue and Withdraw (attached as Exhibit 5). The court thus closed the case that day. *See* Order (attached as Exhibit 6).

While petitioners' much-publicized explanation for their voluntary withdrawal was on its face implausible given the considerable resources Stein had raised, Stein has since confirmed that the explanation was in fact false. She explained that "the problem was not that [the $1 million bond] was too expensive," but that the state-court proceeding "was a dead-end course of action" since she had no evidence of election-related tampering to present at the hearing. Prachi Gupta, *Jill Stein on What's Next With the Recount Effort in Wisconsin, Michigan, and*

*Pennsylvania*, Cosmopolitan.com (Dec. 6, 2016) (emphasis added).[9]  The withdrawal, in other words, was strategic.

This makes sense.  As Stein's public comments confirm, she and her allies knew that petitioners could not possibly meet the substantive requirements for contesting the election.  Under the governing election-contest standards, they were required to exercise "due diligence to ascertain and specify the facts which, if sustained by proof, would require the court to set aside the result of the election." *Gollmar's Election Case*, 175 A. 510, 512 (Pa. 1934).  This standard required allegations of particular acts of fraud, that such fraud increased the vote of the victor, and that it affected the outcome of the election.  *See id.*  Yet the election-contest petition failed to meet even these basic pleading standards.  It did not allege any specific acts of fraud or tampering in Pennsylvania, much less that any such fraud increased the votes of President-elect Trump, let alone to such degree that it affected the outcome of the election.  Nor did the petition identify any basis for believing that Stein's ongoing recount efforts would uncover even a shred of evidence of election tampering.  But rather than risk a court stating these conclusions on the record and thereby undermining her three-state recount efforts, Stein opted instead to withdraw and try her hand in yet another forum, this time a federal one.

---

[9] *Available at* http://www.cosmopolitan.com/politics/a8467128/jill-stein-voter-recount-wisconsin-michigan-pennsylvania/.

On December 5, Stein filed suit in this Court. In her complaint, Stein alleged that the very state-devised system she invoked in the previous weeks was unconstitutional because, in her estimation, it makes a statewide recount too difficult. But despite allegations of imminent and irreparable harm to her alleged constitutional rights, Stein waited a day to file her motion for preliminary injunction seeking a statewide recount and forensic examination of Pennsylvania's voting systems. The premise of Stein's argument—in direct contradiction to what she told the media and the public—is that the $1 million bond was an "insurmountable barrier[]" to obtaining a recount, and thus an unconstitutional abridgment of the right to vote. (Mot. for PI at 30.)

Finally, while Stein's county-level efforts to force a recount and obtain forensic examinations are too numerous to describe here, one such proceeding is worth noting—specifically, Stein's request for recounts and forensic examinations in Philadelphia County. The Philadelphia County Board of Elections granted her recount requests, but denied her request to conduct forensic examinations during that process. Stein appealed and, on December 7, the Pennsylvania Court of Common Pleas affirmed, concluding that Stein possessed no state-law right to the forensic examinations she requested. *See* Opinion, *Stein v. Philadelphia Cnty. Bd. of Elections*, No. 161103335 (Ct. of Common Pleas) (attached as Exhibit 7).

In the course of reaching that conclusion, the court made several observations that bear repeating here.  The court explained that Stein had a statutory right not only to be present when the county board tested its voting systems both before and after the election, but also "to have a technically qualified person there to make independent tests of the equipment prior to, during, and following the vote count."  *Id.* at 3.  But, the court noted, there was no evidence that "Dr. Stein took advantage of these provisions."  *Id.*  The court added that the Board's recount efforts "revealed no discrepancies in the electronic tallies," and that there was "absolutely no evidence of any voting irregularities."  *Id.* at 4.

## **ARGUMENT**

The Court should deny Plaintiffs' request for a preliminary injunction, both because this Court lacks jurisdiction over the asserted claims and because Stein cannot possibly satisfy the standards for obtaining such relief.

But before addressing these issues, Intervenors note the mandatory deadline imposed by the federal safe harbor set forth in 3 U.S.C. § 5.  This provision requires certification of the Presidential Electors by Pennsylvania's Governor on or before December 13, 2016.  *See also Bush v. Gore*, 531 U.S. 98, 110 (2000).  Meeting this deadline is critical to participating in the formal Electoral College vote on December 19, 2016.  *See* 3 U.S.C. § 7.  The remedies Plaintiffs request,

even if merited, could thus never be implemented in time, a fact that alone justifies denying Plaintiffs' requested relief.

The following are additional grounds for reaching the same result.

## I.     This Court Lacks Jurisdiction Over This Suit.

### A.     Plaintiffs lack standing.

"A party has standing only if he shows that he has suffered an 'injury in fact,' that the injury is 'fairly traceable' to the conduct being challenged, and that the injury will likely be 'redressed' by a favorable decision." *Wittman v. Personhuballah*, 136 S. Ct. 1732, 1736 (2016). Stein, however, has not alleged an injury-in-fact likely to be redressed by any ruling related to the need for a recount. She does not contend that she will (or even might) win Pennsylvania's electoral votes after a recount. Nor, in any event, would a victory in Pennsylvania send Stein to the White House. After all, Stein gained no more than three percent of the vote in any state where she appeared on the ballot. *See* America's Election Headquarters, FOX NEWS, http://www.foxnews.com/politics/elections/2016/ presidential-election-headquarters (last visited Nov. 29, 2016). Accordingly, she has failed to allege facts showing that she has suffered a constitutionally cognizable injury.

Nor does Plaintiff Reitz satisfy Article III standing requirements. Reitz describes himself as a "voter in the State of Pennsylvania." Assuming Reitz did

16

vote, he still has not alleged any facts giving rise to a plausible assumption that his vote was not properly counted. He is left with only a "merely speculative" injury, one that does not meet Article III's injury-in-fact requirement for establishing standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Insofar as Plaintiffs seek to defend the interest in a free and fair election, they have no standing to assert that grievance either. It is a "generally available grievance," one for which relief benefits Plaintiffs no more "than it does the public at large." *Id.* at 573–74 ("We have consistently held that a plaintiff raising only a generally available grievance,"—"claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy."). That generalized grievance "does not state an Article III case or controversy." *Id.* at 574. And even if Plaintiffs could seek relief for a generalized grievance, they failed to allege any facts plausibly suggesting that fraud or mistake tainted the election results.

This Court thus has no jurisdiction over this case, which alone warrants denying Plaintiffs' request for a preliminary injunction.

### B. The *Rooker-Feldman* Doctrine deprives this Court of jurisdiction over Plaintiff's claims.

In addition to Plaintiffs' standing problem, the *Rooker-Feldman* doctrine independently deprives this Court of jurisdiction over Plaintiffs' claims.

    **1.**  The *Rooker-Feldman* doctrine provides that "lower federal courts lack subject matter jurisdiction to engage in appellate review of state-court determinations or to evaluate constitutional claims that are inextricably intertwined with the state court's decisions in a judicial proceeding." *Port Auth. Police Benevolent Ass'n, Inc. v. Port Auth. of N. Y. & N.J. Police Dept't,*, 973 F.2d 169, 177 (3d Cir. 1992) (citing *D.C. Court of Appeal v. Feldman*, 460 U.S. 462, 483 n.16 (1983)). The doctrine "precludes lower federal courts from exercising appellate jurisdiction over final state-court judgments because such appellate jurisdiction rests solely with the United States Supreme Court." *Madera v. Ameriquest Mortg. Co. (In re Madera)*, 586 F.3d 228, 232 (3d Cir. 2009) (quoting *Lance v. Dennis*, 546 U.S. 459, 463 (2006)).

    "[T]here are four requirements that must be met for the *Rooker-Feldman* doctrine to apply: (1) the federal plaintiff lost in state court; (2) the plaintiff complains of injuries caused by the state-court judgments; (3) those judgments were rendered before the federal suit was filed; and (4) the plaintiff is inviting the district court to review and reject the state judgments." *Great W. Mining & Mineral Co. v. Fox Rothschild L.L.P.*, 615 F.3d 159, 166 (3d Cir. 2010).

    "The second requirement—that a plaintiff must be complaining of injuries caused by a state-court judgment—may also be thought of as an inquiry into the source of the plaintiff's injury." *Id.* Under this requirement, "[t]he critical task is

18

… to identify those federal suits that profess to complain of injury by a third party, but actually complain of injury produced by a state-court judgment and not simply ratified, acquiesced in, or left unpunished by it." *Id.* at 167 (quoting *Hoblock v. Albany County Board of Elections*, 422 F.3d 77, 88 (2d Cir. 2005)). "A useful guidepost is the timing of the injury, that is, whether the injury complained of in federal court existed prior to the state-court proceedings and thus could not have been 'caused by' those proceedings." *Id.*

"[C]losely related" to the second requirement, the fourth element "targets [] whether the plaintiff's claims will require appellate review of state-court decisions by the district court." *Id.* at 169. Prohibited appellate review "consists of a review of the proceedings already conducted by the lower tribunal to determine whether it reached its result in accordance with law." *Id.* (quoting *Bolden v. City of Topeka*, 441 F.3d 1129, 1143 (10th Cir. 2006)). Prohibited appellate review also includes constitutional claims that a plaintiff declined to assert in state court but are "inextricably intertwined with" the state court's decision. *Feldman*, 460 U.S. at 482 n. 16.

**2.** Here, all four requirements of the *Rooker-Feldman* test are met. *First*, Plaintiffs lost their election contest. They sought a statewide recount and a declaration that the presidential election was "illegal," but they failed to obtain either. They also requested a bond amount of $25,000, which the Commonwealth

19

Court rejected in setting the bond at $1,000,000. While Reitz was a formal party in that proceeding and Stein was not, Stein has been the driving force behind all of the recount efforts in Pennsylvania, Michigan, and Wisconsin. Having publicly owned that role and raised millions as a result, she should be estopped from claiming that she was not a party in the state-court proceeding, especially where doing so would allow her to evade subject-matter limitations on this Court's jurisdiction.

*Second*, it is the Commonwealth Court's decision to set bond at $1,000,000 that (according to their pleadings) caused petitioners to withdraw their election contest—the same decision Plaintiffs allege caused their injuries here. Indeed, Plaintiffs repeatedly cite the bond amount as one of the "insurmountable barriers" to vindicating their alleged constitutional right to a recount and forensic examination. (PI Mot. at 30, 35.) And the fact that this barrier did not "exist[]" prior to the state-court proceedings" (*Great W. Mining & Mineral Co.*, 615 F.3d at 166) reinforces that the state-court judgment caused Plaintiffs' asserted injuries.

*Third*, the state-court judgments were rendered before the federal suit was filed. The Commonwealth Court established the bond amount on December 2 and closed the case on December 3. This suit was not filed until December 5.

*Finally*, Plaintiffs are inviting this Court to review and reject a state judgment—namely, the Commonwealth Court's decision to set a $1,000,000 bond.

20

Plaintiffs have alleged that this decision abridged their constitutional rights by imposing an onerous burden on obtaining a statewide recount.  To state the argument is to demonstrate that Plaintiffs' constitutional claims and the bond amount are "inextricably intertwined."  *Feldman*, 460 U.S. at 482 n.16.  Plaintiffs' theory here would thus necessarily entail review of the state court's decision, which is precisely what the *Rooker-Feldman* doctrine prohibits.

Enforcing this doctrine is particularly important in today's case.  In setting the bond, the Commonwealth Court expressly indicated that it was open to modifying the amount upon a showing of "good cause."  Plainly, avoiding a constitutional violation would amount to "good cause."  The Commonwealth Court even allowed the parties to file after hours and over the weekend.  While petitioners took advantage of this concession to withdraw their petition, they declined to request a lower bond amount.  Having made the decision not to raise their constitutional concerns in the state forum, Plaintiffs should not be permitted to obtain review of the bond amount here.  That would effectively allow an end-run around the state judiciary, and impermissibly expand this Court's subject-matter jurisdiction.

## II.     Plaintiffs Are Not Entitled To Injunctive Relief.

Even setting aside the fundamental jurisdictional problems inherent in the Complaint, Stein's request for a preliminary injunction fails on the merits: there is

no constitutional right to a recount and, even if there were, her request is much too late to justify such relief. And because the other preliminary-injunction factors weigh against her request, she has not carried her burden to obtain the "extraordinary remedy" she seeks. *AT&T v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1426-27 (3rd Cir. 1994).

### A.      Stein has not established any likelihood of success on her constitutional claims.

**1.**  Boiled down, Plaintiffs charge that Pennsylvania's Election Code is unconstitutional because, in Stein's estimation, it makes obtaining a statewide recount too difficult, especially for 1% candidates like herself. This argument borders on the frivolous, as there is no constitutional right to a recount, especially so where there is no evidence of fraud or tampering.

The First Amendment gives a right to political association. The Fourteenth Amendment requires that, if states permit voters to vote for president, they must fairly tabulate the votes. And the Due Process Clause prohibits voting procedures that are fundamentally unfair. But the mere absence of an easily invoked, mandatory statewide recount provision does not jeopardize any of these rights. There is no dispute that every Pennsylvania voter had the legal right and ability to cast his or her vote. Nor is there evidence—or even an allegation—that the votes already cast have not been fairly and accurately tabulated. Indeed, Plaintiffs cite no evidence of tampering or fraud, but instead invoke the *possibility* that someone,

22

somewhere tampered with a voting machine (or machines!) in Pennsylvania.
Who?  We are not told.  To help which candidate?  Again, we are not told.  How
did they do it?  Silence.

We are thus left solely with speculation that the results *could* have been
inaccurate, which Stein insists triggers a constitutional right to a recount to show
that they are not.  By that logic, however, every person, in every state, has the
constitutional right to a recount anytime one thinks votes might have been
inaccurately counted, without regard to whether that person has evidence
suggesting as much.  And the tab for those recounts would be the state's alone,
calling into question ubiquitous state laws requiring recount requestors to pay some
or all of the recount fee.  After all, just as the right to cast a ballot cannot be
infringed by a poll tax, *see generally Harper v. Bd. of Educ.*, 383 U.S. 663 (1966),
the recount right similarly could not encumbered by state fees.

All of this explains why the only court to address the precise claims Stein
raises here rejected them in full.  On Wednesday, a federal district court in
Michigan denied Stein's request for a statewide recount in that state.  *See* Order,
*Stein v. Thomas*, No. 2:16-cv-14233 (E.D. Mich. Dec. 7, 2016) (ECF 36) (attached
as Exhibit 2).  The reasons for doing so was eminently clear: "[t]here is no case
law recognizing an independent federal right to a recount that either this Court or
the parties have come across, in the absence of actual deprivation of voting rights."

*Id.* at 7.  And "to date," the court explained, "Plaintiffs have not presented evidence of tampering or mistake."  *Id.*  "Instead," as in this case, "they present speculative claims going to the vulnerability of the voting machinery—but not actual injury."  *Id.*  And "because mere potentiality does not amount to a claim that the vote was not fairly conducted," the court concluded that plaintiffs had shown "[n]o likelihood of success" on the merits.  *Id.*  Indeed, Plaintiff's theory "has never been endorsed by any court":

> [I]nvoking a court's aid to remedy that problem in the manner Plaintiffs have chosen—seeking a recount as an audit of the election to test whether the vulnerability led to actual compromise of the voting system—has never been endorsed by any court, and would require, at a minimum, evidence of significant fraud or mistake—and not speculative fear of them.  Such evidence has not been presented here.

*Id.*  The court did not engage in the balancing test Plaintiffs invite here (PI Mot. 29-30), but rightly dismissed the claims out of hand since (as here) there was no evidence that Stein's rights were burdened *at all*.[10]

Nothing in Plaintiffs' 41 pages of briefing here undermines these conclusions.  Indeed, Plaintiffs do not cite a *single* case suggesting that there is a

---

[10] Plaintiffs cite an earlier, now-dissolved TRO order from the same federal district court.  (PI Mot. 32-33.)  But that order is wholly inapposite, because it merely addressed the *timing* of a statewide recount that had already been ordered by the state elections board on state-law grounds (the district court did not, as Plaintiffs misleadingly suggest, order the statewide recount in the first place).  *See* Order at 4, *Stein v. Thomas*, No. 2:16-cv-14233 (E.D. Mich. Dec. 5, 2016) (ECF 16).  Shortly after the TRO was issued, the Michigan Court of Appeals ruled that Stein lacked a right to a recount under state law.  Within 24 hours of that ruling, the federal district court promptly dissolved its TRO and issued the opinion (discussed above) rejecting Stein's alleged *constitutional* right to a recount.

constitutionally protected right to a recount.  Plaintiffs' decisions are not even

close.  Some involved challenges to a decision not to count a voter's ballot in the

first place.  *See Hoblock v. Albany Cty. Bd. of Elections*, 487 F. Supp. 2d 90, 98

(N.D.N.Y. 2006); *Griffin v. Burns*, 570 F.2d 1065, 1074 (1st Cir. 1978).  Others

involved challenges to provisions governing candidates' ability to appear on the

ballot.  *See Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Belitskus v. Pizzingrilli*,

343 F.3d 632, 636 (3d Cir. 2003); *Constitution Party of Penn. v. Cortes*, 116 F.

Supp. 3d 486 (E.D. Pa. 2015).  One case involved constitutional claims based on

deficiencies in the state system that allegedly precluded plaintiffs from voting or

resulted in their votes not being counted.  *League of Women Voters of Ohio v.*

*Brunner*, 548 F.3d 463, 469 (6th Cir. 2008).  Still others involved a decision to

cancel or refuse to hold an election altogether.  *See Bonas v. Town of N. Smithfield*,

265 F.3d 69, 75 (1st Cir. 2001); *Duncan v. Poythress*, 657 F.2d 691, 693 (5th Cir.

1981).

     Others are even further afield.  One case declined a request by voters for a

preliminary injunction stopping a manual recount provided under state law.  *Siegel*

*v. LePore*, 234 F.3d 1163, 1187 (11th Cir. 2000).  Another case concerned the

validity of an indictment that alleged violations of the Enforcement Act of 1870,

which protects voters from intimidation.  *United States v. Mosley*, 238 U.S. 383

(1915).  And another involved a conspiracy between a candidate and members of

the county election board "to cause numerous illegally obtained absentee ballots to be cast." *Marks v. Stinson*, 19 F.3d 873, 875 (3d Cir. 1994).

Regarding this last case, Stein suggests that the Third Circuit court found the state-law proceedings themselves unconstitutional (for example, because they required a $50,000 bond). (PI Mot. 35.) That is false. Setting aside that the Commonwealth Court specifically set a hearing for Stein to present her fraud claims here (which Stein declined to attend by dismissing the action), *Marks* cited the difficulties plaintiffs faced in the state proceedings solely as background for its *abstention* ruling. *See Marks*, 19 F.3d at 879 ("In order to understand the first of these issues [abstention], some knowledge of the state proceedings in this controversy is required."). And, in any event, *Marks* did not involve a recount, let alone a constitutionally required recount.

Thus, none of Plaintiffs' cases involved a court-ordered recount. In fact, some of the cases—to the extent they touched on recounts—undermine her position. *See Griffin v. Burns*, 570 F.2d 1065, 1078 (1st Cir. 1978) (suggesting a claim is more likely to succeed where the federal court is "not asked to count and validate ballots"); *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 478 (6th Cir. 2008) (expressly contrasting the case before it, which alleged a plausible constitutional claim, with a claim requesting "a recount of the 2004 electoral results," which the court suggested would not be proper). At the very least, the

26

absence of even a single case granting the relief Plaintiffs demand—and one squarely rejecting it—is good evidence that they in fact have no constitutional right to a recount.

Finally, it is worth reminding the Court of the discrepancies between Stein's public comments and the constitutional arguments raised here. The premise of Stein's constitutional argument is that the $1 million bond set by the Commonwealth Court created an "insurmountable barrier[]" to obtaining a constitutionally required recount through the state system. Yet Stein, who instigated and directed the state-court litigation, has since admitted that petitioners' asserted plight—that they were "regular citizens of ordinary means" who could not "afford to post the $1,000,000 bond"—was a farce. Posting the bond was not the problem, she explained. *Supra*, note 7. Rather, it was the virtual certainty that petitioners would lose on the merits due to their inability to prove fraud or tampering. *Id.* Stein has admitted, in other words, that she has no valid constitutional grievance, but is simply unhappy that the state court would not roll over and grant a statewide recount without any evidence of actual fraud.

With these facts in view, it is clear there is no constitutional violation. Moreover, even if there were, this Court should decline to grant a preliminary injunction due to Stein's decision to make a mockery of the state and federal courts. "Courts condone neither forum shopping nor forum avoidance." *FMC*

*Corp. v. AMVAC Chem. Corp.*, 379 F. Supp. 2d 733, (E.D. Pa. 2005).  "Attempting to avoid a particular judge or precedent is exactly the kind of forum shopping anticipated and expressly prohibited by the local rules of many districts."  *Id.*  Because there is good reason to believe this occurred here, Stein's efforts should not be rewarded with a preliminary injunction.

**2.**  There is another problem with Plaintiffs' request: it comes much too late in the day and is thus barred by the doctrine of laches.

A party asserting the defense of laches must show: "(1) lack of diligence by party against whom the defense is asserted and (2) prejudice to the party asserting the defense."  *United States v. Koreh*, 59 F.3d 431, 445 (3d Cir. 1995).  Both elements are satisfied here.

First, Stein's conduct is a study in "lack of diligence."  The premise of Stein's claim is that Pennsylvania's election machinery is vulnerable to attack.  But the machinery has not changed in years.  Nor has the evidence that Stein relies upon in an attempt to support her theory.  (*See, e.g.*, PI Mot. at 4, 6-7 (citing studies, events, and research from 2005, 2007, 2008, and 2009).  Thus, if Stein's motivation for this recount was truly to ensure election integrity, she could have raised these issues *before* the election.  And if she had specific concerns about what had occurred during Pennsylvania's election on November 8, she could have

raised these concerns on *November 9*, immediately following the election. Pennsylvania law allows for such a challenge.  *See* 25 P.S. § 3456.

But Stein did not do so.  She did not raise her concerns before the election, as she could have done.  She did not raise these concerns immediately following the election, as she could have done.  Instead, she waited until November 28—just hours before the deadline—to file her election-contest petition, which she then dismissed before the court-ordered hearing.  She then waited two more days to file her complaint here and three days to file her motion seeking a preliminary injunction.  She now has the audacity to argue that the entire recount and election-contest process under the Pennsylvania Election Code is unconstitutional, and that this Court should intervene on an emergency basis.  But it is Stein's own unjustified delay that has caused the concerns she now raises.  If ever there were a case of "lack of diligence" by a party, this is it.

Second, the prejudice to a host of parties—including Intervenors—is clear. A last-minute, unexpected statewide recount would have the enormous financial impact of causing Pennsylvania's taxpayers to shoulder massive expenses to complete the undertaking in less than a week.  It would also cause a logistical nightmare for both state officials and political parties, who would have to train and recruit volunteers to assist in conducting and overseeing an accurate recount.  And if this process failed to conclude by December 13 (which it almost certainly

would), it would jeopardize Pennsylvania's ability to identify and certify its Presidential Electors and thus the State's place at the Electoral College table. This could disenfranchise millions of Pennsylvania voters, all while robbing the presidential and vice-presidential candidates of the added electoral heft that Pennsylvania's twenty electoral votes would provide. Because this morass could have been easily avoided by a prompt filing of Stein's claims, laches independently bars her requested relief.

### B. Plaintiffs do not face any irreparable injury.

Plaintiffs cannot demonstrate any harm, much less irreparable harm, which explains why their brief struggles to identify any *concrete* impending injury (invoking constitutional platitudes instead) and quickly pivots to discussing the supposed reasonableness of the requested relief (to be clear: in the section on irreparable harm). (*See* PI Mot. at 37-39.) This is not surprising. For Stein, there is no possible outcome of a recount that would cause her to win the statewide election in Pennsylvania for President of the United States. She received less than 1% of the Pennsylvania vote, and there is simply no conceivable way for any recanvass or recount to change the more than 2.8 million votes necessary for Stein to earn Pennsylvania's twenty electoral votes. Indeed, Stein herself has admitted that her aim is not to change the election result. *Supra*, at note 8.

As for Reitz, he has not identified *any* evidence—or, for that matter, even alleged—that his vote was not properly tabulated. On this record, there is simply no basis for concluding that either faces irreparable harm.

### C.   Plaintiffs' requested relief would seriously harm Intervenors.

Intervenors, Defendants, and all citizens of Pennsylvania face almost certain irreparable harm if a preliminary injunction is entered, as it would run the risk of preventing Pennsylvania from meeting state and federal deadlines for participating in the Electoral College.

As noted, the federal safe harbor requires Pennsylvania to certify its electors by December 13. *See* 3 U.S.C. § 5. State law requires the electors to vote on the federally scheduled date, December 19. *See* 25 P.S. § 3192. At this point, however, time is short, especially given the nature of the requested relief. The State would have just four days to put together a massive workforce capable of conducting the recounts in over 9,100 election districts, and oversee that the recount is conducted properly. This is not possible. And to order it creates the very real possibility of disenfranchising every Pennsylvania voter who exercised their right to vote on election day.

### D.   Granting an injunction would be contrary to the public interest.

The recount in question would also undermine confidence in Pennsylvania's elections, and force the State to pay potentially millions for a recount admittedly

undertaken for completely academic reasons. Perhaps Pennsylvania's courts would have concluded that Pennsylvania's laws required the State to bear those costs. Stein, however, made certain we would never find out; she and her allies aborted the state-law process before it was even concluded. But what is clear is that declining Plaintiffs' request now will save the State from wasting millions of dollars of taxpayer money, and thousands of hours of manpower, and will avoid the chaos that a hurried, last-minute recount would create. Indeed, it is difficult to emphasize enough the disruption an eleventh-hour recount order would cause to state electoral processes already underway. Most counties have already certified their election results. The rest will do so any day now. All must be completed by December 13, the critical federal safe-harbor deadline. A statewide recount would thwart that process, and virtually guarantee that the State would not certify its Presidential Electors by state and federal deadlines, and disenfranchising millions of voters who voted honestly this election.

At a minimum, the availability of state-court proceedings (even if Stein elected to bail out of them for strategic considerations) suggests that this Court should abstain from deciding this matter. It could do so under the *Younger* abstention doctrine, which applies where there are ongoing state proceedings that are judicial in nature, the state proceedings implicate important state interests, and the state proceedings afford an adequate opportunity to raise federal claims. *Port*

*Auth. Police Benev. Ass'n, Inc.*, 973 F.2d at 173.  Here, it is beyond dispute that Pennsylvania's regulation of its election process and an individual's right to vote is a state interest of great importance.  Additionally, the state-court election contest certainly afforded Plaintiffs sufficient opportunity to raise their constitutional claims.  Although Plaintiffs voluntarily discontinued the state election contest, abstention is nevertheless warranted because they had the ability to pursue remedies in that forum.  *See id.* at 174 ("One cannot escape *Younger* abstention by failing to assert remedies in a timely manner in state court."); *Huffman v. Pursue, Ltd.*, 420 U.S. 592 (1975) (*Younger* abstention appropriate where plaintiff sought injunctive relief in federal court rather than appealing state trial court judgment within the state system).  It is also warranted because Plaintiffs in effect are requesting this Court to stand in judgment of the Commonwealth Court's bond order.  *See Port Auth. Police Benev. Ass'n, Inc.*, 973 F.2d at 174 ("the federal courts must also generally abstain from reviewing the state court orders themselves, where the state provides an adequate forum for appellate review of all claims of a federal nature").

This Court could also abstain under the *Pullman* abstention doctrine, which applies in cases where a litigant asks a federal court to reach a constitutional question predicated on the federal court's own, non-binding interpretation of state law.  *Moore v. Sims*, 442 U.S. 415, 423 (1979).  Or, alternatively, the Court could

apply the *Burford* abstention doctrine, which is proper "where timely and adequate state-court review is available and (1) a case presents difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar, or (2) the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Caudill v. Eubanks Farms, Inc*., 301 F.3d 658, 660 (6th Cir. 2002). At the very least, the spirit of these doctrines—that federal courts not needlessly interfere with states' prerogatives—suggests that the Court's decision to stay its hand would advance the public interest.

*     *     *

Stein's law-defying efforts to enlist this Court's assistance in upsetting an election she could not possibly win prompts the question: What is the reason for Stein's request? We know it has nothing to do with changing the election's outcome. Stein did not win the State of Pennsylvania. Not by a longshot. She finished over 2.8 million votes behind the winner in the 2016 Presidential election.

Nor could her request have rested on ensuring the fairness and accuracy of Pennsylvania's presidential election. All available evidence indicates that the 2016 general election was not tainted by fraud or mistake.

So why is Stein seeking a recount? All we know for certain is that she is using it to line her pockets with funds donated from those she has scared into believing that Pennsylvania's electoral process was hijacked by nameless foreign entities. It would be bad enough if she were wasting only her own time and resources as part of her electoral farce. But she is also wasting millions of dollars in taxpayer money and calling into doubt Pennsylvania's ability to meet the deadline for certifying its electors in accordance with federal and state law.

With Stein having made the same demands in neighboring states as well, she threatened to put at risk confirmation of the entire election's outcome when Congress meets in January 2017. Ultimately, Stein cannot change the outcome of the presidential election. She apparently has no qualms, however, with creating chaos in her attempts to do so. Rejection of today's case should amount to the final blow to Stein's self-interested electoral odyssey.

## CONCLUSION

For these reasons, Intervenors respectfully request that this Court deny Plaintiffs' motion for a preliminary injunction and dismiss their Complaint with prejudice.

35

Respectfully submitted,

/s/ *Lawrence J. Tabas*
Lawrence J. Tabas, I.D. No. 27815
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA  19102
Phone: 215-665-3158
Email: lawrence.tabas@obermayer.com

/s/ *Rebecca L. Warren*
Rebecca L. Warren, I.D. No. 63669
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA  19102
Phone: 717-221-1602
Email: rebecca.warren@obermayer.com

*/s/ Chad Readler*
Chad A. Readler*
JONES DAY
325 John H. McConnell Blvd., Suite 600
Columbus, OH  43215
Phone: 614-469-3939
careadler@jonesday.com
* Admitted *pro hac vice*

*/s/ David M. Morrell*
David M. Morrell*
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001
Phone: (202) 879-3717 (direct)
Email: dmorrell@jonesday.com
*Admitted *pro hac vice*

Donald F. McGahn II (I.D. No. 73796)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001
Phone: (202) 879-3748 (direct)
Email: dmcgahn@jonesday.com


Dated:    December 8, 2016

# EXHIBIT B

<u>**IN T HE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA**</u>

<u>**CIVIL DIVISON**</u>

| | | |
|---|---|---|
| DELAWARE COUNTY REPUBLICAN | : | |
| EXECUTIVE COMMITTEE | : | ELECTION LAW |
| | | NO: |
| 323 West Front Street | : | |
| Media PA, 19063 | : | |
| V. | : | |
| | | |
| DELAWARE COUNTY | : | |
| BOARD OF ELECTIONS | : | |
| 201 West Front Street | : | |
| Media, PA 19063 | : | |

<u>**ORDER**</u>

**AND NOW,** to wit, this _____*4th*_____ day of November 2020, upon consideration of Petitioner's Emergency Petition or Relief Seeking Order Granting Access to Canvassing of Official Absentee Ballots and Mail-In Ballots, and the hearing held on November 4, 2020 wherein argument was heard from both Parties, it is hereby **ORDERED** and **DECREED** as follows:

1. Four Observers in total (2 observers from the Republican Party, or affiliated candidates, and 2 observers from the Democratic Party, or affiliated candidates,) are permitted to observe the resolution area at all hours while ballots are being resolved;

2. Two observers (1 representing the Republican Party, or affiliated candidates, and 1 representing the Democratic Party, or affiliated candidates,) are permitted to observe the sorting machine area at all times while the machine is in use. However, all observers shall stand back while the machine is in use due to safety concerns.

3. At two-hour intervals, two observers in total (1 representing the Republican Party, or affiliated candidates, and 1 representing the Democratic party, or affiliated candidates) are permitted to enter the ballot room, to examine the room; however, are not permitted to examine the physical ballots contained within the room, individually. They must be escorted by a member of the Election Board Staff with the time not to exceed five minutes each visit.

4. Any observer may not interference with the process, nor may any observer object to individual ballots.

By the Court:

JUDGE JOHN P. CAPUZZI, SR.

# EXHIBIT C

# Pennsylvania struggles with how — or if — to help voters fix their mail ballots

**T** inquirer.com/politics/election/pennsylvania-flawed-mail-ballots-cure-20201029.html

by Jonathan Lai, Updated: October 29, 2020



MARGO REED

Officials across Pennsylvania are trying to help voters fix mail ballots that would otherwise be disqualified because of technical mistakes in completing them, creating a patchwork of policies around how — or even whether — people are notified and given a chance to make their votes count.

Some counties are marking those ballots as received, the same as any other ballot, which gives voters no indication there's a problem. Some are marking them as canceled, as the state says to do, which sends voters warning emails and updates the online ballot status tool but doesn't notify voters without email addresses on file.

Still others try to reach voters directly, including by mail, phone, or email — and at least one county mails the actual flawed ballots back to voters.

The Pennsylvania Department of State, which oversees elections, provided some direction Sunday, telling counties to mark ballots as canceled if they have clear flaws, such as missing voters' signatures, or are "naked ballots" without the required inner secrecy envelopes. Those ballots have to be rejected when votes are counted beginning on Election Day.

But the state left it to counties to decide how aggressive to be in trying to contact voters to help them fix their ballots — or "cure" them, in election jargon. And some counties aren't planning to follow the state's instructions. Officials in Montgomery and Centre Counties, for example, won't cancel flawed ballots because they want voters to be able to fix them. Allegheny County mails flawed ballots right back to voters, never canceling them nor marking them in the system at all.

The state also fumbled how canceled ballots are handled in the system, which initially led to voters receiving emails with inaccurate information.

For Election Day reporting, analysis, and results (when we have 'em) out of Pennsylvania, sign up to get our PA 2020 newsletter.

Some elections officials described the state's new directions as flawed themselves, or as simply too late to implement.

"I don't think it's right for me to change the way we're recording ballots at this late date," said Forrest Lehman, elections director for Lycoming County in central Pennsylvania. "It was well-intentioned — they saw a problem and they tried to do something about it — but it's just too little, too late."

It's the latest challenge for a state that has had to quickly build the infrastructure for a massive vote-by-mail operation on top of an aging voter registry built two decades ago. Pennsylvania last year enacted a new law allowing any voter to use mail ballots, but the pandemic has fueled a massive surge in demand beyond anyone's expectations.

About 1% or 2% of mail ballots in U.S. elections are typically rejected, often because of signature problems or missed deadlines. The state Supreme Court ruled last week that ballots can't be rejected based on signatures that don't match what officials have on file, but votes will still be tossed if signatures are missing altogether.

It's hard to predict how many such flawed ballots there will be, especially with major public-education campaigns over the last few weeks. The issue of naked ballots, in particular, has drawn attention from national groups and celebrities trying to minimize the number of rejected votes.

As counties receive ballots, they scan the bar codes on the envelopes to mark them in the state's voter database. That's what powers the online status tracker and sends notification emails to voters. But defining ballots as flawed is complicated, especially because officials aren't allowed to "inspect" or open ballots until 7 a.m. on Election Day.

Does it count as "inspecting" an envelope to check whether a signature is present? Is it OK to set aside ballots that are clearly missing secrecy envelopes? And if counties want to help voters cure flawed ballots, how do they track those ballots? If they mark them as received,

voters are told their status is "vote recorded," even though that's not necessarily true. If they mark ballots as canceled, does that overstep what they're allowed to do before Election Day?

After counties sought guidance on flawed ballots from the Department of State, a top official there said counties should scan the flawed ballots as quickly as possible and mark them as canceled. That would trigger notification emails to voters "advising them that their ballot has been canceled, and they will also be informed that they may vote by provisional ballot on Election Day," wrote Jonathan Marks, the deputy secretary for elections and commissions.

That way, Marks wrote, "the voter has warning that their vote will not be counted unless they take further action."

But contrary to Marks' email, the notifications sent to voters didn't say they can use provisional ballots.

Advertisement

In Wyoming County, in Northeastern Pennsylvania, elections director Florence Kellett followed Marks' instructions Monday morning and scanned flawed ballots as canceled. Instead of clearing things up, the system incorrectly told voters their ballots couldn't be counted "due to voting at the polling place" — in other words, suggesting they had already voted in person.

Kellett soon began to receive calls from voters who were angry and confused, she said. When she told them they would have to use provisional ballots on Election Day, one said she's an out-of-town student. Another is undergoing chemotherapy in Philadelphia. They won't be able to return and cast their votes.

The Department of State quickly stopped the automated emails and updated them Tuesday morning to send the correct information, spokesperson Wanda Murren said.

"The Department will also continue to send out additional emails to voters falling in these codes to inform them of their option to vote by provisional ballot," she said.

The updated emails tell voters they "must take further action" for their votes to count.

"Don't miss your chance to vote," the emails say, "take action today!"

Counties are still handling flawed ballots differently. Some are going further than others to try to reach voters, and some counties aren't following Marks' directions to cancel ballots.

Philadelphia officials had been setting clearly flawed ballots aside for the last several weeks. This week, they are marking them as canceled and considering direct outreach to affected voters, <u>who can request replacement ballots</u> or use provisional ballots on Election Day. Delaware County officials had planned to reach out to voters to help them fix their ballots, but will now mark them canceled and rely on the state's notification emails to reach voters. Bucks County has been sending postcards to voters they can't reach by phone or email.

"We want to help everyone make sure their vote gets counted," said Gail Humphrey, chief clerk for Bucks County. "So we're going to take the extra effort to make sure that happens the best we can."

In Montgomery County, elections officials aren't marking flawed ballots in as canceled. Staffers are instead reaching out to voters to tell them they can come in and complete any missing information on their envelopes, request a replacement ballot, or use a provisional ballot.

"We're not accepting them, so they're not scanned in and we're not canceling them," said Lee Soltysiak, the county's chief operating officer and chief clerk of its elections board. "We're giving people the opportunity to cure."

Centre County also isn't canceling ballots, and is instead contacting by voters by mail, telling them their ballots are unsigned and to come in and sign them. And in Allegheny County, home to Pittsburgh, clearly flawed ballots "are being returned by mail to the voter with instructions on how to remedy," a spokesperson said. "They are not checked in as received."

Lehman, in Lycoming County, said he's not planning on canceling any of the flawed ballots. Canceling ballots and setting them aside is just too similar to the ballot processing procedures that aren't supposed to start until Election Day, he said.

"I also understand that by not doing it, these people won't be alerted at all," Lehman said. "But we don't have any good tools to do this in a way that alerts voters to a problem without a way that makes it seem like we're jumping the gun."

https://www.inquirer.com/politics/election/pennsylvania-flawed-mail-ballots-cure-20201029.html

© 2020 The Philadelphia Inquirer, LLC

# EXHIBIT D

# Some Pennsylvania counties offer second chances at mail-ballots, others do not

local21news.com/news/local/some-pennsylvania-counties-offer-second-chances-at-mail-ballots-others-do-not

by Ryan Eldredge

Thursday, October 15th 2020

Some Pennsylvania counties offer second chances at mail-ballots, others do not

Will you get a second chance if you made a mistake on a mail-in ballot?

Well, it may depend on where you live.

"We want every vote to count and so we're going to try and do everything we can to make that happen," said Lebanon County Election Director Michael Anderson.

In Lebanon County, a naked ballot or missed signature may not cost you your vote.

Anderson says if they have your contact info and notice a problem they'll try and get a hold of you.

"I only can speak for our county," says Anderson. "We are going to try to contact the individual, give them the opportunity to come in with the photo ID so they can prove they are who we are looking for. And try to get them to resolve that issue."

But in near-by Lancaster County, a naked ballot is dead in the water and no one will be reaching out if you forget a signature.

"There is a way in the state's computerized election system to mark them as received but not counted, to be set aside because they did not have a signature," says Lancaster County Commissioner Ray D'Agostino.

The disparity forced CBS 21 to send a few emails to the Department of State.

They tell us there is no "cure process" for naked ballots, but didn't reply when asked about the legality of contacting voters.

They also couldn't comment about what a county should do if a signature is missing.

A Supreme Court ruling says that naked ballots are to be discarded, but Lebanon County believes that only applies if the outer envelope is opened during canvassing.

"Could you get sued because of that or could you get sued because you try to fix it," says Anderson. "There was a no-win situation and that's why the board deliberated, went back-and-forth and made a decision to do what we're going to do."

Lancaster says that if you find your vote wasn't tallied you will be allowed to use a provisional ballot. We will continue to seek answers from the state.


MORE TO EXPLORE

STAY CONNECTED

# EXHIBIT E

# What Berks County voters need to know about mistakes with mail-in ballots

M pottsmerc.com/news/what-berks-county-voters-need-to-know-about-mistakes-with-mail-in-ballots/article_d5c9d2ad-3671-5c29-a814-5a68924c6ded.html

By Karen Shuey kshuey@readingeagle.com @KarenShueyRE on Twitter                    October 19, 2020



The introduction of widespread voting by mail in Pennsylvania has proved to be popular among voters due to safety concerns amid the coronavirus pandemic.

It has also created anxiety and confusion among voters and election officials.

Karen Barsoum, assistant director of Berks County Election Services, said Monday that the office is working to address concerns and problems that have emerged because of the new voting method.

For the most part, the challenges are due to human error.

"This is new to all of us," she said. "People are not used to this process, but I think this will get better. It's just going to take some time."

## Missing secrecy ballots

Some voters say they received ballots without a secrecy envelope that is inserted inside a second official election envelope. The Pennsylvania Supreme Court ruled last month that ballots without the secrecy envelope should be rejected.

Barsoum said the office has fielded a few calls about the missing envelopes shortly after the first batch of 60,000 ballots were sent to county voters.

She said she immediately contacted the Harrisburg firm hired to produce and mail the ballots, David A. Smith Printing, to see what happened and was told that a clerical error is likely to blame for the missing envelopes.

"They assured us that it was an anomaly," she said. "They said that putting together the ballot packages is a manual process and that they would be working hard to make sure that this would not happen again."

Barsoum said voters who have not received an envelope titled "Official Election Ballot" can call the elections office. The envelope can be mailed to voters or voters can pick it up at the office.

"We got about 10 calls from people who had this issue," she said. "So it does seem like an anomaly at this point and we have no reason to think otherwise."

Barsoum added that voters who forgot to put their ballot into the secrecy envelope before dropping it in the mail or misplaced the secrecy envelope still have time to correct the issue. She said they can stop by the election office to request a new secrecy envelope.

## Errors on the envelopes

Barsoum said the most prevalent problems election officials are finding are made on the second official election envelope. Those issues include filling out the voter declaration incorrectly and family members mixing up their envelopes.

She encouraged voters who make these mistakes and catch them before putting the ballots in the mail to correct the issue on their own. She instructed voters to use the same pen to cross out the incorrect information, write in the correct information and then initial the envelope.

"As soon as you spot a mistake, it will be much easier to take care of it at home before you drop it in the mail," she said. "We are getting so many ballots that it will be very difficult for us to try to find the ballot here so that you can make the corrections."

Barsoum said the state does have a system set up to give voters who make a mistake a second chance. Voters who provided an email on their application will be notified that their ballot was improperly completed.

"We are doing everything we can to make sure every ballot is counted," she said. "If there is a question or concern that something went wrong, people can call the office and we can check. We know people are very nervous about this."

## Inaccurate addresses

Another common reason voters are calling the election office is because they have yet to receive their ballots.

In many cases, those ballots are on their way. But in some it is a matter of voters having submitted inaccurate or outdated addresses.

Barsoum said there are typically two reasons why a ballot does not reach a voter. The first is that the voter signed up to be on the permanent mailed ballot request list in the spring but failed to update the system with a new address. The second is that the voter entered an incomplete address that might be missing an apartment number, she said.

Undeliverable ballots will also be flagged through the state system set up to give voters who make a mistake a second chance. Voters who provided an email on their application will be notified that their ballot could not be delivered.