# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DONALD J. TRUMP FOR
PRESIDENT, INC., *et al.*,

       Plaintiffs,

       v.

KATHY BOOCKVAR, *et al.*,

       Defendants,

NAACP-PENNSYLVANIA STATE
CONFERENCE, *et al.*,

       Intervenor-Defendants,

DNC SERVICES
CORPORATION/DEMOCRATIC
NATIONAL COMMITTEE,

       Intervenor-Defendant.

Civil Action

No.: 4:20-cv-02078-MWB

Hon. Matthew W. Brann

**UNPUBLISHED CASES CITED IN MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS BY INTERVENOR-DEFENDANTS NAACP-
PENNSYLVANIA STATE CONFERENCE, BLACK POLITICAL
EMPOWERMENT PROJECT, COMMON CAUSE PENNSYLVANIA,
LEAGUE OF WOMEN VOTERS OF PENNSYLVANIA, JOSEPH AYENI,
LUCIA GAJDA, STEPHANIE HIGGINS, MERIL LARA, RICARDO
MORALES, NATALIE PRICE, TIM STEVENS, AND TAYLOR STOVER**

| CASE | ATTACHMENT |
|------|------------|
| *Democratic National Committee v. Wisconsin State Legislature*, No. 20A66, --- S.Ct. ----, 2020 WL 6275871 (Oct. 26, 2020) | 1 |
| *Donald J. Trump for President, Inc v. Boockvar*, No. 2:20-cv-966, --- F.Supp.3d ----, 2020 WL 5997680 (W.D. Pa. Oct. 10, 2020) | 2 |
| *In Re Canvassing Observation Appeal of Donald J. Trump for President, Inc.*, No. 1094 C.D. 2020, 2020 WL 6551316 (Pa. Commw. Ct. Nov. 5, 2020) | 3 |
| *In Re Canvassing Observation Appeal of Donald J. Trump for President, Inc.*, Nos. 07003, (201107003), 2020 WL 6556823 (Pa. Ct. Com. Pl. Nov. 3, 2020) | 4 |
| *Warner v. Sun Ship LLC*, No. 11–7830, 2012 WL 1521866 (E.D. Pa. Apr. 30, 2012) | 5 |

# ATTACHMENT 1

2020 Daily Journal D.A.R. 11,532

2020 WL 6275871
Supreme Court of the United States.

DEMOCRATIC NATIONAL COMMITTEE, et al.

v.

WISCONSIN STATE LEGISLATURE, et al.

No. 20A66
|
October 26, 2020

**Opinion**

The application to vacate stay presented to Justice KAVANAUGH and by him referred to the Court is denied.

CHIEF JUSTICE ROBERTS, concurring in denial of application to vacate stay.

 **\*1**  In this case, as in several this Court has recently addressed, a District Court intervened in the thick of election season to enjoin enforcement of a State's laws. Because I believe this intervention was improper, I agree with the decision of the Seventh Circuit to stay the injunction pending appeal. I write separately to note that this case presents different issues than the applications this Court recently denied in *Scarnati* v. *Boockvar*, —— U.S. ——, ——, —— S.Ct. ——, ——, —— L.Ed.2d —— (2020) *ante*, at ——, 2020 WL 6128194and *Republican Party of Pennsylvania* v. *Boockvar*, —— U.S. ——, ——, —— S.Ct. ——, —— L.Ed.2d —— (2020) *ante*, at ——, 2020 WL 6304626. While the Pennsylvania applications implicated the authority of state courts to apply their own constitutions to election regulations, this case involves federal intrusion on state lawmaking processes. Different bodies of law and different precedents govern these two situations and require, in these particular circumstances, that we allow the modification of election rules in Pennsylvania but not Wisconsin.

Justice GORSUCH, with whom Justice KAVANAUGH joins, concurring in denial of application to vacate stay.

Weeks before a national election, a Federal District Judge decreed that Wisconsin law violates the Constitution by requiring absentee voters to return their ballots no later than election day. The court issued its ruling even though over 30 States have long enforced the very same absentee voting deadline—and for understandable reasons: Elections must end sometime, a single deadline supplies clear notice, and requiring ballots be in by election day puts all voters on the same footing. "Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections," and States have always required voters "to act in a timely fashion if they wish to express their views in the voting booth." *Burdick v. Takushi,* 504 U.S. 428, 433, 438, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992).

Why did the district court seek to scuttle such a long-settled tradition in this area? COVID. Because of the current pandemic, the court suggested, it was free to substitute its own election deadline for the State's. Never mind that, in response to the pandemic, the Wisconsin Elections Commission decided to mail registered voters an absentee ballot application and return envelope over the summer, so no one had to ask for one. Never mind that voters have also been free to seek and return absentee ballots since September. Never mind that voters may return their ballots not only by mail but also by bringing them to a county clerk's office, or various "no touch" drop boxes staged locally, or certain polling places on election day. Never mind that those unable to vote on election day have still other options in Wisconsin, like voting in-person during a 2-week voting period before election day. And never mind that the court itself found the pandemic posed an insufficient threat to the health and safety of voters to justify revamping the State's in-person election procedures.

 **\*2**  So it's indisputable that Wisconsin has made considerable efforts to accommodate early voting and respond to COVID. The district court's only possible complaint is that the State hasn't done *enough*. But how much is enough? If Wisconsin's statutory absentee voting deadline can be discarded on the strength of the State's status as a COVID "hotspot," what about the identical deadlines in 30 other States? How much of a "hotspot" must a State (or maybe some sliver of it) be before judges get to improvise? Then there's the question what these new ad hoc deadlines should be. The judge in this case tacked 6 days onto the State's election deadline, but what about 3 or 7 or 10, and what's to stop different judges choosing (as they surely would) different deadlines in different jurisdictions? A widely shared state policy seeking to make election day real would give way to a Babel of decrees. And what's to stop courts from tinkering with in-person voting rules too? This judge declined to go that far, but the plaintiffs thought he should have, and it's not hard to imagine other judges accepting invitations to unfurl the precinct maps and decide whether States should add polling places, revise their hours, rearrange the voting booths within

2020 Daily Journal D.A.R. 11,532

them, or maybe even supplement existing social distancing, hand washing, and ventilation protocols.

The Constitution dictates a different approach to these how-much-is-enough questions. The Constitution provides that state legislatures—not federal judges, not state judges, not state governors, not other state officials—bear primary responsibility for setting election rules. Art. I, § 4, cl. 1. And the Constitution provides a second layer of protection too. If state rules need revision, Congress is free to alter them. *Ibid.* ("The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations ... "). Nothing in our founding document contemplates the kind of judicial intervention that took place here, nor is there precedent for it in 230 years of this Court's decisions.

Understandably so. Legislators can be held accountable by the people for the rules they write or fail to write; typically, judges cannot. Legislatures make policy and bring to bear the collective wisdom of the whole people when they do, while courts dispense the judgment of only a single person or a handful. Legislatures enjoy far greater resources for research and factfinding on questions of science and safety than usually can be mustered in litigation between discrete parties before a single judge. In reaching their decisions, legislators must compromise to achieve the broad social consensus necessary to enact new laws, something not easily replicated in courtrooms where typically one side must win and the other lose.

Of course, democratic processes can prove frustrating. Because they cannot easily act without a broad social consensus, legislatures are often slow to respond and tepid when they do. The clamor for judges to sweep in and address emergent problems, and the temptation for individual judges to fill the void of perceived inaction, can be great. But what sometimes seems like a fault in the constitutional design was a feature to the framers, a means of ensuring that any changes to the status quo will not be made hastily, without careful deliberation, extensive consultation, and social consensus.

Nor may we undo this arrangement just because we might be frustrated. Our oath to uphold the Constitution is tested by hard times, not easy ones. And succumbing to the temptation to sidestep the usual constitutional rules is never costless. It does damage to faith in the written Constitution as law, to the power of the people to oversee their own government,

and to the authority of legislatures, for the more we assume their duties the less incentive they have to discharge them. Last-minute changes to longstanding election rules risk other problems too, inviting confusion and chaos and eroding public confidence in electoral outcomes. No one doubts that conducting a national election amid a pandemic poses serious challenges. But none of that means individual judges may improvise with their own election rules in place of those the people's representatives have adopted.

Justice KAVANAUGH, concurring in denial of application to vacate stay.

 *3  Approximately 30 States, including Wisconsin, require that absentee ballots be received by election day in order to be counted. Like most States, Wisconsin has retained that deadline for the November 2020 election, notwithstanding the COVID–19 pandemic. In advance of the November election, however, a Federal District Court in Wisconsin unilaterally changed the State's deadline for receipt of absentee ballots. Citing the pandemic, the court extended the deadline for receipt of absentee ballots by six days—from election day, November 3, to November 9, so long as the ballots are postmarked on or before election day, November 3.

The Seventh Circuit stayed the District Court's injunction, ruling that the District Court had violated this Court's precedents in two fundamental ways: first, by changing state election rules too close to an election; and second, by usurping the state legislature's authority to either keep or make changes to state election rules in light of the pandemic.

Applicants here ask that we vacate the Seventh Circuit's stay and reinstate the District Court's order extending the deadline for absentee ballots to be received in Wisconsin. The Court today denies the applications and maintains the Seventh Circuit's stay of the District Court's order. I agree with the Court's decision to deny the applications, and I write separately to explain why.

I

For three alternative and independent reasons, I conclude that the District Court's injunction was unwarranted.

*First*, the District Court changed Wisconsin's election rules too close to the election, in contravention of this Court's precedents. This Court has repeatedly emphasized that federal

courts ordinarily should not alter state election laws in the period close to an election—a principle often referred to as the *Purcell* principle. See *Purcell v. Gonzalez*, 549 U.S. 1, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006) (*per curiam*); see also *Merrill* v. *People First of Ala.*, ––– U.S. ––––, ––– S.Ct. ––––, ––– L.Ed.2d –––– (2020) *ante*, p. ––––, 2020 WL 6156545 *Merrill* v. *People First of Ala.*, ––– U.S. ––––, ––– S.Ct. ––––, ––– L.Ed.2d –––– (2020) *ante*, p. ––––, 2020 WL 6156545 (*Merrill II Merrill II*); *Andino v. Middleton*, ––– U.S. ––––, ––– S.Ct. ––––, ––– L.Ed.2d –––– (2020) *ante*, p. ––––, 2020 WL 5887393; *Merrill* v. *People First of Ala.*, 591 U. S. ––––, ––– S.Ct. ––––, ––– L.Ed.2d ––––, 2020 WL 3604049 (2020) (*Merrill I*); *Clarno* v. *People Not Politicians*, 591 U. S. ––––, ––– S.Ct. ––––, ––– L.Ed.2d ––––, 2020 WL 4589742 (2020); *Little* v. *Reclaim Idaho*, 591 U. S. ––––, 140 S.Ct. 2616, ––– L.Ed.2d –––– (2020); *Republican National Committee* v. *Democratic National Committee*, 589 U. S. ––––, 140 S.Ct. 1205, 206 L.Ed.2d 452 (2020) (*per curiam*) (*RNC*).

The Court's precedents recognize a basic tenet of election law: When an election is close at hand, the rules of the road should be clear and settled. That is because running a statewide election is a complicated endeavor. Lawmakers initially must make a host of difficult decisions about how best to structure and conduct the election. Then, thousands of state and local officials and volunteers must participate in a massive coordinated effort to implement the lawmakers' policy choices on the ground before and during the election, and again in counting the votes afterwards. And at every step, state and local officials must communicate to voters how, when, and where they may cast their ballots through in-person voting on election day, absentee voting, or early voting.

Even seemingly innocuous late-in-the-day judicial alterations to state election laws can interfere with administration of an election and cause unanticipated consequences. If a court alters election laws near an election, election administrators must first understand the court's injunction, then devise plans to implement that late-breaking injunction, and then determine as necessary how best to inform voters, as well as state and local election officials and volunteers, about those last-minute changes. It is one thing for state legislatures to alter their own election rules in the late innings and to bear the responsibility for any unintended consequences. It is quite another thing for a federal district court to swoop in and alter carefully considered and democratically enacted state election rules when an election is imminent.

**\*4** That important principle of judicial restraint not only prevents voter confusion but also prevents election administrator confusion—and thereby protects the State's interest in running an orderly, efficient election and in giving citizens (including the losing candidates and their supporters) confidence in the fairness of the election. See *Purcell*, 549 U.S., at 4–5, 127 S.Ct. 5; *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 197, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008) (plurality opinion). The principle also discourages last-minute litigation and instead encourages litigants to bring any substantial challenges to election rules ahead of time, in the ordinary litigation process. For those reasons, among others, this Court has regularly cautioned that a federal court's last-minute interference with state election laws is ordinarily inappropriate.

In this case, however, just six weeks before the November election and after absentee voting had already begun, the District Court ordered several changes to Wisconsin's election laws, including a change to Wisconsin's deadline for receipt of absentee ballots. Although the District Court's order was well intentioned and thorough, it nonetheless contravened this Court's longstanding precedents by usurping the proper role of the state legislature and rewriting state election laws in the period close to an election.

Applicants retort that the *Purcell* principle precludes an appellate court—such as the Seventh Circuit here—from overturning a district court's injunction of a state election rule in the period close to an election. That argument defies common sense and would turn *Purcell* on its head. Correcting an erroneous lower court injunction of a state election rule cannot itself constitute a *Purcell* problem. Otherwise, appellate courts could never correct a late-breaking lower court injunction of a state election rule. That obviously is not the law. To be sure, it would be preferable if federal district courts did not contravene the *Purcell* principle by rewriting state election laws close to an election. But when they do, appellate courts must step in. See, *e.g., Andino,* ––– U.S. ––––, ––– S.Ct. ––––, ––– L.Ed.2d ––––, *ante* p. ––––; *RNC*, 589 U. S., at ––––, 140 S.Ct., at 1207-1208.

*Second*, even apart from the late timing, the District Court misapprehended the limited role of the federal courts in COVID–19 cases. This Court has consistently stated that the Constitution principally entrusts politically accountable state legislatures, not unelected federal judges, with the responsibility to address the health and safety of the people during the COVID–19 pandemic.

The COVID–19 pandemic has caused the deaths of more than 200,000 Americans, and it remains a serious threat, including in Wisconsin. The virus poses a particular risk to the elderly and to those with certain pre-existing conditions. But federal judges do not possess special expertise or competence about how best to balance the costs and benefits of potential policy responses to the pandemic, including with respect to elections. For that reason, this Court's cases during the pandemic have adhered to a basic jurisprudential principle: When state and local officials " 'undertake[ ] to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad.' " *Andino,* — U.S., at —, — S.Ct., at —, *ante,* at 2 (KAVANAUGH, J., concurring in grant of application for stay). It follows "that a State legislature's decision either to keep or to make changes to election rules to address COVID–19 ordinarily 'should not be subject to second-guessing by an unelected federal judiciary, which lacks the background, competence, and expertise to assess public health and is not accountable to the people.' " *Ibid.* (some internal quotation marks omitted). As the Seventh Circuit rightly explained, "the design of electoral procedures is a legislative task," including during the pandemic. *Democratic National Committee* v. *Bostelmann,* 977 F.3d 639, — (2020).

**\*5**  Over the last seven months, this Court has stayed numerous federal district court injunctions that second-guessed state legislative judgments about whether to keep or make changes to election rules during the pandemic. See *Merrill II,* — U.S. —, — S.Ct. —, — L.Ed.2d —, *ante,* p. — *Merrill II,* — U.S. —, — S.Ct. —, — L.Ed.2d —, *ante,* p. —; *Andino,* — U.S. —, — S.Ct. —, — L.Ed.2d —, *ante,* p. —; *Merrill I,* 591 U.S. —, — S.Ct. —, — L.Ed.2d —; *Clarno,* 591 U.S. —, — S.Ct. —, — L.Ed.2d —; *Little,* 591 U.S.—, — S.Ct. —, — L.Ed.2d —; *RNC,* 589 U.S. —, 140 S.Ct. 1205, 206 L.Ed.2d 452.

To be sure, in light of the pandemic, some state legislatures have exercised their Article I, § 4, authority over elections and have changed their election rules for the November 2020 election. Of particular relevance here, a few States such as Mississippi no longer require that absentee ballots be received before election day. See, *e.g.,* Miss. Code Ann. § 23–15–637 (2020). Other States such as Vermont, by contrast, have decided not to make changes to their ordinary election-deadline rules, including to the election-day deadline for receipt of absentee ballots. See, *e.g.,* Vt. Stat. Ann., Tit. 17, § 2543 (2020). The variation in state responses reflects our constitutional system of federalism. Different state legislatures may make different choices. Assessing the complicated tradeoffs involved in changing or retaining election deadlines, or other election rules, in light of public health conditions in a particular State is primarily the responsibility of state legislatures and falls outside the competence of federal courts.

Applicants respond that this principle of deference to state legislatures applies only when a state legislature has affirmatively made some changes, but not others, to the election code in light of COVID–19. And they say that Wisconsin's legislature has not done so, unlike the South Carolina legislature in *Andino,* for example. But the Wisconsin State Legislature's decision *not* to modify its election rules in light of the pandemic is itself a policy judgment worthy of the same judicial deference that this Court afforded the South Carolina legislature in *Andino,* — U.S. —, — S.Ct. —, — L.Ed.2d —, *ante,* p. —. In short, state legislatures, not federal courts, primarily decide whether and how to adjust election rules in light of the pandemic.

*Third*, the District Court did not sufficiently appreciate the significance of election deadlines. This Court has long recognized that a State's reasonable deadlines for registering to vote, requesting absentee ballots, submitting absentee ballots, and voting in person generally raise no federal constitutional issues under the traditional *Anderson*-*Burdick* balancing test. See *Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983); *Burdick v. Takushi,* 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992).

To state the obvious, a State cannot conduct an election without deadlines. It follows that the right to vote is not substantially burdened by a requirement that voters "act in a timely fashion if they wish to express their views in the voting booth." *Burdick,* 504 U.S., at 438, 112 S.Ct. 2059. For the

2020 Daily Journal D.A.R. 11,532

same reason, the right to vote is not substantially burdened by a requirement that voters act in a timely fashion if they wish to cast an *absentee ballot*. Either way, voters need to vote on time. A deadline is not unconstitutional merely because of voters' "own failure to take timely steps" to ensure their franchise. 🔖 *Rosario v. Rockefeller,* 410 U.S. 752, 758, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973). Voters who, for example, show up to vote at midnight after the polls close on election night do not have a right to demand that the State nonetheless count their votes. Voters who submit their absentee ballots after the State's deadline similarly do not have a right to demand that the State count their votes.

**\*6** For important reasons, most States, including Wisconsin, require absentee ballots to be *received* by election day, not just *mailed* by election day. Those States want to avoid the chaos and suspicions of impropriety that can ensue if thousands of absentee ballots flow in after election day and potentially flip the results of an election. And those States also want to be able to definitively announce the results of the election on election night, or as soon as possible thereafter. Moreover, particularly in a Presidential election, counting all the votes quickly can help the State promptly resolve any disputes, address any need for recounts, and begin the process of canvassing and certifying the election results in an expeditious manner. See 🔖 3 U.S.C. § 5. The States are aware of the risks described by Professor Pildes: "[L]ate-arriving ballots open up one of the greatest risks of what might, in our era of hyperpolarized political parties and existential politics, destabilize the election result. If the apparent winner the morning after the election ends up losing due to late-arriving ballots, charges of a rigged election could explode." Pildes, How to Accommodate a Massive Surge in Absentee Voting, U. Chi. L. Rev. Online (June 26, 2020) (online source archived at www.supremecourt.gov). The "longer after Election Day any significant changes in vote totals take place, the greater the risk that the losing side will cry that the election has been stolen." *Ibid.*

One may disagree with a State's policy choice to require that absentee ballots be received by election day. Indeed, some States require only that absentee ballots be *mailed* by election day. See, *e.g.,* 🔖 W. Va. Code Ann. § 3–3–5(g)(2) (Lexis 2020). But the States requiring that absentee ballots be received by election day do so for weighty reasons that warrant judicial respect. Federal courts have no business disregarding those state interests simply because the federal courts believe that later deadlines would be better.

That constitutional analysis of election deadlines still applies in the pandemic. After all, during the pandemic, a State still cannot conduct an election without deadlines. And the States that require absentee ballots to be received by election day still have strong interests in avoiding suspicions of impropriety and announcing final results on or close to election night.

To be sure, more people are voting absentee during the pandemic. But the State of Wisconsin has repeatedly instructed voters to request and mail their ballots well ahead of time, and the State has taken numerous steps to accommodate the increased number of absentee ballots. Moreover, the State now has some experience to draw upon when administering an election during the pandemic. Wisconsin conducted primary elections in April and August, and has incorporated the lessons from those experiences into its extensive planning for the November election. See Wisconsin Elections Commission, April 7, 2020 Absentee Voting Report 24 (May 15, 2020) (online source archived at www.supremecourt.gov). And that planning has paid off so far: For the November election, more than a million Wisconsin voters have *already* voted by absentee ballot.

In attempting to justify the District Court's injunction, Applicants also rely on this Court's decision in April regarding the Wisconsin primary election. They claim that the Court there approved the District Court's change of the deadline for receipt of absentee ballots in the primary election, so long as the ballots were postmarked by election day. 🔖 *RNC,* 589 U. S. ——, 140 S.Ct. 1205, 206 L.Ed.2d 452. That assertion is incorrect. In that case, this Court explicitly stated that the District Court's last-minute extension of the deadline for receipt of absentee ballots was "not challenged in this Court." 🔖 *Id.,* at ——, 140 S.Ct., at 1206.

In sum, the District Court's injunction was unwarranted for three alternative and independent reasons: The District Court changed the state election laws too close to the election. It misapprehended the limited role of federal courts in COVID–19 cases. And it did not sufficiently appreciate the significance of election deadlines. [1]

## II

**\*7** The dissent rejects all three of the above conclusions and applies the ordinary 🔖 *Anderson*- 🔖 *Burdick* balancing test

for analyzing state election rules. In the dissent's view, the District Court permissibly concluded that the benefits of the State's deadline for receipt of absentee ballots are outweighed by the burdens of the deadline on voters. In light of the three alternative and independent conclusions outlined above, I do not think that we may conduct that kind of open-ended balancing test in this case. But even on its own terms, the dissent's balancing analysis is faulty, in my respectful view.

Start by considering the implications of the dissent's analysis. In reinstating the District Court's order extending Wisconsin's deadline for receipt of absentee ballots, the dissent's approach would necessarily invalidate (or at least call into question) the laws of approximately 30 States for the upcoming election and compel all of those States to accept absentee ballots received after election day. The dissent's *de facto* green light to federal courts to rewrite dozens of state election laws around the country over the next two weeks seems to be rooted in a belief that federal judges know better than state legislators about how to run elections during a pandemic. But over the last several months, this Court has consistently rejected that federal-judges-know-best vision of election administration.

The dissent does not fully come to grips with the destabilizing consequences of its analysis, saying that the facts may differ in other States. But the key facts underlying the District Court's injunction are similar in other States: the existence of the virus and its effects on election workers, voters, mail systems, and in-person voting. The dissent's claim that its reasoning would not necessarily invalidate the absentee-ballot deadlines of approximately 30 other States therefore rings hollow.

Turning to the dissent's balancing analysis, the dissent does not sufficiently appreciate the necessity of deadlines in elections, and does not sufficiently account for all the steps that Wisconsin has already taken to help voters meet those deadlines.

The dissent claims that the State's election-day deadline for receipt of absentee ballots will "disenfranchise" some Wisconsin voters. But that is not what a reasonable election deadline does. This Court has long explained that a State's election deadline does not disenfranchise voters who are capable of meeting the deadline but fail to do so. See *Rosario,* 410 U.S., at 757–758, 93 S.Ct. 1245. In other words, reasonable election deadlines do not "disenfranchise" anyone under any legitimate understanding of that term. And

the dissent cannot plausibly argue that the absentee-ballot deadline imposed—and still in place as of today—in most of the States is not a reasonable one. Those voters who disregard the deadlines or who fail to take the state-prescribed steps for meeting the deadlines may have to vote in person. But no one is disenfranchised by Wisconsin's reasonable and commonplace deadline for receiving absentee ballots. Indeed, more than *one million* Wisconsin voters have already requested, received, *and returned* their absentee ballots.

To help voters meet the deadlines, Wisconsin makes it easy to vote absentee and has taken several extraordinary steps this year to inform voters that they should request and return absentee ballots well before election day.

For starters, as the Seventh Circuit aptly noted, Wisconsin has "lots of rules" that "make voting easier than do the rules of many other states." *Luft v. Evers,* 963 F.3d 665, 672 (2020). Wisconsin law allows voters to vote absentee without an excuse, no questions asked. Wis. Stat. § 6.85 (2017–2018). Registered voters may request an absentee ballot by mail, e-mail, online, or fax. Wisconsin Elections Commission, Absentee Voting, https://elections.wi.gov/ voters/absentee.

**\*8** Since August, moreover, the Wisconsin Elections Commission has been regularly reminding voters of the need to act early so as to avoid backlogs and potential mail delays. See, *e.g.,* Wisconsin Elections Commission, Wisconsin Voting Deadlines and Facts for November 2020 (Aug. 20, 2020), http://elections.wi.gov/node/7039. In August and September, for example, Wisconsin's chief elections official explicitly urged voters not to wait to request a ballot: "It takes time for Wisconsin clerks to process your request. Then it may take up to seven days for you to receive your ballot in the mail. It can then take another seven days for your ballot to be returned by mail." Wisconsin Elections Commission, Wisconsin Mails Voting Information to Registered Voters (Sept. 3, 2020), http://elections.wi.gov/node/7077.

Perhaps most importantly, in early September, Wisconsin decided to leave little to chance and mailed every registered voter in the State who had not already requested an absentee ballot (2.6 million of Wisconsin's registered voters) an absentee ballot application, as well as information about how to vote absentee. *Ibid.*

Returning an absentee ballot in Wisconsin is also easy. To begin with, voters can return their completed absentee ballots by mail. But absentee voters who do not want

Case 4:20-cv-02078-MWB   Document 95-2   Filed 11/12/20   Page 10 of 101

to rely on the mail have several other options. Until election day, voters may, for example, hand-deliver their absentee ballots to the municipal clerk's office or other designated site, or they may place their absentee ballots in a secure absentee ballot drop box. Some absentee ballot drop boxes are located outdoors, either for drive-through or walk-up access, and some are indoors at a location like a municipal clerk's office. Memorandum from M. Wolfe, Administrator of the Wisconsin Elections Commission, et al. to All Wisconsin Election Officials (Aug. 19, 2020) (online source archived at www.supremecourt.gov). The Wisconsin Elections Commission has made federal grant money available to local municipalities to purchase additional absentee ballot drop boxes to accommodate expanded absentee voting.

Alternatively, absentee voters may vote "in-person absentee" beginning two weeks before election day. 🚩 *Wis. Stat. § 6.86(1)(b)*. A Wisconsin voter who votes "in-person absentee" fills out an absentee ballot in person at a municipal clerk's office or other designated location before election day. Some municipalities have created drive-up absentee voting sites to allow voters to vote "in-person absentee" without leaving their cars. See, *e.g.,* City of Madison Clerk's Office, In-Person Absentee Voting Hours and Locations (online source archived at www.supremecourt.gov).

Finally, on election day, a voter may drop off an absentee ballot at a polling place until 8:00 p.m. Memorandum from M. Wolfe, Administrator of the Wisconsin Elections Commission, to Wisconsin Municipal Clerks (Mar. 31, 2020) (online source archived at www.supremecourt.gov).

In sum, as the Governor of Wisconsin correctly said back in March as the COVID–19 crisis broke: "The good news is that absentee voting in Wisconsin is really easy." Marley, The Deadline to Request an Absentee Ballot in Wisconsin Is Friday. Here's How You Do It., Milwaukee Journal Sentinel, Mar. 13, 2020 (online source archived at www.supremecourt.gov).

The current statistics for the November election bear out the Governor's statement that absentee voting in Wisconsin is "really easy." In huge and unprecedented numbers, Wisconsin voters have already taken advantage of the State's generous absentee voting procedures for the November election. As of October 26, 2020, the Wisconsin Elections Commission has mailed 1,706,771 absentee ballots to Wisconsin voters. And it has already received back from voters 1,344,535 completed absentee ballots. Wisconsin Elections Commission, Absentee Ballot Report—November 3, 2020 General Election (Oct. 26, 2020), https://elections.wi.gov/node/7207.

**\*9** As those statistics suggest, the dissent's charge that Wisconsin has disenfranchised absentee voters is not tenable. As the Seventh Circuit explained, the "district court did not find that any person who wants to avoid voting in person on Election Day would be unable to cast a ballot in Wisconsin by planning ahead and taking advantage of the opportunities allowed by state law." *Bostelmann*, —— F. 3d, at ——.

The dissent insists, however, that "tens of thousands" and perhaps even 100,000 votes will not be counted if we do not reinstate the District Court's extension of the deadline. *Post*, at —— (opinion of KAGAN, J.). The District Court arrived at the same prediction, but it was a prediction, not a finding of fact. Indeed, the District Court did not include this prediction in the facts section of its opinion. 🔖 *Democratic National Committee* v. *Bostelmann*, —— F. Supp. 3d ——, 2020 WL 5627186 (WD Wis., Sept. 21, 2020). For its part, the dissent makes the same prediction by looking at the number of absentee ballots that arrived after the primary election day in April. But in the April primary, the received-by deadline had been extended to allow receipt of absentee ballots after election day. The dissent's statistic tells us nothing about how many voters might miss the deadline when voters know that the ballots must be received by election day. To take an analogy: How many people would file their taxes after April 15 if the filing deadline were changed to April 21? Lots. That fact tells us nothing about how many people would file their taxes after April 15 if the deadline remained at April 15.

The dissent also seizes on the fact that Wisconsin law allows voters to request absentee ballots until October 29, five days before election day. But the dissent does not grapple with the good reason why the State allows such late requests. The State allows those late requests for ballots because it wants to accommodate late requesters who still want to obtain an absentee ballot so that they can drop it off in person and avoid lines at the polls on election day. No one thinks that voters who request absentee ballots as late as October 29 can both receive the ballots and *mail* them back in time to be received by election day. As we stated in April, "even in an ordinary election, voters who request an absentee ballot at the deadline for requesting ballots ... will usually receive their ballots on the day before or day of the election." 🔖 *RNC,* 589 U. S., at ——, 140 S.Ct., at 1207. Rather, those late

requesters would, after receiving the ballots, necessarily have to drop their absentee ballots off in person at one of the designated locations. In short, Wisconsin provides an option to request absentee ballots until October 29 for voters who decide relatively late in the game that they would prefer to avoid lines at the polls on election day.

The dissent's October 29-based argument falls short for another reason as well: The dissent's approach would actually penalize Wisconsin for being too generous with its absentee voting regime. Under the dissent's theory, if Wisconsin had just set a *more restrictive* deadline for voters to request absentee ballots—say, two weeks before election day— there presumably would not be a constitutional problem with the State's election-day deadline for receipt of absentee ballots. But it makes little sense to penalize Wisconsin for accommodating voters and making it easier for them to vote absentee and avoid lines on election day.

 **\*10** The dissent's rhetoric of "disenfranchisement" is misplaced for still another reason. As the dissent uses that term, the dissent's own position would itself "disenfranchise" voters. What about voters who request an absentee ballot after October 29? What about voters who mail their ballots after November 3? What about voters who mail their ballots by November 3 but whose ballots arrive after November 9? Even if we reinstated the District Court's order as the dissent would have us do, those votes would not count. The dissent's position would itself therefore "disenfranchise" some voters, at least as the dissent uses the term. All of which simply shows that the dissent's rhetoric of disenfranchisement is mistaken.

The dissent responds that I am just disagreeing with the facts found by the District Court. Not so. I do not disagree with any of the relevant factual facts that the District Court found and that the dissent highlights. The dissent, for example, calls attention to the District Court's finding that nearly two million Wisconsin voters in this election are likely to request mail ballots. I agree. Indeed, the Wisconsin Elections Commission has already sent nearly that number of absentee ballots to voters who have requested them. The dissent notes that the influx of ballots has imposed a serious burden on some local election offices. I agree. The dissent points out that the District Court found that ballots can sometimes take two weeks to be sent and returned in light of Postal Service delays. I agree. The dissent highlights that the pandemic has gotten worse, not better, in Wisconsin over the last few weeks. I agree. And the dissent notes that the in-person voting option can pose a

health risk to elderly and ill voters. I agree; I am fully aware of and sensitive to that reality.

Contrary to the dissent's attempt to characterize our disagreement as factual, the facts in this case are largely undisputed. I have zero disagreement with the dissent on the question of whether COVID–19 is a serious problem. It is. Instead, I disagree with some of the District Court's and the dissent's speculative predictions about how the voting process might unfold with an election-day deadline for receipt of absentee ballots. And I disagree with the District Court's and the dissent's legal analysis of whether, given the agreed-upon facts, the State has done enough to protect the right to vote under the Constitution and this Court's precedents, given the necessity of having election deadlines.

In short, I agree with the dissent that COVID–19 is a serious problem. But you need deadlines to hold elections—there is just no wishing away or getting around that fundamental point. And Wisconsin's deadline is the same as that in 30 other States and is a reasonable deadline given all the circumstances.

To be clear, in every election a voter who requests an absentee ballot, particularly a voter who waits until the last moments to request an absentee ballot, might not receive a ballot in time to mail it back in, or in some cases may not receive a ballot until after election day. Or in some cases, a voter may mail a completed ballot, but it may get delayed and arrive too late to be counted. [2] Indeed, in 2012 and 2016, the States rejected more than 70,000 ballots in each election because the ballots missed the deadlines. U. S. Election Assistance Commission, 2012 Election Administration and Voting Survey 42 (2013); U. S. Election Assistance Commission, 2016 Election Administration and Voting Survey 11, 25 (2017). But moving a deadline would not prevent ballots from arriving after the newly minted deadline any more than moving first base would mean no more close plays. And more to the point, the fact that some ballots will be late in any system with deadlines does not make Wisconsin's widely used deadline facially unconstitutional. See *Crawford*, 553 U.S. at 202–203, 128 S.Ct. 1610.

 **\*11** Put another way, the relevant question is not whether any voter would ever miss the deadlines. After all, in every deadline case, the answer would always be yes, and no election deadline would ever be permissible. The proper question under the Constitution is whether the deadline is

reasonable under the circumstances. See *Rosario*, 410 U.S. at 760, 93 S.Ct. 1245. Again, Wisconsin's deadline is the same as that in about 30 other States for the November election and is reasonable, for the reasons I have explained.

In any event, if a Wisconsin voter does not receive an absentee ballot in time to cast it, the voter still has the option of voting in person. And Wisconsin, like many other States, demonstrated in the April and August primary elections that it can run an in-person election in a way that is reasonably safe for Wisconsin voters, with socially distanced lines, mask requirements, and sanitizing protocols. The District Court acknowledged that in-person voting can be done "safely" again in November "if the majority of votes are cast in advance, sufficient poll workers, polling places, and PPE are available, and social distancing and masking protocols are followed." *Bostelmann*, ---- F. Supp. 3d, at ----. If a voter requests a ballot at the last minute—long after the State has told voters that they should request ballots—and if that voter does not receive a ballot by election day, the voter still has the option of voting in person. That said, the better option, as Wisconsin has repeatedly announced, is for voters who wish to vote absentee to request and submit their ballots well ahead of time. That is what tens of millions of voters across America —including more than one million voters in Wisconsin— have already done.

\* \* \*

For those reasons, I concur in the denial of the applications to vacate the stay.

Justice KAGAN, with whom Justice BREYER and Justice SOTOMAYOR join, dissenting.

In April, residents of Wisconsin voted in presidential primaries. That election was one of the first during the COVID–19 pandemic, which has turned in-person voting (with its often-long lines, touch screens, and enclosed booths) into a health risk, especially for older and less healthy Americans. Given these emergency conditions, a district judge directed the State to accept mail ballots received in the six days after the polls closed. That extension of Wisconsin's ballot-receipt deadline ensured that COVID-related delays in the delivery and processing of mail ballots would not disenfranchise citizens fearful of voting in person. Because of the court's ruling, state officials counted 80,000 ballots— about five percent of the total cast—that were postmarked by Election Day but would have been discarded for arriving a few days later.

Today, millions of Wisconsin citizens are preparing to vote in the November election. But COVID is not over. In Wisconsin, the pandemic is much worse—more than 20 times worse, by one measure—than it was in the spring: The State's health department now reports a weekly average of 3,879 cases per day, compared to 175 per day when the April election took place. See Wisconsin Department of Health Services, COVID–19: Wisconsin Cases (Oct. 26, 2020), www.dhs.wisconsin.gov/covid-19/cases.htm. Indeed, Wisconsin is one of the hottest of all COVID hotspots in the Nation. So rather than vote in person, many Wisconsinites will again choose to vote by mail. State election officials report that 1.7 million people—about 50 percent of Wisconsin's voters—have already asked for mail ballots. And more are expected to do so, because state law gives voters until October 29, five days before Election Day, to make that request.

**\*12** To ensure that these mail ballots are counted, the district court ordered in September the same relief afforded in April: a six-day extension of the receipt deadline for mail ballots postmarked by Election Day. The court supported that order with specific facts and figures about how COVID would affect the electoral process in Wisconsin. See *Democratic National Committee* v. *Bostelmann*, ---- F. Supp. 3d ----, ---- – ----, ---- – ----, 2020 WL 5627186, \*6–\*7, \*9–\*10, \*21 (W.D. Wis., Sept. 21, 2020). The court found that the surge in requests for mail ballots would overwhelm state officials in the weeks leading up to the October 29 ballot-application deadline. And it discovered unusual delays in the United States Postal Service's delivery of mail in the State. The combination of those factors meant, as a high-ranking elections official testified, that a typical ballot would take a full two weeks "to make its way through the mail from a clerk's office to a voter and back again"—even when the voter instantly turns the ballot around. *Id.*, at ----, n. 10, 2020 WL 5627186, \*5, n. 10. Based on the April election experience, the court determined that many voters would not even *receive* mail ballots by Election Day, making it impossible to vote in that way. And as many as 100,000 citizens would not have their votes counted—even though timely requested and postmarked—without the six-day extension. (To put that number in perspective, a grand total of 284 Wisconsin mail ballots were not counted in the 2016 election. [1] ) In the court's view, the discarding of so many

properly cast ballots would severely burden the constitutional right to vote. The fit remedy was to create a six-day grace period, to allow those ballots a little extra time to arrive in the face of unprecedented administrative and delivery delays.

But a court of appeals halted the district court's order, and today this Court leaves that stay in place. I respectfully dissent because the Court's decision will disenfranchise large numbers of responsible voters in the midst of hazardous pandemic conditions.

## I

Start with this fact: The court of appeals did not dispute any of the district court's careful findings about the effect of COVID on voting in Wisconsin. The appellate court did not question the health risks—now increasing daily—of in-person voting in the State, especially to senior citizens and those with some pre-existing conditions. [2] It did not deny that, because of those dangers, state election offices will be swamped until the end of October by timely mail-ballot applications. It did not contest that backlogs in those offices, combined with unusual delays in mail delivery, will prevent tens of thousands of Wisconsinites—through no fault of their own—from successfully casting a mail ballot. Nor did the appellate court express doubt that disenfranchisement of that kind, and on that scale, imposes a severe burden on the right to vote. See generally *Burdick v. Takushi*, 504 U.S. 428, 434, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). In fact, the court never even addressed the constitutional issue.

How could that be? In the appellate court's view, this Court's decision in *Purcell v. Gonzalez*, 549 U.S. 1, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006) (*per curiam*), prohibited the district court from modifying Wisconsin's election rules so close to (*i.e.*, six weeks before) Election Day. See *Democratic National Committee v. Bostelmann*, ---- F. 3d ----, ---- – ----, 2020 WL 5951359, *1–*2 (C.A.7, Oct. 8, 2020) (*per curiam*); see also *ante*, at ---- – ---- (KAVANAUGH, J., concurring). But that is a misunderstanding of *Purcell*'s message. In fixating on timing alone, the court of appeals went astray.

The Court in *Purcell* considered an appellate decision reversing a district court's refusal to enjoin a voter identification law shortly before an election. We vacated the

decision because the court of appeals—much like the one here —failed to "give deference to [a district court's] discretion" in assessing the propriety of injunctive relief. 549 U.S., at 5, 127 S.Ct. 5. In doing so, we briefly addressed how to "weigh" whether an injunction of an election rule should issue. *Id.*, at 4, 127 S.Ct. 5. A court, we counseled, must balance the "harms attendant upon issuance or nonissuance of an injunction," together with "considerations specific to election cases" that may affect "the integrity of our electoral processes." *Ibid.* Among those election-specific factors, we continued, was the potential for a court order, especially close to Election Day, to "result in voter confusion and consequent incentive to remain away from the polls." *Id.*, at 4–5, 127 S.Ct. 5.

***13** That statement, as the dissent below saw, "articulated not a rule but a caution." —— F. 3d, at ——, 2020 WL 5951359, *4 (Rovner, J., dissenting). Last-minute changes to election processes may baffle and discourage voters; and when that is likely, a court has strong reason to stay its hand. But not every such change poses that danger. And a court must also take account of other matters—among them, the presence of extraordinary circumstances (like a pandemic), the clarity of a constitutional injury, and the extent of voter disenfranchisement threatened. At its core, *Purcell* tells courts to apply, not depart from, the usual rules of equity. See, *e.g.*, *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) ("In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief" (internal quotation marks omitted)). And that means courts must consider all relevant factors, not just the calendar. Yes, there is a danger that an autumn injunction may confuse voters and suppress voting. But no, there is not a moratorium on the Constitution as the cold weather approaches. Remediable incursions on the right to vote can occur in September or October as well as in April or May.

And so the district court rightly held here. It is hard to see how the extension of a ballot-receipt deadline could confuse citizens about how to vote: At worst, a voter not informed of the new deadline would (if she could) put her ballot in the mail a few days earlier than needed. Nor would that measure discourage Wisconsin citizens from exercising their right to the franchise. To the contrary, it would prevent the State from throwing away the votes of people actively participating in the

democratic process. And what will undermine the "integrity" of that process is not the counting but instead the discarding of timely cast ballots that, because of pandemic conditions, arrive a bit after Election Day. *Purcell*, 549 U.S., at 4, 127 S.Ct. 5.[3] On the scales of both constitutional justice and electoral accuracy, protecting the right to vote in a health crisis outweighs conforming to a deadline created in safer days.

Indeed, I see no more apt time for the district court to have issued its injunction than when it did. The court of appeals insisted that the injunction would better have come in May, a half-year before Election Day; then, the court said, the order "could not be called untimely." — F. 3d, at ——, 2020 WL 5951359, *2. But "untimely" can mean too early as well as too late. And a May order could have been premature, perhaps even foolishly so. At that time, the district court could not have known the course COVID would take. Cf. *FDA v. American College of Obstetricians & Gynecologists*, — U.S ——, — S.Ct. ——, — L.Ed.2d —— (2020) *ante*, p. ——, 2020 WL 5951467 (instructing a district court to consider whether pandemic conditions have changed enough to warrant modifying an injunction). Nor could the court have known about the current ability of Wisconsin election offices or the Postal Service to handle increased demand for mail ballots. (Doubts about the Postal Service's delivery performance, for example, did not arise until August.) In waiting until late September, the district court resolved to base its ruling on concrete evidence—not on unfounded speculation.

And without *Purcell*, not much is left in the appellate court's opinion to justify its stay. That court separately argued that "the design of electoral procedures" is a solely "legislative task." — F. 3d, at ——, 2020 WL 5951359, *2; see also *ante*, at —— – —— (KAVANAUGH, J., concurring). But that is not so when those procedures infringe the constitutionally enshrined right to vote. See, *e.g.*, *Anderson v. Celebrezze*, 460 U.S. 780, 786, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) (invalidating a state filing deadline); *Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 666, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (invalidating a state poll tax); *Reynolds v. Sims*, 377 U.S. 533, 568, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (invalidating state districting maps). To be sure, deference is usually due to a legislature's decisions about how best to manage the COVID pandemic. See *South Bay Pentecostal Church v.*

*Newsom*, 590 U. S. ——, ——, 140 S.Ct. 1613, 1613-1614, 207 L.Ed.2d 154 (2020) (ROBERTS, C. J., concurring in denial of application for injunctive relief). But the Wisconsin legislature has not for a moment considered whether recent COVID conditions demand changes to the State's election rules; that body has not even met since April. Compare Litke, Fact Check: Wisconsin Legislators Have Gone About 6 Months Without Passing a Bill, USA Today, Oct. 7, 2020 (online source archived at www.supremecourt.gov) ("Wisconsin lawmakers have been among the least active in the country, according to a database of all COVID-related legislation across the country maintained by the National Conference of State Legislatures"), with *Andino v. Middleton*, — U.S. ——, — S.Ct. ——, — L.Ed.2d —— (2020) *ante*, p. ——, 2020 WL 5887393 (staying an order enjoining South Carolina's witness requirement for mail ballots when that rule was part of a legislative package to adjust voting procedures in response to COVID). And if there is one area where deference to legislators should not shade into acquiescence, it is election law. For in that field politicians' incentives often conflict with voters' interests—that is, whenever suppressing votes benefits the lawmakers who make the rules.

## II

**\*14** Justice KAVANAUGH's concurring opinion goes further than the court of appeals. Rather than relying on *Purcell* and deference alone, he also concludes that Wisconsin's election rules, as applied during the COVID pandemic, do not violate the right to vote. See *ante*, at —— – ——. That follows, in his view, because voting by mail is "easy" in Wisconsin and because in-person voting is "reasonably safe." *Ante*, at ——, ——, ——.[4] (In another concurrence, Justice GORSUCH agrees. *Ante*, at —— – ——.)

The first problem with that reasoning is that the district court found to the contrary. As this Court constantly states, a district court has the greatest familiarity with the facts in a case, because it oversees the development and presentation of evidence. See, *e.g.*, *Purcell*, 549 U.S., at 5, 127 S.Ct. 5; see also Fed. Rule Civ. Proc. 52(a). That is why the court of appeals rightly did not question any of the lower court's findings. See *supra*, at ——. And why the concurrence is wrong to take a different tack.

Recall that the district court's findings include the following. See *supra*, at —— ——. The COVID pandemic has been getting worse and worse in Wisconsin. And as the State has "broken numerous new case records," in-person voting—according to credible expert testimony—creates a "significant [health] risk," especially for older and sicker citizens. —— F. Supp. 3d, at —— – ——, 2020 WL 5627186, *9–*10. For that reason, Wisconsinites have turned to the mails. According to the state elections commission, close to 2 million people are likely to request mail ballots. See *id.*, at ——, 2020 WL 5627186, *9. (That is about double the number of already-returned ballots that the concurrence chooses to emphasize. See *ante*, at ——, ——, ——.) State election offices have not received the resources they need to deal with that influx of applications, and severe administrative backlogs have therefore developed. See —— F. Supp. 3d, at ——, 2020 WL 5627186, *9. Postal Service delays, detailed by both state and federal officials, compound the risk that voters will be unable to return timely requested mail ballots by Election Day. See *ibid.* And if a voter discovers on Election Day that her mail ballot has not yet arrived, Wisconsin law prevents her from voting in person—even assuming she would undertake the risk. See Wis. Stat. § 6.86(6). All these facts would mean, as the chair of the Wisconsin Elections Commission testified, that many thousands of timely requested and postmarked votes—potentially into the six-figure range—would not be counted without a short extension of the ballot-receipt deadline. See —— F. Supp. 3d, at ——, 2020 WL 5627186, *21; Electronic Case Filing in No. 3–20–cv–459, Doc. 299 (WD Wis.), p. 9.

**\*15** The concurrence fails to give those findings the respect they are due. Of course, the concurrence *says* it is not committing that elementary error; according to Justice KAVANAUGH, he disputes only the district court's "speculative predictions," not its statement of "historical facts." *Ante*, at —— – ——. But the concurrence alternately rejects, ignores, or accepts only *pro forma* the district court's account of the facts (just the facts). In responding to this dissent, the concurring opinion acknowledges that in-person voting in Wisconsin "can pose a health risk." *Ante*, at ——. Yet in condemning the injunction, it continues to insist— how else could it reach the decision it does?—that going to the polls is "reasonably safe" for Wisconsin's citizens, contrary to the expert testimony the district court relied on. *Ante*, at ——. Similarly, the concurrence nods glancingly to increased ballot applications, see *ante*, at ——, but it

fails to recount (as the district court did in detail) how that influx has created heavy backlogs and prevented ballots from issuing in timely fashion. And it does not discuss the evidence of unusual, even unprecedented, delays in postal delivery service in Wisconsin. In short, the concurrence refuses to engage with the core of the analysis supporting the district court's injunction: that a veritable tsunami (in the form of a pandemic) has hit Wisconsin's election machinery, and disrupted all its usual mail ballot operations. And as to the supposedly "speculative prediction" that without the ballot-receipt extension as many as 100,000 timely cast mail votes would go uncounted? That estimate itself derived from the factual findings just listed, along with the credible testimony of the elections commission's chair—all matters indisputably entitled to deference from an appellate tribunal. Those findings, and not the concurrence's substitute facts purporting to show that voting in Wisconsin is safe and easy, should properly ground today's decision.[5]

A related flaw in the concurring opinion is how much it reasons from normal, pre-pandemic conditions. Cf. *Republican National Committee* v. *Democratic National Committee*, 589 U. S. ——, ——, 140 S.Ct. 1205, 1210, 206 L.Ed.2d 452 (2020) (Ginsburg, J., dissenting) ("The Court's suggestion that the current situation is not substantially different from an ordinary election boggles the mind") (internal quotation marks omitted). A "reasonable election deadline," the concurrence says, "does not disenfranchise voters." *Ante*, at ——. I have no argument with that statement, even though some voters may overlook the deadline. See *Rosario v. Rockefeller*, 410 U.S. 752, 757–758, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973). But what is "reasonable" in one set of circumstances may become unreasonable in another. And when that switch occurs, a constitutional problem arises. So it matters not that Wisconsin could apply its ballot-receipt deadline when ballots moved rapidly through the mails and people could safely vote in person. At *this* time, neither condition holds—again, according to the district court's eminently believable findings. Today, mail ballots often travel at a snail's pace, and the elderly and ill put themselves in peril if they go to the polls. So citizens—thousands and thousands of them—who have followed all the State's rules still cannot cast a successful vote. And because that is true, the ballot-receipt deadline that once survived constitutional review no longer does.[6]

That deadline, contrary to Justice KAVANAUGH's view, now disenfranchises Wisconsin citizens—however much he

objects to applying that term here. Far from using the word "rhetoric[ally]," *ante*, at ——, I mean it precisely. During COVID, the State's ballot-receipt deadline and the Court's decision upholding it disenfranchise citizens by depriving them of their constitutionally guaranteed right to vote. Because the Court refuses to reinstate the district court's injunction, Wisconsin will throw out thousands of timely requested and timely cast mail ballots. And today's decision does not stand alone. In other recent cases as well, the Court has halted injunctions necessary for people to cast ballots safely. See *Merrill* v. *People First of Ala.*, —— U.S. ——, —— S.Ct. ——, —— L.Ed.2d —— (2020) *ante*, p. ——, 2020 WL 6156545 *Merrill v. People First of Ala.*, —— U.S. ——, —— S.Ct. ——, —— L.Ed.2d —— (2020) *ante*, p. ——, 2020 WL 6156545; *Merrill* v. *People First of Ala.*, 591 U. S. ——, —— S.Ct. ——, —— L.Ed.2d ——, 2020 WL 3604049 (2020); *Republican National Committee*, 589 U.S. ——, 140 S.Ct. 1205, 206 L.Ed.2d 452.[7] As the COVID pandemic rages, the Court has failed to adequately protect the Nation's voters.

*16  * * *

For all these reasons, I would vacate the court of appeals' stay. The facts, as found by the district court, are clear: Tens of thousands of Wisconsinites, through no fault of their own, may receive their mail ballots too late to return them by Election Day. Without the district court's order, they must opt between "brav[ing] the polls," with all the risk that entails, and "los[ing] their right to vote." *Republican National Committee*, 589 U. S., at ——, 140 S.Ct., at 1211 (Ginsburg, J., dissenting). The voters of Wisconsin deserve a better choice.

**All Citations**

--- S.Ct. ----, 2020 WL 6275871 (Mem), 2020 Daily Journal D.A.R. 11,532

---

## Footnotes

1    A *federal court's* alteration of state election laws such as Wisconsin's differs in some respects from a *state court's* (or state agency's) alteration of state election laws. That said, under the U. S. Constitution, the state courts do not have a blank check to rewrite state election laws for federal elections. Article II expressly provides that the rules for Presidential elections are established by the States "in such Manner as the *Legislature* thereof may direct." § 1, cl. 2 (emphasis added). The text of Article II means that "the clearly expressed intent of the legislature must prevail" and that a state court may not depart from the state election code enacted by the legislature. *Bush v. Gore*, 531 U.S. 98, 120, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) (Rehnquist, C. J., concurring); see *Bush v. Palm Beach County Canvassing Bd.*, 531 U.S. 70, 76–78, 121 S.Ct. 471, 148 L.Ed.2d 366 (2000) (*per curiam*); *McPherson v. Blacker*, 146 U.S. 1, 25, 13 S.Ct. 3, 36 L.Ed. 869 (1892). In a Presidential election, in other words, a state court's "significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush v. Gore*, 531 U.S. at 113, 121 S.Ct. 525 (Rehnquist, C. J., concurring). As Chief Justice Rehnquist explained in *Bush v. Gore*, the important federal judicial role in reviewing state-court decisions about state law in a federal Presidential election "does not imply a disrespect for state *courts* but rather a respect for the constitutionally prescribed role of state *legislatures*. To attach definitive weight to the pronouncement of a state court, when the very question at issue is whether the court has actually departed from the statutory meaning, would be to abdicate our responsibility to enforce the explicit requirements of Article II." *Id., at 115*, 121 S.Ct. 525. The dissent here questions why the federal courts would have a role in that kind of case. *Post*, at ——, n. 6 (opinion of KAGAN, J.). The answer to that question, as the unanimous Court stated in *Bush* v. *Palm Beach*

*County Canvassing Bd.*, and as Chief Justice Rehnquist persuasively explained in 🔖 *Bush* v. *Gore*, is that the text of the Constitution requires federal courts to ensure that state courts do not rewrite state election laws.

2      In Wisconsin, a voter can track his or her ballot online. MyVote Wisconsin, Track My Ballot, https://myvote.wi.gov/en-us/TrackMyBallot. If a voter is concerned that the ballot may not be received in time, the voter can cancel the absentee ballot and request a new one or vote in person, as long as the voter meets the deadlines set by the municipality for doing so, which typically fall a few days before election day. Memorandum from M. Wolfe, Administrator of the Wisconsin Elections Commission, to Wisconsin County Clerks et al. (Oct. 19, 2020) (online source archived at www.supremecourt.gov).

1      See U. S. Election Assistance Commission, 2016 Election Administration and Voting Survey 25.

2      See C. Cotti, B. Engelhardt, J. Foster, E. Nesson, & P. Niakamp, The Relationship Between In-Person Voting and COVID–19: Evidence From the Wisconsin Primary, NBER Working Paper No. 27187, p. 11 (rev. Oct. 2020) ("Across all models, we find an increase in the positive share of COVID–19 cases in the weeks following the election in counties that had more in-person votes per voting location, all else equal").

3      Justice KAVANAUGH alleges that "suspicions of impropriety" will result if "absentee ballots flow in after election day and potentially flip the results of an election." *Ante*, at ——. But there are no results to "flip" until all valid votes are counted. And nothing could be more "suspicio[us]" or "improp[er]" than refusing to tally votes once the clock strikes 12 on election night. To suggest otherwise, especially in these fractious times, is to disserve the electoral process.

4      Oddly, the concurrence suggests that no change in the State's ballot-receipt deadline is needed because Wisconsin has "incorporated the lessons" from April's primary "into its extensive planning for the November election." *Ante*, at ——. But the April election was conducted under the same extended deadline that the Court today precludes. See *supra*, at ——. One might have thought the April election's principal lesson is that a slightly altered ballot-receipt deadline can save thousands of timely cast mail ballots from the garbage bin.

5      Note as well that nothing rides on the exactness of the district court's estimate. Suppose that without the ballot-receipt extension, only (only?) half as many votes would be discarded as the district court thought. The court's decision would have remained the same, and so too everything I say here. But as for the concurrence? Who can know? Justice KAVANAUGH does not reveal how many uncounted votes he thinks would violate the Constitution. Nor does he suggest how many votes short of that level will be discarded because of the Court's decision today.

6      The concurrence is wrong to view that conclusion as casting doubt on all similar deadlines in all other States. See *ante*, at ——. The district court rested its constitutional judgment, as I would too, on a confluence of factors: COVID conditions in Wisconsin, the scarce time between the State's ballot-application and ballot-receipt deadlines, evidence about in-state mail delivery and the administrative capacity of state election offices. See *supra*, at —— – ——, —— – ——. In another State with all the same facts, the same result should obtain. But in another State with different facts—say, a less intense outbreak of COVID, an earlier ballot-application deadline, faster mail delivery, and better staffed and funded election offices—the constitutional analysis should come out a different way.

7      At the same time that Justice KAVANAUGH defends this stance by decrying a "federal-judges-know-best vision of election administration," *ante*, at ——, he calls for *more* federal court involvement in "reviewing state-court decisions about state [election] law," *ante*, at ——, n. 1. It is hard to know how to reconcile those two views about the federal judiciary's role in voting-rights cases. Contrary to Justice KAVANAUGH's attempted explanation, neither the text of the Elections Clause nor our precedent interpreting it leads to his inconstant approach. See 🔖 *Arizona State Legislature* v. *Arizona Independent Redistricting Comm'n*, 576 U.S. 787, 817–818, 135 S.Ct. 2652, 192 L.Ed.2d 704 (2015); 🔖 *Smiley* v. *Holm*, 285 U.S. 355, 372, 52 S.Ct. 397, 76 L.Ed. 795 (1932).

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# ATTACHMENT 2

2020 WL 5997680
Only the Westlaw citation is currently available.
United States District Court, W.D. Pennsylvania.

DONALD J. TRUMP FOR
PRESIDENT, INC., et al., Plaintiffs

v.

Kathy BOOCKVAR, in her capacity
as Secretary of the Commonwealth
of Pennsylvania, et al., Defendants.

No. 2:20-cv-966
|
Signed 10/10/2020

**Attorneys and Law Firms**

Ronald L. Hicks, Jr., Carolyn Batz McGee, Jeremy A. Mercer, Russell D. Giancola, Devin A. Winklosky, Porter Wright Morris & Arthur LLP, Pittsburgh, PA, Justin R. Clark, Pro Hac Vice, Matthew Earl Morgan, Pro Hac Vice, Elections LLC, Washington, DC, for Plaintiffs.

Daniel T. Donovan, Pro Hac Vice, Caroline Darmody, Pro Hac Vice, Kristen Leigh Bokhan, Michael Glick, Pro Hac Vice, Susan Marie Davies, Pro Hac Vice, Kirkland & Ellis LLP, Washington, DC, Howard G. Hopkirk, Karen Mascio Romano, Keli Marie Neary, Pro Hac Vice, Nicole Boland, Pro Hac Vice, Stephen Moniak, Pennsylvania Office of Attorney General, Kathleen M. Kotula, Kenneth L. Joel, M. Abbegael Giunta, Governor's Office of General Counsel, Timothy Gates, Pennsylvania Department of State Office of Chief Counsel, Harrisburg, PA, Daniel T. Brier, Donna A. Walsh, John B. Dempsey, Nicholas F. Kravitz, Pro Hac Vice, Myers, Brier & Kelly, LLP, Scranton, PA, Jaywin Singh Malhi, Pro Hac Vice, Madelyn Morris, Sara S. Tatum, Kirkland & Ellis LLP, New York, NY, for Defendant Kathy Boockvar.

Molly R. Mudd, Pro Hac Vice, County of Adams, Gettysburg, PA, for Defendant Adams County Board of Elections.

Andrew F. Szefi, Allan J. Opsitnick, George M. Janocsko, Allegheny County Law Department, Pittsburgh, PA, for Defendant Allegheny County Board of Elections.

Steven B. Silverman, Molly E. Meacham, Sean R. Keegan, Andrew Degory, Babst, Calland, Clements and Zomnir, P.C., Pittsburgh, PA, Elizabeth A. Dupuis, Babst Calland, State College, PA, for Defendants Armstrong County Board of Elections, Bedford County Board of Elections, Centre County Board of Elections, Columbia County Board of Elections, Fayette County Board of Elections, Indiana County Board of Elections, Lackawanna County Board of Elections, Lebanon County Board of Elections, Montour County Board of Elections, Northumberland County Board of Elections, Venango County Board of Elections.

Nathan A. Morgan, Beaver, PA, for Defendant Beaver County Board of Elections.

Christine D. Steere, Deasey, Mahoney & Valentini, Ltd., Media, PA, for Defendant Berks County Board of Elections.

Steven B. Silverman, Molly E. Meacham, Sean R. Keegan, Andrew Degory, Babst Calland Clements and Zomnir, PC, Pittsburgh, PA, Elizabeth A. Dupuis, Babst Calland, State College, PA, Nathan W. Karn, Evey Black Attorneys LLC, Hollidaysburg, PA, for Defendant Blair County Board of Elections.

Mark A. Aronchick, Christina Matthias, Pro Hac Vice, John B. Hill, Pro Hac Vice, Michele D. Hangley, Pro Hac Vice, Peter V. Keays, Robert Wiygul, Pro Hac Vice, Hangley Aronchick Segal Pudlin & Schiller, Philadelphia, PA, Joseph J. Khan, County of Bucks, Doylestown, PA, for Defendant Bucks County Board of Elections.

William Gleason Barbin, Cambria County Solicitor's Office, Ebensburg, PA, for Defendant Cambria County Board of Elections.

Gerard Joseph Geiger, Pro Hac Vice, Newman Williams, Stroudsburg, PA, for Defendant Carbon County Board of Elections.

Mark A. Aronchick, Christina Matthias, Pro Hac Vice, John B. Hill, Pro Hac Vice, Michele D. Hangley, Pro Hac Vice, Robert Wiygul, Pro Hac Vice, Hangley Aronchick Segal Pudlin & Schiller, Philadelphia, PA, for Defendant Chester County Board of Elections.

Christopher P. Gabriel, Cardardi Ferguson Wyrick Weis + Gabriel, Sewickley, PA, for Defendant Clarion County Board of Elections.

Frank A. Blum, III, Jefferson Hills, PA, for Defendant Clearfield County Board of Elections.

Keith A. Button, Shafer Law Firm, Meadville, PA, for Defendant Crawford County Board of Elections.

Keith O. Brenneman, Law Office of Keith O. Brenneman, P.C., Mechanicsburg, PA, for Defendant Cumberland County Board of Elections.

Steven B. Silverman, Molly E. Meacham, Sean R. Keegan, Andrew Degory, Babst Calland Clements and Zomnir, PC, Pittsburgh, PA, Elizabeth A. Dupuis, Babst Calland, State College, PA, Joseph A. Curcillo, III, Dauphin County, Harrisburg, PA, for Defendant Dauphin County Board of Elections.

Edward D. Rogers, Pro Hac Vice, Elizabeth Wingfield, Pro Hac Vice, Kahlil Williams, Pro Hac Vice, David S. Fryman, Ballard, Spahr, Andrews & Ingersoll, Terence Grugan, Pro Hac Vice, Ballard Spahr, Philadelphia, PA, for Defendant Delaware County Board of Elections.

Thomas S. Talarico, Talarico & Niebauer, Erie, PA, for Defendant Erie County Board of Elections.

Andrew W. Norfleet, Frank J. Lavery, Jr., Stephen B. Edwards, Lavery Law, Harrisburg, PA, for Defendants Franklin County Board of Elections, Perry County Board of Elections.

Robert Eugene Grimm, Robert Eugene Grimm Attorney, Smithfield, PA, for Defendant Greene County Board of Elections.

Peter M. McManamon, Pro Hac Vice, Gill, McManamon & Ghaner, Huntingdon, PA, Steven B. Silverman, Molly E. Meacham, Sean R. Keegan, Andrew Degory, Babst Calland Clements and Zomnir, PC, Pittsburgh, PA, Elizabeth A. Dupuis, Babst Calland, State College, PA, for Defendant Huntingdon County Board of Elections.

C.J. Zwick, Zwick & Zwick LLP, DuBois, PA, Gregory D. Sobol, Brookville, PA, for Defendant Jefferson County Board of Elections.

Donald Zagurskie, Pro Hac Vice, Johnston & Zagurskie, PC, Mifflin, PA, for Defendant Juniata County Board of Elections.

Christina L. Hausner, Pro Hac Vice, County of Lancaster, Lancaster, PA, for Defendant Lancaster County Board of Elections.

Steven B. Silverman, Molly E. Meacham, Sean R. Keegan, Andrew Degory, Babst Calland Clements and Zomnir, PC, Pittsburgh, PA, Thomas W. Leslie, New Castle, PA, Elizabeth

A. Dupuis, Babst Calland, State College, PA, for Defendant Lawrence County Board of Elections.

Thomas M. Caffrey, Pro Hac Vice, PO BOX A, Coplay, PA, Sarah Mae Murray, Pro Hac Vice, County of Lehigh, Allentown, PA, for Defendant Lehigh County Board of Elections.

Lawrence J. Moran, Jr., Matthew J. Carmody, Joyce, Carmody & Moran, P.C., Regina M. Blewitt, Joyce Carmody Moran, Pittston, PA, for Defendant Luzerne County Board of Elections.

Joseph D. Smith, McCormick Law Firm, Williamsport, PA, for Defendant Lycoming County Board of Elections.

Anthony V. Clarke, The Clarke Firm, Bradford, PA, for Defendant Mckean County Board of Elections.

Steven B. Silverman, Molly E. Meacham, Sean R. Keegan, Babst, Calland, Clements and Zomnir, P.C., Pittsburgh, PA, William J. Madden, Solicitor, Mercer County, Sharon, PA, Elizabeth A. Dupuis, Babst Calland, State College, PA, for Defendant Mercer County Board of Elections.

Gerard Joseph Geiger, Newman Williams, Stroudsburg, PA, for Defendants Monroe County Board of Elections, Pike County Board of Elections, Schuylkill County Board of Elections, Snyder County Board of Elections, Wayne County Board of Elections.

Mark A. Aronchick, Christina Matthias, Pro Hac Vice, John B. Hill, Pro Hac Vice, Michele D. Hangley, Pro Hac Vice, Robert Wiygul, Pro Hac Vice, Hangley Aronchick Segal Pudlin & Schiller, Philadelphia, PA, Maureen Calder, Pro Hac Vice, Montgomery County Solicitor's Office, Norristown, PA, for Defendant Montgomery County Board of Elections.

Brian Taylor, Pro Hac Vice, Richard E. Santee, Pro Hac Vice, County of Northampton, Easton, PA, Timothy P. Brennan, Pro Hac Vice, County of Northampton, PA, PA, for Defendant Northampton County Board of Elections.

Mark A. Aronchick, Christina Matthias, Pro Hac Vice, John B. Hill, Pro Hac Vice, Michele D. Hangley, Robert Wiygul, Pro Hac Vice, Hangley Aronchick Segal Pudlin & Schiller, Zachary Strassburger, City of Philadelphia Law Department, Philadelphia, PA, for Defendant Philadelphia County Board of Elections.

Thomas R. Shaffer, Glassmire & Shaffer Law Offices, Coudersport, PA, for Defendant Potter County Board of Elections.

Michael P. Barbera, Barbera, Melvin, Svonavec & Sperlazza LLP, Somerset, PA, for Defendant Somerset County Board of Elections.

Kenneth R. Levitzky, Kenneth R. Levitzky, Esquire, Dushore, PA, for Defendants Sullivan County Board of Elections, Wyoming County Board of Elections.

Robert Gawlas, Robert Schaub, Rosenn Jenkins & Greenwald LLP, Wilkes-Barre, PA, for Defendant Susquehanna County Board of Elections.

Christopher P. Gabriel, Carfardi Ferguson Wyrick Weis + Gabriel, Sewickley, PA, Raymond E. Ginn, Jr., Pro Hac Vice, Ginn & Vickery, P.C., Wellsboro, PA, for Defendant Tioga County Board of Elections.

Steven B. Silverman, Sean R. Keegan, Babst, Calland, Clements and Zomnir, P.C., Pittsburgh, PA, Allen P. Page, McNerney, Page, Vanderlin & Hall, Williamsport, PA, for Defendant Union County Board of Elections.

Nathaniel Justus Schmidt, Schmidt Law Firm, Warren, PA, for Defendant Warren County Board of Elections.

Robert J. Grimm, Swartz Campbell, Ryan Michael Joyce, Swartz Campbell, LLC, Pittsburgh, PA, for Defendant Washington County Board of Elections.

David A. Regoli, New Kensington, PA, for Defendant Westmoreland County Board of Elections.

Michelle Pokrifka, Pro Hac Vice, York County Solicitor's Office, York, PA, Steven B. Silverman, Molly E. Meacham, Sean R. Keegan, Andrew Degory, Babst Calland Clements and Zomnir, PC, Pittsburgh, PA, Elizabeth A. Dupuis, Babst Calland, State College, PA, for Defendant York County Board of Elections.

Adriel I. Cepeda Derieux, Pro Hac Vice, Dale E. Ho, Pro Hac Vice, Sophia Lin Lakin, Pro Hac Vice, American Civil Liberties Union Foundation, Christopher R. Noyes, Pro Hac Vice, Eleanor Davis, Pro Hac Vice, Jared Vasconcellos Grubow, Pro Hac Vice, Lori A. Martin, Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY, Benjamin David Geffen, Mary McKenzie, Public Interest Law Center, Philadelphia, PA, David P. Yin, Pro Hac Vice, Sarah E.

Brannon, Pro Hac Vice, American Civil Liberties Union Foundation, John Michael Powers, Pro Hac Vice, Lawyers' Committee for Civil Rights Under Law, Washington, DC, Jason H. Liss, Pro Hac Vice, Boston, MA, Samantha Picans, Pro Hac Vice, Wilmer Cutler Pickering Hale and Dorr LLP, Denver, CO, Witold J. Walczak, Aclf of PA, Pittsburgh, PA, for Defendant NAACP Pennsylvania State Conference.

Adriel I. Cepeda Derieux, Pro Hac Vice, Dale E. Ho, Pro Hac Vice, Sophia Lin Lakin, Pro Hac Vice, American Civil Liberties Union Foundation, Christopher R. Noyes, Pro Hac Vice, Eleanor Davis, Jared Vasconcellos Grubow, Pro Hac Vice, Lori A. Martin, Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY, Benjamin David Geffen, Mary McKenzie, Public Interest Law Center, Philadelphia, PA, David P. Yin, Pro Hac Vice, Sarah E. Brannon, Pro Hac Vice, American Civil Liberties Union Foundation, John Michael Powers, Pro Hac Vice, Lawyers' Committee for Civil Rights Under Law, Washington, DC, Jason H. Liss, Pro Hac Vice, Boston, MA, Samantha Picans, Pro Hac Vice, Wilmer Cutler Pickering Hale and Dorr LLP, Denver, CO, Witold J. Walczak, Aclf of PA, Pittsburgh, PA, for Defendant Common Cause Pennsylvania.

Adriel I. Cepeda Derieux, Dale E. Ho, Sophia Lin Lakin, American Civil Liberties Union Foundation, Christopher R. Noyes, Eleanor Davis, Jared Vasconcellos Grubow, Lori A. Martin, Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY, Benjamin David Geffen, Mary McKenzie, Public Interest Law Center, Philadelphia, PA, David P. Yin, Pro Hac Vice, Sarah E. Brannon, American Civil Liberties Union Foundation, John Michael Powers, Pro Hac Vice, Lawyers' Committee for Civil Rights Under Law, Washington, DC, Jason H. Liss, Boston, MA, Samantha Picans, Wilmer Cutler Pickering Hale and Dorr LLP, Denver, CO, Witold J. Walczak, Aclf of PA, Pittsburgh, PA, for Defendants League of Women Voters of Pennsylvania, Patricia Demarco, Danielle Graham Robinson, Kathleen Wise.

## OPINION

J. Nicholas Ranjan, United States District Judge

**\*1** Plaintiffs in this case are President Trump's reelection campaign, the Republican National Committee, and several other Republican congressional candidates and electors. They originally filed this suit, alleging federal and state constitutional violations stemming from Pennsylvania's

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   3

implementation of a mail-in voting plan for the upcoming general election.

Since then, the Pennsylvania Supreme Court issued a decision involving similar claims, which substantially narrowed the focus of this case. And Secretary of the Commonwealth, Kathy Boockvar, issued additional election "guidance," which further narrowed certain of the claims.

Therefore, as this case presently stands, only three claims remain. First, whether the use of so-called "drop boxes" [1] for mail-in ballots is unconstitutional, given the lack of guidance or mandates that those drop boxes have security guards to man them. Second, whether the Secretary's guidance as to mail-in ballots—specifically, her guidance that county election boards should not reject mail-in ballots where the voter's signature does not match the one on file—is unconstitutional. Third, whether Pennsylvania's restriction that poll watchers be residents in the county for which they are assigned, as applied to the facts of this case, is unconstitutional.

In order to present these claims to the Court on a complete record, the parties engaged in extensive fact and expert discovery, and have filed cross-motions for summary judgment. No party has raised a genuine dispute of material fact that would require a trial, and the Court has found none. As such, the parties' cross-motions for summary judgment are ready for disposition.

After a careful review of the parties' submissions and the extensive evidentiary record, the Court will enter judgment in favor of Defendants on all of Plaintiffs' federal-constitutional claims, decline to exercise supplemental jurisdiction over the state-constitutional claims, and dismiss this case. This is so for two main reasons.

First, the Court concludes that Plaintiffs lack Article III standing to pursue their claims. Standing, of course, is a necessary requirement to cross the threshold into federal court. Federal courts adjudicate cases and controversies, where a plaintiff's injury is concrete and particularized. Here, however, Plaintiffs have not presented a concrete injury to warrant federal-court review. All of Plaintiffs' remaining claims have the same theory of injury—one of "vote dilution." Plaintiffs fear that absent implementation of the security measures that they seek (guards by drop boxes, signature comparison of mail-in ballots, and poll watchers), there is a risk of voter fraud by other voters. If another person engages

in voter fraud, Plaintiffs assert that their own lawfully cast vote will, by comparison, count for less, or be diluted.

**\*2** The problem with this theory of harm is that it is speculative, and thus Plaintiffs' injury is not "concrete"— a critical element to have standing in federal court. While Plaintiffs may not need to prove actual voter fraud, they must at least prove that such fraud is "certainly impending." They haven't met that burden. At most, they have pieced together a sequence of uncertain assumptions: (1) they assume potential fraudsters may attempt to commit election fraud through the use of drop boxes or forged ballots, or due to a potential shortage of poll watchers; (2) they assume the numerous election-security measures used by county election officials may not work; and (3) they assume their own security measures may have prevented that fraud.

All of these assumptions could end up being true, and these events could theoretically happen. But so could many things. The relevant question here is: are they "certainly impending"? At least based on the evidence presented, the answer to that is "no." And that is the legal standard that Plaintiffs must meet. As the Supreme Court has held, this Court cannot "endorse standing theories that rest on speculation about the decisions of independent actors." *See Clapper v. Amnesty Int'l USA, 568 U.S. 398, 414, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013).*

Second, even if Plaintiffs had standing, their claims fail on the merits. Plaintiffs essentially ask this Court to second-guess the judgment of the Pennsylvania General Assembly and election officials, who are experts in creating and implementing an election plan. Perhaps Plaintiffs are right that guards should be placed near drop boxes, signature-analysis experts should examine every mail-in ballot, poll watchers should be able to man any poll regardless of location, and other security improvements should be made. But the job of an unelected federal judge isn't to suggest election improvements, especially when those improvements contradict the reasoned judgment of democratically elected officials. *See Andino v. Middleton, —— U.S. ——, —— S.Ct. ——, ——, —— L.Ed.2d ——, 2020 WL 5887393, at \*1 (Oct. 5, 2020)* (Kavanaugh, J. concurring) (state legislatures should not be subject to "second-guessing by an unelected federal judiciary," which is "not accountable to the people") (cleaned up).

Put differently, "[f]ederal judges can have a lot of power— especially when issuing injunctions. And sometimes we may even have a good idea or two. But the Constitution sets out our

sphere of decision-making, and that sphere does not extend to second-guessing and interfering with a State's reasonable, nondiscriminatory election rules." *New Georgia Project v. Raffensperger*, ––– F.3d ––––, ––––, 2020 WL 5877588, at *4 (11th Cir. Oct. 2, 2020).

As discussed below, the Court finds that the election regulations put in place by the General Assembly and implemented by Defendants do not significantly burden any right to vote. They are rational. They further important state interests. They align with the Commonwealth's elaborate election-security measures. They do not run afoul of the United States Constitution. They will not otherwise be second-guessed by this Court.

## **BACKGROUND**

### **I. Procedural Background**

#### **A. Plaintiffs' original claims.**

On June 29, 2020, Plaintiffs filed their original complaint in this case against Defendants, who are the Secretary of the Commonwealth and the 67 county boards of elections. [ECF 4]. With their lawsuit, Plaintiffs challenged a number of Pennsylvania's procedures with respect to mail-in voting —in particular, the use of drop boxes and the counting of mail-in ballots that contained certain procedural defects. *See* [*id.*]. Shortly after filing their original complaint, Plaintiffs moved for expedited discovery and an expedited declaratory-judgment hearing. [ECF 6]. Defendants opposed the motion. The Court partially granted the motion, scheduled a speedy hearing, and ordered expedited discovery before that hearing. [ECF 123; ECF 124].

**\*3** After Plaintiffs filed the original complaint, many non-parties sought to intervene in the action, including several organizations. [2] The Court granted all intervention motions. [ECF 309].

Defendants and Intervenors moved to dismiss the original complaint. In response, Plaintiffs filed an amended complaint. [ECF 234]. The amended complaint maintained the gist of the original, but added two new counts and made a variety of other drafting changes. *See* [ECF 242]. Defendants and Intervenors moved to dismiss the first amended complaint, too, primarily asking the Court to abstain and stay the case.

Plaintiffs' first amended complaint asserted nine separate counts, but they could be sorted into three overarching categories.

#### **1. Claims alleging vote dilution due to unlawful ballot collection and counting procedures.**

The first category covered claims related to allegedly unlawful procedures implemented by some Defendants for the collection and counting of mail-in and absentee ballots. Those included claims related to (1) Defendants' uneven use of drop boxes and other satellite ballot-collection sites, (2) procedures for verifying the qualifications of voters applying in person for mail-in or absentee ballots, and (3) rules for counting non-compliant ballots (such as ballots submitted without a secrecy envelope, without an elector declaration, or that contained stray marks on the envelope).

In Count I, Plaintiffs alleged violations of the Elections Clause and the related Presidential Electors Clause of the U.S. Constitution. [ECF 234, ¶¶ 193-205]. Plaintiffs asserted that, under these provisions, only the state legislature may set the time, place, and manner of congressional elections and determine how the state chooses electors for the presidency. [*Id.* at ¶ 196].

In support of this claim, Plaintiffs alleged that Secretary Boockvar's guidance concerning the use of mail-in ballot drop boxes, whether county boards of elections must independently verify mail-in ballot applications, and the counting of non-compliant mail-in ballots, was an executive overreach—in that the Secretary's guidance allegedly violated certain provisions of the Election Code enacted by the Pennsylvania General Assembly. [*Id.* at ¶ 201]. Plaintiffs also claimed that the Secretary's "unlawful guidance" increased the risk of fraudulent or unlawful voting and infringed on the right to vote, which, they said, amounted to additional violations of the 1st and 14th Amendments to the U.S. Constitution. [*Id.* at ¶¶ 202-03].

In Count II, Plaintiffs alleged a violation of the Equal-Protection Clause under the 14th Amendment. [*Id.* at ¶¶ 206-15]. Plaintiffs asserted that the implementation of the foregoing (*i.e.*, mail-in ballot drop boxes, the verification of mail-in ballot applications, and the counting of non-compliant ballots) was different in different counties, thereby treating voters across the state in an unequal fashion. [*Id.* at ¶¶ 211-13].

**\*4** In Count III, Plaintiffs asserted a violation of the Pennsylvania State Constitution. [*Id.* at ¶¶ 216-22]. Plaintiffs alleged that the same actions and conduct that comprised Counts I and II also violated similar provisions of the Pennsylvania Constitution. [*Id.* at ¶ 220].

Finally, in Counts VI and VII, Plaintiffs alleged that Defendants violated provisions of the federal and state constitutions by disregarding the Election Code's notice and selection requirements applicable to "polling places." [*Id.* at ¶¶ 237-52]. Plaintiffs alleged that drop boxes are "polling places," and thus subject to certain criteria for site selection and the requirement that county election boards provide 20 days' public notice. [*Id.* at ¶¶ 239-42]. Plaintiffs asserted that Defendants' failure to provide this notice or select appropriate "polling places" in the primary election, if repeated in the general election, would create the risk of voter fraud and vote dilution. [*Id.* at ¶¶ 243-246].

### 2. Poll-watcher claims.

The second category of claims in the first amended complaint consisted of challenges to the constitutionality of Election-Code provisions related to poll watchers.

In Count IV, Plaintiffs alleged violations of the 1st and 14th Amendments. These claims had both a facial and an as-applied component. [ECF 234, ¶ 230 ("On its face and as applied to the 2020 General Election ...") ].

First, Plaintiffs alleged that 📄 25 P.S. § 2687 was facially unconstitutional because it "arbitrarily and unreasonably" limits poll watchers to serving only in their county of residence and to monitoring only in-person voting at the polling place on election day. [*Id.* at ¶ 226]. Second, Plaintiffs alleged that the same provision was unconstitutional as applied in the context of Pennsylvania's new vote-by-mail system, because these poll-watcher restrictions, combined with insecure voting procedures, create unacceptable risks of fraud and vote dilution. [*Id.* at ¶ 228]. Plaintiffs contended that these limitations make it "functionally impracticable" for candidates to ensure that they have poll watchers present where ballots are deposited and collected, given the widespread use of remote drop boxes and other satellite collection sites. [*Id.*].

Count V was the same as Count IV, but alleged that the same poll-watching restrictions violated the Pennsylvania Constitution, too. [*Id.* at ¶ 234].

### 3. In-person voting claims.

The third category of claims consisted of challenges to the procedures for allowing electors to vote in person after requesting a mail-in ballot.

That is, in Counts VIII and IX, Plaintiffs asserted that the Election Code permits an elector that has requested a mail-in ballot to still vote in person so long as he remits his spoiled ballot. [ECF 234, ¶¶ 253-267]. Plaintiffs asserted that during the primary, some counties allowed such electors to vote in person, while others did not, and they fear the same will happen in the general election. [*Id.* at ¶¶ 255, 259]. Plaintiffs also asserted that some counties allowed electors who had voted by mail to vote in person, in violation of the Election Code. [*Id.* at ¶¶ 257-58]. Plaintiffs alleged that this conduct also violates the federal and state constitutional provisions concerning the right to vote and equal protection. [*Id.* at ¶¶ 261, 265].

### B. The Court's decision to abstain.

**\*5** Upon consideration of Defendants' and Intervenors' motions to dismiss the first amended complaint, on August 23, 2020, the Court issued an opinion abstaining under

📄 *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) and temporarily staying the case. [ECF 409, 410].

In doing so, the Court determined that the three requisite prongs for 📄 *Pullman* abstention were met, and that the discretionary considerations weighed in favor of abstention.

[ECF 409, p. 3 ("[Under 📄 *Pullman*, federal courts abstain] if (1) doing so requires interpretation of 'unsettled questions of state law'; (2) permitting resolution of the unsettled state-law questions by state courts would 'obviate the need for, or substantially narrow the scope of adjudication of the constitutional claims'; and (3) an 'erroneous construction of state law would be disruptive of important state policies[.]'

" (citing *Chez Sez III Corp. v. Township of Union*, 945 F.2d 628, 631 (3d Cir. 1991))); *id.* at p. 30 (explaining that after the three prongs of 📄 *Pullman* abstention are

met, the court must "make a discretionary determination of whether abstention is appropriate given the particular facts of this case," which requires weighing "such factors as the availability of an adequate state remedy, the length of time the litigation has been pending, and the impact of delay on the litigants." (cleaned up)) ].

The Court found that abstaining under 📙 *Pullman* was appropriate because of several unresolved ambiguities in Pennsylvania's Election Code. Specifically, the Court found that there were significant ambiguities as to whether the Election Code (1) permitted delivery of ballots to locations other than the county election board's headquarters, such as drop boxes, (2) permitted counties to count ballots that were not placed within the "secrecy envelope" (*i.e.*, "naked ballots"), (3) considered drop boxes and other ballot-collection sites as "polling places," as defined in the Election Code, and (4) required counties to automatically verify ballot applications for mail-in ballots (where the person applied for the ballot in person), even if there was no "bona fide objection" to the application. [ECF 409, pp. 17-23].

The Court explained that each of these ambiguities, if settled, would significantly narrow—or even resolve—some of Plaintiffs' claims. As the Court explained, for example, if a state court interpreted the Election Code to disallow drop boxes, Plaintiffs would obtain their requested relief (*i.e.*, no drop boxes); alternatively, if drop boxes were authorized by the Election Code, then Plaintiffs' allegations that drop boxes were illegal would be eliminated, which would, in turn, significantly affect the constitutional analysis of Plaintiffs' claims. [*Id.* at pp. 25-28]. The same held true for "naked ballots," the breadth of coverage of "polling places," and the requisite verification for personal ballot applications.

The Court then explained that it was appropriate for it to abstain until a state court could interpret the ambiguous state law. [*Id.* at pp. 28-30]. The Court concluded that if it interpreted the ambiguous state law, there was a sufficient chance that a state court could disagree with the interpretation, which would render this Court's interpretation not only advisory, but disruptive to state policies. The Court noted that especially in the election context, states have considerable discretion to implement their own policies without federal intervention. Accordingly, because these were questions of uninterpreted state law that were sufficiently ambiguous, federalism and comity demanded that a state court, not this Court, be the first interpreter.

**\*6** Finally, the Court explained that, despite the imminence of the election, abstention was still proper. [*Id.* at pp. 30-33]. The Court noted that state-court litigation was already pending that would resolve some of the statutory ambiguities at issue. [*Id.* at p. 31]. Further, the Court highlighted three courses Plaintiffs could immediately take to resolve the statutory ambiguities: intervene in the pending state-court litigation; file their own state-court case; or appeal this Court's abstention decision to the Third Circuit, and then seek certification of the unsettled state-law issues in the Pennsylvania Supreme Court. [*Id.* at pp. 31-33].

Additionally, the Court explained that it would stay the entire case, despite several of Plaintiffs' claims not being subject to 📙 *Pullman* abstention as they were not based on ambiguous state law. [*Id.* at pp. 34-37]. That's because, in its discretion, the Court determined it would be more efficient for this case to progress as a single proceeding, rather than in piecemeal fashion. [*Id.*]. However, the Court allowed any party to move to lift the stay as to the few claims not subject to 📙 *Pullman* abstention, if no state-court decision had been issued by October 5, 2020. [*Id.*].

On August 28, 2020, five days after the Court abstained, Plaintiffs moved to modify the Court's stay, and moved for a preliminary injunction. [ECF 414]. Plaintiffs requested, among other things, that the Court order Defendants to segregate, and not pre-canvass or canvass, all ballots that were returned in drop boxes, lacked a secrecy envelope, or were delivered by a third party. [*Id.*]. Plaintiffs also requested that the Court lift the stay by September 14, 2020, instead of October 5, 2020. [*Id.*].

The Court denied Plaintiffs' motion for preliminary injunctive relief, finding that Plaintiffs failed to show they would be irreparably harmed. [ECF 444; ECF 445]. The Court also declined to move up the date when the stay would be lifted. [*Id.*]. The Court noted that, at the request of Secretary Boockvar, the Pennsylvania Supreme Court had already exercised its extraordinary jurisdiction to consider five discrete issues and clarify Pennsylvania law in time for the general election. [*Id.* at p. 1]. Since that case appeared to be on track, the Court denied Plaintiffs' motion without prejudice, and the Court's abstention opinion and order remained in effect.

**C. The Pennsylvania Supreme Court's decision.**

On September 17, 2020, the Pennsylvania Supreme Court issued its decision in *Pennsylvania Democratic Party v. Boockvar*, —— Pa. ——, —— A.3d ——, 2020 WL 5554644 (Sept. 17, 2020). The court clarified three issues of state election law that are directly relevant to this case.

### 1. Counties are permitted under the Election Code to establish alternate ballot-collection sites beyond just their main county office locations.

The Pennsylvania Supreme Court first considered whether the Election Code allowed a Pennsylvania voter to deliver his or her mail-in ballot in person to a location other than the established office address of the county's board of election. *Boockvar*, —— A.3d at ——, 2020 WL 5554644, at *8. The court further considered the means by which county boards of election could accept hand-delivered mail-in ballots. *Id.*

Consistent with this Court's abstention opinion, the court found that "the parties' competing interpretations of the Election Code on [these questions] are reasonable, rendering the Code ambiguous" on these questions. *Id.* After applying traditional principles of statutory interpretation, the court held that "the Election Code should be interpreted to allow county boards of election to accept hand-delivered mail-in ballots at locations other than their office addresses including drop-boxes." *Id.* at.——, 2020 WL 5554644, at *9. The court reached this conclusion due to "the clear legislative intent underlying Act 77 ... to provide electors with options to vote outside of traditional polling places." *Id.*

*7 The respondents in that case further argued that this interpretation would cause county boards of election to "employ myriad systems to accept hand-delivered mail-in ballots," which would "be unconstitutionally disparate from one another in so much as some systems will offer more legal protections to voters than others will provide" and violate the Equal-Protection Clause *Id.* The court rejected this argument. It found that "the exact manner in which each county board of election will accept these votes is entirely unknown at this point; thus, we have no metric by which to measure whether any one system offers more legal protection than another, making an equal protection analysis impossible at this time." *Id.*

### 2. Ballots lacking inner secrecy envelopes should not be counted.

The court next considered whether the boards of elections "must 'clothe and count naked ballots,' *i.e.*, place ballots that were returned without the secrecy envelope into a proper envelope and count them, rather than invalidate them." *Boockvar*, —— A.3d at ——, 2020 WL 5554644, at *21. The court concluded that they should not.

The court held that "the Legislature intended for the secrecy envelope provision [in the Election Code] to be mandatory." *Id.* at ——, 2020 WL 5554644, at *24. In other words, the relevant provisions "make clear the General Assembly's intention that, during the collection and canvassing processes, when the outer envelope in which the ballot arrived is unsealed and the sealed ballot removed, it should not be readily apparent who the elector is, with what party he or she affiliates, or for whom the elector has voted." *Id.* The secrecy envelope "properly unmarked and sealed ensures that result," and "[w]hatever the wisdom of the requirement, the command that the mail-in elector utilize the secrecy envelope and leave it unblemished by identifying information is neither ambiguous nor unreasonable." *Id.*

As a result, the court ultimately concluded, "a mail-ballot that is not enclosed in the statutorily-mandated secrecy envelope must be disqualified." *Id.* at ——, 2020 WL 5554644, at *26

### 3. Pennsylvania's county-residency requirement for poll watchers is constitutional.

The final relevant issue the court considered was whether the poll-watcher residency requirement found in 25 P.S. § 2687(b) violates state or federal constitutional rights. *Boockvar*, —— A.3d at ——, 2020 WL 5554644, at *26. Relying on *Republican Party of Pennsylvania v. Cortés*, 218 F. Supp. 3d 396 (E.D. Pa. 2016), the court concluded that the poll-watcher residency provision "impose[d] no burden on one's constitutional right to vote and, accordingly, requires only a showing that a rational basis exists to be upheld." *Id.*

at ——, 2020 WL 5554644, at *30. The court found rational-basis review was appropriate for three reasons.

First, "there is no individual constitutional right to serve as a poll watcher; rather, the right to do so is conferred by statute." *Id.* (citation omitted). Second, "poll watching is not incidental to the right of free association and, thus, has no distinct First Amendment protection." *Id.* (cleaned up). Third, "poll watching does not implicate core political speech." *Id.* (citation omitted).

The court went on to find that there was a "clear rational basis for the county poll watcher residency requirement[.]" *Id.* That is, given "Pennsylvania has envisioned a county-based scheme for managing elections within the Commonwealth," it is "reasonable that the Legislature would require poll watchers, who serve within the various counties of the state, to be residents of the counties in which they serve." *Id.*

In upholding the constitutionality of the "county poll watcher residency requirement," the court rejected the claim that "poll watchers are vital to protect against voter fraud and that because of the distribution of voters throughout Pennsylvania, the residency requirement makes it difficult to identify poll watchers in all precincts." *Id.* The court concluded that the claims of "heightened election fraud involving mail-in voting" were "unsubstantiated" and "specifically belied by the Act 35 report issued by [Secretary Boockvar] on August 1, 2020." *Id.* Moreover, the court held that the "speculative claim that it is 'difficult' for both parties to fill poll watcher positions in every precinct, even if true, is insufficient to transform the Commonwealth's uniform and reasonable regulation requiring that poll watchers be residents of the counties they serve into a non-rational policy choice." *Id.*

**\*8** Based on the foregoing, the court declared "that the poll-watcher residency requirement does not violate the state or federal constitutions." *Id.* at ——, 2020 WL 5554644, at *31.

### D. Plaintiffs' notice of remaining claims.

Following the Pennsylvania Supreme Court's decision, this Court lifted the stay it had imposed pursuant to the *Pullman* abstention doctrine and ordered the parties to identify the remaining viable claims and defenses in the case. [ECF 447].

In their notice, Plaintiffs took the position that nearly all their claims remained viable, with a few discrete exceptions. Plaintiffs conceded that their "federal and state constitutional claims of voter dilution solely on the basis that drop boxes and other collection sites are not statutorily authorized by the Pennsylvania Election Code [were] no longer viable." [ECF 448, p. 4]. They also stated that their "facial challenge to the county residency requirement under 25 P.S. § 2687 is no longer a viable claim." [*Id.* at p. 10]. Plaintiffs also moved for leave to amend their complaint a second time to add new allegations and a new claim relating to Secretary Boockvar's recent signature-comparison guidance. [ECF 451].

Defendants and Intervenors, for their part, suggested that Plaintiffs' claims had been substantially narrowed, if not outright mooted, by the Pennsylvania Supreme Court's decision, and reminded the Court that their arguments for dismissal remained outstanding.

### E. The Court's September 23, 2020, memorandum orders.

In response to the notices filed by the parties and Plaintiffs' motion for leave to amend the first amended complaint, the Court issued an order granting Plaintiffs' motion, narrowing the scope of the lawsuit, and establishing the procedure for resolving the remaining claims. [ECF 459].

As to Plaintiffs' proposed amendment to their complaint, the Court found that the new claim and allegations were relatively narrow, and thus amendment wouldn't prejudice Defendants and Intervenors. [*Id.* at pp. 3-4]. As a result, the Court granted the motion. [*Id.* at p. 4].

The Court, however, did inform the parties that it would "continue to abstain under *Pullman* as to Plaintiffs' claim pertaining to the notice of drop box locations and, more generally, whether the "polling place" requirements under the Election Code apply to drop-box locations." [*Id.* at p. 5]. This was so because those claims involve still-unsettled issues of state law. The Court explained that the "fact that the Pennsylvania Supreme Court did not address this issue in its recent decision is immaterial" because the "propriety of *Pullman* abstention does not depend on the

existence of parallel state-court proceedings." [*Id.* (citing *Stoe v. Flaherty*, 436 F.3d 209, 213 (3d Cir. 2006)) ]. Moreover, Plaintiffs had several other avenues to pursue prompt interpretation of state law after this Court abstained. [*Id.* at p. 6].

The Court also informed the parties, for similar reasons, that it would continue to abstain with respect to Plaintiffs' claims regarding Secretary Boockvar's guidance that personal applications for mail-in ballots shall be accepted absent a "bona fide objection." [ECF 460].

The Court found that "no Article III 'case or controversy' remain[ed] with respect to the claims on which the Pennsylvania Supreme Court effectively ruled in Plaintiffs' favor on state-law grounds (*e.g.*, illegality of third-party ballot delivery; excluding 'naked ballots' submitted without inner-secrecy envelopes)." [ECF 459, p. 6]. Because there was "no reason to believe Defendants plan to violate what they themselves now agree the law requires," the Court held that Plaintiffs' claims were premature and speculative. [*Id.* at p. 7]. The Court therefore dismissed those claims as falling outside of its Article III power to adjudicate. [*Id.* (citations omitted) ].

**\*9** To resolve the remaining claims, the Court directed the parties to file cross-motions for summary judgment presenting all arguments for dismissal or judgment under Federal Rule of Civil Procedure 56. [*Id.* at pp. 8-10]. Before briefing on those motions, the Court authorized additional expedited discovery. [*Id.* at pp. 4-5]. The parties completed discovery and timely filed their motions; they identified no material disputes of fact; and therefore, the motions are now fully briefed and ready for disposition.

### F. The claims now at issue.

Based on the Pennsylvania Supreme Court's prior ruling, this Court's prior decisions, Plaintiffs' nine-count Second Amended Complaint, and recent guidance issued by Secretary Boockvar, the claims remaining in this case are narrow and substantially different than those asserted at the outset of the case.

**Drop Boxes (Counts I-III).** Plaintiffs still advance a claim that drop boxes are unconstitutional, but in a different way. Now that the Pennsylvania Supreme Court has expressly held that drop boxes are authorized under the Election Code, Plaintiffs now assert that the use of "unmanned" drop boxes

is unconstitutional under the federal and state constitutions, for reasons discussed in more detail below.

**Signature Comparison (Counts I-III).** Plaintiffs' newly added claim relates to signature comparison. Secretary Boockvar's September 2020 guidance informs the county boards that they are not to engage in a signature analysis of mail-in ballots and applications, and they must count those ballots, even if the signature on the ballot does not match the voter's signature on file. Plaintiffs assert that this guidance is unconstitutional under the federal and state constitutions.

**Poll Watching (Counts IV, V).** The Pennsylvania Supreme Court already declared that Pennsylvania's county-residency requirement for poll watchers is *facially* constitutional. Plaintiffs now only assert that the requirement, *as applied*, is unconstitutional under the federal and state constitutions.

The counts that remain in the Second Amended Complaint, but which are *not* at issue, are the counts related to where poll watchers can be located. That is implicated mostly by Counts VI and VII, and by certain allegations in Counts IV and V. The Court continues to abstain from reaching that issue. Plaintiffs have filed a separate state lawsuit that would appear to address many of those issues, in any event. [ECF 549-22; ECF 573-1]. Counts VIII and IX concern challenges related to voters that have requested mail-in ballots, but that instead seek to vote in person. The Secretary issued recent guidance, effectively mooting those claims, and, based on Plaintiffs' positions taken in the course of this litigation, the Court deems Plaintiffs to have withdrawn Counts VIII and IX. [ECF 509, p. 15 n.4 ("[I]n the September 28 guidance memo, the Secretary corrected [her] earlier guidance to conform to the Election Code and states that any mail-in voter who spoils his/her ballot and the accompanying envelopes and signs a declaration that they did not vote by mail-in ballot will be allowed to vote a regular ballot. Therefore, Plaintiffs agree to withdraw this claim from those that still are being pursued.") ].

## II. Factual Background

### A. Pennsylvania's Election Code, and the adoption of Act 77.

#### 1. The county-based election system.

Pennsylvania's Election Code, first enacted in 1937, established a county-based system for administering

elections. *See* 25 P.S. § 2641(a) ("There shall be a county board of elections in and for each county of this Commonwealth, which shall have jurisdiction over the conduct of primaries and elections in such county, in accordance with the provisions of [the Election Code]."). The Election Code vests county boards of elections with discretion to conduct elections and implement procedures intended to ensure the honesty, efficiency, and uniformity of Pennsylvania's elections. *Id.* §§ 2641(a), 2642(g).

### 2. The adoption of Act 77.

 **\*10**  On October 31, 2019, the Pennsylvania General Assembly passed "Act 77," a bipartisan reform of Pennsylvania's Election Code. *See* [ECF 461, ¶¶ 91]; 2019 Pa. Legis. Serv. Act 2019-77 (S.B. 421).

Among other things, by passing Act 77, Pennsylvania joined 34 other states in authorizing "no excuse" mail-in voting by all qualified electors. *See* [ECF 461, ¶¶ 92]; 25 P.S. §§ 3150.11- 3150.17; [ECF 549-11, p. 5 ("The largest number of states (34), practice no-excuse mail-in voting, allowing any persons to vote by mail regardless of whether they have a reason or whether they will be out of their jurisdiction on Election Day.") ]. Previously, a voter could only cast an "absentee" ballot if certain criteria were met, such as that the voter would be away from the election district on election day. *See* 1998 Pa. Legis. Serv. 1998-18 (H.B. 1760), § 14.

Like the previous absentee voting system, Pennsylvania's mail-in voting system requires voters to "opt-in" by requesting a ballot from either the Secretary or the voter's county board of elections. *See* 25 P.S. §§ 3146.2(a), 3150.12(a). When requesting a ballot, the voter must provide, among other things, his or her name, date of birth, voting district, length of time residing in the voting district, and party choice for primary elections. *See* 25 P.S. §§ 3146.2(b), 3150.12(b). A voter must also provide proof of identification; namely, either a driver's license number or, in the case of a voter who does not have a driver's license, the last four digits of the voter's Social Security number, or, in the case of a voter who has neither a driver's license nor a Social Security number, another form of approved identification. 25 P.S. § 2602(z.5)(3). In this respect, Pennsylvania differs from states that automatically mail each registered voter a

ballot—a practice known as "universal mail-in voting." [ECF 549-11, p. 6] ("[N]ine states conduct universal vote-by-mail elections in which the state (or a local entity, such [as] a county or municipality) mails all registered voters a ballot before each election without voters' [sic] having to request them.").

### 3. The COVID-19 pandemic.

Since early 2020, the United States, and Pennsylvania, have been engulfed in a viral pandemic of unprecedented scope and scale. [ECF 549-8, ¶ 31]. In that time, COVID-19 has spread to every corner of the globe, including Pennsylvania, and jeopardized the safety and health of many people. [*Id.* at ¶¶ 31, 38-39, 54-55, 66]. As of this date, more than 200,000 Americans have died, including more than 8,000 Pennsylvanians. *See* Covid in the U.S.: Latest Map and Case Count, The New York Times, available at https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last visited Oct. 10, 2020); COVID-19 Data for Pennsylvania, Pennsylvania Department of Health, available at https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx (last visited Oct. 10, 2020).

There have been many safety precautions that Pennsylvanians have been either required or urged to take, such as limiting participation in large gatherings, maintaining social distance, and wearing face coverings. [ECF 549-8, ¶¶ 58, 63-65]. The threat of COVID-19 is likely to persist through the November general election. [*Id.* at ¶¶ 53-56, 66-68].

### B. Facts relevant to drop boxes.

 **\*11**  Pennsylvania's county-based election system vests county boards of elections with "jurisdiction over the conduct of primaries and elections in such county, in accordance with the provisions" of the Election Code. 25 P.S. § 2641(a). The Election Code further empowers the county boards to "make and issue such rules, regulations and instructions, not inconsistent with law, as they may deem necessary for the guidance of voting machine custodians, elections officers and electors." *Id.* at § 2642(f). The counties are also charged with the responsibility to "purchase, preserve, store and maintain primary and election equipment of all kinds, including voting booths, ballot boxes and voting machines." *Id.* at § 2642(c).

As noted above, in *Pennsylvania Democratic Party v. Boockvar*, the Pennsylvania Supreme Court interpreted the Election Code, which allows for mail-in and absentee ballots to be returned to the "county board of election," to "permit[ ] county boards of election to accept hand-delivered mail-in ballots at locations other than their office addresses including drop-boxes." — A.3d at ——, 2020 WL 5554644, at *10.

Thus, it is now settled that the Election Code permits (but does not require) counties to authorize drop boxes and other satellite-collection locations for mailed ballots. 25 P.S. § 3150.16(a). Pennsylvania is not alone in this regard—as many as 34 other states and the District of Columbia authorize the use of drop boxes or satellite ballot collection sites to one degree or another. [ECF 549-11, p. 8, fig. 4]. Indeed, Secretary Boockvar stated that as many as 16% of voters nationwide had cast their ballots using drop boxes in the 2016 general election, including the majority of voters in Colorado (75%) and Washington (56.9%). [ECF 547, p. 18 (citing ECF 549-16) ].

### 1. Secretary Boockvar's guidance with respect to drop boxes.

Since the passage of Act 77, Secretary Boockvar has issued several guidance documents to the counties regarding the counties' implementation of mail-in voting, including guidance with respect to the use of drop boxes. [ECF 504-21; 504-22; 504-23; 504-24; 504-25; 571-1, Ex. E]. In general terms, the Secretary's guidance as to drop boxes informed the counties that the use of drop boxes was authorized by the Election Code and recommended "best practices" for their use. Her latest guidance offered standards for (1) where drop boxes should be located, [ECF 504-23, § 1.2], (2) how drop boxes should be designed and what signage should accompany them, [*id.* at §§ 2.2-2.3], (3) what security measures should be employed, [*id.* at § 2.5], and (4) what procedures should be implemented for collecting and returning ballots to the county election office, [*id.* at §§ 3.1-3.3, 4].

As to the location of drop boxes, the Secretary recommended that counties consider the following criteria, [*id.* at § 1.2]:

- Locations that serve heavily populated urban/suburban areas, as well as rural areas;

- Locations near heavy traffic areas such as commercial corridors, large residential areas, major employers and public transportation routes;

- Locations that are easily recognizable and accessible within the community;

- Locations in areas in which there have historically been delays at existing polling locations, and areas with historically low turnout;

- Proximity to communities with historically low vote by mail usage;

- Proximity to language minority communities;

- Proximity to voters with disabilities;

- Proximity to communities with low rates of household vehicle ownership;

- Proximity to low-income communities;

- Access to accessible and free parking; and

- The distance and time a voter must travel by car or public transportation.

With respect to drop-box design criteria, the Secretary recommended to counties, [*id.* at § 2.2]:

**\*12** • Hardware should be operable without any tight grasping, pinching, or twisting of the wrist;

- Hardware should require no more than 5 lbs. of pressure for the voter to operate;

- Receptacle should be operable within reach-range of 15 to 48 inches from the floor or ground for a person utilizing a wheelchair;

- The drop-box should provide specific points identifying the slot where ballots are inserted;

- The drop-box may have more than one ballot slot (e.g. one for drive-by ballot return and one for walk-up returns);

- To ensure that only ballot material can be deposited and not removed by anyone but designated county board of election officials, the opening slot of a drop-box should be too small to allow tampering or removal of ballots; and

• The opening slot should also minimize the ability for liquid to be poured into the drop-box or rainwater to seep in.

The Secretary's guidance as to signage recommended, [*id.* at § 2.3]:

• Signage should be in all languages required under the federal Voting Rights Act of 1965 ( 52 U.S.C. Sec. 10503);

• Signage should display language stating that counterfeiting, forging, tampering with, or destroying ballots is a second-degree misdemeanor pursuant to sections 1816 and 1817 of the Pennsylvania Election Code ( 25 P.S. §§ 3516 and 3517);

• Signage should also provide a statement that third-party return of ballots is prohibited unless the person returning the ballot is rendering assistance to a disabled voter or an emergency absentee voter. Such assistance requires a declaration signed by the voter and the person rendering assistance; and

• Signage should provide a statement requesting that the designated county elections official should be notified immediately in the event the receptacle is full, not functioning, or is damaged in any fashion, and should provide a phone number and email address for such purpose.

With respect to ballot security, the Secretary stated that county boards should implement the following security measures, [*id.* at § 2.5]:

• Only personnel authorized by the county board of elections should have access to the ballots inside of a drop-box;

• Drop-boxes should be secured in a manner to prevent their unauthorized removal;

• All drop-boxes should be secured by a lock and sealed with a tamper-evident seal. Only authorized election officials designated by the county board of elections may access the keys and/or combination of the lock;

• Drop-boxes should be securely fastened in a manner as to prevent moving or tampering, such as fastening the drop-box to concrete or an immovable object;

• During the hours when the staffed return site is closed or staff is unavailable, the drop-box should be placed in a secure area that is inaccessible to the public and/or otherwise safeguarded;

• The county boards of election should ensure adequate lighting is provided at all ballot return sites when the site is in use;

• When feasible, ballot return sites should be monitored by a video security surveillance system, or an internal camera that can capture digital images and/or video. A video security surveillance system can include existing systems on county, city, municipal, or private buildings. Video surveillance should be retained by the county election office through 60 days following the deadline to certify the election; and

**\*13** • To prevent physical damage and unauthorized entry, the drop-box at a ballot return site located outdoors should be constructed of durable material able to withstand vandalism, removal, and inclement weather.

With respect to ballot collection and "chain of custody" procedures, the Secretary stated that counties should adhere to the following standards, [*id.* at §§ 3.1-3.2]:

• Ballots should be collected from ballot return sites only by personnel authorized by the county board of elections and at times determined by the board of elections, at least every 24 hours, excluding Saturdays and Sundays;

• The county board of elections should designate at least two election officials to collect voted ballots from a ballot return site. Each designated election official should carry identification or an official designation that identifies them as an election official authorized to collect voted ballots;

• Election officials designated to collect voted ballots by the board of elections should sign a declaration declaring that he or she will timely and securely collect and return voted ballots, will not permit any person to tamper with a ballot return site or its contents, and that he or she will faithfully and securely perform his or her duties;

• The designated election officials should retrieve the voted ballots from the ballot return site and place the voted ballots in a secure ballot transfer container;

• The designated election officials should note on *Ballot Return Site Collection Forms* the site and unique identification number of the ballot return site and the date and time of retrieval;

• Ballots collected from any ballot return site should be immediately transported to the county board of elections;

• Upon arrival at the office of the county board of elections, the county board of elections, or their designee(s), should note the time of arrival on the same form, as described above;

• The seal number should be verified by a county election official or a designated representative;

• The county board of elections, or their designee(s), should inspect the drop-box or secure ballot transfer container for evidence of tampering and should receive the retrieved ballots by signing the retrieval form and including the date and time of receipt. In the event tampering is evident, that fact must be noted on the retrieval form;

• The completed collection form should be maintained in a manner proscribed by the board of elections to ensure that the form is traceable to its respective secure ballot container; and

• The county elections official at the county election office or central count location should note the number of ballots delivered on the retrieval form.

And finally, as to election day and post-election day procedures with respect to drop boxes, the Secretary provided as follows, [*id.* at §§ 3.3, 4]:

• The county board of elections should arrange for authorized personnel to retrieve ballots on election night and transport them to the county board of elections for canvassing of the ballots;

• Authorized personnel should be present at ballot return sites immediately prior to 8:00 p.m. or at the time the polls should otherwise be closed;

• At 8:00 p.m. on election night, or later if the polling place hours have been extended, all ballot return sites and drop-boxes must be closed and locked;

**\*14** • Staff must ensure that no ballots are returned to the ballot return site after the close of polls;

• After the final retrieval after the closing of the polls, the drop-box must be removed or locked and/or covered to prevent any further ballots from being deposited, and a sign shall be posted indicating that polling is closed for the election; and

• Any ballots collected from a return site should be processed in the same manner as mail-in ballots personally delivered to the central office of the county board of elections official by the voter and ballots received via the United States Postal Service or any other delivery service.

The Secretary and her staff developed this guidance in consultation with subject-matter experts within her Department and after review of the policies, practices, and laws in other states where drop boxes have been used. [ECF 549-6, pp. 23:14-22]. The evidence reflects at least one instance in which the Secretary's deputies reiterated that these "best practices" should be followed in response to inquiries from county officials considering whether to use drop boxes. [ECF 549-32 ("Per our conversation, the list of items are things the county must keep in mind if you are going to provide a box for voters to return their ballots in person.") ].

Approximately 24 counties plan to use drop boxes during the November general election, to varying degrees. [ECF 549-28; ECF 504-1]. Of these, about nine counties intend to staff the drop boxes with county officials, while about 17 counties intend to use video surveillance in lieu of having staff present. [ECF 549-28].

### 2. Defendants' and Intervenors' evidence of the benefits and low risks associated with drop boxes.

Secretary Boockvar advocates for the use of drop boxes as a "direct and convenient way" for voters to deliver cast ballots to their county boards of elections, "thereby increasing turnout." [ECF 547, p. 22 ¶ 54 (citing 549-11 at pp. 10-11) ]. The Secretary also touts the special benefits of expanding drop-box use in the ongoing COVID-19 pandemic. Specifically, she asserts that drop boxes reduce health risks and inspire voter confidence because "many voters understandably do not wish to cast their votes in person at their polling place on Election Day" due to COVID-19.

[*Id.* at ¶¶ 55, 57 (citing ECF 549-2 ¶ 39; ECF 549-11 at p. 10; 549-8, ¶ 95) ]. Drop boxes, she says, allow voters to vote in person without coming into "close proximity to other members of the public, compared to in-person voting or personally delivering a mail-in ballot to a public office building." [*Id.* at ¶ 57].

Secretary Boockvar also states that drop boxes are highly convenient, and cost-saving, for both counties and voters. For counties, she notes that "24-hour secure ballot drop boxes" are "cost-effective measures ... as they do not have to be staffed by election judges." [*Id.* at p. 24 ¶ 62 (citing ECF 549-11 at p. 11); ECF 549-9 at ¶ 34]. As for voters, the Secretary explains that, in a state where "ten counties ... cover more than 1,000 square miles" and "two-thirds" of counties "cover more than 500 square miles," many Pennsylvania voters "could be required to drive dozens of miles (and perhaps in excess of 100 miles) if he or she wished to deposit his or her mail-in ballot in person at the main county board of elections office." [*Id.* at ¶ 58 (citing ECF 549-29) ].

 **\*15**  In addition to any tangible benefit drop boxes may have for voter access and turnout, Secretary Boockvar also states that drop boxes have a positive impact on voter confidence. In particular, she cites a recent news article, and a letter sent by the General Counsel of the U.S. Postal Service regarding Pennsylvania's absentee and mail-in ballot deadline, which have raised concerns over the timeliness and reliability of the U.S. Postal Service. [*Id.* at ¶¶ 60-61 (citing ECF 549-13; ECF 549-14); ECF 549-17; ECF 549-2 ¶¶ 42-43]. Voters' fears that votes returned by mail will not be timely counted could, the Secretary worries, "justifiably dissuade voters from wanting to rely upon the Postal Service for return of their mail-in or absentee ballot." [ECF 547, ¶ 61]. Drop boxes, she says, can address this concern by allowing voters to safely return mail-in ballots to an in-person location.

In exchange for these benefits, the Secretary insists that any potential security risk associated with drop boxes is low. She notes that the federal Department of Homeland Security has released guidance affirming that a "ballot drop box provides a secure and convenient means for voters to return their mail ballot," and recommending that states deploy one drop box for every 15,000 to 20,000 registered voters. [*Id.* at ¶¶ 63-65 (citing ECF 549-24, p. 1) ]. She also points to a purported lack of evidence of systemic ballot harvesting or any attempts to tamper with, destroy, or otherwise commit voter fraud using drop boxes, either in Pennsylvania's recent primary election, or in other states that have used drop boxes for many years.

[*Id.* at ¶¶ 68-74 (citations omitted) ]. And she asserts that "[i]n the last 20 years in the entire state of Pennsylvania, there have been fewer than a dozen confirmed cases of fraud involving a handful of absentee ballots" among the many millions of votes cast during that time period. [*Id.* at ¶ 70 (citing ECF 549-10, pp. 3-4) ].

Finally, the Secretary, and other Defendants and Intervenors, argue that Pennsylvania already has robust measures in place to prevent fraud, including its criminal laws, voter registration system, mail-in ballot application requirement, and canvassing procedures. [*Id.* at ¶¶ 66-67 (citing 25 P.S. §§ 3516 – 3518) ]; [ECF 549-9, p. 15, ¶¶ 46-47 ("These allegations are not consistent with my experience with drop box security, particularly given the strong voter verification procedures that are followed by elections officials throughout the country and in Pennsylvania. Specifically, the eligibility and identity of the voter to cast a ballot is examined by an election judge who reviews and confirms all the personal identity information provided on the outside envelope. Once voter eligibility is confirmed, the ballot is extracted and separated from the outside envelope to ensure the ballot remains secret. During this step, election judges confirm that there is only one ballot in the envelope and checks for potential defects, such as tears in the ballot.... Regardless of the receptacle used for acceptance of the ballot (drop box versus USPS mailbox), ballot validation occurs when the ballot is received by the county board of elections. The validation is the same regardless of how the ballots are collected or who delivers the ballot, even where that delivery contravenes state law.") ].

Defendants and Intervenors also point to several expert reports expressing the view that drop boxes are both low risk and beneficial. These experts include:

**Professor Matthew A. Barreto**, a Professor of Political Science and Chicana/o Studies at UCLA. [ECF 549-7]. Professor Barreto offers the opinion that ballot drop boxes are an important tool in facilitating voting in Black and Latino communities. Specifically, he discusses research showing that Black and Latino voters are "particularly concerned about the USPS delivering their ballots." [*Id.* at ¶ 22]. And he opines that ballot drop boxes help to reassure these voters that their vote will count, because "there is no intermediary step between the voters and the county officials who collect the ballot." [*Id.* at ¶ 24].

**\*16 Professor Donald S. Burke**, a medical doctor and Distinguished University Professor of Health Science and Policy, Jonas Salk Chair in Population Health, and Professor of Epidemiology at the University of Pittsburgh. [ECF 549-8]. Professor Burke details the "significant risk of exposure" to COVID-19 in "enclosed areas like polling places." [*Id.* at ¶ 69]. He opines that "depositing a ballot in a mailbox and depositing a ballot in a drop-box are potential methods of voting that impart the least health risk to individual voters, and the least public health risk to the community." [*Id.* at ¶ 95].

**Amber McReynolds**, the CEO of the National Vote at Home Institute, with 13 years of experience administering elections as an Elections Director, Deputy Director, and Operations Manager for the City and County of Denver, Colorado. [ECF 549-9]. Ms. McReynolds opines that "[b]allot drop-boxes can be an important component of implementing expanded mail-in voting" that are "generally more secure than putting a ballot in post office boxes." [*Id.* at ¶ 16 (a) ]. She notes that "[d]rop boxes are managed by election officials ... delivered to election officials more quickly than delivery through the U.S. postal system, and are secure." [*Id.*].

Ms. McReynolds also opines that Secretary Boockvar's guidance with respect to drop boxes is "consistent with best practices and advice that NVAHI has provided across jurisdictions." [*Id.* at ¶ 35]. But she also notes that "[b]est practices will vary by county based on the county's available resources, population, needs, and assessment of risk." [*Id.* at ¶ 52].

More generally, Ms. McReynolds argues that "[d]rop-boxes do not create an increased opportunity for fraud" as compared to postal boxes. [*Id.* at ¶ 44]. She also suggests that Pennsylvania guards against such fraud through other "strong voter verification procedures," including "ballot validation [that] occurs when the ballot is received by the county board of elections" and "[r]econciliation procedures adopted by election officials ... [to] protect against the potential risk of double voting." [*Id.* at ¶¶ 46-48]. She notes that "Pennsylvania's balloting system requires that those who request a mail-in vote and do not return the ballot (or spoil the mail-in ballot at their polling place), can only vote a provisional ballot" and "[i]f a mail-in or absentee ballot was submitted by an individual, their provisional ballot is not counted." [*Id.* at ¶ 48].

**Professor Lorraine C. Minnite**, an Associate Professor and Chair of the Department of Public Policy and Administration at Rutgers University-Camden. [ECF 549-10]. Professor Minnite opines that "the incidence of voter fraud in contemporary U.S. elections is exceedingly rare, including the incidence of voter impersonation fraud committed through the use of mail-in absentee ballots." [*Id.* at p. 3]. In Pennsylvania specifically, she notes that "[i]n the last 20 years ... there have been fewer than a dozen confirmed cases of fraud involving a handful of absentee ballots, and most of them were perpetrated by insiders rather than ordinary voters." [*Id.* at pp. 3-4]. As a "point of reference," she notes that 1,459,555 mail-in and absentee ballots were cast in Pennsylvania's 2020 primary election alone. [*Id.* at 4].

**Professor Robert M. Stein**, a Professor of Political Science at Rice University and a fellow in urban politics at the Baker Institute. [ECF 549-11]. Professor Stein opines that "the Commonwealth's use of drop boxes provides a number of benefits without increasing the risk of mail-in or absentee voter fraud that existed before drop boxes were implemented because (manned or unmanned) they are at least as secure as U.S. Postal Service ('USPS') mailboxes, which have been successfully used to return mail-in ballots for decades in the Commonwealth and elsewhere around the U.S." [*Id.* at p. 3]. According to Professor Stein, the use of drop boxes "has been shown to increase turnout," which he suggests is particularly important "during a global pandemic and where research has shown that natural and manmade disasters have historically had a depressive effect on voter turnout." [*Id.* at p. 4]. Professor Stein notes that "[d]rop boxes are widely used across a majority of states as a means to return mail-in ballots" and he is "not aware of any studies or research that suggest that drop boxes (manned or unmanned) are a source for voter fraud." [*Id.*]. Nor is he aware "of any evidence that drop boxes have been tampered with or led to the destruction of ballots." [*Id.*].

**\*17 Professor Paul Gronke**, a Professor of Political Science at Reed College and Director of the Early Voting Information Center. [ECF 545-7]. Professor Gronke recommends that "drop boxes should be provided in every jurisdiction that has significant (20% or more) percentage[ ] of voters casting a ballot by mail, which includes Pennsylvania" for the general election. [*Id.* at ¶ 6]. He avers that "[s]cientific research shows that drop boxes raise voter turnout and enhance voter confidence in the elections process." [*Id.* at ¶ 7]. Voters, he explains, "utilize drop boxes heavily—forty to seventy percent of voters in vote by mail states and twenty-five percent or more in no-excuse absentee states." [*Id.*]. Professor Gronke further states that he is "not

aware of any reports that drop boxes are a source for voter fraud" despite having "been in use for years all over the country." [*Id.* at ¶ 8]. And he suggests that the use of drop boxes is "especially important" in an election "that will be conducted under the cloud of the COVID-19 pandemic, and for a state like Pennsylvania that is going to experience an enormous increase in the number of by-mail ballots cast by the citizenry of the state." [*Id.* at ¶ 9].

Based on this evidence, and the purported lack of any contrary evidence showing great risks of fraud associated with the use of drop boxes, Defendants and Intervenors argue that Pennsylvania's authorization of drop boxes, and the counties' specific implementation of them, furthers important state interests at little cost to the integrity of the election system.

### 3. Plaintiffs' evidence of the risks of fraud and vote dilution associated with drop boxes.

Plaintiffs, on the other hand, argue that the drop boxes allow for an unacceptable risk of voter fraud and "illegal delivery or ballot harvesting" that, when it occurs, will "dilute" the votes of all lawful voters who comply with the Election Code. *See, e.g.,* [ECF 461, ¶¶ 127-128]. As evidence of the dilutive impact of drop boxes, Plaintiffs offer a combination of anecdotal and expert evidence.

Foremost among this evidence is the expert report of Greg Riddlemoser, the former Director of Elections and General Registrar for Stafford County, Virginia from 2011 until 2019. [ECF 504-19]. According to Mr. Riddlemoser, "voter fraud exists." [*Id.* at p. 2]. He defines the term "voter fraud" to mean any "casting and/or counting of ballots in violation of a state's election code." [*Id.*]. Examples he gives include: "Voting twice yourself—even if in multiple jurisdictions," "voting someone else's ballot," and "[e]lection officials giving ballots to or counting ballots from people who were not entitled to vote for various reasons." [*Id.* at pp. 2-3]. All of these things, he asserts, are "against the law and therefore fraudulent." [*Id.*]. [3]

Mr. Riddlemoser argues that "ballot harvesting" (which is the term Plaintiffs use to refer to situations in which an individual returns the ballots of other people) "persists in Pennsylvania." [*Id.* at p. 3]. He points to the following evidence to support this opinion:

- Admissions by Pennsylvania's Deputy Secretary for Elections and Commissions, Jonathan Marks, that "several Pennsylvania counties permitted ballot harvesting by counting ballots that were delivered in violation of Pennsylvania law" during the recent primary election, [*Id.*];

- "[S]everal instances captured by the media where voters in the June 2020 Primary deposited multiple ballots into unstaffed ballot drop boxes," [*Id.* at p. 4];

- "Other photographs and video footage of at least one county's drop box (Elk County) on Primary Election day" which "revealed additional instances of third-party delivery," [*Id.*]; and

- "Documents produced by Montgomery County" which "reveal that despite signs warning that ballot harvesting is not permitted, people during the 2020 Primary attempted to deposit into the five drop boxes used by that county ballots that were not theirs," [*Id.*].

**\*18** With respect to the use of "unstaffed" or "unmanned" ballot drop boxes, Mr. Riddlemoser expresses the opinion that "the use of unmanned drop boxes presents the easiest opportunity for voter fraud" and "certain steps must be taken to make drop boxes 'secure' and 'monitored.' " [*Id.* at p. 16].

He states that, to be "secure," drop boxes must be "attended" by "sworn election officials" at all times (*i.e.*, "never left unattended at any time they are open for ballot drop-off."). [*Id.*]. He further suggests that officials stationed at drop boxes must be empowered, and required, to "verify the person seeking to drop off a ballot is the one who voted it and is not dropping off someone else's ballot." [*Id.*]. Doing so, he says, would, in addition to providing better security, also "allow the election official to ask the voter if they followed the instructions they were provided ... and assist them in doing so to remediate any errors, where possible, before ballot submission." [*Id.*].

In addition to being "manned," Mr. Riddlemoser suggests that certain procedures with respect to ballot collection are necessary to ensure the integrity of votes cast in drop boxes. For example, he suggests that, at the end of each day, drop boxes, which should themselves be "tamperproof," should "be verifiably completely emptied into fireproof/tamperproof receptacles, which are then sealed and labeled by affidavit as to whom, where, when, etc." [*Id.*] Once sealed, the containers

"must then be transported by sworn officials in a county owned vehicle (preferably marked law enforcement) back to the county board where they are properly receipted and safeguarded." [*Id.*]. Emptied drop boxes should also be sealed at the end of each day "such that they are not able to accept any additional ballots until they are 'open' again[.]" [*Id.*]. And boxes should be "examined to ensure no ballots are in the box, that nothing else is inside the box, and that the structural integrity and any security associated with the box remains intact." [*Id.*]. All of this, he suggests, should also be "available for monitoring by poll watchers." [*Id.*].

According to Mr. Riddlemoser, anything short of these robust procedures won't do. In particular, "video cameras would not prevent anyone from engaging in activity that could or is designed to spoil the ballots inside the box; such as dumping liquids into the box, lighting the ballots on fire by using gasoline and matches, or even removing the box itself." [*Id.* at p. 17]. Even if the "identity of the person responsible may be determined ... the ballots themselves would be destroyed —effectively disenfranchising numerous voters." [*Id.*]. And given "recent footage of toppled statues and damage to government buildings" in the news, Mr. Riddlemoser finds the "forcible removal of ballot drop boxes" to be "a distinct possibility." [*Id.*]. In addition to increasing the risk of ballot destruction, Mr. Riddlemoser notes that reliance on video cameras would also "not prohibit someone from engaging in ballot harvesting by depositing more than one ballot in the drop box[.]" [*Id.*].

Beyond Mr. Riddlemoser's expert testimony, Plaintiffs proffer several other pieces of evidence to support their claims that drop boxes pose a dilutive threat to the ballots of lawful voters. Most notably, they present photographs and video stills of, by the Court's count, approximately seven individuals returning more than one ballot to drop boxes in Philadelphia and Elk County (the same photographs referenced by Mr. Riddlemoser). [ECF 504-19, PDF pp. 49-71].

**\*19**  Those photographs depict the following:



- **An unidentified woman holding what appear to be two ballots at a Philadelphia drop box.**

- **Instagram user "thefoodiebarrister" posing for a selfie with two ballots in Philadelphia; captioned, in part, "dropping of [sic] my votes in a designated ballot drop box."**



- **A photograph posted to social media showing a hand placing two ballots in a drop box; captioned, in part, "Cory and I voted!"**







Li Kramer Halpern
Monday at 12:53 PM · One Montgomery Plaza · 🌐

**Cory** and I voted! I miss my sticker.  If you're using the drop box in Norristown, walk through the construction the building is open. Closed at noon today but other days open 7am - 8pm through June 2nd. **https://** www.montcopa.org/ArchiveCenter/ViewFile/Item/ 5177

- **A photograph of an unidentified man wearing a "Philadelphia Water" sweater and hat, placing two ballots in a Philadelphia drop box.**

- **Several video stills that, according to Plaintiffs, show voters depositing more than one ballot in an Elk County drop box.**





In addition to these photographs and video stills, Plaintiffs also provide a May 24, 2020, email sent by an official in Montgomery County (which placed security guards to monitor its drop boxes) observing that security "have turned

people away yesterday and today without incident who had ballots other than their own." [ECF 504-28].

Separate and apart from this evidence specific to the use of drop boxes, Plaintiffs and their expert also provide evidence of instances of election fraud, voter fraud, and illegal voting generally. These include, for example:

- A case in which a New Jersey court ordered a new municipal election after a city councilman and councilman-elect were charged with fraud involving mail-in ballots. [ECF 504-19, p. 3].

- A New York Post article written by an anonymous fraudster who claimed to be a "master at fixing mail-in ballots" and detailed his methods. [*Id.*].

- Philadelphia officials' admission that approximately 40 people were permitted to vote twice during the 2020 primary elections. [*Id.*].

- A YouTube video purporting to show Philadelphia election officials approving the counting of mail-in ballots that lacked a completed certification on the outside of the envelope. [*Id.* (citation omitted) ].

- The recent guilty plea of the former Judge of Elections in South Philadelphia, Domenick J. DeMuro, to adding fraudulent votes to voting machines on election day. [ECF 461, ¶ 61]; *see United States v. DeMuro*, No. 20-cr-112 (E.D. Pa. May 21, 2020).

- The 2014 guilty plea of Harmar Township police chief Richard Alan Toney to illegally soliciting absentee ballots to benefit his wife and her running mate in the 2009 Democratic primary for town council, [ECF 461, ¶ 69];

- The 2015 guilty plea of Eugene Gallagher for unlawfully persuading residents and non-residents of Taylor, in Lackawanna County, Pennsylvania, to register for absentee ballots and cast them for him during his councilman candidacy in the November 2013 election, [*Id.*];

**\*20** • The 1999 indictment of Representative Austin J. Murphy in Fayette County for forging absentee ballots for residents of a nursing home and adding his wife as a write-in candidate for township election judge, [*Id.*];

- The 1994 Eastern District of Pennsylvania and Third Circuit case 📙 *Marks v. Stinson*, which involved an alleged incident of extensive absentee ballot fraud by a candidate for the Pennsylvania 📙 State Senate, *see Marks v. Stinson*, 19 F.3d 873 (3d Cir. 1994); *Marks v. Stinson*, No. 93-6157, 1994 WL 146113 (E.D. Pa. Apr. 26, 1994), [ECF 461, ¶ 78]; and

- A report from the bipartisan Commission on Federal Election Reform, chaired by former President Jimmy Carter and former Secretary of State James A. Baker III, which observed that absentee voting is "the largest source of potential voter fraud" and proposed that states "reduce the risks of fraud and abuse in absentee voting by prohibiting 'third-party' organizations, candidates, and political party activists from handling absentee ballots." [ECF 461, ¶¶ 66-67, 80].

**C. Facts relevant to signature comparison.**

Many of the facts relevant to Plaintiffs' signature-comparison claim relate to the verification procedures for mail-in and absentee ballots, on one hand, and those procedures for in-person voting, on the other. These are described below.

**1. Mail-in and absentee ballot verification.**

As noted above, Pennsylvania does not distribute unsolicited mail-in and absentee ballots. Rather, a voter must apply for the ballot (and any voter can). [ECF 549-2, ¶ 64]. As part of the application for a mail-in ballot,[4] an applicant must provide certain identifying information, including name, date of birth, length of time as a resident of the voting district, voting district if known, party choice in the primary, and address where the ballot should be sent. 📙 25 P.S. § 3150.12(b). In applying for a mail-in ballot, the applicant must also provide "proof of identification," which is defined by statute as that person's driver's license number, last four digits of Social Security number, or another specifically approved form of identification. [ECF 549-2, ¶ 64; ECF 549-27]; 📙 25 P.S. § 2602(z.5)(3). A signature is not mentioned in the definition of "proof of identification." 📙 25 P.S. § 2602(z.5)(3). However, if physically capable, the applicant must sign the application. 📙 *Id.* at § 3150.12(c)- 📙 (d).

Upon receiving the mail-in ballot application, the county board of elections determines if the applicant is qualified by "verifying the proof of identification and comparing the information provided on the application with the information contained on the applicant's permanent registration card." 25 P.S. § 3150.12b(a). The county board of elections then either approves the application [5] or "immediately" notifies the applicant if the application is not approved. *Id.* at § 3150.12b(a), (c). Upon approval, the county mails the voter the mail-in ballot.

**\*21** After receiving the ballot, the mail-in voter must "mark the ballot" with his or her vote, insert the ballot into the "secrecy" envelope, and place the "secrecy" envelope into a larger envelope. *Id.* at § 3150.16(a). Then, the voter must "fill out, date and sign the declaration printed on [the larger] envelope. [The larger] envelope shall then be securely sealed and the elector shall send [it] by mail ... or deliver it in person to said county board of election." *Id.* The declaration on the larger envelope must be signed, unless the voter is physically unable to do so. *Id.* at § 3150.16(a)- (a.1).

Once the voter mails or delivers the completed mail-in ballot to the appropriate county board of elections, the ballot is kept "in sealed or locked containers until they are to be canvassed by the county board of elections." *Id.* at § 3146.8(a). The county boards of elections can begin pre-canvassing and canvassing the mail-in ballots no earlier than election day. *Id.* at § 3146.8(g)(1.1).

When pre-canvassing and canvassing the mail-in ballots, the county boards of elections must "examine the declaration on the [larger] envelope of each ballot ... and shall compare the information thereon with that contained in the ...Voters File." *Id.* at § 3146.8(g)(3). The board shall then verify the "proof of identification" and shall determine if "the declaration [on the larger envelope] is sufficient." *Id.* If the information in the "Voters File ... verifies [the elector's] right to vote," the ballot shall be counted. *Id.*

### 2. In-person voting verification.

When a voter decides to vote in-person on election day, rather than vote by mail, the procedures are different. There is no application to vote in person. Rather, on election day, the in-person voter arrives at the polling place and "present[s] to

an election officer proof of identification," which the election officer "shall examine." *Id.* at § 3050(a). The in-person voter shall then sign a voter's certificate" and give it to "the election officer in charge of the district register." *Id.* at § 3050(a.3) (1). Next, the election officer shall "announce the elector's name" and "shall compare the elector's signature on his voter's certificate with his signature in the district register." *Id.* at § 3050(a.3)(2). If the election officer believes the signature to be "genuine," the in-person voter may vote. *Id.* But if the election officer does not deem the signature "authentic," the in-person voter may still cast a provisional ballot and is given the opportunity to remedy the deficiency. *Id.*

### 3. The September 11, 2020, and September 28, 2020, sets of guidance.

In September 2020, Secretary Boockvar issued two new sets of guidance related to signature comparisons of mail-in and absentee ballots and applications. The first, issued on September 11, 2020, was titled "Guidance Concerning Examination of Absentee and Mail-In Ballot Return Envelopes." [ECF 504-24]. The guidance stated, in relevant part, the "Pennsylvania Election Code does not authorize the county board of elections to set aside returned absentee or mail-in ballots based solely on signature analysis by the county board of elections." [*Id.* at p. 3]. The second set of guidance, issued on September 28, 2020, was titled, "Guidance Concerning Civilian Absentee and Mail-In Ballot Procedures." [ECF 504-25]. This September 28, 2020, guidance stated, in relevant part, "The Election Code does not permit county election officials to reject applications or voted ballots based solely on signature analysis. ... No challenges may be made to mail-in and absentee ballots at any time based on signature analysis." [*Id.* at p. 9]. Thus, as evidenced by these two sets of guidance, Secretary Boockvar advised the county boards of elections not to engage in a signature-comparison analysis of voters' signatures on ballots and applications for ballots.

**\*22** Most of the counties intend to follow the Secretary's guidance and will not compare signatures on mail-in ballots and applications for the upcoming general election. *E.g.*, [ECF 504-1]. A few counties, however, stated their intent to not comply with the guidance, and instead would compare and verify the authenticity of signatures. *E.g.*, [*id.* (noting the counties of Cambria, Elk, Franklin, Juniata, Mifflin, Sullivan, Susquehanna, and Wyoming, as not intending to follow Secretary Boockvar's guidance to not compare signatures) ].

According to Defendants, there are valid reasons to not require signature comparisons for mail-in and absentee ballots. For example, Secretary Boockvar notes that signature verification is a technical practice, and election officers are not "handwriting experts." [ECF 549-2, p. 19, ¶ 68]. Secretary Boockvar also notes that voters' signatures can change over time, and various medical conditions (*e.g.*, arthritis) can impact a person's signature. [*Id.*] Defendants' expert, Amber McReynolds, also finds that "signature verification" involves "inherent subjectivity." [ECF 549-9, p. 20, ¶ 64]. Ms. McReynolds further notes the "inherent variability of individuals' signatures over time." [*Id.*] And according to Secretary Boockvar, these are just some reasons Pennsylvania implements verification procedures other than signature comparisons for mail-in voters, who, unlike in-person voters, are not present when their signature would be verified. [ECF 549-2, p. 20, ¶ 69].

Plaintiffs' expert, Greg Riddlemoser, on the other hand, states that signature comparison is "a crucial security aspect of vote-by-mail" and failing to verify signatures on mail-in ballots would "undermine voter confidence and would increase the possibility of voter fraud." [ECF 504-19, pp. 10-11]. Mr. Riddlemoser asserts that Secretary Boockvar's September 11, 2020, and September 28, 2020, guidance "encourage, rather than prevent, voter fraud." [*Id.* at p. 12]. As such, Mr. Riddlemoser explains that mail-in voters should be subject to the same signature-comparison requirement as in-person voters. [*Id.* at pp. 13-14].

#### 4. Secretary Boockvar's King's Bench petition.

In light of this case and the parties' disagreement over whether the Election Code mandates signature comparison for mail-in ballots, Secretary Boockvar filed a "King's Bench" petition with the Pennsylvania Supreme Court on October 4, 2020. In that petition, she asked the Pennsylvania Supreme Court to exercise its extraordinary jurisdiction, in light of the impending election, to clarify whether the Election Code mandates signature comparison of mail-in and absentee ballots and applications. [ECF 556, p. 11; ECF 557].

On October 7, 2020, several groups, including Donald J. Trump for President, Inc. and the Republican National Committee—who are Plaintiffs in this case—moved to intervene as Respondents in the Pennsylvania Supreme Court case. [ECF 571-1]. The Pennsylvania Supreme Court has not

yet decided the motion to intervene or whether to accept the case. The petition remains pending.

#### D. Facts relevant to poll-watcher claims.

The position of "poll watcher" is a creation of state statute. *See* 25 P.S. § 2687. As such, the Election Code defines how a poll watcher may be appointed, what a poll watcher may do, and where a poll watcher may serve.

#### 1. The county-residency requirement for poll watchers.

**\*23** The Election Code permits candidates to appoint two poll watchers for each election district. 25 P.S. § 2687(a). The Election Code permits political parties and bodies to appoint three poll watchers for each election district. *Id.*

For many years, the Pennsylvania Election Code required that poll watchers serve only within their "election district," which the Code defines as "a district, division or precinct, ... within which all qualified electors vote at one polling place." 25 P.S. § 2687(b) (eff. to May 15, 2002) (watchers "shall serve in only one district and must be qualified registered electors of the municipality or township in which the district where they are authorized to act is located"); 25 P.S. § 2602(g). Thus, originally, poll watching was confined to a more limited geographic reach than one's county, as counties are themselves made up of many election districts.

Then, in 2004, the General Assembly amended the relevant poll-watcher statute to provide that a poll watcher "shall be authorized to serve in the election district for which the watcher was appointed and, when the watcher is not serving in the election district for which the watcher was appointed, in any other election district in the county in which the watcher is a qualified registered elector." 25 P.S. § 2687(b) (eff. Oct. 8, 2004).

This county-residency requirement is in line with (or is, in some cases, more permissive than) the laws of at least eight other states, which similarly require prospective poll watchers to reside in the county in which they wish to serve as a watcher or (similar to the pre-2004 Pennsylvania statute) limit poll watchers to a sub-division of the county. *See, e.g.*, Fla. Stat. Ann. § 101.131(1) (Florida); Ind. Code Ann.

§ 3-6-8-2.5 (Indiana); Ky. Rev. Stat. Ann. § 117.315(1) (Kentucky); N.Y. Elec. Law § 8-500(5) (New York); N.C. Gen. Stat. Ann. § 163-45(a) (North Carolina); Tex. Elec. Code Ann. § 33.031(a) (Texas); S.C. Code Ann. § 7-13-860 (South Carolina); Wyo. Stat. Ann. § 22-15-109(b) (Wyoming). However, at least one state (West Virginia) does not provide for poll watchers at all. *See* W. Va. Code Ann. § 3-1-37; W. Va. Code Ann. § 3-1-41

The General Assembly has not amended the poll-watcher statute since 2004, even though some lawmakers have advocated for the repeal of the residency requirement. *See* Cortés, 218 F. Supp. 3d at 402 (observing that legislative efforts to repeal the poll-watcher residency requirement have been unsuccessful).

As part of its September 17, 2020, decision, the Pennsylvania Supreme Court found that the county-residency requirement does not violate the U.S. or Pennsylvania constitutions. Boockvar, ––– A.3d at ––––, 2020 WL 5554644, at *31.

### 2. Where and when poll watchers can be present during the election.

The Pennsylvania Election Code sets forth the rules for where and when poll watchers are permitted to be present.

The Election Code provides that poll watchers may be present "at any public session or sessions of the county board of elections, and at any computation and canvassing of returns of any primary or election and recount of ballots or recanvass of voting machines under" the Code. 25 P.S. § 2650. Additionally, one poll watcher for each candidate, political party, or political body may "be present in the polling place ... from the time that the election officers meet prior to the opening of the polls ... until the time that the counting of votes is complete and the district register and voting check list is locked and sealed." 25 P.S. § 2687(b).

**\*24**  During this time, poll watchers may raise objections to "challenge any person making application to vote." *Id.* Poll watchers also may raise challenges regarding the voters' identity, continued residence in the election district, or registration status. 25 P.S. § 3050(d).

Although Pennsylvania has historically allowed absentee ballots to be returned by U.S. Postal Service or by in-person delivery to a county board of elections office, the Election Code does not provide (and has never provided for) any right to have poll watchers in locations where absentee voters fill out their ballots (which may include their home, office, or myriad other locations), nor where those votes are mailed (which may include their own mailbox, an official U.S. Postal Service collection box, a work mailroom, or other places U.S. Postal Service mail is collected), nor at county board of elections offices. [ECF 549-2, ¶¶ 86-90].

Before Act 77, absentee ballots were held in election districts rather than centralized at the county board of elections. *See* 25 P.S. § 3146.8 (eff. Mar. 14, 2012 to Oct. 30, 2019) ("In all election districts in which electronic voting systems are used, absentee ballots shall be opened at the election district, checked for write-in votes in accordance with section 1113-A and then either hand-counted or counted by means of the automatic tabulation equipment, whatever the case may be.").

At such time (again, before Act 77), poll workers opened those absentee ballots at each polling place after the close of the polls. *Id.* ("Except as provided in section 1302.1(a.2), the county board of elections shall then distribute the absentee ballots, unopened, to the absentee voter's respective election district concurrently with the distribution of the other election supplies. Absentee ballots shall be canvassed immediately and continuously without interruption until completed after the close of the polls on the day of the election in each election district. The results of the canvass of the absentee ballots shall then be included in and returned to the county board with the returns of that district." (footnote omitted)).

With the enactment of Act 77, processing and counting of mail-in and absentee ballots is now centralized in each county board of elections, with all mail-in and absentee ballots in such county held and counted at the county board of elections (or such other site as the county board may choose) without regard to which election district those ballots originated from. 25 P.S. § 3146.8(a) (eff. Mar. 27, 2020); [ECF 549-2, ¶ 81].

Under Act 12, counties are permitted to "pre-canvass" mail-in or absentee ballots received before Election Day beginning at 7:00 a.m. on Election Day. 25 P.S. § 3146.8(g)(1.1). Counties are further permitted to "canvass" ballots received after that time beginning "no earlier than the close of the polls

on the day of the election and no later than the third day following the election." 📑 *Id.* § 3146.8(g)(2).

The Election Code permits "[o]ne authorized representative of each candidate" and "one representative from each political party" to "remain in the room in which the absentee ballots and mail-in ballots are pre-canvassed." 📑 25 P.S. § 3146.8(g)(1.1). Similarly, during canvassing, the Election Code permits "[o]ne authorized representative of each candidate" and "one representative from each political party" to "remain in the room in which the absentee ballots and mail-in ballots are canvassed." 📑 25 P.S. § 3146.8(g)(2).

**\*25** The Election Code provisions pertaining to the "pre-canvass" and "canvass" do not make any separate reference to poll watchers, instead referring only to the "authorized representatives" of parties and candidates. *See* 📑 25 P.S. § 3146.8.

On October 6, 2020, Secretary Boockvar issued guidance concerning poll watchers and authorized representatives. [ECF 571-1]. The guidance states that poll watchers "have no legal right to observe or be present at ... ballot return sites," such as drop-box locations. [ECF 571-1, Ex. E, p. 5]. The guidance also states that while a candidate's authorized representative may be present when mail-in ballots are opened (including during pre-canvass and canvass), the representative cannot challenge those ballots. [*Id.* at Ex. E, p. 4].

On October 9, 2020, in a separate lawsuit brought by the Trump Campaign in the Philadelphia County Court of Common Pleas, the state court there confirmed Secretary Boockvar's guidance. Specifically, the state court held that satellite ballot-collection locations, such as drop-box locations, are not "polling places," and therefore poll watchers are not authorized to be present in those places. [ECF 573-1, p. 12 ("It is clear from a reading of the above sections [of the Election Code] that the satellite offices where these activities, and only these activities, occur are true 'offices of the Board of Elections' and are not polling places, nor public sessions of the Board of Elections, at which watchers have a right to be present under the Election Code.") ]. Immediately after issuance of this decision, the Trump Campaign filed a notice of appeal, indicating its intention to appeal the decision to the Commonwealth Court of Pennsylvania. Having just been noticed, that appeal remains in its infancy as of the date of this Opinion.

### 3. Plaintiffs' efforts to recruit poll watchers for the upcoming general election.

In order to become a certified poll watcher, a candidate must meet certain criteria. [ECF 504-20, ¶ 9]. That is, a poll watcher needs to be "willing to accept token remuneration, which is capped at $120 under Pennsylvania state law" and must be able to take off work or otherwise make arrangements to be at the polling place during its open hours on Election Day, which can mean working more than 14 hours in a single day. [*Id.*].

The Pennsylvania Director for Election Day Operations for the Trump Campaign, James J. Fitzpatrick, stated that the Trump Campaign wants to recruit poll watchers for every county in Pennsylvania. [ECF 504-2, ¶ 30]. To that end, the RNC and the Trump Campaign have initiated poll-watcher recruitment efforts for the general election by using a website called DefendYourBallot.com. [ECF 528-14, 265:2-15, 326:14-329-7]. That website permits qualified electors to volunteer to be a poll watcher. [*Id.*]. In addition, Plaintiffs have called qualified individuals to volunteer to be poll watchers, and worked with county chairs and conservative activists to identify potential poll watchers. [*Id.*].

Despite these efforts, the Trump Campaign claims it "is concerned that due to the residency restriction, it will not have enough poll watchers in certain counties." [ECF 504-2, ¶ 25]. Mr. Fitzpatrick, however, could not identify a specific county where the Trump Campaign has been unable to obtain full coverage of poll watchers or any county where they have tried and failed to recruit poll watchers for the General Election. [ECF 528-14, 261:21-262:3, 263:8-19, 265:2-266:3].

**\*26** In his declaration, Representative Reschenthaler shared Mr. Fitzpatrick's concern, stating that he does not believe that he will "be able to recruit enough volunteers from Greene County to watch the necessary polls in Greene County." [ECF 504-6, ¶ 12]. But Representative Reschenthaler did not provide any information regarding his efforts to recruit poll watchers to date, or what he plans to do in the future to attempt to address his concern. *See generally* [*id.*].

Representative Kelly stated in his declaration that he was "likely to have difficulty getting enough poll watchers from within Erie County to watch all polls within that county on election day." [ECF 504-5, ¶ 16]. Representative Kelly never detailed his efforts (*e.g.*, the outreach he tried, prospective

candidates he unsuccessfully recruited, and the like), and he never explained why those efforts aren't likely to succeed in the future. *See generally* [*id.*].

In his declaration, Representative Thompson only stated that based on his experience, "parties and campaigns cannot always find enough volunteers to serve as poll watchers in each precinct." [ECF 504-4, ¶ 20].

According to statistics collected and disseminated by the Pennsylvania Department of State, there is a gap between the number of voters registered as Democrats and Republicans in some Pennsylvania counties. [ECF 504-34]. Plaintiffs' expert, Professor Lockerbie, believes this puts the party with less than a majority of voters in that county at a disadvantage in recruiting poll watchers. [ECF 504-20, ¶ 15]. However, despite this disadvantage, Professor Lockerbie states that "the Democratic and Republican parties might be able to meet the relevant criteria and recruit a sufficient population of qualified poll watchers who meet the residency requirement[ ]." [*Id.* at ¶ 16].

Additionally, Professor Lockerbie finds the gap in registered voters in various counties to be especially problematic for minor political parties. [*Id.* at ¶ 16]. As just one example, according to Professor Lockerbie, even if one were to assume that all third-party voters were members of the same minor party, then in Philadelphia County it would require "every 7th registrant" to be a poll watcher in order for the third party to have a poll watcher observing each precinct." [*Id.*].

Professor Lockerbie believes that disruptions to public life caused by the COVID-19 pandemic "magnified" the difficulties in securing sufficient poll watchers. [*Id.* at ¶ 10].

Nothing in the Election Code limits parties from recruiting only registered voters from their own party. [ECF 528-14, 267:23-268:1]. For example, the Trump Campaign utilized at least two Democrats among the poll watchers it registered in the primary. [ECF 528-15, P001648].

#### 4. Rationale for the county-residency requirement.

Defendants have advanced several reasons to explain the rationale behind county-residency requirement for poll watchers.

Secretary Boockvar has submitted a declaration, in which she has set forth the reasons and interests supporting the county-residency requirement. Secretary Boockvar states that the residency requirement "aligns with Pennsylvania's county-based election scheme[.]" [ECF 549-2, p. 22, ¶ 77]. "By restricting poll watchers' service to the counties in which they actually reside, the law ensures that poll watchers should have some degree of familiarity with the voters they are observing in a given election district." [*Id.* at p. 22, ¶ 78].

**\*27** In a similar vein, Intervenors' expert, Dr. Barreto, in his report, states that, voters are more likely to be comfortable with poll watchers that "they know" and are "familiar with ... from their community." [ECF 524-1, p. 14, ¶ 40]. That's because when poll watchers come from the community, "there is increased trust in government, faith in elections, and voter turnout[.]" [*Id.*].

At his deposition, Representative Kelly agreed with this idea: "Yeah, I think – again, depending how the districts are established, I think people are probably even more comfortable with people that they – that they know and they recognize from their area." [ECF 524-23, 111:21-25].

#### LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At summary judgment, the Court must ask whether the evidence presents "a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making that determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." *A.W. v. Jersey City Pub. Schs.*, 486 F.3d 791, 794 (3d Cir. 2007).

The summary-judgment stage "is essentially 'put up or shut up' time for the non-moving party," which "must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Grp. Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party

will bear the burden at trial," summary judgment is warranted.

📌 *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"The rule is no different where there are cross-motions for summary judgment." 📌 *Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008). The parties' filing of cross-motions "does not constitute an agreement that if one is rejected the other is necessarily justified[.]" 📌 *Id.* But the Court may "resolve cross-motions for summary judgment concurrently." *Hawkins v. Switchback MX, LLC*, 339 F. Supp. 3d 543, 547 (W.D. Pa. 2018). When doing so, the Court views the evidence "in the light most favorable to the non-moving party with respect to each motion." *Id.*

## DISCUSSION & ANALYSIS

Plaintiffs, Defendants, and Intervenors all cross-move for summary judgment on all three of Plaintiffs' remaining claims, which the Court refers to, in the short-hand, as (1) the drop-box claim, (2) the signature-comparison claim, and (3) the poll-watching claim. The common constitutional theory behind each of these claims is vote dilution. Absent the security measures that Plaintiffs seek, they fear that others will commit voter fraud, which will, in turn, dilute their lawfully cast votes. They assert that this violates the federal and Pennsylvania constitutions.

The Court will address only the federal-constitutional claims. For the reasons that follow, the Court finds that Plaintiffs lack standing to bring their federal-constitutional claims because Plaintiffs' injury of vote dilution is not "concrete" for Article III purposes.

But even assuming Plaintiffs had standing, the Court also concludes that Defendants' regulations, conduct, and election guidance here do not infringe on any right to vote, and if they do, the burden is slight and outweighed by the Commonwealth's interests—interests inherent in the Commonwealth's other various procedures to police fraud, as well as its overall election scheme.

**\*28** Finally, because the Court will be dismissing all federal-constitutional claims, it will decline to exercise supplemental jurisdiction over any of the state-constitutional claims and will thus dismiss those claims without prejudice.

## I. Defendants' procedural and jurisdictional challenges.

At the outset, Defendants and Intervenors raise a number of jurisdictional, justiciability, and procedural arguments, which they assert preclude review of the merits of Plaintiffs' claims. Specifically, they assert (1) the claims are not ripe and are moot, (2) there is a lack of evidence against certain county boards, and those boards are not otherwise necessary parties, and (3) Plaintiffs lack standing. The Court addresses each argument, in turn.

### A. Plaintiffs' claims are ripe and not moot.

Several Defendants have argued that Plaintiffs' claims in the Second Amended Complaint are not ripe and are moot. The Court disagrees.

### 1. Plaintiffs' claims are ripe.

The ripeness doctrine seeks to "prevent the courts, through the avoidance of premature adjudication, from entangling themselves in abstract disagreements." 📌 *Artway v. Attorney Gen. of N.J.*, 81 F.3d 1235, 1246-47 (3d Cir. 1996) (cleaned up). The ripeness inquiry involves various considerations including whether there is a "sufficiently adversarial posture," the facts are "sufficiently developed," and a party is "genuinely aggrieved." 📌 *Peachlum v. City of York*, 333 F.3d 429, 433-34 (3d Cir. 2003). Ripeness requires the case to "have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them." *Wyatt, Virgin Islands, Inc. v. Gov't of the Virgin Islands*, 385 F.3d 801, 806 (3d Cir. 2004) (quoting 📌 *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 244, 73 S.Ct. 236, 97 L.Ed. 291 (1952)). "A dispute is not ripe for judicial determination if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Id.*

Ultimately, "[r]ipeness involves weighing two factors: (1) the hardship to the parties of withholding court consideration; and (2) the fitness of the issues for judicial review." 📌 *Artway*, 81 F.3d at 1247. Unlike standing, ripeness is assessed at the time of the court's decision (rather than the time the complaint was filed). *See* 📌 *Blanchette v. Connecticut General Ins. Corp.*, 419 U.S. 102, 139-40, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974).

The Court finds that Plaintiffs' claims are ripe. Applying the two-factor test here, the Court first concludes that the parties would face significant hardship if the Court were to hold that the case was unripe (assuming it was otherwise justiciable). The general election is less than one month away, and Plaintiffs assert claims that could significantly affect the implementation of Pennsylvania's electoral procedures. Further, if the Court were to find that Plaintiffs' claims were not ripe, Plaintiffs would be burdened. This is because Plaintiffs would then have to either wait until after the election occurred—and thus after the alleged harms occurred—or Plaintiffs would have to bring suit on the very eve of the election, and thus there would be insufficient time for the Court to address the issues. This hardship makes judicial review at this time appropriate. The first factor is met.

**\*29** Some Defendants argue that because some of the Secretary's guidance was issued after the 2020 primary election, Plaintiffs' claims that rely on such guidance are not ripe because the guidance has not been implemented in an election yet. The Court disagrees. Both the allegations in the Second Amended Complaint, and the evidence presented on summary judgment, reveal that the guidance issued after the primary election will apply to the upcoming general election. This is sufficient to make this a properly ripe controversy.[6]

The second factor the Court must consider in determining ripeness is "the fitness of the issues for judicial review." *Artway*, 81 F.3d at 1247. "The principal consideration [for this factor] is whether the record is factually adequate to enable the court to make the necessary legal determinations. The more that the question presented is purely one of law, and the less that additional facts will aid the court in its inquiry, the more likely the issue is to be ripe, and vice-versa." *Id.* at 1249.

Under this framework, the Court concludes that the issues are fit for review. The parties have engaged in extensive discovery, creating a developed factual record for the Court to review. Further, as shown below, the Court finds it can assess Plaintiffs' claims based on the current factual record and can adequately address the remaining legal questions that predominate this lawsuit. As such, the Court finds Plaintiffs' claims fit for judicial review.

Thus, Plaintiffs' claims are presently ripe.

### 2. Plaintiffs' claims are not moot.

Some Defendants also assert that Plaintiffs' claims are moot because Plaintiffs reference allegations of harm that occurred during the primary election, and since then, Secretary Boockvar has issued new guidance and the Pennsylvania Supreme Court has interpreted the Election Code to clarify several ambiguities. The Court, however, concludes that Plaintiffs' remaining claims are not moot.

Mootness stems from the same principle as ripeness, but is stated in the inverse: courts "lack jurisdiction when 'the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.' " *Merle v. U.S.*, 351 F.3d 92, 94 (3d Cir. 2003) (quoting *Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969)). Like ripeness and unlike standing, mootness is determined at the time of the court's decision (rather than at the time the complaint is filed). *See U.S. Parole Commission v. Geraghty*, 445 U.S. 388, 397, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980). When assessing mootness, the Court may assume (for purposes of the mootness analysis) that standing exists. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (citation omitted).

**\*30** Here, the Court finds that Plaintiffs' claims are not moot, as the claims Plaintiffs are proceeding with are "live." First, Plaintiffs' claims are based on guidance that issued after the primary election and are to be applied in the upcoming general election. As such, the *harms* alleged are not solely dependent on the already-passed primary election. Second, Defendants, by and large, have made clear that they intend to abide by guidance that Plaintiffs assert is unlawful or unconstitutional. Third, Plaintiffs sufficiently show that certain Defendants intend to engage in the conduct (*e.g.*, use unmanned drop-boxes) that Plaintiffs say infringes their constitutional rights. Thus, these issues are presently "live" and are not affected by the completion of the primary election.[7] Plaintiffs' claims are not moot.

### 3. All named Defendants are necessary parties to this lawsuit.

Many of the county boards of elections that are Defendants in this case argue that the claims against them should be dismissed because Plaintiffs did not specifically allege or prove sufficient violative facts against them. Plaintiffs argue in response that all county boards have been joined because they are necessary parties, and the Court can afford relief without their presence in this case. The Court agrees with Plaintiffs, and declines to dismiss the county boards from the case. They are necessary parties.

Federal Rule of Civil Procedure 19(a) states that a party is a necessary party that must be joined in the lawsuit if, "in that [party's] absence, the court cannot accord complete relief among existing parties." Fed. R. Civ. P. 19(a)(1)(A).

Here, if the county boards were not named defendants in this case, the Court would not be able to provide Plaintiffs complete relief should Plaintiffs prove their case. That's because the Court could not enjoin the county boards if they were not parties. See Fed. R. Civ. P. 65(d)(2). [8] This is important because each individual county board of elections manages the electoral process within its county lines. As one court previously summarized, "Election procedures and processes are managed by each of the Commonwealth's sixty-seven counties. Each county has a board of elections, which oversees the conduct of all elections within the county." Cortés, 218 F. Supp. 3d at 403 (citing 25 P.S. § 2641(a)). "The county board of elections selects, fixes and at times alters the polling locations of new election districts. Individual counties are also tasked with the preservation of all ballots cast in that county, and have the authority to investigate fraud and report irregularities or any other issues to the district attorney[.]" Id. (citing 25 P.S. §§ 2726, 2649, and 2642). The county boards of elections may also make rules and regulations "as they may deem necessary for the guidance of voting machine custodians, elections officers and electors." 25 P.S. § 2642(f).

**\*31** Indeed, Defendants' own arguments suggest that they must be joined in this case. As just one example, a handful of counties assert in their summary-judgment brief that the "[Election] Code permits Boards to exercise discretion in certain areas when administering elections, to administer the election in a manner that is both legally-compliant and meets the unique needs of each County's citizens." [ECF 518, p. 6]. Thus, because of each county's discretionary authority, if county boards engage in unconstitutional conduct, the Court

would not be able to remedy the violation by enjoining only Secretary Boockvar. [9]

To grant Plaintiffs relief, if warranted, the Court would need to enter an order affecting all county boards of elections—which the Court could not do if some county boards were not joined in this case. Otherwise, the Court could only enjoin violative conduct in some counties but not others. As a result, inconsistent rules and procedures would be in effect throughout the Commonwealth. While some counties can pledge to follow orders issued by this Court, the judicial system cannot rely on pledges and promises, regardless of the county boards' good intent. The only way to ensure that any illegal or unconstitutional conduct is uniformly remedied, permanently, is to include all county boards in this case.

Thus, because the county boards are necessary parties, the Court cannot dismiss them.

### 4. Plaintiffs lack Article III standing to raise their claims of vote dilution because they cannot establish a "concrete" injury-in-fact.

While Plaintiffs can clear the foregoing procedural hurdles, they cannot clear the final one—Article III standing.

Federal courts must determine that they have jurisdiction before proceeding to the merits of any claim. Steel Co. v. Citizens for Better Env't, 523 U.S. 83, 94-95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." One component of the case-or-controversy requirement is standing, which requires a plaintiff to demonstrate the now-familiar elements of (1) injury in fact, (2) causation, and (3) redressability. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

Standing is particularly important in the context of election-law cases, including a case like this one, that challenge the laws, regulations, and guidance issued by elected and appointed state officials through the democratic processes. As the Supreme Court has explained, the standing "doctrine developed in our case law to ensure that federal courts do not exceed their authority as it has been traditionally understood." Spokeo, Inc. v. Robins, ––– U.S. ––––, 136 S. Ct. 1540, 1547, 194 L.Ed.2d 635 (2016) (cleaned up). The doctrine

"limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Id.* In this way, "Article III standing serves to prevent the judicial process from being used to usurp the powers of the political branches." *Id.* Nowhere is that concern more acute than in a case that challenges a state's exercise of its core constitutional authority to regulate the most deeply political arena of all—elections.

**\*32** Here, Defendants and Intervenors claim that Plaintiffs lack standing, largely arguing that Plaintiffs' injury is too speculative. [ECF 547, pp. 43-50]. The Court agrees and finds that Plaintiffs lack Article III standing for this reason.

Initially, to frame the standing inquiry, understanding the specific claims at issue is important. As discussed above, there are essentially three claims remaining in this case: (1) a challenge to Secretary Boockvar's guidance that does not require all drop boxes to have manned security personnel; (2) a challenge to Secretary Boockvar's guidance that counties should not perform a signature comparison for mail-in ballots; and (3) a challenge to Pennsylvania's county-residency restriction for poll-watchers. *See* [ECF 509, pp. 4-5]. The theory behind all of these claims and the asserted injury is one of vote dilution due to the heightened risk of fraud; that is, without the above measures in place, there is an imminent risk of voter fraud (primarily by mail-in voters); and if fraud occurs, it will dilute the votes of many of Plaintiffs, who intend to vote in person in the upcoming election. [ECF 551, p. 12 ("As qualified electors who will be voting in the November election, Plaintiffs will suffer an injury through their non-equal treatment and/or the dilution or debasement of their legitimately case votes by absentee and mail-in votes that have not been properly verified by matching the voters' signatures on their applications and ballots to the permanent voter registration record and/or that have been improperly delivered by others to drop boxes or other mobile collection sites in manners that are different[ ] from those offered or being used in their counties of residence.") ].

Turning to the familiar elements of Article III standing, the first and, in the Supreme Court's estimation, "foremost" element—injury-in-fact—is dispositive. *See* Gill v. Whitford, —— U.S. ——, 138 S. Ct. 1916, 1929, 201 L.Ed.2d 313 (2018). Specifically, the Court finds that Plaintiffs' theory of vote dilution, based on the evidence presented, is insufficient to establish standing because Plaintiffs' injury-in-fact is not sufficiently "concrete."

With respect to injury-in-fact, the Supreme Court has made clear that an injury must be "concrete" and "particularized." *See* Spokeo, 136 S. Ct. at 1548. Defendants argue that the claimed injury of vote dilution caused by possible voter fraud here is too speculative to be concrete. The Court agrees.

To establish a "concrete" injury, Plaintiffs rely on a chain of theoretical events. They first argue that Defendants' lack of election safeguards (poll watchers, drop-box guards, and signature comparison procedures) creates a risk of voter fraud or illegal voting. *See* [ECF 461, ¶¶ 230-31, 240, 256]. That risk, they say, will lead to potential fraudsters committing voter fraud or ballot destruction. [*Id.*]. And if that happens, each vote cast in contravention of the Election Code will, in Plaintiffs' view, dilute Plaintiffs' lawfully cast votes, resulting in a constitutional violation.

The problem with this theory of harm is that this fraud hasn't yet occurred, and there is insufficient evidence that the harm is "certainly impending."

To be clear, Plaintiffs need not establish actual fraud at this stage; but they must establish that fraud is "certainly impending," and not just a "possible future injury." *See* Clapper, 568 U.S. at 409, 133 S.Ct. 1138 ("Thus, we have repeatedly reiterated that threatened injury must be certainly impending to constitute injury in fact, and that allegations of possible future injury are not sufficient.") (cleaned up).

**\*33** This case is well past the pleading stage. Extensive fact and expert discovery are complete. [ECF 462]. Nearly 300 exhibits have been submitted on cross-motions for summary judgment (including 68 by Plaintiffs alone). Plaintiffs bear the burden of proof on this issue, and unlike on a motion to dismiss, on summary judgment, they must come forward with proof of injury, taken as true, that will prove standing, including a concrete injury-in-fact. *See* Lujan, 504 U.S. at 561, 112 S.Ct. 2130 (1992) ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice ... In response to a summary judgment motion, however, the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts ... which for purposes of the summary judgment motion will be taken to be true.") (cleaned up).

Based on the evidence presented by Plaintiffs, accepted as true, Plaintiffs have only proven the "possibility of future

injury" based on a series of speculative events—which falls short of the requirement to establish a concrete injury. For example, Plaintiffs' expert, Mr. Riddlemoser, opines that the use of "unstaffed or unmanned" drop boxes merely "increases the **_possibility_** for voter fraud (and vote destruction)[.]" [ECF 504-19, p. 20 (emphasis added) ]. That's because, according to him (and Plaintiffs' other witnesses), theoretical bad actors **_might_** intentionally "target" a drop box as the "easiest opportunity for voter fraud" or with the malicious "intent to destroy as many votes ... as possible." [*Id.* at pp. 16-18; *see also* ECF 504-2, ¶ 12 (declaring that drop boxes "**_may_** serve as a target for bad actors that may wish to tamper with lawfully case ballots before such ballots are counted") (emphasis added) ]. But there's no way of knowing whether these independent actors will ever surface, and if they do, whether they will act as Mr. Riddlemoser and Plaintiffs predict.

Similarly, Mr. Riddlemoser concludes that, at most, not conducting signature analysis for mail-in and absentee ballots "open[s] the door to the potential for massive fraud through a mechanism already susceptible to voter fraud." [ECF 504-19, p. 20].

This increased susceptibility to fraud and ballot destruction is the impetus for Plaintiffs, in their various capacities, to express their concerns that vote dilution might occur and disrupt their right to a "free and fair election." *See, e.g.,* [504-3, ¶ 6; 504-4, ¶ 7; ECF 504-6, ¶¶ 6-8; ECF 504-7, ¶¶ 5-9]. But these concerns, as outlined above, are based solely on a chain of unknown events that may never come to pass.

In addition to Plaintiffs' expert report, Plaintiffs' evidence consists of instances of voter fraud in the past, including an article in the N.Y. Post purporting to detail the strategies of an anonymous fraudster, as well as pointing to certain prior cases of voter fraud and election irregularities (*e.g.*, Philadelphia inadvertently allowing 40 people to vote twice in the 2020 primary election; some counties counting ballots that did not have a completed declaration in the 2020 primary election). [ECF 461, ¶¶ 63-82; ECF 504-19, p. 3 & Ex. D]. Initially, with one exception noted directly below, none of this evidence is tied to individuals using drop boxes, submitting forged mail-in ballots, or being unable to poll watch in another county —and thus it is unclear how this can serve as evidence of a concrete harm in the upcoming election as to the specific claims in this case.

**\*34** Perhaps the best evidence Plaintiffs present are the several photographs and video stills, which are depicted above, and which are of individuals who appear to be delivering more than one ballot to a drop box during the primary election. It is undisputed that during the primary election, some county boards believed it be appropriate to allow voters to deliver ballots on behalf of third parties. [ECF 504-9, 92:4-10; ECF 504-10, 60:3-61:10; ECF 504-49].

But this evidence of past injury is also speculative. Initially, the evidence is scant. But even assuming the evidence were more substantial, it would still be speculative to find that third-party ballot delivery will also occur in the general election. It may; it may not. Indeed, it may be less likely to occur now that the Secretary issued her September 28, 2020, guidance, which made clear to all county boards that for the general election, third-party ballot delivery is prohibited. [ECF 504-25 ("Third-person delivery of absentee or mail-in ballots is not permitted, and any ballots delivered by someone other than the voter are required to be set aside. The only exceptions are voters with a disability, who have designated in writing an agent to deliver their ballot for them.") ]. It may also be less likely to occur in light of the Secretary's other guidance, which recommends that county boards place signs near drop boxes, warning voters that third-party delivery is prohibited.

It is difficult—and ultimately speculative—to predict future injury from evidence of past injury. This is why the Supreme Court has recognized that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief if unaccompanied by any continuing, present adverse effects." *Lujan,* 504 U.S. at 564, 112 S.Ct. 2130 (cleaned up).

In fact, based on Plaintiffs' theory of harm in this case, it is almost impossible for them to present anything other than speculative evidence of injury. That is, they would have to establish evidence of a certainly impending illegal practice that is likely to be prevented by the precautions they seek. All of this sounds in "possible future injury," not "certainly impending" injury. In that way, this case is very much like the Supreme Court's decision in *Clapper.*

In *Clapper*, plaintiffs-respondents were attorneys, other advocates, and media groups who communicated with clients overseas whom they feared would be subject to government surveillance under a FISA statute. *568 U.S. at 406, 133*

S.Ct. 1138. The plaintiffs there alleged that the FISA statute at issue created a risk of possible government surveillance, which prevented them from communicating in confidence with their clients and compelled them to travel overseas instead and incur additional costs. *Id.* at 406-07, 133 S.Ct. 1138. Based on these asserted injures, the plaintiffs filed suit, seeking to invalidate provisions of FISA. *Id.* at 407, 133 S.Ct. 1138.

The Supreme Court held that plaintiffs there lacked standing because their risk of harm was not concrete—rather, it was attenuated and based on a series of speculative events that may or may not ever occur. *Id.* at 410, 133 S.Ct. 1138 (finding that "respondents' argument rests on their highly speculative fear that: (1) the Government will decide to target the communications of non-U.S. persons with whom they communicate; (2) in doing so, the Government will choose to invoke its authority under § 1881a rather than utilizing another method of surveillance; (3) the Article III judges who serve on the Foreign Intelligence Surveillance Court will conclude that the Government's proposed surveillance procedures satisfy § 1881a's many safeguards and are consistent with the Fourth Amendment; (4) the Government will succeed in intercepting the communications of respondents' contacts; and (5) respondents will be parties to the particular communications that the Government intercepts).

**\*35** In the end, the Court found that it would not "endorse standing theories that rest on speculation about the decisions of independent actors." *Id.* at 414, 133 S.Ct. 1138.

Like *Clapper*, here, Plaintiffs' theory of harm rests on speculation about the decisions of independent actors. For drop boxes, that speculation includes that unknown individuals will utilize drop boxes to commit fraud or other illegal activity; for signature comparison, that fraudsters will submit forged ballots by mail; for poll watchers, that illegal votes will not be sufficiently challenged; and for all these claims, that other security measures in place to monitor drop boxes, to verify ballot information, and to challenge ballots will not work.

All of this may occur and may result in some of Plaintiffs' votes being diluted; but the question is whether these events are "certainly impending." The evidence outlined above and presented by Plaintiffs simply fails to meet that standard.

This is not to say that claims of vote dilution or voter fraud never give rise to a concrete injury. A plaintiff can have standing to bring a vote-dilution claim—typically, in a malapportionment case—by putting forth statistical evidence and computer simulations of dilution and establishing that he or she is in a packed or cracked district. *See Gill*, 138 S. Ct. at 1936 (Kagan, J., concurring). And a plaintiff can have standing to bring a voter-fraud claim, but the proof of injury there is evidence of actual fraud in the election and thus the suit will be brought after the election has occurred. *See, e.g., Marks v. Stinson*, 19 F.3d 873 (3d Cir. 1994). But, at least based on the evidence presented here, a claim of vote dilution brought in advance of an election on the theory of the risk of potential fraud fails to establish the requisite concrete injury for purposes of Article III standing.

Plaintiffs advance three other theories of harm here, in order to establish standing—none of which establish a concrete injury-in-fact.

First, Plaintiffs assert that since some of them are Republican candidates and that Republicans are more likely to vote in person and Democrats more likely to vote by mail, that their injury here is a competitive disadvantage in the electoral process. [ECF 551, pp. 16-18 ("The challenged guidance will further harm the RNC through the institutional prioritization of voting by mail and the potential disenfranchisement of Republican voters, who prefer to vote in person in the upcoming General Election.") ]. This too is a speculative, non-concrete injury. There is nothing in the record to establish that potential voter fraud and dilution will impact Republicans more than Democrats.

**\*36** To be sure, the information that Plaintiffs present shows that more Democrats are likely to use mail-in ballots. [ECF 551, p. 31 ("[I]n Pennsylvania, of the 1.9 million absentee or mail-in ballots that have been requested for the November 3, 2020 General Election, 'nearly 1.5 million Democrats have requested a mail-in ballot—nearly three times the requests from Republicans.' ") (quoting L. Broadwater, "Both Parties Fret as More Democrats Request Mail Ballots in Key States," New York Times (Sept. 30, 2020), *available at* https://www.nytimes.com/2020/09/30/us/mail-voting-democrats-republicans-turnout.html) ]. But it doesn't necessarily follow that more Democrats will commit voter fraud, such as through the destruction of drop boxes

or third-party ballot harvesting, and thus more Republicans' votes will be diluted.

In fact, as Plaintiffs' expert, Mr. Riddlemoser, explains, fraudsters from either party could target drop boxes in specific areas in order to destroy ballots, depending on who may be the predominant party in the area. [ECF 504-19, at pp. 17-18 ("In short, nothing would prevent someone from intentionally targeting a drop box in a predominantly Republican or predominantly Democratic area with an intent to destroy as many votes for that political party or that party's candidate(s) as possible.") ]. Indeed, the more important fact for this theory of harm is not the party of the voter, but the party of the fraudster—and, on this, Plaintiffs present no evidence that one party over the other is likely to commit voter fraud.

Second, Plaintiffs also argue that the RNC, the Congressional Plaintiffs, and the Trump Campaign have organizational standing because they "have and will continue to devote their time and resources to ensure that their Pennsylvania supporters, who might otherwise be discouraged by the Secretary's guidance memos favoring mail-in and absentee voting and Defendants' implementation thereof, get out to the polls and vote on Election Day." [ECF 551, p. 19]. This is a similar argument raised by the plaintiffs in *Clapper*, and rejected there by the Supreme Court. Because Plaintiffs' harm is not "certainly impending," as discussed above, spending money in response to that speculative harm cannot establish a concrete injury. *Clapper*, 568 U.S. at 416, 133 S.Ct. 1138 ("Respondents' contention that they have standing because they incurred certain costs as a reasonable reaction to a risk of harm is unavailing—because the harm respondents seek to avoid is not certainly impending. In other words, respondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."); *see also Donald J. Trump for President, Inc. v. Cegavske*, ―― F. Supp. 3d ――, ――, 2020 WL 5626974, at *5 (D. Nev. Sept. 18, 2020) ("Outside of stating 'confusion' and 'discouragement' in a conclusory manner, plaintiffs make no indication of how AB 4 will discourage their member voters from voting. If plaintiffs did not expend any resources on educating their voters on AB4, their voters would proceed to vote in-person as they overwhelmingly have in prior elections.").

Third, with respect to the poll-watching claim, Plaintiffs argue that at least one of the Plaintiffs, Ms. Patterson, is a prospective poll watcher who is being denied the right to

poll watch based on the county-residency restriction, and thus she meets the Article III requirements. [ECF 551, p. 34 (citing ECF 551-3, ¶¶ 9-10) ]. However, Ms. Patterson cannot establish standing because, by Plaintiffs' own concession, the theory of harm in this case is not the denial of the right to poll watch, but instead dilution of votes from fraud caused from the failure to have sufficient poll watchers. [ECF 509, p. 67 ("But, the core of the as-applied challenge here is not that the Plaintiffs cannot staff a particular polling place, it is that a candidate and his or her party is presented with the Hobson's choice of selecting limited polling places to observe due to the residency requirement and accept that unobserved polling places must exist due to the inability to recruit a sufficient force of poll watchers due to the necessity that candidates be county residents.") ].

**\*37**  And the remedy sought here is much broader than simply allowing Ms. Patterson to poll watch in a certain county, but is tied to the broader harm of vote dilution that Plaintiffs assert. [ECF 503-1, p. 3, ¶ 3 ("Plaintiffs shall be permitted to have watchers present at all locations where voters are registering to vote, applying for absentee or mail-in ballots, voting absentee or mail-in ballots, and/or returning or collecting absentee or mail-in ballots, including without limitation any satellite or early voting sites established by any county board of elections.") ]. Standing is measured based on the theory of harm and the specific relief requested.

*See* Gill, 138 S. Ct. at 1934 ("We caution, however, that 'standing is not dispensed in gross': A plaintiff's remedy must be tailored to redress the plaintiff's particular injury."). As with all of the claims, the poll-watching claim rests on evidence of vote dilution that does not rise to the level of a concrete harm.

In sum, Plaintiffs here, based on the evidence presented, lack Article III standing to assert their claims. Because they lack standing, the Court will enter judgment in Defendants' favor and dismiss all claims. [10] However, because of the novelty of Plaintiffs' claims and theories, a potential appeal in this case, and the short time before the general election, out of an abundance of caution, the Court will, in the alternative, proceed to examine the claims on the merits.

## II. Defendants and Intervenors are entitled to summary judgment on Plaintiffs' claim that drop boxes violate the U.S. Constitution.

Plaintiffs' drop-box claim has materially changed since the Pennsylvania Supreme Court's decision authorizing the

use of drop boxes. Plaintiffs now allege that drop boxes effectively allow third parties to return the ballots of voters other than themselves because, they say, no one is there to stop them. Absent an in-person guard or poll worker to monitor the drop boxes and prevent the return of ballots cast in a manner contrary to what the Election Code permits, Plaintiffs assert that they face an unacceptable risk of vote dilution, which burdens their right to vote. Plaintiffs also argue that the "uneven" use of drop boxes in Pennsylvania, by some counties but not others, violates equal protection by subjecting voters in different counties to different amounts of dilutive risk, and perhaps by diluting lawful votes cast by individuals who failed to comply with the Election Code.

The evidence relevant to these claims is undisputed. *See* [ECF 509, p. 45 ("After the completion of extensive discovery, including numerous depositions and responses to discovery requests, no genuine dispute of material fact exists regarding Plaintiffs' constitutional claims.") ]. Viewed in the light most favorable to Plaintiffs, the Court could conclude from this evidence, and will assume for purposes of this decision, that (1) drop boxes allow for greater risk of third-party ballot delivery in violation of the Election Code than in-person polling locations or manned drop boxes, and (2) that the use of drop boxes is "uneven" across Pennsylvania due to its county-based election system—*i.e.*, some counties are using "unmanned" drop boxes with varying security measures, some are using "manned" drop boxes, some are using dozens of drop boxes in a variety of locations, some are using one drop box in a county office building, and some are not using drop boxes at all. The question before the Court is whether this state of affairs violates equal protection or due process.

**\*38**  The Court finds that it does not. The uneven use of drop boxes across counties does not produce dilution as between voters in different counties, or between "lawful" and "unlawful" voters, and therefore does not present an equal-protection violation. But even if it did, the guidelines provided by Secretary Boockvar are rational, and weighing the relative burdens and benefits, the Commonwealth's interests here outweigh any burden on Plaintiffs' right to vote.

### A. Pennsylvania's "uneven" use of drop boxes does not violate federal equal-protection rights.

Plaintiffs' primary claim concerns the uneven use of drop boxes across the Commonwealth, which they contend violates the Equal-Protection Clause of the 14th Amendment.

The 14th Amendment's Equal-Protection Clause commands that "no State shall ... deny to any person within its jurisdiction the equal protection of laws." U.S. Const. amend. XIV, § 1. This broad and simple promise is "an essential part of the concept of a government of laws and not men." *Reynolds v. Sims*, 377 U.S. 533, 568, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

But while the Constitution demands equal protection, that does not mean all forms of differential treatment are forbidden. *See Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992) ("Of course, most laws differentiate in some fashion between classes of persons. The Equal Protection Clause does not forbid classifications."). Instead, equal protection "simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Id.* (citation omitted). What's more, "unless a classification warrants some form of heightened review because it jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest." *Id.* (citations omitted).

Of course, the right of every citizen to vote is a fundamental right. *See Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979) ("[F]or reasons too self-evident to warrant amplification here, we have often reiterated that voting is of the most fundamental significance under our constitutional structure.") (citations omitted). Indeed, it is a foundational right "that helps to preserve all other rights." *Werme v. Merrill*, 84 F.3d 479, 483 (1st Cir. 1996); *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964) ("Other rights, even the most basic, are illusory if the right to vote is undermined."). And its scope is broad enough to encompass not only the right of each voter to cast a ballot, but also the right to have those votes "counted without dilution as compared to the votes of others." *Minn. Voters Alliance v. Ritchie*, 720 F.3d 1029, 1031 (8th Cir. 2013) (cleaned up).

As a result, Plaintiffs are quite correct when they suggest that a state election procedure that burdens the right to vote, including by diluting the value of votes compared to others, must "comport with equal protection and all other

constitutional requirements." *Cortés*, 218 F. Supp. 3d at 407. That much, at least, is not in dispute.

At the same time, however, the Constitution "confers on the states broad authority to regulate the conduct of elections, including federal ones." *Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004) (citing U.S. Const. Art. I, § 4, cl. 1). This authority includes "broad powers to determine the conditions under which the right of suffrage may be exercised." *Shelby Cnty., Ala. v. Holder*, 570 U.S. 529, 543, 133 S.Ct. 2612, 186 L.Ed.2d 651 (2013) (cleaned up). Indeed, "[c]ommon sense, as well as constitutional law, compels the conclusion" that states must be free to engage in "substantial regulation of elections" if "some sort of order, rather than chaos, is to accompany the democratic processes." *Burdick v. Takushi*, 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (cleaned up). And all "[e]lection laws will invariably impose some burden upon individual voters." *Id.*

**\*39** If the courts were "to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest," it "would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Id.* The "machinery of government would not work if it were not allowed a little play in its joints." *Bain Peanut Co. of Tex. v. Pinson*, 282 U.S. 499, 501, 51 S.Ct. 228, 75 L.Ed. 482 (1931). Thus, when faced with a constitutional challenge to a state election law, or to the actions of state officials responsible for regulating elections, a federal court must weigh these competing constitutional considerations and "make the 'hard judgment' that our adversary system demands." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 190, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008).

The Supreme Court has supplied lower courts guidance as to how to make these hard judgments, by "forg[ing]" the "flexible standard" for assessing the constitutionality of election regulations into "something resembling an administrable rule." *Id.* at 205, 128 S.Ct. 1610 (Scalia, J. concurring) (citing *Burdick*, 504 U.S. at 434, 112 S.Ct. 2059).

Under this standard, first articulated in *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) and then refined in *Burdick*, the fact "[t]hat a law or state action imposes some burden on the right to vote does not make it subject to strict scrutiny." *Donatelli v. Mitchell*, 2 F.3d 508, 513 (3d Cir. 1993); *see also Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 585 (6th Cir. 2006) ("[V]oting regulations are not automatically subjected to heightened scrutiny."). Instead, any "law respecting the right to vote—whether it governs voter qualifications, candidate selection, or the voting process," is subjected to "a deferential 'important regulatory interests' standard for nonsevere, nondiscriminatory restrictions, reserving strict scrutiny for laws that severely restrict the right to vote." *Crawford*, 553 U.S. at 204, 128 S.Ct. 1610 (Scalia, J. concurring).

In practice, this means that courts must weigh the "character and magnitude of the burden the State's rule imposes" on the right to vote "against the interests the State contends justify that burden, and consider the extent to which the State's concerns make that burden necessary." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997) (cleaned up). If the state imposes a "severe" burden on the right to vote, strict scrutiny applies—the rule may survive only if it is "narrowly tailored" and only if the state advances a "compelling interest." *Id.* But if the state imposes only "reasonable, nondiscriminatory restrictions," its "important regulatory interests will usually be enough" to justify it. *Id.* Indeed, where state regulations are "minimally burdensome and nondiscriminatory" a level of scrutiny "closer to rational basis applies[.]" *Ohio Council 8 Am. Fed'n of State v. Husted*, 814 F.3d 329, 335 (6th Cir. 2016). And where the state imposes no burden on the "right to vote" at all, true rational basis review applies. *See Biener v. Calio*, 361 F.3d 206, 215 (3d Cir. 2004) ("Biener also cannot establish an infringement on the fundamental right to vote ... As the [election] filing fee does not infringe upon a fundamental right, nor is Biener in a suspect class, we consider the claims under a rational basis test.") (citation omitted); *Common Cause/New York v. Brehm*, 432 F. Supp. 3d 285, 310 (S.D.N.Y. 2020) ("Under this framework, election laws that impose no burden on the right to vote are subject to rational-basis review.").

**\*40** This operates as a "sliding scale"—the "more severe the burden imposed, the more exacting our scrutiny; the less

severe, the more relaxed our scrutiny." *Arizona Libertarian Party v. Hobbs*, 925 F.3d 1085, 1090 (9th Cir. 2019); *see also* Fish v. Schwab, 957 F.3d 1105, 1124 (10th Cir. 2020) ("We, and our sister circuits and commentators, have referred to this as a 'sliding scale' test."); *Libertarian Party of New Hampshire v. Gardner*, 638 F.3d 6, 14 (1st Cir. 2011) ("We review all of the First and Fourteenth Amendment claims under the sliding scale approach announced by the Supreme Court in Anderson ... and Burdick[.]"); Burdick, 504 U.S. at 434, 112 S.Ct. 2059 ("[T]he rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights.").

Against that backdrop, the Court now turns to Plaintiffs' claim that the use of unmanned drop boxes by some Pennsylvania counties, but not others, violates equal protection. As will be discussed, Plaintiffs' equal-protection claim fails at the threshold, without even reaching Anderson-Burdick, because Plaintiffs have not alleged or shown that Pennsylvania's system will result in the dilution of votes in certain counties and not others. Furthermore, even if the Court applies Anderson-Burdick, the attenuated "burden" Plaintiffs have identified—an increased risk of vote dilution created by the use of unmanned drop boxes—is more than justified by Defendants' important and precise interests in regulating elections.

### 1. Plaintiffs have not shown that Pennsylvania treats equivalent votes in different counties differently.

Plaintiffs' equal-protection claim asserts differential treatment on a theory of vote dilution. As far as the Court can discern, this claim has two dimensions.

First, the main thrust concerns differential treatment as between counties. Plaintiffs assert that some counties will use drop boxes in certain ways (specifically, without in-person guards or in varying number and locations), while others will not—resulting in differential treatment. *See, e.g.,* [ECF 551, p. 44 ("Plaintiffs assert (and have proven) that Defendants have adopted, and intend to implement in the General Election, an election regime that applies Pennsylvania's Election Code in a way that treats the citizens of Pennsylvania unequally depending on ... the location where they happen to live: in some counties, voters will

have around-the-clock access to 'satellite election offices' at which they can deposit their vote, but in other counties, voters will have no access at all to such drop boxes; in some counties those drop boxes will be staffed and secure, but in other counties drop boxes will be unmonitored and open to tampering[.]") ]; [*Id.* at p. 46 ("Defendants' ongoing actions and stated intentions ensure that votes will not be counted the same as those voting in other counties, and in some instances, in the same Congressional district. For instance, the harm flowing from those actions will fall disproportionately on the Republican candidates that bring suit here because many Democrat-heavy counties have stated intentions to implement the Secretary's unconstitutional ... ballot collection guidance, and many Republican-heavy counties have stated intentions to follow the Election Code as it is written.") ].

**\*41** Second, although less clear, Plaintiffs' equal-protection claim may also concern broader differential treatment between law-abiders and scofflaws. In other words, Plaintiffs appear to suggest that Pennsylvania discriminates against all law-abiding voters by adopting policies which tolerate an unacceptable risk of a lawfully cast votes being diluted by each unlawfully cast vote anywhere in Pennsylvania. *See, e.g.,* [ECF 509, p. 55 ("The use of unstaffed drop boxes ... not only dilutes the weight of *all* qualified Pennsylvanian electors, it curtails a sense of security in the voting process.") (emphasis in original) ]; [ECF 509 p. 68 ("There will be no protection of one-person, one-vote in Pennsylvania, because her policies ... allowing inconsistently located/used drop boxes will result in illegal ballots being cast and counted with legitimate votes[.]") ].

As discussed below, both of these species of equal protection fail because there is, in fact, no differential treatment here—a necessary predicate for an equal-protection claim.

Initially, Plaintiffs "have to identify a burden before we can weigh it." Crawford, 553 U.S. at 205, 128 S.Ct. 1610 (Scalia, J. concurring). In the equal-protection context, this means the plaintiff "must present evidence that s/he has been treated differently from persons who are similarly situated." Renchenski v. Williams, 622 F.3d 315, 337 (3d Cir. 2010) (cleaned up). And not just any differential treatment will do. As discussed above, differences in treatment raise equal-protection concerns, and necessitate heightened scrutiny of governmental interests, only if they burden a fundamental right (such as the right to vote) or involve a suspect classification based on a protected class. *See* Obama for

*Am. v. Husted*, 697 F.3d 423, 429 (6th Cir. 2012) ("If a plaintiff alleges only that a state treated him or her differently than similarly situated voters, without a corresponding burden on the fundamental right to vote, a straightforward rational basis standard of review should be used.").

Plaintiffs argue that equal protection is implicated because Pennsylvania has permitted counties to use drop boxes to varying extents, and with varying degrees of security. Some, like Delaware County, intend to use dozens of drop boxes. *See generally* [ECF 549-28]. Many others will not use drop boxes at all. *See generally* [ECF 504-1]. And among the counties that *do* use drop boxes, some will staff them with county officials, while others will monitor them only with video surveillance or not at all. *See generally* [ECF 549-28].

In this respect, Plaintiffs argue that they suffer an equal-protection harm similar to that found by the Supreme Court in *Bush v. Gore*, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000). There, the Supreme Court held that the Florida Supreme Court violated equal protection when it "ratified" election recount procedures that allowed different counties to use "varying standards to determine what was a legal vote." *Id.* at 107, 121 S.Ct. 525. This meant that entirely equivalent votes might be counted in one county but discounted in another. *See, e.g., id.* ("Broward County used a more forgiving standard than Palm Beach County, and uncovered almost three times as many new votes, a result markedly disproportionate to the difference in population between the counties."). Given the absence of uniform, statewide rules or standards to determine which votes counted, the Court concluded that the patchwork recount scheme failed to "satisfy the minimum requirement for nonarbitrary treatment of voters necessary to secure the fundamental right [to vote]." *Id.*

**\*42** While the Supreme Court expressly limited its holding in *Bush* "to the present circumstances" of a standardless "statewide recount under the authority of a single state judicial officer," *id.* at 109, 121 S.Ct. 525, a few courts have found its reasoning to be persuasive as a broader principle of equal protection. *See Stewart v. Blackwell*, 444 F.3d 843, 859 (6th Cir. 2006) ("Somewhat more recently decided is *Bush v. Gore*, ... which reiterated long established Equal Protection principles."); *Ne. Ohio Coal. for Homeless v. Husted*, 696

F.3d 580, 598 (6th Cir. 2012) ("We agree with all of the parties and the district court that the consent decree likely violates the equal protection principle recognized in *Bush v. Gore*."); *Pierce v. Allegheny Cty. Bd. of Elections*, 324 F. Supp. 2d 684, 705 (W.D. Pa. 2003) (Conti, J.) ("As noted above, the court finds that the facts presented raise a serious equal protection claim under a theory similar to that espoused by the United States Supreme Court in *Bush v. Gore, supra.*"); *Black v. McGuffage*, 209 F. Supp. 2d 889, 899 (N.D. Ill. 2002) ("The Court is certainly mindful of the limited holding of Bush. However, we believe that situation presented by this case is sufficiently related to the situation presented in *Bush* that the holding should be the same.").

Indeed, *Bush's* core proposition—that a state may not take the votes of two voters, similarly situated in all respects, and, for no good reason, count the vote of one but not the other—seems uncontroversial. It also seems reasonable (or at least defensible) that this proposition should be extended to situations where a state takes two equivalent votes and, for no good reason, adopts procedures that greatly increase the risk that one of them will not be counted—or perhaps gives more weight to one over the other. *See, e.g., Black*, 209 F. Supp. 2d at 899 ("Plaintiffs in this case allege that the resulting vote dilution, which was found to be unacceptable in *Bush* without any evidence of a disproportionate impact on any group delineated by traditional suspect criteria, is impacting African American and Hispanic groups disproportionately.... Any voting system that arbitrarily and unnecessarily values some votes over others cannot be constitutional."); *see also Reynolds*, 377 U.S. at 555, 84 S.Ct. 1362 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

That is the sort of equal-protection claim Plaintiffs purport to be asserting—a claim that voters in counties that use drop boxes are subjected to a much higher risk of vote dilution than those in other counties that do not. But that characterization falls apart under scrutiny. Indeed, despite their assertions, Plaintiffs have not actually alleged, let alone proven, that votes cast in some counties are diluted by a greater amount relative to votes cast in others. Rather, they have, at best, shown only that events causing dilution are more likely to occur in counties that use drop boxes. But, importantly, the

effect of those events will, by Plaintiffs' own admission, be felt by every voter across all of Pennsylvania. [ECF 509, p. 55. ("The use of unstaffed drop boxes places the security of unknown hundreds (if not thousands) of ballots in jeopardy of theft, destruction, and manipulation. This not only dilutes the weight of *all* qualified Pennsylvanian electors, it curtails a sense of security in the voting process.") (citations omitted) (emphasis in original) ]. Such dilution impacts the entire electorate equally; not just voters in the county where it occurs.

To illustrate this distinction, consider, for example, a presidential election. The Court agrees with Plaintiffs that the relevant electoral unit in such an election is "the entire Commonwealth of Pennsylvania." [ECF 551, p. 55 ("The electoral unit in this election is the entire Commonwealth of Pennsylvania.") ]. Indeed, on election night, votes cast in each of Pennsylvania's 67 counties will be canvassed, counted, and ultimately added to a statewide vote total that decides who wins Pennsylvania's 20 electoral votes. So, ask: what is the dilutive impact of a hypothetical illegal vote cast in Philadelphia during that election? Does it cause, in any sense, an "unequal evaluation of ballots" cast in different counties, *Bush*, 531 U.S. at 106, 121 S.Ct. 525, such that lawful ballots cast in Philadelphia will be less likely to count, worth less if they do, or otherwise disfavored when compared to votes cast in other counties? The answer is evident—it does not. Rather, the hypothetical illegal vote cast in Philadelphia dilutes *all lawful votes* cast in the election *anywhere* in the Commonwealth by the exact same amount.

**\*43** The same reasoning holds in elections that occur within part of a state, rather than statewide. For example, consider a hypothetical legislative district covering two counties—one that uses drop boxes and one that does not. There may well be a greater risk that illegal voting will occur in the county that uses drop boxes. But any dilutive impact of those votes will be felt equally by voters in *both* counties.

This is categorically different from the harm at issue in *Bush* and cases like it. In *Bush*, Florida's arbitrary use of different recount standards in different counties meant that the state was counting equivalent ballots differently in different counties, meaning that voters in some counties were more likely to have their votes counted than those in others.

In *Black v. McGuffage*, an Illinois district-court case on which Plaintiffs heavily rely, the plaintiffs alleged that

the type of voting machines used in some Illinois counties were statistically much more likely to result in equivalent votes being discounted at a much higher frequency in some counties than others, and that the worst machines were those being used in counties with high populations of minority groups. 209 F. Supp. 2d at 899. As a result, voters (and, specifically, minority voters) were much more likely to have their votes discounted, based just on the county in which they lived. *See* *id.* ("As a result, voters in some counties are statistically less likely to have their votes counted than voters in other counties in the same state in the same election for the same office. Similarly situated persons are treated differently in an arbitrary manner.... In addition, the Plaintiffs in this case allege that the resulting vote dilution ... is impacting African American and Hispanic groups disproportionately.").

Finally, *Stewart v. Blackwell*, another case cited by Plaintiffs, was the same as *Black*—voters in counties that used punch-card voting were "approximately four times as likely not to have their votes counted" as a voter in a different county "using reliable electronic voting equipment." 444 F.3d at 848.

What ties these cases together is that each of them involves a state arbitrarily "valu[ing] one person's vote over that of another," *Bush*, 531 U.S. at 104-05, 121 S.Ct. 525, by permitting counties to either apply different standards to decide what votes count (*Bush*) or use different voting technologies that create a great risk of votes being discounted in one county that does not exist in others (*Black* and *Stewart*). It is this sort of "differential treatment ... burden[ing] a fundamental right" that forms the bedrock of equal protection. *Sullivan v. Benningfield*, 920 F.3d 401, 409 (6th Cir. 2019).

Plaintiffs, in contrast, have shown no constitutionally significant differential treatment at all.

Instead, as discussed, if Plaintiffs are correct that the use of drop boxes increases the risk of vote dilution, all votes in the relevant electoral unit—whether that is statewide, a subset of the state, or a single county—face the same degree of increased risk and dilution, regardless of which county is most at fault for elevating that risk.

What Plaintiffs have really identified, then, are not uneven *risks of vote dilution*—affecting voters in some counties more than equivalent voters in others—but merely different voting procedures in different counties that may contribute different amounts of vote dilution *distributed equally across the electorate as a whole*. The Court finds that this is not an equal-protection issue.

**\*44** To be clear, the reason that there is no differential treatment is solely based on Plaintiffs' theory of harm in this case. In the more "routine" vote-dilution cases, the state imposes some restriction or direct impact on the plaintiff's right to vote—that results in his or her vote being weighed less (*i.e.*, diluted) compared to those in other counties or election districts. *See Gill,* 138 S. Ct. at 1930, (explaining that "the holdings in *Baker* and *Reynolds* were expressly premised on the understanding that the injuries giving rise to those claims were individual and personal in nature, because the claims were brought by voters who alleged facts showing disadvantage to themselves as individuals") (cleaned up). In this case, though, Plaintiffs complain that the state is *not* imposing a restriction on *someone else's* right to vote, which, they say, raises the risk of fraud, which, if it occurs, could dilute the value of Plaintiffs' vote. The consequence of this inverted theory of vote dilution is that all other votes are diluted in the same way; all feel the same effect.

Finally, the Court's ruling in this regard is consistent with the many courts that have recognized that counties may, consistent with equal protection, employ entirely different election procedures and voting systems within a single state.

*See, e.g., Wexler v. Anderson,* 452 F.3d 1226, 1231-33 (11th Cir. 2006) ("Plaintiffs do not contend that equal protection requires a state to employ a single kind of voting system throughout the state. Indeed, local variety in voting systems can be justified by concerns about cost, the potential value of innovation, and so on.") (cleaned up); *Hendon v. N.C. State Bd. of Elections,* 710 F.2d 177, 181 (4th Cir. 1983) ("A state may employ diverse methods of voting, and the methods by which a voter casts his vote may vary throughout the state."); *Short v. Brown,* 893 F.3d 671, 679 (9th Cir. 2018) ("[T]he appellants' reading of the Supreme Court's voting cases would essentially bar a state from implementing any pilot program to increase voter turnout. Under their theory, unless California foists a new system on all fifty-eight counties at once, it creates 'unconstitutional vote-dilution' in counties that do not participate in the pilot plan. Nothing in the Constitution, the Supreme Court's

controlling precedent, or our case law suggests that we can micromanage a state's election process to this degree."); *Fla. State Conference of N.A.A.C.P. v. Browning,* 569 F. Supp. 2d 1237, 1258 (N.D. Fla. 2008) ("[A]s with countless public services delivered through Florida's political subdivisions— such as law enforcement and education—resource disparities are to some degree inevitable. They are not, however, unconstitutional."); *Green Party of State of New York v. Weiner,* 216 F. Supp. 2d 176, 192 (S.D.N.Y. 2002) ("Even in that situation, [*Bush v. Gore*] did not challenge, and the Court did not question, the use of entirely different technologies of voting in different parts of the state, even in the same election."); *Paher v. Cegavske,* No. 20-243, 2020 WL 2748301, at \*9 (D. Nev. May 27, 2020) ("[I]t cannot be contested that Clark County, which contains most of Nevada's population—and likewise voters (69% of all registered voters [ ] )—is differently situated than other counties. Acknowledging this as a matter of generally known (or judicially noticeable) fact and commonsense makes it more than rational for Clark County to provide additional accommodations to assist eligible voters."); *Ron Barber for Cong. v. Bennett,* No. 14-2489, 2014 WL 6694451, at \*5 (D. Ariz. Nov. 27, 2014) ("[T]he [*Bush v. Gore*] Court did not invalidate different county systems regarding implementation of election procedures."); *Tex. Democratic Party v. Williams,* No. 07-115, 2007 WL 9710211, at n.4 (W.D. Tex. Aug. 16, 2007) ("In *Bush v. Gore,* the Supreme Court specifically noted: 'The question before the Court is not whether local entities, in the exercise of their expertise, may develop different systems for implementing elections.' ").

**\*45** Equal protection does not demand the imposition of "mechanical compartments of law all exactly alike." *Jackman v. Rosenbaum Co.*, 260 U.S. 22, 31, 43 S.Ct. 9, 67 L.Ed. 107 (1922). Rather, "the Constitution is sufficiently flexible to permit its requirements to be considered in relation to the ... contexts in which they are invoked." *Merchants Nat'l Bank of Mobile v. Dredge Gen. G. L. Gillespie,* 663 F.2d 1338, 1343 (5th Cir. 1981). And in this context, "few (if any) electoral systems could survive constitutional scrutiny if the use of different voting mechanisms by counties offended the Equal Protection Clause." *Trump v. Bullock,* ––– F.3d ––––, ––––, 2020 WL 5810556, at \*14 (D. Mont. Sept. 30, 2020).

The distinction—between differences in county election procedures and differences in the treatment of votes or voters between counties—is reflected in *Bush* itself. There, the

Supreme Court took pains to clarify that the question before it was "not whether local entities, in the exercise of their expertise, may develop different systems for implementing elections." *Bush*, 531 U.S. at 109, 121 S.Ct. 525; *see also id.* at 134, 121 S.Ct. 525 (Souter, J. dissenting) ("It is true that the Equal Protection Clause does not forbid the use of a variety of voting mechanisms within a jurisdiction, even though different mechanisms will have different levels of effectiveness in recording voters' intentions; local variety can be justified by concerns about cost, the potential value of innovation, and so on."); *Bullock*, ---- F.3d at ----, 2020 WL 5810556, at *14 ("[T]he Supreme Court was clear in *Bush v. Gore* that the question was not whether local entities, in the exercise of their expertise, may develop different systems for implementing elections.") (cleaned up).

Thus, coming back to the theory of Plaintiffs' case, Plaintiffs contend that Secretary Boockvar's drop-box guidance will result in differences between counties and differing risks of fraud. But the result of that uneven implementation will not be votes in certain counties being valued less than others. And the result won't be that voters who vote in person will have their votes valued less, either. Instead, if Plaintiffs are right, any unlawful votes will dilute all other lawful votes in the same way. While certainly voter fraud and illegal voting are bad, as a matter of equal protection, there is no unequal treatment here, and thus no burden on Plaintiffs' rights under the Equal Protection Clause.

In addition to their equal-protection claim based on county differences, Plaintiffs also appear to allude to a more general type of equal-protection violation. They assert that Pennsylvania comprises a single election unit. [ECF 551, p. 55 ("The electoral unit in this election is the entire Commonwealth of Pennsylvania.") ]. They assert that they intend to cast their ballots lawfully. *See, e.g.,* [ECF 504-3, ¶ 4 ("As a Pennsylvania qualified registered elector, I have always voted in-person at primary and general elections, and I intend to vote in-person at the upcoming November 3, 2020 General Election.") ]. And they assert that unmanned drop boxes across the Commonwealth (regardless of the county) will, on a statewide basis, dilute their votes. *See, e.g.,* [*id.* at ¶ 6 ("As a Pennsylvania qualified registered elector who votes in-person, I do not want my in-person vote diluted or cancelled by votes that are cast in a manner contrary to the requirements enacted by the Pennsylvania General Assembly.") ]. For example, if one "qualified elector" casts a lawful ballot, but a fraudulent voter casts ten ballots, then

that elector's vote will, under Plaintiffs' theory, be diluted by a magnitude of ten—resulting in differential treatment.

**\*46** The problem with this theory is that there does not appear to be any law to support it. Indeed, if this were a true equal-protection problem, then it would transform every violation of state election law (and, actually, every violation of every law) into a potential federal equal-protection claim requiring scrutiny of the government's "interest" in failing to do more to stop illegal activity. This is not the law. To the contrary, it is well-established that even violations of state election laws by state officials, let alone violations by unidentified third parties, do not give rise to federal constitutional claims except in unusual circumstances. *See Shipley v. Chicago Bd. of Election Commissioners*, 947 F.3d 1056, 1062 (7th Cir. 2020) ("A violation of state law does not state a claim under § 1983, and, more specifically, a deliberate violation of state election laws by state election officials does not transgress against the Constitution.") (cleaned up); *Martinez v. Colon*, 54 F.3d 980, 989 (1st Cir. 1995) ("[T]he Constitution is not an empty ledger awaiting the entry of an aggrieved litigant's recitation of alleged state law violations— no matter how egregious those violations may appear within the local legal framework.").

Thus, this type of equal-protection claim fails as a matter of law, as well.

### 2. If Pennsylvania's "uneven" use of drop boxes indirectly burdens the right to vote at all, that burden is slight, and justified by important state interests.

Even assuming that Plaintiffs could establish unequal treatment to state an equal-protection claim, their claim nonetheless fails because the governmental interests here outweigh any burden on the right to vote.

Initially, the Court finds that the appropriate level of scrutiny is rational basis. Defendants' failure to implement a mandatory requirement to "man" drop boxes doesn't directly infringe or burden Plaintiffs' rights to vote at all. Indeed, as discussed above in the context of standing, what Plaintiffs characterize as the burden or harm here is really just an ancillary 'increased risk' of a theoretical harm, the degree of which has not been established with any empirical precision.

*See Obama*, 697 F.3d at 429 ("If a plaintiff alleges only that a state treated him or her differently than similarly situated

voters, without a corresponding burden on the fundamental right to vote, a straightforward rational basis standard of review should be used."); *Brehm*, 432 F. Supp. 3d at 310 ("Under this framework, election laws that impose no burden on the right to vote are subject to rational-basis review.").

On rational-basis review, the Secretary's guidance here passes constitutional muster. Her guidance certainly provides some flexibility in how counties may use drop boxes, but the guidance overall is rationally related to a legitimate governmental interest—namely, the implementation of drop boxes in a secure manner, taking into account specific county differences. That Plaintiffs feel the decisions and actions of the Pennsylvania General Assembly, Secretary Boockvar, and the county Defendants are insufficient to prevent fraud or illegal voting is of no significance. "[R]ational-basis review in equal protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Heller v. Doe by Doe*, 509 U.S. 312, 319, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993).

As detailed above, Secretary Boockvar's guidance provides lawful, comprehensive, and reasonable standards with respect to (1) selecting the location of drop boxes, (2) drop-box design criteria, (3) signage, (4) drop-box security measures, and (5) drop-box ballot collection and chain of custody procedures. Of particular note, with respect to ballot security, the Secretary's guidance calls for the use of reasonably robust measures like video surveillance, durable and tamperproof design features, regular ballot collection every 24 hours, chain-of-custody procedures to maintain ballot traceability, and signage advising voters that third-party delivery is prohibited, among other things.

To be sure, the Secretary's guidance doesn't insist on the use of security personnel—though some counties have decided to post security guards outside of drop boxes on their own. But the Court can't say that either the Secretary's failure to provide that requirement, or the decision of some counties to proceed with drop boxes "unmanned," is irrational. For example, the evidence presented demonstrates that placing a security guard outside of a drop box at all times is costly, particularly for cash-strapped counties—at least $13 per hour or about $104 (8 hours) to $312 (24 hours) per day, according to Defendants' expert, Professor Robert McNair. [ECF 549-11, p. 11] In the context of a broader election system that detects and deters fraud at many other stages of the voting process, and given that that there are also no equivalent security measures present at U.S. postal mailboxes (which constitute an arguably more

tempting vehicle for the would-be ballot harvester), the Court finds that the lack of any statewide requirement that all drop boxes be manned or otherwise surveilled is reasonable, and certainly rational.

**\*47** But even assuming Plaintiffs are right that their right to vote here has been burdened (and thus a heightened level of scrutiny must apply), that burden is slight and cannot overcome Defendants' important state interests under the *Anderson*-*Burdick* framework. Indeed, courts routinely find attenuated or ancillary burdens on the right to vote to be "slight" or insignificant, even burdens considerably *less* attenuated or ancillary than any burden arguably shown here. *See, e.g.*, *Weber v. Shelley*, 347 F.3d 1101, 1106 (9th Cir. 2003) ("Under *Burdick*, the use of touchscreen voting systems is not subject to strict scrutiny simply because this particular balloting system may make the possibility of some kinds of fraud more difficult to detect."). [11]

To begin with, application of the *Anderson*-*Burdick* framework here presents something of a "square peg, round hole" dilemma. After all, that test assumes there is some constitutional injury to "weigh" against the state's "important" regulatory interests in the first place. And without differential treatment of votes or voters, there isn't any equal-protection injury for the Court to balance.

The *Anderson*-*Burdick* test is also ill-fitted to Plaintiffs' claims for another reason. Typically, *Anderson*-*Burdick* is invoked where the government takes some direct action to burden or restrict a plaintiff's right to vote. Here, in contrast, Plaintiffs complain that Pennsylvania has indirectly burdened the right to vote through *inaction*—*i.e.*, by not imposing *enough* regulation to secure the voting process it has adopted, which, Plaintiffs say, will allow third parties to vote in an unlawful way, which, if it happens, will dilute (and thus burden) the right to vote.

**\*48** This unusual causal daisy-chain makes it difficult to apply *Anderson*-*Burdick*'s balancing approach. After all, it is one thing to assess the government's interest in taking a specific action that imposed burdens on the right to vote. It is much less natural for a court to evaluate whether the government had a good reason for not doing something differently, or for failing to do more to prevent (or reduce the

risk of) misconduct by third parties that could burden the right to vote.

To the extent *Anderson*-*Burdick* applies in such circumstances, the appropriate course would, in this Court's view, be to weigh any burden stemming from the government's alleged failures against the government's interest in enacting the broader election scheme it has erected, of which the challenged piece is usually only one part. Focusing solely on the allegedly inadequate procedure being challenged, such as the state's authorization of "drop boxes" here, would ignore the fact that Election Code provisions and regulations operate as part of a single, complex organism balancing many competing interests, all of which are "important" for purposes of the *Anderson*-*Burdick* analysis. *See, e.g.,* *Crawford*, 553 U.S. at 184, 128 S.Ct. 1610 ("deterring and detecting voter fraud"); *Tedards v. Ducey*, 951 F.3d 1041, 1067 (9th Cir. 2020) ("voter turnout"); *Lunde v. Schultz*, 221 F. Supp. 3d 1095, 1106 (S.D. Iowa 2014) ("expanding ballot access to nonparty candidates"); *Greenville Cnty. Republican Party Exec. Comm. v. South Carolina*, 824 F. Supp. 2d 655, 671 (D.S.C. 2011) ("promoting voter participation in the electoral process"); *Mays v. LaRose*, 951 F.3d 775, 787 (6th Cir. 2020) ("orderly administration of elections"); *Dudum*, 640 F.3d at 1115 ("orderly administration of ... elections"); *Paher v. Cegavske* , 457 F.Supp.3d 919, ——, 2020 WL 2089813, at *7 (2020) ("protect[ing] the health and safety of ... voters" and "safeguard[ing] the voting franchise"); *Nemes*, —— F. Supp. 3d at ——, 2020 WL 3402345, at *13 ("implementing voting plans that provide for a free and fair election while attempting to minimize the spread of COVID-19").

Thus, on the "burden" side of the equation is Plaintiffs' harm of vote dilution predicated on a risk of fraud. As discussed above in the context of lack of standing, that burden is slight, factually, because it is based on largely speculative evidence of voter fraud generally, anecdotal evidence of the mis-use of certain drop boxes during the primary election, and worries that the counties will not implement a "best practice" of having poll workers or guards man the drop boxes. *See* [ECF 461, ¶¶ 63-82; ECF 504-2, ¶ 12; 504-3, ¶ 6; 504-4, ¶7;; ECF 504-6, ¶¶ 6-8; ECF 504-7, ¶¶ 5-9; ECF 504-9, 92:4-10; ECF 504-10, 60:3-61:10; 504-19, pp. 3, 16-18, 20 & Ex. D; ECF 504-25; ECF 504-49; ECF 509, p. 67; ECF 551, p. 34].

This somewhat scant evidence demonstrates, at most, an increased risk of some election irregularities—which, as many courts have held, does not impose a meaningful burden under *Anderson*-*Burdick*. "Elections are, regrettably, not always free from error," *Hutchinson v. Miller*, 797 F.2d 1279, 1286–87 (4th Cir. 1986), let alone the "risk" of error. In just about every election, votes are counted, or discounted, when the state election code says they should not be. But the Constitution "d[oes] not authorize federal courts to be state election monitors." *Gamza v. Aguirre*, 619 F.2d 449, 454 (5th Cir. 1980). It is "not an empty ledger awaiting the entry of an aggrieved litigant's recitation of alleged state law violations." *Fournier v. Reardon*, 160 F.3d 754, 757 (1st Cir. 1998). Nor is it "an election fraud statute." *Minnesota Voters*, 720 F.3d at 1031.

**\*49**  "Garden variety" election irregularities, let alone the "risk" of such irregularities, are simply not a matter of federal constitutional concern "even if they control the outcome of the vote or election." *Bennett v. Yoshina*, 140 F.3d 1218, 1226 (9th Cir. 1998). And as discussed above, most often, even "a deliberate violation of state election laws by state election officials does not transgress against the Constitution." *Shipley*, 947 F.3d at 1062. *see, e.g.,* *Lecky v. Virginia State Bd. of Elections*, 285 F. Supp. 3d 908, 919 (E.D. Va. 2018) ("[E]ven assuming the Fredericksburg officials' failure to provide provisional ballots amounted to a violation of state law, it would not rise to the level of an equal protection violation.").

Compared, then, to Plaintiffs' slight burden, the Commonwealth has put forward reasonable, precise, and sufficiently weighty interests that are undisputed and that can be distilled into three general categories: (1) the benefits of drop boxes, (2) the Commonwealth's interests in furthering its overall election-security plan concerning drop boxes, and (3) the interests inherent in the Commonwealth's general mail-in ballot scheme.

The first category concerns the benefits of drop boxes generally. Secretary Boockvar has pointed out the Commonwealth's interests generally in using drop boxes— including, (1) the increase of voter turnout, (2) the protection of voters' health in the midst of the ongoing pandemic, (3) the increase of voter satisfaction, in light of ongoing U.S. Postal Service issues, and (4) the reduction of costs for counties.

[ECF No. 547, at pp. 22-25; ECF No. 549-2, ¶¶ 36-39, 42-44]. Plaintiffs do not dispute any of these interests.

The second category of interests concerns the Commonwealth's interests in implementing drop boxes with appropriate and effective safety measures and protocols in place. That is, Secretary Boockvar has, in her capacity as the chief state official charged with overseeing elections, issued uniform guidance to all counties regarding the use of drop boxes, which is noted above. That guidance includes (1) advising counties that the Election Code permits the use of drop boxes, and (2) setting forth best practices that the counties should "consider" with respect to their use. Among other things, the Secretary advised that counties should maintain a traceable chain of custody for mail-in and absentee ballots retrieved from drop boxes; utilize drop boxes with various security features (*e.g.,* anti-tampering features, locks, video surveillance, and removal when the site is closed or cannot be monitored); and designate sworn county personnel to remove ballots from drop boxes. And evidence suggests that the Secretary's deputies have emphasized these best practices when queried by county officials. [ECF 549-32 ("Per our conversation, the list of items are things the county must keep in mind if you are going to provide a box for voters to return their ballots in person.") ].

This guidance is lawful, reasonable, and non-discriminatory, and so does not create any constitutional issue in its own right. With this guidance, the Secretary has diminished the risks tolerated by the legislature in adopting mail-in voting and authorizing drop-boxes, by encouraging the counties to adopt rather comprehensive security and chain-of-custody procedures if they do elect to use drop boxes. Conversely, the legislature's decision to leave the counties with ultimate discretion when it comes to how, and to what extent, to use drop boxes (as opposed to adopting a scheme in which the Secretary could enforce compliance with her guidance) is also reasonable, and justified by sufficiently weighty governmental interests, given the many variations in population, geography, local political culture, crime rates, and resources. [ECF 549-9 ("There is no logical reason why ballot receptacles such as drop boxes must be uniform across different counties; particularly because the verification of the voter is determined by election officials upon receipt of the ballot. Counties vary in size and need. Across the country, best practices dictate that counties determine what type of box and size works for them. The needs of a large county are very different from the needs of a smaller county."); ECF 549-11, p. 9 ("Such variation between counties even within a

state makes sense, since the needs of different counties vary and their use of drop boxes reflects those considerations (e.g., the geographic size of a county, the population of the county, and the ease with which voters in the county can access other locations to return mail-in ballots).").

**\*50** The third category of interests is, more generally, the interests of the Commonwealth in administering its overall mail-in ballot regime, including the various security and accountability measures inherent in that legislative plan.

Pennsylvania did not authorize drop boxes in a vacuum. Last year, the Pennsylvania legislature "weigh[ed] the pros and cons," *Weber*, 347 F.3d at 1107, and adopted a broader system of "no excuse" mail-in voting as part of the Commonwealth's Election Code. As the Pennsylvania Supreme Court has now confirmed, that system left room for counties to authorize drop boxes and other satellite locations for returning ballots to the county boards of elections. *See Boockvar*, ––– A.3d at ––––, 2020 WL 5554644, at \*9 ("[W]e need not belabor our ultimate conclusion that the Election Code should be interpreted to allow county boards of election to accept hand-delivered mail-in ballots at locations other than their office addresses including drop-boxes.").

Inherent in any mail-in or absentee voting system is some degree of increased risk of votes being cast in violation of other provisions of the Election Code, regardless of whether those ballots are returned to drop boxes, mailboxes, or some other location. For example, there is simply no practical way to police third party delivery of ballots to any mailbox anywhere in the Commonwealth, where Plaintiffs do not dispute that such ballots can be lawfully returned. It is also likely that more (and perhaps many more) voters than usual will be disenfranchised by technicalities this year, for failing to comply with the procedural requirements associated with mail-in ballots, such as the requirement that such ballots be placed in "inner secrecy envelopes."

But in enacting the "no excuse" mail-in voting system that it did, the Pennsylvania legislature chose to tolerate the risks inherent in that approach. And the key point is that the legislature made that judgment in the context of erecting a broader election scheme that authorizes other forms of voting and has many other safeguards in place to catch or deter fraud and other illegal voting practices. These safeguards include voter registration; a mail-in ballot application and identity verification process, 25 P.S. §§ 3146.2, 3150.12; a

system for tracking receipt of mail-in ballots, 25 P.S. §§ 3146.3(a), 3150.13(a); and, perhaps most important of all, a pre-canvassing and canvassing process during which mail-in ballots are validated before being counted. In addition, Pennsylvania law also seeks to deter and punish fraud by imposing criminal penalties for unlawful voting, 25 P.S § 3533; voting twice in one election, 25 P.S § 3535; forging or destroying ballots, 25 P.S § 3517; unlawful possession or counterfeiting of ballots 25 P.S § 3516; and much more of the conduct Plaintiffs fear, *see* 25 P.S. § 3501, *et seq.*

In this larger context, the Court cannot say that the balance Pennsylvania struck across the Election Code was unreasonable, illegitimate, or otherwise not "sufficiently weighty to justify," *Crawford,* 553 U.S. at 191, 128 S.Ct. 1610, whatever ancillary risks may be associated with the use of drop boxes, or with allowing counties to exercise discretion in that regard. Pennsylvania may balance the many important and often contradictory interests at play in the democratic process however it wishes, and it must be free to do so "without worrying that a rogue district judge might later accuse it of drawing lines unwisely." *Abbott,* 961 F.3d at 407.

**\*51**  Thus, balancing the slight burden of Plaintiffs' claim of dilution against the categories of interests above, the Court finds that the Commonwealth and Defendants' interests in administering a comprehensive county-based mail-in ballot plan, while both promoting voting and minimizing fraud, are sufficiently "weighty," reasonable, and justified. Notably, in weighing the burdens and interests at issue, the Court is mindful of its limited role, and careful to not intrude on what is "quintessentially a legislative judgment." *Griffin,* 385 F.3d at 1131. "[I]t is the job of democratically-elected representatives to weigh the pros and cons of various balloting systems." *Weber,* 347 F.3d at 1106. "So long as their choice is reasonable and neutral, it is free from judicial second-guessing." *Id.*; *see also Abbott,* 961 at 407, ("That the line might have been drawn differently ... is a matter for legislative, rather than judicial, consideration.") (cleaned up);

*Trinsey v. Com. of Pa.,* 941 F.2d 224, 235 (3d Cir. 1991) ("We take no position on the balancing of the respective interests in this situation. That is a function for which the legislature is uniquely fitted.").

Thus, even under the *Anderson*-*Burdick* framework, the Court finds that Plaintiffs' constitutional challenge fails as a matter of law.

### B. Pennsylvania's use of drop boxes does not violate federal due process.

In addition to their equal-protection challenge to the use of drop boxes, Plaintiffs also appear to argue that the use of unmanned drop boxes violates substantive due process protected by the 14th Amendment. This argument is just a variation on their equal-protection argument—*i.e.*, the uneven use of drop boxes will work a "patent and fundamental unfairness" in violation of substantive due process principles.

*See Griffin v. Burns,* 570 F.2d 1065, 1077 (1st Cir. 1978) (substantive due process rights are violated "[i]f the election process itself reaches the point of patent and fundamental unfairness[.]"). The analysis for this claim is the same as that for equal protection, and thus it fails for the same reasons.

But beyond that, this claim demands even stricter proof. Such a claim exists in only the most extraordinary circumstances.

*See Nolles v. State Comm. for Reorganization of Sch. Districts,* 524 F.3d 892, 898 (8th Cir. 2008) ("A canvass of substantive due process cases related to voting rights reveals that voters can challenge a state election procedure in federal court only in limited circumstances, such as when the complained of conduct discriminates against a discrete group of voters, when election officials refuse to hold an election though required by state law, resulting in a complete disenfranchisement, or when the willful and illegal conduct of election officials results in fraudulently obtained or fundamentally unfair voting results.") (cleaned up); *Yoshina,* 140 F.3d at 1226 ("We have drawn a distinction between 'garden variety' election irregularities and a pervasive error that undermines the integrity of the vote. In general, garden variety election irregularities do not violate the Due Process Clause, even if they control the outcome of the vote or election.") (citation omitted); *Bennett v. Mollis,* 590 F. Supp. 2d 273, 278 (D.R.I. 2008) ("Before an election error becomes a key that unlocks the restraints on the federal court's authority to act, the Plaintiffs must demonstrate either an intentional election fraud or an unintentional error resulting in broad-gauge unfairness.").

Indeed, "only the most egregious official conduct can be said to be arbitrary in the constitutional sense"—the "executive

action must be so ill-conceived or malicious that it 'shocks the conscience.' " *Miller v. City of Phila.*, 174 F.3d 368, 375 (3d Cir. 1999) (cleaned up).

Based on the slight burden imposed here, and the Commonwealth's interests in their overall county specific voting regime, which includes a host of other fraud-prevention measures, the Court finds that the drop-box claim falls short of the standard of substantive due process.

### III. Defendants and Intervenors are entitled to summary judgment on Plaintiffs' signature-comparison claims.

**\*52** Plaintiffs' next claim concerns whether the Secretary's recent guidance on signature comparison violates the federal Constitution. Plaintiffs frame their claims pertaining to signature comparison in two ways—one based on due process and the other based on equal protection.

Plaintiffs initially assert that the Election Code requires a signature comparison for mail-in and absentee applications and ballots. Thus, according to Plaintiffs, Secretary Boockvar's guidance, which says the opposite, is creating unconstitutional vote dilution, in violation of due-process principles—*i.e.*, certain unlawful, unverified ballots will now be counted, thereby diluting the lawful ones cast by other voters (such as in-person voters, whose signatures are verified). Plaintiffs also appear to argue more generally that absent signature comparison, there is a heightened risk of voter fraud, and therefore a heightened risk of vote dilution of lawful votes.

In addition to due process, Plaintiffs argue that the guidance violates equal-protection principles—first, by counties engaging in a patchwork of procedures (where some counties intend to do a signature comparison for mail-in ballots, while others do not); and second, by implementing different standards between mail-in ballots and in-person ones.

In contrast, Defendants and Intervenors take the position that state law does not require signature comparison, and for good reason. According to them, requiring such comparisons is fraught with trouble, as signatures change over time and elections officials are not signature-analysis experts. This leaves open the possibility for arbitrary and discriminatory application that could result in the disenfranchisement of valid voters.

For the reasons that follow, the Court will dismiss the signature-comparison claims and enter judgment in favor of Defendants. A plain reading of the Election Code demonstrates that it does not impose a signature-comparison requirement for mail-in ballots and applications, and thus Plaintiffs' vote-dilution claim sounding in due process fails at the outset. Further, the heightened risk of fraud resulting from a lack of signature comparison, alone, does not rise to the level of a federal constitutional violation. Finally, the equal-protection claims fail because there are sound reasons for the different treatment of in-person ballots versus mail-in ballots; and any potential burdens on the right to vote are outweighed by the state's interests in their various election security measures.

### A. The Election Code does not require signature comparison for mail-in and absentee ballots or ballot applications.

Plaintiffs' federal-constitutional claims in Count I of their Second Amended Complaint are partially based on the Secretary's guidance violating state law. That is, Plaintiffs' first theory is that by the Secretary violating state law, unlawful votes are counted and thus lawfully cast votes are diluted. According to Plaintiffs, this violates the 1st and 14th Amendments, as well as the Elections Clause (the latter of which requires the legislature, not an executive, to issue election laws). [12]

**\*53** Thus, a necessary predicate for these constitutional claims is whether the Election Code mandates signature comparison for mail-in and absentee ballots. If it doesn't, as the Secretary's guidance advises, then there can be no vote dilution as between lawful and unlawful votes, nor a usurpation of the legislature's authority in violation of the Elections Clause.

After carefully considering the parties' arguments and the relevant law, the Court finds that the plain language of the Election Code imposes no requirement for signature comparison for mail-in and absentee ballots and applications. [13] In other words, the Secretary's guidance is consistent with the Election Code, and creates no vote-dilution problems. [14]

Plaintiffs, in advancing their claim, rely on section 3146.8(g) (3)-(7) of the Election Code to assert that the Code requires counties to "verify" the signatures on mail-in and absentee ballots (*i.e.*, examine the signatures to determine whether

they are authentic). Plaintiffs specifically point to 🔖section 3146.8(g)(3) as requiring this signature verification. [ECF 509, pp. 17-18].

🔖Section 3146.8(g)(3) states:

> When the county board meets to pre-canvass or canvass absentee ballots and mail-in ballots ... the board shall examine the declaration on the envelope of each ballot ... and shall compare the information thereon with that contained in the "Registered Absentee and Mail-in Voters File," the absentee voters' list and/or the "Military Veterans and Emergency Civilians Absentee Voters File," whichever is applicable. If the county board has verified the proof of identification as required under this act and is satisfied that the declaration is sufficient and the information contained in the "Registered Absentee and Mail-in Voters File," the absentee voters' list and/or the "Military Veterans and Emergency Civilians Absentee Voters File" verifies his right to vote, the county board shall provide a list of the names of electors whose absentee ballots or mail-in ballots are to be pre-canvassed or canvassed.

**\*54** 🔖25 P.S. § 3146.8(g)(3).

According to Plaintiffs, 🔖Section 3146.8(g)(3)'s requirement to verify the proof of identification, and compare the information on the declaration, is tantamount to signature comparison. The Court disagrees, for at least three reasons.

First, nowhere does the plain language of the statute require signature comparison as part of the verification analysis of the ballots.

When interpreting a statute enacted by the Pennsylvania General Assembly, courts apply Pennsylvania's Statutory Construction Act, 1 Pa. C.S. §§ 1501-🔖1991. And as the Act instructs, the "object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." 🔖1 Pa C.S. § 1921(a). If the words of the statute are clear and unambiguous, the letter of the law applies. 🔖*Id.* at § 1921(b). Otherwise, courts may consider a variety of factors to determine the legislature's intent, including "other statutes upon the same or similar subjects" and "[t]he consequences of a particular interpretation." 🔖*Id.* at § 1921(c)(5)-(6).

🔖Section 3146.8(g)(3) does not expressly require any signature verification or signature comparison. 🔖25 P.S. § 3146.8(g)(3). It instead requires election officials to (1) "examine the declaration on the envelope of each ballot," (2) "compare the information thereon with that contained in the ... 'Voters file' [or] the absentee voters' list," and (3) if "the county board has [a] verified the proof of identification as required under this act and [b] is satisfied that the declaration is sufficient and the information contained in the [Voter's file] ... verifies his right to vote," the election official shall include the ballot to be counted. *Id.*

Under the express terms of the statute, then, the information to be "verified" is the "proof of identification." *Id.* The Election Code defines "proof of identification" as the mail-in/absentee voter's driver's license number, last four digits of their Social Security number, or a specifically approved form of identification. 🔖25 P.S. § 2602(z.5)(3)(i)-(iv).[15] The only other "verification" the election official must conduct is to determine whether "the information contained in the [Voter's file] ... verifies his right to vote."

**\*55** Nowhere does this provision require the election official to compare and verify the authenticity of the elector's signature. In fact, the word "signature" is absent from the provision. It is true that the elector must fill out and sign the declaration included on the ballot. 🔖25 P.S. §§ 3146.6(a), 🔖3150.16(a). However, while 🔖section 3146.8(g)(3) instructs the election official to "examine the declaration ... and compare the information thereon with that contained in the [Voter's file]," the provision clarifies that this is so the election official can be "satisfied that the declaration is sufficient." 🔖25 P.S. § 3146.8(g)(3). In other words, the election official must be "satisfied" that the declaration is "fill[ed] out, date[d] and sign[ed]," as required by sections 3150.16(a) and 3146.6(a) of the Election Code. Notably absent is any instruction to verify the signature and set aside the ballot if the election official believes the signature to be non-genuine. There is an obvious difference between checking to see if a signature was provided at all, and checking to see if the provided signature is sufficiently authentic. Only the former is referred to in 🔖section 3146.8(g)(3).

Second, beyond the plain language of the statute, other canons of construction compel the Court's interpretation. When interpreting statutes passed by the General Assembly, Pennsylvania law instructs courts to look at other aspects of the statute for context. *See* 1 Pa. C.S. § 1921(c)(5) ("When the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering ... other statutes upon the same or similar subjects."); *O'Rourke v. Commonwealth*, 566 Pa. 161, 778 A.2d 1194, 1201 (2001) ("The cardinal rule of all statutory construction is to ascertain and effectuate the intent of the Legislature. To accomplish that goal, we should not interpret statutory words in isolation, but must read them with reference to the context in which they appear." (citation omitted)).

Context here is important because the General Assembly mandated signature comparison for in-person voting elsewhere in the Election Code—thus evidencing its intention not to require such comparison for mail-in ballots. *See* *Fonner v. Shandon, Inc.*, 555 Pa. 370, 724 A.2d 903, 907 (1999) ("[W]here a section of a statute contains a given provision, the omission of such a provision from a similar section is significant to show a different legislative intent.") (citation omitted).

In addressing in-person voting, the General Assembly explicitly instructs that the election official shall, after receiving the in-person elector's voter certificate, immediately "***compare the elector's signature*** on his voter's certificate with his signature in the district register. If, upon such comparison, the signature upon the voter's certificate appears to be genuine, the elector who has signed the certificate shall, if otherwise qualified, be permitted to vote: Provided, That ***if the signature on the voter's certificate, as compared with the signature as recorded in the district register, shall not be deemed authentic*** by any of the election officers, such elector shall not be denied the right to vote for that reason, but shall be considered challenged as to identity and required to [cure the deficiency]." 25 P.S. § 3050(a.3)(2) (emphasis added).

Elsewhere, the General Assembly also explicitly accounts for signature comparison of in-person voters: "[I]f it is determined that the individual was registered and entitled to vote at the election district where the ballot was cast, ***the county board of elections shall compare the signature on the provisional ballot envelope with the signature on the elector's registration form and, if the signatures are determined to be genuine, shall count the ballot*** if the

county board of elections confirms that the individual did not cast any other ballot, including an absentee ballot, in the election. ... [But a] provisional ballot shall not be counted if ... the signature[s] required ... are either not genuine or are not executed by the same individual ..." 25 P.S. § 3050(a.4)(5)(i)-(ii) (emphasis added); *see also* 25 P.S. § 2936 ("[When reviewing nomination papers], the Secretary of the Commonwealth or the county board of elections, although not hereby required so to do, ***may question the genuineness of any signature or signatures appearing thereon***, and if he or it shall thereupon find that any such signature or signatures are not genuine, such signature or signatures shall be disregarded[.]" (emphasis added)).

***\*56*** Clearly then, the General Assembly, in enacting the Election Code, knew that it could impose a signature-comparison requirement that requires an analysis to determine whether a signature is "genuine." And when that was its intent, the General Assembly explicitly and unequivocally imposed that requirement. It is thus telling, from a statutory construction standpoint, that no such explicit requirement is imposed for returned mail-in or absentee ballots. Indeed, the General Assembly is aware—and in fact, requires—that a voter must sign their application for an absentee or mail-in ballot, and must sign the declaration on their returned ballot. 25 P.S. §§ 3146.2(d) (absentee-ballot application), 3150.12(c) (mail-in-ballot application), 3146.6(a) (absentee-voter declaration), 3150.16(a) (mail-in voter declaration). Despite this, the General Assembly did not mention a signature-comparison requirement for returned absentee and mail-in ballots.

The Court concludes from this context that this is because the General Assembly did not intend for such a requirement. *See, e.g.*, *Mishoe v. Erie Ins. Co.*, 573 Pa. 267, 824 A.2d 1153, 1155 (2003) ("In arriving at our conclusion that the foregoing language does not provide for the right to a jury trial, we relied on three criteria. First, we put ***substantial emphasis*** on the fact that the PHRA was silent regarding the right to a jury trial. As we explained, 'the General Assembly is well aware of its ability to grant a jury trial in its legislative pronouncements,' and therefore, 'we can presume that the General Assembly's express granting of trial by jury in some enactments means that it did not intend to permit for a jury trial under the PHRA.' " (cleaned up) (emphasis added)); *Holland v. Marcy*, 584 Pa. 195, 883 A.2d 449, 456, n.15 (2005) ("We additionally note that the legislature, in fact, did specify clearly when

it intended the choice of one individual to bind others. In every other category addressed by Section 1705(a) other than (a)(5) which addressed uninsured owners, the General Assembly specifically referenced the fact that the decision of the named insured ... binds other household members.... Similar reference to the ability of the uninsured owner's deemed choice to affect the rights of household members is conspicuously missing from Section 1705(a)(5).").

Accordingly, the Court finds that the General Assembly's decision not to expressly refer to signature comparisons for mail-in ballots, when it did so elsewhere, is significant.

Third, this Court is mindful that Pennsylvania's election statutes are to be construed in a manner that does not risk disenfranchising voters. *See, e.g.,* 1 Pa. C.S. § 1922(3) ("In ascertaining the intention of the General Assembly in the enactment of a statute the following presumptions, among others, may be used: ... That the General Assembly does not intend to violate the Constitution of the United States or of this Commonwealth."); *id.* at § 1921(c)(6) (in interpreting a statute, the court may consider "[t]he consequences of a particular interpretation").

As the Pennsylvania Supreme Court emphasized last month, "[I]t is well-settled that, although election laws must be strictly construed to prevent fraud, they ordinarily will be construed liberally in favor of the right to vote. Indeed, our goal must be to enfranchise and not to disenfranchise the electorate." *Boockvar,* — A.3d at —, 2020 WL 5554644, at *9 (cleaned up); *see also id.* ("[A]lthough both Respondent and the Caucus offer a reasonable interpretation of Section 3150.16(a) as it operates within the Election Code, their interpretation restricts voters' rights, as opposed to the reasonable interpretation tendered by Petitioner and the Secretary. The law, therefore, militates in favor of this Court construing the Election Code in a manner consistent with the view of Petitioner and the Secretary, as this construction of the Code favors the fundamental right to vote and enfranchises, rather than disenfranchises, the electorate.").

**\*57** Here, imposing a signature-comparison requirement as to mail-in and absentee ballots runs the risk of restricting voters' rights. This is so because election officials, unstudied and untested in signature verification, would have to subjectively analyze and compare signatures, which as discussed in greater detail below, is potentially problematic.[16] [ECF 549-2, p. 19, ¶ 68]; [ECF 549-9, p.

20, ¶ 64]. And perhaps more importantly, even assuming an adequate, universal standard is implemented, mail-in and absentee voters whose signatures were "rejected" would, unlike in-person voters, be unable to cure the purported error. *See* 25 P.S. § 3146.8(a) (stating that in-person and absentee ballots "shall [be safely kept] in sealed or locked containers until they are to be canvassed by the county board of elections," which § 3146.8(g)(1.1)-(2) states is no earlier than election day); *Boockvar,* — A.3d at —, 2020 WL 5554644, at *20 ("[A]lthough the Election Code provides the procedures for casting and counting a vote by mail, it does not provide for the 'notice and opportunity to cure' procedure sought by Petitioner. To the extent that a voter is at risk for having his or her ballot rejected due to minor errors made in contravention of those requirements, we agree that the decision to provide a 'notice and opportunity to cure' procedure to alleviate that risk is one best suited for the Legislature."). As discussed in more detail below, unlike in-person voters, whose signatures are verified in their presence, mail-in and absentee voters' signatures would be verified at a later date outside the presence of the voter. *See generally* 25 P.S. § 3146.8(a), (g) (requiring mail-in and absentee ballots to be kept secured in a sealed container until Election Day). Unbeknownst to the voter, then, and without an opportunity to remedy the purported error, these mail-in and absentee voters may not have their votes counted. Based on this risk of disenfranchisement, which the Court must consider in interpreting the statute, the Court cannot conclude that this was the General Assembly's intention.

The Court is not persuaded by Plaintiffs' arguments to the contrary.

Plaintiffs argue that section 3146.8(g)(5)-(7) provides a voter, whose ballot-signature was rejected, notice and an opportunity to cure the signature deficiency. [ECF 509, pp. 13, 18, 50]. That section, however, refers to when a person raises a specific challenge to a specific ballot or application on the grounds that the elector is not a "qualified elector." 25 P.S. § 3146.8(g)(4) (stating that mail-in and absentee ballots shall be counted unless they were challenged under §§ 3146.2b or 3150.12b, which allow challenges on the grounds that the elector applying for a mail-in or absentee ballot wasn't qualified). Thus, the "challenges" referenced in § 3146.8(g)(5)-(7) refer to a voter's qualifications to vote, not a signature verification.

Plaintiffs similarly argue that section 3146.8(h) provides mail-in voters notice and opportunity to cure signature deficiencies. [ECF 552, p. 60]. But that section relates to "those absentee ballots or mail-in ballots for which proof of identification has not been received or could not be verified." 25 P.S. § 3146.8(h). As discussed above, "proof of identification" is a defined term, and includes the voter's driver's license number, last four digits of their Social Security number, or a specifically approved form of identification. 25 P.S. § 2602(z.5)(3)(i)-(iv). Not included is the voter's signature. [17]

**\*58** At bottom, Plaintiffs request this Court to impose a requirement—signature comparison—that the General Assembly chose not to impose. Section 3146.8(g)(3) does not mention or require signature comparison. The Court will not write it into the statute.

For the same reasons that the Election Code does not impose a signature-comparison requirement for mail-in and absentee ballots, the Election Code does not impose a signature-comparison requirement for mail-in and absentee ballot **_applications._** While the General Assembly imposed a requirement that the application be signed, there is no mention of a requirement that the signature be verified, much less that the application be rejected based solely on such verification. 25 P.S. §§ 3146.2(d) (absentee-ballot application), 3150.12(c) (mail-in-ballot application). Again, finding no explicit instructions for signature comparison here (unlike elsewhere in the Code), the Court concludes that the General Assembly chose not to include a signature-comparison requirement for ballot applications.

The Court again finds Plaintiffs' arguments to the contrary unavailing. Plaintiffs argue that "there is no other proof of identification required to be submitted with the ballot applications," and thus, a signature comparison must be required. [ECF 509, p. 16].

But the Election Code expressly requires the applicant to include several pieces of identifying information, including their name, mailing address, and date of birth. 25 P.S. §§ 3146.2(b), 3150.12(b). And after receiving the applicant's application, the election official must "verify[ ] the proof of identification [a defined term as discussed above] and

compar[e] the information provided on the application with the information contained on the applicant's permanent registration card." [18] _Id._ at §§ 3146.2b(c), 3150.12b(a). Thus, contrary to Plaintiffs' argument, the General Assembly provided for certain methods of identification as to ballot applications. Signature verification isn't one of them.

For these reasons, the Court concludes that the Election Code does not impose a signature-comparison requirement for absentee and mail-in ballots and applications. As such, the Secretary's September 11, 2020, and September 28, 2020, guidance is consistent with the Election Code. Plaintiffs' claims of vote dilution based on this guidance will therefore be dismissed.

### B. The lack of a signature comparison does not violate substantive due process.

In addition to alleging that the Secretary's guidance violates the Election Code, Plaintiffs appear to also argue that their right to vote is unconstitutionally burdened and diluted due to a risk of fraud. That is, regardless of what the Election Code requires, Plaintiffs assert that absent signature comparison, mail-in and absentee ballots will be prone to fraud, thereby diluting other lawful ballots. [ECF 509, pp. 45-50; 504-19, pp. 10-15]. Plaintiffs argue that this significantly burdens their fundamental right to vote, resulting in a due-process violation, and thus strict scrutiny applies. The Court disagrees.

**\*59** As discussed above in the context of Plaintiffs' drop-box claim, Plaintiffs' claim here simply does not rise to the high level for a substantive due process claim. To violate substantive due process in the voting-rights context, the infringements are much more severe. Only in extraordinary circumstances will there be "patent and fundamental unfairness" that causes a constitutional harm.

_See_ _Bonas v. Town of North Smithfield,_ 265 F.3d 69, 74 (1st Cir. 2001); _Shannon v. Jacobowitz,_ 394 F.3d 90, 94 (2d Cir. 2005).

Here, Plaintiffs' signature-comparison claim does not meet this high standard. This isn't a situation of malapportionment, disenfranchisement, or intentional discrimination. And the risk of voter fraud generally without signature comparison —as a matter of fact and law—does not rise to "patent and fundamental unfairness."

Indeed, as discussed above, Plaintiffs' evidence of potential voter fraud here is insufficient to establish "patent and fundamental unfairness." In their summary-judgment brief, Plaintiffs argue that "the Secretary's September 2020 guidance memos promote voter fraud." [ECF 509, p. 48]. Plaintiffs then offer a hypothetical where a parent signs a ballot application on their child's behalf because the child is out-of-state. [ECF 509, p. 48]. Plaintiffs assert that without signature comparisons, such "fraud" could proceed unchecked. [*Id.*]. Plaintiffs continue, arguing that the "fraud" would "snowball," so that "spouses, neighbors, acquaintances, strangers, and others" were signing applications and ballots on others' behalf. [*Id.* at pp. 48-49]. To prevent such fraud, Plaintiffs' expert, Mr. Riddlemoser, asserts that signature comparison is needed. [ECF 504-19, p. 10 ("Not only does enforcing the Election Code's requirement of a completed and signed declaration ensure uniformity, which increases voter confidence, it also functions to reduce fraud possibilities by allowing signature verification.") ].

Mr. Riddlemoser first highlights that in Philadelphia in the primary, ballots were counted "that lacked a completed declaration." [*Id.* at p. 11]. Mr. Riddlemoser further opines that the September 11, 2020, guidance and September 28, 2020, guidance, in instructing that signature comparison is not required for mail-in and absentee ballots and applications, "encourage[s], rather than prevent[s], voter fraud." [*Id.* at pp. 12-13]. Mr. Riddlemoser also notes that signature comparison is "the most common method" to verify ballots and that the Secretary's guidance "leave the absentee/mail-in ballots subject to the potential for unfettered fraud." [*Id.* at p. 14]. He concludes that the guidance "invites the dilution of legitimately cast votes." [*Id.*].

Based on this evidentiary record, construed in Plaintiffs' favor, the Court cannot conclude that there exists "patent and fundamental unfairness." Rather, Plaintiffs present only the possibility and potential for voter fraud. In their briefing, Plaintiffs relied on hypotheticals, rather than actual events. [ECF 509, p. 48]. Mr. Riddlemoser admits that failing to verify signatures only creates "the potential" for fraud and "invites" vote dilution. [ECF 504-19, pp. 14, 15]. Even assuming an absence of signature comparison does indeed invite the potential for fraud, the nondiscriminatory, uniform practice and guidance does not give rise to "patent and fundamental unfairness" simply because of a "potential" for fraud. Plaintiffs have not presented evidence to establish a sufficient burden on their constitutional right to vote.

**\*60** Indeed, even if the Court assumed some "forged" applications or ballots were approved or counted, this is insufficient to establish substantial, widespread fraud that undermines the electoral process. Rather, limited instances of "forged" ballots—which according to Plaintiffs' definition, includes an individual signing for their spouse or child—amount to what the law refers to as "garden variety" disputes of limited harm. As has long been understood, federal courts should not intervene in such "garden variety" disputes. *Hutchinson*, 797 F.2d at 1283 ("[C]ourts have uniformly declined to endorse action under § 1983 with respect to garden variety election irregularities.") (cleaned up); *Yoshina*, 140 F.3d at 1226 ("In general, garden variety election irregularities do not violate the Due Process Clause, even if they control the outcome of the vote or election." (collecting cases)); *Curry v. Baker*, 802 F.2d 1302, 1314-15 (11th Cir. 1986) ("[I]f the election process itself reaches the point of patent and fundamental unfairness, a violation of the due process clause may be indicated and relief under § 1983 therefore in order. Such a situation must go well beyond the ordinary dispute over the counting and marking of ballots." (cleaned up)).

To be clear, the Court does not take Plaintiffs' allegations and evidence lightly. Election fraud is serious and disruptive. And Plaintiffs could be right that the safer course would be to mandate signature comparison for all ballots. But what Plaintiffs essentially complain of here is whether the procedures employed by the Commonwealth are sufficient to prevent that fraud. That is a decision left to the General Assembly, not to the meddling of a federal judge. *Crawford*, 553 U.S. at 208, 128 S.Ct. 1610 (Scalia, J. concurring) ("It is for state legislatures to weigh the costs and benefits of possible changes to their election codes, and their judgment must prevail unless it imposes a severe and unjustified overall burden upon the right to vote, or is intended to disadvantage a particular class."). *Griffin*, 385 F.3d at 1131-32 ("[S]triking of the balance between discouraging fraud and other abuses and encouraging turnout is quintessentially a legislative judgment with which we judges should not interfere unless strongly convinced that the legislative judgment is grossly awry.").

### C. Plaintiffs' federal equal-protection claims based on signature comparison fail.

Plaintiffs present two federal equal-protection claims. The Court will address each in turn.

### 1. County differences over signature comparison do not violate federal equal-protection rights.

Plaintiffs' first federal equal-protection claim is based on some county boards of elections intending to verify the signatures on mail-in and absentee ballots and applications, while others do not intend to do so. To that end, Plaintiffs have presented evidence that some, but not all, counties do intend to verify signatures. *E.g.*, [ECF 504-1]. [19] According to Plaintiffs, this arbitrary and differential treatment of mail-in and absentee ballots among counties—purportedly caused by the Secretary's September 11, 2020, and September 28, 2020, guidance—violates the Equal-Protection Clause because voters will be treated differently simply because of the county in which they reside. The Court, however, finds no equal-protection violation in this context.

The Secretary's guidance about which Plaintiffs complain is uniform and nondiscriminatory. It was issued to all counties and applies equally to all counties, and by extension, voters. Because the uniform, nondiscriminatory guidance is rational, it is sound under the Equal-Protection Clause. *See Gamza*, 619 F.2d at 453 (5th Cir. 1980) ("We must, therefore, recognize a distinction between state laws and patterns of state action that systematically deny equality in voting, and episodic events that, despite non-discriminatory laws, may result in the dilution of an individual's vote. Unlike systematically discriminatory laws, isolated events that adversely affect individuals are not presumed to be a violation of the equal protection clause.") (citation omitted). Indeed, the guidance merely instructs counties to abide by the Election Code—an instruction to follow the law is certainly rational and related to an obviously rational government interest.

**\*61** In fact, if there is any unequal application now, it is caused by those counties that are *not* following the guidance and are going above and beyond the Election Code to impose a signature-comparison requirement. That claim, though, is not before the Court, as Plaintiffs here do not assert that imposing a signature-comparison requirement violates the Constitution (they allege the opposite).

In any event, to the extent there was uncertainty before, this decision informs the counties of the current state of the law as it relates to signature comparison. If any county

still imposes a signature-comparison requirement in order to disallow ballots, it does so without support from the Secretary's guidance or the Election Code. Further, counties that impose this signature-comparison requirement to reject ballots may be creating a different potential constitutional claim for voters whose ballots are rejected. *Boockvar*, --- A.3d at ----, 2020 WL 5554644, at \*34, n.16 (Wecht, J. concurring) (noting that courts around the country have found due process issues with signature-comparison requirements; and collecting cases).

For these reasons, Plaintiffs' equal-protection claim falls short.

### 2. Different treatment between in-person ballots and mail-in ballots also does not violate federal equal-protection rights.

Plaintiffs also assert a second federal equal-protection claim on the grounds that the Election Code, by not requiring signature comparison for mail-in and absentee ballots, treats such ballots differently than in-person ballots (which require signature comparisons). Plaintiffs argue that this is an unconstitutionally arbitrary and unequal treatment. The Court disagrees.

It is well-settled that states may employ in-person voting, absentee voting, and mail-in voting and each method need not be implemented in exactly the same way. *See Hendon*, 710 F.2d at 181 ("A state may employ diverse methods of voting, and the methods by which a voter casts his vote may vary throughout the state.")

"Absentee voting is a fundamentally different process from in-person voting, and is governed by procedures entirely distinct from in-person voting procedures." *ACLU of New Mexico v. Santillanes*, 546 F.3d 1313, 1320 (10th Cir. 2008) (citations omitted). It is an "obvious fact that absentee voting is an inherently different procedure from in-person voting." *Indiana Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 830-31 (S.D. Ind. 2006). Because in-person voting is "inherently different" from mail-in and absentee voting, the procedures for each need not be the same. *See, e.g.*, *Santillanes*, 546 F.3d at 1320-21 ("[B]ecause there are clear differences between the two types of voting procedures, the law's distinction is proper."); *Rokita*, 458 F. Supp. 2d

at 831 ("[I]t is axiomatic that a state which allows for both in-person and absentee voting must therefore apply different requirements to these two groups of voters."); Billups, 439 F. Supp. 2d at 1356-57 ("[A]bsentee voting and in-person voting are inherently different processes, and both processes use different standards, practices, and procedures.").

Plaintiffs argue that while absentee and mail-in voting "is a fundamentally different process from in-person voting," Defendants have "no justification in this instance to create such an arbitrary and disparate rule between absentee/mail-in voters and in-person voters." [ECF 509, p. 51]. Not so.

**\*62** Because of the "inherent" differences between in-person voting and mail-in and absentee voting, Pennsylvania's requirement for signature comparison for in-person ballots, but not mail-in and absentee ballots, is not arbitrary. By way of example, Secretary Boockvar articulated several valid reasons why Pennsylvania implements different verification procedures for mail-in and absentee voters versus in-person voters. [ECF 504-12; ECF 549-2].

In her deposition, Secretary Boockvar explained that for in-person voters, the only possible verification is signature comparison and verification. [ECF 504-12, 55:19-56:19]. This is because, unlike mail-in and absentee voters who must apply for a ballot, in-person voters may simply show up at the polls on Election Day and vote. In contrast, for mail-in and absentee voters, there are several verification steps implemented before the voter's mail-in/absentee ballot is counted, such as checking their application and their drivers' license number or social security number. [*Id.* at 56:8-19]. Thus, counties don't need to resort to a signature comparison to identify and verify the mail-in or absentee voter.

This is important, as Defendants and Intervenors present valid concerns about the uniformity and equality of signature comparisons, in part, due to the technical nature of signature analysis, the subjective underpinnings of signature analysis, and the variety of reasons that signatures can naturally change over time. [ECF 549-2, pp. 19-20, ¶ 68; ECF 549-9, p. 20, ¶¶ 63-64]. Such factors can reasonably justify not requiring a signature comparison when the elector is not physically present.

For example, Secretary Boockvar notes the concern with non-handwriting-expert election officials comparing signatures, without uniform standards. [ECF 549-2, pp. 19-20, ¶ 68]. She also notes that people's signatures can change over time,

due to natural and unavoidable occurrences, like injuries, arthritis, or the simple passage of time. [*Id.*]. Such reasons are valid and reasonable. *See Boockvar, —— A.3d at ——, 2020 WL 5554644, at \*34* (Wecht, J. concurring) ("Signature comparison is a process fraught with the risk of error and inconsistent application, especially when conducted by lay people.").

Secretary Boockvar further asserts that signature comparison is justified for in-person voting, but not mail-in or absentee voting, because the in-person voter is notified of his or her signature deficiency, and afforded an opportunity to cure. [ECF 549-2, pp. 19-20, ¶¶ 66-68 (explaining that in-person voters can be immediately notified of the signature deficiency, but mail-in/absentee voters cannot) ]. Secretary Boockvar's justifications are consistent with the Election Code's framework.

When a voter votes in person, he or she signs the voter's certificate, and the election official immediately, in the voter's presence, verifies the signature. 25 P.S. § 3050(a.3)(1)-(2). If the election official finds the signature to be problematic, the in-person voter is told as such. *Id.* at § 3050(a.3)(2). Notably, however, the in-person voter may still cast a ballot. *Id.* ("[I]f the signature on the voter's certificate ... shall not be deemed authentic by any of the election officers, such elector shall not be denied the right to vote for that reason[.]"). The in-person voter whose signature is questioned must, after casting the ballot, "produce at least one qualified elector of the election district as a witness, who shall make affidavit of his identity or continued residence in the election district." *Id.* at § 3050(d). Thus, the in-person voter whose signature is not verified is immediately notified, is still allowed to cast a ballot, and is given the opportunity to remedy the signature-deficiency.

**\*63** In contrast, a voter who casts a mail-in or absentee ballot cannot be afforded this opportunity. Absentee and mail-in ballots are kept in "sealed or locked containers" until they are "canvassed by the county board of elections." 25 P.S. § 3146.8(a). The pre-canvassing and canvassing cannot begin until Election Day. *Id.* at § 3146.8(g)(1.1)-(2). As such, the absentee and mail-in ballots cannot be verified until Election Day, regardless of when the voter mails the ballot. Further, even if there were sufficient time, a voter cannot cure these types of deficiencies on their mail-in or absentee

ballot. 🔖 *Boockvar*, —— A.3d at ——, 2020 WL 5554644, at *20 ("[A]lthough the Election Code provides the procedures for casting and counting a vote by mail, it does not provide for the "notice and opportunity to cure" procedure sought by Petitioner.").

Therefore, if mail-in and absentee ballots were subject to signature comparison, an election official—who is unstudied in the technical aspects of signature comparison—could deem a voter's signature problematic and not count the ballot, which would effectively disenfranchise that voter. Unlike the in-person voter, the mail-in or absentee voter may not know that his or her signature was deemed inauthentic, and thus may be unable to promptly cure the deficiency even if he or she were aware.

Accordingly, the Court concludes that the inherent differences and opportunities afforded to in-person voters compared to mail-in and absentee voters provides sufficient reason to treat such voters differently regarding signature comparison. The Court concludes that the lack of signature comparison for mail-in and absentee ballots is neither arbitrary, nor burdens Plaintiffs' equal-protection rights.

For these reasons, the Court will dismiss Plaintiffs' federal equal-protection claims related to signature comparison.

### 3. The Election Code provisions related to signature comparison satisfy 🔖 *Anderson*-🔖 *Burdick*.

Finally, even assuming the Election Code's absence of a signature-comparison requirement imposes some burden on Plaintiffs' constitutional rights, Plaintiffs' constitutional claims still fail.

As discussed above with respect to Defendants' drop-box implementation, 🔖 *Anderson*-🔖 *Burdick* does not apply neatly to this claim either. This is because Plaintiffs aren't challenging a specific regulation affecting their right to vote, but are instead challenging the *lack* of a restriction on someone else's right to vote. This makes both the burden difficult to assess and also the state's interests in *not* doing something more abstract. As such, the Court finds that the proper application of the 🔖 *Anderson*-🔖 *Burdick* framework here includes weighing the burden involving Plaintiffs' risk of vote dilution against the state's interests and overall plan

in preventing against voter fraud, including with respect to forged mail-in ballots.

Weighing these considerations compels a conclusion that there is no constitutional violation here. With respect to any burden on Plaintiffs' right to vote, that burden is slight, at best. A failure to engage in a signature comparison may, crediting Plaintiffs' evidence, increase the risk of voter fraud. But even then, this remains a largely speculative concern. This burden too is lessened by the numerous other regulations imposed by the Election Code, including the detailed verification procedure as to the information on mail-in ballots (discussed above), and the deterrence furthered by criminal sanctions for those engaging in such voter fraud.

Against these burdens, the Commonwealth has precise and weighty interests in verifying ballot applications and ballots in an appropriate manner to ensure that they are accurate. As discussed above, the Commonwealth determined that the risk of disenfranchising mail-in and absentee voters, did not justify signature comparison for those voters. [ECF 549-2, pp. 19-20, ¶¶ 66-69]. Unlike for in-person voters, there are other means of identifying and verifying mail-in and absentee voters, such as having to specifically apply for a mail-in or absentee ballot and provide various categories of identifying information. [ECF 504-12, 55:19-56:19]; 🔖 25 P.S. §§ 3146.2(b), 🔖 3150.12(b). And ultimately, due to the slight burden imposed on Plaintiffs, Pennsylvania's regulatory interests in a uniform election pursuant to established procedures is sufficient to withstand scrutiny. 🔖 *Timmons*, 520 U.S. at 358, 117 S.Ct. 1364.

**\*64** The General Assembly opted not to require signature comparisons for mail-in and absentee ballots and applications. And as previously discussed, absent extraordinary reasons to, the Court is not to second-guess the legislature.

### IV. Defendants and Intervenors are entitled to summary judgment on Plaintiffs' as-applied, federal constitutional challenge to the county-residency requirement for poll watchers.

Plaintiffs next take exception with the provision of the Election Code that restricts a registered voter from serving as a poll watcher outside the county of his or her residence. [ECF 461, ¶ 217].

Plaintiffs argue that "[a]s applied to the 2020 General Election, during the midst of the COVID-19 pandemic, Pennsylvania's residency requirement for watchers violates equal protection." [ECF 509, p. 58]. That's because, according to Plaintiffs, the "current pandemic severely challenges the ability of parties to staff watchers[.]" [*Id.* at p. 60]. And not having enough poll watchers in place "puts into danger the constitutionally-guaranteed right to a transparent and undiluted vote," [*id.* at p. 68], by "fostering an environment that encourages ballot fraud or tampering," [ECF 461, ¶ 256]. As such, Plaintiffs believe that the county residency requirement "is not rationally connected or reasonably related to any interest presented by the Commonwealth." [ECF 509, p. 63].

Defendants and Intervenors have a markedly different view.

As an initial matter, the Democratic Intervenors argue that Plaintiffs "are precluded from relitigating their claim that the Commonwealth lacks a constitutionally recognized basis for imposing a county-residence restriction for poll watchers" based on the doctrine articulated in 📑 *England v. Louisiana State Bd. of Med. Examiners*, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964). [ECF 529, p. 16]. That doctrine requires that after a federal court has abstained under 📑 *Pullman*, the plaintiff must expressly reserve the right to litigate any federal claims in federal court while litigating state-law issues in state court. 📑 *England*, 375 U.S. at 419, 421-22, 84 S.Ct. 461. Defendants and Intervenors contend that Plaintiffs (specifically, the Trump Campaign, the RNC, and the Republican Party) failed to do so in the proceedings before the Pennsylvania Supreme Court.

And if the 📑 *England* doctrine doesn't bar this claim, Defendants and Intervenors argue that "Plaintiffs' as-applied challenge simply fails to state a constitutional claim." *See, e.g.*, [ECF 547, p. 65]. They believe that the county-residency requirement does not infringe on a fundamental right or regulate a suspect classification (such as race, sex, or national origin). [*Id.*]. As a result, the Commonwealth need only provide a rational basis for the requirement, which Defendants and Intervenors believe the Commonwealth has done. [*Id.*].

After carefully reviewing the record and considering the parties' arguments and evidence, the Court finds that the 📑 *England* doctrine does not bar Plaintiffs' ability to bring

this claim. Even so, after fully crediting Plaintiffs' evidence, the Court agrees with Defendants and Intervenors that Plaintiffs' as-applied challenge fails on the merits.

### A. The 📑 *England* doctrine does not bar Plaintiffs' federal challenge to the county-residency requirement.

**\*65** In 📑 *England*, the Supreme Court established that after a federal court abstains under 📑 *Pullman*, "if a party freely and without reservation submits his federal claims for decision by the state courts, litigates them there, and has them decided there, then ... he has elected to forgo his right to return to the District Court." 📑 375 U.S. at 419, 84 S.Ct. 461. To reserve those rights, a plaintiff forced into state court by way of abstention must inform the state court that he is exposing the federal claims there only to provide the proper context for considering the state-law questions. 📑 *Id.* at 421, 84 S.Ct. 461. And that "he intends, should the state court[ ] hold against him on the question of state law, to return to the District Court for disposition of his federal contentions." 📑 *Id.* Essentially, in 📑 *England*, the Supreme Court created a special doctrine of *res judicata* for 📑 *Pullman* abstention cases.

The Democratic Intervenors argue that because none of the three Plaintiffs who participated in the Pennsylvania Supreme Court case as either intervenors or *amici* "reserved the right to relitigate [Plaintiffs' poll-watcher claim] in federal court," they are now "precluded" from doing so. [ECF 529, p. 17]. The Court is not convinced that this doctrine bars Plaintiffs' claim for at least two reasons.

First, in its original abstention decision, the Court noted that "[n]one of Plaintiffs' poll-watching claims directly ask the Court to construe an ambiguous state statute." [ECF 409, p. 24]. Instead, these claims resided in a 📑 *Pullman* gray area, because they were only indirectly affected by other unsettled state-law issues. In light of that, the Court finds that the 📑 *England* doctrine was not "triggered," such that Plaintiffs needed to reserve their right to return to federal court to litigate the specific as-applied claim at issue here.

Second, even if it were triggered, not all of the Plaintiffs here were parties in the Pennsylvania Supreme Court case, and only one (the Republican Party) was even given intervenor status. But even the Republican Party, acting as an intervenor,

did not have an opportunity to develop the record or present evidence relevant to its as-applied challenge. Thus, this claim wasn't "fully litigated" by any of the Plaintiffs, which is a necessary condition for the claim to be barred under the *England* doctrine. *Cf.* *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1073 (3d Cir. 1990) (explaining that a litigant "may not relitigate an issue s/he fully and unreservedly litigated in state court").

Thus, Plaintiffs are not precluded by the *England* doctrine from bringing their remaining as applied poll-watcher claim. The Court will now address the claim on the merits.

### B. The county-residency requirement, as applied to the facts presented and the upcoming general election, does not violate the U.S. Constitution.

Originally, Plaintiffs raised a facial challenge to the county-residency requirement under 25 P.S. § 2687. That is, Plaintiffs first took the position that there was no conceivable constitutional application of the requirement that an elector be a resident of the county in which he or she seeks to serve. But, as Plaintiffs' concede, that facial challenge is no longer viable in light of the Pennsylvania Supreme Court's recent decision. [ECF 448, p. 10]. As a result, Plaintiffs now focus solely on raising an as-applied challenge to the county-residency requirement.

"[T]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010).

At a fundamental level, a "facial attack tests a law's constitutionality based on its text alone and does not consider the facts or circumstances of a particular case." *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010). By contrast, an "as-applied attack" on a statute "does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right." *Id.* The distinction between facial and an as-applied attack, then, "goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." *Citizens United*, 558 U.S. at

331, 130 S.Ct. 876; *see also* *Bruni v. City of Pittsburgh*, 824 F.3d 353, 362 (3d Cir. 2016) ("The distinction between facial and as-applied constitutional challenges, then, is of critical importance in determining the remedy to be provided).

**\*66** Because the distinction is focused on the available remedies, not the substantive pleading requirements, "[t]he substantive rule of law is the same for both challenges." *Edwards v. D.C.*, 755 F.3d 996, 1001 (D.C. Cir. 2014); *see also Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 509, n.5 (D.C. Cir. 2016) ("Indeed, the substantive rule of law is the same for both as-applied and facial First Amendment challenges.") (cleaned up); *Legal Aid Servs. of Or. v. Legal Servs. Corp.*, 608 F.3d 1084, 1096 (9th Cir. 2010) ("The underlying constitutional standard, however, is no different [in an as-applied challenge] th[a]n in a facial challenge.").

"In other words, *how* one must demonstrate the statute's invalidity remains the same for both type of challenges, namely, by showing that a specific rule of law, usually a constitutional rule of law, invalidates the statute, whether in a personal application or to all." *Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219, 228 (2d Cir. 2006), *abrogated on other grounds by* *Bond v. United States*, 564 U.S. 211, 131 S.Ct. 2355, 180 L.Ed.2d 269 (2011).

In determining whether a state election law violates the U.S. Constitution, the Court must "first examine whether the challenged law burdens rights protected by the First and Fourteenth Amendments." *Patriot Party of Allegheny Cnty. v. Allegheny Cnty. Dep't of Elections*, 95 F.3d 253, 258 (3d Cir. 1996). "Where the right to vote is not burdened by a state's regulation on the election process, ... the state need only provide a rational basis for the statute." *Cortés*, 218 F. Supp. 3d at 408. The same is true under an equal protection analysis. "If a plaintiff alleges only that a state treated him or her differently than similarly situated voters, without a corresponding burden on the fundamental right to vote, a straightforward rational basis standard of review should be used." *Obama*, 697 F.3d at 428 (6th Cir. 2012); *see also Biener*, 361 F.3d at 214-15 (applying rational basis where there was no showing of an "infringement on the fundamental right to vote."); *Donatelli*, 2 F.3d at 515 ("A legislative classification that does not affect a suspect category or infringe on a fundamental constitutional right

must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." (cleaned up)).

But where the law imposes at least some burden on protected rights, the court "must gauge the character and magnitude of the burden on the plaintiff and weigh it against the importance of the interests that the state proffers to justify the burden." *Patriot Party,* 95 F.3d at 258 (citations omitted).

Consistent with the Pennsylvania Supreme Court's recent decision, but now based on a complete record, this Court finds that the county-residency requirement for poll watching does not, as applied to the particular circumstances of this election, burden any of Plaintiffs' fundamental constitutional rights, and so a deferential standard of review should apply.

*See Boockvar,* —— A.3d at ——, 2020 WL 5554644, at *30. Under a rational-basis review and considering all the relevant evidence before the Court, the county-residency requirement is rational, and thus constitutional. But even if the requirement burdened the right to vote, that burden is slight—and under the *Anderson-Burdick* test, the Commonwealth's interests in a county-specific voting system, viewed in the context of its overall polling-place security measures, outweigh any slight burden imposed by the county-residency restriction.

### 1. The county-residency requirement neither burdens a fundamental right, including the right to vote, nor discriminates based on a suspect classification.

**\*67** At the outset, "there is no individual constitutional right to serve as a poll watcher[.]" *Boockvar,* —— A.3d at ——, 2020 WL 5554644, at *30 (citing *Cortés,* 218 F. Supp. 3d at 408); *see also Dailey v. Hands,* No. 14-423, 2015 WL 1293188, at *5 (S.D. Ala. Mar. 23, 2015) ("[P]oll watching is not a fundamental right protected by the First Amendment."); *Turner v. Cooper,* 583 F. Supp. 1160, 1162 (N.D. Ill. 1983) ("Plaintiffs have cited no authority ..., nor have we found any, that supports the proposition that [the plaintiff] had a first amendment right to act as a poll watcher.").

"State law, not the Federal Constitution, grants individuals the ability to serve as poll watchers and parties and candidates the authority to select those individuals." *Cortés,* 218 F.

Supp. 3d at 414; *see also Boockvar,* —— A.3d at ——, 2020 WL 5554644, at *30 (the right to serve as a poll watcher "is conferred by statute"); *Tiryak v. Jordan,* 472 F. Supp. 822, 824 (E.D. Pa. 1979) ("The number of poll-watchers allowed, the manner of their appointment, their location within the polling place, the activities permitted and the amount of compensation allowed are all dictated by [ 25 P.S. § 2687].""). Given the nature of the right, "[i]t is at least arguable that the [Commonwealth of Pennsylvania] could eliminate the position of poll watcher" without offending the constitution. *Cotz v. Mastroeni,* 476 F. Supp. 332, 364 (S.D.N.Y. 2007). In fact, one neighboring state—West Virginia—has eliminated poll watchers. W. Va. Code Ann. § 3-1-37; W. Va. Code Ann. § 3-1-41.

Nor does the county-residency requirement hinder the "exercise of the franchise." *Cortés,* 218 F. Supp. 3d at 408. It doesn't in any way limit voters' "range of choices in the voting booth"—voters can still "cast ballots for whomever they wish[.]" *Id.* And, as Plaintiffs admit, the county-residency requirement doesn't make the actual act of casting a vote any harder. *See* [ECF 524-24, 67:1-6]. Indeed, at least one of the plaintiffs here, Representative Joyce, testified that he was unaware of anyone unable to cast his ballot because of the county-residency requirement for poll watchers [ *Id.*].

Finally, Plaintiffs' claim that Pennsylvania's "poll watching system" denies them "equal access" to the ability to observe polling places in the upcoming election does not, on its own, require the Court to apply anything other than rational-basis scrutiny. [ECF 551, p. 75]. To the extent Plaintiffs are denied equal access (which discussed below, as a matter of evidence, is very much in doubt), it isn't based on their membership in any suspect classification.

For a state law to be subject to strict scrutiny, it must not only make a distinction among groups, but the distinction must be based on inherently suspect classes such as race, gender, alienage, or national origin. *See City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439-40, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Political parties are not such a suspect class. *Greenville Republican Party,* 824 F. Supp. 2d at 669 ("[T]his court is unfamiliar with, and Plaintiffs have not cited, any authority categorizing political parties as an inherently suspect class.") Likewise, "[c]ounty of residence is

not a suspect classification warranting heightened scrutiny[.]" *Short*, 893 F.3d at 679.

Plaintiffs don't dispute this. [ECF 509, p. 65 ("To be clear, the right at issue here is the right of **candidates** and **political parties** to participate in an election where the process is transparent and open to observation and the right of the **voters** to participate in such election." (emphasis in original)) ]. Rather, Plaintiffs' theory as to how the county-residency requirement burdens the right to vote is based on the same threat of vote dilution by fraud that they have advanced with their other claims. In other words, Plaintiffs' claim that the county-residency requirement for poll watchers limits the ability to find poll watchers, which, in turn, limits the ability for poll watchers to detect fraud and ballot tampering. [ECF 461, ¶¶ 256-57]. The resulting fraudulent or destroyed ballots cause the dilution of lawfully cast ballots. [ECF 509, pp. 64-68].

**\*68** Thus, based on this theory, to establish the burden flowing from the county-residency restriction, Plaintiffs must show (1) the county-residency requirement prevents them from recruiting enough registered Republican poll watchers in every county, (2) the absence of these Republican poll watchers creates a material risk of increased fraud and ballot tampering, and (3) this risk of fraud and ballot tampering will dilute the value of honestly cast votes.

There are both factual and legal problems fatal to Plaintiffs' vote-dilution theory in this context. Factually, Plaintiffs' evidence, accepted as true, fails to establish that they cannot find enough poll watchers because of the county-residency requirement. But even if they made that factual showing, the inability to find poll watchers still does not burden any recognized constitutional right in a way that would necessitate anything more than deferential review.

### 2. Plaintiffs' evidence does not establish any factual predicate for their theory.

Even accepting as true Plaintiffs' version of events, Plaintiffs have not established that the county-residency requirement is responsible for an inability to find enough poll watchers for at least two reasons.

First, Plaintiffs' evidence stops short of demonstrating any actual shortfall of desired poll watchers.

For example, in his declaration, James J. Fitzpatrick, the Pennsylvania Director for Election Day Operations for the Trump Campaign, stated only that the "Trump Campaign is **concerned** that due to the residency restriction, it will not have enough poll watchers in certain counties." [ECF 504-2, ¶ 25 (emphasis added) ]. Notably, however, Mr. Fitzpatrick, even when specifically asked during his deposition, never identified a single county where the Trump Campaign has **actually** tried and failed to recruit a poll watcher because of the county-residency requirement. *See, e.g.*, [ECF 528-14, 261:21-25] ("Q: Which counties does the Trump campaign or the RNC contend that they will not be able to obtain what you refer to as full coverage of poll watchers for the November 2020 election? A: I'm not sure. I couldn't tell you a list.").

Nor do any of Plaintiffs' other witness declarations establish an actual, inability to recruit poll watchers in any specific county. Representative Reschenthaler stated only that he was "concerned" that he "will not be able to recruit enough volunteers from Greene County to watch the necessary polls in Greene County." [ECF 504-6, ¶ 12].

Representative Kelly stated that he was "likely to have difficulty getting enough poll watchers from within Erie County to watch all polls within that county on election day." [ECF 504-5, ¶ 16]. "Likely difficulty" isn't the same as an "actual inability." That aside, the declaration doesn't provide any basis for Representative Kelly's assessment of this "likely difficulty." Nowhere does he detail the efforts he took (*e.g.*, the outreach he tried, prospective candidates he unsuccessfully recruited, and the like), nor did he explain why those efforts aren't likely to succeed in the future.

The same goes for Representative Thompson's declaration. Representative Thompson stated that during some unspecified prior elections, unidentified parties and campaigns did not "always find enough volunteers to serve as poll watchers in each precinct." [ECF 504-4, ¶ 20]. But this undetailed statement doesn't help Plaintiffs' cause, because it doesn't identify the elections during which this was a problem, the parties and campaigns affected by a lack of poll watchers, or the precincts for which no poll watcher could be found.

**\*69** Representative Joyce's declaration doesn't even express a "concern" about "likely difficulty" in recruiting poll watchers. He simply stated his belief that "[p]oll watchers play a very important role in terms of protecting the integrity of the election process[.]" [ECF 504-7, ¶ 11]. While he may be

right, it has no bearing on whether Plaintiffs can find enough people to play that "very important role."

Indeed, Plaintiffs' prediction that they will "likely" have difficulty finding poll watchers is belied by the uncontested Pennsylvania voter registration statistics for 2019 that they included as an exhibit to their summary-judgment brief. [ECF 504-34]. Those statistics suggest that there is no shortage of registered Republican voters who are qualified to serve as poll watchers. [*Id.*]. Even in the three specific counties in which Plaintiffs warn that "Democratic registered voters out-number ... their Republican counterparts" (*i.e.*, Philadelphia, Delaware, and Centre), there are still significant numbers of registered Republicans. *See* [ECF 504-34 (Philadelphia – 118,003; Delaware – 156,867; and Centre – 42,903) ]. And only a very small percentage of the registered Republicans would be needed to fill all the necessary poll watcher positions in those allegedly problematic counties. *See, e.g.,*

*Cortés*, 218 F. Supp. 3d at 410 (noting that, in 2016, the Republican Party "could staff the entirety of the poll watcher allotment in Philadelphia county with just 4.1% of the registered Republicans in the county."). While Plaintiffs argue that these statistics don't show the number of registered Republicans *willing* to serve as a poll watcher, the Court is hard pressed to see, nor do Plaintiffs show, how among the tens—or hundreds—of thousands of registered Republicans in these counties, Plaintiffs are unable to find enough poll workers. [20]

Plaintiffs have not presented any evidence that would explain how, despite these numbers, they will have a hard time finding enough poll watchers. In fact, Plaintiffs' own expert, Professor Lockerbie, admits that "the Democratic and Republican parties might be able to meet the relevant criteria and recruit a sufficient population of qualified poll watchers who meet the residency requirements[.]" [ECF 504-20, ¶ 16].

Professor Lockerbie's report makes clear, and Plaintiffs appear to agree, that the county-residency requirement only potentially burdens other, "minor" political parties' ability to recruit enough poll watchers. [ECF 509, p. 61 (citing ECF 504-20, ¶¶ 16-17) ]. Regardless, any burden on these third parties is not properly before the Court. They are not parties to this litigation, and so the Court doesn't know their precise identities, whether they have, in fact, experienced any difficulty in recruiting poll watchers, or, more fundamentally, whether they even want to recruit poll watchers at all. [21]

**\*70** Additionally, Plaintiffs failed to present evidence that connects the county-residency requirement to their inability to find enough poll watchers. To succeed on their theory Plaintiffs cannot just point to difficulty recruiting poll watchers, they need to also show that " Section 2687(b) is responsible for their purported staffing woes." *Cortés*, 218 F. Supp. 3d at 410. Plaintiffs fail to show this, too.

Plaintiffs argue that the ongoing COVID-19 pandemic greatly reduces the number of people who would be willing to serve as a poll watcher, which further exacerbates the alleged problem caused by the county-residency requirement. [ECF 509, p. 60]. The primary problem with this argument, though, is that Plaintiffs have not presented any evidence to support it. Plaintiffs have not put forward a statement from a single registered voter who says they are unwilling to serve as a poll watcher due to concerns about contracting COVID-19.

Despite this shortcoming, the Court also acknowledges that COVID-19 generally has made it more difficult to do anything in person, and it is entirely plausible that the current pandemic will limit Plaintiffs from recruiting poll watchers to man polling places on election day. But that is likely true for just about every type of election rule and regulation. For example, the effects of the ongoing pandemic coupled with the requirement that the poll watcher be a registered voter (a requirement that unquestionably narrows the pool of potential candidates) would also make it harder to recruit poll watchers. There is no basis to find that the current public-health conditions, standing alone, render the county-residency requirement irrational or unconstitutional.

To bolster their concerns over COVID-19, Plaintiffs point to *Democratic Nat'l Committee v. Bostelmann*, No. 20-249, ---- F.Supp.3d ----, 2020 WL 5627186 (W.D. Wis. Sept. 21, 2020), where the court there enjoined Wisconsin's statute that requires that each election official (*i.e.*, poll worker) be an elector of the county in which the municipality is located. That case is distinguishable in at least two important ways.

First, *Bostelmann* concerned poll *workers*, not poll *watchers*. *Id.* at ----, 2020 WL 5627186, at *7. The difference between the two is significant. Poll workers are a more fundamental and essential aspect of the voting process. Without poll workers, counties cannot even open polling sites, which creates the possibility that voters will be completely disenfranchised. In fact, in *Bostelmann*, the plaintiffs

presented evidence that Milwaukee was only able to open 5 of its normal 180 polling places. *Id.* A failure to provide voters a place to vote is a much more direct and established constitutional harm than the one Plaintiffs allege here.

Second, the plaintiffs in *Bostelmann* actually presented evidence that they were unable to find the poll workers they needed due to the confluence of the COVID-19 pandemic and the challenged restriction. *Id.* As discussed above, Plaintiffs here have presented no such evidence.

To succeed on summary judgment, Plaintiffs need to move beyond the speculative concerns they offer and into the realm of proven facts. But they haven't done so on two critical fronts —they haven't shown an actual inability to find the necessary poll watchers, or that such an inability is caused by the county-residency requirement. Because Plaintiffs have not pointed to any specific "polling place that Section 2687(b) prevents [them] from staffing with poll watchers," Plaintiffs' theory of burden is doomed at launch. *Cortés,* 218 F. Supp. 3d at 409.

### 3. Even if Plaintiffs could establish a factual predicate for their theory, it would fail as a matter of law.

**\*71** As the Pennsylvania Supreme Court concluded last month, Plaintiffs' "speculative claim that it is 'difficult' for both parties to fill poll watcher positions in every precinct, ***even if true***, is insufficient to transform the Commonwealth's uniform and reasonable regulation requiring that poll watchers be residents of the counties they serve into a non-rational policy choice." *Boockvar,* ___ A.3d at ___, 2020 WL 5554644, at *30 (emphasis added).[22] The fundamental constitutional principles undergirding this finding are sound.

Plaintiffs' only alleged burden on the right to vote is that Defendants' lawful imposition of a county-residency requirement on poll watching will result in an increased risk of voter irregularities (*i.e.,* ballot fraud or tampering) that will, in turn, potentially cause voter dilution. While vote dilution is a recognized burden on the right to vote in certain contexts, such as when laws are crafted that structurally devalue one community's or group of people's votes over another's, there is no authority to support a finding of burden based solely on a speculative, future possibility that election irregularities

might occur. *See, e.g., Minnesota Voters,* 720 F.3d at 1033 (affirming dismissal of claims "premised on potential harm in the form of vote dilution caused by insufficient pre-election verification of EDRs' voting eligibility and the absence of post-election ballot rescission procedures"); *Common Cause Rhode Island v. Gorbea,* 970 F.3d 11, 15 (1st Cir. 2020) (rejecting the claim that a ballot witness signature requirement should not be enjoined during a pandemic because it would allegedly increase the risk of voter fraud and put Republican candidates at risk); *Cook Cnty. Rep. Party v. Pritzker,* No. 20-4676, 2020 WL 5573059, at *4 (N.D. Ill. Sept. 17, 2020) (denying a motion to enjoin a law expanding the deadline to cure votes because plaintiffs did not show how voter fraud would dilute the plaintiffs' votes).

Without a recognized burden on the right to vote, Plaintiffs' "argument that the defendants did not present an adequate justification is immaterial." *Green Party of Tennessee v. Hargett,* No. 16-6299, 2017 WL 4011854, at *4 (6th Cir. May 11, 2017). That's because the Court need not apply the *Anderson-Burdick* framework, and its intermediate standards, in this situation. *See Donatelli,* 2 F.3d at 514 & n.10. Instead, just as the Pennsylvania Supreme Court held, the Commonwealth here need only show "that a rational basis exists [for the county-residency requirement] to be upheld." *Boockvar,* ___ A.3d at ___, 2020 WL 5554644, at *30 (citing *Cortes,* 218 F. Supp. 3d at 408); *see also Voting for Am., Inc. v. Andrade,* 488 F. App'x 890, 899 (5th Cir. 2012) (applying rational basis review as opposed to the *Anderson-Burdick* balancing test because state election law did not implicate or burden specific constitutional rights); *McLaughlin v. North Carolina Bd. of Elections,* 65 F.3d 1215, 1227 (4th Cir. 1995) (concluding that a ballot access law "fails the *Anderson* balancing test only if it also does in fact burden protected rights").

**\*72** "Under rational-basis review, the challenged classification must be upheld 'if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.' " *Donatelli,* 2 F.3d at 513 (quoting *FCC v. Beach Commc'ns, Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)). "This standard of review is a paradigm of judicial restraint." *FCC,* 508 U.S. at 314, 113 S.Ct. 2096. It "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices."

*Id.* at 313, 113 S.Ct. 2096. Nor is it the Court's "place to determine whether the [General Assembly's decisions] were the best decisions or even whether they were good ones." *Donatelli,* 2 F.3d at 518.

Applying this deferential standard of review, the Pennsylvania Supreme Court found that given Pennsylvania's "county-based scheme for conducting elections, it is reasonable that the Legislature would require poll watchers, who serve within the various counties of the state, to be residents of the counties in which they serve." *Boockvar,* ——— A.3d at ———, 2020 WL 5554644, at *30 (citing *Cortés,* 218 F. Supp. 3d at 409). The Court agrees.

There are multiple reasons for this. As Secretary Boockvar advises, "[b]y restricting poll watchers' service to the counties in which they actually reside, the law ensures that poll watchers should have some degree of familiarity with the voters they are observing in a given election district." [ECF 549-2, p. 22, ¶ 78]. In a similar vein, Intervenors' expert, Dr. Barreto, in his report, states that, voters are more likely to be comfortable with poll watchers that "they know and they recognize from their area." [ECF 524-1, ¶40 ("Research in political science suggests that voters are much more comfortable and trusting of the process when they know or are familiar with poll workers who are from their community.") ]. When poll watchers come from the community, "there is increased trust in government, faith in elections, and voter turnout[.]" [*Id.*].

At his deposition, Representative Kelly agreed with this idea: "Yeah, I think – again, depending how the districts are established, I think people are probably even more comfortable with people that they – that they know and they recognize from their area." [ECF 524-23, 111:21-25].

Whether requiring poll watchers to be residents of the county in which they will serve is the best or wisest rule is not the issue before the Court. The issue is whether that rule is *reasonable* and rationally advances Pennsylvania's legitimate interests. This Court, like multiple courts before it, finds that it does.

### 4. Plaintiffs' poll-watcher claim fails under the *Anderson*-*Burdick* framework.

Even if rational-basis review did not apply and Plaintiffs had established a burden on their right to vote, their claim nonetheless fails under the *Anderson*-*Burdick* framework.

Viewing Plaintiffs' evidence in the best possible light, at most, the county-residency requirement for poll watching places only an indirect, ancillary burden on the right to vote through an elevated risk of vote dilution.

Against this slight burden, the Commonwealth has sound interests in imposing a county-residency requirement, including, as noted above, local familiarity with rules, regulations, procedures, and the voters. Beyond this, in assessing the Commonwealth's interest in imposing the county-based restriction, that interest must be viewed in the overall context of the Commonwealth's security measures involving polling places that are designed to prevent against fraud and vote dilution.

As the court in *Cortés* recognized, "while poll watchers may help guard the integrity of the vote, they are not the Election Code's only, or even best, means of doing so." 218 F. Supp. 3d at 404.

**\*73** Each county has the authority to investigate fraud and report irregularities to the district attorney. 25 P.S. § 2642(i). Elections in each district are conducted by a multimember election board, which is comprised of an election judge, a majority inspector, and a minor inspector. 25 P.S. § 2671. Each voting district may also use two overseers of election, who are appointed from different political parties by the Pennsylvania Courts of Common Pleas, and "carry greater authority than poll watchers." *Cortés,* 218 F. Supp. 3d at 403 (citing 25 P.S. § 2685). "Election overseers have the right to be present with the officers of an election 'within the enclosed space during the entire time the ... election is held.'" *Id.* "Poll watchers have no such right," they must "remain 'outside the enclosed space' where ballots are counted or voting machines canvassed." *Id.* (citing 25 P.S. § 2687(b)). Election overseers can also challenge any person offering to vote, while poll watchers have no such authority. 25 P.S. § 2687. For these reasons, concerns "over potential voter fraud—whether perpetrated by putative electors or poll workers themselves—appear more effectively

addressed by election overseers than poll watchers[.]" *Id.* at 406.

Plaintiffs complain that poll watchers may not be present during the pre-canvass and canvass meetings for absentee and mail-in ballots. But the Election Code provides that "authorized representatives" of each party *and* each candidate can attend such canvassing. 25 P.S. § 3146.8(g)(1.1), (2). That means if, for example, 15 Republican candidates appear on ballots within a particular county (between both the state and federal elections), there could be up to 16 "authorized representatives" related to the Republican Party (one for each candidate and one for the party as a whole) present during canvassing. Adding poll watchers to that mix would just be forcing unnecessary cooks into an already crowded kitchen. [23] *See* [ECF 549-2, p. 23, ¶ 83 ("If every certified poll watcher within a county was permitted to attend the pre-canvass meeting, the elections staff could be overwhelmed by the vast numbers of poll watchers, and the pre-canvassing process could become chaotic and compromised.") ].

**\*74** Further, Secretary Boockvar testified that Pennsylvania has adopted new voting systems that will provide an additional layer of security. [ECF 524-27, 237:21-238:11]. That is, there will now be a paper trail in the form of verifiable paper ballots that will allow voters to confirm their choice, and the state recently piloted a new program that will help ensure that votes can be properly verified. [*Id.*].

On balance, then, it is clear that to the extent any burden on the right to vote exists, it is minimal. On the other hand, the Commonwealth's interest in a county-specific voting system, including with county-resident poll watchers, is rational and weighty, particularly when viewed in the context of the measures that the Commonwealth has implemented to prevent against election fraud at the polls. As such, under the flexible *Anderson*-*Burdick* standard, Plaintiffs have failed to establish that the county-residency requirement is unconstitutional.

### 5. The Court will continue to abstain from deciding where the Election Code permits poll watching to occur.

Plaintiffs also appear to challenge any attempts to limit poll watching to "monitoring only in-person voting at the polling place on Election Day." [ECF 461, ¶ 254]. That is, in their proposed order accompanying their Motion for Summary Judgement, Plaintiffs seek a declaration that they are "permitted to have watchers present at all locations where voters are registering to vote, applying for absentee or mail-in ballots, voting absentee or mail-in ballots, and/or returning or collecting absentee or mail-in ballots, including without limitation any satellite or early voting sites established by any county board of elections." [ECF 503-1, ¶ 3].

Plaintiffs also argue that Secretary Boockvar's October 6, 2020, guidance expressly, and unlawfully, prohibits poll watchers from being present at county election offices, satellite offices, and designated ballot-return sites. [ECF 571].

This challenge, however, is directly related to the unsettled state-law question of whether drop boxes and other satellite locations are "polling places" as envisioned under the Election Code. If they are, then Plaintiffs may be right in that poll watchers must be allowed to be present. However, the Court previously abstained under *Pullman* in addressing this "location" claim due to the unsettled nature of the state-law issues; and it will continue to do so. [ECF 459, p. 5 ("The Court will continue to abstain under *Pullman* as to Plaintiffs' claim pertaining to the notice of drop box locations and, more generally, whether the 'polling place' requirements under the Election Code apply to drop-box locations. As discussed in the Court's prior opinion, this claim involves unsettled issues of state law.") ].

Moreover, Plaintiffs have filed a lawsuit in the Court of Common Pleas of Philadelphia to secure access to drop box locations for poll watchers. The state court held that satellite ballot-collection locations, such as drop-box locations, are not "polling places," and therefore poll watchers are not authorized to be present in those places. [ECF 573-1, at p. 12]. The Trump Campaign immediately filed a notice of appeal of that decision. Regardless of what happens on appeal, Plaintiffs appear to be on track to obtain resolution of that claim in state court. [ECF 549-22]. Although this isn't dispositive, it does give the Court comfort that Plaintiffs will be able to seek timely resolution of these issues, which appear to be largely matters of state law. *See* *Barr v. Galvin*, 626 F.3d 99, 108 n.3 (1st Cir. 2010) ("Though the existence of a pending state court action is sometimes considered as a factor in favor of abstention, the lack of such pending proceedings does not necessarily prevent abstention by a federal court.").

**V. The Court will decline to exercise supplemental jurisdiction over Plaintiffs' state-constitutional claims.**

**\*75**  In addition to the federal-constitutional claims addressed above, Plaintiffs assert violations of the Pennsylvania Constitution in Counts III, V, VII, and IX of the Second Amended Complaint. Because the Court will be dismissing all federal-constitutional claims in this case, it will decline to exercise supplemental jurisdiction over these state-law claims.

Under 28 U.S.C. § 1367(c)(3), a court "may decline to exercise supplemental jurisdiction over state law claims if it has dismissed all claims over which it has original jurisdiction[.]" *Stone v. Martin*, 720 F. App'x 132, 136 (3d Cir. 2017) (cleaned up). "It 'must decline' to exercise supplemental jurisdiction in such circumstances 'unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for [exercising supplemental jurisdiction].' " *Id.* (quoting *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (emphasis in original)).

Courts have specifically applied this principle in cases raising federal and state constitutional challenges to provisions of the state's election code. *See, e.g., Silberberg v. Bd. of Elections of New York*, 272 F. Supp. 3d 454, 480–81 (S.D.N.Y. 2017) ("Having dismissed plaintiffs' First and Fourteenth Amendment claims, the Court declines to exercise supplemental jurisdiction over plaintiffs' state law claims."); *Bishop v. Bartlett*, No. 06-462, 2007 WL 9718438, at \*10 (E.D.N.C. Aug. 18, 2007) (declining "to exercise supplemental jurisdiction over the state constitutional claim" following dismissal of all federal claims and recognizing "the limited role of the federal judiciary in matters of state elections" and that North Carolina's administrative, judicial, and political processes provide a better forum for plaintiffs to seek vindication of their state constitutional claim), *aff'd*, 575 F.3d 419 (4th Cir. 2009).

Beyond these usual reasons to decline to exercise supplemental jurisdiction over the state-constitutional claims, there are two additional reasons to do so here.

First, the parties do not meaningfully address the state-constitutional claims in their cross-motions for summary judgment, effectively treating them as coextensive with the federal-constitutional claims here. The Pennsylvania Supreme Court, however, has held that Pennsylvania's "Free and Equal Elections" Clause is not necessarily coextensive with the 14th Amendment. *See League of Women Voters v. Commonwealth*, 645 Pa. 1, 178 A.3d 737, 812-813 (2018) (referring to the Pennsylvania Free and Equal Elections Clause as employing a "separate and distinct standard" than that under the 14th Amendment to the U.S. Constitution). Given the lack of briefing on this issue and out of deference to the state courts to interpret their own state constitution, the Court declines to exercise supplemental jurisdiction.

Second, several Defendants have asserted a defense of sovereign immunity in this case. That defense does not apply to Plaintiffs' federal-constitutional claims under the *Ex parte Young* doctrine. *See Acosta v. Democratic City Comm.*, 288 F. Supp. 3d 597, 627 (E.D. Pa. 2018) ("Here, the doctrine of *Ex parte Young* applies to Plaintiffs' constitutional claims for prospective injunctive and declaratory relief, and therefore the First and Fourteenth Amendment claims are not barred by the Eleventh Amendment. Secretary Cortés, as an officer of the Pennsylvania Department of State, may be sued in his individual and official capacities 'for prospective injunctive and declaratory relief to end continuing or ongoing violations of federal law.' "). But sovereign immunity may apply to the state-law claims, at least those against Secretary Boockvar. The possibility of sovereign immunity potentially applying here counsels in favor of declining supplemental jurisdiction to decide the state-law claims.

**\*76**  As such, all state-constitutional claims will be dismissed without prejudice.

## CONCLUSION

For the foregoing reasons, the Court will enter judgment in favor of Defendants and against Plaintiffs on all federal-constitutional claims, decline to exercise supplemental jurisdiction over the remaining state-law claims, and dismiss all claims in this case. Because there is no just reason for delay, the Court will also direct entry of final judgment under Federal Rule of Civil Procedure 54(b). An appropriate order follows.

**All Citations**

--- F.Supp.3d ----, 2020 WL 5997680

### Footnotes

1   "Drop boxes" are receptacles similar to U.S. Postal Service mailboxes. They are made of metal, and have a locking mechanism, storage compartment, and an insert or slot into which a voter can insert a ballot. *See generally* [ECF 549-9].

2   Intervenors include the Pennsylvania State Democratic Party, the League of Women Voters, the NAACP Pennsylvania State Conference, Common Cause Pennsylvania, Citizens for Pennsylvania's Future, the Sierra Club, the Pennsylvania Alliance for Retired Americans, and several affiliated individuals of these organizations.

3   As noted above, Plaintiffs and Mr. Riddlemoser use the term "voter fraud" to mean "illegal voting"—*i.e.*, voter fraud is any practice that violates the Election Code. For purposes of the Court's decision and analysis of Plaintiffs' vote-dilution claims, the Court accepts this definition.

4   The procedure for absentee ballots and applications largely resembles the procedure for mail-in ballots and applications.

5   If the application is approved, the approval is "final and binding," subject only to challenges "on the grounds that the applicant was not a qualified elector." 25 P.S. § 3150.12b(a)(2). An unqualified elector would be, for example, an individual who has not "been a citizen of the United States at least one month." Pa. Const. Art. 7, § 1; *see also* 25 P.S. § 2602(t) (defining "qualified elector" as "any person who shall possess all of the qualifications for voting now or hereafter prescribed by the Constitution of this Commonwealth, or who, being otherwise qualified by continued residence in his election district, shall obtain such qualifications before the next ensuing election").

6   In her summary-judgment brief, Secretary Boockvar argues that Plaintiffs' as-applied challenge to Pennsylvania's county-residency requirement is unripe. [ECF 547, pp. 60-63]. The Secretary reasons that Plaintiffs have not shown sufficient evidence that they are harmed by the county-residency requirement. This argument is directed more towards a lack of standing and a lack of evidence to support the claim on the merits. As the sufficiency of the evidence of harm is a separate issue from ripeness (which is more concerned with timing), the Court does not find Plaintiffs' as-applied challenge to the county-residency requirement unripe. *See Progressive Mountain Ins. Co. v. Middlebrooks*, 805 F. App'x 731, 734 (11th Cir. 2020) ("The question of ripeness frequently boils down to the same question as questions of Article III standing, but the distinction between the two is that standing focuses [on] whether the type of injury alleged is qualitatively sufficient to fulfill the requirements of Article III and whether the plaintiff has personally suffered that harm, whereas ripeness centers on whether that injury has occurred yet." (cleaned up) (citations omitted)).

7   In their briefing, the parties focused on the "capable of repetition yet evading review" exception to the mootness doctrine. The Court, however, does not find that it needs to rely on this exception. Nearing the eve of the election, it is clear that Defendants intend to engage in the conduct that Plaintiffs assert is illegal and unconstitutional. Thus, the claims are presently live, and are not "evading review" in this circumstance.

8   While Rule 65(d)(2)(C) states that an injunction binds "[non-parties] who are in active concert or participation" with the parties or the parties' agents, the Court does not find that Rule 65(d) helps the county boards. As discussed, the county boards manage the elections and implement the electoral procedures. While the Court could enjoin Secretary Boockvar, for example, from using unmanned drop boxes, each individual county election board could still use unmanned drop boxes on their own. Doing so would not result in the counties being in "active concert or participation" with Secretary Boockvar, as each county is independently managing the electoral process within their county lines. *See Marshak v. Treadwell*, 595 F.3d 478, 486 (3d Cir. 2009) ("[N]on-parties guilty of aiding or abetting or acting in concert with a named defendant or his privy in violating the injunction may be held in contempt." (cleaned up) (citations omitted)). In other words, each county elections board would not be "aiding or abetting" Secretary Boockvar in violating the injunction (which would implicate Rule 65(d)(2)(C)); rather, the counties would be utilizing their independent statutory authority to manage elections within their county lines.

9    As evidence of the county boards' indispensability, one court recently found that the failure to join local election officials in an election case can make the harm alleged not "redressable." It would be a catch-22 to say that county boards cannot be joined to this case as necessary parties, but then dismiss the case for lack of standing due to the boards' absence. *Cf. Jacobson v. Florida Secretary of States*, 974 F.3d 1236, ——— – ———, 2020 WL 5289377, at \*11-12 (11th Cir. Sept. 3, 2020) ("The problem for the [plaintiffs] is that Florida law tasks the [county] Supervisors, independently of the Secretary, with printing the names of candidates on ballots in the order prescribed by the ballot statute. ... The Secretary is responsible only for certifying to the supervisor of elections of each county the names of persons nominated ... Because the Secretary didn't do (or fail to do) anything that contributed to [plaintiffs'] harm, the voters and organizations cannot meet Article III's traceability requirement." (cleaned up)).

10    The organizational Plaintiffs also raise certain associational and organizational standing arguments, asserting that they represent their members' interests. The associational standing arguments are derivative of their members' interests. That is, because the Court has found no concrete injury suffered by the individual voters, which would include the members of the organizational Plaintiffs, there are no separate grounds to establish standing for these organizations. *See United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1997) (an organization only has standing to sue on behalf of its members when "its members would otherwise have standing to sue in their own right") (citation omitted).

11    *See, also, e.g., Dudum v. Arntz*, 640 F.3d 1098, 1117 (9th Cir. 2011) ("If the aspects of the City's restricted IRV scheme Dudum challenges impose any burdens on voters' constitutional rights to vote, they are minimal at best."); *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1354–55 (11th Cir. 2009) ("The district court determined that the burden imposed on Georgia voters who lack photo identification was not undue or significant, and we agree.... The NAACP and voters are unable to direct this Court to any admissible and reliable evidence that quantifies the extent and scope of the burden imposed by the Georgia statute."); *Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1183 (9th Cir. 1988) ("Appellants claim that Hawaii's absentee voting law fails to prohibit 'the solicitation, examination and delivery of absentee ballots by persons other than the voters' and that such activities occurred during the special election ... We agree with the district court that the Hawaii absentee ballot statute and the regulations adopted under it adequately protect the secrecy and integrity of the ballot. Although Hawaii has not adopted a regulation to prevent the delivery of ballots by persons other than the voter, the Hawaii regulations go into great detail in their elaboration of procedures to prevent tampering with the ballots."); *McLain v. Meier*, 637 F.2d 1159, 1167 (8th Cir. 1980) ("[A]lthough ballot format has an effect on the fundamental right to vote, the effect is somewhat attenuated."); *Nemes v. Bensinger*, ——— F. Supp. 3d ———, ———, 2020 WL 3402345, at \*13 (W.D. Ky. June 18, 2020) ("The burden imposed by the contraction to one polling place is modest, and the identified groups are afforded various other means under the voting plans to easily and effectively avoid disenfranchisement. As already discussed, Defendants have offered evidence of the substantial government interest in implementing voting plans that provide for a free and fair election while attempting to minimize the spread of COVID-19."); *Paralyzed Veterans of Am. v. McPherson*, No. 06-4670, 2008 WL 4183981, at \*22 (N.D. Cal. Sept. 9, 2008) ("Plaintiff Bohlke's listed burdens rely on speculative risk or the ancillary effects of third party assistance, but not on evidence of any concrete harm. Such speculations or effects are insufficient under Supreme Court and Ninth Circuit precedent to demonstrate a severe burden on the fundamental right to vote.").

12    The parties do not specifically brief the elements of an Elections-Clause claim. This is typically a claim brought by a state legislature, and the Court has doubts that this is a viable theory for Plaintiffs to assert. *See Lance v. Coffman*, 549 U.S. 437, 442, 127 S.Ct. 1194, 167 L.Ed.2d 29 (2007). Regardless, if state law does not

require signature comparison, then there is no difference between the Secretary's guidance and the Election Code, and the Elections-Clause claim necessarily fails.

13    Several Defendants and Intervenors have asked this Court to abstain from deciding this issue on the basis of *Pullman*. As this Court previously discussed, a court can abstain under *Pullman* if three factors are met: "(1) [the dispute] requires interpretation of "unsettled questions of state law,"; (2) permitting resolution of the unsettled state-law questions by state courts would "obviate the need for, or substantially narrow the scope of adjudication of the constitutional claims"; and (3) an "erroneous construction of state law would be disruptive of important state policies[.]" " [ECF 409, p. 3 (quoting *Chez Sez*, 945 F.2d at 631) ]. But if, on the other hand, the answer to the state law dispute is "clear and unmistakable," abstention is not warranted. [*Id.* at p. 15 (citing *Chez Sez*, 945 F.2d at 632) ]. Here, the Court concludes (as discussed below) that the Election Code is clear that signature comparison is not required and further, that Plaintiffs' competing interpretation is not plausible. As such, the Court cannot abstain under *Pullman*.

The *Pullman* analysis does not change simply because Secretary Boockvar has filed a "King's Bench" petition with the Pennsylvania Supreme Court, requesting that court to clarify whether the Election Code mandates signature comparison of mail-in and absentee ballots and applications. [ECF 556, p. 11; ECF 557]. The fact that such a petition was filed does not change this Court's conclusion that the Election Code is clear. The *Pullman* factors remain the same. And they are not met here.

14    The Secretary's September 11, 2020, guidance, stated that the "Pennsylvania Election Code does not authorize the county board of elections to set aside returned absentee or mail-in ballots based solely on signature analysis by the county board of elections." [ECF 504-24, p. 3, § 3]. Similarly, the Secretary's September 28, 2020, guidance stated that "Election Code does not permit county election officials to reject applications or voted ballots based solely on signature analysis. ... No challenges may be made to mail-in and absentee ballots at any time based on signature analysis." [ECF 504-25, p. 9, § 5.2].

15    The Election Code's definition of "proof of identification" in full provides:

The words "proof of identification" shall mean ... For a qualified absentee elector ... or a qualified mail-in elector ...:

i. in the case of an elector who has been issued a current and valid driver's license, the elector's driver's license number;

ii. in the case of an elector who has not been issued a current and valid driver's license, the last four digits of the elector's Social Security number;

iii. in the case of an elector who has a religious objection to being photographed, a copy of a document that satisfies paragraph (1) [*i.e.*, "a valid-without-photo driver's license or a valid-without-photo identification card issued by the Department of Transportation"]; or

iv. in the case of an elector who has not been issued a current and valid driver's license or Social Security number, a copy of a document that satisfies paragraph (2) [*i.e.*, "a document that shows the name of the individual to whom the document was issued and the name substantially conforms to the name of the individual as it appears in the district register; shows a photograph of the individual to whom the document was issued; includes an expiration date and is not expired, except (A) ... or (B) ...; and was issued by" the federal, state, or municipal government, or an "accredited Pennsylvania public or private institution of higher learning [or] "a Pennsylvania are facility."].

25 P.S. § 2602(z.5)(3).

16    While election officials must engage in signature comparison for in-person voters, that requirement is explicitly required by the Election Code, unlike for mail-in ballots. 25 P.S. § 3050(a.3)(2). And as discussed below, in-person voters, unlike mail-in voters, are immediately notified if their signatures are deficient.

17    Plaintiffs also argue that signature comparison for mail-in and absentee ballots is supported by historical case law. [ECF 552, pp. 58-59]. Plaintiffs cite to two cases from the 1960s that the Court of Common Pleas

decided. [*Id.*]. The first, *Appeal of Fogleman*, concluded that under the then-applicable election law, an absentee voter had to sign a declaration to show that he was a proper resident who had not already voted in that election. 36 Pa. D. & C.2d 426, 427 (Pa. Ct. Comm. Pl. 1964). Regarding the voter's signature, the court simply stated, "[i]f the elector fails or refuses to attach his or her signature, then such elector has not completed the declaration as required by law of all voters." *Id.* Thus, no signature comparison or verification was implicated there; rather, the court simply stated that the declaration must be signed (*i.e.*, completed). The second case Plaintiffs cite, *In re Canvass of Absentee Ballots of Gen. Election* [ECF 552, pp. 58-59], arose from individual, post-election challenges to 46 individual absentee ballots. 39 Pa. D. & C.2d 429, 430 (Pa. Ct. Comm. Pl. 1965). Thus, a universal and mandatory signature-comparison requirement was not at issue there, unlike what Plaintiffs contest here. This Court finds neither case persuasive.

18      This identifying information on a ballot application includes much of the same information expressly listed for what a voter must provide in initially registering to vote. 25 Pa. C.S.A. § 1327(a) (stating that the "official voter registration application" shall request the applicant's: full name, address of residence (and mailing address if different), and date of birth).

19      The counties that intend to compare and verify signatures in the upcoming election include at least the following counties: Cambria, Elk, Franklin, Juniata, Mifflin, Sullivan, Susquehanna, and Wyoming. [ECF 504-1].

20      Plus, these figures do not even tell the whole story because they do not take into account the hundreds of thousands of voters who are registered to other parties who could also conceivably serve as poll watchers for the Trump Campaign and the candidate Plaintiffs. [504-34]. While that may not be the ideal scenario for Plaintiffs, they concede there's nothing in the Election Code that limits them to recruiting only registered voters from the Republican Party. [ECF 528-14, 267:23-268:1 (Q: And you don't have to be a registered Republican to serve as a poll watcher for the Trump campaign, do you? A: No.) ]. To that point, the Trump Campaign utilized at least two Democrats among the poll watchers it registered in the primary. [ECF 528-15, P001648].

21      To the extent that Plaintiffs are attempting to bring their claim on behalf of these third parties (which is unclear), they would lack standing to do so. Ordinarily, "a litigant must assert his or her own legal rights and interests and cannot rest a claim of relief on the legal rights or interests of third parties." *Powers v. Ohio*, 499 U.S. 400, 410, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). The only time a litigant can bring an action on behalf of a third party is when "three important criteria are satisfied." *Id.* "The litigant must have suffered an 'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute; the litigant must have a close relation to the third party; and there must exist some hindrance to the third party's ability to protect his or her own interest." *Id. at 410-11, 111 S.Ct. 1364* (cleaned up). Plaintiffs cannot satisfy the second or third criteria.

Plaintiffs claim that they "have a close relationship with these minor parties such that it will act as an effective advocate for the minor parties." [ECF 551, p. 30]. It is hard to see how Plaintiffs can be said to have a close relationship with rival political parties who are their direct adversaries in the upcoming election.

Plaintiffs also argue that these "minor parties are hindered from protecting their own interests, particularly in this action when there are no minor party intervenors." [*Id.*]. But that doesn't hold water either. Just because these other parties have not asked to intervene, it does not mean they were incapable of intervening or seeking relief elsewhere. Indeed, these parties and their candidates have demonstrated time and again that they can raise their own challenges to election laws when they so desire, including by filing suit in federal district court. *See, e.g., Stein v. Cortés*, 223 F. Supp. 3d 423 (E.D. Pa. 2016) (Green Party Presidential candidate Jill Stein seeking recount); *Libertarian Party of Conn. v. Merrill*, No. 20-467, 2020 WL 3526922 (D. Conn. June 27, 2020) (seeking to enjoin Connecticut's ballot access rules that required minor party

candidates to petition their way onto the ballot); 🔖 *Green Party of Ark. v. Martin*, 649 F.3d 675 (8th Cir. 2011) (challenging Arkansas' ballot access laws).

22   The Sierra Club Intervenors argue this should end the analysis. [ECF 542, p. 14 ("Even 'as applied,' Plaintiffs' claim has already been rejected") ]. While the Court finds the Pennsylvania Supreme Court's apparent ruling on Plaintiffs' as-applied challenge instructive, it is not outcome determinative. That is because the Pennsylvania Supreme Court did not have the benefit of the full evidentiary record that the Court has here.

23   After the briefing on the cross-motions for summary judgment had closed, on October 6, 2020, Secretary Boockvar issued additional guidance, which Plaintiffs then raised with the Court the following day. [ECF 571]. This new guidance confirms that poll watchers cannot be present during the pre-canvassing and canvassing of mail-in ballots. It also makes clear that while the authorized representative can be present, the representative cannot make any challenges to the ballots. The Court finds that this new guidance has minimal relevance to the current disputes at issue here. The scope of duties of a representative is not before the Court. Of sole relevance here is whether this new guidance changes how this Court weighs the burdens and benefits of the county-residency restriction for poll watchers. The Court finds that the representative's inability to challenge mail-in ballots does appear to provide less protection to Plaintiffs; but in the grand election scheme, particularly in light of the role of the election overseers, the Court does not find the new guidance to materially upset the Commonwealth's interests in its overall election-monitoring plan.

---

**End of Document**                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# ATTACHMENT 3

Case 4:20-cv-02078-MWB   Document 95-2   Filed 11/12/20   Page 86 of 101

In Re: Canvassing Observation Appeal of: Donald J...., Not Reported in Atl....

2020 WL 6551316
Only the Westlaw citation is currently available.

THIS IS AN UNREPORTED PANEL DECISION
OF THE COMMONWEALTH COURT. AS SUCH,
IT MAY BE CITED FOR ITS PERSUASIVE
VALUE, BUT NOT AS BINDING PRECEDENT.
SEE SECTION 414 OF THE COMMONWEALTH
COURT'S INTERNAL OPERATING PROCEDURES.

Commonwealth Court of Pennsylvania.

In Re: Canvassing Observation
Appeal of: Donald J. Trump for President, Inc.

No. 1094 C.D. 2020
|
Submitted: November 5, 2020
|
FILED: November 5, 2020

BEFORE: HONORABLE CHRISTINE FIZZANO
CANNON, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE FIZZANO CANNON

CHRISTINE FIZZANO CANNON, Judge

**\*1** Donald J. Trump for President, Inc. (Petitioner) appeals the November 3, 2020 order of the Court of Common Pleas of Philadelphia County Election Court (trial court) that denied Petitioner's oral motion to allow closer observation of the canvassing of ballots (Motion). Upon review, we reverse.

On the evening of November 3, 2020, Petitioner, as a representative of presidential candidate Donald J. Trump (Candidate), sent a representative to the Philadelphia Convention Center to observe the canvassing process of absentee and mail-in ballots submitted in Philadelphia County. When its representative proved unable to observe the process to its satisfaction, Petitioner made its Motion in the trial court requesting that the trial court require the Philadelphia County Board of Elections (Board) to allow Petitioner closer access to better observe the canvassing

process. The trial court conducted a hearing on the Motion on the night of November 3, 2020, [1] and issued the order denying the Motion on the morning of November 4, 2020. Petitioner appealed to this Court on November 4, 2020, shortly after the trial court issued its order. [2]

On appeal, [3] Petitioner claims the trial court erred in denying its Motion because the Board configured the tables used for ballot canvassing in such a way so as to preclude observation of the canvassing process by candidates, watchers, and candidates' representatives. *See* Appellant's Brief at 16-25. [4] Specifically, Petitioner argues that the goals of transparency and accountability require that candidates' representatives be allowed an opportunity to observe the canvassing process beyond mere physical presence in the room where the canvassing process is taking place. *See id.* at 16-21. Petitioner argues that the Board's arrangement of and placement of barriers within the canvassing area prevent any meaningful observation by watchers, candidates, or candidates' representatives. *See id.* We note that Petitioner expressly states that its appeal is not based on any alleged ability of observers to challenge individual ballots, but instead on the distinct right provided by the Election Code to observe the proceedings. *See id.* at 22-25.

**\*2** The Board counters that it has complied with the requirements of the Election Code by allowing Petitioner's representative into the room where the canvassing is occurring. *See* Board's Brief at 12-15. The Board argues that the evidence illustrated that Petitioner's representative was able to see every portion of the canvassing process. *See id.* at 15.

This matter requires the Court to interpret the meaning of certain provisions of the Pennsylvania Election Code [5] (Election Code). Initially, we note that

> [i]n matters of statutory interpretation, [appellate courts'] objective is to ascertain and effectuate the intent of the General Assembly.... [T]he best indication of legislative intent is the plain language of the statute. In ascertaining the plain meaning of statutory language, [appellate courts] consider it in context and give words and phrases their common and

Case 4:20-cv-02078-MWB   Document 95-2   Filed 11/12/20   Page 87 of 101

In Re: Canvassing Observation Appeal of: Donald J...., Not Reported in Atl....

approved usage. When the words of a statute are free and clear of all ambiguity, they are the best indicator of legislative intent; hence, in such circumstances, [appellate courts] cannot disregard the letter of the statute under the pretext of pursuing its spirit.

*In re Nov. 3, 2020 Gen. Election,* ___ A.3d ___ (Pa., No. 149 MM 2020, filed Oct. 23, 2020), 2020 WL 6252803, at *9 (internal citations and quotation marks omitted). Additionally, our Supreme Court has further explained the following regarding the interpretive principles that govern ambiguous statutes generally and election matters specifically:

> [W]e are mindful of the longstanding and overriding policy in this Commonwealth to protect the elective franchise. Moreover, it is well-settled that, although election laws must be strictly construed to prevent fraud, they ordinarily will be construed liberally in favor of the right to vote. Indeed, our goal must be to enfranchise and not to disenfranchise the electorate. Lastly, in resolving statutory ambiguity, we may consider, *inter alia,* the occasion and necessity for, the mischief to be remedied by, and the object to be obtained by the statute.

*Pa. Democratic Party v. Boockvar,* ____ A.3d ___ (Pa., No. 133 MM 2020, filed Sept. 17, 2020) (internal citations, quotation marks, and brackets omitted).

This matter concerns the following Election Code provisions. First, Section 310(b) provides, in pertinent part, that

> [e]very candidate shall be entitled *to be present* in person or by attorney in fact duly authorized, and to participate in any proceeding before any county board whenever any matters which may affect his candidacy are being

heard, including any computation and canvassing of returns of any primary or election or recount of ballots or recanvass of voting machines affecting his candidacy.

25 P.S. § 2650(b) (emphasis provided). Next, Section 1308(b) provides that

> [w]atchers shall be permitted *to be present* when the envelopes containing official absentee ballots and mail-in ballots are opened and when such ballots are counted and recorded.

25 P.S. § 3146.8(b)[6] (emphasis provided). Lastly, Section 1308(g)(1.1) provides, in pertinent part, that

> [o]ne authorized representative of each candidate in an election and one representative from each political party shall be permitted *to remain in the room* in which the absentee ballots and mail-in ballots are pre-canvassed.

25 P.S. § 3146.8(g)(1.1) (emphasis provided).

**\*3** At issue here is the interpretation of the phrase "to remain in the room" where ballots are canvassed from 25 P.S. § 3146.8(g)(1.1) and the language allowing candidates, watchers, and candidates' representatives to be "present" during the canvassing process. The Board argues that by using the terms "presence" and "to remain in the room," the Election Code requires simple physical presence of an observer in the room where ballot canvassing occurs, and nothing more. Petitioner, on the other hand, argues that "presence" and "remaining in the room" implies an ability to observe in addition to physical presence. Because these competing interpretations are each reasonable, the Election Code is ambiguous. *See A.S. v. Pa. State Police,* 143 A.3d 896, 905-06 (Pa. 2016) (explaining that a "statute is ambiguous

In Re: Canvassing Observation Appeal of: Donald J...., Not Reported in Atl....

Case 4:20-cv-02078-MWB   Document 95-2   Filed 11/12/20   Page 88 of 101

when there are at least two reasonable interpretations of the text").

Viewing the language of the Election Code sections in question with an eye toward maintaining the integrity of the elective process in the Commonwealth, as we must, we find the language of these sections imports upon candidates, watchers, or candidates' representatives at least a modicum of observational leeway to ascertain sufficient details of the canvassing process for the purpose of intelligently assessing and/or reporting to the candidate represented the details of the canvassing process. To find otherwise would completely undercut the intent of the Election Code by reducing candidates' representatives to tourists incapable of carrying out the observations allowed by the Election Code for the purposes of reporting to the candidate they represent. Obviously, a critical prerequisite to being able to accurately report anything to the represented candidate is that the representatives have the opportunity to observe the processes upon which they are to report. Simply put, allowing candidates, watchers, or candidates' representatives to be physically "present" or "in the room" during the canvassing process but also allowing the relegation of those representatives to a position where meaningful observation of the processes they are present to observe is a practical impossibility would be an absurd interpretation of the Election Code that we cannot countenance. [7] See *Gavin v. Loeffelbein,* 205 A.3d 1209, 1221 (Pa. 2019) (noting that appellate statutory interpretation must not produce absurd results).

Turning to the facts of the instant matter, Jeremy Mercer testified before the trial court on behalf of Petitioner. [8] See Notes of Testimony, November 3, 2020 (N.T.) at 20-41. Mercer explained he was one of the representatives designated on behalf of Candidate to observe the canvassing process of absentee and mail-in ballots in Philadelphia County on November 3, 2020. See id. at 20-21. Despite his status as Candidate's designated representative, [9] Mercer explained that he was not able to get within 15 feet of the tables where the ballots were being processed. [10] See id. at 24. Mercer explained the very large hall where the ballots were being processed had four areas with dozens of tables that spread out away from him at roughly 6-foot intervals behind the closest table, with the farthest one being located over 100 feet from Mercer. See N.T. at 23-24. Mercer also testified that a waist-high metal fence prevented him from getting any closer to the tables where the ballots were being

processed. See id. at 25. As a result of these distances and barriers, Mercer explained that he was unable to observe the ballots being processed, the envelopes that contained them, whether the secrecy envelopes were present, or any markings on those envelopes. See id. at 27-30. Mercer explained that he even used binoculars to attempt to get a better view of the proceedings and ballots, but to no avail. See id. at 32.

**\*4** The Board presented no evidence during the hearing.

In its Pennsylvania Rules of Appellate Procedure 1925(a) opinion filed November 4, 2020 (Trial Court Opinion), the trial court concluded:

> The Board designed the layout of the Philadelphia Convention Center for the canvassing process in keeping with CDC guidelines on social distancing between individuals and safety protocols.1 In creating this physical layout, the Board struck the proper balance between the observer's ability to observe the canvassing process and the paramount interest of voter privacy as there are declaration envelopes that are being opened, secrecy envelopes that are being opened, and ballots that are being extracted.
>
> 1 The Election Board allows the public to observe the canvassing process on You Tube on their website at https://youtu.be/-Zzb-7EH-MQ.

Trial Court Opinion at 3 (some footnotes omitted). These conclusions were unsupported by the record and contrary to the uncontradicted testimony of Mercer, the only witness to present testimony in this matter and who the trial court did not find lacked credibility. Nor does the record contain any evidence regarding the Board's thought process, justification for, or strategy in designing its chosen canvassing setup layout.

Based on this testimony, we conclude that, while he was technically in the room where the canvassing was occurring in strict compliance with the text of the Election Code, Mercer's inability to actually observe the canvassing processes in any meaningful way completely frustrates the intent of the Election Code in allowing a representative in his position to be in the room for observation purposes in the first place. Accordingly, the trial court erred as a matter law in determining that the Board had sufficiently complied with the requirements of the Election Code and denying Petitioner's Motion.

Case 4:20-cv-02078-MWB   Document 95-2   Filed 11/12/20   Page 89 of 101

In Re: Canvassing Observation Appeal of: Donald J...., Not Reported in Atl....

Further, we acknowledge the Board's argument that closer observation by Petitioner is pointless because Petitioner may not challenge individual ballots in any event. *See* Board's Brief at 18-21. We appreciate that "the Election Code presently provides no mechanism for time-of-canvassing challenges by candidate or party representatives[.]" *In re Nov. 3, 2020 Gen. Election,* at *14. We agree with Petitioner, however, that this matter involves the issue of the right of observation, not the right to challenge. *See* Petitioner's Brief at 22-25. As discussed *supra,* the Election Code provides candidates, watchers, and candidates' representatives this right to observe the canvassing process. *See* 25 P.S. §§ 3146.8(b) & 3146.8(g)(1.1).

For these reasons, we reverse the trial court order denying Petitioner's Motion.

ORDER

AND NOW, November 5, 2020, upon review of arguments contained in briefs submitted by Donald J. Trump for President, Inc. (Appellant), the Philadelphia County Board of Elections, and the Pennsylvania Democratic Party, it is hereby ORDERED that the November 4, 2020 order of the Court of Common Pleas of Philadelphia County (trial court) denying Appellant's oral motion to allow closer observation of the canvassing of ballots is REVERSED. The matter is REMANDED to the trial court to enter an ORDER no later than 10:30 a.m. today, November 5, 2020, effective immediately, requiring that all candidates, watchers, or candidate representatives be permitted to be present for the canvassing process pursuant to 25 P.S. § 2650 and/or 25 P.S. § 3146.8 and be permitted to observe all aspects of the canvassing process within 6 feet, while adhering to all COVID-19 protocols, including, wearing masks and maintaining social distancing. Opinion to follow.

**All Citations**

Not Reported in Atl. Rptr., 2020 WL 6551316

---

## Footnotes

1    The hearing commenced at 9:51 p.m. and ended at 11:43 p.m. *See* Notes of Testimony, November 3, 2020 (N.T.) at 4 & 58.

2    The trial court issued its order at 10:03 a.m. on the morning of November 4, 2020. *See* Philadelphia County Court of Common Pleas Docket No. 201107003 at 1. Petitioner filed its appeal of the trial court's order at 12:36 p.m. *See id.*

3    Matters requiring this Court to engage in statutory interpretation of the Election Code implicate questions of law, which are subject to a *de novo* standard of review and a plenary scope of review. *See Banfield v. Cortes,* 110 A.3d 155, 166 (Pa. 2015).

4    Due to the time constraints involved in this matter, on the evening of November 3, 2020, this Court ordered both parties to submit briefs by 8 a.m. on the morning of November 5, 2020, and notified the parties the matter would be decided thereon without argument. *See* Commonwealth Court Order dated November 4, 2020.

5    Act of June 3, 1937, P.L. 1333, *as amended,* §§ 2600-3591.

6    Section 1308 was recently amended by Section 7 of the Act of October 31, 2019, P.L. 552, No. 77, and Section 11 of the Act of March 27, 2020, P.L. 41, No. 12.

7    We note that under the trial court's interpretation of the applicable provisions of the Code, a candidate's representative being relegated to one corner of a convention center hall while ballot canvassing occurs in the opposite corner of the hall would comply with the Code because the representative is present in the room.

8    Mercer did not testify in person before the trial court, but instead testified via Zoom videoconferencing from the Philadelphia Convention Center, where the canvassing activities were occurring. *See* N.T. at 17. The trial court, however, did not permit Mercer to use his phone to show the trial court the canvassing setup during the Zoom call. *See id.* at 21-23.

In Re: Canvassing Observation Appeal of: Donald J...., Not Reported in Atl....

Case 4:20-cv-02078-MWB   Document 95-2   Filed 11/12/20   Page 90 of 101

9       Mercer testified that, in addition to Candidate, he was also serving as the designated representative for other
        candidates on the ballot. *See* N.T. at 20-21.

10      Mercer explained the very large hall where the ballots were being processed had four areas with dozens of
        tables that spread out away from him at roughly 6-foot intervals behind the closest table, with the farthest
        one being located over 100 feet from Mercer. *See* N.T. at 23-24.

---

**End of Document**                                        © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   5

# ATTACHMENT 4

KeyCite Red Flag - Severe Negative Treatment

Reversed by   In Re: Canvassing Observation Appeal of: Donald J. Trump for President, Inc.,   Pa.Cmwlth.,   November 5, 2020

2020 WL 6556823 (Pa.Com.Pl.) (Trial Order)
Court of Common Pleas of Pennsylvania,
First Judicial District,
Trial Division - Civil Section.
Philadelphia County

In re: Canvassing Observation Appeal of DONALD J. TRUMP FOR PRESIDENT, INC.

Nos. 07003, (201107003).
November 3, 2020.

\*1  Election Matter
NOVEMBER TERM 2020
1094 CD 2020

**Opinion**

Tsai, J.

## I. Introduction

Donald J. Trump for President, Inc. ("Appellant") has taken an appeal from our November 3, 2020 Order denying his oral petition to conduct closer inspection of the ballot canvassing process at the Philadelphia Convention Center. In his oral petition, Appellant argued that the Commissioners did not provide his designated observers meaningful access to observe the Election Board employees who are canvassing the absentee and mail-in ballots under 25 P.S. § 3146.8(b) so they could report back to the Candidate as to the integrity of the canvassing process. Appellant had filed two similar motions earlier in the day, but withdrew them both without prejudice and presented the instant petition to the Election Court about 15 minutes before Election Court was scheduled to close at 10 p.m. EST. Based on the testimony of the witness presented by Appellant in support of the Petition, we found that the accommodations afforded to campaign representatives to observe the Election Board employees complied with the relevant provisions of the Election Code and denied the Petition.

For the reasons that follow, we respectfully ask this Court to affirm our decision.

## II. Factual Findings

Appellant's representative, Jeremy Mercer, is a volunteer for Appellant's campaign. He served as an observer of the canvassing process on November 3, 2020 starting at 7 a.m. throughout the entire day. Mr. Mercer testified via Zoom technology.

The observer described how the canvassing room is set up. There are 3 rows of 15 tables spaced apart and observers are asked to stand behind a metal barrier facing the first table, which is about 15-18 feet away. Nov. 3, 2020 Tr. at 21:20-24:23. From that vantage point, Mr. Mercer can see the workers prepare the forms for evaluation, examine them, and sort the ballot into separate bins. He also described in detail the various stages of the process that he could observe, including "extraction" from about 20 feet away, "where the ballot envelopes are being fed through machines to slice them open so that what's inside the

outer envelope can be removed, and then another set of what appear to be the same or very similar machines so that the inner secrecy envelopes then can be sliced open so that what's inside those can be removed." Nov. 3, 2020 Tr. At 28:14-30.

When asked about impediments to his line of sight, he identified the easels that identify each section of the canvassing process around which he can move. Nov. 3, 2020 Tr. 23:2-11. The observer was free to walk around the premises as he wished except beyond the metal safety or "crowd control" barrier. He recounted the specific steps followed by the staff to canvass a ballot. He cited concerns about the long distance between him and the employees, not because he could not see what they were doing, but because he could not see individual markings on the ballot or whether the signature page was completed properly and assess whether the Election Board employee was handling the ballot properly under the Election Code. He was able to use binoculars, but he did not find them to be useful because the process is fast. Nov. 3, 2020 Tr. 36:2-14.

**\*2**  The Board designed the layout of the Philadelphia Convention Center for the canvassing process in keeping with CDC guidelines on social distancing between individuals and safety protocols. [1]  In creating this physical layout, the Board struck the proper balance between the observer's ability to observe the canvassing process and the paramount interest of voter privacy, as there are declaration envelopes that are being opened, secrecy envelopes that are being opened, and ballots that are being extracted. [2]

### III. Discussion

This Court ordered as it did based on our analysis of the statutory provision invoked by the Appellant, 25 P.S. § 3146.8(b), which states: "Watchers [also referred to herein as "observers"] shall be permitted to be present when the envelopes containing official absentee ballots and mail-in ballots are opened and when such ballots are counted and recorded." Despite Appellant's argument that the Board of Elections was not providing observers the opportunity to "meaningfully observe" the canvassing of ballots, Appellant was unable to point to any statutory language or case law using the word "meaningful" or elaborating on what constitutes "meaningful observation." Furthermore, § 3146.8(b), explicitly allows only for the watchers to "be present" for three activities; (1) the opening of the envelopes containing the ballots, (2) the counting of the ballots, and (3) the recording of the ballots.

The Appellant presented a witness, Jeremy Mercer, who provided copious testimony as to his ability to observe the opening and sorting of ballots. He testified as to his ability to observe the ballots being opened, placed in trays, and sorted - including the separation of so-called "naked ballots," which do not have inner secrecy envelopes. This satisfies the three explicit objects of the statute. The witness's concerns, however, pertained to his inability to observe the writing on the outside of the ballots. But observing the writing on the outside of the ballots is not necessary in order to simply be able to "be present" to watch the **opening** of the ballots or to watch the **counting and recording** of the ballots. The statute provides no further specific activities for the watchers to observe, and no activities for the watchers to do other than simply "be present." Watchers are not directed to audit ballots or to verify signatures, to verify voter address, or to do anything else that would require a watcher to see the writing or markings on the outside of either envelope, including challenging the ballots or ballot signatures. [3]

**\*3**  Moreover, the Pennsylvania courts have clearly delineated the purpose of having watchers observe canvassing by making "a distinction between votes which are improperly cast and the subsequent mismanagement of votes by the election board, when those votes were completed correctly by the absentee voter." *In re Canvass of Absentee Ballots of Gen. Election*, 39 Pa. D. & C.2d 429, 433 (Pa. Com. PL 1965). The court further elaborated that:

> In the first situation, the strict requirements must be followed to protect the individual's vote; in the latter case, although strict compliance is desired, it is not mandatory, because slight irregularities can be anticipated in the overall handling of absentee ballots. In the latter case, the principles of liberal interpretation should apply, consistent with the above-quoted approach of the Perles case, supra, viz.: "'Every rationalization within the realm of common sense should aim at saving the ballot rather than voiding it …'"D'

*Id.* at 433-34.

That line of reasoning ultimately led the court to hold that even when it does not condone a short-cutting of canvassing procedures under the act, such short-cutting does not by itself seriously breach the legislative intent. *See id.* at 434. [4] The court thus denied a "general 'blanket' challenge presented by petitioner to all the absentee ballots on the basis of the election board's departure from the statutory directions." *Id.* Likewise, we also recognized that canvassing arrangements may arguably be less than what the observer may deem as optimal without rising to the level of violating the statute, especially when the procedures need to be modified to promote safety during the COVID-19 pandemic. We therefore noted in our order that we "would not discourage the Board from considering the implementation of arrangements to allow for an additional corridor for observation along the side of the canvassing tables if feasible -subject to spatial distancing under COVID-19 and voting privacy requirements." *In re: Canvassing Observation*, Order of November 3, 2020.

Additionally, in *In re Recanvassing of the First Election Dist. of Jefferson Twp.*, 12 Pa. D. & C.4th 536 (Pa. Com. Pl. 1991), the court reasoned that "the Election Code speaks only of canvassing absentee ballots, not single ones," and that the "intent of the statute [is] to preserve and insure the secrecy and anonymity of the voter." *Id.* at 538. Indeed, if watchers like the witness were permitted to observe the canvassing of ballots closely enough to view the names and addresses on single ballots, they would be going beyond the purpose of the statute, which is only to provide for the canvassing of the ballots **writ large.** The watchers would also threaten the secrecy and anonymity of the voter in direct frustration of the statute's purpose. If the watcher intends to observe the canvassing with the intent of voiding ballots, we must emphasize that we "will not disenfranchise a voter for an act that may be contrary to procedure for canvassing the vote," as ballots are not to be voided "because of some minor irregularities or inconsistencies in the canvassing of the ballots." *Id.* at 538, 539.

 **\*4** Overall, the watchers' purpose is not to audit the individual ballots, and "meaningful observation" or "meaningful access" is not a legally recognized reason for a watcher getting close enough do so. Indeed, the term "meaningful" is not even used in the statute. We note that a similar conclusion has been reached in a similar case in Nevada. In that case, the court explained that the statue provides that "[t]he county…shall allow members of the general public to observe the counting of the ballots…," but does not "use the modifier 'meaningful.'" *Kraus v. Cegauske*, First Judicial Dist. Of Nevada, Case No. 20 OC 00142 1B, Dept. 2, October 29, 2020, at p. 10. That court also specifically noted that "Petitioners seem to request… observation of all information involved in the ballot counting process so they can verify the validity of the ballot, creating in effect a second tier of ballot counters and/or concurrent auditors of the ballot counting election workers," adding that the "statutes created observers not counters, validators, or auditors." *Id.* at 10-11.

### IV. Conclusion

Appellant's witness, Jerry Mercer, provided exacting and copious testimony as to his ability to observe the opening and sorting of ballots. Given that observers are directed only to observe and not to audit ballots, we conclude, based on the witness's testimony, that the Board of Elections has complied with the observation requirements under 25 P.S. § 3146.8 and that Appellant is not entitled to the relief that he seeks.

### BY THE COURT:

<<signature>>

**J.**

**Presiding Election Day Judge**

## Footnotes

1   The Election Board allows the public to observe the canvassing process on You Tube on their website at ***https://youtu.be/-Zzb-7EH-MQ***

2   The observer, who has worn a mask while observing the canvassing, testified that he saw Election Board workers who occasionally stood shoulder to shoulder, contrary to the CDC social distancing guidelines. The Appellant appears to contend that these incidents undercut the legitimacy of the social distancing guidelines which have influenced the design of the layout for observers. We do not believe these occasional, likely necessary, instances of shoulder-to-shoulder interactions between fellow workers to carry out their canvassing duties, is a legitimate reason to direct the Board to relax its current distancing requirements on observers.

3   "[I]n 2020, the legislature eliminated time-of-canvassing challenges *entirely* from 🔖 Section 3146.8(g)(3).... Accordingly, the Election Code presently provides no mechanism for time-of-canvassing challenges by candidate or party representatives.... Moreover, as is plain from the above account, at no time did the Code provide for challenges to ballot *signatures.* now does not provide for time-of-canvassing ballot challenges, and which never allowed for signature challenges, as both requiring signature comparisons at canvassing, and allowing for challenges on that basis. We reject this invitation." ***In re November 3, 2020 Gen. Election***, 149 MM 2020, 2020 WL 6252803, at *14 (Pa. Oct. 23, 2020) (footnotes, citations and quotations omitted).

    Presumably, in expanding voting by mail, the legislature sought to streamline the process for canvassing such ballots, perhaps to avoid undermining the expansion effort by eliminating the prospect that voters – including a potentially large number of new mail-in voters – would be brought before the board or the courts to answer third-party challenges. Regardless, Intervenors would have us interpret the Election Code, which

4   "The Montgomery County Board of Elections, prior to the general election of November 2, 1965, met with representatives of both the Democratic and Republican Committees of this county for the purposes of setting up a facile procedure to expedite the handling of absentee ballots within the county. At that meeting, on September 7, 1965, it was agreed that certain procedures required for technical compliance with the dictates of the Absentee Voting Act would be eliminated or modified, so that, at time of canvass, there would be less confusion and involvement. This proposal was approved by Horace A. Davenport, Esq., the solicitor for the county board of elections, Peter P. Stevens, chief clerk for the election board, Sheldon W. Farber, Esq., attorney for the County Democratic Committee, and John G. Kauffman, Esq., attorney for the Republican Committee of the county." 🔖 ***In re Canvass of Absentee Ballots of Gen. Election***, 39 Pa. D. & C.2d 429, 433 (Pa. Com. Pl 1965)

---

**End of Document**                                         © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# ATTACHMENT 5

2012 WL 1521866
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

Thomas WARNER, Plaintiff,

v.

SUN SHIP, LLC, et al., Defendants.

Civil Action No. 11–7830.
|
April 30, 2012.

**Attorneys and Law Firms**

Thomas Warner, York, PA, pro se.

Daniel V. Johns, Kelly Kindig, Philadelphia, PA, for Defendants.

*MEMORANDUM OPINION*

RUFE, District Judge.

**\*1** Plaintiff Thomas Warner brings this action *pro se* against Defendants Sun Ship, LLC and Sunoco, Inc. (R & M), asserting a claim for seaman's wages pursuant to 46 U.S.C. § 10313, for vacation wages accrued during his employment by Sun Transport, Inc. between September 1972 and February 1974. Defendants have filed a motion to dismiss, arguing that the Complaint is barred as a matter of law by the equitable doctrine of laches. For the reasons that follow, the Motion will be granted.

## I. BACKGROUND

Between September 1972 and February 1974, Plaintiff worked as a seaman for Sun Transport, Inc., a predecessor company of Sun Ship. As a crew member on Sun Transport's oil tankers, Plaintiff worked as a messman, ordinary seaman, and able seaman. Plaintiff alleges that during his employment, his earnings comprised base wages (which were calculated monthly and varied depending on whether Plaintiff was working as a messman, ordinary seaman or able seaman), overtime, penalty time, and vacation wages. As with Plaintiff's base wages, his vacation wages were calculated based on the position he held on the ship and in 1974 were, according to Plaintiff, approximately $500 per month.

Plaintiff voluntarily left employment with Sun Transport in February 1974. He alleges that, at the time of his departure, he had accrued vacation wages at a rate of $500 per month for each of the 18 months he was employed with Sun Transport. Upon leaving Sun Transport's employ, Plaintiff did not make a request for vacation wages, but Plaintiff now alleges he was nevertheless entitled to them under 46 U.S.C. § 10313.

More than two decades after leaving Sun Transport's employ, on November 12, 1997, Plaintiff sent a letter to the human resources department of Sun Transport, requesting the vacation wages he claimed he accrued between September 1972 and February 1974. By letter dated April 27, 1998, a representative of Sunoco notified Plaintiff that it had no record of Plaintiff's employment with Sun Transport and requested documentation verifying his employment. Although not specifically alleged in the Complaint, it appears from Exhibit C to the Complaint that Plaintiff responded to Sunoco's letter on January 20, 1999,[1] by providing a document from the Social Security Administration Office of Central Records Operations which contains a record of Plaintiff's work from January 1972 through December 1974. Sunoco responded by letter dated February 16, 1999; Sunoco stated that the information provided was insufficient to validate his claim that he was due vacation wages.

Six-and-a-half years passed before Plaintiff again contacted Sunoco. Plaintiff alleges that he reiterated his claim of unpaid vacation wages by letter dated September 12, 2005. He attached several documents to this letter including copies of his U.S. Coast Guard-issued certificates of discharge. He received no response to the letter. Another five years passed and Plaintiff contacted Sunoco regarding his unpaid vacation wages and the documents he submitted in support of his claims. A Sunoco human resources representative informed Plaintiff that the documents no longer existed.

**\*2** Plaintiff filed this action on December 23, 2011, seeking $30,000 in "inflation-adjusted vacation wages ... along with any interest or penalties which may be applicable."[2]

## II. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 12(b)(6), dismissal of a complaint for failure to state a claim upon which relief can be granted is appropriate where a plaintiff's "plain statement" lacks enough substance to show that she is entitled to relief. [3] In determining whether a motion to dismiss should be granted, the court must consider only those facts alleged in the complaint, accepting the allegations as true and drawing all logical inferences in favor of the nonmoving party. [4] Courts are not, however, bound to accept as true legal conclusions couched as factual allegations. [5] Something more than a mere *possibility* of a claim must be alleged; the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." [6]

The complaint must set forth "direct or inferential allegations respecting all the material elements necessary to sustain recovery under *some* viable legal theory." [7] The court has no duty to "conjure up unpleaded facts that might turn a frivolous ... action into a substantial one." Because Plaintiff here proceeds *pro se,* the Court liberally construes his Complaint. [8]

While some courts have cautioned against dismissing claims as barred by the doctrine of laches on a motion to dismiss, [9] the Third Circuit has held that laches may serve as the basis for dismissal pursuant to Rule 12(b)(6) if applicability of the doctrine is apparent from the face of the Complaint. [10]

### III. DISCUSSION

Plaintiff asserts his claim for unpaid vacation wages pursuant to the Merchant Seamen Protection and Relief Act, [11] which provides in pertinent part:

> (f) At the end of a voyage, the master shall pay each seaman the balance of wages due the seaman within 24 hours after the cargo has been discharged or within 4 days after the seaman is discharged, whichever is earlier....

> (g) (1) ... when payment is not made as provided under subsection (f) of this section without sufficient cause, the master or owner shall pay to the seaman 2 days' wages for each day payment is delayed. [12]

The Act does not establish a statute of limitations for individual claims for unpaid wages. [13] Defendants argue,

however, that Plaintiff's claim is barred by the equitable doctrine of laches which has been applied in other circuits to claims of unpaid wages under the Act. [14]

The Third Circuit has not before applied the laches doctrine in a case involving the Act; the Third Circuit has, however, applied the doctrine in other contexts. In *Santana Products, Inc. v. Bobrick Washroom Equipment, Inc.,* [15] the Third Circuit concluded that it was proper for the district court to use the most analogous statute of limitations as a guideline for determining whether the laches doctrine barred the plaintiff's claim. [16] The Court reasoned that in cases like this one, where the federal statute in question "does not specify a statute of limitation, courts must "adopt a local time limitation as federal law if it is not inconsistent with federal law or policy to do so." [17]

**\*3** "Laches consists of two elements: (1) inexcusable delay in bringing suit, and (2) prejudice to the defendant as a result of the delay." [18] "Once the statute of limitations has expired, the defendant 'enjoys the benefit of a presumption of inexcusable delay and prejudice.' " [19] In cases such as this one, where the statute does not contain a limitations period, the Court begins its analysis by looking to the most analogous state statute of limitations to determine whether the presumption of laches attaches. [20]

Defendants assert that the most analogous state statute of limitations here is the 3–year limitations period under the Pennsylvania Wage Payment and Collection Law ("WPCL"). [21] The Court agrees. WPCL provides: "No ... legal action shall be instituted under the provisions of this act for the collection of unpaid wages or liquidated damages more than three years after the day on which such wages were due and payable." [22] Here, Plaintiff has instituted an action for the collection of unpaid wages and penalties, and the Court considers this analogous state statute in assessing the timeliness of Plaintiff's claim. [23]

Plaintiff's wage claim was filed 37 years after the day on which the alleged wages were due, far outside the analogous 3–year limitations period. The presumption of laches therefore applies and the burden shifts to Plaintiff to show both that the delay was excusable and that Defendants have not been prejudiced by the delay.

**A.** *Cause for the Delay*

Plaintiff has failed to offer any explanation that excuses his 37–year delay in filing suit. While he attributes some of his delay to Defendants' failure to respond to his communications with the Company, Plaintiff's initial contact with the Company occurred 23 years after his wages became due. Plaintiff asserts that "as a merchant seaman," he "depended and relied" on the wage statements of his employer, "erroneously" believing that he would eventually be paid.[24] Even assuming Plaintiff relied on the wage statements and simply believed there was a delay in payment, this cannot justify the extent of the delay here.

Plaintiff urges the Court not to "ascribe functions and responsibilities that have not usually, or historically, been associated with seamen," and impose on him the duty to ensure the accuracy of his own wage statements.[25] The Court will not excuse Plaintiff's delay simply because he was a seaman. Plaintiff had a duty to determine in a timely manner whether he was owned wages.

**B.** *Prejudice to Defendants*

Even if Plaintiff could show that his delay was excusable, Defendants have established that they have been prejudiced by the decades-long delay. Defendants assert that they have been prejudiced for two reasons. First, they argue that they are highly prejudiced by the "astronomical penalties" that may result from the Act's double wage penalty.[26] Plaintiff counters that he "is willing to stipulate that he is willing to forego any and all double wage penalties."[27]

**\*4** Defendants submit that they are also prejudiced by having to defend against a wage claim that is nearly four decades old where the employment records no longer exist and the company that employed Plaintiff is no longer in existence. Plaintiff responds: "It is quite likely that Sun Transport, Inc.'s successor, defendant Sun Ship, LLC still has copies of [his employment] contract, either in paper form or as a computerized record."[28] Plaintiff offers no basis for his contention that the relevant records exist other than his mere speculation that they do. Plaintiff argues that he can calculate the amount of wages due based on his

Social Security Administration documents and "his memory of prevailing wages in a contract between Sun Transport, Inc. and its marine workers" in 1972.[29] However, he has not retained documentation of his employment contract or wage statements. As Defendants allege that they no longer possess such records, Defendants would be compelled to commence a costly discovery process in an attempt to locate individual employment records nearly four decades old, which were originally held by a predecessor company, and which may not exist any longer.

Plaintiff has failed to present the Court with sufficient justification to overcome the presumption of laches. He has not justified the delay nor has he demonstrated a lack of prejudice. To the extent Plaintiff argues that he is entitled to equitable tolling because Sun Transport may have intentionally submitted "inherently inaccurate, incomplete, deceptive, and possible [sic] fraudulent misinformation ... regarding his earnings,"[30] the Court finds that there are simply no factual allegations to support this speculation.[31]

The applicability of the doctrine of laches is apparent from the Complaint. Plaintiff alleges that he became entitled to his wages in February 1974 when he left Sun Transport's employ and that he did not contact Defendants until 1997, offering no explanation for this delay. Thus, the applicability of the doctrine does not depend on facts outside the Complaint such that discovery is necessary.[32] Furthermore, any amendment to the Complaint would be futile.

### IV. CONCLUSION

For the foregoing reasons, the Court finds that Plaintiff's claims are barred by the doctrine of laches. Accordingly, Defendants Motion will be granted and the Complaint will be dismissed with prejudice.

An appropriate Order follows.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 1521866

# Footnotes

1    Compl., Ex. C.

2    Compl. at 3.

3    *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

4    *ALA, Inc. v. CCAIR, Inc.,* 29 F.3d 855, 859 (3d Cir.1994); *Fay v. Muhlenberg Coll.,* No. 07–4516, 2008 WL 205227, at *2 (E.D.Pa. Jan.24, 2008).

5    *Twombly,* 550 U.S. at 555, 564.

6    *Id.* at 570.

7    *Id.* at 562 (quoting *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1106 (7th Cir.1984)).

8    *Higgs v. Attorney Gen. of the U.S.,* 655 F.3d 333, 339 (3d Cir.2011) (citing *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)).

9    *See, e.g., Dziennik v. Sealift, Inc.,* No. 05–4659, 2006 WL 4586140, at *7 (E.D.N.Y. Aug.30, 2006) ( [A]lthough a court may consider the defense of laches on a motion to dismiss, courts generally are not inclined to do so because application of the defense involves consideration of fact issues outside the pleadings.") (quotation marks and citation omitted).

10   *Robinson v. Johnson,* 313 F.3d 128, 135 (3d Cir.2002) (quoting *Hanna v. U.S. Veterans' Admin. Hosp.,* 514 F.2d 1092, 1094 (3d Cir.1975)) (the so-called "Third Circuit Rule" "permits a limitations defense to be raised by motion under Rule 12(b)(6), but only if 'the time alleged in the statement of a claim shows the cause of action has not been brought within the statute of limitations' ").

11   46 U.S.C. § 10101 *et seq.*

12   46 U.S.C. § 10313(f), (g)(1).

13   *But see* 46 U.S.C. § 10313(g)(3) ("A class action suit for wages under this subsection must be commenced within three years after the later of—(A) the date of the end of the last voyage for which the wages are claimed; or (B) the receipt, by a seaman who is a claimant in the suit, of a payment of wages that are the subject of the suit that is made in the ordinary course of employment.").

14   *See, e.g., Dziennik,* 2006 WL 4586140, at *5 (quoting *DeSilvio v. Prudential Lines, Inc.,* 701 F.2d 13, 15 (2d Cir.1983) ("The equitable doctrine of laches has immemorially been applied to admiralty claims to determine whether they have been timely filed.").

15   401 F.3d 123 (3d Cir.2005).

16   *Id.* at 135.

17   *Id.* (internal quotation marks omitted).

18   *Id.* at 138.

19   *Id.* (quoting *Equal Opportunity Employment Comm'n v. The Great Atl. & Pac. Tea Co.,* 735 F.2d 69, 80 (3d Cir.1984)).

20   *Id.* at 135; *see also* DeSilvio, 701 F.2d at 15.

21   43 Pa. Stat. § 260.1 *et seq.*

22   43 Pa. Stat. § 260.9a(g).

23   *See* *McConville v. Florida Towing Corp.,* 321 F.2d 162, 166 (5th Cir.1963). There is additional support for the Court's application of a 3–year limitations period. The Merchant Seamen Protection and Relief Act contains a 3–year time period for the filing of a class action suit for wages. *See* 46 U.S.C. § 10313(g)(3) ("A class action suit for wages under this subsection must be commenced within three years after the later of—(A) the date of the end of the last voyage for which the wages are claimed; or (B) the receipt, by a

seaman who is a claimant in the suit, of a payment of wages that are the subject of the suit that is made in the ordinary course of employment.") Proposed legislation strikes the "class action" language of this provision making the limitations period applicable to any suit for wages under § 10313. *See* H.R. 2838, 112th Cong. (1st Sess.2011).

24   Pl.'s Resp. in Opp. to Def.'s Mot. to Dismiss (Doc. No. 8) at 3.

25   *Id.*

26   46 U.S.C. § 10313(g)(1) ("[W]hen payment is not made as provided under subsection (f) of this section without sufficient cause, the master or owner shall pay to the seaman 2 days' wages for each day payment is delayed.").

27   Pl.'s Resp. at 5.

28   *Id.* at 6.

29   Pl.'s Reply (Doc. No. 15) at 2

30   *Id.* at 10–11.

31   In his Reply, Plaintiff submits that he alleges the following "that he earned vacation wages, that he was not paid these vacation wages, and that this non-payment can be reflected in his earning statements"; he asserts: "These combined statements meet the requirements of F.R.C.P. 9(b)." (Pl.'s Reply at 8.) Federal Rule of Civil Procedure requires that fraud be pled with particularity. *United States ex rel. Wilkins v. United Health Grp., Inc.,* 659 F.3d 295, 301 (3d Cir.2011). These allegations are insufficient to meet the heightened pleading requirements of Rule 9(b).

32   *See Robinson,* 313 F.3d at 135; *Dziennik,* 2006 WL 4586140, at *7.

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.