IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| DONALD J. TRUMP FOR PRESIDENT, INC.; *et al.*, | ) ) ) | Civil Action |
|---|---|---|
| Plaintiffs, | ) | |
| v. | ) ) | No.: 4:20-cv-02078 |
| Kathy Boockvar; *et al*, | ) ) | |
| Defendants. | ) | Judge Matthew W. Brann |

**BRIEF IN SUPPORT OF MOTION TO DISMISS THE COMPLAINT AND JOINDER OF MOTION TO DISMISS THE COMPLAINT OF NORTHAMPTON COUNTY BOARD OF ELECTIONS OR, IN THE ALTERNATIVE, DISMISS PENDING STATE-COURT RESOLUTION OF STATE-LAW QUESTIONS**

Lead Plaintiff Donald J. Trump for President, Inc. is the principal committee for the reelection campaign of Donald J. Trump and its candidate Donald J. Trump. The Complaint also names as Plaintiffs two individuals whom are purported to be qualified electors and registered voters – one from Lancaster County and one from Fayette County. Northampton County Board of Elections ("Movant") is the governmental office charged with running and operating general and primary elections in the County of Northampton, Pennsylvania.

Plaintiff's allegations and overlapping causes of actions raise only two issues: (i) whether a candidate and his/her political party representatives have a right to observe the canvassing of ballots from their preferred distance without limitation, and (ii) whether voters who cast potentially defective ballots may cast their votes

1

prior to the close of the polls, including through the casting of provisional ballots. See Compl. ¶¶ 159-243.

I. **Joinder of Argument**

It is anticipated and expected that the other six (6) Defendant Counties' Boards of Elections and the Secretary of the Commonwealth of Pennsylvania will file Motions to Dismiss in this matter. It is anticipated and expected that the Motions to Dismiss filed by the six (6) counties and Secretary of the Commonwealth of Pennsylvania will provide grounds for dismissal of Plaintiffs' Complaint that would also be grounds for dismissal of Plaintiffs' Complaint against Movant. Movant joins in and incorporates by reference any Motions to Dismiss and Joinders filed by the other six (6) counties and the Secretary of the Commonwealth of Pennsylvania to the extent that such Motion to Dismiss would provide a basis for the dismissal of Plaintiffs' Complaint as to the Movant. Should this Court grant a Motion to Dismiss filed by any of the other six (6) counties or the Secretary of the Commonwealth and dismiss Plaintiffs' Complaint, Movant respectfully requests that any Order dismissing Plaintiffs' Complaint would apply equally to the Movant. In addition to the legal grounds set forth in the Motions of the Co-Defendants, the Movant is entitled to relief on the three grounds as set forth below.

II. **Failure to State a Claim**

The Plaintiffs' Complaint makes broad allegations of the wrongdoing of the Defendant Counties' Boards of Elections without specifying the specific deficiencies attributable to the Movant. In fact, Movant is referenced only once, in paragraph 108(f), other than being named in the caption and identified as a defendant in Paragraph 22. Plaintiffs have not alleged that they have been injured in any way by Movant, nor have they reasonably offered evidence, based on a factual investigation, that the Movant has in any way acted improperly in conducting the Presidential Election of November 2020. Indeed, Plaintiffs' Complaint includes no factual allegations involving the improper conduct or actions of the Movant at all.

A well-pleaded Complaint must be supported by factual allegations. <u>Dreibelbis v. County of Berks</u>, 438 F.Supp.3d 304 citing <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 129 S. Ct 1937, 173 L.Ed,2d 868 (2009) and <u>Bell Atl. Corp v. Twombly</u>, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed.2d 929 (2007). "A Claim has factual plausibility [only] when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the alleged misconduct." Id at 678, 129 S.Ct. 1937. Dismissal for failure to plead appropriately pursuant to Federal Rule of Civil Procedure 12(b)(6) is warranted in the instant matter.

### III. Pennsylvania Election Code

The Plaintiffs object to the practice of advising voters of discernible deficiencies as they are related to their mail-in or absentee ballots. This is an action that preserves the due process rights of such voters, in relation to the state action, and also safeguards their franchise and opportunity to vote. The Plaintiffs claim that the Board failed to follow mandatory duties in the "pre-canvass" and "canvass" of "votes", which diluted the "votes" of individuals in other counties. Painfully, the Plaintiffs cite Baker v. Carr and its progeny asking the court to essentially nullify millions of other votes. Baker v. Carr, 369 U.S. 186 (1962). They do so rather than suggesting a construction of the Election Code that is more rational and that preserves the Constitutionality of the offered construction on due process grounds. The Plaintiffs claim the Defendants pre-vote processing of ballots, including providing a notice regarding state action invalidating ballots and depriving individuals of their vote, devalued the "vote" of certain Plaintiffs in counties that did not provide notice of such deficiencies.

However, their interpretation of the Pennsylvania Election Code, which equates the practice of notifying those attempting to vote of errors with the devaluation of the actual vote of other potential voters, is entirely erroneous. The Plaintiffs can point to no prohibition in providing such notice. They refer to the Boockvar case, which merely concluded that "Boards are *not required* to implement a 'notice and opportunity to cure' procedure for and absentee ballots that voters have filled out

4

incompletely or incorrectly." Pa. Democratic Party v. Boockvar, 2020 Pa. LEXIS 4872, at *55 (Sep. 17, 2020). The Court in Boockvar could have concluded such notice was prohibited, but instead only rejected compelling such action.

The Plaintiffs also cite Pierce, which addressed the application of "different standards to determine whether a third-party hand-delivered absentee ballot *constitutes a legal vote*." Pierce v. Allegheny Cty. Bd. of Elections, 324 F. Supp. 2d 684, 698 (W.D. Pa. 2003). In Pierce, with limited evaluation of the equal protection claim, the issues were specifically couched in terms of the application of different policies to counting otherwise valid votes.[1] At issue was the standards applied to in various counties to determine whether a vote was valid, not necessarily pre-vote actions that would increase the number of voters. The harm was not based on the number of votes in Allegheny County versus Philadelphia County, as is alleged by

---

[1] Notably also in Pierce the Court did not order the decertification of an election and instead treated certain specifically identified ballots as challenged. It also noted that "[n]either the parties nor the intervenors addressed the ramifications of defendant's absentee ballot practices to the results of the *statewide* November 4, 2003 election. Pierce v. Allegheny Cty. Bd. of Elections, 324 F. Supp. 2d 684, 698 (W.D. Pa. 2003). The Pierce court then deferred to the comprehensive challenge procedures in place under the election code. Id. at 698. Other courts have recognized that decertifying an election would cause a massive harm and disenfranchisement of voters. Marks v. Stinson, 19 F.3d 873, 875 (3d Cir. 1994)

the Plaintiff in this case. It was failure to give equal weight to votes cast in both Allegheny County and in Philadelphia County. In fact, there was no way for Philadelphia County, which was subject to an injunction, to count votes from ballots hand-delivered by third parties. Similarly, the Plaintiffs cite <u>Bush v. Gore</u>, which also addresses the actual weight of a vote, stating

> The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another. See, *e.g., Harper* v. *Virginia Bd. of Elections,* 383 U.S. 663, 665, 16 L. Ed. 2d 169, 86 S. Ct. 1079 (1966) ("Once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment"). It must be remembered that "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds* v. *Sims*, 377 U.S. 533, 555, 12 L. Ed. 2d 506, 84 S. Ct. 1362 (1964).

<u>Bush v. Gore</u>, 531 U.S. 98, 104-05, 121 S. Ct. 525, 530 (2000).

Similar to these cases, the Plaintiffs argue the Defendants misapplied 25 P.S. 3146.8 causing an actual devaluation of the vote of other state voters. However, under the Election Code, a rejected absentee or mail-in ballot is not a vote that is part of the canvass or pre-canvass, as alleged. Additionally, the Plaintiffs appear to claim there is some sort of pre-canvass secrecy provision that would prohibit the Defendants from reporting information to the Department of State or to individuals

6

attempting to vote. Rather, there is simply a provision limiting the ability of "watchers" to report "results" prior to the close of the polls.

Section 3146.8 describes the actions of the "county boards of election" and also "watchers" in relation to the tallying of ballots during the "pre-canvass," and subsequent "canvass" of votes. The Plaintiffs erroneously allege that advising potential voters of defects apparent on the exterior envelopes containing absentee or mail-in ballots amounts to a pre-canvass in violation of the Election Code.

The definition of "pre-canvass" means "the inspection ***and*** opening of all envelopes containing official absentee ballots or mail-in ballots, the removal of such ballots from the envelopes ***and*** the counting, computating and tallying of the **votes** reflected on the ballots. The term does not include the recording or publishing of the votes reflected on the ballots." 25 P.S. 2602 (q.1)((2020) (emphasis added). Similarly, except as to recording or publishing votes, the term "canvass," means the gathering of ballots after the final pre-canvass meeting and the counting, computing, and tallying of the votes reflected on the ballots.

The pre-canvass begins no earlier than 7:00 am on election day and it begins the process of actually, among other things, tallying votes on the ballots received inside the envelopes. 25 P.S. 3146.8(g)(1.1) (2020). This is the only time that the actions of the entire definitional term can be undertaken – inspection, opening, removal ***and*** counting. Further, in regard to the envelopes, the definition describes

7

the "inspection **and** opening" as a joint clause. It is not rational to interpret the inspection and opening terms separately. It would be impossible to receive such ballots without observing aspects of the exterior envelope. Some level of inspection of the outer envelope is necessary to process the absentee ballot, to scan the ballot, to ensure the information is inputted to avoid double voting, and to handle the ballot in a manner that makes naked ballots immediately evident due to tracking marks and other relatively obvious indicia. There is also an interior envelope, the only envelope actually containing an official absentee ballot or mail-in ballot.

In short, a rejected application or rejected ballot is not a part of the pre-canvass to be tabulated, nor is it a vote that is counted, computed, or tallied and, as a result, such information is not governed by 25 P.S. 3146.8(g)(1.1), which the Plaintiffs posit prohibits a due process type notice to potential voters. The definition of "pre-canvass" bolsters this clear interpretation as the definition includes an "and" in relation to counting, computating and tallying of votes. This presumes an actual result at the conclusion of such activities and/or a vote actually being a part of such results. 25 P.S. 3146.8(g)(1.1) itself references "results" or any "portion of" results of a pre-canvass meeting which is an indication of finality – the results as a whole or portions of any race or result. The statute must be interpreted in a manner to preserve its Constitutionality, and this interpretation allows the notice and the due

8

process expected. Similar notice and due process is provided for challenged ballots in 25 P.S. 3146.8(g)(5).

Finally, the Plaintiffs claim that the Board cannot publish or communicate any listing of rejected ballots as a result of the pre-canvass proviso that, "[n]o *person* observing, attending or participating in a pre-canvass meeting may disclose the results of any portion of any pre-canvass meeting prior to the close of the polls." 25 P.S. 3146.8(g)(1.1). Notably 25 P.S. 3146.8(g)(1.1) also applies specifically to a "pre-canvass" on election day, and the referenced clause appears immediately after a clause related to representatives being permitted to observe a pre-canvass. The subsequent provision, 25 P.S. 3146.8(g)(2), deals with those votes received after the pre-canvass. In regard to this meeting, the Code specifically references that "[t]he *county board* of election shall not record or publish any votes reflected on the ballots prior to the close of the polls." The inclusion of the Board in prohibiting such contact after the period where a cure is possible by provisional ballot thus appears significant. Further, Section 3146.09 specifically indicates that any elections lists are public records, such as those made when an absent or mail-in ballot is processed, along with "[a]ll official absentee ballots, files, applications for such ballots and envelopes on which the executed declarations appear, and all information and lists." 25 P.S. 3146.9 (2020). It would make little consistent policy sense to have such open records yet an inability to provide such notice.

9

## IV. Res Judicata and Collateral Estoppel

The Plaintiffs have previously litigated several of the exact issues in previous matters in a coordinated jurisdiction and state court, including issues related to providing such ballots, related to a voter's return of mail-in and absentee ballots, related to any review/verification of such ballots, related to notice and opportunity to cure and related to poll watchers. Pa. Democratic Party v. Boockvar, 2020 Pa. LEXIS 4872 (Sep. 17, 2020); Donald J. Trump for President, Inc. v. Boockvar, 2020 U.S. Dist. LEXIS 188390 (W.D. Pa. Oct. 10, 2020). Similarly, the Plaintiffs pursued many of the same legal arguments related to Equal Protection, Substantive Due Process and others.

Res judicata (i.e. claim preclusion) and collateral estoppel (i.e. issue preclusion), bars the relitigation of claims or issues that should or could have been adjudicated in a prior action. McGill v. Southwark Realty Co., 828 A.2d 430, 433 (Pa. Commw. 2003). The main difference between the two doctrines is that res judicata operates to preclude re-litigation of a claim irrespective of the issues raised in the initial suit, whereas collateral estoppel operates only to preclude relitigation of issues that were actually litigated in the initial suit. Chada v. Chada, 756 A.2d 39 (Pa. Super. 2000).

Res judicata prohibits relitigating a *claim* which has already been litigated. It has been stated that "[w]here there has previously been rendered a final

judgment on the merits by a court of competent jurisdiction, the doctrine of res judicata will bar any future suit on the same cause of action between the parties." Chada, 756 A.2d at 42. In addition to a final judgment on the merits, there must be "1. identity in the thing sued upon; 2. identity in the cause of action; 3. identity of persons and parties to the action; and 4. identity of the capacity of the parties sued or being sued" for the doctrine to apply. Id. If it applies it "preclud[es] *any* future suit between the parties . . . on the same cause of action." Balent v. City of Wilkes-Barre, 669 A.2d 309, 313 (Pa. 1995). It applies not only to claims that were litigated but also to claims that should have been litigated. Id.

Collateral estoppel prohibits relitigating an *issue* which was already been decided. In order for collateral estoppel to apply the following must be established: "(1) the issue decided in the prior case is identical to one presented in the later case; (2) there was a final judgment on the merits; (3) the party against whom the plea is asserted was a party or in privity with a party in the prior case; (4) the party or person privy to the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding and (5) the determination in the prior proceeding was essential to the judgment." Chada, 756 A.2d at 43. Our Supreme Court has adopted Restatement (Second) of Judgments § 27 and its definition of issue preclusion, which provides that "when an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the

judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." McGill v. Southwark Realty Co., 828 A.2d 434 n.5 (Pa. Commw. 2003).

As a result, this matter should be dismissed as res judicata or the Plaintiffs should be estopped from proceeding as to the referenced claims.

V.    **No Properly Plead Claim of Vote Devaluation**

American democracy is founded on the concept that power is derived from the consent of the governed.[2] Our society is too large for individual participation in the administration of government, so we delegate our authority to representatives. Americans express their consent through individual votes. Several cases have

---

[2] *See* THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776) ("[w]e hold these Truths to be self-evident, that all Men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness. That to secure these Rights, Governments are instituted among Men, deriving their just Powers from the Consent of the Governed."); DECLARATION OF THE CAUSES AND NECESSITY OF TAKING UP ARMS para. 1-4 (U.S. 1775) (stating that "[i]f it was possible . . . that the divine Author of our existence intended a part of the human race to hold . . . an unbounded power over others . . . the inhabitants of these colonies might at least require from the parliament of Great-Britain some evidence, that this dreadful authority over them, has been granted to that body . . . . [Parliament has imposed unjust laws and taxes without our consent] [b]ut why should we enumerate our injuries in detail? By one statute it is declared, that parliament can 'of right make laws to bind us in all cases whatsoever.' What is to defend us against so enormous, so unlimited a power? Not a single man of those who assume it, is chosen by us.). DECLARATION AND RESOLVES OF THE FIRST CONTINENTAL CONGRESS para. 10 (U.S. 1774) (resolution four states that a "foundation of English liberty, and of all free government, is a right in the people to participate in their legislative council" and that a tax may not be imposed without the consent of the governed.).

addressed the devaluation of these votes, primarily in the redistricting context. As previously noted, Baker v. Carr and its progeny opened the courts' doors to claims of vote devaluation, even over great concerns for the need for judicial restraint in entering a "political thicket." The cases cited by the Plaintiffs primarily address the substantive weight of a vote in comparison to other voters. However, as noted above, the processes the Plaintiffs challenge have more to do with pre-voting access issues, which effectively allows a broader franchise and protection of due process rights. In regard to the Equal Protection analysis, there are no allegations regarding any quantification of the purported devaluation of the Plaintiffs' vote as likely would be required for an actual Equal Protection review, as opposed to an Article I, § 2 analysis. There are certainly no allegations related to actions potentially devaluing a vote by Defendant, Northampton County Board of Elections, and a fair reading of the Complaint cites nothing qualifiable on a statewide basis.

In regard to vote devaluation in the redistricting context, the one-person, one-vote principle announced in Gray v. Sanders and clarified in Wesberry v. Sanders[3] stated that "as nearly as practicable" districts must be drawn to produce

---

[3] *Wesberry* was the first post-*Baker* case to analyze Congressional redistricting. The challenged district had a population of 823,680 in a state with an average district population of 394,312 persons. Surprisingly the Court did not base its decision on the Equal Protection Clause. It based its ruling on Article I, § 2 of the

population equality. <u>Wesberry v. Sanders</u>, 376 U.S. 1 (1963); <u>Gray v. Sanders</u>, 372 U.S. 368 (1963). This is the crux of the argument regarding an equally weighted vote. In the redistricting contest, this standard applies to both state legislative districts and Congressional districts. However, it is derived from two different origins and two slightly different standards have emerged. State legislative districts are reviewed under the Equal Protection Clause of the Fourteenth Amendment and an overall range of ten percent is permitted between the most and least populated districts to accommodate legitimate state policies. <u>Mahan v. Howell</u>, 410 U.S. 315, 93 S. Ct. 979 (1973). On the other hand, Congressional districts are regulated under Article I, § 2 of the United States Constitution, which generally requires absolute equality. <u>Kirkpatrick</u>, 394 U.S. at 530 (1969); <u>White v. Weiser</u>, 412 U.S. 783, 790 (1973); <u>Karcher v. Daggett</u>, 462 U.S. 725, 731 (1983). That said, even under Article I, some deviations are permitted if they are unavoidable or occur despite a good faith effort to reach equality, if a valid justification is offered. <u>Kirkpatrick</u>, 394 U.S. at 530-31. At times, the Plaintiffs seem to conflate these different lines of cases.

  To the extent that the Plaintiffs are alleging a structural or actual devaluation of their "vote" or an analogous pre-vote process that purportedly leads to less votes

---

United States Constitution, which led to the incongruity between state legislative and Congressional redistricting standards.

being cast in their "particular part heavy" county, it is posited that they must still plead some quantification of the harm to meet minimum pleading standards in this Equal Protection context. In this case, there is nearly no actual allegations that state the magnitude of such a deviation. In fact, there are only anecdotal irregularities alleged and nothing that would meet the applicable standards under the Equal Protection clause. Notably, even if one were to assume the Plaintiffs have met their initial burden, there is clearly an exceptionally strong legislative goal being sought – the enfranchisement of more citizens and the protection of their right to vote in a particularly difficult period, i.e. a global pandemic. Notably, in the redistricting context, the burden of justification has also been flexible depending on the size of the deviation. Given the important justification and the near nonexistent offering on the part of the Plaintiffs it is without reasonable question that this burden would be met.

**Conclusion**

Moving Defendant respectfully requests that this Court grant its Motion to Dismiss and dismiss Plaintiffs' Complaint for any of the grounds cited herein or in the Motions to Dismiss and Briefs filed by the Co-Defendants in this matter.

COUNTY OF NORTHAMPTON

By: /s/ Timothy P. Brennan
    Attorney ID: 91798
    Assistant Solicitor
    County of Northampton
    669 Washington Street
    Easton, PA 18042
    610-829-6350
    tbrennan@northamptoncounty.org

By: /s/ Brian J. Taylor, Esq.
    Attorney ID: 66601
    Assistant Solicitor
    County of Northampton
    669 Washington Street
    Easton, PA 18042
    610-829-6350
    btaylor@northamptoncounty.org

Date: November 12, 2020

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DONALD J. TRUMP FOR PRESIDENT, INC.; *et al.,* | ) ) ) | Civil Action |
| Plaintiffs, | ) | |
| v. | ) ) | No.: 4:20-cv-02078 |
| Kathy Boockvar; *et al,* | ) ) | |
| Defendants. | ) | Judge Matthew W. Brann |

## **WORD COUNT CERTIFICATION**

I, Brian J. Taylor, Esquire, counsel for Movant, Northampton County Board of Elections, hereby certify that the herein Brief is in compliance with the requirements for the length and word count of briefs pursuant to Middles District of Pennsylvania Rules of Court LR 7.8(b). The word count function indicates that Movant's Brief contains 3,863 words.

                                                                    COUNTY OF NORTHAMPTON

                                         By:    /s/ Timothy P. Brennan
                                                    Attorney ID: 91798
                                                    Assistant Solicitor
                                                    County of Northampton
                                                    669 Washington Street
                                                    Easton, PA 18042
                                                    610-829-6350
                                                    tbrennan@northamptoncounty.org

                                         By:    /s/ Brian J. Taylor, Esq.
                                                    Attorney ID: 66601
                                                    Assistant Solicitor

County of Northampton
669 Washington Street
Easton, PA 18042
610-829-6350
btaylor@northamptoncounty.org

Date: November 12, 2020

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DONALD J. TRUMP FOR PRESIDENT, INC.; *et al.*, | ) ) ) | Civil Action |
| Plaintiffs, | ) ) | |
| v. | ) ) | No.: 4:20-cv-02078 |
| Kathy Boockvar; *et al*, | ) ) | |
| Defendants. | ) | Judge Matthew W. Brann |

### **<u>CERTIFICATE OF SERVICE</u>**

I, Timothy P. Brennan, Esquire hereby certify that on this date, a copy of Movant's Motion and Brief were served upon all counsel of record via the Court's CM/ECF system, which will provide electronic notice to all parties of record.

                              COUNTY OF NORTHAMPTON

                  By:   <u>/s/ Timothy P. Brennan</u>
                          Attorney ID: 91798
                          Assistant Solicitor
                          County of Northampton
                          669 Washington Street
                          Easton, PA 18042
                          610-829-6350
                          <tbrennan@northamptoncounty.org>

                  By:   <u>/s/ Brian J. Taylor, Esq.</u>
                          Attorney ID: 66601
                          Assistant Solicitor
                          County of Northampton
                          669 Washington Street

Easton, PA 18042
610-829-6350
btaylor@northamptoncounty.org

Date: November 12, 2020