## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DONALD J. TRUMP FOR PRESIDENT, INC.; LAWRENCE ROBERTS; and DAVID JOHN HENRY; | ) ) ) ) ) | CIVIL ACTION |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 20-CV-02078 |
| KATHY BOOCKVAR, in her capacity as Secretary of the Commonwealth of Pennsylvania; ALLEGHENY COUNTY BOARD OF ELECTIONS; CENTRE COUNTY BOARD OF ELECTIONS; CHESTER COUNTY BOARD OF ELECTIONS; DELAWARE COUNTY BOARD OF ELECTIONS; MONTGOMERY COUNTY BOARD OF ELECTIONS; NORTHAMPTON COUNTY BOARD OF ELECTIONS; and PHILADELPHIA COUNTY BOARD OF ELECTIONS; | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | | |

## FIRST AMENDED VERIFIED COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, by their undersigned counsel, hereby complain of Defendants as follows:

**INTRODUCTION**

1.      American citizens deserve fair elections.  Every legal – not illegal – vote should be counted.  And no government should deny American citizens the right to observe the process by which votes are cast, processed, and tabulated.  We must protect our democracy with complete transparency.

2.      Nothing less than the integrity of the 2020 Presidential election is at stake in this action.  Defendants, the very officials charged with ensuring the integrity of the election in Pennsylvania, have so mismanaged the election process that no one – not the voters and not President Trump's campaign – can have any faith that their most sacred and basic rights under the United States Constitution are being protected.

3.      While the bedrock of American elections has been transparency, almost every critical aspect of Pennsylvania's November 3, 2020 General Election was effectively shrouded in secrecy. Democrat-majority counties provided political parties and candidates, including the Trump Campaign, no meaningful access or actual opportunity to review and assess mail-in ballots during the pre-canvassing meetings.

4.      Allegheny and Philadelphia Counties alone received and processed 682,479 mail-in and absentee ballots without review by the political parties and candidates. These are unprecedented numbers in Pennsylvania's elections history.

Rather than engaging in an open and transparent process to give credibility to Pennsylvania's brand-new voting system, the processes were hidden during the receipt, review, opening, and tabulation of those 682,479 votes.

5.      Allegheny and Pennsylvania counties conducted the canvassing and tabulation in convention center rooms and placed observers far away from the action. In the case of Philadelphia County, when an emergency order was issued requiring them to provide meaningful access to representatives, Philadelphia failed to comply.

6.      Worse, Democratic-heavy counties illegally advantaged voters in Democratic-heavy counties as compared to those in Republican-heavy counties. Democratic-heavy counties engaged in pre-canvass activities by reviewing received mail-in ballots for deficiencies, such as lacking the inner secrecy envelope or lacking a signature of the elector on the outer declaration envelope.   Those offending Counties then would notify those voters in order to allow them to cure their ballot deficiencies by voting provisionally on Election Day or cancelling their previously mailed ballot and issuing a replacement.   In other words, those counties provided their mail-in voters with the opportunity to cure mail-in and absentee ballot deficiencies, while Republican-heavy counties, such as Snyder County, followed the law and did not provide a notice and cure process, disenfranchising many.

7.      The commonality and statewide nature of these irregularities impacts the election.

8.     "The right to vote is protected in more than the initial allocation of the franchise.  Equal protection applies as well to the manner of its exercise.  Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore, 531 U.S. 98, 104-05 (2000)*.  All citizens deserve to vote in a transparent system.

9.     As evidenced by numerous sworn statements, Defendants' egregious misconduct has affect all mail-in ballots – which amounted to over 2.6 million of the approximately 6.75 million votes in Pennsylvania – including the mandate that mail-in ballots be post-marked on or before Election Day, and preventing Plaintiff's poll watchers from observing the receipt, review, opening, and tabulation of mail-in ballots.

10.    In a rush to count mail ballots and ensure Democrat Joe Biden is elected, Pennsylvania has created an illegal voting system for the 2020 General Election, devaluing certain votes.

11.    Accordingly, Plaintiffs seek an emergency order prohibiting Defendants from certifying the results of the General Election. In the alternative, Plaintiffs seek a permanent injunction requiring the County Election Boards to invalidate ballots cast by voters who were notified and given an opportunity to cure their invalidly cast mail-in ballot.

**JURISDICTION AND VENUE**

12.     Under 28 U.S.C. §§ 1331 & 1343, this Court has subject matter jurisdiction because this action arises under the Constitution and laws of the United States and involves a federal election for President of the United States.

13.     Venue is proper because a substantial part of the events giving rise to the claims occurred in this District, and certain of the Defendants reside in this District and all of the Defendants are residents of the Commonwealth of Pennsylvania in which this District is located.  28 U.S.C. § 1391(b) & (c).

**PARTIES**

14.     Plaintiff Donald J. Trump for President, Inc. (hereinafter, the "Trump Campaign"), is the principal committee for the reelection campaign of Donald J. Trump, the 45th President of the United States of America (hereinafter, "President Trump").  President Trump is the Republican nominee for the office of the President of the United States of America in the November 3, 2020 General Election.  The Trump Campaign brings this action for itself and on behalf of its candidate, President Trump.  As a political committee for a federal candidate, the Trump Campaign has Article III standing to bring this action.  *See, e.g., Orloski v. Davis*, 564 F. Supp. 526, 530-31 (M.D. Pa. 1983).  *See also Tex. Democratic Party v. Benkiser,* 459 F.3d 582, 587-588 (5th Cir. 2006)* ("[A]fter the primary election, a candidate steps into the shoes of his party, and their interests are identical."); *In re General Election-*

*1985*, 531 A.2d 836, 838 (Pa. Commw. Ct. 1987) (A candidate for office in the election at issue suffers a direct and substantial harm sufficient for standing to contest the manner in which an election will be conducted).

15.     Plaintiff David John Henry (hereinafter, "Mr. Henry") is an adult individual who is a qualified registered elector residing in West Hempfield Township, Lancaster County, Pennsylvania.  Mr. Henry  constitutes a "qualified elector" as that term is defined in Election Code Section 102(t), 25 P.S. § 2602(t). Mr. Henry brings this suit in his capacity as a private citizen.  As a qualified elector and registered voter, Mr. Henry has Article III standing to bring this action.  *See Orloski*, 564 F. Supp. at 530; *Pierce*, 324 F. Supp. 2d at 692-93.  Mr. Henry was notified that his ballot was canceled three days after the election on November 6, 2020.  The ballot was cancelled due to it not being enclosed in a secrecy envelope.

16.     Plaintiff Lawrence Roberts (hereinafter, "Mr. Roberts") is an adult individual who is a qualified registered elector residing in Uniontown, Fayette County, Pennsylvania.  Mr. Roberts  constitutes a "qualified elector" as that term is defined in Election Code Section 102(t), 25 P.S. § 2602(t). Mr. Roberts brings this suit in his capacity as a private citizen.  As a qualified elector and registered voter, Mr. Roberts has Article III standing to bring this action.  *See Orloski*, 564 F. Supp. at 530; *Pierce*, 324 F. Supp. 2d at 692-93.  Mr. Roberts learned on November 9,

2020 that the voter services website in Pennsylvania indicates that his ballot was canceled.  No one called or notified him of that fact.

17.     Defendant Secretary Boockvar is the Secretary of the Commonwealth. In this role, Secretary Boockvar leads the Pennsylvania Department of State.  As Secretary, she is Pennsylvania's Chief Elections Officer and a member of the Governor's Executive Board.  The Pennsylvania Constitution vests no powers or duties in Secretary Boockvar.  *Perzel v. Cortes,* 870 A.2d 759, 764 (Pa. 2005). Instead, her general powers and duties concerning elections are set forth in Election Code Section 201, 25 P.S. § 2621.  Under the Election Code, Secretary Boockvar acts primarily in a ministerial capacity and has no power or authority to intrude upon the province of the Pennsylvania General Assembly.  *Perzel*, 870 A.2d at 764; *Hamilton v. Johnson*, 141 A. 846, 847 (Pa. 1928).  Secretary Boockvar is sued in her official capacity.

18.     Defendants Allegheny, Centre, Chester, Delaware, Philadelphia, Montgomery, and Northampton County Board of Elections (collectively hereinafter, the "County Election Boards") are the county boards of elections in and for the aforementioned counties of the Commonwealth of Pennsylvania as provided by Election Code Section 301, 25 P.S. § 2641.  The County Election Boards "have jurisdiction over the conduct of primaries and elections in such count[ies], in accordance with the provision of [the Election Code.]"  *Id.* at § 2641(a).  The County

Election Boards' general powers and duties are set forth in Election Code Section 302, 25 P.S. § 2642. The County Election Boards are executive agencies that carry out legislative mandates, and their duties concerning the conduct of elections are purely ministerial with no exercise of discretion. *Shroyer v. Thomas*, 81 A.2d 435, 437 (Pa. 1951); *Perles v. Hoffman*, 213 A.2d 781, 786 (Pa. 1965) (Cohen, J., concurring). *See also Deer Creek Drainage Basin Authority v. County Bd. of Elections,* 381 A.2d 103, 109 (Pa. 1977) (Pomeroy, J., dissenting) ("A board of elections, it has been well said, "does not sit as a quasi-judicial body adjudicating contending forces as it wishes, but rather as an executive agency to carry out legislative mandates. Its duties are ministerial only."); *In re Municipal Reapportionment of Township of Haverford*, 873 A.2d 821, 833, n.18 (Pa. Commw. Ct. 2005) ("The duties of a board of elections under the Election Code are ministerial and allow for no exercise of discretion."), *appeal denied* 897 A.2d 462 (Pa. 2006).

## FACTUAL ALLEGATIONS

## I.    Federal Constitutional Protections for Free and Fair Public Elections.

19.    Free, fair, and transparent public elections are crucial to democracy – a government of the people, by the people, and for the people.

20.    In statewide elections involving federal candidates, "a State's regulatory authority springs directly from the United States Constitution." *Project Vote v. Kelly*, 805 F. Supp. 2d 152, 174 (W.D. Pa. 2011) (citing *Cook v. Gralike,*

531 U.S. 510, 522-23 (2001); *U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 805 (1995)).

21.     The Elections Clause of the United States Constitution states that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by *the Legislature* thereof." U.S. Const. Art. I, § 4, cl. 1 (emphasis added).   Likewise, the Electors Clause of the United States Constitution states that "[e]ach State shall appoint, in such Manner as *the Legislature* thereof may direct, a Number of Electors" for President.   U.S. Const. Art. II, § 1, cl. 2 (emphasis added).

22.     The Legislature is "'the representative body which ma[kes] the laws of the people.'"   *Smiley* 285 U.S. 365.   Regulations of congressional and presidential elections, thus, "must be in accordance with the method which the state has prescribed for legislative enactments."   *Id.* at 367; *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 135 S. Ct. 2652, 2668 (U.S. 2015).

23.     In Pennsylvania, the "legislature" is the General Assembly.   Pa. Const. Art. II, § 1. *See also Winston v. Moore,* 91 A. 520, 522 (Pa. 1914) ("The power to regulate elections is legislative, and has always been exercised by the lawmaking branch of the government."); *Patterson v. Barlow,* 60 Pa. 54, 75 (1869) ("It is admitted that the Constitution cannot execute itself, and that the power to regulate

elections is a legislative one, which has always been exercised by the General Assembly since the foundation of the government.").

24.     Because the United States Constitution reserves for state legislatures the power to set the time, place, and manner of holding elections for Congress and the President, state executive officers, including but not limited to Secretary Boockvar, have no authority to unilaterally exercise that power, much less flout existing legislation.

25.     Nor can the authority to ignore existing legislation be delegated to an executive officer.  While the Elections Clause "was not adopted to diminish a State's authority to determine its own lawmaking processes," *Ariz. State Legislature*, 135 S. Ct. at 2677, it does hold states accountable to their chosen processes when it comes to regulating federal elections.   *Id.* at 2668.  A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush*, 531 U.S. at 113 (Rehnquist, J., concurring); *Smiley*, 285 U.S. at 365.

## II.     Actual Observation by Watchers and Representatives Ensures Free and Fair Public Elections.

26.     The United States Supreme Court has noted: "[S]unlight," as has so often been observed, "is the most powerful of all disinfectants." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 305 (1964).

27.     The Pennsylvania General Assembly understood that sentiment long ago and intertwined the concept of watching with the act of voting, enshrining transparency and accountability into the process in which Pennsylvanians choose elected officials.  After all, reasonable people cannot dispute that "openness of the voting process helps prevent election fraud, voter intimidation, and various other kinds of electoral evils." *PG Publishing Co. v. Aichele*, 705 F.3d 91, 111 (3d Cir. 2013).

28.     As long as Pennsylvania has had an Election Code, it has had watchers. In 1937, the Pennsylvania General Assembly included the concept of "watchers" in the then-newly enacted Pennsylvania Election Code, a statutory scheme addressing the administration of elections in the Commonwealth.  *See* 25 P.S. §§ 2600, *et. seq*.

29.     As it exists today, Election Code Section 417, codified at 25 P.S. § 2687, creates the position of watcher and entrusts to each candidate for nomination or election at any election, and each political party and each political body which has nominated candidates for such elections, the power to appoint watchers to serve in each election district in the Commonwealth.  *See* 25 P.S. § 2687(a).

30.     Under the Election Code, "poll watcher[s] perform[] a dual function on Election Day.  On the one hand, because [watchers] are designated and paid by [candidates, political parties, and/or political bodies], [their] job is to guard the interests of [their] candidates [or political parties or bodies].  On the other hand,

because the exercise of [their] authority promotes a free and fair election, poll watcher[s] serve to guard the integrity of the vote.  Protecting the purity of the electoral process is a state responsibility and [watchers'] statutory role in providing that protection involves [them] in a public activity, regardless of [their] private political motives."  *Tiryak*, 472 F. Supp. at 824.

31.    Under Election Code Section 417(b), watchers may observe the election process from the time the first polling place official appears in the morning to open the polling place until the time the polls are closed and the election returns are counted and posted at the polling place entrance.  25 P.S. § 2687(b).

32.    In addition to the activities authorized by Election Code Section 417(b), watchers are among those who are authorized under Election Code Section 1210(d), 25 P.S. § 3050(d), to challenge any person who presents himself or herself to vote at a polling place on Election Day concerning the voter's identity, continued residence in the election district, or registration status.  *See* 25 P.S. § 3050(d) ("any person, although personally registered as an elector, may be challenged by any qualified elector, election officer, overseer, or ***watcher*** at any primary or election as to his identity, as to his continued residence in the election district or as to any alleged violation of the provisions of section 1210 of this act, …") (emphasis added).

33.    Also, watchers are authorized under Election Code Section 1308(b), 25 P.S. § 3146.8(b), to be present when the envelopes containing absentee and mail-in ballots are opened, counted, and recorded.  25 P.S. § 3146.8(b).

34.    Moreover, watchers' functions go beyond the activities authorized under Election Code Sections 417(b) and 1210(d) on Election Day.

35.    For example, under Election Code Section 310, 25 P.S. § 2650, watchers appointed by parties, political bodies, or bodies of citizens may appear "at any public session  or sessions of the county board of elections," and "at any computation and canvassing of returns of any primary or election and recount of ballots or recanvass of voting machines," in which case such poll watchers may exercise the same rights as watchers at polling places and may raise objections to any ballots or machines for subsequent resolution by the county board of elections and appeal to the courts.  25 P.S. § 2650(a) & (c).

36.    In addition to watchers, the Election Code permits "representatives" of candidates and political parties to be involved in the pre-canvassing and canvassing of absentee and mail-in ballots.  *See* 25 P.S. § 3146.8(g)(1.1) & (2).

37.    The Election Code also authorizes "representatives" of candidates and political parties to be present when provisional ballots are examined to determine if the individuals voting such ballots are entitled to vote at the election districts in the election.  *See* 25 P.S. § 3050(a.4)(4).

38.     Election Code Section 417(b) provides that to be a watcher, a person must be "a qualified registered elector of the county in which the election district for which the watcher [is] appointed is located." 25 P.S. § 2687(b).

39.     Without watchers and representatives, the integrity of the vote in elections is threatened and the constitutional right to free and fair public elections under the United States Constitution is denied.

40.     Watchers and representatives serve as an important check to ensure transparency and guard against inconsistencies and other wrongdoing by election officials.  The need for watchers and representatives is demonstrated by the case of *United States v. DeMuro*, Criminal No. 20-112 (E.D. Pa. unsealed May 21, 2020). In that case, a former Judge of Elections in South Philadelphia pled guilty to adding fraudulent votes to the voting machines during Election Day – also known as "ringing up" votes – and then falsely certifying that the voting machine results were accurate for specific federal, state, and local Democratic candidates in the 2014, 2015, and 2016 primary elections.  The scheme involved a political consultant who purportedly solicited monetary payments from the candidates as "consulting fees," and then used portions of those funds to pay election board officials, including DeMuro, in return for ringing up votes.  DeMuro was able to commit the fraud because there were no poll watchers at his precinct.  *See United States v. DeMuro*, Criminal No. 20-112, Information (Doc. #1) (E.D. Pa Mar. 03, 2020); M. Cavacini,

"U.S. Attorney William M. McSwain Announces Charges and Guilty Plea of Former Philadelphia Judge of Elections Who Committed Election Fraud," U.S. Attys. Office – Pa., Eastern (May 21, 2020) (available at *https://www.justice.gov/usao-edpa/pr/us-attorney-william-m-mcswain-announces-charges-and-guilty-plea-former-philadelphia*.

41.     The importance of watchers and representatives serving as an important check in elections is recognized internationally. The International Institute for Democracy and Electoral Assistance issued a publication in 2002 called the *International Electoral Standards:  Guidelines for Review the Legal Framework of Elections*.  The purpose of the International IDEA standards is to be "used as benchmarks to assess whether or not an election is free and fair."  *International Electoral Standards* at v; *see also id.* at 6 ("These international standards are relevant to each component, and necessary for the legal framework to be able to ensure democratic elections.  This publication is intended to identify electoral standards which contribute to uniformity, reliability, consistency, accuracy and overall professionalism in elections.").  The sources for the *Standards* include numerous international Declarations, Charters, and Conventions, including many to which the U.S. is a signatory.  *See id.* at 7.

42.     As it relates to ballot counting and tabulation, the *Standards* set out as a general principle the following:

> A fair, honest and transparent vote count is a cornerstone of democratic elections.  This requires that votes be counted, tabulated and consolidated in the presence of the representatives of parties and candidates and election observers, and that the entire process by which a winner is determined is fully and completely open to public scrutiny.

*Standards*, at 77.

43.     "Regardless of whether ballots are counted at the polling station or at a central counting location or at both places, the representatives of parties and candidates and election observers should be permitted to remain present on this occasion."  *Id.* at 78.

44.     "The legal framework for elections should clearly specify that the representatives of parties and candidates and election observers be given, as far as practicable, certified copies of tabulation and tally sheets."  *Id.* at 78.  "As a necessary safeguard of the integrity and transparency of the election, the legal framework must contain a provision for representatives nominated by parties and candidates contesting the election to observe all voting processes."  *Id.* at 83.

45.     "[T]he representatives of parties and candidates should have the right to immediately query decisions made by polling officials or the implementation of voting procedures . . . ."  *Id.* at 84.  Per the *Standards*, representatives of parties and candidates should be permitted "[t]o observe all activity – with the exception of the marking of ballots by voters – within the polling station, from the check counting of ballots and sealing of ballot boxes prior to the commencement of voting to the final

packaging of material after close of voting; [t]o challenge the right of any person to vote; [and t]o query any decisions made by polling officials with the polling station[,] committee president and election management officials." *Id.* at 85. "The legal framework must also be clear and precise concerning what a domestic observer may not do, for instance, interfere with voting, take a direct part in the voting or counting processes, or attempt to determine how a voter will vote or has voted. It should strike a balance between the rights of observers and the orderly administration of the election processes. But in no case should it hinder legitimate observation, 'muzzle' observers, or prevent them from reporting or releasing information that has been obtained through their observations." *Id.* at 90.

### III.   The Perils of an Unmonitored Mail-In Voting System.

46.   Failing to uphold and ensure the adherence to even basic transparency measures or safeguards against the casting of illegal or unreliable ballots creates an obvious opportunity for ineligible voters to cast ballots, results in fraud, and undermines the public's confidence in the integrity of elections.

47.   According to the Carter-Baker Report, mail-in voting is "the largest source of potential voter fraud." Carter-Baker Report, p. 46. Many well-regarded commissions and groups of diverse political affiliation agree that "when election fraud occurs, it usually arises from absentee ballots." Michael T. Morley, *Election Emergency Redlines*, p. 2 (Mar. 31, 2020) (available at

*https://ssrn.com/abstract=3564829* or *http://dx.doi.org/10.2139/ssrn.3564829,* and referred to and incorporated herein by reference) (hereinafter, "Morley, Redlines"). Such fraud is easier to commit and harder to detect.  As one federal court put it, "absentee voting is to voting in person as a take-home exam is to a proctored one." *Griffin v. Roupas*, 385 F.3d 1128, 1131 (7th Cir. 2004).  *See also id.* at 1130-31 (voting fraud is a "serious problem" and is "facilitated by absentee voting.").

48.     Courts have repeatedly found that mail-in ballots are particularly susceptible to fraud.  As Justice Stevens has noted, "flagrant examples of [voter] fraud ... have been documented throughout this Nation's history by respected historians and journalists," and "the risk of voter fraud" is "real" and "could affect the outcome of a close election." *Crawford*, 553 U.S. at 195-96 (plurality op. of Stevens, J.) (collecting examples).  Similarly, Justice Souter observed that mail-in voting is "less reliable" than in-person voting.  *Crawford*, 553 U.S. at 212, n.4 (Souter, J., dissenting) ("'[E]lection officials routinely reject absentee ballots on suspicion of forgery.'"); *id.* at 225 ("[A]bsentee-ballot fraud . . . is a documented problem in Indiana.").  *See also Veasey v. Abbott,* 830 F.3d 216, 239, 256 (5th Cir. 2016) (en banc) ("[M]ail-in ballot fraud is a significant threat" — so much so that "the potential and reality of fraud is much greater in the mail-in ballot context than with in-person voting.")  *See also id.* at 263 ("[M]ail-in voting . . . is far more

vulnerable to fraud."); *id.* (recognizing "the far more prevalent issue of fraudulent absentee ballots").

49.     Pennsylvania is not immune to mail-in ballot fraud.  For example, in 1999, former Representative Austin J. Murphy was indicted by a Fayette County grand jury and then convicted of absentee ballot fraud for forging absentee ballots for residents of a nursing home and adding his wife as a write-in candidate for township election judge.  *See* B. Heltzel, "Six of seven charges against Austin Murphy dismissed," Pittsburgh Post-Gazette (June 22, 1999) (available at *http://old.post-gazette.com/regionstate/19990622murphy6.asp,* and referred to and incorporated herein by reference).  Similarly, in 2014, Richard Allen Toney, the former police chief of Harmar Township in Allegheny County pleaded guilty to illegally soliciting absentee ballots to benefit his wife and her running mate in the 2009 Democratic primary for town council.  *See* T. Ove, "Ex-Harmar police chief pleads guilty to ballot tampering," Pittsburgh Post-Gazette (Sept. 26, 2014) (available at *https://www.post-gazette.com/local/north/2014/09/26/Ex-Harmar-police-chief-pleads-guilty-to-ballot-tampering-Toney/stories/201409260172,* and referred to and incorporated herein by reference).  Further, in 2015, Eugene Gallagher pled guilty to unlawfully persuading residents and non-residents of Taylor in Lackawanna County to register for absentee ballots and cast them for him during his councilman candidacy in the November 2013 election.  *See* J. Kohut, "Gallagher

resigns from Taylor council, pleads guilty to three charges," The Times-Tribune (Apr. 3, 2015) (available at https://www.thetimes-tribune.com/news/gallagher-resigns-from-taylor-council-pleads-guilty-to-three-charges/article_e3d45edb-fe99-525c-b3f9-a0fc2d86c92f.html, and referred to and incorporated herein by reference). *See also Commonwealth v. Bailey*, 775 A.2d 881, 886 (Pa. Commw. Ct. 2001) (upholding defendant's conviction for absentee ballot violations, holding that a county district attorney has jurisdiction to prosecute such claims even in the absence of an investigation and referral by the Bucks County elections board); *In re Center Township Democratic Party Supervisor Primary Election*, 4 Pa . D. & C.4th 555, 557-563 (Pa. Ct. Com. Pl. Beaver 1989) (court ordered a run-off election after evidence proved that fifteen absentee ballots were applied for and cast by non-existent individuals whose applications and ballots were handled by a political ally of the purported winner).

50.     As part of the November 3, 2020 General Election, there are at least two Counties that had suspected instances of mail-in ballot fraud.  Fayette County experienced two different issues with their mail-in ballots leading up to Election Day. First, an issue caused by Pennsylvania's SURE software system as to the marking of online applications submitted prior to the June primary election with the "permanent mail-in" status caused some voters to receive duplicate ballots for the general election.  *See*  https://www.wpxi.com/news/top-stories/election-officials-

working-correct-mail-in-ballot-problems-fayette

county/NH5DSEM7EVE7LGZLMAN4CS52YE/.    Prior to November 3, 2020,

Fayette County uncovered an incident involving two voters who received mail-in

ballots that were already filled out and two ballots that were found at the election

bureau already opened with the secrecy envelope and the ballot missing out of those

envelopes. Ballots that were already filled out arrived at homes 40 miles apart. *See*

https://www.wtae.com/article/fayette-co-prosecutors-investigating-reports-of-

voters-receiving-mail-in-ballots-already-filled-out/34527256.    In late September

2020, officials in Luzerne County discovered that a temporary seasonal elections

worker had discarded into a trash bin nine (9) military ballots received in unmarked

envelopes,   7   of   which   were   all   cast   for   President   Trump.   *See*

https://www.wgal.com/article/federal-authorities-investigate-discarded-ballots-in-

luzerne-county-pennsylvania/34162209#.

51.    This risk of abuse by absentee or mail-in voting is magnified by the fact

that "many states' voter registration databases are outdated or inaccurate."  Morley,

Redlines, p. 2.  A 2012 study from the Pew Center on the States – which the U.S.

Supreme Court cited in a recent case - found that "[a]pproximately 24 million – one

of every eight – voter registrations in the United States are no longer valid or are

significantly inaccurate"; "[m]ore than 1.8 million deceased individuals are listed as

voters"; and "[a]pproximately 2.75 million people have registrations in more than

one state." *See* Pew Center on the States, *Election Initiatives Issue Brief*, "Inaccurate, Costly, and Inefficient: Evidence That America's Voter Registration System Needs an Upgrade," (Feb. 2012) (available at https://www.issuelab.org/resources/13005/13005.pdf, and referred to and incorporated herein by reference) (cited in *Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1838 (U.S. 2018)).

52.     Crucially as it pertains to Pennsylvania's registered voters, as recently as December 2019, the Auditor General of Pennsylvania, Eugene DePasquale, determined through an audit of Pennsylvania's Statewide Uniform Registry of Electors ("SURE"), administered by the Department of State, that there are more than 50,000 cases of potentially inaccurate voter records.  The Performance Audit Report noted that the audit "found too many instances of potentially bad data and sloppy recordkeeping."  *See* https://www.paauditor.gov/press-releases/auditor-general-depasquale-issues-audit-of-voter-registration-system-calls-for-changes-at-pennsylvania-department-of-state; https://www.paauditor.gov/Media/Default/Reports/Department%20of%20State_SURE%20Audit%20Report%2012-19-19.pdf.  The Department of State was provided 50 recommendations to strengthen their policies and management controls, one of which was to work with counties to resolve records management issues such a duplicative voter records. *See id.*  Mr. DePasquale criticized the Pennsylvania Department of State for its "lack of

cooperation and a failure to provide the necessary information" during the audit, including the "denial of access to critical documents and excessive redaction of documentation." *Id.* As a result, the Auditor General was "unable to establish with any degrees of reasonable assurance that the SURE system is secure and that Pennsylvania voter registration records are complete, accurate and in compliance with applicable laws, regulations, and related guidelines." *Id.*

53. Because of its inherent risk, absentee and mail-in voting is an election process that requires adequate procedural safeguards to deter fraud and ensure transparency.

54. One procedural safeguard that any absentee or mail-in ballot voting system must have is the ability of candidates, political parties, and the public at large to engage in meaningful, effective, and actual observation of the inspection, opening, counting, and recording of absentee and mail-in ballots in order to ensure that the election officers are uniformly applying the same rules and procedures to all absentee and mail-in voters and that only legitimately cast votes are counted and recorded.

## IV.   **Pennsylvania Enacts All-Voter Mail-in Voting.**

55. The Pennsylvania General Assembly may enact laws governing the conduct of elections. *Winston*, 91 A. at 522. However, no legislative enactment

may contravene the United States Constitution.  U.S. CONST. art. VI; *Shankey v. Staisey*, 257 A. 2d 897, 898 (Pa.), *cert. denied* 396 U.S. 1038 (1970).

56.    "Prior to the year 1957, the Pennsylvania Constitution permitted absentee voting only by individuals engaged in actual military service (Art. 8, § 6 of the Pennsylvania Constitution (1874)), and by bedridden or hospitalized veterans (Art. 8, § 18 added to the Pennsylvania Constitution (1949))." *Absentee Ballots Case*, 224 A.2d 197, 199 (Pa. 1966).

57.    In 1957, the Pennsylvania Constitution was further amended to permit absentee voting for those "qualified electors who may, on the occurrence of any election, be absent from the municipality of their residence, because their duties, occupation or business require them to be elsewhere or who, on the occurrence of any election, are unable to attend at their proper polling places because of illness or physical disability or who will not attend a polling place because of the observance of a religious holiday or who cannot vote because of election day duties, in the case of a county employee[.]" Pa. Const. art. VII, § 14.

58.    In 1960, the Election Code was amended to implement the 1957 amendment to the Pennsylvania Constitution. *Absentee Ballots Case*, 224 A.2d at 200. *See also* The Act of January 8, 1960, entitled "An Act amending the Act of June 3, 1937," P.L. 2135, 25 P.S. §§ 3149.1-3149.9 (Supp. 1960).

59.    "Absentee voting has consistently been regarded by the Pennsylvania courts as an extraordinary procedure in which the safeguards of the ordinary election process are absent." *Canvass of Absentee Ballots of April 28, 1964, Primary Election*, 34 Pa. D. & C.2d 419, 420 (Pa. Ct. Com. Pl. Phila. 1964).

60.    Specifically, "in the casting of an absentee ballot, the ordinary safeguards of a confrontation of the voter by the election officials and watchers for the respective parties and candidates at the polling place are absent." *Canvass of Absentee Ballots of April 28, 1964, Primary Election*, 34 Pa. D. & C.2d at 420.

61.    Because "it is fraught with evils and frequently results in void votes," Pennsylvania's laws regarding absentee voting are "strictly construed and the rights created thereunder not extended beyond the plain and obvious intention of the act." *Canvass of Absentee Ballots of April 28, 1964, Primary Election*, 34 Pa. D. & C.2d at 420-21 (citing *Decision of County Board of Elections*, 29 D.&C.2d 499, 506-7 (Pa. Ct. Com. Pl. 1962)). *See also Marks v. Stinson*, Civ. A. No. 93-6157, 1994 U.S. Dist. LEXIS 5273, at *78 (E.D. Pa. Apr. 26, 1994).

62.    Moreover, consistent with Pennsylvania's Statutory Construction Act, the Election Code's use of the word "shall" to identify the manner and other "technicalities" that an elector must follow to cast an absentee ballot are "substantive provisions" that are necessary to "safeguard against fraud" and preserve the "secrecy and the sanctity of the ballot and must therefore be observed," and ballots cast "in

contravention of [such] mandatory provision[s] are void." *In re Canvass of Absentee Ballots of Nov. 4, 2003 Gen. Election, 843 A.2d 1223, 1231-34 (Pa. 2004)*.

63.     On October 31, 2019, the Pennsylvania General Assembly enacted Act 77. *See* Act 2019-77 (S.B. 421), § 8, approved October 31, 2019, eff. October 31, 2019.

64.     Act 77 fundamentally changed the administration of elections in the Commonwealth of Pennsylvania in that, for the first time in its history, qualified Pennsylvania electors now have the choice to vote by mail, rather than in person on Election Day, without providing a reason or excuse.  *See*, *e.g.*, 25 P.S. §§ 3150.11-3150.17; *see also Pa. Dem. Party v. Boockvar*, Case No. 133 MM 2020, 2020 Pa. LEXIS 4872, at * 1 (Pa. Sept. 27, 2020).  Previously, the law offered electors who could not vote in person on the designated Election Day the ability to apply for and receive an absentee ballot, verifying they qualified based on a limited number of excuses outlined in the statute.  Pennsylvania held its first election under Act 77's no excuse mail-in ballot scheme during the Primary Election held on June 2, 2020. The November 3, 2020 election was the first General Election in Pennsylvania under the state's new mail-in voting scheme.

65.     Mail-in ballots are not automatically sent to electors in Pennsylvania. The Election Code requires that a person applying for both an absentee and a mail-in ballot complete a form with various information and sign the application.  *See* 25

P.S. § 3146.2(a)–(e); (the absentee ballot application "shall be signed by the applicant"); 25 P.S. § 3150.12(a)–(d); 25 P.S. § 3146.2(d) (except has not relevant here, "the application [for a mail-in ballot] shall be signed by the applicant."). The only exception to the signature requirement is for military, overseas and disabled voters. *Id.*

66.    Other than the signature requirement, there is no other proof of identification required to be submitted with the ballot applications. *See generally* 25 P.S. § 3146.2; 25 P.S. § 3150.12. When those ballots are being reviewed for approval, the board of elections is required to both (i) compare the information provided on the application with the information contained on the voter's permanent card and (ii) verify the proof of identification. *See* 25 P.S. § 3146.2b(c); 25 P.S. § 3150.12b(a). The board of elections' signature verification on the application is the only means available to it to verify the identity of the voter.

67.    For both absentee and mail-in voting, Act 77 retains the requirement that "the [non-disabled] elector shall send [his or her absentee or mail-in ballot] by mail, postage, except where franked, or deliver it in person to [the] county board of elections," in order for the ballot to be properly cast under Act 77. 25 P.S. §§ 3146.6(a) & 3150.16(a). Accordingly, as it did prior to the enactment of Act 77, the Election Code bars ballot harvesting of absentee and mail-in ballots cast by non-disabled voters. *See Crossey v. Boockvar*, Case No. 108 MM 2020, 2020 Pa. LEXIS

4868, at *4 (Pa., Sept. 17, 2020) ("It has long been the law of this Commonwealth, per 25 P.S. § 3146.6(a), that third-person delivery of absentee ballots is not permitted.  Act 77 adds a substantially identical provision for mail-in ballots, which we likewise conclude forbids third-party delivery of mail-in votes.") (citations omitted); *Absentee Ballots of Nov. 4, 2003 Gen. Election,* 843 A.2d at 1234 ("[W]e hold that Section 3146.6(a)'s 'in person' delivery requirement is mandatory, and that the absentee ballots of non-disabled persons who had their ballots delivered in contravention of this mandatory provision are void."); *Marks,* 1994 U.S. Dist. LEXIS 5273 at *83.

68.    Also, for both absentee and mail-in voting, Act 77 retains the requirement that an elector must comply with the following additional mandatory requirements for such ballot to be properly cast:

> [T]he [non-disabled] elector shall, in secret, proceed to mark the ballot only in black lead pencil, indelible pencil or blue, black or blue-black ink, in fountain pen or ball point pen, and then fold the ballot, enclose and securely seal the same in the envelope on which is printed, stamped or endorsed "Official Election Ballot." This envelope shall then be placed in the second one, on which is printed the form of declaration of the elector, and the address of the elector's county board of election and the local election district of the elector. The elector shall then fill out, date and sign the declaration printed on such envelope . . . .

25 P.S. §§ 3146.6(a) & 3150.16(a).

69.     Moreover, as it did prior to the enactment of Act 77, the Election Code bars the counting of an absentee or mail-in ballot that either lacks an "Official Election Ballot," or contains on that envelope "any text, mark or symbol which reveals the identity of the elector, the elector's political affiliation or the elector's candidate preference," or fails to contain a completed declaration that is signed and dated by the elector.  Election Code Sections 1306.6(a) and 1308(g)(i)-(iv), 25 P.S. §§ 3146.6(a) & 3146.8(g)(4)(i)-(iv).

70.     These provisions in the Election Code, as amended by Act 77, that identify exactly what an elector "shall" do to properly cast and vote an absentee or mail-in ballot serve to ensure the secrecy of such ballots and to prevent fraud.  *See Absentee Ballots of Nov. 4, 2003 Gen. Election,* 843 A.2d at 1232.  *See also id.* at 1234 (the Election Code's provisions of how to cast an absentee ballot are "substantive matters—how to cast a reliable vote—and not [] a mere procedural matter" that can be disregarded by a county board of elections); *Appeal of Yerger,* 333 A.2d 902, 907 (Pa. 1975) (the validity of a ballot must first be ascertained before any factual inquiry into the intention of the voter); *Appeal of James*, 105 A.2d 64, 66 (Pa. 1954) ("[V]iolations of substantive provisions of the [Election] Code cannot be overlooked on the pretext of pursuing a liberal construction.").

71.     Importantly, the Pennsylvania Supreme Court recently reaffirmed that "ballots that voters have filled out incompletely or incorrectly" shall be set aside and

declared void, and election boards are not permitted to afford these voters a "notice and opportunity to cure" procedure to remedy such defects. *Boockvar*, 2020 Pa. LEXIS 4872 at *55. The *Boockvar* Court further concluded "that a mail-in ballot that is not enclosed in the statutorily-mandated secrecy envelope *must be disqualified.*" *Id. at* *73 (emphasis added).

72.    However, in contrast to prior provisions of the Election Code, all absentee and mail-in ballots are no longer sent to polling places on Election Day and are no longer inspected by the local election boards or subject to challenge by watchers at the polling places. Instead, Act 77 mandates that all properly cast absentee and mail-in ballots are to be "safely ke[pt] . . . in sealed or locked containers" at the county boards of elections until they are canvassed by the county elections boards. Election Code Section 1308(a), 25 P.S. § 3146.8(a).

73.    Additionally, Act 77 requires that "no earlier than seven o'clock A.M. on election day," the county boards of elections shall meet to conduct a pre-canvass of all absentee and mail-in ballots received to that meeting. Election Code Section 1308(g)(1.1), 25 P.S. § 3146.8(g)(1.1). During the pre-canvass, the election officials shall inspect and open the envelopes of all absentee and mail-in ballots, remove such ballots from such envelopes, and count, compute and tally the votes reflected on such ballots. However, as part of the pre-canvass, the county election boards are

prohibited from recording or publishing the votes reflected on the ballots that are pre-canvassed.  Election Code 102(q.1), 25 P.S. § 2602(q.1).

74.    Further, contrary to prior provisions of the Election Code, Act 77 mandates that the county boards of elections are to meet no earlier than the close of polls on Election Day and no later than the third day following the election to begin canvassing absentee and mail-in ballots.  *See* Election Code Section 1308(g)(2), 25 P.S. § 3146.8(g)(2).  However, unlike a pre-canvass, the election officials during a canvass are permitted to record and publish the votes reflected on the ballots.  *See* Election Code 102(a.1), 25 P.S. § 2602(a.1).

75.    Act 77 prohibits an elector from casting both an absentee or mail-in ballot and in-person ballot, whether as a regular or provisional ballot.  Specifically, Act 77 provides:

> Any elector who receives and votes a mail-in ballot under section 1301-D shall not be eligible to vote at a polling place on election day.  The district register at each polling place shall clearly identify electors who have received and voted mail-in ballots as ineligible to vote at the polling place, and district election officers shall not permit electors who voted a mail-in ballot to vote at the polling place.

25 P.S. § 3150.16(b)(1).  *See also* Election Code 1306(b)(1), 25 P.S. § 3146.6(b)(1).

76.    Further, Act 77 provides that an elector who requests a mail-in or absentee ballot and who is not shown on the district register as having voted may vote only by provisional ballot at the polling place on Election Day, unless the

elector remits the unvoted mail-in or absentee ballot and the envelope containing the declaration of the elector to the judge of elections to be spoiled and the elector signs a statement under penalties of perjury that he or she has not voted the absentee or mail-in ballot.  25 P.S. §§ 3150.16(b)(2) & (3); 3146.6(b)(2) & (3).

77.     These restrictions and requirements under Act 77 were put in place to reduce the possibility that illegally cast and/or fraudulent ballots would be counted.

78.     On November 3, 2020, Pennsylvania conducted the General Election for national and statewide candidates; this was the first general election that followed the enactment of Act 77 and its no-excuse, mail-in voting alternative.

79.     However, Philadelphians "began in-person mail-in voting at the [S]atellite [O]ffices on September 29, 2020, sometime between 11:30 a.m. and 12:45 p.m.'" *Donald. J. Trump for President, Inc. v. Phila. Cnty. Bd. of Elections*, 983 CD 2020, at 7 n. 3 (Pa. Commw. Ct. Oct. 23, 2020) (McCullough, J.) (dissenting).

80.     In fact, "the presidential election is and has been happening since September 29, 2020. And all across America, news reports in Philadelphia and elsewhere have clearly conveyed that multi-millions of electors have already voted." *Id.* at p. 14-15.

81.     Out of the over 6.70 million votes cast for the Presidential election on November 3, 2020 in Pennsylvania, over 2.5 million of those votes were cast by mail-in or absentee ballot.

82.    Despite the unprecedented number of votes cast by absentee and mail-in ballots, Defendants failed to take adequate measures to ensure that the provisions of the Election Code enacted to protect the validity of absentee or mail-in ballots, including without limitation Act 77, were followed. This is crucial because the casting of votes in violation of the Election Code's mandatory provisions renders them void. *Absentee Ballots of Nov. 4, 2003 Gen. Election,* 843 A.2d at 1234.

## V.    The Department of State's "Guidance" Memos Published Ahead of the General Election.

### A.    *August 19, 2020 Guidance On Inner Secrecy Envelopes.*

83.    On the same day its guidance on the use of unmanned drop boxes and other ballot-collection sites was disseminated, the Pennsylvania Department of State, with the knowledge, approval, and/or consent of Secretary Boockvar, published and disseminated to all the County Election Boards another guidance titled "Pennsylvania Guidance for Missing Official Ballot Envelopes ('Naked Ballots')." A true and correct copy of the August 19, 2020 Naked Ballots guidance was available at the Pennsylvania Department of State's web site at https://www.dos.pa.gov/VotingElections/OtherServicesEvents/Documents/PADOS _NakedBallot_Guidance_1.0.pdf.

84.    In her Naked Ballot Guidance, Secretary Boockvar espoused "the … position that naked ballots should be counted pursuant to the Pennsylvania Election Code, furthering the Right to Vote under the Pennsylvania and United States

Constitutions[,]" that "[t]he failure to include the inner envelope ('Secrecy Envelope') does not undermine the integrity of the voting process[,]" and that "no voter should be disenfranchised for failing to place their ballot in the official election ballot envelope before returning it to the county board of election." *Id.*

85.     On September 17, 2020, the Pennsylvania Supreme Court rejected the Secretary's position and ruled that "the secrecy provision language in Election Code Section 3150.16(a) is mandatory and the mail-in elector's failure to comply with such requisite by enclosing the ballot in the secrecy envelope renders the ballot invalid." *Pennsylvania Democratic Party*, 2020 Pa. LEXIS 4872 at *72.

86.     Following the Pennsylvania Supreme Court's September 17, 2020 decision, Secretary Boockvar has removed the August 19, 2020 Naked Ballot guidance from the Pennsylvania Department of State's website.  However, she has not issued any guidance advising all 67 County Election Boards that they must *not* count non-compliant absentee or mail-in ballots, including, without limitation, those that lack an inner secrecy envelope, contain on that envelope any text, mark, or symbol which reveals the elector's identity, political affiliation, or candidate preference, do not include on the outside envelope a completed declaration that is dated and signed by the elector, and/or are delivered in-person by third-parties for non-disabled voters.

**B.     *Guidance On Approving Absentee and Mail-In Ballot Applications and Canvassing Absentee and Mail-In Ballots.***

87.     On September 11, 2020, the Pennsylvania Department of State, with the knowledge, approval, and/or consent of Secretary Boockvar, published and disseminated to all the County Election Boards a guidance titled "GUIDANCE CONCERNING EXAMINATION OF ABSENTEE AND MAIL-IN BALLOT RETURN ENVELOPES."   A true and correct copy of the September 11, 2020 Guidance is available at the Pennsylvania Department of State's web site at https://www.dos.pa.gov/VotingElections/OtherServicesEvents/Documents/Examination%20of%20Absentee%20and%20Mail-In%20Ballot%20Return%20Envelopes.pdf.

88.     Under the "Background" section of the September 11, 2020 Guidance, Secretary Boockvar states that "[b]efore sending [an absentee or mail-in] ballot to the applicant, the county board of elections confirms the qualifications of the applicant by verifying the proof of identification and comparing the information provided on the application with the information contained in the voter record[,]" that "[i]f the county is satisfied that the applicant is qualified, the application must be approved[,]" and that "[t]his approval shall be final and binding, except that challenges may be made only on the grounds that the applicant was not a qualified voter . . . ."

89.    Yet, the Election Code mandates that for non-disabled and non-military voters, all applications for an absentee or mail-in ballot "shall be signed by the applicant."  25 P.S. §§ 3146.2(d) & 3150.12(c).

90.    Moreover, because of the importance of the applicant's signature and the use of the word "shall," Pennsylvania courts have consistently upheld challenges to absentee ballots that have been cast by voters who did not sign their absentee ballot applications.  *See, e.g., Opening of Ballot Box of the First Precinct of Bentleyville, 598 A.2d 1341, 1343 (Pa. Commw. Ct. 1991).*

91.    Except for first-time voters, the only basis under the Election Code for the identification of any voter, whether voting in-person or by absentee or mail-ballot, is by confirmation of the presence of the voter's signature.

92.    Before one can cast a regular ballot at a polling place on Election Day, that voter is subject to the following signature comparison and challenge process:

> (1) All electors, including any elector that shows proof of identification pursuant to subsection (a), shall subsequently sign a voter's certificate in blue, black or blue-black ink with a fountain pen or ball point pen, and, unless he is a State or Federal employee [sic] who has registered under any registration act without declaring his residence by street and number, he shall insert his address therein, and hand the same to the election officer in charge of the district register.
>
> (2) Such election officer shall thereupon announce the elector's name so that it may be heard by all members of the election board and by all watchers present in the polling place and **shall compare the elector's signature**

***on his voter's certificate with his signature in the district register. If, upon such comparison, the signature upon the voter's certificate appears to be genuine, the elector who has signed the certificate shall, if otherwise qualified, be permitted to vote:*** Provided, That if the signature on the voter's certificate, as compared with the signature as recorded in the district register, shall not be deemed authentic by any of the election officers, such elector shall not be denied the right to vote for that reason, but shall be considered challenged as to identity and required to make the affidavit and produce the evidence as provided in subsection (d) of this section.

25 P.S. § 3050(a.3)(1) – (2)(2020) (emphasis added).

93.     Similarly, under Election Code Section 1308(g)(3)-(7), "[w]hen the county board meets to pre-canvass or canvass absentee ballots and mail-in ballots . . ., the board shall examine the declaration on the envelope of each ballot not set aside under subsection (d) and shall compare the information thereon with that contained in the 'Registered Absentee and Mail-in Voters File,' the absentee voters' list and/or the 'Military Veterans and Emergency Civilians Absentee Voters File,' whichever is applicable. If the county board has verified the proof of identification as required under this act and is satisfied that the declaration is sufficient and the information contained in the 'Registered Absentee and Mail-in Voters File,' the absentee voters' list and/or the 'Military Veterans and Emergency Civilians Absentee Voters File' verifies his right to vote, the county board shall provide a list of the names of electors whose absentee ballots or mail-in ballots are to be pre-canvassed or canvassed." 25 P.S. § 3146.8(g)(3).  Further, only those ballots "that

have been verified under paragraph (3) shall be counted . . . ." 25 P.S. § 3146.8(g)(4). If a ballot is not counted because of a lack of a signature, it is considered "challenged" and subject to the notice and hearing provisions under Section 1308(g)(5)-(7).  25 P.S. § 3146.8(g)(5)-(7).

94.     The Pennsylvania Election Code authorizes the County Election Boards to set aside and challenge returned absentee or mail-in ballots that do not contain the signatures of voters and for which the County Election Boards did not verify the signature of the electors before the mail-in ballot was separated from the outer envelope.

95.     County Elections Boards failure and refusal to set aside and challenge returned absentee or mail-in ballots that do not contain the signatures of voters in the November 3, 2020 General Election has resulted in the arbitrary, disparate, and unequal treatment between those who vote in-person at the polling place versus those who vote by absentee or mail-in ballot.

96.     In addition, the disparate treatment between mail-in and in person voters as to the verification of the voter's identity through signature verification has created an environment in Pennsylvania that encourages ballot fraud or tampering and prevents the Commonwealth and the County Election Boards from ensuring that the results of the November 3, 2020 General Election are free, fair, and transparent.

97.    As a result of the manner in which the County Election Boards were directed to conduct the election including the canvassing of mail-in ballots, the validity of Pennsylvanians' votes have been unconstitutionally diluted through Defendants' arbitrary, disparate, and/or uneven approval of all absentee and mail-in ballots without performing the requisite verification of the voter's signature, resulting in the treatment of by-mail and in-person voters across the state in an unequal fashion in violation of state and federal constitutional standards.

98.    The Department of State issued an additional deficient guidance related to the issue of signature verification on September 28, 2020 related to the issue of signature verification titled "GUIDANCE CONCERNING CIVILIAN ABSENTEE AND MAIL-IN BALLOT PROCEDURES."   (App. Ex. 25.)[1]   This most recent guidance provides additional information about the acceptance and scrutiny of mail-in and absentee ballots for the General Election and not only fails to remedy but doubles down on the illegal September 11 guidance forbidding signature verification as a reason to set aside both mail-in ballots and ballot applications as well.   In this September 28 guidance memo, the Secretary proclaims that "[t]he Election Code does not permit county election officials to reject applications or voted ballots based

---

[1]    Judicial notice of the Secretary's September 28, 2020 guidance memo is appropriate.  *See Miller v. City of Bradford*, No. 17-268 Erie, 2019 U.S. Dist. LEXIS 134248, at *7 n.4 (W.D. Pa. Aug. 9, 2019)  ("The Court takes judicial notice of these provisions, as they constitute matters of public record.").

solely on signature analysis." (*Id.*, at p. 9.)   She then goes even further and pronounces that "[n]o challenges may be made to mail-in and absentee ballots at any time based on signature analysis."  (*Id.*)

99.     Secretary Boockvar continued to issue guidance to the counties in direct contradiction of the Election Code up until the of the eve of the election.  On November 1, 2020, Secretary Boockvar, with no authority to do so, extended the Election Code's mandatory deadline for voters to resolve proof of identification issues with their mail-in and absentee ballots.[2]

## VI.   Defendants' Inconsistent and Uneven Administration of the 2020 General Election Violated the Election Code and Infringed Plaintiffs' Constitutional Rights to Free, Fair and Transparent Public Elections.

100.   As of the filing of this complaint, 6,743,874 million votes were cast for President in Pennsylvania, with approximately 2,635,090 ballots returned and cast by absentee or mail-in ballots (approximately 3.1 million absentee and mail-in ballots were approved and sent to electors for the General Election).[3]

101.   In the named County Elections Boards, the following are the number of canvassed and tabulated absentee and mail-in ballots:

---

[2]     The Trump Campaign filed a Petition for Review challenging the validity of the November 1, 2020 guidance which is currently pending before the Commonwealth Court of Pennsylvania in *Donald J. Trump for President, Inc., et al. v. Boockvar*, Case No. 602 M.D. 2020 (Pa. Commw. Ct. 2020).

[3]     References contained herein to the November 3, 2020 election results in Pennsylvania are derived from https://www.electionreturns.pa.gov/.

    a.  Allegheny:  335,573

    b.  Centre:     32,514

    c.  Chester:   148,465

    d.  Delaware:  127,751

    e.  Montgomery:   238,122

    f.  Northampton:   71,893

    g.  Philadelphia:   345,197

102.   Despite the fact that well over a third of the votes were cast by mail, Secretary Boockvar and the Pennsylvania Department of State did not undertake any meaningful effort to prevent the casting of illegal or unreliable absentee or mail-in ballots and/or to ensure the application of uniform standards across the County Election Boards to prevent the casting of such illegal or unreliable ballots.  Rather, Secretary Boockvar has exercised every opportunity to do quite the opposite, thereby sacrificing the right to vote by those who legally cast their ballots (whether in-person or through properly cast absentee or mail-ballots) through the unlawful dilution or debasement of the weight of their vote.

### A.   *The Prevalence of Unsolicited Mail-In Votes*

103.   Throughout the Commonwealth, including in the named County Election Boards, numerous voters reported receiving mail-in ballots, even though they did not apply for them.

104. Worse, numerous voters reported have received multiple mail-in ballots, in some documented cases as many as four or five ballots, again, even though they had not themselves submitted applications for mail-in ballots.

105. Moreover, at the polling locations on Election Day, voters were informed that they must vote provisionally because they had applied for mail-in votes, even though those voters report that they neither applied for nor received mail-in ballots. Poll watchers throughout the state observed similar incidents.

106. Voters reported being denied the right to vote in person because they had been told that they had already voted by mail-in or absentee ballots, even though they appeared at their polling place with their un-voted mail-in or absentee ballots in hand. In many cases, those voters were required to vote provisionally in-person at the polls.

107. Plaintiffs also have reports of voters who were visited at home in the weeks before the election by individuals soliciting their participation in mail-in voting. Those voters report that even though they never applied for mail-in ballots, they did receive mail in ballots, and when they attempted to vote in person were told that they had voted by mail. In at least two documented cases, even though poll workers told the voters that they were recorded as having already voted by mail, they were allowed to vote in person by live ballot on the voting machines.

108.   Other voters reported having received unsolicited and un-applied for mail-in ballots, but when they went to their in-person polling place, the poll books reflected that no mail-in ballot had been sent.

109.   A witness, who was required to vote provisionally because the voter was identified as having requested a mail-in ballot even though the voter had not done so, contacted the Allegheny County elections office to complain about having to submit a provisional ballot and was advised that a larger number of Republican voters experienced the same issue.

**B.**   ***The Misadministration of the Election by the County Election Boards and Poll Workers.***

110.   In Montgomery County, a poll watcher observed a Judge of Elections pull aside voters who were not listed in the poll books as registered to vote.  The poll watcher reports hearing the Judge of Elections tell those voters that they needed to return later and report their name as another name that was in the poll book.

111.   Across numerous counties, poll watchers observed poll workers mishandling spoiled mail-in or absentee ballots brought to the polling place by voters who intended to vote in-person.  Rather than disposing of the spoiled ballots securely, the spoiled ballots were instead placed in unsecured boxes or in stacks of paper despite the protests of voters or poll watchers.  For instance in Centre County, a poll worker observed mail-in ballots being improperly spoiled.  The workers

placed the mail-in ballots returned to the polling place by in-person voters in a bag without writing "void" on them or otherwise destroying them.

112.   In at least one case, a voter brought the voter's own secrecy envelope to the polling place after realizing that the voter had failed to include it when returning the mail-in ballot.  The voter was not permitted to submit a provisional ballot in accordance with the statute.

113.   In Allegheny County, Plaintiffs have received reports that poll workers were observing voters vote provisionally in such a way that the poll worker could determine which candidates the elector voted on their provisional ballot.

114.   In Centre County, a poll worker reported that persons appearing at the polls and admitting that they were New Jersey voters, rather than Pennsylvania voters, were nonetheless provided provisional ballots on which to vote.

115.   In Chester County, a representative watcher present during the pre-canvass observed the elections workers counting a reported 15% of mail-in ballots that were sliced or otherwise damaged during the mechanized ballot opening process.  Some of those ballots were cut in half and workers had a hard time identifying how to address and/or to rectify the issue.

116.   In Chester County, an observer witnessed a flawed resolution process for over-voted and under-voted ballots.  The observer witnessed one election worker responsible for resolving over-voted and under-voted ballots by subjectively

determining who the elector intended to choose on the empty votes.  The observer reports that in numerous instances the election worker altered the over-voted ballot by changing votes that had been marked for Donald J. Trump to another candidate.

117.   In Delaware County, an observer at the county office observed issues related to mail-in voted ballots being scanned through machines four or five times before finally being counted.  When a voting machine warehouse supervisor arrived to address whether the machine was malfunctioning, the supervisor instead reported that the bar codes on the ballots must be "defective."

118.   In Delaware County, poll watchers observed in at least seven (7) different polling locations numerous instances of voters who were told they had registered to vote by mail, but were given regular ballots, rather than provisional ballots, *and were not made to sign in the registration book*.

119.   Mail carriers have noted significant anomalies related to the delivery of mail-in ballots.  A mail carrier for the USPS in Erie County has noted that during the course of the General Election mail-in ballot delivery period there were multiple instances in which dozens of mail-in ballots were addressed to single addresses, each ballot being in a different name.  Based on the carrier's experience delivering mail to those addresses, the carrier is aware that the people whose names were on the ballots are not names of people who live at those addresses.   In addition, ballots

were mailed to vacant homes, vacation homes, empty lots, and to addresses that do not exist.

120.   It has been reported by Project Veritas, in a release on November 5, 2020, that carriers were told to collect, separate and deliver all mail-in ballots directly to the supervisor.  In addition, Plaintiffs have information that the purpose of that process was for the supervisor to hand stamp the mail-in ballots.

### C.   *Uneven Treatment of Absentee and Mail-Ballots That Fail to Include a Secrecy Envelope or Otherwise Comply with the Mandates of the Election Code.*

121.   The statutory provisions in the Election Code and Act 77 involving absentee and mail-in ballots do not repose in either Secretary Boockvar or the County Election Boards the free-ranging power to attempt to ascertain voter intent or rule out fraud when a vote has been cast in violation of its explicit mandates. While voter intention may be paramount in the realm of the fundamental right to vote, ascertaining that intent necessarily assumes a properly cast ballot..

122.   By enacting the inner secrecy envelope proscription and the other mandates for the casting of a "reliable vote" via an absentee or mail-in ballot, the General Assembly weighed the factors bearing on that question, and it did not vest, and has not vested, any discretion or rule-making authority in Secretary Boockvar and/or the County Election Boards to reweigh those factors in determining whether

or not to count a particular absentee or mail-in ballot should be counted. *Pennsylvania Democratic Party*, 2020 Pa. LEXIS 4872 at *73.

123.   Pennsylvania prominently included secrecy envelope instructions in its mail-in ballot and absentee ballot mailings, and in the months and weeks leading up to the election, repeated those instructions on its website and on its social media postings.   *See,   e.g.*,   https://www.votespa.com/Voting-in-PA/Pages/Mail-and-Absentee-Ballot.aspx

124.   Local officials also engaged in media campaigns to encourage voters to remember not to send their ballots in "naked," *i.e.* without the secrecy envelope.  The "naked ballot" ad campaign even included several local celebrities and election officials appearing on social media topless to remind the public about the inner envelope.

125.   As a result, Boards of Elections in many counties decided to follow the rules and not pre-canvass absentee ballots early.  For example, a Democrat poll watcher approached Joe Kantz, the Chairman of the Board of Elections for Snyder County, and asked him for information on spoiled ballots so that he, the poll watcher, and his team could cure them.  After speaking with the county solicitor, Chairman Kantz declined to violate the statute, instead electing to begin the pre-canvass of mail-in ballots on its statutory start-time:  election day.

126.   But certain other County Election Boards proceeded to pre-canvass mail-in ballot envelopes prior to Election Day on November 3, 2020, and for those ballots that lacked an inner secrecy envelope, the voters were notified prior to Election Day in order to cure the invalidity by voting provisionally on Election Day at their polling location.

127.   Take Philadelphia County, for example. As reflected in a document titled "Cancelled Ballot Notification Information," Philadelphia County sent a "notification" to voters whose "ballot was cancelled" because, among other reasons, the ballot "was returned without a signature on the declaration envelope" or "was determined to lack a secrecy envelope." Philadelphia County allowed those voters to cure this defect by casting a "provisional ballot on Election Day" or requesting "a replacement ballot at a satellite election office." Philadelphia City Comm'rs, *Cancelled Ballot Notification Information*, bit.ly/3la08LR (last visited Nov. 7, 2020).

128.   To figure out which voters should be notified, Philadelphia County had to inspect the mail-in ballots before election day—in plain violation of state law. *See* 25 P.S. §3146.8. This required substantial manipulation: Officials in Philadelphia County were determining whether ballots were missing an inner secrecy envelope, for example, which cannot be determined without manipulating the outer envelope—feeling the envelope, holding the envelope up to the light, weighing the

envelope through sorting or scanning equipment, etc.  This kind of tampering squarely undermines the legislature's "mandate" that mail-in voting cannot compromise "fraud prevention" or "ballot secrecy." *Pa. Democratic Party*, 2020 Pa. LEXIS 4872, at *26.

129.   Secretary Boockvar encouraged this unlawful behavior.   In an November 2, 2020 email sent at approximately 8:30 p.m. on the eve of the November 3, 2020 General Election, her office suggested that counties "should provide information to party and candidate representatives during the pre-canvass that identifies the voters whose ballots have been rejected" so that those voters "may be issued a provisional ballot."

130.   While counties like the Defendant County Boards of Elections permitted voters to cast either replacement absentee and mail-in ballots before Election Day or provisional ballots on Election Day in order to cure their defective mail-in ballots, many more counties did not.  Lancaster, York, Westmoreland and Berks Counties, for example, did not contact voters who submitted defective ballots or give them an opportunity to cure.  They simply followed the law and treated these ballots as invalid and refused to count them.

131.   Because the counties that followed state law and did not provide a cure process are heavily Republican (and counties that violated state law and did provide a cure process are heavily Democratic), Defendants' conduct harmed the Trump

Campaign.  It deprived the President of lawful votes and awarded his opponent with unlawful votes.

**D.**     *Uneven Treatment of Watchers and Representatives at the County Election Boards' Canvassing of Ballots.*

132.   In every instance where an absentee or mail-in ballot is opened and canvassed by a county election board, poll watchers and canvass representatives are legally permitted to be present.  *See* Election Code Section 1308(b), 25 P.S. § 3146.8(b) ("Watchers shall be permitted to be present when the envelopes containing official absentee ballots and mail-in ballots are opened and when such ballots are counted and recorded."); *see also* 25 P.S. § 3146.8(g)(1.1) and (g)(2).

133.   Poll watchers and canvass representatives serve the important purpose of assuring voters, candidates, political parties, and political bodies, who may question the fairness of the election process, that the same is conducted in compliance with the law, and is done in a correct manner which protects the integrity and validity of the vote and ensures that all elections are free, open, fair, and honest.

134.   Defendants have not allowed watchers and representatives to be present when the required declarations on envelopes containing official absentee and mail-in ballots are reviewed for sufficiency, when the ballot envelopes are opened, and when such ballots are counted and recorded.  Instead, watchers were kept by security personnel and a metal barricade from the area where the review, opening, and

counting were taking place.  Consequently, it was physically impossible to view the envelopes or ballots.

135.   In Centre County, the central pre-canvassing location was a large ballroom.  The set-up was such that the poll watchers did not have meaningful access to observe the canvassing and tabulation process of mail-in and absentee ballots, and in fact, the poll watchers and observers who were present could not actually observe the ballots such that they could confirm or object to the validity of the ballots.

136.   In Philadelphia County, poll watchers and canvass representatives were denied access altogether in some instances.

137.   In Delaware County, observers were denied access to a back room counting area. After a court-ordered injunction, the poll watchers and canvass representatives were finally allowed in the back room counting area on November 5, 2020, to observe, but for only five minutes every two hours.  During the allowed observation time in the back room counting area, the observers witnessed tens of thousands of paper ballots.

138.   Other Pennsylvania Counties provided watchers with appropriate access to view the ballots as required by Commonwealth law.  However, Defendants intentionally denied the Trump Campaign access to unobstructed observation and ensure opacity, denying Plaintiffs and the residents of Pennsylvania the equal protection of the law.

139.   With particular regard to the Philadelphia County Board of Elections, the Board would not permit the Trump Campaign's watchers to be within 6 feet of "all aspects" of the pre-canvassing process in direct contravention of Commonwealth Court Judge Christine Fizzano Cannon's November 5, 2020 Order "requiring that all candidates, watchers, or candidate representatives be permitted to be present for the canvassing process pursuant to 25 P.S. § 2650 and/or 25 P.S. § 3146.8 and be permitted to observe all aspects of the canvassing process within 6 feet." *See In Re: Canvassing Observation*, 11/05/2020 Order, 1094 C.D. 2020 (Pa. Commw. Ct. 2020).

140.   The Order required the Philadelphia Board of Elections to comply and allow watcher to be within 6 feet by 10:30 a.m., but at 10:35 a.m. the workers were denied entry.   Instead, the Board sent all of the workers on a break (previously workers received breaks on a rolling basis), and the Commissioners met offsite.   Two hours later the workers returned, and the watchers were allowed to be within 6 feet, but within 6 feet of the first row of counters only.   Within a short period of time, the workers began working at other rows that were well-beyond 6-feet, rendering it impossible for watchers to observe the rows that were more than 25-feet beyond the area where watchers were allowed. Moreover, during the course of the entire period, the workers repeatedly removed ballots, sometimes over 100 feet away, to do

something with them, which the Trump Campaign's watchers were unable to observe.

141.   Other Counties in the Commonwealth afford watchers the right to be present – that is, to be able to meaningfully view and even read – when official absentee and mail-in ballots are reviewed, being opened, counted, or recorded as required by 25 P.S. § 3146.8(b).

142.   It is estimated that 680,770 ballots were processed by the Allegheny and Philadelphia County Boards of Elections when no observation was allowed.

143.   A shocking number of mail-in ballots have inexplicably appeared in counties since the November 4 ballot reports.  For instance, in Delaware County, the county's Wednesday, November 4 report indicated that Delaware County reported it has received about 113,000 mail-in ballots and counted approximately 93,000 voted ballots.  On the next day, November 5, the Secretary of the Commonwealth's 4:30 report reflected that Delaware County had received about 114,000 ballots.  Several hours later, the Delaware County solicitor reported to an observer that the County had received about 126,000 mail-in ballots and counted about 122,000.  As of Sunday, November 8, 2020, the Department of State's website reflects that the County has counted about 127,000 mail-in ballots.  Plaintiffs have received no explanation for where the additional 14,000 voted ballots came from, when they arrived, or why they are included in the current count.

### E.   *Mail-in Ballots Received After 8 p.m. On Election Day*

144.   In Delaware County, an observer in the county office where mail-in ballots were counted was told by the Delaware County Solicitor that ballots received on November 4, 2020, were not separated from ballots received on Election Day, and the County refused to answer any additional questions.

145.   Also in Delaware County, an observer in the county office where mail-in ballots were counted witnessed a delivery on November 5, 2020, of v-cards or USB drives in a plastic bag with no seal and no accompanying paper ballots.  The v-cards or USB drives were taken to the back counting room, where observer access was limited.  There was no opportunity to observe what happened to the v-cards or USB drives in the back counting room.

## VII.   <u>Need for Emergency Judicial Intervention.</u>

146.   The Equal Protection Clause mandates that the Commonwealth provide and use in every County the same statewide uniform standards and regulations when conducting statewide or multi-county elections involving federal candidates, including without limitation the standards and regulations providing for the casting and counting of votes.  *Pierce*, 324 F. Supp. 2d at 698-99.  In other words, the Equal Protection Clause requires every county in the Commonwealth to enforce and apply the same standards and procedures for an election, and it does not allow a select few counties to either decline to enforce or employ those standards or develop their own

contradicting standards that benefit their voters to the detriment of voters outside their counties. *Id.*

147.   For statewide elections involving federal candidates, Defendants' allowance, by act or omission, of the collection and counting of in-person, provisional, and absentee and mail-in ballots in a manner and at locations that are contrary to the Election Code's mandatory provisions (as set forth above) constitutes legislative action by the Executive Branch in violation of the Elections and Electors Clauses of the United States Constitution.

148.   Finally, the Defendants' lack of statewide standards and use of a patchwork of ad-hoc rules that vary from county to county in a statewide election involving federal and state-wide candidates violates the Equal Protection Clause of the Fourteenth Amendment. *Pierce*, 324 F. Supp. 2d at 698-99.

149.   Because the standards in the conduct of statewide elections involving federal and state candidates, including without limitation the casting and counting of votes, are to be uniform, Plaintiffs have a vested interest in ensuring that the electoral process is properly administered in every election district. However, the administration of the November 3, 2020 General Election across the counties of the Commonwealth, in particular in the named County Election Boards, was far from uniform and did not follow legal strictures.

<u>**COUNT I**</u>

**Fourteenth Amendment**
**U.S. Const. Amend. XIV, 42 U.S.C. § 1983**
**Denial of Equal Protection**
**Disparate Treatment of Absentee/Mail-In Voters Among Different Counties**

150.    Plaintiffs incorporate each of the prior allegations in this Complaint.

151.    According to the Supreme Court, the Fourteenth Amendment of the United States Constitution protects the "the right of all qualified citizens to vote … in federal elections." *Reynolds*, 77 U.S. at 554.   Consequently, state election laws may not "deny to any person within" the state's "jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, §1, cl. 4.

152.    The Equal Protection Clause requires States to "'avoid arbitrary and disparate treatment of the members of its electorate.'" *Charfauros v. Bd. of Elections*, 249 F.3d 941, 951 (9th Cir. 2001) (*quoting Bush*, 531 U.S. at 105).   That is, each citizen "has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Bloomstein*, 405 U.S. 330, 336 (1972).  A qualified voter "is no more nor no less so because he lives in the city or on the farm. This is the clear and strong command of our Constitution's Equal Protection Clause." *Reynolds*, 377 U.S. at 568; *see also Gray v. Sanders*, 372 U.S. 368, 380 (1963) ("The idea that every voter is equal to every other voter in his State, when he casts his ballot in favor of one of several competing candidates, underlies many of [the Supreme Court's] decisions.").   "[H]aving once granted the right to

vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush*, 531 U.S. at 104-05.

153.   "The right to vote extends to all phases of the voting process, from being permitted to place one's vote in the ballot box to having that vote actually counted. Thus, the right to vote applies equally to the 'initial allocation of the franchise' as well as 'the manner of its exercise.' Once the right to vote is granted, a state may not draw distinctions between voters that are inconsistent with the guarantees of the Fourteenth Amendment's equal protection clause." *Pierce,* 324 F. Supp. 2d at 695.

154.   "[T]reating voters differently" thus "violate[s] the Equal Protection Clause" when the disparate treatment is the result of arbitrary, ad hoc processes. *Charfauros*, 249 F.3d at 954. Indeed, a "minimum requirement for non-arbitrary treatment of voters [is] necessary to secure the fundamental right [to vote]." *Bush,* 531 U.S. at 105.

155.   The use of "standardless" procedures can violate the Equal Protection Clause. *Bush,* 531 U.S. at 103. "The problem inheres in the absence of specific standards to ensure … equal application" of even otherwise unobjectionable principles. *Id.* at 106. Any voting system that involves discretion by decision makers about how or where voters will vote must be "confined by specific rules designed to ensure uniform treatment." *Id. See also Thomas v. Independence Twp.,*

463 F.3d 285, 297 (3d Cir. 2006) (Equal Protection Clause prohibits the "selective enforcement" of a law based on an unjustifiable standard); *United States v. Batchelder*, 442 U.S. 114, 125 n.9, 99 S. Ct. 2198, 60 L. Ed. 2d 755 (1979).

156.   Allowing a patchwork of different rules from county to county, and as between similarly situated absentee and mail-in voters, in a statewide election involving federal and state candidates implicates equal protection concerns. *Pierce, 324 F. Supp. 2d at 698-99*. *See also Gray*, 372 U.S. at 379-81 (a county unit system which weights the rural vote more heavily than the urban vote and weights some small rural counties heavier than other larger rural counties violates the Equal Protection Clause and its one-person, one-vote jurisprudence).

157.   The equal enforcement of election laws is necessary to preserve our most basic and fundamental rights.  Moreover, the requirement of equal treatment is particularly stringently enforced as to laws that affect the exercise of fundamental rights, *see Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015), including the right to vote.

158.   Because of Defendants' conduct, voters in some counties have been and are being treated differently than voters in other counties—and for no good reason. A voter in any of the counties covered by the Defendant County Elections Boards, who received notice of a defective mail-in ballot and an opportunity to cure it by correcting the ballot or casting a new one before Election Day or by casting a

provisional ballot at the polling place on Election Day, has had or may have his vote counted.  But voters like Mr. Henry, who received no such opportunity, will not, as their votes were rejected as having been improperly cast and thus void.  In addition, voters in Republican-leaning counties who failed to fully fill out their mail or absentee ballot envelopes had their ballots rejected, while voters in Democrat-leaning counties who similarly failed to fill out their mail or absentee ballot envelopes had their ballots counted.

159.   That "different standards have been employed in different counties across the Commonwealth of Pennsylvania to determine whether an absentee ballot should be counted" is the "kind of disparate treatment" that violates "the equal protection clause because uniform standards will not be used statewide to discern the legality of a vote in a statewide election."  *Pierce*, 324 F. Supp. 2d at 699.

160.   Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm unless the injunctive relief requested herein is granted.

## COUNT II

### U.S. Const. Art. I, §4, & Art. II, § 1
**Violation of the Electors & Elections Clauses**

161.   Plaintiffs incorporate each of the prior allegations in this complaint.

162.   The Electors Clause states that "[e]ach State shall appoint, in such Manner as *the Legislature* thereof may direct, a Number of Electors" for President. Art. II, § 1, cl. 2 (emphasis added).  Likewise, the Elections Clause of the U.S.

Constitution states that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by *the Legislature* thereof." Art. I, § 4, cl. 1 (emphasis added).

163.   The Legislature is "'the representative body which ma[kes] the laws of the people.'" *Smiley*, 285 U.S. at 1932.

164.   Regulations of congressional and presidential elections, thus, "must be in accordance with the method which the state has prescribed for legislative enactments." *Id.* at 367; *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2668 (2015).

165.   In Pennsylvania, "[t]he legislative power of this Commonwealth shall be vested in a General Assembly, which shall consist of a Senate and a House of Representative." Pa. Const. Art. II, § 1.  *See also Winston*, 91 A. at 522; *Patterson,* 60 Pa. at 75.

166.   Defendants, as a member of the Governor's Executive Board and county boards of elections, are not part of the General Assembly and cannot exercise legislative power.  Rather, Defendants' power is limited to "tak[ing] care that the laws be faithfully executed." Pa. Const. Art. IV, § 2.

167.   Because the United States Constitution reserves for the General Assembly the power to set the time, place, and manner of holding elections for the President and Congress, county boards of elections and state executive officers have

no authority to unilaterally exercise that power, much less to hold them in ways that conflict with existing legislation.

168.   According to the Pennsylvania Supreme Court, "although the Election Code provides the procedures for casting and counting a vote by mail, it does not provide for the 'notice and opportunity to cure' procedure[.]" *Pa. Democratic Party, 2020 Pa. LEXIS 4872, at \*56*.  Moreover, "[t]o the extent that a voter is at risk for having his or her ballot rejected due to minor errors made in contravention of those requirements, … the decision to provide a 'notice and opportunity to cure' procedure to alleviate that risk is one best suited for the Legislature[,] . . . particularly in light of the open policy questions attendant to that decision, including what the precise contours of the procedure would be, how the concomitant burdens would be addressed, and how the procedure would impact the confidentiality and counting of ballots, all of which are best left to the legislative branch of Pennsylvania's government." *Id*.

169.   Defendants are not the legislature, and their unilateral decision to create a cure procedure violates the Electors and Elections Clauses of the United States Constitution.

170.   Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm unless the injunctive relief requested herein is granted.

WHEREFORE, in addition to any other affirmative relief that the Court may deem necessary and proper, Plaintiffs ask this Court to enter judgment in their favor and provide the following alternative relief:

    i.    An order, declaration, and/or injunction that prohibits the Defendant County Boards of Elections and Defendant Secretary Boockvar from certifying the results of the 2020 General Election in Pennsylvania on a Commonwealth-wide basis;

    ii.    In addition to the alternative requests for relief, an order, declaration, and/or injunction that prohibits Defendants from certifying the results of the General Elections which include the tabulation of absentee and mail-in ballots which Defendants improperly permitted to be cured;

    iii.    A temporary restraining order and preliminary injunction granting the above relief during the pendency of this action;

    iv.    Plaintiffs' reasonable costs and expenses of this action, including attorneys' fees; and cost; and

    v.    All other further relief to which Plaintiffs might be entitled.

Date:  November 15, 2020

Respectfully submitted,
*/s/ Linda A. Kerns*
Linda A. Kerns (PA #84495)
Law Offices of Linda A. Kerns, LLC
1420 Locust Street, Suite 200
Philadelphia, PA 19102
T: 215-731-1413
lak@lindakernslaw.com

John B. Scott
Texas Bar No. 17901500
Franklin Scott Conway
405 West 14th Street
Austin, Texas 78701
Tel.: (512) 340-7805
jscott@fsc.leggal

*Counsel for Plaintiffs*

## **VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that I have reviewed the foregoing Complaint and that the factual allegations are true and correct.

Date: November 15, 2020

/s/ *James Fitzpatrick*
James Fitzpatrick, PA EDO Director
Donald J. Trump for President, Inc.