# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DONALD J. TRUMP FOR PRESIDENT, INC., et al., | ) ) ) | No. 4:20-CV-02078 |
| Plaintiffs, | ) ) | Hon. Matthew Brann |
| v. | ) ) | |
| KATHY BOOCKVAR, et al., | ) ) | |
| Defendants. | ) | |

---

## BRIEF OF *AMICUS CURIAE* DEMOCRATS ABROAD
## IN OPPOSITION TO PLAINTIFFS' MOTION
## FOR INJUNCTIVE RELIEF AND
## IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

---

Plaintiffs have brought a case primarily targeting mail-based voting, alleging it is somehow less "open and transparent" than in-person voting – and insinuating it is somehow poisonous to democracy. *See* ECF No. 1 ¶13. *Amicus* Democrats Abroad ("DA") – an organization dedicated to ensuring Americans living overseas can safely and successfully cast their ballots – submits this brief to provide the Court with context of the challenges that Americans overseas face in casting their ballots, even in the best of times.  In 2018, the Federal Voting Assistance Program found that a stunning 4.7% of eligible voters

abroad cast their ballots – a number that would increase to 31.7% if only certain obstacles were "resolved through voter education, state legislative changes, or improved communication with election offices."[1]

Plaintiffs – whether intentionally or unintentionally – seek to place still more obstacles in the paths of Americans (including uniformed members of the military) who already struggle to cast their ballots from overseas. And they seek to do so *after* those Americans have already cast their ballots. Plaintiffs seek to pick off votes, after voters have already made "decisions about whether and when to request mail-in ballots as well as when and how they cast or intended to cast them" – and in doing so, ask this Court to run through virtually every guardrail the Supreme Court has erected around cases like this. *Bognet v. Sec'y Pa.*, No. 20-3214, 2020 U.S. App. LEXIS 35639, at *50 (3d Cir. Nov. 13, 2020) ("*Bognet*"). The Court should decline that invitation.

---

[1] Federal Voting Assistance Program, <u>U.S. Citizens Abroad And Their Voting Behaviors In 2018: Overseas Citizen Population Analysis Summary Brief</u> (2018), available at <u>https://www.fvap.gov/uploads/FVAP/Reports/FVAP_voters_brief_v3a-(1).pdf</u> ("FVAP Brief").

## STATEMENT OF INTEREST

DA is the official Democratic Party arm for the millions of Americans living outside the United States.  More than that, though, for many voters overseas (including uniformed members of the military) – regardless of party affiliation[2] – DA is the primary resource they use to ensure their votes are actually counted.  DA is staffed by volunteers who assist overseas voters with registration, run a global voter registration effort and support overseas voters with a 24/7 help desk. DA researches voting and election information specific to overseas voters for all 50 states and the 6 non-state U.S. jurisdictions,[3] including: requirements for voting for each jurisdiction; deadlines for submitting voter registration, ballot requests, and returning ballots; available methods for returning forms and ballots; state-specific requirements for overseas voting; and update contact information for local election offices.  Volunteers also respond to questions from overseas voters,

---

[2] The Republican Party does not have any comparable organization.  DA provides its overseas voter registration services on a non-partisan basis (including through its website at www.votefromabroad.org).

[3] District of Columbia, Puerto Rico, American Samoa, Guam, U.S. Virgin Islands, and Northern Mariana Islands.

uniformed services voters, and their dependents, and provide support to help them request their ballots and vote from overseas.

As part of their preparation for upcoming elections, DA staff contacts the various Secretary of State offices and Local Election Offices (LEOs) to verify election information is correct and up to date. They also contact LEOs on behalf of overseas and military voters who need help with registering, requesting their ballots, and returning their ballots. Since DA works closely with voters who use absentee and mail-in ballots every year, they are experts in dealing with these issues in all 50 states and the six non-state jurisdictions, and their expertise is highly relevant to mail-in voting.

This year, DA has already diverted significant resources to dealing with Pennsylvania absentee ballot issues, and will have to spend much more staff time and resources counseling its members on Pennsylvania developments and interacting with Pennsylvania election staff, if the Plaintiffs receive the relief they seek. In short, DA has a vital interest in ensuring that the Court does not (at Plaintiffs' urging) erect barriers in the path of Americans who seek to cast their vote from overseas.

## BACKGROUND ON VOTING ABROAD

Americans live abroad for many reasons:  for work or to live near family, to study, or to serve their country.  But when they move abroad, they do not give up their U.S. citizenship or their rights, including their sacred right to vote in elections.  Though many Americans living abroad might prefer to vote in person, because they live far from their polling locations they have no real choice other than  by absentee ballot.  As a starting point, in ordinary times, the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA")[4] protects the rights of uniformed and overseas voters who live abroad to do just that.

Overseas voters face a number of voting-related hurdles that voters who live in the United States do not:  they may live in different time zones (making it difficult to call state officials to get information about specific requirements for any given election) or they may live in countries or areas with poor infrastructure or limited postal service.  A voter's job—for example, in the military—may require them to live in areas that are hostile to the presence of U.S. citizens.  On top of these hurdles, U.S. citizens who vote from abroad face additional challenges

---

[4] 42 U.S.C. § 1973ff, *et seq.*

in successfully returning their ballot to their local Board of Elections in the United States.  Their ballots must travel through the mail systems of at least two countries (in some cases, in both directions), and must nonetheless be delivered on time.  The process can be confusing to voters who have to navigate the requirements of their state, rigid timelines, changes in ballot styles, and so on, all without the assistance of the poll workers or Board of Elections officials or LEOs who are relatively easier to interact with when they are in the same time zone as the voter.

Because of this and other obstacles, Americans voting from overseas have their ballots rejected at shocking rates for what should be avoidable problems.  In a comprehensive report, the U.S. Election Assistance Commission found that "by far the most common reason for rejection [of a UOCAVA ballot] was that a ballot was received after a state's deadline for UOCAVA absentee ballot receipt."[5]  And, as noted above, though overseas turnout sits historically at a mere 4.7%, FVAP

---

[5] U.S. Election Assistance Commission, Election Administration and Voting Survey:  2018 Comprehensive Report 98 (2018), *available at* https://www.eac.gov/sites/default/files/eac_assets/1/6/2018_EAVS_Report.pdf.

has found that among UOCAVA voters, the "voting rate would be over 5x higher at 31.7% turnout without obstacles."[6]

Relatedly, Pennsylvania currently requires return of overseas ballots by physical mail.  *See* 25 P.S. § 3146.6.  That places the State on the minority side of a vital divide:  including the States that have changed practices because of the pandemic, a significant majority of the States allow voters abroad to return their ballots by email or fax.[7]

This year in particular, the challenges faced by overseas voters are stark.  Even when voters request their ballots at the earliest possible moment, Pennsylvania is only required to send ballots 45 days ahead of each general election (as determined by the MOVE Act, amending UOCAVA).  For the November General Election, that was September 19th this year.  With global postal mail slowed down because of the pandemic, however, there are delays of weeks between when a ballot is sent and when it is received.  Indeed, voters in some countries face delays of 6-8 weeks in the mail[8] – meaning the 45 days provided by

---

[6] FVAP Brief at 3.

[7] *See* FVAP, Ballot/FWAB States Transmission Methods, *available online at* https://www.fvap.gov/uploads/FVAP/Images/FWABTransmissionMethods.pdf.  Note that Pennsylvania allows UOCAVA voters to *request* their ballot by fax or email, but not to *return* the ballot by any means other than physical mail.

[8] Other countries have had their mail stop entirely.

the MOVE Act only create a *possibility* that a particular ballot will be counted, even if mailed back to the State the same day a voter receives it.

The uniform call from advocates for UOCAVA voters – including branches of the Federal Government – has been to remove barriers to voting Americans overseas.  Plaintiffs' proposed relief would serve to place a collection of new barriers in front of Americans overseas. Indeed, even assuming Plaintiffs' factual allegations are correct,[9] the remedy they seek would ultimately add a roll of the dice to whether a particular UOCAVA voter's ballot was tabulated and counted.  Adding that on top of the many barriers that already exist for Americans abroad would – as explained below – unjustifiably burden an already burdened class of voters.

---

[9] Other courts have, faced with similar factual claims by the President's campaign, found that they are not exactly well-supported.  *See, e.g.*, *Donald J. Trump for President, Inc. v. Benson*, 20-000225-MZ, Slip. Op. at 1 (Mich. Ct. of Claims Nov. 6, 2020) (noting that "[t]he complaint does not specify when, where, or by whom plaintiff was excluded. Nor does the complaint provide any details about why the alleged exclusion occurred," and excluding "supplemental evidence" as pure hearsay).

## ARGUMENT

### I.    Plaintiffs' Proposed Relief Would Disenfranchise Large Numbers of Americans Abroad.

Plaintiffs seek to place a cloud of doubt around the validity of mail ballots – including *all* ballots by UOCAVA voters – in the November 3 General Election.  The President of the United States (and his campaign) has for months been tweeting conspiracy theories about massive fraud in mail-in balloting, without, in any of the many litigations he and his campaign have brought, presenting one iota of proof.  On the eve of the Election, for example, the President tweeted: "The Supreme Court decision on voting in Pennsylvania [declining to overturn a decision by the Pennsylvania Supreme Court allowing votes with election day or earlier postmarks to be counted] is a VERY dangerous one. It will allow rampant and unchecked cheating and will undermine our entire systems of laws. It will also induce violence in the streets. Something must be done!"[10]

As the Supreme Court has long recognized, the right to vote is *the* "fundamental political right, because [it is] preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).  This jurisprudential and

---

[10] *See* https://twitter.com/realDonaldTrump/status/1323430341512622080.

9

political touch point has become so well accepted that the qualification

that preceded the declaration in *Yick Wo* – that voting is a "privilege

merely conceded by society according to its will, under certain

conditions" – sounds unfathomably foreign.  *Id.  Compare, e.g.*, *Reynolds*

*v. Sims*, 377 U.S. 533, 561-62 (1964) ("Undoubtedly, the right of

suffrage is a fundamental matter in a free and democratic society.").  In

short:  "Where that right is constitutionally guaranteed and exercised

by citizens through free and fair elections protected by government

authority, democratic rule thrives. Conversely, impairing the franchise,

or imposing undue burdens on the ability of voters to cast ballots for

their elected leaders, necessarily threatens democracy and erodes the

underpinnings of a republican form of government."  *Jones v. United*

*States Postal Serv.,* 2020 U.S. Dist. LEXIS 172430 (SDNY 2020).

In seeking to cast doubt on the validity of all mail-in ballots,

Plaintiffs ask the Court itself to place a severe burden on the right to

vote.  But "[o]ur goal must be to enfranchise and not to disenfranchise

[the electorate.]"  *Pennsylvania Democratic Party v Boockvar,* 2020 Pa.

LEXIS 4872, at *22  (2020), *stay denied,*  2020 U.S. LEXIS 5181 (2020),

*motion for expedited cert. denied*, 2020 U.S. LEXIS 5181 (2020), *ballots*

*arriving after Election Day ordered segregated*,  2020 U.S. LEXIS 5181 (2020) (cleaned up).  *See also, Donald J. Trump for President, Inc. v Boockvar,* 2020 US Dist LEXIS 188390, at \*173 (WD Pa 2020) ("Here, imposing a signature-comparison requirement as to mail-in and absentee ballots runs the risk of restricting voters' rights").

Americans overseas have little or no other choice than to vote by mail in ballot.  "Voting is a right, not a privilege, and a sacred element of the democratic process. For our citizens overseas, voting by absentee ballot may be the only practical means to exercise that right." *Bush v Hillsborough County Canvassing Bd.,* 123 F Supp 2d 1305, 1307 (ND Fla 2000).  *See also, United States v Cunningham,* 2009 US Dist LEXIS 98010, at \*11 (ED Va 2009); *United States v Georgia,* 892 F Supp 2d 1367, 1368 (ND Ga 2012), *aff'd,* 778 F.3d 926 (11th Cir. 2015)  ("Despite their differences of opinion, there is no doubt that both parties share the same fundamental, *and most important*, end goal of ensuring that overseas voters are able to effectively exercise their right to vote in United States elections").

Thus, because the Court itself will be making choices about which classes of voters may have their ballots counted, it should scrutinize its

own actions just as it would those of election officials (if not more so).
*Cf. Shelley v Kraemer,* 334 US 1,14-19 (1948).  As explained by the
Third Circuit, in post-election cases of this kind, that scrutiny may lead
to the conclusion that "[o]ne can assume for the sake of argument that
aspects of the now-prevailing regime in Pennsylvania are unlawful as
alleged and still recognize that, given the timing of Plaintiffs' request
for injunctive relief, the electoral calendar was such that following it
'one last time' was the better of the choices available." *Bognet* at *49,
*quoting Abbott v. Perez,* 138 S. Ct. 2305, 2324 (2018).

In that regard, Plaintiffs' prayed-for relief bears no connection –
let alone the connection required by strict scrutiny – to their alleged
interests.  Plaintiffs' request for the setting aside of all absentee ballots
in Democratic counties will not prove to be narrowly tailored to any
compelling government interest, other than President Trump's desire to
reverse the result of this election.  Even if Plaintiffs had any actual
evidence of fraud[11]—and they do not—then the "least restrictive

---

[11] Plaintiffs' other core allegation – that they were denied access to seeing
certain ballots – is already one they abandoned under questioning from Judge
Diamond in a related case.  Asked "I'm asking you, as a member of the bar of this
court, are people representing Donald J. Trump for president, representing the
plaintiff, in that room?," Plaintiffs answered, "Yes," to which Judge Diamond was
left asking, "I'm sorry, then what's your problem?"

alternative" would obviously be the process by which observers challenge individual ballots, or a litigation of far more limited scope, not to disenfranchise hundreds of thousands of voters *en masse*.[12]  For *amicus* DA and the Americans overseas it represents, that disconnect poses a far steeper burden:  they have no way to vote besides by mail and must make their choices on *how* to cast their vote much further in advance than other voters.  The relief Plaintiffs request is, in short, likely unconstitutional itself.[13]

## II.   **Plaintiffs' Suit Comes Far Too Late For Effective Relief.**

As the Third Circuit held just days ago in *Bognet*, "Plaintiffs' challenge to it was not filed until sufficiently close to the election to raise a reasonable concern in the District Court that more harm than good would come from an injunction changing the rule."  *Bognet* at *52.

---

[12] The result of Plaintiffs' proposed relief would, under *Anderson-Burdick*, be a "burden [that] is exceptionally severe[:]  A large number of ballots will be invalidated, and consequently, not counted based on circumstances entirely out of the voters' control."  *Gallagher v NY State Bd. of Elections,* 2020 US Dist LEXIS 138219, at *47 (SDNY Aug. 3, 2020).

[13] Even if simply structured as a "brief pause" (ECF No. 89-1 at 1), Plaintiffs themselves have repeatedly stressed the importance of having one's voice heard just after the Election – and alleged that votes *tabulated* after Election Day are somehow illegitimate.  Thus, overseas Americans – and other absentee voters – have a profound First Amendment interest in having their votes included in the ongoing, public counts of Pennsylvania votes.

A.        *Purcell* Bars Relief.

As the Supreme Court has "repeatedly emphasized," "lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020), *citing Purcell v. Gonzalez,* 549 U.S. 1, 4-5 (2006). This is because "Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion." 549 U.S. at 4-5. The underlying rationale of *Purcell,* not to undermine voter confidence in the election process by creating confusion, can apply equally well to this action brought after the election, which seeks to disenfranchise hundreds of thousands of other mail-in voters who fulfilled all legal requirements in casting their ballots. *Cf. Gallagher v NY State Bd. of Elections,* 2020 US Dist LEXIS 138219, at *47 (SDNY Aug. 3, 2020) (post-election case finding an "exceptionally severe" burden where "large number of ballots will be invalidated, and consequently, not counted based on circumstances entirely out of the voters' control"). It is in fact sufficient reason to deny the requested relief that Plaintiffs are seeking to undo a completed election.[14]

---

[14] *See, e.g., Samuel v Virgin Is. Joint Bd. of Elections,* 2013 U.S. Dist LEXIS 3689, at *29-30 DVI 2013) ("Plaintiffs did not explain why they waited until the

B.        Laches and reliance also bar relief.

If Plaintiffs wished to have absentee votes comply with some

desired set of rules and procedures, they had months before the election

to advocate for those rules through lobbying and litigation—and they

did in fact bring, and lose, some related litigation, for example seeking a

signature comparison requirement on Pennsylvania ballots.  *See, e.g.*,

*Donald J. Trump for President, Inc. v Boockvar,* 2020 US Dist LEXIS

188390 (WD Pa 2020).

Having delayed this case until after election, given the margins

they face for the relief they seek to be meaningful at all, Plaintiffs are

clearly seeking only a single remedy:  the wholesale disenfranchisement

of large groups of voters.  And it is not as if it were a secret mail-in

---

eleventh hour to file their request for a TRO and preliminary injunction in which
they seek to undo an election. The timing of their filing their lawsuit confirms that
they will not suffer any irreparable harm"); *Soules v Kauaians for Nukolii
Campaign Comm.,* 849 F2d 1176, 1180 (9th Cir. 1988) (" Moreover, the courts have
been wary lest the granting of post-election relief encourage sandbagging on the
part of wily plaintiffs");  *Hendon v. N. C. State Bd. of Elections,* 710 F.2d 177, 182
(4th Cir. 1983) ("[F]ailure to require pre-election adjudication would permit, if not
encourage, parties who could raise a claim to lay by and gamble upon receiving a
favorable decision of the electorate and then, upon losing, seek to undo the ballot
results in a court action"); *Lake v State Bd. of Elections,* 798 F Supp 1199, 1208
(MDNC 1992) ("Such irregularities are the classic concern of the states under the
constitutional framework. Federal intervention to attempt to rectify any injury done
here would require the undoing of a completed election, a remedy properly reserved
to the State of North Carolina and available under its election laws").

ballots would be significant this election. Plaintiffs should not be heard

now given their opportunistic delay.

Laches applies, as the Seventh Circuit has explained, with

particular force in election cases:

> "Laches arises when an unwarranted delay in bringing a suit or
> otherwise pressing a claim produces prejudice to the defendant. In
> the context of elections, this means that any claim against a state
> electoral procedure must be expressed expeditiously. As time
> passes, the state's interest in proceeding with the election
> increases in importance as resources are committed and
> irrevocable decisions are made. The candidate's and party's claims
> to be respectively a serious candidate and a serious party with a
> serious injury become less credible by their having slept on their
> rights."

*Fulani v Hogsett,* 917 F2d 1028, 1031 (7th Cir. 1990), *cert. den.* 501 U.S.

1206 (1991).[15]

---

[15] *See also, Perry v Judd,* 840 F Supp 2d 945, 949 (ED Va 2012), *injunction denied,* 471 Fed. Appx. 219 (4th Cir. 2012) ("[Plaintiffs] knew the rules in Virginia many months ago; the limitations on circulators affected them as soon as they began to circulate petitions. The plaintiffs could have challenged the Virginia law at that time. Instead, they waited until after the time to gather petitions had ended and they had lost the political battle to be on the ballot; then, on the eve of the printing of absentee ballots, they decided to challenge Virginia's laws. In essence, they played the game, lost, and then complained that the rules were unfair"); *Memphis A. Phillip Randolph Inst. v Hargett,* 2020 U.S. Dist LEXIS 133721, at *24-25 [MD Tenn 2020], *affirmed* 2020 U.S. App. LEXIS 32581 (6th Cir. 2020) ("[T]he Court finds unreasonable delay by Plaintiffs in waiting, after Governor Lee's March 12 state of emergency order, seven weeks to file the original complaint and two months to file the Motion. As parties allegedly facing severe violations of their constitutional rights as a result of the implicated election laws, especially considering the existing COVID-19 pandemic, Plaintiffs should have been on the proverbial red alert by the time the Governor's order was issued on March

In sum, Americans voting from overseas – like all Americans – have the right to security and confidence of knowing that their votes were counted and the results of the November 3 election are final. Perhaps more importantly, they also have a right to know their votes will not be subject to post-hoc digging for result-oriented reasons to toss just enough votes to ensure a particular candidate win an election. Thus, even if the Court buys what Plaintiffs are selling (it should not), well-settled law favors allowing the challenged procedures to be applied "one last time," given the broad reliance on those procedures. *Bognet* at 49.

## CONCLUSION

Plaintiffs' complaint, at its heart, is about results rather than principles. Their faction lost an election. Thus, they urge, some relief is required. But as James Madison famously said in *Federalist* 10,

---

12....[P]laintiffs seeking the very extraordinary remedy of enjoining state procedures governing an approaching primary election needed to move more quickly than they did, and the Court has not been satisfied by the various explanations for the delay"); *Arizona Libertarian Party v Reagan,* 189 F Supp 3d 920, 924 (D Ariz 2016), affirmed 925 F.3d 1085 (9ᵗʰ Cir. 2019), *cert. den.* 207 L. Ed. 2D 1052 (2020) ("Plaintiffs were therefore aware of the underlying basis for their challenge by August 2015. Despite this knowledge, Plaintiffs did not file their complaint until April 12, 2016, and did not file their 'emergency' motion for a temporary restraining order until May 12, 2016, less than three weeks before the June 1 deadline for nomination petitions").

"[a]mong the numerous advantages promised by a well-constructed

Union, none deserves to be more accurately developed than its tendency

to break and control the violence of faction … The instability, injustice,

and confusion introduced into the public councils, have, in truth, been

the mortal diseases under which popular governments have everywhere

perished."

That sentiment did not die with the founding generation.  In

*Rutan v Republican Party,* Justice Stevens noted:

> "Ironically, at the time of the adoption of the Bill of Rights, the
> party system itself was far from an accepted political norm.  Our
> founders viewed it as a pathology … Madison and Hamilton, when
> they discussed parties or factions (for them the terms were usually
> interchangeable) in *The Federalist,* did so only to arraign their bad
> effects … George Washington devoted a large part of his political
> testament, the Farewell Address, to stern warnings against 'the
> baneful effects of the Spirit of Party.' His successor, John Adams,
> believed that  'a division of the republic into two great parties . . . .
> is to be dreaded as the greatest political evil under our
> Constitution.'

497 US 62, 82, n 3 (1990).

And lest there be any doubt, "[o]ur contemporary recognition of a

state interest in protecting the two major parties from damaging

intraparty feuding or unrestrained factionalism, has not disturbed our

protection of the rights of individual voters and the role of alternative parties in our government." *Id.*

Ultimately Plaintiffs' prayed-for relief only serves the purpose of delegitimizing this election and disenfranchising voters who relied on the mail to vote, all for the sake of faction.  The Court need not – and should not – follow them there.

Respectfully submitted,

/s/

_____

J. Remy Green[16]
Jonathan Wallace, *of counsel*
**COHEN&GREEN P.L.L.C.**
1639 Centre Street, Suite 216
Ridgewood, New York 11385
(929) 888.9480 (telephone)
(929) 888.9457 (facsimile)
remy@femmelaw.com

Sean M. Shultz
**SAIDIS, SHULTZ & FISHER LLC**
100 Sterling Parkway, Suite 300
Mechanicsburg, Pennsylvania 17050

---

[16] *Pro hac vice* motions for Remy Green and Jonathan Wallace have been filed simultaneously with this brief.

## <ins>WORD COUNT CERTIFICATION</ins>

Because this brief exceeds fifteen pages, I certify that it complies with the word limit in Local Rule 7.8(b)(2). Using the word count feature, with permitted exclusions, I have determined this brief contains 4001 words.

Dated:        November 15, 2020

/s/
_____
J. Remy Green
COHEN&GREEN P.L.L.C.
1639 Centre Street, Suite 216
Ridgewood, New York 11385
(929) 888.9480 (telephone)
(929) 888.9457 (facsimile)
remy@femmelaw.com