## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DONALD J. TRUMP FOR PRESIDENT, INC., *et al.*,<br><br>    Plaintiffs,<br><br>  v.<br><br>KATHY BOOCKVAR, *et al.*,<br><br>    Defendants,<br><br>NAACP-PENNSYLVANIA STATE CONFERENCE, *et al.*,<br><br>    Intervenor-Defendants,<br><br>DNC SERVICES CORPORATION/DEMOCRATIC NATIONAL COMMITTEE,<br><br>    Intervenor-Defendant. | Civil Action<br>No. 4:20-cv-02078-MWB<br><br>Hon. Matthew W. Brann |

**UNPUBLISHED CASES CITED IN REPLY IN SUPPORT OF MOTION TO DISMISS BY INTERVENOR-DEFENDANTS NAACP-PENNSYLVANIA STATE CONFERENCE, BLACK POLITICAL EMPOWERMENT PROJECT, COMMON CAUSE PENNSYLVANIA, LEAGUE OF WOMEN VOTERS OF PENNSYLVANIA, JOSEPH AYENI, LUCIA GAJDA, STEPHANIE HIGGINS, MERIL LARA, RICARDO MORALES, NATALIE PRICE, <u>TIM STEVENS, AND TAYLOR STOVER</u>**

| CASE | ATTACHMENT |
|---|---|
| *Bowden v. DB Schenker,* No. 1:17-cv-01999, 2018 WL 1203362 (M.D. Pa. Mar. 8, 2018) | 1 |
| *Donald J. Trump for President, Inc v. Boockvar*, No. 2:20-cv-966, --- F.Supp.3d ---- , 2020 WL 5997680 (W.D. Pa. Oct. 10, 2020) | 2 |
| *King v. Mansfield Univ. of Pa.,* No. 1:15-cv-0159, 2018 WL 1203467 (M.D. Pa. Mar. 8, 2018) | 3 |
| *Wilson v. Somerset Cnty. Prosecutors Office*, No. 15-6034, 2016 WL 1090811 (D.N.J. Mar. 21, 2016) | 4 |

# ATTACHMENT 1

Bowden v. DB Schenker, Not Reported in Fed. Supp. (2018)

2018 WL 1203362

2018 WL 1203362
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Jerra V. BOWDEN, Plaintiff,

v.

DB SCHENKER, Defendant.

Civil No. 1:17-CV-01999
|
Signed 03/08/2018

**Attorneys and Law Firms**

Alphonso Arnold, Jr., Law Offices of Alphonso Arnold Jr., Harrisburg, PA, for Plaintiff.

Steven K. Ludwig, Fox Rothschild LLP, Philadelphia, PA, for Defendant.

**MEMORANDUM**

SYLVIA H. RAMBO, United States District Judge

 **\*1** In this diversity action, Plaintiff presents claims against her former employer for misappropriation of ideas, unjust enrichments, and *quantum meruit.* Presently before the court are Defendant's motions 1) to transfer venue (Doc. 4); 2) to dismiss the complaint pursuant to Rule 12(b)(6) on the basis of res judicata (Doc. 6); and 3) for sanctions against Plaintiff's counsel for filing a frivolous complaint (Doc. 9). For the reasons stated herein, Defendant's motions to dismiss and for sanctions will be granted, and its motion to transfer venue will be denied as moot.

**I. Background**

Plaintiff filed suit against Defendant [1], her former employer, in the United States District Court for the Eastern District of Pennsylvania on March 21, 2016, asserting, *inter alia,* claims of misappropriation of ideas, unjust enrichment, and *quantum meruit* under Pennsylvania common law. Plaintiff's claims stemmed from Defendant's introduction of an assembly line approach to certain of its operations that relied on Plaintiff's development of, what she referred to as, the "Productivity Tracker." On July 25, 2016, the Eastern District dismissed Plaintiff's complaint in its entirety with prejudice. *See Bowden v. DB Schenker,* Civ. No. 16-cv-1272, 2016 WL 3981354,

\*1 (E.D. Pa. July 26, 2016). Plaintiff timely appealed, and on May 31, 2017, the United States Court of Appeals for the Third Circuit affirmed the Eastern District's decision, *see Bowden v. DB Schenker,* 693 Fed.Appx. 157, 158-59 (3d Cir. 2017), and subsequently denied Plaintiff's request for rehearing *en banc.*

> [1] The court notes for the record that Plaintiff erroneously named Defendant in the complaint as "DB Schenker," whereas Defendant's actual name is Schenker, Inc.

Despite the final judgment as to her claims, on October 2, 2017, Plaintiff nonetheless filed a materially identical complaint in the Court of Common Pleas for Cumberland County at docket number 2017-07277. Defendant notified Plaintiff via telephone and email on October 13, 2017 that the complaint was claim precluded and that Defendant intended to seek sanctions against Plaintiff's counsel if the complaint was not withdrawn. On November 1, 2017, Defendant removed the case to this court (Doc. 1), and on November 8, 2017, Defendant filed a motion to dismiss the case pursuant to Federal Rule of Civil Procedure 12(b)(6) on the basis of res judicata (Doc. 6), as well as a motion to transfer venue to the Eastern District of Pennsylvania (Doc. 4), together with supporting briefs. Defendant served a letter on Plaintiff's counsel on November 17, 2017, once again advising him that Plaintiff's claims were precluded and that sanctions would be sought if counsel did not withdraw the complaint. Counsel for Plaintiff did not withdraw the complaint, and on December 12, 2017, Defendant filed a motion, accompanied by a supporting brief, seeking sanctions against him. (Docs. 9 & 10.)

Plaintiff filed a brief in opposition to the motion for sanctions on December 26, 2017 (Doc. 14), but has failed to respond to the motions to transfer and dismiss for more than sixty days, and, thus, the court may grant those motions as uncontested pursuant to Middle District Local Rule 7.6. (providing that "[a]ny party opposing any motion ... shall file a brief in opposition within fourteen (14) days after service of the movant's brief.... Any party who fails to comply with this rule shall be deemed not to oppose such motion."). Nonetheless, the court will address each of Defendant's motions on the merits.

**II. Motion to Dismiss**

 **\*2** Defendant has moved for dismissal of the complaint on the basis of res judicata, otherwise known as claim preclusion,

Bowden v. DB Schenker, Not Reported in Fed. Supp. (2018)

2018 WL 1203362

Case 4:20-cv-02078-MWB Document 142-2 Filed 11/16/20 Page 5 of 84

which, although an affirmative defense, may be raised in a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *See Lewis v. Smith*, Civ. No. 07-cv-2011, 2008 WL 3200836, *1 (M.D. Pa. Aug. 7, 2008) (quoting *Walzer v. Muriel, Siebert & Co., Inc.*, 221 Fed.Appx. 153, 155 (3d Cir. 2007)). Although the court must generally limit its review to facts contained in the complaint when deciding a motion under Rule 12(b)(6), "[t]he defense of claim preclusion ... may be raised and adjudicated on a motion to dismiss and the court can take notice of all facts necessary for the decision. Specifically, a court may take judicial notice of the record from a previous court proceeding between the parties." *Id.* (quoting *Toscano v. Conn. Gen. Life Ins. Co.*, 288 Fed.Appx. 36, 38 (3d Cir. 2008) (internal citations omitted)).

"Claim preclusion, formerly referred to as res judicata, gives dispositive effect to a prior judgment if a particular issue, although not litigated, could have been raised in the earlier proceeding." *Bd. of Trs. of Trucking Emps. of N. Jersey Welfare Fund, Inc.—Pension Fund v. Centra*, 983 F.2d 495, 504 (3d Cir. 1992). In order for a claim to be precluded, the party asserting the defense must show that there was "(1) a final judgment on the merits in a prior suit involving (2) the same parties or their privies and (3) a subsequent suit based on the same cause of action." *United States v. Athlone Indus., Inc.*, 746 F.2d 977, 983 (3d Cir. 1984) (citing *I.A.M. Nat'l Pension Fund v. Indus. Gear Mfg. Co.*, 723 F.2d 944, 946-47 (D.C. Cir. 1983)). Whether two separately-filed lawsuits are based on the same cause of action "turn[s] on the essential similarity of the underlying events giving rise to the various legal claims." *Id.* Rather than applying this test mechanically, the court "should focus on the central purpose of the doctrine, to require a plaintiff to present all claims arising out the same occurrence in a single suit." *Centra*, 983 F.2d at 504 (citing *Athlone Indus.*, 746 F.2d at 983-84).

Here, all the requirements are clearly met. A final judgment was handed down by the Eastern District and affirmed by the Third Circuit, Plaintiff and Defendant are the same parties as in the previous suit, and Plaintiff brings almost identical claims—misappropriation of ideas, unjust enrichment, and *quantum meruit*—as she alleged in her Eastern District complaint, which once again arise out of her claimed invention of a "Productivity Tracker." Indeed, more than a dozen paragraphs in the two complaints are identical, and Plaintiff does not attempt to allege any new material facts.

Plaintiff's only argument against claim preclusion is that a final judgment in a federal court does not preclude her

from presenting the same claims in state court to seek a determination from the Pennsylvania Supreme Court on whether discovery should be conducted prior to dismissing claims similar to Plaintiff's. This position is both unsupported by the case law that Plaintiff cites, and flies in the face of the well-settled rule applying the United States Constitution's full faith and credit clause of Article IV, § 1 to proceedings of federal courts. *See In re Stevenson*, 40 A.3d 1212, 1225 (Pa. 2012) (citing *Del. Valley Citizens' Council for Clean Air v. Pennsylvania*, 755 F.2d 38, 43-44 (3d Cir. 1985) ("Pennsylvania courts have long recognized the principle that state courts are bound by the judgments of federal courts.")). Plaintiff's argument also ignores another well-established principle; namely, that "[i]n the absence of a reported decision by the state's highest court addressing the precise issue before it, a federal court applying state substantive law must predict how the state's highest court would rule if presented with the case." *See Hittle v. Scripto-Tokai Corp.*, 166 F. Supp. 2d 159, 161 (M.D. Pa. 2001) (citing *Nationwide Mut. Ins. Co. v. Buffetta*, 230 F.3d 634, 637 (3d Cir. 2000)). Thus, even if Plaintiff believed that the federal application of Pennsylvania law was somehow incorrect, that argument should have been presented to the Eastern District to make a determination of how the Pennsylvania Supreme Court would likely rule on the same issue. Simply stated, Plaintiff had her choice of forum when filing her first complaint and could have chosen to file in state court, but did not. She is now bound by the judgment of the Eastern District, which was affirmed by the Third Circuit. Accordingly, the court finds that Plaintiff's claims are precluded, and her complaint will be dismissed with prejudice. [2]

[2] Because the court has opted to decide Defendant's motion to dismiss on the merits and will dismiss the complaint, Defendant's motion to transfer venue (Doc. 4) is moot.

### III. Motion for Sanctions

**\*3** Defendant has also moved for sanctions against Plaintiff's counsel, Arnold Alphonso, Jr., Esq. ("Mr. Arnold"), on the basis that Plaintiff's claims were clearly precluded and therefore frivolous. (*See* Doc. 9.) Counsel for Defendant notified Mr. Arnold multiple times that the claims were precluded and that the filing of such a frivolous lawsuit was sanctionable. On December 12, 2017, after Mr. Arnold failed to withdraw the complaint, counsel for Defendant filed the present motion for sanctions.

2018 WL 1203362

Pursuant to Federal Rule of Civil Procedure 11(b), when presenting a pleading to the court, an attorney must certify that, to the best of his or her "knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: ... (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." Fed. R. Civ. P. 11(b). For a filing to be reasonable under the circumstances, an attorney must have " 'an objective knowledge or belief at the time of the filing of a challenged paper' that the claim was well-grounded in law and fact." *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 289 (3d Cir. 1991) (quoting *Jones v. Pitt. Nat'l Corp.*, 899 F.2d 1350, 1359 (3d Cir. 1990)). The objectivity of the well-grounded in law and fact standard "requires the attorney to 'conduct a reasonable investigation of the facts and a normally competent level of legal research to support the presentation,' " *Howe v. Litwack*, 579 Fed.Appx. 110, 115-16 (3d Cir. 2014) (quoting *Simmerman v. Corino*, 27 F.3d 58, 62 (3d Cir. 1994)), and the failure to do so warrants sanctions. Rule 11(c) allows the court to impose appropriate sanctions against the attorney responsible for the violation, which "may include nonmonetary directives; an order to pay a penalty into court; or ... an order directing payment to the movant of part or all of the reasonable attorneys' fees and other expenses directly resulting from the violation." Fed. R. Civ. P. 11(c)(4). District Courts have broad discretion to impose attorneys' fees and costs as sanctions, as appellate courts "evaluate the [district] court's factual determinations, legal conclusions, and choice of an appropriate sanction with substantial deference." *Keister v. PPL Corp.*, 677 Fed.Appx. 63, 66 (3d Cir. 2017) (citation omitted).

As stated above, Plaintiff's claims were clearly precluded by the judgments of the Eastern District and Third Circuit. Any competent research into the claims Mr. Arnold presented in the instant complaint would have revealed that they were without merit. To make matters worse, the frivolousness and precluded nature of the current claims were brought to Mr. Arnold's attention on multiple occasions, and he had every opportunity to withdraw his complaint. Accordingly, the court finds that the filing of the complaint was frivolous and unreasonable under the circumstances, and the court will impose the sanction on Mr. Arnold of paying Defendant's reasonable attorneys' fees and costs in this matter.

## IV. **Conclusion**

For the reasons stated above, the court finds that Plaintiff's claims are precluded and that Mr. Arnold was unreasonable in filing the complaint. Plaintiff's complaint will be dismissed with prejudice, and sanctions in the form of reasonable attorneys' fees and costs will be imposed upon Plaintiff's counsel.

An appropriate order will issue.

## **All Citations**

Not Reported in Fed. Supp., 2018 WL 1203362

---

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# ATTACHMENT 2

2020 WL 5997680
Only the Westlaw citation is currently available.
United States District Court, W.D. Pennsylvania.

DONALD J. TRUMP FOR PRESIDENT,
INC., et al., Plaintiffs
v.
Kathy BOOCKVAR, in her capacity as
Secretary of the Commonwealth of
Pennsylvania, et al., Defendants.

No. 2:20-cv-966
|
Signed 10/10/2020

**Synopsis**
**Background:** President's reelection campaign, Republican National Committee, and Republican congressional candidates and electors filed suit against state and county election officials alleging federal and state constitutional violations stemming from Pennsylvania's implementation of mail-in voting plan for upcoming general election and its poll watcher residency requirement. State Democratic Party, advocacy organizations, and their members intervened. Parties filed cross-motions for summary judgment.

**Holdings:** The District Court, J. Nicholas Ranjan, J., held that:

plaintiffs' claims were ripe for adjudication;

any injury that plaintiffs would suffer was too speculative to establish Article III standing;

use of unmanned drop boxes for mail-in ballots by some counties, but not others, did not violate Equal Protection Clause;

use of unmanned drop boxes for mail-in ballots did not violate substantive due process principles;

state law did not impose signature comparison requirement for mail-in and absentee ballots;

state law did not impose signature comparison requirement for applications for mail-in and absentee

ballots;

fact that some county boards of elections intended to verify signatures on mail-in and absentee ballots and applications, while others did not, did not violate Equal Protection Clause;

fact that state did not require signature comparison for mail-in and absentee ballots, but did for in-person ballots, did not violate Equal Protection Clause; and

county residency requirement on being poll watcher did not violate plaintiffs' constitutional rights.

Defendants' motion granted.

**Procedural Posture(s):** Motion for Summary Judgment.

**Attorneys and Law Firms**

Ronald L. Hicks, Jr., Carolyn Batz McGee, Jeremy A. Mercer, Russell D. Giancola, Devin A. Winklosky, Porter Wright Morris & Arthur LLP, Pittsburgh, PA, Justin R. Clark, Pro Hac Vice, Matthew Earl Morgan, Pro Hac Vice, Elections LLC, Washington, DC, for Plaintiffs.

Daniel T. Donovan, Pro Hac Vice, Caroline Darmody, Pro Hac Vice, Kristen Leigh Bokhan, Michael Glick, Pro Hac Vice, Susan Marie Davies, Pro Hac Vice, Kirkland & Ellis LLP, Washington, DC, Howard G. Hopkirk, Karen Mascio Romano, Keli Marie Neary, Pro Hac Vice, Nicole Boland, Pro Hac Vice, Stephen Moniak, Pennsylvania Office of Attorney General, Kathleen M. Kotula, Kenneth L. Joel, M. Abbegael Giunta, Governor's Office of General Counsel, Timothy Gates, Pennsylvania Department of State Office of Chief Counsel, Harrisburg, PA, Daniel T. Brier, Donna A. Walsh, John B. Dempsey, Nicholas F. Kravitz, Pro Hac Vice, Myers, Brier & Kelly, LLP, Scranton, PA, Jaywin Singh Malhi, Pro Hac Vice, Madelyn Morris, Sara S. Tatum, Kirkland & Ellis LLP, New York, NY, for Defendant Kathy Boockvar.

Molly R. Mudd, Pro Hac Vice, County of Adams, Gettysburg, PA, for Defendant Adams County Board of Elections.

Andrew F. Szefi, Allan J. Opsitnick, George M. Janocsko, Allegheny County Law Department, Pittsburgh, PA, for Defendant Allegheny County Board of Elections.

Steven B. Silverman, Molly E. Meacham, Sean R. Keegan, Andrew Degory, Babst, Calland, Clements and Zomnir, P.C., Pittsburgh, PA, Elizabeth A. Dupuis, Babst

Calland, State College, PA, for Defendants Armstrong County Board of Elections, Bedford County Board of Elections, Centre County Board of Elections, Columbia County Board of Elections, Fayette County Board of Elections, Indiana County Board of Elections, Lackawanna County Board of Elections, Lebanon County Board of Elections, Montour County Board of Elections, Northumberland County Board of Elections, Venango County Board of Elections.

Nathan A. Morgan, Beaver, PA, for Defendant Beaver County Board of Elections.

Christine D. Steere, Deasey, Mahoney & Valentini, Ltd., Media, PA, for Defendant Berks County Board of Elections.

Steven B. Silverman, Molly E. Meacham, Sean R. Keegan, Andrew Degory, Babst Calland Clements and Zomnir, PC, Pittsburgh, PA, Elizabeth A. Dupuis, Babst Calland, State College, PA, Nathan W. Karn, Evey Black Attorneys LLC, Hollidaysburg, PA, for Defendant Blair County Board of Elections.

Mark A. Aronchick, Christina Matthias, Pro Hac Vice, John B. Hill, Pro Hac Vice, Michele D. Hangley, Pro Hac Vice, Peter V. Keays, Robert Wiygul, Pro Hac Vice, Hangley Aronchick Segal Pudlin & Schiller, Philadelphia, PA, Joseph J. Khan, County of Bucks, Doylestown, PA, for Defendant Bucks County Board of Elections.

William Gleason Barbin, Cambria County Solicitor's Office, Ebensburg, PA, for Defendant Cambria County Board of Elections.

Gerard Joseph Geiger, Pro Hac Vice, Newman Williams, Stroudsburg, PA, for Defendant Carbon County Board of Elections.

Mark A. Aronchick, Christina Matthias, Pro Hac Vice, John B. Hill, Pro Hac Vice, Michele D. Hangley, Pro Hac Vice, Robert Wiygul, Pro Hac Vice, Hangley Aronchick Segal Pudlin & Schiller, Philadelphia, PA, for Defendant Chester County Board of Elections.

Christopher P. Gabriel, Carfardi Ferguson Wyrick Weis + Gabriel, Sewickley, PA, for Defendant Clarion County Board of Elections.

Frank A. Blum, III, Jefferson Hills, PA, for Defendant Clearfield County Board of Elections.

Keith A. Button, Shafer Law Firm, Meadville, PA, for Defendant Crawford County Board of Elections.

Keith O. Brenneman, Law Office of Keith O. Brenneman,

P.C., Mechanicsburg, PA, for Defendant Cumberland County Board of Elections.

Steven B. Silverman, Molly E. Meacham, Sean R. Keegan, Andrew Degory, Babst Calland Clements and Zomnir, PC, Pittsburgh, PA, Elizabeth A. Dupuis, Babst Calland, State College, PA, Joseph A. Curcillo, III, Dauphin County, Harrisburg, PA, for Defendant Dauphin County Board of Elections.

Edward D. Rogers, Pro Hac Vice, Elizabeth Wingfield, Pro Hac Vice, Kahlil Williams, Pro Hac Vice, David S. Fryman, Ballard, Spahr, Andrews & Ingersoll, Terence Grugan, Pro Hac Vice, Ballard Spahr, Philadelphia, PA, for Defendant Delaware County Board of Elections.

Thomas S. Talarico, Talarico & Niebauer, Erie, PA, for Defendant Erie County Board of Elections.

Andrew W. Norfleet, Frank J. Lavery, Jr., Stephen B. Edwards, Lavery Law, Harrisburg, PA, for Defendants Franklin County Board of Elections, Perry County Board of Elections.

Robert Eugene Grimm, Robert Eugene Grimm Attorney, Smithfield, PA, for Defendant Greene County Board of Elections.

Peter M. McManamon, Pro Hac Vice, Gill, McManamon & Ghaner, Huntingdon, PA, Steven B. Silverman, Molly E. Meacham, Sean R. Keegan, Andrew Degory, Babst Calland Clements and Zomnir, PC, Pittsburgh, PA, Elizabeth A. Dupuis, Babst Calland, State College, PA, for Defendant Huntingdon County Board of Elections.

C.J. Zwick, Zwick & Zwick LLP, DuBois, PA, Gregory D. Sobol, Brookville, PA, for Defendant Jefferson County Board of Elections.

Donald Zagurskie, Pro Hac Vice, Johnston & Zagurskie, PC, Mifflin, PA, for Defendant Juniata County Board of Elections.

Christina L. Hausner, Pro Hac Vice, County of Lancaster, Lancaster, PA, for Defendant Lancaster County Board of Elections.

Steven B. Silverman, Molly E. Meacham, Sean R. Keegan, Andrew Degory, Babst Calland Clements and Zomnir, PC, Pittsburgh, PA, Thomas W. Leslie, New Castle, PA, Elizabeth A. Dupuis, Babst Calland, State College, PA, for Defendant Lawrence County Board of Elections.

Thomas M. Caffrey, Pro Hac Vice, PO BOX A, Coplay, PA, Sarah Mae Murray, Pro Hac Vice, County of Lehigh,

Allentown, PA, for Defendant Lehigh County Board of Elections.

Lawrence J. Moran, Jr., Matthew J. Carmody, Joyce, Carmody & Moran, P.C., Regina M. Blewitt, Joyce Carmody Moran, Pittston, PA, for Defendant Luzerne County Board of Elections.

Joseph D. Smith, McCormick Law Firm, Williamsport, PA, for Defendant Lycoming County Board of Elections.

Anthony V. Clarke, The Clarke Firm, Bradford, PA, for Defendant Mckean County Board of Elections.

Steven B. Silverman, Molly E. Meacham, Sean R. Keegan, Babst, Calland, Clements and Zomnir, P.C., Pittsburgh, PA, William J. Madden, Solicitor, Mercer County, Sharon, PA, Elizabeth A. Dupuis, Babst Calland, State College, PA, for Defendant Mercer County Board of Elections.

Gerard Joseph Geiger, Newman Williams, Stroudsburg, PA, for Defendants Monroe County Board of Elections, Pike County Board of Elections, Schuylkill County Board of Elections, Snyder County Board of Elections, Wayne County Board of Elections.

Mark A. Aronchick, Christina Matthias, Pro Hac Vice, John B. Hill, Pro Hac Vice, Michele D. Hangley, Pro Hac Vice, Robert Wiygul, Pro Hac Vice, Hangley Aronchick Segal Pudlin & Schiller, Philadelphia, PA, Maureen Calder, Pro Hac Vice, Montgomery County Solicitor's Office, Norristown, PA, for Defendant Montgomery County Board of Elections.

Brian Taylor, Pro Hac Vice, Richard E. Santee, Pro Hac Vice, County of Northampton, Easton, PA, Timothy P. Brennan, Pro Hac Vice, County of Northampton, PA, PA, for Defendant Northampton County Board of Elections.

Mark A. Aronchick, Christina Matthias, Pro Hac Vice, John B. Hill, Pro Hac Vice, Michele D. Hangley, Robert Wiygul, Pro Hac Vice, Hangley Aronchick Segal Pudlin & Schiller, Zachary Strassburger, City of Philadelphia Law Department, Philadelphia, PA, for Defendant Philadelphia County Board of Elections.

Thomas R. Shaffer, Glassmire & Shaffer Law Offices, Coudersport, PA, for Defendant Potter County Board of Elections.

Michael P. Barbera, Barbera, Melvin, Svonavec & Sperlazza LLP, Somerset, PA, for Defendant Somerset County Board of Elections.

Kenneth R. Levitzky, Kenneth R. Levitzky, Esquire,

Dushore, PA, for Defendants Sullivan County Board of Elections, Wyoming County Board of Elections.

Robert Gawlas, Robert Schaub, Rosenn Jenkins & Greenwald LLP, Wilkes-Barre, PA, for Defendant Susquehanna County Board of Elections.

Christopher P. Gabriel, Carfardi Ferguson Wyrick Weis + Gabriel, Sewickley, PA, Raymond E. Ginn, Jr., Pro Hac Vice, Ginn & Vickery, P.C., Wellsboro, PA, for Defendant Tioga County Board of Elections.

Steven B. Silverman, Sean R. Keegan, Babst, Calland, Clements and Zomnir, P.C., Pittsburgh, PA, Allen P. Page, McNerney, Page, Vanderlin & Hall, Williamsport, PA, for Defendant Union County Board of Elections.

Nathaniel Justus Schmidt, Schmidt Law Firm, Warren, PA, for Defendant Warren County Board of Elections.

Robert J. Grimm, Swartz Campbell, Ryan Michael Joyce, Swartz Campbell, LLC, Pittsburgh, PA, for Defendant Washington County Board of Elections.

David A. Regoli, New Kensington, PA, for Defendant Westmoreland County Board of Elections.

Michelle Pokrifka, Pro Hac Vice, York County Solicitor's Office, York, PA, Steven B. Silverman, Molly E. Meacham, Sean R. Keegan, Andrew Degory, Babst Calland Clements and Zomnir, PC, Pittsburgh, PA, Elizabeth A. Dupuis, Babst Calland, State College, PA, for Defendant York County Board of Elections.

Adriel I. Cepeda Derieux, Pro Hac Vice, Dale E. Ho, Pro Hac Vice, Sophia Lin Lakin, Pro Hac Vice, American Civil Liberties Union Foundation, Christopher R. Noyes, Pro Hac Vice, Eleanor Davis, Pro Hac Vice, Jared Vasconcellos Grubow, Pro Hac Vice, Lori A. Martin, Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY, Benjamin David Geffen, Mary McKenzie, Public Interest Law Center, Philadelphia, PA, David P. Yin, Pro Hac Vice, Sarah E. Brannon, Pro Hac Vice, American Civil Liberties Union Foundation, John Michael Powers, Pro Hac Vice, Lawyers' Committee for Civil Rights Under Law, Washington, DC, Jason H. Liss, Pro Hac Vice, Boston, MA, Samantha Picans, Pro Hac Vice, Wilmer Cutler Pickering Hale and Dorr LLP, Denver, CO, Witold J. Walczak, Aclf of PA, Pittsburgh, PA, for Defendant NAACP Pennsylvania State Conference.

Adriel I. Cepeda Derieux, Pro Hac Vice, Dale E. Ho, Pro Hac Vice, Sophia Lin Lakin, Pro Hac Vice, American Civil Liberties Union Foundation, Christopher R. Noyes, Pro Hac Vice, Eleanor Davis, Jared Vasconcellos Grubow, Pro Hac Vice, Lori A. Martin, Wilmer Cutler

Pickering Hale and Dorr LLP, New York, NY, Benjamin David Geffen, Mary McKenzie, Public Interest Law Center, Philadelphia, PA, David P. Yin, Pro Hac Vice, Sarah E. Brannon, Pro Hac Vice, American Civil Liberties Union Foundation, John Michael Powers, Pro Hac Vice, Lawyers' Committee for Civil Rights Under Law, Washington, DC, Jason H. Liss, Pro Hac Vice, Boston, MA, Samantha Picans, Pro Hac Vice, Wilmer Cutler Pickering Hale and Dorr LLP, Denver, CO, Witold J. Walczak, Aclf of PA, Pittsburgh, PA, for Defendant Common Cause Pennsylvania.

Adriel I. Cepeda Derieux, Dale E. Ho, Sophia Lin Lakin, American Civil Liberties Union Foundation, Christopher R. Noyes, Eleanor Davis, Jared Vasconcellos Grubow, Lori A. Martin, Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY, Benjamin David Geffen, Mary McKenzie, Public Interest Law Center, Philadelphia, PA, David P. Yin, Pro Hac Vice, Sarah E. Brannon, American Civil Liberties Union Foundation, John Michael Powers, Pro Hac Vice, Lawyers' Committee for Civil Rights Under Law, Washington, DC, Jason H. Liss, Boston, MA, Samantha Picans, Wilmer Cutler Pickering Hale and Dorr LLP, Denver, CO, Witold J. Walczak, Aclf of PA, Pittsburgh, PA, for Defendants League of Women Voters of Pennsylvania, Patricia Demarco, Danielle Graham Robinson, Kathleen Wise.

**OPINION**

J. Nicholas Ranjan, United States District Judge

**\*1** Plaintiffs in this case are President Trump's reelection campaign, the Republican National Committee, and several other Republican congressional candidates and electors. They originally filed this suit, alleging federal and state constitutional violations stemming from Pennsylvania's implementation of a mail-in voting plan for the upcoming general election.

Since then, the Pennsylvania Supreme Court issued a decision involving similar claims, which substantially narrowed the focus of this case. And Secretary of the Commonwealth, Kathy Boockvar, issued additional election "guidance," which further narrowed certain of the claims.

Therefore, as this case presently stands, only three claims

remain. First, whether the use of so-called "drop boxes"[1] for mail-in ballots is unconstitutional, given the lack of guidance or mandates that those drop boxes have security guards to man them. Second, whether the Secretary's guidance as to mail-in ballots—specifically, her guidance that county election boards should not reject mail-in ballots where the voter's signature does not match the one on file—is unconstitutional. Third, whether Pennsylvania's restriction that poll watchers be residents in the county for which they are assigned, as applied to the facts of this case, is unconstitutional.

In order to present these claims to the Court on a complete record, the parties engaged in extensive fact and expert discovery, and have filed cross-motions for summary judgment. No party has raised a genuine dispute of material fact that would require a trial, and the Court has found none. As such, the parties' cross-motions for summary judgment are ready for disposition.

After a careful review of the parties' submissions and the extensive evidentiary record, the Court will enter judgment in favor of Defendants on all of Plaintiffs' federal-constitutional claims, decline to exercise supplemental jurisdiction over the state-constitutional claims, and dismiss this case. This is so for two main reasons.

First, the Court concludes that Plaintiffs lack Article III standing to pursue their claims. Standing, of course, is a necessary requirement to cross the threshold into federal court. Federal courts adjudicate cases and controversies, where a plaintiff's injury is concrete and particularized. Here, however, Plaintiffs have not presented a concrete injury to warrant federal-court review. All of Plaintiffs' remaining claims have the same theory of injury—one of "vote dilution." Plaintiffs fear that absent implementation of the security measures that they seek (guards by drop boxes, signature comparison of mail-in ballots, and poll watchers), there is a risk of voter fraud by other voters. If another person engages in voter fraud, Plaintiffs assert that their own lawfully cast vote will, by comparison, count for less, or be diluted.

**\*2** The problem with this theory of harm is that it is speculative, and thus Plaintiffs' injury is not "concrete"—a critical element to have standing in federal court. While Plaintiffs may not need to prove actual voter fraud, they must at least prove that such fraud is "certainly impending." They haven't met that burden. At most, they have pieced together a sequence of uncertain assumptions: (1) they assume potential fraudsters may attempt to commit election fraud through the use of drop boxes or forged ballots, or due to a potential shortage of

poll watchers; (2) they assume the numerous election-security measures used by county election officials may not work; and (3) they assume their own security measures may have prevented that fraud.

All of these assumptions could end up being true, and these events could theoretically happen. But so could many things. The relevant question here is: are they "certainly impending"? At least based on the evidence presented, the answer to that is "no." And that is the legal standard that Plaintiffs must meet. As the Supreme Court has held, this Court cannot "endorse standing theories that rest on speculation about the decisions of independent actors." *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013).

Second, even if Plaintiffs had standing, their claims fail on the merits. Plaintiffs essentially ask this Court to second-guess the judgment of the Pennsylvania General Assembly and election officials, who are experts in creating and implementing an election plan. Perhaps Plaintiffs are right that guards should be placed near drop boxes, signature-analysis experts should examine every mail-in ballot, poll watchers should be able to man any poll regardless of location, and other security improvements should be made. But the job of an unelected federal judge isn't to suggest election improvements, especially when those improvements contradict the reasoned judgment of democratically elected officials. *See Andino v. Middleton*, ___ U.S. ___, ___ S.Ct. ___, ___, ___ L.Ed.2d ___, 2020 WL 5887393, at *1 (Oct. 5, 2020) (Kavanaugh, J. concurring) (state legislatures should not be subject to "second-guessing by an unelected federal judiciary," which is "not accountable to the people") (cleaned up).

Put differently, "[f]ederal judges can have a lot of power—especially when issuing injunctions. And sometimes we may even have a good idea or two. But the Constitution sets out our sphere of decision-making, and that sphere does not extend to second-guessing and interfering with a State's reasonable, nondiscriminatory election rules." *New Georgia Project v. Raffensperger*, ___ F.3d ___, ___, 2020 WL 5877588, at *4 (11th Cir. Oct. 2, 2020).

As discussed below, the Court finds that the election regulations put in place by the General Assembly and implemented by Defendants do not significantly burden any right to vote. They are rational. They further important state interests. They align with the Commonwealth's elaborate election-security measures. They do not run afoul of the United States Constitution. They will not otherwise be second-guessed by this Court.

## BACKGROUND

### I. Procedural Background

#### A. Plaintiffs' original claims.

On June 29, 2020, Plaintiffs filed their original complaint in this case against Defendants, who are the Secretary of the Commonwealth and the 67 county boards of elections. [ECF 4]. With their lawsuit, Plaintiffs challenged a number of Pennsylvania's procedures with respect to mail-in voting—in particular, the use of drop boxes and the counting of mail-in ballots that contained certain procedural defects. *See* [*id.*]. Shortly after filing their original complaint, Plaintiffs moved for expedited discovery and an expedited declaratory-judgment hearing. [ECF 6]. Defendants opposed the motion. The Court partially granted the motion, scheduled a speedy hearing, and ordered expedited discovery before that hearing. [ECF 123; ECF 124].

**\*3** After Plaintiffs filed the original complaint, many non-parties sought to intervene in the action, including several organizations.[3] The Court granted all intervention motions. [ECF 309].

Defendants and Intervenors moved to dismiss the original complaint. In response, Plaintiffs filed an amended complaint. [ECF 234]. The amended complaint maintained the gist of the original, but added two new counts and made a variety of other drafting changes. *See* [ECF 242]. Defendants and Intervenors moved to dismiss the first amended complaint, too, primarily asking the Court to abstain and stay the case.

Plaintiffs' first amended complaint asserted nine separate counts, but they could be sorted into three overarching categories.

#### 1. Claims alleging vote dilution due to unlawful ballot collection and counting procedures.

The first category covered claims related to allegedly unlawful procedures implemented by some Defendants for the collection and counting of mail-in and absentee

ballots. Those included claims related to (1) Defendants' uneven use of drop boxes and other satellite ballot-collection sites, (2) procedures for verifying the qualifications of voters applying in person for mail-in or absentee ballots, and (3) rules for counting non-compliant ballots (such as ballots submitted without a secrecy envelope, without an elector declaration, or that contained stray marks on the envelope).

In Count I, Plaintiffs alleged violations of the Elections Clause and the related Presidential Electors Clause of the U.S. Constitution. [ECF 234, ¶¶ 193-205]. Plaintiffs asserted that, under these provisions, only the state legislature may set the time, place, and manner of congressional elections and determine how the state chooses electors for the presidency. [*Id.* at ¶ 196].

In support of this claim, Plaintiffs alleged that Secretary Boockvar's guidance concerning the use of mail-in ballot drop boxes, whether county boards of elections must independently verify mail-in ballot applications, and the counting of non-compliant mail-in ballots, was an executive overreach—in that the Secretary's guidance allegedly violated certain provisions of the Election Code enacted by the Pennsylvania General Assembly. [*Id.* at ¶ 201]. Plaintiffs also claimed that the Secretary's "unlawful guidance" increased the risk of fraudulent or unlawful voting and infringed on the right to vote, which, they said, amounted to additional violations of the 1st and 14th Amendments to the U.S. Constitution. [*Id.* at ¶¶ 202-03].

In Count II, Plaintiffs alleged a violation of the Equal-Protection Clause under the 14th Amendment. [*Id.* at ¶¶ 206-15]. Plaintiffs asserted that the implementation of the foregoing (*i.e.*, mail-in ballot drop boxes, the verification of mail-in ballot applications, and the counting of non-compliant ballots) was different in different counties, thereby treating voters across the state in an unequal fashion. [*Id.* at ¶¶ 211-13].

**\*4** In Count III, Plaintiffs asserted a violation of the Pennsylvania State Constitution. [*Id.* at ¶¶ 216-22]. Plaintiffs alleged that the same actions and conduct that comprised Counts I and II also violated similar provisions of the Pennsylvania Constitution. [*Id.* at ¶ 220].

Finally, in Counts VI and VII, Plaintiffs alleged that Defendants violated provisions of the federal and state constitutions by disregarding the Election Code's notice and selection requirements applicable to "polling places." [*Id.* at ¶¶ 237-52]. Plaintiffs alleged that drop boxes are "polling places," and thus subject to certain criteria for site selection and the requirement that county election

boards provide 20 days' public notice. [*Id.* at ¶¶ 239-42]. Plaintiffs asserted that Defendants' failure to provide this notice or select appropriate "polling places" in the primary election, if repeated in the general election, would create the risk of voter fraud and vote dilution. [*Id.* at ¶¶ 243-246].

**2. Poll-watcher claims.**

The second category of claims in the first amended complaint consisted of challenges to the constitutionality of Election-Code provisions related to poll watchers.

In Count IV, Plaintiffs alleged violations of the 1st and 14th Amendments. These claims had both a facial and an as-applied component. [ECF 234, ¶ 230 ("On its face and as applied to the 2020 General Election ...") ].

First, Plaintiffs alleged that 25 P.S. § 2687 was facially unconstitutional because it "arbitrarily and unreasonably" limits poll watchers to serving only in their county of residence and to monitoring only in-person voting at the polling place on election day. [*Id.* at ¶ 226]. Second, Plaintiffs alleged that the same provision was unconstitutional as applied in the context of Pennsylvania's new vote-by-mail system, because these poll-watcher restrictions, combined with insecure voting procedures, create unacceptable risks of fraud and vote dilution. [*Id.* at ¶ 228]. Plaintiffs contended that these limitations make it "functionally impracticable" for candidates to ensure that they have poll watchers present where ballots are deposited and collected, given the widespread use of remote drop boxes and other satellite collection sites. [*Id.*].

Count V was the same as Count IV, but alleged that the same poll-watching restrictions violated the Pennsylvania Constitution, too. [*Id.* at ¶ 234].

**3. In-person voting claims.**

The third category of claims consisted of challenges to the procedures for allowing electors to vote in person after requesting a mail-in ballot.

That is, in Counts VIII and IX, Plaintiffs asserted that the

Election Code permits an elector that has requested a mail-in ballot to still vote in person so long as he remits his spoiled ballot. [ECF 234, ¶¶ 253-267]. Plaintiffs asserted that during the primary, some counties allowed such electors to vote in person, while others did not, and they fear the same will happen in the general election. [*Id.* at ¶¶ 255, 259]. Plaintiffs also asserted that some counties allowed electors who had voted by mail to vote in person, in violation of the Election Code. [*Id.* at ¶¶ 257-58]. Plaintiffs alleged that this conduct also violates the federal and state constitutional provisions concerning the right to vote and equal protection. [*Id.* at ¶¶ 261, 265].

**B. The Court's decision to abstain.**
*5 Upon consideration of Defendants' and Intervenors' motions to dismiss the first amended complaint, on August 23, 2020, the Court issued an opinion abstaining under *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) and temporarily staying the case. [ECF 409, 410].

In doing so, the Court determined that the three requisite prongs for *Pullman* abstention were met, and that the discretionary considerations weighed in favor of abstention. [ECF 409, p. 3 ("[Under *Pullman*, federal courts abstain] if (1) doing so requires interpretation of 'unsettled questions of state law'; (2) permitting resolution of the unsettled state-law questions by state courts would 'obviate the need for, or substantially narrow the scope of adjudication of the constitutional claims'; and (3) an 'erroneous construction of state law would be disruptive of important state policies[.]' " (citing *Chez Sez III Corp. v. Township of Union*, 945 F.2d 628, 631 (3d Cir. 1991))); *id.* at p. 30 (explaining that after the three prongs of *Pullman* abstention are met, the court must "make a discretionary determination of whether abstention is appropriate given the particular facts of this case," which requires weighing "such factors as the availability of an adequate state remedy, the length of time the litigation has been pending, and the impact of delay on the litigants." (cleaned up)) ].

The Court found that abstaining under *Pullman* was appropriate because of several unresolved ambiguities in Pennsylvania's Election Code. Specifically, the Court found that there were significant ambiguities as to whether the Election Code (1) permitted delivery of ballots to locations other than the county election board's headquarters, such as drop boxes, (2) permitted counties to count ballots that were not placed within the "secrecy envelope" (*i.e.*, "naked ballots"), (3) considered drop

boxes and other ballot-collection sites as "polling places," as defined in the Election Code, and (4) required counties to automatically verify ballot applications for mail-in ballots (where the person applied for the ballot in person), even if there was no "bona fide objection" to the application. [ECF 409, pp. 17-23].

The Court explained that each of these ambiguities, if settled, would significantly narrow—or even resolve—some of Plaintiffs' claims. As the Court explained, for example, if a state court interpreted the Election Code to disallow drop boxes, Plaintiffs would obtain their requested relief (*i.e.*, no drop boxes); alternatively, if drop boxes were authorized by the Election Code, then Plaintiffs' allegations that drop boxes were illegal would be eliminated, which would, in turn, significantly affect the constitutional analysis of Plaintiffs' claims. [*Id.* at pp. 25-28]. The same held true for "naked ballots," the breadth of coverage of "polling places," and the requisite verification for personal ballot applications.

The Court then explained that it was appropriate for it to abstain until a state court could interpret the ambiguous state law. [*Id.* at pp. 28-30]. The Court concluded that if it interpreted the ambiguous state law, there was a sufficient chance that a state court could disagree with the interpretation, which would render this Court's interpretation not only advisory, but disruptive to state policies. The Court noted that especially in the election context, states have considerable discretion to implement their own policies without federal intervention. Accordingly, because these were questions of uninterpreted state law that were sufficiently ambiguous, federalism and comity demanded that a state court, not this Court, be the first interpreter.

*6 Finally, the Court explained that, despite the imminence of the election, abstention was still proper. [*Id.* at pp. 30-33]. The Court noted that state-court litigation was already pending that would resolve some of the statutory ambiguities at issue. [*Id.* at p. 31]. Further, the Court highlighted three courses Plaintiffs could immediately take to resolve the statutory ambiguities: intervene in the pending state-court litigation; file their own state-court case; or appeal this Court's abstention decision to the Third Circuit, and then seek certification of the unsettled state-law issues in the Pennsylvania Supreme Court. [*Id.* at pp. 31-33].

Additionally, the Court explained that it would stay the entire case, despite several of Plaintiffs' claims not being subject to *Pullman* abstention as they were not based on ambiguous state law. [*Id.* at pp. 34-37]. That's because, in

its discretion, the Court determined it would be more efficient for this case to progress as a single proceeding, rather than in piecemeal fashion. [*Id*.]. However, the Court allowed any party to move to lift the stay as to the few claims not subject to *Pullman* abstention, if no state-court decision had been issued by October 5, 2020. [*Id*.].

On August 28, 2020, five days after the Court abstained, Plaintiffs moved to modify the Court's stay, and moved for a preliminary injunction. [ECF 414]. Plaintiffs requested, among other things, that the Court order Defendants to segregate, and not pre-canvass or canvass, all ballots that were returned in drop boxes, lacked a secrecy envelope, or were delivered by a third party. [*Id*.]. Plaintiffs also requested that the Court lift the stay by September 14, 2020, instead of October 5, 2020. [*Id*.].

The Court denied Plaintiffs' motion for preliminary injunctive relief, finding that Plaintiffs failed to show they would be irreparably harmed. [ECF 444; ECF 445]. The Court also declined to move up the date when the stay would be lifted. [*Id*.]. The Court noted that, at the request of Secretary Boockvar, the Pennsylvania Supreme Court had already exercised its extraordinary jurisdiction to consider five discrete issues and clarify Pennsylvania law in time for the general election. [*Id*. at p. 1]. Since that case appeared to be on track, the Court denied Plaintiffs' motion without prejudice, and the Court's abstention opinion and order remained in effect.

**C. The Pennsylvania Supreme Court's decision.**
On September 17, 2020, the Pennsylvania Supreme Court issued its decision in *Pennsylvania Democratic Party v. Boockvar*, —— Pa. ——, —— A.3d ——, 2020 WL 5554644 (Sept. 17, 2020). The court clarified three issues of state election law that are directly relevant to this case.

**1. Counties are permitted under the Election Code to establish alternate ballot-collection sites beyond just their main county office locations.**

The Pennsylvania Supreme Court first considered whether the Election Code allowed a Pennsylvania voter to deliver his or her mail-in ballot in person to a location other than the established office address of the county's board of election. *Boockvar*, —— A.3d at ——, 2020 WL 5554644, at *8. The court further considered the means by which county boards of election could accept hand-delivered mail-in ballots. *Id*.

Consistent with this Court's abstention opinion, the court found that "the parties' competing interpretations of the Election Code on [these questions] are reasonable, rendering the Code ambiguous" on these questions. *Id*. After applying traditional principles of statutory interpretation, the court held that "the Election Code should be interpreted to allow county boards of election to accept hand-delivered mail-in ballots at locations other than their office addresses including drop-boxes." *Id*. at ——, 2020 WL 5554644, at *9. The court reached this conclusion due to "the clear legislative intent underlying Act 77 ... to provide electors with options to vote outside of traditional polling places." *Id*.

**\*7** The respondents in that case further argued that this interpretation would cause county boards of election to "employ myriad systems to accept hand-delivered mail-in ballots," which would "be unconstitutionally disparate from one another in so much as some systems will offer more legal protections to voters than others will provide" and violate the Equal-Protection Clause *Id*. The court rejected this argument. It found that "the exact manner in which each county board of election will accept these votes is entirely unknown at this point; thus, we have no metric by which to measure whether any one system offers more legal protection than another, making an equal protection analysis impossible at this time." *Id*.

**2. Ballots lacking inner secrecy envelopes should not be counted.**

The court next considered whether the boards of elections "must 'clothe and count naked ballots,' *i.e.*, place ballots that were returned without the secrecy envelope into a proper envelope and count them, rather than invalidate them." *Boockvar*, —— A.3d at ——, 2020 WL 5554644, at *21. The court concluded that they should not.

The court held that "the Legislature intended for the secrecy envelope provision [in the Election Code] to be mandatory." *Id*. at ——, 2020 WL 5554644, at *24. In other words, the relevant provisions "make clear the General Assembly's intention that, during the collection and canvassing processes, when the outer envelope in which the ballot arrived is unsealed and the sealed ballot

removed, it should not be readily apparent who the elector is, with what party he or she affiliates, or for whom the elector has voted." *Id.* The secrecy envelope "properly unmarked and sealed ensures that result," and "[w]hatever the wisdom of the requirement, the command that the mail-in elector utilize the secrecy envelope and leave it unblemished by identifying information is neither ambiguous nor unreasonable." *Id.*

As a result, the court ultimately concluded, "a mail-ballot that is not enclosed in the statutorily-mandated secrecy envelope must be disqualified." *Id.* at ——, 2020 WL 5554644, at *26

### 3. Pennsylvania's county-residency requirement for poll watchers is constitutional.

The final relevant issue the court considered was whether the poll-watcher residency requirement found in 25 P.S. § 2687(b) violates state or federal constitutional rights. *Boockvar*, —— A.3d at ——, 2020 WL 5554644, at *26. Relying on *Republican Party of Pennsylvania v. Cortés*, 218 F. Supp. 3d 396 (E.D. Pa. 2016), the court concluded that the poll-watcher residency provision "impose[d] no burden on one's constitutional right to vote and, accordingly, requires only a showing that a rational basis exists to be upheld." *Id.* at ——, 2020 WL 5554644, at *30. The court found rational-basis review was appropriate for three reasons.

First, "there is no individual constitutional right to serve as a poll watcher; rather, the right to do so is conferred by statute." *Id.* (citation omitted). Second, "poll watching is not incidental to the right of free association and, thus, has no distinct First Amendment protection." *Id.* (cleaned up). Third, "poll watching does not implicate core political speech." *Id.* (citation omitted).

The court went on to find that there was a "clear rational basis for the county poll watcher residency requirement[.]" *Id.* That is, given "Pennsylvania has envisioned a county-based scheme for managing elections within the Commonwealth," it is "reasonable that the Legislature would require poll watchers, who serve within the various counties of the state, to be residents of the counties in which they serve." *Id.*

In upholding the constitutionality of the "county poll watcher residency requirement," the court rejected the claim that "poll watchers are vital to protect against voter

fraud and that because of the distribution of voters throughout Pennsylvania, the residency requirement makes it difficult to identify poll watchers in all precincts." *Id.* The court concluded that the claims of "heightened election fraud involving mail-in voting" were "unsubstantiated" and "specifically belied by the Act 35 report issued by [Secretary Boockvar] on August 1, 2020." *Id.* Moreover, the court held that the "speculative claim that it is 'difficult' for both parties to fill poll watcher positions in every precinct, even if true, is insufficient to transform the Commonwealth's uniform and reasonable regulation requiring that poll watchers be residents of the counties they serve into a non-rational policy choice." *Id.*

**\*8** Based on the foregoing, the court declared "that the poll-watcher residency requirement does not violate the state or federal constitutions." *Id.* at ——, 2020 WL 5554644, at *31.

### D. Plaintiffs' notice of remaining claims.

Following the Pennsylvania Supreme Court's decision, this Court lifted the stay it had imposed pursuant to the *Pullman* abstention doctrine and ordered the parties to identify the remaining viable claims and defenses in the case. [ECF 447].

In their notice, Plaintiffs took the position that nearly all their claims remained viable, with a few discrete exceptions. Plaintiffs conceded that their "federal and state constitutional claims of voter dilution solely on the basis that drop boxes and other collection sites are not statutorily authorized by the Pennsylvania Election Code [were] no longer viable." [ECF 448, p. 4]. They also stated that their "facial challenge to the county residency requirement under 25 P.S. § 2687 is no longer a viable claim." [*Id.* at p. 10]. Plaintiffs also moved for leave to amend their complaint a second time to add new allegations and a new claim relating to Secretary Boockvar's recent signature-comparison guidance. [ECF 451].

Defendants and Intervenors, for their part, suggested that Plaintiffs' claims had been substantially narrowed, if not outright mooted, by the Pennsylvania Supreme Court's decision, and reminded the Court that their arguments for dismissal remained outstanding.

**E. The Court's September 23, 2020, memorandum orders.**

In response to the notices filed by the parties and Plaintiffs' motion for leave to amend the first amended complaint, the Court issued an order granting Plaintiffs' motion, narrowing the scope of the lawsuit, and establishing the procedure for resolving the remaining claims. [ECF 459].

As to Plaintiffs' proposed amendment to their complaint, the Court found that the new claim and allegations were relatively narrow, and thus amendment wouldn't prejudice Defendants and Intervenors. [*Id.* at pp. 3-4]. As a result, the Court granted the motion. [*Id.* at p. 4].

The Court, however, did inform the parties that it would "continue to abstain under *Pullman* as to Plaintiffs' claim pertaining to the notice of drop box locations and, more generally, whether the "polling place" requirements under the Election Code apply to drop-box locations." [*Id.* at p. 5]. This was so because those claims involve still-unsettled issues of state law. The Court explained that the "fact that the Pennsylvania Supreme Court did not address this issue in its recent decision is immaterial" because the "propriety of *Pullman* abstention does not depend on the existence of parallel state-court proceedings." (citing *Stoe v. Flaherty*, 436 F.3d 209, 213 (3d Cir. 2006)) ]. Moreover, Plaintiffs had several other avenues to pursue prompt interpretation of state law after this Court abstained. [*Id.* at p. 6].

The Court also informed the parties, for similar reasons, that it would continue to abstain with respect to Plaintiffs' claims regarding Secretary Boockvar's guidance that personal applications for mail-in ballots shall be accepted absent a "bona fide objection." [ECF 460].

The Court found that "no Article III 'case or controversy' remain[ed] with respect to the claims on which the Pennsylvania Supreme Court effectively ruled in Plaintiffs' favor on state-law grounds (*e.g.*, illegality of third-party ballot delivery; excluding 'naked ballots' submitted without inner-secrecy envelopes)." [ECF 459, p. 6]. Because there was "no reason to believe Defendants plan to violate what they themselves now agree the law requires," the Court held that Plaintiffs' claims were premature and speculative. [*Id.* at p. 7]. The Court therefore dismissed those claims as falling outside of its Article III power to adjudicate. [*Id.* (citations omitted) ].

**\*9** To resolve the remaining claims, the Court directed the parties to file cross-motions for summary judgment presenting all arguments for dismissal or judgment under Federal Rule of Civil Procedure 56. [*Id.* at pp. 8-10].

Before briefing on those motions, the Court authorized additional expedited discovery. [*Id.* at pp. 4-5]. The parties completed discovery and timely filed their motions; they identified no material disputes of fact; and therefore, the motions are now fully briefed and ready for disposition.

**F. The claims now at issue.**

Based on the Pennsylvania Supreme Court's prior ruling, this Court's prior decisions, Plaintiffs' nine-count Second Amended Complaint, and recent guidance issued by Secretary Boockvar, the claims remaining in this case are narrow and substantially different than those asserted at the outset of the case.

**Drop Boxes (Counts I-III).** Plaintiffs still advance a claim that drop boxes are unconstitutional, but in a different way. Now that the Pennsylvania Supreme Court has expressly held that drop boxes are authorized under the Election Code, Plaintiffs now assert that the use of "unmanned" drop boxes is unconstitutional under the federal and state constitutions, for reasons discussed in more detail below.

**Signature Comparison (Counts I-III).** Plaintiffs' newly added claim relates to signature comparison. Secretary Boockvar's September 2020 guidance informs the county boards that they are not to engage in a signature analysis of mail-in ballots and applications, and they must count those ballots, even if the signature on the ballot does not match the voter's signature on file. Plaintiffs assert that this guidance is unconstitutional under the federal and state constitutions.

**Poll Watching (Counts IV, V).** The Pennsylvania Supreme Court already declared that Pennsylvania's county-residency requirement for poll watchers is *facially* constitutional. Plaintiffs now only assert that the requirement, *as applied*, is unconstitutional under the federal and state constitutions.

The counts that remain in the Second Amended Complaint, but which are *not* at issue, are the counts related to where poll watchers can be located. That is implicated mostly by Counts VI and VII, and by certain allegations in Counts IV and V. The Court continues to abstain from reaching that issue. Plaintiffs have filed a separate state lawsuit that would appear to address many of those issues, in any event. [ECF 549-22; ECF 573-1]. Counts VIII and IX concern challenges related to voters that have requested mail-in ballots, but that instead seek

to vote in person. The Secretary issued recent guidance, effectively mooting those claims, and, based on Plaintiffs' positions taken in the course of this litigation, the Court deems Plaintiffs to have withdrawn Counts VIII and IX. [ECF 509, p. 15 n.4 ("[I]n the September 28 guidance memo, the Secretary corrected [her] earlier guidance to conform to the Election Code and states that any mail-in voter who spoils his/her ballot and the accompanying envelopes and signs a declaration that they did not vote by mail-in ballot will be allowed to vote a regular ballot. Therefore, Plaintiffs agree to withdraw this claim from those that still are being pursued.") ].

## II. Factual Background

### A. Pennsylvania's Election Code, and the adoption of Act 77.

#### 1. The county-based election system.

Pennsylvania's Election Code, first enacted in 1937, established a county-based system for administering elections. *See* 25 P.S. § 2641(a) ("There shall be a county board of elections in and for each county of this Commonwealth, which shall have jurisdiction over the conduct of primaries and elections in such county, in accordance with the provisions of [the Election Code]."). The Election Code vests county boards of elections with discretion to conduct elections and implement procedures intended to ensure the honesty, efficiency, and uniformity of Pennsylvania's elections. *Id.* §§ 2641(a), 2642(g).

#### 2. The adoption of Act 77.

**\*10** On October 31, 2019, the Pennsylvania General Assembly passed "Act 77," a bipartisan reform of Pennsylvania's Election Code. *See* [ECF 461, ¶¶ 91]; 2019 Pa. Legis. Serv. Act 2019-77 (S.B. 421).

Among other things, by passing Act 77, Pennsylvania joined 34 other states in authorizing "no excuse" mail-in voting by all qualified electors. *See* [ECF 461, ¶¶ 92]; 25

P.S. §§ 3150.11-3150.17; [ECF 549-11, p. 5 ("The largest number of states (34), practice no-excuse mail-in voting, allowing any persons to vote by mail regardless of whether they have a reason or whether they will be out of their jurisdiction on Election Day.") ]. Previously, a voter could only cast an "absentee" ballot if certain criteria were met, such as that the voter would be away from the election district on election day. *See* 1998 Pa. Legis. Serv. Act. 1998-18 (H.B. 1760), § 14.

Like the previous absentee voting system, Pennsylvania's mail-in voting system requires voters to "opt-in" by requesting a ballot from either the Secretary or the voter's county board of elections. *See* 25 P.S. §§ 3146.2(a), 3150.12(a). When requesting a ballot, the voter must provide, among other things, his or her name, date of birth, voting district, length of time residing in the voting district, and party choice for primary elections. *See* 25 P.S. §§ 3146.2(b), 3150.12(b). A voter must also provide proof of identification; namely, either a driver's license number or, in the case of a voter who does not have a driver's license, the last four digits of the voter's Social Security number, or, in the case of a voter who has neither a driver's license nor a Social Security number, another form of approved identification. 25 P.S. § 2602(z.5)(3). In this respect, Pennsylvania differs from states that automatically mail each registered voter a ballot—a practice known as "universal mail-in voting." [ECF 549-11, p. 6] ("[N]ine states conduct universal vote-by-mail elections in which the state (or a local entity, such [as] a county or municipality) mails all registered voters a ballot before each election without voters' [sic] having to request them.").

#### 3. The COVID-19 pandemic.

Since early 2020, the United States, and Pennsylvania, have been engulfed in a viral pandemic of unprecedented scope and scale. [ECF 549-8, ¶ 31]. In that time, COVID-19 has spread to every corner of the globe, including Pennsylvania, and jeopardized the safety and health of many people. [*Id.* at ¶¶ 31, 38-39, 54-55, 66]. As of this date, more than 200,000 Americans have died, including more than 8,000 Pennsylvanians. *See* Covid in the U.S.: Latest Map and Case Count, The New York Times, available at https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last visited Oct. 10, 2020); COVID-19 Data for Pennsylvania, Pennsylvania Department of Health, available at

Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)

https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx (last visited Oct. 10, 2020).

There have been many safety precautions that Pennsylvanians have been either required or urged to take, such as limiting participation in large gatherings, maintaining social distance, and wearing face coverings. [ECF 549-8, ¶¶ 58, 63-65]. The threat of COVID-19 is likely to persist through the November general election. [*Id.* at ¶¶ 53-56, 66-68].

### B. Facts relevant to drop boxes.

*11 Pennsylvania's county-based election system vests county boards of elections with "jurisdiction over the conduct of primaries and elections in such county, in accordance with the provisions" of the Election Code. 25 P.S. § 2641(a). The Election Code further empowers the county boards to "make and issue such rules, regulations and instructions, not inconsistent with law, as they may deem necessary for the guidance of voting machine custodians, elections officers and electors." *Id.* at § 2642(f). The counties are also charged with the responsibility to "purchase, preserve, store and maintain primary and election equipment of all kinds, including voting booths, ballot boxes and voting machines." *Id.* at § 2642(c).

As noted above, in *Pennsylvania Democratic Party v. Boockvar*, the Pennsylvania Supreme Court interpreted the Election Code, which allows for mail-in and absentee ballots to be returned to the "county board of election," to "permit[ ] county boards of election to accept hand-delivered mail-in ballots at locations other than their office addresses including drop-boxes." —— A.3d at ——, 2020 WL 5554644, at *10.

Thus, it is now settled that the Election Code permits (but does not require) counties to authorize drop boxes and other satellite-collection locations for mailed ballots. 25 P.S. § 3150.16(a). Pennsylvania is not alone in this regard—as many as 34 other states and the District of Columbia authorize the use of drop boxes or satellite ballot collection sites to one degree or another. [ECF 549-11, p. 8, fig. 4]. Indeed, Secretary Boockvar stated that as many as 16% of voters nationwide had cast their ballots using drop boxes in the 2016 general election, including the majority of voters in Colorado (75%) and Washington (56.9%). [ECF 547, p. 18 (citing ECF 549-16) ].

### 1. Secretary Boockvar's guidance with respect to drop boxes.

Since the passage of Act 77, Secretary Boockvar has issued several guidance documents to the counties regarding the counties' implementation of mail-in voting, including guidance with respect to the use of drop boxes. [ECF 504-21; 504-22; 504-23; 504-24; 504-25; 571-1, Ex. E]. In general terms, the Secretary's guidance as to drop boxes informed the counties that the use of drop boxes was authorized by the Election Code and recommended "best practices" for their use. Her latest guidance offered standards for (1) where drop boxes should be located, [ECF 504-23, § 1.2], (2) how drop boxes should be designed and what signage should accompany them, [*id.* at §§ 2.2-2.3], (3) what security measures should be employed, [*id.* at § 2.5], and (4) what procedures should be implemented for collecting and returning ballots to the county election office, [*id.* at §§ 3.1-3.3, 4].

As to the location of drop boxes, the Secretary recommended that counties consider the following criteria, [*id.* at § 1.2]:

• Locations that serve heavily populated urban/suburban areas, as well as rural areas;

• Locations near heavy traffic areas such as commercial corridors, large residential areas, major employers and public transportation routes;

• Locations that are easily recognizable and accessible within the community;

• Locations in areas in which there have historically been delays at existing polling locations, and areas with historically low turnout;

• Proximity to communities with historically low vote by mail usage;

• Proximity to language minority communities;

• Proximity to voters with disabilities;

• Proximity to communities with low rates of household vehicle ownership;

• Proximity to low-income communities;

• Access to accessible and free parking; and

• The distance and time a voter must travel by car or public transportation.

With respect to drop-box design criteria, the Secretary recommended to counties, [*id.* at § 2.2]:

**\*12** • Hardware should be operable without any tight grasping, pinching, or twisting of the wrist;

• Hardware should require no more than 5 lbs. of pressure for the voter to operate;

• Receptacle should be operable within reach-range of 15 to 48 inches from the floor or ground for a person utilizing a wheelchair;

• The drop-box should provide specific points identifying the slot where ballots are inserted;

• The drop-box may have more than one ballot slot (e.g. one for drive-by ballot return and one for walk-up returns);

• To ensure that only ballot material can be deposited and not be removed by anyone but designated county board of election officials, the opening slot of a drop-box should be too small to allow tampering or removal of ballots; and

• The opening slot should also minimize the ability for liquid to be poured into the drop-box or rainwater to seep in.

The Secretary's guidance as to signage recommended, [*id.* at § 2.3]:

• Signage should be in all languages required under the federal Voting Rights Act of 1965 (52 U.S.C. Sec. 10503);

• Signage should display language stating that counterfeiting, forging, tampering with, or destroying ballots is a second-degree misdemeanor pursuant to sections 1816 and 1817 of the Pennsylvania Election Code (25 P.S. §§ 3516 and 3517);

• Signage should also provide a statement that third-party return of ballots is prohibited unless the person returning the ballot is rendering assistance to a disabled voter or an emergency absentee voter. Such assistance requires a declaration signed by the voter and the person rendering assistance; and

• Signage should provide a statement requesting that the designated county elections official should be

notified immediately in the event the receptacle is full, not functioning, or is damaged in any fashion, and should provide a phone number and email address for such purpose.

With respect to ballot security, the Secretary stated that county boards should implement the following security measures, [*id.* at § 2.5]:

• Only personnel authorized by the county board of elections should have access to the ballots inside of a drop-box;

• Drop-boxes should be secured in a manner to prevent their unauthorized removal;

• All drop-boxes should be secured by a lock and sealed with a tamper-evident seal. Only authorized election officials designated by the county board of elections may access the keys and/or combination of the lock;

• Drop-boxes should be securely fastened in a manner as to prevent moving or tampering, such as fastening the drop-box to concrete or an immovable object;

• During the hours when the staffed return site is closed or staff is unavailable, the drop-box should be placed in a secure area that is inaccessible to the public and/or otherwise safeguarded;

• The county boards of election should ensure adequate lighting is provided at all ballot return sites when the site is in use;

• When feasible, ballot return sites should be monitored by a video security surveillance system, or an internal camera that can capture digital images and/or video. A video security surveillance system can include existing systems on county, city, municipal, or private buildings. Video surveillance should be retained by the county election office through 60 days following the deadline to certify the election; and

**\*13** • To prevent physical damage and unauthorized entry, the drop-box at a ballot return site located outdoors should be constructed of durable material able to withstand vandalism, removal, and inclement weather.

With respect to ballot collection and "chain of custody" procedures, the Secretary stated that counties should adhere to the following standards, [*id.* at §§ 3.1-3.2]:

• Ballots should be collected from ballot return sites only by personnel authorized by the county board of elections and at times determined by the board of elections, at least every 24 hours, excluding Saturdays and Sundays;

• The county board of elections should designate at least two election officials to collect voted ballots from a ballot return site. Each designated election official should carry identification or an official designation that identifies them as an election official authorized to collect voted ballots;

• Election officials designated to collect voted ballots by the board of elections should sign a declaration declaring that he or she will timely and securely collect and return voted ballots, will not permit any person to tamper with a ballot return site or its contents, and that he or she will faithfully and securely perform his or her duties;

• The designated election officials should retrieve the voted ballots from the ballot return site and place the voted ballots in a secure ballot transfer container;

• The designated election officials should note on *Ballot Return Site Collection Forms* the site and unique identification number of the ballot return site and the date and time of retrieval;

• Ballots collected from any ballot return site should be immediately transported to the county board of elections;

• Upon arrival at the office of the county board of elections, the county board of elections, or their designee(s), should note the time of arrival on the same form, as described above;

• The seal number should be verified by a county election official or a designated representative;

• The county board of elections, or their designee(s), should inspect the drop-box or secure ballot transfer container for evidence of tampering and should receive the retrieved ballots by signing the retrieval form and including the date and time of receipt. In the event tampering is evident, that fact must be noted on the retrieval form;

• The completed collection form should be maintained in a manner proscribed by the board of elections to ensure that the form is traceable to its respective secure ballot container; and

• The county elections official at the county election office or central count location should note the number of ballots delivered on the retrieval form.

And finally, as to election day and post-election day procedures with respect to drop boxes, the Secretary provided as follows, [*id.* at §§ 3.3, 4]:

• The county board of elections should arrange for authorized personnel to retrieve ballots on election night and transport them to the county board of elections for canvassing of the ballots;

• Authorized personnel should be present at ballot return sites immediately prior to 8:00 p.m. or at the time the polls should otherwise be closed;

• At 8:00 p.m. on election night, or later if the polling place hours have been extended, all ballot return sites and drop-boxes must be closed and locked;

**\*14** • Staff must ensure that no ballots are returned to the ballot return site after the close of polls;

• After the final retrieval after the closing of the polls, the drop-box must be removed or locked and/or covered to prevent any further ballots from being deposited, and a sign shall be posted indicating that polling is closed for the election; and

• Any ballots collected from a return site should be processed in the same manner as mail-in ballots personally delivered to the central office of the county board of elections official by the voter and ballots received via the United States Postal Service or any other delivery service.

The Secretary and her staff developed this guidance in consultation with subject-matter experts within her Department and after review of the policies, practices, and laws in other states where drop boxes have been used. [ECF 549-6, pp. 23:14-22]. The evidence reflects at least one instance in which the Secretary's deputies reiterated that these "best practices" should be followed in response to inquiries from county officials considering whether to use drop boxes. [ECF 549-32 ("Per our conversation, the list of items are things the county must keep in mind if you are going to provide a box for voters to return their ballots in person.") ].

Approximately 24 counties plan to use drop boxes during the November general election, to varying degrees. [ECF 549-28; ECF 504-1]. Of these, about nine counties intend to staff the drop boxes with county officials, while about 17 counties intend to use video surveillance in lieu of

having staff present. [ECF 549-28].

## 2. Defendants' and Intervenors' evidence of the benefits and low risks associated with drop boxes.

Secretary Boockvar advocates for the use of drop boxes as a "direct and convenient way" for voters to deliver cast ballots to their county boards of elections, "thereby increasing turnout." [ECF 547, p. 22 ¶ 54 (citing 549-11 at pp. 10-11) ]. The Secretary also touts the special benefits of expanding drop-box use in the ongoing COVID-19 pandemic. Specifically, she asserts that drop boxes reduce health risks and inspire voter confidence because "many voters understandably do not wish to cast their votes in person at their polling place on Election Day" due to COVID-19. [*Id.* at ¶¶ 55, 57 (citing ECF 549-2 ¶ 39; ECF 549-11 at p. 10; 549-8, ¶ 95) ]. Drop boxes, she says, allow voters to vote in person without coming into "close proximity to other members of the public, compared to in-person voting or personally delivering a mail-in ballot to a public office building." [*Id.* at ¶ 57].

Secretary Boockvar also states that drop boxes are highly convenient, and cost-saving, for both counties and voters. For counties, she notes that "24-hour secure ballot drop boxes" are "cost-effective measures ... as they do not have to be staffed by election judges." [*Id.* at p. 24 ¶ 62 (citing ECF 549-11 at p. 11; ECF 549-9 at ¶ 34]. As for voters, the Secretary explains that, in a state where "ten counties ... cover more than 1,000 square miles" and "two-thirds" of counties "cover more than 500 square miles," many Pennsylvania voters "could be required to drive dozens of miles (and perhaps in excess of 100 miles) if he or she wished to deposit his or her mail-in ballot in person at the main county board of elections office." [*Id.* at ¶ 58 (citing ECF 549-29) ].

**\*15** In addition to any tangible benefit drop boxes may have for voter access and turnout, Secretary Boockvar also states that drop boxes have a positive impact on voter confidence. In particular, she cites a recent news article, and a letter sent by the General Counsel of the U.S. Postal Service regarding Pennsylvania's absentee and mail-in ballot deadline, which have raised concerns over the timeliness and reliability of the U.S. Postal Service. [*Id.* at ¶¶ 60-61 (citing ECF 549-13; ECF 549-14); ECF 549-17; ECF 549-2 ¶¶ 42-43]. Voters' fears that votes returned by mail will not be timely counted could, the Secretary worries, "justifiably dissuade voters from wanting to rely upon the Postal Service for return of their mail-in or absentee ballot." [ECF 547, ¶ 61]. Drop boxes, she says, can address this concern by allowing voters to safely return mail-in ballots to an in-person location.

In exchange for these benefits, the Secretary insists that any potential security risk associated with drop boxes is low. She notes that the federal Department of Homeland Security has released guidance affirming that a "ballot drop box provides a secure and convenient means for voters to return their mail ballot," and recommending that states deploy one drop box for every 15,000 to 20,000 registered voters. [*Id.* at ¶¶ 63-65 (citing ECF 549-24, p. 1) ]. She also points to a purported lack of evidence of systemic ballot harvesting or any attempts to tamper with, destroy, or otherwise commit voter fraud using drop boxes, either in Pennsylvania's recent primary election, or in other states that have used drop boxes for many years. [*Id.* at ¶¶ 68-74 (citations omitted) ]. And she asserts that "[i]n the last 20 years in the entire state of Pennsylvania, there have been fewer than a dozen confirmed cases of fraud involving a handful of absentee ballots" among the many millions of votes cast during that time period. [*Id.* at ¶ 70 (citing ECF 549-10, pp. 3-4) ].

Finally, the Secretary, and other Defendants and Intervenors, argue that Pennsylvania already has robust measures in place to prevent fraud, including its criminal laws, voter registration system, mail-in ballot application requirement, and canvassing procedures. [*Id.* at ¶¶ 66-67 (citing 25 P.S. §§ 3516 - 3518) ]; [ECF 549-9, p. 15, ¶¶ 46-47 ("These allegations are not consistent with my experience with drop box security, particularly given the strong voter verification procedures that are followed by elections officials throughout the country and in Pennsylvania. Specifically, the eligibility and identity of the voter to cast a ballot is examined by an election judge who reviews and confirms all the personal identity information provided on the outside envelope. Once voter eligibility is confirmed, the ballot is extracted and separated from the outside envelope to ensure the ballot remains secret. During this step, election judges confirm that there is only one ballot in the envelope and checks for potential defects, such as tears in the ballot.... Regardless of the receptacle used for acceptance of the ballot (drop box versus USPS mailbox), ballot validation occurs when the ballot is received by the county board of elections. The validation is the same regardless of how the ballots are collected or who delivers the ballot, even where that delivery contravenes state law.") ].

Defendants and Intervenors also point to several expert reports expressing the view that drop boxes are both low risk and beneficial. These experts include:

**Professor Matthew A. Barreto**, a Professor of Political Science and Chicana/o Studies at UCLA. [ECF 549-7]. Professor Barreto offers the opinion that ballot drop boxes are an important tool in facilitating voting in Black and Latino communities. Specifically, he discusses research showing that Black and Latino voters are "particularly concerned about the USPS delivering their ballots." [*Id.* at ¶ 22]. And he opines that ballot drop boxes help to reassure these voters that their vote will count, because "there is no intermediary step between the voters and the county officials who collect the ballot." [*Id.* at ¶ 24].

**\*16 Professor Donald S. Burke**, a medical doctor and Distinguished University Professor of Health Science and Policy, Jonas Salk Chair in Population Health, and Professor of Epidemiology at the University of Pittsburgh. [ECF 549-8]. Professor Burke details the "significant risk of exposure" to COVID-19 in "enclosed areas like polling places." [*Id.* at ¶ 69]. He opines that "depositing a ballot in a mailbox and depositing a ballot in a drop-box are potential methods of voting that impart the least health risk to individual voters, and the least public health risk to the community." [*Id.* at ¶ 95].

**Amber McReynolds**, the CEO of the National Vote at Home Institute, with 13 years of experience administering elections as an Elections Director, Deputy Director, and Operations Manager for the City and County of Denver, Colorado. [ECF 549-9]. Ms. McReynolds opines that "[b]allot drop-boxes can be an important component of implementing expanded mail-in voting" that are "generally more secure than putting a ballot in post office boxes." [*Id.* at ¶ 16 (a) ]. She notes that "[d]rop boxes are managed by election officials ... delivered to election officials more quickly than delivery through the U.S. postal system, and are secure." [*Id.*].

Ms. McReynolds also opines that Secretary Boockvar's guidance with respect to drop boxes is "consistent with best practices and advice that NVAHI has provided across jurisdictions." [*Id.* at ¶ 35]. But she also notes that "[b]est practices will vary by county based on the county's available resources, population, needs, and assessment of risk." [*Id.* at ¶ 52].

More generally, Ms. McReynolds argues that "[d]rop-boxes do not create an increased opportunity for fraud" as compared to postal boxes. [*Id.* at ¶ 44]. She also suggests that Pennsylvania guards against such fraud through other "strong voter verification procedures," including "ballot validation [that] occurs when the ballot is received by the county board of elections" and "[r]econciliation procedures adopted by election officials

... [to] protect against the potential risk of double voting." [*Id.* at ¶¶ 46-48]. She notes that "Pennsylvania's balloting system requires that those who request a mail-in vote and do not return the ballot (or spoil the mail-in ballot at their polling place), can only vote a provisional ballot" and "[i]f a mail-in or absentee ballot was submitted by an individual, their provisional ballot is not counted." [*Id.* at ¶ 48].

**Professor Lorraine C. Minnite**, an Associate Professor and Chair of the Department of Public Policy and Administration at Rutgers University-Camden. [ECF 549-10]. Professor Minnite opines that "the incidence of voter fraud in contemporary U.S. elections is exceedingly rare, including the incidence of voter impersonation fraud committed through the use of mail-in absentee ballots." [*Id.* at p. 3]. In Pennsylvania specifically, she notes that "[i]n the last 20 years ... there have been fewer than a dozen confirmed cases of fraud involving a handful of absentee ballots, and most of them were perpetrated by insiders rather than ordinary voters." [*Id.* at pp. 3-4]. As a "point of reference," she notes that 1,459,555 mail-in and absentee ballots were cast in Pennsylvania's 2020 primary election alone. [*Id.* at 4].

**Professor Robert M. Stein**, a Professor of Political Science at Rice University and a fellow in urban politics at the Baker Institute. [ECF 549-11]. Professor Stein opines that "the Commonwealth's use of drop boxes provides a number of benefits without increasing the risk of mail-in or absentee voter fraud that existed before drop boxes were implemented because (manned or unmanned) they are at least as secure as U.S. Postal Service ('USPS') mailboxes, which have been successfully used to return mail-in ballots for decades in the Commonwealth and elsewhere around the U.S." [*Id.* at p. 3]. According to Professor Stein, the use of drop boxes "has been shown to increase turnout," which he suggests is particularly important "during a global pandemic and where research has shown that natural and manmade disasters have historically had a depressive effect on voter turnout." [*Id.* at p. 4]. Professor Stein notes that "[d]rop boxes are widely used across a majority of states as a means to return mail-in ballots" and he is "not aware of any studies or research that suggest that drop boxes (manned or unmanned) are a source for voter fraud." [*Id.*]. Nor is he aware "of any evidence that drop boxes have been tampered with or led to the destruction of ballots." [*Id.*].

**\*17 Professor Paul Gronke**, a Professor of Political Science at Reed College and Director of the Early Voting Information Center. [ECF 545-7]. Professor Gronke recommends that "drop boxes should be provided in every jurisdiction that has significant (20% or more)

percentage[ ] of voters casting a ballot by mail, which includes Pennsylvania" for the general election. [*Id.* at ¶ 6]. He avers that "[s]cientific research shows that drop boxes raise voter turnout and enhance voter confidence in the elections process." [*Id.* at ¶ 7]. Voters, he explains, "utilize drop boxes heavily—forty to seventy percent of voters in vote by mail states and twenty-five percent or more in no-excuse absentee states." [*Id.*]. Professor Gronke further states that he is "not aware of any reports that drop boxes are a source for voter fraud" despite having "been in use for years all over the country." [*Id.* at ¶ 8]. And he suggests that the use of drop boxes is "especially important" in an election "that will be conducted under the cloud of the COVID-19 pandemic, and for a state like Pennsylvania that is going to experience an enormous increase in the number of by-mail ballots cast by the citizenry of the state." [*Id.* at ¶ 9].

Based on this evidence, and the purported lack of any contrary evidence showing great risks of fraud associated with the use of drop boxes, Defendants and Intervenors argue that Pennsylvania's authorization of drop boxes, and the counties' specific implementation of them, furthers important state interests at little cost to the integrity of the election system.

**3. Plaintiffs' evidence of the risks of fraud and vote dilution associated with drop boxes.**

Plaintiffs, on the other hand, argue that the drop boxes allow for an unacceptable risk of voter fraud and "illegal delivery or ballot harvesting" that, when it occurs, will "dilute" the votes of all lawful voters who comply with the Election Code. *See, e.g.,* [ECF 461, ¶¶ 127-128]. As evidence of the dilutive impact of drop boxes, Plaintiffs offer a combination of anecdotal and expert evidence.

Foremost among this evidence is the expert report of Greg Riddlemoser, the former Director of Elections and General Registrar for Stafford County, Virginia from 2011 until 2019. [ECF 504-19]. According to Mr. Riddlemoser, "voter fraud exists." [*Id.* at p. 2]. He defines the term "voter fraud" to mean any "casting and/or counting of ballots in violation of a state's election code." [*Id.*]. Examples he gives include: "Voting twice yourself—even if in multiple jurisdictions," "voting someone else's ballot," and "[e]lection officials giving ballots to or counting ballots from people who were not entitled to vote for various reasons." [*Id.* at pp. 2-3]. All

of these things, he asserts, are "against the law and therefore fraudulent." [*Id.*].[3]

Mr. Riddlemoser argues that "ballot harvesting" (which is the term Plaintiffs use to refer to situations in which an individual returns the ballots of other people) "persists in Pennsylvania." [*Id.* at p. 3]. He points to the following evidence to support this opinion:

• Admissions by Pennsylvania's Deputy Secretary for Elections and Commissions, Jonathan Marks, that "several Pennsylvania counties permitted ballot harvesting by counting ballots that were delivered in violation of Pennsylvania law" during the recent primary election, [*Id.*];

• "[S]everal instances captured by the media where voters in the June 2020 Primary deposited multiple ballots into unstaffed ballot drop boxes," [*Id.* at p. 4];

• "Other photographs and video footage of at least one county's drop box (Elk County) on Primary Election day" which "revealed additional instances of third-party delivery," [*Id.*]; and

• "Documents produced by Montgomery County" which "reveal that despite signs warning that ballot harvesting is not permitted, people during the 2020 Primary attempted to deposit into the five drop boxes used by that county ballots that were not theirs," [*Id.*].

**\*18** With respect to the use of "unstaffed" or "unmanned" ballot drop boxes, Mr. Riddlemoser expresses the opinion that "the use of unmanned drop boxes presents the easiest opportunity for voter fraud" and "certain steps must be taken to make drop boxes 'secure' and 'monitored.' " [*Id.* at p. 16].

He states that, to be "secure," drop boxes must be "attended" by "sworn election officials" at all times (*i.e.,* "never left unattended at any time they are open for ballot drop-off."). [*Id.*]. He further suggests that officials stationed at drop boxes must be empowered, and required, to "verify the person seeking to drop off a ballot is the one who voted it and is not dropping off someone else's ballot." [*Id.*]. Doing so, he says, would, in addition to providing better security, also "allow the election official to ask the voter if they followed the instructions they were provided ... and assist them in doing so to remediate any errors, where possible, before ballot submission." [*Id.*].

In addition to being "manned," Mr. Riddlemoser suggests that certain procedures with respect to ballot collection are necessary to ensure the integrity of votes cast in drop

Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)

boxes. For example, he suggests that, at the end of each day, drop boxes, which should themselves be "tamperproof," should "be verifiably completely emptied into fireproof/tamperproof receptacles, which are then sealed and labeled by affidavit as to whom, where, when, etc." [*Id.*] Once sealed, the containers "must then be transported by sworn officials in a county owned vehicle (preferably marked law enforcement) back to the county board where they are properly receipted and safeguarded." [*Id.*]. Emptied drop boxes should also be sealed at the end of each day "such that they are not able to accept any additional ballots until they are 'open' again[.]" [*Id.*]. And boxes should be "examined to ensure no ballots are in the box, that nothing else is inside the box, and that the structural integrity and any security associated with the box remains intact." [*Id.*]. All of this, he suggests, should also be "available for monitoring by poll watchers." [*Id.*].

According to Mr. Riddlemoser, anything short of these robust procedures won't do. In particular, "video cameras would not prevent anyone from engaging in activity that could or is designed to spoil the ballots inside the box; such as dumping liquids into the box, lighting the ballots on fire by using gasoline and matches, or even removing the box itself." [*Id.* at p. 17]. Even if the "identity of the person responsible may be determined ... the ballots themselves would be destroyed—effectively disenfranchising numerous voters." [*Id.*]. And given "recent footage of toppled statues and damage to government buildings" in the news, Mr. Riddlemoser finds the "forcible removal of ballot drop boxes" to be "a distinct possibility." [*Id.*]. In addition to increasing the risk of ballot destruction, Mr. Riddlemoser notes that reliance on video cameras would also "not prohibit someone from engaging in ballot harvesting by depositing more than one ballot in the drop box[.]" [*Id.*].

Beyond Mr. Riddlemoser's expert testimony, Plaintiffs proffer several other pieces of evidence to support their claims that drop boxes pose a dilutive threat to the ballots of lawful voters. Most notably, they present photographs and video stills of, by the Court's count, approximately seven individuals returning more than one ballot to drop boxes in Philadelphia and Elk County (the same photographs referenced by Mr. Riddlemoser). [ECF 504-19, PDF pp. 49-71].

**\*19** Those photographs depict the following:

- **An unidentified woman holding what appear to be two ballots at a Philadelphia drop box.**



- **Instagram user "thefoodiebarrister" posing for a selfie with two ballots in Philadelphia; captioned, in part, "dropping of [sic] my votes in a designated ballot drop box."**



• A photograph posted to social media showing a
hand placing two ballots in a drop box; captioned,
in part, "Cory and I voted!"





• A photograph of an unidentified man wearing a
"Philadelphia Water" sweater and hat, placing
two ballots in a Philadelphia drop box.



• Several video stills that, according to Plaintiffs,
show voters depositing more than one ballot in an
Elk County drop box.





In addition to these photographs and video stills, Plaintiffs
also provide a May 24, 2020, email sent by an official in
Montgomery County (which placed security guards to
monitor its drop boxes) observing that security "have

turned people away yesterday and today without incident who had ballots other than their own." [ECF 504-28].

Separate and apart from this evidence specific to the use of drop boxes, Plaintiffs and their expert also provide evidence of instances of election fraud, voter fraud, and illegal voting generally. These include, for example:

• A case in which a New Jersey court ordered a new municipal election after a city councilman and councilman-elect were charged with fraud involving mail-in ballots. [ECF 504-19, p. 3].

• A New York Post article written by an anonymous fraudster who claimed to be a "master at fixing mail-in ballots" and detailed his methods. [*Id.*].

• Philadelphia officials' admission that approximately 40 people were permitted to vote twice during the 2020 primary elections. [*Id.*].

• A YouTube video purporting to show Philadelphia election officials approving the counting of mail-in ballots that lacked a completed certification on the outside of the envelope. [*Id.* (citation omitted) ].

• The recent guilty plea of the former Judge of Elections in South Philadelphia, Domenick J. DeMuro, to adding fraudulent votes to voting machines on election day. [ECF 461, ¶ 61]; *see United States v. DeMuro*, No. 20-cr-112 (E.D. Pa. May 21, 2020).

• The 2014 guilty plea of Harmar Township police chief Richard Allen Toney to illegally soliciting absentee ballots to benefit his wife and her running mate in the 2009 Democratic primary for town council, [ECF 461, ¶ 69];

• The 2015 guilty plea of Eugene Gallagher for unlawfully persuading residents and non-residents of Taylor, in Lackawanna County, Pennsylvania, to register for absentee ballots and cast them for him during his councilman candidacy in the November 2013 election, [*Id.*];

**\*20** • The 1999 indictment of Representative Austin J. Murphy in Fayette County for forging absentee ballots for residents of a nursing home and adding his wife as a write-in candidate for township election judge, [*Id.*];

• The 1994 Eastern District of Pennsylvania and Third Circuit case *Marks v. Stinson*, which involved an alleged incident of extensive absentee ballot fraud by a candidate for the Pennsylvania State Senate, *see*

*Marks v. Stinson*, 19 F.3d 873 (3d Cir. 1994); *Marks v. Stinson*, No. 93-6157, 1994 WL 146113 (E.D. Pa. Apr. 26, 1994), [ECF 461, ¶ 78]; and

• A report from the bipartisan Commission on Federal Election Reform, chaired by former President Jimmy Carter and former Secretary of State James A. Baker III, which observed that absentee voting is "the largest source of potential voter fraud" and proposed that states "reduce the risks of fraud and abuse in absentee voting by prohibiting 'third-party' organizations, candidates, and political party activists from handling absentee ballots." [ECF 461, ¶¶ 66-67, 80].

**C. Facts relevant to signature comparison.**
Many of the facts relevant to Plaintiffs' signature-comparison claim relate to the verification procedures for mail-in and absentee ballots, on one hand, and those procedures for in-person voting, on the other. These are described below.

**1. Mail-in and absentee ballot verification.**

As noted above, Pennsylvania does not distribute unsolicited mail-in and absentee ballots. Rather, a voter must apply for the ballot (and any voter can). [ECF 549-2, ¶ 64]. As part of the application for a mail-in ballot,[4] an applicant must provide certain identifying information, including name, date of birth, length of time as a resident of the voting district, voting district if known, party choice in the primary, and address where the ballot should be sent. 25 P.S. § 3150.12(b). In applying for a mail-in ballot, the applicant must also provide "proof of identification," which is defined by statute as that person's driver's license number, last four digits of Social Security number, or another specifically approved form of identification. [ECF 549-2, ¶ 64; ECF 549-27]; 25 P.S. § 2602(z.5)(3). A signature is not mentioned in the definition of "proof of identification." 25 P.S. § 2602(z.5)(3). However, if physically capable, the applicant must sign the application. *Id.* at § 3150.12(c)-(d).

Upon receiving the mail-in ballot application, the county board of elections determines if the applicant is qualified

by "verifying the proof of identification and comparing the information provided on the application with the information contained on the applicant's permanent registration card." 25 P.S. § 3150.12b(a). The county board of elections then either approves the application[8] or "immediately" notifies the applicant if the application is not approved. Id. at § 3150.12b(a), (c). Upon approval, the county mails the voter the mail-in ballot.

**\*21** After receiving the ballot, the mail-in voter must "mark the ballot" with his or her vote, insert the ballot into the "secrecy" envelope, and place the "secrecy" envelope into a larger envelope. Id. at § 3150.16(a). Then, the voter must "fill out, date and sign the declaration printed on [the larger] envelope. [The larger] envelope shall then be securely sealed and the elector shall send [it] by mail ... or deliver it in person to said county board of election." Id. The declaration on the larger envelope must be signed, unless the voter is physically unable to do so. Id. at § 3150.16(a)-(a.1).

Once the voter mails or delivers the completed mail-in ballot to the appropriate county board of elections, the ballot is kept "in sealed or locked containers until they are to be canvassed by the county board of elections." Id. at § 3146.8(a). The county boards of elections can begin pre-canvassing and canvassing the mail-in ballots no earlier than election day. Id. at § 3146.8(g)(1.1).

When pre-canvassing and canvassing the mail-in ballots, the county boards of elections must "examine the declaration on the [larger] envelope of each ballot ... and shall compare the information thereon with that contained in the ...Voters File." Id. at § 3146.8(g)(3). The board shall then verify the "proof of identification" and shall determine if "the declaration [on the larger envelope] is sufficient." Id. If the information in the "Voters File ... verifies [the elector's] right to vote," the ballot shall be counted. Id.

### 2. In-person voting verification.

When a voter decides to vote in-person on election day, rather than vote by mail, the procedures are different. There is no application to vote in person. Rather, on election day, the in-person voter arrives at the polling place and "present[s] to an election officer proof of identification," which the election officer "shall examine." Id. at § 3050(a). The in-person voter shall then sign a voter's certificate and give it to "the election

officer in charge of the district register." Id. at § 3050(a.3)(1). Next, the election officer shall "announce the elector's name" and "shall compare the elector's signature on his voter's certificate with his signature in the district register." Id. at § 3050(a.3)(2). If the election officer believes the signature to be "genuine," the in-person voter may vote. Id. But if the election officer does not deem the signature "authentic," the in-person voter may still cast a provisional ballot and is given the opportunity to remedy the deficiency. Id.

### 3. The September 11, 2020, and September 28, 2020, sets of guidance.

In September 2020, Secretary Boockvar issued two new sets of guidance related to signature comparisons of mail-in and absentee ballots and applications. The first, issued on September 11, 2020, was titled "Guidance Concerning Examination of Absentee and Mail-In Ballot Return Envelopes." [ECF 504-24]. The guidance stated, in relevant part, the "Pennsylvania Election Code does not authorize the county board of elections to set aside returned absentee or mail-in ballots based solely on signature analysis by the county board of elections." [Id. at p. 3]. The second set of guidance, issued on September 28, 2020, was titled, "Guidance Concerning Civilian Absentee and Mail-In Ballot Procedures." [ECF 504-25]. This September 28, 2020, guidance stated, in relevant part, "The Election Code does not permit county election officials to reject applications or voted ballots based solely on signature analysis. ... No challenges may be made to mail-in and absentee ballots at any time based on signature analysis." [Id. at p. 9]. Thus, as evidenced by these two sets of guidance, Secretary Boockvar advised the county boards of elections not to engage in a signature-comparison analysis of voters' signatures on ballots and applications for ballots.

**\*22** Most of the counties intend to follow the Secretary's guidance and will not compare signatures on mail-in ballots and applications for the upcoming general election. E.g., [ECF 504-1]. A few counties, however, stated their intent to not comply with the guidance, and instead would compare and verify the authenticity of signatures. E.g., [id. (noting the counties of Cambria, Elk, Franklin, Juniata, Mifflin, Sullivan, Susquehanna, and Wyoming, as not intending to follow Secretary Boockvar's guidance to not compare signatures) ].

According to Defendants, there are valid reasons to not

Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)

require signature comparisons for mail-in and absentee ballots. For example, Secretary Boockvar notes that signature verification is a technical practice, and election officers are not "handwriting experts." [ECF 549-2, p. 19, ¶ 68]. Secretary Boockvar also notes that voters' signatures can change over time, and various medical conditions (*e.g.*, arthritis) can impact a person's signature. [*Id.*] Defendants' expert, Amber McReynolds, also finds that "signature verification" involves "inherent subjectivity." [ECF 549-9, p. 20, ¶ 64]. Ms. McReynolds further notes the "inherent variability of individuals' signatures over time." [*Id.*] And according to Secretary Boockvar, these are just some reasons Pennsylvania implements verification procedures other than signature comparisons for mail-in voters, who, unlike in-person voters, are not present when their signature would be verified. [ECF 549-2, p. 20, ¶ 69].

Plaintiffs' expert, Greg Riddlemoser, on the other hand, states that signature comparison is "a crucial security aspect of vote-by-mail" and failing to verify signatures on mail-in ballots would "undermine voter confidence and would increase the possibility of voter fraud." [ECF 504-19, pp. 10-11]. Mr. Riddlemoser asserts that Secretary Boockvar's September 11, 2020, and September 28, 2020, guidance "encourage, rather than prevent, voter fraud." [*Id.* at p. 12]. As such, Mr. Riddlemoser explains that mail-in voters should be subject to the same signature-comparison requirement as in-person voters. [*Id.* at pp. 13-14].

**4. Secretary Boockvar's King's Bench petition.**

In light of this case and the parties' disagreement over whether the Election Code mandates signature comparison for mail-in ballots, Secretary Boockvar filed a "King's Bench" petition with the Pennsylvania Supreme Court on October 4, 2020. In that petition, she asked the Pennsylvania Supreme Court to exercise its extraordinary jurisdiction, in light of the impending election, to clarify whether the Election Code mandates signature comparison of mail-in and absentee ballots and applications. [ECF 556, p. 11; ECF 557].

On October 7, 2020, several groups, including Donald J. Trump for President, Inc. and the Republican National Committee—who are Plaintiffs in this case—moved to intervene as Respondents in the Pennsylvania Supreme Court case. [ECF 571-1]. The Pennsylvania Supreme Court has not yet decided the motion to intervene or

whether to accept the case. The petition remains pending.

**D. Facts relevant to poll-watcher claims.**

The position of "poll watcher" is a creation of state statute. *See* 25 P.S. § 2687. As such, the Election Code defines how a poll watcher may be appointed, what a poll watcher may do, and where a poll watcher may serve.

**1. The county-residency requirement for poll watchers.**

**\*23** The Election Code permits candidates to appoint two poll watchers for each election district. 25 P.S. § 2687(a). The Election Code permits political parties and bodies to appoint three poll watchers for each election district. *Id.*

For many years, the Pennsylvania Election Code required that poll watchers serve only within their "election district," which the Code defines as "a district, division or precinct, ... within which all qualified electors vote at one polling place." 25 P.S. § 2687(b) (eff. to May 15, 2002) (watchers "shall serve in only one district and must be qualified registered electors of the municipality or township in which the district where they are authorized to act is located"); 25 P.S. § 2602(g). Thus, originally, poll watching was confined to a more limited geographic reach than one's county, as counties are themselves made up of many election districts.

Then, in 2004, the General Assembly amended the relevant poll-watcher statute to provide that a poll watcher "shall be authorized to serve in the election district for which the watcher was appointed and, when the watcher is not serving in the election district for which the watcher was appointed, in any other election district in the county in which the watcher is a qualified registered elector." 25 P.S. § 2687(b) (eff. Oct. 8, 2004).

This county-residency requirement is in line with (or is, in some cases, more permissive than) the laws of at least eight other states, which similarly require prospective poll watchers to reside in the county in which they wish to serve as a watcher or (similar to the pre-2004 Pennsylvania statute) limit poll watchers to a sub-division of the county. *See, e.g.*, Fla. Stat. Ann. § 101.131(1) (Florida); Ind. Code Ann. § 3-6-8-2.5 (Indiana); Ky. Rev.

Stat. Ann. § 117.315(1) (Kentucky); N.Y. Elec. Law §
8-500(5) (New York); N.C. Gen. Stat. Ann. § 163-45(a)
(North Carolina); Tex. Elec. Code Ann. § 33.031(a)
(Texas); S.C. Code Ann. § 7-13-860 (South Carolina);
Wyo. Stat. Ann. § 22-15-109(b) (Wyoming). However, at
least one state (West Virginia) does not provide for poll
watchers at all. *See* W. Va. Code Ann. § 3-1-37; W. Va.
Code Ann. § 3-1-41

The General Assembly has not amended the poll-watcher
statute since 2004, even though some lawmakers have
advocated for the repeal of the residency requirement. *See*
*Cortés*, 218 F. Supp. 3d at 402 (observing that legislative
efforts to repeal the poll-watcher residency requirement
have been unsuccessful).

As part of its September 17, 2020, decision, the
Pennsylvania Supreme Court found that the
county-residency requirement does not violate the U.S. or
Pennsylvania constitutions. *Boockvar*, —— A.3d at ——,
2020 WL 5554644, at *31.

**2. Where and when poll watchers can be present
during the election.**

The Pennsylvania Election Code sets forth the rules for
where and when poll watchers are permitted to be present.

The Election Code provides that poll watchers may be
present "at any public session or sessions of the county
board of elections, and at any computation and canvassing
of returns of any primary or election and recount of
ballots or recanvass of voting machines under" the Code.
25 P.S. § 2650. Additionally, one poll watcher for each
candidate, political party, or political body may "be
present in the polling place ... from the time that the
election officers meet prior to the opening of the polls ...
until the time that the counting of votes is complete and
the district register and voting check list is locked and
sealed." 25 P.S. § 2687(b).

**\*24** During this time, poll watchers may raise objections
to "challenge any person making application to vote." *Id.*
Poll watchers also may raise challenges regarding the
voters' identity, continued residence in the election
district, or registration status. 25 P.S. § 3050(d).

Although Pennsylvania has historically allowed absentee
ballots to be returned by U.S. Postal Service or by
in-person delivery to a county board of elections office,

the Election Code does not provide (and has never
provided for) any right to have poll watchers in locations
where absentee voters fill out their ballots (which may
include their home, office, or myriad other locations), nor
where those votes are mailed (which may include their
own mailbox, an official U.S. Postal Service collection
box, a work mailroom, or other places U.S. Postal Service
mail is collected), nor at county board of elections offices.
[ECF 549-2, ¶¶ 86-90].

Before Act 77, absentee ballots were held in election
districts rather than centralized at the county board of
elections. *See* 25 P.S. § 3146.8 (eff. Mar. 14, 2012 to Oct.
30, 2019) ("In all election districts in which electronic
voting systems are used, absentee ballots shall be opened
at the election district, checked for write-in votes in
accordance with section 1113-A and then either
hand-counted or counted by means of the automatic
tabulation equipment, whatever the case may be.").

At such time (again, before Act 77), poll workers opened
those absentee ballots at each polling place after the close
of the polls. *Id.* ("Except as provided in section
1302.1(a.2), the county board of elections shall then
distribute the absentee ballots, unopened, to the absentee
voter's respective election district concurrently with the
distribution of the other election supplies. Absentee
ballots shall be canvassed immediately and continuously
without interruption until completed after the close of the
polls on the day of the election in each election district.
The results of the canvass of the absentee ballots shall
then be included in and returned to the county board with
the returns of that district." (footnote omitted)).

With the enactment of Act 77, processing and counting of
mail-in and absentee ballots is now centralized in each
county board of elections, with all mail-in and absentee
ballots in such county held and counted at the county
board of elections (or such other site as the county board
may choose) without regard to which election district
those ballots originated from. 25 P.S. § 3146.8(a) (eff.
Mar. 27, 2020); [ECF 549-2, ¶ 81].

Under Act 12, counties are permitted to "pre-canvass"
mail-in or absentee ballots received before Election Day
beginning at 7:00 a.m. on Election Day. 25 P.S. §
3146.8(g)(1.1). Counties are further permitted to
"canvass" ballots received after that time beginning "no
earlier than the close of the polls on the day of the
election and no later than the third day following the
election." *Id.* § 3146.8(g)(2).

The Election Code permits "[o]ne authorized
representative of each candidate" and "one representative

from each political party" to "remain in the room in which the absentee ballots and mail-in ballots are pre-canvassed." 25 P.S. § 3146.8(g)(1.1). Similarly, during canvassing, the Election Code permits "[o]ne authorized representative of each candidate" and "one representative from each political party" to "remain in the room in which the absentee ballots and mail-in ballots are canvassed." 25 P.S. § 3146.8(g)(2).

**\*25** The Election Code provisions pertaining to the "pre-canvass" and "canvass" do not make any separate reference to poll watchers, instead referring only to the "authorized representatives" of parties and candidates. *See* 25 P.S. § 3146.8.

On October 6, 2020, Secretary Boockvar issued guidance concerning poll watchers and authorized representatives. [ECF 571-1]. The guidance states that poll watchers "have no legal right to observe or be present at ... ballot return sites," such as drop-box locations. [ECF 571-1, Ex. E, p. 5]. The guidance also states that while a candidate's authorized representative may be present when mail-in ballots are opened (including during pre-canvass and canvass), the representative cannot challenge those ballots. [*Id.* at Ex. E, p. 4].

On October 9, 2020, in a separate lawsuit brought by the Trump Campaign in the Philadelphia County Court of Common Pleas, the state court there confirmed Secretary Boockvar's guidance. Specifically, the state court held that satellite ballot-collection locations, such as drop-box locations, are not "polling places," and therefore poll watchers are not authorized to be present in those places. [ECF 573-1, p. 12 ("It is clear from a reading of the above sections [of the Election Code] that the satellite offices where these activities, and only these activities, occur are true 'offices of the Board of Elections' and are not polling places, nor public sessions of the Board of Elections, at which watchers have a right to be present under the Election Code.") ]. Immediately after issuance of this decision, the Trump Campaign filed a notice of appeal, indicating its intention to appeal the decision to the Commonwealth Court of Pennsylvania. Having just been noticed, that appeal remains in its infancy as of the date of this Opinion.

## 3. Plaintiffs' efforts to recruit poll watchers for the upcoming general election.

In order to become a certified poll watcher, a candidate

must meet certain criteria. [ECF 504-20, ¶ 9]. That is, a poll watcher needs to be "willing to accept token remuneration, which is capped at $120 under Pennsylvania state law" and must be able to take off work or otherwise make arrangements to be at the polling place during its open hours on Election Day, which can mean working more than 14 hours in a single day. [*Id.*].

The Pennsylvania Director for Election Day Operations for the Trump Campaign, James J. Fitzpatrick, stated that the Trump Campaign wants to recruit poll watchers for every county in Pennsylvania. [ECF 504-2, ¶ 30]. To that end, the RNC and the Trump Campaign have initiated poll-watcher recruitment efforts for the general election by using a website called DefendYourBallot.com. [ECF 528-14, 265:2-15, 326:14-329-7]. That website permits qualified electors to volunteer to be a poll watcher. [*Id.*]. In addition, Plaintiffs have called qualified individuals to volunteer to be poll watchers, and worked with county chairs and conservative activists to identify potential poll watchers. [*Id.*].

Despite these efforts, the Trump Campaign claims it "is concerned that due to the residency restriction, it will not have enough poll watchers in certain counties." [ECF 504-2, ¶ 25]. Mr. Fitzpatrick, however, could not identify a specific county where the Trump Campaign has been unable to obtain full coverage of poll watchers or any county where they have tried and failed to recruit poll watchers for the General Election. [ECF 528-14, 261:21-262:3, 263:8-19, 265:2-266:3].

**\*26** In his declaration, Representative Reschenthaler shared Mr. Fitzpatrick's concern, stating that he does not believe that he will "be able to recruit enough volunteers from Greene County to watch the necessary polls in Greene County." [ECF 504-6, ¶ 12]. But Representative Reschenthaler did not provide any information regarding his efforts to recruit poll watchers to date, or what he plans to do in the future to attempt to address his concern. *See generally* [*id.*].

Representative Kelly stated in his declaration that he was "likely to have difficulty getting enough poll watchers from within Erie County to watch all polls within that county on election day." [ECF 504-5, ¶ 16]. Representative Kelly never detailed his efforts (*e.g.*, the outreach he tried, prospective candidates he unsuccessfully recruited, and the like), and he never explained why those efforts aren't likely to succeed in the future. *See generally* [*id.*].

In his declaration, Representative Thompson only stated that based on his experience, "parties and campaigns

cannot always find enough volunteers to serve as poll watchers in each precinct." [ECF 504-4, ¶ 20].

According to statistics collected and disseminated by the Pennsylvania Department of State, there is a gap between the number of voters registered as Democrats and Republicans in some Pennsylvania counties. [ECF 504-34]. Plaintiffs' expert, Professor Lockerbie, believes this puts the party with less than a majority of voters in that county at a disadvantage in recruiting poll watchers. [ECF 504-20, ¶ 15]. However, despite this disadvantage, Professor Lockerbie states that "the Democratic and Republican parties might be able to meet the relevant criteria and recruit a sufficient population of qualified poll watchers who meet the residency requirement[ ]." [*Id.* at ¶ 16].

Additionally, Professor Lockerbie finds the gap in registered voters in various counties to be especially problematic for minor political parties. [*Id.* at ¶ 16]. As just one example, according to Professor Lockerbie, even if one were to assume that all third-party voters were members of the same minor party, then in Philadelphia County it would require "every 7th registrant" to be a poll watcher in order for the third party to have a poll watcher observing each precinct." [*Id.*].

Professor Lockerbie believes that disruptions to public life caused by the COVID-19 pandemic "magnified" the difficulties in securing sufficient poll watchers. [*Id.* at ¶ 10].

Nothing in the Election Code limits parties from recruiting only registered voters from their own party. [ECF 528-14, 267:23-268:1]. For example, the Trump Campaign utilized at least two Democrats among the poll watchers it registered in the primary. [ECF 528-15, P001648].

**4. Rationale for the county-residency requirement.**

Defendants have advanced several reasons to explain the rationale behind county-residency requirement for poll watchers.

Secretary Boockvar has submitted a declaration, in which she has set forth the reasons for and interests supporting the county-residency requirement. Secretary Boockvar states that the residency requirement "aligns with Pennsylvania's county-based election scheme[.]" [ECF

549-2, p. 22, ¶ 77]. "By restricting poll watchers' service to the counties in which they actually reside, the law ensures that poll watchers should have some degree of familiarity with the voters they are observing in a given election district." [*Id.* at p. 22, ¶ 78].

**\*27** In a similar vein, Intervenors' expert, Dr. Barreto, in his report, states that, voters are more likely to be comfortable with poll watchers that "they know" and are "familiar with ... from their community." [ECF 524-1, p. 14, ¶ 40]. That's because when poll watchers come from the community, "there is increased trust in government, faith in elections, and voter turnout[.]" [*Id.*].

At his deposition, Representative Kelly agreed with this idea: "Yeah, I think – again, depending how the districts are established, I think people are probably even more comfortable with people that they – that they know and they recognize from their area." [ECF 524-23, 111:21-25].

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At summary judgment, the Court must ask whether the evidence presents "a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making that determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." *A.W. v. Jersey City Pub. Schs.*, 486 F.3d 791, 794 (3d Cir. 2007).

The summary-judgment stage "is essentially 'put up or shut up' time for the non-moving party," which "must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Grp. Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is warranted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"The rule is no different where there are cross-motions for summary judgment." *Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008). The parties' filing of

cross-motions "does not constitute an agreement that if one is rejected the other is necessarily justified[.]" *Id.* But the Court may "resolve cross-motions for summary judgment concurrently." *Hawkins v. Switchback MX, LLC,* 339 F. Supp. 3d 543, 547 (W.D. Pa. 2018). When doing so, the Court views the evidence "in the light most favorable to the non-moving party with respect to each motion." *Id.*

## DISCUSSION & ANALYSIS

Plaintiffs, Defendants, and Intervenors all cross-move for summary judgment on all three of Plaintiffs' remaining claims, which the Court refers to, in the short-hand, as (1) the drop-box claim, (2) the signature-comparison claim, and (3) the poll-watching claim. The common constitutional theory behind each of these claims is vote dilution. Absent the security measures that Plaintiffs seek, they fear that others will commit voter fraud, which will, in turn, dilute their lawfully cast votes. They assert that this violates the federal and Pennsylvania constitutions.

The Court will address only the federal-constitutional claims. For the reasons that follow, the Court finds that Plaintiffs lack standing to bring their federal-constitutional claims because Plaintiffs' injury of vote dilution is not "concrete" for Article III purposes.

But even assuming Plaintiffs had standing, the Court also concludes that Defendants' regulations, conduct, and election guidance here do not infringe on any right to vote, and if they do, the burden is slight and outweighed by the Commonwealth's interests—interests inherent in the Commonwealth's other various procedures to police fraud, as well as its overall election scheme.

**\*28** Finally, because the Court will be dismissing all federal-constitutional claims, it will decline to exercise supplemental jurisdiction over any of the state-constitutional claims and will thus dismiss those claims without prejudice.

## I.   Defendants' procedural and jurisdictional challenges.

At the outset, Defendants and Intervenors raise a number of jurisdictional, justiciability, and procedural arguments, which they assert preclude review of the merits of Plaintiffs' claims. Specifically, they assert (1) the claims are not ripe and are moot, (2) there is a lack of evidence against certain county boards, and those boards are not

otherwise necessary parties, and (3) Plaintiffs lack standing. The Court addresses each argument, in turn.

### A.  Plaintiffs' claims are ripe and not moot.

Several Defendants have argued that Plaintiffs' claims in the Second Amended Complaint are not ripe and are moot. The Court disagrees.

### 1. Plaintiffs' claims are ripe.

The ripeness doctrine seeks to "prevent the courts, through the avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Artway v. Attorney Gen. of N.J.,* 81 F.3d 1235, 1246-47 (3d Cir. 1996) (cleaned up). The ripeness inquiry involves various considerations including whether there is a "sufficiently adversarial posture," the facts are "sufficiently developed," and a party is "genuinely aggrieved." *Peachlum v. City of York,* 333 F.3d 429, 433-34 (3d Cir. 2003). Ripeness requires the case to "have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them." *Wyatt, Virgin Islands, Inc. v. Gov't of the Virgin Islands,* 385 F.3d 801, 806 (3d Cir. 2004) (quoting *Pub. Serv. Comm'n of Utah v. Wycoff Co.,* 344 U.S. 237, 244, 73 S.Ct. 236, 97 L.Ed. 291 (1952)). "A dispute is not ripe for judicial determination if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Id.*

Ultimately, "[r]ipeness involves weighing two factors: (1) the hardship to the parties of withholding court consideration; and (2) the fitness of the issues for judicial review." *Artway,* 81 F.3d at 1247. Unlike standing, ripeness is assessed at the time of the court's decision (rather than the time the complaint was filed). *See Blanchette v. Connecticut General Ins. Corp.,* 419 U.S. 102, 139-40, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974).

The Court finds that Plaintiffs' claims are ripe. Applying the two-factor test here, the Court first concludes that the parties would face significant hardship if the Court were to hold that the case was unripe (assuming it was otherwise justiciable). The general election is less than one month away, and Plaintiffs assert claims that could

significantly affect the implementation of Pennsylvania's electoral procedures. Further, if the Court were to find that Plaintiffs' claims were not ripe, Plaintiffs would be burdened. This is because Plaintiffs would then have to either wait until after the election occurred—and thus after the alleged harms occurred—or Plaintiffs would have to bring suit on the very eve of the election, and thus there would be insufficient time for the Court to address the issues. This hardship makes judicial review at this time appropriate. The first factor is met.

**\*29** Some Defendants argue that because some of the Secretary's guidance was issued after the 2020 primary election, Plaintiffs' claims that rely on such guidance are not ripe because the guidance has not been implemented in an election yet. The Court disagrees. Both the allegations in the Second Amended Complaint, and the evidence presented on summary judgment, reveal that the guidance issued after the primary election will apply to the upcoming general election. This is sufficient to make this a properly ripe controversy.[6]

The second factor the Court must consider in determining ripeness is "the fitness of the issues for judicial review." *Artway*, 81 F.3d at 1247. "The principal consideration [for this factor] is whether the record is factually adequate to enable the court to make the necessary legal determinations. The more that the question presented is purely one of law, and the less that additional facts will aid the court in its inquiry, the more likely the issue is to be ripe, and vice-versa." *Id.* at 1249.

Under this framework, the Court concludes that the issues are fit for review. The parties have engaged in extensive discovery, creating a developed factual record for the Court to review. Further, as shown below, the Court finds it can assess Plaintiffs' claims based on the current factual record and can adequately address the remaining legal questions that predominate this lawsuit. As such, the Court finds Plaintiffs' claims fit for judicial review.

Thus, Plaintiffs' claims are presently ripe.

**2. Plaintiffs' claims are not moot.**

Some Defendants also assert that Plaintiffs' claims are moot because Plaintiffs reference allegations of harm that occurred during the primary election, and since then, Secretary Boockvar has issued new guidance and the Pennsylvania Supreme Court has interpreted the Election

Code to clarify several ambiguities. The Court, however, concludes that Plaintiffs' remaining claims are not moot.

Mootness stems from the same principle as ripeness, but is stated in the inverse: courts "lack jurisdiction when 'the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.' " *Merle v. U.S.*, 351 F.3d 92, 94 (3d Cir. 2003) (quoting *Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969)). Like ripeness and unlike standing, mootness is determined at the time of the court's decision (rather than at the time the complaint is filed). *See U.S. Parole Commission v. Geraghty*, 445 U.S. 388, 397, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980). When assessing mootness, the Court may assume (for purposes of the mootness analysis) that standing exists. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (citation omitted).

**\*30** Here, the Court finds that Plaintiffs' claims are not moot, as the claims Plaintiffs are proceeding with are "live." First, Plaintiffs' claims are based on guidance that issued after the primary election and are to be applied in the upcoming general election. As such, the *harms* alleged are not solely dependent on the already-passed primary election. Second, Defendants, by and large, have made clear that they intend to abide by guidance that Plaintiffs assert is unlawful or unconstitutional. Third, Plaintiffs sufficiently show that certain Defendants intend to engage in the conduct (*e.g.*, use unmanned drop-boxes) that Plaintiffs say infringes their constitutional rights. Thus, these issues are presently "live" and are not affected by the completion of the primary election.[7] Plaintiffs' claims are not moot.

**3. All named Defendants are necessary parties to this lawsuit.**

Many of the county boards of elections that are Defendants in this case argue that the claims against them should be dismissed because Plaintiffs did not specifically allege or prove sufficient violative facts against them. Plaintiffs argue in response that all county boards have been joined because they are necessary parties, and the Court cannot afford relief without their presence in this case. The Court agrees with Plaintiffs, and declines to dismiss the county boards from the case. They are necessary parties.

Federal Rule of Civil Procedure 19(a) states that a party is

a necessary party that must be joined in the lawsuit if, "in that [party's] absence, the court cannot accord complete relief among existing parties." Fed. R. Civ. P. 19(a)(1)(A).

Here, if the county boards were not named defendants in this case, the Court would not be able to provide Plaintiffs complete relief should Plaintiffs prove their case. That's because the Court could not enjoin the county boards if they were not parties. *See* Fed. R. Civ. P. 65(d)(2).[8] This is important because each individual county board of elections manages the electoral process within its county lines. As one court previously summarized, "Election procedures and processes are managed by each of the Commonwealth's sixty-seven counties. Each county has a board of elections, which oversees the conduct of all elections within the county." *Cortés*, 218 F. Supp. 3d at 403 (citing 25 P.S. § 2641(a)). "The county board of elections selects, fixes and at times alters the polling locations of new election districts. Individual counties are also tasked with the preservation of all ballots cast in that county, and have the authority to investigate fraud and report irregularities or any other issues to the district attorney[.]" *Id.* (citing 25 P.S. §§ 2726, 2649, and 2642). The county boards of elections may also make rules and regulations "as they may deem necessary for the guidance of voting machine custodians, elections officers and electors." 25 P.S. § 2642(f).

**\*31** Indeed, Defendants' own arguments suggest that they must be joined in this case. As just one example, a handful of counties assert in their summary-judgment brief that the "[Election] Code permits Boards to exercise discretion in certain areas when administering elections, to administer the election in a manner that is both legally-compliant and meets the unique needs of each County's citizens." [ECF 518, p. 6]. Thus, because of each county's discretionary authority, if county boards engage in unconstitutional conduct, the Court would not be able to remedy the violation by enjoining only Secretary Boockvar.[9]

To grant Plaintiffs relief, if warranted, the Court would need to enter an order affecting all county boards of elections—which the Court could not do if some county boards were not joined in this case. Otherwise, the Court could only enjoin violative conduct in some counties but not others. As a result, inconsistent rules and procedures would be in effect throughout the Commonwealth. While some counties can pledge to follow orders issued by this Court, the judicial system cannot rely on pledges and promises, regardless of the county boards' good intent. The only way to ensure that any illegal or unconstitutional conduct is uniformly remedied, permanently, is to include

all county boards in this case.

Thus, because the county boards are necessary parties, the Court cannot dismiss them.

## 4. Plaintiffs lack Article III standing to raise their claims of vote dilution because they cannot establish a "concrete" injury-in-fact.

While Plaintiffs can clear the foregoing procedural hurdles, they cannot clear the final one—Article III standing.

Federal courts must determine that they have jurisdiction before proceeding to the merits of any claim. *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 94-95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." One component of the case-or-controversy requirement is standing, which requires a plaintiff to demonstrate the now-familiar elements of (1) injury in fact, (2) causation, and (3) redressability. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

Standing is particularly important in the context of election-law cases, including a case like this one, that challenge the laws, regulations, and guidance issued by elected and appointed state officials through the democratic processes. As the Supreme Court has explained, the standing "doctrine developed in our case law to ensure that federal courts do not exceed their authority as it has been traditionally understood." *Spokeo, Inc. v. Robins*, —— U.S. ——, 136 S. Ct. 1540, 1547, 194 L.Ed.2d 635 (2016) (cleaned up). The doctrine "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Id.* In this way, "Article III standing serves to prevent the judicial process from being used to usurp the powers of the political branches." *Id.* Nowhere is that concern more acute than in a case that challenges a state's exercise of its core constitutional authority to regulate the most deeply political arena of all—elections.

**\*32** Here, Defendants and Intervenors claim that Plaintiffs lack standing, largely arguing that Plaintiffs' injury is too speculative. [ECF 547, pp. 43-50]. The Court agrees and finds that Plaintiffs lack Article III standing for this reason.

Initially, to frame the standing inquiry, understanding the specific claims at issue is important. As discussed above, there are essentially three claims remaining in this case: (1) a challenge to Secretary Boockvar's guidance that does not require all drop boxes to have manned security personnel; (2) a challenge to Secretary Boockvar's guidance that counties should not perform a signature comparison for mail-in ballots; and (3) a challenge to Pennsylvania's county-residency restriction for poll-watchers. *See* [ECF 509, pp. 4-5]. The theory behind all of these claims and the asserted injury is one of vote dilution due to the heightened risk of fraud; that is, without the above measures in place, there is an imminent risk of voter fraud (primarily by mail-in voters); and if that fraud occurs, it will dilute the votes of many of Plaintiffs, who intend to vote in person in the upcoming election. [ECF 551, p. 12 ("As qualified electors who will be voting in the November election, Plaintiffs will suffer an injury through their non-equal treatment and/or the dilution or debasement of their legitimately case votes by absentee and mail-in votes that have not been properly verified by matching the voters' signatures on their applications and ballots to the permanent voter registration record and/or that have been improperly delivered by others to drop boxes or other mobile collection sites in manners that are different[ ] from those offered or being used in their counties of residence.") ].

Turning to the familiar elements of Article III standing, the first and, in the Supreme Court's estimation, "foremost" element—injury-in-fact—is dispositive. *See Gill v. Whitford*, —— U.S. ——, 138 S. Ct. 1916, 1929, 201 L.Ed.2d 313 (2018). Specifically, the Court finds that Plaintiffs' theory of vote dilution, based on the evidence presented, is insufficient to establish standing because Plaintiffs' injury-in-fact is not sufficiently "concrete."

With respect to injury-in-fact, the Supreme Court has made clear that an injury must be "concrete" and "particularized." *See Spokeo*, 136 S. Ct. at 1548. Defendants argue that the claimed injury of vote dilution caused by possible voter fraud here is too speculative to be concrete. The Court agrees.

To establish a "concrete" injury, Plaintiffs rely on a chain of theoretical events. They first argue that Defendants' lack of election safeguards (poll watchers, drop-box guards, and signature-comparison procedures) creates a risk of voter fraud or illegal voting. *See* [ECF 461, ¶¶ 230-31, 240, 256]. That risk, they say, will lead to potential fraudsters committing voter fraud or ballot destruction. [*Id.*]. And if that happens, each vote cast in contravention of the Election Code will, in Plaintiffs'

view, dilute Plaintiffs' lawfully cast votes, resulting in a constitutional violation.

The problem with this theory of harm is that this fraud hasn't yet occurred, and there is insufficient evidence that the harm is "certainly impending."

To be clear, Plaintiffs need not establish actual fraud at this stage; but they must establish that fraud is "certainly impending," and not just a "possible future injury." *See Clapper*, 568 U.S. at 409, 133 S.Ct. 1138 ("Thus, we have repeatedly reiterated that threatened injury must be certainly impending to constitute injury in fact, and that allegations of possible future injury are not sufficient.") (cleaned up).

**\*33** This case is well past the pleading stage. Extensive fact and expert discovery are complete. [ECF 462]. Nearly 300 exhibits have been submitted on cross-motions for summary judgment (including 68 by Plaintiffs alone). Plaintiffs bear the burden of proof on this issue, and unlike on a motion to dismiss, on summary judgment, they must come forward with proof of injury, taken as true, that will prove standing, including a concrete injury-in-fact. *See Lujan*, 504 U.S. at 561, 112 S.Ct. 2130 (1992) ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice ... In response to a summary judgment motion, however, the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts ... which for purposes of the summary judgment motion will be taken to be true.") (cleaned up).

Based on the evidence presented by Plaintiffs, accepted as true, Plaintiffs have only proven the "possibility of future injury" based on a series of speculative events—which falls short of the requirement to establish a concrete injury. For example, Plaintiffs' expert, Mr. Riddlemoser, opines that the use of "unstaffed or unmanned" drop boxes merely "increases the *possibility* for voter fraud (and vote destruction)[.]" [ECF 504-19, p. 20 (emphasis added) ]. That's because, according to him (and Plaintiffs' other witnesses), theoretical bad actors *might* intentionally "target" a drop box as the "easiest opportunity for voter fraud" or with the malicious "intent to destroy as many votes ... as possible." [*Id.* at pp. 16-18; *see also* ECF 504-2, ¶ 12 (declaring that drop boxes "*may* serve as a target for bad actors that may wish to tamper with lawfully case ballots before such ballots are counted") (emphasis added) ]. But there's no way of knowing whether these independent actors will ever surface, and if they do, whether they will act as Mr. Riddlemoser and Plaintiffs predict.

Similarly, Mr. Riddlemoser concludes that, at most, not conducting signature analysis for mail-in and absentee ballots "open[s] the door to the potential for massive fraud through a mechanism already susceptible to voter fraud." [ECF 504-19, p. 20].

This increased susceptibility to fraud and ballot destruction is the impetus for Plaintiffs, in their various capacities, to express their concerns that vote dilution might occur and disrupt their right to a "free and fair election." *See, e.g.,* [504-3, ¶ 6; 504-4, ¶ 7; ECF 504-6, ¶¶ 6-8; ECF 504-7, ¶¶ 5-9]. But these concerns, as outlined above, are based solely on a chain of unknown events that may never come to pass.

In addition to Plaintiffs' expert report, Plaintiffs' evidence consists of instances of voter fraud in the past, including an article in the N.Y. Post purporting to detail the strategies of an anonymous fraudster, as well as pointing to certain prior cases of voter fraud and election irregularities (*e.g.*, Philadelphia inadvertently allowing 40 people to vote twice in the 2020 primary election; some counties counting ballots that did not have a completed declaration in the 2020 primary election). [ECF 461, ¶¶ 63-82; ECF 504-19, p. 3 & Ex. D]. Initially, with one exception noted directly below, none of this evidence is tied to individuals using drop boxes, submitting forged mail-in ballots, or being unable to poll watch in another county—and thus it is unclear how this can serve as evidence of a concrete harm in the upcoming election as to the specific claims in this case.

**\*34** Perhaps the best evidence Plaintiffs present are the several photographs and video stills, which are depicted above, and which are of individuals who appear to be delivering more than one ballot to a drop box during the primary election. It is undisputed that during the primary election, some county boards believed it be appropriate to allow voters to deliver ballots on behalf of third parties. [ECF 504-9, 92:4-10; ECF 504-10, 60:3-61:10; ECF 504-49].

But this evidence of past injury is also speculative. Initially, the evidence is scant. But even assuming the evidence were more substantial, it would still be speculative to find that third-party ballot delivery will also occur in the general election. It may; it may not. Indeed, it may be less likely to occur now that the Secretary issued her September 28, 2020, guidance, which made clear to all county boards that for the general election, third-party ballot delivery is prohibited. [ECF 504-25 ("Third-person delivery of absentee or mail-in ballots is not permitted, and any ballots delivered by someone other than the voter

are required to be set aside. The only exceptions are voters with a disability, who have designated in writing an agent to deliver their ballot for them.") ]. It may also be less likely to occur in light of the Secretary's other guidance, which recommends that county boards place signs near drop boxes, warning voters that third-party delivery is prohibited.

It is difficult—and ultimately speculative—to predict future injury from evidence of past injury. This is why the Supreme Court has recognized that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief if unaccompanied by any continuing, present adverse effects." *Lujan*, 504 U.S. at 564, 112 S.Ct. 2130 (cleaned up).

In fact, based on Plaintiffs' theory of harm in this case, it is almost impossible for them to present anything other than speculative evidence of injury. That is, they would have to establish evidence of a certainly impending illegal practice that is likely to be prevented by the precautions they seek. All of this sounds in "possible future injury," not "certainly impending" injury. In that way, this case is very much like the Supreme Court's decision in *Clapper*.

In *Clapper*, plaintiffs-respondents were attorneys, other advocates, and media groups who communicated with clients overseas whom they feared would be subject to government surveillance under a FISA statute. 568 U.S. at 406, 133 S.Ct. 1138. The plaintiffs there alleged that the FISA statute at issue created a risk of possible government surveillance, which prevented them from communicating in confidence with their clients and compelled them to travel overseas instead and incur additional costs. *Id.* at 406-07, 133 S.Ct. 1138. Based on these asserted injures, the plaintiffs filed suit, seeking to invalidate provisions of FISA. *Id.* at 407, 133 S.Ct. 1138.

The Supreme Court held that plaintiffs there lacked standing because their risk of harm was not concrete—rather, it was attenuated and based on a series of speculative events that may or may not ever occur. *Id.* at 410, 133 S.Ct. 1138 (finding that "respondents' argument rests on their highly speculative fear that: (1) the Government will decide to target the communications of non-U.S. persons with whom they communicate; (2) in doing so, the Government will choose to invoke its authority under § 1881a rather than utilizing another method of surveillance; (3) the Article III judges who serve on the Foreign Intelligence Surveillance Court will conclude that the Government's proposed surveillance procedures satisfy § 1881a's many safeguards and are consistent with the Fourth Amendment; (4) the Government will succeed in intercepting the

communications of respondents' contacts; and (5) respondents will be parties to the particular communications that the Government intercepts).

**\*35** In the end, the Court found that it would not "endorse standing theories that rest on speculation about the decisions of independent actors." *Id.* at 414, 133 S.Ct. 1138.

Like *Clapper*, here, Plaintiffs' theory of harm rests on speculation about the decisions of independent actors. For drop boxes, that speculation includes that unknown individuals will utilize drop boxes to commit fraud or other illegal activity; for signature comparison, that fraudsters will submit forged ballots by mail; for poll watchers, that illegal votes will not be sufficiently challenged; and for all these claims, that other security measures in place to monitor drop boxes, to verify ballot information, and to challenge ballots will not work.

All of this may occur and may result in some of Plaintiffs' votes being diluted; but the question is whether these events are "certainly impending." The evidence outlined above and presented by Plaintiffs simply fails to meet that standard.

This is not to say that claims of vote dilution or voter fraud never give rise to a concrete injury. A plaintiff can have standing to bring a vote-dilution claim—typically, in a malapportionment case—by putting forth statistical evidence and computer simulations of dilution and establishing that he or she is in a packed or cracked district. *See Gill,* 138 S. Ct. at 1936 (Kagan, J., concurring). And a plaintiff can have standing to bring a voter-fraud claim, but the proof of injury there is evidence of actual fraud in the election and thus thus the suit will be brought after the election has occurred. *See, e.g., Marks v. Stinson,* 19 F.3d 873 (3d Cir. 1994). But, at least based on the evidence presented here, a claim of vote dilution brought in advance of an election on the theory of the risk of potential fraud fails to establish the requisite concrete injury for purposes of Article III standing.

Plaintiffs advance three other theories of harm here, in order to establish standing—none of which establish a concrete injury-in-fact.

First, Plaintiffs assert that since some of them are Republican candidates and that Republicans are more likely to vote in person and Democrats more likely to vote by mail, that their injury here is a competitive disadvantage in the electoral process. [ECF 551, pp. 16-18 ("The challenged guidance will further harm the RNC through the institutional prioritization of voting by

mail and the potential disenfranchisement of Republican voters, who prefer to vote in person in the upcoming General Election.") ]. This too is a speculative, non-concrete injury. There is nothing in the record to establish that potential voter fraud and dilution will impact Republicans more than Democrats.

**\*36** To be sure, the information that Plaintiffs present shows that more Democrats are likely to use mail-in ballots. [ECF 551, p. 31 ("[I]n Pennsylvania, of the 1.9 million absentee or mail-in ballots that have been requested for the November 3, 2020 General Election, 'nearly 1.5 million Democrats have requested a mail-in ballot—nearly three times the requests from Republicans.' ") (quoting L. Broadwater, "Both Parties Fret as More Democrats Request Mail Ballots in Key States," New York Times (Sept. 30, 2020), *available at* https://www.nytimes.com/2020/09/30/us/mail-voting-dem ocrats-republicans-turnout.html) ]. But it doesn't necessarily follow that more Democrats will commit voter fraud, such as through the destruction of drop boxes or third-party ballot harvesting, and thus more Republicans' votes will be diluted.

In fact, as Plaintiffs' expert, Mr. Riddlemoser, explains, fraudsters from either party could target drop boxes in specific areas in order to destroy ballots, depending on who may be the predominant party in the area. [ECF 504-19, at pp. 17-18 ("In short, nothing would prevent someone from intentionally targeting a drop box in a predominantly Republican or predominantly Democratic area with an intent to destroy as many votes for that political party or that party's candidate(s) as possible.") ]. Indeed, the more important fact for this theory of harm is not the party of the voter, but the party of the fraudster—and, on this, Plaintiffs present no evidence that one party over the other is likely to commit voter fraud.

Second, Plaintiffs also argue that the RNC, the Congressional Plaintiffs, and the Trump Campaign have organizational standing because they "have and will continue to devote their time and resources to ensure that their Pennsylvania supporters, who might otherwise be discouraged by the Secretary's guidance memos favoring mail-in and absentee voting and Defendants' implementation thereof, get out to the polls and vote on Election Day." [ECF 551, p. 19]. This is a similar argument raised by the plaintiffs in *Clapper,* and rejected there by the Supreme Court. Because Plaintiffs' harm is not "certainly impending," as discussed above, spending money in response to that speculative harm cannot establish a concrete injury. *Clapper,* 568 U.S. at 416, 133 S.Ct. 1138 ("Respondents' contention that they have standing because they incurred certain costs as a

reasonable reaction to a risk of harm is unavailing—because the harm respondents seek to avoid is not certainly impending. In other words, respondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."); *see also Donald J. Trump for President, Inc. v. Cegavske*, —— F. Supp. 3d ——, ——, 2020 WL 5626974, at *5 (D. Nev. Sept. 18, 2020)* ("Outside of stating 'confusion' and 'discouragement' in a conclusory manner, plaintiffs make no indication of how AB 4 will discourage their member voters from voting. If plaintiffs did not expend any resources on educating their voters on AB4, their voters would proceed to vote in-person as they overwhelmingly have in prior elections.").

Third, with respect to the poll-watching claim, Plaintiffs argue that at least one of the Plaintiffs, Ms. Patterson, is a prospective poll watcher who is being denied the right to poll watch based on the county-residency restriction, and thus she meets the Article III requirements. [ECF 551, p. 34 (citing ECF 551-3, ¶¶ 9-10) ]. However, Ms. Patterson cannot establish standing because, by Plaintiffs' own concession, the theory of harm in this case is not the denial of the right to poll watch, but instead dilution of votes from fraud caused from the failure to have sufficient poll watchers. [ECF 509, p. 67 ("But, the core of the as-applied challenge here is not that the Plaintiffs cannot staff a particular polling place, it is that a candidate and his or her party is presented with the Hobson's choice of selecting limited polling places to observe due to the residency requirement and accept that unobserved polling places must exist due to the inability to recruit a sufficient force of poll watchers due to the necessity that candidates be county residents.") ].

**\*37** And the remedy sought here is much broader than simply allowing Ms. Patterson to poll watch in a certain county, but is tied to the broader harm of vote dilution that Plaintiffs assert. [ECF 503-1, p. 3, ¶ 3 ("Plaintiffs shall be permitted to have watchers present at all locations where voters are registering to vote, applying for absentee or mail-in ballots, voting absentee or mail-in ballots, and/or returning or collecting absentee or mail-in ballots, including without limitation any satellite or early voting sites established by any county board of elections.") ]. Standing is measured based on the theory of harm and the specific relief requested. *See Gill*, 138 S. Ct. at 1934 ("We caution, however, that 'standing is not dispensed in gross': A plaintiff's remedy must be tailored to redress the plaintiff's particular injury."). As with all of the claims, the poll-watching claim rests on evidence of vote dilution that does not rise to the level of a concrete harm.

In sum, Plaintiffs here, based on the evidence presented, lack Article III standing to assert their claims. Because they lack standing, the Court will enter judgment in Defendants' favor and dismiss all claims.[10] However, because of the novelty of Plaintiffs' claims and theories, a potential appeal in this case, and the short time before the general election, out of an abundance of caution, the Court will, in the alternative, proceed to examine the claims on the merits.

**II. Defendants and Intervenors are entitled to summary judgment on Plaintiffs' claim that drop boxes violate the U.S. Constitution.**

Plaintiffs' drop-box claim has materially changed since the Pennsylvania Supreme Court's decision authorizing the use of drop boxes. Plaintiffs now allege that drop boxes effectively allow third parties to return the ballots of voters other than themselves because, they say, no one is there to stop them. Absent an in-person guard or poll worker to monitor the drop boxes and prevent the return of ballots cast in a manner contrary to what the Election Code permits, Plaintiffs assert that they face an unacceptable risk of vote dilution, which burdens their right to vote. Plaintiffs also argue that the "uneven" use of drop boxes in Pennsylvania, by some counties but not others, violates equal protection by subjecting voters in different counties to different amounts of dilutive risk, and perhaps by diluting lawful votes cast by individuals who failed to comply with the Election Code.

The evidence relevant to these claims is undisputed. *See* [ECF 509, p. 45 ("After the completion of extensive discovery, including numerous depositions and responses to discovery requests, no genuine dispute of material fact exists regarding Plaintiffs' constitutional claims.") ]. Viewed in the light most favorable to Plaintiffs, the Court could conclude from this evidence, and will assume for purposes of this decision, that (1) drop boxes allow for greater risk of third-party ballot delivery in violation of the Election Code than in-person polling locations or manned drop boxes, and (2) that the use of drop boxes is "uneven" across Pennsylvania due to its county-based election system—*i.e.*, some counties are using "unmanned" drop boxes with varying security measures, some are using "manned" drop boxes, some are using dozens of drop boxes in a variety of locations, some are using one drop box in a county office building, and some are not using drop boxes at all. The question before the Court is whether this state of affairs violates equal protection or due process.

**\*38** The Court finds that it does not. The uneven use of drop boxes across counties does not produce dilution as between voters in different counties, or between "lawful" and "unlawful" voters, and therefore does not present an equal-protection violation. But even if it did, the guidelines provided by Secretary Boockvar are rational, and weighing the relative burdens and benefits, the Commonwealth's interests here outweigh any burden on Plaintiffs' right to vote.

**A. Pennsylvania's "uneven" use of drop boxes does not violate federal equal-protection rights.**

Plaintiffs' primary claim concerns the uneven use of drop boxes across the Commonwealth, which they contend violates the Equal-Protection Clause of the 14th Amendment.

The 14th Amendment's Equal-Protection Clause commands that "no State shall ... deny to any person within its jurisdiction the equal protection of laws." *U.S. Const. amend. XIV, § 1.* This broad and simple promise is "an essential part of the concept of a government of laws and not men." *Reynolds v. Sims*, 377 U.S. 533, 568, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

But while the Constitution demands equal protection, that does not mean all forms of differential treatment are forbidden. *See Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992) ("Of course, most laws differentiate in some fashion between classes of persons. The Equal Protection Clause does not forbid classifications."). Instead, equal protection "simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Id.* (citation omitted). What's more, "unless a classification warrants some form of heightened review because it jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest." *Id.* (citations omitted).

Of course, the right of every citizen to vote is a fundamental right. *See Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979) ("[F]or reasons too self-evident to warrant amplification here, we have often reiterated that voting is of the most fundamental significance under our constitutional structure.") (citations omitted). Indeed, it is a foundational right "that helps to preserve all other rights." *Werme v. Merrill*, 84 F.3d 479, 483 (1st Cir.

1996); *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964) ("Other rights, even the most basic, are illusory if the right to vote is undermined."). And its scope is broad enough to encompass not only the right of each voter to cast a ballot, but also the right to have those votes "counted without dilution as compared to the votes of others." *Minn. Voters Alliance v. Ritchie*, 720 F.3d 1029, 1031 (8th Cir. 2013) (cleaned up).

As a result, Plaintiffs are quite correct when they suggest that a state election procedure that burdens the right to vote, including by diluting the value of votes compared to others, must "comport with equal protection and all other constitutional requirements." *Cortés*, 218 F. Supp. 3d at 407. That much, at least, is not in dispute.

At the same time, however, the Constitution "confers on the states broad authority to regulate the conduct of elections, including federal ones." *Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004) (citing U.S. Const. Art. I, § 4, cl. 1). This authority includes "broad powers to determine the conditions under which the right of suffrage may be exercised." *Shelby Cnty., Ala. v. Holder*, 570 U.S. 529, 543, 133 S.Ct. 2612, 186 L.Ed.2d 651 (2013) (cleaned up). Indeed, "[c]ommon sense, as well as constitutional law, compels the conclusion" that states must be free to engage in "substantial regulation of elections" if "some sort of order, rather than chaos, is to accompany the democratic processes." *Burdick v. Takushi*, 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (cleaned up). And all "[e]lection laws will invariably impose some burden upon individual voters." *Id.*

**\*39** If the courts were "to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest," it "would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Id.* The "machinery of government would not work if it were not allowed a little play in its joints." *Bain Peanut Co. of Tex. v. Pinson*, 282 U.S. 499, 501, 51 S.Ct. 228, 75 L.Ed. 482 (1931). Thus, when faced with a constitutional challenge to a state election law, or to the actions of state officials responsible for regulating elections, a federal court must weigh these competing constitutional considerations and "make the 'hard judgment' that our adversary system demands." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 190, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008).

The Supreme Court has supplied lower courts guidance as to how to make these hard judgments, by "forg[ing]" the "flexible standard" for assessing the constitutionality of election regulations into "something resembling an

Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)

administrable rule." *Id.* at 205, 128 S.Ct. 1610 (Scalia, J. concurring) (citing *Burdick,* 504 U.S. at 434, 112 S.Ct. 2059).

Under this standard, first articulated in *Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) and then refined in *Burdick,* the fact "[t]hat a law or state action imposes some burden on the right to vote does not make it subject to strict scrutiny." *Donatelli v. Mitchell,* 2 F.3d 508, 513 (3d Cir. 1993); *see also Libertarian Party of Ohio v. Blackwell,* 462 F.3d 579, 585 (6th Cir. 2006) ("[V]oting regulations are not automatically subjected to heightened scrutiny."). Instead, any "law respecting the right to vote—whether it governs voter qualifications, candidate selection, or the voting process," is subjected to "a deferential 'important regulatory interests' standard for nonsevere, nondiscriminatory restrictions, reserving strict scrutiny for laws that severely restrict the right to vote." *Crawford,* 553 U.S. at 204, 128 S.Ct. 1610 (Scalia, J. concurring).

In practice, this means that courts must weigh the "character and magnitude of the burden the State's rule imposes" on the right to vote "against the interests the State contends justify that burden, and consider the extent to which the State's concerns make that burden necessary." *Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 358, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997) (cleaned up). If the state imposes a "severe" burden on the right to vote, strict scrutiny applies—the rule may survive only if it is "narrowly tailored" and only if the state advances a "compelling interest." *Id.* But if the state imposes only "reasonable, nondiscriminatory restrictions," its "important regulatory interests will usually be enough" to justify it. *Id.* Indeed, where state regulations are "minimally burdensome and nondiscriminatory" a level of scrutiny "closer to rational basis applies[.]" *Ohio Council 8 Am. Fed'n of State v. Husted,* 814 F.3d 329, 335 (6th Cir. 2016). And where the state imposes no burden on the "right to vote" at all, true rational basis review applies. *See Biener v. Calio,* 361 F.3d 206, 215 (3d Cir. 2004) ("Biener also cannot establish an infringement on the fundamental right to vote ... As the [election] filing fee does not infringe upon a fundamental right, nor is Biener in a suspect class, we consider the claims under a rational basis test.") (citation omitted); *Common Cause/New York v. Brehm,* 432 F. Supp. 3d 285, 310 (S.D.N.Y. 2020) ("Under this framework, election laws that impose no burden on the right to vote are subject to rational-basis review.").

**\*40** This operates as a "sliding scale"—the "more severe the burden imposed, the more exacting our scrutiny; the less severe, the more relaxed our scrutiny." *Arizona*

*Libertarian Party v. Hobbs,* 925 F.3d 1085, 1090 (9th Cir. 2019); *see also Fish v. Schwab,* 957 F.3d 1105, 1124 (10th Cir. 2020) ("We, and our sister circuits and commentators, have referred to this as a 'sliding scale' test."); *Libertarian Party of New Hampshire v. Gardner,* 638 F.3d 6, 14 (1st Cir. 2011) ("We review all of the First and Fourteenth Amendment claims under the sliding scale approach announced by the Supreme Court in *Anderson* ... and *Burdick*[.]"); *Burdick,* 504 U.S. at 434, 112 S.Ct. 2059 ("[T]he rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights.").

Against that backdrop, the Court now turns to Plaintiffs' claim that the use of unmanned drop boxes by some Pennsylvania counties, but not others, violates equal protection. As will be discussed, Plaintiffs' equal-protection claim fails at the threshold, without even reaching *Anderson-Burdick,* because Plaintiffs have not alleged or shown that Pennsylvania's system will result in the dilution of votes in certain counties and not others. Furthermore, even if the Court applies *Anderson-Burdick,* the attenuated "burden" Plaintiffs have identified—an increased risk of vote dilution created by the use of unmanned drop boxes—is more than justified by Defendants' important and precise interests in regulating elections.

## 1. Plaintiffs have not shown that Pennsylvania treats equivalent votes in different counties differently.

Plaintiffs' equal-protection claim asserts differential treatment on a theory of vote dilution. As far as the Court can discern, this claim has two dimensions.

First, the main thrust concerns differential treatment as between counties. Plaintiffs assert that some counties will use drop boxes in certain ways (specifically, without in-person guards or in varying number and locations), while others will not—resulting in differential treatment. *See, e.g.,* [ECF 551, p. 44 ("Plaintiffs assert (and have proven) that Defendants have adopted, and intend to implement in the General Election, an election regime that applies Pennsylvania's Election Code in a way that treats the citizens of Pennsylvania unequally depending on ... the location where they happen to live: in some counties, voters will have around-the-clock access to 'satellite election offices' at which they can deposit their vote, but in other counties, voters will have no access at

Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)

all to such drop boxes; in some counties those drop boxes will be staffed and secure, but in other counties drop boxes will be unmonitored and open to tampering[.]") ]; [*Id.* at p. 46 ("Defendants' ongoing actions and stated intentions ensure that votes will not be counted the same as those voting in other counties, and in some instances, in the same Congressional district. For instance, the harm flowing from those actions will fall disproportionately on the Republican candidates that bring suit here because many Democrat-heavy counties have stated intentions to implement the Secretary's unconstitutional ... ballot collection guidance, and many Republican-heavy counties have stated intentions to follow the Election Code as it is written.") ].

**\*41** Second, although less clear, Plaintiffs' equal-protection claim may also concern broader differential treatment between law-abiders and scofflaws. In other words, Plaintiffs appear to suggest that Pennsylvania discriminates against all law-abiding voters by adopting policies which tolerate an unacceptable risk of a lawfully cast votes being diluted by each unlawfully cast vote anywhere in Pennsylvania. *See, e.g.,* [ECF 509, p. 55 ("The use of unstaffed drop boxes ... not only dilutes the weight of *all* qualified Pennsylvanian electors, it curtails a sense of security in the voting process.") (emphasis in original) ]; [ECF 509 p. 68 ("There will be no protection of one-person, one-vote in Pennsylvania, because her policies ... allowing inconsistently located/used drop boxes will result in illegal ballots being cast and counted with legitimate votes[.]") ].

As discussed below, both of these species of equal protection fail because there is, in fact, no differential treatment here—a necessary predicate for an equal-protection claim.

Initially, Plaintiffs "have to identify a burden before we can weigh it." *Crawford*, 553 U.S. at 205, 128 S.Ct. 1610 (Scalia, J. concurring). In the equal-protection context, this means the plaintiff "must present evidence that s/he has been treated differently from persons who are similarly situated." *Renchenski v. Williams*, 622 F.3d 315, 337 (3d Cir. 2010) (cleaned up). And not just any differential treatment will do. As discussed above, differences in treatment raise equal-protection concerns, and necessitate heightened scrutiny of governmental interests, only if they burden a fundamental right (such as the right to vote) or involve a suspect classification based on a protected class. *See Obama for Am. v. Husted*, 697 F.3d 423, 429 (6th Cir. 2012) ("If a plaintiff alleges only that a state treated him or her differently than similarly situated voters, without a corresponding burden on the fundamental right to vote, a straightforward rational basis

standard of review should be used.").

Plaintiffs argue that equal protection is implicated because Pennsylvania has permitted counties to use drop boxes to varying extents, and with varying degrees of security. Some, like Delaware County, intend to use dozens of drop boxes. *See generally* [ECF 549-28]. Many others will not use drop boxes at all. *See generally* [ECF 504-1]. And among the counties that *do* use drop boxes, some will staff them with county officials, while others will monitor them only with video surveillance or not at all. *See generally* [ECF 549-28].

In this respect, Plaintiffs argue that they suffer an equal-protection harm similar to that found by the Supreme Court in *Bush v. Gore*, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000). There, the Supreme Court held that the Florida Supreme Court violated equal protection when it "ratified" election recount procedures that allowed different counties to use "varying standards to determine what was a legal vote." *Id.* at 107, 121 S.Ct. 525. This meant that entirely equivalent votes might be counted in one county but discounted in another. *See, e.g., id.* ("Broward County used a more forgiving standard than Palm Beach County, and uncovered almost three times as many new votes, a result markedly disproportionate to the difference in population between the counties."). Given the absence of uniform, statewide rules or standards to determine which votes counted, the Court concluded that the patchwork recount scheme failed to "satisfy the minimum requirement for nonarbitrary treatment of voters necessary to secure the fundamental right [to vote]." *Id.*

**\*42** While the Supreme Court expressly limited its holding in *Bush* "to the present circumstances" of a standardless "statewide recount under the authority of a single state judicial officer," *id.* at 109, 121 S.Ct. 525, a few courts have found its reasoning to be persuasive as a broader principle of equal protection. *See Stewart v. Blackwell*, 444 F.3d 843, 859 (6th Cir. 2006) ("Somewhat more recently decided is *Bush v. Gore*, ... which reiterated long established Equal Protection principles."); *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 598 (6th Cir. 2012) ("We agree with all of the parties and the district court that the consent decree likely violates the equal protection principle recognized in *Bush v. Gore*."); *Pierce v. Allegheny Cty. Bd. of Elections*, 324 F. Supp. 2d 684, 705 (W.D. Pa. 2003) (Conti, J.) ("As noted above, the court finds that the facts presented raise a serious equal protection claim under a theory similar to that espoused by the United States Supreme Court in *Bush v. Gore, supra*."); *Black v. McGuffage*, 209 F. Supp. 2d 889, 899 (N.D. Ill. 2002) ("The Court is certainly mindful of the

limited holding of *Bush*. However, we believe that situation presented by this case is sufficiently related to the situation presented in *Bush* that the holding should be the same.").

Indeed, *Bush's* core proposition—that a state may not take the votes of two voters, similarly situated in all respects, and, for no good reason, count the vote of one but not the other—seems uncontroversial. It also seems reasonable (or at least defensible) that this proposition should be extended to situations where a state takes two equivalent votes and, for no good reason, adopts procedures that greatly increase the risk that one of them will not be counted—or perhaps gives more weight to one over the other. *See, e.g.*, *Black*, 209 F. Supp. 2d at 899 ("Plaintiffs in this case allege that the resulting vote dilution, which was found to be unacceptable in *Bush* without any evidence of a disproportionate impact on any group delineated by traditional suspect criteria, is impacting African American and Hispanic groups disproportionately.... Any voting system that arbitrarily and unnecessarily values some votes over others cannot be constitutional."); *see also Reynolds*, 377 U.S. at 555, 84 S.Ct. 1362 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

That is the sort of equal-protection claim Plaintiffs purport to be asserting—a claim that voters in counties that use drop boxes are subjected to a much higher risk of vote dilution than those in other counties that do not. But that characterization falls apart under scrutiny. Indeed, despite their assertions, Plaintiffs have not actually alleged, let alone proven, that votes cast in some counties are diluted by a greater amount relative to votes cast in others. Rather, they have, at best, shown only that events causing dilution are more likely to occur in counties that use drop boxes. But, importantly, the effect of those events will, by Plaintiffs' own admission, be felt by every voter across all of Pennsylvania. [ECF 509, p. 55. ("The use of unstaffed drop boxes places the security of unknown hundreds (if not thousands) of ballots in jeopardy of theft, destruction, and manipulation. This not only dilutes the weight of *all* qualified Pennsylvanian electors, it curtails a sense of security in the voting process.") (citations omitted) (emphasis in original) ]. Such dilution impacts the entire electorate equally; not just voters in the county where it occurs.

To illustrate this distinction, consider, for example, a presidential election. The Court agrees with Plaintiffs that the relevant electoral unit in such an election is "the entire Commonwealth of Pennsylvania." [ECF 551, p. 55 ("The

electoral unit in this election is the entire Commonwealth of Pennsylvania.") ]. Indeed, on election night, votes cast in each of Pennsylvania's 67 counties will be canvassed, counted, and ultimately added to a statewide vote total that decides who wins Pennsylvania's 20 electoral votes. So, ask: what is the dilutive impact of a hypothetical illegal vote cast in Philadelphia during that election? Does it cause, in any sense, an "unequal evaluation of ballots" cast in different counties, *Bush*, 531 U.S. at 106, 121 S.Ct. 525, such that lawful ballots cast in Philadelphia will be less likely to count, worth less if they do, or otherwise disfavored when compared to votes cast in other counties? The answer is evident—it does not. Rather, the hypothetical illegal vote cast in Philadelphia dilutes *all lawful votes* cast in the election *anywhere* in the Commonwealth by the exact same amount.

**\*43** The same reasoning holds in elections that occur within part of a state, rather than statewide. For example, consider a hypothetical legislative district covering two counties—one that uses drop boxes and one that does not. There may well be a greater risk that illegal voting will occur in the county that uses drop boxes. But any dilutive impact of those votes will be felt equally by voters in *both* counties.

This is categorically different from the harm at issue in *Bush* and cases like it. In *Bush*, Florida's arbitrary use of different recount standards in different counties meant that the state was counting equivalent ballots differently in different counties, meaning that voters in some counties were more likely to have their votes counted than those in others.

In *Black v. McGuffage*, an Illinois district-court case on which Plaintiffs heavily rely, the plaintiffs alleged that the type of voting machines used in some Illinois counties were statistically much more likely to result in equivalent votes being discounted at a much higher frequency in some counties than others, and that the worst machines were those being used in counties with high populations of minority groups. 209 F. Supp. 2d at 899. As a result, voters (and, specifically, minority voters) were much more likely to have their votes discounted, based just on the county in which they lived. *See id.* ("As a result, voters in some counties are statistically less likely to have their votes counted than voters in other counties in the same state in the same election for the same office. Similarly situated persons are treated differently in an arbitrary manner.... In addition, the Plaintiffs in this case allege that the resulting vote dilution ... is impacting African American and Hispanic groups disproportionately.").

Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)

Finally, *Stewart v. Blackwell*, another case cited by Plaintiffs, was the same as *Black*—voters in counties that used punch-card voting were "approximately four times as likely not to have their votes counted" as a voter in a different county "using reliable electronic voting equipment." 444 F.3d at 848.

What ties these cases together is that each of them involves a state arbitrarily "valu[ing] one person's vote over that of another," *Bush*, 531 U.S. at 104-05, 121 S.Ct. 525, by permitting counties to either apply different standards to decide what votes count (*Bush*) or use different voting technologies that create a great risk of votes being discounted in one county that does not exist in others (*Black* and *Stewart*). It is this sort of "differential treatment ... burden[ing] a fundamental right" that forms the bedrock of equal protection. *Sullivan v. Benningfield*, 920 F.3d 401, 409 (6th Cir. 2019).

Plaintiffs, in contrast, have shown no constitutionally significant differential treatment at all.

Instead, as discussed, if Plaintiffs are correct that the use of drop boxes increases the risk of vote dilution, all votes in the relevant electoral unit—whether that is statewide, a subset of the state, or a single county—face the same degree of increased risk and dilution, regardless of which county is most at fault for elevating that risk.

What Plaintiffs have really identified, then, are not uneven **risks of vote dilution**—affecting voters in some counties more than equivalent voters in others—but merely different voting procedures in different counties that may contribute different amounts of vote dilution **distributed equally across the electorate as a whole**. The Court finds that this is not an equal-protection issue.

**\*44** To be clear, the reason that there is no differential treatment is solely based on Plaintiffs' theory of harm in this case. In the more "routine" vote-dilution cases, the state imposes some restriction or direct impact on the plaintiff's right to vote—that results in his or her vote being weighed less (*i.e.*, diluted) compared to those in other counties or election districts. *See Gill*, 138 S. Ct. at 1930, (explaining that "the holdings in *Baker* and *Reynolds* were expressly premised on the understanding that the injuries giving rise to those claims were individual and personal in nature, because the claims were brought by voters who alleged facts showing disadvantage to themselves as individuals") (cleaned up). In this case, though, Plaintiffs complain that the state is **not** imposing a restriction on **someone else's** right to vote, which, they say, raises the risk of fraud, which, if it occurs, could dilute the value of Plaintiffs' vote. The

consequence of this inverted theory of vote dilution is that all other votes are diluted in the same way; all feel the same effect.

Finally, the Court's ruling in this regard is consistent with the many courts that have recognized that counties may, consistent with equal protection, employ entirely different election procedures and voting systems within a single state. *See, e.g., Wexler v. Anderson*, 452 F.3d 1226, 1231-33 (11th Cir. 2006) ("Plaintiffs do not contend that equal protection requires a state to employ a single kind of voting system throughout the state. Indeed, local variety in voting systems can be justified by concerns about cost, the potential value of innovation, and so on.") (cleaned up); *Hendon v. N.C. State Bd. of Elections*, 710 F.2d 177, 181 (4th Cir. 1983) ("A state may employ diverse methods of voting, and the methods by which a voter casts his vote may vary throughout the state."); *Short v. Brown*, 893 F.3d 671, 679 (9th Cir. 2018) ("[T]he appellants' reading of the Supreme Court's voting cases would essentially bar a state from implementing any pilot program to increase voter turnout. Under their theory, unless California foists a new system on all fifty-eight counties at once, it creates 'unconstitutional vote-dilution' in counties that do not participate in the pilot plan. Nothing in the Constitution, the Supreme Court's controlling precedent, or our case law suggests that we can micromanage a state's election process to this degree."); *Fla. State Conference of N.A.A.C.P. v. Browning*, 569 F. Supp. 2d 1237, 1258 (N.D. Fla. 2008) ("[A]s with countless public services delivered through Florida's political subdivisions—such as law enforcement and education—resource disparities are to some degree inevitable. They are not, however, unconstitutional."); *Green Party of State of New York v. Weiner*, 216 F. Supp. 2d 176, 192 (S.D.N.Y. 2002) ("Even in that situation, [*Bush v. Gore*] did not challenge, and the Court did not question, the use of entirely different technologies of voting in different parts of the state, even in the same election."); *Paher v. Cegavske*, No. 20-243, 2020 WL 2748301, at *9 (D. Nev. May 27, 2020) ("[I]t cannot be contested that Clark County, which contains most of Nevada's population—and likewise voters (69% of all registered voters [ ] )—is differently situated than other counties. Acknowledging this as a matter of generally known (or judicially noticeable) fact and commonsense makes it more than rational for Clark County to provide additional accommodations to assist eligible voters."); *Ron Barber for Cong. v. Bennett*, No. 14-2489, 2014 WL 6694451, at *5 (D. Ariz. Nov. 27, 2014) ("[T]he [*Bush v. Gore*] Court did not invalidate different county systems regarding implementation of election procedures."); *Tex. Democratic Party v. Williams*, No. 07-115, 2007 WL 9710211, at n.4 (W.D. Tex. Aug. 16, 2007) ("In *Bush v.*

*Gore*, the Supreme Court specifically noted: 'The question before the Court is not whether local entities, in the exercise of their expertise, may develop different systems for implementing elections.' ").

**\*45** Equal protection does not demand the imposition of "mechanical compartments of law all exactly alike." *Jackman v. Rosenbaum Co.*, 260 U.S. 22, 31, 43 S.Ct. 9, 67 L.Ed. 107 (1922). Rather, "the Constitution is sufficiently flexible to permit its requirements to be considered in relation to the ... contexts in which they are invoked." *Merchants Nat'l Bank of Mobile v. Dredge Gen. G. L. Gillespie*, 663 F.2d 1338, 1343 (5th Cir. 1981). And in this context, "few (if any) electoral systems could survive constitutional scrutiny if the use of different voting mechanisms by counties offended the Equal Protection Clause." *Trump v. Bullock*, ––– F.3d ––––, ––––, 2020 WL 5810556, at \*14 (D. Mont. Sept. 30, 2020).

The distinction—between differences in county election procedures and differences in the treatment of votes or voters between counties—is reflected in *Bush* itself. There, the Supreme Court took pains to clarify that the question before it was "not whether local entities, in the exercise of their expertise, may develop different systems for implementing elections." *Bush*, 531 U.S. at 109, 121 S.Ct. 525; *see also id.* at 134, 121 S.Ct. 525 (Souter, J. dissenting) ("It is true that the Equal Protection Clause does not forbid the use of a variety of voting mechanisms within a jurisdiction, even though different mechanisms will have different levels of effectiveness in recording voters' intentions; local variety can be justified by concerns about cost, the potential value of innovation, and so on."); *Bullock*, ––– F.3d at ––––, 2020 WL 5810556, at \*14 ("[T]he Supreme Court was clear in *Bush v. Gore* that the question was not whether local entities, in the exercise of their expertise, may develop different systems for implementing elections.") (cleaned up).

Thus, coming back to the theory of Plaintiffs' case, Plaintiffs contend that Secretary Boockvar's drop-box guidance will result in differences between counties and differing risks of fraud. But the result of that uneven implementation will not be votes in certain counties being valued less than others. And the result won't be that voters who vote in person will have their votes valued less, either. Instead, if Plaintiffs are right, any unlawful votes will dilute all other lawful votes in the same way. While certainly voter fraud and illegal voting are bad, as a matter of equal protection, there is no unequal treatment here, and thus no burden on Plaintiffs' rights under the Equal Protection Clause.

In addition to their equal-protection claim based on county differences, Plaintiffs also appear to allude to a more general type of equal-protection violation. They assert that Pennsylvania comprises a single election unit. [ECF 551, p. 55 ("The electoral unit in this election is the entire Commonwealth of Pennsylvania.") ]. They assert that they intend to cast their ballots lawfully. *See, e.g.,* [ECF 504-3, ¶ 4 ("As a Pennsylvania qualified registered elector, I have always voted in-person at primary and general elections, and I intend to vote in-person at the upcoming November 3, 2020 General Election.") ]. And they assert that unmanned drop boxes across the Commonwealth (regardless of the county) will, on a statewide basis, dilute their votes. *See, e.g., [id.* at ¶ 6 ("As a Pennsylvania qualified registered elector who votes in-person, I do not want my in-person vote diluted or cancelled by votes that are cast in a manner contrary to the requirements enacted by the Pennsylvania General Assembly.") ]. For example, if one "qualified elector" casts a lawful ballot, but a fraudulent voter casts ten ballots, then that elector's vote will, under Plaintiffs' theory, be diluted by a magnitude of ten—resulting in differential treatment.

**\*46** The problem with this theory is that there does not appear to be any law to support it. Indeed, if this were a true equal-protection problem, then it would transform every violation of state election law (and, actually, every violation of every law) into a potential federal equal-protection claim requiring scrutiny of the government's "interest" in failing to do more to stop illegal activity. This is not the law. To the contrary, it is well-established that even violations of state election laws by state officials, let alone violations by unidentified third parties, do not give rise to federal constitutional claims except in unusual circumstances. *See Shipley v. Chicago Bd. of Election Commissioners*, 947 F.3d 1056, 1062 (7th Cir. 2020) ("A violation of state law does not state a claim under § 1983, and, more specifically, a deliberate violation of state election laws by state election officials does not transgress against the Constitution.") (cleaned up); *Martinez v. Colon*, 54 F.3d 980, 989 (1st Cir. 1995) ("[T]he Constitution is not an empty ledger awaiting the entry of an aggrieved litigant's recitation of alleged state law violations—no matter how egregious those violations may appear within the local legal framework.").

Thus, this type of equal-protection claim fails as a matter of law, as well.

**2. If Pennsylvania's "uneven" use of drop boxes indirectly burdens the right to vote at all, that burden is slight, and justified by important state interests.**

Even assuming that Plaintiffs could establish unequal treatment to state an equal-protection claim, their claim nonetheless fails because the governmental interests here outweigh any burden on the right to vote.

Initially, the Court finds that the appropriate level of scrutiny is rational basis. Defendants' failure to implement a mandatory requirement to "man" drop boxes doesn't directly infringe or burden Plaintiffs' rights to vote at all. Indeed, as discussed above in the context of standing, what Plaintiffs characterize as the burden or harm here is really just an ancillary 'increased risk' of a theoretical harm, the degree of which has not been established with any empirical precision. *See Obama*, 697 F.3d at 429 ("If a plaintiff alleges only that a state treated him or her differently than similarly situated voters, without a corresponding burden on the fundamental right to vote, a straightforward rational basis standard of review should be used."); *Brehm*, 432 F. Supp. 3d at 310 ("Under this framework, election laws that impose no burden on the right to vote are subject to rational-basis review.").

On rational-basis review, the Secretary's guidance here passes constitutional muster. Her guidance certainly provides some flexibility in how counties may use drop boxes, but the guidance overall is rationally related to a legitimate governmental interest—namely, the implementation of drop boxes in a secure manner, taking into account specific county differences. That Plaintiffs feel the decisions and actions of the Pennsylvania General Assembly, Secretary Boockvar, and the county Defendants are insufficient to prevent fraud or illegal voting is of no significance. "[R]ational-basis review in equal protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Heller v. Doe by Doe*, 509 U.S. 312, 319, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993).

As detailed above, Secretary Boockvar's guidance provides lawful, comprehensive, and reasonable standards with respect to (1) selecting the location of drop boxes, (2) drop-box design criteria, (3) signage, (4) drop-box security measures, and (5) drop-box ballot collection and chain of custody procedures. Of particular note, with respect to ballot security, the Secretary's guidance calls for the use of reasonably robust measures like video surveillance, durable and tamperproof design features, regular ballot collection every 24 hours, chain-of-custody procedures to maintain ballot traceability, and signage advising voters that third-party delivery is prohibited, among other things.

To be sure, the Secretary's guidance doesn't insist on the use of security personnel—though some counties have decided to post security guards outside of drop boxes on their own. But the Court can't say that either the Secretary's failure to provide that requirement, or the decision of some counties to proceed with drop boxes "unmanned," is irrational. For example, the evidence presented demonstrates that placing a security guard outside of a drop box at all times is costly, particularly for cash-strapped counties—at least $13 per hour or about $104 (8 hours) to $312 (24 hours) per day, according to Defendants' expert, Professor Robert McNair. [ECF 549-11, p. 11] In the context of a broader election system that detects and deters fraud at many other stages of the voting process, and given that that there are also no equivalent security measures present at U.S. postal mailboxes (which constitute an arguably more tempting vehicle for the would-be ballot harvester), the Court finds that the lack of any statewide requirement that all drop boxes be manned or otherwise surveilled is reasonable, and certainly rational.

**\*47** But even assuming Plaintiffs are right that their right to vote here has been burdened (and thus a heightened level of scrutiny must apply), that burden is slight and cannot overcome Defendants' important state interests under the *Anderson-Burdick* framework. Indeed, courts routinely find attenuated or ancillary burdens on the right to vote to be "slight" or insignificant, even burdens considerably *less* attenuated or ancillary than any burden arguably shown here. *See, e.g., Weber v. Shelley*, 347 F.3d 1101, 1106 (9th Cir. 2003) ("Under *Burdick*, the use of touchscreen voting systems is not subject to strict scrutiny simply because this particular balloting system may make the possibility of some kinds of fraud more difficult to detect.").[11]

To begin with, application of the *Anderson-Burdick* framework here presents something of a "square peg, round hole" dilemma. After all, that test assumes there is some constitutional injury to "weigh" against the state's "important" regulatory interests in the first place. And without differential treatment of votes or voters, there isn't any equal-protection injury for the Court to balance.

The *Anderson-Burdick* test is also ill-fitted to Plaintiffs' claims for another reason. Typically, *Anderson-Burdick* is invoked where the government takes some direct action to burden or restrict a plaintiff's right to vote. Here, in contrast, Plaintiffs complain that Pennsylvania has indirectly burdened the right to vote through *inaction*—i.e., by not imposing *enough* regulation to secure the voting process it has adopted, which, Plaintiffs

say, will allow third parties to vote in an unlawful way, which, if it happens, will dilute (and thus burden) the right to vote.

**\*48** This unusual causal daisy-chain makes it difficult to apply *Anderson-Burdick*'s balancing approach. After all, it is one thing to assess the government's interest in taking a specific action that imposed burdens on the right to vote. It is much less natural for a court to evaluate whether the government had a good reason for not doing something differently, or for failing to do more to prevent (or reduce the risk of) misconduct by third parties that could burden the right to vote.

To the extent *Anderson-Burdick* applies in such circumstances, the appropriate course would, in this Court's view, be to weigh any burden stemming from the government's alleged failures against the government's interest in enacting the broader election scheme it has erected, of which the challenged piece is usually only one part. Focusing solely on the allegedly inadequate procedure being challenged, such as the state's authorization of "drop boxes" here, would ignore the fact that Election Code provisions and regulations operate as part of a single, complex organism balancing many competing interests, all of which are "important" for purposes of the *Anderson-Burdick* analysis. *See, e.g.*, *Crawford*, 553 U.S. at 184, 128 S.Ct. 1610 ("deterring and detecting voter fraud"); *Tedards v. Ducey*, 951 F.3d 1041, 1067 (9th Cir. 2020) ("voter turnout"); *Lunde v. Schultz*, 221 F. Supp. 3d 1095, 1106 (S.D. Iowa 2014) ("expanding ballot access to nonparty candidates"); *Greenville Cnty. Republican Party Exec. Comm. v. South Carolina*, 824 F. Supp. 2d 655, 671 (D.S.C. 2011) ("promoting voter participation in the electoral process"); *Mays v. LaRose*, 951 F.3d 775, 787 (6th Cir. 2020) ("orderly administration of elections"); *Dudum*, 640 F.3d at 1115 ("orderly administration of ... elections"); *Paher v. Cegavske*, 457 F.Supp.3d 919, ——, 2020 WL 2089813, at \*7 (2020) ("protect[ing] the health and safety of ... voters" and "safeguard[ing] the voting franchise"); *Nemes*, —— F. Supp. 3d at ——, 2020 WL 3402345, at \*13 ("implementing voting plans that provide for a free and fair election while attempting to minimize the spread of COVID-19").

Thus, on the "burden" side of the equation is Plaintiffs' harm of vote dilution predicated on a risk of fraud. As discussed above in the context of lack of standing, that burden is slight, factually, because it is based on largely speculative evidence of voter fraud generally, anecdotal evidence of the mis-use of certain drop boxes during the primary election, and worries that the counties will not implement a "best practice" of having poll workers or

guards man the drop boxes. *See* [ECF 461, ¶¶ 63-82; ECF 504-2, ¶ 12; 504-3, ¶ 6; 504-4, ¶7;; ECF 504-6, ¶¶ 6-8; ECF 504-7, ¶¶ 5-9; ECF 504-9, 92:4-10; ECF 504-10, 60:3-61:10; 504-19, pp. 3, 16-18, 20 & Ex. D; ECF 504-25; ECF 504-49; ECF 509, p. 67; ECF 551, p. 34].

This somewhat scant evidence demonstrates, at most, an increased risk of some election irregularities—which, as many courts have held, does not impose a meaningful burden under *Anderson-Burdick*. "Elections are, regrettably, not always free from error," *Hutchinson v. Miller*, 797 F.2d 1279, 1286–87 (4th Cir. 1986), let alone the "risk" of error. In just about every election, votes are counted, or discounted, when the state election code says they should not be. But the Constitution "d[oes] not authorize federal courts to be state election monitors." *Gamza v. Aguirre*, 619 F.2d 449, 454 (5th Cir. 1980). It is "not an empty ledger awaiting the entry of an aggrieved litigant's recitation of alleged state law violations." *Fournier v. Reardon*, 160 F.3d 754, 757 (1st Cir. 1998). Nor is it "an election fraud statute." *Minnesota Voters*, 720 F.3d at 1031.

**\*49** "Garden variety" election irregularities, let alone the "risk" of such irregularities, are simply not a matter of federal constitutional concern "even if they control the outcome of the vote or election." *Bennett v. Yoshina*, 140 F.3d 1218, 1226 (9th Cir. 1998). And as discussed above, most often, even "a deliberate violation of state election laws by state election officials does not transgress against the Constitution." *Shipley*, 947 F.3d at 1062. *see, e.g.*, *Lecky v. Virginia State Bd. of Elections*, 285 F. Supp. 3d 908, 919 (E.D. Va. 2018) ("[E]ven assuming the Fredericksburg officials' failure to provide provisional ballots amounted to a violation of state law, it would not rise to the level of an equal protection violation.").

Compared, then, to Plaintiffs' slight burden, the Commonwealth has put forward reasonable, precise, and sufficiently weighty interests that are undisputed and that can be distilled into three general categories: (1) the benefits of drop boxes, (2) the Commonwealth's interests in furthering its overall election-security plan concerning drop boxes, and (3) the interests inherent in the Commonwealth's general mail-in ballot scheme.

The first category concerns the benefits of drop boxes generally. Secretary Boockvar has pointed out the Commonwealth's interests generally in using drop boxes—including, (1) the increase of voter turnout, (2) the protection of voters' health in the midst of the ongoing pandemic, (3) the increase of voter satisfaction, in light of ongoing U.S. Postal Service issues, and (4) the reduction of costs for counties. [ECF No. 547, at pp. 22-25; ECF

No. 549-2, ¶¶ 36-39, 42-44]. Plaintiffs do not dispute any of these interests.

The second category of interests concerns the Commonwealth's interests in implementing drop boxes with appropriate and effective safety measures and protocols in place. That is, Secretary Boockvar has, in her capacity as the chief state official charged with overseeing elections, issued uniform guidance to all counties regarding the use of drop boxes, which is noted above. That guidance includes (1) advising counties that the Election Code permits the use of drop boxes, and (2) setting forth best practices that the counties should "consider" with respect to their use. Among other things, the Secretary advised that counties should maintain a traceable chain of custody for mail-in and absentee ballots retrieved from drop boxes; utilize drop boxes with various security features (*e.g.*, anti-tampering features, locks, video surveillance, and removal when the site is closed or cannot be monitored); and designate sworn county personnel to remove ballots from drop boxes. And evidence suggests that the Secretary's deputies have emphasized these best practices when queried by county officials. [ECF 549-32 ("Per our conversation, the list of items are things the county must keep in mind if you are going to provide a box for voters to return their ballots in person.") ].

This guidance is lawful, reasonable, and non-discriminatory, and so does not create any constitutional issue in its own right. With this guidance, the Secretary has diminished the risks tolerated by the legislature in adopting mail-in voting and authorizing drop-boxes, by encouraging the counties to adopt rather comprehensive security and chain-of-custody procedures if they do elect to use drop boxes. Conversely, the legislature's decision to leave the counties with ultimate discretion when it comes to how, and to what extent, to use drop boxes (as opposed to adopting a scheme in which the Secretary could enforce compliance with her guidance) is also reasonable, and justified by sufficiently weighty governmental interests, given the many variations in population, geography, local political culture, crime rates, and resources. [ECF 549-9 ("There is no logical reason why ballot receptacles such as drop boxes must be uniform across different counties; particularly because the verification of the voter is determined by election officials upon receipt of the ballot. Counties vary in size and need. Across the country, best practices dictate that counties determine what type of box and size works for them. The needs of a large county are very different from the needs of a smaller county."); ECF 549-11, p. 9 ("Such variation between counties even within a state makes sense, since the needs of different

counties vary and their use of drop boxes reflects those considerations (e.g., the geographic size of a county, the population of the county, and the ease with which voters in the county can access other locations to return mail-in ballots).").

**\*50** The third category of interests is, more generally, the interests of the Commonwealth in administering its overall mail-in ballot regime, including the various security and accountability measures inherent in that legislative plan.

Pennsylvania did not authorize drop boxes in a vacuum. Last year, the Pennsylvania legislature "weigh[ed] the pros and cons," *Weber*, 347 F.3d at 1107, and adopted a broader system of "no excuse" mail-in voting as part of the Commonwealth's Election Code. As the Pennsylvania Supreme Court has now confirmed, that system left room for counties to authorize drop boxes and other satellite locations for returning ballots to the county boards of elections. *See Boockvar*, —— A.3d at ——, 2020 WL 5554644, at \*9 ("[W]e need not belabor our ultimate conclusion that the Election Code should be interpreted to allow county boards of election to accept hand-delivered mail-in ballots at locations other than their office addresses including drop-boxes.").

Inherent in any mail-in or absentee voting system is some degree of increased risk of votes being cast in violation of other provisions of the Election Code, regardless of whether those ballots are returned to drop boxes, mailboxes, or some other location. For example, there is simply no practical way to police third party delivery of ballots to any mailbox anywhere in the Commonwealth, where Plaintiffs do not dispute that such ballots can be lawfully returned. It is also likely that more (and perhaps many more) voters than usual will be disenfranchised by technicalities this year, for failing to comply with the procedural requirements associated with mail-in ballots, such as the requirement that such ballots be placed in "inner secrecy envelopes."

But in enacting the "no excuse" mail-in voting system that it did, the Pennsylvania legislature chose to tolerate the risks inherent in that approach. And the key point is that the legislature made that judgment in the context of erecting a broader election scheme that authorizes other forms of voting and has many other safeguards in place to catch or deter fraud and other illegal voting practices. These safeguards include voter registration; a mail-in ballot application and identity verification process, 25 P.S. §§ 3146.2, 3150.12; a system for tracking receipt of mail-in ballots, 25 P.S. §§ 3146.3(a), 3150.13(a); and, perhaps most important of all, a pre-canvassing and

canvassing process during which mail-in ballots are validated before being counted. In addition, Pennsylvania law also seeks to deter and punish fraud by imposing criminal penalties for unlawful voting, 25 P.S § 3533; voting twice in one election, 25 P.S § 3535; forging or destroying ballots, 25 P.S § 3517; unlawful possession or counterfeiting of ballots 25 P.S § 3516; and much more of the conduct Plaintiffs fear, *see* 25 P.S. § 3501, *et seq.*

In this larger context, the Court cannot say that the balance Pennsylvania struck across the Election Code was unreasonable, illegitimate, or otherwise not "sufficiently weighty to justify," *Crawford*, 553 U.S. at 191, 128 S.Ct. 1610, whatever ancillary risks may be associated with the use of drop boxes, or with allowing counties to exercise discretion in that regard. Pennsylvania may balance the many important and often contradictory interests at play in the democratic process however it wishes, and it must be free to do so "without worrying that a rogue district judge might later accuse it of drawing lines unwisely." *Abbott*, 961 F.3d at 407.

**\*51** Thus, balancing the slight burden of Plaintiffs' claim of dilution against the categories of interests above, the Court finds that the Commonwealth and Defendants' interests in administering a comprehensive county-based mail-in ballot plan, while both promoting voting and minimizing fraud, are sufficiently "weighty," reasonable, and justified. Notably, in weighing the burdens and interests at issue, the Court is mindful of its limited role, and careful to not intrude on what is "quintessentially a legislative judgment." *Griffin*, 385 F.3d at 1131. "[I]t is the job of democratically-elected representatives to weigh the pros and cons of various balloting systems." *Weber*, 347 F.3d at 1106. "So long as their choice is reasonable and neutral, it is free from judicial second-guessing." *Id.*; *see also Abbott,* 961 at 407, ("That the line might have been drawn differently ... is a matter for legislative, rather than judicial, consideration.") (cleaned up); *Trinsey v. Com. of Pa.,* 941 F.2d 224, 235 (3d Cir. 1991) ("We take no position on the balancing of the respective interests in this situation. That is a function for which the legislature is uniquely fitted.").

Thus, even under the *Anderson-Burdick* framework, the Court finds that Plaintiffs' constitutional challenge fails as a matter of law.

### B. Pennsylvania's use of drop boxes does not violate federal due process.

In addition to their equal-protection challenge to the use

of drop boxes, Plaintiffs also appear to argue that the use of unmanned drop boxes violates substantive due process protected by the 14th Amendment. This argument is just a variation on their equal-protection argument—*i.e.*, the uneven use of drop boxes will work a "patent and fundamental unfairness" in violation of substantive due process principles. *See Griffin v. Burns*, 570 F.2d 1065, 1077 (1st Cir. 1978) (substantive due process rights are violated "[i]f the election process itself reaches the point of patent and fundamental unfairness[.]"). The analysis for this claim is the same as that for equal protection, and thus it fails for the same reasons.

But beyond that, this claim demands even stricter proof. Such a claim exists in only the most extraordinary circumstances. *See Nolles v. State Comm. for Reorganization of Sch. Districts*, 524 F.3d 892, 898 (8th Cir. 2008) ("A canvass of substantive due process cases related to voting rights reveals that voters can challenge a state election procedure in federal court only in limited circumstances, such as when the complained of conduct discriminates against a discrete group of voters, when election officials refuse to hold an election though required by state law, resulting in a complete disenfranchisement, or when the willful and illegal conduct of election officials results in fraudulently obtained or fundamentally unfair voting results.") (cleaned up); *Yoshina*, 140 F.3d at 1226 ("We have drawn a distinction between 'garden variety' election irregularities and a pervasive error that undermines the integrity of the vote. In general, garden variety election irregularities do not violate the Due Process Clause, even if they control the outcome of the vote or election.") (citation omitted); *Bennett v. Mollis*, 590 F. Supp. 2d 273, 278 (D.R.I. 2008) ("Before an election error becomes a key that unlocks the restraints on the federal court's authority to act, the Plaintiffs must demonstrate either an intentional election fraud or an unintentional error resulting in broad-gauge unfairness.").

Indeed, "only the most egregious official conduct can be said to be arbitrary in the constitutional sense"—the "executive action must be so ill-conceived or malicious that it 'shocks the conscience.' " *Miller v. City of Phila.*, 174 F.3d 368, 375 (3d Cir. 1999) (cleaned up).

Based on the slight burden imposed here, and the Commonwealth's interests in their overall county specific voting regime, which includes a host of other fraud-prevention measures, the Court finds that the drop-box claim falls short of the standard of substantive due process.

## III. Defendants and Intervenors are entitled to summary judgment on Plaintiffs' signature-comparison claims.

**\*52** Plaintiffs' next claim concerns whether the Secretary's recent guidance on signature comparison violates the federal Constitution. Plaintiffs frame their claims pertaining to signature comparison in two ways—one based on due process and the other based on equal protection.

Plaintiffs initially assert that the Election Code requires a signature comparison for mail-in and absentee applications and ballots. Thus, according to Plaintiffs, Secretary Boockvar's guidance, which says the opposite, is creating unconstitutional vote dilution, in violation of due-process principles—*i.e.*, certain unlawful, unverified ballots will now be counted, thereby diluting the lawful ones cast by other voters (such as in-person voters, whose signatures are verified). Plaintiffs also appear to argue more generally that absent signature comparison, there is a heightened risk of voter fraud, and therefore a heightened risk of vote dilution of lawful votes.

In addition to due process, Plaintiffs argue that the guidance violates equal-protection principles—first, by counties engaging in a patchwork of procedures (where some counties intend to do a signature comparison for mail-in ballots, while others do not); and second, by implementing different standards between mail-in ballots and in-person ones.

In contrast, Defendants and Intervenors take the position that state law does not require signature comparison, and for good reason. According to them, requiring such comparisons is fraught with trouble, as signatures change over time and elections officials are not signature-analysis experts. This leaves open the possibility for arbitrary and discriminatory application that could result in the disenfranchisement of valid voters.

For the reasons that follow, the Court will dismiss the signature-comparison claims and enter judgment in favor of Defendants. A plain reading of the Election Code demonstrates that it does not impose a signature-comparison requirement for mail-in ballots and applications, and thus Plaintiffs' vote-dilution claim sounding in due process fails at the outset. Further, the heightened risk of fraud resulting from a lack of signature comparison, alone, does not rise to the level of a federal constitutional violation. Finally, the equal-protection claims fail because there are sound reasons for the different treatment of in-person ballots versus mail-in

ballots; and any potential burdens on the right to vote are outweighed by the state's interests in their various election security measures.

### A. The Election Code does not require signature comparison for mail-in and absentee ballots or ballot applications.

Plaintiffs' federal-constitutional claims in Count I of their Second Amended Complaint are partially based on the Secretary's guidance violating state law. That is, Plaintiffs' first theory is that by the Secretary violating state law, unlawful votes are counted and thus lawfully cast votes are diluted. According to Plaintiffs, this violates the 1st and 14th Amendments, as well as the Elections Clause (the latter of which requires the legislature, not an executive, to issue election laws).[12]

**\*53** Thus, a necessary predicate for these constitutional claims is whether the Election Code mandates signature comparison for mail-in and absentee ballots. If it doesn't, as the Secretary's guidance advises, then there can be no vote dilution as between lawful and unlawful votes, nor a usurpation of the legislature's authority in violation of the Elections Clause.

After carefully considering the parties' arguments and the relevant law, the Court finds that the plain language of the Election Code imposes no requirement for signature comparison for mail-in and absentee ballots and applications.[13] In other words, the Secretary's guidance is consistent with the Election Code, and creates no vote-dilution problems.[14]

Plaintiffs, in advancing their claim, rely on section 3146.8(g)(3)-(7) of the Election Code to assert that the Code requires counties to "verify" the signatures on mail-in and absentee ballots (*i.e.*, examine the signatures to determine whether they are authentic). Plaintiffs specifically point to section 3146.8(g)(3) as requiring this signature verification. [ECF 509, pp. 17-18].

Section 3146.8(g)(3) states:

> When the county board meets to pre-canvass or canvass absentee ballots and mail-in ballots ... the board shall examine the declaration on the envelope of each ballot ... and shall compare the information thereon with that contained in the "Registered Absentee and Mail-in Voters File," the absentee voters' list and/or the "Military Veterans and Emergency Civilians Absentee Voters File," whichever is applicable. If the county

board has verified the proof of identification as required under this act and is satisfied that the declaration is sufficient and the information contained in the "Registered Absentee and Mail-in Voters File," the absentee voters' list and/or the "Military Veterans and Emergency Civilians Absentee Voters File" verifies his right to vote, the county board shall provide a list of the names of electors whose absentee ballots or mail-in ballots are to be pre-canvassed or canvassed. **\*54** 25 P.S. § 3146.8(g)(3).

According to Plaintiffs, Section 3146.8(g)(3)'s requirement to verify the proof of identification, and compare the information on the declaration, is tantamount to signature comparison. The Court disagrees, for at least three reasons.

First, nowhere does the plain language of the statute require signature comparison as part of the verification analysis of the ballots.

When interpreting a statute enacted by the Pennsylvania General Assembly, courts apply Pennsylvania's Statutory Construction Act, 1 Pa. C.S. §§ 1501-1991. And as the Act instructs, the "object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." 1 Pa C.S. § 1921(a). If the words of the statute are clear and unambiguous, the letter of the law applies. *Id.* at § 1921(b). Otherwise, courts may consider a variety of factors to determine the legislature's intent, including "other statutes upon the same or similar subjects" and "[t]he consequences of a particular interpretation." *Id.* at § 1921(c)(5)-(6).

Section 3146.8(g)(3) does not expressly require any signature verification or signature comparison. 25 P.S. § 3146.8(g)(3). It instead requires election officials to (1) "examine the declaration on the envelope of each ballot," (2) "compare the information thereon with that contained in the ... 'Voters file' [or] the absentee voters' list," and (3) if "the county board has [a] verified the proof of identification as required under this act and [b] is satisfied that the declaration is sufficient and the information contained in the [Voter's file] ... verifies his right to vote," the election official shall include the ballot to be counted. *Id.*

Under the express terms of the statute, then, the information to be "verified" is the "proof of identification." *Id.* The Election Code defines "proof of identification" as the mail-in/absentee voter's driver's license number, last four digits of their Social Security number, or a specifically approved form of identification. 25 P.S. § 2602(z.5)(3)(i)-(iv).[15] The only other

"verification" the election official must conduct is to determine whether "the information contained in the [Voter's file] ... verifies his right to vote."

**\*55** Nowhere does this provision require the election official to compare and verify the authenticity of the elector's signature. In fact, the word "signature" is absent from the provision. It is true that the elector must fill out and sign the declaration included on the ballot. 25 P.S. §§ 3146.6(a), 3150.16(a). However, while section 3146.8(g)(3) instructs the election official to "examine the declaration ... and compare the information thereon with that contained in the [Voter's file]," the provision clarifies that this is so the election official can be "satisfied that the declaration is sufficient." 25 P.S. § 3146.8(g)(3). In other words, the election official must be "satisfied" that the declaration is "fill[ed] out, date[d] and sign[ed]," as required by sections 3150.16(a) and 3146.6(a) of the Election Code. Notably absent is any instruction to verify the signature and set aside the ballot if the election official believes the signature to be non-genuine. There is an obvious difference between checking to see if a signature was provided at all, and checking to see if the provided signature is sufficiently authentic. Only the former is referred to in section 3146.8(g)(3).

Second, beyond the plain language of the statute, other canons of construction compel the Court's interpretation. When interpreting statutes passed by the General Assembly, Pennsylvania law instructs courts to look at other aspects of the statute for context. *See* 1 Pa. C.S. § 1921(c)(5) ("When the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering ... other statutes upon the same or similar subjects."); *O'Rourke v. Commonwealth*, 566 Pa. 161, 778 A.2d 1194, 1201 (2001) ("The cardinal rule of all statutory construction is to ascertain and effectuate the intent of the Legislature. To accomplish that goal, we should not interpret statutory words in isolation, but must read them with reference to the context in which they appear." (citation omitted)).

Context here is important because the General Assembly mandated signature comparison for in-person voting elsewhere in the Election Code—thus evidencing its intention not to require such comparison for mail-in ballots. *See Fonner v. Shandon, Inc.*, 555 Pa. 370, 724 A.2d 903, 907 (1999) ("[W]here a section of a statute contains a given provision, the omission of such a provision from a similar section is significant to show a different legislative intent.") (citation omitted).

In addressing in-person voting, the General Assembly explicitly instructs that the election official shall, after

receiving the in-person elector's voter certificate, immediately "*compare the elector's signature* on his voter's certificate with his signature in the district register. If, upon such comparison, the signature upon the voter's certificate appears to be genuine, the elector who has signed the certificate shall, if otherwise qualified, be permitted to vote: Provided, That *if the signature on the voter's certificate, as compared with the signature as recorded in the district register, shall not be deemed authentic* by any of the election officers, such elector shall not be denied the right to vote for that reason, but shall be considered challenged as to identity and required to [cure the deficiency]." 25 P.S. § 3050(a.3)(2) (emphasis added).

Elsewhere, the General Assembly also explicitly accounts for signature comparison of in-person voters: "[I]f it is determined that the individual was registered and entitled to vote at the election district where the ballot was cast, *the county board of elections shall compare the signature on the provisional ballot envelope with the signature on the elector's registration form and, if the signatures are determined to be genuine, shall count the ballot* if the county board of elections confirms that the individual did not cast any other ballot, including an absentee ballot, in the election. ... [But a] provisional ballot shall not be counted if ... the signature[s] required ... are either not genuine or are not executed by the same individual ..." 25 P.S. § 3050(a.4)(5)(i)-(ii) (emphasis added); *see also* 25 P.S. § 2936 ("[When reviewing nomination papers], the Secretary of the Commonwealth or the county board of elections, although not hereby required so to do, *may question the genuineness of any signature or signatures appearing thereon*, and if he or it shall thereupon find that any such signature or signatures are not genuine, such signature or signatures shall be disregarded[.]" (emphasis added)).

**\*56** Clearly then, the General Assembly, in enacting the Election Code, knew that it could impose a signature-comparison requirement that requires an analysis to determine whether a signature is "genuine." And when that was its intent, the General Assembly explicitly and unequivocally imposed that requirement. It is thus telling, from a statutory construction standpoint, that no such explicit requirement is imposed for returned mail-in or absentee ballots. Indeed, the General Assembly is aware—and in fact, requires—that a voter must sign their application for an absentee or mail-in ballot, and must sign the declaration on their returned ballot. 25 P.S. §§ 3146.2(d) (absentee-ballot application), 3150.12(c) (mail-in-ballot application), 3146.6(a) (absentee-voter declaration), 3150.16(a) (mail-in voter declaration). Despite this, the General Assembly did not mention a

signature-comparison requirement for returned absentee and mail-in ballots.

The Court concludes from this context that this is because the General Assembly did not intend for such a requirement. *See, e.g., Mishoe v. Erie Ins. Co.*, 573 Pa. 267, 824 A.2d 1153, 1155 (2003) ("In arriving at our conclusion that the foregoing language does not provide for the right to a jury trial, we relied on three criteria. First, we put *substantial emphasis* on the fact that the PHRA was silent regarding the right to a jury trial. As we explained, 'the General Assembly is well aware of its ability to grant a jury trial in its legislative pronouncements,' and therefore, 'we can presume that the General Assembly's express granting of trial by jury in some enactments means that it did not intend to permit for a jury trial under the PHRA.'" (cleaned up) (emphasis added)); *Holland v. Marcy*, 584 Pa. 195, 883 A.2d 449, 456, n.15 (2005) ("We additionally note that the legislature, in fact, did specify clearly when it intended the choice of one individual to bind others. In every other category addressed by Section 1705(a) other than (a)(5) which addressed uninsured owners, the General Assembly specifically referenced the fact that the decision of the named insured ... binds other household members.... Similar reference to the ability of the uninsured owner's deemed choice to affect the rights of household members is conspicuously missing from Section 1705(a)(5).").

Accordingly, the Court finds that the General Assembly's decision not to expressly refer to signature comparisons for mail-in ballots, when it did so elsewhere, is significant.

Third, this Court is mindful that Pennsylvania's election statutes are to be construed in a manner that does not risk disenfranchising voters. *See, e.g.,* 1 Pa. C.S. § 1922(3) ("In ascertaining the intention of the General Assembly in the enactment of a statute the following presumptions, among others, may be used: ... That the General Assembly does not intend to violate the Constitution of the United States or of this Commonwealth."); *id.* at § 1921(c)(6) (in interpreting a statute, the court may consider "[t]he consequences of a particular interpretation").

As the Pennsylvania Supreme Court emphasized last month, "[I]t is well-settled that, although election laws must be strictly construed to prevent fraud, they ordinarily will be construed liberally in favor of the right to vote. Indeed, our goal must be to enfranchise and not to disenfranchise the electorate." *Boockvar,* —— A.3d at ——, 2020 WL 5554644, at \*9 (cleaned up); *see also id.* ("[A]lthough both Respondent and the Caucus offer a

reasonable interpretation of Section 3150.16(a) as it operates within the Election Code, their interpretation restricts voters' rights, as opposed to the reasonable interpretation tendered by Petitioner and the Secretary. The law, therefore, militates in favor of this Court construing the Election Code in a manner consistent with the view of Petitioner and the Secretary, as this construction of the Code favors the fundamental right to vote and enfranchises, rather than disenfranchises, the electorate.").

**\*57** Here, imposing a signature-comparison requirement as to mail-in and absentee ballots runs the risk of restricting voters' rights. This is so because election officials, unstudied and untested in signature verification, would have to subjectively analyze and compare signatures, which as discussed in greater detail below, is potentially problematic.[16] [ECF 549-2, p. 19, ¶ 68]; [ECF 549-9, p. 20, ¶ 64]. And perhaps more importantly, even assuming an adequate, universal standard is implemented, mail-in and absentee voters whose signatures were "rejected" would, unlike in-person voters, be unable to cure the purported error. *See* 25 P.S. § 3146.8(a) (stating that in-person and absentee ballots "shall [be safely kept] in sealed or locked containers until they are to be canvassed by the county board of elections," which § 3146.8(g)(1.1)-(2) states is no earlier than election day); *Boockvar*, —— A.3d at ——, 2020 WL 5554644, at *20 ("[A]lthough the Election Code provides the procedures for casting and counting a vote by mail, it does not provide for the 'notice and opportunity to cure' procedure sought by Petitioner. To the extent that a voter is at risk for having his or her ballot rejected due to minor errors made in contravention of those requirements, we agree that the decision to provide a 'notice and opportunity to cure' procedure to alleviate that risk is one best suited for the Legislature."). As discussed in more detail below, unlike in-person voters, whose signatures are verified in their presence, mail-in and absentee voters' signatures would be verified at a later date outside the presence of the voter. *See generally* 25 P.S. § 3146.8(a), (g) (requiring mail-in and absentee ballots to be kept secured in a sealed container until Election Day). Unbeknownst to the voter, then, and without an opportunity to remedy the purported error, these mail-in and absentee voters may not have their votes counted. Based on this risk of disenfranchisement, which the Court must consider in interpreting the statute, the Court cannot conclude that this was the General Assembly's intention.

The Court is not persuaded by Plaintiffs' arguments to the contrary.

Plaintiffs argue that section 3146.8(g)(5)-(7) provides a

voter, whose ballot-signature was rejected, notice and an opportunity to cure the signature deficiency. [ECF 509, pp. 13, 18, 50]. That section, however, refers to when a person raises a specific challenge to a specific ballot or application on the grounds that the elector is not a "qualified elector." 25 P.S. § 3146.8(g)(4) (stating that mail-in and absentee ballots shall be counted unless they were challenged under §§ 3146.2b or 3150.12b, which allow challenges on the grounds that the elector applying for a mail-in or absentee ballot wasn't qualified). Thus, the "challenges" referenced in § 3146.8(g)(5)-(7) refer to a voter's qualifications to vote, not a signature verification.

Plaintiffs similarly argue that section 3146.8(h) provides mail-in voters notice and opportunity to cure signature deficiencies. [ECF 552, p. 60]. But that section relates to "those absentee ballots or mail-in ballots for which proof of identification has not been received or could not be verified." 25 P.S. § 3146.8(h). As discussed above, "proof of identification" is a defined term, and includes the voter's driver's license number, last four digits of their Social Security number, or a specifically approved form of identification. 25 P.S. § 2602(z.5)(3)(i)-(iv). Not included is the voter's signature.[17]

**\*58** At bottom, Plaintiffs request this Court to impose a requirement—signature comparison—that the General Assembly chose not to impose. Section 3146.8(g)(3) does not mention or require signature comparison. The Court will not write it into the statute.

For the same reasons that the Election Code does not impose a signature-comparison requirement for mail-in and absentee ballots, the Election Code does not impose a signature-comparison requirement for mail-in and absentee ballot *applications.* While the General Assembly imposed a requirement that the application be signed, there is no mention of a requirement that the signature be verified, much less that the application be rejected based solely on such verification. 25 P.S. § 3146.2(d) (absentee-ballot application), 3150.12(c) (mail-in-ballot application). Again, finding no explicit instructions for signature comparison here (unlike elsewhere in the Code), the Court concludes that the General Assembly chose not to include a signature-comparison requirement for ballot applications.

The Court again finds Plaintiffs' arguments to the contrary unavailing. Plaintiffs argue that "there is no other proof of identification required to be submitted with the ballot applications," and thus, a signature comparison must be required. [ECF 509, p. 16].

But the Election Code expressly requires the applicant to include several pieces of identifying information, including their name, mailing address, and date of birth. 25 P.S. §§ 3146.2(b), 3150.12(b). And after receiving the applicant's application, the election official must "verify[ ] the proof of identification [a defined term as discussed above] and compar[e] the information provided on the application with the information contained on the applicant's permanent registration card."[18] *Id.* at §§ 3146.2b(c), 3150.12b(a). Thus, contrary to Plaintiffs' argument, the General Assembly provided for certain methods of identification as to ballot applications. Signature verification isn't one of them.

For these reasons, the Court concludes that the Election Code does not impose a signature-comparison requirement for absentee and mail-in ballots and applications. As such, the Secretary's September 11, 2020, and September 28, 2020, guidance is consistent with the Election Code. Plaintiffs' claims of vote dilution based on this guidance will therefore be dismissed.

### B. The lack of a signature comparison does not violate substantive due process.

In addition to alleging that the Secretary's guidance violates the Election Code, Plaintiffs appear to also argue that their right to vote is unconstitutionally burdened and diluted due to a risk of fraud. That is, regardless of what the Election Code requires, Plaintiffs assert that absent signature comparison, mail-in and absentee ballots will be prone to fraud, thereby diluting other lawful ballots. [ECF 509, pp. 45-50; 504-19, pp. 10-15]. Plaintiffs argue that this significantly burdens their fundamental right to vote, resulting in a due-process violation, and thus strict scrutiny applies. The Court disagrees.

**\*59** As discussed above in the context of Plaintiffs' drop-box claim, Plaintiffs' claim here simply does not rise to the high level for a substantive due process claim. To violate substantive due process in the voting-rights context, the infringements are much more severe. Only in extraordinary circumstances will there be "patent and fundamental unfairness" that causes a constitutional harm. *See Bonas v. Town of North Smithfield*, 265 F.3d 69, 74 (1st Cir. 2001); *Shannon v. Jacobowitz*, 394 F.3d 90, 94 (2d Cir. 2005).

Here, Plaintiffs' signature-comparison claim does not meet this high standard. This isn't a situation of malapportionment, disenfranchisement, or intentional discrimination. And the risk of voter fraud generally

without signature comparison—as a matter of fact and law—does not rise to "patent and fundamental unfairness."

Indeed, as discussed above, Plaintiffs' evidence of potential voter fraud here is insufficient to establish "patent and fundamental unfairness." In their summary-judgment brief, Plaintiffs argue that "the Secretary's September 2020 guidance memos promote voter fraud." [ECF 509, p. 48]. Plaintiffs then offer a hypothetical where a parent signs a ballot application on their child's behalf because the child is out-of-state. [ECF 509, p. 48]. Plaintiffs assert that without signature comparisons, such "fraud" could proceed unchecked. [*Id.*]. Plaintiffs continue, arguing that the "fraud" would "snowball," so that "spouses, neighbors, acquaintances, strangers, and others" were signing applications and ballots on others' behalf. [*Id.* at pp. 48-49]. To prevent such fraud, Plaintiffs' expert, Mr. Riddlemoser, asserts that signature comparison is needed. [ECF 504-19, p. 10 ("Not only does enforcing the Election Code's requirement of a completed and signed declaration ensure uniformity, which increases voter confidence, it also functions to reduce fraud possibilities by allowing signature verification.") ].

Mr. Riddlemoser first highlights that in Philadelphia in the primary, ballots were counted "that lacked a completed declaration." [*Id.* at p. 11]. Mr. Riddlemoser further opines that the September 11, 2020, guidance and September 28, 2020, guidance, in instructing that signature comparison is not required for mail-in and absentee ballots and applications, "encourage[s], rather than prevent[s], voter fraud." [*Id.* at pp. 12-13]. Mr. Riddlemoser also notes that signature comparison is "the most common method" to verify ballots and that the Secretary's guidance "leave the absentee/mail-in ballots subject to the potential for unfettered fraud." [*Id.* at p. 14]. He concludes that the guidance "invites the dilution of legitimately cast votes." [*Id.*].

Based on this evidentiary record, construed in Plaintiffs' favor, the Court cannot conclude that there exists "patent and fundamental unfairness." Rather, Plaintiffs present only the possibility and potential for voter fraud. In their briefing, Plaintiffs relied on hypotheticals, rather than actual events. [ECF 509, p. 48]. Mr. Riddlemoser admits that failing to verify signatures only creates "the potential" for fraud and "invites" vote dilution. [ECF 504-19, pp. 14, 15]. Even assuming an absence of signature comparison does indeed invite the potential for fraud, the nondiscriminatory, uniform practice and guidance does not give rise to "patent and fundamental unfairness" simply because of a "potential" for fraud.

Plaintiffs have not presented evidence to establish a sufficient burden on their constitutional right to vote.

**\*60** Indeed, even if the Court assumed some "forged" applications or ballots were approved or counted, this is insufficient to establish substantial, widespread fraud that undermines the electoral process. Rather, limited instances of "forged" ballots—which according to Plaintiffs' definition, includes an individual signing for their spouse or child—amount to what the law refers to as "garden variety" disputes of limited harm. As has long been understood, federal courts should not intervene in such "garden variety" disputes. *Hutchinson*, 797 F.2d at 1283 ("[C]ourts have uniformly declined to endorse action under § 1983 with respect to garden variety election irregularities.") (cleaned up); *Yoshina*, 140 F.3d at 1226 ("In general, garden variety election irregularities do not violate the Due Process Clause, even if they control the outcome of the vote or election." (collecting cases)); *Curry v. Baker*, 802 F.2d 1302, 1314-15 (11th Cir. 1986) ("[I]f the election process itself reaches the point of patent and fundamental unfairness, a violation of the due process clause may be indicated and relief under § 1983 therefore in order. Such a situation must go well beyond the ordinary dispute over the counting and marking of ballots." (cleaned up)).

To be clear, the Court does not take Plaintiffs' allegations and evidence lightly. Election fraud is serious and disruptive. And Plaintiffs could be right that the safer course would be to mandate signature comparison for all ballots. But what Plaintiffs essentially complain of here is whether the procedures employed by the Commonwealth are sufficient to prevent that fraud. That is a decision left to the General Assembly, not to the meddling of a federal judge. *Crawford*, 553 U.S. at 208, 128 S.Ct. 1610 (Scalia, J. concurring) ("It is for state legislatures to weigh the costs and benefits of possible changes to their election codes, and their judgment must prevail unless it imposes a severe and unjustified overall burden upon the right to vote, or is intended to disadvantage a particular class."). *Griffin*, 385 F.3d at 1131-32 ("[S]triking the balance between discouraging fraud and other abuses and encouraging turnout is quintessentially a legislative judgment with which we judges should not interfere unless strongly convinced that the legislative judgment is grossly awry.").

### C. Plaintiffs' federal equal-protection claims based on signature comparison fail.
Plaintiffs present two federal equal-protection claims. The Court will address each in turn.

### 1. County differences over signature comparison do not violate federal equal-protection rights.

Plaintiffs' first federal equal-protection claim is based on some county boards of elections intending to verify the signatures on mail-in and absentee ballots and applications, while others do not intend to do so. To that end, Plaintiffs have presented evidence that some, but not all, counties do intend to verify signatures. *E.g.*, [ECF 504-1].[19] According to Plaintiffs, this arbitrary and differential treatment of mail-in and absentee ballots among counties—purportedly caused by the Secretary's September 11, 2020, and September 28, 2020, guidance—violates the Equal-Protection Clause because voters will be treated differently simply because of the county in which they reside. The Court, however, finds no equal-protection violation in this context.

The Secretary's guidance about which Plaintiffs complain is uniform and nondiscriminatory. It was issued to all counties and applies equally to all counties, and by extension, voters. Because the uniform, nondiscriminatory guidance is rational, it is sound under the Equal-Protection Clause. *See Gamza*, 619 F.2d at 453 (5th Cir. 1980) ("We must, therefore, recognize a distinction between state laws and patterns of state action that systematically deny equality in voting, and episodic events that, despite non-discriminatory laws, may result in the dilution of an individual's vote. Unlike systematically discriminatory laws, isolated events that adversely affect individuals are not presumed to be a violation of the equal protection clause.") (citation omitted). Indeed, the guidance merely instructs counties to abide by the Election Code—an instruction to follow the law is certainly rational and related to an obviously rational government interest.

**\*61** In fact, if there is any unequal application now, it is caused by those counties that are *not* following the guidance and are going above and beyond the Election Code to impose a signature-comparison requirement. That claim, though, is not before the Court, as Plaintiffs here do not assert that imposing a signature-comparison requirement violates the Constitution (they allege the opposite).

In any event, to the extent there was uncertainty before, this decision informs the counties of the current state of

Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)

the law as it relates to signature comparison. If any county still imposes a signature-comparison requirement in order to disallow ballots, it does so without support from the Secretary's guidance or the Election Code. Further, counties that impose this signature-comparison requirement to reject ballots may be creating a different potential constitutional claim for voters whose ballots are rejected. *Boockvar, —— A.3d at ——, 2020 WL 5554644, at \*34, n.16* (Wecht, J. concurring) (noting that courts around the country have found due process issues with signature-comparison requirements; and collecting cases).

For these reasons, Plaintiffs' equal-protection claim falls short.

**2. Different treatment between in-person ballots and mail-in ballots also does not violate federal equal-protection rights.**

Plaintiffs also assert a second federal equal-protection claim on the grounds that the Election Code, by not requiring signature comparison for mail-in and absentee ballots, treats such ballots differently than in-person ballots (which require signature comparisons). Plaintiffs argue that this is an unconstitutionally arbitrary and unequal treatment. The Court disagrees.

It is well-settled that states may employ in-person voting, absentee voting, and mail-in voting and each method need not be implemented in exactly the same way. *See Hendon, 710 F.2d at 181* ("A state may employ diverse methods of voting, and the methods by which a voter casts his vote may vary throughout the state.")

"Absentee voting is a fundamentally different process from in-person voting, and is governed by procedures entirely distinct from in-person voting procedures." *ACLU of New Mexico v. Santillanes, 546 F.3d 1313, 1320 (10th Cir. 2008)* (citations omitted). It is an "obvious fact that absentee voting is an inherently different procedure from in-person voting." *Indiana Democratic Party v. Rokita, 458 F. Supp. 2d 775, 830-31 (S.D. Ind. 2006).* Because in-person voting is "inherently different" from mail-in and absentee voting, the procedures for each need not be the same. *See, e.g., Santillanes, 546 F.3d at 1320-21* ("[B]ecause there are clear differences between the two types of voting procedures, the law's distinction is proper."); *Rokita, 458 F. Supp. 2d at 831* ("[I]t is axiomatic that a state which allows for both in-person and absentee voting must therefore apply different

requirements to these two groups of voters."); *Billups, 439 F. Supp. 2d at 1356-57* ("[A]bsentee voting and in-person voting are inherently different processes, and both processes use different standards, practices, and procedures.").

Plaintiffs argue that while absentee and mail-in voting "is a fundamentally different process from in-person voting," Defendants have "no justification in this instance to create such an arbitrary and disparate rule between absentee/mail-in voters and in-person voters." [ECF 509, p. 51]. Not so.

**\*62** Because of the "inherent" differences between in-person voting and mail-in and absentee voting, Pennsylvania's requirement for signature comparison for in-person ballots, but not mail-in and absentee ballots, is not arbitrary. By way of example, Secretary Boockvar articulated several valid reasons why Pennsylvania implements different verification procedures for mail-in and absentee voters versus in-person voters. [ECF 504-12; ECF 549-2].

In her deposition, Secretary Boockvar explained that for in-person voters, the only possible verification is signature comparison and verification. [ECF 504-12, 55:19-56:19]. This is because, unlike mail-in and absentee voters who must apply for a ballot, in-person voters may simply show up at the polls on Election Day and vote. In contrast, for mail-in and absentee voters, there are several verification steps implemented before the voter's mail-in/absentee ballot is counted, such as checking their application and their drivers' license number or social security number. [*Id.* at 56:8-19]. Thus, counties don't need to resort to a signature comparison to identify and verify the mail-in or absentee voter.

This is important, as Defendants and Intervenors present valid concerns about the uniformity and equality of signature comparisons, in part, due to the technical nature of signature analysis, the subjective underpinnings of signature analysis, and the variety of reasons that signatures can naturally change over time. [ECF 549-2, pp. 19-20, ¶ 68; ECF 549-9, p. 20, ¶¶ 63-64]. Such factors can reasonably justify not requiring a signature comparison when the elector is not physically present.

For example, Secretary Boockvar notes the concern with non-handwriting-expert election officials comparing signatures, without uniform standards. [ECF 549-2, pp. 19-20, ¶ 68]. She also notes that people's signatures can change over time, due to natural and unavoidable occurrences, like injuries, arthritis, or the simple passage of time. [*Id.*]. Such reasons are valid and reasonable. *See*

*Boockvar*, —— A.3d at ——, 2020 WL 5554644, at *34 (Wecht, J. concurring) ("Signature comparison is a process fraught with the risk of error and inconsistent application, especially when conducted by lay people.").

Secretary Boockvar further asserts that signature comparison is justified for in-person voting, but not mail-in or absentee voting, because the in-person voter is notified of his or her signature deficiency, and afforded an opportunity to cure. [ECF 549-2, pp. 19-20, ¶¶ 66-68 (explaining that in-person voters can be immediately notified of the signature deficiency, but mail-in/absentee voters cannot) ]. Secretary Boockvar's justifications are consistent with the Election Code's framework.

When a voter votes in person, he or she signs the voter's certificate, and the election official immediately, in the voter's presence, verifies the signature. 25 P.S. § 3050(a.3)(1)-(2). If the election official finds the signature to be problematic, the in-person voter is told as such. *Id.* at § 3050(a.3)(2). Notably, however, the in-person voter may still cast a ballot. *Id.* ("[I]f the signature on the voter's certificate ... shall not be deemed authentic by any of the election officers, such elector shall not be denied the right to vote for that reason[.]"). The in-person voter whose signature is questioned must, after casting the ballot, "produce at least one qualified elector of the election district as a witness, who shall make affidavit of his identity or continued residence in the election district." *Id.* at § 3050(d). Thus, the in-person voter whose signature is not verified is immediately notified, is still allowed to cast a ballot, and is given the opportunity to remedy the signature-deficiency.

**\*63** In contrast, a voter who casts a mail-in or absentee ballot cannot be afforded this opportunity. Absentee and mail-in ballots are kept in "sealed or locked containers" until they are "canvassed by the county board of elections." 25 P.S. § 3146.8(a). The pre-canvassing and canvassing cannot begin until Election Day. *Id.* at § 3146.8(g)(1.1)-(2). As such, the absentee and mail-in ballots cannot be verified until Election Day, regardless of when the voter mails the ballot. Further, even if there were sufficient time, a voter cannot cure these types of deficiencies on his mail-in or absentee ballot. *Boockvar*, —— A.3d at ——, 2020 WL 5554644, at *20 ("[A]lthough the Election Code provides the procedures for casting and counting a vote by mail, it does not provide for the "notice and opportunity to cure" procedure sought by Petitioner.").

Therefore, if mail-in and absentee ballots were subject to signature comparison, an election official—who is unstudied in the technical aspects of signature

comparison—could deem a voter's signature problematic and not count the ballot, which would effectively disenfranchise that voter. Unlike the in-person voter, the mail-in or absentee voter may not know that his or her signature was deemed inauthentic, and thus may be unable to promptly cure the deficiency even if he or she were aware.

Accordingly, the Court concludes that the inherent differences and opportunities afforded to in-person voters compared to mail-in and absentee voters provides sufficient reason to treat such voters differently regarding signature comparison. The Court concludes that the lack of signature comparison for mail-in and absentee ballots is neither arbitrary, nor burdens Plaintiffs' equal-protection rights.

For these reasons, the Court will dismiss Plaintiffs' federal equal-protection claims related to signature comparison.

### 3. The Election Code provisions related to signature comparison satisfy *Anderson-Burdick*.

Finally, even assuming the Election Code's absence of a signature-comparison requirement imposes some burden on Plaintiffs' constitutional rights, Plaintiffs' constitutional claims still fail.

As discussed above with respect to Defendants' drop-box implementation, *Anderson-Burdick* does not apply neatly to this claim either. This is because Plaintiffs aren't challenging a specific regulation affecting their right to vote, but are instead challenging the ***lack*** of a restriction on someone else's right to vote. This makes both the burden difficult to assess and also the state's interests in ***not*** doing something more abstract. As such, the Court finds that the proper application of the *Anderson-Burdick* framework here includes weighing the burden involving Plaintiffs' risk of vote dilution against the state's interests and overall plan in preventing against voter fraud, including with respect to forged mail-in ballots.

Weighing these considerations compels a conclusion that there is no constitutional violation here. With respect to any burden on Plaintiffs' right to vote, that burden is slight, at best. A failure to engage in a signature comparison may, crediting Plaintiffs' evidence, increase the risk of voter fraud. But even then, this remains a largely speculative concern. This burden too is lessened

by the numerous other regulations imposed by the Election Code, including the detailed verification procedure as to the information on mail-in ballots (discussed above), and the deterrence furthered by criminal sanctions for those engaging in such voter fraud.

Against these burdens, the Commonwealth has precise and weighty interests in verifying ballot applications and ballots in an appropriate manner to ensure that they are accurate. As discussed above, the Commonwealth determined that the risk of disenfranchising mail-in and absentee voters, did not justify signature comparison for those voters. [ECF 549-2, pp. 19-20, ¶¶ 66-69]. Unlike for in-person voters, there are other means of identifying and verifying mail-in and absentee voters, such as having to specifically apply for a mail-in or absentee ballot and provide various categories of identifying information. [ECF 504-12, 55:19-56:19]; 25 P.S. §§ 3146.2(b), 3150.12(b). And ultimately, due to the slight burden imposed on Plaintiffs, Pennsylvania's regulatory interests in a uniform election pursuant to established procedures is sufficient to withstand scrutiny. *Timmons*, 520 U.S. at 358, 117 S.Ct. 1364.

**\*64** The General Assembly opted not to require signature comparisons for mail-in and absentee ballots and applications. And as previously discussed, absent extraordinary reasons to, the Court is not to second-guess the legislature.

**IV. Defendants and Intervenors are entitled to summary judgment on Plaintiffs' as-applied, federal constitutional challenge to the county-residency requirement for poll watchers.**
Plaintiffs next take exception with the provision of the Election Code that restricts a registered voter from serving as a poll watcher outside the county of his or her residence. [ECF 461, ¶ 217].

Plaintiffs argue that "[a]s applied to the 2020 General Election, during the midst of the COVID-19 pandemic, Pennsylvania's residency requirement for watchers violates equal protection." [ECF 509, p. 58]. That's because, according to Plaintiffs, the "current pandemic severely challenges the ability of parties to staff watchers[.]" [*Id.* at p. 60]. And not having enough poll watchers in place "puts into danger the constitutionally-guaranteed right to a transparent and undiluted vote," [*id.* at p. 68], by "fostering an environment that encourages ballot fraud or tampering," [ECF 461, ¶ 256]. As such, Plaintiffs believe that the

county residency requirement "is not rationally connected or reasonably related to any interest presented by the Commonwealth." [ECF 509, p. 63].

Defendants and Intervenors have a markedly different view.

As an initial matter, the Democratic Intervenors argue that Plaintiffs "are precluded from relitigating their claim that the Commonwealth lacks a constitutionally recognized basis for imposing a county-residence restriction for poll watchers" based on the doctrine articulated in *England v. Louisiana State Bd. of Med. Examiners*, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964). [ECF 529, p. 16]. That doctrine requires that after a federal court has abstained under *Pullman*, the plaintiff must expressly reserve the right to litigate any federal claims in federal court while litigating state-law issues in state court. *England*, 375 U.S. at 419, 421-22, 84 S.Ct. 461. Defendants and Intervenors contend that Plaintiffs (specifically, the Trump Campaign, the RNC, and the Republican Party) failed to do so in the proceedings before the Pennsylvania Supreme Court.

And if the *England* doctrine doesn't bar this claim, Defendants and Intervenors argue that "Plaintiffs' as-applied challenge simply fails to state a constitutional claim." *See, e.g.*, [ECF 547, p. 65]. They believe that the county-residency requirement does not infringe on a fundamental right or regulate a suspect classification (such as race, sex, or national origin). [*Id.*]. As a result, the Commonwealth need only provide a rational basis for the requirement, which Defendants and Intervenors believe the Commonwealth has done. [*Id.*].

After carefully reviewing the record and considering the parties' arguments and evidence, the Court finds that the *England* doctrine does not bar Plaintiffs' ability to bring this claim. Even so, after fully crediting Plaintiffs' evidence, the Court agrees with Defendants and Intervenors that Plaintiffs' as-applied challenge fails on the merits.

**A. The *England* doctrine does not bar Plaintiffs' federal challenge to the county-residency requirement.**
**\*65** In *England*, the Supreme Court established that after a federal court abstains under *Pullman*, "if a party freely and without reservation submits his federal claims for decision by the state courts, litigates them there, and has them decided there, then ... he has elected to forgo his

right to return to the District Court." 375 U.S. at 419, 84 S.Ct. 461. To reserve those rights, a plaintiff forced into state court by way of abstention must inform the state court that he is exposing the federal claims there only to provide the proper context for considering the state-law questions. *Id.* at 421, 84 S.Ct. 461. And that "he intends, should the state court[ ] hold against him on the question of state law, to return to the District Court for disposition of his federal contentions." *Id.* Essentially, in *England*, the Supreme Court created a special doctrine of *res judicata* for *Pullman* abstention cases.

The Democratic Intervenors argue that because none of the three Plaintiffs who participated in the Pennsylvania Supreme Court case as either intervenors or *amici* "reserved the right to relitigate [Plaintiffs' poll-watcher claim] in federal court," they are now "precluded" from doing so. [ECF 529, p. 17]. The Court is not convinced that this doctrine bars Plaintiffs' claim for at least two reasons.

First, in its original abstention decision, the Court noted that "[n]one of Plaintiffs' poll-watching claims directly ask the Court to construe an ambiguous state statute." [ECF 409, p. 24]. Instead, these claims resided in a *Pullman* gray area, because they were only indirectly affected by other unsettled state-law issues. In light of that, the Court finds that the *England* doctrine was not "triggered," such that Plaintiffs needed to reserve their right to return to federal court to litigate the specific as-applied claim at issue here.

Second, even if it were triggered, not all of the Plaintiffs here were parties in the Pennsylvania Supreme Court case, and only one (the Republican Party) was given intervenor status. But even the Republican Party, acting as an intervenor, did not have an opportunity to develop the record or present evidence relevant to its as-applied challenge. Thus, this claim wasn't "fully litigated" by any of the Plaintiffs, which is a necessary condition for the claim to be barred under the *England* doctrine. *Cf. Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1073 (3d Cir. 1990) (explaining that a litigant "may not relitigate an issue s/he fully and unreservedly litigated in state court").

Thus, Plaintiffs are not precluded by the *England* doctrine from bringing their remaining as applied poll-watcher claim. The Court will now address the claim on the merits.

**B. The county-residency requirement, as applied to the facts presented and the upcoming general election, does not violate the U.S. Constitution.**

Originally, Plaintiffs raised a facial challenge to the county-residency requirement under 25 P.S. § 2687. That is, Plaintiffs first took the position that there was no conceivable constitutional application of the requirement that an elector be a resident of the county in which he or she seeks to serve. But, as Plaintiffs' concede, that facial challenge is no longer viable in light of the Pennsylvania Supreme Court's recent decision. [ECF 448, p. 10]. As a result, Plaintiffs now focus solely on raising an as-applied challenge to the county-residency requirement.

"[T]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010).

At a fundamental level, a "facial attack tests a law's constitutionality based on its text alone and does not consider the facts or circumstances of a particular case." *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010). By contrast, an "as-applied attack" on a statute "does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right." *Id.* The distinction between facial and an as-applied attack, then, "goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." *Citizens United*, 558 U.S. at 331, 130 S.Ct. 876; *see also Bruni v. City of Pittsburgh*, 824 F.3d 353, 362 (3d Cir. 2016) ("The distinction between facial and as-applied constitutional challenges, then, is of critical importance in determining the remedy to be provided).

**\*66** Because the distinction is focused on the available remedies, not the substantive pleading requirements, "[t]he substantive rule of law is the same for both challenges." *Edwards v. D.C.*, 755 F.3d 996, 1001 (D.C. Cir. 2014); *see also Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 509, n.5 (D.C. Cir. 2016) ("Indeed, the substantive rule of law is the same for both as-applied and facial First Amendment challenges.") (cleaned up); *Legal Aid Servs. of Or. v. Legal Servs. Corp.*, 608 F.3d 1084, 1096 (9th Cir. 2010) ("The underlying constitutional standard, however, is no different [in an as-applied challenge] th[a]n in a facial challenge.").

"In other words, *how* one must demonstrate the statute's invalidity remains the same for both type of challenges, namely, by showing that a specific rule of law, usually a constitutional rule of law, invalidates the statute, whether in a personal application or to all." *Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219, 228 (2d Cir. 2006), *abrogated on other grounds by Bond v. United States*, 564 U.S. 211, 131 S.Ct. 2355, 180 L.Ed.2d 269 (2011).

In determining whether a state election law violates the U.S. Constitution, the Court must "first examine whether the challenged law burdens rights protected by the First and Fourteenth Amendments." *Patriot Party of Allegheny Cnty. v. Allegheny Cnty. Dep't of Elections*, 95 F.3d 253, 258 (3d Cir. 1996). "Where the right to vote is not burdened by a state's regulation on the election process, ... the state need only provide a rational basis for the statute." *Cortés*, 218 F. Supp. 3d at 408. The same is true under an equal protection analysis. "If a plaintiff alleges only that a state treated him or her differently than similarly situated voters, without a corresponding burden on the fundamental right to vote, a straightforward rational basis standard of review should be used." *Obama*, 697 F.3d at 428 (6th Cir. 2012); *see also Biener*, 361 F.3d at 214-15 (applying rational basis where there was no showing of an "infringement on the fundamental right to vote."); *Donatelli*, 2 F.3d at 515 ("A legislative classification that does not affect a suspect category or infringe on a fundamental constitutional right must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." (cleaned up)).

But where the law imposes at least some burden on protected rights, the court "must gauge the character and magnitude of the burden on the plaintiff and weigh it against the importance of the interests that the state proffers to justify the burden." *Patriot Party*, 95 F.3d at 258 (citations omitted).

Consistent with the Pennsylvania Supreme Court's recent decision, but now based on a complete record, this Court finds that the county-residency requirement for poll watching does not, as applied to the particular circumstances of this election, burden any of Plaintiffs' fundamental constitutional rights, and so a deferential standard of review should apply. *See Boockvar*, --- A.3d at ----, 2020 WL 5554644, at *30. Under a rational-basis review and considering all the relevant evidence before the Court, the county-residency requirement is rational, and thus constitutional. But even if the requirement burdened the right to vote, that burden is slight—and under the *Anderson-Burdick* test, the Commonwealth's

interests in a county-specific voting system, viewed in the context of its overall polling-place security measures, outweigh any slight burden imposed by the county-residency restriction.

**1. The county-residency requirement neither burdens a fundamental right, including the right to vote, nor discriminates based on a suspect classification.**

**\*67** At the outset, "there is no individual constitutional right to serve as a poll watcher[.]" *Boockvar*, --- A.3d at ----, 2020 WL 5554644, at *30 (citing *Cortés*, 218 F. Supp. 3d at 408); *see also Dailey v. Hands*, No. 14-423, 2015 WL 1293188, at *5 (S.D. Ala. Mar. 23, 2015) ("[P]oll watching is not a fundamental right protected by the First Amendment."); *Turner v. Cooper*, 583 F. Supp. 1160, 1162 (N.D. Ill. 1983) ("Plaintiffs have cited no authority ..., nor have we found any, that supports the proposition that [the plaintiff] had a first amendment right to act as a poll watcher.").

"State law, not the Federal Constitution, grants individuals the ability to serve as poll watchers and parties and candidates the authority to select those individuals." *Cortés*, 218 F. Supp. 3d at 414; *see also Boockvar*, --- A.3d at ----, 2020 WL 5554644, at *30 (the right to serve as a poll watcher "is conferred by statute"); *Tiryak v. Jordan*, 472 F. Supp. 822, 824 (E.D. Pa. 1979) ("The number of poll-watchers allowed, the manner of their appointment, their location within the polling place, the activities permitted and the amount of compensation allowed are all dictated by [25 P.S. § 2687].") Given the nature of the right, "[i]t is at least arguable that the [Commonwealth of Pennsylvania] could eliminate the position of poll watcher" without offending the constitution. *Cotz v. Mastroeni*, 476 F. Supp. 2d 332, 364 (S.D.N.Y. 2007). In fact, one neighboring state—West Virginia—has eliminated poll watchers. W. Va. Code Ann. § 3-1-37; W. Va. Code Ann. § 3-1-41.

Nor does the county-residency requirement hinder the "exercise of the franchise." *Cortés*, 218 F. Supp. 3d at 408. It doesn't in any way limit voters' "range of choices in the voting booth"—voters can still "cast ballots for whomever they wish[.]" *Id.* And, as Plaintiffs admit, the county-residency requirement doesn't make the actual act of casting a vote any harder. *See* [ECF 524-24, 67:1-6]. Indeed, at least one of the plaintiffs here, Representative Joyce, testified that he was unaware of anyone unable to cast his ballot because of the county-residency

requirement for poll watchers [*Id.*].

Finally, Plaintiffs' claim that Pennsylvania's "poll watching system" denies them "equal access" to the ability to observe polling places in the upcoming election does not, on its own, require the Court to apply anything other than rational-basis scrutiny. [ECF 551, p. 75]. To the extent Plaintiffs are denied equal access (which discussed below, as a matter of evidence, is very much in doubt), it isn't based on their membership in any suspect classification.

For a state law to be subject to strict scrutiny, it must not only make a distinction among groups, but the distinction must be based on inherently suspect classes such as race, gender, alienage, or national origin. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439-40, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Political parties are not such a suspect class. *Greenville Republican Party*, 824 F. Supp. 2d at 669 ("[T]his court is unfamiliar with, and Plaintiffs have not cited, any authority categorizing political parties as an inherently suspect class.") Likewise, "[c]ounty of residence is not a suspect classification warranting heightened scrutiny[.]" *Short*, 893 F.3d at 679.

Plaintiffs don't dispute this. [ECF 509, p. 65 ("To be clear, the right at issue here is the right of **candidates** and **political parties** to participate in an election where the process is transparent and open to observation and the right of the **voters** to participate in such election." (emphasis in original) ]. Rather, Plaintiffs' theory as to how the county-residency requirement burdens the right to vote is based on the same threat of vote dilution by fraud that they have advanced with their other claims. In other words, Plaintiffs' claim that the county-residency requirement for poll watchers limits the ability to find poll watchers, which, in turn, limits the ability for poll watchers to detect fraud and ballot tampering. [ECF 461, ¶¶ 256-57]. The resulting fraudulent or destroyed ballots cause the dilution of lawfully cast ballots. [ECF 509, pp. 64-68].

**\*68** Thus, based on this theory, to establish the burden flowing from the county-residency restriction, Plaintiffs must show (1) the county-residency requirement prevents them from recruiting enough registered Republican poll watchers in every county, (2) the absence of these Republican poll watchers creates a material risk of increased fraud and ballot tampering, and (3) this risk of fraud and ballot tampering will dilute the value of honestly cast votes.

There are both factual and legal problems fatal to Plaintiffs' vote-dilution theory in this context. Factually,

Plaintiffs' evidence, accepted as true, fails to establish that they cannot find enough poll watchers because of the county-residency requirement. But even if they made that factual showing, the inability to find poll watchers still does not burden any recognized constitutional right in a way that would necessitate anything more than deferential review.

**2. Plaintiffs' evidence does not establish any factual predicate for their theory.**

Even accepting as true Plaintiffs' version of events, Plaintiffs have not established that the county-residency requirement is responsible for an inability to find enough poll watchers for at least two reasons.

First, Plaintiffs' evidence stops short of demonstrating any actual shortfall of desired poll watchers.

For example, in his declaration, James J. Fitzpatrick, the Pennsylvania Director for Election Day Operations for the Trump Campaign, stated only that the "Trump Campaign is *concerned* that due to the residency restriction, it will not have enough poll watchers in certain counties." [ECF 504-2, ¶ 25 (emphasis added) ]. Notably, however, Mr. Fitzpatrick, even when specifically asked during his deposition, never identified a single county where the Trump Campaign has *actually* tried and failed to recruit a poll watcher because of the county-residency requirement. *See, e.g.*, [ECF 528-14, 261:21-25] ("Q: Which counties does the Trump campaign or the RNC contend that they will not be able to obtain what you refer to as full coverage of poll watchers for the November 2020 election? A: I'm not sure. I couldn't tell you a list.").

Nor do any of Plaintiffs' other witness declarations establish an actual, inability to recruit poll watchers in any specific county. Representative Reschenthaler stated only that he was "concerned" that he "will not be able to recruit enough volunteers from Greene County to watch the necessary polls in Greene County." [ECF 504-6, ¶ 12].

Representative Kelly stated that he was "likely to have difficulty getting enough poll watchers from within Erie County to watch all polls within that county on election day." [ECF 504-5, ¶ 16]. "Likely difficulty" isn't the same as an "actual inability." That aside, the declaration doesn't provide any basis for Representative Kelly's assessment of this "likely difficulty." Nowhere does he detail the efforts he took (*e.g.*, the outreach he tried,

prospective candidates he unsuccessfully recruited, and the like), nor did he explain why those efforts aren't likely to succeed in the future.

The same goes for Representative Thompson's declaration. Representative Thompson stated that during some unspecified prior elections, unidentified parties and campaigns did not "always find enough volunteers to serve as poll watchers in each precinct." [ECF 504-4, ¶ 20]. But this undetailed statement doesn't help Plaintiffs' cause, because it doesn't identify the elections during which this was a problem, the parties and campaigns affected by a lack of poll watchers, or the precincts for which no poll watcher could be found.

*69 Representative Joyce's declaration doesn't even express a "concern" about "likely difficulty" in recruiting poll watchers. He simply stated his belief that "[p]oll watchers play a very important role in terms of protecting the integrity of the election process[.]" [ECF 504-7, ¶ 11]. While he may be right, it has no bearing on whether Plaintiffs can find enough people to play that "very important role."

Indeed, Plaintiffs' prediction that they will "likely" have difficulty finding poll watchers is belied by the uncontested Pennsylvania voter registration statistics for 2019 that they included as an exhibit to their summary-judgment brief. [ECF 504-34]. Those statistics suggest that there is no shortage of registered Republican voters who are qualified to serve as poll watchers. [*Id.*]. Even in the three specific counties in which Plaintiffs warn that "Democratic registered voters out-number ... their Republican counterparts" (*i.e.*, Philadelphia, Delaware, and Centre), there are still significant numbers of registered Republicans. *See* [ECF 504-34 (Philadelphia – 118,003; Delaware – 156,867; and Centre – 42,903) ]. And only a very small percentage of the registered Republicans would be needed to fill all the necessary poll watcher positions in those allegedly problematic counties. *See, e.g.*, *Cortés*, 218 F. Supp. 3d at 410 (noting that, in 2016, the Republican Party "could staff the entirety of the poll watcher allotment in Philadelphia county with just 4.1% of the registered Republicans in the county."). While Plaintiffs argue that these statistics don't show the number of registered Republicans *willing* to serve as a poll watcher, the Court is hard pressed to see, nor do Plaintiffs show, how among the tens—or hundreds—of thousands of registered Republicans in these counties, Plaintiffs are unable to find enough poll workers.[20]

Plaintiffs have not presented any evidence that would explain how, despite these numbers, they will have a hard time finding enough poll watchers. In fact, Plaintiffs' own

expert, Professor Lockerbie, admits that "the Democratic and Republican parties might be able to meet the relevant criteria and recruit a sufficient population of qualified poll watchers who meet the residency requirements[.]" [ECF 504-20, ¶ 16].

Professor Lockerbie's report makes clear, and Plaintiffs appear to agree, that the county-residency requirement only potentially burdens other, "minor" political parties' ability to recruit enough poll watchers. [ECF 509, p. 61 (citing ECF 504-20, ¶¶ 16-17) ]. Regardless, any burden on these third parties is not properly before the Court. They are not parties to this litigation, and so the Court doesn't know their precise identities, whether they have, in fact, experienced any difficulty in recruiting poll watchers, or, more fundamentally, whether they even want to recruit poll watchers at all.[21]

*70 Additionally, Plaintiffs failed to present evidence that connects the county-residency requirement to their inability to find enough poll watchers. To succeed on their theory Plaintiffs cannot just point to difficulty recruiting poll watchers, they need to also show that "Section 2687(b) is responsible for their purported staffing woes." *Cortés*, 218 F. Supp. 3d at 410. Plaintiffs fail to show this, too.

Plaintiffs argue that the ongoing COVID-19 pandemic greatly reduces the number of people who would be willing to serve as a poll watcher, which further exacerbates the alleged problem caused by the county-residency requirement. [ECF 509, p. 60]. The primary problem with this argument, though, is that Plaintiffs have not presented any evidence to support it. Plaintiffs have not put forward a statement from a single registered voter who says they are unwilling to serve as a poll watcher due to concerns about contracting COVID-19.

Despite this shortcoming, the Court also acknowledges that COVID-19 generally has made it more difficult to do anything in person, and it is entirely plausible that the current pandemic will limit Plaintiffs from recruiting poll watchers to man polling places on election day. But that is likely true for just about every type of election rule and regulation. For example, the effects of the ongoing pandemic coupled with the requirement that the poll watcher be a registered voter (a requirement that unquestionably narrows the pool of potential candidates) would also make it harder to recruit poll watchers. There is no basis to find that the current public-health conditions, standing alone, render the county-residency requirement irrational or unconstitutional.

To bolster their concerns over COVID-19, Plaintiffs point to *Democratic Nat'l Committee v. Bostelmann,* No. 20-249, ⸺ F.Supp.3d ⸺⸺, 2020 WL 5627186 (W.D. Wis. Sept. 21, 2020), where the court there enjoined Wisconsin's statute that requires that each election official (*i.e.,* poll worker) be an elector of the county in which the municipality is located. That case is distinguishable in at least two important ways.

First, *Bostelmann* concerned poll *workers,* not poll *watchers. Id.* at ⸺, 2020 WL 5627186, at *7. The difference between the two is significant. Poll workers are a more fundamental and essential aspect of the voting process. Without poll workers, counties cannot even open polling sites, which creates the possibility that voters will be completely disenfranchised. In fact, in *Bostelmann,* the plaintiffs presented evidence that Milwaukee was only able to open 5 of its normal 180 polling places. *Id.* A failure to provide voters a place to vote is a much more direct and established constitutional harm than the one Plaintiffs allege here.

Second, the plaintiffs in *Bostelmann* actually presented evidence that they were unable to find the poll workers they needed due to the confluence of the COVID-19 pandemic and the challenged restriction. *Id.* As discussed above, Plaintiffs here have presented no such evidence.

To succeed on summary judgment, Plaintiffs need to move beyond the speculative concerns they offer and into the realm of proven facts. But they haven't done so on two critical fronts—they haven't shown an actual inability to find the necessary poll watchers, or that such an inability is caused by the county-residency requirement. Because Plaintiffs have not pointed to any specific "polling place that Section 2687(b) prevents [them] from staffing with poll watchers," Plaintiffs' theory of burden is doomed at launch. *Cortés,* 218 F. Supp. 3d at 409.

**3. Even if Plaintiffs could establish a factual predicate for their theory, it would fail as a matter of law.**

**\*71** As the Pennsylvania Supreme Court concluded last month, Plaintiffs' "speculative claim that it is 'difficult' for both parties to fill poll watcher positions in every precinct, *even if true,* is insufficient to transform the Commonwealth's uniform and reasonable regulation requiring that poll watchers be residents of the counties they serve into a non-rational policy choice." *Boockvar,* ⸺ A.3d at ⸺⸺, 2020 WL 5554644, at *30 (emphasis

added).[22] The fundamental constitutional principles undergirding this finding are sound.

Plaintiffs' only alleged burden on the right to vote is that Defendants' lawful imposition of a county-residency requirement on poll watching will result in an increased risk of voter irregularities (*i.e.,* ballot fraud or tampering) that will, in turn, potentially cause voter dilution. While vote dilution is a recognized burden on the right to vote in certain contexts, such as when laws are crafted that structurally devalue one community's or group of people's votes over another's, there is no authority to support a finding of burden based solely on a speculative, future possibility that election irregularities might occur. *See, e.g., Minnesota Voters,* 720 F.3d at 1033 (affirming dismissal of claims "premised on potential harm in the form of vote dilution caused by insufficient pre-election verification of EDRs' voting eligibility and the absence of post-election ballot rescission procedures"); *Common Cause Rhode Island v. Gorbea,* 970 F.3d 11, 15 (1st Cir. 2020) (rejecting the claim that a ballot witness signature requirement should not be enjoined during a pandemic because it would allegedly increase the risk of voter fraud and put Republican candidates at risk); *Cook Cnty. Rep. Party v. Pritzker,* No. 20-4676, 2020 WL 5573059, at *4 (N.D. Ill. Sept. 17, 2020) (denying a motion to enjoin a law expanding the deadline to cure votes because plaintiffs did not show how voter fraud would dilute the plaintiffs' votes).

Without a recognized burden on the right to vote, Plaintiffs' "argument that the defendants did not present an adequate justification is immaterial." *Green Party of Tennessee v. Hargett,* No. 16-6299, 2017 WL 4011854, at *4 (6th Cir. May 11, 2017). That's because the Court need not apply the *Anderson-Burdick* framework, and its intermediate standards, in this situation. *See Donatelli,* 2 F.3d at 514 & n.10. Instead, just as the Pennsylvania Supreme Court held, the Commonwealth here need only show "that a rational basis exists [for the county-residency requirement] to be upheld. *Boockvar,* ⸺ A.3d at ⸺⸺, 2020 WL 5554644, at *30 (citing *Cortes,* 218 F. Supp. 3d at 408); *see also Voting for Am., Inc. v. Andrade,* 488 F. App'x 890, 899 (5th Cir. 2012) (applying rational basis review as opposed to the *Anderson-Burdick* balancing test because state election law did not implicate or burden specific constitutional rights); *McLaughlin v. North Carolina Bd. of Elections,* 65 F.3d 1215, 1227 (4th Cir. 1995) (concluding that a ballot access law "fails the *Anderson* balancing test only if it also does in fact burden protected rights").

**\*72** "Under rational-basis review, the challenged classification must be upheld 'if there is any reasonably

conceivable state of facts that could provide a rational basis for the classification.' " *Donatelli*, 2 F.3d at 513 (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)). "This standard of review is a paradigm of judicial restraint." *FCC*, 508 U.S. at 314, 113 S.Ct. 2096. It "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Id.* at 313, 113 S.Ct. 2096. Nor is it the Court's "place to determine whether the [General Assembly's decisions] were the best decisions or even whether they were good ones." *Donatelli*, 2 F.3d at 518.

Applying this deferential standard of review, the Pennsylvania Supreme Court found that given Pennsylvania's "county-based scheme for conducting elections, it is reasonable that the Legislature would require poll watchers, who serve within the various counties of the state, to be residents of the counties in which they serve." *Boockvar*, ⸺ A.3d at ⸺, 2020 WL 5554644, at *30 (citing *Cortés*, 218 F. Supp. 3d at 409). The Court agrees.

There are multiple reasons for this. As Secretary Boockvar advises, "[b]y restricting poll watchers' service to the counties in which they actually reside, the law ensures that poll watchers should have some degree of familiarity with the voters they are observing in a given election district." [ECF 549-2, p. 22, ¶ 78]. In a similar vein, Intervenors' expert, Dr. Barreto, in his report, states that, voters are more likely to be comfortable with poll watchers that "they know and they recognize from their area." [ECF 524-1, ¶40 ("Research in political science suggests that voters are much more comfortable and trusting of the process when they know or are familiar with poll watchers who are from their community.") ]. When poll watchers come from the community, "there is increased trust in government, faith in elections, and voter turnout[.]" [*Id.*].

At his deposition, Representative Kelly agreed with this idea: "Yeah, I think – again, depending how the districts are established, I think people are probably even more comfortable with people that they – that they know and they recognize from their area." [ECF 524-23, 111:21-25].

Whether requiring poll watchers to be residents of the county in which they will serve is the best or wisest rule is not the issue before the Court. The issue is whether that rule is *reasonable* and rationally advances Pennsylvania's legitimate interests. This Court, like multiple courts before it, finds that it does.

### 4. Plaintiffs' poll-watcher claim fails under the *Anderson-Burdick* framework.

Even if rational-basis review did not apply and Plaintiffs had established a burden on their right to vote, their claim nonetheless fails under the *Anderson-Burdick* framework.

Viewing Plaintiffs' evidence in the best possible light, at most, the county-residency requirement for poll watching places only an indirect, ancillary burden on the right to vote through an elevated risk of vote dilution.

Against this slight burden, the Commonwealth has sound interests in imposing a county-residency requirement, including, as noted above, local familiarity with rules, regulations, procedures, and the voters. Beyond this, in assessing the Commonwealth's interest in imposing the county-based restriction, that interest must be viewed in the overall context of the Commonwealth's security measures involving polling places that are designed to prevent against fraud and vote dilution.

As the court in *Cortés* recognized, "while poll watchers may help guard the integrity of the vote, they are not the Election Code's only, or even best, means of doing so." 218 F. Supp. 3d at 404.

*73 Each county has the authority to investigate fraud and report irregularities to the district attorney. 25 P.S. § 2642(i). Elections in each district are conducted by a multimember election board, which is comprised of an election judge, a majority inspector, and a minor inspector. 25 P.S. § 2671. Each voting district may also use two overseers of election, who are appointed from different political parties by the Pennsylvania Courts of Common Pleas, and "carry greater authority than poll watchers." *Cortés*, 218 F. Supp. 3d at 403 (citing 25 P.S. § 2685). "Election overseers have the right to be present with the officers of an election 'within the enclosed space during the entire time the ... election is held." *Id.* "Poll watchers have no such right," they must "remain 'outside the enclosed space' where ballots are counted or voting machines canvassed." *Id.* (citing 25 P.S. § 2687(b)). Election overseers can also challenge any person offering to vote, while poll watchers have no such authority. 25 P.S. § 2687. For these reasons, concerns "over potential voter fraud—whether perpetrated by putative electors or poll workers themselves—appear more effectively addressed by election overseers than poll watchers[.]" *Id.* at 406.

Plaintiffs complain that poll watchers may not be present during the pre-canvass and canvass meetings for absentee and mail-in ballots. But the Election Code provides that "authorized representatives" of each party **and** each candidate can attend such canvassing. 25 P.S. § 3146.8(g)(1.1), (2). That means if, for example, 15 Republican candidates appear on ballots within a particular county (between both the state and federal elections), there could be up to 16 "authorized representatives" related to the Republican Party (one for each candidate and one for the party as a whole) present during canvassing. Adding poll watchers to that mix would just be forcing unnecessary cooks into an already crowded kitchen.[23] *See* [ECF 549-2, p. 23, ¶ 83 ("If every certified poll watcher within a county was permitted to attend the pre-canvass meeting, the elections staff could be overwhelmed by the vast numbers of poll watchers, and the pre-canvassing process could become chaotic and compromised.") ].

**\*74** Further, Secretary Boockvar testified that Pennsylvania has adopted new voting systems that will provide an additional layer of security. [ECF 524-27, 237:21-238:11]. That is, there will now be a paper trail in the form of verifiable paper ballots that will allow voters to confirm their choice, and the state recently piloted a new program that will help ensure that votes can be properly verified. [*Id.*].

On balance, then, it is clear that to the extent any burden on the right to vote exists, it is minimal. On the other hand, the Commonwealth's interest in a county-specific voting system, including with county-resident poll watchers, is rational and weighty, particularly when viewed in the context of the measures that the Commonwealth has implemented to prevent against election fraud at the polls. As such, under the flexible *Anderson-Burdick* standard, Plaintiffs have failed to establish that the county-residency requirement is unconstitutional.

**5. The Court will continue to abstain from deciding where the Election Code permits poll watching to occur.**

Plaintiffs also appear to challenge any attempts to limit poll watching to "monitoring only in-person voting at the polling place on Election Day." [ECF 461, ¶ 254]. That is, in their proposed order accompanying their Motion for Summary Judgement, Plaintiffs seek a declaration that they are "permitted to have watchers present at all locations where voters are registering to vote, applying for absentee or mail-in ballots, voting absentee or mail-in ballots, and/or returning or collecting absentee or mail-in ballots, including without limitation any satellite or early voting sites established by any county board of elections." [ECF 503-1, ¶ 3].

Plaintiffs also argue that Secretary Boockvar's October 6, 2020, guidance expressly, and unlawfully, prohibits poll watchers from being present at county election offices, satellite offices, and designated ballot-return sites. [ECF 571].

This challenge, however, is directly related to the unsettled state-law question of whether drop boxes and other satellite locations are "polling places" as envisioned under the Election Code. If they are, then Plaintiffs may be right in that poll watchers must be allowed to be present. However, the Court previously abstained under *Pullman* in addressing this "location" claim due to the unsettled nature of the state-law issues; and it will continue to do so. [ECF 459, p. 5 ("The Court will continue to abstain as to Plaintiffs' claim pertaining to the notice of drop box locations and, more generally, whether the 'polling place' requirements under the Election Code apply to drop-box locations. As discussed in the Court's prior opinion, this claim involves unsettled issues of state law.") ].

Moreover, Plaintiffs have filed a lawsuit in the Court of Common Pleas of Philadelphia to secure access to drop box locations for poll watchers. The state court held that satellite ballot-collection locations, such as drop-box locations, are not "polling places," and therefore poll watchers are not authorized to be present in those places. [ECF 573-1, at p. 12]. The Trump Campaign immediately filed a notice of appeal of that decision. Regardless of what happens on appeal, Plaintiffs appear to be on track to obtain resolution of that claim in state court. [ECF 549-22]. Although this isn't dispositive, it does give the Court comfort that Plaintiffs will be able to seek timely resolution of these issues, which appear to be largely matters of state law. *See Barr v. Galvin*, 626 F.3d 99, 108 n.3 (1st Cir. 2010) ("Though the existence of a pending state court action is sometimes considered as a factor in favor of abstention, the lack of such pending proceedings does not necessarily prevent abstention by a federal court.").

**V. The Court will decline to exercise supplemental**

**jurisdiction over Plaintiffs' state-constitutional claims.**
**\*75** In addition to the federal-constitutional claims
addressed above, Plaintiffs assert violations of the
Pennsylvania Constitution in Counts III, V, VII, and IX of
the Second Amended Complaint. Because the Court will
be dismissing all federal-constitutional claims in this case,
it will decline to exercise supplemental jurisdiction over
these state-law claims.

Under 28 U.S.C. § 1367(c)(3), a court "may decline to
exercise supplemental jurisdiction over state law claims if
it has dismissed all claims over which it has original
jurisdiction[.]" Stone v. Martin, 720 F. App'x 132, 136
(3d Cir. 2017) (cleaned up). "It 'must decline' to exercise
supplemental jurisdiction in such circumstances 'unless
considerations of judicial economy, convenience, and
fairness to the parties provide an affirmative justification
for [exercising supplemental jurisdiction].' " Id. (quoting
Hedges v. Musco, 204 F.3d 109, 123 (3d Cir. 2000)
(emphasis in original)).

Courts have specifically applied this principle in cases
raising federal and state constitutional challenges to
provisions of the state's election code. See, e.g.,
Silberberg v. Bd. of Elections of New York, 272 F. Supp.
3d 454, 480–81 (S.D.N.Y. 2017) ("Having dismissed
plaintiffs' First and Fourteenth Amendment claims, the
Court declines to exercise supplemental jurisdiction over
plaintiffs' state law claims."); Bishop v. Bartlett, No.
06-462, 2007 WL 9718428, at \*10 (E.D.N.C. Aug. 18,
2007) (declining "to exercise supplemental jurisdiction
over the state constitutional claim" following dismissal of
all federal claims and recognizing "the limited role of the
federal judiciary in matters of state elections" and that
North Carolina's administrative, judicial, and political
processes provide a better forum for plaintiffs to seek
vindication of their state constitutional claim), aff'd, 575
F.3d 419 (4th Cir. 2009).

Beyond these usual reasons to decline to exercise
supplemental jurisdiction over the state-constitutional
claims, there are two additional reasons to do so here.

First, the parties do not meaningfully address the
state-constitutional claims in their cross-motions for
summary judgment, effectively treating them as
coextensive with the federal-constitutional claims here.
The Pennsylvania Supreme Court, however, has held that
Pennsylvania's "Free and Equal Elections" Clause is not
necessarily coextensive with the 14th Amendment. See
League of Women Voters v. Commonwealth, 645 Pa. 1,
178 A.3d 737, 812-813 (2018) (referring to the

Pennsylvania Free and Equal Elections Clause as
employing a "separate and distinct standard" than that
under the 14th Amendment to the U.S. Constitution).
Given the lack of briefing on this issue and out of
deference to the state courts to interpret their own state
constitution, the Court declines to exercise supplemental
jurisdiction.

Second, several Defendants have asserted a defense of
sovereign immunity in this case. That defense does not
apply to Plaintiffs' federal-constitutional claims under the
Ex parte Young doctrine. See Acosta v. Democratic City
Comm., 288 F. Supp. 3d 597, 627 (E.D. Pa. 2018) ("Here,
the doctrine of Ex parte Young applies to Plaintiffs'
constitutional claims for prospective injunctive and
declaratory relief, and therefore the First and Fourteenth
Amendment claims are not barred by the Eleventh
Amendment. Secretary Cortés, as an officer of the
Pennsylvania Department of State, may be sued in his
individual and official capacities 'for prospective
injunctive and declaratory relief to end continuing or
ongoing violations of federal law.' "). But sovereign
immunity may apply to the state-law claims, at least those
against Secretary Boockvar. The possibility of sovereign
immunity potentially applying here counsels in favor of
declining supplemental jurisdiction to decide the state-law
claims.

**\*76** As such, all state-constitutional claims will be
dismissed without prejudice.

## CONCLUSION

For the foregoing reasons, the Court will enter judgment
in favor of Defendants and against Plaintiffs on all
federal-constitutional claims, decline to exercise
supplemental jurisdiction over the remaining state-law
claims, and dismiss all claims in this case. Because there
is no just reason for delay, the Court will also direct entry
of final judgment under Federal Rule of Civil Procedure
54(b). An appropriate order follows.

**All Citations**

--- F.Supp.3d ----, 2020 WL 5997680

Footnotes

1      "Drop boxes" are receptacles similar to U.S. Postal Service mailboxes. They are made of metal, and have a locking mechanism, storage compartment, and an insert or slot into which a voter can insert a ballot. *See generally* [ECF 549-9].

2      Intervenors include the Pennsylvania State Democratic Party, the League of Women Voters, the NAACP Pennsylvania State Conference, Common Cause Pennsylvania, Citizens for Pennsylvania's Future, the Sierra Club, the Pennsylvania Alliance for Retired Americans, and several affiliated individuals of these organizations.

3      As noted above, Plaintiffs and Mr. Riddlemoser use the term "voter fraud" to mean "illegal voting"—*i.e.*, voter fraud is any practice that violates the Election Code. For purposes of the Court's decision and analysis of Plaintiffs' vote-dilution claims, the Court accepts this definition.

4      The procedure for absentee ballots and applications largely resembles the procedure for mail-in ballots and applications.

5      If the application is approved, the approval is "final and binding," subject only to challenges "on the grounds that the applicant was not a qualified elector." 25 P.S. § 3150.12b(a)(2). An unqualified elector would be, for example, an individual who has not "been a citizen of the United States at least one month." Pa. Const. Art. 7, § 1; *see also* 25 P.S. § 2602(t) (defining "qualified elector" as "any person who shall possess all of the qualifications for voting now or hereafter prescribed by the Constitution of this Commonwealth, or who, being otherwise qualified by continued residence in his election district, shall obtain such qualifications before the next ensuing election").

6      In her summary-judgment brief, Secretary Boockvar argues that Plaintiffs' as-applied challenge to Pennsylvania's county-residency requirement is unripe. [ECF 547, pp. 60-63]. The Secretary reasons that Plaintiffs have not shown sufficient evidence that they are harmed by the county-residency requirement. This argument is directed more towards a lack of standing and a lack of evidence to support the claim on the merits. As the sufficiency of the evidence of harm is a separate issue from ripeness (which is more concerned with timing), the Court does not find Plaintiffs' as-applied challenge to the county-residency requirement unripe. *See Progressive Mountain Ins. Co. v. Middlebrooks*, 805 F. App'x 731, 734 (11th Cir. 2020) ("The question of ripeness frequently boils down to the same question as questions of Article III standing, but the distinction between the two is that standing focuses [on] whether the type of injury alleged is qualitatively sufficient to fulfill the requirements of Article III and whether the plaintiff has personally suffered that harm, whereas ripeness centers on whether that injury has occurred yet." (cleaned up) (citations omitted)).

7      In their briefing, the parties focused on the "capable of repetition yet evading review" exception to the mootness doctrine. The Court, however, does not find that it needs to rely on this exception. Nearing the eve of the election, it is clear that Defendants intend to engage in the conduct that Plaintiffs assert is illegal and unconstitutional. Thus, the claims are presently live, and are not "evading review" in this circumstance.

8      While Rule 65(d)(2)(C) states that an injunction binds "[non-parties] who are in active concert or participation" with the parties or the parties' agents, the Court does not find that Rule 65(d) helps the county boards. As discussed, the county boards manage the elections and implement the electoral procedures. While the Court could enjoin Secretary Boockvar, for example, from using unmanned drop boxes, each individual county election board could still use unmanned drop boxes on their own. Doing so would not result in the counties being in "active concert or participation" with Secretary Boockvar, as each county is independently managing the electoral process within their county lines. *See Marshak v. Treadwell*, 595 F.3d 478, 486 (3d Cir. 2009) ("[N]on-parties guilty of aiding or abetting or acting in concert with a named defendant or his privy in violating the injunction may be held in contempt." (cleaned up) (citations omitted)). In other words, each county elections board would not be "aiding or abetting" Secretary Boockvar in violating the injunction (which would implicate Rule 65(d)(2)(C)); rather, the counties would be utilizing their independent statutory authority to manage elections within their county lines.

9      As evidence of the county boards' indispensability, one court recently found that the failure to join local election officials in an election case can make the harm alleged not "redressable." It would be a catch-22 to say that county boards cannot be joined to this case as necessary parties, but then dismiss the case for lack of standing due to the boards' absence. *Cf. Jacobson v. Florida Secretary of States*, 974 F.3d 1236, ——— – ———, 2020 WL 5289377, at *11-12 (11th Cir. Sept. 3, 2020) ("The problem for the [plaintiffs] is that Florida law tasks the [county] Supervisors, independently of the Secretary, with printing the names of candidates on ballots in the order prescribed by the ballot statute. ... The Secretary is responsible only for certifying to the supervisor of elections of each county the names of persons nominated ... Because the Secretary didn't do (or fail to do) anything that contributed to [plaintiffs'] harm, the voters and organizations cannot meet Article III's traceability requirement." (cleaned up)).

10     The organizational Plaintiffs also raise certain associational and organizational standing arguments, asserting that they represent their members' interests. The associational standing arguments are derivative of their members' interests. That is, because the Court has found no concrete injury suffered by the individual voters, which would include the members of the organizational Plaintiffs, there are no separate grounds to establish standing for these organizations. *See United Food & Commercial Workers*

Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)

_Union Local 751 v. Brown Grp., Inc._, 517 U.S. 544, 553, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1997) (an organization only has standing to sue on behalf of its members when "its members would otherwise have standing to sue in their own right") (citation omitted).

11   _See, also, e.g., Dudum v. Arntz_, 640 F.3d 1098, 1117 (9th Cir. 2011) ("If the aspects of the City's restricted IRV scheme Dudum challenges impose any burdens on voters' constitutional rights to vote, they are minimal at best."); _Common Cause/Georgia v. Billups_, 554 F.3d 1340, 1354–55 (11th Cir. 2009) ("The district court determined that the burden imposed on Georgia voters who lack photo identification was not undue or significant, and we agree.... The NAACP and voters are unable to direct this Court to any admissible and reliable evidence that quantifies the extent and scope of the burden imposed by the Georgia statute."); _Soules v. Kauaians for Nukolii Campaign Comm._, 849 F.2d 1176, 1183 (9th Cir. 1988) ("Appellants claim that Hawaii's absentee voting law fails to prohibit 'the solicitation, examination and delivery of absentee ballots by persons other than the voters' and that such activities occurred during the special election ... We agree with the district court that the Hawaii absentee ballot statute and the regulations adopted under it adequately protect the secrecy and integrity of the ballot. Although Hawaii has not adopted a regulation to prevent the delivery of ballots by persons other than the voter, the Hawaii regulations go into great detail in their elaboration of procedures to prevent tampering with the ballots."); _McLain v. Meier_, 637 F.2d 1159, 1167 (8th Cir. 1980) ("[A]lthough ballot format has an effect on the fundamental right to vote, the effect is somewhat attenuated."); _Nemes v. Bensinger_, ---- F. Supp. 3d ----, ----, 2020 WL 3402345, at *13 (W.D. Ky. June 18, 2020) ("The burden imposed by the contraction to one polling place is modest, and the identified groups are afforded various other means under the voting plans to easily and effectively avoid disenfranchisement. As already discussed, Defendants have offered evidence of the substantial government interest in implementing voting plans that provide for a free and fair election while attempting to minimize the spread of COVID-19."); _Paralyzed Veterans of Am. v. McPherson_, No. 06-4670, 2008 WL 4183981, at *22 (N.D. Cal. Sept. 9, 2008) ("Plaintiff Bohlke's listed burdens rely on speculative risk or the ancillary effects of third party assistance, but not on evidence of any concrete harm. Such speculations or effects are insufficient under Supreme Court and Ninth Circuit precedent to demonstrate a severe burden on the fundamental right to vote.").

12   The parties do not specifically brief the elements of an Elections-Clause claim. This is typically a claim brought by a state legislature, and the Court has doubts that this is a viable theory for Plaintiffs to assert. _See Lance v. Coffman_, 549 U.S. 437, 442, 127 S.Ct. 1194, 167 L.Ed.2d 29 (2007). Regardless, if state law does not require signature comparison, then there is no difference between the Secretary's guidance and the Election Code, and the Elections-Clause claim necessarily fails.

13   Several Defendants and Intervenors have asked this Court to abstain from deciding this issue on the basis of _Pullman_. As this Court previously discussed, a court can abstain under _Pullman_ if three factors are met: "(1) [the dispute] requires interpretation of 'unsettled questions of state law'; (2) permitting resolution of the unsettled state-law questions by state courts would 'obviate the need for, or substantially narrow the scope of adjudication of the constitutional claims'; and (3) an "erroneous construction of state law would be disruptive of important state policies[.]" " [ECF 409, p. 3 (quoting _Chez Sez_, 945 F.2d at 631) ]. But if, on the other hand, the answer to the state law dispute is "clear and unmistakable," abstention is not warranted. [_Id._ at p. 15 (citing _Chez Sez_, 945 F.2d at 632) ]. Here, the Court concludes (as discussed below) that the Election Code is clear that signature comparison is not required and further, that Plaintiffs' competing interpretation is not plausible. As such, the Court cannot abstain under _Pullman_.
The _Pullman_ analysis does not change simply because Secretary Boockvar has filed a "King's Bench" petition with the Pennsylvania Supreme Court, requesting that court to clarify whether the Election Code mandates signature comparison of mail-in and absentee ballots and applications. [ECF 556, p. 11; ECF 557]. The fact that such a petition was filed does not change this Court's conclusion that the Election Code is clear. The _Pullman_ factors remain the same. And they are not here.

14   The Secretary's September 11, 2020, guidance, stated that the "Pennsylvania Election Code does not authorize the county board of elections to set aside returned absentee or mail-in ballots based solely on signature analysis by the county board of elections." [ECF 504-24, p. 3, § 3]. Similarly, the Secretary's September 28, 2020, guidance stated that "Election Code does not permit county election officials to reject applications or voted ballots based solely on signature analysis. ... No challenges may be made to mail-in and absentee ballots at any time based on signature analysis." [ECF 504-25, p. 9, § 5.2].

15   The Election Code's definition of "proof of identification" in full provides:
    The words "proof of identification" shall mean ... For a qualified absentee elector ... or a qualified mail-in elector ...:
    i. in the case of an elector who has been issued a current and valid driver's license, the elector's driver's license number;
    ii. in the case of an elector who has not been issued a current and valid driver's license, the last four digits of the elector's Social Security number;
    iii. in the case of an elector who has a religious objection to being photographed, a copy of a document that satisfies paragraph (1) [_i.e._, "a valid-without-photo driver's license or a valid-without-photo identification card issued by the Department of Transportation"]; or
    iv. in the case of an elector who has not been issued a current and valid driver's license or Social Security number, a copy of a document that satisfies paragraph (2) [_i.e._, "a document that shows the name of the individual to whom the document was issued and the name substantially conforms to the name of the individual as it appears in the district register; shows a photograph of the individual to whom the document was issued; includes an expiration date and is not expired, except (A) ... or (B) ...; and was

issued by" the federal, state, or municipal government, or an "accredited Pennsylvania public or private institution of higher learning [or] "a Pennsylvania are facility."].
25 P.S. § 2602(z.5)(3).

16    While election officials must engage in signature comparison for in-person voters, that requirement is explicitly required by the Election Code, unlike for mail-in ballots. 25 P.S. § 3050(a.3)(2). And as discussed below, in-person voters, unlike mail-in voters, are immediately notified if their signatures are deficient.

17    Plaintiffs also argue that signature comparison for mail-in and absentee ballots is supported by historical case law. [ECF 552, pp. 58-59]. Plaintiffs cite to two cases from the 1960s that the Court of Common Pleas decided. [*Id.*]. The first, *Appeal of Fogleman*, concluded that under the then-applicable election law, an absentee voter had to sign a declaration to show that he was a proper resident who had not already voted in that election. 36 Pa. D. & C.2d 426, 427 (Pa. Ct. Comm. Pl. 1964). Regarding the voter's signature, the court simply stated, "[i]f the elector fails or refuses to attach his or her signature, then such elector has not completed the declaration as required by law of all voters." *Id.* Thus, no signature comparison or verification was implicated there; rather, the court simply stated that the declaration must be signed (*i.e.*, completed). The second case Plaintiffs cite, *In re Canvass of Absentee Ballots of Gen. Election* [ECF 552, pp. 58-59], arose from individual, post-election challenges to 46 individual absentee ballots. 39 Pa. D. & C.2d 429, 430 (Pa. Ct. Comm. Pl. 1965). Thus, a universal and mandatory signature-comparison requirement was not at issue there, unlike what Plaintiffs contest here. This Court finds neither case persuasive.

18    This identifying information on a ballot application includes much of the same information expressly listed for what a voter must provide in initially registering to vote. 25 Pa. C.S.A. § 1327(a) (stating that the "official voter registration application" shall request the applicant's: full name, address of residence (and mailing address if different), and date of birth).

19    The counties that intend to compare and verify signatures in the upcoming election include at least the following counties: Cambria, Elk, Franklin, Juniata, Mifflin, Sullivan, Susquehanna, and Wyoming. [ECF 504-1].

20    Plus, these figures do not even tell the whole story because they do not take into account the hundreds of thousands of voters who are registered to other parties who could also conceivably serve as poll watchers for the Trump Campaign and the candidate Plaintiffs. [504-34]. While that may not be the ideal scenario for Plaintiffs, they concede there's nothing in the Election Code that limits them to recruiting only registered voters from the Republican Party. [ECF 528-14, 267:23-268:1 (Q: And you don't have to be a registered Republican to serve as a poll watcher for the Trump campaign, do you? A: No.) ]. To that point, the Trump Campaign utilized at least two Democrats among the poll watchers it registered in the primary. [ECF 528-15, P001648].

21    To the extent that Plaintiffs are attempting to bring their claim on behalf of these third parties (which is unclear), they would lack standing to do so. Ordinarily, "a litigant must assert his or her own legal rights and interests and cannot rest a claim of relief on the legal rights or interests of third parties." *Powers v. Ohio*, 499 U.S. 400, 410, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). The only time a litigant can bring an action on behalf of a third party is when "three important criteria are satisfied." *Id.* "The litigant must have suffered an 'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute; the litigant must have a close relation to the third party; and there must exist some hindrance to the third party's ability to protect his or her own interest." *Id.* at 410-11, 111 S.Ct. 1364 (cleaned up). Plaintiffs cannot satisfy the second or third criteria.
      Plaintiffs claim that they "have a close relationship with these minor parties such that it will act as an effective advocate for the minor parties." [ECF 551, p. 30]. It is hard to see how Plaintiffs can be said to have a close relationship with rival political parties who are their direct adversaries in the upcoming election.
      Plaintiffs also argue that these "minor parties are hindered from protecting their own interests, particularly in this action when there are no minor party intervenors." [*Id.*]. But that doesn't hold water either. Just because these other parties have not asked to intervene, it does not mean they were incapable of intervening or seeking relief elsewhere. Indeed, these parties and their candidates have demonstrated time and again that they can raise their own challenges to election laws when they so desire, including by filing suit in federal district court. *See, e.g.*, *Stein v. Cortés*, 223 F. Supp. 3d 423 (E.D. Pa. 2016) (Green Party Presidential candidate Jill Stein seeking recount); *Libertarian Party of Conn. v. Merrill*, No. 20-467, 2020 WL 3526922 (D. Conn. June 27, 2020) (seeking to enjoin Connecticut's ballot access rules that required minor party candidates to petition their way onto the ballot); *Green Party of Ark. v. Martin*, 649 F.3d 675 (8th Cir. 2011) (challenging Arkansas' ballot access laws).

22    The Sierra Club Intervenors argue this should end the analysis. [ECF 542, p. 14 ("Even 'as applied,' Plaintiffs' claim has already been rejected")]. While the Court finds the Pennsylvania Supreme Court's apparent ruling on Plaintiffs' as-applied challenge instructive, it is not outcome determinative. That is because the Pennsylvania Supreme Court did not have the benefit of the full evidentiary record that the Court has here.

23    After the briefing on the cross-motions for summary judgment had closed, on October 6, 2020, Secretary Boockvar issued additional guidance, which Plaintiffs then raised with the Court the following day. [ECF 571]. This new guidance confirms that poll watchers cannot be present during the pre-canvassing and canvassing of mail-in ballots. It also makes clear that while the authorized representative can be present, the representative cannot make any challenges to the ballots. The Court finds that this

new guidance has minimal relevance to the current disputes at issue here. The scope of duties of a representative is not before the Court. Of sole relevance here is whether this new guidance changes how this Court weighs the burdens and benefits of the county-residency restriction for poll watchers. The Court finds that the representative's inability to challenge mail-in ballots does appear to provide less protection to Plaintiffs; but in the grand election scheme, particularly in light of the role of the election overseers, the Court does not find the new guidance to materially upset the Commonwealth's interests in its overall election-monitoring plan.

**End of Document**                                   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# ATTACHMENT 3

2018 WL 1203467
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Patrick KING, Plaintiff,
v.
MANSFIELD UNIVERSITY OF
PENNSYLVANIA, et al., Defendant.

Civil No. 1:15-cv-0159
|
Signed 03/08/2018

**Attorneys and Law Firms**

Ralph B. Pinskey, Pinskey & Foster, Harrisburg, PA, for Plaintiff.

Keli M. Neary, Lindsey A. Bedell, PA Office of Attorney General, Kenneth L. Joel, Office of General Counsel, Jonathan D. Koltash, Pennsylvaia Department of Health Office of Chief Counsel, Harrisburg, PA, for Defendant.

**MEMORANDUM**

SYLVIA H. RAMBO, United States District Judge

**\*1** Presently before the court is Plaintiff's Rule 56(a) Motion for Partial Summary Judgment on Defendants' Affirmative Defense of the Statute of Limitations. (Doc. 24.) For the reasons that follow, the motion will be denied as moot without prejudice to the filing of a renewed motion.

**I. Background**

On December 24, 2014, Plaintiff Patrick King ("Plaintiff") filed a complaint in the Court of Common Pleas of Dauphin County, Pennsylvania (Docket No. 2014-cv-9560), naming Defendants Mansfield University of Pennsylvania, the Pennsylvania State System of Higher Education, President John Halsted, and University Police Chief Christine Shegan. Defendants filed an answer to the

complaint on January 30, 2015. (Doc. 3.) On September 5, 2017, Plaintiff filed the instant motion for partial summary judgment on Defendants' affirmative defense of the statute of limitations. (Docs. 24-25.) Two weeks later, on September 19, 2017, Plaintiff filed an amended complaint. (Doc. 27.) Defendants filed a brief in opposition to the motion for partial summary judgment on September 26, 2017, arguing that the court should deny Plaintiff's motion as moot given the later filing of an amended complaint, especially when Defendants had not yet filed an answer to the amended complaint. (Doc. 28.) On October 2, 2017, Defendants filed an answer (Doc. 32), and on October 4, 2017, Plaintiff replied to the brief in opposition to the motion for partial summary judgment (Doc. 33).

**II. Discussion**

Plaintiff's motion for partial summary judgment was filed in response to Defendants' affirmative defense of the statute of limitations, which was raised in its answer to Plaintiff's initial complaint in this civil action.[1] However, on September 19, 2017, Plaintiff filed an amended complaint. (Doc. 27.) An amended complaint supersedes the original complaint such that any pending motions addressing the original complaint may be deemed moot. *See Bullock v. Ashcroft*, Civ. No. 04-cv-2639, 2006 WL 1670278, \*1 (M.D. Pa. June 15, 2006) (stating that, if the court were to accept Plaintiff's third amended complaint, "Defendant's motion to dismiss, or, in the alternative for summary judgment, with respect to the second amended complaint will be rendered moot.").

Because Defendants' affirmative defense of the statute of limitations had yet to be raised in response to the amended complaint as of the date of the filing of both the motion for partial summary judgment and Defendants' opposition thereto, the court finds that the motion should be denied as moot but without prejudice to the filing of a renewed motion for partial summary judgment. The court's decision will provide Defendants with the opportunity to file a meaningful response to Plaintiff's motion, should he choose to renew it.

**III. Conclusion**

**\*2** As stated above, Plaintiff's motion will be denied as moot.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1203467

Footnotes

1       The court notes that the most recent complaint raises factual allegations which are virtually identical to those raised by Plaintiff in
        a previous federal action, *King v. Mansfield, et al.*, Docket No. 1:11-cv-1112.

---

**End of Document**                                                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

# ATTACHMENT 4

2016 WL 1090811
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

David WILSON, Plaintiff,
v.
SOMERSET COUNTY PROSECUTORS
OFFICE, et al., Defendants.

Civil Action No. 15-6034 (FLW)
|
Signed 03/21/2016

**Attorneys and Law Firms**

David Wilson, Newark, NJ, pro se.

Ione Kristy Curva, State of New Jersey, Newark, NJ, for Defendants.

**OPINION**

Freda L. Wolfson, U.S.D.J.

**I. INTRODUCTION**

**\*1** This matter having been opened to the Court by Defendants Somerset County Prosecutor's Office's ("SCPO") and Prosecutor Matthew Murphy's (collectively "Prosecutor Defendants") motion to dismiss Plaintiff's Complaint pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 12(b)(1). For the reasons expressed in this Opinion, the Court will dismiss Plaintiff's section 1983 and New Jersey Civil Rights Act ("NJ CRA") claims pursuant to its screening authority, deny Defendants' motion to dismiss in light of the Court's *sua sponte* dismissal of the federal claims, decline supplemental jurisdiction over Plaintiff's remaining state law claims, and remand the case to the Superior Court of New Jersey, Somerset County.

**II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Plaintiff's section 1983 claims in this action are related to two previous actions that were litigated in this District. In *Wilson v. Piazza, et al.*, an excessive force case filed on June 30, 2010 (the "2010 action"), Plaintiff alleged that on December 3, 2008, Bernard Township Police Officer Anthony Piazza discharged his weapon at him after Plaintiff had already surrendered, thus causing Plaintiff to flee.[1] (Civ. No. 10-3356 MLC, ECF No. 1.) While that litigation was proceeding, on July 13, 2012, Plaintiff filed another action in state court against the SCPO (the "2012 action"), alleging that two Somerset County Prosecutors, Peter DeMarco and Robert Pollack, failed to obtain the internal affairs reports related to Piazza's discharge of his weapon and withheld evidence from the grand jury during Plaintiff's prosecution stemming from his 2008 arrest. That complaint also alleged that the Somerset County Prosecutor's Office failed to train its employees on the proper disclosure of such evidence. (*See* Civ. No. 12-5068 PGS, ECF No. 1.) The gravamen of Plaintiff's 2012 Complaint appears to be that the withheld facts regarding the Piazza's use of his firearm would have negated Plaintiff's guilt on the resisting arrest charge. The defendants there removed the 2012 action to federal court and moved to dismiss the complaint, and the Court dismissed the federal claims with prejudice on statute of limitations grounds on May 21, 2013. The Court also declined to exercise supplemental jurisdiction over any remaining state law claims, and remanded the case to state court. *See Wilson v. Somerset County Prosecutor's Office, et al., Civ. No. 12-5068, 2013 WL 2243836, at \*3 (D.N.J. May, 21, 2013).*

**\*2** The 2010 action against Officer Piazza eventually settled, and the parties stipulated to the dismissal of that action on December 3, 2012. (*See* Civ. Act. No. 10-3356, ECF No. 88, Stipulation of Dismissal with Prejudice.) The stipulation of dismissal is signed only by Plaintiff and Officer Piazza, but Plaintiff alleges in the Amended Complaint filed in this action that the Somerset County Prosecutor's Office was a party to the settlement in the 2010 action. (*See* ECF No. 7-3, Am Compl. at ¶ 4.)

The foregoing background leads to the litigation currently before the Court. Plaintiff filed his initial Complaint on July 14, 2015 against the SCPO and Prosecutor Murphy, alleging violations of his civil rights under section 1983 and the New Jersey Civil Rights Act (NJCRA). After receiving an extension of time to Answer, Defendants

moved to dismiss the Complaint on August 27, 2015. (ECF No. 3.) On September 5, 2015, Plaintiff wrote to the Court seeking an extension of time to file his reply, and on September 16, 2015, he submitted a motion to amend his Complaint, attaching a proposed Amended Complaint, which was docketed on September 25, 2015. (ECF Nos. 6, 7.)

In that Amended Complaint, Plaintiff alleges that, on January 20, 2015, he was arrested in Somerset County and charged with eluding and related offenses, and was indicted approximately 45 days later.[2] (ECF No. 15-6034, Am. Compl. at ¶¶ 1-2, 7.) He further alleges that he sought release on bail and applied for entry into a drug rehabilitation program. (*Id.*) The SCPO opposed his bail application and his entry into the rehabilitation program. In opposition to Plaintiff's application, Somerset County Prosecutor Murphy submitted a brief, dated March 20, 2015, in which he allegedly relied on a sentencing report written by the state court judge who sentenced Plaintiff in 2010 in connection with the charges arising from his December 3, 2008 arrest. Plaintiff alleges that the sentencing report, in turn, incorporated Officer Piazza's allegedly false account of Plaintiff's 2008 arrest, and thus left out the fact that Piazza allegedly fired his gun at Plaintiff during the arrest, causing Plaintiff to flee after he had tried to surrender. (*Id.*)

An excerpt of the brief allegedly submitted by Prosecutor Murphy reads as follows:

> While sentencing defendant Wilson in January 2010, the [sentencing judge], recited the following eerily similar case facts,
>
> [t]he relevant facts concerning the instant charges are: On December 3, 2008, Bernards Township Police were on patrol on I-78 east when the officer observed a vehicle approaching him from the rear at a high rate of speed. The officer maneuvered to let the vehicle pass and ran the vehicle's license plate, determining that the vehicle was stolen. The officer closed the gap between the vehicles and activated his lights in an attempt to stop the vehicle. The vehicle failed to pull over and accelerated to over 95 mph before exiting I-78 at Exit 40, nearly crashing into another vehicle on the exit ramp. The driver passed this car and continued onto Hillcrest Road, crossing the double-yellow line into oncoming traffic and passing another vehicle before running a stop sign at the end of the road and traveling east on Valley Road. The driver again crossed into oncoming traffic, travelling at an excessive rate of speed before running a light and making a left turn onto Deep Dale Drive. The driver crashed the vehicle into the

> yard at 7 Deep Dale Drive and fled on foot, being located a short distance from the vehicle. Officers located the defendant as well as [his] passenger ... and took them into custody.

**\*3** We submit that defendant's criminal history fully supports our genuine fear that, if released from custody, defendant Wilson will likely cause the death of · an innocent citizen while either· attempting to steal their car or while eluding the police. For that reason, the State would never extend nor accept a negotiated plea offer that contemplated defendant's release from custody – even to a drug rehabilitation center.[3]

Civ. Act. No. 10-3356 (MLC), (ECF No. 89, at 5-7.) Plaintiff alleges in his Amended Complaint that the SCPO and Prosecutor Murphy "knowingly used a sentencing statement that was drafted from a tainted fabr[i]cated police report, to deny Plaintiff entry into a drug treatment program." (ECF No. 7-1 at 2.) Plaintiff refers to the police report as the "Piazza Report." (ECF No. 7-3, Am. Compl. at ¶¶ 1-2.)

According to Plaintiff, Prosecutor Murphy failed to disclose in his brief opposing Plaintiff's bail and drug treatment applications that Piazza fired his gun at Plaintiff after he had surrendered, which caused Plaintiff to flee, and that Murphy had "constructive knowledge" that Plaintiff had already sued the SCPO for concealing the Piazza Report. (*Id.* at ¶¶ 2, 8.) With respect to Prosecutor Murphy, Plaintiff also contends that Prosecutor Murphy also stated in his opposition brief that Plaintiff's addiction was not authentic even though Murphy had access to Plaintiff's medical records, which indicated that Plaintiff had an authentic addiction. Plaintiff further alleges that Murphy induced other John Doe employees to represent false facts to the sentencing court and ordered them to rely on Prosecutor Murphy's brief at Plaintiff's Drug Court hearing. He does not identify these John Doe employees as defendants. (*Id.* at ¶ 11.) In addition to his federal and NJCRA claims, Plaintiff's Amended Complaint also alleges violations of state law by Defendant Murphy, arising from the same alleged conduct. (*Id.* at ¶ 12.)

Plaintiff's Amended Complaint further alleges that Defendant SCPO "was responsible for [D]efendant Murphy's use of the Piazza Report after having constructive knowledge of its taintedness [sic] but, was reckless and disregardful of that fact." (*Id.* at ¶ 3.) He alleges that the SCPO knew that Piazza was forced to resign for fabricating the police report in connection with Plaintiff's 2008 arrest and should have "contain[ed]" the fabricated evidence. (*Id.*) He also alleges that the SCPO knew about the 2010 action, in which Plaintiff's sued Officer Piazza for excessive force, because they were

Wilson v. Somerset County Prosecutors Office, Not Reported in Fed. Supp. (2016)

"combin[e]d for settlement purposes, due to having the same insurance company." (*Id.* at ¶ 4.) Finally, he alleges that the SCPO had evidence in their possession which indicated that the original sentencing judge was not aware that he drafted his sentencing report from a fabricated police report, and the SCPO also deceived the judge who sentenced Plaintiff in connection with his more recent 2015 eluding charges. (*Id.* at ¶¶ 11.)

**\*4** Finally, Plaintiff's Amended Complaint alleges that Defendant Murphy's brief was filed as "an act of retaliation for bringing a past suit against [the SCPO]" and that both the SCPO and Murphy opposed his application for bail and drug treatment "as an act of retaliation." (*Id.* at ¶¶ 6, 15.) In his Amended Complaint, Plaintiff also asserts that he does not challenge his conviction for eluding or the length of his sentence and describes his civil suit as "malicious deprivation of entry into a drug treatment program." (*Id.* at ¶ 6.)

Plaintiff seeks damages and several forms equitable relief, including: (1) an order declaring the Piazza Report to be "illegal" and restraining Defendants from using the Piazza Report; (2) a new drug treatment application hearing; and (3) entry into a drug treatment program in lieu of the sentence he is currently serving. (*Id.* at ¶ 17.)

## III. DISCUSSION

### a. Plaintiff's Motion to Amend

As noted above, Plaintiff submitted his Amended Complaint on September 16, 2015 in response to Defendants' motion to dismiss, which was filed on August 27, 2015. (ECF Nos. 3, 7.) The Prosecutor Defendants did not file a reply brief or otherwise address Plaintiff's motion to amend.

Although Plaintiff sought leave to amend, it appears that he could have filed his Amended Complaint as of right under Fed. R. Civ. P. 15(a). Rule 15(a) of the Federal Rules of Civil Procedure allows a party to amend its pleading once as a matter of course within 21 days after serving it or within 21 days after service of a responsive pleading. Fed. R. Civ. P. 15(a). *See Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000) ("[when] a defendant asserts the defense of failure to state a claim by motion, the plaintiff may amend the complaint once 'as a matter of

course' without leave of court") (citations omitted). Applying the prisoner mailbox rule to Plaintiff's filing, the Court will permit the amendment as of right.[4]

Generally speaking, "[a]n amended complaint supersedes the original version in providing the blueprint for the future course of a lawsuit." *Snyder v. Pascack Valley Hospital*, 202 F.3d 271, 276 (3d Cir. 2002); *see also Ryerson v. New Jersey*, No. CIV A 06-1214-JAG, 2007 WL 749813, at \*1 n.1 (D.N.J. Mar. 7, 2007) (citing *Florida Dept. of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 706 n. 2 (1982) ("once accepted, an amended complaint replaces the original")).[5] Where a Plaintiff has filed an amended complaint in response to a pending motion to dismiss, "a trial court has discretion to deny the [pending] motion as moot (thereby effectively requiring a new motion) or to consider the merits of the motion as applied to the amended complaint." Rule 15 Amended and Supplemental Pleadings, 1 Federal Rules of Civil Procedure, Rules and Commentary Rule 15 (explaining that the best view is that a Court is permitted to "transfer" the motion to the amended complaint if the same issues are presented in the original and amended complaint, but should require a defendant to file a new motion if applying the pending motion to the amended complaint would create confusion); *see also Sunset Financial Resources, Inc. v. Redevelopment Group V, LLC*, 417 F. Supp. 2d 632, 642 n.15 (D.N.J. 2006) (addressing arguments in motion to dismiss in relation to amended complaint to the extent possible); *Harnish v. Widener Univ. Sch. of Law*, CIV. No. 12-608 WHW, 2012 WL 2576353, at \*3 (D.N.J. July 3, 2012) (finding that amendment of complaint as of right moots the previously filed motion to dismiss); *Demeter v. Buskirk*, 2003 WL 22416045, \*5 (E.D. Pa. Oct. 20, 2003) (recognizing that proper filing of amended complaint renders moot previously filed motion to dismiss).

**\*5** Here, Plaintiff's Amended Complaint appears to reiterate in large part the allegations in the original Complaint but, notably, adds a section 1983 claim for First Amendment retaliation and requests for additional relief. As noted above, the Prosecutor Defendants have not responded to Plaintiff's Amended Complaint or filed a reply brief with the Court. Plaintiff's Amended Complaint is also subject to *sua sponte* screening pursuant to 28 U.S.C. § 1915A to determine whether it should be dismissed as frivolous or malicious, for failure to state a claim upon which relief may be granted, or because it seeks monetary relief from a defendant who is immune from such relief. *See, e.g., George v. Warden*, 523 F. App'x 904, 907 (3d Cir. 2013) (affirming practice of screening of second amended complaint under § 1915A). Because the Amended Complaint has not yet been

screened, the Court will screen the Amended Complaint for dismissal under § 1915A. Where possible, the Court, in its discretion, will address the arguments made by Prosecutor Defendants in their motion to dismiss, but otherwise denies that motion without prejudice in light of its rulings on screening.

**b. Standards of Review**

The legal standard for dismissing a complaint for failure to state a claim pursuant to 28 U.S.C. § 1915A is the same as that for dismissing a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). See *Courteau v. United States*, 287 F. App'x 159, 162 (3d Cir. 2008) (discussing 28 U.S.C. § 1915A(b)). Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a claim "for failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When reviewing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), courts first separate the factual and legal elements of the claims, and accept all of the well-pleaded facts as true. See *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009). All reasonable inferences must be made in the plaintiff's favor. See *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314 (3d Cir. 2010). In order to survive a motion to dismiss, the plaintiff must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This standard requires the plaintiff to show "more than a sheer possibility that a defendant has acted unlawfully," but does not create what amounts to a "probability requirement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The pleadings of *pro se* plaintiffs are liberally construed. *Haines v. Kerner*, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). Nevertheless, "pro se litigants still must allege sufficient facts in their complaints to support a claim." *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013) (citation omitted).

The Prosecutor Defendants have also moved to dismiss under Rule 12(b)(1), which allows the court to dismiss a suit for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). This type of motion permits a party to raise the issue of Eleventh Amendment immunity at the earliest stage of litigation. In *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690 (3d Cir. 1996), the Third Circuit Court of Appeals noted that "the Eleventh Amendment is a jurisdictional bar which deprives federal courts of subject matter jurisdiction." *Id.* at 694 n. 2 (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98–100 (1984)).

The *Blanciak* court added that Rule 12(b)(1) was the proper means of raising the issue of whether the Eleventh Amendment bars federal jurisdiction. *Id.*

**c. Plaintiff's Section 1983 and NJCRA Claims**[6]

**\*6** Construed generously, Plaintiff's Amended Complaint alleges that the SCPO and Prosecutor Murphy opposed Plaintiff's applications for bail and entry into New Jersey's "Drug Court" in retaliation for Plaintiff's filing of the 2010 and 2012 section 1983 actions against Piazza, the SCPO, and its individual prosecutors.

To state a claim under § 1983, plaintiffs must show that the defendant, under the color of state law, deprived them of a federal constitutional or statutory right. See *Gruenke v. Seip*, 225 F.3d 290, 298 (3d Cir. 2000). Plaintiff describes his claims as "malicious deprivation of entry into a drug treatment program" and alleges that the Prosecutor Defendants opposed his bail and drug court applications in retaliation for Plaintiff's filing of the 2010 and 2012 actions. To prevail on a retaliation claim, a defendant must prove "(1) that he engaged in constitutionally-protected activity; (2) that the government responded with retaliation; and (3) that the protected activity caused the retaliation." *Miller v. Mitchell*, 598 F.3d 139, 147 (3d Cir. 2010) (citing *Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 282 (3d Cir. 2004)).

**i. Claims Against the SCPO and Claim for Damages against Prosecutor Murphy in his Official Capacity.**

Although the Court proceeds under its *sua sponte* screening authority, it notes that Defendants have moved to dismiss on a number of theories. First, the Prosecutor Defendants argue that they are entitled to dismissal on the basis of Eleventh Amendment immunity (ECF No. 3-2, Moving Br. at 6-11); however, the Prosecutor Defendants waived their Eleventh Amendment immunity by removing the instant action to federal court.[7] See *Lombardo v. Pennsylvania, Dep't of Pub. Welfare*, 540 F.3d 190, 198 (3d Cir. 2008) ("hold[ing that] that the Commonwealth's removal of federal-law claims to federal court effected a waiver of immunity from suit in federal court").

**\*7** The Prosecutor Defendants next contend that the section 1983 and NJCRA claims against the SCPO are not cognizable because the SCPO is not a "person" subject to suit under 42 U.S.C. § 1983. The Court agrees. *See Will v. Michigan Department of State Police*, 491 U.S. 58, 64, 70–71 (1989) (holding that state is not a "person" within the meaning of Section 1983); *Gordon v. Berkeley Twp. Police*, Civ. No. 10–5061, 2011 WL 2580473, at \*4 (D.N.J. June 27, 2011) (holding that a "Prosecutor's Office" is not a "person" within the meaning of a Section 1983 suit) (citations omitted); *Baker v. Lewis*, Civ. No. 10–3438, 2010 WL 4117140, at \*1 n. 1 (D.N.J. Oct.19, 2010) (same) (citations omitted); *Martin v. Red Lion Police Dep't*, 146 F. App'x, 558, 562 n. 3 (3d Cir. 2005). Although the removal of this action waives the Prosecutor Defendants' Eleventh Amendment immunity from suit in a federal forum, it does not affect the application of *Will's* personhood requirement. *See Didiano v. Balicki*, CIV. No. 10-4483 RBK/AMD, 2011 WL 1466131, at \*8 (D.N.J. Apr. 18, 2011) (explaining that a state (or state entity) is still not a person for § 1983 purposes regardless of whether it waived its Eleventh Amendment immunity by removing such claims to federal court), *aff'd*, 488 F. App'x 634 (3d Cir. 2012). As such, the Court dismisses with prejudice the section 1983 and NJCRA claims against the SCPO.

The Court also dismisses the official capacity damages claims against Prosecutor Murphy, which are essentially damages claims against the State.[8] *See Hafer v. Melo*, 502 U.S. 21, 27 (1991) ("State officers sued for damages in their official capacity are not 'persons' for purposes of the suit because they assume the identity of the government that employs them."); *see also Estate of Tyler ex rel. Floyd v. Grossman*, 108 F. Supp. 3d 279, 289 (E.D. Pa. 2015). "Under New Jersey law, when county prosecutors and their subordinates perform law enforcement and prosecutorial functions, 'they act as agents of the State,' and the State must indemnify a judgment arising from their conduct." *Hyatt v. Cty. of Passaic*, 340 F. App'x 833, 836 (3d Cir. 2009) (citing *Wright v. State*, 169 N.J. 422, 778 A.2d 443, 461–62, 464 (2001)).

**ii. Remaining Claims Against Prosecutor Murphy**

Plaintiff also seeks damages from Prosecutor Murphy in his individual capacity and injunctive/declaratory relief from Prosecutor Murphy in his individual <u>and</u> official capacities. The Court addresses these claims in order.

**1. Prosecutor Murphy is Absolutely Immunity for Damages under Section 1983**

A state prosecuting attorney who acts within the scope of his or her duties in initiating and pursuing a criminal prosecution is not amenable to suit for damages under § 1983. *See Imbler v. Pachtman*, 424 U.S. 409, 410, 430-31 (1976) ("[I]n initiating a prosecution and presenting the State's case, the prosecutor is immune from a civil suit for damages under [§] 1983" and actions relating to the initiation and prosecution of a criminal matter); *see also Arsad v. Means*, 365 F. App'x 327, 329 (3d Cir. 2010) (*per curiam*); *Clark v. Capaldi-Corsi*, Civ. No. 14-2142 RBK, 2015 WL 1541919, at \*4 (D.N.J. Mar. 31, 2015). As a general matter, "state prosecutors are absolutely immune from liability [for damages] under § 1983 for actions performed in a [judicial or] quasi-judicial role." *Munchinski v. Solomon*, 618 F. App'x at 153 (citing *Yarris v. Cnty. of Del.*, 465 F.3d 129, 135 (3d Cir. 2006)). "This immunity extends to acts that are 'intimately associated with the judicial phase of the criminal process,'" *id.* (quoting *Imbler*, 424 U.S. at 430–31), but does not encompass "[a] prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings," *id.* (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993)); *see also Carter v. City of Philadelphia*, 181 F.3d 339, 356 (3d Cir.1999) (explaining that "participation in court proceedings and other conduct intimately associated with the judicial phases of litigation" are "actions performed in a quasi-judicial role") (internal quotation marks and citations omitted).

**\*8** "Ultimately, whether a prosecutor is entitled to absolute immunity depends on whether [he or] she establishes that [he or] she was functioning as the state's 'advocate' while engaging in the alleged conduct that gives rise to the constitutional violation." *Id.* (citing *Yarris*, 465 F.3d at 136). It is well established that a prosecutor's appearance in court as an advocate of the state's position or the presentation of evidence at a hearing is protected by absolute immunity. *Clark*, 2015 WL 1541919, at \*4 (citing *Burns v. Reed*, 500 U.S. 478, 492 (1991)). Furthermore, that a prosecutor had an illicit or even criminal motive is irrelevant to his immunity so long as he or she was performing a prosecutorial function. *See Duffy v. Freed*, Civ. No. 09-2978 JBS/JS, 2010 WL 3740659, at \*2 (D.N.J. Sept. 17, 2010) *aff'd*, 452 F. App'x 200 (3d Cir. 2011) (citing *Rose v. Bartle*, 871 F.2d

Wilson v. Somerset County Prosecutors Office, Not Reported in Fed. Supp. (2016)

331, 347 n.12 (3d Cir. 1989); *Jennings v. Shuman*, 567 F.2d 1213, 1221–22 (3d Cir. 1977) ("[A] prosecutor is entitled to absolute immunity while performing his official duties as an officer of the court, even if, in the performance of those duties, he is motivated by a corrupt or illegal intention.")); *see also Bush v. Dep't of Human Servs.*, 614 F. App'x 616, 621 (3d Cir. 2015) ("A [section] 1983 action for retaliatory prosecution cannot be brought against prosecutor, as prosecutor is absolutely immune from liability arising from decision to prosecute.") (citing *Hartman v. Moore*, 547 U.S. 250, 262 (2006)).

To determine whether Prosecutor Murphy is entitled to absolute immunity from Plaintiff's damages claims, the Court must examine the acts of misconduct alleged in the Amended Complaint and discern whether Prosecutor Murphy was acting in a judicial or quasi-judicial role, or was instead performing administrative or investigatory functions. *See Munchinski*, 618 F. App'x at 153-54 (citing *Wilson v. Rackmill*, 878 F.2d 772, 775–76 (3d Cir. 1989)). At the Rule 12(b)(6) stage, the Prosecutor Defendants must establish that "the allegations of [ Plaintiff's Amended Complaint] ... indicate the existence of absolute immunity as an affirmative defense; the defense must clearly appear on the face of the [Amended Complaint]." *Id.* at 776; *Light v. Haws*, 472 F.3d 74, 78 (3d Cir. 2007).

Here, Prosecutor Murphy is entitled to absolute immunity for the arguments he made in his legal brief opposing Plaintiff's bail and Drug Court applications because he was advocating for the state's position during the course of Plaintiff's criminal proceedings. *See Brown v. Donio*, CIV. No. 14-5697 JBS, 2014 WL 5089579, at *3 (D.N.J. Oct. 9, 2014) (finding that prosecutors were absolutely immune for their allegedly improper denial of access to drug court); *Clark*, 2015 WL 1541919, at *4 (same). Because he was acting in an advocate's role, his alleged bad motive or retaliatory purpose does not affect his immunity. The Court thus dismisses the damages claims against Prosecutor Murphy.

## 2. Plaintiff's Claims for Injunctive Relief Fail to State a Claim for Relief

The Court next addresses Plaintiff's claims for injunctive/declaratory relief. Prosecutors, such as Defendant Murphy, are not immune from suit as to requests for declaratory or injunctive relief. *See Blakeney v. Marsico*, 340 F. App'x 778, 779 (3d Cir. 2009) (citing

*Supreme Court of Va. v. Consumers Union of the U.S.*, 446 U.S. 719, 736 (1980); *Jorden v. National Guard Bureau*, 799 F.2d 99, 110 (3d Cir. 1986)). Plaintiff seeks injunctive relief in the form of an order requiring (1) defendants to refra[in] from using the Piazza [report]; (2) a new drug treatment application hearing; (3) entry into a long term drug treatment program. He also seeks a declaration "that the Piazza Report is illegal and can never be used." (ECF No. 7-3, Am. Complaint at ¶ 17.) Plaintiff's requests for injunctive/declaratory relief fail to state a claim against Defendant Murphy for a number of reasons.

The Court first addresses Plaintiff's requests for a new drug treatment application and entry into a drug treatment program under New Jersey's "Drug Court" Program. As explained below, even if Plaintiff were to prevail on his First Amendment retaliation claim, the Court could not grant the requested injunctive relief because Prosecutor Murphy does not have the authority under state law to provide the relief that Plaintiff seeks.

**\*9** "Drug Courts are specialized courts within the Superior Court that target drug-involved 'offenders who are most likely to benefit from treatment and do not pose a risk to public safety.'" *State v. Meyer*, 192 N.J. 421, 428–29 (2007); *see also State v. Maurer*, 438 N.J. Super. 402, 408 (App. Div. 2014). There are two general ways to be admitted to drug court. *See Maurer*, 438 N.J. Super. at 413-414. Defendants admitted to Drug Court who are subject to sentencing with a presumption of incarceration are assigned to Track 1 and required to serve a period of "special probation" under N.J.S.A. 2C:35–14. *Id.* Defendants with drug abuse problems who are not subject to a presumption of incarceration are assigned to Track 2 and are eligible for Drug Court under the general sentencing provisions of the Criminal Code pursuant to N.J.S.A. 2C:45–2. *See Id.*[9]

Under a prior version of the statute governing admission to Drug Court, "N.J.S.A. 2C:35-14(c) granted the prosecutor the right to object to an otherwise qualified defendant's entry into Drug Court and, absent a showing of 'gross and patent abuse of [the prosecutor's] discretion,' a court could not override that objection and admit the defendant to Drug Court." *Maurer*, 438 N.J. Super. at 414. On July 19, 2012, however, the Legislature repealed section (c) of N.J.S.A. 2C:35–14, thus removing the prosecutor's objection as an impediment to the sentencing court's decision to sentence a defendant to special probation. *See* P.L. 2012, c. 23 (N.J.S.A. 2C:35–14); *Maurer*, 438 N.J. Super. at 414; *State v. J.B.*, No. A-5244-10T4, 2012 WL 3628863, at *2 (N.J. Super. Ct. App. Div. Aug. 24, 2012) (explaining that

"Legislature has determined that judges shall be vested with additional discretion in admitting defendants to the drug court program"). It is clear that under the current statutory framework of N.J.S.A. 2C:35-14, it is the sentencing court, not the prosecutor, who makes the final determination regarding an applicant's eligibility for Drug Court. *See Mauer*, 438 N.J. Super. at 414.

Here, Plaintiff was denied entry into Drug Court sometime after March, 3 2015. Even if the Court assumes, without deciding, that Plaintiff could bring this action under section 1983 and could establish that Prosecutor Murphy violated his constitutional rights by retaliating against Plaintiff for bringing the 2010 and 2012 actions, Plaintiff cannot obtain the relief requested because Prosecutor Murphy cannot grant Plaintiff admission into Drug Court or provide Plaintiff with a new Drug Court hearing.[10] Pursuant to statute, that relief can only be provided by the sentencing court.[11] As such, the Court dismisses with prejudice these claims for relief.

**\*10** Plaintiff also requests that the Court enjoin the Prosecutor Defendants from using the Piazza Report in the future and declare the Report to be illegal. However, even if Prosecutor Murphy violated Plaintiff's rights in the past, Plaintiff has not alleged in the Amended Complaint that the Piazza Report will be used again him in the future. As such, this claim for injunctive relief is purely speculative and does not present a "case or controversy" under Article III. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 101–110 (1983); *see also Naranjo v. City of Philadelphia*, 626 F. App'x 353 (3d Cir. 2015). Plaintiff's request for declaratory relief is similarly flawed. He seeks a declaration that the defendants violated his constitutional rights, but a party seeking a declaratory judgment "must allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future." *Naranjo*, 626 F. App'x at 356 (citing *Bauer v. Texas*, 341 F.3d 352, 358 (5th Cir. 2003)); *see also Martin v. Keitel*, 205 F. App'x 925, 928 (3d Cir. 2006)) (same). Again, Plaintiff does not allege that he will be subject to the alleged conduct in the future, and, in any event, even if the defendants violated his rights in the past, he is not entitled to a declaration to that effect. *Id.* (citing *Brown v. Fauver*, 819 F.2d 395, 399–400 (3d Cir. 1987)). The Court therefore dismisses Plaintiff's remaining claim for injunctive/declaratory relief.

**d. The Court Declines to Exercise Supplemental Jurisdiction and Remands the Case Back to the**

**Superior Court of New Jersey, Somerset County**

Although the Complaint fails to state a federal claim, Plaintiff's Amended Complaint also asserts state law claims against Prosecutor Murphy under N.J.S.A. 2C:30-2 and 2C:30-6, which are criminal statutes dealing with Official Misconduct.[12]

Because the Court has dismissed the federal claims, the remaining potential basis for this Court's jurisdiction over Plaintiff's state law claims is supplemental jurisdiction pursuant to 28 U.S.C. § 1367. "Supplemental jurisdiction allows federal courts to hear and decide state-law claims along with federal-law claims when they are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." *Wisconsin Dept. of Corrections v. Schacht*, 524 U.S. 381, 387 (1998) (citation and internal quotation marks omitted). Where a district court has original jurisdiction pursuant to 28 U.S.C. § 1331 over federal claims and supplemental jurisdiction over state claims pursuant to 28 U.S.C. § 1367(a), the district court has discretion to decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3); *Growth Horizons, Inc. v. Delaware County, Pennsylvania*, 983 F.2d 1277, 1284–1285 (3d Cir. 1993). In exercising its discretion, "the district court should take into account generally accepted principles of 'judicial economy, convenience, and fairness to the litigants.'" *Growth Horizons, Inc.*, 983 F.2d at 1284 (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)). Where the federal claims are dismissed at an early stage in the litigation, courts generally decline to exercise supplemental jurisdiction over state claims. *United Mine Workers*, 383 U.S. at 726; *Growth Horizons*, Inc., 983 F.2d at 1284–1285.

**\*11** Because Plaintiff's federal claims against the SCPO and Prosecutor Murphy have been dismissed pursuant to the Court's screening authority under 28 U.S.C. § 1915A(b) at the earliest stage of the litigation, the Court will exercise is discretion to decline supplemental jurisdiction over Plaintiff's state law claims and remand the case to state court.

### IV. CONCLUSION

The Court dismisses with prejudice Plaintiff's federal and NJCRA claims against the SCPO and Prosecutor Murphy pursuant to the Court's authority under 28 U.S.C. § 1915A(b), and the Court declines supplemental jurisdiction over Plaintiff's remaining state law claims.

Wilson v. Somerset County Prosecutors Office, Not Reported in Fed. Supp. (2016)

The matter will be remanded to the Superior Court of New Jersey, Somerset County. The State's motion to dismiss is denied without prejudice, and Defendants may raise any remaining issues before the state court.[13] An appropriate Order follows.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 1090811

Footnotes

1    According to his Complaint in the 2010 action,
       Plaintiff allege[d] that on December 3, 2008, following some sort of police chase, he exited the back seat of the car in which he
       was riding, got down on the ground, and surrendered to police. Plaintiff allege[d] that while he was on the ground, unarmed, not
       moving or resisting arrest, Defendant police officer Anthony Piazza got out of his car, drew his handgun while standing about 30
       feet from Plaintiff, and yelled "Freeze." Plaintiff allege[d] that Defendant Piazza then fired his handgun at Plaintiff. Plaintiff
       allege[d] that he then got up off the ground, in fear for his life, and ran to hide in some bushes, where he was later found by
       another officer. Plaintiff allege[d] that Defendant Piazza stated in his report on the incident that his firearm accidentally
       discharged. Plaintiff allege[d] that he complained about the incident to Defendant Sergeant Mark Leopold, who had participated
       in the arrest, but that Defendant Leopold failed to investigate or take action in response to the complaint.
       *Wilson v. Piazza*, No. CIV.A. 10-3356 MLC, 2011 WL 765806, at *1 (D.N.J. Feb. 22, 2011) (permitting excessive force claim to
       proceed against Piazza and dismissing claims against remaining police officer defendants).

2    The arrest on January 20, 2015, appears to be unrelated to his prior arrests.

3    In addition to filing the instant action, Plaintiff also unsuccessfully attempted to reopen the 2010 action, alleging that the SCPO
       "breached" the settlement agreement. Plaintiff submitted this excerpt of Murphy's opposition brief as attachment to his letter to the
       Court in the 2010 action. Because Plaintiff's Amended Complaint refers to Prosecutor Murphy's March 20, 2015 opposition brief,
       the Court finds it appropriate to include this except in the factual recitation because it helps to illuminate Plaintiff's allegations.

4    Generally, a prisoner's complaint is deemed filed on the date that it is delivered to prison officials for mailing. *See Burns v.
       Morton*, 134 F.3d 109 (3d Cir. 1998) (citing *Houston v. Lack*, 487 U.S. 266 (1988)); *Mosch v. Brown*, No. CIV A 06-4067 JLL,
       2007 WL 2682979, at *3 (D.N.J. Sept. 7, 2007). The Court assumes for purposes of this Opinion that Plaintiff delivered his motion
       to amend to prison officials on the date he signed it.

5    "[T]he amended complaint 'supersedes the original and renders it of no legal effect, unless the amended complaint specifically
       refers to or adopts the earlier pleading.'" *W. Run Student Hous. Associates, LLC v. Huntington Nat. Bank*, 712 F.3d 165, 171 (3d
       Cir. 2013) (citing *New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.*, 101 F.3d 1492, 1504 (3d Cir. 1996)
       (emphasis added)); *see also* 6 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1476 (3d ed. 2008). An
       amended complaint may adopt some or all of the allegations in the original complaint, but the identification of the particular
       allegations to be adopted must be clear and explicit. *Id.* To avoid confusion, the safer course is to file an amended complaint that is
       complete in itself. *Id.*; *see also Stevenson v. County Sheriff's Office of Monmouth*, No. 13-5953, 2015 WL 512423, at *8 n.2
       (D.N.J. Feb. 6, 2015) (explaining same).

6    To the extent that Plaintiff raises New Jersey Civil Rights Act (NJCRA) claims mirroring his § 1983 claims, those NJCRA claims
       are addressed in tandem with his federal causes of action. *See Trafton v. City of Woodbury*, 799 F.Supp.2d 417, 443–44 (D.N.J.
       2011); *see also Chapman v. New Jersey*, Civ. No. 08–4130, 2009 U.S. Dist. LEXIS 75720, at *7, 2009 WL 2634888 (D.N.J. Aug.
       25, 2009) ("Courts have repeatedly construed the NJCRA in terms nearly identical to its federal counterpart...."); *Armstrong v.
       Sherman*, Civ. No. 09–716, 2010 U.S. Dist. LEXIS 55616, at *15, 2010 WL 2483911 (D.N.J. Jun. 4, 2010) ("[T]he New Jersey
       Civil Rights Act is a kind of analog to section 1983 ...."); *see generally Hedges v. Musco*, 204 F.3d 109, 122 n. 12 (3d Cir. 2000)
       (concluding that New Jersey's constitutional provisions concerning search and seizures are interpreted analogously to the Fourth
       Amendment).

7    The Prosecutor Defendants also contend that the Court should dismiss Plaintiff's Complaint on the basis of *Younger* abstention. "A
       federal district court has discretion to abstain from exercising jurisdiction over a particular claim where resolution of that claim in
       federal court would offend principles of comity by interfering with an ongoing state proceeding." *Addiction Specialists, Inc. v.
       Twp. of Hampton*, 411 F.3d 399, 408 (3d Cir. 2005) (citing *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27
       L.Ed.2d 669 (1971)). *Younger* abstention is appropriate when (1) there are ongoing state proceedings that are judicial in nature; (2)
       the state proceedings implicate important state interests; and (3) the state proceedings afford an adequate opportunity to raise
       federal claims. *Id.*; *see also Clark v. Capaldi-Corsi*, No. CIV.14-2142 RBK AMD, 2015 WL 1541919, at *4 (D.N.J. Mar. 31,
       2015) (finding *Younger* abstention applicable and dismissing claim for injunctive relief without prejudice where Plaintiff sought to

Wilson v. Somerset County Prosecutors Office, Not Reported in Fed. Supp. (2016)

have "Court intervene in plaintiff's presumably criminal proceedings in 'drug court'"). Although dismissal without prejudice on the basis of *Younger* abstention may have been appropriate when Plaintiff initially filed his Complaint because his criminal proceedings were then ongoing, it appears that those criminal proceeding have concluded, as Plaintiff has notified the Court that he is currently serving a sentence at Northern State Prison. In any event, Defendants, who did not file a response to Plaintiff's Amended Complaint, have not established the first prong for *Younger* abstention, *i.e.*, that the criminal proceedings at issue are ongoing. As such, the Court declines to find that *Younger* abstention applies at this time.

8    State officials in their official capacities do not have Eleventh Amendment immunity when sued for prospective injunctive relief. *See Ex parte Young*, 209 U.S. 123 (1908). The Court also notes that the Eleventh Amendment does not bar suits against officials in their individual capacities, even if the actions that are the subject of the suit were part of the officials' governmental duties. *Hafer*, 502 U.S. at 30–31. Since Plaintiff has sued the Prosecutor Murphy in his official capacity for injunctive relief and in his individual capacity for damages and injunctive relief, Eleventh Amendment immunity does not apply to these claims, *see, e.g., Munchinski v. Solomon*, 618 F. App'x 150, 156 (3d Cir. 2015), and the Court addresses them in the next section.

9    In *State v. Bishop*, 429 N.J. Super. 533, 541 (App. Div. 2013) *aff'd*, 223 N.J. 290 (2015) the Appellate Division defined the two tracks for admission into Drug Court and explained the distinction as follows:
     "offenders sentenced to regular probation are not necessarily prison bound, based upon the nature and seriousness of their crimes and the general sentencing provisions of the Code. On the other hand, offenders sentenced to special probation are prison bound because their offenses, deemed more serious in the Code, carry a mandatory or presumptive term of imprisonment. Their eligibility for this form of non-prison sentence is not determined by weighing aggravating and mitigating factors as is the case with regular probation, but by reference to the enumerated statutory requirements listed in N.J.S.A. 2C:35–14")
     *Id.* (citing *Clarke*, supra, 203 N.J. at 175).

10   It is not clear whether some of the relief requested by Plaintiff is properly sought in a section 1983 action. As explained by the Third Circuit in *Doe v. Pennsylvania Bd. of Prob. & Parole*, 513 F.3d 95, 100 (3d Cir. 2008),
     [f]or prisoners, the difference between a civil rights action and a collateral attack is easy to describe. Challenges to conditions of confinement fall under § 1983. *Preiser v. Rodriguez*, 411 U.S. 475, 500, 93 S.Ct. 1827, 36 L.Ed.2d 439, (1973). Attacks on the fact or duration of the confinement come under 28 U.S.C.A. § 2254. *Id.*
     "[A] prisoner in state custody cannot use a § 1983 action to challenge "the fact or duration of his confinement." *Preiser*, 411 U.S. at 489. Under Supreme Court precedent, "a state prisoner's § 1983 action is barred (absent prior invalidation)—no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings)—if success in that action would necessarily demonstrate the invalidity of confinement or its duration." *Wilkinson v. Dotson*, 544 U.S. 74, 81-82 (2005). Where a prisoner's claim for injunctive relief would not "necessarily spell speedier release, it does not lie at 'the core of habeas corpus.'" *Id.* at 82 (request for new parole hearing properly brought as section 1983 action) (citing *Preiser*, supra, at 489).
     Plaintiff contends in his Amended Complaint that he is not challenging his conviction or length of his sentence but only the conditions under which he will serve his sentence. Plaintiff requests both a new Drug Court hearing and admission to Drug Court. The former would not necessarily reduce the length of his sentence, and it is not clear from the Amended Complaint whether the latter would necessarily result in a shorter sentence. *See, e.g., Lee v. Williamson*, 297 Fed. App'x 147 (3d Cir. 2008) ("We agree with the District Court that Lee's claims concerning retaliation, denial of placement in the drug treatment program, and medical needs do not lie at the 'core of habeas' and, therefore, are not cognizable in a § 2241 petition."). Because the Court finds that Plaintiff cannot obtain either type of relief from Defendant Murphy, it need not reach this issue.

11   It is not clear from the Amended Complaint whether Plaintiff ever attempted to inform the sentencing court about the Prosecutor's alleged retaliatory motives or the alleged inaccuracies in the prior sentencing report. Plaintiff states only that the SCPO and Prosecutor Murphy "deceived Judge Rahill[']s court [by relying on tainted fabricated evidence]." (ECF No. 7-3, Am. Compl. at ¶ 11.) It is also not clear whether Plaintiff ever appealed the denial of his Drug Court application in state court as a "gross or patent abuse of [the prosecutor's] discretion" or otherwise. *See State v. Hester*, 357 N.J. Super. 428 (App. Div. 2003) (Defendant challenging prosecutor's decision to deny him entry into drug court program must show that prosecutor's decision was not premised upon consideration of all relevant factors, was based upon consideration of irrelevant or inappropriate factors, or amounted to clear error in judgment). This Court expresses no opinion as to whether such an appeal is still possible or whether it would be successful.

12   As explained by another court in this District, "private citizens are generally not allowed 'to enforce the state penal laws,' and '[v]iolations of these laws 'are left to the agencies charged with the enforcement of the criminal law.'" *Mannarino v. Deutsche Bank Nat. Trust Co.*, No. CIV.A. 14-7771 MAS, 2015 WL 5383995, at *3 (D.N.J. Sept. 14, 2015) (citing *Matter of State Comm'n of Investigation*, 108 N.J. 35, 42 (1987)). A private cause of action could be implied, however, from the legislative intent of a state penal law. *See id.* (finding that legislative intent of criminal statute at issue did not imply a private cause of action). Because the Court declines to exercise supplemental jurisdiction in this case, it need not address whether a private cause of action could be implied by the legislative history of either N.J.S.A. 2C:30-2 or 2C:30-6.

Wilson v. Somerset County Prosecutors Office, Not Reported in Fed. Supp. (2016)

13      The Court makes no determinations as to whether Plaintiff sufficiently alleges claims for relief under state law.

**End of Document**                                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.