# APPENDIX OF UNPUBLISHED OPINIONS

1.  *Bognet v. Secretary Commonwealth of Pennsylvania*, --- F.3d ----, No. 20-3214, 2020 WL 6686120 (3d Cir. Nov. 13, 2020)

2.  *In re Canvassing Observation Appeal of City of Philadelphia Bd. of Elections*, --- A.3d ---, No. 30 EAP 2020, 2020 WL 6737895 (Pa. Nov. 17, 2020)

3.  *Conde-Shenery v. Snow*, No. 18-929, 2019 WL 2399720 (M.D. Pa. 2019)

4.  *Donald J. Trump for President, Inc. v. Boockvar*, --- F. Supp. 3d ----, No. 20-966, 2020 WL 5997680 (W.D. Pa. Oct. 10, 2020)

5.  *Hotze v. Hollins*, No. 20-03709, 2020 WL 6437668 (S.D. Tex. Nov. 2, 2020)

6.  *Nelson v. Warner*, --- F. Supp. 3d ---, No. 19-0898, 2020 WL 4582414 (S.D. W.Va. Aug. 10, 2020)

7.  *Pa. Democratic Party v. Boockvar*, No. 133 MM 2020, 2020 WL 5554644 (Pa. Sept. 17, 2020)

8.  *Pa. Voters Alliance v. Centre Cnty.*, --- F. Supp. 3d ----, No. 20-1761, 2020 WL 6158309 (M.D. Pa. Oct. 21, 2020)

9.  *Ron Barber for Cong. v. Bennett*, No. 14-2489, 2014 WL 6694451 (D. Ariz. Nov. 27, 2014)

10. *Tex. Democratic Party v. Williams*, No. 07-115, 2007 WL 9710211 (W.D. Tex. Aug. 16, 2007)

1

Bognet v. Secretary Commonwealth of Pennsylvania, --- F.3d ---- (2020)
2020 WL 6686120
Case: 20-cv-02078-MPP Document 76 Filed 11/19/20 Page 3 of 205

2020 WL 6686120
Only the Westlaw citation is currently available.
United States Court of Appeals, Third Circuit.

Jim BOGNET, Donald K. Miller,
Debra Miller, Alan Clark,
Jennifer Clark, Appellants

v.

SECRETARY COMMONWEALTH OF
PENNSYLVANIA; Adams County Board
of Elections; Allegheny County Board
of Elections; Armstrong County Board
of Elections; Beaver County Board
of Elections; Bedford County Board
of Elections; Berks County Board of
Elections; Blair County Board of Elections;
Bradford County Board of Elections;
Bucks County Board of Elections; Butler
County Board of Elections; Cambria
County Board of Elections; Cameron
County Board of Elections; Carbon County
Board of Elections; Centre County Board
of Elections; Chester County Board
of Elections; Clarion County Board of
Elections; Clearfield County Board of
Elections; Clinton County Board of
Elections; Columbia County Board of
Elections; Crawford County Board of
Elections; Cumberland County Board
of Elections; Dauphin County Board of
Elections; Delaware County Board of
Elections; Elk County Board of Elections;
Erie County Board of Elections; Fayette
County Board of Elections; Forest County
Board of Elections; Franklin County
Board of Elections; Fulton County Board
of Elections; Greene County Board of
Elections; Huntingdon County Board

of Elections; Indiana County Board
of Elections; Jefferson County Board
of Elections; Juniata County Board of
Elections; Lackawanna County Board
of Elections; Lancaster County Board
of Elections; Lawrence County Board
of Elections; Lebanon County Board
of Elections; Lehigh County Board of
Elections; Luzerne County Board of
Elections; Lycoming County Board
of Elections; Mckean County Board
of Elections; Mercer County Board
of Elections; Mifflin County Board of
Elections; Monroe County Board of
Elections; Montgomery County Board
of Elections; Montour County Board
of Elections; Northampton County
Board of Elections; Northumberland
County Board of Elections; Perry County
Board of Elections; Philadelphia County
Board of Elections; Pike County Board
of Elections; Potter County Board of
Elections; Schuylkill County Board
of Elections; Snyder County Board of
Elections; Somerset County Board of
Elections; Sullivan County Board of
Elections; Susquehanna County Board of
Elections; Tioga County Board of Elections;
Union County Board of Elections; Venango
County Board of Elections; Warren County
Board of Elections; Washington County
Board of Elections; Wayne County Board
of Elections; Westmoreland County Board
of Elections; Wyoming County Board of
Elections; York County Board of Elections
Democratic National
Committee, Intervenor

No. 20-3214

|

Submitted Pursuant to Third Circuit
L.A.R. 34.1(a) November 9, 2020

|

(Filed: November 13, 2020)

**Synopsis**
**Background:** Voters and congressional candidate brought action against Secretary of Commonwealth of Pennsylvania and county boards of elections, seeking to enjoin the counting of mail-in ballots received during the three-day extension of the ballot-receipt deadline ordered by the Pennsylvania Supreme Court, and seeking a declaration that the extension period and presumption of timeliness was unconstitutional. The United States District Court for the Western District of Pennsylvania, Kim R. Gibson, Senior District Judge, 2020 WL 6323121, denied voters' and candidate's motion for a temporary restraining order (TRO) and preliminary injunction. Voters and candidate appealed.

**Holdings:** The Court of Appeals, Smith, Chief Judge, held that:

[1] the District Court's order was immediately appealable;

[2] voters and candidate lacked standing to bring action alleging violation of Constitution's Elections Clause and Electors Clause;

[3] voters lacked concrete injury for their alleged harm of vote dilution, and thus voters did not have standing for such claim;

[4] voters lacked particularized injury for their alleged harm of vote dilution, and thus voters did not have standing for such claim;

[5] voters failed to allege legally cognizable "preferred class," for purposes of standing to claim equal protection violation;

[6] alleged harm from presumption of timeliness was hypothetical or conjectural, and thus voters did not have standing to challenge presumption; and

[7] voters and candidate were not entitled to receive injunction so close to election.

Affirmed.

West Headnotes (45)

**[1] Election Law** 👈
The Elections Clause effectively gives state governments the default authority to regulate the mechanics of federal elections, with Congress retaining exclusive control to make or alter any state's regulations. U.S. Const. art. 1, § 4, cl. 1.

**[2] Election Law** 👈
When exercised, the action of Congress under the Elections Clause, so far as it extends and conflicts with the regulations of a state, necessarily supersedes them. U.S. Const. art. 1, § 4, cl. 1.

**[3] Federal Courts** 👈
District court's order that denied voters' and congressional candidate's request for temporary restraining order (TRO) to prevent counting of certain mail-in ballots in Pennsylvania was immediately appealable, where order went beyond simply ruling on TRO request, court ruled on merits of request for injunctive relief after parties filed supporting, opposing, and reply briefs and after hearing arguments from parties during 90-minute hearing, and order confirmed that Commonwealth was to count mailed ballots. 28 U.S.C.A. § 1292(a)(1).

**[4] Federal Courts** 👈
Ordinarily, an order denying a temporary restraining order (TRO) is not immediately appealable.

**[5] Federal Courts** 👈
Review of a legal issue that does not require resolution of any factual dispute is de novo.

[6]     **Federal Courts** ⟳

When reviewing a district court's denial of a preliminary injunction, the appellate court reviews the district court's findings of fact for clear error, its conclusions of law de novo, and the ultimate decision for an abuse of discretion.

[7]     **Federal Civil Procedure** ⟳

Derived from separation-of-powers principles, the law of standing serves to prevent the judicial process from being used to usurp the powers of the political branches. U.S. Const. art. 3, § 2.

[8]     **Federal Civil Procedure** ⟳

To ensure that judges avoid rendering impermissible advisory opinions, parties seeking to invoke federal judicial power must first establish their standing to do so. U.S. Const. art. 3, § 2.

[9]     **Federal Civil Procedure** ⟳

Article III standing doctrine means that to bring suit, you—and you personally—must be injured, and you must be injured in a way that concretely impacts your own protected legal interests; if you are complaining about something that does not harm you—and does not harm you in a way that is concrete—then you lack standing. U.S. Const. art. 3, § 2.

[10]    **Federal Civil Procedure** ⟳

Article III standing doctrine means that if the injury that you claim is an injury that does no specific harm to you, or if it depends on a harm that may never happen, then you lack an injury for which you may seek relief from a federal court. U.S. Const. art. 3, § 2.

[11]    **Federal Civil Procedure** ⟳

The elements of Article III standing require a plaintiff to have (1) suffered an injury in fact, (2)

that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. U.S. Const. art. 3, § 2.

[12]    **Federal Civil Procedure** ⟳

To plead an injury in fact, as required for Article III standing, the party invoking federal jurisdiction must establish three sub-elements: first, the invasion of a legally protected interest, second, that the injury is both concrete and particularized, and third, that the injury is actual or imminent, not conjectural or hypothetical. U.S. Const. art. 3, § 2.

[13]    **Federal Civil Procedure** ⟳

A concrete and particularized injury, as required to plead the injury-in-fact element of Article III standing, is an injury that affects the plaintiff in a personal and individual way. U.S. Const. art. 3, § 2.

[14]    **Federal Civil Procedure** ⟳

When a plaintiff alleges future injury, as part of pleading an injury in fact to establish Article III standing, such injury must be certainly impending; allegations of possible future injury simply are not enough. U.S. Const. art. 3, § 2.

[15]    **Federal Civil Procedure** ⟳

All elements of Article III standing must exist at the time the complaint is filed. U.S. Const. art. 3, § 2.

[16]    **Election Law** ⟳

Voters and congressional candidate lacked standing to bring § 1983 action alleging that counting of mail-in ballots received during three-day extension of ballot-receipt deadline ordered by Pennsylvania Supreme Court violated Constitution's Elections Clause and Electors Clause; relief under clauses would have no

more directly benefited voters and candidate than public at large, voters and candidate lacked any relationship to state lawmaking process, precluding them from suing over alleged usurpation of General Assembly's rights, and there was no hindrance to General Assembly's ability to protect its own interests. U.S. Const. art. 1, § 4, cl. 1; U.S. Const. art. 2, § 1, cl. 2; 42 U.S.C.A. § 1983.

**[17]    Federal Courts** ⟢

Federal courts are not venues for plaintiffs to assert a bare right to have the Government act in accordance with law.

**[18]    Federal Civil Procedure** ⟢

When the alleged injury is undifferentiated and common to all members of the public, courts routinely dismiss such cases as generalized grievances that cannot support Article III standing. U.S. Const. art. 3, § 2.

**[19]    Election Law** ⟢

Private plaintiffs lack Article III standing to sue for alleged injuries attributable to a state government's violations of the Elections Clause. U.S. Const. art. 1, § 4, cl. 1; U.S. Const. art. 3, § 2.

**[20]    Federal Civil Procedure** ⟢

Even a party that meets Article III standing requirements must ordinarily rest its claim for relief on violation of its own rights, not those of a third party. U.S. Const. art. 3, § 2.

**[21]    Federal Civil Procedure** ⟢

Prudential standing can suspend Article III's general prohibition on a litigant's raising another person's legal rights. U.S. Const. art. 3, § 2.

**[22]    Federal Civil Procedure** ⟢

A plaintiff may assert the rights of another if he or she has a close relationship with the person who possesses the right and there is a hindrance to the possessor's ability to protect his own interests.

**[23]    Election Law** ⟢

States have no inherent or reserved power over federal elections.

**[24]    Election Law** ⟢

When deciding issues raised under the Elections Clause, courts need not be concerned with preserving a delicate balance between competing sovereigns; either federal and state election law operate harmoniously in a single procedural scheme, or they do not—and the federal law preempts state election law under the Elections Clause. U.S. Const. art. 1, § 4, cl. 1.

**[25]    Election Law** ⟢

Voters who planned to vote in person lacked concrete Equal Protection Clause injury for their alleged harm of vote dilution attributable to three-day extension of mail-in ballot-receipt deadline ordered by Pennsylvania Supreme Court, and thus voters did not have Article III standing for such claim; only cognizable basis for alleging dilution from "unlawful" counting of invalid ballots was state law defining lawful and unlawful ballot counting practices, which was not a concrete harm as Equal Protection Clause was concerned with votes being weighed differently, and any alleged harm of vote dilution that turned on federal illegality of deadline extension was quintessentially abstract. U.S. Const. art. 3, § 2; U.S. Const. Amend. 14.

**[26]    Election Law** ⟢

Federal law does not provide for when or how ballot counting occurs; instead, the Elections Clause delegates to each state's lawmaking function the authority to prescribe such procedural regulations applicable to federal elections. U.S. Const. art. 1, § 4, cl. 1.

**[27]**    **Election Law** 👉

The Elections Clause's delegation to each state's lawmaking function the authority to prescribe procedural regulations applicable to federal elections embraces all procedures which experience shows are necessary in order to enforce the fundamental right involved. U.S. Const. art. 1, § 4, cl. 1.

**[28]**    **Election Law** 👉

Congress exercises its power under the Elections Clause to alter state election regulations only if the state regime cannot operate harmoniously with federal election laws in a single procedural scheme. U.S. Const. art. 1, § 4, cl. 1.

**[29]**    **Election Law** 👉

Violation of state election laws by state officials or other unidentified third parties is not always amenable to a federal constitutional claim.

**[30]**    **Constitutional Law** 👉

It was not intended by the Fourteenth Amendment that all matters formerly within the exclusive cognizance of the states should become matters of national concern. U.S. Const. Amend. 14.

**[31]**    **Election Law** 👉

Vote dilution under the Equal Protection Clause is concerned with votes being weighed differently. U.S. Const. Amend. 14.

**[32]**    **Election Law** 👉

Voters who planned to vote in person lacked particularized Equal Protection Clause injury for their alleged harm of vote dilution attributable to three-day extension of mail-in ballot-receipt deadline and presumption of timeliness ordered by Pennsylvania Supreme Court, and thus voters

did not have Article III standing for such claim; even though right to vote had been labeled as "personal," votes allegedly counted illegally resulted in dilution suffered equally by all voters, and no Pennsylvania voter's vote would have counted for less than that of any other voter as a result of deadline extension and presumption of timeliness. U.S. Const. art. 3, § 2; U.S. Const. Amend. 14.

**[33]**    **Election Law** 👉

A vote cast by fraud or mailed in by the wrong person through mistake, or otherwise counted illegally, has a mathematical impact on the final tally and thus on the proportional effect of every vote, but no single voter is specifically disadvantaged; such an alleged "dilution" is suffered equally by all voters and is not particularized for Article III standing purposes. U.S. Const. art. 3, § 2.

**[34]**    **Election Law** 👉

A voter who complains of gerrymandering, but who does not live in a gerrymandered district, asserts, for purposes of Article III standing, only a generalized grievance against governmental conduct of which he or she does not approve. U.S. Const. art. 3, § 2.

**[35]**    **Election Law** 👉

The key inquiry for Article III standing in an equal protection claim is whether the alleged violation of the right to vote arises from an invidious classification—including those based on race, sex, economic status, or place of residence within a State—to which the plaintiff is subject and in which the favored group has full voting strength and the groups not in favor have their votes discounted. U.S. Const. art. 3, § 2; U.S. Const. Amend. 14.

**[36]**    **Election Law** 👉

Voters who allege facts showing disadvantage to themselves have Article III standing to

bring an equal protection suit to remedy that disadvantage, but a disadvantage to the plaintiff exists only when the plaintiff is part of a group of voters whose votes will be weighed differently compared to another group. U.S. Const. art. 3, § 2; U.S. Const. Amend. 14.

**[37]    Election Law** ⬤

Voters who planned to vote in person failed to allege legally cognizable "preferred class," for purposes of claimed equal protection violation attributable to three-day extension of mail-in ballot-receipt deadline and presumption of timeliness ordered by Pennsylvania Supreme Court, and thus voters did not have Article III standing for such claim; deadline extension and presumption applied to all voters, rather than subset of "preferred" voters, and voters showed no disadvantage to themselves that arose simply by being separated into groupings. U.S. Const. art. 3, § 2; U.S. Const. Amend. 14.

**[38]    Constitutional Law** ⬤

An equal protection claim will not lie by conflating all persons not injured into a preferred class receiving better treatment than the plaintiff. U.S. Const. Amend. 14.

**[39]    Election Law** ⬤

The right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.

**[40]    Federal Civil Procedure** ⬤

A private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another.

**[41]    Federal Civil Procedure** ⬤

A plaintiff lacks standing to complain about his inability to commit crimes because no one has a right to commit a crime.

**[42]    Election Law** ⬤

Alleged harm from votes counted solely due to Pennsylvania Supreme Court's ordered presumption of timeliness, which held that mail-in ballots with missing or illegible postmarks were presumed timely if received by deadline, was hypothetical or conjectural, and thus voters who planned to vote in person did not have Article III standing for such equal protection claim; presumption could have inflicted injury on voters only if another voter violated law by casting absentee ballot after Election Day, illegally cast ballot did not bear legible postmark and still arrived within three days of Election Day, and ballot lacked sufficient indicia of its untimeliness to overcome presumption, such that ballot was ultimately counted. U.S. Const. art. 3, § 2; U.S. Const. Amend. 14.

**[43]    Federal Civil Procedure** ⬤

When determining Article III standing, a court accepts allegations based on well-pleaded facts, but it does not credit bald assertions that rest on mere supposition. U.S. Const. art. 3, § 2.

**[44]    Federal Civil Procedure** ⬤

An Article III standing theory becomes more speculative when it requires that independent actors make decisions to act unlawfully. U.S. Const. art. 3, § 2.

**[45]    Election Law** ⬤

Voters who planned to vote in person and congressional candidate were not entitled to receive injunction preventing enforcement of Pennsylvania Supreme Court's extension of ballot-receipt deadline and presumption of timeliness for mail-in ballots, where injunction was requested less than two weeks before Election Day, and extension and presumption

had been established nearly seven weeks before Election Day, which may have informed some voters' decisions about whether and when to request mail-in ballots, as well as when and how they cast or intended to cast them.

On Appeal from the United States District Court for the Western District of Pennsylvania, District Court No. 3-20-cv-00215, District Judge: Honorable Kim. R. Gibson

**Attorneys and Law Firms**

Brian W. Barnes, Peter A. Patterson, David H. Thompson, Cooper & Kirk, 1523 New Hampshire Avenue, N.W., Washington, D.C. 20036, Counsel for Appellants

Mark A. Aronchick, Michele D. Hangley, Robert A. Wiygul, Hangley Aronchick Segal Pudlin & Schiller, One Logan Square, 18th & Cherry Streets, 27th Floor, Philadelphia, PA 19103, J. Bart DeLone, Sean A. Kirkpatrick, Keli M. Neary, Office of Attorney General of Pennsylvania, Strawberry Square, Harrisburg, PA 17120, Dimitrios Mavroudis, Jessica Rickabaugh, Joe H. Tucker, Jr., Tucker Law Group, Ten Penn Center, 1801 Market Street, Suite 2500, Philadelphia, PA 19103, Counsel Secretary Commonwealth of Pennsylvania

Elizabeth A. Dupuis, Molly E. Meachem, Babst Calland, 330 Innovation Boulevard, Suite 302, State College, PA 16803, Counsel for Armstrong, Blair, Centre Columbia, Dauphin, Fayette, Huntingdon, Indiana, Lackawanna, Lawrence, Northumberland, Venango, and York County Boards of Elections

Christine D. Steere, Deasey Mahoney & Valentini, 103 Chesley Drive, Lafayette Building, Suite 101, Media, PA 19063, Counsel for Berks County Board of Elections

Edward D. Rogers, Elizabeth V. Wingfield, Ballard Spahr, 1735 Market Street, 51st Floor, Philadelphia, PA 19103, Counsel for Delaware County Board of Elections

Stephen B. Edwards, Frank J. Lavery, Jr., Andrew W. Norfleet, Lavery Law, 225 Market Street, Suite 304, P.O. Box 1245, Harrisburg, PA 17108, Counsel for Franklin and Perry County Boards of Elections

Thomas R. Shaffer, Glassmire & Shaffer Law Offices, 5 East Third Street, P.O. Box 509, Coudersport, PA 16915, Counsel for Potter County Board of Elections

Marc E. Elias, Uzoma Nkwonta, Courtney A. Elgart, Perkins Coie, 700 13th Street, N.W. Suite 800, Washington, D.C. 20005, Counsel for Intervenor Democratic National Committee

Before: SMITH, Chief Judge, SHWARTZ and SCIRICA, Circuit Judges

OPINION OF THE COURT

SMITH, Chief Judge.

**\*1** *A share in the sovereignty of the state, which is exercised by the citizens at large, in voting at elections is one of the most important rights of the subject, and in a republic ought to stand foremost in the estimation of the law.*—Alexander Hamilton[1]

The year 2020 has brought the country unprecedented challenges. The COVID-19 pandemic, which began early this year and continues today, has caused immense loss and vast disruption. As this is a presidential election year, the pandemic has also presented unique challenges regarding where and how citizens shall vote, as well as when and how their ballots shall be tabulated. The appeal on which we now rule stems from the disruption COVID-19 has wrought on the national elections. We reach our decision, detailed below, having carefully considered the full breadth of statutory law and constitutional authority applicable to this unique dispute over Pennsylvania election law. And we do so with commitment to a proposition indisputable in our democratic process: that the lawfully cast vote of every citizen must count.

**I. Background & Procedural History**

**A. The Elections and Presidential Electors Clause**

[1]      [2] The U.S. Constitution delegates to state "Legislature[s]" the authority to regulate the "Times, Places and Manner of holding Elections for Senators and Representatives," subject to Congress's ability to "make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1. This provision is known as the "Elections Clause." The Elections Clause effectively gives state governments the "default" authority to regulate the mechanics of federal elections, *Foster v. Love*, 522 U.S. 67, 69, 118 S.Ct. 464, 139 L.Ed.2d 369 (1997), with Congress retaining "exclusive control" to "make or alter" any state's regulations, *Colegrove v. Green*,

Case 4:20-cv-02078-MWB Document 176-1 Filed 11/19/20 Page 10 of 205
**Bognet v. Secretary Commonwealth of Pennsylvania, --- F.3d ---- (2020)**
2020 WL 6686120

328 U.S. 549, 554, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946). Congress has not often wielded this power but, "[w]hen exercised, the action of Congress, so far as it extends and conflicts with the regulations of the State, necessarily supersedes them." *Ex Parte Siebold*, 100 U.S. 371, 384, 399, 25 L.Ed. 717 (1879) ("[T]he Constitution and constitutional laws of the [United States] are ... the supreme law of the land; and, when they conflict with the laws of the States, they are of paramount authority and obligation."). By statute, Congress has set "[t]he Tuesday next after the 1st Monday in November, in every even numbered year," as the day for the election. 2 U.S.C. § 7.

Much like the Elections Clause, the "Electors Clause" of the U.S. Constitution provides that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of [Presidential] Electors." U.S. Const. art. II, § 1, cl. 2. Congress can "determine the Time of chusing the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States." U.S. Const. art. II, § 1, cl. 4. Congress has set the time for appointing electors as "the Tuesday next after the first Monday in November, in every fourth year succeeding every election of a President and Vice President." 3 U.S.C. § 1.

**\*2** This year, both federal statutes dictate that the day for the election was to fall on Tuesday, November 3 ("Election Day").

### B. Pennsylvania's Election Code

In keeping with the Constitution's otherwise broad delegation of authority to states to regulate the times, places, and manner of holding federal elections, the Pennsylvania General Assembly has enacted a comprehensive elections code. In 2019, the General Assembly passed Act 77, which (among other things) established "no-excuse" absentee voting in Pennsylvania[2]: all eligible voters in Pennsylvania may vote by mail without the need to show their absence from their voting district on the day of the election. 25 Pa. Stat. and Cons. Stat. §§ 3150.11–3150.17. Under Act 77, "[a]pplications for mail-in ballots shall be processed if received not later than five o'clock P.M. of the first Tuesday prior to the day of any primary or election." *Id.* § 3150.12a(a). After Act 77, "a completed absentee [or mail-in] ballot must be received in the office of the county board of elections no later than eight o'clock P.M. on the day of the primary or election" for that vote to count. *Id.* §§ 3146.6(c), 3150.16(c).

### C. The Pennsylvania Supreme Court Decision

Soon after Act 77's passage, Donald J. Trump for President, Inc., the Republican National Committee ("RNC"), and several Republican congressional candidates and voters brought suit against Kathy Boockvar, Secretary of the Commonwealth of Pennsylvania, and all of Pennsylvania's county boards of elections. That suit, filed in the Western District of Pennsylvania, alleged that Act 77's "no-excuse" mail-in voting regime violated both the federal and Pennsylvania constitutions. *Donald J. Trump for Pres., Inc. v. Boockvar*, No. 2:20-cv-966, —— F.Supp.3d ——, ——, 2020 WL 4920952, at \*1 (W.D. Pa. Aug. 23, 2020). Meanwhile, the Pennsylvania Democratic Party and several Democratic elected officials and congressional candidates filed suit in Pennsylvania's Commonwealth Court, seeking declaratory and injunctive relief related to statutory-interpretation issues involving Act 77 and the Pennsylvania Election Code. *See Pa. Democratic Party v. Boockvar*, —— Pa. ——, 238 A.3d 345, 352 (2020). Secretary Boockvar asked the Pennsylvania Supreme Court to exercise extraordinary jurisdiction to allow it to immediately consider the case, and her petition was granted without objection. *Id.* at 354–55.

Pending resolution of the Pennsylvania Supreme Court case, Secretary Boockvar requested that the Western District of Pennsylvania stay the federal case. *Trump for Pres. v. Boockvar*, —— F.Supp.3d at ——, 2020 WL 4920952, at \*1. The District Court obliged and concluded that it would abstain under *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). *See Trump for Pres. v. Boockvar*, —— F.Supp.3d at ——, 2020 WL 4920952, at \*21. The RNC then filed a motion for limited preliminary injunctive relief asking that all mailed ballots be segregated, but the District Court denied the motion, finding that the plaintiffs' harm had "not yet materialized in any actualized or imminent way." *Donald J. Trump for Pres., Inc. v. Boockvar*, No. 2:20-cv-966, 2020 WL 5407748, at \*1 (W.D. Pa. Sept. 8, 2020).

**\*3** With the federal case stayed, the state court matter proceeded. The Pennsylvania Democratic Party argued that a combination of the COVID-19 pandemic and U.S. Postal Service ("USPS") mail-delivery delays made it difficult for absentee voters to timely return their ballots in the June 2020 Pennsylvania primary election. *Pa. Democratic Party*, 238 A.3d at 362. The Pennsylvania Democratic Party claimed that this voter disenfranchisement violated the Pennsylvania Constitution's Free and Equal Elections Clause, art I., § 5,[3]

**Bognet v. Secretary Commonwealth of Pennsylvania, --- F.3d ---- (2020)**
Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 11 of 205

2020 WL 6686120

and sought, among other things, a weeklong extension of the deadline for receipt of ballots cast by Election Day in the upcoming general election—the same deadline for the receipt of ballots cast by servicemembers residing overseas. *Id.* at 353–54. Secretary Boockvar originally opposed the extension deadline; she changed her position after receiving a letter from USPS General Counsel which stated that Pennsylvania's ballot deadlines were "incongruous with the Postal Service's delivery standards," and that to ensure that a ballot in Pennsylvania would be received by 8:00 P.M. on Election Day, the voter would need to mail it a full week in advance, by October 27, which was also the deadline to *apply* for a mail-in ballot. *Id.* at 365–66; 25 Pa. Stat. and Cons. Stat. § 3150.12a(a). Secretary Boockvar accordingly recommended a three-day extension to the received-by deadline. *Pa. Democratic Party*, 238 A.3d at 364–65.

In a September 17, 2020 decision, the Pennsylvania Supreme Court concluded that USPS's existing delivery standards could not meet the timeline built into the Election Code and that circumstances beyond voters' control should not lead to their disenfranchisement. *Pa. Democratic Party*, 238 A.3d at 371. The Court accordingly held that the Pennsylvania Constitution's Free and Equal Elections Clause required a three-day extension of the ballot-receipt deadline for the November 3 general election. *Id.* at 371, 386–87. All ballots postmarked by 8:00 P.M. on Election Day and received by 5:00 P.M. on the Friday after Election Day, November 6, would be considered timely and counted ("Deadline Extension"). *Id.* at 386–87. Ballots postmarked or signed after Election Day, November 3, would be rejected. *Id.* If the postmark on a ballot received before the November 6 deadline was missing or illegible, the ballot would be presumed to be timely unless "a preponderance of the evidence demonstrates that it was mailed after Election Day" ("Presumption of Timeliness"). *Id.* Shortly after the ruling, Pennsylvania voters were notified of the Deadline Extension and Presumption of Timeliness.

**D. Appeal to the U.S. Supreme Court, and This Litigation**

The Republican Party of Pennsylvania and several intervenors, including the President pro tempore of the Pennsylvania Senate, sought to challenge in the Supreme Court of the United States the constitutionality of the Pennsylvania Supreme Court's ruling. Because the November election date was fast approaching, they filed an emergency application for a stay of the Pennsylvania Supreme Court's order pending review on the merits. The U.S. Supreme

Court denied the emergency stay request in a 4-4 decision. *Republican Party of Pa. v. Boockvar*, No. 20A54, 592 U.S. ——, —— S.Ct. ——, —— L.Ed.2d ——, 2020 WL 6128193 (Oct. 19, 2020); *Scarnati v. Boockvar*, No. 20A53, 592 U.S. ——, —— S.Ct. ——, —— L.Ed.2d ——, 2020 WL 6128194 (Oct. 19, 2020). After denial of the stay, the petitioners moved for expedited consideration of their petition for certiorari. In denying that motion, Justice Alito noted that, per the Pennsylvania Attorney General, all county boards of elections would segregate ballots received during the Deadline Extension period from those received by 8:00 P.M. on Election Day. *Republican Party of Pa. v. Boockvar*, No. 20-542, 592 U.S. ——, —— S.Ct. ——, —— L.Ed.2d ——, 2020 WL 6304626, at *2 (Oct. 28, 2020) (Alito, J., statement). Justice Alito later issued an order requiring that all county boards of elections segregate such ballots and count them separately. *Republican Party of Pa. v. Boockvar*, No. 20A84, —— U.S. ——, —— S.Ct. ——, —— L.Ed.2d ——, 2020 WL 6536912 (Mem.) (U.S. Nov. 6, 2020) (Alito, J.).

*4 In the meantime, on October 22, 2020, three days after the U.S. Supreme Court declined to stay the Pennsylvania Supreme Court's order, Plaintiffs herein filed this suit in the Western District of Pennsylvania. Plaintiffs are four registered voters from Somerset County, Pennsylvania, who planned to vote in person on Election Day ("Voter Plaintiffs") and Pennsylvania congressional candidate Jim Bognet. Defendants are Secretary Boockvar and each Pennsylvania county's board of elections.

Bognet, the congressional candidate, claimed that the Deadline Extension and Presumption of Timeliness "allow[ ] County Boards of Elections to accept votes ... that would otherwise be unlawful" and "undermine[ ] his right to run in an election where Congress has paramount authority to set the 'times, places, and manner' " of Election Day. *Bognet v. Boockvar*, No. 3:20-cv-215, 2020 WL 6323121, at *2 (W.D. Pa. Oct. 28, 2020). The Voter Plaintiffs alleged that by voting in person, they had to comply with the single, uniform federal Election Day deadline, whereas mail-in voters could submit votes any time before 5:00 P.M. on November 6. *Id.* Thus, they alleged, the Pennsylvania Supreme Court treated them in an arbitrary and disparate way by elevating mail-in voters to a "preferred class of voters" in violation of the U.S. Constitution's Equal Protection Clause and the single, uniform, federal Election Day set by Congress. *Id.* The Voter Plaintiffs also asserted that counting ballots received after Election Day during the Deadline Extension period

would unlawfully dilute their votes in violation of the Equal Protection Clause. *Id.*

All Plaintiffs sought to enjoin Defendants from counting ballots received during the Deadline Extension period. *Id.* They also sought a declaration that the Deadline Extension and Presumption of Timeliness are unconstitutional under the Elections Clause and the Electors Clause as well as the Equal Protection Clause. *Id.* Because Plaintiffs filed their suit less than two weeks before Election Day, they moved for a temporary restraining order ("TRO"), expedited hearing, and preliminary injunction. *Id.*

The District Court commendably accommodated Plaintiffs' request for an expedited hearing, then expeditiously issued a thoughtful memorandum order on October 28, denying the motion for a TRO and preliminary injunction. *Id.* at *7. The District Court held that Bognet lacked standing because his claims were too speculative and not redressable. *Id.* at *3. Similarly, the District Court concluded that the Voter Plaintiffs lacked standing to bring their Equal Protection voter dilution claim because they alleged only a generalized grievance. *Id.* at *5.

At the same time, the District Court held that the Voter Plaintiffs had standing to pursue their Equal Protection arbitrary-and-disparate-treatment claim. But it found that the Deadline Extension did not engender arbitrary and disparate treatment because that provision did not extend the period for mail-in voters to actually cast their ballots; rather, the extension only directed that the timely cast ballots of mail-in voters be counted. *Id.* As to the Presumption of Timeliness, the District Court held that the Voter Plaintiffs were likely to succeed on the merits of their arbitrary-and-disparate-treatment challenge. *Id.* at *6. Still, the District Court declined to grant a TRO because the U.S. Supreme Court "has repeatedly emphasized that ... federal courts should ordinarily not alter the election rules on the eve of an election." *Id.* at *7 (citing *Purcell v. Gonzalez,* 549 U.S. 1, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006) (per curiam)). The District Court concluded that with "less than two weeks before the election. ... [g]ranting the relief Plaintiffs seek would result in significant voter confusion; precisely the kind of confusion that *Purcell* seeks to avoid." *Id.*

**\*5** Plaintiffs appealed the denial of their motion for a TRO and preliminary injunction to this Court on October 29, less than a week before Election Day. Plaintiffs requested an expedited briefing schedule: specifically, their opening brief

would be due on October 30 and the response briefs on November 2. Notably, Plaintiffs sought to file a reply brief on November 3—Election Day. Appellants' Emergency Mot. for Expedited Briefing, Dkt. No. 17. Defendants opposed the expedited briefing schedule, arguing that Plaintiffs' own delay had caused the case to reach this Court mere days before the election. Sec'y Boockvar's Opp. to Appellants' Emergency Mot. for Expedited Briefing, Dkt. No. 33. Defendants also contended that Plaintiffs sought to punish voters by invalidating the very rules mail-in voters had relied on when they cast their ballots. Defendants asked us to deny the motion for expedited briefing and offered to supply us with the actual numbers of mail-in ballots received during the Deadline Extension period together with an approximate count of how many of those mail-in ballots lacked legible postmarks. *Id.*

Even had we granted Plaintiffs' motion for expedited briefing, the schedule they proposed would have effectively foreclosed us from ruling on this appeal before Election Day. So we denied Plaintiffs' motion and instead ordered that their opening brief be filed by November 6. Order, No. 20-3214, Oct. 30, 2020, Dkt. No. 37. We directed Defendants to file response briefs by November 9, forgoing receipt of a reply brief.[4] *Id.* With the matter now fully briefed, we consider Plaintiffs' appeal of the District Court's denial of a TRO and preliminary injunction.

## II. Standard of Review

**[3]** The District Court exercised jurisdiction under 28 U.S.C. § 1331. We exercise jurisdiction under § 1292(a)(1).

**[4]** Ordinarily, an order denying a TRO is not immediately appealable. *Hope v. Warden York Cnty. Prison,* 956 F.3d 156, 159 (3d Cir. 2020). Here, although Bognet and the Voter Plaintiffs styled their motion as an Emergency Motion for a TRO and Preliminary Injunction, *see Bognet v. Boockvar,* No. 3:20-cv-00215, Dkt. No. 5 (W.D. Pa. Oct. 22, 2020), the District Court's order plainly went beyond simply ruling on the TRO request.

Plaintiffs filed their motion for a TRO and a preliminary injunction on October 22, along with a supporting brief. Defendants then filed briefs opposing the motion, with Plaintiffs filing a reply in support of their motion. The District Court heard argument from the parties, remotely, during a 90-minute hearing. The next day, the District Court ruled on

the merits of the request for injunctive relief. *Bognet,* 2020 WL 6323121, at \*7. The District Court's Memorandum Order denied both Bognet and the Voter Plaintiffs the affirmative relief they sought to obtain prior to Election Day, confirming that the Commonwealth was to count mailed ballots received after the close of the polls on Election Day but before 5:00 P.M. on November 6.

**[5]   [6]**   In determining whether Bognet and the Voter Plaintiffs had standing to sue, we resolve a legal issue that does not require resolution of any factual dispute. Our review is de novo. *Blunt v. Lower Merion Sch. Dist.,* 767 F.3d 247, 266 (3d Cir. 2014). "When reviewing a district court's denial of a preliminary injunction, we review the court's findings of fact for clear error, its conclusions of law de novo, and the ultimate decision ... for an abuse of discretion." *Reilly v. City of Harrisburg,* 858 F.3d 173, 176 (3d Cir. 2017) (quoting *Bimbo Bakeries USA, Inc. v. Botticella,* 613 F.3d 102, 109 (3d Cir. 2010)) (cleaned up).

## III. Analysis

### A. Standing

**[7]   [8]**   Derived from separation-of-powers principles, the law of standing "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 408, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013) (citations omitted). Article III of the U.S. Constitution vests "[t]he judicial Power of the United States" in both the Supreme Court and "such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art. III, § 1. But this "judicial Power" extends only to "Cases" and "Controversies." *Id.* art. III, § 2; *see also Spokeo, Inc. v. Robins,* — U.S. —, 136 S. Ct. 1540, 1547, 194 L.Ed.2d 635 (2016). To ensure that judges avoid rendering impermissible advisory opinions, parties seeking to invoke federal judicial power must first establish their standing to do so. *Spokeo,* 136 S. Ct. at 1547.

**\*6   [9]   [10]**   Article III standing doctrine speaks in jargon, but the gist of its meaning is plain enough. To bring suit, you—and you personally—must be injured, and you must be injured in a way that concretely impacts your own protected legal interests. If you are complaining about something that does not harm you—and does not harm you in a way that is concrete—then you lack standing. And if the injury that you claim is an injury that does no specific harm to you, or if it depends on a harm that may never happen, then you lack an injury for which you may seek relief from a federal court. As we will explain below, Plaintiffs here have not suffered a concrete, particularized, and non-speculative injury necessary under the U.S. Constitution for them to bring this federal lawsuit.

**[11]   [12]   [13]   [14]   [15]**   The familiar elements of Article III standing require a plaintiff to have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,* 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)). To plead an injury in fact, the party invoking federal jurisdiction must establish three sub-elements: first, the "invasion of a legally protected interest"; second, that the injury is both "concrete and particularized"; and third, that the injury is "actual or imminent, not conjectural or hypothetical." *Spokeo,* 136 S. Ct. at 1548 (quoting *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130); *see also Mielo v. Steak 'n Shake Operations,* 897 F.3d 467, 479 n.11 (3d Cir. 2018). The second sub-element requires that the injury "affect the plaintiff in a personal and individual way." *Lujan,* 504 U.S. at 560 n.1, 112 S.Ct. 2130. As for the third, when a plaintiff alleges future injury, such injury must be "certainly impending." *Clapper,* 568 U.S. at 409, 133 S.Ct. 1138 (quoting *Lujan,* 504 U.S. at 565 n.2, 112 S.Ct. 2130). Allegations of "possible" future injury simply aren't enough. *Id.* (quoting *Whitmore v. Arkansas,* 495 U.S. 149, 158, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990)). All elements of standing must exist at the time the complaint is filed. *See Lujan,* 504 U.S. at 569 n.4, 112 S.Ct. 2130.

With these guideposts in mind, we turn to whether Plaintiffs have pleaded an Article III injury. They bring several claims under 42 U.S.C. § 1983, asserting deprivation of their constitutional rights. They allege that Defendants' implementation of the Pennsylvania Supreme Court's Deadline Extension and Presumption of Timeliness violates the Elections Clause of Article I, the Electors Clause of Article II, and the Equal Protection Clause of the Fourteenth Amendment. Because Plaintiffs lack standing to assert these claims, we will affirm the District Court's denial of injunctive relief.

Case 4:20-cv-02078-MWB Document 176-1 Filed 11/19/20 Page 14 of 205
Bognet v. Secretary Commonwealth of Pennsylvania, --- F.3d ---- (2020)

2020 WL 6686120

**1. Plaintiffs lack standing under the Elections Clause and Electors Clause.**

[16] [17] [18] Federal courts are not venues for plaintiffs to assert a bare right "to have the Government act in accordance with law." *Allen v. Wright*, 468 U.S. 737, 754, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126–27, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014). When the alleged injury is undifferentiated and common to all members of the public, courts routinely dismiss such cases as "generalized grievances" that cannot support standing. *United States v. Richardson*, 418 U.S. 166, 173–75, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974). Such is the case here insofar as Plaintiffs, and specifically candidate Bognet, theorize their harm as the right to have government administered in compliance with the Elections Clause and Electors Clause.

[19] To begin with, private plaintiffs lack standing to sue for alleged injuries attributable to a state government's violations of the Elections Clause. For example, in *Lance v. Coffman*, 549 U.S. 437, 127 S.Ct. 1194, 167 L.Ed.2d 29 (2007) (per curiam), four private citizens challenged in federal district court a Colorado Supreme Court decision invalidating a redistricting plan passed by the state legislature and requiring use of a redistricting plan created by Colorado state courts. *Id.* at 438, 127 S.Ct. 1194. The plaintiffs alleged that the Colorado Supreme Court's interpretation of the Colorado Constitution violated the Elections Clause "by depriving the state legislature of its responsibility to draw congressional districts." *Id.* at 441, 127 S.Ct. 1194. The U.S. Supreme Court held that the plaintiffs lacked Article III standing because they claimed harm only to their interest, and that of every citizen, in proper application of the Elections Clause. *Id.* at 442, 127 S.Ct. 1194 ("The only injury plaintiffs allege is that the law—specifically the Elections Clause—has not been followed."). Their relief would have no more directly benefitted them than the public at large. *Id.* The same is true here. If anything, Plaintiffs' "interest in the State's ability to 'enforce its duly enacted laws' " is even less compelling because Pennsylvania's "election officials support the challenged decree." *Republican Nat'l Comm. v. Common Cause R.I.*, No. 20A28, 591 U.S. ——, —— S.Ct. ——, —— L.Ed.2d ——, 2020 WL 4680151 (Mem.), at *1 (Aug. 13, 2020) (quoting *Abbott v. Perez*, —— U.S. ——, 138 S. Ct. 2305, 2324 n.17, 201 L.Ed.2d 714 (2018)).

*7 Because the Elections Clause and the Electors Clause have "considerable similarity," *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 839, 135 S.Ct. 2652, 192 L.Ed.2d 704 (2015) (Roberts, C.J., dissenting) (discussing how Electors Clause similarly vests power to determine manner of appointing electors in "the Legislature" of each State), the same logic applies to Plaintiffs' alleged injury stemming from the claimed violation of the Electors Clause. *See also Foster*, 522 U.S. at 69, 118 S.Ct. 464 (characterizing Electors Clause as Elections Clause's "counterpart for the Executive Branch"); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 804–05, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995) (noting state's "duty" under Elections Clause "parallels the duty" described by Electors Clause).

[20] Even a party that meets Article III standing requirements must ordinarily rest its claim for relief on violation of its own rights, not those of a third party. *Pitt News v. Fisher*, 215 F.3d 354, 361–62 (3d Cir. 2000). Plaintiffs assert that the Pennsylvania Supreme Court's Deadline Extension and Presumption of Timeliness usurped the General Assembly's prerogative under the Elections Clause to prescribe "[t]he Times, Places and Manner of holding Elections." U.S. Const. art. I, § 4, cl. 1. The Elections Clause grants that right to "the Legislature" of "each State." *Id.* Plaintiffs' Elections Clause claims thus "belong, if they belong to anyone, only to the Pennsylvania General Assembly." *Corman v. Torres*, 287 F. Supp. 3d 558, 573 (M.D. Pa. 2018) (three-judge panel) (per curiam). Plaintiffs here are four individual voters and a candidate for federal office; they in no way constitute the General Assembly, nor can they be said to comprise any part of the law-making processes of Pennsylvania. *Ariz. State Legislature*, 576 U.S. at 824, 135 S.Ct. 2652.[5] Because Plaintiffs are not the General Assembly, nor do they bear any conceivable relationship to state lawmaking processes, they lack standing to sue over the alleged usurpation of the General Assembly's rights under the Elections and Electors Clauses. No member of the General Assembly is a party to this lawsuit.

[21] [22] That said, prudential standing can suspend Article III's general prohibition on a litigant's raising another person's legal rights. Yet Plaintiffs don't fit the bill. A plaintiff may assert the rights of another if he or she "has a 'close' relationship with the person who possesses the right" and "there is a 'hindrance' to the possessor's ability to protect his own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 130, 125 S.Ct. 564, 160 L.Ed.2d 519 (2004) (citation omitted).

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 15 of 205
**Bognet v. Secretary Commonwealth of Pennsylvania, --- F.3d ---- (2020)**
2020 WL 6686120

Plaintiffs cannot invoke this exception to the rule against raising the rights of third parties because they enjoy no close relationship with the General Assembly, nor have they alleged any hindrance to the General Assembly's ability to protect its own interests. *See, e.g., Corman*, 287 F. Supp. 3d at 573. Nor does Plaintiffs' other theory of prudential standing, drawn from *Bond v. United States*, 564 U.S. 211, 131 S.Ct. 2355, 180 L.Ed.2d 269 (2011), advance the ball.

**\*8** In *Bond*, the Supreme Court held that a litigant has prudential standing to challenge a federal law that allegedly impinges on the state's police powers, "in contravention of constitutional principles of federalism" enshrined in the Tenth Amendment. *Id.* at 223–24, 131 S.Ct. 2355. The defendant in *Bond* challenged her conviction under 18 U.S.C. § 229, which Congress enacted to comply with a chemical weapons treaty that the United States had entered. *Id.* at 214–15, 131 S.Ct. 2355. Convicted under the statute she sought to challenge, Bond satisfied Article III's standing requirements. *Id.* at 217, 131 S.Ct. 2355 (characterizing Bond's sentence and incarceration as concrete, and redressable by invalidation of her conviction); *id.* at 224–25, 131 S.Ct. 2355 (noting that Bond was subject to "[a] law," "prosecution," and "punishment" she might not have faced "if the matter were left for the Commonwealth of Pennsylvania to decide"). She argued that her conduct was "local in nature" such that § 229 usurped the Commonwealth's reserved police powers. *Id.* Rejecting the Government's contention that Bond was barred as a third party from asserting the rights of the Commonwealth, *id.* at 225, 131 S.Ct. 2355, the Court held that "[t]he structural principles secured by the separation of powers protect the individual as well" as the State. *Id.* at 222, 131 S.Ct. 2355 ("Federalism also protects the liberty of all persons within a State by ensuring that laws enacted in excess of delegated governmental power cannot direct or control their actions. ... When government acts in excess of its lawful powers, that [personal] liberty is at stake.").

**[23]** **[24]** But the nub of Plaintiffs' argument here is that the Pennsylvania Supreme Court intruded on the authority delegated to the Pennsylvania General Assembly under Articles I and II of the U.S. Constitution to regulate federal elections. They do not allege any violation of the Tenth Amendment, which provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. Nor could they. After all, states have no inherent or reserved power over federal elections. *U.S. Term Limits*, 514 U.S. at 804–05, 115 S.Ct.

1842. When "deciding issues raised under the Elections Clause," courts "need not be concerned with preserving a 'delicate balance' between competing sovereigns." *Gonzalez v. Arizona*, 677 F.3d 383, 392 (9th Cir. 2012). Either federal and state election law "operate harmoniously in a single procedural scheme," or they don't—and the federal law preempts ("alter[s]") state election law under the Elections Clause. *Id.* at 394. An assessment that the Pennsylvania Supreme Court lacked the legislative authority under the state's constitution necessary to comply with the Elections Clause (Appellants' Br. 24–27) does not implicate *Bond*, the Tenth Amendment, or even Article VI's Supremacy Clause.[6] *See Gonzalez*, 677 F.3d at 390–92 (contrasting Elections Clause with Supremacy Clause and describing former as "unique," containing "[an] unusual delegation of power," and "unlike virtually all other provisions of the Constitution"). And, of course, third-party standing under *Bond* still presumes that the plaintiff otherwise meets the requirements of Article III; as discussed above, Plaintiffs do not.

Plaintiff Bognet, a candidate for Congress who is currently a private citizen, does not plead a cognizable injury by alleging a "right to run in an election where Congress has paramount authority," Compl. ¶ 69, or by pointing to a "threatened" reduction in the competitiveness of his election from counting absentee ballots received within three days after Election Day. Appellants' Br. 21. Bognet does not explain how that "right to run" affects him in a particularized way when, in fact, all candidates in Pennsylvania, including Bognet's opponent, are subject to the same rules. And Bognet does not explain how counting *more* timely cast votes would lead to a *less* competitive race, nor does he offer any evidence tending to show that a greater proportion of mailed ballots received after Election Day than on or before Election Day would be cast for Bognet's opponent. What's more, for Bognet to have standing to enjoin the counting of ballots arriving after Election Day, such votes would have to be sufficient in number to change the outcome of the election to Bognet's detriment. *See, e.g., Sibley v. Alexander*, 916 F. Supp. 2d 58, 62 (D.D.C. 2013) ("[E]ven if the Court granted the requested relief, [plaintiff] would still fail to satisfy the redressability element [of standing] because enjoining defendants from casting the ... votes would not change the outcome of the election." (citing *Newdow v. Roberts*, 603 F.3d 1002, 1011 (D.C. Cir. 2010) (citations omitted)). Bognet does not allege as much, and such a prediction was inherently speculative when the complaint was filed. The same can be said for Bognet's alleged wrongfully incurred expenditures and future expenditures. Any harm

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 16 of 205
Bognet v. Secretary Commonwealth of Pennsylvania, --- F.3d ---- (2020)

2020 WL 6686120

Bognet sought to avoid in making those expenditures was not "certainly impending"—he spent the money to avoid a speculative harm. *See Donald J. Trump for Pres., Inc. v. Boockvar*, No. 2:20-cv-966, —— F.Supp.3d ——, ——, 2020 WL 5997680, at *36 (W.D. Pa. Oct. 10, 2020). Nor are those expenditures "fairly traceable" under Article III to the actions that Bognet challenges. *See, e.g., Clapper*, 568 U.S. at 402, 416, 133 S.Ct. 1138 (rejecting argument that plaintiff can "manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending").[7]

**\*9** Plaintiffs therefore lack Article III standing to challenge Defendants' implementation of the Pennsylvania Supreme Court's Deadline Extension and Presumption of Timeliness under the Elections Clause and Electors Clause.

## 2. The Voter Plaintiffs lack standing under the Equal Protection Clause.

Stressing the "personal" nature of the right to vote, the Voter Plaintiffs assert two claims under the Equal Protection Clause.[8] First, they contend that the influence of their votes, cast in person on Election Day, is "diluted" both by (a) mailed ballots cast on or before Election Day but received between Election Day and the Deadline Extension date, ballots which Plaintiffs assert cannot be lawfully counted; and (b) mailed ballots that were unlawfully cast (*i.e.*, placed in the mail) after Election Day but are still counted because of the Presumption of Timeliness. Second, the Voter Plaintiffs allege that the Deadline Extension and the Presumption of Timeliness create a preferred class of voters based on "arbitrary and disparate treatment" that values "one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104–05, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000). The Voter Plaintiffs lack Article III standing to assert either injury.

### a. Vote Dilution

As discussed above, the foremost element of standing is injury in fact, which requires the plaintiff to show a harm that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo*, 136 S. Ct. at 1547–48 (citation omitted). The Voter Plaintiffs lack standing to redress their alleged vote dilution because that alleged injury is not concrete as to votes counted under the Deadline Extension,

nor is it particularized for Article III purposes as to votes counted under the Deadline Extension or the Presumption of Timeliness.

*i. No concrete injury from vote dilution attributable to the Deadline Extension.*

**[25]** The Voter Plaintiffs claim that Defendants' implementation of the Deadline Extension violates the Equal Protection Clause because "unlawfully" counting ballots received within three days of Election Day dilutes their votes. But the source of this purported illegality is necessarily a matter of state law, which makes any alleged harm abstract for purposes of the Equal Protection Clause. And the purported vote dilution is also not concrete because it would occur in equal proportion *without* the alleged procedural illegality —that is, had the *General Assembly* enacted the Deadline Extension, which the Voter Plaintiffs do not challenge substantively.[9]

**\*10** **[26]** **[27]** **[28]** The concreteness of the Voter Plaintiffs' alleged vote dilution stemming from the Deadline Extension turns on the federal and state laws applicable to voting procedures. Federal law does not provide for *when* or *how* ballot counting occurs. *See, e.g., Trump for Pres., Inc. v. Way*, No. 20-cv-01753, —— F.Supp.3d ——, ——, 2020 WL 5912561, at *12 (D.N.J. Oct. 6, 2020) ("Plaintiffs direct the Court to no federal law regulating methods of determining the timeliness of mail-in ballots or requiring that mail-in ballots be postmarked."); *see also Smiley v. Holm*, 285 U.S. 355, 366, 52 S.Ct. 397, 76 L.Ed. 795 (1932) (noting that Elections Clause delegates to state lawmaking processes all authority to prescribe "procedure and safeguards" for "counting of votes"). Instead, the Elections Clause delegates to each state's lawmaking function the authority to prescribe such procedural regulations applicable to federal elections. *U.S. Term Limits*, 514 U.S. at 832–35, 115 S.Ct. 1842 ("The Framers intended the Elections Clause to grant States authority to create procedural regulations .... [including] 'whether the electors should vote by ballot or vivâ voce ....' " (quoting James Madison, 2 Records of the Federal Convention of 1787, at 240 (M. Farrand ed. 1911) (cleaned up)); *Smiley*, 285 U.S. at 366, 52 S.Ct. 397 (describing state authority under Elections Clause "to provide a complete code for congressional elections ... in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making

and publication of election returns"). That delegation of authority embraces all procedures "which experience shows are necessary in order to enforce the fundamental right involved." *Smiley*, 285 U.S. at 366, 52 S.Ct. 397. Congress exercises its power to "alter" state election regulations only if the state regime cannot "operate harmoniously" with federal election laws "in a single procedural scheme." *Gonzalez*, 677 F.3d at 394.

The Deadline Extension and federal laws setting the date for federal elections can, and indeed do, operate harmoniously. At least 19 other States and the District of Columbia have post-Election Day absentee ballot receipt deadlines.[10] And many States also accept absentee ballots mailed by overseas uniformed servicemembers that are received after Election Day, in accordance with the federal Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. §§ 20301–20311. So the Voter Plaintiffs' only cognizable basis for alleging dilution from the "unlawful" counting of invalid ballots is state law defining lawful and unlawful ballot counting practices. *Cf. Wise v. Circosta*, 978 F.3d 93, 100–01 (4th Cir. 2020) ("Whether ballots are *illegally* counted if they are received more than three days after Election Day depends on an issue of state law from which we must abstain." (emphasis in original)), *application for injunctive relief denied sub nom. Moore v. Circosta*, No. 20A72, 592 U.S. ——, —— S.Ct. ——, —— L.Ed.2d ——, 2020 WL 6305036 (Oct. 28, 2020). The Voter Plaintiffs seem to admit as much, arguing "that counting votes that are unlawful under the General Assembly's enactments will unconstitutionally dilute the lawful votes" cast by the Voter Plaintiffs. Appellants' Br. 38; *see also id.* at 31. In other words, the Voter Plaintiffs say that the Election Day ballot receipt deadline in Pennsylvania's codified election law renders the ballots untimely and therefore unlawful to count. Defendants, for their part, contend that the Pennsylvania Supreme Court's extension of that deadline under the Free and Equal Elections Clause of the state constitution renders them timely, and therefore lawful to count.

**\*11** **[29]** **[30]** This conceptualization of vote dilution—state actors counting ballots in violation of state election law—is not a concrete harm under the Equal Protection Clause of the Fourteenth Amendment. Violation of state election laws by state officials or other unidentified third parties is not always amenable to a federal constitutional claim. *See Shipley v. Chicago Bd. of Election Comm'rs*, 947 F.3d 1056, 1062 (7th Cir. 2020) ("A deliberate violation of state election laws by state election officials does not transgress against the

Constitution.") (cleaned up); *Powell v. Power*, 436 F.2d 84, 88 (2d Cir. 1970) (rejecting Equal Protection Clause claim arising from state's erroneous counting of votes cast by voters unqualified to participate in closed primary). "It was not intended by the Fourteenth Amendment ... that all matters formerly within the exclusive cognizance of the states should become matters of national concern." *Snowden v. Hughes*, 321 U.S. 1, 11, 64 S.Ct. 397, 88 L.Ed. 497 (1944).

**[31]** Contrary to the Voter Plaintiffs' conceptualization, vote dilution under the Equal Protection Clause is concerned with votes being weighed differently. *See Rucho v. Common Cause*, —— U.S. ——, 139 S. Ct. 2484, 2501, 204 L.Ed.2d 931 (2019) (" '[V]ote dilution' in the one-person, one-vote cases refers to the idea that each vote must carry *equal weight*." (emphasis added)); *cf. Baten v. McMaster*, 967 F.3d 345, 355 (4th Cir. 2020), *as amended* (July 27, 2020) ("[N]o vote in the South Carolina system is diluted. Every qualified person gets one vote and each vote is counted equally in determining the final tally."). As explained below, the Voter Plaintiffs cannot analogize their Equal Protection claim to gerrymandering cases in which votes were weighted differently. Instead, Plaintiffs advance an Equal Protection Clause argument based solely on state officials' alleged violation of state law that does not cause unequal treatment. And if dilution of lawfully cast ballots by the "unlawful" counting of invalidly cast ballots "were a true equal-protection problem, then it would transform every violation of state election law (and, actually, every violation of every law) into a potential federal equal-protection claim requiring scrutiny of the government's 'interest' in failing to do more to stop the illegal activity." *Trump for Pres. v. Boockvar*, —— F.Supp.3d at ———— ——, 2020 WL 5997680, at \*45–46. That is not how the Equal Protection Clause works.[11]

Even if we were to entertain an end-run around the Voter Plaintiffs' lack of Elections Clause standing—by viewing the *federal* Elections Clause as the source of "unlawfulness" of Defendants' vote counting—the alleged vote dilution would not be a concrete injury. Consider, as we've noted, that the Voter Plaintiffs take no issue with the content of the Deadline Extension; they concede that the General Assembly, as other state legislatures have done, could have enacted exactly the same Deadline Extension as a valid "time[ ], place[ ], and manner" regulation consistent with the Elections Clause. *Cf. Snowden*, 321 U.S. at 8, 64 S.Ct. 397 (concluding that alleged "unlawful administration by state officers of a state statute *fair on its face*, resulting in its unequal application

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 18 of 205
**Bognet v. Secretary Commonwealth of Pennsylvania, --- F.3d ---- (2020)**

2020 WL 6686120

to those who are entitled to be treated alike, is not a denial of equal protection" (emphasis added)); *Powell*, 436 F.2d at 88 ("Uneven or erroneous application of an *otherwise valid* statute constitutes a denial of equal protection only if it represents 'intentional or purposeful discrimination.' " (emphasis added) (quoting *Snowden*, 321 U.S. at 8, 64 S.Ct. 397)). Reduced to its essence, the Voter Plaintiffs' claimed vote dilution would rest on their allegation that federal law required a different state organ to issue the Deadline Extension. The Voter Plaintiffs have not alleged, for example, that they were prevented from casting their votes, *Guinn v. United States*, 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340 (1915), nor that their votes were not counted, *United States v. Mosley*, 238 U.S. 383, 35 S.Ct. 904, 59 L.Ed. 1355 (1915). Any alleged harm of vote dilution that turns not on the proportional influence of votes, but solely on the federal illegality of the Deadline Extension, strikes us as quintessentially abstract in the election law context and "divorced from any concrete harm." *Spokeo*, 136 S. Ct. at 1549 (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 496, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009)). That the alleged violation here relates to election law and the U.S. Constitution, rather than the mine-run federal consumer privacy statute, does not abrogate the requirement that a concrete harm must flow from the procedural illegality. *See, e.g., Lujan*, 504 U.S. at 576, 112 S.Ct. 2130 ("[T]here is absolutely no basis for making the Article III inquiry turn on the source of the asserted right.").

**\*12** The Voter Plaintiffs thus lack a concrete Equal Protection Clause injury for their alleged harm of vote dilution attributable to the Deadline Extension.

*ii. No particularized injury from votes counted under the Deadline Extension or the Presumption of Timeliness.*

**[32]** The opposite of a "particularized" injury is a "generalized grievance," where "the impact on plaintiff is plainly undifferentiated and common to all members of the public." *Id.* at 575, 112 S.Ct. 2130 (cleaned up); *see also Lance*, 549 U.S. at 439, 127 S.Ct. 1194. The District Court correctly held that the Voter Plaintiffs' "dilution" claim is a "paradigmatic generalized grievance that cannot support standing." *Bognet*, 2020 WL 6323121, at \*4 (quoting *Carson v. Simon*, No. 20-cv-02030, —— F.Supp.3d ——, 2020 WL 6018957, at \*7 (D. Minn. Oct. 12, 2020), *rev'd on other grounds*, No. 20-3139, —— F.3d ——, 2020 WL 6335967 (8th Cir. Oct. 29, 2020)). The Deadline Extension

and Presumption of Timeliness, assuming they operate to allow the illegal counting of unlawful votes, "dilute" the influence of all voters in Pennsylvania equally and in an "undifferentiated" manner and do not dilute a certain group of voters particularly.[12]

**[33]** Put another way, "[a] vote cast by fraud or mailed in by the wrong person through mistake," or otherwise counted illegally, "has a mathematical impact on the final tally and thus on the proportional effect of every vote, but no single voter is specifically disadvantaged." *Martel v. Condos*, No. 5:20-cv-00131, —— F.Supp.3d ——, 2020 WL 5755289, at \*4 (D. Vt. Sept. 16, 2020). Such an alleged "dilution" is suffered equally by all voters and is not "particularized" for standing purposes. The courts to consider this issue are in accord. *See id.; Carson*, —— F.Supp.3d at ——, 2020 WL 6018957, at \*7–8; *Moore v. Circosta*, Nos. 1:20-cv-00911, 1:20-cv-00912, —— F.Supp.3d ——, ——, 2020 WL 6063332, at \*14 (M.D.N.C. Oct. 14, 2020), *emergency injunction pending appeal denied sub nom. Wise v. Circosta*, 978 F.3d 93 (4th Cir. 2020), *application for injunctive relief denied sub nom. Moore v. Circosta*, No. 20A72, 592 U.S. ——, —— S.Ct. ——, L.Ed.2d ——, 2020 WL 6305036 (U.S. Oct. 28, 2020); *Paher v. Cegavske*, 457 F. Supp. 3d 919, 926–27 (D. Nev. Apr. 30, 2020).

But the Voter Plaintiffs argue that their purported "vote dilution" is an injury in fact sufficient to confer standing, and *not* a generalized grievance belonging to all voters, because the Supreme Court has "long recognized that a person's right to vote is 'individual and personal in nature.' " *Gill v. Whitford*, —— U.S. ——, 138 S. Ct. 1916, 1929, 201 L.Ed.2d 313 (2018) (quoting *Reynolds v. Sims*, 377 U.S. 533, 561, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964)). "Thus, 'voters who allege facts showing disadvantage to themselves as individuals have standing to sue' to remedy that disadvantage." *Id.* (quoting *Baker v. Carr*, 369 U.S. 186, 206, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)).

**\*13** The Voter Plaintiffs' reliance on this language from *Baker* and *Reynolds* is misplaced. In *Baker*, the plaintiffs challenged Tennessee's apportionment of seats in its legislature as violative of the Equal Protection Clause of the Fourteenth Amendment. 369 U.S. at 193, 82 S.Ct. 691. The Supreme Court held that the plaintiffs *did* have standing under Article III because "[t]he injury which appellants assert is that this classification disfavors the voters in the counties in which they reside, placing them in a position of constitutionally

**Bognet v. Secretary Commonwealth of Pennsylvania, --- F.3d ---- (2020)**

2020 WL 6686120

unjustifiable inequality *vis-à-vis* voters in irrationally favored counties." *Id.* at 207–08, 82 S.Ct. 691.

Although the *Baker* Court did not decide the merits of the Equal Protection claim, the Court in a series of cases—including *Gray v. Sanders*, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), and *Reynolds*—made clear that the Equal Protection Clause prohibits a state from "diluti[ng] ... the *weight* of the votes of certain ... voters merely because of where they reside[ ]," just as it prevents a state from discriminating on the basis of the voter's race or sex. *Reynolds*, 377 U.S. at 557, 84 S.Ct. 1362 (emphasis added). The Voter Plaintiffs consider it significant that the Court in *Reynolds* noted—though not in the context of standing—that "the right to vote" is "individual and personal in nature." *Id.* at 561, 84 S.Ct. 1362 (quoting *United States v. Bathgate*, 246 U.S. 220, 227, 38 S.Ct. 269, 62 L.Ed. 676 (1918)). The Court then explained that a voter's right to vote encompasses both the right to cast that vote and the right to have that vote counted without "debasement or dilution":

> The right to vote can neither be denied outright, *Guinn v. United States*, 238 U.S. 347 [35 S.Ct. 926, 59 L.Ed. 1340 (1915) ], *Lane v. Wilson*, 307 U.S. 268 [59 S.Ct. 872, 83 L.Ed. 1281 (1939) ], nor destroyed by alteration of ballots, see *United States v. Classic*, 313 U.S. 299, 315 [61 S.Ct. 1031, 85 L.Ed. 1368 (1941) ], nor diluted by ballot-box stuffing, *Ex parte Siebold*, 100 U.S. 371 [25 L.Ed. 717 (1880) ], *United States v. Saylor*, 322 U.S. 385 [64 S.Ct. 1101, 88 L.Ed. 1341 (1944) ]. As the Court stated in *Classic*, "Obviously included within the right to choose, secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted ...." 313 U.S. at 315 [61 S.Ct. 1031].

> ...

> "The right to vote includes the right to have the ballot counted. ... It also includes the right to have the vote counted at full value without dilution or discount. ... That federally protected right suffers substantial dilution ... [where a] favored group has full voting strength ... [and] [t]he groups not in favor have their votes discounted."

*Reynolds*, 377 U.S. at 555 & n.29, 84 S.Ct. 1362 (alterations in last paragraph in original) (quoting *South v. Peters*, 339 U.S. 276, 279, 70 S.Ct. 641, 94 L.Ed. 834 (1950) (Douglas, J., dissenting)).

**[34]   [35]   [36]**   Still, it does not follow from the labeling of the right to vote as "personal" in *Baker* and *Reynolds* that

*any* alleged illegality affecting voting rights rises to the level of an injury in fact. After all, the Court has observed that the harms underlying a racial gerrymandering claim under the Equal Protection Clause "are personal" in part because they include the harm of a voter "being personally subjected to a racial classification." *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 263, 135 S.Ct. 1257, 191 L.Ed.2d 314 (2015) (cleaned up). Yet a voter "who complains of gerrymandering, but who does not live in a gerrymandered district, 'assert[s] only a generalized grievance against governmental conduct of which he or she does not approve.' " *Gill*, 138 S. Ct. at 1930 (quoting *United States v. Hays*, 515 U.S. 737, 745, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995)) (alteration in original). The key inquiry for standing is whether the alleged violation of the right to vote arises from an invidious classification—including those based on "race, sex, economic status, or place of residence within a State," *Reynolds*, 377 U.S. at 561, 84 S.Ct. 1362—to which the plaintiff is subject and in which "the favored group has full voting strength and the groups not in favor have their votes discounted," *id.* at 555 n.29, 84 S.Ct. 1362 (cleaned up). In other words, "voters who allege facts *showing disadvantage to themselves*" have standing to bring suit to remedy that disadvantage, *Baker*, 369 U.S. at 206, 82 S.Ct. 691 (emphasis added), but a disadvantage to the plaintiff exists only when the plaintiff is part of a group of voters whose votes will be weighed differently compared to another group. Here, no Pennsylvania voter's vote will count for less than that of any other voter as a result of the Deadline Extension and Presumption of Timeliness.[13]

**\*14**   This conclusion cannot be avoided by describing one group of voters as "those ... who lawfully vote in person and submit their ballots *on time*" and the other group of voters as those whose (mail-in) ballots arrive after Election Day and are counted because of the Deadline Extension and/or the Presumption of Timeliness. Appellants' Br. 33 (emphasis in original). Although the former group, under Plaintiffs' theory, should make up 100% of the total votes counted and the latter group 0%, there is simply no differential *weighing* of the votes. *See Wise*, 978 F.3d at 104 (Motz, J., concurring) ("But if the extension went into effect, plaintiffs' votes would not count for less *relative to other North Carolina voters*. This is the core of an Equal Protection Clause challenge." (emphasis in original)). Unlike the malapportionment or racial gerrymandering cases, a vote cast by a voter in the so-called "favored" group counts not one bit more than the same vote cast by the "disfavored" group—no matter what set of scales one might choose to employ. *Cf. Reynolds*, 377 U.S. at 555 n.29, 84 S.Ct. 1362. And, however

**Bognet v. Secretary Commonwealth of Pennsylvania, --- F.3d ---- (2020)**

2020 WL 6686120

one tries to draw a contrast, this division is not based on a voter's personal characteristics at all, let alone a person's race, sex, economic status, or place of residence. Two voters could each have cast a mail-in ballot before Election Day at the same time, yet perhaps only one of their ballots arrived by 8:00 P.M. on Election Day, given USPS's mail delivery process. It is passing strange to assume that one of these voters would be denied "equal protection of the laws" were *both* votes counted. U.S. Const. amend. XIV, § 1.

The Voter Plaintiffs also emphasize language from *Reynolds* that "[t]he right to vote can neither be denied outright ... nor diluted by ballot-box stuffing." 377 U.S. at 555, 84 S.Ct. 1362 (citing *Ex parte Siebold*, 100 U.S. 371, 25 L.Ed. 717 (1879); *United States v. Saylor*, 322 U.S. 385, 64 S.Ct. 1101, 88 L.Ed. 1341 (1944)). In the first place, casting a vote in accordance with a procedure approved by a state's highest court—even assuming that approval violates the Elections Clause—is not equivalent to "ballot-box stuffing." The Supreme Court has only addressed this "false"-tally type of dilution where the tally was false as a result of a scheme to cast falsified or fraudulent votes. *See Saylor*, 322 U.S. at 386, 64 S.Ct. 1101. We are in uncharted territory when we are asked to declare that a tally that includes false or fraudulent votes is equivalent to a tally that includes votes that are or may be unlawful for non-fraudulent reasons, and so is more aptly described as "incorrect." *Cf. Gray*, 372 U.S. at 386, 83 S.Ct. 801 (Harlan, J., dissenting) ("[I]t is hard to take seriously the argument that 'dilution' of a vote in consequence of a legislatively sanctioned electoral system can, without more, be analogized to an impairment of the political franchise by ballot box stuffing or other criminal activity.").

Yet even were this analogy less imperfect, it still would not follow that every such "false" or incorrect tally is an injury in fact for purposes of an Equal Protection Clause claim. The Court's cases that describe ballot-box stuffing as an injury to the right to vote have arisen from criminal prosecutions under statutes making it unlawful for anyone to injure the exercise of another's constitutional right. *See, e.g., Ex parte Siebold*, 100 U.S. at 373–74 (application for writ of habeas corpus); *Saylor*, 322 U.S. at 385–86, 64 S.Ct. 1101 (criminal appeal regarding whether statute prohibiting "conspir[ing] to injure ... any citizen in the free exercise ... of any right or privilege secured to him by the Constitution" applied to conspiracy to stuff ballot boxes); *Anderson v. United States*, 417 U.S. 211, 226, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974) (criminal prosecution for conspiracy to stuff ballot boxes under successor to statute in *Saylor*). Standing was, of course,

never an issue in those cases because the Government was enforcing its criminal laws. Here, the Voter Plaintiffs, who bear the burden to show standing, have presented no instance in which an individual voter had Article III standing to claim an equal protection harm to his or her vote from the existence of an allegedly illegal vote cast by someone else in the same election.

Indeed, the logical conclusion of the Voter Plaintiffs' theory is that whenever an elections board counts any ballot that deviates in some way from the requirements of a state's legislatively enacted election code, there is a *particularized* injury in fact sufficient to confer Article III standing on every other voter—provided the remainder of the standing analysis is satisfied. Allowing standing for such an injury strikes us as indistinguishable from the proposition that a plaintiff has Article III standing to assert a general interest in seeing the "proper application of the Constitution and laws"—a proposition that the Supreme Court has firmly rejected. *Lujan*, 504 U.S. at 573–74, 112 S.Ct. 2130. The Voter Plaintiffs thus lack standing to bring their Equal Protection vote dilution claim.

### b. Arbitrary and Disparate Treatment

**\*15** The Voter Plaintiffs also lack standing to allege an injury in the form of "arbitrary and disparate treatment" of a preferred class of voters because the Voter Plaintiffs have not alleged a legally cognizable "preferred class" for equal protection purposes, and because the alleged harm from votes counted solely due to the Presumption of Timeliness is hypothetical or conjectural.

#### i. No legally protected "preferred class."

[37] The District Court held that the Presumption of Timeliness creates a "preferred class of voters" who are "able to cast their ballots after the congressionally established Election Day" because it "extends the date of the election by multiple days for a select group of mail-in voters whose ballots will be presumed to be timely in the absence of a verifiable postmark."[14] *Bognet*, 2020 WL 6323121, at \*6. The District Court reasoned, then, that the differential treatment between groups of voters is by itself an injury for standing purposes. To the District Court, this supposed "unequal treatment of voters ... harms the [Voter] Plaintiffs because, as in-person voters, they must vote by the end of

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 21 of 205
**Bognet v. Secretary Commonwealth of Pennsylvania, --- F.3d ---- (2020)**

2020 WL 6686120

the congressionally established Election Day in order to have their votes counted." *Id.* The District Court cited no case law in support of its conclusion that the injury it identified gives rise to Article III standing.

The District Court's analysis suffers from several flaws. First, the Deadline Extension and Presumption of Timeliness apply to all voters, not just a subset of "preferred" voters. It is an individual voter's *choice* whether to vote by mail or in person, and thus whether to become a part of the so-called "preferred class" that the District Court identified. Whether to join the "preferred class" of mail-in voters was entirely up to the Voter Plaintiffs.

**[38]** Second, it is not clear that the mere creation of so-called "classes" of voters constitutes an injury in fact. An injury in fact requires the "invasion of a legally protected interest." *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130. We doubt that the mere existence of groupings of voters qualifies as an injury per se. "An equal protection claim will not lie by 'conflating all persons not injured into a preferred class receiving better treatment' than the plaintiff." *Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005) (quoting *Joyce v. Mavromatis*, 783 F.2d 56, 57 (6th Cir. 1986)); *see also, e.g., Batra v. Bd. of Regents of Univ. of Neb.*, 79 F.3d 717, 721 (8th Cir. 1996) ("[T]he relevant prerequisite is unlawful discrimination, not whether plaintiff is part of a victimized class."). More importantly, the Voter Plaintiffs have shown no disadvantage to themselves that arises simply by being separated into groupings. For instance, there is no argument that it is inappropriate that some voters will vote in person and others will vote by mail. The existence of these two groups of voters, without more, simply does not constitute an injury in fact to in-person voters.

**[39]** Plaintiffs may believe that injury arises because of a preference shown for one class over another. But what, precisely, is the preference of which Plaintiffs complain? In *Bush v. Gore*, the Supreme Court held that a State may not engage in arbitrary and disparate treatment that results in the valuation of one person's vote over that of another. 531 U.S. at 104–05, 121 S.Ct. 525. Thus, "the right of suffrage can be denied by a *debasement or dilution of the weight of a citizen's vote* just as effectively as by wholly prohibiting the free exercise of the franchise." *Id.* at 105, 121 S.Ct. 525 (quoting *Reynolds*, 377 U.S. at 555, 84 S.Ct. 1362) (emphasis added). As we have already discussed, vote dilution is not an injury in fact here.

*16 **[40]** **[41]** What about the risk that some ballots placed in the mail after Election Day may still be counted? Recall that no voter—whether in person or by mail—is *permitted* to vote after Election Day. Under Plaintiffs' argument, it might theoretically be easier for one group of voters—mail-in voters—to illegally cast late votes than it is for another group of voters—in-person voters. But even if that is the case, no group of voters has the *right* to vote after the deadline.[15] We remember that "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973) (citations omitted). And "a plaintiff lacks standing to complain about his inability to commit crimes because no one has a right to commit a crime." *Citizen Ctr. v. Gessler*, 770 F.3d 900, 910 (10th Cir. 2014). Without a showing of discrimination or other intentionally unlawful conduct, or at least some burden on Plaintiffs' own voting rights, we discern no basis on which they have standing to challenge the slim opportunity the Presumption of Timeliness conceivably affords wrongdoers to violate election law. *Cf. Minn. Voters Alliance v. Ritchie*, 720 F.3d 1029, 1033 (8th Cir. 2013) (affirming dismissal of claims "premised on potential harm in the form of vote dilution caused by insufficient pre-election verification of [election day registrants'] voting eligibility and the absence of post-election ballot rescission procedures").

*ii. Speculative injury from ballots counted under the Presumption of Timeliness.*

**[42]** **[43]** **[44]** Plaintiffs' theory as to the Presumption of Timeliness focuses on the potential for some voters to vote after Election Day and still have their votes counted. This argument reveals that their alleged injury in fact attributable to the Presumption is "conjectural or hypothetical" instead of "actual or imminent." *Spokeo*, 136 S. Ct. at 1547–48 (quoting *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130). The Supreme Court has emphasized that a threatened injury must be "*certainly impending*" and not merely "*possible*" for it to constitute an injury in fact. *Clapper*, 568 U.S. at 409, 133 S.Ct. 1138 (emphasis in original) (quoting *Whitmore v. Ark.*, 495 U.S. 149, 158, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990)). When determining Article III standing, our Court accepts allegations based on well-pleaded facts; but we do not credit bald assertions that rest on mere supposition. *Finkelman v. NFL*, 810 F.3d 187, 201–02 (3d Cir. 2016). The Supreme Court has also emphasized its "reluctance to endorse standing theories that rest on speculation about the decisions of independent

2020 WL 6686120

actors." *Clapper*, 568 U.S. at 414, 133 S.Ct. 1138. A standing theory becomes even more speculative when it requires that independent actors make decisions to act *unlawfully*. *See City of L.A. v. Lyons*, 461 U.S. 95, 105–06 & 106 n.7, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (rejecting Article III standing to seek injunction where party invoking federal jurisdiction would have to establish that he would unlawfully resist arrest or police officers would violate department orders in future).

Here, the Presumption of Timeliness could inflict injury on the Voter Plaintiffs only if: (1) another voter violates the law by casting an absentee ballot after Election Day; (2) the illegally cast ballot does not bear a legible postmark, which is against USPS policy;[16] (3) that same ballot still arrives within three days of Election Day, which is faster than USPS anticipates mail delivery will occur;[17] (4) the ballot lacks sufficient indicia of its untimeliness to overcome the Presumption of Timeliness; and (5) that same ballot is ultimately counted. *See Donald J. Trump for Pres., Inc. v. Way*, No. 20-cv-10753, 2020 WL 6204477, at *7 (D.N.J. Oct. 22, 2020) (laying out similar "unlikely chain of events" required for vote dilution harm from postmark rule under New Jersey election law); *see also Reilly v. Ceridian Corp.*, 664 F.3d 38, 43 (3d Cir. 2011) (holding purported injury in fact was too conjectural where "we cannot now describe how Appellants will be injured in this case without beginning our explanation with the word 'if' "). This parade of horribles "may never come to pass," *Trump for Pres. v. Boockvar*, 2020 WL 5997680, at *33, and we are especially reluctant to endorse such a speculative theory of injury given Pennsylvania's "own mechanisms for deterring and prosecuting voter fraud," *Donald J. Trump for Pres., Inc. v. Cegavske*, No. 20-1445, ---- F.Supp.3d ----, ----, 2020 WL 5626974, at *6 (D. Nev. Sept. 18, 2020).[18]

**\*17** To date, the Secretary has reported that at least 655 ballots without a legible postmark have been collected within the Deadline Extension period.[19] But it is mere speculation to say that any one of those ballots was cast after Election Day. We are reluctant to conclude that an independent actor —here, one of 655 voters—decided to mail his or her ballot after Election Day contrary to law. The Voter Plaintiffs have not provided any empirical evidence on the frequency of voter fraud or the speed of mail delivery that would establish a statistical likelihood or even the plausibility that any of the 655 ballots was cast after Election Day. Any injury to the Voter Plaintiffs attributable to the Presumption of Timeliness

is merely "possible," not "actual or imminent," and thus cannot constitute an injury in fact.

### B. Purcell

**[45]** Even were we to conclude that Plaintiffs have standing, we could not say that the District Court abused its discretion in concluding on this record that the Supreme Court's election-law jurisprudence counseled against injunctive relief. Unique and important equitable considerations, including voters' reliance on the rules in place when they made their plans to vote and chose how to cast their ballots, support that disposition. Plaintiffs' requested relief would have upended this status quo, which is generally disfavored under the "voter confusion" and election confidence rationales of *Purcell v. Gonzalez*, 549 U.S. 1, 4–5, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006). One can assume for the sake of argument that aspects of the now-prevailing regime in Pennsylvania are unlawful as alleged and still recognize that, given the timing of Plaintiffs' request for injunctive relief, the electoral calendar was such that following it "one last time" was the better of the choices available. *Perez*, 138 S. Ct. at 2324 ("And if a [redistricting] plan is found to be unlawful very close to the election date, the only reasonable option may be to use the plan one last time.").

Here, less than two weeks before Election Day, Plaintiffs asked the District Court to enjoin a deadline established by the Pennsylvania Supreme Court on September 17, a deadline that may have informed voters' decisions about whether and when to request mail-in ballots as well as when and how they cast or intended to cast them. In such circumstances, the District Court was well within its discretion to give heed to Supreme Court decisions instructing that "federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, ---- U.S. ----, 140 S. Ct. 1205, 1207, 206 L.Ed.2d 452 (2020) (per curiam) (citing *Purcell*, 549 U.S. at 1, 127 S.Ct. 5).

In *Purcell*, an appeal from a federal court order enjoining the State of Arizona from enforcing its voter identification law, the Supreme Court acknowledged that "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." 549 U.S. at 4, 127 S.Ct. 5. In other words, "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Id.* at 4–5, 127 S.Ct. 5. Mindful of "the necessity for clear guidance to the State of Arizona" and "the imminence

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 23 of 205
Bognet v. Secretary Commonwealth of Pennsylvania, --- F.3d ---- (2020)
2020 WL 6686120

of the election," the Court vacated the injunction. *Id.* at 5, 127 S.Ct. 5.

The principle announced in *Purcell* has very recently been reiterated. First, in *Republican National Committee*, the Supreme Court stayed on the eve of the April 7 Wisconsin primary a district court order that altered the State's voting rules by extending certain deadlines applicable to absentee ballots. 140 S. Ct. at 1206. The Court noted that it was adhering to *Purcell* and had "repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Id.* at 1207 (citing *Purcell*, 549 U.S. at 1, 127 S.Ct. 5). And just over two weeks ago, the Court denied an application to vacate a stay of a district court order that made similar changes to Wisconsin's election rules six weeks before Election Day. *Democratic Nat'l Comm. v. Wis. State Legislature*, No. 20A66, 592 U.S. ——, —— S.Ct. ——, —— L.Ed.2d ——, 2020 WL 6275871 (Oct. 26, 2020) (denying application to vacate stay). Justice Kavanaugh explained that the injunction was improper for the "independent reason[ ]" that "the District Court changed Wisconsin's election rules too close to the election, in contravention of this Court's precedents." *Id.* at ——, 2020 WL 6275871 at *3 (Kavanaugh, J., concurring). *Purcell* and a string[20] of Supreme Court election-law decisions in 2020 "recognize a basic tenet of election law: When an election is close at hand, the rules of the road should be clear and settled." *Id.*

*\*18* The prevailing state election rule in Pennsylvania permitted voters to mail ballots up through 8:00 P.M. on Election Day so long as their ballots arrived by 5:00 P.M. on November 6. Whether that rule was wisely or properly put in place is not before us now. What matters for our purposes today is that Plaintiffs' challenge to it was not filed

until sufficiently close to the election to raise a reasonable concern in the District Court that more harm than good would come from an injunction changing the rule. In sum, the District Court's justifiable reliance on *Purcell* constitutes an "alternative and independent reason[ ]" for concluding that an "injunction was unwarranted" here. *Wis. State Legislature*, —— S.Ct. at ——, 2020 WL 6275871, at *3 (Kavanaugh, J., concurring).

## IV. Conclusion

We do not decide today whether the Deadline Extension or the Presumption of Timeliness are proper exercises of the Commonwealth of Pennsylvania's lawmaking authority, delegated by the U.S. Constitution, to regulate federal elections. Nor do we evaluate the policy wisdom of those two features of the Pennsylvania Supreme Court's ruling. We hold only that when voters cast their ballots under a state's facially lawful election rule and in accordance with instructions from the state's election officials, private citizens lack Article III standing to enjoin the counting of those ballots on the grounds that the source of the rule was the wrong state organ or that doing so dilutes their votes or constitutes differential treatment of voters in violation of the Equal Protection Clause. Further, and independent of our holding on standing, we hold that the District Court did not err in denying Plaintiffs' motion for injunctive relief out of concern for the settled expectations of voters and election officials. We will affirm the District Court's denial of Plaintiffs' emergency motion for a TRO or preliminary injunction.

## All Citations

--- F.3d ----, 2020 WL 6686120

## Footnotes

1    Second Letter from Phocion (April 1784), *reprinted in* 3 The Papers of Alexander Hamilton, 1782–1786, 530–58 (Harold C. Syrett ed., 1962).
2    Throughout this opinion, we refer to absentee voting and mail-in voting interchangeably.
3    The Free and Equal Elections Clause of the Pennsylvania Constitution provides: "Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." Pa. Const. art. 1, § 5.
4    Because we have received comprehensive briefing, and given the weighty public interest in a prompt ruling on the matter before us, we have elected to forgo oral argument.
5    Bognet seeks to represent Pennsylvania in Congress, but even if he somehow had a relationship to *state* lawmaking processes, he would lack personal standing to sue for redress of the alleged "institutional injury (the diminution of legislative power), which necessarily damage[d] all Members of [the legislature] ... equally." *Raines v. Byrd*, 521 U.S. 811, 821, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) (plaintiffs were six out of 535 members of Congress); *see also Corman*, 287 F. Supp. 3d at 568–69 (concluding that "two of 253 members of the Pennsylvania General Assembly" lacked standing to

6      sue under Elections Clause for alleged "deprivation of 'their legislative authority to apportion congressional districts' ");
*accord Va. House of Delegates v. Bethune-Hill*, ---- U.S. ----, 139 S. Ct. 1945, 1953, 204 L.Ed.2d 305 (2019).

6      Our conclusion departs from the recent decision of an Eighth Circuit panel which, over a dissent, concluded that candidates for the position of presidential elector had standing under *Bond* to challenge a Minnesota state-court consent decree that effectively extended the receipt deadline for mailed ballots. *See Carson v. Simon*, No. 20-3139, ---- F.3d ----, ----, 2020 WL 6335967, at *5 (8th Cir. Oct. 29, 2020). The *Carson* court appears to have cited language from *Bond* without considering the context—specifically, the Tenth Amendment and the reserved police powers—in which the U.S. Supreme Court employed that language. There is no precedent for expanding *Bond* beyond this context, and the *Carson* court cited none.

7      The alleged injury specific to Bognet does not implicate the Qualifications Clause or exclusion from Congress, *Powell v. McCormack*, 395 U.S. 486, 550, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), nor the standing of members of Congress to bring actions alleging separation-of-powers violations. *Moore v. U.S. House of Reps.*, 733 F.2d 946, 959 (D.C. Cir. 1984) (Scalia, J., concurring).

8      Only the Voter Plaintiffs bring the Equal Protection count in the Complaint; Bognet did not join that count.

9      We exclude the Presumption of Timeliness from our concreteness analysis. Plaintiffs allege that the federal statutes providing for a uniform election day, 3 U.S.C. § 1 and 2 U.S.C. § 7, conflict with, and thus displace, any state law that would authorize voting after Election Day. They claim that the Presumption permits, theoretically at least, some voters whose ballots lack a legible postmark to vote *after* Election Day, in violation of these federal statutes. So unlike the Deadline Extension, Plaintiffs contend that the General Assembly could not enact the Presumption consistent with the Constitution. This conceptualization of injury is thus more properly characterized as "concrete" than is the purported Deadline Extension injury attributable to voters having their timely mailed ballots received and counted after Election Day. That said, we express no opinion about whether the Voter Plaintiffs have, in fact, alleged such a concrete injury for standing purposes.

10    *See* AS § 15.20.081(e) & (h) (Alaska – 10 days after Election Day if postmarked on or before Election Day); West's Ann. Cal. Elec. Code § 3020(b) (California – three days after Election Day if postmarked on or before Election Day); DC ST § 1-1001.05(a)(10A) (District of Columbia – seven days after the election if postmarked on or before Election Day); 10 ILCS 5/19-8, 5/18A-15 (Illinois – 14 days after the election if postmarked on or before Election Day); K.S.A. 25-1132 (Kansas – three days after the election if postmarked before the close of polls on Election Day); MD Code, Elec. Law, § 9-505 (Maryland – the second Friday after Election Day if postmarked on or before Election Day); Miss. Code Ann. § 23-15-637 (Mississippi – five business days after Election Day if postmarked on or before Election Day); NV Rev Stat § 293.317 (Nevada – by 5:00 P.M. on the seventh day after Election Day if postmarked by Election Day, and ballots with unclear postmarks must be received by 5:00 P.M. on the third day after Election Day); N.J.S.A. 19:63-22 (New Jersey – 48 hours after polls close if postmarked on or before Election Day); McKinney's Elec. Law § 8-412 (New York – seven days after the election for mailed ballots postmarked on or before Election Day); N.C. Gen. Stat. § 163-231(b)(2) and *Wise v. Circosta*, 978 F.3d 93, 96 (4th Cir. 2020) (North Carolina – recognizing extension from three to nine days after the election the deadline for mail ballots postmarked on or before Election Day); Texas Elec. Code § 86.007 (the day after the election by 5:00 P.M. if postmarked on or before Election Day); Va. Code 24.2-709 (Virginia – by noon on the third day after the election if postmarked on or before Election Day); West's RCWA 29A.40.091 (Washington – no receipt deadline for ballots postmarked on or before Election Day); W. Va. Code, §§ 3-3-5, 3-5-17 (West Virginia – five days after the election if postmarked on or before Election Day); *see also* Iowa Code § 53.17(2) (by noon the Monday following the election if postmarked by the day before Election Day); NDCC 16.1-07-09 (North Dakota – before the canvass if postmarked the day before Election Day); R.C. § 3509.05 (Ohio – 10 days after the election if postmarked by the day before Election Day); Utah Code Ann. § 20A-3a-204 (seven to 14 days after the election if postmarked the day before the election).

11    *Bush v. Gore* does not require us to perform an Equal Protection Clause analysis of Pennsylvania election law as interpreted by the Pennsylvania Supreme Court. *See* 531 U.S. at 109, 121 S.Ct. 525 ("Our consideration is limited to the present circumstances ...."); *id.* at 139–40, 121 S.Ct. 525 (Ginsburg, J., dissenting) (discussing "[r]are[ ] occasions when Supreme Court rejected state supreme court's interpretation of state law, one of which was in 1813 and others occurred during Civil Rights Movement—and none decided federal equal protection issues).

12    In their complaint, the Voter Plaintiffs alleged that they are all "residents of Somerset County, a county where voters are requesting absentee ballots at a rate *far less* than the state average" and thus, somehow, the Voter Plaintiffs' votes "will be diluted to a greater degree than other voters." Compl. ¶ 71 (emphasis in original). Plaintiffs continue to advance this argument on appeal in support of standing, and it additionally suffers from being a conjectural or hypothetical injury under

Bognet v. Secretary Commonwealth of Pennsylvania, --- F.3d ---- (2020)

2020 WL 6686120

the framework discussed *infra* Section III.A.2.b.ii. It is purely hypothetical that counties where a greater percentage of voters request absentee ballots will more frequently have those ballots received after Election Day.

13    Plaintiffs also rely on *FEC v. Akins*, 524 U.S. 11, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998), for the proposition that a widespread injury—such as a mass tort injury or an injury "where large numbers of voters suffer interference with voting rights conferred by law"—does not become a "generalized grievance" just because many share it. *Id.* at 24–25, 118 S.Ct. 1777. That's true as far as it goes. But the Voter Plaintiffs have not alleged an injury like that at issue in *Akins*. There, the plaintiffs' claimed injury was their inability to obtain information they alleged was required to be disclosed under the Federal Election Campaign Act. *Id.* at 21, 118 S.Ct. 1777. The plaintiffs alleged a statutory right to obtain information and that the same information was being withheld. Here, the Voter Plaintiffs' alleged injury is to their right under the Equal Protection Clause not to have their votes "diluted," but the Voter Plaintiffs have not alleged that their votes are less influential than any other vote.

14    The District Court did not find that the Deadline Extension created such a preferred class.

15    Moreover, we cannot overlook that the mail-in voters potentially suffer a *disadvantage* relative to the in-person voters. Whereas in-person ballots that are timely cast will count, timely cast mail-in ballots may not count because, given mail delivery rates, they may not be received by 5:00 P.M. on November 6.

16    *See* Defendant-Appellee's Br. 30 (citing 39 C.F.R. § 211.2(a)(2); Postal Operations Manual at 443.3).

17    *See* Pa. Democratic Party, 238 A.3d at 364 (noting "current two to five day delivery expectation of the USPS").

18    Indeed, the conduct required of a voter to effectuate such a scheme may be punishable as a crime under Pennsylvania statutes that criminalize forging or "falsely mak[ing] the official endorsement on any ballot," 25 Pa. Stat. & Cons. Stat. § 3517 (punishable by up to two years' imprisonment); "willfully disobey[ing] any lawful instruction or order of any county board of elections," *id.* § 3501 (punishable by up to one year's imprisonment); or voting twice in one election, *id.* § 3535 (punishable by up to seven years' imprisonment).

19    As of the morning of November 12, Secretary Boockvar estimates that 655 of the 9383 ballots received between 8:00 P.M. on Election Day and 5:00 P.M. on November 6 lack a legible postmark. *See* Dkt. No. 59. That estimate of 655 ballots does not include totals from five of Pennsylvania's 67 counties: Lehigh, Northumberland, Tioga, Warren, and Wayne. *Id.* The 9383 ballots received, however, account for all of Pennsylvania's counties. *Id.*

20    *See, e.g.*, *Andino v. Middleton*, No. 20A55, 592 U.S. ——, —— S.Ct. ——, ——, —— L.Ed.2d ——, 2020 WL 5887393, at *1 (Oct. 5, 2020) (Kavanaugh, J., concurring) ("By enjoining South Carolina's witness requirement shortly before the election, the District Court defied [the *Purcell*] principle and this Court's precedents." (citations omitted)); *Merrill v. People First of Ala.*, No. 19A1063, 591 U.S. ——, —— S.Ct. ——, ——, —— L.Ed.2d ——, 2020 WL 3604049 (Mem.), at *1 (July 2, 2020); *Republican Nat'l Comm.*, 140 S. Ct. at 1207; *see also Democratic Nat'l Comm. v. Bostelmann*, 977 F.3d 639, 641 (7th Cir. 2020) (per curiam) (holding that injunction issued six weeks before election violated *Purcell*); *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1283 (11th Cir. Oct. 2, 2020) ("[W]e are not on the eve of the election—we are in the middle of it, with absentee ballots already printed and mailed. An injunction here would thus violate *Purcell*'s well-known caution against federal courts mandating new election rules—especially at the last minute." (citing *Purcell*, 549 U.S. at 4–5, 127 S.Ct. 5)).

---

**End of Document**                               © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2

2020 WL 6737895
Only the Westlaw citation is currently available.
Supreme Court of Pennsylvania.

IN RE: CANVASSING OBSERVATION
APPEAL OF: CITY OF PHILADELPHIA
BOARD OF ELECTIONS

No. 30 EAP 2020
|
SUBMITTED: November 13, 2020
|
DECIDED: November 17, 2020

Appeal from the November 5, 2020, Single-Judge Order
of the Honorable Christine Fizzano Cannon of the
Commonwealth Court at No. 1094 CD 2020, reversing the
November 3, 2020 Order of the Honorable Stella Tsai of the
Court of Common Pleas of Philadelphia County at November
Term 2020, No. 07003

SAYLOR, C.J., BAER, TODD, DONOHUE,
DOUGHERTY, WECHT, MUNDY, JJ.

**OPINION**

JUSTICE TODD

**\*1** This appeal arises out of the processing of mail-in and
absentee ballots received from voters in Philadelphia County
in the November 3, 2020 General Election. Specifically,
Appellee Donald J. Trump, Inc. (the "Campaign") orally
moved for the Philadelphia County Court of Common Pleas
to give its representative more proximate access to the
canvassing activities being carried out by Appellant, the
Philadelphia County Board of Elections (the "Board"). The
trial court denied relief, the Commonwealth Court reversed,
and the Board now appeals that order. For the following
reasons, we vacate the order of the Commonwealth Court, and
reinstate the trial court's order denying the Campaign relief.

**I. Background**

This dispute concerns the Board's pre-canvassing and
canvassing of mail-in and absentee ballots at the Philadelphia
Convention Center. According to the Board, in advance of

the election, it arranged the workspace of its employees
at this facility in a manner that it considered best suitable
for the processing and maintenance of the security of the
estimated 350,000 absentee and mail-in ballots it anticipated
receiving, while ensuring that the social distancing protocols
for COVID-19 promulgated by the federal Centers for
Disease Control were maintained and the voter's privacy in
his or her ballot was protected, and providing a candidate
or campaign representative with the ability to observe the
entirety of the pre-canvassing and canvassing process. N.T.
Hearing, 11/3/20, at 10-11.[1]

Under the Board's authority, a designated area of the
Convention Center was divided into discrete sections,
each devoted to various aspects of the pre-canvassing and
canvassing process. *Id.* at 22. Each section contained three
rows of fifteen folding tables with each table separated by
5-6 feet. *Id.* at 24. In the first section, workers examined the
back of the ballot return envelopes and then, based on that
examination, sorted the envelopes into different trays. *Id.* at
27. In the next section, ballots in their secrecy envelopes were
first extracted from the ballot return envelope by machine, and
then, while encased in their secrecy envelopes, were sent on to
another machine which sliced open the secrecy envelope and
removed the ballot from within. *Id.* at 28. During this phase,
ballots without secrecy envelopes – so-called "naked" ballots
– were segregated and placed into a separate tray.[2] *Id.* at 30.

Pursuant to the Election Code, designated observers for
campaigns or candidates were permitted to physically enter
the Convention Center hall and observe the entirety of this
process; however, the Board erected a waist-high security
fence to separate the observers from the above-described
workspace of Board employees. The fence, behind which
observers could freely move, was separated from the first
row of employees' desks in each section by a distance
of approximately 15-18 feet. *Id.* at 23. Board employees
used this "buffer" area between the security fence and their
workspace to enter or leave their work areas for their shifts,
or to take scheduled breaks. *Id.* at 30-31.

**\*2** On the morning of November 3, 2020 – Election Day
– the Campaign sent a designated representative, Attorney
Jeremy Mercer, to observe the pre-canvassing and canvassing
process. Attorney Mercer entered the Convention Center at
7:00 a.m. and remained there throughout the entire day. He
testified that he was able to move freely along the length
of the security fence and observe the employees engaged in
their pre-canvassing and canvassing activities from various

vantage points. *Id.* at 21. He related that, while he could see the Board employees in the first section of the workspace examining the back of the ballot return envelopes, from his position, he could not read the actual declarations on the ballot envelopes. *Id.* at 27. Regarding the ballot extraction activities in the next section, Attorney Mercer testified that he could see employees removing the ballots contained in secrecy envelopes from the return envelopes, and that, when "watching closely," he could discern if any return envelopes contained naked ballots. *Id.* at 30. However, he stated that he could not see whether there were any markings on the security envelopes themselves.[3] *Id.* at 38.

At 7:45 a.m. on Election Day, the Campaign filed a suit in the Philadelphia Court of Common Pleas challenging the location where observers such as Attorney Mercer could watch the process. The Campaign subsequently withdrew that action, without prejudice, but then refiled it at 9:45 p.m. that night. The trial court subsequently conducted an evidentiary hearing that same night utilizing the "Zoom" videoconference tool, which enabled Attorney Mercer to testify remotely.

After hearing Attorney Mercer's testimony and argument from the Campaign and the Board, the trial court rejected the Campaign's primary argument, raised orally during the hearing, that Section 3146.8(b) of the Election Code – which allows designated watchers or observers of a candidate "to be present when the envelopes containing official absentee ballots and mail-in ballots are opened and when such ballots are counted and recorded," 25 P.S. § 3146.8(b) – requires that the observers have the opportunity to "meaningfully ... see the process." N.T. Hearing, 11/3/20, at 49. In rejecting the argument, the trial court noted that Section 3146.8 contained no language mandating "meaningful observation"; rather, the court interpreted the section as requiring only that the observer be allowed to be "present" at the opening, counting, and recording of the absentee or mail-in ballots. Trial Court Opinion, 11/4/20, at 3-4.

The court observed that Attorney Mercer's testimony that he could not see individual markings on the secrecy envelopes, or determine whether the signature on all the ballot envelopes was properly completed, did not establish a violation of Section 3416.8, inasmuch as that statute "provides for no further specific activities for the watchers to observe, and no activities for the watchers to do other than simply 'be present'." *Id.* at 4. The court opined that, under this section, "[w]atchers are not directed to audit ballots or to verify signatures, to verify voter address[es], or to do anything else

that would require a watcher to see the writing or markings on the outside of either envelope, including challenging the ballots or ballot signatures." *Id.* Consequently, that same day, the trial court denied the Campaign's request that the Board modify the work area to allow for closer observation of the ongoing ballot canvassing. The court indicated, however, that it was not discouraging the Board from providing an additional corridor for observers along the side of the tables to watch the proceedings, provided COVID-19 protocols and voter information secrecy protections were maintained.[4] Trial Court Order, 11/3/20.

**\*3** The Campaign immediately appealed to the Commonwealth Court, and the matter was assigned to the Honorable Christine Fizzano Cannon.[5] Judge Fizzano Cannon held a status conference on the night of November 4, 2020, and issued an order on the morning of November 5, 2020, which reversed the trial court. She directed the trial court to enter an order by 10:30 a.m. to require "all candidates, watchers, or candidate representatives be permitted to be present for the canvassing process pursuant to 25 P.S. § 2650 and/or 25 P.S. § 3146.8 and to be permitted to observe all aspects of the canvassing process within 6 feet, while adhering to all COVID-19 protocols." Commonwealth Court Order, 11/5/20.

In her opinion, filed later that day, Judge Fizzano Cannon focused her analysis on what she considered to be the relevant governing provisions of the Election Code, Section 3146.8(b) and Section 3146.8(g)(1.1). Section 3146.8(b) provides:

> Watchers shall be permitted to be *present* when the envelopes containing official absentee ballots and mail-in ballots are opened and when such ballots are counted and recorded.

25 P.S. § 3146.8(b) (emphasis added). Section 3146.8(g)(1.1) states, in relevant part:

> The county board of elections shall meet no earlier than seven o'clock A.M. on election day to pre-canvass all ballots received prior to the meeting ... One authorized representative of each candidate in an election and one representative from each political party shall be permitted to *remain in the room* in which the absentee ballots and mail-in ballots are pre-canvassed.

25 P.S. § 3146.8(g)(1.1) (emphasis added).

Judge Fizzano Cannon noted that the parties offered competing interpretations of the phrases "present," and "to

remain in the room," with the Board arguing that these terms require only that the observer be physically present in the room where the ballot counting occurs; whereas the Campaign contended that these phrases required the observer to be able to *observe* "meaningfully," in addition to being physically present. Judge Fizzano Cannon deemed each of these interpretations to be reasonable, and, hence, concluded the statutory language was ambiguous.

Because these provisions of the Election Code had as their purpose "maintaining the integrity of the elective process in the Commonwealth," the judge determined that the language in question "imports upon ... candidates' representatives at least a modicum of observational leeway to ascertain sufficient details of the canvassing process for the purpose of intelligently assessing and/or reporting to the candidate represented the details of the canvassing process." Commonwealth Court Opinion, 11/5/20, at 5. In her view, in order for representatives to fulfill their reporting duty to their candidate, they are required to "have the opportunity to observe the processes upon which they are to report," *id.*, and so mere physical presence of the observers was insufficient to guarantee this "meaningful observation," *id.* at 6.

Judge Fizzano Cannon then found that, based on Attorney Mercer's testimony that, while he was physically present in the room where the pre-canvassing and canvassing processes were occurring, the distance from which he was observing those processes, as well as the physical barriers in the room, prevented him from observing the ballots being processed, the ballot envelopes, the secrecy envelopes, and any markings on the secrecy envelopes, depriving him of the ability to actually observe those processes "in any meaningful way." *Id.* at 8. Consequently, the judge concluded that the trial court erred as a matter of law in determining that the Board had complied with the Election Code. The Board filed an emergency petition for allowance of appeal with our Court on the morning of November 5, 2020.

**\*4** While this petition was pending, that same day, the Campaign filed a one-page "Complaint and Motion for Emergency Injunction" in the United States District Court for the Eastern District of Pennsylvania alleging, *inter alia,* that, in the aftermath of the Commonwealth Court's order in the instant case, the Board was violating the Election Code by "refusing to allow any representatives and poll watchers for President Trump and the Republican Party" to observe the counting of the ballots, and that the "counting continues with no Republicans present." *See* Complaint and Motion

for Emergency Injunction in *Donald J. Trump For President, Inc. v. Philadelphia County Board of Elections,* No. 20-5533 (E.D. Pa. filed Nov. 5 2020) (hereinafter "*Trump*") (attached as Exhibit 2 to Board's Brief), at ¶¶ 4 & 5.

That case was assigned to District Court Judge Paul S. Diamond, who held a hearing on the request for an emergency injunction at 5:30 p.m. on November 5, 2020. During the hearing, counsel for the Campaign stated that the Campaign had "a nonzero number of people in the room." N.T. Hearing in *Trump*, 11/5/20 at 10. Judge Diamond, seeking clarification of the meaning of the term "nonzero," asked counsel for the Campaign directly: "as a member of the bar of this Court, are people representing the Donald J. Trump for President [campaign], representing the plaintiff in that room?" *Id.* at 11. Counsel replied "yes." *Id.*

Because the District Court recognized that the petition for allowance of appeal filed by the Board was pending before our Court, and that a decision from our Court on the proper interpretation of the governing provisions of the Election Code would obviate the need for it to rule on a question of state law, the District Court encouraged the parties to reach an interim accommodation. Thus, the Board and the Campaign reached an agreement, which was entered on the record in open court before Judge Diamond, under which the crowd control barrier, which the Board had moved to within six feet of the first row of tables in its employees' work area as the result of the Commonwealth Court decision, would remain in that position, and that all campaign observers would have equal access to positions behind that barrier to watch the canvassing process. *Id.* at 38-40. Judge Diamond deferred action on the merits of the underlying claims in the lawsuit, which remains pending.

Subsequently, on November 9, 2020, the Campaign filed yet another federal lawsuit, in the United States District Court of the Middle District of Pennsylvania, seeking to enjoin Pennsylvania from certifying the results of the November 3, 2020 General Election or, alternatively, to exclude from the certified results "the tabulation of absentee and mail-in and ballots for which [its] watchers were prevented from observing during the pre-canvass and canvass in the County Election Boards." Complaint for Declaratory and Injunctive Relief in *Donald J. Trump, Inc., et.al. v. Boockvar,* No. 20-CV-02078 (M.D. Pa. filed Nov. 9, 2020) (Exhibit 1 to Board's Brief), at 84. This matter was assigned to District Court Judge Matthew Brann who promptly issued an order setting an expedited schedule for the Campaign to file motions

for injunctive relief, and for the Board to file a responsive motion thereto as well as a motion to dismiss. Notably, however, on November 15, 2020, the Campaign filed an amended complaint, removing all counts which were based on canvassing access. *See* First Amended Complaint Verified Complaint for Declaratory and Injunctive Relief in *Donald J. Trump, Inc., et.al. v. Boockvar*, No. 20-CV-02078 (M.D. Pa. filed Nov. 15, 2020).

During the interim, on November 9, 2020, our Court granted the Board's emergency petition for allowance of appeal on the following issues:

**\*5** 1. Whether, as a matter of statutory construction pursuant to Pennsylvania law, the Commonwealth Court erred in reversing the trial court, which concluded that Petitioner City of Philadelphia Board of Elections' regulations regarding observer and representative access complied with applicable Election Code requirements.

2. Whether the issue raised in Petitioner's petition for allowance of appeal is moot.

3. If the issue raised in Petitioner's petition for allowance of appeal is moot, does there remain a substantial question that is capable of repetition yet likely to evade review, and, thus, fall within an exception to the mootness doctrine.

In our order, we directed the Prothonotary to establish an expedited briefing schedule; we also indicated that our grant order was not a stay of the Board's canvassing process, which is ongoing as of this writing.[6]

## II. Mootness

We begin by addressing whether the central legal issue in this matter – involving an interpretation of the provisions of the Election Code establishing campaign access requirements to ballot canvassing activities – is moot. *See Stuckley v. Zoning Hearing Board of Newtown Township*, 79 A.3d 510, 516 (Pa. 2013) (we will generally not address matters where there is no actual case or controversy between the parties). Both parties and Intervenor argue that this case is not moot because the Board continues to count ballots, and the Campaign continues to want its representatives to have maximal access to the canvassing process.

We conclude that, because ballots are still being canvassed by the Board at the time of this writing, the legal question

before us is not moot.[7] In this regard, we note that the interim agreement between the parties entered in the federal litigation being overseen by Judge Diamond did not purport to resolve this question, and, indeed, Judge Diamond expressly refrained from addressing it as he viewed it as purely a question of Pennsylvania law which could be definitively resolved only by our Court. We will, therefore, proceed to address the merits of the issue before us.

## III. Access under the Election Code

### A. Arguments of the Parties

The Board argues that the Election Code granted to it the express statutory authority "[t]o make and issue such rules, regulations and instructions, not inconsistent with law, as they may deem necessary for the guidance of ... elections officers and electors." Board Brief at 32 (quoting 25 P.S. § 2642(f)). Thus, it reasons that the access rules it established for ballot processing in Philadelphia County – which were based on its perceived need for protecting its workers' safety from COVID-19 and physical assault from those individuals who have contact with its workers; ensuring security of the ballots; efficiently processing large numbers of ballots; protecting the privacy of voters; and ensuring campaign access to the canvassing proceedings – are a valid exercise of its authority. The Board maintains that these rules can be invalidated by a court only if they are inconsistent with the Election Code.

**\*6** In determining whether its access rules are consistent with the Election Code, the Board contends that only two provisions of the Code are relevant: 25 P.S. § 3146.8(g) (1.1) (specifying that "[o]ne authorized representative of each candidate in an election and one representative from each political party shall be permitted to remain in the room in which the absentee ballots and mail-in ballots are pre-canvassed"), and Section 3146.8(g)(2) (providing that "[o]ne authorized representative of each candidate in an election and one representative from each political party shall be permitted to remain in the room in which the absentee ballots and mail-in ballots are canvassed.").

The Board rejects the relevance of Section 3146.8(b), given that it sets forth the access requirements for "watchers".[8] The Board characterizes this provision as vestigial in nature, reflecting the manner in which absentee ballots were handled prior to the 2006 and 2019 amendments to the Election

Code which, respectively, added Section 3146.8(g)(2) and Section 3146.8(g)(1.1). Prior to those amendments, absentee ballots received by a board of elections were taken to the electors' local polling places to be canvassed, and, thus, candidates' designated poll watchers were permitted by Section 3146.8(b) to remain in the room at the polling place while the absentee ballots were canvassed. According to the Board, Sections 3146.8(g)(1.1) and (2) established that all mail-in and absentee ballots would be pre-canvassed and canvassed at a central location designated by the board of elections; hence, poll watchers are not granted access to these proceedings. Consequently, in the Board's view, the rights of the Campaign's designated representative in this matter are delineated exclusively by Sections 3146.8(g)(1.1) and (2).

The Board contends that these statutory provisions should be construed in accordance with the plain meaning of their terms, *i.e.*, requiring only that a candidate's authorized representative be permitted to remain in the room while the ballots are pre-canvassed or canvassed. The Board notes that the Campaign's representative was, in fact, permitted to be in the room at the Convention Center where the ballots were being pre-canvassed and canvassed at all times during this process, just as these provisions require. Relatedly, the Board contends that, even if Section 3146.8(b) of the Election Code were deemed to be applicable herein, its requirements were met as well, given that the Campaign's representative was present at all times when absentee and mail-in ballots were opened, counted, and recorded.

Moreover, the Board emphasizes that, contrary to the Commonwealth Court's conclusion, the evidence of record indicated that Attorney Mercer could see every portion of the pre-canvassing and canvassing process and, as a result, could confirm that the only ballots which were scanned and tabulated were those which had been removed from secrecy envelopes, and that the outer ballot envelope had been inspected for sufficiency and then sorted.

The Board points out that Attorney Mercer's complaints about being unable to read the actual declarations on the ballot envelopes, or his inability to see whether the secrecy envelopes contained improper markings, were relevant only to his desire to determine if the ballots met the requirements of the Election Code. However, the Board stresses that our Court very recently, in *In re: November 3, 2020 General Election*, ___ A.3d.____, 2020 WL 6252803 (Pa. Oct. 23, 2020), interpreted the Election Code as precluding timeof-canvassing challenges by campaign representatives; hence,

the Board maintains that a candidate's representative has no need for the information about which Attorney Mercer complains, as the representative cannot lodge a challenge based on it. Most importantly, however, from the Board's perspective, there is nothing in the statutory language of Sections 3146.8(g)(1.1) and (2) which grants a candidate's representative an unqualified right of access to that kind of information during the pre-canvassing and canvassing process.[9]

**\*7** The Campaign responds that "the plain meaning and purpose of the statutes at issue is to provide the public the opportunity to observe and vet the canvassing and tabulation of the vote." Campaign Brief at 17. The Campaign reasons that, as the Election Code gives a candidate's representative the right to be "present" and to "remain in the room" during the canvassing of absentee and mail-in ballots, citing 25 P.S. § 2650 ("Every candidate shall be entitled to be *present* in person or by attorney in fact duly authorized, and to participate in any proceeding before any county board whenever any matters which may affect his candidacy are being heard, including any computation and canvassing of returns of any primary or election or recount of ballots or recanvass of voting machines affecting his candidacy." (emphasis added)); *id.* § 3146.8(b) (allowing watchers to "be *present* when the envelopes containing official absentee ballots and mail-in ballots are opened and when such ballots are counted and recorded" (emphasis added)); *id.* § 3146.8(g)(2) (providing that an "authorized representative of each candidate in an election and one representative from each political party shall be permitted to *remain in the room* in which the absentee ballots and mail-in ballots are canvassed" (emphasis added)), these terms should be broadly interpreted consistent with their overall purpose of allowing public observation of the vote and the counting thereof. The Campaign rejects the Board's interpretation as "a hyper-technical focus on the words themselves," that disregards this purpose. Campaign Brief at 19.

The Campaign argues that, under the Board's interpretation, merely being in the far end of a room like the Convention Center, which is as large as a football field, would be sufficient to comport with these requirements. This, in the Campaign's view, "defies logic and reasonableness." *Id.* at 20. The Campaign contends that the Board's setup – imposing a barrier and having some tables in the area over a hundred feet away from the edge of the security fence – effectively deprived its representative of the ability to be truly present, and effectively eliminates the representative's

ability to perform his or her role of ensuring openness and transparency in the electoral process.

The Campaign denies that it was seeking the right to challenge mail-in or absentee ballots at the time of canvassing; rather, it claims that it was merely seeking the right to observe "in a meaningful way" the Board's conduct of the electoral process so that it could "challenge that process through appropriate litigation." Campaign Brief at 22 (emphasis omitted). The Campaign asserts its ability to do so is vital given that these canvassing activities have a high prospect of human error.

**B. Analysis**

As this issue presents a question of statutory interpretation under Pennsylvania law, our standard of review is *de novo*, and our scope of review is plenary. *Danganan v. Guardian Protection Services*, 645 Pa. 181, 179 A.3d 9, 15 (2018). Our objective is, therefore, to ascertain and effectuate the intent of the General Assembly. *Id.*; *see also* 1 Pa.C.S. § 1921(a). It is well established that "[t]he best indication of legislative intent is the plain language of the statute." *Crown Castle NG East v. Pennsylvania Public Utility Commission*, 234 A.3d 665, 674 (Pa. 2020). In ascertaining the plain meaning of statutory language, we consider it in context and give words and phrases their "common and approved usage." *Commonwealth by Shapiro v. Golden Gate National Senior Care*, 194 A.3d 1010, 1027-28 (Pa. 2017). When the words of a statute are free and clear of all ambiguity, they are the best indicator of legislative intent; hence, in such circumstances, "we cannot disregard the letter of the statute under the pretext of pursuing its spirit." *Fletcher v. Pennsylvania Property & Casualty Insurance Guarantee Association*, 603 Pa. 452, 985 A.2d 678, 684 (2009) (citing 1 Pa.C.S. § 1921(b)). Consistent with these principles, when interpreting a statute "we must listen attentively to what the statute says, but also to what it does not say." *Discovery Charter School v. School District of Philadelphia*, 166 A.3d 304, 321 (Pa. 2017). Moreover, regarding the factual findings of the trial court, we must defer to those findings if they are supported by the evidence. *Gentex Corp. v. WCAB (Morack)*, 23 A.3d 528, 534 (Pa. 2011); *Generette v. Donegal Mutual Insurance Company*, 957 A.2d 1180, 1189 (Pa. 2008).

As a threshold matter, given the specific issue in this case — the degree of access required by the Election Code for an "authorized representative" of a candidate to the pre-canvassing and canvassing proceedings of an election board

— we regard Sections 3146.8(g)(1.1) and (2) of the Code to be the governing statutory provisions, as they directly set forth the rights of such individuals. Section 2650, offered by the Campaign, by its plain terms is inapplicable, as we are addressing the right of access of a campaign's representative to canvassing proceedings, not a candidate or his "attorney in fact". Section 3146.8(b) is likewise not controlling, given that it applies only to the right of "watchers" to be present while ballots are canvassed. The Election Code contains specific certification requirements for an individual to be appointed as a "watcher," *see* 25 P.S. § 2687 ("Appointment of watchers"), and there is no evidence of record establishing that Attorney Mercer met these requirements, and, critically, he did not identify himself as a watcher, but rather as "one of the representatives designated by the Trump campaign ... to observe the pre-canvass." N.T. Hearing, 11/3/20, at 20-21.

**\*8** As recited above, Section 3146.8(g)(1.1) requires only that an authorized representative "be permitted to *remain in the room* in which the absentee ballots and mail-in ballots are pre-canvassed," 25 P.S. § 3146.8(g)(1.1) (emphasis added), and Section 3146.8(g)(2) likewise mandates merely that an authorized representative "be permitted to *remain in the room* in which the absentee ballots and mail-in ballots are canvassed." 25 P.S. § 3146.8(g)(2) (emphasis added). While this language contemplates an opportunity to broadly observe the mechanics of the canvassing process, we note that these provisions do not set a minimum distance between authorized representatives and canvassing activities occurring while they "remain in the room." The General Assembly, had it so desired, could have easily established such parameters; however, it did not. It would be improper for this Court to judicially rewrite the statute by imposing distance requirements where the legislature has, in the exercise of its policy judgment, seen fit not to do so. *See Sivick v. State Ethics Commission*, ___ A.3d ___. 2020 WL 5823822, at \*10 (Pa. filed Oct. 1, 2020) ("It is axiomatic that we may not add statutory language where we find the extant language somehow lacking.").

Rather, we deem the absence of proximity parameters to reflect the legislature's deliberate choice to leave such matters to the informed discretion of county boards of elections, who are empowered by Section 2642(f) of the Election Code "[t]o make and issue such rules, regulations and instructions, not inconsistent with law, as they may deem necessary for the guidance of ... elections officers." 25 P.S. § 2642(f).

In the case at bar, the Board promulgated regulations governing the locations in which authorized representatives were permitted to stand and move about while observing the pre-canvassing and canvassing process. The Board's averments that it fashioned these rules based on its careful consideration of how it could best protect the security and privacy of voters' ballots, as well as safeguard its employees and others who would be present during a pandemic for the pre-canvassing and canvassing process, while, at the same time, ensuring that the ballots would be counted in the most expeditious manner possible, were undisputed by the Campaign. We discern no basis for the Commonwealth Court to have invalidated these rules and impose arbitrary distance requirements.

Significantly, as to any opportunity to observe the mechanics of the canvassing process, the evidence of record, provided through the Campaign's own witness, Attorney Mercer, whom the trial court deemed to be credible, indicates that the Board's rules regarding where campaign representatives could remain in the room to view the pre-canvassing and canvassing process did not deprive Attorney Mercer of the ability "to actually observe the ... process in any meaningful way," as the Commonwealth Court concluded, Commonwealth Court Opinion, 11/5/20, at 8, and the Campaign presently argues. According to Attorney Mercer's candid testimony, which the trial court accepted as credible, from his vantage point, he could view the entirety of the pre-canvassing and canvassing process. Clearly, then, Attorney Mercer had the opportunity to observe the mechanics of the canvassing process. Specifically, Attorney Mercer witnessed Board employees inspecting the back of ballot envelopes containing the voter's declaration, before sending them on for processing; witnessed ballots being removed from their secrecy envelopes, and naked ballots which had been delivered to the Board without a secrecy envelope being segregated from ballots which arrived within such envelopes; saw that the ballot processing methods utilized by the Board were not destroying the ballot envelopes containing the voter's declaration; and perceived that the ballot secrecy envelopes were being preserved during their processing. See N.T. Hearing, 11/3/20, at 20-21, 27, 30, 38; Trial Court Order, 11/3/20 ("The [Campaign's] witness provided copious testimony as to his ability to observe the opening and sorting of ballots."). Although Attorney Mercer related that he could not view the actual declarations on the ballot envelopes, nor examine individual secrecy envelopes for improper markings, as the trial court properly determined, this information would only be necessary if he were making challenges to individual ballots during the pre-canvassing

and canvassing process, which appeared to be his primary motivation in seeking such information. See id. at 37-38; Trial Court Order, 11/3/20 ("His concerns pertained to his inability to observe the writing on the outside of the ballots. Given that observers are directed only to observe and not to audit ballots, we conclude, based on the witness's testimony, that the Board of Elections has complied with the observation requirements under 25 P.S. [§] 3146.8."). As discussed above, such challenges are not permissible under the Election Code. Thus, as found by the trial court, Attorney Mercer was able to appropriately observe that the Board's employees were performing their duties under the Election Code.

**\*9** In sum, we conclude the Board did not act contrary to law in fashioning its regulations governing the positioning of candidate representatives during the pre-canvassing and canvassing process, as the Election Code does not specify minimum distance parameters for the location of such representatives. Critically, we find the Board's regulations as applied herein were reasonable in that they allowed candidate representatives to observe the Board conducting its activities as prescribed under the Election Code. Accordingly, we determine the Commonwealth Court's order was erroneous. Thus, we vacate that order, and reinstate the trial court's order.

Jurisdiction relinquished.

Justices Baer, Donohue, Dougherty and Wecht join the opinion.

Chief Justice Saylor files a dissenting opinion in which Justice Mundy joins.

Justice Mundy files a dissenting opinion.

CHIEF JUSTICE SAYLOR, dissenting
The Commonwealth Court reasonably directed election officials in Philadelphia to move restrictive barriers in the Convention Center closer to the ballot-canvassing operations, which had been staged up to thirty-five yards from the areas to which the statutorily-authorized candidate representatives were confined. Under the Commonwealth Court's order, these representatives could then observe whether ballots were being counted lawfully to the best of their ability, consistent with health and safety restrictions. The record -- as well as publicly-available video recordings from the Convention Center -- amply demonstrate that this simply wasn't the case previously.

The canvassing has now proceeded to near conclusion under an ensuing agreement among the parties associated with federal litigation. In my judgment, the matter is therefore moot -- or at least moot enough -- so that this Court's discretionary intervention was and is not required. Moreover, the Legislature already is signaling that there will be an intense after-action review of the no-excuse mail-in voting regime, which is in its infancy in Pennsylvania. Accordingly, I doubt that the Court's present ruling, relative to governance that is quite likely to be substantially refined, will be of any importance in the future.

I also note that, given the enormous scale of canvassing activities and the historical balkanization associated with the administration of the election franchise at the county-and-district levels across the Commonwealth, there have been, and will always be, some localized irregularities. This is why courts are open throughout the election cycle, as here, to remedy these just as quickly as possible. It is also one of the reasons why we have a Commonwealth Court, with expertise in election matters, and organized to act expeditiously via single-judge consideration.

Finally, short of demonstrated fraud, the notion that presumptively valid ballots cast by the Pennsylvania electorate would be disregarded based on isolated procedural irregularities that have been redressed -- thus disenfranchising potentially thousands of voters -- is misguided. Accordingly, to the degree that there is a concern with protecting or legitimizing the will of the Philadelphians who cast their votes while candidate representatives were unnecessarily restrained at the Convention Center, I fail to see that there is any real issue.

Justice Mundy joins this dissenting opinion.

JUSTICE MUNDY, dissenting
Based on the particular circumstances surrounding this election, and the volume of mail-in ballots cast due to the current global pandemic, I disagree with the majority that the "issue before us is one which is capable of repetition but likely to evade review[.]" Majority Op. at 10, n. 7. As such, I join Chief Justice Saylor's dissenting opinion in full.

**\*10** In denying Appellee's initial motion, the trial court concluded "[Appellee]'s argument that the Board of Elections was not providing observers the opportunity to 'meaningfully observe' the canvassing of ballots" failed because "[Appellee] was unable to point to any statutory language or case law using the word 'meaningful' or elaborating on what constitutes 'meaningful observation.'" Trial Court Op. at 3. The Commonwealth Court reversed noting "the relegation of those representatives to a position where meaningful observation of the processes they are present to observe is a practical impossibility would be an absurd interpretation of the Election Code[.]" Cmwlth Ct. Op. at 6. I agree. The majority now vacates the Commonwealth Court's order and holds "[w]hile this language contemplates an opportunity to broadly observe the mechanics of the canvassing process, we note that these provisions do not set a minimum distance between authorized representatives and canvassing activities occurring while they 'remain in the room.'" Majority Op. at 17. In so doing, the majority seemingly endorses what the Commonwealth Court did in its order, provide an "opportunity to broadly observe[.]"

Appellee was merely requesting the ability to be able to observe the ballots in order to accurately relay compliance information. Appellees' Brief at 22 ("The Campaign simply wants the right to observe in a meaningful way that would allow the Campaign to determine whether the Board was following legal processing procedures, and if not, to challenge that *process* through appropriate litigation."). The Commonwealth Court's order, and the subsequent mutual agreement of the parties in the Federal action, did precisely that, and I would not disturb it. Accordingly, I dissent.

**All Citations**

--- A.3d ----, 2020 WL 6737895

Footnotes

1   Except as otherwise noted, such citations are to the notes of testimony of the hearing before the trial court.

2   Ballots not placed into the provided secrecy envelopes are invalid. *Pennsylvania Democratic Party v. Boockvar*, 238 A.3d 345, 380 (Pa. 2020).

3   The Election Code prohibits the security envelope from containing any "text, mark or symbol which reveals the identity of the elector, the elector's political affiliation or the elector's candidate preference." 25 P.S. § 3146.8(g)(4)(ii).

IN RE: CANVASSING OBSERVATION APPEAL OF: CITY OF..., --- A.3d ---- (2020)

4    It should be noted that the pre-canvassing and canvassing activities were also broadcast live on YouTube.

5    The Pennsylvania Democratic Party ("Intervenor") was granted leave to intervene in these proceedings by the Commonwealth Court.

6    Bryan Cutler, Speaker of the Pennsylvania House of Representatives, and Kerry Benninghoff, Majority Leader of the Pennsylvania House of Representatives, have filed a motion to intervene in this matter before our Court, as well as an accompanying brief. While we deny this motion, we, nevertheless, accept the accompanying brief as an *amicus* brief.

7    Even were the ballot counting process to conclude prior to our final disposition of this matter, we regard this issue before us as one which is capable of repetition but likely to evade review, and therefore subject to our review under this exception to the mootness doctrine. *See Reuther v. Delaware County Bureau of Elections*, 205 A.3d 302, 306 n.6 (Pa. 2019) ("Given the abbreviated time frame applicable to elections and the amount of time that it takes for litigation to reach this Court, this exception is particularly applicable when the question presented relates to an election dispute.").

8    Section 3146.8(b) provides:
> Watchers shall be permitted to be present when the envelopes containing official absentee ballots and mail-in ballots are opened and when such ballots are counted and recorded.

9    Intervenor's brief endorses the Board's contention that the Commonwealth Court erred in its interpretation of the relevant provisions of the Election Code, but it does not develop a separate argument to support this claim.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

3

2019 WL 2399720

2019 WL 2399720
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Aquiles CONDE-SHENERY, Plaintiff

v.

C.O. SNOW, et al., Defendants

Civil No. 3:18-cv-929
|
Signed June 4, 2019
|
Filed 06/05/2019

**Attorneys and Law Firms**

Aquiler Conde-Shenery, Albion, PA, pro se.

Gerard J. Geiger, Newman, Williams, Mishkin, Corveleyn,
Wolfe & Fareri, Stroudsburg, PA, for Defendants.

**MEMORANDUM**

Robert D. Mariani, United States District Judge

**I. Background**

*1  On May 2, 2018, Plaintiff Aquiles Conde-Shenery
("Plaintiff"), a pretrial detainee who, at all relevant times, was
housed at the Monroe County Correctional Facility, initiated
the above-captioned action pursuant to 42 U.S.C. § 1983.
(Doc. 1). Named as Defendants are Benjamin Eyer, Radian
Laylor, James Nunez, Robert Redmond, Nathanial Snow, and
Joseph Fortunato. (*Id.* at p. 4). On June 19, 2018, Defendants
Eyer, Laylor, Nunez, Redmond, and Snow filed an answer
to the complaint. (Doc. 20). On June 26, 2018, Defendant
Fortunato filed an answer to the complaint, (Doc. 27).

Presently pending before the Court is Plaintiffs motion for
leave to file an amended complaint. (Doc. 76). For the reasons
set forth below, the Court will grant Plaintiffs motion for leave
to amend.

**II. Discussion**

Pursuant to Federal Rule of Civil Procedure 15, a party may
amend its pleading once as a matter of course within 21 days
of serving it, or 21 days after the service of a responsive
pleading or motion under Rule 12(b), (e), or (f), whichever is

earlier. Fed. R. Civ. P. 15(a)(1). In all other circumstances, a
party may amend its pleading only with the opposing party's
written consent or with leave of court. Fed. R. Civ. P. 15(a)
(2). Rule 15 embodies a liberal approach to amendment and
specifies that "leave shall be freely given when justice so
requires." *Dole v. Arco Chemical Co.,* 921 F.2d 484, 486-87
(3d Cir. 1990); Fed. R. Civ. P. 15(a)(1)(2). "An applicant
seeking leave to amend a pleading has the burden of showing
that justice requires the amendment." *Katzenmoyer v. City
of Reading,* 158 F. Supp. 2d 491, 497 (E.D. Pa. 2001); *see
Garvin v. City of Phila.,* 354 F.3d 215, 222 (3d Cir. 2003)
(explaining that a plaintiff must show that the elements of
Rule 15(c) are met in order to change the party or the naming
of the party against whom claims are asserted). "The policy
favoring liberal amendment of pleadings is not, however,
unbounded." *Dole,* 921 F.2d at 487. Factors which may
weigh against amendment include "undue delay, bad faith or
dilatory motive on the part of the movant, repeated failure to
cure deficiencies by amendments previously allowed, undue
prejudice to the opposing party by virtue of allowance of the
amendment, futility of amendment, etc." *Foman v. Davis,* 371
U.S. 178, 182 (1962).

Plaintiff's original complaint was filed on May 2, 2018. (Doc.
1). Defendants filed their answers to the complaint on June 19,
2018 and June 26, 2018. (Docs. 20, 27). Plaintiffs motion for
leave to amend was not filed until February 20, 2019, (Doc.
76), clearly past the time period allotted for filing an amended
complaint as a matter of course. Plaintiff has not obtained the
opposing parties' written consent thus, at this point, Plaintiff
is required to request leave of court to file such a pleading.
*See* Fed. R. Civ. P. 15(a)(2).

As stated, a court need not grant leave to amend in the
presence of bad faith, undue delay, undue prejudice, or futility.
*See Diaz v. Palakovich,* 448 F. App'x 211, 215-16 (3d Cir.
2011) (citing *Lake v. Arnold,* 232 F.3d 360, 373 (3d Cir.
2000)); *see also Lorenz v. CSX Corp.,* 1 F.3d 1406, 1414
(3d Cir. 1993). "Delay becomes 'undue,' and thereby creates
grounds for the district court to refuse leave, when it places
an unwarranted burden on the court or when the plaintiff has
had previous opportunities to amend." *Bjorgung v. Whitetail
Resort, LP,* 550 F.3d 263, 266 (3d Cir. 2008) (citation
omitted). Even where there is no undue delay, prejudice to
the non-moving party remains the touchstone for the denial
of a motion to amend. *Arthur v. Maersk, Inc.,* 434 F.3d 196,
202 (3d Cir. 2006). The Court must consider whether granting
leave to amend the complaint "would result in additional
discovery, cost, and preparation to defend against new facts or

new theories." *Cureton v. Nat'l Collegiate Athletic Ass'n,* 252 F.3d 267, 273 (3d Cir. 2001). An amendment is futile when "the complaint, as amended, would fail to state a claim upon which relief could be granted." *Shane v. Fauver,* 213 F.3d 113, 115 (3d Cir. 2000).

**\*2** The Court finds that accepting Plaintiffs proposed amended complaint would not result in prejudice to the Defendants.[1] In the proposed amended complaint, Plaintiff names the six originally named Defendants and sets forth the same allegations against those Defendants. Plaintiff also seeks to add constitutional claims against five new Defendants, namely, Correctional Officer Kuebler, Stephanie Dullen, Barbara Forsness, PrimeCare, and Monroe City or Borough. The claims against these new Defendants relate to the same conduct in the original complaint, Plaintiff contends that he identified the new Defendants through discovery. Plaintiff did not exhibit any undue delay in filing his proposed amended complaint, nor did he act in bad faith or with improper motive. As such, Plaintiffs request for leave to file an amended complaint will be granted.

### III. Conclusion

Leave to amend should be liberally given "when justice so requires," Fed. R. Civ. P. 15(a)(2). Plaintiffs proposed amended complaint will be accepted as filed. A separate Order shall issue.

### All Citations

Slip Copy, 2019 WL 2399720

Footnotes

1    Defendants have not opposed nor moved to strike Plaintiff's proposed amended complaint.

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

4

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 40 of 205
Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)
2020 WL 5997680

2020 WL 5997680
Only the Westlaw citation is currently available.
United States District Court, W.D. Pennsylvania.

DONALD J. TRUMP FOR
PRESIDENT, INC., et al., Plaintiffs

v.

Kathy BOOCKVAR, in her capacity
as Secretary of the Commonwealth
of Pennsylvania, et al., Defendants.

No. 2:20-cv-966
|
Signed 10/10/2020

**Synopsis**
**Background:** President's reelection campaign, Republican National Committee, and Republican congressional candidates and electors filed suit against state and county election officials alleging federal and state constitutional violations stemming from Pennsylvania's implementation of mail-in voting plan for upcoming general election and its poll watcher residency requirement. State Democratic Party, advocacy organizations, and their members intervened. Parties filed cross-motions for summary judgment.

**Holdings:** The District Court, J. Nicholas Ranjan, J., held that:

[1] plaintiffs' claims were ripe for adjudication;

[2] any injury that plaintiffs would suffer was too speculative to establish Article III standing;

[3] use of unmanned drop boxes for mail-in ballots by some counties, but not others, did not violate Equal Protection Clause;

[4] use of unmanned drop boxes for mail-in ballots did not violate substantive due process principles;

[5] state law did not impose signature comparison requirement for mail-in and absentee ballots;

[6] state law did not impose signature comparison requirement for applications for mail-in and absentee ballots;

[7] fact that some county boards of elections intended to verify signatures on mail-in and absentee ballots and applications, while others did not, did not violate Equal Protection Clause;

[8] fact that state did not require signature comparison for mail-in and absentee ballots, but did for in-person ballots, did not violate Equal Protection Clause; and

[9] county residency requirement on being poll watcher did not violate plaintiffs' constitutional rights.

Defendants' motion granted.

West Headnotes (56)

**[1]** **Federal Civil Procedure** ⟿

Summary judgment stage is essentially "put up or shut up" time for non-moving party, which must rebut motion with facts in record and cannot rest solely on assertions made in pleadings, legal memoranda, or oral argument. Fed. R. Civ. P. 56(a).

**[2]** **Federal Civil Procedure** ⟿

If non-moving party fails to make showing sufficient to establish existence of element essential to that party's case, and on which that party will bear burden at trial, summary judgment is warranted. Fed. R. Civ. P. 56(a).

**[3]** **Federal Civil Procedure** ⟿

Parties' filing of cross-motions for summary judgment does not constitute agreement that if one is rejected the other is necessarily justified, but court may resolve cross-motions for summary judgment concurrently, viewing evidence in light most favorable to non-moving party with respect to each motion. Fed. R. Civ. P. 56(a).

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 41 of 205
Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)
2020 WL 5997680

**[4]    Federal Courts** ⟜

Ripeness doctrine seeks to prevent courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.

**[5]    Federal Courts** ⟜

Ripeness inquiry involves various considerations, including whether there is sufficiently adversarial posture, facts are sufficiently developed, and party is genuinely aggrieved.

**[6]    Federal Courts** ⟜

Ripeness requires case to have taken on fixed and final shape so that court can see what legal issues it is deciding, what effect its decision will have on adversaries, and some useful purpose to be achieved in deciding them.

**[7]    Federal Courts** ⟜

Dispute is not ripe for judicial determination if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.

**[8]    Federal Courts** ⟜

Ripeness involves weighing two factors: (1) hardship to parties of withholding court consideration; and (2) fitness of issues for judicial review.

**[9]    Federal Courts** ⟜

Claims by President's reelection campaign, Republican National Committee, and Republican congressional candidates and electors that Pennsylvania's use of drop boxes for mail-in ballots, its guidance not to reject mail-in ballots where voter's signature did not match the one on file, and its poll watcher

residency requirement violated their federal constitutional rights were ripe for adjudication; general election was one month away, claims could significantly affect implementation of Pennsylvania's electoral procedures, delay would prevent court from providing meaningful relief, and parties had engaged in extensive discovery, creating sufficient factual record to permit court to adequately address legal issues.

**[10]    Federal Courts** ⟜

Mootness stems from same principle as ripeness, but is stated in inverse: courts lack jurisdiction when issues presented are no longer live or parties lack legally cognizable interest in outcome.

**[11]    Federal Courts** ⟜

Mootness is determined at time of court's decision, rather than at time that complaint is filed.

**[12]    Federal Courts** ⟜

For purposes of mootness analysis, court may assume that standing exists.

**[13]    Federal Courts** ⟜

Claims by President's reelection campaign, Republican National Committee, and Republican congressional candidates and electors that Pennsylvania's use of drop boxes for mail-in ballots, its guidance not to reject mail-in ballots where voter's signature did not match signature on file, and its poll watcher residency requirement violated their federal constitutional rights were not rendered moot by primary election, Secretary of the Commonwealth's issuance of new guidance, or Pennsylvania Supreme Court's clarification of Election Code; alleged harms were not solely dependent on already-passed primary election, and state officials indicated their intention to abide by guidelines and to use drop boxes during general election.

**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**
2020 WL 5997680

[14]   **Federal Civil Procedure** 👝

County boards of elections were necessary parties in action by President's reelection campaign, Republican National Committee, and Republican congressional candidates and electors alleging that Pennsylvania's use of drop boxes for mail-in ballots, its guidance not to reject mail-in ballots where voter's signature did not match signature on file, and its poll watcher residency requirement violated their federal constitutional rights; county boards had discretion in certain areas when administering elections, and court could not enjoin county boards if they were not parties. Fed. R. Civ. P. 19(a), 65(d)(2).

[15]   **Federal Civil Procedure** 👝

One component of Article III's case-or-controversy requirement is standing, which requires plaintiff to demonstrate (1) injury in fact, (2) causation, and (3) redressability. U.S. Const. art. 3, § 2, cl. 1.

[16]   **Federal Civil Procedure** 👝

Article III standing serves to prevent judicial process from being used to usurp political branches' powers. U.S. Const. art. 3, § 2, cl. 1.

[17]   **Election Law** 👝

Any injury that President's reelection campaign, Republican National Committee, and Republican congressional candidates and electors would suffer as result of Pennsylvania's allegedly unconstitutional use of drop boxes without manned security personnel for mail-in ballots, its guidance not to perform signature comparison for mail-in ballots, and its poll watcher residency requirement was too speculative to establish Article III standing to raise claims of vote dilution, despite their contention that these alleged deficiencies opened door to potential for massive fraud; no fraud had yet occurred, and possibility of future injury

was based on series of speculative events by theoretical bad actors that might never come to pass. U.S. Const. art. 3, § 2, cl. 1.

[18]   **Injunction** 👝

Past exposure to illegal conduct does not in itself show present case or controversy regarding injunctive relief if unaccompanied by any continuing, present adverse effects. U.S. Const. art. 3, § 2, cl. 1.

[19]   **Election Law** 👝

Plaintiff can have standing to bring vote-dilution claim—typically, in malapportionment case—by putting forth statistical evidence and computer simulations of dilution and establishing that he or she is in packed or cracked district.

[20]   **Federal Civil Procedure** 👝

Standing is measured based on theory of harm and specific relief requested.

[21]   **Constitutional Law** 👝

Equal Protection Clause keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike. U.S. Const. Amend. 14, § 1.

[22]   **Constitutional Law** 👝

Unless classification warrants some form of heightened review because it jeopardizes exercise of fundamental right or categorizes on basis of inherently suspect characteristic, Equal Protection Clause requires only that classification rationally further legitimate state interest. U.S. Const. Amend. 14, § 1.

[23]   **Election Law** 👝

Right of every citizen to vote is fundamental right that helps to preserve all other rights.

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 43 of 205
Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)
2020 WL 5997680

**[24]    Election Law** 👈

Scope of right to vote is broad enough to encompass not only right of each voter to cast ballot, but also right to have those votes counted without dilution as compared to votes of others.

**[25]    Election Law** 👈

State election procedure that burdens right to vote, including by diluting value of votes compared to others, must comport with equal protection and all other constitutional requirements. U.S. Const. Amend. 14, § 1.

**[26]    Election Law** 👈

Constitution confers on states broad authority to regulate conduct of elections, including federal ones, including broad powers to determine conditions under which right of suffrage may be exercised. U.S. Const. art. 1, § 4, cl. 1.

**[27]    Election Law** 👈

Fact that law or state action imposes some burden on right to vote does not make it subject to strict scrutiny; instead, any law respecting right to vote—whether it governs voter qualifications, candidate selection, or voting process—is subjected to deferential important regulatory interests standard for nonsevere, nondiscriminatory restrictions, reserving strict scrutiny for laws that severely restrict right to vote.

**[28]    Election Law** 👈

In determining whether state law or action imposes undue burden on right to vote, courts must weigh character and magnitude of burden that state's rule imposes on right to vote against interests that state contends justify that burden, and consider extent to which state's concerns make that burden necessary.

**[29]    Election Law** 👈

If state imposes severe burden on right to vote, strict scrutiny applies, and rule may survive only if it is narrowly tailored and only if state advances compelling interest.

**[30]    Election Law** 👈

If state imposes only reasonable, nondiscriminatory restrictions on right to vote, its important regulatory interests will usually be enough to justify it.

**[31]    Constitutional Law** 👈

Pennsylvania's use of unmanned drop boxes for mail-in ballots by some counties, but not others, did not result in differential treatment as between counties, and thus did not violate Equal Protection Clause, even though state permitted counties to use drop boxes to varying extents and with varying degrees of security; any dilutive impact resulting from illegal voting in counties using drop boxes would be felt equally by voters in all counties. U.S. Const. Amend. 14, § 1.

**[32]    Constitutional Law** 👈

Equal protection does not demand imposition of mechanical compartments of law all exactly alike; rather, Constitution is sufficiently flexible to permit its requirements to be considered in relation to contexts in which they are invoked. U.S. Const. Amend. 14, § 1.

**[33]    Constitutional Law** 👈

Possible risk of vote dilution resulting from Pennsylvania's use of unmanned drop boxes for mail-in ballots in some counties, but not in others, was justified by important state interests in increasing voter turnout, protecting voters' health in midst of ongoing pandemic, increasing voter satisfaction, and reducing costs for counties, despite possibility of voter fraud; potential for fraud was speculative, state provided lawful, comprehensive, and reasonable

**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**

2020 WL 5997680

standards regarding location, design, signage, security, and collection, providing security guards would impose financial burden on cash-strapped counties, there were no equivalent security measures present at United States postal mailboxes, and state chose to tolerate risks inherent in "no excuse" mail-in voting scheme. U.S. Const. Amend. 14, § 1.

**[34]**    **Election Law** &#x1F846;

Constitution does not authorize federal courts to be state election monitors. U.S. Const. art. 1, § 4, cl. 1.

**[35]**    **Election Law** &#x1F846;

Garden variety election irregularities, let alone risk of such irregularities, are not matter of federal constitutional concern even if they control outcome of vote or election.

**[36]**    **Election Law** &#x1F846;

It is job of democratically-elected representatives to weigh pros and cons of various balloting systems, and so long as their choice is reasonable and neutral, it is free from judicial second-guessing.

**[37]**    **Constitutional Law** &#x1F846;

Pennsylvania's use of unmanned drop boxes for mail-in ballots did not work patent and fundamental unfairness, in violation of substantive due process principles, despite possible risk of vote dilution; any burden on right to vote was slight, and state took host of other fraud-prevention measures. U.S. Const. Amend. 14, § 1.

**[38]**    **Election Law** &#x1F846;

Under Pennsylvania law, Election Code provision requiring county election boards to verify proof of identification did not impose signature comparison requirement for mail-in

and absentee ballots; word "signature" was absent from provision, Code defined "proof of identification" as mail-in/absentee voter's driver's license number, last four digits of their Social Security number, or specifically approved form of identification, and Code expressly referred to signature comparisons for in-person voting, but not for mail-in and absentee ballots. 25 Pa. Stat. Ann. §§ 2602(z.5)(3)(i)-(iv), 3146.8(g)(3).

**[39]**    **Election Law** &#x1F846;

Under Pennsylvania law, although election laws must be strictly construed to prevent fraud, they ordinarily will be construed liberally in favor of right to vote.

**[40]**    **Election Law** &#x1F846;

Under Pennsylvania law, Election Code provision requiring applications for mail-in and absentee ballots to be signed did not impose signature-comparison requirement for such applications; Code expressly required applicant to include several pieces of identifying information, including their name, mailing address, and date of birth, and required election official to verify proof of identification and to compare it with information contained on applicant's permanent registration card, but did not mention signature verification. 25 Pa. Stat. Ann. §§ 3146.2(d), 3150.12(c).

**[41]**    **Constitutional Law** &#x1F846;

Pennsylvania's failure to require signature comparison for mail-in and absentee ballots or ballot applications did not violate substantive due process principles, despite possibility that mail-in and absentee ballots would be prone to fraud, thereby diluting other lawful ballots; there was no evidence of actual fraud resulting from failure to verify signatures. U.S. Const. Amend. 14, § 1.

**[42]**    **Constitutional Law** &#x1F846;

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 45 of 205
Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)
2020 WL 5997680

Fact that some county boards of elections in Pennsylvania intended to verify signatures on mail-in and absentee ballots and applications, while others did not, did not violate Equal Protection Clause; Secretary of the Commonwealth's guidance instructing county boards not to verify signatures was uniform and nondiscriminatory, and boards that verified signatures did so without support from Secretary or Election Code. U.S. Const. Amend. 14, § 1.

**[43]      Constitutional Law** ⬅

Fact that Pennsylvania Election Code did not require signature comparison for mail-in and absentee ballots, but did for in-person ballots, did not violate Equal Protection Clause; signature comparison was only required verification for in-person voters, whereas there were several verification steps implemented before mail-in or absentee ballot could be counted, and in-person voter would be notified of his or her signature deficiency and afforded opportunity to cure, but absentee and mail-in ballots could not be verified until Election Day, thus precluding opportunity to cure. U.S. Const. Amend. 14, § 1; 25 Pa. Stat. Ann. §§ 3050(a.3)(2), 3146.8(g)(3).

**[44]      Election Law** ⬅

States may employ in-person voting, absentee voting, and mail-in voting, and each method need not be implemented in exactly same way.

**[45]      Election Law** ⬅

Pennsylvania Election Code's signature comparison requirement for mail-in and absentee ballots, but not for in-person ballots, did not impose undue burden on in-person voters' right to vote, even if failure to engage in signature comparison might increase risk of voter fraud; evidence of voter fraud was largely speculative, Code imposed detailed verification procedure as to information on mail-in ballots, and state imposed criminal penalties for voter fraud.

**[46]      Federal Courts** ⬅

Under *England*, 84 S.Ct. 461, doctrine, after federal court has abstained under *Pullman*, if party freely and without reservation submits his federal claims for decision by state courts, litigates them there, and has them decided there, then he has elected to forgo his right to return to district court.

**[47]      Federal Courts** ⬅

To reserve its right to litigate federal claims in federal court, plaintiff forced into state court by way of *Pullman* abstention must inform state court that it is exposing federal claims there only to provide proper context for considering the state law questions, and that it intends, should state court hold against it on question of state law, to return to district court for disposition of its federal contentions.

**[48]      Federal Courts** ⬅

Failure of President's reelection campaign, Republican National Committee, and Republican congressional candidates, as intervenors or amici in state court action, to reserve right to relitigate in federal court claim that Pennsylvania's county residency requirement for poll watchers violated their constitutional rights as applied did not bar their claim in federal court pursuant to *England*, 84 S.Ct. 461, doctrine; none of their poll-watching claims directly asked court to construe ambiguous state statute, they were not parties in state court case, and they were not given opportunity to develop record or present evidence relevant to claim.

**[49]      Constitutional Law** ⬅

Where right to vote is not burdened by state's regulation on election process, state need only provide rational basis for statute to survive equal protection challenge. U.S. Const. Amend. 14, § 1.

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 46 of 205
Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)
2020 WL 5997680

**[50]    Constitutional Law** ⚖

Pennsylvania statute imposing county residency requirement on being poll watcher did not impose burden on any fundamental right or discriminate on based suspect classification, and thus rational basis test applied in determining whether requirement violated equal protection, free speech, or association rights as applied. U.S. Const. Amends. 1, 14; 25 Pa. Stat. Ann. § 2687.

**[51]    Election Law** ⚖

There is no individual right to serve as poll watcher protected by First Amendment. U.S. Const. Amend. 1.

**[52]    Constitutional Law** ⚖

Political parties are not suspect class for purposes of equal protection analysis. U.S. Const. Amend. 14, § 1.

**[53]    Election Law** ⚖

Pennsylvania statute imposing county residency requirement on being poll watcher did not violate major political party's and Presidential campaign's equal protection, free speech, or association rights as applied, despite their contention that requirement might make it more difficult to recruit poll watchers, and result in election irregularities; they did not identify any counties where they actually tried and failed to recruit poll watcher because of residency requirement or pandemic, there were significant numbers of party members in all counties, and residency requirement ensured that poll watchers would have some degree of familiarity with voters they were observing in given election district, resulting in increased trust in government, faith in elections, and voter turnout. U.S. Const. Amends. 1, 14; 25 Pa. Stat. Ann. § 2687.

**[54]    Federal Civil Procedure** ⚖

Ordinarily, litigant must assert his or her own legal rights and interests and cannot rest claim of relief on legal rights or interests of third parties.

**[55]    Federal Civil Procedure** ⚖

Only time that litigant can bring action on third party's behalf is when: (1) litigant suffered injury in fact, thus giving him or her sufficiently concrete interest in outcome of issue in dispute; (2) litigant has close relation to third party; and (3) there is some hindrance to third party's ability to protect his or her own interest.

**[56]    Federal Courts** ⚖

District court must decline to exercise supplemental jurisdiction over state law claims if it has dismissed all claims over which it has original jurisdiction unless considerations of judicial economy, convenience, and fairness to parties provide affirmative justification for exercising supplemental jurisdiction. 28 U.S.C.A. § 1367(c)(3).

**Attorneys and Law Firms**

Ronald L. Hicks, Jr., Carolyn Batz McGee, Jeremy A. Mercer, Russell D. Giancola, Devin A. Winklosky, Porter Wright Morris & Arthur LLP, Pittsburgh, PA, Justin R. Clark, Pro Hac Vice, Matthew Earl Morgan, Pro Hac Vice, Elections LLC, Washington, DC, for Plaintiffs.

Daniel T. Donovan, Pro Hac Vice, Caroline Darmody, Pro Hac Vice, Kristen Leigh Bokhan, Michael Glick, Pro Hac Vice, Susan Marie Davies, Pro Hac Vice, Kirkland & Ellis LLP, Washington, DC, Howard G. Hopkirk, Karen Mascio Romano, Keli Marie Neary, Pro Hac Vice, Nicole Boland, Pro Hac Vice, Stephen Moniak, Pennsylvania Office of Attorney General, Kathleen M. Kotula, Kenneth L. Joel, M. Abbegael Giunta, Governor's Office of General Counsel, Timothy Gates, Pennsylvania Department of State Office of Chief Counsel, Harrisburg, PA, Daniel T. Brier, Donna A. Walsh, John B. Dempsey, Nicholas F. Kravitz, Pro Hac Vice, Myers, Brier & Kelly, LLP, Scranton, PA, Jaywin Singh Malhi, Pro

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 47 of 205
**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**
2020 WL 5997680

Hac Vice, Madelyn Morris, Sara S. Tatum, Kirkland & Ellis LLP, New York, NY, for Defendant Kathy Boockvar.

Molly R. Mudd, Pro Hac Vice, County of Adams, Gettysburg, PA, for Defendant Adams County Board of Elections.

Andrew F. Szefi, Allan J. Opsitnick, George M. Janocsko, Allegheny County Law Department, Pittsburgh, PA, for Defendant Allegheny County Board of Elections.

Steven B. Silverman, Molly E. Meacham, Sean R. Keegan, Andrew Degory, Babst, Calland, Clements and Zomnir, P.C., Pittsburgh, PA, Elizabeth A. Dupuis, Babst Calland, State College, PA, for Defendants Armstrong County Board of Elections, Bedford County Board of Elections, Centre County Board of Elections, Columbia County Board of Elections, Fayette County Board of Elections, Indiana County Board of Elections, Lackawanna County Board of Elections, Lebanon County Board of Elections, Montour County Board of Elections, Northumberland County Board of Elections, Venango County Board of Elections.

Nathan A. Morgan, Beaver, PA, for Defendant Beaver County Board of Elections.

Christine D. Steere, Deasey, Mahoney & Valentini, Ltd., Media, PA, for Defendant Berks County Board of Elections.

Steven B. Silverman, Molly E. Meacham, Sean R. Keegan, Andrew Degory, Babst Calland Clements and Zomnir, PC, Pittsburgh, PA, Elizabeth A. Dupuis, Babst Calland, State College, PA, Nathan W. Karn, Evey Black Attorneys LLC, Hollidaysburg, PA, for Defendant Blair County Board of Elections.

Mark A. Aronchick, Christina Matthias, Pro Hac Vice, John B. Hill, Pro Hac Vice, Michele D. Hangley, Pro Hac Vice, Peter V. Keays, Robert Wiygul, Pro Hac Vice, Hangley Aronchick Segal Pudlin & Schiller, Philadelphia, PA, Joseph J. Khan, County of Bucks, Doylestown, PA, for Defendant Bucks County Board of Elections.

William Gleason Barbin, Cambria County Solicitor's Office, Ebensburg, PA, for Defendant Cambria County Board of Elections.

Gerard Joseph Geiger, Pro Hac Vice, Newman Williams, Stroudsburg, PA, for Defendant Carbon County Board of Elections.

Mark A. Aronchick, Christina Matthias, Pro Hac Vice, John B. Hill, Pro Hac Vice, Michele D. Hangley, Pro Hac Vice,

Robert Wiygul, Pro Hac Vice, Hangley Aronchick Segal Pudlin & Schiller, Philadelphia, PA, for Defendant Chester County Board of Elections.

Christopher P. Gabriel, Carfardi Ferguson Wyrick Weis + Gabriel, Sewickley, PA, for Defendant Clarion County Board of Elections.

Frank A. Blum, III, Jefferson Hills, PA, for Defendant Clearfield County Board of Elections.

Keith A. Button, Shafer Law Firm, Meadville, PA, for Defendant Crawford County Board of Elections.

Keith O. Brenneman, Law Office of Keith O. Brenneman, P.C., Mechanicsburg, PA, for Defendant Cumberland County Board of Elections.

Steven B. Silverman, Molly E. Meacham, Sean R. Keegan, Andrew Degory, Babst Calland Clements and Zomnir, PC, Pittsburgh, PA, Elizabeth A. Dupuis, Babst Calland, State College, PA, Joseph A. Curcillo, III, Dauphin County, Harrisburg, PA, for Defendant Dauphin County Board of Elections.

Edward D. Rogers, Pro Hac Vice, Elizabeth Wingfield, Pro Hac Vice, Kahlil Williams, Pro Hac Vice, David S. Fryman, Ballard, Spahr, Andrews & Ingersoll, Terence Grugan, Pro Hac Vice, Ballard Spahr, Philadelphia, PA, for Defendant Delaware County Board of Elections.

Thomas S. Talarico, Talarico & Niebauer, Erie, PA, for Defendant Erie County Board of Elections.

Andrew W. Norfleet, Frank J. Lavery, Jr., Stephen B. Edwards, Lavery Law, Harrisburg, PA, for Defendants Franklin County Board of Elections, Perry County Board of Elections.

Robert Eugene Grimm, Robert Eugene Grimm Attorney, Smithfield, PA, for Defendant Greene County Board of Elections.

Peter M. McManamon, Pro Hac Vice, Gill, McManamon & Ghaner, Huntingdon, PA, Steven B. Silverman, Molly E. Meacham, Sean R. Keegan, Andrew Degory, Babst Calland Clements and Zomnir, PC, Pittsburgh, PA, Elizabeth A. Dupuis, Babst Calland, State College, PA, for Defendant Huntingdon County Board of Elections.

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 48 of 205
**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**

2020 WL 5997680

C.J. Zwick, Zwick & Zwick LLP, DuBois, PA, Gregory D. Sobol, Brookville, PA, for Defendant Jefferson County Board of Elections.

Donald Zagurskie, Pro Hac Vice, Johnston & Zagurskie, PC, Mifflin, PA, for Defendant Juniata County Board of Elections.

Christina L. Hausner, Pro Hac Vice, County of Lancaster, Lancaster, PA, for Defendant Lancaster County Board of Elections.

Steven B. Silverman, Molly E. Meacham, Sean R. Keegan, Andrew Degory, Babst Calland Clements and Zomnir, PC, Pittsburgh, PA, Thomas W. Leslie, New Castle, PA, Elizabeth A. Dupuis, Babst Calland, State College, PA, for Defendant Lawrence County Board of Elections.

Thomas M. Caffrey, Pro Hac Vice, PO BOX A, Coplay, PA, Sarah Mae Murray, Pro Hac Vice, County of Lehigh, Allentown, PA, for Defendant Lehigh County Board of Elections.

Lawrence J. Moran, Jr., Matthew J. Carmody, Joyce, Carmody & Moran, P.C., Regina M. Blewitt, Joyce Carmody Moran, Pittston, PA, for Defendant Luzerne County Board of Elections.

Joseph D. Smith, McCormick Law Firm, Williamsport, PA, for Defendant Lycoming County Board of Elections.

Anthony V. Clarke, The Clarke Firm, Bradford, PA, for Defendant Mckean County Board of Elections.

Steven B. Silverman, Molly E. Meacham, Sean R. Keegan, Babst, Calland, Clements and Zomnir, P.C., Pittsburgh, PA, William J. Madden, Solicitor, Mercer County, Sharon, PA, Elizabeth A. Dupuis, Babst Calland, State College, PA, for Defendant Mercer County Board of Elections.

Gerard Joseph Geiger, Newman Williams, Stroudsburg, PA, for Defendants Monroe County Board of Elections, Pike County Board of Elections, Schuylkill County Board of Elections, Snyder County Board of Elections, Wayne County Board of Elections.

Mark A. Aronchick, Christina Matthias, Pro Hac Vice, John B. Hill, Pro Hac Vice, Michele D. Hangley, Pro Hac Vice, Robert Wiygul, Pro Hac Vice, Hangley Aronchick Segal Pudlin & Schiller, Philadelphia, PA, Maureen Calder, Pro Hac Vice, Montgomery County Solicitor's Office, Norristown, PA, for Defendant Montgomery County Board of Elections.

Brian Taylor, Pro Hac Vice, Richard E. Santee, Pro Hac Vice, County of Northampton, Easton, PA, Timothy P. Brennan, Pro Hac Vice, County of Northampton, PA, PA, for Defendant Northampton County Board of Elections.

Mark A. Aronchick, Christina Matthias, Pro Hac Vice, John B. Hill, Pro Hac Vice, Michele D. Hangley, Robert Wiygul, Pro Hac Vice, Hangley Aronchick Segal Pudlin & Schiller, Zachary Strassburger, City of Philadelphia Law Department, Philadelphia, PA, for Defendant Philadelphia County Board of Elections.

Thomas R. Shaffer, Glassmire & Shaffer Law Offices, Coudersport, PA, for Defendant Potter County Board of Elections.

Michael P. Barbera, Barbera, Melvin, Svonavec & Sperlazza LLP, Somerset, PA, for Defendant Somerset County Board of Elections.

Kenneth R. Levitzky, Kenneth R. Levitzky, Esquire, Dushore, PA, for Defendants Sullivan County Board of Elections, Wyoming County Board of Elections.

Robert Gawlas, Robert Schaub, Rosenn Jenkins & Greenwald LLP, Wilkes-Barre, PA, for Defendant Susquehanna County Board of Elections.

Christopher P. Gabriel, Carfardi Ferguson Wyrick Weis + Gabriel, Sewickley, PA, Raymond E. Ginn, Jr., Pro Hac Vice, Ginn & Vickery, P.C., Wellsboro, PA, for Defendant Tioga County Board of Elections.

Steven B. Silverman, Sean R. Keegan, Babst, Calland, Clements and Zomnir, P.C., Pittsburgh, PA, Allen P. Page, McNerney, Page, Vanderlin & Hall, Williamsport, PA, for Defendant Union County Board of Elections.

Nathaniel Justus Schmidt, Schmidt Law Firm, Warren, PA, for Defendant Warren County Board of Elections.

Robert J. Grimm, Swartz Campbell, Ryan Michael Joyce, Swartz Campbell, LLC, Pittsburgh, PA, for Defendant Washington County Board of Elections.

David A. Regoli, New Kensington, PA, for Defendant Westmoreland County Board of Elections.

Michelle Pokrifka, Pro Hac Vice, York County Solicitor's Office, York, PA, Steven B. Silverman, Molly E. Meacham, Sean R. Keegan, Andrew Degory, Babst Calland Clements and Zomnir, PC, Pittsburgh, PA, Elizabeth A. Dupuis, Babst

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 49 of 205
**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**
2020 WL 5997680

Calland, State College, PA, for Defendant York County Board of Elections.

Adriel I. Cepeda Derieux, Pro Hac Vice, Dale E. Ho, Pro Hac Vice, Sophia Lin Lakin, Pro Hac Vice, American Civil Liberties Union Foundation, Christopher R. Noyes, Pro Hac Vice, Eleanor Davis, Pro Hac Vice, Jared Vasconcellos Grubow, Pro Hac Vice, Lori A. Martin, Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY, Benjamin David Geffen, Mary McKenzie, Public Interest Law Center, Philadelphia, PA, David P. Yin, Pro Hac Vice, Sarah E. Brannon, Pro Hac Vice, American Civil Liberties Union Foundation, John Michael Powers, Pro Hac Vice, Lawyers' Committee for Civil Rights Under Law, Washington, DC, Jason H. Liss, Pro Hac Vice, Boston, MA, Samantha Picans, Pro Hac Vice, Wilmer Cutler Pickering Hale and Dorr LLP, Denver, CO, Witold J. Walczak, Aclf of PA, Pittsburgh, PA, for Defendant NAACP Pennsylvania State Conference.

Adriel I. Cepeda Derieux, Pro Hac Vice, Dale E. Ho, Pro Hac Vice, Sophia Lin Lakin, Pro Hac Vice, American Civil Liberties Union Foundation, Christopher R. Noyes, Pro Hac Vice, Eleanor Davis, Jared Vasconcellos Grubow, Pro Hac Vice, Lori A. Martin, Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY, Benjamin David Geffen, Mary McKenzie, Public Interest Law Center, Philadelphia, PA, David P. Yin, Pro Hac Vice, Sarah E. Brannon, Pro Hac Vice, American Civil Liberties Union Foundation, John Michael Powers, Pro Hac Vice, Lawyers' Committee for Civil Rights Under Law, Washington, DC, Jason H. Liss, Pro Hac Vice, Boston, MA, Samantha Picans, Pro Hac Vice, Wilmer Cutler Pickering Hale and Dorr LLP, Denver, CO, Witold J. Walczak, Aclf of PA, Pittsburgh, PA, for Defendant Common Cause Pennsylvania.

Adriel I. Cepeda Derieux, Dale E. Ho, Sophia Lin Lakin, American Civil Liberties Union Foundation, Christopher R. Noyes, Eleanor Davis, Jared Vasconcellos Grubow, Lori A. Martin, Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY, Benjamin David Geffen, Mary McKenzie, Public Interest Law Center, Philadelphia, PA, David P. Yin, Pro Hac Vice, Sarah E. Brannon, American Civil Liberties Union Foundation, John Michael Powers, Pro Hac Vice, Lawyers' Committee for Civil Rights Under Law, Washington, DC, Jason H. Liss, Boston, MA, Samantha Picans, Wilmer Cutler Pickering Hale and Dorr LLP, Denver, CO, Witold J. Walczak, Aclf of PA, Pittsburgh, PA, for Defendants League of Women Voters of Pennsylvania, Patricia Demarco, Danielle Graham Robinson, Kathleen Wise.

## OPINION

J. Nicholas Ranjan, United States District Judge

**\*1** Plaintiffs in this case are President Trump's reelection campaign, the Republican National Committee, and several other Republican congressional candidates and electors. They originally filed this suit, alleging federal and state constitutional violations stemming from Pennsylvania's implementation of a mail-in voting plan for the upcoming general election.

Since then, the Pennsylvania Supreme Court issued a decision involving similar claims, which substantially narrowed the focus of this case. And Secretary of the Commonwealth, Kathy Boockvar, issued additional election "guidance," which further narrowed certain of the claims.

Therefore, as this case presently stands, only three claims remain. First, whether the use of so-called "drop boxes"[1] for mail-in ballots is unconstitutional, given the lack of guidance or mandates that those drop boxes have security guards to man them. Second, whether the Secretary's guidance as to mail-in ballots—specifically, her guidance that county election boards should not reject mail-in ballots where the voter's signature does not match the one on file—is unconstitutional. Third, whether Pennsylvania's restriction that poll watchers be residents in the county for which they are assigned, as applied to the facts of this case, is unconstitutional.

In order to present these claims to the Court on a complete record, the parties engaged in extensive fact and expert discovery, and have filed cross-motions for summary judgment. No party has raised a genuine dispute of material fact that would require a trial, and the Court has found none. As such, the parties' cross-motions for summary judgment are ready for disposition.

After a careful review of the parties' submissions and the extensive evidentiary record, the Court will enter judgment in favor of Defendants on all of Plaintiffs' federal-constitutional claims, decline to exercise supplemental jurisdiction over the state-constitutional claims, and dismiss this case. This is so for two main reasons.

First, the Court concludes that Plaintiffs lack Article III standing to pursue their claims. Standing, of course, is a

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 50 of 205
Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)
2020 WL 5997680

necessary requirement to cross the threshold into federal court. Federal courts adjudicate cases and controversies, where a plaintiff's injury is concrete and particularized. Here, however, Plaintiffs have not presented a concrete injury to warrant federal-court review. All of Plaintiffs' remaining claims have the same theory of injury—one of "vote dilution." Plaintiffs fear that absent implementation of the security measures that they seek (guards by drop boxes, signature comparison of mail-in ballots, and poll watchers), there is a risk of voter fraud by other voters. If another person engages in voter fraud, Plaintiffs assert that their own lawfully cast vote will, by comparison, count for less, or be diluted.

**\*2** The problem with this theory of harm is that it is speculative, and thus Plaintiffs' injury is not "concrete"—a critical element to have standing in federal court. While Plaintiffs may not need to prove actual voter fraud, they must at least prove that such fraud is "certainly impending." They haven't met that burden. At most, they have pieced together a sequence of uncertain assumptions: (1) they assume potential fraudsters may attempt to commit election fraud through the use of drop boxes or forged ballots, or due to a potential shortage of poll watchers; (2) they assume the numerous election-security measures used by county election officials may not work; and (3) they assume their own security measures may have prevented that fraud.

All of these assumptions could end up being true, and these events could theoretically happen. But so could many things. The relevant question here is: are they "certainly impending"? At least based on the evidence presented, the answer to that is "no." And that is the legal standard that Plaintiffs must meet. As the Supreme Court has held, this Court cannot "endorse standing theories that rest on speculation about the decisions of independent actors." *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013).

Second, even if Plaintiffs had standing, their claims fail on the merits. Plaintiffs essentially ask this Court to second-guess the judgment of the Pennsylvania General Assembly and election officials, who are experts in creating and implementing an election plan. Perhaps Plaintiffs are right that guards should be placed near drop boxes, signature-analysis experts should examine every mail-in ballot, poll watchers should be able to man any poll regardless of location, and other security improvements should be made. But the job of an unelected federal judge isn't to suggest election improvements, especially when those improvements contradict the reasoned judgment of democratically elected

officials. *See Andino v. Middleton*, —— U.S. ——, —— S.Ct. ——, ——, —— L.Ed.2d ——, 2020 WL 5887393, at \*1 (Oct. 5, 2020) (Kavanaugh, J. concurring) (state legislatures should not be subject to "second-guessing by an unelected federal judiciary," which is "not accountable to the people") (cleaned up).

Put differently, "[f]ederal judges can have a lot of power—especially when issuing injunctions. And sometimes we may even have a good idea or two. But the Constitution sets out our sphere of decision-making, and that sphere does not extend to second-guessing and interfering with a State's reasonable, nondiscriminatory election rules." *New Georgia Project v. Raffensperger*, —— F.3d ——, ——, 2020 WL 5877588, at \*4 (11th Cir. Oct. 2, 2020).

As discussed below, the Court finds that the election regulations put in place by the General Assembly and implemented by Defendants do not significantly burden any right to vote. They are rational. They further important state interests. They align with the Commonwealth's elaborate election-security measures. They do not run afoul of the United States Constitution. They will not otherwise be second-guessed by this Court.

## BACKGROUND

### I. Procedural Background

#### A. Plaintiffs' original claims.

On June 29, 2020, Plaintiffs filed their original complaint in this case against Defendants, who are the Secretary of the Commonwealth and the 67 county boards of elections. [ECF 4]. With their lawsuit, Plaintiffs challenged a number of Pennsylvania's procedures with respect to mail-in voting—in particular, the use of drop boxes and the counting of mail-in ballots that contained certain procedural defects. *See [id.]*. Shortly after filing their original complaint, Plaintiffs moved for expedited discovery and an expedited declaratory-judgment hearing. [ECF 6]. Defendants opposed the motion. The Court partially granted the motion, scheduled a speedy hearing, and ordered expedited discovery before that hearing. [ECF 123; ECF 124].

**\*3** After Plaintiffs filed the original complaint, many non-parties sought to intervene in the action, including several organizations.[2] The Court granted all intervention motions. [ECF 309].

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 51 of 205
**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**
2020 WL 5997680

Defendants and Intervenors moved to dismiss the original complaint. In response, Plaintiffs filed an amended complaint. [ECF 234]. The amended complaint maintained the gist of the original, but added two new counts and made a variety of other drafting changes. *See* [ECF 242]. Defendants and Intervenors moved to dismiss the first amended complaint, too, primarily asking the Court to abstain and stay the case.

Plaintiffs' first amended complaint asserted nine separate counts, but they could be sorted into three overarching categories.

## 1. Claims alleging vote dilution due to unlawful ballot collection and counting procedures.

The first category covered claims related to allegedly unlawful procedures implemented by some Defendants for the collection and counting of mail-in and absentee ballots. Those included claims related to (1) Defendants' uneven use of drop boxes and other satellite ballot-collection sites, (2) procedures for verifying the qualifications of voters applying in person for mail-in or absentee ballots, and (3) rules for counting non-compliant ballots (such as ballots submitted without a secrecy envelope, without an elector declaration, or that contained stray marks on the envelope).

In Count I, Plaintiffs alleged violations of the Elections Clause and the related Presidential Electors Clause of the U.S. Constitution. [ECF 234, ¶¶ 193-205]. Plaintiffs asserted that, under these provisions, only the state legislature may set the time, place, and manner of congressional elections and determine how the state chooses electors for the presidency. [*Id.* at ¶ 196].

In support of this claim, Plaintiffs alleged that Secretary Boockvar's guidance concerning the use of mail-in ballot drop boxes, whether county boards of elections must independently verify mail-in ballot applications, and the counting of non-compliant mail-in ballots, was an executive overreach—in that the Secretary's guidance allegedly violated certain provisions of the Election Code enacted by the Pennsylvania General Assembly. [*Id.* at ¶ 201]. Plaintiffs also claimed that the Secretary's "unlawful guidance" increased the risk of fraudulent or unlawful voting and infringed on the right to vote, which, they said, amounted to additional violations of the 1st and 14th Amendments to the U.S. Constitution. [*Id.* at ¶¶ 202-03].

In Count II, Plaintiffs alleged a violation of the Equal-Protection Clause under the 14th Amendment. [*Id.* at ¶¶ 206-15]. Plaintiffs asserted that the implementation of the foregoing (*i.e.*, mail-in ballot drop boxes, the verification of mail-in ballot applications, and the counting of non-compliant ballots) was different in different counties, thereby treating voters across the state in an unequal fashion. [*Id.* at ¶¶ 211-13].

**\*4** In Count III, Plaintiffs asserted a violation of the Pennsylvania State Constitution. [*Id.* at ¶¶ 216-22]. Plaintiffs alleged that the same actions and conduct that comprised Counts I and II also violated similar provisions of the Pennsylvania Constitution. [*Id.* at ¶ 220].

Finally, in Counts VI and VII, Plaintiffs alleged that Defendants violated provisions of the federal and state constitutions by disregarding the Election Code's notice and selection requirements applicable to "polling places." [*Id.* at ¶¶ 237-52]. Plaintiffs alleged that drop boxes are "polling places," and thus subject to certain criteria for site selection and the requirement that county election boards provide 20 days' public notice. [*Id.* at ¶¶ 239-42]. Plaintiffs asserted that Defendants' failure to provide this notice or select appropriate "polling places" in the primary election, if repeated in the general election, would create the risk of voter fraud and vote dilution. [*Id.* at ¶¶ 243-246].

## 2. Poll-watcher claims.

The second category of claims in the first amended complaint consisted of challenges to the constitutionality of Election-Code provisions related to poll watchers.

In Count IV, Plaintiffs alleged violations of the 1st and 14th Amendments. These claims had both a facial and an as-applied component. [ECF 234, ¶ 230 ("On its face and as applied to the 2020 General Election ...")].

First, Plaintiffs alleged that 25 P.S. § 2687 was facially unconstitutional because it "arbitrarily and unreasonably" limits poll watchers to serving only in their county of residence and to monitoring only in-person voting at the polling place on election day. [*Id.* at ¶ 226]. Second, Plaintiffs alleged that the same provision was unconstitutional as applied in the context of Pennsylvania's new vote-by-mail system, because these poll-watcher restrictions, combined

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 52 of 205
**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**
2020 WL 5997680

with insecure voting procedures, create unacceptable risks of fraud and vote dilution. [*Id.* at ¶ 228]. Plaintiffs contended that these limitations make it "functionally impracticable" for candidates to ensure that they have poll watchers present where ballots are deposited and collected, given the widespread use of remote drop boxes and other satellite collection sites. [*Id.*].

Count V was the same as Count IV, but alleged that the same poll-watching restrictions violated the Pennsylvania Constitution, too. [*Id.* at ¶ 234].

### 3. In-person voting claims.

The third category of claims consisted of challenges to the procedures for allowing electors to vote in person after requesting a mail-in ballot.

That is, in Counts VIII and IX, Plaintiffs asserted that the Election Code permits an elector that has requested a mail-in ballot to still vote in person so long as he remits his spoiled ballot. [ECF 234, ¶¶ 253-267]. Plaintiffs asserted that during the primary, some counties allowed such electors to vote in person, while others did not, and they fear the same will happen in the general election. [*Id.* at ¶¶ 255, 259]. Plaintiffs also asserted that some counties allowed electors who had voted by mail to vote in person, in violation of the Election Code. [*Id.* at ¶¶ 257-58]. Plaintiffs alleged that this conduct also violates the federal and state constitutional provisions concerning the right to vote and equal protection. [*Id.* at ¶¶ 261, 265].

### B. The Court's decision to abstain.

**\*5** Upon consideration of Defendants' and Intervenors' motions to dismiss the first amended complaint, on August 23, 2020, the Court issued an opinion abstaining under *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) and temporarily staying the case. [ECF 409, 410].

In doing so, the Court determined that the three requisite prongs for *Pullman* abstention were met, and that the discretionary considerations weighed in favor of abstention. [ECF 409, p. 3 ("[Under *Pullman*, federal courts abstain] if (1) doing so requires interpretation of 'unsettled questions of state law'; (2) permitting resolution of the unsettled state-law questions by state courts would 'obviate the need for,

or substantially narrow the scope of adjudication of the constitutional claims'; and (3) an 'erroneous construction of state law would be disruptive of important state policies[.]' " (citing *Chez Sez III Corp. v. Township of Union*, 945 F.2d 628, 631 (3d Cir. 1991))); *id.* at p. 30 (explaining that after the three prongs of *Pullman* abstention are met, the court must "make a discretionary determination of whether abstention is appropriate given the particular facts of this case," which requires weighing "such factors as the availability of an adequate state remedy, the length of time the litigation has been pending, and the impact of delay on the litigants." (cleaned up)) ].

The Court found that abstaining under *Pullman* was appropriate because of several unresolved ambiguities in Pennsylvania's Election Code. Specifically, the Court found that there were significant ambiguities as to whether the Election Code (1) permitted delivery of ballots to locations other than the county election board's headquarters, such as drop boxes, (2) permitted counties to count ballots that were not placed within the "secrecy envelope" (*i.e.*, "naked ballots"), (3) considered drop boxes and other ballot-collection sites as "polling places," as defined in the Election Code, and (4) required counties to automatically verify ballot applications for mail-in ballots (where the person applied for the ballot in person), even if there was no "bona fide objection" to the application. [ECF 409, pp. 17-23].

The Court explained that each of these ambiguities, if settled, would significantly narrow—or even resolve—some of Plaintiffs' claims. As the Court explained, for example, if a state court interpreted the Election Code to disallow drop boxes, Plaintiffs would obtain their requested relief (*i.e.*, no drop boxes); alternatively, if drop boxes were authorized by the Election Code, then Plaintiffs' allegations that drop boxes were illegal would be eliminated, which would, in turn, significantly affect the constitutional analysis of Plaintiffs' claims. [*Id.* at pp. 25-28]. The same held true for "naked ballots," the breadth of coverage of "polling places," and the requisite verification for personal ballot applications.

The Court then explained that it was appropriate for it to abstain until a state court could interpret the ambiguous state law. [*Id.* at pp. 28-30]. The Court concluded that if it interpreted the ambiguous state law, there was a sufficient chance that a state court could disagree with the interpretation, which would render this Court's interpretation not only advisory, but disruptive to state policies. The Court noted that especially in the election context, states have considerable

discretion to implement their own policies without federal intervention. Accordingly, because these were questions of uninterpreted state law that were sufficiently ambiguous, federalism and comity demanded that a state court, not this Court, be the first interpreter.

**\*6** Finally, the Court explained that, despite the imminence of the election, abstention was still proper. [*Id.* at pp. 30-33]. The Court noted that state-court litigation was already pending that would resolve some of the statutory ambiguities at issue. [*Id.* at p. 31]. Further, the Court highlighted three courses Plaintiffs could immediately take to resolve the statutory ambiguities: intervene in the pending state-court litigation; file their own state-court case; or appeal this Court's abstention decision to the Third Circuit, and then seek certification of the unsettled state-law issues in the Pennsylvania Supreme Court. [*Id.* at pp. 31-33].

Additionally, the Court explained that it would stay the entire case, despite several of Plaintiffs' claims not being subject to *Pullman* abstention as they were not based on ambiguous state law. [*Id.* at pp. 34-37]. That's because, in its discretion, the Court determined it would be more efficient for this case to progress as a single proceeding, rather than in piecemeal fashion. [*Id.*]. However, the Court allowed any party to move to lift the stay as to the few claims not subject to *Pullman* abstention, if no state-court decision had been issued by October 5, 2020. [*Id.*].

On August 28, 2020, five days after the Court abstained, Plaintiffs moved to modify the Court's stay, and moved for a preliminary injunction. [ECF 414]. Plaintiffs requested, among other things, that the Court order Defendants to segregate, and not pre-canvass or canvass, all ballots that were returned in drop boxes, lacked a secrecy envelope, or were delivered by a third party. [*Id.*]. Plaintiffs also requested that the Court lift the stay by September 14, 2020, instead of October 5, 2020. [*Id.*].

The Court denied Plaintiffs' motion for preliminary injunctive relief, finding that Plaintiffs failed to show they would be irreparably harmed. [ECF 444; ECF 445]. The Court also declined to move up the date when the stay would be lifted. [*Id.*]. The Court noted that, at the request of Secretary Boockvar, the Pennsylvania Supreme Court had already exercised its extraordinary jurisdiction to consider five discrete issues and clarify Pennsylvania law in time for the general election. [*Id.* at p. 1]. Since that case appeared to be on track, the Court denied Plaintiffs' motion without

prejudice, and the Court's abstention opinion and order remained in effect.

**C. The Pennsylvania Supreme Court's decision.**

On September 17, 2020, the Pennsylvania Supreme Court issued its decision in *Pennsylvania Democratic Party v. Boockvar*, ⸺ Pa. ⸺, ⸺ A.3d ⸺, 2020 WL 5554644 (Sept. 17, 2020). The court clarified three issues of state election law that are directly relevant to this case.

**1. Counties are permitted under the Election Code to establish alternate ballot-collection sites beyond just their main county office locations.**

The Pennsylvania Supreme Court first considered whether the Election Code allowed a Pennsylvania voter to deliver his or her mail-in ballot in person to a location other than the established office address of the county's board of election. *Boockvar*, ⸺ A.3d at ⸺, 2020 WL 5554644, at \*8. The court further considered the means by which county boards of election could accept hand-delivered mail-in ballots. *Id.*

Consistent with this Court's abstention opinion, the court found that "the parties' competing interpretations of the Election Code on [these questions] are reasonable, rendering the Code ambiguous" on these questions. *Id.* After applying traditional principles of statutory interpretation, the court held that "the Election Code should be interpreted to allow county boards of election to accept hand-delivered mail-in ballots at locations other than their office addresses including drop-boxes." *Id.* at⸺, 2020 WL 5554644, at \*9. The court reached this conclusion due to "the clear legislative intent underlying Act 77 ... to provide electors with options to vote outside of traditional polling places." *Id.*

**\*7** The respondents in that case further argued that this interpretation would cause county boards of election to "employ myriad systems to accept hand-delivered mail-in ballots," which would "be unconstitutionally disparate from one another in so much as some systems will offer more legal protections to voters than others will provide" and violate the Equal-Protection Clause *Id.* The court rejected this argument. It found that "the exact manner in which each county board of election will accept these votes is entirely unknown at this point; thus, we have no metric by which to measure whether any one system offers more legal protection than another,

Case 4:20-cv-02078-MWB Document 176-1 Filed 11/19/20 Page 54 of 205
Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)
2020 WL 5997680

making an equal protection analysis impossible at this time."
*Id.*

### 2. Ballots lacking inner secrecy envelopes should not be counted.

The court next considered whether the boards of elections "must 'clothe and count naked ballots,' *i.e.*, place ballots that were returned without the secrecy envelope into a proper envelope and count them, rather than invalidate them." *Boockvar*, ⸺ A.3d at ⸺, 2020 WL 5554644, at *21. The court concluded that they should not.

The court held that "the Legislature intended for the secrecy envelope provision [in the Election Code] to be mandatory." *Id.* at ⸺, 2020 WL 5554644, at *24. In other words, the relevant provisions "make clear the General Assembly's intention that, during the collection and canvassing processes, when the outer envelope in which the ballot arrived is unsealed and the sealed ballot removed, it should not be readily apparent who the elector is, with what party he or she affiliates, or for whom the elector has voted." *Id.* The secrecy envelope "properly unmarked and sealed ensures that result," and "[w]hatever the wisdom of the requirement, the command that the mail-in elector utilize the secrecy envelope and leave it unblemished by identifying information is neither ambiguous nor unreasonable." *Id.*

As a result, the court ultimately concluded, "a mail-ballot that is not enclosed in the statutorily-mandated secrecy envelope must be disqualified." *Id.* at ⸺, 2020 WL 5554644, at *26

### 3. Pennsylvania's county-residency requirement for poll watchers is constitutional.

The final relevant issue the court considered was whether the poll-watcher residency requirement found in 25 P.S. § 2687(b) violates state or federal constitutional rights. *Boockvar*, ⸺ A.3d at ⸺, 2020 WL 5554644, at *26. Relying on *Republican Party of Pennsylvania v. Cortés*, 218 F. Supp. 3d 396 (E.D. Pa. 2016), the court concluded that the poll-watcher residency provision "impose[d] no burden on one's constitutional right to vote and, accordingly, requires only a showing that a rational basis exists to be upheld." *Id.* at ⸺, 2020 WL 5554644, at *30. The court found rational-basis review was appropriate for three reasons.

First, "there is no individual constitutional right to serve as a poll watcher; rather, the right to do so is conferred by statute." *Id.* (citation omitted). Second, "poll watching is not incidental to the right of free association and, thus, has no distinct First Amendment protection." *Id.* (cleaned up). Third, "poll watching does not implicate core political speech." *Id.* (citation omitted).

The court went on to find that there was a "clear rational basis for the county poll watcher residency requirement[.]" *Id.* That is, given "Pennsylvania has envisioned a county-based scheme for managing elections within the Commonwealth," it is "reasonable that the Legislature would require poll watchers, who serve within the various counties of the state, to be residents of the counties in which they serve." *Id.*

In upholding the constitutionality of the "county poll watcher residency requirement," the court rejected the claim that "poll watchers are vital to protect against voter fraud and that because of the distribution of voters throughout Pennsylvania, the residency requirement makes it difficult to identify poll watchers in all precincts." *Id.* The court concluded that the claims of "heightened election fraud involving mail-in voting" were "unsubstantiated" and "specifically belied by the Act 35 report issued by [Secretary Boockvar] on August 1, 2020." *Id.* Moreover, the court held that the "speculative claim that it is 'difficult' for both parties to fill poll watcher positions in every precinct, even if true, is insufficient to transform the Commonwealth's uniform and reasonable regulation requiring that poll watchers be residents of the counties they serve into a non-rational policy choice." *Id.*

***8** Based on the foregoing, the court declared "that the poll-watcher residency requirement does not violate the state or federal constitutions." *Id.* at ⸺, 2020 WL 5554644, at *31.

### D. Plaintiffs' notice of remaining claims.

Following the Pennsylvania Supreme Court's decision, this Court lifted the stay it had imposed pursuant to the *Pullman* abstention doctrine and ordered the parties to identify the remaining viable claims and defenses in the case. [ECF 447].

In their notice, Plaintiffs took the position that nearly all their claims remained viable, with a few discrete exceptions. Plaintiffs conceded that their "federal and state constitutional claims of voter dilution solely on the basis that drop boxes and other collection sites are not statutorily authorized by the Pennsylvania Election Code [were] no longer viable." [ECF

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 55 of 205
**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**
2020 WL 5997680

448, p. 4]. They also stated that their "facial challenge to the county residency requirement under 25 P.S. § 2687 is no longer a viable claim." [*Id.* at p. 10]. Plaintiffs also moved for leave to amend their complaint a second time to add new allegations and a new claim relating to Secretary Boockvar's recent signature-comparison guidance. [ECF 451].

Defendants and Intervenors, for their part, suggested that Plaintiffs' claims had been substantially narrowed, if not outright mooted, by the Pennsylvania Supreme Court's decision, and reminded the Court that their arguments for dismissal remained outstanding.

### E. The Court's September 23, 2020, memorandum orders.

In response to the notices filed by the parties and Plaintiffs' motion for leave to amend the first amended complaint, the Court issued an order granting Plaintiffs' motion, narrowing the scope of the lawsuit, and establishing the procedure for resolving the remaining claims. [ECF 459].

As to Plaintiffs' proposed amendment to their complaint, the Court found that the new claim and allegations were relatively narrow, and thus amendment wouldn't prejudice Defendants and Intervenors. [*Id.* at pp. 3-4]. As a result, the Court granted the motion. [*Id.* at p. 4].

The Court, however, did inform the parties that it would "continue to abstain under *Pullman* as to Plaintiffs' claim pertaining to the notice of drop box locations and, more generally, whether the "polling place" requirements under the Election Code apply to drop-box locations." [*Id.* at p. 5]. This was so because those claims involve still-unsettled issues of state law. The Court explained that the "fact that the Pennsylvania Supreme Court did not address this issue in its recent decision is immaterial" because the "propriety of *Pullman* abstention does not depend on the existence of parallel state-court proceedings." [*Id.* (citing *Stoe v. Flaherty*, 436 F.3d 209, 213 (3d Cir. 2006)) ]. Moreover, Plaintiffs had several other avenues to pursue prompt interpretation of state law after this Court abstained. [*Id.* at p. 6].

The Court also informed the parties, for similar reasons, that it would continue to abstain with respect to Plaintiffs' claims regarding Secretary Boockvar's guidance that personal applications for mail-in ballots shall be accepted absent a "bona fide objection." [ECF 460].

The Court found that "no Article III 'case or controversy' remain[ed] with respect to the claims on which the Pennsylvania Supreme Court effectively ruled in Plaintiffs' favor on state-law grounds (*e.g.*, illegality of third-party ballot delivery; excluding 'naked ballots' submitted without inner-secrecy envelopes)." [ECF 459, p. 6]. Because there was "no reason to believe Defendants plan to violate what they themselves now agree the law requires," the Court held that Plaintiffs' claims were premature and speculative. [*Id.* at p. 7]. The Court therefore dismissed those claims as falling outside of its Article III power to adjudicate. [*Id.* (citations omitted) ].

**\*9** To resolve the remaining claims, the Court directed the parties to file cross-motions for summary judgment presenting all arguments for dismissal or judgment under Federal Rule of Civil Procedure 56. [*Id.* at pp. 8-10]. Before briefing on those motions, the Court authorized additional expedited discovery. [*Id.* at pp. 4-5]. The parties completed discovery and timely filed their motions; they identified no material disputes of fact; and therefore, the motions are now fully briefed and ready for disposition.

### F. The claims now at issue.

Based on the Pennsylvania Supreme Court's prior ruling, this Court's prior decisions, Plaintiffs' nine-count Second Amended Complaint, and recent guidance issued by Secretary Boockvar, the claims remaining in this case are narrow and substantially different than those asserted at the outset of the case.

**Drop Boxes (Counts I–III).** Plaintiffs still advance a claim that drop boxes are unconstitutional, but in a different way. Now that the Pennsylvania Supreme Court has expressly held that drop boxes are authorized under the Election Code, Plaintiffs now assert that the use of "unmanned" drop boxes is unconstitutional under the federal and state constitutions, for reasons discussed in more detail below.

**Signature Comparison (Counts I–III).** Plaintiffs' newly added claim relates to signature comparison. Secretary Boockvar's September 2020 guidance informs the county boards that they are not to engage in a signature analysis of mail-in ballots and applications, and they must not count those ballots, even if the signature on the ballot does not match the voter's signature on file. Plaintiffs assert that this guidance is unconstitutional under the federal and state constitutions.

**Poll Watching (Counts IV, V).** The Pennsylvania Supreme Court already declared that Pennsylvania's county-residency

Case 4:20-cv-02078-MWB  Document 176-1  Filed 11/19/20  Page 56 of 205
**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**

2020 WL 5997680

requirement for poll watchers is *facially* constitutional. Plaintiffs now only assert that the requirement, *as applied*, is unconstitutional under the federal and state constitutions.

The counts that remain in the Second Amended Complaint, but which are *not* at issue, are the counts related to where poll watchers can be located. That is implicated mostly by Counts VI and VII, and by certain allegations in Counts IV and V. The Court continues to abstain from reaching that issue. Plaintiffs have filed a separate state lawsuit that would appear to address many of those issues, in any event. [ECF 549-22; ECF 573-1]. Counts VIII and IX concern challenges related to voters that have requested mail-in ballots, but that instead seek to vote in person. The Secretary issued recent guidance, effectively mooting those claims, and, based on Plaintiffs' positions taken in the course of this litigation, the Court deems Plaintiffs to have withdrawn Counts VIII and IX. [ECF 509, p. 15 n.4 ("[I]n the September 28 guidance memo, the Secretary corrected [her] earlier guidance to conform to the Election Code and states that any mail-in voter who spoils his/her ballot and the accompanying envelopes and signs a declaration that they did not vote by mail-in ballot will be allowed to vote a regular ballot. Therefore, Plaintiffs agree to withdraw this claim from those that still are being pursued.") ].

## II. Factual Background

### A. Pennsylvania's Election Code, and the adoption of Act 77.

#### 1. The county-based election system.

Pennsylvania's Election Code, first enacted in 1937, established a county-based system for administering elections. *See* 25 P.S. § 2641(a) ("There shall be a county board of elections in and for each county of this Commonwealth, which shall have jurisdiction over the conduct of primaries and elections in such county, in accordance with the provisions of [the Election Code]."). The Election Code vests county boards of elections with discretion to conduct elections and implement procedures intended to ensure the honesty, efficiency, and uniformity of Pennsylvania's elections. *Id.* §§ 2641(a), 2642(g).

#### 2. The adoption of Act 77.

*10  On October 31, 2019, the Pennsylvania General Assembly passed "Act 77," a bipartisan reform of Pennsylvania's Election Code. *See* [ECF 461, ¶¶ 91]; 2019 Pa. Legis. Serv. Act 2019-77 (S.B. 421).

Among other things, by passing Act 77, Pennsylvania joined 34 other states in authorizing "no-excuse" mail-in voting by all qualified electors. *See* [ECF 461, ¶¶ 92]; 25 P.S. §§ 3150.11-3150.17; [ECF 549-11, p. 5 ("The largest number of states (34), practice no-excuse mail-in voting, allowing any persons to vote by mail regardless of whether they have a reason or whether they will be out of their jurisdiction on Election Day.") ]. Previously, a voter could only cast an "absentee" ballot if certain criteria were met, such as that the voter would be away from the election district on election day. *See* 1998 Pa. Legis. Serv. Act 1998-18 (H.B. 1760), § 14.

Like the previous absentee voting system, Pennsylvania's mail-in voting system requires voters to "opt-in" by requesting a ballot from either the Secretary or the voter's county board of elections. *See* 25 P.S. §§ 3146.2(a), 3150.12(a). When requesting a ballot, the voter must provide, among other things, his or her name, date of birth, voting district, length of time residing in the voting district, and party choice for primary elections. *See* 25 P.S. §§ 3146.2(b), 3150.12(b). A voter must also provide proof of identification; namely, either a driver's license number or, in the case of a voter who does not have a driver's license, the last four digits of the voter's Social Security number, or, in the case of a voter who has neither a driver's license nor a Social Security number, another form of approved identification. 25 P.S. § 2602(z.5)(3). In this respect, Pennsylvania differs from states that automatically mail each registered voter a ballot— a practice known as "universal mail-in voting." [ECF 549-11, p. 6 ("[N]ine states conduct universal vote-by-mail elections in which the state (or a local entity, such [as] a county or municipality) mails all registered voters a ballot before each election without voters' [sic] having to request them.").

#### 3. The COVID-19 pandemic.

Since early 2020, the United States, and Pennsylvania, have been engulfed in a viral pandemic of unprecedented scope and scale. [ECF 549-8, ¶ 31]. In that time, COVID-19 has spread to every corner of the globe, including Pennsylvania, and jeopardized the safety and health of many people. [*Id.* at ¶¶ 31, 38-39, 54-55, 66]. As of this date, more than 200,000 Americans have died,

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 57 of 205
**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**
2020 WL 5997680

including more than 8,000 Pennsylvanians. *See* Covid in the U.S.: Latest Map and Case Count, The New York Times, available at https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last visited Oct. 10, 2020); COVID-19 Data for Pennsylvania, Pennsylvania Department of Health, available at https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx (last visited Oct. 10, 2020).

There have been many safety precautions that Pennsylvanians have been either required or urged to take, such as limiting participation in large gatherings, maintaining social distance, and wearing face coverings. [ECF 549-8, ¶¶ 58, 63-65]. The threat of COVID-19 is likely to persist through the November general election. [*Id.* at ¶¶ 53-56, 66-68].

**B. Facts relevant to drop boxes.**

***11** Pennsylvania's county-based election system vests county boards of elections with "jurisdiction over the conduct of primaries and elections in such county, in accordance with the provisions" of the Election Code. 25 P.S. § 2641(a). The Election Code further empowers the county boards to "make and issue such rules, regulations and instructions, not inconsistent with law, as they may deem necessary for the guidance of voting machine custodians, elections officers and electors." *Id.* at § 2642(f). The counties are also charged with the responsibility to "purchase, preserve, store and maintain primary and election equipment of all kinds, including voting booths, ballot boxes and voting machines." *Id.* at § 2642(c).

As noted above, in *Pennsylvania Democratic Party v. Boockvar*, the Pennsylvania Supreme Court interpreted the Election Code, which allows for mail-in and absentee ballots to be returned to the "county board of election," to "permit[ ] county boards of election to accept hand-delivered mail-in ballots at locations other than their office addresses including drop-boxes." —— A.3d at ——, 2020 WL 5554644, at *10.

Thus, it is now settled that the Election Code permits (but does not require) counties to authorize drop boxes and other satellite-collection locations for mailed ballots. 25 P.S. § 3150.16(a). Pennsylvania is not alone in this regard—as many as 34 other states and the District of Columbia authorize the use of drop boxes or satellite ballot collection sites to one degree or another. [ECF 549-11, p. 8, fig. 4]. Indeed, Secretary Boockvar stated that as many as 16% of voters nationwide had cast their ballots using drop boxes in the 2016 general election, including the majority of voters in Colorado

(75%) and Washington (56.9%). [ECF 547, p. 18 (citing ECF 549-16) ].

**1. Secretary Boockvar's guidance with respect to drop boxes.**

Since the passage of Act 77, Secretary Boockvar has issued several guidance documents to the counties regarding the counties' implementation of mail-in voting, including guidance with respect to the use of drop boxes. [ECF 504-21; 504-22; 504-23; 504-24; 504-25; 571-1, Ex. E]. In general terms, the Secretary's guidance as to drop boxes informed the counties that the use of drop boxes was authorized by the Election Code and recommended "best practices" for their use. Her latest guidance offered standards for (1) where drop boxes should be located, [ECF 504-23, § 1.2], (2) how drop boxes should be designed and what signage should accompany them, [*id.* at §§ 2.2-2.3], (3) what security measures should be employed, [*id.* at § 2.5], and (4) what procedures should be implemented for collecting and returning ballots to the county election office, [*id.* at §§ 3.1-3.3, 4].

As to the location of drop boxes, the Secretary recommended that counties consider the following criteria, [*id.* at § 1.2]:

- Locations that serve heavily populated urban/suburban areas, as well as rural areas;

- Locations near heavy traffic areas such as commercial corridors, large residential areas, major employers and public transportation routes;

- Locations that are easily recognizable and accessible within the community;

- Locations in areas in which there have historically been delays at existing polling locations, and areas with historically low turnout;

- Proximity to communities with historically low vote by mail usage;

- Proximity to language minority communities;

- Proximity to voters with disabilities;

- Proximity to communities with low rates of household vehicle ownership;

- Proximity to low-income communities;

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 58 of 205
Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)
2020 WL 5997680

• Access to accessible and free parking; and

• The distance and time a voter must travel by car or public transportation.

With respect to drop-box design criteria, the Secretary recommended to counties, [*id.* at § 2.2]:

**\*12** • Hardware should be operable without any tight grasping, pinching, or twisting of the wrist;

• Hardware should require no more than 5 lbs. of pressure for the voter to operate;

• Receptacle should be operable within reach-range of 15 to 48 inches from the floor or ground for a person utilizing a wheelchair;

• The drop-box should provide specific points identifying the slot where ballots are inserted;

• The drop-box may have more than one ballot slot (e.g. one for drive-by ballot return and one for walk-up returns);

• To ensure that only ballot material can be deposited and not be removed by anyone but designated county board of election officials, the opening slot of a drop-box should be too small to allow tampering or removal of ballots; and

• The opening slot should also minimize the ability for liquid to be poured into the drop-box or rainwater to seep in.

The Secretary's guidance as to signage recommended, [*id.* at § 2.3]:

• Signage should be in all languages required under the federal Voting Rights Act of 1965 (52 U.S.C. Sec. 10503);

• Signage should display language stating that counterfeiting, forging, tampering with, or destroying ballots is a second-degree misdemeanor pursuant to sections 1816 and 1817 of the Pennsylvania Election Code (25 P.S. §§ 3516 and 3517);

• Signage should also provide a statement that third-party return of ballots is prohibited unless the person returning the ballot is rendering assistance to a disabled voter or an emergency absentee voter. Such assistance requires a declaration signed by the voter and the person rendering assistance; and

• Signage should provide a statement requesting that the designated county elections official should be notified immediately in the event the receptacle is full, not functioning, or is damaged in any fashion, and should provide a phone number and email address for such purpose.

With respect to ballot security, the Secretary stated that county boards should implement the following security measures, [*id.* at § 2.5]:

• Only personnel authorized by the county board of elections should have access to the ballots inside of a drop-box;

• Drop-boxes should be secured in a manner to prevent their unauthorized removal;

• All drop-boxes should be secured by a lock and sealed with a tamper-evident seal. Only authorized election officials designated by the county board of elections may access the keys and/or combination of the lock;

• Drop-boxes should be securely fastened in a manner as to prevent moving or tampering, such as fastening the drop-box to concrete or an immovable object;

• During the hours when the staffed return site is closed or staff is unavailable, the drop-box should be placed in a secure area that is inaccessible to the public and/or otherwise safeguarded;

• The county boards of election should ensure adequate lighting is provided at all ballot return sites when the site is in use;

• When feasible, ballot return sites should be monitored by a video security surveillance system, or an internal camera that can capture digital images and/or video. A video security surveillance system can include existing systems on county, city, municipal, or private buildings. Video surveillance should be retained by the county election office through 60 days following the deadline to certify the election; and

**\*13** • To prevent physical damage and unauthorized entry, the drop-box at a ballot return site located outdoors should be constructed of durable material able to withstand vandalism, removal, and inclement weather.

**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**

2020 WL 5997680

---

With respect to ballot collection and "chain of custody" procedures, the Secretary stated that counties should adhere to the following standards, [*id.* at §§ 3.1-3.2]:

- Ballots should be collected from ballot return sites only by personnel authorized by the county board of elections and at times determined by the board of elections, at least every 24 hours, excluding Saturdays and Sundays;

- The county board of elections should designate at least two election officials to collect voted ballots from a ballot return site. Each designated election official should carry identification or an official designation that identifies them as an election official authorized to collect voted ballots;

- Election officials designated to collect voted ballots by the board of elections should sign a declaration declaring that he or she will timely and securely collect and return voted ballots, will not permit any person to tamper with a ballot return site or its contents, and that he or she will faithfully and securely perform his or her duties;

- The designated election officials should retrieve the voted ballots from the ballot return site and place the voted ballots in a secure ballot transfer container;

- The designated election officials should note on *Ballot Return Site Collection Forms* the site and unique identification number of the ballot return site and the date and time of retrieval;

- Ballots collected from any ballot return site should be immediately transported to the county board of elections;

- Upon arrival at the office of the county board of elections, the county board of elections, or their designee(s), should note the time of arrival on the same form, as described above;

- The seal number should be verified by a county election official or a designated representative;

- The county board of elections, or their designee(s), should inspect the drop-box or secure ballot transfer container for evidence of tampering and should receive the retrieved ballots by signing the retrieval form and including the date and time of receipt. In the event tampering is evident, that fact must be noted on the retrieval form;

- The completed collection form should be maintained in a manner proscribed by the board of elections to ensure that the form is traceable to its respective secure ballot container; and

- The county elections official at the county election office or central count location should note the number of ballots delivered on the retrieval form.

And finally, as to election day and post-election day procedures with respect to drop boxes, the Secretary provided as follows, [*id.* at §§ 3.3, 4]:

- The county board of elections should arrange for authorized personnel to retrieve ballots on election night and transport them to the county board of elections for canvassing of the ballots;

- Authorized personnel should be present at ballot return sites immediately prior to 8:00 p.m. or at the time the polls should otherwise be closed;

- At 8:00 p.m. on election night, or later if the polling place hours have been extended, all ballot return sites and drop-boxes must be closed and locked;

- **\*14** • Staff must ensure that no ballots are returned to the ballot return site after the close of polls;

- After the final retrieval after the closing of the polls, the drop-box must be removed or locked and/or covered to prevent any further ballots from being deposited, and a sign shall be posted indicating that polling is closed for the election; and

- Any ballots collected from a return site should be processed in the same manner as mail-in ballots personally delivered to the central office of the county board of elections official by the voter and ballots received via the United States Postal Service or any other delivery service.

The Secretary and her staff developed this guidance in consultation with subject-matter experts within her Department and after review of the policies, practices, and laws in other states where drop boxes have been used. [ECF 549-6, pp. 23:14-22]. The evidence reflects at least one instance in which the Secretary's deputies reiterated that these "best practices" should be followed in response to inquiries from county officials considering whether to use drop boxes.

Case 4:20-cv-02078-MWB    Document 176-1    Filed 11/19/20    Page 60 of 205
**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**
2020 WL 5997680

[ECF 549-32 ("Per our conversation, the list of items are things the county must keep in mind if you are going to provide a box for voters to return their ballots in person.") ].

Approximately 24 counties plan to use drop boxes during the November general election, to varying degrees. [ECF 549-28; ECF 504-1]. Of these, about nine counties intend to staff the drop boxes with county officials, while about 17 counties intend to use video surveillance in lieu of having staff present. [ECF 549-28].

### 2. Defendants' and Intervenors' evidence of the benefits and low risks associated with drop boxes.

Secretary Boockvar advocates for the use of drop boxes as a "direct and convenient way" for voters to deliver cast ballots to their county boards of elections, "thereby increasing turnout." [ECF 547, p. 22 ¶ 54 (citing 549-11 at pp. 10-11) ]. The Secretary also touts the special benefits of expanding drop-box use in the ongoing COVID-19 pandemic. Specifically, she asserts that drop boxes reduce health risks and inspire voter confidence because "many voters understandably do not wish to cast their votes in person at their polling place on Election Day" due to COVID-19. [*Id.* at ¶¶ 55, 57 (citing ECF 549-2 ¶ 39; ECF 549-11 at p. 10; 549-8, ¶ 95) ]. Drop boxes, she says, allow voters to vote in person without coming into "close proximity to other members of the public, compared to in-person voting or personally delivering a mail-in ballot to a public office building." [*Id.* at ¶ 57].

Secretary Boockvar also states that drop boxes are highly convenient, and cost-saving, for both counties and voters. For counties, she notes that "24-hour secure ballot drop boxes" are "cost-effective measures ... as they do not have to be staffed by election judges." [*Id.* at p. 24 ¶ 62 (citing ECF 549-11 at p. 11); ECF 549-9 at ¶ 34]. As for voters, the Secretary explains that, in a state where "ten counties ... cover more than 1,000 square miles" and "two-thirds" of counties "cover more than 500 square miles," many Pennsylvania voters "could be required to drive dozens of miles (and perhaps in excess of 100 miles) if he or she wished to deposit his or her mail-in ballot in person at the main county board of elections office." [*Id.* at ¶ 58 (citing ECF 549-29) ].

**\*15**  In addition to any tangible benefit drop boxes may have for voter access and turnout, Secretary Boockvar also states that drop boxes have a positive impact on voter confidence.

In particular, she cites a recent news article, and a letter sent by the General Counsel of the U.S. Postal Service regarding Pennsylvania's absentee and mail-in ballot deadline, which have raised concerns over the timeliness and reliability of the U.S. Postal Service. [*Id.* at ¶¶ 60-61 (citing ECF 549-13; ECF 549-14); ECF 549-17; ECF 549-2 ¶¶ 42-43]. Voters' fears that votes returned by mail will not be timely counted could, the Secretary worries, "justifiably dissuade voters from wanting to rely upon the Postal Service for return of their mail-in or absentee ballot." [ECF 547, ¶ 61]. Drop boxes, she says, can address this concern by allowing voters to safely return mail-in ballots to an in-person location.

In exchange for these benefits, the Secretary insists that any potential security risk associated with drop boxes is low. She notes that the federal Department of Homeland Security has released guidance affirming that a "ballot drop box provides a secure and convenient means for voters to return their mail ballot," and recommending that states deploy one drop box for every 15,000 to 20,000 registered voters. [*Id.* at ¶¶ 63-65 (citing ECF 549-24, p. 1) ]. She also points to a purported lack of evidence of systemic ballot harvesting or any attempts to tamper with, destroy, or otherwise commit voter fraud using drop boxes, either in Pennsylvania's recent primary election, or in other states that have used drop boxes for many years. [*Id.* at ¶¶ 68-74 (citations omitted) ]. And she asserts that "[i]n the last 20 years in the entire state of Pennsylvania, there have been fewer than a dozen confirmed cases of fraud involving a handful of absentee ballots" among the many millions of votes cast during that time period. [*Id.* at ¶ 70 (citing ECF 549-10, pp. 3-4) ].

Finally, the Secretary, and other Defendants and Intervenors, argue that Pennsylvania already has robust measures in place to prevent fraud, including its criminal laws, voter registration system, mail-in ballot application requirement, and canvassing procedures. [*Id.* at ¶¶ 66-67 (citing 25 P.S. §§ 3516 - 3518) ]; [ECF 549-9, p. 15, ¶¶ 46-47 ("These allegations are not consistent with my experience with drop box security, particularly given the strong voter verification procedures that are followed by elections officials throughout the country and in Pennsylvania. Specifically, the eligibility and identity of the voter to cast a ballot is examined by an election judge who reviews and confirms all the personal identity information provided on the outside envelope. Once voter eligibility is confirmed, the ballot is extracted and separated from the outside envelope to ensure the ballot remains secret. During this step, election judges confirm that there is only one ballot in the envelope and checks for

potential defects, such as tears in the ballot.... Regardless of the receptacle used for acceptance of the ballot (drop box versus USPS mailbox), ballot validation occurs when the ballot is received by the county board of elections. The validation is the same regardless of how the ballots are collected or who delivers the ballot, even where that delivery contravenes state law.") ].

Defendants and Intervenors also point to several expert reports expressing the view that drop boxes are both low risk and beneficial. These experts include:

**Professor Matthew A. Barreto,** a Professor of Political Science and Chicana/o Studies at UCLA. [ECF 549-7]. Professor Barreto offers the opinion that ballot drop boxes are an important tool in facilitating voting in Black and Latino communities. Specifically, he discusses research showing that Black and Latino voters are "particularly concerned about the USPS delivering their ballots." [Id. at ¶ 22]. And he opines that ballot drop boxes help to reassure these voters that their vote will count, because "there is no intermediary step between the voters and the county officials who collect the ballot." [Id. at ¶ 24].

**\*16 Professor Donald S. Burke,** a medical doctor and Distinguished University Professor of Health Science and Policy, Jonas Salk Chair in Population Health, and Professor of Epidemiology at the University of Pittsburgh. [ECF 549-8]. Professor Burke details the "significant risk of exposure" to COVID-19 in "enclosed areas like polling places." [Id. at ¶ 69]. He opines that "depositing a ballot in a mailbox and depositing a ballot in a drop-box are potential methods of voting that impart the least health risk to individual voters, and the least public health risk to the community." [Id. at ¶ 95].

**Amber McReynolds,** the CEO of the National Vote at Home Institute, with 13 years of experience administering elections as an Elections Director, Deputy Director, and Operations Manager for the City and County of Denver, Colorado. [ECF 549-9]. Ms. McReynolds opines that "[b]allot drop-boxes can be an important component of implementing expanded mail-in voting" that are "generally more secure than putting a ballot in post office boxes." [Id. at ¶ 16 (a) ]. She notes that "[d]rop boxes are managed by election officials ... delivered to election officials more quickly than delivery through the U.S. postal system, and are secure." [Id.].

Ms. McReynolds also opines that Secretary Boockvar's guidance with respect to drop boxes is "consistent with best practices and advice that NVAHI has provided across jurisdictions." [Id. at ¶ 35]. But she also notes that "[b]est practices will vary by county based on the county's available resources, population, needs, and assessment of risk." [Id. at ¶ 52].

More generally, Ms. McReynolds argues that "[d]rop-boxes do not create an increased opportunity for fraud" as compared to postal boxes. [Id. at ¶ 44]. She also suggests that Pennsylvania guards against such fraud through other "strong voter verification procedures," including "ballot validation [that] occurs when the ballot is received by the county board of elections" and "[r]econciliation procedures adopted by election officials ... [to] protect against the potential risk of double voting." [Id. at ¶¶ 46-48]. She notes that "Pennsylvania's balloting system requires that those who request a mail-in vote and do not return the ballot (or spoil the mail-in ballot at their polling place), can only vote a provisional ballot" and "[i]f a mail-in or absentee ballot was submitted by an individual, their provisional ballot is not counted." [Id. at ¶ 48].

**Professor Lorraine C. Minnite,** an Associate Professor and Chair of the Department of Public Policy and Administration at Rutgers University-Camden. [ECF 549-10]. Professor Minnite opines that "the incidence of voter fraud in contemporary U.S. elections is exceedingly rare, including the incidence of voter impersonation fraud committed through the use of mail-in absentee ballots." [Id. at p. 3]. In Pennsylvania specifically, she notes that "[i]n the last 20 years ... there have been fewer than a dozen confirmed cases of fraud involving a handful of absentee ballots, and most of them were perpetrated by insiders rather than ordinary voters." [Id. at pp. 3-4]. As a "point of reference," she notes that 1,459,555 mail-in and absentee ballots were cast in Pennsylvania's 2020 primary election alone. [Id. at 4].

**Professor Robert M. Stein,** a Professor of Political Science at Rice University and a fellow in urban politics at the Baker Institute. [ECF 549-11]. Professor Stein opines that "the Commonwealth's use of drop boxes provides a number of benefits without increasing the risk of mail-in or absentee voter fraud that existed before drop boxes were implemented because (manned or unmanned) they are at least as secure as U.S. Postal Service ('USPS') mailboxes, which have been successfully used to return mail-in ballots for decades in the Commonwealth and elsewhere around the U.S." [Id. at p. 3]. According to Professor Stein, the use of drop boxes "has been shown to increase turnout," which he suggests is

particularly important "during a global pandemic and where research has shown that natural and manmade disasters have historically had a depressive effect on voter turnout." [*Id.* at p. 4]. Professor Stein notes that "[d]rop boxes are widely used across a majority of states as a means to return mail-in ballots" and he is "not aware of any studies or research that suggest that drop boxes (manned or unmanned) are a source for voter fraud." [*Id.*]. Nor is he aware "of any evidence that drop boxes have been tampered with or led to the destruction of ballots." [*Id.*].

**\*17 Professor Paul Gronke**, a Professor of Political Science at Reed College and Director of the Early Voting Information Center. [ECF 545-7]. Professor Gronke recommends that "drop boxes should be provided in every jurisdiction that has significant (20% or more) percentage[ ] of voters casting a ballot by mail, which includes Pennsylvania" for the general election. [*Id.* at ¶ 6]. He avers that "[s]cientific research shows that drop boxes raise voter turnout and enhance voter confidence in the elections process." [*Id.* at ¶ 7]. Voters, he explains, "utilize drop boxes heavily—forty to seventy percent of voters in vote by mail states and twenty-five percent or more in no-excuse absentee states." [*Id.*]. Professor Gronke further states that he is "not aware of any reports that drop boxes are a source for voter fraud" despite having "been in use for years all over the country." [*Id.* at ¶ 8]. And he suggests that the use of drop boxes is "especially important" in an election "that will be conducted under the cloud of the COVID-19 pandemic, and for a state like Pennsylvania that is going to experience an enormous increase in the number of by-mail ballots cast by the citizenry of the state." [*Id.* at ¶ 9].

Based on this evidence, and the purported lack of any contrary evidence showing great risks of fraud associated with the use of drop boxes, Defendants and Intervenors argue that Pennsylvania's authorization of drop boxes, and the counties' specific implementation of them, furthers important state interests at little cost to the integrity of the election system.

**3. Plaintiffs' evidence of the risks of fraud and vote dilution associated with drop boxes.**

Plaintiffs, on the other hand, argue that the drop boxes allow for an unacceptable risk of voter fraud and "illegal delivery or ballot harvesting" that, when it occurs, will "dilute" the votes of all lawful voters who comply with the Election Code. *See, e.g.*, [ECF 461, ¶¶ 127-128]. As evidence of the

dilutive impact of drop boxes, Plaintiffs offer a combination of anecdotal and expert evidence.

Foremost among this evidence is the expert report of Greg Riddlemoser, the former Director of Elections and General Registrar for Stafford County, Virginia from 2011 until 2019. [ECF 504-19]. According to Mr. Riddlemoser, "voter fraud exists." [*Id.* at p. 2]. He defines the term "voter fraud" to mean any "casting and/or counting of ballots in violation of a state's election code." [*Id.*]. Examples he gives include: "Voting twice yourself—even if in multiple jurisdictions," "voting someone else's ballot," and "[e]lection officials giving ballots to or counting ballots from people who were not entitled to vote for various reasons." [*Id.* at pp. 2-3]. All of these things, he asserts, are "against the law and therefore fraudulent." [*Id.*].[3]

Mr. Riddlemoser argues that "ballot harvesting" (which is the term Plaintiffs use to refer to situations in which an individual returns the ballots of other people) "persists in Pennsylvania." [*Id.* at p. 3]. He points to the following evidence to support this opinion:

- Admissions by Pennsylvania's Deputy Secretary for Elections and Commissions, Jonathan Marks, that "several Pennsylvania counties permitted ballot harvesting by counting ballots that were delivered in violation of Pennsylvania law" during the recent primary election, [*Id.*];

- "[S]everal instances captured by the media where voters in the June 2020 Primary deposited multiple ballots into unstaffed ballot drop boxes," [*Id.* at p. 4];

- "Other photographs and video footage of at least one county's drop box (Elk County) on Primary Election day" which "revealed additional instances of third-party delivery," [*Id.*]; and

- "Documents produced by Montgomery County" which "reveal that despite signs warning that ballot harvesting is not permitted, people during the 2020 Primary attempted to deposit into the five drop boxes used by that county ballots that were not theirs," [*Id.*].

**\*18** With respect to the use of "unstaffed" or "unmanned" ballot drop boxes, Mr. Riddlemoser expresses the opinion that "the use of unmanned drop boxes presents the easiest opportunity for voter fraud" and "certain steps must be taken to make drop boxes 'secure' and 'monitored.' " [*Id.* at p. 16].

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 63 of 205
**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**
2020 WL 5997680

He states that, to be "secure," drop boxes must be "attended" by "sworn election officials" at all times (*i.e.*, "never left unattended at any time they are open for ballot drop-off."). [*Id.*]. He further suggests that officials stationed at drop boxes must be empowered, and required, to "verify the person seeking to drop off a ballot is the one who voted it and is not dropping off someone else's ballot." [*Id.*]. Doing so, he says, would, in addition to providing better security, also "allow the election official to ask the voter if they followed the instructions they were provided ... and assist them in doing so to remediate any errors, where possible, before ballot submission." [*Id.*].

In addition to being "manned," Mr. Riddlemoser suggests that certain procedures with respect to ballot collection are necessary to ensure the integrity of votes cast in drop boxes. For example, he suggests that, at the end of each day, drop boxes, which should themselves be "tamperproof," should "be verifiably completely emptied into fireproof/tamperproof receptacles, which are then sealed and labeled by affidavit as to whom, where, when, etc." [*Id.*] Once sealed, the containers "must then be transported by sworn officials in a county owned vehicle (preferably marked law enforcement) back to the county board where they are properly receipted and safeguarded." [*Id.*]. Emptied drop boxes should also be sealed at the end of each day "such that they are not able to accept any additional ballots until they are 'open' again[.]" [*Id.*]. And boxes should be "examined to ensure no ballots are in the box, that nothing else is inside the box, and that the structural integrity and any security associated with the box remains intact." [*Id.*]. All of this, he suggests, should also be "available for monitoring by poll watchers." [*Id.*].

According to Mr. Riddlemoser, anything short of these robust procedures won't do. In particular, "video cameras would not prevent anyone from engaging in activity that could or is designed to spoil the ballots inside the box; such as dumping liquids into the box, lighting the ballots on fire by using gasoline and matches, or even removing the box itself." [*Id.* at p. 17]. Even if the "identity of the person responsible may be determined ... the ballots themselves would be destroyed —effectively disenfranchising numerous voters." [*Id.*]. And given "recent footage of toppled statues and damage to government buildings" in the news, Mr. Riddlemoser finds the "forcible removal of ballot drop boxes" to be "a distinct possibility." [*Id.*]. In addition to increasing the risk of ballot destruction, Mr. Riddlemoser notes that reliance on video cameras would also "not prohibit someone from engaging in ballot harvesting by depositing more than one ballot in the drop box[.]" [*Id.*].

Beyond Mr. Riddlemoser's expert testimony, Plaintiffs proffer several other pieces of evidence to support their claims that drop boxes pose a dilutive threat to the ballots of lawful voters. Most notably, they present photographs and video stills of, by the Court's count, approximately seven individuals returning more than one ballot to drop boxes in Philadelphia and Elk County (the same photographs referenced by Mr. Riddlemoser). [ECF 504-19, PDF pp. 49-71].

**\*19** Those photographs depict the following:

- **An unidentified woman holding what appear to be two ballots at a Philadelphia drop box.**



- **Instagram user "thefoodiebarrister" posing for a selfie with two ballots in Philadelphia; captioned, in part, "dropping of [sic] my votes in a designated ballot drop box."**

Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)

2020 WL 5997680









- A photograph posted to social media showing a hand placing two ballots in a drop box; captioned, in part, "Cory and I voted!"

- A photograph of an unidentified man wearing a "Philadelphia Water" sweater and hat, placing two ballots in a Philadelphia drop box.



Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 65 of 205
**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**
2020 WL 5997680

• **Several video stills that, according to Plaintiffs, show voters depositing more than one ballot in an Elk County drop box.**





In addition to these photographs and video stills, Plaintiffs also provide a May 24, 2020, email sent by an official in Montgomery County (which placed security guards to monitor its drop boxes) observing that security "have turned people away yesterday and today without incident who had ballots other than their own." [ECF 504-28].

Separate and apart from this evidence specific to the use of drop boxes, Plaintiffs and their expert also provide evidence of instances of election fraud, voter fraud, and illegal voting generally. These include, for example:

• A case in which a New Jersey court ordered a new municipal election after a city councilman and councilman-elect were charged with fraud involving mail-in ballots. [ECF 504-19, p. 3].

• A New York Post article written by an anonymous fraudster who claimed to be a "master at fixing mail-in ballots" and detailed his methods. [*Id.*].

• Philadelphia officials' admission that approximately 40 people were permitted to vote twice during the 2020 primary elections. [*Id.*].

• A YouTube video purporting to show Philadelphia election officials approving the counting of mail-in

ballots that lacked a completed certification on the outside of the envelope. [*Id.* (citation omitted) ].

• The recent guilty plea of the former Judge of Elections in South Philadelphia, Domenick J. DeMuro, to adding fraudulent votes to voting machines on election day. [ECF 461, ¶ 61]; *see United States v. DeMuro*, No. 20-cr-112 (E.D. Pa. May 21, 2020).

• The 2014 guilty plea of Harmar Township police chief Richard Allen Toney to illegally soliciting absentee ballots to benefit his wife and her running mate in the 2009 Democratic primary for town council, [ECF 461, ¶ 69];

• The 2015 guilty plea of Eugene Gallagher for unlawfully persuading residents and non-residents of Taylor, in Lackawanna County, Pennsylvania, to register for absentee ballots and cast them for him during his councilman candidacy in the November 2013 election, [*Id.*];

**\*20**  • The 1999 indictment of Representative Austin J. Murphy in Fayette County for forging absentee ballots for residents of a nursing home and adding his wife as a write-in candidate for township election judge, [*Id.*];

• The 1994 Eastern District of Pennsylvania and Third Circuit case *Marks v. Stinson*, which involved an alleged incident of extensive absentee ballot fraud by a candidate for the Pennsylvania State Senate, *see Marks v. Stinson*, 19 F.3d 873 (3d Cir. 1994); *Marks v. Stinson*, No. 93-6157, 1994 WL 146113 (E.D. Pa. Apr. 26, 1994), [ECF 461, ¶ 78]; and

• A report from the bipartisan Commission on Federal Election Reform, chaired by former President Jimmy Carter and former Secretary of State James A. Baker III, which observed that absentee voting is "the largest source of potential voter fraud" and proposed that states "reduce the risks of fraud and abuse in absentee voting by prohibiting 'third-party' organizations, candidates, and political party activists from handling absentee ballots." [ECF 461, ¶¶ 66-67, 80].

### C. Facts relevant to signature comparison.
Many of the facts relevant to Plaintiffs' signature-comparison claim relate to the verification procedures for mail-in and absentee ballots, on one hand, and those procedures for in-person voting, on the other. These are described below.

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 66 of 205
**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**
2020 WL 5997680

**1. Mail-in and absentee ballot verification.**

As noted above, Pennsylvania does not distribute unsolicited mail-in and absentee ballots. Rather, a voter must apply for the ballot (and any voter can). [ECF 549-2, ¶ 64]. As part of the application for a mail-in ballot,[4] an applicant must provide certain identifying information, including name, date of birth, length of time as a resident of the voting district, voting district if known, party choice in the primary, and address where the ballot should be sent. 25 P.S. § 3150.12(b). In applying for a mail-in ballot, the applicant must also provide "proof of identification," which is defined by statute as that person's driver's license number, last four digits of Social Security number, or another specifically approved form of identification. [ECF 549-2, ¶ 64; ECF 549-27]; 25 P.S. § 2602(z.5)(3). A signature is not mentioned in the definition of "proof of identification." 25 P.S. § 2602(z.5)(3). However, if physically capable, the applicant must sign the application. *Id.* at § 3150.12(c)-(d).

Upon receiving the mail-in ballot application, the county board of elections determines if the applicant is qualified by "verifying the proof of identification and comparing the information provided on the application with the information contained on the applicant's permanent registration card." 25 P.S. § 3150.12b(a). The county board of elections then either approves the application[5] or "immediately" notifies the applicant if the application is not approved. *Id.* at § 3150.12b(a), (c). Upon approval, the county mails the voter the mail-in ballot.

**\*21**  After receiving the ballot, the mail-in voter must "mark the ballot" with his or her vote, insert the ballot into the "secrecy" envelope, and place the "secrecy" envelope into a larger envelope. *Id.* at § 3150.16(a). Then, the voter must "fill out, date and sign the declaration printed on [the larger] envelope. [The larger] envelope shall then be securely sealed and the elector shall send [it] by mail ... or deliver it in person to said county board of election." *Id.* The declaration on the larger envelope must be signed, unless the voter is physically unable to do so. *Id.* at § 3150.16(a)-(a.1).

Once the voter mails or delivers the completed mail-in ballot to the appropriate county board of elections, the ballot is kept "in sealed or locked containers until they are to be canvassed by the county board of elections." *Id.* at § 3146.8(a). The county boards of elections can begin pre-canvassing and canvassing the mail-in ballots no earlier than election day. *Id.* at § 3146.8(g)(1.1).

When pre-canvassing and canvassing the mail-in ballots, the county boards of elections must "examine the declaration on the [larger] envelope of each ballot ... and shall compare the information thereon with that contained in the ...Voters File." *Id.* at § 3146.8(g)(3). The board shall then verify the "proof of identification" and shall determine if "the declaration [on the larger envelope] is sufficient." *Id.* If the information in the "Voters File ... verifies [the elector's] right to vote," the ballot shall be counted. *Id.*

**2. In-person voting verification.**

When a voter decides to vote in-person on election day, rather than vote by mail, the procedures are different. There is no application to vote in person. Rather, on election day, the in-person voter arrives at the polling place and "present[s] to an election officer proof of identification," which the election officer "shall examine." *Id.* at § 3050(a). The in-person voter shall then sign a voter's certificate" and give it to "the election officer in charge of the district register." *Id.* at § 3050(a.3)(1). Next, the election officer shall "announce the elector's name" and "shall compare the elector's signature on his voter's certificate with his signature in the district register." *Id.* at § 3050(a.3)(2). If the election officer believes the signature to be "genuine," the in-person voter may vote. *Id.* But if the election officer does not deem the signature "authentic," the in-person voter may still cast a provisional ballot and is given the opportunity to remedy the deficiency. *Id.*

**3. The September 11, 2020, and September 28, 2020, sets of guidance.**

In September 2020, Secretary Boockvar issued two new sets of guidance related to signature comparisons of mail-in and absentee ballots and applications. The first, issued on September 11, 2020, was titled "Guidance Concerning Examination of Absentee and Mail-In Ballot Return Envelopes." [ECF 504-24]. The guidance stated, in relevant part, the "Pennsylvania Election Code does not authorize the county board of elections to set aside returned absentee or mail-in ballots based solely on signature analysis by the county board of elections." [*Id.* at p. 3]. The second set of guidance, issued on September 28, 2020, was titled, "Guidance Concerning Civilian Absentee and Mail-

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 67 of 205
**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**
2020 WL 5997680

In Ballot Procedures." [ECF 504-25]. This September 28, 2020, guidance stated, in relevant part, "The Election Code does not permit county election officials to reject applications or voted ballots based solely on signature analysis. ... No challenges may be made to mail-in and absentee ballots at any time based on signature analysis." [*Id.* at p. 9]. Thus, as evidenced by these two sets of guidance, Secretary Boockvar advised the county boards of elections not to engage in a signature-comparison analysis of voters' signatures on ballots and applications for ballots.

**\*22**  Most of the counties intend to follow the Secretary's guidance and will not compare signatures on mail-in ballots and applications for the upcoming general election. *E.g.*, [ECF 504-1]. A few counties, however, stated their intent to not comply with the guidance, and instead would compare and verify the authenticity of signatures. *E.g.*, [*id.* (noting the counties of Cambria, Elk, Franklin, Juniata, Mifflin, Sullivan, Susquehanna, and Wyoming, as not intending to follow Secretary Boockvar's guidance to not compare signatures) ].

According to Defendants, there are valid reasons to not require signature comparisons for mail-in and absentee ballots. For example, Secretary Boockvar notes that signature verification is a technical practice, and election officers are not "handwriting experts." [ECF 549-2, p. 19, ¶ 68]. Secretary Boockvar also notes that voters' signatures can change over time, and various medical conditions (*e.g.*, arthritis) can impact a person's signature. [*Id.*] Defendants' expert, Amber McReynolds, also finds that "signature verification" involves "inherent subjectivity." [ECF 549-9, p. 20, ¶ 64]. Ms. McReynolds further notes the "inherent variability of individuals' signatures over time." [*Id.*] And according to Secretary Boockvar, these are just some reasons Pennsylvania implements verification procedures other than signature comparisons for mail-in voters, who, unlike in-person voters, are not present when their signature would be verified. [ECF 549-2, p. 20, ¶ 69].

Plaintiffs' expert, Greg Riddlemoser, on the other hand, states that signature comparison is "a crucial security aspect of vote-by-mail" and failing to verify signatures on mail-in ballots would "undermine voter confidence and would increase the possibility of voter fraud." [ECF 504-19, pp. 10-11]. Mr. Riddlemoser asserts that Secretary Boockvar's September 11, 2020, and September 28, 2020, guidance "encourage, rather than prevent, voter fraud." [*Id.* at p. 12]. As such, Mr. Riddlemoser explains that mail-in voters should be subject

to the same signature-comparison requirement as in-person voters. [*Id.* at pp. 13-14].

### 4. Secretary Boockvar's King's Bench petition.

In light of this case and the parties' disagreement over whether the Election Code mandates signature comparison for mail-in ballots, Secretary Boockvar filed a "King's Bench" petition with the Pennsylvania Supreme Court on October 4, 2020. In that petition, she asked the Pennsylvania Supreme Court to exercise its extraordinary jurisdiction, in light of the impending election, to clarify whether the Election Code mandates signature comparison of mail-in and absentee ballots and applications. [ECF 556, p. 11; ECF 557].

On October 7, 2020, several groups, including Donald J. Trump for President, Inc. and the Republican National Committee—who are Plaintiffs in this case—moved to intervene as Respondents in the Pennsylvania Supreme Court case. [ECF 571-1]. The Pennsylvania Supreme Court has not yet decided the motion to intervene or whether to accept the case. The petition remains pending.

### D. Facts relevant to poll-watcher claims.

The position of "poll watcher" is a creation of state statute. *See* 25 P.S. § 2687. As such, the Election Code defines how a poll watcher may be appointed, what a poll watcher may do, and where a poll watcher may serve.

### 1. The county-residency requirement for poll watchers.

**\*23**  The Election Code permits candidates to appoint two poll watchers for each election district. 25 P.S. § 2687(a). The Election Code permits political parties and bodies to appoint three poll watchers for each election district. *Id.*

For many years, the Pennsylvania Election Code required that poll watchers serve only within their "election district," which the Code defines as "a district, division or precinct, ... within which all qualified electors vote at one polling place." 25 P.S. § 2687(b) (eff. to May 15, 2002) (watchers "shall serve in only one district and must be qualified registered electors of the municipality or township in which the district where they are authorized to act is located"); 25 P.S. § 2602(g). Thus, originally, poll watching was confined to a

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 68 of 205
**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**
2020 WL 5997680

more limited geographic reach than one's county, as counties are themselves made up of many election districts.

Then, in 2004, the General Assembly amended the relevant poll-watcher statute to provide that a poll watcher "shall be authorized to serve in the election district for which the watcher was appointed and, when the watcher is not serving in the election district for which the watcher was appointed, in any other election district in the county in which the watcher is a qualified registered elector." 25 P.S. § 2687(b) (eff. Oct. 8, 2004).

This county-residency requirement is in line with (or is, in some cases, more permissive than) the laws of at least eight other states, which similarly require prospective poll watchers to reside in the county in which they wish to serve as a watcher or (similar to the pre-2004 Pennsylvania statute) limit poll watchers to a sub-division of the county. *See, e.g.,* Fla. Stat. Ann. § 101.131(1) (Florida); Ind. Code Ann. § 3-6-8-2.5 (Indiana); Ky. Rev. Stat. Ann. § 117.315(1) (Kentucky); N.Y. Elec. Law § 8-500(5) (New York); N.C. Gen. Stat. Ann. § 163-45(a) (North Carolina); Tex. Elec. Code Ann. § 33.031(a) (Texas); S.C. Code Ann. § 7-13-860 (South Carolina); Wyo. Stat. Ann. § 22-15-109(b) (Wyoming). However, at least one state (West Virginia) does not provide for poll watchers at all. *See* W. Va. Code Ann. § 3-1-37; W. Va. Code Ann. § 3-1-41

The General Assembly has not amended the poll-watcher statute since 2004, even though some lawmakers have advocated for the repeal of the residency requirement. *See Cortés,* 218 F. Supp. 3d at 402 (observing that legislative efforts to repeal the poll-watcher residency requirement have been unsuccessful).

As part of its September 17, 2020, decision, the Pennsylvania Supreme Court found that the county-residency requirement does not violate the U.S. or Pennsylvania constitutions. *Boockvar,* —— A.3d at ——, 2020 WL 5554644, at *31.

**2. Where and when poll watchers can be present during the election.**

The Pennsylvania Election Code sets forth the rules for where and when poll watchers are permitted to be present.

The Election Code provides that poll watchers may be present "at any public session or sessions of the county board of elections, and at any computation and canvassing of returns of any primary or election and recount of ballots or recanvass of voting machines under" the Code. 25 P.S. § 2650. Additionally, one poll watcher for each candidate, political party, or political body may "be present in the polling place ... from the time that the election officers meet prior to the opening of the polls ... until the time that the counting of votes is complete and the district register and voting check list is locked and sealed." 25 P.S. § 2687(b).

*24 During this time, poll watchers may raise objections to "challenge any person making application to vote." *Id.* Poll watchers also may raise challenges regarding the voters' identity, continued residence in the election district, or registration status. 25 P.S. § 3050(d).

Although Pennsylvania has historically allowed absentee ballots to be returned by U.S. Postal Service or by in-person delivery to a county board of elections office, the Election Code does not provide (and has never provided for) any right to have poll watchers in locations where absentee voters fill out their ballots (which may include their home, office, or myriad other locations), nor where those votes are mailed (which may include their own mailbox, an official U.S. Postal Service collection box, a work mailroom, or other places U.S. Postal Service mail is collected), nor at county board of elections offices. [ECF 549-2, ¶¶ 86-90].

Before Act 77, absentee ballots were held in election districts rather than centralized at the county board of elections. *See* 25 P.S. § 3146.8 (eff. Mar. 14, 2012 to Oct. 30, 2019) ("In all election districts in which electronic voting systems are used, absentee ballots shall be opened at the election district, checked for write-in votes in accordance with section 1113-A and then either hand-counted or counted by means of the automatic tabulation equipment, whatever the case may be.").

At such time (again, before Act 77), poll workers opened those absentee ballots at each polling place after the close of the polls. *Id.* ("Except as provided in section 1302.1(a.2), the county board of elections shall then distribute the absentee ballots, unopened, to the absentee voter's respective election district concurrently with the distribution of the other election supplies. Absentee ballots shall be canvassed immediately and continuously without interruption until completed after the close of the polls on the day of the election in each election district. The results of the canvass of the absentee ballots shall then be included in and returned to the county board with the returns of that district." (footnote omitted)).

With the enactment of Act 77, processing and counting of mail-in and absentee ballots is now centralized in each county board of elections, with all mail-in and absentee ballots in such county held and counted at the county board of elections (or such other site as the county board may choose) without regard to which election district those ballots originated from. 25 P.S. § 3146.8(a) (eff. Mar. 27, 2020); [ECF 549-2, ¶ 81].

Under Act 12, counties are permitted to "pre-canvass" mail-in or absentee ballots received before Election Day beginning at 7:00 a.m. on Election Day. 25 P.S. § 3146.8(g)(1.1). Counties are further permitted to "canvass" ballots received after that time beginning "no earlier than the close of the polls on the day of the election and no later than the third day following the election." *Id.* § 3146.8(g)(2).

The Election Code permits "[o]ne authorized representative of each candidate" and "one representative from each political party" to "remain in the room in which the absentee ballots and mail-in ballots are pre-canvassed." 25 P.S. § 3146.8(g)(1.1). Similarly, during canvassing, the Election Code permits "[o]ne authorized representative of each candidate" and "one representative from each political party" to "remain in the room in which the absentee ballots and mail-in ballots are canvassed." 25 P.S. § 3146.8(g)(2).

**\*25** The Election Code provisions pertaining to the "pre-canvass" and "canvass" do not make any separate reference to poll watchers, instead referring only to the "authorized representatives" of parties and candidates. *See* 25 P.S. § 3146.8.

On October 6, 2020, Secretary Boockvar issued guidance concerning poll watchers and authorized representatives. [ECF 571-1]. The guidance states that poll watchers "have no legal right to observe or be present at ... ballot return sites," such as drop-box locations. [ECF 571-1, Ex. E, p. 5]. The guidance also states that while a candidate's authorized representative may be present when mail-in ballots are opened (including during pre-canvass and canvass), the representative cannot challenge those ballots. [*Id.* at Ex. E, p. 4].

On October 9, 2020, in a separate lawsuit brought by the Trump Campaign in the Philadelphia County Court of Common Pleas, the state court there confirmed Secretary Boockvar's guidance. Specifically, the state court held that satellite ballot-collection locations, such as drop-box locations, are not "polling places," and therefore poll watchers

are not authorized to be present in those places. [ECF 573-1, p. 12 ("It is clear from a reading of the above sections [of the Election Code] that the satellite offices where these activities, and only these activities, occur are true 'offices of the Board of Elections' and are not polling places, nor public sessions of the Board of Elections, at which watchers have a right to be present under the Election Code.") ]. Immediately after issuance of this decision, the Trump Campaign filed a notice of appeal, indicating its intention to appeal the decision to the Commonwealth Court of Pennsylvania. Having just been noticed, that appeal remains in its infancy as of the date of this Opinion.

### 3. Plaintiffs' efforts to recruit poll watchers for the upcoming general election.

In order to become a certified poll watcher, a candidate must meet certain criteria. [ECF 504-20, ¶ 9]. That is, a poll watcher needs to be "willing to accept token remuneration, which is capped at $120 under Pennsylvania state law" and must be able to take off work or otherwise make arrangements to be at the polling place during its open hours on Election Day, which can mean working more than 14 hours in a single day. [*Id.*].

The Pennsylvania Director for Election Day Operations for the Trump Campaign, James J. Fitzpatrick, stated that the Trump Campaign wants to recruit poll watchers for every county in Pennsylvania. [ECF 504-2, ¶ 30]. To that end, the RNC and the Trump Campaign have initiated poll-watcher recruitment efforts for the general election by using a website called DefendYourBallot.com. [ECF 528-14, 265:2-15, 326:14-329-7]. That website permits qualified electors to volunteer to be a poll watcher. [*Id.*]. In addition, Plaintiffs have called qualified individuals to volunteer to be poll watchers, and worked with county chairs and conservative activists to identify potential poll watchers. [*Id.*].

Despite these efforts, the Trump Campaign claims it "is concerned that due to the residency restriction, it will not have enough poll watchers in certain counties." [ECF 504-2, ¶ 25]. Mr. Fitzpatrick, however, could not identify a specific county where the Trump Campaign has been unable to obtain full coverage of poll watchers or any county where they have tried and failed to recruit poll watchers for the General Election. [ECF 528-14, 261:21-262:3, 263:8-19, 265:2-266:3].

**\*26** In his declaration, Representative Reschenthaler shared Mr. Fitzpatrick's concern, stating that he does not believe that

Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)

2020 WL 5997680

he will "be able to recruit enough volunteers from Greene County to watch the necessary polls in Greene County." [ECF 504-6, ¶ 12]. But Representative Reschenthaler did not provide any information regarding his efforts to recruit poll watchers to date, or what he plans to do in the future to attempt to address his concern. *See generally [id.]*.

Representative Kelly stated in his declaration that he was "likely to have difficulty getting enough poll watchers from within Erie County to watch all polls within that county on election day." [ECF 504-5, ¶ 16]. Representative Kelly never detailed his efforts (*e.g.*, the outreach he tried, prospective candidates he unsuccessfully recruited, and the like), and he never explained why those efforts aren't likely to succeed in the future. *See generally [id.]*.

In his declaration, Representative Thompson only stated that based on his experience, "parties and campaigns cannot always find enough volunteers to serve as poll watchers in each precinct." [ECF 504-4, ¶ 20].

According to statistics collected and disseminated by the Pennsylvania Department of State, there is a gap between the number of voters registered as Democrats and Republicans in some Pennsylvania counties. [ECF 504-34]. Plaintiffs' expert, Professor Lockerbie, believes this puts the party with less than a majority of voters in that county at a disadvantage in recruiting poll watchers. [ECF 504-20, ¶ 15]. However, despite this disadvantage, Professor Lockerbie states that "the Democratic and Republican parties might be able to meet the relevant criteria and recruit a sufficient population of qualified poll watchers who meet the residency requirement[ ]." [*Id.* at ¶ 16].

Additionally, Professor Lockerbie finds the gap in registered voters in various counties to be especially problematic for minor political parties. [*Id.* at ¶ 16]. As just one example, according to Professor Lockerbie, even if one were to assume that all third-party voters were members of the same minor party, then in Philadelphia County it would require "every 7th registrant" to be a poll watcher in order for the third party to have a poll watcher observing each precinct." [*Id.*].

Professor Lockerbie believes that disruptions to public life caused by the COVID-19 pandemic "magnified" the difficulties in securing sufficient poll watchers. [*Id.* at ¶ 10].

Nothing in the Election Code limits parties from recruiting only registered voters from their own party. [ECF 528-14,

267:23-268:1]. For example, the Trump Campaign utilized at least two Democrats among the poll watchers it registered in the primary. [ECF 528-15, P001648].

### 4. Rationale for the county-residency requirement.

Defendants have advanced several reasons to explain the rationale behind county-residency requirement for poll watchers.

Secretary Boockvar has submitted a declaration, in which she has set forth the reasons for and interests supporting the county-residency requirement. Secretary Boockvar states that the residency requirement "aligns with Pennsylvania's county-based election scheme[.]" [ECF 549-2, p. 22, ¶ 77]. "By restricting poll watchers' service to the counties in which they actually reside, the law ensures that poll watchers should have some degree of familiarity with the voters they are observing in a given election district." [*Id.* at p. 22, ¶ 78].

**\*27** In a similar vein, Intervenors' expert, Dr. Barreto, in his report, states that, voters are more likely to be comfortable with poll watchers that "they know" and are "familiar with ... from their community." [ECF 524-1, p. 14, ¶ 40]. That's because when poll watchers come from the community, "there is increased trust in government, faith in elections, and voter turnout[.]" [*Id.*].

At his deposition, Representative Kelly agreed with this idea: "Yeah, I think – again, depending how the districts are established, I think people are probably even more comfortable with people that they – that they know and they recognize from their area." [ECF 524-23, 111:21-25].

### LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At summary judgment, the Court must ask whether the evidence presents "a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making that determination, the Court must "consider all evidence in the light most favorable to the party

2020 WL 5997680

opposing the motion." *A.W. v. Jersey City Pub. Schs.*, 486 F.3d 791, 794 (3d Cir. 2007).

**[1]** **[2]** The summary-judgment stage "is essentially 'put up or shut up' time for the non-moving party," which "must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Grp. Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is warranted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**[3]** "The rule is no different where there are cross-motions for summary judgment." *Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008). The parties' filing of cross-motions "does not constitute an agreement that if one is rejected the other is necessarily justified[.]" *Id.* But the Court may "resolve cross-motions for summary judgment concurrently." *Hawkins v. Switchback MX, LLC*, 339 F. Supp. 3d 543, 547 (W.D. Pa. 2018). When doing so, the Court views the evidence "in the light most favorable to the non-moving party with respect to each motion." *Id.*

## DISCUSSION & ANALYSIS

Plaintiffs, Defendants, and Intervenors all cross-move for summary judgment on all three of Plaintiffs' remaining claims, which the Court refers to, in the short-hand, as (1) the drop-box claim, (2) the signature-comparison claim, and (3) the poll-watching claim. The common constitutional theory behind each of these claims is vote dilution. Absent the security measures that Plaintiffs seek, they fear that others will commit voter fraud, which will, in turn, dilute their lawfully cast votes. They assert that this violates the federal and Pennsylvania constitutions.

The Court will address only the federal-constitutional claims. For the reasons that follow, the Court finds that Plaintiffs lack standing to bring their federal-constitutional claims because Plaintiffs' injury of vote dilution is not "concrete" for Article III purposes.

But even assuming Plaintiffs had standing, the Court also concludes that Defendants' regulations, conduct, and election guidance here do not infringe on any right to vote, and if they do, the burden is slight and outweighed by the Commonwealth's interests—interests inherent in the Commonwealth's other various procedures to police fraud, as well as its overall election scheme.

**\*28** Finally, because the Court will be dismissing all federal-constitutional claims, it will decline to exercise supplemental jurisdiction over any of the state-constitutional claims and will thus dismiss those claims without prejudice.

## I. Defendants' procedural and jurisdictional challenges.

At the outset, Defendants and Intervenors raise a number of jurisdictional, justiciability, and procedural arguments, which they assert preclude review of the merits of Plaintiffs' claims. Specifically, they assert (1) the claims are not ripe and are moot, (2) there is a lack of evidence against certain county boards, and those boards are not otherwise necessary parties, and (3) Plaintiffs lack standing. The Court addresses each argument, in turn.

### A. Plaintiffs' claims are ripe and not moot.

Several Defendants have argued that Plaintiffs' claims in the Second Amended Complaint are not ripe and are moot. The Court disagrees.

### 1. Plaintiffs' claims are ripe.

**[4]** **[5]** **[6]** **[7]** The ripeness doctrine seeks to "prevent the courts, through the avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Artway v. Attorney Gen. of N.J.*, 81 F.3d 1235, 1246-47 (3d Cir. 1996) (cleaned up). The ripeness inquiry involves various considerations including whether there is a "sufficiently adversarial posture," the facts are "sufficiently developed," and a party is "genuinely aggrieved." *Peachlum v. City of York*, 333 F.3d 429, 433-34 (3d Cir. 2003). Ripeness requires the case to "have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them." *Wyatt, Virgin Islands, Inc. v. Gov't of the Virgin Islands*, 385 F.3d 801, 806 (3d Cir. 2004) (quoting *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 244, 73 S.Ct. 236, 97 L.Ed. 291 (1952)). "A dispute is not ripe for judicial determination if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Id.*

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 72 of 205
**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**

2020 WL 5997680

**[8]** Ultimately, "[r]ipeness involves weighing two factors: (1) the hardship to the parties of withholding court consideration; and (2) the fitness of the issues for judicial review." *Artway*, 81 F.3d at 1247. Unlike standing, ripeness is assessed at the time of the court's decision (rather than the time the complaint was filed). *See Blanchette v. Connecticut General Ins. Corp.*, 419 U.S. 102, 139-40, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974).

**[9]** The Court finds that Plaintiffs' claims are ripe. Applying the two-factor test here, the Court first concludes that the parties would face significant hardship if the Court were to hold that the case was unripe (assuming it was otherwise justiciable). The general election is less than one month away, and Plaintiffs assert claims that could significantly affect the implementation of Pennsylvania's electoral procedures. Further, if the Court were to find that Plaintiffs' claims were not ripe, Plaintiffs would be burdened. This is because Plaintiffs would then have to either wait until after the election occurred—and thus after the alleged harms occurred—or Plaintiffs would have to bring suit on the very eve of the election, and thus there would be insufficient time for the Court to address the issues. This hardship makes judicial review at this time appropriate. The first factor is met.

**\*29** Some Defendants argue that because some of the Secretary's guidance was issued after the 2020 primary election, Plaintiffs' claims that rely on such guidance are not ripe because the guidance has not been implemented in an election yet. The Court disagrees. Both the allegations in the Second Amended Complaint, and the evidence presented on summary judgment, reveal that the guidance issued after the primary election will apply to the upcoming general election. This is sufficient to make this a properly ripe controversy.[6]

The second factor the Court must consider in determining ripeness is "the fitness of the issues for judicial review." *Artway*, 81 F.3d at 1247. "The principal consideration [for this factor] is whether the record is factually adequate to enable the court to make the necessary legal determinations. The more that the question presented is purely one of law, and the less that additional facts will aid the court in its inquiry, the more likely the issue is to be ripe, and vice-versa." *Id.* at 1249.

Under this framework, the Court concludes that the issues are fit for review. The parties have engaged in extensive discovery, creating a developed factual record for the Court to review. Further, as shown below, the Court finds it can assess Plaintiffs' claims based on the current factual record

and can adequately address the remaining legal questions that predominate this lawsuit. As such, the Court finds Plaintiffs' claims fit for judicial review.

Thus, Plaintiffs' claims are presently ripe.

**2. Plaintiffs' claims are not moot.**

Some Defendants also assert that Plaintiffs' claims are moot because Plaintiffs reference allegations of harm that occurred during the primary election, and since then, Secretary Boockvar has issued new guidance and the Pennsylvania Supreme Court has interpreted the Election Code to clarify several ambiguities. The Court, however, concludes that Plaintiffs' remaining claims are not moot.

**[10]   [11]   [12]** Mootness stems from the same principle as ripeness, but is stated in the inverse: courts "lack jurisdiction when 'the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.' " *Merle v. U.S.*, 351 F.3d 92, 94 (3d Cir. 2003) (quoting *Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969)). Like ripeness and unlike standing, mootness is determined at the time of the court's decision (rather than at the time the complaint is filed). *See U.S. Parole Commission v. Geraghty*, 445 U.S. 388, 397, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980). When assessing mootness, the Court may assume (for purposes of the mootness analysis) that standing exists. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (citation omitted).

**\*30   [13]** Here, the Court finds that Plaintiffs' claims are not moot, as the claims Plaintiffs are proceeding with are "live." First, Plaintiffs' claims are based on guidance that issued after the primary election and are to be applied in the upcoming general election. As such, the *harms* alleged are not solely dependent on the already-passed primary election. Second, Defendants, by and large, have made clear that they intend to abide by guidance that Plaintiffs assert is unlawful or unconstitutional. Third, Plaintiffs sufficiently show that certain Defendants intend to engage in the conduct (*e.g.*, use unmanned drop-boxes) that Plaintiffs say infringes their constitutional rights. Thus, these issues are presently "live" and are not affected by the completion of the primary election.[7] Plaintiffs' claims are not moot.

**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**

2020 WL 5997680

**3. All named Defendants are necessary parties to this lawsuit.**

[14] Many of the county boards of elections that are Defendants in this case argue that the claims against them should be dismissed because Plaintiffs did not specifically allege or prove sufficient violative facts against them. Plaintiffs argue in response that all county boards have been joined because they are necessary parties, and the Court cannot afford relief without their presence in this case. The Court agrees with Plaintiffs, and declines to dismiss the county boards from the case. They are necessary parties.

Federal Rule of Civil Procedure 19(a) states that a party is a necessary party that must be joined in the lawsuit if, "in that [party's] absence, the court cannot accord complete relief among existing parties." Fed. R. Civ. P. 19(a)(1)(A).

Here, if the county boards were not named defendants in this case, the Court would not be able to provide Plaintiffs complete relief should Plaintiffs prove their case. That's because the Court could not enjoin the county boards if they were not parties. *See* Fed. R. Civ. P. 65(d)(2).[8] This is important because each individual county board of elections manages the electoral process within its county lines. As one court previously summarized, "Election procedures and processes are managed by each of the Commonwealth's sixty-seven counties. Each county has a board of elections, which oversees the conduct of all elections within the county." *Cortés*, 218 F. Supp. 3d at 403 (citing 25 P.S. § 2641(a)). "The county board of elections selects, fixes and at times alters the polling locations of new election districts. Individual counties are also tasked with the preservation of all ballots cast in that county, and have the authority to investigate fraud and report irregularities or any other issues to the district attorney[.]" *Id.* (citing 25 P.S. §§ 2726, 2649, and 2642). The county boards of elections may also make rules and regulations "as they may deem necessary for the guidance of voting machine custodians, elections officers and electors." 25 P.S. § 2642(f).

*31 Indeed, Defendants' own arguments suggest that they must be joined in this case. As just one example, a handful of counties assert in their summary-judgment brief that the "[Election] Code permits Boards to exercise discretion in certain areas when administering elections, to administer the election in a manner that is both legally-compliant and meets the unique needs of each County's citizens." [ECF 518, p. 6]. Thus, because of each county's discretionary authority, if

county boards engage in unconstitutional conduct, the Court would not be able to remedy the violation by enjoining only Secretary Boockvar.[9]

To grant Plaintiffs relief, if warranted, the Court would need to enter an order affecting all county boards of elections—which the Court could not do if some county boards were not joined in this case. Otherwise, the Court could only enjoin violative conduct in some counties but not others. As a result, inconsistent rules and procedures would be in effect throughout the Commonwealth. While some counties can pledge to follow orders issued by this Court, the judicial system cannot rely on pledges and promises, regardless of the county boards' good intent. The only way to ensure that any illegal or unconstitutional conduct is uniformly remedied, permanently, is to include all county boards in this case.

Thus, because the county boards are necessary parties, the Court cannot dismiss them.

**4. Plaintiffs lack Article III standing to raise their claims of vote dilution because they cannot establish a "concrete" injury-in-fact.**

While Plaintiffs can clear the foregoing procedural hurdles, they cannot clear the final one—Article III standing.

[15] Federal courts must determine that they have jurisdiction before proceeding to the merits of any claim. *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 94–95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." One component of the case-or-controversy requirement is standing, which requires a plaintiff to demonstrate the now-familiar elements of (1) injury in fact, (2) causation, and (3) redressability. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

[16] Standing is particularly important in the context of election-law cases, including a case like this one, that challenge the laws, regulations, and guidance issued by elected and appointed state officials through the democratic processes. As the Supreme Court has explained, the standing "doctrine developed in our case law to ensure that federal courts do not exceed their authority as it has been traditionally understood." *Spokeo, Inc. v. Robins*, — U.S. ——, 136 S. Ct. 1540, 1547, 194 L.Ed.2d 635 (2016) (cleaned up).

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 74 of 205
**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**
2020 WL 5997680

The doctrine "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Id.* In this way, "Article III standing serves to prevent the judicial process from being used to usurp the powers of the political branches." *Id.* Nowhere is that concern more acute than in a case that challenges a state's exercise of its core constitutional authority to regulate the most deeply political arena of all—elections.

**\*32**   [17]   Here, Defendants and Intervenors claim that Plaintiffs lack standing, largely arguing that Plaintiffs' injury is too speculative. [ECF 547, pp. 43-50]. The Court agrees and finds that Plaintiffs lack Article III standing for this reason.

Initially, to frame the standing inquiry, understanding the specific claims at issue is important. As discussed above, there are essentially three claims remaining in this case: (1) a challenge to Secretary Boockvar's guidance that does not require all drop boxes to have manned security personnel; (2) a challenge to Secretary Boockvar's guidance that counties should not perform a signature comparison for mail-in ballots; and (3) a challenge to Pennsylvania's county-residency restriction for poll-watchers. *See* [ECF 509, pp. 4-5]. The theory behind all of these claims and the asserted injury is one of vote dilution due to the heightened risk of fraud; that is, without the above measures in place, there is an imminent risk of voter fraud (primarily by mail-in voters); and if that fraud occurs, it will dilute the votes of many of Plaintiffs, who intend to vote in person in the upcoming election. [ECF 551, p. 12 ("As qualified electors who will be voting in the November election, Plaintiffs will suffer an injury through their non-equal treatment and/or the dilution or debasement of their legitimately case votes by absentee and mail-in votes that have not been properly verified by matching the voters' signatures on their applications and ballots to the permanent voter registration record and/or that have been improperly delivered by others to drop boxes or other mobile collection sites in manners that are different[ ] from those offered or being used in their counties of residence.") ].

Turning to the familiar elements of Article III standing, the first and, in the Supreme Court's estimation, "foremost" element—injury-in-fact—is dispositive. *See Gill v. Whitford*, —— U.S. ——, 138 S. Ct. 1916, 1929, 201 L.Ed.2d 313 (2018). Specifically, the Court finds that Plaintiffs' theory of vote dilution, based on the evidence presented, is insufficient to establish standing because Plaintiffs' injury-in-fact is not sufficiently "concrete."

With respect to injury-in-fact, the Supreme Court has made clear that an injury must be "concrete" and "particularized." *See Spokeo*, 136 S. Ct. at 1548. Defendants argue that the claimed injury of vote dilution caused by possible voter fraud here is too speculative to be concrete. The Court agrees.

To establish a "concrete" injury, Plaintiffs rely on a chain of theoretical events. They first argue that Defendants' lack of election safeguards (poll watchers, drop-box guards, and signature-comparison procedures) creates a risk of voter fraud or illegal voting. *See* [ECF 461, ¶¶ 230-31, 240, 256]. That risk, they say, will lead to potential fraudsters committing voter fraud or ballot destruction. [*Id.*]. And if that happens, each vote cast in contravention of the Election Code will, in Plaintiffs' view, dilute Plaintiffs' lawfully cast votes, resulting in a constitutional violation.

The problem with this theory of harm is that this fraud hasn't yet occurred, and there is insufficient evidence that the harm is "certainly impending."

To be clear, Plaintiffs need not establish actual fraud at this stage; but they must establish that fraud is "certainly impending," and not just a "possible future injury." *See Clapper*, 568 U.S. at 409, 133 S.Ct. 1138 ("Thus, we have repeatedly reiterated that threatened injury must be certainly impending to constitute injury in fact, and that allegations of possible future injury are not sufficient.") (cleaned up).

**\*33**   This case is well past the pleading stage. Extensive fact and expert discovery are complete. [ECF 462]. Nearly 300 exhibits have been submitted on cross-motions for summary judgment (including 68 by Plaintiffs alone). Plaintiffs bear the burden of proof on this issue, and unlike on a motion to dismiss, on summary judgment, they must come forward with proof of injury, taken as true, that will prove standing, including a concrete injury-in-fact. *See Lujan*, 504 U.S. at 561, 112 S.Ct. 2130 (1992) ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice ... In response to a summary judgment motion, however, the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts ... which for purposes of the summary judgment motion will be taken to be true.") (cleaned up).

Based on the evidence presented by Plaintiffs, accepted as true, Plaintiffs have only proven the "possibility of future injury" based on a series of speculative events—which falls short of the requirement to establish a concrete injury. For

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 75 of 205
**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**
2020 WL 5997680

example, Plaintiffs' expert, Mr. Riddlemoser, opines that the use of "unstaffed or unmanned" drop boxes merely "increases the *possibility* for voter fraud (and vote destruction)[.]" [ECF 504-19, p. 20 (emphasis added) ]. That's because, according to him (and Plaintiffs' other witnesses), theoretical bad actors *might* intentionally "target" a drop box as the "easiest opportunity for voter fraud" or with the malicious "intent to destroy as many votes ... as possible." [*Id.* at pp. 16-18; *see also* ECF 504-2, ¶ 12 (declaring that drop boxes "*may* serve as a target for bad actors that may wish to tamper with lawfully case ballots before such ballots are counted") (emphasis added) ]. But there's no way of knowing whether these independent actors will ever surface, and if they do, whether they will act as Mr. Riddlemoser and Plaintiffs predict.

Similarly, Mr. Riddlemoser concludes that, at most, not conducting signature analysis for mail-in and absentee ballots "open[s] the door to the potential for massive fraud through a mechanism already susceptible to voter fraud." [ECF 504-19, p. 20].

This increased susceptibility to fraud and ballot destruction is the impetus for Plaintiffs, in their various capacities, to express their concerns that vote dilution might occur and disrupt their right to a "free and fair election." *See, e.g.,* [504-3, ¶ 6; 504-4, ¶ 7; ECF 504-6, ¶¶ 6-8; ECF 504-7, ¶¶ 5-9]. But these concerns, as outlined above, are based solely on a chain of unknown events that may never come to pass.

In addition to Plaintiffs' expert report, Plaintiffs' evidence consists of instances of voter fraud in the past, including an article in the N.Y. Post purporting to detail the strategies of an anonymous fraudster, as well as pointing to certain prior cases of voter fraud and election irregularities (*e.g.,* Philadelphia inadvertently allowing 40 people to vote twice in the 2020 primary election; some counties counting ballots that did not have a completed declaration in the 2020 primary election). [ECF 461, ¶¶ 63-82; ECF 504-19, p. 3 & Ex. D]. Initially, with one exception noted directly below, none of this evidence is tied to individuals using drop boxes, submitting forged mail-in ballots, or being unable to poll watch in another county —and thus it is unclear how this can serve as evidence of a concrete harm in the upcoming election as to the specific claims in this case.

**\*34** Perhaps the best evidence Plaintiffs present are the several photographs and video stills, which are depicted above, and which are of individuals who appear to be

delivering more than one ballot to a drop box during the primary election. It is undisputed that during the primary election, some county boards believed it be appropriate to allow voters to deliver ballots on behalf of third parties. [ECF 504-9, 92:4-10; ECF 504-10, 60:3-61:10; ECF 504-49].

But this evidence of past injury is also speculative. Initially, the evidence is scant. But even assuming the evidence were more substantial, it would still be speculative to find that third-party ballot delivery will also occur in the general election. It may; it may not. Indeed, it may be less likely to occur now that the Secretary issued her September 28, 2020, guidance, which made clear to all county boards that for the general election, third-party ballot delivery is prohibited. [ECF 504-25 ("Third-person delivery of absentee or mail-in ballots is not permitted, and any ballots delivered by someone other than the voter are required to be set aside. The only exceptions are voters with a disability, who have designated in writing an agent to deliver their ballot for them.") ]. It may also be less likely to occur in light of the Secretary's other guidance, which recommends that county boards place signs near drop boxes, warning voters that third-party delivery is prohibited.

[18] It is difficult—and ultimately speculative—to predict future injury from evidence of past injury. This is why the Supreme Court has recognized that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief if unaccompanied by any continuing, present adverse effects." *Lujan,* 504 U.S. at 564, 112 S.Ct. 2130 (cleaned up).

In fact, based on Plaintiffs' theory of harm in this case, it is almost impossible for them to present anything other than speculative evidence of injury. That is, they would have to establish evidence of a certainly impending illegal practice that is likely to be prevented by the precautions they seek. All of this sounds in "possible future injury," not "certainly impending" injury. In that way, this case is very much like the Supreme Court's decision in *Clapper.*

In *Clapper,* plaintiffs-respondents were attorneys, other advocates, and media groups who communicated with clients overseas whom they feared would be subject to government surveillance under a FISA statute. 568 U.S. at 406, 133 S.Ct. 1138. The plaintiffs there alleged that the FISA statute at issue created a risk of possible government surveillance, which prevented them from communicating in confidence with their clients and compelled them to travel overseas instead and

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 76 of 205
**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**
2020 WL 5997680

incur additional costs. *Id.* at 406–07, 133 S.Ct. 1138. Based on these asserted injures, the plaintiffs filed suit, seeking to invalidate provisions of FISA. *Id.* at 407, 133 S.Ct. 1138.

The Supreme Court held that plaintiffs there lacked standing because their risk of harm was not concrete—rather, it was attenuated and based on a series of speculative events that may or may not ever occur. *Id.* at 410, 133 S.Ct. 1138 (finding that "respondents' argument rests on their highly speculative fear that: (1) the Government will decide to target the communications of non-U.S. persons with whom they communicate; (2) in doing so, the Government will choose to invoke its authority under § 1881a rather than utilizing another method of surveillance; (3) the Article III judges who serve on the Foreign Intelligence Surveillance Court will conclude that the Government's proposed surveillance procedures satisfy § 1881a's many safeguards and are consistent with the Fourth Amendment; (4) the Government will succeed in intercepting the communications of respondents' contacts; and (5) respondents will be parties to the particular communications that the Government intercepts).

**\*35**  In the end, the Court found that it would not "endorse standing theories that rest on speculation about the decisions of independent actors." *Id.* at 414, 133 S.Ct. 1138.

Like *Clapper,* here, Plaintiffs' theory of harm rests on speculation about the decisions of independent actors. For drop boxes, that speculation includes that unknown individuals will utilize drop boxes to commit fraud or other illegal activity; for signature comparison, that fraudsters will submit forged ballots by mail; for poll watchers, that illegal votes will not be sufficiently challenged; and for all these claims, that other security measures in place to monitor drop boxes, to verify ballot information, and to challenge ballots will not work.

All of this may occur and may result in some of Plaintiffs' votes being diluted; but the question is whether these events are "certainly impending." The evidence outlined above and presented by Plaintiffs simply fails to meet that standard.

**[19]**  This is not to say that claims of vote dilution or voter fraud never give rise to a concrete injury. A plaintiff can have standing to bring a vote-dilution claim—typically, in a malapportionment case—by putting forth statistical evidence and computer simulations of dilution and establishing that he or she is in a packed or cracked district. *See Gill,* 138 S.

Ct. at 1936 (Kagan, J., concurring). And a plaintiff can have standing to bring a voter-fraud claim, but the proof of injury there is evidence of actual fraud in the election and thus the suit will be brought after the election has occurred. *See, e.g., Marks v. Stinson,* 19 F.3d 873 (3d Cir. 1994). But, at least based on the evidence presented here, a claim of vote dilution brought in advance of an election on the theory of the risk of potential fraud fails to establish the requisite concrete injury for purposes of Article III standing.

Plaintiffs advance three other theories of harm here, in order to establish standing—none of which establish a concrete injury-in-fact.

First, Plaintiffs assert that since some of them are Republican candidates and that Republicans are more likely to vote in person and Democrats more likely to vote by mail, that their injury here is a competitive disadvantage in the electoral process. [ECF 551, pp. 16-18 ("The challenged guidance will further harm the RNC through the institutional prioritization of voting by mail and the potential disenfranchisement of Republican voters, who prefer to vote in person in the upcoming General Election.") ]. This too is a speculative, non-concrete injury. There is nothing in the record to establish that potential voter fraud and dilution will impact Republicans more than Democrats.

**\*36**  To be sure, the information that Plaintiffs present shows that more Democrats are likely to use mail-in ballots. [ECF 551, p. 31 ("[I]n Pennsylvania, of the 1.9 million absentee or mail-in ballots that have been requested for the November 3, 2020 General Election, 'nearly 1.5 million Democrats have requested a mail-in ballot—nearly three times the requests from Republicans.' ") (quoting L. Broadwater, "Both Parties Fret as More Democrats Request Mail Ballots in Key States," New York Times (Sept. 30, 2020), *available at* https://www.nytimes.com/2020/09/30/us/mail-voting-democrats-republicans-turnout.html) ]. But it doesn't necessarily follow that more Democrats will commit voter fraud, such as through the destruction of drop boxes or third-party ballot harvesting, and thus more Republicans' votes will be diluted.

In fact, as Plaintiffs' expert, Mr. Riddlemoser, explains, fraudsters from either party could target drop boxes in specific areas in order to destroy ballots, depending on who may be the predominant party in the area. [ECF 504-19, at pp. 17-18 ("In short, nothing would prevent someone from intentionally targeting a drop box in a predominantly Republican or

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 77 of 205
**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**
2020 WL 5997680

predominantly Democratic area with an intent to destroy as many votes for that political party or that party's candidate(s) as possible.") ]. Indeed, the more important fact for this theory of harm is not the party of the voter, but the party of the fraudster—and, on this, Plaintiffs present no evidence that one party over the other is likely to commit voter fraud.

Second, Plaintiffs also argue that the RNC, the Congressional Plaintiffs, and the Trump Campaign have organizational standing because they "have and will continue to devote their time and resources to ensure that their Pennsylvania supporters, who might otherwise be discouraged by the Secretary's guidance memos favoring mail-in and absentee voting and Defendants' implementation thereof, get out to the polls and vote on Election Day." [ECF 551, p. 19]. This is a similar argument raised by the plaintiffs in *Clapper*, and rejected there by the Supreme Court. Because Plaintiffs' harm is not "certainly impending," as discussed above, spending money in response to that speculative harm cannot establish a concrete injury. *Clapper*, 568 U.S. at 416, 133 S.Ct. 1138 ("Respondents' contention that they have standing because they incurred certain costs as a reasonable reaction to a risk of harm is unavailing—because the harm respondents seek to avoid is not certainly impending. In other words, respondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."); *see also Donald J. Trump for President, Inc. v. Cegavske*, —— F. Supp. 3d ——, ——, 2020 WL 5626974, at *5 (D. Nev. Sept. 18, 2020) ("Outside of stating 'confusion' and 'discouragement' in a conclusory manner, plaintiffs make no indication of how AB 4 will discourage their member voters from voting. If plaintiffs did not expend any resources on educating their voters on AB4, their voters would proceed to vote in-person as they overwhelmingly have in prior elections.").

Third, with respect to the poll-watching claim, Plaintiffs argue that at least one of the Plaintiffs, Ms. Patterson, is a prospective poll watcher who is being denied the right to poll watch based on the county-residency restriction, and thus she meets the Article III requirements. [ECF 551, p. 34 (citing ECF 551-3, ¶¶ 9-10)]. However, Ms. Patterson cannot establish standing because, by Plaintiffs' own concession, the theory of harm in this case is not the denial of the right to poll watch, but instead dilution of votes from fraud caused from the failure to have sufficient poll watchers. [ECF 509, p. 67 ("But, the core of the as-applied challenge here is not that the Plaintiffs cannot staff a particular polling place, it is that a candidate and his or her party is presented with the Hobson's

choice of selecting limited polling places to observe due to the residency requirement and accept that unobserved polling places must exist due to the inability to recruit a sufficient force of poll watchers due to the necessity that candidates be county residents.") ].

**\*37** **[20]** And the remedy sought here is much broader than simply allowing Ms. Patterson to poll watch in a certain county, but is tied to the broader harm of vote dilution that Plaintiffs assert. [ECF 503-1, p. 3, ¶ 3 ("Plaintiffs shall be permitted to have watchers present at all locations where voters are registering to vote, applying for absentee or mail-in ballots, voting absentee or mail-in ballots, and/or returning or collecting absentee or mail-in ballots, including without limitation any satellite or early voting sites established by any county board of elections.") ]. Standing is measured based on the theory of harm and the specific relief requested. *See Gill*, 138 S. Ct. at 1934 ("We caution, however, that 'standing is not dispensed in gross': A plaintiff's remedy must be tailored to redress the plaintiff's particular injury."). As with all of the claims, the poll-watching claim rests on evidence of vote dilution that does not rise to the level of a concrete harm.

In sum, Plaintiffs here, based on the evidence presented, lack Article III standing to assert their claims. Because they lack standing, the Court will enter judgment in Defendants' favor and dismiss all claims.[10] However, because of the novelty of Plaintiffs' claims and theories, a potential appeal in this case, and the short time before the general election, out of an abundance of caution, the Court will, in the alternative, proceed to examine the claims on the merits.

## II. Defendants and Intervenors are entitled to summary judgment on Plaintiffs' claim that drop boxes violate the U.S. Constitution.

Plaintiffs' drop-box claim has materially changed since the Pennsylvania Supreme Court's decision authorizing the use of drop boxes. Plaintiffs now allege that drop boxes effectively allow third parties to return the ballots of voters other than themselves because, they say, no one is there to stop them. Absent an in-person guard or poll worker to monitor the drop boxes and prevent the return of ballots cast in a manner contrary to what the Election Code permits, Plaintiffs assert that they face an unacceptable risk of vote dilution, which burdens their right to vote. Plaintiffs also argue that the "uneven" use of drop boxes in Pennsylvania, by some counties but not others, violates equal protection by subjecting voters in different counties to different amounts

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 78 of 205
**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**
2020 WL 5997680

of dilutive risk, and perhaps by diluting lawful votes cast by individuals who failed to comply with the Election Code.

The evidence relevant to these claims is undisputed. *See* [ECF 509, p. 45 ("After the completion of extensive discovery, including numerous depositions and responses to discovery requests, no genuine dispute of material fact exists regarding Plaintiffs' constitutional claims.") ]. Viewed in the light most favorable to Plaintiffs, the Court could conclude from this evidence, and will assume for purposes of this decision, that (1) drop boxes allow for greater risk of third-party ballot delivery in violation of the Election Code than in-person polling locations or manned drop boxes, and (2) that the use of drop boxes is "uneven" across Pennsylvania due to its county-based election system—*i.e.*, some counties are using "unmanned" drop boxes with varying security measures, some are using "manned" drop boxes, some are using dozens of drop boxes in a variety of locations, some are using one drop box in a county office building, and some are not using drop boxes at all. The question before the Court is whether this state of affairs violates equal protection or due process.

**\*38** The Court finds that it does not. The uneven use of drop boxes across counties does not produce dilution as between voters in different counties, or between "lawful" and "unlawful" voters, and therefore does not present an equal-protection violation. But even if it did, the guidelines provided by Secretary Boockvar are rational, and weighing the relative burdens and benefits, the Commonwealth's interests outweigh any burden on Plaintiffs' right to vote.

### A. Pennsylvania's "uneven" use of drop boxes does not violate federal equal-protection rights.

Plaintiffs' primary claim concerns the uneven use of drop boxes across the Commonwealth, which they contend violates the Equal-Protection Clause of the 14th Amendment.

The 14th Amendment's Equal-Protection Clause commands that "no State shall ... deny to any person within its jurisdiction the equal protection of laws." U.S. Const. amend. XIV, § 1. This broad and simple promise is "an essential part of the concept of a government of laws and not men." *Reynolds v. Sims*, 377 U.S. 533, 568, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

**[21]** **[22]** But while the Constitution demands equal protection, that does not mean all forms of differential treatment are forbidden. *See Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992) ("Of

course, most laws differentiate in some fashion between classes of persons. The Equal Protection Clause does not forbid classifications."). Instead, equal protection "simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Id.* (citation omitted). What's more, "unless a classification warrants some form of heightened review because it jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest." *Id.* (citations omitted).

**[23]** **[24]** Of course, the right of every citizen to vote is a fundamental right. *See Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979) ("[F]or reasons too self-evident to warrant amplification here, we have often reiterated that voting is of the most fundamental significance under our constitutional structure.") (citations omitted). Indeed, it is a foundational right "that helps to preserve all other rights." *Werme v. Merrill*, 84 F.3d 479, 483 (1st Cir. 1996); *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964) ("Other rights, even the most basic, are illusory if the right to vote is undermined."). And its scope is broad enough to encompass not only the right of each voter to cast a ballot, but also the right to have those votes "counted without dilution as compared to the votes of others." *Minn. Voters Alliance v. Ritchie*, 720 F.3d 1029, 1031 (8th Cir. 2013) (cleaned up).

**[25]** As a result, Plaintiffs are quite correct when they suggest that a state election procedure that burdens the right to vote, including by diluting the value of votes compared to others, must "comport with equal protection and all other constitutional requirements." *Cortés*, 218 F. Supp. 3d at 407. That much, at least, is not in dispute.

**[26]** At the same time, however, the Constitution "confers on the states broad authority to regulate the conduct of elections, including federal ones." *Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004) (citing U.S. Const. Art. I, § 4, cl. 1). This authority includes "broad powers to determine the conditions under which the right of suffrage may be exercised." *Shelby Cnty., Ala. v. Holder*, 570 U.S. 529, 543, 133 S.Ct. 2612, 186 L.Ed.2d 651 (2013) (cleaned up). Indeed, "[c]ommon sense, as well as constitutional law, compels the conclusion" that states must be free to engage in "substantial regulation of elections" if "some sort of order, rather than chaos, is to accompany the democratic processes." *Burdick v. Takushi*, 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992)

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 79 of 205
**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**
2020 WL 5997680

(cleaned up). And all "[e]lection laws will invariably impose some burden upon individual voters." *Id.*

**\*39** If the courts were "to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest," it "would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Id.* The "machinery of government would not work if it were not allowed a little play in its joints." *Bain Peanut Co. of Tex. v. Pinson,* 282 U.S. 499, 501, 51 S.Ct. 228, 75 L.Ed. 482 (1931). Thus, when faced with a constitutional challenge to a state election law, or to the actions of state officials responsible for regulating elections, a federal court must weigh these competing constitutional considerations and "make the 'hard judgment' that our adversary system demands." *Crawford v. Marion Cnty. Election Bd.,* 553 U.S. 181, 190, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008).

The Supreme Court has supplied lower courts guidance as to how to make these hard judgments, by "forg[ing]" the "flexible standard" for assessing the constitutionality of election regulations into "something resembling an administrable rule." *Id.* at 205, 128 S.Ct. 1610 (Scalia, J. concurring) (citing *Burdick,* 504 U.S. at 434, 112 S.Ct. 2059).

[27] Under this standard, first articulated in *Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) and then refined in *Burdick,* the fact "[t]hat a law or state action imposes some burden on the right to vote does not make it subject to strict scrutiny." *Donatelli v. Mitchell,* 2 F.3d 508, 513 (3d Cir. 1993); *see also Libertarian Party of Ohio v. Blackwell,* 462 F.3d 579, 585 (6th Cir. 2006) ("[V]oting regulations are not automatically subjected to heightened scrutiny."). Instead, any "law respecting the right to vote—whether it governs voter qualifications, candidate selection, or the voting process," is subjected to "a deferential 'important regulatory interests' standard for nonsevere, nondiscriminatory restrictions, reserving strict scrutiny for laws that severely restrict the right to vote." *Crawford,* 553 U.S. at 204, 128 S.Ct. 1610 (Scalia, J. concurring).

[28]   [29]   [30] In practice, this means that courts must weigh the "character and magnitude of the burden the State's rule imposes" on the right to vote "against the interests the State contends justify that burden, and consider the extent to which the State's concerns make that burden necessary." *Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 358, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997) (cleaned

up). If the state imposes a "severe" burden on the right to vote, strict scrutiny applies—the rule may survive only if it is "narrowly tailored" and only if the state advances a "compelling interest." *Id.* But if the state imposes only "reasonable, nondiscriminatory restrictions," its "important regulatory interests will usually be enough" to justify it. *Id.* Indeed, where state, regulations are "minimally burdensome and nondiscriminatory" a level of scrutiny "closer to rational basis applies[.]" *Ohio Council 8 Am. Fed'n of State v. Husted,* 814 F.3d 329, 335 (6th Cir. 2016). And where the state imposes no burden on the "right to vote" at all, true rational basis review applies. *See Biener v. Calio,* 361 F.3d 206, 215 (3d Cir. 2004) ("Biener also cannot establish an infringement on the fundamental right to vote ... As the [election] filing fee does not infringe upon a fundamental right, nor is Biener in a suspect class, we consider the claims under a rational basis test.") (citation omitted); *Common Cause/New York v. Brehm,* 432 F. Supp. 3d 285, 310 (S.D.N.Y. 2020) ("Under this framework, election laws that impose no burden on the right to vote are subject to rational-basis review.").

**\*40** This operates as a "sliding scale"—the "more severe the burden imposed, the more exacting our scrutiny; the less severe, the more relaxed our scrutiny." *Arizona Libertarian Party v. Hobbs,* 925 F.3d 1085, 1090 (9th Cir. 2019); *see also Fish v. Schwab,* 957 F.3d 1105, 1124 (10th Cir. 2020) ("We, and our sister circuits and commentators, have referred to this as a 'sliding scale' test."); *Libertarian Party of New Hampshire v. Gardner,* 638 F.3d 6, 14 (1st Cir. 2011) ("We review all of the First and Fourteenth Amendment claims under the sliding scale approach announced by the Supreme Court in *Anderson* ... and *Burdick*[.]"); *Burdick,* 504 U.S. at 434, 112 S.Ct. 2059 ("[T]he rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights.").

Against that backdrop, the Court now turns to Plaintiffs' claim that the use of unmanned drop boxes by some Pennsylvania counties, but not others, violates equal protection. As will be discussed, Plaintiffs' equal-protection claim fails at the threshold, without even reaching *Anderson-Burdick,* because Plaintiffs have not alleged or shown that Pennsylvania's system will result in the dilution of votes in certain counties and not others. Furthermore, even if the Court applies *Anderson-Burdick,* the attenuated "burden" Plaintiffs have identified—an increased risk of vote dilution created by the use of unmanned drop boxes—is more than justified

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 80 of 205
**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**
2020 WL 5997680

by Defendants' important and precise interests in regulating elections.

### 1. Plaintiffs have not shown that Pennsylvania treats equivalent votes in different counties differently.

Plaintiffs' equal-protection claim asserts differential treatment on a theory of vote dilution. As far as the Court can discern, this claim has two dimensions.

First, the main thrust concerns differential treatment as between counties. Plaintiffs assert that some counties will use drop boxes in certain ways (specifically, without in-person guards or in varying number and locations), while others will not—resulting in differential treatment. *See, e.g.,* [ECF 551, p. 44 ("Plaintiffs assert (and have proven) that Defendants have adopted, and intend to implement in the General Election, an election regime that applies Pennsylvania's Election Code in a way that treats the citizens of Pennsylvania unequally depending on ... the location where they happen to live: in some counties, voters will have around-the-clock access to 'satellite election offices' at which they can deposit their vote, but in other counties, voters will have no access at all to such drop boxes; in some counties those drop boxes will be staffed and secure, but in other counties drop boxes will be unmonitored and open to tampering[.]") ]; [*Id.* at p. 46 ("Defendants' ongoing actions and stated intentions ensure that votes will not be counted the same as those voting in other counties, and in some instances, in the same Congressional district. For instance, the harm flowing from those actions will fall disproportionately on the Republican candidates that bring suit here because many Democrat-heavy counties have stated intentions to implement the Secretary's unconstitutional ... ballot collection guidance, and many Republican-heavy counties have stated intentions to follow the Election Code as it is written.") ].

*41 Second, although less clear, Plaintiffs' equal-protection claim may also concern broader differential treatment between law-abiders and scofflaws. In other words, Plaintiffs appear to suggest that Pennsylvania discriminates against all law-abiding voters by adopting policies which tolerate an unacceptable risk of a lawfully cast votes being diluted by each unlawfully cast vote anywhere in Pennsylvania. *See, e.g.,* [ECF 509, p. 55 ("The use of unstaffed drop boxes ... not only dilutes the weight of *all* qualified Pennsylvanian electors, it curtails a sense of security in the voting process.") (emphasis in original) ]; [ECF 509 p. 68 ("There will be no

protection of one-person, one-vote in Pennsylvania, because her policies ... allowing inconsistently located/used drop boxes will result in illegal ballots being cast and counted with legitimate votes[.]") ].

[31] As discussed below, both of these species of equal protection fail because there is, in fact, no differential treatment here—a necessary predicate for an equal-protection claim.

Initially, Plaintiffs "have to identify a burden before we can weigh it." *Crawford,* 553 U.S. at 205, 128 S.Ct. 1610 (Scalia, J. concurring). In the equal-protection context, this means the plaintiff "must present evidence that s/he has been treated differently from persons who are similarly situated." *Renchenski v. Williams,* 622 F.3d 315, 337 (3d Cir. 2010) (cleaned up). And not just any differential treatment will do. As discussed above, differences in treatment raise equal-protection concerns, and necessitate heightened scrutiny of governmental interests, only if they burden a fundamental right (such as the right to vote) or involve a suspect classification based on a protected class. *See Obama for Am. v. Husted,* 697 F.3d 423, 429 (6th Cir. 2012) ("If a plaintiff alleges only that a state treated him or her differently than similarly situated voters, without a corresponding burden on the fundamental right to vote, a straightforward rational basis standard of review should be used.").

Plaintiffs argue that equal protection is implicated because Pennsylvania has permitted counties to use drop boxes to varying extents, and with varying degrees of security. Some, like Delaware County, intend to use dozens of drop boxes. *See generally* [ECF 549-28]. Many others will not use drop boxes at all. *See generally* [ECF 504-1]. And among the counties that *do* use drop boxes, some will staff them with county officials, while others will monitor them only with video surveillance or not at all. *See generally* [ECF 549-28].

In this respect, Plaintiffs argue that they suffer an equal-protection harm similar to that found by the Supreme Court in *Bush v. Gore,* 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000). There, the Supreme Court held that the Florida Supreme Court violated equal protection when it "ratified" election recount procedures that allowed different counties to use "varying standards to determine what was a legal vote." *Id.* at 107, 121 S.Ct. 525. This meant that entirely equivalent votes might be counted in one county but discounted in another. *See, e.g., id.* ("Broward County used a more forgiving standard than Palm Beach County, and uncovered

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 81 of 205
**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**
2020 WL 5997680

almost three times as many new votes, a result markedly disproportionate to the difference in population between the counties."). Given the absence of uniform, statewide rules or standards to determine which votes counted, the Court concluded that the patchwork recount scheme failed to "satisfy the minimum requirement for nonarbitrary treatment of voters necessary to secure the fundamental right [to vote]." *Id.*

**\*42** While the Supreme Court expressly limited its holding in *Bush* "to the present circumstances" of a standardless "statewide recount under the authority of a single state judicial officer," *id.* at 109, 121 S.Ct. 525, a few courts have found its reasoning to be persuasive as a broader principle of equal protection. *See Stewart v. Blackwell*, 444 F.3d 843, 859 (6th Cir. 2006) ("Somewhat more recently decided is *Bush v. Gore*, ... which reiterated long established Equal Protection principles."); *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 598 (6th Cir. 2012) ("We agree with all of the parties and the district court that the consent decree likely violates the equal protection principle recognized in *Bush v. Gore*."); *Pierce v. Allegheny Cty. Bd. of Elections*, 324 F. Supp. 2d 684, 705 (W.D. Pa. 2003) (Conti, J.) ("As noted above, the court finds that the facts presented raise a serious equal protection claim under a theory similar to that espoused by the United States Supreme Court in *Bush v. Gore, supra*."); *Black v. McGuffage*, 209 F. Supp. 2d 889, 899 (N.D. Ill. 2002) ("The Court is certainly mindful of the limited holding of *Bush*. However, we believe that situation presented by this case is sufficiently related to the situation presented in *Bush* that the holding should be the same.").

Indeed, *Bush*'s core proposition—that a state may not take the votes of two voters, similarly situated in all respects, and, for no good reason, count the vote of one but not the other—seems uncontroversial. It also seems reasonable (or at least defensible) that this proposition should be extended to situations where a state takes two equivalent votes and, for no good reason, adopts procedures that greatly increase the risk that one of them will not be counted—or perhaps gives more weight to one over the other. *See, e.g., Black*, 209 F. Supp. 2d at 899 ("Plaintiffs in this case allege that the resulting vote dilution, which was found to be unacceptable in *Bush* without any evidence of a disproportionate impact on any group delineated by traditional suspect criteria, is impacting African American and Hispanic groups disproportionately.... Any voting system that arbitrarily and unnecessarily values some votes over others cannot be constitutional."); *see also Reynolds*, 377 U.S. at 555, 84 S.Ct. 1362 ("[T]he right of

suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

That is the sort of equal-protection claim Plaintiffs purport to be asserting—a claim that voters in counties that use drop boxes are subjected to a much higher risk of vote dilution than those in other counties that do not. But that characterization falls apart under scrutiny. Indeed, despite their assertions, Plaintiffs have not actually alleged, let alone proven, that votes cast in some counties are diluted by a greater amount relative to votes cast in others. Rather, they have, at best, shown only that events causing dilution are more likely to occur in counties that use drop boxes. But, importantly, the effect of those events will, by Plaintiffs' own admission, be felt by every voter across all of Pennsylvania. [ECF 509, p. 55. ("The use of unstaffed drop boxes places the security of unknown hundreds (if not thousands) of ballots in jeopardy of theft, destruction, and manipulation. This not only dilutes the weight of *all* qualified Pennsylvanian electors, it curtails a sense of security in the voting process.") (citations omitted) (emphasis in original) ]. Such dilution impacts the entire electorate equally; not just voters in the county where it occurs.

To illustrate this distinction, consider, for example, a presidential election. The Court agrees with Plaintiffs that the relevant electoral unit in such an election is "the entire Commonwealth of Pennsylvania." [ECF 551, p. 55 ("The electoral unit in this election is the entire Commonwealth of Pennsylvania.") ]. Indeed, on election night, votes cast in each of Pennsylvania's 67 counties will be canvassed, counted, and ultimately added to a statewide vote total that decides who wins Pennsylvania's 20 electoral votes. So, ask: what is the dilutive impact of a hypothetical illegal vote cast in Philadelphia during that election? Does it cause, in any sense, an "unequal evaluation of ballots" cast in different counties, *Bush*, 531 U.S. at 106, 121 S.Ct. 525, such that lawful ballots cast in Philadelphia will be less likely to count, worth less if they do, or otherwise disfavored when compared to votes cast in other counties? The answer is evident—it does not. Rather, the hypothetical illegal vote cast in Philadelphia dilutes *all lawful votes* cast in the election *anywhere* in the Commonwealth by the exact same amount.

**\*43** The same reasoning holds in elections that occur within part of a state, rather than statewide. For example, consider a hypothetical legislative district covering two counties—one that uses drop boxes and one that does not. There may well be

a greater risk that illegal voting will occur in the county that uses drop boxes. But any dilutive impact of those votes will be felt equally by voters in *both* counties.

This is categorically different from the harm at issue in *Bush* and cases like it. In *Bush*, Florida's arbitrary use of different recount standards in different counties meant that the state was counting equivalent ballots differently in different counties, meaning that voters in some counties were more likely to have their votes counted than those in others.

In *Black v. McGuffage*, an Illinois district-court case on which Plaintiffs heavily rely, the plaintiffs alleged that the type of voting machines used in some Illinois counties were statistically much more likely to result in equivalent votes being discounted at a much higher frequency in some counties than others, and that the worst machines were those being used in counties with high populations of minority groups. 209 F. Supp. 2d at 899. As a result, voters (and, specifically, minority voters) were much more likely to have their votes discounted, based just on the county in which they lived. *See id.* ("As a result, voters in some counties are statistically less likely to have their votes counted than voters in other counties in the same state in the same election for the same office. Similarly situated persons are treated differently in an arbitrary manner.... In addition, the Plaintiffs in this case allege that the resulting vote dilution ... is impacting African American and Hispanic groups disproportionately.").

Finally, *Stewart v. Blackwell*, another case cited by Plaintiffs, was the same as *Black*—voters in counties that used punch-card voting were "approximately four times as likely not to have their votes counted" as a voter in a different county "using reliable electronic voting equipment." 444 F.3d at 848.

What ties these cases together is that each of them involves a state arbitrarily "valu[ing] one person's vote over that of another," *Bush*, 531 U.S. at 104-05, 121 S.Ct. 525, by permitting counties to either apply different standards to decide what votes count (*Bush*) or use different voting technologies that create a great risk of votes being discounted in one county that does not exist in others (*Black* and *Stewart*). It is this sort of "differential treatment ... burden[ing] a fundamental right" that forms the bedrock of equal protection. *Sullivan v. Benningfield*, 920 F.3d 401, 409 (6th Cir. 2019).

Plaintiffs, in contrast, have shown no constitutionally significant differential treatment at all.

Instead, as discussed, if Plaintiffs are correct that the use of drop boxes increases the risk of vote dilution, all votes in the relevant electoral unit—whether that is statewide, a subset of the state, or a single county—face the same degree of increased risk and dilution, regardless of which county is most at fault for elevating that risk.

What Plaintiffs have really identified, then, are not uneven *risks of vote dilution*—affecting voters in some counties more than equivalent voters in others—but merely different voting procedures in different counties that may contribute different amounts of vote dilution *distributed equally across the electorate as a whole*. The Court finds that this is not an equal-protection issue.

**\*44** To be clear, the reason that there is no differential treatment is solely based on Plaintiffs' theory of harm in this case. In the more "routine" vote-dilution cases, the state imposes some restriction or direct impact on the plaintiff's right to vote—that results in his or her vote being weighed less (*i.e.*, diluted) compared to those in other counties or election districts. *See Gill*, 138 S. Ct. at 1930, (explaining that "the holdings in *Baker* and *Reynolds* were expressly premised on the understanding that the injuries giving rise to those claims were individual and personal in nature, because the claims were brought by voters who alleged facts showing disadvantage to themselves as individuals") (cleaned up). In this case, though, Plaintiffs complain that the state is *not* imposing a restriction on *someone else's* right to vote, which, they say, raises the risk of fraud, which, if it occurs, could dilute the value of Plaintiffs' vote. The consequence of this inverted theory of vote dilution is that all other votes are diluted in the same way; all feel the same effect.

Finally, the Court's ruling in this regard is consistent with the many courts that have recognized that counties may, consistent with equal protection, employ entirely different election procedures and voting systems within a single state. *See, e.g., Wexler v. Anderson*, 452 F.3d 1226, 1231-33 (11th Cir. 2006) ("Plaintiffs do not contend that equal protection requires a state to employ a single kind of voting system throughout the state. Indeed, local variety in voting systems can be justified by concerns about cost, the potential value of innovation, and so on.") (cleaned up); *Hendon v. N.C. State Bd. of Elections*, 710 F.2d 177, 181 (4th Cir. 1983) ("A state may employ diverse methods of voting, and the methods by which a voter casts his vote may vary throughout the state."); *Short v. Brown*, 893 F.3d 671, 679 (9th Cir. 2018) ("[T]he appellants' reading of the Supreme Court's

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 83 of 205
**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**
2020 WL 5997680

voting cases would essentially bar a state from implementing any pilot program to increase voter turnout. Under their theory, unless California foists a new system on all fifty-eight counties at once, it creates 'unconstitutional vote-dilution' in counties that do not participate in the pilot plan. Nothing in the Constitution, the Supreme Court's controlling precedent, or our case law suggests that we can micromanage a state's election process to this degree."); *Fla. State Conference of N.A.A.C.P. v. Browning*, 569 F. Supp. 2d 1237, 1258 (N.D. Fla. 2008) ("[A]s with countless public services delivered through Florida's political subdivisions—such as law enforcement and education—resource disparities are to some degree inevitable. They are not, however, unconstitutional."); *Green Party of State of New York v. Weiner*, 216 F. Supp. 2d 176, 192 (S.D.N.Y. 2002) ("Even in that situation, [*Bush v. Gore*] did not challenge, and the Court did not question, the use of entirely different technologies of voting in different parts of the state, even in the same election."); *Paher v. Cegavske*, No. 20-243, 2020 WL 2748301, at *9 (D. Nev. May 27, 2020) ("[I]t cannot be contested that Clark County, which contains most of Nevada's population—and likewise voters (69% of all registered voters [ ] )—is differently situated than other counties. Acknowledging this as a matter of generally known (or judicially noticeable) fact and commonsense makes it more than rational for Clark County to provide additional accommodations to assist eligible voters."); *Ron Barber for Cong. v. Bennett*, No. 14-2489, 2014 WL 6694451, at *5 (D. Ariz. Nov. 27, 2014) ("[T]he [*Bush v. Gore*] Court did not invalidate different county systems regarding implementation of election procedures."); *Tex. Democratic Party v. Williams*, No. 07-115, 2007 WL 9710211, at n.4 (W.D. Tex. Aug. 16, 2007) ("In *Bush v. Gore*, the Supreme Court specifically noted: 'The question before the Court is not whether local entities, in the exercise of their expertise, may develop different systems for implementing elections.' ").

**\*45  [32]**  Equal protection does not demand the imposition of "mechanical compartments of law all exactly alike." *Jackman v. Rosenbaum Co.*, 260 U.S. 22, 31, 43 S.Ct. 9, 67 L.Ed. 107 (1922). Rather, "the Constitution is sufficiently flexible to permit its requirements to be considered in relation to the ... contexts in which they are invoked." *Merchants Nat'l Bank of Mobile v. Dredge Gen. G. L. Gillespie*, 663 F.2d 1338, 1343 (5th Cir. 1981). And in this context, "few (if any) electoral systems could survive constitutional scrutiny if the use of different voting mechanisms by counties offended the Equal Protection Clause." *Trump v. Bullock*, ---- F.3d ----, ----, 2020 WL 5810556, at \*14 (D. Mont. Sept. 30, 2020).

The distinction—between differences in county election procedures and differences in the treatment of votes or voters between counties—is reflected in *Bush* itself. There, the Supreme Court took pains to clarify that the question before it was "not whether local entities, in the exercise of their expertise, may develop different systems for implementing elections." *Bush*, 531 U.S. at 109, 121 S.Ct. 525; *see also id.* at 134, 121 S.Ct. 525 (Souter, J. dissenting) ("It is true that the Equal Protection Clause does not forbid the use of a variety of voting mechanisms within a jurisdiction, even though different voting mechanisms will have different levels of effectiveness in recording voters' intentions; local variety can be justified by concerns about cost, the potential value of innovation, and so on."); *Bullock*, ---- F.3d at ----, 2020 WL 5810556, at \*14 ("[T]he Supreme Court was clear in *Bush v. Gore* that the question was not whether local entities, in the exercise of their expertise, may develop different systems for implementing elections.") (cleaned up).

Thus, coming back to the theory of Plaintiffs' case, Plaintiffs contend that Secretary Boockvar's drop-box guidance will result in differences between counties and differing risks of fraud. But the result of that uneven implementation will not be votes in certain counties being valued less than others. And the result won't be that voters who vote in person will have their votes valued less, either. Instead, if Plaintiffs are right, any unlawful votes will dilute all other lawful votes in the same way. While certainly voter fraud and illegal voting are bad, as a matter of equal protection, there is no unequal treatment here, and thus no burden on Plaintiffs' rights under the Equal Protection Clause.

In addition to their equal-protection claim based on county differences, Plaintiffs also appear to allude to a more general type of equal-protection violation. They assert that Pennsylvania comprises a single election unit. [ECF 551, p. 55 ("The electoral unit in this election is the entire Commonwealth of Pennsylvania.") ]. They assert that they intend to cast their ballots lawfully. *See, e.g.,* [ECF 504-3, ¶ 4 ("As a Pennsylvania qualified registered elector, I have always voted in-person at primary and general elections, and I intend to vote in-person at the upcoming November 3, 2020 General Election.") ]. And they assert that unmanned drop boxes across the Commonwealth (regardless of the county) will, on a statewide basis, dilute their votes. *See, e.g.,* [*id.* at ¶ 6 ("As a Pennsylvania qualified registered elector who votes in-person, I do not want my in-person vote diluted or cancelled by votes that are cast in a manner contrary

2020 WL 5997680

to the requirements enacted by the Pennsylvania General Assembly.") ]. For example, if one "qualified elector" casts a lawful ballot, but a fraudulent voter casts ten ballots, then that elector's vote will, under Plaintiffs' theory, be diluted by a magnitude of ten—resulting in differential treatment.

**\*46.** The problem with this theory is that there does not appear to be any law to support it. Indeed, if this were a true equal-protection problem, then it would transform every violation of state election law (and, actually, every violation of every law) into a potential federal equal-protection claim requiring scrutiny of the government's "interest" in failing to do more to stop illegal activity. This is not the law. To the contrary, it is well-established that even violations of state election laws by state officials, let alone violations by unidentified third parties, do not give rise to federal constitutional claims except in unusual circumstances. *See Shipley v. Chicago Bd. of Election Commissioners*, 947 F.3d 1056, 1062 (7th Cir. 2020) ("A violation of state law does not state a claim under § 1983, and, more specifically, a deliberate violation of state election laws by state election officials does not transgress against the Constitution.") (cleaned up); *Martinez v. Colon*, 54 F.3d 980, 989 (1st Cir. 1995) ("[T]he Constitution is not an empty ledger awaiting the entry of an aggrieved litigant's recitation of alleged state law violations—no matter how egregious those violations may appear within the local legal framework.").

Thus, this type of equal-protection claim fails as a matter of law, as well.

### 2. If Pennsylvania's "uneven" use of drop boxes indirectly burdens the right to vote at all, that burden is slight, and justified by important state interests.

[33] Even assuming that Plaintiffs could establish unequal treatment to state an equal-protection claim, their claim nonetheless fails because the governmental interests here outweigh any burden on the right to vote.

Initially, the Court finds that the appropriate level of scrutiny is rational basis. Defendants' failure to implement a mandatory requirement to "man" drop boxes doesn't directly infringe or burden Plaintiffs' rights to vote at all. Indeed, as discussed above in the context of standing, what Plaintiffs characterize as the burden or harm here is really just an ancillary 'increased risk' of a theoretical harm, the degree of which has not been established with any empirical precision.

*See Obama*, 697 F.3d at 429 ("If a plaintiff alleges only that a state treated him or her differently than similarly situated voters, without a corresponding burden on the fundamental right to vote, a straightforward rational basis standard of review should be used."); *Brehm*, 432 F. Supp. 3d at 310 ("Under this framework, election laws that impose no burden on the right to vote are subject to rational-basis review.").

On rational-basis review, the Secretary's guidance here passes constitutional muster. Her guidance certainly provides some flexibility in how counties may use drop boxes, but the guidance overall is rationally related to a legitimate governmental interest—namely, the implementation of drop boxes in a secure manner, taking into account specific county differences. That Plaintiffs feel the decisions and actions of the Pennsylvania General Assembly, Secretary Boockvar, and the county Defendants are insufficient to prevent fraud or illegal voting is of no significance. "[R]ational-basis review in equal protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Heller v. Doe by Doe*, 509 U.S. 312, 319, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993).

As detailed above, Secretary Boockvar's guidance provides lawful, comprehensive, and reasonable standards with respect to (1) selecting the location of drop boxes, (2) drop-box design criteria, (3) signage, (4) drop-box security measures, and (5) drop-box ballot collection and chain of custody procedures. Of particular note, with respect to ballot security, the Secretary's guidance calls for the use of reasonably robust measures like video surveillance, durable and tamperproof design features, regular ballot collection every 24 hours, chain-of-custody procedures to maintain ballot traceability, and signage advising voters that third-party delivery is prohibited, among other things.

To be sure, the Secretary's guidance doesn't insist on the use of security personnel—though some counties have decided to post security guards outside of drop boxes on their own. But the Court can't say that either the Secretary's failure to provide that requirement, or the decision of some counties to proceed with drop boxes "unmanned," is irrational. For example, the evidence presented demonstrates that placing a security guard outside of a drop box at all times is costly, particularly for cash-strapped counties—at least $13 per hour or about $104 (8 hours) to $312 (24 hours) per day, according to Defendants' expert, Professor Robert McNair. [ECF 549-11, p. 11] In the context of a broader election system that detects and deters fraud at many other stages of the voting process, and given

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 85 of 205
**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**
2020 WL 5997680

that that there are also no equivalent security measures present at U.S. postal mailboxes (which constitute an arguably more tempting vehicle for the would-be ballot harvester), the Court finds that the lack of any statewide requirement that all drop boxes be manned or otherwise surveilled is reasonable, and certainly rational.

**\*47** But even assuming Plaintiffs are right that their right to vote here has been burdened (and thus a heightened level of scrutiny must apply), that burden is slight and cannot overcome Defendants' important state interests under the *Anderson-Burdick* framework. Indeed, courts routinely find attenuated or ancillary burdens on the right to vote to be "slight" or insignificant, even burdens considerably *less* attenuated or ancillary than any burden arguably shown here. *See, e.g., Weber v. Shelley,* 347 F.3d 1101, 1106 (9th Cir. 2003) ("Under *Burdick,* the use of touchscreen voting systems is not subject to strict scrutiny simply because this particular balloting system may make the possibility of some kinds of fraud more difficult to detect.").[11]

To begin with, application of the *Anderson-Burdick* framework here presents something of a "square peg, round hole" dilemma. After all, that test assumes there is some constitutional injury to "weigh" against the state's "important" regulatory interests in the first place. And without differential treatment of votes or voters, there isn't any equal-protection injury for the Court to balance.

The *Anderson-Burdick* test is also ill-fitted to Plaintiffs' claims for another reason. Typically, *Anderson-Burdick* is invoked where the government takes some direct action to burden or restrict a plaintiff's right to vote. Here, in contrast, Plaintiffs complain that Pennsylvania has indirectly burdened the right to vote through *inaction*—*i.e.,* by not imposing *enough* regulation to secure the voting process it has adopted, which, Plaintiffs say, will allow third parties to vote in an unlawful way, which, if it happens, will dilute (and thus burden) the right to vote.

**\*48** This unusual causal daisy-chain makes it difficult to apply *Anderson-Burdick*'s balancing approach. After all, it is one thing to assess the government's interest in taking a specific action that imposed burdens on the right to vote. It is much less natural for a court to evaluate whether the government had a good reason for not doing something differently, or for failing to do more to prevent (or reduce the risk of) misconduct by third parties that could burden the right to vote.

To the extent *Anderson-Burdick* applies in such circumstances, the appropriate course would, in this Court's view, be to weigh any burden stemming from the government's alleged failures against the government's interest in enacting the broader election scheme it has erected, of which the challenged piece is usually only one part. Focusing solely on the allegedly inadequate procedure being challenged, such as the state's authorization of "drop boxes" here, would ignore the fact that Election Code provisions and regulations operate as part of a single, complex organism balancing many competing interests, all of which are "important" for purposes of the *Anderson-Burdick* analysis. *See, e.g., Crawford,* 553 U.S. at 184, 128 S.Ct. 1610 ("deterring and detecting voter fraud"); *Tedards v. Ducey,* 951 F.3d 1041, 1067 (9th Cir. 2020) ("voter turnout"); *Lunde v. Schultz,* 221 F. Supp. 3d 1095, 1106 (S.D. Iowa 2014) ("expanding ballot access to nonparty candidates"); *Greenville Cnty. Republican Party Exec. Comm. v. South Carolina,* 824 F. Supp. 2d 655, 671 (D.S.C. 2011) ("promoting voter participation in the electoral process"); *Mays v. LaRose,* 951 F.3d 775, 787 (6th Cir. 2020) ("orderly administration of elections"); *Dudum,* 640 F.3d at 1115 ("orderly administration of ... elections"); *Paher v. Cegavske* , 457 F.Supp.3d 919, ——, 2020 WL 2089813, at \*7 (2020) ("protect[ing] the health and safety of ... voters" and "safeguard[ing] the voting franchise"); *Nemes,* —— F. Supp. 3d at ——, 2020 WL 3402345, at \*13 ("implementing voting plans that provide for a free and fair election while attempting to minimize the spread of COVID-19").

Thus, on the "burden" side of the equation is Plaintiffs' harm of vote dilution predicated on a risk of fraud. As discussed above in the context of lack of standing, that burden is slight, factually, because it is based on largely speculative evidence of voter fraud generally, anecdotal evidence of the mis-use of certain drop boxes during the primary election, and worries that the counties will not implement a "best practice" of having poll workers or guards man the drop boxes. *See* [ECF 461, ¶¶ 63-82; ECF 504-2, ¶ 12; 504-3, ¶ 6; 504-4, ¶7;; ECF 504-6, ¶¶ 6-8; ECF 504-7, ¶¶ 5-9; ECF 504-9, 92:4-10; ECF 504-10, 60:3-61:10; 504-19, pp. 3, 16-18, 20 & Ex. D; ECF 504-25; ECF 504-49; ECF 509, p. 67; ECF 551, p. 34].

**[34]** This somewhat scant evidence demonstrates, at most, an increased risk of some election irregularities—which, as many courts have held, does not impose a meaningful burden under *Anderson-Burdick.* "Elections are, regrettably, not always free from error," *Hutchinson v. Miller,* 797 F.2d

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 86 of 205
**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**
2020 WL 5997680

1279, 1286–87 (4th Cir. 1986), let alone the "risk" of error. In just about every election, votes are counted, or discounted, when the state election code says they should not be. But the Constitution "d[oes] not authorize federal courts to be state election monitors." *Gamza v. Aguirre*, 619 F.2d 449, 454 (5th Cir. 1980). It is "not an empty ledger awaiting the entry of an aggrieved litigant's recitation of alleged state law violations." *Fournier v. Reardon*, 160 F.3d 754, 757 (1st Cir. 1998). Nor is it "an election fraud statute." *Minnesota Voters*, 720 F.3d at 1031.

**\*49  [35]**  "Garden variety" election irregularities, let alone the "risk" of such irregularities, are simply not a matter of federal constitutional concern "even if they control the outcome of the vote or election." *Bennett v. Yoshina*, 140 F.3d 1218, 1226 (9th Cir. 1998). And as discussed above, most often, even "a deliberate violation of state election laws by state election officials does not transgress against the Constitution." *Shipley*, 947 F.3d at 1062. *see, e.g., Lecky v. Virginia State Bd. of Elections*, 285 F. Supp. 3d 908, 919 (E.D. Va. 2018) ("[E]ven assuming the Fredericksburg officials' failure to provide provisional ballots amounted to a violation of state law, it would not rise to the level of an equal protection violation.").

Compared, then, to Plaintiffs' slight burden, the Commonwealth has put forward reasonable, precise, and sufficiently weighty interests that are undisputed and that can be distilled into three general categories: (1) the benefits of drop boxes, (2) the Commonwealth's interests in furthering its overall election-security plan concerning drop boxes, and (3) the interests inherent in the Commonwealth's general mail-in ballot scheme.

The first category concerns the benefits of drop boxes generally. Secretary Boockvar has pointed out the Commonwealth's interests generally in using drop boxes— including, (1) the increase of voter turnout, (2) the protection of voters' health in the midst of the ongoing pandemic, (3) the increase of voter satisfaction, in light of ongoing U.S. Postal Service issues, and (4) the reduction of costs for counties. [ECF No. 547, at pp. 22-25; ECF No. 549-2, ¶¶ 36-39, 42-44]. Plaintiffs do not dispute any of these interests.

The second category of interests concerns the Commonwealth's interests in implementing drop boxes with appropriate and effective safety measures and protocols in place. That is, Secretary Boockvar has, in her capacity as the chief state official charged with overseeing elections,

issued uniform guidance to all counties regarding the use of drop boxes, which is noted above. That guidance includes (1) advising counties that the Election Code permits the use of drop boxes, and (2) setting forth best practices that the counties should "consider" with respect to their use. Among other things, the Secretary advised that counties should maintain a traceable chain of custody for mail-in and absentee ballots retrieved from drop boxes; utilize drop boxes with various security features (*e.g.*, anti-tampering features, locks, video surveillance, and removal when the site is closed or cannot be monitored); and designate sworn county personnel to remove ballots from drop boxes. And evidence suggests that the Secretary's deputies have emphasized these best practices when queried by county officials. [ECF 549-32 ("Per our conversation, the list of items are things the county must keep in mind if you are going to provide a box for voters to return their ballots in person.") ].

This guidance is lawful, reasonable, and non-discriminatory, and so does not create any constitutional issue in its own right. With this guidance, the Secretary has diminished the risks tolerated by the legislature in adopting mail-in voting and authorizing drop-boxes, by encouraging the counties to adopt rather comprehensive security and chain-of-custody procedures if they do elect to use drop boxes. Conversely, the legislature's decision to leave the counties with ultimate discretion when it comes to how, and to what extent, to use drop boxes (as opposed to adopting a scheme in which the Secretary could enforce compliance with her guidance) is also reasonable, and justified by sufficiently weighty governmental interests, given the many variations in population, geography, local political culture, crime rates, and resources. [ECF 549-9 ("There is no logical reason why ballot receptacles such as drop boxes must be uniform across different counties; particularly because the verification of the voter is determined by election officials upon receipt of the ballot. Counties vary in size and need. Across the country, best practices dictate that counties determine what type of box and size works for them. The needs of a large county are very different from the needs of a smaller county."); ECF 549-11, p. 9 ("Such variation between counties even within a state makes sense, since the needs of different counties vary and their use of drop boxes reflects those considerations (e.g., the geographic size of a county, the population of the county, and the ease with which voters in the county can access other locations to return mail-in ballots).").

**\*50**  The third category of interests is, more generally, the interests of the Commonwealth in administering its overall

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 87 of 205
**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**
2020 WL 5997680

mail-in ballot regime, including the various security and accountability measures inherent in that legislative plan.

Pennsylvania did not authorize drop boxes in a vacuum. Last year, the Pennsylvania legislature "weigh[ed] the pros and cons," *Weber*, 347 F.3d at 1107, and adopted a broader system of "no excuse" mail-in voting as part of the Commonwealth's Election Code. As the Pennsylvania Supreme Court has now confirmed, that system left room for counties to authorize drop boxes and other satellite locations for returning ballots to the county boards of elections. *See Boockvar*, ---- A.3d at ----, 2020 WL 5554644, at *9 ("[W]e need not belabor our ultimate conclusion that the Election Code should be interpreted to allow county boards of election to accept hand-delivered mail-in ballots at locations other than their office addresses including drop-boxes.").

Inherent in any mail-in or absentee voting system is some degree of increased risk of votes being cast in violation of other provisions of the Election Code, regardless of whether those ballots are returned to drop boxes, mailboxes, or some other location. For example, there is simply no practical way to police third party delivery of ballots to any mailbox anywhere in the Commonwealth, where Plaintiffs do not dispute that such ballots can be lawfully returned. It is also likely that more (and perhaps many more) voters than usual will be disenfranchised by technicalities this year, for failing to comply with the procedural requirements associated with mail-in ballots, such as the requirement that such ballots be placed in "inner secrecy envelopes."

But in enacting the "no excuse" mail-in voting system that it did, the Pennsylvania legislature chose to tolerate the risks inherent in that approach. And the key point is that the legislature made that judgment in the context of erecting a broader election scheme that authorizes other forms of voting and has many other safeguards in place to catch or deter fraud and other illegal voting practices. These safeguards include voter registration; a mail-in ballot application and identity verification process, 25 P.S. §§ 3146.2, 3150.12; a system for tracking receipt of mail-in ballots, 25 P.S. §§ 3146.3(a), 3150.13(a); and, perhaps most important of all, a pre-canvassing and canvassing process during which mail-in ballots are validated before being counted. In addition, Pennsylvania law also seeks to deter and punish fraud by imposing criminal penalties for unlawful voting, 25 P.S § 3533; voting twice in one election, 25 P.S § 3535; forging or destroying ballots, 25 P.S § 3517; unlawful possession or

counterfeiting of ballots 25 P.S § 3516; and much more of the conduct Plaintiffs fear, *see* 25 P.S. § 3501, *et seq.*

In this larger context, the Court cannot say that the balance Pennsylvania struck across the Election Code was unreasonable, illegitimate, or otherwise not "sufficiently weighty to justify," *Crawford*, 553 U.S. at 191, 128 S.Ct. 1610, whatever ancillary risks may be associated with the use of drop boxes, or with allowing counties to exercise discretion in that regard. Pennsylvania may balance the many important and often contradictory interests at play in the democratic process however it wishes, and it must be free to do so "without worrying that a rogue district judge might later accuse it of drawing lines unwisely." *Abbott*, 961 F.3d at 407.

**\*51** **[36]** Thus, balancing the slight burden of Plaintiffs' claim of dilution against the categories of interests above, the Court finds that the Commonwealth and Defendants' interests in administering a comprehensive county-based mail-in ballot plan, while both promoting voting and minimizing fraud, are sufficiently "weighty," reasonable, and justified. Notably, in weighing the burdens and interests at issue, the Court is mindful of its limited role, and careful to not intrude on what is "quintessentially a legislative judgment." *Griffin*, 385 F.3d at 1131. "[I]t is the job of democratically-elected representatives to weigh the pros and cons of various balloting systems." *Weber*, 347 F.3d at 1106. "So long as their choice is reasonable and neutral, it is free from judicial second-guessing." *Id.*; *see also Abbott*, 961 at 407, ("That the line might have been drawn differently ... is a matter for legislative, rather than judicial, consideration.") (cleaned up); *Trinsey v. Com. of Pa.*, 941 F.2d 224, 235 (3d Cir. 1991) ("We take no position on the balancing of the respective interests in this situation. That is a function for which the legislature is uniquely fitted.").

Thus, even under the *Anderson-Burdick* framework, the Court finds that Plaintiffs' constitutional challenge fails as a matter of law.

### B. Pennsylvania's use of drop boxes does not violate federal due process.

**[37]** In addition to their equal-protection challenge to the use of drop boxes, Plaintiffs also appear to argue that the use of unmanned drop boxes violates substantive due process protected by the 14th Amendment. This argument is just a variation on their equal-protection argument—*i.e.*, the uneven use of drop boxes will work a "patent and fundamental unfairness" in violation of substantive due process principles. *See Griffin v. Burns*, 570 F.2d 1065, 1077 (1st Cir. 1978)

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 88 of 205
**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**

2020 WL 5997680

(substantive due process rights are violated "[i]f the election process itself reaches the point of patent and fundamental unfairness[.]"). The analysis for this claim is the same as that for equal protection, and thus it fails for the same reasons.

But beyond that, this claim demands even stricter proof. Such a claim exists in only the most extraordinary circumstances. *See Nolles v. State Comm. for Reorganization of Sch. Districts*, 524 F.3d 892, 898 (8th Cir. 2008) ("A canvass of substantive due process cases related to voting rights reveals that voters can challenge a state election procedure in federal court only in limited circumstances, such as when the complained of conduct discriminates against a discrete group of voters, when election officials refuse to hold an election though required by state law, resulting in a complete disenfranchisement, or when the willful and illegal conduct of election officials results in fraudulently obtained or fundamentally unfair voting results.") (cleaned up); *Yoshina*, 140 F.3d at 1226 ("We have drawn a distinction between 'garden variety' election irregularities and a pervasive error that undermines the integrity of the vote. In general, garden variety election irregularities do not violate the Due Process Clause, even if they control the outcome of the vote or election.") (citation omitted); *Bennett v. Mollis*, 590 F. Supp. 2d 273, 278 (D.R.I. 2008) ("Before an election error becomes a key that unlocks the restraints on the federal court's authority to act, the Plaintiffs must demonstrate either an intentional election fraud or an unintentional error resulting in broad-gauge unfairness.").

Indeed, "only the most egregious official conduct can be said to be arbitrary in the constitutional sense"—the "executive action must be so ill-conceived or malicious that it 'shocks the conscience.' " *Miller v. City of Phila.*, 174 F.3d 368, 375 (3d Cir. 1999) (cleaned up).

Based on the slight burden imposed here, and the Commonwealth's interests in their overall county specific voting regime, which includes a host of other fraud-prevention measures, the Court finds that the drop-box claim falls short of the standard of substantive due process.

### III. Defendants and Intervenors are entitled to summary judgment on Plaintiffs' signature-comparison claims.

**\*52** Plaintiffs' next claim concerns whether the Secretary's recent guidance on signature comparison violates the federal Constitution. Plaintiffs frame their claims pertaining to signature comparison in two ways—one based on due process and the other based on equal protection.

Plaintiffs initially assert that the Election Code requires a signature comparison for mail-in and absentee applications and ballots. Thus, according to Plaintiffs, Secretary Boockvar's guidance, which says the opposite, is creating unconstitutional vote dilution, in violation of due-process principles—*i.e.*, certain unlawful, unverified ballots will now be counted, thereby diluting the lawful ones cast by other voters (such as in-person voters, whose signatures are verified). Plaintiffs also appear to argue more generally that absent signature comparison, there is a heightened risk of voter fraud, and therefore a heightened risk of vote dilution of lawful votes.

In addition to due process, Plaintiffs argue that the guidance violates equal-protection principles—first, by counties engaging in a patchwork of procedures (where some counties intend to do a signature comparison for mail-in ballots, while others do not); and second, by implementing different standards between mail-in ballots and in-person ones.

In contrast, Defendants and Intervenors take the position that state law does not require signature comparison, and for good reason. According to them, requiring such comparisons is fraught with trouble, as signatures change over time and elections officials are not signature-analysis experts. This leaves open the possibility for arbitrary and discriminatory application that could result in the disenfranchisement of valid voters.

For the reasons that follow, the Court will dismiss the signature-comparison claims and enter judgment in favor of Defendants. A plain reading of the Election Code demonstrates that it does not impose a signature-comparison requirement for mail-in ballots and applications, and thus Plaintiffs' vote-dilution claim sounding in due process fails at the outset. Further, the heightened risk of fraud resulting from a lack of signature comparison, alone, does not rise to the level of a federal constitutional violation. Finally, the equal-protection claims fail because there are sound reasons for the different treatment of in-person ballots versus mail-in ballots; and any potential burdens on the right to vote are outweighed by the state's interests in their various election security measures.

### A. The Election Code does not require signature comparison for mail-in and absentee ballots or ballot applications.

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 89 of 205
Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)
2020 WL 5997680

Plaintiffs' federal-constitutional claims in Count I of their Second Amended Complaint are partially based on the Secretary's guidance violating state law. That is, Plaintiffs' first theory is that by the Secretary violating state law, unlawful votes are counted and thus lawfully cast votes are diluted. According to Plaintiffs, this violates the 1st and 14th Amendments, as well as the Elections Clause (the latter of which requires the legislature, not an executive, to issue election laws).[12]

**\*53** Thus, a necessary predicate for these constitutional claims is whether the Election Code mandates signature comparison for mail-in and absentee ballots. If it doesn't, as the Secretary's guidance advises, then there can be no vote dilution as between lawful and unlawful votes, nor a usurpation of the legislature's authority in violation of the Elections Clause.

**[38]** After carefully considering the parties' arguments and the relevant law, the Court finds that the plain language of the Election Code imposes no requirement for signature comparison for mail-in and absentee ballots and applications.[13] In other words, the Secretary's guidance is consistent with the Election Code, and creates no vote-dilution problems.[14]

Plaintiffs, in advancing their claim, rely on section 3146.8(g)(3)-(7) of the Election Code to assert that the Code requires counties to "verify" the signatures on mail-in and absentee ballots (*i.e.*, examine the signatures to determine whether they are authentic). Plaintiffs specifically point to section 3146.8(g)(3) as requiring this signature verification. [ECF 509, pp. 17-18].

Section 3146.8(g)(3) states:

When the county board meets to pre-canvass or canvass absentee ballots and mail-in ballots ... the board shall examine the declaration on the envelope of each ballot ... and shall compare the information thereon with that contained in the "Registered Absentee and Mail-in Voters File," the absentee voters' list and/or the "Military Veterans and Emergency Civilians Absentee Voters File," whichever is applicable. If the county board has verified the proof of identification as required under this act and is satisfied that the declaration is sufficient and the information contained in the "Registered Absentee and Mail-in Voters File," the absentee voters' list and/or the "Military Veterans and Emergency Civilians Absentee Voters File" verifies his

right to vote, the county board shall provide a list of the names of electors whose absentee ballots or mail-in ballots are to be pre-canvassed or canvassed.

**\*54** 25 P.S. § 3146.8(g)(3).

According to Plaintiffs, Section 3146.8(g)(3)'s requirement to verify the proof of identification, and compare the information on the declaration, is tantamount to signature comparison. The Court disagrees, for at least three reasons.

First, nowhere does the plain language of the statute require signature comparison as part of the verification analysis of the ballots.

When interpreting a statute enacted by the Pennsylvania General Assembly, courts apply Pennsylvania's Statutory Construction Act, 1 Pa. C.S. §§ 1501-1991. And as the Act instructs, the "object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." 1 Pa C.S. § 1921(a). If the words of the statute are clear and unambiguous, the letter of the law applies. *Id.* at § 1921(b). Otherwise, courts may consider a variety of factors to determine the legislature's intent, including "other statutes upon the same or similar subjects" and "[t]he consequences of a particular interpretation." *Id.* at § 1921(c)(5)-(6).

Section 3146.8(g)(3) does not expressly require any signature verification or signature comparison. 25 P.S. § 3146.8(g)(3). It instead requires election officials to (1) "examine the declaration on the envelope of each ballot," (2) "compare the information thereon with that contained in the ... 'Voters file' [or] the absentee voters' list," and (3) if "the county board has [a] verified the proof of identification as required under this act and [b] is satisfied that the declaration is sufficient and the information contained in the [Voter's file] ... verifies his right to vote," the election official shall include the ballot to be counted. *Id.*

Under the express terms of the statute, then, the information to be "verified" is the "proof of identification." *Id.* The Election Code defines "proof of identification" as the mail-in/absentee voter's driver's license number, last four digits of their Social Security number, or a specifically approved form of identification. 25 P.S. § 2602(z.5)(3)(i)-(iv).[15] The only other "verification" the election official must conduct is to determine whether "the information contained in the [Voter's file] ... verifies his right to vote."

2020 WL 5997680

**\*55** Nowhere does this provision require the election official to compare and verify the authenticity of the elector's signature. In fact, the word "signature" is absent from the provision. It is true that the elector must fill out and sign the declaration included on the ballot. 25 P.S. §§ 3146.6(a), 3150.16(a). However, while section 3146.8(g)(3) instructs the election official to "examine the declaration ... and compare the information thereon with that contained in the [Voter's file]," the provision clarifies that this is so the election official can be "satisfied that the declaration is sufficient." 25 P.S. § 3146.8(g)(3). In other words, the election official must be "satisfied" that the declaration is "fill[ed] out, date[d] and sign[ed]," as required by sections 3150.16(a) and 3146.6(a) of the Election Code. Notably absent is any instruction to verify the signature and set aside the ballot if the election official believes the signature to be non-genuine. There is an obvious difference between checking to see if a signature was provided at all, and checking to see if the provided signature is sufficiently authentic. Only the former is referred to in section 3146.8(g)(3).

Second, beyond the plain language of the statute, other canons of construction compel the Court's interpretation. When interpreting statutes passed by the General Assembly, Pennsylvania law instructs courts to look at other aspects of the statute for context. *See* 1 Pa. C.S. § 1921(c)(5) ("When the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering ... other statutes upon the same or similar subjects."); *O'Rourke v. Commonwealth*, 566 Pa. 161, 778 A.2d 1194, 1201 (2001) ("The cardinal rule of all statutory construction is to ascertain and effectuate the intent of the Legislature. To accomplish that goal, we should not interpret statutory words in isolation, but must read them with reference to the context in which they appear." (citation omitted)).

Context here is important because the General Assembly mandated signature comparison for in-person voting elsewhere in the Election Code—thus evidencing its intention not to require such comparison for mail-in ballots. *See Fonner v. Shandon, Inc.*, 555 Pa. 370, 724 A.2d 903, 907 (1999) ("[W]here a section of a statute contains a given provision, the omission of such a provision from a similar section is significant to show a different legislative intent.") (citation omitted).

In addressing in-person voting, the General Assembly explicitly instructs that the election official shall, after receiving the in-person elector's voter certificate, immediately "*compare the elector's signature* on his voter's certificate with his signature in the district register. If, upon such comparison, the signature upon the voter's certificate appears to be genuine, the elector who has signed the certificate shall, if otherwise qualified, be permitted to vote: Provided, That *if the signature on the voter's certificate, as compared with the signature as recorded in the district register, shall not be deemed authentic* by any of the election officers, such elector shall not be denied the right to vote for that reason, but shall be considered challenged as to identity and required to [cure the deficiency]." 25 P.S. § 3050(a.3)(2) (emphasis added).

Elsewhere, the General Assembly also explicitly accounts for signature comparison of in-person voters: "[I]f it is determined that the individual was registered and entitled to vote at the election district where the ballot was cast, *the county board of elections shall compare the signature on the provisional ballot envelope with the signature on the elector's registration form and, if the signatures are determined to be genuine, shall count the ballot* if the county board of elections confirms that the individual did not cast any other ballot, including an absentee ballot, in the election. ... [But a] provisional ballot shall not be counted if ... the signature[s] required ... are either not genuine or are not executed by the same individual ..." 25 P.S. § 3050(a.4)(5)(i)-(ii) (emphasis added); *see also* 25 P.S. § 2936 ("[When reviewing nomination papers], the Secretary of the Commonwealth or the county board of elections, although not hereby required so to do, *may question the genuineness of any signature or signatures appearing thereon*, and if he or it shall thereupon find that any such signature or signatures are not genuine, such signature or signatures shall be disregarded[.]" (emphasis added)).

**\*56** Clearly then, the General Assembly, in enacting the Election Code, knew that it could impose a signature-comparison requirement that requires an analysis to determine whether a signature is "genuine." And when that was its intent, the General Assembly explicitly and unequivocally imposed that requirement. It is thus telling, from a statutory construction standpoint, that no such explicit requirement is imposed for returned mail-in or absentee ballots. Indeed, the General Assembly is aware—and in fact, requires—that a voter must sign their application for an absentee or mail-in ballot, and must sign the declaration on their returned ballot. 25 P.S. §§ 3146.2(d) (absentee-ballot application), 3150.12(c) (mail-in-ballot application), 3146.6(a) (absentee-voter declaration), 3150.16(a) (mail-in voter declaration). Despite this, the General Assembly did

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 91 of 205
Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)
2020 WL 5997680

not mention a signature-comparison requirement for returned absentee and mail-in ballots.

The Court concludes from this context that this is because the General Assembly did not intend for such a requirement. *See, e.g., Mishoe v. Erie Ins. Co.,* 573 Pa. 267, 824 A.2d 1153, 1155 (2003) ("In arriving at our conclusion that the foregoing language does not provide for the right to a jury trial, we relied on three criteria. First, we put **substantial emphasis** on the fact that the PHRA was silent regarding the right to a jury trial. As we explained, 'the General Assembly is well aware of its ability to grant a jury trial in its legislative pronouncements,' and therefore, 'we can presume that the General Assembly's express granting of trial by jury in some enactments means that it did not intend to permit for a jury trial under the PHRA.' " (cleaned up) (emphasis added)); *Holland v. Marcy,* 584 Pa. 195, 883 A.2d 449, 456, n.15 (2005) ("We additionally note that the legislature, in fact, did specify clearly when it intended the choice of one individual to bind others. In every other category addressed by Section 1705(a) other than (a)(5) which addressed uninsured owners, the General Assembly specifically referenced the fact that the decision of the named insured ... binds other household members.... Similar reference to the ability of the uninsured owner's deemed choice to affect the rights of household members is conspicuously missing from Section 1705(a)(5).").

Accordingly, the Court finds that the General Assembly's decision not to expressly refer to signature comparisons for mail-in ballots, when it did so elsewhere, is significant.

Third, this Court is mindful that Pennsylvania's election statutes are to be construed in a manner that does not risk disenfranchising voters. *See, e.g.,* 1 Pa. C.S. § 1922(3) ("In ascertaining the intention of the General Assembly in the enactment of a statute the following presumptions, among others, may be used: ... That the General Assembly does not intend to violate the Constitution of the United States or of this Commonwealth."); *id.* at § 1921(c)(6) (in interpreting a statute, the court may consider "[t]he consequences of a particular interpretation").

**[39]** As the Pennsylvania Supreme Court emphasized last month, "[I]t is well-settled that, although election laws must be strictly construed to prevent fraud, they ordinarily will be construed liberally in favor of the right to vote. Indeed, our goal must be to enfranchise and not to disenfranchise the electorate." *Boockvar,* ––– A.3d at ––––, 2020 WL 5554644, at *9 (cleaned up); *see also id.* ("[A]lthough both

Respondent and the Caucus offer a reasonable interpretation of Section 3150.16(a) as it operates within the Election Code, their interpretation restricts voters' rights, as opposed to the reasonable interpretation tendered by Petitioner and the Secretary. The law, therefore, militates in favor of this Court construing the Election Code in a manner consistent with the view of Petitioner and the Secretary, as this construction of the Code favors the fundamental right to vote and enfranchises, rather than disenfranchises, the electorate.").

**\*57** Here, imposing a signature-comparison requirement as to mail-in and absentee ballots runs the risk of restricting voters' rights. This is so because election officials, unstudied and untested in signature verification, would have to subjectively analyze and compare signatures, which as discussed in greater detail below, is potentially problematic.[16] [ECF 549-2, p. 19, ¶ 68]; [ECF 549-9, p. 20, ¶ 64]. And perhaps more importantly, even assuming an adequate, universal standard is implemented, mail-in and absentee voters whose signatures were "rejected" would, unlike in-person voters, be unable to cure the purported error. *See* 25 P.S. § 3146.8(a) (stating that in-person and absentee ballots "shall [be safely kept] in sealed or locked containers until they are to be canvassed by the county board of elections," which § 3146.8(g)(1.1)-(2) states is no earlier than election day); *Boockvar,* ––– A.3d at ––––, 2020 WL 5554644, at *20 ("[A]lthough the Election Code provides the procedures for casting and counting a vote by mail, it does not provide for the 'notice and opportunity to cure' procedure sought by Petitioner. To the extent that a voter is at risk for having his or her ballot rejected due to minor errors made in contravention of those requirements, we agree that the decision to provide a 'notice and opportunity to cure' procedure to alleviate that risk is one best suited for the Legislature."). As discussed in more detail below, unlike in-person voters, whose signatures are verified in their presence, mail-in and absentee voters' signatures would be verified at a later date outside the presence of the voter. *See generally* 25 P.S. § 3146.8(a), (g) (requiring mail-in and absentee ballots to be kept secured in a sealed container until Election Day). Unbeknownst to the voter, then, and without an opportunity to remedy the purported error, these mail-in and absentee voters may not have their votes counted. Based on this risk of disenfranchisement, which the Court must consider in interpreting the statute, the Court cannot conclude that this was the General Assembly's intention.

The Court is not persuaded by Plaintiffs' arguments to the contrary.

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 92 of 205
**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**
2020 WL 5997680

Plaintiffs argue that section 3146.8(g)(5)-(7) provides a voter, whose ballot-signature was rejected, notice and an opportunity to cure the signature deficiency. [ECF 509, pp. 13, 18, 50]. That section, however, refers to when a person raises a specific challenge to a specific ballot or application on the grounds that the elector is not a "qualified elector." 25 P.S. § 3146.8(g)(4) (stating that mail-in and absentee ballots shall be counted unless they were challenged under §§ 3146.2b or 3150.12b, which allow challenges on the grounds that the elector applying for a mail-in or absentee ballot wasn't qualified). Thus, the "challenges" referenced in § 3146.8(g)(5)-(7) refer to a voter's qualifications to vote, not a signature verification.

Plaintiffs similarly argue that section 3146.8(h) provides mail-in voters notice and opportunity to cure signature deficiencies. [ECF 552, p. 60]. But that section relates to "those absentee ballots or mail-in ballots for which proof of identification has not been received or could not be verified." 25 P.S. § 3146.8(h). As discussed above, "proof of identification" is a defined term, and includes the voter's driver's license number, last four digits of their Social Security number, or a specifically approved form of identification. 25 P.S. § 2602(z.5)(3)(i)-(iv). Not included is the voter's signature.[17]

**\*58** At bottom, Plaintiffs request this Court to impose a requirement—signature comparison—that the General Assembly chose not to impose. Section 3146.8(g)(3) does not mention or require signature comparison. The Court will not write it into the statute.

[40] For the same reasons that the Election Code does not impose a signature-comparison requirement for mail-in and absentee ballots, the Election Code does not impose a signature-comparison requirement for mail-in and absentee ballot *applications*. While the General Assembly imposed a requirement that the application be signed, there is no mention of a requirement that the signature be verified, much less that the application be rejected based solely on such verification. 25 P.S. §§ 3146.2(d) (absentee-ballot application), 3150.12(c) (mail-in-ballot application). Again, finding no explicit instructions for signature comparison here (unlike elsewhere in the Code), the Court concludes that the General Assembly chose not to include a signature-comparison requirement for ballot applications.

The Court again finds Plaintiffs' arguments to the contrary unavailing. Plaintiffs argue that "there is no other proof of identification required to be submitted with the ballot applications," and thus, a signature comparison must be required. [ECF 509, p. 16].

But the Election Code expressly requires the applicant to include several pieces of identifying information, including their name, mailing address, and date of birth. 25 P.S. §§ 3146.2(b), 3150.12(b). And after receiving the applicant's application, the election official must "verify[ ] the proof of identification [a defined term as discussed above] and compar[e] the information provided on the application with the information contained on the applicant's permanent registration card."[18] *Id.* at §§ 3146.2b(c), 3150.12b(a). Thus, contrary to Plaintiffs' argument, the General Assembly provided for certain methods of identification as to ballot applications. Signature verification isn't one of them.

For these reasons, the Court concludes that the Election Code does not impose a signature-comparison requirement for absentee and mail-in ballots and applications. As such, the Secretary's September 11, 2020, and September 28, 2020, guidance is consistent with the Election Code. Plaintiffs' claims of vote dilution based on this guidance will therefore be dismissed.

**B. The lack of a signature comparison does not violate substantive due process.**

[41] In addition to alleging that the Secretary's guidance violates the Election Code, Plaintiffs appear to also argue that their right to vote is unconstitutionally burdened and diluted due to a risk of fraud. That is, regardless of what the Election Code requires, Plaintiffs assert that absent signature comparison, mail-in and absentee ballots will be prone to fraud, thereby diluting other lawful ballots. [ECF 509, pp. 45-50; 504-19, pp. 10-15]. Plaintiffs argue that this significantly burdens their fundamental right to vote, resulting in a due-process violation, and thus strict scrutiny applies. The Court disagrees.

**\*59** As discussed above in the context of Plaintiffs' drop-box claim, Plaintiffs' claim here simply does not rise to the high level for a substantive due process claim. To violate substantive due process in the voting-rights context, the infringements are much more severe. Only in extraordinary circumstances will there be "patent and fundamental unfairness" that causes a constitutional harm.

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 93 of 205
**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**

2020 WL 5997680

*See Bonas v. Town of North Smithfield*, 265 F.3d 69, 74 (1st Cir. 2001); *Shannon v. Jacobowitz*, 394 F.3d 90, 94 (2d Cir. 2005).

Here, Plaintiffs' signature-comparison claim does not meet this high standard. This isn't a situation of malapportionment, disenfranchisement, or intentional discrimination. And the risk of voter fraud generally without signature comparison —as a matter of fact and law—does not rise to "patent and fundamental unfairness."

Indeed, as discussed above, Plaintiffs' evidence of potential voter fraud here is insufficient to establish "patent and fundamental unfairness." In their summary-judgment brief, Plaintiffs argue that "the Secretary's September 2020 guidance memos promote voter fraud." [ECF 509, p. 48]. Plaintiffs then offer a hypothetical where a parent signs a ballot application on their child's behalf because the child is out-of-state. [ECF 509, p. 48]. Plaintiffs assert that without signature comparisons, such "fraud" could proceed unchecked. [*Id.*]. Plaintiffs continue, arguing that the "fraud" would "snowball," so that "spouses, neighbors, acquaintances, strangers, and others" were signing applications and ballots on others' behalf. [*Id.* at pp. 48-49]. To prevent such fraud, Plaintiffs' expert, Mr. Riddlemoser, asserts that signature comparison is needed. [ECF 504-19, p. 10 ("Not only does enforcing the Election Code's requirement of a completed and signed declaration ensure uniformity, which increases voter confidence, it also functions to reduce fraud possibilities by allowing signature verification.") ].

Mr. Riddlemoser first highlights that in Philadelphia in the primary, ballots were counted "that lacked a completed declaration." [*Id.* at p. 11]. Mr. Riddlemoser further opines that the September 11, 2020, guidance and September 28, 2020, guidance, in instructing that signature comparison is not required for mail-in and absentee ballots and applications, "encourage[s], rather than prevent[s], voter fraud." [*Id.* at pp. 12-13]. Mr. Riddlemoser also notes that signature comparison is "the most common method" to verify ballots and that the Secretary's guidance "leave the absentee/mail-in ballots subject to the potential for unfettered fraud." [*Id.* at p. 14]. He concludes that the guidance "invites the dilution of legitimately cast votes." [*Id.*].

Based on this evidentiary record, construed in Plaintiffs' favor, the Court cannot conclude that there exists "patent and fundamental unfairness." Rather, Plaintiffs present only the possibility and potential for voter fraud. In their briefing,

Plaintiffs relied on hypotheticals, rather than actual events. [ECF 509, p. 48]. Mr. Riddlemoser admits that failing to verify signatures only creates "the potential" for fraud and "invites" vote dilution. [ECF 504-19, pp. 14, 15]. Even assuming an absence of signature comparison does indeed invite the potential for fraud, the nondiscriminatory, uniform practice and guidance does not give rise to "patent and fundamental unfairness" simply because of a "potential" for fraud. Plaintiffs have not presented evidence to establish a sufficient burden on their constitutional right to vote.

**\*60** Indeed, even if the Court assumed some "forged" applications or ballots were approved or counted, this is insufficient to establish substantial, widespread fraud that undermines the electoral process. Rather, limited instances of "forged" ballots—which according to Plaintiffs' definition, includes an individual signing for their spouse or child— amount to what the law refers to as "garden variety" disputes of limited harm. As has long been understood, federal courts should not intervene in such "garden variety" disputes. *Hutchinson*, 797 F.2d at 1283 ("[C]ourts have uniformly declined to endorse action under § 1983 with respect to garden variety election irregularities.") (cleaned up); *Yoshina*, 140 F.3d at 1226 ("In general, garden variety election irregularities do not violate the Due Process Clause, even if they control the outcome of the vote or election." (collecting cases)); *Curry v. Baker*, 802 F.2d 1302, 1314-15 (11th Cir. 1986) ("[I]f the election process itself reaches the point of patent and fundamental unfairness, a violation of the due process clause may be indicated and relief under § 1983 therefore in order. Such a situation must go well beyond the ordinary dispute over the counting and marking of ballots." (cleaned up)).

To be clear, the Court does not take Plaintiffs' allegations and evidence lightly. Election fraud is serious and disruptive. And Plaintiffs could be right that the safer course would be to mandate signature comparison for all ballots. But what Plaintiffs essentially complain of here is whether the procedures employed by the Commonwealth are sufficient to prevent that fraud. That is a decision left to the General Assembly, not to the meddling of a federal judge. *Crawford*, 553 U.S. at 208, 128 S.Ct. 1610 (Scalia, J. concurring) ("It is for state legislatures to weigh the costs and benefits of possible changes to their election codes, and their judgment must prevail unless it imposes a severe and unjustified overall burden upon the right to vote, or is intended to disadvantage a particular class."). *Griffin*, 385 F.3d at 1131-32 ("[S]triking of the balance between discouraging fraud and other abuses and

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 94 of 205
**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**
2020 WL 5997680

encouraging turnout is quintessentially a legislative judgment with which we judges should not interfere unless strongly convinced that the legislative judgment is grossly awry.").

### C. Plaintiffs' federal equal-protection claims based on signature comparison fail.

Plaintiffs present two federal equal-protection claims. The Court will address each in turn.

### 1. County differences over signature comparison do not violate federal equal-protection rights.

[42]   Plaintiffs' first federal equal-protection claim is based on some county boards of elections intending to verify the signatures on mail-in and absentee ballots and applications, while others do not intend to do so. To that end, Plaintiffs have presented evidence that some, but not all, counties do intend to verify signatures. *E.g.,* [ECF 504-1].[19] According to Plaintiffs, this arbitrary and differential treatment of mail-in and absentee ballots among counties—purportedly caused by the Secretary's September 11, 2020, and September 28, 2020, guidance—violates the Equal-Protection Clause because voters will be treated differently simply because of the county in which they reside. The Court, however, finds no equal-protection violation in this context.

The Secretary's guidance about which Plaintiffs complain is uniform and nondiscriminatory. It was issued to all counties and applies equally to all counties, and by extension, voters. Because the uniform, nondiscriminatory guidance is rational, it is sound under the Equal-Protection Clause. *See Gamza,* 619 F.2d at 453 (5th Cir. 1980) ("We must, therefore, recognize a distinction between state laws and patterns of state action that systematically deny equality in voting, and episodic events that, despite non-discriminatory laws, may result in the dilution of an individual's vote. Unlike systematically discriminatory laws, isolated events that adversely affect individuals are not presumed to be a violation of the equal protection clause.") (citation omitted). Indeed, the guidance merely instructs counties to abide by the Election Code—an instruction to follow the law is certainly rational and related to an obviously rational government interest.

**\*61**  In fact, if there is any unequal application now, it is caused by those counties that are *not* following the guidance and are going above and beyond the Election Code to impose

a signature-comparison requirement. That claim, though, is not before the Court, as Plaintiffs here do not assert that imposing a signature-comparison requirement violates the Constitution (they allege the opposite).

In any event, to the extent there was uncertainty before, this decision informs the counties of the current state of the law as it relates to signature comparison. If any county still imposes a signature-comparison requirement in order to disallow ballots, it does so without support from the Secretary's guidance or the Election Code. Further, counties that impose this signature-comparison requirement to reject ballots may be creating a different potential constitutional claim for voters whose ballots are rejected. *Boockvar,* —— A.3d at ——, 2020 WL 5554644, at \*34, n.16 (Wecht, J. concurring) (noting that courts around the country have found due process issues with signature-comparison requirements; and collecting cases).

For these reasons, Plaintiffs' equal-protection claim falls short.

### 2. Different treatment between in-person ballots and mail-in ballots also does not violate federal equal-protection rights.

[43]   Plaintiffs also assert a second federal equal-protection claim on the grounds that the Election Code, by not requiring signature comparison for mail-in and absentee ballots, treats such ballots differently than in-person ballots (which require signature comparisons). Plaintiffs argue that this is an unconstitutionally arbitrary and unequal treatment. The Court disagrees.

[44]   It is well-settled that states may employ in-person voting, absentee voting, and mail-in voting and each method need not be implemented in exactly the same way. *See Hendon,* 710 F.2d at 181 ("A state may employ diverse methods of voting, and the methods by which a voter casts his vote may vary throughout the state.")

"Absentee voting is a fundamentally different process from in-person voting, and is governed by procedures entirely distinct from in-person voting procedures." *ACLU of New Mexico v. Santillanes,* 546 F.3d 1313, 1320 (10th Cir. 2008) (citations omitted). It is an "obvious fact that absentee voting is an inherently different procedure from in-person voting." *Indiana Democratic Party v. Rokita,* 458 F. Supp.

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 95 of 205
**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**
2020 WL 5997680

2d 775, 830-31 (S.D. Ind. 2006). Because in-person voting is "inherently different" from mail-in and absentee voting, the procedures for each need not be the same. *See, e.g., Santillanes*, 546 F.3d at 1320-21 ("[B]ecause there are clear differences between the two types of voting procedures, the law's distinction is proper."); *Rokita*, 458 F. Supp. 2d at 831 ("[I]t is axiomatic that a state which allows for both in-person and absentee voting must therefore apply different requirements to these two groups of voters."); *Billups*, 439 F. Supp. 2d at 1356-57 ("[A]bsentee voting and in-person voting are inherently different processes, and both processes use different standards, practices, and procedures.").

Plaintiffs argue that while absentee and mail-in voting "is a fundamentally different process from in-person voting," Defendants have "no justification in this instance to create such an arbitrary and disparate rule between absentee/mail-in voters and in-person voters." [ECF 509, p. 51]. Not so.

**\*62** Because of the "inherent" differences between in-person voting and mail-in and absentee voting, Pennsylvania's requirement for signature comparison for in-person ballots, but not mail-in and absentee ballots, is not arbitrary. By way of example, Secretary Boockvar articulated several valid reasons why Pennsylvania implements different verification procedures for mail-in and absentee voters versus in-person voters. [ECF 504-12; ECF 549-2].

In her deposition, Secretary Boockvar explained that for in-person voters, the only possible verification is signature comparison and verification. [ECF 504-12, 55:19-56:19]. This is because, unlike mail-in and absentee voters who must apply for a ballot, in-person voters may simply show up at the polls on Election Day and vote. In contrast, for mail-in and absentee voters, there are several verification steps implemented before the voter's mail-in/absentee ballot is counted, such as checking their application and their drivers' license number or social security number. [*Id.* at 56:8-19]. Thus, counties don't need to resort to a signature comparison to identify and verify the mail-in or absentee voter.

This is important, as Defendants and Intervenors present valid concerns about the uniformity and equality of signature comparisons, in part, due to the technical nature of signature analysis, the subjective underpinnings of signature analysis, and the variety of reasons that signatures can naturally change over time. [ECF 549-2, pp. 19-20, ¶ 68; ECF 549-9, p. 20, ¶¶ 63-64]. Such factors can reasonably justify not requiring

a signature comparison when the elector is not physically present.

For example, Secretary Boockvar notes the concern with non-handwriting-expert election officials comparing signatures, without uniform standards. [ECF 549-2, pp. 19-20, ¶ 68]. She also notes that people's signatures can change over time, due to natural and unavoidable occurrences, like injuries, arthritis, or the simple passage of time. [*Id.*]. Such reasons are valid and reasonable. *See Boockvar*, ⸺ A.3d at ⸺, 2020 WL 5554644, at \*34 (Wecht, J. concurring) ("Signature comparison is a process fraught with the risk of error and inconsistent application, especially when conducted by lay people.").

Secretary Boockvar further asserts that signature comparison is justified for in-person voting, but not mail-in or absentee voting, because the in-person voter is notified of his or her signature deficiency, and afforded an opportunity to cure. [ECF 549-2, pp. 19-20, ¶¶ 66-68 (explaining that in-person voters can be immediately notified of the signature deficiency, but mail-in/absentee voters cannot)]. Secretary Boockvar's justifications are consistent with the Election Code's framework.

When a voter votes in person, he or she signs the voter's certificate, and the election official immediately, in the voter's presence, verifies the signature. 25 P.S. § 3050(a.3)(1)-(2). If the election official finds the signature to be problematic, the in-person voter is told as such. *Id.* at § 3050(a.3)(2). Notably, however, the in-person voter may still cast a ballot. *Id.* ("[I]f the signature on the voter's certificate ... shall not be deemed authentic by any of the election officers, such elector shall not be denied the right to vote for that reason[.]"). The in-person voter whose signature is questioned must, after casting the ballot, "produce at least one qualified elector of the election district as a witness, who shall make affidavit of his identity or continued residence in the election district." *Id.* at § 3050(d). Thus, the in-person voter whose signature is not verified is immediately notified, is still allowed to cast a ballot, and is given the opportunity to remedy the signature-deficiency.

**\*63** In contrast, a voter who casts a mail-in or absentee ballot cannot be afforded this opportunity. Absentee and mail-in ballots are kept in "sealed or locked containers" until they are "canvassed by the county board of elections." 25 P.S. § 3146.8(a). The pre-canvassing and canvassing cannot begin until Election Day. *Id.* at § 3146.8(g)(1.1)-(2). As such, the absentee and mail-in ballots cannot be verified until Election

Case 4:20-cv-02078-MWB  Document 176-1  Filed 11/19/20  Page 96 of 205
**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**
2020 WL 5997680

Day, regardless of when the voter mails the ballot. Further, even if there were sufficient time, a voter cannot cure these types of deficiencies on their mail-in or absentee ballot. *Boockvar*, — A.3d at —, 2020 WL 5554644, at *20 ("[A]lthough the Election Code provides the procedures for casting and counting a vote by mail, it does not provide for the "notice and opportunity to cure" procedure sought by Petitioner.").

Therefore, if mail-in and absentee ballots were subject to signature comparison, an election official—who is unstudied in the technical aspects of signature comparison—could deem a voter's signature problematic and not count the ballot, which would effectively disenfranchise that voter. Unlike the in-person voter, the mail-in or absentee voter may not know that his or her signature was deemed inauthentic, and thus may be unable to promptly cure the deficiency even if he or she were aware.

Accordingly, the Court concludes that the inherent differences and opportunities afforded to in-person voters compared to mail-in and absentee voters provides sufficient reason to treat such voters differently regarding signature comparison. The Court concludes that the lack of signature comparison for mail-in and absentee ballots is neither arbitrary, nor burdens Plaintiffs' equal-protection rights.

For these reasons, the Court will dismiss Plaintiffs' federal equal-protection claims related to signature comparison.

**3. The Election Code provisions related to signature comparison satisfy *Anderson-Burdick*.**

Finally, even assuming the Election Code's absence of a signature-comparison requirement imposes some burden on Plaintiffs' constitutional rights, Plaintiffs' constitutional claims still fail.

As discussed above with respect to Defendants' drop-box implementation, *Anderson-Burdick* does not apply neatly to this claim either. This is because Plaintiffs aren't challenging a specific regulation affecting their right to vote, but are instead challenging the *lack* of a restriction on someone else's right to vote. This makes both the burden difficult to assess and also the state's interests in *not* doing something more abstract. As such, the Court finds that the proper application of the *Anderson-Burdick* framework here includes weighing the burden involving Plaintiffs' risk of vote dilution against

the state's interests and overall plan in preventing against voter fraud, including with respect to forged mail-in ballots.

[45] Weighing these considerations compels a conclusion that there is no constitutional violation here. With respect to any burden on Plaintiffs' right to vote, that burden is slight, at best. A failure to engage in a signature comparison may, crediting Plaintiffs' evidence, increase the risk of voter fraud. But even then, this remains a largely speculative concern. This burden too is lessened by the numerous other regulations imposed by the Election Code, including the detailed verification procedure as to the information on mail-in ballots (discussed above), and the deterrence furthered by criminal sanctions for those engaging in such voter fraud.

Against these burdens, the Commonwealth has precise and weighty interests in verifying ballot applications and ballots in an appropriate manner to ensure that they are accurate. As discussed above, the Commonwealth determined that the risk of disenfranchising mail-in and absentee voters, did not justify signature comparison for those voters. [ECF 549-2, pp. 19-20, ¶¶ 66-69]. Unlike for in-person voters, there are other means of identifying and verifying mail-in and absentee voters, such as having to specifically apply for a mail-in or absentee ballot and provide various categories of identifying information. [ECF 504-12, 55:19-56:19]; 25 P.S. §§ 3146.2(b), 3150.12(b). And ultimately, due to the slight burden imposed on Plaintiffs, Pennsylvania's regulatory interests in a uniform election pursuant to established procedures is sufficient to withstand scrutiny. *Timmons*, 520 U.S. at 358, 117 S.Ct. 1364.

*64 The General Assembly opted not to require signature comparisons for mail-in and absentee ballots and applications. And as previously discussed, absent extraordinary reasons to, the Court is not to second-guess the legislature.

**IV. Defendants and Intervenors are entitled to summary judgment on Plaintiffs' as-applied, federal constitutional challenge to the county-residency requirement for poll watchers.**

Plaintiffs next take exception with the provision of the Election Code that restricts a registered voter from serving as a poll watcher outside the county of his or her residence. [ECF 461, ¶ 217].

Plaintiffs argue that "[a]s applied to the 2020 General Election, during the midst of the COVID-19 pandemic,

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 97 of 205
**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**
2020 WL 5997680

Pennsylvania's residency requirement for watchers violates equal protection." [ECF 509, p. 58]. That's because, according to Plaintiffs, the "current pandemic severely challenges the ability of parties to staff watchers[.]" [*Id.* at p. 60]. And not having enough poll watchers in place "puts into danger the constitutionally-guaranteed right to a transparent and undiluted vote," [*id.* at p. 68], by "fostering an environment that encourages ballot fraud or tampering," [ECF 461, ¶ 256]. As such, Plaintiffs believe that the county residency requirement "is not rationally connected or reasonably related to any interest presented by the Commonwealth." [ECF 509, p. 63].

Defendants and Intervenors have a markedly different view.

As an initial matter, the Democratic Intervenors argue that Plaintiffs "are precluded from relitigating their claim that the Commonwealth lacks a constitutionally recognized basis for imposing a county-residence restriction for poll watchers" based on the doctrine articulated in *England v. Louisiana State Bd. of Med. Examiners*, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964). [ECF 529, p. 16]. That doctrine requires that after a federal court has abstained under *Pullman*, the plaintiff must expressly reserve the right to litigate any federal claims in federal court while litigating state-law issues in state court. *England*, 375 U.S. at 419, 421-22, 84 S.Ct. 461. Defendants and Intervenors contend that Plaintiffs (specifically, the Trump Campaign, the RNC, and the Republican Party) failed to do so in the proceedings before the Pennsylvania Supreme Court.

And if the *England* doctrine doesn't bar this claim, Defendants and Intervenors argue that "Plaintiffs' as-applied challenge simply fails to state a constitutional claim." *See, e.g.*, [ECF 547, p. 65]. They believe that the county-residency requirement does not infringe on a fundamental right or regulate a suspect classification (such as race, sex, or national origin). [*Id.*]. As a result, the Commonwealth need only provide a rational basis for the requirement, which Defendants and Intervenors believe the Commonwealth has done. [*Id.*].

After carefully reviewing the record and considering the parties' arguments and evidence, the Court finds that the *England* doctrine does not bar Plaintiffs' ability to bring this claim. Even so, after fully crediting Plaintiffs' evidence, the Court agrees with Defendants and Intervenors that Plaintiffs' as-applied challenge fails on the merits.

### A. The *England* doctrine does not bar Plaintiffs' federal challenge to the county-residency requirement.

**\*65** **[46]** **[47]** In *England*, the Supreme Court established that after a federal court abstains under *Pullman*, "if a party freely and without reservation submits his federal claims for decision by the state courts, litigates them there, and has them decided there, then ... he has elected to forgo his right to return to the District Court." 375 U.S. at 419, 84 S.Ct. 461. To reserve those rights, a plaintiff forced into state court by way of abstention must inform the state court that he is exposing the federal claims there only to provide the proper context for considering the state-law questions. *Id.* at 421, 84 S.Ct. 461. And that "he intends, should the state court[ ] hold against him on the question of state law, to return to the District Court for disposition of his federal contentions." *Id.* Essentially, in *England*, the Supreme Court created a special doctrine of *res judicata* for *Pullman* abstention cases.

**[48]** The Democratic Intervenors argue that because none of the three Plaintiffs who participated in the Pennsylvania Supreme Court case as either intervenors or *amici* "reserved the right to relitigate [Plaintiffs' poll-watcher claims in federal court," they are now "precluded" from doing so. [ECF 529, p. 17]. The Court is not convinced that this doctrine bars Plaintiffs' claim for at least two reasons.

First, in its original abstention decision, the Court noted that "[n]one of Plaintiffs' poll-watching claims directly ask the Court to construe an ambiguous state statute." [ECF 409, p. 24]. Instead, these claims resided in a *Pullman* gray area, because they were only indirectly affected by other unsettled state-law issues. In light of that, the Court finds that the *England* doctrine was not "triggered," such that Plaintiffs needed to reserve their right to return to federal court to litigate the specific as-applied claim at issue here.

Second, even if it were triggered, not all of the Plaintiffs here were parties in the Pennsylvania Supreme Court case, and only one (the Republican Party) was even given intervenor status. But even the Republican Party, acting as an intervenor, did not have an opportunity to develop the record or present evidence relevant to its as-applied challenge. Thus, this claim wasn't "fully litigated" by any of the Plaintiffs, which is a necessary condition for the claim to be barred under the *England* doctrine. *Cf. Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1073 (3d Cir. 1990) (explaining that a litigant "may not relitigate an issue s/he fully and unreservedly litigated in state court").

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 98 of 205
**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**

2020 WL 5997680

Thus, Plaintiffs are not precluded by the *England* doctrine from bringing their remaining as applied poll-watcher claim. The Court will now address the claim on the merits.

**B. The county-residency requirement, as applied to the facts presented and the upcoming general election, does not violate the U.S. Constitution.**

Originally, Plaintiffs raised a facial challenge to the county-residency requirement under 25 P.S. § 2687. That is, Plaintiffs first took the position that there was no conceivable constitutional application of the requirement that an elector be a resident of the county in which he or she seeks to serve. But, as Plaintiffs' concede, that facial challenge is no longer viable in light of the Pennsylvania Supreme Court's recent decision. [ECF 448, p. 10]. As a result, Plaintiffs now focus solely on raising an as-applied challenge to the county-residency requirement.

"[T]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010).

At a fundamental level, a "facial attack tests a law's constitutionality based on its text alone and does not consider the facts or circumstances of a particular case. *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010). By contrast, an "as-applied attack" on a statute "does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right." *Id.* The distinction between facial and an as-applied attack, then, "goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." *Citizens United*, 558 U.S. at 331, 130 S.Ct. 876; *see also Bruni v. City of Pittsburgh*, 824 F.3d 353, 362 (3d Cir. 2016) ("The distinction between facial and as-applied constitutional challenges, then, is of critical importance in determining the remedy to be provided).

**\*66** Because the distinction is focused on the available remedies, not the substantive pleading requirements, "[t]he substantive rule of law is the same for both challenges." *Edwards v. D.C.*, 755 F.3d 996, 1001 (D.C. Cir. 2014); *see also Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 509, n.5 (D.C. Cir. 2016) ("Indeed, the substantive rule of law is the same for both as-applied and facial First Amendment challenges.") (cleaned up); *Legal Aid Servs. of*

*Or. v. Legal Servs. Corp.*, 608 F.3d 1084, 1096 (9th Cir. 2010) ("The underlying constitutional standard, however, is no different [in an as-applied challenge] th[a]n in a facial challenge.").

"In other words, *how* one must demonstrate the statute's invalidity remains the same for both type of challenges, namely, by showing that a specific rule of law, usually a constitutional rule of law, invalidates the statute, whether in a personal application or to all." *Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219, 228 (2d Cir. 2006), *abrogated on other grounds by Bond v. United States*, 564 U.S. 211, 131 S.Ct. 2355, 180 L.Ed.2d 269 (2011).

[49]  In determining whether a state election law violates the U.S. Constitution, the Court must "first examine whether the challenged law burdens rights protected by the First and Fourteenth Amendments." *Patriot Party of Allegheny Cnty. v. Allegheny Cnty. Dep't of Elections*, 95 F.3d 253, 258 (3d Cir. 1996). "Where the right to vote is not burdened by a state's regulation on the election process, ... the state need only provide a rational basis for the statute." *Cortés*, 218 F. Supp. 3d at 408. The same is true under an equal protection analysis. "If a plaintiff alleges only that a state treated him or her differently than similarly situated voters, without a corresponding burden on the fundamental right to vote, a straightforward rational basis standard of review should be used." *Obama*, 697 F.3d at 428 (6th Cir. 2012); *see also Biener*, 361 F.3d at 214-15 (applying rational basis where there was no showing of an "infringement on the fundamental right to vote."); *Donatelli*, 2 F.3d at 515 ("A legislative classification that does not affect a suspect category or infringe on a fundamental constitutional right must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." (cleaned up)).

But where the law imposes at least some burden on protected rights, the court "must gauge the character and magnitude of the burden on the plaintiff and weigh it against the importance of the interests that the state proffers to justify the burden." *Patriot Party*, 95 F.3d at 258 (citations omitted).

[50]  Consistent with the Pennsylvania Supreme Court's recent decision, but now based on a complete record, this Court finds that the county-residency requirement for poll watching does not, as applied to the particular circumstances of this election, burden any of Plaintiffs' fundamental constitutional rights, and so a deferential

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 99 of 205
**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**
2020 WL 5997680

standard of review should apply. *See Boockvar*, ⸻ A.3d at ⸻, 2020 WL 5554644, at *30. Under a rational-basis review and considering all the relevant evidence before the Court, the county-residency requirement is rational, and thus constitutional. But even if the requirement burdened the right to vote, that burden is slight—and under the *Anderson-Burdick* test, the Commonwealth's interests in a county-specific voting system, viewed in the context of its overall polling-place security measures, outweigh any slight burden imposed by the county-residency restriction.

**1. The county-residency requirement neither burdens a fundamental right, including the right to vote, nor discriminates based on a suspect classification.**

*67 **[51]** At the outset, "there is no individual constitutional right to serve as a poll watcher[.]" *Boockvar*, ⸻ A.3d at ⸻, 2020 WL 5554644, at *30 (citing *Cortés*, 218 F. Supp. 3d at 408); *see also Dailey v. Hands*, No. 14-423, 2015 WL 1293188, at *5 (S.D. Ala. Mar. 23, 2015) ("[P]oll watching is not a fundamental right protected by the First Amendment."); *Turner v. Cooper*, 583 F. Supp. 1160, 1162 (N.D. Ill. 1983) ("Plaintiffs have cited no authority ..., nor have we found any, that supports the proposition that [the plaintiff] had a first amendment right to act as a poll watcher.").

"State law, not the Federal Constitution, grants individuals the ability to serve as poll watchers and parties and candidates the authority to select those individuals." *Cortés*, 218 F. Supp. 3d at 414; *see also Boockvar*, ⸻ A.3d at ⸻, 2020 WL 5554644, at *30 (the right to serve as a poll watcher "is conferred by statute"); *Tiryak v. Jordan*, 472 F. Supp. 822, 824 (E.D. Pa. 1979) ("The number of poll-watchers allowed, the manner of their appointment, their location within the polling place, the activities permitted and the amount of compensation allowed are all dictated by [25 P.S. § 2687].")." Given the nature of the right, "[i]t is at least arguable that the [Commonwealth of Pennsylvania] could eliminate the position of poll watcher" without offending the constitution. *Cotz v. Mastroeni*, 476 F. Supp. 2d 332, 364 (S.D.N.Y. 2007). In fact, one neighboring state—West Virginia—has eliminated poll watchers. W. Va. Code Ann. § 3-1-37; W. Va. Code Ann. § 3-1-41.

Nor does the county-residency requirement hinder the "exercise of the franchise." *Cortés*, 218 F. Supp. 3d at 408. It doesn't in any way limit voters' "range of choices in the voting booth"—voters can still "cast ballots for whomever they

wish[.]" *Id.* And, as Plaintiffs admit, the county-residency requirement doesn't make the actual act of casting a vote any harder. *See* [ECF 524-24, 67:1-6]. Indeed, at least one of the plaintiffs here, Representative Joyce, testified that he was unaware of anyone unable to cast his ballot because of the county-residency requirement for poll watchers [*Id.*].

Finally, Plaintiffs' claim that Pennsylvania's "poll watching system" denies them "equal access" to the ability to observe polling places in the upcoming election does not, on its own, require the Court to apply anything other than rational-basis scrutiny. [ECF 551, p. 75]. To the extent Plaintiffs are denied equal access (which discussed below, as a matter of evidence, is very much in doubt), it isn't based on their membership in any suspect classification.

**[52]** For a state law to be subject to strict scrutiny, it must not only make a distinction among groups, but the distinction must be based on inherently suspect classes such as race, gender, alienage, or national origin. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439-40, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Political parties are not such a suspect class. *Greenville Republican Party*, 824 F. Supp. 2d at 669 ("[T]his court is unfamiliar with, and Plaintiffs have not cited, any authority categorizing political parties as an inherently suspect class.") Likewise, "[c]ounty of residence is not a suspect classification warranting heightened scrutiny[.]" *Short*, 893 F.3d at 679.

Plaintiffs don't dispute this. [ECF 509, p. 65 ("To be clear, the right at issue here is the right of **candidates** and **political parties** to participate in an election where the process is transparent and open to observation and the right of the **voters** to participate in such election." (emphasis in original)) ]. Rather, Plaintiffs' theory as to how the county-residency requirement burdens the right to vote is based on the same threat of vote dilution by fraud that they have advanced with their other claims. In other words, Plaintiffs' claim that the county-residency requirement for poll watchers limits the ability to find poll watchers, which, in turn, limits the ability for poll watchers to detect fraud and ballot tampering. [ECF 461, ¶¶ 256-57]. The resulting fraudulent or destroyed ballots cause the dilution of lawfully cast ballots. [ECF 509, pp. 64-68].

*68 Thus, based on this theory, to establish the burden flowing from the county-residency restriction, Plaintiffs must show (1) the county-residency requirement prevents them from recruiting enough registered Republican poll watchers

Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)

2020 WL 5997680

in every county, (2) the absence of these Republican poll watchers creates a material risk of increased fraud and ballot tampering, and (3) this risk of fraud and ballot tampering will dilute the value of honestly cast votes.

There are both factual and legal problems fatal to Plaintiffs' vote-dilution theory in this context. Factually, Plaintiffs' evidence, accepted as true, fails to establish that they cannot find enough poll watchers because of the county-residency requirement. But even if they made that factual showing, the inability to find poll watchers still does not burden any recognized constitutional right in a way that would necessitate anything more than deferential review.

**2. Plaintiffs' evidence does not establish any factual predicate for their theory.**

[53] Even accepting as true Plaintiffs' version of events, Plaintiffs have not established that the county-residency requirement is responsible for an inability to find enough poll watchers for at least two reasons.

First, Plaintiffs' evidence stops short of demonstrating any actual shortfall of desired poll watchers.

For example, in his declaration, James J. Fitzpatrick, the Pennsylvania Director for Election Day Operations for the Trump Campaign, stated only that the "Trump Campaign is *concerned* that due to the residency restriction, it will not have enough poll watchers in certain counties." [ECF 504-2, ¶ 25 (emphasis added) ]. Notably, however, Mr. Fitzpatrick, even when specifically asked during his deposition, never identified a single county where the Trump Campaign has *actually* tried and failed to recruit a poll watcher because of the county-residency requirement. *See, e.g.*, [ECF 528-14, 261:21-25] ("Q: Which counties does the Trump campaign or the RNC contend that they will not be able to obtain what you refer to as full coverage of poll watchers for the November 2020 election? A: I'm not sure. I couldn't tell you a list.").

Nor do any of Plaintiffs' other witness declarations establish an actual, inability to recruit poll watchers in any specific county. Representative Reschenthaler stated only that he was "concerned" that he "will not be able to recruit enough volunteers from Greene County to watch the necessary polls in Greene County." [ECF 504-6, ¶ 12].

Representative Kelly stated that he was "likely to have difficulty getting enough poll watchers from within Erie County to watch all polls within that county on election day." [ECF 504-5, ¶ 16]. "Likely difficulty" isn't the same as an "actual inability." That aside, the declaration doesn't provide any basis for Representative Kelly's assessment of this "likely difficulty." Nowhere does he detail the efforts he took (*e.g.*, the outreach he tried, prospective candidates he unsuccessfully recruited, and the like), nor did he explain why those efforts aren't likely to succeed in the future.

The same goes for Representative Thompson's declaration. Representative Thompson stated that during some unspecified prior elections, unidentified parties and campaigns did not "always find enough volunteers to serve as poll watchers in each precinct." [ECF 504-4, ¶ 20]. But this undetailed statement doesn't help Plaintiffs' cause, because it doesn't identify the elections during which this was a problem, the parties and campaigns affected by a lack of poll watchers, or the precincts for which no poll watcher could be found.

*69 Representative Joyce's declaration doesn't even express a "concern" about "likely difficulty" in recruiting poll watchers. He simply stated his belief that "[p]oll watchers play a very important role in terms of protecting the integrity of the election process[.]" [ECF 504-7, ¶ 11]. While he may be right, it has no bearing on whether Plaintiffs can find enough people to play that "very important role."

Indeed, Plaintiffs' prediction that they will "likely" have difficulty finding poll watchers is belied by the uncontested Pennsylvania voter registration statistics for 2019 that they included as an exhibit to their summary-judgment brief. [ECF 504-34]. Those statistics suggest that there is no shortage of registered Republican voters who are qualified to serve as poll watchers. [*Id.*]. Even in the three specific counties in which Plaintiffs warn that "Democratic registered voters outnumber ... their Republican counterparts" (*i.e.*, Philadelphia, Delaware, and Centre), there are still significant numbers of registered Republicans. *See* [ECF 504-34 (Philadelphia – 118,003; Delaware – 156,867; and Centre – 42,903) ]. And only a very small percentage of the registered Republicans would be needed to fill all the necessary poll watcher positions in those allegedly problematic counties. *See, e.g.*, *Cortés*, 218 F. Supp. 3d at 410 (noting that, in 2016, the Republican Party "could staff the entirety of the poll watcher allotment in Philadelphia county with just 4.1% of the registered Republicans in the county."). While Plaintiffs argue that these statistics don't show the number of registered

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 101 of 205
**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**
2020 WL 5997680

Republicans *willing* to serve as a poll watcher, the Court is hard pressed to see, nor do Plaintiffs show, how among the tens—or hundreds—of thousands of registered Republicans in these counties, Plaintiffs are unable to find enough poll workers.[20]

Plaintiffs have not presented any evidence that would explain how, despite these numbers, they will have a hard time finding enough poll watchers. In fact, Plaintiffs' own expert, Professor Lockerbie, admits that "the Democratic and Republican parties might be able to meet the relevant criteria and recruit a sufficient population of qualified poll watchers who meet the residency requirements[.]" [ECF 504-20, ¶ 16].

[54]   [55] Professor Lockerbie's report makes clear, and Plaintiffs appear to agree, that the county-residency requirement only potentially burdens other, "minor" political parties' ability to recruit enough poll watchers. [ECF 509, p. 61 (citing ECF 504-20, ¶¶ 16-17) ]. Regardless, any burden on these third parties is not properly before the Court. They are not parties to this litigation, and so the Court doesn't know their precise identities, whether they have, in fact, experienced any difficulty in recruiting poll watchers, or, more fundamentally, whether they even want to recruit poll watchers at all.[21]

**\*70**   Additionally, Plaintiffs failed to present evidence that connects the county-residency requirement to their inability to find enough poll watchers. To succeed on their theory Plaintiffs cannot just point to difficulty recruiting poll watchers, they need to also show that "Section 2687(b) is responsible for their purported staffing woes." *Cortés*, 218 F. Supp. 3d at 410. Plaintiffs fail to show this, too.

Plaintiffs argue that the ongoing COVID-19 pandemic greatly reduces the number of people who would be willing to serve as a poll watcher, which further exacerbates the alleged problem caused by the county-residency requirement. [ECF 509, p. 60]. The primary problem with this argument, though, is that Plaintiffs have not presented any evidence to support it. Plaintiffs have not put forward a statement from a single registered voter who says they are unwilling to serve as a poll watcher due to concerns about contracting COVID-19.

Despite this shortcoming, the Court also acknowledges that COVID-19 generally has made it more difficult to do anything in person, and it is entirely plausible that the current pandemic will limit Plaintiffs from recruiting poll watchers to man polling places on election day. But that is likely true for

just about every type of election rule and regulation. For example, the effects of the ongoing pandemic coupled with the requirement that the poll watcher be a registered voter (a requirement that unquestionably narrows the pool of potential candidates) would also make it harder to recruit poll watchers. There is no basis to find that the current public-health conditions, standing alone, render the county-residency requirement irrational or unconstitutional.

To bolster their concerns over COVID-19, Plaintiffs point to *Democratic Nat'l Committee v. Bostelmann*, No. 20-249, —— F.Supp.3d ——, 2020 WL 5627186 (W.D. Wis. Sept. 21, 2020), where the court there enjoined Wisconsin's statute that requires that each election official (*i.e.*, poll worker) be an elector of the county in which the municipality is located. That case is distinguishable in at least two important ways.

First, *Bostelmann* concerned poll **workers**, not poll **watchers**. *Id.* at ——, 2020 WL 5627186, at *7. The difference between the two is significant. Poll workers are a more fundamental and essential aspect of the voting process. Without poll workers, counties cannot even open polling sites, which creates the possibility that voters will be completely disenfranchised. In fact, in *Bostelmann*, the plaintiffs presented evidence that Milwaukee was only able to open 5 of its normal 180 polling places. *Id.* A failure to provide voters a place to vote is a much more direct and established constitutional harm than the one Plaintiffs allege here.

Second, the plaintiffs in *Bostelmann* actually presented evidence that they were unable to find the poll workers they needed due to the confluence of the COVID-19 pandemic and the challenged restriction. *Id.* As discussed above, Plaintiffs here have presented no such evidence.

To succeed on summary judgment, Plaintiffs need to move beyond the speculative concerns they offer and into the realm of proven facts. But they haven't done so on two critical fronts —they haven't shown an actual inability to find the necessary poll watchers, or that such an inability is caused by the county-residency requirement. Because Plaintiffs have not pointed to any specific "polling place that Section 2687(b) prevents [them] from staffing with poll watchers," Plaintiffs' theory of burden is doomed at launch. *Cortés*, 218 F. Supp. 3d at 409.

Case 4:20-cv-02078-MWB    Document 176-1    Filed 11/19/20    Page 102 of 205
**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**
2020 WL 5997680

### 3. Even if Plaintiffs could establish a factual predicate for their theory, it would fail as a matter of law.

*\*71 As the Pennsylvania Supreme Court concluded last month, Plaintiffs' "speculative claim that it is 'difficult' for both parties to fill poll watcher positions in every precinct, *even if true*, is insufficient to transform the Commonwealth's uniform and reasonable regulation requiring that poll watchers be residents of the counties they serve into a non-rational policy choice." *Boockvar*, —— A.3d at ——, 2020 WL 5554644, at *30 (emphasis added).[22] The fundamental constitutional principles undergirding this finding are sound.

Plaintiffs' only alleged burden on the right to vote is that Defendants' lawful imposition of a county-residency requirement on poll watching will result in an increased risk of voter irregularities (*i.e.*, ballot fraud or tampering) that will, in turn, potentially cause voter dilution. While vote dilution is a recognized burden on the right to vote in certain contexts, such as when laws are crafted that structurally devalue one community's or group of people's votes over another's, there is no authority to support a finding of burden based solely on a speculative, future possibility that election irregularities might occur. *See, e.g., Minnesota Voters,* 720 F.3d at 1033 (affirming dismissal of claims "premised on potential harm in the form of vote dilution caused by insufficient pre-election verification of EDRs' voting eligibility and the absence of post-election ballot rescission procedures"); *Common Cause Rhode Island v. Gorbea,* 970 F.3d 11, 15 (1st Cir. 2020) (rejecting the claim that a witness signature requirement should not be enjoined during a pandemic because it would allegedly increase the risk of voter fraud and put Republican candidates at risk); *Cook Cnty. Rep. Party v. Pritzker,* No. 20-4676, 2020 WL 5573059, at *4 (N.D. Ill. Sept. 17, 2020) (denying a motion to enjoin a law expanding the deadline to cure votes because plaintiffs did not show how voter fraud would dilute the plaintiffs' votes).

Without a recognized burden on the right to vote, Plaintiffs' "argument that the defendants did not present an adequate justification is immaterial." *Green Party of Tennessee v. Hargett,* No. 16-6299, 2017 WL 4011854, at *4 (6th Cir. May 11, 2017). That's because the Court need not apply the *Anderson-Burdick* framework, and its intermediate standards, in this situation. *See Donatelli,* 2 F.3d at 514 & n.10. Instead, just as the Pennsylvania Supreme Court held, the Commonwealth here need only show "that a rational basis exists [for the county-residency requirement] to be upheld.

*Boockvar,* —— A.3d at ——, 2020 WL 5554644, at *30 (citing *Cortes,* 218 F. Supp. 3d at 408); *see also Voting for Am., Inc. v. Andrade,* 488 F. App'x 890, 899 (5th Cir. 2012) (applying rational basis review as opposed to the *Anderson-Burdick* balancing test because state election law did not implicate or burden specific constitutional rights); *McLaughlin v. North Carolina.Bd. of Elections,* 65 F.3d 1215, 1227 (4th Cir. 1995) (concluding that a ballot access law "fails the *Anderson* balancing test only if it also does in fact burden protected rights").

*\*72 "Under rational-basis review, the challenged classification must be upheld 'if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.' " *Donatelli,* 2 F.3d at 513 (quoting *FCC v. Beach Commc'ns, Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)). "This standard of review is a paradigm of judicial restraint." *FCC,* 508 U.S. at 314, 113 S.Ct. 2096. It "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Id.* at 313, 113 S.Ct. 2096. Nor is it the Court's "place to determine whether the [General Assembly's decisions] were the best decisions or even whether they were good ones." *Donatelli,* 2 F.3d at 518.

Applying this deferential standard of review, the Pennsylvania Supreme Court found that given Pennsylvania's "county-based scheme for conducting elections, it is reasonable that the Legislature would require poll watchers, who serve within the various counties of the state, to be residents of the counties in which they serve." *Boockvar,* —— A.3d at ——, 2020 WL 5554644, at *30 (citing *Cortés,* 218 F. Supp. 3d at 409). The Court agrees.

There are multiple reasons for this. As Secretary Boockvar advises, "[b]y restricting poll watchers' service to the counties in which they actually reside, the law ensures that poll watchers should have some degree of familiarity with the voters they are observing in a given election district." [ECF 549-2, p. 22, ¶ 78]. In a similar vein, Intervenors' expert, Dr. Barreto, in his report, states that, voters are more likely to be comfortable with poll watchers that "they know and they recognize from their area." [ECF 524-1, ¶40 ("Research in political science suggests that voters are much more comfortable and trusting of the process when they know or are familiar with poll workers who are from their community.") ]. When poll watchers come from the community, "there is increased trust in government, faith in elections, and voter turnout[.]" [*Id.*].

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 103 of 205
Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)
2020 WL 5997680

At his deposition, Representative Kelly agreed with this idea: "Yeah, I think – again, depending how the districts are established, I think people are probably even more comfortable with people that they – that they know and they recognize from their area." [ECF 524-23, 111:21-25].

Whether requiring poll watchers to be residents of the county in which they will serve is the best or wisest rule is not the issue before the Court. The issue is whether that rule is *reasonable* and rationally advances Pennsylvania's legitimate interests. This Court, like multiple courts before it, finds that it does.

**4. Plaintiffs' poll-watcher claim fails under the *Anderson-Burdick* framework.**

Even if rational-basis review did not apply and Plaintiffs had established a burden on their right to vote, their claim nonetheless fails under the *Anderson-Burdick* framework.

Viewing Plaintiffs' evidence in the best possible light, at most, the county-residency requirement for poll watching places only an indirect, ancillary burden on the right to vote through an elevated risk of vote dilution.

Against this slight burden, the Commonwealth has sound interests in imposing a county-residency requirement, including, as noted above, local familiarity with rules, regulations, procedures, and the voters. Beyond this, in assessing the Commonwealth's interest in imposing the county-based restriction, that interest must be viewed in the overall context of the Commonwealth's security measures involving polling places that are designed to prevent against fraud and vote dilution.

As the court in *Cortés* recognized, "while poll watchers may help guard the integrity of the vote, they are not the Election Code's only, or even best, means of doing so." 218 F. Supp. 3d at 404.

**\*73** Each county has the authority to investigate fraud and report irregularities to the district attorney. 25 P.S. § 2642(i). Elections in each district are conducted by a multimember election board, which is comprised of an election judge, a majority inspector, and a minor inspector. 25 P.S. § 2671. Each voting district may also use two overseers of election, who are appointed from different political parties by the Pennsylvania Courts of Common Pleas, and "carry greater authority than poll watchers." *Cortés*, 218 F. Supp. 3d at 403 (citing 25 P.S. § 2685). "Election overseers have the right to be present with the officers of an election 'within the enclosed space during the entire time the ... election is held.'" *Id.* "Poll watchers have no such right," they must "remain 'outside the enclosed space'" where ballots are counted or voting machines canvassed." *Id.* (citing 25 P.S. § 2687(b)). Election overseers can also challenge any person offering to vote, while poll watchers have no such authority. 25 P.S. § 2687. For these reasons, concerns "over potential voter fraud —whether perpetrated by putative electors or poll workers themselves—appear more effectively addressed by election overseers than poll watchers[.]" *Id.* at 406.

Plaintiffs complain that poll watchers may not be present during the pre-canvass and canvass meetings for absentee and mail-in ballots. But the Election Code provides that "authorized representatives" of each party *and* each candidate can attend such canvassing. 25 P.S. § 3146.8(g)(1.1), (2). That means if, for example, 15 Republican candidates appear on ballots within a particular county (between both the state and federal elections), there could be up to 16 "authorized representatives" related to the Republican Party (one for each candidate and one for the party as a whole) present during canvassing. Adding poll watchers to that mix would just be forcing unnecessary cooks into an already crowded kitchen.[23] *See* [ECF 549-2, p. 23, ¶ 83 ("If every certified poll watcher within a county was permitted to attend the pre-canvass meeting, the elections staff could be overwhelmed by the vast numbers of poll watchers, and the pre-canvassing process could become chaotic and compromised.") ].

**\*74** Further, Secretary Boockvar testified that Pennsylvania has adopted new voting systems that will provide an additional layer of security. [ECF 524-27, 237:21-238:11]. That is, there will now be a paper trail in the form of verifiable paper ballots that will allow voters to confirm their choice, and the state recently piloted a new program that will help ensure that votes can be properly verified. [*Id.*].

On balance, then, it is clear that to the extent any burden on the right to vote exists, it is minimal. On the other hand, the Commonwealth's interest in a county-specific voting system, including with county-resident poll watchers, is rational and weighty, particularly when viewed in the context of the measures that the Commonwealth has implemented to prevent against election fraud at the polls. As such, under the flexible *Anderson-Burdick* standard, Plaintiffs have

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 104 of 205
**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**
2020 WL 5997680

failed to establish that the county-residency requirement is unconstitutional.

## 5. The Court will continue to abstain from deciding where the Election Code permits poll watching to occur.

Plaintiffs also appear to challenge any attempts to limit poll watching to "monitoring only in-person voting at the polling place on Election Day." [ECF 461, ¶ 254]. That is, in their proposed order accompanying their Motion for Summary Judgement, Plaintiffs seek a declaration that they are "permitted to have watchers present at all locations where voters are registering to vote, applying for absentee or mail-in ballots, voting absentee or mail-in ballots, and/or returning or collecting absentee or mail-in ballots, including without limitation any satellite or early voting sites established by any county board of elections." [ECF 503-1, ¶ 3].

Plaintiffs also argue that Secretary Boockvar's October 6, 2020, guidance expressly, and unlawfully, prohibits poll watchers from being present at county election offices, satellite offices, and designated ballot-return sites. [ECF 571].

This challenge, however, is directly related to the unsettled state-law question of whether drop boxes and other satellite locations are "polling places" as envisioned under the Election Code. If they are, then Plaintiffs may be right in that poll watchers must be allowed to be present. However, the Court previously abstained under *Pullman* in addressing this "location" claim due to the unsettled nature of the state-law issues; and it will continue to do so. [ECF 459, p. 5 ("The Court will continue to abstain under *Pullman* as to Plaintiffs' claim pertaining to the notice of drop box locations and, more generally, whether the 'polling place' requirements under the Election Code apply to drop-box locations. As discussed in the Court's prior opinion, this claim involves unsettled issues of state law.") ].

Moreover, Plaintiffs have filed a lawsuit in the Court of Common Pleas of Philadelphia to secure access to drop box locations for poll watchers. The state court held that satellite ballot-collection locations, such as drop-box locations, are not "polling places," and therefore poll watchers are not authorized to be present in those places. [ECF 573-1, at p. 12]. The Trump Campaign immediately filed a notice of appeal of that decision. Regardless of what happens on appeal, Plaintiffs appear to be on track to obtain resolution of that claim in state court. [ECF 549-22]. Although this isn't

dispositive, it does give the Court comfort that Plaintiffs will be able to seek timely resolution of these issues, which appear to be largely matters of state law. *See Barr v. Galvin*, 626 F.3d 99, 108 n.3 (1st Cir. 2010) ("Though the existence of a pending state court action is sometimes considered as a factor in favor of abstention, the lack of such pending proceedings does not necessarily prevent abstention by a federal court.").

## V. The Court will decline to exercise supplemental jurisdiction over Plaintiffs' state-constitutional claims.

**\*75** In addition to the federal-constitutional claims addressed above, Plaintiffs assert violations of the Pennsylvania Constitution in Counts III, V, VII, and IX of the Second Amended Complaint. Because the Court will be dismissing all federal-constitutional claims in this case, it will decline to exercise supplemental jurisdiction over these state-law claims.

**[56]** Under 28 U.S.C. § 1367(c)(3), a court "may decline to exercise supplemental jurisdiction over state law claims if it has dismissed all claims over which it has original jurisdiction[.]" *Stone v. Martin*, 720 F. App'x 132, 136 (3d Cir. 2017) (cleaned up). "It 'must decline' to exercise supplemental jurisdiction in such circumstances 'unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for [exercising supplemental jurisdiction].' " *Id.* (quoting *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (emphasis in original)).

Courts have specifically applied this principle in cases raising federal and state constitutional challenges to provisions of the state's election code. *See, e.g., Silberberg v. Bd. of Elections of New York*, 272 F. Supp. 3d 454, 480–81 (S.D.N.Y. 2017) ("Having dismissed plaintiffs' First and Fourteenth Amendment claims, the Court declines to exercise supplemental jurisdiction over plaintiffs' state law claims."); *Bishop v. Bartlett*, No. 06-462, 2007 WL 9718438, at \*10 (E.D.N.C. Aug. 18, 2007) (declining "to exercise supplemental jurisdiction over the state constitutional claim" following dismissal of all federal claims and recognizing "the limited role of the federal judiciary in matters of state elections" and that North Carolina's administrative, judicial, and political processes provide a better forum for plaintiffs to seek vindication of their state constitutional claim), *aff'd*, 575 F.3d 419 (4th Cir. 2009).

**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**
2020 WL 5997680

Beyond these usual reasons to decline to exercise supplemental jurisdiction over the state-constitutional claims, there are two additional reasons to do so here.

First, the parties do not meaningfully address the state-constitutional claims in their cross-motions for summary judgment, effectively treating them as coextensive with the federal-constitutional claims here. The Pennsylvania Supreme Court, however, has held that Pennsylvania's "Free and Equal Elections" Clause is not necessarily coextensive with the 14th Amendment. *See League of Women Voters v. Commonwealth*, 645 Pa. 1, 178 A.3d 737, 812-813 (2018) (referring to the Pennsylvania Free and Equal Elections Clause as employing a "separate and distinct standard" than that under the 14th Amendment to the U.S. Constitution). Given the lack of briefing on this issue and out of deference to the state courts to interpret their own state constitution, the Court declines to exercise supplemental jurisdiction.

Second, several Defendants have asserted a defense of sovereign immunity in this case. That defense does not apply to Plaintiffs' federal-constitutional claims under the *Ex parte Young* doctrine. *See Acosta v. Democratic City Comm.*, 288 F. Supp. 3d 597, 627 (E.D. Pa. 2018) ("Here, the doctrine of *Ex parte Young* applies to Plaintiffs' constitutional claims for prospective injunctive and declaratory relief, and therefore the First and Fourteenth Amendment claims are not barred by the Eleventh Amendment. Secretary Cortés, as an officer of the Pennsylvania Department of State, may be sued in his individual and official capacities 'for prospective injunctive and declaratory relief to end continuing or ongoing violations of federal law.' "). But sovereign immunity may apply to the state-law claims, at least those against Secretary Boockvar. The possibility of sovereign immunity potentially applying here counsels in favor of declining supplemental jurisdiction to decide the state-law claims.

**\*76** As such, all state-constitutional claims will be dismissed without prejudice.

### CONCLUSION

For the foregoing reasons, the Court will enter judgment in favor of Defendants and against Plaintiffs on all federal-constitutional claims, decline to exercise supplemental jurisdiction over the remaining state-law claims, and dismiss all claims in this case. Because there is no just reason for delay, the Court will also direct entry of final judgment under Federal Rule of Civil Procedure 54(b). An appropriate order follows.

**All Citations**

--- F.Supp.3d ----, 2020 WL 5997680

Footnotes

1  "Drop boxes" are receptacles similar to U.S. Postal Service mailboxes. They are made of metal, and have a locking mechanism, storage compartment, and an insert or slot into which a voter can insert a ballot. *See generally* [ECF 549-9].

2  Intervenors include the Pennsylvania State Democratic Party, the League of Women Voters, the NAACP Pennsylvania State Conference, Common Cause Pennsylvania, Citizens for Pennsylvania's Future, the Sierra Club, the Pennsylvania Alliance for Retired Americans, and several affiliated individuals of these organizations.

3  As noted above, Plaintiffs and Mr. Riddlemoser use the term "voter fraud" to mean "illegal voting"—*i.e.*, voter fraud is any practice that violates the Election Code. For purposes of the Court's decision and analysis of Plaintiffs' vote-dilution claims, the Court accepts this definition.

4  The procedure for absentee ballots and applications largely resembles the procedure for mail-in ballots and applications.

5  If the application is approved, the approval is "final and binding," subject only to challenges "on the grounds that the applicant was not a qualified elector." 25 P.S. § 3150.12b(a)(2). An unqualified elector would be, for example, an individual who has not "been a citizen of the United States at least one month." Pa. Const. Art. 7, § 1; *see also* 25 P.S. § 2602(t) (defining "qualified elector" as "any person who shall possess all of the qualifications for voting now or hereafter prescribed by the Constitution of this Commonwealth, or who, being otherwise qualified by continued residence in his election district, shall obtain such qualifications before the next ensuing election").

6  In her summary-judgment brief, Secretary Boockvar argues that Plaintiffs' as-applied challenge to Pennsylvania's county-residency requirement is unripe. [ECF 547, pp. 60-63]. The Secretary reasons that Plaintiffs have not shown sufficient evidence that they are harmed by the county-residency requirement. This argument is directed more towards a lack of standing and a lack of evidence to support the claim on the merits. As the sufficiency of the evidence of harm is a separate issue from ripeness (which is more concerned with timing), the Court does not find Plaintiffs' as-applied challenge to the

**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**

2020 WL 5997680

county-residency requirement unripe. *See Progressive Mountain Ins. Co. v. Middlebrooks*, 805 F. App'x 731, 734 (11th Cir. 2020) ("The question of ripeness frequently boils down to the same question as questions of Article III standing, but the distinction between the two is that standing focuses [on] whether the type of injury alleged is qualitatively sufficient to fulfill the requirements of Article III and whether the plaintiff has personally suffered that harm, whereas ripeness centers on whether that injury has occurred yet." (cleaned up) (citations omitted)).

7        In their briefing, the parties focused on the "capable of repetition yet evading review" exception to the mootness doctrine. The Court, however, does not find that it needs to rely on this exception. Nearing the eve of the election, it is clear that Defendants intend to engage in the conduct that Plaintiffs assert is illegal and unconstitutional. Thus, the claims are presently live, and are not "evading review" in this circumstance.

8        While Rule 65(d)(2)(C) states that an injunction binds "[non-parties] who are in active concert or participation" with the parties or the parties' agents, the Court does not find that Rule 65(d) helps the county boards. As discussed, the county boards manage the elections and implement the electoral procedures. While the Court could enjoin Secretary Boockvar, for example, from using unmanned drop boxes, each individual county election board could still use unmanned drop boxes on their own. Doing so would not result in the counties being in "active concert or participation" with Secretary Boockvar, as each county is independently managing the electoral process within their county lines. *See Marshak v. Treadwell*, 595 F.3d 478, 486 (3d Cir. 2009) ("[N]on-parties guilty of aiding or abetting or acting in concert with a named defendant or his privy in violating the injunction may be held in contempt." (cleaned up) (citations omitted)). In other words, each county elections board would not be "aiding or abetting" Secretary Boockvar in violating the injunction (which would implicate Rule 65(d)(2)(C)); rather, the counties would be utilizing their independent statutory authority to manage elections within their county lines.

9        As evidence of the county boards' indispensability, one court recently found that the failure to join local election officials in an election case can make the harm alleged not "redressable." It would be a catch-22 to say that county boards cannot be joined to this case as necessary parties, but then dismiss the case for lack of standing due to the boards' absence. *Cf. Jacobson v. Florida Secretary of States*, 974 F.3d 1236, ––– – –––, 2020 WL 5289377, at *11-12 (11th Cir. Sept. 3, 2020) ("The problem for the [plaintiffs] is that Florida law tasks the [county] Supervisors, independently of the Secretary, with printing the names of candidates on ballots in the order prescribed by the ballot statute. ... The Secretary is responsible only for certifying to the supervisor of elections of each county the names of persons nominated ... Because the Secretary didn't do (or fail to do) anything that contributed to [plaintiffs'] harm, the voters and organizations cannot meet Article III's traceability requirement." (cleaned up)).

10       The organizational Plaintiffs also raise certain associational and organizational standing arguments, asserting that they represent their members' interests. The associational standing arguments are derivative of their members' interests. That is, because the Court has found no concrete injury suffered by the individual voters, which would include the members of the organizational Plaintiffs, there are no separate grounds to establish standing for these organizations. *See United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1997) (an organization only has standing to sue on behalf of its members when "its members would otherwise have standing to sue in their own right") (citation omitted).

11       *See, also, e.g., Dudum v. Arntz*, 640 F.3d 1098, 1117 (9th Cir. 2011) ("If the aspects of the City's restricted IRV scheme Dudum challenges impose any burdens on voters' constitutional rights to vote, they are minimal at best."); *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1354–55 (11th Cir. 2009) ("The district court determined that the burden imposed on Georgia voters who lack photo identification was not undue or significant, and we agree.... The NAACP and voters are unable to direct this Court to any admissible and reliable evidence that quantifies the extent and scope of the burden imposed by the Georgia statute."); *Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1183 (9th Cir. 1988) ("Appellants claim that Hawaii's absentee voting law fails to prohibit 'the solicitation, examination and delivery of absentee ballots by persons other than the voters' and that such activities occurred during the special election ... We agree with the district court that the Hawaii absentee ballot statute and the regulations adopted under it adequately protect the secrecy and integrity of the ballot. Although Hawaii has not adopted a regulation to prevent the delivery of ballots by persons other than the voter, the Hawaii regulations go into great detail in their elaboration of procedures to prevent tampering with the ballots."); *McLain v. Meier*, 637 F.2d 1159, 1167 (8th Cir. 1980) ("[A]lthough ballot format has an effect on the fundamental right to vote, the effect is somewhat attenuated."); *Nemes v. Bensinger*, ––– F. Supp. 3d –––, –––, 2020 WL 3402345, at *13 (W.D. Ky. June 18, 2020) ("The burden imposed by the contraction to one polling place is modest, and the identified groups are afforded various other means under the voting plans to easily and effectively avoid disenfranchisement. As already discussed, Defendants have offered evidence of the substantial government interest in implementing voting plans that provide for a free and fair election while attempting to minimize the spread of COVID-19.");

Case 4:20-cv-02078-MWB    Document 176-1    Filed 11/19/20    Page 107 of 205
Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)
2020 WL 5997680

*Paralyzed Veterans of Am. v. McPherson*, No. 06-4670, 2008 WL 4183981, at *22 (N.D. Cal. Sept. 9, 2008) ("Plaintiff Bohlke's listed burdens rely on speculative risk or the ancillary effects of third party assistance, but not on evidence of any concrete harm. Such speculations or effects are insufficient under Supreme Court and Ninth Circuit precedent to demonstrate a severe burden on the fundamental right to vote.").

12    The parties do not specifically brief the elements of an Elections-Clause claim. This is typically a claim brought by a state legislature, and the Court has doubts that this is a viable theory for Plaintiffs to assert. *See Lance v. Coffman*, 549 U.S. 437, 442, 127 S.Ct. 1194, 167 L.Ed.2d 29 (2007). Regardless, if state law does not require signature comparison, then there is no difference between the Secretary's guidance and the Election Code, and the Elections-Clause claim necessarily fails.

13    Several Defendants and Intervenors have asked this Court to abstain from deciding this issue on the basis of *Pullman*. As this Court previously discussed, a court can abstain under *Pullman* if three factors are met: "(1) [the dispute] requires interpretation of "unsettled questions of state law,"; (2) permitting resolution of the unsettled state-law questions by state courts would "obviate the need for, or substantially narrow the scope of adjudication of the constitutional claims"; and (3) an "erroneous construction of state law would be disruptive of important state policies[.]" " [ECF 409, p. 3 (quoting *Chez Sez*, 945 F.2d at 631) ]. But if, on the other hand, the answer to the state law dispute is "clear and unmistakable," abstention is not warranted. [*Id.* at p. 15 (citing *Chez Sez*, 945 F.2d at 632) ]. Here, the Court concludes (as discussed below) that the Election Code is clear that signature comparison is not required and further, that Plaintiffs' competing interpretation is not plausible. As such, the Court cannot abstain under *Pullman*.

The *Pullman* analysis does not change simply because Secretary Boockvar has filed a "King's Bench" petition with the Pennsylvania Supreme Court, requesting that court to clarify whether the Election Code mandates signature comparison of mail-in and absentee ballots and applications. [ECF 556, p. 11; ECF 557]. The fact that such a petition was filed does not change this Court's conclusion that the Election Code is clear. The *Pullman* factors remain the same. And they are not met here.

14    The Secretary's September 11, 2020, guidance, stated that the "Pennsylvania Election Code does not authorize the county board of elections to set aside returned absentee or mail-in ballots based solely on signature analysis by the county board of elections." [ECF 504-24, p. 3, § 3]. Similarly, the Secretary's September 28, 2020, guidance stated that "Election Code does not permit county election officials to reject applications or voted ballots based solely on signature analysis. ... No challenges may be made to mail-in and absentee ballots at any time based on signature analysis." [ECF 504-25, p. 9, § 5.2].

15    The Election Code's definition of "proof of identification" in full provides:

The words "proof of identification" shall mean ... For a qualified absentee elector ... or a qualified mail-in elector ...:

i. in the case of an elector who has been issued a current and valid driver's license, the elector's driver's license number;

ii. in the case of an elector who has not been issued a current and valid driver's license, the last four digits of the elector's Social Security number;

iii. in the case of an elector who has a religious objection to being photographed, a copy of a document that satisfies paragraph (1) [*i.e.*, "a valid-without-photo driver's license or a valid-without-photo identification card issued by the Department of Transportation"]; or

iv. in the case of an elector who has not been issued a current and valid driver's license or Social Security number, a copy of a document that satisfies paragraph (2) [*i.e.*, "a document that shows the name of the individual to whom the document was issued and the name substantially conforms to the name of the individual as it appears in the district register; shows a photograph of the individual to whom the document was issued; includes an expiration date and is not expired, except (A) ... or (B) ...; and was issued by" the federal, state, or municipal government, or an "accredited Pennsylvania public or private institution of higher learning [or] "a Pennsylvania are facility."].

25 P.S. § 2602(z.5)(3).

16    While election officials must engage in signature comparison for in-person voters, that requirement is explicitly required by the Election Code, unlike for mail-in ballots. 25 P.S. § 3050(a.3)(2). And as discussed below, in-person voters, unlike mail-in voters, are immediately notified if their signatures are deficient.

17    Plaintiffs also argue that signature comparison for mail-in and absentee ballots is supported by historical case law. [ECF 552, pp. 58-59]. Plaintiffs cite to two cases from the 1960s that the Court of Common Pleas decided. [*Id.*]. The first, *Appeal of Fogleman*, concluded that under the then-applicable election law, an absentee voter had to sign a declaration to show that he was a proper resident who had not already voted in that election. 36 Pa. D. & C.2d 426, 427 (Pa. Ct. Comm. Pl. 1964). Regarding the voter's signature, the court simply stated, "[i]f the elector fails or refuses to attach his or her signature, then such elector has not completed the declaration as required by law of all voters." *Id.* Thus, no signature

**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**

2020 WL 5997680

comparison or verification was implicated there; rather, the court simply stated that the declaration must be signed (*i.e.*, completed). The second case Plaintiffs cite, *In re Canvass of Absentee Ballots of Gen. Election* [ECF 552, pp. 58-59], arose from individual, post-election challenges to 46 individual absentee ballots. 39 Pa. D. & C.2d 429, 430 (Pa. Ct. Comm. Pl. 1965). Thus, a universal and mandatory signature-comparison requirement was not at issue there, unlike what Plaintiffs contest here. This Court finds neither case persuasive.

18   This identifying information on a ballot application includes much of the same information expressly listed for what a voter must provide in initially registering to vote. 25 Pa. C.S.A. § 1327(a) (stating that the "official voter registration application" shall request the applicant's: full name, address of residence (and mailing address if different), and date of birth).

19   The counties that intend to compare and verify signatures in the upcoming election include at least the following counties: Cambria, Elk, Franklin, Juniata, Mifflin, Sullivan, Susquehanna, and Wyoming. [ECF 504-1].

20   Plus, these figures do not even tell the whole story because they do not take into account the hundreds of thousands of voters who are registered to other parties who could also conceivably serve as poll watchers for the Trump Campaign and the candidate Plaintiffs. [504-34]. While that may not be the ideal scenario for Plaintiffs, they concede there's nothing in the Election Code that limits them to recruiting only registered voters from the Republican Party. [ECF 528-14, 267:23-268:1 (Q: And you don't have to be a registered Republican to serve as a poll watcher for the Trump campaign, do you? A: No.) ]. To that point, the Trump Campaign utilized at least two Democrats among the poll watchers it registered in the primary. [ECF 528-15, P001648].

21   To the extent that Plaintiffs are attempting to bring their claim on behalf of these third parties (which is unclear), they would lack standing to do so. Ordinarily, "a litigant must assert his or her own legal rights and interests and cannot rest a claim of relief on the legal rights or interests of third parties." *Powers v. Ohio*, 499 U.S. 400, 410, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). The only time a litigant can bring an action on behalf of a third party is when "three important criteria are satisfied." *Id.* "The litigant must have suffered an 'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute; the litigant must have a close relation to the third party; and there must exist some hindrance to the third party's ability to protect his or her own interest." *Id.* at 410-11, 111 S.Ct. 1364 (cleaned up). Plaintiffs cannot satisfy the second or third criteria.

Plaintiffs claim that they "have a close relationship with these minor parties such that it will act as an effective advocate for the minor parties." [ECF 551, p. 30]. It is hard to see how Plaintiffs can be said to have a close relationship with rival political parties who are their direct adversaries in the upcoming election.

Plaintiffs also argue that these "minor parties are hindered from protecting their own interests, particularly in this action when there are no minor party intervenors." [*Id.*]. But that doesn't hold water either. Just because these other parties have not asked to intervene, it does not mean they were incapable of intervening or seeking relief elsewhere. Indeed, these parties and their candidates have demonstrated time and again that they can raise their own challenges to election laws when they so desire, including by filing suit in federal district court. *See, e.g., Stein v. Cortés*, 223 F. Supp. 3d 423 (E.D. Pa. 2016) (Green Party Presidential candidate Jill Stein seeking recount); *Libertarian Party of Conn. v. Merrill*, No. 20-467, 2020 WL 3526922 (D. Conn. June 27, 2020) (seeking to enjoin Connecticut's ballot access rules that required minor party candidates to petition their way onto the ballot); *Green Party of Ark. v. Martin*, 649 F.3d 675 (8th Cir. 2011) (challenging Arkansas' ballot access laws).

22   The Sierra Club Intervenors argue this should end the analysis. [ECF 542, p. 14 ("Even 'as applied,' Plaintiffs' claim has already been rejected") ]. While the Court finds the Pennsylvania Supreme Court's apparent ruling on Plaintiffs' as-applied challenge instructive, it is not outcome determinative. That is because the Pennsylvania Supreme Court did not have the benefit of the full evidentiary record that the Court has here.

23   After the briefing on the cross-motions for summary judgment had closed, on October 6, 2020, Secretary Boockvar issued additional guidance, which Plaintiffs then raised with the Court the following day. [ECF 571]. This new guidance confirms that poll watchers cannot be present during the pre-canvassing and canvassing of mail-in ballots. It also makes clear that while the authorized representative can be present, the representative cannot make any challenges to the ballots. The Court finds that this new guidance has minimal relevance to the current disputes at issue here. The scope of duties of a representative is not before the Court. Of sole relevance here is whether this new guidance changes how this Court weighs the burdens and benefits of the county-residency restriction for poll watchers. The Court finds that the representative's inability to challenge mail-in ballots does appear to provide less protection to Plaintiffs; but in the grand election scheme, particularly in light of the role of the election overseers, the Court does not find the new guidance to materially upset the Commonwealth's interests in its overall election-monitoring plan.

**Donald J. Trump for President, Inc. v. Boockvar, --- F.Supp.3d ---- (2020)**

2020 WL 5997680

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

5

2020 WL 6437668
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas, Houston Division.

Steven HOTZE, M.D., Wendell
Champion, Hon. Steve Toth,
and Sharon Hemphill, Plaintiffs,
v.
Chris HOLLINS, in his official capacity
as Harris County Clerk, Defendant.

Civil Action No. 4:20-cv-03709
|
Signed 11/02/2020

**Attorneys and Law Firms**

Jared Ryker Woodfill, Woodfill Law Firm P.C., Houston, TX,
for Plaintiffs.

Richard Warren Mithoff, Jr., Mithoff Law Firm, Kenneth
Royce Barrett, KBR Law, Houston, TX, Charles Stein Siegel,
Waters & Kraus, LLP, Dallas, TX, S. Nasim Ahmad, The
Ahmad Law Firm, The Woodlands, TX, for Defendant.

**ORDER**

Andrew S. Hanen, United States District Judge

**\*1** The Court has before it the Motion for Preliminary
Injunction (Doc. No. 3) filed by Plaintiffs Steven Hotze,
M.D., Wendell Champion, Hon. Steve Toth, and Sharon
Hemphill (collectively, "Plaintiffs"), the Response in
Opposition (Doc. No. 22) filed by Defendant Chris Hollins
in his official capacity as Harris County Clerk (hereinafter,
"Defendant"), and various Motions to Intervene filed on
behalf of forty-eight individuals and/or entities. The Court
also has before it *amicus curiae* briefs filed by the Texas
Coalition of Black Democrats, The Lincoln Project, the
Libertarian Party of Texas, Joseph R. Straus, III, and election
law professor, Benjamin L. Ginsberg.

**I.**

Due to the time constraints given the issue involved, this
Court cannot issue the formal opinion that this matter
deserves. Consequently, given those confines, this Order
must suffice. The Court first notes that it appreciates the
participation of all counsel involved and the attention each
gave to this important topic on such short notice.

This Court's overall ruling is that the Plaintiffs do not have
standing (as explained below). While this ruling is supported
by general Equal Protection and Election Clause cases, it
is somewhat without precedent with regard to the Plaintiffs
(or Intervenors) who are actual candidates for elected office.
Therefore, the Court, in anticipation of an appeal or petition
for writ of mandamus and knowing that the appellate court
could draw a distinction in that regard and hold that standing
exists, has gone further to indicate what its ruling would have
been in that case.

**II.**

The Court finds that Plaintiffs lack standing to sue. Federal
courts must determine whether they have jurisdiction before
proceeding to the merits. *Steel Co. v. Citizens for Better
Environment*, 523 U.S. 83, 94–95 (1998). Article III of
the Constitution limits federal jurisdiction to "Cases" and
"Controversies." One component of the case or controversy
requirement is standing. *Lujan v. Defenders of Wildlife*,
504 U.S. 555, 560–61 (1992). The Supreme Court has
repeatedly held that an individual plaintiff raising only a
generalized grievance about government does not meet the
Article III requirement of a case or controversy. *Id.* at 573–
74. This Court finds that the Plaintiffs here allege only a
"generalized grievance about the conduct of government."
*Lance v. Coffman*, 549 U.S. 437, 442 (2007).

The Plaintiffs' lack of a particularized grievance is fatal to
their claim under the Equal Protection Clause. "The rule
against generalized grievances applies with as much force
in the equal protection context as in any other." *U.S. v.
Hays*, 515 U.S. 737, 743 (1995). Plaintiffs' general claim that
Harris County's election is being administered differently than
Texas's other counties does not rise to the level of the sort
of particularized injury that the Supreme Court has required
for constitutional standing in elections cases. *See id.; Gill v.
Whitford*, 138 S. Ct. 1916, 1933 (2018) (no standing in equal
protection case when alleged injury involved "group political
interests" and not "individual legal rights").

**\*2** Further, it is unclear that individual plaintiffs have standing to assert claims under the Elections Clause at all. The Supreme Court has held that individual plaintiffs, like those here, whose only asserted injury was that the Elections Clause had not been followed, did not have standing to assert such a claim. *See Lance*, 549 U.S. at 442. Conversely, the Court has held that the Arizona Legislature did have standing to allege a violation of the Elections Clause as it was "an institutional plaintiff asserting an institutional injury." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 802 (2015). In addition, the Supreme Court has also held plaintiffs had such standing when they were state senators whose "votes had been completely nullified" by executive action. *Id.* at 803 (citing *Raines v. Byrd*, 521 U.S. 811, 822–23 (1997)). These cases appear to stand for the proposition that only the state legislature (or a majority of the members thereof) have standing to assert a violation of the Elections Clause.

The Court finds that the Plaintiffs here are akin to those in *Lance v. Coffman*, in which the Supreme Court held that private citizens, whose primary alleged injury was that the Elections Clause was not followed, lacked standing to bring a claim under the Elections Clause. 549 U.S. at 442. To summarize the Plaintiffs' primary argument, the alleged irreparable harm caused to Plaintiffs is that the Texas Election Code has been violated and that violation compromises the integrity of the voting process. This type of harm is a quintessential generalized grievance: the harm is to every citizen's interest in proper application of the law. *Lujan*, 504 U.S. at 573–74; *Fairchild v. Hughes*, 258 U.S. 126, 129 (1922) (holding that the right, possessed by every citizen, to require that the Government be administered according to the law does not entitle a private citizen to institute a lawsuit in federal court). Every citizen, including the Plaintiff who is a candidate for federal office, has an interest in proper execution of voting procedure. Plaintiffs have not argued that they have any specialized grievance beyond an interest in the integrity of the election process, which is "common to all members of the public." *United States v. Richardson*, 418 U.S. 166, 176–77.[1]

### III.

If the Court had plaintiffs with standing, it would have denied in part and granted in part the motion for preliminary injunction.[2] A preliminary injunction is an "extraordinary remedy" that should only be granted if the movant has "clearly carried the burden of persuasion" on all four factors. *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 196 (5th Cir. 2003). The movant, however, "need not prove his case." *Lakedreams v. Taylor*, 932 F.2d 1103, 1109 (5th Cir. 1991) (citing *H & W Indus. v. Formosa Plastics Corp.*, 860 F.2d 172, 179 (5th Cir. 1988)). Before a court will grant a preliminary injunction, the movants must clearly show "(1) a substantial likelihood that they will prevail on the merits, (2) a substantial threat that they will suffer irreparable injury if the injunction is not granted, (3) that their substantial injury outweighs the threatened harm to the party whom they seek to enjoin, and (4) granting the preliminary injunction will not disserve the public interest." *City of El Cenizo v. Texas*, 890 F.3d 164, 176 (5th Cir. 2018) (quoting *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 574 (5th Cir. 2012)); *see also Winter v. NRDC*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."). "The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974).

**\*3** This Court finds that there is a difference between the voting periods presented to it. The merits need to be analyzed separately by early voting and election day voting. With respect to the likelihood of success, the Court would find that the Plaintiffs do not prevail on the element of likelihood of success with respect to early voting. First, § 85.062 of the Texas Election Code provides for "temporary branch polling places" during early voting. Tex. Elec. Code. § 85.062. The statute authorizes county election officials to use "movable structure[s]" as polling places. *Id.* § 85.062(b). The Code does not define "structure," but Black's Law Dictionary defines the term as: "Any construction, production, or piece of work artificially built up or composed of parts purposefully joined together." Black's Law Dictionary (11th ed. 2019). The Court finds, after reviewing the record, the briefing, and considering the arguments of counsel, that the tents used for drive-thru voting qualify as "movable structures" for purposes of the Election Code. The Court is unpersuaded by Plaintiffs' argument that the voters' vehicles, and not the tents, are the polling places under the drive-thru voting scheme. Consequently, the Court finds that drive-thru voting was permissible during early voting. Moreover, the Plaintiffs failed to demonstrate under the Texas Election Code that an

otherwise legal vote, cast pursuant to the instructions of local voting officials, becomes uncountable if cast in a voting place that is subsequently found to be non-compliant.

Additionally, the promptness with which one brings an injunction action colors both the elements of likelihood of success on the merits and irreparable harm. *See Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 685 (2014) ("In extraordinary circumstances, however, the consequences of a delay in commencing suit may be of sufficient magnitude to warrant, at the very outset of the litigation, curtailment of the relief equitably awardable."); *Environmental Defense Fund, Inc. v. Alexander*, 614 F.2d 474, 478 (1980) ("equitable remedies are not available if granting the remedy would be inequitable to the defendant because of the plaintiff's long delay."). Here, the Court finds that the Plaintiffs did not act with alacrity. There has been an increasing amount of conversation and action around the subject of implementing drive-thru voting since earlier this summer. The Defendant has argued, and no one has refuted, that discussions were held with leaders of both major political parties, and, using that input, a drive-thru voting plan was developed. The Harris County Commissioners Court approved a budget for drive-thru voting in late September. Finally, actual drive-thru voting began October 13, 2020. At virtually any point, but certainly by October 12, 2020, Plaintiffs could have filed this action. Instead, they waited until October 28, 2020 at 9:08 p.m. to file their complaint and did not file their actual motion for temporary relief until mid-day on October 30, 2020—the last day of early voting. The Court finds this delay is critical. It is especially important in this compact early voting timeframe, in a particularly tense election, where each day's voting tally functionally equated to many days or even weeks of early voting in different situations.

Therefore, this Court finds the Plaintiffs do not prevail on the first element.

With regard to the second element, "irreparable injury," this point is covered more thoroughly in the standing discussion, but suffice it to say, in response to the Court's question during oral argument, Plaintiff's counsel described their injuries as the concern for the voting law to be accurately enforced and voting to be legal. In response to the Court's questions, Plaintiffs' Counsel said their irreparable injury was that the election process was being compromised, and that it prevents there being uniformity in the manner of voting throughout Texas. While certainly valid concerns, those are not the kind of injuries that separate Plaintiffs

from other concerned citizens. Plaintiffs have no evidence of individualized irreparable injuries.

The one element that the Court finds the Plaintiffs have prevailed on is the harm to the party defendant. The Court finds that there would be no harm to Harris County. The only suggested harm is that the County has spent millions of dollars to implement drive-thru voting. While these funds may have been better spent, their loss does not prevail over tens of thousands of potentially illegal votes. Further, if granted, the injunction would only require the Defendant to conduct elections as Harris County has conducted them in the past without drive-thru voting.

**\*4**  The last element must, like the first, take on extraordinary significance in this context. That element concerns the public interest. Plaintiffs argue, correctly, that the public has an interest in seeing that elections are carried out pursuant to the Election Code. This is no doubt true; however, this generalized interest is offset by two somewhat stronger factors. First, the drive-thru early voting as designed and implemented is, to this Court's reading, legal as described above. Second, there have been over 120,000 citizens who have legally voted utilizing this process. While Plaintiffs have complained about anecdotal reports of irregularities, the record reflects that the vast majority were legal voters, voting as instructed by their local voting officials and voting in an otherwise legal manner. The only claimed widespread illegality is the place of voting—a tent outside the polling place instead of inside the actual building. To disenfranchise over 120,000 voters who voted as instructed the day before the scheduled election does not serve the public interest.

Therefore, if the Court had found standing existed, it would have denied an injunction as to the drive-thru early voting.

The Court finds the issue as to Election Day to cut the opposite direction. On Election Day, as opposed to early voting, there is no legislative authorization for movable structures as polling places. The Election Code makes clear that, on Election Day, "[e]ach polling place shall be located inside a building." Tex. Elec. Code § 43.031(b). The term "building" is not defined in the Code. Nevertheless, Black's Law Dictionary defines "building" as: "A structure with walls and a roof, esp. a permanent structure." Black's Law Dictionary (11th ed. 2019). The Court finds, after reviewing the record and arguments of counsel, that the tents used for drive-thru voting are not "buildings" within the meaning of the Election Code. Further, they are not inside, they are clearly outside.

Accordingly, if the Plaintiffs had standing, the Court would have found that the continuation of drive-thru voting on Election Day violates the Texas Election Code.

It also finds that, unlike in early voting, the Plaintiffs prevail when one weighs the various elements that underlie the issuance of an injunction. First, as stated above, the Court does not find a tent to be a building. Therefore, under the Election Code it is not a legal voting location. Second, the Plaintiffs' request for injunctive relief is timely. While it could and should have been made earlier, it was made days before the election. The Court would have found that the Plaintiffs had a likelihood of success. The analysis of the second element remains the same. With regard to the loss that the Defendant might suffer, the Court finds this to be minimal. While it apparently spent millions in implementing the drive-thru voting system, it had over 120,000 voters use it—so it is money well-spent. The fact it would not be used on Election Day does not diminish its benefit. The analysis of the last element, public interest, swings in favor of the Plaintiffs. No one should want votes to be cast illegally or at an illegal polling place. No one has voted yet—so no one is being disenfranchised. Moreover, for those who are injured or worried that their health would be compromised should they be compelled to enter the building to vote, curbside voting is available under § 64.009 of the Texas Election Code.[3] Lastly, there are very few citizens who would want their vote to be in jeopardy, so it is incumbent on election officials to conduct voting in a proper location—not one which the Attorney General has already said was inappropriate. Consequently, this Court, had it found that standing existed, would have granted the injunction prospectively and enjoined drive-thru voting on Election Day and denied all other relief.

**\*5** Nevertheless, since it found standing does not exist, this action is hereby dismissed.

### All Citations

Slip Copy, 2020 WL 6437668

---

**Footnotes**

1    This Court finds the answer to this question to be particularly thorny, given that some of the Plaintiffs are actual candidates who have put in time, effort, and money into campaigning, to say nothing of the blood, sweat, and tears that a modern campaign for public office entails. This Court would readily understand if some appellate court finds that these Plaintiffs have standing despite the fact they cannot individualize their damage beyond their rightful feeling that an election should be conducted lawfully. Neither this Court's research nor the briefing of the parties have brought forth any precedent to support this concept under either of the two pleaded causes of action based upon claimed violations of Equal Protection or the "Elections Clause." Given the timing of this case and the impact that such a ruling might have, this Court finds it prudent to follow the existing precedent.

2    The Defendant and Intervenors suggested both in oral argument and in their written presentations that the Court should abstain under either *Pullman, Colorado River,* or *Rooker-Feldman* doctrine. Since standing is jurisdictional and since this Court is dismissing this action, it need not analyze these arguments. *See Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S. Ct. 643 (1941); *Colorado River Water Conservation Dist. v. U.S.,* 424 U.S. 800 (1976); *Rooker v. Fidelity Trust Co.,* 263 U.S. 413 (1923); and *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462 (1983).

3    This Court is quite cognizant of the Texas Supreme Court ruling (in a slightly different context) that fear of contracting COVID-19 does not establish an exception. *In re State,* 602 S.W.3d 549 (Tex. 2020).

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

6

⌕ KeyCite Blue Flag – Appeal Notification
Appeal Filed by DAKOTA NELSON v. MAC WARNER, 4th Cir., August
11, 2020

2020 WL 4582414
Only the Westlaw citation is currently available.
United States District Court, S.D. West Virginia,
Huntington Division.

Dakota NELSON; Belinda Biafore,
individually and as Chairperson of the
West Virginia Democratic Party; Elaine A.
Harris, individually and as Chairperson
of the Kanawha County Democratic
Executive Committee; West Virginia
Democratic Party; and West Virginia
House Legislative Committee, Plaintiffs,
v.
Mac WARNER in his official capacity
as West Virginia Secretary of State; and
Vera McCormick, in her official capacity
as Clerk of Kanawha County, West
Virginia, and all ballot commissioners for
the state of West Virginia, Defendants.

CIVIL ACTION NO. 3:19-0898
|
Signed 08/10/2020

**Synopsis**
**Background:** Democratic candidate, West Virginia
Democratic party, legislative campaign committee, and party
members brought action against West Virginia Secretary of
State, county clerk, and ballot commissioners, alleging West
Virginia statute, which required ballots for partisan offices
list first the party whose presidential candidate received most
votes in last election, unconstitutionally burdened plaintiffs'
First and Fourteenth Amendment rights. Following a bench
trial, plaintiffs filed motion seeking to permanently enjoin
enforcement of statute and adoption of ballot ordering system
that gave similarly situated major-party candidates equal
opportunity for ballot to list them first.

**Holdings:** The District Court, Robert C. Chambers, J., held
that:

[1] statute burdened First and Fourteenth Amendment rights;

[2] West Virginia's interests in effective administration of
elections and voting efficiency were weak justifications for
actual burden imposed on plaintiffs; and

[3] West Virginia's interests were outweighed by substantial
burden.

Motion granted.

West Headnotes (40)

**[1]** **Federal Civil Procedure** ⬤= In general;
injury or interest
**Federal Courts** ⬤= Case or Controversy
Requirement
For a legal dispute to qualify as a genuine case or
controversy, as required for federal jurisdiction,
at least one plaintiff must have standing to sue.
U.S. Const. art. 3, § 2, cl. 1.

**[2]** **Federal Civil Procedure** ⬤= In general;
injury or interest
**Federal Civil Procedure** ⬤= Causation;
redressability
To prove standing, a plaintiff must present: (1)
an injury that is concrete, particularized, and
actual or imminent, (2) fairly traceable to the
defendant's challenged behavior, and (3) likely to
be redressed by a favorable ruling. U.S. Const.
art. 3, § 2, cl. 1.

**[3]** **Federal Civil Procedure** ⬤= In general;
injury or interest
Concrete-injury element of standing requires an
invasion of a legally protected interest which is
both concrete and particularized and actual or

imminent, not conjectural or hypothetical. U.S. Const. art. 3, § 2, cl. 1.

**[4]**    **Federal Civil Procedure** ⬤⟿ In general; injury or interest

An allegation of future injury may suffice for standing inquiry if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur. U.S. Const. art. 3, § 2, cl. 1.

**[5]**    **Federal Civil Procedure** ⬤⟿ Causation; redressability

Traceability element of standing requires showing a causal connection between the injury and the conduct complained of such that the injury is not the result of the independent action of some third party not before the court. U.S. Const. art. 3, § 2, cl. 1.

**[6]**    **Federal Civil Procedure** ⬤⟿ Causation; redressability

Redressability element of standing requires it to be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. U.S. Const. art. 3, § 2, cl. 1.

**[7]**    **Associations** ⬤⟿ Suits on organization's own behalf; organizational standing in general

Standing inquiry applies to organizational plaintiffs as well as individuals. U.S. Const. art. 3, § 2, cl. 1.

**[8]**    **Federal Civil Procedure** ⬤⟿ In general; injury or interest

The party invoking a court's jurisdiction bears the burden of establishing the elements of standing. U.S. Const. art. 3, § 2, cl. 1.

**[9]**    **Constitutional Law** ⬤⟿ Particular Constitutional Provisions in General

**Constitutional Law** ⬤⟿ Elections

Democratic candidate alleged there was substantial risk that he would suffer harm to electoral prospects due to West Virginia statute requiring ballots for partisan offices list first the party whose presidential candidate received most votes in last election, as required for injury-in-fact element of standing in action alleging statute unconstitutionally burdened First and Fourteenth Amendment rights; advantage to first-listed candidates was 80 to 85 percent likely to manifest in each West Virginia election, candidate had lost previous election in which he was listed last, and candidate would be listed with other candidates in upcoming election. U.S. Const. art. 3, § 2, cl. 1; U.S. Const. Amends. 1, 14; W. Va. Code Ann. § 3-6-2(c)(3).

**[10]**    **Federal Civil Procedure** ⬤⟿ In general; injury or interest

Proving a substantial risk of injury is sufficient for injury-in-fact element of standing. U.S. Const. art. 3, § 2, cl. 1.

**[11]**    **Constitutional Law** ⬤⟿ Particular Constitutional Provisions in General

**Constitutional Law** ⬤⟿ Elections

West Virginia Democratic party and legislative campaign committee alleged there was substantial risk that Democratic candidate would suffer harm to electoral prospects due to West Virginia statute requiring ballots for partisan offices list first the party whose presidential candidate received most votes in last election, as required for injury-in-fact element of standing in action alleging statute unconstitutionally burdened First and Fourteenth Amendment rights; purpose of party and committee was to elect Democratic candidates, advantage to first-listed candidates was 80 to 85 percent likely to manifest in each West Virginia election, candidate had lost previous election in which he was listed last, and candidate would be listed with other candidates in upcoming election. U.S. Const. art. 3, § 2, cl. 1; U.S. Const. Amends. 1, 14; W. Va. Code Ann. § 3-6-2(c)(3).

**[12]**    **Constitutional Law** ⟜ Particular
Constitutional Provisions in General

**Constitutional Law** ⟜ Elections

Democratic candidate, West Virginia Democratic
party, and legislative campaign committee
alleged substantial risk that candidate would
suffer harm to electoral prospects due to
West Virginia statute requiring ballots for
partisan offices list first the party whose
presidential candidate received most votes in
last election was traceable to West Virginia
Secretary of State and ballot commissioners,
as required for traceability element of standing
in action alleging statute unconstitutionally
burdened First and Fourteenth Amendment
rights; commissioners had duty to prepare ballots
necessary for elections, Secretary had direct
control over commissioners' compliance with
election law, and Secretary had duty to prepare
ballots for special elections. U.S. Const. art. 3,
§ 2, cl. 1; U.S. Const. Amends. 1, 14; W. Va.
Code Ann. §§ 3-1-19(g), 3-1-21(a), 3-1-21(b)(2),
3-1A-6(a), 3-6-2(c)(3).

**[13]**    **Federal Civil Procedure** ⟜ Causation;
redressability

Traceability element of standing requires the
injury be fairly traceable to the challenged action
of the defendant, and not the result of the
independent action of some third party not before
the court. U.S. Const. art. 3, § 2, cl. 1.

**[14]**    **Declaratory Judgment** ⟜ Subjects of relief
in general

**Injunction** ⟜ Candidates and ballot access

Risk that Democratic candidate would suffer
harm to electoral prospects due to West Virginia
statute requiring ballots for partisan offices
list first the party whose presidential candidate
received most votes in last election would
likely be redressed by declaration that statute
was unconstitutional, injunction preventing
enforcement of statute, and ballot ordering
system that gave similarly situated major-party

candidates equal opportunity for ballot to list
them first, as required for redressability element
of standing in action brought by candidate,
West Virginia Democratic party, and legislative
campaign committee alleging statute burdened
First and Fourteenth Amendment rights, seeking
permanent injunction enjoining enforcement of
statute, and requesting revised ballot system.
U.S. Const. art. 3, § 2, cl. 1; U.S. Const. Amends.
1, 14; W. Va. Code Ann. § 3-6-2(c)(3).

**[15]**    **Constitutional Law** ⟜ Particular
Constitutional Provisions in General

**Constitutional Law** ⟜ Elections

West Virginia Democratic party and legislative
campaign committee had associational standing on behalf
of members who were candidates in contested
races in upcoming election in action alleging
West Virginia statute requiring ballots for
partisan offices list first the party whose
presidential candidate received most votes in
last election unconstitutionally burdened First
and Fourteenth Amendment rights; candidates
placement below Republican opposition created
substantial risk of harm to electoral prospects,
both organizations' missions included electing
Democratic candidates across West Virginia, and
claims did not require participation by individual
members. U.S. Const. art. 3, § 2, cl. 1; U.S.
Const. Amends. 1, 14; W. Va. Code Ann. §
3-6-2(c)(3).

**[16]**    **Associations** ⟜ Suits on Behalf of Members;
Associational or Representational Standing

Associational standing for an organization exists
when: (1) its members would otherwise have
standing to sue in their own right, (2) the
interests it seeks to protect are germane to
the organization's purpose, and (3) neither the
claim asserted nor the relief requested requires
the participation of individual members in the
lawsuit. U.S. Const. art. 3, § 2, cl. 1.

**[17]**    **Constitutional Law** ⟜ Voting rights and
suffrage in general

Voting is of the most fundamental significance under the United States' constitutional structure.

**[18]** **Constitutional Law** ⬅ Elections in general

**Constitutional Law** ⬅ Voting rights and suffrage in general

**Constitutional Law** ⬅ Elections, voting, or ballot access in general

Electoral regulations often implicate substantial voting, associational, and expressive rights protected by the First and Fourteenth Amendments. U.S. Const. Amends. 1, 14.

**[19]** **Constitutional Law** ⬅ Equality of Voting Power (One Person, One Vote)

Voting regulations implicate the Equal Protection Clause because having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another. U.S. Const. Amend. 14.

**[20]** **Constitutional Law** ⬅ Elections, Voting, and Political Rights

The Equal Protection Clause protects the right to participate in elections on an equal basis with other citizens in the jurisdiction. U.S. Const. Amend. 14.

**[21]** **Constitutional Law** ⬅ Voting rights and suffrage in general

**Constitutional Law** ⬅ Elections, Voting, and Political Rights

Voting and equal protection rights under the First and Fourteenth Amendments are not absolute because all election laws, including perfectly valid ones, inevitably affect, at least to some degree, the individual's right to vote and his right to associate with others for political ends. U.S. Const. Amends. 1, 14.

**[22]** **Constitutional Law** ⬅ Voting rights and suffrage in general

Inquiry as to constitutionality of state laws regulating voting rights under First and Fourteenth Amendment is flexible and depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. U.S. Const. Amends. 1, 14.

**[23]** **Constitutional Law** ⬅ Voting rights and suffrage in general

State laws imposing only reasonable, nondiscriminatory restrictions or modest burdens on voting rights under First and Fourteenth Amendment are usually justified by a state's important regulatory interests. U.S. Const. Amends. 1, 14.

**[24]** **Constitutional Law** ⬅ Voting rights and suffrage in general

State laws imposing severe burdens on voting rights under First and Fourteenth Amendment are subject to strict scrutiny and must be narrowly drawn to advance a state interest of compelling importance. U.S. Const. Amends. 1, 14.

**[25]** **Constitutional Law** ⬅ Voting rights and suffrage in general

Under inquiry as to constitutionality of state laws regulating voting rights under First and Fourteenth Amendment, the class of laws facing strict scrutiny is limited because subjecting too many laws to strict scrutiny would unnecessarily tie the hands of states seeking to assure that elections are operated equitably and efficiently. U.S. Const. Amends. 1, 14.

**[26]** **Constitutional Law** ⬅ Similarly situated persons; like circumstances

Dissimilar treatment of dissimilar groups does not violate the Equal Protection Clause. U.S. Const. Amend. 14.

[27]    **Constitutional Law** ☞ Voting rights and suffrage in general

Under inquiry as to constitutionality of state laws regulating voting rights under First and Fourteenth Amendment, a statute may still be unquestionably a partisan provision even if it is only a fair-weather friend whose inclination may change depending on the prevailing political breeze. U.S. Const. Amends. 1, 14.

[28]    **Constitutional Law** ☞ Ballots and ballot access

**Election Law** ☞ Order and arrangement of tickets and names

West Virginia statute requiring ballots for partisan offices list first the party whose presidential candidate received most votes in last election burdened First and Fourteenth Amendment rights of Democratic candidate, West Virginia Democratic party, and legislative campaign committee, for purposes of determining constitutionality of statute; statute systemically awarded highly beneficial first ballot position to candidates based solely on political party, and first ballot position received approximately 2.94 point advantage, which would be doubled to determine ultimate impact on margin of victory in a race. U.S. Const. Amends. 1, 14; W. Va. Code Ann. § 3-6-2(c)(3).

[29]    **Constitutional Law** ☞ Ballots and ballot access

**Election Law** ☞ Order and arrangement of tickets and names

West Virginia's interests in effective administration of elections and voting efficiency were weak justifications for actual burden imposed on Democratic candidate, West Virginia Democratic party, and legislative campaign committee by statute requiring ballots for partisan offices list first the party whose presidential candidate received most votes in last election, for purposes of determining whether statute unconstitutionally burdened right to

vote in violation of First and Fourteenth Amendments; burden stemmed from statute assigning ballot order based on candidates' partisan affiliation, asserted interests did not support using statute's partisan criteria over any other, and interests would be just as well served by determining order by lot or some other nondiscriminatory criteria. U.S. Const. Amends. 1, 14; W. Va. Code Ann. § 3-6-2(c)(3).

[30]    **Constitutional Law** ☞ Ballots and ballot access

Under inquiry as to constitutionality of state laws regulating voting rights under First and Fourteenth Amendment, a state's interests must justify the specific restriction at issue. U.S. Const. Amends. 1, 14.

[31]    **Constitutional Law** ☞ Ballots and ballot access

**Election Law** ☞ Order and arrangement of tickets and names

West Virginia's interests in effective administration of elections and voting efficiency were outweighed by substantial burden imposed on Democratic candidate, West Virginia Democratic party, and legislative campaign committee by statute requiring ballots for partisan offices list first the party whose presidential candidate received most votes in last election, and thus statute unconstitutionally burdened right to vote in violation of First and Fourteenth Amendments; first ballot position received approximately 2.94 point advantage, which was highly statistically significant and frequently determined election outcomes in West Virginia, interests had no relationship to statute's use of partisan criteria to order on ballots, and nondiscriminatory and easy-to-implement alternatives existed. U.S. Const. Amends. 1, 14; W. Va. Code Ann. § 3-6-2(c)(3).

[32]    **Constitutional Law** ☞ Voting rights and suffrage in general

Under inquiry as to constitutionality of state laws regulating voting rights under First and Fourteenth Amendment, laws imposing severe burdens are subject to strict scrutiny and must be narrowly drawn to advance a state interest of compelling importance. U.S. Const. Amends. 1, 14.

**[33]**    **Constitutional Law** ⬥ Voting rights and suffrage in general

Under inquiry as to constitutionality of state laws regulating voting rights under First and Fourteenth Amendment, laws imposing only reasonable, nondiscriminatory restrictions or modest burdens are usually justified by a state's important regulatory interests. U.S. Const. Amends. 1, 14.

**[34]**    **Constitutional Law** ⬥ Voting rights and suffrage in general

Under inquiry as to constitutionality of state laws regulating voting rights under First and Fourteenth Amendment, strict scrutiny and rational basis scrutiny are only two markers under the flexible standard used to weigh the burdens on the plaintiffs' rights against the defendants' asserted justifications. U.S. Const. Amends. 1, 14.

**[35]**    **Constitutional Law** ⬥ Voting rights and suffrage in general

The rigorousness of inquiry as to constitutionality of state laws regulating voting rights under First and Fourteenth Amendment ultimately depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. U.S. Const. Amends. 1, 14.

**[36]**    **Injunction** ⬥ Candidates and ballot access

Democratic candidate, West Virginia Democratic party, and legislative campaign committee suffered irreparable injury to voting rights under First and Fourteenth Amendments from West Virginia statute requiring ballots for partisan offices list first the party whose presidential candidate received most votes in last election, as required for permanent injunction prohibiting enforcement of statute. U.S. Const. Amends. 1, 14; W. Va. Code Ann. § 3-6-2(c)(3).

**[37]**    **Injunction** ⬥ Candidates and ballot access

Monetary damages were inadequate remedy at law for violations of voting rights under First and Fourteenth Amendments of Democratic candidate, West Virginia Democratic party, and legislative campaign committee by West Virginia statute requiring ballots for partisan offices list first the party whose presidential candidate received most votes in last election, as required for permanent injunction prohibiting enforcement of statute. U.S. Const. Amends. 1, 14; W. Va. Code Ann. § 3-6-2(c)(3).

**[38]**    **Injunction** ⬥ Candidates and ballot access

Balance of hardships imposed by permanent injunction prohibiting enforcement of West Virginia statute requiring ballots for partisan offices list first the party whose presidential candidate received most votes in last election weighed in favor of Democratic candidate, West Virginia Democratic party, and legislative campaign committee over West Virginia Secretary of State, county clerk, and ballot commissioners, as required for injunction; statute violated voting rights under First and Fourteenth Amendments, and defendants were not harmed by issuance of injunction that prevented West Virginia from enforcing unconstitutional restrictions. U.S. Const. Amends. 1, 14; W. Va. Code Ann. § 3-6-2(c)(3).

**[39]**    **Injunction** ⬥ Candidates and ballot access

Public interest would not be disserved by permanent injunction prohibiting enforcement of West Virginia statute requiring ballots for partisan offices list first the party whose presidential candidate received most votes

2020 WL 4582414

in last election, as required for permanent injunction prohibiting enforcement of statute; statute violated voting rights under First and Fourteenth Amendments, and upholding constitutional rights was in the public interest. U.S. Const. Amends. 1, 14; W. Va. Code Ann. § 3-6-2(c)(3).

[40]   **Injunction** ⬦ Discretion as to scope of relief
A federal district court has wide discretion to fashion appropriate injunctive relief in a particular case.

**West Codenotes**

**Held Unconstitutional**

W. Va. Code Ann. § 3-6-2(c)(3)

**Attorneys and Law Firms**

Anthony J. Majestro, Powell & Majestro, Charleston, WV, for Plaintiffs.

Curtis R. Capehart, John Mercer Masslon, II, Jessica Anne Lee, West Virginia Attorney General's Office, Charleston, WV, for Defendant Mac Warner.

Michael W. Taylor, Samuel M. Bloom, Bailey & Wyant, Charleston, WV, for Defendant Vera McCormick.

**MEMORANDUM OPINION AND ORDER**

ROBERT C. CHAMBERS, UNITED STATES DISTRICT JUDGE

**\*1** This suit challenges the constitutionality of West Virginia's Ballot Order Statute, which mandates that ballots for partisan offices list first the party whose presidential candidate received the most votes in the last election. Following the parties' bench trial, the Court must now weigh the extent to which the Statute burdens the plaintiffs' First and Fourteenth Amendment rights against the state's asserted interests. Finding the state's interests insufficient to justify the burdens created by the Statute, the Court now declares the Ballot Order Statute unconstitutional, enjoins the defendants from enforcing it, and orders the defendants to implement

a constitutional ballot ordering system for future elections, including the November 2020 general election.

**I. BACKGROUND**

The West Virginia legislature enacted the state's Ballot Order Statute in 1991. Stips. ¶ 22, ECF No. 106-2. The Statute provides:

> The party whose candidate for president received the highest number of votes at the last preceding presidential election is to be placed in the left, or first column, row or page, as is appropriate to the voting system. The party which received the second highest vote is to be next and so on. Any groups or third parties which did not have a candidate for president on the ballot in the previous presidential election are to be placed in the sequence in which the final certificates of nomination by petition were filed.

W. Va. Code § 3-6-2(c)(3). Election officials have interpreted "highest number of votes" to refer to votes in West Virginia, not nationwide. Therefore, ballots for the upcoming November general election will list Republican Party candidates first because most West Virginian voters supported Donald Trump in 2016.

The plaintiffs, all of whom are affiliated with the Democratic Party, argue candidates listed first on a ballot benefit from a human tendency to choose the first candidate in a list of names. Am. Compl. ¶¶ 3, 25, ECF No. 7. Because of this "primacy effect," the plaintiffs argue the Ballot Order Statute gives certain candidates a significant advantage over others based solely on partisan affiliation.[1] Am. Compl. ¶¶ 1–3. Count One alleges the Ballot Order Statute is an undue burden on the right to vote in violation of the First and Fourteenth Amendments because the Statute dilutes votes for candidates whose political party is not favored by the Statute. Am. Compl. ¶¶ 36–42. Count Two alleges the Statute constitutes disparate treatment in violation of the Fourteenth Amendment's Equal Protection Clause because the Statute treats one major political party (and its candidates, members, constituencies, and supportive voters and organizations) differently from the other major party by granting an electoral advantage based solely on the party's performance in the last presidential election. Am. Compl. ¶¶ 43–47. The essence of these claims is that, through the Statute, the state puts its thumb on the scale in partisan elections to benefit a favored political party. Am. Compl. ¶ 1. The plaintiffs ask the Court

to declare the Ballot Order Statute unconstitutional, enjoin the defendants from enforcing it, and require the defendants to use a ballot ordering system that gives similarly situated major-party candidates an equal opportunity for the ballot to list them first. Am. Compl. 17.

**\*2** The first individual plaintiff is Dakota Nelson, a resident of Huntington, Cabell County, West Virginia. Stips. ¶ 1; Trial Tr. 89, ECF Nos. 119–22. He is registered to vote as a Democrat and is a member of the Democratic Party. Stips. ¶ 1; Tr. 89. Nelson was a Democratic candidate in the 2018 general election for District 16 of the West Virginia House of Delegates, which is a three-delegate district.[2] Tr. 92; Pls.' Ex. 8, at 4, ECF No. 104-9. The ballot listed him last out of six candidates, and he lost the election. Tr. 90; Pls.' Ex. 8, at 4. Nelson ran again for District 16 in the June 2020 primary and was nominated. Stips. ¶ 2. He will appear on the November 2020 ballot with three Republicans and two other Democrats who are also running for District 16. Stips. ¶ 4; Tr. 89–90.

The second individual plaintiff is Belinda Biafore. She is a registered Democrat and resident of Fairmont, Marion County, West Virginia. Stips. ¶ 6. She has been a member of the Democratic Party in West Virginia for over forty-four years and an active supporter of the Democratic Party for over fifty years. Stips. ¶ 6. She is the Chairperson of the West Virginia Democratic Party and previously served as Vice Chairperson, as a member of the Executive Committee, and in several leadership roles for the West Virginia Federation of Democratic Women. Stips. ¶ 6; Tr. 70. She regularly supports Democratic candidates in state elections and intends to vote for Democrats in the upcoming November election. Stips. ¶ 6.

Elaine Harris is the third individual plaintiff. She did not testify at trial, but the parties stipulated to the following. She is a registered Democrat and resident of Kanawha County, West Virginia. Stips. ¶ 7. She has been a member and active supporter of the Democratic Party in West Virginia for many years. Stips. ¶ 7. She currently serves as Chairperson of the Kanawha County Democratic Executive Committee. Stips. ¶ 7. Harris regularly supports Democratic candidates in West Virginia elections and intends to vote for Democratic Party candidates in the upcoming general election. Stips. ¶ 7.

The plaintiffs also include two organizations. The West Virginia Democratic Party is a state political party as defined by West Virginia Code §§ 3-1-8 and 3-8-1a(30). Stips. ¶ 9. Party members include all registered Democrats in the state, including those running in the upcoming general election.

Stips. ¶ 10. The Party's mission is to elect Democratic candidates across West Virginia, and it has nominated approximately one hundred candidates who will appear on the ballot in November. Stips. ¶¶ 10, 11; Tr. 70–71. The West Virginia Democratic House Legislative Committee is the West Virginia Democratic Party's caucus campaign committee for the House of Delegates as defined by West Virginia Code § 3-8-1a(6). Stips. ¶ 12. The Legislative Committee is comprised of the forty-one Democratic members of the House of Delegates. Stips. ¶ 13; Tr. 52. Its mission is to elect its members and other Democratic candidates to the House of Delegates. Stips. ¶ 13; Tr. 52. Twenty-eight Legislative Committee members are running for reelection in November against Republican challengers.[3] Stips. ¶ 13; Tr. 53–55.

**\*3** The Court has adjudicated this case on an expedited schedule because the ballot order for the November election must be set on August 25. W. Va. Code § 3-6-2(d)(2); Stips. ¶¶ 21, 35. The plaintiffs filed their operative Amended Complaint on January 6, 2020. On March 17, the Court denied defendant Clerk of Kanawha County Vera McCormick's motion to dismiss. Mem. Op. and Order, ECF No. 28. On June 30, the Court granted the plaintiffs' motion to certify the defendant class of all county ballot commissioners in West Virginia and designated McCormick as the class representative. Mem. Op. and Order, ECF No. 75. The Court denied McCormick's and defendant Secretary of State Mac Warner's motions for summary judgment on July 15. Mem. Op. and Order, ECF No. 87. The defendants argued the plaintiffs lacked standing to bring this suit and that this case involves a nonjusticiable political question, but the Court rejected these arguments. The bench trial occurred in Huntington on July 27 through 30. Because this proceeding was a bench trial, the Court must weigh the evidence, determine witnesses' credibility, and find the facts. *United States v. Bales*, 813 F.2d 1289, 1293 (4th Cir. 1987).

## II. STANDING

Before arriving at the case's merits, the Court must answer the defendants' contention that the plaintiffs lack standing to bring their claims. The defendants have unsuccessfully challenged the plaintiffs' standing at every stage of this litigation. In denying the defendants' motions for summary judgment, the Court held that Nelson, the Democratic Party, and the Legislative Committee demonstrated direct standing based on harm to their electoral prospects.[4] Mem. Op. 4–

10, ECF No. 87. The Court also held the Democratic Party demonstrated associational standing on behalf of Nelson. *Id.* at 14–15. Relying on the evidence at trial, the Court reaches the same conclusions here with the addition that the Legislative Committee has associational standing on behalf of its members who are running in contested races in the November election.

## A. Legal Standard

[1]   [2]   [3]   [4]   [5]   [6]   [7]   [8] Article III of the United States Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. "For a legal dispute to qualify as a genuine case or controversy, at least one plaintiff must have standing to sue." *Dep't of Commerce v. New York*, ---- U.S. ----, 139 S. Ct. 2551, 2565, 204 L.Ed.2d 978 (2019). To prove standing, a plaintiff must "present [1] an injury that is concrete, particularized, and actual or imminent; [2] fairly traceable to the defendant's challenged behavior; and [3] likely to be redressed by a favorable ruling." *Id.* (citation omitted). The first element requires "an invasion of a legally protected interest which is [both] concrete and particularized ... [and] actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotation marks and citations omitted). "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158, 134 S.Ct. 2334, 189 L.Ed.2d 246 (2014) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 n.5, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013)). The second element requires showing a "causal connection between the injury and the conduct complained of" such that the injury is "not ... the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130 (citation omitted). The third element requires it to be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561, 112 S.Ct. 2130 (internal quotation marks and citation omitted). This three-part inquiry applies to organizational plaintiffs as well as individuals. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982) (citations omitted). The party invoking a court's jurisdiction bears the burden of establishing the elements of standing. *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130 (citations omitted). If controverted by the opposing party, the facts forming the basis for standing must be "supported adequately by the evidence adduced at trial." *Id.* (citation omitted).

## B. Nelson, the Democratic Party, and the Legislative Committee have direct standing.

### 1. Injury-in-Fact

#### a. Nelson proved an injury based on his harmed electoral prospects.

**\*4** "The inability to compete on an equal footing due to the application of allegedly biased criteria has been recognized in many contexts as an injury in fact sufficient to support constitutional standing." *Nat. Law Party of U.S. v. Fed. Elec. Comm'n*, 111 F. Supp. 2d 33, 44 (D.D.C. 2000) (collecting cases); *e.g. Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993) (holding contractors had standing to challenge city ordinance based on "inability to compete on an equal footing in the bidding process"); *see also Fulani v. Brady*, 935 F.2d 1324, 1327 (D.C. Cir. 1991) (collecting cases and explaining that courts have recognized "competitor standing" in "circumstances where a defendant's actions benefitted a plaintiff's competitors, and thereby caused the plaintiff's subsequent disadvantage"). The D.C. Circuit explained so-called "competitive standing" this way: "when regulations illegally structure a competitive environment—whether an agency proceeding, a market, or a reelection race—parties defending concrete interests (e.g., retention of elected office) in that environment suffer legal harm under Article III." *Shays v. Fed. Elec. Comm'n*, 414 F.3d 76, 87 (D.C. Cir. 2005).

Several circuits have extended this competitive standing theory to elections, holding that a candidate and his or her party can show an injury-in-fact if the defendant's actions harm the candidate's chances of winning. *See, e.g., Pavek v. Donald J. Trump for President, Inc.*, No. 20-2410, ---- F.3d ----, ----, 2020 WL 4381845, at \*1 (8th Cir. July 31, 2020) (holding two Democratic Party committees demonstrated standing to challenge a ballot order statute based on the statute unequally favoring supporters of other political parties); *Green Party of Tenn. v. Hargett*, 767 F.3d 533, 538 (6th Cir. 2014) (holding Green Party and Constitution Party had standing to challenge state's ballot access and ballot order statutes); *Drake v. Obama*, 664 F.3d 774, 783 (9th Cir. 2011) (explaining that the "potential loss of an election" was an injury-in-fact sufficient to give a local candidate and party officials supporting that candidate

2020 WL 4582414

standing); *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587–88 (5th Cir. 2006) (holding party demonstrated injury of "harm to its election prospects" and "threatened loss of political power" and candidate demonstrated injury because the opposing party's actions "threaten[ed] his election prospects"); *Fulani v. Hogsett*, 917 F.2d 1028, 1030 (7th Cir. 1990) (holding third party and its candidates faced the injury of "increased competition" when the defendants allegedly improperly placed major-party candidates on the ballot); *Schulz v. Williams*, 44 F.3d 48, 53 (2d Cir. 1994) (holding the "well-established concept of competitors' standing" gave Conservative Party representative standing because the party "stood to suffer a concrete, particularized, actual injury— competition on the ballot from candidates that ... were able to 'avoid complying with the Election Laws' and a resulting loss of votes"); *see also Hollander v. McCain*, 566 F. Supp. 2d 63, 68 (D.N.H. 2008) ("[C]ourts have held that a candidate or his political party has standing to challenge the inclusion of an allegedly ineligible rival on the ballot, on the theory that doing so hurts the candidate's or party's own chances of prevailing in the election."); *Mann v. Powell*, 333 F. Supp. 1261, 1265 (N.D. Ill. 1969) (holding candidates had standing to challenge ballot order statute based on statute's possible threat of discriminatory treatment).

[9] Contrary to this overwhelming precedent, the defendants have relied on the recent Eleventh Circuit decision in *Jacobson v. Florida Secretary of State*, 957 F.3d 1193 (11th Cir. 2020) to argue the asserted injury to Nelson's electoral prospects is too speculative. The plaintiffs in *Jacobson* challenged Florida's ballot order statute, which required that ballots list first candidates from the party that won the last gubernatorial election. 957 F.3d at 1198. The district court ruled based on the consequences of the primacy effect that the statute violated the First and Fourteenth Amendments. *Id.* at 1200. However, the Eleventh Circuit vacated that decision on the grounds that none of the plaintiffs had standing. *Id.* at 1212. According to the Eleventh Circuit, the Democratic National Committee's reliance "solely on an average measure of the primacy effect" gave the court "no basis to conclude that the primacy effect will impact any particular voter or candidate in any particular election." *Id.* at 1205 (citation omitted). The Democratic National Committee therefore had "not proved that at least one of its unidentified members 'is certain to be injured by' the primacy effect" as required for standing. *Id.* (citing *Ga. Republican Party v. Sec. & Exch. Comm'n*, 888 F.3d 1198, 1204 (11th Cir. 2018)).

*5 Both the plaintiffs in *Jacobson* and here relied on expert witness Dr. Jon A. Krosnick, one of the nation's foremost political psychologists. In both cases, Dr. Krosnick submitted extensive statistical research and concluded that listing a candidate first "almost always" accords that person an advantage. Pls.' Ex. 2, at 1, ECF No. 104-2; Sec'y's Ex. 2, at 2, ECF No. 105-2. His research includes a meta-analysis of over 1,000 primacy effect tests, of which 84 percent manifested differences in the direction of primacy—a statistically significant pattern constituting "near unanimity." Pls.' Ex. 2, at 21–23; Sec'y's Ex. 2, at 34–36. Due either to a misunderstanding of the evidence or an unclear presentation of it by the plaintiffs, the Eleventh Circuit failed to grasp that Dr. Krosnick's conclusions on the prevalence of the primacy effect apply to all elections. To prevent this Court from making the same interpretative error, Dr. Krosnick repeatedly testified that his research establishes an 80 to 85 percent probability of the primacy effect occurring in *each and every* election.[5] Tr. 378, 384, 398, 401, 416, 428. He explained that a phenomenon with this level of probability is "nearly universal" and "almost a law of nature" because "[y]ou can't get a frequency that high in past studies unless essentially every type of candidate in every type of race in every year is experiencing those same phenomena in the minds of voters that produce that primacy effect." Tr. 123–24, 192. Dr. Krosnick's conclusions and his underlying statistical evidence thus provide an ample "basis to conclude that the primacy effect will impact any particular voter or candidate in any particular election." *Jacobson*, 957 F.3d at 1205.

[10] As explained below in the merits analysis, the Court finds Dr. Krosnick's conclusion that the primacy effect is 80 to 85 percent likely to manifest in each West Virginia election, including multi-candidate elections, to be reasonable, reliable, and credible. Nelson therefore proved harm to his electoral prospects based on the extreme likelihood that the primacy effect manifested in his 2018 race and will manifest in his 2020 race. The 15 to 20 percent probability of the primacy effect not occurring in an election does not undermine Nelson's standing because standing does not "uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about." *Clapper*, 568 U.S. at 414 n.5, 133 S.Ct. 1138. Instead, proving a "substantial risk" of injury is sufficient. *Id.*; *Susan B. Anthony List*, 573 U.S. at 158, 134 S.Ct. 2334. An 80 to 85 percent probability of the primacy effect benefiting a candidate's opposition is undoubtedly a "substantial risk" of injury.[6] *See also Pavek v. Simon*, No. 19-CV-3000 (SRN/ DTS), ——F.Supp.3d——, ——, 2020 WL 3183249, at *13–

14 (D. Minn. June 15, 2020) (holding plaintiffs demonstrated an injury-in-fact to challenge Minnesota's ballot order statute based on a substantial risk that the primacy effect will occur in the 2020 general election), *stayed on other grounds pending appeal*, ─── F.3d at ───, 2020 WL 4381845, at *1 (affirming the plaintiffs had standing). Nelson therefore proved a sufficient injury-in-fact for standing.

**b. The Democratic Party and the Legislative Committee also proved an injury based on harm to their candidates' electoral prospects.**

[11] As noted above, the unlawful structuring of a competitive election not only injures a disadvantaged candidate, but also the political party supporting that candidate. *See Pavek*, ─── F.3d at ───, 2020 WL 4381845, at *1 (holding two Democratic committees demonstrated standing to challenge ballot order statute based on the statute unequally favoring supporters of other political parties); *Green Party of Tenn.*, 767 F.3d at 538 (holding third parties had standing to challenge state's ballot access and ballot order statutes); *Drake*, 664 F.3d at 783 (explaining that the "potential loss of an election" can be a sufficient injury-in-fact for party officials); *Tex. Democratic Party*, 459 F.3d at 587–88 (holding party demonstrated injury of "harm to its election prospects" and "threatened loss of political power"); *Fulani*, 917 F.2d at 1030 (holding third party faced injury of "increased competition" when defendants allegedly improperly placed major-party candidates on the ballot); *Schulz*, 44 F.3d at 53 (holding third-party representative had standing because the party stood to suffer from "competition on the ballot from candidates that ... were able to 'avoid complying with the Election Laws' and a resulting loss of votes"); *Hollander*, 566 F. Supp. 2d at 68 (explaining that a "political party has standing to challenge the inclusion of an allegedly ineligible rival on the ballot, on the theory that doing so hurts the ... party's own chances of prevailing in the election"). The Fifth Circuit explained why in *Texas Democratic Party v. Benkiser*:

> **\*6** [A] political party's interest in a candidate's success is not merely an ideological interest. Political victory accedes power to the winning party, enabling it to better direct the machinery of government toward the party's interests. While power may be less tangible than money, threatened loss of that power is still a concrete and particularized injury sufficient for standing purposes.

459 F.3d at 587 (citation omitted). Thus, the alleged harm resulting from West Virginia's Ballot Order Statute is not only a sufficient injury-in-fact for Nelson, but also for the Democratic Party and the Legislative Committee because their very purpose is to elect Democratic candidates across the state. Stips. ¶¶ 10, 13; Tr. 52, 70–71.

Following the Supreme Court's recent decision in *Gill v. Whitford*, the Eleventh Circuit held in *Jacobson* that an organization's "general interest in its preferred candidates winning as many elections as possible" is only a "generalized partisan preference" that federal courts are "not responsible for vindicating." *Jacobson*, 957 F.3d at 1206 (quoting *Gill v. Whitford*, ─── U.S. ───, 138 S. Ct. 1916, 1933, 201 L.Ed.2d 313 (2018)). The organizational plaintiffs in *Jacobson* thus failed to establish standing because their claimed injury was a "systemic disadvantage to [their] party relative to other political parties" rather than harm to "a particular candidate's prospects in a future election." *Id.* The Eleventh Circuit, however, expressly declined to decide "whether a political party would have standing to challenge an electoral practice that harmed one of *its* candidate's electoral prospects in a particular election." *Id.* (emphasis in original). *Jacobson* is therefore inapplicable here because the Democratic Party and the Legislative Committee base their standing on the Ballot Order Statute's harm to *their* candidates (Nelson and the twenty-eight Committee members previously identified) in the upcoming November election. *See Tex. Democratic Party*, 459 F.3d at 586 (holding party had standing to challenge an action that would reduce "its congressional candidate's chances of victory" in an upcoming election); *Pavek*, ─── F.Supp.3d at ─── n.13, 2020 WL 3183249, at *14 n.13 (holding *Jacobson* did not apply to standing analysis for organizational plaintiffs because the plaintiffs' focused their injury on harm to the plaintiffs' candidates in the upcoming election), *stayed on other grounds pending appeal*, ─── F.3d at ───, 2020 WL 4381845, at *1 (affirming the plaintiffs had standing). As already discussed, the plaintiffs proved through Dr. Krosnick that a "substantial risk" exists that the Statute will harm each of these candidates' electoral prospects in November. This sufficiently proves an injury-in-fact for standing.

**2. Traceability**

[12] [13] Having concluded that Nelson, the Democratic Party, and the Legislative Committee proved an injury-in-fact, the Court now turns to traceability. This element

of standing requires the injury be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130 (citation omitted). As previously discussed, the plaintiffs showed through Dr. Krosnick that the Ballot Order Statute causes the primacy effect to disproportionately benefit Republican candidates, which injures Democratic candidates' electoral prospects. This injury is fairly traceable to the defendant class of ballot commissioners because their statutory duties include preparing the ballots "necessary for conducting every election for public officers in which the voters of the county participate," including all "general, special, and primary elections held in the county or any magisterial district thereof." W. Va. Code §§ 3-1-21(a), 3-1-19(g). They must also provide the ballots "for any countywide special election ordered by the county commission." W. Va. Code § 3-1-21(b)(2). The plaintiffs' injury is also traceable to the Secretary of State based on his statutory duties. The Eleventh Circuit ruled in *Jacobson* that the alleged injury from Florida's ballot order statute was not traceable to the Secretary of State because she had no role in ordering candidates' names on ballots, but West Virginia requires its Secretary of State to prepare the ballots "for any statewide special election ordered by the Legislature." W. Va. Code § 3-1-21(b)(1); 957 F.3d at 1207. And unlike in *Jacobson* where the Secretary had no control over county supervisors except through coercive judicial process, West Virginia binds its ballot commissioners to "any orders that may be issued and any legislative rules that may be promulgated by the Secretary of State." W. Va. Code § 3-1A-6(a); 957 F.3d at 1207–08. This direct control over ballot commissioners' compliance with state election law, along with the Secretary's own duty to prepare ballots for special elections, make the plaintiffs' injury fairly traceable to him.

**3. Redressability**

*7   [14]   Lastly, the plaintiffs must show it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130 (citation and internal quotation marks omitted). The plaintiffs ask the Court to declare the Ballot Order Statute unconstitutional, enjoin the defendants from enforcing it, and require the defendants to use a ballot ordering system that gives similarly situated major-party candidates an equal opportunity for the ballot to list them first. Am. Compl. 17. As explained regarding traceability, the

Secretary of State and ballot commissioners are responsible under state law for enforcing the Statute, so declaratory and injunctive relief against them would effectively stop implementation of the Statute across West Virginia. Cf. *Jacobson*, 957 F.3d at 1208 (explaining that enjoining the Florida Secretary of State from following Florida's ballot order statute would not provide redress because the Secretary does not enforce the statute and the county supervisors who do enforce it were not joined as parties). If the Court enjoins enforcement of the Statute, the primacy effect will no longer disproportionately harm candidates' electoral prospects based on their party affiliation. And the parties have stipulated that the kind of randomized or rotational ballot ordering that the plaintiffs seek to cure the harm of the Ballot Order Statute is possible with West Virginia's current voting systems. Stip. Regard. Voting Sys., ECF No. 106-1. The Court therefore finds that granting the requested relief would redress the plaintiffs' injury.

**C. The Democratic Party and the Legislative Committee also have associational standing.**

[15]   [16]   In addition to having standing on their own behalf, the Democratic Party and the Legislative Committee have associational standing on behalf of members who are candidates in contested races in the November election. *See Tex. Democratic Party*, 459 F.3d at 587–88 (holding the Texas Democratic Party had associational standing on behalf of its candidate). Associational standing for an organization exists when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). The Democratic Party and the Legislative Committee meet all three requirements.

First, the Court has already determined that Nelson, a Democratic Party member, has standing to sue based on his harmed electoral prospects in the 2018 general election and the upcoming November election. *See Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 186 (4th Cir. 2007) (citation omitted) ("Associational standing may exist even when just one of the association's members would have standing."). For the same reasons, the twenty-eight Legislative Committee members who are running for reelection in November against Republican challengers have standing. *See* Stips. ¶ 13; Tr. 53–55. As with Nelson, the Statute's placement of these Democratic candidates below their Republican opposition

creates a substantial risk of harm to the candidates' electoral prospects because it is extremely likely that the primacy effect will benefit the candidates listed first.

Second, both the Democratic Party and the Legislative Committee undoubtedly seek to protect their organizational interests in this suit. Both organizations' missions include electing Democratic candidates across West Virginia. Stips. ¶¶ 10, 13; Tr. 52, 70–71. In the words of the Supreme Court, the goal of a state political party is to "to gain control of the machinery of state government by electing its candidates to public office." *Storer v. Brown*, 415 U.S. 724, 745, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974). Both organizations seek here to invalidate a state law that frustrates this goal by diminishing their candidates' competitiveness.

Third, the claims asserted do not require participation by the organizations' individual members. Even though Nelson is a plaintiff and his candidacy is a basis for standing, the Democratic Party's and the Legislative Committee's separate standing make Nelson's inclusion as a plaintiff unnecessary. And nothing about the plaintiffs' claims or their requested relief make participation by the Legislative Committee's individual members necessary. "Unlike a suit for money damages, which would require examination of each member's unique injury, this action seeks a declaratory judgment and injunctive relief, the type of relief for which associational standing was originally recognized." *Retail Indus. Leaders Ass'n*, 475 F.3d at 187. Therefore, having met all three requirements, the Democratic Party and the Legislative Committee have associational standing to bring this suit.

**\*8** In sum, the Court concludes Nelson, the Democratic Party, and the Legislative Committee have direct standing in this case based on harm to their electoral prospects. The Democratic Party also has associational standing on behalf of Nelson, and the Legislative Committee has associational standing on behalf of the twenty-eight identified members seeking reelection. Having found standing on these grounds, the Court declines to address whether Biafore and Harris have individual standing as voters. *See Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014) ("[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.") (quoting *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006)). The Court now proceeds to the case's merits.

## III. MERITS

### A. Legal Standard

**[17]    [18]    [19]    [20]    [21]** "[V]oting is of the most fundamental significance under our constitutional structure." *Burdick v. Takushi*, 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (citation omitted). And there "must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974). Electoral regulations often "implicate substantial voting, associational and expressive rights protected by the First and Fourteenth Amendments." *Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 716 (4th Cir. 2016) (citation omitted). Voting regulations also implicate the Equal Protection Clause because "[h]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104–05, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) (citation omitted). In other words, the Equal Protection Clause protects the right "to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (citations omitted). "These rights, however, are not absolute" because "all election laws, including perfectly valid ones, inevitably affect—at least to some degree—the individual's right to vote and his right to associate with others for political ends." *Alcorn*, 826 F.3d at 716 (cleaned up) (citing *Anderson*, 460 U.S. at 788, 103 S.Ct. 1564).

Both of the plaintiffs' claims here are cognizable because the Ballot Order Statute implicates the right to vote and the right to equal protection. Regarding Count One, the Statute affects the individual plaintiffs' right to vote under the First and Fourteenth Amendments because, by awarding the benefit of the primacy effect to one party's candidates based on partisan affiliation, the Statute dilutes votes for candidates whose party the Statute disfavors. *See, e.g., Pavek v. Donald J. Trump for President, Inc.*, No. 20-2410, —— F.3d ——, ——, 2020 WL 4381845, at \*2 (8th Cir. July 31, 2020) (holding the plaintiffs' challenge to Minnesota's ballot order statute implicated the right to vote); *McLain v. Meier*, 637 F.2d 1159, 1167 (8th Cir. 1980) (holding incumbent-first statute "burdens the fundamental right to vote possessed by supporters of the last-listed candidates, in violation of the fourteenth amendment" and collecting cases); *Graves v. McElderry*, 946 F. Supp. 1569, 1578–79 (W.D. Okla. 1996) (holding statute placing

2020 WL 4582414

Democratic candidates first burdened "the right ... to cast a meaningful and fully weighted vote"). And as to Count Two, the Statute implicates the Fourteenth Amendment right to equal protection because it treats one major political party (and its candidates, members, constituencies, and supportive voters and organizations) differently from the other major party by granting an electoral advantage based solely on the party's performance in the last presidential election. *See, e.g., McLain*, 637 F.2d at 1165–67 (holding incumbent-first statute violated equal protection); *Sangmeister v. Woodard*, 565 F.2d 460, 467 (7th Cir. 1977) (affirming that county clerks excluding plaintiffs from top ballot positions violated equal protection); *Mann v. Powell*, 314 F. Supp. 677, 679 (N.D. Ill. 1969) (holding the favoring of incumbents when breaking ballot order ties was "a purposeful and unlawful invasion of [the] plaintiffs' Fourteenth Amendment right to fair and evenhanded treatment"), *aff'd*, 398 U.S. 955, 90 S.Ct. 2169, 2170, 26 L.Ed.2d 539 (1970).

**\*9** The Court adjudicates both Counts One and Two using the standard established by the Supreme Court in *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), and *Burdick v. Takushi*, 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). To assess the Ballot Order Statute's constitutionality under the First and Fourteenth Amendments:

> [The Court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

*Anderson*, 460 U.S. at 789, 103 S.Ct. 1564.

**[22]   [23]   [24]   [25]** This inquiry is "flexible" and "depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Burdick*, 504 U.S. at 434, 112 S.Ct. 2059. Laws imposing only "reasonable, nondiscriminatory restrictions" or "modest" burdens are usually justified by a state's "important regulatory interests." *Anderson*, 460 U.S. at 788, 103 S.Ct. 1564; *Alcorn*, 826 F.3d at 716–17 (citation omitted). On the other hand, laws imposing "severe" burdens are subject to "strict scrutiny" and must be "narrowly drawn to advance a state interest of

compelling importance." *Alcorn*, 826 F.3d at 717 (citations omitted). The class of laws facing strict scrutiny is limited because "subjecting too many laws to strict scrutiny would unnecessarily tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Id.* (cleaned up) (citing *Burdick*, 504 U.S. at 433, 112 S.Ct. 2059).

**\*10** The Fourth Circuit used the *Anderson/Burdick* standard to evaluate Virginia's three-tiered ballot ordering system in *Libertarian Party of Virginia v. Alcorn*, 826 F.3d 708 (4th Cir. 2016). For a first-tier position, a candidate's party must have received at least ten percent of the total votes for any statewide office filled in either of the two preceding statewide general elections. *Id.* at 712. Only the Republican and Democratic parties met this requirement. *Id.* The second tier listed other recognized political parties, including the Libertarian Party, and the third tier included independent candidates. *Id.* The order of candidates in the first and second tiers was set by lot, and each political office on the ballot replicated that order. *Id.* Candidates in the third tier were listed alphabetically by surname. *Id.* The appellant, a figure in the Libertarian Party, argued the statute conferred an unconstitutional advantage on Republican and Democratic candidates while disadvantaging minor-party candidates. *Id.* at 714. The appellant conceded that the burden created by the law did not warrant strict scrutiny, and the court upheld it because the law only imposed a slight burden on the appellant's constitutional rights and the state articulated several important interests. *Id.* at 718, 721. These interests included speeding the voting process by reducing voter confusion, creating a symmetrical ballot pattern, and maintaining a stable political system. *Id.* at 719–20.

**[26]** While *Alcorn* is a helpful example for applying the *Anderson/Burdick* standard, the Fourth Circuit addressed a ballot statute significantly different than West Virginia's. The core issue in *Alcorn* was Virginia's privileging of major parties over minor ones, and it is well-established that the "dissimilar treatment of ... dissimilar groups does not violate the Equal Protection Clause." *Kolbe v. Hogan*, 813 F.3d 160, 190 (4th Cir. 2016), *on reh'g en banc*, 849 F.3d 114 (4th Cir. 2017). The court also held the statute's tiered structure was facially neutral and nondiscriminatory because all parties were "subject to the same requirements" and had "an evenhanded chance at achieving political party status and a first-tier ballot position." *Id.* at 717. The court determined that the appellant exaggerated the difficulty of entering the first tier because first-tier status only required candidates for any office to receive ten percent of the vote in either

of the two preceding statewide general elections. *Id.* Once a party met this requirement, the statute determined its position in the first tier by lot. *Id.* at 712. Therefore, no party was "automatically elevated to the top of the ballot." *Id.* at 717. The Fourth Circuit made the broad observation that "[a]ccess to a preferred position on the ballot so that one has an equal chance of attracting the windfall vote is not a constitutional concern." *Id.* at 719 (quoting *New Alliance Party v. N.Y. State Bd. of Elections*, 861 F. Supp. 282, 295 (S.D.N.Y. 1994)). But this observation must be understood in light of the court's finding that Virginia's law was politically neutral and nondiscriminatory, except for making the legitimate distinction between dissimilar major and minor parties. While the benefit of an advantageous ballot position is not necessarily a constitutional concern, a discriminatory allocation of that benefit among similarly situated political parties is.

[27]  In contrast to the Virginia law at issue in *Alcorn*, West Virginia's Ballot Order Statute is not facially neutral or nondiscriminatory. Virginia's statute determined major parties' position by lot, but West Virginia awards the benefit of the primacy effect to candidates based on their political affiliation with the last presidential candidate who received the most votes. *See Fusaro v. Cogan*, 930 F.3d 241, 259 (4th Cir. 2019) (explaining "facially neutral and nondiscriminatory" generally refers to a statute "that does not favor one political party or viewpoint over another"). In doing so, the Statute "automatically elevate[s]" candidates "to the top of the ballot" based on their party affiliation. *Alcorn*, 826 F.3d at 717. In this sense, West Virginia's Statute is more akin to the unconstitutional Oklahoma law in *Graves v. McElderry*—a decision cited approvingly in *Alcorn*—that automatically placed Democratic candidates at the top of the ballot. 946 F. Supp. 1569, 1582 (W.D. Okla. 1996); *Alcorn*, 826 F.3d at 718; *see also McLain*, 637 F.2d at 1165–67 (holding incumbent-first statute violated equal protection); *Sangmeister*, 565 F.2d at 468 (holding county clerks listing their own party's candidates first was unconstitutional); *Jacobson v. Lee*, 411 F. Supp. 3d 1249, 1282–83 (N.D. Fla. 2019) (holding listing candidates from the governor's political party first was discriminatory and unconstitutional), *vacated on other grounds and remanded sub nom. Jacobson v. Fla. Sec'y of State*, 957 F.3d 1193 (11th Cir. 2020); *Netsch v. Lewis*, 344 F. Supp. 1280, 1281 (N.D. Ill. 1972) (holding state law ordering ballot by incumbency and seniority violated equal protection); *Mann*, 314 F. Supp. at 679 (holding the favoring of incumbents when breaking ballot order ties was unconstitutional), *aff'd*, 398 U.S. 955,

90 S.Ct. 2169, 2170, 26 L.Ed.2d 539. The party benefiting from West Virginia's law may shift over time, but this does not mean the Statute is nonpartisan. A statute may still be "unquestionably a partisan provision" even if it is only a "fair-weather friend" whose "inclination may change depending on the prevailing political breeze."[7] *Jacobson*, 411 F. Supp. 3d at 1276–77; *see also Pavek v. Simon*, No. 19-CV-3000 (SRN/DTS), —— F.Supp.3d ——, ——, 2020 WL 3183249, at *24 (D. Minn. June 15, 2020) (explaining that Minnesota's ballot order statute is still partisan even though the party benefiting may vary), *stayed on other grounds pending appeal*, —— F.3d ——, ——, 2020 WL 4381845, at *3. Because West Virginia's Ballot Order Statute is politically discriminatory, *Alcorn* does not provide a clear answer in this case.

## B. Character and Magnitude of the Injury

*11  [28]  The Court's first step under the *Anderson/Burdick* standard is to "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Anderson*, 460 U.S. at 789, 103 S.Ct. 1564. As discussed in the Court's review of *Alcorn*, the character of the injury imposed by the Ballot Order Statute is discriminatory. The Statute selects one party for ballots to list first based explicitly and exclusively on that party's performance in the last presidential election. Even though the direction of the Statute's partisanship may change over time, the Statute discriminates by awarding the benefit of the top ballot position to candidates based solely on their political affiliation. Consequently, the Statute places a politically discriminatory burden on the right to vote and the right to participate in elections on an equal basis. The Statute is in no way politically neutral, and this kind of state-sanctioned favoritism in elections is of constitutional concern. *See McLain*, 637 F.2d at 1167 (holding incumbent-first statute constituted "favoritism" that "burden[ed] the fundamental right to vote possessed by supporters of the last-listed candidates, in violation of the fourteenth amendment").

As to the injury's magnitude, the plaintiffs presented Dr. Jon A. Krosnick. Dr. Krosnick is a renowned political scientist and professor at Stanford University, where he runs a research institute that studies political psychology, especially through political surveys including ballots. Tr. 109, 113–14; Pls.' Ex. 2, at 2. He runs a second research institute devoted to improving scientific research methods across disciplines, and he teaches courses on political psychology, statistics, and quantitative research. Tr. 109–11; Pls.' Ex. 2, at 2. Dr.

2020 WL 4582414

Krosnick is also a research advisor to the Gallup Organization and a research psychologist at the U.S. Census Bureau, where he performs and teaches statistical analysis of survey data. Tr. 111–12; Pls.' Ex. 2, at 2. In addition to nine other books, he is the author of a forthcoming book that brings together a hundred years of scholarship on survey research methods. Tr. 114, 117; Pls.' Ex. 1, at 33, ECF No. 104-1; Pls.' Ex. 2, at 3. He has published around 200 articles, including in top-ranked journals of social psychology, political science, and survey research methods. Tr. 117; Pls.' Ex. 1, at 34–47; Pls.' Ex. 2, at 3. Dr. Krosnick has studied the primacy effect in elections for 30 years. Tr. 120; Pls.' Ex. 2, at 3. And his curriculum vitae and testimony demonstrate his substantial experience in using a diversity of quantitative analyses and statistical methods to analyze voter behavior, especially candidate name order effects, in different electoral settings. Tr. 218–22; Pls.' Ex. 1. While these qualifications do not automatically establish his credibility, they are strongly probative.

Dr. Krosnick presented a comprehensive review of decades of peer-reviewed academic research on the primacy effect. He examined studies of name order effects in general, primary, and presidential elections in the United States, as well as studies from abroad. Tr. 124–37, 139–40; Pls.' Ex. 2, at 9–20. These studies examine many types of elections across many years using a diversity of research methods and data sets. Tr. 137, 140–42. Included were studies of elections in states that rotate candidates' names, which provide the strongest evidence for the primacy effect. Tr. 156. For example, Dr. Krosnick reviewed his prior research on the 1992 election in Ohio where candidates' names were rotated by precinct. Tr. 125–31. Examining 118 races in Ohio's 3 largest counties, he found a majority of races showed differences in the direction of primacy. Tr. 125–31; Pls.' Ex. 2, at 9. Taken together, the studies in Dr. Krosnick's literature review overwhelmingly reinforce the conclusion that candidates listed first receive an increased number of votes. Tr. 137, 140–42. To summarize this body of research quantitatively, Dr. Krosnick conducted a meta-analysis of 1,100 different tests of name order effects. Tr. 137–39; Pls.' Ex. 2, at 21–23. Eighty-four percent of these tests manifested differences in the direction of primacy, a highly statistically significant result demonstrating near unanimity. Tr. 138; Pls.' Ex. 2, at 22.

**\*12**  Dr. Krosnick offered two basic reasons for why the primacy effect manifests in elections. First, voters often lack information about specific races. The order of candidates' names can nudge these low-information voters toward choosing the top-listed candidate. Tr. 147–49; Pls.'

Ex. 2, at 24–26. Second, voters may be ambivalent in their choice between candidates. Even though these voters may be highly informed, their ambivalence makes them susceptible to the candidates' order nudging them toward the top choice. Tr. 149–50; Pls.' Ex. 2, at 27–28. This explains why the primacy effect still manifests in high information races like the 2016 presidential election between Hillary Clinton and Donald Trump. Tr. 149–50. The defendants did not dispute the literature supporting these two explanations for the primacy effect.

To assess the susceptibility of West Virginia voters to the primacy effect, Dr. Krosnick compared voters in West Virginia to voters in Ohio, California, North Dakota, and New Hampshire. Tr. 155–57; Pls.' Ex. 2, at 33–35, 48–64. He chose these four states for comparison because they use rotational ballot ordering systems that allow researchers to produce the strongest evidence for the existence and size of the primacy effect. Tr. 156. Dr. Krosnick compared the states by looking at voters' sex, age, race, ethnicity, marital status, education, employment status, household income, household size, home ownership, active duty service, metropolitan status, and whether a telephone is present in the home. Pls.' Ex. 2, at 35, 59–64. After comparing these variables, he concluded that the similarity of voters in West Virginia to voters in these other states, especially Ohio, shows that West Virginians are similarly susceptible to the primacy effect when voting. Tr. 156–57; Pls.' Ex. 2, at 35. The only noticeable difference between voters in West Virginia and Ohio was that West Virginians are more rural, but there is no evidence this factor influences the primacy effect's magnitude. Tr. 157.

Finally, Dr. Krosnick did a far-reaching statistical regression analysis of West Virginia elections from 1960 to 2018.[8] Tr. 159–77; Pls.' Ex. 4, at 8–10, ECF No. 104-4. His data included all general election partisan races for federal offices (President, Senator, and Representative) and high-profile state offices (Governor, Attorney General, Treasurer, Secretary of State, State Auditor, Commissioner of Agriculture, State Senator, State Delegate, Supreme Court Justice, Circuit Court Judge, and Family Court Judge) that included a Democrat and Republican. Tr. 159; Pls.' Ex. 2, at 36; Pls.' Ex. 4, at 4–5. Dr. Krosnick only excluded a relatively small number of races in which voters could choose more than one candidate from the same party because he was unable to determine the order of same-party candidates on the ballot. Tr. 161–62. This nearly 60-year collection of elections included 21,196 vote totals, a massive number of data points allowing for a high degree of analytical accuracy. Tr. 175; Pls.' Ex. 3,

ECF No. 104-3. To isolate the impact of the primacy effect, Dr. Krosnick controlled for 33 different variables, including political party, incumbency, gender, the unemployment rate, and party affiliation with the governor. Tr. 166–74; Pls.' Ex. 4, at 8–10. From his regression, Dr. Krosnick determined the average benefit for a candidate listed first on the ballot was 2.94 percentage points. Tr. 166–67; Pls.' Ex. 4, at 6, 8. He testified that, based on quantitative research standards, this conclusion is highly accurate and shows a more than 99 percent likelihood that this primacy effect in West Virginia is real. Tr. 167, 174–75; Pls.' Ex. 4, at 8, 10.

**\*13** Putting all of this research together, Dr. Krosnick testified to a reasonable degree of certainty that there is an 80 to 85 percent probability of the primacy effect occurring in every West Virginia election, and the best scientific estimate of that effect in each election is 2.94 percentage points. Tr. 122–24, 200–01, 378, 416, 428. Because one candidate gains votes at the expense of another, the 2.94 figure is doubled to determine the primacy effect's ultimate impact on the margin of victory in a race. Tr. 326–28; Pls.' Ex. 2, at 8–9. In other words, the outcome of an election in which the first-listed candidate won by less than 5.88 percentage points would likely have been different if the other major candidate had been listed first. Pls.' Ex. 2, at 41–43. At trial, the defendants challenged the applicability of Dr. Krosnick's conclusions to Nelson's 2018 race because that race involved several candidates from each party and was therefore excluded from Dr. Krosnick's data. See Tr. 161–62. However, Dr. Krosnick testified that because his analysis includes such a vast range of elections, his conclusions can be confidently generalized to all partisan races in West Virginia, including multi-candidate district races. Tr. 162–63, 200. In fact, he testified that the name order effects in multi-candidate district races are likely stronger because voters cannot use party affiliation to distinguish between candidates of the same party. Tr. 162–63. Thus, Dr. Krosnick concluded that Nelson faced in 2018, and will face in 2020, an 80 to 85 percent probability of the primacy effect occurring with the best estimate of that effect being 2.94 percentage points. Tr. 404–05, 425.

On cross-examination, defense counsel repeatedly attempted to poke holes in Dr. Krosnick's testimony but only ended up giving him more time to prove his mastery over the subject matter. For example, defense counsel cited a position Dr. Krosnick took in a 1998 article that differed from his current perspective. Tr. 215. But Dr. Krosnick's response demonstrated how he has carefully refined his approach to studying elections over several decades as new and sometimes contrary research emerges. Tr. 216–20. Throughout the cross-examination, Dr. Krosnick frequently had to explain why defense counsel's questions misinterpreted his research. E.g. Tr. 220–21, 230–31, 234–36, 237–38, 245. And practically every time defense counsel pointed out an alleged weakness, such as the exclusion of some House of Delegates races or Dr. Krosnick's approach to clustering standard errors, Dr. Krosnick had a compelling explanation for his methodology. Tr. 232–33, 251–52.

To challenge Dr. Krosnick's conclusions, the defendants called Dr. Jason A. MacDonald as their expert witness. Dr. MacDonald earned his PhD in political science from George Washington University and is now an associate professor of political science at West Virginia University. Tr. 432–33; Sec'y's Ex. 30, at 1–2, ECF No. 105-42. His research focuses on American national political institutions, and he primarily uses quantitative methods, including those used by Dr. Krosnick to study the primacy effect. Sec'y's Ex. 30, at 1. Dr. MacDonald has published his research in peer-reviewed academic journals, and he teaches quantitative political analysis to graduate students at West Virginia University. Tr. 433–37; Sec'y's Ex. 30, at 2–3. He does not, however, have research experience with the primacy effect in elections. Tr. 440; Sec'y's Ex. 30, at 3.

The scope of Dr. MacDonald's testimony was limited. He did not evaluate Dr. Krosnick's literature review, meta-analysis, or opinions on the psychological bases for the primacy effect. Tr. 527. Nor did he evaluate Dr. Krosnick's analysis on the susceptibility of West Virginians to the primacy effect compared to voters in other states. Tr. 527–28. Dr. MacDonald also did not dispute the general existence of the primacy effect in West Virginia. Instead, he criticized specific modeling decisions Dr. Krosnick made in his regression analysis of West Virginia elections. Tr. 528–29. After creating what he believed to be a more accurate model, Dr. MacDonald computed a smaller 1.606 percentage point average primacy effect in West Virginia elections. Tr. 561; Sec'y's Ex. 32, at 7, 24, ECF No. 105-44.

After listening to the expert witnesses, it is evident to the Court that accurately measuring the primacy effect requires a high degree of skill and experience given that slight changes in modeling can significantly alter results. It is also evident that the more one studies a phenomenon, the more adept that person becomes at choosing the appropriate method to draw conclusions from a large data set. The Court does not assume Dr. Krosnick's credibility based on his

2020 WL 4582414

qualifications, but his professional achievements demonstrate that his methods for studying the primacy effect have been subjected to the highest academic scrutiny. And while the Court has no doubts regarding Dr. MacDonald's competency in quantitative research methods, his inexperience in studying the primacy effect in elections seriously undermines the reliability of his opinions in this case. Dr. MacDonald has never studied name order effects or published a research paper on the topic. Tr. 526. He has not thoroughly reviewed the existing literature on the primacy effect in elections. Tr. 439, 526. And the data set compiled by Dr. Krosnick for this case is the only data set related to the primacy effect and voter behavior that Dr. MacDonald has ever looked at. Tr. 529.

**\*14** Having considered the criticisms raised by Dr. MacDonald, the Court concludes that none of them convincingly call into question Dr. Krosnick's methodological judgments. In his direct examination, Dr. Krosnick anticipated and responded to many of these criticisms. For example, in response to Dr. MacDonald's concerns about outliers, Dr. Krosnick explained how he checked the impact of individual observations on his regression and examined possible races or election years that could be outliers. Tr. 178–79. In regard to Dr. MacDonald's concerns about the data's temporal properties, Dr. Krosnick explained that he controlled for a linear time trend, the interaction between time and political party, and for dummy variables for years. Tr. 186–88. Dr. MacDonald also softened some of his criticisms when pressed on the stand by plaintiffs' counsel. For instance, Dr. MacDonald was originally critical of Dr. Krosnick's use of the unemployment rate as an indicator for economic health, but he walked back that criticism when plaintiffs' counsel guided him through Dr. Krosnick's rationale for using the unemployment rate. Tr. 536–40.

For these reasons, the Court finds Dr. Krosnick's methods and conclusions to be far more credible, reasonable, and reliable than Dr. MacDonald's, and the Court confidently adopts Dr. Krosnick's conclusion that first-listed candidates in West Virginia are overwhelmingly likely to receive an approximately 2.94 percentage point advantage. To appreciate the magnitude of the burden created by this effect, the Court must look at its impact on election outcomes. The 2.94 figure is doubled to determine the primacy effect's impact on the margin of victory in a race because the votes gained by one candidate are necessarily lost from the other candidate. Tr. 326–28; Pls.' Ex. 2, at 8–9. Therefore, the Court can reasonably conclude that the outcome of every election in which the first-listed candidate won by a margin

of less than 5.88 percentage points would have been different if the other major party had been listed first instead. Pls.' Ex. 2, at 41–43. Dr. Krosnick identified 105 elections between 1960 and 2018 that would likely have changed if the order of major-party candidates had been flipped. Tr. 197–99, 399–401; Pls.' Ex. 2, at 43, 69–71. These elections include races for President, U.S. Senator, U.S. Representative, State Senator, State Delegate, Secretary of State, Attorney General, Commissioner of Agriculture, and Circuit Court Judge. Tr. 198–99; Pls.' Ex. 2, at 43, 69–71. This total also understates the impact of the primacy effect because Dr. Krosnick used a lower 2.425 calculation of the primacy effect (a figure he later revised to 2.94) and the list does not include gubernatorial races or races excluded from Dr. Krosnick's final data set. Tr. 198–99, 399–401; Pls.' Ex. 2, at 43. While the Court finds the most accurate measure of the average primacy effect in West Virginia is 2.94 percentage points, a primacy effect of 1.606 as calculated by Dr. MacDonald would still significantly impact West Virginia elections. Of the 105 races identified by Dr. Krosnick, 64 have a margin of victory of less than 3.212 percentage points. Pls.' Ex. 2, at 69–71.

In conclusion, the plaintiffs proved that West Virginia's Ballot Order Statute burdens their First and Fourteenth Amendment rights by systemically awarding the highly beneficial first ballot position to candidates based solely on their political party. Although numerically small, a survey of West Virginia elections shows this advantage is frequently outcome-determinative and has a dramatic aggregate effect on West Virginia's political landscape. The Statute is undoubtedly politically discriminatory because it selects which candidate to list first based exclusively on that candidate's political party. In doing so, the Statute burdens the individual plaintiffs' right to vote by diluting votes for candidates whose party the Statute disfavors. And by systemically advantaging one major party over the other, the Statute interferes with the plaintiffs' right to participate in elections on an equal basis with other citizens. Given the discriminatory character and considerable magnitude of the injury imposed by the Statute, weighty state interests are required to justify it.

### C. State's Interests

**\*15** **[29]** **[30]** The Court's second step under the *Anderson/Burdick* standard is to "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed" by the Ballot Order Statute. *Anderson*, 460 U.S. at 789, 103 S.Ct. 1564. The Court must consider the legitimacy and strength of these interests and the extent to

which the interests make it necessary to impose the identified burdens on the plaintiffs' rights. *Id.* The state's interests must "justify the specific restriction ... at issue." *Id.* at 796, 103 S.Ct. 1564.

The Secretary of State's General Counsel Donald Kersey articulated several state interests served by Ballot Order Statute. Many of these interests overlap, and they can be grouped into two basic categories: the effective administration of elections and voting efficiency. First, the Statute serves the effective administration of elections by creating a simple process for determining ballot order that can be easily implemented across the state. Tr. 265–66. In contrast, a rotational ballot ordering system would be more complicated and expensive to administer, including in the preparation of sample ballots. Tr. 276. Second, the Statute serves voting efficiency by creating party-symmetry on the ballot. Tr. 266–67. Because many voters rely on candidates' party affiliation when voting, a symmetrical ballot allows voters to quickly identify and mark their preferred candidates. Tr. 266–67. Symmetrical ballots thus reduce confusion and errors and speed up the voting process. Tr. 266–67. According to Kersey, these efficiencies ultimately increase voters' confidence in the integrity of elections. Tr. 265, 277–79.

The Fourth Circuit affirmed the importance of these interests in *Libertarian Party of Virginia v. Alcorn.* 826 F.3d at 719–21. The court explained that ordering candidates by party "makes the ballot more easily decipherable" and allows voters to "quickly find their preferred choice for a given office, especially when party loyalties influence many voters' decisions." *Id.* Random ordering, on the other hand, can create confusion and "risks requiring voters to decipher lengthy multi-office, multi-candidate ballots in order to find their preferred candidates." *Id.* at 720. And "[f]or each extra minute that a voter spends deciphering his ballot in the voting booth, dozens or more voters may spend another minute in line." *Id.* at 720. Slowing the voting process thus creates a risk of discouraging citizens from exercising their right to vote. *Id.*

While the defendants here assert these same interests, there are two important differences between *Alcorn* and this case. First, the Fourth Circuit held in *Alcorn* that Virginia's ballot order statute imposed "only the most modest burdens" on the appellant's constitutional rights, so the state faced a very low bar in justifying the statute. *Id.* at 717. The constitutional burden imposed here by the Ballot Order Statute is far more significant and requires a weightier set of justifications. Second, in addition to the state's more

general interests involving voting efficiency, the defendants in *Alcorn* articulated another state interest—the preservation of political stability—that specifically justified the division between major and minor parties that gave rise to the alleged constitutional burden. *Id.* at 720. The court held this division served Virginia's interest in political stability because, by enacting a regulation that favored the traditional two-party system, Virginia could "temper the destabilizing effects of party-splintering and excessive factionalism." *Id.* (citation omitted).

\*16  The Eighth Circuit's recent decision in *Pavek v. Donald J. Trump for President, Inc.* is also a helpful example of a state articulating interests that justify the specific feature of the statute producing the constitutional burden. —— F.3d at ——, 2020 WL 4381845, at \*2–3. At issue in *Pavek* was Minnesota's ballot order statute that lists major-party candidates in reverse order of the parties' average vote count in the last general election. *Id.* at ——, 2020 WL 4381845 at \*1. The district court granted a preliminary injunction against the statute, but the Eighth Circuit stayed the injunction pending appeal. *Id.* at ——, 2020 WL 4381845 at \*3. The court explained that the statute was likely constitutional because the state's interests of encouraging political diversity, countering the advantages of incumbency, and discouraging sustained single-party rule all reasonably supported listing candidates in reverse order of popularity. *Id.* Instead of just generally supporting a party-symmetrical ballot, these interests justified the specific criteria used to determine candidates' order.

In contrast to both *Alcorn* and *Pavek*, the state's interests here do not justify the specific feature of the Ballot Order Statute challenged by the plaintiffs. The burden on the plaintiffs' constitutional rights stems from the Statute assigning ballot order based on candidates' partisan affiliation with the presidential candidate who received the most votes in the last election. While all of the state's asserted interests are important, none of them actually support using the Statute's partisan criteria over any other. The state's interests would be just as well served by determining candidates' order by lot or by using some other nondiscriminatory criteria to create a statewide and party-symmetrical ballot order. For this reason, the state's asserted interests do not "make it necessary to burden the plaintiff's rights" in any sense of the phrase. *Anderson*, 460 U.S. at 789, 103 S.Ct. 1564. Therefore, while the state's interests are important and served generally by the statute, the Court finds them to be universally weak as justifications for the actual burden the Statute imposes.

### D. Weighing the Injury Against the State's Interests

**[31]**   **[32]**   **[33]**   **[34]**   **[35]** As its final step under the *Anderson/Burdick* standard, the Court must determine which level of scrutiny to apply and weigh the burdens on the plaintiffs' rights against the defendants' asserted justifications. *Anderson*, 460 U.S. at 789, 103 S.Ct. 1564; *Burdick*, 504 U.S. at 433–34, 112 S.Ct. 2059. Laws imposing "severe" burdens are subject to "strict scrutiny" and must be "narrowly drawn to advance a state interest of compelling importance." *Alcorn*, 826 F.3d at 717 (citations omitted). On the other hand, laws imposing only "reasonable, nondiscriminatory restrictions" or "modest" burdens are usually justified by a state's "important regulatory interests." *Anderson*, 460 U.S. at 788, 103 S.Ct. 1564; *Alcorn*, 826 F.3d at 716–17 (citation omitted). These two forms of scrutiny, however, are only two markers under the "flexible" standard. *Burdick*, 504 U.S. at 434, 112 S.Ct. 2059. The "rigorousness" of the inquiry ultimately "depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Id.*

Strict scrutiny does not apply here. As the Fourth Circuit explained, "the class of laws facing [strict scrutiny] is limited" because "[s]ubjecting too many laws to strict scrutiny would unnecessarily tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Alcorn*, 826 F.3d at 717 (cleaned up) (quoting *Burdick*, 504 U.S. at 433, 112 S.Ct. 2059). The Ballot Order Statute does not belong to this limited class because it denies "neither the right to vote, nor the right to appear on the ballot, nor the right to form or associate in a political organization." *Id.*; *see also Green Party of Tenn. v. Hargett*, 767 F.3d 533, 547 (6th Cir. 2014) (citation omitted) (explaining a restriction is typically not severe if it "does not 'affect a political party's ability to perform its primary functions,' such as organizing, recruiting members, and choosing and promoting a candidate"). The Statute does not create an insurmountable burden, and the state has legitimate interests in administering orderly elections to which the Court owes deference.

**\*17** At the same time, a low form of scrutiny akin to rational basis is also inappropriate. As previously explained, the Statute is not neutral. *See Fusaro*, 930 F.3d at 263 ("[W]hen a court evaluates an electoral regulation, political neutrality is a touchstone for assessing the burden imposed thereby."). It elevates candidates to the top of the ballot to receive the benefit of the primacy effect based solely on partisan affiliation. By doing so, the Statute burdens the plaintiffs' rights in a politically discriminatory way. And while a primacy effect of 2.94 percent is not a large share of total votes, it has been outcome-determinative in dozens of elections, significantly shaping West Virginia politics. The burden created by the primacy effect, therefore, cannot be dismissed as merely "modest." *Alcorn*, 826 F.3d at 716–17 (citation omitted).

The Court thus takes a more rigorous, less deferential approach in determining whether the state's interests are "sufficiently weighty to justify the limitation" imposed by the Statute. *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008) (citation omitted). At issue is a politically discriminatory burden on the plaintiffs' First and Fourteenth Amendment rights. While this burden may seem attenuated, the Supreme Court has instructed courts to conduct a "realistic appraisal" of a challenged statute's effect. *Anderson*, 460 U.S. at 806, 103 S.Ct. 1564. The Fourth Circuit has likewise emphasized looking at a statute's "practical operation." *Fusaro*, 930 F.3d at 259. While the effect of the Statute's discriminatory allocation of ballot order is numerically small, it is highly statistically significant and frequently determines election outcomes in West Virginia. As the Court found based on Dr. Krosnick's testimony, the results of at least 105 elections since 1960 would very likely have changed if the order of major-party candidates had been reversed. Tr. 197–99, 399–401; Pls.' Ex. 2, at 43, 69–71. Forty-six of these elections occurred after the state legislature enacted the Statute in 1991, and these races include significant offices like U.S. Representative, Secretary of State, and Attorney General. Pls.' Ex. 2, at 69–71. As Dr. Krosnick explained, this list of races is underinclusive because he based it on a lower average primacy effect and excluded races for certain offices, including Governor. Tr. 198–99, 399–401; Pls.' Ex. 2, at 43. The Statute therefore has a major practical impact on elections and thereby imposes a substantial burden on the plaintiffs' right to vote and participate in elections on an equal basis with other citizens.

While the state's asserted interests are important, they are extremely weak justifications for the burden imposed by the Statute. The effective administration of elections and voting efficiency are served by a statewide and party-symmetrical ballot order, but they have no relationship to the Statute's specific use of partisan criteria to order the ballot. The state's interests therefore are not directly relevant to the feature of the Ballot Order Statute causing the constitutional burden. And because many nondiscriminatory and easy-to-implement alternatives exist, the state's interests in maintaining a

statewide and party-symmetrical ballot order do not "make it necessary to burden the plaintiff's rights" as the Statute currently does. *Anderson*, 460 U.S. at 789, 103 S.Ct. 1564. At a minimum, the defendants can implement a constitutional ballot ordering scheme simply by determining the order of major-party candidates by lot. *See Koppell v. N.Y. State Bd. of Elections*, 153 F.3d 95, 96 (2d Cir. 1998) (holding state's ordering of candidates by lottery was nondiscriminatory and therefore constitutional); *Mann*, 314 F. Supp. at 679 (ordering the "drawing of candidates' names by lot or other nondiscriminatory means by which each of such candidates shall have an equal opportunity to be placed first on the ballot"), *aff'd*, 398 U.S. 955, 90 S.Ct. 2169, 2170, 26 L.Ed.2d 539. Doing so would alleviate the constitutional burden while preserving all of the efficiencies and benefits of the state's current ballot ordering system. To award candidates from a favored political party an extra 2.94 percentage points in an election would be blatantly unconstitutional. To do the same through the allocation of ballot position without a weighty justification is also unconstitutional. The Court therefore concludes after weighing the substantial burden imposed on the plaintiffs' constitutional rights against the state's weak justifications that West Virginia's Ballot Order Statute violates the First and Fourteenth Amendments.

## IV. PERMANENT INJUNCTION

**\*18** **[36]** **[37]** **[38]** **[39]** Having concluded the Ballot Order Statute is unconstitutional, the Court now considers the plaintiffs' request to permanently enjoin the defendants from enforcing it and to adopt a ballot ordering system that gives similarly situated major-party candidates an equal opportunity for the ballot to list them first. Am. Compl. 17. To obtain a permanent injunction, the plaintiffs must demonstrate: (1) they suffered an irreparable injury; (2) their remedies at law are inadequate; (3) the balance of hardships weighs in their favor; and (4) a permanent injunction would not disserve the public interest. *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006) (citations omitted).

These elements are easily satisfied. First, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion) (citation omitted). And "[c]ourts routinely deem restrictions on fundamental voting rights irreparable injury" because "once the election occurs, there

can be no do-over and no redress." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (citations omitted). Second, monetary damages cannot remedy the violations of the plaintiffs' constitutional rights. *See Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011) (citation omitted) ("[M]onetary damages are inadequate to compensate for the loss of First Amendment freedoms."). Third, the balance of hardships weighs in the plaintiffs' favor because the defendants are "in no way harmed by issuance of an injunction that prevents the state from enforcing unconstitutional restrictions." *Id.* at 302–03 (citation omitted). And fourth, "upholding constitutional rights is in the public interest." *Id.* at 303 (citation omitted); *see also Newsom ex rel. Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) ("Surely, upholding constitutional rights serves the public interest.").

**[40]** The more complicated issue is deciding the injunction's terms. "It is well established ... that a federal district court has wide discretion to fashion appropriate injunctive relief in a particular case." *Richmond Tenants Org., Inc. v. Kemp*, 956 F.2d 1300, 1308 (4th Cir. 1992) (citing *Lemon v. Kurtzman*, 411 U.S. 192, 200, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973)). Here, however, the Court must consider both the need to remedy the plaintiffs' injury as well as the West Virginia legislature's authority to regulate elections. As the Fourth Circuit explained in *Libertarian Party of Virginia v. Alcorn*, extensive debate among the Framers of the Constitution produced a federal system that grants each state's legislature the presumptive authority to regulate elections within its sovereign territory. 826 F.3d 708, 714–16 (4th Cir. 2016). This authority emanates from the text and history of the Constitution, well-established Supreme Court precedent, and the structural principles inherent in American federalism. *Id.* The local administration of elections under our federalist system vitalizes democracy by "allow[ing] for greater individual input and accountability" while avoiding control by "a distant bureaucracy" that appears "out of reach and out of touch." *Id.* at 716. Federal courts, therefore, must be cautious not to overstep their authority in reviewing and remedying state election laws.[9]

**\*19** In light of these principles, the Court concludes that a permanent injunction prohibiting enforcement of the Ballot Order Statute is appropriate but requiring the defendants to adopt a particular alternative is not. Many ballot ordering schemes exist that would not systematically award the advantage of the primacy effect based on party affiliation or impose significant burdens on the state. To mandate one

of the many possibilities would be too great of an intrusion into the sovereignty of West Virginia's political branches. *See Sangmeister v. Woodard*, 565 F.2d 460, 467–68 (7th Cir. 1977) (holding the district court abused its discretion in ordering county clerks to adopt a specific rotational system for ballot placement); *Gould v. Grubb*, 14 Cal.3d 661, 122 Cal.Rptr. 377, 536 P.2d 1337, 1347 (1975) ("[W]e do not believe that it would be appropriate for this court to mandate a single form of procedure that must be followed in every election."). The Court therefore limits its injunction to prohibiting the defendants from implementing the Ballot Order Statute. By virtue of its sovereignty, the state may implement any alternative that comports with the Constitution and other applicable law.

The Court must also decide whether to give the injunction immediate effect considering the imminency of the general election. *See Reynolds v. Sims*, 377 U.S. 533, 585, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (explaining that "under certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief"). At trial, the Court expressed its inclination to withhold relief until after the election because a short period of time remains before the ballot order is set on August 25. W. Va. Code § 3-6-2(d)(2); Stips. ¶¶ 21, 35. Upon further consideration, however, the Court finds immediate relief is appropriate. The Secretary's General Counsel testified that implementing the rotational ballot ordering system sought by the plaintiffs would require several complex changes, including to sample ballot publication and the state's electronic voting machines. Tr. 271–76, 296, 310. The plaintiffs now argue that the state can feasibly implement the technologically simple solution of setting a statewide party order by lot. Pls.' Mem. in Supp. 3–5, ECF No. 109. The defendants do not seriously dispute this conclusion. *See* McCormick's Resp., ECF No. 113; Sec'y of State's Resp., ECF No. 114. In fact, the Secretary represented to the Court that the state's voting machines are programmed to use a consistent statewide party order across all races, and any ballot ordering system that produces a statewide party order does not require an increase in the number of sample ballots. Mot. for Unstayed Final J. Ex. A, at 1, ECF No. 108-1; *see also* Tr. 313 (explaining the voting machines' current firmware is "based on the partisan separation, the partisan form of the ballot"); Sec'y of State's Resp. 15 ("The vendor confirmed that the current software ... is based on consistent party order throughout the ballot and that multiple sample ballots are not needed so long as candidate name

order is the same everywhere."). McCormick similarly did not dispute the technical feasibility of setting major parties' order by lot. McCormick's Resp. 3 ("The defendant makes no claim that there is a technical barrier to changing the order of the ballots."). And the feasibility of this solution is further supported by the fact the state already uses drawings to determine the general election ballot order for candidates running in multi-candidate districts. W. Va. Code § 3-6-2(d) (2). The Secretary's General Counsel testified he is not aware of any problems that have arisen from this method. Tr. 291–92. The feasibility of setting major-party candidates' order by lot is therefore not seriously contested, and this solution would satisfy the First and Fourteenth Amendments while serving the state's asserted interests just as well as the current Statute. The Court does not order the defendants to implement this specific alternative, but it demonstrates that at least one constitutional option that the defendants can implement by August 25 exists. The Court cannot withhold injunctive relief and permit an election to proceed under an unconstitutional law when the defendants can realistically bring the state's ballots into constitutional compliance. Immediate injunctive relief is therefore granted.

## V. CONCLUSION

**\*20** In accordance with the reasoning above, the Court **DECLARES** that West Virginia Code § 3-6-2(c)(3) violates the plaintiffs' rights under the First and Fourteenth Amendments of the United States Constitution. Finding immediate relief appropriate, the Court **GRANTS** the plaintiffs' Motion for the Court to Enter an Unstayed Final Judgment, ECF No. 108. Effective immediately, the Court **PERMANENTLY ENJOINS** the defendants from issuing any ballots prepared following the protocol described in § 3-6-2(c)(3). In place of § 3-6-2(c)(3), the defendants must implement a ballot ordering system that comports with the United States Constitution and other applicable law until the West Virginia legislature adopts a permanent alternative.

Per the Court's authority to monitor the status of injunctive relief, the Court **ORDERS** the defendants to file a notice with the Court explaining the new ballot ordering system the defendants will use in the November 2020 general election once the defendants make this decision. The defendants must notify the Court if they adopt a different ballot ordering system for subsequent elections. And the defendants must notify the Court when the West Virginia legislature adopts a permanent alternative to § 3-6-2(c)(3). The defendants must

Nelson v. Warner, --- F.Supp.3d ---- (2020)
2020 WL 4582414

append the text of the state's new ballot order statute to their notice.

**All Citations**

--- F.Supp.3d ----, 2020 WL 4582414

Footnotes

1    Other names for this phenomenon include "position bias,".the "ballot order effect," the "candidate name order effect," the "windfall vote," and the "donkey vote."

2    The parties' stipulations wrongly identify Nelson as a 2016 candidate. Stips. ¶ 5. Nelson's testimony and the 2018 ballot document the correct year. Tr. 92; Pls.' Ex. 8, at 4; *see also November 6, 2018 General Election*, West Virginia State, https://results.enr.clarityelections.com/WV/92360/Web02-state.222648/#/ (last visited Aug. 4, 2020).

3    These members include Michael Angelucci, Jason Barrett, Mick Bates, Nathan Brown, Sammi Brown, Jeff Campbell, Phillip Diserio, John Doyle, Amanda Estep-Burton, Ed Evans, Barbara Evans Fleischauer, Shawn Fluharty, Evan Hansen, William Hartman, Sean Hornbuckle, Cindy Lavender-Bowe, Chad Lovejoy, Rodney Miller, David Pethtel, Rodney Pyles, Larry Rowe, Doug Skaff, Margaret Staggers, Cody Thompson, Tim Tomblin, Danielle Walker, John Williams, and Lisa Zukoff. Tr. 53–55; Pls.' Ex. 7, ECF No. 104-8. Brent Boggs and Mike Pushkin are also running for reelection, but they are unopposed. Tr. 55.

4    The plaintiffs also argued in response to the defendants' motions for summary judgment that the Democratic Party and the Legislative Committee had direct standing based on a diversion of resources, but the Court rejected this theory of injury for lack of evidence. Mem. Op. 10–12, ECF No. 87. The plaintiffs did not renew this argument for standing at trial, so the Court does not address it here.

5    At several points in the trial, the defendants misinterpreted Dr. Krosnick as concluding that the primacy effect occurs in 80 to 85 percent of elections and does not occur in 15 to 20 percent of elections. *E.g.* Tr. 398, 401. This is an inaccurate extrapolation from the probability of the primacy effect occurring in an individual election.

6    For this reason, Nelson's candidacy in either the 2018 or the 2020 election is sufficient for his standing, but the Court also notes that Nelson's candidacy in both elections creates an even greater risk of injury. The probability of the primacy effect not manifesting in either election is a mere 4 percent when the higher 20 percent figure is used to calculate the odds.

7    In reality, this political breeze does not shift often in West Virginia. Voters have favored Republican presidential candidates since George W. Bush in 2000, so the Ballot Order Statute has kept Republican candidates at the top of ballots for the past twenty years without interruption. *See Historical Timeline*, 270 to Win, https://www.270towin.com/historical-presidential-elections/timeline/ (last visited Aug. 4, 2020).

8    Dr. Krosnick performed several regressions, but he bases his ultimate conclusions on the regression included as Table 1 of his May 28, 2020 expert report. Tr. 164; Pls.' Ex. 4, at 8–10. The Court also notes that the expert witnesses in this case frequently used quantitative research terms like regression without giving a direct definition for the record. However, the Court is comfortable with its grasp of these concepts because their application to this case was explained in testimony, argument, and the parties' expert reports.

9    These concerns do not, however, make this case nonjusticiable. The Court rejected McCormick's argument that the political question doctrine bars this suit in its Memorandum Opinion and Order denying the defendants' motions for summary judgment. Mem. Op. 15–20, ECF No. 87; *see also Pavek v. Donald J. Trump for President, Inc.*, No. 20-2410, —— F.3d ——, ——, 2020 WL 4381845, at *1 (8th Cir. July 31, 2020) (explaining that judicially manageable standards exist to adjudicate a challenge to Minnesota's ballot order statute).

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

7

KeyCite Blue Flag – Appeal Notification
Petition for Certiorari Docketed by JOSEPH B. SCARNATI, III, ET AL. v.
PENNSYLVANIA DEMOCRATIC PARTY, ET AL., U.S., October 30, 2020

238 A.3d 345
Supreme Court of Pennsylvania.

PENNSYLVANIA DEMOCRATIC PARTY,
Nilofer Nina Ahmad, Danilo Burgos,
Austin Davis, Dwight Evans, Isabella
Fitzgerald, Edward Gainey, Manuel M.
Guzman, Jr., Jordan A. Harris, Arthur
Haywood, Malcolm Kenyatta, Patty H.
Kim, Stephen Kinsey, Peter Schweyer,
Sharif Street, and Anthony H. Williams
v.
Kathy BOOCKVAR, in her Capacity
as Secretary of the Commonwealth of
Pennsylvania; Adams County Board
of Elections; Allegheny County Board
of Elections; Armstrong County Board
of Elections; Beaver County Board
of Elections; Bedford County Board
of Elections; Berks County Board of
Elections; Blair County Board of Elections;
Bradford County Board of Elections;
Bucks County Board of Elections; Butler
County Board of Elections; Cambria
County Board of Elections; Cameron
County Board of Elections; Carbon County
Board of Elections; Centre County Board
of Elections; Chester County Board
of Elections; Clarion County Board of
Elections; Clearfield County Board of
Elections; Clinton County Board of
Elections; Columbia County Board of
Elections; Crawford County Board of
Elections; Cumberland County Board
of Elections; Dauphin County Board of
Elections; Delaware County Board of
Elections; Elk County Board of Elections;
Erie County Board of Elections; Fayette
County Board of Elections; Forest County
Board of Elections; Franklin County
Board of Elections; Fulton County Board
of Elections; Greene County Board of
Elections; Huntingdon County Board
of Elections; Indiana County Board
of Elections; Jefferson County Board
of Elections; Juniata County Board of
Elections; Lackawanna County Board
of Elections; Lancaster County Board
of Elections; Lawrence County Board
of Elections; Lebanon County Board of
Elections; Lehigh County Board of
Elections; Luzerne County Board of
Elections; Lycoming County Board
of Elections; Mckean County Board
of Elections; Mercer County Board
of Elections; Mifflin County Board of
Elections; Monroe County Board of
Elections; Montgomery County Board
of Elections; Montour County Board
of Elections; Northampton County
Board of Elections; Northumberland
County Board of Elections; Perry County
Board of Elections; Philadelphia County
Board of Elections; Pike County Board
of Elections; Potter County Board of
Elections; Schuylkill County Board
of Elections; Snyder County Board of
Elections; Somerset County Board of
Elections; Sullivan County Board of
Elections; Susquehanna County Board of
Elections; Tioga County Board of Elections;
Union County Board of Elections;
Venango County Board of Elections;

Warren County Board of Elections;
Washington County Board of Elections;
Wayne County Board of Elections;
Westmoreland County Board of Elections;
Wyoming County Board of Elections;
and York County Board of Elections
Petition of: Kathy Boockvar, in
Her Capacity as Secretary of the
Commonwealth of Pennsylvania

No. 133 MM 2020
|
Submitted: September 8, 2020
|
Decided: September 17, 2020

**Synopsis**
**Background:** Democratic party, elected officials, and congressional candidates petitioned for review against Secretary of the Commonwealth and county election boards, seeking declaratory and injunctive relief regarding various aspects of mail-in voting and the poll watcher residency requirement. Secretary's application for the Supreme Court to exercise extraordinary jurisdiction was granted, and applications to intervene by Republican party and elected officials were granted.

**Holdings:** The Supreme Court, No. 133 MM 2020, Baer, J., held that:

[1] Election Code permits county boards to accept hand-delivered mail-in ballots at locations other than their office addresses including drop-boxes;

[2] three-day extension of absentee and mail-in ballot received-by deadline was warranted;

[3] county boards were not required to provide opportunity to cure mail-in and absentee ballots that were filled out incompletely or incorrectly;

[4] an elector's failure to enclose mail-in ballot in the secrecy envelope renders the ballot invalid; and

[5] statute imposing residency requirement on being poll watcher did not violate due process, equal protection, free speech, and association rights.

Relief granted in part and denied in part.

Wecht, J., filed concurring opinion.

Saylor, Chief Justice, filed concurring and dissenting opinion in which Mundy, J., joined.

Donohue, J., filed concurring and dissenting opinion in which Saylor, Chief Justice, and Mundy, J., joined in part.

Mundy, J., filed dissenting opinion.

West Headnotes (22)

**[1]** **Appeal and Error**  ⬥  Plenary, free, or independent review
**Appeal and Error**  ⬥  De novo review
The Supreme Court's standard of review over a pure question of law is de novo and the scope of review is plenary.

**[2]** **Declaratory Judgment**  ⬥  Liberal or strict construction
The Declaratory Judgments Act is to be liberally construed and administered. 42 Pa. Cons. Stat. Ann. § 7531 et seq.

**[3]** **Election Law**  ⬥  Liberal or strict construction
The Election Code should be liberally construed so as not to deprive, inter alia, electors of their right to elect a candidate of their choice. 25 Pa. Stat. Ann. § 2601 et seq.

1 Cases that cite this headnote

**[4]** **Injunction**  ⬥  Conduct of elections
Democratic party was not entitled to affirmative injunction requiring that county election boards evaluate particular facts and circumstances in

their jurisdictions and develop reasonable plan reflecting needs of citizens to ensure expedient return of mail-in ballots, where clear right to relief was required for injunction, and there was no legal authority that would have allowed Supreme Court to mandate that county boards take such action.

**[5]**    **Election Law**  ⟜  Construction and Operation

The policy in the Commonwealth, when construing election laws, is to protect the elective franchise.

**[6]**    **Election Law**  ⟜  Liberal or strict construction

Although election laws must be strictly construed to prevent fraud, they ordinarily will be construed liberally in favor of the right to vote.

1 Cases that cite this headnote

**[7]**    **Election Law**  ⟜  Construction and Operation

The goal in construing election laws is to enfranchise and not to disenfranchise the electorate.

**[8]**    **Election Law**  ⟜  Application and delivery

The Election Code permits county boards of election to accept hand-delivered mail-in ballots at locations other than their office addresses including drop-boxes. 25 Pa. Stat. Ann. § 3150.16(a).

3 Cases that cite this headnote

**[9]**    **Election Law**  ⟜  Application and delivery

Three-day extension of absentee and mail-in ballot received-by deadline, to allow for tabulation of ballots mailed by voters via United States Postal Service (USPS) and postmarked by 8:00 p.m. on election day, was warranted due to COVID-19 pandemic and USPS delays; pandemic equated to natural disaster, timeline built into Election Code could not be met by USPS's delivery standards, and extending

deadline on statewide basis would prevent disenfranchisement of voters and prevent chaos and confusion. 25 Pa. Stat. Ann. § 3150.16(c).

7 Cases that cite this headnote

**[10]**    **Constitutional Law**  ⟜  Elections in general

**Constitutional Law**  ⟜  Voting rights and suffrage in general

The Free and Equal Elections Clause of the Pennsylvania Constitution requires that all aspects of the electoral process, to the greatest degree possible, be kept open and unrestricted to the voters of the Commonwealth, and, also, conducted in a manner which guarantees, to the greatest degree possible, a voter's right to equal participation in the electoral process for the selection of his or her representatives in government. Pa. Const. art. 1, § 5.

1 Cases that cite this headnote

**[11]**    **Election Law**  ⟜  Power to Restrict or Extend Suffrage

The state may enact substantial regulation containing reasonable, non-discriminatory restrictions to ensure honest and fair elections that proceed in an orderly and efficient manner.

**[12]**    **Election Law**  ⟜  Scope of Inquiry and Powers of Court or Board

Courts of common pleas have the power, on the day of an election, to decide matters pertaining to the election as may be necessary to carry out the intent of the Election Code, which includes providing an equal opportunity for all eligible electors to participate in the election process. 25 Pa. Stat. Ann. § 3046.

1 Cases that cite this headnote

**[13]**    **Election Law**  ⟜  Rejection of vote by election officers

County election boards were not required to implement a "notice and opportunity to cure" procedure for mail-in and absentee

ballots that voters had filled out incompletely or incorrectly; even though state constitution mandated elections be free and equal, Election Code did not provide for notice and opportunity to cure procedure, and decision to provide such a procedure was best suited for legislature. Pa. Const. art. 1, § 5.

1 Cases that cite this headnote

**[14]    Election Law** ⮞ Mode of voting in general

**Election Law** ⮞ Application and delivery

The secrecy provision language in the Election Code is mandatory and the mail-in elector's failure to comply with such requisite by enclosing the ballot in the secrecy envelope renders the ballot invalid. 25 Pa. Stat. Ann. § 3150.16(a).

1 Cases that cite this headnote

**[15]    Constitutional Law** ⮞ Intent of and Considerations Influencing Legislature

Legislative enactments enjoy the presumption that the General Assembly did not intend to violate constitutional norms, in part because there exists a judicial presumption that the sister branches take seriously their constitutional oaths. 1 Pa. Cons. Stat. Ann. § 1922(3).

**[16]    Constitutional Law** ⮞ Presumptions and Construction as to Constitutionality

A statute is presumed to be valid, and will be declared unconstitutional only if it is shown to be clearly, palpably, and plainly violative of the Constitution.

**[17]    Election Law** ⮞ Constitutionality and validity

In analyzing whether a state election law violates the constitution, courts must first examine the extent to which a challenged regulation burdens one's constitutional rights; upon determining the extent to which rights are burdened, courts can then apply the appropriate level of

scrutiny needed to examine the propriety of the regulation.

**[18]    Election Law** ⮞ Constitutionality and validity

Where a state election regulation imposes a severe burden on a plaintiff's right to vote, strict scrutiny applies and requires that the regulation is narrowly drawn to advance a state interest of compelling importance.

**[19]    Constitutional Law** ⮞ Voting rights and suffrage in general

When a state election law imposes only reasonable, nondiscriminatory restrictions upon the constitutional rights of voters, an intermediate level of scrutiny applies, and the state's important regulatory interests are generally sufficient to justify the restrictions.

**[20]    Election Law** ⮞ Constitutionality and validity

Where a state election law does not regulate a suspect classification, such as race, alienage, or national origin, or burden a fundamental constitutional right, such as the right to vote, the state need only provide a rational basis for its imposition.

**[21]    Constitutional Law** ⮞ Elections in general

**Constitutional Law** ⮞ Polling places

**Constitutional Law** ⮞ Elections, Voting, and Political Rights

**Constitutional Law** ⮞ Voters, candidates, and elections

**Election Law** ⮞ Presence of representatives of candidates or parties

Statute imposing residency requirement on being poll watcher imposed no burden on one's constitutional right to vote, and thus required only a showing that rational basis existed to validate law on claim that requirement violated due process, equal protection, free speech, and

association rights; right to serve as poll watcher was conferred by statute rather than constitution, poll watching was not incidental to right of free association, and poll watching did not implicate core political speech. U.S. Const. Amends. 1, 14; 25 Pa. Stat. Ann. § 2687(b).

1 Cases that cite this headnote

**[22]** **Constitutional Law** ⟜ Elections in general

**Constitutional Law** ⟜ Polling places

**Constitutional Law** ⟜ Elections, Voting, and Political Rights

**Constitutional Law** ⟜ Voters, candidates, and elections

**Election Law** ⟜ Presence of representatives of candidates or parties

Statute imposing residency requirement on being poll watcher did not violate due process, equal protection, free speech, and association rights, despite contention that poll watchers were vital to protect against voter fraud and residency requirement made it difficult to identify poll watchers in all precincts; General Assembly chose county-based scheme for conducting elections, making it reasonable to require poll watchers, who served within various counties of state, to be residents of counties in which they served, and there was no indication that there was heightened election fraud involving mail-in voting. U.S. Const. Amends. 1, 14; 25 Pa. Stat. Ann. § 2687(b).

1 Cases that cite this headnote

## Attorneys and Law Firms

**\*349** Kathleen Marie Kotula, Nicole Jeanne Boland, Pennsylvania Department of State, John Bartley Delone, Timothy Eugene Gates, Mary Abbegeal Giunta, Pennsylvania Governor's Office, Howard Greeley Hopkirk, Sean Andrew Kirkpatrick, Karen Mascio Romano, Pennsylvania Office of Attorney General, Stephen Moniak, Josh Shapiro, Attorney General of the Commonwealth of Pennsylvania, Kenneth Lawson Joel, Harrisburg, Richard Louis Armezzani, Myers, Brier & Kelly, LLP, Daniel Thomas Brier, John B. Dempsey,

Donna Ann Walsh, Myers, Brier & Kelly, LLP, Scranton, Susan M. Davies, Daniel T. Donovan, Michael A. Glick, Kirkland & Ellis LLP, Washington, DC, Daniel Barrett Mullen, Pennsylvania Office of Attorney General, Pittsburgh, for Petitioner Kathy Boockvar.

Richard P. Limburg, Obermayer, Rebmann, Maxwell & Hippel, LLP, Philadelphia, Jonathan Lienhard, Shawn Sheehy, Jason Torchinsky, Holtzman Vogel Josefiak and Torchinsky, LLP, Haymarket, VA, for Intervenors—Appellees Jake Corman, Joseph Scarnati.

Mark Alan Aronchick, Hangley, Aronchick, Segal, Pudlin & Schiller, Michele D. Hangley, John Brent Hill, Hangley, Aronchick, Robert Andrew Wiygul, Segal, Pudlin & Schiller, Philadelphia, for Respondents Bucks County Board of Elections, Chester County Board of Elections, Montgomery County Board of Elections, Philadelphia County Board of Elections.

William Gleason Barbin, Ebensburg, for Respondent Cambria County Board of Elections.

Thomas M. Caffrey, Lehigh County Department of Law, Coplay, Sarah Mae Murray, Allentown, for Respondent Lehigh County Board of Elections.

Larry E. Coploff, Coploff, Ryan, Welch & Houser Lock Haven, for Respondent Clinton County Board of Elections.

Jonathan Lee DeWald, McNerney, Allen P. Page, IV, Page, Vanderlin & Hall, Williamsport, for Respondent Union County Board of Elections.

Elizabeth A. Dupuis, Babst Calland Clements and Zomnir PC, State College, for Respondents Armstrong County Board of Elections, Bedford County Board of Elections, Blair County Board of Elections, Centre County Board of Elections, Columbia County Board of Elections, Dauphin County Board of Elections, Fayette County Board of Elections, Huntingdon County Board of Elections, Indiana County Board of Elections, Lackawanna County Board of Elections, Lawrence County Board of Elections, Lebanon County Board of Elections, Mercer County Board of Elections, Montour County Board of Elections, Northampton County Board of Elections, Northumberland County Board of Elections, Venango County Board of Elections, and York County Board of Elections.

Christopher P. Gabriel, Cafardi Ferguson Wyrick Weis & Gabriel LLC, for Respondents Clarion County Board of Elections and Tioga County Board of Elections.

Gerard Joseph Geiger, Newman Williams, P.C., Stroudsburg, for Respondents Carbon County Board of Elections, Monroe County Board of Elections, Pike County Board of Elections, Snyder County Board of Elections, Wayne County Board of Elections.

Kevin Michael Greenberg, Anthony Michael Pratt, Adam R. Roseman, Greenberg Traurig, LLP, Philadelphia, Alex Michael Lacey, Clifford B. Levine, Dentons Cohen & Grigsby P.C., Pittsburgh, for Respondent Pennsylvania Democratic Party, et al.

Robert Eugene Grimm, Law Office of Robert Eugene Grimm, Smithfield, for Respondent Greene County Board of Elections.

Robert J. Grimm, for Swartz Campbell, LLC, Pittsburgh, for Respondent Washington County Board of Elections.

Christina Lee Hausner, Lancaster County Solicitor's Office, Lancaster, for Lancaster County Board of Elections.

Frank J. Lavery, Jr., Stephen Bradley Edwards, Andrew W. Norfleet, Lavery Law PC, Harrisburg, for Respondents Franklin County Board of Elections and Perry County Board of Elections.

Lawrence John Moran, Jr., Joyce, Carmody & Moran, P.C., Pittston, for Respondent Luzerne County Board of Elections.

Sean Alexander Mott, Adams County Solicitor's Office, Molly Ruth Mudd, Gettysburg, for Respondent Adams County Board of Elections.

David Allen Regoli, Westmoreland County Sheriff's Office, Greensburg, for Respondent Westmoreland County Board of Elections.

Edward David Rogers, Terence Martin Grugan, Elizabeth Victoria Wingfield, Ballard Spahr LLP, Philadelphia, for Respondent Delaware County Board of Elections.

Robert D. Schaub, Rosenn, Jenkins & Greenwald, LLP, Wilkes-Barre, for Respondent Susquehanna County Board of Elections.

Steven B. Silverman, Babst Calland Clements and Zomnir PC, Pittsburgh, for Respondents Armstrong County Board of Elections, Bedford County Board of Elections, Blair County Board of Elections, Centre County Board of Elections, Columbia County Board of Elections, Dauphin County Board of Elections, Fayette County Board of Elections, Huntingdon County Board of Elections, Indiana County Board of Elections, Lackawanna County Board of Elections, Lawrence County Board of Elections, Mercer County Board of Elections, Montour County Board of Elections, Venango County Board of Elections, and York County Board of Elections.

Stephen S. Snook, BMZ Law, PC, Lewistown, for Respondent Mifflin County Board of Elections.

Gregory Dale Sobol, Zwick & Zwick LLP, Brookville, Carl John Zwick, Zwick & Zwick LLP, Dubois, for Respondent Jefferson County Board of Elections.

Christine D. Steere, Deasey, Mahoney & Valentini, Ltd., Media, for Respondent Berks County Board of Elections.

Andrew Francis Szefi, George M. Janocsko, Allan Joseph Opsitnick, Allegheny County Law Department, Pittsburgh, for Respondent Allegheny County Board of Elections.

Thomas S. Talarico, Talarico & Associates, Erie, for Respondent Erie County Board of Elections.

Thomas George Wagner, Meyer Wagner Brown & Kraus, Saint Marys, for Respondent Elk County Board of Elections.

H. William White, III, Butler County Solicitor's Office, Butler, for Respondent Butler County Board of Elections.

Regina Marie Blewitt, Joyce, Carmody & Moran, P.C., Pittston, for Respondent Luzerne County Board of Elections.

Timothy Patrick Brennan, Richard Eugene Santee, Brian J. Taylor, Easton, for Respondent Northampton County Board of Elections.

Robert Lawrence Gawlas, Rosenn, Jenkins & Greenwald, LLP, Wilkes-Barre, for Respondent Susquehanna County Board of Elections.

William J. Madden, William J. Madden PC, Sharon, for Respondent Mercer County Board of Elections.

Ryan Michael Joyce, Swartz Campbell, LLC, Pittsburgh, for Respondent Washington County Board of Elections.

Nathan W. Karn, Hollidaysburg, for Respondent Blair County Board of Elections.

Sean Robert Keegan, Babst Calland Clements and Zomnir PC, Pittsburgh, for Respondents Armstrong County Board of Elections, Bedford County Board of Elections, Blair County Board of Elections, Centre County Board of Elections, Columbia County Board of Elections, Dauphin County Board of Elections, Fayette County Board of Elections, Huntingdon County Board of Elections, Indiana County Board of Elections, Lackawanna County Board of Elections, Lawrence County Board of Elections, Lebanon County Board of Elections, Mercer County Board of Elections, Montour County Board of Elections, Northumberland County Board of Elections, Venango County Board of Elections, and York County Board of Elections.

Krista Ann M. Staley, Babst, Calland, Clements and Zomnir, P.C., Pittsburgh, for Respondents Armstrong County Board of Elections, Bedford County Board of Elections, Blair County Board of Elections, Centre County Board of Elections, Columbia County Board of Elections, Dauphin County Board of Elections, Fayette County Board of Elections, Huntingdon County Board of Elections, Indiana County Board of Elections, Lackawanna County Board of Elections, Lawrence County Board of Elections, Lebanon County Board of Elections, Montour County Board of Elections, Northumberland County Board of Elections, Venango County Board of Elections, and York County Board of Elections.

Kathleen A. Gallagher, Russell David Giancola, Devin Arlie Winklosky, Porter Wright Morris & Arthur LLP, Pittsburgh, for Intervenor – Appellee Republican Party of Pennsylvania, Possible Intervenors Donald J. Trump for President, Inc., Republican National Committee.

Tara Lynn Hazelwood, Pennsylvania House of Representatives, Harrisburg, Pennsylvania House of Representatives Democratic Caucus, Amicus Curiae.

Lori A. Martin, Wilmer Cutler Pickering Hale and Dorr LLP, New York, Common Cause Pennsylvania, Patricia M. Demarco, League of Women Voters of Pennsylvania, Make the Road Pennsylvania, Robinson, Danielle Graham, The Black Political Empowerment Project, Kathleen Wise, Amici Curiae, Common Cause Pennsylvania, Patricia M. DeMarco, League of Women Voters of Pennsylvania, Make the Road Pennsylvania, Danielle Graham Robinson, The Black Political Empowerment Project, Kathleen Wise, Possible Intervenors.

Ralph J. Teti, Willig, John R. Bielski, Williams & Davidson, Philadelphia, Pennsylvania AFL-CIO, et al, Amicus Curiae.

Claude Joseph Hafner, II, Pennsylvania State Senate, Harrisburg, for Senate Democratic Leader, State Senator Jay Costa, et al., Possible Intervenor.

SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.

## OPINION

JUSTICE BAER

**\*\*1 \*352** In October 2019, the General Assembly of the Commonwealth of Pennsylvania enacted Act 77 of 2019, which, *inter alia*, created for the first time in Pennsylvania the opportunity for all qualified electors to vote by mail, without requiring the electors to demonstrate their absence from the voting district on Election Day, 25 P.S. §§ 3150.11-3150.17. The Pennsylvania Democratic Party and several Democratic elected officials and congressional candidates, some in their official capacity and/or as private citizens (collectively, "Petitioner"), filed the instant action, initially in the Commonwealth Court, in the form of a petition for review seeking declaratory and injunctive relief relating primarily to five issues of statutory interpretation involving Act 77 and the Election Code, 25 P.S. §§ 2600-3591.[1] This Court exercised Extraordinary Jurisdiction to address these issues and to clarify the law of this Commonwealth in time for the 2020 General Election.[2]

## I. FACTS AND PROCEDURAL HISTORY

On July 10, 2020, Petitioner filed its petition for review in the Commonwealth Court against Secretary of the Commonwealth Kathy Boockvar ("Secretary") and all 67 county election boards ("Boards").[3] In its petition, Petitioner requested that the Commonwealth Court issue declaratory and injunctive relief "so as to protect the franchise of absentee and mail-in voters." Petition for Review ("Petition"), 7/10/2020, at 5.[4]

**\*\*2** Specifically, Petitioner raised several discrete issues for the Commonwealth Court's consideration, which are discussed in more detail *infra*. Briefly, in Count 1, Petitioner requested declaratory relief to **\*353** confirm that Act 77 permits Boards "to provide secure, easily accessible locations as the Board deems appropriate, including, where appropriate,

Case 4:20-cv-02078-MWB Document 176-1 Filed 11/19/20 Page 147 of 205
Pennsylvania Democratic Party v. Boockvar, 238 A.3d 345 (2020)

2020 WL 5554644

mobile or temporary collection sites, and/or drop-boxes for the collection of mail-in ballots." *Id.* at 47, ¶ 165. Additionally, Petitioner sought an injunction requiring the Boards to "evaluate the particular facts and circumstances in their jurisdictions and develop a reasonable plan ... to ensure the expedient return of mail-in ballots." *Id.* at ¶ 166.

In Count 2, Petitioner sought an injunction to "lift the deadline in the Election Code across the state to allow any ballot postmarked by 8:00 p.m. on Election Night to be counted if it is received by the Boards" by 5:00 p.m. on Tuesday, November 10, which is the deadline for ballots to be received under the Federal Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA").[5] *Id.* at 50, ¶ 178. In the alternative, Petitioner posited that the Commonwealth Court could, with a few caveats, "enjoin the Counties to extend a more tailored ballot extension deadline to the date that is 21 days after the particular voter's ballot is mailed by the county[.]" *Id.* at ¶ 179.

In Count 3, Petitioner highlighted that the "procedure for mail-in ballots often leads to minor errors, which result in many ballots being rejected and disenfranchising voters who believe they have exercised their right to vote."*Id.* at 51, ¶ 186. In anticipation of these expected errors, Petitioner again sought an injunction requiring Boards that have knowledge of an incomplete or incorrectly filled out ballot and the elector's contact information to contact the elector and provide them "the opportunity to cure the facial defect until the UOCAVA deadline." *Id.* at 52, ¶ 187.

In Count 4, Petitioner requested a declaration that there is no statutory authority to set aside an absentee or mail-in ballot solely for failure to place it into the official election ballot envelope (hereinafter referred to as the "secrecy envelope"), as well as an injunction prohibiting any "naked ballots," which are otherwise without error, from being invalidated.[6]*Id.* at 54, ¶ 198-199. A "naked ballot" refers to an official mail-in ballot that is not placed in the secrecy envelope before mailing.

Finally, in Count 5, Petitioner sought a declaration that the "Election Code's poll watcher residency requirement does not violate the United States Constitution's First and Fourteenth Amendments, its Equal Protection Clause, or the Equal Protection and Free and Equal Elections Clauses of the Pennsylvania Constitution." *Id.* at 55, ¶ 207.

On August 13, 2020, the Secretary filed an Answer and New Matter to the petition. In addition, twenty of the named Boards filed answers with new matter, fourteen of the Boards filed answers, and nine of the Boards filed preliminary objections.[7] Requests *354 to intervene were filed by Donald J. Trump for President, Inc., the Republican Party of Pennsylvania, and the RNC, as well as Joseph B. Scarnati III, President Pro Tempore, and Jake Corman, Majority Leader of the Pennsylvania Senate, in opposition to the petition. The Common Cause Pennsylvania, The League of Women Voters of Pennsylvania, The Black Political Empowerment Project ("B-PEP"), Make the Road Pennsylvania, a project of Make the Road States ("Make the Road PA"), Patricia M. DeMarco, Danielle Graham Robinson, and Kathleen Wise filed a joint application to intervene as co-petitioners.

**3 On August 16, 2020, the Secretary filed an application asking this Court to exercise extraordinary jurisdiction over Petitioner's petition for review.[8] Highlighting, *inter alia*, the two major political parties' "diametric positions" on the interpretation of several Act 77 provisions and the fast-approaching 2020 General Election, the Secretary asserted that "[t]he exercise of extraordinary jurisdiction by this Court is the only means available to resolve these disputes without disrupting the election." Secretary's Application for Extraordinary Relief, 8/16/2020, at 14-16. On August 19, 2020, Petitioner filed an Answer to the Secretary's application, noting that it had no objection to this Court exercising its extraordinary jurisdiction.[9]

Faced with a national election scheduled to occur on November 3, 2020 and substantial legal issues that required the highest court of Pennsylvania's analysis and response to ensure a free and fair election, on September 1, 2020, this Court granted the Secretary's Application and set forth a schedule for supplemental briefing and filings.[10] Later, on September 3, 2020, this *355 Court filed an order granting the motions to intervene filed by the Republican Party of Pennsylvania (hereinafter, "Respondent") and Joseph B. Scarnati III, Pennsylvania Senate President Pro Tempore, and Jake Corman, Senate Majority Leader, representing the Republican Senate Caucus (hereinafter, "Caucus"). Applications to intervene filed by Donald J. Trump for President, Inc., and the RNC; Common Cause of Pennsylvania, the League of Women Voters of Pennsylvania, B-PEP, Make the Road PA, Patricia M. DeMarco, Danielle Graham Robinson, and Kathleen Wise were denied without prejudice to the parties' ability to file briefs as *amicus curiae* pursuant to Pa.R.A.P. 531.[11] The parties have submitted supplemental filings in support of their respective positions,

and this matter is now ripe for disposition of the discrete five legal issues before us.

## II. RELEVANT OVERARCHING PRINCIPLES OF LAW

**\*\*4 [1]** Generally speaking, each of the five issues presented by Petitioner presents a pure question of law, over which our standard of review is *de novo* and our scope of review is plenary. *In re Vencil*, 638 Pa. 1, 152 A.3d 235, 241 (2017). Specifically, in large part, Petitioner requests relief in the form of declarations of law regarding Act 77 pursuant to the Declaratory Judgments Act, 42 Pa.C.S. §§ 7531-7541. Accordingly, we address the issues presented mindful of the following.

**[2]** The Declaratory Judgments Act, which is to be liberally construed and administered, was promulgated to "settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations[.]" 42 Pa.C.S. § 7541(a). Pertinent to the instant matter, this Act provides, in relevant part, that "[a]ny person ... whose rights, status, or other legal relations are affected by a statute ... may have determined any question of construction or validity arising under the ... statute ... and obtain a declaration of rights, status, or other legal relations thereunder." 42 Pa.C.S. § 7533.[12]

When presented with matters of statutory construction, this Court is guided by Pennsylvania's Statutory Construction Act, 1 Pa.C.S. § 1501-1991. Under this **\*356** Act, "the object of all statutory construction is to ascertain and effectuate the General Assembly's intention." *Sternlicht v. Sternlicht*, 583 Pa. 149, 876 A.2d 904, 909 (2005) (citing 1 Pa.C.S. § 1921(a) ("The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly")). When the words of a statute are clear and unambiguous, "the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b); *see also Sternlicht, supra.* However, when the words of a statute are not explicit, the General Assembly's intent is to be ascertained by consulting a comprehensive list of specific factors set forth in 1 Pa.C.S. § 1921(c). *See also Pennsylvania Associated Builders & Contractors, Inc. v. Commonwealth Dep't of Gen. Servs.*, 593 Pa. 580, 932 A.2d 1271, 1278 (2007) (recognizing that when the "words of the statute are not explicit, the General Assembly's intent is to be ascertained by considering matters other than statutory language, like the occasion and necessity for the statute; the

circumstances of its enactment; the object it seeks to attain; the mischief to be remedied; former laws; consequences of a particular interpretation; contemporaneous legislative history; and legislative and administrative interpretations").

Moreover, we recognize that in this Commonwealth, "[e]lections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." Pa. Const. art. I, § 5 (hereinafter referred to as the "Free and Equal Elections Clause"). The broad text of this specific provision "mandates clearly and unambiguously, and in the broadest possible terms, that *all* elections conducted in this Commonwealth must be 'free and equal.' " *League of Women Voters v. Commonwealth*, 645 Pa. 1, 178 A.3d 737, 804 (2018) (emphasis in original). Stated another way, this clause was "specifically intended to equalize the power of voters in our Commonwealth's election process[.]" *Id.* at 812.

**\*\*5 [3]** Finally, this Court has previously observed that the purpose and objective of the Election Code, which contains Act 77, is "[t]o obtain freedom of choice, a fair election and an honest election return[.]" *Perles v. Hoffman*, 419 Pa. 400, 213 A.2d 781, 783 (1965). To that end, the Election Code should be liberally construed so as not to deprive, *inter alia*, electors of their right to elect a candidate of their choice. *Id.* at 784. With these general principles in mind, this Court will address in turn each of the five discrete issues presented by Petitioner.

## III. ISSUES

### A. COUNT I OF THE PETITION FOR REVIEW

Section 3150.16(a) of the Election Code, 25 P.S. § 3150.16(a), is part of Act 77 and pertinent to several issues in this matter. That statutory provision, which is entitled "Voting by mail-in electors," states as follows:

**(a) General rule.**--At any time after receiving an official mail-in ballot, but on or before eight o'clock P.M. the day of the primary or election, the mail-in elector shall, in secret, proceed to mark the ballot only in black lead pencil, indelible pencil or blue, black or blue-black ink, in fountain pen or ball point pen, and then fold the ballot, enclose and securely seal the same in the envelope on which is printed, stamped or endorsed "Official Election Ballot." This envelope shall then be placed in the second one, on which is printed the form of declaration of the elector, and the address of the elector's county board of election and the

local election district of **\*357** the elector. The elector shall then fill out, date and sign the declaration printed on such envelope. Such envelope shall then be securely sealed and the elector shall send same by mail, postage prepaid, except where franked, or deliver it in person to said county board of election.

25 P.S. § 3150.16(a). The last sentence of this provision is the primary focus of the first question of law that we will address. The plain language of this sentence allows an elector to mail her securely sealed envelope containing the elector's "Official Election Ballot" to her "county board of election" or, more relevant to this issue, "deliver it in person to said county board of election." *Id.*

[4] In Count I of its petition for review, Petitioner seeks a declaration that a reasonable interpretation of Section 3150.16(a) of the Election Code permits county boards of election to provide electors with as many secure and easily accessible locations to deliver personally their mail-in ballots as each board deems appropriate.[13] Petitioner suggests that these locations can consist of mobile or temporary collection sites and that county boards of election may utilize secure drop-boxes for the collection of hand-delivered mail-in ballots.

**\*\*6** Indeed, Petitioner contends that, by enacting Section 3150.16(a) of the Election Code, the General Assembly clearly and unambiguously intended to provide the various county boards of election with the option of accepting hand-delivered mail-in ballots at any location controlled by the boards, not just at the boards' central offices. In support of this position, Petitioner points out, *inter alia*, that pursuant to Section 3151 of the Election Code, the General Assembly empowered each county board of election to receive "ballot boxes and returns" in their offices or "in any such other place as has been designated by the board."[14] 25 P.S. § 3151.

The Secretary builds on Petitioner's argument. In so doing, the Secretary highlights that, in construing Section 3150.16(a) of the Election Code, the Court should consider that the General Assembly defined "county board" or "board" as meaning "the county board of elections of any county herein provided for." 25 P.S. § 2602. According to the Secretary, this **\*358** definition clarifies that, for purposes of Section 3150.16(a), "county board of election" refers to a municipal body, not a physical office or address. In other words, the Secretary believes that, when this definition is used for purposes of Section 3150.16(a), that Section unambiguously permits voters to deliver mail-in ballots in person to places

designated by county boards of election, other than their respective office addresses.

In further support of this position, the Secretary asserts that the Election Code contemplates that county boards of election will operate out of multiple locations. *See* 25 P.S. § 2645(b) (stating, *inter alia*, that the "county commissioners or other appropriating authorities of the county shall provide the county board with suitable and adequate offices at the county seat, property furnished for keeping its records, holding its public sessions and otherwise performing its public duties, and shall also provide, such branch offices for the board in cities other than the county seat, as may be necessary"). Echoing Petitioner's argument, the Secretary further suggests that the Election Code anticipates that "ballot boxes and returns" may be received "in the office of the county elections board, or received in such other places as has been designated by the board." 25 P.S. § 3151.

The Secretary insists that the Election Code is devoid of any language limiting county boards of election from accepting delivery of mail-in votes solely at their primary office addresses. In fact, the Secretary takes the position that to hold otherwise would contravene the plain language of the Election Code. However, assuming *arguendo* that this Court deems the Election Code ambiguous on this point, the Secretary advocates that a reasonable interpretation of the Code nonetheless authorizes county boards of election to utilize multiple drop-off sites to accept hand-delivered mail-in ballots.

In this regard, the Secretary focuses on the statutory considerations to which this Court may refer when construing an ambiguous statute, 1 Pa.C.S. § 1921(c), as described *supra*. More specifically, the Secretary posits that the General Assembly enacted Act 77 with the object of increasing the electorate's participation in the electoral process by making it easier and more convenient to vote, providing all electors with the option to mail in their ballots. The Secretary opines that, consistent with this objective, the General Assembly intended to allow county boards of election to accept hand-delivered mail-in ballots at locations besides the boards' central office addresses. The Secretary takes the position that, if this Court deems reasonable the various parties' competing interpretations of the Election Code, then the Court should construe the Code in favor of the right to vote.

**\*\*7** Contrary to the contentions of the Secretary and Petitioner, Respondent submits that the Election Code

**Pennsylvania Democratic Party v. Boockvar, 238 A.3d 345 (2020)**

2020 WL 5554644

prohibits county boards of election from designating locations other than their established county offices for hand delivery of mail-in ballots. Rather, according to Respondent, Section 3150.16(a) of the Election Code unambiguously mandates that an elector must either mail her mail-in ballot to the office address of the county board of election or deliver that ballot in person to the same office address. Stated differently, Respondent takes the position that the Election Code requires electors either to place their mail-in ballots, addressed to their county boards of election, into the United States Postal Service's ["USPS"] system or personally to deliver their mail-in ballot to that office.

In further support of this position, Respondent highlights the Election Code's **\*359** use of the word "office" in the "deadline" provision for mail-in votes, Section 3150.16(c), which states that "a completed mail-in ballot must be received in the office of the county board of elections no later than eight o'clock P.M. on the day of the primary or election." 25 P.S. § 3150.16(c). Respondent also points out that the Election Code requires that a secure envelope containing a mail-in ballot have printed upon it "the address of the elector's county board of election," so that "the elector shall send same by mail, postage prepaid, except where franked, or deliver it in person to said county board of election." 25 P.S. § 3150.16(a). Thus, Respondent believes that, in sum, these statutory directives clearly indicate that the General Assembly intended that electors either mail or personally deliver mail-in ballots to the established office addresses of the county boards of election.

Next, Respondent reminds us that the Secretary and Petitioner are asking this Court to interpret the Election Code to allow voters to deliver their mail-in ballots to locations that will include unmanned drop-boxes. Respondent contends that Petitioner and the Secretary fail to articulate where the Election Code mentions "drop-boxes" or "satellite locations." Respondent then asserts that, if this Court were to interpret the Election Code as Petitioner and the Secretary propose, the Court would invalidate an alleged requirement of Act 77, *i.e.*, the need to deliver mail-in ballots to the established offices of county boards of election.

In addition, Respondent suggests that the preferred interpretation of the Election Code advocated by the Secretary and Petitioner permits the individual counties to implement differing ballot-return regimes. Respondent avers that this outcome would violate principles of equal protection. In support, Respondent quotes *Pierce v. Allegheny County Bd.*

*of Elections*, 324 F.Supp.2d 684, 697 (W.D. Pa. 2003), for the proposition that "[a] state must impose uniform statewide standards in each county in order to protect the legality of a citizen's vote. Anything less implicates constitutional problems under the equal protection clause of the Fourteenth Amendment." For these reasons, Respondent contends that the interpretation of the Election Code posited by Petitioner and the Secretary must fail.

**\*\*8** The primary argument of the Caucus largely tracks that of Respondent, particularly the contention that the relief proposed by Petitioner and the Secretary would create an equal protection problem. According to the Caucus, pursuant to the solution offered by Petitioner and the Secretary, some counties will provide more locations for voters to deliver their mail-in ballots, while other counties will allow voters to convey their mail-in ballots solely to the office addresses of the county boards of election. The Caucus views this possibility as a violation of equal protection.

Notably, in an apparent break from Respondent's position, subject to its equal protection argument, the Caucus seems to concede that Pennsylvania law allows county boards of election to provide for in person delivery of mail-in ballots at more than one county election board office located within the county's borders. However, the Caucus insists that additional offices must comply with various requirements, including those outlined in Section 2645(b) of the Election Code. See 25 P.S. § 2645(b) (explaining that "[t]he county commissioners or other appropriating authorities of the county shall provide the county board with suitable and adequate offices at the county seat, property furnished for keeping its records, holding its public sessions and otherwise performing its public duties, and shall also provide, such branch offices **\*360** for the board in cities other than the county seat, as may be necessary"). In closing, the Caucus submits that unstaffed drop-boxes would not constitute a branch office of a county board of election and are otherwise not authorized by the Election Code as a method for collecting hand-delivered mail-in ballots.

Turning to our analysis, we observe that the question before us consists of the following two-part query regarding the Election Code: Does the Election Code allow a Pennsylvania voter to deliver her mail-in ballot in person to a location other than the established office address of her county's board of election, and if so, what means can county boards of election utilize to accept hand-delivered mail-in ballots? For the reasons that follow, we find that the parties'

competing interpretations of the Election Code on this issue are reasonable, rendering the Code ambiguous as it relates to this query. *See A.S. v. Pennsylvania State Police*, 636 Pa. 403, 143 A.3d 896, 905-06 (2016) (explaining that a "statute is ambiguous when there are at least two reasonable interpretations of the text").

In reaching this conclusion, we observe that Section 3150.16(a) of the Election Code explicitly allows an elector to deliver in person her securely sealed envelope containing her mail-in ballot "to said county board of election." 25 P.S. § 3150.16(a). The Election Code simply defines "county board" or "board" to mean "the county board of elections of any county herein provided for." 25 P.S. § 2602(c). Thus, the language used by the Legislature regarding where a mail-in ballot may be delivered in person is not solely limited to the official central office of the county board of election, and other sections of the Election Code permit a board of election to operate outside of its principal office. *See, e.g.*, 25 P.S. § 2645(b) (stating, *inter alia*, that the "county commissioners or other appropriating authorities of the county shall provide the county board with suitable and adequate offices at the county seat, property furnished for keeping its records, holding its public sessions and otherwise performing its public duties, and shall also provide, such branch offices for the board in cities other than the county seat, as may be necessary"). Therefore, on the one hand, these provisions tend to favor the view of Petitioner and the Secretary that the General Assembly did not intend to limit voters to delivering personally their mail-in ballots solely to the established office addresses of their county boards of election. Rather, as these parties rationally contend, when this definition is utilized for purposes of construing Section 3150.16(a), that exercise suggests that a voter can hand deliver her mail-in ballot to any location designated by the county board of election as a place where the board will accept these ballots.

**\*\*9**  Alternatively, we recognize that Section 3150.16(a) of the Election Code directs that an elector may deliver her mail-in ballot in person only to "the county board of election." 25 P.S. § 3150.16(a). As Respondent in particular understandably emphasizes, neither this statutory language nor any other provision of the Election Code explicitly empowers a county board of election to establish satellite mail-in ballot collection facilities or to utilize secure drop-boxes for purposes of accepting hand-delivered mail-in ballots. These observations, when viewed in the totality of the various arguments, lead us to conclude that the parties' competing interpretations are reasonable.

**[5]  [6]  [7]**  Accordingly, we turn to interpretive principles that govern ambiguous statutes generally and election matters specifically. In so doing, we are mindful of the "longstanding and overriding policy in this **\*361** Commonwealth to protect the elective franchise." *Shambach v. Bickhart*, 577 Pa. 384, 845 A.2d 793, 798 (2004) (citations omitted). Moreover, it is well-settled that, "although election laws must be strictly construed to prevent fraud, they ordinarily will be construed liberally in favor of the right to vote." *Id.* (internal quotation marks omitted). Indeed, "[o]ur goal must be to enfranchise and not to disenfranchise [the electorate]." *In re Luzerne Cty. Return Bd.*, 447 Pa. 418, 290 A.2d 108, 109 (1972). Lastly, in resolving statutory ambiguity, we may consider, *inter alia*, the occasion and necessity for, the mischief to be remedied by, and the object to be obtained by the statute. 1 Pa.C.S. § 1921(c)(1), (3), and (4), respectively.

With all of that said, we need not belabor our ultimate conclusion that the Election Code should be interpreted to allow county boards of election to accept hand-delivered mail-in ballots at locations other than their office addresses including drop-boxes. This conclusion is largely the result of the clear legislative intent underlying Act 77, which animates much of this case, to provide electors with options to vote outside of traditional polling places. Section 3150.16(a) of the Election Code undeniably exemplifies this intent by granting the Pennsylvania electorate the right to vote by way of a mail-in ballot beyond the circumstances that ordinarily allow this alternative, such as voter absenteeism.

Accordingly, although both Respondent and the Caucus offer a reasonable interpretation of Section 3150.16(a) as it operates within the Election Code, their interpretation restricts voters' rights, as opposed to the reasonable interpretation tendered by Petitioner and the Secretary. The law, therefore, militates in favor of this Court construing the Election Code in a manner consistent with the view of Petitioner and the Secretary, as this construction of the Code favors the fundamental right to vote and enfranchises, rather than disenfranchises, the electorate.

In light of this conclusion, we will briefly address the equal protection argument of Respondent and the Caucus. The premise of that argument, as detailed *supra*, is that, if this Court interprets the Election Code in a manner that is consistent with the position of Petitioner and the Secretary,

which we have, then the county boards of election will employ myriad systems to accept hand-delivered mail-in ballots, which allegedly will be unconstitutionally disparate from one another in so much as some systems will offer more legal protections to voters than others will provide. However, the exact manner in which each county board of election will accept these votes is entirely unknown at this point; thus, we have no metric by which to measure whether any one system offers more legal protection than another, making an equal protection analysis impossible at this time. Accordingly, the equal protection argument of Respondent and the Caucus does not alter our conclusion in this matter.

**10 [8]** Thus, for these reasons, this Court declares that the Election Code permits county boards of election to accept hand-delivered mail-in ballots at locations other than their office addresses including drop-boxes.[15]

## *362 B. COUNT II OF THE PETITION FOR REVIEW

In its second count, Petitioner presents this Court with an as-applied challenge to the Election Code's deadline for receiving ballots ("received-by deadline"), which requires mail-in and absentee ballots to be returned to Boards no later than 8:00 p.m. on Election Day, 25 P.S. §§ 3146.6(c), 3150.16(c). It contends that strict enforcement of this deadline, in light of the current COVID-19 pandemic and alleged delays in mail delivery by the USPS, will result in extensive voter disenfranchisement in violation of the Pennsylvania Constitution's Free and Equal Elections Clause.

As noted above, the Free and Equal Elections Clause provides that "[e]lections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right to suffrage." Pa. Const. art. I, § 5. Petitioner interprets this provision as forbidding the Boards from interfering with the right to vote by failing to act in a timely manner so as to allow electors to participate in the election through mail-in voting. Petition at 49, ¶ 176.

In support of its as-applied challenge in regard to the upcoming General Election, Petitioner recounts this Commonwealth's recent experience during the June Primary. It emphasizes that, during the Primary, the Boards were inundated with over 1.8 million requests for mail-in ballots, rather than the expected 80,000 - 100,000, due in large part to the COVID-19 pandemic, which caused many voters to be wary of congregating in polling places. Petitioner's Brief at 2, 51. Petitioner asserts that "[t]his crush of applications created

massive disparities in the distribution and return of mail-in ballots." Petition at 24, ¶ 70.

It explains that, while some Boards were able to process the requests within the statutory requirements established by Act 77,[16] other boards, especially those in areas hard-hit by the pandemic, were unable to provide electors with ballots in time for the electors to return their ballot in accord with the statutory deadline. Petition at 23, ¶ 66. Indeed, it avers that in Delaware County, thousands of ballots were "not mailed out until the night" of the Primary, making timely return impossible. Petition at 26, ¶ 77. Bucks County apparently experienced similar delays.

**11** To remedy this situation, the Election Boards of Bucks and Delaware Counties sought relief in their county courts.[17] *363 Recognizing that the Election Code "implicitly granted [the courts the] authority to provide relief when there is a natural disaster or emergency" that threatens to deprive electors of the opportunity to participate in the electoral process, the Courts of Common Pleas of Bucks and Delaware Counties extended the deadline for the return of mail-in ballots for seven days, so long as the ballot was postmarked by the date of the Primary. *In re: Extension of Time for Absentee and Mail-In Ballots to be Received By Mail and Counted in the 2020 Primary Election*, No. 2020-02322-37 (C.P. Bucks) (McMaster, J.); *see also In re: Extension of Time for Absentee and Mail-In Ballots to be Received By Mail and Counted in the 2020 Primary Election*, No.-CV 2020-003416 (C.P. Delaware).

Petitioner also observes that voters in six counties received an extension to the return deadline pursuant to an executive order issued by Governor Wolf, invoking the Emergency Management Services Code, 35 Pa.C.S. § 7301(c).[18] In Executive Order No. 2020-02, Governor Wolf addressed impediments to timely ballot return arising from the pandemic as well as civil unrest that had arisen immediately before the Primary in the specified counties following the killing of George Floyd by police officers. The impediments included road closures, public transportation disruptions, and curfews. To combat the potential disenfranchisement of voters, especially in light of the "unprecedented number" of mail-in ballots due to the pandemic, the Governor extended the received-by deadline for seven days, so long as the ballots were postmarked by the date of the Primary. Governor Wolf, Executive Order No. 2020-02 (June 1, 2020).

While voters in specified counties benefitted from extensions of time to return their ballots, Petitioner emphasizes that the Commonwealth Court rejected a request for a statewide extension of the ballot received-by deadline in *Delisle v. Boockvar*, 319 M.D. 2020 (Pa. Cmwlth. June 2, 2020) (Memorandum Opinion), favoring instead a county-by-county remedy. Indeed, while not mentioned by Petitioner, this Court additionally denied relief to a petitioner seeking a statewide extension of the ballot received-by deadline weeks before the June Primary, where the petitioner similarly argued for the extension based upon the overwhelming number of mail-in ballot applications and delays in the USPS system. *Disability Rights Pa. v. Boockvar*, No. 83 MM 2020, —— Pa. ——, 2020 WL 2820467 (May 15, 2020).

In light of the lessons learned from the June Primary, Petitioner asserts that a statewide remedy is now necessary for the General Election. It suggests that the lack of a statewide remedy risks an equal protection challenge as only some voters would benefit from the extended deadline based on their county court's determination. Petition at 32-33, ¶ 105. Moreover, it emphasizes that a statewide order from this Court early in the election process would reduce voter confusion, as compared to the last-minute county-by-county relief granted during the Primary to address emergency situations. Petitioner's Brief at 26-27 n.9.

**\*\*12** Petitioner avers that the difficulties encountered by Boards processing the ballot applications prior to the June Primary will only be exacerbated in the November General Election. It emphasizes the continued grip of the pandemic, and a potential second **\*364** wave of infections, which will result in more electors seeking to exercise their right to vote by mail. Petition at 49, ¶ 173-175. Additionally, it recognizes the undisputed fact that heavily contested Presidential elections involve substantially greater voter participation than largely uncontested primaries, further observing that "[i]t is normal in elections with significant public attention for there to be a flood of registrations received right before deadlines." Petition at 26, ¶ 79. It highlights that the Secretary estimates that 3 million electors will seek mail-in or absentee ballots for the General Election in contrast to the 1.5 million votes cast by mail at the Primary, and the pre-pandemic assumption of 80,000 - 100,000 absentee and mail-in ballots. Petitioner's Brief at 51.

Petitioner asserts that the overwhelming demand on the Boards will be exacerbated by delays in the USPS mail delivery system. Petitioner observes that historically the law

presumed that a document placed in a mail collection box would be delivered within three days of placement, rather than the current two to five day delivery expectation of the USPS. *Id.* at 50. Petitioner avers that substantial delivery delays have resulted from a combination of recent operational changes at the USPS and decreased staffing caused by the pandemic. *Id.* at 20-21. It emphasizes that the USPS recently warned that there is a "significant risk" that Pennsylvania voters who submit timely ballot requests will not have sufficient time to complete and return their ballot to meet the Election Code's received-by deadline. *Id.* at 2-3 (quoting USPS General Counsel and Executive Vice President Thomas Marshall's July 29, 2020 letter to the Secretary (hereinafter "USPS General Counsel's Letter"), discussed in detail *infra*).

Petitioner avers that this Court has the authority to act to protect electors' right to cast their ballot, as protected by Pennsylvania's Free and Equal Elections Clause. It emphasizes that " '[c]ourt[s] possess broad authority to craft meaningful remedies' when 'regulations of law ... impair the right of suffrage.' " *Id.* at 48-49 (quoting *League of Women Voters of Pa.*, 178 A.3d at 809, 822) (alterations in original). It observes that courts have exercised that authority to provide equitable relief to voters faced with natural disasters that impede their right to vote. As an example, Petitioner highlights the Commonwealth Court's actions in *In re General Election-1985*, 109 Pa.Cmwlth. 604, 531 A.2d 836, 838-39 (1987), in which the court affirmed a two-week suspension in an election where severe flooding prevented electors from safely voting due to "circumstances beyond their control." Petitioner asserts that Pennsylvania electors in the November General Election similarly face a threat to their ability to vote due to no fault of their own, but instead due to a perfect storm combining the dramatic increase in requested ballots due to the COVID-19 pandemic and the inability of the USPS to meet the delivery standards required by the Election Code.

Accordingly, Petitioner asks this Court to grant an injunction ordering the Respondent to "lift the deadline in the Election Code across the state in a uniform standard to allow any ballot postmarked by 8 p.m. on Election Night to be counted if it is received by the deadline for ballots to be received" under the UOCAVA, specifically by 5:00 p.m. on Tuesday, November 10.[19] Petition at 50, ¶ 178. Recognizing **\*365** that the Secretary recommends a three-day extension, as detailed below, Petitioner counters that "[a] 7-day extension to the ballot receipt deadline is consistent with the USPS's recommendation to the Secretary that voters should mail their ballots to Boards no later than October 27, 2020," which

is seven days prior to Election Day. Petitioner's Brief at 53 (referencing USPS General Counsel's Letter at 2). While it acknowledges that a seven-day extension could impact other post-election deadlines as discussed *infra*, it asserts that this Court has the authority to alter those deadlines to be consistent with the relief granted in this case. *Id.* at 55.

**\*\*13** As noted, the Secretary sought extraordinary jurisdiction to allow this Court to resolve the various challenges to the mail-in ballot process in an orderly and timely fashion before the impending General Election, where she estimates more than three million Pennsylvanians will exercise their right to vote by mail. Secretary's Brief at 1. The Secretary observes that she previously advocated against a similar request for an extension of the received-by deadline for mail-in and absentee ballots in the *Crossey* case. She, however, reassessed her position following receipt of the USPS General Counsel's Letter, which she attaches to her Application. Secretary's Application at 10, Exhibit A.

Significantly, the USPS General Counsel's Letter opined that "certain deadlines for requesting and casting mail-in ballots are incongruous with the Postal Service's delivery standards," providing for 2-5 day delivery for domestic First Class Mail and 3-10 day delivery for domestic Marketing Mail. USPS General Counsel's Letter at 1. As the parties recognize, the Election Code designates October 27, 2020, as the last day for electors to request a mail-in ballot. 25 P.S. § 3150.12a(a) ("Applications for mail-in ballots shall be processed if received not later than five o'clock P.M. of the first Tuesday prior to the day of any primary or election."). Even if a county board were to process and mail a ballot the next day by First Class Mail on Wednesday, October 28th, according to the delivery standards of the USPS, the voter might not receive the ballot until five days later on Monday, November 2nd, resulting in the impossibility of returning the ballot by mail before Election Day, Tuesday November 3rd. The USPS General Counsel's Letter, instead, advised that voters should mail their ballots no later than October 27, 2020 in order to meet the received-by deadline. USPS General Counsel's Letter at 2. "This mismatch [between the USPS's delivery standards and the Election Code deadlines] creates a risk that ballots requested near the deadline under state law will not be returned by mail in time to be counted under [Pennsylvania's Election Code]." *Id.* at 1.

In light of the information contained in the USPS General Counsel's Letter, the Secretary concludes that a temporary extension of the Election Code's received-by deadline is necessary for the upcoming General Election to ensure a free and equal election as protected by Article I, Section 5 of the Pennsylvania Constitution. Secretary's Application at 27. The Secretary specifically asks that this Court order an extension of the deadline to allow the counting of any ballot postmarked by Election Day and received on or before the third day after Election Day, which is November 6, 2020.[20]*Id.* at 27-28. The Secretary **\*366** deems a three-day extension of the deadline, rather than the seven-day extension sought by Petitioner, to be sufficient to address the potential delay in mailing while also not disrupting other elements of election administration. *Id.* at 29.

**\*\*14** The Secretary emphasizes that the remedy sought here is not the invalidation of the Election Code's received-by deadline, but rather the grant of equitable relief to extend temporarily the deadline to address "mail-delivery delays during an on-going public health disaster." Secretary's Brief at 18. As no party is seeking the invalidation of the received-by deadline, the Secretary rejects the suggestion of Respondent and the Caucus that the remedy would trigger the nonseverability provision of Act 77, reasoning that the Court would be granting "a temporary short extension to address the exigencies of a natural disaster" rather than "the invalidation of a statutory deadline." *Id.* at 21 (referencing Section 11 of Act 77 set forth *infra*). She emphasizes that the statutory deadline would remain unchanged for future elections.

The Secretary observes that courts have previously granted temporary equitable relief to address natural disasters, given that neither the Election Code nor the Constitution "provides any procedure to follow when a natural disaster creates an emergency situation that interferes with an election." *Id.* at 19 (citing *In re General Election-1985*, 531 A.2d at 839).[21] She argues that the current pandemic is equivalent to other natural disasters and that it necessitates the requested extension of the Election Code's received-by deadline for mail-in ballots.

In contrast, Respondent contends that Petitioner asks this Court to rewrite the plain language of Act 77 and to substitute its preferred ballot deadline for the statutory deadline that resulted from the legislative compromise during the bi-partisan enactment of Act 77. It emphasizes that this Court "recently reaffirmed [that] the judiciary 'may not usurp the province of the legislature by rewriting [statutes].' " Respondent's Supplemental Brief at 16 (quoting *In re Fortieth Statewide Investigating Grand Jury*, 649 Pa. 574, 197 A.3d 712, 721 (2018)).

Judicial restraint, according to Respondent, is especially necessary in regard to election law, where this Court has long recognized that "[t]he power to regulate elections is a legislative one, and has been exercised by the General Assembly since the foundation of the government." *Id.* at 17 (quoting *Winston v. Moore*, 244 Pa. 447, 91 A. 520, 522 (1914)). Indeed, it observes that the United States Constitution dictates that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each state by the Legislature thereof," subject to directives of Congress, **\*367** U.S. Const. art. I, § 4, cl. 1, and that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct," electors for President and Vice President. U.S. Const. art. II, § 1, cl. 2.[22] Respondent highlights special concerns relevant to Presidential elections, emphasizing that " '[w]ith respect to a Presidential election,' state courts must 'be mindful of the legislature's role under Article II in choosing the manner of appointing electors.' " Respondent's Supplemental Brief at 20 (quoting *Bush v. Gore*, 531 U.S. 98, 114, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) (Rehnquist, C.J., concurring)).

Respondent additionally warns that if this Court were to deem application of the deadline unconstitutional and substitute a judicially-determined deadline, it would trigger the nonseverability provision of Act 77, which would invalidate the entirety of the Act, including all provisions creating universal mail-in voting. Specifically, Section 11 provides: "Sections 1, 2, 3, 3.2, 4, 5, 5.1, 6, 7, 8, 9 and 12 of this act are nonseverable. If any provision of this act or its application to any person or circumstances is held invalid, the remaining provisions or applications of this act are void." Act 77, § 11. It emphasizes that this Court has previously deemed nonseverability provisions to be constitutionally proper and additionally recognized that nonseverability provisions are crucial to the legislative process as they "may be essential to securing the support necessary to enact the legislation in the first place." Respondent's Supplemental Brief at 18 (citing *Stilp v. Commonwealth*, 588 Pa. 539, 905 A.2d 918, 978 (2006)). Respondent asserts that it is clear that the severability provision in Act 77 "was intended to preserve the compromise struck" in the bipartisan enactment. *Id.* at 19.

**\*\*15** On the merits, Respondent asserts that the plain language of the Election Code setting the deadline for submission of ballots by 8:00 p.m. on Election Day does not violate the Free and Equal Elections Clause but instead provides "a neutral, evenhanded rule that applies to all Pennsylvania voters equally." Respondent's Answer to the Secretary's Application at 21. It emphasizes that numerous courts, including this Court during the June Primary, have upheld the application of mail-in deadlines during the COVID-19 pandemic. Respondent's Supplemental Brief at 24 (citing, *inter alia*, *Disability Rights Pa. v. Boockvar*, No. 83 MM 2020, —— Pa. ——, 2020 WL 2820467 (May 15, 2020)).

Respondent additionally rejects the Secretary's assertion that the deadline should be extended based upon the threat of mail delays. It avers that these concerns are "speculative at best." *Id.* at 25. Moreover, it contends that "given Pennsylvania's unparalleled and generous absentee and mail-in voting period, any voter's inability to cast a timely ballot is not caused by the Election Day received-by deadline but instead by their own failure to take timely steps to effect completion and return of their ballot." *Id.* at 26-27 (internal citation and quotation marks omitted).

Respondent further supports its argument by attaching to its Supplemental Brief a declaration of USPS Vice President Angela Curtis, which in turn attaches the statement provided by Postmaster General Louis DeJoy to the Senate Committee on Homeland Security and Governmental Affairs on August 21, 2020 and his statement of August 24, 2020, to the House Committee on Oversight and Reform. In his statement, **\*368** Postmaster General Louis DeJoy addressed public accusations that the implementation of various cost-saving reforms had allegedly resulted in delays in mail delivery that threatened the timely delivery of election mail.

While disputing the validity of the accusations, the Postmaster General provided the following commitments relating to the delivery of election mail:

> [R]etail hours at Post Offices won't be changed, and mail processing equipment and blue collection boxes won't be removed during this period. No mail processing facilities will be closed and we have terminated the pilot program that began in July that expedited carrier departures to their delivery routes, without plans to extend or expand it. To clear up any confusion, overtime has, and will continue to be, approved as needed. Finally, effective October 1, 2020, we will engage standby resources in all areas of our operations, including transportation, to satisfy any unforeseen demand for the election.

Statement of Postmaster General Louis DeJoy provided to Senate Committee on Homeland Security and Governmental Affairs Hearing of Aug. 21, 2020, at 14; Statement of Postmaster General Louis DeJoy provided to House Committee on Oversight and Reform of Aug. 24, 2020, at

14. Respondent emphasizes that Postmaster General DeJoy also asserted that the "USPS has not changed [its] delivery standards, [its] processing, [its] rules, or [its] prices for Election Mail[,]" and that it "can, and will, handle the volume of Election Mail [it] receive[s]." Respondent's Supplemental Brief at 10.

Finally, Respondent argues that moving the received-by deadline until after Election Day would undermine the federal designation of a uniform Election Day, as set forth in three federal statutes, specifically 3 U.S.C. § 1 ("The electors of President and Vice President shall be appointed, in each State, on the Tuesday next after the first Monday in November, every fourth year succeeding every election of a President and Vice President"); 2 U.S.C. § 7 ("The Tuesday next after the 1st Monday in November, in every even numbered year, is established as the day for the election, in each of the States and Territories of the United States, of Representatives and Delegates to the Congress commencing on the 3d day of January next thereafter."); and 2 U.S.C. § 1 ("At the regular election held in any State next preceding the expiration of the term for which any Senator was elected to represent such State in Congress is regularly by law to be chosen, a United States Senator from said State shall be elected by the people thereof for a term commencing on the 3d day of January next thereafter.").[23]

**16** The Caucus also files a brief with this Court arguing against the extension of the deadline for mail-in votes. It asserts that "[t]here is no constitutional right to vote by mail" and that states have broad authority to enact regulations to ensure the integrity of its elections, including mail-in ballots, as was done in Act 77, including by setting a deadline for the receipt of ballots. Caucus's Brief at 19.

The Caucus warns that granting an extension of the mail-in ballot received-by deadline in this case "would have a cascading effect on other election code deadlines, *369 thereby causing chaos for election officials and confusion for voters." *Id.* at 26. It observes that the Election Code requires that Boards begin canvassing absentee and mail-in ballots within three days of Election Day and shall continue through the eighth day following the Election. *Id.* at 28 (citing 25 P.S. § 3146.8(g)(2)). Additionally, the Boards shall submit the unofficial returns to the Secretary on the Tuesday following the Election, and the Secretary must determine whether a recount is required within nine days of Election Day, citing 25 P.S. § 3154(f), (g)(2), and the Boards must certify the final results to the Secretary no later than twenty days after

Election Day, citing 25 P.S. § 2642(k). It additionally asserts that federal law requires all state recounts and challenges to be "resolved at least 6 days prior to the meeting of electors," which it asserts this year is December 14. Caucus's Brief at 28 n.17 (citing 3 U.S.C. §§ 1, 5). The Caucus therefore urges this Court to refrain from altering the received-by deadline for mail-in ballots, asserting that the "requested injunction would override the election deadlines which were fully debated and properly enacted by the peoples' representatives in the Pennsylvania General Assembly." *Id.* at 29.

**[9]** Unlike other provisions of Act 77 currently before this Court, we are not asked to interpret the statutory language establishing the received-by deadline for mail-in ballots. Indeed, there is no ambiguity regarding the deadline set by the General Assembly:

> **Deadline.**--Except as provided under 25 Pa.C.S. § 3511[24] (relating to receipt of voted ballot), a completed mail-in ballot must be received in the office of the county board of elections no later than eight o'clock P.M. on the day of the primary or election.

25 P.S. § 3150.16(c). Moreover, we are not asked to declare the language facially unconstitutional as there is nothing constitutionally infirm about a deadline of 8:00 p.m. on Election Day for the receipt of ballots. The parties, instead, question whether the application of the statutory language to the facts of the current unprecedented situation results in an as-applied infringement of electors' right to vote.

**17 [10]   [11]** In considering this issue, we reiterate that the Free and Equal Elections Clause of the Pennsylvania Constitution requires that "all aspects of the electoral process, to the greatest degree possible, be kept open and unrestricted to the voters of our Commonwealth, and, also, conducted in a manner which guarantees, to the greatest degree possible, a voter's right to equal participation in the electoral process for the selection of his or her representatives in government." *League of Women Voters*, 178 A.3d at 804. Nevertheless, we also recognize that "the state may enact substantial regulation containing reasonable, non-discriminatory *370 restrictions to ensure honest and fair elections that proceed in an orderly and efficient manner." *Banfield v. Cortes*, 631 Pa. 229, 110 A.3d 155, 176–77 (2015) (internal citation and quotation marks omitted).

As we have recently seen, an orderly and efficient election process can be crucial to the protection of a voter's participation in that process. Indeed, the struggles of our

most populous counties to avoid disenfranchising voters while processing the overwhelming number of pandemic-fueled mail-in ballot applications during the 2020 Primary demonstrates that orderly and efficient election processes are essential to safeguarding the right to vote. An elector cannot exercise the franchise while her ballot application is awaiting processing in a county election board nor when her ballot is sitting in a USPS facility after the deadline for ballots to be received.

We are fully cognizant that a balance must be struck between providing voters ample time to request mail-in ballots, while also building enough flexibility into the election timeline to guarantee that ballot has time to travel through the USPS delivery system to ensure that the completed ballot can be counted in the election. Moreover, we recognize that the determination of that balance is fully enshrined within the authority granted to the Legislature under the United States and Pennsylvania Constitutions. *See* U.S. Const. art. I, § 4, cl. 1; *id.* art. II, § 1, cl. 2.

[12] Nevertheless, we find the Commonwealth Court's rationale in *In re General Election-1985* germane to the current challenge to the application of the ballot received-by deadline. In that case, the court recognized that, while neither the Constitution nor the Election Code specified "any procedure to follow when a natural disaster creates an emergency situation that interferes with an election," courts could look to the direction of 25 P.S. § 3046. *In re General Election-1985*, 531 A.2d at 839. As noted, Section 3046 provides courts of common pleas the power, on the day of an election, to decide "matters pertaining to the election as may be necessary to carry out the intent" of the Election Code, which the Commonwealth Court properly deemed to include providing "an equal opportunity for all eligible electors to participate in the election process," which in that case necessitated delaying the election during a flood. *Id.*

We have no hesitation in concluding that the ongoing COVID-19 pandemic equates to a natural disaster. *See Friends of Devito v. Wolf*, —— Pa. ——, 227 A.3d 872, 888 (2020) (agreeing "that the COVID-19 pandemic qualifies as a 'natural disaster' under the Emergency Code"). Moreover, the effects of the pandemic threatened the disenfranchisement of thousands of Pennsylvanians during the 2020 Primary, when several of the Commonwealth's county election boards struggled to process the flow of mail-in ballot applications for voters who sought to avoid exposure to the virus. *See, e.g.*, Delaware County Board of Elections' Answer to Petition

at 15, ¶ 77 (acknowledging that it "mailed out thousands of ballots in the twenty-four hour period preceding the election"). It is beyond cavil that the numbers of mail-in ballot requests for the Primary will be dwarfed by those applications filed during the upcoming highly-contested Presidential Election in the midst of the pandemic where many voters are still wary of congregating in crowded locations such as polling places. We acknowledge that the Secretary has estimated that nearly three million Pennsylvanians will apply for mail-in applications, in contrast to the 1.5 million cast during the Primary. Secretary's Brief at 1.

**\*\*18 \*371** In light of these unprecedented numbers and the near-certain delays that will occur in Boards processing the mail-in applications, we conclude that the timeline built into the Election Code cannot be met by the USPS's current delivery standards, regardless of whether those delivery standards are due to recent changes in the USPS's logistical procedures or whether the standards are consistent with what the General Assembly expected when it enacted Act 77. In this regard, we place stock in the USPS's General Counsel's expression that his client could be unable to meet Pennsylvania's statutory election calendar. General Counsel's Letter at 2. The Legislature enacted an extremely condensed timeline, providing only seven days between the last date to request a mail-in ballot and the last day to return a completed ballot. While it may be feasible under normal conditions, it will unquestionably fail under the strain of COVID-19 and the 2020 Presidential Election, resulting in the disenfranchisement of voters.

Under our Extraordinary Jurisdiction, this Court can and should act to extend the received-by deadline for mail-in ballots to prevent the disenfranchisement of voters. We have previously recognized that, in enforcing the Free and Equal Elections Clause, this "Court possesses broad authority to craft meaningful remedies when required." *League of Women Voters*, 178 A.3d at 822 (citing Pa. Const., art. V, §§ 1, 2, 10; 42 Pa.C.S. § 726 (granting power to "enter a final order or otherwise cause right and justice to be done")). We additionally conclude that voters' rights are better protected by addressing the impending crisis at this point in the election cycle on a statewide basis rather than allowing the chaos to brew, creating voter confusion regarding whether extensions will be granted, for how long, and in what counties.[25] Instead, we act now to allow the Secretary, the county election boards, and most importantly, the voters in Pennsylvania to have clarity as to the timeline for the 2020 General Election mail-in ballot process.

After consideration, we adopt the Secretary's informed recommendation of a three-day extension of the absentee and mail-in ballot received-by deadline to allow for the tabulation of ballots mailed by voters via the USPS and postmarked by 8:00 p.m. on Election Day to reduce voter disenfranchisement resulting from the conflict between the Election Code and the current USPS delivery standards, given the expected number of Pennsylvanians opting to use mail-in ballots during the pandemic.[26] We observe that this extension **\*372** provides more time for the delivery of ballots while also not requiring alteration of the subsequent canvassing and reporting dates necessary for the Secretary's final reporting of the election results. In so doing, we emphasize that the Pennsylvania's election laws currently accommodate the receipt of certain ballots after Election Day, as it allows the tabulation of military and overseas ballots received up to seven days after Election Day. 25 Pa.C.S. § 3511. We conclude that this extension of the received-by deadline protects voters' rights while being least at variance with Pennsylvania's permanent election calendar, which we respect and do not alter lightly, even temporarily.

### C. COUNT III OF THE PETITION FOR REVIEW

**\*\*19** In Count III of its petition, Petitioner seeks to require that the Boards contact qualified electors whose mail-in or absentee ballots contain minor facial defects resulting from their failure to comply with the statutory requirements for voting by mail, and provide them with an opportunity to cure those defects. More specifically, Petitioner submits that when the Boards have knowledge of an incomplete or incorrectly completed ballot as well as the elector's contact information, the Boards should be required to notify the elector using the most expeditious means possible and provide the elector a chance to cure the facial defect up until the UOCAVA deadline of November 10, 2020, discussed *supra*.

Petitioner bases this claim on its assertion that the multi-stepped process for voting by mail-in or absentee ballot inevitably leads to what it describes as minor errors, such as not completing the voter declaration or using an incorrect ink color to complete the ballot. *See* 25 P.S. § 3146.6(a) (explaining the process for voting by absentee ballot, which requires, *inter alia*, an elector to mark the ballot using only certain writing implements and ink; and to fill out, date, and sign the declaration printed on the outer envelope); *id.* § 3150.16(a) (explaining the process for voting by mail-in ballot, which imposes the same requirements). According to

Petitioner, these minor oversights result in many ballots being rejected and disenfranchising voters who believe they have exercised their right to vote.

Petitioner submits that voters should not be disenfranchised by technical errors or incomplete ballots, and that the "notice and opportunity to cure" procedure ensures that all electors who desire to cast a ballot have the opportunity to do so, and for their ballot to be counted. Petitioner further claims there is no governmental interest in either: (1) requiring the formalities for the completion of the outside of the mailing envelope to be finalized prior to mailing as opposed to prior to counting, or (2) rejecting the counting of a ballot so long as ballots continue to arrive under federal law, which is the UOCAVA deadline of seven days after Election Day.

As legal support for its position, Petitioner relies upon the Free and Equal Elections Clause. Pa. Const. art. I, § 5 ("Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage."); *see also Winston*, 91 A. at 523 (explaining that elections are "free and equal" for constitutional purposes when, *inter alia*, "the regulation of the right to exercise the franchise does not deny the franchise itself, or make it so difficult as to amount to a denial; and when **\*373** no constitutional right of the qualified elector is subverted or denied him"). It further emphasizes that election laws should be construed liberally in favor of voters, and that "[t]echnicalities should not be used to make the right of the voter insecure." *Appeal of James*, 377 Pa. 405, 105 A.2d 64, 65-66 (1954). Petitioner also asserts that ballots with minor irregularities should not be rejected, except for compelling reasons and in rare circumstances. *Id.* at 66. Based on these legal principles, as well as this Court's "broad authority to craft meaningful remedies" when necessary, *League of Women Voters*, 178 A.3d at 822, Petitioner claims that the Pennsylvania Constitution and spirit of the Election Code require the Boards to provide a "notice and opportunity to cure" procedure, and that this Court has the authority to afford the relief it seeks.

Unlike the other claims asserted herein, the Secretary opposes Petitioner's request for relief in this regard. She counters that there is no statutory or constitutional basis for requiring the Boards to contact voters when faced with a defective ballot and afford them an opportunity to cure defects. The Secretary further notes that, while Petitioner relies upon the Free and Equal Elections Clause, that Clause cannot create statutory language that the General Assembly chose not to provide. *See*

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 159 of 205
Pennsylvania Democratic Party v. Boockvar, 238 A.3d 345 (2020)

2020 WL 5554644

Winston, 91 A. at 522 (noting that "[t]he power to regulate elections is legislative").

**\*\*20** The Secretary submits that so long as a voter follows the requisite voting procedures, he or she "will have an equally effective power to select the representative of his or her choice." League of Women Voters, 178 A.3d at 809. Emphasizing that Petitioner presents no explanation as to how the Boards would notify voters or how the voters would correct the errors, the Secretary further claims that, while it may be good policy to implement a procedure that entails notice of defective ballots and an opportunity to cure them, logistical policy decisions like the ones implicated herein are more properly addressed by the Legislature, not the courts.

Respondent echoes the Secretary's opposition to Petitioner's request for relief.[27] Specifically, it reiterates that Petitioner has failed to assert a legal basis to support imposing a "notice and opportunity to cure" procedure, noting that the Free and Equal Elections Clause does not enable courts to rewrite the Election Code to align with a litigant's notion of good election policy. Respondent emphasizes that "ballot and election laws have always been regarded as peculiarly within the province of the legislative branch of government," Winston, 91 A. at 522, and that to the extent restrictions are burdensome, relief should be sought in the Legislature. Id. at 525.

Respondent also discusses the practical implications of granting Petitioner's request, expressing concern that implementing a "notice and opportunity to cure" procedure would be a monumental undertaking requiring the expenditure of significant resources, particularly on the eve of an election. Respondent thus reiterates that the Legislature, not this Court, is the entity best suited to address the procedure proposed by Petitioner.

Respondent adds that the tardiness of Petitioner's request is alone a sufficient basis to deny it and that, in any event, Petitioner cannot show a "plain, palpable and clear abuse of the [legislative] power which actually infringes on the rights of the electors" with respect to this claim. Patterson v. Barlow, 60 Pa. 54, 75 (1869). Respondent notes that, to the contrary, a **\*374** requirement that voters follow the appropriate procedures when filling out their ballots easily passes constitutional muster.

**[13]** Upon review, we conclude that the Boards are not required to implement a "notice and opportunity to cure" procedure for mail-in and absentee ballots that voters have

filled out incompletely or incorrectly. Put simply, as argued by the parties in opposition to the requested relief, Petitioner has cited no constitutional or statutory basis that would countenance imposing the procedure Petitioner seeks to require (i.e., having the Boards contact those individuals whose ballots the Boards have reviewed and identified as including "minor" or "facial" defects—and for whom the Boards have contact information—and then afford those individuals the opportunity to cure defects until the UOCAVA deadline).

While the Pennsylvania Constitution mandates that elections be "free and equal," it leaves the task of effectuating that mandate to the Legislature. Winston, 91 A. at 522. As noted herein, although the Election Code provides the procedures for casting and counting a vote by mail, it does not provide for the "notice and opportunity to cure" procedure sought by Petitioner. To the extent that a voter is at risk for having his or her ballot rejected due to minor errors made in contravention of those requirements, we agree that the decision to provide a "notice and opportunity to cure" procedure to alleviate that risk is one best suited for the Legislature. We express this agreement particularly in light of the open policy questions attendant to that decision, including what the precise contours of the procedure would be, how the concomitant burdens would be addressed, and how the procedure would impact the confidentiality and counting of ballots, all of which are best left to the legislative branch of Pennsylvania's government. Thus, for the reasons stated, the Petitioner is not entitled to the relief it seeks in Count III of its petition.

### D. COUNT IV OF THE PETITION FOR REVIEW
**\*\*21** In Count IV, Petitioner seeks a declaration that under Act 77, the Boards must "clothe and count naked ballots," i.e., place ballots that were returned without the secrecy envelope into a proper envelope and count them, rather than invalidate them. It further seeks a preliminary injunction prohibiting the Boards from excluding such ballots from the canvass.

To understand the nature of a "naked ballot," as well as Petitioner's claim that such ballots are valid and should be counted, we examine the relevant provisions of Act 77. The Act directs Boards to send to the qualified mail-in elector an official mail-in ballot, the list of candidates when authorized, the uniform instructions as prescribed by the Secretary, and two envelopes to be returned to the Boards, as described in detail infra. 25 P.S. § 3150.14(c).

Section 3150.14(a) ("Envelopes for official mail-in ballots") explains the nature of the envelopes sent to the mail-in voter. This provision directs the Boards to "provide two additional envelopes for each official mail-in ballot of a size and shape as prescribed by the Secretary of the Commonwealth, in order to permit the placing of one within the other and both within the mailing envelope" addressed to the elector. *Id.* § 3150.14(a). On the smaller of the two envelopes to be returned to the Boards shall be printed only the words "Official Election Ballot." *Id.* On the larger envelope shall be printed: (1) "the form of the declaration of the elector;" (2) the "name and address of the county board of election of the proper county;" and (3) "information *375 indicating the local election district of the mail-in voter." *Id.*

As noted, Section 3150.16(a) directs the mail-in elector to mark the ballot in secret with the enumerated ink or lead pencil and then fold the ballot, enclose it, and secure it in the smaller envelope on which is printed "Official Election Ballot." 25 P.S. § 3150.16(a). The statute further directs the mail-in elector to place the smaller envelope into the second envelope on which is printed the form of declaration of the elector, the elector's local election district, and the address of the elector's county board of election. *Id.* The statute next directs the mail-in elector to fill out, date, and sign the declaration printed on the second envelope, and secure the ballot and send it by mail or deliver it in person to his or her county board of election. *Id.* A ballot is "naked" for purposes of this action if the mail-in elector fails to utilize the smaller envelope on which is printed "Official Election Ballot," and, instead, places the official election ballot directly into the second envelope, upon which is printed the form of declaration of the elector and the address of the elector's county board of election.

Act 77 additionally sets forth the procedure by which mail-in ballots are canvassed. *See id.* § 3146.8(a) (providing that mail-in ballots "shall be canvassed in accordance with subsection (g)"). Relevant thereto, the Act directs that mail-in ballots cast by electors who died prior to Election Day shall be rejected and not counted. *Id.* § 3146.8(d). Additionally, the Act provides that mail-in ballots shall be counted as long as: (1) election officials verify the ballots by comparing the voter's declaration with the official voting list; and (2) the ballots are not challenged on the ground that the voter is unqualified to vote. *Id.* §§ 3146.8(g)(4); 3150.12b(a)(2). Notably, Section 3146.8(g)(4)(ii) provides that if any of the envelopes on which are printed "Official Election Ballot" "contain any text, mark or symbol which reveals the identity

of the elector, the elector's political affiliation or the elector's candidate preference, the envelopes and the ballots contained therein shall be set aside and declared void." *Id.* § 3146.8(g)(4)(ii).

**22** The crux of Petitioner's position is that although Act 77 directs a mail-in voter to utilize the secrecy envelope in submitting the mail-in ballot, there is no provision in the Election Code authorizing the Boards to discard a ballot on grounds that the voter failed to insert the ballot into the secrecy envelope before returning it to the Boards. Rather, Petitioner asserts, the statute directs the Boards to reject mail-in ballots only if the mail-in elector died prior to Election Day, *id.* § 3146.8(d), the ballot is unverified or challenged on grounds that the mail-in voter was unqualified to vote, *id.* § 3146.8(g)(4), or the ballot is returned in an "Official Election Ballot" envelope that contains "any text, mark or symbol which reveals the identity of the elector, the elector's political affiliation or the elector's candidate preference." *Id.* § 3146.8(g)(4)(ii). Petitioner concludes that the failure to place the ballot in a secrecy envelope does not fall within these enumerated statutory grounds which would result in an invalid mail-in ballot.

Moreover, Petitioner emphasizes that the General Assembly was aware of how to invalidate ballots for lack of a secrecy envelope, as it expressly did so in another provision of the Election Code regarding provisional ballots. *See id.* § 3050(a.4)(5)(ii)(C) (providing that a "provisional ballot shall not be counted if: ... a provisional ballot envelope does not contain a secrecy envelope").[28] Had the General *376 Assembly intended to invalidate mail-in ballots on this basis, Petitioner submits, the Legislature would have included a similar provision in Act 77, but chose not to do so.

Absent statutory authority directing the Boards to invalidate a ballot based exclusively on the lack of a secrecy envelope, Petitioner contends that the refusal to canvass and count ballots cast without a secrecy envelope violates the Election Code, as well as the rights of electors to have their vote counted under the Free and Equal Elections Clause. It posits that rather than disenfranchising the voter in contravention of these edicts, the Boards could take corrective measures to protect privacy, such as placing the naked ballot inside a replacement secrecy envelope before canvassing.

Accordingly, Petitioner requests a declaration that naked ballots must be counted, as well as injunctive relief requiring

Boards to undertake reasonable measures to protect the privacy of naked ballots cast by mail-in electors.

The Secretary's position aligns with Petitioner on this issue as she agrees that the counting of naked ballots is permitted by the Election Code and furthers the right to vote under the Free and Equal Elections Clause and the First and Fourteenth Amendments to the United States Constitution.[29]

The Secretary contends that the secrecy envelope procedure set forth in Section 3150.16(a) is merely directory, and that this Court's longstanding precedents establish that ballots should not be disqualified based upon the failure to follow directory provisions. *See Bickhart,* 845 A.2d at 803 (holding that although the Election Code provides that an elector may cast a write-in vote for any person not printed on the ballot, a write-in vote for a candidate whose name, in fact, appears on the ballot is not invalid where there is no evidence of fraud and the voter's intent is clear); *Weiskerger Appeal,* 447 Pa. 418, 290 A.2d 108, 109 (1972) (holding that the elector's failure to mark the ballot with the statutorily enumerated ink color does not render the ballot invalid unless there is a clear showing that the ink was used for the purpose of making the ballot identifiable or otherwise indicating fraud).

**\*\*23** The Secretary further opines that no fraud arises from counting naked ballots, considering that the naked ballot remains sealed in an envelope and the sealed ballot is certified by the elector. Accordingly, the Secretary concludes that no voter should be disenfranchised for failing to place his or her mail-in ballot in the secrecy envelope before returning it to the Boards.

In response, Respondent argues that the statutory language of Section 3150.16(a), providing that the mail-in elector "shall **\*377** ... enclose and securely seal the [ballot] in the envelope on which is printed, stamped or endorsed 'Official Election Ballot,' " is clear and constitutes a mandatory requisite to casting a mail-in ballot, and having that ballot counted. It relies on *In re Canvass of Absentee Ballots of Nov. 4, 2003 Gen. Election,* 577 Pa. 231, 843 A.2d 1223 (2004) ("*Appeal of Pierce*"), where this Court held that the use of the term "shall" in Section 3146.6(a) of the Election Code, providing that the elector "shall" send an absentee ballot or deliver the ballot in person, carries a mandatory meaning, thereby precluding third parties from hand-delivering absentee ballots to county election boards, and invalidating those ballots that were hand-delivered by a third party. Respondent submits that Section 3150.16(a) requires the same invalidation of ballots where

the mandatory statutory requisite of enclosing the ballot in a secrecy envelope is ignored.

Respondent observes that the Election Code further directs election officials to "set aside and declare[ ] void" a ballot whose secrecy envelope contains "any text, mark, or symbol which reveals the identity of the elector, the elector's political affiliation or the elector's candidate preference." 25 P.S. § 3146.8(g)(4)(ii). Citing *Appeal of Weiskerger, supra,* it argues that the purpose of this provision is to prevent the disclosure of the elector's identity. Respondent posits that a ballot unclothed by a secrecy envelope and placed directly in the outer envelope also discloses the elector's identity because the outer envelope contains the elector's signed declaration. Thus, it concludes, Section 3146.8(g)(4)(ii) requires invalidation of any ballot contained in an envelope that reveals the identity of the voter, regardless of whether that envelope is a secrecy envelope or an outer envelope. To hold to the contrary, Respondent argues, would violate Article VII, Section 4 of the Pennsylvania Constitution, which provides, in relevant part, that "secrecy in voting shall be preserved." Pa. Const. art. VII, § 4.[30]

Respondent discounts the Secretary's suggestion that because there is no fraud involved in the submission of a naked ballot, the ballot should be counted. The secrecy envelope provision of the statute, in Respondent's view, advances the distinct constitutional interest of protecting the sanctity of the ballot by preventing the ballot from disclosing the elector's identity. The significance of this interest, it submits, distinguishes this matter from cases involving noncompliance with minor procedural demands set forth in the Election Code, such as the color of ink used to mark a ballot or the listing of a write-in candidate whose name already appears on the ballot. Accordingly, Respondent requests that we deny Petitioner's request for declaratory and injunctive relief.

**\*\*24** The Caucus reiterates all of the arguments expressed by Respondent. It contends that in addition to violating voter secrecy, the counting of naked ballots raises the concern of voter fraud. It contends that when a ballot arrives at the county election board without the protective shield of a sealed privacy envelope, the election official cannot guarantee that the ballot travelled from the voter's hand to the county election board without compromise. It argues that there is no way for the election official to verify that the vote was accurately recorded, because the mere act of ascertaining the voter's identity from the elector's declaration may violate the secrecy protections of **\*378** Article VII, Section 4. The Caucus

concludes that the only way to be certain that no fraud has taken place is to reject all naked ballots.

Turning now to our analysis, we observe that, in determining the propriety of naked ballots, we must ascertain the General Assembly's intention by examining the statutory text of the secrecy envelope provision to determine whether it is mandatory or directory, as that will govern the consequences for non-compliance. *See JPay, Inc. v. Dep't of Corr. & Governor's Office of Admin.*, 89 A.3d 756, 763 (Pa. Cmwlth. 2014) (internal citation omitted) (observing that "[w]hile both mandatory and directory provisions of the Legislature are meant to be followed, the difference between a mandatory and directory provision is the consequence for non-compliance: a failure to strictly adhere to the requirements of a directory statute will not nullify the validity of the action involved").

Upon careful examination of the statutory text, we conclude that the Legislature intended for the secrecy envelope provision to be mandatory. We respectfully reject the contentions of Petitioner and the Secretary that because the General Assembly did not delineate a remedy narrowly linked to the mail-in elector's failure to utilize a secrecy envelope, the language of the Election Code is directory, and an elector's violation of the command inconsequential.

As noted, Section 3150.16(a) provides:

> [The mail-in elector] shall, in secret, ... enclose and securely seal the [ballot] in the envelope on which is printed, stamped or endorsed "Official Election Ballot." This envelope shall then be placed in the second one, on which is printed the form of declaration of the elector, and the address of the elector's county board of election and the local election district of the elector.
>
> *Id.*

This statutory text must be read *in pari materia*[31] with Subsection 3146.8(g)(4)(ii), which also speaks directly to secrecy envelopes, providing:

> If any of the envelopes on which are printed, stamped or endorsed the words 'Official Election Ballot' contain any text, mark or symbol which reveals the identity of the elector, the elector's political affiliation or the elector's candidate preference, the envelopes and the ballots contained therein shall be set aside and declared void.

25 P.S. § 3146.8(g)(4)(ii).

These provisions make clear the General Assembly's intention that, during the collection and canvassing processes, when the outer envelope in which the ballot arrived is unsealed and the sealed ballot removed, it should not be readily apparent who the elector is, with what party he or she affiliates, or for whom the elector has voted. The secrecy envelope properly unmarked and sealed ensures that result, unless it is marked with identifying information, in which case that goal is compromised. Whatever the wisdom of the requirement, the command that the mail-in elector utilize the secrecy envelope and leave it unblemished by identifying information is neither ambiguous nor unreasonable.

**\*\*25** As noted cogently by Respondent, this case is distinguishable from those cases **\*379** relied upon by the Secretary, which deemed mandatory language merely directory and without consequence. For example, in *Bickhart*, 845 A.2d at 795, the Court declined to invalidate a write-in vote cast for a candidate who was named on the ballot proper. In reaching that conclusion, the Court observed that "ballots containing mere minor irregularities should only be stricken for compelling reasons," noting that marking a ballot is an imprecise process, the focus of which is upon the "unmistakable registration of the voter's will in substantial conformity to the statutory requirements." *Bickhart*, 845 A.2d at 798-99 (internal quotation marks and citations omitted).

Similarly, in *Appeal of Weiskerger, supra*, this Court declined to invalidate a ballot based upon the "minor irregularity" that it was completed in the wrong color of ink. The statute at issue provided: "Any ballot that is marked in blue, black or blue-black ink ... shall be valid and counted." 290 A.2d at 109 (citing 25 P.S. § 3063). Thus, the only mandatory direction it provided was for the canvassers who receive the ballots, not the electors who prepared them. In providing that ballots completed in the right color must be counted, the Legislature neither stated nor implied that ballots completed in a different color must not be counted. Neither statutory provision at issue in *Bickhart* nor *Weiskerger* contained anything analogous to the directive at issue in this case, which involves secrecy in voting protected expressly by Article VII, Section 4 of this Court's state charter.

As posited by Respondent, most analogous to the instant case is our decision in *Appeal of Pierce*. There, we held that the Election Code's "in-person" ballot delivery requirement, *see* 25 P.S. § 3146.6, was mandatory, and that votes delivered by third persons must not be counted. The provision in question unambiguously provided that "the elector shall send

[the absentee ballot] by mail, postage [prepaid], except where franked, or deliver it in person to [said county] board of election." *Appeal of Pierce*, 843 A.2d at 1231 (quoting 25 P.S. § 3146.6(a)). The parties seeking to ensure that votes delivered by third parties would be counted cited *Weiskerger* and its flexibility with respect to "minor irregularities."

This Court, however, was unpersuaded and declined the invitation to interpret "shall" as anything less than mandatory. Moreover, the Court rejected precisely the same reasoning for interpreting "shall" as directory that Petitioner and the Secretary offer in this case. As in the instant case, the provision of the Election Code at issue in *Appeal of Pierce* did not expressly provide for voiding a ballot delivered by someone other than the voter. Nevertheless, we held that to construe the in-person requirement "as merely directory would render its limitation meaningless and, ultimately, absurd." *Id.* at 1232. The Court thus distinguished *Weiskerger* and its safe harbor for "minor irregularities," noting that the in-person requirement served the salutary purpose of "limit[ing] the number of third persons who unnecessarily come in contact with the ballot[,] ... provid[ing] some safeguard that the ballot was filled out by the actual voter, ... and that once the ballot has been marked by the actual voter in secret, no other person has the opportunity to tamper with it." *Id.* The provision thus served the spirit of the Code, "which requires that a voter cast his ballot alone, and that it remain secret and inviolate." *Id.*

Petitioner and the Secretary attempt to distinguish *Appeal of Pierce* by emphasizing that there was no statutory provision in that case that was inconsistent with the judicially inferred remedy, such as the provisional **\*380** ballot secrecy envelope provision in this case. They assert that here, by contrast, the Legislature has directed the disqualification of provisional ballots not enclosed in the secrecy envelope, and of mail-in ballots with certain markings on the secrecy envelope, rendering its silence with regard to omitted secrecy envelopes for mail-in ballots all the more conspicuous.

**\*\*26** The clear thrust of *Appeal of Pierce*, however, is that, even absent an express sanction, where legislative intent is clear and supported by a weighty interest like fraud prevention, it would be unreasonable to render such a concrete provision ineffective for want of deterrent or enforcement mechanism. What we learn from that decision is that violations of the mandatory statutory provisions that pertain to integral aspects of the election process should not

be invalidated *sub silentio* for want of a detailed enumeration of consequences.

We must in all instances assume that the General Assembly does not intend a statute to be interpreted in a way that leads to an absurd or unreasonable result. *See* 1 Pa.C.S. § 1922(1) ("In ascertaining the intention of the General Assembly in the enactment of a statute the following presumptions ... may be used: (1) That the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable."). The result proffered by Petitioner and the Secretary is no more reasonable than that which the Court in *Appeal of Pierce* found untenable. The Court in *Appeal of Pierce* viewed a textual mandate pertaining to fraud prevention and ballot secrecy as signaling the Legislature's intent that its violation would require voiding the ballot, notwithstanding no statutory provision to that effect. To avoid an absurd result, it inferred that intent from nothing more than the provision itself.

We reach the same result here. It is clear that the Legislature believed that an orderly canvass of mail-in ballots required the completion of two discrete steps before critical identifying information on the ballot could be revealed. The omission of a secrecy envelope defeats this intention. Moreover, in providing for the disqualification of mail-in ballots that arrive in secrecy envelopes that bear markings identifying the elector, the elector's party affiliation, or the elector's vote, all categories of information that appear on the ballot itself, the Legislature signaled beyond cavil that ballot confidentiality up to a certain point in the process is so essential as to require disqualification. Thus, we find that our holding in *Appeal of Pierce* leads to the inescapable conclusion that a mail-in ballot that is not enclosed in the statutorily-mandated secrecy envelope must be disqualified.

**[14]** Accordingly, we hold that the secrecy provision language in Section 3150.16(a) is mandatory and the mail-in elector's failure to comply with such requisite by enclosing the ballot in the secrecy envelope renders the ballot invalid.

**E. COUNT V OF THE PETITION FOR REVIEW**
In Count V of its petition, Petitioner seeks a declaration specifying that the poll watcher residency requirement, found in Section 2687(b) of the Election Code, 25 P.S. § 2687(b), does not violate state or federal constitutional rights.[32] Petition at **\*381** 55, ¶ 207. The Secretary concurs with Petitioner in this regard.

The Election Code permits candidates and political parties to appoint "poll watchers" to monitor the integrity of the voting process.[33] "Each watcher so appointed must be a qualified registered elector of the county in which the election district for which the watcher was appointed is located." 25 P.S. § 2687(b). This provision, in full, specifies:

**27** Each watcher so appointed must be a qualified registered elector of the county in which the election district for which the watcher was appointed is located. Each watcher so appointed shall be authorized to serve in the election district for which the watcher was appointed and, when the watcher is not serving in the election district for which the watcher was appointed, in any other election district in the county in which the watcher is a qualified registered elector: Provided, That only one watcher for each candidate at primaries, or for each party or political body at general, municipal or special elections, shall be present in the polling place at any one time from the time that the election officers meet prior to the opening of the polls under section 1208 until the time that the counting of votes is complete and the district register and voting check list is locked and sealed, and all watchers in the room shall remain outside the enclosed space. It shall not be a requirement that a watcher be a resident of the election district for which the watcher is appointed. After the close of the polls and while the ballots are being counted or voting machine canvassed, all the watchers shall be permitted to be in the polling place outside the enclosed space. Each watcher shall be provided with a certificate from the county board of elections, stating his name and the name of the candidate, party or political body he represents. Watchers shall be required to show their certificates when requested to do so. Watchers allowed in the polling place under the provisions of this act, shall be permitted to keep a list of voters and shall be entitled to challenge any person making application to vote and to require proof of his qualifications, as provided by this act. During those intervals when voters are not present in the polling place either voting or waiting to vote, the judge of elections shall permit watchers, upon request, to inspect the voting check list and either of the two numbered lists of voters maintained by the county board: Provided, That the watcher shall not mark upon or alter these official election records. The judge of elections shall supervise or delegate the inspection of any requested documents.

25 P.S. § 2687(b) (footnote omitted).

Petitioner observes that the General Assembly enacted the current poll watcher residency requirement in 2004 and that no changes were made to this requirement in Act 77. Petitioner asserts that this provision does not suffer from any constitutional infirmities and notes that the provision has been upheld as constitutional by the federal District Court for the Eastern District of Pennsylvania in *Republican Party of Pennsylvania v. Cortés*, 218 F. Supp. 3d 396 (E.D. Pa. 2016), discussed further below.

The Secretary likewise maintains that the poll watcher residency requirement is constitutional. The Secretary notes that the United States Supreme Court in *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), recognized the importance of States in regulating elections. There, the Court stated,

We have recognized that, 'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.' *Id.* at 788, 103 S.Ct. 1564 (citing *Storer v. Brown*, 415 U.S. 724, 730, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974)). In this regard, the Secretary observes that the Election Code provides a comprehensive scheme of regulations for voting and elections in the Commonwealth. The Secretary maintains that these regulatory interests are generally considered sufficient to justify reasonable, nondiscriminatory restrictions on elections. *Id.*; *see also Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997) (specifying that "[s]tates may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder").

Regarding the provisions in the Election Code requiring that poll watchers be qualified registered electors from the county in which they serve, like Petitioner, the Secretary observes that although this Court has not previously addressed the question of whether this requirement is constitutional, the federal District Court for the Eastern District of Pennsylvania has done so and rejected a constitutional challenge to the poll watcher residency requirement in *Cortés*, *supra.*

Specifically, there, the District Court considered a constitutional challenge to Section 2687(b) of the Election Code by the respondent here. Respondent claimed that the poll watcher residency requirement found at Section 2687(b), requiring poll watchers to reside in the county in which they serve, is violative of its Fourteenth Amendment rights to due

process and equal protection and their rights to free speech and association under the First Amendment.

**\*\*28** The District Court rejected these claims, noting first, that the regulation does not violate due process or equal protection. The court observed that serving as a poll watcher does not implicate a fundamental constitutional right, like the right to vote, but rather, is a right conferred by statute. *Id.* at 408. Additionally, the court found that because the state's regulation of the qualifications of who may serve as a poll watcher does not burden one's voting rights or any other constitutional right, the state imposing the regulation need only cite a rational basis for the regulation to be upheld. *Id.* (citing *Donatelli v. Mitchell,* 2 F.3d 508, 514 & n.10 (3d Circ. 1993) (declining to apply intermediate scrutiny standards because the plaintiffs' fundamental rights were not burdened by state law)); and *Voting for Am., Inc. v. Andrade,* 488 Fed.Appx. 890, 899 (5th Cir. 2012) (applying rational basis review as opposed to an intermediate balancing test because state election law did not implicate or burden specific constitutional rights). In this regard, the court concluded as follows:

> There is a rational basis for Section 2678(b)'s requirement that poll watchers be qualified electors in the county in which they work. The Secretary notes that in 1937, the General Assembly enacted a county-based scheme to manage **\*383** elections within the state, and consistent with that scheme the legislature endeavored to allow county election officials to oversee a manageable portion of the state in all aspects of the process, including in credentialing poll watchers. In short, Pennsylvania opted to design a county-by-county system of elections; in doing so it ensured as much coherency in this patchwork system as possible. To that end it ensured that participants in the election—voters and watchers alike—were qualified electors in the relevant county. The legislature's decision to allow county election officials to credential only poll watchers from their own county is rationally related to the state's interest in maintaining its county-run election system; each county election official is tasked with managing credentials for a discrete part of the state's population. As the Secretary's counsel noted at the hearing, the legislature chose to 'draw the lines' at the county level, something entirely rational in fashioning a scheme for a state as large as Pennsylvania.

*Cortés,* 218 F.Supp. 3d at 409.

The District Court, likewise, rejected Respondent's claims that Section 2687 violates the First Amendment. The court first noted that courts have found that "poll watching is not incidental to" the right of free association and has "no distinct First Amendment protection." *Id.* at 414 (citing *Cotz v. Mastroeni,* 476 F.Supp.2d 332, 364 (S.D. N.Y. 2007); and *Dailey v. Hands,* No. 14-00423, 2015 WL 1293188, at \*5 (S.D. Ala. Mar. 23, 2015) ("[P]oll watching is not a fundamental right protected by the First Amendment.")). Moreover, the court found that poll watchers do not engage in core political speech while completing their duties. *Id.* at 415. Rather, the court observed that "when a poll watcher reports incidents of violations, he is performing a public function delegated by the state." *Id.* (citing *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 158, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978) (stating that "[w]hile the Constitution protects private rights of association and advocacy with regard to the election of public officials, [the Supreme Court] cases make it clear that the conduct of the elections themselves is an [e]xclusively public function.")). Thus, the District Court found that the Commonwealth's county poll watcher residency requirement did not implicate poll watchers' private rights of association or advocacy and, therefore, did not violate the First Amendment.

Respondent again maintains that the poll watcher residency requirement set forth in the Election Code is unconstitutional.[34] First, Respondent maintains that *Cortés* is distinguishable from this matter because of the procedural posture and the timing of that case. Specifically, Respondent emphasizes the fact that in *Cortés* it sought a preliminary injunction eighteen days before the general election and that on this basis the court found the request for relief to be untimely. Thus, it contends that the court's further discussion of the constitutionality of the poll watcher residency requirement was *dicta.*

**\*\*29** Additionally, Respondent argues that the court in *Cortés,* like the Secretary here, gave short shrift to the Commonwealth's obligation to safeguard the electorate from voter fraud, noting that "every voter in a federal ... election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, **\*384** without its being distorted by fraudulently cast votes." Respondent's Brief at 45 (citing *Anderson v. United States,* 417 U.S. 211, 227, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974)). Respondent maintains that due to the distribution of voters throughout the Commonwealth, the county residency requirement makes it difficult for both political parties to identify poll watchers in all precincts. Thus, it asserts that, in the absence of

poll watchers, "fraud can flourish." *Id.* at 46. Respondent further argues that with Pennsylvania moving to an entirely new election regime under Act 77, with alleged increased opportunities for ballot fraud and tampering, the need for poll watchers is heightened.

Turning to the merits, initially, regarding Respondent's assertion that the District Court's discussion of the constitutionality of the poll watcher residency requirement constitutes *dicta* because the court found the claims there to be untimely, we note that although that court pointed out that the emergent nature of Respondent's claims amounted to a "judicial fire drill" based on their late filing, the court opined further that the relief sought "would be inappropriate for a number of reasons, not the least of which is that at this late hour courts should not disrupt an impending election 'absent a powerful reason for doing so.' " *Cortés*, 218 F.Supp.3d at 405 (citation omitted). The court then went on to analyze the merits of the constitutional claims asserted and denied relief. Accordingly, it appears the court made its decision on multiple bases, including the merits as well as the timing of the claims. Moreover, regardless of the status of the District Court's determination of the constitutional issues presented there, we find its analysis persuasive and agree with its reasoning in upholding the constitutionality of the poll watcher residency requirement.

The "times, places and manner" of conducting elections generally falls to the states. U.S. Const. art. I, § 4 (providing that "the Times, Places and Manner of holding Elections...shall be prescribed in each State by the Legislature thereof"). Pennsylvania has enacted a comprehensive code of election laws pursuant to its authority to regulate its elections. The General Assembly, in enacting its comprehensive scheme, has required that any person serving as a poll watcher for a particular candidate or party be a resident of the county in which she serves in her position. 25 P.S. § 2687(b).

**[15]  [16]** This provision is a legislative enactment which enjoys the presumption that the General Assembly did not intend to violate constitutional norms, "in part because there exists a judicial presumption that our sister branches take seriously their constitutional oaths." *Stilp v. Commonwealth,* 588 Pa. 539, 905 A.2d 918, 938–39 (2006); *see also* 1 Pa.C.S. § 1922(3). Accordingly, a statute is presumed to be valid, and will be declared unconstitutional only if it is shown to be "clearly, palpably, and plainly [violative of] the Constitution." *West Mifflin Area School District v. Zahorchak,* 607 Pa. 153, 4 A.3d 1042, 1048 (2010).

**[17]** In analyzing whether a state election law violates the constitution, courts must first examine the extent to which a challenged regulation burdens one's constitutional rights. *Burdick v. Takushi,* 504 U.S. 428, 434, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). Upon determining the extent to which rights are burdened, courts can then apply the appropriate level of scrutiny needed to examine the propriety of the regulation. *See id.* (indicating that "the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation **\*385** burdens First and Fourteenth Amendment rights").

**\*\*30 [18]  [19]  [20]** Where a state election regulation imposes a "severe" burden on a plaintiff's right to vote, strict scrutiny applies and requires that the regulation is "narrowly drawn to advance a state interest of compelling importance." *Id.* When a state election law imposes only "reasonable, nondiscriminatory restrictions," upon the constitutional rights of voters, an intermediate level of scrutiny applies, and "the State's important regulatory interests are generally sufficient to justify" the restrictions. *See Id.* (upholding Hawaii's ban on write-in voting in the primary where doing so places a minimal burden on one's voting right and supports the state's interest in supporting its ballot access scheme). Where, however, the law does not regulate a suspect classification (race, alienage, or national origin) or burden a fundamental constitutional right, such as the right to vote, the state need only provide a rational basis for its imposition. *See Donatelli,* 2 F.3d at 510 & 515.

**[21]** In examining the constitutionality of the poll watcher residency provision at issue here, we conclude, as the District Court in *Cortés* concluded, that it imposes no burden on one's constitutional right to vote and, accordingly, requires only a showing that a rational basis exists to be upheld. In this regard, as the District Court aptly noted, there is no individual constitutional right to serve as a poll watcher; rather, the right to do so is conferred by statute. *Cortés,* 218 F.Supp.3d at 408. Additionally, courts have indicated that "poll watching is not incidental to" the right of free association and, thus, "has no distinct First Amendment protection." *Cotz,* 476 F.Supp.2d at 364. Finally, poll watching does not implicate core political speech. *Cortés,* 218 F.Supp.3d at 415.

**[22]** As the poll watcher county residency requirement does not burden one's constitutional voting rights, the regulation need only be shown to satisfy a rational basis for its imposition. Again, as the District Court aptly recounted, from

its inception, Pennsylvania has envisioned a county-based scheme for managing elections within the Commonwealth. Consistent therewith, the Legislature has endeavored to allow county election officials to oversee and manage their portion of the state in all aspects of the election process, including credentialing poll watchers. Given that Pennsylvania's General Assembly. chose a county-based scheme for conducting elections, it is reasonable that the Legislature would require poll watchers, who serve within the various counties of the state, to be residents of the counties in which they serve. Thus, there is a clear rational basis for the county poll watcher residency requirement, and we determine, therefore, that this requirement should be upheld.

Respondent does not claim that poll watching involves a fundamental constitutional right or that a level of scrutiny other than rational basis needs to be shown regarding the regulation of poll watcher qualifications. Instead, Respondent claims that poll watchers are vital to protect against voter fraud and that because of the distribution of voters throughout Pennsylvania, the residency requirement makes it difficult to identify poll watchers in all precincts. While Respondent asserts the greater need for poll watchers because of heightened election fraud involving mail-in voting, these claims are unsubstantiated and are specifically belied by the Act 35 report issued by the Secretary on August 1, 2020, concerning mail in voting in the Primary Election, finding:

> [D]ata provided by the counties reinforces numerous independent studies that conclude that mail ballot fraud is **\*386** exceedingly rare, and it demonstrates that the errors that occurred [in the Primary Election] accounted for a very small fraction of the nearly 1.5 million absentee and mail-in ballots requested and cast by voters.

Pennsylvania 2020 Primary Election Act 35 of 2020 Report at 39; Appendix to Petitioner's Brief, Exhibit F. Moreover, Respondent's speculative claim that it is "difficult" for both parties to fill poll watcher positions in every precinct, even if true, is insufficient to transform the Commonwealth's uniform and reasonable regulation requiring that poll watchers be residents of the counties they serve into a non-rational policy choice.

**\*\*31** Based on the foregoing, we conclude that the poll watcher residency requirement does not violate the state or federal constitutions.[35] Accordingly, we grant the relief sought by Petitioner in their petition for review and declare the poll watcher residency requirement set forth in Section

2687(b) of the Election Code, 25 P.S. § 2687(b), to be constitutional.

## IV. CONCLUSION

Based on our disposition of all of the claims set forth above, we grant relief on the claims set forth in Counts I, II, and V of the Democratic Party's petition for review as follows and hold that: (Count I) the Election Code permits county boards of election to collect hand-delivered mail-in ballots at locations other than their office addresses including drop-boxes as indicated herein, *see supra*. at —— n. 15; (Count II) a three-day extension of the absentee and mail-in ballot received-by deadline is adopted such that ballots mailed by voters via the United States Postal Service and postmarked by 8:00 p.m. on Election Day, November 3, 2020, shall be counted if they are otherwise valid and received by the county boards of election on or before 5:00 p.m. on November 6, 2020; ballots received within this period that lack a postmark or other proof of mailing, or for which the postmark or other proof of mailing is illegible, will be presumed to have been mailed by Election Day unless a preponderance of the evidence demonstrates that it was mailed after Election Day; (Count V) the poll watcher residency requirement set forth in Section 2687(b) of the Election Code, 25 P.S. § 2687(b), is constitutional. Also, for the reasons set forth herein, we deny the relief sought in Count III and IV of the petition for review.

Justices Todd, Dougherty, and Wecht join the opinion.

Chief Justice Saylor and Justice Mundy join Parts I, II, and III(C), (D) and (E) of the opinion.

Justice Donohue joins Parts I, II, and III(A), III(C), III(D) and III(E) of the opinion.

Justice Wecht files a concurring opinion.

Chief Justice Saylor files a concurring and dissenting opinion in which Justice Mundy joins.

Justice Donohue files a concurring and dissenting opinion in which Chief Justice Saylor and Justice Mundy join Part II.

JUSTICE WECHT, concurring
I join the learned Majority's Opinion in full. "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good

citizens, we must live. Other *387 rights, even the most basic, are illusory if the right to vote is undermined."[1] As the Supreme Court of the United States has explained, the right to vote comprises not just "the right of qualified voters within a state to cast their ballots," but also the right "to have their ballots counted."[2] In our Commonwealth, the franchise is guaranteed by the Free and Equal Elections Clause of the Pennsylvania Constitution, which commands: "Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage."[3] The history of that clause, which predates the United States Constitution and has no federal counterpart, evinces the intent of its framers that it be given "the broadest interpretation, one which governs all aspects of the electoral process."[4]

**32 Expounding upon the contours of the guarantee of free and equal suffrage contained within the Constitution of Kentucky, which was modeled on our own organic charter, the Kentucky Supreme Court observed that, "when any substantial number of legal voters are, from any cause, denied the right to vote, the election is not free and equal, in the meaning of the Constitution."[5]

> [T]his constitutional provision admits of no evasions or exceptions. No amount of good intention or good faith can be allowed to defeat its purpose or its meaning. When the question arises, the single inquiry will be: Was the election free and equal, in the sense that no substantial number of persons entitled to vote and who offered to vote were denied the privilege?[6]

Although the conditions that might infringe the franchise are too manifold to enumerate, when we are satisfied that a violation of the right has occurred or is likely to occur, "our Court possesses broad authority to craft meaningful remedies when required."[7]

"Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy."[8] To that end, we recognized in *League of Women Voters* that "[a] broad and robust interpretation" of the Free and Equal Elections Clause could restore the public's confidence in the redistricting process by "guard[ing] against the risk of unfairly rendering votes nugatory."[9] The same easily could be said of an election scheduled in the wake—or midst —of a natural disaster, civil unrest, or other emergency, where systemic disruptions in basic government services

like mail delivery—upon which the machinery of our election system relies more than ever with the advent of broad mail-in voting—can be demonstrated or *388 reasonably anticipated.[10] Indeed, the "adverse consequences" occasioned by a dysfunctional electoral process that threatens to disenfranchise a broad swath of the electorate are no less pernicious than those of partisan gerrymandering. Left unabated, each threatens to "discourag[e] voters from participating in the electoral process because they have come to believe" that their vote will not count through no fault of their own.[11]

In determining whether present systemic disruptions in government services are well-documented in this Commonwealth, we need look no further than the recent Congressional testimony of Postmaster General Louis DeJoy. Appearing before committees of the United States House and Senate, DeJoy acknowledged that "[a] substantial portion of [mail] delays are related to COVID."[12] Highlighting the acute effects of the pandemic on mail delays within Pennsylvania, DeJoy explained:

> **33 As the coronavirus cases throughout the country have expanded it has had an impact on our employee availability. And in the urban areas that are hotspots— the averages don't play out what the real picture is like in areas like Philadelphia, where employee availability is significantly below normal run rates.[13]

Lacking any materially contradictory evidence, we have no reason to doubt the accuracy of DeJoy's testimony on these points. While the Postal Service may be able to prioritize election mail to mitigate these concerns, they cannot alter the laws of time and space.

The extraordinary circumstances under which this year's quadrennial presidential election must be contested manifestly justify an equitable remedy modifying the received-by deadline for absentee and mail-in ballots to account for these exigencies and to ensure that no unnecessary impediments to each citizen's exercise of the franchise be interposed that reasonably can be avoided. Having determined that the convergence of a once-in-a-century pandemic and unprecedented operational delays in United States Postal Service delivery capacity threatens to undermine the integrity of our general election, this *force majeure* necessitates relief.

I endorse the Majority's narrowly-tailored remedy, which extends the received-by deadline by just three days to

compensate for projected mail-delivery delays of similar duration. Extrapolating from the Department of State's primary election data, that timeframe should capture the vast majority of late-arriving ballots that were deposited with the Postal Service on or in the few days before Election Day. That approach also will minimize the number of voters denied the franchise simply **\*389** for mailing their votes based upon long-trusted, but presently unrealistic expectations about the speed of the post, while minimizing any subsequent delay in the tallying of votes and avoiding any material disruption to the sequence of events that follow in the weeks following a national election.

While I join the Majority's resolution of Count III, I do so subject to the belief that it is limited to the particular concerns litigated and the lack of any proposal regarding a practicable manner of relieving the problem alleged. In my view, today's ruling should be understood to extend no farther than to ballot defects that are capable of objective assessment pursuant to uniform standards[14]—a qualification that captures all of the defects Petitioners seek the opportunity to cure in this case.

**\*\*34** For example, the failure to "fill out, date and sign the declaration printed on" the ballot return envelope, as required by 25 P.S. § 3150.16(a), is a deficiency that can be readily observed. Absent some proof that the enforcement of such a uniform, neutrally applicable election regulation will result in a constitutionally intolerable ratio of rejected ballots, I detect no offense to the Free and Equal Elections Clause. Moreover, Petitioners propose only an amorphous standard that would permit electors to cure "minor" defects and omissions; they supply no judicially manageable criteria for distinguishing "minor" defects from "major" ones that could be adopted on a statewide basis, nor do they propose a process to facilitate the opportunity to cure that they seek that can be implemented and fairly administered in every voting district in the Commonwealth in the weeks between now and the general election. So long as the Secretary and the county boards of elections provide electors with adequate instructions for completing the declaration of the elector—including conspicuous warnings regarding the consequences for failing strictly to adhere—pre-deprivation notice is unnecessary.

But I view these issues as distinct from circumstances in which a ballot's validity turns on subjective assessments, such as signature mismatches assessed by poll workers with no training or expertise in matching signatures. The enforcement of such requirements presents risks of inconsistency and arbitrariness that may implicate constitutional guarantees not raised in this case, including due process and equal protection principles. Signature comparison is a process fraught with the risk of error and inconsistent application, especially when conducted by lay people.[15] While this case offers no challenge to such inherently subjective bases for disqualifying ballots, I do not view today's Opinion as foreclosing the possibility of relief in a future case seeking the opportunity to address circumstances in which a subjective, lay assessment of voter requirements as to which reasonable minds might differ stands between the elector and the tabulating machine.

**\*390** We would not write on a blank slate in this regard. These concerns have been recognized by numerous tribunals in recent years, and various courts have granted relief on similar grounds, including three federal courts in the last few weeks alone.[16] Those courts have found that the administrative burden of a notice-and-cure remedy is outweighed by the threat to the fundamental rights of voters whose ballots otherwise would not be counted.

**\*\*35** While one might hope that the General Assembly would revisit the issue and consider furnishing such a procedure on its own initiative, this Court has the prerogative to address this problem if it proves worthy upon closer examination. As a "state court with the power to assure uniformity," we have the authority, and indeed the obligation, to direct the canvassing of absentee and mail-in ballots in a manner that satisfies "the rudimentary requirements of equal treatment and fundamental fairness" when we find a palpable failure to meet those constitutional thresholds.[17] Regardless, Petitioners do not bring a discrete challenge to the Commonwealth's prescribed processes for examining the validity of signatures on ballot envelopes, so resolution of that question must wait.[18]

Turning finally to Count IV, I agree wholeheartedly with the Majority's analysis. I write separately to underscore that this case illustrates most consequentially the potential for mischief, albeit well-meaning, when we are called upon to question the "true" meaning of the General Assembly's contextually ambiguous use of **\*391** the word "shall." In my view, there are times when this Court has done so gratuitously. But far more frequently, this unfortunate circumstance is foisted upon us by the choices made by the General Assembly during the often tortuous drafting process,

Pennsylvania Democratic Party v. Boockvar, 238 A.3d 345 (2020)
2020 WL 5554644

The difficulty inherent in that enterprise, and concomitantly the risk that we will misconstrue legislative intent, is clear. In searching for methods to remove the guesswork from such situations, Pennsylvania courts have labored mightily but in vain to fashion a coherent organizing principle for determining when the legislature meant "you may" when it said "you must."

For example, the Superior Court once suggested that the distinction inheres in "the *effect* of non-compliance .... A provision is mandatory when failure to follow it renders the proceedings to which it relates illegal and void; it is directory when the failure to follow it does not invalidate the proceedings."[19] But where the court considers the consequences of a failure to perform a task stated in mandatory language, this distinction is nonsensical: we cannot gauge the effect of non-compliance simply by asking what the effect of non-compliance is. In *Bell v. Powell*, we proposed an equally confounding alternative:

> [Shall] may be construed to mean 'may' when no right or benefit to any one depends on its imperative use, when no advantage is lost, when no right is destroyed, when no benefit is sacrificed, either to the public or to any individual, by giving it that construction, or when it is absolutely necessary to prevent irreparable mischief, or to construe a direction so that it shall not interfere with vested rights, or conflict with the proper exercise of power by either of the fundamental branches of government ....[20]

This impenetrable passage suggests nothing to me so much as that we are free to do whatever we want only when what we do does not matter.

**36** To be sure, there may be value in legislating in both mandatory and directory terms. But no benefit is served by, nor is there any excuse for, rendering the distinction opaque with critical omissions, such as the failure to specify a specific consequence for failing to adhere to a particular mandate—especially where, as in the case of naked ballots, the legislature did so for closely related, if not constructively identical, correlative statutory provisions. The General Assembly must endeavor always to distinguish between what it intends to be mandatory and what directory, in its words or by clear and necessary inference. When it fails to do so, courts are left to bend unclear texts toward whatever ends that they believe to be consonant with legislative intent, but with little or no contemporaneous insight into whether they have done so successfully. When the General Assembly does not choose its words carefully according to

their intended effect, it leaves courts with no choice but to sharpen what the drafters made dull.

For this Court's part, if we are to maintain a principled approach to statutory interpretation that comports with the mandate of our Statutory Construction Act, if we are to maximize the likelihood that we interpret statutes faithfully to the drafters' intended effect, we must read mandatory language as it appears, and we must recognize that a mandate without consequence is no mandate at all. If the result, at times, is that the Court imposes a more doctrinaire *392 result than the legislature intended, that body has the tools at its disposal to ensure that the same mistake does not recur.

CHIEF JUSTICE SAYLOR, concurring and dissenting
I join Parts I, II, and III(C), (D) and (E) of the majority opinion, and I respectfully dissent relative to Parts III(A) and (B), concerning the approval of unmanned drop boxes and the extension of the deadline for receiving mail-in ballots.

With regard to drop boxes, I agree with Respondent and the Caucus that the statutory option for a voter to deliver a mail-in ballot "in person to said county board of election" contemplates in-person delivery to a manned, office location. 25 P.S. § 3150.16(a). Although another provision of the Election Code contemplates receipt of "ballot boxes and returns ... in such other place as has been designated by the board" on Election Day, *id.* § 3151, no analogous provision applies to the submission by voters of individual ballots. Moreover, the legislative policy to restrain aggregated handling of mail-in ballots by third parties is manifest, *see, e.g., id.* § 3150.16(a) (requiring *the elector* to mail or deliver a ballot), and the enforceability of this policy is weakened by the use of non-statutory, unmanned drop boxes. This, to me, this suggests against a permissive interpretation of the Election Code.

Relative to the deadline for receiving mail-in ballots, I join Part II of Justice Donohue's concurring and dissenting opinion, as this most closely hews to the express legislative intent that the election be concluded by 8:00 p.m. on election night.

Finally, although the majority decision appears to be designed to accommodate only ballots actually mailed on Election Day or before, the majority does not so much as require a postmark. Particularly in combination with the allowance of drop boxes, this substantially increases the likelihood of

confusion, as well as the possibility that votes will be cast after 8:00 p.m. on Election Day, thus greatly undermining a pervading objective of the General Assembly.

Justice Mundy joins this concurring and dissenting opinion.

JUSTICE DONOHUE, concurring and dissenting

I.

I join the Majority's opinion as to Parts I, II, and III(A), III(C), III(D) and III(E).

II.

With respect to Part III(B), I agree that Petitioners are entitled to relief, but I distance myself from the Majority's analysis to reach this conclusion as well as the specific relief granted. Petitioners base their request for relief on the infringement of the rights afforded by Article 1, Section 5 of the Pennsylvania Constitution, our Free and Equal Elections Clause.[1] In my mind, the issue must be framed as an as-applied challenge, during the duration of the COVID-19 public health crisis and current USPS service standards, to the constitutionality of Sections 3150.12a(a) and 3150.16(c) of Act 77, which respectively set the last date on which voters may request mail-in ballots and the deadline for when ballots must be received by county boards **393** of elections. With deference to my learned colleagues, I believe that this issue should have been decided in a case in this Court's original jurisdiction under Act 77, *Michael Crossey et al, v. Kathy Boockvar, et al.*, No. 108 MM 2020, where the claims likewise were based on the Free and Equal Elections clause and in which this Court ordered the creation of a complete evidentiary record to determine whether the petitioners there had met their high burden to prove the existence of a constitutional injury entitling them to relief.

**\*\*37** Despite invoking an as-applied constitutional challenge in the present case, Petitioners and the Secretary (as in *Crossey*) seek equitable relief in the form of an order permitting non-compliance with the received-by provision in Act 77 (Section 3150.16(c)) during the COVID-19 pandemic. I am not as comfortable as the Majority with the ability of this Court to exercise equitable powers in election

matters.[2] Because they are inherently political, elections are appropriately regulated by the political branch. *In re Guzzardi*, 627 Pa. 1, 99 A.3d 381, 385 (2014). As such, out of respect for legislatures and for the sake of regularity and orderliness in the election process, the supreme courts of our sister states have routinely held that courts cannot exercise equitable powers to mitigate harsh results in derogation of legislative requirements for strict compliance with election-related deadlines. *Butts v. Bysiewicz*, 298 Conn. 665, 5 A.3d 932, 947 (2010) ("Equity only applies in the absence of a specific statutory mandate."); *see also Martin v. Secretary of State*, 482 Mich. 956, 755 N.W.2d 153, 154 (2008); *Smith v. Kiffmeyer*, 721 N.W.2d 912, 914–15 (Minn. 2006); *Andrews v. Secretary of State*, 235 Md. 106, 200 A.2d 650, 651 (1964). Following the leads of these courts, in 2014, this Court denied equitable relief to a litigant in an election case, holding as follows:

> [T]he judiciary should act with restraint, in the election arena, subordinate to express statutory directives. Subject to constitutional limitations, the Pennsylvania General Assembly may require such practices and procedures as it may deem necessary to the orderly, fair, and efficient administration of public elections in Pennsylvania. At least where the Legislature has attached specific consequences to particular actions or omissions, Pennsylvania courts may not mitigate the legislatively prescribed outcome through recourse to equity.

*Guzzardi*, 99 A.3d at 385. The Court recently reaffirmed our decision in *Guzzardi*. *Reuther v. Delaware Cty. Bureau of Elections*, —— Pa. ——, 205 A.3d 302, 308-09 (2019).

Without the availability of equitable relief, it is my view that Petitioners are entitled to relief only in the context of an **\*394** as-applied constitutional challenge. Specifically, Petitioners must prove that in light of the existing circumstances, the short seven-day timeframe established by Sections 3150.12a(a) and 3150.16(c) of Act 77 provides insufficient time for a voter to request a mail-in ballot (by October 27, 2020) and return it to a county board of elections by the statutorily set received-by date (8:00 p.m. on Election Day, November 3, 2020), so that the vote is counted. Such a constitutional challenge requires a plain showing of injury. "There is a presumption that lawfully enacted legislation is constitutional. Should the constitutionality of legislation be challenged, the challenger must meet the burden of rebutting the presumption of constitutionality by a clear, palpable and plain demonstration that the statute violates a

constitutional provision." *Yocum v. Commw. of Pennsylvania Gaming Control Bd.*, 639 Pa. 521, 161 A.3d 228, 238 (2017).

**38 In *Crossey*, the petitioners produced sufficient evidence to meet this high "clear, palpable and plain" burden of proof. Given the deadlines set for the request of and subsequent return of ballots, considered in light of the pandemic and current lagging USPS service standards (which are highly unlikely to improve significantly before Election Day), the evidence in *Crossey* established that there is a strong likelihood that voters who wait until the last day to apply for a mail-in or absentee ballot will be disenfranchised, as their mail-in ballots will not be delivered by Election Day and thus will not be counted. Thus, the short seven-day window set forth in Sections 3150.12a(a) and 3150.16(c) of Act 77 constitutes an interference with the free exercise of the right to vote as guaranteed by our Free and Equal Elections Clause. The evidentiary linchpin for establishing the unconstitutionality of the seven-day time frame was correspondence from Thomas J. Marshall, General Counsel and Executive Vice President for the USPS, to Secretary Boockvar dated July 29, 2020 advising that the current service standards for delivery of First Class Mail is two to five days, and cautioning that Pennsylvania's application and return deadlines for mail-in ballots are such that despite prompt actions by voters, the ballots may "not be returned in time to be counted." The letter was accepted into evidence in *Crossey* and was further supported by the testimony of the Deputy Postmaster at the time the correspondence was crafted.

The existence of the constitutional injury suffered by virtue of adherence to the statutory deadlines for request and return of ballots is illustrated in the following chart, which incorporates the fact of receipt by the board of elections of an application on the statutory deadline of October 27, 2020. It also assumes that the application is immediately processed and a ballot mailed to the voter within forty-eight hours of receipt of the application.[3] I further take into account that mail is processed by USPS but not delivered on Sundays. All computations are based on the use of First-Class Mail:

*395

| DATE BALLOT MAILED BY BOARD | DELIVERY TIME (in days) | DATE BALLOT IS RECEIVED BY VOTER | DATE BALLOT IS MAILED BACK BY VOTER | DELIVERY TIME (in days) | DATE BALLOT IS RECEIVED BY BOARD | BALLOT RECEIVED IN TIME TO BE COUNTED? |
|---|---|---|---|---|---|---|
| Thursday, | 2 | | Saturday, | 2 | Monday, 11/2/2020 | YES |
| 10/29/2020 | | | 10/31/2020 | 3 | Tuesday, 11/3/2020 | YES |
| | | Saturday, | | 4 | Wednesday, 11/4/2020 | NO |
| | | 10/31/2020 | | 5 | Thursday, 11/5/2020 | NO |
| | | | | 2 | Wednesday, 11/4/2020 | NO |
| | | Saturday, | Monday, | 3 | Thursday, 11/5/2020 | NO |
| | | 10/31/2020 | 11/2/2020 | 4 | Friday, 11/6/2020 | NO |
| | | | | 5 | Saturday, 11/7/2020 | NO |
| | | Monday, 11/2/2020 | | 2 | Wednesday, 11/4/2020 | NO |

| | | | | | |
|---|---|---|---|---|---|
| 3–4 | Monday, 11/2/2020 | Monday, | 3 | Thursday, 11/5/2020 | NO |
| | Monday, 11/2/2020 | 11/2/2020 | 4 | Friday, 11/6/2020 | NO |
| | | | 5 | Saturday 11/7/2020 | NO |
| | | Tuesday, | 2–5 | (After Election Day) | NO |
| 5 | Tuesday, | 11/3/2020 | 2–5 | (After Election Day) | NO |
| | 11/3/2020 | Wednesday, 11/4/2020 | 2–5 | (After Election Day) | NO |

The only way the current statutory framework works is if the ballot is delivered by USPS in two days, the voter immediately returns the ballot, and it is received by the board of elections within three days. All other voters who comply with the statutory framework are disenfranchised, even though they complied with the statute.

The role of the judiciary when a meritorious constitutional challenge is brought "includes the obligation to vindicate" the constitutional rights at issue, and in doing so courts have wide latitude to craft an appropriate remedy." *Robinson Twp. v. Commonwealth*, 623 Pa. 564, 83 A.3d 901, 953 (2013); *see also League of Women Voters of Pa. v. Commonwealth*, 645 Pa. 1, 178 A.3d 737, 793 (2018) ("The Court possesses broad authority to craft meaningful remedies [for constitutional violations] when required."). Where, as here, "a legislatively unforeseen constitutional problem requires modification of a statutory provision as applied," the United States Supreme Court has admonished courts to look to legislative intent when devising a remedy. *See United States v. Booker*, 543 U.S. 220, 246-47, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005) (after ruling that federal sentencing statute that made guidelines mandatory was unconstitutional, the Court made an effort to determine what " 'Congress would have intended' in light of the Court's constitutional holding.") *Id.* at 246-47, 125 S.Ct. 738.

**\*\*39** In *Crossey* (and in the present case), Petitioners recommend that the "received by" date be moved from Election Day to seven days after Election Day, so long as **\*396** the mailing is postmarked by Election Day. In *Crossey* (and here), Secretary Boockvar believes that moving the received-by day forward by three days is sufficient, and that Petitioners' longer time period would in fact interfere with other important functions that must take place after Election Day. In crafting a remedy for an as-applied constitutional violation, a court's duty is to effectuate the intent of the General Assembly to the extent possible and to otherwise not disrupt the statutory scheme. In light of these principles, I do not believe that either of the parties' recommended remedies provide the appropriate solution.

There is no reasonable reading of the statute that would lead to the conclusion that the Tuesday before Election Day was of any institutional importance. Instead, the clear legislative intent was that all ballots were to be cast by 8:00 p.m. on Election Day, the termination of the balloting process. It cannot be viewed as a coincidence that the closing of the polls terminating in-person voting and the receipt of mail-in ballots were designated by the statute to be the same. The last date on which applications for ballots would be accepted was tied to an assumption that a timely vote could be cast before the only meaningful milestone, Election Day. As a result, the remedy to best effectuate the legislative intent before the intervening circumstances is to move back, i.e., make earlier, the final date on which applications for mail-in ballots may be submitted to the county boards of elections. I would accept Secretary Boockvar's opinion that three additional days will substantially correct the problem. However, moving back by three days the deadline for the receipt of applications by the boards of elections would result in that deadline falling on Saturday. Instead, to reflect normal business days, the deadline for receipt of the application by the boards of election should be moved to Friday, October 23, 2020. The received-

by date for the ballot by the boards of elections, Election Day by 8:00 p.m., should remain unchanged.

For comparison, the following chart illustrates the new deadlines interfaced with current USPS delivery standards:

*397

| DATE BALLOT MAILED BY BOARD | DELIVERY TIME (in days) | DATE BALLOT RECEIVED BY VOTER | DATE BALLOT MAILED BY VOTER | DELIVERY TIME (in days) | DATE BALLOT RECEIVED BY BOARD | BALLOT RECEIVED IN TIME TO BE COUNTED? |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | 2 | Friday, 10/30/2020 | YES |
| | | Wednesday, | Wednesday, | 3 | Saturday, 10/31/2020 | YES |
| | | 10/28/2020 | 10/28/2020 | 4 | Monday 11/2/2020 | YES |
| | | | | 5 | Monday 11/2/2020 | YES |
| | | Wednesday, | | 2 | Saturday, 10/31/2020 | YES |
| Monday, | | 10/28/2020 | Thursday, | 3 | Monday, 11/2/2020 | YES |
| 10/26/2020 | | Thursday, | 10/29/2020 | 4 | Monday, 11/2/2020 | YES |
| | | 10/29/2020 | | 5 | Tuesday, 11/3/2020 | YES |
| | 3 | Thursday, 10/29/2020 | Friday, | 2 | Monday, 11/2/2020 | YES |
| | | | 10/30/2020 | 3 | Monday, 11/2/2020 | YES |
| | Friday, | | | 4 | Tuesday, 11/3/2020 | YES |
| | 10/30/2020 | | | 5 | Wednesday, 11/4/2020 | NO |
| 4 | Friday, | | | 2 | Monday, 11/2/2020 | YES |
| | 10/30/2020 | | Saturday, | 3 | Tuesday, 11/3/2020 | YES |
| | Saturday, | | 10/31/2020 | 4 | Wednesday, 11/4/2020 | NO |
| 5 | 10/31/2020 | | | 5 | Thursday, 11/5/2020 | NO |

| | Saturday, 10/31/2020 | Monday, 11/2/2020 | 2–5 | (After Election Day) | NO |
|---|---|---|---|---|---|

As with the previous illustration, I assume that county boards of elections will process **and** send out the ballots within forty-eight hours of receipt. Whether this is possible, likely or impossible is apparently immaterial, since Secretary Boockvar, with knowledge of the capacities of the county boards of elections, recommended a three-day extension, so I assume that it accounted for this factor.

As required when remedying an as-applied constitutional defect, this remedy is the least disruptive to the enacted statutory scheme. The problem to be remedied here is that the seven-day period to complete the mail-in vote process has been rendered unworkable by the current extraordinary circumstances. I have no doubt that the statute was intended to accommodate the realities as they existed when Act 77 was enacted. It is unconstitutional as applied to the November 2020 general election because of current realities.

**\*\*40** For these reasons, in connection with the November 2020 general election only, the deadline for requesting a ballot should be moved to Friday, October 23, 2020.[4] **\*398** The legislative choice of Election Day at 8:00 p.m. should remain intact.

In summary, I agree with the Majority that the received-by date for ballot applications in light of the deadline for submission of ballots to the county boards of election is unworkable under current circumstances. I dissent from the invocation of equitable powers to craft a remedy. In my view, this issue should have been decided on the evidentiary record developed in *Crossey* based on the analytical framework for an as-applied challenge to the constitutionality of the statutory provisions as violative of Article 1, Section 5 of our Constitution, with the remedy crafted based upon the legislative intent in enacting the circumstantially defective statutes.

Chief Justice Saylor and Justice Mundy join Part II of this concurring and dissenting opinion.

Emergency Applications to Stay

**JUSTICE MUNDY, dissenting**

In my view, Intervenors[1] make a substantial case on the merits that this Court should stay the portion of our opinion extending the deadline for receipt of mail-in ballots past 8:00 p.m. on November 3, 2020, Election Day.[2] In *Pennsylvania Democratic Party v. Boockvar*, —— Pa. ——, —— A.3d ——, 2020 WL 5554644 (2020), a majority of this Court held that all mail-in ballots postmarked by 8:00 on Election Day, and received by 5:00 p.m. November 6, 2020, even those lacking a postmark or bearing an illegible postmark, would be counted. *Id.* at ——, 2020 WL 5554644, at \*37. Without further explanation, the majority qualified that such ballots "will be presumed to have been mailed by Election Day unless a preponderance of the evidence demonstrates that it was mailed after Election Day." *Id.* The Republican Party of Pennsylvania Intervenors argue that virtually no evidence exists to overcome such a presumption, and "the Court's presumption opens the door to illegally and untimely cast or mailed ballots being counted in, and tainting the results of, the imminent general election in which millions of Pennsylvanians will exercise their right to vote." Republican Party of **\*399** Pennsylvania Application for Partial Stay at 4.

**\*\*41** Intervenors assert that there is a substantial likelihood that they will be successful on the merits of the stay application and writ of certiorari to be filed in the United States Supreme Court. Citing to *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, —— U.S. ——, 140 S. Ct. 1205, 206 L.Ed.2d 452 (2020), Intervenors note that the United States Supreme Court stayed a judgment of a federal district Court in Wisconsin and held that "[e]xtending the date by which ballots may be cast by voters after the scheduled election day fundamentally alters the nature of the election." *Id.* at 1207. It is reasonable that the United States Supreme Court may view this Court's presumption regarding ballots lacking a postmark or bearing an illegible postmark in the same light. As a result, I would grant a stay to preserve the public confidence in the integrity of the upcoming election.

**All Citations**

238 A.3d 345, 2020 WL 5554644

Footnotes

1    The caption reflects the Secretary of the Commonwealth Kathy Boockvar as filing the petition before the Court based upon her application for extraordinary review, which this Court granted. Regardless, as noted, we now refer to the plaintiffs in the underlying lawsuit as "Petitioner" and, as noted *infra*, Secretary Boockvar as "Secretary."

2    Pursuant to 42 Pa.C.S. § 726, this Court

   may, on its own motion or upon petition of any party, in any matter pending before any court or magisterial district judge of the Commonwealth involving an issue of immediate public importance, assume plenary jurisdiction of such matter at any stage thereof and enter a final order or otherwise cause right and justice to be done.

3    At the time Petitioner filed its petition, an action filed by Donald J. Trump for President, Inc., the Republican National Committee ("RNC"), and several Republican congressional candidates and electors (collectively, "Republican Party") against the Secretary and the Boards was pending in the U.S. District Court for the Western District of Pennsylvania. In that case, the Republican Party alleged federal and state constitutional violations stemming from the recent implementation of no excuse mail-in voting under Act 77. The specific issues raised by the Republican Party in the federal action are, to some extent, the mirror image of the issues raised by Petitioner in the case *sub judice*.

4    Concurrently, Petitioner filed both an Application for Special Relief in the Nature of an Expedited Motion for Alternative Service and an Application for an Expedited Discovery Schedule and Evidentiary Hearing, to which several responses were filed. On July 15, 2020, the Commonwealth Court denied Petitioner's request for alternative service. On July 30, 2020, the Commonwealth Court, *inter alia*, granted in part and denied in part Petitioner's application for an expedited discovery schedule and evidentiary hearing. In this order, the Commonwealth Court set forth specific deadlines for responsive pleadings.

5    The UOCAVA delineates, *inter alia*, the process and procedure in which overseas voters and voters in the uniformed services receive absentee ballots for federal elections. *See generally* 52 U.S.C. §§ 20301-20311.

6    As explained more fully below, upon receipt of an official mail-in ballot, the mail-in elector is to mark the ballot in secret, and then fold the ballot, enclose, and securely seal the same in the secrecy envelope provided. 25 P.S. § 3150.16(a). The secrecy envelope "shall then be placed in the second one, on which is printed the form of declaration of the elector, and the address of the elector's county board of election and the local election district of the elector." *Id.*

7    On August 27, 2020, Petitioner filed its: (1) Answer to the Secretary's New Matter; (2) Answer to the new matter filed by various Boards; and (3) an omnibus memorandum of law opposing the preliminary objections filed by several Boards.

8    In her application, the Secretary informed this Court that she had filed a motion in the aforementioned federal action urging the District Court to abstain from rendering a decision pursuant to *R.R. Comm'n of Tex. v. Pullman*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) (explaining that, where appropriate, a federal court may abstain from deciding a case to permit a state court the opportunity to resolve a state law question). Secretary's Application for Extraordinary Relief, 8/16/2020, at 17. This motion was later granted. *See Trump for President, Inc. v. Boockvar*, ―― F.Supp.3d ――, ――, 2020 WL 4920952, at *21 (W.D. Pa. 2020).

9    In addition, on August 18, 2020, Bucks, Chester, Montgomery, and Philadelphia County Boards of Election filed an Answer in Support of the Secretary's application. Likewise, on August 19, 2020, Armstrong, Bedford, Blair, Centre, Columbia, Dauphin, Fayette, Huntingdon, Indiana, Lackawanna, Lawrence, Lebanon, Montour, Northumberland, Venango, and York County Boards of Election also filed an answer joining the Secretary's application. Several of the remaining 67 counties filed no answer letters. On August 20, 2020, answers were filed by the Republican proposed intervenors, as well as proposed co-petitioners, The Common Cause Pennsylvania, The League of Women Voters of Pennsylvania, B-PEP, Make the Road PA, Patricia M. DeMarco, Danielle Graham Robinson, and Kathleen Wise.

10   The Secretary highlighted in her application for extraordinary relief to this Court that there was insufficient time to engage in full pre-trial proceedings and discovery before applications for summary relief could be filed. *See* Secretary's Application for Extraordinary Relief, 8/16/2020, at 13-14. In fact, the Secretary explained that because of all the uncertainties surrounding the case, it was unclear "whether discovery, dispositive motions, and a hearing were even necessary." *Id.* at 14 n.3. She maintained that Petitioner's application to expedite discovery and a hearing in Commonwealth Court was premature. Thus, the Secretary sought extraordinary review of the discrete legal claims alleged in the lawsuit as if at the summary relief stage of the case. Cognizant of our authority when exercising extraordinary jurisdiction, this Court granted the Secretary's request. *See* Order dated 9/1/2020. Accordingly, because of the intense time pressure confronting this Court, we do not address the various procedural filings in the case and, rather, address only the five discrete legal claims before us. *See* 42 Pa.C.S. § 726 (this Court may "assume plenary jurisdiction of [any matter pending before any court] at any stage thereof and enter a final order or otherwise cause right and justice to be done").

11  After this Court granted the Secretary's application and set a schedule for supplemental filings, Bryan Cutler and Kerry Benninghoff, Speaker and Majority Leader of the Pennsylvania House of Representatives, respectively, filed an Application to Intervene, while State Senator Jay Costa, on behalf of the Senate Democratic Caucus filed an Application to Intervene, which was later amended to include State Representative Frank Dermody, on behalf of the House Democratic Caucus. Because of the necessary expediency of reaching a decision in this case, and given that adequate advocacy has been provided, these applications, submitted close to this Court's deadline for supplemental filings, are denied. In any case, the requests are moot given the issuance of our decision.

12  Notably, while Petitioner has styled its requested relief as "injunctive" in reality it seeks declaratory relief. We will treat its prayers for relief accordingly. In this regard, as noted, essentially, we are treating the matter as if it is at the summary relief stage. *See Hosp. & Healthsystem Ass'n of Pa. v. Com.*, 621 Pa. 260, 77 A.3d 587, 602 (2013) ("An application for summary relief may be granted if a party's right to judgment is clear and no material issues of fact are in dispute.") (citation omitted). *See also* Pa.R.A.P. 1532(b) (providing that "[a]t any time after the filing of a petition for review in an appellate or original jurisdiction matter, the court may on application enter judgment if the right of the applicant thereto is clear.").

13  Under Count I, Petitioner also sought relief "in the form of an affirmative injunction requiring that county Boards are required to evaluate the particular facts and circumstances in their jurisdictions and develop a reasonable plan reflecting the needs of the citizens of the county to ensure the expedient return of mail-in ballots." Petition at 47, ¶ 166. Petitioner accurately concedes that it must establish a clear right to this relief. *Id.* at ¶ 167; *see Roberts v. Bd. of Directors of Sch. Dist. of City of Scranton*, 462 Pa. 464, 341 A.2d 475, 478 (1975) (explaining that, "for a mandatory injunction to issue, it is essential that a clear right to relief in the plaintiff be established"). To the extent that Petitioner continues to seek injunctive relief in this form, we summarily decline the request, as there simply is no legal authority that would allow this Court to mandate that the county boards of election "evaluate the particular facts and circumstances in their jurisdictions and develop a reasonable plan reflecting the needs of the citizens of the county to ensure the expedient return of mail-in ballots." In other words, Petitioner cannot establish a clear right to relief with regard to their request for a mandatory injunction.

14  Section 3151 of the Election Code states, in full, as follows:

> Each county board of elections shall cause its office to remain open, in charge of one or more members of the board, during the entire duration of each primary and election, and after the close of the polls, until all the ballot boxes and returns have been received in the office of the county elections board, or received in such other place as has been designated by the board.

25 P.S. § 3151.

15  We note that the Secretary has issued guidelines in this regard specifying that the Boards "may provide voters with access to a secure ballot return receptacle." *See* Secretary's Post-Submission Communication dated 8/24/2020, setting forth the Secretary's Absentee and Mail-in Ballot Return Guidance at 1.1. Additionally, and consistent with the requirement that all votes must be cast by Election Day, these guidelines specify that: "Authorized personnel should be present at ballot return sites immediately prior to 8:00 p.m. or at the time the polls should otherwise be closed"; "At 8:00 p.m. on election night, or later if the polling place hours have been extended, all ballot sites, and drop-boxes must be closed and locked"; and "Staff must ensure that no ballots are returned to ballot return sites after the close of the polls." *Id.* at 3.3.

16  Act 77, *inter alia*, requires Boards to verify an applicant's submitted information to determine whether the applicant is "qualified to receive an official mail-in ballot." 25 P.S. § 3150.12b(a). After approving an application, the Election Code, as amended by Act 77, instructs that "the board shall deliver or mail official mail-in ballots to the additional electors within 48 hours." 25 P.S. § 3150.15.

17  The Election Code grants courts of common pleas the authority to address situations which arise on the day of a primary or general election, 25 P.S. § 3046. Section 3046 entitled "Duties of common pleas court on days of primaries and elections," provides:

> During such period said court shall act as a committing magistrate for any violation of the election laws; shall settle summarily controversies that may arise with respect to the conduct of the election; shall issue process, if necessary, to enforce and secure compliance with the election laws; and shall decide such other matters pertaining to the election as may be necessary to carry out the intent of this act.

25 P.S. § 3046.

18  The affected counties were Allegheny, Dauphin, Delaware, Erie, Montgomery, and Philadelphia.

19  As adopted in Pennsylvania, the UOCAVA provides that military and overseas ballots will be counted if received by the county board by "5:00 p.m. on the seventh day following the election," which this year will be November 10, 2020. 25 Pa.C.S. § 3511.

As an alternative remedy, Petitioner proposes that each ballot could have an individualized deadline twenty-one days after the specific ballot is mailed by the county, so long as it is received before the UOCAVA deadline. Petition at 50, ¶ 108, 179.

20    She specifically recommends that the Court "order that ballots mailed by voters by 8:00 p.m. on Election Day be counted if they are otherwise valid and received by the county boards of election by November 6, 2020. Ballots received within this period that lack a postmark or other proof of mailing, or for which the postmark or other proof of mailing is illegible, should enjoy a presumption that they were mailed by Election Day." Secretary's Application at 29. We observe that this proposal therefore requires that all votes be cast by Election Day but does not disenfranchise a voter based upon the absence or illegibility of a USPS postmark that is beyond the control of the voter once she places her ballot in the USPS delivery system.

21    The Secretary observes that other jurisdictions have likewise granted temporary extensions when faced with natural disasters, such as hurricanes. Secretary's Application at 28 (citing *Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250, 1259 (N.D. Fla. 2016); *Georgia Coalition for the Peoples' Agenda, Inc. v. Deal*, 214 F. Supp. 3d 1344, 1345 (S.D. Ga. 2016)).

22    Respondent further observes that the Pennsylvania Constitution specifically directs the Legislature to "provide a manner in which, and the time and place at which" a qualified elector can submit an absentee ballot. Pa. Const. art. VII, § 14(a).

23    In so arguing, Respondent seemingly ignores the fact that allowing the tabulation of ballots received after Election Day does not undermine the existence of a federal Election Day, where the proposal requires that ballots be cast by Election Day, similar to the procedure under federal and state law allowing for the tabulation of military and overseas ballots received after Election Day.

24    Section 3511 addresses the timeline for the return of ballots of uniform military and oversees voters and provides for the counting of such votes if delivered to the county board by 5 p.m. on the seventh day after Election Day:

> **§ 3511. Receipt of voted ballot**
> **(a) Delivery governs.**--A valid military-overseas ballot cast under section 3509 (relating to timely casting of ballot) shall be counted if it is delivered by 5 p.m. on the seventh day following the election to the address that the appropriate county election board has specified.
> **(b) Rule regarding postmarks.**--If, at the time of completing a military-overseas ballot and balloting materials, the voter has declared under penalty of perjury that the ballot was timely submitted, the ballot may not be rejected on the basis that it has a late postmark, an unreadable postmark or no postmark.

25 Pa.C.S. § 3511.

25    We recognize that we rejected a very similar argument presented in *Disability Rights Pennsylvania* on May 15, 2020, weeks prior to the Primary. *Disability Rights Pa. v. Boockvar*, No. 83 MM 2020, —— Pa. ——, 2020 WL 2820467 (May 15, 2020). At that time, the potential of voter disenfranchisement was speculative as many unknowns existed relating to the magnitude of the pandemic, the extent to which voters would seek mail-in applications, and the ability of Boards to handle the increase. Those uncertainties no longer exist in light of our experience in the 2020 Primary where thousands of voters would have been disenfranchised but for the emergency actions of the courts of common pleas and the Governor.

26    We likewise incorporate the Secretary's recommendation addressing ballots received within this period that lack a postmark or other proof of mailing, or for which the postmark or other proof of mailing is illegible. Accordingly, in such cases, we conclude that a ballot received on or before 5:00 p.m. on November 6, 2020, will be presumed to have been mailed by Election Day unless a preponderance of the evidence demonstrates that it was mailed after Election Day.

We emphasize that voters utilizing the USPS must cast their ballots prior to 8:00 p.m. on Election Day, like all voters, including those utilizing drop boxes, as set forth *supra*. We refuse, however, to disenfranchise voters for the lack or illegibility of a postmark resulting from the USPS processing system, which is undeniably outside the control of the individual voter.

27    The Caucus does not advance argument on the merits of this issue.

28    A provisional ballot is a ballot cast by an individual who claims to be properly registered and eligible to vote at the election district, but whose name does not appear on the district register and whose registration cannot be determined. 25 P.S. § 3050(a.4)(1).

29    The Secretary's position herein is consistent with the directive that the Department of State distributed to the counties on May 28, 2020, indicating that there is no statutory requirement nor any authority for setting aside an absentee or mail-in ballot exclusively because the voter forgot to insert it into the official election ballot envelope. *See* Exhibit B to Petition, Directive of Deputy Secretary for Elections and Commissions Jonathan M. Marks to the county election directors, May 28, 2020. The directive further indicated that "[t]o preserve the secrecy of such ballots, the board of elections in its discretion

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 179 of 205
**Pennsylvania Democratic Party v. Boockvar, 238 A.3d 345 (2020)**

2020 WL 5554644

may develop a process by which the members of the pre-canvass or canvass boards insert these ballots into empty official ballot envelopes or privacy sleeves until such time as they are ready to be tabulated." *Id. See also* Exhibit J to Petition, Guidance for Missing Official Election Ballot Envelopes.

30   Article VII, Section 4 ("Method of elections; secrecy in voting") states, in full, that "[a]ll elections by the citizens shall be by ballot or by such other method as may be prescribed by law: Provided, That secrecy in voting be preserved." Pa Const. art. VII, § 4.

31   Section 1932 of our Statutory Construction Act, "Statutes in pari materia," provides:

  (a) Statutes or parts of statutes are *in pari materia* when they relate to the same persons or things or to the same class of persons or things.

  (b) Statutes *in pari materia* shall be construed together, if possible, as one statute.

  1 Pa.C.S. § 1932.

32   Specifically, Petitioner maintains that the poll watcher residency requirement does not violate the United States Constitution's First Amendment, the Fourteenth Amendment, the Equal Protection Clause, or the Equal Protection and Free and Equal Elections Clauses of the Pennsylvania Constitution.

33   Section 2687(a) provides:

  Each candidate for nomination or election at any election shall be entitled to appoint two watchers for each election district in which such candidate is voted for. Each political party and each political body which had nominated candidates in accordance with the provisions of this act, shall be entitled to appoint three watchers at any general, municipal or special election for each election district in which the candidates of such party or political body are to be voted for. Such watchers shall serve without expense to the county.

  25 P.S. § 2687(a).

34   The Caucus does not advocate in favor of finding the poll watcher residency requirement unconstitutional.

35   Respondent has not asserted that the Pennsylvania Constitution offers greater protection under the circumstances presented. Thus, for purposes of our review, we treat them as co-extensive.

1   *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964).

2   *United States v. Classic*, 313 U.S. 299, 314, 315, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941); *accord United States v. Mosley*, 238 U.S. 383, 386, 35 S.Ct. 904, 59 L.Ed. 1355 (1915).

3   Pa. Const. art. I, § V.

4   *League of Women Voters of Pa. v. Pa.*, 645 Pa. 1, 178 A.3d 737, 809 (2018); *see Winston v. Moore*, 244 Pa. 447, 91 A. 520, 523 (1914).

5   *Wallbrecht v. Ingram*, 164 Ky. 463, 175 S.W. 1022, 1026 (1915).

6   *Id.* at 1027.

7   *League of Women Voters*, 178 A.3d at 822 (citing Pa. Const. art. V, §§ 1, 2, 10); *see Reynolds v. Sims*, 377 U.S. 533, 566, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) ("[A] denial of constitutionally protected rights demands judicial protection; our oath and our office require no less of us.").

8   *Purcell v. Gonzalez*, 549 U.S. 1, 4, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006) (*per curiam*).

9   *League of Women Voters*, 178 A.3d at 814.

10   *See In re General Election-1985*, 109 Pa.Cmwlth. 604, 531 A.2d 836, 839 (1987) ("To permit an election to be conducted where members of the electorate could be deprived of their opportunity to participate because of circumstances beyond their control ... would be inconsistent with the purpose of the election laws.").

11   *League of Women Voters*, 178 A.3d at 814; *cf. Working Families Party v. Commonwealth*, —— Pa. ——, 209 A.3d 270, 306-07 (2019) (Wecht, J., concurring and dissenting) ("The Free and Equal Elections Clause is compromised where the regulatory approach adopted by the legislature has the well-documented effect of ... depressing voter enthusiasm and participation.").

12   Examining the Finances and Operations of the United States Postal Service During COVID-19 and Upcoming Elections: Hearing Before the S. Homeland Security Comm., 116th Cong. (Aug. 21, 2020).

13   Protecting the Timely Delivery of Mail, Medicine, and Mail-in Ballots: Hearing Before the H. Oversight & Gov't Reform Comm., 116th Cong. (Aug. 24, 2020).

14   *See* Pa. Const. art. VII, § 6 ("All laws regulating the holding of elections by the citizens ... shall be uniform throughout the State."); *Kuznik v. Westmoreland Cty. Bd. of Comm'rs*, 588 Pa. 95, 902 A.2d 476, 490 (2006) ("We have held that 'to be uniform in the constitutional sense ... a law [regulating the holding of elections] must treat all persons in the same circumstances alike.' ") (quoting *Kerns v. Kane*, 363 Pa. 276, 69 A.2d 388, 393 (1949)).

15   *Cf. United States v. Starzecpyzel*, 880 F.Supp. 1027, 1046 (S.D.N.Y. 1995) (noting the risk of "natural variations" in handwriting and citing factors such as "disease, intoxication and the passage of time," and citing a putative handwriting expert as observing that "[s]ome people have a lot of individuality present in their writing and other people do not").

16   *See, e.g., Ariz. Dem. Party v. Hobbs*, CV-20-01143-PHX-DLR, —— F.Supp.3d ——, 2020 WL 5423898 (D. Ariz. Sept. 10, 2020); *Richardson v. Tex. Sec. of State*, SA-19-cv-00963-OLG, —— F.Supp.3d ——, 2020 WL 5367216 (W.D. Tex. Sept. 8, 2020); *Frederick v. Lawson*, 1:19-cv-01959-SEB-MDJ, —— F. Supp. 3d ——, 2020 WL 4882696 (S.D. Ind. Aug. 20, 2020); *see also League of Un. Latin Am. Citizens of Iowa v. Pate*, Polk Cty. CVCV056403, 2018 WL 3946147, at *1 (Iowa Aug. 10, 2018) (enjoining use of signature-matching provisions in Iowa's Election Code); *Martin v. Kemp*, 341 F. Supp. 3d 1326 (N.D. Ga. 2018) (enjoining enforcement of Georgia statute permitting rejection of absentee ballots and ballot applications due to alleged signature mismatch), *emergency motion for stay of injunction pending appeal denied, Georgia Muslim Voter Project v. Kemp*, 918 F.3d 1262 (11th Cir. 2019); *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 222 (D. N.H. 2018) (holding that New Hampshire's signature-match requirement for absentee ballots was facially unconstitutional under the Fourteenth Amendment); *Florida Dem. Party v. Detzner*, 4:16cv607-MW/CAS, 2016 WL 6090943, at *9 (N.D. Fla. Oct. 16, 2016) (striking down Florida's mail-in ballot signature match law as violative of the Fourteenth Amendment); *Zessar v. Helander*, 05 C 1917, 2006 WL 642646, at *10 (N.D. Ill. 2006) (finding that the Illinois Election Code provisions requiring signature comparisons on absentee ballots violated voters' due process rights); *La Follette v. Padilla*, CPF-17-515931, 2018 WL 3953766, at *3 (Cal. Super. Ct. Mar. 5, 2018) (holding that California Election Code ballot signature-mismatch provision facially violates due process); *cf.* Susie Armitage, *Handwriting Disputes Cause Headaches for Some Absentee Voters*, ProPublica (Nov. 5, 2018), www.propublica.org/article/handwriting-disputes-cause-headaches-for-some-absentee-voters (discussing legal challenges to signature-match laws).

17   *Bush v. Gore*, 531 U.S. 98, 109, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) (*per curiam*).

18   During the pendency of this appeal, Secretary Boockvar issued a guidance document that, in furtherance of "consistency across the 67 counties," instructs election officials that "[t]he Pennsylvania Election Code does not authorize the county board of elections to set aside returned absentee or mail-in ballots based solely on signature analysis by the county board of elections." Guidance Concerning Examination of Absentee and Mail-In Ballot Return Envelopes at 3 (Sept. 11, 2020) www.dos.pa.gov/VotingElections/OtherServicesEvents/Documents/Examination%20of%20Absentee%20and%20Mail-In%20Ballot%20Return%20Envelopes.pdf.

19   *Borough of Pleasant Hills v. Carroll*, 182 Pa.Super. 102, 125 A.2d 466, 469 (1956) (*en banc*) (emphasis in original).

20   *Commonwealth ex rel. Bell v. Powell*, 249 Pa. 144, 94 A. 746, 748 (1915) (cleaned up).

1   Article I, Section 5 of the Pennsylvania Constitution provides as follows:
> Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage.

Pa. Const., art. 1, § 5.

2   Section 3046 of the Election Code provides courts of common pleas with authority, with some latitude, to make rulings on Election Day to secure compliance with the election laws. 25 P.S. § 6046. Specifically, a judge or judges from each county will remain in session on Election Day to "act as a committing magistrate for any violation of the election laws; shall settle summarily controversies that may arise with respect to the conduct of the election; shall issue process, if necessary, to enforce and secure compliance with the election laws; and shall decide such other matters pertaining to the election as may be necessary to carry out the intent of this act." *Id.* The Commonwealth Court relied on Section 3046 in deciding *In re General Election-1985*, 109 Pa.Cmwlth. 604, 531 A.2d 836 (1987) (in light of a flood occurring on election day, the court of common pleas had the authority to suspend voting in certain districts until the emergency was over), *appeal denied*, 518 Pa. 653, 544 A.2d 963 (1988).
The Majority relies on *In re General Election-1985* to support our broad equitable powers to act in this case despite the limitations in Section 3046.

3   In this regard, we note that 25 P.S. § 3150.15 provides that county boards of elections must deliver the ballots to the voters within forty-eight hours **after** approval of the application. *See* 25 P.S. § 3150.15 ("As additional applications are received and approved, the board shall deliver or mail official mail-in ballots to the additional electors within 48 hours.").

4   To the extent that the non-severability clause in Section 11 of Act 77, 1 Pa.C.S. § 1925 is enforceable, I do not view the election specific remedies at issue here as-applied constitutional violation as triggering the draconian consequence. In the context of the COVID-19 pandemic, applying the non-severability provision to void Act 77 in its entirety would itself be unconstitutional, as it would disenfranchise a massive number of Pennsylvanians from the right to vote in the upcoming election.

2020 WL 5554644

More broadly, in *Stilp v. Commonwealth*, [588 Pa. 539], 905 A.2d 918, 978 ([Pa.] 2006), this Court declined to apply an identically worded non-severability provision, *id.* at 973, refusing to allow the General Assembly to "dictate the effect of a judicial finding that a provision in an act is 'invalid.' " *Id.* at 976. Here, as in *Stilp*, Act 77's boilerplate non-severability provision "sets forth no standard for measuring non-severability, but instead simply purports to dictate to the courts how they must decide severability." *Id.* at 973.

1    Intervenors refers to the Republican Party of Pennsylvania and Joseph B. Scarnati III, President Pro Tempore, Jake Corman, Majority Leader of the Pennsylvania Senate, Bryan Cutler, Speaker of the Pennsylvania House of Representatives, and Kerry Benninghoff, Majority Leader of the Pennsylvania House of Representatives.

2    A stay may be granted where Petitioners, "make a substantial case on the merits and show that without the stay, irreparable injury will be suffered. Additionally, before granting a request for a stay, the court must be satisfied the issuance of the stay will not substantially harm other interested parties in the proceedings and will not adversely affect the public interest." *Maritrans G.P., Inc. v. Pepper, Hamilton & Scheetz*, 573 A.2d 1001, 1003 (1990).

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

8

2020 WL 6158309

KeyCite Blue Flag – Appeal Notification

Appeal Filed by PENNSYLVANIA VOTERS ALLIANCE, ET AL v. COUNTY OF CENTRE, ET AL, 3rd Cir., October 23, 2020

2020 WL 6158309
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

PENNSYLVANIA VOTERS
ALLIANCE, et al., Plaintiffs,

v.

CENTRE COUNTY, et al., Defendants.

No. 4:20-CV-01761
|
Filed 10/21/2020

**Attorneys and Law Firms**

Jordan P. Shuber, Ronald T. Elliott, Thomas Eric Breth, Dillon McCandless King Coulter & Graham, LLP, Butler, PA, Erick G. Kaardal, Pro Hac Vice, Mohrman, Kaardal & Erickson, P.A., Minneapolis, MN, Thomas W. King, III, Dillon McCandless King Coulter & Graham LLP, Buter, PA, for Plaintiffs.

Elizabeth A. Dupuis, Babst Calland, State College, PA, Molly E. Meacham, Babst, Calland, Clements and Zomnir, P.C., Pittsburgh, PA, for Defendant Centre County.

Edward D. Rogers, Pro Hac Vice, Elizabeth Wingfield, Pro Hac Vice, Terence M. Grugan, Pro Hac Vice, Timothy D. Katsiff, Ballard Spahr LLP, Philadelphia, PA, for Defendant Delaware County.

Claire Ann Blewitt, Jerry R. Desiderato, Timothy James Ford, Dilworth Paxson LLP, Philadelphia, PA, for Defendant the City of Philadelphia.

Michele D. Hangley, Robert A. Wiygul, Hangley Aronchick Segal Pudlin& Schiller, Philadelphia, PA, Stephen Moniak, Pa Office of Attorney General, Harrisburg, PA, for Defendant Kathy Boockvar.

**MEMORANDUM OPINION**

Matthew W. Brann, United States District Judge

**I. BACKGROUND**

*1 Plaintiffs filed this civil rights action to enjoin Centre County, Delaware County, and the City of Philadelphia (collectively "Defendants") from receiving election grants from the Center of Tech and Civic Life ("CTCL").[1] Plaintiffs argue that these grants violate the Election and Equal Protection Clauses of the United States Constitution,[2] and that they are preempted by both the Constitution and federal law.[3]

**A. Plaintiffs**

Plaintiffs consist of the Pennsylvania Voters Alliance organization ("PVA") and fourteen individual registered voters who reside in Pennsylvania.[4] These fourteen individuals are residents of Centre County, Delaware County, and the City of Philadelphia.[5] They all generally oppose the election of "progressive" candidates in local, state, and federal elections.[6]

**B. CTCL and the CTCL Grants**

CTCL, a non-party to this action, is a nonpartisan, nonprofit organization formed in 2012 by a "team of civic technologists, trainers, researchers, election administration and data experts" to "foster a more informed and engaged democracy" and to help "modernize elections."[7] CTCL has designated $250,000,000 in grant money to be paid to election offices across the country "to help ensure that [these offices] have the staffing, training, and equipment necessary so this November every eligible voter can participate in a safe and timely way and have their vote counted."[8]

These funds may be used for election-related expenses, including to: maintain in-person polling on election day; obtain personal protective equipment for election officials and voters; support drive-thru voting; publish reminders to voters to update their voter registration information; educate voters on election policies and procedure; recruit and hire poll workers; provide increased cleaning and sanitation at poll sites; train poll workers; expand in-person early voting sites; and deploy additional staff or technology to improve mail ballot processing.[9]

CTCL provides grant funds to any local election office that applies, and the final grant is calculated using nonpartisan criteria.[10] CTCL reports that over 1,100 local election administrators across the country have applied for CTCL grants, including eighteen counties within Pennsylvania, as

Case 4:20-cv-02078-MWB  Document 176-1  Filed 11/19/20  Page 184 of 205
Pennsylvania Voters Alliance v. Centre County, --- F.Supp.3d ---- (2020)

2020 WL 6158309

well as the Pennsylvania Department of State.[11] Of these eighteen counties, eleven voted for Donald Trump over Hillary Clinton in the 2016 election, "and five did so by more than a two-to-one margin."[12]

**\*2** Nevertheless, Plaintiffs claim that CTCL provides funds only to regions that contain "demographics with overwhelmingly progressive voters."[13] Plaintiffs count Defendants among such regions, and note that for the 2016 presidential election, Hillary Clinton received 84.3% of the votes in Philadelphia, 61.58% of the votes in Delaware County, and 50.93% of the votes in Centre County.[14]

### C. Procedural Posture

The genesis of this action stems from Defendants' decision to accept funding from CTCL, allegedly without the consent of the United States Congress or the Commonwealth of Pennsylvania.[15] Each Defendant has accepted grant money from CTCL to varying degrees.[16] This money has been used to fund various election-related initiatives and to defray certain election-related expenses. For example, Defendants have used CTCL moneys to: purchase processing equipment for mail-in and absentee voting; create satellite election offices; install secure drop-boxes; pay for in-person voting expenses; and cover the cost of printing and postage.[17] All three counties have also received election grants under the Help America Vote Act ("HAVA") and the Coronavirus Aid, Relief, and Economic Securities Act, both of which are distributed by the Secretary of the Commonwealth of Pennsylvania.[18]

Plaintiffs allege that Defendants' acceptance of the CTCL grants is unlawful for two reasons. First, they argue that any authority granted to the Defendants to receive these CTCL grants is preempted by the Elections Clause, the Supremacy Clause, HAVA, and the National Voters Registration Act.[19] And second, Plaintiffs claim that the grants directly violate the Pennsylvania Election Code, the Election Clause of the United States Constitution, and the Equal Protection Clause of the Fourteenth Amendment.[20] Specifically, Plaintiffs argue that the CTCL grants violate the Equal Protection Clause because only some counties chose to apply for them; thus resulting in those counties with CTCL funding having more money to spend on elections than those who chose to forgo applying.[21] It is this resultant inequity that Plaintiffs argue is unconstitutional.[22]

Plaintiffs have filed a motion for a temporary restraining order and preliminary injunction.[23] They contend that: they are likely to succeed on the merits of their claims; they will be irreparably harmed absent an injunction; there will be little to no harm to Defendants should an injunction issue; and the public interest weighs in favor of an injunction.[24]

Plaintiffs make sweeping constitutional claims. But there is less to this case than meets the eye. That is because, despite their assertions, Plaintiffs cannot satisfy the threshold standing requirement of Article III. The Court thus concludes that it cannot reach the merits of Plaintiffs' motion because they lack standing. Accordingly, the complaint will be dismissed without prejudice.[25]

## II. DISCUSSION

**\*3** "Article III of the United States Constitution limits the power of the federal judiciary to 'cases' and 'controversies.' "[26] "For a federal court to exercise jurisdiction under Article III, plaintiffs must allege—and eventually prove—that they hav[e] 'standing' to pursue their claims."[27] "The [United States] Supreme Court has repeatedly described the question of Article III standing as a 'threshold' issue."[28] "It is an 'irreducible constitutional minimum,' without which a court would not have jurisdiction to pass on the merits of the action."[29] "As a result, federal courts 'have an obligation to assure themselves of litigants' standing under Article III.' "[30] As the United States Court of Appeals for the Third Circuit has explained, the "continuing obligation to assure that [courts] have jurisdiction requires that [they] raise the issue of standing sua sponte."[31]

"The plaintiff, 'as the party invoking federal jurisdiction,' bears the burden of establishing the minimal requirements of Article III standing: '(1) an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.' "[32] "In assessing whether a plaintiff has carried this burden, [courts must] separate [the] standing inquiry from any assessment of the merits of the plaintiff's claim."[33] "To maintain this fundamental separation between standing and merits at the dismissal stage, [courts] assume for the purposes of [the] standing inquiry that a plaintiff has stated valid legal claims."[34] "While [the Court's] standing inquiry may necessarily reference the nature and source of the claims

asserted, [the Court's] focus remains on whether the plaintiff is the proper party to bring those claims."[35]

Plaintiffs assert three theories of standing.[36] First, they argue that the CTCL grants disadvantage the Plaintiffs because they provide an advantage to progressive and Democrat candidates in the counties where Plaintiffs live and vote.[37] Second, they argue that, without injunctive relief, the CTCL grants will delegitimize and thus invalidate the elections, consequently resulting in Plaintiffs lacking political representation until the election can be re-done.[38] Third, Plaintiffs offer the novel theory that they have suffered an injury as a third-party beneficiary to the "social contract" between the federal government and the individual States.[39]

None of these theories are persuasive. Plaintiffs have not shown that they can satisfy any of the three elements of standing. That is, Plaintiffs have not shown that they will suffer an injury in fact, that any injury is fairly traceable to Defendants, or that any purported injury is likely to be redressable. Consequently, their complaint is dismissed.

### A. Injury in Fact

**\*4** Plaintiffs have not alleged an injury in fact sufficient to support standing. "To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent.' "[40] Plaintiffs' injuries lack particularity and imminence, and the Court accordingly dismisses this action for lack of standing.

### 1. Particularity

All three of Plaintiffs' alleged injuries constitute generalized grievances and are thus insufficiently particularized to support standing. Limiting jurisdiction to those cases which are "personal and individual" to the party "ensures that courts exercise power that is judicial in nature."[41] Thus, the Supreme Court has made clear that "[a] federal court is not 'a forum for generalized grievances.' "[42] The Supreme Court defines generalized grievances as those "predicated upon an interest ... which is held in common by all members of the public."[43] As a result, the Supreme Court has repeatedly rejected challenges to government action premised solely on an individual's general interest in ensuring that the law is followed.[44]

In the voting rights context, the Supreme Court has "long recognized that a person's right to vote is individual and personal in nature."[45] But this right does not give plaintiffs carte blanche to challenge any action that conceivably infringes upon that right. For example, a mere violation of the Elections Clause, on its own, will not support standing because it constitutes a generalized grievance.[46] Nor will "statewide harm" to a voter's interest in "collective representation in the legislature" or in "influencing the legislature's overall 'composition and policymaking.' "[47] To the extent that the latter interest is recognized, it is "embodied in [an individual's] right to vote for [his or her] representative."[48]

In asserting their first theory of standing, Plaintiffs argue that Defendants, by accepting and using CTCL funding, have disadvantaged and wasted Plaintiffs' votes in the upcoming state and federal elections.[49] They claim that Defendants accepted CTCL funding "for the specific purpose to maintain, promote, or favor a historic specific demographic group that can influence the outcome of federal elections within the boundaries of those counties and city."[50] The general crux of this argument seems to be that Defendants' use of CTCL funding will improve voter turnout which in turn will make it more likely that progressive candidates will succeed in the upcoming election.

Importantly, however, Plaintiffs try to dodge the burden of articulating precisely which of their interests have been purportedly infringed. Despite citing their "right to vote," Plaintiffs do not allege that CTCL funding has actually been used to restrict that right. They do not argue that Defendants have used the CTCL funding to impede Plaintiffs' ability to vote or deny them the ability to effectively participate in the upcoming election. Moreover, Plaintiffs remain free to advocate on behalf of their preferred candidates and encourage others to vote.[51] Thus, Plaintiffs' appear to allege only that their right to vote has been infringed because it now might be more difficult for them to elect their preferred candidate.

**\*5** Plaintiffs' argument is unavailing because, at core, their claim is merely a generalized grievance. Though Plaintiffs have done a valiant job of disguising it, the only interest they have identified is of a general nature: that Plaintiffs' ability to influence state and federal elections will be diluted if Defendants take steps that might result in increased voter turnout. This is not a legally cognizable injury under

Article III. And it is "precisely the kind of undifferentiated, generalized grievance about the conduct of government that [the Supreme Court has] refused to countenance in the past."[52] The Court therefore finds Plaintiffs' first theory insufficient to support standing.

Plaintiffs' second theory of standing also fails because it constitutes a generalized grievance. Plaintiffs argue that maintaining CTCL's grants to Defendants would result in Plaintiffs losing representation in their individual districts (because the election results would be subsequently invalidated). But the Court is not aware of any cases holding that the right to be politically represented is a legally cognizable interest under Article III. And the Court declines to expand standing doctrine in such a manner, especially given that any right to political representation would be one "held in common by all members" of the county.[53] This injury is not sufficiently particularized, and thus does not satisfy standing.

Finally, Plaintiffs' third theory of injury also constitutes a generalized grievance. They claim that there is a social contract between the federal government and the individual States, and that Plaintiffs, as citizens, are third-party beneficiaries to this contract. The general thrust of this argument is that Plaintiffs' interest as third-party beneficiaries are harmed whenever the government violates the Constitution, and that this injury is particularized enough to predicate standing.

The Court cannot accept this argument. To adopt Plaintiffs' conception of standing would be to reject the entirety of standing doctrine as it exists today. Under Plaintiffs' theory, any citizen of the United States would have standing to challenge any constitutional violation for any reason. This is simply not supported by precedent or doctrine.[54] And the Court declines to take such an expansive approach in this case.

**2. Imminence**

Even if Plaintiffs could establish that their first two theories state a particularized and concrete injury, the alleged injuries are far too speculative to support standing.[55] To show standing for an alleged future injury, a party must show that the injury is imminent.[56] "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure the alleged injury is not too speculative for Article III purposes—that the injury is

*certainly* impending."[57] Standing thus cannot be predicated on a "highly attenuated chain of possibilities."[58] And courts should exercise caution when determining whether to "endorse standing theories that rest on speculation about the decisions of independent actors."[59]

**\*6** Plaintiffs' theories of standing fail to show that any alleged injury is certainly impending because they rely on a highly attenuated causal chain of events. For example, both theories require the Court to assume that: (1) CTCL funding will result in higher voter turnout; (2) any higher voter turnout will be in support of progressive candidates; (3) the higher voter turnout will be significant enough to impact the outcome of the election; (4) this turnout will impact the election in favor of progressive candidates; and (5) regarding Plaintiffs' second theory, that a party will challenge the election if this Court does not grant Plaintiffs' motion and that challenge will result in the invalidation of the election results.

None of these assumptions are supported by the record. Defendants have used CTCL funding in a nonpartisan way to facilitate the upcoming election; they have spent the CTCL money to set up satellite election offices, offer dropboxes, and pay for various election-related expenses. Defendants have notably not attempted to use the CTCL funds to increase voter turnout by, for example, implementing get-out-the-vote efforts. There simply is no indication in the record that CTCL funds will increase voter turnout at all, which Plaintiffs allege is the root cause of their purported harm.[60]

Further, nothing in the record suggests that, if Defendants' use of the CTCL funding does increase voter turnout, it will necessarily benefit progressive candidates. The implication that increased voter turnout is inherently beneficial to progressive candidates is dubious at best.[61] And the Court finds this assumption far too dependent on the actions of tens, if not hundreds, of thousands of voters to premise standing. As a result, the Court finds that Plaintiffs' injuries are too speculative and not sufficiently imminent to support standing.

**B. Causation**

Plaintiffs also fail to establish that any alleged injury "is fairly traceable to the challenged conduct of the defendant."[62] In *Allen v. Wright*, the Supreme Court concluded that standing was absent where "[t]he links in the chain of causation between the challenged Government conduct and the asserted injury [we]re far too weak for the chain as a whole to sustain

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 187 of 205
**Pennsylvania Voters Alliance v. Centre County, --- F.Supp.3d ---- (2020)**

2020 WL 6158309

respondents' standing."[63] There, the plaintiffs challenged the Internal Revenue Service's grant of tax-exempt status to certain racially discriminatory schools, arguing that such tax-exempt status aided the schools in maintaining segregation and, accordingly, in harming their children by forcing them to attend segregated schools.[64]

Such alleged harm was "not fairly traceable to the Government conduct respondents challenge as unlawful" because there was no evidence that "there were enough racially discriminatory private schools receiving tax exemptions in respondents' communities for withdrawal of those exemptions to make an appreciable difference in public school integration."[65] The Supreme Court noted that it was unclear "how many racially discriminatory private schools [we]re in fact receiving tax exemptions," whether the withdrawal of tax-exempt status "from any particular school would lead the school to change its policies," "whether any given parent of a child attending such a private school would decide to transfer the child to public school as a result of any changes in educational or financial policy made by the private school once it was threatened with loss of tax-exempt status," or "whether, in a particular community, a large enough number of the numerous relevant school officials and parents would reach decisions that collectively would have a significant impact on the racial composition of the public schools."[66]

**\*7** Ultimately, any alleged harm "involve[d] numerous third parties (officials of racially discriminatory schools receiving tax exemptions and the parents of children attending such schools) who may not even exist in respondents' communities and whose independent decisions may not collectively have a significant effect on the ability of public school students to receive a desegregated education."[67] Given that the harm was not directly traceable to the IRS, the Supreme Court concluded that plaintiffs did not have standing to pursue their claims.[68]

Here too, Plaintiffs' alleged harms result from a third-party and, thus, their alleged injuries are not fairly traceable to Defendants. The purported injuries here arise not from Defendants' acceptance of CTCL funds, but from CTCL's decision to allegedly direct those funds to counties with higher rates of progressive voters. Indeed, Plaintiffs make clear in their amended complaint that they are not harmed by the use of funds to secure a safer and more efficient election, but instead "are injured by CTCL's private federal election grants because they are targeted to counties and cities with progressive voter patterns."[69] Because Plaintiffs' injuries are not fairly traceable to Defendants' actions but, instead, to the actions of a non-defendant (CTCL), Plaintiffs do not have standing to pursue their claims in this action.[70]

### C. Redressability

Lastly, the Court finds that standing is absent because Plaintiffs have not demonstrated that any purported harm is likely to be redressed by a favorable decision.[71] At bottom, Plaintiffs claim rests on supposition—their conclusion that safer and more efficient voting as a result of CTCL funds will necessarily lead to increased progressive voter turnout, thereby harming Plaintiffs' preferred conservative candidates.

However, as discussed above, there is no evidence that CTCL funds will result in an increase in voter participation. Indeed, a majority of the funding appears to be dedicated to assisting with the processing of mail-in voting and, thus, would appear likely to have no discernable effect on voter turnout. It appears then that the harm alleged by Plaintiffs would instead be caused by the number of progressive voters who may turn out to vote, not by additional funding that increases the safety and efficiency of the election in the Defendant counties. Consequently, simply forcing Defendants to return all CTCL funding is not likely to stem the harm of which Plaintiffs complain, as those voters may still turn out regardless of whether or not Defendants keep or return the CTCL grant.

It is therefore "entirely conjectural whether the ... activity that affects respondents will be altered or affected by" the Court blocking Defendants from using CTCL funding.[72] Because Plaintiffs' alleged injuries stem from the actions of voters, not Defendants, their claims are not redressable and the Court finds that they lack standing.

### III. CONCLUSION

In accordance with the above discussion, Plaintiffs' complaint will be dismissed without prejudice for lack of standing.

**\*8** An appropriate Order follows.

### All Citations

--- F.Supp.3d ----, 2020 WL 6158309

2020 WL 6158309

Footnotes

1   Doc. 1. Plaintiffs have since amended their complaint and added Kathy Boockvar, in her capacity as Secretary of the Commonwealth of Pennsylvania, as a Defendant. Doc. 38 at ¶ 196.

2   *Id.* at ¶¶ 102-76.

3   *Id.* at ¶¶ 177-216. Specifically, Plaintiffs argue that these grants are preempted by the Elections Clause, the Supremacy Clause, the Help America Vote Act, and the National Voters Registration Act. *Id.*

4   *Id.* at ¶¶ 4-18.

5   *Id.* at ¶¶ 5-18.

6   *Id.* Several Plaintiffs are members of the Pennsylvania House of Representatives and several are Republican candidates in the upcoming election. *Id.* at ¶¶ 5, 9-18. But because neither group asserts claims based on these statuses, they will be treated the same as the other individual Plaintiffs.

7   *Id.* at ¶ 44; Doc. 37 at 5.

8   Doc. 38 at ¶ 55.

9   *Id.* at ¶ 59.

10  Doc. 37 at 6.

11  *Id.*

12  *Id.*

13  *Id.* at 17. Specifically, Plaintiffs contend that CTCL is "a progressive organization [that] targets urban counties and cities for its private federal election grants to turn out the progressive vote so [that] progressive candidates win." Doc. 38 at ¶ 53.

14  *Id.* at ¶¶ 72-74.

15  *Id.* at ¶¶ 79-83.

16  Philadelphia received $10,012,000, Delaware County received $2,200,000, and Centre County received $863,838. *Id.*; *see* Doc. 37 at 15-16.

17  Doc. 38-3.

18  Doc. 38 at ¶¶ 87-97.

19  *Id.* at ¶¶ 102-76.

20  *Id.* at ¶¶ 176-217.

21  *Id.* at ¶¶ 211, 213.

22  *Id.* Plaintiffs' claims against Defendant Boockvar are premised on the alleged illegality of the CTCL grants. Plaintiffs argue that Boockvar is culpable because she permitted Defendants to accept the grants.

23  Doc. 4.

24  Doc. 5.

25  *See Cottrell v. Alcon Labs.*, 874 F.3d 154, 164 n.7 (3d Cir. 2017) ("Because the absence of standing leaves the court without subject matter jurisdiction to reach a decision on the merits, dismissals 'with prejudice' for lack of standing are generally improper").

26  *Id.* at 161-62 (quoting U.S. Const. art. III).

27  *Id.*

28  *Wayne Land & Mineral Grp., LLC v. Delaware River Basin Comm'n*, 959 F.3d 569, 573-74 (3d Cir. 2020) (quoting *Va. House of Delegates v. Bethune-Hill*, ––– U.S. –––, 139 S. Ct. 1945, 1951, 204 L.Ed.2d 305 (2019)).

29  *Id.* at 574 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

30  *Id.* (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006) (brackets omitted)).

31  *Id.* (brackets and ellipsis omitted).

32  *Cottrell*, 874 F.3d at 162 (quoting *Spokeo, Inc. v. Robins*, ––– U.S. –––, 136 S. Ct. 1540, 1547, 194 L.Ed.2d 635 (2016) (ellipsis omitted)).

33  *Id.*

34  *Id.*

35  *Id.* (brackets, citation, and internal quotation marks omitted).

36  Plaintiff PVA premises its associational standing on the standing of its members, the individual named Plaintiffs in this case. Doc. 39 at 4. Accordingly, the Court will analyze Plaintiffs' standing together. Similarly, because Plaintiffs base

**Pennsylvania Voters Alliance v. Centre County, --- F.Supp.3d ---- (2020)**

2020 WL 6158309

their theories of standing against all Defendants on the same injuries, the Court will analyze Plaintiffs' standing against the Defendants as a whole.

37    *Id.* at 5-7.

38    *Id.* at 7.

39    *Id.* at 9-10.

40    *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149, 130 S.Ct. 2743, 177 L.Ed.2d 461 (2010)).

41    *Lance v. Coffman*, 549 U.S. 437, 441, 127 S.Ct. 1194, 167 L.Ed.2d 29 (2007).

42    *Gill v. Whitford*, —— U.S. ——, 183 S. Ct. 1916, 1929, 201 L.Ed.2d 313 (2018).

43    *Lance*, 549 U.S. at 441, 127 S.Ct. 1194.

44    *E.g., id.* at 442; *United States v. Richardson*, 418 U.S. 166, 176-77, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974); *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 220-21, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974).

45    *Lance*, 549 U.S. at 442, 127 S.Ct. 1194.

46    *Id.*

47    *Gill*, —— U.S. at ——, 138 S. Ct. at 1931.

48    *Id.*

49    Doc. 39 at 6.

50    *Id.*

51    Their efforts may even be more easily rewarded now that Defendants have taken additional steps to facilitate early and in-person voting.

52    *Lance*, 549 U.S. at 442, 127 S.Ct. 1194.

53    *Schlesinger*, 418 U.S. at 220, 94 S.Ct. 2925.

54    *Lance*, 549 U.S. at 441, 127 S.Ct. 1194 (asserting only that the law has not been followed is insufficient to establish standing); *Richardson*, 418 U.S. at 176-77, 94 S.Ct. 2940 (holding that a federal taxpayer does not have standing to challenge certain CIA expenditures as a violation of the Constitution's Accounts Clause absent a showing that he suffered a particular injury); *Schlesinger*, 418 U.S. at 220, 94 S.Ct. 2925 ("[S]tanding to sue may not be predicated upon an interest of the kind alleged here which is held in common by all members of the public, because of the necessarily abstract nature of the injury all citizens share.").

55    It is clear that Plaintiffs' "social contract" theory is too generalized to establish standing.

56    *Clapper*, 568 U.S. at 409, 133 S.Ct. 1138.

57    *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 565, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)) (emphasis in original).

58    *Id.* at 410, 133 S.Ct. 1138.

59    *Id.* at 414, 133 S.Ct. 1138.

60    It could be argued that safer, more efficient funding will increase voter turnout in these areas. However, it is equally likely that even without safe and efficient funding, voters in a presidential election—especially one that is viewed as highly consequential to both Republican and Democratic voters—will still be motivated to turn out in the same numbers regardless of any risks associated with voting during a pandemic.

61    As the adage goes, "a rising tide lifts all boats." *Missouri v. Jenkins*, 515 U.S. 70, 102, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995).

62    *Cottrell*, 874 F.3d at 162.

63    *Allen v. Wright*, 468 U.S. 737, 759, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014).

64    *Id.* at 743-45, 104 S.Ct. 3315

65    *Id.* at 757-58, 104 S.Ct. 3315.

66    *Id.* at 758, 104 S.Ct. 3315.

67    *Id.* at 759, 104 S.Ct. 3315.

68    *Id.* at 759-60, 104 S.Ct. 3315.

69    Doc. 38 at 2.

70    *See Leeke v. Timmerman*, 454 U.S. 83, 86-87, 102 S.Ct. 69, 70 L.Ed.2d 65 (1981) (injury indirect insufficient to support standing because injury turned on the action of a prosecutor who was not a party not before the court); *Linda R.S. v.*

Pennsylvania Voters Alliance v. Centre County, --- F.Supp.3d ---- (2020)

2020 WL 6158309

*Richard D.*, 410 U.S. 614, 617-18, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973) (injury too indirect to support standing where injury turned on the action of non-party actor).

71    *Cottrell*, 874 F.3d at 162.

72    *Lujan*, 504 U.S. at 571, 112 S.Ct. 2130.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

9

2014 WL 6694451

2014 WL 6694451
Only the Westlaw citation is currently available.
United States District Court, D. Arizona.

RON BARBER fOR
CONGRESS, et al., Plaintiffs,
v.
Ken BENNETT, et al., Defendants.

No. CV–14–02489–TUC–CKJ.
|
Signed Nov. 27, 2014.

**ORDER**

CINDY K. JORGENSON, District Judge.

**\*1** On November 24, 2014, the Plaintiffs filed a Verified Complaint and Application for Temporary Restraining Order (TRO), Preliminary Injunction and Declaratory Relief. The Plaintiffs are Ron Barber for Congress and three residents of Pima County, Lea Goodwine–Cesarec, Laura Alessandra Breckenridge, and Josh Adam Cohen. The Defendants are Ken Bennett, Secretary of State; the Pima County Board of Supervisors, and Board members Ally Miller, Ramon Valdez, Sharon Bronson, Ray Carroll, and Richard Elias; and the Cochise County Board of Supervisors and Board members Patrick Call, Ann English, and Richard Searle. Martha McSally for Congress and Martha McSally (collectively, "McSally") have moved to intervene, filed an opposition, and a Motion to Dismiss. (Docs.11, 12, 13.) Defendant Bennett has joined in the Opposition to the Motion for a Preliminary Injunction and the Motion to Dismiss. (Docs.18, 19.) Plaintiffs have filed a Reply. (Doc. 22.)

This Order addresses the Application for a Temporary Restraining Order (TRO). Oral argument was heard on this matter on November 26, 2014. The Court having considered the pleadings and arguments presented will deny Plaintiffs' request for a Temporary Restraining Order for the reasons stated herein.

**I. Background**
The general election was held on November 4, 2014. The initial returns indicate that Martha McSally leads the incumbent, Congressman Ron Barber, by a very small margin of 161 votes—less than one—tenth of one percent of the votes cast–in the election for Arizona's second district. [Hamilton Decl. ¶ 6] Each county's Board of Supervisors must meet to canvass the returns and report those returns to the Secretary of State by November 24, 2014. The Secretary of State must certify the election results to the Governor on December 1, 2014, pursuant to A.R.S. § 16–648.

Plaintiffs assert that 133 contested ballots have not been counted and they ask that the Secretary of State, who must certify the results of the general election or the need for a recount of the votes for the United States House of Representatives second congressional district seat, be restrained from certifying the results until after the ballots have been counted. The Preliminary Injunction asks that the other defendants count the votes. (Doc. 2 at 1.) If the Court does not both enjoin the certifying and order Defendants Pima County and Cochise County to count some or all of the problematic votes, then those votes are forever lost and even in a recount will not be considered. No party disputes this, nor is there statutory authority to count the votes after the Secretary of State certifies the result.

According to the Plaintiffs, both the Pima County and Cochise County Board of Supervisors refused to count several categories of ballots. Specifically, they allege:

1. Voters who moved within Pima County and who cast provisional ballots (3 contested ballots);

2. County official wrongly believed that the signature on the affidavit for the early ballot did not match the signature on the voter registration form (27 contested ballots);

**\*2** 3. Early ballots were not signed (8 contested ballots);

4. Provisional ballots were not signed (8 contested ballots);

5. Voters who moved were not directed to the proper precinct by election officials (31 contested ballots);

6. Election officials made misleading or erroneous statements regarding voting in the proper precinct (11 contested ballots); and

7. Voters were not told they were in the wrong precinct (45 contested ballots).

Plaintiffs raise claims under the Equal Protection and Due Process Clauses of the Federal Constitution; the State Constitution Art. II, 21 providing that "elections shall be free and equal" and no power shall interfere to prevent free exercise of suffrage; federal statute, Help America Vote Act (52 USC § 21082(a)(4)); and state statutes (A.R.S. §§ 16579, 583, 584). (Doc. 1.)

## II. Legal Standard for TRO

The test for a TRO is the same as for a preliminary injunction; a preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion." *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (per curiam) (citation omitted) (emphasis in original). The Ninth Circuit has adopted two tests a district court must use when deciding whether to grant a preliminary injunction. *See Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1135 (9th Cir.2011) (finding District Court "made an error of law" by employing only one test when denying preliminary injunction). First, a plaintiff can attempt to satisfy the four-part test adopted by the Supreme Court in *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7 (2008). Under the *Winter* test, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. If a plaintiff cannot meet the *Winter* test, he may attempt to satisfy the second test by showing there are "serious questions going to the merits," the balance of hardships tips sharply in his favor, there is a likelihood of irreparable injury, and the injunction is in the public interest. *Cottrell,* 632 F.3d at 1135. This latter "sliding scale approach" allows a plaintiff to make a lesser showing of likelihood of success provided he will suffer substantial harm in the absence of relief. *Id.* at 1133.

Temporary restraining orders are governed by Rule 65(b). A TRO lasts for only 14 days and may only be extended an additional 14 days for good cause shown or upon consent of the opposing party. Rule 65(b), Fed.R.Civ.P. If a TRO is granted, the motion for a preliminary injunction must be heard at the earliest possible time and takes precedence over all matters except older matters of the same character. *Id.*

Under the Rule, a temporary injunction/TRO may not be issued without imposition of a bond or other security upon the applicant. Rule 65(c), Fed.R.Civ.P. The district court, however, has wide discretion in setting the amount of the bond. *Connecticut General Life Ins. Co. v. New Images of Beverly Hills,* 321 F.3d 878, 882 (9th Cir.2003). In fact, the amount may be set at zero if there is no evidence the party will suffer damages from the injunction. *Id* .

## III. Jurisdiction

**\*3**  The Supreme Court has recognized that federal courts have jurisdiction to entertain suits regarding the seating of a member of Congress in some situations. *Powell v. McCormack,* 395 U.S. 486 (1969). However, not every election contest is appropriately reviewed by a federal court. *See e.g. Curry v. Baker,* 802 F.2d 1302, 1313 n. 6 (11th Cir.1986) (permitting "any voter [to] invoke federal jurisdiction to review the resolution of any vote tabulation or election contest with which he is dissatisfied [ ] would effectively federalize contests of state and local elections").

Indeed, "with only a few narrow and well-defined exceptions, federal courts are not authorized to meddle in local elections." *Bonas v. Town of North Smithfield,* 265 F.3d 69, 74 (1st Cir.2001). Instances where federal jurisdiction over an election contest may be invoked include where a discrete group of voters suffer a denial of equal protection or where a denial of substantive due process occurs (i.e., the election process is patently and fundamentally unfair). *Id.; see also* 29 C.J.S. Election § 422 (Nov.2014).

Nonetheless, "if aggrieved parties, without adequate explanation, do not come forward before the election, they will be barred from the equitable relief of overturning the results of the election." *Soules v. Kauaians for Nukolii Campaign Committee,* 849 F.2d 1176, 1180 (9th Cir.1988); *see also Hart v. King,* 470 F .Supp. 1195 (D.C.Haw.1979).

Indeed, Defendants and McSally argue that Plaintiffs' claims are brought too early or too late. The statutory basis for an elector to contest a claim is set forth in Count VI—a contest of the election on the bases set forth in A.R.S. § 16–672 is to be brought after the secretary of state or governor has canvassed the election and declared the result. A.R.S. § 16–673. That has not happened in this case. Additionally, Defendants argue other bases for contesting the election must have been brought before the County Boards of Supervisors canvassed the official results. A.R.S. § 16–642 and 16–672. However, Plaintiffs' claim based on Arizona statutes is not based on those Arizona statutes. Rather, they base their claims on other procedural Arizona statutes and constitutional violations.

Ron Barber for Congress v. Bennett, Not Reported in F.Supp.3d (2014)

2014 WL 6694451

Further, some of the claims brought by Plaintiffs do not appear to be reasonably foreseeable. For example, if an elector knew his precinct had changed, that elector would have gone to the correct precinct; similarly, it is not likely an elector would have reason to suspect that a person reviewing signatures may not believe the signatures match. There is no basis to conclude that the electors knew of the basis of the claims in advance of the election.

Because there is an adequate explanation for not bringing some of the claims earlier, the Court preliminarily finds that it has jurisdiction in this case to resolve whether or not to grant a TRO. Further, the Court declines to abstain from exercising jurisdiction pursuant to the *Younger* and *Burford* doctrines. *See Younger v. Harris*, 401 U.S. 37 (1971); *Burford v. Sun Oil Co.*, 319 U.S. 315, 334 (1943).

## IV. Discussion

### A. No Likelihood of Success on the Merits of the Federal Claims[1]

**\*4** The Court finds that Plaintiffs have not met their burden to show either likelihood of success on the merits or serious questions going to the merits. They have the burden and have not shown a pervasive error that undermines the integrity of the vote.

As to the second, third, fourth, fifth, and sixth categories of alleged errors—voters who signed both their registration form and their ballot affidavit and still had their ballot rejected for signature mismatch issues (27 ballots); unsigned early (8 ballots); unsigned provisional ballots (8 ballots); failure by election officials to direct voters who had moved to the proper precinct (31 ballots); misleading or erroneous statements by election officials regarding proper precinct—Plaintiffs raise both federal and state claims.

The federal claims are for violations of equal protection and due process.

Regarding the signature mismatch issues, Plaintiffs cite to the State Elections Procedure Manual, which they allege has the force of law. It permits a voter to explain that he or she did vote and why the signatures do not match. They argue that the attached declarations constitute such explanations. They argue an equal protection violation based on a lack of state-wide standards for determining when signatures do not match and how determinations can be cured. It is unclear what standards either Pima or Cochise

County applied to determine a mismatch and whether the cure process is arbitrary. Pima County arbitrarily asserted that the deadline for curing signature-mismatch ballots was noon on November 8th and then changed the deadline to close of business on November 9th, while Cochise County used Election Day as the deadline for curing signature-mismatch ballots. [Declaration of Kurt Bagley ¶ 6 ("Bagley Decl."); Decl. Van Nuys III ¶ 3]. Plaintiffs also claim this unduly burdens a fundamental right because the lack of standards ensures arbitrary and disparate treatment, citing *Bush v. Gore*, 531 U.S. 98, 104–06 (2000). In assessing whether an electoral practice imposes such a burden, a court must "weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). Plaintiffs argue that failing to count the ballots imposes a severe burden and refusing to count serves no legitimate state interest.

They assert a due process violation because the state can regulate absentee voting but it cannot disqualify ballots without affording appropriate due process. *Raetzel v. Parks/ Bellemont Absentee Election Bd.*, 762 F.Supp. 1354, 1358 (D.Ariz.1990).

As to unsigned early ballots, Plaintiffs argue that until approximately the Thursday before Election Day, Pima County mailed ballots back to early voters who failed to sign their ballot affidavit to provide an opportunity to correct the issue. Cochise County called at least some such voters prior to Election Day to inform them of the oversight and/ or sent an affidavit for the voters to return by Election Day. Neither county took any action to cure unsigned early ballots after Election Day. [Quinn–Quesada Decl. ¶¶ 3–4]. Plaintiffs appear to argue an equal protection violation based on arbitrary and inconsistent rules and lack of a rational basis to distinguish between permitting a post-election cure for a mismatched signature but not to permit such a cure where a ballot has not been signed.

**\*5** Regarding unsigned provisional ballots, Plaintiffs argue that because poll workers are required by the Elections Procedure Manual to sign the provisional ballot form that is attached to the provisional ballot envelope, casting of an unsigned provisional ballot necessarily reflects either that a poll worker looked at the unsigned ballot yet failed to inform

the voter that it had not been signed or that the poll worker failed to sign the provisional ballot. [*See, e.g.,* Hamilton Decl., Ex. E, Tab E (Troutman Decl. ¶¶ 3–5).] The unsigned provisional ballots would have been signed if the State had ensured that poll workers took the straight-forward step of ensuring that voters had signed their provisional ballots.

Regarding erroneous statements as to voting in the proper precinct, Plaintiffs assert equal protection and due process claims based on poll workers failure to direct voters to the proper polling place.

Plaintiffs cite primarily to *Bush v. Gore,* 531 U.S. 98, 104–06 (2000), to argue disparate treatment based on allegedly arbitrary procedures and to *Northeast Ohio Coalition for the Homeless v. Husted (NEOCH),* 696 F.3d 580, 598 (6th Cir.2012). But the present case is distinguishable from both *Bush v. Gore* and *NEOCH.*

*Bush v. Gore* involved the 2000 presidential election and the failure of Florida voting machines to fully punch out the chads that represented the vote for a particular candidate; chads were left hanging by corners or were merely indented. 531 U.S. at 102, 105. As a result, thousands of votes were not counted. After a flurry of legal actions, the Florida Supreme Court ordered that when recounting votes, the intent of the voter be determined from the ballot. As the United States Supreme Court noted, this was not problematic as an abstract proposition; the problem was the absence of specific standards to ensure equal application. *Id.* at 106. The evidence showed that "the standards for accepting or rejecting contested ballots might vary not only from county to county but indeed within a single county from one recount team to another." *Id.*

In addition, the Supreme Court specifically noted that

> [t]he question before the Court is not whether local entities, in the exercise of their expertise, may develop different systems for implementing elections. Instead, we are presented with a situation where a state court with the power to assure uniformity has ordered a statewide recount with minimal procedural safeguards. When a court orders a statewide remedy, there must be at least some assurance that the rudimentary requirements of equal treatment and fundamental fairness are satisfied.

*Id.* at 109. In other words, the Court did not invalidate different county systems regarding implementation of election procedures.

In addition, a rational basis standard applies to state regulations that do not burden the fundamental right to vote; strict scrutiny applies when a state's restriction imposes "severe" burdens. *Dudum v. Arntz,* 640 F.3d 1098, 1106 (9th Cir.2011), citing *Burdick,* 504 U.S. at 434; *NEOCH,* 696 F.3d 580, at 592 (6th Cir.2012), citing *McDonald v. Bd. of Election Comm'rs,* 394 U.S. 802, (1969) and *Burdick,* 504 U.S. at 434. For the majority of cases falling between these extremes, courts apply the "flexible" *Anderson/Burdick* balancing test. *NEOCH,* 696 F .3d at 592.

**\*6** In *NEOCH,* the court of appeals found that the plaintiffs "demonstrated that their right to vote is ... burdened by" Ohio's law that rejects wrong-precinct ballots regardless of poll-worker error, and therefore the "[t]he *Anderson–Burdick* standard ... applies." 696 F.3d at 592, citing *Obama for America v. Husted,* 697 F.3d 423, 430 (6th Cir.2012). But in *NEOCH,* the record showed a " 'systemic' disqualification of thousands of wrong-precinct provisional ballots and a strong likelihood that the majority of these miscast votes result from poll-worker error." *Id.* at 593. The court noted that although the number and frequency of disqualifications varied from "county to county, the problem as a whole is systemic and statewide." *Id* . at 586. In addition, the challenge by the voters was a pre-election challenge, not post-election as here.

In *Crawford v. Marion County Election Board,* 533 U.S. 181 (2008), voters challenged as an equal protection violation the state law requiring government issued photo identification to vote. The Court noted that it had not identified any litmus test for measuring the severity of a burden that a state law imposes on a political party, an individual voter, or a discrete class of voters. *Id.* at 191. "However slight that burden may appear, it must be justified by relevant and legitimate state interests "sufficiently weighty to justify the limitation." Plaintiffs note the language regarding the burden on an individual voter. But plainly the issue in *Crawford* involved potentially thousands of voters, and Plaintiffs cite no cases finding constitutional violations where only small numbers of voters were affected by polling place or counting error.

The Ninth Circuit draws a distinction between "garden variety" election irregularities and a pervasive error that undermines the integrity of the vote. *Bennett v. Yoshima,* 140 F.3d 1218, 1226 (9th Cir.1998). *Bennett* is not inconsistent with *Burdick* or *Crawford.* In general, garden variety election irregularities do not violate the Due Process Clause, even if they control the outcome of the vote or election. *Gold v. Feinberg,* 101 F.3d 796, 801 (2d Cir.1996) (human error

2014 WL 6694451

resulting in miscounting of votes, presence of ineligible candidates on ballot, and delay in arrival of voting machines); *Curry v. Baker,* 802 F.2d 1302, 1316 (11th Cir.1986) (allegedly inadequate state response to illegal cross-over voting); *Bodine v. Elkhart County Elec. Bd.,* 788 F.2d 1270, 1272 (7th Cir.1986) (mechanical and human error in counting votes); *Hendon v. North Carolina State Bd. of Elections,* 710 F.2d 177, 182 (4th Cir.1983) (technical deficiencies in printing ballots); *Gamza v. Aguirre,* 619 F.2d 449, 454 (5th Cir.1980) (negligent vote counting); *Hennings v. Grafton,* 523 F.2d 861, 864–65 (7th Cir.1975) (malfunctioning of voting machines); *Pettengill v. Putnam County R–1 School Dist.,* 472 F.2d 121, 122 (8th Cir.1973) (counting some votes that were illegally cast); *Powell v. Power,* 436 F.2d 84 (2d Cir.1970) (non-party members mistakenly allowed to vote in congressional primary); *Johnson v. Hood,* 430 F.2d 610, 613 (5th Cir.1970) (arbitrary rejection of 10 ballots).

**\*7** To illustrate election problems warranting federal intervention, the *Bennett* court pointed to *Griffin v. Burns,* 570 F.2d 1065 (1st Cir.1978). 140 F.3d at 1220. There, absentee and shut-in voters were allowed to use mail-in ballots to vote in a primary election for a city council seat but after the election, the Rhode Island Supreme Court found "no constitutional or statutory basis for allowing absentee and shut-in voters to cast their votes in a primary election," and invalidated the ballots. *Id.* at 1068. Disenfranchised voters sued in federal court, arguing that their constitutional rights had been violated. *Griffin* allowed the claims to proceed because "Rhode Island could not, constitutionally, invalidate the absentee and shut-in ballots that state officials had offered to the voters in this primary, where the effect of the state's action had been to induce the voters to vote by this means rather than in person." *Id.* at 1074. "If the election process itself reaches the point of patent and fundamental unfairness, a violation of the due process clause may be indicated and relief under § 1983 therefore in order. Such a situation must go well beyond the ordinary dispute over the counting and marking of ballots." *Id.* at 1077.

In *Krieger v. City of Peoria,* 2014 WL 4187500 (D.Ariz.2014), the district court recently considered a challenge by a candidate whose name was omitted from early voting ballots. The court cited to *Bennett* and noted that *Griffin v. Burns,* 570 F.2d 1065 (1st Cir.1978), provides helpful guidance on the dividing line between garden variety irregularities and a pervasive error that undermines the integrity of the vote:

While there is no single bright line to distinguish [the two cases] from the cases ... in which federal courts have declined to intervene, it is apparent that in both cases the attack was, broadly, upon the fairness of the official terms and procedures under which the election was conducted. The federal courts were not asked to count and validate ballots and enter into the details of the administration of the election. Rather they were confronted with an officially-sponsored election procedure which, in its basic aspect, was flawed. Due process, "representing a profound attitude of fairness between ... individual and government, is implicated in such a situation".

*Id.* at 1078 (internal citation omitted). Here, Plaintiffs' claims are not based broadly on the fairness of the terms and procedures of the election; rather they focus on individual and infrequent polling-place irregularities and verification procedures. Moreover, they are asking the Court to validate ballots.

As noted, Plaintiffs point to no case where scattered election-procedure violations regarding a small number of voters was found to raise a constitutional violation warranting a federal court's entry into the details of the administration of an election. Certainly, they point to no cases where a court enjoined further action by state electoral officials after the election. Thus, while the Court is not unsympathetic to the plight of individual voters whose ballots may have been improperly rejected, the Court finds that Plaintiffs have not met their burden to show pervasive error that undermines the integrity of the election.

**\*8** As to violations of the Help America Vote Act, HAVA is clear that an eligible voter's "provisional ballot shall be counted as a vote in that election in accordance with State law." 52 U.S.C. § 21082(a)(4). To refuse to count all eligible voters' ballots for those elections in which they may legally vote is a violation of federal law.

HAVA provides that provisional votes shall be counted "[i]f the appropriate *State or local election official ... determines that the individual is eligible under State law to vote,* the individual's provisional ballot shall be counted as a vote in that election *in accordance with State law.*" 52 U.S.C. § 21082(a) (4) (emphasis added). There has been no determination that these voters were not eligible to vote. On the other hand, HAVA does not contain language that requires that the provisional votes be counted; it is directed to providing provisional votes. As the Sixth Circuit noted, the Help America Vote Act's (HAVA) provisional voting

2014 WL 6694451

section is designed to recognize, and compensate for, the improbability of "perfect knowledge" on the part of local election officials. *Sandusky County Democratic Party v. Blackwell,* 387 F.3d 565 (6th Cir.2004).

Thus, the Court finds that Plaintiffs have not met their burden to show a likelihood of success on the merits of equal protection or due process claims or a claim under the HAVA or serious questions going to the merits.

### B. Irreparable Harm

The Supreme Court has stated that "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry v. Sanders,* 376 U.S. 1, 17 (1964); *see also Mitchell v. Cuomo,* 748 F.2d 804, 806 (2nd Cir.1984) ( "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."); *Cardona v. Oakland Unified School Dist., California,* 758 F.Supp. 837 (N.D.Cal.1992) (citations omitted) ("Abridgement or dilution of a right so fundamental as the right to vote constitutes irreparable injury."). The Court finds that, because the votes of the three individual voter Plaintiffs will not count if a TRO is not issued, Plaintiffs have met their burden of showing irreparable harm. However, Plaintiff Ron Barber for Congress' allegation of irreparable harm is speculative at this juncture. Even if all 133 votes are counted, it is undisputed that Martha McSally wins the election because she leads by a margin of 161 votes at this time.

### C. Balance of the Equities and Public Interest

Plaintiffs argue that the Defendants will suffer no harm if the requested relief is granted and that the Secretary of State will merely need to update the vote totals for the 2014 election to include the votes in the contested ballots. They assert that any nominal burden from counting ballots that should have been counted in the first place is outweighed by the interests of the three individual Plaintiffs who were denied the right to vote. They also contend that it is always in the public interest to prevent the violation of a party's constitutional rights.

**\*9** Defendants argue that they will suffer significant harm. McSally asserts that harm to her and all other state and local candidates will result from the entering of a restraining order and preliminary injunction, creating an unwarranted ripple effect through all other races. Further, local and state officials at oral argument expressed concern about the logistics of

reviewing again the 133 ballots and whether this would be unfair to other voters whose ballots were already rejected for similar reasons. In other words, a different review process would take place implicating the fairness of the election as a whole.

The Secretary of State asserts that his Office has been taking action to prepare for the eventual recount under A.R.S. § 16–661 *et seq.* and for the possible filing of an election contest under A.R.S. § 16–672 *et seq.* To that end, the Secretary of State has been working constantly since Election Day to finalize the results with the Official Canvass, to anticipate and plan for the recount, and to anticipate and plan for a contest. These state procedures require numerous actions being taken by the Secretary of State's staff, the county election personnel, and legal counsel. This lawsuit, however, was unanticipated and, for the reasons set forth in McSally's Response and Motion to Dismiss, is inappropriate and disruptive to those state processes that exist.

The Secretary of State also asserts that he has no discretion to delay the Official Canvass. A.R.S. § 16–648(A) provides that "On the fourth Monday following a general election, the secretary of state, in the presence of the governor and the attorney general, shall canvass all offices for which the nominees filed nominating petitions and papers with the secretary of state pursuant to § 16–311, subsection E." The Secretary of State may delay the Canvass only if the Secretary of State has not yet received all of the county canvasses by that first Monday after the general election. A .R.S. § 16–648(C). As of November 24, 2014, the Secretary of State has received all of the county canvasses. Delaying the canvass delays the state processes from occurring, which will delay resolution of this election with respect to this office.

The Court finds that the hardship to Defendants and the electorate of the Second Congressional District outweighs the hardship to Plaintiffs. Like the voter challenge in *Southwest Voter Registration Education Project v. Shelley,* 344 F.3d 914, 919 (9th Cir.2003), hardship falls not only on the Secretary of State but on all citizens of the district. "The public interest is significantly affected. For this reason our law recognizes that election cases are different from ordinary injunction cases.... Interference with impending elections is extraordinary, and interference with an election after voting has begun is unprecedented." *Id.* (internal citations omitted.)

Thus, the Court finds that Plaintiffs have not met their burden for the TRO they request, and the Application is denied.[2]

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 198 of 205
**Ron Barber for Congress v. Bennett, Not Reported in F.Supp.3d (2014)**
2014 WL 6694451

**\*10  IT IS ORDERED** that the Application for a Temporary Restraining Order (Doc. 2) is denied. The Clerk of Court is directed that the docket should reflect that the Motion for a Preliminary Injunction (Doc. 2) remains pending.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 6694451

Footnotes

1   The Supreme Court of Arizona has stated that " 'election contests are purely statutory, unknown to the common law, and are neither actions at law nor suits in equity, but are special proceedings.' " *Griffin v. Buzard,* 86 Ariz. 166, 342 P.2d 201 (Ariz.1959); *Fish v. Redeker,* 2 Ariz.App. 602, 411 P.2d 40 (1966). Arizona permits contests of elections as set forth in A.R.S. § 16–671 *et seq.* Plaintiffs acknowledge that their state law claims are not included in A.R.S. § 16–672, which sets forth the grounds for contesting an election. In light of *Griffin,* it appears that statutory contests not based on the delineated claims do not state a claim and, therefore, are not valid grounds for injunctive relief.

2   It was not discussed at the November 26 hearing whether Plaintiff will continue to seek a preliminary injunction if a TRO is denied.

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

10

Case 4:20-cv-02078-MWB   Document 176-1   Filed 11/19/20   Page 200 of 205

**Texas Democratic Party v. Williams, Not Reported in Fed. Supp. (2007)**

2007 WL 9710211

2007 WL 9710211
Only the Westlaw citation is currently available.
United States District Court,
W.D. Texas, Austin Division.

**TEXAS DEMOCRATIC PARTY and Boyd
L. Richie, in his capacity as Chairman of
the Texas Democratic Party, Plaintiffs,
v.
Roger WILLIAMS, in his capacity
as Secretary of State for the
State of Texas, Defendant.**

Case No. A–07–CA–115–SS
|
Signed 08/16/2007

**Attorneys and Law Firms**

Chad W. Dunn, Brazil & Dunn, K. Scott Brazil, Brazil & Dunn, Houston, TX, Randall Buck Wood, Ray, Wood & Bonilla LLP, Austin, TX, for Plaintiffs.

Kathlyn C. Wilson, Attorney General of Texas, Austin, TX, for Defendant.

## ORDER

SAM SPARKS, UNITED STATES DISTRICT JUDGE

**\*1** BE IT REMEMBERED on the 10th day of August 2007, the Court called the above-styled cause for a hearing and the parties appeared through counsel. Before the Court were Defendant Roger Williams's Motion for Summary Judgment [#4], Plaintiffs' Response thereto [#26, 27], and Defendant's Reply thereto [#35]. Having considered the motion, the response, and the reply, the arguments of counsel at the hearing, the relevant law, and the case file as a whole, the Court enters the following opinion and order.

## Background

Plaintiffs have sued claiming that the eSlate voting systems, manufactured by Hart Intercivic and first certified for use in Texas elections in the year 2000, do not allow voters to "emphasize" their votes when voting a straight party ticket, which causes no votes to be recorded in a race when a voter chooses to vote a straight party ticket and also to "emphasize vote" for a candidate of the same party.[1] According to Plaintiffs, "emphasis voting" occurs when a voter selects the straight party option, and then continues down the ballot to select one or more of his chosen party's individual candidates. These voters, Plaintiffs allege, "do not have complete confidence that their straight-party vote will give a vote to every party candidate." Orig. Compl. at 2, ¶4. Plaintiffs allege these voters want to "make sure" their votes count for these candidates, and that the practice is "not unusual, especially among elderly voters or where voters are distrustful of the voting system or of the election officials." Id. at 2, ¶5. They argue that by emphasis voting, the voter has made his or her choice clear.

Plaintiffs complain that the eSlate voting systems do not allow emphasis voting because when a voter chooses the straight party ticket, and then manually selects the same party's candidate in an individual race, the voting machine de-selects[2] the voter's choice in the individual race and records no vote in that race. Plaintiffs claim this de-selection process fails to record a voter's intent in instances where the voter has made his or her intent especially clear.

Defendant and Plaintiffs do not disagree regarding how the eSlate voting machines work. When a voter begins the voting process, the first screen he or she is shown contains the straight party choice. Def.'s Mot. Summ. J., Ex. 1 at 1; see also Ex. 7. The instructions for straight party voting read as follows: "To cast a straight-party vote, choose the option to the left of the name of that party. Selecting a party automatically selects all candidates associated with that party. If you select a candidate associated with a party other than the straight-party selection, your vote for that candidate will be counted in that particular contest." Id., Ex. 1 at 2. The eSlate machines record straight party votes in the following way: A voter who wishes to utilize the straight party option scrolls down to his or her party choice. Id. at 3. After pressing enter, the box beside the party choice, for example, the Democratic Party, is marked in red. Id. at 4. At the same time, all of the races in which there is a Democratic candidate on the ballot are also marked in red. Id. at 4–9. The voter can therefore see by scrolling down the ballot that all of the Democratic Party choices have been automatically marked in red and selected.

**\*2** When a voter scrolls down to an individual race, such as the race for U.S. Senator shown on page 4 of Exhibit 1, the

Case 4:20-cv-02078-MWB    Document 176-1    Filed 11/19/20    Page 201 of 205

**Texas Democratic Party v. Williams, Not Reported in Fed. Supp. (2007)**
2007 WL 9710211

voter's choice of the Democratic candidate in that particular race is already marked and the name of the Democratic Party candidate is displayed in red. *Id.* at 13. If at this point the voter decides to vote again for the already-selected Democratic Party candidate, the voter's pressing of the enter button will de-select the choice. Before the eSlate voting machine will allow a voter to deselect a straight party candidate, it warns the voter that he is making a change to a straight party choice by displaying a warning screen. *Id.*, Ex. 2. That screen says, "Be aware that you are changing a straight-party choice." *Id.*[3] When the voter proceeds past this warning, the screen then displays, for example, the U.S. Senator's race and shows that the voter now has made no selection in the race because the red mark beside the Democratic candidate's name is no longer there and the Democratic candidate's name is no longer in red. *Id.*, Ex. 3. The voter at this time has an opportunity to re-select the Democratic candidate or any other candidate for the race. Finally, before casting the vote, the voter is shown a screen summarizing his or her choices. On that screen, beside the race for U.S. Senator, the message, "No selections," is written in red. *Id.*, Ex. 4. The Ballot Summary Page states at the top "To change a vote, highlight the contest to change and press ENTER." *Id.*

Plaintiffs seek a declaratory judgment and injunctive relief to enforce rights guaranteed under the Fourteenth Amendment under section 1983. Orig. Compl. at 4. Specifically, Plaintiffs claim the eSlate voting machines burden the fundamental right to vote under the Due Process Clause of the Fourteenth Amendment to the United States Constitution by de-selecting votes lawfully cast for particular candidates. *Id.* at 10. Plaintiffs also claim the voting machines burden the fundamental right to vote under the Equal Protection Clause of the Fourteenth Amendment because the machines treat voter selections differently than other voting systems throughout the state. Finally, Plaintiffs claim the eSlate voting machines violate the Texas Election Code and the Help America Vote Act.

**Analysis**

**I. Summary Judgment Standard**
Summary judgment may be granted if the moving party shows there is no genuine issue of material fact, and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In deciding summary judgment, the Court construes all facts and inferences in the light most favorable to the nonmoving party. *Richter v. Merchs. Fast Motor Lines, Inc.*, 83 F.3d 96, 98 (5th

Cir. 1996). The standard for determining whether to grant summary judgment "is not merely whether there is a sufficient factual dispute to permit the case to go forward, but whether a rational trier of fact could find for the nonmoving party based upon the record evidence before the court." *James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990).

Both parties bear burdens of production in the summary judgment process. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The moving party has the initial burden of showing there is no genuine issue of any material fact and judgment should be entered as a matter of law. Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 322–23; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The nonmoving party must then come forward with competent evidentiary materials establishing a genuine fact issue for trial and may not rest upon the mere allegations or denials of its pleadings. *Anderson*, 477 U.S. at 256–57; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). However, "[n]either 'conclusory allegations' nor 'unsubstantiated assertions' will satisfy the non-movant's burden." *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996).

**II. Defendant's Motion for Summary Judgment**
Defendant moves for summary judgment claiming Plaintiffs have failed to demonstrate any violation of the United States Constitution, the Texas Election Code, or the Help America Vote Act.

**A. Due Process and Equal Protection**
Plaintiffs allege their access to the ballot is impacted by the eSlate's process of de-selecting votes. They claim that this process violates due process by disenfranchising voters, and that the voting system violates equal protection because there are no uniform rules to determine intent where a voter chooses to emphasize individual candidate selections after casting a straight party vote.

*\*3* The right to vote in both state and federal elections is protected by the Federal Constitution. *Reynolds v. Sims*, 377 U.S. 533, 554 (1964); *Gamza v. Aguirre*, 619 F.2d 449, 452 (5th Cir. 1980). The constitutional protections afforded the right to vote do not end the moment the ballot is cast; they continue, to ensure the vote is tallied accurately after it has been cast. *Reynolds*, 377 U.S. at 554.

**Texas Democratic Party v. Williams, Not Reported in Fed. Supp. (2007)**

2007 WL 9710211

The Court evaluates Plaintiffs' claims under the *Anderson* and *Burdick* framework. *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564 (1982); *Burdick v. Takashi*, 504 U.S. 428, 112 S.Ct. 245 (1992); *see Wexler v. Anderson*, 452 F.3d 1226, 1232–33 (11th Cir. 2006) (analyzing challenge to use of touchscreen ballots lacking paper verification under "important regulatory interests" standard of *Burdick*); *Weber v. Shelley*, 347 F.3d 1101, 1105–06 (9th Cir. 2003) (analyzing challenge to lack of voter-verified paper trail in touchscreen voting system under equal protection and due process clauses under *Anderson* and *Burdick*). The Court rejects Plaintiffs' argument that *Bush v. Gore*, 531 U.S. 98, 104–05 (2000) requires the use of a different framework.[4]

In *Anderson v. Celebrezze*, the Supreme Court required that lower courts analyzing a ballot access case must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments. Then the courts must identify and evaluate the precise interests put forth by the state as justifications for the voting regulation. In making this evaluation, the court is to determine the legitimacy and strength of each of these interests and consider the extent to which these interests make it necessary to burden plaintiffs' rights. At that point, the court must weigh all factors. *Anderson* at 789, 103 S.Ct. at 1570.

In *Burdick v. Takushi*, the Supreme Court added that the rigorousness of the inquiry depends upon the extent of the burden on First and Fourteenth Amendment rights. When state statutes impose "severe" restrictions, the statute must be narrowly drawn to advance a compelling interest. However, when a state law imposes only "reasonable, nondiscriminatory restrictions" on those rights, the state's important regulatory interests are generally sufficient to uphold the statute. *Burdick*, 504 U.S. at 434. The Fifth Circuit recognized and applied this standard in *Texas Independent Party v. Kirk*, 84 F.3d 178, 182 (5th Cir. 1996). The Supreme Court explicitly rejected a standard under which every voting case would be subject to strict scrutiny: "to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest ... would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Burdick*, 504 U.S. at 433. "Election laws will invariably impose some burden upon individual voters." *Id.*

*4 In applying the *Anderson-Burdick* analysis, one must first examine the extent to which a challenged provision burdens First and Fourteenth Amendment rights. Plaintiffs have alleged the eSlate voting system disenfranchises "emphasis voters" and that it treats voters in different Texas counties differently with respect to the tabulation of votes. Plaintiffs have offered voting records they claim show instances in which the eSlate system failed to record "emphasized" votes; however, a facial review of these records does not show the eSlate voting system impacts a voters' constitutional rights because it is impossible to know whether or not the voters intended to both vote a straight party ticket and to make no selection in certain races. *See* Orig. Compl., Ex. B. Plaintiffs seek to have this Court assume that anytime a voting record shows no selection beside a race in which the straight party selected has a candidate on the ballot that this resulted from a straight party voter attempting to emphasize his or her vote.[5]

The assumptions Plaintiffs are making are speculative to say the least. Reaching the conclusion that every time a straight party voter failed to make a selection in a race involving one of that party's candidates indicates an attempt to emphasis vote requires the following: (1) an assumption that the voter did not see or did not understand the fact that all of his Democratic choices were automatically marked when he chose the straight party Democratic ticket option; (2) an assumption that the voter did not see or did not understand the screen that told him to be aware that he was changing a straight party choice; (3) an assumption that the voter did not understand that he had de-selected his party choice when he was shown the screen showing the individual race in which the Democratic candidate's box, that had been marked in red, was no longer marked in red; and (4) the assumption that the voter did not see or understand the summary screen, which told him that he had made no selection in the particular race(s) in which he attempted to emphasize his vote. *See* Def.'s Mot. Summ. J., Exs. 1–4. If a voter works his way through each of these warnings and still leaves a particular race with no selection, it is equally if not more plausible that the voter intended to make no selection for that race. The Court is not impressed by Plaintiffs' argument that the summary screen indicating that a straight party selection has been made and also indicating that no selection has been made for some or all races is so confusing or misleading as to violate voters' constitutional rights.

Assuming *arguendo* that the eSlate impacts the constitutional rights of "emphasis voters," any such impact is too slight to violate the Constitution under the *Anderson-Burdick* framework. The first step in this analysis is to examine the extent to which the Texas statute allowing the certification of the eSlate voting system in 2000 burdens voters' First

**Texas Democratic Party v. Williams, Not Reported in Fed. Supp. (2007)**

2007 WL 9710211

and Fourteenth Amendment rights. The Texas Election Code governs systems certified for use in Texas counties as a result of an approval process providing standards to be applied to all voting systems and giving the Secretary of State the ultimate authority to determine whether a particular voting system meets these standards. *See* Tex. Elec. Code §§ 122.001,[6] 122.031 *et seq.* All voting systems in Texas must maintain these standards, but the standards allow for differences in the operation of systems for counties with differing needs. There is no requirement in Section 122.001 that voting systems record "emphasis votes" in any particular way, nor is there any Constitutionally guaranteed right to "emphasis vote." The only burden the eSlate machine arguably places on the First and Fourth Amendment rights of voters is to notice that the box beside his chosen candidate's name is marked in red after selecting the straight party ticket option. The machine warns the voter several times, as discussed above, should the voter seek to emphasize his straight party candidate by de-selecting that candidate. This burden is slight and requires only the amount of engagement necessary to read the computer screen in front of him.[7]

**\*5** In a case such as this in which the burden on First and Fourteenth Amendment rights is slight, the state's important regulatory interests are generally sufficient to uphold the statute. *Burdick*, 504 U.S. at 434. "[S]tates are entitled to broad leeway in enacting reasonable, even-handed legislation to ensure that elections are carried out in a fair and orderly manner." *Weber*, 347 F.3d at 1105 (citing *Storer v. Brown*, 415 U.S. 724, 730 (1974)). "No balloting system is perfect. Traditional paper ballots, as became evident during the 2000 presidential election, are prone to overvotes, undervotes, 'hanging chads,' and other mechanical and human errors that may thwart voter intent." *Weber*, 347 F.3d at 1106 (citing *Bush v. Gore*, 531 U.S. 98 (2000)). Touchscreen voting systems like the eSlate remedy a number of these problems, albeit at the hypothetical price of susceptibility to not recording emphasis votes where a voter does not follow the directions of the machine and/or does not understand the warnings given by the machine when he attempts to emphasis vote for a candidate already selected. "The unfortunate reality is that the possibility of electoral fraud [and undervotes] can never be *completely* eliminated, no matter what type of ballot is used." *Weber*, 347 F.3d at 1106. "However, it is the job of democratically-elected representatives to weigh the pros and cons of various balloting systems. So long as their choice is reasonable and neutral, it is free from judicial second-guessing." *Id.* at 1107.

Here, the Secretary of State of Texas made a reasonable, politically neutral,[8] and non-discriminatory choice to certify the eSlate voting machines for use in elections, and nothing in the Constitution forbids this choice. The standards delineated in Section 122.001 of the Election Code are reasonable, nondiscriminatory, and they do not impose any severe burden on voters who wish to emphasize their vote by allowing certification of the eSlate voting system. "Emphasis voters" have the same right as any voter to read the instructions in front of them and to follow them to ensure their intended vote is recorded. Plaintiffs have failed to allege a burden on their rights so severe as to violate the Constitution; therefore, the Court grants summary judgment in favor of Defendants.

Plaintiffs have brought forth no evidence to show the eSlate voting system violates the constitutional rights of emphasis voters. Plaintiffs have proffered the affidavits of three Madison County voters who voted on the eSlate and who state that they "emphasis voted." Pl.'s Response, Exs. B, C, D. All three voters attest they never saw any warning screen or sign; however, Plaintiffs' attorney conceded at the hearing that the eSlate machine does in fact generate the warning screen and on paper that the description of the system is assumed accurate. *Id.* at 6, Exs. B, C, D. Therefore, it is entirely unclear whether or not these voters actually claim their votes were de-selected and/or not properly counted because they selected the straight party choice and also emphasis voted. These affidavits are not evidence that any constitutional violation occurred because it is unclear whether or not the affiants de-selected their candidates of choice and/or did not have their intended selections counted. Plaintiffs have provided no evidence of a single voter who testifies that he was confused by the warning screens or the process for selecting or de-selecting candidates. As explained above, there will always be certain voters whose intended votes are not counted by any voting method because the votes are not recorded properly or unambiguously by the voters themselves.

Plaintiffs also present the affidavit of Robert Parten, the former Tarrant County Election Administrator, who opines that emphasis voting occurs, and states "The eSlate's operation concerning straight-party and emphasis voters is likely to explain some or all of the undervote observed when comparing paper and eSlate voting systems." Pl.'s Response, Ex. A. However, Parten's opinions are inadmissible under Federal Rule of Evidence 702 because Parten has not collected data on undervotes or emphasis voters, his opinion is not the product of reliable principles and methods, and he has not applied any principles or methods to the facts of the case.

**Texas Democratic Party v. Williams, Not Reported in Fed. Supp. (2007)**

2007 WL 9710211

*See* Fed. R. Civ. P. 702. Therefore, the Court places little, if any, importance on his opinions from the summary judgment evidence. Mr. Parten's unsupported statement simply does not tie undervotes to emphasis voters any more than to other possible explanations—e.g., a voter intentionally choosing not to vote in every race.

**\*6** For the reasons set forth above, the Court finds there is no genuine issue of material fact with regard to any violation of the equal protection and due process rights of Texas voters based on the eSlate voting system's tabulation of "emphasis votes."

**III. Texas Election Code and Help America Vote Act ("HAVA") Claims**

The Court also finds as a matter of law that Plaintiffs are not entitled to relief on their claims of violations of Texas Election Code § 65.009 or 42 U.S.C. § 15481 (Section 301 of HAVA).

**Conclusion**

In accordance with the foregoing:

IT IS ORDERED that Defendant Roger Williams's Motion for Summary Judgment [#4] is GRANTED;

IT IS FURTHER ORDERED that Non–Party Dana DeBeauvoir's Motion to Quash and for Protection From Subpoena Duces Tecum [#22], Non-Party Diana Barrera's Motion to Quash and for Protection from Plaintiff's Notice of Deposition and Written Questions and Subpoena Duces Tecum [#25], and Plaintiffs' Motion to Compel [#32] are DISMISSED AS MOOT.

**All Citations**

Not Reported in Fed. Supp., 2007 WL 9710211

**Footnotes**

1   The Court is somewhat puzzled by the motivation behind "emphasis voting," given that who a person votes for is privileged and private information. Thus, "emphasis voters" are really only emphasizing their fervor or lack of fervor for a particular candidate to a machine or a piece of paper.

2   Choosing the straight party option automatically highlights and selects the party's candidate in all races in which the party has a candidate on the ballot. When an emphasis voter clicks on a party candidate's name in a particular race, this click de-selects and removes the color highlighting from that candidate's name, leaving no candidate selected. *See* Def.'s Mot. Summ. J., Exs. 1, 3.

3   Before the hearing Plaintiffs had contested that such a warning screen in fact appeared; however, Plaintiffs' counsel conceded to the existence of the warning screen during the hearing.

4   In *Bush v. Gore*, the Supreme Court specifically noted: "The question before the Court is not whether local entities, in the exercise of their expertise, may develop different systems for implementing elections." 531 U.S. at 109.
    Plaintiffs claim *Bush v. Gore* implicitly requires strict scrutiny review; however, the Supreme Court explicitly states that a state cannot by "arbitrary and disparate treatment, value one person's vote over that of another." *Id.* at 104–05. This does not clearly require the use of strict scrutiny and instead implies that rational basis review is the standard where a state uses differing rules for measuring the intent of voters on the same punch card technology. Even applying *Bush v. Gore* here, the Court finds the eSlate machines to not treat voters arbitrarily or disparately compared to Texas voters using other voting technologies.

5   There are certainly other possible explanations for this phenomenon, including that some straight party voters simply do not want to vote in every race, for example because they do not like any of the candidates in certain races, and de-selecting the party candidate is the most efficient and accurate way for them to achieve this result.

6   This section, entitled "Voting system standards" provides as follows:
    (a) A voting system may not be used in an election unless the system:
       (1) preserves the secrecy of the ballot;
       (2) is suitable for the purpose for which it is intended;
       (3) operates safely, efficiently, and accurately and complies with the error rate standards of the voting system standards adopted by the Federal Election Commission;
       (4) is safe from fraudulent or unauthorized manipulation;
       (5) permits voting on all offices and measures to be voted on at the election;
       (6) prevents counting votes on offices and measures on which the voter is not entitled to vote;

**Texas Democratic Party v. Williams, Not Reported in Fed. Supp. (2007)**

2007 WL 9710211

  (7) prevents counting votes by the same voter for more than one candidate for the same office or, in elections in which a voter is entitled to vote for more than one candidate for the same office, prevents counting votes for more than the number of candidates for which the voter is entitled to vote;

  (8) prevents counting a vote on the same office or measure more than once;

  (9) permits write-in voting;

  (10) is capable of permitting straight-party voting; and

  (11) is capable of providing records from which the operation of the voting system may be audited.

 (b) A voting system may not be used in an election in which straight-party voting is permitted unless the system permits or prevents, as applicable, counting votes in accordance with Sections 65.007(c) and (d).

 (c) The secretary of state may prescribe additional standards for voting systems consistent with this title. The standards may apply to particular kinds of voting systems, to particular elements comprising a voting system, including operation procedures, or to voting systems generally.

 (d) Effective January 1, 2006, a voting system may not be used in an election if the system uses:

  (1) mechanical voting machines; or

  (2) a punch-card ballot or similar form of tabulating card.

 (e) For an election for federal office in which a state or federal court order has extended the time for voting beyond the time allowed by Subchapter B, Chapter 41, a voting system must provide a separate count of the votes cast after the time allowed by that subchapter.

Tex. Elec. Code § 122.001.

7 It is hard to imagine the voter who is so unsophisticated that he cannot read the screen in front of him, cannot tell the difference between a color-highlighted box and an empty box, and does not read or cannot understand the several warnings provided by the eSlate system when he attempts to "emphasize vote" for a the straight-party candidate already selected. Would the election process be improved if whistles and bells and flashing lights were generated by the voting machine anytime a straight party choice was de-selected? A hypothetical voter using any type of voting system will always have problems voting in the context of a lawsuit filed by a political party for political purposes.

8 Plaintiffs admit that the statistics they have at present establish that more Republican voters vote a straight party ticket and therefore more Republican voters are allegedly disenfranchised through emphasis voting than Democratic voters. *See* Pl.'s Response Summ. J. at 11.

---

**End of Document**
© 2020 Thomson Reuters. No claim to original U.S. Government Works.