# PLAINTIF'S PROPOSED ORDER FOR SUMMARY JUDGMENT

AND NOW, this_____ day of _____, 2020 upon consideration Plaintif's Motion for Default Judgment and for good cause shown, it is hereby ORDERED the Motion is GRANTED.      SO ORDERED.

[1]   Order the SUMMARY Judgment against all defendants be granted and made FINAL at one million dollars per day or as a neotiated amount for each defendant.

[2]   Order the order of Judge Margret Miller made March 17, 2017 against Jeffrey Cutler vacated, the order by Judge Margaret Miller against Jammal Harris vacated and order by Judge Lawrence Stengel against Lisa Michelle Lambert vacated and all persons similarly situated (William Henry Cosby, Joe Johnson, Jeffrey Smiles, Emily Weinman, David Sommers, Mr. William H. McMichael, Stan Caterbone, Claire Risoldi, Rufus Seth Williams, Stepen T. Kirchner (1873 MDA 2018), Scott Capps, General Flynn, Mr. Popodopolis, Ari Goldstein, charges against Roger Stone and Eric Snowden, etc.), for violations of equal protection. All prosecutions of  Robert Mueller as special prosecutor vacated because his appointment was based on perjured testimony, which is verfied by Mr. Steele in a foreign court.

[3]   Order the summary and default judgment of all other cases filed by Mr. Cutler in every court also be granted, and all judgements against Mr. Cutler by every Judge vacated including traffic violations for expired inspection in York, PA East Lampeter Township and Haverford, PA.

[4]   Order ECF 103, 104, 105 & 106 be denied.

[5]   Order Nancy Pelosi and Adam Schiff to resign from their elected positions based on crimes identified in this document, or from their leadership positions.

[6]   Order Judge Barry Bloss, Judge Cynthia Rufe, Judge Jeffrey Schemel,  Judge Eduardo Robreno  pay twice their daily salary each day to the innosense project , until they resign.

[7]   Order Tom Wolf to resign for interference in interstate commerce by restricting traffic on Pennsylvania highways based on news media reports that were equally reliable on stating the Eagles Football team cannot loose against the Florda Marlins.

[8]   Order all vandalism perpetuated against Mr. Cutler and **Mr. Krieger** to be compensated, and listed.

[9]   Provide documentation to the court of how much all court costs and legal fees have been to date, and list cost or legal hours and **ALL LEGAL FIRMS** used to try to change the outcome of a certified election, of Jeffrey Cutler and Donald Trump in all future actions with the court by East Lampeter Township Lancaster County.  Legal fee documentation should start with the actions of the solicitor on and East Lampeter Township starting in 05NOV2013.

[10] Order East Lampeter Township to reveal all persons or individuals that have expressed interest in this case, especially any officials of the United States Government, and all payments by any George Soros organization.

[11] Order a one million dollar a day penalty per named defendant, until Mr. Cutler's reputation and credit are restored or individual agreements are reached with each party.

[12] Order Susan Peipher Esquire, East Lampeter Township, Lancaster County Courts and unnamed others show cause why they should not be charged with violations of the RICCO ACT, both 18 U.S.C. §§ 1961–1968. RICO violations, and 18 U.S.C. § 1964, Civil RICCO Act.

[13] Order Susan Peipher Esquire, Christina Hausner, East Lampeter Township, East Lampeter Township Police, Lancaster County Courts, Ralph Hutchinson, Judge Margaret Miller, Scott Martin, Elam Herr, all named defendants in this case and unnamed others show cause why they should not be charged with violations of 18 U.S.C. § 2113 (bank robbery).

[14] Order Fulton Financial to return all money for accounts ending with 8603 and 8612 with penalties.

[15] Order Fulton Financial to compensate the plaintiffs for cases 5:18-cv-00987 and case 2:17-cv-02763 as demanded in their respective lawsuits.

[16] Order Wikimedia foundation and all media outlets specified to provide space and corrections as provided by the plaintiff and his designated representative for fake news.

[17] Order Summary Judgement be awarded for all other cases Mr. Cutler been denied due process be awarded.

[18] Other remedies the court deems appropriate.

[19] Order the Democratic National Committee to also show why they are not a party to Religious discrimination.

[20] Order Micheal Bloomberg pay the amount promised to his employees when he ran for President, and the 18 million dollars transfered to the DNC be made available fto Mr. Cutler for use in the prosecution of this case. Mr. Bloomberg should pay a fine proportional to the amount Mr. Dinesh DSouza paid for Election Fraud illegal campaign contribution (21.6 million)

[21] Order Susan Peipher Esquire and other lawyers guilty of similar activites, to be barred from participation in the Federal Court CM/ECF system.

[22] Order the United States Government to stop collecting or accessing penalties **FOR FAILURE** to *comply with established tenets or teachings of such sect or division of ANY religion* in violation of the U.S. Constitution amendment 1 and declare the ACA unconstitutional , based on the 89 page writ of USCA case 17-2709 on page 314A, and Supreme court case # 15-632.

Dated: ____ , 2020_____

BY THE COURT

# ADDENDUM

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

Antietam Battlefield KOA, et al.          *
                                          *          Civil Action No. CCB-20-1130
          v.                              *
                                          *
Lawrence J. Hogan, et al.                 *

MEMORANDUM

The world is now in the grip of a public health crisis more severe than any seen for a

hundred years.  In the United States, over 1,480,349 people are confirmed to have been infected

with coronavirus and over 89,407 people have died from the disease it causes.[1]  In Maryland,

over 41,546 people have been infected and over 1,963 people have died.[2]

In the face of this pandemic, Governor Larry Hogan, using the emergency powers

granted to him by the state legislature, has issued a series of executive orders designed to slow

the spread of the disease and protect the health of Maryland residents.  In so doing he has

consulted with and relied on the advice of acknowledged public health professionals.  Based on

that advice and the data related to the rate and number of infections and hospitalizations, the

Governor of necessity has made extremely difficult choices that affect the economic health of the

state and impose restrictions on individual liberties that, in ordinary times, are freely enjoyed by

all Maryland residents.

The plaintiffs in this case ask the court to enjoin the Governor's orders because of their

impact on those individual liberties.  But, as the Supreme Court explained more than one

---

[1] Severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly referred to as COVID-19.  Naming the Coronavirus Disease and the Virus that Causes It, World Health Organization, https://www.who.int/emergencies/diseases/novel-coronavirus-2019/technical-guidance/naming-the-coronavirus-disease-(covid-2019)-and-the-virus-that-causes-it (last accessed May 19, 2020).

[2] Coronavirus data can be found at Cases in the U.S., CDC, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last accessed May 19, 2020) and Coronavirus Disease 2019 (COVID-19) Outbreak, Maryland Department of Health, https://coronavirus.maryland.gov/ (last accessed May 19, 2020).

hundred years ago: "Real liberty for all could not exist under the operation of a principle which recognizes the right of each individual person to use his own, whether in respect of his person or his property, regardless of the injury that may be done to others." Jacobson v. Commonwealth of Massachusetts, 197 U.S. 11, 26 (1905). To overturn the Governor's orders, those who disagree with them must show that they have "no real or substantial relation" to protecting public health, or that they are "beyond all question, a plain, palpable invasion of rights secured by the fundamental law."

In these extraordinary times, for the reasons explained below, the plaintiffs have not met their burden. Their motion for a temporary restraining order, treated as a motion for preliminary injunction, has been fully briefed. No oral argument is necessary, and the motion will be denied.[3]

## FACTS AND PROCEDURAL HISTORY

The spread of COVID-19 in Maryland has been rapid since the first case was reported on March 5, 2020. (ECF 26-2, Decl. of Clifford Mitchell, Maryland Department of Health ¶ 33). Since then, and as of May 19, 2020, there have been over 41,546 confirmed cases, 7,199 hospitalizations, and 1,963 deaths. Coronavirus Disease 2019 (COVID-19) Outbreak, Maryland Department of Health, https://coronavirus.maryland.gov/. Although the "vast majority of people who contract the virus experience only mild or moderate symptoms," some individuals who contract COVID-19, especially those in high-risk categories, can experience obstruction of the lungs, acute respiratory distress syndrome, or death. (ECF 26-2, Decl. of Mitchell ¶¶ 5–8). High-risk categories include those above the age of 60 or those with underlying conditions such

---

[3] The court gave notice to the parties that the motion would be treated as one for preliminary injunction (see ECF 31) and received no objection.

as cancer, diabetes, or heart disease.[4]  (Id. ¶ 8).  COVID-19 is believed to be transmitted through respiratory droplets from an infected person, close personal contact, or touching a surface with the virus on it.  (Id. ¶ 9).  There is currently no vaccine, cure, or proven effective treatment for COVID-19.  (Id. ¶ 10).

In response to the COVID-19 pandemic, on March 5, 2020, Governor Larry Hogan issued a Proclamation of Catastrophic Health Emergency, which declared a state of emergency in Maryland, and which was renewed on March 17, 2020, April 10, 2020, and May 6, 2020. (Compl. ¶ 53; Proclamation, Renewal of Declaration of State of Emergency, May 6, 2020).  The Governor also issued a series of executive orders prohibiting gatherings of certain numbers of people and ordering the closure of certain businesses, referred to as "stay at home" orders.

This case was filed on May 2, 2020, when the March 30, 2020, executive order was in effect.  On May 6, 2020, the Governor issued an amended executive order (EO 20-05-06-01),[5] under which individuals were generally required to stay at home (subject to certain exceptions, including conducting or participating in essential activities), gatherings of more than ten people were prohibited,[6] and non-essential businesses were required to remain closed.[7]  But on May 13, 2020, (the day that the plaintiffs filed their reply), the Governor issued an amended order (EO 20-05-13-01).  This order still prohibits gatherings of over ten people and orders the closure of

---

[4] Other underlying conditions that might put people at a higher risk for severe illness from COVID-19 include moderate to severe asthma, chronic lung disease, and serious heart conditions, including pulmonary hypertension. Groups at a Higher Risk for Severe Illness, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last accessed May 20, 2020).

[5] It is titled: "Amending and Restating the Order of March 30, 2020, Prohibiting Large Gatherings and Events and Closing Senior Centers, and All Non-Essential Businesses and Other Establishments, and Additionally Requiring All Persons to Stay at Home."

[6] The order banned "[s]ocial, community, spiritual, religious, recreational, leisure, and sporting gatherings and events of more than 10 people."  (EO 20-05-06-01 at ¶ III).

[7] Non-essential businesses were already ordered to close by the previous executive orders.  Non-essential businesses are defined as businesses not part of the critical infrastructure as identified by the U.S. Department of Homeland Security's Cybersecurity and Infrastructure Security Agency.  (EO 20-05-06-01 ¶ IV).  The order specifically required the continued closure of senior centers, restaurants and bars (except for takeout and delivery), fitness centers (except for childcare services), theaters, malls (with certain exceptions), and other recreational and miscellaneous establishments.  (Id. ¶ V).

certain non-essential businesses, but allows certain outdoor recreation areas and non-essential retail establishments to open, and allows indoor religious services at 50% capacity, subject to certain operating requirements, including complying with social distancing guidance.  (EO 20-05-13-01 ¶ III).

Violation of the order is a misdemeanor "subject to imprisonment not exceeding one year or a fine not exceeding $5,000 or both."  (Id. at ¶ VIII).  The order will remain in effect until termination of the state of emergency or until it is otherwise rescinded, superseded, or amended. (Id.).  Also relevant to the plaintiffs' allegations is the order requiring individuals to wear face coverings in retail establishments and on public transportation.  (EO 20-04-15-01, April 15, 2020).  The coronavirus-related executive orders all reference Title 14 of the Maryland Public Safety Article.  Section 14-3A-03 of that title states that, following the declaration of a catastrophic health emergency, the Governor is empowered to "order the evacuation, closing, or decontamination of any facility" and to "order individuals to remain indoors or refrain from congregating."

The plaintiffs are individuals threatened with arrest if they violate the executive orders or who otherwise object to having to comply; businesses that have been deemed non-essential; and religious leaders whose ability to hold religious services has been affected by the orders.  State Delegate Daniel Cox alleges that he was threatened with criminal prosecution if he attended or spoke at a Vehicle-Ride Rally to Reopen Maryland on May 2, 2020, which was to protest the Governor's executive orders, because Cox would be violating the prohibition on large gatherings.  (Compl. ¶¶ 1, 68).  Antietam Battlefield KOA and Adventure Parks USA, LLC have both been deemed non-essential businesses and forced to close, which has caused them to lose substantial amounts of money.  (Id. ¶¶ 2, 3, 23, 24, 70).  Staff Sergeant Jason Anderson and

4

Lance Corporal Christopher Repogle are veterans who object to the executive orders, particularly the requirement to cover one's face when entering a retail establishment, because it reminds them of the battlefield in Iraq. (Id. ¶¶ 4, 5). Anderson has also been prevented from obtaining needed physical therapy and an injection in his back because of the orders closing "non-essential" health clinics. (Id. ¶ 25; ECF 1-4, Aff. of Anderson ¶ 5).[8]  Plaintiff Reopen Maryland, LLC is a corporation with 22,000 members seeking redress of the alleged ongoing violations of their constitutional rights. (Compl. ¶ 41). Cox and State Delegates Warren Miller and Neil Parrott allege that they have been prevented from freely speaking and meeting with their constituents, campaigning for office (as to Parrott), holding rallies and events, leaving their home except for reasons deemed "essential," and from ensuring as lawmakers that the laws are not suspended. (ECF 32-3, Decl. of Miller; ECF 32-4, Decl. of Parrott; ECF 32-5, Decl. of Cox).

Reverends Christopher Ogne, James Wickham, Fredrick Caudle, Paul Goodwin, John Seay, Gary Pomrenke,[9] Gary L. Cox, Steven Dixon, and Johnny Hudson,[10] and Deacon David Serenda object to the executive orders which prohibit them from holding religious services with more than 10 people, and from attending weddings and funerals in person. (Id. ¶ 6; see id. ¶¶ 31–40). The plaintiff religious leaders allege that they are "without the resources or equipment to broadcast their worship services online or conduct parking lot or drive-in services," and even if they could, their congregants and members do not necessarily have the resources to watch

---

[8] It is not clear what physical therapy Anderson receives.  The court notes that, per Interpretive Guidance COVID 19-04, dated March 23, 2020, health care facilities, including those providing physical therapy, are not required to close.

[9] Pomrenke filed a stipulation of dismissal as to himself on May 15, 2020. (ECF 35).

[10] Hudson also objects to the face-covering requirement because he was born without arms, as the requirement "denies him access to drive his car which he does with his teeth, facial recognition on his phone which is required to call as he has no hands, and makes him feel like the state has forced and controlled his body in a way that is frightening and harmful to his health and liberty." (Id. ¶ 39).  Guidance from the Maryland Department of Health states "[p]eople with disabilities who are unable to wear a mask are provided reasonable accommodations per the Americans with Disabilities Act."  COVID-19 Frequently Asked Questions, Maryland Department of Health, https://phpa.health.maryland.gov/Documents/coronavirus_FAQ.pdf (last updated May 14, 2020).

services over the Internet. (Id. ¶ 15). Further, it is a tenet of their faith to meet in person. (Id.).

The plaintiffs bring this suit against Governor Larry Hogan, Secretary of the Maryland Department of Health Robert Neall, Deputy Secretary of Public Health Frances Phillips, and Superintendent of Maryland State Police Woodrow Jones III. (Id. ¶¶ 42–45). They bring the following claims: violation of the right to free exercise of religion under the First Amendment (Count I) and Article 36 of the Maryland Declaration of Rights (Count VII); violation of the right to peaceable assembly under the First Amendment (Count II); violation of the right to freedom of speech under the First Amendment (Count III); violation of the Establishment Clause under the First Amendment (Count IV); violation of equal protection under the Fourteenth Amendment (Count V); violation of the Guarantee Clause under the U.S. Constitution and the Maryland Declaration of Rights (Count VI); violation of the right to freedom of speech, assembly, due process, rule of law, separation of powers, not be subject to martial law, and rights under English common law under Articles 5, 8, 10, 13, 24, 32, 40 and 44 of the Maryland Declaration of Rights (Count VIII); violation of the right to have laws suspended only by the Maryland General Assembly under Article 9 of the Maryland Declaration of Rights (Count IX); and violation of the commerce clause and the Fifth Amendment takings clause (Count X).[11]

The plaintiffs seek a temporary restraining order ("TRO") enjoining enforcement of the Governor's executive orders. The motion for a TRO also requests that the court expedite a hearing for preliminary injunctive relief. Because the court finds that no hearing is necessary and because the court will treat the motion as one for a preliminary injunction, the court will deny the request to expedite a hearing. Additionally, Americans United for Separation of Church

---

[11] The complaint, in the section titled "Jurisdiction and Venue" states that "[t]his action arises under the First, Fifth, Eighth and Fourteenth Amendments to the United States Constitution and is brought pursuant to 42 U.S.C. § 1983. This action also arises under the Religious Land Use and Institutionalized Persons Act, ["RLUIPA"] 42 U.S.C. §2000cc, et seq." (Compl. ¶ 46). The plaintiffs, however, do not bring an Eighth Amendment or RLUIPA claim.

and State has filed a motion for leave to file an amicus brief, which will be granted.[12]

## STANDARD OF REVIEW

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20, (2008). "The standard for a temporary restraining order is the same as a preliminary injunction." Maages Auditorium v. Prince George's Cty., Md., 4 F. Supp. 3d 752, 760 n.1 (D. Md. 2014), aff'd, 681 F. App'x 256 (4th Cir. 2017); see Fed. R. Civ. P. 65.

## DISCUSSION

I.    Claims to be addressed

The plaintiffs filed a motion for a TRO on May 2, 2020, but without an accompanying memorandum of law. The defendants filed their opposition on May 8, 2020, and the plaintiffs filed their reply on May 13, only addressing some of their claims. For example, the plaintiffs did not discuss the merits of their Establishment Clause, Takings Clause, Guarantee Clause, Equal Protection Clause, and several of their Maryland Declaration of Rights claims. Therefore, the plaintiffs do not appear to base their motion for a temporary restraining order on these claims, and the court will not address them here.[13] See Wootten v. Commonwealth of Virginia, 168 F. Supp. 3d 890, 895–96 (W.D. Va. 2016) ("[C]ourts widely agree that parties have the burden to

---

[12] The plaintiffs indicated that they opposed the motion but did not file an opposition until May 20, 2020, (ECF 39) after the deadline of May 13, 2020, set by the court. (See ECF 31). Because the plaintiffs did not file a motion for extension of time or otherwise indicate the reason for the delay, the court will not consider their opposition. The court also finds that Americans United's "proffered information" in their proposed brief is "timely and useful." Finkle v. Howard Cty., Md., 12 F. Supp. 3d 780, 783 (D. Md. 2014) (citation omitted). Finally, because the court finds that no oral argument is necessary, Americans United's motion for leave to take part in oral argument (ECF 30) will be denied as moot.

[13] Similarly, Cox filed a declaration stating that he heard the Governor is trying to take his Bar license. (ECF 21). This does not appear to be discussed in the briefing on the motion for a TRO so the court will not address it.

present legal arguments in the first instance," and collecting cases). The reply also makes

reference to the right to travel and to access medical care that is deemed "elective," (see ECF 32,

Reply at 8), but makes no legal arguments as to these claims, so the court will not address them

here either. See Ned Chartering & Trading, Inc. v. Republic of Pakistan, 294 F.3d 148, 155

(D.C. Cir. 2002) (court not required to unearth theories and precedents not cited by the parties).

   II.   Mootness

   The plaintiffs' legal argument regarding their free exercise claim is based on an older

version of the executive order, which prohibited all religious services involving gatherings of

more than ten people. (See, e.g., Reply at 32). That executive order has been amended to allow

in-person indoor religious services at half-capacity. The plaintiffs argue "even though the

Governor just lifted the in-person ban of religious services, he stated the emergency continues

until a vaccine is found and as such he may reinstitute severe measures such as those he lifted at

any time." (Reply at 32).

   "[A] case is moot when the issues presented are no longer 'live' or the parties lack a

legally cognizable interest in the outcome." Porter v. Clarke, 852 F.3d 358, 363 (4th Cir. 2017)

(citations omitted). "There is, however, a well-recognized exception to the mootness doctrine

holding that 'a defendant's voluntary cessation of a challenged practice does not deprive a

federal court of its power to determine the legality of the practice.'" Id. (citations omitted). "To

that end, 'a defendant claiming that its voluntary compliance moots a case bears the formidable

burden of showing that it is absolutely clear the allegedly wrongful behavior could not

reasonably be expected to recur.'" Id. at 364 (citation omitted). "[C]ourts have been particularly

unwilling to find that a defendant has met its heavy burden to establish that its allegedly

wrongful conduct will not recur when the defendant expressly states that, notwithstanding its

abandonment of a challenged policy, it could return to the contested policy in the future." Id. at 365.

Here, the current executive order permits in-person religious services at half-capacity, but this is due to downward trends in COVID-19 hospitalizations, not because of the plaintiffs' claims.[14] The Governor could amend the executive order to again include religious gatherings in the ban on gatherings of ten or more people. Therefore, voluntary cessation does not moot the motion for a temporary restraining order with respect to the religious claims.

III.   Likelihood of success on the merits

COVID-19 has been labeled by both the Governor and the President as a public health emergency. See Proclamation on Declaring National Emergency Concerning the COVID-19 Outbreak, https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ (last accessed May 14, 2020). Numerous cases have applied the standard in Jacobson v. Commonwealth of Massachusetts, 197 U.S. 11 (1905), when reviewing measures that curtail constitutional rights during the COVID-19 pandemic. See, e.g., In re Abbott, 954 F.3d 772, 784–85 (5th Cir. 2020); see also Robinson v. Attorney Gen., --- F.3d ----, 2020 WL 1952370, at *5 (11th Cir. Apr. 23, 2020).

Jacobson involved a board of health regulation requiring all adults to get a smallpox vaccination. 197 U.S. at 12–13. This regulation was enacted after a smallpox outbreak in Cambridge, MA, and pursuant to a state law that provided the board of health such power. Id. at 28. In reviewing the law, the court counseled against infringing on the legislature's power to decide the best way to protect public safety. Id. at 30. Rather,

---

[14] See Maryland Gov. Hogan Lifts Stay-at-home Order, Allows Limited Retail to Resume, Baltimore Sun, https://www.baltimoresun.com/coronavirus/bs-md-pol-stay-at-home-20200513-lzdziypfbrcybmanwqard4tp5u-story.html (last updated May 13, 2020).

> If there is any such power in the judiciary to review legislative action in respect of a matter affecting the general welfare, it can only be when that which the legislature has done comes within the rule that, if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution.

Id. at 31. Since the challenged orders are public health measures to address a disease outbreak, Jacobson provides the proper scope of review. Therefore, the plaintiffs must demonstrate that they are likely to succeed in showing that the Governor's orders have either no "real or substantial relation" to protecting public health or that they are "beyond all question, a plain, palpable invasion of rights secured by the fundamental law."[15]

A. Real or substantial relation

The executive orders at issue have a "real or substantial relation" to the public health crisis. The orders all aim at reducing the opportunities for the virus to spread. The limit on gatherings has a real and substantial relation to reducing the spread of COVID-19, since COVID-19 can spread easily in large groups, because respiratory droplets carrying the virus can spread up to six feet, with some studies showing they can spread even farther. (Decl. of Mitchell ¶ 15). Outbreaks in Virginia, Kentucky, Chicago, and Washington State have been linked to large gatherings. (Id. ¶ 22). Additionally, requirements for face coverings also reduce the chance that respiratory droplets containing the virus will infect others. (Id. ¶ 23). Finally, the Governor has taken these measures based on the advice and with the assistance of an advisory committee of eight individuals, all with either disease, public health, and/or emergency management

---

[15] The scope of review set out in Jacobson is more appropriate for this situation than the scope of review in United States v. Chalk, which the defendants cite, as that case dealt with a situation where "civil control ha[d] broken down to the point where emergency measures are necessary," and not a public health emergency. See 441 F.2d 1277, 1281 (4th Cir. 1971). The plaintiffs are incorrect, though, that Chalk was limited to whether there was probable cause to search a vehicle for a weapon. Chalk also addressed the validity of a curfew, which Chalk was arrested for violating, and which is what triggered the search. Id. at 1278, 1283.

experience, (id. ¶ 26), which further indicates that the Governor's measures are informed, based on science, and substantially related to the COVID-19 pandemic.

It is not clear if the plaintiffs argue that the orders lack a real and substantial relation to protecting public health, but they do dispute the defendants' characterization of the severity of the COVID-19 outbreak and the need for such measures. Instead, they argue that COVID-19 has not caused extensive loss of life, as "the total number of Marylanders who, after nearly three months of the virus being in the State, have succumbed to the disease is far less than those who have died even this year from the annual flu or possibly from the effects of being under the stay-in home lock-down orders from suicide and overdoses," and that the state's projections regarding COVID-19 have been wrong. (Reply at 5). But even if these assertions were true,[16] the plaintiffs ignore the likelihood that the restrictions that were put in place reduced the number of deaths and serious disability the State has experienced. The plaintiffs reject the Governor's consideration of projections for cases outside of Maryland, but that ignores the fact that the first three Maryland cases were travel related, (Decl. of Mitchell ¶ 33), indicating COVID-19 data outside of Maryland is relevant to the public health and safety of Maryland residents. This is further supported by the fact that the outbreak originated in China and has now spread across the world, causing over 320,623 reported deaths so far. Mapping the Worldwide Spread of Coronavirus, Wash. Post, https://www.washingtonpost.com/graphics/2020/world/mapping-spread-new-coronavirus/?itid=sf_coronavirus (last updated May 19, 2020). Additionally, the Governor's executive orders, including the gradual easing of restrictions based on COVID-19 data, are in line with the federal government's Guidelines for Opening Up America Again. See Opening Up America Again, https://www.whitehouse.gov/openingamerica/ (last accessed May

[16] The plaintiffs do not provide sources supporting these assertions. The plaintiffs also have not provided any affidavits from public health officials or other similar evidence supporting their characterization of the COVID-19 outbreak.

19, 2020).[17]

The court's role is not to "usurp the functions of another branch of government" in deciding how best to protect public health, as long as the measures are not arbitrary or unreasonable. Jacobson, 197 U.S. at 28. It might be, as the plaintiffs contend, that the prohibitions in place are not necessary to ensure public health and safety, or it might be that even stricter prohibitions are warranted.[18] But although there may be more than one reasonable way to respond to the COVID-19 outbreak, it is clear that the Governor's orders have at least a real and substantial relation to protecting public health.

B. Constitutional rights[19]

As to whether the orders are "beyond all question, a plain, palpable invasion of rights secured by the fundamental law," for the reasons stated below, the court finds that the plaintiffs have not shown a likelihood of success on the merits.

1. Free Exercise

---

[17] The plaintiffs also argue that the Governor violated Title 14 of the Maryland public safety article when he declared a catastrophic health emergency, because none exists, and because the Governor is quarantining individuals in violation of the statute by not providing due process. It is not clear how this fits into the plaintiffs' constitutional claims, and the plaintiffs do not bring any statutory claims under Title 14 (assuming one could be brought). The court notes that it does not appear that requiring individuals to stay at home except for essential activities, which includes engaging in outdoor exercise, constitutes a quarantine of those individuals. (See ECF 37, Surreply at 11–12). The plaintiffs also argue that the Governor is imposing a duty to protect a neighbor from an unknown disease, when no such tort duty exists in Maryland. (Reply at 4). It is not clear what the plaintiffs mean by this argument. If the argument is that the police power of the state is limited to regulating conduct that would be considered tortious, the plaintiffs provide nothing to support that.

[18] For example, some might question the wisdom of reopening indoor religious services even at 50% capacity, given the greater likelihood of contagion in an enclosed space where people are talking, and perhaps singing, for a significant period of time. (See Decl. of Mitchell ¶ 23 (distinguishing between activities like shopping and prolonged proximity to others in a group); ECF 24-1, Americans United's Amicus Brief at 16–17 (religious gatherings that have caused the spread of COVID-19)); A Choir Decided to Go Ahead with Rehearsal. Now Dozens of Members have COVID-19 and Two are Dead, LA Times, https://www.latimes.com/world-nation/story/2020-03-29/coronavirus-choir-outbreak (last updated March 29, 2020); A Funeral and a Birthday Party: CDC Traces Chicago Coronavirus Outbreak to Two Family Gatherings, Wash. Post, https://www.washingtonpost.com/health/2020/04/08/funeral-birthday-party-hugs-covid-19/ (last updated April 8, 2020).

[19] The plaintiffs bring facial and as-applied challenges. "[C]lassifying a lawsuit as facial or as-applied affects the extent to which the invalidity of the challenged law must be demonstrated and the corresponding 'breadth of the remedy,' but it does not speak at all to the substantive rule of law necessary to establish a constitutional violation." Bucklew v. Precythe, 139 S. Ct. 1112, 1127 (2019) (citation omitted).

The plaintiffs argue that the prohibition on gatherings of over ten people infringes on their right to free exercise of religion under the First Amendment of the U.S. Constitution and Article 36 of the Maryland Declaration of Rights.[20]  In accordance with Emp't Div., Dep't of Human Res. v. Smith, 494 U.S. 872, 879 (1990) and Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 534–35 (1993), as well as recent cases addressing similar orders prohibiting gatherings,[21] the court first addresses whether the prohibition is neutral and of general applicability.  Second, the court addresses whether the prohibition is properly tailored under the appropriate scrutiny.

The free exercise clause does not require the government "to exempt religious practices from a 'valid and neutral law of general applicability.'"  Liberty Univ., Inc. v. Lew, 733 F.3d 72, 99 (4th Cir. 2013) (quoting Smith, 494 U.S. at 879); see also Prince v. Massachusetts, 321 U.S. 158, 166–67 (1944) ("The right to practice religion freely does not include liberty to expose the community . . . to communicable disease[.]").  "A law is considered neutral if it proscribes conduct without regard to whether that conduct is religiously motivated or not."  Hines v. S.C. Dep't of Corr., 148 F.3d 353, 357 (4th Cir. 1998).  Alternatively, a law is not neutral if it targets conduct because of its religious motivation, which may be shown through a lack of facial neutrality, evidence about the purpose of the law, or the effect of the law in operation.  Lukumi, 508 U.S. at 534–35.  As to general applicability, "[a]ll laws are selective to some extent, but

---

[20] It does not appear that the plaintiffs make any distinction between the First Amendment and Article 36 of the Maryland Declaration of Rights claims, so the court will treat them as the same.  See Supermarkets Gen. Corp. v. State, 286 Md. 611, 625 (1979) ("Toys makes no distinction in its argument between the establishment of religion clause of the First Amendment to the Constitution of the United States and the declarations of Article 36 of the Maryland Declaration of Rights.  Therefore, we need not consider whether the two constitutional provisions are in Pari materia.")

[21] See, e.g., On Fire Christian Center, Inc. v. Fischer, --- F. Supp. 3d ----, 2020 WL 1820249 (W.D. Ky. Apr. 11, 2020); First Baptist Church. v. Kelly, --- F. Supp. 3d ----, 2020 WL 1910021 (D. Kan. Apr. 18, 2020); Legacy Church, Inc. v. Kunkel, --- F. Supp. 3d ----, 2020 WL 1905586 (D.N.M. Apr. 17, 2020); Maryville Baptist Church, Inc. v. Beshear, --- F. Supp. 3d ----, 2020 WL 2111316 (6th Cir. May 2, 2020); Lighthouse Fellowship Church v. Northam, --- F. Supp. 3d ----, 2020 WL 2110416 (E.D. Va May 1, 2020).

categories of selection are of paramount concern when a law has the incidental effect of burdening religious practice." Id. at 542. The government cannot in a selective manner only impose burdens on conduct motivated by religious belief. Id. at 543. This might be shown when the law is underinclusive, such that it fails to prohibit secular conduct that also endangers the interests the law is meant to promote. Id.

This court agrees with the reasoning of the many courts that have found similar orders to be neutral and generally applicable.[22] See, e.g., Legacy Church, Inc. v. Kunkel, --- F. Supp. 3d ----, 2020 WL 1905586 (D.N.M. Apr. 17, 2020); Cassell v. Snyders, --- F. Supp. 3d -----, 2020 WL 2112374 (N.D. Ill. May 3, 2020); see also American United's Amicus Brief at 11–12 (collecting cases). The Governor's order is neutral because it proscribes conduct (gatherings of more than 10 people) without regard to whether that conduct is religiously motivated or not. There is no indication that the order is meant to target conduct because of its religious motivation.

The order is also generally applicable. The plaintiffs argue that the order is underinclusive because it still allows some businesses to "accommodate large crowds and masses of persons," such as Lowe's and Walmart. (Compl. ¶¶ 6, 95). But plaintiffs have not shown that these activities are comparable to religious services. First, these businesses are part of the critical infrastructure, according to the U.S. Department of Homeland Security's Cybersecurity and Infrastructure Security Agency, which the executive order relies upon in determining which businesses are essential. Lowe's, Walmart, and businesses like them "either sell[] items necessary for everyday life or [] facilitate the mitigation of COVID-19" and, unlike religious services, they cannot operate remotely. Legacy Church, 2020 WL 1905586, at *40.

Second, the plaintiffs have not shown that allowing essential businesses to remain open is

---

[22] The plaintiffs argue "[t]he Governor's actions must pass strict scrutiny to be both generally applicable and neutral." (Reply at 33). This is incorrect. Whether a law is generally applicable and neutral determines whether it will be subject to strict scrutiny.

"nonreligious conduct that endangers these interests in a similar or greater degree than" religious services, so that it is comparable. Lukumi, 508 U.S. at 543.[23] This is because "[c]asual contact (briefly passing someone in the aisle of a big box store[)] entails a much smaller risk of contracting COVID-19 than a group congregating near one another for a longer period," because under the latter circumstance there is "prolonged exhalation of respiratory droplets," and the increased likelihood of contacting surfaces with the virus. (Decl. of Mitchell ¶ 23). As one district court noted, "[a]n in-person religious gathering is not analogous to picking up groceries, food, or medicine, where people enter a building quickly, do not engage directly with others except at points of sale, and leave once the task is complete." Gish v. Newsom, No. EDCV-20-755-JGB (KKx), 2020 WL 1979970, at *6 (C.D. Cal. Apr. 23, 2020); see also Lighthouse Fellowship Church v. Northam, --- F. Supp. 3d ----, 2020 WL 2110416, at *8 (E.D. Va. May 1, 2020) ("The exceptions have been carved out for specific reasons to avoid harms equal to or greater than the spread of this deadly pandemic. Such exemptions are perfectly in keeping with the goal of reducing to the maximum extent practicable gatherings of more than ten people." (emphasis in original)); Calvary Chapel of Bangor v. Mills, --- F. Supp. 3d ----, 2020 WL 2310913, at *8 (D. Me. May 9, 2020) ("[I]n this free exercise analysis, the question is not whether any secular entity faces fewer restrictions than any religious one" but whether comparable secular entities do); Elim Romanian Pentecostal Church v. Pritzker, --- F. Supp. 3d -----, 2020 WL 2468194, at *4 (N.D. Ill. May 13, 2020) ("Plaintiffs also complain that the Order classifies law and accounting firms as essential, with no ten-person limit, suggesting that this somehow shows that the Order targets religion. Again, however, people do not go to those

---

[23] According to an Executive Order issued on April 5, 2020, facilities that are allowed to remain open must still comply with social distancing guidelines and follow the instructions of local health officials. See Delegating Authority to Local Health Officials to Control and Close Unsafe Facilities, EO 20-04-05-02.

places to gather in groups for hours at a time.").[24]

And secular activities analogous to religious services at least with respect to the type of interactions – that is, individuals gathered in one place for a set period of time – such as movie theaters or sporting events, are also banned by the order. Cross Culture Christian Ctr. v. Newsom, --- F. Supp. 3d ----, 2020 WL 2121111, at *6 (E.D. Cal. May 5, 2020) ("[T]he type of gathering that occurs at in-person religious services is much more akin to conduct the orders prohibit—attending movies, restaurants, concerts, and sporting events—than that which the orders allow"); see also Legacy Church, 2020 WL 1905586, at *34 ("Here, Secretary Kunkel may distinguish between certain classes of activity, grouping religious gatherings in with a host of secular conduct, to achieve what she determines is a balance between maintaining community needs and protecting public health.").[25]

There have been some courts that have applied strict scrutiny to similar prohibitions, see Roberts v. Neace, --- F. Supp. 3d ----, 2020 WL 2316679 (6th Cir. May 9, 2020);[26] Berean Baptist Church et al. v. Governor Roy A. Copper, III, --- F. Supp. 3d ----, 2020 WL 2514313

---

[24] The Seventh Circuit has denied the Elim plaintiffs' motion for an injunction pending appeal stating that the executive order at issue appears to be neutral and generally applicable. No. 20-1811, 2020 WL 2517093 (7th Cir. May 16, 2020)

[25] The plaintiffs argue that the prohibition on gatherings has not been equally enforced, but this relies on the characterization of shopping at essential businesses as "gatherings." For the reasons explained above, shopping at businesses does not expose individuals to the same risk of contracting COVID-19 as congregating together for a long period of time, such as during religious services. Additionally, the plaintiffs cite to Smith for the proposition that "where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason." Smith, 494 U.S. at 884 (citation omitted). But there are no "individual exemptions" for the executive order, and the Supreme Court went on to note that those cases "at least have nothing to do with an across-the-board criminal prohibition on a particular form of conduct." Id. As explained above, the categorical exceptions for essential businesses are based on the Department of Homeland Security's guidance, and are not individual exemptions based on each business's personal circumstances.

[26] Roberts v. Neace incorporates some of the reasoning and language of the Sixth Circuit's earlier decision, Maryville Baptist Church, 2020 WL 2111316, which involves the same church as in Roberts. See Roberts, 2020 WL 2316679, at *2. Another case, Tabernacle Baptist Church, Inc. of Nicholasville v. Beshear, --- F. Supp. 3d ----, 2020 WL 2305307, at *3, *6 (E.D. Ky. May 8, 2020), in which the court granted a TRO to enjoin the enforcement of a large gathering prohibition with respect to religious services, also involved an executive order issued by the Kentucky Governor.

(E.D.N.C. May 16, 2020), but it appears the executive order here is distinguishable.[27] It is not

clear how the Governor decided what businesses were deemed "life-sustaining" in the order at

issue in Roberts, and it appears that the executive order in Roberts banned all mass gatherings,

rather than gatherings over a certain number of people. In fact, the Sixth Circuit said in Roberts

that "[i]f the problem is numbers, and risks that grow with greater numbers, there is a

straightforward remedy: limit the number of people who can attend a service at one time," which

is what the prohibition here does, as it limits gatherings to ten or fewer people. See Roberts,

2020 WL 2316679, at *5. And in Berean Baptist Church, the North Carolina executive order

allowed indoor gatherings of more than ten people (including religious gatherings) if it was

impossible for the gatherings to take place outdoors, with impossibility to be judged by law

enforcement. 2020 WL 2514313, at *6. The court found that this would in effect allow for

indoor gatherings of more than ten at locations such as shopping malls and shopping centers (as

such gatherings could not take place outdoors), but would not allow for indoor religious

gatherings of more than ten. Id. at *7. Unlike the prohibition at issue here, the North Carolina

order gave law enforcement discretion to determine whether outdoor religious gatherings were

"impossible,"[28] and apparently also allowed all retail businesses (including businesses that might

be deemed nonessential under the Maryland order) to remain open. Further, the North Carolina

order also provided an exception allowing up to fifty people to gather at a funeral, even though

---

[27] Other cases applying strict scrutiny are On Fire, 2020 WL 1820249, and First Baptist Church, 2020 WL 1910021.
On Fire involved an order banning drive-in church services, and the temporary restraining order only allowed
religious groups to conduct drive-in services. 2020 WL 1820249, at *1. The order at issue in First Baptist Church
appears to have not allowed for drive-in services, as it was "a wholesale prohibition on in-person religious services."
2020 WL 1910021, at *6.

[28] The court stated, "the question becomes: who decides whether a religious organization or group of worshipers
correctly determined that their religious beliefs dictated the need to have more than 10 people inside to worship?
Under EO 138, the answer is a sheriff or another local law enforcement official. This court has grave concerns about
how that answer comports with the Free Exercise Clause." Berean Baptist Church, 2020 WL 2514313, at *7
(citations omitted) (emphasis in original). The Maryland prohibition does not require law enforcement to be
similarly involved in evaluating a person's religious beliefs.

"the Governor's counsel conceded that there is no public health rationale for allowing 50 people to gather inside at a funeral, but to limit an indoor religious worship service to no more than 10 people." Id. at *8. The Maryland prohibition contains no exceptions for large gatherings at funerals.

"Under the Supreme Court's free exercise doctrine, a neutral government decision of general applicability is subject to rational basis review, even where it has the incidental effect of burdening religious exercise." Jesus Christ Is the Answer Ministries, Inc. v. Baltimore Cty., Maryland, 915 F.3d 256, 265 (4th Cir. 2019) (citation omitted). Here, it is clear that the prohibition on large gatherings is rationally related to the legitimate government interest of reducing the spread of COVID-19, because the prohibition limits contact between individuals, which is how the virus spreads. Further, the order still allows for a variety of religious services, including "drive-in" services and services with ten or fewer people. See Interpretive Guidance No. COVID 19-09 (April 1, 2020).

2. Freedom of Assembly and Freedom of Speech[29]

The plaintiffs argue that the prohibition on gatherings and the face covering requirement violates the First Amendment.[30]

a. Gatherings

"The right of peaceable assembly is a right cognate to those of free speech and free press

---

[29] The plaintiffs also bring a claim under Article 40 of the Maryland Declaration of Rights, which is read in pari materia with the First Amendment. Nefedro v. Montgomery Cty., 414 Md. 585, 593 n.5 (2010).

[30] The plaintiffs argue "the Delegates plaintiffs herein had their speech chilled by the Governor's 'large gathering prohibition' order, by his placement of the National Guard surrounding the Maryland General Assembly doors and steps during the 2020 Session, and by the 'stay-at-home' order." (Reply at 38). There is, however, no further discussion about how the placement of the National Guard or the stay-at-home order chilled the delegates' speech in violation of the First Amendment, so the court will not address it here, except to note that it was the state legislature's, not the Governor's, decision for the legislature to adjourn on March 18 and to not hold a special session in May. See General Assembly Leaders Postpone May Special Session, Maryland Reporter, https://marylandreporter.com/2020/04/20/general-assembly-leaders-postpone-may-special-session/ (last updated April 20, 2020).

and is equally fundamental." Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 578 (1980)

(quoting De Jonge v. Oregon, 299 U.S. 353, 364 (1937)). The plaintiffs argue that the

prohibition restricts their fundamental rights to freedom of speech and assembly, and should be

subject to strict scrutiny. The defendants argue that the prohibition is more akin to a time, place,

and manner restriction, subject to intermediate scrutiny.

 The prohibition on large gatherings of individuals for the duration of the public health

crisis is more akin to a time, place, and manner restriction. In Ward v. Rock Against Racism, the

Supreme Court stated that while content-based regulations are normally subject to strict scrutiny,

content-neutral time, place, and manner restrictions are not. 491 U.S. 781, 798 (1989).

"'[C]ontent-neutral' speech restrictions [are] those that 'are justified without reference to the

content of the regulated speech.'" Boos v. Barry, 485 U.S. 312, 320 (1988) (citation and

emphasis omitted). "The government's purpose is the controlling consideration." Ward, 491

U.S. at 791.

 Here, the Governor's executive order does not regulate speech based on its content.

Rather, it regulates the time and manner in which speech can be expressed; specifically, it

prohibits all gatherings of more than ten people, no matter the purpose for the gathering or the

type of speech the gathering wishes to express. And the order does so only for the duration of

the public health emergency. Therefore, it is best analyzed as a time, place, and manner

restriction. The plaintiffs argue that "[t]he Orders targeted even Legislative speech, inferred

arrest for the same in writing from [the Governor's] office to plaintiff Delegate Cox herein, as

well as targeted with his State Troopers the protests of his own Executive Orders." (Reply at

39). This refers to Cox's desire to attend a Reopen Maryland rally, and the Governor's senior

advisor referring him to the executive order prohibiting large gatherings. (Compl. ¶ 1). But this

is not evidence that the order is a content-based restriction because the order prohibits all large gatherings regardless of the speech expressed. Additionally, there is no evidence that the order is being applied selectively to discourage speech that the Governor disagrees with. (See Surreply at 10–11).

The right to assembly and speech may be subject to reasonable time, place, and manner restrictions. Richmond Newspapers, 448 U.S. at 578. Content neutral time, place, and manner restrictions on First Amendment rights are subject to intermediate scrutiny. See Ross v. Early, 746 F.3d 546, 552 (4th Cir. 2014). The content-neutral regulation must be "narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication of the information." Ward, 491 U.S. at 791 (citations omitted). "[T]he requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" Id. at 799 (citations omitted); see also Blasecki v. City of Durham, N. C., 456 F.2d 87, 91 (4th Cir. 1972) ("[W]henever the state restricts the right of assembly . . . the state must have a compelling interest in the subject matter to justify abridgment, and the scope of the abridgment itself must not be greater than reasonably necessary to serve the state interest."). Additionally, "'[u]nder the pressure of great dangers,' constitutional rights may be reasonably restricted 'as the safety of the general public may demand.' That settled rule allows the state to restrict, for example, one's right to peaceably assemble, to publicly worship, to travel, and even to leave one's home." In re Abbott, 954 F.3d at 778 (quoting Jacobson, 197 U.S. at 29).

Reducing the spread of COVID-19 is a legitimate and substantial government interest. Additionally, the prohibition on gatherings larger than ten people "promotes a substantial government interest that would be achieved less effectively absent the regulation." Because of

the ease with which COVID-19 spreads, and because asymptomatic individuals may spread the virus, a gathering larger than ten people poses an increased risk that more people will get the virus if one of the attendees has it. The history of the orders also indicates narrow tailoring. The Governor's March 12, 2020, order banned gatherings over 250 people. That was amended on March 16, 2020, to gatherings over 50 people. On March 19, 2020, an amended order prohibited gatherings over 10 people, which is the limit currently in effect (although the prohibition no longer includes religious gatherings). This demonstrates a gradual tailoring of the prohibition based on the COVID-19 figures and how well the previous prohibitions were working. See Reynolds v. Middleton, 779 F.3d 222, 231 (4th Cir. 2015) ("[T]he burden of proving narrow tailoring requires the County to prove that it actually tried other methods to address the problem." (emphasis in original)); Givens v. Newsom, No. 2:20-CV-00852-JAM-CKD, 2020 WL 2307224, at *6 (E.D. Cal. May 8, 2020) ("Admittedly, a blanket ban on the issuance of CHP [protest] permits for an unspecified period does not intuitively ring of narrow tailoring. But 'narrow' in the context of a public health crisis is necessarily wider than usual.").[31]

Finally, the order leaves open ample alternative channels for communication, at least in view of the COVID-19 context. "In order to satisfy this standard, the available alternatives need not be the speaker's first or best choice or provide the same audience or impact for the speech. Rather, the relevant inquiry is simply whether the challenged regulation provides avenues for the more general dissemination of a message." Ross, 746 F.3d at 559 (citation omitted and cleaned up). Still, the available alternatives must be "adequate." Reynolds, 779 F.3d at 232 n.5. Here,

---

[31] Two state courts have enjoined stay-at-home orders based on state law claims not at issue here. See Elkhorn Baptist Church, et al. v. Katherine Brown Governor of the State of Oregon, Case # 20CV17482 (Or. Circ. Ct. May 18, 2020) (Opinion on Temporary Injunctive Relief); Wisconsin Legislature v. Palm, No. 2020AP765-OA, 2020 WL 2465677 (Wis. May 13, 2020). The Oregon trial court's injunction was stayed by the Oregon Supreme Court pending resolution of the defendants' mandamus petition. No. S067736 (Or. May 18, 2020) (Order Granting Temporary Stay).

the ban on gatherings larger than ten people leaves open several alternatives: Cox and Reopen

Maryland, for instance, may still protest in groups of ten or fewer, and can also communicate

information in other ways such as through the Internet, newspaper, or signs. Similarly, religious

organizations may perform services in groups of ten or fewer people, virtually, or through drive-

in services. The court understands that these alternatives might not carry the same force as a

large rally or an in-person religious service with all congregants. But, especially in view of the

COVID-19 pandemic, sufficient alternatives are available.[32]

### b.  Face coverings

The plaintiffs argue that the face covering requirement violates their freedom of speech.

"In deciding whether particular conduct possesses sufficient communicative elements to bring

the First Amendment into play, [the Supreme Court has] asked whether '[a]n intent to convey a

particularized message was present, and [whether] the likelihood was great that the message

would be understood by those who viewed it.'"  Texas v. Johnson, 491 U.S. 397, 404 (1989)

(citation omitted).  Therefore, the Supreme Court has found that allowing military recruiters on

campus was not expressive conduct protected by the First Amendment, see Rumsfeld v. Forum

for Acad. & Institutional Rights, Inc. ("FAIR"), 547 U.S. 47, 66 (2006), and the Fourth Circuit

has found that recreational dancing was not either, Willis v. Town Of Marshall, N.C., 426 F.3d

251, 257 (4th Cir. 2005).  As to the military recruiting, the Court found that schools' refusal to

allow recruiting on campus was expressive only because the schools' conduct was accompanied

by speech.  FAIR, 547 U.S. at 66.  But "[t]he fact that such explanatory speech is necessary is

---

[32] Several courts have analyzed freedom of assembly claims under the freedom of association framework. See, e.g., Legacy Church, 2020 WL 1905586, at *25–27; Givens, 2020 WL 2307224, at *7. Although neither party addresses this, the result would be the same. In Roberts v. U.S. Jaycees, the Supreme Court held that "[t]he right to associate for expressive purposes is not, however, absolute. Infringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." 468 U.S. 609, 623 (1984). As discussed above, the prohibition is unrelated to the suppression of ideas and furthers the compelling interest of slowing the spread of COVID-19. The order is also narrowly tailored, as discussed infra.

strong evidence that the conduct at issue here is not so inherently expressive that it warrants

protection" as symbolic speech. Id.

Similarly, while wearing a face covering might be to several of the plaintiffs a "sign

of capture on the battlefield, and subservience to the captor," (Compl. ¶73), that meaning is not

"overwhelmingly apparent." FAIR, 547 U.S. at 66 (quoting Johnson, 491 U.S. at 406). Instead,

especially in the context of COVID-19, wearing a face covering would be viewed as a means of

preventing the spread of COVID-19, not as expressing any message. As the Supreme Court

explained in City of Dallas v. Stanglin, "[i]t is possible to find some kernel of expression in

almost every activity a person undertakes—for example, walking down the street or meeting

one's friends at a shopping mall—but such a kernel is not sufficient to bring the activity within

the protection of the First Amendment." 490 U.S. 19, 25 (1989).

### c.  Strict Scrutiny

Even if the plaintiffs' First Amendment claims (free exercise, free speech, and freedom

of assembly) were subject to strict scrutiny, they have not demonstrated a likelihood of success

on the merits. Strict scrutiny requires the government to show that the regulation is narrowly

tailored to serve a compelling government interest, with narrowly tailored meaning that "no 'less

restrictive alternative'" would serve its purpose. Cent. Radio Co. Inc. v. City of Norfolk, Va., 811

F.3d 625, 633 (4th Cir. 2016) (citation omitted); see Lukumi, 508 U.S. at 546 ("To satisfy the

commands of the First Amendment, a law restrictive of religious practice must advance 'interests

of the highest order' and must be narrowly tailored in pursuit of those interests"). In applying

strict scrutiny to a Florida law prohibiting judicial candidates from personally soliciting

campaign donations, the Supreme Court found protecting the integrity of the judiciary to be a

compelling interest, and that the law was narrowly tailored, because "[t]he solicitation ban aims

squarely at the conduct most likely to undermine public confidence in the integrity of the judiciary" and "restricts a narrow slice of speech." Williams-Yulee v. Fla. Bar, 575 U.S. 433, 449, 452 (2015).

Slowing the spread of COVID-19 is a compelling government interest. Workman v. Mingo Cty. Bd. of Educ., 419 F. App'x 348, 353 (4th Cir. 2011) ("[T]he state's wish to prevent the spread of communicable diseases clearly constitutes a compelling interest."); McCormick v. Stalder, 105 F.3d 1059, 1061 (5th Cir. 1997) ("[T]he prison's interest in preventing the spread of tuberculosis, a highly contagious and deadly disease, is compelling."). The plaintiffs argue that less restrictive alternatives are available because religious services and gatherings can be allowed as long as they comply with social distancing precautions. But the plaintiffs have not shown that the proposed less restrictive means would be equally effective in "serving [the] State's compelling interests." Burson v. Freeman, 504 U.S. 191, 206 (1992); see also Legacy Church, 2020 WL 1905586, at *40.

In addressing a state law claim under Illinois's Religious Freedom Restoration Act ("RFRA"), which requires government acts that substantially burden religion to be in furtherance of a compelling interest and the least restrictive means of furthering that interest, a district court found that the plaintiffs did not identify "any less restrictive rules that would achieve the same result as the prohibition on large gatherings." Cassell, 2020 WL 2112374, at *12. The court noted that a large religious service, even with social distancing measures, posed a higher risk of spreading COVID-19 than a gathering of ten or fewer or a drive-in service. Id. Similarly, the plaintiffs here do not effectively dispute that the best way to slow the spread of COVID-19 is to restrict large gatherings, or that interactions at businesses, such as retail stores, pose a lower risk of spreading COVID-19 than "a group congregating near one another for a longer period."

24

(Decl. of Mitchell ¶ 23). As in Williams-Yulee, the prohibition is aimed at conduct most likely to spread COVID-19. Additionally, essential businesses allowed to remain open are determined based on the Department of Homeland Security's definition of critical infrastructure. In order to ensure public health, the Governor must also balance the food, shelter, and security needs of Maryland residents. Finally, the order still allows drive-in, virtual and small religious services and gatherings. For these reasons, the plaintiffs have not demonstrated a likelihood of success that the order would fail even under a strict scrutiny test.

   d.  Commerce Clause

The plaintiffs claim that the order closing certain non-essential businesses in Maryland violates the commerce clause, because the plaintiff Adventure Park and other businesses forced to close regularly do business with suppliers and customers outside of Maryland, and are now prevented from engaging in that interstate commerce. (See ECF 32-1, Reply Ex. A, Decl. of Kevin Kaufman, General Manager at Adventure Park). The plaintiffs allege that since COVID-19 primarily affects elderly and immune-deficient individuals, those individuals can be protected without shutting down these businesses. They argue that "states like Georgia, including densely populated Atlanta, and West Virginia, have reopened with no spike in sickness. Countries like Israel and Sweden have been successful at curbing the spread of the virus despite no mandatory business closures and guidelines which do not compel behavior." (Reply at 13).[33]

---

[33] The plaintiffs do not provide sources for these assertions. The court notes, however, that the openings in Georgia and West Virginia are phased openings. For example, it appears Georgia still prohibits amusement parks from operating in its most recent May 12 executive order. See EO 05.12.20.02 ("Reviving a Healthy Georgia"), May 12, 2020, at 13. It also does not appear that West Virginia has allowed amusement parks to open. West Virginia Strong -- The Comeback, https://governor.wv.gov/Pages/The-Comeback.aspx (last accessed May 15, 2020). The court also notes that Sweden has experienced more COVID-19-related deaths per capita as compared to its neighbor countries. COVID-19 Deaths in Sweden, Reuters, https://www.reuters.com/article/us-health-coronavirus-sweden-casualties/covid-19-deaths-in-sweden-pass-3000-public-health-agency-idUSKBN22J1UV (last updated May 7, 2020); Sweden Stayed Open. A Deadly Month Shows the Risks, NY Times, https://www.nytimes.com/interactive/2020/05/15/world/europe/sweden-coronavirus-deaths.html (last updated May 15, 2020). Moreover, to the extent there are multiple reasonable ways to address the COVID-19 outbreak, "[i]t is no

The commerce clause provides that "The Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes[.]" U.S. Const. art. I, § 8, cl. 3. "[I]t is well-established that th[e] affirmative grant of authority [in the commerce clause] implies a 'negative' or 'dormant' constraint on the power of the States to enact legislation that interferes with or burdens interstate commerce." Brown v. Hovatter, 561 F.3d 357, 362 (4th Cir. 2009) (citation omitted). Dormant commerce clause challenges are guided by two general principles: "First, state regulations may not discriminate against interstate commerce; and second, States may not impose undue burdens on interstate commerce." S. Dakota v. Wayfair, Inc., 138 S. Ct. 2080, 2091 (2018).[34]

"To determine whether a law violates this so-called 'dormant' aspect of the Commerce Clause, we first ask whether it discriminates on its face against interstate commerce." United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth., 550 U.S. 330, 338 (2007). "In this context, 'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'" Id. (citations omitted). A law may discriminate against interstate commerce in three ways: facially, in its practical effect, or in its purpose. Colon Health Centers of Am., LLC v. Hazel, 813 F.3d 145, 152 (4th Cir. 2016).

---

part of the function of a court or a jury to determine which one of two modes was likely to be the most effective for the protection of the public against disease." Jacobson, 197 U.S. at 30.[33]

[34] The plaintiffs cite a quote by John Stuart Mill, which they state was cited in the opinion in Mugler v. Kansas, 123 U.S. 623 (1887). John Stuart Mill was actually cited by the plaintiffs in their assignments of error, for the proposition that the right to manufacture beer for one's own use cannot be regulated by the government. Mugler, 8 S. Ct. 273, 288. The court rejected that argument, stating that while the government does not have the power to control rights that are purely and exclusively private, the government may require citizens to conduct themselves and use property so as not to injure others. Mugler, 123 U.S. at 660. The power to determine what may injure the public must be vested somewhere, the court noted, or "else society will be at the mercy of the few, who, regarding only their own appetites or passions, may be willing to imperil the peace and security of the many, provided only they are permitted to do as they please." Id. at 660–61. Following this reasoning, the court upheld Kansas's prohibition on the manufacture and sale of alcohol within the state. Id. at 662; see also Jacobson, 197 U.S. at 26 ("Real liberty for all could not exist under the operation of a principle which recognizes the right of each individual person to use his own, whether in respect of his person or his property, regardless of the injury that may be done to others.").

The Governor's order is not facially discriminatory against interstate commerce, as it only orders the closure of certain Maryland businesses, and does not regulate out-of-state businesses. Nor do the plaintiffs present any evidence that the order has a discriminatory purpose or effect. There is no indication that the purpose of the order is to "advance [Maryland's] own commercial interests by curtailing the movement of articles of commerce." Colon Health Centers, 813 F.3d at 152 (quoting H.P. Hood & Sons, Inc. v. Du Mond, 336 U.S. 525, 535 (1949)). And there is no indication that the order "negatively impact[s] interstate commerce to a greater degree than intrastate commerce." Id. at 153. If anything, the order negatively impacts intrastate commerce to a greater degree, as it only applies to Maryland businesses.

The plaintiffs argue that the Governor's order closing certain non-essential businesses is foreclosed by the 1890 Supreme Court case Minnesota v. Barber, 136 U.S. 313 (1890). But Barber involved a statute that, in its effect, prohibited meat from being sold in Minnesota unless the animal was slaughtered in Minnesota. Id. at 328. The court found that this was an unconstitutional regulation of interstate commerce. Id. The plaintiffs argue that "[h]ere the circumstances are very similar since the result of the shut down is to prevent manufacturers, suppliers and vendors from selling to Maryland businesses and, of course, for Maryland businesses to purchase goods and services for delivery in Maryland." (Reply at 16). But for the same reasons that Maryland businesses might not purchase out-of-state goods while they are closed (which, of course, they are not prevented from doing), they also might not purchase in-state goods. Unlike the Minnesota law, there is no discriminatory effect on out-of-state goods.

Because the orders do not discriminate against interstate commerce, they will be analyzed under the "Pike test": "Where the statute regulates even-handedly to effectuate a

legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970); see also Wayfair, Inc., 138 S. Ct. at 2091. The Fourth Circuit has characterized this as a rational basis standard of review. Colon Health Centers, 813 F.3d at 156.

The putative local benefits of closing certain businesses deemed non-essential are to reduce interactions between individuals that could spread COVID-19. (See Decl. of Mitchell ¶ 38 (children may be infectious without showing any symptoms, and must be accompanied by older individuals when they go to Adventure Park); ¶ 13 (the best way to slow the spread of COVID-19 is avoiding close contact with others). The plaintiffs bear the burden of showing that the burden on interstate commerce outweighs the local benefits. Colon Health Centers, 813 F.3d at 157. The plaintiffs' main argument is that the orders are especially burdensome for Maryland small businesses.[35] While the court sympathizes with Maryland businesses that have had to shut down, this is not a burden on interstate commerce to be analyzed under the dormant commerce clause. And although the order closing certain businesses incidentally burdens interstate commerce, (see Decl. of Kaufman, stating that Adventure Park does business with out-of-state businesses and customers, and because of the shut down, will lose some of that interstate business), it is not clearly excessive in relation to local benefits. "To override [Maryland's] judgments casually would be to undermine a cornerstone of our federal system: the state police power. Courts enforcing the dormant Commerce Clause were 'never intended to cut the States

---

[35] For example, the plaintiffs argue, "[i]f grocery stores, certain big box stores, liquor stores and home improvement stores can stay open and be deemed safe for the public, then the same rules and conditions can be applied to small businesses like those of the Plaintiffs, including Adventure Park, Antietam Campground and many thousands of other small businesses. If the State can continue to sell lottery tickets, then Adventure Park should be able to sell admission tickets." (Reply at 17). The plaintiffs cite to no sources or cases to support this proposition, and the court notes that the Governor's orders do not distinguish between small and large businesses. Rather, whether a business is essential is based on the goods or services it provides, and is based on guidance by the Department of Homeland Security. But regardless, the relevant inquiry here is the burden to interstate commerce.

off from legislating on [ ] subjects relating to the health, life, and safety of their citizens.'"

Colon Health Centers, 813 F.3d at 158.

Finally, the plaintiffs argue that since Congress would have the power to regulate sales between suppliers and vendors and Maryland businesses, the state does not. But the Governor has not regulated sales between suppliers, vendors, and Maryland businesses. None of the orders regulate or prohibit interstate sales. The orders may have an effect on interstate commerce, which has been analyzed under the Pike test, above. But the plaintiffs are incorrect to the extent they argue that if the orders have any effect on interstate commerce they are invalid. The Pike test presumes that state laws may pose an incidental burden on interstate commerce as long as the burden is not "clearly excessive in relation to the putative local benefits." Pike, 397 U.S. at 142.

    e.  Article 8 of the Maryland Declaration of Rights

The plaintiffs argue that the Governor violated Article 8 ("That the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other") by silencing a legislator who wished to speak about an issue and by refusing to exempt legislators from the prohibitions in his executive orders. This appears to refer to Cox, who alleges he was told that he would be violating the Governor's executive order prohibiting large gatherings if he attended a Reopen Maryland rally. As discussed above, the Governor has not silenced Cox or any other legislator. They remain free to express their disagreement with the executive orders while complying with the time, place, and manner restrictions the orders set forth. To the extent the plaintiffs argue that legislators should be

exempt from the executive orders while fulfilling their legislative duties or while acting as legislators, the plaintiffs provide no support for that position.

      f.   Article 44 of the Maryland Declaration of Rights

      The plaintiffs also argue that the Governor has violated Article 44, which states that the provisions of the U.S. Constitution and the Maryland Constitution apply both in times of war and in times of peace, by violating "the Right to Free Exercise of Religion, Right to Assemble, Right to Conduct Lawful Business, Due Process, Closure of Courts" and by "suspend[ing] statutes of the state or a locality in the case of any declaration of emergency – as deemed not by science or Legislative decision, but by one person, The Governor." (Reply at 40). They cite Kenly v. Huntingdon Bldg. Ass'n, which regarded a Depression-era foreclosure sale. 166 Md. 182, 170 A. 526 (1934). Kenly held that a court in equity could not decline to enforce the legal rights of the mortgagee just because of the economic conditions. Id. at 527. But as discussed above, the plaintiffs have not at this point demonstrated that the defendants have violated their "clearly defined legal right[s.]" See id. at 529 (Diggs, J., concurring). As to the assertion that the Governor has violated the "Right to Conduct Lawful Business, Due Process, Closure of Courts" the court will not address it because the plaintiffs have not made their argument with any specificity. It is not clear what "right to conduct lawful business" the plaintiffs refer to, how they allege that the Governor has violated the due process clause, or that the Governor has ordered the closure of the courts.[36] Therefore, the plaintiffs have not demonstrated a likelihood of success in showing that the defendants have violated Article 44.

      II.    Other Factors

---

[36] It appears that Maryland courts have issued their own orders governing operations due to COVID-19. See Fourth Amended Administrative Order, https://mdcourts.gov/sites/default/files/admin-orders/20200504fourthamendedadministrativeorderexpandingandextendingjudiciaryrestrictedoperations.pdf (last accessed May 14, 2020).

For the reasons stated above, the plaintiffs have not shown that the harm they are facing is the result of constitutional violations. Therefore, the irreparable harm factor weighs against granting a TRO or a preliminary injunction. See Legacy Church, 2020 WL 1905586, at *41–43. The other factors, the balance of the equities and the public interest, which "merge when the Government is the opposing party," Nken v. Holder, 556 U.S. 418, 435 (2009), also do not weigh in favor of granting a TRO or a preliminary injunction. Here the harm to the public in granting a TRO or preliminary injunction, which may result in more transmissions of COVID-19 and more cases of serious illness and death, could be great. This harm to the public is not outweighed by the irreparable harm the plaintiffs might suffer, especially when the plaintiffs have not demonstrated a likelihood of success in showing that the harm is a result of any constitutional violation.

## CONCLUSION

Public officials cannot responsibly exercise their broad authority to protect the health of the entire community without considering the data, the science, and the advice of experienced public health professionals. Governor Hogan, exercising the powers given to him by the legislature in the face of the COVID-19 crisis, has made reasonable choices informed, if not dictated by, such data, science, and advice. In opposing the Governor's stay at home orders, including the prohibition on large gatherings, the closing of nonessential businesses, and the requirement that face coverings be worn on public transportation and in retail stores, the plaintiffs minimize the risks of this pandemic but cite no contrary scientific authority. Under the Jacobson framework, they have not shown that the measures have "no real or substantial relation" to protecting public health, nor have they shown that the measures are, "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." For the reasons

stated above, the court will deny the plaintiffs' motion for a TRO, treated as a motion for a

preliminary injunction.  A separate order follows.


|     |     |
| --- | --- |
| 5/20/20 | /S/ |
| Date | Catherine C. Blake |
|      | United States District Judge |

In The

# United States Court of Appeals

## for the Third Circuit

**20-1449**

UNITED STATES OF AMERICA, et al.
Paintiff-Appellees

v.

JOESPH R. JOHNSON
Defendants-Appellant

JEFFREY CUTLER
Intervenor Defendants-Appellant

*Appeal from the Order/Judgment entered February 28, 2020 in the United States District
Court for the Eastern District of Pennsylvania at No. 2:19-cr-00367-1*

# PETITION FOR IMMEDIATE INJUNTION PENDING APPEAL

ORAL ARGUMENTS REQUESTED

Here comes Jeffrey Cutler, Intervenor Defendant-Appellant in this case and

Requests an **IMMEDIATE INJUNCTION PENDING APPEAL FOR ALL**

juridictions of the United States, based on the ruling in case **# 4:20-cv-00081** in

the United States District Court for the Eastern Ditrict of North Carolina on

16MAY2020 by Judge James C. Dever III.  Since Governor Roy Cooper has

made public statements that he does not intend to appeal, this is settled law.  Mr.

Cutler had filed a Petition to DENY the Motion For Summary Affirmation and

to consolidte related cases of religious discrimination by the government in case

20-1805 on 14MAY2020 and the document has yet to be put online.  The

document filed by Brian L. Calistri on May 8, 2020 contains some perjured

statements and since it was sent by mail constitues Mail Fraud and Perjury  (18

USC § 1001) and constitutes a **CONSPIRACY** to conceal the murder of a

Federal Employee found on 04DEC2003 (Jonathan Luna) , by persons in the

governments (both federal and state) and five children on May 13, 1985 as a

form of Eviction with the aid of persons in the **FBI**.  Mr. Cutler had stated that

he believed that the **MURDER of  JONATHAN LUNA** was carried out by the

**KLU KLUX KLAN**, and concealed with help of the **FBI**.  The judge dismissed

the case even though 5 parties defaulted and were properly served.  Based on

ECF #5 in case # 2:17-cv-00984 by the late Thomas O'Neill, Mr. Brian

L.Calistri's  motion failed to notify the parties that have defaulted in this case

and therefore should be **DENIED**.  **Ahmaud Arbery** was **MURDERED** in

Georgia by 2 individuals, and no prosecution was being pursued **74** days. At minimum 2 DA's recused themselves and **DID NOTHING**. Mr. Cutler had made a complaint by mail to the DA office in Lancaster County, Pennsylvania and York, County Pennsylvania. Mr. Cutler had also filed a motion to intervene on 22SEP2019 in the case of Tami Levin in federal court case 2:19-cv-03149 (ECF 5) which named **DA Larry Krasner** as a Defendant in the case. Mr. Cutler also filed a response to the motion filed in oppoition on 25SEP2019. Even though the document filed on 25SEP2019 contained evidence of **OBSTRUCTION OF JUSTICE** and **VIOLATIONS of EQUAL PROTECTION**, Judge Eduardo C. Robreno issued an order on 09OCT2019 which not only denied Mr. Cutler's right to intervene but also violated the United States Constitution **Ammend 1**, by making a **THREAT BY MAIL** if Mr. Cutler filed any additional motions in the case, limiting Mr. Cutler's right to **PETITION THE GOVERNMENT FOR REDRESS OF GRIEVIENCES**. Tami Levin was replaced by **Movita Johnson-Harrell** who pleaded guilty to the theft of approximtely half million dollars. Mr.Cutler had filed objections to limit the power of the Tom Wolf to classify that religion as a **NOT a LIFE SUSTAINING activity** in the Commonwealth of Pennsylvania. Mr. Cutler filed his first lawsuit on 31DEC2013 regrding violations of Religious Freedom as case number **1:13-cv-02066**. He was granted the right to challenge OBAMACARE in Appeal as case **14-5183** on **14AUG2015** for violations of the

**ESTABLSHMENT CLAUSE**.  To this end Mr. Cutler Previously requested that district court case number  4:20-cv-0064 in the United States District Court for the Northern District of Mississippi [**TEMPLE BAPTIST CHURCH et al. v. CITY OF GREENVLLE et al.**], and case number  1:20-cv-00323 in the United States District Court for the Western  District of Michigan [KIMBERLEY BEEMER et al. v. GRETCHEN WHTMER et al.] and case number  1:20-cv-01120 in the United States District Court for the District of MARYLAND, BALTIMORE DIVISION [**ANTIETAM BATTLEFIELD KOA et al. v. LAWRENCE J. HOGAN et al.**] are also cases that should be part of this consolidation.  All charges in each case should be included by reference for all civil cases as if they are filed with this filing.   Mr. Cutler has previously called Mr. Wolf a member of the **KLU KLUX KLAN** in documents related to this case in federal court.  Despite Mr. Cutler filing a request with the state prior to the end of the **WAIVER** deadline that **ALL BUSINESSES** in Pennsylvania be considered **LIFE SUSTAINING** , Mr. Cutler has never heard back about his request until 12MAY2020.  Mr. Wolf also NOW wants to start a **NEW** group to **TRACK** everyone in **PENNSYLVANIA**  Based  on the story about Mike Du Toit of South Africa <ref> https://www.dailymail.co.uk/news/article-2478889/White-supremacist-Mike-du-Toit-plotted-kill-Nelson-Mandela-jailed.html </ref> the **BOEREMAG** was just another name for **KLU KLUX KLAN**.  Also Tom Wolf made statements that said that people cannot be evicted until July yet in

there are 6 pges of Legal Notices in the Inquirer on **07MAY2020** that use

**WRIT OF EXECUTION** to **sieze property**.  Recently in New York white

police officers were beating a BLACK MAN for failing to practice social

distncing (neither police officer was wearing a mask), and they should be

prosecuted for violating the same law that they were alledgely enforcing.  It is

notable that Wikipedia has **SCRUBBED** **Mike Du Toit** from their records

(effectively trying to rewrite history).  Brazil has put **NO** mandtory social

distancing in place and a country with about 66% of the size population of the

United States but only has 10% of the deaths.  In the Appeals for the Fifth

Circuit the Order from the United States Northern District of Texas dated

January 16, 2020 denying Plaintiff's MOTION FOR RECONSIDERATION OF

MOTION TO CHANGE VENUE FOR CASE 4:18-cv-00167-0 FROM STATE

OF TEXAS TO PENNSYLVANIA AND COMBINE CASE WITH 5:19-cv-

00834 , and the motion denying Plaintiff's motion of December 30, 2019.   The

current order from that court is in error since the USCA order of  December 18,

2019, remanded the case back to District Court and for further disposition and

was unopposed and is still unopposed.  Mr. Cutler had previously filed a

document by MAIL on March 1, 2019 but it was illegally discarded.  He then

filed on 07MAR2019 in person (Document 00514863727) , and it was put online

March 7, 2019.  The office of the clerk decided it would be ignored.   Mr. Cutler

filed a NOTICE OF APPEAL on 27JAN2020, (Document 00515289904

International Holocaust Remembrance Day), and it was only put online when Mr. Cutler informed the **Deputy Clerk Mary Francis Yeager** that she was violating Mr. Cutler's civil rights. It was put online January 29, 2020. A violation of EQUAL PROTECTION by employee of the federal government, which treated the two documents differently and potentially hid the document from the review of the judges considering an ENBANC review. Mr. Cutler subsequently filed a PETITION FOR ENBANC HEARING AND TO TRANSFER RESIDUAL CASE TO PENNSYLVANIA AND COMBINE WITH CASE 5:19-cv-00834, this document was put online as document number 00515298284 on 04FEB2020, the same date it was filed in court. In the case both **Deputy Clerk Mary Francis Yeager** and **Deputy Clerk Roeshawn Johnson** denied the petition. This violated the United States Constitution Ammend 1 and 5. It also also violates Mr. Cutler's rights under the Sixth Amendment of the Constitution. Mr. Cutler then on 04MAR2020 filed a 380 page document in this case (2:19-cr-00367). Within 24 hours of the filing Mr. Cutler got a threat by phone from an unidentified individual about the filing. On 06MAR2020 Mr. Cutler filed a nine page correction to the document previously filed. When the document was downloaded from the federal pacer system it was devoid of any markings. On 12MAR2020 Mr. Cutler filed a MOTION TO VACATE ORDER DENYING ORDER OF RECONSIDERATION – ON 04MAR2020 FOR IMPROPER SERVICE – BRADY VIOLATION AND

COMBINE WITH CASE NUMBER 2:20-cv-00735 (GRANT v.

PHILADELPHIA) AND 4:18-cv-00167-0 FROM THE NORTHERN

DISTRICT OF TEXAS AND DEFAULT JUDGEMENT. At that time Mr.

Cutler used the terminal in the Federal Courthouse to view some dockets. In

case 2:19-cr-00367 Mr. Cutler noticed the copy of the document (ECF 99)

**NOW** was properly marked. Based on this Mr. Cutler printed a second copy of

the document. Based on Elouise Pepion Corbel et al. v. Gale v. Norton, et al.

(03-5262, 03-5314). Mr. Cutler requested the district court cases be

consolidated in Pennsylvania and deliberations allowed on an expedited basis

since they both involve related issues and the Supreme Court has indicated they

will not consider the case this term. This court had allowed the House of

Representatives to be an Intervenor. The petitioner, Jeffrey Cutler, acting pro

se, respectfully previously identified that the speaker of the house of

representaives, in her official capacity, as the speaker of the House of

Representatives (and former resident of Baltimore, Maryland).

This is the same city that Johnathan Luna on 03DEC2003 (a black federal

employee) left his office at approximately 11 PM and was found dead the next

morning in Lancaster County, Pennsylvania with 36 stab wounds, neck back and

genitals, but the cause of death was drowning. **Sean Suiter** a Baltimore Police

office died from a suicide during a special arrest, 1 day before he was to testify.

Other individuals have died unexpectedly, possibly of murder including **Beranton**

**Whisenant Jr.** (also a federal prosecuter), and Kobe Bryant. The medical records

of **Jonathan Luna** have finally resurfaced and are currently trying to be

sealed/hidden by the current DA in Lancaster County. <ref>
https://www.fox43.com/article/news/jonathan-luna-murder-mystery-2003/521-2229b272-9355-43a8-8163-
506440862577 </ref><ref>

https://lancasteronline.com/news/local/lnp-county-clash-over-newly-discovered-records-in-jonathan-
luna/article_01ba656a-483b-11ea-86ed-43533b224839.html </ref><ref>

https://lancasteronline.com/news/local/lancaster-county-judge-gives-prosecutor-days-to-say-why-
jonathan/article_66aa5a86-49ec-11ea-8d57-37ffa1b9ed27.html </ref><ref>

https://www.wgal.com/article/newly-discovered-documents-are-related-to-investigation-into-death-of-
federal-prosecutor-jonathan-luna/30783745 </ref><ref>

https://www.pennlive.com/news/2020/02/re-discovery-of-records-on-mysterious-death-of-federal-
prosecutor-prompts-fight-between-da-news-media.html </ref><ref>

https://www.youtube.com/watch?v=cLAldUHDwj8 </ref> <ref> https://www.nbcnews.com/news/us-
news/disgraced-baltimore-police-officer-says-detective-who-was-killed-testifying-n844831

</ref> <ref> https://www.cnn.com/2018/08/29/us/baltimore-police-detective-sean-suiter-
suicide/index.html </ref>

**Nancy Pelosi** made a false statement in court via her lawyer (Mr Donald B. Verilli

Jr.) stated "[N]o one would be hurt and the greater justice would be attained" and

violated (18 USC § 1001) on 03JAN2019 on page 24 of the filing that was made in

case 4:18-cv-00167-0, a significant federal crime. During a speech at the National

Association of Counties' annual Legislative Conference on 9 March 2010, in

Washington D.C. <ref> https://www.youtube.com/watch?v=QV7dDSgbaQ0 </ref>

she stated "We have to pass the bill to find out what is in it". The petitioner "found

out what was in it" and filed a Pro se lawsuit 31DEC2013 in Wasington, DC case

1:13-cv-2066. He also via lawyers hired had previously filed a Writ of Certiorari

for the Supreme Court of the United States (15-632) and inserted that same writ in United States Court of Appeals case 17-2709, page 314A, via district court case number 2:17-cv-00984 page 10. Since the individual mandate of the Affordable Care Act is now null and void based on the rulling of the USCA and the other provisons of the bill should also be eliminated to preserve the constitution. Mr. Cutler paid the docketing fee for this appeal to preserve the right of appeal of Mr. Johnson. His lawyer previously made a false statement to the court in his request to withdraw, based on the documents filed by Mr. Johnson (ECF 100-103) a significant crime (18 USC § 1001). The current orders of Tom Wolf in Pennsylvania violate **GMP** procedures and allows the commonwealth to track every individual on the Pennsylvania Turnpike. (See history of IBP recalls of beef procedures that using a delivery ADDS RISK TO EXPOSING EVERYONE. Mr. Cutler had worked for multiple pharmaceutical and food compnaies including, HEINZ, CAMPBELLS, MERCK, GSK, BAXTER and others. COVID-19 is actually an excuse for **MASS GENOCIDE** against individuals that are deemed undesirable including Jewish and black Individuals and to discontinue pensions via MURDER (see <ref> https://en.wikipedia.org/wiki/Joyce_Gilchrist </ref>. It is very easy to bribe or pay individuals to bear false witness against another individual. The order Tom Wolf issued effectively allows the governments to discontinue religion in Pennsylvania, a member of the **KLU KLUX KLAN** or related organization. Other members of the KKK in the United States and the World, are all organized to take

on the HOAX. This was previously called Agenda 21. As of 16MAR2020

Canada was still allowing flights from CHINA and those persons

could be carrying hazardous bio material simply enter the United States from

Canada. When Mr. Cutler was working for Merck as a contractor some individuals

were caught stealing trade secrects by security at the West Point site. It has

been known China has been effectively using live people for transplants for years.

Mr. Ellyahoo has stated the word in HUNGARY for SIN is pronounced VIRUS.

The closing of all CASINOS in the STATE is to get 100% of all gambling

revenue, to have a total monopoly on all sources of payment organized for a

complete KKK takeover. Jeffrey Smiles has told Jeffrey Cutler that the Allentown

Courthouse contains NAZI insigna in the tile work in the building, and there is a 7

acre compound in Southern Lancaster county that is owned by the **KKK**.

The connection of Joe Biden to China and the transfer of technology to them has

violated the world's civil rights. Also Based on case # **19-cv-2407** in

the Southern District of California, by Cyrus A. Parsa which should be included by

reference these claims are true and correct and the book Bloody Harvest

<ref> https://www.bookdepository.com/Bloody-Harvest-David-Matas/9780980887976 </ref>

Based on Mr. Cutler's experience, Engineering Experience, and the case of Joyce

Gilchrist <ref> https://en.wikipedia.org/wiki/Joyce_Gilchrist </ref> persons in Federal

government may have violated the Logan Act Stat. 613, 18 U.S.C. § 953 with

China. Since Mr. Wolf's order is illegal, all the Insurance companies have

conspired to not pay BUSINESS INTERUPTION CLAIMS based on the order of Tom Wolf. Mr. Wolf's order also violates the Federal Voting law Voting Rights Act of 1965, which prohibits any jurisdiction from implementing a "voting qualification or prerequisite to voting, or standard, practice, or procedure ... in a manner which results in a denial or abridgement of the right ... to vote on account of race," color, or language minority status. Mr. Cutler notifies this court that the failure of the Dams in Michigan may be the result of a deliberate act to prevent and obscure the lawsuit of governor Gretchen Witmer's unlawful act from being persued in federal court case 1:20-cv-00323. Persons of the **CDC** have **LIED** about an Approved Vaccine to Stop **COMPLICATIONS** from COVID-19. It is called PNEUMOVAX23 and Prevnar13 which is the PRIME COMPLICATION TO THE COVID-19 pneumococcal disease. Based on Tigers in the Bronx zoo being diagnosed with COVID-19, there is **ZERO** evidence that the tigers ever failed to practice social distancing, because the person would be called **LUNCH**. This **EFFECTIVELY INVALIDATES ALL THE MODELS** being used to justify the restrictions being imposed!!. Pursuant to Title 18, United States Code § 4, Plaintiff, Jeffrey Cutler, notifies the court of possible ongoing criminal activity directly involved with his civil rights action (No. 5:19-cv-00834) and requests the court to notify the Prosecutor's Office immediately, and any other criminal justice authorities the court deems necessary, to effect and insure the prompt investigation and prosecution of crimes involved with this case which

includes mail Fraud  (18 U.S. Code § 1341), the murder of a federal employee

(18 U.S. Code § 1114),  Obtruction of Jutice, and  Title 18, Section 871.

The courts have  affirmed, it must "afford a liberal reading to a complaint filed by

a pro se plaintiff," particularly when the plaintiff has no formal legal training or

education.  Klayman v. Zuckerberg, 753 F.3d 1354, 1357 (D.C.Cir. 2014); see also

Erickson v. Pardus, 551 U.S. 89, 94 (2007) ("A document filed pro se is to be

liberally construed, and a pro se complaint, however inartfully pleaded, must be

held to less stringent standards than formal pleadings drafted by lawyers.")

(internal quotations and citations omitted).

**WHEREFORE**, for all the foregoing reasons, petitioner respectfully requests

the court grant an **IMMEDIATE INJUNCTION PENDIING APPEAL THAT**

**ENJOINS EVERY JURISDICTION OF THE UNITED STATES FROM**

**SPECIFYING RESTICTIONS ON HOW TO PRAY** during a Pandemic, either

real or created by colusion with foreign governments.  This court should

also declare the entire Affordable Care Act (Obamacare) law and the law signed in

1942 as Executive Order 9066 by Franklin Roseveldt **UNCONSTITUTIONAL**,

during an immediate **ENBANC** review of this case when combined with the writ

from case **15-632**, have Mr. Johnson's incarceration be suspended pending this

appeal process because of the tampering of documents as demonstrated by ECF 99

filed by Mr. Cutler in the other case, as well as the **RESPONSE TO PETITION**

**OF VERIZON LLC FOR SUMMARY AFIRMATION AND TO**

**CONSOLIDATE RELATED CASES  FOR JUDICIAL EFFICIENCY** in case 20-1805  on 14MAY2020 and grant a transfer of the rest of this district court case and let a jury determine the penalties for each party, including **Micheal Bloomberg**, **Deputy Clerk Mary Francis Yeager** and  **Deputy Clerk Roeshawn Johnson**.  The exiting Injunction Pending Appeal in Case 20-1449 should be granted as well as the proposed  **ORDER** filed with the NOTICE OF APPEAL of case number 20-1805 and other penalties the court deems appropriate.

Respectfully submitted,

DATE:_____20MAY2020_____           _____/s/ Jeffrey Cutler_____

Jeffrey Cutler, pro se
215-872-5715 (phone)
eltaxcollector@gmail.com
P.O. Box 2806
York, PA 17405

## CERTIFICATE OF SERVICE

I hereby certify that on May  8, 2020, I filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit via United States Mail or in person. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system. I further certify that all of the other  participants or their lawyers in this case are registered CM/ECF users, except JOE JOHNSON P.O. BOX  441572, FORT WASHINGTON, MD 20749

_____/s/ Jeffrey Cutler_____
Jeffrey Cutler

## CERTIFICATION OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. AP. P. 35(b)(2) and Circuit Rule 40-1 because this brief contains no more than 15 pages, excluding the parts of the brief exempted by Fed. R. AP. P. 32.

Respectfully Submitted,

/s/ Jeffrey Cutler

DATE:_____20MAY2020_____     ——————————————————

Jeffrey Cutler, pro se
215-872-5715 (phone)
eltaxcollector@gmail.com
P.O. Box 2806
York, PA 17405

# ADDENDUM

# Human Events.

POLITICS    NEWS & ANALYSIS    TECH    TO TELL THE TRUTH     🔍

Further evidence that this government cannot be trusted to hold up its end of any 'comprehensive immigration reform' deal.

SUBMISSIONS

## LATEST POSTS

**Biden Poised to Deep Six Much of Trump Legacy With Executive Orders.**

ARCHIVE

# The Most Important Obamacare Case You�??ve Never Heard Of

**The New Purpose of Public Education.**

**To Tell the Truth: New York Times Fails to Understand the Definition of Evidence**

**In Defense of Big Pharma.**

**To Tell the Truth: New York Times Misleads Readers On Stock market Perfomance**

ADVERTISEMENT



While the nation eagerly awaits the Supreme Court�??s ruling in King v. Burwell, a case brought by an unknown Pennsylvania tax collector has quietly made its way to the U.S. Court of Appeals for the District of Columbia and has the potential to end President

# Barack Obama�??s most important piece of legislation, the Affordable Care Act.



By **Justin Haskins**
on May 13, 2015

ADVERTISEMENT

While the nation eagerly awaits the Supreme Court�??s ruling in *King v. Burwell*, a case brought by an unknown Pennsylvania tax collector has quietly made its way to the U.S. Court of Appeals for the District of Columbia and has the potential to end President Barack Obama�??s most important piece of legislation, the Affordable Care Act.

Like countless others, Jeffrey Cutler, currently the tax collector of East Lampeter Township, Pennsylvania, received a notice from his health insurance company in October 2013 that indicated his plan did not qualify for renewal under the rules established by the Affordable Care Act

(ACA), also known as Obamacare. Cutler, who had been enrolled in the same plan since 2007, was satisfied with his coverage and did not want to switch to what he considered to be an inferior plan offered through the government-run health insurance exchange.

Facing significant political pressure from Republicans and Americans who had lost their insurance plans, Obama announced a �?? transition policy�?� in November 2013 that promised to allow individuals to temporarily keep their health insurance plans even if they otherwise would not qualify for renewal under the ACA. However, the transition plan was not applied universally; state governments had the authority to decide whether or not to allow their own citizens to keep their plans.

Rules established by Pennsylvania state officials

made it possible for Cutler
to keep his plan, but only
if his insurance company
agreed. His insurance
company did not, and
Cutler lost his insurance
on January 1, 2014. He has
been without health
insurance since.

Representing himself,
Cutler filed suit on
December 31, 2013,
alleging Obamacare
violates his constitutional
rights on two counts.
First, Cutler says the
Obama administration�??
s transition policy, also
known as the �??
administrative fix,�?�
violates the Fifth
Amendment�??s
guarantee to equal
protection under the law.
Because every state was
given the authority by the
federal government to
apply the administrative
fix differently, Obamacare
did not exist equally in
every state. If Cutler had
been a citizen of Arkansas,
a state that required
insurance companies to
continue covering what

the ACA determined to be non-compliant plans, he would have been able to keep his health insurance.

Cutler�??s second argument is Obamacare violates the Establishment Clause of the First Amendment. According to Cutler, who is Jewish�??a religion that is not exempt from Obamacare mandates�??federal agencies under Obamacare unfairly give certain religious groups the freedom to avoid having compliant health insurance plans without paying a penalty. By making this exception, Obamacare clearly favors some religious groups over others.

The federal government filed a motion for dismissal in U.S. District Court claiming Cutler lacked proper standing. Judge Colleen Kollar-Kotelly granted the dismissal, and Cutler appealed the decision to the U.S. Court of Appeals,

11/14/2020          https://humanevents.com/2015/05/13/the-most-important-obamacare-case-youve-never-heard-of/?utm_source=hedaily&utm_medium=...

which has agreed to hear
the case. Oral arguments
were presented on May 12.

Cutler is now represented
by constitutional lawyers
David Yerushalmi and
Robert Muise of the
American Freedom Law
Center, and he�??s
confident his case will
eventually take down
Obamacare.

�??My case is a full blown
frontal attack on the
constitutionality of the
law,�?� said Cutler. �??
Many of the cases are
about minute parts of the
law. *King* v. *Burwell* is
about five words. Hobby
Lobby�??s suit was
largely about
contraception. My case
strikes at the heart of
Obamacare and the
administrative fix that was
unconstitutionally applied
after ACA�??s passage.�?
�

West Virginia Attorney
General Patrick Morrisey
filed suit on behalf of his
state in July 2014 alleging
similar claims.

�??My letter to the attorney general of [West Virginia] seems to have resulted in them also challenging the law on the same point,�?� said Cutler.

�??I think Jeffrey Cutler is correct�??his First Amendment rights, and probably those of many other people, may have been violated under the ACA,�?� said Kenneth Artz, a research fellow specializing in health care at The Heartland Institute. �??This is not unexpected considering Obama�??s massive health care reform bill is the most complex piece of legislation in the history of the world.�?�

Regardless of what the D.C. Court of Appeals decides, Cutler says he expects his case to eventually be heard by the Supreme Court.

No matter what becomes of Cutler�??s case, his arguments raise important questions about the

federal government�??s authority to create laws and regulations that are applied unequally. While it�??s true the signers of the Constitution and the Bill of Rights did not intend for religion to be shoved out of the public sphere, they absolutely were concerned about the federal government favoring one religious group over another, and they also feared certain states, especially the more wealthy and powerful states, being treated differently than others.

It�??s within this context that the Constitution was agreed upon, and Cutler�??s case directly addresses these same concerns. If federal authorities can pick particular groups based on religion or geography to exempt from federal law, then our national laws are, by definition, not truly national and not equally applied.

The only question now is: Will the courts agree, or will they allow the power of the executive branch to continue to expand beyond what anyone in 1789, when the Constitution was implemented, believed was possible under the law?

*Justin Haskins (Jhaskins@heartland.org) is editor of The Heartland Institute, a leading free-market think tank headquartered in Chicago.*

**In this article:**

**Up Next:** **Verizon-AOL Merger Fits My Always On, Always Connected PowerTrend**

**Don't Miss:** **The Return of Obama's Hoax-Spreading Bitter Half**



Written By

# Justin Haskins

TRENDING NOW:



DLA PIPER

NEOPOST
01/03/2019
US POSTAGE $000.47²

ZIP 19103
041M11280266

PHILADELPHIA
PA 191
04 JAN 19
PM 5 L

17405-280606

Jeffrey Cutler
67 Cambridge Village
P.O. Box 2806
York, PA 17405

DLA Piper US LLP
One Liberty Place, 1650 Market Street, Suite 4900
Philadelphia, Pennsylvania 19103-7301

https://en.wikipedia.org/wiki/List_of_lawsuits_involving_Donald_Trump    ⟳    🔍 Search    ☆     

- Donald J. Trump for President v. Way[59]

### Pennsylvania [ edit ]

- Republican Party of Pennsylvania v. Boockvar, 20-542; Scarnati v. Pennsylvania Democratic Party, 20-574
- Donald J. Trump for President Inc. v. Kathy Boockvar and County Boards of Elections, 602 MD 2020
- Philadelphia County Canvassing Observation Appeal, 1094 CD 20
- Donald J. Trump for President Inc. v. Philadelphia County Board of Elections, 20-5533
- Hamm, Kelly, Allred, Horner, Connor and Hauser v. Boockvar, 600 MD 2020
- Donald J. Trump for President Inc., et al. v. Kathy Boockvar, et al. 4:20-cv-02078 [60]
- COUNTY OF BUTLER et al, JEFFREY CUTLER INTERVENOR PLAINTIFF-APPELLEE v. THOMAS W WOLF, et al. - United States Court of Appeals for the Third Circuit 20-2936

### Michigan [ edit ]

- Donald J. Trump and Eric Ostergren v. Jocelyn Benson, 20-000225-MZ

### Georgia [ edit ]

- In Re: Enforcement of Election Laws and Securing Ballots Cast or Received after 7:00pm on November 3, 2020, SPCV20-00982

### Wisconsin [ edit ]

- Pierson v. Stepien, 20-CV-9266

