**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

DONALD J. TRUMP FOR
PRESIDENT, INC., *et al.*,

      Plaintiffs,

    v.

KATHY BOOCKVAR, *et al.*,

      Defendants,

NAACP-PENNSYLVANIA STATE
CONFERENCE, *et al.*,

      Intervenor-Defendants,

DNC SERVICES
CORPORATION/DEMOCRATIC
NATIONAL COMMITTEE,

      Intervenor-Defendant.

Civil Action
No. 4:20-cv-02078-MWB

Hon. Matthew W. Brann

**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION BY INTERVENOR-DEFENDANTS NAACP-
PENNSYLVANIA STATE CONFERENCE, BLACK POLITICAL
EMPOWERMENT PROJECT, COMMON CAUSE PENNSYLVANIA,
LEAGUE OF WOMEN VOTERS OF PENNSYLVANIA,
JOSEPH AYENI, LUCIA GAJDA, STEPHANIE HIGGINS,
MERIL LARA, RICARDO MORALES, NATALIE PRICE,
<u>TIM STEVENS, AND TAYLOR STOVER</u>**

# <u>TABLE OF CONTENTS</u>

Introduction ................................................................................. 1

Argument.................................................................................... 6

I.      Plaintiffs Have No Reasonable Likelihood Of Success On The Merits. ....... 7

        A.      Plaintiffs' Claims Are Barred By Laches............................................. 7

        B.      Plaintiffs' Requested Remedies Are Unavailable. ............................ 12

II.     The "Irreparable Harm" Asserted by Plaintiffs Is Not Cognizable............. 14

III.    The Balance of Equities And Public Interest Weigh Decisively
        Against An Injunction. ................................................................. 18

Conclusion ............................................................................... 22

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*AM Gen. Corp. v. Daimler Chrysler Corp.*,
  311 F.3d 796 (7th Cir. 2002) ............................................................11

*Appeal of Simon*,
  46 A.2d 243 (Pa. 1946).....................................................................14

*Benisek v. Lamone*,
  138 S. Ct. 1942 (2018) (per curiam)..................................................21

*Bullock v. Carney*,
  463 F. Supp. 3d 519, 524 (D. Del.)......................................................7

*Bush v. Gore*,
  531 U.S. 98 (2000) (per curiam).........................................................13

*Carlson v. Ritchie*,
  830 N.W.2d 887 (Minn. 2013) .............................................................8

*Cont'l Grp., Inc. v. Amoco Chems. Corp.*,
  614 F.2d 351 (3d Cir. 1980) ..............................................................14

*Costello v. United States*,
  365 U.S. 265 (1961)..............................................................................8

*Donald J. Trump for President, Inc. v. Way*,
  No. CV2010753MASZNQ, 2020 WL 5912561
  (D.N.J. Oct. 6, 2020).........................................................................20

*Fulani v. Hogsett*,
  917 F.2d 1028 (7th Cir. 1990) ..............................................................8

*Greater Phila. Chamber of Commerce v. City of Philadelphia*,
  949 F.3d 116 (3d Cir. 2020) ................................................................6

*Hendon v. N.C. State Bd. of Elections*,
  710 F.2d 177 (4th Cir. 1983) ...............................................................8

*Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*,
  182 F.3d 598 (8th Cir. 1999) .............................................................11

*In re Canvass of Absentee and Mail-in Ballots of Nov. 3, 2020
General Election*, Nos. 89-93 EM 2020 (Pa. Nov. 18, 2020)
(per curiam) ........................................................................................9

*In re Canvassing Observation Appeal of City of Philadelphia Bd. of
Elections*, No. 30 EAP 2020, 2020 WL 6737895 (Pa. Nov. 17,
2020) ...........................................................................................5, 10, 14

*Kauffman v. Osser*,
321 F. Supp. 327 (E.D. Pa. 1971) ....................................................16

*Marks v. Stinson*,
19 F.3d 873 (3d Cir. 1994) .........................................................14, 16

*Planned Parenthood of Cent. N.J. v. Farmer*,
220 F.3d 127 (3d Cir. 2000) .............................................................11

*R.R. Comm'n of Tex. v. Pullman Co.*,
312 U.S. 496 (1941)............................................................................9

*Reilly v. City of Harrisburg*,
858 F.3d 173 (3d Cir. 2017) ...............................................................7

*Republican Party of Pa. v. Cortés*,
218 F. Supp. 3d 396, 410 (E.D. Pa. 2016)........................................17

*Respect Maine PAC v. McKee*,
622 F.3d 13 (1st Cir. 2010)...............................................................21

*Reynolds v. Sims*,
377 U.S. 533 (1964)............................................................................6

*Samuel v. Virgin Islands Joint Bd. of Elections*,
No. 2012-0094, 2013 WL 106686 (D.V.I. Jan. 6, 2013)...................15

*Soules v. Kauaians for Nukolii Campaign Comm.*,
849 F.2d 1176 (9th Cir. 1988) ............................................................8

*Stein v. Cortés*,
223 F. Supp. 3d 423, 431 (E.D. Pa. 2016).........................6, 13, 17, 20

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008)..........................................................................6, 18

**Statutes**

25 P.S. § 2642(k)............................................................................18

25 P.S. § 3146.8(g)(1.1), (2) ..........................................................10

25 P.S. § 3150.16(b)(2)..................................................................13

## Other Authorities

Christina A. Cassidy and Frank Bajak, *In Battlegrounds Like Pa.,*
    *Absentee Ballot Rejections Could Rise, Affecting Close Races*
    (Sept. 8, 2020) ........................................................................5

Angela Couloumbis & Jamie Martines, *Republicans Seek to Sideline*
    *Pa. Mail Ballots That Voters Were Allowed to Fix*, Spotlight PA
    (Nov. 3, 2020) ........................................................................4

Pa. Dep't of State, Press Release, Mail Voting Steps For The Nov. 3
    General Election Explained (Oct. 1, 2020)...............................4

**INTRODUCTION**

While Plaintiffs' allegations and claims continue to twist and turn, in search of a legal theory that could justify this lawsuit, their ultimate goal has remained the same: to disenfranchise the Voter Intervenors and millions of other Pennsylvanians in an effort to overturn an unfavorable election result.

Joseph Ayeni is a 77-year-old Philadelphian and registered voter. (Dkt. 31-9, ¶¶ 4, 5.) No secrecy envelope was included with the mail-in ballot he received, so he returned his ballot in mid-October without the required envelope. (*Id.* ¶¶ 6–9.) The day before Election Day, election officials called Mr. Ayeni and informed him that his ballot was rejected. (*Id.* ¶ 8.) Mr. Ayeni went to the elections office, where officials told him to vote in person on Election Day. (*Id.* ¶ 9.) He did so, casting a provisional ballot, as is permitted under Pennsylvania's Election Code. (*Id.* ¶ 10.)

Plaintiffs call Mr. Ayeni's vote "illegal" and say it should be "set aside." (Dkt. 183, at 2.)

Natalie Price is a 73-year-old resident of Elkins Park in Montgomery County. (Dkt. 31-8, ¶¶ 2–3, 5.) She votes in every election. (*Id.* ¶ 3.) A day or two before the election, Ms. Price was notified that her ballot had been rejected because she did not write her name and address on the ballot declaration, which seemed unnecessary because it was pre-printed on the envelope. (*Id.* ¶¶ 8–11.) After traveling to

Norristown and visiting two different sites in the pouring rain, Ms. Price added this duplicative information to her ballot.  (*Id.* ¶¶ 10–15.)

Plaintiffs call Ms. Price's vote "illegal" and say it, too, should be "set aside." (Dkt. 183, at 2.)

Ricardo Morales, Meril Lara, and Taylor Stover have similar stories.  (Dkt. 31-7, ¶¶ 8–9; Dkt. 31-10, ¶¶ 8–9; Dkt. 31-11, ¶¶ 8–9.)  All were committed to voting, were told they had made mistakes, and diligently fixed them in order to have their votes counted and their voices heard.  (*Id.*)  Plaintiffs call their votes "illegal" and demand that they not be counted.

Lucia Gajda, a Northampton County resident with an autoimmune disorder, decided to vote by mail due to heightened susceptibility to COVID-19, and did so successfully.  (Dkt. 31-6, ¶¶ 3-6.)  Stephanie Higgins, a Philadelphian in the third trimester of a high-risk pregnancy with similar concerns, successfully voted by mail. (Dkt. 31-5, ¶¶ 6–9.)  Tim Stevens, a lifelong Allegheny County resident and long-time civil rights leader in Pittsburgh, voted by mail because of his age and concerns about the disproportionate impact of COVID-19 on Black people, and he complied with every requirement.  (Dkt. 31-2, ¶ 2.)  Plaintiffs do not suggest that these voters did anything wrong.   But because of allegations about how their counties administered the election, Plaintiffs want to subject every mail-in vote in these counties to some sort of statistical analysis.  Perhaps their votes will count after that

process, and perhaps not.  Ultimately it would not matter, because whatever the final tally, Plaintiffs want the Court to "declare Trump the winner."  (Dkt. 183, at 2.)

These are just a few of the Pennsylvanians whom Plaintiffs want to disenfranchise.  The organizational Voter Intervenors (NAACP-Pennsylvania State Conference, Black Political Empowerment Project, Common Cause Pennsylvania, and League of Women Voters of Pennsylvania), represent nearly 50,000 other such voters.  (Dkt. 31-1, ¶ 7; Dkt. 31-3, ¶ 5; Dkt. 31-4, ¶ 7.)  To even arguably support Plaintiffs' request, they would need to put forward compelling evidence of massive fraud.  They have utterly failed to do that.

Instead, Plaintiffs seek to justify mass disenfranchisement with an incoherent conspiracy theory.  Plaintiffs theorize that certain counties restricted where observers could stand, not to protect election workers from a raging pandemic, but to count defective ballots in secret.  Plaintiffs fail to offer any evidence for this, and it is contradicted by their own allegations about these counties' allowing voters to cure defective ballots.  Plaintiffs do not explain why, if these counties were conspiring to count defective ballots, they went out of their way to help voters fix mistakes to cast *non-defective* ballots.  Plaintiffs then complain that this cure procedure was designed "to favor Biden" (Dkt. 183, at 6), ignoring the use of similar notice-and-cure protocols in several counties where voters favored President Trump:

3

Wyoming County (67%-32%), Lebanon County (65%-33%), York County (62%-37%), and Luzerne County (57%-42%).[1]

Plaintiffs see further proof of a conspiracy in decisions "to count thousands of ballots" with alleged deficiencies, such as voters forgetting to write their address on an envelope that already pre-printed that address. (Dkt. 183, at 10–11 & n.11.) But if the point of restricting observers was to count defective ballots *secretly*, it would not make much sense for these counties to set them aside and make on-the-record decisions that could be tested in state court—decisions that Plaintiffs themselves cite. (*Id.*) Plaintiffs further find it suspicious that there was a "lower rejection rate" for ballots in the General Election than in the Primary. (*Id*. at 17.) But this is entirely unsurprising given the extensive efforts of many organizations (including the organizational Voter Intervenors) and of the Commonwealth to educate the public on how to properly return mail-in ballots.[2]   And even if, for example, Philadelphia

---

[1] *See* Dkt. 95-1, at 52, 56; Angela Couloumbis & Jamie Martines, *Republicans Seek to Sideline Pa. Mail Ballots That Voters Were Allowed to Fix*, Spotlight PA (Nov. 3, 2020),   https://www.spotlightpa.org/news/2020/11/pennsylvania-mail-ballots-republican-legal-challenge-naked-ballots-fixed-cured/.

[2] *See, e.g.*, Dkt. 31-1, ¶ 13; Dkt. 31-2, ¶ 7; Dkt. 31-3, ¶ 9; Dkt. 31-4, ¶ 17; *see also, e.g.*, Pa. Dep't of State, Press Release, Mail Voting Steps For The Nov. 3 General Election Explained (Oct. 1, 2020),   https://www.media.pa.gov/pages/state-details.aspx?newsid=406.

had rejected ballots at the same 3.9% rate as in the Primary,[3] that would be nowhere near the rate of "10%" Plaintiffs guess would be "sufficient to overturn reported results."   (Dkt. 183, at 2 n.2.)

Although Plaintiffs' logic is absurd, the injunction Plaintiffs request is deadly serious.   Chief Justice Saylor recently described exactly what Plaintiffs want—to "disenfranchis[e]" voters.   *In re Canvassing Observation Appeal of City of Philadelphia Bd. of Elections*, No. 30 EAP 2020, 2020 WL 6737895, at *9 (Pa. Nov. 17, 2020) (Saylor, C.J., dissenting).   For now, Plaintiffs are "only" asking the Court to suspend the normal operation of Pennsylvania law and prohibit state officials from carrying out the necessary steps to certify election results.   After securing that extraordinary injunction, Plaintiffs' next demand is to inspect the outside envelopes of 1.5 million ballots and ask a statistical expert to guess how many were "improperly counted" and who those voters might have voted for.  (Dkt. 183, at 1.)

Everything about this is wrong.   We did not establish a representative democracy to ask courts to "declare" who wins our elections.   (Dkt. 183, at 2.)   We did not march for civil rights so that voters in "urban counties" could be casually denigrated.   (Dkt. 183, at 5.)   And we did not establish the principle of "one person,

---

[3] *See* Christina A. Cassidy and Frank Bajak, *In Battlegrounds Like Pa., Absentee Ballot Rejections Could Rise, Affecting Close Races* (Sept. 8, 2020), https://www.pennlive.com/news/2020/09/in-battlegrounds-like-pa-absentee-ballot-rejections-could-rise-it-could-be-pivotal-in-close-races.html (Ex. A).

one vote," *Reynolds v. Sims*, 377 U.S. 533, 558 (1964), to decide elections based on the losing candidate's "statistical expert analysis," (Dkt. 183, at 2.). Mr. Ayeni, Ms. Price, Ms. Stover, Ms. Lara, Mr. Morales, Ms. Gajda, Ms. Higgins, and Mr. Stevens did their civic duty and are entitled to have their votes counted. They deserve better than disenfranchisement. So do 6.8 million other Pennsylvanians.

## ARGUMENT

Plaintiffs fail to satisfy the burden of justifying the extraordinary relief they seek of preventing certification of the presidential election results. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. Only if the first two factors are established must the court consider the remaining two. *Greater Phila. Chamber of Commerce v. City of Philadelphia*, 949 F.3d 116, 133 (3d Cir. 2020).

The burden of making these showings rests firmly on Plaintiffs. *Stein v. Cortés*, 223 F. Supp. 3d 423, 431 (E.D. Pa. 2016). Plaintiffs cannot meet their burden if there is "no record evidence to support" their assertions; "attorney

argument" is not enough.  *Bullock v. Carney*, 463 F. Supp. 3d 519, 524 (D. Del.), *aff'd*, 806 F. App'x 157 (3d Cir. 2020).

## I.     Plaintiffs Have No Reasonable Likelihood Of Success On The Merits.

To succeed in their brazen attempt to nullify the results of the election, Plaintiffs must first "demonstrate that [they] can win on the merits"—that is, that they have at least a "reasonable chance" of success.  *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 & n.3 (3d Cir. 2017).  Plaintiffs do not come close.  Their brief presents a hodgepodge of legal theories, most of which are not encompassed by Plaintiffs' operative complaint.  (Dkt. 183, at 15–24.)  As other Defendants have explained, to the extent those claims *are* before the Court, Plaintiffs have neither standing nor a viable constitutional claim.

Voter Intervenors focus here on further, independent grounds why this Court should deny the request for injunctive relief:  *First*, Plaintiffs' claims are untimely; and *second*, even if Defendants' notice-and-cure procedures and treatment of observers were legally erroneous—and they were not—any error on the part of the *Commonwealth and counties* could not legally justify mass disenfranchisement of *voters*.

### A.     Plaintiffs' Claims Are Barred By Laches.

The doctrine of laches prohibits a party from asserting a claim when (1) the party failed to exercise diligence in raising the claim, and (2) the delay prejudiced

the party's opponent. *See Costello v. United States*, 365 U.S. 265, 282 (1961). This rule applies with particular force to election law. "In the context of elections, [laches] means that any claim against a state electoral procedure must be expressed expeditiously." *Fulani v. Hogsett*, 917 F.2d 1028, 1031 (7th Cir. 1990). After an election, courts are especially loath to entertain claims that could have been raised before, lest they "permit, if not encourage, parties who could raise a claim to lay by and gamble upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in a court action." *Hendon v. N.C. State Bd. of Elections*, 710 F.2d 177, 182 (4th Cir. 1983). Laches will thus generally bar plaintiffs from raising post-election challenges they could have raised before the election. *See, e.g.*, *Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1180 (9th Cir. 1988); *Carlson v. Ritchie*, 830 N.W.2d 887, 892 (Minn. 2013).

As Voter Intervenors' briefing on the motions to dismiss explains, Plaintiffs' notice-and-cure claims are all barred by laches. (*See* Dkt. 95, 142, 161, 175.) Plaintiffs failed to raise their notice-and-cure claims before Election Day, even though they knew or should have known about those claims from the press coverage given to, and the government communications concerning, this issue in the weeks and days before Election Day. (Dkt. 95, at 13–14; Dkt. 175, at 7–8.) Plaintiffs' delay prejudiced not only the governmental Defendants but also the Voter

8

Intervenors (both individually and through their members), whose previously cast votes Plaintiffs seek to nullify.

Plaintiffs cannot avoid this problem by belatedly shifting focus to ballots with declarations missing a date or voter address. The First Amended Complaint does not advance this claim in anything but the most conclusory terms. Even if it were in the case, disputes over what Pennsylvania law requires voters to include in their declarations are already being litigated in state court in the ordinary course, and the Pennsylvania Supreme Court has indicated that it will answer that question as a matter of state law. *See In re Canvass of Absentee and Mail-in Ballots of Nov. 3, 2020 General Election*, Nos. 89-93 EM 2020 (Pa. Nov. 18, 2020) (per curiam) (Ex. B) (exercising extraordinary jurisdiction). Even assuming these issues are before this Court, it "should exercise its wise discretion by staying its hands" while the Supreme Court of Pennsylvania decides the issue. *See R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 501 (1941).

Laches also bars Plaintiffs' observers claims, again assuming for the sake of argument that those claims (omitted from the operative complaint) are before this Court. The Trump Campaign should always have known in what numbers and under what conditions their representatives would be allowed to observe the pre-canvass and canvass of mail ballots, given the Election Code's clear statement that "[o]ne authorized representative" of each candidate and political party would be allowed to

"remain in the room" where those ballots were pre-canvassed and canvassed, 25 P.S. § 3146.8(g)(1.1), (2), and Secretary Boockvar's pre-election guidance to the same effect. (Dkt. 95, at 10–11.)  Certainly, the Campaign knew about those conditions as soon as pre-canvassing started early on Election Day.  The time to file suit was then, when the Campaign could have sought a court order modifying those restrictions while ballots were being pre-canvassed and canvassed, rather than seeking after-the-fact disenfranchisement of anyone whose ballot was counted under those procedures.  (*Id.* at 14–15.)  In fact the Trump Campaign *did* sue in Philadelphia and quickly reached an accommodation, which as Chief Justice Saylor pointed out, ensured any access concerns were quickly remedied.  *In re Canvassing Observation*, 2020 WL 6737895, at *9 (Saylor, C.J., dissenting).  If Plaintiffs had similar concerns in Allegheny County or elsewhere, they could have taken similar action.

And now, for the first time, Plaintiffs add that an October 23 Pennsylvania Supreme Court decision about ballot challenges violates Due Process (Dkt. 183, at 11), which they obviously could have litigated a month ago.

Plaintiffs have not disputed that their claims are subject to laches defenses; that laches generally bars claims that could have been raised before an election from being raised afterwards; or that they knew or should have known about their notice-and-cure claims before Election Day.  (*See* Dkt. 170, at 26–28.)  Nor have Plaintiffs

offered any substantive response to Voter Intervenors' arguments on prejudice.  (*Id.* at 27–28.)  Instead, they have offered only three arguments, none persuasive.

*First*, Plaintiffs asked the Court not to consider laches at the motion to dismiss stage.  (Dkt. 170, at 27.)  Even if that were accepted, Plaintiffs cannot escape laches while requesting injunctive relief.  *See AM Gen. Corp. v. Daimler Chrysler Corp.*, 311 F.3d 796, 822 (7th Cir. 2002) (negligible likelihood of success where movant "demonstrated no chance of overcoming [defendant's] affirmative defense of laches"); *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 601 (8th Cir. 1999) (laches properly considered as part of likelihood of success).

*Second*, Plaintiffs assert that they did not inexcusably delay in bringing their claims because they filed suit only when their claims became "ripe."  (Dkt. 170, at 26–27.)  Not so.  A claim is ripe as soon as there is "danger of imminent injury." *Planned Parenthood of Cent. N.J. v. Farmer*, 220 F.3d 127, 147 (3d Cir. 2000). Whatever injury Plaintiffs claim to have suffered, there was clearly an imminent risk of it before Election Day.

Plaintiffs' observers claims fare no better, to the extent they are relevant. Plaintiffs state that they "did not know Defendants would violate the law until canvassing began."  (Dkt. 170, at 27.)  That statement is unsupported by record evidence.  In any case, if Plaintiffs only learned what was happening when canvassing began, they should have sued *when canvassing began*, as they did in

11

Philadelphia.  Instead they waited until the counting was nearly done, and attempt to cast a retroactive shadow over every vote that was counted.

**B.    Plaintiffs' Requested Remedies Are Unavailable.**

Plaintiffs are also unlikely to succeed on the merits because the relief they seek is legally unavailable.  Plaintiffs allege nothing more than that some counties apprised voters that they could cure certain defects in their absentee or mail-in ballots by casting provisional ballots or correcting their original ballots.  Plaintiffs' original Complaint and proposed Second Amended Complaint, if even relevant to this motion, add nothing more than allegations that some counties—in accordance with the Election Code and social-distancing requirements—declined to give the Trump Campaign unfettered access to the rooms where mail ballots were reviewed and counted.  For all their rhetoric at oral argument, Plaintiffs nowhere allege, much less present *evidence*, as they must do to obtain an injunction, that a single absentee or mail-in ballot was fraudulently cast.  Even if Plaintiffs were correct that the county Defendants erred in certain aspects in how they administered the election, or that county-to-county variation in election procedures could give rise to constitutional claims (and Plaintiffs are wrong on both scores), no authority could justify their attempt to disenfranchise millions of qualified Pennsylvania electors because of these alleged errors.

Plaintiffs do not and cannot dispute that the right to vote for presidential electors, once vested in the people of a State, is a fundamental right protected by the Constitution. *See, e.g.*, *Bush v. Gore*, 531 U.S. 98, 104 (2000) (per curiam). Plaintiffs seek first and foremost to block certification of the results of the election. (Dkt. 125, at 62.)   That remedy would disenfranchise literally every qualified Pennsylvania voter who cast a ballot.  It almost goes without saying that such a remedy "would abrogate the right of millions of Pennsylvanians to select their President and Vice President." *Stein*, 223 F. Supp. 3d at 442 (because requested relief could prevent certification of election results, it "may . . . be unconstitutional").

Limiting the injunction to certification of election results that include the tabulation of absentee or mail-in ballots that "Defendants improperly permitted to be cured" (or "which Plaintiffs' watchers were prevented from observing during the pre-canvass and canvass") (Dkt. 125, at 62.) cannot salvage Plaintiffs' request. Plaintiffs present no evidence that anyone voted who was not qualified to do so.  Nor do Plaintiffs present any argument that Pennsylvania law prohibits counties from allowing individuals who cast mail-in or absentee ballots to spoil those ballots by casting new ones, including provisional ballots.  *See* 25 P.S. § 3150.16(b)(2).  At most, Plaintiffs contend that Defendants erred in providing, or allowing others to provide, notice to voters that their absentee or mail-in ballots were rejected, or by

limiting campaign observers' access to the pre-canvass and canvass. Any *governmental* error in these technical aspects of election administration would provide no basis for discounting ballots cast by *qualified voters*. *See Appeal of Simon*, 46 A.2d 243, 246 (Pa. 1946) ("[T]he rights of voters are not to be prejudiced by [officials'] errors."). "[S]hort of demonstrated fraud, the notion that presumptively valid ballots cast by the Pennsylvania electorate would be disregarded based on isolated procedural irregularities that have been redressed—thus disenfranchising potentially thousands of voters—is misguided." *In re Canvassing Observation*, 2020 WL 6737895, at *9 (Saylor, C.J., dissenting).

Plaintiffs stake their case on *Marks v. Stinson*, 19 F.3d 873 (3d Cir. 1994), but to no avail. That decision involved a state senate race tainted by "massive absentee ballot fraud, deception, intimidation, harassment and forgery." *Id.* at 887. Here, Plaintiffs have presented no evidence that even a single vote was fraudulently cast. Nor do Plaintiffs present any evidence to support their provocative attempts to impugn the integrity of the officials who administered the election, and even the fundamental honesty of entire counties.

## II.   The "Irreparable Harm" Asserted by Plaintiffs Is Not Cognizable.

Even if they were likely to succeed on the merits, Plaintiffs must make a "clear showing of immediate irreparable injury." *Cont'l Grp., Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 359 (3d Cir. 1980). They have not done so. Seeking to set dangerous

election law precedent, they ask this Court to conclude that any losing candidate can establish a threat of irreparable harm by simply proclaiming that some discrepancy in the administration of an election exists, and a "short stay" of the results "*could*" uncover a factual or legal basis to change the result.  (*See* Dkt. 183, at 24 (emphasis added).)  To call that irreparable harm would upend election law.

*First*, a campaign or candidate cannot establish that it would be irreparably harmed where the moving party has not shown that the alleged irregularities are substantial enough to change the outcome.   Losing candidates seeking the extraordinary remedy of a stay of certification must establish that "*but for*" the challenged acts, "they *would have been elected*."  *Samuel v. Virgin Islands Joint Bd. of Elections*, No. 2012-0094, 2013 WL 106686, at *8 (D.V.I. Jan. 6, 2013) (emphasis added).

Plaintiffs have made no such showing.   They offer no evidence for the assertion that "tens of thousands of votes" were "cast invalidly" and "counted contrary to Pennsylvania law."  (Dkt. 183, at 5.)  Plaintiffs have not alleged how many ballots with minor declaration defects were determined to be valid by county boards, but the ballots at issue in the exhibits they cite pale in comparison to President Trump's deficit. (Dkt. 183, at 11 n.11; Dkt. 182-6; Dkt. 182-7; Dkt. 182-8.)  And Plaintiffs' complaints about canvass observers provide no evidence that ballots were cast invalidly.   Apart from gesturing toward a "statistical expert,"

Plaintiffs present no evidence showing how the Trump Campaign could possibly overcome a deficit of more than 80,000 votes.

*Second*, a candidate cannot demonstrate irreparable harm without evidence of conduct so egregious, intentional, and fraudulent that the results of the election may no longer reflect the will of the collective electorate.  *See Marks*, 19 F.3d at 887 (judicial intervention available only where there is "substantial wrongdoing"—*i.e.*, "massive absentee ballot fraud, deception, intimidation, harassment and forgery" which "render[s] the apparent result an unreliable indicium of the will of the electorate").

This is *far* from that case.  Plaintiffs have admitted that they allege no fraud, much less massive fraud.  Plaintiffs' objection to "curing" is focused on ballots that *by definition* meet all applicable requirements.  Plaintiffs' objections to ballots with alleged declaration defects raise issues that will soon be settled by the Supreme Court of Pennsylvania, but even if Plaintiffs could establish a small number of ballots with technical defects, counting the innocently cast votes of qualified voters is not cognizable harm.  *See Kauffman v. Osser*, 321 F. Supp. 327 (E.D. Pa. 1971) (even where " some absentee ballots cast by persons not qualified to vote by absentee will be counted," this "creates no danger of a government not resting on the will of competent electors who have voted, there is no dilution of the plaintiffs' votes").

Plaintiffs also go outside the operative complaint to object to a lack of "meaningful access" for canvass observers, demeaning the Commonwealth's predominantly Black urban centers as not "honest places." Nov. 17, 2020 Hr'g, Digital Recording 27:05-22. But if Plaintiffs want injunctive relief, they need evidence, not innuendo. Plaintiffs "have not made out" and cannot make out "even the possibility—much less the likelihood—that any vote tampering" or casting of fraudulent ballots occurred in this election." *Stein*, 223 F. Supp. 3d at 441–42 (rejecting unsupported contentions with respect to 2016 election). As in *Stein*, Plaintiffs "have certainly not made the required clear showing of immediate irreparable injury." *Id.*

*Third*, courts routinely refuse to credit dilatory Plaintiffs' assertions of irreparable harm. *See Republican Party of Pa. v. Cortés*, 218 F. Supp. 3d 396, 410 (E.D. Pa. 2016) (finding no irreparable harm where "the emergent nature of this suit is the Plaintiffs' own doing"). By sitting on their claims—choosing to see how the election played out instead of bringing a pre-election suit challenging the county-by-county "notice and cure processes" or timely raising all of their concerns about observer access (*see* Section I.A)—Plaintiffs created the purported emergency they now ask this Court to redress with a precedent-shattering injunction.

## III.   The Balance of Equities And Public Interest Weigh Decisively Against An Injunction.

Even if Plaintiffs could establish likelihood of success and irreparable harm, the Court would still need to "balance the competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested relief," paying "particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24.

The equities and public interest strongly favor denying Plaintiffs' unprecedented relief. Plaintiffs misleadingly minimize their request as one for only a "short stay, and in no events past December 8." (Dkt. 183, at 25.) But they are asking the Court to force the defendant counties to violate Pennsylvania law—the statutory November 23 deadline by which they must certify the election results—and put the Commonwealth at risk of being unable to meet the December 8 deadline by which Pennsylvania needs to certify its election results to Congress. *See* 25 P.S. § 2642(k); *id*. §§ 3159, 3166.

Furthermore, such a novel injunction would cast an unjustified pall of illegitimacy over results and diminish public confidence in the electoral process by preventing timely certification of the results by county boards of elections. In the meantime, Pennsylvanians who exercised their fundamental right to vote in extraordinary numbers would face uncertainty about whether their votes would ultimately be counted. These voters, unsurprisingly, are devastated by the prospect

18

that their votes might not be counted.    Ms. Higgins, for instance, found it "particularly important" as a mother-to-be to cast a ballot in an election that "will affect my child's future" and "would be extremely upset if my vote was not counted and my voice was silenced despite the fact that I did everything I was supposed to do in order to safely vote."  (Dkt. 31-5, ¶ 9; *see also* Dkt. 31-10, ¶ 11 ("A denial of my vote would tell me that I'm not an equal citizen of the United States, that my voice doesn't matter."); Dkt. 31-2, ¶ 2; Dkt. 31-6, ¶¶ 8–9;  Dkt. 31-7, ¶ 10; Dkt. 31-8, ¶ 15; Dkt. 31-9, ¶ 11;  Dkt. 31-11 ¶ 10.)

With just two-and-a-half weeks until December 8, Plaintiffs view the requested injunction as a stepping stone to asking the Court to  "set aside" the votes of thousands or millions of Pennsylvanians and "declare Trump the winner."  (Dkt. 183, at 1–2.)  The equities and public interest weigh overwhelmingly in favor of these voters having their votes counted rather than disrupting the electoral process in order to aid a candidate's efforts to disenfranchise voters.  The Trump Campaign endorsed this common-sense proposition when it argued four years ago, successfully opposing similar relief sought by presidential candidate Jill Stein, that injunctions are especially injurious to the public interest when they would "disrupt[] . . . state electoral processes" for the certification of vote totals that are "already underway." Br. of Intervenors President-Elect Donald Trump et al. at 31–32, *Stein v. Cortés*, No. 2:16-cv-6287 (E.D. Pa. filed Dec. 8, 2016) (Dkt. 95, Ex. A).  The Court agreed,

holding that the "public interest conclusively weigh[ed] against" an injunction given the "real risk" that it "would disenfranchise six million Pennsylvanians" and "abrogate" their right to "select their President and Vice President." *Stein*, 223 F. Supp. 3d at 442. Countless decisions recognize that an "injunction that risks such disenfranchisement is against the public interest." *E.g.*, *Donald J. Trump for President, Inc. v. Way*, No. CV2010753MASZNQ, 2020 WL 5912561, at *15 (D.N.J. Oct. 6, 2020).

The equities and public interest further weigh strongly against an injunction because Plaintiffs provide no evidence of fraudulent conduct on the part of voters, or votes being cast by ineligible electors. *See* Sections I.B & II. Those votes Plaintiffs challenge include voters such as Mr. Morales, whose ballot was rejected for unknown reasons, possibly because he could not write his full Hispanic name in the "very small" space provided on the ballot envelope, and who therefore cast a provisional ballot on Election Day. (Dkt. 31-7, ¶ 8.) Ms. Price did not write her name and address on her ballot declaration because they were pre-printed on the envelope. (Dkt. 31-8, ¶ 11.) Other voters did not include the secrecy envelope that the Supreme Court of Pennsylvania only recently confirmed was necessary. (Dkt. 31-9, ¶ 7; Dkt. 31-10, ¶ 7.)

Furthermore, Plaintiffs seek to throw out an unquantified number of mail-in and absentee votes based on a statistical analysis that they promise will be conducted

in the future.  This "extrapolation" would necessarily disregard votes that were entirely proper, even under Plaintiffs' unsupported theory.  Those would include, for instance, Mr. Stevens, who leads the Black Political Empowerment Project, and voted by mail because he faces increased COVID-19 exposure due to his age and race.  (Dkt. 31-2, ¶¶ 2–3; *see also* Dkt. 31-1, ¶ 15 (describing similar voters).)

He did everything right, yet because he voted in a county that supported Mr. Biden, Plaintiffs want to discard his ballot and disenfranchise voters in seven counties they have cherry-picked.  Yet, if Plaintiffs have their way, the votes of electors in predominately Republican counties—even those that followed similar procedures (*see* footnote 1) —will all be counted.

On the other side, no equities favor massive disenfranchisement and electoral chaos; that is the *least* equitable position imaginable.  As discussed above, Plaintiffs suffer no cognizable irreparable harm.  *See* Section II.  And Plaintiffs have not shown the "reasonable diligence" necessary to support injunctive relief.  *See Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (per curiam); *Respect Maine PAC v. McKee*, 622 F.3d 13, 16 (1st Cir. 2010) (denying motion for emergency injunction pending appeal when Plaintiffs' claimed "'emergency is largely one of their own making").  *See* Section I.A.

In sum, the equities and public interest confirm what common sense dictates: the Court should not grant Plaintiffs the unprecedented relief of ordering the

Commonwealth not to certify the presidential election, just to give Plaintiffs the time to concoct evidence that they would use to seek to disenfranchise countless Pennsylvania voters. These voters exercised their fundamental right to vote, following the instructions of state and county election officials. Their votes must be counted, and Plaintiffs' motion should be denied.

## CONCLUSION

The Court should deny Plaintiffs' Motion for Preliminary Injunction.

Dated:  November 20, 2020

Respectfully submitted,

Witold J. Walczak (PA No. 62976)
AMERICAN CIVIL LIBERTIES UNION OF
PENNSYLVANIA
P.O. Box 23058
Pittsburgh, PA 15222
Telephone: (412) 681-7736
vwalczak@aclupa.org

Marian K. Schneider (PA No. 50337)*
AMERICAN CIVIL LIBERTIES UNION OF
PENNSYLVANIA
P.O. Box 60173
Philadelphia, PA 19102
Telephone: (215) 592-1513
mschneider@aclupa.org

Sophia Lin Lakin*
Adriel I. Cepeda Derieux*
Ihaab Syed*
Dale Ho*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004

*/s/  Claudia De Palma*
Mary M. McKenzie (PA No. 47434)*
Benjamin D. Geffen (PA No. 310134)
Claudia De Palma (PA No. 320136)
PUBLIC INTEREST LAW CENTER
1500 JFK Blvd., Suite 802
Philadelphia, PA 19102
Telephone: (215) 627-7100
mmckenzie@pubintlaw.org
bgeffen@pubintlaw.org
cdepalma@pubintlaw.org

Shankar Duraiswamy*
David M. Zionts*
COVINGTON & BURLING LLP
One City Center
850 Tenth Street NW
Washington, DC 20001
Telephone: (202) 662-6000
SDuraiswamy@cov.com
DZionts@cov.com

Rani Gupta*
COVINGTON & BURLING LLP

Telephone: (212) 549-2500
slakin@aclu.org
acepedaderieux@aclu.org
isyed@aclu.org
dho@aclu.org

Sarah Brannon*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street, NW
Washington, DC 20005
Telephone: (202) 210-7287
sbrannon@aclu.org


* Admitted *pro hac vice*
** *Pro hac vice* application forthcoming

3000 El Camino Real
5 Palo Alto Square
Palo Alto, CA 94306-2112
Telephone: (650) 632-4700
RGupta@cov.com

Kristen Clarke**
Jon Greenbaum*
Ezra Rosenberg*
LAWYERS COMMITTEE FOR CIVIL RIGHTS
UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005
Telephone: (202) 662-8300
kclarke@lawyerscommittee.org
jgreenbaum@lawyerscommittee.org
erosenberg@lawyerscommittee.org

*Counsel for Intervenor-Defendants
NAACP-Pennsylvania State Conference,
Black Political Empowerment Project,
Common Cause Pennsylvania, League of
Women Voters of Pennsylvania, Joseph
Ayeni, Lucia Gajda, Stephanie Higgins,
Meril Lara, Ricardo Morales, Natalie
Price, Tim Stevens, and Taylor Stover*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this date, the foregoing Opposition to Plaintiffs' Motion for Preliminary Injunction was filed electronically and served on Plaintiffs' counsel of record via the ECF system of the U.S. District Court for the Middle District of Pennsylvania.

Dated: November 20, 2020

*/s/ Claudia De Palma*
Claudia De Palma
