## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DONALD J. TRUMP FOR
PRESIDENT, INC., *et al.*,

      Plaintiffs,

      v.

KATHY BOOCKVAR, *et al.*,

      Defendants,

NAACP-PENNSYLVANIA STATE
CONFERENCE, *et al.*,

      Intervenor-Defendants,

DNC SERVICES
CORPORATION/DEMOCRATIC
NATIONAL COMMITTEE,

      Intervenor-Defendant.

Civil Action
No. 4:20-cv-02078-MWB

Hon. Matthew W. Brann

**TABLE OF UNPUBLISHED CASES CITED IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION BY
INTERVENOR-DEFENDANTS NAACP-PENNSYLVANIA STATE
CONFERENCE, BLACK POLITICAL EMPOWERMENT PROJECT,
COMMON CAUSE PENNSYLVANIA, LEAGUE OF WOMEN VOTERS
OF PENNSYLVANIA, JOSEPH AYENI, LUCIA GAJDA,
STEPHANIE HIGGINS, MERIL LARA, RICARDO MORALES,
NATALIE PRICE, TIM STEVENS, AND TAYLOR STOVER**

| CASE | ATTACHMENT |
|---|---|
| *Donald J. Trump for President, Inc. v. Way*, No. CV2010753MASZNQ, 2020 WL 5912561 (D.N.J. Oct. 6, 2020) | 1 |
| *In re Canvassing Observation Appeal of City of Philadelphia Bd. of Elections*, No. 30 EAP 2020, 2020 WL 6737895 (Pa. Nov. 17, 2020) | 2 |
| *Samuel v. Virgin Islands Joint Board of Elections*, No. 2012–0094, 2013 WL 106686 (D.V.I. Jan. 6, 2013) | 3 |

# ATTACHMENT 1

2020 WL 5912561
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

DONALD J. TRUMP FOR
PRESIDENT, INC., et al., Plaintiffs,

v.

Tahesha WAY, in her official capacity as
Secretary of State of New Jersey, Defendant.

Civil Action No. 20-10753 (MAS) (ZNQ)
|
Filed 10/06/2020

**Synopsis**

**Background:** Presidential campaign organization, Republican National Committee, and New Jersey Republican State Committee filed a complaint against Secretary of State challenging law permitting the general election to be held primarily by mail, and filed a motion for an order to show cause seeking a preliminary injunction enjoining the state from canvassing ballots ten days before election day and from canvassing ballots received up to 48 hours after election day if those ballots lack a postmark.

**Holdings:** The District Court, Michael A. Shipp, J., held that:

campaign and committees failed to establish a reasonable probability of success on the merits of their claim that state law permitting canvassing of ballots before election day violated federal election day statutes;

campaign and committees failed to establish a reasonable probability of success on the merits of their claim that state law permitting the canvassing of ballots lacking a postmark if they were received within 48 hours of the closing of the polls violated federal election day statutes;

campaign and committees failed to establish likelihood of imminent irreparable harm of voter confusion or deterrence in the absence of preliminary injunction;

balance of harms favored denial of preliminary injunction; and

public interest supported denial of preliminary injunction.

Motion denied.

**Procedural Posture(s):** Motion for Preliminary Injunction.

**Attorneys and Law Firms**

Michael L. Testa, Jr., Testa Heck Testa & White, P.A., Vineland, NJ, for Plaintiffs.

Matthew Jon Lynch, State of New Jersey Office of the Attorney General, Trenton, NJ, Penny Venetis, Rutgers Law School, Newark, NJ, for Defendant.

**MEMORANDUM OPINION**

SHIPP, District Judge

**\*1** In response to the COVID-19 pandemic, the New Jersey Legislature authorized the November 2020 General Election to be conducted predominantly by mail. Among other things, the legislation allows election officials to canvass mail-in ballots ten days before Election Day and to canvass mail-in ballots received within days of Election Day even if those ballots lack a postmark from the United States Postal Service. Plaintiffs Donald J. Trump for President, Inc., the Republican National Committee, and the New Jersey Republican State Committee (collectively, "Plaintiffs") seek to enjoin these provisions, asserting they are preempted by federal law that establishes a national uniform election day for Congress and the Presidency. (ECF No. 35.)

Defendant Secretary of State Tahesha Way and Defendant-Intervenors DCCC, League of Women Voters of New Jersey, and NAACP New Jersey Conference (collectively, "Defendants") opposed (ECF Nos. 57, 58, 59), and Plaintiffs replied (ECF No. 63). The Court has carefully considered the parties' submissions, as well as the submissions of amicus curiae, and decides the matter without oral argument pursuant to Local Civil Rule 78.1.

The Constitution "principally entrusts the safety and health of the people to the politically accountable officials of the States." *Andino v. Middleton*, No. 20A55, —— U.S. ——, —— S.Ct. ——, —— L.Ed.2d ——, 2020 WL 5887393, at \*1 (Oct. 5, 2020) (Kavanaugh, J., concurring in grant of application for stay) (quoting *South Bay United Pentecostal Church v. Newsom*, —— U.S. ——, 140 S. Ct. 1613, 207 L.Ed.2d

154 (2020) (Roberts, C.J., concurring in denial of application for injunctive relief)). "When those officials undertake[ ] to act in areas fraught with medical and scientific uncertainties, their latitude must be especially broad." *Id.* (internal quotation marks and citation omitted) (alteration in original). "It follows that a State legislature's decision ... to make changes to election rules to address COVID-19 ordinarily should not be subject to second-guessing by an unelected federal judiciary, which lacks the background, competence, and expertise to assess public health and is not accountable to the people." *Id.* (internal quotation marks and citation omitted). The Court agrees. For the reasons set forth herein, the Court denies Plaintiffs' request for a preliminary injunction.

The Court finds that Plaintiffs fail to establish they are likely to succeed on the merits of their claims. Federal law establishing a national uniform election day does not prevent New Jersey from canvassing ballots before Election Day so long as the election is not consummated and the results reported before the polls close on Election Day. Although federal law prohibits New Jersey from canvassing ballots cast after Election Day, it is within New Jersey's discretion to choose its methods of determining the timeliness of ballots, so long as there is no appreciable risk of canvassing untimely ballots. The Court also finds that Plaintiffs fail to establish they face a likelihood of irreparable harm without their requested injunction, that entering an injunction would cause greater harm to the State, and that Plaintiffs' proposed preliminary injunction is against the public interest.

# I. BACKGROUND

## A. New Jersey's May and July 2020 Elections during the COVID-19 Pandemic

**\*2** COVID-19, a highly contagious and life-threatening respiratory disease, has sparked an unprecedented public health crisis across the United States, including in New Jersey. The virus has already claimed the lives of over 200,000 Americans and 14,000 New Jersey residents. *See* Centers for Disease Control and Prevention, *Provisional Death Counts for Coronavirus Disease 2019 (COVID-19)*, https://www.cdc.gov/nchs/nvss/vsrr/covid19/index.htm (last visited Oct. 6, 2020).

On March 9, 2020, in response to the rapidly unfolding public health crisis, Governor Phillip D. Murphy ("Governor Murphy") declared a Public Health Emergency and State of Emergency. (Am. Compl. ¶ 55, ECF No. 33.) Soon after, Governor Murphy implemented multiple social distancing

policies to the reduce spread of the virus, including Executive Orders 105 and 144. (*See id.* ¶¶ 55–63.) These Orders authorized the May 2020 and July 2020 elections respectively to be conducted primarily via vote-by-mail ballots. (*Id.* ¶¶ 77, 87.)

### 1. Allegations of Fraud

News reports after the May 2020 election suggest that the State faced serious challenges in conducting its elections. According to those reports, ten percent of ballots cast were invalidated. (Colleen O'Dea, *One in Ten Ballots Rejected in Last Month's Vote-by-Mail Elections*, NJSPOTLIGHT.COM, June 10, 2020, Ex. 14 to Weir Decl., ECF No. 35-16.) More troubling still, there were allegations of voter fraud in connection with elections in Paterson, New Jersey. (*See* David Wildstein, *Evidence of Massive Voter Fraud in Paterson Election, Court Records Show*, NEW JERSEY GLOBE, June 14, 2020, Ex. 15 to Weir Decl., ECF No. 35-17.) In that incident, a campaign worker reportedly stole ballots out of mailboxes, both completed and uncompleted, at the direction of a local campaign. (*Id.*) There were also reports that authorities discovered nearly 900 votes that were mailed in bulk from three individual mailboxes, including more than 300 rubber-band-bound ballots from a single mailbox. [1] (*Id.*)

### 2. USPS and the July 2020 Primary Election

**\*3** During the July 2020 Primary Election, the State experienced problems arising from the United States Postal Service's ("USPS" or the "Postal Service") postmarking practices. The Postal Service's general policy is to not apply postmarks to postage prepaid envelopes. (USPS, Handbook PO-408 § 1-1.3, Ex. 22 to Weir Decl., ECF No. 35-24.) Notwithstanding that general policy, "the Postal Service has directed personnel to postmark all ballots to assist state election boards." (USPS, OFFICE OF INSPECTOR GENERAL, ELECTION READINESS REPORT 3 (Aug. 31, 2020), Ex. 7 to Lynch Decl., ECF No. 58-2.)

Despite the Postal Service's direction to postmark all ballots, a report by the USPS Office of the Inspector General found "it is a challenge for the Postal Service to ensure full compliance." (*Id.*) Some ballots will not be postmarked due to "(1) envelopes sticking together when processed on a machine; (2) manual mail processing; or (3) personnel unaware that all return ballots, even those in prepaid reply

envelopes, need to receive a postmark." (*Id.*) For primary elections in other states this year, there is evidence the USPS failed to postmark thousands of ballots. [2] There is no evidence, however, of a correlation between a ballot lacking a postmark and a ballot being mailed after Election Day.

A Camden County official reports the following experiences related to USPS's postmarking practices during the July 7, 2020 Primary. According to the official, "certain mail-in ballots delivered to the Board [of Elections] on the morning of July 8, 2020 and bearing postmarked dates of July 8, 2020 had in fact been received by USPS on or before July 7, 2020." (Campisi Decl. ¶ 5, ECF No. 58-7.) Additionally, "certain mail-in ballots were in possession of USPS on the morning of July 8, 2020 that did not have postmarks. USPS postmarked those ballots with a July 8, 2020 date and delivered them to the Board on July 8, 2020." (*Id.* ¶ 6.) The official further reports that "USPS stated that based on its operational processes, it believed that the mail-in ballots located at a delivery unit on the morning of July 8, 2020 and delivered later that same day, would have been received by USPS on or before July 7, 2020." (*Id.* ¶ 7.) Officials in Essex and Ocean counties report similar communications with USPS regarding ballots returned for the July 7, 2020 Primary Elections. (McGuckin Decl. ¶¶ 4–7, ECF No. 58-9; Von Nessi Decl. ¶¶ 4–7, ECF No. 58-11.)

Election officials also struggled to canvass the substantially greater number of mail-in and provisional ballots by statutory deadlines. New Jersey saw a significant increase in mail-in ballots in 2020 compared with 2016. [3] Additionally, New Jersey extended the statutory deadline for the receipt of mail-in ballots by boards of elections by seven days. (Campisi Decl. ¶ 10 (citing N.J. Stat. Ann. § 19:63-22).) But "to ensure that a provisional ballot was not counted from a voter who also submitted a mail-in ballot," New Jersey only reviewed provisional ballots after the deadline for receiving mail-in ballots passed. (*Id.*) The extension of time for receiving mail-in ballots prevented the State from reviewing provisional ballots until July 14. (*Id.*) The combination of these logistical challenges led to petitions from Camden, Monmouth, Middlesex, and Somerset counties for extensions of time to canvass and count ballots. (Giles Decl. ¶ 11, ECF No. 58-6.)

**B. New Jersey's 2020 General Election Legislation**
**\*4** On August 14, 2020 Governor Murphy issued Executive Order 177. (Am. Compl. ¶ 64.) Within two weeks, the State legislature passed Assembly Bill No. 4475 ("A4475"), which codified several of Executive Order 177's voting provisions. Pursuant to A4475, the November 2020 General Election will take place primarily by mail: all active registered voters will be sent a mail-in ballot at least twenty-nine days before the election. *See* N.J. Stat. Ann. § 19:63-31(a).

New Jersey's A4475 also allows voters to return their ballots by mail. N.J. Stat. Ann. § 19:63-31(m). Consistent with the Postal Service's guidance, ballot return envelopes are required to have prepaid First-Class Postage. N.J. Stat. Ann. § 19:63-31(b); (*see* July 30, 2020 Marshall Correspondence, Ex. 6 to Lynch Decl., ECF No. 58-2 ("[v]oters must use First-Class Mail (or an expedited level of service) to mail their ballots").) The law provides dates by which mail-in ballots must be cast and received to be counted in the election: "Every vote-by-mail ballot that is postmarked on or before November 3, 2020, and that is received by November 10, 2020, at 8:00 p.m. shall be considered valid and shall be canvassed, assuming the ballot meets all other statutory requirements." N.J. Stat. Ann. § 19:63-31(m). According to the Legislature, this provision "ensure[s] that registered voters' efforts to vote are not impacted by delays in the postal service." *Id.* The Legislature's concern is supported by guidance from the Postal Service. (*See, e.g.,* July 30, 2020 Marshall Correspondence (stating that "[w]hile the specific transit times" for First-Class Mail "cannot be guaranteed and depend on factors such as a given mailpiece's place of origin and destination, most domestic first class mail is delivered 2–5 days after it is received by the Postal Service").)

Furthermore, A4475 provides that;

> Every ballot without a postmark, and ballots mis-marked and confirmed by the [Postal Service] that those ballots were received by the [Postal Service] on or before November 3, 2020, that is received by the county boards of elections from the [Postal Service] within 48 hours of the closing of the polls on November 3, 2020, shall be considered valid and shall be canvassed, assuming the ballot meets all other statutory requirements.

N.J. Stat. Ann. § 19:53-31(m).

The law also includes provisions regulating when State election officials can begin canvassing votes. To "account for the increase in vote-by-mail ballots" expected during the November 2020 General Election, A4475 allows election officials to "begin opening the inner envelopes and canvassing each mail-in ballot from the inner envelopes no earlier than ten days prior to the day of the election." *Id.* New Jersey law requires election officials to certify the November 2020 General Election results by November 20, 2020. N.J. Stat. Ann. § 19:63-31(p). Election officials must then transmit the official November 2020 General Election results to the New Jersey Secretary of State by November 23, 2020. *Id.* These dates cannot be extended "[b]ecause of the need to meet the federal deadlines for the State's electors to meet." *Id.* According to State election officials, "without early counting, it would be difficult, if not impossible, to ensure that all votes [in the November 2020 General Election] are counted within the statutory timeframe." (Campisi Decl. ¶ 16; McGuckin Decl. ¶ 14; Von Nessi Decl. ¶ 14.)

**\*5** Although A4475 allows State officials to begin canvassing votes before Election Day, election officials may not report the results of any canvassing until polls close on November 3, 2020. N.J. Stat. Ann. § 19:63-31(m) ("The contents of the mail-in ballots and the results of the ballot canvassing shall remain confidential and shall be ... in no circumstances disclosed prior to the close of polls on the day of the election."). According to the Director of the New Jersey Division of Elections, the "only practical way to obtain a ... tabulation of the votes is for county elections staff to run the tabulation report[,]" and election officials are prohibited from running a tabulation report before the polls close on Election Day. (Giles Decl. ¶ 23.) Moreover, "the Division of Elections will ... conduct[ ] an audit of the county boards of elections to ensure that no tabulation report was run" before the polls close on Election Day. (*Id.*) Finally, under New Jersey law, it is a third-degree crime for election officials to knowingly release the results of the canvass before polls close on Election Day. N.J. Stat. Ann. § 19:34-13(b).

**C. Procedural Background**

Plaintiffs filed their initial Complaint challenging Governor Murphy's Executive Order 177 on August 18, 2020. (Compl., ECF No. 1.) Following the passage of A4475, Plaintiffs filed an Amended Complaint on September 11, 2020, challenging the law's provisions. (*See generally* Am. Compl.) Counts One and Two allege violations of 2 U.S.C. §§ 1, 7 and 3

U.S.C. § 1, (*id.* ¶¶ 109–117); Count Three alleges violations of the right to vote, (*id.* ¶¶ 118–123); and Count Four alleges violations of the Equal Protection Clause, (*id.* ¶¶ 124–37).

Plaintiffs first filed a Motion for an Order to Show Cause on September 16, 2020. (ECF No. 35). The Motion seeks the entry of a preliminary injunction enjoining the State from canvassing ballots ten days before Election Day and from canvassing ballots received up to forty-eight hours after Election Day if those ballots lack a postmark. [4] (*Id.*) Plaintiffs allege these acts violate 2 U.S.C. §§ 1, 7 and 3 U.S.C. § 1. Defendants opposed, and Plaintiffs replied.

## II. LEGAL STANDARD

"Preliminary injunctive relief is an extraordinary remedy and should be granted only in limited circumstances." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (internal quotation marks and citation omitted). This remedy should be granted only if: (1) Plaintiffs "are likely to succeed on the merits of their claims"; (2) Plaintiffs "are likely to suffer irreparable harm without relief"; (3) "the balance of harm favors [Plaintiffs]"; and (4) "relief is in the public interest." *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 131 (3d Cir. 2017). To establish they are likely to succeed on the merits of their claims, Plaintiffs must show a "reasonable probability of success." *Issa, 847 F.3d at 131.* The burden is on Plaintiffs to "establish every element in [their] favor, or the grant of a preliminary injunction is inappropriate." *P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005) (citing *NutraSweet Co. v. Vit-Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999) (citations omitted)).

## III. DISCUSSION

**A. Standing**

As a preliminary matter, Defendants each argue that Plaintiffs lack standing. (*See* League of Women Voters/NAACP's Opp'n Br. 10–14, ECF No. 57; Way's Opp'n Br. 20–26, ECF No. 58; DCCC's Opp'n Br. 8–14, ECF No. 59.) After briefing on this matter was complete, DCCC also moved to dismiss the Amended Complaint for lack of subject matter jurisdiction, arguing Plaintiffs lack standing. (DCCC's Mot. Dismiss Br. 7–12, ECF No. 71.)

To satisfy the standing requirement, a plaintiff must show: (1) "it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) "the injury is fairly traceable to the challenged action of the defendant"; and (3) "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). Plaintiffs are each associations or organizations, and thus may have standing to bring suit under two circumstances. *Common Cause of Pa. v. Pennsylvania*, 558 F.3d 249, 261 (3d Cir. 2009) (quoting *Prison Soc'y v. Cortes*, 508 F.3d 156, 162–63 (3d Cir. 2007)). First, by organizational standing, "an organization may be granted standing in its own right to seek judicial relief from *injury to itself* and to vindicate whatever rights and immunities the organization or association itself may enjoy." *Id.* (quoting *Cortes*, 508 F.3d at 163). This may occur when an organization must divert its resources to counteract unlawful conduct. See *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). Alternatively, by associational standing, "an association may assert claims on behalf of its members, but only where the record shows that the organization's *individual members themselves have standing to bring those claims*." *Common Cause*, 558 F.3d at 261. An entity may establish associational standing on behalf of its members where: (1) "its members would otherwise have standing to sue in their own right"; (2) "the interests it seeks to protect are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

**\*6** Defendants assert that Plaintiffs lack organizational standing because Plaintiffs fail to demonstrate how the regulations in A4475 will require them to expend resources or will result in voter confusion. (Way's Opp'n Br. 25; DCCC's Opp'n Br. 11–13.) Defendants also assert that Plaintiffs lack associational standing on behalf of its members for claims arising from the consideration of ballots lacking postmarks because alleged injuries of vote dilution affect all voters, not just Plaintiffs' members, and thus are impermissibly generalized grievances. (Way's Opp'n Br. 22 (citing *Donald J. Trump for President, Inc. v. Cegavske*, No. 20-1445, ––– F.Supp.3d ––––, ––––, 2020 WL 5626974, at \*4 (D. Nev.

Sept. 18, 2020)); DCCC's Opp'n Br. 9; NAACP's Opp'n Br. 12–14.) Defendants also argue that Plaintiffs' claims that untimely ballots will be canvassed are impermissibly speculative because New Jersey's regulations explicitly prohibit canvassing untimely ballots and A4475's alterations do not raise a substantial risk that untimely ballots will be canvassed. (Way's Opp'n Br. 21–22; DCCC's Opp'n Br. 10–11.) As for Plaintiffs' asserted injuries arising from canvassing ballots before Election Day, Defendants argue that these injuries are too speculative because Plaintiffs fail to present any reason to think election officials would unlawfully release canvassing information before the polls close. (Way's Opp'n Br. 23–24.)

Plaintiffs assert they have both organizational and associational standing. Plaintiffs assert that they have organizational standing because they "will have to divert paid and volunteer resources from ... voter contact programs ... to poll watching instead"; they "also must recruit, hire, and train more poll watchers than would otherwise be needed to monitor the counting of ballots for ten additional days before the election"; and they have transferred resources from national coffers to state organizations to "assist them in their efforts to respond to the new counting regime." (Pls.' Reply Br. 4.) Plaintiffs also argue they have associational standing on behalf of their members, just as other plaintiffs suing on behalf of voters have challenged state statutes as preempted by the federal laws setting a uniform election day. (Pls.' Reply Br. 5–6 (citing *Foster v. Love*, 522 U.S. 67, 70, 118 S.Ct. 464, 139 L.Ed.2d 369 (1997); *Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1174 (9th Cir. 2001); *Millsaps v. Thompson*, 259 F.3d 535, 536 (6th Cir. 2001); *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 774 (5th Cir. 2000)).) Plaintiffs argue that A4475 "substantially increases the risk of early vote counts becoming public," citing "New Jersey's unfortunate history of election fraud —including fraud committed by election insiders just this year—which likewise carry criminal penalties." (*Id.* at 7.) Plaintiffs also argue that ballots sent after Election Day that lack postmarks could arrive within forty-eight hours of Election Day, thus diluting the valid votes of Plaintiffs' members. (*Id.* at 8.)

District courts confronting standing issues in cases challenging state regulations for the upcoming November 2020 election—with at least some of the same plaintiffs as this matter—have reached conflicting conclusions. *See, e.g.*, *Donald J. Trump for President, Inc. v. Bullock*, No. 20-66,

--- F.Supp.3d ----, ----, 2020 WL 5810556, at *6–8 (D. Mont. Sept. 30, 2020) (finding lead plaintiff had standing); *Cegavske*, ---- F.Supp.3d at ----, 2020 WL 5626974, at *4 (finding no plaintiffs had standing). In light of these conflicting decisions and the pending briefing on DCCC's Motion to Dismiss that should clarify the standing inquiries here, the Court finds good cause to defer consideration of standing. Furthermore, as explained below, the Court need not definitively rule on standing at this stage because it finds that Plaintiffs have failed to demonstrate they are entitled to a preliminary injunction. *See Cook Cnty. Republican Party v. Pritzker*, No. 20-4676, 2020 WL 5573059, at *3 (N.D. Ill. Sept. 17, 2020) (citing *Simic v. City of Chicago*, 851 F.3d 734, 737–38, 740 (7th Cir. 2017) (holding that "[a] district court has jurisdiction to decide its jurisdiction, so it can address a motion for a preliminary injunction without making a conclusive decision about whether it has subject matter jurisdiction")).

### B. Preliminary Injunction

#### 1. Plaintiffs Fail to Establish They are Likely to Succeed on the Merits of Their Claims.

##### a. Canvassing Ballots Before Election Day

**\*7** "Under the Supremacy Clause, state laws that 'interfere with, or are contrary to the laws of congress, made in pursuance of the constitution' are invalid." *Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 604, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991) (internal citation omitted) (quoting *Gibbons v. Ogden*, 22 U.S. 1, 211, 9 Wheat. 1, 6 L.Ed. 23 (1824)). The Elections Clause of the United States Constitution provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of [choosing] Senators." U.S. CONST. art. I, § 4, cl. 1. The Elections Clause grants the states "comprehensive ... authority to provide a complete code for the congressional elections, not only as to times and places, but in relation to ... supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of elections returns," unless Congress should "supplement these state regulations or ... substitute its own." *Smiley v. Holm*, 285 U.S. 355, 366–67, 52 S.Ct. 397, 76

L.Ed. 795 (1932); *see also Foster*, 522 U.S. at 71 n.2, 118 S.Ct. 464.

"The [Elections] Clause is a default provision; it invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to preempt state legislative choices." *Foster*, 522 U.S. at 69, 118 S.Ct. 464 (internal citation omitted) (citing *Storer v. Brown*, 415 U.S. 724, 730, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974); *Roudebush v. Hartke*, 405 U.S. 15, 24, 92 S.Ct. 804, 31 L.Ed.2d 1 (1972)); *see United States v. Classic*, 313 U.S. 299, 311, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941) (stating that the Elections Clause grants states "wide discretion in the formulation of a system for the choice by the people of representatives in Congress"); *Bomer*, 199 F.3d at 775 ("[A] state's discretion and flexibility in establishing the time, place and manner of electing its federal representatives has only one limitation: the state system cannot directly conflict with federal election laws on the subject."). "[I]t is well settled that the Elections Clause grants Congress 'the power to override state regulations' by establishing uniform rules for federal elections, binding on the States." *Foster*, 522 U.S. at 69, 118 S.Ct. 464 (internal quotation marks omitted) (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 832–33, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995)).

One such rule established by Congress that overrides state regulations is the uniform date of election for Congress and the Presidency, set as the first Tuesday after the first Monday in November. *Id.* at 69–70, 118 S.Ct. 464; *see* 2 U.S.C. §§ 1, 7; 3 U.S.C. § 1. New Jersey's A4475 permits election officials to begin canvassing mail-in ballots up to ten days before Election Day. N.J. Stat. Ann. § 19:63-31(m). Plaintiffs, in Count One of the Amended Complaint, assert that permitting the canvassing of mail-in ballots before Election Day is preempted by Congress's legislation setting a uniform federal election day, 2 U.S.C. §§ 1, 7 and 3 U.S.C. § 1 (the "Federal Election Day Statutes"), and thus that provision of A4475 is void. (Am. Compl. ¶¶ 109–112.)

In setting a uniform election day throughout the country, Congress sought to avoid "the distortion of the voting process threatened when the results of an early federal election in one State can influence later voting in other States" as well as "the burden on citizens forced to turn out on two different election

days to make final selections of federal officers in Presidential election years." *Foster*, 522 U.S. at 73–74, 118 S.Ct. 464 (citing CONG. GLOBE 42d Cong., 2d Sess., 141 (1871) (remarks of Rep. Butler)). "When the [Federal Election Day Statutes] speak of 'the election' ..., they plainly refer to the combined actions of voters and officials meant to make a final selection of an officeholder ...." *Id.* at 71, 118 S.Ct. 464 (citing N. WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE 433 (C. Goodrich and N. Porter eds. 1869)). The Court in *Foster* declined to specify "what may constitute the final act of selection within the meaning of the law" or "what acts a State must cause to be done on federal election day (and not before it) in order to satisfy the statute[s]." *Id.* at 72, 118 S.Ct. 464. Instead, the Court only held that an election "may not be consummated prior to federal election day." *Id.* at 72 n.4, 118 S.Ct. 464. Where a state's election laws conflict with the Federal Election Day Statutes by permitting the consummation of the election before the federal election day, those state laws are preempted and void. *Id.* at 74, 118 S.Ct. 464.

**\*8** Courts of Appeals addressing conflict preemption between the Federal Election Day Statutes and state election laws have found that "some acts associated with the election," such as early voting or absentee voting, "may be conducted before the federal election day without violating the [Federal Election Day Statutes]." *Bomer*, 199 F.3d at 776 (finding early voting seventeen days before Election Day was not preempted where "the polls are open on federal election day and most voters cast their ballots that day"); *see Millsaps*, 259 F.3d at 546 (finding early voting was not preempted by Federal Election Day Statutes, and that under *Foster*, "so long as a State does not conclude an election prior to federal election day, the State's law will not 'actually conflict' with federal law"); *Keisling*, 259 F.3d at 1175 (citing *Foster*, 522 U.S. at 72 n.4, 118 S.Ct. 464). None of these decisions thoroughly discussed the issue of canvassing votes prior to Election Day. The Fifth Circuit in *Bomer*, however, found that early voting was not preempted by the Federal Election Day Statutes where "[n]o election results are released until the votes are tabulated on federal election day," therefore the election "is not decided or 'consummated' before federal election day." *199 F.3d at 775–76*; *see also Millsaps*,

259 F.3d at 543 (noting that "tallying results" of early voting did not occur until Election Day).

Plaintiffs urge a broad construction of these statutes: that "nowhere are States given any discretion whatsoever on the timing of the uniform Election Day"; that canvassing must take place only on Election Day; and that the legislative history reveals that Congress sought to prevent multi-day voting. (Pls.' Moving Br. 18–21, ECF No. 35-1); *see Keisling*, 259 F.3d at 1172, 1176 (acknowledging that legislative history supports an interpretation that "all voting in federal elections should take place on a single day").

This broad construction, however, is at odds with Congress's requirement that states permit some form of absentee voting, 52 U.S.C. § 10502(d) ("[E]ach State shall provide by law for the casting of absentee ballots for the choice of electors for President and Vice President ...."), as well as Courts of Appeals decisions permitting some election activity prior to Election Day so long as the election is not consummated before Election Day, *see, e.g., Keisling*, 259 F.3d at 1176 ("Although voting takes place, perhaps most voting, prior to election day, the election is not 'consummated' before election day because voting still takes place on that day."). The interpretation that the Federal Election Day Statutes preempt any state discretion on the timing of election-related activity cannot be reconciled with Congress's requirement that states permit absentee voting, but leaving the manner and timing of absentee voting to the discretion of each state. *See* 28 U.S.C. § 10502(d). Moreover, if the Federal Election Day Statutes supplanted all discretion by the states on the timing of the election, it is doubtful that the early and absentee voting schemes discussed in *Bomer*, *Millsaps*, and *Keisling* could be upheld. The Courts of Appeals discounted the persuasive weight of the legislative history in part because it could not be reconciled with Congress's later endorsement of absentee voting prior to Election Day. *See Millsaps*, 259 F.3d at 547 ("[T]he plaintiffs' argument would apply with equal force to absentee voting and result in a declaration that federal law preempts a widely accepted and long-standing electoral practice."); *Keisling*, 259 F.3d at 1175–76 ("Congress has recently required ... states to provide for absentee voting in federal elections.").

Contrary to Plaintiffs' argument, the Supreme Court's decision in *Foster* does not support their broad interpretation. There, the Court declined to specify election-related activity that may not occur prior to Election Day.

*Foster*, 522 U.S. at 72, 118 S.Ct. 464. The Court only held that an "election ... may not be consummated prior to federal election day." *Id.* at 72 n.4, 118 S.Ct. 464. Nevertheless, the Court's definition of "election"—"the combined actions of voters and officials meant to make a final selection of an officeholder"—is useful in determining whether A4475 is preempted by the Federal Election Day Statutes. *Id.* at 71, 118 S.Ct. 464.

**\*9** Here, the Court finds that Plaintiffs fail to establish a reasonable probability of success on the merits of Count One because the Federal Election Day Statutes do not preempt state law permitting the canvassing of ballots before Election Day. The Court finds that the canvassing of mail-in ballots before Election Day may be a combined action of voters and officials, but this action does not make a final selection of an officeholder. Canvassing ballots before Election Day does not consummate the election because that cannot occur before the polls close on Election Day and election officials run a final tabulation report. Accordingly, New Jersey's law permitting the canvassing of mail-in ballots prior to Election Day is not preempted by the Federal Election Day Statutes.

The Court is persuaded by Congress's intent in enacting the Federal Election Day Statutes. "Congress was concerned ... with the distortion of the voting process threatened when the results of an early federal election in one State can influence later voting in other states." *Foster*, 522 U.S. at 73, 118 S.Ct. 464. Although the Court acknowledges that "Congress considered and rejected the practice of multi-day voting," *Keisling*, 259 F.3d at 1172, the primary concern when enacting the statutes appears to be the reporting of final election results in some states before other states had yet to open the polls. *See* CONG. GLOBE, 42d Cong., 2d Sess. 112, 141 (1871) (remarks of Rep. Butler); *see also* *Millsaps*, 259 F.3d at 541–42. Here, Plaintiffs fail to establish an appreciable risk that the results of New Jersey's election will be reported prior to Election Day. New Jersey law specifies that "[t]he contents of the mail-in ballots and the results of the ballot canvassing shall remain confidential and ... in no circumstances disclosed prior to the close of the polls on the day of the election." N.J. Stat. Ann. § 19:63-31(m). Election boards are required to "implement the measures necessary to ensure the security and secrecy of the mail-in ballots." *Id.* Election staff are prohibited from running a tabulation report prior to the close of polls, and the Division of Elections will conduct an audit to ensure this mandate is followed. (Giles

Decl. ¶ 23; *see also* Campisi Decl. ¶¶ 19–22; McGuckin Decl. ¶¶ 15–17; Von Nessi Decl. ¶¶ 15–17.) Finally, it is a crime to reveal the contents of a mail-in ballot prior to the close of the polls. N.J. Stat Ann. § 19:34-13(b). The Fifth Circuit identified similar criminal sanctions as persuasive in affirming Texas's early voting law. *Bomer*, 199 F.3d at 777 (citing Tex. Elec. Code §§ 61.007, 81.002). Plaintiffs do not identify any reason to suspect that election officials will ignore or intentionally violate these laws and procedures, or that violators will not be prosecuted. The Court, accordingly, finds there is no appreciable risk that this provision of A4475 will result in one of the evils sought to be avoided when establishing a uniform election day.

The Court is also persuaded by the diverse absentee or mail-in voting practices among the states that have grown in the shadow of the Federal Election Day Statutes and the discretion afforded by Congress. Several states allow some form of canvassing or tallying ballots received prior to Election Day. *See, e.g.,* Ariz. Rev. Stat. Ann. §§ 16-550(73), 16-551 (specifying the "tallying of [early] ballots shall not begin any earlier than fourteen days before election day"); Colo. Rev. Stat. § 1-7.5-107.5 ("Counting of the mail ballots may begin fifteen days prior to the election and continue until counting is completed."); Fla. Stat. § 101.68(2)(a) ("The county canvassing board may begin the canvassing of vote-by-mail ballots at 7 a.m. on the 22nd day before the election ...."). At least one state prohibits canvassing absentee ballots until *after* Election Day. Md. Code Ann., Elec. Law § 11-302(b)(1) ("A local board may not open any envelope of an absentee ballot prior to 8 a.m. on the Wednesday following election day."). Under Plaintiffs' proposed interpretation, it would seem that either scheme would be prohibited because canvassing may take place on a day other than Election Day. But Congress has not supplanted any of these election laws. This is not dispositive of Plaintiffs' arguments, but cuts against the likelihood of Plaintiffs' ultimate success on the merits and the wisdom of enjoining application of A4475.

**\*10** The Court must reconcile the Federal Election Day Statutes that establish "*the* day for the election," 2 U.S.C. § 7 (emphasis added), with Congress's endorsement of absentee voting, which necessarily requires some election-related activity prior to Election Day, *see* 52 U.S.C. § 10502(d). The Court finds that the Federal Election Day Statutes mandate some "combined action of voters and officials meant to make a final selection of an officeholder" on Election Day so that no state's election is concluded prior to Election Day.

*Millsaps, 259 F.3d at 547.* The Federal Election Day Statutes, however, do not prevent all election-related activity prior to Election Day—including early voting by mail and the canvassing of mail-in ballots—so long as that activity does not make a final selection of an officeholder or reveal the results of the canvassing before Election Day, Because there is no final selection of an officeholder until after the polls close on Election Day, New Jersey law prohibits reporting the results of the canvassing before the polls close, and Plaintiffs fail to establish any risk that canvassing results will be reported before the polls close, the Court finds that Plaintiffs fail to establish they are likely to succeed on the merits of Count One.

### b. Canvassing Ballots Without Postmarks Received Within Two Days After Election Day

Plaintiffs also assert, in Count Two of the Amended Complaint, that the Federal Election Day Statutes, by setting a uniform day for the federal election, preempt the counting of ballots cast after Election Day. (Am. Compl. ¶¶ 113–117.) Plaintiffs argue that "New Jersey cannot permit ballots cast after Election Day to be counted," (Pls.' Moving Br. 21–22), and that A4475 allows the possibility of counting untimely ballots by permitting "ballots that have not been postmarked to be counted if they are received two days after Election Day," (Am. Compl. ¶¶ 114). Plaintiffs argue that a mail-in ballot "is not a legal vote unless it is marked and cast on or before" Election Day, (Pls.' Moving Br. 21), and the Federal Election Day Statutes preempt any state law that permits counting ballots cast after Election Day, (*id.* at 23.) Defendants agree that New Jersey cannot permit counting of untimely ballots, and argue that A4475 does not permit it. (Way's Opp'n Br. 34–35.) Instead, according to Defendants, A4475 merely addresses an evidentiary issue: how the State determines whether a ballot was cast by Election Day. (*Id.* at 35.)

As discussed above, "a state's discretion and flexibility in establishing the time, place and manner of electing its federal representatives has only one limitation: the state system cannot directly conflict with federal election laws on the subject." *Bomer, 199 F.3d at 775.* The Federal Election Day Statutes set a uniform date for the elections of Congress and the Presidency. 2 U.S.C. §§ 1, 7; 3 U.S.C. § 1. Congress provides only limited situations where an election for federal office can be held on a later date: (1) where a state

requires a majority of all votes to elect a representative and no candidate receives a majority vote on Election Day, *Foster, 522 U.S. at 71 n.3, 118 S.Ct. 464*; *see* 2 U.S.C. § 8; or (2) "to fill a vacancy ... caused ... by the death, resignation, or incapacity of a person elected," 2 U.S.C. § 8; *Millsaps, 259 F.3d at 541 n.2.* Plainly, a state regulation permitting voters to cast ballots after Election Day or permitting the canvassing of ballots cast after Election Day would directly conflict with the Federal Election Day Statutes.

New Jersey, however, does not expressly permit canvassing ballots cast after the polls close. New Jersey law prohibits canvassing the following categories of mail-in ballots: (1) mail-in ballots postmarked on or before Election Day but not received by the county boards of elections by November 10, 2020, at 8 p.m.; (2) mail-in ballots postmarked after Election Day and lacking confirmation from the Postal Service that they were received at the post office by Election Day; (3) mail-in ballots postmarked after Election Day, confirmed by the Postal Service to have been received at the post office by Election Day, but not received by the county boards of elections within forty-eight hours of the closing of the polls; and (4) mail-in ballots lacking a postmark and not received by the county boards of elections within forty-eight hours of the closing of the polls. N.J. Stat. Ann. § 19:63-31(m).

**\*11** On the other hand, A4475 provides that the following mail-in ballots shall be canvassed: (1) mail-in ballots postmarked on or before Election Day and received by the county boards of elections by November 10, 2020, at 8 p.m.;[5] (2) mail-in ballots postmarked after Election Day but confirmed by the Postal Service to have been received at the post office on or before Election Day and received by the county boards of elections within forty-eight hours of the closing of the polls; and (3) mail-in ballots lacking a postmark but received by the county boards of elections within forty-eight hours of the closing of the polls. *Id.* Plaintiffs challenge the canvassing of the third category of mail-in ballots.

The evidence before the Court shows that all ballots should be postmarked by the Postal Service, but the Postal Service has previously failed to abide by this policy. "A postmark is an official Postal Service imprint applied ... on the address side of a stamped mailpiece. [It] indicates the location and date the Postal Service accepted custody of a mailpiece ...." (USPS, Handbook PO-408 § 1-1.3, Ex. 22 to Weir Decl.) Postmarks "are intended to be a revenue protection mechanism to prevent the reuse of postage," and

generally "are not required on all mailings." (USPS, OFFICE OF INSPECTOR GENERAL, ELECTION READINESS REPORT 3 (Aug. 31, 2020).) Ballots are an exception, and must be postmarked under USPS policy to provide a date the ballot was cast. (*Id.* ("[T]he Postal Service has directed [its] personnel to postmark all ballots to assist state election boards."); *id.* at 2 (stating a postmark "provides an official date stamp for ballots").) Notwithstanding this policy, there is evidence that the Postal Service has failed to postmark every ballot in 2020 primary elections in other states. *Gallagher, --- F.Supp.3d at ----, 2020 WL 4496849, at \*5*; (USPS, OFFICE OF INSPECTOR GENERAL, TIMELINESS OF BALLOT MAIL IN THE MILWAUKEE PROCESSING & DISTRIBUTION CENTER SERVICE AREA 3, 5 (July 7, 2020).) There is no evidence, however, that the Postal Service's failure to postmark a ballot is correlated with the date of the ballot's mailing, or that a ballot cast after Election Day will, or is more likely to, lack a postmark.

The evidence also shows that ballots are likely to require no fewer than two days in transit from voters to election officials. According to the Postal Service, "all Election Mail (including ballots) mailed from individual voters to state or local election officials *must* be sent by First-Class Mail." (May 29, 2020 Marshall Correspondence 1, Ex. 4 to Lynch Decl., ECF No. 58-2; *see also* July 30, 2020 Marshall Correspondence 1, Ex. 6 to Lynch Decl., ECF No. 58-2.) The Postal Service advised the State that First-Class Mail is generally delivered within two to five days. (May 29, 2020 Marshall Correspondence 1 ("Most domestic First-Class Mail is delivered in 2-5 days."); *see also* July 30, 2020 Marshall Correspondence 1). The Postal Service, however, has also advised that, leading up to Election Day, election officials and voters should plan for First-Class Mail delivery timelines of up to one week. [6] (*See* July 30, 2020 Marshall Correspondence 1 ("[T]he Postal Service recommends that election officials use First-Class Mail to transmit blank ballots and allow 1 week for delivery to voters."); *id.* at 2 ("To allow enough time for ballots to be returned to election officials, domestic voters should generally mail their completed ballots at least one week before the state's due date.")) Based on the evidence before it, the Court finds the probability remote that any ballots lacking a postmark and received within forty-eight hours of the closing of the polls are cast after Election Day. [7]

**\*12** The parties agree that New Jersey cannot permit ballots cast after Election Day to be canvassed. The issue then is whether the Federal Election Day Statutes preempt New Jersey's method of determining whether a ballot received without a postmark—thus lacking that official date stamp indicating when a ballot was cast—was cast on or before Election Day. The Court finds that New Jersey's law permitting the canvassing of ballots lacking a postmark if they are received within forty-eight hours of the closing of the polls is not preempted by the Federal Election Day Statutes because the Federal Election Day Statutes are silent on methods of determining the timeliness of ballots.

As discussed above, the Elections Clause grants the states "comprehensive ... authority to provide a complete code for the congressional elections, not only as to times and places, but in relation to ... prevention of fraud and corrupt practices, counting of votes, [and] duties of inspectors and canvassers," unless Congress should "supplement these state regulations or ... substitute its own." *Smiley, 285 U.S. at 366–67, 52 S.Ct. 397*. The Elections Clause grants the states "wide discretion in the formulation of a system for the choice by the people of representatives," *Classic, 313 U.S. at 311, 61 S.Ct. 1031*, the only limitation is "the state system cannot directly conflict with federal election laws on the subject." *Bomer, 199 F.3d at 775*. Here, the Court finds no direct conflict between A4475 and the Federal Election Day Statutes cited by Plaintiffs. New Jersey law prohibits canvassing ballots cast after Election Day, in accordance with the Federal Election Day Statutes. Plaintiffs direct the Court to no federal law regulating methods of determining the timeliness of mail-in ballots or requiring that mail-in ballots be postmarked. Where Congress "declines to preempt state legislative choices," the Elections Clause vests the states with responsibility for the "mechanics of congressional elections." *Foster, 522 U.S. at 69, 118 S.Ct. 464*.

Plaintiffs argue that even if Congress has not explicitly addressed the method of determining the timeliness of a ballot, A4475 nevertheless acts as an "obstacle to the accomplishment and execution of the full purposes and objectives" of the Federal Election Day Statutes. (Pls.' Reply Br. 14 (quoting *Sikkelee v. Precision Airmotive Corp., 822 F.3d 680, 688 (3d Cir. 2016)*).) Plaintiffs argue that if A4475 were not preempted here, there would be nothing to stop New Jersey from enacting more lenient methods, such as accepting all ballots lacking a postmark received up to a week after Election Day. (*Id.* at 14–15.)

The Court need not consider the preemption of such hypothetical regulations, only the regulations adopted in

A4475. Here, the Court finds there is only a remote possibility that an untimely ballot could be canvassed. This would require an unlikely chain of events where a ballot would be (1) cast after Election Day; (2) happen to lack a postmark against Postal Service policy, which is both rare and not correlated to the date the ballot is mailed; and (3) arrive faster than the Postal Service's most optimistic expectations. Weighing against this remote possibility is Congress's concern in enacting the Federal Election Day Statutes: "that citizens be able to exercise their right to vote." *Bomer*, 199 F.3d at 777. The Court finds, with a high degree of confidence, that ballots lacking a postmark and received within forty-eight hours of the closing of the polls are timely cast. *Accord Gallagher*, ––– F.Supp.3d at –––, 2020 WL 4496849, at *16 (finding with "high degree of confidence" that ballots received within two days of the election day were mailed by the election day). The Court finds that A4475 adopts a conservative method to identify and count timely ballots that might otherwise be rejected through no fault of the voters, and only due to the Postal Service's inability to expeditiously process and deliver the mail or follow its own postmarking procedures. New Jersey's A4475 does not act as an obstacle to the accomplishment and execution of the purposes and objectives of the Federal Election Day Statutes. The Court, accordingly, finds that Plaintiffs fail to establish a likelihood of success on the merits of Count Two.

### 2. Plaintiffs Fail to Establish They are Likely to Suffer Irreparable Harm Absent Relief.

**\*13** To demonstrate irreparable harm in the absence of preliminary relief, a movant has the burden of establishing a "clear showing of immediate irreparable injury." *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987) (quoting *Cont'l Grp., Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 359 (3d Cir. 1980)). "Establishing a risk of irreparable harm is not enough [to warrant a preliminary injunction]." *Id.*; *see also Laidlaw, Inc. v. Student Transp. of Am., Inc.*, 20 F. Supp. 2d 727, 766 (D.N.J. 1998) ("[T]he claimed injury cannot merely be possible, speculative, or remote." (citation omitted)).

Plaintiffs assert that A4475 "threatens to confuse voters, undermine confidence in the electoral process, and create 'incentive[s] to remain away from the polls,' " (Pls.' Moving Br. 25 (alteration in original) (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4–5, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006)),

which is an irreparable harm, (*id.* (citing *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 707–08 (N.D. Ohio 2006))). But Plaintiffs' argument and supporting authority do little to explain how the relief they seek addresses their alleged immediate irreparable injury. For example, Plaintiffs fail to explain how election officials canvassing mail-in ballots ten days before Election Day or canvassing ballots lacking postmarks will confuse voters or deter them from voting. These activities are conducted after a ballot is mailed. Voters need not take any new action and face no discouragement from casting a ballot. Unlike *Blackwell*, cited by Plaintiffs, voters face no threat of criminal charges from New Jersey's regulations. [8] *See* 455 F. Supp. 2d at 707–08. Furthermore, voters have no knowledge or control over when or whether a ballot is postmarked or how quickly the Postal Service delivers the ballot. The Court finds that the election regulations concerning the canvassing of ballots lacking postmarks is unlikely to confuse voters or deter them from voting.

Plaintiffs cite several instances of voter fraud over the last decade for the proposition that more fraud is inevitable. (Pls.' Reply Br. 17 (citing Pls.' Moving Br. 4–9)); *see supra* note 1. Plaintiffs, however, fail to connect these past instances of voter fraud with the relief they now seek. Plaintiffs do not explain how preventing election officials from canvassing ballots before Election Day would prevent the kind of voter fraud documented in their submissions. As discussed above, the only credible harm that could arise from canvassing ballots before Election Day is the wrongful early disclosure of election results. The Court has already found this injury is too speculative and remote: Plaintiffs provide no reason to suspect election officials would intentionally violate the law and disclose election results before the polls close, and Defendants have provided evidence of sufficient safeguards to prevent accidental or intentional early disclosure of election results.

Plaintiffs also fail to connect their documented instances of voter fraud to mail-in ballots lacking postmarks or mail-in ballots cast after Election Day. Plaintiffs offer no instances of voter fraud resulting from ballots cast after Election Day, or any reason to suspect that a fraudulent ballot or a ballot cast after Election Day is more likely to lack a postmark. As the Court previously found, there is only a remote possibility that mail-in ballots cast after Election Day and lacking postmarks could reach election officials within forty-eight hours after the closing of the polls. Even if a voter mailed a ballot the

day after Election Day, that voter would have no control over the postmarking. The Postal Service would have to neglect to postmark the ballot—counter its policies and an infrequent occurrence in the 2020 primary elections—yet also manage to deliver the mail-in ballot faster than the Postal Service's most optimistic estimate. Plaintiffs fail to establish this unlikely chain of events is more than speculative or remote.

**\*14** Plaintiffs' only remaining argument is that A4475 undermines voter confidence in the election process. (*See* Pls.' Moving Br. 25.) Plaintiffs' only evidence of this comes from a declaration submitted in its reply papers stating that in "the [Republican National Committee's] experience, major or hasty changes [to a state's election laws] confuse voters, undermine confidence in the electoral process, and create incentive to remain away from the polls." (Voccola Decl. ¶ 5, ECF No. 63-3.) This self-serving statement, lacking any factual support, based on vague changes to any state's election laws rather than A4475, and submitted for the first time in reply does not establish a sufficient likelihood of irreparable harm. The Court, accordingly, finds that Plaintiffs fail to establish a likelihood of imminent irreparable harm.

### 3. Plaintiffs Fail to Establish the
### Balance of Harms is in Their Favor.

Plaintiffs assert that Defendants will suffer no injury and "there is no basis for concluding that preliminary relief will negatively impact the November [2020] election." (Pls.' Moving Br. 25–26 (alteration in original) (quoting *Council of Alt. Pol. Parties v. Hooks*, 121 F.3d 876, 884 (3d Cir. 1997)).) On the other hand, a state generally "has a compelling interest in preserving the integrity of its election process." *Purcell*, 549 U.S. at 4, 127 S.Ct. 5 (citation omitted). The Court identifies at least two harms to Defendants that outweigh the speculative harms set forth by Plaintiffs.

First, if the Court were to enter an injunction, Defendants will face additional logistical challenges in conducting a predominantly by-mail election during a pandemic. To enable social distancing and ensure the safety of voters and election officials, New Jersey has chosen to mail ballots to every registered voter to prevent the typical congregating of voters and poll workers in polling places on Election Day. This choice brings its own logistical challenge: timely canvassing many times the usual number of mail-in ballots. (*See* Giles

Decl. ¶¶ 4–5; Campisi Decl. ¶¶ 2–3; McGuckin Decl. ¶¶ 2–3; Von Nessi Decl. ¶¶ 2–3.) As evidenced in the July 2020 Primary Election, election officials required more time to canvass the substantial increase in mail-in ballots. (*See* Giles Decl. ¶ 11; Campisi Decl. ¶¶ 8–11.) But because election officials cannot seek an extension of time to canvass ballots for the general election, New Jersey must either "hire and train additional staff members to review, canvass, and count ballots" or get a head start by employing its existing staff to canvass ballots prior to Election Day. (Campisi Decl. ¶ 15; *see also* McGuckin Decl. ¶ 13; Von Nessi Decl. ¶ 13.) Social distancing and sanitation measures complicate recruiting and training new staff as well as conducting a typical canvass of ballots with even more employees. (Campisi Decl. ¶ 15; *see also* McGuckin Decl. ¶ 13; Von Nessi Decl. ¶ 13.) Defendants assert that "it would be difficult, if not impossible, to ensure that all votes are counted within the statutory timeframe" without canvassing before Election Day. (Campisi Decl. ¶ 16; *see also* McGuckin Decl. ¶ 14; Von Nessi Decl. ¶ 14.) According to Defendants, enjoining the early canvassing provision "this close to Election Day would disrupt the [boards of elections'] administration of the election" because the Board "would have a minimal amount of time ... to recruit and train new staff." (Campisi Decl. ¶ 15; McGuckin Decl. ¶ 13; Von Nessi Decl. ¶ 13.) The Court finds this is a significant harm that would result from entering Plaintiffs' proposed injunction.

The Court also finds that entering an injunction would frustrate Defendants' ongoing efforts to educate voters about the new by-mail election. Election officials have already begun educating voters through the media about the new procedures, including that ballots lacking a postmark will be counted if timely received and that voters can cast ballots up to 8 p.m. on Election Day. (*See* Giles Decl. ¶ 19; Von Nessi Decl. ¶ 19; McGuckin Decl. ¶ 20; *see, e.g.*, Brent Johnson, *What You Need to Know About N.J.'s Mostly Mail-In Ballot Elections, With All the Controversy*, NJ.COM, Aug. 15, 2020, Ex. 15 to Lynch Decl., ECF No. 58-5.) Entering an injunction now would force election officials to walk back their education campaign at the risk of time and expense for the State and confusion for the voters.

**\*15** The Court finds that Plaintiffs face only speculative and remote risk of injury without an injunction, compared to Defendants* more likely and onerous injury if an injunction is entered. Accordingly, Plaintiffs fail to establish the balance of harms weighs in their favor.

#### 4. Plaintiffs Fail to Establish an Injunction is in the Public Interest.

Plaintiffs assert a preliminary injunction is in the public interest because "the public interest obviously weighs in favor of enjoining the government from violating federal law," and more specifically, in preserving the integrity of the election process. (Pls.' Moving Br. 26 (citing *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 231, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989)); *Berne Corp. v. Gov't of V.I.*, 120 F. Supp. 2d 528, 537 (D.V.I. 2000).) Because the Court finds that Plaintiffs have failed to establish a reasonable probability of success on the merits of their claims, Plaintiffs' argument that the public interest favors an injunction to prevent a violation of federal law is unpersuasive.

The Court agrees that the public interest favors preserving the integrity of the election process, but finds that an injunction would erode that integrity. It is a general principle that "federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, ––– U.S. ––––, 140 S. Ct. 1205, 1207, 206 L.Ed.2d 452 (2020) (citing *Purcell*, 549 U.S. 1, 127 S.Ct. 5 (2006); *Frank v. Walker*, 574 U.S. 929, 135 S.Ct. 7, 190 L.Ed.2d 245 (2014); *Veasey v. Perry*, ––– U.S. ––––, 135 S. Ct. 9, 190 L.Ed.2d 283 (2014)). The Court must consider that enjoining a state's election regulations and procedures on the eve of an election can "result in voter confusion" and incentivize voters "to remain away from the polls." *Purcell*, 549 U.S. at 4–5, 127 S.Ct. 5; (*see* McGuckin Decl. ¶ 20 ("Voters might be confused or frustrated by receiving new instructions so close to the election ...."). As discussed above, New Jersey voters have already received news of the changes to the November 2020 General Election. Some voters have already received and cast ballots. Further changes to the State's election procedures on the eve of the election are likely to cause confusion among the electorate that is against the public interest.

Additionally, the Court finds that Plaintiffs' proposed preliminary injunction risks voter disenfranchisement. As previously discussed, the Court finds, with a high degree of confidence, that mail-in ballots lacking postmarks received within forty-eight hours of Election Day are timely cast. Enjoining regulations that allow these ballots to be canvassed risks rejecting qualified voters' properly cast ballots for no fault of the voters. An injunction that risks such disenfranchisement is against the public interest.

Finally, the Court must not only consider the public's interest in the election, but also the public's interest in the crisis that precipitated New Jersey's new election regulations: the COVID-19 pandemic. Here, the risk is not just voters remaining away from the polls, but also voters *traveling to* the polls. It is foreseeable that an injunction on the eve of the by-mail election could prompt such confusion or distrust that voters opt to avoid the mail system altogether and cast provisional ballots in person. Such an outcome would defeat the purpose of the vote-by-mail election and needlessly force voters and poll workers into close proximity. The Court, accordingly, finds that Plaintiffs fail to establish that a preliminary injunction is in the public interest.

#### IV. CONCLUSION

 **\*16**  The Court concludes that Plaintiffs fail to establish any of the preliminary injunction factors in their favor. Plaintiffs fail to establish they are likely to succeed on the merits of their claims because the Federal Election Day Statutes do not preempt the challenged regulations. Plaintiffs fail to establish they are likely to suffer immediate, irreparable harm, and the balance of the harms weighs in favor of Defendants. Finally, Plaintiffs' proposed preliminary injunction is against the public interest. The Court, accordingly, must deny Plaintiffs' request for a preliminary injunction. The Court will enter an Order consistent with this Memorandum Opinion.

#### All Citations

--- F.Supp.3d ----, 2020 WL 5912561

### Footnotes

1    Plaintiffs also direct the Court to several instances of voter fraud in New Jersey over the past decade that predate the current public health emergency or the election laws at issue in this matter. *See, e.g.*, Jerry

DeMarco, *Elmwood Park Mayor Charged with Voter Fraud, Resigns*, SADDLE BROOK-ELMWOOD PARK DAILY VOICE, Apr. 29, 2019, Ex. 13 to Weir Decl., ECF No. 35-15 (reporting that a New Jersey mayor was charged with completing vote by mail applications and ballot certifications for other voters); John Heinis, *Feds: Hoboken Woman Pleads Guilty to Promoting Vote-by-Mail Fraud Scheme*, HUDSON COUNTY VIEW, Nov. 8, 2018, Ex. 11 to Weir Decl., ECF No. 35-13 (reporting that a New Jersey resident pleaded guilty to paying other voters to cast ballots at payor's direction); Corey McDonald, *Hoboken Man Pleads Guilty to Participating in 2015 Vote-by-Mail Fraud Scheme*, HUDSON COUNTY VIEW, Oct. 8, 2019, Ex. 10 to Weir Decl., ECF No. 35-12 (reporting that a New Jersey resident pleaded guilty to paying other voters to cast ballots at payor's direction); N.J. Office of the Attorney General, *Former Campaign Worker in Essex County Convicted at Trial of Engaging in Ballot Fraud in 2007 Races in 29th Legislative District*, Sept. 28, 2012, Ex. 9 to Weir Decl., ECF No. 35-11 (reporting that a New Jersey resident was found guilty of election fraud for submitting ballots on behalf of voters who had never received a ballot nor casted a vote; Joe Malinconico, *Councilman and Wife Arrested in Voter Fraud Case*, TAP INTO PATERSON, Dec. 2, 2010, Ex. 7 to Weir Decl., ECF No. 35-9 (reporting councilman and wife charged with tampering with absentee ballots). The instances of voter fraud cited by Plaintiffs do not arise from mail-in ballots cast after Election Day or lacking postmarks, and are not related to the early canvassing provision at issue in this case.

2      *See Gallagher v. N.Y. State Bd. of Elections*, No. 20-5504, ––– F.Supp.3d ––––, ––––, 2020 WL 4496849, at *5 (S.D.N.Y. Aug. 3, 2020) ("[D]espite the postal service's best efforts, there is uncontroverted evidence that thousands of absentee ballots for the June 23 Primary were not postmarked."); (USPS, OFFICE OF INSPECTOR GENERAL, TIMELINESS OF BALLOT MAIL IN THE MILWAUKEE PROCESSING & DISTRIBUTION CENTER SERVICE AREA 3, 5 (July 7, 2020), Ex. 14 to Lynch Decl., ECF No. 58-4 (documenting 390 ballots in Milwaukee with postmark issues).)

3      (*See* Campisi Decl. ¶¶ 2–3 (reporting approximately 78,490 mail-in ballots returned in 2020 for Primary Elections in Camden County compared with 20,200 such ballots returned in 2016); McGuckin Decl. ¶¶ 2–3 (reporting more than 90,000 mail-in ballots returned in 2020 for Primary Elections in Ocean County compared with 5,928 such ballots returned in 2016); Von Nessi Decl. ¶¶ 2–3 (reporting approximately 104,925 mail-in ballots returned in 2020 for Primary Elections in Essex County compared with 2,672 such ballots in 2016).)

4      Plaintiffs do not seek emergent relief for Counts Three and Four of their Amended Complaint.

5      Plaintiffs do not assert that ballots postmarked by Election Day and received by November 10, 2020 may not be canvassed. (*See generally* Pls.' Moving Br.) Accordingly, the Court does not consider any argument challenging the canvassing of *all* ballots after Election Day—only arguments challenging the canvassing of ballots lacking a postmark received within two days after Election Day.

6      Plaintiffs, relying on pre-pandemic information on the Postal Service website, argue that ballots can potentially be delivered in fewer than two days. (Pls.' Moving Br. 16–17, 22–23 (citing USPS, FAQs: Types of First-Class Mail? (Jan. 26, 2020)), Ex. 26 to Weir Decl. ("In some instances (short distance between ZIP Codes), it is possible for delivery to occur in one day.").) The Court has considered this evidence but finds it unpersuasive compared to the Postal Service's direct communication to New Jersey election officials about the probable timelines near Election Day.

7      Indeed, New Jersey's procedure for determining the timeliness of ballots lacking postmarks appears more likely to reject timely ballots than canvass untimely ballots. Plaintiffs do not object to probable rejection of timely ballots.

8      Plaintiffs also cite *Purcell*, 549 U.S. at 4–5, 127 S.Ct. 5 (2006), for the proposition that A4475 would incentivize voters to avoid the polls. (Pls.' Moving Br. 25.) The Court notes that that passage concerned the risk that a court order issued on the eve of an election could "result in voter confusion and consequent incentive to remain away from the polls" just as much as any state's election regulations. *Purcell*, 549 U.S. at 4–5, 127 S.Ct. 5.

# ATTACHMENT 2

2020 WL 6737895
Only the Westlaw citation is currently available.
Supreme Court of Pennsylvania.

IN RE: CANVASSING OBSERVATION
Appeal of: City of Philadelphia Board of Elections

No. 30 EAP 2020
|
Submitted: November 13, 2020
|
Decided: November 17, 2020

Appeal from the November 5, 2020, Single-Judge Order of the Honorable Christine Fizzano Cannon of the Commonwealth Court at No. 1094 CD 2020, reversing the November 3, 2020 Order of the Honorable Stella Tsai of the Court of Common Pleas of Philadelphia County at November Term 2020, No. 07003, Tsai, Stella M., Judge

**Attorneys and Law Firms**

Kathleen Marie Kotula, Esq., Pennsylvania Department of State, for Bureau of Commissions, Elections & Legislation, Participants.

Zachary Michael Wallen, Esq., Chalmers & Adams LLC, for Cutler, Bryan, Benninghoff, Kerry, Possible Intervenors.

City Commissioners of Philadelphia, Pro Se.

Mark Alan Aronchick, Esq., Robert Andrew Wiygul, Esq., Hangley, Aronchick, Segal, Pudlin & Schiller, Philadelphia, Craig R. Gottlieb, Esq., Sean James McGrath, Esq., Marcel S. Pratt, Esq., Zachary Gene Strassburger, Esq., Philadelphia Law Department, for Philadelphia County Board of Elections, Appellant

Adam Craig Bonin, Esq., The Law Office of Adam C. Bonin, Clifford B. Levine, Esq., Dentons Cohen & Grigsby, PC, Pittsburgh, Susan Mon-Yi Lin, Esq., Kairys, Rudovsky, Messing, Feinberg & Lin, LLP, Philadelphia, for Pennsylvania Democratic Party, Appellee

Ronald Lee Hicks Jr., Esq., Carolyn Batz McGee, Esq., Porter Wright Morris & Arthur LLP, Pittsburgh, Linda Ann Kerns, Esq., Law Offices of Linda A. Kerns, LLC, Philadelphia, for Donald J. Trump for President, Inc., Appellee

SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.

**OPINION**

JUSTICE TODD

**\*1** This appeal arises out of the processing of mail-in and absentee ballots received from voters in Philadelphia County in the November 3, 2020 General Election. Specifically, Appellee Donald J. Trump, Inc. (the "Campaign") orally moved for the Philadelphia County Court of Common Pleas to give its representative more proximate access to the canvassing activities being carried out by Appellant, the Philadelphia County Board of Elections (the "Board"). The trial court denied relief, the Commonwealth Court reversed, and the Board now appeals that order. For the following reasons, we vacate the order of the Commonwealth Court, and reinstate the trial court's order denying the Campaign relief.

**I. Background**

This dispute concerns the Board's pre-canvassing and canvassing of mail-in and absentee ballots at the Philadelphia Convention Center. According to the Board, in advance of the election, it arranged the workspace of its employees at this facility in a manner that it considered best suitable for the processing and maintenance of the security of the estimated 350,000 absentee and mail-in ballots it anticipated receiving, while ensuring that the social distancing protocols for COVID-19 promulgated by the federal Centers for Disease Control were maintained and the voter's privacy in his or her ballot was protected, and providing a candidate or campaign representative with the ability to observe the entirety of the pre-canvassing and canvassing process. N.T. Hearing, 11/3/20, at 10-11. [1]

Under the Board's authority, a designated area of the Convention Center was divided into discrete sections, each devoted to various aspects of the pre-canvassing and canvassing process. *Id.* at 22. Each section contained three rows of fifteen folding tables with each table separated by 5-6 feet. *Id.* at 24. In the first section, workers examined the back of the ballot return envelopes and then, based on that examination, sorted the envelopes into different trays. *Id.* at 27. In the next section, ballots in their secrecy envelopes were first extracted from the ballot return envelope by machine, and then, while encased in their secrecy envelopes, were sent on to another machine which sliced open the secrecy envelope and

removed the ballot from within. *Id.* at 28. During this phase, ballots without secrecy envelopes – so-called "naked" ballots – were segregated and placed into a separate tray. [2] *Id.* at 30.

Pursuant to the Election Code, designated observers for campaigns or candidates were permitted to physically enter the Convention Center hall and observe the entirety of this process; however, the Board erected a waist-high security fence to separate the observers from the above-described workspace of Board employees. The fence, behind which observers could freely move, was separated from the first row of employees' desks in each section by a distance of approximately 15-18 feet. *Id.* at 23. Board employees used this "buffer" area between the security fence and their workspace to enter or leave their work areas for their shifts, or to take scheduled breaks. *Id.* at 30-31.

**\*2** On the morning of November 3, 2020 – Election Day – the Campaign sent a designated representative, Attorney Jeremy Mercer, to observe the pre-canvassing and canvassing process. Attorney Mercer entered the Convention Center at 7:00 a.m. and remained there throughout the entire day. He testified that he was able to move freely along the length of the security fence and observe the employees engaged in their pre-canvassing and canvassing activities from various vantage points. *Id.* at 21. He related that, while he could see the Board employees in the first section of the workspace examining the back of the ballot return envelopes, from his position, he could not read the actual declarations on the ballot envelopes. *Id.* at 27. Regarding the ballot extraction activities in the next section, Attorney Mercer testified that he could see employees removing the ballots contained in secrecy envelopes from the return envelopes, and that, when "watching closely," he could discern if any return envelopes contained naked ballots. *Id.* at 30. However, he stated that he could not see whether there were any markings on the security envelopes themselves. [3] *Id.* at 38.

At 7:45 a.m. on Election Day, the Campaign filed a suit in the Philadelphia Court of Common Pleas challenging the location where observers such as Attorney Mercer could watch the process. The Campaign subsequently withdrew that action, without prejudice, but then refiled it at 9:45 p.m. that night. The trial court subsequently conducted an evidentiary hearing that same night utilizing the "Zoom" videoconference tool, which enabled Attorney Mercer to testify remotely.

After hearing Attorney Mercer's testimony and argument from the Campaign and the Board, the trial court rejected the Campaign's primary argument, raised orally during the hearing, that Section 3146.8(b) of the Election Code – which allows designated watchers or observers of a candidate "to be present when the envelopes containing official absentee ballots and mail-in ballots are opened and when such ballots are counted and recorded," 25 P.S. § 3146.8(b) – requires that the observers have the opportunity to "meaningfully ... see the process." N.T. Hearing, 11/3/20, at 49. In rejecting the argument, the trial court noted that Section 3146.8 contained no language mandating "meaningful observation"; rather, the court interpreted the section as requiring only that the observer be allowed to be "present" at the opening, counting, and recording of the absentee or mail-in ballots. Trial Court Opinion, 11/4/20, at 3-4.

The court observed that Attorney Mercer's testimony that he could not see individual markings on the secrecy envelopes, or determine whether the signature on all the ballot envelopes was properly completed, did not establish a violation of Section 3416.8, inasmuch as that statute "provides for no further specific activities for the watchers to observe, and no activities for the watchers to do other than simply 'be present'." *Id.* at 4. The court opined that, under this section, "[w]atchers are not directed to audit ballots or to verify signatures, to verify voter address[es], or to do anything else that would require a watcher to see the writing or markings on the outside of either envelope, including challenging the ballots or ballot signatures." *Id.* Consequently, that same day, the trial court denied the Campaign's request that the Board modify the work area to allow for closer observation of the ongoing ballot canvassing. The court indicated, however, that it was not discouraging the Board from providing an additional corridor for observers along the side of the tables to watch the proceedings, provided COVID-19 protocols and voter information secrecy protections were maintained. [4] Trial Court Order, 11/3/20.

**\*3** The Campaign immediately appealed to the Commonwealth Court, and the matter was assigned to the Honorable Christine Fizzano Cannon. [5] Judge Fizzano Cannon held a status conference on the night of November 4, 2020, and issued an order on the morning of November 5, 2020, which reversed the trial court. She directed the trial court to enter an order by 10:30 a.m. to require "all candidates, watchers, or candidate representatives be permitted to be present for the canvassing process pursuant to 25 P.S. § 2650 and/or 25 P.S. § 3146.8 and to be permitted to observe

all aspects of the canvassing process within 6 feet, while adhering to all COVID-19 protocols." Commonwealth Court Order, 11/5/20.

In her opinion, filed later that day, Judge Fizzano Cannon focused her analysis on what she considered to be the relevant governing provisions of the Election Code, 📁 Section 3146.8(b) and 📁 Section 3146.8(g)(1.1). 📁 Section 3146.8(b) provides:

> Watchers shall be permitted to be *present* when the envelopes containing official absentee ballots and mail-in ballots are opened and when such ballots are counted and recorded.

📁 25 P.S. § 3146.8(b) (emphasis added). 📁 Section 3146.8(g)(1.1) states, in relevant part:

> The county board of elections shall meet no earlier than seven o'clock A.M. on election day to pre-canvass all ballots received prior to the meeting ... One authorized representative of each candidate in an election and one representative from each political party shall be permitted to *remain in the room* in which the absentee ballots and mail-in ballots are pre-canvassed.

📁 25 P.S. § 3146.8(g)(1.1) (emphasis added).

Judge Fizzano Cannon noted that the parties offered competing interpretations of the phrases "present," and "to remain in the room," with the Board arguing that these terms require only that the observer be physically present in the room where the ballot counting occurs; whereas the Campaign contended that these phrases required the observer to be able to *observe* "meaningfully," in addition to being physically present. Judge Fizzano Cannon deemed each of these interpretations to be reasonable, and, hence, concluded the statutory language was ambiguous.

Because these provisions of the Election Code had as their purpose "maintaining the integrity of the elective process in the Commonwealth," the judge determined that the language in question "imports upon ... candidates' representatives at least a modicum of observational leeway to ascertain sufficient details of the canvassing process for the purpose of intelligently assessing and/or reporting to the candidate represented the details of the canvassing process." Commonwealth Court Opinion, 11/5/20, at 5. In her view, in order for representatives to fulfill their reporting duty to their candidate, they are required to "have the opportunity to observe the processes upon which they are to report," *id.*, and so mere physical presence of the observers was insufficient to guarantee this "meaningful observation," *id.* at 6.

Judge Fizzano Cannon then found that, based on Attorney Mercer's testimony that, while he was physically present in the room where the pre-canvassing and canvassing processes were occurring, the distance from which he was observing those processes, as well as the physical barriers in the room, prevented him from observing the ballots being processed, the ballot envelopes, the secrecy envelopes, and any markings on the secrecy envelopes, depriving him of the ability to actually observe those processes "in any meaningful way." *Id.* at 8. Consequently, the judge concluded that the trial court erred as a matter of law in determining that the Board had complied with the Election Code. The Board filed an emergency petition for allowance of appeal with our Court on the morning of November 5, 2020.

**\*4** While this petition was pending, that same day, the Campaign filed a one-page "Complaint and Motion for Emergency Injunction" in the United States District Court for the Eastern District of Pennsylvania alleging, *inter alia*, that, in the aftermath of the Commonwealth Court's order in the instant case, the Board was violating the Election Code by "refusing to allow any representatives and poll watchers for President Trump and the Republican Party" to observe the counting of the ballots, and that the "counting continues with no Republicans present." *See* Complaint and Motion for Emergency Injunction in *Donald J. Trump For President, Inc. v. Philadelphia County Board of Elections*, No. 20-5533, 2020 WL 6535282 (E.D. Pa. filed Nov. 5 2020) (hereinafter "*Trump*") (attached as Exhibit 2 to Board's Brief), at ¶¶ 4 & 5.

That case was assigned to District Court Judge Paul S. Diamond, who held a hearing on the request for an emergency injunction at 5:30 p.m. on November 5, 2020. During the hearing, counsel for the Campaign stated that the Campaign

had "a nonzero number of people in the room." N.T. Hearing in *Trump*, 11/5/20 at 10. Judge Diamond, seeking clarification of the meaning of the term "nonzero", asked counsel for the Campaign directly: "as a member of the bar of this Court, are people representing the Donald J. Trump for President [campaign], representing the plaintiff in that room?" *Id.* at 11. Counsel replied "yes." *Id.*

Because the District Court recognized that the petition for allowance of appeal filed by the Board was pending before our Court, and that a decision from our Court on the proper interpretation of the governing provisions of the Election Code would obviate the need for it to rule on a question of state law, the District Court encouraged the parties to reach an interim accommodation. Thus, the Board and the Campaign reached an agreement, which was entered on the record in open court before Judge Diamond, under which the crowd control barrier, which the Board had moved to within six feet of the first row of tables in its employees' work area as the result of the Commonwealth Court decision, would remain in that position, and that all campaign observers would have equal access to positions behind that barrier to watch the canvassing process. *Id.* at 38-40. Judge Diamond deferred action on the merits of the underlying claims in the lawsuit, which remains pending.

Subsequently, on November 9, 2020, the Campaign filed yet another federal lawsuit, in the United States District Court of the Middle District of Pennsylvania, seeking to enjoin Pennsylvania from certifying the results of the November 3, 2020 General Election or, alternatively, to exclude from the certified results "the tabulation of absentee and mail-in and ballots for which [its] watchers were prevented from observing during the pre-canvass and canvass in the County Election Boards." Complaint for Declaratory and Injunctive Relief in *Donald J. Trump, Inc., et.al. v. Boockvar*, No. 20-CV-02078 (M.D. Pa. filed Nov. 9, 2020) (Exhibit 1 to Board's Brief), at 84. This matter was assigned to District Court Judge Matthew Brann who promptly issued an order setting an expedited schedule for the Campaign to file motions for injunctive relief, and for the Board to file a responsive motion thereto as well as a motion to dismiss. Notably, however, on November 15, 2020, the Campaign filed an amended complaint, removing all counts which were based on canvassing access. *See* First Amended Complaint Verified Complaint for Declaratory and Injunctive Relief in *Donald J. Trump, Inc., et.al. v. Boockvar*, No. 20-CV-02078 (M.D. Pa. filed Nov. 15, 2020).

During the interim, on November 9, 2020, our Court granted the Board's emergency petition for allowance of appeal on the following issues:

**\*5** 1. Whether, as a matter of statutory construction pursuant to Pennsylvania law, the Commonwealth Court erred in reversing the trial court, which concluded that Petitioner City of Philadelphia Board of Elections' regulations regarding observer and representative access complied with applicable Election Code requirements.

2. Whether the issue raised in Petitioner's petition for allowance of appeal is moot.

3. If the issue raised in Petitioner's petition for allowance of appeal is moot, does there remain a substantial question that is capable of repetition yet likely to evade review, and, thus, fall within an exception to the mootness doctrine.

In our order, we directed the Prothonotary to establish an expedited briefing schedule; we also indicated that our grant order was not a stay of the Board's canvassing process, which is ongoing as of this writing. [6]

## II. Mootness

We begin by addressing whether the central legal issue in this matter – involving an interpretation of the provisions of the Election Code establishing campaign access requirements to ballot canvassing activities – is moot. *See* 🔲 *Stuckley v. Zoning Hearing Board of Newtown Township*, 621 Pa. 509, 79 A.3d 510, 516 (2013) (we will generally not address matters where there is no actual case or controversy between the parties). Both parties and Intervenor argue that this case is not moot because the Board continues to count ballots, and the Campaign continues to want its representatives to have maximal access to the canvassing process.

We conclude that, because ballots are still being canvassed by the Board at the time of this writing, the legal question before us is not moot. [7] In this regard, we note that the interim agreement between the parties entered in the federal litigation being overseen by Judge Diamond did not purport to resolve this question, and, indeed, Judge Diamond expressly refrained from addressing it as he viewed it as purely a question of Pennsylvania law which could be definitively resolved only

by our Court. We will, therefore, proceed to address the merits of the issue before us.

### III. Access under the Election Code

#### A. Arguments of the Parties

The Board argues that the Election Code granted to it the express statutory authority "[t]o make and issue such rules, regulations and instructions, not inconsistent with law, as they may deem necessary for the guidance of ... elections officers and electors." Board Brief at 32 (quoting 25 P.S. § 2642(f)). Thus, it reasons that the access rules it established for ballot processing in Philadelphia County – which were based on its perceived need for protecting its workers' safety from COVID-19 and physical assault from those individuals who have contact with its workers; ensuring security of the ballots; efficiently processing large numbers of ballots; protecting the privacy of voters; and ensuring campaign access to the canvassing proceedings – are a valid exercise of its authority. The Board maintains that these rules can be invalidated by a court only if they are inconsistent with the Election Code.

**\*6** In determining whether its access rules are consistent with the Election Code, the Board contends that only two provisions of the Code are relevant: 25 P.S. § 3146.8(g) (1.1) (specifying that "[o]ne authorized representative of each candidate in an election and one representative from each political party shall be permitted to remain in the room in which the absentee ballots and mail-in ballots are pre-canvassed"), and Section 3146.8(g)(2) (providing that "[o]ne authorized representative of each candidate in an election and one representative from each political party shall be permitted to remain in the room in which the absentee ballots and mail-in ballots are canvassed.").

The Board rejects the relevance of Section 3146.8(b), given that it sets forth the access requirements for "watchers." [8] The Board characterizes this provision as vestigial in nature, reflecting the manner in which absentee ballots were handled prior to the 2006 and 2019 amendments to the Election Code which, respectively, added Section 3146.8(g)(2) and Section 3146.8(g)(1.1). Prior to those amendments, absentee ballots received by a board of elections

were taken to the electors' local polling places to be canvassed, and, thus, candidates' designated poll watchers were permitted by Section 3146.8(b) to remain in the room at the polling place while the absentee ballots were canvassed. According to the Board, Sections 3146.8(g) (1.1) and (2) established that all mail-in and absentee ballots would be pre-canvassed and canvassed at a central location designated by the board of elections; hence, poll watchers are not granted access to these proceedings. Consequently, in the Board's view, the rights of the Campaign's designated representative in this matter are delineated exclusively by Sections 3146.8(g)(1.1) and (2).

The Board contends that these statutory provisions should be construed in accordance with the plain meaning of their terms, *i.e.*, requiring only that a candidate's authorized representative be permitted to remain in the room while the ballots are pre-canvassed or canvassed. The Board notes that the Campaign's representative was, in fact, permitted to be in the room at the Convention Center where the ballots were being pre-canvassed and canvassed at all times during this process, just as these provisions require. Relatedly, the Board contends that, even if Section 3146.8(b) of the Election Code were deemed to be applicable herein, its requirements were met as well, given that the Campaign's representative was present at all times when absentee and mail-in ballots were opened, counted, and recorded.

Moreover, the Board emphasizes that, contrary to the Commonwealth Court's conclusion, the evidence of record indicated that Attorney Mercer could see every portion of the pre-canvassing and canvassing process and, as a result, could confirm that the only ballots which were scanned and tabulated were those which had been removed from secrecy envelopes, and that the outer ballot envelope had been inspected for sufficiency and then sorted.

The Board points out that Attorney Mercer's complaints about being unable to read the actual declarations on the ballot envelopes, or his inability to see whether the secrecy envelopes contained improper markings, were relevant only to his desire to determine if the ballots met the requirements of the Election Code. However, the Board stresses that our Court very recently, in *In re: November 3, 2020 General Election*, ---- Pa. ----, ---- A.3d ----, 2020 WL 6252803 (Pa. Oct. 23, 2020), interpreted the Election Code as precluding time-of-canvassing challenges by campaign representatives; hence, the Board maintains that a candidate's representative has

no need for the information about which Attorney Mercer complains, as the representative cannot lodge a challenge based on it. Most importantly, however, from the Board's perspective, there is nothing in the statutory language of Sections 3146.8(g)(1.1) and (2) which grants a candidate's representative an unqualified right of access to that kind of information during the pre-canvassing and canvassing process. [9]

**\*7** The Campaign responds that "the plain meaning and purpose of the statutes at issue is to provide the public the opportunity to observe and vet the canvassing and tabulation of the vote." Campaign Brief at 17. The Campaign reasons that, as the Election Code gives a candidate's representative the right to be "present" and to "remain in the room" during the canvassing of absentee and mail-in ballots, citing 25 P.S. § 2650 ("Every candidate shall be entitled to be *present* in person or by attorney in fact duly authorized, and to participate in any proceeding before any county board whenever any matters which may affect his candidacy are being heard, including any computation and canvassing of returns of any primary or election or recount of ballots or recanvass of voting machines affecting his candidacy." (emphasis added)); *id.* § 3146.8(b) (allowing watchers to "be *present* when the envelopes containing official absentee ballots and mail-in ballots are opened and when such ballots are counted and recorded" (emphasis added)); *id.* § 3146.8(g)(2) (providing that an "authorized representative of each candidate in an election and one representative from each political party shall be permitted to *remain in the room* in which the absentee ballots and mail-in ballots are canvassed" (emphasis added)), these terms should be broadly interpreted consistent with their overall purpose of allowing public observation of the vote and the counting thereof. The Campaign rejects the Board's interpretation as "a hyper-technical focus on the words themselves," that disregards this purpose. Campaign Brief at 19.

The Campaign argues that, under the Board's interpretation, merely being in the far end of a room like the Convention Center, which is as large as a football field, would be sufficient to comport with these requirements. This, in the Campaign's view, "defies logic and reasonableness." *Id.* at 20. The Campaign contends that the Board's setup – imposing a barrier and having some tables in the area over a hundred feet away from the edge of the security fence – effectively deprived its representative of the ability to be truly present, and effectively eliminates the representative's ability to perform his or her role of ensuring openness and transparency in the electoral process.

The Campaign denies that it was seeking the right to challenge mail-in or absentee ballots at the time of canvassing; rather, it claims that it was merely seeking the right to observe "in a meaningful way" the Board's conduct of the electoral process so that it could "challenge that process through appropriate litigation." Campaign Brief at 22 (emphasis omitted). The Campaign asserts its ability to do so is vital given that these canvassing activities have a high prospect of human error.

### B. Analysis

As this issue presents a question of statutory interpretation under Pennsylvania law, our standard of review is *de novo*, and our scope of review is plenary. *Danganan v. Guardian Protection Services*, 645 Pa. 181, 179 A.3d 9, 15 (2018). Our objective is, therefore, to ascertain and effectuate the intent of the General Assembly. *Id.*; *see also* 1 Pa.C.S. § 1921(a). It is well established that "[t]he best indication of legislative intent is the plain language of the statute." *Crown Castle NG East v. Pennsylvania Public Utility Commission*, ___ Pa. ___, 234 A.3d 665, 674 (2020). In ascertaining the plain meaning of statutory language, we consider it in context and give words and phrases their "common and approved usage." *Commonwealth by Shapiro v. Golden Gate National Senior Care*, 648 Pa. 604, 194 A.3d 1010, 1027-28 (2017). When the words of a statute are free and clear of all ambiguity, they are the best indicator of legislative intent; hence, in such circumstances, "we cannot disregard the letter of the statute under the pretext of pursuing its spirit." *Fletcher v. Pennsylvania Property & Casualty Insurance Guaranty Association*, 603 Pa. 452, 985 A.2d 678, 684 (2009) (citing 1 Pa.C.S. § 1921(b)). Consistent with these principles, when interpreting a statute "we must listen attentively to what the statute says, but also to what it does not say." *Discovery Charter School v. School District of Philadelphia*, 641 Pa. 136, 166 A.3d 304, 321 (2017). Moreover, regarding the factual findings of the trial court, we must defer to those findings if they are supported by the evidence. *Gentex Corp. v. WCAB (Morack)*, 611 Pa. 38, 23 A.3d 528, 534 (2011); *Generette v. Donegal Mutual Insurance Company*, 598 Pa. 505, 957 A.2d 1180, 1189 (2008).

As a threshold matter, given the specific issue in this case — the degree of access required by the Election Code for an "authorized representative" of a candidate to the pre-canvassing and canvassing proceedings of an election board — we regard Sections 3146.8(g)(1.1) and (2) of the Code to be the governing statutory provisions, as they directly set forth the rights of such individuals. Section 2650, offered by the Campaign, by its plain terms is inapplicable, as we are addressing the right of access of a campaign's representative to canvassing proceedings, not a candidate or his "attorney in fact". Section 3146.8(b) is likewise not controlling, given that it applies only to the right of "watchers" to be present while ballots are canvassed. The Election Code contains specific certification requirements for an individual to be appointed as a "watcher," see 25 P.S. § 2687 ("Appointment of watchers"), and there is no evidence of record establishing that Attorney Mercer met these requirements, and, critically, he did not identify himself as a watcher, but rather as "one of the representatives designated by the Trump campaign ... to observe the pre-canvass." N.T. Hearing, 11/3/20, at 20-21.

**8** As recited above, Section 3146.8(g)(1.1) requires only that an authorized representative "be permitted to *remain in the room* in which the absentee ballots and mail-in ballots are pre-canvassed," 25 P.S. § 3146.8(g)(1.1) (emphasis added), and Section 3146.8(g)(2) likewise mandates merely that an authorized representative "be permitted to *remain in the room* in which the absentee ballots and mail-in ballots are canvassed." 25 P.S. § 3146.8(g)(2) (emphasis added). While this language contemplates an opportunity to broadly observe the mechanics of the canvassing process, we note that these provisions do not set a minimum distance between authorized representatives and canvassing activities occurring while they "remain in the room." The General Assembly, had it so desired, could have easily established such parameters; however, it did not. It would be improper for this Court to judicially rewrite the statute by imposing distance requirements where the legislature has, in the exercise of its policy judgment, seen fit not to do so. *See Sivick v. State Ethics Commission*, ―― Pa. ――, 238 A.3d 1250, ――, 2020 WL 5823822, at *10 (2020) ("It is axiomatic that we may not add statutory language where we find the extant language somehow lacking.").

Rather, we deem the absence of proximity parameters to reflect the legislature's deliberate choice to leave such matters to the informed discretion of county boards of elections, who are empowered by Section 2642(f) of the Election Code "[t]o make and issue such rules, regulations and instructions, not inconsistent with law, as they may deem necessary for the guidance of ... elections officers." 25 P.S. § 2642(f).

In the case at bar, the Board promulgated regulations governing the locations in which authorized representatives were permitted to stand and move about while observing the pre-canvassing and canvassing process. The Board's averments that it fashioned these rules based on its careful consideration of how it could best protect the security and privacy of voters' ballots, as well as safeguard its employees and others who would be present during a pandemic for the pre-canvassing and canvassing process, while, at the same time, ensuring that the ballots would be counted in the most expeditious manner possible, were undisputed by the Campaign. We discern no basis for the Commonwealth Court to have invalidated these rules and impose arbitrary distance requirements.

Significantly, as to any opportunity to observe the mechanics of the canvassing process, the evidence of record, provided through the Campaign's own witness, Attorney Mercer, whom the trial court deemed to be credible, indicates that the Board's rules regarding where campaign representatives could remain in the room to view the pre-canvassing and canvassing process did not deprive Attorney Mercer of the ability "to actually observe the ... process in any meaningful way," as the Commonwealth Court concluded, Commonwealth Court Opinion, 11/5/20, at 8, and the Campaign presently argues. According to Attorney Mercer's candid testimony, which the trial court accepted as credible, from his vantage point, he could view the entirety of the pre-canvassing and canvassing process. Clearly, then, Attorney Mercer had the opportunity to observe the mechanics of the canvassing process. Specifically, Attorney Mercer witnessed Board employees inspecting the back of ballot envelopes containing the voter's declaration, before sending them on for processing; witnessed ballots being removed from their secrecy envelopes, and naked ballots which had been delivered to the Board without a secrecy envelope being segregated from ballots which arrived within such envelopes; saw that the ballot processing methods utilized by the Board were not destroying the ballot envelopes containing the voter's declaration; and perceived that the ballot secrecy envelopes were being preserved during their processing. *See* N.T. Hearing, 11/3/20, at 20-21, 27, 30,

38; Trial Court Order, 11/3/20 ("The [Campaign's] witness provided copious testimony as to his ability to observe the opening and sorting of ballots."). Although Attorney Mercer related that he could not view the actual declarations on the ballot envelopes, nor examine individual secrecy envelopes for improper markings, as the trial court properly determined, this information would only be necessary if he were making challenges to individual ballots during the pre-canvassing and canvassing process, which appeared to be his primary motivation in seeking such information. *See id.* at 37-38; Trial Court Order, 11/3/20 ("His concerns pertained to his inability to observe the writing on the outside of the ballots. Given that observers are directed only to observe and not to audit ballots, we conclude, based on the witness's testimony, that the Board of Elections has complied with the observation requirements under 25 P.S. [§] 3146.8."). As discussed above, such challenges are not permissible under the Election Code. Thus, as found by the trial court, Attorney Mercer was able to appropriately observe that the Board's employees were performing their duties under the Election Code.

**\*9** In sum, we conclude the Board did not act contrary to law in fashioning its regulations governing the positioning of candidate representatives during the pre-canvassing and canvassing process, as the Election Code does not specify minimum distance parameters for the location of such representatives. Critically, we find the Board's regulations as applied herein were reasonable in that they allowed candidate representatives to observe the Board conducting its activities as prescribed under the Election Code. Accordingly, we determine the Commonwealth Court's order was erroneous. Thus, we vacate that order, and reinstate the trial court's order.

Jurisdiction relinquished.

Justices Baer, Donohue, Dougherty and Wecht join the opinion.

Chief Justice Saylor files a dissenting opinion in which Justice Mundy joins.

Justice Mundy files a dissenting opinion.

CHIEF JUSTICE SAYLOR, dissenting
The Commonwealth Court reasonably directed election officials in Philadelphia to move restrictive barriers in the Convention Center closer to the ballot-canvassing operations, which had been staged up to thirty-five yards from the areas to which the statutorily-authorized candidate representatives were confined. Under the Commonwealth Court's order, these representatives could then observe whether ballots were being counted lawfully to the best of their ability, consistent with health and safety restrictions. The record -- as well as publicly-available video recordings from the Convention Center -- amply demonstrate that this simply wasn't the case previously.

The canvassing has now proceeded to near conclusion under an ensuing agreement among the parties associated with federal litigation. In my judgment, the matter is therefore moot -- or at least moot enough -- so that this Court's discretionary intervention was and is not required. Moreover, the Legislature already is signaling that there will be an intense after-action review of the no-excuse mail-in voting regime, which is in its infancy in Pennsylvania. Accordingly, I doubt that the Court's present ruling, relative to governance that is quite likely to be substantially refined, will be of any importance in the future.

I also note that, given the enormous scale of canvassing activities and the historical balkanization associated with the administration of the election franchise at the county-and-district levels across the Commonwealth, there have been, and will always be, some localized irregularities. This is why courts are open throughout the election cycle, as here, to remedy these just as quickly as possible. It is also one of the reasons why we have a Commonwealth Court, with expertise in election matters, and organized to act expeditiously via single-judge consideration.

Finally, short of demonstrated fraud, the notion that presumptively valid ballots cast by the Pennsylvania electorate would be disregarded based on isolated procedural irregularities that have been redressed -- thus disenfranchising potentially thousands of voters -- is misguided. Accordingly, to the degree that there is a concern with protecting or legitimizing the will of the Philadelphians who cast their votes while candidate representatives were unnecessarily restrained at the Convention Center, I fail to see that there is any real issue.

Justice Mundy joins this dissenting opinion.

JUSTICE MUNDY, dissenting

Based on the particular circumstances surrounding this election, and the volume of mail-in ballots cast due to the current global pandemic, I disagree with the majority that the "issue before us is one which is capable of repetition but likely to evade review[.]" Majority Op. at ——, n. 7. As such, I join Chief Justice Saylor's dissenting opinion in full.

**\*10**  In denying Appellee's initial motion, the trial court concluded "[Appellee]'s argument that the Board of Elections was not providing observers the opportunity to 'meaningfully observe' the canvassing of ballots" failed because "[Appellee] was unable to point to any statutory language or case law using the word 'meaningful' or elaborating on what constitutes 'meaningful observation.' " Trial Court Op. at 3. The Commonwealth Court reversed noting "the relegation of those representatives to a position where meaningful observation of the processes they are present to observe is a practical impossibility would be an absurd interpretation of the Election Code[.]" Cmwlth Ct. Op. at 6. I agree. The majority now vacates the Commonwealth Court's order and holds "[w]hile this language contemplates an opportunity to broadly observe the mechanics of the canvassing process, we note that these provisions do not set a minimum distance between authorized representatives and canvassing activities occurring while they 'remain in the room.' " Majority Op. at ——. In so doing, the majority seemingly endorses what the Commonwealth Court did in its order, provide an "opportunity to broadly observe[.]"

Appellee was merely requesting the ability to be able to observe the ballots in order to accurately relay compliance information. Appellees' Brief at 22 ("The Campaign simply wants the right to observe in a meaningful way that would allow the Campaign to determine whether the Board was following legal processing procedures, and if not, to challenge that *process* through appropriate litigation."). The Commonwealth Court's order, and the subsequent mutual agreement of the parties in the Federal action, did precisely that, and I would not disturb it. Accordingly, I dissent.

**All Citations**

--- A.3d ----, 2020 WL 6737895

## Footnotes

1    Except as otherwise noted, such citations are to the notes of testimony of the hearing before the trial court.

2    Ballots not placed into the provided secrecy envelopes are invalid. *Pennsylvania Democratic Party v. Boockvar*, —— Pa. ——, 238 A.3d 345, 380 (2020).

3    The Election Code prohibits the security envelope from containing any "text, mark or symbol which reveals the identity of the elector, the elector's political affiliation or the elector's candidate preference." 25 P.S. § 3146.8(g)(4)(ii).

4    It should be noted that the pre-canvassing and canvassing activities were also broadcast live on YouTube.

5    The Pennsylvania Democratic Party ("Intervenor") was granted leave to intervene in these proceedings by the Commonwealth Court.

6    Bryan Cutler, Speaker of the Pennsylvania House of Representatives, and Kerry Benninghoff, Majority Leader of the Pennsylvania House of Representatives, have filed a motion to intervene in this matter before our Court, as well as an accompanying brief. While we deny this motion, we, nevertheless, accept the accompanying brief as an *amicus* brief.

7    Even were the ballot counting process to conclude prior to our final disposition of this matter, we regard this issue before us as one which is capable of repetition but likely to evade review, and therefore subject to our review under this exception to the mootness doctrine. *See Reuther v. Delaware County Bureau of Elections*, 651 Pa. 406, 205 A.3d 302, 306 n.6 (2019) ("Given the abbreviated time frame applicable to elections and the amount of time that it takes for litigation to reach this Court, this exception is particularly applicable when the question presented relates to an election dispute.").

8    Section 3146.8(b) provides:

    Watchers shall be permitted to be present when the envelopes containing official absentee ballots and mail-in ballots are opened and when such ballots are counted and recorded.

9    Intervenor's brief endorses the Board's contention that the Commonwealth Court erred in its interpretation of the relevant provisions of the Election Code, but it does not develop a separate argument to support this claim.

---

**End of Document**
© 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# ATTACHMENT 3

2013 WL 106686
Only the Westlaw citation is currently available.
District Court of the Virgin
Islands, Division of St. Croix

Norma Pickard SAMUEL, Individually and as a St.
Thomas Candidate for Delegate to Congress, Wilma
Marsh–Monsanto, individually and as a St. Thomas
Candidate for Senate–at–Large, Lawrence Olive,
individually and as a St. Thomas Candidate for the
30th Legislature, Diane Magras, Individually and
as a St. Thomas Candidate for Board of Elections,
and Harriet Mercer, individually and as a St.
Thomas Candidate for Board of Elections, Plaintiffs,
v.
VIRGIN ISLANDS JOINT BOARD OF ELECTIONS,
St. Croix Board of Elections, St. Thomas–St.
John Board of Elections, John Abramson, Jr.,
as supervisor of Elections, Rupert Ross, Jr., as
chairman of the St. Croix Board of Elections,
Alecia Wells, as chairwoman of the St. Thomas–
St. John Board of Elections, Defendants.

Civil No. 2012–0094
|
January 6, 2013

**Attorneys and Law Firms**

Norma Pickard Samuel, Pro Se, St. Thomas, U.S.V.I.

Wilma Marsh–Monsanto, Pro Se, St. Thomas, U.S.V.I.

Lawrence Olive, Pro Se, St. Thomas, U.S.V.I.

Diane Magras, Pro Se, St. Thomas, U.S.V.I.

Harriet Mercer, Pro Se, St. Thomas, U.S.V.I.

Tamika M. Archer, Esq., Ariel Smith–Francois, Esq., St.
Thomas, U.S.V.I., For the Defendants

*ORDER*

RAYMOND L. FINCH, District Judge

**\*1** For the reasons set forth in the Memorandum Opinion
dated January 6, 2013, and having considered post-hearing
documents filed on January 6, 2013, it is hereby

**ORDERED** that Plaintiffs' Motion for a Preliminary
Injunction (Dkt. No. 33), is **DENIED;** and it is further

**ORDERED** that Defendants' Motion to Dismiss (Dkt. No.
73), is **DENIED.**

**SO ORDERED.**

*MEMORANDUM OPINION*

THIS MATTER comes before the Court on Plaintiffs'
"Application for a Temporary Restraining Order, Injunctive
Relief, Mandamus Relief, Declaratory Judgment and Costs,"
filed on December 21, 2012. (Dkt. No. 33). Plaintiffs,
proceeding *pro se,* have filed an action pursuant to 42
U.S.C. § 1983 in which they seek to decertify the November
6, 2012 general election in the Virgin islands and enjoin
the January 2013 swearing in of the Virgin Islands' officials
elected at that time. They claim that Defendants have not
addressed their election-related concerns and complaints, and
have violated various federal and local laws which has cast
the results of the election in doubt. On January 2, 2013, this
Court issued an Amended Order denying Plaintiffs' petition
for a temporary restraining order. (Dkt. No. 69). [1] Also on
January 2, 2013, the Chief Judge of this District reassigned
this case to the undersigned Judge for all further proceedings.
(Dkt. No. 70). Defendants filed a "Brief in Response to
January 2, 201[3], Court Order Scheduling a Preliminary
Injunction Hearing" on January 4, 2013. (Dkt. No. 73). The
Court held a hearing on Plaintiffs' petition for injunctive
relief, mandamus relief, and declaratory judgment on January
4, 2013. During the hearing, the Defendants converted their
brief into a Motion to Dismiss. For the reasons that follow,
the Court denies Defendants' motion to dismiss and denies
Plaintiffs' request for injunctive relief.

**BACKGROUND**

**A. The Amended Complaint**
As set forth in the Amended Complaint, Plaintiff Norma
Pickard–Samuel was a federal candidate for the territory-
wide position of Delegate to Congress in the November 2012

elections; Plaintiff Wilma Marsh–Monsanto was a candidate for the territory-wide position of Senator–at–Large; Plaintiff Lawrence Olive was a candidate for the St. Thomas District position as Senator for the 30th Legislature; and Plaintiffs Diane Magras and Harriet Mercer were candidates for the St. Thomas/St. John District Board of Elections. (Dkt. No. 33, ¶¶ 7–11). Plaintiffs were not elected. The Defendants include the Virgin Islands Joint Board of Elections, the St. Croix Board of Elections, the St. Thomas–St. John Board of Elections, as well as the following individuals, sued in their official capacities: John Abramson, Jr., Supervisor of Elections, Rupert Ross, Jr., Chairman of the St. Croix District and Joint Boards of Elections, and Alecia Wells, Chairwoman of the St. Thomas/St. John District Board of Elections. (*Id.,* ¶¶ 12–17).

**\*2** Plaintiffs' twenty-one page Amended Complaint contains a number of general factual allegations that can be roughly divided into eight categories: (1) Defendants have ignored admonishments by the District Court and the Superior Court of the Virgin Islands contained in *Bryan v. Todman,* 1993 U.S Dist LEXIS 21461 (D.V.I. Oct. 29, 1993) and *St. Thomas– St. John Bd. of Elections v. Daniel,* 2007 WL 4901116 (V.I. Sept. 17, 2007), *id.* ¶ 25; (2) Defendants have failed to enforce the Uniformed and Overseas Citizens Absentee Voting Act, amended by the Military & Overseas Voter Empowerment Act, *id.* ¶ 26; (3) On occasions in 2001, 2003, and 2006, Defendant Abramson acted in a manner that has exposed or could expose the election system to compromise, *id.* ¶ 27; (4) Defendants have misrepresented the "true status of electronic voting machine certification" between 2010 and 2012 when, *inter alia,* Defendant Abramson stated that the Virgin Island voting machines were federally certified by the Election Assistance Commission ("EAC") when they were not, *id.* ¶ 28; (5) various individuals, including Plaintiff Marsh–Monsanto, made written requests for "election intervention and audit pertaining to the integrity and security of the Election System and Boards of Elections" from 2009 to 2012, *id.* ¶ 30; (6) Plaintiffs submitted correspondence to the Virgin Islands Attorney General and United States Attorney challenging the 2012 primary election process, which were neither officially acknowledged, acted upon "fully and impartially, nor resolved to the satisfaction of the plaintiffs," *id.* ¶¶ 31, 32; (7) between August and November 2012, "a number of candidates" and others submitted correspondence and inquiries to the Boards of Ejections expressing serious concerns about the primary election; a person filed a complaint for a recount, which

was granted but did not strictly conform to the statute; an unnamed person challenged the certification of the primary election; Plaintiff Pickard–Samuel submitted a letter to the Attorney General and U.S. Attorney concerning the use of non-EAC certified voting machines in the general election, in contravention of the Help America Vote Act of 2002 ("HAVA"), 116 Stat. 1666, 42 U.S.C. § 15301 *et seq.,* which she felt would negatively impact her election bid; a person challenged the Attorney General's announcement that his office would conduct an investigation into the 2012 general election, documenting a conflict of interest. According to Plaintiffs, all of this correspondence was ignored. *Id.* ¶¶ 33– 44; and (8) Plaintiffs hand-delivered petitions for recount concerning the general election to the St. Thomas/St. John Elections Office "alleging a wide variety of substantiated election-related complaints," including fraud, resulting in "the public's diminished trust and confidence in the Election System," and they believe they are entitled to a new election because Defendants failed to establish a quorum at the meeting where they decided the recount issue, as required by 18 V.I.C. §§ 629(b) and (c). *Id.* ¶¶ 45, 46.

Based on these allegations, Plaintiffs contend that Defendants have infringed on "voters' fundamental right to vote, fair and transparent elections and to equal protection"; they will be "severely burdened in exercising their due process right" to have their election challenges decided; and the legitimacy of the general election results, in terms of vote tabulation and certification are in doubt, as the tabulation is "independently unverifiable and indeterminable." *Id.* ¶¶ 48–50. They do not specifically explain how their constitutional rights have been violated.

Plaintiffs assert that Defendants, acting under color of law, have administered the election in a manner inconsistent with federal and local election law, violating 42 U.S.C. § 1983, and seek decertification of the general election and a new election. *Id.* ¶¶ 52–53. They request that Defendants be enjoined from conducting the January 8, 2013 swearing-in ceremony of all candidates. [2] They also request that the Court declare that: (1) Defendants' denial of petitions for recount by lack of quorum violates their due process rights; (2) Defendants have violated 18 V.I.C. §§ 629(b) and (c); (3) the 2012 general election is null and void, order the Boards of Elections to decertify the election, and issue an order to conduct the new election on a one-page paper ballot. *Id.* pp. 19–20.

## B. Defendants' Response

Defendants raise two arguments in their brief filed in response to the Court Order scheduling the preliminary injunction hearing. They make a number of contentions related to HAVA: (1) Plaintiffs have alleged no violation of HAVA because the statute does not provide for a private cause of action to be brought by individual plaintiffs; (2) no HAVA violation has been alleged which would give rise to subject matter jurisdiction by this Court since Plaintiffs have alleged that the non-EAC-certified voting machines violates HAVA; such certification of hardware is discretionary under HAVA; and Plaintiffs cannot establish a HAVA violation and the claim must be dismissed; and (3) the candidates for local office have no standing to bring a challenge under HAVA, which applies only to the election of individuals for federal offices. (Dkt. No. 73 at 4–7). Defendants also argue that Plaintiffs' claims are barred by the doctrine of laches because they had knowledge of the alleged election irregularities before the election, but waited until after the election to file a lawsuit—an approach that has been discouraged by the District Court of the Virgin Islands. *Id.* pp. 7–8 (citing cases).

## C. The January 4, 2013 Hearing

**\*3** At the hearing, Plaintiffs made statements which reflected the concerns articulated in their Amended Complaint. They also called witnesses. The testimony focused on whether the voting machines had been EAC-certified, whether certain Defendants (Ross and Wells) had received and answered correspondence from Plaintiffs concerning various election matters, and if not, why not; testimony by two poll watchers about a 78–vote discrepancy at a St. Thomas polling station on election day, where they saw poll workers cross off names of people who voted from one book and put them in another book; and an admission by Defendant Wells that the voting machines were not EAC certified—although she explained that the Attorney General had advised the Board of Elections that the machines could still be used.

Also at the hearing, Defendants converted their brief into a motion to dismiss. The Court permitted Plaintiffs to file a response to Defendants' motion by January 6, 2013.

## *DISCUSSION*

### A. Applicable Standards

### 1. Standard for Preliminary Injunction

The Third Circuit has articulated the standard for granting a preliminary injunction pursuant to Fed. R. Civ. P. 65 as follows:

> To determine whether to grant a preliminary injunction, 'a district court must consider: (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest.'

*Iles v. de Jongh,* 638 F.3d 169, 172 (3d Cir. 2011) (quoting *McTernan v. City of New York,* 577 F.3d 521, 526 (3d Cir. 2009)). The party seeking relief must, "by a clear showing, carr[y] the burden of persuasion," *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (per curiam), on "each of the four prongs of the preliminary injunction standard." *United States v. Roach,* 947 F.Supp. 872, 877 (E.D.Pa.1996). Injunctive relief is " 'an extraordinary remedy' and 'should be granted only in limited circumstances.' " *Kos Pharms., Inc. v. Andrx Corp.,* 369 F.3d 700, 708 (3d Cir. 2004) (quoting *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.,* 42 F.3d 1421, 1427 (3d Cir. 1994)). "The purpose of a preliminary injunction is to preserve the status quo, not to decide the issues on their merits." *Anderson v. Davila,* 125 F.3d 148, 156 (3d Cir. 1997). The decision whether to grant a preliminary injunction is left to the sound discretion of the Court. *See Am. Exp. Travel Related Servs., Inc. v. Sidamon–Eristoff,* 669 F.3d 359, 366 (3d Cir. 2012).

### 2. Standard for Decertification of an Election

The standard for decertifying, or invalidating, an election in the Virgin Islands was articulated in *Bryan v. Todman,* 28 V.I. 42, 1992 V.I. Lexis 19 (Terr. Ct. Dec. 17, 1992), *aff'd* 1993 U.S. Dist. Lexis 21461 (D.V.I. Oct. 29, 1993). The court opined:

No Court should invalidate an election and order a new one unless where there is a finding of fraud or deprivation of rights which would implicate the Constitution of the United States, unless there is a clear statutory provision requiring it. or unless violations of the statutory scheme were pervasive enough to affect or change the result of the election[.] Where irregularities are alleged, the burden of proof is on the plaintiff to show that the irregularities affect or change the result of the election by the questioned votes.

*Id.* at 45 (citations omitted). "Virgin Islands Courts deciding election challenges reflect that invalidating an election should be rare and for the most compelling reasons." *St. Thomas–St. John Board of Elections v. Daniel,* 2007 WL 4901116, at *21 (V.I. Sept. 17, 2007) (Swan, J., dissenting). Justice Swan went on to say that "[t]o invalidate an election, it must be proven by the complaining party that there was substantial non-compliance with election statutes regarding the ballot, and that this has resulted in reasonable doubt that the election reflected the will of the voters." *Id.* at *22 (citing *Beckstrom v. Volusia Cnty. Canvassing Board,* 101 So.2d 720, 725 (Fla. 1998)). "The Court must consider 'the extremely disruptive effect of election invalidation and the havoc it wreaks upon local political continuity.' " *Golden v. Gov't of the V.I.,* 2005 WL 6106401, at *5 (D.V.I. Mar. 1, 2005) (quoting *Soules v. Kauaians Nukolii Campaign Comm.,* 849 F.2d 1176, 1180 (9th Cir. 1988)).

**B. Subject Matter Jurisdiction**

**\*4** Defendants' theory that the Court lacks subject matter jurisdiction over Plaintiffs' Amended Complaint is predicated on alleged deficiencies in Plaintiffs' pleading related to HAVA, a federal statute that concerns federal not local elections. They assert that HAVA "does not permit suit over claims that originate in state elections and that Plaintiffs' bare assertions of HAVA violations are without merit and dismissal of those claims is required." (Dkt. No. 73 at 6). They also allege that Plaintiffs, with the exception of Norma Pickard Samuel, lack standing under HAVA because HAVA applies only to the election of federal officials, not local officials. *Id.*

Defendants' arguments are misplaced. Plaintiffs § 1983 cause of action confers subject matter jurisdiction on this Court pursuant to 28 U.S.C. § 1331. *See Bond v. City of Bethlehem,* 2012 WL 5870870, at *1 (3d Cir. Nov. 21, 2012). Any alleged deficiency in a HAVA claim would not rob the Court of subject matter jurisdiction in this case. [3]

**C. Preliminary Injunction Analysis**

**1. Initial Matters**

As an initial matter, it is important to clarify what relief this Court has the potential to grant, and what relief it does not. Plaintiffs request both decertification of the November 2012 election and that Defendants be enjoined from conducting the January 2013 swearing-in ceremonies of all the candidates. In *Democratic Party of the Virgin Islands v. Bd. of Elections, St. Thomas–St. John,* 649 F.Supp. 1549 (D.V.I. 1986), the district court was asked to enjoin the taking of the oath of office by any person elected to the Legislature. The Court declined to do so because "the Legislature is obviously not a party to this action, and ... because we believe it would unnecessarily impinge upon the authority of the Legislature itself to direct its manner of organization." *Id.* at 1553. The Court cited Section 6(g) of the Revised Organic Act of 1954 as likely applying in that circumstance: "The legislature shall be the sole judge of the elections and qualifications of its members ..." *Id.* at 1554. While *Democratic Party* did not cite the political question doctrine, this is precisely the kind of circumstance where that doctrine would apply: The decision concerning who is appropriately seated as a member of the Legislature is "demonstrably committed to a coordinate political department"—that of the legislative branch. *See Roudebush v. Hartke,* 405 U.S. 15, 19 (1972) ("Which candidate is entitled to be seated in the Senate is, to be sure, a nonjusticiable political question [.]"). Accordingly, this Court lacks jurisdiction to enjoin the swearing in of Legislative candidates.

**\*5** Secondly, it is uncontested that the winning candidate for the Virgin Islands Delegate to Congress has already been sworn in. Therefore, even if this Court had jurisdiction to address a request for injunctive relief to prevent the swearing in of the Congressional candidate, it would be denied as moot.

### 2. Mandatory Injunction

The sole purpose of a preliminary injunction is to preserve the status quo pending a trial on the merits. The status quo is that the winners have been certified but have not yet been sworn in. Thus, preserving the status quo would entail enjoining the swearing in of the certified election winners. However, as indicated above, this Court has no jurisdiction to prevent the Legislature from swearing in the candidates who won the legislative election. The only possible relief the Court could provide, in that regard, would be to decertify the entire election—which would *not* preserve the status quo. This defines a mandatory injunction. *Black's Law Dictionary* (9th ed. 2009) (defining mandatory injunction as "[a]n injunction that orders an affirmative act or mandates a specified course of conduct."). If a party seeks a mandatory relief, "the burden on the moving party is particularly heavy." *Punnett v. Carter,* 621 F.2d 578, 582 (3d Cir. 1980). "Mandatory injunctions should be used sparingly." *United States v. Price,* 688 F.2d 204, 212 (3d Cir. 1982). Thus, Plaintiffs must satisfy an even higher burden to warrant the injunctive relief they seek.

### a. Likelihood of Success on the Merits

In their Amended Complaint, Plaintiffs alleged the deprivation of their Constitutional rights in the most general terms: "Plaintiffs believe defendants have infringed on voters' fundamental right to vote, fair and transparent elections and to equal protection." (Dkt. No. 33, ¶ 48); "Plaintiffs believe that ... they and other candidates and voters, will continue to be disenfranchised or severely burdened in exercising their due process right to have their election concerns ... acknowledged." (*Id.* ¶ 49); "The overall process suggests the Plaintiffs were denied, and continue to be denied, due process ...") (*Id.* ¶ 50). They have also alleged that the denial of their petitions for recount violated 18 V.I.C. §§ 629(b) and (c) and therefore they were denied their due process rights. *Id.* p. 19.

The right to vote is a "fundamental political right." *Yick Wo v. Hopkins,* 118 U.S. 356, 370 (1886). With regard to Plaintiffs' equal protection claim, the Supreme Court "has made clear that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens

in the jurisdiction." *Dunn v. Blumstein,* 405 U.S. 330, 336 (1972). Equal protection applies to the manner in which the franchise is exercised: "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore,* 531 U.S. 98, 104–05 (2000) (citing *Harper v. Va. Bd. of Elections,* 383 U.S. 663, 665 (1966) ("[O]nce the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment."); *cf.Rodgers v. Johnson,* 174 F. App'x 3, 5 (3d Cir. 2006) (opining that, in order to state an equal protection claim, a plaintiff has to assert that "he is being treated differently than other similarly situated persons"); *Congregation Kol Ami v. Abington Twp.,* 309 F.3d 120 136–37 (3d Cir. 2002) (instructing that equal protection analysis requires establishing that plaintiff is similarly situated to other persons, and that there was no rational reason for the differential treatment of similarly situated persons).

**\*6** Plaintiffs' Amended Complaint and the testimony offered at the hearing were bereft of any reference as to how they may have been treated differently than people who were similarly-situated to them in the context of voting—or in any other way. For example, they did not articulate how their right to vote was interfered with or impinged to such an extent that it amounted to a constitutional violation by not participating on an equal basis with other-unnamed—citizens, or how election officials treated them differently from other people. Accordingly, Plaintiffs have failed to show a likelihood of success on the merits of their Equal Protection Clause cause of action. [4]

Plaintiffs have alleged that their due process rights have been violated. "It is well established that the Due Process Clause contains both a procedural and substantive component." *Sidamon–Eristoff,* 669 F.3d at 366. To establish a procedural due process claim, "a plaintiff must demonstrate that '(1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of life, liberty, or property, and (2) the procedures available to him did not provide due process of law.' " *Iles,* 638 F.3d at 173 (quoting *Biliski v. Red Clay Consol. Sch. Dist. Bd. of Educ.,* 574 F.3d 214, 219 (3d Cir. 2009)). To establish a substantive due process claim, a plaintiff must establish that an election was "conducted in a manner that is fundamentally

unfair." *Montgomery Cnty. v. Mitrovote Corp.,* 2000 WL 134708, at \*4 n.3 (E.D. Pa. Feb. 3, 2000); *see also Gonzalez–Cancel v. Partido Nuevo Progresista,* 696 F.3d 115, 119 (1st Cir. 2012) (opining that a substantive due process violation occurs in context of an election where " 'the election process reaches a point of patent and fundamental unfairness' " such as complete disenfranchisement of absentee and shut-in voters, or a municipality's decision not to hold an election at all) (citation omitted).

Plaintiffs allege, in general, that the November 2012 election suffered from certain irregularities—in particular, the fact that the voting machines were not EAC-certified. They conclude that the election was subverted by "fraud, corruption, and mistake" and contend that the public has "diminished trust and confidence in the Election System, its processes, instruments, officials, and vote outcomes." (Dkt. No. 33 at 16). While "[t]he right to vote—to the extent it exists and an individual has been deprived of it—is certainly a protected liberty interest," Plaintiffs have not alleged, nor did they proffer evidence at the hearing, that they were personally deprived of that right, or make any other representation that they suffered a constitutional deprivation of life, liberty or property. *Barefoot v. City of Wilmington, N.C.,* 37 F. App'x 626, 635 n.5 (4th Cir. 2002). The only deprivation they assert is a general lack of confidence in the election system, which simply does not rise to the level of a life, liberty, or property interest protected by the Fourteenth Amendment.

Plaintiffs contend that the procedures available to them—specifically the use of non-EAC certified voting machines in the primary and general elections, and general irregularities and violations of HAVA and local election laws—did not provide due process of law. At the hearing, they provided evidence of a discrepancy in one polling place, from the purview of two poll watchers, and Defendant Wells admitted that the voting machines were not EAC certified. Plaintiffs have alleged that the general election was "deliberate[ly] subvert [ted] by fraud, corruption, and mistake" which prompted their petition for recount. (Dkt. No. 33 at ¶ 45). This allegation, however, does not specify what fraud has taken place. They refer to alleged misrepresentation of the true status of the electronic voting machine certification over the course of the last two years ( *id.* ¶ 28) and have questioned the validity of vote tabulation ( *id.* ¶ 31). But none of these allegations rise to the level of widespread fraud—fundamental unfairness—requiring the invalidation of an election. Plaintiffs have not, for example, even alleged that

voting machine irregularities were so pervasive that they affected the outcome of the election, or would have resulted in their election. *Daniel,* 2007 WL 4901116, at \*21. Cases draw "[a] distinction ... between 'garden variety' election irregularities and pervasive errors that undermine the integrity of the vote." *Bennett v. Yoshina,* 140 F.3d 1218, 1226 (9th Cir. 1998). "Garden variety election irregularities do not generally violate the Due Process Clause, even if they control the outcome of the vote or election." *Id.* Only when election irregularities transcend garden variety problems is the election invalid. *Id. See also Hennings v. Grafton,* 523 F.2d 861, 864 (7th Cir. 1975) (finding "no constitutional violation where irregularities were caused by mechanical or human error and were not due to invidious or fraudulent intent."). Plaintiffs have no constitutional right to have their election concerns and complaints, conveyed in various writings over the course of at least the last two years, "fully and impartially decided." In sum, Plaintiffs have failed to show that they would succeed on the merits of their due process cause of action.

**\*7** In addition, to the extent that Plaintiffs have alleged a § 1983 claim under HAVA, the Court finds that they would not succeed on the merits of such claim. In *Taylor v. Onorato,* 428 F. Supp.2d 384 (W.D. Pa. 2006), the court addressed a § 1983 cause of action where plaintiffs alleged that defendants had violated HAVA and were seeking a preliminary injunction against the use of touch screen voting machines in an upcoming election. Plaintiffs contended that Defendants violated Section 301 of HAVA, which provides that "participating states must ensure that local voting jurisdictions have voting systems in place that comply with certain mandated features for all federal elections taking place after January 1, 2006. 42 U.S.C. § 15481." *Id.* at 386. This appears to be the same section of HAVA that Plaintiffs allege was violated. (Dkt. No. 33 ¶ 20). The *Onorato* Court found that HAVA

> does not provide a private right of action to enforce the mandates of section 301. Plaintiffs contend, however, that section 301 of the Act creates a federal right enforceable against state officials under 42 U.S.C. § 1983. In this regard,

2013 WL 106686

the Supreme Court decision in *Gonzaga University v. Doe,* 536 U.S. 273, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002), is controlling. There, the Supreme Court held that there is no private right of action to enforce this type of statute unless Congress, in a clear voice and unambiguously, confers a right to a private cause of action. *Id.* at 280, 122 S.Ct. 2268. Nowhere in section 301 or elsewhere in the Act, does Congress indicate an intention that section 301 may be enforced by private individuals.

*Id.* The court further explained that

a private right of action will only be recognized for violations of federal rights not simply federal laws. Here, section 301 does not grant any private rights to an identifiable class of people. Rather, section 301 imposes an obligation on the states and local jurisdictions to put in place a voting system that meets certain criteria. The voters as a whole may benefit from the mandates of section 301. That is insufficient, however, to create a federal "right" as that term is defined by the Supreme Court.

*Id.* at 387. This Court agrees with the *Onorato* Court's analysis that there is no private remedy for a violation of Section 301 of HAVA. Consequently, Plaintiffs' § 1983 cause of action, to the extent it is based on a violation of HAVA, has no likelihood of success on the merits.

Finally, Plaintiffs have alleged violations of some local election laws. Specifically, they contend that Defendants did not report their correspondence and challenges regarding the 2012 primary and general election to the Attorney General's Office, as required under 18 V.I.C. § 47(8), (Dkt. No. 33, ¶ 32); and that Defendants failed to establish a quorum at a special meeting convened to discuss Plaintiffs' petitions and decide the recount issue, as required under 18 V.I.C. §§ 629(b) and (c). (*Id.* ¶ 46). They do not explain how Defendants' alleged violations of the provisions of 18 V.I.C. § 47(8), which concerns the Board of Election's duty to "investigate election frauds, irregularities and violations of this title, and report all suspicious circumstances to the Virgin Islands Department of Justice for possible prosecution", or 18 V.I.C. § 629(b) and (c), which concern the Board of Elections' procedures for a recount, violate their constitutional rights. *See Hennings,* 523 F.3d at 864 ("It is not every election irregularity, however, which will give rise to a constitutional claim and an action under section 1983. Mere violation of a state statute by an election official, for example, will not. *See Snowden v. Hughes,* 321 U.S. 1, 11 (1944))." *See also Moultrie v. S.C. Election Comm'n,* 2007 WL 445383, at *7 (D.S.C. Feb. 6, 2007) (noting that what was alleged, al most, constituted a violation of state election laws, through non-enforcement, not a violation of federal law, and granting summary judgment to defendants; *Bryan,* 1993 U.S. Dist. Lexis 21461, at *16–17, 20 (commenting that " 'election laws are, as a general rule, considered to be merely directory, even though mandatory in form' " and noting that even where actual irregularities existed and were numerous, if they were "not of a character as to cast doubt upon the outcome of the vote, [they were] not sufficiently substantial to warrant nullification of the election.").

**\*8** The Court concludes that Plaintiffs cannot meet their burden of demonstrating that they are likely to succeed on the merits of their Equal Protection and Due Process Clause claims, their HAVA claims, or any local law claims in their § 1983 case. Their "failure to show a likelihood of success on the merits 'must necessarily result in the denial of a preliminary injunction.' " *Sidamon–Eristoff,* 669 F.3d at 366 (quoting *In re Arthur Treacher's Franchisee Litig.,* 689 F.2d 1137, 1143 (3d Cir. 1982)).

### b. Irreparable Harm

Although the Court denies Plaintiff's petition for a preliminary injunction because they have not demonstrated a likelihood of success on the merits, it will briefly discuss the irreparable harm factor. Defendants assert, in passing, that "the election process may have been deliberately left open to compromise and vulnerabilities exploited, thus

yielding disbelievable vote outcomes and irreparably harming plaintiffs ..." (Dkt. No. 33, ¶ 50). This allegation of irreparable harm is based on systemic allegations of a compromised voting system, but Plaintiffs do not elucidate how *they* were irreparably harmed, or how such harm is imminent. See *Chester ex rel. NLRB v. Grane Healthcare Co.,* 666 F.3d 87, 89 (3d Cir. 2011) (observing that the threat of irreparable harm must be "imminent."). They do not allege, for example, that but for the operation of the voting machines or some miscounting of the votes, or but for the various responses or non-responses of Defendants to their concerns, they would have been elected, or they were otherwise injured, and why whatever their injury is would be addressed by decertifying the election results. *See* ▯ *Golden,* 2005 WL 6106401 at *3. At the hearing, they did not proffer any evidence that would tend to show that they would suffer immediate irreparable harm.

In addition, the timing of Plaintiffs' lawsuit deserves attention here. The Amended Complaint contains allegations that: (1) it was known since February 2013 that the voting machines were not certified by EAC (Dkt. No. 33, ¶ 28(d)); (2) problems with "voting machine testing .... confusing ballot design and prolonged counting of paper ballots" had been reported by a local newspaper as early as the 2012 primary election cycle, ▯ *id.* ¶ 29; and (3) certain Plaintiffs sent letters critical of voting machine testing and use in October and early November 2012, *id.* ¶¶ 39–42. However, Plaintiffs' original complaint was not filed until December 11, 2012, and the Amended Complaint, containing their application for a temporary restraining order and preliminary injunction, was not filed until December 21, 2012—after the election results were certified.

Preliminary injunctions are "generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action." ▯ *Citibank, N.A. v. Citytrust,* 756 F.2d 273, 276 (2d Cir. 1985). Plaintiffs did not explain why they waited until the eleventh hour to file their request for a TRO and preliminary injunction in which they seek to undo an election. The timing of their filing their lawsuit confirms

that they will not suffer any irreparable harm. *See Soules,* 849 F.2d at, 1180 (taking equitable considerations such as laches into account in fashioning an appropriate remedy in a ▯ § 1983 elections case and noting that "the courts have been wary lest the granting of post-election relief encourage relief on the part of wily plaintiffs. As the Fourth Circuit put it, the 'failure to require pre-election adjudication would permit, if not encourage, parties who could raise a claim to lay by and gamble upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in a court action.' ") (quoting *Hendon v. N.C. State Bd. of Elections,* 710 F.2d 177, 182 (4th Cir. 1983)).

**\*9** In sum, Plaintiffs have not met their burden of showing a likelihood of success on the merits, nor have they shown irreparable harm, to warrant this Court granting their petition for a preliminary injunction. Neither have they met their burden for a mandatory injunction. This is not the kind of case warranting an "extraordinary remedy." ▯ *Kos Pharms., Inc.,* 369 F.3d at 708. The Court will exercise its discretion and will deny Plaintiffs' petition for a preliminary injunction.

### D. Defendants' Motion to Dismiss

Defendants converted their "Brief in Response to January 2, 201[3], Court Order Scheduling a Preliminary Injunction Hearing" into a motion to dismiss. (Dkt. No. 73). In this filing, Defendants focused on Plaintiffs' HAVA claim; they did not address the constitutional issues associated with Plaintiffs' ▯ § 1983 cause of action. Accordingly, the Court denies Defendants' motion to dismiss.

### CONCLUSION

For the foregoing reasons, Plaintiff Motion for a Preliminary Injunction is denied. The Court also denies Defendants' motion to dismiss.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 106686

## Footnotes

1    The Court originally issued an Order denying Plaintiffs' petition for a temporary restraining order on December 28, 2012 (Dkt. No. 50), and issued the Amended Order to correct an oversight in a footnote contained in the original Order. (Dkt. No. 69 n.1).

2    At the January 4, 2013 hearing, the Court learned that the Virgin Islands Delegate to Congress had already been sworn in; that the successful candidates for the Virgin Islands Legislature will be sworn in on January 14, 2013, the successful candidates for the St. Croix and St. Thomas–St. John Board of Elections will be sworn in on January 11, 2013, and the successful candidates for the St. Croix Board of Education will be sworn in on January 7, 2013.

3    In any event, Defendants point to nothing in the HAVA statute that defines a court's subject matter jurisdiction over questions related to it *See* *United States v. Weatherspoon,* 696 F.3d 416, 421 (3d Cir. 2012) ("Indeed, as only Congress may define a court's subject-matter jurisdiction, 'limits on the reach of federal statutes, even nontemporal ones, are only jurisdictional if Congress says so: when Congress does not rank a statutory limitation as jurisdictional, courts should treat the restriction as nonjurisdictional in character.' ") (quoting *Bowles v. Russell,* 551 U.S. 205, 127 S.Ct. 2360, 2368 (2007)). Instead, Defendants appear to contest whether Plaintiffs have stated a cognizable claim under HAVA by claiming that Plaintiffs' assertions of HAVA violations are without merit, requiring dismissal. They are not debating whether the Court has the jurisdiction to address causes of action under HAVA. Even a failure to allege statutory standing is analyzed in the context of failure to state a claim rather than lack of subject matter jurisdiction. *See In re Century Aluminum Co. Sec. Litig.,* __ F.3d __, 2013 WL 11887, at *4 (9th Cir. Jan. 2, 2013) ("Failure to allege statutory standing results in failure to state a claim on which relief can be granted, not the absence of subject matter jurisdiction.") (citing cases).

4    In their Amended Complaint, Plaintiffs also referred to the Voting Rights Act of 1965, 42 U.S.C. § 1973j, as "prohibiting discrimination based on a potential voter's race, or on ethnic factors [.]" (Dkt. No. 33, ¶ 23). Plaintiffs have not alleged, however, that they have suffered any discrimination during the course of the election, nor did they present evidence in that regard at the hearing.

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.