1                IN THE UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2
   DONALD J. TRUMP FOR              :
3  PRESIDENT, INC., et al.,         :    Civil Action
                    Plaintiffs      :    No. 4:20-CV-02078
4                                   :
              vs.                   :
5                                   :    (Judge Brann)
   KATHY BOOCKVAR, et al.,          :
6                    Defendants     :
                                    :
7  NAACP-PENNSYLVANIA STATE         :
   CONFERENCE, et al.,              :
8        Intervenor Defendants      :
                                    :
9  DNC SERVICES CORPORATION/        :
   DEMOCRATIC NATIONAL COMMITTEE,   :
10       Intervenor Defendant       :

11

12           TRANSCRIPT OF ORAL ARGUMENT PROCEEDINGS
                 IN RE:  MOTION TO DISMISS
13
             BEFORE THE HONORABLE MATTHEW W. BRANN
14            UNITED STATES DISTRICT COURT JUDGE
                 NOVEMBER 17, 2020; 1:30 P.M.
15                WILLIAMSPORT, PENNSYLVANIA

16

17

18

19

20

21                      Lori A. Shuey
              Federal Certified Realtime Reporter
22                United States Courthouse
              228 Walnut Street, P.O. Box 983
23               Harrisburg, PA  17108-0983
                      717-215-1270
24            lori_shuey@pamd.uscourts.gov
    Proceedings recorded by mechanical stenography; transcript
25          produced by computer-aided transcription.

```
 1                              APPEARANCES

 2

     COUNSEL FOR PLAINTIFFS:
 3
          Rudolph W. Giuliani, Esquire
 4        Giuliani Partners, LLC
          445 Park Avenue, 18th Floor
 5        New York, NY  10022

 6        Linda A. Kerns, Esquire
          Law Offices of Linda A. Kerns, LLC
 7        1420 Locust Street, Suite 200
          Philadelphia, PA  19102
 8
          Marc A. Scaringi, Esquire
 9        Brian C. Caffrey, Esquire
          Scaringi Law
10        2000 Linglestown Road, Suite 106
          Harrisburg, PA  17110
11
     COUNSEL FOR DEFENDANT KATHY BOOCKVAR:
12
          Daniel T. Donovan, Esquire
13        Michael A. Glick, Esquire
          Kirkland & Ellis, LLP
14        1301 Pennsylvania Avenue, N.W.
          Washington, D.C.  20004
15
          Daniel T. Brier, Esquire
16        Myers, Brier & Kelly, LLP
          425 Spruce Street, Suite 200
17        Scranton, PA  18503

18        Keli M. Neary, Exec. Deputy Attorney General (via Webex)
          Pennsylvania Office of Attorney General
19        Civil Law Division
          Strawberry Square, 15th Floor
20        Harrisburg, PA  17120

21

22

23

24

25
```

```
 1                      APPEARANCES (cont'd.)

 2

    COUNSEL FOR DEFENDANTS ALLEGHENY, CHESTER, MONTGOMERY &
 3  PHILADELPHIA COUNTIES:

 4       Mark A. Aronchick, Esquire (via Webex)
         Michele D. Hangley, Esquire
 5       Hangley, Aronchick, Segal, Pudlin & Schiller
         One Logan Square, 27th Floor
 6       Philadelphia, PA  19103

 7       Andrew F. Szefi, Esquire (via Webex)
         Allegheny County Law Department
 8       445 Fort Pitt Boulevard, Suite 300
         Pittsburgh, PA  15219
 9
    COUNSEL FOR DEFENDANT CENTRE COUNTY:
10
         Elizabeth A. Dupuis, Esquire
11       Babst, Calland, Clements and Zomnir, P.C.
         330 Innovation Boulevard, Suite 302
12       State College, PA  16803

13       Molly E. Meacham, Esquire
         Babst, Calland, Clements and Zomnir, P.C.
14       Two Gateway Center
         603 Stanwix Street, 6th Floor
15       Pittsburgh, PA  15222

16  COUNSEL FOR DEFENDANT DELAWARE COUNTY:

17       Terence M. Grugan, Esquire
         Edward D. Rogers, Esquire (via Webex)
18       Ballard Spahr, LLP
         1735 Market Street, 51st Floor
19       Philadelphia, PA  19103

20  COUNSEL FOR DEFENDANT NORTHAMPTON COUNTY:

21       Timothy P. Brennan, Esquire (via Webex)
         County of Northampton
22       669 Washington Street
         Easton, PA  18042
23
         Brian J. Taylor, Esquire (via Webex)
24       King, Spry, Herman, Freund & Faul, LLC
         One West Broad Street, Suite 700
25       Bethlehem, PA  18018
```

```
1                    APPEARANCES (cont'd.)

2

   COUNSEL FOR INTERVENOR DEFENDANTS NAACP-PSC, COMMON CAUSE PA,
3  LEAGUE OF WOMEN VOTERS OF PA, BLACK POLITICAL EMPOWERMENT
   PROJECT, GAJDA, HIGGINS, LARA, MORALES, PRICE, STOVER, AYENI &
4  STEVENS:

5       Witold J. Walczak, Esquire
        American Civil Liberties Union of PA
6       P.O. Box 23058
        Pittsburgh, PA  15222
7
        David M. Zionts, Esquire
8       Covington & Burling, LLP
        One City Center
9       850 Tenth Street, N.W.
        Washington, D.C.  20001
10
        Benjamin D. Geffen, Esquire
11      The Public Interest Law Center
        2 Penn Center
12      1500 John F. Kennedy Boulevard, Suite 802
        Philadelphia, PA  19102
13
   COUNSEL FOR INTERVENOR DEFENDANT DEMOCRATIC NATIONAL COMMITTEE:
14
        Uzoma Nkwonta, Esquire
15      Marc E. Elias, Esquire
        Perkins Coie, LLP
16      700 13th Street, N.W., Suite 600
        Washington, D.C.  20005
17
        Clifford B. Levine, Esquire
18      Dentons, Cohen & Grigsby, P.C.
        625 Liberty Avenue, 5th Floor
19      Pittsburgh, PA  15222

20      Ari Holtzblatt, Esquire
        Seth P. Waxman, Esquire (via Webex)
21      Wilmer Hale
        1875 Pennsylvania Avenue, N.W.
22      Washington, D.C.  20006

23

24

25
```

```
1                          I N D E X
2
3                                                        PAGE
4    Argument by Mr. Giuliani                             14
5    Argument By Mr. Donovan                              33
6    Argument By Mr. Aronchick                            66
7    Argument by Ms. Dupuis                               93
8    Argument By Mr. Nkwonta                              95
9    Argument By Mr. Zionts                              100
10   Questions by The Court                              106
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1          *THE COURT:*  The matter before the court this afternoon

2    is that of Donald J. Trump for President, Incorporated, at al.,

3    against Kathy Boockvar, et al., docketed in this court at Civil

4    Number 4:20-CV-2078.

5          I have the list of the many counsel present, but just

6    to confirm this for the court, we'll start with plaintiffs'

7    counsel, if you could identify yourselves for the record,

8    please.  Mr. Giuliani, we'll start with you.

9          *MR. GIULIANI:*  Rudolph W. Giuliani.  I represent the

10   plaintiffs in this case but need to be admitted pro hac vice

11   with Your Honor's permission.

12         *COURTROOM DEPUTY:*  It's been done.

13         *THE COURT:*  My staff confirms that's done.

14         *MR. GIULIANI:*  Thank you, Your Honor.

15         *THE COURT:*  You're a member of the bar of New York?

16         *MR. GIULIANI:*  I am, yes, sir.

17         *THE COURT:*  And at least one federal court?

18         *MR. GIULIANI:*  Yes, sir.

19         *THE COURT:*  You're good to go.

20         *MR. GIULIANI:*  May I take this off when I speak?

21         *THE COURT:*  Well, that's your choice.  I have mine off

22   because I'm doing some speaking, and it's easiest for me to

23   hear and I think it's easiest for the court reporter to hear if

24   you take your mask off when you're speaking.

25         *MR. GIULIANI:*  It also doesn't fog up my glasses.

```
1              THE COURT:  Well, that's the same -- I have the same
2      issue, so I understand that.  All right.  Is this Ms. Kerns?
3              MS. KERNS:  Yes, Your Honor.
4              THE COURT:  Identify yourself, please.
5              MS. KERNS:  Good afternoon, Your Honor.  Linda Kerns,
6      K-e-r-n-s, for the plaintiffs, Donald J. Trump for President,
7      Incorporated, David Henry, and Lawrence Roberts.
8              THE COURT:  Very good.  Thank you.  Mr. Scaringi.
9              MR. SCARINGI:  Yes, good afternoon, Your Honor.  Marc
10     Scaringi from my law firm Scaringi Law for the plaintiffs.
11             THE COURT:  Very good.  And?
12             MR. CAFFREY:  Good afternoon, Your Honor.  Brian C.
13     Caffrey from Scaringi Law for the plaintiffs.
14             THE COURT:  Very good.  Anyone else here for the
15     plaintiffs?  All right.  Thank you.  Mr. Donovan.
16             MR. DONOVAN:  Good afternoon, Your Honor.  Daniel
17     Donovan for the Secretary, Kathy Boockvar.
18             THE COURT:  Thank you.  Mr. Brier.
19             MR. BRIER:  Yes, good afternoon, Your Honor.  Dan
20     Brier on behalf of the Secretary, as well.
21             THE COURT:  Thank you.  And you're Mr. --
22             MR. GLICK:  Glick, Michael Glick on behalf of
23     Secretary Boockvar.
24             THE COURT:  Are you with Kirkland and Ellis?
25             MR. GLICK:  I am, Your Honor.
```

1          THE COURT:  Thank you, sir.  And then in the next row

2     back, it's not Mr. Rogers.  I think it's Mr. Rogers' partner.

3     Is that right?

4          MR. GRUGAN:  That's right, Your Honor.

5          THE COURT:  And you are?

6          MR. GRUGAN:  Terence Grugan here for Delaware County.

7          THE COURT:  Right.  You're with Ballard Spahr?

8          MR. GRUGAN:  Yes, sir.

9          THE COURT:  Very good, sir.  And next to you?

10          MS. HANGLEY:  Good afternoon, Your Honor.  Michele

11     Hangley from Hangley, Aronchick, Segal, Pudlin and Schiller for

12     Allegheny, Chester, Montgomery, and Philadelphia Counties.

13          THE COURT:  And Mr. Aronchick, I think, is with us

14     virtually.  Is that right, Mr. Aronchick?

15          MR. ARONCHICK:  Yes, it is.  I am here for the same

16     clients.  Thank you.

17          THE COURT:  Very good, sir.  Thank you.  And who is

18     behind you, the next gentleman?  Yes, you, sir.

19          MR. NKWONTA:  Good afternoon, Your Honor, Uzoma

20     Nkwonta from Perkins Coie on behalf of the DNC.

21          THE COURT:  Thank you, sir.  And to your left?

22          MR. HOLTZBLATT:  Ari Holtzblatt of the firm Wilmer

23     Hale on behalf of the DNC, Your Honor.

24          THE COURT:  Thank you.  Next gentleman.

25          MR. LEVINE:  Your Honor, Clifford Levine.  I'm here

1    for the DNC, Dentons, Cohen and Grigsby.

2              THE COURT:  Right.  Very good, sir.  And then behind

3    you, Mr. Walczak.

4              MR. WALCZAK:  Good afternoon, Your Honor.  Wit Walczak

5    from the ACLU of Pennsylvania on behalf of NAACP, Common Cause

6    Pennsylvania, League of Women Voters Pennsylvania, Black

7    Political Empowerment Project, and individual intervenors.

8              THE COURT:  Thank you, sir.  And to your left?  It's

9    Mr. Geffen, isn't it?  All right.

10             MR. GEFFEN:  Good afternoon, Your Honor, Benjamin

11   Geffen from the Public Interest Law Center in Philadelphia on

12   behalf of the same voter intervenors.

13             THE COURT:  Thank you.  And to your left?

14             MR. ZIONTS:  Good afternoon, Your Honor.  David Zionts

15   from Covington and Burling on behalf of the voter intervenors.

16             THE COURT:  Thank you.  And then I think in the back,

17   is it Ms. Dupuis?

18             MS. DUPUIS:  Yes, Your Honor, on behalf of Centre

19   County, and I believe my partner, Molly Meacham, is also on the

20   phone.  Thank you.

21             THE COURT:  Ms. Meacham, you're with us virtually?

22             MS. MEACHAM:  That's correct, Your Honor.

23             THE COURT:  Or telephonically.

24             MS. MEACHAM:  Yes, Your Honor.

25             THE COURT:  One way or the other, I guess.  Oh, you're

1    here.  Very good, Ms. Meacham.  Thank you.  Is there anyone

2    else who is here -- we have some people in the back who I don't

3    know.  Who are these other individuals in the back?  Are you

4    presenting or just dropped by?

5         MR. MARKS:  Your Honor, my name is Bruce Marks.  I

6    have not formally been engaged by the plaintiffs yet, but I

7    have been assisting in the preparation.

8         THE COURT:  All right.  Thank you.

9         MR. MARKS:  I'm an attorney.

10        THE COURT:  Yes, I'm familiar with you, Mr. Marks, at

11   least by reputation.  Anyone else?

12        MR. EPSHTEYN:  Your Honor, Boris Epshteyn with the

13   Trump Campaign as an adviser, not as an attorney.

14        THE COURT:  All right.  Is there anyone else here,

15   whether you're an attorney or not, who is going to be

16   presenting on behalf of either the plaintiffs or any of the

17   defendants who would want to be identified for the record?

18        My court reporter, Ms. Shuey, probably would

19   appreciate receiving business cards from any of you at the

20   conclusion of our argument today just for the purpose of

21   getting spellings of names, firms, et cetera, who you're with.

22   And to the extent that a transcript would later need to be

23   produced, you can make those arrangements with her.

24        So before you depart the premises -- she will have, of

25   course, the docket sheet, but I think there are some -- maybe

```
1    some late arrivals who may not be immediately on the docket

2    sheet.  It would be beneficial at the conclusion of the hearing

3    if you'd just pause a moment.  She would appreciate that, I

4    think.  Would you not, Lori?  She says she would.  All right.

5              So we're here to conduct an oral argument on the

6    defendants' motion to dismiss that was filed on both

7    November 15 and November 16, 2020.

8              Before we begin, I need some clarification, I think,

9    as to how the defendants would like to proceed.  It's the

10   court's preference that the attorney or attorneys for one of

11   the defendants present the general defense on behalf of all

12   defendants, and then, if it is necessary, attorneys for the

13   remaining defendants may raise any factual or legal issues that

14   are specific as to that particular defendant.

15             Do we agree, defense counsel, that would be the best

16   way to proceed?  Mr. Donovan?

17             MR. DONOVAN:  Yes.  Good afternoon, Your Honor.  I'm

18   going to take the lead and present the arguments, Mr. Aronchick

19   is going to do abstention, and then if any other lawyers have

20   any other points, we've tried to coordinate that.

21             THE COURT:  Right, I assumed you did.  And we'll do a

22   little round robin then at the end of that --

23             MR. DONOVAN:  That's great.

24             THE COURT:  -- to make sure everyone, everyone's been

25   acknowledged.  Don't feel the need to speak if it's been
```

1    covered.  All right.  So I don't think I need an opening

2    statement, but I'll give you the opportunity to make one.  I've

3    read everything that has -- I've read everything that's been

4    docketed.

5          There are a couple of ministerial, what I would

6    describe as ministerial issues that I want to take up at the

7    end.  You can reasonably anticipate what those issues would be.

8    I'm really here for the main event and -- primarily.

9          So let me just make sure, before I get opening

10   statements, if counsel wish to provide them, to clarify a few

11   items to make sure that we're all on the same page.  I think we

12   are or can be.

13         The plaintiffs' amended complaint, which was filed

14   this past Sunday, November 15, 2020, has essentially removed

15   several counts from the plaintiffs' original complaint.  As I

16   understand now, the only two remaining counts are for alleged

17   violations of the Equal Protection Clause of the Fourteenth

18   Amendment and the Elections and Electors Clause.

19         Am I correct?  Who would like to speak for the

20   plaintiffs on that point?  Mr. Mayor?

21         *MR. GIULIANI:*  I would, Your Honor, yes.

22         *THE COURT:*  Go ahead.

23         *MR. GIULIANI:*  That's correct.

24         *THE COURT:*  All right.  Thank you.  And do the

25   plaintiffs agree that after the United States Court of Appeals

1    for the Third Circuit's opinion at the end of last week in the

2    matter of Bognet versus the Secretary of the Commonwealth, that

3    the plaintiffs cannot assert standing in this circuit to raise

4    their Elections and Electors Clause claims?

5         MR. GIULIANI:  Yes, Your Honor.  The only

6    clarification is that we are going to seek leave, we've already

7    prepared it, to amend this complaint to restore our due process

8    claim, which we think was mistakenly removed.

9         THE COURT:  Well --

10        MR. GIULIANI:  But we're not -- but we are

11   withdrawing -- we're preserving for appeal the Elector and the

12   Elections Clause, but we will not be proceeding on that.

13        THE COURT:  All right.  Well, that is one of the --

14   I'm going to describe as ministerial issues that I'd like to

15   talk about --

16        MR. GIULIANI:  Thank you, Your Honor.

17        THE COURT:  -- at the end of the oral argument.

18        MR. GIULIANI:  Thank you.

19        THE COURT:  I'm going to circle back to you then.

20   Remind me of that.  I assumed that was an issue.  We'll attend

21   to that issue about a further amendment of the complaint at

22   that point.

23        MR. GIULIANI:  Thank you.

24        THE COURT:  All right.  So the only outstanding claim

25   really before this court at this point is the equal protection

1    claim.  Do you agree?

2            *MR. GIULIANI:*  Right now, Your Honor, yes.

3            *THE COURT:*  Mr. Donovan, speaking for your collective

4    defendants, do you think you'd agree?

5            *MR. DONOVAN:*  Agree, Your Honor.

6            *MR. GIULIANI:*  Yes, Your Honor.

7            *THE COURT:*  All right.  The plaintiffs bear the burden

8    of proof, so I'll ask them to present first.  Mr. Giuliani, go

9    right ahead.

10           *MR. GIULIANI:*  Your Honor, would you like me to remain

11   here or there?

12           *THE COURT:*  Is it easiest for counsel to speak at

13   counsel table?

14           *MR. GIULIANI:*  Sure, either way.

15           *THE COURT:*  That's fine with me.

16           *MR. DONOVAN:*  That's fine, Your Honor.

17           *THE COURT:*  If you need to use the podium, you're

18   certainly welcome to do that.  We've just found in the course

19   of this pandemic that many times the attorneys prefer to just

20   remain seated at counsel table.  It's not my general

21   preference, but I understand.  And so if you'd like to speak

22   and it's easier for you to do that, stay right at counsel

23   tables.

24           *MR. GIULIANI:*  Thank you, Your Honor.  May it please

25   the court, my name is Rudolph Giuliani, and I'm here on behalf

1    of the plaintiffs.  I thank the court very much for allowing me

2    to be admitted pro hac vice.

3              Your Honor, the best description of what we're

4    alleging -- and, again, on a motion to dismiss, our allegations

5    have to be deemed to be accurate and true.  Of course, that's

6    subject to testing during the hearing.  But the best

7    description of this situation is, it's widespread, nationwide

8    voter fraud of which this is a part.  And that's probably the

9    reason I'm here, Your Honor, because this is not an isolated

10   case, it's a case that is repeated in at least ten other

11   jurisdictions.

12             It seems to me, in the words of Emanuel, not the

13   prophet, Rahm Emanuel, this is one of those situations where

14   you never let a serious crisis go to waste.  It's an

15   opportunity to do things you think you could not do before.

16             Specifically, the crisis was the pandemic that was

17   taking place, the opportunity to do something that had been

18   resisted for two decades, which is to create a wide-scale, open

19   mail-in ballot process, which we had been warned about by none

20   other than Jimmy Carter and James Baker in a report they did in

21   2006, I believe, on election reform.  And in it, they very,

22   very seriously warn us, quote, mail-in balloting is the largest

23   source of voter fraud.

24             And I don't think there's any dispute about that,

25   mail-in balloting is exceedingly dangerous and can much more

1    easily be used to effectuate a voter fraud, a deliberate voter

2    fraud.  And we believe that in this case, we're going to prove

3    that former President Carter and former Secretary Baker were

4    prophets.

5           This mail-in system, this new mail-in system, which,

6    as I said, President Carter warned against, Justice Souter

7    warned against it, even The New York Times wrote articles

8    explaining how dangerous this was.  They've since changed their

9    position.

10          And this whole situation, on a smaller scale, goes

11   back to as early as 1960 when Mayor Daley held back votes in

12   Chicago so that he could tidy up the result to make sure it

13   came out the way he wanted.  Or you can go to 2018 in Florida

14   in the governor's election and the senate election, the votes

15   from Palm Beach County and Broward County were withheld for ten

16   days to see if they could catch up until a group of ballots

17   were found heading from Jacksonville to Palm Beach that

18   appeared to be fraudulent ballots.  And the election came to an

19   end, and Florida reformed its system so we didn't have that

20   happen again this year.

21          Well, this practice of holding back votes, which

22   happens in my city also, Your Honor, is a time-honored practice

23   that's done in the big cities, particularly the corrupt big

24   cities in our country.  All of the sudden, we now have -- it's

25   almost like, you know, putting them in a candy store.  We now

1    have a wonderful opportunity to hold back votes, even to

2    produce votes after the election to make up a deficit.

3            So what happened?  In 2016, in this state, in the

4    Commonwealth, there were only 266,000 absentee ballots, this

5    year, so far, 2.6 million.  That's a totally different world.

6    And the number of -- and the allegations that we're talking

7    about take place in each one of these counties, but the

8    principal ones are in Philadelphia and in Allegheny, both of

9    them Democrat machines, controlled by Democrats, in the case of

10   Philadelphia, 60 years, well known for voter fraud.

11           I don't know, if you kept a list of all the voter

12   fraud convictions in Philadelphia, I don't know if it would

13   exceed Chicago or not.  And just this year a judge pled guilty

14   to voter fraud, and Congressman Ozzie Myers has been indicted

15   for it.  And I could go on and on.

16           Relevant to this case, Philadelphia and Pittsburgh we

17   used in this state.  Just a little bit to the west, Detroit,

18   similar allegations, Milwaukee, similar allegations, meaning

19   all of the sudden, for the first time ever, that I've ever

20   heard of, inspectors, watchers, observers, they're called

21   different things in different states, weren't allowed to

22   observe the counting of absentee ballots.

23           Never heard of that happening.  I've never heard of an

24   inspector being kept out of an absentee ballot counting,

25   because that's the only time that you can assure the validity

1   of the ballot, because the minute they're separated, the ballot

2   goes off anonymous and it's lost forever.  You can never link

3   it to the certifying paper.  And things could be wrong with it,

4   but you can't figure out which vote to cancel.  So that's why

5   so much emphasis is put on the inspection process before this

6   became a major way of voting.

7          That ability to inspect now becomes critical.  It is

8   our only way to assure that this new form of voting, which has

9   been widely criticized as open to massive fraud, can be at all

10  policed.  And it has been not violated in this case, it's been

11  trashed.  It's been stepped all over.  It's been disregarded

12  here and in ten other places in an eerily similar pattern.

13         And also, in the places it happens, they just all

14  happen to be big cities controlled by Democrats who, all of the

15  sudden, have decided that you don't have a right to inspect an

16  absentee ballot.  Fifty states have this rule.  I don't

17  remember this problem ever existing before.

18         The point is, Your Honor, this is not an accident.

19  You'd have to be a fool to think this was an accident.  You'd

20  have to be a fool to think that somebody woke up in

21  Philadelphia and in Pittsburgh and in Milwaukee and in Detroit

22  and in Phoenix and all the way in Las Vegas and then way back

23  in Atlanta and they decided, oh, we're going to shut out all

24  the Republicans today, we're not going to let them see a single

25  absentee ballot.

1                 And they also did it with very similar devices,

2       like -- and I can give the court and co-counsel these pictures,

3       like all these fences they put up.  The witnesses will describe

4       them as corrals or cages.  They must have had a subcontract

5       with a major company to get all of them in all these places.

6                 So the point that I'm making, Your Honor, is, this is

7       not an isolated case, peculiar just to Pittsburgh,

8       Philadelphia, or the Commonwealth of Pennsylvania.  This

9       happened in at least ten other jurisdictions at precisely the

10      same time.

11                Let me get to the individual plaintiffs because in

12      many ways what happened to them is totally outrageous.

13      Mr. Roberts -- I'm sorry, Mr. Henry, who is in Lancaster

14      County, voted by absentee ballot.  I believe he made a mistake

15      in his vote for absentee ballot, a critical mistake, usually,

16      under your law, which is he failed to insert the ballot in the

17      secrecy envelope.

18                So the ballot looks something like this.  I used to

19      vote by absentee ballot a lot because I traveled a lot.  And

20      you're supposed to put it in an inner envelope.  Outer envelope

21      has all the information we need to see.  And I've been in these

22      contests myself in New York.  They're kind of like wrestling

23      matches.

24                And instead of doing it this way, he unfortunately

25      just put the ballot in without the -- they call it the secure

1    envelope so that his vote can remain anonymous.  So it came in.
2    When they opened it, they quite properly disregarded the ballot
3    because your law is quite strict about that, as it should be,
4    because, again, this is the only way to secure the validity of
5    these votes.  His vote was discarded.
6          Very similarly the same thing happened to Mr. Roberts.
7    However, in Philadelphia, in Pittsburgh, Allegheny County, in
8    the other counties, with the encouragement of the Secretary of
9    State, they were told to disregard, to disregard that, and they
10   were allowed to cure.  They informed people that there was
11   something wrong with their entry.
12         And, again, they're quite strict.  If you leave
13   out your -- in New York, we call it an assembly district.  I'm
14   not certain how you do it here.  But you've got to have your
15   assembly district, you've got to have your precinct number, you
16   have to have your voter ID number, address, and you need to
17   sign it.  Any one of those things are missing, the ballot is
18   tossed, any one.
19         Now, in the case of Mr. Henry and Mr. Roberts, they
20   had made mistakes.  They were given no opportunity to cure,
21   thousands, thousands of people.  And since we haven't had
22   discovery yet, we don't know how many.  It could be hundreds of
23   thousands of people.
24         In a certain part of the state, let's call it the more
25   Democrat part of the state, were given a very, very fulsome

1    opportunity to cure.  And we have many cases of their being

2    told, oh, you made a mistake, redo it.  You made a mistake, you

3    didn't sign your full name.  You made a mistake, you didn't put

4    the address in.

5          Your Honor, that's a classic violation of equal

6    protection.  I have no idea what their standing objection is.

7    That is exactly Bush v. Gore, exactly.  If you were teaching a

8    law school class and you wanted to give an example of a Bush v.

9    Gore violation, you could use this as an example.  They are

10   being discriminated based on their location.

11         In one part of the state, you can cure the ballot.  In

12   the other part of the state, you can't cure the ballot, which

13   means they would deny their right to vote.  I don't know what's

14   more serious than being denied your right to vote in a

15   democracy.  And, therefore, how they can object to standing is

16   almost frivolous, Your Honor.

17         Now, let's get to the campaign.  Unlike Bognet, which

18   is the case that, you know, has caused a repleading of the

19   pleadings, we're totally different than Bognet.  Bognet was a

20   harm that might possibly happen in the future.  It was

21   inchoate.  It hadn't happened.  This is a harm that has

22   happened.  Mr. Henry and Mr. Roberts have been denied their

23   right to vote.  Their votes have been canceled.

24         The Trump Campaign has been treated totally

25   differently than the Bush Campaign.  It depends on where you

1    are in the state.  The rest of the state complied with the law

2    and allowed observers.  We have no complaints from the

3    Republican or neutral part of the state about this happening.

4            The only place we have it happening en masse is in the

5    Democrat -- heavily controlled counties that you can call

6    counties controlled by a Democratic machine that have quite an

7    impressive list of voter fraud convictions as part of their

8    history and tradition.  And all of the sudden, with this

9    greater opportunity to do it, they did it on a grand scale.

10           So I don't understand what the standing argument is.

11   I don't understand how the President of the United States, the

12   campaign, doesn't have standing to assert, if we're right,

13   which we have to assume here, that we were treated totally

14   differently in one part of the state, namely Philadelphia and

15   Pittsburgh, where our inspectors didn't get to see a single

16   ballot, and then most of, if not all of the rest of the state

17   we had no problem with that, just like we've never had a

18   problem with that in 50 years.  This has never been a problem

19   before.  That's an equal protection claim.

20           Now, I believe we're going to prove it.  I believe

21   we're going to prove it way beyond even the numbers we have

22   now.  One of the problems that we have in this case and why we

23   had to amend is because as compared to last week, we have twice

24   as much evidence this week.  And it's not just here, all over

25   the country.

1          Just yesterday in Clark County, which is Las Vegas,

2     the election board in Clark County, which is five Democrats and

3     no Republicans, reversed an election of a Democrat based on

4     irregularities in Clark County.  Those are exactly the same

5     irregularities that we are asserting in Clark County except he

6     was only part of it and we have five times more.

7          So we're not bringing up a frivolous argument here,

8     Your Honor.  This is happening in all these places.  We have

9     already begun four lawsuits.  We've got another one for

10    tomorrow.  We've got three others asserting just about

11    precisely this same thing.

12         And how this is not an injury, real, tangible, actual,

13    already happened, why do we come to a federal court?  We come

14    to a federal court because the federal court enforces and

15    protects people against violations of equal protection.  It

16    protects voters who have had their vote stolen from them.  It

17    protects a candidate who it appears, if we prove our

18    allegations, had an election stole in the State of Pennsylvania

19    and I believe in other states.

20         Where else would we -- where else should we come but

21    to a federal court when we're talking about an election for

22    President of the United States?  This is not an inchoate

23    injury.  This isn't an injury that might happen, a hypothetical

24    injury.  It happened.  The votes have been counted.  The

25    illegal ballots that were not inspected at all have been

1    entered and counted, in fact, precisely 682,770 that we can

2    count now.

3           Last week it was about 340,000.  And probably when we

4    get to the hearing, it will be over 700,000.  And that's only

5    in Allegheny County and in Pittsburgh -- and in Philadelphia.

6    The whole state, we're at about 1.2 million.

7           What am I talking about?  I'm talking about absentee

8    or mail-in ballots that were entered without a single

9    Republican having the opportunity to observe anything about the

10   ballot.  They were kept behind barricades so far away that even

11   as to the closest you couldn't see it.  You have no possible

12   chance of seeing it in the back.  This is absurd.  This is a

13   disgrace.

14          This is like saying to the General Assembly of

15   Pennsylvania, we don't care about your law.  We run

16   Philadelphia the way we want to run Philadelphia.  You say we

17   can't cure ballots, we can cure ballots.  You say you have to

18   have people present, yeah, yeah, we'll have them present,

19   except we'll have them behind barricades so far away they can't

20   see a darn thing, even when they try to do it by binocular.

21          Now, isn't this ridiculous, Your Honor?  This

22   is supposed to be an inspection or something darn important.

23   This woman has got to use a binocular?  And this isn't fraud?

24   A binocular.  This is totally laughable.  This couldn't happen

25   in a neutral county that wasn't controlled by one political

1  party and in that particular place that has a long history of
2  corruption.
3         If we have to enter those in the record, we're more
4  than happy to show all of the political corruption convictions
5  in Philadelphia over the last 20 to 30 years.  They'd fill an
6  encyclopedia.  This doesn't happen in an honest place.  It
7  didn't happen in the rest of the state, which is an honest
8  place.  It didn't happen in the rest of the place even that's
9  Democratic but not machine Democratic.
10        This is an outrage, Your Honor, to do this to people.
11 I have several people back here who endured it.  In
12 Philadelphia, it got nasty.  In Philadelphia, we objected.  We
13 were told we'd be arrested.  We were pushed further back.
14 Several people were assaulted.  Several people were pushed
15 around, including women.  And then we went to court, and we got
16 a clarification from the court that we could be six feet
17 closer.
18        And when we came back -- and we have two witnesses to
19 prove this -- when we came back, the gentleman who got the
20 order forgot to bring the order with him.  He told the sheriff
21 we now want to move six feet closer.  We move six feet closer,
22 and they move them twelve feet further back.
23        Net result, two and a half days in Philadelphia, we
24 didn't see a single ballot.  The same thing, two days in
25 Pittsburgh, we didn't see a single ballot, none, zero.  These

1    people wasted two days of their time to be made fools of,

2    pushed around, threatened.

3           And when we got the order and we showed it to the

4    sheriff, the sheriff said, if you move one step closer, I will

5    arrest you.  This is America?  They're going to arrest somebody

6    because he wants to observe a ballot to make sure that his

7    candidate isn't being cheated in a place that is well known for

8    cheating?  I mean, he wasn't exactly in heaven.

9           So the net result, the net result is to the -- at the

10   point that we are at now, 338,000 in Pittsburgh, something over

11   340,000 in Philadelphia, for a total of 682,770.  And let me

12   correct what I said, when you look at the seven counties and

13   you put them all together, it's 1.5 million, 1.5 million votes

14   that were entered illegally, 1.5 million votes that went in

15   there, and the only person that knows if it complied with the

16   law is an employee of a Democratic-controlled city or county,

17   nobody else.

18          In many cases, even Democrats weren't allowed to see

19   it.  Democrats weren't allowed to see it because they couldn't

20   count on the fact that all Democrats are crooked.  They're not.

21   A decent Democrat seeing this would have said, what the heck

22   are we doing?  In fact, one in Detroit did do it and is a

23   witness for us.  She was so disgusted by the process, she came

24   and reported it.

25          So they made sure it stayed with their little mafia

1    who would be nice and quiet about it.  They didn't let a

2    Democrat see it, didn't let a Republican see it, nobody got to

3    see it, completely flaunting the law of Pennsylvania, but even

4    more importantly, completely -- and that's why we want the due

5    process count back -- completely violating what has been

6    universally recognized as a thing of fundamental fairness with

7    these ballots.

8          Every state in the union has an inspection

9    requirement.  That's not by accident.  And if it didn't have an

10   inspection requirement, now that a third of our vote is being

11   counted by absentee ballot, well, you've got to have one, but

12   you don't just have to have one, you have to have one that

13   you're going to enforce.

14         If this is allowed without serious sanction, meaning

15   the canceling of these ballots, this will become an epidemic.

16   I mean, you give them an inch, they're going to take a mile.

17   They've already taken a mile.  They take a mile, they're going

18   to take a whole city.  This cannot be allowed.

19         And what did they steal, really?  Well, they stole,

20   they stole an election, at least in this Commonwealth.  These

21   votes are way more than enough to overturn the results of the

22   election.  And one of the questions in Bognet was, did they

23   have enough votes to overturn the results of the election.

24         We have ten times more votes than we need, and we're

25   still getting complaints.  It would overturn the results of the

1    election.  So this is a real controversy.  This is a case and

2    it's a controversy, and I don't know, since I went to law

3    school, that's always been the simple test for whether you have

4    standing or not.  And I really do believe their argument on

5    standing is just an argument to delay this, because they'd like

6    to delay this as long as possible.  It's certainly a frivolous

7    argument, Your Honor.

8         Your Honor, I ask the court to allow us -- first of

9    all, to deny the motion to dismiss so we can quickly move to

10   starting to put before you the proof that we have.  We have

11   hundreds of affidavits, Your Honor.  The question here is going

12   to be -- if we proceed to a hearing, if that's your decision,

13   the question is going to be, how do we present that evidence

14   without burdening the court?  I mean, a lot of it is

15   repetitious, but repetition proves it over and over again.

16        I'd say we have 300 either affidavits, declarations,

17   or our own statements that we've written down that will be

18   subjected to the process of affidavits.  And we do have, in

19   addition to these pictures, which I'll submit to the court --

20   should I mark them as an exhibit, Your Honor, or --

21        THE COURT:  You're welcome to do so.  Mr. Donovan and

22   defense counsel, have you had an opportunity to see those

23   photographs?

24        MR. GIULIANI:  Sure.  No, no, they haven't.  I'm going

25   to give it to them now, Your Honor.

1              *THE COURT:*  Or have copies of them available?

2              *MR. DONOVAN:*  I haven't, Judge.  And I don't believe

3    they're part of the complaint, and I have no objection to

4    looking at them, but I'll get to that when I see them.

5              *MR. GIULIANI:*  No, no, they are, Your Honor.

6    They're -- in Paragraphs 132 to 149, we allege this.

7              *THE COURT:*  Well, if --

8              *MR. GIULIANI:*  Well, okay, can I mark this --

9              *THE COURT:*  Let's circle back to that.  But if you can

10   supply a set to Mr. Donovan.  And what are the paragraphs of

11   the complaint?  One thirty-two to what, did you say?

12             *MR. GIULIANI:*  I believe it's 132 to 150.

13             *THE COURT:*  Thank you.

14             *MR. GIULIANI:*  So --

15             *THE COURT:*  Continue your argument, and we'll get to

16   the photographs.

17             *MR. GIULIANI:*  Well, I'm just at about the end, Your

18   Honor.  So I'll mark, just so that we're clear at what they

19   are, the first one is a picture of the center in Philadelphia

20   where the woman appears to be 20 to 30 feet away from the

21   closest, from the closest counting area, quite obviously unable

22   to see anything of significance.  So I'll call that Exhibit A

23   and give it to co-counsel.  And -- I used to be a clerk, Your

24   Honor.  I hope I'm doing it right.  I'll make it Exhibit A.

25             *THE COURT:*  Yeah, so far so good.

1          MR. GIULIANI:  In case I need a job after this.  This

2     is Exhibit A.  Again, a second picture to show how far away

3     they were.  And as you might imagine, there was very serious

4     objection by these people to this.  The whole day was wasted

5     standing there like potted plants.

6          The first two, A and B, are Philadelphia.  Here you

7     are, sir.  And the second two, which we'll call C, is a young

8     woman having to use a binocular to try to see.  As you might

9     imagine, it didn't accomplish anything.  She wasn't able to see

10    anything, largely because the ballots are here.  You can't find

11    them.  There's C.  That is -- that's Pittsburgh.

12         MR. DONOVAN:  Sir, Judge, may I have a representation

13    from counsel that A and B, as an officer of the court, is

14    Philadelphia?

15         MR. GIULIANI:  I was told that.

16         MR. DONOVAN:  Well, I'm --

17         MR. GIULIANI:  That's my understanding, sir.

18         MR. DONOVAN:  Okay.

19         MR. GIULIANI:  If it isn't, I'll correct it.

20         THE COURT:  So Mr. Giuliani is representing that what

21    are proposed to be -- what have been marked and are proposed as

22    Plaintiffs' Exhibits A and B are from Philadelphia County.  I

23    think Exhibit C he's indicated is Allegheny County.

24         MR. GIULIANI:  Allegheny County.  And the last one,

25    Exhibit D, is also from Allegheny County.  And since I just got

1    these coming here today, I will check, and if they're different

2    counties, I'll correct it, Your Honor.

3          So again, in conclusion, Your Honor, we would ask you

4    to deny the motion to dismiss so that we can, as quickly as

5    practical, move to the part of it where we can present the

6    evidence so that we can show you that what we are alleging,

7    which you have to deem to be true now, is, in fact, true and

8    that we can establish it and prove it with witnesses,

9    photographs, videos, audios, and expert witnesses.

10          *THE COURT:*  Very good, sir.

11          *MR. GIULIANI:*  Thank you, Your Honor.

12          *THE COURT:*  Thank you.  Ms. Kerns, Mr. Scaringi, do

13   you have anything to add by way of at least initial argument

14   before I turn to the defense?

15          *MS. KERNS:*  No, Your Honor.  As you know, I filed a

16   motion to withdraw with the agreement of my client, and I defer

17   to the new counsel's strategy.

18          *THE COURT:*  Thank you.  I know that, Ms. Kerns.  I

19   didn't act on that.  I let Texas counsel withdraw last evening.

20   I wanted you here because I had some specific questions that

21   I'll circle back to later --

22          *MS. KERNS:*  Sure.

23          *THE COURT:*  -- that I thought you, since you've been

24   involved in representing the Trump Campaign from the beginning,

25   might best be able to answer.

1          You are welcome, if you are not able to answer those

2     questions or if you would prefer to defer those questions to

3     Mr. Giuliani and Mr. Scaringi, you're welcome to do so, but I

4     wanted to have you here today because I had some questions

5     specifically -- that I thought specifically you could answer.

6          MS. KERNS:  Absolutely, Your Honor.  I'd be happy to

7     answer anything that you ask.

8          THE COURT:  Very good.  Thank you.  Mr. Scaringi,

9     anything to add to Mr. Giuliani's argument?

10         MR. SCARINGI:  No, Your Honor.

11         THE COURT:  Thank you.

12         MR. GIULIANI:  Your Honor, may I just also point out

13    that Linda is going to be representing the campaign and Donald

14    Trump in the state court actions.

15         THE COURT:  Understood.  Thank you.

16         MR. GIULIANI:  She's going to continue to be part of

17    the team --

18         MS. KERNS:  Correct.

19         MR. GIULIANI:  -- but not just on this particular --

20         THE COURT:  Understood.

21         MS. KERNS:  Yeah, I'm continuing cases in both the

22    Supreme Court and the Commonwealth Court that I'm handling.

23         THE COURT:  Very good, Ms. Kerns.  Thank you very

24    much.  All right.  Mr. Donovan, I'll turn to you next.

25         MR. DONOVAN:  Thank you, Your Honor.  May I use the

 1   podium?

 2          THE COURT:  If you prefer, that's fine.

 3          MR. DONOVAN:  I do.  Thank you.  Judge, I have some

 4   demonstratives I plan to use.  I just Purell'd up.  Can I hand

 5   them up to the court?

 6          THE COURT:  Certainly.

 7          MR. DONOVAN:  Thank you.

 8          THE COURT:  Are you going to show these on the screen,

 9   as well, or are they just --

10          MR. DONOVAN:  They're just hard copies.

11          THE COURT:  That's fine.

12          MR. DONOVAN:  I have some extras for people.

13          THE COURT:  That's fine.

14          MR. DONOVAN:  I gave some to your --

15          THE COURT:  Mr. Giuliani, do you have a copy of --

16          MR. GIULIANI:  I do, Your Honor.

17          MR. DONOVAN:  Your Honor, Daniel Donovan for the

18   Secretary.  And let me start on behalf of the Secretary to

19   thank you for all the efforts, and your staff, I know you went

20   through to have us here live.  I think that's important, but I

21   also know it's a difficult task.  So on behalf of the

22   Secretary, thank you.

23          The November 23rd deadline for county boards to

24   certify the election results are fast approaching, and the

25   Secretary and her team are working to certify the election

1    results of the over 6.8 million votes passed here in the

2    Commonwealth of Pennsylvania.

3         I know you've received a tremendous amount of

4    briefing.  I intend to do my best to distill the arguments

5    rather than repeat them.  A couple observations.  Let me start,

6    Judge, I am going to focus on the first amended complaint filed

7    by the plaintiffs.

8         Much of -- I think counsel on the other side of the

9    aisle focused on allegations that are not in the complaint.  In

10   fact, the canvass watcher allegations were deleted out of the

11   amended complaint.  And the plaintiffs were kind enough to

12   provide a redlined version, so those claims are out.  But I'm

13   going to focus, Judge, this afternoon on the motion to dismiss

14   standard.  Okay.

15        So let me start and address what this case involves

16   and what this case does not involve.  And just for ease for

17   those that have a hard copy, I'm on Page 3 of the slides.  So

18   at this point we have a single count, a federal constitutional

19   equal protection claim.  And the plaintiffs' factual predicate

20   in the first amended complaint can be distilled into a

21   challenge to three Election Code practices, Judge.

22        First, plaintiffs allege that certain voters were

23   permitted to cure deficiencies to their mail-in ballots before

24   Election Day.  That's one.  Two, plaintiffs allege that certain

25   voters were apprised that their mail-in ballots were defective,

1    and some of those voters elected to vote a provisional ballot

2    on Election Day.

3           And, of course, I know Your Honor knows, but so others

4    know, provisional ballots go through a process.  They're

5    reviewed pursuant to the Pennsylvania Election Code that

6    involves a public process before county boards, and then they

7    can be challenged in state court if there are any challenges to

8    this.  So that's two.

9           And then number three, Your Honor, is plaintiffs

10   allege generally that certain mail-in ballot envelopes were not

11   filled out consistent with the Pennsylvania Election Code, and

12   unspecified counties should not have counted those, although

13   they allege generally some might have.

14          Those are each of the three practices that are alleged

15   to be violations of the Pennsylvania Election Code.  And that

16   is, under state law, plaintiffs argue certain ballots should

17   not have been counted.  That is the basis in the complaint for

18   the equal protection claim.

19          I believe it's just as critical to summarize what's

20   not in the complaint.  There is no claim in the complaint that

21   any qualified Pennsylvania voter cast more than one ballot that

22   was counted.  There's no claim that any qualified voter who

23   submitted a mail-in ballot had his vote wrongly rejected.

24   There's no claim that anyone not eligible to vote, in fact,

25   voted.  And there's no claim of voter fraud that affects the

1   equal protection claim.  That's not in the first amended

2   complaint.

3          So to be sure, all qualified Pennsylvania voters have

4   an equal right to vote.  Every voter in every county, including

5   voter plaintiffs here, had the right to vote either in person

6   or by mail.  And there's nothing unequal about the ability to

7   cast a vote in this case.  And I'm going to get to some of the

8   cases, actually, that talk -- I know one of yours does, as

9   well, Your Honor.

10         But at the end of the day, this case is about a claim

11  that a very limited number of qualified voters had their votes

12  counted, in fact, counted, when plaintiffs argue under state

13  law they should not have been counted.

14         As a relief, the plaintiffs ask Your Honor to enjoin

15  certification of every ballot in the state of qualified

16  electors, and they do that by alleging that some state

17  officials did not follow the code.  That's the allegation.

18         That's not an equal protection claim.  I'm going to

19  walk through that, Your Honor.  No federal court has ever

20  recognized that theory.  And anything other, I submit, than

21  counting ballots lawfully cast by qualified Pennsylvania

22  electors is not only against the law, I submit it's

23  un-American, but it certainly is not a federal constitutional

24  claim.

25         So now, Judge, let me turn -- actually, if you just go

1    back to Slide 2.  I had them a little backwards there.  These

2    are the four issues we're going to address this afternoon.

3            First, Judge, is the lack of standing by any of the

4    plaintiffs to pursue their Equal Protection Clause.  This

5    jurisdictional defect most recently made clear in Bognet, as

6    well as Your Honor's case I'll get to, remains fatal to the

7    plaintiffs' claims even as amended.  That's one.

8            Two, plaintiffs' claims fail to state an equal

9    protection claim pursuant to 12(b)(6).  Plaintiffs attempt to

10   create a federal constitutional equal protection claim when

11   what they are challenging are state law practices.  And we're

12   going to show that that doesn't establish, even at the motion

13   to dismiss stage, the Equal Protection Clause.

14           Third, Mr. Aronchick, once I pass the -- I guess the

15   virtual podium to Mr. Aronchick, he's going to address

16   abstention and the final arguments, and I understand some other

17   counsel may have some other points for Your Honor.

18           So let me start with standing, Judge.  And for that

19   I'm going to turn to Slide 5.  Judge, plaintiffs lack standing

20   to assert the equal protection claim.  And I would submit to

21   the court there are three cases I'm going to focus on.  First

22   is Your Honor's case, the Pennsylvania Voters Alliance from

23   October, Your Honor's decision on standing there; second, the

24   Bognet decision that followed yours; and then, third, Judge

25   Ranjan's decision in the Western District of Pennsylvania with

1    the same plaintiffs who made equal protection theories there.

2    That's what I'm going to focus on, Judge.

3          And because I went through your opinion and as Your

4    Honor says about standing, Article III courts -- Article III,

5    excuse me, of the United States Constitution limits the power

6    of the federal judiciary to cases in controversies.  As I've

7    heard it said, federal courts have immense power but limited

8    jurisdiction.  And this is what you go on to say when you say

9    it's an irreducible constitutional minimum to address that.

10         Your Honor then goes through the law on standing for

11   particularity, speculation, causation, and redressability.  So

12   I don't intend to repeat the law, Judge, I know it's in your

13   opinion, but I want to apply these facts to it.

14         So the plaintiffs, in the first amended complaint,

15   Judge, on standing, are actually quite limited.  They argue

16   some qualified voters were able to cure their deficient mail-in

17   ballots or vote provisionally when they find out their mail-in

18   ballot was deficient.

19         The only specific allegations they refer to are to

20   Philadelphia County in the first amended complaint.  There's

21   nothing as to the six other defendant counties, and there's

22   nothing as to the other 60 counties in the Commonwealth.

23         And these allegations I'm going to show, under settled

24   case law, do not establish standing for the individual voters

25   or the campaign.  In the end, Your Honor's case, Voters

1    Alliance, Bognet, and the Trump Campaign versus Boockvar in the

2    Western District all lead and support dismissal based on

3    standing.

4           So I want to turn to Bognet, Judge.  Bognet faithfully

5    applies these principles, as you know Chief Judge Smith wrote

6    for the Third Circuit.  And he explained, this was a quote at

7    star six of the Westlaw, If the injury you claim is an injury

8    that does no specific harm to you or if it depends on a harm

9    that may never happen, then you lack an injury for which you

10   may seek relief from a federal court.

11          And I'm going to show you the plaintiffs fail to

12   assert particularized, concrete injuries under the law.  And

13   why is that?  Well, the premise of the plaintiffs' challenge is

14   that certain allegedly invalid votes may dilute, I think that's

15   what Mr. Giuliani was talking about, may dilute other votes

16   that they believe were validly cast in the state, Commonwealth.

17          But that's not a concrete and particularized injury

18   under Voters Alliance, Bognet, or even the Trump case from the

19   Western District.  The injury is not particularized to the

20   voters or to the campaign.  And I submit Bognet squarely

21   forecloses plaintiffs' attempt to manufacture that claim.

22          And I'm going to show you some of the pieces of that

23   now, Judge.  In Bognet, as you know, the Third Circuit held

24   that the plaintiffs lack standing to bring Equal Protection

25   Clause claims alleging vote dilution because such harm was

1    neither concrete nor particularized.

2          Specifically, the court held counting ballots in

3    violation of state law is not a concrete harm under the Equal

4    Protection Clause.  They could challenge in state court, as

5    Ms. Kerns is doing, but it's not an Equal Protection Clause

6    under the United States Constitution.

7          And the court further held in Bognet that the alleged

8    counting of improper votes is a generalized grievance that is

9    insufficient to confer standing.  And here, Judge, if you -- I

10   know you've looked, but if you look again at the first amended

11   complaint, it boils down to allegations that the Election Code

12   was not followed in certain instances.

13         Judge, if you turn to Slide 6, if you would, I put a

14   piece of Bognet up there.  In the Third Circuit writing, a vote

15   cast by fraud or mailed in by the wrong person through mistake

16   or otherwise counted illegally has a mathematical impact on the

17   final tally and thus on the proportional effect of every vote,

18   but no single voter is specifically disadvantaged.  Such an

19   alleged dilution is suffered equally by all voters and is not

20   particularized for standing purposes.

21         And, Judge, the sole equal protection claim in the

22   first amended complaint boils down to a claim that some, but

23   not all of the defendant counties counted mail-in ballots with

24   some facial defect in them or they should not have been

25   counted.  Nothing more is left in the complaint, Judge.

1          And Bognet, I submit, holds plainly that plaintiffs do

2     not have standing to assert those votes -- or, excuse me, to

3     challenge those votes arguing they were diluted under federal

4     law.

5          Whether the equal protection claim is predicated on

6     unlawful counting, as they allege, or counting ballots that

7     were corrected, Chief Judge Smith's analysis in Bognet confirms

8     that plaintiffs lack standing.

9          And in both instances, the allegations amount to a

10    generalized grievance that the Pennsylvania Election Code was

11    not followed.  Every citizen has an interest in the proper

12    application of the Election Code, and plaintiffs have no

13    concrete particularized and nonspecific.

14         And the source of these allegations, it's a matter of

15    state law, Judge, which makes any alleged harm abstract for

16    purposes of equal protection.  The plaintiffs only basis for

17    allegedly dilution from the unlawful counting is the Election

18    Code.  That's not a concrete harm.

19         Now, here, plaintiffs allege that some electors were

20    treated unequally, but that's not a particularized harm to

21    them.  It's a generalized claim, again, Judge, that the

22    Pennsylvania Election Code was not followed in certain

23    instances.  And here, Judge, I go to Slide 7.  This was, again,

24    addressed in Bognet.

25         On the issue of standing, the Third Circuit held,

1    precedential decision, The logical conclusion of the voter

2    plaintiffs' theory is that whenever an election board counts

3    any ballot that deviates in some way from the requirement of a

4    state's legislatively enacted Election Code, there is a

5    particularized injury in fact sufficient to confer Article III

6    standing on every other voter, provided the remainder of the

7    standing analysis is satisfied.  But allowing standing for such

8    an injury strikes us as indistinguishable from the proposition

9    that a plaintiff has Article III standing to assert a general

10   interest in seeing the proper application of the Constitution

11   and laws, a proposition that the Supreme Court has firmly

12   rejected.  And that's what we have here, Judge.

13          The campaign's argument is no different.  The campaign

14   argues that the counting of alleged cured ballots or

15   provisional ballots, but it would not affect the campaign in a

16   particularized way.  And why is that?  Because the ballots that

17   are being counted are for all races on the ballot, federal and

18   state.

19          I know sometimes we only focus on certain races, but

20   the ballots, as Your Honor knows, are for all federal and state

21   elections, and for whoever that vote is for, all candidates in

22   state and federal races were subject to the same rules.

23          And, Judge, it's not just in this circuit.  I would

24   direct the court's attention to Slide 8.  This was in Hotze v.

25   Hollins.  Again, this was a voting case, recent, November 2nd

1   of 2020, from the Southern District of Texas.  Here they said

2   the plaintiffs' general claim that Harris County's election is

3   being administered differently than Texas's other counties does

4   not rise to the level of the sort of particularized injury that

5   the Supreme Court has required for constitutional standing in

6   election cases.

7           And, Judge, that was a case relating to -- Harris

8   County had that drive-through for COVID, you could drop off

9   your ballot, but no standing there.

10          So in the briefing, Judge, there was some allegations

11  that plaintiffs -- that they were denied the vote, okay, but

12  plaintiffs don't actually allege vote denial.  And let me start

13  with the two voters.  If the concern of the voters was that

14  their vote was denied, they would have sued their own counties,

15  Fayette and Lancaster County.  They are not defendants here.

16          The defendant counties in this case did not in any way

17  deny those two plaintiffs their vote, nor could they.  They're

18  not voters in those counties.  Their home counties did not

19  count their vote.  And according to the plaintiffs'

20  allegations, they admit they did it wrong and they should have.

21  And the requested relief in this case is to stop votes of

22  people in other counties.  And under standing case law, they

23  don't have standing to assert that.  It's generalized.  And

24  that goes to Slide 9, Judge.

25          We now go to, well, can the candidate sue for that in

1    federal court, under the U.S. Constitution, not Pennsylvania

2    law.  In Slide 9, Bognet says, For a candidate to have standing

3    to enjoin the counting of ballots arriving after Election Day,

4    such vote would have to be sufficient in number to change the

5    outcome of the election.

6            And we heard numbers today and pictures, Judge.  I

7    don't have everything, I'm just a lawyer, Judge, but I looked

8    at the complaint, and none of those numbers are in there,

9    Judge.  And that's what I show on Slide 10.

10           What is not alleged in the complaint, it does not

11   allege which counties publicized a cure process, whether voters

12   cured their original ballot or cast a provisional, whether any

13   such county has cured any provisional ballots, and whether such

14   counted ballots were cast for President Trump or anyone else.

15           Judge, this goes to plaintiffs' alleged injuries that

16   are speculative.  These speculative injuries cannot give them

17   standing in federal court, in federal court.  The campaign does

18   not allege the issues they raise in the amended complaint would

19   change the outcome of the election.  I heard from counsel this

20   morning, but that's not in the complaint, Judge.  There are no

21   such allegations.

22           Now, they do argue they'd like discovery to find

23   facts, but, Your Honor, I've been before you before, and I know

24   that under the rules and the understanding is the plaintiffs

25   must make allegations that survive dismissal before discovery.

```
 1              And, finally, there's no sufficient allegations of an
 2     imminent injury that they allege.  They advance specific
 3     allegations regarding Philadelphia County in the complaint.
 4     That's at Paragraphs 127 and 128 related to their equal
 5     protection claim.  And there they allege that Philadelphia
 6     County allowed certain voters to cure ballot envelope defects
 7     by casting provisional ballots.  But plaintiffs don't allege
 8     whether those votes actually -- those voters actually cast such
 9     a ballot or that Philadelphia counted those ballots.
10              This is what I think, Judge, is the death knell in the
11     motion to dismiss:  There's no allegations about any other
12     county there and there's nothing related to the other 60
13     counties in the Commonwealth.  It's just speculation.
14              So let me wrap up standing, Judge.  I come back to the
15     trinity of cases, Your Honor's Pennsylvania Voters Alliance
16     from October, Bognet from recent, and then the October decision
17     by Judge Ranjan in the Campaign versus Boockvar.  All three
18     found lack of standing, all laid out the law, and all
19     foreclosed standing in federal court to address these issues.
20              And why is that?  The two voters, Mr. Roberts and
21     Mr. Henry, they allege vote dilution.  They're not challenging
22     their own counties.  And a general grievance that counties
23     should follow Pennsylvania Election Code and not count other
24     votes is not permissible in federal court.
25              Your Honor, I just covered for the campaign there's no
```

1    vote denial, the campaign is not a voter, but they don't have

2    standing.  There's no vote dilution standing because the

3    allegations they assert under Bognet and the progeny don't

4    provide for standing for these allegations.  That's not an

5    unequal or competitive disadvantage under Bognet, whether valid

6    Pennsylvania electors were able to get their ballots to be

7    counted.

8            So, Judge, I'm going to stop on standing, although I'm

9    happy to answer any questions as I go, Judge, but I'm now going

10   to turn to the equal protection claim.  That's Slide 11, and

11   I'll go to Slide 12.  But let me start on the equal protection

12   claim.

13           So on standing, Judge, I just want to say, I think

14   that's the place to stop, Judge.  I think that's what it is.

15   There are challenges in state court, and no one is trying to

16   stop any state court, valid state court.  But here in federal

17   court, we have limitations, and I don't believe they've

18   satisfied it, Judge.  That's step one.

19           *THE COURT:*  I don't want to interrupt your flow of

20   argument, but --

21           *MR. DONOVAN:*  Please.

22           *THE COURT:*  With regard to the -- and Mr. Giuliani and

23   Ms. Kerns can answer this question, as well, but just orient

24   me, how many matters are pending in Pennsylvania state courts,

25   and, if you know, which common pleas courts are impacted?

1          *MR. DONOVAN:*  Yeah, so the one I'd start with is, in

2     the Pennsylvania Supreme Court currently is the issue that

3     Mr. Giuliani and Ms. Kerns referred to about whether a canvass,

4     under state law, is it six feet, is it twelve feet, that issue.

5          *THE COURT:*  And that's on appeal to the Supreme Court

6     of Pennsylvania?

7          *MR. DONOVAN:*  Yes.

8          *THE COURT:*  Yes.

9          *MR. DONOVAN:*  It's currently there.  There also have

10    been -- and I know Mr. Aronchick was part of these, so he could

11    probably hit these better.  Some in the state courts have

12    already been adjudicated.  And that's where Mr. Aronchick is

13    going to make the point there's abstention issues, there's

14    Rooker-Feldman issues.  They've been litigated.  And there are

15    some ongoing that Mr. Aronchick can, because he's involved in

16    those --

17         *THE COURT:*  Can he better answer that question?

18         *MR. DONOVAN:*  Yes, he can on the common pleas.

19         *THE COURT:*  That's fine.  Let me defer those

20    questions --

21         *MR. DONOVAN:*  Okay.

22         *THE COURT:*  -- to him.  I assume he'll answer them as

23    part of his argument.  All right.  Go right ahead, sir.

24         *MR. DONOVAN:*  Okay.  But that I think, though, Judge,

25    is where we are, is the challenge that the plaintiffs have of

1    trying to -- I know they're trying to get into federal court,

2    but they don't provide standing.

3            They do have an avenue, and that's the point I want to

4    make, I was going to make later, is, they're not foreclosed

5    from a path.  If there are challenges from voters or campaigns,

6    there's a path, but it's state court, not federal court.

7            So I'll move now to the election Equal Protection

8    Clause claim.  And it must be dismissed, Judge, if you get to

9    it, because it fails to state a cognizable claim.  And, again,

10   I just want to emphasize this because it is the current

11   complaint, that plaintiffs' claim is that certain counties

12   permitted voters to cure defective mail-in ballots and have

13   those votes counted and that certain ballot envelopes were not

14   fully filled out but were counted.  This alleged violation of

15   state law simply, under the cases I'm going to go through,

16   cannot establish a federal Equal Protection Clause.

17           The amended complaint continues to try to create a

18   constitutional claim out of what's called, I think in both Your

19   Honor's case and other cases, garden-variety election practice

20   disputes.

21           And now, Judge, I'm going to refer to Judge

22   Ranjan's -- there's two cases.  There's the Campaign versus

23   Secretary Boockvar from earlier this year in the Western

24   District.  And in that, Judge Ranjan held that garden-variety

25   election irregularities are simply not a matter of federal

1    constitutional concern.  And, Judge, this is Slide 12 for

2    those.  It's not a matter of federal constitutional concern

3    even if they control the outcome of the vote or the election.

4    And that's at star 49 of the Westlaw cite there, Judge.

5          And the plaintiffs' allegations about notice and cure

6    do not state a constitutional claim, either.  The claim does

7    not involve any persons who are not qualified Pennsylvania

8    voters in the Commonwealth.

9          Instead, plaintiffs allege that certain qualified

10    voters were given notice or they figured out that their mail

11    ballots -- because you can go online on the SURE system and it

12    says whether your vote is canceled, and they might have come in

13    and voted provisionally.

14          And, again, I want to stop here.  Both under federal

15    law and Pennsylvania Election Code if a voter shows up at a

16    polling place and says, I want to vote, even if the poll book

17    shows that they've already voted, they have to be provided a

18    provisional, and what that means is that then gets figured out

19    later.  That goes through the provisional process.  So that's

20    the allegation here.

21          Well, so what's alleged?  Well, instead, plaintiffs

22    allege in the amended complaint -- they don't even allege that

23    any county even counted any such cured ballots.  The

24    provisionals, remember, they're going through the process.  The

25    amended complaint, again, I come back to, they only allege that

1    there was a cure process with respect to Philadelphia County at

2    Paragraphs 127, 128.  And the plaintiffs offer nothing as to

3    the other six defendant counties and offer nothing as to the

4    other 60 Pennsylvania counties.

5            So let's turn now then, Judge, to what do they allege.

6    Well, the plaintiffs do not and cannot allege that any notice

7    and cure process changed the ability of an actual voter because

8    that comes back to there's no challenge that anybody who voted

9    wasn't a qualified Pennsylvania elector.  Voters in the

10   Commonwealth could vote by mail or in person.  That was equal

11   throughout the Commonwealth.  That was a choice.

12           And let me pause there, Judge, because I think it is a

13   point.  That choice for mail-in ballot was passed bipartisan in

14   the Commonwealth.  It was passed by the Republican legislature

15   and signed by Governor Wolf.  Okay?  So to the extent there was

16   some suggestion that any party -- and, in fact, it was passed,

17   and Secretary Boockvar and her team worked hard to make sure

18   everybody in the state was able to vote however they chose

19   during the pandemic.  And any suggestion otherwise is just not

20   true.

21           But, also, we go to the claim that, wait, some voters

22   got to vote a provisional.  But, again, Judge, that's expressly

23   permitted and required under the Pennsylvania Election Code.

24   All the U.S. Constitution requires -- and I'm going to get to

25   the cases -- is that a person have the right to vote and that

1    the plaintiff voters do not dispute here that they had the
2    opportunity to vote.
3           I agree with Mr. Giuliani, both of them said, we
4    mailed in our votes, we did it wrong, they were what we call
5    naked ballots.  But there's no dispute.  They admit that.  They
6    had the opportunity to do that.
7           Now, because plaintiffs cannot demonstrate any burden
8    on the right to vote, they had the opportunity, they say, well,
9    allowing other citizens to cure defective ballots before the
10   close of the polls, for Your Honor, it's rational basis.  And
11   there I would refer to the Husted case out of the Sixth
12   Circuit, 697 F.3d at 429.  And there's -- that's then rational
13   basis.
14          And there's plenty of reasons to have such processes.
15   Some counties might have known they were going to have higher
16   rates of mail-in ballots.  And the counties can allocate
17   resources, Judge, differently without creating a constitutional
18   issue.  And I'm going to go through those cases.
19          And just a couple other related examples, Judge,
20   different counties have a different number of polling places.
21   That's been determined that's not an equal protection claim.
22          Judge Ranjan, in the campaign's case, said, well,
23   wait, having more drop box locations in some areas, that has
24   higher fraud, they alleged, and Judge Ranjan said that's not an
25   equal protection violation.  It's just not.

1             And the plaintiffs also cannot argue that the counties

2      were somehow limited from having cure processes only in certain

3      counties.  The Secretary, Judge, I know it's attached, the

4      Secretary issued her guidance to all counties, all counties,

5      and encouraged all counties to make information available to

6      both the parties and to put it in the SURE system.  The fact

7      that some counties may have emphasized these more than others

8      is simply not a constitutional violation.

9             And, Judge, plaintiffs don't grapple with these

10     cases that --

11             THE COURT:  Why isn't it?

12             MR. DONOVAN:  I'm sorry?

13             THE COURT:  Why isn't it, if, indeed, that happened?

14             MR. DONOVAN:  Yeah, yeah, and I'm going to start with

15     going through those cases, Judge, and --

16             THE COURT:  That's all right, then weave it in.

17             MR. DONOVAN:  Yeah, okay.  Thank you.

18             THE COURT:  Weave that in right as you are.

19             MR. DONOVAN:  You were a little ahead of me.  That's

20     where I'm heading now, though.  And Judge Ranjan, let me start,

21     found that the counties may, consistent with equal protection,

22     employ entirely different election procedures and voting

23     systems within a state.

24             And that's slide -- yep, on the next slide, Judge, it

25     shows that if this were a true equal protection problem, on

1    Slide 13, then it would transform every violation of state

2    election law, and, actually, every violation, into a potential

3    federal equal protection claim requiring scrutiny of the

4    government's interest in failing to do more to stop.  That is

5    not the law.

6            And then when we look at Slide 14, Judge, again, from

7    Judge Ranjan, again, there they were challenging different drop

8    boxes in different counties.  On Slide 14, he held that the

9    counties may, consistent with equal protection, employ

10   different election procedures and voting systems within a

11   single state.

12           And that's what I want to turn to for a moment, is the

13   Trump Campaign's case against the Secretary in the Western

14   District with the decision from Judge Ranjan.  They're here.

15   They didn't appeal that decision.  They didn't appeal that

16   decision, and the time has passed.

17           And I want to explain why this claim now is not a

18   constitutional violation, because these nearly identical equal

19   protection theories were asserted by the campaign in that case.

20   There, just like here, the campaign alleged that Pennsylvania's

21   uneven use of drop boxes in different counties violated equal

22   protection for voters in counties without drop boxes.  They

23   said one county and the other.

24           And Judge Ranjan -- and this is at star 38 of the

25   Westlaw decision.  And he kind of goes through it, Judge.  He

1    held that equal protection does not mean that all forms of

2    differential treatment are forbidden.  And, actually, he held,

3    Judge Ranjan held the campaign's equal protection claim, quote,

4    fails at the threshold because the plaintiffs have not alleged

5    that Pennsylvania's system of different use of drop boxes, or

6    here of different cure processes, will result in the dilution

7    of votes in certain counties and not others.  This goes to the

8    point it's a statewide.

9            After analysis, Judge Ranjan held his rejection of the

10   equal protection claim is consistent with many courts that have

11   recognized that counties may, consistent with equal protection,

12   employ different election procedures and voting systems within

13   a single state.  And that's at star 44 of that opinion.

14           And, Judge, before I proceed, I want to address --

15   Mr. Giuliani addressed Bush v. Gore.  And a couple points.

16   First of all, the bulk of the claims here go to notice and cure

17   process, which goes to differences the way counties gave

18   notice, not the way votes are counted.

19           But the flaw in the plaintiffs' argument, Judge, is

20   the Supreme Court, in Bush v. Gore, found Florida's interest in

21   certifying its election results to be paramount, and because

22   they said we have to -- we've got to make sure the Secretary

23   certifies there, they halted the recount there because that was

24   having issues that would prevent Florida from certifying the

25   results.

1          Here, Judge, the plaintiffs are asking you to do the

2     opposite.  They're asking you to be in conflict with Bush v.

3     Gore.  They're asking you to enjoin certification, enjoin

4     certification.  They want the court to issue an injunction that

5     prohibits certification.

6          And, again, Judge, this isn't the first time this came

7     up.  Again, Judge Ranjan's decision at star 42 to 43 addressed

8     the campaign's argument in that case related to Bush v. Gore,

9     and he held that the claim that different use of drop boxes

10    could be a -- could be an Equal Protection Clause under Bush v.

11    Gore, he said, is wrong.

12         Such dilution, that is, if it actually happens, such

13    dilution impacts the entire electorate equally, not just voters

14    in counties where it occurs, end quote, star 42.  And I think

15    that -- that answers the question, Judge, for federal court

16    claims, equal protection, even taking what they allege as true,

17    that voter dilution impacts the entire electorate equally, not

18    just voters in the county where it occurs.  And Judge Ranjan

19    then held that the alleged harm by the campaign is, quote,

20    categorically different from the harm at issue in Bush and

21    cases like that.

22         *THE COURT:*  Mr. Donovan, hold on just a moment.  I'm

23    told we have some technical issue.

24    *(The Court and Courtroom Deputy confer.)*

25         *THE COURT:*  So I'm sorry to interrupt your

1    presentation.  What I'm advised by my staff is that we had -- I
2    think ultimately there were 8,000 telephone lines set up
3    through AT&T so that any journalist, any citizen, et cetera,
4    who expressed an interest in listening to this oral argument
5    today could tune in.
6              Well, guess what, the lines have dropped, so the --
7    you know, naturally.  So we're going to take a short recess,
8    and it will be short, for the IT department to get this
9    promptly corrected.  We've done this before, but we haven't had
10   this many lines, haven't had this -- quite this much interest.
11             And I'm not suggesting, by the way, there are 8,000
12   people on the line.  The Clerk of Court told me before I came
13   out into the courtroom there were at least 3700 people who had
14   dialed in, which is wonderful as far as I'm concerned.  But
15   they can't hear.
16             So counsel who are here virtually, you can hear me?
17   Mr. Aronchick and Ms. Meacham, you can hear me?
18             *MS. MEACHAM:*  Yes, Your Honor.
19             *THE COURT:*  That's fine, that's fine.  You understood
20   what I just said?  We're going to take a brief recess at this
21   point, a little earlier than I had hoped, and let the IT
22   department try to get these telephone lines set back up again.
23   Again, my apologies to you, Mr. -- my apologies to you, Mr.
24   Donovan.  Sorry to interrupt your argument.
25             *MR. DONOVAN:*  That's just fine, Judge.

1          *THE COURT:*  I think we need to do that at this point.

2     So we'll stand in recess for probably no more than ten minutes

3     or so.  I don't know whether the --

4          *MR. ARONCHICK:*  Your Honor.

5          *THE COURT:*  The IT department will --

6          *MR. ARONCHICK:*  Your Honor.

7          *THE COURT:*  -- handle this promptly.

8          *MR. DONOVAN:*  Thank you.

9          *MR. ARONCHICK:*  Your Honor.

10         *THE COURT:*  Oh, yes, Mr. Aronchick.

11         *MR. ARONCHICK:*  This is Mark Aronchick.

12         *THE COURT:*  Yes.

13         *MR. ARONCHICK:*  Your Honor, while we're in recess, the

14    Pennsylvania Supreme Court just issued --

15         *THE COURT:*  I'm sorry, say it again, Mr. Aronchick.

16         *MR. ARONCHICK:*  -- a decision -- yes.  Can you hear

17    me?

18         *THE COURT:*  No, you're breaking up on me.  Yeah, maybe

19    move away from or closer to the microphone.

20         *MR. ARONCHICK:*  All right.  Can you hear me now?

21         *THE COURT:*  Try it again.

22         *MR. ARONCHICK:*  Can you hear me?

23         *THE COURT:*  No, you're breaking up on me, Mr.

24    Aronchick.  I'm sorry.  Why don't we do this.  Let's see if we

25    can tune you back in on a ten-minute break.

1          *MR. ARONCHICK:*  All right.  I have important

2     information for you, though, for your break.

3          *THE COURT:*  Okay.  Go ahead, what is it?  Do your

4     best.

5          *MR. ARONCHICK:*  The Supreme Court, the Pennsylvania

6     Supreme Court just issued a five-to-two opinion in our case, it

7     was my case, the observer case, saying that there was nothing

8     wrong whatsoever about what Philadelphia did.  All of the

9     things that Mr. Giuliani was talking about have been ruled out

10    five to two.  It was acceptable, but it was all proper.  Maybe

11    Your Honor could get the opinion while you're on break.

12         *THE COURT:*  We're going to do that.  All right.  I'll

13    repeat that.  Mr. Aronchick, thank you very much.  Let's check

14    into Mr. Aronchick's line, as well.

15         The nub of it is the Pennsylvania Supreme Court

16    apparently, according to Mr. Aronchick, has just ruled and

17    issued a decision seven to two that affirmed the lower court.

18         *MR. ARONCHICK:*  Five.

19         *THE COURT:*  I'm sorry, five.  Maybe I misspoke, five

20    to two, seven-member court, five to two affirming the prior

21    decision.  Is that the nub of it, Mr. Aronchick?

22         *MR. ARONCHICK:*  Yes, saying that the observer issue --

23         *THE COURT:*  Yes.

24         *MR. ARONCHICK:*  -- is not, not improper at all.

25         *THE COURT:*  The observer issue is not an improper --

1          *MR. DONOVAN:*  Correct, Judge.  So it affirmed the

2     trial court --

3          *THE COURT:*  Affirming the trial court.

4          *MR. DONOVAN:*  -- and reversed the Commonwealth Court.

5          *THE COURT:*  I misspoke, yes.  It affirms the trial

6     court, reverses the Commonwealth Court.  And that is a

7     five-to-two decision with a seven-member State Supreme Court,

8     as you're probably aware.  So I'll pull that decision up.  I

9     think that may have some -- it may have some, have some

10     assistance to me as I make my determination here.

11          So for those of you who are down in Courtroom 3 or

12     members of the public, we are taking a short break because

13     there are some technical difficulties with those people who

14     have dialed in on telephone lines, both members of the press,

15     as well as members of the public.

16          For those of you in the jury assembly room who, I

17     believe, are exclusively members of the press, again, we're

18     going to stand in recess, I hope not very long, to get these

19     telephone lines hooked back up.  So don't stray too far away.

20     We'll be back momentarily.  Thank you, counsel.  The court will

21     rise.

22          *COURTROOM DEPUTY:*  All rise.

23       *(Recess taken.)*

24          *THE COURT:*  We're back on the record again.  We had,

25     as counsel is aware and the members of the media and to the

1    extent the public is present, we had the telephone lines go

2    down for reasons that I don't understand.  I'm told that

3    they're back up again so that the public can participate in

4    this oral argument by listening to it.

5            So, again, my apologies, Mr. Donovan.  Go right ahead.

6    You're sort of midway through your equal protection argument.

7            *MR. DONOVAN:*  Thank you, Judge.

8            *THE COURT:*  Why don't you pick up where you left off.

9            *MR. DONOVAN:*  I will, Judge.  Thank you.  And where we

10   were discussing was really why the allegations here do not

11   establish an equal protection vote dilution claim.  And I was

12   on the Campaign versus Boockvar case from the Western District,

13   and just a couple more points and then I want to point to some

14   other cases.

15           But what Judge Ranjan said there in the drop box

16   context where they were saying it was unequal, right before

17   star 44 he said what plaintiffs, they're the campaign, have

18   really identified then are not uneven risks of vote dilution

19   affecting voters in some counties more than equivalent voters

20   in others, but merely different voting procedures in different

21   counties that may contribute different amounts of vote dilution

22   distributed equally across the electorate as a whole.  The

23   court finds that this is not an equal protection issue.  And

24   I'd submit that's the same claim here.

25           And, finally, with respect to that, I come back to the

1    end of that section from Judge Ranjan's opinion.  He's citing

2    other courts, but he says, It is well established that even

3    violations of state election laws by state officials, let alone

4    violations by unidentified third parties, do not give rise to

5    federal constitutional claims.  And then he goes on at the end,

6    he goes what they were alleging there, this type of equal

7    protection claim fails as a matter of law.  And, Judge, I'd

8    submit we're no different here.

9           And at Page 27 of our brief to the amended complaint

10   we cited Judge Ranjan, but we also cited two other cases.  I

11   just want to give you the context to see.  One is the Northeast

12   Ohio Coal. for the Homeless.  And there the Sixth Circuit

13   rejected an equal protection challenge even where the

14   plaintiffs presented uncontested evidence that in determining

15   whether to reject a given ballot, the practices of boards of

16   elections can vary and sometimes considerably.

17          In the Eleventh Circuit in 2006, Wexler, plaintiffs do

18   not contend that equal protection requires a state to employ a

19   single kind of voting system throughout the state.  Indeed,

20   local variety in voting systems can be justified by concerns

21   about cost, the potential value of innovation, and so on.

22          The point is, Judge, general complaints, whether there

23   are differences between counties or that counties may have

24   counted some ballots differently, is not a federal court equal

25   protection claim.  And for that, Judge, I'd move on to Slide 15

1    just to show you a couple other courts.  Short v. Brown, the

2    Ninth Circuit, and there they said, Under the plaintiffs'

3    theory, unless California foists a new system on all 58

4    counties at once, it creates an unconstitutional vote dilution

5    in counties that do not participate in the pilot plan they have

6    there.  Nothing in the Constitution, the Supreme Court's

7    controlling precedent, or our case law suggests that we can

8    micromanage a state's election process to this degree.  No

9    different here, Judge.

10           And then Slide 16, Judge, two more cases I just want

11   to tick off particularly.  One is the Fifth Circuit recently

12   where, again, they said, A law that makes it easier for others

13   to vote does not abridge any person's right to vote.  And this

14   goes to the named plaintiffs, voter plaintiffs here.  There was

15   the drive-through.  Again, the July 27 and October 1

16   proclamations, which must be read together to make sense, are

17   beyond doubt -- are beyond any doubt measures that make it

18   easier for eligible Texans to vote absentee.  How this

19   expansion of the voting opportunities burdens anyone's right to

20   vote is a mystery.

21           And, finally, Judge, the District of Nevada recently,

22   there they said, Clark County's plan to make it easier or more

23   convenient to vote in Clark County but does not have any

24   adverse effects on the ability of voters in other counties to

25   vote.  Plaintiffs are unlikely to succeed on their claim of

1    equal protection violation where they provide no evidence, and

2    cannot provide any, that the Clark County plan makes it harder

3    for voters in other counties to vote.

4         The same thing here for the two voter plaintiffs.

5    They said, we couldn't vote, but nothing any county did,

6    anybody did, made it any harder.  They got to vote by mail.

7    Unfortunately, they didn't do the secrecy envelope, and the

8    Pennsylvania Supreme Court, under state law, said that's

9    required, so they weren't counted.

10        So where does that leave us, Judge?  Well, where it

11   leaves us is that the two named plaintiffs, as I said, they

12   don't have standing, but they also can't make an Equal

13   Protection Clause claim because the fact that some counties may

14   have taken some steps to tell people, hey, your mail-in vote is

15   defective, you can vote provisional if you want and we'll see

16   if it gets counted, didn't impact them.  They got the right to

17   vote.

18        And the same thing for the campaign that I talked

19   about earlier about -- what they talk about for the campaign,

20   right, the competitive advantage.  And I just went through all

21   these equal protection claims cases, including the campaign's

22   case in the Western District.  And there -- what they can't

23   show here is that any ballot that was counted affected any race

24   differently on ballots and it affected all candidates, and

25   that's under federal equal protection law.

1          So to wrap this section up, Judge, the Secretary

2    fundamentally disagrees with allegations that the Pennsylvania

3    Election Code was violated or there was fraud.  In fact, it's

4    quite a huge success during the pandemic that almost

5    seven million Pennsylvania citizens voted.  But that's not an

6    issue in this case.  That's not an issue in this case.

7          Suffice it to say the plaintiffs' allegations, as

8    they've alleged in the first amended complaint, do not

9    establish a federal Equal Protection Clause that they can

10   pursue, and it should be dismissed today as a matter of law.

11         And, Judge, I want to end my section before I hand off

12   to Mr. Aronchick where you started today, Judge.  There's one

13   count in this case that's active.  The second one is for

14   appeal.  Mr. Giuliani spent a lot of time on canvass, and I

15   know the Pennsylvania Supreme Court has now ruled, so I think

16   that's moot.

17         But more importantly, for our purposes, Judge, the

18   redline the plaintiffs provided about the canvass is deleted,

19   deleted, deleted, deleted.  So, you know, I'm here on a motion

20   to dismiss, so I think we have to take the first amended

21   complaint.  No standing, no Equal Protection Clause claim, and

22   they deleted the claims Mr. Giuliani talked about.

23         And I want to add one final point.  To say they don't

24   have a federal Equal Protection Clause claim does not mean

25   there can't be challenges.  Both -- I'm sure there are lots

```
 1   of -- I know the campaign here did, they challenged on Election
 2   Day, they challenged after Election Day, they're challenging
 3   still in state court.  That's to be decided by state court.
 4   But for our purposes, Judge, they do not have a federal -- they
 5   don't have standing, and they don't have a federal equal
 6   protection claim.  Thank you, Judge, for your time again.
 7             THE COURT:  Thank you, sir.
 8             MR. DONOVAN:  I turn to Mr. Aronchick next.
 9             THE COURT:  Mr. Aronchick, are you ready to proceed on
10   the abstention issues?  Mr. Aronchick, you're speaking.  I
11   think you may still be on mute.
12             MR. ARONCHICK:  Am I unmuted now?
13             THE COURT:  Let's try it again.
14             MR. ARONCHICK:  Am I unmuted now?
15             THE COURT:  Yes.  Could we turn him up just a little
16   bit?
17             MR. ARONCHICK:  Okay.  Your Honor, Your Honor --
18             THE COURT:  Maybe could we turn you up just a little
19   bit in volume, sir?
20             MR. ARONCHICK:  I'm at the highest I can be here.
21             THE COURT:  That's fine.
22             MR. ARONCHICK:  Do you have a volume control?
23             THE COURT:  No, you're good.  That was good.  Counsel,
24   can you hear him?
25             MR. ARONCHICK:  Okay?
```

1            *THE COURT:*  Counsel has indicated yes.  You were good

2       there just a moment ago, Mr. Aronchick.  Go right ahead.

3            *(The following argument was via Webex with intermittent*

4       *audio difficulties:)*

5            *MR. ARONCHICK:*  Thank you, Judge Brann, and thank you

6       for the courtesy of appearing virtually.  I appreciate that a

7       lot.

8            Your Honor, I was prepared and will address

9       abstention, but because of a number of the items that

10      Mr. Giuliani raised, because of some of the intervening case

11      law from the Supreme Court, because of your questions that you

12      raised, permit me to cut through a series of other points

13      briefly, and then I will get to abstention.

14           The first thing I want to say is that if you --

15      there's a very, very important statement in Chief Justice

16      Saylor's dissenting opinion in today's ruling.  The ruling, of

17      course, was five to two that observers are just that.  They're

18      not --

19           *MR. GIULIANI:*  Your Honor, I can't hear him.

20           *THE COURT:*  Mr. Aronchick.

21           *MR. ARONCHICK:*  They're not --

22           *THE COURT:*  We're having some problems hearing you.

23      Just a moment.  Mr. Aronchick, just a minute.  Can they put

24      their screens up and see him?  No, I suppose not.  Yeah, pop

25      them up if they can.  That may help.  Hold on a second.  I

1    realize that seeing is not hearing, I appreciate they're

2    different senses, but somehow in my mind that helps.

3            *MR. GIULIANI:*  It does.

4            *THE COURT:*  All right.  Go ahead, sir.  You know

5    this --

6            *MR. ARONCHICK:*  Thank you, Your Honor.

7            *THE COURT:*  Virtual arguments have some difficulties,

8    as you can appreciate, so do the best you can.

9            *MR. ARONCHICK:*  I do, I do.  And I hope that you can

10   hear me because you're the important one.

11           *THE COURT:*  I can hear you.

12           *MR. ARONCHICK:*  So the first part of the argument was

13   that, yes, the observer issue was decided decisively.  The

14   Pennsylvania Supreme Court thought -- and you can see that in

15   the majority opinion.  And it eliminates, I mean, it really

16   cuts out, I think, almost 90 percent of what Mr. Giuliani was

17   trying to argue is involved somehow in this case.

18          And I will address, I am sure Mr. Giuliani is going to

19   then come up and say, you know, the Pennsylvania Supreme Court

20   just committed some kind of an equal protection violation by

21   saying that different counties can set up their ways of

22   observation consistent with their local needs differently.  I

23   just want to say I'm sure he's going to say something like that

24   because he's very inventive.  He just keeps moving on.

25          But on this particular issue, two things.  Number one,

1    there is no constitutional right to be a poll watcher or an

2    observer.  That's settled in Judge Ranjan's opinion.  That's in

3    the Pennsylvania Supreme Court's opinion.  There is no such

4    right.  It is a creature of state statute.  The Pennsylvania

5    Supreme Court has just told us what it is and end of story.

6            Mr. Mercer and all of Mr. Giuliani's supposed

7    witnesses had their right to observe, and they had nothing to

8    challenge anything.  They had a right to see what was going on.

9    They did see it.  That's over.  That can't be hijacked into an

10   equal protection case.

11           But number two, Chief Justice Saylor, a great chief

12   justice, by the way, said in his dissent on Page 2, it's

13   important:  Finally, short of demonstrated fraud, the notion

14   that presumptively valid ballots cast by Pennsylvania

15   electorate would be disregarded based on isolated procedural

16   irregularities that have been redressed, thus disenfranchising

17   potentially thousands of voters, is misguided.

18           What the chief is saying there is that the kind of

19   thing that Mr. Giuliani is asking, wipe out all the mail-in

20   ballots supposing a couple, a handful of irregularities, is

21   misguided, not available, not happening under Pennsylvania law.

22   Now, that's -- so that's the first one I want to address about

23   this observer opinion, a very important opinion.

24           The second issue, I don't think that Mr. Giuliani has

25   even read Judge Ranjan's opinion or even understands it.  It

1    wasn't addressed by Mr. Giuliani in his argument.  It was not

2    addressed at all, to any degree, by the brief that was

3    submitted to Your Honor yesterday or the day before.

4           Judge Ranjan, if you step back, Your Honor, had before

5    him an even better version, a better pleaded version, of the

6    same theoretical thing that they are now arguing about the

7    notice and cure issue.  And what I mean is this, in that case,

8    there were 200, 200-paragraph allegations in that case.  They

9    all have 200-page allegations.

10          They put into that case all sorts of elements of

11   fraud, not in this amended complaint, Your Honor, not here, but

12   there tried to say with the primary election, we have this kind

13   of fraud and this kind of drop box fraud and this person had

14   two ballots in their hand.  And they showed all kinds of

15   pictures, more pictures and, frankly, better pictures than the

16   ones Mr. Giuliani is waving around now, largely irrelevant

17   because of the Supreme Court's opinion, by the way, but, in any

18   event, pictures.  And he said there's all sorts of fraud and

19   susceptibility of fraud.

20          They also said that in a lot of these drop boxes,

21   which are susceptible to fraud, some counties relied on them

22   because it would make voters' experiences easier in a pandemic

23   and other counties may not, and, oh, that's an equal protection

24   violation.

25          Your Honor, it's the same thing here.  They tried to

1    say, in the first amended complaint, there are -- 33 times they

2    said there are allegations of fraud.  They took all 33 out of

3    their amended complaint.  Mr. Giuliani is talking about another

4    case, not the case before Your Honor, some invented case, some

5    fantasy world.  But the case before Your Honor, they removed

6    all the fraud allegations.

7             Even if they're left, Judge Ranjan showed the way

8    here.  And I know you're -- you know, we respect him.  We

9    respect you.  You're independent of Judge Ranjan.  I understand

10   that.  We're in the Middle District.  But he showed you in

11   painstaking detail how he went through each of their fraud

12   allegations and rejected them.  This picture doesn't say what

13   you said it said.  This picture he distorted.  There are no

14   fraud allegations.

15            And you know what else he said?  He said your effort

16   to go way back in history about something that happened in 1960

17   or 1993 or 2001 somewhere or someplace that amounted to some

18   kind of fraud doesn't belong in this case because the case law

19   that he cited says you don't go back to those kinds of things

20   to talk about susceptibility to fraud in present day, moment in

21   time, current elections.  That was really irrelevant under the

22   case law.

23            Now, what else did he say?  He also said the

24   allegations on uses of drop boxes, that's okay.  Of course,

25   there is a legion of case law, some of it Mr. Donovan directed

1    himself to, directed you to, that says that variations on the

2    administration of an election county to county are not equal

3    protection violations.

4            And what's more to the point, what's in this case?

5    The variations that Judge Ranjan faced and that you face are

6    variations where some counties have the ability to make voting

7    easier in a pandemic.  All counties had that choice uniformly

8    across Pennsylvania.  All counties could have done it.  They

9    could all use drop boxes, they could all have notice and cure,

10   they all could have done the same thing.

11           The fact that Mr. Giuliani's favorite counties didn't

12   do it doesn't mean it's not available, and it doesn't mean it's

13   an equal protection violation for the counties that did do it.

14   There is no case that they have cited, there is no case that we

15   can find where efforts to make voting experiences easier, even

16   not in a pandemic, but now particularly in a pandemic, is an

17   equal protection violation.

18           What they are doing, as Judge Ranjan said, is

19   inverting the Equal Protection Clause, turning it upside down.

20   They are saying to the counties with the lowest level of

21   administrative experience, whatever they tried to do for their

22   voters for whatever reasons I'm not saying is bad or good, but

23   whatever the lowest level of running the election is, whatever

24   the lowest level of opportunities to make voting easier they

25   chose.  In Mr. Henry's case, Lancaster, counting the ballot,

1    notice and cure, it was in the loop.  He had the opportunity.

2    He should have read it.  He blew it when he put his vote

3    together and didn't vote.

4            And Fayette County apparently didn't tell Mr. Rogers.

5    Okay, but we don't race to the bottom now, we don't say that we

6    measure these by the lowest common denominator of whatever any

7    counties did.  That is not an equal protection violation, that

8    is not a rational basis decision, that is nonsense, total

9    nonsense, and it is not recognized by any law.

10           And more to the point, Bognet, a three-judge panel,

11   Chief Judge Brooks Smith, Judge -- former Chief Judge Scirica,

12   Judge Shwartz, not from Pennsylvania, by the way, from New

13   Jersey, they wrote a panel decision unanimous that said that

14   the kinds of -- the kinds of claims that Mr. Giuliani is paving

15   here today that amount to equal protection violations just

16   don't.  And they went back eighty years, eighty years to the

17   Pennsylvania -- to the Third Circuit decisions in 1944 that

18   said the same thing.

19           And, you know, if you look at Bush versus Gore, all

20   nine justices said the same thing.  We're not talking about

21   differences or precedents or even if they're wrong in the

22   administration of elections and the counting of votes.  That's

23   not an equal protection violation.  That's not what Bush versus

24   Gore is all about.  That's not what Bognet is all about.

25   That's not what Judge Ranjan was all about.  That's not what

1    anybody has been all about.

2            So let me just put that equal protection issue over

3    here for a second.  I want to underscore what Mr. Donovan was

4    saying to you.  The cases he proposed to you, they all say the

5    same thing, the Short case, the Husted case, the Northeast Ohio

6    case, one after another, in the current environment, as well.

7            Now, number two, they -- you know, Mr. Giuliani talks

8    about when he went to law school he learned about cases in

9    controversies and he remembers from his first year of law

10   school class something about standing.

11           But what he doesn't remember is how standing actually

12   is articulated in the case law, including in your case, which

13   he didn't even address, your Voters Alliance case, which our

14   firm was involved in.  We were involved in all these cases.  He

15   didn't even bother to address your own standard in your own

16   opinion.  But let's put aside that for one second.

17           I believe that we have an actual complaint in front of

18   us and first amended complaint.  We don't have an invented

19   story, as Mr. Giuliani came here with, about ten other states,

20   about Clark County, Nevada, about something that happened in

21   1960, about Ozzie Myers, about -- and the mafia in

22   Philadelphia.

23           He called our election workers, our patriots, our

24   people who run the elections the mafia?  I mean, this is --

25   this just is disgraceful in an American court of any place,

1    including in the Federal District Court.

2              But put aside the invention and let's look at the

3    complaint, not the one he thinks he's going to invent right

4    now.  He has no right to a second amended complaint, by the

5    way, Your Honor, under the rules.  There is no right to do

6    that.  But let's look at what's here.  And let me direct you,

7    for standing purposes, Your Honor, to the actual allegations in

8    this complaint.  That's where the analysis starts.

9              In Count 1, they talk about notice and cure.  By the

10   way, a miniscule problem, not affecting any amount of votes

11   that matter here.  But let's just say -- let's just take their

12   claim, and he's saying notice and cure is an equal protection

13   violation.

14             But what are the facts you have to look at, Your

15   Honor, if you're to measure standing?  Out of 150 allegations,

16   there's eight vaguely worded allegations, giving them the

17   benefit of all the doubt, eight vaguely worded allegations that

18   address what they think are problems about notice and cure.

19             Let me direct Your Honor to them so that you can study

20   them later.  In Paragraph 129 we're told that on November the

21   2nd, Secretary Boockvar told all the counties that they can

22   give lists of rejected mailed ballots, they can give them out

23   to everybody, and they could advise parties, candidates, and

24   voters about the list of rejections so that voters would know

25   and could have the opportunity to exercise their right to spoil

1    their ballot and vote in person or provisionally -- a machine

2    in person, if they're allowed, or provisionally if there's some

3    issue.  This is Paragraph 129.

4         I say halleluiah to Secretary Boockvar.  I mean, what

5    in the world is wrong with telling all the counties that they

6    could advise voters that their mail-in ballots were rejected so

7    that they can go to the polls and exercise their rights over

8    25 Purdon's 3150, Paragraph 16, Paragraph (b)(2), which is they

9    can spoil their ballots and vote in person if the

10   computer shows -- if the system shows that the ballot was

11   spoiled or provisionally if it's not yet in the computer.  That

12   is a problem?  Hardly.

13        Number two, Paragraph 127, they say -- well, if you

14   did that, I say halleluiah.  I mean, what's wrong with telling

15   voters there's -- you have a right to vote?  Your mail-in

16   ballot didn't work.  I mean, I feel really bad for Mr. Henry

17   and Mr. Rogers that their counties didn't bother to tell them,

18   not so bad that they didn't follow their own instructions, not

19   so bad that they didn't know the law themselves, but so what?

20        Paragraph 130, they say four counties chose not to,

21   not to tell the voters what the Secretary said all counties

22   could tell them, and we feel they did.  Those four counties,

23   Berks, Westmoreland, Lancaster, and York.  You know, I don't

24   know and you don't know and nobody knows from this complaint

25   what did the other 60 counties in Pennsylvania do?

1          Mr. Giuliani waves his hand around, somehow he must

2    have some superior knowledge, but if he does, it's not in the

3    amended complaint.  It's nothing you can do anything about in

4    evaluating the strength of this complaint as against standing.

5          Paragraph 15 and 16, that talks about Rogers and Henry

6    had their problems because they didn't do it right and no one

7    told them that they had another chance.

8          Paragraph 124, this is the one that for standing

9    purposes is amazing that it's in this complaint and that they

10   still are asking you to say there is standing, because standing

11   involves, as Your Honor knows, in your opinion, a few things,

12   one of which is concrete particularized harm.  But the second

13   is harm particular to the person complaining that is traceable,

14   traceable to the problem that is being alleged.

15         They say in Paragraph 124, apart from the notice that

16   I guess -- I live in Philadelphia, that's all I know about

17   here, gave -- although they try to act as if there's some cabal

18   or mafia among Democratic counties.  I mean, ridiculous.

19         But apart from the notice that Philadelphia gave, they

20   say essentially here, you can read it, they used a huge public

21   service campaign and media announcements and all sorts of

22   information in the public that you have to be careful about

23   filling out your ballots, writing your declaration, having no

24   naked ballots, make sure they're signed, make sure they have

25   the secrecy envelope, an enormous public relations campaign.

1          Now, these unnamed voters who they don't talk -- I

2     mean, these people that they're worrying about that bothered to

3     cure their ballot or bothered to vote provisionally so that

4     they could exercise their franchise in this important election,

5     how do they know why these voters went and did that?  How do

6     they know whether these voters listened to the public service

7     announcements, listened to candidate President Trump who told

8     everybody don't vote by mail, go vote in person?

9          How do they know whether these voters who went and

10    spoiled their ballots and voted provisionally actually voted?

11    They have nothing in here that traces the supposed harm to the

12    individuals that they are complaining about, nothing, and are

13    leaving it for you to speculate about.  And that is not a

14    federal complaint.  That is not standing, it is not

15    jurisdiction, that is not a case in controversy with whatever

16    law school we all went to.

17         And in Paragraph 97, as Mr. -- as my colleague

18    Mr. Donovan said, there is some -- well, there is vote dilution

19    from the people who went and cured their ballots or voted

20    provisionally.  Well, if there was, there are no specifics.

21    There are no numbers in here.  You have no basis to judge -- to

22    figure out what is in front of you from this complaint.

23         But even then, back to Judge Ranjan, back to the

24    Bognet decision, back to every decision that deals with this

25    loose concept of vote dilution, if it is dilution -- if it is a

1    problem, if there is a state law violation that somebody's vote

2    was counted improperly, it affects everybody else, not just one

3    person, everybody equally, and that is a generalized grievance.

4    That is not standing.

5          And then they say, in the last of these handful of

6    paragraphs, Paragraph 131, as a result of this, President Trump

7    lost votes.  They just want you to accept that, but there's

8    nothing in here that they can establish that that happened.

9    How do they know that the people, the few people who went and

10   voted provisionally or that spoiled their ballots and didn't

11   use them or the very few who cured, how do they know who they

12   voted for?  How can you know?

13         Redressability is part of the issue.  There's nothing

14   in this complaint, nothing that says that these claims, whether

15   it's by individuals, whether it's by the campaign, have any

16   business of redressability, other than Mr. Giuliani's notion

17   that let's just throw out 680,000 votes, which, by the way,

18   because observers couldn't see things.

19         By the way, that is what the Pennsylvania Supreme

20   Court just said you can't do under Pennsylvania law.  But

21   common sense, Your Honor, would say that you can't do it based

22   on this complaint.  Can you imagine anybody understanding a

23   court order canceling six hundred -- or up to now, I get from

24   Mr. Giuliani, 1.2 million votes based on nothing in this

25   amended complaint?

1          Can you -- I mean, the idea of that, you are being

2     asked to do that, honestly, Your Honor, I don't use these words

3     very much, I am in court a lot, it is disgraceful that you're

4     even being asked to do that.  That is not -- whatever.  And so,

5     you know, that's it.  That's it.

6          So when we talk about standing, we don't know anything

7     that's important from this complaint, anything.  I just went

8     through all of that.

9          Let me give you the one fundamental about this, and

10     that is this:  This complaint is, at its core, at its essence,

11     a small, bald complaint about a certain kind of procedure that

12     the Secretary said is available to counties, a limited

13     procedure that if the ballot wasn't completely -- wasn't

14     signed, come in and sign it and then we'll put you into the

15     system for canvass.

16          Now, how does that come about as a matter of state

17     law?  Here's how it comes about.  Under state law, the -- to

18     give you the citation, 25 Purdon's 3150, 16(b)(1), there is an

19     activity that happens before the canvass and pre-canvass.

20     Mr. Giuliani didn't tell you about this.  That activity is that

21     the board of elections are supposed to prepare a register of

22     all of the votes that they're going to count, that are being

23     put into the counting system, the canvassing system, all the

24     mail-in votes.  They have to prepare a register.

25          So when they're doing administrative work to prepare

1    that register to put it into the pre-canvass and the canvass,

2    they naturally are looking at the mail that came in.  They're

3    not opening it.  They maybe would look at one, and, look,

4    here's one, the declaration, oh, this isn't signed.

5           We have sophisticated machinery now that Your Honor

6    knows about from the Voter Alliance case.  But they were

7    complaining, oh, it's so terrible that there was funding for

8    counties to have sophisticated machinery to move the counting

9    along, but they did it.

10          And it's sophisticated machinery because it's being

11   weighed in the back, that's coming through, and if it doesn't

12   have a secrecy envelope, then it is going to weigh less,

13   imperceptibly less, but that's how good the machinery is.  And

14   so, oh, look, this ballot apparently doesn't have a secrecy

15   envelope, we can't open it, we're not going to open it, so we

16   pull it out, we're not going to put it on the register.  That

17   is the administrative crunching the counties do.

18          Now, some of the counties develop small numbers of

19   votes, these are not big numbers, and call voters, you know,

20   we're not going to put your vote on -- this is before Election

21   Day, days before, we know you don't want to vote in person

22   because of the pandemic, that's why -- perhaps that's why you

23   voted by mail.  We're not going to make you go and vote in

24   person because of the pandemic, we're not going to spoil that

25   ballot.  You can spoil that ballot and vote in person.

1          We're going to tell you if you want to come in and

2     sign it, sign it.  We don't know if you're a Trump voter, we

3     don't know if you're a Green Party voter, we don't know if

4     you're a Biden voter, we don't know, but come in and sign it.

5     And all voters equally have that opportunity, and some voters

6     took advantage of it, not many.

7          Now, the second thing that happens is, the vote is in

8     canvass, and at the canvass, they're evaluating these votes,

9     are they filled out, is there a defect, what's going on, and

10    some voters either knew about their rights, heard it on the

11    public relations information that they plead in their

12    complaint -- I'm not going outside of the complaint, not like

13    Mr. Giuliani.  I'm staying in this complaint.  That's what they

14    pled.  And they went and voted provisionally.  Okay, so what?

15         But here's the thing, if there's anything wrong about

16    that -- and this gets to the question you asked me, you --

17    Mr. Donovan punted to me that you asked.  There are state law

18    remedies and procedures to challenge at the county level,

19    county by county, whether they do or don't or should or

20    shouldn't count that vote.

21         And on Page 10 and 11 of our brief, we listed the

22    cases that we knew about, that we knew about at the time last

23    week when we sent in our brief.  Since then -- I'm going to use

24    apparently an Allegheny County decision.  There is a -- I

25    believe a Chester County.  No, I'm sorry, a Berks County

1    decision.  And these common pleas decisions, election

2    decisions, common pleas decisions, are moving through the

3    system as they should.

4             And, now, a new development is that we find yesterday,

5    last evening, a King's Bench -- here's what happened, the

6    Commonwealth Court took the Philadelphia, five Philadelphia

7    cases, consolidated them together and set them down for

8    argument on Thursday.

9             And these cases, these cases are dealing with

10   general -- challenges of all sorts to the mail-in ballots at

11   the county level.  And, again, not many, not many votes, not

12   many votes, and I'll address that in a second, but nothing

13   that's going to affect the outcome of the election, nothing,

14   not even close, not the number of votes, not even close.

15            But the Commonwealth Court consolidated those cases,

16   and they set it down for argument on Thursday.  Looking at

17   the -- you know, what happened in these Philadelphia

18   challenges, a total number of about maybe 8,000 votes in Philly

19   completely that are -- that are under challenge in the

20   Commonwealth Court.

21            *THE COURT:*  I'm sorry, how many?

22            *MR. ARONCHICK:*  And --

23            *THE COURT:*  Mr. Aronchick, how many?

24            *MR. ARONCHICK:*  About 8,000.  I believe it's about

25   8,000.  I'm giving you round numbers.  I can give you precise

1   numbers afterward, but I'm giving you round numbers.  I believe

2   it's about 8,000.  That's the order of magnitude.

3          And then last night we filed -- we said, look, in

4   these cases that are going to percolate from other counties,

5   Pennsylvania Supreme Court, would you be available to take a

6   King's Bench because, you know, November 23rd is right on our

7   heels here.  If the Commonwealth Court makes a decision, then

8   there's going to be an appeal -- you know, it's going to be

9   Sunday and you're going to be in this, so how about a King's

10  Bench.

11         And it's under advisement right now, Your Honor, and

12  they want an answer to the King's Bench petition at 5 o'clock.

13  Is it 5 o'clock yet?  In a half hour.  They wanted answers, and

14  I guess they'll decide whether they're going to take this

15  particular challenge up as a King's Bench.

16         So that's what we know about right now about the

17  county things.  But there's one point I want to address about

18  that, and that is this, Judge Ranjan, it's going to get to --

19  some points I want to make about abstention, but it comes up

20  here logically, and I just want to point this out.

21         Judge Ranjan was facing the same kind of an issue,

22  drop boxes and whether signatures were even required under

23  the -- you know, on mail-in ballot declarations.  And he said,

24  well, I'm going to abstain under Pullman and Younger, and I'm

25  saying to you Trump Campaign, because it's the same campaign,

1    I'm saying to you Trump Campaign, you wrote this, you have

2    state remedies.

3           This is way before the eve of certification.  This is

4    in August.  You have state remedies.  There are cases pending.

5    You can go intervene.  That's your choice.  You can build a new

6    case.  That's your choice.  But you need to do that.  Don't ask

7    me, because the kind of claims you're putting at my doorstep

8    are equal protection claims based on state law violations, and

9    I want to know from the authoritative courts what state law

10   violations you're talking about here.

11          Now, the same thing here.  And one case to dwell on is

12   the Hamm case, which we mention on Page 10 and 11 of our brief,

13   the Hamm case which is before Judge Brobson in Commonwealth

14   Court.  That was a challenge by some -- by voters, different

15   parties, about the mail-in ballots and whether you can spoil

16   and whether you can vote provisionally.

17          And the main thing that they're -- in this small, you

18   know, complaint that they're trying to dress up as something

19   big before Your Honor, the main piece of it is about whether

20   you can spoil your ballot and vote provisionally, believe it or

21   not.  That's the main piece.

22          And Judge Brobson said, look, okay, I want who's

23   counting these to segregate those ballots, go ahead and count,

24   but segregate them, and there were 593 ballots segregated.

25   Five hundred and ninety-three, this is the order of magnitude

1    we're talking about, segregated.

2          Now, maybe that will come back to Judge Brobson.  The

3    case is still open.  But here's the thing about abstention, the

4    Democratic Party intervened and was granted party status.  The

5    Trump Campaign knows about that case.  They didn't intervene.

6    They could have.  Judge Ranjan told them in the summer, if you

7    can, do it.

8          No, instead, they wanted to dress up that issue for

9    you and ask you as a federal court to audit this election, to

10   collaterally sideswipe this election, to act as some kind of

11   superior appellate court over the state court.  It's a

12   Rooker-Feldman problem.

13         That's how they came about doing this.  They did not

14   choose the logical path under Younger and Pullman.  Instead,

15   they come running in here and they don't even talk about the

16   complaint that is before Your Honor.  Mr. Giuliani is talking

17   about something that is not before Your Honor, not before Your

18   Honor.

19         So let me go back to abstention.  There are so many

20   ways and cases and authorities on this point, Your Honor, I

21   don't even know where to start.  Judge Ranjan put a lot of them

22   together.  It starts with the Pullman and Younger, meaning is

23   there something pending or something that could be pending,

24   basically, is what it means.

25         And the fundamental question is the one I said before,

```
 1    is it okay, when they're compiling a registry of absentee votes
 2    and the same problems, to let voters know they can come in and
 3    correct the problem and not have to go into the polling place
 4    on Election Day if they -- and many voters can't and don't want
 5    to.
 6            And that's the issue.  The -- it is up to them.  It's
 7    their burden to show you why they can't go or didn't go to the
 8    Supreme Court -- state court, rather, and get a ruling on that
 9    issue.  I mean, they presumably still can, but they didn't.
10            And that -- you know, if anything, Your Honor, I'm
11    urging you, I'm pleading that you tell them just what Judge
12    Ranjan told them, I am not getting involved.  You had -- and if
13    you waived them, that's too bad -- or have whatever
14    opportunities you can think of to go to the state court and get
15    a ruling on your question.
16            You know, there is an opportunity now, still, under
17    the Election Code, under our contest provisions, that they can
18    raise up to the day of certification, that they need not --
19    they are (inaudible).  They are the ones that Judge Diamond
20    faced in the Stein case in 2016.  I'll address that in a
21    second.  They are there.
22            But it is too bad for them if they don't like what the
23    Election Code has provided as their remedy because it's too
24    hard, it requires actual evidence and not sweeping statements
25    about hearsay affidavits in Nevada or anywhere else.  They have
```

1    to put real evidence in the contest petition and they have to

2    show real numbers of votes that are affected and they have to

3    put up a very good fight.

4           But that is available to them if that's where they

5    want to go.  And that is -- and that is why abstention is so

6    important.  I mean, it's abstention on steroids.  And here's

7    why, what you have in front of you is not only Younger and

8    Pullman abstention, it's abstention on legal steroids.  Here's

9    why, look at what Judge Diamond said in the Stein case.  The

10   Stein case is very instructive.

11          In 2016, Jill Stein was the Mr. Giuliani today.  Jill

12   Stein was the one who came in with all sorts of sweeping

13   allegations about hacked voting machines and all sorts of

14   incidents of fraud around the Commonwealth and in the world and

15   in the universe.  That was Jill Stein then.

16          And Jill Stein, unlike the Trump campaign today, at

17   least went ahead and filed a contest petition.  Remember, she

18   was faced with a million-dollar bond, decided, whoops, I'm

19   going to go to federal court instead.  So it went there to

20   here.

21          In other words, in 2016, Jill Stein is Trump today,

22   the Trump Campaign today.  In 2016, the Trump Campaign was us

23   today.  The Trump Campaign said, no way, Ms. Stein, abstention,

24   get out of federal court.  Your case doesn't belong in federal

25   court.  It's not an equal protection violation.  It's an

```
 1    abstention problem.  That's what they said then.  They were

 2    right then.  So are we today.  Same campaign, different

 3    election.

 4            MR. GIULIANI:  Your Honor, I couldn't hear what he

 5    just said.

 6            MR. ARONCHICK:  And we don't play fast and loose with

 7    federal courts.  And on that point, Judge Diamond said the

 8    following -- this is why I said it's abstention on steroids.

 9    Judge Diamond --

10            THE COURT:  Excuse me, Mr. Aronchick, again, we're

11    having maybe some difficulty hearing you, and I don't know what

12    we do to improve that.  It may be -- and I don't say this

13    disrespectfully, maybe you're moving around too much.

14            MR. ARONCHICK:  Okay.  I don't think so, but I don't

15    have much more to do.  And, I'm sorry, I may -- I mean, if I'm

16    moving around too much, I'll try to --

17            THE COURT:  Try not to move.  Are you looking at me?

18            MR. ARONCHICK:  I will.

19            THE COURT:  I'm not moving at all.  I'm like -- if you

20    follow me, I mean, I'm not moving.  Once in a while I'll prop

21    my -- in a characteristic Brann move.  It doesn't mean I'm

22    bored.  It's just I picked it up my from father, I think, I put

23    my fingers to my head.  That's as much movement as you're going

24    to get from me.  So you might want to model that and see if

25    your voice improves.
```

 1              MR. ARONCHICK:  Okay, okay.

 2              THE COURT:  In a characteristic gesture --

 3              MR. ARONCHICK:  I appreciate that.

 4              THE COURT:  -- I'll go like this.  I won't move for a

 5    while.

 6              MR. ARONCHICK:  I'm going to stay right at your

 7    glasses and not --

 8              THE COURT:  Perfect.

 9              MR. ARONCHICK:  -- and not avert my face.

10              THE COURT:  I'm staring right at yours.  The camera is

11    here, but I'm looking directly at you, believe it or not.  So

12    don't move, just your lips.

13              MR. ARONCHICK:  I'm not going to move.  My lips are

14    moving.  But, Your Honor, I want to know if you got my

15    arguments already, or do I have to go back over any of it?

16              THE COURT:  Oh, no, no, no.  Let's just pick up where

17    you left off.

18              MR. ARONCHICK:  Okay.  So what I want to say about

19    Judge Diamond is this, Judge Diamond said, wait a second, we're

20    in a presidential election and abstention means something even

21    bigger.  It actually means comity, it actually means deference,

22    and here's why.  It means dismissing the whole case, not

23    waiting for something else to happen, and here's why.  Under 3

24    U.S.C. Section 5, Congress has said that we will leave to the

25    states to set up the Election Code with their counting regime,

1    with their administration, with their remedies, and we will

2    expect that that will fit with the constitutional imperatives

3    and the statutory imperatives of making sure that by the safe

4    harbor date, the governor is able to certify a slate.

5            Now, that is the last act, but the first act is

6    November 23rd.  That's the first set of certifications.  And

7    the Pennsylvania Election Code set that up, provided for

8    remedies.  Whether they, the Trump Campaign, likes them or not,

9    those are the remedies.

10           And Judge Diamond said, we need to honor that.  We

11   have a presidential election.  We need to understand that we

12   have to have electors certified by the governor by the safe

13   harbor date of December 8th.  We need to move backwards from

14   that.

15           And we will not, will not countenance, Judge Diamond

16   said, in strong language, federal courts, the use of federal

17   courts on any but the most extreme equal protection violations

18   upsetting that calendar, no matter what you want, Jill Stein,

19   and I would say no matter what you want, President Trump.

20           And those most egregious violations of equal

21   protection are the ones left by Chief Judge Smith in Bognet.

22   Pervasive fraud, not here, not in this complaint, not before

23   you, 33 counts removed, and systemic -- the system where, like,

24   a hurricane blows out a whole system, when you know how many

25   votes were involved and you come to court on that kind of

1    extreme situation.  Bush versus Gore, which is not, as they

2    said in our opinion, what this case is all about, or the

3    monumental efforts to try to go to federal court, you don't

4    have that in front of you, Your Honor.

5            And so I would say, just like Judge Diamond, you have

6    a half a dozen ripe significant ways to dismiss this case.

7    There shouldn't be a hearing.  There's no need for a hearing.

8    You can already understand what kind of circus that will

9    become.  Mr. Giuliani proved it.  We're going to hear about

10   Nevada, ten states, stacks of unverified affidavits that he's

11   going to look for special ways to introduce, all kinds of

12   things, based on nothing.

13           And so I urge, on behalf of the counties I represent,

14   dismiss this case.  Please, dismiss this case so we can move on

15   to the real business of this country.  You are being -- you

16   know, this case, for some reason, has become a lifeline to the

17   Trump Campaign.

18           Please, we need to move on.  We need to get this

19   election certified.  We need to do it the way the Election Code

20   says we need to do it.  And I urge you, please, to enter that

21   order, enter that order, and that is it.  That's all I have to

22   say, Your Honor.  I hope you heard it all.

23           *THE COURT:*  I did.  Thank you, sir.

24           *MR. ARONCHICK:*  Thank you.

25           *THE COURT:*  Now I'm going to turn back to Mr. Donovan

1    for a moment just to orient the court.  Do you know, Mr.

2    Donovan, what other defense counsel would like to speak?  Do

3    you have anything else you'd like to add?

4         MR. DONOVAN:  If I can just have one moment, I'll

5    confer to see if we can --

6         THE COURT:  I can do a little round robin with them,

7    but I'll let you go ahead first.

8         MR. GIULIANI:  Your Honor, can I ask for a short

9    recess?

10        THE COURT:  We're going to take one momentarily, yeah,

11   momentarily.

12        MR. DONOVAN:  So, Judge, my understanding, there are

13   two of the intervenors who want to address you very briefly on

14   discrete issues, and then I'm happy to answer any questions for

15   the defense.

16        THE COURT:  I will have, I'll have some questions.

17   Why don't we do this.  I think some counsel have asked for a

18   short recess at this point, so let's take about a ten-minute

19   recess.  It's now 4:45 p.m.  Let's stand in recess until 4:55.

20        For those of you with the press, we're going to take

21   just a ten-minute recess.  We'll be back on the bench.  I'm

22   sorry the other recess went as long as it did.  As you may or

23   may not appreciate, the telephone lines for both the press and

24   for members of the public were down, and that had to be squared

25   with AT&T.

1          This is an ordinary recess of ten minutes.  Again, for

2    those of you who are viewing from Judge Arbuckle's courtroom on

3    the third floor, again, the court will stand in recess for

4    about ten minutes and then we'll resume the argument.  The

5    court will rise.

6          *COURTROOM DEPUTY:*  All rise.

7       *(Recess taken.)*

8          *THE COURT:*  Mr. Donovan, you signaled that two of the

9    counsel representing the intervenors wish to make some

10   commentary to the court.

11         *MR. DONOVAN:*  Yeah, Judge, one amendment.  Centre

12   County counsel has about two minutes.  She'd like to address an

13   issue, if she could, before we go to the intervenors.

14         *THE COURT:*  That's fine.  Is it Ms. Dupuis or Ms.

15   Meacham?

16         *MR. DONOVAN:*  Yes.

17         *THE COURT:*  Ms. Dupuis.

18         *MS. DUPUIS:*  Your Honor, thank you.  Elizabeth Dupuis

19   for Centre County Government.  Centre County joins in the

20   standing and abstention arguments stated previously, but

21   additionally, based upon the allegations both in the amended

22   complaint and the proffer of evidence in the plaintiffs'

23   opening argument, Centre County did nothing wrong.

24         The plaintiffs do not put forth any concrete facts in

25   the complaint which show a violation of law as to Centre

1    County.  We know from the Pa. Supreme Court decision that the

2    manner of handling pre-canvass is a county decision.  Looking

3    at the complaint as to Centre County, handling of the

4    pre-canvass, which the plaintiffs correctly note was in a

5    ballroom, which was live-streamed on the web, and, more

6    importantly, all candidates and parties had full access to the

7    room during the two-day period.  Additionally, no complaints

8    were made by either party or campaign to Centre County.

9         The other matter in the complaint is an unspecific

10   allegation that a voter, not identifying the voter or the

11   precinct -- we have 80-plus precincts in Centre County --

12   received a provisional ballot.  If the same were true, per the

13   Election Code, the challenge to that ballot should be handled

14   through the provisional ballot process, which is under the

15   Pennsylvania Election Code, again, the issue of abstention.

16        The plaintiff campaign team was present the entire

17   time that Centre County reviewed provisional ballots and raised

18   no objections to the process, nor were any provisional ballots

19   in Centre County challenged.  Centre County is entitled to a

20   dismissal of this complaint against it based upon both standing

21   and abstention and the failure to state a claim.

22        *THE COURT:*  Thank you, Ms. Dupuis.  Mr. Nkwonta, I

23   believe.  Remind me, sir, who you represent again.

24        *MR. NKWONTA:*  Uzoma Nkwonta on behalf of the DNC, Your

25   Honor.

1            *THE COURT:* Okay, yes.  Thank you.

2            *MR. NKWONTA:* Good afternoon, Your Honor.  I'm here to

3    make a few quick points about some of the arguments that have

4    been raised that I believe are dispositive to this claim, to

5    the case that has been brought by plaintiffs, and I will make

6    every effort not to repeat arguments that have been made

7    already.

8            First, I want to start off with the injury that

9    plaintiffs have alleged.  Plaintiffs have actually disclaimed

10   any vote dilution injury on Page 4 of plaintiffs' opposition to

11   defendants' motion to dismiss.  It states, Yet plaintiffs'

12   injuries do not turn on vote dilution, but rather vote denial.

13   That is in the beginning of the second paragraph of Page 4.

14           And the reason that is instructive here and the reason

15   that is dispositive here is because a vote denial injury is not

16   traceable to any defendant in this case.  The plaintiffs in

17   this case are from counties that are not listed as defendants

18   here.  Lancaster and Fayette County are the appropriate

19   defendants in a vote denial claim.  A vote denial claim alleges

20   that some party improperly or unconstitutionally denied an

21   individual the right to vote.  None of the defendants in this

22   case have done that.

23           And when it comes to the Trump Campaign, as

24   Mr. Donovan had spelled out in detail, the Bognet case makes

25   clear that individuals, whether individual candidates or

1  campaigns, do not have standing or a right to enforce the

2  general code and enforce the Election Code generally.

3       These individuals have to demonstrate that the

4  procedures that they seek to challenge and the election law,

5  potential election law violations, will actually affect the

6  outcome of the election, and the Trump Campaign has not even

7  made any such allegation that that has occurred.

8       Next I'd like to point to the equal protection

9  arguments that have been asserted by plaintiffs and the claims

10 and allegations in their amended complaint only to highlight

11 that the main source of their authority, Bush v. Gore, actually

12 counsels against the rule that they seek here.

13      In Bush v. Gore, the court never recognized or

14 endorsed the rule that every single locality has to provide

15 uniform voting procedures.  Quite the opposite.  In fact, it's

16 unclear what jurisdictions' Election Code would survive under

17 such a rule.  And it would lead to a breathtaking expansion of

18 the equal protections clause.

19      And I want to quote from Bush v. Gore just to make

20 sure everyone and the court is aware of what was at stake.  The

21 court said, The question before the court is not whether local

22 entities, in the exercise of their expertise, may develop

23 different systems for implementing elections, that was not the

24 question before the court, rather the state court had

25 implemented a procedure and had the authority to implement

1    uniform procedures but failed to do so.  And that was the issue

2    that the Supreme Court confronted in Bush v. Gore.

3           Now, the Supreme Court also made clear that an overly

4    rigid application of the Equal Protection Clause undermines the

5    state legislature's decision to delegate to local authorities.

6           So Pennsylvania law does not have a supreme election

7    judge that tells every single county exactly how to run

8    elections and whose decisions are binding on every single

9    county, rather Pennsylvania law delegates that decision such

10   that elections are run by county boards, and county boards have

11   the power to make and issue regulations, instructions, not

12   inconsistent with the law, as they may deem necessary for the

13   guidance of election officers and electors.  That's in 25 P.S.

14   2642(f).

15          That type of delegation is contemplated not only by

16   Pennsylvania law, but was contemplated by all nine justices in

17   Bush v. Gore, and there has not been a single case yet that has

18   suggested that such differences in administration of election

19   procedures can somehow trigger an equal protection violation.

20          Lastly, I want to address briefly some of the

21   allegations of voter fraud that have been asserted in this

22   courtroom but were not included in the complaint, and

23   specifically with respect to Mr. Giuliani's accusations on

24   behalf of the Trump Campaign.  Because as the court may know,

25   the Trump Campaign is a plaintiff or at least a petitioner in

1   several lawsuits in state court challenging decisions of county

2   boards during the canvassing process.

3         And in some of those appeals, the attorneys for the

4   Trump Campaign were specifically asked whether they were

5   asserting that the ballots that were being -- that were being

6   accepted were cast fraudulently or whether they had any

7   information to suggest that there was fraud in the election.

8         So, for instance, in the Montgomery County appeal

9   there was -- the court conducted a hearing on November 10th

10  and, in that hearing, asked counsel for the Trump Campaign

11  whether they were alleging that fraud had occurred.  In

12  response, counsel stated, Accusing people of fraud is a pretty

13  big step.  And later stated, Everybody is coming to this with

14  good faith.  The DNC is coming to this with good faith.

15        Again, the court asked, Are you claiming that there is

16  fraud in connection with the 592 disputed ballots?  Counsel for

17  the Trump Campaign stated, To my knowledge, at present, no.

18  That was on Page 11 of the Montgomery County transcript.  I

19  know that transcript is not before the court, is not in the

20  record, but nor were the allegations asserted by Mr. Giuliani.

21        The DNC is happy to provide that transcript, but to

22  the extent that those allegations do come before the court or

23  the court decides to consider them, the court should also

24  consider the statements made by the Trump Campaign's attorneys

25  before state courts.

 1            I'd like to also highlight a hearing before the

 2     Philadelphia Court of Common Pleas, and I believe Ms. Kerns

 3     participated in this hearing.  And in that hearing, the court

 4     asked similarly whether Ms. Kerns was alleging voter fraud with

 5     respect to the challenged ballots, and Ms. Kerns answered, I am

 6     not proceeding on those allegations.  She repeatedly,

 7     throughout the transcript, made clear that she was not

 8     asserting any claims of voter fraud.

 9            So the allegations that you have heard today, that is

10     not the position that the Trump Campaign has taken in state

11     court.  And if there were anything that confirms this, I will

12     point to -- and this is actually on the record -- the order

13     issued by the Montgomery County Court of Common Pleas.  It was

14     actually filed as an exhibit to one of the intervenor's briefs.

15     And the docket number is 142-1, Page 3, and it's, I think,

16     halfway down the page.  And I'll read this excerpt.

17            It states, The court heard oral argument on

18     November 10th, 2020.  Petitioners, being the Trump Campaign,

19     stated they were not claiming any voter fraud, undue or

20     improper influence, regarding the challenged ballots at issue.

21     That was in the court decision because that was a concession

22     that they had made in the state court.

23            And there's a reason why they made that concession.

24     The reason is because all of these challenged procedures,

25     whether it be poll observers, the ability to cure, they

1    affected Democrats and Republicans equally.  Democrats were not

2    able to stand over their shoulder of county board of election

3    employees while they were counting ballots and nor were the

4    Republican observers.

5         And it's particularly telling that the ballots that

6    plaintiffs complain of and the claim -- that plaintiffs claim

7    were subject to fraud included a number of other races, some of

8    which went for Democrats, some of which went for Republicans.

9    For instance, the auditor general, the candidate in the lead is

10   a Republican.  The state treasurer, the candidate in the lead

11   is a Republican.

12        Now, these are statewide races.  These are on the same

13   ballots that the presidential race is on.  So if these races

14   are on the same ballots and the Republicans are in the lead,

15   then where does that leave their theory of fraud in Democratic

16   counties or the theory of a fraudulent conspiracy conducted by

17   Democrats?

18        I think what this shows, Your Honor, is that

19   plaintiffs' concerns and what they take issue with is not the

20   ballots, it's the voters' choices, and that is why this

21   complaint needs to be dismissed.  Thank you.

22        THE COURT:  Thank you, sir.

23        MR. ZIONTS:  Good afternoon, Your Honor.  David Zionts

24   for the voter intervenors, NAACP, and the other organizations

25   and individual voters.

1          Your Honor, I promised to be very brief and to not

2    repeat anything that you've heard, but we do think it's

3    important to bring this back to the voters, the perspective of

4    the voters who -- you know, what's at stake is whether we toss

5    out thousands or perhaps hundreds of thousands or perhaps we've

6    heard millions of lawfully cast ballots.

7          The first quick issue I'd like to discuss is the

8    doctrine of laches.  I think we have agreement from the

9    plaintiffs at Page 10 of their opposition in the Third Circuit,

10   laches can be applied at the motion to dismiss.  I also don't

11   think the plaintiffs have disputed that this is a particularly

12   important principle in election litigation.

13         We've cited case after case, there is a basic

14   fundamental rule if you can challenge election procedures

15   before the election, you must bring that challenge before the

16   election.  This isn't some kind of technicality.  And this case

17   illustrates exactly why this is so important, and it's

18   important to protect the voters.

19         What the plaintiffs are asking for is to toss out

20   votes, is to disenfranchise people.  But if plaintiffs had

21   acted earlier, when they could have, we wouldn't be having that

22   conversation at all.  Plaintiffs could have come in, said, you

23   know, we're concerned that some counties, some counties are not

24   making the same level of effort as others to help voters

25   correct their ballots.

1          Okay, so if they had said that, you know, we could

2     have -- you know, that's not an equal protection violation for

3     the reasons that you've heard, but suppose that it was.  You

4     know, there could be a tailored remedy, and perhaps the remedy

5     would have been, well, Fayette County, you need to bring

6     yourself up to the standard so that you are getting the same --

7     you know, Plaintiff Henry and Plaintiff Roberts are getting the

8     same opportunities to correct valid ballots.

9          We would never have been having a discussion about

10    should we toss out thousands or hundreds of thousands or

11    millions of votes, and that is the inherent prejudice of

12    waiting until the last minute and really beyond the last

13    minute.  It's, you know, can you solve a problem, can you fix

14    these alleged irregularities before the voters go to the polls,

15    before they cast their ballots, and never even have a

16    conversation about should we be discarding votes that have

17    already been cast.

18         So the question is, prejudice is clear, could the

19    plaintiffs have brought this challenge earlier?  The answer to

20    that is clearly yes, as well.  These notice and cure practices

21    are not some arcane issue.  This was well known.  I think it's

22    clear the plaintiffs in their complaint cite information about

23    this that was available before the election.

24         You know, the court could just decide this on the

25    basis of the complaint, but as sort of icing on the cake, we've

 1    attached, you know, a judicially noticeable document as Exhibit
 2    D to our motion.  It's an October 15th, October 15th report
 3    from CBS Harrisburg, not, you know, something that would be
 4    hard to find.  It ran a report that began, quote, Will you get
 5    a second chance if you made a mistake on a ballot, on a mail-in
 6    ballot?  Well, it may depend on where you live.
 7          "It may depend on where you live" is the exact equal
 8    protection theory that we've heard in the amended complaint,
 9    it's the exact theory that we heard this afternoon.  If
10    plaintiffs thought that was an equal protection violation, on
11    October 15th, they could have come into court and done
12    something about it.
13          The one thing they say in their opposition for why
14    they couldn't do that, well, votes hadn't been counted yet, so
15    the injury wasn't ripe.  That can't possibly be correct because
16    we know that plaintiffs went to Judge Ranjan over the summer
17    and in the fall complaining about very similar mail-in
18    balloting procedures, and the issue of ripeness was litigated
19    on October 10th.
20          Judge Ranjan issued a decision where he said, this is
21    ripe because otherwise you would have to wait until after the
22    election, so, yes, your harm is imminent and you can challenge
23    this now.  That was October 10th.
24          So of course plaintiffs could have come in well before
25    the election if they thought this was a problem.  They didn't.

1    As a result and only because of that delay, we're talking about

2    casting aside thousands or hundreds of thousands or millions of

3    votes, and that just can't possibly be correct.  The doctrine

4    of laches applies and is another basis among the many others

5    that you've heard already for dismissing this complaint.

6         Just to say one word about the proposed second amended

7    complaint that we've heard about, you know, that would just add

8    to the prejudice and add to the delay if we're now a couple of

9    weeks after Election Day, we are coming upon the counties'

10   deadline for certification, the safe harbor date for the

11   electoral college.

12        You know, putting aside the electoral college for a

13   minute, if there aren't certified results in Pennsylvania by

14   the end of this month, there essentially is no Pennsylvania

15   state house.  There are no elected members of the Pennsylvania

16   state house.

17        So the idea that after all of this delay, something

18   that easily could have been litigated before the election, to

19   now say we're going to take two shots at it and actually we

20   need a third amended complaint a couple of weeks later, you

21   know, the prejudice from that just compounds and compounds.

22   That's all I wanted to say about laches.

23        Just one final word about the remedy that we're

24   hearing about, about getting rid of votes.  And the refrain

25   that we've heard in Paragraph 1 of the amended complaint is, we

```
1    want to count the legal votes and don't count the illegal

2    votes.  But when you drill down to it, no one is talking about

3    illegal votes.  We're talking primarily about what's been

4    called notice and cure.  Think about the word "cure."  A ballot

5    that is cured is fixed.  It's legal.  It has done everything

6    right.

7           The plaintiffs are complaining that the counties

8    did -- some counties did something that they weren't supposed

9    to in notifying voters that there was a problem, but the votes,

10   the ballots, a cured ballot is, by definition, a legal ballot,

11   complies with every applicable requirement cast by a qualified

12   Pennsylvania voter.

13          And, you know, we quoted in our brief the Appeal of

14   Simon case.  It says, quote, The rights of voters are not to be

15   prejudiced by the errors or wrongful acts of the officers of

16   the election.  We don't think that the officers of the election

17   made any mistake or made any error here.

18          Even if you accept that allegation, if you accept that

19   conclusion, the voters did nothing wrong, and it just makes

20   absolutely no sense to say the remedy to any of this is that

21   you would disenfranchise voters.

22          You know, we've heard this idea that what is happening

23   here, illegal votes or fraudulent votes, you know, I think it

24   helps to get a little less abstract and talk concretely about

25   what we're talking about.
```

1          One of the intervenors in our case is a 73-year-old

2     woman named Natalie Price.  She lives in Elkins Park.  She was

3     committed to participating in this election.  She cast a

4     mail-in ballot and was notified that there was a problem and it

5     wouldn't be counted and what she should do is go to Norristown,

6     which is a half an hour away, to correct it.  So she did.  She

7     made that trip.

8          First she went to the wrong place.  She had to go to

9     two different sites.  It was pouring rain, but she was

10    determined to make sure that she, a qualified Pennsylvania

11    voter, cast one single valid ballot.  You know, to call that

12    fraud, to call that illegal is just insulting.

13         To say that thousands or hundreds of thousands or

14    millions of Pennsylvanians should be disenfranchised because of

15    these alleged minor irregularities or, you know, slight

16    different practices in one county or another, that just can't

17    possibly be right.  So for all of those reasons, Your Honor,

18    this complaint should be dismissed.

19         *THE COURT:*  Thank you, sir.  Mr. Donovan.

20         *MR. DONOVAN:*  Judge, I believe that's it from the

21    defense side.  We want to thank you and just request that the

22    first amended complaint be dismissed at your earliest

23    convenience.  Thank you.

24         *THE COURT:*  Very good, sir.  I have some questions.

25    So, Ms. Kerns, I'm going to start with you.  Again, you're

1   welcome, if you think it's best, to defer answering this to

2   either Mr. Giuliani or Mr. Scaringi, but I'm going to ask it to

3   you because you've been involved in the case, this case, from

4   its beginning.

5          You're alleging that the two individual plaintiffs,

6   Mr. Henry and Mr. Lawrence, were denied the right to vote in

7   violation of the Equal Protection Clause of the Fourteenth

8   Amendment.  But at bottom, you're asking this court to

9   invalidate more than 6.8 million votes, which we just heard

10  about from counsel, thereby disenfranchising every single voter

11  in the Commonwealth.

12         Can you tell me how this result can possibly be

13  justified?

14  *MR. GIULIANI:*  Your Honor, we're not asking that

15  6.8 million votes be canceled.  We're asking that the votes

16  that were counted without inspection, which are approximately

17  680,000 votes, be deemed null and void, as you would with any

18  violation of the absentee ballot requirement.

19         And it always is somewhat unfair to the person who

20  hasn't canceled, but if there's something wrong with an

21  absentee ballot, that ballot is not counted.  And in this

22  particular case -- I'm sorry.  And in this particular case,

23  Your Honor, it was a plan that was carried out in two different

24  jurisdictions, not in others, to make certain that uniformly

25  Republicans got no opportunity to observe the count.

1          The conduct was egregious.  The conduct was

2    premeditated.  The conduct was planned.  They have to have

3    gotten those barriers beforehand.  They couldn't have just done

4    it on the spur of the moment.  And the purpose was to have

5    those ballots examined in secret so that only a Democratic

6    officeholder would get to see it in just two counties and no

7    place else in the state.

8          I heard the representative of Chester County, I

9    believe it was, or was it Delaware, I'm not sure, say that that

10   didn't happen in their county.  If that's the case, we would

11   consider dropping that county from the lawsuit.

12         But the reality is that we're not asking for the

13   entire vote to be canceled, we're asking that the remedy be the

14   remedy that is usually applied when there's a violation of the

15   rules with regard to absentee ballots.  And this is an

16   egregious violation, a planned violation, and the remedy is

17   really required and is draconian because their conduct was

18   egregious.  Whoever heard of 600,000, 700,000 absentee ballots

19   not being examined?  It never happened in American history.

20         So the scope of the remedy is because of the scope of

21   the injury.  We're not asking the entire election be reversed.

22   But these ballots were not examined, and that is not just a

23   state issue, that's a due process issue.

24         We would contend that one of the fundamental tenets of

25   a fair election in the United States is the ability to inspect,

1    particularly, mail-in ballots, which are seen as inherently

2    difficult, fraudulent.  You can go to all the authorities,

3    we've been afraid of that for 20 years.

4            Now we have it, and the only way we can police these

5    ballots, there's only one way, there's the inspection.  If

6    you're going to make a mockery of the inspection, I don't know

7    where we're going to go.  I mean, as far as we're concerned,

8    Your Honor, those ballots could have been for Micky Mouse.  We

9    have no idea, have no idea.  This has never happened before.

10           And it didn't -- and the reason I point it out, that

11   it happened in other states for which I was personally

12   criticized, is because there was a connection here.  There's a

13   connection between Philadelphia and Pittsburgh.  And then

14   exactly the same thing happened in Detroit at the same time and

15   exactly the same thing in Milwaukee and exactly the same thing

16   in Nevada.

17           Republicans were uniformly refused the almost obvious

18   right to inspect an absentee ballot.  I've never heard of that

19   before, that an absentee ballot wasn't examined, and it was

20   done for a specific purpose.

21           If that ballot were a perfectly fine ballot, Your

22   Honor, why wouldn't they have invited the 18 Republican

23   inspectors -- there were 20 or 30 that they were keeping in a

24   pen -- hey, take a look at it, it's a real good ballot.

25           And then if you look at where they were and where they

1    came, they started the process 800,000 votes, 700,000 votes

2    behind, and they caught up in counting a lot of those ballots

3    very furiously.  Some of our witnesses will say that they saw

4    them not even look at the envelope, just throw it in a bin,

5    throw it in a bin, throw it in a bin, throw it in a bin.

6         And I also take exception to their saying we didn't

7    plead it and that I didn't plead it.  My goodness, Judge, I was

8    accused of not reading your opinion and, if I did, not

9    understanding it.  I have read your opinion, and I do

10   understand it, and it's completely distinguishable from this

11   case.  You were dealing with preelection, and you were dealing

12   with what could arguably be considered an injury that may or

13   may not happen, a generalized grievance.  We're not dealing

14   with that.  The election is over.

15        Those two men lost their right to vote.  They lost

16   their right to vote because they were treated differently in

17   their counties than they would have been treated if they were

18   in Philadelphia or if they were in Pittsburgh, where, in fact,

19   the Secretary varied the law.  The law is clear, you can't cure

20   a ballot.  It's clear.  The legislature hasn't changed that.

21   The Secretary has no legislative power, Your Honor.

22        That was -- and then they say that those two

23   plaintiffs, our clients, should sue their counties.  For what?

24   For following the law and not violating the law like their

25   counties?  Why -- I mean, if I were in that county, I'd look at

1   the law, and the law says you can't cure a ballot.  But then

2   the Secretary says, oh, it's okay to cure a ballot.

3          As a good lawyer, I'd say to my client, the Secretary

4   doesn't mean anything.  She can't or he can't vary the law.

5   The law is set by the legislature.  And this isn't some

6   technical law like is it three days or four days, it's can you

7   fix a ballot that is invalid.  That's a substantive law.  And I

8   would tell my client, don't do it.

9          So I don't know what we would accomplish by suing

10  those two counties.  They didn't do anything wrong.  The

11  counties that did something wrong are the counties that varied

12  the law to make it easier to accumulate enormous numbers of

13  illegal votes.

14         Now, they say, well, we don't know how people voted.

15  We do know that in Philadelphia, the vote was eight out of ten

16  for Biden.  So let's not be stupid.  I mean, that's ridiculous

17  to say we don't know what would happen.  And if it was equal

18  all over the entire state, what are they doing all over the

19  state?

20         But the reality is, this was a deliberate plan to do

21  this.  And to say that we didn't allege these voter violations

22  of the inspectors, Your Honor, from Page 56, in every instance

23  where an absentee mail-in ballot is opened and canvassed, poll

24  watchers are supposed to be present.

25         Defendants have not allowed watchers and

```
 1    representatives to be present when the required declaration

 2    containing official -- when the ballot envelopes are opened and

 3    when such ballots are counted and recorded.  Isn't that what I

 4    said?  It's in the complaint.  I wasn't making up the

 5    complaint, and I feel aggrieved by them misrepresenting what I

 6    said.  I mean, to say it's not in the complaint is just plain

 7    wrong.

 8          In Delaware County, observers were denied access to a

 9    back room counting area.  Other Pennsylvania counties provided

10    appropriate reviews.  However, in defendants' counties, they

11    were denied the opportunity to have an unobstructed observation

12    and ensure opacity.  I'm not quite sure I know what opacity

13    means, but it probably means you can see, right, you can see,

14    see well?

15          THE COURT:  I think it means you can't.

16          MR. GIULIANI:  It's a big word, Your Honor.

17          THE COURT:  It is for me, too.  Let me move to my next

18    question.

19          MR. GIULIANI:  One last point, Your Honor.  Those

20    allegations, which take up five pages, and also allege -- as

21    they said, we didn't allege a specific amount of ballots?  I

22    don't know, 680,770 sounds pretty specific to me.  That's

23    Number 142.  And, finally, all of that is incorporated by

24    reference in the first count, denial of due process.

25          THE COURT:  Thank you.
```

1         MS. KERNS:  Well, just to -- Your Honor, you asked me

2    to be helpful to the court, and just to circle back to your

3    original question because I think we got off on a tangent, we

4    do believe our equal protection claim is well established and

5    strong.  And it should not only survive the motion to dismiss

6    today, because that's what we're here for today, but also

7    warrant the extraordinary relief of the preliminary injunction.

8    And that's why we're here today.

9         State law can say count certain votes, and it can say

10   discard certain votes.  It can say that.  But what it cannot do

11   is say, under the U.S. Constitution, count some votes but don't

12   count other votes depending on where you reside in this

13   Commonwealth.  And that's what happened here.  And that is the

14   simple issue.  And I know that we -- today it went off into

15   other issues, but that is why -- that is this issue why we're

16   here today.

17        We believe that the equal protection violations are

18   absolutely undeniable.  And the fundamental question that you

19   have in front of you is how extensive and how persuasive -- or

20   pervasive are those undeniable violations.  And at this point,

21   if you go through the pleadings, the defendants are flailing

22   and they're grasping at any excuse not to answer those really

23   simple targeted questions that we asked.

24        We're just asking that the defendants be transparent,

25   and the stakes are high here.  The stakes are very high here,

1    and we're asking the defendants to be transparent immediately

2    because there is irreparable harm.

3          So to the extent that you're talking about all of the

4    votes, today what we're talking about is the motion to dismiss

5    and the preliminary injunction to get us through to the hearing

6    on Thursday when Your Honor can hear what we want to present

7    with our witnesses and then decide those questions.

8          MR. GIULIANI:  Your Honor, we're asking you for a

9    hearing.  And as far as the remedy is concerned --

10         MR. DONOVAN:  Judge --

11         MR. GIULIANI:  -- once we have an opportunity to

12   present the evidence to you, you'll decide whether or not the

13   remedy is too broad, too narrow, the right remedy, the correct

14   remedy, or you'll decide that our witnesses aren't telling the

15   truth.

16         But we no longer have an opportunity to go to the

17   state courts.  The Supreme Court of Pennsylvania has now

18   decided that presence only means being in the room and not

19   having an opportunity to observe, which would be in conflict

20   with the law in 49 other states, which I believe does give

21   rise -- Mr. -- the man who was very angry at me, I've forgotten

22   his name.

23         He said that it's not a good equal protection claim.

24   Well, it's a darn good due process claim since it is part of

25   the fundamental rights in an election in 49 other states, and

```
1    it used to be a fundamental right in this state.

2              So that's a case that really gives us another claim

3    that just arose today, but it can only be brought in a federal

4    court.  The state courts are virtually closed to us now.  We

5    can't make this argument in state court.

6         THE COURT:  All right.  Before I get to my second

7    question, Mr. Donovan, you had something to add?

8         MR. DONOVAN:  Yes, yes, brief.  Judge, I actually want

9    to answer your question.  Page 62 of the first amended

10   complaint, plaintiffs ask this court to enter judgment in their

11   favor and provide the following:  An order, declaration, or

12   injunction that prohibits the Defendant County Boards of

13   Elections and Defendant Secretary Boockvar from certifying the

14   results of the 2020 General Election in Pennsylvania on a

15   Commonwealth-wide basis.

16             That means no certification of president, no

17   certification of attorney general in the state, auditor, local

18   races, and the houses.  That's what they asked for, Judge.  So

19   when they didn't answer your question, that's really

20   problematic.

21             And I think Mr. Giuliani is going to be more aggrieved

22   because, in fact, he deleted his due process claim.  So when he

23   talks about canvass people, he deleted it.  And when he talks

24   about 680,000, it has nothing to do with the claim in this

25   case.
```

1          I know Mr. Giuliani wants to talk about his canvass

2     that now is no longer a claim.  It's not in the complaint

3     before the court.  And I do this, Judge, because I want to

4     bring -- I've been before Your Honor, I appreciate it, but I'm

5     bringing it back to this pleading, Judge.  This pleading is

6     defective, and they've asked you for extraordinary relief, so I

7     wanted to answer that question.  Thank you.

8          *THE COURT:*  Thank you.  Let me ask my next question,

9     which sort of flows from the first.  And, again, I'll direct

10    this to plaintiffs' counsel.  You can choose who should

11    respond.

12         In the amended complaint, the pleading that I'm

13    looking at, you repeatedly mention the dangers of voter fraud,

14    in particular susceptibility of mail-in ballots to fraud.

15    However, neither count in your complaint seeks relief from any

16    fraud.  Am I correct?

17         *MS. KERNS:*  Your Honor, the amended complaint, as it

18    was filed, seeks the specific relief that I mentioned earlier,

19    which is --

20         *THE COURT:*  Noted.

21         *MS. KERNS:*  -- the equal protection claim.

22         *THE COURT:*  So it's correct to say then that you're

23    not alleging fraud in the amended complaint?

24         *MR. GIULIANI:*  No, Your Honor, it is not, because we

25    incorporate by reference in 150 all of the allegations that

1   precede it, which include a long explanation of a fraudulent,

2   fraudulent process, a planned fraudulent process.

3        *THE COURT:*  So you are alleging a fraud?

4        *MR. GIULIANI:*  Yes, Your Honor.

5        *THE COURT:*  All right.  Well, if -- you've

6   acknowledged at the beginning of the hearing that the only

7   issue in the case is the equal protection claim related to

8   ballot curing procedure, but you've repeatedly spoken now about

9   claims relating to alleged violations of your right to have

10  poll watchers present during the ballot counting process.  Your

11  poll watching claims were deleted, they're now not before this

12  court, so why should I consider them now on oral argument when

13  you deleted the claims and thus took them out of this action,

14  something I think Mr. Donovan has just referenced?

15       Remember what I'm bound to look at at this point.  I

16  mean, that's what I'm bound to.  The complaint has been

17  amended.  Do we agree?

18       *MR. GIULIANI:*  Oh, certainly, Your Honor, it's been

19  amended.

20       *THE COURT:*  So since you claim that you're alleging

21  fraud in the complaint, putting aside for a moment whether or

22  not I think that's an accurate description of the pleadings,

23  then this complaint has to satisfy the heightened pleading

24  standard imposed by Federal Rule of Civil Procedure 9, does it

25  not?  Something that Mr. Donovan is referencing from a prior

1    matter that he had before me some years ago, sort of a private

2    joke, I suppose.

3              *MR. DONOVAN:*  Mr. Brier was here, too, Judge.

4              *THE COURT:*  It's not even a very funny joke.

5              *MR. GIULIANI:*  But Your Honor --

6              *THE COURT:*  But it's adherence to the rules, I guess

7    is what he's driving at.  Aren't you, Mr. Donovan?

8              *MR. DONOVAN:*  Yes, Your Honor.

9              *THE COURT:*  Isn't that it?

10             *MR. GIULIANI:*  Yes, Your Honor.  And I really have to

11   correct what I said, because we'd have to interpret it, we'd

12   have to interpret it to charge fraud.

13             *THE COURT:*  Right.  So --

14             *MR. GIULIANI:*  It charges -- what it charges is the

15   conduct in 132 to 149, without characterizing --

16             *THE COURT:*  I understand that.  So the amended

17   complaint -- does the amended complaint plead fraud with

18   particularity?

19             *MR. GIULIANI:*  No, Your Honor.  And it doesn't plead

20   fraud.  It pleads the -- it pleads the plan or scheme that we

21   lay out in 132 to 149 without characterizing it.

22             *THE COURT:*  Understood.  Now I want to talk about

23   standing for a minute.  I have some questions on standing.  I

24   understand that the new theory is based on the claim that the

25   individual plaintiffs were denied the right to vote.  You've

1    stated that this is the injury your clients have suffered.

2            In the amended complaint, you allege that the

3    individual plaintiffs tried to vote in Lancaster and Fayette

4    Counties, but by your own admission, it was those counties that

5    rejected those individual plaintiffs' votes.

6            So why are you before me in this court suing the

7    defendant, the defendants, for something that Lancaster and

8    Fayette counties did?  In other words, why didn't you just sue

9    the counties that actually caused your clients' injuries?

10           We've talked about this a little bit, but I'm not --

11   that was addressed by the defendants, but I'm not sure

12   specifically by you.  Do you want to take that up?

13           MS. KERNS:  Sure, Your Honor.  We -- the violations or

14   this issue was triggered when we learned after the election

15   that certain votes were counted and certain votes weren't, in

16   terms of certain voters were given the opportunity to cure and

17   certain voters weren't and those voters lived in different

18   parts of the Commonwealth.

19           And we believe that we have standing in this court, in

20   a federal court, because the alleged violations of equal

21   protection turn not on transforming the state law into a

22   federal question under the Third Circuit case that we were

23   talking about, but on the unequal treatment of the voters

24   regardless of what the state law says.

25           So we're not asking you about state law.  We're asking

1    you about the equal protection claim.  And like I said before,

2    state law can say what to count or what not to count, and

3    that's not at issue here.  It cannot say that they -- under the

4    U.S. Constitution that they're going to treat different voters

5    differently, and that's what happened here.  If you lived in

6    Philadelphia or another county in the north or the west of the

7    state, your vote was treated differently.

8            And the gentleman from the NAACP talked about a woman

9    who was notified, apparently, that she had sent in her ballot

10   and there were problems with it and she was able to get to the

11   voter registration office and fix it.  And that was a

12   compelling story, but we have a compelling story in our

13   complaint because our two plaintiffs did not even know there

14   was a problem with their ballots until a couple days after the

15   election.

16           So they did not have the same opportunity as a

17   plaintiff -- as a voter in a county where they were being told

18   in some type of a pre-Election Day review of ballots that there

19   was a problem.  So that's what this issue comes back to, the

20   unequal treatment.  And that's why we have standing in this

21   court.  It's under the federal constitutional claim.

22           *MR. GIULIANI:*  Your Honor, if I may, interestingly, on

23   Page 54, the new number is 127, I think the issue that she's

24   describing is really very clearly laid out, because it says in

25   Philadelphia County, they were allowed to cure, particularly, a

1    lack of secrecy envelope.  Well, that's exactly why Mr. Henry's

2    vote was declined in -- I guess it was Lancaster County.

3           And whether one is legal or not, as Ms. Kerns points

4    out, I believe it is illegal to cure.  I think the law of the

5    state says that.  And I don't think the Secretary has a right

6    to vary that.  But that's irrelevant to what we're arguing

7    right now.

8           What we're arguing right now is, she set up a system

9    that allows cure.  You can't have the system for the northern

10   part of the state but not for the southern part of the state.

11   You can't have it for Philadelphia County but not for Lancaster

12   County.  That's exactly what Bush v. Gore is talking about.

13   That is about as classic a case of denial of equal protection

14   with a sacred right, the right to vote.  It can't be played

15   with that way.  And I think that's the point that we're making.

16          That's an unassailable equal protection claim for the

17   two plaintiffs, particularly Mr. Henry, who happens to have

18   done exactly in his county, where he was denied the right to

19   vote, what happened in Philadelphia, where they were given the

20   right.  And it's the Commonwealth that really denies him the

21   right to vote, not his county.

22          THE COURT:  Well, that's what I'm driving at.  So why

23   is Secretary Boockvar here?  I mean, you don't allege that she

24   personally rejected the plaintiffs' votes or had any authority

25   to do so.  So could you explain how the Secretary --

1          *MR. GIULIANI:*  Sure.

2          *THE COURT:*  -- of the Commonwealth's actions caused --

3          *MR. GIULIANI:*  Yes.

4          *THE COURT:*  -- Lancaster or Fayette Counties to deny

5    the plaintiffs the right to vote?  How did Secretary Boockvar's

6    actions affect these individual voters in Lancaster and Fayette

7    Counties?

8          *MS. KERNS:*  Your Honor, if you review our motion for a

9    temporary injunction, you'll see that the Secretary

10   periodically put out guidance.  And the Secretary is not an

11   elected official and does not have the authority to interpret

12   the law or change the law.  And periodically she would put out

13   guidance, and not all counties, it appears, might have followed

14   it or had the ability to follow it, follow that advice.

15          And the night before the election apparently an email

16   went out to the counties from the Secretary of State's office.

17   It was not made public.  It was not public guidance.  And it

18   told the counties -- I think it went out at 8:38 p.m. from the

19   Secretary of State's office telling the counties during the

20   pre-canvass the next day -- and pre-canvass is when the -- that

21   was the first time anyone was supposed to start to look at

22   these ballots.

23          Under the Pennsylvania Election Code, at 7 o'clock on

24   Election Day, that was the first time anyone was ever supposed

25   to look at these ballots.  So that triggers, well, why was

1    everyone looking at the ballots before Election Day?  But then

2    when the Secretary's office put that email out the night

3    before, some -- first of all, it was 8:38 p.m. when it got put

4    out, and some counties apparently followed it and some counties

5    apparently didn't.

6            And our plaintiffs are a great, a great example

7    because no one told them, no one asked them to come in and cure

8    their ballot or that there was anything the matter with it, and

9    they didn't find out until a couple days after the election.

10           And Your Honor says, well, why didn't they sue their

11   county, well, sue their county afterwards to say that their

12   ballot didn't count?  So the issue here is that the guidance

13   and --

14           THE COURT:  Well, yes, yes.

15           MS. KERNS:  Have each individual -- well, Your Honor,

16   and that's why --

17           THE COURT:  Isn't the remedy ultimately the Court of

18   Common Pleas of Lancaster County and the Court of Common Pleas

19   of Fayette County or the appropriate, you know, state judicial

20   districts?  I think they're individual.  I think those counties

21   make up their own judicial districts, if I'm not -- if I

22   remember the law correctly.

23           MS. KERNS:  That would be --

24           THE COURT:  Isn't that where you go?

25           MS. KERNS:  That would be a state law claim.  That

1    would be asking the county -- telling the county you didn't

2    treat my individual vote correctly.

3            What we're here today, though, is an Equal Protection

4    Clause -- an equal protection argument for all citizens of the

5    Commonwealth, that all citizens were not treated equally.  So

6    that is different than just simply taking it to a county under,

7    under a state law claim after the election.

8            What's before Your Honor today is that because of the

9    actions of the Secretary of State and the various county boards

10   of elections, voters were treated differently, and that's

11   what's in this federal court today.

12           THE COURT:  Let me switch gears.

13           MS. KERNS:  Okay.

14           THE COURT:  And I want to talk now about the Trump

15   Campaign's equal protection claim against the defendants, which

16   you've just referenced.

17           Can you clarify whether the campaign is bringing its

18   own equal protection claim or whether the campaign's claim is

19   derivative of the individual plaintiffs' injuries?  Follow my

20   question?

21           MS. KERNS:  I think I follow the question.

22           THE COURT:  Your statement to me, your argument just a

23   moment ago sort of is a lead, it seems to me, into that.

24           MR. GIULIANI:  Isn't it both?

25           MS. KERNS:  My answer --

1          *THE COURT:*  So is the campaign's claim derivative of

2    the individual -- you have two individual plaintiffs' injuries.

3          *MS. KERNS:*  My answer would be it would be both, that

4    it's derivative of the individual voters, but the campaign is

5    also suffering an injury because once the -- and remember,

6    we're here today --

7          *THE COURT:*  What is the injury?

8          *MS. KERNS:*  Of the voters or the campaign?

9          *THE COURT:*  The campaign.

10         *MS. KERNS:*  That the votes -- that because of the

11   unequal treatment of the voters across the Commonwealth,

12   certain votes were counted properly and certain votes weren't,

13   because if -- we don't -- and this is the subject of our

14   targeted interrogatories.

15         And that's why we needed that answer, because if we --

16   if certain -- if everyone would have had a chance to cure, if

17   everyone equally had a chance to cure, if every voter in this

18   Commonwealth had a chance to cure, it was very likely that the

19   result -- and this is what we're alleging in our TRO -- it's

20   very likely that the results would have been very, very

21   different.

22         And -- or, or, on the flip side, if no one had a

23   chance to cure, if no county had implemented this procedure,

24   the results would have been very, very different.  And that is

25   a -- and that is an injury to the campaign.

1          *THE COURT:*  You see, Ms. Kerns, aren't you so happy

2    that I kept you in this case and didn't, you know, exclude you

3    last night, as I did your co-counsel from Texas?

4          *MS. KERNS:*  Well --

5          *THE COURT:*  Well, you are.

6          *MS. KERNS:*  I think you're happy because I think you

7    wanted my answers.

8          *THE COURT:*  Well, I'm asking if you're happy.  I'm a

9    neutral player here.

10          Here's my next question, why does the campaign have

11   standing to vindicate the plaintiffs' rights when the

12   plaintiffs themselves, the individual plaintiffs, appear to be

13   capable and willing to vindicate those rights on their own?

14          *MR. GIULIANI:*  Well, they can, and we're --

15          *THE COURT:*  But why does the campaign have standing?

16          *MR. GIULIANI:*  That's what the whole point is.

17          *THE COURT:*  Why does the campaign have standing when

18   the individual plaintiffs have the ability, the willingness,

19   the capability, to vindicate those rights on their own, the two

20   individual players here?

21          *MR. GIULIANI:*  Your Honor, the campaign's right to

22   raise denial of equal protection derives from the plaintiffs in

23   one sense, and then it's the campaign itself that was denied

24   equal protection.

25          So the net result of these two plaintiffs not being

```
1   able to cure their ballot is that the campaign was harmed
2   because in one part of the state they would have been allowed
3   to vote, and in another part of the state, they're not allowed
4   to vote.
5           And it just happens, if you analyze the two parts of
6   the state, that the part of the state where they're allowed to
7   vote and allowed to cure, even in violation of state law, is a
8   heavily Democratic part of the state that was 80 percent,
9   70 percent to the other side.  And then we look at all those
10  other counties and they weren't allowed to and they didn't.
11          And why is the Secretary involved?  Because this
12  happens because of the inconsistent advice being given by the
13  Secretary in which she puts these election --
14          THE COURT:  Was it inconsistent advice that you're
15  alleging or selective advice?
16          MR. GIULIANI:  Selective, selective advice, and also
17  very ambiguous advice.  So if you were sitting in one of those
18  counties that is -- one of those Republican counties and you
19  get the memo from her and you talk to your lawyer, your lawyer
20  is going to have a real problem because your lawyer is going to
21  say, I'm sorry, but nobody changed the statute to allow curing
22  and you're allowing it.
23          THE COURT:  Of course, the thing of it is, I mean, we
24  get into the nuances of this.  I used to be involved in this
25  sort of thing a long time ago.  I mean, I look at Fayette
```

1   County, Fayette County is a traditionally Democratic county in

2   the state.  Lancaster County, traditionally Republican.  Now,

3   things are changing out there, but I would -- I don't know --

4           *MR. GIULIANI:*  Quite a bit.

5           *THE COURT:*  -- but I would suppose that the county's,

6   Fayette County's registration is still heavily Democratic,

7   isn't it, even if they don't --

8           *MR. GIULIANI:*  It is.

9           *THE COURT:*  -- don't vote that way in a presidential

10  race?

11          *MR. GIULIANI:*  But I'm not sure that --

12          *THE COURT:*  But that's the point, it's a Democratic

13  county.

14          *MR. GIULIANI:*  But I'm not sure in this particular

15  election that's as important if it's a very, very strong Trump

16  county.

17          *THE COURT:*  All right.

18          *MR. GIULIANI:*  I mean, that's where --

19          *THE COURT:*  But the Democratic/Republican end of it

20  is --

21          *MR. GIULIANI:*  Well, then maybe we should say

22  Trump/Biden.

23          *THE COURT:*  Well, yeah.  Well, in a way, that's sort

24  of smeared together because you're going to have -- you're

25  going to have some traditionally Democratic counties,

1    particularly, I think, in the western part of the state.  The

2    exceptions, Butler County is traditionally a very Republican

3    county, Allegheny County, a heavily Democratic county.  But a

4    lot of the neighboring counties are traditionally, in my

5    historical sense --

6            MR. GIULIANI:  Right.

7            THE COURT:  -- in modern history of the state,

8    traditionally Democratic counties, and yet many of those

9    counties are counties that voted for your man, I think, in this

10   last election and did so four years ago in 2019, but they'd

11   still be Democratic counties.

12           MR. GIULIANI:  Again, I don't know if that's relevant

13   in the modern world that we live in.  And the reality is, this

14   confusion is created because of whatever we want to call it,

15   inconsistent, ambiguous advice being given by the Secretary who

16   doesn't clarify to anyone how is it that I can change the cure

17   provisions of the legislature.

18           So people -- and running an election like that is, in

19   itself, also a violation of due process, which is why I want to

20   restore the due process count.

21           THE COURT:  I want to have another question on

22   standing here for you.  In the briefing, the plaintiffs assert

23   that the campaign has competitive standing, competitive

24   standing.  None of the cases you've cited for this proposition

25   are from the Third Circuit, however.

1          So is there any precedent that plaintiffs' counsel can

2     cite from this circuit expressly addressing the theory of

3     competitive standing?

4          *MR. GIULIANI:*  Well, Mr. Marks --

5          *THE COURT:*  Mr. Marks is going to help you.  That's

6     fine.

7          *MR. GIULIANI:*  He leaned over and said Marks v.

8     Stinson.  And we have the unusual situation of he was the

9     plaintiff in Marks v. Stinson.

10         *MR. MARKS:*  Your Honor, if I might, I don't want to --

11    I don't want to do anything inappropriate.

12         *MR. GIULIANI:*  Please.

13         *MR. MARKS:*  But you asked for a cite, and I was --

14         *THE COURT:*  Yeah.

15         *MR. MARKS:*  But if Your Honor looks to the Marks v.

16    Stinson case, there is a reported final injunction decision.

17         *THE COURT:*  What court?

18         *MR. MARKS:*  Eastern District of Pennsylvania and --

19         *THE COURT:*  Which judge heard it?

20         *MR. MARKS:*  Judge Newcomer from Lancaster County.  It

21    was a Republican --

22         *THE COURT:*  I remember him.

23         *MR. MARKS:*  And, Your Honor, it was affirmed --

24         *THE COURT:*  What year was that?

25         *MR. MARKS:*  Your Honor, the election was 1993.  The

 1    case was tried in a preliminary injunction in February of '94.

 2    The critical Third Circuit opinion affirmed the preliminary

 3    injunction in part, reversed it in part, removing my opponent,

 4    but saying that the judge had to go back and have more hearing

 5    to determine if I won.

 6         And then there was a final injunction decision that

 7    was entered in April of 1994, which was then affirmed by the

 8    Third Circuit, where Judge Newcomer concluded if you set aside

 9    their illegal ballots, the absentee ballots which resulted from

10    the massive fraud, that I was the winner and that my opponent

11    was the loser.

12         In that case, Your Honor, Judge Newcomer held under

13    the Equal Protection Clause that the election board in

14    Philadelphia, the same board that's being sued today by the

15    Trump Campaign, that they couldn't favor one candidate over the

16    other.  They couldn't give a competitive advantage to the

17    Democratic -- I was a plaintiff.  You couldn't give a

18    competitive advantage, let alone in violation of the state law,

19    to one campaign over the other.

20              *THE COURT:*  And this addressed competitive standing?

21              *MR. MARKS:*  Yes, it was standing.  They held that I,

22    as the candidate -- I wasn't incorporated.  I'm not like Donald

23    Trump.

24              *THE COURT:*  Understood.

25              *MR. MARKS:*  That I, as the candidate, had standing

1    because the state actors -- it was a civil rights claim just

2    like here, it was also an equal protection claim, that I had

3    standing because the government couldn't put its thumb on the

4    scale in favor of one candidate over the other.  And that's

5    what happened in my case because they were violating the law

6    and giving absentee ballots themselves to campaign workers who

7    were, you know --

8            THE COURT:  Understood.  All right.  That's good.

9            MR. MARKS:  So --

10            THE COURT:  What's the case again?

11            MR. MARKS:  Marks v. Stinson.

12            THE COURT:  Marks v. Stinson.

13            MR. MARKS:  I actually gave it to the mayor.  We --

14            THE COURT:  We'll look it up.

15            MR. MARKS:  So, Your Honor, it's sort of -- if I just

16    might and then I'm going to step out of this.  It's sort of the

17    same thing in this case because there were no observers.  The

18    people who ran the elections in the seven defending counties

19    knew that the mail ballots were going to be heavily in favor of

20    candidate Biden.  They knew that from the registrations of the

21    voters who had submitted them, and they also knew it from the

22    publicized campaign strategies.

23            They knew that the Trump voters were going to go to

24    the polls, they knew that the Biden voters were going to vote

25    by mail, so if they didn't allow inspection and if they allowed

1   ballots that shouldn't have been counted because they didn't

2   have a signature or they didn't have the date on them,

3   technical things, but that is -- Your Honor knows those are

4   requirements in Pennsylvania, no different than if you vote at

5   the polls, you've got to be there before 8:01 or it doesn't

6   count.

7           So that was the competitive standing determination in

8   Marks v. Stinson, Your Honor, and I'd suggest that analogy

9   would apply here.

10          *THE COURT:*  That's good.  We'll look that up.  Thank

11  you, sir.  Now, beyond competitive standing itself, is the

12  campaign raising any other theories of standing?

13          *MR. GIULIANI:*  We're raising --

14          *THE COURT:*  Beyond competitive standing, any other

15  theories of standing you want to address with me?

16          *MR. GIULIANI:*  Yes, Your Honor.  We have standing as

17  having been aggrieved under the Equal Protection Clause of the

18  United States Constitution.  We were treated, in all of the

19  different respects in which we outline in this complaint, not

20  just curing ballots, we were treated differently than the

21  candidate on the other side.  We were -- the cure provisions,

22  backdating provisions.

23          You look at the individual allegations against the

24  different counties, each of those treats our side -- I'll call

25  it the Trump side now and the Biden side rather than Republican

1   and Democrat -- differently than the Democrat side.

2       And the allegations about the inspectors -- I'm sorry,

3   the watchers, is incorporated by reference in the equal

4   protection claim and there not alleging fraud, we're alleging

5   denial of equal protection.

6       In certain counties in the state, there was no

7   inspection.  In other counties in the state, it was very rigid

8   inspection.  And, in fact, in most counties in the state, there

9   was rigid inspection.  The difference between the two, if you

10  take a look at it, in the Biden counties, the 70 percent,

11  80 percent Biden counties, there was no inspection, and in the

12  Trump counties, there was the usual rigid inspection.

13      So if you look at the 680,770 ballots that went in in

14  Philadelphia and in Pittsburgh that were never inspected, you

15  use just statistical probability, expert testimony which is

16  allowable in an election case, it would be eight to two.  If

17  you go look at the counties that had rigid inspection, the

18  percentage is going to be more like 60/40, maybe 70/30 Trump.

19      When you have rigid inspection, more ballots are going

20  to be rejected.  So that's another way in which we were treated

21  in a disparate fashion and not subjected to the same standard.

22  And the reality is, on issues like this, counting votes, curing

23  votes -- one of the gentlemen, I think quite rightly, said,

24  you're not going to have rigid similarity in every single

25  county, different times, different rules.

1          But we're not talking about little technical rules
2     here, we're talking about whether an absentee ballot is
3     accepted or it isn't accepted.  We're talking about whether, if
4     you mess up a ballot -- and the rule has always been once
5     you've messed up one of these ballots, you're finished, you
6     can't fix it, pretty much the case around the country.
7          Now, all of the sudden, the new concept is floated by
8     the Secretary that you can cure it, but nobody bothered to go
9     to the legislature and have the legislature change the
10    legislation.
11         So it set up a situation of mass confusion.  Well,
12    that alone deprives you of equal protection and due process.
13    An election like this shouldn't be conducted with mass
14    confusion over whether you can cure a ballot or not cure a
15    ballot or whether you should have inspectors or you shouldn't
16    have inspectors.
17         *THE COURT:*  I've been watching Mr. Donovan.  He's been
18    itching to stand up here, as he's moving around in his chair at
19    counsel table.  You have something to add on that point,
20    Mr. Donovan?
21         *MR. DONOVAN:*  I do on the prior one, too, Judge.
22    Marks v. Stinson, I just did a search.
23         *THE COURT:*  Right.
24         *MR. DONOVAN:*  Competitive doesn't even come up in the
25    opinion, so it's hard to understand how competitive standing is

1  in the opinion since the word doesn't appear.  And the only

2  time --

3       *THE COURT:*  Well, we didn't find it.  That's why I --

4  we'll read the opinion.

5       *MR. DONOVAN:*  No, no, no, sure.

6       *THE COURT:*  I had, maybe, difficulty finding it for

7  the same reasons.

8       *MR. DONOVAN:*  I just wanted to put a little finer

9  point, since that word doesn't appear, it's hard to see that it

10  stands for that.  In fact, all of --

11       *THE COURT:*  We understand what I'm talking about,

12  competitive standing.

13       *MR. DONOVAN:*  I did.

14       *THE COURT:*  It has meaning, specific meaning.

15       *MR. DONOVAN:*  Yes.

16       *THE COURT:*  I'm not dismissing what Mr. Marks told me,

17  I just -- I didn't find that in my research because it's

18  specific as to that language.  Go ahead.

19       *MR. DONOVAN:*  One more point.  There's a little

20  freelancing going on over here about the advice from the

21  Secretary.  The Secretary issues advice or guidance.  That's

22  her job.  She issues it.  When she issues it, it goes on a

23  website that everyone gets, and it goes to all counties.  And

24  if you review the guidance, Judge, or Mr. Giuliani, you'll see

25  that these instructions do not go to specific counties.  She

1    gives guidance, which is her role.

2            As the Secretary taught me and reminded me, that

3    Pennsylvania is a Commonwealth.  She cannot enforce, but she

4    gives guidance as her role is, and she gives it to all counties

5    at the same time.  And it's on the website, and it's still on

6    the website today.

7            THE COURT:  All right.  Good.  I want to turn to the

8    merits now.  What standard of review should I apply and why?

9    What standard of review should I apply in this case on --

10           MR. GIULIANI:  On a motion to dismiss?  Well, I mean,

11   I think the normal one, which is that you have to deem the

12   factual allegations to be correct, and even if they are

13   correct, you'd have to find that there's no merit, no legal

14   merit, no legal theory on which we can get relief.

15           THE COURT:  Well, let me ask you, are you arguing then

16   that strict scrutiny should apply here?

17           MR. GIULIANI:  No, the normal scrutiny should apply.

18   If we had alleged fraud, yes, but this is not a fraud case.

19           THE COURT:  So if that's so -- what's this background

20   noise?  What is it?  Mr. Aronchick, are you moving around

21   again?

22           MR. ARONCHICK:  I unmuted, Your Honor.  I just want

23   you to remember I'm here.  I want to say a couple things at

24   some point.

25           THE COURT:  We'll get back to you.  We haven't

1   forgotten about you.  Try not to move around.

2            So if that's the case, why don't Secretary Boockvar

3   and the counties satisfy the standard of review that you're

4   talking about?  If it's not strict scrutiny and it's the

5   standard of review you're implying, why don't their actions

6   satisfy this?

7            *MR. GIULIANI:*  I'm sorry, I don't really understand

8   the question, Your Honor.

9            *THE COURT:*  Well, this is how I would look at it.  I

10  would think that it's a standard of review of strict scrutiny,

11  potentially.  You're not sure that that's the case.  I'm not

12  imposing my views --

13           *MR. GIULIANI:*  Maybe I don't understand what you mean

14  by strict --

15           *THE COURT:*  Well, for strict scrutiny to apply, a

16  fundamental right needs to be burdened, as I understand it.  So

17  how do the counties or Secretary Boockvar on behalf of the

18  Commonwealth burden the plaintiffs' right to vote?  How do they

19  burden the right to vote?

20           *MR. GIULIANI:*  Oh, because based on issuing these

21  opinions that are confusing, ambiguous, in several instances

22  contrary to the law.

23           It's very, very hard to have consistency in the

24  principle -- let's stick to the one we've talked about most

25  often, about whether you can cure a ballot, whether you can

1    supply the information after the fact.  She created a great

2    deal of confusion about that and never clarified it, so that

3    she conducted --

4              THE COURT:  Okay.

5              MR. GIULIANI:  She conducted -- I guess the language

6    in Bush v. Gore would be an election without standards, uniform

7    standards.

8              THE COURT:  Well, I follow that, but how does making

9    it easier for some people to vote burden the plaintiffs'

10   ability or right to vote?

11             MR. GIULIANI:  Well, it isn't so much making it easier

12   for someone to vote, it's specifically the same thing.  It's

13   exactly the same thing, at least in the case of Mr. Henry.

14   Mr. Henry made a mistake.

15             THE COURT:  So his right to vote was burdened by the

16   Secretary's actions?

17             MR. GIULIANI:  His right to vote was denied by the way

18   in which the Secretary's advice was interpreted in part of the

19   state and in his part of the state it was interpreted

20   differently.

21             Pennsylvania conducted an election in which people in

22   different parts of the state had a right to vote under certain

23   circumstances and other people didn't.  So in Pennsylvania, as

24   we allege in the complaint, when someone had a ballot in which

25   he didn't use the secure envelope, that person in

1    Pennsylvania -- in Philadelphia was allowed to vote.

2                THE COURT:  Let me ask you.

3             MR. GIULIANI:  In the case of --

4             THE COURT:  How are -- Mr. Roberts and Mr. Henry are

5    the individual plaintiffs.  So how were they actually denied

6    the right to vote?  If I understand it, they filled out their

7    ballots incorrectly, and then their individual counties,

8    Lancaster County and Fayette County, didn't count them.

9             MR. GIULIANI:  Yep.

10            THE COURT:  But you're not saying that every ballot

11   that isn't counted for whatever reason constitutes a denial of

12   the right to vote.

13            MS. KERNS:  No, but here, here, Your Honor -- and

14   there was a perfect example from the gentleman from the NAACP.

15   Here, Mr. Henry and Mr. Roberts voted, and their vote

16   ultimately was -- they did not have the ability to cure that

17   vote.  The government, the state actor here, did not give them

18   the ability to cure that vote, whereas other voters were given

19   that opportunity.  They were -- and you'll hear this if --

20            THE COURT:  But is that a denial of the right to vote?

21            MS. KERNS:  We would absolutely --

22            THE COURT:  The actions of Lancaster and Fayette

23   Counties, is that a denial of the right to vote?

24            MS. KERNS:  Yes, because everyone should have -- every

25   county should have had the same procedure.

1          *MR. GIULIANI:*  Either they should have been allowed to

2     cure or nobody should have been allowed to cure.

3          *MS. KERNS:*  Your Honor, but the issue here is that the

4     procedures were not all the same.  So from Mr. Henry's

5     perspective and Mr. Roberts' perspective, their ability to vote

6     was denied because had they simply lived in a different county,

7     their vote -- they would have had the opportunity to cure and

8     therefore that vote would have been counted.  And these two

9     gentlemen, their vote was not counted, so they did not vote.

10    Their vote was denied.

11         *THE COURT:*  Let me move away from strict scrutiny and

12    go, instead, in another direction, and that is, if I conclude

13    that rational basis review is appropriate, why don't the

14    defendants' actions satisfy this standard?  You have a strict

15    scrutiny standard, you've got a rational basis standard.  It's

16    a different standard.  So why don't the defendants' actions

17    here satisfy that standard?

18         *MR. GIULIANI:*  Well, how is it rational to have, in

19    one state, two vastly different standards about how you're

20    going to deal with what turns out to be 2.6 million votes?  And

21    depending on the location in the state, which is exactly what

22    Bush v. Gore uses as an example of a violation of equal

23    protection, I mean, how can that be -- how could that be

24    possibly rational?

25              Whatever you say about her advice and the advice of

1    others, the result of it was a totally unequal, completely

2    unfair election in which in one part of the state, if you did

3    what Linda just said, if you made a mistake, you don't get

4    counted, in the other part of the state, if you do make exactly

5    that same mistake, your vote is counted.

6           And forget even now Trump or Biden, in Bush v. Gore

7    they say you can't have different standards based on location.

8    You can't have -- you can't say that somebody has a right to

9    vote under certain circumstances in one place, but then under

10   the same circumstances in another place, they don't have a

11   right to vote or, in this particular case, the right to cure an

12   absentee ballot.

13          THE COURT:  But in order --

14          MR. GIULIANI:  I don't know how you're rational about

15   that.

16          THE COURT:  Let me cut to the chase here.  In order to

17   violate the Equal Protection Clause, the defendants needed to

18   have done more than simply violate state election law.  So why

19   is this a constitutional question and not simply a matter more

20   appropriately determined, as I suggested before, in state trial

21   court and with appellate review thereafter?

22          MR. GIULIANI:  It really isn't a question of whether

23   they -- I mean, it so happens they violated state law, but that

24   isn't the -- we're not charging them with violating state law.

25   It could have been some other way in which they did it.  What

1    they did was, they set up a system where you have two

2    different, fundamentally different sets of rights in one part

3    of the state as opposed to another.

4          Again, in one part of the state if you make a mistake,

5    it gets fixed.  The other part of the state, you make a

6    mistake, you don't get to vote.  It doesn't even matter if it's

7    Bush -- I mean Biden or Trump, Republican or Democrat.  The

8    fact that you have two disparate standards in different parts

9    of the state means that they have set up a standardless

10   election, an election in which the standards are not uniform

11   about something very, very important, how you're going to deal

12   with an absentee ballot, particularly in an era in which that's

13   going to become a much more significant part of the vote.

14         If anything, the uniformity of those standards, the

15   scrutiny applied to it should have been greater since it now

16   became a much more meaningful part of how you're going to

17   decide the election.

18         THE COURT:  Thank you.  I have some questions for the

19   defendants.  I'm going to look to you, Mr. Donovan.  Do you

20   want to add something?

21         MR. DONOVAN:  Can I respond to these, or am I going to

22   get the same ones?

23         THE COURT:  No.

24         MR. DONOVAN:  I just want to address a couple of these

25   followup --

1          *THE COURT:*  You're getting different questions.

2          *MR. DONOVAN:*  I'll be short.

3          *THE COURT:*  Go ahead.

4          *MR. DONOVAN:*  First, on your first question of strict

5     scrutiny, there is no strict scrutiny because I think as the

6     colloquy showed, these two individuals were not denied their

7     right to vote.  They vote, it was defective, and what the

8     Secretary and what some counties may have done is what you've

9     said, Your Honor, which is they tried to make it easier to

10    vote.  That, in my mind, is the opposite of a burden.  And --

11         *THE COURT:*  So the standard of review, instead, is

12    the --

13         *MR. DONOVAN:*  Rational basis, Judge, because -- and

14    then what happens is, since there is no vote denial in this

15    case, there just isn't, it's dilution, rational basis, Bognet

16    forecloses it.  So that's one.

17         Second, Mr. Giuliani keeps referring to standards.

18    And, in fact, the Secretary -- there's election law, and the

19    Secretary issues uniform standards.  What Bush v. Gore talked

20    about in standards is the Florida Supreme Court actually told

21    different counties when they were in the middle of recounts to

22    stop at different points.  So the standard there was they

23    weren't counting all the votes.

24         What I showed you this afternoon in my PowerPoint

25    presentation, Judge, was all the cases that say you can have

1    some differences among counties without being able to establish

2    an Equal Protection Clause.  Thank you.

3          THE COURT:  Well, let me -- I'm going to start with

4    you, Mr. Donovan.

5          MR. DONOVAN:  Okay.

6          THE COURT:  I'm looking to you.  Mr. Aronchick, I

7    think, wants to speak, and I'm going to let him do that, and

8    he's welcome to answer some of these questions, as well, as are

9    any of the other attorneys present who care to defer to them.

10         So the first question is this, Mr. Giuliani has noted

11   that the Bognet decision's interpretation of standing was based

12   on a future inquiry.  Why is that case not distinguishable here

13   where the alleged injury happened in the past?  Do you

14   understand my question?

15         MR. DONOVAN:  I do.  If I may, Judge, it is for the

16   same reasons Judge Ranjan, that they're together.  The reason

17   why is because it isn't the temporal aspect that is the problem

18   there, the issue goes back to is it vote dilution and is it a

19   specific particularized harm.

20         That was the point about drop boxes and Judge Ranjan

21   in Bognet.  It's not the timing, Judge.  The question is, is

22   there a general harm that's done to all voters, and when it is,

23   an individual doesn't have standing to assert an Equal

24   Protection Clause.  They might have state law remedies, but

25   that's what those cases stand for, Judge.

1          *THE COURT:*  Thank you.  The next question is, why

2     doesn't the Trump Campaign have standing here?

3          *MR. DONOVAN:*  For a couple reasons.

4          *THE COURT:*  Just sum it up for me again.

5          *MR. DONOVAN:*  Yeah, sure.  So first, Judge, they

6     don't -- there's no such thing as derivative voting or -- I

7     think he called it, they called it derivative.  That doesn't

8     exist, number one.  They have to have their own standing.  And

9     the problem is, they don't have any competitive standing

10    because they -- at least as alleged, and that's what we're

11    dealing with, is the first amended complaint.

12          And they also have no standing because, again, I go

13    back to Bognet, they can't actually point to anything that has

14    causation or redressability or the different reasons in your

15    Voter Alliance.  I won't go through those different doctrines.

16    But that's why, Judge.

17          *MR. GIULIANI:*  Your Honor, if I could respond to this.

18          *THE COURT:*  Yeah, go ahead.

19          *MR. GIULIANI:*  Well, first of all, on dilution or

20    denial or the right to vote, the fact is the vote wasn't

21    counted, Your Honor.  I can't see what the difference is if I'm

22    not allowed to go into the voting booth and kept out or I go in

23    the voting booth and they cancel my vote.

24          The fact is, it's -- the vote wasn't counted.  That's

25    a denial of the right to vote, particularly if I lived in

1   another location in the state, I would have been allowed to

2   vote.  That vote would have been counted.

3        You can't have, in a presidential election, a

4   nationwide election, you can't have two different standards,

5   two different practices, let's say, in different parts of the

6   state.  I do precisely the same thing in one part of the state

7   and you count my vote, and I do the same thing in another part

8   of the state and you don't count my vote.  And it's almost a

9   distinction without a difference to say, oh, that's dilution

10  rather than denial.  The vote didn't get counted; therefore,

11  the vote was denied.

12        *THE COURT:*  Thank you.  Mr. Donovan, next question.

13  Why isn't this injury, either by the campaign or the individual

14  plaintiffs, redressable?

15        *MR. DONOVAN:*  It's not redressable, Judge, because it

16  comes back to the cases we walked through, that is, the alleged

17  harm that is here, I think as alleged, is that some individuals

18  were able to go vote provisional -- which, by the way, is a

19  standard.  It's part of the Election Code, and any voter can go

20  do it.  It's actually required by federal law, as well.

21        But when that happens, Judge, the harm there is the

22  dilution to everyone.  So what Judge Ranjan and in your

23  opinion, so assume someone goes and they vote and it is wrong,

24  they shouldn't have voted.  Okay?  And what those cases stand

25  for is, that is a general harm to the entire statewide tally,

```
 1    not to Mr. Henry, not to Mr. Rogers, not to any campaign,

 2    because as Bognet said then when you look at a campaign is, are

 3    the rules that are out there affecting all candidates, auditor,

 4    treasurer, president, and that's what it holds.

 5              THE COURT:  Thank you.  Can you explain to me why the

 6    Pullman abstention applies in this case?

 7              MR. DONOVAN:  Yes, Judge.

 8              THE COURT:  Or should I ask Mr. --

 9              MR. DONOVAN:  Mr. Aronchick can, if he wants to

10    take --

11              THE COURT:  Mr. Aronchick, do you want to take that

12    one up?  It's really your wheel --

13              MR. ARONCHICK:  I'll take that one up.

14              THE COURT:  Yeah.

15              MR. ARONCHICK:  Can you hear me?

16              THE COURT:  Why does Pullman abstention apply in this

17    case?

18              MR. ARONCHICK:  For the same reason that Judge Ranjan

19    analyzed in that we have a comprehensive Election Code with

20    remedies.  And Younger is interfering with a remedy or at least

21    allowing a remedy that's chosen to go forward.  Pullman is if

22    you have comprehensive remedies that are available to you, and

23    particularly in the context of the presidential election

24    structure that Congress has set up, you need to go to those

25    remedies, and it's classic, it's classic Pullman.
```

1          You can go -- and what's happening here in this case

2     is there are ongoing proceedings that they could intervene or

3     at least even raise the issues.  Ms. Kerns has already told you

4     that.  And there are proceedings that are available to them,

5     i.e. Pullman, that they could then invoke to try to test these

6     issues.

7          But, Your Honor, just -- I don't want to get off your

8     question, but I wanted to, well, only if it's appropriate, make

9     one other point, only if it's appropriate.

10          *THE COURT:*  Well, let me, while I've got you there on

11     abstention, I have another question for you --

12          *MR. ARONCHICK:*  Yeah.

13          *THE COURT:*  -- Mr. Aronchick.  You've stated that the

14     Rooker-Feldman Doctrine applies because the Trump Campaign has

15     already litigated questions regarding public identification of

16     voters who submitted defective mail-in ballots in, if I

17     understand it, Bucks, Philadelphia, and Northampton Counties.

18          Did those decisions deal with the notice and cure

19     question at issue here?

20          *MR. ARONCHICK:*  No.  Those particular decisions dealt

21     more generally with ballots that were either counted or not

22     counted based on defects, you know, with a variety of defects

23     that could occur.  The Hamm case is the one that deals with the

24     notice and cure issues that was in front of Judge Brobson.

25          And the Rooker-Feldman Doctrine I didn't -- I don't

1    think applies yet to even that case because it's pending.

2    Rooker-Feldman would apply, for example, to Mr. Giuliani's

3    imploring you to cast aside the Supreme Court of Pennsylvania's

4    final opinion today about observers.  That's a classic

5    Rooker-Feldman problem.  And so I wanted to differentiate that.

6            *THE COURT:*  Understood.

7            *MR. ARONCHICK:*  The -- okay.

8            *THE COURT:*  So, well, that's fine.  Mr. Aronchick, I

9    think you wanted to add something else now while I've got you

10   here.  Why don't you go ahead and do that.

11           *MR. ARONCHICK:*  Yes.  The primary -- you know, this

12   whole notion of notice and cure is being used very loosely.

13   But to focus in on what they actually alleged in the complaint

14   about Philadelphia is -- in the paragraph I referred to earlier

15   is primarily the issue of people who spoiled their ballot on

16   Election Day and voted provisionally.

17           And that -- and they say these folks have the ability

18   to do that because the Secretary issued guidance the day before

19   and Philadelphia let voters know that their vote is not on the

20   register of approved voters, and if you want to invoke your

21   rights, you can do that.

22           And in Mr. Giuliani's -- and by the way, it's nothing

23   personal with Mr. Giuliani at all.  I'm sorry if he took it

24   that way.  It's personal, absolutely not.  It's professional

25   about being dismissive of his arguments.

1          But the point he made he said several times, and I

2     don't expect that he would know the Pennsylvania Election Code,

3     that the idea of voting provisionally, spoiling your ballot and

4     voting provisionally is somehow illegal, that the Secretary

5     made up law, but it's in the code.  The sections I cited to you

6     earlier, it's in the law that you can spoil and vote

7     provisionally.

8          What is important about the standing analysis,

9     aside -- in addition to what Mr. Donovan said, is the

10    traceability issue, because, number one, it's legal to spoil

11    your ballot and vote provisionally.

12         Number two, it's impossible for them to say that

13    Philadelphia's notice advising voters that they can do so --

14    first, as I said before, what's wrong with that?  I mean, what

15    world are we living in here?

16         But it's impossible to say that's the reason why any

17    voter went to the polls and spoiled their ballot and voted

18    provisionally.  Their own complaint says that this was a

19    gigantic public -- issue in the public.  And so I really think

20    it's important to address that point as a matter of standing.

21         And the final point I just want to make, I'm not going

22    to repeat what Mr. Nkwonta and Mr. Donovan and I already went

23    over about equal protection, but the idea that this is a Marks

24    Stinson case is crazy.

25         Marks Stinson stands alone in the Third Circuit.  The

1    Bognet decision pretty much said so.  There is nothing about

2    this complaint that meets the Marks Stinson facts, and Marks

3    Stinson said nothing about competitive standing.  I mean,

4    that's a completely invented notion.

5           I appreciate that my old and good friend Bruce Marks

6    was in court today, it's nice to see him again after all these

7    years, but it had nothing to do with competitive standing,

8    nothing.  I mean, it's not in the opinion.

9           And what is before you is the Third Circuit law

10   gathered together by Bognet.  And if other circuits can say

11   that in the administration of the vote, even if counties are

12   wrong about how they administered it, those kinds of issues are

13   not equal protection.  They're just simply not.  And thank you

14   for letting me deviate from your question on that one.

15          THE COURT:  Thank you, sir.

16          MR. ARONCHICK:  Thank you.

17          THE COURT:  All right.  Well, those are my questions,

18   so let's talk about some post-hearing items to address and some

19   other, what I described at the beginning of the argument today

20   as ministerial matters.

21          First, I think the plaintiff should be given the

22   opportunity to file an opposition brief to the motions to

23   dismiss.  That hasn't happened.  I'm suggesting by 5:00 p.m.

24   tomorrow, Wednesday, November 18th, and you're agreeing with

25   me.

1              *MR. GIULIANI:*  Your Honor, again, say that again, I'm

2        sorry.

3              *THE COURT:*  Well, I mean, we should get, I think, an

4        opposition brief from you.  I'm willing to take one.

5              *MR. GIULIANI:*  Could we have leave to amend now, Your

6        Honor?

7              *THE COURT:*  This is a brief in opposition to their

8        motions to dismiss.

9              *MR. GIULIANI:*  Oh.

10             *THE COURT:*  I want to give you the chance to brief

11       that, if you want to do that.

12             *MR. GIULIANI:*  Oh, sure, absolutely.

13             *THE COURT:*  So I'm suggesting by 5:00 p.m. tomorrow.

14             *MR. GIULIANI:*  A brief in opposition to basically what

15       they argued today?

16             *THE COURT:*  The defense -- well, the defense filed new

17       motions to dismiss to the amended complaint --

18             *MR. GIULIANI:*  Yes, of course.

19             *THE COURT:*  -- that was filed Sunday.  But I

20       understand what your arguments are, but I'm willing to take

21       it --

22             *MS. KERNS:*  I understand what you mean.

23             *THE COURT:*  -- in written form, as well.  So in light

24       of our timeline, I'd suggest -- it doesn't give you quite 24

25       hours, but by 5:00 p.m. tomorrow, and then the defendants until

1   noon Thursday, which is November 19, to file a reply brief.

2   I'll issue an order on that, maybe not this evening but

3   tomorrow morning to confirm it.  So a brief in opposition to

4   the new motion to dismiss.

5           The first motion to dismiss, of course, is mooted out

6   under the rules with the amended complaint, so don't bother

7   with that.  And then the reply, as I said, by noon on Thursday

8   November 19.  And I'm sure you'll make that happen somehow or

9   the other.

10          Now, I also suggest that you consider, plaintiffs

11  really consider whether there should be a new motion for

12  preliminary injunction.  There was the initial motion with the

13  initial complaint, but, again, there's now an amended

14  complaint, and technically you probably ought to file a new

15  motion for preliminary injunction.

16          Can you do that?  And I'm suggesting that you be given

17  until 5:00 p.m. tomorrow to do that, as well, which I think

18  under our time frame is doable.

19          *MS. KERNS:*  Right.

20          *THE COURT:*  Right?  You can redo that from what was

21  done previously, I think, modify that margin, make sure it

22  fits.  So both of those things by tomorrow at 5:00.  And then

23  I'll give the defendants until 5:00 p.m. Thursday the 19th to

24  respond to that.  In doing all of this, I'm looking at

25  Mr. Donovan, but I'm really looking at all of you.  And then

```
 1   the plaintiffs, I'll give you until Friday the -- whatever
 2   Friday is, the 20th, November 20, to reply.
 3          MS. KERNS:  Will this all be in your order?  Because
 4   I'm not writing.
 5          THE COURT:  Yes.  You should write it down, anyway,
 6   Ms. Kerns.  That's what lawyers do, they write things down.  So
 7   we'll sketch that out.  So there will be an order tomorrow
 8   morning, maybe later tonight.  I think my staff probably wants
 9   to part for the evening, but at some point I'll dictate an
10   order, probably docketed in the morning.  But that, if you
11   wrote it down, that's our time frame.  That's what I need, I
12   think, in terms of papers.
13          Now, let me talk about these ministerial matters.
14   First, there's a -- I don't think it's been filed, but there's
15   a desire, I think, to file a second amended complaint, which
16   Mr. Giuliani --
17          MR. GIULIANI:  Yes, Your Honor, we would ask for leave
18   to do that to clear up the issues today and also to add --
19          THE COURT:  You need to file -- have you filed --
20   Mr. Scaringi, I'm looking back at you.  Did you file a motion
21   to file a second amended complaint?  You filed a motion to
22   continue.  I said no on that.  But you referenced that, I
23   think.
24          MR. SCARINGI:  No, we didn't, Your Honor.
25          THE COURT:  All right.
```

1          MR. SCARINGI:  We just filed a motion to continue.  In

2     our motion to continue, we did express our intent to file --

3          THE COURT:  You'd like to file.  All right.  But you

4     need, at this point, to file a motion for the court's approval,

5     and you might get agreement or you might get opposition from

6     the defendants.

7          Now, I'm typically not a betting man, occasionally at

8     the track, I would guess that there will be nonconcurrence, but

9     I don't know.

10          MR. SCARINGI:  Well, we can open up to the floor right

11     now.

12          THE COURT:  Well, we're going to talk about it at the

13     end because it might resolve all of this for you.  I'll take

14     you to dinner.

15          MR. DONOVAN:  You're a good better, Judge.

16          THE COURT:  Right?

17          MR. DONOVAN:  I mean, in all seriousness --

18          THE COURT:  A lot of these matters can be cured with a

19     drink and dinner, and I've sent counsel out to do just that.

20     I'm not sure this is one of those cases, but hope springs

21     eternal.

22          MR. DONOVAN:  It does.  Judge, that's just -- I think

23     a couple reasons, Judge.  Look, I appreciate the schedule.  We

24     obviously don't have a hearing on Thursday.  You know, hope

25     does spring eternal.  I think you're going to dismiss this

1    case.  I think the law requires it.  We'll do the other

2    briefing.  But once you dismiss that case, I think then when

3    they file this motion, if you permit them -- this is now their

4    third time, okay, in an expedited election --

5         THE COURT:  I don't know whether I'm going to permit

6    it.  I just want to say --

7         MR. DONOVAN:  Yeah.

8         THE COURT:  -- they would need to file the motion --

9         MR. DONOVAN:  I agree.

10        THE COURT:  -- to do so with concurrence or

11   nonconcurrence of the defendants.  I suspect nonconcurrence

12   will be coming into play here.

13        MR. DONOVAN:  I guess with that, Judge, I don't want

14   that to moot out -- we have spent a lot of time, effort, we

15   have a state election to certify, we really want your ruling.

16   And I know sometimes -- I guess they're going to file a motion

17   for leave and then we'll brief that.

18        THE COURT:  Right, well, that's what I'm talking

19   about.  But I don't want them to think --

20        MR. DONOVAN:  I gotcha.

21        THE COURT:  -- that I've prejudged, I've decided

22   today.  I don't want the plaintiffs to think that.

23        MR. DONOVAN:  Understood, understood, Judge.

24        THE COURT:  That's what I'm driving at.

25        MR. DONOVAN:  Understood.

1          THE COURT:  So if you want to send in, in the next day

2     or so, a motion to file, I guess, a second amended complaint,

3     I'll take that up and adjudicate it.

4          MR. GIULIANI:  Your Honor, may I just clarify just a

5     little bit?  We can file with you a motion for leave by

6     tomorrow morning.  We could also give you the amended complaint

7     and give them the amended complaint.

8          THE COURT:  You've got to go through --

9          MR. GIULIANI:  I'm told we need until 5 o'clock,

10    but --

11         THE COURT:  You've got to go through the procedures.

12    You've got to go back to them, and we've got to go --

13         MR. GIULIANI:  But the benefit of that would be that

14    the amended complaint does not differ very, very much from what

15    we've already addressed, with one exception, and that's the due

16    process count.

17         THE COURT:  You can attach it.  I mean, I'll take it

18    up.

19         MR. GIULIANI:  Okay.

20         THE COURT:  Mr. Donovan and company will decide how

21    they want to respond.

22         MR. DONOVAN:  Yeah, Judge, I think at this point we'd

23    also ask that we don't even have to respond to that, Judge,

24    until we get your ruling on the current motion to dismiss.

25         THE COURT:  That may be, but --

1          MR. DONOVAN:  I understand what you're telling them.

2     I'm just asking for the --

3          THE COURT:  I don't want the plaintiffs, or the

4     defendants, but particularly the plaintiffs in this instance,

5     since they're seeking this relief, to think that I've decided

6     the matter.  I've got to --

7          MR. DONOVAN:  Understood.

8          MR. SCARINGI:  Your Honor --

9          THE COURT:  I've got to mull it over, frankly.  Yeah.

10         MR. SCARINGI:  For clarification on the motion seeking

11    leave to file an amended complaint, the due date would be

12    tomorrow at 5:00 p.m.?

13         THE COURT:  If that works.  I think someone has --

14    Mr. Giuliani just suggested.  That's fine with me.  I think you

15    need some time to do it.

16         MR. SCARINGI:  Yes, yes, Your Honor, we do, yes.

17         MR. DONOVAN:  And Judge --

18         THE COURT:  It's not a lot of time, but I give you --

19    I don't want to say noon tomorrow when you need to go home and

20    sleep on it and think about how you want to word it.  You know,

21    tomorrow at 5:00 is fine.

22         MR. SCARINGI:  Yes.

23         MR. DONOVAN:  And, Judge, we would request to not have

24    to respond even to that motion until we complete this briefing

25    and get your ruling.

160

1          THE COURT:  I don't have an objection to that.

2          MR. DONOVAN:  Thank you, Judge.

3          THE COURT:  All right.  The discovery and the

4     questions issue, I'll take that under advisement.

5          Last issue is this, I call it the Kerns versus

6     Kirkland and Ellis matter.  That's my note.  So that's --

7     Ms. Kerns, I listened to the -- I guess it was a voicemail.  Is

8     that what it was?  From somebody.  I don't know whether you

9     sent it along or Mr. Donovan sent it along.  It doesn't matter.

10    I listened to it.

11         So, all right, so that's bad form.  It's not a

12    sanctionable matter.  So, Mr. Donovan, I realize this is not

13    you.  I realize it's not Kirkland and Ellis, you know,

14    attending this.  But where is this -- is this man, like, in

15    your Abu Dhabi satellite office?  You're a big shop.  Where was

16    it?

17         MR. DONOVAN:  Not yet.

18         THE COURT:  Paris?

19         MR. DONOVAN:  No, Judge.

20         THE COURT:  Does he still work at the firm?

21         MR. DONOVAN:  He does, yes.

22         THE COURT:  Okay.  Well, look, you've got to go back

23    and tell this guy -- I mean, the one thing is, and you've

24    already told him this, I'm sure, whoever the managing partner

25    is.

1          MR. DONOVAN:  In very stern words.

2          THE COURT:  Maybe that's you.  Look, you know, this is

3    evident, we -- at least the attorneys would appreciate this.

4    So Ms. Kerns and Mr. Giuliani and Mr. Scaringi and the other

5    attorneys who are involved have every right to represent the

6    Trump Campaign or really anybody they want.  They can take up

7    what, in some corridors, I suppose, the professional corridors

8    of Washington, D.C., might, might be an unpopular cause.

9          Well, you look a couple of rows back at the leader of

10   the NAACP here in Pennsylvania, and you can chat with him on

11   the way out or, better yet, have your associate or whoever he

12   was at Kirkland have a chat with him or his counterpart in

13   Washington.  You want to deal with somebody who picks up what

14   might, in some corridors, be an unpopular cause.

15         Now, I would suggest that representing the Trump

16   Campaign in many corridors is not an unpopular cause.  I think

17   there are a lot of people, about half, maybe a little less than

18   half the country by voting population, if we assume that the

19   stats are what they are, think this is exactly the right thing

20   to do.  But what's unpopular to somebody is not popular to

21   another.

22         So he didn't advance the ball forward much with

23   anybody.  What you can tell him he did is, he took the time of

24   a very busy Federal District Court judge in Pennsylvania to

25   read the papers, which, of course, I read because I read

1    everything, listened to this unfortunate voicemail.  It just

2    wasted my time.

3         It's not sanctionable, but it's bad form.  And you

4    should have a chat, somebody should have a chat with him about

5    it.  You probably already have, and don't do that, don't do

6    that again.

7         Counsel, I don't know what's going on in this country.

8    These individuals have a right to legal representation of their

9    choice.  And it wasn't a threatening call to Ms. Kerns, but it

10   was just -- you know, it was -- you know, she probably, you

11   know, using the term broadly, accurately described it as a

12   harassing call.

13        So you can convey my disdain back to your man.  He's

14   not going to be sanctioned.  I'm sure that your people at

15   Kirkland will attend to that --

16        *MR. DONOVAN:*  You can be assured of that.

17        *THE COURT:*  -- if you haven't already.  And,

18   Ms. Kerns, I'm very sorry that that happened.  I understand

19   from my staff that you've gotten other calls of that sort and

20   things.  But it's not -- believe me, I've had to sanction a few

21   attorneys.  I don't enjoy it.  This is not, in my mind, a

22   sanctionable issue.

23        Remember, I'm here for the main event.  That's what we

24   dealt with today.  These other issues are just -- you know what

25   it is, it's piffle.  And I'm just so busy that I've got to deal

1    with the main event, and spending any more of my time dealing

2    with that -- and I'm sorry that you were affronted by that.  I

3    mean, at least if this young man at Kirkland and Ellis is not

4    sorry about it, I'm sorry on his behalf, but that's all.

5              MS. KERNS:  May I just briefly be heard on it, Your

6    Honor?

7              THE COURT:  Well, do I need any more than I've already

8    said?

9              MS. KERNS:  Well, I want the record to be clear that I

10   did not release that voicemail to anyone except this court --

11             THE COURT:  Yeah.

12             MS. KERNS:  -- my legal team, and the other side.  So

13   to the extent that it gets out, it's not from me.  And --

14             THE COURT:  Is it out?

15             MS. KERNS:  Not that I know of, but I want to make

16   that clear on the record.  And when that -- because, Your

17   Honor, I would not want to rain down on him what has rained

18   down on me.

19             And when that call came through, it was more than an

20   inconvenience, because I am getting hundreds of calls, and I'm

21   in danger of missing legitimate communications from Pacer and

22   from opposing counsel.

23             And when the caller ID said Kirkland and Ellis, I

24   rightly thought it might be from one of the many, many lawyers

25   on the other side.  And it took a lot of time for an attorney

1    who is representing somebody in federal court to go through

2    that.

3              And I think what offended me most was that I knew

4    within minutes that it came from Kirkland and Ellis using a

5    Google search to do a reverse lookup, yet when I reached out to

6    Mr. Donovan on Sunday night, he said he had to investigate.  I

7    mean, I already knew.  He said he had to investigate and it was

8    Sunday night and he would get back to me.  And he disagreed

9    with my conclusion that it was Kirkland and Ellis.

10             And then when I sent him the voicemail that had the

11   caller ID with it, he simply called it discourteous, and he

12   said the lawyer was not on the file or was not a litigator.

13   And I just felt that that was not a sincere apology.  And the

14   smugness and the dismissiveness with which he treated me should

15   not be allowed.

16             And I've represented now the President of the United

17   States, and I've also represented people in small claims court

18   over hundred-dollar claims, and I've represented the gamut.

19   And this should not happen to any litigant because my time was

20   taken away from this case because of something that happened in

21   Kirkland and Ellis.  And I just feel that this should not be

22   allowed.

23             And I defer to Your Honor about sanctions, and I

24   completely understand your ruling, but I want people to

25   understand how this impacted this case, and that should never

1    be allowed.  I don't understand what goes on at Kirkland and

2    Ellis, I'm not privy to how they train people, but this should

3    absolutely not happen.

4         And as we're sitting here today, Mr. Donovan has not

5    apologized to me, Kirkland and Ellis has not apologized to me,

6    and the gentleman whose name I refuse to give out because I

7    don't want this to rain down on him, he has not made a sincere

8    apology, and to me that's a disgrace.

9         THE COURT:  Well, so noted.  Now, is there anything

10   else for today?

11        MR. ARONCHICK:  Your Honor?

12        THE COURT:  I'll take the matter under advisement.

13        MR. ARONCHICK:  Your Honor, I have a question.  Your

14   Honor?  Your Honor?

15        THE COURT:  Yes.

16        MR. ARONCHICK:  Mark Aronchick.

17        THE COURT:  Yes.

18        MR. ARONCHICK:  A housekeeping question.

19        THE COURT:  Yes.

20        MR. ARONCHICK:  Housekeeping.  I believe that all of

21   us that argued -- first of all, I want to thank you for -- you

22   know, for this lengthy day and the opportunities.  I believe

23   all the lawyers who argued no doubt are going to be asked by

24   the press to comment, to talk about this hearing.

25        I have no problem with that one way or another.  I

1    suspect that there are certain people in your courtroom who

2    will be asked to comment more than others, and that's okay.  I

3    just want to know if Your Honor has a problem.  In light of

4    this conversation, it occurs to me.  I wanted to ask you if you

5    have a problem of lawyers, while this is under advisement,

6    commenting or talking about what happened today, if that

7    matters to you.

8               THE COURT:  No.

9               MR. ARONCHICK:  Okay, I just wanted to be careful.

10   Okay.

11              MR. DONOVAN:  Judge, just to clarify, I think you've

12   already answered it, but there's no hearing on Thursday now?

13              THE COURT:  I don't think there's a need.  I just

14   don't think there's a need for a hearing --

15              MR. DONOVAN:  I agree.

16              THE COURT:  -- at this juncture.

17              MR. DONOVAN:  Thank you, Judge.

18              THE COURT:  And so that, I will note that, as well, in

19   tomorrow's order that outlines our remaining briefing schedule,

20   notes that, and I'll take this matter under advisement and

21   attend to it accordingly.  Is there anything else?  Yes.

22              MR. SCARINGI:  Just a couple of last-minute items.

23   Did you say that you are going to resolve plaintiffs' motion to

24   compel discovery that's outstanding?

25              THE COURT:  At some point I'll take care of it, I'll

1    take that up.

2            MR. SCARINGI:  And also the motion to quash subpoenas

3    for certain witnesses?

4            THE COURT:  I loop that altogether as an ongoing

5    discovery issue.

6            MR. SCARINGI:  And, also, the plaintiffs would like to

7    file a motion for expedited discovery in this case, for

8    additional discovery.

9            THE COURT:  Send it in tomorrow by 5:00.

10           MR. SCARINGI:  Tomorrow by 5:00.

11           THE COURT:  If you can do that.

12           MR. SCARINGI:  I think we can, Your Honor.

13           MS. KERNS:  Your Honor, as you know, my motion to

14   withdraw is still pending, so --

15           THE COURT:  Do you still want to withdraw?  Well,

16   look --

17           MR. GIULIANI:  Your Honor --

18           THE COURT:  Why don't you do this, are you going to --

19   are you staying over tonight?

20           MS. KERNS:  No.

21           THE COURT:  Heading back in the morning?  You don't

22   know?

23           MS. KERNS:  No, I'm going to Philadelphia tonight.

24           THE COURT:  Why don't you call my staff tomorrow, call

25   Mrs. Rhinehart, who's my courtroom deputy who is right here,

1   and just tell me by midday.  Think it over.

2          MS. KERNS:  Okay.  I'll discuss it with my client.

3          THE COURT:  I wanted you involved, Ms. Kerns, because

4   you've really been involved from the beginning.

5          MS. KERNS:  I understand.

6          THE COURT:  And until I had sorted things around with

7   Mr. Giuliani, Mr. Scaringi, allowed them to get up and settle

8   into the case, I thought it was important that you stay

9   involved.

10          The Texas attorneys were fine.  They hadn't been

11   involved in the case -- they had only been involved in the

12   case, I don't know, a day, maybe, and then they were apparently

13   discharged or whatever happened.  But you weren't.  So why

14   don't you think about what you want to do.

15          MS. KERNS:  I have to discuss it with the client.

16          THE COURT:  Yes, well, indeed, and you decide yourself

17   what you need to do.  But if you want to do that, why don't you

18   just send in a very short one-page motion singularly for you,

19   and if that's what your desire is, then let Mrs. Rhinehart know

20   you're going to do that.  I'll take you off immediately.

21          MS. KERNS:  Thank you.

22          THE COURT:  But mull it over.

23          MS. KERNS:  Thank you.

24          THE COURT:  I appreciate your attendance today.

25   Anything else?

1          *MR. SCARINGI:*  Two last very quick questions.

2          *THE COURT:*  Mr. Scaringi, you've got a lot of these

3    technical questions.

4          *MR. SCARINGI:*  On the motion for permission for leave

5    to amend and file a second amended complaint, may we waive the

6    local rule requiring concurrence or nonconcurrence among the

7    defendants considering there are seven?

8          *MR. DONOVAN:*  Yes, we'll nonconcur now for you.

9          *THE COURT:*  Yeah, they have an oral nonconcurrence.

10   Do all the defendants present agree you will not concur in this

11   particular motion?

12      *(Affirmative responses from defense counsel.)*

13          *THE COURT:*  All defense counsel --

14          *MR. ARONCHICK:*  Yes, Your Honor.

15          *THE COURT:*  Well, I guess, Ms. Hangley, you're here on

16   behalf of your --

17          *MR. SCARINGI:*  That would expedite the filing.  Thank

18   you.

19          *THE COURT:*  It will.

20          *MR. SCARINGI:*  And considering the state certification

21   deadline, November 23rd, and the hearing for Thursday being

22   canceled, postponed, does the court have any idea as to, if the

23   motion to dismiss is resolved in our favor, when the hearing

24   would be, the evidentiary hearing?

25          *THE COURT:*  No.  I've got to recalculate that.  I

1    haven't continued it, I've canceled it.  If it needs to be

2    rescheduled, you'll know.  We'll talk on the phone.  I'll

3    convene another telephone conference call with counsel, and

4    we'll set a date as expeditiously as I can.

5              *MR. SCARINGI:*  Thank you, Your Honor.

6              *THE COURT:*  Counsel, is there anything else today?

7              *MR. GIULIANI:*  Your Honor, I'd like to say one thing

8    on behalf of Ms. Kerns, the reality is, and without going into

9    great detail, she's been under a lot of attack as a result of

10   this case.  So the call from the gentleman from Kirkland and

11   Ellis -- and I have not heard the conversation.  She hasn't

12   shared it with anyone but you.  I mean, it was in the context

13   of the woman needed protection.

14             *THE COURT:*  Well, it wasn't a threatening call.  It

15   was a call, I would suggest, if I used a word, the word would

16   be "mockery."

17             *MR. GIULIANI:*  But the reason I say it is, I just want

18   you to understand the context in which it took place.

19             *THE COURT:*  No, I --

20             *MR. GIULIANI:*  It's not kind of a mutual situation

21   where you get a call like that and you can evaluate it.  It's a

22   situation in which she's been put under extraordinary pressure.

23             And part of the reason for the confusion and the

24   different complaints which I see you noted is because our

25   original counsel also was kind of forced off the case --

1          *THE COURT:*  Well, I --

2          *MR. GIULIANI:*  -- because his law firm, because his

3     law firm wouldn't allow him to do it, which I think is pretty

4     outrageous.

5          *THE COURT:*  The press suggested that, but in their

6     motion to withdraw, they gave me a more anodyne, you know,

7     reason --

8          *MR. GIULIANI:*  Yeah.  Well, that's not exactly the

9     case.

10          *THE COURT:*  -- and it isn't for me to speculate.  But,

11     I mean, I think that's regrettable.  You should be able to

12     represent your clients, and that's -- I mean, without, without

13     difficulty, criticism.

14          Now, this is what I suggest you do.  You can -- this

15     is off the record, by the way, Lori.  Thank you.

16     *(Discussion held off the record.)*

17          *THE COURT:*  Thank you, counsel, very much.  Court is

18     adjourned.

19     *(Whereupon, the proceedings were concluded at 7:00 p.m.)*

20

21

22

23

24

25

```
1                 CERTIFICATE OF OFFICIAL COURT REPORTER

2

3

4          I, Lori A. Shuey, Federal Certified Realtime Reporter, in

5    and for the United States District Court for the Middle

6    District of Pennsylvania, do hereby certify that pursuant to

7    Section 753, Title 28, United States Code, that the foregoing

8    is a true and correct transcript to the best of my ability of

9    the stenographically reported proceedings held in the

10   above-captioned matter and that the transcript page format is

11   in conformance with the regulations of the Judicial Conference

12   of the United States.

13         Dated in Harrisburg, Pennsylvania, this 21st day of

14   November, 2020.

15

16                              /s/ Lori A. Shuey
                                Lori A. Shuey
17                              Federal Certified Realtime Reporter

18

19

20

21

22

23

24

25
```