## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DONALD J. TRUMP FOR
PRESIDENT, INC., *et al.*,

        Plaintiffs,

    v.

KATHY BOOCKVAR, *et al.*,

        Defendants.

No. 4:20-CV-02078

(Judge Brann)

## MEMORANDUM OPINION

### NOVEMBER 21, 2020

Pending before this Court are various motions to dismiss Plaintiffs' First Amended Complaint.  Plaintiffs in this matter are Donald J. Trump for President, Inc. (the "Trump Campaign"), and two voters, John Henry and Lawrence Roberts (the "Individual Plaintiffs").[1]  Defendants, who filed these motions to dismiss, include seven Pennsylvania counties (the "Defendant Counties"), as well as Secretary of the Commonwealth Kathy Boockvar.[2]

## I.     INTRODUCTION

In this action, the Trump Campaign and the Individual Plaintiffs (collectively, the "Plaintiffs") seek to discard millions of votes legally cast by Pennsylvanians from all corners – from Greene County to Pike County, and

---

[1]  Doc. 125.

[2]  *Id.*  Since the filing of the initial complaint, there have also been several intervenors and amicus petitioners.

everywhere in between.  In other words, Plaintiffs ask this Court to disenfranchise

almost seven million voters.  This Court has been unable to find any case in which

a plaintiff has sought such a drastic remedy in the contest of an election, in terms

of the sheer volume of votes asked to be invalidated.  One might expect that when

seeking such a startling outcome, a plaintiff would come formidably armed with

compelling legal arguments and factual proof of rampant corruption, such that this

Court would have no option but to regrettably grant the proposed injunctive relief

despite the impact it would have on such a large group of citizens.

That has not happened.  Instead, this Court has been presented with strained

legal arguments without merit and speculative accusations, unpled in the operative

complaint and unsupported by evidence.  In the United States of America, this

cannot justify the disenfranchisement of a single voter, let alone all the voters of its

sixth most populated state.  Our people, laws, and institutions demand more.  At

bottom, Plaintiffs have failed to meet their burden to state a claim upon which

relief may be granted.  Therefore, I grant Defendants' motions and dismiss

Plaintiffs' action with prejudice.

## II.    BACKGROUND

### A.    Legal and Factual Background

The power to regulate and administer federal elections arises from the

Constitution.[3]  "Because any state authority to regulate election to those offices

---

[3]    *Cook v. Gralike*, 531 U.S. 510, 522 (2001).

could not precede their very creation by the Constitution, such power 'had to be delegated to, rather than reserved to by, the States.'"[4]  Consequently, the Elections Clause "delegated to the States the power to regulate the 'Times, Places, and Manner of holding Elections for Senators and Representatives,' subject to a grant of authority to Congress to 'make or alter such Regulations.'"[5]  Accordingly, States' power to "regulate the incidents of such elections, including balloting" is limited to "the exclusive delegation of power under the Elections Clause."[6]

Pennsylvania regulates the "times, places, and manner" of its elections through the Pennsylvania Election Code.[7]  The Commonwealth's Constitution mandates that "[e]lections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage."[8] Recognizing this as a foundational principle, the Pennsylvania Supreme Court has declared that the purpose of the Election Code is to promote "freedom of choice, a fair election and an honest election return."[9]

In October 2019, the General Assembly of Pennsylvania enacted Act 77, which, "for the first time in Pennsylvania," extended the opportunity for all

---

[4]   *Id.* (quoting *U.S. Term Limits v. Thornton*, 514 U.S. 779, 804 (1995)).

[5]   *Id.* (quoting U.S. Const. Art. I, § 4, cl. 1).

[6]   *Id.* at 523.

[7]   25 P.S. §§ 2601, *et seq.*

[8]   *Pa. Democratic Party v. Boockvar*, 238 A.3d 345, 356 (Pa. 2020) (quoting Pa. Const., Art. I, § 5).

[9]   *Id.* (quoting *Perles v. Hoffman*, 213 A.2d 781, 783 (Pa. 1965)).

registered voters to vote by mail.[10]  Following the beginning of the COVID-19

outbreak in March 2020, the General Assembly enacted laws regulating the mail-in

voting system.[11]  Section 3150.16 of the Election Code sets forth procedural

requirements that voters must follow in order for their ballot to be counted.[12]

These procedures require, for example, that voters mark their ballots in pen or

pencil, place them in secrecy envelopes, and that ballots be received by the county

elections board on or before 8:00 P.M. on Election Day.[13]

Nowhere in the Election Code is any reference to "curing" ballots, or the

related practice of "notice-and-cure."  This practice involves notifying mail-in

voters who submitted procedurally defective mail-in ballots of these deficiencies

and allowing those voters to cure their ballots.[14]  Notified voters can cure their

ballots and have their vote counted by requesting and submitting a provisional

ballot.[15]

Recently, the Supreme Court of Pennsylvania in *Democratic Party of*

*Pennsylvania v. Boockvar* addressed whether counties are *required* to adopt a

notice-and-cure policy under the Election Code.[16]  Holding that they are not, the

---

[10]   *Id.* at 352 (citing 25 P.S. §§ 3150.11-3150.17).  Prior to the enactment of Act 77, voters were only permitted to vote by mail if they could "demonstrate their absence from the voting district on Election Day."  *Id.* (internal citations omitted).

[11]   *E.g.*, 25 P.S. § 3150.16.

[12]   *Id.*

[13]   *Id.*

[14]   *Pa. Democratic Party*, 238 A.3d at 372.

[15]   Doc. 93 at 9.

[16]   *Pa. Democratic Party*, 238 A.3d at 374.

court declined to explicitly answer whether such a policy is necessarily

*forbidden*.[17]

Following this decision, Secretary Boockvar sent an email on November 2,

2020 encouraging counties to "provide information to party and candidate

representatives during the pre-canvass that identifies the voters whose ballots have

been rejected" so those ballots could be cured.[18]  From the face of the complaint, it

is unclear which counties were sent this email, which counties received this email,

or which counties ultimately followed Secretary Boockvar's guidance.

Some counties chose to implement a notice-and-cure procedure while others

did not.[19]  Importantly, however, Plaintiffs allege only that Philadelphia County

implemented such a policy.[20]  In contrast, Plaintiffs also claim that Lancaster and

York Counties (as well as others) did not adopt any cure procedures and thus

rejected all ballots cast with procedural deficiencies instead of issuing these voters

provisional ballots.[21]

Both Individual Plaintiffs had their ballots cancelled in the 2020 Presidential

Election.[22]  John Henry submitted his mail-in ballot to Lancaster County; however,

it was cancelled on November 6, 2020 because he failed to place his ballot in the

---

[17]  *Id.*  (holding only that the Election Code "does not provide for the 'notice and opportunity to cure' procedure sought by Petitioner").

[18]  Doc. 125 at ¶ 129.

[19]  *Id.* at ¶¶ 124-27.

[20]  *Id.* at ¶ 127.

[21]  *Id.* at ¶ 130.

[22]  *Id.* at ¶¶ 15-16.

required secrecy envelope.[23]  Similarly, after submitting his ballot to Fayette County, Lawrence Roberts discovered on November 9, 2020 that his ballot had been cancelled for an unknown reason.[24]  Neither was given an opportunity to cure his ballot.[25]

### B.    The 2020 Election Results

In large part due to the coronavirus pandemic still plaguing our nation, the rate of mail-in voting in 2020 was expected to increase dramatically.  As anticipated, millions more voted by mail this year than in past elections.  For weeks before Election Day, ballots were cast and collected.  Then, on November 3, 2020, millions more across Pennsylvania and the country descended upon their local voting precincts and cast ballots for their preferred candidates.  When the votes were counted, the Democratic Party's candidate for President, Joseph R. Biden Jr., and his running-mate, Kamala D. Harris, were determined to have received more votes than the incumbent ticket, President Donald J. Trump and Vice President Michael R. Pence.  As of the day of this Memorandum Opinion, the Biden/Harris ticket had received 3,454,444 votes, and the Trump/Pence ticket had received 3,373,488 votes, giving the Biden ticket a lead of more than 80,000 votes, per the Pennsylvania state elections return website.[26]  These results will become

---

[23]  *Id.* at ¶ 15.
[24]  *Id.* at ¶ 16.
[25]  *Id.* at ¶¶ 15-16.
[26]  Pa. Dep't of State, *Unofficial Returns, Statewide*, https://www.electionreturns.pa.gov/ (last visited on November 21, 2020).

official when counties certify their results to Secretary Boockvar on November 23, 2020 – the result Plaintiffs seek to enjoin with this lawsuit.

### C.    Procedural History

Although this case was initiated less than two weeks ago, it has already developed its own tortured procedural history.  Plaintiffs have made multiple attempts at amending the pleadings, and have had attorneys both appear and withdraw in a matter of seventy-two hours.  There have been at least two perceived discovery disputes, one oral argument, and a rude and ill-conceived voicemail which distracted the Court's attention from the significant issues at hand.[27]  The Court finds it helpful to place events in context before proceeding further.

In the evening of November 9, 2020, Plaintiffs filed suit in this Court against Secretary Boockvar, as well as the County Boards of Elections for the following counties: Allegheny, Centre, Chester, Delaware, Montgomery, Northampton, and Philadelphia.[28]  The original complaint raised seven counts; two equal-protection claims, two due-process claims, and three claims under the Electors and Elections Clauses.[29]

The following day, I convened a telephonic status conference with the parties to schedule future proceedings.  During that conference, I learned that several organizations, including the Democratic National Committee, sought to file

---

[27]   Doc. 131 (denied).
[28]   *See* Doc. 1.
[29]   *Id.*

intervention motions with the Court.  Later that day, I set a briefing schedule.[30]

Additionally, November 17, 2020 was set aside for oral argument on any motions

to dismiss, and the Court further told the parties to reserve November 19, 2020 in

their calendars in the event that the Court determined that an evidentiary hearing

was necessary.  Subsequent to the Court's scheduling order, the proposed-

intervenors filed their motions, and the parties filed their briefings.  Plaintiffs then

filed a motion for a preliminary injunction on November 12, 2020.[31]

On November 12, 2020, Plaintiffs also underwent their first change in

counsel.  Attorneys Ronald L. Hicks, Jr., and Carolyn B. McGee with Porter

Wright Morris & Arthur LLP filed a motion seeking to withdraw from the case.

The Court granted this motion, and Plaintiffs retained two attorneys from Texas,

John Scott and Douglas Brian Hughes, to serve as co-counsel to their original

attorney, Linda A. Kerns.

The next day, November 13, 2020, was a relatively quiet day on the docket

for this case, but an important one for the parties.  That day, the United States

Court of Appeals for the Third Circuit issued a decision in *Bognet v. Secretary*

*Commonwealth of Pennsylvania*.[32]  This decision, though not factually connected

---

30  *See* Doc. 35.
31  Doc. 89.
32  No. 20-3214, 2020 WL 6686120 (3d Cir. Nov. 13, 2020) (pending publication).

- 8 -

to this matter, addressed issues of standing and equal protection relevant to the Plaintiffs' claims.[33]

Thereafter, on Sunday, November 15, 2020 – the day Plaintiffs' response to Defendants' motions to dismiss was due – Plaintiffs filed a First Amended Complaint (the "FAC") with the Court.  This new complaint excised five of the seven counts from the original complaint, leaving just two claims: one equal-protection claim, and one Electors and Elections Clauses claim.[34]  In addition, a review of the redline attached to the FAC shows that Plaintiffs deleted numerous allegations that were pled in the original complaint.

Plaintiffs acknowledge that under the Third Circuit's decision in *Bognet*, this Court cannot find that Plaintiffs have standing for their Elections and Electors Clauses claim in the FAC.  Plaintiffs represent that they have included this claim in the FAC to preserve the argument for appellate review.  Because Plaintiffs have made this concession, and because the Third Circuit's decision in *Bognet* is clear, this Court dismisses Count II for lack of standing without further discussion.

Defendants filed new motions to dismiss and briefs in support thereof on November 16, 2020.  That evening, less than 24 hours before oral argument was to begin, Plaintiffs instituted a second series of substitutions in counsel.  Ms. Kerns,

---

[33]   For example, *Bognet* held that only the General Assembly had standing to raise claims under the Elections and Electors Clauses.  *Id.* at *7.  This ruling effectively shut the door on Plaintiffs' allegations under those clauses of the Constitution.
[34]   Doc. 125.

along with Mr. Scott and Mr. Hughes, requested this Court's permission to

withdraw from the litigation.  I granted the motions of the Texan attorneys because

they had been involved with the case for approximately seventy-two hours.

Because oral argument was scheduled for the following day, however, and because

Ms. Kerns had been one of the original attorneys in this litigation, I denied her

request.  I believed it best to have some semblance of consistency in counsel ahead

of the oral argument.  That evening, attorney Marc A. Scaringi entered an

appearance on behalf of Plaintiffs.  Furthermore, Mr. Scaringi asked the Court to

postpone the previously-scheduled oral argument and evidentiary hearing.  The

Court denied Mr. Scaringi's motion for a continuance; given the emergency nature

of this proceeding, and the looming deadline for Pennsylvania counties to certify

their election results, postponing those proceedings seemed imprudent.

On November 17, 2020, the Court prepared to address the parties in oral

argument.  That morning, attorney Rudolph W. Giuliani entered his appearance on

behalf of Plaintiffs.  With this last-minute appearance, Plaintiffs had made their

final addition to their representation.[35]  At the conclusion of the argument, I

determined that an evidentiary hearing (previously scheduled to take place on

November 19, 2020) was no longer needed and cancelled that proceeding.  Instead,

I imposed a new briefing schedule in light of the FAC's filing, which arguably

---

[35]   Ms. Kerns has since withdrawn from the case.

mooted the initial motions to dismiss.  The parties submitted briefing on the issues.[36]

### D.    Plaintiffs' Claims

Plaintiffs' only remaining claim alleges a violation of equal protection.  This claim, like Frankenstein's Monster, has been haphazardly stitched together from two distinct theories in an attempt to avoid controlling precedent.  The general thrust of this claim is that it is unconstitutional for Pennsylvania to give states discretion to adopt a notice-and-cure policy.  Invoking *Bush v. Gore*, Plaintiffs assert that such local control is unconstitutional because it creates an arbitrary system where some persons are allowed to cure procedurally defective mail-in ballots while others are not.

Apparently recognizing that such a broad claim is foreclosed under the Third Circuit's decision in *Bognet*, Plaintiffs try to merge it with a much simpler theory of harm based on the cancellation of Individual Plaintiffs' ballots in order to satisfy standing.[37]  Because Individual Plaintiffs' votes were invalidated as procedurally

---

[36]  Separately, Plaintiffs filed a motion seeking leave to file a second amended complaint.  Doc. 172.  Having filed the FAC as of right, Plaintiffs may file a second amended complaint only with the opposing party's written consent or the court's leave.  During the oral argument on November 17, 2020, Defendants indicated that they would not consent to the filing of a third pleading and did not concur in the motion for leave to file this second amended complaint.

[37]  Plaintiffs initially appeared to base their standing under the Equal Protection Clause on the theory that the notice-and-cure policy unlawfully allowed certain ballots to be counted, and that this inclusion of illegal ballots diluted Plaintiffs' legal votes.  Doc. 1.  After *Bognet* expressly rejected this theory of standing, however, Plaintiffs have since reversed course and now argue that their standing is based on the cancellation of Individual Plaintiffs' votes and the Trump Campaign's "competitive standing."  2020 WL 6686120, at *9-10; Doc. 124 at 2.

defective, Individual Plaintiffs argue, for purposes of standing, that their claim is based on the denial of their votes. But on the merits, Plaintiffs appear to have abandoned this theory of harm and instead raise their broader argument that the lack of a uniform prohibition against notice-and-cure is unconstitutional.[38] They assert this theory on behalf of both Individual Plaintiffs and the Trump Campaign.

That Plaintiffs are trying to mix-and-match claims to bypass contrary precedent is not lost on the Court. The Court will thus analyze Plaintiffs' claims as if they had been raised properly and asserted as one whole for purposes of standing *and* the merits. Accordingly, the Court considers Plaintiffs as alleging two equal-protection claims. The first being on behalf of Individual Plaintiffs whose ballots were cancelled. And the second being on behalf of the Trump Campaign and raising the broad *Bush v. Gore* arguments that Plaintiffs allege is the main focus of this lawsuit.[39] The Court analyzes both claims separately for purposes of standing and the merits analysis.

## III.   STANDING

Plaintiffs lack standing to raise either of their claims. "Article III of the United States Constitution limits the power of the federal judiciary to 'cases' and

---

To the extent that Plaintiffs may still argue that votes have been unconstitutionally diluted (*see*, FAC ¶ 97), those claims are barred by the Third Circuit's decision in *Bognet*.

[38]   Plaintiffs essentially conceded that they were only setting forth the vote-denial theory for purposes of standing when they stated on the record at oral argument that they believed Individual Plaintiffs' votes were *lawfully* cancelled. Hr'g. Tr. 110:22-111:02.

[39]   In briefing, Plaintiffs attempt to revive their previously-dismissed poll-watcher claims. Count I does not seek relief for those allegations, but the Court considers them, *infra*.

'controversies.'"[40]  To satisfy the case-or-controversy requirement, a plaintiff must establish that they have standing.[41]  Standing is a "threshold" issue.[42]  It is an "irreducible constitutional minimum," without which a federal court lacks jurisdiction to rule on the merits of an action.[43]  Consequently, federal courts are obligated to raise the issue of standing sua sponte.[44]

The plaintiff bears the burden of establishing standing.[45]  To demonstrate standing, he must show: (1) an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.[46]  "In assessing whether a plaintiff has carried this burden, [courts must] separate [the] standing inquiry from any assessment of the merits of the plaintiff's claim."[47]  "To maintain this fundamental separation between standing and merits at the dismissal stage, [courts] assume for the purposes of [the] standing inquiry that a plaintiff has stated valid legal claims."[48]  "While [the Court's] standing inquiry may necessarily reference the 'nature and

---

[40]  *Pa. Voters All. v. Centre Cnty.*, No. 4:20-CV-01761, 2020 WL 6158309, at *3 (M.D. Pa. Oct. 21, 2020) (*quoting Cotrell v. Alcon Laboratories*, 874 F.3d 154, 161-62 (3d Cir. 2017)).

[41]  *Cotrell*, 874 F.3d at 161-62.

[42]  *Wayne Land & Mineral Grp., LLC v. Del. River Basin Comm'n*, 959 F.3d 569, 573-74 (3d Cir. 2020) (internal citations omitted).

[43]  *Id.* at 574 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

[44]  *Id.* (quoting *Seneca Reservation Corp. v. Twp. of Highland*, 863 F.3d 245, 252 (3d Cir. 2017).

[45]  *Cottrell*, 874 F.3d at 162 (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)).

[46]  *Id.* (quoting *Spokeo,* 136 S. Ct. at 1547).

[47]  *Id.*

[48]  *Id.* (citing *Info. Handling Servs., Inc. v. Defense Automated Printing Servs.*, 338 F.3d 1024, 1029 (D.C. Cir. 2003)).

source of the claims asserted,' [the Court's] focus remains on whether the plaintiff is the proper party to bring those claims."[49]

As discussed above, Plaintiffs allege two possible theories of standing. First, Individual Plaintiffs argue that their votes have been unconstitutionally denied. Under this theory, Individual Plaintiffs must show that Defendant Counties' use of the notice-and-cure procedure, as well as Secretary Boockvar's authorization of this procedure, denied Individual Plaintiffs the right to vote.[50] Second, the Trump Campaign maintains that it has competitive standing.[51]

Both theories are unavailing. Assuming, as this Court must, that Plaintiffs state a valid equal-protection claim, the Court finds that Individual Plaintiffs have adequately established an injury-in-fact. However, they fail to establish that it was Defendants who caused these injuries and that their purported injury of vote-denial is adequately redressed by invalidating the votes of others. The Trump Campaign's theory also fails because neither competitive nor associational standing applies, and it does not assert another cognizable theory of standing.

---

[49]   *Id.* (brackets and internal citations omitted).

[50]   As discussed above, to the extent that Plaintiffs would have premised standing on the theory that Pennsylvania's purportedly unconstitutional failure to uniformly prohibit the notice-and-cure procedure constitutes vote-dilution, such an assertion would be foreclosed under *Bognet.* 2020 WL 6686120, at *9-10. Accordingly, the Court will only consider whether Individual Plaintiffs have standing under their vote-denial theory.

[51]   In the interest of comprehensiveness, the Court also addresses whether the Trump Campaign has associational standing.

### A.   Voters

#### 1.   Injury in Fact

Individual Plaintiffs have adequately demonstrated that they suffered an injury-in-fact.  "[A] person's right to vote is 'individual and personal in nature.'"[52] Accordingly, the denial of a person's right to vote is typically always sufficiently concrete and particularized to establish a cognizable injury.[53]  This is true regardless of whether such a harm is widely shared.[54]  So long as an injury is concrete, courts will find that an injury in fact exists despite the fact that such harm is felt by many.[55]

This is precisely the situation presented here.  Individual Plaintiffs have adequately pled that their votes were denied.  As discussed above, the denial of a vote is a highly personal and concrete injury.  That Individual Plaintiffs had their ballots cancelled and thus invalidated is sufficiently personal to establish an injury in fact.  It is of no matter that many persons across the state might also have had their votes invalidated due to their county's failure to implement a curing

---

[52]  *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (quoting *Reynolds v. Sims*, 377 U.S. 533, 561 (1964)).

[53]  *See Gomillion v. Lightfoot*, 364 U.S. 339, 349 (1960) (Whittaker, J.) (noting the distinction between injuries caused by outright denial of the right to vote versus those caused by reducing the weight or power of an individual's vote).  The Court notes that much of standing doctrine as it relates to voting rights arises from gerrymandering or vote-dilution cases, which often involve relatively abstract harms. *See, e.g.*, *Gill*, 138 S. Ct.; *Gaffney v. Cummings*, 412 U.S. 735 (1973); *Reynolds v. Sims*, 377 U.S. 533 (1964)).

[54]  *See Federal Elections Comm'n v. Akins*, 524 U.S. 11, 24 (1998) (citing *Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449-50 (1989)).

[55]  *See id.*  ("[W]here a harm is concrete, though widely shared, the [United States Supreme] Court has found 'injury in fact.'") (quoting *Public Citizen*, 491 U.S. at 449-50).

procedure.  Accordingly, the Court finds that Individual Plaintiffs have established injury in fact.

### 2.    Causation

However, Individual Plaintiffs fail to establish that Defendant Counties or Secretary Boockvar actually caused their injuries.  First, Defendant Counties, by Plaintiffs' own pleadings, had nothing to do with the denial of Individual Plaintiffs' ability to vote.  Individual Plaintiffs' ballots were rejected by Lancaster and Fayette Counties, neither of which is a party to this case.  None of Defendant Counties received, reviewed, or discarded Individual Plaintiffs' ballots.  Even assuming that Defendant Counties unconstitutionally allowed *other* voters to cure their ballots, that alone cannot confer standing on Plaintiffs who seek to challenge the denial of *their* votes.

Second, Individual Plaintiffs have not shown that their purported injuries are fairly traceable to Secretary Boockvar.  Individual Plaintiffs have entirely failed to establish any causal relationship between Secretary Boockvar and the cancellation of their votes.  The only connection the Individual Plaintiffs even attempt to draw is that Secretary Boockvar sent an email on November 2, 2020 to some number of counties, encouraging them to adopt a notice-and-cure policy.  However, they fail to allege which counties received this email or what information was specifically included therein.  Further, that this email encouraged counties to adopt a notice-and-cure policy does not suggest in any way that Secretary Boockvar intended or

desired Individual Plaintiffs' votes to be cancelled.  To the contrary, this email

suggests that Secretary Boockvar encouraged counties to allow exactly these types

of votes to be counted.  Without more, this Court cannot conclude that Individual

Plaintiffs have sufficiently established that their injuries are fairly traceable to

Secretary Boockvar.[56]

### 3.     Redressability

In large part because the Individual Plaintiffs cannot establish that their

injury is "fairly traceable" to the Defendants' conduct, they also cannot show that

their injury could be redressed by a favorable decision from this Court.[57]  Beyond

that substantial hurdle, however, a review of the injury alleged and the relief

sought plainly shows that the Individual Plaintiffs' injury would not be redressable.

The Individual Plaintiffs base their equal-protection claim on the theory that their

---

[56]  The Third Circuit has held that a party may have standing "to challenge government action
that permits or authorizes third-party conduct that would otherwise be illegal in the absence
of the Government's action."  *Constitution Party of Pennsylvania v. Aichele*, 757 F.3d 347,
366 (3d Cir. 2014) (quoting *Bloomberg L.P. v. CFTC*, 949 F. Supp. 2d 91, 116 (D.D.C.
2013)).  But in that case, standing was permitted to avoid a catch-22 situation where, absent
standing against a third-party government actor, a plaintiff would not be able to bring suit
against any responsible party.  *Id.* at 367.  Here, Plaintiffs allege that Secretary Boockvar is
responsible for authorizing the unconstitutional actions of Defendant Counties.  However,
unlike the plaintiffs in *Aichele*, Plaintiffs are able to sue Defendant Counties for their
allegedly unconstitutional actions.  Moreover, because this Court has already concluded that
Plaintiffs lack standing to sue Defendant Counties for their use of the notice-and-cure policy,
it would be counterintuitive for Plaintiffs to have standing to challenge Secretary Boockvar's
authorization of this policy, which is even further removed from any purported harm that
Individual Plaintiffs have suffered.

[57]  *See, e.g.*, *Newdow v. Roberts*, 603 F.3d 1002, 1011 (D.C. Cir. 2010) (noting that when an
injury is caused by a third party not before the Court, courts cannot "redress injury . . . that
results from [such] independent action.") (ellipses and alterations in original) (quoting *Simon
v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)).

right to vote was denied.  Their prayer for relief seeks, in pertinent part: (1) an order, declaration, or injunction from this Court prohibiting the Defendants from certifying the results of the 2020 General Election in Pennsylvania on a Commonwealth-wide basis; and (2) another order prohibiting Defendants from certifying the results which include ballots the Defendants permitted to be cured.

Neither of these orders would redress the injury the Individual Plaintiffs allege they have suffered.  Prohibiting certification of the election results would not reinstate the Individual Plaintiffs' right to vote.  It would simply deny more than 6.8 million people *their* right to vote.  "Standing is measured based on the theory of harm and the specific relief requested."[58]  It is not "dispensed in gross: A plaintiff's remedy must be tailored to redress the plaintiff's particular injury."[59]  Here, the answer to invalidated ballots is not to invalidate millions more.  Accordingly, Plaintiffs have not shown that their injury would be redressed by the relief sought.

### B.    Trump Campaign

The standing inquiry as to the Trump Campaign is particularly nebulous because neither in the FAC nor in its briefing does the Trump Campaign clearly assert what its alleged injury is.  Instead, the Court was required to embark on an

---

[58]  *Donald J. Trump for President, Inc. v. Boockvar*, No. 2:20-CV-966, 2020 WL 5997680, at *37 (W.D. Pa. Oct. 10, 2020) (citing *Gill*, 138 S. Ct. at 1934).

[59]  *Gill*, 138 S. Ct. at 1934 (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006)).

extensive project of examining almost every case cited to by Plaintiffs to piece together the theory of standing as to this Plaintiff – the Trump Campaign.

The Trump Campaign first posits that "as a political committee for a federal candidate," it has "Article III standing to bring this action."[60]  On its face, this claim is incorrect.  Simply being a political committee does not obviate the need for an injury-in-fact, nor does it automatically satisfy the other two elements of standing.

For this proposition, the Trump Campaign relies on two federal cases where courts found associational standing by a political party's state committee. Therefore, the Court considers whether the Trump Campaign can raise associational standing, but finds that those cases are inapposite.[61]  First, a candidate's political committee and a political party's state committee are not the same thing.  Second, while the doctrine of associational standing is well established, the Trump Campaign overlooks a particularly relevant, very recent decision from another federal court – one where the Trump Campaign itself argued that it had associational standing.  In *Donald J. Trump for President, Inc. v. Cegavske*,[62] the Trump Campaign asserted associational standing, and that court rejected this theory.

---

[60]   Doc. 170 at 11.
[61]   *Texas Democratic Party v. Benkiser*, 459 F.3d 582 (5th Cir. 2006); *Orloski v. Davis*, 564 F. Supp. 526 (M.D. Pa. 1983).
[62]   No. 2:20-CV-1445, 2020 WL 5626974 (D. Nev. Sept. 18, 2020).

Associational standing allows an entity to bring suit on behalf of members upon a showing that: (1) "its members would otherwise have standing to sue in their own right;" (2) "the interests it seeks to protect are germane to the organization's purpose;" and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."[63]

In *Cegavske* (another case in which the Trump Campaign alleged violations of equal protection), the court found that the Trump Campaign failed to satisfy the second prong of associational standing because it "represents only Donald J. Trump and his 'electoral and political goals' of reelection."[64]  That court noted that while the Trump Campaign might achieve its purposes through its member voters, the "constitutional interests of those voters are wholly distinct" from that of the Trump Campaign.[65]  No different here.  Even if the Individual Plaintiffs attempted to vote for President Trump, their constitutional interests are different, precluding a finding of associational standing.  In any event, because the Individual Plaintiffs lack standing in this case, the Trump Campaign cannot satisfy the first prong of associational standing either.

The Trump Campaign's second theory is that it has "'competitive standing' based upon disparate state action leading to the 'potential loss of an election.'"[66]

---

[63]   *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).
[64]   *Cegavske*, 2020 WL 5626974 at *4 (internal citations omitted).
[65]   *Id*.
[66]   Doc. 170 at 11 (citing *Drake v. Obama*, 664 F.3d 774, 783 (9th Cir. 2011)).

Pointing to a case from the United States Court of Appeals for the Ninth Circuit,

*Drake v. Obama*,[67] the Trump Campaign claims this theory proves injury-in-fact.

First, the Court finds it important to emphasize that the term "competitive

standing" has specific meaning in this context.  Second, the Trump Campaign's

reliance on the theory of competitive standing under *Drake v. Obama* is, at best,

misguided.  Subsequent case law from the Ninth Circuit has explained that

competitive standing "is the notion that 'a candidate or his political party has

standing to challenge the *inclusion of an allegedly ineligible rival on the ballot*, on

the theory that doing so hurts the candidate's or party's own chances of prevailing

in the election.'"[68]  In the present matter, there is no allegation that the Democratic

Party's candidate for President, or any other candidate, was ineligible to appear on

the ballot.

Examination of the other case law cited to by Plaintiffs contradicts their

theory that competitive standing is applicable here for the same reason.  For

example, in *Texas Democratic Party v. Benkiser*, the United States Court of

Appeals for the Fifth Circuit found competitive standing in a case in which the

Democratic Party petitioned against the decision to deem a candidate ineligible and

---

[67]   664 F.3d.

[68]   *Townley v. Miller*, 722 F.3d 1128, 1135 (9th Cir. 2013) (emphasis added) (quoting *Drake*, 664 F.3d at 782); *see also Mecinas v. Hobbs*, No. CV-19-05547, 2020 WL 3472552, at *11-12 (D. Ariz. June 25, 2020) (explaining the current state of the doctrine of competitive standing and collecting cases).

replace him with another.[69]  Likewise, in *Schulz v. Williams*, the United States

Court of Appeals for the Second Circuit found competitive standing where the

Conservative party alleged an injury in fact by arguing that a candidate from the

Libertarian Party of New York was improperly placed on the ballot for the

Governor's race in 1994.[70]  By way of yet another example, Plaintiffs' citation to

*Fulani v. Hogsett* makes the same point; competitive standing applies to challenges

regarding the eligibility of a candidate.  There, the Indiana Secretary of State was

required to certify the names of candidates for President by a certain date.[71]  When

the Secretary failed to certify the Democratic and Republican candidates by that

date, the New Alliance party challenged the inclusion of those candidates on the

ballot, arguing that allowing these ineligible candidates constituted an injury-in-

fact.[72]  Three other cases relied on by Plaintiffs illustrate separate grounds for

stating an injury in fact, all still relating to ballot provisions.[73]

It is telling that the only case from the Third Circuit cited to by Plaintiffs,

*Marks v. Stinson*, does not contain a discussion of competitive standing or any

other theory of standing applicable in federal court.[74]  Simply pointing to another

---

[69]   459 F.3d at 586.
[70]   44 F.3d 48, 53 (2d Cir. 1994).
[71]   917 F.2d 1028, 1029-30 (7th Cir. 1990).
[72]   *Id*.
[73]   *See Green Party of Tennessee v. Hargett*, 767 F.3d 533, 542-43 (6th Cir. 2014) (finding that Plaintiffs had standing to challenge Tennessee's *ballot-access* laws); *see also Pavek v. Donald J. Trump for President, Inc.*, 967 F.3d 905, 907 (8th Cir. 2020) (finding that Plaintiffs had standing to challenge the *ballot-ordering* provision in Minnesota);  *Nelson v. Warner*, No. 3:19-0898, 2020 WL 4582414, at *3 (S.D. W. Va. Aug. 10, 2020) (same).
[74]   19 F.3d 873 (3d Cir. 1994).

case where a competitor in an election was found to have standing does not establish *competitive standing* in this matter.  Without more, this Court declines to take such an expansive view of the theory of competitive standing, particularly given the abundance of guidance from other Circuits, based on Plaintiffs' own citations, limiting the use of this doctrine.

The Trump Campaign has not offered another theory of standing, and therefore, cannot meet its burden of establishing Article III jurisdiction.  To be clear, this Court is not holding that a political campaign can never establish standing to challenge the outcome of an election; rather, it merely finds that in this case, the Trump Campaign has not pled a cognizable theory.[75]

## IV.   MOTION TO DISMISS 12(b)(6)

### A.   Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), the Court dismisses a complaint, in whole or in part, if the plaintiff has failed to "state a claim upon which relief can be granted."  A motion to dismiss "tests the legal sufficiency of a claim"[76] and "streamlines litigation by dispensing with needless discovery and factfinding."[77]  "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of

---

[75]   Even assuming, however, that the Trump Campaign could establish that element of standing, it would still fail to satisfy the causation and redressability requirements for the same reasons that the Voter Plaintiffs do.  To the extent the Trump Campaign alleges any injury at all, its injury is attenuated from the actions challenged.

[76]   *Richardson v. Bledsoe*, 829 F.3d 273, 289 n. 13 (3d Cir. 2016) (Smith, C.J.) (*citing Szabo v. Bridgeport Machines, Inc.,* 249 F.3d 672, 676 (7th Cir. 2001) (Easterbrook, J.)).

[77]   *Neitzke v. Williams,* 490 U.S. 319, 326-27 (1989).

a dispositive issue of law."[78]  This is true of any claim, "without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one."[79]

Following the Roberts Court's "civil procedure revival,"[80] the landmark decisions of *Bell Atlantic Corporation v. Twombly*[81] and *Ashcroft v. Iqbal*[82] tightened the standard that district courts must apply to 12(b)(6) motions.[83]  These cases "retired" the lenient "no-set-of-facts test" set forth in *Conley v. Gibson* and replaced it with a more exacting "plausibility" standard.[84]

Accordingly, after *Twombly* and *Iqbal*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[85]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[86]  "Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted

---

[78]  *Id.* at 326 (internal citations omitted).
[79]  *Id.* at 327.
[80]  Howard M. Wasserman, The Roberts Court and the Civil Procedure Revival, 31 Rev. Litig. 313, 316, 319-20 (2012).
[81]  550 U.S. 544 (2007).
[82]  556 U.S. 662 (2009).
[83]  *Id.* at 670.
[84]  *Id.*
[85]  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).
[86]  *Id.*

unlawfully."[87]  Moreover, "[a]sking for plausible grounds . . . calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [wrongdoing]."[88]

The plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[89]  No matter the context, however, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"[90]

When disposing of a motion to dismiss, the Court "accept[s] as true all factual allegations in the complaint and draw[s] all inferences from the facts alleged in the light most favorable to [the plaintiff]."[91]  However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions."[92]  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[93]

As a matter of procedure, the Third Circuit has instructed that:

> Under the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps. First, it

---

[87] *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (Jordan, J.) (internal quotations and citations omitted).

[88] *Twombly*, 550 U.S. at 556.

[89] *Iqbal*, 556 U.S. at 679.

[90] *Id.* at 678 (*quoting Twombly*, 550 U.S. at 557).

[91] *Phillips v. County. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008) (Nygaard, J.).

[92] *Iqbal*, 556 U.S. at 678;

[93] *Id.* (citing *Twombly*, 550 U.S. at 555); *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (Nygaard, J.) ("After *Iqbal*, it is clear that conclusory or 'bare-bones' allegations will no longer survive a motion to dismiss.").

must tak[e] note of the elements [the] plaintiff must plead to state a claim. Second, it should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, [w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.[94]

## B.    Equal Protection

Even if Plaintiffs had standing, they fail to state an equal-protection claim. The Equal Protection Clause of the Fourteenth Amendment commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws."[95]  The principle of equal protection is fundamental to our legal system because, at its core, it protects the People from arbitrary discrimination at the hands of the State.

But, contrary to Plaintiffs' assertions, not all "unequal treatment" requires Court intervention.[96]  The Equal Protection Clause "does not forbid classifications."[97]  It simply keeps governmental decisionmakers from treating similarly situated persons differently.[98]  The government could not function if complete equality were required in all situations.  Consequently, a classification resulting in "some inequality" will be upheld unless it is based on an inherently suspect characteristic or "jeopardizes the exercise of a fundamental right."[99]

---

[94]   *Connelly*, 809 F.3d at 787 (internal quotations and citations omitted).
[95]   U.S. Const. Amend. XIV, cl. 1.
[96]   Doc. 170 at 29.
[97]   *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (citing *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920)).
[98]    *Id*. (citing *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920)).
[99]   *Id.* (quoting *McGowan v. Maryland*, 366 U.S. 420, 425-26 (1961)).

One such fundamental right, at issue in this case, is the right to vote.  Voting is one of the foundational building blocks of our democratic society, and that the Constitution firmly protects this right is "indelibly clear."[100]  All citizens of the United States have a constitutionally protected right to vote.[101]  And all citizens have a constitutionally protected right to have their votes counted.[102]

With these background principles firmly rooted, the Court turns to the merits of Plaintiffs' equal-protection claims.  The general gist of their claims is that Secretary Boockvar, by failing to prohibit counties from implementing a notice-and-cure policy, and Defendant Counties, by adopting such a policy, have created a "standardless" system and thus unconstitutionally discriminated against Individual Plaintiffs.  Though Plaintiffs do not articulate why, they also assert that this has unconstitutionally discriminated against the Trump Campaign.

As discussed above, the Court will address Individual Plaintiffs' and the Trump Campaign's claims separately.  Because Individual Plaintiffs premised standing on the purported wrongful cancellation of their votes, the Court will only analyze whether Defendants have impermissibly burdened Individual Plaintiffs' ability to vote.  Further, the Court will consider two issues raised by the Trump Campaign; the first being whether it has stated a valid claim alleging discrimination relating to its use of poll-watchers, and the second being whether

---

[100] *Reynolds v. Sims*, 377 U.S. 533, 554 (1964).
[101] *Id.* (citing *Ex parte Yarbrough*, 110 U.S. 651 (1884)).
[102] *Id.* (citing *United States v. Mosley*, 238 U.S. 383 (1915)).

the General Assembly's failure to uniformly prohibit (or permit) the notice-and-cure procedure is unconstitutional.

### 1. Individual Plaintiffs

States have "broad authority to regulate the conduct of elections, including federal ones."[103]  "This authority includes 'broad powers to determine the conditions under which the right of suffrage may be exercised.'"[104]  Because states must have freedom to regulate elections if "some sort of order, rather than chaos, is to accompany the democratic processes,"[105] such regulation is generally insulated from the stringent requirements of strict scrutiny.[106]

Instead, state regulation that burdens voting rights is normally subject to the *Anderson-Burdick* balancing test, which requires that a court "weigh the asserted injury to the right to vote against the 'precise interests put forward by the State as justifications for the burden imposed by its rule.'"[107]  Under this test, "any 'law respecting the right to vote – whether it governs voter qualifications, candidate selection, or the voting process,' is subjected to 'a deferential "important

---

[103] *Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004) (citing U.S. Const. Art. I, § 4, cl. 1).

[104] *Donald J. Trump for President, Inc.*, 2020 WL 5997680, at *38 (quoting *Shelby County, Ala. v. Holder*, 570 U.S. 529, 543 (2013)).

[105] *Id.* (quoting *Burdick v. Takushi*, 504 U.S. 428, 433 (1992)).

[106] *Burdick*, 504 U.S. at 432-33.

[107] *Crawford v. Marion County Election Board*, 553 U.S. 181, 190 (2008) (quoting *Burdick*, 504 U.S. at 434).

regulatory interests" standard for nonsevere, nondiscriminatory restrictions, reserving strict scrutiny for laws that severely restrict the right to vote.'"[108]

The *Anderson-Burdick* balancing test operates on a sliding scale.[109]  Thus, more restrictive laws are subject to greater scrutiny.  Conversely, "minimally burdensome and nondiscriminatory" regulations are subject to "a level of scrutiny 'closer to rational basis.'"[110]  "And where the state imposes no burden on the 'right to vote' at all, true rational basis review applies."[111]

Here, because Defendants' conduct "imposes no burden" on Individual Plaintiffs' right to vote, their equal-protection claim is subject to rational basis review.[112]  Defendant Counties, by implementing a notice-and-cure procedure, have in fact *lifted* a burden on the right to vote, even if only for those who live in those counties.  Expanding the right to vote for some residents of a state does not burden the rights of others.[113]  And Plaintiffs' claim cannot stand to the extent that it complains that "the state is *not* imposing a restriction on *someone else's* right to vote."[114]  Accordingly, Defendant Counties' use of the notice-and-cure procedure

---

[108] *Donald J. Trump for President*, 2020 WL 5997680, at *39 (quoting *Crawford*, 533 U.S. at 204 (Scalia, J. concurring)).

[109] *See id.* at *40; *see also Arizona Libertarian Party v. Hobbs*, 925 F.3d 1085, 1090 (9th Cir. 2019); *Fish v. Schwab*, 957 F.3d 1105, 1124 (10th Cir. 2020).

[110] *Donald J. Trump for President*, 2020 WL 5997680, at *39 (quoting *Ohio Council 8 Am. Fed'n of State v. Husted*, 814 F.3d 329, 335 (6th Cir. 2016)).

[111] *Id. (citing Biener v. Calio*, 361 F.3d 206, 215 (3d Cir. 2004)).

[112] Even after questioning from this Court during oral argument regarding the appropriate standard of review for their equal-protection claim, Plaintiffs failed to discuss this key aspect of the claim in briefing.  *See* Doc. 170.

[113] *See, e.g., Short v. Brown*, 893 F.3d 671, 677 (9th Cir. 2018).

[114] *Donald J. Trump for President*, 2020 WL 5997680, at *44 (emphasis in original).

(as well as Secretary Boockvar's authorization of this procedure) will be upheld unless it has no rational basis.[115]

Individual Plaintiffs' claims fail because it is perfectly rational for a state to provide counties discretion to notify voters that they may cure procedurally defective mail-in ballots.  Though states may not discriminatorily sanction procedures that are likely to burden some persons' right to vote more than others, they need not expand the right to vote in perfect uniformity.  All Plaintiffs have alleged is that Secretary Boockvar allowed counties to choose whether or not they wished to use the notice-and-cure procedure.  No county was forced to adopt notice-and-cure; each county made a choice to do so, or not.  Because it is not irrational or arbitrary for a state to allow counties to expand the right to vote if they so choose, Individual Plaintiffs fail to state an equal-protection claim.

Moreover, even if they could state a valid claim, the Court could not grant Plaintiffs the relief they seek.  Crucially, Plaintiffs fail to understand the relationship between right and remedy.  Though every injury must have its proper redress,[116] a court may not prescribe a remedy unhinged from the underlying right being asserted.[117]  By seeking injunctive relief preventing certification of the Pennsylvania election results, Plaintiffs ask this Court to do exactly that.  Even

---

[115] *Biener*, 361 F.3d at 215.
[116] *Marbury v. Madison*, 5 U.S. 137, 147 (1803).
[117] *Gill*, 138 S. Ct. at 1934 ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury.") (citing *Cuno*, 547 U.S. at 353).

assuming that they can establish that their right to vote has been denied, which they cannot, Plaintiffs seek to remedy the denial of their votes by invalidating the votes of millions of others.  Rather than requesting that their votes be counted, they seek to discredit scores of other votes, but only for one race.[118]  This is simply not how the Constitution works.

When remedying an equal-protection violation, a court may either "level up" or "level down."[119]  This means that a court may either extend a benefit to one that has been wrongfully denied it, thus leveling up and bringing that person on par with others who already enjoy the right,[120] or a court may level down by withdrawing the benefit from those who currently possess it.[121]  Generally, "the preferred rule in a typical case is to extend favorable treatment" and to level up.[122]  In fact, leveling down is impermissible where the withdrawal of a benefit would necessarily violate the Constitution.[123]  Such would be the case if a court were to remedy discrimination by striking down a benefit that is constitutionally guaranteed.

---

[118]  Curiously, Plaintiffs now claim that they seek only to enjoin certification of the presidential election results. Doc. 183 at 1.  They suggest that their requested relief would thus not interfere with other election results in the state.  But even if it were logically possible to hold Pennsylvania's electoral system both constitutional and unconstitutional at the same time, the Court would not do so.

[119]  *Heckler v. Matthews*, 465 U.S. 728, 740 (1984) (internal citations omitted).

[120]  *Id.* at 741; *Califano v. Westcott*, 443 U.S. 76, 90-91 (1979).

[121]  *E.g.*, *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1701 (2017).

[122]  *Id.* (internal citations omitted).

[123]  *See Palmer v. Thompson*, 403 U.S. 217, 226-27 (1971) (addressing whether a city's decision to close pools to remedy racial discrimination violated the Thirteenth Amendment); *see also Reynolds*, 377 U.S. at 554 (citing *Mosley*, 238 U.S. at 383).

Here, leveling up to address the alleged cancellation of Plaintiffs' votes would be easy; the simple answer is that their votes would be counted. But Plaintiffs do not ask to level up. Rather, they seek to level down, and in doing so, they ask the Court to violate the rights of over 6.8 million Americans. It is not in the power of this Court to violate the Constitution.[124] "The disenfranchisement of even one person validly exercising his right to vote is an extremely serious matter."[125] "To the extent that a citizen's right to vote is debased, he is that much less a citizen."[126]

Granting Plaintiffs' requested relief would necessarily require invalidating the ballots of every person who voted in Pennsylvania. Because this Court has no authority to take away the right to vote of even a single person, let alone millions of citizens, it cannot grant Plaintiffs' requested relief.

### 2.      Trump Campaign

Plaintiffs' brief in opposition to the motions to dismiss spends only *one* paragraph discussing the merits of its equal-protection claim. Plaintiffs raise two arguments as to how equal protection was violated. The first is that "Defendants excluded Republican/Trump observers from the canvass so that they would not

---

[124]   *Marbury*, 5 U.S. at 147.

[125]   *Perles v. County Return Bd. of Northumberland County*, 202 A.2d 538, 540 (Pa. 1964) (cleaned up).

[126]   *Id.* at 567.

observe election law violations."[127]  The second claims that the "use of notice/cure procedures violated equal protection because it was deliberately done in counties where defendants knew that mail ballots would favor Biden/Democrats."[128]  The former finds no support in the operative pleading, and neither states an equal-protection violation.

Count I of the FAC makes no mention of disparity in treatment of observers based on which campaign they represented.  Instead, Count I discusses the use of "standardless" procedures.  These are two separate theories of an equal protection violation.  That deficiency aside, to the extent this new theory is even pled, Plaintiffs fail to plausibly plead that there was "uneven treatment" of Trump and Biden watchers and representatives.  Paragraphs 132-143 of the FAC are devoted to this alleged disparity.  None of these paragraphs support Plaintiffs' argument.  A selection below:

- "Defendants have not allowed *watchers and representatives* to be present . . ."[129]
- "In Centre County, the central pre-canvassing location was a large ballroom. The set-up was such that the *poll watchers did not have meaningful access* to observe the canvassing and tabulation process of mail-in and absentee ballots, and in fact, the *poll watchers and observers* who were present could not actually observe the ballots such that they could confirm or object to the validity of the ballots."[130]

---

[127]  Doc. 170 at 29.  Count I makes no mention of the poll-watching allegations, nor does it seek relief for any violation of law on the basis of those allegations.  Out of an abundance of caution, however, the Court considers whether these allegations state a claim.

[128]  *Id.*

[129]  Doc. 125 at ¶ 134 (emphasis added).

[130]  *Id.* at ¶ 135 (emphasis added).

- "In Philadelphia County, *poll watchers and canvass representatives* were denied access altogether in some instances."[131]
- "In Delaware County, *observers* were denied access to a back room counting area . . ."[132]

None of these allegations (or the others in this section) claim that the Trump Campaign's watchers were treated *differently* than the Biden campaign's watchers. Simply alleging that poll watchers did not have access or were denied access to some areas does not plausibly plead unequal treatment. Without actually alleging that one group was treated differently than another, Plaintiffs' first argument falls flat.

Likewise, Plaintiffs cannot salvage their notice-and-cure theory by invoking *Bush v. Gore*.[133] Plaintiffs claim that the Equal Protection clause "imposes a 'minimum requirement for nonarbitrary treatment of voters' and forbids voting systems and practices that distribute resources in 'standardless' fashion, without 'specific rules designed to ensure uniform treatment.'"[134] Plaintiffs attempt to craft a legal theory from *Bush*, but they fail because: (1) they misapprehend the issues at play in that case; and (2) the facts of this case are distinguishable.

Plaintiffs' interpretation of *Bush v. Gore* would broaden the application of that case far beyond what the Supreme Court of the United States endorsed. In *Bush*, the Supreme Court stopped a recount of votes in Florida in the aftermath of

---

[131]   *Id*. at ¶ 136 (emphasis added).
[132]   *Id*. at ¶ 137 (emphasis added).
[133]   531 U.S. 98 (2000).
[134]   Doc. 170 at 13.

the 2000 Presidential Election.  Despite Plaintiffs' assertions, *Bush* does not stand

for the proposition that every rule or system must ensure uniform treatment.  In

fact, the Supreme Court explicitly said so, explaining: "[t]he question before the

Court is *not* whether local entities, in the exercise of their expertise, may develop

different systems for implementing elections."[135]  Instead, the Court explained that

its holding concerned a "situation where a state court with the power to assure

uniformity has ordered a statewide recount with minimal procedural

safeguards."[136]  Where a state court has ordered such a remedy, the Supreme Court

held that "there must be at least some assurance that the rudimentary requirements

of equal treatment and fundamental fairness are satisfied."[137]  In other words, the

lack of guidance from a court constituted an equal-protection violation.

In the instant matter, Plaintiffs are not challenging any court action as a

violation of equal protection, and they do not allege that Secretary Boockvar's

guidance differed from county to county, or that Secretary Boockvar told some

counties to cure ballots and others not to.  That some counties may have chosen to

implement the guidance (or not), or to implement it differently, does not constitute

an equal-protection violation.  "[M]any courts that have recognized that counties

may, consistent with equal protection, employ entirely different election

---

[135] *Bush*, 531 U.S. at 109 (emphasis added).
[136] *Id.*
[137] *Id.*

procedures and voting systems within a single state."[138]  "Arguable differences in

how elections boards apply uniform statewide standards to the innumerable

permutations of ballot irregularities, although perhaps unfortunate, are to be

expected, just as judges in sentencing-guidelines cases apply uniform standards

with arguably different results."[139]  Requiring that every single county administer

elections in exactly the same way would impose untenable burdens on counties,

whether because of population, resources, or a myriad of other reasonable

considerations.

## V.   CONCLUSION

Defendants' motions to dismiss the First Amended Complaint are granted

with prejudice.  Leave to amend is denied.  "Among the grounds that could justify

a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice,

and futility."[140]  Given that: (1) Plaintiffs have already amended once as of right;

(2) Plaintiffs seek to amend simply in order to effectively reinstate their initial

complaint and claims; and (3) the deadline for counties in Pennsylvania to certify

their election results to Secretary Boockvar is November 23, 2020, amendment

would unduly delay resolution of the issues. This is especially true because the

Court would need to implement a new briefing schedule, conduct a second oral

argument, and then decide the issues.

---

[138] *Donald J. Trump for President*, 2020 WL 5997680, at *44.
[139] *Northeast Ohio Coalition for the Homeless v. Husted*, 837 F.3d 612, 636 (6th Cir. 2020).
[140] *Lorenz v. CSX Corp.*, 1 F.3d 1406, 1413–14 (3d Cir.1993).

An appropriate Order follows.

BY THE COURT:


_s/ Matthew W. Brann_
Matthew W. Brann
United States District Judge