IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DONALD J. TRUMP FOR PRESIDENT, INC., et al., | : : : | CASE NO. 4:20-CV-02078-MWB |
| Plaintiffs, | : | The Hon. Matthew W. Brann |
| v. | : | |
| KATHY BOOCKVAR, et al., | : : | |
| Defendants. | : | |

## MOTION TO INTERVENE PURSUANT TO RULE 24(a) OF THE FED. RULES OF CIVIL PROCEDURE

AND NOW come Intervenors Mike Kelly, Kathy Barnette, Sean Parnell, Luke Negron, David Torres, Clay Breece, Dasha Pruett, Daryl Metcalfe, Cris Dush, Thomas Sankey, Kathy Rapp, Robert Kaufman, Stephanie Borowicz and PA Voters Alliances, by and through their attorneys Thomas W. King, III, and Thomas E. Breth, through Dillon McCandless King Coulter & Graham, LLP, and allege the following:

1.      Intervenors are residents in various counties throughout the Commonwealth of Pennsylvania (including within the counties identified by the Boards of Elections in this suit) and all Intervenors voted in their respective counties of residence in the 2020 General Election.

2.      PA Voters Alliance is a Pennsylvania unincorporated association whose members include some of the Intervenors. The PA Voter Alliance is an association with members who seek to ensure, as part of the Association's objectives, public confidence in the integrity of Pennsylvania's elections, in election results and election systems, processes, procedures and enforcement and that the public officials act in accordance with the law in exercising their obligations to the people of the Commonwealth of Pennsylvania.  PA Voters Alliance asserts the rights of its members as electors within the Commonwealth of Pennsylvania.

1

3. Intervenors assert that Defendants' conduct violated Intervenors' First Amendment rights by illegally discriminating against the Republican Presidential Candidate, Donald Trump, and favoring the Democrat Presidential Candidate, Joe Biden.

4. Intervenors further assert that Defendants' conduct violated Intervenors' Equal Protection rights by illegally discriminating against Republican Presidential Candidate, Donald Trump, and in favor of Democrat Presidential Candidate, Joe Biden, with no rational reason or purpose.

5. Intervenors further assert that Defendants' conduct violated Intervenors' substantive due process rights to a fair and free election.

6. Intervenors further assert that they can establish a likelihood of success on the merit of their claims based upon the evidence and expert testimony that they would present, if permitted, to intervene.

7. The Supreme Court of Pennsylvania noted that the Elections Code does not provide election officials with procedures for contacting electors and allowing electors to cure defects in mail-in and absentee ballots:

> "As noted herein, although the Election Code provides the procedures for casting and counting a vote by mail, it does not provide for the "notice and opportunity to cure" procedure sought by Petitioner. To the extent that a voter is at risk for having his or her ballot rejected due to minor errors made in contravention of those requirements, we agree that the decision to provide a "notice and opportunity to cure" procedure to alleviate that risk is one best suited for the Legislature." *Pennsylvania Democratic Party v. Boockvar*, No. 133 MM 2020, 2020 WL 5554644, at *20 (Pa. Sept. 17, 2020); *see also In re: November 3, 2020 General Election*, 2020 WL 6252803, at *7 (Pa. Oct. 23, 2020)

8. The Supreme Court expressly held that "… [U]nlike in-person voters, mail-in or absentee voters are not provided an opportunity to cure perceived defects in a timely manner." *Id. at p. 20.*

2

9.      On November 1, 2020, Frank Dean, Director of Mail-In Elections in Montgomery County, acknowledged that Montgomery County election officials regularly failed to comply with the requirement to safely keep the ballots in sealed or locked containers until pre-canvassed by the board of elections.

10.      Director Dean confirmed that election officials daily evaluated and identified ballots for potential defects, such as, omitted secrecy envelopes and incomplete declarations.  In addition, election officials weighed the ballot envelopes to determine whether secrecy envelopes were contained within the outer envelopes.  Under-weight ballot envelopes were segregated from other ballot envelopes so that election official could permit electors to alter the envelopes.

11.      The photograph below shows some of the thousands of absentee and mail-in ballots pre-canvassed by the Board of Elections in violation of the Election Code.[1]  These defective ballots were not secured in any way and were easily accessible to the public.



---

[1] This "Ballots for Sale" photo was taken on 11/01/2020 by Robert Gillies during a tour of the Montgomery County mail-in ballot storage and canvass facility.

12.     In violation of electors' right to secrecy in their ballots, election officials used the information gathered through their inspection of the ballot envelopes to identify the names of electors who had cast potentially defective ballots.

13.     With this information, the election officials accessed the Statewide Uniform Registry of Electors ("SURE") System to compile lists of available confidential elector information including, each elector's name, street address, email address, telephone number, precinct, voter identification number and a description of the potential defect in the ballot envelope.

14.     In an October 31, 2020, e-mail, Director Dean emailed the latest list of confidential elector information to other election officials, Lee Soltysiak and Josh Stein, and wrote:



15.     There is no authority within the Election Code that authorizes election officials to manually alter the information contained within the SURE system for the purposes described by Director Dean.

16.     In order to cancel or replace an elector's absentee or mail-in ballot, election officials would be required to manually alter the information contained in the Commonwealth's Statewide Uniform Registry of Electors ("SURE").

17.     There is no authority within the Election Code that authorizes election officials to cancel and/or replace an elector's absentee or mail-in ballot as described by Defendant Dean.

18.     Further, in violation of electors' right to secrecy in their ballots, election officials used the information gathered through their inspection of the ballot envelopes to identify the names of electors who had cast potentially defective ballots.

19.     The Excel spreadsheet attached to Director Dean's October 31, 2020, e-mail notes that when mail-in or absentee ballot envelopes were found to have such defects, a limited number of electors were provided with the opportunity to alter their ballot envelopes.

20.     This picture shows page 1 or 124 pages that include thousands of defective ballot envelopes that elections officials were trying to "cure" in violation of the Election Code.

21.     Intervenors also seek an Order from this Honorable Court directing Secretary Boockvar to secure and cease alterations on the records of the SURE System with respect to the 2020 Presidential Election and to prevent the wholesale elimination of the evidence contained on the SURE System as part of a plan to replace the System, at least while election contests/suits are pending.  The Secretary of State has otherwise publicly announced her office's intention to proceed with plans to eliminate the SURE System.

22.     Despite the clear legal prohibition against efforts to "cure" absentee and mail-in ballot envelopes, Defendant Boockvar issued guidance just hours before Election Day directing county boards of elections to provide electors who have cast defective absentee or mail-in ballots with provisional ballots and to promptly update the SURE system.

23.     Deputy Secretary for Elections and Commissions of the Commonwealth issued an email which stated:

**Sent:** Monday, November 2, 2020 8:38 PM
**To:** Marks, Jonathan
**Subject:** Important DOS Email - Clarification regarding Ballots Set Aside During Pre-canvass

*** This is an external email. Please use caution when clicking on links and downloading attachments ***

Dear County Election Directors,

The Department of State has been asked whether county boards of elections can provide information to authorized representatives and representatives of political parties during the pre-canvass about voters whose absentee and mail-in ballots have been rejected.  The Department issued provisional ballot guidance on October 21, 2020, that explains that voters whose completed absentee or mail-in ballots are rejected by the county board for reasons unrelated to voter qualifications may be issued a provisional ballot.  To facilitate communication with these voters, the county boards of elections should provide information to party and candidate representatives during the pre-canvass that identifies the voters whose ballots have been rejected and should promptly update the SURE system.

Kind regards,

Jonathan M. Marks
Deputy Secretary for Elections & Commissions
Pennsylvania Department of State
302 North Office Building | Harrisburg, PA 17120
☎ 717.783.2035 🖶 717.787.1734
✉ jmarks@pa.gov


DEPARTMENT OF STATE

6

24.     In order to obtain a provisional ballot on Election Day, an elector who previously requested an absentee or mail-in ballot must sign an affidavit stating "I do solemnly swear or affirm that my name is … and that this is the only ballot that I cast in this election." *25 P.S. §3146.8; 25 P.S. §3050.*

25.     If an elector has already submitted an absentee or mail-in ballot and that ballot was received by his or her county board of elections, the elector cannot truthfully affirm that the provisional ballot is the only ballot cast by them in the election.  The provisional ballot is in fact a second ballot cast by them.

26.     Defendants' actions appear to be coordinated with the Democratic Party that apparently considered the matter to be URGENT.



27.     Intervenors assert that there were almost 100,000 provisional ballots cast in the 2020 General Election.

28.     Intervenors will produce two expert witnesses whose reports are attached hereto and marked Exhibit "A" and "B".   Such experts will identify significant and dispositive discrepancies/error or misconduct which would call into questions the results of the Presidential Election in Pennsylvania.   If the Intervenors' Motion is granted, they will file the Pleading marked as Exhibit "C" and attached hereto.   Intervenors will also produce various fact witnesses to substantiate the assertions made in the Motion to Intervene and in the pleading attached hereto.

29.     In addition, Defendant Kathy Boockver, without statutory authorization or legal authority, provided select organizations that have close ties to the Democratic Party and common goals, to directly access to the Commonwealth's SURE System.   Defendant Boockvar is quoted as stating:



"Rock the Vote's web tool was connected to our system, making the process of registering through their online programs, and those of their partners, seamless for voters across Pennsylvania."

-Kathy Boockvar, Pennsylvania Secretary of State

30.     Finally, Intervenors assert that they would be irreparably harmed if an improperly elected President of the United States is sworn in violation of the United States Constitution.

31.     In light of the massive nature of Defendants' illegal conduct, it would be an historic constitutional violation of massive proportions to allow Democrat Presidential Candidate Biden to take office based upon election results within the Commonwealth of Pennsylvania that cannot be properly and legally certified as accurate.

32.     Intervenors can establish that a significant number of the votes cast by absentee and mail-in ballots were directly impacted by Defendants' illegal and inappropriate conduct.

33.     Intervenors can establish that a significant number of the votes cast by provisional ballots were directly impacted by Defendants' illegal and inappropriate conduct.

34.     The votes cast using voting machines on Election Day more accurately reflect the will of electorate within the Commonwealth because these votes were less susceptible to Defendants' illegal and inappropriate conduct.

WHEREFORE, showing the above, the proposed Intervenors pray this Honorable Court for an Order granting their Motion to Intervene, and as set forth herein.

Respectfully submitted,

Dated: November 21, 2020

/s/ Thomas W. King, III
Thomas W. King, III (PA I.D. No. 21580)
Email: tking@dmkcg.com
Thomas E. Breth (PA I.D. No. 66350)
Email: tbreth@dmkcg.com
*Special Counsel for the Amistad Project*
*of the Thomas More Society*
Dillon, McCandless, King, Coulter
& Graham, L.L.P.
128 West Cunningham Street
Butler, PA 16001
Telephone: (724) 283-2200
Facsimile: (724) 283-2298
*Counsel for Intervenors*

/s/ Timothy P. Griffin
Timothy P. Griffin (VA. I.D. No. 83195)*

Email: tgriffin@thomasmoresociety.org
*Special Counsel for the Amistad Project*
*of the Thomas More Society*
Thomas More Society
Amistad Project
115 Sandiges Road
Amherst, VA 24521
Telephone: (434) 660-6198

*\*Pro Hac Vice Pending*

10

EXHIBIT "A"

# EXPERT REPORT ON PA MAIL-IN BALLOTS

## Dr Steven J Miller

## EXECUTIVE SUMMARY

The analysis was performed on a data set provided by Matt Braynard and his firm, External Affairs, Inc, *and the analysis is predicated on the assumption that the responders are a representative sample of the population of registered Republicans in Pennsylvania for whom a mail-in ballot was requested but not counted, and responded accurately to the questions during the phone calls*. As of November 16th, 2020, there were 165,412 mail-in ballots requested by registered PA Republicans that had not arrived to be counted. Around 18,000 people on this list were called and around 3000 answered up to four questions. These responses are used to estimate how many of these 165,412 ballots were requested by someone other than the named person, and to estimate how many of these ballots were mailed back but not received.

- *Estimate of how many of the 165,412 uncounted mail-in ballots were requested in the name of a registered Republican by someone other than that person:* 40,875.
- *Estimate of how many of the 165,412 uncounted Republican ballots that the requester returned but were not counted:* 44,892.

Doing a more detailed analysis with confidence intervals**, I estimate that with a reasonable degree of mathematical certainty (based on the data I received being accurate and a representative sample of the population) the number of the 165,412 mail-in ballots requested by someone other than the registered Republican is at least 37,000, and the number of the 165,412 mail-in ballots requested by registered Republicans and returned but not counted is at least 38,910.**

- Extrapolating *from the survey responses*, we estimate about 40% who had requested a mail-in ballot believe they returned it but it had not been counted by the 16th, nearly two weeks after the election.

- The analysis is based on responses from a data set drawn from 165,412 registered Republican voters who had a mail-in ballot requested in their name but not counted in the election. We estimate on the order of 41,000 of these ballots were requested by someone other than the proper voter. Who made such requests, and why? One possible explanation is that ballots were requested by others. Another possible explanation is that a large number of people requested ballots and forgot they did so later. Again, the conclusions above are based on the data provided being both accurate and a representative sample.

1

## DETAILED ANALYSIS

I received a data set of responses to a phone survey given to people who are registered Republicans in PA. These people were contacted because there was a mail-in ballot requested in their name for the November 2020 election, but the ballot had not arrived to be counted as of November 16th, 2020; **there are 165,412 such ballots.** In the analysis below I will always make conservative choices (i.e., choices leading to smaller values) when there are multiple ways to interpret the data.

*I assume that the people who responded are a representative sample of this population, and responded accurately in the call.* Around 20,000 of the people called did not respond; most of the calls went to answering machines (around 14,000), had people refuse to talk (around 3000), or there was a bad number / language barrier (about 3500). There were 2684 people who answered the call on November 9th or 10th, saying either they were the person asked for or wanting to know what the call was about. These respondents were then asked several questions.

The first question was whether or not they had requested a mail-in ballot; 1114 said they did, and 36 were a household member confirming the ballot request. **Thus 1150 of the 2684 confirmed requesting a ballot.** A sizeable number said they did not request a ballot: 531 said they did not while another 25 were a household member stating no mail-in ballot was requested. **This sums to 556 people stated that no ballot was requested.** Of the remaining 978 people, 343 either hung up, refused to talk, or said the person asked for is not available to talk; these 343 people were not asked subsequent questions, though there were also 91 people who said they were unsure if they had requested a ballot were asked the next question. **The remaining 544 people answered that they voted in person** and were not asked any additional questions; this response complicates the analysis as you cannot vote in person if you mail-in a ballot unless you bring the ballot to be cancelled. From the response 'voted in person at the polls' it is unclear if they requested a mail-in ballot; we will thus do the analysis assuming both they all requested and assuming none of them requested.

**We have 1241 people moving on to Question 3** (those who answered yes, had a family member answer yes, or were unsure). Of these, **463 mailed back their ballot** (though there is no record of their ballot being received; 452 said they mailed back their ballot and 11 were family members saying it was mailed) and **643 said they had not mailed back their ballot** (632 said they had not, 11 had family members say it was not mailed). The remaining people were unsure, refused to speak, hung up, or were not the right person.

Our goal is to try to estimate the number of mail-in ballots in PA from these responses with these two issues. We start with the 165,412 people who were recorded as having requested a mail-in ballot but no ballot had arrived. From Question 2 there were 1150 who confirmed requesting a ballot and 556 who did not (this is ignoring the 91 who were unsure and the 544 who said they voted in the polls). Thus we have 556 out of 1706 who said the did not request a ballot but one was requested in their name, which is about 32.59% or 53,909 ballots. To be conservative, we include the 544 people who answered Question 2 by saying they voted in person at the polls. If we assume all of these people brought their ballots with them to be voided, this raises the denominator from 1706 to 2250 for a percentage of around 24.18% (down from the 32.59% before). If we extrapolate *this* number to the 165,412 ballots **we now have 40,875 ballots across PA that were requested by someone other than the person in whose name they were recorded**.

We now turn to estimating the number of mail-in ballots requested by registered Republicans who thought they returned them but which have not arrived and been counted (as of November 16th, 2020). From the responses,

463 people out of 1150 (or around 40.26%) said they had requested a ballot and sent it back; however, these ballots have not been counted. We need to figure out what number to apply this percentage to. We adopt a conservative approach and from the 165,412 ballots we now remove the estimated 53,909 (the largest of all our numbers) ballots that were not requested by registered Republicans in their name to get there were 111,503 ballots requested by registered Republicans in PA. Multiplying this by 40.26% yields **44,892 Republican ballots that the requesters returned but were not counted**. If instead we remove the lower estimate of 40,875 ballots (for the number of ballots requested in someone's name but not by them) and subtract that from 165,412 we get 120,520 ballots requested by registered Republicans in PA. Multiplying this by 40.26% yields **48,522 Republican ballots that the requester returned but were not counted.**

## EXTENSION: CONFIDENCE INTERVALS

We can do a more detailed analysis and obtain confidence intervals; we will be conservative and take the lower values. If we have a large number of data points (usually more than 30 suffice; as we are in the hundreds to thousands there are no concerns) and we observe in a sample of size n of a population of size N that x have a property, we can extrapolate that to how many in the entire population have the property.

The simplest estimate is that the proportion in the sample with the property is p = x/n. so the number in the entire population is just pN = x N / n. The difficulty with that is small errors in our estimate of the proportion in the sample scale. Thus we frequently construct 95% and 99% confidence intervals.

If each person from the population of size N is independently chosen to be in the sample of size n, and each person has the same probability p of having the desired property, then the number of people in the sample with the property can be approximated by a normal distribution. We have 95% of the mass of the normal is within 1.96 standard deviations of the mean, and 99% is within 2.576 standard deviations. This leads to the following confidence intervals, where below p is the observed sample proportion having the property (p = x/n):

- 95% confidence interval for the probability: $p - 1.96 \sqrt{\frac{p(1-p)}{n}}$ to $p + 1.96 \sqrt{\frac{p(1-p)}{n}}$

- 99% confidence interval for the probability: $p - 2.576 \sqrt{\frac{p(1-p)}{n}}$ to $p + 2.576 \sqrt{\frac{p(1-p)}{n}}$

Once we have these, we can extrapolate to the entire population by multiplying by N:

- 95% for the number with property: $p - 1.96 \, N \sqrt{\frac{p(1-p)}{n}}$ to $p + 1.96 \, N \sqrt{\frac{p(1-p)}{n}}$

- 99% for the number with property: $pN - 2.576 \, N \sqrt{\frac{p(1-p)}{n}}$ to $pN + 2.576 \, N \sqrt{\frac{p(1-p)}{n}}$

We now apply this to our problem. For the first question, we had either 556 out of 1706 who said they did not request a ballot but we know one was requested in their name, or (including the 544 who said they voted in person) we have 556 out of 2250.

3

- 95% confidence interval for the probability: [30.46%, 34.92%] or [22.93%, 26.49%],
- 99% confidence interval for the probability: [29.76%, 35.62%] or [22.37%, 27.05%].

We can use this to estimate the number of ballots requested by someone other than the registered Republican:
- 95% confidence interval for such ballots: [50,380, 57,755] or [37927, 43823],
- 99% confidence interval for such ballots: [49,222, 58,914] or [37001, 44750].

Thus our conservative estimate is there are at least 37,000 ballots requested by someone other than the voter, assuming the data is accurate and the responders are a representative sample.

We can apply a similar analysis to the number of ballots that responders said were returned but were not received. Here we have 463 of 1150 registered Republicans saying they had requested and returned a ballot, but as of November 16th, 2020 no ballot in their name had arrived to be counted. It is easy to construct 95% and 99% confidence intervals for these probabilities (we observed 40.26%).

- 95% confidence interval for the probability: [37.43%, 43.10%],
- 99% confidence interval for the probability: [36.54%, 43.99%].

To estimate a 95% or 99% confidence interval we need to know how many ballots to remove from the 165,412. We can compute this many different ways, but in the interest of obtaining the most conservative estimate we subtract the largest number, 58,914, and use the smallest percentage, 36.54%, which gives

simplest, widest range we can look at the high and low values from the above analysis of what to subtract from 165,412: 37,001 and 58,914. Thus using the lower value of the 99% confidence interval values we obtain that **to a reasonable level of mathematical certainty, assuming the data is accurate and drawn from a representative sample of the population, the number of mail-in ballots requested by registered Republicans and returned but not counted is at least 38,910**.

Respectfully submitted,

Steven J Miller

November 21, 2020

4

# Declaration of Professor of Mathematics, Steven J. Miller, Ph.D.

1.     My name is Steven J. Miller.  I am over 18 years of age and am competent to testify in this action.  All of the facts stated herein are true and based on my personal knowledge.

2.     I received a B.S. in Mathematics and Physics from Yale University in 1996 and a Ph.D of Mathematics from Princeton University in 2002. I have published numerous papers and written several books on statistical topics, and have taught probability and statistics for the past 15 years.

3.     I am currently a professor of mathematics at Williams College.  I make this declaration in my personal capacity.

4.     I have analyzed a summary of phone bank data provided to me regarding responses to questions relating to mail ballot requests, returns and related issues.

5.     I evaluated the data provided and performed a statistical evaluation of the data and various related calculations.  I provide this declaration with regard to the report presenting my findings.

6.     I can show, to a reasonable degree of professional certainty, that the conclusions as stated in this report are correct under the assumptions that the responders are a representative sample of the population and have responded accurately.

I declare under the penalty of perjury that the foregoing is true and correct.

_____

Dr. Steven J Miller,     November 21, 2020

EXHIBIT "B"

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DONALD J. TRUMP FOR PRESIDENT, INC., et al., | : | CASE NO. 4:20-CV-02078-MWB |
| | : | |
| Plaintiffs, | : | The Hon. Matthew W. Brann |
| v. | : | |
| | : | |
| KATHY BOOCKVAR, et al., | : | |
| | : | |
| Defendants. | : | |

## EXPERT REPORT OF MATTHEW BRAYNARD

## I.    INTRODUCTION

I have been retained as an expert witness on behalf of Intervenors in the above-captioned proceeding. I expect to testify on the following subject matters: (i) analysis of the database for the November 3, 2020 election for the selection of Presidential Electors in the Commonwealth of Pennsylvania ("Commonwealth"); (ii) render opinions regarding whether individuals identified in the Commonwealth's voter database actually had their votes counted or received mail-in ballots; and (iii) render opinions regarding whether certain individuals identified in the Commonwealth's voter database were actually qualified to vote on election day.

This is my opinion and an outline of the factual basis for this opinion. The opinions and facts contained herein are based on the information made available to me in this case

prior to preparation of this report, as well as my professional experience as an election data analyst.

I reserve the right to supplement or amend this statement on the basis of further information obtained prior to the time of trial or in order to clarify or correct the information contained herein.

## II.    DOCUMENTS REVIEWED

I reviewed the following documents in arriving at my opinions.

1.    The voter records and election returns as maintained on the Commonwealth's election database;

2.    Records maintained by the National Change of Address Source which is maintained by the United States Postal Service and which is available for licensed users on the internet.  I am a licensed member.

3.    Records developed by the staff of my call centers and social media researchers; and

4.    A national voter database maintained by L2 Political;

In addition, I discussed the facts of this matter with Petitioner's attorney Erick G. Kaardal and members of his legal team.

## III.    PROFESSIONAL QUALIFICATIONS

I have attached hereto as Exhibit 1 a true and correct copy of my resume.  As detailed in the resume, I graduated from George Washington University in 2000 with a degree in business administration with a concentration in finance and management information systems.  I have been working in the voter data and election administration

2

field since 1996.  I have worked building and deploying voter databases for the Republican National Committee, five Presidential campaigns, and no less than one-hundred different campaigns and election-related organizations in all fifty states and the U.S. Virgin Islands. I worked for eight years as a senior analyst at the nation's premier redistricting and election administration firm, Election Data Services, where I worked with states and municipalities on voter databases, delineation, and litigation support related to these matters. Also, while at Election Data Services, I worked under our contract with the US Census Bureau analyzing voting age population. Since 2004, I have worked for my own business, now known as External Affairs, Inc., providing statistical and data analysis for local, state, and federal candidates and policy organizations in the areas of voter targeting, polling/research, fundraising, branding, and online development and strategy. My firm has worked for over two-hundred candidates from president to town council and over a dozen DC-based policy/advocacy organizations.

With respect to publications I have authored in the last 10 years, I have not authored any publications in the last ten years.

## IV.    COMPENSATION

Have you ever been accepted in any Court as an "expert"?  If so, list that or those.

## V.    PRIOR TESTIMONY

I have not provided testimony as an expert either at trial or in deposition in the last four years.

## VI.    STATEMENT OF OPINIONS

As set forth above, I have been engaged to provide expert opinions regarding analysis in the November 3, 2020 election of Presidential electors.  Based on my review of the documents set forth above, my discussions with statisticians and analysts working with me and at my direction, my discussions with the attorneys representing the Petitioners, I have the following opinions:

1. It is my opinion, to a reasonable degree of scientific certainty, that in the Commonwealth, the Commonwealth's database for the November 3, 2020 election show 3,096,057 individuals voted early or applied for and the Commonwealth sent an absentee or mail-in ballot, and 481,022 voters whom the state marks as having requested and been sent an mail-in ballot did not return it.  It is my opinion, to a reasonable degree of scientific certainty, that in my sample of this universe, 32.59% of these mail-in voters in the Commonwealth did not request an absentee ballot.

2. From the Commonwealth's database for the November 3, 2020 election and our call center results, it is my opinion to a reasonable degree of scientific certainty that 481,022 individuals whom the Commonwealth's database identifies as having not returned a mail-in  ballot, that in my sample of this universe, 27.14% of those mail-in voters did in fact mail back an absentee ballot to the  Board of Elections.

3. From the Commonwealth's database for the November 3, 2020 election and the NCOA database and other state's voter databases, it is my opinion to a reasonable degree of scientific certainty, that at least 14,328 mail-in or early voters were not residents of the Commonwealth when they voted.

4. From the Commonwealth's database for the November 3, 2020 election and comparing that data to other states voting data and identifying individuals who cast early/mail-in ballots in multiple states, it is my opinion to a reasonable degree of scientific certainty, that at least 742 individuals in the Commonwealth voted in multiple states.

## VII.    BASIS AND REASONS SUPPORTING OPINIONS.

It is my opinion that due to the lax controls on mail-in voting in the November 3, 2020 election that the current unofficial results of that election include tens of thousands

of individuals who were not eligible to vote or failed to record ballots from individuals that were.

First, Commonwealth maintains a database for the November 3, 2020 election which I obtained from L2 Political and which L2 Political obtained from the Commonwealth's records on, among other things, voters who applied for an absentee or early voter status. I received this database from L2 Political in a table format with columns and rows which can be searched, sorted and filtered. Each row sets forth data on an individual voter. Each column contained information such as the name of the voter, the voter's address, whether the voter applied for a mail-in ballot, whether the voter voted and whether the voter voted.

Second, we are able to obtain other data from other sources such as the National Change of Address Database maintained by the United States Postal Service and licensed by L2 Political. This database also in table format shows the name of an individual, the individual's new address, the individual's old address and the date that the change of address became effective.

Third, I conducted randomized surveys of data obtained from the Commonwealth's database by having my staff or the call center's staff make phone calls to and ask questions of individuals identified on the Commonwealth's database by certain categories such as absentee voters who did not return a ballot. Our staff, if they talked to any of these individuals, would then ask a series of questions beginning with a confirmation of the individual's name to ensure it matched the name of the voter identified in the

Commonwealth's database. The staff would then ask additional questions of the individuals and record the answers.

Below are the opinions I rendered and the basis of the reasons for those opinions.

1. It is my opinion, to a reasonable degree of scientific certainty, that in the Commonwealth, the Commonwealth's database for the November 3, 2020 election show 3,096,057 individuals voted early or applied for and the Commonwealth sent an absentee or mail-in ballot, and 481,022 voters whom the state marks as having requested and been sent an absentee ballot did not return it. It is my opinion, to a reasonable degree of scientific certainty, that in my sample of this universe, 32.59% of these absentee voters in the Commonwealth did not request an absentee or mail-in ballot.

I obtained this data from the Commonwealth via L2 Political after the November 3, 2020, Election Day. This data identified 3,096,057 individuals as having applied for an absentee/mail-in ballot and the Commonwealth sending an absentee/mail-in ballot to these individuals. This data also identified 481,022 absentee/mail-in voters who were sent a ballot but who failed to return the mail-in ballot.

I then had my staff make phone calls to a sample of this universe. When contacted, I had my staff confirm the individual's identity by name. Once the name was confirmed, I then had staff ask if the person requested an absentee ballot or not. Staff then recorded the number of persons who answered yes. My staff then recorded that of the 1,706 individuals who answered the question, 1150 individuals answered yes to the question whether they requested an absentee ballot. My staff recorded that 556 individuals answered no to the question whether they requested an absentee ballot. Attached as Exhibit 2 is my written analysis containing information from the data above on absentee voters. Paragraph 2 of Exhibit 2 presents this information.

6

Next, I then had staff ask the individuals who answered yes, they requested a mail-in ballot, whether the individual mailed back the ballot or did not mail back the ballot. Staff then recorded that of the 1,106 individuals who answered the question, 463 individuals answered yes, they mailed back the mail-in ballot.  Staff recorded 643 individuals answered no, they did not mail back the mail-in ballot.  Paragraph 2 of Exhibit 2 presents this information.

Based on these results, 32.59% of our sample of these voters in the Commonwealth did not request a mail-in ballot.

2. From the Commonwealth's database for the November 3, 2020 election and our call center results, it is my opinion to a reasonable degree of scientific certainty that out of the 481,022 individuals whom the Commonwealth's database identifies as having not returned a mail-in ballot, that in my sample of this universe, 27.14% of those voters did in fact mail back a mail-in ballot to the Board of Elections.

This opinion includes the analysis set forth above.  Among the 1106 who told our call center that they did request a mail-in ballot and answered the second question, 325 told our staff that they mailed the ballot back, which is 27.14 of the total sample of 1706 whom the Commonwealth identified as having not returned the ballot the Commonwealth sent them. Paragraph 2 of Exhibit 2 presents this information.

3. From the Commonwealth's database for the November 3, 2020 election and the NCOA database and other state's voter databases, it is my opinion to a reasonable degree of scientific certainty, that at least 14,328 mail-in or early voters were not residents of the Commonwealth when they voted.

On Exhibit 2, in paragraph 1, I took the Commonwealth's database of all mail-in or early voters and matched those voters to the NCOA database for the day after Election Day.  This data identified 7,426 individuals who had moved of the Commonwealth prior

7

to Election Day. Further, by comparing the other 49 states voter databases to the Commonwealth's database, I identified 7051 who registered to vote in a state other than the Commonwealth subsequent to the date they registered to vote in the Commonwealth. When merging these two lists and removing the duplicates, and accounting for moves that would not cause an individual to lose their residency and eligibility to vote under Commonwealth law, these voters total 14,328.

    4. From the Commonwealth's database for the November 3, 2020 election and comparing that data to other states voting data and identifying individuals who cast early/mail-in ballots in multiple states, it is my opinion to a reasonable degree of scientific certainty, that at least 742 individuals in the Commonwealth voted in multiple states.

On Exhibit 2, in paragraph 2, I had my staff compare the Commonwealth's early and mail-in voters to other states voting data and identified individuals who cast early/mail-in ballots in multiple states. My staff located 742 individuals who voted in the Commonwealth and in other states for the November 3, 2020 general election.

## VIII. EXHIBITS TO BE USED AT TRIAL TO SUMMARIZE OR EXPLAIN OPINIONS

At the present time, I intend to rely on the documents identified above as possible exhibits.

**REMAINDER OF PAGE LEFT INTENTIONALLY BLANK**

**SIGNATURE PAGE TO FOLLOW**

Dated: 11/20/2020

_____
Matthew Braynard

**MATT BRAYNARD**                    EXHIBIT "1"
202.423.5333 (c) | matt@braynard.com

Matt Braynard is the president of both political consulting firm External Affairs, Inc., and a voter-registration non-profit, Look Ahead America.

CURRENT EMPLOYMENT

External Affairs, Inc.
**Principal**                                                                    **2004 – Present**
External Affairs, Inc. works for local, state, and federal candidates and policy organizations in the areas of voter targeting, polling/research, fundraising, branding, and online development and strategy. The firm has worked for over two-hundred candidates from president to town council and over a dozen DC-based policy/advocacy organizations.

Look Ahead America, Inc.
**President**                                                                    **March 2017 – Present**
Matt founded LAA, a 501(c)(3), along with over thirty other former Trump campaign staffers with the goal of registering and turning out disaffected, patriotic voters.

PREVIOUS EMPLOYMENT

Donald J. Trump for President, Inc.
**Director, Data Division**                                                      **October 2015 – March**
**2016**
Matt was responsible for developing the voter contact strategy, building technology infrastructure, managing vendor relationships, recruiting the data division staff, and supporting and auditing state efforts on door-to-door, phone, mail, and email operations.

Election Data Services, Inc.
**Senior Analyst**                                                              **2001-2005**
Matt Braynard was responsible for analyzing and redistricting states and municipal political boundaries, as well as analyzing election result administration data.

Republican National Committee
**Political Analyst**                                                           **1996, 1998-2001**
Matt Braynard worked in the political analysis department developing and deploying voter targeting databases, and directed the precinct election result research project.

Luntz Research Companies
**Research Consultant**                                                         **1997-2001**
Matt Braynard analyzed survey toplines and cross tabulations to create executive presentation materials.

EDUCATION

Columbia University                                                             **2018**
**Master of Fine Arts**
Writing Program

The George Washington University
**Bachelors of Business Administration**                                        **2000**
Concentrations in Finance and Management Information Systems

EXHIBIT "2"

Date:   November 19, 2020

From:   Matt Braynard
        External Affairs, Inc.
        matt@braynard.com
        202.423.5333
        November 19, 2020

Re:     Pennsylvania Voter Integrity Project: Illegal Ballots Preliminary Results

───────────────────────────────────────────────

This is an outline of the six analysis methods we have applied to the State of Pennsylvania ("State") and the results we have obtained as of the date set forth above.

   1.   **Residency Violations**

   We have evaluated early and absentee voters who were matched to the national change of address database (NCOA) or are found to have registered to vote in other states subsequent to their registration in target states (OOSSR), strongly indicating a violation of residency requirements.

|      | NCOA  | OOSSR |  | Merged |
|------|-------|-------|--|--------|
| PA   | 7,426 | 7,051 |  | 14,477 |

   The OOSSR would be much higher, but we limited due to the lack of full dates of birth available to us from many states' voter databases. A full, complete birthdate is necessary for our match process.

   2.   **Double Voting (Early/Absentee ONLY)**

   We compared the target state early and absentee voters to other states voting data and identified individuals who cast early/absentee ballots in multiple states.

        PA: 742

   3.   **Confirmation of "Unreturned" Absentee Ballots**

   I obtained data from the State via L2 Political after the November 3, 2020, Election Day.  This data identified 3,096,057 individuals as having voted early or applied for an absentee or mail-in ballot and the State sending an absentee ballot to these individuals.  This data also identified 481,022 absentee voters who were sent a ballot but who failed to return the absentee ballot.

   We then called a sample of these voters totaling 2114 individuals to ask if they requested the absentee ballot. If the individual said they did request it, we asked if they also returned it. Of the 2,114 individuals our call center contacted and spoke with whom the State data identified as

1

having requested an absentee ballot but identified as having not returned the ballot, our call center identified 383 individuals who did not request an absentee ballot. Among the 1106 who did request the ballot and agreed to answer whether or not they returned it, 325 individuals who told our call center that they returned a ballot.

| State | Did Not Request | | Percentage of 1106 Sample |
|---|---|---|---|
| Pennsylvania | 383 | | 32.59% |

| State | Requested & Returned | | Percentage of 1106 Sample |
|---|---|---|---|
| Pennsylvania | 325 | | 27.14% |

EXHIBIT "C"

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DONALD J. TRUMP FOR             :        CASE NO. 4:20-CV-02078-MWB
PRESIDENT, INC., et al.,        :
                                :
            Plaintiffs,         :        The Hon. Matthew W. Brann
       v.                       :
KATHY BOOCKVAR, et al.,         :
                                :
            Defendants.         :

## INTERVENORS' COMPLAINT FOR DECLARATORY JUDGMENT
## AND INJUNCTIVE RELIEF

### PARTIES

1.      Intervenors are residents in various counties throughout the Commonwealth of Pennsylvania (including within the counties identified by the Boards of Elections in this suit) and all Intervenors voted in their respective counties of residence in the 2020 General Election.

2.      PA Voters Alliance is a Pennsylvania unincorporated association whose members include some of the Intervenors. The PA Voter Alliance is an association with members who seek to ensure, as part of the Association's objectives, public confidence in the integrity of Pennsylvania's elections, in election results and election systems, processes, procedures and enforcement and that the public officials act in accordance with the law in exercising their obligations to the people of the Commonwealth of Pennsylvania.  PA Voters Alliance asserts the rights of its members as electors within the Commonwealth of Pennsylvania.

3.      Defendant, Kathy Boockvar, in her official capacity as the Secretary of the Commonwealth has the obligation and duty to assure that the Election Code of the Commonwealth, as established and amended by the General Assembly, is implemented equally throughout the Commonwealth of Pennsylvania.

4.      Defendant, Montgomery County Board of Elections, has the obligation and duty to assure that the Election Code of the Commonwealth, as established and amended by the General Assembly, is faithfully implemented within Montgomery County, Commonwealth of Pennsylvania.

5.      Defendant, Delaware County Board of Elections, has the obligation and duty to assure that the Election Code of the Commonwealth, as established and amended by the General Assembly, is faithfully implemented within Delaware County, Commonwealth of Pennsylvania.

6.      Defendant, Philadelphia County Board of Elections, has the obligation and duty to assure that the Election Code of the Commonwealth, as established and amended by the General Assembly, is faithfully implemented within Philadelphia County, Commonwealth of Pennsylvania.

7.      Defendant, Centre County Board of Elections, has the obligation and duty to assure that the Election Code of the Commonwealth, as established and amended by the General Assembly, is faithfully implemented within Centre County, Commonwealth of Pennsylvania.

8.      Defendant, Allegheny County Board of Elections, has the obligation and duty to assure that the Election Code of the Commonwealth, as established and amended by the General Assembly, is faithfully implemented within Allegheny County, Commonwealth of Pennsylvania.

9.      Defendant, Chester County Board of Elections, has the obligation and duty to assure that the Election Code of the Commonwealth, as established and amended by the General Assembly, is faithfully implemented within Chester County, Commonwealth of Pennsylvania.

10.      Defendant, Northampton County Board of Elections, has the obligation and duty to assure that the Election Code of the Commonwealth, as established and amended by the General Assembly, is faithfully implemented within Northampton County, Commonwealth of Pennsylvania.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction of this matter, pursuant to 28 U.S.C. §§ 1331 and 1343, because this matter involves violations of the United States Constitution and the laws of the United States as related to Federal Elections. Further, the Court has supplemental jurisdiction over any state law and constitutional claims pursuant to 28 U.S.C. §1367. This Court has personal jurisdiction over the named individual Defendants, who are sued in their official capacities only.

12.     This Court has jurisdiction to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

13.     Venue is proper under 28 U.S.C. § 1391(b).

14.     Intervenors bring this action under 42 U.S.C. §§ 1983 and 1988.

## BACKGROUND

15.     The Elections Clause of the United States Constitution provides that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in [Pennsylvania] by the Legislature thereof…" *Art. I § 4, cl. 1. U.S. Const.*

16.     The Electors Clause of the United States Constitution provides that "[e]ach state shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, …" for President of the United States. *Art. II, §1, cl. 2., U.S. Const.*

17.     Legislative power in the Commonwealth of Pennsylvania is vested solely within the General Assembly. *Art. II, §1. PA Const.*

18.     In addition to the General Assembly's rule making powers, it retains "… all other powers necessary for the Legislature of a free State. …" *Art. II, §11. PA Const.*

19.     The General Assembly has proscribed a role for county board of elections, "[t]here shall be a county board of elections in and for each county of this Commonwealth,

which shall have jurisdiction over the conduct of primaries and elections in such county, in accordance with the provisions of [the Election Code]." *25 P.S. § 2641(a).*

20.     This jurisdiction includes the selection of polling places, appointment of poll watchers, maintaining election equipment, and making other regulations that must be consistent with law and "necessary for the guidance of voting machine custodians, elections officers and electors." *25 P.S. § 2642.*

21.     One notable limitation on these administrative powers, in addition to the required adherence to the Election Code, is Pennsylvania's Constitutional requirement that "[a]ll laws regulating the holding of elections by the citizens, or for the registration of electors, shall be uniform throughout the State . . . ." A*rt. VII, § 6. PA Const.*

22.     Pennsylvania's Election Code was amended by Act 77 of 2019 which for the first time, provided electors with the ability to vote via mail-in ballots without providing a necessitous reason for their absence on Election Day. *25 P.S. §§3150.11-3150.17.*

23.     Under the amended Election Code, county boards of election are required, upon receipt of sealed official absentee and mail-in ballot envelopes, to "safely keep the ballots in sealed or locked containers until they are to be canvassed by the county board of elections." *25 P.S. §3146.8(a).*

24.     In addition to Act 77 of 2019, Pennsylvania passed Act 12 of 2020, *25 P.S. 2600, et seq.,* which made various changes to the Pennsylvania Election Code, including by amending when mail-in and absentee ballots could be reviewed and counted and by defining "pre-canvass" procedures for mail-in and absentee ballots.  Act 12 defined "pre-canvass" procedures as:

> "the inspection and opening of all envelopes containing official absentee ballots or mail-in ballots, the removal of such ballots from the envelopes and the counting, computing and tallying of the votes reflected on the ballots. The term does not include the recording or publishing of the votes reflected on the ballots." *25 P.S. 2602(q.1).*

25.     A county board of elections is prohibited from pre-canvassing absentee and mail-in ballots prior to 7:00 a.m. of Election Day. *25 P.S. § 3146.8(g)(1.1.).*

26.     As such, from the time ballot envelopes are received by the county board of elections through 7:00 a.m. on Election Day, the ballots are to be safely kept in sealed or locked containers. *25 P.S. §3146.8(a).* Stated in a different way, the county board of elections is not permitted to remove absentee and mail-in ballot envelopes from their sealed or locked containers until the ballots are pre-canvassed at 7:00 a.m. on Election Day.

27.     Absentee and mail-in ballots are required to be canvassed in accordance with subsection (g) of Section 3146.8 - <u>Canvassing of official absentee and mail-in ballots</u>. *25 P.S. §3146.8(g) (1)(i-ii) & (1.1).*

28.     The Election Code defines the term "pre-canvass" to mean "the inspection and opening of all envelopes containing official absentee ballots or mail-in ballots, the removal of such ballots from the envelopes and the counting, computing and tallying of the votes reflected on the ballots. The term does not include the recording or publishing of the votes reflected on the ballots." *25 P.S. § 2602(q.1).*

29.     Prior to any pre-canvassing meeting, the county board of elections is required to provide at least forty-eight hours' notice by publicly posting a notice of a pre-canvass meeting on its publicly accessible Internet website. *25 P.S. § 3146.8(g)(1.1.).*

30.     Each candidate and political party is entitled to have one designated and authorized representative in the room any time absentee and mail-in ballots are being canvassed by a board of elections. *25 P.S. §3146.8(g)(2).*

31.     The candidates' watchers or other representatives are permitted to be present any time the envelopes containing absentee and mail-in ballots are opened. *25 P.S. §3146.8*

32.     The candidates and political parties are entitled to have watchers present any time there is canvassing of returns. *25 P.S. §2650(a).*

33.     During pre-canvasing, the county board of elections is required to examine each ballot cast to determine if the declaration envelope is properly completed and to compare the information with the information contained in the Registered Absentee and Mail-in Voters File. *25 P.S. § 3146.8(g)(3).*

34.     Only then is the board of elections authorized to open the outer envelope of every unchallenged absentee or mail-in envelope in such a manner so as not to destroy the declaration executed thereon. *25 P.S. § 3146.8(g)(4)(i).*

35.     Individuals who attend pre-canvassing meetings are prohibited from disclosing any portion of the pre-canvass meeting prior to the close of the polls. *25 P.S. § 3146.8(g)(1.1.).*

36.     If challenged, the board of elections is prohibited from opening the outer envelope and the absentee or mail-in ballot envelope is marked challenged and segregated for further review.

37.     If unchallenged and in proper form, the county board of elections is only then authorized to break the seals of such envelopes; remove the ballots and count, compute and tally the votes.  *25 P.S. § 3146.8(g)(4)(iii).*

38.     The Pennsylvania Constitution guarantees that "[e]lections shall be free and equal; and, no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." *Art. I, §5 PA Const.*

39.     The Secretary of the Commonwealth and the county boards of elections have the constitutional obligation to preserve the secrecy of voting within the Commonwealth. *Art. VII, §4 PA Const.*

40.     The Secretary of the Commonwealth and the county boards of elections have the constitutional obligation to make sure that "[a]ll laws regulating the holding of elections by the citizens, or for the registration of electors, shall be uniform throughout the state …", *Art. VII, §6 PA Const.*

41.     Only "[t]he Legislature shall, by general law, provide a manner in which, and the time and place at which, qualified electors who may … be absent from the municipality of their residence … or who, on the occurrence of any election, are unable to attend at their proper polling place … may vote, and for the return and canvass of their votes in the election district in which they respectively reside." *Art. VII, §14 PA Const.*

42.     The Secretary of the Commonwealth and the county boards of elections have no authority to prescribe or implement guidance, regulations or procedures that circumvent, obfuscate or conflict with the Election Code as approved by the Legislature.

43.     The Fourteenth Amendment of the United States Constitution forbids a state from depriving anyone of life, liberty, or property without due process of law.

44.     The substantive component of the Due Process Clause guarantees that all fundamental rights comprised within the term "liberty" are protected by the Federal Constitution from invasion by the States.

45.     The right to freely and fairly vote in federal elections is a fundamental right protected by the Fourteenth Amendment of the United States Constitution.

46.     Elections in Pennsylvania are governed and regulated by the Pennsylvania Election Code. "Although the [Commonwealth] is ultimately responsible for the conduct and organization of elections, the statutory scheme [promulgated by the Election Code] delegates aspects of that responsibility to the political parties. This delegation is a legislative recognition of 'the critical role played by political parties in the process of selecting and electing candidates for state and national office.'" *Tiryak v. Jordan, 472 F. Supp. 822, 823-24 (E.D. Pa. 1979) (quoting Marchioro v. Chaney, 442 U.S. 191, 195 (1979))*. "Pennsylvania's election laws apply equally to federal and state elections." *Project Vote v. Kelly, 805 F. Supp. 2d 152, 174 (W.D. Pa. 2011) (citing Kuznik v. Westmoreland County Board of Elections, 902 A.2d 476, 49093 (Pa. 2006))*.

47.     The Pennsylvania General Assembly understood that sentiment long ago and intertwined the concept of watching with the act of voting, enshrining transparency and accountability into the process in which Pennsylvanians choose elected officials. After all, reasonable people cannot dispute that "openness of the voting process helps prevent election fraud, voter intimidation, and various other kinds of electoral evils.*" PG Publishing Co. v. Aichele*, 705 F.3d 91, 111 (3d Cir. 2013).

48.     As long as Pennsylvania has had an Election Code, it has had watchers. In 1937, the Pennsylvania General Assembly included the concept of "watchers" in the then-newly enacted Pennsylvania Election Code, a statutory scheme addressing the administration of elections in the Commonwealth. *25 P.S. §§ 2600, et. seq.*

49.     Election Code Section 417, codified at *25 P.S. § 2687,* creates the position of watcher and entrusts to each candidate for nomination or election at any election, and each political party and each political body which has nominated candidates for such elections, the power to appoint watchers to serve in each election district in the Commonwealth.  *25 P.S. § 2687(a).*

50.     "… Poll watcher[s] perform a dual function on Election Day. On the one hand, because [watchers] are designated and paid by [candidates, political parties, and/or political bodies], [their] job is to guard the interests of [their] candidates [or political parties or bodies]. On the other hand, because the exercise of [their] authority promotes a free and fair election, poll watcher[s] serve to guard the integrity of the vote. Protecting the purity of the electoral process is a state responsibility and [watchers'] statutory role in providing that protection involves [them] in a public activity, regardless of [their] private political motives." *Tiryak, 472 F. Supp. at 824.*

51.     The Supreme Court of Pennsylvania noted that the Elections Code does not provide elections officials with procedures for contacting electors and allowing electors to cure defects in mail-in and absentee ballots:

"As noted herein, although the Election Code provides the procedures for casting and counting a vote by mail, it does not provide for the "notice and opportunity to cure" procedure sought by Petitioner. To the extent that a voter is at risk for having his or her ballot rejected due to minor errors made in contravention of those requirements, we agree that the decision to provide a "notice and opportunity to cure" procedure to alleviate that risk is one best suited for the Legislature." *Pennsylvania Democratic Party v. Boockvar*, No. 133 MM 2020, 2020 WL 5554644, at *20 (Pa. Sept. 17, 2020); *see also In re: November 3, 2020 General Election*, 2020 WL 6252803, at *7 (Pa. Oct. 23, 2020)

52.     The Supreme Court expressly held that "… [U]nlike in-person voters, mail-in or absentee voters are not provided an opportunity to cure perceived defects in a timely manner." *Id. at p. 20.*

53.     Allowing a voter to cure a defect in a mail-in or absentee ballot after the ballot is submitted treats key provisions of the Pennsylvania Election Code as surplusage.

54.     Indeed, 1 Pa.C.S.A. § 1921(a) mandates: "Every statute shall be construed, if possible, to give effect to all of its provisions."

55.     Counties in the Commonwealth of Pennsylvania, including Defendant Counties, have only the power to act as granted by the Commonwealth, under the Dillon Rule.  *Warner Cable Commc'ns Inc. v. Borough of Schuylkill Haven*, 784 F. Supp. 203, 211 (E.D. Pa. 1992) ("It is well established that Pennsylvania has adopted the *Dillon* rule, which states that a municipal corporation does not possess and cannot exercise any other than the following powers: (1) those granted in express words; (2) those necessarily or fairly implied in or incident to the powers expressly granted; (3) those essential to the declared objects and purposes of the corporation, not simply convenient, but indispensable." [internal citations and quotations omitted]).

56.     The Elections Clause has two functions: "Upon the States it imposes the duty ('*shall* be prescribed') to prescribe the time, place, and manner of electing Representatives and Senators; upon Congress it confers the power to alter those regulations or supplant them altogether."  *Arizona v. Inter Tribal Council of Arizona, Inc*., 570 U.S. 1, 8-9 (2013).

57.     Such power to regulate federal elections, when specifically allocated to the Commonwealth by Congress, cannot be amended at will by individual election officials in wayward counties.

58.     Officials of Defendant Counties have no wiggle room to shape federal election law as they desire; the County has only the ability to take the action afforded to it by the Commonwealth's Legislature.

59.     Prior to the 2020 General Election, the Pennsylvania Supreme Court addressed the issue of whether county boards of elections are required to contact qualified electors whose mail-in or absentee ballots contain defects to provide them with an opportunity to cure those defects. *Pa. Democratic Party v. Boockvar*, 2020 WL 5554644, *19 (Pa. September 17, 2020).

60.     The Supreme Court held as follows:

"While the Pennsylvania Constitution mandates that elections be 'free and equal,' it leaves the task of effectuating that mandate to the Legislature.  Winston, 81 A. at 522.  As noted herein, although the Election Code provides the procedures for casting and counting a vote by mail, it does not provide for the 'notice and opportunity to cure' procedure sought by Petitioner.  To the extent that a voter is at risk for having his or her ballot rejected due to minor errors made in contravention of those requirements, we agree that the decision to provide a 'notice and opportunity to cure' procedure to alleviate that risk is one best suited for the Legislature.  We express this agreement particularly in light of the open policy questions attendant to that decision, including what the precise contours of the procedure would be, how the concomitant burdens would be addressed, and how the procedure would impact the confidentiality and counting of ballots, all of which are best left to the legislative branch of Pennsylvania's government. . . ." *Id. at pp. 19-20*

61.     This the above-referenced case, Defendant Boockvar agreed with the Supreme Court's position and argued that "there is no statutory or constitutional basis for requiring the Boards to contact voters when faced with a defective ballot and afford them an opportunity to do so." *Id. at p. 19.*

62.     Defendant Boockvar further acknowledged that "while it may be good policy to implement a procedure that entails notice of defective ballots and an opportunity to cure them,

logistical policy decisions like the ones implicated herein are more properly addressed by the Legislature, not the courts." *Id. at p. 20.*

63.    The legislature has not provided a process for implementing a "notice and opportunity to cure" procedure and has not expressly authorized the counties to create one.

64.    The United States Supreme Court has held that "having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore, 531 U.S. 98, 104-05 (2000).*

## COUNT I
### Violation of the Constitution and Election Code of the Commonwealth of Pennsylvania

65.    The averments contained in Paragraphs 1 through 64 are incorporated herein by reference as if fully set forth.

66.    As early as October 21, 2020, election officials in Defendant Counties (hereinafter "election officials") regularly failed to safely keep received absentee and mail-in ballot envelopes in sealed or locked containers. See *Declarations of Jacob G. Daniels, Shawn M. Packer, Daniel Cox)*

67.    To the contrary, as early as October 21, 2020, election officials regularly reviewed, inspected, evaluated and identified absentee and mail-in ballot envelopes to determine whether the ballot envelopes contained a potential defect such as an incomplete declaration or omitted secrecy envelope.

68.    Once identified, these potentially defective ballot envelopes were segregated from other ballot envelopes and not safely kept in sealed or locked container.

69.    Plaintiffs presume that the non-defective ballot envelopes were safely kept in sealed or locked containers, but Plaintiffs are without information regarding those ballots since Plaintiffs were prohibited from observing the handling of the ballot envelopes.

70.     There is authority within the Election Code that authorizes Defendants to treat some absentee and mail-in ballot envelopes differently that other absentee and mail-in ballot envelopes.

71.     Throughout this process, Plaintiffs' authorized representative attempted to observe the election officials actions; however, Plaintiffs' authorized representatives were denied the access necessary to properly observe the handling of these ballot envelopes and subsequently, the ballots, as a direct result of Defendants' action.

72.     By letters dated October 31, 2020, and November 1, 2020, Intervenor Barnette reiterate, through her legal representative, her requests for access, pursuant to the Election Code, to properly observe the pre-canvassing, canvassing and other activities related to the handling of ballot envelopes, along with other issues.  *See Affidavits.*

73.     Despite Plaintiffs' best good faith efforts, election officials denied Plaintiffs' request in violation of the Election Code.

74.     On November 1, 2020, Frank Dean, Director of Mail-In Elections in Montgomery County, acknowledged that Montgomery County election officials regularly failed to comply with the requirement to safely keep the ballots in sealed or locked containers until pre-canvassed by the board of elections.

75.     Director Dean confirmed that election officials daily evaluated and identified ballots for potential defects, such as, omitted secrecy envelopes and incomplete declarations.

76.     In further violation of its obligation to safely keep the ballots in sealed or locked container until pre-canvassed, election officials weighed the ballot envelopes to determine whether secrecy envelopes were contained within the outer envelopes.  Under-weight ballot envelopes were segregated from other ballot envelopes so that election official could permit electors to alter the envelopes.

77.     In Montgomery County, election officers only "accepted" absentee and mail-in ballot envelopes that election officials determined to be free from potential defects.

78.     According to the election officials, absentee and mail-in ballot envelopes with potential defects were not accepted so that electors could vote by way of provisional ballots.

79.     According to election officials in Montgomery County, if the absentee or mail-in ballot envelope is accepted, the elector is not able to vote by way of provisional ballot.

80.     The Election Code only addresses the county board of elections' receipt of the absentee and mail-in ballot envelopes.

81.     Once received, all absentee and mail-in ballot envelopes are accepted until rejected through the pre-canvassing and canvassing provisions of the Election Code.

82.     In violation of electors' right to secrecy in their ballots, election officials used the information gathered through their inspection of the ballot envelopes to identify the names of electors who had cast potentially defective ballots.

83.     With this information, the election officials accessed the Statewide Uniform Registry of Electors ("SURE") System to compile lists of available confidential elector information, including, each elector's name, street address, email address, telephone number, precinct, voter identification number and a description of the potential defect in the ballot envelope.

84.     In an October 31, 2020, e-mail, Director Dean emailed the latest list of confidential elector information to other election officials, Lee Soltysiak and Josh Stein, and wrote: "If the defect is an Incomplete Declaration or Missing Secrecy Envelope, the voter need only come to 1430 DeKalb Street, Norristown, PA 19401.  They will be given the opportunity to correct their declaration or we will provide them with a secrecy envelope, which they can insert and reseal inside the Ballot Return Envelope."

85.    Director Dean further wrote: "For the remainder of defects, the voter needs to go to Voter Services, One Montgomery Plaza, 425 Swede Street, Suite 602, Norristown, PA 19404 and request a Cancel/Replace."

86.    There is no authority within the Election Code that authorizes election officials to cancel and/or replace an elector's absentee or mail-in ballot as described by Defendant Dean.

87.    In order to cancel or replace an elector's absentee or mail-in ballot, election officials would be required to manually alter the information contained in the Commonwealth's Statewide Uniform Registry of Electors ("SURE").

88.    There is authority within the Election Code that authorizes election officials to manually alter the information contained within the SURE system for the purposes described by Director Dean.

89.    The Excel spreadsheet attached to Director Dean's October 31, 2020, e-mail notes that when mail-in or absentee ballot envelopes were found to have such defects, a limited number of electors were provided with the opportunity to alter their ballot envelopes.

90.    There is no legal dispute that under Pennsylvania's Election Code "… mail-in or absentee voters are not provided an opportunity to cure perceived defects in a timely manner." *In re: November 3, 2020 General Election,* No. 149 MM 2020, at *12.

91.    In addition to permitting some electors to alter their defectively cast absentee and mail-in ballot envelopes, Defendants also permitted other similar electors the alternative to vote a second time by provisional ballots.

92.    Despite the clear legal prohibition against efforts to "cure" absentee and mail-in ballot envelopes, Defendant Boockvar issued guidance just hours before Election Day directing county boards of elections to provide electors who have cast defective absentee or mail-in ballots with provisional ballots and to promptly update the SURE system.

93.     The above-referenced guidance is not the first time Defendant Boockvar has issued guidance in violation of the Election Code.   See, *Trump, et al v. Boockvar, et al, November 12, 2020 Order, 602 M.D. 2020.*

94.     It is unclear what Defendant Boockvar intended when she directed county boards of elections to promptly update the SURE system since there is no authority within the Election Code for election official to delete a properly received absentee or mail-in ballot envelope from the SURE System.

95.     There is no authority within Election Code to delete, cancel and/or replace an absentee or mail-in ballot envelope once received by a county board of elections.

96.     In order to obtain a provisional ballot on Election Day, an elector who previously requested an absentee or mail-in ballot must sign an affidavit stating "I do solemnly swear or affirm that my name is … and that this is the only ballot that I cast in this election."   *25 P.S. §3146.8; 25 P.S. §3050.*

97.     If an elector has already submitted an absentee or mail-in ballot and that ballot was received by his or her county board of elections, the elector cannot truthfully affirm that the provisional ballot is the only ballot cast by them in the election.   The provisional ballot is in fact a second ballot cast by them.

98.     Defendants' actions are in clear contravention of the Election Code and the Pennsylvania Supreme Court's decision in *In re November 3, 2020 Gen. Election*, 149 MM 2020, 2020 WL 6252803, at *6 (Pa. Oct. 23, 2020).

99.     As articulated by the Supreme Court of Pennsylvania, the Elections Code does not provide elections officials with procedures for contacting electors and allowing electors to cure defects in mail-in and absentee ballots:

> "As noted herein, although the Election Code provides the procedures for casting and counting a vote by mail, it does not provide for the "notice and opportunity to cure" procedure sought by Petitioner. To the extent that a voter is at risk for

having his or her ballot rejected due to minor errors made in contravention of those requirements, we agree that the decision to provide a "notice and opportunity to cure" procedure to alleviate that risk is one best suited for the Legislature." *Pennsylvania Democratic Party v. Boockvar*, No. 133 MM 2020, 2020 WL 5554644, at *20 (Pa. Sept. 17, 2020); *see also In re: November 3, 2020 General Election*, 2020 WL 6252803, at *7 (Pa. Oct. 23, 2020)

100.    Upon information and belief, counties, other than Defendant Counties, throughout the Commonwealth have not deviated from the Election Code.

101.    As articulated Berks County has uniformly complied the Election Code by (a) refraining from pre-canvasing until 7:00 a.m. on Election Day and (b) not providing electors an opportunity to change their ballots after submitting the ballots to Berks County.

102.    Berks County and other counties throughout the Commonwealth, also provided candidates, political parties and their authorized representatives with a full and fair opportunity to observe the entire pre-canvassing and canvassing process.

103.    As a result of Defendants' actions, similiarly-situated voters are being treated differently based on the county where they are required to vote.  In other words, equivalent votes in different counties are being treated differently.

104.    In *Bush v. Gore*, 531 U.S. 98, 104-05 (2000), the Court determined that Florida's disparate method of determining a legal vote amounted to an unconstitutional abridgment of the right to vote.

105.    The Supreme Court held that "[h]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another."  *Id*. (citing *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 665 (1966) ("[O]nce the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment.").

106.    Allowing voters to cure a defective declaration requires counties to examine a declaration prior to 7:00 a.m. on Election Day and, thus, treats the requirement to begin pre-canvassing no earlier than 7:00 a.m. on Election Day as surplusage. *25 P.S. § 3146.8(g)(1.1).*

107.    During pre-canvassing, the Pennsylvania Election Code mandates that county boards of election "shall examine the declaration on the envelope of each ballot" to be "satisfied that the declaration is sufficient." *25 P.S. § 3146.8(g)(3).*

108.    At this juncture, in order to make sure that voters in Berks County and Montgomery County are treated equally, Defendants must set aside and declare void any ballots that have been submitted to Montgomery County and subsequently changed.

109.    Intervenor Barnette is running as the candidate in the 4th Congressional District for the Republican Party, and she will be at a significant disadvantage as the 4th Congressional District consists of both Montgomery County and Berks County.

110.    A vote that could count in Montgomery County will not count in Berks County because of the decisions made by Defendants in violation of Pennsylvania's Election Code and the Supreme Court of Pennsylvania's holding.

111.    Intervenor Barnette is running as the candidate in the 4th Congressional District for the Republican Party, and she will be at a significant disadvantage as the 4th Congressional District consists of both Montgomery County and Berks County.

112.    Defendants' conduct is unlawful and unconstitutional, and it must be enjoined and corrected before the election results are certified.

## COUNT II
### Demand for Declaratory Judgment and Relief

113.    The averments contained in Paragraphs 1 through 112 are incorporated herein by reference as if fully set forth.

114.    Defendants' The Supreme Court of the Commonwealth of Pennsylvania in the case of *Sprague v. Casey, et al, 520 Pa. 38 (1988)*, determined that an election conducted in such a manner as to violate the Constitution and laws of the Commonwealth of Pennsylvania should be set aside and declared null and void.

115.    The evidence of mis-deeds, illegalities, and constitutional violations is so pervasive in the election conducted in the Commonwealth of Pennsylvania for President of the United States that this election should be declared void and invalid, set aside, and the Legislature of the Commonwealth of Pennsylvania should determine, absent such invalid results, the election of electors necessary to cast the votes of the Commonwealth of Pennsylvania in the National Electoral College, or in the alternative, this Court should order an immediate new election.

## PRAYER FOR RELIEF

WHEREFORE, Intervenors respectfully request that this Court enter judgment in their favor and Order immediate relief as follows:

a.    An Order directing Defendants only count such ballots as were lawfully cast in the 2020 Presidential Election; and,

b.    An Order directing Defendant Kathy Boockvar, in her official capacity as Secretary of the Commonwealth, to immediately secure, segregate and safeguard all available elector and election data contained within the Commonwealth's Statewide Uniform Registry of Electors ("SURE") System and/or within her care, custody and/or control pending further Order of this Court; and, further directing the Secretary from replacing the SURE System pending further Order of this Court; and,

c.    An Order prohibiting Defendant Counties from disposing of, destroying or failing to preserve any and all available elector and election data within their care, custody and/or control pending further Order of this Court; and,

d.    Intervenors' reasonable legal fees, costs and expenses under 42 U.S.C. §§ 1983 and

1988; and,

e. All other relief for which Intervenors are entitled or which the Court deems appropriate.

Respectfully Submitted,

Dated: November 21, 2020

/s/ Thomas W. King, III

Thomas W. King, III (PA I.D. No. 21580)
Email: tking@dmkcg.com
Thomas E. Breth (PA I.D. No. 66350)
Email: tbreth@dmkcg.com
*Special Counsel for the Amistad Project
of the Thomas More Society*
Dillon, McCandless, King, Coulter
& Graham, L.L.P.
128 West Cunningham Street
Butler, PA 16001
Telephone: (724) 283-2200
Facsimile: (724) 283-2298

*Counsel for Intervenors*

/s/ Timothy P. Griffin

Timothy P. Griffin (VA. I.D. No. 83195)*
Email: tgriffin@thomasmoresociety.org
*Special Counsel for the Amistad Project
of the Thomas More Society*
Thomas More Society
Amistad Project
115 Sandiges Road
Amherst, VA 24521
Telephone: (434) 660-6198

*Pro Hac Vice Pending*

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DONALD J. TRUMP FOR PRESIDENT, INC., et al., | : | CASE NO. 4:20-CV-02078-MWB |
| | : | |
| Plaintiffs, | : | The Hon. Matthew W. Brann |
| | : | |
| vs. | : | |
| | : | |
| KATHY BOOCKVAR, et al., | : | |
| | : | |
| Defendants. | : | |

## [PROPOSED] ORDER OF COURT

AND NOW this ___ day of November 2020, upon consideration of Intervenors' Motion to Intervene pursuant to Rule 24(a) of the Fed. Rules of Civil Procedure, the Court hereby GRANTS Intervenors' Motion.

BY THE COURT,

_____
Judge