**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-3371
_____

DONALD J. TRUMP FOR PRESIDENT, INC.;
LAWRENCE ROBERTS; DAVID JOHN HENRY,

                                                   Appellants

v.

SECRETARY COMMONWEALTH OF PENNSYLVANIA;
ALLEGHENY COUNTY BOARD OF ELECTIONS; CENTRE COUNTY BOARD
OF ELECTIONS; CHESTER COUNTY BOARD OF ELECTIONS; DELAWARE
COUNTY BOARD OF ELECTIONS; MONTGOMERY COUNTY BOARD OF
ELECTIONS; NORTHAMPTON COUNTY BOARD OF ELECTIONS;
PHILADELPHIA COUNTY BOARD OF ELECTIONS
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 4:20-cv-02078)
District Judge: Honorable Matthew W. Brann
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
on November 25, 2020

Before: SMITH, *Chief Judge*, and CHAGARES and BIBAS, *Circuit Judges*

(Filed:  November 27, 2020)
_____

OPINION*
_____

_____

* This disposition is not an opinion of the full Court and, under I.O.P. 5.7, is not binding
precedent.

BIBAS, *Circuit Judge*.

Free, fair elections are the lifeblood of our democracy. Charges of unfairness are serious. But calling an election unfair does not make it so. Charges require specific allegations and then proof. We have neither here.

The Trump Presidential Campaign asserts that Pennsylvania's 2020 election was unfair. But as lawyer Rudolph Giuliani stressed, the Campaign "doesn't plead fraud. … [T]his is not a fraud case." Mot. to Dismiss Hr'g Tr. 118:19–20, 137:18. Instead, it objects that Pennsylvania's Secretary of State and some counties restricted poll watchers and let voters fix technical defects in their mail-in ballots. It offers nothing more.

This case is not about whether those claims are true. Rather, the Campaign appeals on a very narrow ground: whether the District Court abused its discretion in not letting the Campaign amend its complaint a second time. It did not.

Most of the claims in the Second Amended Complaint boil down to issues of state law. But Pennsylvania law is willing to overlook many technical defects. It favors counting votes as long as there is no fraud. Indeed, the Campaign has already litigated and lost many of these issues in state courts.

The Campaign tries to repackage these state-law claims as unconstitutional discrimination. Yet its allegations are vague and conclusory. It never alleges that anyone treated the Trump campaign or Trump votes worse than it treated the Biden campaign or Biden votes. And federal law does not require poll watchers or specify how they may observe. It also says nothing about curing technical state-law errors in ballots. Each of these defects is fatal,

and the proposed Second Amended Complaint does not fix them. So the District Court properly denied leave to amend again.

Nor does the Campaign deserve an injunction to undo Pennsylvania's certification of its votes. The Campaign's claims have no merit. The number of ballots it specifically challenges is far smaller than the roughly 81,000-vote margin of victory. And it never claims fraud or that any votes were cast by illegal voters. Plus, tossing out millions of mail-in ballots would be drastic and unprecedented, disenfranchising a huge swath of the electorate and upsetting all down-ballot races too. That remedy would be grossly disproportionate to the procedural challenges raised. So we deny the motion for an injunction pending appeal.

## I. BACKGROUND

### A. Pennsylvania election law

In Pennsylvania, each county runs its own elections. 25 Pa. Stat. §2641(a). Counties choose and staff polling places. §2642(b), (d). They buy their own ballot boxes and voting booths and machines. §2642(c). They even count the votes and post the results. §2642(k), (*l*). In all this, counties must follow Pennsylvania's Election Code and regulations. But counties can, and do, adopt rules and guidance for election officers and electors. §2642(f). And they are charged with ensuring that elections are "honestly, efficiently, and uniformly conducted." §2642(g).

1. *Poll watchers and representatives*. Counties must admit qualified poll "watchers" to observe votes being tallied. 25 Pa. Stat. §2650(a). Poll watchers must be registered to vote in the county where they will serve. §2687(b). Each candidate can pick two poll watchers per election district; each political party, three. §2687(a). The poll watchers

3

remain at the polling place while election officials count in-person ballots. § 2687(b). They can ask to check voting lists. *Id.* And they get to be present when officials open and count all the mail-in ballots. § 3146.8(b). Likewise, candidates' and political parties' "represent-atives" may be present when absentee and mail-in ballots are inspected, opened, or counted, or when provisional ballots are examined. §§ 2602(a.1), (q.1), 3050(a.4)(4), 3146.8(g)(1.1) & (2); *see also* § 3050(a.4)(12) (defining provisional ballots as those cast by voters whose voter registration cannot be verified right away).

Still, counties have some control over these poll watchers and representatives. The Election Code does not tell counties how they must accommodate them. Counties need only allow them "in the polling place" or "in the room" where ballots are being inspected, opened, or counted. §§ 2687(b), 3050(a.4)(4), 3146.8(g)(1.1) & (2). Counties are expected to set up "an enclosed space" for vote counters at the polling place, and poll watchers "shall remain outside the enclosed space." § 2687(b). So the counties decide where the watchers stand and how close they get to the vote counters.

2. *Mail-in ballots*. For decades, Pennsylvania let only certain people, like members of the military and their families, vote by mail. *See, e.g.*, 25 Pa. Stat. § 3146.1. But last year, as part of a bipartisan election reform, Pennsylvania expanded mail-in voting. Act of Oct. 31, 2019, Pub. L. No. 552, sec. 8, § 1310-D, 2019 Pa. Legis. Serv. Act 2019-77 (S.B. 421). Now, any Pennsylvania voter can vote by mail for any reason. *See* 25 Pa. Stat. §§ 2602(t), 3150.11(a).

To vote by mail, a Pennsylvania voter must take several steps. First, he (or she) must ask the State (Commonwealth) or his county for a mail-in ballot. 25 Pa. Stat. § 3150.12(a).

To do that, he must submit a signed application with his name, date of birth, address, and other information. §3150.12(b)–(c). He must also provide a driver's license number, the last four digits of his Social Security number, or the like. §§2602(z.5), 3150.12b(a), (c). Once the application is correct and complete, the county will approve it. *See* §§3150.12a(a), 3150.12b.

Close to the election, the county will mail the voter a mail-in ballot package. §3150.15. The package has a ballot and two envelopes. The smaller envelope (also called the secrecy envelope) is stamped "Official Election Ballot." §3150.14(a). The larger envelope is stamped with the county board of election's name and address and bears a printed voter declaration. *Id.*

Next, the voter fills out the ballot. §3150.16(a). He then folds the ballot; puts it into the first, smaller secrecy envelope; and seals it. *Id.* After that, he puts the secrecy envelope inside the larger envelope and seals that too. *Id.* He must also "fill out, date and sign the declaration printed" on the outside of the larger envelope. §§3150.16(a), 3150.14(b). The declaration for the November 2020 election read thus:

> I hereby declare that I am qualified to vote from the below stated address at this election; that I have not already voted in this election; and I further declare that I marked my ballot in secret. I am qualified to vote the enclosed ballot. I understand I am no longer eligible to vote at my polling place after I return my voted ballot. However, if my ballot is not received by the county, I understand I may only vote by provisional ballot at my polling place, unless I surrender my balloting materials, to be voided, to the judge of elections at my polling place.
>
> [BAR CODE]

Voter, sign or mark here/Votante firme o mar[q]ue aqui

**X**_____

_____

Date of signing (MM/DD/YYYY)/Fechade firme (MM/DD/YYYY)

_____

Voter, print name/Votante, nombre en letra de impreta

*In re: Canvass of Absentee and Mail-in Ballots of November 3, 2020 General Election*, Nos. 31–35 EAP & 29 WAP 2020, \_\_\_ A.3d \_\_\_, 2020 WL 6875017, at *4 (Pa. Nov. 23, 2020). Once the voter assembles the ballot packet, he can mail it back or deliver it in person. 25 Pa. Stat. § 3150.16(a).

Not every voter can be expected to follow this process perfectly. Some forget one of the envelopes. Others forget to sign on the dotted line. Some major errors will invalidate a ballot. For instance, counties may not count mail-in ballots that lack secrecy envelopes. *Pa. Dem. Party v. Boockvar*, 238 A.3d 345, 378–80 (Pa. 2020). But the Election Code says nothing about what should happen if a county notices these errors before election day. Some counties stay silent and do not count the ballots; others contact the voters and give them a chance to correct their errors.

### B.  Facts and procedural history

On appeal from the dismissal of a complaint, we take the factual allegations as true:

1. *Mail-in voting*. For months, Pennsylvanians went to the polls, so to speak. The first batch of mail-in ballots went out to voters in late September. As they trickled back in, election officials noticed that some voters had not followed the rules. Some ballots were

not in secrecy envelopes, so those packages were lighter and thinner than complete ballot packages. Others had declarations that voters had not completed. Some counties did not notify voters about these defective ballots. Others, including the counties named in this suit, decided to reach out to these voters to let them cure their mistakes by voting provisionally on Election Day or asking for a replacement ballot.

2. *Election Day*. Though more than two million Pennsylvanians voted by mail, even more voted in person. On Election Day, November 3, the Campaign set up poll watchers at polling places around the Commonwealth. Appellees' election officials kept poll watchers and representatives away from where ballots were opened, counted, and tallied. In Philadelphia, for instance, poll watchers were kept six to twenty-five feet back from officials. In comparison, other, "Republican[-]controlled" counties did give the Campaign's poll watchers and representatives full access. Second Am. Compl. ¶¶ 151, 154.

In all, nearly seven million Pennsylvanians voted, more than a third of them by mail. *Unofficial Returns for the 2020 Presidential Election*, Pa. Dep't of State, https://www.electionreturns.pa.gov/ (last visited Nov. 27, 2020). As of today, former Vice President Biden leads President Trump in Pennsylvania by 81,660 votes. *Id.*

Pennsylvania's counties certified their election results by the November 23 certification deadline. 25 Pa. Stat. § 2642(k). The next morning, the Secretary of State (technically, Secretary of the Commonwealth) certified the vote totals, and the Governor signed the Certificate of Ascertainment and sent it to the U.S. Archivist. *Department of State Certifies Presidential Election Results*, PA Media, https://www.media.pa.gov/Pages/State-details.aspx?newsid=435 (last visited Nov. 27, 2020). The certified margin of victory was 80,555 votes. *Id.*

3. *This lawsuit*. Almost a week after the election, the Campaign (as well as two voters) sued seven Pennsylvania counties and Secretary of State Kathy Boockvar. It alleged that they had violated the Due Process, Equal Protection, and Electors and Elections Clauses of the U.S. Constitution by taking two basic actions: First, the counties (encouraged by Secretary Boockvar) identified defective mail-in ballots early and told voters how to fix them. Second, they kept poll watchers and representatives from watching officials count all ballots.

So far, the Campaign has filed or tried to file three complaints. The original Complaint, filed November 9, set out six counts (plus a duplicate). After Boockvar and the counties moved to dismiss, on November 15 the Campaign filed a First Amended Complaint as of right, dropping four of the six counts (plus the duplicate), including all the counts relating to poll watchers and representatives. The Campaign sought a preliminary injunction to block certifying the election results. Boockvar and the counties again moved to dismiss. On November 18, the Campaign sought to file a Second Amended Complaint, resurrecting four dropped claims from the original Complaint and adding three more about how Philadelphia had blocked poll watching.

The District Court ended these volleys, denying leave to file the Second Amended Complaint. Instead, it dismissed the First Amended Complaint with prejudice and denied the Campaign's motion for a preliminary injunction as moot. *Donald J. Trump for President, Inc. v. Boockvar*, No. 4:20-cv-02078, ___ F. Supp. 3d ___, 2020 WL 6821992 (M.D. Pa. Nov. 21, 2020). In doing so, it held that the individual voters lacked standing. *Id.* at *5–

6. We commend the District Court for its fast, fair, patient handling of this demanding litigation.

4. *This appeal*. The Campaign filed this appeal on Sunday, November 22, and we granted its motion to expedite. The Campaign filed its brief and another motion November 23; opposing briefs and filings arrived the next day. We are issuing this opinion nonprecedentially so we can rule by November 27.

The Campaign does not challenge the District Court's finding that the voters lacked standing, so we do not consider their claims. On appeal, it seeks only narrow relief: to overturn the District Court's decision not to let it amend its complaint again. We address that claim in Part II. Separately, the Campaign asks us for an injunction to prevent the certified vote totals from taking effect. We address that claim in Part III.

## II.  THE DISTRICT COURT PROPERLY DENIED LEAVE TO AMEND THE COMPLAINT AGAIN

After one amendment, the District Court denied the Campaign's motion to amend the complaint a second time. We review that denial for abuse of discretion. *Premier Comp. Sol., LLC v. UPMC*, 970 F.3d 316, 318–19 (3d Cir. 2020). But on any standard of review, the court got it right.

Courts should grant leave to amend "freely … when justice so requires." Fed. R. Civ. P. 15(a)(2). In civil-rights cases, that means granting leave unless "amendment would be futile or inequitable." *Vorchheimer v. Phila. Owners Ass'n*, 903 F.3d 100, 113 (3d Cir. 2018); *Cureton v. NCAA*, 252 F.3d 267, 272–73 (3d Cir. 2001) (giving undue delay as an example of inequity). Here, the Campaign's request fails as both inequitable and futile.

### A. The Campaign's delay was undue, given its stress on needing to resolve the case by November 23

When the Campaign was before the District Court, it focused its arguments on the need to resolve the case by Pennsylvania's deadline for counties to certify their votes: Monday, November 23. Indeed, all three iterations of the complaint focused their prayers for relief on blocking the certification of the vote tally. The Campaign said it could get no "meaningful remedy" after that date. Br. in Supp. of Mot. for TRO & PI, Dkt. 89-1, at 4.

The Campaign filed its First Amended Complaint on November 15, eight days before the certification deadline. In response to several pending motions to dismiss, it dropped many of the challenged counts from the original Complaint. It did not then move to file a Second Amended Complaint until November 18, when its opposition to the new motions to dismiss was due. And it did not file a brief in support of that motion until Friday, November 20. Certification was three days away.

As the District Court rightly noted, amending that close to the deadline would have delayed resolving the issues. True, delay alone is not enough to bar amendment. *Cureton*, 252 F.3d at 273. But "at some point, the delay will become 'undue,' placing an unwarranted burden on the court." *Id.* (quoting *Adams v. Gould, Inc.*, 739 F.2d 858, 868 (3d Cir. 1984)). The Campaign's motion would have done just that. It would have mooted the existing motions to dismiss and required new briefing, possibly new oral argument, and a reasoned judicial opinion within seventy-two hours over a weekend. That is too much to ask—especially since the proposed Second Amended Complaint largely repleaded many claims abandoned by the first one. *Cf. Rolo v. City Investing Co. Liquidating Tr.*, 155 F.3d 644, 654–

10

55 (3d Cir. 1998) (affirming denial of leave to amend because the movant sought largely to "replead facts and arguments that could have been pled much earlier").

Having repeatedly stressed the certification deadline, the Campaign cannot now pivot and object that the District Court abused its discretion by holding the Campaign to that very deadline. It did not.

**B.  Amending the Complaint again would have been futile**

The Campaign focuses on critiquing the District Court's discussion of undue delay. Though the court properly rested on that ground, we can affirm on any ground supported by the record. Another ground also supports its denial of leave to amend: it would have been futile.

1.  *The Campaign had to plead plausible facts, not just conclusory allegations.* Plaintiffs must do more than allege conclusions. Rather, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* The Second Amended Complaint does not meet *Twombly* and *Iqbal*'s baseline standard of specifics.

To start, note what it does not allege: fraud. Indeed, in oral argument before the District Court, Campaign lawyer Rudolph Giuliani conceded that the Campaign "doesn't plead fraud." Mot. to Dismiss Hr'g Tr. 118:19–20 (Nov. 17, 2020). He reiterated: "If we had alleged fraud, yes, but this is not a fraud case." *Id.* at 137:18.

Though it alleges many conclusions, the Second Amended Complaint is light on facts. Take the nearly identical paragraphs introducing Counts One, Two, Four, and Six: "Democrats who controlled the Defendant County Election Boards engaged in a deliberate scheme of intentional and purposeful discrimination … by excluding Republican and Trump Campaign observers from the canvassing of the mail ballots in order to conceal their decision not to enforce [certain ballot] requirements." Second Am. Compl. ¶¶ 167, 193, 222, 252. That is conclusory. So is the claim that, "[u]pon information and belief, a substantial portion of the approximately 1.5 million absentee and mail votes in Defendant Counties should not have been counted." *Id.* ¶¶ 168, 194, 223, 253. "Upon information and belief" is a lawyerly way of saying that the Campaign does not know that something is a fact but just suspects it or has heard it. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. Yet the Campaign offers no specific facts to back up these claims.

2. *The Campaign has already litigated and lost most of these issues*. Many of the Second Amended Complaint's claims have already had their day in court. The Campaign cannot use this lawsuit to collaterally attack those prior rulings. On Counts One, Two, Four, and Six, the Campaign has already litigated whether ballots that lack a handwritten name, address, or date on the outer envelope must be disqualified. *See In re: Canvass of Absentee and Mail-in Ballots*, 2020 WL 6875017, at *1. The Pennsylvania Supreme Court ruled against the Campaign, holding: "[T]he Election Code does not require boards of elections to disqualify mail-in or absentee ballots submitted by qualified electors who signed the declaration on their ballot's outer envelope but did not handwrite their name, their address,

12

and/or date, where no fraud or irregularity has been alleged." *Id.* at *1. That holding undermines the Campaign's suggestions that defective ballots should not have been counted.

Counts One and Two also challenge the requirement that poll watchers be registered electors of the county they wish to observe and that observers be Pennsylvania lawyers. But a federal district court has already held "that the county-residency requirement for poll watching does not, as applied to the particular circumstances of this election, burden any of [the Campaign's] fundamental constitutional rights." *Donald J. Trump for President, Inc. v. Boockvar*, No. 2:20-cv-966, ___ F. Supp. 3d ___, 2020 WL 5997680, at *66 (W.D. Pa. Oct. 10, 2020). The Campaign never appealed that decision, so it is bound by it.

Count Seven alleges that Philadelphia's Board of Elections violated due process by obstructing poll watchers and representatives. But nothing in the Due Process Clause requires having poll watchers or representatives, let alone watchers from outside a county or less than eighteen feet away from the nearest table. The Campaign cites no authority for those propositions, and we know of none. (Ditto for notice-and-cure procedures.) And the Campaign litigated and lost that claim under state law too. The Pennsylvania Supreme Court held that the Election Code requires only that poll watchers be in the room, not that they be within any specific distance of the ballots. *In re Canvassing Observation Appeal of: City of Phila. Bd. of Electors*, No. 30 EAP 2020, ___ A.3d ___, 2020 WL 6737895, at *8–9 (Pa. Nov. 17, 2020).

The Campaign does not even challenge the dismissal of Counts Three, Five, and Nine, the Electors and Elections Clause counts. It concedes that under our recent decision, it lacks standing to pursue alleged violations of those clauses. *Bognet v. Sec'y Commonwealth of*

*Pa.*, No. 20-3214, ___ F.3d ___, 2020 WL 6686120, at \*6–9 (3d Cir. Nov. 13, 2020). Given its concession, we need not consider the issue any more.

The Second Amended Complaint thus boils down to the equal-protection claims in Counts Two, Four, Six, and Eight. They require not violations of state law, but discrimination in applying it. Those claims fail too.

3. *The Campaign never pleads that any defendant treated the Trump and Biden campaigns or votes differently.* A violation of the Equal Protection Clause requires more than variation from county to county. It requires unequal treatment of similarly situated parties. But the Campaign never pleads or alleges that anyone treated it differently from the Biden campaign. Count One alleges that the counties refused to credential the Campaign's poll watchers or kept them behind metal barricades, away from the ballots. It never alleges that other campaigns' poll watchers or representatives were treated differently. Count Two alleges that an unnamed lawyer was able to watch all aspects of voting in York County, while poll watchers in Philadelphia were not. It also makes a claim about one Jared M. Mellott, who was able to poll watch in York County. Counts Four and Six allege that poll watcher George Gallenthin had no issues in Bucks County but was barred from watching in Philadelphia. And Count Eight alleges that Philadelphia officials kept Jeremy Mercer too far away to verify that ballots were properly filled out. None of these counts alleges facts showing improper vote counting. And none alleges facts showing that the Trump campaign was singled out for adverse treatment. The Campaign cites no authority suggesting that an actor discriminates by treating people equally while harboring a partisan motive, and we know of none.

14

These county-to-county variations do not show discrimination. "[C]ounties may, consistent with equal protection, employ entirely different election procedures and voting systems within a single state." *Donald J. Trump for President, Inc.*, 2020 WL 5997680, at *44 (collecting cases). Even when boards of elections "vary … considerably" in how they decide to reject ballots, those local differences in implementing statewide standards do not violate equal protection. *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 635–36 (6th Cir. 2016); *see also Wexler v. Anderson*, 452 F.3d 1226, 1231–33 (11th Cir. 2006) (recognizing that equal protection lets different counties use different voting systems).

Nor does *Bush v. Gore* help the Campaign. 531 U.S. 98 (2000) (per curiam). There, the Florida Supreme Court had ratified treating ballots unequally. *Id.* at 107. That was because the principle it set forth, the "intent of the voter," lacked *any* "specific standards to ensure its equal application." *Id.* at 105–06. The lack of any standards at all empowered officials to treat ballots arbitrarily, violating equal protection. *Id.* Here, by contrast, Pennsylvania's Election Code gives counties specific guidelines. To be sure, counties vary in implementing that guidance, but that is normal. Reasonable county-to-county variation is not discrimination. *Bush v. Gore* does not federalize every jot and tittle of state election law.

4. *The relief sought—throwing out millions of votes—is unprecedented*. Finally, the Second Amended Complaint seeks breathtaking relief: barring the Commonwealth from certifying its results or else declaring the election results defective and ordering the Pennsylvania General Assembly, not the voters, to choose Pennsylvania's presidential electors. It cites no authority for this drastic remedy.

The closest the Campaign comes to justifying the relief it seeks is citing *Marks v. Stinson*, 19 F.3d 873 (3d Cir. 1994). But those facts were a far cry from the ones here. In *Marks*, the district court found that the Stinson campaign had orchestrated "massive absentee ballot fraud, deception, intimidation, harassment and forgery." *Id.* at 887 (quoting district court's tentative findings). It had lied to voters, deceived election officials, and forged ballots. *Id.* at 877. We remanded that case, instructing that "the district court should not direct the certification of a candidate unless it finds, on the basis of record evidence, that the designated candidate would have won the election but for wrongdoing." *Id.* at 889. And that seemed likely: the Stinson campaign had gotten about 600 net absentee-ballot applications (roughly 1000 minus 400 that were later rejected), more than the 461-vote margin of victory. *Id.* at 876–77.

Here, however, there is no clear evidence of massive absentee-ballot fraud or forgery. On the contrary, at oral argument in the District Court, the Campaign specifically disavowed any claim of fraud. And the margin of victory here is not nearly as close: not 461 votes, but roughly 81,000.

 Though district courts should freely give leave to amend, they need not do so when amendment would be futile. Because the Second Amended Complaint would not survive a motion to dismiss, the District Court properly denied leave to file it.

### III.  NO STAY OR INJUNCTION IS WARRANTED

We could stop here. Once we affirm the denial of leave to amend, this case is over. Still, for completeness, we address the Campaign's emergency motion to stay the effect of certification. No stay or injunction is called for.

Though the Campaign styles its motion as seeking a stay or preliminary injunction, what it really wants is an injunction pending appeal. But it neither requested that from the District Court during the appeal nor showed that it could not make that request, as required by Federal Rule of Appellate Procedure 8(a)(2)(A). That failure bars the motion.

Even if we could grant relief, we would not. Injunctions pending appeal, like preliminary injunctions, are "extraordinary remed[ies] never awarded as of right." *Winter v. NRDC*, 555 U.S. 7, 24 (2008). For a stay or injunction pending appeal, the movant must show both (1) a "strong" likelihood of success on the merits and (2) irreparable injury absent a stay or injunction. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). The first two factors are "the most critical." *Nken v. Holder*, 556 U.S. 418, 434 (2009). After that, we also balance (3) whether a stay or injunction will injure other interested parties (also called the balance of equities) and (4) the public interest. *Hilton*, 481 U.S. at 776; *In re Revel AC, Inc.*, 802 F.3d 558, 568–71 (3d Cir. 2015). None of the four factors favors taking this extraordinary step.

### A.  The Campaign has no strong likelihood of success on the merits

As discussed, the Campaign cannot win this lawsuit. It conceded that it is not alleging election fraud. It has already raised and lost most of these state-law issues, and it cannot relitigate them here. It cites no federal authority regulating poll watchers or notice and cure. It alleges no specific discrimination. And it does not contest that it lacks standing under the Elections and Electors Clauses. These claims cannot succeed.

### B.  The Campaign faces no irreparable harm

The Campaign has not shown that denying relief will injure it. "Upon information and belief," it suspects that many of the 1.5 million mail-in ballots in the challenged counties were improperly counted. Second Am. Compl. ¶¶ 168, 194, 223, 253. But it challenges no specific ballots. The Campaign alleges only that at most three specific voters cast ballots that were not counted. *Id.* ¶ 237 (one voter); First Am. Compl. ¶¶ 15–16, 112 (three). And it never alleges that anyone except a lawful voter cast a vote. Of the seven counties whose notice-and-cure procedures are challenged, four (including the three most populous) represented that they gave notice to only about 6,500 voters who sent in defective ballot packages. Allegheny Cty. Opp. Mot. TRO & PI 7–8, D. Ct. Dkt. No. 193 (Nov. 20, 2020). The Campaign never disputed these numbers or alleged its own. Even if 10,000 voters got notice and cured their defective ballots, and every single one then voted for Biden, that is less than an eighth of the margin of victory.

Without more facts, we will not extrapolate from these modest numbers to postulate that the number of affected ballots comes close to the certified margin of victory of 80,555 votes. Denying relief will not move the needle.

Plus, states are primarily responsible for running federal elections. U.S. Const. art. I, § 4, cl. 1; 3 U.S.C. § 5. Pennsylvania law has detailed mechanisms for disputing election results. 25 Pa. Stat. §§ 3261–3474. Because the Campaign can raise these issues and seek relief through state courts and then the U.S. Supreme Court, any harm may not be irreparable. *Touchston v. McDermott*, 234 F.3d 1130, 1132–33 (11th Cir. 2000) (per curiam) (en banc).

### C. The balance of equities opposes disenfranchising voters

Nor would granting relief be equitable. The Campaign has already litigated and lost most of these issues as garden-variety state-law claims. It now tries to turn them into federal constitutional claims but cannot. *See Bognet*, 2020 WL 6686120, at *11.

Even if it could, it has delayed bringing this suit. For instance, in proposed Count Four, it challenges giving voters notice and letting them cure ballot defects as violating equal protection. The Campaign could have disputed these practices while they were happening or during the canvassing period. Instead, it waited almost a week after Election Day to file its original complaint, almost another week to amend it, and then another three days to amend it again. Its delay is inequitable, and further delay would wreak further inequity.

And the Campaign's charges are selective. Though Pennsylvanians cast 2.6 million mail-in ballots, the Campaign challenges 1.5 million of them. It cherry-picks votes cast in "Democratic-heavy counties" but not "those in Republican-heavy counties." Second Am. Compl. ¶8. Without compelling evidence of massive fraud, not even alleged here, we can hardly grant such lopsided relief.

Granting relief would harm millions of Pennsylvania voters too. The Campaign would have us set aside 1.5 million ballots without even alleging fraud. As the deadline to certify votes has already passed, granting relief would disenfranchise those voters or sidestep the expressed will of the people. Tossing out those ballots could disrupt every down-ballot race as well. There is no allegation of fraud (let alone proof) to justify harming those millions of voters as well as other candidates.

**D. The public interest favors counting all lawful voters' votes**

Lastly, relief would not serve the public interest. Democracy depends on counting all lawful votes promptly and finally, not setting them aside without weighty proof. The public must have confidence that our Government honors and respects their votes.

What is more, throwing out those votes would conflict with Pennsylvania election law. The Pennsylvania Supreme Court has long "liberally construed" its Election Code "to protect voters' right to vote," even when a ballot violates a technical requirement. *Shambach v. Bickhart*, 845 A.2d 793, 802 (Pa. 2004). "Technicalities should not be used to make the right of the voter insecure." *Appeal of James*, 105 A.2d 64, 66 (Pa. 1954) (internal quotation marks omitted). That court recently reiterated: "[T]he Election Code should be liberally construed so as not to deprive, *inter alia*, electors of their right to elect a candidate of their choice." *Pa. Dem. Party*, 238 A.3d at 356. Thus, unless there is evidence of fraud, Pennsylvania law overlooks small ballot glitches and respects the expressed intent of every lawful voter. *In re: Canvass of Absentee and Mail-in Ballots*, 2020 WL 6875017, at *1 (plurality opinion). In our federalist system, we must respect Pennsylvania's approach to running elections. We will not make more of ballot technicalities than Pennsylvania itself does.

\* \* \* \* \*

Voters, not lawyers, choose the President. Ballots, not briefs, decide elections. The ballots here are governed by Pennsylvania election law. No federal law requires poll watchers or specifies where they must live or how close they may stand when votes are counted. Nor does federal law govern whether to count ballots with minor state-law defects or let voters

cure those defects. Those are all issues of state law, not ones that we can hear. And earlier lawsuits have rejected those claims.

Seeking to turn those state-law claims into federal ones, the Campaign claims discrimination. But its alchemy cannot transmute lead into gold. The Campaign never alleges that any ballot was fraudulent or cast by an illegal voter. It never alleges that any defendant treated the Trump campaign or its votes worse than it treated the Biden campaign or its votes. Calling something discrimination does not make it so. The Second Amended Complaint still suffers from these core defects, so granting leave to amend would have been futile.

And there is no basis to grant the unprecedented injunction sought here. First, for the reasons already given, the Campaign is unlikely to succeed on the merits. Second, it shows no irreparable harm, offering specific challenges to many fewer ballots than the roughly 81,000-vote margin of victory. Third, the Campaign is responsible for its delay and repetitive litigation. Finally, the public interest strongly favors finality, counting every lawful voter's vote, and not disenfranchising millions of Pennsylvania voters who voted by mail. Plus, discarding those votes could disrupt every other election on the ballot.

We will thus affirm the District Court's denial of leave to amend, and we deny an injunction pending appeal. The Campaign asked for a very fast briefing schedule, and we have granted its request. Because the Campaign wants us to move as fast as possible, we also deny oral argument. We grant all motions to file overlength responses, to file amicus briefs, and to supplement appendices. We deny all other outstanding motions as moot. This Court's mandate shall issue at once.

21